No. 24-5101

IN THE

# United States Court of Appeals for the District of Columbia Circuit

Center for Biological Diversity, et al.,

*Appellees,*

v.

Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency, et al.,

*Defendants,*

State of Florida and Florida Department of Environmental Protection,

*Appellants.*

On Appeal from the United States District Court for the District of Columbia Case No. 21-119 (RDM)

**MOTION TO STAY PENDING APPEAL**

**(RULING REQUESTED BY MAY 21, 2024)**

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7700
jeff.wood@bakerbotts.com

Aaron M. Streett
Anthony J. Lucisano
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
anthony.lucisano@bakerbotts.com

*Counsel for the State of Florida and the Florida Department of Environmental Protection*

i

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

## A.      Parties and Amici

Intervenor-Defendant-Appellants: State of Florida and Florida Department of Environmental Protection.

Federal Defendants: Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency; Radhika Fox, in her official capacity as Assistant Administrator for the Office of Water of the U.S. Environmental Protection Agency; Jeffrey Prieto, in his official capacity as General Counsel for the U.S. Environmental Protection Agency; Lawrence Starfield, in his official capacity as Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance for the U.S. Environmental Protection Agency; John Blevins, in his official capacity as Acting Administrator for Region 4 of the U.S. Environmental Protection Agency; Leopoldo Miranda-Castro, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service; Martha Williams, in her official capacity as Principal Deputy Director for the U.S. Fish and Wildlife Service; Scott Spellmon, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; James Booth, in his official capacity as District Commander of the Jacksonville District for the U.S. Army Corps of Engineers; U.S. Environmental Protection Agency; U.S. Army Corps of Engineers; and U.S. Fish and Wildlife Service.

ii

Plaintiff-Appellees: Center for Biological Diversity; Defenders of Wildlife; the Sierra Club; the Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

Additional Parties Before the District Court: Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd.

Amici Before the District Court: Association of Florida Community Developers, Incorporated; Florida Chamber of Commerce; Cameratta Companies LLC; CAM7-SUB, LLC; Lennar Corporation; G.L. Homes; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison; Florida Transportation Builders Association; Florida State Hispanic Chamber of Commerce; and Associated Industries of Florida.

Amici Before this Court: None as of the time of filing of this motion.

## B.     Ruling Under Review

The State of Florida and the Florida Department of Environmental Protection seek review of the district court's February 15, 2024 order, as amended on April 12, 2024, vacating federal approval of Florida's permitting program under Section 404 of the Clean Water Act and the accompanying Programmatic Biological Opinion and Incidental Take Statement. That vacatur order was made final and appealable on April 12, 2024, when the district court entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b).

**C.      Related Cases**

None.

/s/ *Aaron M. Streett*
Aaron M. Streett
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1855


Dated: April 25, 2024

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 8(a)

The undersigned certifies that this motion for stay complies with Circuit Rule 8(a)(1). The State of Florida and the Florida Department of Environmental Protection previously requested a full stay of the February 15, 2024 vacatur order pending appeal from the district court. The district court denied that request on April 23, 2024. Accordingly, the State of Florida and the Florida Department of Environmental Protection now seek a stay from this Court.

The undersigned further certifies under Circuit Rule 8(a)(2) that counsel for the State of Florida and the Florida Department of Environmental Protection notified by telephone counsel for the Federal Defendants and counsel for Plaintiff-Appellees Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper that the State of Florida and the Florida Department of Environmental Protection would be filing this motion.

/s/ *Aaron M. Streett*
Aaron M. Streett
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1855

Dated: April 25, 2024

v

## TABLE OF CONTENTS

**Page**

Certificate As To Parties, Rulings, And Related Cases ............................................ ii

Certificate of Compliance with Circuit Rule 8(a) ..................................................... v

Table of Authorities ................................................................................................. iii

Glossary ................................................................................................................... vi

List of Exhibits ........................................................................................................ vii

Introduction .............................................................................................................. 1

Statement of the Case ............................................................................................... 3

I.      EPA and Florida follow a recognized blueprint in transferring Section 404 permitting authority consistent with the CWA and ESA ...................................................................................................... 3

A.      The CWA embodies a policy of cooperative federalism and encourages States to administer their own Section 404 programs .................................................................................... 3

B.      ESA Section 7 establishes a species "consultation" process, which the Second Circuit held in *Cooling Water* may be conducted on a programmatic level with project-specific reviews during program implementation. .................... 5

C.      The federal government and Florida rely on *Cooling Water* in modeling a Section 404 assumption and programmatic BiOp. ................................................................. 8

II.     The district court vacates Florida's Section 404 program. ................. 10

Standard of Review ................................................................................................. 11

Argument ................................................................................................................. 11

I.      Florida is likely to succeed on the merits. ........................................... 11

      A.     The district court erroneously vacated the programmatic BiOp and incidental-take statement. ...........................................11

      B.     The district court erroneously held that Plaintiffs have standing. ....................................................................................19

II.    Florida will be irreparably harmed absent a stay. ...............................20

III.   The balance of harms and public interest weigh heavily in favor of a stay ...............................................................................................22

Conclusion .............................................................................................233

Certificate of Compliance .....................................................................255

Certificate of Service ............................................................................266

## TABLE OF AUTHORITIES

**CASES**                                                                                     **Page(s)**

*Akiachak Native Cmty. v. Jewell*,
    995 F. Supp. 2d 7 (D.D.C. 2014)..................................................................25

*Cooling Water Intake Structure Coal. v. EPA*,
    905 F.3d 49 (2d Cir. 2018) ................................................................*passim*

*Crow Creek Sioux Tribe v. Brownlee*,
    331 F.3d 912 (D.C. Cir. 2003)..............................................................24, 25

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
    861 F.3d 174 (D.C. Cir. 2017)........................................................................24

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009)..........................................................................5

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
    733 F.3d 1106 (11th Cir. 2013) ..................................................................13, 16

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981).......................................................................................23

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) .........................................................................25

*Nat'l Wildlife Fed. v. Brownlee*,
    402 F.Supp. 2d (D.D.C. 2005).......................................................................19

*Nken v. Holder*,
    556 U.S. 418 (2009).......................................................................................12

*N. Slope Borough v. Andrus*,
    642 F.2d 589 (D.C. Cir. 1980)........................................................................19

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001).......................................................................................25

*Waterkeeper Alliance, Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022).........................................................................24

**STATUTES**

16 U.S.C. § 1531(c)(2) ................................................................................23

16 U.S.C. § 1536(a)(2) ........................................................................5, 6, 13

16 U.S.C. § 1536(b)(4) ..................................................................................6

16 U.S.C. § 1536(b)(4)(C) ..........................................................................15

16 U.S.C. § 1536(o)(2) ...........................................................................6, 15

16 U.S.C. § 1538 ...........................................................................................6

16 U.S.C. § 1539(a)(1)(B) ............................................................................6

33 U.S.C. § 1251(b) ......................................................................................3

33 U.S.C. § 1311(a) ......................................................................................3

33 U.S.C. § 1332 ...........................................................................................3

33 U.S.C. § 1344(i) .......................................................................................4

33 U.S.C. § 1344(g) ......................................................................................3

33 U.S.C. § 1344(h) ......................................................................................4

33 U.S.C. § 1344(h)(1) .................................................................................3

33 U.S.C. § 1344(h)(1)(A)(i) ........................................................................4

33 U.S.C. § 1344(h)(4) .................................................................................3

33 U.S.C. § 1344(j) .......................................................................................4

**REGULATIONS**

40 C.F.R. § 230.10(b)(3) ..............................................................................4

40 C.F.R. § 233, Subpart F ...........................................................................4

40 C.F.R. § 233.15 ........................................................................................3

40 C.F.R. § 233.50(b) ...................................................................................4

40 C.F.R. § 233.50(f) ................................................................4

40 C.F.R. § 233.50(g) ................................................................4

40 C.F.R. § 233.50(h) ................................................................4

40 C.F.R. § 233.50(i) ................................................................4

40 C.F.R. § 233.50(j) ................................................................4

50 C.F.R. § 402.02 ...................................................6, 13, 14

50 C.F.R. § 402.13 ................................................................5

50 C.F.R. § 402.13(a) ................................................................5

50 C.F.R. § 402.14(a) ................................................................5

50 C.F.R. § 402.14(b) ................................................................5

50 C.F.R. § 402.14(c) ................................................................8

50 C.F.R. § 402.14(g)(3) ................................................................5

50 C.F.R. § 402.14(g)(4) ................................................................6

50 C.F.R. § 402.14(h)(2) ................................................................6

**FEDERAL REGISTER**

85 Fed. Reg. 57,853 (Sept. 16, 2020) ................................................................8

85 Fed. Reg. 83,553 (Dec. 22, 2020) ................................................................10

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| Corps | U.S. Army Corps of Engineers |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| Federal Defendants | EPA, Fish and Wildlife, the Corps, and other named federal officials |
| Florida | State of Florida and the Florida Department of Environmental Protection |
| Fish and Wildlife | United States Fish and Wildlife Service |
| Fisheries Service | National Marine Fisheries Service |
| Plaintiffs | Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| Services | Fish and Wildlife and Fisheries Service |

LIST OF EXHIBITS

| Tab | Exhibit |
|-----|---------|
| A | *Cooling Water Intake Structure Coal. v. EPA,* 905 F.3d 49 (2d Cir. 2018) |
| B | Letter from Fish and Wildlife Director, Dec. 22, 1993 |
| C | Biological Assessment, July 24, 2020 |
| D | Memorandum on ESA Section 7(a)(2) Consultation for State and Tribal CWA Section 404 Program Approvals |
| E | EPA, Biological Evaluation, Aug. 2020 |
| F | Fish and Wildlife, Biological Opinion, Nov. 17, 2020 |
| G | Plaintiffs' Motion for Summary Judgment, Feb. 28, 2023 |
| H | Defendants' Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Apr. 26, 2023 |
| I | State of Florida and Florida Department of Environmental Protection's Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment, May 10, 2023 |
| J | Memorandum Opinion, Feb. 15, 2024 |
| K | Memorandum Opinion, Apr. 12, 2024 |
| L | Amended Memorandum Opinion, Apr. 12, 2024 |
| M | Florida Intervenors' Motion for Stay of Vacatur Order Pending Appeal (Expedited Ruling Requested), Apr. 16, 2024 |
| N | Memorandum Opinion and Order, Apr. 23, 2024 |
| O | Hearing Transcript, Oct. 19, 2023 |

P   Declaration of Justin Wolfe, General Counsel for the Florida Department of Environmental Protection, Apr. 25, 2024

Q   Declaration of Jennifer Marshall, Director of the Office of Environmental Management for the Florida Department of Transportation, Apr. 24, 2024

## INTRODUCTION

For more than three years, Florida has run its own permit program under Section 404 of the CWA, as Congress expressly authorized states to do. The program has benefited Florida's citizens, businesses, and environment. Nearly all significant economic development and infrastructure in Florida requires Section 404 permits. Florida's program has streamlined the permit process compared to the default federal-only permitting model, while also protecting Florida's waters and species through extensive federal oversight and a technical-assistance process that brings the federal and state agencies together in a consolidated process. Florida hired and trained over 300 permitting staff, and Florida has already processed thousands of Section 404 permit requests.

When EPA approved Florida's program in 2020, that approval followed a model for ESA compliance that the federal government has used and defended over the course of the last three administrations, and that the Second Circuit approved in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018) (attached as Exhibit A). The district court below upended that status quo when it invalidated Florida's program, halting permitting for new economic development projects. In the district court's view, the Second Circuit, EPA, Fish and Wildlife, and Florida have had it all wrong this entire time. The district court ruled that Fish and Wildlife could not lawfully approve a "programmatic" authorization for Florida

1

to issue permits under the ESA without conducting an upfront statewide evaluation that is "species-specific"—a term that nowhere appears in the statute—despite EPA's and Fish and Wildlife's determination that Florida's program contained ample safeguards to ensure protection of endangered species in Florida and compliance with the ESA.

The district court's decision to second-guess the judgments of so many others should be stayed pending appeal.  It is likely to be reversed.  The decision would make it essentially impossible for any state with many federally-listed species to have a workable 404 program, contrary to what Congress contemplated in the statute.  And it imposes irreparable injuries by placing over a thousand Florida projects into indefinite regulatory limbo.

Florida believes that this appeal should be expedited in light of the irreparable harm and important interests at stake, and thus, respectfully requests a ruling on this stay motion by May 21, 2024.  For the merits stage, Florida intends to coordinate with the other parties to propose an agreed expedited briefing schedule and placement of the case in the standby pool for oral argument.

**STATEMENT OF THE CASE**

**I.    EPA and Florida follow a recognized blueprint in transferring Section 404 permitting authority consistent with the CWA and ESA.**

**A.    The CWA embodies a policy of cooperative federalism and encourages States to administer their own Section 404 programs.**

The CWA prohibits unauthorized discharges of any pollutant into waters of the United States.  33 U.S.C. § 1311(a).  The CWA creates two permitting programs—(1) the Section 402 program to control point-source pollution to surface waters, and (2) the Section 404 program to regulate the dredge or fill of surface waters.  *Id.* §§ 1332, 1344.  This case involves the Section 404 permitting program.

The Corps is the default administrator of the Section 404 program.  *Id.* § 1344(a).  But the CWA favors cooperative federalism, providing that "[i]t is the policy of Congress that *the States* . . . implement the[se] permit programs."  *Id.* § 1251(b) (emphasis added).  Accordingly, the CWA invites States to seek EPA's approval to administer state-level permit programs in place of the Corps-administered federal Section 404 program.  *Id.* § 1344(g).

Once a State applies for transfer of Section 404 permitting authority, EPA evaluates that application against statutory criteria.  33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15.  Upon approval of the State program, the Corps must "transfer" any such pending permit "applications for activities" that fall under the new State program.  33 U.S.C. § 1344(h)(4).  But federal oversight of the State program does

3

not evaporate. EPA is bound to ensure ongoing compliance with federal requirements. *Id.* § 1344(h); 40 C.F.R. § 233, Subpart F (Federal Oversight). That includes EPA's obligation to review "permits proposed to be issued by such State" and solicit comments from other federal agencies—including the Services, which administer the ESA—in deciding whether to "comment, object or to require permit conditions" vis-à-vis each permit application. 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50(b). This review "assure[s] compliance with" the "guidelines established under [Section 404(b)(1)]," 33 U.S.C. § 1344(h)(1)(A)(i), including that "[n]o discharge of dredged or fill material shall be permitted if it . . . [j]eopardizes the continued existence of [listed] species" or "results in likelihood of the destruction or adverse modification of [designated critical] habitat." 40 C.F.R. § 230.10(b)(3).

If EPA objects to the permit application, the State must deny the permit or make EPA's requested changes, or else the authority to issue that permit reverts to the Corps (colloquially referred to as "federalizing" a permit). 33 U.S.C. § 1344(j); 40 C.F.R. §§ 233.50(f)-(j). Along with veto power over non-compliant permit applications, EPA may also withdraw approval of the entire State program if it determines the State "is not administering" the program "in accordance with" the CWA. 33 U.S.C. § 1344(i).

**B.    ESA Section 7 establishes a species "consultation" process, which the Second Circuit held in *Cooling Water* may be conducted on a programmatic level with project-specific reviews during program implementation.**

ESA Section 7 obligates federal agencies to "consult[]" with the Services for any "agency actions" to "insure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize" certain species or damage critical habitat. 16 U.S.C. § 1536(a)(2).  EPA approval of a state 404 application is one such "agency action."  Under the governing regulations, "[i]f an agency concludes that its action 'may affect' a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the [Services]." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 474-75 (D.C. Cir. 2009) (citing 50 C.F.R. §§ 402.13, 402.14).

Informal consultation is a precursor evaluation process to determine if the proposed action is "likely to adversely affect" listed species or critical habitat, in which case formal consultation is required.  50 C.F.R. §§ 402.13(a), 402.14(a)-(b).  During formal consultation, the Services evaluate the proposed agency action against a set of enumerated "[s]ervice responsibilities," including to review relevant information, evaluate the environmental baseline, and consider the "effects of the action and cumulative effects on the listed species or critical habitat." *Id.* § 402.14(g)(3).  The formal consultation ends with the Services issuing a BiOp indicating whether a proposed action is likely to "jeopardize the continued existence

5

of" any listed species or destroy or adversely modify critical habitat.  *Id.* § 402.14(g)(4).

If the BiOp indicates that the action would do so, the Services "shall include reasonable and prudent alternatives" to the proposed action or indicate that "there are no reasonable prudent alternatives."  *Id.* § 402.14(h)(2).  If the BiOp indicates that the action would result in incidental take[1] but would not have jeopardizing effects, then the Services "shall provide" an incidental-take statement specifying, among other things, the impact of incidental take on the species, measures necessary to minimize that impact, and terms and conditions to implement such measures.  16 U.S.C. § 1536(b)(4).  Written in broad terms, Section 7(o) provides that "any taking that is in compliance with the terms and conditions specified in" any such incidental-take statement "shall not be considered to be a prohibited taking of the species concerned."  *Id.* § 1536(o)(2).  This incidental-take statement protection applies not just to "the Federal Agency," but also to the non-federal "applicant concerned, if any."  *Id.* § 1536(b)(4).

---

[1] Section 9 of the ESA prohibits "take" (e.g., harming, harassing, etc.) of listed species.  16 U.S.C. § 1538.  But "takes" that are  "incidental" only to otherwise lawful activities are exempt from Section 9 liability if they fall under ESA Sections 7 or 10.  50 C.F.R. § 402.02; 16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Section 10 creates a voluntary process for private actors to seek an incidental take "permit."  16 U.S.C. § 1539(a)(1)(B).

In *Cooling Water Intake Structure Coalition*, the Second Circuit squarely addressed whether ESA Section 7 can be deployed in a workable fashion in the context of cooperative federal-state environmental programs. There, EPA in 2014 had promulgated a nationwide program applicable to cooling-water-intake structures, to be administered through state permits in 47 states (and, where no state program existed, EPA permits). *Id.* at 58-59. For this program, EPA engaged in the ESA Section 7 consultation process for the program, resulting in the Services issuing a "programmatic" BiOp concluding it was not likely to jeopardize listed species or critical habitat, and providing an incidental-take statement covering program participants. *Id.* at 62-63. Because the "'large scale and broad scope' of the proposed rule precluded an accurate estimate of the precise amount of incidental take" at the outset, the "Services therefore deferred quantification of incidental take to the site-specific permitting process." *Id.* at 63. That deferral, however, was predicated on the existence of a binding "technical assistance process," which would "giv[e] the Services a meaningful opportunity to review permit applications," including those administered by the States issuing those permits, and "to recommend [certain] measures." *Id.* at 71-72.

Environmental petitioners challenged EPA's program, arguing that the "programmatic approach" of the BiOp violated the ESA. *Id.* at 71. The Second Circuit unanimously rejected those arguments, concluding that "[n]othing in the

ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis," rather than "assess[ing] 'the effects of the action as a whole'" by relying on the "protections of the technical assistance process" that would bind the Services to ongoing evaluations on a permit-specific basis. *Id.* at 73-75 (citing 50 C.F.R. § 402.14(c)).

### C.    The federal government and Florida rely on *Cooling Water* in modeling a Section 404 assumption and programmatic BiOp.

In 2018, the federal government and Florida worked together to structure a programmatic Section 404 consultation and permitting process consistent with the ESA and the blueprint approved in *Cooling Water*. This approach adhered to Fish and Wildlife's position since 1993 that "future consultations on state assumptions will be conducted as programmatic formal consultations." Ex. B at 3. And it was a decision accompanied by robust agency explanation following the notice-and-comment process.[2]

After Florida prepared and submitted a comprehensive "Biological Assessment" for its proposed program (Ex. C) and EPA prepared and submitted a comprehensive "Biological Evaluation" of the program (Ex. E), Fish and Wildlife evaluated the program and issued its Biological Opinion, or BiOp, concluding that

---

[2] 85 Fed. Reg. 57,853, 57,856 (Sept. 16, 2020) (explaining EPA's decision to initiate ESA Section 7 consultation in accordance with an agency memorandum dated August 27, 2020, which is available in the Administrative Record at EPA-HQ-OW-2018-0640-0660-A1) (attached as Exhibit D).

EPA's action in approving Florida's Section 404 program was not likely to jeopardize listed species or adversely modify critical habitat. Ex. F at 69-70. Fish and Wildlife explained that, even without a "site- and species-specific analyses to estimate the number of individuals [of listed species] that might be affected by permitted activities," each project approved under the program would undergo sufficient ESA review through a joint federal-state technical-assistance process with Florida incorporating into state permits any project-specific species protections requested by Fish and Wildlife and the Florida Fish and Wildlife Conservation Commission. *Id.* And, as required by ESA Section 7(o), the BiOp included an incidental-take statement authorizing incidental take and providing that the amount and degree of incidental take would be quantified and evaluated on a project-specific basis through the technical-assistance process. *Id*. This approach precisely tracked the model adopted by EPA during the Obama Administration and approved by the Second Circuit in *Cooling Water*.

EPA ultimately determined that Florida had "the necessary authority to operate a program in accordance with the requirements in CWA Section 404 and 40 C.F.R. part 233" and approved Florida's Section 404 program. 85 Fed. Reg. 83,553 (Dec. 22, 2020).

**II.    The district court vacates Florida's Section 404 program.**

In 2021, Plaintiffs sued the Federal Defendants, challenging EPA's approval of Florida's Section 404 assumption.    After Florida intervened to defend the program, the parties cross-moved for summary judgment on, *inter alia*, Plaintiffs' APA claims that the Section 404 program—and principally its programmatic BiOp and incidental-take statement—violated the ESA.  Ex. G; Ex. H; Ex. I.

On February 15, 2024, the district court granted summary judgment for Plaintiffs on the ESA-related claims.  Ex. J at 7.  It first rejected Florida's challenge to Plaintiffs' standing, concluding that Plaintiffs had suffered a "procedural injury" through "the failure of both the action agency (the EPA) and the consulting agency ([Fish and Wildlife]) to comply with the ESA."  *Id.* at 40.  On the merits, the court rejected *Cooling Water* and concluded that Fish and Wildlife and its programmatic BiOp failed to "engage in the detailed, species-specific analysis necessary" to constitute a valid Section 7 consultation, and that the "non-statutory technical assistance process cannot substitute for what the statute requires."  *Id.* at 61, 70.  Even though it found that only Fish and Wildlife's BiOp and incidental-take statement were invalid, the district court vacated EPA's approval as to the *entire* Florida Section 404 assumption.  *Id.* at 88-96.

After inviting the parties to brief the propriety of a partial stay of its vacatur order, *id.* at 96, the district court denied a partial stay nearly two months later.  Ex.

K.  Concurrently, the district court issued an amended summary judgment opinion (Ex. L) and granted Florida's request for a Rule 54(b) final judgment on Plaintiffs' ESA-based claims. Ex. K.

Florida immediately appealed and moved for a *full* stay of the entire February 15, 2024 vacatur order pending appeal, which the district court denied on April 23, 2024.  Ex. M; Ex. N.

## STANDARD OF REVIEW

Courts consider four factors in assessing whether to grant stays pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## ARGUMENT

### I.    Florida is likely to succeed on the merits.

#### A.    The district court erroneously vacated the programmatic BiOp and incidental-take statement.

In approving Florida's 404 permitting program, Fish and Wildlife did two things.  It issued a biological opinion concluding that Florida and the federal government's collaborative technical-assistance process and corresponding safeguards would ensure that Florida's Section 404 program assumption would not

jeopardize listed species or critical habitat. And it issued an incidental-take statement concluding that the anticipated amount and extent of incidental take would be assessed on a project-specific basis through Florida and Fish and Wildlife. But the district court held that those actions were unlawful because it concluded that the ESA inflexibly requires Fish and Wildlife to engage in a species-specific review of all downstream contingencies of Florida's Section 404 program at the outset. That conclusion transgresses the ESA's text, conflicts with the Second Circuit's *Cooling Water* decision, and runs roughshod over the cooperative-federalism principles that animate the CWA and ESA.

1.    The district court's key textual misstep was its assumption that, to satisfy ESA Section 7's consultation process, the BiOp *itself* must exhaustively detail all future "species specific" effects of the program, rather than using a programmatic approach that builds in those assessments on a permit-by-permit basis through the technical-assistance process. The text of the ESA imposes no such requirement; instead, the consultation must result in a finding that the "action" "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat." 16 U.S.C. § 1536(a)(2). As the Eleventh Circuit explained, ESA Section 7(a)(2) "simply directs the federal agency to 'insure' in consultation with [the Services] that its actions are not likely to jeopardize the existence of listed species or their critical

habitat . . . .  It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013).  The BiOp plainly fulfills that mandate.

The district court divined its rigid requirement from regulations, concluding that "the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required 'detailed discussion of the effects of the action on listed species.'" Ex. L at 67 (citing 50 C.F.R. § 402.14(g)).  In doing so, the district court fundamentally misapprehended the relevant "action"—EPA's approval of the Section 404 assumption program.  50 C.F.R. § 402.02 (defining "action" to include "activities or programs").  The BiOp did not "bypass" an analysis of the effects of that action; it robustly considered the *programmatic* process it was approving and how the *program* would fully account for impacts on species and habitats through the technical-assistance process.  Ex. F at 3-73.

The district court also mistakenly relied on the regulatory definition of "framework programmatic action" and its reference to "future action(s) [that] are authorized, funded, or carried out and subject to further section 7 consultation."  50 C.F.R. § 402.02.  But "further section 7 consultation" is not required at the state 404 permitting stage, so that definition is inapplicable.  Ex. L at 69.  When a programmatic framework contemplates future *federal* actions resulting in additional impacts, then further Section 7 consultations are necessary.  But nothing about that

regulatory provision expands Section 7's reach to foist formal Section 7 consultation on downstream *state*-permitting decisions. *See Cooling Water*, 905 F.3d at 73 n.15 ("The 'agency action' subject to consultation here was the EPA's promulgation of the Rule, not the subsequent implementation of the Rule by State Directors."). Fish and Wildlife appropriately evaluated Florida's 404 federally-approved "program" and made a Section 7 no-jeopardy finding by analyzing all processes that the program would use to protect species. Nothing in the statute or regulations required Fish and Wildlife to make an upfront, species-specific Section 7 analysis of every permit that *Florida* would issue after approval.

Because EPA properly approved Florida's program under Section 7, Fish and Wildlife was required to issue an incidental-take statement protecting Florida and its permittees. 16 U.S.C. § 1536(b)(4)(C) (providing that the Services "shall provide" a written incidental-take statement to not just "the Federal agency" (here, EPA) but also to "the applicant concerned" (here, Florida as the applicant for EPA approval). And "any taking that is in compliance" with the written incidental-take statement "shall not be considered to be a taking . . . ." *Id.* § 1536(o)(2). Contrary to the district court's opinion, the Second Circuit correctly explained that the incidental-take statement for such a program need not contain take limits, but can instead defer that analysis to the ongoing, federally-overseen site-specific technical-assistance process. *Cooling Water*, 905 F.3d at 77 ("Given the Services' commitment to the

technical assistance process, their justification for not immediately quantifying take is adequate.").

2. The programmatic BiOp at issue in *Cooling Water*—which the Second Circuit upheld against various "challenge[s] to the Services' programmatic approach," 905 F.3d at 75— provided the blueprint for the programmatic BiOp at issue here.  Ex. E at 73; Ex. F at 74-75; Ex. M at 6-7.  So it should come as no surprise that *Cooling Water* rejected key arguments embraced by the district court below.  Three examples bear emphasis.

First, the district court concluded that the "bottom line is that the Federal Defendants were required to conduct the required species-specific analysis because Florida structured, designed, and implemented its program so as to provide incidental take liability upfront to itself and all future state permittees."  Ex. L at 62.  But the Second Circuit rejected that argument, concluding that "[n]othing in the ESA requires the Services to assess every future 'phase' of an agency action on a site-specific or species-specific basis."  *Cooling Water*, 905 F.3d at 73; *see also id.* (citing *Navy*, 733 F.3d at 1121 ("[T]he rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA.")).

Second, the district court concluded that a "non-statutory technical assistance cannot substitute for" what it believed the statute requires, even if it amounts to

"arguably similar procedures." Ex. L at 62, 70. Again, the Second Circuit rejected the argument that it was impermissible for Fish and Wildlife to "provide[] the current status of the species and the environmental baseline but, relying on the protections of the technical-assistance process, defer[] evaluation of the Rule's effects on the species within its jurisdiction." 905 F.3d at 75.

Third, the district court held that Fish and Wildlife "did not give . . . meaningful consideration" to the "biological information that was available," thus disagreeing with Fish and Wildlife's *scientific conclusion* that it lacked information necessary to conduct a species-specific analysis on a categorical, state-wide level at the outset. Ex. L at 63-64. Once more, the Second Circuit disagreed, holding that the programmatic BiOp's conclusion that "a categorical assessment of . . . impacts was infeasible reflects a scientific determination deserving deference," thus rejecting an argument that the Services "violate[d] their statutory obligations when they decided to solicit more data (during the permitting process) in order to assess thermal impacts on a site-specific basis." 906 F.3d at 74 (internal quotation marks omitted). In other words, the Second Circuit rejected each of the core underpinnings of the district court's opinion.

Acknowledging this dissonance, the district court tried to "distinguish[] [*Cooling Water*] on its facts," noting that the *Cooling Water* action was a "final rule"—as opposed to an assumption approval—as though that was the key feature

16

that made the technical-assistance process involve "legally binding responsibilities for all parties." Ex. L at 65. But what the Second Circuit actually found determinative was that the Services (a) "conditioned their no-jeopardy finding on compliance with certain procedures" nearly identical to those used here for the Florida program, and (b) "represented to th[e] Court . . . that they have a 'commitment' to those procedures." 905 F.3d at 72. That is exactly what Fish and Wildlife did here. *See* Ex. F at 67-72; Ex. O at 95-96 (counsel for Fish and Wildlife representing that it is "committed" to "comply[ing] with" its "own biological opinion").

At bottom, the district court deemed *Cooling Water* "at odds with the statute, regulations, and caselaw." Ex. L at 67. The various facets of Florida's program that the district court found to violate the ESA all flow from the programmatic-consultation approach. The district court was textually wrong for the reasons given above, which will be further developed in merits briefing. But the critical point for purposes of a stay pending appeal is that the district court was the *first court in the country*[3] to question—much less reject—the Second Circuit's unanimous opinion,

---

[3] The case law relied upon by the district court (Ex. L at 69-71) does not contradict *Cooling Water* or support invalidating a programmatic BiOp like this one. *North Slope Borough v. Andrus* merely stated that a BiOp "may not deal exclusively with any one particular stage of an outer continental shelf project," 642 F.2d 589, 608 (D.C. Cir. 1980), whereas this programmatic BiOp takes explicit account of the ongoing, comprehensive technical-assistance process. And in *National Wildlife*

which had garnered over five years' worth of reliance interests *nationwide* since its issuance.  This Court should stay the district court's judgment while it decides whether to create a circuit split on an important issue of federal law.

3.      The district court's opinion also gravely undermines the federalism principles that pervade the CWA and the ESA.  Despite acknowledging the "primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," the district court's opinion denigrates the ability of states to carry out those responsibilities.  Ex. L at 20, 68 (relying on the fact "that the later phase involves state, rather than federal, action" as grounds to find an ESA violation).  Nor did the district court mention Section 2(c) of the ESA, which explicitly calls for "federal agencies [to] *cooperate with [s]tate and local agencies* to resolve water resource issues in concert with conservation of endangered species."  16 U.S.C. § 1531(c)(2) (emphasis added).

The opinion effectively nullifies the bedrock principle that, within a "program of cooperative federalism" like Section 404, states can, "within limits established by federal minimum standard," "enact and administer their *own regulatory programs*, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981) (emphasis added).  A

---

*Federation v. Brownlee*, the action agency issued nationwide permits while skipping the programmatic consultation EPA conducted here.  402 F. Supp. 2d 1, 4, 10 (D.D.C. 2005).

programmatic ESA Section 7 consultation for a broad statewide program simply cannot quantify, at the outset, all the granular effects from innumerable future permitting activities.  And yet the district court's opinion deprives the Services of the ability to craft the programmatic BiOp and incidental-take statement necessary to facilitate  a state-wide assumption—*regardless* of how robust the species-specific safeguards that the state/federal partnership will employ when reviewing each permit.  The district court, therefore, reduces Section 404's pledge of cooperative federalism to an illusory promise, at least for states with a sizeable number of federally-listed species.   Congress spoke directly as to its wishes: maximum cooperation between the States and federal agencies.  16 U.S.C. § 1531(c)(2).

## B.  The district court erroneously held that Plaintiffs have standing.

Florida is also likely to succeed in showing that Plaintiffs lack standing in this programmatic context where federal agencies maintain substantial oversight.  Where plaintiffs—as here—assert procedural injuries, "the injury in fact requirement [remains] a hard floor of Article III jurisdiction that cannot be altered by statute," as does the requisite "causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."  *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 183 (D.C. Cir. 2017) (internal quotation marks omitted).  Plaintiffs claim that the BiOp and incidental-take statement are procedurally

19

defective, but they cannot connect the alleged technical shortcomings to any increased risk to species.  Indeed, the district court's standing analysis ignores pivotal D.C. Circuit precedent involving similar facts, including *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654 (D.C. Cir. 2022) (dismissing *sua sponte* an environmental group's challenge to EPA's approval of Oklahoma's coal-ash program), and *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912 (D.C. Cir. 2003) (holding that Indian tribe lacked standing to challenge transfer of federal lands to state government where the federal land-transfer statute ensured continued enforcement of cultural-protection requirements).  Because the federal agencies "have an ongoing and undiluted enforcement role" under the Florida Section 404 program to ensure adherence to federal species-protection measures, no non-conjectural injury can be established under this Court's precedent.  *Crow Creek*, 331 F.3d at 332.

## II.    Florida will be irreparably harmed absent a stay.

Florida had successfully administered its Section 404 program for over three years—administering *thousands of permitting actions* throughout the State—by the time the district court vacated it.  Wrenching administration of that program from Florida's sovereign control imparts a multitude of irreparable harms, each of which is described by the Florida Department of Environmental Protection's General Counsel.  Ex. P.  As he explains, the vacatur order eviscerates Florida's sovereign

interests in the conservation and management of water resources, land use, and wildlife—areas of traditional state responsibility. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 161 (2001) (recognizing "States' traditional and primary power over land and water use"). The loss of sovereignty constitutes irreparable harm. *See, e.g.*, *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of "state sovereignty and state management of land" as an irreparable harm); *Kentucky v. Biden*, 23 F.4th 585, 611-12 n.19 (6th Cir. 2022) (discussing "invasions of state sovereignty" as harms that cannot be monetarily addressed).

Vacatur has also thrown Florida's regulators and regulated community into permitting chaos, deprived Florida of the benefits of years of effort and investment into a comprehensive state program, put over 1,000 pending permit applications into regulatory limbo, blocked Florida agencies from performing legal duties, and deprived the State of significant permitting efficiencies obtained from consolidating federal and state wetlands-permitting requirements. Ex. P ¶¶ 15-66. Concerning the Corps' recent (and vague) assurances about adding Corps employees to help alleviate disruptions to Florida permittees, Florida sees things differently (*id.* ¶¶ 23-29), and the Corps' vague assurances cannot substitute for the more than 300 personnel on hand at the Florida Department of Environmental Protection who are ready, willing, and able to get back to work immediately processing 404 permits in

Florida. Pending projects involve critically important issues to Florida and its citizens, including everglades restoration work, grid-reliability projects, major roads and bridges, and new medical and educational facilities, just to name a few examples. Ex. P ¶¶ 34-45. A Florida Department of Transportation official's declaration further expands on these concerns (Ex. Q).

## III.    The balance of harms and public interest weigh heavily in favor of a stay.

As discussed above and the Florida declarations (Exs. P-Q), many of the irreparable harms arising from the vacatur order are inflicted not just on the regulated community in Florida, but also on the beneficiaries of those projects—residents in senior-living communities or affordable-housing projects, commuters, communities that would benefit from post-hurricane restoration work, and countless other beneficiaries of projects that are now on hold. The harm to the public from that regulatory uncertainty and delay is self-evident, while the harm alleged by Plaintiffs is conjectural at best when they have shown no impacts to endangered species that would have differed in any way from impacts under the Corps-administered Section 404 program. Ultimately, the public benefits when federal and state agencies work cooperatively to achieve shared environmental goals, as Congress intended.

**CONCLUSION**

The Court should stay the district court's judgment pending appeal (including staying in full the district court's February 15, 2024 vacatur order, made final in the last two paragraphs of its April 12, 2024 order).

April 25, 2024

Respectfully submitted,

*/s/ Aaron M. Streett*

Aaron M. Streett
Anthony J. Lucisano
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com
anthony.lucisano@bakerbotts.com

Jeffrey H. Wood
700 K Street NW
BAKER BOTTS LLP
Washington, D.C. 20001
(202) 639-7700
jeff.wood@bakerbotts.com

*Counsel for the State of Florida and the Florida Department of Environmental Protection*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f), this document contains 4,824 words.

2.      This document complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

*/s/ Aaron M. Streett*
Aaron M. Streett

*Counsel for the State of Florida and the Florida Department of Environmental Protection*

25

**CERTIFICATE OF SERVICE**

I certify that on April 25, 2024, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett

*Counsel for the State of Florida
and the Florida Department of
Environmental Protection*

26

# EXHIBIT A

14-4645(L)
Cooling Water Intake Structure Coal., et al. v. EPA, et al.

1      **UNITED STATES COURT OF APPEALS**
2           **FOR THE SECOND CIRCUIT**
3
4              August Term, 2017
5
6    (Argued: September 14, 2017    Decided: July 23, 2018)
7
8    Docket Nos. 14-4645(L), 14-4657(CON), 14-4659(CON), 14-4664(CON),
9                14-4667(CON), 14-4670(CON)
10
11   _____
12
13   COOLING WATER INTAKE STRUCTURE COALITION,
14
15                    *Petitioner*,
16
17   AMERICAN PETROLEUM INSTITUTE, UTILITY WATER ACT GROUP,
18      ENTERGY CORPORATION, AMERICAN LITTORAL SOCIETY,
19    ENVIRONMENT AMERICA, ENVIRONMENT MASSACHUSETTS,
20     RIVERKEEPER, INC., NATURAL RESOURCES DEFENSE COUNCIL,
21    INCORPORATED, DELAWARE RIVERKEEPER NETWORK, RARITAN
22       BAYKEEPER, INC., DBA NY/NJ BAYKEEPER, HACKENSACK
23   RIVERKEEPER, CASCO BAYKEEPER, SAVE THE BAY – NARRAGANSETT
24   BAY, SCENIC HUDSON, INC., SIERRA CLUB, WATERKEEPER ALLIANCE,
25      INC., SOUNDKEEPER, INC., SURFRIDER FOUNDATION,
26
27               *Intervenors-Petitioners*,
28
29   CENTER FOR BIOLOGICAL DIVERSITY, LOUISIANA ENVIRONMENTAL
30     ACTION NETWORK, CALIFORNIA COASTKEEPER ALLIANCE,
31    HUMBOLDT BAYKEEPER, SUNCOAST WATERKEEPER, INC., PUGET
32              SOUNDKEEPER ALLIANCE,
33
34                   *Intervenors*,
35
36                       v.
37

1    UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ANDREW
2         R. WHEELER, IN HIS OFFICIAL CAPACITY AS ACTING
3       ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL
4    PROTECTION AGENCY,* NATIONAL MARINE FISHERIES SERVICE,
5         UNITED STATES FISH AND WILDLIFE SERVICE,

6

7                            *Respondents.*

8

9                    _____

10

11   Before:

12

13          JACOBS, CABRANES, and LOHIER, *Circuit Judges*.

14

15          Environmental conservation groups and industry associations petition
16   for review of a final rule promulgated by the United States Environmental
17   Protection Agency ("EPA") pursuant to section 316(b) of the Clean Water Act,
18   establishing requirements for cooling water intake structures at existing
19   facilities.  The Petitioners also seek review of a May 19, 2014 biological
20   opinion jointly issued by the United States Fish and Wildlife Service and the
21   National Marine Fisheries Service at the close of formal Endangered Species
22   Act consultation on the final rule.  Because we conclude that both the final
23   rule and the biological opinion are based on reasonable interpretations of the
24   applicable statutes and sufficiently supported by the factual record, and
25   because the EPA gave adequate notice of its rulemaking, we **DENY** the
26   petitions.

27

28                         Russell S. Frye, FryeLaw PLLC,
29                         Washington, DC, *for Petitioner* Cooling
30                         Water Intake Structure Coalition.

31

32                         Fredric P. Andes, Jill M. Fortney, Barnes
33                         & Thornburg LLP, Chicago, IL; Jeffrey S.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Administrator
Andrew R. Wheeler is substituted for former Administrator Gina McCarthy as a
respondent.  The Clerk of the Court is directed to amend the caption accordingly.

2

| | |
|---|---|
| 1 | Longsworth, Barnes & Thornburg LLP, |
| 2 | Washington, DC, *for Intervenor-Petitioner* |
| 3 | American Petroleum Institute. |
| 4 | |
| 5 | KRISTY A.N. BULLEIT (Andrew J. Turner, |
| 6 | Todd S. Mikolop, Kerry L. McGrath, *on* |
| 7 | *the brief*), Hunton & Williams LLP, |
| 8 | Washington, DC, *for Intervenors-* |
| 9 | *Petitioners* Utility Water Act Group, |
| 10 | Entergy Corporation. |
| 11 | |
| 12 | REED W. SUPER, EDAN ROTENBERG, |
| 13 | Super Law Group, LLC, New York, NY, |
| 14 | *for Intervenors-Petitioners* Riverkeeper |
| 15 | Inc., American Littoral Society, Casco |
| 16 | Baykeeper, Delaware Riverkeeper |
| 17 | Network, Hackensack Riverkeeper, |
| 18 | Natural Resources Defense Council, |
| 19 | Inc., Raritan Baykeeper, Inc. d/b/a |
| 20 | NY/NJ Baykeeper, Save the Bay – |
| 21 | Narragansett Bay, Scenic Hudson, Inc., |
| 22 | Sierra Club, Soundkeeper, Inc., |
| 23 | Surfrider Foundation, Waterkeeper |
| 24 | Alliance, Inc., *and for Intervenors* Center |
| 25 | for Biological Diversity, Louisiana |
| 26 | Environmental Action Network, |
| 27 | California Coastkeeper Alliance, |
| 28 | Humboldt Baykeeper, Suncoast |
| 29 | Waterkeeper, Inc., Puget Soundkeeper |
| 30 | Alliance. |
| 31 | |
| 32 | Eric E. Huber, Sierra Club, Boulder, CO, |
| 33 | *for Intervenor-Petitioner* Sierra Club, *and* |
| 34 | *for Intervenors* Center for Biological |
| 35 | Diversity, California Coastkeeper |
| 36 | Alliance, Humboldt Baykeeper, |

3

|    |                                                      |
|----|------------------------------------------------------|
| 1  | Louisiana Environmental Action                       |
| 2  | Network, Suncoast Waterkeeper, Inc.                  |
| 3  |                                                      |
| 4  | Charles C. Caldart, National                         |
| 5  | Environmental Law Center, Seattle,                   |
| 6  | WA, *for Intervenors-Petitioners*                    |
| 7  | Environment America, Environment                     |
| 8  | Massachusetts.                                        |
| 9  |                                                      |
| 10 | PERRY M. ROSEN, United States                        |
| 11 | Department of Justice, Environment &                 |
| 12 | Natural Resources Division,                          |
| 13 | Environmental Defense Section,                       |
| 14 | Washington, DC; BRIDGET KENNEDY                      |
| 15 | MCNEIL, United States Department of                  |
| 16 | Justice, Environment & Natural                       |
| 17 | Resources Division, Wildlife & Marine                |
| 18 | Resources Section, Denver, CO (Simi                  |
| 19 | Bhat, United States Department of                    |
| 20 | Justice, Environment & Natural                       |
| 21 | Resources Division, Environmental                    |
| 22 | Defense Section, Washington, DC,                     |
| 23 | Clifford E. Stevens, Jr., United States              |
| 24 | Department of Justice, Environment &                 |
| 25 | Natural Resources Division, Wildlife &               |
| 26 | Marine Resources Section, Denver, CO,                |
| 27 | *on the brief*; Richard T. Witt, Alexis              |
| 28 | Wade, United States Environmental                    |
| 29 | Protection Agency, Office of General                 |
| 30 | Counsel, *of counsel*), *for Respondents*.           |
| 31 |                                                      |
| 32 | Andrew K. Jacoby, Varadi, Hair &                     |
| 33 | Checki, LLC, New Orleans, LA (Ann                    |
| 34 | Brewster Weeks, Legal Director, Clean                |
| 35 | Air Task Force, Boston, MA, *of counsel*),           |
| 36 | *for Amicus Curiae* Clean Air Task Force.            |

FWS-006838

1    LOHIER, *Circuit Judge*:

2          In these consolidated cases, several environmental conservation groups

3    and industry associations petition for review of a final rule promulgated four

4    years ago, in August 2014, by the United States Environmental Protection

5    Agency ("EPA") pursuant to section 316(b) of the Clean Water Act ("CWA"), 33

6    U.S.C. § 1326(b), establishing requirements for cooling water intake structures

7    ("CWISs") at existing regulated facilities, see National Pollutant Discharge

8    Elimination System—Final Regulations to Establish Requirements for Cooling

9    Water Intake Structures at Existing Facilities and Amend Requirements at Phase

10   I Facilities, 79 Fed. Reg. 48,300 (Aug. 15, 2014) (codified at 40 C.F.R. pts. 122, 125)

11   ("Final Rule" or "Rule").[1]  The Petitioners also seek review of a May 19, 2014

12   biological opinion jointly issued by the United States Fish and Wildlife Service

13   ("FWS") and the National Marine Fisheries Service ("NMFS," and, together with

14   the FWS, the "Services") at the close of formal Endangered Species Act ("ESA")

15   consultation on the Final Rule.  The Government continues to defend the Rule

16   today.  Because we conclude, among other things, that both the Rule and the

---

[1] The various abbreviations in this opinion are defined both in text and in a separate glossary set forth in the Appendix.

1    biological opinion are based on reasonable interpretations of the applicable

2    statutes and sufficiently supported by the factual record, and because the EPA

3    gave adequate notice of its rulemaking, we **DENY** the petitions for review.

4                                **BACKGROUND**

5        To start, we describe CWISs; their general impact on the environment; and

6    the statutes, regulations, and rules relevant to these petitions.  We then provide

7    an overview of the relevant regulatory and procedural history and a summary of

8    the arguments advanced in the various petitions before us.

9        1.  <u>Cooling Water Intake Structures</u>

10       To dissipate waste heat, power plants and manufacturing facilities use

11   CWISs to extract large volumes of water—nearly 75 trillion gallons annually—

12   from nearby water sources.  The force of inflowing water can trap, or "impinge,"

13   larger aquatic organisms against the structures and draw, or "entrain," smaller

14   aquatic organisms into a facility's cooling system.  Impingement and

15   entrainment kill hundreds of billions of aquatic organisms from waters of the

16   United States each year.

17       The harm to aquatic organisms caused by a CWIS most directly relates to

18   the amount of water the structure withdraws, which in turn depends on the type

FWS-006840

1   of cooling system the facility uses. "Once-through" cooling systems draw cold

2   water from a waterbody and return heated water to the waterbody in a

3   continuous flow. See Riverkeeper, Inc. v. EPA, 358 F.3d 174, 182 n.5 (2d Cir.

4   2004) ("Riverkeeper I"). "Closed-cycle" cooling systems generally recirculate the

5   same cooling water within a CWIS by using towers or reservoirs to dissipate heat

6   from the water. Id.; see also 79 Fed. Reg. at 48,333. Closed-cycle cooling

7   withdraws approximately 95 percent less water than once-through cooling.

8       2. Statutory Framework

9           A. The Clean Water Act

10          The express purpose of the CWA is "to restore and maintain the chemical,

11  physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

12  Sections 301 and 306 of the CWA broadly authorize the EPA to establish

13  pollution discharge standards. Id. §§ 1311, 1316. In 1972 Congress amended the

14  CWA to specifically address the operation of CWISs. See Federal Water

15  Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816; see

16  also Riverkeeper I, 358 F.3d at 184 (describing the 1972 amendments as marking

17  a "sea of change" in Congress's approach to water pollution). In section 316(b), it

18  directed the EPA to establish standards governing the operation of CWISs:

FWS-006841

1    Any standard established pursuant to [CWA section 301] or [CWA
2    section 306] and applicable to a point source shall require that the
3    location, design, construction, and capacity of cooling water intake
4    structures reflect the best technology available for minimizing
5    adverse environmental impact.

6

7  33 U.S.C. § 1326(b). Section 316(b) lists no specific factors that the EPA should

8  consider in establishing the applicable "best technology available" ("BTA")

9  standard. We have held that "interpretation of section 316(b) is informed by the

10  two provisions it cross-references," Riverkeeper, Inc. v. EPA, 475 F.3d 83, 91 (2d

11  Cir. 2007) ("Riverkeeper II"), rev'd on other grounds, Entergy Corp. v.

12  Riverkeeper, Inc., 556 U.S. 208 (2009), but that the EPA need not comply with

13  "every statutory directive contained" in those two provisions when acting

14  pursuant to section 316(b), id. (quoting Riverkeeper I, 358 F.3d at 187).

15  Moreover, the EPA may consider "the benefits derived from reductions [in

16  adverse environmental impact] and the costs of achieving them" when

17  establishing the BTA. Entergy, 556 U.S. at 219.

18      The standards promulgated under CWA sections 301, 306, and 316(b) are

19  implemented by permits issued through the National Pollutant Discharge

20  Elimination System ("NPDES"). See 33 U.S.C. § 1342; 40 C.F.R. §§ 122.44(b)(3),

21  125.90(a). "An NPDES permit serves to transform generally applicable . . .

8

1    standards . . . into the obligations . . . of the individual discharger . . . ." <u>EPA v.</u>

2    <u>California ex rel. State Water Res. Control Bd.</u>, 426 U.S. 200, 205 (1976).  NPDES

3    permits are issued by the EPA or, if the EPA has approved a State's permitting

4    program, by the Director of the NPDES program for the State.[2]  <u>See</u> 33 U.S.C.

5    § 1342.  Under the authorized State programs, Directors must submit draft

6    permits to the EPA for review.  <u>Id.</u> § 1342(d)(1)–(2).  If a Director fails to amend

7    the permit in response to any EPA objections, the EPA may federalize the permit

8    (<u>i.e.</u>, reclaim permitting authority for that permit).  <u>Id.</u> § 1342(d)(4).  And if a State

9    fails to administer the NPDES program in accordance with standards

10   promulgated pursuant to the CWA, the EPA may withdraw approval of the State

11   program.  <u>Id.</u> § 1342(c).

12          B.  <u>The Endangered Species Act</u>

13          In enacting the ESA, Congress wanted to ensure "that all Federal

14   departments and agencies . . . seek to conserve endangered species and

15   threatened species."  16 U.S.C. § 1531(c)(1).  To "reverse the trend toward species

16   extinction," <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 184 (1978), the ESA provides

---

[2] As of 2014, when the Final Rule was published, forty-six States operated an EPA-approved NPDES permitting program.  79 Fed. Reg. at 48,312.  In June 2018 Idaho became the forty-seventh State to receive the EPA's approval.  <u>See</u> 83 Fed. Reg. 27,769, 27,770 (June 14, 2018).

FWS-006843

1    for the listing of species as threatened or endangered and the designation of their

2    critical habitats, 16 U.S.C. § 1533.  Once a species is listed, certain statutory

3    protections apply.  For example, section 9 of the ESA prohibits the "take"[3] of

4    endangered species and those threatened species to which the Services have

5    extended protection, 16 U.S.C. § 1538(a)(1)(B), except that take "incidental" to an

6    otherwise lawful activity may be exempted pursuant to the procedures set forth

7    in ESA sections 7 or 10, id. § 1539(a)(1)(B).  Section 7 of the ESA directs federal

8    agencies, in consultation with one or both of the Services, to "insure that any

9    action authorized, funded, or carried out by such agency . . . is not likely to

10   jeopardize the continued existence of any endangered species or threatened

11   species," or to adversely modify critical habitats designated for such species.[4] Id.

12   § 1536(a)(2).  A federal agency must consult with the Services on a proposed

13   action whenever there is "reason to believe that an endangered species or a

14   threatened species may be present in the area affected by [the proposed action]

---

[3] The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).
[4] The ESA's implementing regulations define the phrase "[j]eopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

10

1    and that implementation of such action will likely affect such species."  Id.

2    § 1536(a)(3); see 50 C.F.R. § 402.14(a) (requiring consultation where the acting

3    agency determines that its action "may affect" listed species or critical habitat).

4         Consultation with the Services may be informal or formal.  Informal

5    consultation is an optional process to determine whether formal consultation is

6    necessary.  50 C.F.R. § 402.13(a).  As part of informal consultation, the acting

7    agency may prepare a "biological evaluation" that analyzes the potential effects

8    of a proposed action on listed species and their critical habitat.  See

9    Memorandum of Agreement Between the Environmental Protection Agency,

10   Fish and Wildlife Service and National Marine Fisheries Service Regarding

11   Enhanced Coordination Under the Clean Water Act and Endangered Species Act,

12   66 Fed. Reg. 11,202, 11,210 (Feb. 22, 2001) ("MOA").  If the acting agency

13   determines, with the written concurrence of the consulting Service, that the

14   action "is not likely to adversely affect" listed species or critical habitat, the

15   consultation process ends.  50 C.F.R. § 402.13(a); see id. §§ 402.12(k)(1),

16   402.14(b)(1).  But if either the acting agency or the consulting Service determines

17   that the proposed action is "likely to adversely affect" listed species or critical

18   habitat, the agency and the Service must engage in formal consultation.  Id.

1    § 402.13(a); see id. § 402.14(a)–(b).  At the end of formal consultation, the Service

2    must, using "the best scientific and commercial data available," 16 U.S.C.

3    § 1536(a)(2); 50 C.F.R. § 402.14(g)(8), prepare a biological opinion with both a

4    "detailed discussion of the effects of the action on listed species or critical

5    habitat," 50 C.F.R. § 402.14(h)(2), and a position "as to whether the action, taken

6    together with cumulative effects, is likely to jeopardize the continued existence of

7    listed species or result in the destruction or adverse modification of critical

8    habitat," id. § 402.14(g)(4).  If the Service concludes that the action is likely to

9    jeopardize listed species, the biological opinion must suggest "reasonable and

10   prudent alternatives" to the agency's proposed action.  16 U.S.C. § 1536(b)(3)(A);

11   50 C.F.R. § 402.14(g)(5).  If the Service concludes that the action is not likely to

12   jeopardize listed species but that incidental take is reasonably likely to occur, the

13   Service is required to provide an incidental take statement ("ITS") that meets the

14   requirements set forth in 16 U.S.C. § 1536(b)(4).  A taking that complies with

15   measures specified in an ITS "shall not be considered to be a prohibited taking of

16   the species concerned."  16 U.S.C. § 1536(o)(2).

FWS-006846

1          C.  The Administrative Procedure Act

2          The Administrative Procedure Act ("APA") requires a federal agency

3    conducting notice-and-comment rulemaking to include in its notice of proposed

4    rulemaking "either the terms or substance of the proposed rule or a description

5    of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  A final rule "need not

6    be an exact replica of the rule proposed in the [n]otice," only a "logical

7    outgrowth."  Riverkeeper II, 475 F.3d at 113 (quotation marks omitted).  A central

8    question under the APA is "whether the agency's notice would fairly apprise

9    interested persons of the subjects and issues of the rulemaking."  Nat'l Black

10   Media Coal. v. FCC, 791 F.2d 1016, 1022 (2d Cir. 1986) (quotation marks omitted).

11         3.  Regulatory History

12         Our decisions in Riverkeeper I, 358 F.3d 174, and Riverkeeper II, 475 F.3d

13   83, discuss at length the history of the EPA's rulemaking pursuant to section

14   316(b) of the CWA.  We assume familiarity with those decisions and therefore

15   provide only a brief overview of the various stages of the rulemaking relevant to

16   these petitions.

17         The EPA first promulgated a regulation implementing section 316(b) in

18   1976.  See 41 Fed. Reg. 17,387 (Apr. 26, 1976).  The Fourth Circuit remanded

1    certain aspects of that regulation for procedural reasons, see Appalachian Power

2    Co. v. Train, 566 F.2d 451, 457 (4th Cir. 1977), and the EPA subsequently

3    withdrew the remanded regulation, see 44 Fed. Reg. 32,854, 32,956 (June 7, 1979).

4         In 1993 environmental conservation groups sued the EPA to compel the

5    issuance of regulations under section 316(b), which had already been

6    significantly delayed.  An amended 1995 consent decree required the EPA to

7    promulgate new regulations in three phases, each addressing a different category

8    of facilities.  See Riverkeeper, Inc. v. Whitman, No. 93 Civ. 0314(AGS), 2001 WL

9    1505497, at *1 (S.D.N.Y. Nov. 27, 2001); Cronin v. Browner, 898 F. Supp. 1052,

10   1055 (S.D.N.Y. 1995).  We describe each phase in turn.

11        The EPA's Phase I rule, published in 2001,[5] established uniform national

12   BTA standards for new facilities based on closed-cycle cooling and offered two

13   alternative compliance options.  See 40 C.F.R. § 125.84; 79 Fed. Reg. at 48,315–16.

14   In Riverkeeper I, we upheld the Phase I rule with the exception of the compliance

15   option based on "restoration measures," holding that restoration was

---

[5] Also in 2001, the EPA and the Services entered into the MOA, which addressed the
protection of endangered and threatened species under the CWA's programs for water
quality standards and NPDES permitting.  See 66 Fed. Reg. 11,202.  The MOA
encouraged greater cooperation and communication among the Services, the EPA, and
Directors in ensuring that these programs protect ESA-listed species consistent with the
scope of the EPA's authority under the CWA.  Id. at 11,203–04.

FWS-006848

1    inconsistent with Congress's expressed intent in section 316(b) that the EPA

2    directly regulate the "design" of CWISs.  358 F.3d at 189–91.

3           The EPA's Phase II rule, published in 2004, provided that large, existing

4    power plants could comply with BTA performance standards by choosing from a

5    suite of designated technologies that would reduce impingement mortality by 80

6    to 95 percent and entrainment by 60 to 90 percent.  See 69 Fed. Reg. 41,576, 41,590

7    (July 9, 2004).  The Phase II rule identified five compliance options, including a

8    "cost-benefit comparison" option that allowed site-specific variances from the

9    rule's standards if a facility demonstrated that its compliance costs would be

10   "significantly greater than" the benefits.  Id. at 41,591, 41,597.  In Riverkeeper II,

11   we held that section 316(b) does not authorize the EPA to determine the BTA or

12   provide for site-specific determinations of the BTA based on a cost-benefit

13   analysis.  475 F.3d at 101, 114, 130–31.  Because we could not determine whether

14   the EPA had relied on a cost-benefit analysis in selecting the rule's suite of

15   technologies as the BTA, we remanded the Phase II rule for the EPA to clarify the

16   basis for its decision and possibly to reassess the BTA.  Id. at 101, 105.  In Entergy

17   Corp. v. Riverkeeper, Inc., the Supreme Court granted certiorari only as to the

18   question whether section 316(b) "authorizes the EPA to compare costs with

FWS-006849

1   benefits in determining 'the best technology available for minimizing adverse

2   environmental impact' at [CWISs]."  556 U.S. at 217.  The Supreme Court

3   answered that question in the affirmative, "express[ing] no view on the

4   remaining bases for the Second Circuit's remand."  Id. at 226.

5          Lastly, the EPA's Phase III rule, published in 2006, established standards

6   for new offshore facilities, smaller existing power plants, and existing

7   manufacturing facilities.  See 71 Fed. Reg. 35,006 (June 16, 2006).  After

8   petitioners challenged the Phase III rule in the Fifth Circuit, the EPA requested

9   and received a partial remand of the rule so that it could reconsider the

10  provisions addressing existing facilities in light of Entergy.  See ConocoPhillips

11  Co. v. EPA, 612 F.3d 822, 832, 842 (5th Cir. 2010).

12          4.   The Challenged Rule

13          In response to the Phase II and III remands, the EPA proposed a new

14  round of rulemaking for all existing facilities and new units at existing facilities.

15  See National Pollutant Discharge Elimination System—Cooling Water Intake

16  Structures at Existing Facilities and Phase I Facilities, 76 Fed. Reg. 22,174 (Apr.

17  20, 2011).  Several rounds of comment on the proposed rule followed, and the

FWS-006850

1    EPA ultimately reviewed comments from over 1,100 organizations and

2    individuals.  79 Fed. Reg. at 48,352.

3        In 2012 the EPA initiated ESA consultation with the Services on the effects

4    of the proposed rule on listed species and their critical habitat.  During informal

5    consultation, the Services disagreed with the EPA's determination, in a draft

6    biological evaluation, that the proposed rule was unlikely to have adverse effects

7    on listed species.  On June 18, 2013, after several meetings between the agencies,

8    the EPA requested formal section 7 consultation and submitted a final biological

9    evaluation.  With that evaluation in hand, in late 2013 the Services preliminarily

10   concluded that the proposed rule would cause "jeopardy" as defined in the ESA.

11   The EPA and the Services continued to discuss the proposed rule and revisions,

12   culminating in a draft final rule in March 2014.  Soon thereafter, in May 2014, the

13   Services jointly issued a biological opinion, concluding that although the

14   operation of CWISs could have significant adverse effects on listed species and

15   their critical habitat, the proposed rule's inclusion of certain process-based

16   protections ensured that it was not likely to "jeopardize" the continued existence

17   of listed species or "adversely modify" critical habitat within the meaning of ESA

18   section 7.  See U.S. Fish and Wildlife Service & National Marine Fisheries Service,

1   Endangered Species Act Section 7 Consultation Programmatic Biological Opinion

2   on the U.S. Environmental Protection Agency's Issuance and Implementation of

3   the Final Regulations Section 316(b) of the Clean Water Act 71 (2014) ("Bio.

4   Op.").  The biological opinion also included an ITS, which found that the "large

5   scale and broad scope" of the proposed rule precluded an accurate estimate of

6   the precise amount of incidental take.  Id. at 76.  The Services therefore deferred

7   quantification of incidental take to the site-specific permitting process laid out in

8   the proposed rule.

9        The Final Rule promulgated by the EPA and challenged by the Petitioners

10  applies to existing power plants and manufacturing facilities that use CWISs to

11  withdraw more than 2 million gallons of water per day ("mgd"), of which 25

12  percent or more is used for cooling.[6]  See 79 Fed. Reg. at 48,304–05.  As we

13  discuss in more detail and as relevant below, the Rule establishes impingement

14  and entrainment standards for existing facilities and for new units at existing

15  facilities, id. at 48,321–23, and it implements several processes to ensure

16  compliance with the ESA, id. at 48,380–83.

---

[6] The Rule covers 99.8 percent of total water withdrawals by industrial sources in the
United States.  79 Fed. Reg. at 48,308.

18

1      5. <u>Procedural History</u>

2      After the Final Rule was published, petitions for review were filed in six

3  Circuits.  The Fourth Circuit consolidated the petitions, allowed the Petitioners to

4  intervene in one another's suits, and transferred the consolidated petitions to this

5  Circuit pursuant to 28 U.S.C. § 2112(a)(5).  We then granted the Petitioners leave

6  to amend their petitions to include challenges to the Services' biological opinion

7  and to add the Services as respondents.  We also granted the motion filed by the

8  Center for Biological Diversity, Louisiana Environmental Action Network,

9  California Coastkeeper Alliance, Humboldt Baykeeper, Suncoast Waterkeeper,

10  Inc., and Puget Soundkeeper Alliance for leave to intervene as petitioners.

11      6. <u>The Petitions</u>

12      Four petitions for review are before us.

13          A. <u>Environmental Petition</u>

14      The first petition, filed by the self-described "Environmental Petitioners"

15  and "Environmental Intervenors" (collectively, the "Environmental

16  Petitioners"),[7] argues that: (1) the Rule's entrainment and impingement

---

[7] American Littoral Society, Environment America, Environment Massachusetts, Riverkeeper, Inc., Natural Resources Defense Council, Incorporated, Delaware

FWS-006853

1   requirements violate section 316(b) of the CWA in several ways; (2) the Rule's

2   definition of "new unit" is arbitrary and capricious under the APA insofar as it

3   excludes rebuilt, repowered, and replaced units; (3) the Services violated section

4   7 of the ESA and its implementing regulations, especially by finding that the

5   Rule incorporates adequate process-based protections to avoid jeopardizing

6   listed species; and (4) the Services' ITS fails to meet the requirements set forth in

7   section 7(b)(4) of the ESA.  The Environmental Petitioners seek vacatur and

8   remand of the Final Rule and request that we declare unlawful and set aside the

9   biological opinion and ITS issued by the Services.

10            B.  <u>Industry Association Petition</u>

11        The second petition, filed by several industry associations we refer to

12   collectively as "UWAG,"[8] challenges the Rule primarily on the grounds that:

13   (1) the EPA exceeded its authority under the CWA; (2) the Services violated the

14   ESA by, among other things, issuing a biological opinion that relied on an

---

Riverkeeper Network, Raritan Baykeeper, Inc., d/b/a NY/NJ Baykeeper, Hackensack
Riverkeeper, Casco Baykeeper, Save the Bay – Narragansett Bay, Scenic Hudson, Inc.,
Sierra Club, Waterkeeper Alliance, Inc., Soundkeeper, Inc., Surfrider Foundation,
Center for Biological Diversity, Louisiana Environmental Action Network, California
Coastkeeper Alliance, Humboldt Baykeeper, Suncoast Waterkeeper, Inc., and Puget
Soundkeeper Alliance.
[8] Utility Water Act Group, Entergy Corporation, Cooling Water Intake Structure
Coalition, and American Petroleum Institute.

FWS-006854

1   erroneous environmental baseline; and (3) the EPA violated the APA by failing

2   to provide notice of and an opportunity to comment on certain provisions of the

3   Rule adopted at the Services' behest.  UWAG requests that we vacate these so-

4   called "Service-driven" provisions and set aside the Services' biological opinion.

5              C.  American Petroleum Institute Petition

6         The third petition, separately filed by the American Petroleum Institute

7   ("API"), argues that the EPA violated the APA when it concluded that

8   manufacturing facilities will incur minimal compliance costs in meeting the

9   Rule's standards for "new units," and when in the proposed rule it defined "new

10  unit" so vaguely that interested parties were deprived of notice and an

11  opportunity to comment.

12             D.  CWIS Coalition Petition

13        The fourth petition, separately filed by the Cooling Water Intake Structure

14  Coalition ("CWIS Coalition" or "Coalition"), argues that the EPA acted

15  arbitrarily and capriciously in violation of the APA with respect to permit

16  application requirements and with respect to requirements for intake structures

17  that withdraw little or no water exclusively for cooling purposes.

FWS-006855

1                                    **DISCUSSION**

2           1.  Jurisdiction

3           We have jurisdiction to review the Final Rule pursuant to CWA section

4    509(b)(1), 33 U.S.C. § 1369(b)(1).  See Riverkeeper II, 475 F.3d at 95.  Because

5    evaluating the biological opinion's "evidentiary and analytic basis is . . . integral

6    to reviewing the EPA's final decision," we can "consider the adequacy of both

7    the section 7 consultation and the [b]iological [o]pinion that resulted from it

8    while reviewing the EPA's final decision."  Defs. of Wildlife v. EPA, 420 F.3d 946,

9    956 (9th Cir. 2005), rev'd on other grounds, Nat'l Ass'n of Home Builders v. Defs.

10   of Wildlife, 551 U.S. 644 (2007).

11          2.  Standard of Review

12          Our substantive review of the Rule has two steps.  "First, we examine the

13   regulation against the statute that contains the [agency's] charge."  Riverkeeper

14   II, 475 F.3d at 95 (quotation marks omitted).  If Congress "has directly spoken to

15   the precise question at issue" and has unambiguously expressed its intent, we

16   must give effect to that intent.  Chevron U.S.A., Inc. v. Nat'l Res. Def. Council,

17   Inc., 467 U.S. 837, 842–43 (1984).  If the statute is silent or ambiguous, we ask only

18   "whether the agency's answer is based on a permissible construction of the

1    statute," id. at 843, that is, we ask whether the agency's action is "arbitrary,

2    capricious, or manifestly contrary to the statute," Riverkeeper I, 358 F.3d at 184

3    (quotation marks omitted).  "Second, if the agency has followed Congress's

4    unambiguously expressed intent or permissibly construed an ambiguous statute,

5    we measure the regulation against the record developed during the rulemaking,"

6    Riverkeeper II, 475 F.3d at 95 (quotation marks omitted), holding it unlawful

7    only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

8    accordance with law," id. (quoting 5 U.S.C. § 706(2)(A)).  Our review is "narrow,

9    limited to examining the administrative record to determine whether the agency

10   decision was based on a consideration of the relevant factors and whether there

11   has been a clear error of judgment."  Riverkeeper I, 358 F.3d at 184 (quotation

12   marks omitted).  Because "we lack the [agencies'] expertise when it comes to

13   scientific or technical matters," id., we look only to see whether the agency

14   "examined the relevant data and articulated a satisfactory explanation for its

15   action," and whether there is a "rational connection between the facts found and

16   the choice made," Nat. Res. Def. Council v. FAA, 564 F.3d 549, 555 (2d Cir. 2009)

17   (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.

18   Co., 463 U.S. 29, 43 (1983)).  We apply the same analysis to the Services'

FWS-006857

1    biological opinion.  See Bennett v. Spear, 520 U.S. 154, 177–78 (1997); Defs. of

2    Wildlife v. U.S. Dep't of the Navy, 733 F.3d 1106, 1114–15 (11th Cir. 2013).

3         We also review the Rule for compliance with the procedural requirements

4    of the APA.  See 5 U.S.C. § 553(b), (c).  In particular, we will remand for further

5    proceedings if an agency fails to comply with the APA's notice-and-comment

6    provisions.  Riverkeeper II, 475 F.3d at 96.

7         With these general principles in mind, we consider first the several

8    challenges raised by the Environmental Petitioners and then turn to the

9    arguments raised by UWAG, API, and the CWIS Coalition.

10        3.  The Environmental Petitioners

11    We address the Environmental Petitioners' broader CWA-based

12    arguments followed by their arguments based on the APA and the ESA.

13             A.  Environmental Petitioners' CWA-Based Challenges[9]

14                  i.  Entrainment Requirements

15        The EPA recognized that closed-cycle cooling is the most effective system

16    for minimizing entrainment.  79 Fed. Reg. at 48,342.  But the EPA also concluded

_____

[9] As a preliminary matter, we deny the Environmental Petitioners' motion to compel the
Respondents to amend the certified list of documents comprising the administrative

1    that significant barriers at many existing facilities prevent retrofitting to

2    incorporate closed-cycle cooling systems.  Id. at 48,340–42.  The EPA therefore

3    decided that closed-cycle cooling is not the best technology actually "available"

4    on a national basis and declined to mandate it for all facilities as the required

5    entrainment technology.  Id.  The EPA also found that there is no alternative

6    high- or intermediate-performing technology that is nationally available to

7    minimize entrainment.  Id. at 48,330.  For that reason, the EPA established that a

8    Director should determine the BTA to limit entrainment on a site-specific basis

9    during the NPDES process, considering the factors identified in the Rule and

10   information that facilities are required to provide under 40 C.F.R. § 122.21(r).  Id.

11   at 48,351–52; see also 40 C.F.R. §§ 122.43(a), 125.98(f).  As contemplated by the

12   Rule, the Director determines the BTA (which may be closed-cycle cooling) at

---

record to include certain specified additional documents.  The Environmental
Petitioners have narrowed the scope of this motion to encompass just seven documents,
all of which are draft documents produced by the Services during consultation with the
EPA.  The Respondents have produced a privilege log that adequately describes the
nature of the seven requested documents and their rationale for classifying those
documents as deliberative and therefore privileged.  See Fed. R. Civ. P. 26(b)(5)(A)(ii).
We see nothing in the privilege log that would disturb the "presumption of regularity"
afforded to the agencies' certified record.  Citizens to Pres. Overton Park, Inc. v. Volpe,
401 U.S. 402, 415 (1971).

FWS-006859

1    each facility and ensures implementation of that technology through NPDES

2    permit conditions.

3        The Environmental Petitioners argue that, in promulgating these

4    entrainment provisions, the EPA violated CWA section 316(b) in four ways.

5        First, the Environmental Petitioners argue that section 316(b) requires the

6    EPA to establish a single, national, categorical entrainment standard.  That might

7    be quite advantageous, but we have already held that "the EPA's decision to

8    regulate some aspects of [CWISs] on a site-specific basis is within its authority

9    and reasonable."  Riverkeeper I, 358 F.3d at 198; see id. at 203 ("The [CWA] does

10   not forbid the EPA from addressing certain environmental problems on a case-

11   by-case basis where categorical regulation is not technologically feasible . . . .").

12   As we explained in Riverkeeper I, section 316(b) "merely directs the EPA to

13   require every [CWIS] subject to regulation . . . to reflect the 'best technology

14   available.'"  Id. at 203.  "It does not compel the EPA to regulate either by one

15   overarching regulation . . . or on a case-by-case basis . . . ."  Id.; see also Nat'l

16   Wildlife Fed'n v. EPA, 286 F.3d 554, 566–67 (D.C. Cir. 2002) (upholding the EPA's

17   decision to regulate color pollution on a case-by-case basis during the NPDES

18   permitting process where the EPA found that the impact of color pollutants

26

1   depended on "highly site-specific conditions" (quotation marks omitted)); <u>Maier,</u>

2   <u>P.E. v. EPA</u>, 114 F.3d 1032, 1043 (10th Cir. 1997).[10]  Here, the EPA found that a

3   "one-size-fits-all" approach to entrainment was infeasible.  79 Fed. Reg. at 48,342.

4   In light of this finding and our precedent, we conclude that the EPA acted both

5   reasonably and within its authority in adopting a case-by-case approach to

6   entrainment standards.  We also reject the Environmental Petitioners' related

7   argument that the EPA inappropriately abdicated its statutory obligation to set

8   standards for entrainment reduction.

9         Second, the Environmental Petitioners argue that the EPA acted arbitrarily

10   and capriciously when it concluded that closed-cycle cooling is not nationally

11   available.  We are not persuaded.  The EPA identified three factors that, in

12   combination, render closed-cycle cooling unavailable on a national scale: first,

13   about 25 percent of facilities have constraints on land availability (<u>e.g.</u>, limited

14   physical space, restrictive zoning requirements) that would prevent them from

---

[10] The Environmental Petitioners' reliance on <u>E.I. du Pont de Nemours & Co. v. Train</u>, 430 U.S. 112 (1977), is misplaced.  There, the Supreme Court held only that section 301 of the CWA does not <u>require</u> the EPA to establish effluent limitations on a site-specific basis, and that the EPA has the authority to issue regulations establishing effluent limitations for classes of power plants.  <u>Id.</u> at 128, 133–36; <u>see</u> <u>Entergy</u>, 556 U.S. at 223 ("[U]nder <u>Chevron</u>, that an agency is not <u>required</u> to do so does not mean that an agency is not <u>permitted</u> to do so.").

FWS-006861

1    retrofitting; second, retrofitting would increase the emission of various

2    pollutants at facilities because of the energy required to retrofit; and third, due to

3    the time required to design and construct closed-cycle systems, facilities nearing

4    the end of their useful lives would not see a net benefit in entrainment reduction

5    resulting from a retrofit.  79 Fed. Reg. at 48,341–42.  As to the first factor, the

6    Environmental Petitioners argue that the 25 percent land availability figure is

7    unsupported by the administrative record.  Although the EPA acknowledged

8    that its data was inadequate to predict with certainty the number of facilities

9    facing space constraints, we decide only whether the data available provided the

10    EPA an adequate basis for its decision.  See Miami-Dade Cty. v. EPA, 529 F.3d

11    1049, 1064–65 (11th Cir. 2008); Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 1004–

12    05 (D.C. Cir. 1997).  Here, the EPA rationally concluded, based on the studies and

13    surveys in the administrative record, that geographic limitations would curtail

14    the availability of closed-cycle cooling at a significant number of facilities.  With

15    respect to the second and third factors, the Environmental Petitioners argue that

16    air pollution and limited remaining useful life do not affect "availability," which

17    they define as "technologically feasible."  Perhaps, but the EPA's different

18    interpretation of "availability" is rational.  See Riverkeeper I, 358 F.3d at 194–96

FWS-006862

1    (concluding that the EPA acted rationally in determining that dry cooling was

2    not nationally available due to its high cost, air emissions resulting from

3    increased energy use, and other factors).  The Environmental Petitioners also

4    fault the EPA for relying in part on a "cost-benefit concern," Envtl. Br. 54, even

5    though, in the Rule's preamble, the EPA disclaimed that costs were a

6    "dispositive factor," 79 Fed. Reg. at 48,340.  Yet even assuming that the EPA

7    compared costs to benefits (direct and indirect) in deciding whether to designate

8    closed-cycle cooling as the BTA, the Environmental Petitioners have not

9    explained why the EPA could not do so to inform its analysis of availability.  See

10   Entergy, 556 U.S. at 218–19 (BTA may "describe the technology that most

11   efficiently produces some good" and may "involve a consideration of the

12   benefits derived from reductions [in adverse environmental impact] and the

13   costs of achieving them").  Indeed, agencies are ordinarily required to consider

14   the relative costs and benefits of a regulation as part of reasoned decisionmaking.

15   See Michigan v. EPA, 135 S. Ct. 2699, 2707 (2015) ("Consideration of cost reflects

16   the understanding that reasonable regulation ordinarily requires paying

17   attention to the advantages and the disadvantages of agency decisions.").  For all

18   of these reasons, we reject the Environmental Petitioners' second argument

FWS-006863

1    under the CWA and hold that the EPA did not act arbitrarily and capriciously in

2    determining that the combination of three "availability" factors justified rejecting

3    a national standard based on closed-cycle cooling.[11]

4         The Environmental Petitioners' third argument under the CWA is that the

5    Rule fails adequately to define "best technology available," leaving Directors

6    with "unfettered discretion" to establish entrainment requirements at individual

7    facilities.  Envtl. Br. 62 (quoting Riverkeeper II, 475 F.3d at 111 n.22).  We do not

8    think the Rule gives Directors excessive discretion.  As the Environmental

9    Petitioners acknowledge, the Rule lists eleven factors that a Director may

10   consider when establishing a site-specific entrainment standard, five of which the

11   Director must consider.  40 C.F.R. § 125.98(f)(2)–(3).  The Environmental

12   Petitioners nonetheless argue that because the Rule provides no guidance on

13   how these factors should be weighed, Directors may "reach and justify any and

14   all decisions on any grounds that they please."  Envtl. Br. 64–65.  Not so.  After a

---

[11] We also reject the Environmental Petitioners' argument that the EPA could have addressed its availability concerns by creating a variance procedure that exempts certain facilities from the Rule's standards.  The existence of other permissible approaches to regulation does not render the EPA's chosen approach irrational.  See Entergy, 556 U.S. at 218.  Moreover, the EPA expressly considered a variance procedure and concluded that, due to the "complex interaction" of several factors limiting the availability of closed-cycle cooling, a variance procedure would be less precise than site-specific balancing of all relevant factors.  See 79 Fed. Reg. at 48,343.

FWS-006864

1    Director considers the required and optional factors set forth in the Rule, which

2    themselves limit her discretion, she must explain to the EPA in writing why she

3    rejected any better-performing technologies.  40 C.F.R. § 125.98(f)(1).  The EPA

4    may then review the Director's explanation and object if it disagrees with the

5    Director's determination of the BTA.  Id. § 123.44; 79 Fed. Reg. at 48,383.  This

6    scheme hardly leaves the Director's determination of the BTA "virtually

7    unreviewable."  Envtl. Br. 66.

8         Finally, the Environmental Petitioners argue that the EPA exceeded its

9    statutory authority by allowing Directors to base their BTA determinations in

10   part on a cost-benefit analysis.  See 40 C.F.R. § 125.98(f)(2)(v), (f)(4).  As noted

11   above, the Supreme Court held in Entergy that the EPA may weigh costs against

12   benefits when setting BTA standards under section 316(b).  556 U.S. at 218–20,

13   226.  The Environmental Petitioners acknowledge Entergy but insist that the

14   Court "did not give its blessing to all forms of cost-benefit analysis," endorsing it

15   only where necessary to prevent "extreme disparities" between costs and

16   benefits.  Envtl. Br. 66, 70.  We do not read Entergy so narrowly.  Although the

17   Court in Entergy noted that the EPA, in the Phase II rule, had "sought only to

18   avoid extreme disparities between costs and benefits," 556 U.S. at 224, it held that

FWS-006865

1    the EPA may generally "rel[y] on cost-benefit analysis" in promulgating

2    standards pursuant to section 316(b), id. at 218–22, 226, and emphasized that

3    section 316(b)'s silence on the permissibility of cost-benefit analysis "convey[s]

4    nothing more than a refusal to tie the agency's hands as to whether cost-benefit

5    analysis should be used, and if so to what degree," id. at 222.  And although the

6    Environmental Petitioners argue that the Supreme Court did not explicitly

7    approve the delegation of authority to consider costs and benefits to individual

8    Directors, they fail to explain why Directors would be precluded from

9    considering the same factors the EPA could have considered had it chosen to

10    establish a national, categorical standard.

11        For these reasons, we reject the Environmental Petitioners' CWA-based

12    challenges to the Rule's entrainment requirements.

13                ii.    Impingement Requirements

14        The EPA also declined to adopt closed-cycle cooling as the BTA to

15    minimize impingement mortality at existing facilities, largely for the same

16    reasons it identified with respect to entrainment.  See 79 Fed. Reg. at 48,325,

17    48,343.  Instead, the EPA determined that "modified traveling screens with a

1    fish-friendly fish return" constitute the BTA.[12] Id. at 48,329, 48,337.  The EPA

2    projected that these screens will achieve, on average, a 76 percent survival rate

3    (in other words, reduce impingement mortality to no more than 24 percent).  Id.

4    at 48,337 (citing 40 C.F.R. § 125.94(c)(7)).  Under the Rule's impingement

5    provisions, a regulated facility may choose from seven compliance options that

6    reduce impingement mortality, including any type of "modified traveling

7    screen" that meets the Rule's definition and that the facility demonstrates to the

8    Director is the BTA at that particular site.  See 40 C.F.R. § 125.94(c)(1)–(7); 79 Fed.

9    Reg. at 48,321.  The Environmental Petitioners argue primarily that these

10   impingement provisions violate the CWA in three ways.

11       First, the Environmental Petitioners argue that closed-cycle cooling, not

12   modified traveling screens, is the BTA for minimizing impingement mortality.

13   But as with the Rule's entrainment standards, the EPA rationally concluded that

14   closed-cycle cooling is not nationally available.  Therefore, it was neither

15   arbitrary nor capricious for it to reject closed-cycle cooling as the BTA to reduce

16   impingement mortality nationwide.

---

[12] A traveling screen is a mesh screen that prevents debris from entering an intake system.  A modified traveling screen is a traveling screen that incorporates certain features to protect aquatic organisms, such as a gentle vacuum that returns fish to the water.

FWS-006867

1    Second, the Environmental Petitioners contend that even if the EPA's BTA

2    determination were lawful, the Rule violates the CWA because it fails to ensure

3    that regulated facilities will meet the 76 percent survival rate standard set forth

4    in 40 C.F.R. § 125.94(c)(7).  Specifically, they argue that two of the seven options

5    for reducing impingement mortality, 40 C.F.R. § 125.94(c)(6) and (c)(5), are

6    "loopholes" that allow regulated facilities to avoid complying with the 76

7    percent standard and that "impose[] no standard at all."  Envtl. Br. 75–76.  One of

8    these two options allows a facility to "operate a system of technologies,

9    management practices, and operational measures" that "the Director determines

10    is the [BTA] for impingement reduction" at that particular site.  40 C.F.R.

11    § 125.94(c)(6).  To avail itself of this option, a facility must submit an

12    "impingement technology performance optimization study" under 40 C.F.R.

13    § 122.21(r)(6) that includes at least two years of biological data and describes the

14    technologies that will be used to minimize impingement mortality.  Id.

15    § 125.94(c)(6).  The Director's determination will then "be informed" by

16    comparing the study results to the 76 percent standard.  Id.  Although the

17    Environmental Petitioners complain that this language does not technically

18    require compliance with the 76 percent standard, we conclude that the EPA acted

FWS-006868

1    rationally in affording Directors some discretion to determine whether a

2    particular facility's impingement reduction efforts are adequate, especially

3    because, as the EPA persuasively explained, the overall impingement reduction

4    at a particular site cannot always be measured strictly by survival or mortality

5    percentages.  See 79 Fed. Reg. at 48,365.

6         The other compliance option challenged by the Environmental Petitioners

7    allows facilities to operate a "modified traveling screen" that meets the definition

8    set forth in 40 C.F.R. § 125.92(s) and "is the [BTA] for impingement reduction at

9    the site."  40 C.F.R. § 125.94(c)(5) (emphasis added).  Relying on Riverkeeper II,

10   the Environmental Petitioners argue that this provision does not require facilities

11   to meet the 76 percent standard or even require a Director's decision to be

12   "informed" by that standard, allowing facilities to choose a type of modified

13   traveling screen that does not achieve the 76 percent survival rate.  But

14   Riverkeeper II does not support the Environmental Petitioners' position.  There

15   we held that the EPA may set national performance standards as ranges so long

16   as it "require[s] facilities to minimize the adverse environmental impacts

17   attributable to their [CWISs] to the best degree they can."  Riverkeeper II, 475

18   F.3d at 105 (emphasis added); see also id. at 106 (EPA should "require facilities to

1  choose technologies that produce the greatest reduction possible" within the

2  ranges). That is essentially what the EPA has done here. A facility may choose

3  the modified traveling screen option only when "the Director determines [that it]

4  is the [BTA] for impingement reduction at the site," that is, only when a facility

5  shows that "the technology is or will be optimized to minimize impingement

6  mortality of all non-fragile species." 40 C.F.R. § 125.94(c)(5); see also 79 Fed. Reg.

7  at 48,325, 48,346. Further, the Director must include in the permit "verifiable and

8  enforceable . . . conditions that ensure the technology will perform as

9  demonstrated." 40 C.F.R. § 125.94(c)(5); 79 Fed. Reg. at 48,329. Under certain

10 circumstances, the Director can also require additional protective measures that

11 must be incorporated into the permit. See 40 C.F.R. § 125.94(c)(8)–(9), (g). This

12 process adequately ensures that a modified traveling screen at a particular site is

13 in fact the BTA for reducing impingement mortality at that site.

14     The third way in which these impingement provisions violate the CWA,

15 the Environmental Petitioners argue, is that the EPA arbitrarily excluded fragile

16 species from the calculation of impingement mortality. Under 40 C.F.R.

17 § 125.94(c)(7), a facility meets the impingement mortality standard so long as no

18 more than 24 percent of "non-fragile species" are killed. The EPA has explained,

1 though, that it excluded fragile species because its data showed that the mortality

2 of those species depends largely on natural conditions, not technology

3 performance.  Including fragile species in the mortality calculation would

4 therefore mask the true effectiveness of the technology and render it impossible

5 to identify a BTA to minimize impingement.  The EPA's explanation is

6 adequately supported by the administrative record, and the Environmental

7 Petitioners point to no evidence suggesting that it is irrational.

8           B.  Environmental Petitioners' APA-Based Challenge

9           We turn to the Environmental Petitioners' challenge under the APA to the

10 definition of "new unit."  The EPA determined that "new units" at existing

11 facilities, like the "new facilities" covered by the Phase I rule, 40 C.F.R. § 125.83

12 (defining "new facility"), must meet performance standards commensurate with

13 those that may be attained by closed-cycle cooling, id. § 125.94(e)(1)–(2).  It

14 defined "new unit" to exclude rebuilt, repowered, and replacement units at

15 existing facilities, such that only "new stand-alone" units added after October 14,

16 2014 are subject to the more stringent closed-cycle standard.  Id. § 125.92(u)

17 (quotation marks omitted); see 79 Fed. Reg. at 48,311.  The Environmental

18 Petitioners argue that there is no rational connection between the facts found by

FWS-006871

1   the EPA and its decision to exclude rebuilt, repowered, and replacement units

2   from the definition of "new unit."  We disagree.

3        Responding to comments on the proposed rule, the EPA explained that it

4   excluded rebuilt units for two primary reasons: first, including rebuilt units

5   would discourage manufacturers from improving their facilities; and

6   second, many activities that could be considered "rebuilding" or "repowering"

7   would raise the same hurdles that led the EPA to conclude that closed-cycle

8   cooling was not nationally available.  The Rule's preamble reflects the same

9   concerns.  See 79 Fed. Reg. at 48,311, 48,339.  The EPA thus "articulate[d] a

10  satisfactory explanation for" limiting the definition of "new unit," and there is a

11  "rational connection between the facts found and the choice made."  State Farm,

12  463 U.S. at 43 (quotation marks omitted).

13        The Environmental Petitioners stress that the EPA narrowed the definition

14  of "new unit" that appeared in the proposed rule.  But an agency may modify a

15  rule through the notice-and-comment process so long as the agency's

16  modification is rational and "the agency's path may reasonably be discerned."

17  Id. (quotation marks omitted); see also Ne. Md. Waste Disposal Auth. v. EPA,

18  358 F.3d 936, 951 (D.C. Cir. 2004) ("Agencies[] are free—indeed, they are

FWS-006872

1  encouraged—to modify proposed rules as a result of the comments they

2  receive.").  Here, the EPA explained why it ultimately defined "new unit" in the

3  manner it did after the notice-and-comment period, and we discern no "clear

4  error of judgment" in its explanation.  See Nat. Res. Def. Council, Inc. v.

5  Muszynski, 268 F.3d 91, 97 (2d Cir. 2001) (quotation marks omitted).

6  Accordingly, we decline to vacate this portion of the Rule.

7                    C.  Environmental Petitioners' ESA-Based Challenges

8        The Environmental Petitioners next challenge various elements of the

9  section 7 consultation process—relating to the Services' biological opinion and

10  ITS—as inconsistent with the ESA and the Services' own implementing

11  regulations.

12                    i.  The Biological Opinion

13        The Environmental Petitioners argue that the Services' biological opinion

14  violates section 7 of the ESA by (1) deferring analysis of the Rule's impact on

15  jeopardy to later review by individual Directors; (2) failing to use the best

16  scientific and commercial data available to evaluate thermal impacts of the Rule;

17  (3) failing to analyze the Rule's effect on species under the FWS's jurisdiction;

18  and (4) concluding that the Rule is unlikely to jeopardize ESA-listed species or

1   adversely modify their critical habitat.  We reject each of these arguments, most

2   of which are really challenges to the Services' "programmatic" approach to the

3   biological opinion.

4              a.  <u>Jeopardy Analysis</u>

5        As stated above, section 7 of the ESA requires federal agencies, in

6   consultation with the Services, to "insure that any action authorized, funded, or

7   carried out by" the agency "is not likely to jeopardize the continued existence of

8   any endangered species or threatened species" or destroy or adversely modify

9   any critical habitat designated for such species.  16 U.S.C. § 1536(a)(2).  In

10  evaluating the Rule, the Services determined that a "programmatic," or process-

11  based, approach was appropriate.  Bio. Op. 36.  Instead of site- and species-

12  specific analyses, this approach involves "examin[ing] whether and to what

13  degree [the] EPA has structured" the Rule to satisfy section 7's mandate.  <u>Id.</u>

14  Applying this approach, the Services concluded that the Rule was unlikely to

15  jeopardize listed species because it "built in a sufficient process" to avoid

16  jeopardy (<u>e.g.</u>, giving the Services a meaningful opportunity to review permit

17  applications and to recommend control measures and requirements for

18  monitoring and reporting).  <u>Id.</u> at 72.  As this "technical assistance process" was

1    critical to the Services' no-jeopardy conclusion, we briefly describe its key

2    features below.

3          The Rule contemplates that regulated facilities must include in their permit

4    applications information about the presence of ESA-listed species.  40 C.F.R.

5    § 125.95(f).  The Director who reviews the application then sends it to the

6    Services for a sixty-day review period, after which the Director must publish any

7    information or recommendations the Services provide.  Id. § 125.98(h); 79 Fed.

8    Reg. at 48,382.  In those jurisdictions where a Director administers the permitting

9    process, the Services may raise concerns with the EPA, which can then

10   coordinate with the Director to comply with the CWA and the ESA.

11   Alternatively, the EPA may federalize the permit and initiate formal consultation

12   with the Services pursuant to section 7 of the ESA.  See 40 C.F.R. § 123.44; 79 Fed.

13   Reg. at 48,381–83.

14         The Environmental Petitioners object, first, that "there is no formal

15   assurance that such a process will, in fact, be followed."  Envtl. Br. 98.  Although

16   the Rule explicitly requires Directors to send permit applications and draft

17   permits to the Services, 40 C.F.R. § 125.98(h), the Rule's preamble, they point out,

18   characterizes the Services' role as reflecting the EPA's "expectations," see, e.g., 79

FWS-006875

1    Fed. Reg. at 48,381 ("EPA expects that the Services will respond within 60 days

2    and provide to the Director . . . any measures that the Services recommend . . . for

3    the protection of listed species . . . ." (emphasis added)).  True, but the Rule itself

4    is properly interpreted to require the Services' participation in the technical

5    assistance process because that process is part of the proposed action the Services

6    approved pursuant to formal consultation.  See Ctr. for Bio. Diversity v. FWS, 807

7    F.3d 1031, 1046 & n.12 (9th Cir. 2015) (proposed conservation measures in

8    challenged memorandum of agreement were enforceable because they were

9    "included as part of the project consulted upon" (quotation marks omitted)); see

10    also FWS & NMFS, Endangered Species Consultation Handbook: Procedures for

11    Conducting Consultation and Conference Activities Under Section 7 of the

12    Endangered Species Act at 4-19 (1998) ("Consultation Handbook") ("Since

13    conservation measures are part of the proposed action, their implementation is

14    required under the terms of the consultation.").[13]  We do not presume that an

15    agency will act in accordance with "expectations" set out in a governing

16    regulation.  Rather, we reach the much more limited conclusion that where, as

_____

[13] Moreover, formal consultation can be reinitiated if any of "the assumptions about the [technical assistance] process . . . are not being followed."  Bio. Op. 78–79.

FWS-006876

1    here, the Services conditioned their no-jeopardy finding on compliance with

2    certain procedures and represented to this Court at oral argument that they have

3    a "commitment" to those procedures, Oral Arg. Tr. 33:11, the Rule obligates the

4    Services to abide by those procedures.  If the Services fail to honor the obligations

5    specified in the Rule's technical assistance provisions, the Environmental

6    Petitioners may challenge individual permits pursuant to the ESA's citizen-suit

7    provisions once those permits issue.  See 16 U.S.C. § 1540(g)(1)(A).

8         The Environmental Petitioners also contend that even if the technical

9    assistance process is binding, the Services nonetheless contravened the ESA and

10   its implementing regulations by deferring analysis of the Rule's impact on

11   jeopardy to the permit-specific review stage.  According to the Environmental

12   Petitioners, the Services improperly disregarded their obligation to "consider all

13   phases" of the agency action in their initial biological opinion, as the Ninth

14   Circuit appears to require.  Envtl. Br. 100 (citing Conner v. Burford, 848 F.2d

15   1441, 1453–54 (9th Cir. 1988)).  But "the rule that biological opinions must be

16   coextensive in scope with the entire action or else violate the ESA is nowhere to

17   be found in the language of the ESA," Defs. of Wildlife, 733 F.3d at 1121

18   (quotation marks omitted), and, like the Eleventh Circuit, we decline to adopt

1    such a rule here.[14]  Nothing in the ESA requires that the Services assess every

2    future "phase" of an agency action on a site-specific or species-specific basis.

3    Therefore, properly construing the agency action as the promulgation of CWA

4    section 316(b) standards, the Services discharged their duty to assess "the effects

5    of the action as a whole" in their biological opinion.  50 C.F.R. § 402.14(c).

6                                      b.  Thermal Impacts

7         The Services similarly deferred consideration of how thermal pollution

8    resulting from the operation of CWISs would affect aquatic ecosystems.  They

9    explained in the biological opinion that "[t]o date, [the] EPA has not been able to

10   reliably estimate the impact of thermal discharge associated with CWIS

_____

[14] In any event, the Services' biological opinion would satisfy even the Ninth Circuit's
purported rule.  The "agency action" subject to consultation here was the EPA's
promulgation of the Rule, not the subsequent implementation of the Rule by State
Directors.  See 50 C.F.R. § 402.03 (section 7 consultation requirement applies only to
"actions in which there is discretionary Federal involvement or control"); Nat'l Ass'n of
Home Builders, 551 U.S. at 650, 653 n.4 ("If [permitting] authority is transferred [from
the EPA to a State], then state officials—not the federal EPA—have the primary
responsibility for reviewing and approving NPDES discharge permits, albeit with
continuing EPA oversight.").  To the extent future permits affect ESA-listed species,
those effects are not "phases" of the Rule, Envtl. Br. 100, but, as the Services concluded,
"indirect effects" of the Rule, 50 C.F.R. §§ 402.02, 402.14(g)(3).

    For similar reasons, we reject the Environmental Petitioners' complaint that the
technical assistance process "is not the equivalent of" section 7 consultation.  Envtl. Br.
106.  In those jurisdictions where the State administers the NPDES program, the
Services have no obligation to conduct section 7 consultation or its "equivalent" on
individual permits because the issuance of such a permit is not a federal action.

44

1    operations on federally-listed species or designated critical habitat."  Bio. Op. 51.

2    Instead of relying on available data, the Services thought it enough that the EPA

3    committed to overseeing the technical assistance process, "which will allow [the]

4    EPA to more reliably estimate the . . . stressors that are likely to be produced as a

5    direct or indirect result of thermal discharge activities" at individual facilities.

6    Id.  The Environmental Petitioners argue that the Services thus shirked their

7    statutory responsibility to consider the "best scientific and commercial data

8    available."  16 U.S.C. § 1536(a)(2).  They claim that available modeling techniques

9    would have allowed the Services to estimate thermal pollution in the biological

10   opinion rather than defer analysis to the permitting process.

11         As an initial matter, we disagree with the Environmental Petitioners that

12   the Services failed to "seek out and consider" existing scientific data on thermal

13   pollution.  Miccosukee Tribe of Indians v. United States, 566 F.3d 1257, 1265 (11th

14   Cir. 2009); see Bio. Op. App'x C, at 41 (citing a report on thermal stressors the

15   Environmental Petitioners suggest was ignored).  Rather, evidently aware of this

16   data and the risk of environmental harm from thermal pollution, the Services

17   nonetheless agreed with the EPA that "[t]he exact nature and magnitude of . . .

18   indirect effects [including thermal pollution] would be species-specific based on

1   the relative size and amount of overlap of habitat with facility and CWIS

2   locations . . . and many other factors."  Bio. Op. 42 (quotation marks omitted).

3        The more central question, then, is not whether the Services considered

4   available data, but whether they were authorized to determine that there was no

5   "best . . . data available" that would enable assessment of thermal pollution on a

6   national scale, 16 U.S.C. § 1536(a)(2), and therefore to defer consideration of

7   thermal impacts to the site-specific permitting process.

8        We conclude that they were so authorized.  We find support for our

9   conclusion in the Eleventh Circuit's 2013 decision in Defenders of Wildlife, 733

10  F.3d 1106.  Petitioners there challenged a biological opinion issued by the NMFS

11  that approved the installation of an "Undersea Warfare Training Range" and

12  allegedly deferred any consideration of the effects of operations expected to

13  occur on that range until those operations were actually authorized.  Id. at 1113–

14  14, 1118.  The Eleventh Circuit concluded both that the NMFS adequately

15  considered the effects of future operations in its initial biological opinion and

16  that the NMFS was authorized to reconsider those effects in a new biological

17  opinion "closer in time to when [the] operations will actually commence."  Id. at

18  1122.

1     We agree with the Eleventh Circuit that, as long as the initial stage of an

2 agency's project "does not foreclose the adoption of . . . reasonable and prudent

3 measures [to avoid jeopardy], and as long as the conclusions of the biological

4 opinion are not arbitrary, a staged structuring of consultation may comply fully

5 with Section 7's mandate." Id. Far from being arbitrary, the Services' conclusion

6 here that a categorical assessment of thermal impacts was infeasible reflects a

7 "scientific determination deserving deference," Miccosukee Tribe, 566 F.3d at

8 1265, and nothing else compels us to order that consultation be carried out in

9 some other manner, see Defs. of Wildlife, 733 F.3d at 1121–22. We therefore hold

10 that the Services did not violate their statutory obligations when they decided to

11 solicit more data (during the permitting process) in order to assess thermal

12 impacts on a site-specific basis.

13          c.  Species Within the FWS's Jurisdiction

14     The Environmental Petitioners next argue that the FWS failed adequately

15 to analyze the Rule's effect on species within its jurisdiction before making a no-

16 jeopardy determination. Unlike the NMFS, which provided detailed appendices

17 containing information on species under its jurisdiction, the FWS provided one

18 section in the biological opinion that, according to the Environmental Petitioners,

1    is "cursory to the point of meaninglessness" and fails to satisfy the FWS's duty

2    under 16 U.S.C. § 1536(b)(3)(A) to "detail[] how the agency action affects . . .

3    species or [their] critical habitat." Envtl. Br. 131–32. As the Environmental

4    Petitioners acknowledge, however, a biological opinion need only include the

5    following elements: "the current status of the species, the environmental

6    baseline, the effects of the proposed action, and the cumulative effects of the

7    proposed action." Gifford Pinchot Task Force v. FWS, 378 F.3d 1059, 1063 (9th

8    Cir. 2004) (citing 50 C.F.R. § 402.14(g)(2)–(3)), superseded on other grounds by

9    Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed.

10   Reg. 7214 (Feb. 11, 2016) (codified at 50 C.F.R. § 402.02). Here, the FWS provided

11   the current status of the species and the environmental baseline but, relying on

12   the protections of the technical assistance process, deferred evaluation of the

13   Rule's effects on the species within its jurisdiction. At bottom, then, the

14   Environmental Petitioners' argument is yet another challenge to the Services'

15   programmatic approach, and we reject it for the same reasons stated above with

16   respect to the Services' analysis of thermal impacts.

1                          d.  No-Jeopardy Conclusion

2          Having resolved the Environmental Petitioners' various challenges to the

3    Services' programmatic approach, we now turn to their attack on the Services'

4    substantive conclusion that the Rule, including the protections of the technical

5    assistance process, is "not likely to jeopardize the continued existence of ESA-

6    listed species" or destroy or adversely modify their critical habitat.  Bio. Op. 71.

7    The Environmental Petitioners argue that the administrative record does not

8    support the Services' conclusion because the Services failed to consider four

9    factors: the current jeopardy of numerous listed species, the impact on listed

10   species during the Rule's indefinite implementation period, the Rule's impact on

11   species recovery (as opposed to species survival), and the discretionary nature of

12   the technical assistance process.  We address each of these factors in turn.

13         First, the Environmental Petitioners fault the Services for reaching a no-

14   jeopardy conclusion after they identified several species that are currently or

15   nearly in jeopardy.  They argue that the Services may not sanction agency action

16   that causes any additional harm and thus "deepens" jeopardy.  Envtl. Br. 110

17   (quoting Nat'l Wildlife Fed'n v. NMFS, 524 F.3d 917, 930 (9th Cir. 2008)).  But the

18   Services made no formal finding that any species are, as the Environmental

1    Petitioners contend, "currently in jeopardy or nearly so."  Envtl. Br. 110.  The

2    NMFS found only that continued operation of CWISs under the Rule would have

3    adverse impacts on species that are threatened or whose status is "precarious."

4    See, e.g., Bio. Op. App'x B, at 15; Bio. Op. App'x C, at 53.  Were this finding

5    enough to foreclose a no-jeopardy conclusion, even the Environmental

6    Petitioners' preferred solution of mandating closed-cycle cooling—which, after

7    all, would not eliminate impingement and entrainment of threatened species by

8    CWISs—would fail ESA consultation.

9        Second, the Environmental Petitioners claim that the biological opinion

10   "ignores the harm that will occur during the significant time lag . . . between the

11   effective date of the Rule and implementation of any protective measures for

12   listed species at specific facilities."  Envtl. Br. 115.  This argument rests on a

13   misunderstanding of the actions subject to section 7 consultation.  Section 7 tasks

14   the Services with analyzing the effects of the EPA's proposed action.  "Take"

15   resulting from CWIS operations at facilities operating under permits issued prior

16   to the Rule, see 16 U.S.C. § 1538(a)(1)(B), (G), and which the EPA has no

17   authority to modify, is not an "effect" of the Rule and is therefore not subject to

1   analysis by the Services.[15]  To the extent the Environmental Petitioners object to

2   the "significant lag time in the Rule's implementation," Envtl. Reply Br. 82, that

3   lag time, without more, is not arbitrary or capricious, especially where, as here,

4   the EPA reasonably explained why it may take three to fourteen years to fully

5   implement the Rule, see 79 Fed. Reg. at 48,358–60.

6          Third, the Environmental Petitioners argue that the Services failed to

7   consider whether the Rule would hinder the recovery of listed species.  As part

8   of their jeopardy analysis, the Services were required to consider the Rule's

9   impact on species recovery, in addition to species survival.  See Nat'l Wildlife

10  Fed'n, 524 F.3d at 932.  But an independent analysis of recovery is not required,

11  see Rock Creek All. v. FWS, 663 F.3d 439, 443 (9th Cir. 2011), in part because it is

12  hard to "draw clear-cut distinctions" between survival and recovery, 51 Fed.

13  Reg. 19,926, 19,934 (June 3, 1986).  Nevertheless, the Services here recognized the

14  need to "assess[] whether the action would appreciably reduce the likelihood of

15  recovery of listed species," Bio. Op. 17, and concluded that the Rule "has built in

---

[15] The Rule makes clear that it does not independently authorize take.  40 C.F.R.
§§ 125.90, 125.94(c)(11), 125.98(b)(1), 125.98(j); see 79 Fed. Reg. at 48,382.  If a facility
engages in unlawful take before the Rule is fully implemented, the Environmental
Petitioners may file an action against that facility to enjoin the take.  See 16 U.S.C.
§ 1540(g).

1    a sufficient [technical assistance] process to insure that it is not likely to result in

2    an appreciable reduction in the likelihood of both the survival <u>and recovery</u> of

3    any listed species," <u>id.</u> at 72 (emphasis added).  The Services therefore did not

4    "avoid . . . consideration of recovery impacts," <u>Nat'l Wildlife Fed'n</u>, 524 F.3d at

5    932, but rather concluded that such impacts, like survival impacts, should be

6    assessed on a site-specific basis—an approach that complies with the ESA.

7          Finally, the Environmental Petitioners maintain that even if the Services

8    can rely on a rule's process-based protections rather than analyze its substantive

9    impacts, <u>this</u> Rule's technical assistance process cannot support a no-jeopardy

10   finding because it is "wholly voluntary" and "not designed to provide

11   meaningful species protection," as it fails to promote the use of closed-cycle

12   cooling.  Envtl. Br. 120–21.  We reject this argument because, as explained, the

13   technical assistance process involves a binding commitment by the Services, and

14   the EPA acted reasonably in declining to mandate standards based on closed-

15   cycle cooling.

16                    ii.  <u>The Incidental Take Statement</u>

17          In their final challenge, the Environmental Petitioners contend that the

18   Services failed to comply with the provisions of the ESA that specify

1    requirements for ITSs.  If a consulting Service concludes after formal consultation

2    that the incidental take of listed species will not cause jeopardy, that Service

3    "shall" provide the acting agency with an ITS that:

4        (i)    specifies the impact of such incidental taking on the species,
5        (ii)   specifies those reasonable and prudent measures that the
6              [Service] considers necessary or appropriate to minimize such
7              impact,
8        (iii)  in the case of marine mammals, specifies those measures that
9              are necessary to comply with section 1371(a)(5) of [the Marine
10             Mammal Protection Act] with regard to such taking, and
11       (iv)  sets forth the terms and conditions (including, but not limited
12             to, reporting requirements) that must be complied with by the
13             Federal agency . . . to implement the measures specified under
14             clauses (ii) and (iii).
15
16   16 U.S.C. § 1536(b)(4).  The Environmental Petitioners assert that the ITS issued

17   by the Services here is deficient in all four respects.

18       The Services' ITS fails to specify the impact of the take, the Environmental

19   Petitioners argue, because it does not numerically quantify the Rule's anticipated

20   take.  It is true that Congress preferred expressing take in numerical form, so as

21   to establish a "trigger" for the re-initiation of consultation.  See Endangered

22   Species Act, H.R. Rep. No. 97-567, at 27 (1982); Ariz. Cattle Growers' Ass'n v.

23   FWS, 273 F.3d 1229, 1249 (9th Cir. 2001).  But Congress also acknowledged that a

24   "precise number" is not always available.  H.R. Rep. No. 97-567, at 27; see Ariz.

1    <u>Cattle Growers' Ass'n</u>, 273 F.3d at 1249 ("We have never held that a numerical

2    limit is required.").  Therefore, although an ITS that "contains no numerical cap

3    . . . normally violates the ESA," such an ITS is adequate if it "explain[s] why it

4    was impracticable to express a numerical measure of take."  <u>Ctr. for Bio.</u>

5    <u>Diversity v. U.S. Bureau of Land Mgmt.</u>, 698 F.3d 1101, 1126–27 (9th Cir. 2012)

6    (quotation marks omitted); <u>see also</u> <u>Miccosukee Tribe</u>, 566 F.3d at 1275.  The ITS

7    here explains that the "paucity of information" about facilities with CWISs

8    prevented the Services from quantifying anticipated take at this juncture, and it

9    contemplates that the Services' field offices will quantify incidental take at

10   individual facilities as part of the technical assistance process.  Bio. Op. 75–76.

11   Given the Services' commitment to the technical assistance process, their

12   justification for not immediately quantifying take is adequate.

13        The Environmental Petitioners next assert that the Services' ITS failed to

14   specify "reasonable and prudent measures" to minimize the impact of incidental

15   take on listed species, in contravention of 16 U.S.C. § 1536(b)(4)(ii), or to set forth

16   terms and conditions required to implement those measures, in contravention of

17   16 U.S.C. § 1536(b)(4)(iv) and 50 C.F.R. § 402.14(i)(1)(iv).  But the ITS <u>does</u>

18   identify one reasonable and prudent measure, namely, that the "EPA will use its

FWS-006888

1    authorities under the CWA to minimize impacts to listed species pursuant to the

2    [section] 316(b) Rule and [the] CWA."  Bio. Op. 76.  The ITS also includes various

3    administrative conditions, like a detailed annual reporting requirement, and

4    several substantive implementing conditions.  It specifies, for example, that the

5    EPA will ask Directors to reopen continued permits if the Services determine that

6    a facility's CWIS operations may have more than minor detrimental effects on

7    listed species.  These elements of the ITS are adequate.  The ESA does not

8    mandate any particular form or content for reasonable and prudent measures,

9    requiring only that the Services identify measures that they "consider[] necessary

10   or appropriate" to minimize the impact of incidental take.[16]  16 U.S.C.

11   § 1536(b)(4)(ii).  And contrary to the Environmental Petitioners' assertion, the

12   Services have not "delegate[d]" the task of determining reasonable and prudent

13   measures to the EPA.  Envtl. Br. 124.  Rather, the Services specified as a

14   reasonable and prudent measure that the EPA must exercise its oversight

15   authority under the CWA in connection with the Rule's technical assistance

16   process.  Their reliance on the binding technical assistance process was a

---

[16] The ESA's implementing regulations, far from demanding an extensive list of reasonable and prudent measures or terms and conditions, specify only that these elements of the ITS "cannot alter the basic design, location, scope, duration, or timing of the [agency] action and may involve only minor changes."  50 C.F.R. § 402.14(i)(2).

FWS-006889

1    "meaningful . . . attempt to minimize incidental takings associated with the

2    project."  Or. Nat. Res. Council v. Allen, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007).

3        Finally, the Environmental Petitioners assert that the ITS fails to include

4    measures necessary to comply with the Marine Mammal Protection Act

5    ("MMPA") and that the NMFS unlawfully failed to prescribe regulations under

6    section 1371(a)(5) of the MMPA that set forth permissible methods of taking

7    marine mammals due to the operation of CWISs.[17]  We are not persuaded,

8    especially because the biological opinion contemplates that facilities whose

9    CWISs may affect certain marine mammals or their critical habitat will be

10    required to "[i]nstall large organism excluder devices" and contact the NMFS "to

11    determine whether [they] need to apply for a[n] [MMPA] permit."  Bio. Op.

12    App'x D, at 1.  The biological opinion thus outlines a procedure under which

---

[17] Section 1371(a)(5)(A)(i) provides that the NMFS may authorize the incidental taking of small numbers of marine mammals if it:

> (I) finds that the total of such taking . . . will have a negligible impact on such species or stock . . . ; and (II) prescribes regulations setting forth—
> (aa) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat . . . ; and (bb) requirements pertaining to the monitoring and reporting of such taking.

16 U.S.C. § 1371(a)(5)(A)(i).

FWS-006890

1   either no marine mammals are taken or, if necessary, the NMFS will authorize

2   take pursuant to the MMPA in the context of individual permit applications.

3       For these reasons, we reject the Environmental Petitioners' challenges to

4   the ITS under the ESA.

5       4.   The Industry Petitioners

6       We now turn to the three petitions for review filed by the Industry

7   Petitioners—UWAG, API, and the CWIS Coalition.

8           A.   UWAG

9       UWAG challenges on procedural and substantive grounds what it

10  describes as the "Service-driven" provisions of the Rule (including provisions

11  relating to the technical assistance process) that the EPA added after formal

12  consultation to minimize harm to listed species resulting from the operation of

13  CWISs.

14               i.   Procedural Challenges

15      UWAG contends that the EPA violated the APA by failing to provide

16  adequate notice of and an opportunity to comment on the Rule's Service-driven

17  provisions, the EPA's biological evaluation, the Services' biological opinion, and

18  the underlying data that supported each.  See 5 U.S.C. § 553(b), (c).  But there is

1    no "independent right to public comment with regard to consultations

2    conducted under § 7(a)(2)" of the ESA.  Nat'l Ass'n of Home Builders, 551 U.S. at

3    660 n.6.  So no procedural infirmity arises in failing to provide notice of or an

4    opportunity to comment on the biological opinion or other determinations by the

5    Services.  See id. ("Nothing in section 7 authorizes or requires the Service[s] to

6    provide for public involvement (other than that of the applicant) in the

7    'interagency' consultation process." (quoting 51 Fed. Reg. at 19,928)).  Unless the

8    scientific material discussed in the biological opinion ultimately formed the

9    "basis" of the EPA's rule, the public was not entitled to comment on it.  See

10   United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 252 (2d Cir. 1977).

11       As for the Rule itself, the EPA was required only to "fairly apprise

12   interested persons of the subjects and issues of [its] rulemaking."  Nat'l Black

13   Media Coal., 791 F.2d at 1022 (quotation marks omitted).  "The final rule need

14   only be a logical outgrowth of the proposed rule, not an exact replica of it."

15   Riverkeeper I, 358 F.3d at 202 (quotation marks omitted); see also Riverkeeper II,

16   475 F.3d at 116 ("An agency cannot pull a surprise switcheroo on interested

17   parties between a proposal and the issuance of a final rule." (quotation marks

18   omitted)); Ne. Md. Waste Disposal, 358 F.3d at 951–52.  Here, the proposed rule

FWS-006892

1    addressed potential impacts on listed species.  It would have required Directors

2    to identify the benefits of available technologies to threatened and endangered

3    species, 76 Fed. Reg. at 22,288, and NPDES permit applicants to submit

4    information on all threatened and endangered species susceptible to

5    impingement and entrainment at their CWISs, id. at 22,276.  The proposed rule

6    also contemplated input from the Services by allowing Directors to confer with

7    both the EPA and the Services when issuing permit applications.  See id. at

8    22,205, 22,210, 22,278.  Because these provisions "fairly apprise[d] interested

9    persons" that the "subjects and issues of the rulemaking" included compliance

10    with the ESA and also fairly apprised them of the Services' role in achieving that

11    compliance, Nat'l Black Media Coal., 791 F.2d at 1022 (quotation marks omitted),

12    we reject UWAG's APA-based challenge to the Service-driven provisions.

13                 ii.   Substantive Challenges

14                    a.   The Service-Driven Requirements

15       UWAG broadly contends that the Service-driven requirements of the Final

16    Rule are neither authorized by nor consistent with section 316(b) of the CWA.[18]

---

[18] As stated above, section 316(b) mandates that any standard established pursuant to section 301 or 306 "shall" require that the "location, design, construction, and capacity"

1    It goes so far as to say that the EPA had no authority to create a role for the

2    Services, even in advising the EPA and Directors on site-specific environmental

3    impacts.  Although that broad claim has no basis in the statutory language or, for

4    that matter, our caselaw, see Fund for Animals v. Kempthorne, 538 F.3d 124, 133

5    (2d Cir. 2008), we address UWAG's more pointed assertion that the EPA

6    unlawfully delegated its authority to the Services.

7          An agency impermissibly delegates its authority where, without statutory

8    authorization, "it shifts to another party almost the entire determination of

9    whether a specific statutory requirement . . . has been satisfied, or where [it]

10   abdicates its final reviewing authority."  Id. at 133 (quotation marks omitted).

_____

of CWISs "reflect the best technology available for minimizing adverse environmental impact."  33 U.S.C. § 1326(b).  Relying on Riverkeeper I, UWAG argues that an agency acting pursuant to section 316(b) may require measures related only to the "location, design, construction, [or] capacity" of CWISs, but 40 C.F.R. § 125.98(b)(2) allows Directors to require facilities to implement "additional control measures" unrelated to these four parameters.  This provision, though, is more limited than the "restoration" provisions we remanded in Riverkeeper I.  See 358 F.3d at 189–91.  If a Director at a given site includes in a permit control measures that "have nothing to do with" section 316(b)'s parameters, id. at 189, the EPA may still veto the permit, see 40 C.F.R. § 123.44(c).  If the EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge.  We therefore agree with the EPA that UWAG's challenge is unripe.  See EPA v. EME Homer City Generation, L.P., 134 S. Ct. 1584, 1609 (2014); Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 732–33 (1998) (ripeness requirement is intended to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties" (quotation marks omitted)).

FWS-006894

1    "Agencies may seek advice and policy recommendations from outside parties,

2    but they may not rubber-stamp decisions made by others under the guise of

3    seeking their advice."  Id. (quotation marks omitted).  Because section 402 of the

4    CWA, which authorizes the EPA to delegate responsibility for administering the

5    NPDES program to the States (with the EPA retaining veto authority), does not

6    authorize delegation to the Services, UWAG objects to the provisions of the Rule

7    "requir[ing] States to coordinate or consult with the Services" and giving the

8    Services "a special opportunity to provide 'technical assistance.'"  UWAG Br. 38.

9    It also objects to an interpretation of the Rule that allows the EPA to veto a draft

10   permit "based on recommendations or determinations made by the Services."

11   UWAG Br. 39.  These objections lack merit for two reasons.

12       First, the Rule does not require Directors to accept the Services'

13   recommendations and clearly vests the authority to establish permit

14   requirements in Directors, not the Services.[19]  See 40 C.F.R. § 125.94(g) ("[C]ontrol

15   measures, monitoring requirements, and reporting requirements [established by

16   the Director] may include measures or requirements identified by [the Services]."

---

[19] UWAG's delegation challenge is therefore weaker than the one we rejected in Fund for Animals, where the FWS issued an order under the Migratory Bird Treaty Act that transferred final permitting authority to other agencies.  538 F.3d at 130, 132–33.

1   (emphasis added)); see also id. §§ 125.96(g), 125.98(b), 125.98(f).  Second, the EPA

2   has hardly "abdicate[d] its final reviewing authority" by providing for the

3   Services' input.  Fund for Animals, 538 F.3d at 133 (quotation marks omitted); see

4   U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 568 (D.C. Cir. 2004).  To the contrary,

5   nothing in the Rule itself suggests that the EPA will "rubber-stamp" the Services'

6   conclusions.  See 79 Fed. Reg. at 48,382–83 (EPA has "discretionary" oversight

7   authority).  Rather, the Rule contemplates that the EPA will independently

8   determine, with the benefit of the Services' expertise, whether the terms of a

9   permit comply with section 316(b) of the CWA.  Such a scheme reflects the

10  cooperative arrangement specified by Congress in the ESA and by the agencies

11  in their MOA, not unlawful delegation.

12                              b.  The Biological Opinion

13      UWAG also challenges the Services' biological opinion.  Again, we are not

14  persuaded.

15      UWAG asserts that the biological opinion is unlawful because the Services

16  should have concurred in the EPA's initial determination that the proposed rule

17  was unlikely to adversely affect listed species.  This is especially true, UWAG

18  claims, where the EPA, in its biological evaluation, initially defined its action as

1    one that merely sets standards rather than authorizes any new activities.  Under

2    these circumstances, UWAG asserts, the Services could not conduct formal

3    consultation.

4         We conclude that the agencies acted appropriately in conducting formal

5    consultation.  The ESA requires the Services to independently evaluate the

6    effects of agency action on a species or critical habitat.  See 16 U.S.C.

7    § 1536(b)(3)(A); Conservation Cong. v. U.S. Forest Serv., 720 F.3d 1048, 1051 (9th

8    Cir. 2013).  The Services' Consultation Handbook explains that the Services will

9    find that an agency action is "not likely to adversely affect" a species or habitat

10   "only if ALL of the reasonably expected effects of the proposed action will be

11   beneficial, insignificant, or discountable."  Consultation Handbook at 4-1.  In

12   this case, the Services' finding that this standard was not satisfied was

13   reasonable because the EPA acknowledged that listed species would continue to

14   be affected after implementation of the proposed rule and because the nature of

15   the proposed rule's impact on listed species remained unclear.  See id. at 3-13

16   ("[I]f there is not enough information to adequately determine the nature of the

17   effects, a letter of nonconcurrence is provided to the action agency.").

FWS-006897

1    Nor do we agree that the Services, having proceeded with formal

2  consultation, should have issued a no-jeopardy finding without including the

3  Service-driven provisions just because the proposed rule would have produced

4  a net reduction in species mortality even absent those provisions.  The ESA's

5  implementing regulations provide a structure for issuing jeopardy findings.  To

6  determine whether a proposed action is "likely to jeopardize" listed species or

7  adversely modify critical habitat, 50 C.F.R. § 402.14(g)(4), the Services are

8  required to evaluate the "[e]ffects of the action," meaning "the direct and

9  indirect effects of an action on the species or critical habitat, together with the

10  effects of other activities that are interrelated or interdependent with that action,

11  that will be added to the environmental baseline," id. § 402.02.  The

12  "environmental baseline" includes, as relevant here, "the past and present

13  impacts of all Federal, State, or private actions and other human activities in the

14  action area."  Id. § 402.02; see also Consultation Handbook at 4-22 ("The

15  environmental baseline is a 'snapshot' of a species' health at a specified point in

16  time.  It does not include the effects of the action under review in the

17  consultation.").  "Indirect effects," which are not included in the baseline, "are

18  those that are caused by the proposed action and are later in time, but still are

1    reasonably certain to occur." 50 C.F.R. § 402.02. Where the future operation of a

2    regulated facility depends on the discretion of the acting agency, the continued

3    operation of that facility is not a "past" or "present" impact of previous federal

4    action. See Nat'l Wildlife Fed'n, 524 F.3d at 930–31; In re Operation of the Mo.

5    River Sys. Litig., 421 F.3d 618, 632–33 (8th Cir. 2005).

6        The Services here concluded that because "the operation of [CWISs] is

7    within [the] EPA's discretion" under section 316(b)—i.e., the discretion to set

8    BTA standards that affect how CWISs operate and whether they will jeopardize

9    listed species—the continued operation of CWISs under the Rule is not "a past

10   impact of Federal action" (such that it would be included in the environmental

11   baseline), but rather an indirect effect of the Rule. Bio. Op. 28. We defer to the

12   Services' reasonable interpretation that the effects of future CWIS operations on

13   listed species are properly considered indirect effects of the Rule. See Forest

14   Watch v. U.S. Forest Serv., 410 F.3d 115, 117–18 (2d Cir. 2005). And the Services

15   were not cornered into making a no-jeopardy finding just because the proposed

16   rule was expected to reduce entrainment and impingement mortality.

17   Consistent with the ESA's goal of "conserv[ing] endangered species and

18   threatened species," 16 U.S.C. § 1531(c)(1), the relevant inquiry is whether the

FWS-006899

1    action causes jeopardy or adverse modification, <u>period</u>—not whether it provides

2    "incremental improvements" that make conditions "slightly less harmful" to a

3    species but still reduce the likelihood of survival and recovery for that species,

4    Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin., 175 F.3d 1156, 1162

5    n.6 (9th Cir. 1999).

6         B.    American Petroleum Institute

7         As we explained above, the Final Rule requires that "new units" at existing

8    power plants and manufacturing facilities be designed to withdraw an amount

9    of water commensurate with that withdrawn by a closed-cycle cooling system or

10   otherwise provide the same protection from adverse environmental impacts.  40

11   C.F.R. § 125.94(e).  Focusing on how the Rule applies to manufacturing facilities,

12   API argues that the proposed rule did not provide adequate notice of the

13   meaning of "new unit" and that the EPA's estimate of compliance costs for

14   manufacturing facilities that install "new units" improperly relied on limited and

15   outdated data.  We reject both arguments.

16         i.    Notice of "New Unit" Definition

17         As already noted, the Final Rule need only be a "logical outgrowth" of the

18   proposed rule.  Riverkeeper II, 475 F.3d at 113 (quotation marks omitted).  In its

1     proposed rule, the EPA defined "new unit" (which the preamble likened to "new

2     stand-alone facilities") as "any addition of an operating unit at an existing

3     facility" after the Rule's effective date, including "newly built units added to

4     increase capacity at the facility." 76 Fed. Reg. at 22,196, 22,282. During the

5     comment period, API commented on this proposed definition, arguing that it

6     was unclear and that, insofar as it referred to "increase[d] capacity," it applied

7     only to power plants, not manufacturing facilities. In the Final Rule, the EPA

8     removed the "increase[d] capacity" language and defined "new unit" as a new

9     "stand-alone" unit. See 40 C.F.R. § 125.92(u); see also 79 Fed. Reg. at 48,311,

10    48,353. API thus had, and took advantage of, the opportunity to comment on the

11    definition of "new unit," and also had "fair notice" of the change the EPA

12    eventually adopted in response. Long Island Care at Home, Ltd. v. Coke, 551

13    U.S. 158, 174–75 (2007). The EPA therefore complied with the APA's notice-and-

14    comment requirements in defining "new unit."

15                 ii.   Estimate of Compliance Costs

16       We turn, then, to the EPA's estimate of compliance costs. To analyze

17    compliance costs, the EPA collected data from site visits (including visits to eight

18    manufacturing facilities), reviewed industry comments, and considered

FWS-006901

1    industry-specific studies involving manufacturing facilities.  The EPA

2    acknowledges that it collected more extensive data from power plants than from

3    manufacturing facilities.  But in urging that the data on manufacturing facilities

4    is unduly limited, API fails to explain why data on intake structures used at

5    power plants would not apply equally to those used at manufacturing facilities.

6    Nor is the EPA's greater focus on power plants arbitrary and capricious, as

7    manufacturing facilities have more options to reuse cooling water and therefore

8    will, on average, incur lower compliance costs than power plants.

9         We also reject API's assertion that the EPA relied excessively on

10   "outdated" data.  Although the EPA relied in part on surveys conducted during

11   the Phase II rulemaking in the early 2000s, see 67 Fed. Reg. 17,122, 17,134 (Apr. 9,

12   2002), the EPA sought to improve accuracy by collecting additional information

13   and adjusting costs for inflation.  Based on this information, the EPA determined

14   that most manufacturing facilities would comply with the Rule's "new unit"

15   standards by reusing cooling water for manufacturing processes (now reported

16   to be an industry standard practice).  The EPA thus "examine[d] the relevant

17   data" and articulated "a rational connection" between that data and its

18   conclusion that manufacturing facilities would not incur meaningful additional

1    costs in implementing the Rule's requirements for new units.  State Farm, 463

2    U.S. at 43 (quotation marks omitted); see also Forest Watch, 410 F.3d at 118–19.

3                    C.    CWIS Coalition

4            The CWIS Coalition brings two additional challenges to the Final Rule,

5    both of which rest on misinterpretations of the Rule.

6                            i.    Permit Application Requirements for "Below-Threshold"
7                                  Facilities

8            The parties agree that the Final Rule, at least as described in its preamble,

9    sets standards only for facilities that withdraw more than 2 mgd and use 25

10   percent or more of that water exclusively for cooling purposes.  79 Fed. Reg. at

11   48,304–05, 48,361.  But the Coalition argues that the Rule's permit application

12   requirements at 40 C.F.R. § 122.21(r)(1)(ii)(A) apply more broadly to "[a]ll

13   existing facilities" as defined at 40 C.F.R. § 125.92(k), which does not contain any

14   thresholds.  Therefore, the Coalition asserts, the Rule arbitrarily subjects even

15   "below-threshold" facilities to burdensome permit application requirements.

16           The Coalition reads the permit application requirements out of context.

17   The Rule's permit application requirements "apply to [CWISs] at existing

18   facilities that are subject to this subpart," which incorporates the 2 mgd and 25

19   percent thresholds.  40 C.F.R. § 125.90(a).  Although section 122.21(r)(1)(ii)(A)

1    might appear to apply to below-threshold facilities, other subparts of section

2    122.21(r) confirm that it does not.  Section 122.21(r)(1)(ii)(E), for example, states

3    that if a new unit at an existing facility increases the capacity of that facility to

4    more than 2 mgd, then that facility must submit permit application information

5    even if it was "not previously subject to" the Rule's requirements.  This provision

6    would be incongruous if below-threshold facilities were already required to meet

7    the permit application requirements.  And even if the Rule were ambiguous with

8    respect to the applicability of its permit application requirements, the Coalition

9    has not shown that the EPA's interpretation of its own regulations in this case is

10   "plainly erroneous or inconsistent with the regulation."  <u>Chase Bank USA, N.A.</u>

11   <u>v. McCoy</u>, 562 U.S. 195, 208 (2011) (quotation marks omitted).  We therefore defer

12   to that interpretation and decline to vacate 40 C.F.R. § 122.21(r)(1)(ii)(A).

13                  ii.  <u>BTA Requirements for Individual Structures</u>

14          The Coalition also contends that the EPA exceeded its authority under

15   section 316(b) by imposing BTA requirements on individual intake structures

16   that withdraw no water for cooling purposes.  But the Rule defines a "cooling

17   water intake structure" as the "total physical structure and any associated

18   constructed waterways used to withdraw <u>cooling water</u> from waters of the

1    United States." 40 C.F.R. § 125.92(f) (emphasis added). If a structure withdraws

2    water only for process purposes, it is not a "cooling water intake structure" and

3    therefore not subject to the Rule's requirements. To the extent the Coalition

4    argues that the EPA may not regulate CWISs that use only a "small portion of the

5    water withdrawn" for cooling purposes, Coal. Br. 19, this argument lacks any

6    basis in the CWA. Section 316(b) directs the EPA to promulgate regulatory

7    standards for "cooling water intake structures" without defining the term or

8    setting any particular threshold for water withdrawal. 33 U.S.C. § 1326(b).

9    Again, we defer to the EPA's reasonable determination that an intake structure

10   that withdraws some amount of cooling water is a "cooling water intake

11   structure." See Chevron, 467 U.S. at 843; see also Riverkeeper I, 358 F.3d at 203.

12                                    **CONCLUSION**

13         To summarize, we hold that: (1) the EPA acted reasonably and within its

14   statutory authority in establishing BTA standards to minimize aquatic mortality

15   resulting from both entrainment and impingement; (2) the EPA adequately

16   explained why it defined "new units" at existing facilities as new stand-alone

17   structures; (3) the Services' biological opinion is consistent with the ESA and its

18   implementing regulations, and their no-jeopardy finding is supported by the

FWS-006905

1  administrative record; (4) the Services' ITS is consistent with the ESA; (5) the

2  EPA provided adequate notice of the Rule's "Service-driven" provisions; (6) the

3  EPA acted within, and did not unlawfully delegate, its statutory authority by

4  including provisions in the Rule that allow the Services to advise the EPA and

5  Directors on the site-specific impacts of CWISs; (7) the EPA and the Services did

6  not violate the ESA by engaging in formal consultation on the proposed rule;

7  (8) the Services were not compelled to find that the proposed rule (without the

8  technical assistance process) would avoid jeopardy just because the proposed

9  rule was expected to reduce impingement and entrainment; (9) the Services

10  complied with their own implementing regulations by treating the continued

11  operation of CWISs as an "indirect effect" of the Rule rather than as part of the

12  environmental baseline; (10) the EPA provided adequate notice of the Rule's

13  definition of "new unit"; (11) the EPA reasonably estimated the cost of

14  complying with the Rule's standards for "new units"; (12) the EPA reasonably

15  interpreted the Rule as not imposing new permit application requirements on

16  "below-threshold" facilities (namely, those that do not withdraw more than 2

17  mgd and use 25 percent or more of that water exclusively for cooling purposes);

18  and (13) the EPA reasonably determined that section 316(b) of the CWA

1    authorizes it to regulate all CWISs, including those that use only a small portion

2    of the water withdrawn for cooling purposes.

3         We have considered the Petitioners' remaining arguments and conclude

4    that they are without merit.  For the foregoing reasons, we **DENY** the petitions

5    for review.

FWS-006907

1                                **APPENDIX**

2                        <u>Glossary of Abbreviations</u>

3     APA Administrative Procedure Act

4     API American Petroleum Institute

5     BTA Best Technology Available

6     CWA Clean Water Act

7     CWIS Cooling Water Intake Structure

8     EPA Environmental Protection Agency

9     ESA Endangered Species Act

10    FWS Fish and Wildlife Service

11    ITS Incidental Take Statement

12    MMPA Marine Mammal Protection Act

13    MOA Memorandum of Agreement

14    NMFS National Marine Fisheries Service

15    NPDES National Pollutant Discharge Elimination System

16    UWAG Utility Water Act Group

FWS-006908

# EXHIBIT B



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
300 Westgate Center Drive
Hadley, MA 01035-9589



In Reply Refer To:
FWS/Region 5/ES

DEC 2 2 1993

Mr. William J. Muszynski
Acting Regional Administrator
U.S. Environmental Protection Agency
26 Federal Plaza
New York, New York - 10278-0090

Dear Mr. Muszynski:

On May 4, 1993, the Environmental Protection Agency (EPA) requested the Fish and Wildlife Service (FWS) concur with the determination that EPA's approval of the New Jersey Department of Environmental Protection and Energy's (NJDEPE) application to assume the Section 404 permit program pursuant to the Clean Water Act of 1977 (33 U.S.C. 1344 et seq.) (State assumption) is not likely to adversely affect federally-listed threatened and endangered species. By FWS' letter of May 25, 1993, we were not able to concur with that finding, based on analysis of NJDEPE's proposed program. FWS suggested that an MOA outlining an adequate conservation program for listed species would, if implemented, allow FWS to concur that the State assumption "is not likely to adversely affect" these species.

In the ensuing months, EPA, FWS, and NJDEPE have worked on that MOA, which all three parties signed on December 22, 1993. In light of that agreement, FWS can now concur that New Jersey's assumption of the Section 404 permit program is not likely to adversely affect federally-listed species.

<u>Authority</u>

This response is provided as informal consultation on the subject action pursuant to section 7(a)(2) of the Endangered Species Act of 1973 (ESA) (87 Stat. 884, as amended; 16 U.S.C. 1531 et seq.) and regulations (50 CFR §402.13) to ensure the protection of federally-listed threatened and endangered species.

<u>Federally-listed Species</u>

Federally-listed species dependent on the waters and wetlands within the jurisdictional boundaries of the proposed State assumption include: swamp pink (*Helonias bullata*), Kniéskern's beaked-rush (*Rhynchospora knieskernii*), and the bald eagle (*Haliaeetus leucephalus*). Another

Mr. William J. Muszynski                                                                2

federally-listed species, sensitive joint-vetch (*Aeschynomene virginica*) does not appear within the jurisdictional boundaries covered by the State assumption, however, this species occurs within the tidal freshwater wetlands immediately adjacent to the assumption boundaries and could be directly impacted by activities in State-assumed wetlands and waters upstream of its habitat. Three other federally-listed species, the Indiana bat (*Myotis sodalis*), American chaffseed (*Schwaleba americana*) and the small whorled pogonia (*Isotria medeoloides*) are not wetland species: however, they could be indirectly affected by projects requiring State-assumed Section 404 permits in New Jersey.

Attached are the lists of municipalities in New Jersey where federally-listed species are documented to occur. These lists represent FWS' current determination of locations where any category of discharges will have reasonable potential for affecting endangered and threatened species, as provided in 40 CFR Part 233.51(b)(2), and thus are not subject to waiver. FWS will revise these lists as species are added to the federal list of endangered and threatened species, as species are extirpated from New Jersey, or as new information on listed species or potential impacts to those species becomes available.

Candidate Species

Candidate species are species under consideration by the Service for possible inclusion on the List of Endangered and Threatened Wildlife and Plants (50 CFR Parts 17.11 and 17.12). Currently, there are 47 federal candidate species (Categories 1 and 2) in New Jersey, many of which are dependent on freshwater wetlands. FWS is mandated to continually monitor the status of these species to determine priorities for listing. If listed, these species will receive the full protection provided by ESA.

Incidental Take

Coordination under the MOA is designed to eliminate adverse effects to listed species and designated critical habitat. When this coordination process fails to eliminate take considered "incidental take" under the ESA, the State and/or applicant must seek authorization for such incidental take of federally-listed animal species under section 10(a)(1)(B) of the ESA (the habitat conservation planning process). EPA should insure that NJDEPE advises permit applicants that their project has not undergone ESA section 7 review, and therefore, the action is not entitled to protection from prosecution under section 9 of ESA, as no incidental take statement has been issued. Take of federally-listed plants is a violation of State law, and thus a violation of section 9 of ESA.

Conclusions

FWS has reviewed the State's program and EPA's procedures for review of permit applications outlined in the attached document entitled "Memorandum of Agreement Among the U.S. Fish and Wildlife Service, U.S. Environmental Protection Agency, New Jersey Department of Environmental Protection and

Mr. William J. Muszynski                                          3

Energy Related to the Protection of Federally-Listed Threatened and
Endangered Species and Designated Critical Habitat Under a New Jersey-
Assumed Section 404 Program," dated December 22, 1993.  The procedures
described in that agreement (MOA procedures) do not constitute procedures
for consultation pursuant to section 7(a)(2) of the ESA.  These MOA
procedures are designed to eliminate adverse effects to federally-listed
species and critical habitats through alternative coordination.

Under MOA procedures, when adverse effects cannot be eliminated through
informal coordination between NJDEPE and FWS, EPA has committed to ensuring
that a State permit will be issued only if it is not likely to jeopardize
the continued existence of federally-listed species or result in the
destruction or adverse modification of designated critical habitat, and if
it avoids or minimizes incidental take of federally-listed species.  When
the State cannot agree with EPA's decision, the permit application will be
transferred to the Corps of Engineers for processing under Section 404 of
the Clean Water Act.  Any residual incidental take must be dealt with under
section 10(a)(1)(B) of the ESA if not addressed through section 7
consultation with the Corps.

The procedures adopted in this consultation are specific to the
circumstances surrounding State assumption of the Section 404 program for
the freshwater wetlands and other State waters of New Jersey.  I would
advise you for planning purposes, that future consultations on state
assumptions will be conducted as programmatic formal consultations,
requiring preparation of all data enumerated at 50 CFR §402.14(c), the ESA
consultation regulations.

If changes in the State program occur or additional information on effects
to listed or newly listed species or critical habitat becomes available,
this determination of concurrence may need to be reconsidered, and section
7 consultation may have to be reinitiated.

Other issues

This ESA consultation does not address all FWS concerns about the proposed
State assumption.  FWS identified many significant concerns other than
endangered species in our September 2, 1993, technical comments on NJDEPE's
assumption application.  We look forward to EPA's response pursuant to 40
CFR 233.15(g).

                              Sincerely,

                              *Arnold E Lambertson*

                              Regional Director

# EXHIBIT C



July 24, 2020

# ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida



Ochlockonee River State Park, Florida

# ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida

July 24, 2020

Supplemental information prepared by the Florida Department of Environmental Protection to assist in the evaluation of impacts to species listed and considered by the Endangered Species Act.



Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road MS 2500
Tallahassee, FL 32399-2400

Note for printing: Pages for Appendix C are 8.5" x 14"



# Executive Summary

In accordance with the Endangered Species Act of 1973 (ESA) and its implementing regulations, the purpose of this Biological Assessment (BA) is to evaluate the potential effects of the United States Environmental Protection Agency's (EPA) potential approval of the State of Florida's Assumption and administration of Section 404 of the Clean Water Act (CWA) on ESA-listed species, proposed species, designated critical habitat and proposed critical habitat (50 Code of Federal Regulations [CFR] § 402.12). The BA will consider whether EPA's approval of the Assumption request (Action) is likely to adversely affect any species or habitat. EPA is the federal agency charged with approving or denying the state's request, pursuant to the CWA implementing regulations (40 CFR § 233 *et seq*). The Florida Department of Environmental Protection (FDEP) is the state agency requesting administration of the CWA Section 404 Program (Assumption).

On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR §402.08, to serve as a non-federal representative to prepare the subject BA for possible ESA section 7 consultation. The EPA designated FDEP as the non-federal representative to prepare this BA in a letter dated December 12, 2019, consistent with 50 CFR § 402.08. In a separate letter to the U.S. Department of Commerce and the Department of the Interior dated December 13, 2019, the EPA stated that it would voluntarily engage in informal consultation with the Services (the United States Fish and Wildlife Service [USFWS] and the National Oceanic and Atmospheric Administration [NOAA] National Marine Fisheries Service [NMFS]).

FDEP requested input on a draft species list for Florida's BA from the USFWS and the NMFS on November 22, 2019.  On April 15, 2020, NMFS responded to FDEP that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state (see Appendix A). They stated that based on their review, while there is shared jurisdiction for the Gulf Sturgeon between NMFS and USFWS, the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. Based on NMFS' determination, this BA makes a "no effect" determination for NMFS jurisdictional species.

If approved, the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in state regulations (Chapters 62-330, and 62-331, Florida Administrative Code [F.A.C.]), Memorandums of Agreement with EPA and the United States Army Corps of Engineers (USACE), and a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission (FWC) and the USFWS. Should EPA request formal consultation with USFWS at the time of EPA's review of whether to approve Assumption of the State 404 program, USFWS may issue a programmatic biological opinion (Program assumption BiOp). The opinion may include conditions that guide implementation of the State 404 program. If the USFWS determines that the Action is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat, the Program assumption BiOp may also include an incidental take statement (ITS) with reasonable and prudent measures and terms and conditions that must be complied with during the implementation of the State 404 program, as well as description of triggers for reinitiation of the Program assumption BiOp.

Florida's request to assume the administration of the CWA Section 404 permit program only includes those Waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters or State-assumed waters.  The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "Retained Waters". This definition can be found in the State 404 Handbook in

Chapter 2.0 and the process to determine whether a project is in retained, or assumed waters, is described in Chapter 4.1 of the Handbook. In addition, Appendix A of the State 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

In accordance with section 7 regulations, this BA only evaluates effects to ESA-considered species, which includes ESA-listed species, their critical habitats, those species proposed to be listed and their proposed critical habitat, candidate species, petitioned species, and those otherwise under review for potential ESA listing. For the sake of clarity in understanding the State's implementation of the State 404 program and the ERP program, the State 404 program would address species that may not be listed under the ESA, but are protected under other federal or state laws. Examples of these types of laws include the Bald and Golden Eagle Protection Act (16 USC § 668 et seq.) and the Migratory Bird Treaty Act of 1918 (16 USC §§ 703-712 (§ 709 omitted). Also, all ESA proposed, candidate, and petitioned plant and animal species with ranges within Florida are discussed in this BA, to provide a thorough review of Florida's potentially at-risk species, and because the lists of threatened and endangered species may be modified to include some or all of the petitioned species, depending upon the outcome of those status reviews. This BA evaluates the effects of the that EPA's approval for the State of Florida Assumption of Section 404 of the CWA would have on listed species in present time, and analyzes effects into the future. All species that are currently listed, proposed to be listed or might be listed in the future are discussed, with evaluations of effects on respective guilds. At bottom, this review evaluates the effects the State's 404 program would have on any species that are currently listed or may become listed in the future because implementation of the State's 404 program is the direct effect of EPA's approval of Florida's Assumption of Section 404 of the CWA.

This BA analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or is ESA-considered (96). Species that must be addressed pursuant to Section 404 of the CWA and Chapter 62-331, F.A.C. for the State 404 program, are federally listed species or species proposed to be listed under the ESA (a total of 141 species). If these listed species have designated critical habitats, or critical habitats proposed to be designated, the adverse effects and impacts to those habitats must also be analyzed and addressed in the State 404 program. See Table 3-1 for the list of species discussed in this BA.

Because of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible this BA. Since the State 404 program is implemented through future state-issued 404 permits authorizing activities, a programmatic BA is appropriate to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits. The BA will address how the process will consider effects to listed endangered and threatened species or species proposed to be listed so that the effects of this Action may be analyzed. The BA describes the effects of the Action, which includes a broad array of activities that are likely to be authorized in the future and a general description of the ESA-listed species and their habitat ranges and critical habitats that are likely to be affected by such activities. These descriptions include baseline discussions, historical perspectives of previous permitting by the USACE, an estimate of the physical, chemical, or biotic stressors to species that are likely to be produced, and a description of the processes and

mechanisms to avoid and minimize the adverse effects of these activities on ESA-listed species and designated critical habitats.

In implementing the State 404 program, FDEP will send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the USFWS for review and comment (see Chapter 7 for details). This coordination is to ensure that any permit issued by FDEP is not likely to jeopardize the continued existence of any listed or proposed species, or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)). Upon coordination, FDEP will consider any information that USFWS provides as technical assistance and will include all species protection measures that the USFWS may recommend as permit conditions or deny the request for a permit, whether the permit conditions are designed to avoid jeopardizing an ESA-listed species or adverse modification of designated critical habitat, or whether permit conditions are designed to avoid or minimize the amount of incidental take when the take or other effects would not be likely to jeopardize a species or adversely modify designated critical habitat. This exchange of information between USFWS and FDEP falls within the broad scope of "technical assistance" as described in the ESA's implementing regulations and the USFWS' Interagency Consultation Handbook.

The FWC will partner with FDEP to assist in the coordination of federally listed species reviews with the USFWS, expanding FWC's current review of impacts to federally listed and State-listed species during the Environmental Resource Permitting (ERP) process (Chapter 62-330, F.A.C.). The interactions between agencies will inform applicants of the importance of implementing impact avoidance and minimization measures on listed species in order to be eligible for authorization of their proposed activities, all while maintaining compliance with the ESA.

The State 404 program rule [Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C.] and EPA regulations (40 CFR 233.20, 40 CFR 230.10(b)(3)) prohibits issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS and confirms that USFWS conclusions about the effects of State 404 permits on listed species are determinative (40 CFR § 230.30(c). FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into their permit tracking database, similar to the information collected by the USACE. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat would ultimately result in the State either denying the permit or the State informing EPA that it will neither issue nor deny the permit, which would result in EPA transferring the permit to the USACE for processing in accordance with 40 CFR 233.50(j).

It is the intent of the FDEP to resolve all disputes and objections with USFWS prior to EPA's review during the public noticing process. FDEP, FWC and USFWS are entering into a Memorandum of Understanding which includes a resolution process. This process, and the State's rule requirement that USFWS's recommendations and conditions are determinative, it is unlikely that issues would need to be elevated to EPA. During their review, EPA may comment upon, object to, or make recommendations with respect to a permit pursuant to 40 CFR § 233.50. As stated in 40 CFR § 233.50(j), in the event a state that has assumed CWA Section 404 responsibilities neither satisfies EPA's objections or requirements for a permit condition, nor denies the permit, the EPA will transfer the permit to the USACE and the USACE shall process the permit application, which would trigger a section 7 consultation between USACE and USFWS and NMFS

During the analysis of existing Florida permitting data provided by the USACE for fiscal years 2014 through 2018, approximately 7% of past USACE Section 404 permit application reviews were formal consultations.  It is reasonable to anticipate that the past number of applications submitted for that five-year period provides an approximation of the number and types of proposed permitting activities that may occur over the next five-year period. Further analysis of this data shows that a small proportion of the total number of ESA-listed species accounted for the majority of consultations. Many of the species subject to frequent ESA consultation have programmatic consultation keys or programmatic biological opinions, which can help guide or inform future reviews and impact assessments by FDEP, FWC and USFWS. See Chapter 4.2.1 regarding the limitations of the USACE queried data used in the analyses of this BA, and interpretation using the USACE database and shapefile.

Historical CWA Section 404 permitting by the USACE resulted in issuance of permits for one or more projects that adversely affected one or more listed species and their critical habitats. The USACE Section 404 process, in accordance with section 7 of the ESA, employed various conservation measures to avoid and minimize adverse effects. Because of the reasonable and prudent measures and terms and conditions anticipated in the Program assumption BiOp and its Incidental Take Statement (ITS), the State 404 program would not issue a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats. Similar to the USACE Section 404 program, however, the State 404 program may result in the issuance of one or more permits with projects that "may adversely affect" an ESA-listed species and/or designated critical habitat. These adverse effects would be addressed during the technical assistance process between FDEP and USFWS.

This BA is provided to assist in the review of potential effects to ESA-listed endangered and threatened species anticipated with the State of Florida's request for the Assumption of Section 404 of the CWA.

# Table of Contents

1.    Purpose of Biological Assessment ....................................................................... 1

1.1  Objectives of Action ............................................................................................ 1

1.2  The History of Florida's Request for Assumption ............................................... 3

1.3  Organization of the Document ............................................................................ 5

2.    Action & Action Area ........................................................................................... 6

2.1  Description of Action ........................................................................................... 6

2.2  Types of Future Activities to be Authorized by Florida's 404 Program .............. 7

2.3  Description of Action Area ................................................................................. 13

2.4  Ecosystems/Habitats Located Within the Action Area ..................................... 18

        2.4.1  Discussion of Aquatic Ecosystems and Habitats ................................... 18

        2.4.2  Discussion of Terrestrial Ecosystems and Habitats ............................... 21

3.    ESA-considered Species Potentially Affected by the Action ............................. 22

3.1  ESA-considered Species and Critical Habitat in the Action Area ..................... 35

3.2  NMFS-Listed Species ....................................................................................... 36

3.3  State-Listed Species ......................................................................................... 36

4.    Baseline Conditions .......................................................................................... 37

4.1  Regulatory Baseline .......................................................................................... 37

        4.1.1  Federal Wetland Regulations ................................................................. 37

        4.1.2  Florida Wetlands Regulations ................................................................ 39

4.2  Environmental Baseline ..................................................................................... 41

        4.2.1  Historical Federal Permitting: Habitat .................................................... 43

        4.2.2  Historical Federal Permitting: ESA Consultations ................................. 47

5.    Potential Effects on ESA-considered Species .................................................. 56

5.1  Types of Effects ................................................................................................ 57

        5.1.1  Biotic Stressors ..................................................................................... 57

        5.1.2  Physical Stressors ................................................................................. 57

        5.1.3  Physicochemical Water Quality Stressors ............................................. 58

5.2  Potential Effects ................................................................................................ 58

        5.2.1  Mammals ................................................................................................ 58

        5.2.2  Birds ....................................................................................................... 60

        5.2.3  Reptiles .................................................................................................. 61

        5.2.4  Amphibians ............................................................................................ 62

        5.2.5  Fish ........................................................................................................ 62

        5.2.6  Insects ................................................................................................... 63

5.2.7    Crustaceans ................................................................................................ 63

5.2.8    Mollusks ..................................................................................................... 64

5.2.9    Plants ......................................................................................................... 64

6.    Cumulative Effects ................................................................................................ 65

6.1    Effects of Non-Federal Activities ........................................................................ 65

6.1.1    Watershed Development ............................................................................ 65

6.1.2    Increased Water Use ................................................................................. 68

6.1.3    Climate Change ......................................................................................... 70

6.1.4    Summary of Cumulative Effects of Non-Federal Activities ......................... 71

7.    State 404 Program Species Coordination ............................................................. 71

7.1    Federally and State-listed Species Coordination Review ..................................... 72

7.2    State 404 Program and Prior-existing USFWS HCPs and BiOps ......................... 73

7.3    State 404 Program Species Coordination Process ............................................. 74

7.4    Application Review .............................................................................................. 75

7.4.1    Technical Assistance with the USFWS ..................................................... 76

7.4.2    EPA Oversight and Review ......................................................................... 80

7.5    Species Assessments ......................................................................................... 83

7.5.1    Identifying Project Area and Affected Species ........................................... 83

7.5.2    Assessments Using Available Federal Decision Tools ............................... 83

7.5.3    Case by Case Assessments When Tools Are Not Available ...................... 86

7.6    Impact/Affect Determinations and Protective Measures ....................................... 88

7.6.1    Impact and Affect Determinations .............................................................. 89

7.6.2    Developing and Ensuring Protective Measures .......................................... 90

7.6.3    Statements of Adverse Impact in Public Notices ....................................... 93

7.6.4    Dispute Resolution between FDEP and USFWS and USFWS-EPA Coordination ............ 94

8.    Conclusions ......................................................................................................... 95

9.    Literature Cited ................................................................................................... 99

10.    Lists of Contacts and Preparers ......................................................................... 103

# Figure Index

Figure 2-1   Example of activities authorized by the USACE 404 program ........................................15

Figure 2-2   Example of activities authorized by USACE and FDEP................................................16

Figure 2-3   Example of a linear project ..........................................................................................17

Figure 4-1   Historic freshwater flows compared to freshwater flows after C&SF Project.................42

Figure 4-2   Future Ecosystem Conditions based on CERP .............................................................43

Figure 4-3   Acreage of Authorized Fill, by Wetland Type ...............................................................46

Figure 4-4   Locations of ESA Consultations in Action Area, 2014 - 2018 ........................................54

Figure 4-5   Concentrations of ESA consultations in the Action Area, 2014 - 2018...........................55

Figure 6-1   Comparison of projected 2010-2070 population change in four Florida Regions............66

Figure 6-2   A comparison of the State development scenarios.........................................................67

Figure 6-3    State Water Scenarios (gallons/day/acre).....................................................................69

Figure 7-1   Species Coordination Overview ...................................................................................82

# Table Index

Table 2-1   Freshwater Non-Forested Wetlands ...............................................................................18

Table 2-2   Freshwater Forested Wetlands ......................................................................................19

Table 2-3   Lakes ............................................................................................................................19

Table 2-4   Rivers and Streams ......................................................................................................20

Table 2-5   Estuarine Areas ............................................................................................................20

Table 2-6   Aquatic Caves ..............................................................................................................21

Table 2-7   Sandhill and Scrub Areas..............................................................................................22

Table 2-8   Dry Prairie and Pine Rockland Areas.............................................................................22

Table 3-1   ESA Species Potentially Affected by the Action .............................................................23

Table 4-1   Authorized Areas and Acreages by Wetland Type, 2014 - 2018 .....................................45

Table 4-2a   Consultation Types for Federal Actions Totals, FY 2014 – 2018 ...................................49

Table 4-2b   Consultation Types for Federal Actions by Year, FY 2014 – 2018..................................49

Table 4-3a   ESA Consultations Without Programmatic, By Species, 2014-2018 ..............................49

Table 4-3b   ESA Consultations with Programmatic, 2014-2018 ......................................................51

Table 6-1   Historic Water Use in Florida (millions of gallons per day) .............................................69

Table 7-1   Programmatic Consultations and Consultation Keys in Florida, 2010 - 2019..................84

# Appendix Index

Appendix A April 15, 2020 Letter from NMFS to FDEP Regarding NMFS Jurisdiction ..................... 105

Appendix B Species Accounts ..................................................................................................... 108

Appendix C Effects of the Action on ESA-listed Species ............................................................. 102

Appendix D Figures 1 through 6 .................................................................................................. 154

Appendix E Dredge and Fill Activities as Defined in the Corps Database ......................................... 161

# Acronyms

| | |
|---|---|
| Wildlife Plan | Florida's State Wildlife Action Plan (FWC) |
| assumption | Assumption of Section 404 of CWA by the State of Florida |
| BA | Biological Assessment |
| BMP | Best Management Practices |
| BiOp | Biological Opinion |
| C&SF | Central and Southern Florida |
| CERP | Comprehensive Everglades Restoration Plan |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| CWIS | Cooling Water Intake Structure |
| EIS | Environmental Impact Statement |
| ECOS | Environmental Conservation Online System |
| EPA | United States Environmental Protection Agency |
| ERP | Environmental Resource Permit |
| ESA | Endangered Species Act |
| F.A.C. | Florida Administrative Code |
| FDEP | Florida Department of Environmental Protection |
| FEMA | Federal Emergency Management Agency |
| FLCCS | Florida Land Cover Classification System |
| FNAI | Florida Natural Areas Inventory |
| F.S. | Florida Statutes |
| FWC | Florida Fish and Wildlife Conservation Commission |
| GIS | Geographic Information Systems |
| HCP | Habitat Conservation Plan |
| IPaC | Information for Planning and Consultation |
| ITS | Incidental Take Statement |
| MOA | Memorandum of Agreement |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NWP | Nationwide Permit |

| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PSS | Palustrine Shrub Scrub |
| RAI | Request for Additional Information |
| SFWMD | South Florida Water Management District |
| SLOPES | Standard Local Operating Procedures for Endangered Species |
| USACE | United States Army Corps of Engineers |
| USC | United States Code |
| USFWS | United States Fish and Wildlife Service |
| WMDs | Water Management Districts |
| WOTUS | Waters of the United States |

# Glossary

**CWA** means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 USC 1251, et seq. (Rule 62-331.030, F.A.C., State 404 Handbook section 2.0(b)1).

**Action** means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon high seas (50 CFR § 402.02). For the purposes of this document, the Action would be the EPA's approval of the State of Florida's request for the assumption of the administration and permitting of Section 404 of the CWA.

**Action Area** means all areas to be affected directly or indirectly by the Federal Action, and not merely the immediate area involved in the Action (50 CFR § 402.02).

**Activity** for the purposes of the State 404 program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (Rule 62-331.030, F.A.C.).

**Administratively complete** means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

**Affect/effect** as a verb, to "affect" means is to bring about a change. The "effect" (usually a noun) is the result of a change. "Affect" appears in section 7 of the ESA (16 USC § 153) and "Effect" appears throughout ESA section 7 regulations (50 CFR § 402 *et seq*) and guidance documents (ESA section 7 Consultation Handbook).

**Assumed waters** (or **State-assumed waters)** State-assumed waters are all waters of the United States that are not retained waters (as identified in Chapter 62-331, F.A.C., and State 404 Handbook).

**Avoidance** means mitigating a resource impact by selecting the least-damaging project type, spatial location and extent compatible with achieving the purpose of the project. Avoidance is achieved through an analysis of appropriate and practicable alternatives and a consideration of impact footprint.

**Assumption** means a state has requested and the EPA has approved a state dredge and fill permitting program to be administered in lieu of, Section 404 program administered by the USACE for discharges into assumed waters.

**Best available data** to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under statute 7(a)(2), the USFWS is required to use the best available science. In the context of the ESA, the USFWS and NMFS has a policy statement that further describes best available data (see Notice of Interagency Cooperative Policy on Information Standards Under the Endangered Species Act 1994).

**Biological opinion** means a document which includes 1) the opinion of the Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; 2) a summary of information on which the opinion is based; and 3) a detailed discussion of the effects of the action on listed species or designated critical habitat (50 CFR § 402.02, 50 CFR § 402.14(h)).

**Candidate species** means a plant and animal taxa considered for possible addition to the list of Endangered and Threatened Species. These are taxa for which USFWS as on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is currently

precluded by higher priority listing actions (50 CFR § 424.02, ESA section 7 Consultation Handbook).

**Conservation** means to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which protective measures are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking (ESA 16 U.S.C. § 1532(3)).

**Critical habitat** for a threatened or endangered species means 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of Section 1533, on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protection; and 2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of Section 1533, upon a determination by the Secretary of the Interior or the Secretary of Commerce that such areas are essential for the conservation of the species (ESA 16 U.S.C. § 1532(5)).

**Cumulative effects** are those effects of future State or private activities, not involving federal activities, that are reasonably certain to occur within the action area of the action subject to coordination. For the purposes of this document, this definition only applies to ESA section 7 analyses (50 CFR § 402.02).

**Destruction or adverse modification of critical habitat** means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species (50 CFR § 402.02).

**Effects of the action** are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR § 402.02).

**Endangered species** means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of the ESA would present an overwhelming and overriding risk to man (ESA 16 U.S.C. § 1532(6)).

**Endangered or threatened species** in this document refers to those animal species that are identified as federally endangered or threatened by the USFWS or NMFS, and those animal species that are identified as State-listed by the FWC; it also means plant species identified as endangered or threatened by the USFWS or by the Florida Department of Agriculture and Consumer Services when such plants are located in a wetland or other surface water (Rule 62-330.021, F.A.C.).

**Environmental baseline** refers to the condition of the listed species or its designated critical habitat in the Action Area, without the consequences to the listed species or designated critical habitat caused by the proposed Action. The environmental baseline includes the past and present impacts of all federal, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early ESA section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR § 402.02).

**ESA-considered** refers to species that are either listed, proposed, petitioned, or considered candidates for listing under the Endangered Species Act.

**Fish or wildlife** means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof. (ESA 16 U.S.C. § 1532(8)).

**Incidental take** refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by a federal agency or applicant (50 CFR § 402.02).

**Jeopardize the continued existence of** means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR § 404.02).

**Listed species** refers to any species of fish, wildlife or plant which has been determined to be endangered or threatened under section 4 of the ESA or under Chapter 68A-27, F.A.C.

**May affect** is the appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed species or designated critical habitat.

**Minimization** means mitigating an aquatic resource impact by managing the severity of a project's impact on resources at the selected site. Minimization is achieved through the incorporation of appropriate and practicable design and risk avoidance measures.

**No effect** is the appropriate conclusion when the action agency determines its action will not affect a listed species or designated critical habitat per ESA.

**Practicable** means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes (Rule 62-331.030, F.A.C.).

**Programmatic consultation** (under ESA implementing regulations 50 CFR § 402.02) is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the USFWS to consult on the effects of programmatic actions such as:

(1)  Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and
(2)  A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

**Project area** or **Project site** means that a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area (Rule 62-331.030, F.A.C.). In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas.

**Protection measures** means those avoidance and minimization measures to address adverse impacts to listed species and critical habitat under the State 404 program. Protection measures recommended by the USFWS are incorporated as conditions to the State 404 permit. Examples of protection measures include, but are not limited to, project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work). (as used in Chapter 62-331, F.A.C.).

**Proposed species** any species of fish, wildlife or plant that is proposed in the Federal Register to be listed under section 4 of the Endangered Species Act (50 CFR § 402.02).

**Reasonable potential to affect** for the purposes of this document and for the State of Florida's 404 program, refers to a project that has a reasonable potential for affecting endangered or threatened species (40 CFR § 233.51(b)(2)) where it has been determined during the species coordination process that the project may affect federally listed species or their critical habitat.

**Retained Waters** means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of State 404 Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Rule 62-331.030, F.A.C.).

**Section 7 consultation** refers to section 7(a)(2) of the ESA that requires federal agencies to use their authorities to further the conservation of listed species, including the requirement to consult with the USFWS to ensure that they are not undertaking, funding, permitting or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.

**Section 404** a section of the federal CWA that establishes a program to regulate the discharge of dredged and fill material into the WOTUS, including wetlands.

**Services(s)** describes the USFWS and/or the NMFS.

**Species coordination** is a process to address potential adverse effects to threatened or endangered species, ensuring compliance with Florida Chapter 62-331, F.A.C., and the ESA. This process includes coordination between the FDEP, FWC, and the USFWS during the review of submitted State 404 permit applications. Recommendations for avoiding and minimizing the effects of a project to federally listed species and their critical habitat is provided by technical assistance from the USFWS.

**Species coordination lead or State species lead** is the designated FDEP or FWC staff person who coordinates with the USFWS and is the point of contact for all ESA species issues during the review of a specific State 404 application. FDEP and FWC staff will decide on a project by project basis which agency will act as the State's species lead on the project when coordinating with the USFWS. Factors that will be considered in this decision include the complexity of the coordination and relative workloads.

**State 404 program** is the FDEP permitting program (Chapter 62-331, F.A.C.) that fulfills the requirements of the Section 404 of the CWA in a similar manner as the USACE 404 program, post-assumption, if approved by the EPA.

**Stream** means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel shall have been dredged or improved does not prevent the watercourse from being a stream (§ 373.019(20), F.S.).

**Stressors** are any physical, chemical, or biological alteration of resources (i.e., increase, decrease, or introduction) that can induce an adverse organism response. Stressors can act directly on an individual, or indirectly through impacts to resources.

**Surface water** means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface (§ 373.019(21), F.S.).

**Take** means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct. (ESA 16 U.S.C. § 1532(19)) **Harass** is further defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include but are not limited to, breeding, feeding, or sheltering. **Harm** is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering (ESA implementing regulations 50 CFR § 17.3).

**Technical assistance** refers to a coordination process described in the ESA section 7 Consultation Handbook (1998) that outlines a variety of ways in which the USFWS provide expertise and guidance on an individual project basis. In the context of State 404 permit application reviews, the USFWS assists the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA and Chapter 62-331, F.A.C.

**Technically complete** means a State 404 application where each application item is adequate to allow the FDEP to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 program authorization, the State 404 program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met (Rule 62-331.030, F.A.C.).

**Threatened species** means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range (ESA 16 U.S.C.§ 1532(20)).

**Uplands** means areas that are not wetlands or other surface waters, as delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by § 373.4211, F.S.

**USACE 404 program** refers to the administration and permitting responsibilities by the USACE for Section 404 of the CWA, prior to any assumption by the State of Florida.

**Waters of the State** are as defined in § 403.031(13), F.S.

**Waters of the United States (WOTUS)** means those waters defined in the regulations under 40 CFR 230(s).

**Wetland** means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas ( 40 CFR § 232.2).

**Works** means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the State [§ 373.403(5), F.S.] and includes all types of dredging and filling to create, remove, or locate structures in, on, or over wetlands or other surface waters (Rule 62-330.021, F.A.C.).

# 1.    Purpose of Biological Assessment

The purpose of this BA is to evaluate the effects of the EPA potential approval of the State of Florida's request for Assumption and administration of Section 404 of the CWA. The BA will consider whether EPA's approval of the Assumption request (Action) is likely to adversely affect species listed, or proposed to be listed under the Endangered Species Act (ESA), as well as designated critical habitat and proposed critical habitat for those species (50 Code of Federal Regulations [CFR] § 402.12). EPA is the federal agency charged with approving or denying the state's request, pursuant to the CWA implementing regulations (40 CFR § 233 *et seq*). The FDEP is the state agency requesting administration of Section 404 of the CWA (Assumption).

Florida's request to assume the administration of Section 404 of the CWA only includes those WOTUS not retained by the USACE, referred to as assumed waters or State-assumed waters. The USACE will retain permitting responsibility for the discharges of dredged or fill material into those waters defined as "Retained Waters". The definition of retained waters can be found in the State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in Chapter 4.1 of the State 404 Handbook. In addition, Appendix A of the Handbook includes the Retained Waters List maintained by the USACE.

## 1.1    Objectives of Action

By assuming permitting responsibilities under Section 404 of the CWA, the State of Florida would be able to have an active, major role in the implementation of the CWA within its jurisdiction. This would allow the State to more effectively and efficiently address regional issues by permitting both State and Federal (assumed waters) discharges of dredged or fill material through the Florida Environmental Resource Permitting program (ERP) per Chapter 62-330, F.A.C. and State 404 program per Chapter 62-331, F.A.C. authorizations. The ability to review these two regulatory requirements by the State, at the same time, is expected to provide consistency, certainty, and timeliness to the regulated community.

For Florida to assume administration of Section 404 of the CWA, pursuant to the provisions of 40 CFR §233.10, the State must submit an application for Assumption package to the EPA Region IV Administrator:

1.  Letter from the Governor of Florida requesting program approval;

2.  Complete program description as set forth in 40 CFR § 233.11;

3.  Attorney General's statement, as set forth in 40 CFR § 233.12;

4.  Memorandum of Agreement (MOA) with the EPA Regional Administrator, as set forth in Section 40 CFR § 233.13;

5.  MOA with the Secretary of the Army, as set forth in 40 CFR § 233.14; and

6.  Copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures.

The EPA has stated that it will voluntarily engage in consultation with the United State Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS) under section 7 of the ESA in their letter dated December 15, 2019 to FDEP. This allows FDEP to act as a non-federal representative to develop this

BA to assist in EPA's review of potential impacts to ESA-listed species. If approved, the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in state regulations (Chapters 62-330, and 62-331, Florida Administrative Code [F.A.C.]), Memorandums of Agreement with EPA and the United States Army Corps of Engineers (USACE), and a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission (FWC) and the USFWS. Should EPA request formal consultation with USFWS at the time of their review of whether to approve Assumption of the State 404 program, USFWS may issue a programmatic biological opinion (Program assumption BiOp). The opinion may include conditions that guide implementation of the State 404 program. If the USFWS determines that the Action is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat, the Program assumption BiOp may also include an incidental take statement (ITS) with reasonable and prudent measures and terms and conditions that must be complied with in the implementation of the State 404 program, which would trigger a section 7 consultation between USACE and USFWS and NMFS

*The Programmatic Biological Assessment*

In accordance with section 7 regulations, this BA only evaluates effects to ESA-listed species and those species proposed to be listed and their critical habitat or proposed critical habitat. For the sake of clarity in understanding the State's implementation of the State 404 program and the ERP program, the State 404 program would address species that may not be listed under the ESA, but are protected under other federal or state laws. Examples of these types of laws include the Bald and Golden Eagle Protection Act (16 USC § 668 et seq.) and the Migratory Bird Treaty Act of 1918 (16 USC §§ 703-712 (§ 709 omitted).

Also ESA proposed, candidate, and petitioned plant and animal species with ranges within Florida are discussed in this BA, to provide a thorough review of Florida's potentially at-risk species, and because the lists of species that are listed as threatenedmay be modified to include some or all of these petitioned species, depending on the outcome of the status review. This BA analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or is ESA-considered (96). The effects of the potential approval by EPA for the State of Florida assuming Section 404 of the CWA on listed species is discussed in present time, and are estimated for the future. All species that are currently listed, proposed to be listed or that might be listed in the future are discussed, with evaluations of effects on respective guilds. This review helps evaluate the effects of the State 404 program on any species that are currently listed or those we are aware of that may become listed in the next 10 to 20 years.

Because of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible. Since the State 404 program is implemented through future State-issued 404 permit actions, a programmatic BA is appropriate to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits. The BA will address how that subsequent process will consider effects to listed endangered and threatened species, or species proposed to be listed so that the effects of this Action may be analyzed.

This BA and any future Program assumption BiOp will address future impacts and effects programmatically, through assessing the regulatory process by which the State of Florida will issue Section 404 permits, and by establishing a technical assistance process with the USFWS for species coordination. More specifically, the components of State 404 program establish the process and responsibilities for FDEP to follow to effectively

implement the State 404 program. This programmatic consultation would examine whether and to what degree EPA's review and approval of the State 404 program ensures that implementation of the program is not likely to jeopardize the continued existence of endangered or threatened species, or result in the destruction or adverse modification of critical habitat.

As recently recognized by the USFWS, "various forms of programmatic consultations have been successfully implemented for many years now" (84 CFR 44996). To help guide development of a biological assessment, Florida considered prior examples of programmatic consultation that involved rules applicable to large areas that also involved state-issued permits. For example, in 2013, EPA developed a programmatic biological evaluation for a rulemaking under Section 316(b) of the CWA that revised requirements for Cooling Water Intake Structures (CWIS) at existing facilities. This proposed rule change, called the 316(b) rule, governs permits issued by states, so it was national in scope and covered a large number (312) of ESA-listed species. In 2014, the USFWS and NMFS responded with a programmatic Biological Opinion that the action was not likely to jeopardize the continued existence of ESA-listed species, and was not likely to destroy or adversely modify designated critical habitat, and included an ITS. EPA issued the final rule in 2014.

The 316(b) Rule and the Biological Opinion were challenged in the United States Court of Appeals for the Second Circuit (*Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018). The Court rejected the petitioner's challenges, most of which it deemed challenges to the Biological Opinion's "programmatic" approach, and upheld the rule and the Biological Opinion. The petitioners also alleged that the Services failed to comply with the statutory requirements for an ITS. However, the Court found that given their commitment to the technical assistance process, the agencies' justification for not immediately quantifying take was adequate. Upon implementation of the rule, any potential incidental take would be monitored through the permitting process. The Court also found that the ITS's reasonable and prudent measure specifying that EPA exercise its oversight authority in connection with the technical assistance process set forth in the rule to address impacts on listed species, was adequate.

This BA adopts a similar approach. However, post-assumption implementation in the case of an Assumption under CWA Section 404 is also guided by regulations found at 40 CFR § 233, which contain specific requirements regarding the issuance of permits by a State 404 program. The State of Florida's 404 program (Chapter 62-331, F.A.C.) has a structure and technical assistance process that requires a review of species listed by the ESA at the time future permit applications are received. This approach ensures that if a new species is listed or a listed species' status changes after the EPA's review of this BA and application Assumption package, the effects of any State 404 permit on the new species or its status change would be reviewed by USFWS.  If the State 404 program's processes are proposed to be changed significantly in the future, those proposed changes would be submitted to EPA for review before implementation and may trigger reinitiation of consultation with USFWS.

## 1.2   The History of Florida's Request for Assumption

On March 23, 2018, the Florida Governor signed into law Rule 2018-88, Laws of Florida, granting FDEP with the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program (creating § 373.4146, F.S.). Since that time, FDEP has drafted Chapter 62-331, F.A.C. to implement the State 404 program, and drafted Memorandums of Agreement with the EPA and the USACE, as required by 40 CFR § 233.13. In addition, a Memorandum of Understanding has been drafted between FDEP, FWC and USFWS to better facilitate post-assumption implementation

On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR §402.08, to serve as a non-federal representative to prepare the subject BA for possible ESA section 7 consultation. The EPA designated FDEP as the non-federal representative to prepare this BA in a letter dated December 12, 2019, consistent with 50 CFR § 402.08. This designation allowed FDEP to consult informally with the USFWS and NMFS, to coordinate on the list of species that may be affected and to coordinate on potential processes for the review of State 404 permits.

FDEP requested input on a draft species list for Florida's application package for Assumption from the USFWS and the NMFS on November 22, 2019.  On April 15, 2020, NMFS responded to FDEP with the conclusion that ESA-listed species under NMFS jurisdiction do not occur in waters that are assumable by the state. Based on their review, they stated that where there is shared jurisdiction for the Gulf Sturgeon between NMFS and USFWS, and the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. Based on their determination, this BA makes a "no effect" determination for NMFS jurisdictional species.

A brief sequence of recent events and actions by the State of Florida pertaining to the Assumption are as follows:

- On March 23, 2018, the Governor signed into law Rule 2018-88, Laws of Florida, which created § 373.4146, F.S., granting FDEP with the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program.

- In 2018 FDEP began work with both EPA and the USACE to draft separate memorandums of agreement that describe the commitments and responsibilities of each agency, should the Assumption be approved by the EPA. FDEP also began assembly of other required components that will constitute a complete Assumption request package per 40 CFR § 233.10-14(b).

- In May 2018, FDEP published a Notice of Rule Development to implement the State 404 program and held three rulemaking workshops to collect public comment on the draft rule, Chapter 62-331, F.A.C.  The workshops were held on May 5th, May 31st and June 1st, 2018. This rule has been created to implement the State 404 program and to include federal requirements that are not currently covered under the ERP program.

- On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR § 402.08, to serve as a non-federal representative for ESA section 7 consultation to prepare the subject BA.

- On September 18, 2019, EPA, FDEP, United States Department of Interior, USFWS, and USACE members attended a meeting to discuss Florida's proposal to use programmatic consultation for ESA purposes under the Section 404 Assumption.

- On November 22, 2019, FDEP sent a request to USFWS and NMFS to review a preliminary list of affected species for the BA.

- On December 12, 2019, the FDEP Secretary received a response from the EPA Region IV Administrator approving the requested non-federal representative designation, allowing FDEP to move forward with the development of this BA. The letter indicated that at the request of FDEP, EPA would voluntarily engage in consultation with the Services on approving Florida's program.

- In February 2020, FDEP published a Notice of Proposed Rule to implement the State 404 program and in April, held five rulemaking hearings to collect public comment on the draft rule, Chapter 62-331, F.A.C. The hearings occurred on April 2nd, April 6th, April 10th, April 24th, and April 27th.

- In February 2020, FDEP, FWC and USFWS began work to draft a Memorandum of Understanding (MOU) to describe commitments, roles and responsibilities in the State 404 program's species coordination process, should the Assumption be approved by the EPA.

- Additional public hearings were held in March and April 2020 regarding rulemaking for Chapter 62-331, F.A.C.

- On April 15, 2020, NMFS responded to FDEP's November 22, 2019 letter with the conclusion that ESA-Listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State.

- On June 8th, 2020, the Final Notice of Proposed Rule Change for Chapter 62-331, F.A.C. was published.

## 1.3 Organization of the Document

This BA is organized as follows:

- **Chapter 1** provides an overview of the objectives of the Action, whereby the State of Florida would assume the administration of Section 404 of the CWA in those waters not retained by the USACE and offers a history (timeline) of actions leading up to FDEP's request for Assumption.

- **Chapter 2** provides descriptions and details of the request for Assumption and describes the Action Area. It also identifies the ecosystems/habitats evaluated in the remainder of the document.

- **Chapter 3** identifies ESA-listed species evaluated in the remainder of the document and describes sources of information for the ESA-listed, NMFS-listed, State-listed species, and critical habitat within the Action Area.

- **Chapter 4** develops the baseline environmental conditions prior to the Action. Further, it provides a brief history of the regulatory framework prior to (and leading up to) the Action.

- **Chapter 5** analyzes the potential effects of the Action on ESA-listed species and designated critical habitat.

- **Chapter 6** considers the cumulative effect of non-Federal actions that are reasonably certain to occur within the Action Area in the foreseeable future.

- **Chapter 7** discusses species coordination, avoidance and minimization measures, obtaining USFWS technical assistance, and discusses various tools and guidelines for species review and decision making.

- **Chapter 8** provides an effects determination for ESA-listed species and their critical habitat and concluding remarks regarding subsequent actions that will be required.

- **Chapter 9** provides a listing of the references/citations utilized to prepare this document.

The April 15, 2020 letter from NMFS to FDEP stating that it does not have assets (ESA-listed species) that may be affected by this Action is provided in Appendix A. Species accounts on those ESA-listed, candidate, or under review species in Florida potentially affected by the Section 404 Assumption are contained in

Appendix B. Additional information pertaining to the effects of the Action on ESA-listed species, map figures, and a list of dredge and fill activities as described in the USACE database are contained in Appendices C, D, and E respectively.

# 2.     Action & Action Area

## 2.1   Description of Action

This BA analyzes the potential EPA Action; approval of Florida's Assumption for administration of Section 404 of the CWA in State-assumed waters. If the State of Florida's request for Assumption is approved, FDEP would assume regulatory responsibility over all dredging and filling activities in WOTUS not retained by USACE pursuant to 33 USC § 1344(g) (see Chapter 2.3, Description of Action Area). The subsequent issuance of State 404 permits and any ensuing adverse effects to ESA-listed species or critical habitat caused by permitted activities is an effect or consequence of EPA's approval of the State 404 program.

Per Section 404(g) of the CWA, 33 USC. § 1344(g), a state, with approval from the EPA, may be authorized to administer its own permit program for the discharge of dredge or fill material into certain WOTUS in lieu of the permitting program implemented by the USACE. The EPA has promulgated regulations at 40 CFR § 233 outlining, among other things, its requirements for approving a State 404 program.

The Secretary of FDEP is the State official charged with administering the State 404 program when the program is approved in accordance with 40 CFR § 233 and has authority to issue permits pursuant to Part IV of § 373, F.S. In accordance with § 373.4146, F.S., FDEP has the power and authority to issue permits for regulated activities conducted in State assumed waters.

The FDEP, the water management districts (WMDs) and certain local governments delegated by FDEP jointly implement Florida's Environmental Resource Permitting (ERP) program. The agencies' responsibilities are divided according to the Operating and Delegation Agreement (operating agreements) and the geographic regions of the WMDs. At this time, the administration and implementation of the State 404 program is limited to the FDEP. It is anticipated that the State 404 program may be delegated to the WMDs by FDEP in the future. If this is considered, approval from the EPA will be required prior to implementation. Upon approval, these agencies' will be provided training and will be required to follow the same procedures outlined for the State 404 program.

If approved, Florida's State 404 program will regulate discharges of dredge or fill material in those areas where USACE does not retain jurisdiction (assumed waters). EPA's review of the proposed State 404 program includes Chapter 62-331, F.A.C., which will include requirements of federal law that are not addressed in the existing state regulations for dredge and fill permitting (such as noticing provisions, alternatives analysis, and the federal mitigation hierarchy, etc.). The State 404 rule, Chapter 62-331, F.A.C., also includes definitions, procedures for review and agency action on exemption requests, processes for Individual Permits, public notice requirements, procedures regarding mitigation banking, and procedures and descriptions for General Permits created to correspond to the federal Nationwide Permits and appropriate regional general permits as granted by the USACE. EPA's review of this program will also include the State 404 program's Handbook (State 404 Handbook) and new forms, incorporated by rule reference.

## 2.2   Types of Future Activities to be Authorized by Florida's 404 Program

This chapter discusses the different types of future proposed activities that may be issued by the State of Florida as State 404 program permits. A list of the types of future activities that may be authorized under the Section 404 Assumption is included below. A more expansive list is available in Appendix E, which was derived from the USACE project information database. All the activities in the Appendix E list, however, may not be applicable to the State 404 program. Dredging and filling activities include but are not limited to:

- o Discharge of fill material
- o Dredging
- o Ecological restoration
- o Discharge of dredged material
- o Excavation associated with the discharge of dredged or fill material
- o Other (Aquaculture, Work, Aerial or Submarine cable crossings)
- o Conversion of waters type (forested wetland to emergent wetland, stream to lake)
- o Commercial developments
- o Residential developments
- o Single-family residence

- o Agriculture
- o Utilities
- o Roadways
- o Airports
- o Marinas
- o Docks
- o Piers
- o Boat Ramps
- o Dams
- o Levees
- o Mining activities
- o Mitigation
- o Restoration

### *Proposed Activities Authorized or Exempt Under Program*

Types of activities the State 404 program will regulate include all dredge and fill activities within the State assumed waters. Construction activities, including excavation and filling of wetlands, may impact ESA-listed species and habitat occurring in those areas. Other effects associated with dredge and fill construction include, but are not limited to, turbidity, decreased water quality, noise, pollution (including exhaust and new sources of light), short- or long-term hydrodynamic changes in the area and its surroundings, and changes in wet and dry periodicity. Permitted projects may have adverse impacts, and those impacts will be taken into consideration during the permitting process, with protection measures identified and implemented to avoid or reduce those impacts. The proposed activities and exemptions below are excerpts from 40 CFR § 232 and select definitions from 40 CFR § 232.2, also summarized in Appendix B of the State 404 Handbook:

*Discharge of dredged material.*

(1) Except as provided below in paragraph (2), the term "discharge of dredged material" means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:

    (i)   The addition of dredged material to a specified discharge site located in waters of the United States;

(ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

(iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:

(i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to Section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.

(ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chain sawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.

(iii) Incidental fallback.

(3) Section 404 authorization is not required for the following:

(i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized land clearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized land clearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.

(ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at §232.2(r) of this chapter.

(iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

(5)  For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

*Discharge of fill material.*

(1)  The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2)  In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

   (i)  Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

*40 CFR § 232.3 Activities not requiring permits.*

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be subject to any

applicable toxic effluent standard or prohibition and shall require a Section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of Section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from Section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

(1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

(ii) (A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (i.e., ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

(B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a Section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

(2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3)    Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4)    Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5)    Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6)    Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i)    Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii)   All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii)  The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv)   The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v)    Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi)   In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii)  The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix)    The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x)     Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi)    The discharge shall not be located in the proximity of a public water supply intake;

(xii)   The discharge shall not occur in areas of concentrated shellfish production;

(xiii)  The discharge shall not occur in a component of the National Wild and Scenic Rivers System;

(xiv)   The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv)    All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d)    For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1)    Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2)    Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i)  Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a Section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.
Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such

removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in Section 404(r) of the Act are exempt from Section 404 permit requirements but may be subject to other State or Federal requirements.

## 2.3   Description of Action Area

The Action Area is defined as "all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the Action" (50 CFR § 402.02; and Subsection 62-331.010(2), F.A.C.). For the review of this Action, the Action Area encompasses the geographic extent of the FDEP Assumption of Section 404 permitting within the entire State of Florida. The Action Area consists of, and is limited to, the State-assumed waters and areas affected directly or indirectly by the Federal Action.

Florida's request to assume the administration of the CWA Section 404 permitting only includes those Waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters or State-assumed waters.  The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "Retained Waters". This definition can be found in the State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in

Chapter 4.1 of the 404 Handbook. In addition, Appendix A of the 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The USACE also retains permitting authority for projects within "Indian country" as that term is defined at 18 USC §1151 (provided below):

> "Except as otherwise provided in Sections 1154 and 1156 of this title, the term "Indian country," as used in this chapter, means
>
> a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,
>
> b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
>
> c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
>
> A list of "Indian country" can be found online in the USACE Jacksonville District Regulatory Division Sourcebook.
>
> The boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA."

Federal and state-approved dredge and fill activities may occur in isolation or adjacent to one another. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Figure 2-1). Projects that fall entirely outside of the 300-foot buffer of the retained waters will be permitted by the State 404 program (Project 3 in Figure 2-2). Linear projects that have some portion of dredge and fill activities in retained waters will be entirely authorized and permitted by the USACE, even if dredge and fill activities occur in wetlands landward of the 300-foot buffer (Figure 2-3).



**Figure 2-1  Example of activities authorized by the USACE 404 program**



**Figure 2-2   Example of activities authorized by USACE and FDEP**

Projects 1, 2, and 3 show the difference between retained and assumed waters responsibilities. Project 3 would be authorized by FDEP.



**Figure 2-3   Example of a linear project**

Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guideline within the project boundary, the project is considered within retained waters and will be processed by the USACE.

## 2.4     Ecosystems/Habitats Located Within the Action Area

The State of Florida has several widely used land cover classification systems that define habitat/land use across the entire state. Each classification plays an integral role in the FWC's Florida's State Wildlife Action Plan (Wildlife Plan). The Wildlife Plan was the main resource for descriptions of ecosystems within the proposed Action Area. The key systems referenced for this BA are the Natural Communities Classification developed by the Florida Natural Areas Inventory (FNAI) and the Florida Land Cover Classification System (FLCCS) developed by FWC. FLCCS is a combination of several systems to include the FNAI Natural Communities Classification. The discussion below summarizes major wetland types within Florida, including freshwater non-forested wetlands, freshwater forested wetlands, lakes, rivers and streams, and estuarine wetlands. Each of the major types includes a variety of more specific sub-types (Tables 2-1 through 2-6).

### 2.4.1   Discussion of Aquatic Ecosystems and Habitats

Florida's freshwater ecosystem includes 7,800 freshwater lakes, 700 springs, 11 million acres of wetlands, more than 1,700 rivers and streams, and numerous underground aquifers (Fernald and Purdum 1998) (Appendix D, Figure 1). It is through these systems that freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem.

*Freshwater Non-Forested Wetlands*

Florida's freshwater non-forested wetlands habitats include shrubby or herbaceous, non-tidal perennial communities in floodplains or depressions (Appendix D, Figure 2). In Florida, these habitats generally consist of sandy, clay, marl, and organic soils with a seven to 12-month hydroperiod. Fire in the summer months is often essential for these habitats to thrive. Freshwater non-forested wetlands can be divided into two major types: marshes and prairies/bogs (Table 2-1). Freshwater marshes are characterized by deeper, long inundation periods and tall emergent and floating-leaved species. Prairies and bogs are characterized by shallow, periodic inundation and are dominated by aquatic grasses, sedges, and/or titi (FWC 2019).

### Table 2-1   Freshwater Non-Forested Wetlands

| Major Type | Includes | Acres |
|---|---|---|
| Marshes | Depression Marsh, Basin Marsh, Coastal Interdunal Swale, Floodplain Marsh, and Glades Marsh | 2,743,064 |
| Prairies and Bogs | Wet Prairie, Shrub Bog, Marl Prairie, and Seepage Slope | 1,714,632 |

Source: FWC 2019

*Freshwater Forested Wetlands*

Freshwater forested wetlands occur in floodplains and depressional areas adjacent to large rivers, creeks, and lakes throughout Florida (Appendix D, Figure 3). The various types of freshwater forested wetlands are defined by their distinct fire frequency, hydroperiod, accumulated organic material, and water source. Areas with longer hydroperiods encourage the growth of cypress and tupelos, and areas with short hydroperiods support more hydrophytic hardwoods. Freshwater forested wetlands (Table 2-2) consist of a wide variety of soil types and diverse plant communities.

**Table 2-2   Freshwater Forested Wetlands**

| Major Type | Includes | Acres |
|---|---|---|
| Coniferous Dominated Wetlands | Wet Flatwoods, Pond Pine, Atlantic White Cedar, and Slash Pine Swamp Forest | 782,518 |
| Cypress/Tupelo | Dome Swamp, Basin Swamp, Strand Swamp, and Floodplain Swamp | 1,534,202 |
| Hardwood Dominated Wetlands | Baygall, Hydric Hammock, Bottomland Forest, and Alluvial Forest | 1,531,214 |
| Other Wetland Forested Mixed | Cypress/Hardwood Swamps and Cypress/Pine/Cabbage Palm | 1,514,386 |

Source: FWC 2019

### *Lakes*

Ponds and lakes are non-flowing water bodies in natural depressions but lacking persistent emergent vegetation except around their perimeters (Appendix D, Figure 4). Many of Florida's natural lakes are shallow and lack a natural surface outflow though some may be connected to aquatic caves. The majority of Florida's natural lakes are permanent, with some lakes thought to have held water for thousands of years (Table 2-3). Lakes provide essential habitat for a variety of terrestrial, semi-aquatic, and aquatic species.

**Table 2-3  Lakes**

| Major Type | Includes | Acres |
|---|---|---|
| Limnetic Lake | Clastic Upland Lake, Coastal Dune Lake, Flatwoods/Prairie Lake, Marsh Lake, River Floodplain Lake, Swamp Lake, Sinkhole Lake, Coastal Rockland Lake, and Sandhill Lake | 24,786 |

Source: FWC 2019

### *Rivers and Streams*

Florida's rivers and streams are characterized as natural, flowing waters from their source to the limits of tidal influence and bounded by channel banks (FNAI 2010) (Appendix D, Figure 5). Of the 1,700 rivers that flow through Florida, twenty-three are considered major rivers. Species such as the Okaloosa Darter and Shortnose Sturgeon rely on these waterways. Florida contains an abundance of springs that originate from the underground aquifer. These springs are noted for their high water clarity, low sedimentation, stable channels, and openings that are less than 40 feet wide. Table 2-4 below provides several habitat classes of rivers and streams in Florida.

**Table 2-4  Rivers and Streams**

| Major Type | Includes |
|---|---|
| River | Alluvial River |
| Streams | Blackwater Stream, Calcareous Stream, Seepage Stream, Spring-run Stream, and Tidally-influenced Stream |
| Springs | Major Springs – 32 count |

Source: FWC 2019

*Estuarine*

The estuarine ecosystem is the tidally influenced zone landward to the point at which seawater becomes significantly diluted with freshwater inflow from the land (FNAI 2010) (Appendix D, Figure 6). This ecosystem occurs in the intertidal or supratidal zones, is dominated by herbaceous or woody halophytic vascular plants, and experiences salinity levels 0.5 parts per thousand and higher. Species diversity is low due to the extreme physiological stressors in these habitats.

Soils in mangrove swamps and salt marshes are typically muck/sand or limestone substrate and are inundated by daily tides with saltwater creating anoxic conditions. Both systems are found in relatively flat, low-wave energy areas. Salt marshes are dominated by vascular plants (saltmarsh cordgrass, needle rush, and saltwort). Mangrove swamps are usually stands of one of the three species present in Florida: red, white, and black mangroves (Table 2-5).

**Table 2-5  Estuarine Areas**

| Major Type | Acres |
|---|---|
| Mangrove Swamp | 614,097 |
| Salt Marsh | 378,677 |

Source: FWC 2019

*Subterranean*

Natural chambers in the karstic limestone underlay much of northern and central Florida. These cavities are in the twilight, middle, and deep zones, and as such are characterized by animals that are in the trogloxenes, troglophiles, and troglobites groups. Many caves in Florida alternate between aquatic and terrestrial due to the rise and fall of water levels, though most cave systems are permanently inundated by groundwater (Table 2-6). Caves that are submerged are typically associated with spring systems. Due to the stability of conditions in caves, species that rely on these systems are very sensitive to any changes in environmental conditions. Caves provide supporting habitat for various salamanders, bats, crayfish, amphipods, and isopods.

**Table 2-6  Aquatic Caves**

| Major Type | Caves |
|---|---|
| Aquatic | 105 |
| Terrestrial | 64 |

Source: FWC 2019

## 2.4.2  Discussion of Terrestrial Ecosystems and Habitats

Although terrestrial habitats are not regulated under the CWA, many ESA-listed species that occupy assumed waters also require or utilize adjacent uplands. Upland portions of permitted activities are also subject to ESA consultation as part of permit review. Thus, terrestrial habitat types are briefly summarized below.

Florida's terrestrial ecosystem includes approximately 3.7 million acres of natural habitats that are essential breeding, foraging, and refuge areas for many species. Florida has very little topographic relief, with the highest point at 328 feet above sea level. Slight changes in elevation result in habitat changes, with some upland communities at an only slightly greater elevation than adjacent wetlands. Diverse terrestrial ecosystems provide important habitat for a large variety of wildlife, including the Florida Panther, Gopher Tortoise, salamanders and frogs breeding in inclusions of ephemeral wetlands, and bats and crayfish living in caves (FWC 2019). Though uphill terrestrial habitats help to filter rainwater to lower elevations connected to freshwater habitats, only select ecosystems from the Wildlife Plan are discussed herein due to their relation to the Action Area.

### *High Pine and Scrub*

High pine and scrub ecosystems are uplands with deep, sandy soils and mesic to xeric woodlands or shrublands. If present, open canopies consist of pine or a mixture of pine and deciduous hardwoods. Upland natural pine is often associated with and grades into upland mixed woodland, upland hardwoods, or sandhill.

Sandhill and scrub are mostly present in the panhandle and central Florida in upland areas with sand substrates. Sandhill is dominated by widely spaced longleaf pine, a midstory of oaks, and an herbaceous understory, all that rely on a frequent fire regime. Temporary wetlands in sandhills provide essential breeding habitat for a number of animal species. Scrub habitats are characterized by open to dense shrub cover with or without a pine canopy, with the midstory typically consisting of evergreen scrubby oaks and/or Florida rosemary. Temporary wetlands found in scrub provide foraging and breeding habitat for numerous species (Table 2-7).

**Table 2-7  Sandhill and Scrub Areas**

| Major Type | Acres |
|---|---|
| Sandhill | 775,775 |
| Scrub | 400,308 |
| Upland Coniferous | 444,728 |
| Upland Mixed Woodland | 10,939 |

Source: FWC 2019

*Dry Prairie and Pine Rockland*

Dry prairie and pine rockland are characterized by low to non-existent canopy cover with mixed shrubs and herbs in the understory. Dry prairies occur on very flat terrain with wetlands scattered throughout. Pine rocklands are extremely rare habitats that occur on shallow soils over elevated areas of limestone bedrock and are bordered by wet prairies, rockland hammock, or mangroves (Table 2-8).

**Table 2-8  Dry Prairie and Pine Rockland Areas**

| Major Type | Acres |
|---|---|
| Dry Prairie | 155,891 |
| Pine Rockland | 16,867 |

Source: FWC 2019

# 3.    ESA-considered Species Potentially Affected by the Action

Table 3-1 includes 235 species: 139 listed and 96 considered by the ESA which occur or could occur within the Action Area and which may potentially be affected by the Action. Table 3-1 forms the basis of the analysis of the effects in Chapter 5. Species that have been petitioned for listing been included because some of these species may be added to the federal list in the future. The programmatic nature of this BA, and the proposed structure of the species coordination process address future listing status changes for listed species and any new species that may be listed that may not be included in this BA. At the time of a State 404 application review, any changes in listing status for affected species will be addressed during species coordination and technical assistance with the USFWS. Asterisks in this table indicate species that are also State-listed.

## Table 3-1  ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| *MAMMALS* | | | | |
| Sherman's Short-tailed Shrew* | *Blarina brevicauda shermani* | Under review[1] | No | Yes |
| Gray Wolf | *Canis lupus* | Endangered | Yes | No |
| Red Wolf | *Canis rufus* | Endangered | No | Yes |
| Florida Bonneted Bat | *Eumops floridanus* | Endangered | No | Yes |
| Florida Salt Marsh Vole | *Microtus pennsylvanicus dukecampbelli* | Endangered | No | Yes |
| Gray Bat | *Myotis grisescens* | Endangered | No | Yes |
| Little Brown Bat | *Myotis lucifugus occultus* | Under review | No | Yes |
| Indiana Bat | *Myotis sodalis* | Endangered | Yes | No |
| Key Largo Woodrat | *Neotoma floridana smalli* | Threatened | No | Yes |
| Key Deer | *Odocoileus virginianus clavium* | Endangered | No | No |
| Rice Rat | *Oryzomys palustris natator* | Endangered | Yes | Yes |
| Pine Island Rice Rat | *Oryzomys palustris planirostris* | Under review[1] | No | Yes |
| Sanibel Island Rice Rat* | *Oryzomys palustris sanibeli* | Under review[1] | No | Yes |
| Tricolored Bat | *Perimyotis subflavus* | Under review[1] | No | Yes |
| Key Largo Cotton Mouse | *Peromyscus gossypinus allapaticola* | Endangered | No | Yes |
| Choctawhatchee Beach Mouse | *Peromyscus polionotus allophrys* | Endangered | No | No |
| Southeastern Beach Mouse | *Peromyscus polionotus niveiventris* | Threatened | No | No |
| St. Andrew Beach Mouse | *Peromyscus polionotus peninsularis* | Endangered | Yes | No |
| Anastasia Island Beach Mouse | *Peromyscus polionotus phasma* | Endangered | No | No |
| Perdido Key Beach Mouse | *Peromyscus polionotus trissyllepsis* | Endangered | No | No |
| Florida Panther | *Puma [=Felis] concolor coryi* | Endangered | No | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Insular Hispid Cotton Rat | *Sigmodon hispidus insulicola* | Under review[1] | No | No |
| Lower Keys Rabbit | *Sylvilagus palustris hefneri* | Endangered | No | Yes |
| West Indian Manatee | *Trichechus manatus* | Threatened | Yes | Yes |
| **BIRDS** | | | | |
| Cape Sable Seaside Sparrow | *Ammodramus maritimus mirabilis* | Endangered | Yes | Yes |
| Florida Grasshopper Sparrow | *Ammodramus savannarum floridanus* | Endangered | No | No |
| Saltmarsh Sparrow | *Ammospiza caudacutas* | Under review | No | Yes |
| Florida Scrub-Jay | *Aphelocoma coerulescens* | Threatened | No | No |
| Rufa Red Knot | *Calidris canutus rufa* | Threatened | No | Yes (tidal flats) |
| Ivory-billed Woodpecker | *Campephilus principalis* | Endangered | No | Yes |
| Piping Plover | *Charadrius melodus* | Threatened - Atlantic Coast DPS, which occurs in Florida | Yes | Yes (intertidal beaches) |
| Whooping Crane | *Grus americana* | Endangered | Yes | Yes |
| Eastern Black Rail | *Laterallus jamaicensis ssp. jamaicensis* | Under review[1] | No | Yes |
| Wood Stork | *Mycteria americana* | Threatened | No | Yes |
| Eskimo Curlew | *Numenius borealis* | Endangered | No | Yes |
| Red-cockaded Woodpecker | *Picoides borealis* | Endangered | No | No |
| Audubon's Crested Caracara | *Polyborus plancus audubonii* | Threatened | No | Yes |
| Black-capped Petrel | *Pterodroma hasitata* | Proposed for listing as Threatened | No | No |
| Everglade Snail Kite | *Rostrhamus sociabilis plumbeus* | Endangered | Yes | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Roseate Tern | *Sterna dougallii dougallii* | Threatened - Caribbean population, which occurs in Florida | No | No |
| Bachman's Wood Warbler | *Vermivora bachmanii* | Endangered | No | Yes |
| Golden-winged Warbler | *Vermivora chrysoptera* | Under review[1] | No | Yes |
| REPTILES | | | | |
| American Alligator | *Alligator mississippiensis* | Threatened - due to similarity of appearance | No | Yes |
| Spotted Turtle | *Clemmys guttata* | Under review[1] | No | Yes |
| American Crocodile | *Crocodylus acutus* | Threatened | Yes | Yes |
| Eastern Diamondback Snake | *Crotalus adamanteus* | Under review[1] | No | No |
| Key Ringneck Snake* | *Diadophis punctatus acricus* | Under review[1] | No | No |
| Eastern Indigo Snake | *Drymarchon corais couperi* | Threatened | No | Yes, especially in north Florida |
| Gopher Tortoise* | *Gopherus polyphemus* | Candidate - eastern population, which occurs in Florida (western population listed as Threatened) | No | No |
| Escambia Map Turtle | *Graptemys ernsti* | Under review[1] | No | Yes (streams) |
| Southern Hognose Snake | *Heterodon simus* | Not warranted 12-month finding | No | No |
| Apalachicola Common Kingsnake | *Lampropeltis getula meansi* | Under review[1] | No | Yes |
| Alligator Snapping Turtle | *Macrochelys termminckii* | Under review[1] | No | Yes (streams) |
| Atlantic Salt Marsh Snake | *Nerodia clarkii taeniata* | Threatened | No | Yes (streams) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Florida Pine Snake* | *Pituophis melanoleucus mugitus* | Under review[1] | No | No |
| Bluetail Mole Skink | *Plestiodon egregius lividus* | Threatened | No | No |
| Sand Skink | *Plestiodon reynoldsi* | Threatened | No | No |
| Florida Red-bellied (Florida Panhandle) Turtle | *Pseudemys nelsoni* | Under review[1] | No | Yes (streams) |
| Florida Scrub Lizard | *Sceloporus woodi* | Under review[1] | No | No |
| Short-tailed Snake* | *Stilosoma extenuatum* | Under review[1] | No | No |
| Rim Rock Crowned Snake* | *Tantilla oolitica* | Under review[1] | No | No |
| *AMPHIBIANS* | | | | |
| Reticulated Flatwoods Salamander | *Ambystoma bishopi* | Endangered | No | Yes |
| Frosted Flatwoods Salamander | *Ambystoma cingulatum* | Threatened | No | Yes |
| Georgia Blind Salamander* | *Eurycea wallacei* | Under review[1] | No | Yes (aquatic caves) |
| Gopher Frog | *Lithobates capito* | Under review[1] | No | Yes |
| Gulf Hammock Dwarf Siren | *Pseudobranchus striatus lustricolus* | Under review[1] | No | Yes |
| *FISH* | | | | |
| Shortnose Sturgeon | *Acipenser brevirostrum* | Endangered | No | Yes (streams) |
| Gulf Sturgeon | *Acipenser oxyrinchus [=oxyrhynchus] desotoi* | Threatened | Yes | Yes (streams) |
| Atlantic Sturgeon | *Acipenser oxyrinchus oxyrinchus* | Endangered - South Atlantic DPS, which occurs in Florida | Yes | Yes (streams) |
| Okaloosa Darter | *Etheostoma okaloosae* | Threatened | No | Yes (streams) |
| Saltmarsh Topminnow* | *Fundulus jenkinsi* | Under review[1] | No | Yes (streams) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Smalltooth Sawfish | *Pristis pectinate* | Endangered - US DPS (Bahaman DPS also listed as Endangered) | Yes | Yes (streams) |
| *MOLLUSKS* | | | | |
| Southern Elktoe | *Alasmidonta triangulata* | Under review[1] | No | Yes (streams) |
| Fat Threeridge | *Amblema neislerii* | Endangered | Yes | Yes (streams) |
| Rayed Creekshell | *Anodontoides radiatus* | Under review[1] | No | Yes (streams) |
| Pygmy Siltsnail Snail | *Cincinnatia parva* | Under review[1] | No | Yes (streams) |
| Ponderous Siltsnail Snail | *Cincinnatia ponderosa* | Under review[1] | No | Yes (streams) |
| Delicate Spike | *Elliptio arctata* | Under review[1] | No | Yes (streams) |
| Chipola Slabshell | *Elliptio chiplolaensis* | Threatened | Yes | Yes (streams) |
| Purple Bankclimber | *Elliptoideus sloatianus* | Threatened | Yes | Yes (streams) |
| Tapered Pigtoe | *Fusconaia burki* | Threatened | Yes | Yes (streams) |
| Narrow Pigtoe | *Fusconaia escambia* | Threatened | Yes | Yes (streams) |
| Round Ebonyshell | *Fusconaia rotulata* | Endangered | Yes | Yes (streams) |
| Southern Sandshell | *Hamiota australis* | Threatened | Yes | Yes (streams) |
| Shinyrayed Pocketbook | *Lampsilis subangulata* | Endangered | Yes | Yes |
| Gulf Moccasinshell | *Medionidus penicillatus* | Endangered | Yes | Yes (streams) |
| Ochlockonee Moccasinshell | *Medionidus simpsonianus* | Endangered | Yes | Yes (streams) |
| Suwannee Moccasinshell | *Medionidus walker* | Threatened | Yes | Yes (streams) |
| Stock Island Tree Snail | *Orthalicus reses [not incl. nesodryas]* | Threatened | No | Yes |
| Oval Pigtoe | *Pleurobema pyriforme* | Endangered | Yes | Yes (streams) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Fuzzy Pigtoe | *Pleurobema strodeanum* | Threatened | Yes | Yes (streams) |
| Southern Kidneyshell | *Ptychobranchus jonesi* | Endangered | Yes | Yes (streams) |
| Choctaw Bean | *Villosa choctawensis* | Endangered | Yes | Yes |
| *CRUSTACEANS* | | | | |
| Cypress Crayfish | *Cambarellus blacki* | Under review[1] | No | Yes |
| Florida Cave Amphipod | *Crangonyx grandimanus* | Under review[1] | No | Yes (aquatic caves) |
| Hobb's Cave Amphipod | *Crangonyx hobbsi* | Under review[1] | No | Yes (aquatic caves) |
| Squirrel Chimney Cave Shrimp | *Palaemonetes cummingi* | Threatened | No | Yes (aquatic caves) |
| Orange Cave Crayfish | *Procambarus acherontis* | Under review[1] | No | Yes |
| Coastal Flatwoods Crayfish | *Procambarus apalachicolae* | Under review[1] | No | Yes |
| Silver Glen Springs Crayfish | *Procambarus attiguus* | Under review[1] | No | Yes (aquatic caves) |
| Bigcheek Cave Crayfish | *Procambarus delicatus* | Under review[1] | No | Yes (aquatic caves) |
| Panama City Crayfish** | *Procambarus econfinae* | Proposed for listing as Threatened | No | Yes |
| Santa Fe Cave Crayfish* | *Procambarus erythrops* | Under review[1] | No | Yes (aquatic caves) |
| Orange Lake Cave Crayfish | *Procambarus franzi* | Under review[1] | No | Yes (aquatic caves) |
| Coastal Lowland Cave Crayfish | *Procambarus leitheuser* | Under review[1] | No | Yes (aquatic caves) |
| Florida Cave Crayfish | *Procambarus lucifugus* | Under review[1] | No | Yes (aquatic caves) |
| Miami Cave Crayfish | *Procambarus milleri* | Under review[1] | No | Yes (aquatic caves) |
| Putnam County Cave Crayfish | *Procambarus morrisi* | Under review[1] | No | Yes (aquatic caves) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Pallid Cave Crayfish | *Procambarus pallidus* | Under review[1] | No | Yes (aquatic caves) |
| Black Creek Crayfish | *Procambarus pictus* | Under review[1] | No | Yes (streams) |
| Spider Cave Crayfish | *Troglocambarus maclanei* | Under review[1] | No | Yes (aquatic caves) |
| *INSECTS* | | | | |
| Logan's Agarodes Caddisfly | *Agarodes logani* | Under review[1] | No | Yes (streams) |
| Florida Leafwing | *Anaea troglodyta floridalis* | Endangered | Yes | No |
| Frosted Elfin Butterfly | *Callophrys irus* | Under review | No | No |
| Miami Tiger Beetle | *Cicindelidia floridana* | Endangered | No | No |
| Nickerbean Blue Butterfly | *Cyclargus ammon* | Threatened - due to similarity of appearance | No | No |
| Miami Blue Butterfly | *Cyclargus thomasi bethunebakeri* | Endangered | No | No |
| Monarch Butterfly | *Danaus plexippus plexippus* | Under review[1] | No | No |
| Duke's Skipper Butterfly | *Euphyes dukesi calhouni* | Under review[1] | No | Yes |
| Palatka Skipper Butterfly | *Euphyes pilatka klotsi* | Under review[1] | No | Yes |
| Westfall's Clubtail Dragonfly | *Gomphus westfalli* | Under review[1] | No | Yes (streams) |
| Ceraunus Blue Butterfly | *Hemiargus ceraunus antibubastus* | Threatened - due to similarity of appearance | No | No |
| Schaus Swallowtail Butterfly | *Heraclides aristodemus ponceanus* | Endangered | No | No |
| Gulf Coast Solitary Bee | *Hesperapis oraria* | Under review[1] | No | No |
| Sykora's Hydroptila Caddisfly | *Hydroptila sykorai* | Under review[1] | No | Yes (streams) |
| Morse's Little Plain Brown Sedge Caddisfly | *Lepidostoma morsei* | Under review[1] | No | Yes (streams) |

### Table 3-1  ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cassius Blue Butterfly | *Leptotes cassius theonus* | Threatened - due to similarity of appearance | No | No |
| Purple Skimmer Dragonfly | *Libellula jesseana* | Under review[1] | No | Yes (lakes) |
| American Burying Beetle | *Nicrophorus americanus* | Endangered | No | No |
| Little Oecetis Longhorn Caddisfly | *Oecetis parva* | Under review[1] | No | Yes (lakes) |
| Southern Snaketail Dragonfly | *Ophiogomphus australis* | Under review[1] | No | Yes (streams) |
| Blue Calamintha Bee | *Osmia calaminthae* | Under review[1] | No | No |
| Calvert's Emerald Dragonfly | *Somatochlora calverti* | Under review[1] | No | Yes (streams) |
| Bartram's Scrub-hairstreak | *Strymon acis bartrami* | Endangered | Yes | No |
| Yellow-sided Clubtail Dragonfly | *Stylurus potulentus* | Under review[1] | No | Yes (streams) |
| Three-toothed Long-Horned Caddisfly | *Triaenodes tridontus* | Under review[1] | No | Yes (streams) |
| **PLANTS** | | | | |
| Meadow Joint-vetch | *Aeschynomene pratensis* | Under review[1] | No | Yes |
| Crenulate Lead-plant | *Amorpha crenulata* | Endangered | No | No |
| Blodgett's Silverbush | *Argythamnia blodgettii* | Threatened | No | No |
| Four-petal Pawpaw | *Asimina tetramera* | Endangered | No | No |
| Purpledisk Honeycombhead Sunflower | *Balduina atropurpurea* | Under review[1] | No | Yes |
| Apalachicola Wild Indigo | *Baptisia megacarpa* | Under review[1] | No | Yes |
| Florida Bonamia | *Bonamia grandiflora* | Threatened | No | No |
| Florida Brickell-bush | *Brickellia mosieri* | Endangered | Yes | No |
| Brooksville Bellflower | *Campanula robinsiae* | Endangered | No | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Fragrant Prickly-apple | *Cereus eriophorus var. fragrans* | Endangered | No | No |
| Deltoid Spurge | *Chamaesyce deltoidea ssp. deltoidea* | Endangered | No | No |
| Pineland Sandmat | *Chamaesyce deltoidea pinetorum* | Threatened | No | No |
| Wedge Spurge | *Chamaesyce deltoidea serpyllum* | Endangered | No | No |
| Garber's Spurge | *Chamaesyce garberi* | Threatened | No | No |
| Big Pine Partridge Pea | *Chamaecrista lineata keyensis* | Endangered | No | No |
| Pygmy Fringe-tree | *Chionanthus pygmaeus* | Endangered | No | No |
| Cape Sable Thoroughwort | *Chromolaena frustrata* | Endangered | Yes | No |
| Florida Golden Aster | *Chrysopsis floridana* | Endangered | No | No |
| Florida Perforate Cladonia | *Cladonia perforata* | Endangered | No | No |
| Pigeon Wings | *Clitoria fragrans* | Threatened | No | No |
| Short-Leaved Rosemary | *Conradina brevifolia* | Endangered | No | No |
| Etonia Rosemary | *Conradina etonia* | Endangered | No | No |
| Apalachicola Rosemary | *Conradina glabra* | Endangered | No | No |
| Florida Semaphore Cactus | *Consolea corallicola* | Endangered | Yes | No |
| Ciliate-Leaf Tickseed Sunflower | *Coreopsis integrifolia* | Endangered | Yes | Yes |
| Avon Park Harebells | *Crotalaria avonensis* | Endangered | No | No |
| Okeechobee Gourd | *Cucurbita okeechobeensis ssp. okeechobeensis* | Endangered | No | Yes |
| Florida Prairie-Clover | *Dalea carthagenensis floridana* | Endangered | No | No |
| Beautiful Pawpaw | *Deeringothamnus pulchellus* | Endangered | No | Yes |
| Rugel's Pawpaw | *Deeringothamnus rugelii* | Endangered | No | Yes |
| Garrett's Mint | *Dicerandra christmanii* | Endangered | No | No |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Longspurred Mint | *Dicerandra cornutissima* | Endangered | No | No |
| Scrub Mint | *Dicerandra frutescens* | Endangered | No | No |
| Lakela's Mint | *Dicerandra immaculata* | Endangered | No | No |
| Florida Pineland Crabgrass | *Digitaria pauciflora* | Threatened | No | Yes |
| Clam-shell Orchid | *Encyclia cochleata var. triandra* | Not warranted 12-month finding | No | No |
| Big Cypress Epidendrum Orchid | *Epidendrum strobiliferum* | Under review[1] | No | No |
| Blackbract Pipewort | *Eriocaulon nigrobracteatum* | Under review[1] | No | Yes |
| Scrub Buckwheat | *Eriogonum longifolium var. gnaphalifolium* | Threatened | No | No |
| Snakeroot (Wedgeleaf Eryngo) | *Eryngium cuneifolium* | Endangered | No | No |
| Telephus Spurge | *Euphorbia telephioides* | Threatened | No | No |
| Small's Milkpea | *Galactia smallii* | Endangered | No | No |
| Harper's Beauty | *Harperocallis flava* | Endangered | No | No |
| Aboriginal Prickly-apple | *Harrisia (=Cereus) aboriginum (=gracilis)* | Endangered | Yes | No |
| Florida Hartwrightia Sunflower | *Hartwrightia floridana* | Under review[1] | No | Yes |
| Henry's Spider-lily | *Hymenocallis henryae* | Under review[1] | No | No |
| Highlands Scrub Hypericum | *Hypericum cumulicola* | Endangered | No | No |
| Edison's Ascyrum St. Johns Wort | *Hypericum edisonianum* | Under review[1] | No | Yes |
| Smooth Barked St. Johns Wort | *Hypericum lissophloeus* | Under review[1] | No | Yes |
| Yellow Anisetree | *Illicium parviflorum* | Not warranted 12-month finding | No | Yes |
| Beach Jacquemontia | *Jacquemontia reclinata* | Endangered | No | No |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cooley's Water-willow | *Justicia cooleyi* | Endangered | No | Yes |
| Scrub Blazingstar | *Liatris ohlingerae* | Endangered | No | No |
| Panhandle Lily | *Lilium iridollae* | Under review[1] | No | Yes |
| Bog Spicebush | *Lindera subcoriacea* | Under review[1] | No | Yes |
| Sand Flax | *Linum arenicola* | Endangered | No | Yes |
| Carter's Small Flowered Flax | *Linum carteri carteri* | Endangered | Yes | Yes |
| West's Flax | *Linum westii* | Under review[1] | No | Yes |
| Boykin's Lobelia | *Lobelia boykinii* | Under review[1] | No | Yes |
| Raven's Seedbox | *Ludwigia ravenii* | Under review[1] | No | Yes |
| Scrub Lupine | *Lupinus aridorum* | Endangered | No | No |
| Curtis' Loosestrife | *Lythrum curtissii* | Under review[1] | No | Yes |
| Lowland Loosestrife | *Lythrum flagellare* | Under review[1] | No | Yes |
| White Birds-in-a-nest | *Macbridea alba* | Threatened | No | Yes |
| Godfrey's Stitchwort | *Minuartia godfreyi* | Under review[1] | No | Yes |
| Needleleaf or Narrowleaf Naiad Water-nymph | *Najas filifolia* | Under review[1] | No | Yes |
| Britton's Beargrass | *Nolina brittoniana* | Endangered | No | No |
| Cape Sable Orchid | *Oncidium undulatum* | Under review[1] | No | Yes |
| Papery Whitlow-wort | *Paronychia chartacea* | Threatened | No | No |
| Key Tree Cactus | *Pilosocereus robinii* | Endangered | No | No |
| Godfrey's Butterwort | *Pinguicula ionantha* | Threatened | No | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Lewton's Polygala Milkwort | *Polygala lewtonii* | Endangered | No | No |
| Tiny Polygala Milkwort | *Polygala smallii* | Endangered | No | No |
| Horton Wireweed (Small) | *Polygonella basiramia* | Endangered | No | No |
| Sandlace (Woody Wireweed) | *Polygonella myriophylla* | Endangered | No | No |
| Florida Pondweed | *Potamogeton floridanus* | Under review[1] | No | Yes |
| Scrub Plum | *Prunus geniculata* | Endangered | No | No |
| White Meadowbeauty | *Rhexia parviflora* | Under review[1] | No | Yes |
| Panhandle Meadowbeauty | *Rhexia salicifolia* | Under review[1] | No | Yes |
| Chapman Rhododendron | *Rhododendron chapmanii* | Endangered | Yes | Yes |
| Hairy Peduncled Beakrush | *Rhynchospora crinipes* | Under review[1] | No | Yes |
| Miccosukee Gooseberry | *Ribes echinellum* | Threatened | No | Yes |
| Eared Coneflower | *Rudbeckia auriculata* | Under review[1] | No | Yes |
| Florida Willow | *Salix floridana* | Under review[1] | No | Yes |
| Gulf Sweet Pitcherplant | *Sarracenia rubra ssp. gulfensis* | Under review[1] | No | Yes |
| American Chaffseed | *Schwalbea americana* | Endangered | No | Yes |
| Florida Skullcap | *Scutellaria floridana* | Threatened | No | Yes |
| Everglades Bully | *Sideroxylon reclinatum ssp. austrofloridense* | Threatened | No | Yes |
| Georgia Bully | *Sideroxylon thorne* | Under review[1] | No | No |
| Fringed Campion | *Silene polypetala* | Endangered | No | No |
| Gentian Pinkroot | *Spigelia gentianoides* | Endangered | No | No |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cooley's Meadow Rue | *Thalictrum cooleyi* | Endangered | No | Yes |
| Florida Torreya | *Torreya taxifolia* | Endangered | No | No |
| Florida Bristle Fern | *Trichomanes punctatum ssp. floridanum* | Endangered | No | No |
| Ocala Vetch | *Vicia ocalensis* | Not warranted 12-month finding | No | Yes |
| Wide-leaf Warea | *Warea amplexifolia* | Endangered | No | No |
| Carter's Mustard | *Warea carteri* | Endangered | No | No |
| Karst Pond Xyris | *Xyris longisepala* | Under review[1] | No | Yes |
| Florida Ziziphus (Jujube) | *Ziziphus celata* | Endangered | No | No |

[1]Substantial 90-day Finding
*Species/subspecies is also State-listed in Florida (i.e., State threatened)
**State Species of Special Concern (SSC)

## 3.1   ESA-considered Species and Critical Habitat in the Action Area

As noted, the Action is EPA's approval of Florida's Assumption of Section 404 permitting and the transfer of permitting responsibility from USACE to FDEP in State-assumed waters. If the State 404 program is approved, FDEP would assume regulatory responsibility over dredging and filling activities in WOTUS not retained by USACE pursuant to 33 USC § 1344(g).

All ESA-listed, proposed, candidate, and petitioned plant and animal species under USFWS jurisdiction and with ranges within Florida are discussed in this BA. The status of listed species can change from year to year, and species that have been petitioned for ESA-listing have also been included because some of these species may be listed in the future. Including a comprehensive analysis in this BA for the list of species in Table 3-1 helps evaluate the effects of the State 404 program on any species that are currently listed or that are currently under review and may become listed in the future. Table 3-1 includes all species analyzed in Chapter 5, although a few species were determined to be likely "no effect" findings because they are believed to be extirpated in Florida or any effects were considered to be insignificant or discountable.

Species dependent on aquatic systems are more likely to be affected by the Action; however, upland species may also be present in staging areas or along access routes or otherwise within or affected by individual

project action areas. If adverse impacts/effects to upland species would not occur "but for" the Action, those adverse impacts must be addressed. Thus, upland species have been retained in the analysis.

Information for the species analyzed in this document was gathered from the USFWS Environmental Conservation Online System (ECOS) and various documents linked from ECOS, including 5-year reviews, Recovery Plans, and Species Status Assessments. Secondary references cited in ECOS documents were reviewed as necessary. For species under review for ESA-listing, petitions to list and 90-day and/or 12-month findings were reviewed. The amount of information available for under review species ranged from minimal to considerable, depending on the species. For some species, extensive additional literature was available; for others, relatively little is known.

As the precise locations of future permit applications are not known at this time, no attempt was made to generate detailed range maps or analyze species distributions relative to anticipated impacts. Without knowledge of future permit locations, it is impractical to determine the amount of overlap between project sites and species at this time. However, a relatively small number of species have repeatedly occurred in large numbers of past consultations, and these are identified in the Effects analysis chapter (Chapter 5) of this BA.

Similarly, critical habitat was not mapped because the locations of future permit applications are not precisely known at this time. Conservation tools are available online, including Geographic Information System (GIS) downloads for critical habitats and habitat ranges, including the ECOS system mentioned above. Additional tools are also available at https://www.fws.gov/southeast/conservation-tools/. The USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) can also be used to determine whether critical habitats or habitat ranges exist within a project area. Table 3-1 identifies whether or not critical habitat has been designated for each ESA-listed species. For species with designated critical habitat, future State 404 permit review will evaluate whether the project location is within a critical habitat unit.

Each State 404 permit application within assumed waters will identify the location and extent of proposed activities, allowing identification of ESA-listed species present or potentially present, and presence or absence of designated critical habitat (using IPaC, FNAI database, etc.). This data will be used to determine potential effects on ESA-listed species on a project-specific basis.

## 3.2   NMFS-Listed Species

FDEP requested input on a draft species list for Florida's application package for Assumption from the USFWS and the NMFS on November 22, 2019.  On April 15, 2020, NMFS responded to FDEP with the conclusion that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State (See Appendix A). They stated that where there is shared jurisdiction for the Gulf sturgeon between NMFS and USFWS, the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. While ESA-listed species under NMFS jurisdiction are anticipated to only occur in retained waters, they are included in this BA as part of the comprehensive review of all Florida's imperiled species. Based on the NMFS' letter, this BA will reflect the NMFS' recommendation of "no effect" for species under NMFS jurisdiction.

## 3.3   State-Listed Species

Although this BA focuses on federal ESA-listed, proposed, or under review species, there is considerable overlap with Florida's State-listed species (FWC 2018). The current listing status of all of Florida's federal and

state listed species is found in Chapter 68A-27, F.A.C. It is noteworthy that Florida's definition of "take" is identical to the federal definition (Chapter 68A-27.003, F.A.C.). See Chapter 7.1 for additional information regarding State-listed species.

# 4.    Baseline Conditions

This chapter identifies and describes all known natural and anthropogenic sources of impact on ESA-considered species and the condition of their habitats in the Action Area, except those caused by the Action. The purpose of the environmental baseline is to provide the context for the impacts of the Action with regard to the impacts of all the other human activities that are also affecting the ESA-considered species.

This environmental baseline describes wetlands status and trends within Florida, and implications for ESA-considered species. The baseline assessment focuses on factors influencing habitat and those which affect the distribution and abundance of ESA-considered species. The baseline also includes past and present impacts of federal, state, and private activities within the Action Area, and activities underway at present (i.e., coincident with the Assumption). The Action Area was previously defined and described in Chapter 2.

## 4.1    Regulatory Baseline

### 4.1.1  Federal Wetland Regulations

Section 404 of the CWA (33 USC § 1344) establishes a program to regulate the discharge of dredged or fill material into WOTUS, inclusive of wetlands. The Administrator of the EPA, in conjunction with the Secretary of the Army, acting through the Chief of Engineers, established guidelines for regulating such discharges under Section 404(b)(1) of the CWA (40 CFR § 230). The EPA and the USACE jointly implement the regulation and permitting of such proposed activities. In Florida, the USACE Jacksonville District acts as the regulatory agency that issues Section 404 dredge and fill permits.

*Individual Permits*

To receive a dredge and fill permit authorization from the USACE, an applicant must demonstrate the following under 40 CFR § 230.10:

- No practicable alternative to the proposed activity exists that would have less adverse impact on the aquatic ecosystem;
- The proposed activity will not:
  - violate State water quality standards,
  - violate any applicable toxic effluent standard or prohibition,
  - jeopardize the continued existence of Endangered and Threatened species, or result in the likelihood of destruction or adverse modification of critical habitat
  - violate any requirement imposed to protect a marine sanctuary;
- The proposed activity will not cause or contribute to significant degradation of WOTUS; and
- The applicant has taken appropriate and practicable steps that will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

The USACE will request any additional information required to deem an application complete, typically within 15 days of receipt of the application. Once the agency deems the application to be complete, the USACE publishes a public notice within 15 days to receive comments from interested and/or affected parties on the proposed action.

Following receipt of an application and evaluation as to the completeness of the application, the USACE is charged with evaluating the effects of the proposed action on ESA-listed species or designated critical habitat. Where a proposed action may affect a listed species or critical habitat, USACE coordinates and/or consults with the Services prior to issuing any permit. If the USACE determines the proposed activity may affect any endangered or threatened species or their critical habitat, beneficially or adversely, the USACE District Engineer will initiate consultation with the Services. If the USACE District Engineer makes a determination from the submitted application that the proposed activity would not affect ESA-listed species or their critical habitat, the public notice will contain a statement attesting to such and consultation with the Services is not required.

The comment period is typically 30 days; upon receipt of comments, the USACE evaluates the comments received, provides them to the applicant, and determines whether a public hearing is required. Following the comment period (and a public hearing if conducted), the USACE makes a determination as to whether the Section 404 permit should be issued. This determination is based on applicable regulations governing the activity as well as comments received as part of the record. The USACE District Engineer will either prepare a Statement of Findings or – where an Environmental Impact Statement (EIS) has been prepared – a Record of Decision on all permit decisions. The final action of the USACE is either the signature of the issuing official on the authorizing document (a USACE Permit) or a signature on a letter notifying the application of the denial of the permit. An issued permit will contain conditions to follow in execution of the work; a denial will contain written documentation of the reason(s) for the denial.

### *General Permits*

A general permit is issued for structures, work, or discharges that will result in only minimal adverse effects. General permits are issued on a nationwide, regional, or state basis for particular categories of activities. There are three types of general permits – Nationwide Permits, Regional General Permits, and Programmatic General Permits. General permits (which are reviewed by the Services) are usually valid for five years and may be re-authorized by the USACE (the Services will review the proposed reauthorizations).

### *Nationwide Permits*

On a five-year basis, the USACE issues Nationwide Permits (NWPs) pursuant to Section 404(e) of the CWA (33 USC § 1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 USC § 401 et seq.). As of January 6, 2017, there were a total of 52 NWPs. The NWPs streamline the requirements of the CWA and are informed by extensive feedback from the public and other key stakeholders. NWPs provide expedited review of projects that have minimal impact on the aquatic environment. Categories of activities that may be covered under the NWPs include linear transportation projects, bank stabilization activities, aquatic habitat restoration, residential development, commercial and industrial developments, aids to navigation, and certain maintenance activities.

In 2017, the USACE added two new NWPs in addition to the 50 that were in place in 2012. One addition provides a mechanism for an efficient authorization process for the removal of low-head dams to restore streams and enhance public safety; the second addition covers the construction and maintenance of living shorelines to control erosion in coastal areas (adapted from USACE news release dated January 6, 2017)

(https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/1043614/army-corps-of-engineers-revises-and-renews-nationwide-permits/; accessed January 30, 2020).

### Regional General Permits

As of February 2020, the USACE Jacksonville District has issued 18 general permits. Each regional general permit has specific terms and conditions, all of which must be met for project-specific actions to be verified as compliant with and covered by the respective general permit.

### Programmatic General Permits

Programmatic General Permits are based on an existing state, local, or other federal programs and designed to avoid duplication of that program. The USACE Jacksonville District lists 12 programmatic general permits - one of which is only applicable to Puerto Rico (https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Obtain-a-Permit/; accessed January 30, 2020).

## 4.1.2   Florida Wetlands Regulations

Part IV of § 373, F.S. regulates dredging and filling in wetlands and other surface waters, such as: the construction, alteration, operation, maintenance, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, works (including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other artificial structures), and appurtenant works (artificial improvements to a dam).

This statute authorizes FDEP and the five water management districts (WMDs) in the state to jointly implement Florida's ERP program. The responsibilities of the agencies are divided according to Operating Agreements between FDEP and the particular WMD. Provisions in the statute allow for FDEP to approve local government programs to implement the ERP program on behalf of the FDEP and the WMDs. As of January 2020, full delegation has been given to Broward County and minor works delegated to the Environmental Protection Commission for Hillsborough County.

The ERP program operates in addition to the USACE Section 404 program that regulates activities in WOTUS. All state, local, and regional governments in Florida delineate wetlands in accordance with state methodology (Chapter 62-340, F.A.C.) instead of the federal wetland delineation method (Section 404 of the CWA and the Federal Manual for Identifying and Delineating Jurisdictional Wetlands). While the ERP application is issued, withdrawn, or denied in accordance with state statutory and rule criteria (briefly summarized below), agency action on the ERP application also constitutes any needed water quality certification (waiver thereto) under Section 401 of the CWA, and coastal zone consistency concurrence statements with Florida's federally-approved Coastal Zone Management program under section 307 (Coastal Zone Management Act). These State ERP reviews and approvals by FDEP, WMD, or delegated local governments are not connected to, dependent upon, nor do they influence the USACE permit review processes under Section 404 of the CWA. Therefore, the USACE must take separate action to issue or deny any needed federal permit under Section 404 of the CWA and/or section 10 of the Rivers and Harbors Act of 1899, and the USACE decision to issue a permit may or may not be consistent with the State's decision to issue an ERP permit.

To receive an ERP, an applicant must demonstrate that the proposed activity will not be harmful to the water resources of the state and will not be inconsistent with the overall objectives of Florida rules and statutes. The applicant must provide reasonable assurance that the activity will not violate the applicable state water quality

standards and that the activity is not contrary to the public interest for all waters that are not designated as Aquatic Preservers or Outstanding Florida Waters. For activities in those designated waters, the applicant must provide reasonable assurance that the proposed activity will be clearly in the public interest. Surface water quality standards are published in Chapter 62-302, F.A.C. In addition, FDEP provides policy guidance on anti-degradation in Rule 62-4.242, F.A.C., and in Rule 62-302.300, F.A.C, which allows for the protection of water quality above the minimum required for classification. Further, FDEP administers the Impaired Waters Rule (Chapter 62-303, F.A.C.), and has established Total Maximum Daily Load criteria (Chapter 62-304, F.A.C.) (FDEP 2020b). It is the intent of FDEP and the WMDs that these criteria are implemented in a manner that achieves a programmatic goal and a project-permitting goal of no net loss in wetlands or other surface water functions.

To determine whether an activity is not contrary to the public interest or is clearly in the public interest, the FDEP must consider and balance the following criteria:

- Whether the activity will adversely affect the public health, safety, or welfare or the property of others;

- Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

- Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

- Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;

- Whether the activity will be of a temporary or permanent nature;

- Whether the activity will adversely affect or will enhance significant historical and archaeological resources; and

- The current condition and relative value of functions being performed by areas affected by the proposed activity.

FDEP provides a copy of all notices of ERP applications for individual permits that propose regulated activities in, on, or over wetlands or other surface waters to the FWC for review and comment. The FDEP and FWC frequently work together on non-regulatory issues as well as regulatory. Examples of the many collaboration efforts include habitat restoration projects, management of State Parks and management of species on other State-owned easements and property.

In accordance with the provisions of § 373.4141, F.S., the FDEP shall review the ERP application to determine if it is complete. If the application is incomplete, FDEP must request additional information (RAI) within 30 days. The applicant must respond to such requests within 90 days. Within 30 days after receipt of such additional information, FDEP must review the submitted material for completeness. The WMD processing procedures for ERP vary somewhat to accommodate the requirements of their specific Governing Boards.

In accordance with § 120, F.S., FDEP must decide whether it should issue or deny an ERP within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application. Application completeness is determined by whether the applicant has submitted all materials required for review as specified by rule and statute. The WMDs also are subject to this requirement, but their ERP processing procedures vary by each district to

accommodate the requirements of their different Governing Boards. Pursuant to § 120.60(1), F.S., any application that FDEP or the WMD does not approve or deny within 60 days is considered approved by default.

Once issued, ERP permits are valid for the life of the system (which includes all structures and works authorized for construction or land alteration). The ERP permit does not automatically expire after the construction phase (typically five years) of a project but continues to cover operation (use) of the system in perpetuity.

Under current regulations for permit issuance, an applicant proposing any activity that is expected to result in impacts to both federal and state jurisdictional wetlands or other surface waters must obtain both a Section 404 permit from the USACE and an ERP permit from FDEP or the WMDs. There is the potential for duplication of effort to obtain what, in some cases, results in nearly identical permits for anticipated impacts to the same extent of wetlands and other surface waters. The timelines for review and issuance of a federal Section 404 Permit and a State ERP permit can vary substantially. The State of Florida has an interest in assuming the federal permitting responsibility for Section 404 and will preserve the environmental protections afforded by federal law; the result should increase efficiency and consistency in the application review and issuance process while ensuring a framework that will maintain protections for listed species and their critical habitats.

## 4.2    Environmental Baseline

### Wetlands

In 1845, the State of Florida contained an estimated 20.3 million acres of wetlands (Dahl 2005). By 1996, only about half of the original wetlands remained (USFWS 1996). From the mid-1950s through the mid-1970s, prior to the CWA, the rate of wetland loss has been estimated at 72,000 acres per year (Hefner 1986). In the following decade, wetland loss decreased to an estimated 23,700 acres per year (Hefner et al. 1994).

As of 1996, an estimated 11.4 million acres of wetlands covered about 29 percent of the surface area of Florida, more than any other state in America at that time. Of these wetlands, 90 percent or about 10.2 million acres were freshwater wetlands. The average annual net loss of wetlands from 1985 through 1996 was 4,740 acres, and freshwater forested wetlands exhibited a net gain. During the 1985-1996 interval, 72 percent of wetland loss was attributed to development and 28 percent to agriculture (Dahl 2005).

### Central and Southern Florida Project

The Central and Southern Florida (CS&F) Project for flood control and other purposes was authorized by the Flood Control Act of 1948 as an improvement plan for flood control, drainage, and other purposes over an 18,000-square-mile area of central and south Florida. This project authorized the diversion of water to the Atlantic Ocean and the Gulf of Mexico through canals and the diversion of water southwest through the Everglades. The project provided benefits for human populations that were able to build, grow, and develop these new lands. The Everglades Agricultural Area was developed for the production of food, and areas further east became densely populated cities, including Miami, Ft. Lauderdale, and West Palm Beach. Unfortunately, the project also resulted in the modification and loss of 2,400 square miles of freshwater wetlands, including the Everglades (USACE 2019a). See Figure 4-1 for a comparison of historic freshwater flows compared to water flows today.



**Figure 4-1   Historic freshwater flows compared to freshwater flows after C&SF Project**

Source: USACE and SFWMD 2007

### *Everglades Restoration*

Florida's everglades are twice the size of New Jersey, comprised of a mixture of dense forests and open prairies, sunny croplands and shady swamps, rural areas and cities. The South Florida Ecosystem Restoration Program, a partnership between the federal government and the State of Florida, consists of a suite of projects that focus on the C&SF system.  In 2000, congressional authorization created the Comprehensive Everglades Restoration Plan (CERP), which is the single largest of the program's efforts. CERP is a 50/50 partnership between the federal government and the State of Florida. It is a program to restore, protect, and preserve water resources in central and southern Florida, including the Everglades. The USACE is the lead federal agency, and the South Florida Water Management District (SFWMD) is the lead State agency in this effort.

For 20 years, the CERP program has been designing, planning, and constructing multiple components of the South Florida Ecosystem Restoration Program. The goal of these efforts is to eventually improve 2.4 million acres of south Florida's wetlands ecosystems (including Everglades National Park), by reducing high volume discharges from Lake Okeechobee to the estuaries and improve water delivery to the Florida and Biscayne Bays, as well as enhance the freshwater supply (USACE 2019b). See Figure 4-2 for a depiction of the Everglades restoration project and the associated improvements to future ecosystem conditions.

**Figure 4-2  Future Ecosystem Conditions based on CERP**

Source: USACE and SFWMD 2007

### 4.2.1  Historical Federal Permitting Habitat

WOTUS, as defined under currently applicable regulations and guidance, are regulated by the USACE under Section 404 of the CWA, and by FDEP and the WMDs. The following discussion is based on data provided by the USACE and characterizes Section 404 permits issued from 2014 through 2018. The habitat types are from Wildlife Plan and Guide to the Natural Communities of Florida (FNAI 2010), and each includes multiple subtypes. These are cross walked with Cowardin types used for USACE reporting; while similar, definitions may not match entirely.

Table 4-1 summarizes wetland permits issued in Florida by the USACE over the most recently available five-year period, from FY 2014 through FY 2018. Permitted wetland fill is presented by type of wetland and acreage; the dataset is limited to wetlands mostly within the Action Area covered by the current document and does not include all wetlands in the state. For the first four years of the period, permitted wetland fill ranged from 1,587 to 2,417 acres per year, then more than doubled to 4,363 acres in FY 2018 reportedly because of a confluence of multiple larger one-time projects being permitted in that year. The mean annual permitted acreage for the period was 2,423 acres per year. This suggests that annual wetland loss has remained at or below levels identified in previous decades. The numbers in Table 4-1 do not include offsets from wetland mitigation, wetland dredge, or grant-funded restoration. Based on national data, mitigation and restoration

likely result in lower net loss of wetlands and even net gains for some habitat types in some years (1998-2004), although in 2004-2009 there was a continued national net loss (Dahl 2011).

As indicated in Table 4-1, wetland fill impacts within the Action Area were primarily to palustrine wetlands. Impacts on other wetland types were considerably less in comparison. Palustrine wetlands provide habitat for numerous ESA-listed species.

**NOTES regarding interpretation of USACE data:**

A single 404 permit may authorize activities that affect multiple wetlands or surface waters areas within the project area. So, the total number of areas will be larger than the total number of permits issued.

The USACE data assigns an ID number for each WOTUS that is delineated on a site, and that number is in the Table 4-1 under the column "Number of Areas". The acreages for these areas under the column "Total Acres" represent the entire footprint of the fill authorized for each area, not just the amount of WOTUS that was adversely impacted. (R. Barron, USACE, personal communication, April 16, 2020).

The USACE has been developing a GIS shapefile to depict the retained waters. At the time of this BA, the draft shapefile (February 2019) does not include all of the retained and tidal waters noted in the USACE list of retained water (particularly canal systems in southwest and south Florida). Because it was the best available information at the time, FDEP queried the USACE project data by overlaying it with the draft retained water shapefile. This was performed in order to estimate the number and types of projects in State-assumed waters, outside of boundaries of the draft USACE retained waters file. Due to the limitations of the geographically referenced shapefile, the USACE permit-related data in this BA does not accurately represent projects/permits in only assumed waters. Please note that this data was used to analyze and depict general data trends for this BA, and not serve as a source for definitive quantitative data. Tables and Figures in this BA that use this data likely overestimate the number of projects that will be in assumed waters but is presented here as best available information. The data provided in Table 4-1 and Figure 4-3 likely inadvertently include some retained waters and may include values for some section 10 projects.

**Table 4-1    Authorized Areas and Acreages by Wetland Type, 2014 - 2018**

| Cowardin Type | FY 14 | | FY 15 | | FY 16 | | FY 17 | | FY 18 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number[1] of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres |
| Estuarine | 29 | 2.71 | 39 | 6.85 | 22 | 5.55 | 55 | 17.3 | 112 | 10.82 |
| Lacustrine | 29 | 10.39 | 26 | 48.86 | 35 | 9.29 | 24 | 17.45 | 32 | 12.46 |
| Marine | 6 | 0.46 | 2 | 0.03 | 4 | 3.08 | 11 | 59.91 | 15 | 10.58 |
| Palustrine | 740 | 1,491.65 | 788 | 1,452.29 | 786 | 2,162.99 | 990 | 1,851.78 | 1,234 | 4,141.19 |
| Riverine | 130 | 432.94 | 124 | 78.95 | 169 | 235.75 | 141 | 44.34 | 238 | 188.06 |
| **Total** | **934** | **1,938.15** | **979** | **1,586.98** | **1,016** | **2,416.66** | **1,221** | **1,990.78** | **1,631** | **4,363.11** |

[1]The Number of Areas represents the number of WOTUS areas authorized. A single 404 permit may authorize multiple WOTUS areas, so the number of areas will exceed the number of permits issued. Also see Notes subsection under 4.2.1 regarding areas and acreages. FY = Federal Fiscal Year (October through September)

Source: USACE Jacksonville District



**Figure 4-3     Acreage of Authorized Fill, by Wetland Type**

A single 404 permit may authorize multiple WOTUS areas, so the number of areas will exceed the number of permits issued. Also see Notes subsection under 4.2.1 regarding areas and acreages. FY = Federal Fiscal Year (October through September). Source: USACE Jacksonville District

### Freshwater Non-forested Wetlands – Palustrine Wetlands including Palustrine Emergent (PEM) and Palustrine Shrub Scrub (PSS)

As shown in Table 4-1, freshwater non-forested wetlands (assumed to be roughly equivalent to combined PEM and PSS Cowardin Types) are associated with a considerable number of the permitted activities in Florida from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 263 to 542, and the acreage ranged from 320 to 2,069 annually. Although freshwater non-forested wetlands are among the most extensive in Florida (about 5.4 million acres) (FWC 2019), Table 4-1 suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

### Freshwater Forested Wetlands

Freshwater forested wetlands (assumed to be roughly equivalent to Palustrine Forested (PFO) Cowardin Types) accounted for an even greater number of permitted fill activities from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 354 to 622, and the acreage ranged from 727 to 1,980.

Freshwater forested wetlands include about 4.2 million acres or about 10 percent of Florida's land area. Table 4-1 suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

### Lakes

Lakes (assumed to be roughly equivalent to lacustrine Cowardin Types) accounted for a relatively small proportion of permitted activities: 24 to 32 WOTUS areas authorized from FY 2014 through 2018, and nine to 48 acres. Lakes cover almost 1.3 million acres in Florida, with much of the surface area in public ownership.

### Rivers and Streams

Rivers and streams (assumed to be roughly equivalent to riverine Cowardin Types) accounted for 124 to 238 WOTUS areas authorized from FY 2014 through 2018, and 79 to 432 acres with considerable year to year variation. Estuarine Cowardin Type wetlands may also fall in this category, with a small area included in assumed waters; 22 to 112 WOTUS areas associated with permits were issued for estuarine wetlands, including three to 17 acres of impacts.

### Marine

Relatively small areas of marine habitat (assumed to be equivalent to marine Cowardin Types) are within assumed waters; WOTUS areas authorized ranged from two to 15 per year, including less than one to about 10 acres of impacts per year.

### Uplands

While uplands are not regulated under state wetland regulations, under the CWA and ESA, if uplands include listed species which can be adversely affected as a result of the Action, those impacts/effects must be addressed. ESA-listed species could be affected by Actions on uplands that are associated with wetlands permits such as construction of access roads or staging areas, and many species utilize both wetland and upland habitat. Thus, such features are often included as part of the species coordination process for a State 404 permit application review.

### Inventories and Surveys for Habitat Types and Quantities

The most current information on Florida habitat types is summarized in the Wildlife Plan and is also available as GIS layers from the FNAI. While this information is in some cases based on site-specific inventories or surveys, it is presented at the statewide level. A statewide approach is believed to be appropriate for this statewide Programmatic BA. Available GIS layers can be used to map specific wetlands, at a scale that can be presented in a statewide view or mapped on a finer scale when needed.

## 4.2.2   Historical Federal Permitting: ESA Consultations

Baseline conditions were derived from the USACE permit database provided by the Regulatory Division of the USACE Jacksonville District, which encompasses federal fiscal years 2014 through 2018. This database includes all temporary and permanent permitted wetland impacts by Cowardin code, permit authorization type, dredge or fill acreage approved, and a project site coordinate. The database also includes all ESA consultations by type, agency, closure method, ESA-listed species potentially affected, and a corresponding object identification number that links the ESA consultations with the permitted wetland impacts.

Please see the Notes subsection in 4.2.1 for details regarding interpretation of the data in this BA. Tables 4-2a and 4-2b show the types of consultations for ESA-listed species for the USACE consultation data involving permanent and temporary dredge and fill actions in Florida from 2014 through 2018. We estimate that out of those past Section 404 permit applications reviewed, 7.08 percent of reviews were reasonably certain to

result in take (n=~368 permit reviews out of 5,195). This percentage was calculated using the USACE Jacksonville District permitting database's "Formal" choice in the "Consultation Type" field, since most of the formal consultations can be assumed to be associated with activities that may cause incidental take. The percentages of all types of consultations are shown for the five-year period is shown in Table 4.2a.  In Table 2b, this data is shown annually for years 2014-2018. Approximately 14 percent resulted in "Informal" type consultations. As shown in Table 4.2, over ~79 percent of findings over the period 2014-2018 were covered by existing programmatic consultations or decision tools. For the USACE permit data collected during the years 2014-2018, a small proportion of the total number of ESA-listed species accounted for the majority of consultations. During this time, many of the species subject to frequent consultation had existing decisions tools such as consultation keys or programmatic biological opinions. For those species, such decision tools can help guide future consultations and assist FDEP when assessing potential effects of proposed actions.

Of the 139 listed and two (2) proposed species in the Action Area, 84 have been the subject of ESA consultations in the past five years. Two species (Eastern Indigo Snake and Wood Stork) accounted for 56.6 percent of species-level consultations, and just 15 species accounted for 93.3 percent of all species-level consultations (see Table 4-3a and Table 4-3b; note that most consultations include more than one species, therefore these numbers may represent a smaller number of consultations). Recent consultations are not distributed evenly within the Action Area and can be especially dense in areas of rapid growth and development (see Figures 8 and 9).

Discrepancies in the numbers between Tables 4-2 and Table 4-3 are explained as follows. Each permit may have several habitat types and species associated with it that may require input from either the USFWS or NMFS, sometimes both. Due to the availability of tools such as programmatic consultations and consultation keys, some species for a given permit may be covered under a programmatic consultation while others may require a formal or informal consultation. This results in the possibility of multiple species in the USACE database being associated with one USACE-assigned ESA Action Identification number based on their closure method and consultation type while other species associated with the permit fall into a different ESA Action Identification number.

**Table 4-2a  Consultation Types for Federal Actions Totals, FY 2014 – 2018**

| ESA Determination | Total # (2014-2018) | % of Total |
|---|---|---|
| Formal | 368 | 7.08 |
| Informal | 710 | 13.67 |
| Programmatic | 4117 | 79.25 |
| **Total** | **5195** | **100** |

Source: USACE Jacksonville District

**Table 4-3b  Consultation Types for Federal Actions by Year, FY 2014 – 2018**

| ESA Determination | Total # 2014 | Total # 2015 | Total # 2016 | Total # 2017 | Total # 2018 | % of Total |
|---|---|---|---|---|---|---|
| Formal | 41 | 61 | 63 | 80 | 123 | 7.08 |
| Informal | 137 | 131 | 127 | 131 | 184 | 13.67 |
| Programmatic | 811 | 738 | 740 | 883 | 945 | 79.25 |
| **Total** | **994** | **942** | **933** | **1096** | **1252** | **100** |

Source: USACE Jacksonville District

**Table 4-4a  ESA Consultations Without Programmatic, By Species, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| *Mammals* | | | |
| Florida Bonneted Bat, (*Eumops floridanus*) | 383 | Choctawhatchee Beach Mouse, (*Peromyscus polionotus allophrys*) | 1 |
| Key Largo Woodrat, (*Neotoma floridana smalli*) | 1 | Southeastern Beach Mouse, (*Peromyscus polionotus niveiventris*) | 2 |
| Key Deer, (*Odocoileus virginianus clavium*) | 2 | St. Andrew Beach Mouse, (*Peromyscus polionotus peninsularis*) | 3 |
| Rice Rat, (*Oryzomys palustris natator*) | 2 | Florida Panther, (*Puma (=felis)*) | 108 |
| Key Largo Cotton Mouse, (*Peromyscus gossypinus allapaticola*) | 1 | Lower Keys Marsh Rabbit, (*Sylvilagus palustris hefneri*) | 2 |
| *Birds* | | | |
| Cape Sable Sparrow, Seaside (*Ammodramus maritimus mirabilis*) | 9 | Wood Stork, (*Mycteria americana*) | 216 |
| Florida Grasshopper Sparrow, (*Ammodramus savannarum floridanus*) | 45 | Red-Cockaded Woodpecker, (*Picoides borealis*) | 230 |

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Florida Scrub-Jay, (*Aphelocoma coerulescens*) | 143 | Audubon's Crested Caracara, (*Polyborus plancus audubonii*) | 142 |
| Red Knot, (*Calidris canutus rufa*) | 8 | Everglade Snail Kite, (*Rostrhamus sociabilis plumbeus*) | 121 |
| Piping Plover, (*Charadrius melodus*) | 19 | - | - |
| *Reptiles* | | | |
| American Alligator, (*Alligator mississippiensis*) | 2 | Gopher Tortoise, (*Gopherus polyphemus*) | 1 |
| American Crocodile, (*Crocodylus acutus*) | 12 | Atlantic Salt Marsh Snake, (*Nerodia clarkii taeniata*) | 6 |
| Eastern Indigo Snake, (*Drymarchon couperi*) | 207 | Bluetail Mole Skink, (*Plestiodon egregius lividus*) | 31 |
| Sand Skink, (*Plestiodon reynoldsi*) | 59 | - | - |
| *Amphibians* | | | |
| Reticulated Flatwoods Salamander, (*Ambystoma bishopi*) | 4 | - | - |
| *Fish* | | | |
| Shortnose Sturgeon, (*Acipenser brevirostrum*) | 5 | Atlantic Sturgeon, (*Acipenser oxyrinchus oxyrinchus*) | 6 |
| Smalltooth Sawfish, (*Pristis pectinata*) | 188 | Okaloosa Darter, (*Etheostoma okaloosae*) | 1 |
| *Mollusks* | | | |
| Fat threeridge, (*Amblema neislerii*) | 3 | Gulf Moccasinshell, (*Medionidus penicillatus*) | 4 |
| Chipola Slabshell, (*Elliptio chipolaensis*) | 3 | Ochlockonee Moccasinshell, (*Medionidus simpsonianus*) | 3 |
| Purple Bankclimber, (*Elliptoideus sloatianus*) | 5 | Choctaw Bean, (*Villosa choctawensis*) | 6 |
| Tapered Pigtoe, (*Fusconaia burkei*) | 5 | Stock Island Tree Snail, (*Orthalicus reses* (not incl. nesodryas)) | 1 |
| Narrow Pigtoe, (*Fusconaia escambia*) | 3 | Oval Pigtoe, (*Pleurobema pyriforme*) | 6 |
| Round Ebonyshell, (*Fusconaia rotulata*) | 2 | Fuzzy Pigtoe, (*Pleurobema strodeanum*) | 6 |
| Southern Sandshell, (*Hamiota australis*) | 6 | Southern Kidneyshell, (*Ptychobranchus jonesi*) | 6 |
| Shinyrayed Pocketbook, (*Lampsilis subangulata*) | 4 | - | - |

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| *Crustaceans* | | | |
| N/A | - | N/A | - |
| *Insects* | | | |
| Schaus Swallowtail Butterfly, (*Heraclides aristodemus ponceanus*) | 1 | - | - |
| *Plants* | | | |
| Telephus Spurge, (*Euphorbia telephioides*) | 12 | Miccosukee Gooseberry, (*Ribes echinellum*) | 2 |
| Florida Torreya, (*Torreya taxifolia*) | 1 | American Chaffseed, (*Schwalbea americana*) | 1 |
| Key Tree Cactus, (*Pilosocereus robinii*) | 2 | Fringed Campion, (*Silene polypetala*) | 1 |
| Chapman Rhododendron, (*Rhododendron chapmanii*) | 1 | - | - |

Source: USACE Jacksonville District

**Table 4-5b    ESA Consultations with Programmatic, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| *Mammals* | | | |
| West Indian Manatee, (*Trichechus manatus*) | 493 | Choctawhatchee Beach Mouse, (*Peromyscus polionotus allophrys*) | 1 |
| Florida Bonneted Bat, (*Eumops floridanus*) | 411 | Southeastern Beach Mouse, (*Peromyscus polionotus niveiventris*) | 3 |
| Key Largo Woodrat, (*Neotoma floridana smalli*) | 1 | St. Andrew Beach Mouse, (*Peromyscus polionotus peninsularis*) | 4 |
| Key Deer, (*Odocoileus virginianus clavium*) | 5 | Florida Panther, (*Puma (=felis*) | 197 |
| Rice Rat, (*Oryzomys palustris natator*) | 5 | Lower Keys Marsh Rabbit, (*Sylvilagus palustris hefneri*) | 6 |
| Key Largo Cotton Mouse, (*Peromyscus gossypinus allapaticola*) | 1 | - | - |
| *Birds* | | | |
| Cape Sable Sparrow, Seaside (*Ammodramus maritimus mirabilis*) | 9 | Wood Stork, (*Mycteria americana*) | 2681 |

**Table 4-5b   ESA Consultations with Programmatic, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Florida Grasshopper Sparrow, (*Ammodramus savannarum floridanus*) | 57 | Red-Cockaded Woodpecker, (*Picoides borealis*) | 298 |
| Florida Scrub-Jay, (*Aphelocoma coerulescens*) | 199 | Audubon's Crested Caracara, (*Polyborus plancus audubonii*) | 175 |
| Red Knot, (*Calidris canutus rufa*) | 9 | Everglade Snail Kite, (*Rostrhamus sociabilis plumbeus*) | 159 |
| Ivory-Billed Woodpecker, (*Campephilus principalis*) | 1 | Kirtland's Warbler, (*Setophaga kirtlandii* (= *dendroica kirtlandii*) | 2 |
| Piping Plover, (*Charadrius melodus*) | 29 | Roseate Tern, (*Sterna dougallii dougallii*) | 1 |
| *Reptiles* | | | |
| American Alligator, (*Alligator mississippiensis*) | 2 | Gopher Tortoise, (*Gopherus polyphemus*) | 1 |
| American Crocodile, (*Crocodylus acutus*) | 33 | Atlantic Salt Marsh Snake, (*Nerodia clarkii taeniata*) | 6 |
| Eastern Indigo Snake, (*Drymarchon couperi*) | 2697 | Bluetail Mole Skink, (*Plestiodon egregius lividus*) | 31 |
| Sand Skink, (*Plestiodon reynoldsi*) | 66 | - | - |
| *Amphibians* | | | |
| Reticulated Flatwoods Salamander, (*Ambystoma bishopi*) | 6 | - | - |
| *Fish* | | | |
| Shortnose Sturgeon, (*Acipenser brevirostrum*) | 15 | Atlantic Sturgeon, (*Acipenser oxyrinchus oxyrinchus*) | 16 |
| Smalltooth Sawfish, (*Pristis pectinata*) | 305 | Okaloosa Darter, (*Etheostoma okaloosae*) | 1 |
| *Mollusks* | | | |
| Fat threeridge (*Amblema neislerii*) | 6 | Gulf Moccasinshell, (*Medionidus penicillatus*) | 6 |
| Chipola Slabshell, (*Elliptio chipolaensis*) | 6 | Ochlockonee Moccasinshell, | 6 |
| Purple Bankclimber, (*Elliptoideus sloatianus*) | 8 | Choctaw Bean, (*Villosa choctawensis*) | 9 |
| Tapered Pigtoe, (*Fusconaia burkei*) | 8 | Stock Island Tree Snail, (*Orthalicus reses* (not incl. nesodryas) | 2 |

**Table 4-5b    ESA Consultations with Programmatic, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Narrow Pigtoe, (*Fusconaia escambia*) | 3 | Oval Pigtoe, (*Pleurobema pyriforme*) | 11 |
| Round Ebonyshell, (*Fusconaia rotulata*) | 2 | Fuzzy Pigtoe, (*Pleurobema strodeanum*) | 7 |
| Southern Sandshell, (*Hamiota australis*) | 7 | Southern Kidneyshell, (*Ptychobranchus jonesi*) | 7 |
| Shinyrayed Pocketbook, (*Lampsilis subangulata*) | 6 | - | - |
| *Crustaceans* | | | |
| N/A | - | N/A | - |
| *Insects* | | | |
| Miami Blue Butterfly, (*Cyclargus (=hemiargus*) | 1 | Schaus Swallowtail Butterfly, (*Heraclides aristodemus ponceanus*) | 1 |
| *Plants* | | | |
| Beautiful Pawpaw, (*Deeringothamnus pulchellus*) | 1 | Chapman Rhododendron, (*Rhododendron chapmanii*) | 1 |
| Telephus Spurge, (*Euphorbia telephioides*) | 12 | Miccosukee Gooseberry, (*Ribes echinellum*) | 2 |
| Florida Torreya, (*Torreya taxifolia*) | 1 | American Chaffseed, (*Schwalbea americana*) | 1 |
| Aboriginal Prickly-Apple, (*Harrisia (=cereus*) | 0 | Fringed Campion, (*Silene polypetala*) | 1 |
| Key Tree Cactus, (*Pilosocereus robinii*) | 3 | - | - |

Source: USACE Jacksonville District

**Figure 4-4   Locations of ESA Consultations in Action Area, 2014 - 2018**



**Figure 4-5   Concentrations of ESA consultations in the Action Area, 2014 - 2018**



# 5.    Potential Effects on ESA-considered Species

Effects of an action are all consequences to listed species or critical habitat that are caused by the action, including the consequences of other activities that are caused by the action. A consequence is caused by the action if it would not occur but for the action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR §402.02). The Action studied in this BA is EPA's approval of the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. A direct consequence of the Action is that an applicant must go through the State 404 permitting process for a permit in waters assumed by the State and may not go directly to the USACE to get a 404 permit to place fill in State-assumed waters. Therefore, the effects of the EPA approving the Program Assumption are 1) the USACE would no longer be allowed to issue a wetland fill permit in assumable waters, 2) FDEP would be the only entity allowed to issue 404 permits in assumable waters, and 3) the consequence of FDEP issuing 404 permits would be the placement of dredge material in wetlands, which in turn would alter the environment where ESA-considered species may exist or designated critical habitat may exist.

The Action is not expected to substantially increase or decrease the number of Section 404-type authorized activities post-assumption as compared to before Assumption, since the only expected change will be the entity processing the permits. The State 404 program's processes and structure will be consistent with CWA requirements and Section 404 analysis of species and aquatic resources and potential effects of proposed fill or dredge activities. It is reasonable to expect that permitting history available by the USACE for the interval 2014-2018 approximates the number and types of permitting activities that might be anticipated for the next five-year interval. See Chapter 4.2.1 regarding the limitations of the data used in the analyses of this BA, regarding the interpretations of the USACE database and shapefile.

The precise number and locations of future Section 404 permit applications are unknown. Some can be predicted well in advance, such as large public works projects with long lead times and planning horizons. However, most applications, especially from individuals or private entities, are less predictable. While precise locations are mostly unknown, as shown in Figures 8 and Figure 9 consultations related to Section 404 applications tend to cluster in rapidly developing regions of the state.

Using the best available data on recent (past five years) permitting activities as a baseline (see Chapter 4), as well as ecological theory, professional judgment, and the information included in the species accounts in Appendix B, we conducted a qualitative assessment of the potential effects of the Action on species and designated critical habitat. We did not distinguish direct and indirect effects based on 2019 updates to the section 7 implementing regulations of the ESA (50 CFR § 402); however, both immediate impacts and those delayed in time were considered.

Table C.1 in Appendix C summarizes the potential impacts of dredge and fill activities on ESA-listed and proposed to be listed species. This stressor table is intended to identify potential effects and facilitate analysis of which effects are reasonably likely to occur as a result of activities authorized, if Assumption of Section 404 is approved. A detailed analysis of potential effects in the future is not possible, because, as stated above, the exact locations, amounts, and types of impacts are not yet known. We briefly summarize major categories of impacts below, followed by a discussion of potential effects on major taxa.

## 5.1   Types of Effects

The following discussion is not exhaustive but includes some of the more common influencing factors and consequences to species that may result from dredge and fill activities. There is a spectrum of effects to consider, including beneficial effects, but for the purposes of this BA the focus will be on potential adverse effects. For example, there is a level of disturbance without a detectable sign of effect (e.g. a wood stork flushed off a nest but returns before the eggs are harmed). There is also disturbance with a detectable sign of effect (e.g. a wood stork is flushed off a nest and the eggs overheat and die). Heightened levels of effect include injury that is observable or detectable, such as a failure to reproduce because of physiological or ecological effects of the action, or the death of one or more individuals.

There is also a spectrum of likelihoods that an effect may occur from a theoretical or conceptual standpoint. The likelihood that an effect may occur can be described by how confident a reviewer may be that something is actually going to occur. These levels of likelihood that something will occur include potential, unlikely, possible, likely, more than likely, and reasonably certain. Potential stressors or effects to the species and to the essential physical and biological features of any critical habitat are discussed below and summarized in Appendix C, but also must be assessed during the review of State 404 permit applications.

### 5.1.1   Biotic Stressors

Biotic stress is stress that occurs as a result of damage done to an organism by other living organisms, such as bacteria, viruses, fungi, parasites, beneficial and harmful insects, weeds, and cultivated or native plants. Dredge and fill activities can alter competitive balances, change predator/prey relationships, or encourage the establishment of invasive plants or animals, which can alter habitat structure. Loss or decrease, or colonization or increase, of a species can cascade through multiple trophic levels and, in some cases, even contribute to habitat alteration (monotypic stands of invasive plants).

### 5.1.2   Physical Stressors

Physical stressors should be assessed individually and cumulatively, when assessing potential biological impacts. An example of a physical stressor could be the physical diversion of a stream to another location, which may adversely impact the habitat for the flora and fauna using the original location of the stream. Other examples include the construction of new, improvements to, and even the removal of dams, weirs, and culverts, the removal of wetlands and surface waters by filling with materials, and the creation of surface waters by dredging and excavation. Physical stressors include direct mortality (burying or trapping of individual animals by fill or equipment placing fill), especially for smaller, less mobile species; it can also result in loss of habitat and displacement of more mobile species able to escape the immediate effect. Fill of part of a wetland can contribute to loss of function even if most of the wetland remains intact.

Dredging can result in temporary to permanent loss of aquatic bottom communities, and sedimentation can reduce visibility, clog gills of aquatic species, and bury immobile organisms. Recovery from dredge effects may require hours to years, depending on the habitat, substrate type, and the extent of the disturbance.

Fragmentation can affect species that migrate seasonally between habitat types (pond breeding salamanders which spend the summer in uplands up to hundreds of feet away) or which have large home ranges and frequently move among resource types (Eastern Indigo Snake or Florida Panther). It can also disrupt metapopulations, especially for short-lived invertebrates dependent on stochastic environments, reducing the frequency of recolonization of otherwise suitable habitat.

Changes to hydrologic regime may include lowering of groundwater levels, increased runoff, or altered hydroperiod. Changes that result in early drying of ponds or wetlands may result in mortality to pond breeding amphibian larvae or small fish, while conversion of a seasonal wetland to a permanent pond may allow colonization by large predators, including stocking of game fish.

Some construction activities (e.g., pile driving or dredging) can result in air or underwater noise and vibration effects. Analysis of and attempting to reduce these effects has become more common in recent years. Construction activities such as noise, vibration, as well as visual disturbance, may alter the behavior of ESA-listed species.

Even measures intended to reduce effects can sometimes have unintended consequences. Some projects have relocated ESA-listed species, but little follow-up monitoring has been done to document success or failure of the translocations.

### 5.1.3  Physicochemical Water Quality Stressors

Physicochemical stress results from environmental factors such as food/nutrition, toxins, metabolic disorders, infections, and inflammation. Water Quality changes are commonly associated with dredge and fill activities, although these are not always easy to describe. Effects can include changes in water temperature, gas or oil dripping from construction equipment or generators to fill of a wetland, eliminating or reducing natural filtration of sediment and pollutants and resulting in degradation of downstream habitat. Dredging may also re-suspend environmental contaminants in sediment (common in industrial areas). Changes to nutrient cycling or exchange are even less obvious and may result from new activities occurring on or adjacent to the filled areas.

## 5.2  Potential Effects

The following discussion is grouped by major taxa and discusses potential effects of the Action by future activities that may be authorized, should the State 404 program be approved, within guilds of species with similar habitat needs or life-history traits. These effects are similar to the effects of the current USACE Section 404 process for granting or denying permits, only will be performed by the State 404 program process as a consequence of the Action, if approved. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the general types of activities and overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for Assumption.

### 5.2.1  Mammals

Twenty-four mammalian species/subspecies are included in Appendix C, Table C.1. Two of these mammals are extirpated from the state and are therefore excluded from further consideration in this BA. General habitat preferences in Florida can group the remaining twenty mammals into the following broad categories: wetland/marsh (six mammals), forests/grasslands/swamps (two mammals), tropical hardwood hammock/mangrove (three mammals), caves (four mammals), pine rockland (one mammal), beach/scrub dune (five mammals), and aquatic (one mammal). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Table C.1.

In general, all mammalian species under consideration in this BA that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories and behaviors may be disturbed by activities during periods when authorized activity-related noise and vibration exceed baseline levels. Such activities may also disturb the natural behavior of ESA-considered species due to visual disturbance during construction activities.

ESA-considered mammals that occupy wetlands and marshes in Florida include voles, rabbits, and rats. These species/subspecies may occupy or use wetland/marsh habitat during all or a portion of their life history (e.g., for breeding, foraging, or shelter). Marsh and wetland species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality associated with future authorized activities could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development. Development of marshes/wetlands may create suitable conditions for non-native predators (e.g., cats and dogs) and competitors (e.g., *Rattus rattus*), which would also impact these ESA-considered species via increased ecological pressures.

Carnivores with large home ranges (e.g., Florida Panther and Red Wolf) occupy a diverse range of habitats, such as forests, grasslands, and swamps in Florida (as well as pine rocklands). Due to the restricted range of the Red Wolf on protected land in Florida (limited to St. Vincent Island, a USFWS National Wildlife Refuge), future activities authorized by the State 404 program are not likely to adversely affect the species. However, future permitted activities may impact the Florida Panther through direct impacts to habitat (dredge and fill), habitat fragmentation, and changes to existing hydrological regimes/water quality. Habitat fragmentation is one of the primary threats to this subspecies and a limit to its recovery.

Tropical hardwood hammock/mangrove ESA-considered mammal species (bats, rats, and mice) are likely to be impacted by future permitted activities via habitat fragmentation from fill or impacts to hydrology/water quality. Several species require fresh sources of drinking water, and their prey items are also dependent on these landscape features. In addition, impacts to habitat, including fragmentation, may create opportunities for non-native predators (e.g., cats) to colonize/thrive. The extent of tropical hardwood hammock and mangrove, particularly in south Florida, has declined significantly over the last several decades as a result of development, and further fragmentation could have significant impacts on ESA-considered species (USFWS 1999).

Several ESA-considered bat species/subspecies occur in limestone karst cave regions of the Florida Panhandle. Most of these bats are rare/unlikely to occur in the state, and future permitted activities are unlikely to adversely affect them. However, the Tricolored Bat is a permanent resident throughout Florida and occupies caves as well as woodland habitat and urban landscapes. Water features are also important to the species as foraging habitat. Direct impacts on the species' habitat (fill) as well as an increase in habitat fragmentation or impacts to hydrological regimes/water quality, may adversely affect the species.

The Key Deer (as well as the Florida Panther) inhabits pine rocklands. Pine rockland (as well as hammock) contains a substantial portion of the deer's forage plants, freshwater, and cover, which is especially important for fawning. Ongoing threats to the species include urbanization. Through direct impacts to habitat via fill, as well as habitat fragmentation and impacts to water quality, future permitted activities could have an impact on the subspecies.

Several ESA-considered beach mice occupy dune systems vegetated by sea oats and adjacent scrub (dominated by oaks and sand pine or palmetto) in coastal Florida. The predominant factors of decline for

these mice are habitat loss due to alteration or conversion of dunes (from human development and use) as well as predation by non-native predators. Direct impacts to habitat via fill, dredging, and habitat fragmentation (which may make habitat for hospitable for non-native predators) could affect these species.

The West Indian Manatee is the only ESA-listed aquatic marine mammal considered in this BA. Florida manatees occur in freshwater, brackish, and marine environments, including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Future activities authorized by the State 404 program could affect this species from dredge and fill activities, increases in vessel storage and operation, and impacts on habitat, including changes in hydrologic regimes, water quality, water control structures, and habitat fragmentation.

## 5.2.2    Birds

Nineteen avian species/subspecies are included in Appendix C, Table C.1. Five of these birds are extirpated from the state and are therefore excluded from further impact analysis in this BA. The remaining 14 birds can be grouped by general habitat preferences in Florida into the following broad categories: marsh/wetland birds (five birds), upland scrub birds (one bird), coastal tidal/marine birds (four birds), grassland birds (two birds), pine savanna birds (one bird), and forest/forested wetlands birds (one bird). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is also presented in Appendix C, Table C.1.

In general, all avian species under consideration in this BA that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories may be disturbed by future permitted activities during periods project noise and vibration exceed baseline levels. In addition, these activities may also alter the natural behavior of ESA-considered via visual disturbance during construction activities.

Marsh/wetland avian species may be affected by any direct impacts to their habitat (nesting, foraging, roosting, overwintering, or stop-over site habitat). Physical impacts to their habitat associated with future State 404 permits may include fill, dredging, and habitat fragmentation. In addition, fill of marsh/wetland habitat may result in a change to existing hydrologic regimes that could impact prey availability, via providing better conditions for invasive/competing prey species or reducing habitat for prey). Changes in hydrology also have the potential to flood habitat and nesting areas (resulting in nest failure), allow aquatic or terrestrial predators easier access to nests (during flooding vs. receding water conditions), and change the existing nutrient cycle. Changes in hydrology may result in high nitrogen levels in marshes/wetlands. The habitat then may become choked by an overabundance of emergent vegetation. Future permitted activities may also result in changes to water quality that could impact existing marsh/wetland vegetation and prey items (reducing habitat suitability for the species).

The only upland scrub avian species under evaluation is the Florida Scrub-jay. Florida Scrub-jays occupy early successional xeric scrub and scrub flatwood habitat in relict sand dunes in north and central Florida. This xeric habitat is well-drained but may be interspersed with swale marshes. Direct impacts associated with permitted activities that could affect the species include placement of fill, alteration of hydrologic regimes, and habitat fragmentation (a major issue that hampers the recovery of this species).

Direct impacts of future permitted activities on coastal tidal/marine avian species may include fill, dredging, and habitat fragmentation of nesting and foraging habitat (beaches, mudflats, intertidal areas, and inlets).

Shoreline stabilization efforts, in particular, threaten several coastal avian species (i.e., fortification by riprap and other hardscape reduces available habitat). Permitted activities may also result in changes to hydrologic regimes and water quality in coastal areas.

Grassland (or dry prairie) avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes. Throughout Florida, grassland habitat is declining and highly fragmented. This habitat may also be mismanaged by suppression of natural fire regimes (USFWS 1999). Additional habitat loss and fragmentation may impact grassland species. Many grassland species also nest on or close to the ground and are highly susceptible to nest flooding (could occur with altered hydrological conditions in the grassland).

The only pine savanna avian species under evaluation is the Red-cockaded Woodpecker. Pine savanna ecosystems (or "high pine") are characterized by widely spaced pine trees and extensive ground cover. Wetlands may be interspersed in low-lying areas. This habitat is almost extinct and highly fragmented in Florida. Also, the quality of existing high pine forests may be hampered by fire suppression (USFWS 1999). Pine savanna avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes.

Forest/forested wetlands avian species may be impacted if future authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes and water quality. Many of the forest/forested wetland obligate species under evaluation are extirpated from the State of Florida. Habitat fragmentation may expose the remaining forest/forested wetland avian species to increased predation risk and nest failure (Stephens et al. 2004). Altered hydrology and water quality may impact prey availability as well.

### 5.2.3  Reptiles

Nineteen reptiles are included in Appendix C, Table C.1. These reptiles can be grouped by general habitat preferences in Florida into the following broad categories: wetland/marsh/freshwater (seven reptiles), swamp/saltwater (one reptile), pine flatwoods (two reptiles), pine rocklands (two reptiles), and sandhill/scrub flatwood (seven reptiles). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Wetland/marsh/freshwater reptile species in Florida may be affected by any direct impacts to their habitat (foraging, breeding, loafing, etc.). Dredge and fill activities in wetlands, marshes, and freshwater (ponds, rivers, streams), including ditching, diking, and impoundments, may result in habitat fragmentation and potentially impact both prey and predator populations (both native and invasive species). In addition, species that spend a large portion of their lives in water are likely to be impacted by changes in hydrological regimes, water quality, and vegetation composition (e.g., increased levels of sedimentation, impacts to burrowing mud substrate, and changes in emergent/submerged vegetation). Impacts are anticipated to be similar for species that inhabit swamps/forested wetlands and saltwater mangroves.

Pine flatwoods serve as a mesic successional stage between hardwood hammock and wet flatwoods (USFWS 1999). This habitat is threatened by conversion or loss and degradation from fire suppression. Species restricted to pine flatwoods are unlikely to be adversely affected by future State 404 permits. However, species that range between pine flatwoods and other habitat types such as wet flatwoods may be affected by direct impacts to habitat and habitat fragmentation.

In Florida, large areas of pine rockland habitats are protected on federal lands. However, particularly around Miami and the Keys, this habitat is on private land and under threat from development, conversion to agriculture, fire suppression, and invasive species (USFWS 1999). Pine rocklands are interspersed with areas of freshwater wetlands. Species associated with these wetland features may be affected by direct impacts to habitat as well as habitat fragmentation.

Sandhill/scrub flatwoods are xeric, well-drained areas of prairie, hammock, and scrub. These habitats are threatened by conversion, degradation, and fragmentation. The species that are found in sandhill/scrub flatwoods are not typically associated with wetlands/WOTUS during their life histories. The future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

### 5.2.4  Amphibians

Five amphibians are included in Appendix C, Table C.1. These include species that utilize seasonal wetlands to breed and then disperse into surrounding upland habitat (three amphibians); species restricted to aquatic caves (one amphibian); and subspecies that primarily utilize perennial wetlands but which always had a restricted distribution and may now be extirpated (one amphibian).

Pond breeding species are easily affected by direct fill of wetlands and by hydrology alteration, especially shortening of pond hydroperiod, which may strand aquatic larvae prior to metamorphosis. As these species move between upland and wetland habitat, fragmentation is a concern. In other parts of the United States, the USFWS sometimes explicitly considers fragmentation in making effects determinations and making conservation recommendations for pond-breeding ESA-listed amphibians (R. Henry pers. comm.). Fire suppression is believed to be a concern for some species in some habitat types. Pond breeding amphibians are also at risk because they utilize seasonal isolated wetlands, which often are not subject to CWA jurisdiction. For cave-dwelling amphibians, water quality degradation, both chemical and from sedimentation, could have adverse effects. Hydrology alteration is also a concern.

Most ESA-considered amphibians in Florida have relatively small distributions. Fully implemented safeguards, such as careful review to identify occurrences associated with future permitting and with adequate avoidance and minimization measures including minimization of fragmentation near utilized wetlands, would ensure that effects would remain at or below baseline conditions.

### 5.2.5  Fish

Six species/subspecies of fish are included in Appendix C, Table C.1 including three types of sturgeon associated with larger rivers and estuaries, two other coastal species, and one species associated with smaller streams. The stream species (Okaloosa Darter) is especially at risk of fragmentation or direct habitat loss because of a restricted range and very limited mobility; however, most populations are currently managed, and the species is considered to be stable at present. The estuarine and coastal species are less likely to be affected by small amounts of dredge or fill because they tend to occur in larger and more contiguous habitats, although sedimentation, water quality degradation, and to a lesser extent direct habitat loss are potential effects. As fish are, by definition, fully aquatic, they are frequently affected by CWA activities. Should these species be found in State-assumed waters, coordination with the Services and important safeguards may need to be identified during permit review, such as implementation of Best Management Practices (BMPs), and avoidance and minimization measures.

### 5.2.6 Insects

Twenty-five species/subspecies of insects are included in Appendix C, Table C.1 including 11 butterflies, five caddisflies, five dragonflies, two bees, and two beetles. Two of these insects, the American Burying Beetle and the Three-toothed Long-horned Caddisfly, are extirpated from the state and therefore excluded from further consideration in this BA. The majority of these ESA-considered insects are threatened by the use of pesticides for agricultural purposes (e.g., Monarch Butterfly's loss of milkweed host plant) and biocides/insecticides for mosquito control.

All of the caddisfly and dragonfly species face similar threats associated with spring, stream, river, and lake modifications. They may be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Given that both groups spend the larval stage of their life cycles in an aquatic habitat, they are especially vulnerable to changes in water quality conditions (e.g., siltation, pollution, and eutrophication) and changes to existing hydrological regimes. Thus, changes in existing hydrological regimes and water quality could also degrade the quality of aquatic habitat and vegetation (e.g., allow for invasion of non-native vegetation).

ESA-considered insects that occupy wetlands, marshes, and swamps in Florida include the Palatka Skipper and Duke's Skipper butterflies and the Calvert's Emerald Dragonfly. These species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development and, in turn, habitat fragmentation.

Species that occupy forests, woodlands, pine barrens, pine rocklands, and/or grasslands in Florida (e.g., Monarch Butterfly, Florida Leafwing, Frosted Elfin Butterfly, Ceraunus Blue Butterfly, Cassius Blue Butterfly, Bartram's Scrub-hairstreak, and Miami Tiger Beetle) do not use wetlands or WOTUS during any stage of their life history. Future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

Coastal or tropical hardwood hammocks, dunes, sand pine, and/or scrub obligate insect species (e.g., Gulf Coast Solitary Bee, Nickerbean Blue Butterfly, Miami Blue Butterfly, and Blue Calamintha Bee) may be impacted by habitat fragmentation from fill. These impacts may occur where waters/wetland habitat is interspersed with or border these habitat types. As insects are declining on a global scale, impacts to habitat and other resources that factor into species' life history could affect ESA-considered species recovery.

### 5.2.7 Crustaceans

Nineteen crustacean species/subspecies are included in Appendix C, Table C.1. These species can be grouped by general habitat preferences in Florida into the following broad categories: pond/river/stream species (four crustaceans) and cave/well/sinkhole species (15 crustaceans). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Future authorizations under the State 404 program may impact pond/river/stream crustaceans (crayfish) via direct mortality or physical alteration of habitat through dredge and fill activities. Dredge and fill activities may also fragment habitat, change existing hydrological regimes, and affect water quality. All of the crayfish species under consideration in the Action Area are highly sensitive to and already threatened by impacts to both surface and groundwater quality (e.g., changes in temperature, flow, siltation levels, etc.). Changes in

water quality (e.g., an increase in nitrogen levels) may also create favorable conditions for invasive aquatic vegetation or change existing levels and/or species composition of native vegetation. This could decrease the quality of the existing crayfish habitat.

Crustaceans (crayfish and amphipods) that inhabit caves, wells, sinkholes, and other subterranean water features may also experience indirect mortality and/or impacts to habitat as a result of dredge and fill activities in or adjacent to occupied areas. Many cave/well obligates are extremely restricted in range (some species are only known from one or two localities). Any changes in habitat conditions could potentially result in species extirpation. Cave/subterranean crustaceans are also highly threatened by changes in hydrology. Any future activities that would deplete groundwater/aquifers results in changes in flow and, in turn, impacts availability of detrital food items or burrowing habitat. Water quality impacts (increase in nitrogen or sediment levels) may also affect the species. In addition, many cave-dwelling species are dependent on cave-roosting bats, specifically their guano, as a food source. Impacts on cave-roosting bat populations may also affect these crustaceans by reducing food availability.

### 5.2.8  Mollusks

As freshwater mussels are, by definition, fully aquatic, they are likely to be impacted by dredge and fill activities. Twenty-one species of mollusks are included in Appendix C, Table C.1, including 18 types of freshwater mussels that are associated with varying sizes of springs, creeks, and rivers, two freshwater snails, and one tree snail. The freshwater mussel species all face similar threats associated with habitat modification. These include direct habitat modifications such as impoundments, dredging/channelization, stream bed destabilization, and streamflow depletion (e.g., water extraction). They are especially vulnerable to changes in water quality conditions (e.g., excessive sedimentation, environmental contaminants, and eutrophication) and changes to existing hydrological regimes. Similarly, as filter feeders, they are vulnerable to changes in nutrient cycling. Given the reliance all freshwater mussels have on host fish during the larval period of their life cycle, impoundments or other effects influencing host fish species may affect these species. Additionally, mollusk species may be threatened by the invasive species (e.g., Asiatic Clam (*Corbicula fluminea*)), which could be spread by dredge and fill activities. Tree Snails are less likely to be affected as they occur in terrestrial, arboreal environments; nonetheless, direct habitat fragmentation is possible.

### 5.2.9  Plants

Ninety-nine plants are included in Appendix C, Table C.1. These species/subspecies/varieties can be grouped by guild into the following categories: lichens, graminoids, annual forbs, perennial forbs, sub-shrubs, shrubs, cacti, and trees. These groups are intentionally broad for this macro analysis. Impact analysis on the species/subspecies/varietal level (that takes into consideration microhabitat preferences) is presented in Appendix C, Table C.1.

Nine annual forbs are included in this analysis. Five of these forbs occur primarily in wetland habitats, including non-forested wetlands such as prairies, as well as ponds and lakes, ditches, and road shoulders. Fifty-five perennial forbs are included, and roughly half of these occur in wetland habitats. They occur in a variety of specific habitats within freshwater non-forested and freshwater forested wetlands, including wet prairies, cypress swamps, bogs, fens, and seeps. Some occur in pond or lake habitats, and others occur in floodplains or along the banks of rivers or streams. Two epiphytic orchids in this category grow on trees in forested wetlands. One grass and one sedge species included in this analysis may be affected as well.

Four sub-shrubs, six shrubs, and two tree species considered in the analysis occur in wetland habitats, or in habitats which may border wetlands, and which may be affected by future activities that may be permitted under the State 404 program. These species occur in both freshwater non-forested and freshwater-forested wetlands. The sole lichen species and the four cacti species occur in upland habitats that are not likely to be affected.

Many of the species analyzed in this document have experienced substantial habitat loss and range restrictions due to a number of factors, including development and land conversion, alteration of fire regimes and fire suppression, threats from invasive species, and changes to hydrologic regimes. Some have been impacted by forestry practices or horticultural collection. Direct impacts to several of the plants may occur from future authorized fill or dredging activities (which could result in direct mortality or direct impact on wetland habitats). Indirect impacts from wetland dredge or fill activities may affect not only hydrophytes but also some upland species occurring in habitats that border wetlands, from the building of access roads or staging areas. Other indirect impacts include changes in hydrology, water quality, nutrient alteration, and competitive pressure that may arise from shifts in species composition.

# 6. Cumulative Effects

Cumulative effects are defined as the effects of future non-federal activities, including Tribal, state, local, and private actions on ESA-considered species or their critical habitat that are reasonably certain to occur in the Action Area for this BA. While these effects will likely occur regardless of the agency responsible for administering the requirements in Section 404 of the CWA, they are considered during the analysis of this Action.  Any future State 404 program permits would also consider cumulative effects.

## 6.1  Effects of Non-Federal Activities

ESA regulations (50 CFR § 402.02; § 402.14) require the action agency to evaluate all effects of a proposed non-federal activity. Effects of an activity may occur later in time and may include consequences occurring outside the immediate area involved. Cumulative effects are those effects of future State or private activities, not involving federal activities, that are reasonably certain to occur within the Action Area of the federal Action subject to consultation 50 CFR § 402.02.

There are existing anthropogenic stressors currently impacting ESA-listed species. In addition, there are national-scale, non-federal activities that are reasonably certain to occur. These include watershed development, increased water use, and climate change (USEPA 2013). The "What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project," prepared by 1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services (2017), addresses the current anthropogenic stressors that will impact development and water use in Florida in the future.

### 6.1.1  Watershed Development

Florida's population continues to grow rapidly, and it is expected that 33.7 million people will reside in Florida by 2070 - nearly 15 million more than were in residence in 2010 (1000 Friends of Florida et al. 2017). The greatest projected population growth is observed in the Central region of Florida (Figure 6-1). If growth continues as projected, nearly one-third of Florida's land will be developed, and development-related water demand will more than double. Due to the significant increase of projected development, especially in the

Central region of Florida, agricultural lands will be consumed by residential, commercial, or industrial activity; therefore, agricultural irrigation development is expected to decrease except for the Southern region of Florida.



**Figure 6-1   Comparison of projected 2010-2070 population change in four Florida Regions**

Source: 1000 Friends of Florida et al. 2017

Projected development scenarios for the State of Florida depict a significant increase in land use between 2010 and 2070 (Figure 6-2). It is expected that by 2070, developed land in Florida will increase from 6,275,000 acres to 11,648,000 acres, growing by 15.55 percent (1000 Friends of Florida, et al. 2016). As a result of increased civil and industrial development, land usage for agricultural purposes in the State of Florida is expected to decrease from 7,586,000 acres to 5,422,000 acres by 2070. However, increased development has the potential for various adverse effects in terms of water quality.

Developmental activity associated with new construction, as well as the overall growth of urban areas, directly affect the stormwater quality and can result in detrimental effects for aquatic communities. Not only does the increased flow from additional stormwater drainage systems affect receiving water bodies, but the stormwater runoff quality that is impacted by developmental activities such as litter, chemicals, metals, nutrients, pesticides, bacteria, sediment loads, and organic matter can harm biological health. These various pollutants and how they can impact water quality are discussed below.



**Figure 6-2 A comparison of the State development scenarios**

Source: 1000 Friends of Florida et al. 2016

Increased sedimentation loads in water systems can result from construction and agricultural activities. There are significant differences in suspended solid concentrations between urban and non-urban stream systems. For example, a study comparison in South Carolina documented a higher total suspended solid concentration value of 2.7 kilograms per square meter per year in an urbanized coastal stream compared to a nearby forested stream that reported a value of 1.6 kilograms per square meter per year (Nagy et al. 2011). Both suspended and accumulated sediment can have adverse impacts. Sedimentation can infill porous areas in a stream/riverbed, eliminating niche areas that multiple aquatic organisms use for egg protection and/or attachment surfaces. Suspended sedimentation can lead to increased turbidity, which not only decreases dissolved oxygen levels (one of the most critical components of water quality) but also can interfere with benthic organisms and their feeding abilities. Makepeace et al. (1995) found that turbid water can be detrimental to aquatic biota. The authors found that total suspended solids concentration between 25 and 100 milligrams per liter "could reduce a river's primary biological productivity by 13 percent to 50 percent" (Makepeace et al. 1995).

Pollutants, including chemicals, bacteria, metals, oils, and pesticides are commonly found in stormwater runoff. These substances and increased concentration levels in urban stormwater can be correlated with construction, developmental, and agricultural activities. Dependent on various factors, these chemicals and substances can result in either acute or chronic detrimental effects to biological life. Stream hydrologic, microbial, and physiochemical data collected in watershed areas in Florida with impervious surfaces ranging from 0-15 percent displayed higher pH, specific conductivity, elevated temperature, higher loads of nutrients (Cl-, NO3-, SO2-4_, Na+, K+, Mg2+, Ca2+, and total phosphorus), higher bacterial concentrations (fecal coliform and *Escherichia coli,*) and increased hydrologic flashiness in areas with greater impervious surfaces (Nagy et al. 2011). The expected trend of exponential developmental growth of approximately 15.55 percent by 2070 for the State of Florida will increase impervious surface areas; conversely, stormwater quality will decrease while flow rates will demonstrate hydrologic flashiness. The combined hydrologic flashes and influx of toxic substances in stormwater will negatively influence biological communities.

Heavy nutrient pollution is deemed one of America's most challenging environmental problems and is mainly influenced by nitrogen and phosphorus loading. Sources of heavy nutrient loading include but are not limited to agriculture, urban stormwater runoff, wastewater, power generation, and private fertilizer usage. Heavy concentrations of dissolved nitrogen and phosphorus in freshwater systems stimulate plant growth, especially algal growth, which ultimately can harm biological life due to the lack of available dissolved oxygen. A two-year monitoring study on reefs in Florida found that harmful algal blooms alter entire fish assemblages and can reduce both abundance and species richness (Baumberger 2008). With development in Florida increasing in the future, increased construction and higher rates of urban stormwater will consequently increase heavy nutrient loading in aquatic systems and reduce biotic diversity.

Another issue specific to Florida, related to watershed developmental concerns, is the potential for saltwater intrusion into confined aquifer systems. Historical evidence since the 1930s documents the concerns and issues related to saltwater intrusion in Florida as a result of encroaching development. In many areas around Florida, draining efforts were initiated to provide dry land for both developmental and agricultural purposes. There are severe and current concerns for the drinking water of nearly 2.5 million residents of Miami-Dade County, due to saltwater intrusion of the Biscayne aquifer stem (a consequence of the draining of the Everglades to allow for development) (Prinos 2014). As of 2011, Prinos determined that 463 square miles (mi$^2$) of the Biscayne aquifer had been intruded with saltwater. Further pump-out of wetland or lake areas in Florida to create additional areas for development could impact groundwater quality by saltwater intrusion mechanisms.

## 6.1.2   Increased Water Use

An increase in population size will place higher demands on the supply of water. Table 6-1 provides the historical water use data in Florida from 1975-2000. A large source of freshwater for the state of Florida is from underground aquifer systems. With growing pressures of climate change, influxes of anthropogenic demands, and unstable weather patterns, aquifer systems will be unable to meet recharge rates to suffice these conditions. Projected data report that by 2070, development-related freshwater demands will increase as much as 100 percent compared to 2010 (Figure 6-3). The Florida statewide demand for water in 2010 was 5,269,311,481 gallons per day; however, by 2070, the demand is expected to increase to 8,094,862,839 gallons per day. (1000 Friends of Florida et al. 2017). It is estimated that approximately 90 percent of the consumed water in the State of Florida is sourced from groundwater, and only 10 percent is from surface water (Holt 2005).

**Table 6-1  Historic Water Use in Florida (millions of gallons per day)**

| Category | 1975 | 1980 | 1985 | 1990 | 1995 | 2000 |
|---|---|---|---|---|---|---|
| Public Supply | 1124 | 1406 | 1685 | 1925 | 2079 | 2437 |
| Domestic self-supplied | 228 | 243 | 259 | 299 | 297 | 199 |
| Commercial – industrial mining | 883 | 700 | 709 | 770 | 692 | 563 |
| Agricultural irrigation[a] | 2930 | 3026 | 2798 | 3495 | 3244 | 3923 |
| Recreational irrigation[b] | n/a | n/a | 182 | 310 | 281 | 411 |
| Power generation | 1608 | 1326 | 680 | 784 | 637 | 659 |
| **Total** | **6773** | **6701** | **6313** | **7583** | **7230** | **8192** |

n/a – Not available; b – Withdrawals for turfgrass and landscaping; – Withdrawals for crops, livestock, and fish farming

Source: Holt 2005, reprinted from Bureau of Economic and Business Research, University of Florida, Table 8:40, Florida Statistical Abstracts 2003

The higher demands for groundwater result in the extensive pumping of aquifer systems, which can result in saltwater intrusion. Depleting existing aquifer storage potential and further, harming future aquifer water quality by saltwater intrusion is expected as a consequence of increased water demands for the State of Florida. Receiving an average of 4.6 feet of rainfall annually, Florida has the second-highest precipitation rate behind Louisiana. With climatic changes and differing seasonal patterns, precipitation is likely to be influenced in the future. Approximately 70 percent of annual rainfall in Florida is lost due to evaporation and the remaining 30 percent flows through pervious surfaces to aquifers, surface water bodies, or to impervious surfaces (Holt 2005). Rising temperatures associated with climate change will increase the evaporation rates of Florida precipitation, therefore reducing overall recharge rates of surface and groundwater systems.



**Figure 6-3    State Water Scenarios (gallons/day/acre)**

Source: 1000 Friends of Florida et al. 2016

Impacts of increased water demand may include reduced depth, areal coverage, and habitat quality for many aquatic communities and aquatic threatened and endangered species. Anthropogenic water demands are also likely to be exacerbated by climate change (see below), leading to greater hydrological variability with an increased probability of drought in many regions.

### 6.1.3  Climate Change

Florida is among the states in the United States most vulnerable to climate change. The extent of coastline in Florida, along with its low elevation and heavy development of coastal and inland areas, will result in large-scale impacts both to human development and biological habitat as climate changes and sea levels continue to rise. According to the Fourth National Climate Assessment (4th NCA), "The Southeast's diverse natural systems, which provide many benefits to society, will be transformed by climate change. Changing winter temperature extremes, wildfire patterns, sea levels, hurricanes, floods, droughts, and warming ocean temperatures are expected to redistribute species and greatly modify ecosystems. As a result, the ecological resources that people depend on for livelihood, protection, and well-being are increasingly at risk, and future generations can expect to experience and interact with natural systems that are much different than those that we see today."

Annual average temperatures throughout the Southeast United States have been increasing since the 1970s. The decade of the 2010s through 2017 was warmer than any previous decade, with much of this warming being experienced as higher nighttime temperatures and longer freeze-free season lengths. (4th NCA) Statistically significant warming is projected for all parts of the United States through the next century, although, in the Southeast, that trend will be somewhat mitigated by latent heat release from increases in evapotranspiration. Average annual temperatures are projected to increase by 3.4°F to 4.3°F by the middle of the 2000s, and between 4.4°F and 7.7°F by 2100 (Vose et al. 2017).

Warmer winter temperatures in Florida will drive some ecosystem changes, especially when combined with sea level rise. Mangroves are being documented in more northerly locations than previously, thanks to more winters without freeze events, and are beginning to replace *Spartina* marshes. As sea level rises, mangroves and other tidal marsh species may be blocked from migrating up-gradient by sea walls, roads, ditches, or other natural or manmade landscape features, and may drown in place.

Landfall of tropical storms and hurricanes has occurred more frequently in Florida than any other state and increasing sea surface temperatures are expected to increase the frequency of high-intensity tropical cyclones (Mendelsohn et al. 2012). Additionally, increasing sea surface temperature has already negatively impacted Florida's coral reefs. As the ocean becomes more acidic due to the uptake of atmospheric carbon, it will become increasingly difficult for a variety of marine invertebrates to produce calcium carbonate shells and skeletons. This will impact biodiversity and the ecosystem services these species provide. These include shellfisheries production, wave and storm surge attenuation, water filtration, tourism, and transfer of energy via trophic processes to recreationally and commercially important finfish species.

Localized changes in precipitation regimes are also expected to occur due to climate change and will likely have a negative impact on a variety of habitats and species. Periods of unstable precipitation patterns of severe storms followed by longer drought periods pose not only risks for threatened and endangered species but also humans. Abiotic factors such as hydroperiod, water table height, salinity gradient, and surface water depth are likely to be disrupted as precipitation patterns change. Southeast Florida has already experienced hydroclimate variability, which has increased drought conditions causing decreased surface water levels,

decreased groundwater recharge rates, lower groundwater tables, and ultimately leads to higher risks of saltwater intrusion (Abiy 2019).

Climate change impacts associated with rising sea levels pose immediate and long-term risks for land management practices of Florida. Coastal degradation and land loss due to sea-level rise will result in land fragmentation and habitat loss for biological organisms. Changes in abiotic factors from a number of climate change-related drivers are likely to cause habitats and species to shift their ranges in response. In addition to biological habitat loss, rising sea levels will also reduce available land in Florida for development. A study of ESA-listed subspecies in Florida showed both high vulnerability and low adaptive capacity in response to rising sea levels and habitat fragmentation (Benscoter et al. 2013). This will be especially problematic for habitats that are unable to migrate because of natural or anthropogenic barriers, and for species that are rare, occur in isolated populations, and/or have poor dispersal capabilities. Sustainable and climate change specific planning should be at the forefront of developmental planning, conservation efforts, and land usage for the State of Florida. The FWC has an adaptation guide, *A Guide to Climate Change Adaptation for Conservation* that can be found on their website at https://myfwc.com/media/5864/adaptation-guide.pdf. For more information about what the FWC is doing to address the impacts of climate change on fish and wildlife in Florida, see their website at: https://myfwc.com/conservation/special-initiatives/climate-change/.

### 6.1.4  Summary of Cumulative Effects of Non-Federal Activities

As compared to the regulatory baseline, the Action does not authorize any new activities or increased discharge of pollutants that would significantly increase the magnitude of adverse cumulative environmental impacts to ESA-listed species, and the implementation of the State 404 program by FDEP will ensure effects on ESA-listed species will be evaluated and addressed at project-level.

# 7.    State 404 Program Species Coordination

*This Chapter is written as if the State has assumed the CWA 404 program*

The following chapter describes the ESA-listed species coordination process that will occur if the EPA were to approve FDEP's request to assume the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. The intention of presenting this section as if the State has assumed the CWA 404 program is to describe the effects of the Action by articulating the changes to the process that would occur as the result of EPA's approval. It is also to establish a clear difference between the pre-assumption coordination between federal agencies (section 7 consultation between USFWS and EPA), from the potential post-assumption coordination between federal and state agencies (technical assistance between USFWS and FDEP as part of the State 404 program species coordination process).

The State 404 program rule [Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C] and EPA regulations (40 CFR 233.20, 40 CFR 230) prohibits issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS and confirms that USFWS conclusions about the effects of 404 permits on listed species are determinative.

The USFWS will review State 404 permit applications and provide, through technical assistance, recommendations to FDEP on a project-by-project basis to ensure adverse effects to ESA-listed species are

avoided and minimized, and to ensure that no State 404 permits will be issued that will jeopardize the continued existence of a listed or proposed to be listed species, or result in adverse modification of critical habitat. This process will also assist USFWS in monitoring any incidental take that is reasonably certain to occur. Under this process, the USFWS will not be issuing any project-by-project incidental take statements (ITS). The anticipated Program assumption BiOp will have a programmatic ITS that will exempt all incidental take associated with State 404 permits from being considered prohibited take under section 9 of the ESA. However, the section 9 exemption provided in the programmatic ITS is contingent on the EPA, FDEP, and the State 404 permit applicant complying with processes and conditions described in the BA, state rules, and any reasonable and prudent measures and terms and conditions provided in the USFWS Program assumption BiOp and it's ITS.

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C. that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. This is ensured by the technical assistance process between the FDEP and USFWS.

The scope of Chapter 62-331, F.A.C. is statewide, covering a wide range of construction activities that are reasonably certain to affect a wide variety of listed species and their habitats. The word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under the ESA. The terms "effect" and "impact" are used interchangeably throughout this document. The review will be in accordance with the requirements and processes specified in the BA, the MOAs, the MOU, Chapter 62-331, F.A.C., and the anticipated Program assumption BiOp. Figure 7-1 at the end of this chapter depicts an overview of the species coordination process.

## 7.1   Federally and State-listed Species Coordination Review

While this BA and this chapter focuses on the species review coordination for federally listed species, it is important to note that both the State 404 permit and the State ERP permit require protections for both federally listed and State-listed species. If a project requires both a State 404 permit and a State ERP permit, protection measures for federally listed species will be incorporated as permit conditions to both permits. In addition, protection measures for State-listed species will be incorporated as permit conditions to both permits. The species review processes for the the State 404 permit and the species review processes for the ERP permit will be similar, with the FDEP permit processor and the FWC permit reviewer working together as a team to resolve issues related to both ESA-listed species and species listed in Chapter 68A-27, F.A.C. The species coordination process outlined in this BA as well as the Memorandum of Understanding between FDEP, FWC and the USFWS will ensure that measures for ESA-listed species that may conflict with measures for a State-listed species that use the same habitat types will be addressed.

The Florida Fish and Wildlife Conservation Commission (FWC) is already involved in the review of many ERP applications and provides FDEP recommended wildlife-related permit conditions, including those that are federally proposed to be listed. In many cases, FWC is the lead conservation agency for federally proposed or candidate species in Florida. A number of species analyzed in this BA are State-listed and under federal review. FWC provides useful resources for State-listed species, including species summary pages with conservation goals, identification of threats, current protections, and links to species action plans and biological status review reports (FWC 2016). These resources include valuable information for future permit

application reviews and can help to identify effective measures to reduce the adverse impacts resulting from project activities.

Florida's Imperiled Species Management Plan (FWC 2016) includes integrated conservation strategies as well as other useful material intended to benefit multiple species. Effective conservation strategies can provide protections that improve the status of an imperiled species and contribute to a decision not to federally list the species.

## 7.2    State 404 Program and Prior-existing USFWS HCPs and BiOps

In some cases, a landowner or project proponent have a project that had undergone previous section 7 consultation with the USFWS and is covered by a valid BiOp or is covered by a valid Habitat Conservation Plan (HCP) and Incidental Take Permit (ITP). Briefly, Congress recognized the need for a process to reduce conflicts between listed species and economic development, in addition to the permits to authorize take from scientific research or certain other conservation actions. As such, the ESA was amended to add an exemption for incidental take of listed species that would result from non-Federal activities (section 10(a)(1)[B] of the ESA). To obtain a permit from USFWS for such take, an applicant must develop a habitat conservation plan (HCP) that meets specific requirements identified in section 10(a)(2)(A) of the ESA and its implementing regulations at 50 CFR § 17.22 and § 17.32 and 50 CFR § 222.25, § 222.27, and § 222.31. HCPs are planning documents that describe the anticipated effects of the proposed taking; how those impacts will be minimized or mitigated; and how the HCP is to be funded. Additional information about Habitat Protection Planning can be found at: https://www.fws.gov/endangered/what-we-do/hcp-overview.html.

The Habitat Conservation Planning Handbook (December 2016) and a USFWS Memorandum dated April 22, 2020 provide guidance regarding how approved HCPs or new HCPs being developed are integrated with the ESA section 7(a)(2) consultations with other federal agencies. This guidance specifically addresses potential federal agency permit actions within an HCP area for activities where take has been authorized in an ESA section 10 permit.

In summary, the guidance provides the USACE the ability to recognize the pre-existing HCP/ITP and use it to comply with section 7 of the ESA. Whether the USACE has been involved in the development of the HCP or not, there is still a streamlined section 7 process that can occur if the USACE 404 permit application's activities are also covered by the HCP within the HCP plan area, and the effects of to all ESA-listed species and/or critical habitat were analyzed in the USFWS's biological opinion. The streamlined process involves the USACE requesting consultation with the USFWS, describing the proposed activities and asking if those activities are consistent with those covered in the HCP and analyzed in the biological opinion. If so, the USFWS would issue a brief letter to the USACE agreeing that the proposed permit is consistent with the HCP and biological opinion, and that extends the exemption of the prohibition against take to the USACE. However, the streamlined process may not be available if a proposed USACE permit project's actions involve activities, species, or areas that were not covered in the biological opinion associated with the HCP, or the USACE intends to authorize the action in a manner that is inconsistent with biological opinion.

It is FDEP's intent to adopt this guidance for its species coordination process to insure consistent and adequate protections for species and regulatory certainty to the regulated community, satisfying the requirements in Chapters 62-331, and 62-330, F.A.C.  After technical assistance with the USFWS to confirm that the activities in the proposed State 404 permit are consistent with the HCP and biological opinion, FDEP will incorporate by reference in the State 404 permit, the terms and conditions contained in the approved HCP or biological opinion. Compliance with the HCP requires project applicants to implement the applicable and

appropriate avoidance and minimization measures, and any other applicable terms and conditions as contained in the HCP. In addition, FDEP and/or FWC may participate in the development of HCPs when staff are available, to help ensure that all State requirements are covered appropriately under the HCP.

## 7.3    State 404 Program Species Coordination Process

The State 404 program, based on Chapter 62-331, F.A.C., requires the analysis for whether effects to listed species and their critical habitats have reasonable potential to occur, and if so, further determines whether those effects are "likely to be an adverse effect", or "not likely to be an adverse effect". If adverse effects/impacts may occur, conditions or measures to avoid and minimize the impacts would be included as permit conditions and implemented by the Permittee. This State 404 program species assessment is modeled after the federal processes for determining, avoiding, and minimizing effects to listed species and ensures compliance with the ESA and the CWA during State 404 permit application review and permit issuance.

The resulting species coordination processes are intended to fulfill the following criteria when reviewing future State 404 permit applications: (1) the scope of the action is adequately described; (2) the physical, chemical, or biotic stressors to species that are likely to be produced as a result of the action is estimated; (3) the adverse effects of such activities on ESA-listed species and designated critical habitat is minimized; (4) applicants participating in permitted activities are informed, encouraged, and screened for potential incidental take exemption eligibility as required by permit issuance; (5) likely adverse effects on listed species and critical habitat are monitored and evaluated; (6) permit compliance is monitored and enforced; and (7) if new information becomes available (including inadequate protection for species or low levels of compliance), the action is re-evaluated and modified if warranted.

The FWC has partnered with FDEP to assist with the coordination of federally listed species reviews, which would take place concurrently with their review of impacts to State-listed species (per Chapters 62-330, F.A.C. and 68A-27, F.A.C.) for the State 404 and ERP programs. The FWC may assist FDEP as the State's species coordination lead to be the point of contact for coordination with the USFWS. FWC may provide information and other preliminary assessment assistance to USFWS as USFWS reviews State 404 permit applications and develops recommendations for FDEP/FWC to avoid and minimize adverse impacts to listed species and their habitats.

*Key commitments for the species coordination process*

The species coordination process includes a USFWS review of all State 404 permit applications for consistency with the ESA and an EPA review of applications with a reasonable potential to affect ESA-listed species. Key commitments between FDEP, FWC, and the USFWS to ensure a successful species coordination review process include:

- FDEP's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA requirements.

- FDEP, FWC, and USFWS will participate in a State 404 program species coordination technical team. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in

refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

- Prior to assuming 404 permitting, FDEP and FWC permit review staff will be trained in the new State 404 program species coordination procedures and processes. The FDEP, FWC and the USFWS will collaborate on developing the training materials, and the FWC and the USFWS be invited to participate in the in-person and/or virtual training meetings for FDEP permit review staff.

- All State 404 applications will be forwarded to USFWS for review, the majority of which will include FDEP or FWC preliminary determinations for effects to ESA-listed  species or species proposed to be listed within a few days of the application provided to the USFWS. These preliminary determinations may include possible effects for species found onsite, potential impacts to critical habitat, and potential protective measures that may address the effects and impacts.

- Technical assistance in individual project-by-project reviews from the USFWS may be accomplished by individual USFWS staff or by USFWS-approved effect determination tools, as described below.

- FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat.  In addition, if:

    1) the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the USFWS and

    2) the species and activities described in the State 404 permit application are covered in the Program assumption BiOp, HCP/ITP (or similar agreement), then no additional avoidance and minimization measures would be required. FDEP would provide the documentation in order for USFWS review the project. If the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, FDEP will issue a Notice of Intent to Deny the permit.

## 7.4   Application Review

### *State 404 Program Application Review Process*

FDEP will review all submitted applications or additional information provided by the applicant in response to FDEP's request for additional information, for administrative and technical completeness. Upon receipt, submitted applications will be forwarded to all appropriate State and Federal agencies for comment, including FWC and USFWS.FDEP will request any additional information required to publish public notice pursuant to Rule 62-331.060, F.A.C. (administrative completeness), and to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. (technical completeness).

The provisions described in the Applicant's Handbook (Volume I, sections 5.5.3.5 through 5.5.3.7, which govern an applicant's timeframes to respond to requests for additional information) apply to applications for State 404 permits. Once FDEP has determined that an application is administratively complete, FDEP will provide public notice as described in Subsection 62-331.060(2), F.A.C.

Permit applications will not be considered technically complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C., and section 5 of the State 404 Handbook). FDEP may request additional information as necessary during its review of any information it receives during the public comment period, at a public meeting, or during federal review.

*Application Timelines*

Pursuant to Rule 62-331.052, F.A.C., FDEP will review the application within 30 days of receipt of an application for a permit, or receipt of any additional information provided by the applicant in response to FDEP's request for additional information, for: 1) administrative and technical completeness; 2) request any additional information required to publish the public notice; and 3) determine if the proposed activity meets the conditions for issuance. The applicant may voluntarily submit a written waiver of the above 30-day timeclock requirement to allow more time for FDEP to determine if additional information is required. However, FDEP is not obligated to accept the waiver or to delay sending the request for additional information. FDEP may request additional information as necessary during its review of any information that FDEP receives during the public comment period, at a public meeting, or during federal review.

Within 10 days of FDEP determining that an application is administratively complete pursuant to subsection 62-331.060(1), F.A.C., FDEP will provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, FDEP will send a copy of the public notice to EPA for those projects that EPA reviews, in accordance with section 5.2.5 of the 404 Handbook. EPA review timelines and potential public meetings are discussed in section 7.4.2.

FDEP will provide public notice within 10 days of the following: 1) FDEP determination that an application for an individual permit or major modification is administratively complete; 2) FDEP notification to a permittee of revocation or suspension of a permit; and 3) issuance of an emergency field authorization. The FDEP shall provide public notice 30 days prior to any scheduled public meeting for such projects.

From date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of 30 days, or 15 days for the projects listed in 62-331.060(b)(3)(b). The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting.

## 7.4.1  Technical Assistance with the USFWS

Similar to the USACE Section 404 permit review process, applicants submitting a State 404 permit application will be required to submit information that allows FDEP (and USFWS) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats. To that end, the following information will be required as part of the State 404 application:

- Description of the proposed activity

- Description of the specific areas affected by the activity

- Description of listed species/critical habitat that are present in the area affected by the activity

- Description on the manner in which species may be affected by the activity

- Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably certain to occur within the project area

- Relevant information (e.g., species surveys, etc.)
- When needed, proposed project designs and proposed conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.

If incomplete, additional information will be requested during the information gathering and review processes and forwarded by FDEP to the FWC and USFWS.

As part of the species coordination process, FDEP will provide copies of all State 404 permit applications to the USFWS and FWC. At the time each application is submitted to USFWS (or within a short period after submittal), FDEP or FWC will include a preliminary determination to the USFWS as to whether listed or proposed to be listed species are expected to be present, and whether the species will be affected. If this preliminary review finds that ESA-listed or proposed to be listed species may be affect, this effect determination from the State to the USFWS will also include a request for USFWS to review the forwarded information and submit questions or recommendations regarding the permit application in order to adequately review the project. In some cases, after all needed information about the application has been received, FDEP or FWC may provide the USFWS with a preliminary protective measures for the USFWS to review or develop the protective measures in coordination with the USFWS.

The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their habitats. Upon coordination with the USFWS on appropriate protection measures for federally listed species, FDEP will incorporate the USFWS-recommended measures as permit conditions, or will issue a Notice of Intent to Deny the permit.

### *Estimated Species Review Timelines*

Times frames are identified in State regulations (see *Application Timelines* under 7.4 above), however, there are transitional timelines between these timeframes, and they are estimated and described in the steps below.

1) FDEP receives a permit application.

2) Within 3-5 days, FDEP sends a copy to USFWS and FWC. Within a day or two, FWC sends preliminary affected species list and type of effects determination to USFWS.

3) Within 10-15 days of receipt, USFWS may send to FDEP [no longer than 20 days from the date received by FDEP]:

   a) For incomplete or General Permit applications: Provide comment or any questions it has about missing information; or

b) For complete applications: Provide comment or notify FDEP of intent to comment with request for notification of deadline.

4) Within 30 days from receipt, FDEP must request additional information (RAI) from applicant or deem the application complete.

5) After FDEP receives additional info, FDEP has 30 days to review the response and:

a) Request clarification of answers to the questions; or

b) Notify applicant their application is complete.

6) During the RAI process, FWC and USFWS determine affected species, affected critical habitats, types of effects, and potential protective measures. These determinations are forwarded to FDEP, preferably before the application is deemed complete.

7) After application is deemed complete, FDEP has 10 days to issue a public notice for applications for individual permits.

8) The public notice is provided to EPA and USFWS.

9) The public notice comment period is 15 days for minor projects and 30 days for more complicated ones.

10) If EPA has waived review, then after the public comment period closes, FDEP has either 60 or 90 days to issue or deny the permit.

11) If EPA reviews the public notice, then the 40 CFR 233.50 regulations and timeframes govern the timeframes and process of permit review.

a) EPA has 10 days to send a copy of the public notice to USFWS.

b) USFWS has 15 days to notify EPA it intends to comment

c) USFWS has 50 days from receipt of public notice from EPA to send comments to EPA

d) EPA has 90 days to send comments or objection to FDEP. The final decision to comment, object, or to require permit conditions will be made by EPA.

12) Because applications that are deemed as "no effects" by FDEP will not be subject to EPA review, the USFWS will have a shorter amount of time to review and provide FDEP with additional information to consider.

a) The total time that USFWS will have a permit application that is not subject to EPA review is 15 days to send questions about missing information to FDEP, plus another 15 for FDEP to send that request to the applicant, plus the 20 days FDEP has to let the applicant know the permit is complete, plus 10 days for FDEP to issue the public notice, plus 15-30 days for the public comment period. Therefore, the potential maximum amount of time USFWS would have to review and comment on a permit application that is not subject to EPA review would be approximately 75-90 days, depending on whether the public comment period was 15 days or 30 days. If the application had all the necessary information at the start then the time for USFWS review and comment would be 55-70 days, depending on whether the public comment period was 15 days or 30 days.

b) Therefore, it will be important for FWC and USFWS to work with FDEP to develop an efficient system to promptly check applications for completeness and their potential to affect listed species to ensure "no effects" are accurate determinations.

### *Identifying applications that may pose adverse impacts*

The FDEP/FWC species coordination and technical assistance with the USFWS may begin before the application's public notice is posted. The USFWS will receive applications prior to FDEP posting a public notice and USFWS may submit information and questions to FDEP prior to FDEP posting a public notice. The public notice will also go to the USFWS, and details regarding the type of effects/impacts to species and their critical habitat as well as proposed protection measures that may have been suggested by USFWS will be included in the public notice. The technical assistance process between the USFWS, FDEP, and FWC will not be considered complete until any modifications are incorporated as a result of the public notice. If needed, technical assistance with the USFWS may continue during and after the public notice period.

Upon receiving an application, FDEP and FWC will review the submittal by the applicant and preliminarily identify the affected species, affected project area, and critical habitats. The species lead is responsible for making a preliminary determination for affected species, affected project area and critical habitats, and assess whether, and what type of, adverse impacts to endangered or threatened species and their critical habitats is expected. The FDEP will forward the application to FWC and the USFWS within three-five days of receipt. The species lead will contact the USFWS and send their preliminary assessments to the USFWS as soon as possible. Response from USFWS are due to FDEP within 20 days of FDEP's receipt of information.

For example, if FDEP received an application on June 1st and forwarded it to USFWS on June 5th, any questions USFWS need to be answered must be relayed through the species coordinator by June 20th. If USFWS has no questions, technical assistance continues. All comment deadlines for USFWS's response will be included in FDEP/FWC request to USFWS.

- If FDEP/FWC does not get a response from the USFWS by the deadline for questions or comments, the lack of a response will be considered a "no comment" and no further information from the USFWS is needed. If the State species coordinator believes that effects may be significant and the lack of response may be in error, they will contact the USFWS asap to confirm. In addition, the USFWS will receive a copy of all public notices and may provide comments to EPA and/or FDEP at that time.

- For the determination of potential affected species, project area or impact/effect on the species, if FDEP/FWC receives a response from USFWS with additional information to consider, the information will be re-evaluated and resubmitted to USFWS, if needed.

- Once it has been determined by FDEP/FWC that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) and the USFWS has not submitted information or questions that would lead the State to reconsider its determination, the species review concludes for that application. If the applicant modifies the project activities or increases the project area as the application is continued to be reviewed, FDEP/FWC/USFWS may re-evaluate the application with this information, if warranted.

- Once it has been determined by FDEP/FWC that an application may cause an adverse impact or adverse effect to federally listed endangered or threatened species (or species proposed to be

listed), technical assistance with USFWS continues in order to determine if, and how, the impacts and effects can be addressed with protection measures.

*Coordination of protective measures with the USFWS*

- For applications determined to have an adverse impact to federally listed or species proposed to be listed, the species coordination lead will forward all available information to the USFWS with a request for additional technical assistance.

- The FDEP/FWC species coordination lead will compile additional information or questions needed to complete the review, including information or questions from the USFWS, to forward to FDEP. These questions and requested information will be incorporated into the FDEP's RAI to the applicant.

- The species coordination lead will coordinate with the USFWS regarding potential protection measures that may offset the anticipated adverse impacts. In some cases, depending upon the project, the USFWS may submit recommendations to FDEP/FWC. In other cases, the species coordination lead will compile a package that presents the proposed protection measures and transmit the package to USFWS for their review and comment.

- After USFWS provides/agrees with recommended protection measures appropriate to offset the expected adverse impacts associated with the proposed project, the protection measures are incorporated into the public notice as proposed permit conditions.

  - If modifications are made during the public comment period that may change the original conclusion, FDEP reviewers will forward this information to FWC and USFWS for further review and comment.

  - If no modifications are made, or if the modifications during the public notice process can be addressed by FDEP/FWC/USFWS, protective measures are incorporated into the permit as special conditions and the species review concludes for that application.

- If the review by FDEP, FWC, and USFWS concludes that adverse impacts are likely to jeopardize the continued existence of a species, or will destroy, or adversely modify critical habitat, either of the following alternatives may occur, depending upon the project:

  - Additional protection measures that will satisfy the requirements of the ESA and avoid jeopardy or adverse modification are developed in coordination with or as recommended by USFWS, FDEP incorporates those measures as permit conditions and processes the permit; or

  - The FDEP issues an "Intent to Deny" the application for a permit.

## 7.4.2   EPA Oversight and Review

In accordance with the FDEP-EPA MOA and governing federal regulations (40 CFR § 233), EPA will retain federal oversight authority on the issuance of State 404 permits, with the ability to review applications, review proposed protection measures/conditions and, if necessary, recommend additional protection measures if deemed prudent and practicable. EPA's federal authority also allows EPA to intervene in the application review process, if needed, where there may be disagreements or issues that need to be resolved. FDEP can also request EPA's assistance in the application review process for the same reasons, if needed.

Pursuant to 40 CFR § 233.51(b)(2), there are specific categories of discharge EPA can waive Federal review of State 404 permit applications. Discharges with reasonable potential for affecting endangered or threatened species, however, are not waived and must be reviewed. For those projects subject to EPA review, FDEP will send a copy of the public notice to EPA, in accordance with section 5.2.5 of the State 404 Handbook (also 40 CFR § 233.50(a)(1)). Under the State 404 program, projects with reasonable potential for affecting listed or proposed to be listed species are the projects that have been determined by FDEP and FWC, in coordination with USFWS, to affect listed species. Details regarding the level of effects to species and their critical habitat as well as proposed protection measures will be included in the public notice.

Within 30 days of receipt of notice, EPA will notify FDEP of the intent to comment upon, object to, or make recommendations with respect to a permit application, draft general permit or FDEP's failure to accept the recommendations of an affected state pursuant to § 233.31(a). Within this time period, EPA may also request information from FDEP if the information provided is inadequate to determine whether the permit application or draft permit meets the requires of the CWA, 40 CFR § 233.50, and the 404(b)(1) Guidelines. EPA may notify FDEP that there is no comment but reserves the right to object within 90 days of receipt, based on any new information brought out by the public during the comment period or at a hearing.

Pursuant to 40 CFR § 233.50(b), EPA will provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the USACE, USFWS, and NMFS, within 10 days of receipt. These agencies will notify the EPA within 15 days of their receipt if they wish to comment on the public notice or draft general permit. Such agencies should submit their evaluation and comments to EPA within 50 days of such receipt. The final decision to comment, object, or to require permit conditions will be made by EPA.

If EPA has given notice to FDEP of the intent to comment, those comments shall be submitted within 90 days of the receipt of the public notice, draft general permit, or FDEP's failure to accept the recommendations of an affected State. An FDEP permit shall not be issued until after the receipt of such comments or 90 days of the EPA's receipt of the public notice, draft general permit, or FDEP's response (§ 233.31(a), whichever comes first. Within 90 days, the EPA will provide a written statement with comments, objections, or recommendations; and the actions that must be taken by FDEP in order to eliminate any objections (see 40 CFR § 233.50(e) for more details). FDEP shall not issue a permit until steps required by EPA to eliminate an objection or incorporate a requirement for a permit condition to a permit application or draft general permit. Within 90 days of FDEP receipt of EPA's comments, EPA may hold a public hearing on the objection or requirement (see 40 CFR § 233.50(g) and (h) for more details).

If no public hearing is held, within 90 days of receipt of EPA's comments, FDEP shall either issue the permit revised to satisfy EPA's objections or notify EPA of its intent to deny the permit. In the event FDEP neither satisfies EPA's objections, requirement for a permit condition, nor denies the permit, EPA shall transfer the permit application to the USACE for processing.

## Figure 7-1  Species Coordination Overview



## 7.5   Species Assessments

The structure of the species coordination process discussed in the previous section allows for the determination of effects regulated activities may have on a listed species and/or critical habitat that is consistent with past processes regulated by the CWA and the ESA. It also will identify, through coordination with USFWS, practicable, implementable process for developing protective measures that may avoid or minimize potential adverse impacts of the regulated activity consistent with past consultations under the USACE 404 program.

### 7.5.1   Identifying Project Area and Affected Species

The first step in assessing potential adverse impacts to listed species or those proposed to be listed as endangered or threatened, as well as their habitats, is to define the project area (similar to the "action area" during a federal section 7 consultation). The project area can be larger than the immediate area of activity, since it is an identification of all areas that may affect listed species and their habitats directly or indirectly by the project's activities.

For species within the USFWS's jurisdiction, the USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) allows for the user to draw a polygon to represent the project area. The project area must include the proposed project's potential impacts to the affected species and their habitats, even those traditionally considered as offsite, if the impacts would occur as a result of approval of the project. By creating a polygon that is geographically referenced, the system will produce a preliminary list of resources for the area chosen. This list of species and habitats will be considered preliminary, because all potential adverse effects need to be determined (and some species may need to be confirmed by on-site surveys) and verified during the State and Federal species reviews. The result of this online search will also include critical habitats that overlap with the project area. While critical habitat is a special designation under the ESA, during project reviews all occupied habitat within the species range that may be adversely affected will be considered if the project's activity may affect listed species, even that which is not designated as critical habitat under the ESA.

### 7.5.2   Assessments Using Available Federal Decision Tools

Once there is a proposed affected species list, the State's species coordination lead determines (preliminarily or concurrently with the USFWS) whether adverse effects/impacts are likely to occur. The types of impacts that may occur could be beneficial to species and their critical habitat or could adversely impact or adversely affect them. Adverse impacts to species include the potential for harm to members of the species, such as injury, death, or those that occur by loss of feeding, breeding, or sheltering resources due to a project's activities affecting habitat where members of the species exist. Adverse impacts also include the potential for jeopardizing the continued existence of a species, or adversely modifying critical habitat. Adverse effects/impacts, or types of harm to one or more individuals, can result directly from dredging and filling activities involved with construction or demolition proposed by the project, as well as secondary impacts caused by the ongoing operations of the project once constructed. Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur. Adverse impacts to habitats, particularly critical habitats, include alteration or destruction of

the physical and biological characteristics of that habitat. These characteristics are important to the listed species using the area, and harm to species may occur temporarily during construction or permanently during operation or by alteration of the habitat.

For some species, the IPaC system provides Federal species guidelines. These guidelines include General Project Design Guidelines, Habitat Assessment Guidelines, Species Survey Guidelines, Effects Determination (consultation and/or dichotomous) Keys, conservation measures, guidance for determining whether a species 'may be present', proactive management suggestions, Species Assessment Guides (SAGs) or Standard Local Operating Procedures for Endangered Species (SLOPES).

Programmatic consultations, when available, help identify where impacts/effects will occur and whether technical assistance with the USFWS is needed. Some programmatic consultations do not exempt take; rather, they attempt to avoid take through setting project-specific criteria that either determines a project is "not likely to adversely affect" a listed species or critical habitat, or sets avoidance and minimization measures that allow a "not likely to adversely affect" determination to be made. Because these consultation keys and programmatic biological opinions cover many of the species which are most often the subject of ESA section 7 consultations in Florida, they include many useful measures to identify, avoid, or minimize adverse effects to ESA-listed species.

These tools, particularly SLOPES, benefit the species, the USFWS, and the regulated community by:

- Increasing the effect determinations' accuracy and consistency;
- Improving completeness and efficiency in the documentation of the administrative record;
- Decreasing the amount of staff and time needed to complete coordination; and
- Improving ESA-listed species conservation and compliance with the ESA.

These tools also provide a major benefit to the regulated community because they are available to the public and may be used by the applicant during the pre-application and application phases. An applicant is often able to identify any potential effects of the proposed project and be able to consider whether effects could be avoided or minimized before a significant amount of planning resources have been expended.

Lists or links to other biological opinions, including a few additional examples of programmatic biological opinions, can be found on the USFWS Vero Beach Field Office website at https://www.fws.gov/verobeach/Programmatic%20Consultations.html. Additional information and tools can also be found at https://www.fws.gov/northflorida/Tools2Use/consult-landowner-refs.htm.  A few examples of these are included in Table 7-1 below.

## Table 7-1 Programmatic Consultations and Consultation Keys in Florida, 2010 - 2019

| Name of Consultation | Year Published | Species | Exempts Incidental Take |
|---|---|---|---|
| FEMA National Flood Insurance Program Projects (Florida Keys) | 2014 | American Crocodile | No |
| Eastern Indigo Snake Consultation Key | 2017 | Eastern Indigo Snake | No |
| Florida Bonneted Bat Consultation Key | 2019 | Florida Bonneted Bat | No |

| Name of Consultation | Year Published | Species | Exempts Incidental Take |
|---|---|---|---|
| Florida Panther Effect Determination Key | 2007 | Florida Panther | No |
| Natural Resources Conservation Services Working Lands for Wildlife Program | 2012 | Gopher Tortoise | No |
| Piping Plover Programmatic Biological Opinion | 2013 | Piping Plover | Yes |
| Sand Placement Programmatic Biological Opinion | 2015 | Sea Turtles and Beach Mice | Yes |
| Department of Housing and Urban Development Loan Projects | 2010 | Various | No |
| FEMA Conditional Letters of Map Revision | 2014 | Various | No |
| Clearance to Proceed with Federally Insured Loan and Grant Projects | 2016 | Various | No |
| West Indian Manatee Programmatic Biological Opinion | 2011 | West Indian Manatee | No |
| Guidance to Proceed with Events Authorized by the US Coast Guard | 2016 | West Indian Manatee and Sea Turtles | No |
| Wood Stork Programmatic Key (North and South Florida) | 2010 | Wood Stork | No |

Source: USFWS 2019a

Some types of guidelines are considered decision tools (i.e., SLOPES, dichotomous keys, etc.), and can assist in determining not only whether an impact/effect will likely occur and may also recommend protection measures appropriate for specific species and specific activities. For example, effect determinations for wide-ranging species such as the Eastern Indigo Snake rely on whether an individual was detected on site and the size of the habitat loss. The Wood Stork determination key is also used extensively and has had some success. As stated in chapter 4.2.2., the Eastern Indigo Snake and Wood Stork accounted for 56.6 percent of all species-level consultations in Florida between 2014 and 2018. Species guidelines, or decision guidance tools, are also available independently from the IPaC system on the USFWS website.

These types of tools provide consistent criteria to reach impact/effect determinations and will be used by the State's species coordination lead to facilitate the USFWS's review. The review process for species with these types of decision tools will likely be slightly different and simplified compared to those species that do not have these tools. In the beginning of the review of a State 404 permit application, the State's species lead will use these decision tools to arrive at impact/effect determinations and potential protection measures. This preliminary review will be submitted to the USFWS with a request for technical assistance, allowing the USFWS to concur with the conclusions, or provide additional information that may change the conclusions. Once the species review outcome is finalized, technical assistance from the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued.

### 7.5.3  Case by Case Assessments When Tools Are Not Available

For those species or activities that do not have federal species guidelines or decision tools, a case by case assessment must be performed. A preliminary assessment will be performed by the applicant and verified or expanded upon by the FDEP/FWC species coordination lead. Applicants will need to provide all of the information necessary to perform an assessment of potential impacts to listed species and their habitats, as well as submitting proposed protection measures to avoid and minimize the anticipated impacts.

The following factors should be considered when evaluating the impacts/effects of the activity:

- Proximity of the activity to the species and/or designated critical habitat;

- Location and extent of the area of disturbance;

- Timing (with regards to sensitive periods of a species lifecycle);

- Duration of the activity or impact;

- Disturbance frequency, and

- Nature of the effect (elements of a lifecycle, population size, variability, or distribution, physical and biological features of habitat, etc.).

Federal species guidelines, information on IPaC, USFWS specific species webpages, the results of species surveys, (see Table 7.2 below for guidance), relevant scientific literature, species accounts in Appendix B of this document, stressors and effects in Appendix C with discussion in Chapter 5 of this document, and other available sources of information are reviewed to develop preliminary conclusions of impact/effect as well as develop any potential protection measures.

Physical or Biological Features essential to the conservation of the species as identified in the final rules designating critical habitat for specific listed species should be considered to determine whether there may be adverse modification of critical habitat.

**Table 7.2  Interpreting the results of species surveys**

| Suitable habitat present in the project area? | Species Survey Result | Conclusion | Next Step | Comments |
|---|---|---|---|---|
| No | N/A | Species unlikely to be present | No technical assistance needed. Document conclusion in project record | Consider the potential for the species habitat to become established in the project area before the activity is complete |
| Yes | Species not detected[1] | Species unlikely to be present | – | Review species-specific survey protocols; make sure survey methods and results are sufficient to support conclusion |
| Yes | No survey data or surveys inconclusive | Species unlikely to be present until new information shows it exists | Review potential impacts/effects to critical habitats | |
| Yes | Positive survey data | Species is present | | |

[1] Within species range and preferred habitat type

The species coordination lead will use the information from the applicant and assess all the data available to them to determine if there will be impacts to any listed species and the severity of adverse impacts to each species and habitats present in the project area. For projects with large amounts of acreage or that are intensive in the amount of activities proposed, or with multiple species and critical habitats, a written assessment determining preliminary anticipated adverse impacts and protection measures to avoid and minimize those impacts would be developed. This preliminary review will be submitted to the USFWS with a request for technical assistance or would be developed in coordination with the USFWS. The USFWS would agree with the conclusions and recommended protection measures or provide additional information that may change the conclusions and protective measures. Once the species coordination review and technical assistance with the USFWS is completed, the species coordination process with the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued. At any time during the review of State 404 permit applications, if modifications to the project are proposed after the species coordination process, the species review will be revisited with the USFWS. If modification occurs after the application is granted, and the modification causes effects not previously considered by USFWS, the applicant may be liable for any take under section 9 of the ESA.

## 7.6   Impact/Affect Determinations and Protective Measures

The word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under ESA. Throughout this document, these terms are used interchangeably. The State 404 program has two standards of review regarding the protection of listed species: the species protections required under CWA and ESA, and the species protections required under State Chapters 62-330, and 62-331, F.A.C. Under State rules, the requirements of CWA and ESA are incorporated into the species review process for adverse impacts to listed species and their habitats. The State rules are broad; the ERP rule and State 404 program rule protect not only federally listed and State-listed species, but all fish and wildlife in Florida.

While the State 404 program has been developed to meet the requirements of CWA and ESA, it also relies on the requirements of the existing State ERP program. The ERP program requires the applicant to provide reasonable assurances that the proposed activities will not damage or harm the water resources of the State nor reduce the value of wetland functions including functions provided to fish, wildlife and listed species. A state or federally listed species' ability to nest or den cannot be interrupted by negative impacts to the uplands or wetlands a listed species uses. Subsection 62-330.301(1)(d), F.A.C. requires an applicant provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment "will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters" to obtain approval for a permit.  This review also includes consideration for secondary and cumulative impacts.

There is case law that has defined the terms "adversely impact" regarding listed species that should be considered while reviewing State 404 program and ERP program applications (*Metro. Dade County v. Coscan Florida*, 609 *So. 2d 644, 649-50 (Fla. Dist. Ct. App. 1992).* The Florida District Court of Appeals overruled the recommended order from the administrative hearing, finding that the hearing officer ruled under the federal standard rather than the Florida standard. The federal standard is stated as "whether the project would jeopardize the continued existence of an endangered species", whereas the Florida standard is stated as "whether the project would adversely impact" an endangered species. According to the District Court, any impacts that adversely affect a species should be considered (and addressed if warranted), regardless of whether those impacts result in jeopardizing the continued existence of the entire species. Therefore, under Florida law, the standards for addressing adverse impacts/effects to listed species includes not only a prohibition of issuing permits that may jeopardize the continued existence of the species, but it also includes a requirement to identify and address adverse impacts to ESA-listed species.

Protection measures are defined as those avoidance and minimization measures to address adverse impacts to listed species and critical habitat. Protection measures, in the form of avoidance and minimization measures recommended by the USFWS, are incorporated as conditions to the State 404 permit. Examples of protection measures include but are not limited to project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work).

For the purposes of the affected species list for this BA, anticipated stressors are outlined in Table C.1.a and anticipated effect determinations are noted in Table C.1.b in Appendix C. During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews.

### 7.6.1  Impact and Affect Determinations

When decision tools are not available, the determination of whether a project's activities will affect endangered or threatened species is preliminarily made by FDEP and FWC, and confirmed with USFWS during the technical assistance process. Information about a species should be cross-referenced with knowledge of the project's activities and the project area to help predict whether and how the species at any life stage will respond when exposed to the effects of the activities. Based on best available data, if any of the following occurs it will be determined that the project will adversely impact/effect the species and technical assistance with the USFWS to determine possible protective measures is required. The following statements can be used as guidance for the determination of "may adversely impact":

- Data indicate the species may be exposed to the elements of the activity and respond deleteriously upon exposure to elements of the activity or to stressors produced by the activity; or

- Data indicate the proposed activity will cause changes to the physical and biological features of critical habitat and produces exposure or stressor to species.

As the species coordination process progresses during the review of a State 404 permit application, proposed activities will be assessed for potential effects to species. The USFWS will confirm whether adverse impacts are anticipated to occur, and how significant the impacts are expected to affect the species or critical habitats. These determinations can be categorized as follows:

- No Effect/No Impact

- Not Likely to Adversely Affect/Impact

- Likely to Adversely Affect/Impact

- Jeopardizes the Continued Existence of the Species, and/or Destroys or Adversely Modifies Critical Habitat


#### *No Effect/No Impact*

If physical or biological features essential to the conservation of the species are not present or are present but will not be affected in the project area, then no further review of effects/impacts to critical habitats is required. In addition, a determination of "No Effect/No Impact" would be made if listed species do not occur and do not have the potential to occur on a site. If neither the species nor the critical habitat will respond in any manner, no further review of adverse impacts to species is required and technical assistance with the USFWS is concluded.

#### *Not Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may affect a species or designated critical habitat, but the effect is not anticipated to cause harm to a member of the species, nor cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. The impact expected may not require protective measures (if discountable, or insignificant) or it may be deemed as not likely to adversely affect via required protective measures to avoid and minimize the effects.

### *Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may adversely affect a species or designated critical habitat, and the effect is anticipated to cause harm to a member of the species and/or cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. Harm to an individual(s) means injury or death. The level of harm, however, may not result in jeopardizing the continued existence of the species or destroying or adversely modifying critical habitat. The adverse impact expected is likely to require protective measures to avoid and minimize the effects.

### *Jeopardizes the Continued Existing of the Species and/or Destroys or Adversely Modifies Critical Habitat*

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C. that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. Through technical assistance with the USFWS, the FDEP and FWC will be informed of when a proposed project and its activities is anticipated to jeopardize the continued existence of the species, or if critical habitat is destroyed, or adversely modified. Under these circumstances, the FDEP, FWC, USFWS and the applicant will discuss to determine what, if any, protective measures may be appropriate.

It should be noted that the continued existence of a species could still be in question even without anticipated harm to individuals, but if there were harm to the resources the species depend on. An example would be a project site that includes pines trees that are 70-90 years old, and a listed species has been verified as being onsite with habitat requirements for that age of pine tree. The applicant proposes to cut all the trees before they reach the age of 70 or just after they reach the age of 90. The applicant's proposed protection measures only includes making sure no species are present in each tree before they are cut down. This project area would leave only pine trees younger than 70 years old. If this activity was taken across the entire range of the listed species onsite, it could jeopardize the existence of the species without directly or indirectly taking (as defined by ESA section 9) individual members of the species.

## 7.6.2  Developing and Ensuring Protective Measures

After the determination of "may adversely effect/impact" and the level of adverse impact, the species coordination process continues between the State species coordination lead and the USFWS during the review of a State 404 permit application. In order to move towards authorization of an activity, the project's adverse effects/impacts to species and habitat that have been identified must be avoided and minimized by implementing protective measures. Those protective measures may likely either modify the project design, modify the project operation, or follow species-specific protective measures. Early in the review process, the species lead will draft and compile the applicant's information as well as their own assessment and forward to the USFWS for review. The assessment may also be done in coordination with the USFWS, depending upon the project. The USFWS may agree with the proposed preliminary impact review and proposed protection measures, and the finalized assessment and recommendations will be provided to the applicant in the form of comments and draft permit conditions. The USFWS may also recommend additional avoidance and minimization measures, provide recommendations for appropriate permit conditions if none were proposed in the informational package sent to them, or state that the proposed measures are not adequate.

Some of the federal species guidelines discussed in the previous subsection of this chapter provide minimization measures that are considered standard conditions for adverse effects associated with common, minor activities. For other species, there are typical minimization measures for common activities that are frequently incorporated into permits as standard conditions that may not be associated with programmatic guidance but can be found in biological opinions. Some projects, particularly those with a greater level of adverse impacts or multiple activities and/or multiple species that may be affected, have a need for a more comprehensive assessment and intensive coordination with USFWS.

In addition to species-specific protective measures, thorough assessments of adverse impacts to habitat must be performed in order to ensure alterations to habitat do not adversely affect listed species. There are various methods for avoiding and minimizing effects of dredge and fill activities within wetlands. Some impacts can be avoided or minimized through BMPs (e.g., silt fences, turbidity curtains, containing dredge materials during dewatering, transfer and storage), while others require administrative restrictions or permit conditions (e.g., contractor education, not refueling equipment within 100 feet of wetlands) to protect wetlands, waters, or "at-risk" species. A major administrative control that compensates for wetland destruction is wetland mitigation. Wetland mitigation includes the enhancement, restoration, establishment, and/or preservation of wetlands that serve to offset unavoidable impacts on wetlands (FDEP 2019b). Governments and agencies have used this policy across North America with notable levels of success (NAWCCC 2000). The species coordination process will avoid and minimize adverse impacts to habitat when practicable.

In addition, FDEP intends to incorporate adaptive management into the State 404 process as needed, particularly as it pertains to wetland compensatory mitigation projects. Per the FDEP's State 404 handbook, wetland compensatory mitigation projects that cannot be constructed in accordance with the approved mitigation plans will require FDEP approval prior to any significant modifications. Wetland compensatory mitigation projects not progressing toward meeting their performance standards will be evaluated for measures to address deficiencies and a determination as to whether these modifications will result in the project meeting its original ecological objectives. These modifications/measures may include but are not limited to site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. Performance standards will be revised to address deficiencies in wetland compensatory mitigation projects and to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

### *Best Management Practices for Wetland Protection*

BMPs, including schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of WOTUS from discharges of dredged or fill material, will be implemented for all projects under the State 404 program. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with the Section 404(b)(1) Guidelines (40 CFR § 230), effluent limitations or prohibitions under Section 307(a), and applicable water quality standards.

Wetland mitigation measures included in a Section 404 application may also offset effects or result in longer-term beneficial effects to ESA-listed species; however, they are part of the wetland protection process of the State 404 and ERP processes and not a requirement of the ESA coordination.

*Protective Measures for Plants and Animals*

In Florida, fifty-four (54) plant species are on the federal list of endangered species and 14 are on the federal list of threatened species. The ESA (16 USC § 1531) provides protection to both endangered and threatened plants and animals. The ESA, however, does not prohibit the destruction, damage or transplantation of protected plants unless such activities involve an endangered species on federal land or if the activities occur in violation of state laws. If a person wishes to develop private land, with no federal jurisdiction involved, and if the proposal is in accordance with state law, then the potential destruction, damage, or movement of endangered or threatened plants does not violate ESA. Further, a section 10 ESA incidental take permit is only needed in situations where a non-federal project is likely to result in "take" of a listed species of fish or wildlife; there is no such process for plants.

But while incidental take does not apply to plants, an assessment of jeopardy and adverse modification to critical habitat under section 7(a)(2) applies to plants. For the State 404 program, 40 CFR § 233.51(2), and 40 CFR § 233.20(a) would prohibit issuance of a State 404 permit that will jeopardize a plant species or adversely modify its critical habitat. FDEP will incorporate any reasonable and prudent measures and terms and conditions provided by the USFWS into permit conditions for a State 404 permit for such a project.

Endangered, threatened and commercially exploited plant species in Florida are regulated by the Florida Department of Agriculture and Consumer Services, by their Division of Plant Industry. Florida's State ERP program under Chapter 62-330, F.A.C. and the State 404 program under Chapter 62-331, F.A.C. include plants in the definition of endangered and threatened species, which requires consideration of adverse impacts resulting from activities authorized under these programs. During the permit review process for each type of permit, FDEP will evaluate potential impacts and effects to listed plant species. This evaluation may include a request to the USFWS for recommendations to avoid and reduce anticipated impacts. For those types of projects where jeopardy is not expected to occur and no adverse modification to critical habitat is expected, some projects may still need protective measures incorporated as permit conditions in order to adequately conserve endangered and threatened plant species.

The State 404 program, the State ERP program, and the ESA provide protection to both endangered and threatened plants and animals. As with animals, there could be a situation in which a federally listed plant is located in the upland portion of the project area that is adjacent to assumable waters and would be affected by the permit. As discussed in subsection 3.1., the State 404 program is required to consider adverse impacts in uplands that would not occur except for the authorization of the proposed activity. In addition, while the State 404 program does not have jurisdiction in isolated wetlands, the ERP program does have jurisdiction and can address adverse impacts to animal and plant species dependent on these wetlands.

*Ensuring Protection for Endangered and Threatened Species in Florida*

The State of Florida is required to incorporate all USFWS recommendations for protection measures as State 404 program permit conditions (Subsection 62-331.054(1), F.A.C.). The existing working relationship and coordination during the review of projects would continue between the FDEP and the USACE. The FDEP will add fields in their permitting tracking database that will continue the collection of data done by the USACE for past Section 404 permits. This data will continue the monitoring of adverse effects on listed species and critical habitat, facilitating the State's ability to do compliance.

In the current ERP program, FWC provides recommendations to FDEP and the WMDs for State-listed species and some federally listed species, such as manatees and sea turtles. FWC has offered to assist FDEP in the State 404 program review for impacts to federally listed species, and the current collaboration between FDEP and FWC will be enhanced by the Assumption. FWC and the USFWS have a long-standing partnership and a current ESA section 6 Cooperative Agreement for conserving Florida's federally endangered and threatened wildlife. This relationship between FWC and USFWS will bring an existing level of cooperation, knowledge, and expertise to the State 404 program. In addition, FDEP, FWC and USFWS have entered into a Memorandum of Understanding to identify commitments, roles and responsibilities regarding species coordination for the State 404 program as well as the ERP program.

The State 404 program species coordination process involves the applicant, FDEP, FWC and USFWS, and encourages compliance by the applicant to avoid and minimize adverse effects, reducing the expected impacts to listed species and their habitats. The interactions between agencies and the applicant will inform applicants of the importance of this process in order to be eligible for authorization of their proposed activities and in order to ensure compliance with the ESA.

## 7.6.3    Statements of Adverse Impact in Public Notices

While many adverse effects can be avoided and minimized during the species coordination review process, impacts that are likely to adversely affect a species (e.g. likely to cause incidental take or jeopardy) or critical habitat (e.g. destroy or adversely modify critical habitat) must be recorded, monitored, provided to the USFWS for tracking and species conservation purposes. These types of projects will receive the most stringent review and be documented in the Public Notice as well as the FDEP database and project file.

The public notice, required by Rule 62-331.060, F.A.C., will include an effect determination statement and include the proposed protection measures, if known at the time of publication. The effect determinations statements for species may include one of the following: "No Effect/Impact", "Not Likely to Adversely Affect/Impact", "Likely to Adversely Affect/Impact", or "Jeopardizes the Continued Existence of the Species" for endangered or threatened species or species proposed to be listed. The effect determination statements for critical habitat may include one of the following: "Destroys Critical Habitat" or "Adversely Modifies Critical Habitat" for designated critical habitat or habitat proposed to be designated as critical.

The USFWS will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as "No Effect/No Impact". If the USFWS elected to not respond to these types of applications upon first submittal, they will still receive public notices for these applications and may elect to comment at that time. Receiving public notices for all applications also provides an opportunity for the USFWS to re-review all of the effect determinations made by the State and provide oversight of the species coordination process. Along with the public notice, the USFWS will receive copies of all applications and

supplemental information submitted for applications required to be publicly noticed, with all stated effect or no effect determinations.

With the public notice, EPA will receive copies of all applications with a determination other than "No Effect/Impact". This provides an opportunity for the EPA to monitor the effectiveness of the species coordination process and to provide oversight for CWA and ESA compliance.

### 7.6.4   Dispute Resolution between FDEP and USFWS and USFWS-EPA Coordination

To be clear, as stated elsewhere in this BA, State 404 permits (as with USACE 404 permits) must comply with Section 404(b)(1) guidelines which include a stipulation that "Where consultation with the Secretary of the Interior occurs under section 7 of the Endangered Species Act, the conclusions of the Secretary concerning the impact(s) of the discharge on threatened and endangered species and their habitat shall be considered final" (per 40 CFR § 230.30(c). Furthermore, per the State 404 Chapter 62-331, F.A.C. and CWA 404(g) and 404(b)(1) guidelines: 404 permits may not be issued if doing so jeopardizes the continued existence of species of plants and animals listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a designated critical habitat.

For permits that would result in injury or harm to individuals of a listed species but whose impacts would not jeopardize the continued existence of the species or cause adverse modifications to critical habitat, FDEP shall incorporate USFWS-recommended protection measures as permit conditions to fulfill compliance with the anticipated Program assumption BiOp and for any subsequent anticipated incidental take to be exempted from the prohibitions of section 9.

In the event FDEP questions or disagrees with a local USFWS office about the necessity of project-specific, species-specific USFWS-recommended protection measures being added as permit conditions for the purpose of either 1) avoiding jeopardy to a ESA-listed species or adverse modification of critical habitat; or 2) for the purpose of mimiizing incidental take to fish and wildlife, the following steps would guide the resolution process.

1.  If there is a dispute that occurs between FDEP and USFWS prior to FDEP issuing a public notice for a permit application, the dispute resolution process will only involve the State (FDEP and FWC) and the State-level USFWS Ecological Services (ES) office. The processes detailed in the 2020 FDEP, FWC, USFWS Endangered Species Coordination Memorandum of Understanding will be followed and the Florida 404 Endangered Species technical team composed of FDEP, FWC, and USFWS staff and decision-makers will assist in resolving any local disputes. The EPA will not be involved at this stage but may later be involved should it receive a copy of the public notice from FDEP. EPA would then coordinate with FDEP, the USFWS, NMFS, and USACE per the EPA's federal oversight regulations pertaining to state 404 permits (40 CFR 233.50). In the highly unlikely event the dispute is not resolved between FDEP and USFWS prior to the state's deadline for issuing a public notice and the USFWS has not settled on a final conclusion (e.g., USFWS local office's recommendations are being reviewed by higher levels within USFWS),, FDEP will prepare a public notice that reflects FDEP's position and submit that public notice to EPA (per EPA's regulations governing federal oversight of State 404 permits - 40 CFR § 233.50) along with a transmittal letter to EPA that succinctly presents the relevant facts, FDEP's position, and conveys that the USFWS is formulating its final comments/position.

2.  Per 40 CFR § 233.50, EPA will then transmit FDEP's public notice to USFWS within 10 days of receipt. USFWS will notify EPA within 15 days of receipt on whether it will submit comments. USFWS will have 50 days from receipt to provide comments to EPA. EPA shall make final decisions to comment, object or to require permit conditions (per 40 CFR 233.50) and shall consider USFWS conclusions concerning impacts to ESA-listed species to be final (per CFR 230.30(c). FDEP or any interested person can ask EPA to hold a public hearing on EPA's objection or required permit conditions. At any point and whether or not EPA has a public hearing, FDEP may accept EPA's conditions and issue the permit, deny the permit, or notify EPA that it is neither issuing or denying the permit. In the latter case, EPA would transfer the permit application to the Corps for processing (per 40 CFR § 233.50).

# 8.   Conclusions

This BA evaluates the effects of the potential approval by EPA for the State of Florida assuming Section 404 of the CWA on listed species in present time, and estimates effects into the future. All species that are currently listed, proposed to be listed or might be listed in the future are discussed, with evaluations of effects on respective guilds. This review helps evaluate the effects of the State 404 program on any species that are currently listed or may become listed in the future.

This BA analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or is ESA-considered. Species that must be addressed pursuant to Section 7 of the ESA, Section 404 of the CWA and Chapter 62-331, F.A.C. for the State 404 program, are federally listed species or species proposed to be listed under the ESA (a total of 141 species). If these listed species have designated critical habitats, or critical habitats proposed to be listed, the adverse effects and impacts to those habitats must also be analyzed and addressed under the State 404 program.

If approved, the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in state regulations (Chapters 62-330, and 62-331, F.A.C.), MOAs with EPA and USACE, and an MOU with the FWC and the USFWS. Should EPA request formal consultation with USFWS at the time of EPA's review of whether to approve Assumption of the State 404 program, USFWS may issue a Program assumption BiOp. The opinion may include conditions that guide implementation of the State 404 program. If the USFWS determines that the Action is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat, the Program assumption BiOp may also include an ITS with reasonable and prudent measures and terms and conditions that must be complied with during the implementation of the State 404 program.

In implementing the State 404 program, FDEP will request technical assistance from the USFWS in order to address federally listed species and critical habitat issues. This coordination is to ensure that any permit issued by FDEP is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)). As such, FDEP will consider all information provided by USFWS and will include all species protection measures recommended by USFWS as conditions to the State 404 permit.

If Section 404 of the CWA is assumed by the State of Florida, it will allow the State to assess and regulate all activities that will occur in assumed waters, integrating protections that were previously regulated by two

different programs. Chapter 62-331, F.A.C., by referencing much of the existing State ERP Chapter 62-330, F.A.C., will facilitate the State's implementation of the CWA requirements and provide a more comprehensive approach to the protection of WOTUS and Florida's habitats and species.

The State 404 program is designed to provide equivalent conservation of ESA-listed species as the currently operating USACE Section 404 program. The ability of the State of Florida to process applications with permitting authority equivalent to Section 404 of the CWA in conjunction with the State ERP program allows for addressing potential adverse effects to both federally listed or State-listed species more comprehensively, consistently and efficiently. Conservation strategies for some species will benefit multiple species that share the same habitat. Some State-listed species are also proposed to be federally listed and assessing the expected adverse impacts from proposed projects for all listed species at the same time is likely to improve conservation efforts. It is also possible that the Action could improve efficiencies in processing applications as well as enhance the consistency of decision making, resulting in greater predictability to both the regulated and the conservation communities.

Florida's State ERP program is jointly implemented by FDEP, the WMDs and certain local governments delegated by FDEP. At this time, the administration and implementation of the State 404 program is limited to the FDEP. It is anticipated, however, that the State 404 program may be delegated to the WMDs by FDEP in the future. If this is considered, approval from the EPA will be required prior to implementation. Upon approval, these agencies' will be provided training and will be required to follow the same procedures outlined for the State 404 program.

### *Effect of the Action on Tribal Resources or Interests*

Consultations on permit actions taking place on waters in Indian Country would continue to be conducted by the USACE, as they are at present. The Section 404 Assumption rules include a procedure to offer an opportunity for tribal comment by the Seminole Tribe of Florida and the Miccosukee Tribe of Indians of Florida on any applications within a buffer zone around these lands.

A public notice will be sent to the Seminole Tribe of Florida Environmental Resource Management Department for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.

A public notice will be sent to the Miccosukee Tribe of Indians of Florida for any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also, for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A. With these provisions, no substantial difference in effects on tribal resources would be expected under the Action.

### *Uncertainty Associated with the Effects Determination*

The precise locations and types of activities included in future permit applications are unknown at this time. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the

general types of activities and overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for Assumption. The number of applications and the total quantities may vary over time and with economic fluctuations and would be greatest in areas of rapid growth where the number of proposed projects tends to be high. However, over shorter timeframes, one or a few large projects (for example, a major infrastructure initiative) can result in a concentration of proposed impacts in a given area or a given set of habitat types, with effects on one or a few species. Not all individual project proposals are known or can be anticipated in advance.

Other uncertainties can include the introduction of new invasive species, the spread of new pathogens, or other biotic or abiotic factors that can affect ESA-listed species or populations. For example, chytrid fungus and white-nose syndrome have contributed to the loss of populations of amphibians and bats, respectively, in recent years. Unexpected changes in the status of an ESA-listed species can lead to the increased importance of future project-level decisions, which under baseline conditions would have little effect on the species. Similarly, recovery of species can lead to increased resilience and, ultimately, in some cases, to delisting. If there are uncertainties, FDEP will work closely with the USFWS on a project by project basis to address those uncertainties and any impacts to ESA-listed species or their critical habitat to ensure effects are avoided and minimized.

### *Conclusions*

Historical Section 404 permitting by the USACE resulted in issuance of permits for one or more projects that adversely affected one or more listed species and their critical habitats. The USACE Section 404 process, in accordance with section 7 of the ESA, employed various conservation measures to avoid and minimize adverse effects. And similar to the USACE 404 program, the State 404 program may result in permitting the discharge of dredged or fill material that may adversely affect one or more ESA-listed species and designated critical habitats. While State 404 permits can potentially have significant adverse effects on the aquatic environment and ESA-listed species, many effects can be avoided and minimized during the technical assistance process between FDEP and the USFWS, as demonstrated in the past through the USACE Section 404 review and permitting processes.

It is anticipated that with technical assistance to be set in place by a USFWS Program assumption biological opinion, Chapter 62-331 F.A.C., and Memorandums of Agreement provided in FDEP's Assumption application package, the Action will result in procedural and substantive protections that are at least as protective as the protections afforded by the USACE Section 404 program and through section 7 consultation with the USACE under the ESA. The State 404 program is prohibited from issuing a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats because of the prohibition in the 404(b) Guidelines. The State's Assumption of CWA Section 404 permit program is not expected to result in significant changes from the number, type, or location of permit applications and proposed projects typically issued by the USACE. This BA is provided to assist in the review of potential effects to ESA-listed endangered and threatened species anticipated with the State of Florida's request for the Assumption of Section 404 of the CWA.

# 9.    Literature Cited

16 United States Code (USC) Chapter 35, Sections 1531, 1532, and 1536. The Endangered Species Act of 1973.

18 United States Code (USC) Chapter 53, Section 1151. Indian Country Defined.

33 Code of Federal Regulations (CFR) Part 322. Permits for Structures or Work in or Affecting Navigable Waters of the United States.

40 Code of Federal Regulations (CFR) Part 232 and 233. 404 State Program Regulations.

50 Code of Federal Regulations (CFR) Part 402. Interagency Cooperation-Endangered Species Act of 1973, As Amended.

1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services. 2017. A Special Report – What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project. https://1000friendsofflorida.org/florida2070/ (01/15/2020).

Abiy, A. Z., A. M. Melesse, W. Abtew, and D. Whitman. 2019. Rainfall trend and variability in Southeast Florida: Implications for freshwater availability in the Everglades. *PLOS ONE* **14**(2): e0212008.

Baumberger, R. E. 2008. The impacts of harmful algal blooms on a Florida reef fish community. Master's thesis. Florida Atlantic University, Boca Raton, Florida, USA. https://fau.digital.flvc.org/islandora/object/fau%3A2853/datastream/OBJ/view/impacts_of_harmful_algal_blooms_on_a_Florida_reef_fish_community.pdf.

Benscoter, A. M., J. S. Reece, R. F. Noss, L.A. Brandt, F. J. Mazzotti, et al. 2013. Threatened and endangered subspecies with vulnerable ecological traits also have high susceptibility to sea level rise and habitat fragmentation. *PLOS ONE* **8**(8): e70647.

Dahl, T. E. 2005. Status and trends of wetland sin the conterminous United States 1998 to 2004. U.S. Fish and Wildlife Service, Fisheries and habitat Conservation, Washington, District of Columbia, USA.

Dahl, T. E. 2011. Status and trends of wetlands in the conterminous United States 2004-2009. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

Fernald, E. A., and E. D. Purdum. 1998. *Water resources atlas of Florida.* Institute of Science and Public Affairs, Florida State University, Tallahassee, Florida, USA.

Florida Administrative Code (FAC) Chapter 62-330. Environmental Resource Permitting.

Florida Administrative Code (FAC) Chapter 62-331. State 404 program.

Florida Administrative Code (FAC) Chapter 68A-27. Rules Relating to Endangered or Threatened Species.

Florida Department of Environmental Protection (FDEP). 2019b. Wetlands Mitigation. Available online at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/mitigation. Accessed January 27, 2020.

Florida Department of Environmental Protection (FDEP). 2020a. State 404 program applicant's handbook. FDEP. Version 02/11/2020. https://floridadep.gov/water/water/content/water-resource-management-rules-development. (02/24/2020).

Florida Department of Environmental Protection (FDEP). 2020b. Water Quality Standards. FDEP. floridadep.gov/DEAR/Water-Quality-Standards. (02/16/2020).

Florida Fish and Wildlife Conservation Commission (FWS). 2016. Florida's Imperiled Species Management Plan. November 2016, with amendments incorporated December 2018. Tallahassee.

Florida Fish and Wildlife Conservation Commission (FWC). 2018. Florida's endangered and threatened species. Updated December 2018. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2019. Florida's Wildlife Legacy Initiative: Florida's State Wildlife Action Plan. Tallahassee, Florida, USA.

Florida Natural Areas Inventory (FNAI). 2010. Guide to the natural communities of Florida. 2010 edition. Tallahassee, Florida, USA. http://fnai.org/PDF/FNAI-Natural-Community-ClassificationGuide-2010_20150218.pdf. (02/24/2020).

Florida Statutes (F.S.) Chapter 373. Water Resources.

Hefner, J. M. 1986. Wetlands of Florida, 1950s to 1970s. Pp. 23-31 *in:* E. D. Estevez, J. Miller, J. Morris, and R. Hamman (eds.), *Managing Cumulative Effects in Florida Wetlands.* New College Environmental Studies program Publication No. 37. Omnipress, Madison, Wisconsin, USA.

Hefner, J. M., B. O. Wilen, T. E. Dahl, and W. E. Frayer. 1994. Southeast wetlands; status and trends, mid-1970's to mid-1980's. Department of Interior, Fish and Wildlife Service, Atlanta, Georgia, USA.

Holt, L. 2005. Avoiding a water crisis in Florida: how should water resources be managed in response to growth? *Florida Water Resources Journal* (October):16-22.

Makepeace, D. K., D. W. Smith, and S. J. Stanley. 1995. Urban stormwater quality: summary of contaminant data. *Critical Reviews in Environmental Science and Technology* **25**:93-139.

Mendelsohn, R., K. Emauel, S. Chonabayshi, and L. Bakkenshen. 2012. The impacts of climate change on global tropical cyclone damage. *Nature Climate Change* **2**: 205-209.

Nagy, R. C., B. G. Lockaby, L. Kalin, and C. Anderson. 2011. Effects of Urbanization on Stream Hydrology and Water Quality: the Florida Gulf Coast. *Hydrological Processes* **26**:2019-2030.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (*Pristis pectinata*). Prepared by the smalltooth sawfish recovery team for the National Marine Fisheries Service, Silver Spring, Maryland, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Smalltooth sawfish. Species directory. https://www.fisheries.noaa.gov/species/smalltooth-sawfish#overview. (01/07/2020).

NatureServe. 2020. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/. (01/15/2020).

North American Wetlands Conservation Council (Canada) (NAWCCC). 2000. Wetland Mitigation in Canada. A Framework for Application. No. 2000-1 Available online at: http://nawcc.wetlandnetwork.ca/Wetland%20Mitigation%202000-1.pdf. Accessed January 28, 2020.

Prinos, S. T. 2014. Origins and delineation of saltwater intrusion in the Biscayne Aquifer and changes in the distribution of saltwater in Miami-Dade County, Florida. *Scientific Investigations Report.* doi:10.3133/sir20145025.

U.S. Army Corps of Engineers (USACE). 2019a. Central and Southern Florida (C&SF) project – fact sheet. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/About/Congressional-Fact-Sheets-2019/C-SF-Project-C/. (02/24/2020).

U.S. Army Corps of Engineers (USACE). 2019b. Ecosystem restoration. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem-Restoration/. (02/24/2020).

U.S. Army Corps of Engineers (USACE) and South Florida Water Management District (SFWMD). 2007. Broward County Water Preserve Areas Comprehensive Everglades Restoration Plan (CERP) Final Project Implementation Report and EIS Briefing to the Civil Works Review Board. https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/5154. (01/27/2020).

U.S. Environmental Protection Agency (USEPA). 2013. ESA biological evaluation for CWA section 316(b) rulemaking. USEPA, Office of Water Engineering and Analysis Division, Washington, District of Columbia, USA.

U. S. Fish and Wildlife Service. 1996. The South Florida ecosystem. South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (*Trichechus manatus latirostris*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019a. Consultation guidance - programmatic consultations. USFWS South Florida Ecological Services Field Office, Vero Beach, Florida, USA. https://www.fws.gov/verobeach/Programmatic%20Consultations.html. (02/24/2020).

U.S. Fish and Wildlife Service and National Marine Fisheries Service (USFWS and NMFS). 2014. Endangered Species Act Section 7 consultation, programmatic biological opinion on the U.S. Environmental Protection Agency's issuance and implementation of the final regulations Section 316(b) of the Clean Water Act. USFWS, Endangered Species Program, Division of Environmental Review, Arlington, Virginia, USA; NMFS, Office of Protected Resources, Endangered Species Act, Interagency Cooperation Division, Silver Spring, Maryland, USA.

Vose, R.S., D.R. Easterling, K.E. Kunkel, A.N. LeGrande, and M.F. Wehner, 2017: Temperature changes in the United States. In: *Climate Science Special Report: Fourth National Climate Assessment, Volume I* [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 185-206, doi: 10.7930/J0N29V45

# 10. Lists of Contacts and Preparers

## FDEP 404 Assumption BA – List of Contacts

Doug Beason – Florida Department of Environmental Protection

Mary Duncan – Florida Department of Environmental Protection

Stephanie Gray – Florida Department of Environmental Protection

Heather Mason – Florida Department of Environmental Protection

Benjamin Melnick – Florida Department of Environmental Protection

Ravi Sharma – Florida Department of Environmental Protection

John Truitt – Florida Department of Environmental Protection


Florida Fish and Wildlife Conservation Commission – conservationplanningservices@myfwc.com z


## FDEP 404 Assumption BA – List of Preparers

### Lead Authors

Michael Barnett – GHD

Eric Dohner – GHD

Dean Goodin – GHD

Ken Mierzwa – GHD

Emma Pattison – GHD

Genevieve Rozhon – GHD

Cindy Dohner – Cindy K. Dohner, LLC

Mary Duncan – Florida Department of Environmental Protection


### Section Authors (Species)

Nicole Charlton – GHD

Joslyn Curtis – GHD

Amy Douglas – GHD

Amy Livingston – GHD

Kerry McNamee – GHD

Elizabeth Meisman – GHD

Elissa Overton – GHD

James Seery – GHD

Jordan Widmaier – GHD

**GIS/Graphics**

Elizabeth-Noelle Morata – GHD

**Technical Editors**

Mikeila Morgan – GHD

Justyn Patterson – GHD

**Technical Support**

Laura Lawlor – GHD

Jason Curole – GHD

# Appendix A
# April 15, 2020 Letter from
# NMFS to FDEP Regarding
# NMFS Jurisdiction



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

April 15, 2020

Heather Mason, PWS
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400

RE:     National Marine Fisheries Service in the Clean Water Act Section 404 Assumption by the
        State of Florida

Dear Ms. Mason:

On November 22, 2019, the National Marine Fisheries Service (NMFS) received your request
for input on a draft species list for Florida's assumption of Clean Water Act Section 404
permitting from the U.S. Army Corps of Engineers (USACE). Through subsequent
communications with you and your staff, a review of state mapping products, NMFS'own
mapping analysis, and a review of state-provided documents about the assumption, we conclude
that Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in
waters that are assumable by the state.

We specifically analyzed the possible spatial overlap of the assumption with waters used by
shortnose sturgeon, Atlantic sturgeon, smalltooth sawfish, and Gulf sturgeon. Based on that
analysis, shortnose sturgeon and Atlantic sturgeon occur in the St. Marys and St. Johns Rivers,
which are included on the USACE retained waters list. Smalltooth sawfish occur in waters
"subject to the ebb and flow of the tide" which will also remain under the USACE's jurisdiction,
per the draft State 404 Program Applicant's Handbook definition of "Retained Waters."
Therefore, the USACE will retain ESA Section 7 responsibility for proposed Section 404 actions
in the waterways where NMFS's trust resources are most likely to occur.

For Gulf sturgeon, which has shared jurisdiction between NMFS and the U.S. Fish and Wildlife
Service, the U.S. Fish and Wildlife Service is responsible for all consultations regarding Gulf
sturgeon and critical habitat in riverine habitat units (final rule designating critical habitat for the
Gulf sturgeon – 68 FR 13370). Rivers in Florida that include riverine critical habitat units (i.e.,
Escambia, Yellow, Choctawhatchee, Apalachicola, and Suwannee rivers) and river areas where
Gulf sturgeon are known to occur (e.g., lower Ochlockonee River) are all listed by the USACE
as retained waters.

Based on this determination we also assume that the Environmental Protection Agency will
make a "no effect" determination for NMFS' ESA-listed species that were originally identified
as part of this proposed assumption.



We appreciate all the information and assistance you provided in making this determination. If you have any questions, please contact Dr. Pat Shaw-Allen at (301) 427-8473, or by e-mail at pat.shaw-allen@noaa.gov or me at (301) 427-8495 or by e-mail at cathy.tortorici@noaa.gov.

Sincerely,

TORTORICI.CAT HRYN.E.136582 6850
Digitally signed by TORTORICI.CATHRYN.E.13 6826850
Date: 2020.04.15 13:25:25 -04'07'

Cathryn E. Tortorici
Chief, ESA Interagency Cooperation Division
Office of Protected Resources

cc:    Karen Myers, US Fish and Wildlife Service
       Robert Tawes, US Fish and Wildlife Service
       David Bernhart, NMFS, Southeast Regional Office

2

# Appendix B
# Species Accounts

**Vertebrates**

**MAMMALS**

**Sherman's Short-tailed Shrew**

Sherman's Short-tailed Shrew (*Blarina brevicauda shermani = Blarina carolinensis shermani*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The small range of the subspecies in southwestern Florida extends from Fort Myers to near Royal Palm in Lee County (Benedict et al. 2006), although it has not been located since 1955. Current status is unknown, and it is possible the species has been extirpated. Habitat is described as edges of marshes or shallow depressions, mesic flatwoods, with abundant grasses (FNAI 2001a); also drainage ditches with abundant grass cover (Layne 1978). Threats include habitat loss and predation by cats (Layne 1992).

**Gray Wolf**

The Gray Wolf (*Canis lupus*), was first listed as endangered effective March, 11, 1967 (32 FR 4001). Various populations throughout the west were listed after this date (43 FR 9607, 76 FR 25590, 43 FR 9607). Critical habitat has been designated in Michigan and Minnesota (43 FR 9607). There have been multiple proposals to delist the Gray Wolf (USFWS 2020a). On May 14, 2019, the US Fish and Wildlife Service (USFWS, the Service) announced a proposal to delist the Gray Wolf, except for the Mexican Wolf (*Canis lupus baileyi*) subspecies (84 FR 21312). This decision is controversial and some organizations believe delisting is premature (CBD 2020a).

Gray Wolves are a keystone terrestrial predator. They feed primarily on ungulates, and utilize a wide range of habitats (USFWS 2020a). In North America, their historic range spanned much of Canada, the US, and Mexico (International Wolf Center 2020, NatureServe 2020). There is disagreement in the scientific community regarding Gray Wolf taxonomy and how many subspecies there are within the United States (International Wolf Center 2020). 'American' Gray Wolves were nearly driven extinct as a result of federal extermination programs. Protection of Gray Wolves has resulted in substantial increases to population numbers, in part due to reintroduction programs. However, Gray Wolves have only returned to an approximate 10 percent of their historic range in the US. Gray Wolves remain extirpated from Florida. Ongoing threats include direct persecution, often as a result of conflicts with livestock, and habitat fragmentation (limiting population growth and genetic diversity) (CBD 2020a).

**Red Wolf**

The Red Wolf (*Canis rufus*) is listed as endangered effective March, 11, 1967 (32 FR 4001), except for experimental populations in areas of North Carolina and Tennessee (51 FR 26564). Critical habitat has not been designated (USFWS 2020a).

Red Wolves were nearly driven to extinction as a result of predator control programs and habitat loss (CBD 2019a). The historical range for Red Wolves included North Carolina, Tennessee, and Texas (USFWS 2020a), and may have been much larger spanning the Southeast, the lower Midwest, and into southern Pennsylvania and New York (Weller 2018). A captive breeding program began in 1973 and was largely successful until the mid-2000s (FWC 2020a, CBD 2019a). These captive-bred wolves were reintroduced as experimental populations on several National Wildlife Refuges in North Carolina. In addition, one breeding pair was introduced to St. Vincent Island, Florida (FWC 2020a, USFWS 2020c). A multi-generational pack was present on the island as of 2019 (USFWS 2020c). The species occupies coastal prairies, forests, and swamps within these areas. A major threat to Red Wolf populations is loss of genetic diversity from interbreeding with coyotes (*Canis latrans*) (FWC 2020a). Additionally, incidental take of Red Wolves (mistaken for coyotes) in North Carolina has caused substantial

declines in the reintroduced population (CBD 2019a).

**Florida Bonneted Bat**

The Florida Bonneted Bat (*Eumops floridanus*) was listed as endangered effective November 1, 2013 (78 FR 61003). Critical habitat has not been designated for this species, although designation was expected to occur in 2014 (FWC 2013).

The Florida Bonneted Bat (previously the Florida Mastiff Bat) is the largest bat species in Florida. The species has an extremely restricted range and only occupies pineland, tropical hardwood, and mangrove habitat in Charlotte, Collier, Lee, Monroe, and Miami-Dade counties. It is known from a total of nine locations. Areas of freshwater wetlands are also important to the species (78 FR 61003). Very limited information is available on the species' natural history. The Florida Bonneted Bat does not undergo periods of hibernation and the species is active year-round, although they may engage in torpor during cold weather. The bats roost singly or in small colonies in tree cavities (including Red-cockaded Woodpecker cavities), buildings, foliage, and rock crevices, as well as artificial roosts (FWC 2011a, 2013). Peak breeding season is in April (USFWS 2018a). Florida Bonneted Bats give birth from June through September (a second breeding season may also occur in January or February) (78 FR 61003, FWS 2013). They feed on insects primarily from the orders Coleoptera, Diptera, and Hemiptera (FWC 2013).

The species' range contracted due to habitat loss (urbanization) in the mid-1900s (FWC 2011a, 2013). Current threats to the species include a restricted range and small population size, loss of forested habitat via urbanization, limited roost sites, environmental stochasticity, and pesticides (FWC 2013, USFWS 2018a). The current population size is estimated to be a few hundred individuals and the species is considered to be critically endangered (FWC 2011a, 2013).

**Florida Salt Marsh Vole**

The Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) was listed as endangered effective February 13, 1991 (56 FR 1457). Critical habitat has not been designated (USFWS 2020a).

The Florida Salt Marsh Vole is a subspecies of the Meadow Vole. This subspecies is endemic to the central Gulf coast of Florida and is only known from 32 kilometers of salt marsh habitat. The species occurs between the Lower Suwannee River and the Withlacoochee River, Levy County, Florida, predominantly located on state or federal conservation lands. This distribution appears to be a relic from a formerly large range along the Gulf coast (when sea levels were lower and suitable habitat extended west of the current coastline of Florida) (USFWS 2019a).

Habitat for this species has been documented to include the following vegetation: saltgrass (*Distichlis spicata*), smooth cordgrass (*Spartina alterniflora*) and black needle rush (*Juncus roemerianus*) (USFWS 1997, 2019). Because of its rarity, the life history and reproductive behavior of the Florida Salt Marsh Vole have not been well studied. Life history of the Meadow Vole has been well studied and some aspects are expected to be similar to that of the Florida Salt Marsh Vole. Typically, Meadow Voles are active both day and night and feed on a variety of plant matter, including bark, grass, roots, and seeds. Voles have a high reproductive rate and breed throughout most the year with a peak of breeding activity occurring in the spring. The life span of voles is short; typically, few individuals live longer than six months (USFWS 2019a).

The decline of the species appears to be due to climatic changes and associated rise in sea level (USFWS 1997, 2019). Encroachment of mangroves into Florida Salt Marsh Vole habitat may be a new threat. Given a very limited range and only a few known locations within 32 kilometers of each other, an environmental or human-caused stochastic event could cause a catastrophic decline or possibly extinction of this subspecies (USFWS 2019a).

**Gray Bat**

The Gray Bat (*Myotis grisescens*) was listed as endangered effective May 3, 1976 (41 FR 17736). Critical habitat

has not been designated (USFWS 2020a).

The Gray Bat occurs in limestone karst regions of Alabama, Arkansas, Kentucky, Missouri, Tennessee, and Indiana (USFWS 1982). The species roosts colonially in caves year-round, occupying deep, vertical, colder caves and mines in the winter (hibernacula at 1 °C to -4 °C) and warmer caves with restricted rooms or domed ceilings during the summer. Environmental conditions aid in thermoregulation (USFWS 1982, USFWS 2009a). Summer caves are typically located near bodies of open fresh water (foraging habitat) (USFWS 1982). In Florida, the species occurs in a single county (Jackson) in the northwest Panhandle. Roosting (including some maternity roosts) has been documented in nine caves in this county (USACE 2007). The bats breed in early fall and then hibernate from October or November to March.

Females enter hibernation a few weeks before males (USFWS 1982). Pups are born in May or June. The species feeds on aquatic insects including mayflies, caddisflies, and stoneflies (USFWS 2009a).

The majority of high priority maternity sites for this species have been protected. Approximately 95 percent of the total population size is confined to nine caves. The species was increasing in the early 2000s (USFWS 2009a); however, nationwide population data is not available post the discovery of white- nose syndrome in Gray Bats. Although large declines have not yet been documented, they are possible (USFWS 2012a, Powers et al. 2016). Threats to the species include roost disturbance (environmental or human-caused) and white-nose syndrome (USFWS 1982, USFWS 2012a).

## Little Brown Bat

The Little Brown Bat (*Myotis lucifugus lucifugus,* formerly *M. l. occultus*) is under review for listing by the USFWS (NatureServe 2020). On January 21, 2010, the Center for Biological Diversity petitioned the USFWS to close caves to protect bat species from becoming exposed to white-nose syndrome (caused by the fungus *Pseudogymnoascus destructans*) and petitioned for the listing of several other bat species. On June 29, 2011, the USFWS determined that the petition may be warranted, and a status review was initiated (however, not for the Little Brown Bat) (76 FR 38095).

The Little Brown Bat is widely distributed across North America with the exception of the southern Great Plains, southeastern California, and the coastal southeast, in regions with suitable hibernacula (caves and mines). There are currently five recognized subspecies of *Myotis lucifugus* although there is now evidence that these may be five distinct species (Morales and Carstens 2018, Kunz and Reichard 2010). The subspecies that occurs in Florida is *Myotis lucifugus lucifugus.* The northeastern US is considered to be the core range of the species. The Little Brown Bat has been occasionally detected in northern Florida, although it is not common in the state (Kunz and Reichard 2010). General habitat requirements include forested or herbaceous wetlands, hardwood and mixed forest, grassland, and scrub (NatureServe 2020).

The species migrates between winter hibernacula and summer roost sites. Mating occurs during fall swarming, from August through October. Females store sperm over the winter. Characteristics of winter hibernacula include caves or mines with high humidity and stable temperatures above freezing (typically between 2 °C to 12°C). Winter hibernacula may be located up to 300 kilometers from summer roosts. Summer maternity colonies are located in tree cavities and man-made structures such as barns and attics (Kunz and Reichard 2010). Females give birth in late spring or early summer (NatureServe 2020). The species feeds on a variety of insects from the orders Diptera, Lepidoptera, Coleoptera, Thrichoptera, Ephemeroptera, and Neuroptera (Kunz and Reichard).

Prior to the introduction of white-nose syndrome to the US, the species population was estimated to be greater than 6.5 million. This species appears to have experienced one of the highest mortality rates from white-nose syndrome in North America, and the population is in rapid decline. Current estimates put the northeast population at a 99 percent chance of extinction by 2026 (CBD 2010b, Kunz and Reichard 2010). Threats to the species

include white-nose syndrome, climate change, pesticides, mortality from wind turbines, and habitat modification or destruction (CBD 2010b, Kunz and Reichard 2010, NatureServe 2020).

## Indiana Bat

The Indiana Bat (*Myotis sodalis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the species on September 24, 1976 (41 FR 41914).

The Indiana Bat is found in karst regions of the east-central US. There are no current records of the species in Florida (USFWS 2009b). However, there has been one historical winter record of the species in Old Indian Cave in Jackson County (pre 1995). During the winter, the species hibernates colonially in caves and mines (exhibits site fidelity). Winter hibernacula temperatures are above freezing but below 10 °C. The species hibernates from October through April. In the summer, the species roosts behind the bark of large trees (live trees or dead snags) in wooded wetlands, riparian forest, bottomland, floodplains, and uplands. Mating occurs shortly before hibernation in the fall (fall "swarming"). Breeding females may migrate up to 575 kilometers between winter and summer habitat. In contrast, non-breeding females and males remain close to their winter hibernacula and may roost singly in trees. Breeding females form maternity roosts. Maternity roost trees are typically next to an opening in the forest such as a forest edge, gap in the canopy, or along a fence line. Females give birth to one pup in June or July. Foraging habitat consists of open habitats or areas with an open understory in forests, along forest edges, and in riparian areas. The species feeds on prey items primarily from the orders Coleoptera, Diptera, Lepidoptera, and Trichoptera (USFWS 2007a).

The population size is currently estimated as 537,297 bats, with 71 percent of the population located in Indiana and Missouri. From the 1960s to the early 2000s, the species declined as a result of habitat destruction, habitat modification, and roost disturbance (USFWS 2007a). The total population size increased in the early 2000s, thanks to recovery efforts (USFWS 2009b); however, since 2007, the population declined again by 19 percent, primarily due to the spread of white-nose syndrome. Current threats to the species include roost disturbance, white-nose syndrome, climate change, environmental contaminants, collisions with man-made objects, mining operations, forest fragmentation, invasive species, and loss/degradation of habitat (including swarming and migration habitat; USFWS 2019b).

## Key Largo Woodrat

The Key Largo Woodrat (*Neotoma floridana smalli*) was originally listed as threatened under the Endangered Species Conservation Act of 1969 (USFWS 1999a). It was listed as endangered under an emergency rule effective September 21, 1983 (48 FR 43040) and protection continued through a final rule in 1984 (49 FR 34504). The USFWS announced the initiation of the latest five-year review of the species in 2016 (81 FR 59650). Critical habitat has not been designated (USFWS 2020a). The subspecies was protected in conjunction with the Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) because of their similar habitat requirements.

The Key Largo Woodrat is a subspecies of the Eastern Woodrat (*Neotoma floridana*). The subspecies inhabits tropical hardwood hammock forests (48 FR 43040). The historic range of the Key Largo Woodrat spanned all of Key Largo. Unfortunately, as a result of development, much of the hammock forest habitats have been destroyed. Currently the subspecies is limited to North Key Largo, which is approximately half of its historical range (USFWS 1999a). Woodrats are well-known for their large stick nests (USFWS 1999a). The subspecies is omnivorous, with a diet primarily composed of buds, leaves, and fruit from a variety of plants (USFWS 1999a, 2020b).

Key Largo Woodrats were introduced to Lignumvitae Key in 1970 (48 FR 43040). Although the subspecies is not historically native there, it hosts similar hammock forest habitats as those found on Key Largo. Key Largo Woodrats appear to have been extirpated on Lignumvitae Key by 1990 (USFWS 1999a). A captive propagation program began in 2002 because the causes of continued decline were undetermined. The Key Largo Woodrat's

small and isolated populations are especially vulnerable to extinction because of a wide range of threats including demographic factors and natural catastrophes (USFWS 2018b). Predation poses another significant risk, as they are depredated by a wide range of raptorial, reptilian, and mammalian (including free-roaming cats) predators (USFWS 1999a).

Reintroduction efforts have been largely unsuccessful because of high predation (USFWS 2018b).

### Key Deer

The Key Deer (*Odocoileus virginianus clavium*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The Key Deer is found in the Florida Keys within 11 island complexes from Johnson Keys to Sugarloaf Key. Each of these complexes are considered a subpopulation which collectively form a metapopulation. Key Deer are concentrated on Big Pine Key and No Name Key, which are home to approximately three- quarters of the metapopulation. The historical range of the subspecies extended into Marathon and Key West; however, these areas are now too urbanized to support Key Deer populations. The subspecies selectively uses hammock and pine rockland upland habitats. These habitats contain a substantial portion of their forage plants, fresh water, and cover, which is especially important for fawning. The diet of Key Deer is primarily composed of red mangrove (*Rhizophora mangle*) as well as a wide variety of other plants (USFWS 2010a).

Roads and fences fragment deer habitat as well as cause direct mortality. Despite high annual mortality rates, the population growth rate appears stable (USFWS 2010a). Ongoing threats include urbanization (documented to increase deer habituation and result in conflicts between dogs and deer) and vehicular collisions. The Service has translocated animals from the core areas to periphery islands in an attempt to bolster the metapopulation (USFWS 2010a).

### Rice Rat

The Lower Keys population of the Rice Rat, also known as the Silver Rice Rat, (*Oryzomys palustris natator = O. argentatus*) was listed as endangered effective May 30, 1991 (56 FR 19809) due to its low population numbers (restricted to wetlands on eight of the Lower Keys, Florida). Rice Rats in mainland Florida are not listed. Critical habitat was designated in 1993 (58 FR 45030) and includes nine keys or groups of keys inhabited by the species.

Rice Rat habitat includes contiguous mangrove swamps, saltmarsh flats, buttonwood transition vegetation (Goodyear 1987), and fresh water cattail marshes (56 FR 19809). Generally, the rats use mangrove habitats for foraging and higher elevation saltmarsh flats for nesting and foraging (Forys et al. 1996). They are primarily nocturnal and have large home ranges, with some individuals traveling up to 325 meters at a time (Spitzer 1983, Forys et al. 1996). Although Rice rats may breed throughout the year, few juveniles have been observed during population studies (Forys et al. 1996, NatureServe 2020). A reproduction rate may be due to limited resources. Rice Rats are impacted by the continued development of the Lower Keys, increased populations of predators (such as raccoons, cats, and dogs), and through competition with introduced Black Rats (*Rattus rattus*) (Goodyear 1992).

### Pine Island Rice Rat

The Pine Island Rice Rat (*Oryzomys palustris planirostris*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The subspecies is known from only two occurrences, on Pine Island and the adjacent mainland. The Pine Island Rice Rat has been found in a garbage dump, in an adjacent herbaceous wetland, and in runways with Cotton Rats (*Sigmodon*) (Layne 1978). Little is known about the species ecology, though they have been noted to feed on stems of cord-grass (*Spartina* spp.), smut grass (*Sporoborus* spp.), and shoreline purslane (*Sesuvium* spp.)

(Hamilton 1955). To complete the species review, habitat requirements should be studied in more detail and additional taxonomic study has been recommended. The Pine Island Rice Rat's habitat is threatened with habitat destruction by filling and draining of wetlands and invasion of woody plants (NatureServe 2020).

## Sanibel Island Rice Rat

The Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The subspecies is known only from one Florida island that is currently being extensively developed (Sanibel Island). The Sanibel Island Rice Rat's preferred habitat is along the edge of freshwater swamps of artesian origin, including swales and cattail stands. While the subspecies is protected in part on Ding Darling National Wildlife Refuge, it is threatened by habitat destruction through drainage, filling of marshes, lowering of the water table for human use, and woody plant invasion. Due to the limited information available on this subspecies, ecological studies are required to establish comprehensive management plans and the effects of major hurricanes (NatureServe 2020).

## Tricolored Bat

The Tricolored Bat, formally known as the Eastern Pipistrelle, (*Perimyotis subflavus*) was petitioned for listing on June 14, 2016 (CBD and DOW 2016), and the 90-day finding found that listing may be warranted (82 FR 60362). The species remains under review at this time (USFWS 2020a).

The Tricolored Bat is found throughout eastern North and Central America and the US Midwest (CBD and DOW 2016). The species is a permanent resident throughout the Florida peninsula. However, the majority of records are from the Panhandle (CBD and DOW 2016, NatureServe 2020). Habitat preferences include open landscapes bordered by woodland (e.g., hardwood woodlands, grasslands, abandoned fields, and urban landscapes) (CBD and DOW 2016). The species migrates between summer roosting areas and winter hibernacula. Summer and winter sites are typically less than 100 kilometers apart. Winter hibernacula are located in the deepest part of caves and mines with high thermal stability and temperatures typically in the range of -6 °C to 14 °C (CBD and DOW 2016). Summer roosting sites, including maternity colonies, are located in barns and other man-made structures as well as tree foliage. Males and non-breeding females may also use the winter hibernacula as a roost during the summer (CBD and DOW 2016, NatureServe 2020). The species mates during fall "swarming" outside of winter hibernacula. Females store sperm, overwinter, and give birth to two pups in the later summer. Tricolored Bats forage near water and in early successional forests and feed on a variety of insects, primarily from the orders Homoptera, Coleopteran, and Diptera (CBD and DOW 2016, USFWS 2019c).

This species has experienced precipitous population declines resulting from white-nose syndrome mortality (CBD and DOW 2016). Threats to the species include white-nose syndrome, human disturbance of hibernacula, habitat loss and modification, pesticides, climate change, and mortality from wind energy (CBD and DOW 2016, USFWS 2019c).

## Key Largo Cotton Mouse

The Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) was listed as endangered under an emergency rule effective September 21, 1983 (48 FR 43040), and protection continued through a final rule in 1984 (49 FR 34504). The USFWS announced the initiation of the latest five-year review of the species in 2016 (81 FR 59650). Critical habitat has not been designated (USFWS 2020a). The species was protected simultaneously with the Key Largo Woodrat (*Neotoma floridana smalli*) because of similar habitat requirements and the fact that the Cotton Mouse constructs its leaf-lined lairs in close proximity to or within Key Largo Woodrat nests (48 FR 43040, USFWS 2015a).

The Key Largo Cotton Mouse is a subspecies of the widespread southeastern species, *P. gossypinus*. The subspecies inhabits tropical hardwood hammock forests, one of the most limited and threatened ecosystem types in the state of Florida (48 FR 43040), as well as nearby Salicornia coastal strands. The historical range of the Key Largo Cotton Mouse spanned all of Key Largo to Tavernier on Plantation Key. Unfortunately, as a result of development, much of the hammock forest habitats have been destroyed and currently the species is limited to North Key Largo, an area delineated as north of the US Highway 1 and County Road 905 intersection (USFWS 2015a). Key Largo Cotton Mice were introduced to Lignumvitae Key in 1970 (48 FR 43040). Although the subspecies was not historically native there, it hosts similar hammock forest habitats as those found on Key Largo (USFWS 1999a).The Cotton Mouse is herbivorous, with a diet composed of fruits, seeds, and leaves (USFWS 2015a).

The last sighting of a Cotton Mouse on Lignumvitae Key was in 1977 (USFWS 2019d). Fortunately, much of their remaining habitat on Key Largo has been acquired and protected. However, free-roaming cats and loss of hammock forest habitat through sea level rise (e.g., salt intolerant forest) are ongoing threats to their populations (USFWS 2015a).

## Choctawhatchee Beach Mouse

The USFWS listed the Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) as Endangered effective June 6, 1985 (50 FR 23872). Critical habitat has not been designated (USFWS 2020a).

The historical distribution of the Choctawhatchee Beach Mouse included Florida's western Gulf Coast, as well as the barrier between Choctawhatchee Bay and St. Andrew Bay (USFW 1987). Remaining populations of this subspecies exist in the sand dunes on Shell Island, Grayton Beach, and Topsail Hill (FWC 2020b). This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and beach grasses, and adjacent interior scrub areas populated by oaks including yaupon (*Ilex vomitoria*), marsh-elder (*Iva spp.*), scrub oak (*Quercus myrtifolia),* sand-live oak (*Quercus virginiana var. maritima)* and sand pine (*Pinus clausa*), saw palmetto (*Sereona repens*), and slash pine (*Pinus elliotti).* Optimal habitat for the Choctawhatchee Beach Mouse should include: high maximum elevation of coastal sand dunes; relatively great difference between maximum dune height and minimum interdunal elevation; close proximity of forest; sparse ground cover; and relatively low cover of sea oats. The fruits of beach grass are readily available to the mice, but those of sea oats are usually obtainable only after they have been blown down by heavy winds. The Choctawhatchee Beach Mouse also likely eats invertebrates in the late winter and early spring when seeds are scarce (USFWS 1987). The breeding season for the subspecies starts in November and ends in early January. Females reach reproductive maturity at six weeks of age and produce two to seven mice per litter (70 FR 94426). The predominant factor of decline for this subspecies is habitat loss due to alteration or conversion of dunes for human development and use (USFWS 1987).

More than two-thirds of this species' habitat has been lost as a result of real estate development (USFWS 1987).

## Southeastern Beach Mouse

The Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) was listed as threatened effective June 12, 1989 (54 FR 20598). Critical habitat has not been designated (USFWS 2020a).

This Southeastern Beach Mouse is a coastal subspecies of the Oldfield Mouse (*Peromyscus polionotus*), (USFWS 2005a). The original distribution of the Southeastern Beach Mouse included approximately 280 kilometers of the central eastern coast of Florida from Ponce Inlet, Volusia County, southward to Hollywood, Broward County, and possibly as far south as Miami Beach in Dade County. Remaining populations of this species exist in Volusia County (Canaveral National Seashore to 11 kilometers north of the Volusia-Brevard County line); Brevard County (Canaveral National Seashore, Merritt Island National Wildlife Refuge, and Cape Canaveral Air Force Station); scattered localities in Indian River County (Sebastian Inlet State Recreation Area, Seavie Subdivision, Treasure Shores Park, and Turtle Trail Public Beach access area); and St. Lucie County (Pepper Park and Fort Pierce Inlet State Recreation Area). As of 1993, this species occupies approximately 80 kilometers of beach (USFWS 1993).

This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass (*Panicum* spp.), and adjacent interior scrub areas populated by oaks and sand pine (*Pinus clausa*) or palmetto (*Sabal* spp.; USFWS 2005a). The best habitat for Southeastern Beach Mouse is characterized by patches of bare, loose, sandy soil. Sea oats must be blown to the ground for the mice to eat, and during the spring and early summer; when seeds are scarce, beach mice may eat invertebrates. The breeding season for the Southeastern Beach Mouse starts in November and ends in early January.

Females reach reproductive maturity at six weeks of age, and produce two to seven mice per litter (USFWS 2005a). The predominant factors of decline for this species are habitat loss due to alteration or conversion of dunes due for human development and use, and destruction of habitat due to hurricanes and storms (USFWS 1993).

### St. Andrew Beach Mouse

The St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) was listed as endangered effective January 19, 1999 (63 FR 70053). Critical habitat has been designated and includes dunes in Bay and Gulf counties, Florida (71 FR 60238).The USFWS announced the initiation of the latest five-year review of the subspecies in 2018 (83 FR 38320).

The St. Andrew Beach Mouse is one of the eight beach mice subspecies. Its historical range spanned from East Pass of St. Andrew Bay, along the coastline of St. Joseph Bay to St. Joseph Peninsula, and east to Money Bayou. The two existing populations of St. Andrew Beach Mouse inhabit East Crooked Island in Bay County and St. Joseph Peninsula in Gulf County. Habitat requirements include primary and secondary scrub dune ecosystems. The subspecies constructs burrows within the dunes, especially in steep, well-vegetated areas. The Beach Mouse feeds primarily on the seeds and fruits of dune plants as well as insects (USFWS 2010b).

The St. Andrew Beach Mouse population on East Crooked Island was presumed extinct in 1994. However, reintroduction efforts have led to a reestablished population there. St. Andrew Beach Mice face a suite of threats primarily related to habitat loss or degradation via urbanization and stochastic environmental events. Predation by feral cats is also a significant threat (USFWS 2010b).

### Anastasia Island Beach Mouse

The Anastasia Island Beach Mouse (*Peromyscus polionotus phasma*) was listed as endangered effective June 12, 1989 (54 FR 20598). Critical habitat has not been designated (USFWS 2020a).

This species historically occurred from the Duval-St. Johns County line southward to Matanzas Inlet, St. Johns County along Florida's northern east coast (USFWS 1993). Currently, two populations of this species exist on Anastasia Island: at Anastasia Island State Park and Fort Matanzas National Monument (USFWS 1993, USFWS 2005a). This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass (*Panicum* spp.), and adjacent interior scrub areas populated by oaks and sand pine or palmetto (USFWS 2005a). Prime habitat for Anastasia Island Beach Mouse is characterized by patches of bare, loose, sandy soil. (USFWS 1993). Sea oats must be blown to the ground for the mice to eat. During the spring and early summer, when seeds are scarce, beach mice may eat invertebrates. The breeding season for beach mice starts in November and ends in early January.

Females reach reproductive maturity at six weeks of age, and produce two to seven mice per litter (USFWS 2005a).

The predominant factors of decline for this species are habitat loss through alteration or conversion of dunes due to human development and use and destruction of habitat due to hurricanes and storms (USFWS 1993). In 1992, mice from Anastasia Island were reintroduced into suitable historical habitat between Ponte Vedra Beach and South Ponte Vedra Beach in north St. Johns County at the Guana- Tolomato-Matanzas National Estuarine

Research Reserve (formerly Guana River State Park). The reintroduced population is surviving, although in low numbers (USFWS 2005a).

## Perdido Key Beach Mouse

The Perdido Key Beach Mouse (*Peromyscus polionotus trissyllepsis*) was listed as endangered effective June 6, 1985 (50 FR 23872). Critical habitat was designated on June 6, 1985 (50 CFR § 17) and revised most recently in 2006 (71 FR 60238).

The species' current range is restricted to Perdido Key in Florida, with critical habitats identified in Gulf State Park, West Perdido Key, Perdido Key State Park, Gulf Beach, and Gulf Islands National Seashore. The Perdido Key Beach Mouse is a nocturnal herbivore that feeds primarily on dune plant seeds such as sea oats (*Uniola paniculata*) and beach grass (*Panicum amarum*); it is also known to prey on insects, likely as a result of seasonal fluctuations in seed availability. They require a mosaic of frontal and scrub dunes for food, burrow sites, and refuge habitat. The frontal dunes have a cover of sea oats, blue stem (*Schizachyrium scoparium*), beach grass, and beach goldenrod (*Chrysoma paciflosculosa*) while the scrub dunes are dominated by scrub live oak (*Quercus geminata*) with gopher apple (*Licania michauxii*) and green briar (*Smilax* spp.) ground covers. The importance of scrub dunes for this species was recognized through the revision to its critical habitat in 2006 (71 FR 60238). Threats to the species include loss/fragmentation of habitat for land development, tropical storm damage and mortality, and predation by non-native species (71 FR 60238). In addition, predicted future sea level rise and associated flooding is expected to produce increased habitat fragmentation and isolation (USFWS 2019e).

## Florida Panther

Florida Panther (*Puma* (= *Felis*) *concolor coryi*) was listed as endangered effective March 10, 1967 (32 FR 4001). The Service announced the initiation of the latest five-year review of the species in 2017 (82 FR 29916). Critical habitat has not been designated (USFWS 2020a).

The historic range of the Florida Panther included Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, South Carolina, and Tennessee (USFWS 2020a). The subspecies is now limited to a single population in southern Florida (inhabits less than five percent of its historic range). Panther habitat preferences are closely associated with prey abundance (USFWS 2008a). Habitats with dense understory vegetation are also important as they provide cover for panthers to hunt, rest, and den (USFWS 2020a). Panthers have vast home ranges, occur at low densities, and require large swaths of contiguous habitat (USFWS 2008a). Although their population numbers have increased substantially from 12 to 20 individuals in the 1970s to 100 to 120 in 2007, Florida Panther incompatibility with urbanization continues to limit the recovery of this subspecies. Habitat fragmentation and loss also serve as significant threats to Florida Panthers. Additionally, vehicular collisions continue to limit the subspecies' population growth (USFWS 2020a).

## Insular Hispid Cotton Rat

The Insular Hispid Cotton Rat *(Sigmodon hispidus insulicola)* was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The Insular Hispid Cotton Rat currently has a range of <100-250 square kilometers within peninsular Florida and the Keys. The preferred habitat is herbaceous wetlands, grasslands, shrubland, and mixed woodlands (NatureServe 2020). Populations apparently undergo large annual fluctuations. Pregnant and lactating females have been recorded in May and August with a litter size of 2-4 young (Layne 1978).

Further research is required to determine subspecies life history, ecology, habitat requirements, and population sizes. The rat is threatened by habitat destruction from urbanization (NatureServe 2020).

**Lower Keys Rabbit**

The Lower Keys Rabbit, also known as the Lower Keys Marsh Rabbit, *(Sylvilagus palustris hefneri*) was listed as endangered effective June 23, 1990 (55 FR 25588). Critical habitat has not been designated (USFWS 2020a).

The subspecies is endemic to a very small area (<100-250 square kilometers) in the Florida Keys (NatureServe 2020). The Lower Keys Rabbit likely breeds year-round, with a peak from December through to June. Gestation lasts approximately 30-37 days. The rabbit's habitat is at risk due to development, dredging and filling of wetlands, human exploitation of very limited fresh water, and impacts from predators such as cats, dogs, and human poachers (Wolfe 1992). The population has been categorized as "declining" (USFWS 1990). Recommended conservation efforts focus on protecting the rabbit's preferred marshland habitat and areas used in dispersal, including the lower-mangrove and upland-forest (Forys and Humphrey 1996).

**West Indian Manatee**

The West Indian Manatee *(Trichechus manatus)* was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Listing was revised in 1970 to include the Caribbean subspecies and South American subspecies *(T. m. manatus)* (35 FR 18319). The species was down-listed to Threatened on April 5, 2017 (82 FR 16668). Critical habitat was designated in 1976 (50 CFR § 17.95(a)).

There are two subspecies of West Indian Manatee, *T. m. manatus* and *T. m. latirostris*. The latter of these subspecies occurs in Florida and the Gulf of Mexico (USFWS 1999b, 2007). There are four unique Florida sub-populations/management units (there is genetic exchange amongst populations) that exhibit varying degrees of site fidelity: the Upper St. Johns River subpopulation, the Northwest subpopulation, the southwest subpopulation, and the Atlantic Coast subpopulation (USFWS 2007b). Florida manatees occur in freshwater, brackish and marine environments including coastal river estuaries, sloughs, canals, creeks, and lagoons (USFWS 1999b). The species requires a source of freshwater for drinking (USFWS 2001). They are not cold-tolerant, prefer waters with temperatures above 68°F, and remain in warm-water sites around the state during the winter (e.g. warm water springs and power plant outfall sites) (USFWS 2001, USFWS 2007b). Breeding may occur year-round, although peak breeding is suspected to occur from March through November. Manatees form "mating herds" (one female and multiple males) to breed. Manatees reach sexual maturity at around four years. Gestation is roughly 11 to 14 months, and females may give birth to one or two calves per litter. The species feeds on submerged and emergent floating vegetation such as seagrass, hydrilla (*Hydrilla verticillata*), and smooth cordgrass *(Spartina alterniflora)* (USFWS 2001).

The most recent population estimate (2015), put the Florida population at 6,350 manatees (82 FR 16668). Recent analysis indicates this population is stable or increasing throughout much of the state (USFWS 2014a). Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, and red tides (*Gymnodinium breve*) (USFWS 2007b, USFWS 2014a).

## BIRDS

### Cape Sable Seaside Sparrow

The Cape Sable Seaside Sparrow (*Ammodramus maritimus mirabilis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated in Collier, Dade, and Monroe counties in Florida in 1977 (42 FR 47840). This designation was revised in 2007 (72 FR 62736).

The Cape Sable Seaside Sparrow is non-migratory and inhabits freshwater marl prairies with muhly grass (*Muhlenbergia filipes*) in the Everglades National Park. These marl prairies are defined by short hydroperiods, densely clumped grasses, and periodic fires (USFWS 1999b). Within the park, populations are located at Shark River Slough, Big Cypress Preserve, and at Taylor Slough in the Southern Glades Wildlife and Environmental Area (the subspecies occurs entirely on public conservation lands) (USFWS 2019f). Nesting occurs from late February through early August and a pair may raise multiple broods per season (USFWS 1999b). The subspecies builds their nests in clumps of grass a few centimeters above the ground; nests are highly susceptible to floods during the breeding season (USFWS 2019f). The Cape Sable Seaside Sparrow will feed on a variety of invertebrate prey items including spiders, caterpillars, worms, beetles, and shrimp (USFWS 1999b). Subspecies recovery has been hampered by altered hydrology in the region which has impacted their prairie habitat (Central and Southern Florida Project) (USFWS 1999b, 2010). Threats to the subspecies include habitat loss and conversion, nest predation, climate change, fires, and sea level rise (USFWS 2019f, USFWS 2010c). This subspecies is considered to be in decline (USFWS 2010c).

### Florida Grasshopper Sparrow

The Florida Grasshopper Sparrow (*Ammodramus savannarum floridanus*) was listed as endangered effective September 2, 1986 (51 FR 27492). Critical habitat has not been designated (USFWS 2020a).

The Florida Grasshopper is a non-migratory subspecies of grasshopper sparrow that inhabits dry, treeless, flat prairies in central and southern Florida. These prairies are dominated by saw palmetto (*Serenoa repens*), dwarf oaks (*Quercus minima*), bluestems (*Andropogon* spp.), St. John's wort (*Hypericum* spp.), and wiregrass (*Aristida stricta*). They avoid areas of dense vegetation and accumulated litter (breeding grasslands defined by a history of frequent fires) (51 FR 27492). The range of the Florida Grasshopper Sparrow is currently restricted to Avon Park Air Force Range, Kissimmee Prairie Preserve State Park, Three Lakes Wildlife Management Area, and three private ranches (USFWS 2019g). The Florida Grasshopper Sparrow was historically more widespread, but a 95 percent decrease in habitat since pre-settlement times has severely restricted the subspecies' distribution.

The Florida Grasshopper Sparrow breeds from early April through late June, although at some locations they breed through September. They are ground nesters. Nest structure includes a shallow scrape in sand substrate with a dome-shaped cup of woven grasses. Grasshopper Sparrows prey on insects (e.g., beetles, crickets, and moths) and will also feed on seeds (USFWS 1999b). Threats to the subspecies include habitat loss, degradation, fragmentation (conversion of native prairie to agriculture), unfavorable hydrology (though management or natural phenomena), and predation (particularly by the red imported fire ant, *Solenopsis invicta*). The subspecies also has a high risk of extinction due to factors such as environmental stochasticity and loss of genetic diversity (USFWS 2019g). The subspecies is in decline and there are only an estimated 23 breeding pairs remaining in the wild (USFWS 2008b, USFWS 2019g). The USFWS is currently engaged in a captive propagation program (USFWS 2019g).

## Saltmarsh Sparrow

The Saltmarsh Sparrow, also known as the Saltmarsh Sharp-tailed Sparrow, (*Ammospiza caudacuta*) is proactively being assessed for listing by USFWS. The Service is currently conducting a Species Status Assessment (USFWS 2018c). The species remains under review at this time (USFWS 2020a).

As their name implies, this species has a strong habitat association with tidal saltmarshes. Their breeding range extends along the Atlantic Coast from Maine to Virginia. Their wintering range covers similar coastal habitats from Maryland to Florida, with concentrated numbers from South Carolina to northern Florida.

Their populations have experienced substantial declines since the 1990s or earlier, with an estimated 75 percent decline from 1998 to 2012. This decline was caused primarily by habitat degradation of coastal marshes. Other factors such as sea level rise are threats to their breeding populations (Greenlaw et al. 2018). Having been listed as Vulnerable (international status) for quite some time, the species was up- listed to Endangered during the latest assessment in 2018 (BirdLife International 2018).

## Florida Scrub-jay

The Florida Scrub-jay (*Aphelocoma coerulescens*) was listed as threatened effective June 6, 1987 (52 FR 20715). Critical habitat has not been designated (USFWS 2020a).

The Florida Scrub-jay is a non-migratory corvid that serves as the state's only endemic bird species (USFWS 2019h). The species is restricted to early successional xeric scrub and scrub flatwood habitat in relict dunes located on Florida's central ridges and coasts, in areas defined by historic fires (USFWS 1999b, USFWS 2007c, USFWS 2019h). Habitat requirements include low densities of pine trees, a minimum of 50 percent scrub oak cover, and open areas of sand or minimal herbaceous vegetation (USFWS 2019h). Florida Scrub-jay's may live in pairs or family groups and the species engages in cooperative breeding with helpers at the nest (USFWS 2019h). Territory size is a minimum of 5 hectares. The species defends their territory year-round (USFWS 2015b). Nesting occurs from March through the end of July. Florida Scrub-jays typically construct their nests in sand live oak (*Quercus geminate*), scrub oak (*Q. inopina*), or myrtle oaks (*Q. myrtifolia*). Nests consist of a cup constructed out of oak twigs and woven with palmetto or cabbage palm (*Sabal palmetto*). The species feeds on insects such as grasshoppers, beetles, and butterfly or moth larvae (USFWS 2015b).

Historically, the Florida Scrub-jay occupied 39 counties in Florida. They have been functionally extirpated from nine of these counties and the species is in decline (USFWS 1999b, USFWS 2007c, USFWS 2019h). Currently, about 25 percent of the state's population is located in areas that have urbanized, and research indicates that these urban populations are not sustainable (USFWS 2014b). Threats to the species include habitat loss, fragmentation, degradation (through urbanization and fire suppression), predation, and epidemic diseases (USFWS 1999b, USFWS 2015b, USFWS 2019h).

## Rufa Red Knot

The Rufa Red Knot (*Calidris canutus rufa*) was listed as threatened effective January 12, 2015 (79 FR 73705 73748). Critical habitat has not been designated (USFWS 2020a).

The Rufa Red Knot is one of the six subspecies of Red Knot (Baker et al. 2013). They follow one of the longest known migrations, traveling roughly 15,000 kilometers from their breeding grounds in the central Canadian arctic to their overwintering grounds as far south as Tierra del Fuego at the tip of South America (USFWS 2019i). Nests are constructed as scrapes on bare tundra habitat. Usually four eggs are laid which the male is left to care for after hatching (Baker et al. 2013). There are four concentrated overwintering areas, including the Southeast US, the Northwest Gulf of Mexico, the northern coast of South America, and Tierra del Fuego (USFWS 2019i). Delaware Bay is an important stopover site on their spring migration path (79 FR 73705).

Overharvested by market hunting in the 19th Century, their populations seemed to have largely recovered after the passage of the Migratory Bird Treaty Act (USFWS 2019i). However, a crash in Horseshoe Crab population (*Limulus polyphemus*) during the 2000s (a primary prey item), caused Rufa Red Knot populations to plummet (79 FR 73705). Other prey items include marine invertebrates, such as bivalves and amphipods (Baker et al. 2013). Red Knots face a suite of ongoing environmental and anthropogenic threats across their range (79 FR 73705), specifically the threat of sea level rise inundating their coastal habitats (Kieffer 2014).

## Ivory-billed Woodpecker

The Ivory-billed Woodpecker (*Campephilus principalis*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a). The Service announced the initiation of the latest five-year review of the species in 2018 (83 FR 20092).

The Ivory-billed Woodpecker was the largest woodpecker species in North America. (Jackson 2002, USFWS 2020a). The historical range of the Ivory-billed Woodpecker included the southeast US (Arkansas, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas) and the main island of Cuba. It inhabited old-growth forests with abundant beetle larvae – its primary food source. Dense swamps were selected for nesting. Parents excavated nest cavities in dead portions of both live trees and snags, usually below a dead branch (Jackson 2002).

Ivory-billed Woodpeckers were historically harvested by humans for food and regalia (by Native Americans), souvenirs and trade, and as scientific specimens for personal natural history collections (Jackson 2002). This overexploitation along with habitat destruction led to the species' demise (USFWS 2010d). The last accepted sightings were in 1938 in the US and in 1948 in Cuba. There is a great deal of contention whether Ivory-billed Woodpeckers are still extant, given recent reported sightings; however, none of these sightings have been confirmed (Jackson 2002). Nonetheless, reports over the last several decades have prompted surveys across multiple states and some suggestive evidence has been found (USFWS 2010d).

## Piping Plover

The Piping Plover (*Charadrius melodus*) Great Lakes Distinct Population Segment (DPS; *C. m. circumcinctus*) was listed as endangered effective January 10, 1986 (50 FR 50726). The Atlantic Coast and Northern Great Plains populations (*C. m. melodus* and *C. m. circumcinctus*, respectively) were listed as threatened at the same time (50 FR 50726). Critical habitat was designated for this species on May 7, 2001 and September 11, 2002 (for separate breeding populations; 66 FR 22938, 67 FR 57637). Critical habitat for wintering populations was designated on July 10, 2001 (66 FR 36038). Critical habitat was revised several times via court rulings and final critical habitat was published on May 19, 2009 (74 FR 23476).

The Piping Plover is a migratory shorebird that breeds along the Atlantic Coast from Canada to North Carolina and along inland rivers and lakes in the Great Plains and Great Lakes regions (three independent populations with two subspecies). Piping Plovers winter along the Gulf Coast, Southern Atlantic Coast (including Florida), Bahamas, and the West Indies (USFWS 1999b). Fall migration occurs from June through August while peak spring migration occurs in April (Elliott-Smith and Haig 2004). The largest number of wintering birds are routinely found in Texas; however, a significant proportion of the species also winters in states along the Gulf Coast, including Florida (USFWS 2015c). The species exhibits site fidelity to migration and wintering sites (USFWS 2009c). On their breeding grounds, the species favor open, sparsely vegetated sand or gravel beaches for nesting. Nesting microhabitat within these larger landscape features includes open ground adjacent to bunches of grass, logs, or other conspicuous items in an otherwise barren landscape. Nest scrapes are also constructed in areas relatively free of vegetative cover. These scrapes are lined with debris such as shell fragments or pebbles. Both adults will share in incubating and parental care duties. The species typically forages within five meters of the water's edge and feeds on a variety of freshwater, saltwater, terrestrial, and benthic invertebrates (Elliot-Smith and Haig 2004). Wintering habitat preferences in Florida include bay beaches (vs. ocean facing beaches) and inlets with exposed

intertidal areas and tide cast wrack (USFWS 2009c).

Threats to the species include habitat loss and degradation from urbanization and some shoreline stabilization efforts, sea level rise, predation, and anthropogenic disturbance (USFWS 2009c, USFWS 2015c). A recent population viability analysis revealed that the species is highly sensitive to extinction risk (USFWS 2015c). Modeling of the Great Plains and Great Lakes populations have indicated that the species has a low probability of persisting for more than 100 years (Elliott-Smith and Haig 2004).

## Whooping Crane

The Whooping Crane (*Grus americana*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the species on May 15, 1978 (43 FR 20938). Critical habitat was revised on July 21, 1997 (62 FR 38932).

Brought back from the brink of extinction by intensive recovery efforts, the Whooping Crane is an environmental success story. Population declines (the population sank to only 15 individuals in 1941) were primarily the result of shooting and destruction of prairie habitat (CWS and USFWS 2007, USFWS 2012b). Historically, the documented breeding range of the Whooping Crane included tall and mixed-grass prairie marshes throughout the central US and Canada. Wintering locations included tall grass prairie, wetlands, deltas, and interior tablelands along the southeast and Gulf Coast, including Florida. Currently, four populations of Whooping Cranes exist in North America, only one of which is self- sustaining. This naturally occurring population, the Aransas/Wood Buffalo population, nests in in the Northwest Territories and Alberta within Wood Buffalo National Park and winters along the Texas Gulf Coast at the Aransas National Wildlife Refuge (Urbanek and Lewis 2015). Two reintroduction efforts (out of an initial four) are ongoing, the Eastern Migratory Population and the Louisiana non-migratory population (USFWS 2012b, Urbanek and Lewis 2015). Reintroduced Whooping Cranes in Florida, located in the Kissimmee Prairie area, are designated as an experimental, non-essential population (population size of five as of March 2019; 58 FR 5647, International Crane Foundation 2019). Reintroduction efforts in Florida were hampered by drought conditions and ceased in 2005 (USFWS 2012b). As of the winter of 2018/2019, the national wild population comprised of over 505 individuals (Butler and Harrell 2019).

Whooping Cranes breed in April and May (CWS and USFWS 2007). The preferred nesting habitat for the species is shallow, silty-bottom wetlands with trees such as willow, spruce, and birch. The species is well known for their elaborate courtship displays. Nests are constructed on shallow water islands out of surrounding vegetation (e.g., bulrush, cattail, etc.). The species is omnivorous and feeds on crustaceans, fish, amphibians, small reptiles, tubers, insects, berries, and grains (Urbanek and Lewis 2015). During fall migration, the Aransas/Wood Buffalo population leaves their breeding grounds in Canada between September and October. The birds take roughly 50 days to reach their wintering grounds at the Aransas National Wildlife Refuge on the Gulf Coast. Spring migration is initiated between late March and mid-April and may take as little as 10 days (CWS and USFWS 2007, Urbanek and Lewis 2015). The species remains at risk due to numerous factors such as environmental degradation, genetic bottlenecks, climate change, and natural disasters (USFWS 2012b). In addition, the slow reproductive rate of the species hampers breeding efforts (CWS and USFWS 2007).

## Eastern Black Rail

The Eastern Black Rail (*Laterallus jamaicensis jamaicensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

The Eastern Black Rail is a subspecies of the Black Rail that inhabits brackish, freshwater, and saltwater wetlands with dense vegetation cover in eastern North and Central American and the Caribbean. While some populations are migratory, in Florida the subspecies is present year-round. On the Florida Gulf Coast, breeding habitat is dominated by black needlerush (*Juncus roemerianus*) and cordgrass (*Spartina* spp.), coastal saltgrass (*Distichlis spicata*), Jamaican swamp sawgrass (*Cladium jamaicense*), and wax myrtle (*Myrica cerifera*). The breeding

season spans from March through August. Nest cups are built out of emergent, herbaceous plants in a clump of vegetation over mud or shallow water usually at higher elevations in the marsh; these are required refugia to survive high water events as these rails do not typically fly. Nest failure is common with flooding and heavy rain. Average clutch size is seven eggs (USFWS 2018d). Eastern Black Rails feed on seeds and a variety of invertebrate prey including aquatic beetles, weevils, and snails (Eddleman et al. 19994, USFWS 2018d).

The subspecies has undergone a significant range contraction in the last century. Historic and current threats to the subspecies include marsh habitat loss, degradation, fragmentation (conversion to urban or agricultural lands and sea level rise), stochastic events, and incompatible land management. Historically, mosquito abatement measures in the region may have also reduced habitat for the subspecies. Currently, there are an estimated 200 to 500 breeding pairs in Florida. The subspecies is considered to have a low level of resiliency in the southeast and further extirpations are anticipated (USFWS 2018d).

## Wood Stork

The Wood Stork (*Mycteria americana*) was listed as endangered effective March 29, 1984 (49 FR 7332). The species was downlisted to Threatened effective June 30, 2014 (79 FR 37077). Critical habitat has not been designated (USFWS 2020a).

The Wood Stork is a wading bird that occurs in the southeastern US, Cuba, Hispaniola, as well as Central and South America. The populations currently listed under the ESA are located in Florida, Georgia, the Carolinas, Alabama, and Mississippi (USFWS 2007d). The Wood Stork was originally listed due to population declines in the early and mid-1900s, stemming from inhibited/reduced natural wetland function in south Florida ecosystems tied to water management practices including the Central and Southern Florida project (USFWS 1999b, USFWS 2007d).

The species inhabits freshwater, estuarine wetlands, cypress and mangrove swamps, stock ponds, and seasonally flooded agricultural areas (USFWS 1996a, USFWS 1999b, USFWS 2007d). Wood Storks breed in colonies. In Florida, major colonies are located in the following counties: Broward, Charlotte, Collier, Miami-Dade, Hardee, Indian River, Lee, Monroe, Osceola, Palm Beach, Polk, St. Lucie, and Sarasota (USFWS 1999b). Nesting site features include tall trees either in water (swamps) or located on islands surrounded by water. In Florida, the nesting season runs from October to June (USFWS 1996a, USFWS 1999b). Nests are platforms constructed out of sticks, Spanish moss, and leaves and may be placed in a variety of tree species including bald cypress (*Taxodium distichum*), swamp black gum (*Nyssa biflora*), southern willow (*Salix carolina*), and red mangroves (*Rhizophora mangle*) (USFWS 1999b, USFWS 1996a). Wood Storks feed on fish, and the species is heavily dependent on hydrology (dropping water levels) to concentrate fish in foraging areas (USFWS 1996a). Although not a traditional migrant, the species tends to disperse following the breeding season and in response to local environmental conditions (Coulter et al. 1999). Since its initial listing, the species' status has improved, with an increase in breading pairs and nesting colonies across the southeast. In addition, the species has undergone a range extension. Based on the most recent USFWS five-year review, 50 to 75 percent of recovery objectives have been achieved. Current threats to the species include wetland habitat loss, fragmentation, and modification (USFWS 2007d).

## Eskimo Curlew

The Eskimo Curlew (*Numenius borealis*) is listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The historical range for the Eskimo Curlew covered all 48 contiguous states (including Florida), as well as Alaska. Currently, the Eskimo Curlew may still occur in Alaska, Nebraska, and Texas (USFWS 2020a).

Eskimo Curlews were not well studied before their decline and little is known about their biology (USFWS 2016a). Only two confirmed breeding sites for Eskimo Curlews exist from tundra areas in the Northwest Territories of Canada (Gill et al. 1998, USFWS 2016a). Their breeding range likely included tundra habitats in the Northwest

Territories, Nunavut, and possibly Alaska and eastern Russia. Nests were constructed as simple scrapes on bare ground with typically four eggs (USFWS 2016a). As long-distant migrants, they traveled from their breeding grounds to overwinter in the Pampas regions of Argentina, Brazil, Uruguay, Chile, and Patagonia (Gill et al. 1998, USFWS 2016a). Their diet was based on an annual cycle with dependence on insect eggs, larvae, and adults during their northward migration and on ericaceous berries and marine invertebrates during their southward migration. They utilized prairie habitats in the Midwestern United States on their spring migration and a variety of terrestrial and coastal habitats on their fall migration (Gill et al. 1998).

Eskimo Curlew population numbers were once thought to range in the hundreds of thousands (USFWS 2016a). However, by the end of the 19th century, their populations had declined precipitously as a result of market hunting (USFWS 2016a, Lewis 2018). Other contributing factors were habitat loss with the conversion of grasslands for agricultural use and the extinction of one of their primary food sources, the Rocky Mountain Grasshopper (*Melanoplus spretus*) (Lewis 2018). The last confirmed sighting dates from 1963 from a specimen collected in Barbados.

Based on multiple analyses, the USFWS concluded the likelihood that Eskimo Curlews are extant is extremely low (USFWS 2016a). However, the Service has not declared the species extinct because of recent potential sightings in the last two decades (USFWS 2016a). At this time there is no expectation of presence in Florida.

## Red-cockaded Woodpecker

The Red-cockaded Woodpecker (*Picoides borealis*) was listed as endangered effective October 8, 1970 (35 FR 16047). Critical habitat has not been designated (USFWS 2020a).

The Red-cockaded Woodpecker is a keystone species endemic to old growth, pine savanna ecosystems in the southeastern US (USFWS 2003a). These pine ecosystems are defined by longleaf pine (*Pinus palustris*), shortleaf pine (*P. echinata*), loblolly (*P. taeda*), or slash pine (*P. elliottii*) and abundant herbaceous groundcover. Red-cockaded Woodpeckers underwent precipitous population declines in the 1800s and 1900s due to habitat loss (logging and agriculture), incompatible forest management practices, and fire suppression (USFWS 2003a). There are currently 10 core populations of the species remaining, and the total population was estimated as 14,068 in 2003 (USFWS 2003a, USFWS 2006). In Florida, the largest populations occur in the Panhandle. Estimated population size for the state is roughly 1,500 pairs (USFWS 1999b). Red-cockaded Woodpeckers are non-migratory and territorial year-round. The species feeds on arthropods, beetles, moths, and a variety of other insects as well as fruits and seeds. They breed cooperatively in family groups (have helpers at the nest) (USFWS 2003a). The species is limited by the availability of old growth pines; the species excavates their own cavities, a process which may take several years. Nest trees are frequently infected with a heartwood fungus (*Phellinus pini*). These trees are in open stands with little to no hardwood midstory or overstory (Jackson 1994, USFWS 2003a). The nesting season in Florida runs from April through June (USFWS 1999b).

Threats to the species include suppression of natural fire regimes (which allows encroachment of hardwoods in habitat), genetic stochasticity, and habitat loss (USFWS 2003a). The species status is considered to be improving, bolstered by intensive management efforts including creation of artificial nest cavities, translocation, and prescribed burning (USFWS 2006).

## Audubon's Crested Caracara

Audubon's Crested Caracara (*Polyborus plancus audubonii*) was listed as threatened effective August 5, 1987 (52 FR 25229). Recent taxonomic data indicates that Florida caracaras should be recognized as a discrete population of the Northern Crested Caracara (*Caracara cheriway*) (Dove and Banks 1999, USFWS 2008c). Critical habitat has not been designated (USFWS 2020a).

The Northern Crested Caracara is a distinctive, medium-sized raptor that inhabits open, upland prairies, interspersed with ponds, marshes, and cabbage palm hammocks in south-central Florida. The species' current

range is limited to the following counties: Brevard, Charlotte, Collier, De Soto, Glades, Hardee, Hendry, Highlands, Indian River, Manatee, Martin, Okeechobee, Osceola, Palm Beach, Polk, and St. Lucie (Morrison and Dwyer 2012).

Northern Crested Caracaras in Florida are non-migratory (USFWS 2008c). The majority of occupied habitat and nesting occurs on private rather than public lands. Nests are built in tall trees (e.g., cabbage palms) bordering open habitat and nest fidelity is common (Morrison and Dwyer 2012). Crested Caracaras may breed year-round in Florida although the majority of nesting occurs from October through March (Dwyer 2010). The species feeds on road-kill carrion as well as invertebrates and a variety of vertebrate prey (fish, reptiles, birds, eggs, etc.) (USFWS 2008c, Morrison and Dwyer 2012). The species has declined throughout its range from the 1900s to the 1980s (USFWS 1999b). Threats to the species include habitat loss, degradation, and fragmentation, specifically from urbanization in south-central Florida (particularly loss or conversion of cattle ranches). Loss of natural fire regimes also have resulted in habitat homogeneity that threatens the species. In addition, this population is isolated from other breeding populations (closest is Cuba) and may be subjected to factors such as reduced gene flow and loss of genetic diversity (USFWS 2008c).

## Black-capped Petrel

The Black-capped Petrel (*Pterodroma hasitata*) was proposed for listing as Threatened under the Endangered Species Act on October 9, 2018 (83 FR 50560). The species remains under review at this time (USFWS 2020a).

The Black-capped Petrel, or regionally "diablotín" ("little devil"), is a pelagic seabird that nests on the island of Hispaniola and forages offshore of the southeastern US. The species exhibits nest site fidelity (83 FR 50560). The majority of nest sites are located in the Parc National La Visite. Nesting habitat includes high elevation montane forests. Nest burrows are located in rocky substrate on steep slopes, rock crevices, and caves and lined with twigs and pine needles. Black-capped Petrels lay one egg per breeding attempt; therefore, productivity and fecundity are inherently low. The species commonly forages in flocks at night or in the early morning in the Gulf Stream in areas with upwellings (USFWS 2018e). Prey items include crustaceans, squid, and fish (83 FR 50560). Historically, the species was harvested on Hispaniola for consumption. Current threats to the species include breeding habitat loss from deforestation and forest fires, climate change, invasive predators, and human population growth (USFWS 2018, NatureServe 2020). Currently, the estimated number of breeding birds on Hispaniola is 500 to 1,000 and population resiliency is considered to be low. Off the coast of Florida, Black-capped Petrels may be found year-round in relatively shallow waters near shore (USFWS 2018e, NatureServe 2020).

## Everglade Snail Kite

The Everglade Snail Kite, also known as the Snail Kite, (*Rostrhamus sociabilis plumbeus = Rostrhamus sociabilis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the subspecies on August 11, 1977 (42 FR 40685). The designation was revised on September 22, 1977 (42 FR 47840).

The Everglade Snail Kite is a non-migratory raptor that resides in central and South Florida, Cuba, and Honduras (AOU 1983, USFWS 1999b). In Florida, the historic distribution of the species was considerably larger than the current range and included most of the peninsula. The distribution of Everglade Snail Kite is currently limited to the following freshwater ecosystems: Upper St. Johns marshes, Kissimmee River Basin, Lake Okeechobee, Loxahatchee Slough, the Everglades, and Big Cypress basin. Species habitat preferences include freshwater marshes with shallow water, patchy emergent vegetation, and large expanses of open water for foraging. Emergent vegetation is important for nesting habitat. Other important habitat features include communal roosts, typically in riparian tree species within or bordering the marsh/lake, which are used throughout the year (USFWS 1999b). Snail Kites nest in patches of emergent marsh vegetation such as sawgrass (*Cladium jamaicense*) and cattails (*Typha* spp.) over water. The species may also nest in small trees such as willows (*Salix spp*), pond cypress (*Taxodium ascendens*), and paperbarks (*Melaleuca*). Nests are a loose platform of woven sticks and

herbaceous vegetation. The Snail Kite is a specialist that preys on the native Florida Apple Snail (*Pomacea paludosa*), but is also adapting to prey on the Exotic Apple Snail (*Pomacea insularum*; USFWS 2019j). Shallow, open, calm and clear water is required for foraging habitat (USFWS 1999b).

Threats to the species include habitat loss and fragmentation, hydrology management practices in the state (that may directly or indirectly impact both the kite and its prey), predation, invasive species (predators as well as the Exotic Apple Snail), and anthropogenic sources of disturbance. Another threat to the species is that designated critical habitat does not closely match habitat currently being used by the species (USFWS 2019j). The subspecies is considered to be in decline, and juvenile survival has been trending downward in the last decade (USFWS 2008d, USFWS 2019j).

## Roseate Tern

The Roseate Tern (*Sterna dougallii dougallii*) is managed as two separate populations. The Northeast population is listed as endangered and the Caribbean population as Threatened effective November 2, 1987 (52 FR 42064). The Service announced the initiation of a five-year species review in 2018 (83 FR 39113). Critical habitat has not been designated (USFWS 2020a).

The range of the Roseate Tern includes the two listed populations as well as populations in Britain, France, the Azores, Canary Islands, and southeastern Africa (USFWS 2010e). They almost solely breed in large colonies on islands (Nisbet et al. 2014). A metapopulation of the Caribbean Roseate Tern is known to breed in 12 areas of the Florida Keys (USFWS 2010e, Nisbet et al. 2014). High colony site fidelity has been documented in the Northeast population. Nests are simple scrapes on the ground comprised of sand, rock, or vegetation. The species feeds on small marine fish (Nisbet et al. 2014).

Historically, Roseate Terns suffered declines as a result of overharvesting for the millinery trade (52 FR 42064). The species continues to be particularly vulnerable because of its small and localized nesting populations. These habitats face a variety of threats such as erosion, invasive plant species, sea level rise, and intensification of storms. For instance, severe winter storms in 2005 substantially eroded colony sites within Florida, resulting in the species relocating to other areas for breeding. Additionally, breeding colonies often experience substantial pressure from mammalian predators. In Canada, displacement from colony sites by competing gulls is a significant threat (USFWS 2010e).

## Bachman's Wood Warbler

Bachman's Wood Warbler, hereafter Bachman's Warbler per recent naming standards, (*Vermivora bachmanii*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a). This species is considered to be extinct by most authorities (Hamel 2011).

Historically, this species bred in the southeastern US and wintered in Cuba and the Isle of Youth. However, habitat loss on both the breeding and wintering grounds and other population pressures beginning in the 1800s resulted in considerable species declines. The Bachman's Warbler is now considered to be one of the rarest passerines in North America. It has not been documented in the states since 1962 and the last sighting in Cuba is from 1981 (USFWS 2015d, Hamel 2018).

Habitat preferences and behavior of the species are not well understood. Breeding habitat likely consisted of bottomland hardwood forested wetlands with an understory of cane/bamboo (*Arundanaria gigantea*) or palmetto (*Sabal minor*). Longleaf pine forest and brackish marsh habitat may also have served as breeding habitat. All documented nests (cups of grass and leaves) have been located in dense understory close to the ground. Wintering habitat potentially included the Cuban lowlands, but this is not well documented (Hamel 2018). Historical threats to the species included habitat loss from palustrine forested wetland habitat conversion to agriculture (sugar cane production) as well as logging. Diet included invertebrates. Bachman's Warblers were previously documented in Florida while passing through on migration (breeding has not been documented in the state)

(Hamel 2011, USFWS 2015d). The species is not currently known to occur in Florida (USFWS 1999b).

**Golden-winged Warbler**

The Golden-winged Warbler (*Vermivora chrysoptera*) was petitioned for listing on February 10, 2010 by a private citizen (Sewell 2010), and the 90-day finding determined that the listing may be warranted (76 FR 31920). The species remains under review at this time (USFWS 2020a).

The Golden-winged Warbler is a neotropical migrant that breeds in upland and wetland forest landscapes in the Great Lakes and Appalachian regions of North America and winters in Central and South America. The species occurs in Florida strictly during migration (Confer et al. 2011, Roth 2012). Migration records from the state are primarily clustered in the Panhandle with few records from the coast. Habitat on migration is not well documented, but may include forest edge and second-growth forest (Confer et al. 2011). On their breeding grounds, the species is associated with early successional, disturbed habitats with dense shrubs, often near forest edges, with low to moderate canopy cover (76 FR 31920, Confer et al. 2011). Golden-winged Warblers construct their nests on the ground or in a grassy tussock. Nests are constructed out of woven plant material including leaves and bark (Confer et al. 2012). The species feeds on moths, larvae, and spiders (76 FR 31920, Confer et al. 2011)

This species is declining throughout its range as a result of habitat loss (on both the breeding and wintering grounds), degradation (through fire suppression and development), fragmentation, cowbird nest parasitism, and competition and hybridization with the co-occurring Blue-winged Warbler (*Vermivora cyanoptera*) (76 FR 31920, Confer 2011, Roth et al. 2012). This species also is known to have high levels of mortality during migration from building strikes (Roth et al. 2012). Extensive management of breeding habitat in the northeast and Great Lakes regions has successfully bolstered regional populations (McNeil et al. 2017).

## REPTILES

**American Alligator**

The American Alligator (*Alligator mississippiensis*) was listed as endangered effective March 11, 1967 (32 FR 4001). This was prompted by decimation of their populations as a result of unregulated harvesting.

Federal protections and wide scale recovery efforts led to a swift recovery and the species is no longer considered to be "biologically endangered or threatened" (52 FR 21059). Based on similarity of appearance to the American Crocodile, which is currently listed under the Endangered Species Act, the American Alligator was reclassified to Threatened in 1975 (40 FR 44412). Critical habitat has not been designated (USFWS 2020a).

The American Alligator is one of the two native crocodilian species to North American, the other being the American Crocodile (70 FR 15052). The range of the American Alligator includes Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Florida, and Texas. The majority (83 percent) of Alligator habitat available within this range is concentrated in Florida, Louisiana, and Texas (52 FR 21059). They utilize a variety of wetland habitats including but not limited to marshes, ponds, lakes, rivers, swamps, bayous, and canals. Females construct nest mounds from debris (e.g., vegetation, rocks, mud, etc.), often in marshes or near lakes and rivers. As opportunistic predators, they feed on a wide array of prey from invertebrates as juveniles to deer as large adults (NatureServe 2020).

**Spotted Turtle**

The Spotted Turtle (*Clemmys guttata*) was petitioned for listing on July 11, 2012 (CBD 2012) and the 90- day finding in 2015 determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

Although the range of the Spotted Turtle is extensive and extends from the Great Lakes along the Atlantic Coast

and into northern Florida (Ernst and Lovich 2009), the species has apparently been extirpated from many regions resulting in disjunct populations (CBD 2012). Habitat includes a variety of shallow, isolated wetlands with clean water, soft substrate, and emergent or submerged vegetation (Ernst and Lovich 2009). The species may engage in terrestrial movements, especially in spring. In cold weather, hibernation occurs in water depths of 56 to 94 centimeters with muddy bottoms and dense vegetation (CBD 2012). Spotted Turtle populations tend to be small and isolated, and dispersal ability is limited (van Dijk 2010, Anthonysamy et al. 2014). Threats to the species include habitat destruction and loss of wetlands, collection for the pet trade, road mortality, and invasive species (Ernst and Lovich 2009, van Dijk 2010).

## American Crocodile

The American Crocodile (*Crocodylus acutus*) is managed as two separate populations, those in Florida and those that occur in the rest of the United States. The US population of American Crocodile was listed as endangered effective October 25, 1975 (40 FR 44149). The Florida population was classified as a distinct population segment and listed as threatened effective May 1, 2006 (71 FR 13027). In 1978, the Saltwater (estuarine) Crocodile (*Crocodylus porosus*) was listed as endangered because of the similarity in appearance (44 FR 75074, 70 FR 15052). Critical habitat has been designated (41 FR 41914, 42 FR 47840), and includes "portions of Biscayne Bay south of Turkey Point, northeast Florida Bay, including the Keys, and the mainland extending as far west as Flamingo" as well as Everglades National Park (70 FR 15052).

The American Crocodile is one of the two crocodilian species native to North America. The broader range of the American crocodile includes the Caribbean Islands and the Atlantic and Pacific coastal regions along southern Mexico, Central America, and northern South America. In Florida, at the northern extent of its range, it is limited to the southern tip of Florida and the Florida Keys. Crocodile habitat includes mangrove-lined bays, swamps, and marshes (70 FR 15052). Adult crocodiles are powerful predators and feed primarily on fish (NatureServe 2020), as well as a wide array of prey including birds, mammals, crabs, and turtles. Young specialize in fish and aquatic invertebrates (USFWS 2020a). They are primarily nocturnal, aiding in prey ambush. Earthen nests are constructed on well-drained soils in close proximity to water, often along ditches and beaches. Females lay an average of 38 eggs, and often will not nest every year. The nest must be excavated by the female after the young have hatched (70 FR 15052).

The American Crocodile was historically common across southern Florida, with breeding records as far north as Lake Worth. Their populations were decimated because of habitat loss from development and excessive human persecution. At the time of listing in 1975, only an estimated 10 to 20 breeding females remained in Florida (40 FR 44149). Through the protections afforded by listing, their populations grew from 200 to 300 individuals in 1975 to 500 to 1,000 individuals in 2005 (70 FR 15052). As of 2005, the mainland shore of Florida Bay between Cape Sable and Key Largo makes up the majority of the current breeding range (70 FR 15052). They may be expanding their range back into the Florida Keys, but nesting is only known from Key Largo (70 FR 15052).

## Eastern Diamondback Rattlesnake

The Eastern Diamondback Rattlesnake (*Crotalus adamanteus*) was petitioned for listing on August 22, 2011 (CBD 2011a), and the 90-day finding determined that listing may be warranted (77 FR 27403). The species remains under review at this time (USFWS 2020a).

Although the species was historically distributed through much of the southeast from Louisiana to North Carolina, there have reportedly been considerable declines over much of the range (Means 1986, Waldron et al. 2008, CBD 2011a). In Florida, large sub-populations remain in the northern peninsula and the eastern and southern Panhandle (Timmerman and Martin 2003); however, populations in other parts of the state have been considerably reduced or in some cases extirpated (Means 2010). About half of the currently occupied range is in Florida (Timmerman and Martin 2003). The primary pre-settlement habitat was longleaf pine savanna (Means 2006), although other open-canopy habitats with a dense herbaceous understory are also utilized today. In addition to

habitat conversion or loss, rattlesnakes are actively targeted for malicious killing by humans (Means 2010).

**Key Ringneck Snake**

The Key Ringneck Snake (*Diadophis punctatus acricus*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

Distribution is restricted to five Lower Keys: Key West, Big Pine, Little Torch, Middle Torch, and No Name keys. Presence on a few additional keys which have suitable habitat is possible but unverified (Weaver et al. 1992). Habitat includes pine rocklands and rockland hammocks, usually near permanent fresh water (Lazell 1989, FNAI 2001a). Up to 98 percent of pine rockland habitat has reportedly been lost (Bentzien 1987) and what remains has been fragmented. There have been few recent surveys for Key Ringneck Snakes (and relatively few individuals found) (CBD 2012). Storm surge and sea level rise could be a future risk given the low elevation of much of the remaining habitat (FWC 2011b).

**Eastern Indigo Snake**

The Eastern Indigo Snake (Drymarchon couperi = Drymarchon corais couperi) was listed as threatened effective March 3, 1978 (43 FR 4026). Critical habitat has not been designated (USFWS 2020a).

Indigo Snakes are currently considered to be extirpated or very rare in the Florida Panhandle (Enge et al. 2013). The majority of recent records are in Peninsular Florida south of Gainesville. Indigo Snakes require large patches greater than 4000 hectares of contiguous, good quality habitat with few roads and sufficient shelter sites, such as Gopher Tortoise burrows (USFWS 2019k). Individual home ranges are large, from tens to several hundred hectares. A variety of upland and lowland habitat types are utilized, generally with a preference for upland habitat (Bauder et al. 2018). Winter shelter is a key structural component, and may include Gopher Tortoise burrows, hollowed root channels, hollow logs, stump holes, rodent or armadillo burrows, or other similar shelter (Hyslop et al. 2014, Bauder et al. 2017, USFWS 2019k).

There have been considerable Indigo Snake population declines reported, including a 97 percent loss in the Florida Panhandle and 56 percent loss in Peninsular Florida. Out of 83 total historic populations, 53 remain extant, although only four are considered to have high resiliency. Major threats to the species include habitat fragmentation, fire suppression leading to eventual habitat degradation, and road mortality (USFWS 2019k).

**Gopher Tortoise**

The Gopher Tortoise (*Gopherus polyphemus*) is managed as two separate populations, western and eastern. The western Gopher Tortoise population was listed as threatened effective August 6, 1987 (52 FR 25376). The Gopher Tortoise eastern population was petitioned for listing on January 18, 2006 (USFWS 2018f). The listing was determined to be warranted; however, the species has been precluded from listing because of delays from higher priority listings (USFWS 2018f). Thus, the eastern population remains a Candidate for listing (USFWS 2020a). Critical habitat has not been designated (USFWS 2020a).

The western Gopher Tortoise population occurs west of the Mobile and Tombigbee Rivers in Alabama, Louisiana, and Mississippi (USFWS 2020a). The eastern Gopher Tortoise population occurs east of the Mobile and Tombigbee Rivers in Alabama, Georgia, Florida, and South Carolina (USFWS 2020a). The majority of the eastern population occurs in Florida (CBD 2020b). The species is associated with habitats characterized by dry sandy soils, open canopy cover, and abundant herbaceous vegetation (USFWS 2018f). Gopher Tortoises are considered a keystone species because the burrows they dig are utilized by 360 other species (CBD 2020b). The primary threats to Gopher Tortoise populations include habitat loss, degradation, and fragmentation (84 FR 54732).

**Escambia Map Turtle**

The Escambia Map Turtle (*Graptemys ernsti*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

This species is endemic to very few relatively small river systems in western Florida and adjacent southern Alabama where it is locally abundant, with populations appearing to be relatively stable (NatureServe 2020). The species usually favors areas with good flow, avoids backwaters and salt water, and nests along sandbars and river berms. Basking individuals are conspicuous from late spring to fall, despite being present year-round. Florida currently has a state possession limit of two turtles, however it is illegal to buy or sell the species or its parts. Future management recommends the acquisition of remaining private floodplain and bordering uplands in both Escambia and Yellow river systems, and to identify and control sources of pollution within those river systems (FNAI 2001a).

## Southern Hognose Snake

The Southern Hognose Snake (*Heterodon simus*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). Following further review in 2019, the USFWS announced that the listing was not warranted based on likely population persistence (84 FR 53336).

The Southern Hognose Snake is endemic to the Coastal Plain of the southeastern United States. The species range extent includes 200,000 to 2,500,000 square kilometers with a presumed population of at least several thousand. The main threats to the species are loss of habitat through fire and urban development, fragmentation, and invasive species such as red imported fire ants and feral hogs (USFWS 2019l). The Southern Hognose Snake inhabits open, xeric habitats with well-drained, sandy soils, dominated by pine or pine-oak woodland with an open canopy and grassy understory (Enge et al. 2016). They spend a considerable amount of time burrowed in the soil and may use their snout to excavate buried toads (NatureServe 2020). Further studies are required to determine the factor or combination of factors that have caused the population to decline. Once established, management strategies can be implemented.

## Apalachicola Kingsnake

The Apalachicola Kingsnake (*Lampropeltis getula meansi*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). The subspecies remains under review at this time (USFWS 2020a). The petition requested listing of the subspecies if recognized, or as a distinct population segment (DPS) level if not recognized. Krysko et al. (2017) presented further genetic evidence that the Apalachicola Kingsnake may be a distinct species.

Endemic to the Florida panhandle, the range of the Apalachicola Kingsnake is limited to Franklin and Liberty Counties between the Apalachicola and Ochlockonee Rivers and south of Telogia Creek. Some intergradation with the nominate subspecies has been reported in surrounding counties (Krysko and Judd 2006). Habitat has been described as wetland margins within longleaf pine flatwoods. The Apalachicola Kingsnake has been found in freshwater marshes in the Apalachicola River estuary and behind the Franklin County beachfront (Moler 1992). The subspecies has declined considerably since the 1970s in part due to extensive development in the southern Apalachicola region, where only two to three percent of the original longleaf pine savanna is estimated to remain intact (Noss et al. 1995, Krysko and Smith 2005).

## Alligator Snapping Turtle

The Alligator Snapping Turtle (*Macrochelys temminckii*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). Despite a lawsuit filed by the Center for Biological Diversity in 2016 pressing for more timely protection, the species remains under review at this time (CBD 2016, USFWS 2020a). A recent genetic study proposed two new species (*Macrochelys apalachicolae* and *Macrochelys suwanniensis*) that had previously been considered Alligator Snapping Turtle (Thomas et al.

2014, CBD 2016).

Alligator Snapping Turtles are fully aquatic (except while nesting), foraging on the bottom of permanent water bodies. Their diet consists primarily of aquatic animals, supplemented with carrion and plants (NatureServe 2020). They are secretive and occupy large home ranges (NatureServe 2020).

Alligator Snapping Turtle populations are experiencing drastic declines and the species has been extirpated from much of their historic range, including Iowa, Illinois, Kentucky, Missouri and Tennessee. Extant populations remain in Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Mississippi, Oklahoma, and Texas. Primary threats to their populations are overharvest in the exotic trade market and habitat loss (CBD 2012).

## Atlantic Salt Marsh Snake

The Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) was listed as threatened effective December 29, 1977 (42 FR 60743). Critical habitat has not been designated (USFWS 2020a). The 2008 and 2019 five- year reviews prioritized taxonomic and genetic analysis because status at both the specific and subspecific levels is unknown and in question. Analysis reportedly was scheduled for completion late in 2019 (USFWS 2019m) but is not yet available. Earlier work suggests that the subspecies may not be genetically, morphologically, or ecologically distinct (Territo 2013, Parkinson et al. 2016).

As currently defined, the range of the Atlantic Salt Marsh Snake is believed to be restricted to coastal marshes in Volusia County, Florida (Territo 2013). Habitat is described as brackish coastal marshes dominated by pickleweed (*Salicornia* spp.) and saltgrass (*Distichlis spicata*); black mangrove (*Avicennia* spp.) may also be present. Habitat loss due to development and habitat degradation resulting from ditching, diking, and impoundments has had a negative impact on the species, but these impacts have slowed in recent years (USFWS 2019m). Florida Natural Areas Inventory mapped 3,696 hectares of suitable habitat for the subspecies, of which 95 hectares are protected within public lands (FNAI 2007). Nearly 400 hectares of salt marsh have recently been restored in Volusia County. Northward encroachment of mangrove swamp replacing brackish marsh is reportedly a threat to subspecies habitat (USFWS 2019m).

## Florida Pine Snake

The Florida Pine Snake (*Pituophis melanoleucas mugita*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568).

This southeastern Coastal Plain species occurs from South Carolina to Alabama, including Florida north of the Everglades (Ernst and Ernst 2003). Preferred habitat is characterized by well-drained sandy soils and relatively open canopy, including sandhills, xeric hammock, scrubby flatwoods, and dry prairie (Enge 1997, Franz 2005). In northern Florida, most observational reports are from sandhill or high pine habitat. The number of reports has decreased over time, suggesting an ongoing population decline (Franz 2005). Major threats are thought to include collecting, road mortality, and habitat loss (Franz 1992, Golden et al. 2009).

## Bluetail Mole Skink

The Bluetail Mole Skink (*Plestiodon egregious lividus* = *Eumeces egregious lividus*) was listed as threatened effective December 7, 1987 (52 FR 42658). Critical habitat has not been designated (USFWS 2020a).

The subspecies has been reported from 23 localities, almost all of them on the Lake Wales Ridge in Highlands, Polk, and Osceola Counties; about half the localities are on public lands (Turner et al. 2006, USFWS 2007e). Because the subspecies is fossorial, spending much of its time underground, little abundance information is available. Populations are associated with scrub and sandhill habitat, and are believed to require loose soils, moderate soil temperatures, and presence of vegetation (although much of this information is inferred from studies of related species) (Mushinsky and McCoy 1999, Gianopulos et al. 2001). Threats to the subspecies include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation.

**Sand Skink**

The Sand Skink (*Plestiodon reynoldsi* = *Neoseps reynoldsi*) was listed as threatened effective December 7, 1987 (52 FR 42658). Critical habitat has not been designated (USFWS 2020a).

The species has been reported from 73 localities, 70 of them on the Lake Wales Ridge in central Florida (Turner et al. 2006, USFWS 2007e). The species is fossorial, spending much of its time underground; presence of loose, uncompacted, coarse-grained soil is thought to be an important habitat component. Populations are associated with scrub and sandhill habitat (Mushinsky and McCoy 1999, Gianopulos et al. 2001). Occasional fire is important to keep sites open, although Sand Skink densities tend to be somewhat higher on sites which have not burned in several years (Schrey et al. 2011), suggesting that there is a range of optimal fire frequency. Threats to the species include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. About 85 percent of pre-settlement sand scrub habitat has been lost to development, and only about six percent is currently protected (Turner et al. 2007). There is some evidence that populations may persist in lower densities in altered habitat as long as loose, dry soil is present (USFWS 2007e).

**Florida Red-Bellied (Florida Panhandle) Turtle**

The Florida Red-bellied (Florida Panhandle) Turtle (*Pseudemys nelsoni* pop. 1) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (77 FR 27403). The species remains under review at this time (USFWS 2020a). There is no evidence of taxonomic distinctness between the Panhandle and peninsular populations in Florida; however, the populations are separated by a considerable physical distance (NatureServe 2020).

The Florida Panhandle population is restricted to the lower Apalachicola/Chipola River drainage, associated delta, and off-shore islands in the Florida Panhandle (NatureServe 2020). The remainder of the population is found from Suwannee River area south, primarily in Florida with extensions into Georgia. The species inhabits water rich with aquatic plant life, such as streams, ponds, lakes, ditches, sloughs, marshes, and mangrove-bordered creeks (Gleaton 2020). It is threatened by drought, predators, and (though now illegal) harvesting for food by turtle trappers. The Florida Red-bellied (Florida Panhandle) Turtle requires extensive survey work to verify its occurrence, population size, habitat use, and ecological and biological processes to establish appropriate management plans (NatureServe 2020).

**Florida Scrub Lizard**

The Florida Scrub Lizard (*Sceloporus woodi*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2016 determined that listing may be warranted (81 FR 63160). The species remains under review at this time (USFWS 2020a).

Endemic to Florida, the range consists of four disjunct areas: Ocala National Forest and vicinity in the northern Peninsula; portions of Polk and Highlands Counties in central inland Florida; Atlantic Coast scrub from Brevard to Broward Counties; and Gulf Coast scrub in Lee and Collier Counties (DeMarco 1992).

Habitat is limited to evergreen oak scrub and young sand pine scrub; and to a lesser extent sandhills adjacent to scrub or scrubby flatwoods. Both open areas and mature trees are required, and habitat is exclusively xeric (Hammerson 2007a). Density tends to be higher in recently burned areas (Tiebout and Anderson 2001, Schrey et al 2011). Declines are attributed to loss and fragmentation of sand scrub habitats and fire suppression (Whelan 1995).

**Short-tailed Snake**

The Short-tailed Snake (*Stilosoma extenuatum* = *Lampropeltis extenuata*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted as of early 2020 (80 FR 56423). The species remains under review at this time (USFWS 2020a).

Found only in northern and central Florida, Short-tailed Snake preferred habitat includes dry upland habitats of sandhill, xeric hammock, and sand pine scrub (FNAI 2001a). They are rarely seen above ground and are known to burrow or use soil, fallen logs, or debris for shelter. Little is known about the ecology of this snake; as such, further studies on ecology, behavior, life history, movement patterns, and other natural history would be valuable to understand and effectively manage this species (NatureServe 2020).

### Rim Rock Crowned Snake

The Rim Rock Crowned Snake (*Tantilla oolitica*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

The range of the Rim Rock Crowned Snake is small, restricted to eastern Dade County around Miami and to several of the Keys. Most of the Dade County range is extirpated and what remains is fragmented, Very few specimens have been collected from this area (Hammerson 2007b). Habitat includes pine rockland and rockland hammock as well as disturbed urban environments including vacant lots, roadsides, and pastures (Hines and Bradley 2009, CBD 2012). In natural habitat types, refugia include crevices in oolitic limestone, rock rubble, or accumulated organic matter in depressions within the rock (Enge et al. 2003).

Animals are sometimes found under surface cover including rocks, downed woody debris, or palmetto leaves (Rochford et al. 2010, Yirka et al. 2010). Habitat loss and fragmentation are the primary threats to the species (CBD 2012).

### AMPHIBIANS

### Reticulated Flatwoods Salamander

The Reticulated Flatwoods Salamander (*Ambystoma bishopi*) was listed as endangered effective March 12, 2009, and critical habitat was designated simultaneously (74 FR 6700).The listing recognized Flatwoods Salamanders west of the Apalachicola and Flint Rivers as a distinct species from the Frosted Flatwoods Salamander, as originally proposed by Pauly et al. (2007).

Breeding occurs in the fall in acidic seasonal wetlands; eggs are inundated and larvae hatch after subsequent rains. Breeding ponds range from relatively open-canopy to dense canopy cypress domes, and are located within longleaf pine-dominated flatwoods or savannas with a predominantly wiregrass understory (Palis 1997, USFWS 2015e). Fire suppression may have led to increased canopy closure Gorman et al. 2013). Adults, and juveniles after leaving the ponds, spend most of their time underground in crayfish burrows or root channels (USFWS 2015e). The Florida range is entirely west of the Apalachicola River. Of the 20 populations known at the time of listing (11 on private land, nine on public land), only six were known to be extant as of 2014 (USFWS 2015e). All of these populationsare on public land, and five of them are in Florida. Private lands have not been extensively surveyed and status there is unknown.

### Frosted Flatwoods Salamander

The Flatwoods Salamander (*Ambystoma cingulatum*) was listed as threatened effective May 3, 1999 (54 FR 15691). Following a taxonomic revision which recognized two species of Flatwoods Salamander (Pauly et al. 2007), the listing was revised with the Frosted Flatwoods Salamander retaining Threatened status and defined as including populations east of the Apalachicola River (74 FR 6700). Critical habitat was designated for the Frosted Flatwoods Salamander in 2009 (74 FR 6700).

The Frosted Flatwoods Salamander has a disjunct range in parts of Florida, Georgia, and South Carolina; the historic Florida distribution included a band from the Apalachicola River to east of Tallahassee, and a separate area west of Jacksonville. Of the 25 populations identified in the original listing, only nine are confirmed extant

(USFWS 2019n). In Florida, five populations are within Apalachicola National Forest, and two are within St. Marks National Wildlife Refuge.

The Frosted Flatwoods Salamander breeds in the fall, depositing eggs in small depressions which are inundated by subsequent rains (Palis 1995, 1997). Aquatic larvae metamorphose from March to May and disperse from the ponds (Palis 1995). Terrestrial adult habitat is typically within mesic longleaf pine (Pinus palustris)/wiregrass flatwoods or savanna, or slash pine (Pinus elliottii)/sawgrass (USFWS 2019n).

Juveniles and adults spend considerable time underground in crayfish burrows or root channels (Petranka 1998). The species' population is in decline (USFWS 2019n). Habitat management recommendations include actions to increase herbaceous vegetation cover (Gorman et al 2014).

## Georgia Blind Salamander

The Georgia Blind Salamander (*Eurycea wallacei = Hadeotriton wallacei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

Distribution is restricted to the karst region of the Marianna Lowlands-Dougherty Plain physiographic region of Florida and adjacent Georgia (NatureServe 2020). There are at least 22 localities in the Chipola River watershed of Jackson County, one in Calhoun County, and five in the Lower Choctawatchee River watershed of Washington County (Fenolio et al 2013, NatureServe 2020). Georgia Blind Salamanders are fully aquatic, neotenic, and restricted to streams and pools within caves. Presence may be associated with bat droppings (Means 2005). Although density may be high at some localities, there are no reliable population estimates because of the difficulty of sampling within caves (Fenolio et al 2013). Primary threats include habitat loss and water quality degradation (NatureServe 2020).

## Gopher Frog

The Gopher Frog (*Lithobates capito*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90- day finding determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

The Gopher Frog is a southeastern Coastal Plain species, extending from North Carolina to Florida with isolated populations in Alabama and Tennessee. Gopher Frogs historically occurred throughout Florida except in the Everglades (CBD 2012). Habitat is primarily fire-maintained xeric uplands (Greenberg and Tanner 2008), with breeding occurring in fishless semi-permanent emergent wetlands (Bailey 1991).

Gopher Frogs are commensal with Gopher Tortoises, relying on tortoise burrows for shelter (Kent et al 1997).

Although the historic range is extensive, Gopher Frog populations are thought to be in significant decline (Bailey 1991, CBD 2012). Threats include loss or degradation of longleaf pine (*Pinus palustris*) habitat as a result of logging and fire suppression, as well as wetland loss, introduction of fish into wetlands, ATV use, and reduced Gopher Tortoise populations (CBD 2012).

## Gulf Hammock Dwarf Siren

The Gulf Hammock Dwarf Siren (*Pseudobranchus striatus lustricolus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

The Gulf Hammock Dwarf Siren was described in 1951 from 11 specimens found in Levy and Citrus Counties, and has not been observed since. The survival and even the validity of the subspecies is uncertain because of the small number of available specimens and long interval since detection (NatureServe 2020). Habitat is believed to

be restricted to hydric hardwood hammocks within a small geographic area, where they burrow in the soft mud at wetland margins. Threats within the historic range include commercial forestry, habitat conversion for agriculture or development, and hydrology alteration (FWC 2008).

## FISH

### Shortnose Sturgeon

The Shortnose Sturgeon *(Acipenser brevirostrum)* was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The Shortnose Sturgeon's historical range spans riverine and estuarine waters along the Atlantic coast of North America from the Indian River in Florida to the St. John River in Canada. There are three metapopulations distributed across this area: northern, mid-Atlantic, and southern. The current range is disjunct, with a 402 kilometer gap between the northern and mid-Atlantic metapopulations and the southern metapopulation (NOAA 2020). The species is managed across 19 distinct population segments (DPSs) (NMFS 1998).

As primarily an amphidromous fish, Shortnose Sturgeon are born in freshwater rivers in which they live and spend most of their adult lives, making short trips to marine waters for foraging (NOAA 2020). Some populations in the southern range exhibit estuarine anadromous life histories, but adults remain in estuaries rather than foraging offshore and only engage in short-distance migrations (NMFS 1998). In the southern portion of their range, spawning occurs from January to April (NOAA 2020). Spawning habitat typically includes the uppermost reach of a river (NMFS 1998). Adult sturgeons are characterized as benthic feeders, primarily upon mollusks and crustaceans (NOAA 2020).

Extensive overfishing contributed to initial declines. Pollution and habitat impediments as a result of industrial development has prevented the recovery of this species (NMFS 1998). Ongoing major threats include habitat impediment (e.g., dams), habitat degradation (e.g., dredging and poor water quality), and fisheries bycatch (NOAA 2020).

### Gulf Sturgeon

The Gulf Sturgeon (*Acipenser oxyrinchus desotoi*, formerly known as *Acipenser oxyrhynchus desotoi*), was as Threatened effective October 30, 1991 (56 FR 49653). Critical habitat was designated for the Gulf Sturgeon on March 19, 2003 (68 FR 13370).

The Gulf Sturgeon is primarily confined to the eastern Gulf of Mexico and classified as a subspecies of Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) (NatureServe 2020). This anadromous fish spends much of its adult life foraging in the Gulf during colder months of the year, returning to natal freshwater river systems to spawn from February to April (FNAI 2001a). The species may migrate as far as 225 kilometers upriver to spawn. Spawning typically occurs over substrates consisting of hard clay, rubble, and gravel (NatureServe 2020). Adults return to the Gulf of Mexico in late fall and young-of-the-years remain in their natal rivers for as long as 12 months before moving into the lower estuarine habitats (68 FR 13370). Adult sturgeons are characterized as bottom feeders, utilizing their barbels to scan the benthos primarily in search of invertebrates such as brachiopods, insect larvae, mollusks, worms and crustaceans (56 FR 49653).

Initially, population declines were the product of overfishing for caviar, smoked fish, and isinglass. Damming and disconnection of spawning grounds from the Gulf of Mexico is one of the current major factors contributing to the species decline. Other factors such as habitat modification due to dredging, navigation maintenance activities, and water pollution also pose potential threats (68 FR 13370). In Florida, the Gulf Sturgeon distribution extends from all major Panhandle river systems east to the Suwannee River (FNAI 2001a). The species seen as far southeast as Florida Bay, although these observations coincide with especially cold years and are rare (68 FR 13370).

**Atlantic Sturgeon**

The Atlantic Sturgeon *(Acipenser oxyrinchus oxyrinchus)* is managed across five distinct population segments (DPSs) all of which were federally listed in 2012: the Carolina DPS, Chesapeake Bay DPS, New York Bight DPS, and South Atlantic DPS are listed as endangered; and the Gulf of Maine DPS is listed as threatened (77 FR 5913, 77 FR 5880). The South Atlantic DPS was listed as endangered effective April 6, 2012 (77 FR 5913). Critical habitat was designated for all DPSs in 2017 (82 FR 39160). Critical habitat for the South Atlantic DPS includes the Edisto, Combahee-Salkehatchie, Savannah, Ogeechee, Altamaha, Ocmulgee, Oconee, Satilla, and St. Marys Rivers in South Carolina, Georgia, and Florida (82 FR 39160).

The species' historical range spans riverine and coastal waters along the Atlantic coast of North America from Florida to Canada. As an anadromous fish, adults spend their lives foraging in the Atlantic Ocean, with records as far north as Iceland. Adults return to their natal freshwater rivers to spawn in springtime every one to five years. Adult sturgeons are characterized as bottom feeders, utilizing their barbels to scan the benthos primarily in search of invertebrates such as mollusks, worms, crustaceans, and fish (NOAA Fisheries 2020).

Extensive overfishing contributed to initial species declines (NOAA Fisheries 2020). Despite a moratorium on all Atlantic Sturgeon fisheries that began in 1998, some populations have continued to decline (77 FR 5913). Current threats include fisheries bycatch, habitat degradation (e.g., dredging and poor water quality), habitat impediment (e.g. dams), and vessel strikes (FWC 2020c, NOAA Fisheries 2020).

**Okaloosa Darter**

The Okaloosa Darter (*Etheostoma okaloosae*) was originally listed as endangered efffective June 4, 1973 (38 FR 14678). The species was downlisted to Threatened effective May 2, 2011 (76 FR 18087). Critical habitat has not been designated (USFWS 2020a).

The species occurs only in Florida, with the range limited to six streams (Toms, Turkey, Mill, Swift, East Turkey, and Rocky Creeks) in two Florida Panhandle counties (Walton and Okaloosa). An estimated 98.7 percent of the occupied range is within and managed by Eglin Air Force Base (76 FR 18087). Habitat is typically dense vegetation, root mats, and detritus along clear, flowing stream margins (FNAI 2001a). Holt et al. (2013) reported that individual fish remained within relatively small areas, with 22 percent of individuals remaining in the same 20-meter reach for one year; fish infrequently crossed open, sandy, mid-channel areas to the other side. Most populations are believed to be stable or increasing at present and vulnerability is primarily due to the small range and limited number of occurrences (NatureServe 2020).

**Saltmarsh Topminnow**

The Saltmarsh Topminnow (*Fundulus jenkinsi*) was petitioned for listing on September 3, 2010 (WildEarth Guardians and Felsen 2010), and the 90-day finding determined that listing may be warranted (76 FR 49412). The species remains under review at this time (USFWS 2020a).

Habitat includes small meandering channels of brackish marshes dominated by cordgrass (*Spartina alterniflora*) and needle grass rush (*Juncus roemerianus*). Channel and marsh salinities are in the range of 1-4 parts per thousand (ppt) (Lopez et al. 2011). Patchy populations occur along the Gulf Coast from Texas (Galveston Bay) to Florida. In Florida, the species is restricted to the estuary of the Escambia River (Gilbert and Relyea 1992).

**Smalltooth Sawfish**

The US distinct population segment (DPS) of Smalltooth Sawfish (Pristis pectinate) was listed as endangered on April 1, 2003 (68 FR 15674). The Bahamian DPS was listed as endangered in 2014 (79 FR 73977). In 2009, two areas along the southwestern coast of Florida were designated as critical habitat for the US DPS (74 FR 45353).

This species has a circumtropical distribution, from Brazil through the Caribbean and Central America, the Gulf of

Mexico, and the Atlantic Coast of the United States (NMFS 2009). NMFS regulates the US DPS in four regions of the eastern US including Florida. Peninsular Florida has the largest number of capture records on the East Coast (NMFS 2018). The species occurs off the southwest coast of Florida from about Charlotte Harbor through the Everglades (NOAA Fisheries 2020). Currently, Smalltooth Sawfish can only be found regularity in south Florida between the Caloosahatchee River and the Florida Keys (NMFS 2009). Habitat includes shallow coastal waters of most warm seas. The species is found very close to shore in muddy and sandy bottoms, seldom descending to depths greater than 10 meters. They are often found in sheltered bays, on shallow banks, and in estuaries or river mouths (NMFS 2009). Juvenile Smalltooth Sawfish generally live in estuaries during their first two years (habitats fringed with vegetation, especially red mangroves (*Rhizophora mangle*)), and move into more coastal habitats upon reaching two meters in length. Female Smalltooth Sawfish may have 7 to 14 pups at a time, gestate for 12 months, and give birth every other year (NOAA Fisheries 2020). This species generally subsists on small schooling fish, crustaceans and other bottom-dwelling organisms (NMFS 2009), and utilize their rostra (or "saw") to slash through schools of fish and to find shrimp and crabs on the seafloor (NOAA Fisheries 2020).

The species has declined as a result of habitat loss (development of the Florida waterfront) and bycatch (NMFS 2009, NMFS 2018, NOAA Fisheries 2020). Historically, Smalltooth Sawfish were often accidentally caught in fishing nets, and often killed rather than released unharmed (NOAA Fisheries 2020). This threat has been reduced with the 1995 enactment of the Florida Net Ban Amendment and improved education reform (NMFS 2009, NOAA Fisheries 2020). It is likely that the population is currently at a level less than 5 percent of its size at the time of European settlement (NMFS 2009).

**Invertebrates**

**MOLLUSKS**

**Southern Elktoe**

The Southern Elktoe (*Alasmidonta triangulata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Southern Elktoe is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, and Endangered by the American Fisheries Society (CBD 2010a, NatureServe 2010).

The Southern Elktoe is a rare freshwater mussel that lives in sandy substrates, such as sandbars, of rivers and larger creeks with moderate currents. Its range is limited to a single river system, the Apalachicola Basin, which includes the Chattahoochee River in Alabama and Georgia, the Flint River in Georgia, and the Apalachicola and lower Chipola rivers in Florida (CBD 2010a, NatureServe 2020).

Adults are detritivores and the glochidia (larvae) are parasitic, though specificity of fish hosts is not known (NatureServe 2020). The species has suffered severe declines (70 to 90 percent) and there are less than five populations remaining within its range. Major threats to the species include habitat degradation and fragmentation caused by dredging, impoundment, sedimentation, water extraction, and drought (CBD 2010a).

**Fat Threeridge**

The Fat Threeridge (*Amblema neislerii*) was listed as endangered effective April 15,, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Fat Threeridge is endemic to Georgia and Florida. In Florida, their distribution is limited to the Chipola and Apalachicola rivers (FNAI 2001a). Fat Threeridge Mussels typically inhabit the main channels of small to large rivers where the current is slow to moderate and the substrate varies from gravel to cobble to a mixture of sand and sandy mud (Williams and Butler 1994).

Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). This mussel is a short-term brooder with gravid females observed in late May and June, suggesting the mussel releases glochidia in summer. Glochidia are parasitic and released in a white web-like structure to wrap around fish hosts. Fish hosts include Speckled Madtom (*Noturus leptocanthus*), Weed Shiner (*Notropis texanus*), Bluegill (*Lepomis macrochirus*), Redear sunfish (*Lepomis microlophus*), Largemouth Bass (*Micropterus salmoides*), and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adults are relatively nonmotile and significant dispersal only occurs via glochidia (NatureServe 2020). The primary factors contributing to population declines are anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants that alter water quality (USFWS 2003b).

**Rayed Creekshell**

The Rayed Creekshell (*Anodontoides radiates* = *A. radiatus*, formerly *Strophitus radiatus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Rayed Creekshell is listed by several other entities, including Imperiled by NatureServe, Near Threatened by the IUCN, and as a Special Concern species by the American Fisheries Society (CBD 2010a, NatureServe 2020).

The Rayed Creekshell has a sporadic distribution throughout Alabama, Florida, Georgia, Louisiana, and Mississippi. Specifically it is known from the Apalachicola, Chattahoochee and Flint to Tickfaw River system, the Yazoo River (a tributary of the Mississippi drainage), as well as the Mobile and Apalachicola drainages. Recent surveys have also discovered Rayed Creekshells in several new locations. In Florida, they are known from only Gadsden County (NatureServe 2020). Rayed Creekshells live in the mud, sand, or gravel of large rivers as well as medium to small sized creeks in areas of moderate currents (CBD 2010a).

Rayed Creekshells are detritivores and the glochidia (larvae) are parasitic and feed on the outer gill of fish (though specificity of fish hosts is not known). Gravid females have been observed in September and December (NatureServe 2020). Although distribution historically may have always been sporadic and rare, recent survey efforts have resulted in low numbers at formerly known sites, suggesting up to a 30 percent population decline. Major threats to their populations are associated with stream modifications and come from a variety of sources including pesticide use, deforestation, damming, and water extraction for human consumption (CBD 2010a).

**Pygmy Siltsnail**

The Pygmy Siltsnail (*Cincinnatia parva* = *Floridobia parva*) was first petitioned for listing in 1984 (46 FR 21664), with multiple petitions since that point. The species was again petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The species is considered Critically Imperiled by NatureServe (NatureServe 2020).

This species is restricted to Blue Spring (St. John's River system) in Volusia County, Florida; specifically the spring run section (approximately 0.5 kilometers long) (NatureServe 2020). Blue Spring is a freshwater karst spring run, characterized by clear circular pools with abundant aquatic vegetation and silty- sand/gravel substrate over limestone (CBD 2010a). Little to no information is available on the species' list history (NatureServe 2020). Threats to the species include recreational activities (Blue Spring is a popular recreation site), increased sedimentation from erosion and logging practices, invasive species, and any impacts to water quality. The single population also places the species at high risk of extinction from stochastic events. The population is considered in decline (CBD 2010a).

**Ponderous Siltsnail**

The Ponderous Siltsnail, formerly known as Ponderosa Spring Siltsnail, *(Cincinnatia ponderosa = Floridobia*

*ponderosa)* was first petitioned for listing in 1984 (49 FR 21664). The species has been under review on several occasions (54 FR 554, 56 FR 58804, 59 FR 58982). The species was again petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Ponderous Siltsnail is listed by several other entities including as Critically Imperiled by NatureServe and as Vulnerable by the IUCN (CBD 2010a).

The Ponderous Siltsnail is a rare freshwater snail only known to occur in Sanlando Springs and the following approximate 450 meters of Little Wekiva River below it in Seminole County, Florida (NatureServe 2020). The species is commonly found in vegetated areas as well as in sand and gravel. The Ponderous Siltsnail is vulnerable due to its extremely limited range. In addition, habitat degradation (including water quality impacts from recreation and nearby urban areas) are threats to the species (CBD 2010a). Sanlando Springs has been dammed to be used as a recreational swimming hole (NatureServe 2020). Like other freshwater springs in Florida, there are many other threats to Ponderous Siltsnail habitat including saltwater intrusion, groundwater extraction for human consumption, and pollution from development (CBD 2010a).

## Delicate Spike

The Delicate Spike (*Elliptio arctata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Delicate Spike is listed by several other entities, including Imperiled Globally and in Florida by NatureServe, and as a Special Concern species by the American Fisheries Society (CBD 2010a, NatureServe 2020).

The Delicate Spike is a river mussel. Adults are detritivores and glochidia (larvae) are parasitic on fish, though specificity of fish hosts is not known (NatureServe 2020). Its historic range included much of the eastern Gulf Coast drainages in Alabama, Florida, Georgia, Mississippi, and Tennessee. Specifically, it is known from the Apalachicola Basin in Georgia and Florida (Panhandle) west to the Pearl River drainage in Mississippi. Delicate Spike live in areas of moderate currents among large rocks or in the sand and gravel underneath them. Historically they were also common in headwater streams and river bars (CBD 2010a).

The Delicate Spike has been extirpated from many of its historic drainages and populations may become genetically isolated. The species is declining across its range, especially within the Coosa-Tallapoosa and Choctawhatchee-Escambia drainages. Delicate Spike populations face a wide array of threats related to habitat degradation including damming, eutrophication and pollution, water extraction, deforestation, bank scouring, and sedimentation (CBD 2010a).

## Chipola Slabshell

The Chipola Slabshell (*Elliptio chipolaensis*) was listed as threatened effective April 15, 1998 (63 FR 12664). Critical habitat has been designated and encompasses several rivers and streams in Florida (as well as other states not described here) including: Econfina Creek, Chipola River, Apalachicola River, Upper Ochlockonee River, Ochlockonee River, and Santa Fe River and New River (72 FR 64286).

The Chipola Slabshell is one of seven rare and listed freshwater mussel species that are evaluated together because they are endemic to eastern Gulf Slope tributaries of the Apalachicolan Region in southeast Alabama, southwest Georgia, and north Florida. The Chipola Slabshell was named from the Chipola River in Florida where it was first described and thought to be endemic. Recent records have documented its presence in a tributary of the Chattahoochee River as well as in Alabama (63 FR 12664). It lives in muddy and silty-sand substrates in areas with slow to moderate currents (NatureServe 2020). It has been extirpated from approximately one-third of its historical range (USFWS 2007f). Bluegill (*Lepo mis macrochirus*) and centrarchids (sun fishes) are likely main host fish species for parasitic larvae (glochidia) (63 FR 12664, USFWS 2007f). Like other freshwater mussels, adults are detritivores (filter feeders) and are likely very long-lived (examples of up to 130 years of age in other species (63 FR 12664). Given its extremely limited distribution and ongoing severe declines (over 75 percent of the

population size), this species is particularly vulnerable to extinction. Ongoing threats include dams, stream channelization, pollution, and sedimentation (NatureServe 2020).

## Purple Bankclimber

The Purple Bankclimber (*Elliptoideus sloatianus*) was listed as threatened effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Purple Bankclimber is endemic to Alabama, Georgia, and Florida, where they are found in the Apalachicola-Chattahoochee-Flint and Ochlockonee river basins (63 FR 12664). The species is believed to be extirpated from the Chipola and Chattahoochee rivers, making it no longer extant in Alabama (63 FR 12664). However, one individual was observed from the Chattahoochee River in December 2000; the most recent record from that river since the 1800s (Brim Box and Williams 2000). Depending on the river system, the preferred habitat of the Purple Bankclimber seems to vary slightly. In general, they are typically observed in small to large rivers, often in the main channels, where there is moderate current (Clench and Turner 1956, NatureServe 2020). They seem to prefer sand substrate but have also been observed in fine gravel, muddy sand, and sand/limestone. They are frequently observed at depths greater than three meters (Brim Box and Williams 2000).

This species is thought to be a summer releasing mussel as gravid females have been observed in the Ochlockonee River from February through April (NatureServe 2020). They produce parasitic glochidia (NatureServe 2020). Glochidia transformation has occurred on Eastern Mosquitofish (*Gambusia holbrooki*), Guppy (*Poecilia reticulata*), and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adult Bankclimbers are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively nonmotile and only move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs through glochidia transportation through infected fish movement (NatureServe 2020). The primary factors contributing to species decline are habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants (68 FR 42419).

## Tapered Pigtoe

The Tapered Pigtoe (*Fusconaia burkei*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Tapered Pigtoe is an endemic species found in the Choctawhatchee River drainage in Alabama and Florida. Within this river drainage, its distribution also includes several oxbow lakes in Florida. Tapered Pigtoe are found in areas with slow to moderate currents in medium creeks to medium rivers, where the substrate is stable and consists of sand, small gravel, or sandy mud (77 FR 61663). They are also occasionally found in floodplain lakes (Williams and Butler 1994).

Little is known about the specific life history of this mussel, although, based on closely related species, they are thought to be short-term brooders (NatureServe 2020). Gravid females have been observed from mid-March through May, and possibly June (Pilarczyk et al. 2006).Their glochidia are parasitic. Blacktail Shiner (*Cyprinella venusta*) are confirmed to produce glochidia transformation (White et al. 2008). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively nonmotile and only move to burrow deeper into the sediment (NatureServe 2020). Dispersal occurs via glochidia transportation on parasitized fish. The primary factors contributing to their population decline are habitat degradation caused by excessive sedimentation, streambed destabilization, and environmental contaminants (77 FR 61663).

## Narrow Pigtoe

The Narrow Pigtoe (*Fusconaia escambia*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Narrow Pigtoe is an endemic species with its presence limited to two river systems that drain through northwestern Florida: the Escambia River and Yellow River (77 FR 61663). This mussel is typically found in substrate consisting of sand, gravel, sandy gravel, or silty sand and prefers slow to moderate currents within small to medium sized streams and rivers (CBD 2010a). Little is known about the specific life history of this mussel, although they are thought to be short-term brooders, with gravid females observed in June containing eggs and glochidia (CBD 2010a, Mirarchi et al. 2004). Their glochidia are believed to be parasitic larvae, a common reproductive strategy shared among most freshwater mussels (NatureServe 2020). The host fish species for larvae development is currently unknown (77 FR 61663, Mirarchi et al. 2004). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974).

Threats to the species include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants altering the water quality (77 FR 61663). The total species population size of the Narrow Pigtoe is estimated to be low, around 2,500 to 10,000 individuals. Surveys of sites currently supporting the species averaged three individuals per site; this likely contributes to low recruitment (NatureServe 2020).

## Round Ebonyshell

The Round Ebonyshell (*Fusconaia rotulata*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Round Ebonyshell has one of the most restricted ranges of all North American unionids (NatureServe 2020). It is endemic to the Escambia River drainage in Alabama and Florida where it is only found in the main river channel (77 FR 61663). The habitat for this species consists of areas with moderate current on sand and gravel substrate (Williams and Butler 1994).

Little is known about the specific life history of this mussel, although based on closely related species, they are thought to be short-term brooders (NatureServe 2020). Gravid females have been observed in the spring and summer (77 FR 61663). Their glochidia are believed to be parasitic larvae, a common reproductive strategy shared among most freshwater mussels (NatureServe 2020). The host fish species for larvae development is currently unknown (77 FR 61663, NatureServe 2020). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller, 1974). Adults are relatively nonmotile but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). Primary factors contributing to the species decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Due to the limited species distribution, the Round Ebonyshell is at a high risk of catastrophic events such as flood scour, contaminated spills, and activities associated with streambed destabilization (77 FR 61663).

## Southern Sandshell

The Southern Sandshell (*Hamiota australis*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Southern Sandshell is an endemic species limited to the Escambia, Choctawhatchee, and Yellow River drainages that flow through Alabama and northwestern Florida. In Florida, the species has only been observed within the Choctawhatchee and Yellow River drainages. Southern Sandshell habitat includes areas with slow to moderate currents in small creeks and rivers, where the substrate is stable and consists of sand or a mix of sand and fine gravel (77 FR 61663). This mussel also relies on clear water to complete its life cycle, as it is one of the few mussels to produce a super conglutinate lure to attract a host fish (NatureServe 2020).

This Southern Sandshell is believed to be a long-term brooder with females remaining gravid from late summer/autumn to the following spring (77 FR 61663, Blalock-Herod et al. 2002). This species produces parasitic glochidia (NatureServe 2020). A host fish species has not been identified, although predatory centrarchids such as basses are believed to be a suitable host based on closely related mussel species (77 FR 61663). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974).

Adults are relatively nonmotile but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). The primary factors contributing to the species' decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants (77 FR 61663, NatureServe 2020). In addition, habitat fragmentation is likely to limit the dispersal and reproductive capabilities of this species (Williams et al. 2008).

## Shinyrayed Pocketbook

The Shinyrayed Pocketbook (*Lampsilis subangulata*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Shinyrayed Pocketbook is endemic to Alabama, Georgia, and Florida, where they are found in the Apalachicola-Chattahoochee-Flint and Ochlockonee river systems. In Florida, their distribution is limited to the Chipola and Ochlockonee rivers (FNAI 2001a). Shinyrayed Pocketbook habitat includes areas with slow to moderate currents in medium sized creeks to rivers, where the substrate consists of clean sand or silty sand (Williams and Butler 1994). Individuals are often found in areas where the current strength and sediment particle size are transitional, such as the interface of stream channel and sloping bank habitats (NatureServe 2020).

Gravid females have been observed from December through August and it is suggested that nearly an entire year of incubation is required for glochidia to reach full maturity. Glochidia are parasitic and released from late May to early July to attract a host. The primary host fish for this mussel are Spotted Bass (*Micropterus punctulatus*) and Largemouth Bass (*Micrjjopterus salmoides*) (O'Brien and Brim Box 1999). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively non-motile and significant dispersal occurs via glochidia transportation on parasitized fish (NatureServe 2020). The primary factors contributing to their population decline are anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants (USFWS 2003b).

## Gulf Moccasinshell

The Gulf Moccasinshell (*Medionidus penicillatus*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

While the range of the Gulf Moccasinshell has been debated due to lack of strong populations and presence at sample sites, it is generally considered to be restricted to the Apalachicola-Chattahoochee- Flint river system and Ecofina Creek in Alabama, Georgia, and Florida (USFWS 2003b). In Florida, populations of this species are found in the Chipola River, Ecofina Creek, and potentially the Choctawhatchee, Yellow, and Apalachicola Rivers (may be extirpated; FNAI 2001a). Gulf Moccasinshell habitat includes areas with a slow to moderate current in medium-sized creeks to large rivers where the substrate consists of sand and gravel or silty sand (Williams and Butler 1994).

Gravid females have been observed in March, April, September, and November. Due to the timing of these gravid female observations, it is suggested that this species is an overwintering mussel and releases glochidia in the summer. Glochidia are parasitic and the primary fish host includes Brown Darter (*Etheostoma edwini*) and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and

zooplankton from the water column for food (Fuller 1974).

Adults are relatively nonmotile and typically only voluntarily move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs through glochidia transportation through infected fish movement (NatureServe 2020). The primary threats to the species include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants altering the water quality (USFWS 2003b).

## Ochlockonee Moccasinshell

The Ochlockonee Moccasinshell (*Medionidus simpsonianus*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Ochlockonee Moccasinshell is an endemic species. Its range is restricted to one river system, Ochlockonee River, in Florida and Georgia (FNAI 2001a). Most observations of this rare mussel have been from large creeks where there is current. The species seems to prefer substrates that are primarily sand with some gravel (William and Butler 1994).

Due to the rarity of the species, specific life history is not well understood but is assumed to be similar to related species. It likely overwinters glochidia and releases in summer, using darters as host fish (USFWS 2003b). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton for food (Fuller 1974). Adults are relatively non-motile and only move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs via glochidia transportation of parasitized fish (NatureServe 2020). The primary factors contributing to the species' decline is habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining and environmental contaminants altering water quality (USFWS 2003b).

## Suwannee Moccasinshell

The Suwannee Moccasinshell (*Medionidus walkeri*) was listed as threatened effective November 7, 2016 (81 FR 69417). Critical habitat was proposed on November 27, 2019 and is awaiting public comment and a final rule (84 FR 65325).

The Suwannee Moccasinshell is a rare freshwater mussel that lives in the mud, muddy sand, sand, and gravel of larger streams with moderate flows. The species generally occurs in proximity to large woody debris (80 FR 60335, CBD 2010a, NatureServe 2020). Its range is limited to a single river system in Florida and Georgia: the Suwannee River system. There are less than five populations within this range (CBD 2010a).

Adults are detritivores and the glochidia (larvae) are parasitic; main host species include the Blackbanded Darter (*Percina nigrofasciata*) and the Brown Darter (*Etheostoma edwini*) (84 FR 65325, NatureServe 2020). The following five criteria are required to support Suwannee Moccasinshell: stable stream, stable substrates, natural flow regimes, suitable water quality conditions, and presence of host fish species (84 FR 65325). The species has undergone extreme declines (70-90 percent), and it is now only known from the main channel of the Suwannee River and the lower Santa Fe River in Florida (CBD 2010a, 80 FR 60335). Population declines are the result of chemical pollution (e.g., industrial pulp mill in the Withlacoochee watershed), sedimentation from logging and agriculture, development, pollution from mining and agriculture, invasive species (Asiatic Clam (*Corbicula fluminea*)), stream channel instability, water extraction, and eutrophication (CBD 2010a, 81 FR 69417). Additionally, the species has been overharvested by shell collectors (CBD 2010a).

## Stock Island Tree Snail

The Stock Island Tree Snail (*Orthalicus reses = O. s. reses*, [not incl. *nesodryas*]) was listed as threatened effective August 2, 1978 (43 FR 28932). Critical habitat has not been designated (USFWS 2020a). The Service

announced the initiation of the latest five-year review on the species in 2018 (83 FR 38320). The Stock Island Tree Snail is also listed by the Florida Fish and Wildlife Conservation Commission as Endangered (USFWS 2009d).

The Stock Island Tree Snail is an arboreal snail endemic to tropical hammock hardwood trees (USFWS 2009d, NatureServe 2019). Its historical range included many of the western Florida Key islands, including Key West, the lower Keys, and Key Vaca. Its range was limited to Stock Island at the time of listing (43 FR 28932). As of 2006, the current range encompasses 25 known sites within the Florida Keys and two sites on the Florida mainland in Monroe and Miami-Dade counties (USFWS 2009d). The species feeds on lichens, fungi, and algae in the trees they live on (NatureServe 2020).

The Stock Island Tree Snail underwent a significant range reduction as a result of urbanization (43 FR 28932). Relocation efforts by hobbyists have spread Stock Island Tree Snails to areas beyond their historical range, particularly to Key Largo (USFWS 2009d). Current threats to the species include habitat degradation and loss. Additionally, poaching, hurricanes, and droughts are significant threats (NatureServe 2020).

## Oval Pigtoe

The Oval Pigtoe (*Pleurobema pyriforme*) waslisted as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Oval Pigtoe is endemic to Georgia, Alabama, and Florida. Their center of distribution is generally limited to the Apalachicola-Chattahoochee-Flint and Ochlockonee river basins (63 FR 12664). In Florida, the species is found in the Apalachicola, Chipola, Suwanee, and Ochlockonee river systems, as well as Ecofina creek (63 FR 12664, NatureServe 2020). Oval Pigtoe habitat includes areas with slow to moderate current in medium-sized creeks to small rivers, where the substrate is silty sand to sand and gravel (Williams and Butler 1994).

Adults are relatively nonmotile and typically only move to burrow deeper into the sediment. Dispersal occurs via glochidia transportation on parasitized fish. Individuals observed in the Apalachicola- Chattahoochee-Flint basin were gravid between March through July, indicating that fertilization may take place in late winter to early spring and that the species is a summer releasing mussel (NatureServe 2020). Glochidia transformation has occurred on the gills of Sailfin Shiner (*Pteronotropis hypselopterus*), Eastern Mosquitofish (*Gambusia holbrooki*), and Guppy (*Poecilia reticulata*) (NatureServe 2020, O'Brien and Williams 2002). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). The primary factors contributing to species decline are habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants (68 FR 42419).

## Fuzzy Pigtoe

The Fuzzy Pigtoe (*Pleurobema strodeanum*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Fuzzy Pigtoe is an endemic species with its presence limited to three river systems that drain through northwestern Florida: the Escambia, Choctawhatchee, and Yellow River. The species is exceedingly rare within the Yellow River, with only a single documented observation in 2010 (77 FR 61663). Fuzzy Pigtoe habitat includes areas with moderate flow in medium-sized creek and rivers where the substrate is sand to silty sand (Williams and Butler 1994, Williams et al. 2000).

The mussel is a short-term brooder, with gravid females observed from mid-March to May. Their glochidia are parasitic, a common reproductive strategy shared among most freshwater mussels. Host species include the Blacktail Shiner (*Cyprinella venusta*) (White et al. 2008). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). Adults are relatively nonmotile and typically only move to burrow deeper

into the sediment. Dispersal occurs via glochidia transportation through infected fish movement (NatureServe 2020). The primary factors contributing to population declines are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants altering the water quality (77 FR 61663).

## Southern Kidneyshell

The Southern Kidneyshell (*Ptychobranchus jonesi*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The distribution of the Southern Kidneyshell is limited to the Escambia, Choctawhatchee, and Yellow River drainages that flow through Alabama and northwestern Florida. In Florida, recent occurrences of the Southern Kidneyshell have only been observed within the Choctawhatchee River drainage. Their habitat requirements are not fully understood; however, individuals are typically observed in areas with slow to moderate currents in medium creeks to small rivers, where the substrate consists of firm sand (77 FR 61663). Additionally, recent surveys conducted in the Choctawhatchee basin found their preferred habitat to be stable substrates near bedrock outcroppings (Gangloff and Hartfield 2009).

Little is known about the specific life history of this mussel although, based on closely related species, they are thought to be long-term brooders (Mirarchi et al. 2004, NatureServe 2020). Females are gravid from autumn through spring/summer of the following year. Their glochidia are believed to be parasitic. A host fish species has not been identified, although darters are believed to be a suitable host based on closely related mussel species (77 FR 61663). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller, 1974). Adults are relatively nonmotile, but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). Primary factors contributing to their population decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants (77 FR 61663, NatureServe 2020). In addition, habitat fragmentation and host fish disappearance will likely limit the dispersal and reproductive capabilities of this species (NatureServe 2020). Due to the limited species distribution, the Southern Kidneyshell is vulnerable to stochastic environmental and human-caused events (CBD 2010a).

## Choctaw Bean

The Choctaw Bean (*Villosa choctawensis*, formerly *Obovaria choctawensis*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat has been designated and encompasses habitat in the following Florida counties: Bay, Escambia, Holmes, Jackson, Okaloosa, Santa Rosa, Walton, and Washington (as well as other rivers in Alabama not described here) (76 FR 61482). In 2019, the USFWS announced the initiation of the latest five-year review of the species (84 FR 14669).

The Choctaw Bean is one of eight listed freshwater mussel species that are endemic to the East Gulf Coastal Plain Physiographic Region. Its range includes the Escambia, Yellow, and Choctawhatchee rivers systems in Florida and Alabama. It lives in silty sand and sandy clay substrates in medium-sized creeks and rivers with moderate currents. Adults are detritivores and the glochidia (larvae) are parasitic, though specificity of fish hosts is not known (76 FR 61482). Despite still occurring across much of its historical range, population numbers are low and declining, and the Choctaw bean can no longer be found from many historical sites. Its populations within the Escambia River drainage have become fragmented (76 FR 61482). The primary threat to this species is habitat loss and degradation (NatureServe 2020).

## CRUSTACEANS

## Cypress Crayfish

The Cypress Crayfish (*Cambarellus blacki*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Cypress Crayfish is listed by several other entities, including Endangered by the IUCN, Endangered by the American Fisheries Society, and as Critically Imperiled by NatureServe (CBD 2010a).

The Cypress Crayfish is a rare freshwater crayfish that inhabits cypress ponds. It is usually found within submergent and emergent vegetation (CBD 2010a, NatureServe 2019). The species range is limited to one locality in Escambia County, Florida (CBD 2010a). Further surveys are needed to locate potential nearby populations (NatureServe 2019). Its limited range and number of populations make the species vulnerable. The major threat facing Cypress Crayfish is expansion of a nearby oil production facility (CBD 2010a).

## Florida Cave Amphipod

The Florida Cave Amphipod (*Crangonyx grandimanus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). Despite the Service announcing the species review of Florida Cave Amphipod in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), it has yet to be listed and remains under review at this time (USFWS 2020a). The Florida Cave Amphipod is listed by several other entities, including Imperiled by NatureServe, as Vulnerable by the IUCN, and as a Species of Greatest Conservation Need in Florida (CBD 2010a, NatureServe 2020).

The Florida Cave Amphipod is a stygobitic amphipod which inhabits caves, wells, and karst springs. Its range spans 12 counties (Alachua, Citrus, Dade, Gilchrist, Hernando, Leon, Levy, Madison, Marion, Pasco, Suwanne, and Wakulla) in Florida, with the Ochlockonee River serving as its western boundary. Despite this seemingly large range, the species is uncommon and population numbers are low. The species is likely threatened by changes in detrital flows and depletion of aquifers (CBD 2010a).

## Hobb's Cave Amphipod

The Hobb's Cave Amphipod (*Crangonyx hobbsi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835 59862). Listing was first deemed warranted but precluded in 1984 (49 FR 2485). Despite the Service announcing the species review of Florida Cave Amphipod in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), the species remains under review at this time (USFWS 2020a). The Hobb's Cave Amphipod is listed by several other entities, including Critically Imperiled by NatureServe and as Vulnerable by the IUCN (CBD 2010a).

The Hobb's Cave Amphipod is a troglobitic freshwater amphipod that inhabits subterranean caves and wells (NatureServe 2020). It is often associated with limestone and detritus, and found near cave entrances. Its range spans 13 counties (Alachua, Citrus, Columbia, Dade, Gilchrist, Hernando, Leon, Levy, Madison, Marion, Pasco, Suwannee, and Wakulla) in Florida, primarily in the northern portion of the peninsula as well as the Panhandle. It is likely threatened by changes in detrital flows and depletion of aquifers (CBD 2010a).

## Squirrel Chimney Cave Shrimp

The Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) was listed as threatened effective June 23, 1990 (55 FR 25588). Critical habitat has not been designated (USFWS 2020). A petition to delist the species was put forth by the Florida Game and Freshwater Fish Commission in 1997. However, the USFWS found that the petition did not present substantial scientific or commercial information indicating that delisting this species due to extinction may be warranted (63 FR 67618).

The Squirrel Chimney Cave Shrimp was discovered in 1953 and is only known from the Squirrel Chimney, a small sinkhole that connects to a flooded cave system near Gainesville, Alachua County, Florida. Due to a lack of evidence of cave shrimp from other surveyed caves, it is believed that the Squirrel Chimney Cave Shrimp is the

only cave shrimp in Florida (USFWS 2016b, 2018g). Habitat for this species includes groundwater within a flooded limestone cave (FNAI 2001a). The water temperature in Squirrel Chimney is approximately 20°C throughout the year. Other than an apparent drop in water levels between the 1970 surveys and 1990 surveys, there were no indications of any significant change in the physical environment at Squirrel Chimney; both water level and water quality have remained the same since 1992 (USFWS 2016b).Threats to the species include expanded development associated with the growth of Gainesville, Florida, which may alter land uses and groundwater in the vicinity of Squirrel Chimney (USFWS 2016b, 2018g). Stormwater runoff, septic tank drainage fields, aquifer recharge, herbicide/fertilizer use, and erosion/sediment deposition are some of the primary factors impacting groundwater quality. A small fish, the Redeye Chub (*Notropis harperi*), was detected in Squirrel Chimney during 1994 to 1996 surveys. This species is believed to prey on Squirrel Chimney Cave Shrimp; therefore, predation may also constitute a threat to the species (USFWS 2016b).

## Orlando Cave Crayfish

The Orlando Cave Crayfish (*Procambarus acherontis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). Listing was first deemed warranted but precluded in 1984 by the USFWS (Service) (49 FR 2485). Despite the Service announcing review of the species in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), the species remains under review at this time (USFWS 2020a). The Orlando Cave Crayfish is listed by several other entities, including Endangered by the IUCN, Endangered by the American Fisheries Society, Critically Imperiled by NatureServe, as Rare by the Florida Committee on Rare and Endangered Plants and Animals, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a, NatureServe 2020).

The Orlando Cave Crayfish is a troglobitic freshwater crayfish that inhabits aquifers. It is associated with karst and the entrances of springs, sinkholes, and underground water features. Its range is limited to the central Florida Peninsula (Seminole and Orange counties). All of the four remaining populations are within the vicinity of Orlando. The species type locality was destroyed when the well they lived in collapsed. The major threat facing Orlando Cave Crayfish is expanding human populations and development (CBD 2010a).

## Coastal Flatwoods Crayfish

The Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). In the state of Florida, the species is listed as Imperiled (NatureServe 2020). It is listed as endangered on the IUCN Red List (Crandall 2010).

The species occurs in the Apalachicola coastal flatwoods of northwest Florida in Bay and Gulf Counties. Coastal Flatwoods Crayfish inhabit still waters when water levels are high and burrow when waters recede (USFWS 2014c). The species is usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence (Franz and Franz 1979). Coastal Flatwoods Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality.

## Silver Glen Springs Crayfish

The Silver Glen Springs Crayfish (*Procambarus attiguus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). In the state of Florida, the species is listed as Critically Imperiled (NatureServe 2020). It is listed as Critically Endangered on the IUCN Red List (USFWS 2020a).

This species has been documented from only one cave system in Ocala Natural Forest, Silver Glen Springs, Marion County, Florida. The species is potentially threatened by water pollution and disturbance from tourists (snorkelers and scuba divers, as the cave is a popular recreation area). This species may have late reproductive maturity and a long life span, which make it particularly susceptible to loss of individuals. As a cave species, Silver

Glen Springs Crayfish are likely sensitive to changes in habitat, especially water quality (NatureServe 2020).

## Bigcheek Cave Crayfish

The Bigcheek Cave Crayfish (*Procambarus delicates*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The Service may drop the species from further review because it could already be extinct (this is not confirmed as its population has likely always been very small and difficult to detect due its deep-cave habitat) (CBD 2018, NatureServe 2019). The Bigcheek Cave Crayfish is listed by several other entities, including Critically Endangered by the IUCN, Endangered by the American Fisheries Society, and Critically Imperiled by NatureServe (Crandall and Cordeiro 2010, CBD 2018, NatureServe 2020). The species has not been seen in decades, with the last sighting dating 1976 or 1985 (CBD 2018, NatureServe 2020).

The Bigcheek Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves (BD 2018, NatureServe 2020). This species has extremely specific habitat requirements and they are limited to only one cave system at Alexander Springs within the Ocala National Forest, Lake County, Florida (Crandall and Cordeiro 2010, CBD 2018, NatureServe 2020). Their population is threatened by disturbance and habitat degradation from recreational use, as these cave systems are located within National Forest property readily accessible to the general public (CBD 2018, NatureServe 2020).

## Panama City Crayfish

The Panama City Crayfish (*Procambarus econfinae*) was proposed as Threatened on January 3, 2018 (83 FR 330). A formal listing decision has not been made as of January 2020 (USFWS 2020a).

This species occupies shallow, often ephemeral, vegetated, freshwater systems in pine flatwoods or wet prairie/marsh habitats of Bay County, Florida. After the majority of its habitat was converted to slash pine plantations or residential/commercial development, the species has been relegated to grassy ditches or swales of slash pine plantations, utility rights-of-way, and other relic wetland habitats protected on easements (83 FR 330, USFWS 2017a). These crayfish require specific types of substrate that allow them to burrow down to the water table, where they can remain hydrated to survive dry seasons or droughts. If soils are too sandy or do not hold water long enough, sustained colonization of this species is not supported. This species occupies the surface water primarily when it is present, and utilizes its burrows when surface water recedes (USFWS 2017a). Threats to this species include habitat loss, degradation, and fragmentation; development; hydrologic alterations; silviculture practices; and collection for fish bait (83 FR 330).

## Santa Fe Cave Crayfish

The Santa Fe Cave Crayfish (*Procambarus erythrops*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Santa Fe Cave Crayfish is listed by several other entities, including Endangered by the IUCN and the American Fisheries Society (CBD 2010a).

The Santa Fe Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean pools (CBD 2010a, NatureServe 2020). Its range is limited to five locations within southern Suwannee County, Florida (CBD 2010a). These may make up five populations or only one as they may be interconnected through passageways in the aquifer (NatureServe 2020). It lives within detritus at the entrances of subterranean caves and sinkholes. The Santa Fe Cave Crayfish requires waters with low flows so that detritus is able to build up. It is particularly long-lived, with documented recaptures of crayfish at least 16 years old. The species is threatened by hydrological changes, particularly pollution (there is a garbage dump at one of their known localities) and saltwater intrusion (CBD 2010a).

## Orange Lake Cave Crayfish

The Orange Lake Cave Crayfish (*Procambarus franzi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Orange Lake Cave Crayfish is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need in Florida (CBD 2010a).

The Orange Lake Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves (CBD 2010a, NatureServe 2020). It is associated with bat colonies and the detrital input provided. Its range is limited to Marion County, Florida, where it is known from three cave locations near Orange Lake. These three locations may represent a single population, as sites are part of the same chamber and likely interconnected. The species is particularly vulnerable because of its limited range and small numbers. The species may be sensitive to impacts to water quality from nearby quarrying (CBD 2010a).

### Coastal Lowland Cave Crayfish

The Coastal Lowland Cave Crayfish (*Procambarus leitheuseri*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Coastal Lowland Cave Crayfish is listed by several other entities, including Vulnerable by the IUCN, Endangered by the American Fisheries Society, Critically Imperiled by NatureServe, as Rare by the Florida Committee on Rare and Endangered Plants, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Coastal Lowland Cave Crayfish is a troglobitic freshwater crayfish that inhabits deep, subterranean, karst cave systems (CBD 2010a, NatureServe 2020). Most areas of occurrence are tidally influenced and associated with silt. Specimens have been documented at depths of over 60 meters. The species' range is limited to Pasco and Hernando counties, Florida. There are only eight known localities which may represent fewer populations, as five of these are within five kilometers of each other. Populations are threatened by changes in water quality such as increased saltwater intrusion resulting from extraction of groundwater for human consumption. The species is additionally threatened by rapid urbanization in this part of Florida (CBD 2010a).

### Florida Cave Crayfish

The Florida Cave Crayfish (*Procambarus lucifugus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted for both the species and its two subspecies, Withlacoochee Light-fleeing Cave Crayfish (*P. l. lucifugus*) and Vampire Crayfish (*P. l. alachua*) (76 FR 59835). All three remain under review at this time (USFWS 2020a). The Florida Cave Crayfish is listed by several other entities, including Least Concern by the IUCN, Endangered and Threatened by the American Fisheries Society, and Imperiled by NatureServe (NatureServe 2020).

The Florida Cave Crayfish is a troglobitic freshwater crayfish that inhabits karstic subterranean caves and sinkholes (CBD 2010a, NatureServe 2020). Its range spans Florida counties from Citrus and Hernando north to Marion. It feeds primarily on bat guano, as well as invertebrates, and is associated with bat roosting caves. Populations are threatened directly by water quality degradation and indirectly by threats facing bat populations (CBD 2010a).

### Miami Cave Crayfish

The Miami Cave Crayfish (*Procambarus milleri*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Miami Cave Crayfish is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need in Florida (CBD 2010a).

The Miami Cave Crayfish is a rare troglobitic freshwater crayfish that inhabits wells (CBD, NatureServe 2020). The species is likely recently adapted (from an evolutionary standpoint) to subterranean living based on a lack of blindness that typify troglobitic creatures. Until recently, the species range was known only from a single population in Miami, Florida, from a well on a nursery and garden store property (CBD 2010a). It has since been found at over a dozen sites and those sites may be interconnected, including populations within the nearby Everglades (NatureServe 2020). As the species has an extremely limited range and population size within a metropolitan area, with continually increasing human pressures on aquifers, this species is especially vulnerable to extinction (CBD 2010a).

## Putnam County Cave Crayfish

The Putnam County Cave Crayfish (*Procambarus morrisi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Putnam County Cave Crayfish is listed by several other entities, including Imperiled by NatureServe, Critically Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Putnam County Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean sinkholes (CBD 2010a, NatureServe 2020). As their name implies, this species has extremely specific habitat requirements and they are limited to a single cave called Devil's Sink in Putnam County, Florida. This single population is particularly vulnerable to threats posed by water quality degradation as a result of heavy recreational use, pollution (including direct dumping), and groundwater depletion for human consumption (CBD 2010a). The population is at imminent risk of extinction if the entrance to the sinkhole is sealed by human-caused erosion (CBD 2010a).

## Pallid Cave Crayfish

The Pallid Cave Crayfish (*Procambarus pallidus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Pallid Cave Crayfish is listed by several other entities, including Imperiled by NatureServe, Vulnerable by the AFS, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Pallid Cave Crayfish is a freshwater crayfish that inhabits caves (CBD 2010a, NatureServe 2020). It is associated with areas of high flows and karst. Its range is limited to Florida, with records from Alachua, Columbia, Gilchrist, Hamilton, Lafayette, Levy, Madison, and Suwannee counties.

Populations are threatened by pollution (because of their likely sensitivity to chemicals) and by disturbance from recreational diving. A large kill of Pallid Cave Crayfish in the upper Suwannee River was suspected to have been the result of a pollution event (CBD 2010a).

## Black Creek Crayfish

The Black Creek Crayfish, also known as the Spotted Royal Crayfish, (*Procambarus pictus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Black Creek Crayfish is listed by several other entities, including as a Species of Special Concern in the state of Florida and as as Near Threatened by the IUCN (CBD 2010a).

The species occurs in a geographically small area of northeastern Florida – Clay, Putnam, and Duval counties (FNAI 2001a). Black Creek Crayfish inhabit small, relatively swift, sand-bottomed, tannic-stained streams, often emanating from sandhills and flowing through or from swampy terrain. Black Creek Crayfish are usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence (Franz and Franz 1979). They are restricted to a few small stream systems. Most known localities are

within the Black and Rice creek drainages. Black Creek Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Protection of inhabited headwater and secondary streams, especially within the Black and Rice creek drainages, is therefore critical to the species' survival (NatureServe 2020).

## Spider Cave Crayfish

The Spider Cave Crayfish (*Troglocambarus maclanei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Spider Cave Crayfish is listed by several other entities, including as Imperiled by NatureServe, as Vulnerable by the AFS, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Spider Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves and sinkholes near areas with fresh detrital input, such as bat caves (CBD 2010a, NatureServe 2020). Its range spans 16 localities from Suwannee County to Hernando County, along an approximate 130 kilometers area in Florida. It is often associated with karst and fine silt. The Spider Cave Crayfish is frequently seen hanging upside down from cave ceilings. It is likely an aquatic predator of smaller invertebrates. Major threats to the species include anthropogenic impacts on water quality and reduced detritus flows (CBD 2010a). Three of the species' known localities are popular sites for recreational diving and face acute degradation (NatureServe 2020).

## INSECTS

## Logan's Agarodes Caddisfly

Logan's Agarodes Caddisfly (*Agarodes logani*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The species has a very small range and has only been observed from one stream in Gadsden County, Florida (NatureServe 2020). The stream is spring-fed and runs through a deep ravine on the Florida Agriculture and Mechanical University Farm (CBD 2010a). As the population is restricted to such a small area and adjacent to an active farm, the species is at risk from farming practices, which may result in pollution, siltation, or habitat degradation (NatureServe 2020).

## Florida Leafwing Butterfly

The Florida Leafwing Butterfly (*Anaea troglodyta floridalis*) was listed as endangered effective September 11, 2014 (79 FR 47221). Critical habitat has been designated and includes areas of pine rockland habitat (79 FR 47179).

The historical range of the Florida Leafwing Butterfly spanned south Florida, including Miami-Dade, Monroe, Collier, Martin Palm Beach, and Broward counties (78 FR 49878). This may be the most imperiled butterfly subspecies given that it has experienced drastic declines and is now extirpated from nearly 96 percent of its historical range. No individuals have been detected since 2006 (78 FR 49878, NatureServe 2020) and the only population within Everglades National Park is known to be extant. The species has only one host plant, the pineland croton (*Croton linearis*), upon which larvae develop and feed (78 FR 49878). The species is highly restricted to pine rockland habitats which support its host plant. Adult diets are varied and include rotting fruit, dung, and nectar (NatureServe 2020). Both adults and larvae (instars) use cryptic mimicry to blend in with its host plant. Florida Leafwings are non-migratory butterflies with a multivoltine life history (multiple generations each year) (78 FR 49878). This species may be at imminent risk of extinction as the pine rockland habitats on which it depends are very limited and continue to be destroyed by development and tropical storm events (NatureServe 2020).

## Frosted Elfin

The Frosted Elfin (*Callophrys irus*) is proactively being assessed for listing by USFWS and a listing determination is expected by September 30, 2023. An interim Species Status Assessment was completed in 2018 (USFWS 2018h). The species remains under review at this time (USFWS 2020a).

The current range of Frosted Elfin spans 25 states in the eastern US. The three described subspecies of Frosted Elfin (*Callophrys irus irus*, *C. i. hadros*, and *C. i. arsace*) occupy separate distributions. *C. i. irus* has the largest range, spanning interior areas from Florida to New York, and east through Ohio, Michigan, and Wisconsin. Frosted Elfins are small non-migratory butterflies with a univoltine lifespan (a single adult flight period) (USFWS 2018h). They are reliant on pine barren habitat which supports their host plants, blue lupine (*Lupinus* spp.) and wild indigo (*Baptisia* spp.; USFWS 2019o). They also need various nectar plants nearby in addition to their host plants (USFWS 2018h).

There are records from 20 counties in Florida (Thom 2013). The species has been extirpated from large portions of their historical range (USFWS 2018h, USFWS 2019p). The major causes of population decline are habitat loss caused by development, invasive species, succession, and incompatible vegetation management, as well as the limiting factor of small population sizes (USFWS 2018h, USFWS 2019o).

## Miami Tiger Beetle

The Miami Tiger Beetle (*Cicindelidia floridana*) was listed as endangered effective November 4, 2016 (81 FR 68985). Critical habitat has not been designated (USFWS 2020a).

This species was rediscovered in 2007 after not being seen since 1934 (and believed to be extinct). This species was first discovered in the Northern Biscayne Pinelands region, around Miami and North Miami Cities in Miami-Dade County, Florida. The region was known for its large, quartz sand areas within rare pine rockland habitat. The 2007 rediscovery of this species was made in the Richmond Heights area of south Miami, known as Richmond Pine Rocklands on Miami Rock Ridge. Limited studies on this species' microhabitat preferences suggest that it prefers open, bare, white to gray sandy areas of two to six square meters with less than five percent organic matter. There were only two known extant populations of this beetle at the time of listing (80 FR 79533).

This species is a day-active predator that moves quickly to seize other small arthropods, such as ants. The larvae of this species are grub-like with large mandibles. Larvae occupy a permanent ground burrow that is flush with the soil surface. The larvae anchor themselves in the burrow and ambush small arthropods when they come close. Efforts in the 1970s to relocate the species found that the type locality had been destroyed and developed. Threats to this species include habitat loss, degradation, and fragmentation; development; non-native species encroachment; and specimen collection by enthusiasts (80 FR 79533).

## Nickerbean Blue Butterfly

The Nickerbean Blue Butterfly (*Cyclargus ammon*) was listed as threatened effective April 6, 2012, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (77 FR 20948).
Critical habitat has not been designated (USFWS 2020a).

The range of the Nickerbean Blue Butterfly includes the Bahamas and Cuba, where it is native, as well as Big Pine Key in Florida, where it has colonized. It occupies tropical hardwood hammock forests, especially in forest openings and edges. Larvae develop and feed on Nickerbean (*Cesalpinia bahamensis*). Adults feed on a variety of nectar plants, including Croton (*Codiaeum variegatum*). Although listed because of similar appearance, this species seems to be stable as evidenced by range expansion and stable populations on Big Pine Key where other butterfly species are declining (NatureServe 2020).

## Miami Blue Butterfly

The Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) was listed as endangered on effective April 6, 2012.

Critical habitat has not been designated (USFWS 2020a).

The Miami Blue Butterfly is a Florida endemic that occurs in open, sunny areas of coastal hardwood hammocks, dunes, and scrub habitat in the Florida Keys (Bahia Honda State Park and Key West National Wildlife Refuge; although the Bahia Honda population may now be extirpated). Research indicates that the species is non-migratory/sedentary, but additional studies are needed to confirm this information (77 FR 20948, CBD 2011b). The species is present year-round, with multiple overlapping generations (eight to 10 generations per year). Individuals are believed to be in diapause from December through April. Adult Miami Blue Butterflies only live around nine days in the wild (77 FR 20948, CBD 2011b). Generation time from egg to adults is roughly 30 to 40 days (77 FR 20948). The species lays eggs on the following host plants: blackbead (*Pithecellobium* spp.), nickerbean (*Caesalpinia* spp.), balloonvine (*Cardiospermum* spp.) and acacia (*Acacia* spp.). The Miami Blue Butterfly has a symbiotic relationship with several ant species (commonly *Camponotus floridanus*), which tend the butterfly pupae/instars on host plants and feed on liquid from their nectary organ (77 FR 20948). The butterflies feed on nectar from plants in the Boraginaceae, Asteraceae, Fabaceae, Polygonaceae, and Verbenaceae families (77 FR 20948).

The range of the species has contracted significantly (originally found from Tampa Bay to the Keys). The species was believed to be extirpated in the early 1990s, until a small population was rediscovered in 1999 on Bahia Honda Key. Reintroduction efforts of the species have largely been unsuccessful (77 FR 20948). The Miami Blue Butterfly population size is estimated to be in the low hundreds. Current threats to the species include habitat loss and fragmentation, illegal collection, pesticides, impacts to host plants from introduced iguanas, loss of genetic diversity, and stochastic environmental events (natural or human- caused) (CDB 2011, USFWS 2012c).

## Monarch Butterfly

The Monarch Butterfly (*Danaus plexippus plexippus*) was petitioned for listing on August 26, 2014 (CBD et al. 2014), and the 90-day finding determined that listing may be warranted (79 FR 78775). The listing decision has been delayed from June 2019 to December 2020 (Monarch Joint Venture 2019).

The subspecies, *D. p. plexippus*, is distributed across North America in the spring and summer months (Encyclopedia Britannica 2019). They rely on milkweed (*Asclepias* spp.) for larval development and various nectar plants for adult food (CBD et al. 2014). The Continental Divide splits their overwintering populations: those on the eastern side typically overwinter in Mexico, while those on the western side overwinter in California (Pelton et al. 2016). There are resident Monarch populations in southern Florida where growing seasons continue and climates remain temperate year-round (Williams 2015). Statewide, Florida Monarchs have experienced an 80 percent decline since 2005 (Marchese and Hoose 2018).

Monarch populations face many threats, but primary among these is the loss of their host plants (milkweed) as a result of intensive pesticide use, particularly glyphosate (CBD et al. 2014).

## Duke's Skipper Butterfly

The Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). This subspecies may become elevated to the level of a full species and, should that occur, the Center for Biological Diversity petitioned for either the subspecies or species to be listed (CBD 2010a). The subspecies is remains under review at this time (USFWS 2020a). The Duke's Skipper Butterfly is considered Imperiled by NatureServe (CBD 2010a).

This subspecies is known from at least seven and up to 12 counties in the northern Florida peninsula including: Brevard, Dixie, Duval, Hernando, Hillsborough (thought to be extirpated), Orange, Pasco, Pinellas, Polk, Seminole, Sumter, Taylor, and Volusia (NatureServe 2020). There are 17 known occurrences of this butterfly. This subspecies inhabits sedge patches within wetlands and swamps dominated by cypress (*Cupressus* spp.), gum (*Eucalyptus* spp.), red maple (*Acer rubrum*), or mixed canopy (CBD 2010a). Larval foodplants are narrowfruit

horned beaksedge (*Rynchospora inundata*), millet beaksedge (*Rynchospora miliacea*), and an unidentified sedge (*Carex*) species. Adults visit flowers such as buttonbush (*Cephalanthus occidentalis*) and pickerel weed (*Pontederia cordata*) (NatureServe 2020). Threats to the species include conversion of wetland habitat to urbanization, development, and pesticides (CBD 2010a).

**Palatka Skipper Butterfly**

The Palatka Skipper Butterfly (*Euphyes pilatka klotsi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Palatka Skipper Butterfly is listed by several other entities, including Critically Imperiled by NatureServe and as a Species of Greatest Conservation Need in Florida (CBD 2010a, NatureServe 2020).

The range of the Palatka Skipper Butterfly is limited to a few islands in the Florida Keys: Big Pine, Big Torch, Cudjoe, No Name, Sugarloaf, and Stock Island. They inhabit areas dominated by sawgrass near mangroves in tropical pinelands and sawgrass marshes (CBD 2010a). Larvae develop and feed on sawgrass leaves (NatureServe 2020). This species is rare, with only 10 adults detected during intensive surveys spanning two years. Major threats to the subspecies include habitat loss as a result of development and the use of insecticides (CBD 2010a).

## Westfall's Clubtail Dragonfly

The Westfall's Clubtail Dragonfly (*Gomphus westfalli*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Westfall's Clubtail Dragonfly is considered Critically Imperiled by Nature Serve (NatureServe 2020).

The Westfall's Clubtail Dragonfly is a small dragonfly which requires specialized habitat: sphagnum bog trickles and streams in areas that undergo periodic burning. Larvae develop in silt and adults forage in nearby forests. The species is limited to only four streams within or near Blackwater River State Forest in Santa Rosa County, Florida. The primary threats to their populations are "excessive clearcutting" and altered fire regimes. Their extremely limited range (only about 25 kilometers) makes their populations especially vulnerable (CBD 2010a).

## Ceraunus Blue Butterfly

The Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) was emergency listed as threatened effective August 10, 2011, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (76 FR 49408). Critical habitat has not been designated (USFWS 2020a).

The Ceraunus Blue is a neotropical butterfly that occurs in Arizona, California, Florida, Kansas, New Mexico, Nevada, and Texas (NatureServe 2020). In Florida, Ceraunus Blue Butterflies occur year-round and inhabit grasslands, parks, roadsides, and open woodlands. Host plants includes herbaceous legumes such as rosary pea (*Abrus precatorius*) (UF IFAS 2019). The population in Florida is considered Apparently Secure (NatureServe 2020).

## Schaus Swallowtail Butterfly

The Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) was listed as threatened effective May 4, 1976 (41 FR 17736). Due to continued declines after listing, its status was reclassified to Endangered effective October 1, 1984 (49 FR 34501). Critical habitat has not been designated (USFWS 2020a).

The historical range of the Schaus Swallowtail Butterfly spanned Upper and Lower Matacumbe Keys and Lignumvitae Key north to areas surrounding Miami on the Florida mainland (USFWS 2008e). It is currently limited to Key Biscayne National Park (USFWS 2020a). Larvae develop and feed on torchwood (*Amyris elemifera*)

(NatureServe 2020). Adults are nectivores (NatureServe 2008). The adult flight period spans late April to June, and occasionally into late summer. Although the subspecies is non-migratory, they are known to fly between islands. Populations are threatened by habitat destruction and biocides (as a result of mosquito control) (NatureServe 2020). This species is especially vulnerable to extinction because of its isolated and small populations and limited range. Reintroduction efforts have been somewhat successful, resulting in reproduction. However, these efforts have not improved long-term population trends (USFWS 2008e).

## Gulf Coast Solitary Bee

The Gulf Coast Solitary Bee (*Hesperapis oraria*) was petitioned for listing on March 27, 2019 (CBD 2019b), and the 90-day finding determined that listing may be warranted (84 FR 69713). The species remains under review at this time (USFWS 2020a). The Gulf Coast Solitary Bee is considered Critically Imperiled by NatureServe (NatureServe 2020).

The Gulf Coast Solitary Bee is extremely rare and the only known member of its family in the eastern US (CBD 2019b). The historical range of the Gulf Coast Solitary Bee was limited to barrier islands and a narrow shoreline band (one to two km) along the Gulf Coast from eastern Mississippi to northeastern Florida (Kopec and Burd 2017, NatureServe 2020). Currently it is only found in Florida in state and national parks and is reduced to a mere six populations (CBD 2019b). The species has one obligate host plant: the Coastal Plain Honeycombhead (*Balduina angustifolia*). It relies solely on this plant for all its pollen and nectar. The Coastal Plain Honeycombhead is is reliant upon the Gulf Coast Solitary Bee to transfer its pollen and cannot reproduce without it (Kopec and Burd 2017). This plant only grows in sandy coastal dune habitats and the bee nests in these sandy soils (NatureServe 2020).

Given its extremely limited range and host specificity, this species is at imminent risk of extinction (Kopec and Burd 2017). Threats include habitat loss, degradation, and fragmentation as a result of development; pesticide use; competition with European honeybees; sea level rise and hurricanes (intensified by climate change); limited genetic diversity; and a lack of protection (Kopec and Burd 2017, CBD 2019b). The Gulf Coast Solitary Bee is considered a flagship species for habitat conservation and an indicator species of barrier island and Gulf Coast ecosystem health (CBD 2019b).

## Sykora's Hydroptila Caddisfly

Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Sykora's Hydroptila Caddisfly is considered Critically Imperiled by NatureServe (CBD 2010a).

This species has a very small range and is only known from two spring-run streams in Gadsden County, Florida. Both localities are located 25 kilometers apart, with one stream flowing through the Florida Agriculture and Mechanical University Farm (NatureServe 2020, CBD 2010a). The species is at risk of nearby farming practices which may result in pollution, siltation, or habitat degradation (CBD 2010a).

## Morse's Little Plain Brown Sedge Caddisfly

Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Morse's Little Plain Brown Sedge Caddisfly is listed by several other entities, including as Critically Imperiled in Florida by NatureServe and Threatened by the Florida Committee on Rare and Endangered Plants and Animals (CBD 2010a).

This is an extremely rare species and its habitat is not well understood. This caddisfly occurs in flowing water habitats, typically soft blackwater streams, associated with decaying plant matter. Similar to other members of the

Lepidostomatidae family, larvae are aquatic and produce protective tube-cases out of sand, vegetation, and other available materials. As caddisflies spend a large part of their life as aquatic larvae, this species is sensitive to siltation and pollution caused by practices such as unsustainable forestry and conversion of land to agricultural use (CBD 2010a). This species is endemic to the southeastern US in very limited locations within its range. In Florida, it is only known from Little Alaqua Creek in Walton County (NatureServe 2020).

## Cassius Blue Butterfly

The Cassius Blue Butterfly (*Leptotes cassius theonus*) was emergency listed as threatened effective August 10, 2011, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (76 FR 49408). Critical habitat has not been designated (USFWS 2020a).

The Cassius Blue Butterfly occurs in Florida, Texas, Virginia, and Kansas. The species may also pass through other southeast states during migration. The Florida subspecies, *theonus*, is a primarily non- migratory resident of coastal habitats in the central and south peninsula (although the species may engage in migratory movements during cold spurts). The subspecies occurs in grassland, urban areas, hardwood forests, and scrub (NatureServe 2020). Host plants for the subspecies include members of the pea family (Fabaceae) and leadwort (Plumbaginacea). Populations are considered to be secure (NatureServe 2020).

## Purple Skimmer Dragonfly

The Purple Skimmer Dragonfly (*Libellula jesseana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Purple Skimmer Dragonfly is listed by several other entities, including Critically Imperiled by NatureServe and Vulnerable by the IUCN (CBD 2010a, NatureServe 2020).

The Purple Skimmer Dragonfly is medium-sized, lacustrine, Florida-endemic dragonfly species. Its distribution includes nine eastern Peninsula counties, and two Panhandle counties (Bay and Washington). Historically, there were 15 known populations within this range. Currently, the species may only remain at a single lake within a state park. They utilize clear, sand-bottomed lakes bordered by maiden-cane grass and St. John's Wort shrubs (*Hypericum* spp.). Adults feed on invertebrates in nearby woodlands or shrublands. This species is extremely sensitive to pollution and eutrophication, and is unable to survive in polluted habitats. In degraded habitats, even with only slight eutrophication, the common and closely related Golden-winged Skimmer (*L. auripennis*) outcompetes and displaces Purple. The major threat to Purple Skimmer populations is lakeshore development and impacts to water quality (CBD 2010a).

## American Burying Beetle

The American Burying Beetle (*Nicrophorus americanus*) was listed as endangered effective July 13, 1989 (54 FR 29652). Critical habitat has not been designated (USFWS 2020a). The species is under consideration for downlisting to Threatened status (84 FR 19013).

The historic range of the American Burying Beetle spanned 35 states. There are no known extant populations of this species in Florida. Current populations exist in Rhode Island, South Dakota, Nebraska, Texas, Oklahoma, and Arkansas (USFWS 2019q). A Michigan record from 2017 is under investigation (84 FR 19013).

The American Burying Beetle is a nocturnal carrion beetle species active from late spring through early fall. They bury themselves in moist soil to hibernate for the winter. Reproduction occurs in the spring and early summer. They are considered habitat generalists and do not appear to be limited by vegetation types as long as food, shelter, and moisture are available. Its specialization toward the use of larger carrion compared to that used by other carrion beetles is suspected to be a factor in its decline. Changing land use practices and conversion of lands to intensive agriculture or for other development purposes fragments the habitat and reduces the availability of its preferred carrion, with other site-specific factors varying across its current range (USFWS 2019q).

**Little Oecetis Longhorn Caddisfly**

Little Oecetis Longhorn Caddisfly (*Oecetis parva*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Oecetis Longhorn Caddisfly is listed by several other entities, including as Critically Imperiled in Florida by NatureServe and a State Historical in Alabama (CBD 2010a).

This species is found in northern and central Florida with only one individual recorded outside of Florida, from Wright's Creek, Alabama (NatureServe 2020). In Florida, occurrences have been recorded in the Apalachicola River, Choctawhatchee River, Kissimmee River, Oklawaha River, upper St. Johns River, and St. Marks River (CBD 2010a). The species inhabits natural lakes and springs, especially within the Ocala National Forest (NatureServe 2020). Due to their high abundances in healthy lake systems, they are thought to be an excellent bioindicator of lake health in Florida (Rasmussen et al. 2008). It is thought that this species is sensitive to activities that affect water quality and hydrologic regimes such as agriculture, urban development, forestry, water withdrawal, and nutrient loading (CBD 2010a). The primary threat to their populations is negative changes to water quality (CBD 2010a).

Findings from Rasmussen at al. (2008) report indicate six new occurrences of this species. Based on these surveys, the population trend was recommended to be reassigned from unknown to stable (Rasmussen et al. 2008).

**Southern Snaketail Dragonfly**

The Southern Snaketail Dragonfly (*Ophiogomphus australis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Southern Snaketail Dragonfly is listed by several other entities, including Critically Imperiled by NatureServe and Endangered by the IUCN flows (CBD 2010a, NatureServe 2020).

The Southern Snaketail Dragonfly may be a subspecies of *O. incurvatus* (CBD 2010a). Its historical range encompassed Florida, Georgia, Louisiana, and Mississippi (NatureServe 2020). It is known from three streams and rivers in Louisiana and Mississippi. Additionally, previously misidentified specimens of *O. australis* have been documented at Englin Air Force Base in Okaloosa County, Florida. It inhabits graveled streams and requires consistent water flows and clean water. Major threats to their populations are water quality degradation from a variety of sources including gravel mining, pesticide use, and deforestation. Recent population trends have shown an estimated 10 to 30 percent decline (CBD 2010a).

**Blue Calamintha Bee**

The Blue Calamintha Bee (*Osmia calaminthae*) was petitioned for listing on February 5, 2015 (DoW 2015), and the 90-day finding determined that listing may be warranted (80 FR 56423). The species remains under review at this time (USFWS 2020a). The Blue Calamintha Bee is considered Critically Imperiled by NatureServe (NatureServe 2020).

The Blue Calamintha Bee is restricted to sandy scrub habitats at four sites in the southern Lake Wales Ridge in Highlands County, Florida. The species is believed to be a specialist on the Florida state threatened Ashe's calamint (*Calamintha ashei*), which occurs in sand pine and scrub habitat in the Florida central highlands and southeastern Georgia. Some of the bee's known populations are within protected areas, but they are still subject to pesticide drift and destructive off-road recreational activities. Other populations occur in unprotected lands (Rightmyer et al. 2011).

**Calvert's Emerald Dragonfly**

Calvert's Emerald Dragonfly (*Somatochlora calverti*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835)). The species remains under review at this time (USFWS 2020a). Calvert's Emerald Dragonfly is listed by several other entities, including as Vulnerable in Florida by NatureServe and Near Threatened by the IUCN (CBD 2010a).

Habitat is unknown but is thought to include "boggy forest seepages" (CBD 2010a). Most North American Calvert's Emerald Dragonfly are associated with cool groundwater for breeding, with adult foraging taking place in surrounding wetland and upland habitats. Other species of Calvert's Emerald breed in graminoid fens and sedge meadows fed by cool groundwater, small streams in woody ravines, or boggy wooded seeps (Mierzwa et al. 1995, CBD 2010a). Due to the typically cool temperatures associated with groundwater sources, the larval period can be prolonged - up to three to five years in some species.

Related Hine's Emerald Dragonfly (*S. hineana*) larvae escape drought or extreme temperatures by retreating into crayfish burrows (Pintor and Soluk 2006).

Calvert's Emerald Dragonfly has been reported in Florida from a handful of localities in the Panhandle including Torreya State Park, Blackwater River State Forest, Ralph E. Simmons State Forest, and Apalachicola National Forest (CBD 2010a, Odonta Central 2019, USFWS 2019o). There is an unverified report from Apalachicola Bluffs Preserve (CBD 2010a). Populations are believed to be small, and breeding habitat is often limited in extent (Paulson 2018). The short adult flight season, cryptic behavior and difficulty of sampling larvae, and difficulty distinguishing *Somatochlora* species hampers survey efforts.

## Bartram's Scrub-hairstreak Butterfly

The Bartram's Scrub-hairstreak Butterfly (*Strymon acis bartrami*) was listed as endangered effective August 12, 2014 (79 FR 47221). Critical habitat was designated within Miami-Dade and Monroe Counties, specifically on Big Pine Key, Navy Wells Pineland Preserve, Richmond Pine Rocklands, and in Everglades National Park. (79 FR 47179).

The Bartram's Scrub-hairstreak is restricted to pine rockland habitat in southern Florida (USFWS 2015f). The subspecies occurs on Big Pine Key, Everglades National Park (Long Pine Key), and in Miami-Dade County (e.g., Navy Wells Pineland Preserve and the Richmond Pine Rocklands). The pineland croton is the host plant for Bartram's Scrub-hairstreak and occurrence records for the species are never more than five meters from host plants (the species is primarily sedentary/non-migratory). The subspecies is threatened by fire suppression, habitat loss, and climate change/sea level rise (USFWS 2015f).

## Yellow-sided Clubtail Dragonfly

The Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Westfall's Clubtail Dragonfly is listed by several other entities, including as Imperiled by NatureServe and Vulnerable by the IUCN (CBD 2010a, NatureServe 2020).

The Yellow-sided Clubtail is a medium-sized slender dragonfly. Its range extends through the Florida Panhandle and coastal Mississippi (NatureServe 2020). The species requires pristine stream and river habitats with sandy bottoms. Within its range, it occupies only seven streams and one river. The species is highly sensitive to impacts to water quality. The major threat to Yellow-sided Clubtail Dragonflies is pollution as a result of development, clearcutting, and pesticide use. Its limited range makes populations particularly vulnerable (CBD 2010a).

## Three-Toothed Long-horned Caddisfly

The Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species

remains under review at this time (USFWS 2020a). The Three-toothed Long-horned Caddisfly is listed by several other entities, including as Critically Imperiled by NatureServe and Extinct by the IUCN (CBD 2010a).

The species is only known historically from Oklahoma, the Florida Panhandle, and the Coastal Plain of Alabama. However, the last occurrence in Florida was in 1938. It is believed that the only extant population occurs in Alabama, with the most recent observation of the species occurring in coastal plains streams in Clarke and Perry County in 1991 (NatureServe 2020). Due to this species rarity and few observations, little is known about the species' specific life history and habitat requirements other than it being an aquatic benthic dweller.

## PLANTS

### Meadow Jointvetch

Meadow Jointvetch (*Aeschynomene pratensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Meadow Jointvetch is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

In Florida, this plant only occurs in Collier, Dade, and Monroe Counties; there are 11 known populations (CBD 2010a). Its range outside of Florida extends to the Caribbean and South America (NatureServe 2020). Meadow Jointvetch is classified as a perennial herb species, often observed growing in pine rocklands, marl prairies, cypress domes, and swales (FNAI 2001b, NatureServe 2020). The primary threats to this species are the drainage and conversion of wetland habitat and competition with invasive exotic species (CBD 2010a).

### Crenulate Lead-plant

Crenulate Lead-plant (*Amorpha crenulata = Amorpha herbacea* var. *crenulata*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

Crenulate Lead-plant is characterized as a deciduous, perennial shrub, capable of growing 1.5 meters tall. There are currently only six known populations of this species, all located within Dade County, Florida (FNAI 2001b). It is restricted to poorly drained Opalocka sands within pine rocklands or in wet prairies with Opalocka-rock outcrop complex soils. Frequent fires are a natural process of pine rocklands, and it is presumed that Crenulate Lead-plant is adapted to this environment (USFWS 1999b). It is estimated that 99 percent of Crenulate Lead-plant habitat has been lost (FNAI 2001b). This is mainly the result of development, although remaining habitat is also at risk due to fire suppression (NatureServe 2020).

Current threats to the species include fire suppression in pine rocklands, which results in encroachment by tropical hardwood hammock (unsuitable habitat for the lead-plant), invasive species, and urbanization (50 FR 29345, NatureServe 2020).

### Blodgett's Silverbush

Blodgett's Silverbush, also known as Blodgett's Wild Mercury, (*Argythamnia blodgettii*) was listed as threatened effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

This species is restricted to the Florida mainland and the Florida Keys in Miami-Dade and Monroe counties. There are approximately 15-20 known occurrences, and fewer than 10,000 individual plants. The species grows in the low, moist limestone areas near margins of pine rocklands, rockland hammocks, and coastal berm; particularly in open sunny gaps or along edges (NatureServe 2020). It flowers and fruits all year (FNAI 2001b). This species has a considerable amount of its habitat to urbanization. Fire suppression and exotic species invasion are immediate threats to the species. (NatureServe 2020).

### Four-petal Pawpaw

The Four-petal Pawpaw (*Asimina tetramera*) was listed as endangered effective September 26, 1986 (USFWS 2020a). Critical habitat has not been designated (USFWS 2020a).

This large shrub/tree (one to three meters) grows in sand pine scrub communities on the inland prehistoric dunes of Martin and Palm Beach Counties, Florida. It is adapted to disturbances such as fire and hurricanes and grows back from its root system (51 FR 34415). As of 2018, this species was known to be extant in only 15 locations out of 26 historically documented occurrence sites (USFWS 2019r). Threats to this species include fire suppression, overgrowth of surrounding trees, non-native species encroachment, development, habitat loss/degradation, and population fragmentation (51 FR 34415, USFWS 2009e, USFWS 2019r).

## Purpledisk Honeycombhead Sunflower

Purpledisk Honeycombhead Sunflower, also known as Purple Balduina, (*Balduina atropurpurea*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

Purpledisk Honeycombhead Sunflower is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).Purpledisk Honeycombhead Sunflower is a perennial member of the Asteraceae family that occurs in southeastern and southcentral Georgia and northeast Florida. It is possibly extirpated from the Florida Panhandle and adjacent Alabama. Disjunct historic occurrences were known in southeast North Carolina and northcentral South Carolina, but these occurrences have not been observed recently. Only seven populations are known in Florida (NatureServe 2020).

General habitat for Purpledisk Honeycombhead Sunflower is wet savanna and bog (Nature Serve 2020). Specific habitats include wet pine flatwoods and savannas, seepage slopes, pitcherplant bogs, and wet ditches (FNAI 2001b). Associated species usually include either longleaf pine (*Pinus palustris*) or slash pine (*Pinus elliotti*). Much of the naturally rare habitats of this species have been altered or destroyed by fire suppression or drained and converted for agriculture and pine plantations. This species is threatened by encroachment of woody vegetation and alterations to hydrology such as wetland drainage and improper firebreak construction (Nature Serve 2020).

## Apalachicola Wild Indigo

Apalachicola Wild Indigo (*Baptisia megacarpa*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).Apalachicola Wild Indigo is listed by several other entities, including as Endangered by the state of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

This plant is characterized as a perennial herb capable of growing up to 1.2 meters tall. Its range is limited to southeast Alabama, southwest Georgia and in the adjacent Holmes, Gadsden, and Liberty Counties in Florida (NatureServe 2020). It is typically observed growing in mixed hardwood and hardwood-pine forests, often in close proximity to a floodplain, streams, or ravines (CBD 2010a). This species is primarily at risk due to habitat loss and fragmentation cause by land development, stream impoundment, and forestry management practices (NatureServe 2020). Competition with invasive species such as Japanese honeysuckle (*Lonicera japonica*) and human collection add additional pressure in some localities (NatureServe 2020). Approximately 20 known populations of this species exist, often with low number of individuals (CBD 2010a).

## Florida Bonamia

The Florida Bonamia (*Bonamia grandiflora*) was listed as threatened effective November 2, 1987 (52 FR 42068). Critical habitat has not been designated (USFWS 2020a).

The Florida Bonamia is a perennial, herbaceous vine with prostrate stems reaching one meter or greater in length. The Florida Bonamia inhabits clearings or openings in shrublands and chaparral in deep, white, dry sands of

ancient dunes and sandy ridges in central Florida. Species occurrences have been documented in the following counties: Hardee, Highlands, Lake, Marion, Orange, and Polk (NatureServe 2020). Fire stimulates flowering and seed production in mature plants, germination of seed, and causes turnover of the large seed bank mainly found in the top centimeter of soil surrounding the plant (USFWS 1996b). The species is in decline as approximately 62 percent of known populations occur on private, unprotected lands vulnerable to destruction if they are developed or continue to be unmanaged (USFWS 2017b).

## Florida Brickell-bush

The Florida Brickell-bush (*Brickellia mosieri*) was listed as endangered effective October 6, 2014 (78 FR 61273). Critical habitat was designated in Miami-Dade county in Florida (80 FR 49845). *Brickellia mosieri* is a synonym for the more recently accepted taxonomic name *B. eupatorioides* var. *floridana*.

Florida Brickell-bush is a perennial herb that is endemic to Miami Rock Ridge in Miami-Dade County, Florida. Older literature suggested this species had a wider distribution, occurring in surrounding states; however, this has since been proven false. Florida Brickell-bush habitat includes pine rockland communities with sandy soils dominated by open canopy slash pine (*Pinus elliottii* var. *densa*). In addition, an open shrub canopy is required; shrubs include saw palmetto (*Serenoa repens*) and wax myrtle (*Myrica cerifera*), among others (80 FR 49845). The remaining populations are under threat from housing development, fire suppression, and encroachment of invasive plants (NatureServe 2020).

## Brooksville Bellflower

Brooksville Bellflower (*Campanula robinsiae*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

Native to Brooksville Ridge, Hernando County, Florida, there are only four, possibly five, sites that are currently occupied by this species: one site at Burns Prairie (Florida Fish and Wildlife Conservation Commission Wildlife Management Area), one site on privately owned land known as the Young site, and three sites at Hillsborough River State Park. Only four of these sites, at Burns Prairie in Hernando County and Hillsborough River State Park in Hillsborough County, meet the recovery criteria of being protected.

The species is found in wet prairie and along the edges of ponds near pastureland or adjacent hardwood forests (NatureServe 2020). The population size of this species has fluctuated due to factors such as altered hydrology and drought. Seeds may remain dormant for long periods until high levels of cumulative rainfall stimulate germination and the annual life cycle. There has been a loss of large oaks that would historically have shaded the soil and kept soils moist, which is required for seed germination (USFWS 2019s). Urbanization and habitat alteration has resulted in poor water quality and low water levels resulting in the loss of populations. Cattle grazing and trampling are also threats to the species as well as invasive plant species (FNAI 2001b). Displacement by skunk vine (*Paederia foetida*) is an increasing problem. (NatureServe 2020).

## Fragrant Prickly-apple

The Fragrant Prickly-apple (*Cereus eriophorus* var. *fragrans = Harrisia fragrans*) was listed as endangered effective November 1, 1985. Critical habitat has not been designated (USFWS 2020a).

The Fragrant Prickly-apple occurs in at least 10 confirmed locations in Florida; nine of these are within an area of about 16 kilometers by one kilometer around Savannas Preserve State Park in St. Lucie County. There is also one disjunct population at Canaveral National Seashore in Volusia County, Florida, and one unconfirmed occurrence reported in Indian River County. Unraveling the historical distribution of this species was problematic due to misidentification with the more common Simpson's prickly-apple (*Cereus gracilis* var. *simpsonii*). The range for the fragrant prickly-apple is hypothesized to included Volusia, St. Lucie, Brevard, and Indian River Counties. It prefers to grow in coastal hammock communities but is also found in sand pine habitats. It thrives in partial sun and mature climax communities that experience infrequent fires. Threats to this varietal include habitat

loss/degradation, population fragmentation, poaching, insect predation, invasive species encroachment (plant species as well as feral hogs), herbicide, and stochastic events (USFWS 2010f, NatureServe 2020).

## Deltoid Spurge

The Deltoid Spurge (*Chamaesyce deltoidea* ssp. *deltoidea*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

The Deltoid Spurge is an herbaceous, mat-forming plant endemic to the pine rocklands with scattered shrubs and exposed limestone of Miami rock ridge in Miami-Dade Country, Florida (FNAI 2001b, USFWS 2010g). The species underwent precipitous population declines as a result of urban expansion in the Miami area (USFWS 1999b). The species is threatened by habitat destruction, fire suppression (allows for encroachment of unsuitable tropical hammock), and by invasive species (NatureServe 2020).

## Pineland sandmat

Pineland sandmat (*Chamaesyce deltoidea pinetorum*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

Pineland sandmat is a perennial herbaceous species endemic to South Florida, occurring in Miami-Dade County. The historic and current range of pineland sandmat is restricted to an area of 68 kilometers, only within the southern portion of the Miami Rock Ridge, from Homestead to the Long Pine Key region of Everglades National Park. Pineland sandmat is most abundant within the Long Pine Key region of Everglades National Park. It also occurs on County-owned conservation lands adjacent to the Park (82 FR 46991). Pineland sandmat occurs in pine rocklands, which are characterized by an open canopy of South Florida slash pine (*Pinus elliottii* var. *densa*) with a patchy understory of tropical and temperate shrubs and palms, and a rich herbaceous layer containing many species that are endemic to South Florida.

Weathered oolitic limestone outcrops (known as pinnacle rock) are common in pine rocklands. Pine rocklands are maintained by regular fire, which historically occurred at three to seven-year intervals. This habitat is now maintained with prescribed fire, which prevents succession to rockland hammock, and reduces woody competition for pineland sandmat which is not shade tolerant. Pine rocklands are prone to annual flooding during the wet season; however, pineland sandmat generally occurs in higher elevation pine rocklands that are less subject to flooding (81 FR 70282). Ninety-eight percent of pine rocklands, the only habitat for pineland sandmat outside of Everglades National Park, has been lost to development (82 FR 46991). Habitat for pineland sandmat is also susceptible to natural disturbance such as hurricanes, frost events, and sea level rise (81 FR 70282, NatureServe 2020).

## Wedge spurge

The Wedge Spurge (*Chamaesyce deltoidea* ssp. *serpyllum*) was listed as endangered effective October 31, 2016. Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial, tap-rooted herb grows on upland, rocky soils in pine rocklands and along roadways where non-native lawn grasses are not the dominant vegetation. It is only known to occur on Big Pine Key in Monroe County, Florida. The spurge responds positively to fire. From 1996 to 2013, this species' population size fluctuated somewhat, but overall it has been relatively stable. Severe natural disturbances, such as hurricanes, have contracted and restricted the range and distribution of this plant on Big Pine Key (80 FR 58535). Threats to this species include habitat loss/degradation, development, roadside maintenance, invasive species encroachment, fire suppression, over-shading, and stochastic events (81 FR 66842, NatureServe 2020).

## Garber's Spurge

Garber's Spurge (*Chamaesyce garberi* ≡ *Euphorbia garberi*) was listed as threatened effective July 18, 1985. Critical habitat has not been designated (USFWS 2020a).

As of the 2007 USFWS five-year review, this species consisted of 17 populations: 14 on the Keys of Monroe County, two in Miami-Dade County, and one at Cape Sable in Everglades National Park (USFWS 2007g). This short-lived herb grows on dry, sandy substrates in ecotone areas between hammocks and pine rocklands and coastal beach dune ridges (50 FR 29345, USFWS 2007g). Populations sprout vigorously in response to disturbances, e.g., after fires or hurricanes. Threats to this species include habitat destruction/degradation in the Keys (mainland populations exist on protected lands), fire suppression, invasive species encroachment, and possibly Key deer herbivory (USFWS 2007g).

## Big Pine Partridge Pea

Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) was listed as endangered effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

Formerly known from several Monroe County Keys, this species is now found only on Big Pine Key. There are an estimated 10,000 plants on the island, many in the National Key Deer Refuge (FNAI 2001b). The subspecies is shade intolerant and requires periodic burning to reduce competition. Required habitat is very uncommon; these plants occur only on the edges of rockland hammocks and pinelands in the pine rocklands. It occupies a narrow habitat range, and typically occurs in small numbers. Current fire management occurs in early summer/late winter (prescribed management of co-occurring federally endangered Key Deer). Competing invasive species include Brazilian pepper (*Schinus terebinthifolius*), earleaf acacia (*Acacia auriculiformis*), natal grass (*Rhynchelytrum repens*), shrub verbena (*Lantana camara*), and tongue tree (*Albezia lebbeck*). Some of these species are known to affect fire return interval because of their extreme flammability. The subspecies is threatened by habitat alteration, altered fire regimes, development, and non-native plants. Based on the extremely narrow range, catastrophic events such as hurricanes and tropical storms may also result in extirpation of the subspecies (FNAI 2001b, NatureServe 2020).

## Pygmy Fringe-tree

Pygmy Fringe-tree (*Chionanthus pygmaeus*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

Pygmy Fringe-tree is endemic to south-central peninsular Florida where it occurs primarily in sand pine scrub, as well as high pineland, dry hammocks, and transitional habitats (USFWS 1999b). Sand pine scrub vegetation consists of sand pine (*Pinus clausa*) with shrubby evergreen oaks (USFWS 1987).

Pygmy Fringe Tree is known from west of Lake Apopka in Lake County, northwestern Osceola County, and the Lake Wales Ridge in Polk and Highlands Counties, including the Saddle Blanket Lakes Scrub Preserve and Highlands Hammock State Park (USFWS 1999b), and in Orange County (Nature Serve 2020). One of the largest populations is in the Carter Creek scrubs in Highlands County where it occurs with turkey oak (*Quercus laevis*), a species more typical of a high pine community (USFWS 1999b).

Pygmy Fringe-tree is a fire dependent, long-lived shrub or small tree, with stems rising from branches buried by blowing sand (USFWS 1999b). Sand pine scrub vegetation burns infrequently and intensely, approximately every 20 to 70 years, and Pygmy Fringe Tree reproduces from root sprouts post fire. It is also known to reproduce occasionally by seed. The species is similar to the widespread white fringe-tree (*Chionanthus virginicus*), who's range extends into central Florida. The two species appear to hybridize in habits other than scrub, though they are distinct species (USFWS 1999b). Threats to the Pygmy Fringe-tree include habitat loss to residential development and conversion to citrus groves. It is also threatened by collection for horticultural use (USFWS 1987).

## Cape Sable Thoroughwort

Cape Sable Thoroughwort (*Chromolaena frustrata*) was listed as endangered effective November 25, 2013 (78 FR 63795). Critical habitat was designated on January 8, 2014 (79 FR 1551).

The species is endemic to South Florida and the Keys. Current occurrences are known from Boca Grande Key in the far west, Big Munson Island in the Newfound Harbor Keys, and a cluster of keys farther east: Long Key, Lignumvitae Key, Lower Matecumbe Key, and Upper Matecumbe Key. Cape Sable Thoroughwort is also known from the Flamingo/Cape Sable region on the mainland (NatureServe 2020). Habitat consists of coastal rock barrens and berms and the sunny edges of rockland hammock (FNAI 2001b).

The Cape Sable Thoroughwort is severely threatened by loss of habitat, fragmentation of populations, and invasion of exotic plants, especially Brazilian pepper (*Schinus terebinthifolius*), carrotwood (*Cupaniopsis anacardioides*), and latherleaf (*Colubrina asiatica*). Sea level rise is also a threat to this species. Given the species' narrow range, fragmented distribution, and the small population size, Cape Sable Thoroughwort is vulnerable to stochastic environmental events (NatureServe 2020).

**Florida Golden Aster**

The Florida Golden Aster (*Chrysopsis floridana*) was listed as endangered effective May 16, 1986 (51 FR 17974). Critical habitat has not been designated (USFWS 2020a). The species has a high recovery potential and the Service recommended the species listing be reduced from Endangered to Threatened (USFWS 2009f). An initiation of review and request for information was published on September 23, 2014 (79 FR 56821).

The species is endemic to Florida and restricted to the west-central region of the state. It occurs in sunny habitats with bare patches of sand in sand pine scrub and on ecotones between this habitat and scrubby flatwoods. It also inhabits disturbed areas of loose sand (FNAI 2001b). The Florida Golden Aster is known from the following counties: Hardee, Highlands, Hillsborough, Manatee, and Pinellas (NatureServe 2020). The species is under threat due to habitat loss and degradation through residential development and suppression of natural fire regimes (USFWS 2009f). The Florida Golden Aster was introduced to 10 sites where the species was not known to occur naturally, increasing the estimated global population size from 21,000 to 46,000 individuals (NatureServe 2020).

**Florida Perforate Cladonia**

The Florida Perforate Cladonia (*Cladonia perforata*) was listed as endangered effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The Florida Perforate Cladonia is a conspicuous lichen, endemic to Florida and restricted to small areas in northwest, central, and southeast portions of the state (NatureServe 2020). The species inhabits rosemary scrub on the Florida Pandhandle coasts, Lake Wales Ridge, and Atlantic Coastal Ridge and it is known from fewer than 30 populations (FNAI 2001b). Florida Perforate Cladoniais threatened by trampling, over- collection, fire, and habitat loss from urbanization (NatureServe 2020). The recovery potential of the species is also hampered by slow reproductive growth as well limited opportunities for dispersal and population expansion due to habitat loss and fragmentation (USFWS 2007h).

**Pigeon Wings**

Pigeon Wings (*Clitoria fragrans*) was listed as threatened effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The species is a perennial herb that blooms from May to June (FNAI 2001b). Pigeon Wings are endemic to central Florida, inhabiting undisturbed clearings of xeric sandhill and scrub communities on well-drained soils, and turkey oak barrens with wire grass (*Aristida stricta*), bluejack (*Quercus incana*) and turkey oak (*Quercus laevis*) (FNAI 2001b, NatureServe 2020). Threats to the species include habitat loss from urbanization and agriculture (USFWS 2008f, NatureServe 2020).

## Short-leaved Rosemary

The Short-leaved Rosemary (*Conradina brevifolia*) was listed as endangered effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

Short-leaved Rosemary is a perennial, aromatic shrub growing from a woody root to one meter high. The species is known from approximately 30 occurrences on the Lake Wales Ridge of central Florida, with only a few of those populations having greater than 25 individuals (NatureServe 2020). The Short-leaved Rosemary inhabits xeric white sands supporting evergreen-Florida rosemary-sand pine scrub (USFWS 2008g). Populations are at risk of habitat loss due to conversion to citrus groves, residential, recreational, and commercial development. Short-leaved Rosemary is also a target of over-collection for horticulture (NatureServe 2020).

## Etonia Rosemary

The Etonia Rosemary (*Conradina etonia*) was listed as endangered effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

This shrub species was described relatively recently in 1991. There are two known populations, one in Etonia Creek State Forest and one in Interlachen Estates Subdivision, in Putnam County, Florida. Two populations were thought to have been found in Dunn's Creek State Park, but genetic research revealed these populations to be a separate species entirely (*C. cygniflora*). This species prefers sunny, disturbed sites in sand pine or shrubby oak communities. Within the subdivision, plants are found along roadsides or with subdivided lots of at least 0.4 hectare. Healthy populations are associated with natural fire regimes.

Threats to this species include habitat degradation due to lack of management and fire suppression (USFWS 2019t, NatureServe 2020).

## Apalachicola Rosemary

The Apalachicola Rosemary (*Conradina glabra*) was listed as endangered on August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

This shrub species was described relatively recently in 1962. Most of the known populations are currently found in an extremely limited area of 1,000 to 1,470 hectares in Liberty County, Florida. It is believed this species was more abundant across former sandhill habitats, but by the 1950s the silviculture industry had destroyed most of that habitat. This species is adapted to relatively frequent, low-intensity fires that maintain healthy mature populations. Historically in sandhill communities, these fires occurred on average every one to 10 years. A few populations of this plant occur on private land, two populations have been reintroduced on Nature Conservancy land, and only one population currently exists on public land at the Sweetwater Creek Track in Torreya State Park. Continuing threats to this species include habitat destruction/modification, range curtailment, and herbicide application (USFWS 2017c).

## Florida Semaphore Cactus

The Florida Semaphore Cactus (*Consolea corallicola* = *Opuntia corallicola*) was listed as endangered effective November 25, 2013 (78 FR 63795). Critical habitat was designated in the Florida Keys (81 FR 3865).

The Florida semaphore cactus is a Florida endemic cactus. The Florida Semaphore Cactus grows on bare rock or areas of loose rock such as talus and scree slopes. It is also found in shallow soil areas of hardwood hammocks near sea level. Only three naturally occurring populations of this species remain on Swan Key, Little Torch Key, and Key Largo. Reintroduction efforts have been initiated on other keys (USFWS 2013). Threats to the species include large hurricanes, its small population size, over-collection, urbanization, sea level rise, and introduced species, such as a moth that feeds on cacti (NatureServe 2020).

**Ciliate-leaf Tickseed Sunflower**

Ciliate-leaf Tickseed Sunflower (*Coreopsis intergrifolia*) was listed as endangered effective October 6, 2014 (79 FR 52567). Critical habitat was designated effective September 16, 2015 (80 FR 49845).

This species occurs from southeastern South Carolina south to the Panhandle of Florida. It is reported from five counties in northern Florida (Calhoun, Jackson, Nassau, St. Johns, and Washington). Habitat consists of low floodplain woodlands, streambanks, floodplains of blackwater streams (especially over limestone), and the edges of swamp forests bordering longleaf pinelands or brackish marshes. Soil is characterized by moist, sandy loam. Threats to the species include damming of streams, clearcutting bottomlands, herbicides, cattle grazing, and anthropogenic disturbance at high use recreation areas (NatureServe 2020).

**Avon Park Harebells**

The Avon Park Harebells (*Crotalaria avonensis*) was listed as endangered effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The Avon Park Harebells is endemic to Florida and known from only three sites in Polk and Highlands counties near Avon Park (58 FR 25746, NatureServe 2020). The species is found onlyon xeric white sand scrub. Avon Park Harebells are small, deciduous, perennial herbs that grow from a deep taproot, blooming from March to June. It is thought that the deep taproot, combined with being deciduous, helps the species survive the dry winter months and fires common for their habitat (NatureServe 2020).

Populations are threatened by fragmentation and habitat loss through the development of citrus groves, cattle pastures, and housing subdivisions (USFWS 1999c). A five-year review of the species indicated a need to preserve the remaining populations of Avon Park Harebells and to research the life history and propagation with and without disturbance (USFWS 1999c, NatureServe 2020).

**Okeechobee Gourd**

The Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) was listed as endangered effective August 11, 1993 (58 FR 37432), and revised on April 1, 1994 (59 FR 15345), due to a technical correction to the scientific name. Critical habitat has not been designated (USFWS 2020a).

The Okeechobee Gourd is found in swampy forests and hammocks on muck soils and are restricted to disturbed, uncultivated areas (e.g., ditch banks, wet road shoulders; NatureServe 2020). There are only two natural populations known in Florida, one on Lake Okeechobee and the other along St. Johns River (USFWS 2009g). Threats to the species include habitat destruction and modification (USFWS 2019u).

**Florida Prairie-clover**

The Florida Prairie-clover (*Dalea carthagenensis floridana*) was listed as endangered effective November 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial shrub is endemic to Florida. It grows in tropical savanna pine rockland, rockland hammock, marl prairie, and coastal berm habitats. This subspecies is likely extirpated from Everglades National Park. Only nine populations of this subspecies are currently extant. Florida Prairie-clover is threatened by habitat loss/fragmentation, fire suppression, non-native species encroachment, recreational activities, and stochastic events (82 FR 46691).

**Beautiful Pawpaw**

Beautiful Pawpaw (*Deeringothamnus pulchellus*) was listed as endangered effective September 26, 1986 (50 FR 45634). Critical habitat has not been designated (USFWS 2020a).

Half of the existing Beautiful Pawpaw shrubs are found in xeric, mesic, and hydric pine flatwoods on two preserves in western Charlotte and Lee counties (eastern Florida) (USFWS 2020a). Approximately 5,000 plants remain (FNAI 2001b). In 1996, 200 individual Beautiful Pawpaws were relocated from private agricultural land on Pine Island, where habitat destruction was anticipated, to unoccupied habitat in Lee County (USFWS 2020a).

Beautiful Pawpaw thrives alongside open slash pine (*Pinus elliotti*) or longleaf pine (*Pinus palustris*) flatwoods with evergreen blueberries (*Vaccinium myrsinites*), saw palmetto (*Serenoa repens*), wax myrtle, (*Myrica cerifera*), flag pawpaw (*Asimia reticulate*), and dwarf live oak (*Quercus minima*) in the understory. Soils in these habitats are poorly drained sandy substrates (FNAI 2001b).

Decline of the Beautiful Pawpaw is due to loss of available habitat from urbanization, degradation, and fire suppression (USFWS 1999). Fire not only creates clearings to let in sunlight, but the heat promotes germination as well. Other threats to the species include exotic invasive species such as the Brazilian pepper (*Schinus terebinthifolius*), the leafroller caterpillar (*Choristoneura parallela*), and feral pigs (FNAI 2001b).

## Rugel's Pawpaw

The Rugel's Pawpaw (*Deeringothamnus rugelii*) was listed as endangered effective October 27, 1986 (51 FR 34415). Critical habitat has not been designated (USFWS 2020a).

The Rugel's Pawpaw is a low-growing shrub (USFWS 2009h). Its range is extremely limited and it can only be found in Volusia County in the northeastern Florida peninsula (USFWS 2018i, NatureServe 2020). Its historic range included Seminole County (NatureServe 2020). The species is known from approximately 33 occurrences, mostly in the vicinity of New Smyrna Beach (USFWS 2009h, USFWS 2018i). There are two additional sites with introduced populations. It thrives in mesic and wet flatwood habitats dominated by slash pine (*Pinus elliottii* var. *densa*) or longleaf pine (*Pinus palustris*) and associated with poorly drained sandy soils. Additionally, it is sometimes found along roadsides. Rugel's Pawpaw is often associated with netted pawpaw (*Asimina reticulate*), common pawpaw (*A. triloba*), tarflower (*Bejaria racemose*), shiny liona/fetterbush (*Lyonia lucida*), dwarf live oak (*Quercus minima*), saw palmetto (*Serenoa repens*), and shiny blueberry (*Vaccinnium myrsinites*). These natural communities require regular fire intervals (USFWS 2018i). This species is threatened by habitat loss from urbanization, industrial timber, and fire suppression (NatureServe 2020).

## Garrett's Mint

Garrett's Mint (*Dicerandra christmanii*) was listed as endangered effective December 2, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

Garrett's Mint is a perennial shrub; flowering occurs from July through November. It is dependent on insects for pollination as well as on regular fire disturbance for long-term survival. Based on studies of a similar mint species, populations may decline after only five years without fire. Its range is limited to Highlands County in Florida, specifically, to a six-kilometer stretch along Lake Wales Ridge. This distribution has been fragmented by development. The species thrives in gaps within xeric oak-hickory scrub habitat. It grows exclusively on soils composed of fairly well-drained yellow sands (USFWS 2009i). The limited area where this species is found is threatened by habitat loss and degradation from urbanization (NatureServe 2020).

## Longspurred Mint

The Longspurred Mint *(Dicerandra cornutissima)* was listed as endangered, effective November 1, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

This short-lived plant has 15 known occurances in Marion and Sumter Counties, Florida (USFWS 2005b). The majority of the occurances are on the Cross Florida Greenway State Recreation and Conservation area in Maron County. Unfortunately, the Marion County sites are no longer sutabile habitat due to increasing development and

road widening projects (USFWS 2005b). Fire suppression and invasive exotic species are also a factor. (USFWS 2005b).

Strongly aromatic, this low growing shrub is found alongside sand pine scrub and turkey oak communities. It can spread on the edges of roads and vigerously along streets (USFWS 2018j). It prefers forested woodland, shrub and chaparral communities throughout the scrub and sandhill in openings (USFWS 2018j).

## Scrub Mint

Scrub Mint (*Dicerandra frutescens*) was listed as endangered effective November 1, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

Scrub Mint is an aromatic shrub that blooms from August to February (FNAI 2001b). Scrub Mint is endemic to Highlands County in central Florida (NatureServe 2020) and inhabits yellow sand soil types supporting sand pine scrub or oak-hickory scrub vegetation. These habitats are currently threatened by residential, commercial, and agricultural development and modification due to long-term fire suppression (USFWS 2009j).

## Lakela's Mint

The Lakela's Mint (*Dicerandra immaculata*) was listed as endangered effective May 15, 1985 (50 FR 20212). Critical habitat has not been designated (USFWS 2020a).

This short, hemispheric shrub species grows in the disturbed, well-drained, sterile sand of ancient inland dunes. It is endemic to coastal sand pine scrub in Indian River and St. Lucie Counties in Florida (50 FR 20212, NatureServe 2020). Its historical range was limited to an area approximately three kilometers wide by five kilometers long. In 1991 and 1992, transplants were introduced to the Hobe Sound National Wildlife Refuge in Martin County. Similar to other scrub mints, it is believed this species is adapted to patchy, infrequent fires to maintain an open canopy and facilitate new recruitment. Threats to this species include habitat loss, degradation, and fragmentation; altered fire regimes; development; feral hogs; and non-native plant species encroachment (USFWS 2008h).

## Florida Pineland Crabgrass

Florida Pineland Crabgrass (*Digitaria pauciflora*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

The species is currently known only from one site of approximately 8,000 hectares in Everglades National Park, Florida (NatureServe 2020). Florida Pineland Crabgrass commonly occurs in the ecotone between pine rockland and grassy marl prairie habitats, extending somewhat into both (Bradley and Gann 1999). Florida Pineland Crabgrass is a perennial clump-forming grass. The main threat to this species is alteration of the hydrology of the Everglades National Park. Extensive urban development, rising sea levels, invasive species, and altered fire regimes also threaten the population (USFWS 2004).

## Clam-shell Orchid

The Clam-shell Orchid (*Encyclia cochleata* var. *triandra*) was petitioned for listing on April 20, 2010 (CBD 2010a). On October 7, 2019, listing was deemed not warranted after review (84 FR 53336). The Clam- shell Orchid is considered Imperiled by NatureServe (CBD 2010a).

The Clam-shell Orchid is relatively abundant in southern Florida from Ft. Lauderdale to further south, especially in Big Cypress and near West Lake in Everglades National Park (Dade, Collier, and Monroe counties). Habitat includes forested hardwood wetlands, hammocks, and buttonwood/cypress strands. The Clam-shell Orchid grows on buttonwood and red mangroves. Although current population levels are adequate to sustain the variety, widespread collecting of the native form has significantly impacted populations. However, populations in very inaccessible portions of Big Cypress National Preserve and Everglades National Park are well-protected

(NatureServe 2020).

## Big Cypress Epidendrum Orchid

The Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Big Cypress Epidendrum Orchid is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled by NatureServe (CBD 2010a).

Big Cypress Epidendrum Orchid is widespread in tropical America including Collier County in South Florida, the West Indies, Central and South America, Mexico to Brazil, and Cuba (USFWS 2020a). It is a very small, perennial epiphytic orchid that flowers through the winter and can be found in pop ash (*Fraxinus caroliniana*) and pond apple (*Annona glabra*) swamps and sloughs (FNAI 2001b, CBD 2010a). Big Cypress Epidendrum Orchid has been severely reduced by plant poaching and wetland habitat destruction (FNAI 2001b).

## Blackbract Pipewort

Blackbract Pipewort, also known as Dark Headed Hatpins, (*Eriocaulon nigrobracteatum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Blackbract Pipewort is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled by NatureServe (CBD 2010a).

The species is endemic to the Gulf Coast lowlands of the east-central Florida Panhandle in Bay, Calhoun, and Gulf counties (FNAI 2001b). The Florida Natural Areas Inventory reports 12 occurrence records in its database as of 2014 (NatureServe 2020). The Blackbract Pipework occurs in open wet bog/fen wetland habitat at stream heads or on open, grassy seepage slopes. In addition, habitat includes deep sapric muck soils of nutrient-poor, somewhat oxygen-rich and acidic mires, with little wood or Sphagnum moss present in the muck (poor fens; FNAI 2001b). Within this habitat, the plants are locally abundant in areas saturated by groundwater seepage and in seep spring rivulets (NatureServe 2020). The Blackbract Pipewort flowers in March and goes to seed in April and May. This species is threatened by development and road and power line maintenance adversely affects the hydrology of seepage slope habitat in a number of the occurrences. Shading by shrubs is also a primary threat (the result of suppressed fire regimes) (NatureServe 2020).

## Scrub Buckwheat

Scrub Buckwheat (*Eriogonum longifolium* var. *gnaphalifolium*) was listed as threatened effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

Scrub Buckwheat is a perennial herb that blooms from May to October or after fire (FNAI 2001b). The species is endemic to central Florida and occurs in dry pinelands, sandhills, scrub, and ecotones between scrub and high pineland. The Scrub Buckwheat is threatened by habitat loss through development of citrus groves, pine plantations, and residential housing (USFWS 2018k, NatureServe 2020).

## Snakeroot

Snakeroot, also known as Wedge-leaf Eryngo, (*Eryngium cuneifolium*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This species has an extremely restricted range with approximately 20 occurrences, all occurring in Highlands County, central Florida. Most of these occurrences are located on three preserves (FNAI 2001b). It inhabits areas of open sand, including blowouts and other highly disturbed soil surfaces such as road shoulders (Christman and Judd 1990). Snakeroot is currently threatened by habitat loss from development and modification due to long-term fire suppression (USFWS 2010h).

## Telephus Spurge

The Telephus Spurge (*Euphorbia telephioides*) was listed as threatened effective May 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

The Telephus Spurge is a perennial herb (NatureServe 2020). This species is currently only known from Bay, Gulf, and Franklin counties in Florida. It inhabits longleaf pine savannas, scrubby and mesic flatwoods, and coastal scrub on low sand ridges near the Gulf of Mexico (FNAI 2001b). It can be subdioecious (having separate male and female plants) or monoecious (having both male and female flowers on the same plant). Subdioecious plants ensure genetic variation through reducing outcrossing; however, this can also reduce the effective reproductive population if the population is comprised of only one sex (USFWS 2008i). The species needs fire to maintain community structure and is threatened by habitat degradation due to forestry practices, lack of prescribed fire, and by urban development (NatureServe 2020).

## Small's Milkpea

Small's Milkpea (*Galactia smallii*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has ot been designated (USFWS 2020a).

This species is known from only 11 occurrences, all located in a small area of Dade County, South Florida (NatureServe 2020). It inhabits redland pine rocklands with South Florida slash pine (*Pinus elliottii*), saw palmetto (*Serenoa repens*), willow bustic (*Dipholis saliciolia*), and poisonwood (*Metopium toxiferum*) (FNAI 2001b). The species prefers open sun and little shade and can be threatened by shading from hardwoods (USFWS 2010i). Threats to this species include residential, commercial, and agricultural development, succession in the absence of fire, and competition from invasive species (NatureServe 2020). Ninety-eight percent of the original pine rockland habitat has disappeared, resulting in just six remaining populations on five managed areas (FNAI 2001b).

## Harper's Beauty

The Harper's Beauty (*Harperocallis flava*) was listed as endangered effective November 1, 1979 (44 FR 56862). Critical habitat has not been designated (USFWS 2020a).

This species is a perennial herb that grows in the ecotones between sunny, open wet prairies and wetter shrub/tree areas, such as cypress swamps, roadside depressions, seepage savannas between pinelands, pine flatwood bogs, and ditches in the vicinity of pine plantations near flatwood habitats. Current occurrence records are known from Liberty, Franklin, and Bay Counties in Florida (USFWS 2016c).

Genetic studies on this plant show low genetic diversity within the species and some suggestions of instability within its genetics (e.g., a threat to the species) (NatureServe 2020). Other threats to Harper's Beauty include horticultural collection, timber production processes, habitat degradation due to lack of management, road widening, development, hydrology modification, and fire suppression (USFWS 2016c).

## Aboriginal Prickly-apple

The Aboriginal Prickly-apple (*Harrisia aboriginum*) was listed as endangered effective October 24, 2013 (78 FR 63795). Critical habitat was designated on January 22, 2016. (81 FR 3865).

The Aboriginal Prickly-apple is a cylindrical-stemmed cactus measuring up to six meters in height (78 FR 63804, USFWS 2020a). It occurs on Florida's southwest coast and is often established on shell mounds or shelly substrates (NatureServe 2020, USFWS 2020a). This species occurs in coastal berms, coastal grasslands (78 FR 63805), coastal strand vegetation, and tropical coastal hammocks, with trees such as gumbo limbo (*Bursera simaruba*), wild lime (*Zanthoxylum fagara*), and/or live oak (*Quercus virginiana*). It may be found near, but never within mangrove communities (USFWS 2020a). Threats to this species include the destruction and modification of habitat, bonfires, vandalism, and competition with non-native plants such as Brazilian pepper (*Schinus

*terebinthifolius*) and leather leaf (*Chamaedaphne calyculata*) (78 FR 63806).

## Florida Hartwrightia

Florida Hartwrightia (*Hartwrightia floridana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Florida Hartwrightia is considered Imperiled in Florida and Critically Imperiled in Georgia by NatureServe (NatureServe 2020).

This perennial herb species is known to inhabit areas near the Florida-Georgia border. Occurrences have been documented in the following Florida counties: Highlands, Clay, Nassau, Polk, and Putnam. The species grows in wet, organic mats such as peat bogs/fens or forested wetlands (e.g., slash pine/longleaf pine/saw palmetto flatwoods, pineland swamps/bogs), and seepage areas that are acidic. In the last 40 years, only 50 occurrences of this species have been reported. Threats to this species include incompatible hydrological practices, habitat conversion (pine plantations or pasture), fire suppression, and canopy encroachment (NatureServe 2020).

## Henry's Spider-lily

Henry's Spider-lily (*Hymenocallis henryae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Henry's Spider-lily is considered Imperiled in Florida by NatureServe (NatureServe 2020).

This perennial, bulbous herb is known only from the south-central Florida Panhandle in Bay, Franklin, Gulf, Liberty, and Walton Counties. It grows at the edges of dome swamps, between these and flatwood or wet prairie habitats. Only 20 occurrences of this species are known. Threats to Henry's Spider-lily include horticultural collecting, development, hog damage, hydrology alteration, habitat conversion (pine plantations), fire suppression, and canopy encroachment (NatureServe 2020).

## Highlands Scrub Hypericum

Highlands Scrub Hypericum (*Hypericum cumulicola*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This perennial, tap-rooted herb/subshrub grows in the openings of dry, upland sand pine, oak scrub, and rosemary scrub communities. It is known from a limited distribution in the southern Polk and Highlands Counties of Florida along the ancient, inland dune ridge or along sandy road edges (52 FR 2227, USFWS 2008j, NatureServe 2020). Populations of this species are invigorated following fire events, though effects are temporally delayed (15 years at least, but not more than 50 years between events; USFWS 2008j).

Threats to this species include citrus farming, urban development, off-highway-vehicle/trampling damage, invasive species encroachment, fire suppression, extreme climate conditions (droughts, flooding, and frost), and stochastic events (USFWS 2008j, NatureServe 2020).

## Edison's Ascyrum St. John's Wort

Edison's Ascyrum St. John's Wort (*Hypericum edisonianum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Edison's Ascyrum St. John's Wort is considered Imperiled in Florida (CBD 2010a).

The species is endemic to central peninsular Florida and occurs in depressions in scrub, cutthroat seeps, flatwoods ponds, lake margins, and wet prairies. Although it is locally abundant due to its thicket-forming habit, it is only found at 25 sites and only in five of these sites are conservation areas (FNAI 2001b). The species has been documented in the following Florida counties: Polk, Highlands, Glades, and DeSoto.

The primary threat to the species is loss of habitat due to extreme development pressure, wetland drainage, fire

suppression, and agriculture (NatureServe 2020).

**Smooth-barked St. John's Wort**

Smooth-barked St. John's Wort (*Hypericum lissophloeus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Smooth-barked St. John's Wort is listed by several other entities, including as Endangered by the state of Florida and Imperiled by NatureServe (CBD 2010a).

Smooth-barked St. John's Wort is endemic to the karst pond area of Bay and Washington Counties in the Florida Panhandle. It occurs on the fluctuating shores and shallow water of karst sinkhole ponds and small sandhill lakes (FNAI 2001b, NatureServe 2020). Although its range is limited, it may be locally abundant, even the most abundant shrub on the shores of the ponds where it occurs. Occurrences may number in the thousands. The species is known to form a solid ring around the ponds. Smooth-barked St. John's Wort is threatened by rapid lakeshore development in the region, disturbance of upland habitats leading to increased erosion into ponds, prolonged droughts, and increased recreational use of ponds (NatureServe 2020). Future recommendations include preservation of natural lakeshore vegetation, preventing conversion of lakeshores to sandy beaches, and halting the erosion into lakes from upland developments and logging practises (FNAI 2001b).

**Yellow Anisetree**

The Yellow Anisetree, also known as Star Anise, (*Illicium parviflorum*) was petitioned for listing on September 27, 2011 (76 FR 59835). On October 7, 2019, listing was deemed not warranted based on the moderate to high resiliency of the species (84 FR 53336).

The Yellow Anisetree is widely used as an ornamental landscaping plant in southeastern US; however, it is only known from fewer than 20 native occurrences in central Florida (NatureServe 2020). The species blooms from April to June. Fruit are woody, star-shaped, and distinctive all year (FNAI 2001b). The Yellow Anisetree is restricted to habitats with continually moist soils, such as sandy loams or sandy peat mucks, on the banks of spring-run or seepage streams, hydric hammock, and bottomland forest (FNAI 2001b, NatureServe 2020). Threats to the species include logging or hydrology-altering practices in forested wetlands and collection by hobbyists (FNAI 2001b).

**Beach Jacquemontia**

Beach Jacquemontia (*Jacquemontia reclinata*) was listed as endangered effective November 24, 1993 (58 FR 14357). Critical habitat has not been designated (USFWS 2020a).

Beach Jacquemontia is a perennial vine endemic to coastal vegetated dunes, disturbed marine hammock, and woodland habitat in Palm Beach, Broward, and Dade Counties, Florida. There were 22 occurrences of the species in 2018 (USFWS 1999, FNAI 2001b, NatureServe 2020). Common vegetative associates include sea grape (*Coccoloba uvifera*), cabbage palm (*Sabal palmetto*), poisonwood (*Metopium toxiferum*), Madagascar periwinkle (*Catharanthus roseus*), croton (*Croton involucrate*), gopher apple (*Licania michauxii*), prickly pear cactus (*Opuntia* spp.), sandspurs (*Cenchrus* spp.), sea oats (*Uniola paniculata*) and other shrubs and dwarfed trees (USFWS 2020a). Beach Jacquemontia population are in decline due to loss of available habitat from urbanization, degradation, beach erosion, and invasive species (NatureServe 2019).

**Cooley's Water-willow**

Cooley's Water-willow (*Justicia cooleyi*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

This species occurs within an extremely limited range in central Florida flatwoods. The Cooley's Water- willow only occurs on Brooksville Ridge in Hernando County, Florida and at one location in Sumter County. (USFWS 2019v,

NatureServe 2020). The Cooley's Water-willow is a rhizomatous, perennial herb found in mesic hardwood hammocks and pine forests underlain by limestone (FNAI 2001b). Soil composition includes sandy loams or silty clay loams (FNAI 2001b, NatureServe 2020). The species has declined as a result of habitat loss via lime and phosphate mining, timber harvesting, and agricultural and urban development. Current threats to the species include habitat loss and encroachment of invasive species in Cooley's Water-willow habitat (USFWS 2019v).

## Scrub Blazingstar

Scrub Blazingstar (*Liatris ohlingerae*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

Scrub Blazingstar is characterized as an erect, perennial herb (NatureServe 2020). This species is endemic to Florida and has a limited range, occurring along the Lake Wales Ridge in Polk and Highlands counties (FNAI 2001b). It is restricted to sand pine and open oak-rosemary scrub habitats, often along the ecotone between rosemary balds and surrounding scrub habitats (USFWS 1999, NatureServe 2020). This habitat is often a dynamic vegetative complex dependent on the frequency and intensity of fires, which maintain ideal growing conditions for this species. The species is threatened by habitat loss due to agriculture, commercial, residential, and recreational purposes. Fire suppression is another factor that has caused habitat degradation as areas that were once used by this species are continually becoming overgrown (USFWS 1999).

## Panhandle Lily

Panhandle Lily (*Lilium iridollae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Panhandle Lily is considered Imperiled in Florida by NaturServe (CBD 2010a).

The range of the Panhandle Lily is contested due to taxonomic uncertainty regarding plants of the Carolinas and Virginia, which are treated by many as a distinct species (Sandhill Lily, *Lilium pyrophilum*) (Skinner and Sorrie 2002; Nature Serve 2020). Taking the broader view of the range, including plants that many consider to be the Sandhill Lily, the range for Panhandle Lily is discontinuous from southern Alabama and northwest Florida north to Virginia. If the Sandhill Lily is accepted as a distinct species, then the range of Panhandle Lily includes only four counties in the western Florida panhandle and three counties in adjacent southern Alabama. General habitats for Panhandle Lily include bogs and fens, herbaceous wetlands, and scrub-shrub wetlands. It inhabits baygalls, wet flatwoods, seepage slopes, and the edges of bottomland forests typically in sandy peat or loamy soils (Nature Serve 2020).

The quality and extent of potential habitat for Panhandle Lily has declined due to fire suppression and drainage for conversion to silviculture and agriculture (Nature Serve 2020). Habitat conversion has resulted in considerable permanent impacts to the species. Panhandle Lily has showy flowers that are attractive to collectors and an entire population was removed from the Conecuh National Forest by collectors. Additional threats include cattle grazing and potentially insect herbivory (CBD 2010a, Nature Serve 2020).

## Bog Spicebush

Bog Spicebush (*Lindera subcoriacea*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Bog Spicebush is considered Vulnerable by NatureServe (NatureServe 2020).

The Bog Spicebush occurs on the Atlantic and Gulf Coast plains from southern Virginia south to Florida and west to Louisiana. There are currently over 100 occurrences; most of them consist of very small populations located on sites that will require active management for the plants to persist. The plants occupy a relatively narrow ecological niche and have a correspondingly spotty distribution within the range. In the deep south, Bog Spicebush is not found outside the wettest portions of rare, sphagnum bog habitats. This species is found streamside and in

seepage bogs, with sphagnum moss, titi, and other evergreen shrubs. The species is clonal, and most sites have only one to five genetic individuals (FNAI 2001b).

The general lack of fire in these habitats during the last 50 or more years has placed the plants under increased stress from competing shrubs and trees. Restoring fire to the landscapes via controlled burns would reverse this trend. This is becoming increasingly difficult with continued development of surrounding longleaf pine/wiregrass uplands for housing, agriculture, timber management, and pinestraw raking. Other known or perceived threats to the species include siltation of streamheads, logging, road building, draining and of bogs and wetlands (NatureServe 2020).

## Sand Flax

Sand flax *(Linum arenicola,* formerly *Cathartolinum arenicola)* was listed as endangered, effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

Sand flax is a perennial herb that flowers from February to September. Its historical range encompasses Miami-Dade County and many islands in the Florida Keys. As of 2016, there were eight extant populations known from Miami-Dade County and four from the Florida Keys (80 FR 58535). Sand flax thrives in pine rockland and flatwoods, dry marl prairie, as well as in disturbed areas (e.g. roadsides) (80 FR 58535, FNAI 2001b, NatureServe 2020). It grows in rocky soils, often near exposed limestone. It has been described as occurring in solution pits and shallow soil of ephemeral pools on limerock in open pinelands, pineland clearings and adjacent roadsides (NatureServe 2020). These natural communities require regular fire intervals. Currently, it is more commonly found in disturbed areas than within intact pine rocklands (80 FR 58535). This species is threatened by habitat loss from urbanization, agriculture, and fire suppression (NatureServe 2020).

## Carter's Small Flowered Flax

Carter's Small Flowered Flax (*Linum carteri carteri*) was listed as endangered effective October 6, 2014 (79 FR 52567). Critical habitat was designated on August 17, 2015 (80 FR 49845).

The subspecies is restricted to eastern Miami-Dade County, Florida, in the vicinity of the Miami metropolitan area on conservation lands. Plants occur in highly disturbed margins of Miami Rockridge Pine Rocklands and in mowed open areas. Carter's Small Flowered Flax has declined as a result of habitat loss to residential and commercial development and agricultural conversion throughout South Florida pine rocklands. Pine rockland habitat in Miami-Dade County has been reduced to roughly 11 percent of its historical extent and, outside of Everglades National Park, only about one percent of these pinelands remain (as fragmented patches).The small number of populations and scarcity of individuals makes this species vulnerable to effects of stochastic processes and catastrophic phenomena. In addition, extant plants appear to exhibit somewhat weak reproduction: plants collected in August, at the end of the fruiting season, had few seeds (NatureServe 2020). Current threats to Carter's Small Flowered Flax include fire suppression and invasive species (FNAI 2000).

## West's Flax

The West's Flax (*Linum westii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). NatureServe ranks this species as Critically Imperiled (NatureServe 2020).

This perennial herb grows in full sun, sandy, meagerly vegetated edges of wetlands such as bogs, marshes, shallow ponds, slash pine-saw palmetto flatwoods, cypress ponds, ditches, and soggy prairies. There are 20 known extant populations scattered across northeast Florida in Liberty, Franklin, Gulf, Okaloosa, and Clay Counties. It is possibly under-reported because it only blooms at dusk and is not easily distinguished from similar species. Surveys in 2013 were not able to find plants at many of the historic locations. The species responds well to controlled burning every two to three years. Threats to West's Flax include fire suppression, changes in

hydrology, and commercial logging operations (NatureServe 2020).

## Boykin's Lobelia

Boykin's Lobelia (*Lobelia boykinii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Boykin's Lobelia is considered Imperiled by NatureServe (NatureServe 2020).

Boykin's Lobelia is a perennial herb, growing 40 to 80 centimeters tall. The species has blue flowers with a white eye at the throat. Blooming occurs from May through August; flowering is dependent on fluctuating water levels (NatureServe 2020). Boykin's Lobelia inhabits forested, herbaceous, or scrub-shrub wetlands and occurs throughout much of the Coastal Plain, from North Carolina south to Florida, and west to Mississippi (Weakley 2012). They are obligate outcrossers, meaning they may limit seed production in small populations to reduce inbreeding depression. As Boykin's Lobelia is a self-incompatible species, this can have drastic effects on population size and density across years (Bates 1996, Moreno 2003, Royo et al. 2008). The Boykin's Lobelia's wetland habitats are threatened with drainage and conversion to tree farms or agriculture; this has led to a decline in the species' populations (NatureServe 2020).

## Raven's Seedbox

Raven's Seedbox (*Ludwigia ravenii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Raven's Seedbox is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

Raven's Seedbox is a perennial herb in the evening primrose family (*Primulaceae*) (Nature Serve 2020). Occurrences are known from the Coastal Plain of southeastern Virginia, eastern North Carolina, southeastern South Carolina, and northeastern Florida. At least 17 of the nearly 30 occurrences of this species are known to be historic and, at present, only five to six occurrences are known to be extant.

Extant occurrences are known from North Carolina and Virginia. Raven's Seedbox may be extirpated from Florida, where it has not been observed since 1982. The only record of Raven's Seedbox in Florida is from Clay County in the northeastern part of the state. Raven's Seedbox is a wetland obligate, and general habitat for this species include bogs, fens and forested wetlands. Specific habitat includes open, wet, peaty places such as ditches and the margins of swamps, ponds, or bogs. In Virginia, all extant populations are in ditches and power line right-of-ways (Nature Serve 2020).

Populations of Raven's Seedbox are composed of scattered individuals (Nature Serve 2020). The species is self-compatible, a trait that could result in low genetic diversity of the species and potentially influence its long-term survival. The ditches and power lines occupied by this species are threatened by herbicide use, excavation and deepening of ditches, and road widening and paving (Nature Serve 2020).

## Scrub Lupine

The Scrub Lupine (*Lupinus aridorum* = *Lupinus westianus* var. *aridorum*) was listed as endangered effective April 7 1987 (52 FR 11172). Critical habitat has not been designated (USFWS 2020a).

This short-lived perennial subshrub is currently known only from 12 extant populations in Orange and Polk Counties in Florida (USFWS 2016d). The Scrub Lupine grows on fine, well-drained, sandy soils in openings of sand pine scrub, oak scrub, and rosemary scrub, usually where there has been disturbance (USFWS 2016d, NatureServe 2020). Three natural populations and three introduced populations occur on protected lands, while the remaining populations exist on private land that is vulnerable to development (USFWS 2016d). Due to its short life cycle of four to six years, populations can fluctuate significantly from year to year, with some populations decreasing and increasing by hundreds from one year to the next (USFWS 2016d, NatureServe 2020). Excluding the three managed populations on protected sites, the species is declining (USFWS 2016d). Threats to this

species include urban development, recreational damage, disease, insect herbivory, fire suppression, and stochastic events (USFWS 2016d, NatureServe 2020).

## Curtis' Loosestrife

Curtis' Loosestrife (*Lythrum curtissii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Curtis' Loosestrife is considered Critically Imperiled by NatureServe (NatureServe 2020).

This perennial herb species grows in wet areas, such as bogs, seeps, acid or calcareous swamps, karst ponds, creek swamps, floodplains, tidal flats, streambanks, and tidal river mouths of Florida and Georgia. In Florida, occurrences of this species are known from Liberty, Franklin, Gadsden, Putnam, and St. Johns counties, Florida. There are also vague, non-specific location reports from Bay, Calhoun, and Levy counties in Florida. Threats to this species are known to be soil disturbance (tilling, grading, etc.), herbicide application on roadsides, fire suppression, and hydrology alteration (NatureServe 2020).

## Lowland Loosestrife

Lowland Loosestrife (*Lythrum flagellare*) was petitioned for listing in April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under at this time (USFWS 2020a). Lowland Loosestrife is listed by several other entities, including as Endangered by the state of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

This species is characterized as a sprawling perennial herb with a creeping rhizome (NatureServe 2020). It lives in herbaceous wetlands and is often observed growing in mucky or sandy-peat muck soils on the peripheries of ponds, ditch banks, and edges of cypress depressions (NatureServe 2020). This plant has a small range in the west central portion of the Florida peninsula, with individuals found in Charlotte, Collier, Dade, Desoto, Glades, Henry, Lee, Manatee, Okeechobee, and Sarasota Counties. The primary threat to Lowland Loosestrife is habitat loss through drainage, canopy closure, fire suppression, and logging (CBD 2010a).

## White Birds-in-a-nest

The White Birds-in-a-nest (*Macbridea alba*) was listed as threatened effective June 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

The White Birds-in-a-nest is a perennial herb that blooms from May to mid-July. It is endemic to the Florida Panhandle, occurring in Bay, Gulf, Franklin, and Liberty counties (USFWS 2009k), and isthreatened by habitat degradation due to intensive forestry practices and lack of prescribed fire (NatureServe 2020). This species inhabits wet to mesic pine flatwoods, seepage bogs, savannas, and occasionally drier sites with longleaf pine (*Pinus palustris*) and runner oaks (*Quercus pumila*) (FNAI 2001b, NatureServe 2020). It is capable of both sexual and vegetative (via rhizomes) reproduction; however, self-fertilized seeds have been observed to exhibit inbreeding depression (USFWS 2009k).

## Godfry's Stitchwort

Godfry's Stitchwort (*Minuartia godfreyi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Godfry's Stitchwort is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This perennial herb grows in herbaceous wetlands such as creek banks, roadside ditches, tidal freshwater marshes, delta post oak flatwoods, saline wet prairies, and wet meadows. As of 2011, NatureServe reported between six and 20 known occurrences of this species ranging from central Tennessee to coastal North Carolina south to Florida, with only three populations believed to be of good viability/integrity. In Florida, the species is

restricted to Taylor County. Threats to this species include habitat destruction/conversion from roadside construction or commercial logging operations (NatureServe 2020).

## Needleleaf Waternymph

Needleleaf Waternymph, also known as Narrowleaf Naiad, (*Najas filifolia*) was petitioned for listing in April 20, 2010 (CBD 2010a) and the 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Needleleaf Waternymph is listed by several other entities, including as Threatened by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This species is characterized as a floating annual plant, which typically inhabits shallow, dark (tannic-acid tinted) water of ponds and lakes (FNAI 2001b). The range of the Needleleaf Waternymph extends from the Florida Panhandle down through the Florida peninsula and parts of southwestern Georgia (NatureServe 2020). As of 2000, this species was only reported in Santa Rosa and Leon Counties, Florida, and in Decatur County, Georgia (CBD 2010a). Occurrences have also been recorded in the Blackwater River (FNAI 2001b). This species is at risk due to habitat destruction caused by damming and other practices that alter hydrological regimes (NatureServe 2020). As an aquatic species, the Needleleaf Waternymph also faces risk of predation by grass carp (*Ctenopharyngodon idella*), an introduced/invasive herbivorous fish (CBD 2010a).

## Britton's Beargrass

Britton's Beargrass (*Nolina brittoniana*) was listed as endangered on April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The species is found in the following Florida counties: Hardee, Hernando, Highlands, Lake, Orange, Osceola, Polk, and Marion counties of Florida. Britton's Beargrass habitat includes forest/woodland, sand/dune, and shrubland/chaparral habitat with fine-textured, well-drained sands. Associated plant species include saw palmetoo (*Serenoa repens*), scrub palmetto (*Sabal etonia*), crooked-wood (*Lyonia ferruginea*), sand heath (*Ceratiola ericoides*), Feay's palafox (*Palafoxia feayi*), and pineland threeawn (*Aristida stricta*) (NatureServe 2020). The species flowers from March through May (USFWS 2020a).

More than 90 percent of Britton's Beargrass habitat has been lost to citrus agriculture and rapid urbanization. It is also declining due to fire suppression, which results in a dense canopy cover. About 100 populations remain, with half of these occurring on 10 conservation areas. The species has also been impacted by off-road vehicles in some locations (FNAI 2001b).

## Cape Sable Orchid

The Cape Sable Orchid (*Oncidium undulatum = Trichocentrum undulatum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Cape Sable Orchid is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

The Cape Sable Orchid is an epiphytic orchid that produces a large, showy, many-flowered inflorescence. From April to September, they produce many glossy brown to yellow-green flowers that are marked with brown (NAOCC 2019). It is known to inhabit buttonwood stands in southern Florida and is infrequently found in remote cypress sloughs in Big Cypress National Preserve (NatureServe 2020). The Cape Sable Orchid consists of a shoot with one tough leathery leaf; they grow on the trunks and branches of trees and can reach one to five meters in height. Although it is widely distributed in the West Indies, Mexico, Central America, and northern South America, it was been petitioned for federal listing based on its overutilization for commercial purposes and the inadequacy of existing regulatory mechanisms (76 FR 59835).

## Papery Whitlow-wort

The species *Paronychia chartacea* was listed as threatened effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

The species *Paronychia chartacea* is a small, herbaceous member of the pink family (Caryophyllaceae) that forms low mats. Papery Whitlow-wort (*Paronychia chartacea* ssp. *chartacea*), is a short-lived perennial subspecies which occurs in scrub habitats on the Lake Wales Ridge and adjacent uplands in central Florida. It occurs in Lake, Polk, Highland, Orange and Glade counties (USFWS 2008k). The natural habitat for Papery Whitlow-wort is rosemary scrub, which is also known as the rosemary phase of sand pine (*Pinus clausca*) scrub (USFWS 1999). Papery Whitlow-wort also occurs in scrubby flatwoods or adjacent firelines and sandy roads (USFWS 2008k). The subspecies depends on occasional fires, or equivalent mechanical land disturbance to maintain bare sand habitats. It is vulnerable to destruction by off-road vehicles that drive through openings between shrubs, and it is threatened by lack of fire or other disturbance (USFWS 1999). Crystal Lake Nailwort, (*P. c. minima*) was first recognized as a separate subspecies in 1991 and its prior range is unknown. The Crystal Lake Nailwort is an annual occurring almost exclusively on the sandy margins of karst ponds in the Florida Panhandle. It is currently known from only Washington and Bay Counties (USFWS 2008k). At the time of listing, the two distinct subspecies of *Paronychia chartacea* were not recognized. Both subspecies are endemic to Florida, and geographically isolated (USFWS 2008k). *Paronychia chartacea* is primarily threatened by habitat loss (USFWS 1999).

### Key Tree Cactus

The Key Tree Cactus (*Pilosocereus robinii* = *Cereus robinii*,) was listed as endangered effective July 19, 1984 (49 FR 29237). Critical habitat has not been designated (USFWS 2020a).

This tree-cactus is found only on the Keys of Monroe County, Florida and in Cuba; only seven populations are extant. It grows on sandy soils with limestone geology in hardwood hammocks and thorn scrub communities just above high tide levels. Threats to this species include illegal horticultural collection, development/habitat conversion, population fragmentation, sea level rise/increased soil salinity, deer herbivory, and stochastic events (USFWS 2010j, NatureServe 2020).

### Godfrey's Butterwort

Godfrey's Butterwort (*Pinguicula ionantha*) was listed as threatened effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

Godfrey's Butterwort is a perennial herb. Flowering occurs February to April (FNAI 2001b). This carnivorous plant thrives in bog habitats within longleaf pine savannas including bogs, seeps, wet pine flatwoods, wet prairies, and ditches; it is frequently seen growing directly in the water (FNAI 2001b, USFWS 2018l, NatureServe 2020). Godfrey's Butterwort may also occur in open peat or sandy peat soils (USFWS 2018l). It is highly dependent upon regular fire regimes for population growth (NatureServe 2020). Its range includes in Bay, Calhoun, Franklin, Gulf, Liberty, and Wakulla counties in Florida (USFWS 2018l). The main threats facing this species are habitat conversion and degradation associated with fire suppression and silviculture practices (NatureServe 2020). It has already been extirpated from several sites as a result of these threats. Recent survey efforts have documented 24 remaining populations out of 83 known historical occurrence sites (USFWS 2018l).

### Lewton's Polygala

The Lewton's Polygala, as known as Lewton's polygala milkwort, (*Polygala lewtonii*) was listed as endangered effective May 7, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial, tap-rooted herb grows exclusively on dry, well-drained, yellow sand areas of sandhill and oak-hickory scrub communities. In Florida, the species occurs in the following counties: Marion, Lake, Osceola, Orange, Polk, and Highlands. Its range includes the Lake Wales Ridge and Mount Dora Ridge. This species is adapted to patchy, infrequent fires to maintain an open canopy and facilitate new recruitment. While

mature plants rarely survive fires, seedlings sprout readily. Threats to this species include habitat loss, degradation, and fragmentation; altered fire regimes; urbanization; off-highway- vehicle/trampling damage; and non-native plant species encroachment (USFWS 2010k).

### Tiny Polygala Milkwort

The Tiny Polygala Milkwort (*Polygala smallii*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

The species is endemic to the southern portion of Florida's Atlantic Coastal Ridge, an area that is rapidly being converted into commercial and residential developments (NatureServe 2020). The Tiny Polygala Milkwort is a small perennial herb that grows up to 10 centimeters high and blooms year-round (FNAI 2001b). The species inhabits areas of open grassy pineland, sandy pine rockland, scrubby flatwoods, and sandhill. It is often found in disturbed areas and relies on fire or other means of suppressing competition from other plants (NatureServe 2020). Its distribution is fragmented and clusters of sites are separated by an average of 61 kilometers (USFWS 2010l). Threats to the species include urban development, invasive species, and fire suppression (FNAI 2001b).

### Horton Wireweed

Horton Wireweed (*Polygonella basiramia*) was listed as endangered effective Febuary 20, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This species is a short-lived, tap-rooted herb that is endemic to central Florida's Polk and Highlands counties along the Winter Haven, Bombing Range, and Lake Wales Ridges. It grows only on moderately drained, white sand gaps, typically in rosemary scrub or oak scrub communities. It is semi-dependent on patchy, infrequent fire to maintain the open scrub canopy and the bare sand microhabitat it requires. Fire kills mature plants, and the species does not have a persistent soil seed bank. Reestablishment is reliant on neighboring, unburned plants for reseeding (USFWS 2010m). Threats to this species include off-road vehicle damage, habitat degradation due to lack of management/altered fire regimes, development, citrus grove conversion, pedestrian trampling, and non-native plant species encroachment (USFWS 2010m, NatureServe 2020).

### Sandlace

Sandlace, also known as Woody Wireweed or Small's Jointweed, (*Polygonella myriophylla*) was listed as endangered effective May 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

Sandlace is a sprawling perennial subshrub, which forms large mats along the ground through clonal growth (58 FR 25746, USFWS 2010n). It is a slow-growing and long-lived species. Flowering occurs throughout much of the year, except January and February (USFWS 2010n). Its range includes Orange, Osceola (just one location), and Polk counties in Florida (58 FR 25746). The species has been documented recently at 113 occurrences of 140 known historic occurrences. Sandlace inhabits sandy gaps in Florida scrublands (USFWS 2010n), as well as disturbed areas. The species prefers to grow in areas with xeric, white sandy soils. It is adapted to long intervals of eight to 30 years between fire disturbances (USFWS 2010n). This species is threatened by habitat loss from urbanization and agriculture (NatureServe 2020).

### Florida Pondweed

The Florida Pondweed (*Potamogeton floridanus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

This species is known from only four recorded occurrences within a single drainage (the Blackwater River and its tributaries) in Santa Rosa County, Florida (NatureServe 2020). It is a submerged aquatic herb that inhabits slow-moving blackwater streams and rivers (FNAI 2001b). The species is at risk of destruction, modification, or

curtailment of its habitat or range, and from inadequate protection under existing regulatory mechanisms (76 FR 59835).

## Scrub Plum

The Scrub Plum (*Prunus geniculata*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

The Scrub Plum is a deciduous shrub that blooms from January to February (FNAI 2001b). It is endemic to central Florida and inhabits fairly open areas of sandhill and oak scrub, responds vigorously to fire disturbance, and cannot withstand soil disturbance or shade (NatureServe 2020). The species is declining due to rapid loss of habitat from conversion to citrus groves and residential housing and fire suppression (NatureServe 2020). The Scrub Plum has extremely low recruitment, which impedes population growth (USFWS 2017d).

## White Meadowbeauty

White Meadowbeauty, also known as the Small-flowered Meadowbeauty, (*Rhexia parviflora*)) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). White Meadowbeauty is listed by several other entities, including as Endangered by the state of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

It is a perennial herb that blooms from June to August (FNAI 2001b). The species occurs mainly in the Florida Panhandle, southeast Alabama, and Georgia. It is uncommon within its known range and only a few individuals exist per population. The White Meadowbeauty inhabits seepage slopes, margins of ponds, and shallow depressions associated with pine-palmetto flatwoods and savannas of the Gulf Coastal Plain (NatureServe 2020). The species is sensitive to changes in ground and surface hydrology and has been nearly eliminated from private lands due to logging and wetland drainage (FNAI 2001b).

## Panhandle Meadowbeauty

Panhandle Meadowbeauty (*Rhexia salicifolia*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Panhandle Meadowbeauty is listed by several other entities, including as Threatened by the state of Florida, Imperiled in Florida by NatureServe, and a Species of Concern by the USFWS (CBD 2010a).

Panhandle Meadowbeauty is a tall, perennial, herbaceous species in the Melastomataceae (meadow beauty) family. It is known from approximately 50 to 80 occurrences scattered through the western and central Florida Panhandle and adjacent to Alabama, and from one location in Georgia (Nature Serve 2020). Panhandle Meadowbeauty is an obligate wetland species and grows in full sun in wet sandy or sandy-peaty areas of sinkhole pond shores, interdunal swales, margins of depression marshes, flatwood ponds, and sandhill upland lakes. Approximately half of the known occurrences of Panhandle Meadowbeauty are from the shores of private karst ponds that are often scraped to create "beaches" (FNAI 2001b). Panhandle Meadowbeauty is highly threatened by land use conversion, habitat fragmentation, and human disturbance (off-road vehicle use and mowing of pond margins), and threatened to a lesser extent by forest management practices. Additional threats include erosion and run- off from pine plantations and lakeside developments, which cause damage to shorelines and alter the hydrology of karst ponds (Nature Serve 2020).

## Chapman Rhododendron

Chapman Rhododendron (*Rhododendron chapmanii = R. minus* var. *chapmanii*) was listed as endangered effective May 23, 1979 (44 FR 24248). Critical habitat has not been designated (USFWS 2020a).

The Chapman Rhododendron is a perennial, evergreen shrub with egg-shaped or elliptic leaves alternately arranged on the stem; the plant can reach heights of three meters. It has a fairly narrow flowering period of two to three weeks beginning in mid-March or early-April (NatureServe 2020). The Chapman Rhododendron inhabits the transitional area between upland mesic or scrubby flatwoods and floodplain swamps or baygalls. The species is occasionally found within mesic pine flatwoods or on sandhills at low elevations. These habitats are fire-dependent and the species prolifically resprouts and flowers following fire (USFWS 2019w). Threats to the species include development, timber harvesting, agriculture, inadequate fire management, and invasive species (USFWS 2019w).

## Hairy-peduncled Beaked-rush

Hairy-peduncled Beaked-rush (*Rhynchospora crinipes*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Hairy-peduncled Beaked-rush is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This perennial sedge was first collected and described in the 1800s. Over 100 years passed before additional sightings were reported. Since then, 18 occurrences were discovered in Florida, 11 in Alabama, four in North Carolina, one in Mississippi, and eight in Georgia. The Hairy-peduncled Beaked rush is known to occur in Gulf, Liberty, Okaloosa, and Santa Rosa Counties in Florida. It grows in riparian habitats, along the stream channels and terraces, or sand-clay bars. Threats to the species include hydrology alteration (river damming and flow alteration), sand and gravel extraction, urbanization, military training activities, siltation from logging, and water quality degradation (NatureServe 2020).

## Miccosukee Gooseberry

Miccosukee Gooseberry (*Ribes echinellum*) was listed as threatened effective August 19, 1985 (50 FR 29338). Critical habitat has not been designated (USFWS 2020a).

This shrub was first discovered on the shores of Lake Miccosukee in Jefferson County, Florida. It has since been found at two more locations around the lake, and two locations 322 kilometers to the northeast in McCormick and Edgefield Counties, South Carolina. The Miccosukee Gooseberry grows in mesic forest communities, such as oak-hickory. Threats to this species include development, invasive species encroachment, and logging activity (NatureServe 2020, USFWS 2015g).

## Eared Coneflower

Eared Coneflower (*Rudbeckia auriculata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Eared Coneflower is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

The species is almost completely restricted to the Coastal Plain and has been reported in Alabama, Georgia, and Florida. In Florida, the species occurs in Walton County (Panhandle) (Wunderlin et al. 2020). It occurs in full sun in open bogs, seeps, swamps, ditches, swales, wet openings in woodlands, and occasionally in the partial shade at the edges of hardwood swamps. Only a few number of occurrences inhabit healthy native habitat, with the majority inhabiting highly modified habitat conditions such as utility corridors, roadsides, and pastures. Threats to this species include herbicide application, grazing, silviculture practices impacting soil hydrology, and encroachment of woody species into the open habitat (NatureServe 2020).

## Florida Willow

Florida Willow (*Salix floridana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90- day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Florida Willow is listed by several other entities, including as Imperiled in Florida by NatureServe

and Vulnerable by IUCN (CBD 2010a).

According to NatureServe, there are only 22 known occurrences of this species, with less than 500 individuals left. There are 18 extant populations in Florida, two in Alabama, and two in Georgia. Many of these populations are on protected lands. This small tree/shrub grows in saturated, calcareous soils. It is found growing in roadside ditches, near springs, hydric hammocks, and densely wooded floodplains.

Threats to this species include hydrology changes, ditch clearing, water quality degradation, invasive species encroachment, and pine plantation conversion (NatureServe 2020).

### Gulf Sweet Pitcherplant

Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Gulf Sweet Pitcherplant is listed by several other entities, including as Imperiled in Florida by NatureServe and Endangered by the IUCN (CBD 2010a).

This perennial, carnivorous herb grows in saturated sandy-muck conditions. It thrives in full sunlight or partial shade; the subspecies is not drought tolerant. Habitat includes springhead bogs, the heads of small streams, shallow pond borders, or meandering watercourses. The subspecies occurs in Florida's western Panhandle from Holmes County to Santa Rosa County. There is little information on population size for this subspecies. Threats to Gulf Sweet Pitcherplant include urbanization, habitat destruction/conversion, and altered hydrological conditions (NatureServe 2020).

### American Chaffseed

American Chaffseed (*Schwalbea americana*) was listed as endangered effective September 29, 1992 (57 FR 44703). Critical habitat has not been designated (USFWS 2020a).

American Chaffseed is a perennial herb that blooms from April to June/July along the eastern seaboard and Gulf Coast (USFWS 2019x). In Florida, the species is known from the following counties: Gadsden, Leon, Okaloosa, and Putnam in populations throughout the Southeastern US (NatureServe 2020). Recent surveys have documented only three extant populations in the state (all of which are protected, on Blackwater River State Forest and Horseshoe Plantation) (USFWS 2019y). Habitat consists of open landscapes dominated by frequent fire: pine flatwoods, savannas, and peaty wetlands (USFWS 1995). In terms of microhabitat, the species occurs in areas of disturbance (e.g., roadside ditches, canal banks, and railroad crossings) (USFWS 2019y). Soils are acidic and moist to dry and sandy, sandy/peat, or sandy loam (USFWS 1995). American Chaffseed is dependent on frequent fires to thrive (USFWS 2019y).

Historically, the species occurred along coastal plains from New England to Florida and along the Gulf to the west. Most populations were extirpated as a result of habitat loss from urban and agricultural development. Current threats to the species include habitat loss, collection by hobbyists, and fire suppression (NatureServe 2020). The species is currently in decline (USFWS 2019x).

### Florida Skullcap

The Florida Skullcap (*Scutellaria floridana*) was listed as threatened effective May 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

This species is a Florida endemic that grows in only four counties of the Panhandle region: Bay, Gulf, Franklin, and Liberty. Since the 1980s, there has been a 30 percent decline in the species population size; many of the losses are due to development and timber harvest. This species grows in wet areas in longleaf pine flatwoods, prairies, and grassy bog communities near forests and shrub wetlands that are fire-dependent. It grows in sandy, acidic, low nutrient soils in the ecotones between wetlands and mesic areas. Florida Skullcap grows in full sun or light

shade and flowers vigorously after fire. The species is under threat from timber industry practices, habitat modification/destruction, and fire suppression (USFWS 2019z).

**Everglades Bully**

The Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

There is some debate about the taxonomic distinction of this subspecies of the Everglades Bully (*S. reclinatum* ssp. *reclinatum*). The Everglades Bully is a Florida endemic shrub that grows only in tropical savanna pine rockland and marl prairie habitats of the southeastern peninsular Florida. The Everglades Bully is adapted to natural fire regimes, as well as the seasonal, months-long flooding of marl prairie communities. Its current range includes only Big Cypress National Park and Long Pine Key. This subspecies is threatened by habitat loss/fragmentation, fire suppression, non-native species encroachment, recreation activities, and stochastic events (82 FR 46691).

**Georgia Bully**

Georgia Bully, also known as Swamp Buckthorn, (*Sideroxylon thornei*) has been under review for listing many times since 1975 (USFWS 2020a). It was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Georgia Bully is listed by several other entities including as Critically Imperiled in Florida by NatureServe, and as Endangered by the State of Georgia (CBD 2010a).

Georgia Bully is a thorny shrub (NatureServe 2020). Flowering occurs in May and June (CBD 2010a). It thrives in low-lying oak flatwoods. Soils in these habitats include wetlands atop limestone and areas of high moisture saturation. Its range covers southern Georgia and scattered locations in Alabama and Florida. In Florida, it is known from Franklin, Escambia, and Jackson Counties. The primary threat to this species is habitat degradation, particularly associated with hydrological shifts (e.g., conversion of wetlands for agricultural or silviculture uses) (CBD 2010a).

**Fringed Campion**

The Fringed Campion (*Silene polypetala* = *Silene catesbaei*) was listed as endangered effective February 19, 1991 (56 FR 1932). Critical habitat has not been designated (USFWS 2020a).

This perennial herb grows in two disjunct areas, one in central Georgia and the other on the Georgia- Florida border near the Flint and Apalachicola Rivers (56 FR 1932). It grows on well-drained, sandy-loam soils in mesic hardwood forests, typically on north-facing slopes or in ravines (56 FR 1932, USFWS 2015h). Threats to this species include habitat loss/degradation, logging management practices, and invasive species, as well as population fragmentation/low genetic diversity, and deer herbivory (USFWS 2015h, NatureServe 2020).

**Gentian Pinkroot**

Gentian Pinkroot (*Spigelia gentianoides*) was listed as endangered effective December 26, 1990 (55 FR 49046). Critical habitat has not been designated (USFWS 2020a).

Gentian Pinkroot is a perennial herb (FNAI 2001b). Flowering typically occurs in May and June, but may be observed earlier or later in the year. The species thrives in upland mixed oak-pine forests (FNAI 2001b, USFWS 2018m). Preferred soils are well-drained and commonly include exposed limestone and calcareous soil types, as well rich in humus (USFWS 2018m). This species is currently limited to Jackson and Calhoun counties, Florida. Its historic range encompasses several adjacent counties (55 FR 9472), including Washington, Calhoun, Jackson, Gadsden, and Liberty counties in Florida and Geneva County in southern Alabama (FNAI 2001b, USFWS 2018m,

NatureServe 2020). There were only three populations at the time of listing (55 FR 9472). Since that time, five new populations were discovered; however, two of them have been extirpated and currently only two remain (FNAI 2001b, NatureServe 2020). The main threat to these remaining populations is silviculture practices (NatureServe 2020).

A new variety of Gentian Pinkroot was described in 1996: *Spigelia gentianoides* var. *alabamensis* (USFWS 2018). This was included in recovery plan analyses. Based on recent genetic research, Spigelia gentianoides var. alabamensis is now considered a distinct species, pinkroot (*Spigelia alabamensis*). This species inhabits nearly treeless glades associated with Ketona Dolomite (USFWS 2018m).

## Cooley's Meadowrue

Cooley's Meadowrue (*Thalictrum cooleyi*) was listed as endangered effective February 7, 1989 (54 FR 5935). Critical habitat has not been designated (USFWS 2020a).

Cooley's Meadowrue is a perennial herb that occurs in grass-sedge bogs and wet pine savannahs, flatwoods, and seepage slopes in North Carolina, Florida, and Georgia. The species needs some type of disturbance such as fire or mowing to maintain its open habitat (FNAI 2001b, USFWS 2017e). In Florida, the species is restricted to one occurrence in Walton County on a timber company land utility right-of-way through former flatwoods. However, this occurrence may be extirpated (FNAI 2001, USFWS 2009l, NatureServe 2020). Plants often found in association with Cooley's Meadowrue include tulip poplar (*Liriodendron tulipifera*), bald cypress (*Taxodium distichum*), and/or Atlantic white cedar (*Chamaecyparis thyoides*) (USFWS 2017e). The species is threatened by fire suppression, herbicides, urbanization, timber harvest, and utility maintenance in habitat areas (USFWS 2017e).

## Florida Torreya

The Florida Torreya (*Torreya taxifolia*) was listed as endangered effective January 23, 1984 (49 FR 2783). Critical habitat has not been designated (USFWS 2020a).

This conifer tree species is found only along ravine slopes on the eastern bank of the Apalachicola River in Florida and Georgia. In Florida, the species occurs in the Panhandle in Liberty and Gadsten counties. Before the 1950s, the Florida Torreya used to be one of the most abundant tree species in the Apalachicola Bluff region. Experts estimate that the species has lost at least 98.5 percent of its population since that time, with only an estimated 500 to 600 trees still left on the landscape. These remaining trees do not appear to reach reproductive maturity due to disease-related mortality, and all population viability models show that natural populations of this species will inevitably go extinct. Some conservationists are making controversial efforts to translocate this species to areas north of its current known range. Threats to this species include soil chemistry changes associated with hydrology disruption, fire suppression, and disease (USFWS 2010o).

### Florida Bristle Fern

The Florida Bristle Fern, also known as Florida Filmy Fern, (*Trichomanes punctatum* ssp. *floridanum*) was listed as endangered effective October 6, 2015 (80 FR 60440). Critical habitat has not been designated (USFWS 2020a).

The subspecies has two distinct metapopulations, one in Central and one is South Florida (Sumter and Miami-Dade Counties) (USFWS 2018n). Within these metapopulations, there are only six documented populations (USFWS 2018n). The subspecies inhabits tree trunks in hammocks, edges of limesinks, and limestone boulders, often with mosses and liverworts (FNAI 2001b). The Florida Bristly Fern is threatened by multiple factors: extreme curtailment of its habitat; habitat destruction, conversion and fragmentation; destruction or damage from foot traffic and recreational vehicles; invasive species; sea level rise; incompatible hydrological management strategies; and climatic changes in seasonal precipitation as well as temperature and storm cycles (USFWS 2018, NatureServe 2020).

**Ocala Vetch**

Ocala Vetch (*Vicia ocalensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90- day finding determined that listing may be warranted (76 FR 59835). On October 10, 2019, the species was determined to not be warranted for listing (84 FR 53336).

This species is characterized as an herbaceous perennial vine. It is often observed growing in sandy peat of open, wet thickets along the margins of spring runs and streambanks. This plant has a small range and is only found in two Florida counties (Lake and Marion) (NatureServe 2020). All known occurrences are from Ocala National Forest and Lake Woodruff National Wildlife Refuge (FNAI 2001b). This species is not particularly vulnerable to agriculture and land development as it is currently only known to occur on federally protected land; however, hydrological changes caused by logging and competition with invasive species still pose a threat to this species (NatureServe 2020).

**Wide-leaf Warea**

Wide-leaf Warea, also known as the Clasping Warea and Wideleaf Pinelandcress, (*Warea amplexifolia*) was listed as endangered effective April 29, 1987 (52 FR 15501). Critical habitat has not been designated (USFWS 2020a).

The Wide-leaf Warea is an annual herb growing from 30 to 100 centimeters high. It flowers in September and October (FNAI 2001b). Occurrence records are from the following Florida counties: Lake, Polk, Osceola, and Orange. The species is restricted to longleaf pine and turkey oak sandhill habitats in central Florida and requires frequent fire (every one to three years) to maintain the open habitat in which it thrives. Microhabitat features include sandy substrate and direct sunlight. This habitat has been highly fragmented and degraded, and is threatened by the development of citrus groves and residential housing (NatureServe 2020).

**Carter's Mustard**

Carter's Mustard (*Warea carteri*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

Carter's Mustard occurs along Lake Wales Ridge in central Florida. One occurrence is also known from coastal scrub habitat in Brevard County on Florida's Atlantic Coast (however, this occurrence has not been recently relocated). The species occurred historically in the Miami metropolitan area but is extirpated from that region (USFWS 2020a). The species occurs in xeric, shrub-dominated, sandhill, scrubby flatwood, inland, and coastal scrub habitats. Carter's Mustard appears only after fire (USFWS 1999). The primary threat to the species is habitat loss or modification (habitat frequently converted to citrus groves or urban development) (FNAI 2001b).

**Karst Pond Xyris**

The Karst Pond Xyris (*Xyris longisepala*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). NatureServe has designated this species Imperiled in Florida (NatureServe 2020).

This perennial herb has between 50 to 90 known occurrences. Occurrences are from Bay, Leon, Okaloosa, Wakulla, Walton, and Washington counties in Florida, and two sites in Covington County, Alabama. It grows in open, sunny wetlands; along the edges of sandy lime-sink lakes/ponds; and upland, sandhill lakes. It usually grows in abundance along the shores of water. Threats to this species include vegetation removal/mowing associated with residential infrastructure, silt deposition from upland disturbance, and recreational activities (off-road vehicles and other shore edge trampling; NatureServe 2020).

**Florida Ziziphus**

The Florida Ziziphus (*Ziziphus celata*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical

habitat has not been designated (USFWS 2020a).

This species was thought to be extinct when it was first described from a 36-year-old herbarium specimen in 1984. Since then, 14 locations of this species were discovered (USFWS 2009m). All remaining populations exist in Polk and Highlands Counties, on the Lake Wales Ridge in central Florida. It grows on the xeric, yellow sand paleo-dunes of Central Florida (USFWS 2019aa). Florida Ziziphus is a short (1.5 meter), thorny, clonal, hermaphroditic shrub. Research shows that this species is sterile when fertilized with its own pollen or with the pollen of an individual of the same genotype. Almost all the remaining wild populations have become so isolated from one another that they are now composed of genetically identical, fragmented individuals (USFWS 2009m, USFWS 2019aa). Since the most recent USFWS five- year review in 2009, four populations were reintroduced on protected lands (USFWS 2019aa). Threats to this species include habitat destruction/conversion, fire suppression, invasive plants, and genetic isolation (USFWS 2009m).

**Literature Cited for Species Accounts**

American Ornithologists' Union (AOU). 1983. Check list of North-American birds. Sixth edition. American Ornithologists' Union, Baltimore, Maryland, USA.

Anthonysamy, W. J. B., M. J. Dreslik, D. Mauger, and C. A. Phillips. 2014. A preliminary assessment of habitat partitioning in a freshwater turtle community at an isolated preserve. Copeia 2014:269-278.

Bailey, M. A. 1991. The dusky gopher frog in Alabama. Journal of the Alabama Academy of Science 62: 28-34.

Baker, A., P. Gonzalez, R. I. G. Morrison, and B. A. Harrington. 2013. Red knot (Calidris canutus), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.563 (01/07/2020)

Bates, R. 1996. The reproductive biology of Lobelia boykinii. M.S. thesis, University of North Carolina at Greensboro, Greensboro, North Carolina, USA.

Bauder, J. M., D. J. Stevenson, C. S. Sutherland, and C. J. Jenkins. 2017. Occupancy of potential overwintering habitat on protected lands by two imperiled snake species in the coastal plain of the southeastern United States. Journal of Herpetology 51:73-88.

Bauder, J. M., D. R. Breininger, M. R. Bolt, R. Breininger, M. L. Legare, C.L. Jenkins, B. B. Rothermel, and K. McGarigal. 2018. Multi-level, multi-scale habitat selection by a wide-ranging, federally threatened snake. Landscape Ecology 33:743-763.

Benedict, R. A., H. H. Genoways, and J. R. Choate. 2006. Taxonomy of short-tailed shrews (genus Blarina) in Florida. Occasional Papers, Museum of Texas Tech University 251:1-19.

Bentzien, M. M. 1987. Agency draft recovery plan for five rockland plant species. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

BirdLife International. 2018. Ammospiza caudacuta. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. http://dx.doi.org/10.2305/IUCN.UK.2018-2.RLTS.T22721129A131887480.en (01/05/2020)

Blalock-Herod, H. N., J. J. Herod, and J. D. Williams. 2002. Evaluation of conservation status, distribution, and reproductive characteristics of an endemic Gulf Coast freshwater mussel, Lampsilis australis (Bivalvia: Unionidae). Biodiversity and Conservation 11:1877-1887.

Bocetti, C. I., D. M. Donner, and H. F. Mayfield. 2014. Kirtland's warbler (Setophaga kirtlandii), version 2.0. A. F. Poole, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.19 (01/14/2020)

Bradley, K. A., and G. D. Gann. 1999. Status summaries of 12 rockland plant taxa in southern Florida. The Institute for Regional Conservation. Report submitted to the U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

Brim Box, J. and J. D. Williams. 2000. Unionid mollusks of the Apalachicola Basin in Alabama, Florida, and Georgia. Alabama Museum of Natural History Bulletin 21:1-143.

Butler, M. J., and W. Harrell. 2019. Whooping Crane survey results: winter 2018-2019. U.S. Department of the Interior, Fish and Wildlife Service, National Wildlife Refuge System, Division of Biological Services, Albuquerque, New Mexico and U.S. Department of the Interior, Fish and Wildlife Service, Ecological

Services, Aransas National Wildlife, Austwell, Texas, USA. https://www.fws.gov/uploadedFiles/WHCR_Winter_Update_2018_2019percent20(1).pdf (01/09/2020) Canadian Wildlife Service and US Fish and Wildlife Service (CWS and USFWS). 2007. International recovery plan for the whooping crane. Ottawa: Recovery of Nationally Endangered Wildlife (RENEW), Ottawa, QC and U.S. Department of the Interior, Fish and Wildlife Service, Southwest Regional Office, Albuquerque, New Mexico, USA.

Center for Biological Diversity (CBD). 2010a. Petition to list 404 aquatic, riparian and wetland species from the southeastern United States as threatened or endangered under the Endangered Species Act. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD). 2010b. Petition for rulemaking to enact immediate cave closures to protect bat species from white-nose syndrome; to promulgate a rule governing the "take" of endangered bat species; and to designate as significant all caves on federal lands in the continental United States. CBD, Washington, District of Columbia, USA.

Center for Biological Diversity (CBD). 2011a. Petition to list the eastern diamondback rattlesnake (Crotalus adamanteaus) as threatened under the endangered species act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2011b. Emergency petition to list the Miami blue butterfly (Cyclargus thomasi bethunebakeri) as endangered under the Endangered Species Act. CBD, Flagstaff, Arizona, USA.

Center for Biological Diversity (CBD). 2012. Petition to list 53 amphibians and reptiles in the United States as threatened or endangered species under the Endangered Species Act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2016. Lawsuit filed to push alligator snapping turtles closer to Endangered Species Act protection. CBD, Tucson, Arizona, USA. https://www.biologicaldiversity.org/news/press_releases/2016/alligator-snapping-turtle-03-16-2016.html (01/15/2020)

Center for Biological Diversity (CBD). 2018. Letter to FWS on reviews of Southeast species. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD). 2019a. Red wolf revised recovery plan: notice of intent to sue for violations of the Endangered Species Act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2019b. Petition to list the Gulf Coast solitary bee (Hesperapis oraria) under the Endangered Species Act and concurrently designate critical habitat. CBD, Portland, Oregon, USA.

Center for Biological Diversity (CDB). 2020a. America's gray wolves: a long road to recovery. CBD, Tucson, Arizona, USA. https://www.biologicaldiversity.org/campaigns/gray_wolves/. (01/09/2020).

Center for Biological Diversity (CBD). 2020b. Saving the gopher tortoise. CBD, Tucson, Arizona, USA. https://www.biologicaldiversity.org/species/reptiles/gopher_tortoise/index.html (01/03/2020)

Center for Biological Diversity (CBD) et al. 2014. Petition to protect the monarch butterfly (Danaus plexippus plexippus) under the Endangered Species Act. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD) and Defenders of Wildlife (DOW). 2016. Petition to list the tricolored bat Perimyotis subflavus as threatened or endangered under the Endangered Species Act. CBD, Washington, District of Columbia, USA.

Christman, S. P., and W. S. Judd. 1990. Notes on plants endemic to Florida scrub. Florida Scientist 53: 52-73.

Clench, W. J. and R. D. Turner. 1956. Freshwater mollusks of Alabama, Georgia, and Florida from the Escambia to the Suwanee River. Bulletin of the Florida State Museum Biological Sciences 1:97-239.

Confer, J. L., P. Hartman, and A. Roth. 2011. Golden-winged warbler (Vermivora chrysoptera), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.20 (01/09/2020)

Coulter, M. C., J. A. Rodgers Jr., J. C. Ogden, and F. C. Depkin.1999. Wood stork (Mycteria americana), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.409 (01/13/2019)

Crandall, K. A. 2010. Procambarus apalachicolae. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2010-3.RLTS.T18191A7762594.en (01/13/2020)

Crandall, K. A. and J. Cordeiro. 2010. Procambarus delicatus. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3.http://dx.doi.org/10.2305/IUCN.UK.2010- 3.RLTS.T18196A7774195.en (01/07/2020)

Defenders of Wildlife (DoW). 2015. A petition to list the blue calamintha bee (Osmia calaminthae) as an endangered, or alternatively as a threatened, species pursuant to the endangered species act and for the designation of critical habitat for this species. DoW, Denver, Colorado, USA.

DeMarco, V. 1992. Florida scrub lizard Sceloporus woodi. Stejneger. Pages 141-145 in P. E. Moler, editor. Rare and endangered biota of Florida: Vol. III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Dove, C. J., and R. C. Banks. 1999. A taxonomic study of crested caracaras (Falconidae). Wilson Bulletin 111: 330-339.

Dwyer, J. F. 2010. Ecology of non-breeding and breeding crested caracaras (Caracara cheriway) in Florida. Doctoral dissertation, Virginia Polytechnic Institute and State University, Blacksburg, Virginia, USA.

eBird. 2019. An online database of bird distribution and abundance. http://www.ebird.org. (01/15/2020)

Eddleman, W. R., R. E. Flores, and M. Legare. 1994. Black rail (Laterallus jamaicensis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.123 (01/07/2020)

Elliott-Smith, E. and S. M. Haig. 2004. Piping Plover (Charadrius melodus), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.2 (01/10/2020)

Encyclopedia Britannica. 2019. Monarch Butterfly. Encyclopedia Britannica, Inc., Chicago, Illinois, USA. https://www.britannica.com/animal/monarch-butterfly (01/03/2020)

Enge, K. M. 1997. A standardized protocol for drift-fence surveys. Commission Technical Report No. 14. Florida Game and Fresh Water Fish Tallahassee, Florida, USA.

Enge, K. M., B. A. Millsap, T. J. Doonan, J. A Gore, N. J. Douglass, and G. L. Sprandel. 2003. Conservation plans for biotic regions in Florida containing multiple rare or declining wildlife taxa. Bureau of Wildlife Diversity Conservation Final Report. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Enge, K. M., D. J. Stevenson, M. J. Elliott, and J. M. Bauder. 2013. The historical and current distribution of the eastern indigo snake (Drymarchon couperi). Herpetological Conservation and Biology 8:288-307.

Enge, K., J. D., Mays, R. Butryn, and E. P. Hill. 2016. Status assessments of the southern hognose snake, Florida pinesnake, short-tailed kingsnake, and eastern diamond-backed rattlesnake in Florida, Gainesville. Florida Fish and Wildlife Conservation Commission, Fish and Wildlife Research Institute, Gainesville, Florida, USA.

Ernst, C. H., and E. M. Ernst. 2003. Snakes of the United States and Canada. Smithsonian Books, Washington, District of Columbia, USA.

Ernst, C. H., and J. E. Lovich. 2009. Turtles of the United States and Canada. The John Hopkins University Press, Baltimore, Maryland, USA.

Fenolio, D. B., M. L. Niemiller, M. Levy, and B. Martinez. 2013. Conservation status of the Georgia blind salamander (Eurycea wallacei) from the Floridan Aquifer of Florida and Georgia. Reptiles and Amphibians Conservation and Natural History 20:97-111.

Florida Fish and Wildlife Conservation Commission (FWC). 2008. Wildlife habitats: Legacy natural lakes. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2011a. Florida bonneted bat biological status review report. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2011b. Key ringneck snake biological status review report. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2013. A species action plan for the Florida bonneted bat (Eumops floridanus). FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2020. Atlantic sturgeon. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/freshwater/atlantic-sturgeon/. (2/10/2020)

Forys, E. A., and S. R. Humphrey. 1996. Home range and movements of the Lower Keys marsh rabbit in a highly fragmented habitat. Journal of Mammalogy 77:1042-1048.

Florida Fish and Wildlife Conservation Commission (FWC). 2020a. Red wolf. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/mammals/land/red-wolf/ (01/03/2020)

Florida Fish and Wildlife Conservation Commission (FWC). 2020b. Choctawhatchee Beach Mouse. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/mammals/land/choctawhatchee-beach-mouse (01/19/2020)

Florida Fish and Wildlife Conservation Commission (FWC). 2020c. Atlantic Sturgeon. https://myfwc.com/wildlifehabitats/profiles/freshwater/atlantic-sturgeon (01/11/2020)

Florida Natural Areas Inventory (FNAI). 2001a. Field guide to the rare animals of Florida. FNAI, Florida Resources and Environmental Analysis Center, Florida State University, Tallahassee, Florida, USA. www.fnai.org (01/15/2020)

Florida Natural Areas Inventory (FNAI). 2001b. Field guide to the rare plants of Florida. FNAI, Florida Resources and Environmental Analysis Center, Florida State University, Tallahassee, Florida, USA. www.fnai.org (01/15/2020)

Florida Natural Areas Inventory (FNAI). 2007. Florida Forever conservation needs assessment technical report, version 2.2. FNAI, Tallahassee, Florida, USA.

Forys, E. A., P. A. Frank, and R. S. Kautz. 1996. Recovery actions for the lower keys marsh rabbit, silver rice rat, and stock island tree snail. Unpublished report to Florida Game and Fresh Water Fish Commission, Cooperative Agreement No. 1448-0004-94-9164, Tallahassee, Florida, USA.

Franz, R. 1992. Florida pine snake Pituophis melanoleucus mugitus Barbour. Pages 254-258 in P. E. Moler, editor. Rare and endangered biota of Florida: Vol. III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Franz, R. D. 2005. Up close and personal: a glimpse into the life of the Florida pine snake in a North Florida sand hill. Pages 120-131 in W. E. Meshaka, Jr., and K. J. Babbitt, editors. Amphibians and reptiles: status and conservation in Florida. Krieger, Malabar, Florida, USA.

Franz, R., and L. M. Franz. 1979. Distribution, habitat preference and status of populations of the Black Creek crayfish, Procambarus (Ortmannicus) pictus (Decapoda: Cambaridae) Florida Science 42:13-18.

Fuller, S. L. H. 1974. Chapter 8: Clams and mussels (Mollusca: Bivalvia). Pages 215-273 in C.W. Hart, Jr. and S.L.H. Fuller, editors. Pollution ecology of freshwater invertebrates. Academic Press, New York, New York, USA.

Gangloff, M. M. and P. W. Hartfield. 2009. Seven populations of the southern kidneyshell (Ptychobranchus jonesi) discovered in the Choctawhatchee River basin, Alabama. Southeastern Naturalist 8:245-254.

Gianopulos, K. D., H. R. Mushinsky, and E. D. McCoy. 2001. Response of the threatened sand skink (Neoseps reynoldsi) to controlled burning and clear cutting in Florida sand pins scrub habitat. Proceedings of the Florida Scrub Symposium, Orlando, Florida, USA.

Gilbert, C. R., and K. Relyea. 1992. Saltmarsh topminnow, Fundulus jenkinsi. Pp 68-72 in: C. R. Gilbert, editor. Rare and endangered biota of Florida: Volume II. Fishes.

Gill, R. E., P. Canevari, and E. H. Iversen. 1998. Eskimo curlew (Numenius borealis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.347 (01/02/2020)

Gleaton, A. 2020. Species profile: Florida redbelly turtle (Pseudemys nelsoni). Savannah River ecology laboratory, University of Georgia, Athens, Georgia, USA. https://srelherp.uga.edu/turtles/psenel.htm. (01/08/2020)

Golden, D. M., P. Winkler, P. Woerner, G. Fowles, W. Pitts, and D. Jenkins. 2009. Status assessment of the northern pine snake (Pituophis m. melanoleucus) in New Jersey: an evaluation of trends and threats. New Jersey Department of Environmental Protection, Trenton, New Jersey, USA.

Goodyear, N. C. 1992. Spatial overlap and dietary selection of native rice rats and exotic black rats. Journal of Mammalogy 73:186-200.

Goodyear, N.C. 1987. Distribution and habitat of the silver rice rat, Oryzomys argentatus. Journal of Mammalogy 68:692-695.

Gorman, T. A., C. A. Hass, and J. G. Himes. 2013. Evaluating methods to restore amphibian habitat in fire-suppressed pine flatwoods wetlands. Fire Ecology 9:96-109.

Gorman, T. A., S. D. Powell, K. C. Jones, and C. A. Haas. 2014. Microhabitat characteristics of egg deposition sites used by Reticulated Flatwoods Salamanders. Herpetological Conservation and Biology 9:543-550.

Greenberg, C. H., and G. W. Tanner. 2008. Long-term landscape scale monitoring of amphibians uplands of the Ocala National Forest, Florida. Final report. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Greenlaw, J. S., C. S. Elphick, W. Post, and J. D. Rising. 2018. Saltmarsh sparrow (Ammospiza caudacuta), version 2.1. P. G. Rodewald, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.sstspa.02.1 (01/05/2020)

Hamel, P. B. 2011. Bachman's warbler (Vermivora bachmanii), version 2.0. A. F. Poole, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.150 (01/07/2020)

Hamel, P. B. 2018. Bachman's warbler, a species in peril. 2nd edition. Smithsonian Institution Press, Washington, District of Columbia, USA.

Hamilton, W. J., Jr. 1955. Two new rice rats (genus Orzomys) from Florida. Proceedings of the Biological Society of Washington 78:83-86.

Hammerson, G. A. 2007a. Sceloporus woodi. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2007.RLTS.T64160A12742089.en (01/13/2020)

Hammerson, G.A. 2007b. Tantilla oolitica. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2007.RLTS.T63954A12731242.en (01/13/2020)

Hines, K. N., and K. A. Bradley. 2009. Assessment of the status and distribution of the endemic rim rock crowned snake (Tantilla oolitica) in Miami-Dade and Monroe counties, Florida. Final Report Grant Agreement No. 401817G006. The Institute for Regional Conservation, Miami, Florida, USA.

Hobbs, H. H., Jr. 1942. The crayfishes of Florida. University of Florida Biological Science Series 3:21-179.

Hobbs, H. H., Jr., and C. W. Hart, Jr. 1959. The freshwater decapod crustaceans of the Apalachicola drainage system in Florida, southern Alabama, and Georgia. Bulletin of the Florida State Museum 4:145-191.

Holt, D. E., H. L. Jelks, and F. Jordan. 2013. Movement and longevity of imperiled okaloosa darters (Etheostoma okaloosae). Copiea 2013:653-659.

Hyslop, N. L., J. M. Meyers, R. J. Cooper, and D. J. Stevenson. 2014. Effects of body size and sex of Drymarchon couperi (eastern indigo snake) on habitat use, movements, and home range size in Georgia. Journal of Wildlife Management 78:101-111.

International Crane Foundation. 2019. Whooping crane eastern population update - March 2019. International Crane Foundation, Barboo, Wisconsin, USA. https://www.savingcranes.org/whooping-crane-eastern-population-update-march-2019. (01/09/2020)

International Wolf Center. 2020. Types of wolves. International Wolf Center. Minneapolis, Minnesota, USA. https://wolf.org/wolf-info/basic-wolf-info/types-of-wolves/ (01/09/2020)

Jackson, J. A. 1994. Red-cockaded Woodpecker (Dryobates borealis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.85 (01/10/2020)

Jackson, J. A. 2002. Ivory-billed woodpecker (Campephilus principalis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.711 (01/13/2020)

Kent, D. M., M. A. Langston, and D. W. Hanf. 1997. Observations of vertebrates associated with gopher tortoise burrows in Orange County, Florida. Florida Scientist 60:197-201.

Kieffer, S. 2014. Rufa red knot gets listed. National Audubon Society, Manhattan, New York, USA. https://www.audubon.org/news/rufa-red-knot-gets-listed (01/07/2020)

Kopec, K., and L. A. Burd. 2017. A systematic status review of North American and Hawaiian native bees. Center for Biological Diversity, Tucson, Arizona, USA.
Krysko, K. L. and D. J. Smith. 2005. The decline and extirpation of kingsnakes, Lampropeltis getula, in Florida. Pp 132-141 in: W. E. Meshaka, Jr. and K. J. Babbitt, editors. Status and conservation of Florida amphibians and reptiles. Krieger, Malabar, Florida, USA.

Krysko, K. L. and W. S. Judd. 2006. Morphological systematics of kingsnakes, Lampropeltis getula complex (Serpentes: Colubridae), in the eastern United States. Zootaxa 1193: 1-39.

Krysko, K. L., L. P. Nunez, C. E. Newman, and B. W. Bowen. 2017. Phylogenetics of kingsnakes, Lampropeltis getula complex (Serpentes: Colubbridae), in eastern North America. Journal of Heredity 108:226-238.

Kunz, T. H., and J. D. Reichard. 2010. Status review of the little brown myotis (Myotis lucifugus) and determination that immediate listing under the Endangered Species Act is scientifically and legally warranted. Boston University, Boston, Massachusetts, USA.

Layne, J. N. 1992. Sherman's short-tailed shrew Blarina carolinensis shermani. Pages 328-334 in S. R. Humphrey, editor. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Layne, J. N., editor. 1978. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Lazell, J.D., Jr. 1984. A new marsh rabbit (Sylvilagus Palustris) from Florida's Lower Keys. Journal of Mammalogy 65:26-33.
Lazell, J. D., Jr. 1989. Wildlife of the Florida Keys: a natural history. Island Press, Covelo, California, USA.

Lewis, A. 2018. The Eskimo curlew hasn't been seen in 55 years. Is It Time to Declare It Extinct? National Audubon Society, Manhattan, New York, USA. https://www.audubon.org/news/the-eskimo-curlew-hasnt-been-seen-55-years-it-time-declare-it-extinct# (01/02/2020)

Lopez, J. D., M. S. Peterson, J. Walker, G. L. Grammer, and M. S. Woodrey. 2011. Distribution, abundance, and habitat characterization of the saltmarsh topminnow, Fundulus jenkinsi (Everman 1892). Estuaries and Coasts 34:148-158.

Marchese, H. and N. V. Hoose. 2018. Florida monarch butterfly populations have dropped 80 percent since 2005. Florida Museum of Natural History, Gainesville, Florida, USA. https://www.floridamuseum.ufl.edu/science/florida-monarch/ (01/03/2020)

McNeil, D. J., K. R. Aldinger, M. H. Bakermans, J. A. Lehman, A. C. Tisdale, J. A. Jones, P. B. Wood, D. A. Buehler, C. G. Smalling, L. Siefferman, and J. L. Larkin. 2017. An evaluation and comparison of conservation guidelines for an at-risk migratory songbird. Global Ecology and Conservation 9:90-103.

Means, D.B. 1986. Life history and ecology of the eastern diamondback rattlesnake (Crotalus adamanteus). Final Project Report. Florida Game and Fresh Water Fish Commission, Tallahassee, Florida, USA.

Means, D. B. 2005. Haideotriton wallacei Carr, 1939. Georgia blind salamander. Pages 779-780 in M. Lannoo, editor. Amphibian declines: the conservation status of United States species. University of California Press, Berkeley, California, USA.

Means, D. B. 2006. Vertebrate faunal diversity of longleaf pine ecosystems. In S. Jose et al., editors. The longleaf pine ecosystem: ecology, silviculture, and restoration. Springer, New York, New York, USA.

Means, D. B. 2010. Time to end rattlesnake roundups: the ecological impacts of a long tradition. The Wildlife Professional Winter 2010:65-67.

Mierzwa, K. S. (ed.). 1995. The hine's emerald dragonfly in Illinois: an assessment of population dynamics and habitat use. Unpublished report, TAMS Consultants, Chicago.

Mirarchi, R. E., J. T. Garner, M. F. Mettee, and P.E. O'Neil. 2004. Alabama wildlife. Volume 2. Imperiled aquatic mollusks and fishes. University of Alabama Press, Tuscaloosa, Alabama, USA.

Moler, P. E. 1992. Rare and endangered biota of Florida: Volume III. Amphibians and reptiles. University Press of Florida, Gainesville.

Moler, P., and K. A. Crandall. 2010. Procambarus pictus. In: IUCN 2019. The IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2010-3.RLTS.T18213A7811189.en. (01/13/2020)

Monarch Joint Venture. 2019. Monarch butterfly ESA listing decision deadline extended. Monarch Joint Venture, St. Paul, Minnesota, USA. https://monarchjointventure.org/news-events/news/monarch-butterfly-esa-listing-decision-deadline-extended (01/03/2020)

Morales, A. E. and B. C. Carstens. 2018. Evidence that Myotis lucifugus "subspecies" are five nonsister species, despite gene flow. Systematic Biology 67:756-769.

Moreno, R. 2003. Genetic variation in three populations of a rare plant Lobelia boykinii: A microsatellite analysis. M.S. thesis, University of North Carolina at Greensboro, Greensboro, North Carolina, USA.

Morrison, J. L., and J. F. Dwyer. 2012. Crested caracara (Caracara cheriway), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.249 (01/06/2019)

Mushinsky, H. R., and E. D. McCoy. 1999. Studies of the sand skink (Neoseps reynoldsi) in Central Florida. Final report to Walt Disney Imagineering. University of South Florida, Tampa, Florida, USA.

National Marine Fisheries Service (NMFS). 1998. Final Recovery Plan for the Shortnose Sturgeon Acipenser brevirostrum. NMFS, Silver Spring, Maryland, USA.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (Pristis pectinata). NMFS, Silver Spring, Maryland, USA.

National Marine Fisheries Service (NMFS). 2018. Smalltooth sawfish (Pristis pectinata) 5-year review: summary and evaluation of United States distinct population segment of smalltooth sawfish. NMFS, Southeast Regional Office, St. Petersburg, Florida, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Species Directory. NOAA Fisheries. NOAA Fisheries, Office of Protected Resources, Silver Spring, Maryland, USA. https://www.fisheries.noaa.gov/species (2/11/2020)

NatureServe. 2020: NatureServe Explorer An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/ (01/15/2020)

Nisbet, I. C. T., M. Gochfeld, and J. Burger. 2014. Roseate tern (Sterna dougallii), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.370 (01/10/2020)

North American Orchid Conservation Center (NAOCC). 2019. Trichocentrum undulatum. NAOCC, Smithsonian Environmental Research Center, Edgewater, Maryland, USA. https://goorchids.northamericanorchidcenter.org (12/23/2019)

Noss, R. F., E. T. LaRoe, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. Biological Report 28. U.S. Department of the Interiro, National Biological Service, Washington, District of Columbia, USA.
O'Brien, C. A. and J. Brim Box. 1999. Reproductive biology and juvenile recruitment of the shinyrayed pocketbook, Lampsilis subangulata (Bivalvia: Unionidae) in the Gulf Coastal Plain. The American Midland Naturalist 142:129-140.

O'Brien, C. A. and J. D. Williams. 2002. Reproductive biology of four freshwater mussels (Bivalvia: Unionidae) endemic to eastern gulf coastal plain drainages of Alabama, Florida, and Georgia. American Malacological Bulletin 17:147-158.

Odonata Central. 2019. Somatochlora calverti. www.odonatacentral.org (12/13/2019)

Palis, J. G. 1995. Larval growth, development, and metamorphosis of Ambystoma cingulatum on the Gulf Coastal Plain of Florida. Florida Scientist 58:352-358.

Palis, J. G. 1997. Distribution, habitat, and status of the flatwoods salamander (Ambystoma cingulatum) in Florida, USA. Herpetological Natural History 5:53-65.

Parkinson, C. L., M. DiMeo, and K. Mercier. 2016. Evaluating mole skink and salt marsh snake subspecific taxonomy in Florida using genomics. Interim Report Submitted to the U.S. Fish and Wildlife Service. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

Paulson, D. R. 2018. Somatochlora calverti. In: IUCN 2019. The IUCN Red List of threatened species. Version 2019.3 https://dx.doi.org/10.2305/IUCN.UK.2018-1.RLTS.T20341A80697450.en (12/13/2019)

Pauly, G. B., O. Piskurek, and H. B. Shaffer. 2007. Phylogeographic concordance in the southeastern United States: The flatwoods salamander, Ambystoma cingulatum, as a test case. Molecular Ecology 16:415-429.

Pelton, E., S. Jepsen, C. Schultz, C. Fallon, and S. H. Black. 2016. State of the monarch butterfly overwintering sites in California. Report to the U.S. Fish and Wildlife Service. The Xerces Society for Invertebrate Conservation, Portland, OR, USA.

Petranka, J. W. 1998. Salamanders of the United States and Canada. Smithsonian Institution Press, Washington, District of Columbia, USA.

Pilarczyk, M. M., P. M. Stewart, D. N. Shelton, and D. J. Williams. 2006. Current and recent historical freshwater mussel assemblages in the Gulf Coastal plains. Southeastern Naturalist 5: 205-226.

Pintor, L. M., and D. A. Soluk. 2006. Evaluating the non-consumptive, positive effects of a predator in the persistence of an endangered species. Biological Conservation 130:584-591.

Post, W. and J. S. Greenlaw. 2018. Seaside sparrow (Ammospiza maritima), version 2.1. P. G. Rodewald, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.seaspa.02.1 (01/07/2020)

Powers, K. E., R. J. Reynolds, W. Orndorff, B. A. Hyzy, C .S. Hobson, and W. M. Ford. 2016. Monitoring the status of gray bats (Myotis grisescens) in Virginia, 2009-2014, and potential impacts of white-nose Syndrome. Southeastern Naturalist 12:127-137.

Rasmussen, A. K., D. R. Denson, S. C. Harris. 2008. Status of caddisflies (Insecta: Trichoptera) in greatest conservation need in Florida. Final report, Agreement Number 06009.
Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Rightmyer, M. G, M. Deyrup, J. S. Ascher, and T. Griswold. 2011. Osmia species (Hymenoptera, Megachilidae) from the southeastern United States with modified facial hairs: taxonomy, host plants, and conservation status. Contributions Celebrating Kumar Krishna. ZooKeys 148:257-278.

Rochford, M., K. Hines, and F. J. Mazzotti. 2010. Tantilla oolitica (rim rock crowned snake). Defensive behavior. Herpetological Review 41: 99.

Roth, A. M., R. W. Rohrbaugh, T. Will, and D. A. Buehler, editors. 2012. Golden-winged warbler status review and conservation plan. Cornell Lab of Ornithology, Golden-winged Warbler Working Group, National Widlife Federation, U.S. Fish and Wildlife Service.

Royo, A. A., R. Bates, and E. P. Lacey. 2008. Demographic constraints in three populations of Lobelia boykinii: A rare wetland endemic. The Journal of the Torrey Botanical Society 135:189-199.

Schrey, A. W., A. M. Fox, H. R. Mushinsky, and E. D. McCoy. 2011. Fire increases variance in genetic characteristics of Florida sand skink (Plestiodon reynoldsi) local populations. Molecular Ecology 20:56-66.

Schrey, A. W., K. G. Ashton, S. Heath, E. D. McCoy, and H. R. Mushinsky. 2011. Fire alters patterns of genetic diversity among 3 lizard species in Florida scrub habitat. Journal of Heredity 102:399-409.

Skinner, M. W. and B. A. Sorrie. 2002. Conservation and ecology of Lilium pyrophilium, a new species of Liliaceae from the Sandhills region of the Carolinas and Virginia, U.S.A. Novon 12:94-105.

Sewell, A. 2010. Petition to List the Golden-winged Warlber (Vermivora chrysoptera) as a Threatened or Endangered Species under the U.S. Endangered Species Act. Sewell, State College, Pennsylvania, USA.

Spitzer, N. C., 1983. Aspects of the biology of the silver rice rat Oryzomys argentatus. M.S. Thesis, University of Rhode Island, South Kingstown, Rhode Island, USA.

Territo, G. P. 2013. Biogeography and systematics of Nerodia clarkia/Nerodia fasciata clade in Florida. M.S. Thesis. University of Central Florida, Orlando, Florida, USA.

Thom, M. D. 2013. The ecology and conservation of Callophrys irus godart: The role of fire and microhabitat. Doctoral dissertation, University of Florida, Gainesville, Florida, USA.

Thomas, T. M., M. C. Granatosky, J. R. Bourque, K. L. Krysko, P. E. Moler, T. Gamble, E. Suarez, E. Leone, K. M. Enge, and J. Roman. 2014. Taxonomic assessment of alligator snapping turtles (Chelydridae: Macrochelys), with the description of two new species from the southeastern United States. Zootaxa 3786:141-165.

Tiebout, H.M., III and R.A. Anderson. 2001. Mesocosm experiments on habitat choice by an endemic lizard: implications for timber management. Journal of Herpetology 35:173-185.

Timmerman, W. and W. Martin. 2003. Conservation guide to the eastern diamondback rattlesnake. Society for the Study of Amphibians and Reptiles, Shoreview, Minnesota, USA.

Turner, W. R., D. S. Wilcove, and H. M. Swaim. 2006. State of the scrub: Conservation progress, management responsibilities, and land acquisition priorities for imperiled species of Florida's Lake Wales Ridge. Final report to USFWS, South Florida Ecological Services Office, Vero Beach, Florida, USA.

University of Florida Institute of Food and Agricultural Sciences (UF IFAS). 2019. Cassius blue butterfly (Leptotes cassius theonus). UF IFAS, Gainesville, Florida, USA. http://entnemdept.ufl.edu/creatures/bfly/cassius_blue.htm (01/23/2020)

U.S. Army Corps of Engineers (USACE). 2007. Assessment of the population status of the Gray Bat (Myotis grisescens), status review, DOD initiatives, and results of a multi-agency effort to survey wintering populations at major hibernacula, 2005-2007. USACE, Army Endangered Species Research Program, US Army Engineer Research and Development Center, Vicksburg, Mississippi, USA.

U.S. Fish and Wildlife Service (USFWS). 1982. Gray bat recovery plan. U.S. Department of the Interior, Fish and Wildlife Reference Service, Colorado Ecological Services Office, Denver, Colorado, USA.

U.S. Fish and Wildlife Service (USFWS). 1987. Recovery plan for the Choctawhatchee, Perdido Key and Alabama beach mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1990. Endangered and threatened species recovery program: report to Congress. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

U.S. Fish and Wildlife Service (USFWS). 1993. Recovery plan for the Anastasia Island beach mouse and southeastern beach mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1995. American chaffseed (Schwalbea americana) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Field Office, Pleasantville, New Jersey, USA.

U.S. Fish and Wildlife Service. 1996a. Revised recovery plan for the US breeding population of the wood stork. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1996b. Recovery plan for nineteen central Florida scrub and high pineland plants (revised). USFWS, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1997. Recovery plan for the Florida salt marsh vole (Microtus pennsylvanicus dukecampbelli). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1999a. Key Largo woodrat (Neotoma floridana smalli) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999b. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1999c. Avon Park harebells (Crotalaria avonensis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (Trichechus manatus latirostris), Third Revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA

U.S. Fish and Wildlife Service. 2003a. Recovery plan for the red-cockaded woodpecker (Picoides borealis): second revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2003b. Agency draft recovery plan for endangered fat threeridge (Amblema neislerii), shinyrayed pocketbook (Lampsilis subangulata), gulf moccasinshell (Medionidus penicillatus), ochlockonee moccasinshell (Medionidus simpsonianus), and oval pigtoe (Pleurobema pyriforme); and threatened chipola slabshell (Elliptio chipolaensis), and purple bankclimber (Elliptoideus sloatianus). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2004. Species assessment and listing priority assignment form – Digitaria pauciflora. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2005a. Anastasia Island beach mouse (Peromyscus poliomotus phasma) and southeastern beach mouse (Peromyscus polionotus niveiventris). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2005b. Longspurred mint (Dicerandra cornutissima) species account biologue. Summary and Evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville Florida.

U.S. Fish and Wildlife Service (USFWS). 2006. Red-cockaded Woodpecker (Picoides borealis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service,Clemson Ecological Services Field Office, Clemson, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2007a. Indiana bat (Myotis sodalis) draft recovery plan: first revision. U.S. Department of the Interior, Fish and Wildlife Service, Great Lakes-Big Rivers Regional Office, Fort Snelling, Minnesota, USA.

U.S. Fish and Wildlife Service (USFWS). 2007b. West Indian manatee (Trichechus manatus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007c. Florida scrub-jay (Aphelocoma coerulescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007d. Wood Stork (Mycteria americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service Southeast Region, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007e. Bluetail mole skink (Eumeces egregious lividus) and sand skink (Neoseps reynoldsi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007f. Fat threeridge (Amblema neislerii), shinyrayed pocketbook (Lampsilis subangulata), gulf moccasinshell (Ifedionidus penicillatus), ochlockonee moccasinshell (Medionidus simpsonianus), oval pigtoe (Pleurobema pyriforme), chipola slabshell (Elliptio chipolaensis), purple bankclimber (Elliptoideus sloatianus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007g. Garber's spurge (Chamaesyce garberi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007h. Florida perforate cladonia (Cladonia perforata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008a. Florida panther recovery plan, Third Revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2008b. Florida grasshopper sparrow (Ammodramus savannarum floridanus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008c. Florida population of the Audubon's crested caracara (Polyborus plancus audubonii) = northern crested caracara (Caracara cheriway) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008d. Everglade snail kite (Rostrhamus sociabilis plumbeus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008e. Schaus swallowtail butterfly (Heraclides aristodemus ponceanus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008f. Pigeon wings (Clitoria fragrans) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008g. Short-leaved rosemary (Conradina brevifolia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008h. Lakela's mint (Dicerandra immaculata) 5-Year Review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008i. Euphorbia telephioides (Telephus spurge) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008j. Highlands scrub hypericum (Hypericum cumulicola) 5- year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Region, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service. 2008k. Papery whitlow-wort (Paryonchia chartacea) 5-year Review: Summary and Evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida.

U.S. Fish and Wildlife Service (USFWS). 2009a. Gray bat (Myotis grisescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Missouri Ecological Services Field Office, Columbia, Missouri, USA.

U.S. Fish and Wildlife Service (USFWS). 2009b. Indiana bat (Myotis sodalis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Bloomington Ecological Services Field Office, Bloomington, Indiana, USA.

U.S. Fish and Wildlife Service (USFWS). 2009c. Piping plover (Charadrius melodus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Region, Hadley, Massachusetts, and the Midwest East Lansing Field Office, Michigan, USA.

U.S. Fish and Wildlife Service (USFWS). 2009d. Stock Island tree snail (Orthalicus reses (not including nesodryas)) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009e. Four-petal pawpaw (Asimina tetramera) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009f. Florida golden aster (Chrysopsis floridana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009g. Okeechobee gourd (Cucurbita okeechobeensis ssp. okeechobeensis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009h. Species account: Rugel's pawpaw (Deeringothamnus rugelii). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009i. Garrett's mint (Dicerandra christmanii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009j. Scrub mint (Dicerandra frutescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009k. Macbridea alba (white birds-in-a-nest) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2009l. Cooley's meadowrue (Thalictrum cooleyi) 5-year review, summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Carolina Ecological Services Office, Raleigh, North Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2009m. Florida ziziphus (Ziziphus celata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2010a. Key deer (Odocoileus virginianus clavium) 5 year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Region, Atlanta, Georgia, USA.

U.S. Fish & Wildlife Service (USFWS). 2010b. The St. Andrew beach mouse (Peromyscus polionotus peninsularis) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010c. Cape Sable seaside sparrow (Ammodramus maritimus mirabilis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2010d. Recovery plan for the ivory-billed woodpecker (Campephilus principalis). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2010e. Caribbean roseate tern and North Atlantic roseate tern (Sterna dougallii dougallii), 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA and Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2010f. Fragrant prickly-apple (Cereus eriophorus var. fragrans) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010g. Deltoid Spurge (Chamaesyce deltoidea ssp. deltoidea) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010h. Snakeroot (Eryngium cuneifolium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010i. Small's milkpea (Galactia smallii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010j. Key tree-cactus (Pilosocereus robinii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010k. Lewton's polygala (Polygala lewtonii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010l. Tiny polygala (Polygala smallii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010m. Wireweed (Polygonella basiramia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS) 2010n. Sandlace (Polygonella myriophylla) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

US Fish and Wildlife Service (USFWS). 2010o. Torreya taxifolia (Florida torreya) 5-year review: summary and evaluation. September 2017. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2012a. White-nose syndrome confirmed in federally endangered gray bats. U.S. Department of the Interior, Fish and Wildlife Service, Office of Public Affairs, Falls Church, Virginia, USA. https://www.fws.gov/news/ShowNews.cfm?ID=348CC168-D4C6-F1B4- 4AF2C93DFD8E2473 (01/13/2020)

U.S. Fish and Wildlife Service (USFWS). 2012b. Whooping crane (Grus americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Aransas National Wildlife Refuge, Austwell, Texas, and Corpus Christi Ecological Service Field Office, Texas, USA.

U.S. Fish and Wildlife Service (USFWS). 2012c. Recovery outline for Miami blue butterfly (Cyclargus thomasi bethunebakeri). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2013. Recovery outline for Consolea corallicola (Florida semaphore cactus). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2014a. West Indian manatee (Trichechus manatus) Florida stock (Florida subspecies, Trichechus manatus latirostris), stock assessment report. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2014b. Florida scrub-jay umbrella Habitat Conservation Plan and Environmental Assessment. Revision 1. https://www.fws.gov/northflorida/Scrub-Jays/Docs/Umbrella/20121000_FSJ_Umbrella_HCP_EA_2014rev.pdf (01/09/2020)
U.S. Fish and Wildlife Service (USFWS). 2014c. At-risk species in Florida's Panhandle. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015a. Status of the species - Key Largo cotton mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2015b. Status of the species - Florida scrub-jay (Aphelocoma coerulescens). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015c. Recovery Plan for the Northern Great Plains piping plover (Charadrius melodus) in two volumes. Volume I: Draft breeding recovery plan for the Northern Great Plains piping plover (Charadrius melodus) and Volume II: Draft revised recovery plan for the wintering range of the Northern Great Plains piping plover (Charadrius melodus) and comprehensive conservation strategy for the piping plover (Charadrius melodus) in its coastal migration and wintering range in the continental United States. U.S. Department of the Interior, Fish and Wildlife Service, Colorado Ecological Services Office, Denver, Colorado, USA.

U.S. Fish and Wildlife Service (USFWS). 2015d. Bachman's warbler (Vermivora bachmanii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service. 2015e. Reticulated flatwoods salamander (Ambystoma bishopi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015f. Status of the Species – Bartram's scrub-hairstreak (Strymon acis bartrami). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015g. Ribes echinellum (Miccosukee gooseberry) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015h. Fringed campion (Silene catesbaei = Silene polypetala) 5-year review: summary and evaluation., U.S. Department of the Interior, Fish and Wildlife Service, Georgia Ecological Services Field Office, Athens, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2016a. Eskimo curlew (Numenius borealis) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Fairbanks Fish and Wildlife Field Office, Fairbanks, Alaska, USA.

U.S. Fish and Wildlife Service (USFWS). 2016b. Squirrel chimney cave shrimp (Palaemonetes cummingi). 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2016c. Harperocallis flava-Harper's beauty 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2016d. Scrub lupine (Lupinus aridorum) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017a. Species status assessment report for the Panama City crayfish, Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2017b. Florida bonamia (Bonamia grandiflora) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017c. Conradina glabra (Apalachicola rosemary) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017d. Scrub plum (Prunus geniculata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

US Fish & Wildlife Service (USFWS). 2017e. Cooley's meadowrue (Thalictrum cooleyi). U.S. Department of the Interior, Fish and Wildlife Service, Raleigh Ecological Field Office, Raleigh, North Carolina, USA. https://www.fws.gov/raleigh/species/es_cooleys_meadowrue.html (01/24/2020)

U.S. Fish and Wildlife Service (USFWS). 2018a. Recovery outline for Florida bonneted bat (Eumops floridanus). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018b. Key Largo woodrat (Neotoma floridana smalli) 5-year review: summary and evaluation - 2018 update. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018c. U.S. Fish and Wildlife Service Region 5 Endangered Species Act Update July 25, 2018. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA.

U.S. Fish and Wildlife Service (USFWS). 2018d. Species status assessment for the eastern black rail (Laterallus jamaicensis jamaicensis). Version 1.2. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018e. Species status assessment report for the black-capped petrel (Pterodroma hasitata). Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018f. U.S. Fish and Wildlife listing species assessment and listing priority assignment form: Gopherus polyphemus. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018g. Species account: squirrel chimney cave shrimp. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018h. Species status assessment report for the frosted elfin (Callophrys irus), Version 1.2. U.S. Department of the Interior, Fish and Wildlife Service, New York Field Office, Cortland, New York, USA.

U.S. Fish and Wildlife Service (USFWS). 2018i. Rugel's pawpaw (Deeringothamnus rugelii) 5 year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018j. Longspurred mint (Dicerandra cornutissima) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018k. Scrub buckwheat (Eriogonum longifolium var. gnaphalifolium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018l. Pinguicula ionantha godfrey's butterwort 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018m. Spigelia gentianoides gentian pinkroot 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018n. Recovery outline for Florida bristle fern (Trichomanes punctatum ssp. floridanum). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019. Florida salt marsh vole (Microtus pennsylvanicus dukecampbelli) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Field Office, Jacksonville, Florida.

U.S. Fish and Wildlife Service (USFWS). 2019b. Indiana bat (Myotis sodalis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Indiana Ecological Services Field Office, Bloomington, Indiana, USA.

U.S. Fish and Wildlife Service (USFWS). 2019c. Conserving South Carolina's at-risk species: species facing threats to their survival - tricolored bat. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Field Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2019d. Recovery plan for the endangered Key Largo cotton mouse (Peromyscus gossypinus allapaticola) amendment. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019e. Perdido Key beach mouse recovery plan amendment. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019f. Recovery plan for Cape Sable seaside sparrow (Ammodramus maritimus mirabilis) draft amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019g. Recovery plan for Florida grasshopper sparrow (Ammodramus savannarum floridanus) Amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019h. Recovery plan for the Florida scrub-jay (Aphelocoma coerulescens). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019i. Recovery outline for the rufa red knot (Calidris canutus rufa). U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Field Office, Galloway, New Jersey, USA.

U.S. Fish and Wildlife Service (USFWS). 2019j. Recovery plan for the endangered everglade snail kite (Rostrhamus sociabilis plumbeus) Amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019k. Species status assessment (SSA) report for the eastern indigo snake (Drymarchon couperi). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019l. Species status assessment report for the southern hognose snake (Heterodon simus). Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019m. Atlantic salt marsh snake (Nerodia clarkii taeniata) 5- year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Field Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service. 2019n. Frosted Flatwoods salamander (Ambystoma cingulatum) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019o. Conserving South Carolina's at-risk species. U.S. Department of the Interior, Fish & Wildlife Service, South Carolina Field Office, Charleston, South Carolia, USA. www.fws.gov/southeast/endangered-species-act/at-risk-species (12/13/2019)

U.S. Fish and Wildlife Service (USFWS). 2019p. Frosted elfin. U.S. Department of the Interior, Fish & Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA. https://www.fws.gov/northeast/frosted-elfin/index.html (01/02/2020)

U.S. Fish and Wildlife Service (USFWS). 2019q. Species status assessment report for the American burying beetle Nicrophorus americanus. U.S. Department of the Interior, Fish and Wildlife Service, Oklahoma Ecological Services Field Office, Tulsa, Oklahoma, USA.

U.S. Fish and Wildlife Service (USFWS). 2019r. Recovery plan for the endangered Asimina tetramera (four-petal pawpaw). U U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019s. Brooks bellflower (Campanula robinsiae) 5-year review: summary and evaluations. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019t. Etonia rosemary (Conradina etonia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019u. Recovery plan amendment for the endangered Cucurbita okeechobeensis ssp. okeechobeensis (Okeechobee gourd). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

US Fish & Wildlife Service (USFWS). 2019v. Cooley's water-willow (Justicia cooleyi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019w. Rhododendron minus var. champani (Chapman's Rhododendron) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019x. American chaffseed (Schwalbea americana) recovery plan amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Ecological Services Field Office, Pleasantville, New Jersey, USA.

U.S. Fish and Wildlife Service (USFWS). 2019y. American chaffseed (Schwalbea americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Field Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2019z. Scutellaria floridana (Florida skullcap) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019aa. Lake Wales Ridge plants recovery plan amendment. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2020a. Environmental Conservation Online System (ECOS). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA. https://ecos.fws.gov/ (01/15/2020)

U.S. Fish and Wildlife Service (USFWS). 2020b. Key Largo woodrat (Neotoma floridana smalli) 5-year review: summary and evaluation - 2018 update. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2020c. St. Vincent National Wildlife Refuge update. U.S. Department of the Interior, Fish and Wildlife Service, St. Vincent National Wildlife Refuge, Apalachicola, Florida, USA. https://www.fws.gov/refuge/st_vincent/ (01/20/2020)

Urbanek, R. P. and J. C. Lewis. 2015. Whooping crane (Grus americana), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.153 (01/09/2020)

van Dijk, P.P. 2011. Clemmys guttata. In: IUCN 2019. The IUCN Red List of Threatened Species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2011-1.RLTS.T4968A11103766.en (01/13/2020)

Waldron, J., S. Welch, and S. Bennett. 2008. Vegetation structure and habitat specificity of a declining North American reptile: A remnant of former landscapes. Biological Conservation 141:2477-82.

Weakley, A. S. 2012. Flora of the Carolinas, Virginia, Georgia, northern Florida, and surrounding areas. Working Draft of 30 November 2012. University of North Carolina Herbarium (NCU), North Carolina Botanical Garden, University of North Carolina at Chapel Hill, North Carolina, USA. http://herbarium.unc.edu/flora.htm (12/23/2019)

Weaver, W. G., S. P. Christman, and P. E. Moler. 1992. Big Pine Key ringneck snake, Diadophis punctatus acricus Paulson. Pages 146-149 in P. E. Moler, editor. Rare and endangered biota of Florida: Volume III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Weller, E. 2018. 5 year review: red wolf (Canis rufus). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

Whelan R. J. 1995. The ecology of fire. Cambridge University Press, Cambridge, UK.

White, M. P., H. N. Blalock-Herod, and P. M. Stewart. 2008. Life history and fish host identification for Fusconaia burkei and Pleurobema strodeanum (Bivalvia: Unionidae). American Malacological Bulletin 24:121-125.

White, M.P., H.N. Blalock-Herod, and P.M. Stewart. 2008. Life history and fish host identification for Fusconaia burkei and Pleurobema strodeanum (Bivalvia: Unionidae). American Malacological Bulletin 24:121-125.

WildEarth Guardians and S. Felsen. 2010. Petition to list the saltmarsh topminnow (Fundulus jenkinsi) under the US Endangered Species Act. WildEarth Guardians, Santa Fe, New Mexico, USA. Williams, J. D., A. E. Bogan, and J. T. Garner. 2008. Freshwater mussels of Alabama & the Mobile Basin in Georgia, Mississippi, & Tennessee. University of Alabama Press, Tuscaloosa, Alabama, USA.

Williams, J. D. and R. S. Butler. 1994. Class Bivalvia, Order Unionoida, freshwater bivalves. Pages 53- 128, 740-742 in M. Deyrup and R. Frantz, editors. Rare and endangered biota of Florida: Volume 4. Invertebrates. University Press of Florida, Gainesville, Florida, USA.

Williams, J. D., H. N. Blalock, A. Benson, and D. N. Shelton. 2000. Distribution of the freshwater mussel fauna (Bivalvia: Margaritiferidae and Unionidae) in the Escambia and Yellow river drainages in southern Alabama and western Florida. Final Report for the US Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

Williams, M. J. 2015. Monarchs make Florida home. U.S. Department of Agriculture, Natural Resources Conservation Service, Gainesville, Florida, USA. https://www.nrcs.usda.gov/wps/portal/nrcs/detail/fl/newsroom/releases/?cid=NRCSEPRD363613 (01/03/2020)

Wolfe, J. L. 1992. Lower Keys marsh rabbit Silvilagus palustris herneri. in S. R. Humphrey, editor. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Wunderlin, R. P., B.F. Hansen, A. R. Franck, and F. B. Essig. 2020. Atlas of Florida Plants. Institute for Systematic Botany, University of South Florida, Tampa, Florida, USA. http://florida.plantatlas.usf.edu/plant.aspx?id=4103 (01/24/2020)

Yirka, M. A., J. N. Flowers, M. D. Martin, K. R. Messenger, and N. A. Shepard. 2010. Geographic distribution: *Tantilla oolitica* (rim rock crowned snake). *Herpetological Review* 41:382.

# Appendix C
## Effects of the Action on ESA-listed Species

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic Competition | Biotic Predation | Biotic Invasive Species | Physical Fill | Physical Dredging | Physical Habitat Fragmentation | Physical Hydro | Chemical Nutrients | Chemical W/Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mammals** | | | | | | | | | | | | | | | |
| Wetland/marsh | Sherman's Short-tailed Shrew (*Blarina brevicauda shermani*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Forest/grasslands/swamp | Gray Wolf (*Canis lupus*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Forest/grasslands/swamp | Red Wolf (*Canis rufus*) | E | N | Y | N/A | - | X | | | X | | X | | | |
| Tropical hardwood hammock/mangrove | Florida Bonneted Bat (*Eumops floridanus*) | E | N | Y | N/A | 411 | | | | X | | X | X | | X |
| Wetland/marsh | Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) | E | N | Y | N/A | - | | | | X | X | X | X | | X |
| Caves | Gray Bat (*Myotis grisescens*) | E | N | Y | N/A | - | | | | X | | X | | | |
| Caves | Little Brown Bat (*Myotis lucifugus occultus*) | UR | N | Y | N/A | - | | | | X | | X | X | | X |
| Caves | Indiana Bat (*Myotis sodalis*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Tropical hardwood hammock/mangrove | Key Largo Woodrat (*Neotoma floridana smalli*) | T | N | Y | N/A | 1 | | X | | X | | X | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| Pine rockland | Key Deer (*Odocoileus virginianus clavium*) | E | N | N | N/A | 5 | | | | | | | X | | X |
| Wetland/ marsh | Rice Rat (*Oryzomys palustris natator*) | E | Y | Y | N/A | 5 | X | X | | X | X | X | X | | X |
| Wetland/ marsh | Pine Island Rice Rat (*Oryzomys palustris planirostris*) | URS | N | Y | N/A | - | | | X | X | X | X | X | | X |
| Wetland/ marsh | Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) | URS | N | Y | N/A | - | | | X | X | | X | X | | X |
| Caves | Tricolored Bat (*Perimyotis subflavus*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Tropical hardwood hammock/ mangrove | Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) | E | N | Y | N/A | 1 | | X | | X | X | X | X | | X |
| Beach/ scrub dune | Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) | E | N | N | N/A | 1 | | | | X | X | X | | | |
| Beach/ scrub dune | Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) | T | N | N | N/A | 3 | | X | | X | X | X | | | |
| Beach/ scrub dune | St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) | E | Y | N | N/A | 4 | | | | X | X | X | | | |
| Beach/ scrub dune | Anastasia Island Beach Mouse | E | N | N | N/A | - | | | | X | X | X | | | |

## C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (Peromyscus polionotus phasma) | | | | | | | | | | | | | | |
| Beach/scrub dune | Perdido Key Beach Mouse (Peromyscus polionotus trissyllepsis) | E | N | N | N/A | - | | X | X | X | X | | | | |
| Forests/grasslands/swamps | Florida Panther (Puma [=Felis] concolor coryi) | E | N | Y | N/A | 197 | | | | X | X | X | X | | |
| Wetland/marsh | Insular Hispid Cotton Rat (Sigmodon hispidus insulicola) | URS | N | N | N/A | - | | | | X | | X | X | | X |
| Wetland/marsh | Lower Keys Rabbit (Sylvilagus palustris hefneri) | E | N | Y | N/A | 6 | | X | X | X | X | X | X | | X |
| Aquatic | West Indian Manatee (Trichechus manatus) | T | Y | Y | N/A | 493 | | | | X | X | X | X | | X |
| **Birds** | | | | | | | | | | | | | | | |
| Wetland/marsh | Cape Sable Seaside Sparrow (Ammodramus maritimus mirabilis) | E | Y | Y | N/A | 9 | | | | X | X | X | | | X |
| Grassland | Florida Grasshopper Sparrow (Ammodramus savannarum floridanus) | E | N | N | N/A | 57 | | | | X | | X | X | | |
| Wetland/marsh | Saltmarsh Sparrow (Ammospiza caudacuta) | UR | N | Y | N/A | - | | | | X | X | X | X | | X |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | | Chemical | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Upland scrub | Florida Scrub-Jay (*Aphelocoma coerulescens*) | T | N | N | N/A | 199 | | | | | | X | X | | |
| Coastal tidal/marine | Rufa Red Knot (*Calidris canutus rufa*) | T | N | Y (tidal flats) | N/A | 9 | | | | X | X | X | X | | X |
| Forest/forested wetland | Ivory-billed Woodpecker (*Campephilus principalis*) | E | N | T | N/A | 1 | | | | X | | X | X | | X |
| Coastal tidal/marine | Piping Plover (*Charadrius melodus*) | T* | Y | Y (intertidal beaches) | N/A | 29 | | | | X | X | X | X | | X |
| Grassland | Whooping Crane (*Grus americana*) | E | Y | Y | N/A | | | | | X | X | X | X | | X |
| Wetland/marsh | Eastern Black Rail (*Laterallus jamaicensis* ssp. *jamaicensis*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Wetland/marsh | Wood Stork (*Mycteria americana*) | T | N | Y | N/A | 2681 | | X | | X | X | X | X | | X |
| Grassland | Eskimo Curlew (*Numenius borealis*) | E | N | Y | N/A | - | | | | X | | X | X | | |
| Pine savanna | Red-cockaded Woodpecker (*Picoides borealis*) | E | N | N | N/A | 298 | | | | X | | X | X | | |
| Grassland | Audubon's Crested Caracara (*Polyborus plancus audubonii*) | T | N | Y | N/A | 175 | | X | | X | | X | X | | X |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Coastal tidal/marine | Black-capped Petrel (*Pterodroma hasitata*) | P | N | N | N/A | - | | | | | X | | | | |
| Wetland/ marsh | Everglade Snail Kite (*Rostrhamus sociabilis plumbeus*) | E | Y | Y | N/A | 159 | | X | X | X | | X | X | X | X |
| Forest/ forested wetland | Kirtland's Warbler (*Setophaga kirtlandii = Dendroica kirtlandii*) | D | N | N | N/A | 2 | | | | X | | X | | | |
| Coastal tidal/marine | Roseate Tern (*Sterna dougallii dougallii*) | T* | N | N | N/A | 1 | | | | | X | X | | | |
| Forest/ forested wetland | Bachman's Wood Warbler (*Vermivora bachmanii*) | E | N | Y | N/A | - | | | | X | | X | X | | |
| Forest/ forested wetland | Golden-winged Warbler (*Vermivora chrysoptera*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| ***Reptiles*** | | | | | | | | | | | | | | | |
| Wetland/ marsh/ freshwater | American Alligator (*Alligator mississippiensis*) | TS | N | Y | N/A | 2 | | X | | X | X | X | X | X | X |
| Wetland/ marsh/ freshwater | Spotted Turtle (*Clemmys guttata*) | URS | N | Y | N/A | - | X | X | X | X | X | X | | X | X |
| Swamp/ saltwater | American Crocodile (*Crocodylus acutus*) | T | Y | Y | N/A | 33 | | X | | X | X | X | X | X | X |
| Pine flatwoods | Eastern Diamondback Snake | URS | N | N | N/A | - | | | | X | | X | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (Crotalus adamanteus) | | | | | | | | | | | | | | |
| Pine rocklands | Key Ringneck Snake (Diadophis punctatus acricus) | URS | N | N | N/A | - | | | | | | X | | | |
| Pine flatwoods | Eastern Indigo Snake (Drymarchon corais couperi) | T | N | Y | N/A | 2697 | | | | X | | | X | | |
| Sandhill/ scrub flatwoods | Gopher Tortoise (Gopherus polyphemus) | C* | N | N | N/A | 1 | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Escambia Map Turtle (Graptemys ernsti) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Southern Hognose Snake (Heterodon simus) | NW | N | N | N/A | - | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Apalachicola Common Kingsnake (Lampropeltis getula meansi) | URS | N | Y | N/A | - | | X | | X | X | X | X | | |
| Wetland/ marsh/ freshwater | Alligator Snapping Turtle (Macrochelys temminckii) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Wetland/ marsh/ freshwater | Atlantic Salt Marsh Snake (Nerodia clarkii taeniata) | T | N | Y (streams) | N/A | 6 | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Florida Pine Snake (Pituophis melanoleucus mugitus) | URS | N | N | N/A | - | | | | X | | X | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
| Sandhill/scrub flatwoods | Bluetail Mole Skink (*Plestiodon egregius lividus*) | T | N | N | N/A | 31 | | | | X | | X | | | |
| Sandhill/scrub flatwoods | Sand Skink (*Plestiodon reynoldsi*) | T | N | N | N/A | 66 | | | | X | | X | | | |
| Wetland/marsh/freshwater | Florida Red-bellied Turtle (*Pseudemys nelson*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sandhill/scrub flatwoods | Florida Scrub Lizard (*Sceloporus woodi*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Sandhill/scrub flatwoods | Short-tailed Snake (*Stilosoma extenuatum*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Pine rocklands | Rim Rock Crowned Snake (*Tantilla oolitica*) | URS | N | N | N/A | - | | | | X | | X | | | |
| ***Amphibians[a]*** | | | | | | | | | | | | | | | |
| Pond breeding | Reticulated Flatwoods Salamander (*Ambystoma bishopi*) | E | N | Y | N/A | 6 | | | | X | | X | X | | X |
| Pond breeding | Frosted Flatwoods Salamander (*Ambystoma cingulatum*) | T | N | Y | N/A | - | | | | X | | X | X | | X |
| Cave | Georgia Blind Salamander (*Eurycea wallacei*) | URS | N | Y (aquatic caves) | N/A | - | | | | | | | X | | X |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Pond breeding | Gopher Frog (*Lithobates capito*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Aquatic | Dwarf Siren (*Pseudobranchus striatus lustricolus*) | URS | N | Y | N/A | - | | | X | X | X | X | X | X | X |
| ***Fishes*** | | | | | | | | | | | | | | | |
| Sturgeon | Shortnose Sturgeon (*Acipenser brevirostrum*) | E | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sturgeon | Gulf Sturgeon (*Acipenser oxyrinchus [=oxyrhynchus] desotoi*) | T | Y | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sturgeon | Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) | E* | Y | Y (streams) | N/A | - | | X | | | | | | | X |
| Benthic insectivore | Okaloosa Darter (*Etheostoma okaloosae*) | T | N | Y (streams) | N/A | 1 | X | X | X | X | X | X | X | X | X |
| Topminnow | Saltmarsh Topminnow (*Fundulus jenkinsi*) | URS | N | Y (streams) | N/A | - | X | X | X | X | X | X | X | X | X |
| Sawfish | Smalltooth Sawfish (*Pristis pectinata*) | E* | Y | Y (streams) | N/A | 305 | | X | | X | X | X | X | X | X |
| ***Mollusks*** | | | | | | | | | | | | | | | |
| Mussel | Southern Elktoe (*Alasmidonta triangulata*) | URS | N | Y (streams) | N/A | - | | | | | | | X | X | X |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | | Chemical | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Mussel | Fat Threeridge (Amblema neislerii) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Rayed Creekshell (Anodontoides radiatus) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Snail | Pygmy Siltsnail Snail (Cincinnatia parva) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Snail | Ponderous Siltsnail Snail (Cincinnatia ponderosa) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Mussel | Delicate Spike (Elliptio arctata) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Mussel | Chipola Slabshell (Elliptio chipolaensis) | T | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Purple Bankclimber (Elliptoideus sloatianus) | T | Y | Y (streams) | N/A | 8 | | X | | X | X | X | X | X | X |
| Mussel | Tapered Pigtoe (Fusconaia burki) | T | Y | Y (streams) | N/A | 8 | | X | | X | X | X | X | X | X |
| Mussel | Narrow Pigtoe (Fusconaia escambia) | T | Y | Y (streams) | N/A | 3 | | X | | X | X | X | X | X | X |
| Mussel | Round Ebonyshell (Fusconaia rotulata) | E | Y | Y (streams) | N/A | 2 | | X | | X | X | X | X | X | X |
| Mussel | Southern Sandshell (Hamiota australis) | T | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Shinyrayed Pocketbook (Lampsilis subangulata) | E | Y | Y | N/A | 6 | | X | | X | X | X | X | X | X |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mussel | Gulf Moccasinshell (*Medionidus penicillatus*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Ochlockonee Moccasinshell (*Medionidus simpsonianus*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Suwannee moccasinshell (*Medionidus walkeri*) | T | Y | Y (streams) | N/A | 6 | X | X | X | | X | X | | X | X |
| Snail | Stock Island Tree Snail (*Orthalicus reses* [not incl. *reses/odyssa*]) | T | N | Y (streams) | N/A | 2 | | | | X | | X | | | |
| Mussel | Oval Pigtoe (*Pleurobema pyriforme*) | E | Y | Y (streams) | N/A | 11 | | X | | X | X | X | X | X | X |
| Mussel | Fuzzy Pigtoe (*Pleurobema strodeanum*) | T | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Southern Kidneyshell (*Ptychobranchus jonesi*) | E | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Choctaw Bean (*Villosa choctawensis*) | E | Y | Y | N/A | 9 | | X | | X | X | X | X | X | X |
| ***Crustaceans*** | | | | | | | | | | | | | | | |
| Pond/ river/ stream | Cypress Crayfish (*Cambarellus blacki*) | URS | N | Y | N/A | - | | | | | | X | X | | X |
| Cave/well/ sinkhole | Florida Cave Amphipod | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | | X | X |

## C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *(Crangonyx grandimanus)* | | | | | | | | | | | | | | |
| Cave/well/sinkhole | Hobb's Cave Amphipod *(Crangonyx hobbsi)* | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| | Squirrel Chimney Cave Shrimp *(Palaemonetes cummingi)* | T | N | Y (aquatic caves) | N/A | - | | | X | X | | X | X | X | X |
| Cave/well/sinkhole | Orange Cave Crayfish *(Procambarus acherontis)* | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Pond/river/stream | Coastal Flatwoods Crayfish *(Procambarus apalachicolae)* | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Cave/well/sinkhole | Silver Glen Springs Crayfish *(Procambarus attiguus)* | URS | N | Y (aquatic caves) | N/A | - | | | | X | X | X | X | | X |
| Cave/well/sinkhole | Bigcheek Cave Crayfish *(Procambarus delicatus)* | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Pond/river/stream | Panama City Crayfish *(Procambarus econfinae)* | P | N | Y | N/A | - | | | | X | X | X | X | | X |
| Cave/well/sinkhole | Santa Fe Cave Crayfish *(Procambarus erythrops)* | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Cave/well/sinkhole | Orange Lake Cave Crayfish (*Procambarus franzi*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| Cave/well/sinkhole | Coastal Lowland Cave Crayfish (*Procambarus leitheuseri*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/s inkhole | Florida Cave Crayfish (*Procambarus lucifugus*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| Cave/well/sinkhole | Miami Cave Crayfish (*Procambarus milleri*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/sinkhole | Putnam County Cave Crayfish (*Procambarus morrisi*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/sinkhole | Pallid Cave Crayfish (*Procambarus pallidus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/sinkhole | Black Creek Crayfish (*Procambarus pictus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | X | X | X | | X |
| Cave/well/sinkhole | Spider Cave Crayfish (*Troglocambarus maclanei*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| *Insects* | | | | | | | | | | | | | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic — Competition | Predation | Invasive Species | Physical — Fill | Dredging | Habitat Fragmentation | Hydro | Chemical — Nutrients | W/Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Caddisfly | Logan's Agarodes Caddisfly (*Agarodes logani*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Butterfly | Florida Leafwing (*Anaea troglodyta floridalis*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Butterfly | Frosted Elfin Butterfly (*Callophrys irus*) | UR | Y | N | N/A | - | | | X | X | | X | | | |
| Beetle | Miami Tiger Beetle (*Cicindelidia floridana*) | E | N | N | N/A | - | | | X | X | | X | | | |
| Butterfly | Nickerbean Blue Butterfly (*Cyclargus ammon*) | TS | N | N | N/A | - | | | | X | | X | | | |
| Butterfly | Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) | E | N | N | N/A | 1 | | | X | X | | X | | | |
| Butterfly | Monarch Butterfly (*Danaus plexippus plexippus*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Butterfly | Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Butterfly | Palatka Skipper Butterfly (*Euphyes pilatka klots*) | URS | N | Y | N/A | - | | | | X | | X | X | | |
| Dragonfly | Westfall's Clubtail Dragonfly (*Gomphus westfalli*) | URS | N | Y (streams) | N/A | - | X | X | | X | X | X | X | | X |
| Butterfly | Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) | TS | N | N | N/A | - | | | | X | | X | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Butterfly | Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) | E | N | N | N/A | 1 | | | | X | | X | X | | |
| Bee | Gulf Coast Solitary Bee (*Hesperapis oraria*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Caddisfly | Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | | X |
| Caddisfly | Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) | URS | NN | Y (streams) | N/A | - | | | | X | X | X | X | | X |
| Butterfly | Cassius Blue Butterfly (*Leptotes cassius theonus*) | TS | N | N | N/A | - | | | | X | | X | | | |
| Dragonfly | Purple Skimmer Dragonfly (*Libellula jesseana*) | URS | N | Y (lakes) | N/A | - | X | X | | X | X | X | X | X | X |
| Beetle | American Burying Beetle (*Nicrophorus americanus*) | E | N | N | N/A | - | | | | | | X | | | |
| Caddisfly | Little ocelis longhorn caddisfly (*Oecetis parva*) | URS | N | Y (lakes) | N/A | - | | | | X | X | X | X | X | X |
| Dragonfly | Southern Snaketail Dragonfly (*Ophiogomphus australis*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Bee | Blue Calamintha Bee (*Osmia calaminthae*) | URS | N | N | N/A | - | | | | X | | X | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Dragonfly | Calvert's Emerald Dragonfly (*Somatochlora calverti*) | URS | N | Y (streams) | N/A | - | | X | | | X | X | X | | X |
| Butterfly | Bartram's Scrub-hairstreak (*Strymon acis bartrami*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Dragonfly | Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) | URS | N | Y (streams) | | - | | X | | X | X | X | X | | X |
| Caddisfly | Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) | URS | N | Y (streams) | N/A | - | | X | X | X | X | X | | | X |
| **Plants** | | | | | | | | | | | | | | | |
| Substrub | Meadow Joint-vetch (*Aeschynomene pratensis*) | URS | N | Y | OBL | | | | X | X | | | | | |
| Shrub | Crenulate Lead-plant (*Amorpha crenulata*) | E | N | N | FAC | 2 | | | | X | | X | | | |
| Perennial Forb | Blodgett's Silverbush (*Argythamnia blodgettii*) | T | N | N | NL (UPL) | | | | X | | | X | | | |
| Shrub | Four-petal Pawpaw (*Asimina tetramera*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Honeycombhead Sunflower (*Balduina atropurpurea*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Apalachicola Wild Indigo (*Baptisia megacarpa*) | URS | N | Y | FACW | | | | X | X | | X | X | | |

## C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perennial Forb | Florida Bonamia (*Bonamia grandiflora*) | T | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Florida Brickell-bush (*Brickellia mosieri*) | E | Y | N | NL (UPL) | | | | X | | | | | | |
| Annual Forb | Brooksville Bellflower (*Campanula robinsiae*) | E | N | Y | FACW | | | | X | X | | | X | | X |
| Cactus | Fragrant Prickly-apple (*Cereus eriophorus var. fragrans*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Deltoid Spurge (*Chamaesyce deltoidea ssp. Deltoidea*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Pineland Sandmat (*Chamaesyce deltoidea pinetorum*) | T | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Wedge Spurge (*Chamaesyce deltoidea serpyllum*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Annual Forb | Garber's Spurge (*Chamaesyce garberi*) | T | N | N | NL (UPL) | | | | X | | | | | | |
| Subshrub | Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Shrub | Pygmy Fringe-tree (*Chionanthus pygmaeus*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Cape Sable Thoroughwort | E | N | N | NL (UPL) | 1 | | | X | | | | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
| | (Chromolaena frustrate) | | | | | | | | | | | | | | |
| Perennial Forb | Florida Golden Aster (Chrysopsis floridana) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Lichen | Florida Perforate Cladonia (Cladonia perforate) | E | N | N | N/A | | | | | | | X | | | |
| Perennial Forb | Pigeon Wings (Clitoria fragrans) | F | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Short-leaved Rosemary (Conradina brevifolia) | E | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Etonia Rosemary (Conradina etonia) | E | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Apalachicola Rosemary (Conradina glabra) | E | N | N | NL (UPL) | | | | | | | | | | |
| Cactus | Florida Semaphore Cactus (Consolea corallicola) | E | Y | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Ciliate-leaf Tickseed Sunflower (Coreopsis integrifolia) | E | Y | Y | FACW | | | | | X | | X | X | | |
| Perennial Forb | Avon Park Harebells (Crotalaria avonensis) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Annual Forb | Okeechobee Gourd (Cucurbita okeechobeensis ssp. okeechobeensis) | E | N | Y | OBL | | | | | X | | X | X | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Biotic** | | | **Physical** | | | | **Chemical** | |
| Shrub | Florida Prairie-Clover (*Dalea carthagenensis floridana*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Subshrub | Beautiful Pawpaw (*Deeringothamnus pulchellus*) | E | N | Y | FAC | | | | X | | | | | | |
| Subshrub | Rugel's Pawpaw (*Deeringothamnus rugelii*) | E | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Garrett's Mint (*Dicerandra christmanii*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Longspurred Mint (*Dicerandra cornutissima*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Scrub Mint (*Dicerandra frutescens*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Lakela's Mint (*Dicerandra immaculata*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Graminoid | Florida Pineland Crabgrass (*Digitaria pauciflora*) | T | N | Y | FACW | | | | X | X | | | X | | |
| Perennial Forb | Clam-shell Orchid (*Eryngia cochleata var. triandra*) | NW | N | N | NL (UPL) | | | | | X | | | X | | |
| Perennial Forb | Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) | URS | N | N | NL (UPL) | | | | | X | | | X | | |
| Perennial Forb | Blackbract Pipewort (*Eriocaulon nigrobracteatum*) | URS | N | Y | OBL | | | | | X | | | X | X | |

Major Stressors Associated with the Proposed Action

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
| Perennial Forb | Scrub Buckwheat (Eriogonum longifolium var. gnaphalifolium) | T | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Snakeroot (Wedgeleaf Eryngo) (Eryngium cuneifolium) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Telephus Spurge (Euphorbia telephioides) | T | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Small's Milkpea (Galactia smallii) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Harper's Beauty (Harperocallis flava) | E | N | N | FACW | | | | | X | | X | X | | |
| Cactus | Aboriginal Prickly-apple (Harrisia aboriginum (=Cereus) (=gracilis)) | E | Y | N | FACU | 3 | | | X | | | | | | |
| Perennial Forb | Florida Hartwrightia (Hartwrightia floridana) | URS | N | Y | OBL | | | | | X | | | | X | |
| Perennial Forb | Henry's Spider-lily (Hymenocallis henryae) | URS | N | N | OBL | | | | | X | | | | | |
| Perennial Forb | Highlands Scrub Hypericum (Hypericum cumulicola) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Shrub | Edison's Ascyrum St. Johns Wort | URS | N | Y | OBL | | | | | X | | | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
| Substrub | (Hypericum edisonianum) Smooth Barked St. Johns Wort (Hypericum lissophloeus) | URS | N | Y | OBL | 1 | | | | X | | | X | | X |
| Tree | Yellow Anisetree (Illicium parviflorum) | NW | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Beach Jacquemontia (Jacquemontia reclinata) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Cooley's Water-willow (Justicia cooleyi) | E | N | Y | FACW | | | | X | X | | | X | | |
| Perennial Forb | Scrub Blazingstar (Liatris ohlingerae) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Panhandle Lily (Lilium iridollae) | URS | N | Y | OBL | | | | | X | | X | | | |
| Shrub | Bog Spicebush (Lindera subcoriacea) | URS | N | Y | OBL | 1 | | | | X | | | X | | |
| Perennial Forb | Sand Flax (Linum arenicola) | E | N | Y | OBL | | | | X | X | | | X | | |
| Annual Forb | Carter's Small Flowered Flax (Linum carteri carteri) | E | Y | Y | FACW | | | | X | X | | X | | | |
| Perennial Forb | West's Flax (Linum westii) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Boykin's Lobelia (Lobelia boykinii) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Raven's Seedbox (Ludwigia ravenii) | URS | N | Y | OBL | | | | | X | | | X | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Subshrub | Scrub Lupine (*Lupinus aridorum*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Curtis' Loosestrife (*Lythrum curtissii*) | URS | N | Y | OBL | 1 | | | | X | X | | X | | |
| Perennial Forb | Lowland Loosestrife (*Lythrum flagellare*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | White Birds-in-a-nest (*Macbridea alba*) | T | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Godfrey's Stitchwort (*Minuaria godfreyi*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Annual Forb | Needleleaf or Narrowleaf Naiad Water-nymph (*Najas filifolia*) | URS | N | Y | OBL | | | | X | X | | | X | | |
| Subshrub | Briton's Beargrass (*Nolina brittoniana*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Cape Sable Orchid (*Oncidium undulatum*) | URS | N | Y | NL (UPL) | | | | | X | | | X | | |
| Annual Forb | Papery Whitlow-wort (*Paronychia chartacea*) | T | N | N | NL (UPL) | | | | | X | | | X | | |
| Cactus | Key tree Cactus (*Pilosocereus robinii*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Godfrey's Butterwort (*Pinguicula ionantha*) | T | N | Y | OBL | | | | | X | | | | | |
| Perennial Forb | Lewton's Polygala Milkwort (*Polygala lewtonii*) | E | N | N | NL (UPL) | | | | X | | | | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
| Perennial Forb | Tiny Polygala Milkwort (Polygala smallii) | E | N | N | FACU | | | | X | | | | | | |
| Annual Forb | Horton Wireweed (small) (Polygonella basiramia) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Sandlace (Woody Wireweed) (Polygonella myriophylla) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Florida Pondweed (Potamogeton floridanus) | URS | N | Y | OBL | | | | | X | | | X | | X |
| Shrub | Scrub Plum (Prunus geniculata) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | White Meadowbeauty (Rhexia parviflora) | URS | N | Y | OBL | | | | | X | | X | X | | |
| Perennial Forb | Panhandle Meadowbeauty (Rhexia salicifolia) | URS | N | Y | OBL | | | | | X | | X | X | X | X |
| Shrub | Chapman Rhododendron (Rhododendron chapmanii) | E | Y | Y | FACW | 2 | | | X | X | | X | | | |
| Graminoid | Hairy Peduncled Beakrush (Rhynchospora crinipes) | URS | N | Y | OBL | | | | | X | X | | X | | X |
| Shrub | Miccosukee Gooseberry (Ribes echinellum) | T | N | Y | FAC | 1 | | | X | X | | | | | |

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Biotic** | | | **Physical** | | | | **Chemical** | |
| Perennial Forb | Eared Coneflower (*Rudbeckia auriculata*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Tree | Florida Willow (*Salix floridana*) | URS | N | Y | FACW | | | | X | X | | | X | | X |
| Perennial Forb | Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | American Chaffseed (*Schwalbea americana*) | E | N | Y | FAC | | | | | | X | | X | | |
| Perennial Forb | Florida Skullcap (*Scutellaria floridana*) | T | N | Y | OBL | | | | | X | | | X | | |
| Shrub | Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) | T | N | Y | FAC | | | | | X | | | X | | |
| Shrub | Georgia Bully (*Sideroxylon thorne*) | URS | N | N | NL (UPL) | | | | | X | | | | | |
| Perennial Forb | Fringed Campion (*Silene polypetala*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Gentian Pinkroot (*Spigelia gentianoides*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Cooley's Meadow Rue (*Thalictrum cooleyi*) | E | N | Y | FACW | | | | | X | | | X | | |
| Tree | Florida Torreya (*Torreya taxifolia*) | E | N | N | NL (UPL) | | | | | | | | X | | |
| Perennial Forb | Florida Bristle Fern (*Trichomanes*) | E | N | N | NL (UPL) | | | | X | | | X | | | |

## C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | W/Q |
| | *punctatum* ssp. *floridanum* | | | | | | | | | | | | | | |
| Perennial Forb | Ocala Vetch (*Vicia ocalensis*) | NW | N | Y | OBL | 3 | | | X | | | | X | | |
| Annual Forb | Wide-leaf Warea (*Warea amplexifolia*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Annual Forb | Carter's Mustard (*Warea carteri*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Karst Pond Xyris (*Xyris longisepala*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Shrub | Florida Ziziphus (Jujube) (*Ziziphus celata*) | E | N | N | NL (UPL) | 1 | | | X | | | X | | | |

**Header Key:**
CN (SN) - Common Name (Scientific Name)
FLS – Federal Listing Status under the Endangered Species Act (ESA)
CH? – Has critical habitat been designated?
Wetlands - Are wetlands or waters regularly utilized by the species?
# ESA – Number of ESA consultations for this species in Florida over the last five years
IS – Wetland indicator status (plant-specific)
Competition – Competitive balance alteration
Predation – Predator/prey relationship alteration
Invasive species – Invasive species introduction/colonization
Hydro – Changes in hydrologic regime
Nutrients – Nutrient cycle exchange/alteration
WQ – Water Quality

**Table Text Key:**
a – Certain amphibian species may also be threatened by relocation during project activities (as this impact was not broadly applicable to other species, it was not included as a column in the table)

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |

FLS – E (Endangered), T (Threatened), TS (Threatened due to Similarity of Appearance), C (Candidate), P (Proposed for listing), UR (Under Review), URS (Under Review, Substantial Finding), NW (Not Warranted Finding), * (Listing status of DPS that occurs in Florida. Other DPSs may have different listing statuses in other region).

CH – Y (Yes), N (No)

IS – OBL (Obligate), FACW (Facultative Wetland), FAC (Facultative), UPL (Upland), FACU (Facultative Upland), NL UPL (Not Listed, Generally Assumed to be Upland)

## C.1.b.- Effects of the Action on ESA-listed Species - Findings

| Guild | CN (SN) | FLS | CH? | Finding | Comments (ESA determinations made for all species, including proposed, to encompass possibility for future listings) |
|---|---|---|---|---|---|
| **Mammals** | | | | | |
| Wetland/ marsh | Sherman's Short-tailed Shrew (*Blarina brevicauda shermani*) | URS | N | No effect | Habitat is described as edges of marshes or shallow depressions, mesic flatwoods, with abundant grasses; also drainage ditches with abundant grass cover. Threats include habitat loss and predation by cats. Current status is unknown, and it is possible thespecies has been extirpated (has not been located since 1995). As the species is likely extirpated, this action will have no effect on the subspecies. |
| Forest/ grasslands/ swamp | Gray Wolf (*Canis lupus*) | E | Y | No effect | As this species is extirpated from Florida, this action will have no effect on the species. |
| Forest/ grasslands/ swamp | Red Wolf (*Canis rufus*) | E | N | NLAA | The species occupies coastal prairies, forests, and swamps within these areas. In Florida, range limited to one island (St. Vincent; a USFWS National Wildlife Refuge). A major threat to Red Wolf populations is loss of genetic diversity from interbreeding with coyotes. As the species only occurs on protected lands, this action is NLAA the species. |
| Tropical hardwood hammock/mang rove | Florida Bonneted Bat (*Eumops floridanus*) | E | N | LAA | Occupies pineland, tropical hardwood, and mangrove habitat. Areas of freshwater wetlands are also important to the species. The bats roost singly or in small colonies in tree cavities (including Red-cockaded Woodpecker cavities), buildings, foliage, and rock crevices, as well as artificial roosts. Current threats to the species include a restricted range and small population size, habitat loss, limited roost sites, environmental stochasticity, and pesticides. Through impacts to habitat (loss and fragmentation) and water quality, the action could result in a LAA determination. |
| Wetland/ marsh | Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) | E | N | LAA | Species occurs in salt marsh habitat. Decline of the species appears to be due to climatic changes and associated rise in sea level. Through impacts to habitat (loss and fragmentation) and water quality, the action could result in a LAA determination. |
| Caves | Gray Bat (*Myotis grisescens*) | E | N | NLAA | In Florida, the species occurs in a single county (Jackson) in the northwest Panhandle (limestone karst region). Threats to the species include roost disturbance (environmental or human-caused) and white-nose syndrome. Roosting (including some maternity roosts) has been documented in nine caves in this county (on both public and private and). Due to the restricted range of the species in Florida and the fact that the species has not recently used maternity caves in the state, the action is NLAA the species. |

| | | | | | |
|---|---|---|---|---|---|
| Caves | Little Brown Bat (*Myotis lucifugus occultus*) | UR | N | NLAA | The Little Brown Bat has been occasionally detected in northern Florida, although it is not common in the state. General habitat requirements include forested or herbaceous wetlands, hardwood and mixed forest, grassland, and scrub. Threats to the species include white-nose syndrome, climate change, pesticides, mortality from wind turbines, and habitat modification or destruction. Species is extremely uncommon in Florida and the action is NLAA the subspecies. |
| Caves | Indiana Bat (*Myotis sodalis*) | E | Y | NLAA | There are no current records of the species in Florida. However, there has been one historical winter record of the species in Old Indian Cave in Jackson County. Due to the restricted range of the species in Florida and the fact that the species has not recently been detected in the state, the action is NLAA the species. |
| Tropical hardwood hammock/mangrove | Key Largo Woodrat (*Neotoma floridana smalli*) | T | N | LAA | Inhabits tropical hardwood hammock forests. Currently the species is limited to North Key Largo, with is approximately half of its historical range. The woodrat's small and isolated populations are especially vulnerable to extinction because of a wide range of threats including demographic factors and natural catastrophes. Predation poses another significant risk, as they are depredated by a wide range of raptorial, reptilian, and mammalian (including free-roaming cats) predators. Based on the limited range and habitat preferences of the species, the action could result in a LAA determination. |
| Pine rockland | Key Deer (*Odocoileus virginianus clavium*) | E | N | LAA | Key Deer is found in the Florida Keys within 11 island complexes from Johnson Keys to Sugarloaf Key. Selectively uses hammock and pine rockland upland habitats. These habitats contain a substantial portion of their forage plants, fresh water, and cover, which is especially important for fawning. Ongoing threats include urbanization and vehicular collisions. Through direct impacts to habitat via fill, habitat fragmentation, and water quality, the action could result in a LAA determination. |
| Wetland/ marsh | Rice Rat (*Oryzomys palustris natator*) | E | Y | LAA | Inhabits mangrove swamps, saltmarsh flats, buttonwood transition vegetation, and fresh water cattail marshes in the lower Florida Keys. Rice rats are impacted by the continued development of the Lower Keys (dredge and fill), increased populations of predators (such as raccoons, cats, and dogs) and through competition with introduced black rats (*Rattus rattus*). Based on all the above-listed threats and impacts, this action could result in a LAA determination. |
| Wetland/ marsh | Pine Island Rice Rat (*Oryzomys palustris planirostris*) | URS | N | LAA | Subspecies is known from only two occurrences: on Pine Island (Florida Keys) and the adjacent mainland. Occurs in herbaceous wetlands. The rat's habitat is threatened with habitat destruction by filling and draining of wetlands and invasion of woody plants. Through impacts to habitat, water quality, and introduction of invasive species, this action could result in a LAA determination. |

| Habitat | Species | Status | Listed | Determination | Description |
|---|---|---|---|---|---|
| Wetland/ marsh | Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) | URS | N | LAA | Restricted to Sanibel Island. Occurs along the edge of freshwater swamps of artesian origin, including swales and cattail stands. While the subspecies is protected in part on Ding Darling National Wildlife Refuge, it is threatened by habitat destruction through drainage, filling of marshes, lowering of the water table for human use, and woody plant invasion. Through impacts to habitat, water quality, and introduction of invasive species, the action could result in a LAA determination. |
| Caves | Tricolored Bat (*Perimyotis subflavus*) | URS | N | LAA | The species is a permanent resident throughout the Florida peninsula. However, the majority of records are from the Panhandle. Habitat preferences include open landscapes bordered by woodland (e.g. hardwood woodlands, grasslands, abandoned fields, and urban landscapes. Roosts in caves and mines in the winter and trees, man-made structures, and caves in the summer. Tricolored Bats forage near water and in early successional forests. Threats to the species include white-nose syndrome, human disturbance of hibernacula, habitat loss and modification, pesticides, climate change, and mortality from wind energy . Action could result in habitat fragmentation for the species as well as impacts to hydrology and water quality. This could result in a LAA determination. |
| Tropical hardwood hammock/mang rove | Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) | E | N | NLAA | Inhabits tropical hardwood hammock forests as well as nearby Salicornia coastal strands. Currently the species is limited to North Key Largo (mostly on protected habitat). Free-roaming cats loss of hammock forest habitat through sea level rise (e.g., salt intolerant forest) are ongoing threats to their populations. Due to the species restricted range, primarily on protected land, the action is NLAA the subspecies. |
| Beach/ scrub dune | Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) | E | N | LAA | This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and beach grasses, and adjacent interior scrub areas populated by oaks and sand pine or palmetto. Remaining populations of this subspecies exist in the sand dunes on Shell Island, Grayton Beach, and Topsail Hill in Florida. The predominant factor of decline for this species is habitat loss due to alteration or conversion of dunes (from human development and use). Through direct impacts to habitat via fill, dredging, and habitat fragmentation, the action could result in a LAA determination. |
| Beach/ scrub dune | Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) | T | N | LAA | Species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass, and adjacent interior scrub areas populated by oaks and sand pine or palmetto. The predominant factors of decline for this species are habitat loss due to alteration of conversion of dunes due to human development and use, and destruction of habitat due to hurricanes and storms. Through direct impacts to habitat via fill, dredging, and habitat fragmentation, the action could result in a LAA determination. |
| Beach/ scrub dune | St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) | E | Y | LAA | Two existing populations of St. Andrew Beach Mouse inhabit East Crooked Island in Bay County and St. Joseph Peninsula in Gulf County. Habitat requirements include primary and secondary scrub dune ecosystems. St. Andrew Beach Mice face a suite of threats primarily related to habitat loss or degradation via urbanization and stochastic environmental events. Predation by feral cats is also a significant threat. Impacts to habitat could result in a LAA determination. |

| Habitat | Species | Status | | Determination | Description |
|---|---|---|---|---|---|
| Beachy scrub dune | Anastasia Island Beach Mouse (*Peromyscus polionotus phasma*) | E | N | LAA | Currently, two populations of this subspecies exist on Anastasia Island: at Anastasia Island State Park and Fort Matanzas National Monument. This species occurs in beach dune systems vegetated by sea oats and dune panic grass and adjacent interior scrub areas populated by oaks and sand pine or palmetto. As the species strictly occurs on protected lands, the action is NLAA the subspecies. Possible adverse effects with restoration projects |
| Beachy scrub dune | Perdido Key Beach Mouse (*Peromyscus polionotus trissyllepsis*) | E | N | LAA | Restricted to Perdido Key in Florida. Requires a mosaic of frontal and scrub dunes for food, burrow sites, and refuge habitat. Threats to the species include loss/fragmentation of habitat for land development, tropical storm damage and mortality, and predation by non-native species. Impacts to could result in a LAA determination. |
| Forests/ grasslands/swa mps | Florida Panther (*Puma [=Felis] concolor coryi*) | E | N | LAA | Subspecies is limited to a single population in southern Florida. Panthers have vast home ranges, occur at low densities, and require large swaths of contiguous habitat. Incompatibility with urbanization continues to limit the recovery of this subspecies. Habitat fragmentation and loss also serve as significant threats to panthers. Additionally, vehicular collisions continue to limit panther population growth. Impacts to habitat (fragmentation) could result in a LAA determination. |
| Wetland/ marsh | Insular Hispid Cotton Rat (*Sigmodon hispidus insulicola*) | URS | N | LAA | Occurs within peninsular Florida and the Keys. The preferred habitat is herbaceous wetlands, grasslands, shrubland, and mixed woodlands. The rat is threatened by habitat destruction from urbanization. Impacts to habitat could result in a LAA determination. |
| Wetland/ marsh | Lower Keys Rabbit (*Sylvilagus palustris hefneri*) | E | N | LAA | Restricted to a small area of the Florida Keys. Occurs in saltmarsh, hammocks, and flatwoods. The rabbit's habitat is at risk due to development, dredging and filling of wetlands, human exploitation of very limited fresh water, and impacts from predators such as cats, dogs, and human poachers. Impacts to habitat could result in a LAA determination. |
| Aquatic | West Indian Manatee (*Trichechus manatus*) | T | Y | LAA | Florida manatees occur in freshwater, brackish and marine environments including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Impacts to habitat and water quality could result in a LAA determination. |
| **Birds** | | | | | |
| Wetland/ marsh | Cape Sable Seaside Sparrow (*Ammodramus maritimus mirabilis*) | E | Y | LAA | Non-migratory residents of freshwater to brackish marshes. Inhabits freshwater marl prairies with muhly grass (short-hydroperiods, densely clumped grasses, and periodic fires). Impacts to wetland habitat and changes in hydrological regimes and water quality could result in a LAA determination. |
| Grassland | Florida Grasshopper Sparrow (*Ammodramus savannarum floridanus*) | E | N | LAA | Inhabits dry, treeless, flat prairies in central and southern Florida. Species is a ground nester and changes in hydrologic regimes have resulted in nest loss via flooding. Action could result in habitat fragmentation and changes in hydrologic regimes. This could result in a LAA determination. |

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Wetland/ marsh | Saltmarsh Sparrow (*Ammospiza caudacutus*) | UR | N | LAA | Species inhabits coastal tidal marshes. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| Upland scrub | Florida Scrub-jay (*Aphelocoma coerulescens*) | T | N | LAA | Restricted to early successional xeric scrub and scrub flatwood habitat in relict dunes located on Florida's central ridges and coasts, in areas defined by historic fires. Habitat interspersed with wetlands/swales. Action could result in habitat fragmentation for the species. This could result in a LAA determination. |
| Coastal tidal/marine | Rufa Red Knot (*Calidris canutus rufa*) | T | N | LAA | Any impacts to coastal waters (fill, dredging, etc.) could impact this species and could result in a LAA determination. |
| Forest/ forested wetland | Ivory-billed Woodpecker (*Campephilus principalis*) | E | N | No effect | This species is extirpated and potentially extinct. The action will have no effect on this species. |
| Coastal tidal/marine | Piping Plover (*Charadrius melodus*) | T* | Y | LAA | Wintering habitat preferences in Florida include bay beaches (vs. ocean facing beaches) and inlets with exposed intertidal areas and tide cast wrack. Threats to the species include habitat loss and degradation from urbanization and some shoreline stabilization efforts and sea level rise. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| Grassland | Whooping Crane (*Grus americana*) | E | Y | NLAA | Wintering locations included tall grass prairie, wetlands, deltas, and interior tablelands along the southeast and Gulf Coast, including Florida. Reintroduced Whooping Cranes in Florida, located in the Kissimmee Prairie area (state protected land), are designated as an experimental, non-essential population (outside of federal lands, experimental populations are treated as proposed species; within federal lands, treated as threatened). Population size in Florida was 5 as of March 2019. The species is extirpated from all other areas of Florida. If actions occur on Kissimmee Prairie, the action may affect but is not likely to adversely affect the species. |
| Wetland/ marsh | Eastern Black Rail (*Laterallus jamaicensis* ssp. *jamaicensis*) | URS | N | LAA | Inhabits brackish, freshwater, and saltwater wetlands with dense vegetation cover. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| Wetland/ marsh | Wood Stork (*Mycteria americana*) | T | N | LAA | Inhabits freshwater, estuarine wetlands, cypress and mangrove swamps, stock ponds, and seasonally flooded agricultural areas. Species dependent on hydrology to concentrate prey (fish). Altered hydrology regimes could impact foraging habitat. Impacts to prey resources, habitat, hydrology, and water quality could result in a LAA determination. |
| Grassland | Eskimo Curlew (*Numenius borealis*) | E | N | No effect | Extirpated (Florida likely only a historic stopover site only during migration). This action would have no effect on the species. |
| Pine savanna | Red-cockaded Woodpecker (*Picoides borealis*) | E | N | LAA | Endemic to old growth, pine savanna ecosystems. Action could result in habitat fragmentation for the species and could result in a LAA determination. |

| Habitat | Species | Status | | Effect | Description |
|---|---|---|---|---|---|
| Grassland | Audubon's Crested Caracara (Polyborus plancus audubonii) | T | N | LAA | Inhabits open, upland prairies, interspersed with ponds, marshes, and cabbage palm hammocks in south-central Florida. The majority of occupied habitat and nesting occurs on private lands. The species feeds on road-kill carrion as well as invertebrates and a variety of vertebrate prey (fish, reptiles, birds, eggs, etc.). Impacts to prey, habitat, and water quality could result in a LAA determination. |
| Coastal tidal/marine | Black-capped Petrel (Pterodroma hasitata) | P | N | No effect | Nests on the island of Hispaniola and forages offshore of the southeastern U.S. Off the coast of Florida, Black-capped Petrels may be found year-round in relatively shallow waters near shore. As this action does not encompass marine fill off the coast of Florida, the action will have no effect on this species. |
| Wetland/ marsh | Everglade Snail Kite (Rostrhamus sociabilis plumbeus) | E | Y | LAA | Species habitat preferences include freshwater marshes with shallow water, patchy emergent vegetation, and large expanses of open water for foraging. Threats to the species include habitat loss and fragmentation, hydrology management practices in the state (that may directly or indirectly impact both the kite and its prey), predation, invasive species (predators as well as the exotic apple snail (Pomacea spp.). Impacts associated with the action (including all of the above) could result in a LAA determination. |
| Coastal tidal/marine | Roseate Tern (Sterna dougallii dougallii) | T* | N | LAA | A metapopulation of the Caribbean Roseate Tern is known to breed in 12 areas of the Florida Keys. Species may nest on the ground or the roofs of buildings. Microhabitat features at nest sites include open sand, coral rubble, or rock. Impacts of the action associated with fill, and dredging in coastal areas could result in a LAA determination. |
| Forest/ forested wetland | Bachman's Wood Warbler (Vermivora bachmanii) | E | N | No effect. | The species is not known to currently occur in Florida. Species inhabited bottomland hardwood forested wetlands but is now believed to be extirpated. This action will have no effect on the species. |
| Forest/ forested wetland | Golden-winged Warbler (Vermivora chrysoptera) | URS | N | LAA | The species occurs in Florida strictly during migration. Habitat on migration is not well-documented, but may include forest edge and second-growth forest. Species hybridizes with Golden-winged Warbler, but this is not an issue in Florida as no breeding occurs in the state. Impacts to habitat, including fragmentation, and changes in hydrology/water quality could result in a LAA determination. |
| **Reptiles** | | | | | |
| Wetland/ marsh/ freshwater | American Alligator (Alligator mississippiensis) | TS | N | LAA | Inhabits variety of wetland habitats including but not limited to marshes, ponds, lakes, rivers, swamps, bayous, canals, and canals. The species is no longer considered to be "biologically endangered or threatened" but remains listed because of similarity of appearance. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Wetland/ marsh/ freshwater | Spotted Turtle (Clemmys guttata) | URS | N | LAA | Inhabits variety of shallow, isolated wetlands with clean water, soft substrate, and emergent or submerged vegetation. Major threats include habitat destruction and loss of wetlands, collection for the pet trade, road mortality, and invasive species. Through impacts to habitat, hydrology, and water quality, as well as aiding in the spread of invasive species, the action is LAA the species. |

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Swamp/ saltwater | American Crocodile (*Crocodylus acutus*) | T | Y | LAA | Inhabits mangrove-lined bays, swamps, creeks, and inland swamps. Major threats include habitat loss from development. Through impacts to habitat, hydrology, and water quality, the action is LAA the species. |
| Pine flatwoods | Eastern Diamondback Snake (*Crotalus adamanteus*) | URS | N | LAA | Inhabits longleaf pine savanna, and other open-canopy habitats with a dense herbaceous understory. Major threats include habitat conversion or loss, and malicious killing by humans. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands may be impacted. |
| Pine rocklands | Key Ringneck Snake (*Diadophis punctatus acricus*) | URS | N | LAA | Inhabits pine rocklands and rockland hammocks, usually near permanent fresh water in the Florida Keys. Storm surge and sea level rise could be a future risk given the low elevation of much of the remaining habitat. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Pine flatwoods | Eastern Indigo Snake (*Drymarchon corais couperi*) | T | N | LAA | Inhabits variety of upland and lowland habitat types. Major threats to the species include habitat fragmentation, fire suppression leading to eventual habitat degradation, and road mortality. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Gopher Tortoise (*Gopherus polyphemus*) | C* | N | LAA | Inhabits areas characterized by dry sandy soils, open canopy cover, and abundant herbaceous vegetation. Major threats include habitat loss, degradation, and fragmentation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Escambia Map Turtle (*Graptemys ernsti*) | URS | N | LAA | Inhabits rivers with good flow, avoids backwaters and salt water, and nests along sandbars and river berms. Major threats include pollution. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Southern Hognose Snake (*Heterodon simus*) | NW | N | LAA | Inhabits open, xeric habitats with well-drained, sandy soils, dominated by pine or pine-oak woodland with an open canopy and grassy understory. Further studies are required to determine the factor or combination of factors that have caused the population to decline. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Apalachicola Common Kingsnake (*Lampropeltis getula meansi*) | URS | N | LAA | Inhabits wetland margins within longleaf pine flatwoods. Major threats include habitat loss. Through impacts to habitat, and hydrology, the action could result in a LAA determination. |
| Wetland/ marsh/ freshwater | Alligator Snapping Turtle (*Macrochelys temminckii*) | URS | N | LAA | Inhabits permanent water bodies. Major threats include overharvest in the exotic trade market and habitat loss. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Wetland/ marsh/ freshwater | Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) | T | N | LAA | Inhabits brackish coastal marshes. Major threats include habitat loss due to development and habitat degradation resulting from ditching, diking, and impoundments. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Florida Pine Snake (*Pituophis melanoleucus mugitus*) | URS | N | LAA | Inhabits well-drained sandy soils and relatively open canopy, including sandhills, xeric hammock, scrubby flatwoods, and dry prairie. Major threats are thought to include collecting, road mortality, and habitat loss. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Bluetail Mole Skink (*Plestiodon egregius lividus*) | T | N | LAA | Inhabits scrub and sandhill habitat, and is believed to require loose soils, moderate soil temperatures, and presence of vegetation. Major threats include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Sand Skink (*Plestiodon reynoldsi*) | T | N | LAA | Inhabits scrub and sandhill habitat and loose, un-compacted, coarse-grained soil is thought to be an important habitat component. Major threats include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Florida Red-bellied Turtle (*Pseudemys nelsoni*) | URS | N | LAA | Inhabits water rich with aquatic plant life, such as streams, ponds, lakes, ditches, sloughs, marshes, and mangrove-bordered creeks. Major threats include drought, predators, and illegal harvesting for food by turtle trappers. Through impacts to habitat, and hydrology, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Florida Scrub Lizard (*Sceloporus woodi*) | URS | N | LAA | Inhabits evergreen oak scrub and young sand pine scrub; and to a lesser extent sandhills adjacent to scrub or scrubby flatwoods. Major threats include habitat loss and fragmentation, and fire suppression. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Short-tailed Snake (*Stilosoma extenuatum*) | URS | N | LAA | Inhabits dry upland habitats of sandhill, xeric hammock, and sand pine scrub. Little is known about threats to this species. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Pine rocklands | Rim Rock Crowned Snake (*Tantilla oolitica*) | URS | N | LAA | Inhabits pine rockland and rockland hammock as well as disturbed urban environments including vacant lots, roadsides, and pastures. Major threats include habitat loss and fragmentation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| ***Amphibians*** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Pond breeding | Reticulated Flatwoods Salamander (Ambystoma bishop) | E | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Pond breeding | Frosted Flatwoods Salamander (Ambystoma cingulatum) | T | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Cave | Georgia Blind Salamander (Eurycea wallacei) | URS | N | NLAA | Limited to aquatic caves, alteration of hydrology or WQ is major concern. Based on habitat preferences, this action is NLAA the species. |
| Pond breeding | Gopher Frog (Lithobates capito) | URS | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Aquatic | Gulf Hammock Dwarf Siren (Pseudobranchus striatus lustricolus) | URS | N | No effect | Extirpated, limited historic range. The action will have no effect on this species. |
| **Fishes** | | | | | |
| Sturgeon | Shortnose Sturgeon (Acipenser brevirostrum) | E | N | No effect | Inhabits rivers and estuaries. Major threats include habitat impediment (e.g., dams), habitat degradation (e.g., dredging and poor water quality), and fisheries bycatch. Through impacts to aquatic habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sturgeon | Gulf Sturgeon (Acipenser oxyrinchus [=oxyrrhynchus] desotoi) | T | Y | No effect | Inhabits rivers and Gulf of Mexico waters, but not expected in Action Area. Major threats include damming and disconnection of spawning grounds, as well as habitat modification due to dredging, navigation maintenance activities, and water pollution. Impacts to aquatic habitat, hydrology, and water quality. |
| Sturgeon | Atlantic Sturgeon (Acipenser oxyrinchus oxyrinchus) | E* | Y | No effect | Inhabits riverine and Atlantic coast waters, but not expected in Action Area. Major threats include fisheries bycatch, habitat degradation (e.g., dredging and poor water quality), habitat impediment (e.g., dams), and vessel strikes. Impacts to aquatic habitat, hydrology, and water quality. |
| Benthic insectivore | Okaloosa Darter (Etheostoma okaloosae) | T | N | LAA | Inhabits dense vegetation, root mats, and detritus along clear, flowing stream margins in rivers. Most populations are believed to be stable or increasing at present, and vulnerability is primarily due to the small range and limited number of occurrences. Through impacts to aquatic habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Topminnow | Saltmarsh Topminnow (Fundulus jenkinsi) | URS | N | LAA | Inhabits small meandering channels of brackish marshes. Major threats include pollution and habitat destruction. Impacts to aquatic habitat, hydrology, and water quality. |
| Sawfish | Smalltooth Sawfish (Pristis pectinata) | E* | Y | No effect | Inhabits estuaries and coastal waters, but not expected in Action Area. Major threats include habitat loss and bycatch. Impacts to aquatic habitat, hydrology, and water quality. |
| **Mollusks** | | | | | |

| Type | Common Name (Scientific) | Status | | Determination | Description |
|---|---|---|---|---|---|
| Mussel | Southern Elktoe (*Alasmidonta triangulata*) | URS | N | LAA | Inhabits sandy substrates, such as sandbars, of rivers and larger creeks with moderate currents. Major threats include habitat degradation and fragmentation caused by dredging, impoundment, sedimentation, water extraction, and drought. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Fat Threeridge (*Amblema neisleri*) | E | Y | LAA | Inhabits the main channels of small to large rivers where the current is slow to moderate and the substrate varies from gravel to cobble to a mixture of sand and sandy mud. Major threats include anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Rayed Creekshell (*Anodontoides radiatus*) | URS | N | LAA | Inhabits mud, sand, or gravel of large rivers as well as medium to small sized creeks in areas of moderate currents. Major threats are associated with stream modifications and come from a variety of sources including pesticide use, deforestation, damming, and water extraction. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Snail | Pygmy Siltsnail Snail (*Cincinnatia parva*) | URS | N | LAA | Inhabits Blue Spring, a freshwater karst spring run. Major threats include recreational activities, increased sedimentation from erosion and logging practices, invasive species, and any impacts to water quality. Impacts to freshwater spring habitat, changes in hydrological regimes and water quality could result in a LAA determination. |
| Snail | Ponderous Siltsnail Snail (*Cincinnatia ponderosa*) | URS | N | LAA | Inhabits vegetated areas, as well as in sand and gravel, in springs and rivers. Major threats include saltwater intrusion, groundwater extraction for human consumption, and pollution from development. Impacts to freshwater spring and stream habitat, changes in hydrological regimes and water quality could result in a LAA determination. |
| Mussel | Delicate Spike (*Elliptio arctata*) | URS | N | LAA | Inhabits areas of moderate currents among large rocks or in the sand and gravel underneath them. Major threats are related habitat degradation including damming, eutrophication and pollution, water extraction, deforestation, bank scouring, and sedimentation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Chipola Slabshell (*Elliptio chipolaensis*) | T | Y | LAA | Inhabits muddy and silty- sandy substrates in areas with slow to moderate currents. Major threats include dams, stream channelization, pollution, and sedimentation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Purple Bankclimber (*Elliptoideus sloatianus*) | T | Y | LAA | Inhabits small to large rivers, often in the main channels, where there is moderate current. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Mussel | Tapered Pigtoe (*Fusconaia burkei*) | T | Y | LAA | Inhabit areas with slow to moderate currents in medium creeks to medium rivers and occasionally floodplain lakes, where the substrate is stable and consists of sand, small gravel, or sandy mud. Major threats are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Narrow Pigtoe (*Fusconaia escambia*) | T | Y | LAA | Inhabits substrate consisting of sand, gravel, sandy gravel, or silty sand and prefers slow to moderate currents within small to medium sized streams and rivers. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Round Ebonyshell (*Fusconaia rotulata*) | E | Y | LAA | Inhabits areas in rivers with moderate current on sand and gravel substrate. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Southern Sandshell (*Hamiota australis*) | T | Y | LAA | Inhabits areas with slow to moderate currents in small creeks and rivers, where the substrate is stable and consists of sand or a mix of sand and fine gravel. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Shinyrayed Pocketbook (*Lampsilis subangulata*) | E | Y | LAA | Inhabits areas with slow to moderate currents in medium sized creeks to rivers, where the substrate consists of clean sand or silty sand. Major threats include anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Gulf Moccasinshell (*Medionidus penicillatus*) | E | Y | LAA | Inhabits areas with a slow to moderate current in medium sized creeks to large rivers where the substrate consists of sand and gravel or silty sand. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Ochlockonee Moccasinshell (*Medionidus simpsonianus*) | E | Y | LAA | Inhabits sand with some gravel substrates in large creeks with current. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Mussel | Suwannee moccasinshell (*Medionidus walkeri*) | T | Y | LAA | Inhabits mud, muddy sand, sand, and gravel of larger streams with moderate flows. Major threats include chemical pollution, sedimentation from logging and agriculture, development, pollution from mining and agriculture, invasive species (experiences with the Asiatic Clam (*Corbicula fluminea*)), stream channel instability, water extraction, and eutrophication. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Snail | Stock Island Tree Snail (*Orthalicus reses* [not incl. *nesodryas*]) | T | N | LAA | Inhabits tropical hammock hardwood trees. Major threats include habitat degradation and loss. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Mussel | Oval Pigtoe (*Pleurobema pyriforme*) | E | Y | LAA | Inhabits areas with slow to moderate current in medium-sized creeks to small rivers, where the substrate is silty sand to sand and gravel. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Fuzzy Pigtoe (*Pleurobema strodeanum*) | T | Y | LAA | Inhabits areas with moderate flow in medium sized creek and rivers where the substrate is sand to silty sand. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Southern Kidneyshell (*Ptychobranchus jonesi*) | E | Y | LAA | Inhabits areas with slow to moderate currents in medium creeks for small rivers, where the substrate consists of firm sand and near bedrock outcroppings. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Choctaw Bean (*Villosa choctawensis*) | E | Y | LAA | Inhabits silty sand and sandy clay substrates in medium-sized creeks and rivers with moderate currents. Major threats are habitat loss and degradation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| **Crustaceans** | | | | | |
| Pond/ river/ stream | Cypress Crayfish (*Cambarellus blacki*) | URS | N | LAA | Inhabits cypress ponds. It is usually found within submergent and emergent vegetation. The major threat facing Cypress Crayfish is expansion of a nearby oil production facility. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Florida Cave Amphipod (*Crangonyx grandimanus*) | URS | N | LAA | Inhabits caves, wells, and karst springs. The species is likely threatened by changes in detrital flows and depletion of aquifers. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| | | | | |
|---|---|---|---|---|
| Cave/well/ sinkhole | Hobb's Cave Amphipod (*Crangonyx hobbsi*) | URS | N | LAA | Inhabits subterranean caves and wells. It is often associated with limestone and detritus, and found near cave entrances. It is likely threatened by changes in detrital flows and depletion of aquifers. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) | T | N | LAA | Only known from the Squirrel Chimney, a small sinkhole that connects to a flooded cave system near Gainesville, Alachua County, Florida. Habitat for this species includes groundwater within a flooded limestone cave. Threats to the species include expanded development associated with the growth of Gainesville, Florida, which may alter land uses and groundwater in the vicinity of Squirrel Chimney. Stormwater runoff, septic tank drainage fields, aquifer recharge, herbicide/fertilizer use, and erosion/sediment deposition are some of the primary factors impacting groundwater quality. A small fish, the Redeye Chub (*Notropis harperi*), was detected in Squirrel Chimney during 1994-1996 surveys; this species is believed to prey on Squirrel Chimney Cave Shrimp. Therefore predation may also constitute a threat to the species. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Orange Cave Crayfish (*Procambarus acherontis*) | URS | N | LAA | Inhabits aquifers. It is associated with karst and the entrances of springs, sinkholes, and underground water features. The major threat facing Orlando Cave Crayfish is expanding human populations and development. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Pond/river/stream | Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) | URS | N | LAA | Inhabits still waters when water levels are high and burrows when waters recede. The species is usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence. They are restricted to a few small stream systems. Species is susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Protection of inhabited headwater and secondary streams is critical to the species' survival. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Silver Glen Springs Crayfish (*Procambarus attiguus*) | URS | N | LAA | This species has been documented from only one cave system in Ocala Natural Forest, Silver Glen Springs, Marion County, Florida. The species is threatened potentially by water pollution and disturbance from tourists (snorkelers and scuba divers, as the cave is a popular recreation area). Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Bigcheek Cave Crayfish (*Procambarus delicatus*) | URS | N | NLAA | Inhabits subterranean caves. Limited to only one cave system at Alexander Springs within the Ocala National Forest, Lake County, Florida. Their population is threatened by disturbance and habitat degradation from recreational use. As the species only occurs on federally-protect land, the action is NLAA the species. |

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Pond/river/stream | Panama City Crayfish (*Procambarus econfinae*) | P | N | LAA | Occupies shallow, often ephemeral, vegetated, freshwater systems in pine flatwoods or wet prairie/marsh habitats of Bay County, Florida. Threats to this species include habitat loss/degradation/fragmentation, development, hydrologic alterations, silviculture practices, and collection for fish bait. Through impacts to habitat, hydrology, and water quality, the action is could result in a LAA determination. |
| Cave/well/sinkhole | Santa Fe Cave Crayfish (*Procambarus erythrops*) | URS | N | LAA | Inhabits subterranean pools within southern Suwannee County, Florida. The Santa Fe Cave Crayfish requires waters with low flows. The species is threatened hydrological changes, pollution, and saltwater intrusion. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Orange Lake Cave Crayfish (*Procambarus franzi*) | URS | N | LAA | Inhabits subterranean caves. It is associated with bat colonies and the detrital input provided. Its range is limited to Marion County, Florida, where it is known from three cave locations near Orange Lake. The species is particularly vulnerable because of its limited range and small numbers. The species may be sensitive to impacts to water quality from nearby quarrying. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Coastal Lowland Cave Crayfish (*Procambarus leitheuser*) | URS | N | LAA | Inhabits deep, subterranean, karst cave systems. Most areas of occurrence are tidally influenced and associated with silt. Populations are threatened by changes in water quality such as increased saltwater intrusion resulting from extraction of groundwater for human consumption. The species is additionally threatened by rapid urbanization. Through impacts to habitat, hydrology, and water quality, the action is could result in a LAA determination. |
| Cave/well/sinkhole | Florida Cave Crayfish (*Procambarus lucifugus*) | URS | N | LAA | Inhabits karstic subterranean caves and sinkholes. Populations are threatened directly by water quality degradation and indirectly by threats facing bat populations (species feeds on bat guano; "prey"). Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Miami Cave Crayfish (*Procambarus miller*) | URS | N | LAA | Inhabits wells. It has been found at over a dozen sites, those these sites may be interconnected, including populations within the nearby Everglades As the species has an extremely limited range and population size within a metropolitan area, with continually increasing human pressures on aquifers, this species is especially vulnerable to extinction. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Putnam County Cave Crayfish (*Procambarus morrisi*) | URS | N | LAA | Limited to a single cave called Devil's Sink in Putnam County, Florida. This single population is particularly vulnerable to threats posed by water quality degradation as a result of heavy recreational use, pollution (including direct dumping), and groundwater depletion for human consumption. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Pallid Cave Crayfish (*Procambarus pallidus*) | URS | N | LAA | Inhabits caves. It is associated with areas of high flows and karst. Populations are threatened by pollution (because of their likely sensitivity to chemicals) and by disturbance from recreational diving. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| Habitat | Common Name (Scientific Name) | Status | Y/N | Determination | Rationale |
|---|---|---|---|---|---|
| Cave/well/sinkhole | Black Creek Crayfish (*Procambarus pictus*) | URS | N | LAA | Inhabits small, relatively swift, sand-bottomed, tannic-stained streams, often emanating from sandhills and flowing through or from swampy terrain. Black Creek Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Spider Cave Crayfish (*Troglocambarus maclanei*) | URS | N | LAA | Inhabits subterranean caves and sinkholes near areas with fresh detrital input, such as bat caves. Major threats to the species include anthropogenic impacts on water quality and reduced detritus flows. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| **Insects** | | | | | |
| Caddisfly | Logan's Agarodes Caddisfly (*Agarodes logani*) | URS | N | LAA | Has only been observed from one stream in Gadsden County, Florida. As the population is restricted to such a small area and adjacent to an active farm, the species is at risk from farming practices which may result in pollution, siltation, or habitat degradation. Impacts to stream habitat near this species location, changes in hydrological regimes and water quality could result in a LAA determination. |
| Butterfly | Florida Leafwing (*Anaea troglodyta floridalis*) | E | Y | LAA | Inhabits pine rocklands. The species has only one host plant, the pineland croton (*Croton linearis*). Only one population within Everglades National Park is known to be extant. This species may be at imminent risk of extinction as the pinelands habitats on which it depends are very limited and continue to be destroyed by development and tropical storm events. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Frosted Elfin Butterfly (*Callophrys irus*) | UR | Y | LAA | Inhabits pine barrens. The major causes of population decline to their populations are habitat loss caused by development, invasive species, succession, and incompatible vegetation management, as well as the limiting factor of small population sizes. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Beetle | Miami Tiger Beetle (*Cicindelidia floridana*) | E | N | LAA | Prefers open, bare, white to gray sandy areas in pine rockland habitat. Threats to this species include habitat loss/degradation/fragmentation, development, non-native species encroachment, and specimen collection by enthusiasts. Habitat fragmentation could result in a LAA determination. |
| Butterfly | Nickerbean Blue Butterfly (*Cyclargus ammon*) | TS | N | LAA | Inhabits tropical hardwood hammock forests. Listed because of similar appearance, otherwise species seems stable. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| Type | Species | Status | | Determination | Notes |
|---|---|---|---|---|---|
| Butterfly | Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) | E | N | LAA | Inhabits coastal hardwood hammocks, dunes, and scrub habitats. Current threats to the species include habitat loss and fragmentation, illegal collection, pesticides, impacts to host plants from introduced iguanas, loss of genetic diversity, and stochastic environmental events (natural or human-caused). Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Monarch Butterfly (*Danaus plexippus plexippus*) | URS | N | LAA | Widespread. Monarch populations face many threats, but primary among these is the loss of their host plants (milkweed, *Asclepias spp.*) as a result of intensive pesticide use, particularly glyphosate. Habitat fragmentation associated with the action could result in a LAA determination. |
| Butterfly | Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) | URS | N | LAA | Inhabits sedge patches within wetlands and swamps. Threats include conversion of wetland habitat to urbanization, and pesticides. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Palatka Skipper Butterfly (*Euphyes pilatka klots*) | URS | N | LAA | Inhabits areas dominated by sawgrass near mangroves in tropical pinelands and sawgrass marshes. Major threats to the subspecies include habitat loss as a result of development, and the use of insecticides. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Dragonfly | Westfall's Clubtail Dragonfly (*Gomphus westfalli*) | URS | N | LAA | Inhabits sphagnum-bog trickles and streams. The primary threats to their populations are "excessive clearcutting" and altered fire regimes. Their extremely limited range (only about 25 kilometers) makes their populations especially vulnerable. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) | TS | N | LAA | Inhabits grasslands, parks, along roadsides, and open woodlands. Listed because of similar appearance. The population in Florida is considered secure. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) | E | N | LAA | It is currently limited to the Florida Keys. Populations are threatened by habitat destruction and biocides (as a result of mosquito control). This species is especially vulnerable to extinction because of its small size, isolated and small populations, and limited range. Through impacts to habitat (fragmentation and changes in hydrology), the action could result in a LAA determination. |
| Bee | Gulf Coast Solitary Bee (*Hesperapis oraria*) | URS | N | LAA | Inhabits sandy coastal dunes. Threats include: habitat loss, degradation, and fragmentation as a result of development; pesticide use; competition with European Honeybees; sea level rise and hurricanes (intensified by climate change); limited genetic diversity; and a lack of protection. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| | | | | | |
|---|---|---|---|---|---|
| Caddisfly | Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) | URS | N | LAA | This species has a very small range and is only known from two spring-run streams in Gadsden County, Florida. The species is at risk of nearby farming practices which may result in pollution, siltation, or habitat degradation. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Caddisfly | Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) | URS | NN | LAA | Inhabits flowing waters, typically soft blackwater streams. This species is sensitive to siltation and pollution caused by practices such as unsustainable forestry and conversion of land to agricultural use. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Cassius Blue Butterfly (*Leptotes cassius theonus*) | TS | | LAA | Inhabits grassland, urban areas, hardwood forests, and scrub. Listed because of similar appearance, otherwise species seems stable. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Dragonfly | Purple Skimmer Dragonfly (*Libellula jesseana*) | URS | N | LAA | Inhabits "clear-water, sand-bottomed lakes bordered by maiden-cane grass and St. John's Wort shrubs. Currently, the species might may only remain at a single lake within a state park. This species is extremely sensitive to pollution and eutrophication. The major threat to populations is lakeshore development and impacts to water quality. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Beetle | American Burying Beetle (*Nicrophorus americanus*) | E | N | No effect | Extirpated in Florida. This action would have no effect on the species. |
| Caddisfly | Little oecetis longhorn caddisfly (*Oecetis parva*) | URS | N | LAA | Inhabits natural lakes and springs. This species is sensitive to activities that affect water quality and hydrologic regimes such as agriculture, urban development, forestry, water withdrawal, and nutrient loading. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Dragonfly | Southern Snaketail Dragonfly (*Ophiogomphus australis*) | URS | N | LAA | Inhabits graveled streams. Major threats to their populations are water quality degradation from a variety of sources including gravel mining, pesticide use, and deforestation. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Bee | Blue Calamintha Bee (*Osmia calaminthae*) | URS | N | LAA | Inhabits sand pine and scrub habitat, as a specialist on the threatened Asher's calamint (*Calamintha ashei*).Threats include pesticide drift and destructive off-road recreational activities. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Dragonfly | Calvert's Emerald Dragonfly (*Somatochlora calverti*) | URS | N | LAA | Habitat is unknown but is thought to include "boggy forest seepages." Little is known about the threats that affect this species. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Bartram's Scrub-hairstreak (*Strymon acis bartrami*) | E | Y | LAA | Inhabits pine rocklands. The pineland croton is the host plant. The subspecies is threaed by fire suppression, habitat loss, and climate change/sea level rises. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| | | | | | |
|---|---|---|---|---|---|
| Dragonfly | Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) | URS | N | LAA | Inhabits pristine stream and river habitats with sandy bottoms. The major threat is pollution as a result of development, clearcutting, and pesticide use. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Caddisfly | Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) | URS | N | No effect | Extirpated in Florida. This action would have no effect on the species. |
| **Plants** | | | | | |
| Subshrub | Meadow Joint-vetch (*Aeschynomene pratensis*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and potential for invasive species introduction, the action could result in a LAA determination. |
| Shrub | Crenulate Lead-plant (*Amorpha crenulata*) | E | N | LAA | This species is restricted to poorly-drained Opalocka sands within pine rocklands or in wet prairies with Opalocka-rock outcrop complex soil. Impacts to wetlands may affect this species. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Blodgett's Silverbush (*Argythamnia blodgettii*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Four-petal Pawpaw (*Asimina tetramera*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Purpledisk Honeycombhead Sunflower (*Balduina atropurpurea*) | URS | N | LAA | Habitat for this species includes wet pine flatwoods and savannas, seepage slopes, pitcherplant bogs, and wet ditches. Through impacts to habitat and changes in hydrologic regime, the action could result in a LAA determination. |
| Perennial Forb | Apalachicola Wild Indigo (*Baptisia megacarpa*) | URS | N | LAA | Habitat includes mixed hardwood and hardwood-pine forests, in proximity to floodplains, streams, or ravines. Through impacts to habitat, changes in hydrologic regime, and potential for invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Florida Bonamia (*Bonamia grandiflora*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Florida Brickell-bush (*Brickella mosieri*) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Brooksville Bellflower (*Campanula robinsiae*) | E | N | LAA | There are only four, possibly five sites where this wetland dependent species occurs. Four of these sites meet recovery criteria of being protected. If wetland impacts occurred at the site on private land, this could result in a LAA determination. This species occurs in wet prairies and along the edges of ponds near pastureland or in adjacent hardwood forests. |

| | | | | |
|---|---|---|---|---|
| Cactus | Fragrant Prickly-apple (*Cereus eriophorus var. fragrans*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the varietal. |
| Perennial Forb | Deltoid Spurge (*Chamaesyce deltoidea* ssp. *Deltoidea*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Perennial Forb | Pineland Sandmat (*Chamaesyce deltoidea pinetorum*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Perennial Forb | Wedge Spurge (*Chamaesyce deltoidea serpyllum*) | E | N | No effect | This species has a very restricted range. It is endemic to, and known only from Big Pine Key. However, habitat for this species is upland pine rocklands and along roadways. Based on habitat requirements, the action is anticipated to have no effect on the subspecies. |
| Annual Forb | Garber's Spurge (*Chamaesyce garberi*) | T | N | No effect. | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Substrub | Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Pygmy Fringe-tree (*Chionanthus pygmaeus*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Substrub | Cape Sable Thoroughwort (*Chromolaena frustrate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Golden Aster (*Chrysopsis floridana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Lichen | Florida Perforate Cladonia (*Cladonia perforate*) | E | N | No effect. | Occurs in dry scrub environments. The action is anticipated to have no effect on the species. |
| Perennial Forb | Pigeon Wings (*Clitoria fragrans*) | F | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Short-leaved Rosemary (*Conradina brevifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

| | | | | | |
|---|---|---|---|---|---|
| Shrub | Etonia Rosemary (*Conradina etonia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Apalachicola Rosemary (*Conradina glabra*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Cactus | Florida Semaphore Cactus (*Consolea corallicola*) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Ciliate-leaf Tickseed Sunflower (*Coreopsis integrifolia*) | E | Y | LAA | This species occurs in floodplain and streambank habitats, on the edges of swamp forests, and the borders of brackish marshes. Through impacts to habitat and changes in hydrology, the action could result in a LAA determination. |
| Perennial Forb | Avon Park Harebells (*Crotalaria avonensis*) | E | N | No effect | Habitat is xeric white sand scrub. However, this species is known from only three sites in Polk and Highlands Counties near Avon Park. The action is anticipated to have no effect on the species. |
| Annual Forb | Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) | E | N | LAA | There are only two natural populations of this annual vine in Florida. It is a wetland obligate formerly known from swampy forest and hammocks. This species is presently restricted to the banks of ditches and wet road shoulders. Through impacts to habitat and changes in hydrologic regime, the action is LAA the species. |
| Shrub | Florida Prairie-Clover (*Dalea carthagenensis floridana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Subshrub | Beautiful Pawpaw (*Deeringothamnus pulchellus*) | E | N | LAA | This facultative species generally occurs in upland habitat in xeric and mesic pine flatwoods. As pine flatwoods are often bordered by wetlands, impacts to wetland habitats may affect this species. Through potential introduction of invasive species, the action could result in a LAA determination. |
| Subshrub | Rugel's Pawpaw (*Deeringothamnus rugelii*) | E | N | LAA | This species occurs in mesic and wet flatwood habitats. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Garrett's Mint (*Dicerandra christmanii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Longspurred Mint (*Dicerandra cornutissima*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Scrub Mint (*Dicerandra frutescens*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

| Life Form | Species | Status | Y/N | Effect | Comment |
|---|---|---|---|---|---|
| Perennial Forb | Lakela's Mint (*Dicerandra immaculate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Graminoid | Florida Pineland Crabgrass (*Digitaria pauciflora*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, hydrology, and potential invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Clam-shell Orchid (*Encyclia cochleata var. triandra*) | NW | N | LAA | Epiphytic orchid occurring on trees in wetlands so impacts to wetlands may impact this species. Through impacts to habitat and changes in hydrologic regime, the action could result in a LAA determination. |
| Perennial Forb | Big Cypress Epidendrum Orchid (*Epidendrum strobilliferum*) | URS | N | LAA | Habitat for this epiphytic orchid is generally pop ash and pond apple inhabiting swamps and sloughs which would be affected by impacts to wetlands. Impacts to habitat could result in LAA determination. |
| Perennial Forb | Blackbract Pipewort (*Eriocaulon nigrobracteatum*) | URS | N | LAA | This species is endemic to Florida and occurs in wetland habitats. Impacts to habitat and changes in hydrology/nutrient cycles could result in a LAA determination. |
| Perennial Forb | Scrub Buckwheat (*Eriogonum longifolium var. gnaphalifolium*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the varietal. |
| Perennial Forb | Snakeroot (Wedgeleaf Eryngo) (*Eryngium cuneifolium*) | E | N | No effect | This is an upland species and although it has an extremely restricted range, most of the 20 known occurrences are located on three preserves. The action is anticipated to have no effect on the species. |
| Perennial Forb | Telephus Spurge (*Euphorbia telephioides*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Small's Milkpea (*Galacia smallii*) | E | N | No effect | This Florida endemic species is known from only six populations in pine rockland habitat. However, five of these populations are on managed areas. Based on this restricted range on protected lands, the action is anticipated to have no effect on the species. |
| Perennial Forb | Harper's Beauty (*Harperocallis flava*) | E | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Impacts to habitat and changes in hydrology could result in a LAA determination. |
| Cactus | Aboriginal Prickly-apple (*Harrisia* (=*Cereus*) *aboriginum* (=*gracilis*)) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Hartwrightia Sunflower (*Hartwrightia floridana*) | URS | N | LAA | This species occurs in a variety of wetland habitats including acidic seeps and bogs among others. Impacts to habitat, hydrology, and nutrient cycles could result in a LAA determination. |

| Growth Form | Common Name (Scientific Name) | Code | N | Determination | Comment |
|---|---|---|---|---|---|
| Perennial Forb | Henry's Spider-lily (*Hymenocallis henryae*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Impacts to habitat and changes in hydrology could result in a LAA determination. |
| Perennial Forb | Highlands Scrub Hypericum (*Hypericum cumulicola*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Edison's Ascyrum St. Johns Wort (*Hypericum edisonianum*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Substrub | Smooth Barked St. Johns Wort (*Hypericum lissophloeus*) | URS | N | LAA | This species occurs on the fluctuating shores of karst ponds and small sandhill lakes. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Tree | Yellow Anisetree (*Illicium parviflorum*) | NW | N | LAA | Occurs on the banks of spring run or seepage springs, hydric hammock, and bottomland forest. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Beach Jacquemontia (*Jacquemontia reclinata*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cooley's Water-willow (*Justicia cooleyi*) | E | N | LAA | This Florida endemic species occurs in several wetland habitats including streams, swamp woodlands, and also in mesic hammocks. Through impacts to habitat, hydrology, and the potential to invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Scrub Blazingstar (*Liatris ohlingerae*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Panhandle Lily (*Lilium iridollae*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, the action could result in a LAA determination. |
| Shrub | Bog Spicebush (*Lindera subcoriacea*) | URS | N | LAA | This species has a narrow ecological niche. It is often found in sphagnum bogs, or seepage bogs. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Sand Flax (*Linum arenicola*) | E | N | LAA | Nature Serve reports this species occurs in temporary pools of palustrine habitats, and further states that it is documented from solution pits and shallow soils of ephemeral pools on limerock in open pinelands. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| Group | Species | Status | Y/N | Effect | Comment |
|---|---|---|---|---|---|
| Annual Forb | Carter's Small Flowered Flax (*Linum carteri carteri*) | E | Y | LAA | This species occurs in disturbed margins of pine rocklands. Pine rockland habitat has been greatly reduced, especially outside of Everglades National Park, where only one percent of pinelands remain as fragmented patches. Through impacts to habitat and potential for invasive species introduction, the action is LAA the species. |
| Perennial Forb | West's Flax (*Linum westii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Boykin's Lobelia (*Lobelia boykinii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Raven's Seedbox (*Ludwigia ravenii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Subshrub | Scrub Lupine (*Lupinus aridorum*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Curtis' Loosestrife (*Lythrum curtissii*) | URS | N | LAA | Occurs in bogs, seeps, acid or calcareous swamps, karst ponds, creek swamps, floodplains, tidal flats, streambanks, and tidal river mouths. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Lowland Loosestrife (*Lythrum flagellare*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | White Birds-in-a-nest (*Macbridea alba*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Godfrey's Stitchwort (*Minuartia godfreyi*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Annual Forb | Needleleaf or Narrowleaf Naiad Water-nymph (*Najas filifolia*) | URS | N | LAA | Habitat for this annual aquatic species is typically tannic-acid tinted ponds and lakes. Through impacts to habitat, hydrology, and potential invasive species introduction, the action is LAA the species. |
| Subshrub | Britton's Beargrass (*Nolina brittoniana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cape Sable Orchid (*Oncidium undulatum*) | URS | N | LAA | This is an epiphytic orchid that attaches to tree trunks in hammocks, cypress swamps, buttonwood forest, and cypress swamps. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Annual Forb | Papery Whitlow-wort (*Paronychia chartacea*) | T | N | LAA | There are two distinct subspecies, both are listed. *Paryonychia chartacea* ssp. *minima* occurs almost exclusively on the sandy margins of karst ponds and impacts to Karst ponds could result in a LAA determination for this subspecies. |
| Cactus | Key tree Cactus (*Pilosocereus robinii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Godfrey's Butterwort (*Pinguicula ionantha*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Lewton's Polygala Milkwort (*Polygala lewtonii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Tiny Polygala Milkwort (*Polygala smallii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Horton Wireweed (small) (*Polygonella basiramia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Sandlace (Woody Wireweed) (*Polygonella myriophylla*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Pondweed (*Potamogeton floridanus*) | URS | N | LAA | Submerged aquatic herb inhabiting slow moving backwater streams and rivers. Known form only the Blackwater River and its tributaries. Through impacts to habitat and hydrology/water quality, the action could result in a LAA determination. |
| Shrub | Scrub Plum (*Prunus geniculate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | White Meadowbeauty (*Rhexia parviflora*) | URS | N | LAA | Occurs in wetland habitats and is sensitive to changes in ground and surface hydrology. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Panhandle Meadowbeauty (*Rhexia salicifolia*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, hydrology, nutrient cycles, and water quality, the action could result in a LAA determination. |
| Shrub | Chapman Rhododendron (*Rhododendron chapmanii*) | E | Y | LAA | This species usually inhabits the transitional area between upland mesic or scrubby flatwoods and floodplain swamps or baygalls. Through impacts to habitat and potential introduction of invasive species, the action could result in a LAA determination. |

| Group | Species | Code | | Determination | Comment |
|---|---|---|---|---|---|
| Graminoid | Hairy Peduncled Beakrush (*Rhynchospora crinipes*) | URS | N | LAA | Occurs in riparian habitats along stream channels and terraces and sand-caly bars. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Shrub | Miccosukee Gooseberry (*Ribes echinellum*) | T | N | LAA | This species occurs in mesic forest communities. Through impacts to habitat and potential introduction of invasive species, the action could result in a LAA determination. |
| Perennial Forb | Eared Coneflower (*Rudbeckia auriculata*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Tree | Florida Willow (*Salix floridana*) | URS | N | LAA | This species occurs in roadside ditches, near springs, hydric hammocks, and densely wooded floodplains. Through impacts to habitat, hydrology, and potential introduction of invasive species, the action could result in a LAA determination. |
| Perennial Forb | Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | American Chaffseed (*Schwalbea americana*) | E | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Florida Skullcap (*Scutellaria floridana*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Shrub | Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) | T | N | LAA | This species occurs in low-lying oak flatwoods. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Shrub | Georgia Bully (*Sideroxylon thorne*) | URS | N | LAA | This species occurs in wet woods bordering streams or cypress ponds so there is potential for this species to be affected by impacts to wetlands. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Fringed Campion (*Silene polypetala*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Gentian Pinkroot (*Spigelia gentianoides*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cooley's Meadow Rue (*Thalictrum cooleyi*) | E | N | LAA | This species occurs in bogs and wet pine savannahs, flatwoods and seepage slopes. In Florida this species is known from only one occurrence, on a timber company land utility right of way through former flatwoods. This population may be extirpated (USFWS 2009). However as this possible occurrence is on private property, impacts could occur. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| | | FLS | CH? | Finding | |
|---|---|---|---|---|---|
| Tree | Florida Torreya (*Torreya taxifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Bristle Fern (*Trichomanes punctatum* ssp. *floridanum*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on this subspecies. |
| Perennial Forb | Ocala Vetch (*Vicia ocalensis*) | NW | N | NLAA | All known occurrences of this obligate wetland species are from the Ocala National Forest and Lake Woodruff National Wildlife Refuge. It is threatened by hydrologic changes from logging. However, since all known occurrences are on protected land, the action is NLAA the species. |
| Annual Forb | Wide-leaf Warea (*Warea amplexifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Carter's Mustard (*Warea carteri*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

FLS – Federal Listing Status under the Endangered Species Act (ESA) CH? – Has critical habitat been designated?

**Table Text Key:**
FLS – E (Endangered), T (Threatened), TS (Threatened due to Similarity of Appearance), C (Candidate), P (Proposed for listing), UR (Under Review), URS (Under Review, Substantial Finding), NW (Not Warranted Finding). * (Listing status of DPS that occurs in Florida. Other DPSs may have different listing statuses in other region).
CH – Y (Yes), N (No)
Finding – NLAA (May Affect Not Likely to Adversely Affect), LAA (May Affect Likely to Adversely Affect)

# Appendix D
# Figures 1 through 6



Legend
- Freshwater Forested Wetlands
- Freshwater Non-Forested Wetlands
- Natural Lakes and Ponds
- Rivers and Streams

Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficulties and insufficient data sources **

Florida Department of Environmental Protection
404 Assumption Biological Assessment

Combined Freshwater Wetlands

Project No. 11206416
Revision No. -
Date June 16, 2020

FIGURE 1



Florida Department of Environmental Protection
404 Assumption Biological Assessment

Freshwater Habitats
Non-Forested Wetlands

Project No. 11206416
Revision No. -
Date June 16, 2020

FIGURE 2







Florida Department of Environmental Protection
404 Assumption Biological Assessment

Freshwater Habitats
Rivers and Streams

FIGURE 5



# Appendix E
# Dredge and Fill Activities as Defined in the Corps Database

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ AGRICULTURE \ CONVERSION
\ AGRICULTURE \ NON-EXEMPT
\ AQUACULTURE \ FINFISH
\ AQUACULTURE \ PLANTS
\ AQUACULTURE \ SHELLFISH
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ ENERGY GENERATION NUCLEAR
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ INTAKE/OUTFALL
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ ROADS \ CULVERT
\ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ UTILITY \ AERIAL
\ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ INDUSTRIAL
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RECREATIONAL
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ COMMERCIAL, \ STRUCTURE \ BULKHEAD
\ DEVELOPMENT \ COMMERCIAL, \ STRUCTURE \ INTAKE/OUTFALL
\ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ AIRPORT \ FACILITY
\ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ RAIL \ FACILITY
\ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ STRUCTURE \ INTAKE/OUTFALL
\ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ ROADS \ CULVERT
\ DEVELOPMENT \ INDUSTRIAL
\ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RECREATIONAL
\ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RECREATIONAL, \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ ENHANCEMENT
\ DEVELOPMENT \ RECREATIONAL, \ STRUCTURE \ BOAT RAMP
\ DEVELOPMENT \ RECREATIONAL, \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BREAKWATER
\ DEVELOPMENT \ RECREATIONAL, \ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ BULKHEAD
\ DEVELOPMENT \ RECREATIONAL, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ MITIGATION \ ENHANCEMENT, \ MITIGATION \ CREATION
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ STRUCTURE \ MARINA, \ DREDGING \ NAVIGATION \ PRIVATE
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ STRUCTURE \ MARINA, \ STRUCTURE \ BOAT RAMP
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ ROADS CROSSING (NON BRIDGE), \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ UTILITY \ BURIED
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RECREATIONAL
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DREDGING \ CHANNELIZATION, \ STRUCTURE \ BOAT LIFT
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ OTHER \ BANK STABILIZATION
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ BULKHEAD
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ DOCK \ FIXED
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ MARINA

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ MISCELLANEOUS
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CULVERT
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ DREDGING \ BOAT SLIP
\ DREDGING \ CHANNELIZATION
\ DREDGING \ CHANNELIZATION, \ STRUCTURE \ WEIR
\ DREDGING \ DISPOSAL
\ DREDGING \ DISPOSAL, \ DREDGING \ MAINTENANCE, \ STRUCTURE \ INTAKE/OUTFALL
\ DREDGING \ GENERAL
\ DREDGING \ GENERAL, \ OTHER \ BANK STABILIZATION, \ MITIGATION \ ENHANCEMENT
\ DREDGING \ GENERAL, \ STRUCTURE \ BOAT RAMP, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ DREDGING \ GENERAL, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ OTHER \ BANK STABILIZATION
\ DREDGING \ MAINTENANCE
\ DREDGING \ MAINTENANCE, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ BOAT HOUSE
\ DREDGING \ MAINTENANCE, \ DREDGING \ CHANNELIZATION
\ DREDGING \ MAINTENANCE, \ DREDGING \ GENERAL
\ DREDGING \ MAINTENANCE, \ OTHER \ BANK STABILIZATION
\ DREDGING \ MAINTENANCE, \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ BULKHEAD
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ GABION
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR
\ DREDGING \ MAINTENANCE, \ TRANSPORTATION \ PIPELINE \ MAINTENANCE
\ DREDGING \ NAVIGATION \ PRIVATE, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ ENERGY GENERATION \ NATURAL GAS
\ ENERGY GENERATION \ NATURAL GAS, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ ENERGY GENERATION \ NATURAL GAS, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ ENERGY GENERATION \ SOLAR
\ MINING AND DRILLING \ DRILLING \ ACCESS
\ MINING AND DRILLING \ DRILLING \ FACILITIES
\ MINING AND DRILLING \ MINING \ FACILITES
\ MINING AND DRILLING \ MINING \ GRAVEL, \ MINING AND DRILLING \ MINING \ SAND
\ MINING AND DRILLING \ MINING \ OTHER MINERAL
\ MINING AND DRILLING \ MINING \ PHOSPHATE

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ MINING AND DRILLING \ MINING \ ROCK
\ MINING AND DRILLING \ MINING \ SAND
\ MINING AND DRILLING \ MINING \ SAND, \ MINING AND DRILLING \ MINING \ ROCK
\ MITIGATION \ CREATION
\ MITIGATION \ CREATION, \ DREDGING \ MAINTENANCE
\ MITIGATION \ ENHANCEMENT
\ MITIGATION \ ENHANCEMENT, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ MITIGATION \ FISH/WILDLIFE \ CREATION
\ MITIGATION \ FISH/WILDLIFE \ CREATION, \ OTHER \ BANK STABILIZATION
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ DEVELOPMENT \ RECREATIONAL
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ MITIGATION \ FISH/WILDLIFE \ CREATION, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ FISH/WILDLIFE \ CREATION
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ OTHER \ DAMS \ LOW WATER, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ TRANSPORTATION \ ROADS \ CULVERT
\ MITIGATION \ FISH/WILDLIFE \ PLANTING
\ MITIGATION \ FISH/WILDLIFE \ RESTORATION
\ MITIGATION \ MITIGATION BANK
\ MITIGATION \ MITIGATION BANK, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ MITIGATION \ MITIGATION BANK, \ MITIGATION \ PRESERVATION, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ STREAM
\ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ CREATION, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ RESTORATION \ WETLAND, \ OTHER \ DAMS \ REMOVAL
\ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ WETLAND, \ AGRICULTURE \ CONVERSION
\ MITIGATION \ RESTORATION \ WETLAND, \ DEVELOPMENT \ RECREATIONAL
\ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ CREATION, \ MITIGATION \ RESTORATION \ STREAM
\ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ RESTORATION \ STREAM
\ MITIGATION \ RESTORATION \ WETLAND, \ TRANSPORTATION \ ROADS \ CULVERT
\ MITIGATION \ WETLAND RECLAMATION
\ MITIGATION \ WETLAND RECLAMATION, \ DREDGING \ MAINTENANCE
\ OTHER \ BANK STABILIZATION
\ OTHER \ BANK STABILIZATION, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ OTHER \ BANK STABILIZATION, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ OTHER \ BANK STABILIZATION, \ DREDGING \ GENERAL
\ OTHER \ BANK STABILIZATION, \ DREDGING \ MAINTENANCE
\ OTHER \ BANK STABILIZATION, \ DREDGING \ NAVIGATION \ PRIVATE
\ OTHER \ BANK STABILIZATION, \ MITIGATION \ ENHANCEMENT
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BULKHEAD
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ GABION
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ INTAKE/OUTFALL
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ INTAKE/OUTFALL, \ DREDGING \ GENERAL
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MAINTENANCE
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MARINA, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ WATER CONTROL
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ MAINTENANCE
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ OTHER \ CLEANUP HAZARDOUS OR TOXIC WASTES
\ OTHER \ DAMS \ COFFER
\ OTHER \ DAMS \ COFFER, \ OTHER \ BANK STABILIZATION
\ OTHER \ DAMS \ GENERAL
\ OTHER \ DAMS \ LOW WATER, \ OTHER \ DAMS \ REMOVAL
\ OTHER \ DAMS \ MAINTENANCE
\ OTHER \ DAMS \ MAINTENANCE, \ STRUCTURE \ GABION, \ STRUCTURE \ WATER CONTROL
\ OTHER \ DAMS \ REMOVAL
\ OTHER \ DAMS \ REMOVAL, \ MITIGATION \ WETLAND RECLAMATION
\ OTHER \ DAMS \ RESERVOIR
\ OTHER \ DAMS \ WEIR
\ OTHER \ DAMS \ WEIR, \ OTHER \ DAMS \ MAINTENANCE
\ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM
\ OTHER \ RESTRICTED AREAS
\ OTHER \ SURVEY ACTIVITIES
\ STRUCTURE \ BOAT LIFT
\ STRUCTURE \ BOAT LIFT, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BOAT LIFT, \ STRUCTURE \ MISCELLANEOUS, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BOAT RAMP
\ STRUCTURE \ BOAT RAMP, \ DREDGING \ GENERAL, \ DEVELOPMENT \ COMMERCIAL
\ STRUCTURE \ BOAT RAMP, \ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ RECREATIONAL

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ STRUCTURE \ BOAT RAMP, \ STRUCTURE \ MARINA
\ STRUCTURE \ BREAKWATER
\ STRUCTURE \ BREAKWATER, \ MITIGATION \ FISH/WILDLIFE \ CREATION
\ STRUCTURE \ BRIDGE/RELATED WORK
\ STRUCTURE \ BRIDGE/RELATED WORK, \ STRUCTURE \ INTAKE/OUTFALL
\ STRUCTURE \ BRIDGE/RELATED WORK, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ ROADS \ CULVERT
\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ STRUCTURE \ BULKHEAD
\ STRUCTURE \ BULKHEAD, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ STRUCTURE \ BULKHEAD, \ DREDGING \ BOAT SLIP
\ STRUCTURE \ BULKHEAD, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BULKHEAD, \ DREDGING \ MAINTENANCE, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BULKHEAD, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BOAT LIFT
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ INTAKE/OUTFALL
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ MARINA
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ COMMERCIAL
\ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ STRUCTURE \ DOCK \ FIXED, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BREAKWATER
\ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BOAT LIFT
\ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BULKHEAD
\ STRUCTURE \ DOCK \ FIXED, \ TRANSPORTATION \ AIRPORT \ RUNWAY, \ STRUCTURE \ BOAT RAMP
\ STRUCTURE \ DOCK \ FLOATING
\ STRUCTURE \ ELEV REC DECK
\ STRUCTURE \ GABION
\ STRUCTURE \ GABION, \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ STRUCTURE \ GABION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ STRUCTURE \ INTAKE/OUTFALL

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ COMMERCIAL
\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ STRUCTURE \ INTAKE/OUTFALL, \ DREDGING \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ ENERGY GENERATION \ NATURAL GAS
\ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ DAMS \ WEIR
\ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ INTAKE/OUTFALL, \ TRANSPORTATION \ ROADS IMPROVEMENTS
\ STRUCTURE \ INTAKE/OUTFALL, \ TRANSPORTATION \ UTILITY MAINTENANCE
\ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ MAINTENANCE, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ MAINTENANCE, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ INTAKE/OUTFALL
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WEIR
\ STRUCTURE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT
\ STRUCTURE \ MARINA
\ STRUCTURE \ MARINA, \ DEVELOPMENT \ RESIDENTIAL MULTI- FAMILY
\ STRUCTURE \ MARINA, \ DREDGING \ NAVIGATION \ PRIVATE
\ STRUCTURE \ MARINA, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ STRUCTURE \ MISCELLANEOUS
\ STRUCTURE \ MISCELLANEOUS, \ DEVELOPMENT \ RECREATIONAL
\ STRUCTURE \ MISCELLANEOUS, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BULKHEAD
\ STRUCTURE \ MISCELLANEOUS, \ STRUCTURE \ WATER CONTROL, \ OTHER \ DAMS \ WEIR
\ STRUCTURE \ PIER \ NON-RESIDENTIAL
\ STRUCTURE \ PILE/DOLPHIN, \ DREDGING \ BOAT SLIP
\ STRUCTURE \ RAMP
\ STRUCTURE \ RAMP, \ STRUCTURE \ RECREATIONAL
\ STRUCTURE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT
\ STRUCTURE \ MARINA

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ STRUCTURE \ RECREATIONAL
\ STRUCTURE \ RECREATIONAL, \ DEVELOPMENT \ RECREATIONAL
\ STRUCTURE \ RECREATIONAL, \ STRUCTURE \ PIER \ NON-RESIDENTIAL, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ RECREATIONAL, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ REMOVAL
\ STRUCTURE \ REMOVAL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ STRUCTURE \ SCIENTIFIC DEVICE
\ STRUCTURE \ UNSPECIFIED
\ STRUCTURE \ UNSPECIFIED, \ DREDGING \ MAINTENANCE
\ STRUCTURE \ UNSPECIFIED, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ INDUSTRIAL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ RECREATIONAL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ ENERGY GENERATION \ OIL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ MITIGATION, ENHANCEMENT
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ INTAKE/OUTFALL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ AERIAL
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ BURIED
\ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ RECREATIONAL
\ STRUCTURE \ WATER CONTROL, \ DREDGING \ MAINTENANCE
\ STRUCTURE \ WATER CONTROL, \ MITIGATION, CREATION
\ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ INTAKE/OUTFALL
\ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR
\ STRUCTURE \ WATER CONTROL, \ TRANSPORTATION \ ROADS \ CULVERT
\ STRUCTURE \ WEIR
\ STRUCTURE \ WEIR, \ STRUCTURE \ BULKHEAD

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ AIRPORT \ FACILITY

\ TRANSPORTATION \ AIRPORT \ FACILITY, \ TRANSPORTATION \ AIRPORT \ MAINTENANCE

\ TRANSPORTATION \ AIRPORT \ FACILITY, \ TRANSPORTATION \ ROADS \ CULVERT

\ TRANSPORTATION \ AIRPORT \ MAINTENANCE

\ TRANSPORTATION \ AIRPORT \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL

\ TRANSPORTATION \ AIRPORT \ RUNWAY

\ TRANSPORTATION \ AIRPORT \ RUNWAY, \ TRANSPORTATION \ AIRPORT \ FACILITY

\ TRANSPORTATION \ AIRPORT \ RUNWAY, \ TRANSPORTATION \ AIRPORT \ MAINTENANCE

\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)

\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)

\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ CULVERT

\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS

\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT

\ TRANSPORTATION \ BRIDGE \ MAINTENANCE

\ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ STRUCTURE \ BRIDGE/RELATED WORK

\ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ TRANSPORTATION \ BRIDGE \ PROTECTION

\ TRANSPORTATION \ BRIDGE \ PROTECTION

\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT

\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT

\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ RAIL \ FACILITY

\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ ROADS \ CULVERT

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ OTHER \ BANK STABILIZATION

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ BRIDGE/RELATED WORK

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ MAINTENANCE

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ UNSPECIFIED

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ CULVERT

\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS

\ TRANSPORTATION \ PIPELINE \ ACCESS ROAD

\ TRANSPORTATION \ PIPELINE \ ACCESS ROAD, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ STRUCTURE

\ TRANSPORTATION \ PIPELINE \ AERIAL

\ TRANSPORTATION \ PIPELINE \ BURIED

\ TRANSPORTATION \ PIPELINE \ BURIED, \ OTHER \ DAMS \ COFFER

\ TRANSPORTATION \ PIPELINE \ BURIED, \ STRUCTURE \ UTILITY LINE OR STRUCTURE

\ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ AERIAL

\ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ PIPELINE \ MAINTENANCE
\ TRANSPORTATION \ PIPELINE \ MAINTENANCE, \ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ PIPELINE \ STRUCTURE
\ TRANSPORTATION \ PIPELINE \ STRUCTURE, \ DREDGING \ GENERAL
\ TRANSPORTATION \ PIPELINE \ STRUCTURE, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ ACCESS ROAD
\ TRANSPORTATION \ PIPELINE \ SUBMERGED
\ TRANSPORTATION \ RAIL \ BRIDGE
\ TRANSPORTATION \ RAIL \ FACILITY
\ TRANSPORTATION \ RAIL \ FACILITY, \ STRUCTURE \ WATER CONTROL
\ TRANSPORTATION \ RAIL \ MAINTENANCE
\ TRANSPORTATION \ RAIL \ MAINTENANCE, \ TRANSPORTATION \ RAIL \ BRIDGE
\ TRANSPORTATION \ RAIL \ TRACK
\ TRANSPORTATION \ RAIL \ TRACK, \ TRANSPORTATION \ RAIL \ BRIDGE, \ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ RAIL \ TRACK, \ TRANSPORTATION \ RAIL \ MAINTENANCE, \ DEVELOPMENT \ INDUSTRIAL
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RESIDENTIAL MULTI- FAMILY
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ MINING AND DRILLING \ MINING \ PHOSPHATE
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ CULVERT, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ TRANSPORTATION \ ROADS \ CULVERT, \ DREDGING \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ MITIGATION \ ENHANCEMENT
\ TRANSPORTATION \ ROADS \ CULVERT, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ WATER CONTROL
\ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ WEIR

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ DEVELOPMENT \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ STRUCTURE \ INTAKE/OUTFALL
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ STRUCTURE \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ LOGGING
\ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ DEVELOPMENT \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ STRUCTURE \ BRIDGE/RELATED WORK
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ DOCK \ FLOATING
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ TRANSPORTATION \ UTILITY \ AERIAL
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ AERIAL

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ UTILITY \ AERIAL, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ UTILITY \ BURIED
\ TRANSPORTATION \ UTILITY \ BURIED, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ TRANSPORTATION \ UTILITY \ BURIED, \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ BURIED, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ UTILITY \ AERIAL
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ UTILITY \ BURIED
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ STRUCTURE \ REMOVAL
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ UTILITY \ BURIED
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ UTILITY \ SUBMERGED, \ STRUCTURE \ WEIR
\ TRANSPORTATION \ UTILITY \ SUBMERGED, \ TRANSPORTATION \ UTILITY \ AERIAL

# EXHIBIT D



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF WATER

**Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals**

Pursuant to Section 404 of the Clean Water Act (CWA), 33 U.S.C. 1344, the U.S. Army Corps of Engineers (Corps) is authorized to permit the discharge of dredged or fill material into "waters of the United States." States and federally recognized tribes may assume authority to implement the CWA Section 404 permitting program within their respective jurisdictions from the Corps by submitting a request to the U.S. Environmental Protection Agency (EPA or Agency), as Congress authorized the EPA Administrator to approve program transfers from the Corps to the states and tribes. In the past, EPA has taken the position that such program transfer decisions do not involve an exercise of discretion warranting consultation under Section 7 of the Endangered Species Act (ESA), 16 U.S.C. 1536, meaning EPA would not need to consult with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (hereafter referred to as "the Services") when acting on an assumption application from a state or tribe. EPA has reconsidered its prior position, articulated in 2010, that the decision to approve a state or tribal CWA Section 404 program does not trigger ESA Section 7 consultation. Going forward, EPA has determined that it should consult with the Services under Section 7 of the ESA if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat.

## I. Background

To assume the CWA Section 404 permitting program, states and tribes must develop permit programs for discharges of dredged or fill material consistent with the requirements of the CWA and implementing regulations at 40 C.F.R. part 233 and submit a request to assume any such program to EPA. States and tribes must administer and implement programs that are consistent with and no less stringent than the requirements of the CWA and implementing regulations. 40 C.F.R. 233.1(d). The Administrator "shall approve" an assumption request if the state or tribal program satisfies the requirements of the CWA Section 404(h)(1). 33 U.S.C. 1344(h)(2)(A). If the Administrator fails to make a determination within 120 days of receiving the request, the program shall be deemed approved. 33 U.S.C. 1344(h)(3).

Section 7 of the ESA directs each federal agency to ensure, in consultation with one or both of the Services, as appropriate, that "any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence" of listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). ESA Section 7 consultation is not required if the agency determines that an action will not affect listed species or designated critical habitat. ESA Section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. 402.03.

In December 2010, EPA articulated its position that ESA Section 7 consultation is not applicable to CWA Section 404 program transfer decisions. EPA stated at that time that a 2007 U.S. Supreme Court decision from another context, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("*NAHB*"), controlled the inquiry. In *NAHB*, the Supreme Court held that because the transfer of CWA National Pollutant Discharge Elimination System (NPDES) permitting authority to a state "is not discretionary, but rather is mandated once a State has met the criteria set forth in Section 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger Section 7(a)(2)'s consultation and no-jeopardy requirements." 551 U.S. at 673. The Supreme Court held that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add an entirely separate prerequisite to the list. Nothing in the text of Section 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id.* at 671.

EPA evaluated this decision in response to a December 6, 2010 letter sent to the Agency by the Environmental Council of the States (ECOS) and the Association of State Wetland Managers (ASWM) asking whether EPA must conduct an ESA Section 7 consultation prior to approving or disapproving a Section 404 program request. The Agency responded to ECOS and ASWM in a December 27, 2010 letter ("2010 Letter"), see Docket ID No. EPA–HQ–OW–2020–0008, stating that, as in the CWA Section 402(b) context, when considering a CWA Section 404 program transfer request, EPA is only permitted to evaluate the specified criteria in CWA Section 404(h) and does not have discretion to add requirements to the list in CWA Section 404(h), including considerations of potential impacts to endangered and threatened species through ESA Section 7 consultation with the Services.

EPA stated in the 2010 Letter that although there are some differences between CWA Sections 402 and 404, the Supreme Court's reasoning in *NAHB* applies to EPA's approval of a CWA Section 404(g) permitting program. Section 404(h)(2) of the CWA states that if the Administrator determines that a state program submitted under CWA Section 404(g)(1) has the authority set forth in CWA Section 404(h)(1), then the Administrator "shall approve" the state's application to transfer the CWA Section 404 permitting program. The 2010 Letter acknowledged that "there are some differences between § 402(b) and § 404(h)," but concluded that those differences did not render EPA's action approving a state CWA Section 404 program a "discretionary federal action." The letter did not address the specific differences between the approval requirements of the CWA Section 402 and 404 programs that EPA now recognizes are relevant to the applicability of ESA Section 7. The 2010 Letter concluded that EPA's decision as to whether to approve a state CWA Section 404 program action is non-discretionary and ESA consultation is not required.

In July 2019, EPA received a request from the Florida Department of Environmental Protection (FDEP) asking EPA to engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of Florida's request to assume the CWA Section 404 program. FDEP provided a white paper asserting that ESA Section 7 consultation is required in the CWA Section 404 assumption context based on the unique statutory text of CWA Section 404 and its associated legislative history, which, in FDEP's view, differs in critical respects from other state delegation programs administered by EPA to which ESA Section 7 does not apply. FDEP stated that EPA's position was articulated in a two-page letter a few weeks after receiving the ECOS and ASWM letter and failed to acknowledge the critical distinctions between the statutory text of CWA Section 404 and the Section 402 program at issue in *NAHB*. FDEP also questioned the 2010 Letter's reliance on the legislative history of CWA Section 404

to support the non-discretionary nature of a state assumption decision, arguing that the legislative history supports the opposite conclusion.

The white paper explained that when a state or tribe administers the CWA Section 404 program, permittees must avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10, which involves a burdensome process for both permit applicants and government agencies. The white paper characterized the lack of incidental take coverage in state- or tribe-assumed programs as a significant hurdle to establishing an effective and efficient CWA Section 404 program in Florida and estimated that approximately ten percent of CWA Section 404 permits issued in Florida require some form of incidental take coverage.

The white paper viewed a one-time ESA Section 7 programmatic consultation in connection with EPA's initial review of an assumption application as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies. An ESA Section 7 consultation on EPA's potential approval of Florida's program would allow the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state permitting under CWA Section 404 needed to support the Services' determination that assumption would not result in jeopardy to any listed species. Subject to the Services' incidental take statement and provided these requirements are followed, FDEP stated that this process would bring state CWA Section 404 permits within the ESA Section 7(o)(2) exemption from take liability.

## II. Public Comment

On May 21, 2020, EPA initiated a 45-day public comment period through an announcement in the Federal Register titled "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation" (Docket ID No. EPA-HQ-OW-2020-0008). EPA sought public comment regarding whether to reconsider its position that it lacks discretionary involvement or control within the meaning of 50 C.F.R. 402.03 when acting on a state or tribal application to administer the CWA Section 404 program sufficient to trigger ESA Section 7 consultation requirements. EPA identified the positions articulated in the FDEP white paper, as well as other considerations that may be relevant to this issue, and requested comment on whether EPA can and should engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of a state or tribal request to assume the CWA Section 404 program. The public comment period closed on July 6, 2020, and EPA received comments from a variety of stakeholders.

Several commenters stated that EPA's decision regarding a request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7. These commenters recommended that EPA engage in a single ESA Section 7 programmatic consultation with the Services in connection with EPA's initial review of an assumption application. The commenters said that this process would enable the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state and tribal CWA Section 404 permits. They indicated that this approach could support a determination on the part of the Services that assumption would not result in jeopardy to any listed species and would ensure that activities authorized under state- or tribal CWA Section 404 permits would not be liable for incidental take as long as the terms and conditions of permitting are met.

Other commenters agreed that EPA's approval of a state or tribal CWA Section 404 permitting program is discretionary and thus triggers the requirements for consultation under Section 7 of the ESA. However, the commenters expressed concern about how states or tribes would ensure that the ESA's requirements are being applied at the project-specific level. These commenters said that EPA's consultation regarding whether to approve or disapprove an assumption request does not alleviate ESA liability concerns related to actions authorized by future state or tribal CWA Section 404 permits.

Certain commenters asserted that the Supreme Court's decision in *NAHB* applies to EPA's approval of CWA Section 404 programs, in addition to its approval of CWA Section 402 programs, and therefore EPA lacks discretion to consult under ESA Section 7 in approving state or tribal requests to assume permitting authority under CWA Section 404. These commenters argued that EPA's role under both the CWA Section 402 and 404 programs is limited to determining whether states and tribes have the legal authority Congress has specified; if the criteria are satisfied, EPA lacks the discretion to deny an application. The commenters also expressed concern that, as a practical matter, the agencies will spend significant time and resources collecting data and conducting analyses for a consultation but may not ultimately provide states and private landowners with incidental take protection under the ESA.

### III. ESA Section 7 Applies to CWA Section 404 Program Assumption Decisions

Following the release of the May 2020 Federal Register Notice and its review of public comments, EPA has reconsidered the position articulated in the 2010 Letter to ECOS and ASWM. EPA concludes that the Agency's decision as to whether to approve a state or tribal request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7 if EPA determines that such an approval action may affect a listed species or designated critical habitat. EPA's current view is that the *NAHB* decision, while informative, does not control in the CWA Section 404 program assumption context because Congress established a framework in which ESA concerns could be addressed when delegating authority to the Agency to transfer permitting responsibility from the Corps to individual states and tribes. That ability is absent in the list of factors Congress instructed EPA to consider when authorizing states to take on NPDES permitting authority.

For example, CWA Section 404(h)(1)(A) requires the Administrator to determine whether a state or tribe seeking CWA Section 404 program assumption has the authority to issue permits which apply and assure compliance with the CWA Section 404(b)(1) Guidelines. Those Guidelines include a provision that prohibits the permitting of a discharge if it jeopardizes the continued existence of endangered or threatened species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 C.F.R. 230.10(b)(3). EPA's regulations state that in determining compliance with the CWA Section 404(b)(1) Guidelines, where ESA Section 7 consultation occurs, the Services' conclusions "concerning the impact of the discharge on threatened and endangered species and habitat shall be considered final." 40 C.F.R. 230.30(c). The CWA Section 404(b)(1) Guidelines were first promulgated in 1975, including the current prohibition on issuing permits jeopardizing threatened or endangered species, *before* Congress enacted CWA Section 404(g). 40 Fed. Reg. 41,292, 41,296 (Sept. 5, 1975). Thus, Congress was aware when requiring state or tribal program compliance with the CWA Section 404(b)(1) Guidelines that the no jeopardy mandate would apply to all permits issued by states and tribes.

Unlike the statutory construct governing EPA's delegation of NPDES program authority under CWA Section 402, EPA is required to seek and consider comments from the Services when deciding whether to approve a state or tribal request to assume the CWA Section 404 permitting program. Under CWA Section 404(g)(2), EPA must provide the Services with an opportunity to comment on a state or tribal

program submission. CWA Section 404(g)(2) provides that within ten days after receipt of a program assumption submission, EPA shall provide copies of the program application to the Corps and FWS. EPA extended that statutory direction to NMFS by regulation. 40 C.F.R. 233.15(d). CWA Section 404(h)(1) directs EPA to consider comments submitted by the Corps and FWS when determining whether a state or tribe has the requisite authority and meets the CWA statutory requirements with respect to implementing the CWA Section 404 program. EPA's regulations make clear that EPA should provide heightened attention to comments from the Services, providing that in issuing its approval or disapproval of a state or tribal program, EPA shall provide a responsiveness summary of significant comments received and its responses. EPA "shall respond individually to comments received from the Corps, FWS, and NMFS." 40 C.F.R. 233.15(g).

By requiring EPA to consider the Services' comments before deciding to approve an assumption request, and requiring states and tribes to comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program, the CWA provides EPA with discretionary involvement and control that triggers the need for ESA Section 7 consultation when EPA's action may affect listed species. EPA has discretion regarding *the extent to which* it takes into account the Services' comments and can do so with an eye towards ensuring compliance with the CWA Section 404(b)(1) Guidelines. States and tribes are not required to consult on their individual permitting decisions, see 16 U.S.C. 1536(a)(2), so the program approval stage provides the most reasonable and efficient point in which to help ensure a process is in place to consider potential adverse impacts to species resulting from those permitting decisions. EPA has discretionary authority at that stage to shape program implementation to ensure compliance with the CWA Section 404(b)(1) Guidelines. This discretionary authority is unique to the transfer of CWA Section 404 permitting authority. There is no requirement in CWA Section 402 for EPA to take into consideration the views of the Services, and there is no corollary in the CWA Section 402 program to the CWA Section 404(b)(1) Guidelines. These provisions in CWA Section 404 provide discretion to EPA that is not present in the Section 402 context.

The legislative history of CWA Section 404 supports the argument for consultation. According to the Senate Report accompanying enactment of the assumption authority:

> The committee amendments relating to the Fish and Wildlife Service are designed to (1) recognize the particular expertise of that agency and the relationship between its goals for fish and wildlife protection and the goals of the Water Act, and (2) encourage the exercise of its capabilities in the early stages of planning. By soliciting the views of the principal Federal agencies involved in the review of these programs at an early stage, objections can be resolved that might otherwise surface later and impede the operation of a State program approved by the Administrator. This consultation preserves the Administrator's discretion in addressing the concerns of these agencies, yet affords them reasonable and early participation which can both strengthen the State program and avoid delays in implementation. That is, early participation in the development and design of programs, guidelines, and regulations should serve to reduce the emphasis now placed on the review by the Fish and Wildlife Service of individual applications for permits under the Water Act.

S. Rep. 95-370, at 78 (1977). The report expresses a preference for early engagement with FWS at the program approval stage with the goal of reducing engagement at the individual permitting stage while preventing comments at the permitting stage that might lead to a permit objection.

While the legislative history does not specifically mention ESA Section 7 consultation, Congress used the phrase "consultation" at the developmental stage of state programs while recognizing EPA's "discretion" in considering the FWS's comments and ensuring efficient and effective program implementation following approval. Ensuring that federal decisions contemplate, where appropriate, potential impacts to listed species at a stage where those impacts can be most efficiently addressed is one of the hallmarks of the ESA Section 7 consultation process. The legislative history therefore supports programmatic consultation more so than suggesting that formal consultation is not required.

In *NAHB*, the Supreme Court held that ESA Section 7 consultation on an NPDES program transfer could impose conditions beyond those found in Section 402(b). 551 U.S. at 663-664. The Court stated that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list." *Id.* at 671. In the CWA Section 404 context, however, an ESA consultation will not impose an entirely separate condition. Instead, ESA consultation will fulfill Congress's statutory directive that the Services provide input on a state program prior to EPA's approval. By allowing for consideration of the views of the Services through their comments and incorporation of the no jeopardy requirement from the CWA Section 404(b)(1) Guidelines, the statute provides authority for EPA to consult and consider protection of listed species in the approval decision.

In *NAHB*, the Supreme Court found that the canon against implied repeals supports the interpretation that the transfer of CWA Section 402 programs was a non-discretionary agency action. This reasoning is not applicable in the CWA Section 404 assumption context. The Court stated: "An agency cannot simultaneously obey the differing mandates set forth in Section 7(a)(2) of the ESA and the Section 402(b) of the CWA, and consequently the statutory language – read in light of the canon against implied repeals – does not itself provide clear guidance as to which command must give way." 551 U.S. at 666. In the CWA Section 402 context, the Court found that approval of the state's permitting authority was non-discretionary and "comports with the canon against implied repeals because it stays Section 7(a)(2)'s mandate where it would effectively override otherwise mandatory statutory duties." *Id.* at 670. CWA Section 404 is distinguishable from CWA Section 402 because Congress required EPA to solicit comment from the FWS at the program approval stage and because the statute incorporates the jeopardy prohibition by reference to the CWA Section 404(b)(1) Guidelines. Here, ESA Section 7(a)(2)'s mandate does not override EPA's statutory duties but instead fits into the existing statutory structure.

## IV. Implementation

On August 20, 2020, EPA received a request from the State of Florida to assume administration of the CWA Section 404 program. For Florida and other states and tribes seeking to assume the CWA Section 404 program, EPA intends to engage in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption request if a

decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. To initiate consultation, the Agency will submit a biological evaluation to the Services, which evaluates the potential effects of EPA's potential approval of an assumption request on ESA-listed species, proposed species, designated critical habitat, and proposed critical habitat (50 C.F.R. 402.12). A biological evaluation also considers whether EPA's approval of an assumption request is likely to adversely affect any species or habitat.

For Florida and other states and tribes seeking to assume administration of the CWA Section 404 permitting program, EPA's engagement in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption application would allow one or both of the Services, as appropriate, to issue a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program. The biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures that help ensure the state or tribal permitting program and individual permits issued pursuant to that program, as well as EPA's approval of that program, do not result in jeopardy to any listed species. This process, assuming compliance with any applicable permit conditions or measures, would extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program. This streamlined permitting process would reduce costs and duplication of effort by state or tribal and federal authorities and facilitate more effective and efficient state and tribal CWA Section 404 programs. This programmatic consultation approach will ensure that listed species are protected while avoiding additional ESA Section 10 processes to obtain similar liability protections.

EPA disagrees with the comments stating that EPA's consultation regarding whether to approve or disapprove a request to assume the CWA Section 404 program does not alleviate existing ESA liability related to actions authorized by future state or tribal CWA Section 404 permits. The Services are required, as part of formal consultation, to prepare an incidental take statement if such take is reasonably certain to occur and will not violate ESA Section 7(a)(2). 50 C.F.R. 402.14(g)-(i). If, pursuant to the ESA regulations, the Services provide an incidental take statement, then "any taking which is subject to a statement as specified in [50 C.F.R. 402.14(i)(1)] and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the [ESA], and no other authorization or permit under the [ESA] is required." 50 C.F.R. 402.14(i)(5).

At the individual permit level, the CWA Section 404(b)(1) Guidelines prohibit discharges that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by the Services. See 40 C.F.R. 233.20; 40 C.F.R. 230.10(b)(3). EPA anticipates that states and tribes may develop different program structures and coordination mechanisms to meet these requirements and any conditions of a programmatic incidental take statement, depending on factors such as the structure and expertise of the state and tribal agencies, provisions of state and tribal law, previous coordination among state or tribal and federal agencies, the number of ESA-considered species and extent of critical habitat, and other factors. States and tribes maintain the existing flexibilities in developing their CWA Section 404 programs to meet these requirements.

EPA's determination that CWA Section 404 provides the requisite discretionary involvement or control for the ESA to apply to EPA's approval of a state or tribal CWA Section 404 program does not modify or alter the application of the ESA to other EPA actions not analyzed here, such as actions under the CWA (other than state assumption of CWA Section 404 programs), Safe Drinking Water Act, the

Resource Conservation and Recovery Act, or other statutes implemented by EPA. For example, there are significant differences in how the CWA Section 402 and 404 programs operate, legally and procedurally, and nothing in this memorandum modifies established precedent and procedures for the NPDES permitting program. Likewise, EPA's determination that EPA has the discretion to consult on CWA Section 404 program approvals does not apply to actions by other federal agencies. EPA and other federal agencies must evaluate each federal activity considering the relevant implementing statute and the relevant factual situations to determine if the ESA consultation requirement attaches.

DAVID ROSS   Digitally signed by DAVID
             ROSS
             Date: 2020.08.27 13:35:21
             -05'00'
_____
David P. Ross,                    Date
Assistant Administrator

# EXHIBIT E



Ochlockonee River State Park, Florida

# ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida

August, 2020



# ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida

August, 2020



US Environmental Protection Agency
Region 4
61 Forsyth St SW
Atlanta, GA  30303

Note for printing: Pages for Appendix C are 8.5" x 14"

# Executive Summary

In accordance with the Endangered Species Act of 1973 (ESA) and its implementing regulations, the purpose of this Biological Evaluation (BE) is to evaluate the possible effects of the United States Environmental Protection Agency's (EPA) potential approval of the State of Florida's assumption of administration of a Clean Water Act (CWA) Section 404 program on ESA-listed species, proposed species, designated critical habitat and proposed critical habitat (50 Code of Federal Regulations [CFR] § 402.12). The BE will consider whether the EPA's approval of the assumption request (Action) may affect listed species or designated critical habitat and if any effects are likely to adversely affect any such species or habitat. The EPA is the federal agency charged with approving or denying the State's request, pursuant to the CWA implementing regulations (40 CFR Part 233). The Florida Department of Environmental Protection (FDEP) is the State agency requesting administration of a CWA Section 404 Program (assumption).

Florida's request to assume the administration of a CWA Section 404 program only includes those Waters of the United States (WOTUS) not retained by the U.S. Army Corps of Engineers (USACE), referred to as assumed waters or State-assumed waters. The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "Retained Waters." This definition can be found in FDEP's State 404 Handbook in Chapter 2.0, and the process to determine whether a project is in retained or assumed waters is described in Chapter 4.1 of the Handbook. In addition, Appendix A of FDEP's State 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

On July 17, 2019, the FDEP sent a request to the EPA that sought designation, pursuant to 50 CFR § 402.08, to serve as a non-federal representative to prepare the subject BA for possible ESA Section 7 consultation. The EPA designated FDEP as the non-federal representative to prepare a BA in a letter dated December 12, 2019, consistent with 50 CFR § 402.08; accordingly, FDEP drafted the subject BA, which the EPA adapted into this BE. In a separate letter to the U.S. Department of Commerce and the Department of the Interior dated December 13, 2019, the EPA provided notification that it would voluntarily engage in informal consultation with the Services (the United States Fish and Wildlife Service [USFWS] and the National Oceanic and Atmospheric Administration [NOAA] National Marine Fisheries Service [NMFS]).

FDEP requested input on a draft list of threatened and endangered species and designated critical habitat from the USFWS and the NMFS on November 22, 2019. On April 15, 2020, NMFS responded to FDEP that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State (see Appendix A). They stated that based on their review, while there is shared jurisdiction for the Gulf Sturgeon between NMFS and USFWS, the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further stated that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. Based on NMFS' determination, the EPA therefore concludes that the EPA's approval of FDEP's assumption of the Section 404 program has no effect on NMFS jurisdictional species.

If approved, the State's assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in State

regulations (Chapters 62-330, and 62-331, Florida Administrative Code [F.A.C.]), Memoranda of Agreement with the EPA and with the USACE, and a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission (FWC) and the USFWS. The EPA is initiating formal consultation with the Services on the EPA's Action: the potential approval of Florida's request to assume administration of the CWA Section 404 program. In accordance with ESA Section 7 regulations, this BE only evaluates effects to ESA-species of concern, which includes ESA-listed species, their critical habitats, those species proposed to be listed and their proposed critical habitat, candidate species, petitioned species, and those otherwise under review for potential ESA listing. For the sake of clarity in understanding the State's implementation of the State 404 program and the Environmental Resource Permit (ERP) program, the State 404 program would address species that may not be listed under the ESA, but are protected under other federal or State laws. Examples of these types of laws include the Bald and Golden Eagle Protection Act (16 USC Part 668) and the Migratory Bird Treaty Act of 1918 (16 USC Parts 703-712 (Part 709 omitted)). Also, all ESA proposed, candidate, and petitioned plant and animal species with ranges within Florida are discussed in this BE, to provide a thorough review of Florida's potentially at-risk species, and because the lists of threatened and endangered species may be modified to include some or all of the petitioned species, depending upon the outcome of those status reviews. This BE evaluates the effects that the EPA's approval of the State of Florida's assumption of Section 404 of the CWA would have on listed species in present time and analyzes effects into the future. All species that are currently listed, proposed to be listed, or might be listed in the future are discussed, with evaluations of effects on respective guilds. This review evaluates the effects the State's 404 program would have on any species that are currently listed or those that there is reason to believe could be listed in the future because implementation of the State's 404 program would be the direct effect of the EPA's approval of Florida's assumption of Section 404 of the CWA.

This BE analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95) or threatened (44), or ESA-species of concern (96). Species that must be addressed pursuant to Section 404 of the CWA and Chapter 62-331, F.A.C. for the State 404 program are federally listed species or species proposed to be listed under the ESA (a total of 141 species). If these listed species have designated critical habitats, or critical habitats proposed to be designated, the adverse effects and impacts to those habitats must also be analyzed and addressed in the State 404 program. See Table 3-1 for the list of species discussed in this BE.

Because the State 404 program would be implemented through future State-issued 404 permits authorizing activities, a programmatic BE is appropriate to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits. The BE will address how the process will consider effects to listed endangered and threatened species or species proposed to be listed so that the effects of this Action may be analyzed. The BE describes the effects of the Action, which includes a broad array of activities that are likely to be authorized in the future and a general description of the ESA-listed species and their habitat ranges and critical habitats that are likely to be affected by such activities. These descriptions include baseline discussions; historical perspectives based on previous permitting by the USACE; an estimate of the physical, chemical, or biotic stressors to species that are likely to be produced; and a description of the processes and mechanisms to avoid and minimize the adverse effects of these activities on ESA-listed species and designated critical habitats.

In implementing the State 404 program, FDEP will send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the USFWS for review and comment (see Chapter 7 for details). This coordination is to ensure that any permit issued by FDEP is not likely to jeopardize

the continued existence of any listed or proposed species, or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)). Upon coordination, FDEP will consider any information that USFWS provides as technical assistance and will include all species protection measures that the USFWS may recommend as permit conditions or deny the request for a permit, whether the permit conditions are designed to avoid jeopardizing an ESA-listed species or adverse modification of designated critical habitat, or whether permit conditions are designed to avoid or minimize the amount of incidental take when the take or other effects would not be likely to jeopardize a species or adversely modify designated critical habitat. This exchange of information between USFWS and FDEP falls within the broad scope of "technical assistance" as described in the ESA's implementing regulations and the USFWS' Interagency Consultation Handbook.

The FWC will partner with FDEP to assist in the coordination of federally listed species reviews with the USFWS, expanding FWC's current review of impacts to federally listed and State-listed species during the ERP process (Chapter 62-330, F.A.C.). The interactions between agencies will inform applicants of the importance of implementing impact avoidance and minimization measures on listed species in order to be eligible for authorization of their proposed activities, all while maintaining compliance with the ESA.

The State 404 program rule [Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C.] and EPA regulations (40 CFR § 233.20, 40 CFR § 230.10(b)(3)) prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS, and confirms that USFWS conclusions about the effects of State 404 permits on listed species are determinative (40 CFR § 230.30(c)). FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into their permit tracking database, similar to the information collected by the USACE. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat would ultimately result in the State either denying the permit or the State informing the EPA that it will neither issue nor deny the permit, which would result in the EPA transferring the permit to the USACE for processing in accordance with 40 CFR § 233.50(j).

FDEP has indicated that it intends to resolve all disputes and objections with USFWS prior to the EPA's review during the public noticing process. FDEP, FWC and USFWS are entering into a Memorandum of Understanding which includes a dispute resolution process. Because of this process, and the State's rule stipulating that USFWS's recommendations and conditions are determinative, it is unlikely that issues would need to be elevated to the EPA. During its review, the EPA may comment upon, object to, or make recommendations with respect to a permit pursuant to 40 CFR § 233.50. As stated in 40 CFR § 233.50(j), in the event a state that has assumed CWA Section 404 responsibilities neither satisfies EPA's objections or requirements for a permit condition, nor denies the permit, the EPA will transfer the permit to the USACE and the USACE shall process the permit application.

During the analysis of existing Florida CWA Section 404 permitting data provided by the USACE for fiscal years 2014 through 2018, approximately seven percent of past USACE Section 404 permit application reviews involved formal consultations. It is reasonable to anticipate that the past number of applications submitted for that five-year period provides an approximation of the number and types of proposed permitting activities that may occur over the next five-year period. Further analysis of this data shows that a small proportion of the total number of ESA-listed species accounted for the majority of consultations. Many of the species subject to frequent ESA consultation have programmatic consultation keys or programmatic biological opinions, which can help guide or inform future reviews and impact assessments by FDEP, FWC, and

USFWS. See Chapter 4.2.1 regarding the limitations of the USACE queried data used in the analyses of this BE, and interpretation using the USACE database and shapefile.

Historical CWA Section 404 permitting by the USACE resulted in issuance of permits for one or more projects that adversely affected one or more listed species and their critical habitats. The USACE Section 404 process, in accordance with Section 7 of the ESA, employed various conservation measures to avoid and minimize adverse effects. Similar to the USACE Section 404 program, however, the State 404 program may result in the issuance of one or more permits with projects that "may adversely affect" an ESA-listed species and/or designated critical habitat. These adverse effects would be addressed during the technical assistance process between FDEP and USFWS.

This BE is provided to assist in the review of potential effects to ESA-listed endangered and threatened species anticipated with the State of Florida's request for the assumption of Section 404 of the CWA. EPA is requesting a formal consultation on EPA's approval of the State's Section 404 program.

# Table of Contents

1.  Purpose of Biological Evaluation ......................................................................... 1

    1.1  Objectives of Action ................................................................................... 1

    1.2  The History of Florida's Request for Assumption ........................................ 3

    1.3  Organization of the Document .................................................................... 4

2.  Action & Action Area ...................................................................................... 5

    2.1  Description of Action ................................................................................. 5

    2.2  Types of Future Activities to be Authorized by Florida's 404 Program .......... 6

    2.3  Description of Action Area ........................................................................ 12

    2.4  Ecosystems/Habitats Located Within the Action Area .............................. 17

        2.4.1  Discussion of Aquatic Ecosystems and Habitats ............................ 17

        2.4.2  Discussion of Terrestrial Ecosystems and Habitats ....................... 20

3.  ESA-considered Species Potentially Affected by the Action ............................ 21

    3.1  ESA-considered Species and Critical Habitat in the Action Area ................ 34

    3.2  NMFS-Listed Species ............................................................................... 35

    3.3  State-Listed Species ............................................................................... 35

4.  Baseline Conditions ...................................................................................... 36

    4.1  Regulatory Baseline ................................................................................ 36

        4.1.1  Federal Wetland Regulations ....................................................... 36

        4.1.2  Florida Wetlands Regulations ...................................................... 38

    4.2  Environmental Baseline ........................................................................... 40

        4.2.1  Historical Federal Permitting: Habitat ........................................... 42

        4.2.2  Historical Federal Permitting: ESA Consultations .......................... 46

5.  Potential Effects on ESA-considered Species ................................................ 55

    5.1  Types of Effects ..................................................................................... 56

        5.1.1  Biotic Stressors .......................................................................... 56

        5.1.2  Physical Stressors ...................................................................... 56

        5.1.3  Physicochemical Water Quality Stressors ..................................... 57

    5.2  Potential Effects ..................................................................................... 57

        5.2.1  Mammals .................................................................................... 57

        5.2.2  Birds .......................................................................................... 59

        5.2.3  Reptiles ...................................................................................... 60

        5.2.4  Amphibians ................................................................................. 61

        5.2.5  Fish ............................................................................................ 61

        5.2.6  Insects ....................................................................................... 62

  5.2.7 Crustaceans.................................................................................................62

  5.2.8 Mollusks....................................................................................................63

  5.2.9 Plants........................................................................................................63

6. Cumulative Effects .........................................................................................64

 6.1 Effects of Non-Federal Activities ...............................................................64

  6.1.1 Watershed Development ...........................................................................64

  6.1.2 Increased Water Use ................................................................................67

  6.1.3 Climate Change ........................................................................................69

  6.1.4 Summary of Cumulative Effects of Non-Federal Activities.......................70

7. State 404 Program Species Coordination ........................................................70

 7.1 Federally and State-listed Species Coordination Review ............................71

 7.2 State 404 Program and Prior-existing USFWS HCPs and BiOps .................72

 7.3 State 404 Program Species Coordination Process ......................................73

 7.4 Application Review ...................................................................................74

  7.4.1 Technical Assistance with the USFWS ......................................................75

  7.4.2 EPA Oversight and Review ........................................................................80

 7.5 Species Assessments ................................................................................83

  7.5.1 Identifying Project Area and Affected Species ..........................................83

  7.5.2 Assessments Using Available Federal Decision Tools ................................83

  7.5.3 Case by Case Assessments When Tools Are Not Available .........................86

 7.6 Impact/Affect Determinations and Protective Measures ...........................88

  7.6.1 Impact and Affect Determinations ...........................................................89

  7.6.2 Developing and Ensuring Protective Measures .........................................90

  7.6.3 Statements of Adverse Impact in Public Notices .......................................93

  7.6.4 Dispute Resolution between FDEP and USFWS and USFWS-EPA Coordination ............94

8. Conclusions...................................................................................................95

9. Literature Cited .............................................................................................98

10. Lists of Contacts and Preparers.........................................................**Error! Bookmark not defined.**

# Figure Index

Figure 2-1    Example of activities authorized by the USACE 404 program.........................14

Figure 2-2    Example of activities authorized by USACE and FDEP...................................15

Figure 2-3    Example of a linear project.................................................................................16

Figure 4-1    Historic freshwater flows compared to freshwater flows after C&SF Project..................41

Figure 4-2    Future Ecosystem Conditions based on CERP ..................................................42

Figure 4-3    Acreage of Authorized Fill, by Wetland Type ....................................................45

Figure 4-4    Locations of ESA Consultations in Action Area, 2014 - 2018..........................53

Figure 4-5    Concentrations of ESA consultations in the Action Area, 2014 - 2018...........54

Figure 6-1    Comparison of projected 2010-2070 population change in four Florida Regions............65

Figure 6-2    A comparison of the State development scenarios..........................................66

Figure 6-3     State Water Scenarios (gallons/day/acre)........................................................68

Figure 7-1    Species Coordination Overview .......................................................................82

# Table Index

Table 2-1    Freshwater Non-Forested Wetlands ...................................................................17

Table 2-2    Freshwater Forested Wetlands ...........................................................................18

Table 2-3    Lakes .....................................................................................................................18

Table 2-4    Rivers and Streams ..............................................................................................19

Table 2-5    Estuarine Areas.....................................................................................................19

Table 2-6    Aquatic Caves .......................................................................................................20

Table 2-7    Sandhill and Scrub Areas ....................................................................................21

Table 2-8    Dry Prairie and Pine Rockland Areas..................................................................21

Table 3-1    ESA Species Potentially Affected by the Action ................................................22

Table 4-1    Authorized Areas and Acreages by Wetland Type, 2014 - 2018.......................44

Table 4-2a    Consultation Types for Federal Actions Totals, FY 2014 – 2018 .....................48

Table 4-2b    Consultation Types for Federal Actions by Year, FY 2014 – 2018...................48

Table 4-3a    ESA Consultations Without Programmatic, By Species, 2014-2018 ................48

Table 4-3b    ESA Consultations with Programmatic, 2014-2018 ...........................................50

Table 6-1    Historic Water Use in Florida (millions of gallons per day) ..............................68

Table 7-1    Programmatic Consultations and Consultation Keys in Florida, 2010 - 2019..................84

# Appendix Index

Appendix A April 15, 2020 Letter from NMFS to FDEP Regarding NMFS Jurisdiction ...................... 103

Appendix B Species Accounts .................................................................................................. 106

Appendix C Effects of the Action on ESA-listed Species ................................................. 102

Appendix D Figures 1 through 6 ........................................................................................... 154

Appendix E Dredge and Fill Activities as Defined in the Corps Database ........................................ 161

# Acronyms

| | |
|---|---|
| Wildlife Plan | Florida's State Wildlife Action Plan (FWC) |
| assumption | Assumption of Section 404 of CWA by the State of Florida |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BMP | Best Management Practices |
| BiOp | Biological Opinion |
| C&SF | Central and Southern Florida |
| CERP | Comprehensive Everglades Restoration Plan |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| CWIS | Cooling Water Intake Structure |
| EIS | Environmental Impact Statement |
| ECOS | Environmental Conservation Online System |
| EPA | United States Environmental Protection Agency |
| ERP | Environmental Resource Permit |
| ESA | Endangered Species Act |
| F.A.C. | Florida Administrative Code |
| FDEP | Florida Department of Environmental Protection |
| FEMA | Federal Emergency Management Agency |
| FLCCS | Florida Land Cover Classification System |
| FNAI | Florida Natural Areas Inventory |
| F.S. | Florida Statutes |
| FWC | Florida Fish and Wildlife Conservation Commission |
| GIS | Geographic Information Systems |
| HCP | Habitat Conservation Plan |
| IPaC | Information for Planning and Consultation |
| ITS | Incidental Take Statement |
| MOA | Memorandum of Agreement |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |

| | |
|---|---|
| NWP | Nationwide Permit |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PSS | Palustrine Shrub Scrub |
| RAI | Request for Additional Information |
| SFWMD | South Florida Water Management District |
| SLOPES | Standard Local Operating Procedures for Endangered Species |
| USACE | United States Army Corps of Engineers |
| USC | United States Code |
| USFWS | United States Fish and Wildlife Service |
| WMDs | Water Management Districts |
| WOTUS | Waters of the United States |

# Glossary

**CWA** means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 USC 1251, et seq. (Rule 62-331.030, F.A.C., FDEP's State 404 Handbook section 2.0(b)1).

**Action** means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon high seas (50 CFR § 402.02). For the purposes of this document, the Action is the EPA's approval of the State of Florida's request for the assumption of the administration and permitting of a CWA Section 404 program.

**Action Area** means all areas to be affected directly or indirectly by the Federal Action, and not merely the immediate area involved in the Action (50 CFR § 402.02).

**Activity** for the purposes of the State 404 program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (Rule 62-331.030, F.A.C.).

**Administratively complete** means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

**Affect/effect** as a verb, to "affect" means is to bring about a change. The "effect" (usually a noun) is the result of a change. "Affect" appears in Section 7 of the ESA (16 USC § 1536) and "Effect" appears throughout ESA Section 7 regulations (50 CFR § 402 *et seq*) and guidance documents (ESA Section 7 Consultation Handbook).

**Assumed waters** (or **State-assumed waters)** State-assumed waters are all waters of the United States that are not retained waters (as identified in Chapter 62-331, F.A.C., and FDEP's State 404 Handbook).

**Avoidance** means mitigating a resource impact by selecting the least-damaging project type, spatial location and extent compatible with achieving the purpose of the project. Avoidance is achieved through an analysis of appropriate and practicable alternatives and a consideration of impact footprint.

**Assumption** means a state has requested and the EPA has approved a state dredge and fill permitting program to be administered in lieu of the Section 404 program administered by the USACE for discharges into assumed waters.

**Best available data** means data to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under Section 7(a)(2) of the ESA, the USFWS is required to use the best available science. In the context of the ESA, the USFWS and NMFS has a policy statement that further describes best available data (see Notice of Interagency Cooperative Policy on Information Standards Under the Endangered Species Act 1994).

**Biological opinion** means a document which includes 1) the opinion of the US Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; 2) a summary of information on which the opinion is based; and 3) a detailed discussion of the effects of the action on listed species or designated critical habitat (50 CFR § 402.02, 50 CFR § 402.14(h)).

**Candidate species** means plant and animal taxa considered for possible addition to the list of Endangered and Threatened Species. These are taxa for which USFWS has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is currently

precluded by higher priority listing actions (See 50 CFR § 424.02, ESA Section 7 Consultation Handbook).

**Conservation** means to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which protective measures are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking (ESA 16 U.S.C. § 1532(3)).

**Critical habitat** for a threatened or endangered species means 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of Section 1533, on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protection; and 2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of Section 1533, upon a determination by the Secretary of the Interior or the Secretary of Commerce that such areas are essential for the conservation of the species (ESA 16 U.S.C. § 1532(5)).

**Cumulative effects** are those effects of future State or private activities, not involving federal activities, that are reasonably certain to occur within the action area of the action subject to coordination. For the purposes of this document, this definition only applies to ESA Section 7 analyses (50 CFR § 402.02).

**Destruction or adverse modification of critical habitat** means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species (50 CFR § 402.02).

**Effects of the action** are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR § 402.02).

**Endangered species** means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of the ESA would present an overwhelming and overriding risk to man (ESA 16 U.S.C. § 1532(6)).

**Endangered or threatened species** in this document refers to those animal species that are identified as federally endangered or threatened by the USFWS or NMFS, and those animal species that are identified as State-listed by the FWC; it also means plant species identified as endangered or threatened by the USFWS or by the Florida Department of Agriculture and Consumer Services when such plants are located in a wetland or other surface water (Rule 62-330.021, F.A.C.).

**Environmental baseline** refers to the condition of the listed species or its designated critical habitat in the Action Area, without the consequences to the listed species or designated critical habitat caused by the proposed Action. The environmental baseline includes the past and present impacts of all federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early ESA Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR § 402.02).

**ESA-species of concern** refers to species that are either listed, proposed, petitioned, or considered candidates for listing under the Endangered Species Act.

**Fish or wildlife** means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof. (ESA 16 U.S.C. § 1532(8)).

**Incidental take** refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by a federal agency or applicant (50 CFR § 402.02).

**Jeopardize the continued existence of** means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR § 404.02).

**Listed species** refers to any species of fish, wildlife or plant which has been determined to be endangered or threatened under Section 4 of the ESA or under Chapter 68A-27, F.A.C.

**May affect** is the appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed species or designated critical habitat.

**Minimization** means mitigating an aquatic resource impact by managing the severity of a project's impact on resources at the selected site. Minimization is achieved through the incorporation of appropriate and practicable design and risk avoidance measures.

**No effect** is the appropriate conclusion when the action agency determines its action will not affect a listed species or designated critical habitat per the ESA.

**Practicable** means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes (Rule 62-331.030, F.A.C.).

**Programmatic consultation** (under ESA implementing regulations 50 CFR § 402.02) is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the USFWS to consult on the effects of programmatic actions such as:

(1)  Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and
(2)  A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

**Project area** or **Project site** means that a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area (Rule 62-331.030, F.A.C.). In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas.

**Protection measures** means those avoidance and minimization measures to address adverse impacts to listed species and critical habitat under the State 404 program. Protection measures recommended by the USFWS are incorporated as conditions to the State 404 permit. Examples of protection measures include, but are not limited to, project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work). (as used in Chapter 62-331, F.A.C.).

**Proposed species** means any species of fish, wildlife or plant that is proposed in the Federal Register to be listed under Section 4 of the Endangered Species Act (50 CFR § 402.02).

**Reasonable potential to affect** for the purposes of this document and for the State of Florida's 404 program, refers to a project that has a reasonable potential for affecting endangered or threatened species (40 CFR § 233.51(b)(2)) where it has been determined during the species coordination process that the project may affect federally listed species or their critical habitat.

**Retained Waters** means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of the FDEP's State 404 Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide  line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Rule 62-331.030, F.A.C.).

**Section 7 consultation** refers to Section 7(a)(2) of the ESA that requires federal agencies to use their authorities to further the conservation of listed species, including the requirement to consult with the USFWS to ensure that they are not undertaking, funding, permitting or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.

**Section 404** is a section of the federal CWA that establishes a program to regulate the discharge of dredged and fill material into the WOTUS.

**Services(s)** describes the USFWS and/or the NMFS.

**Species coordination** is a process to address potential adverse effects to threatened or endangered species, ensuring compliance with Florida Chapter 62-331, F.A.C., and the ESA. This process includes coordination between the FDEP, FWC, and the USFWS during the review of submitted State 404 permit applications. Recommendations for avoiding and minimizing the effects of a project to federally listed species and their critical habitat is provided by technical assistance from the USFWS.

**Species coordination lead or State species lead** is the designated FDEP or FWC staff person who coordinates with the USFWS and is the point of contact for all ESA species issues during the review of a specific State 404 application. FDEP and FWC staff will decide on a project by project basis which agency will act as the State's species lead on the project when coordinating with the USFWS. Factors that will be considered in this decision include the complexity of the coordination and relative workloads.

**State 404 program** is the FDEP program (Chapter 62-331, F.A.C.) that fulfills the requirements of Section 404 of the CWA in a similar manner as the USACE 404 program, post-assumption, if approved by EPA.

**Stream** means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel shall have been dredged or improved does not prevent the watercourse from being a stream (§ 373.019(20), F.S.).

**Stressors** are any physical, chemical, or biological alteration of resources (i.e., increase, decrease, or introduction) that can induce an adverse organism response. Stressors can act directly on an individual, or indirectly through impacts to resources.

**Surface water** means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface (§ 373.019(21), F.S.).

**Take** means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct. (ESA 16 U.S.C. § 1532(19)) **Harass** is further defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include but are not limited to, breeding, feeding, or sheltering. **Harm** is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering (ESA implementing regulations 50 CFR § 17.3).

**Technical assistance** refers to a coordination process described in the ESA Section 7 Consultation Handbook (1998) that outlines a variety of ways in which the USFWS provides expertise and guidance on an individual project basis. In the context of State 404 permit application reviews, the USFWS assists the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA and Chapter 62-331, F.A.C.

**Technically complete** means a State 404 application where each application item is adequate to allow the FDEP to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 program authorization, the State 404 program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met (Rule 62-331.030, F.A.C.).

**Threatened species** means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range (ESA 16 U.S.C.§ 1532(20)).

**Uplands** means areas that are not wetlands or other surface waters, as delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by § 373.4211, F.S.

**USACE 404 program** refers to the administration and permitting responsibilities by the USACE for Section 404 of the CWA, prior to any assumption by the State of Florida.

**Waters of the State** are as defined in § 403.031(13), F.S.

**Waters of the United States (WOTUS)** means those waters defined in the regulations under 40 CFR § 120.2.

**Wetland** means areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas (40 CFR § 120.2).

**Works** means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the State [§ 373.403(5), F.S.] and includes all types of dredging and filling to create, remove, or locate structures in, on, or over wetlands or other surface waters (Rule 62-330.021, F.A.C.).

# 1.    Purpose of Biological Evaluation

The purpose of this BE is to evaluate the effects of the EPA's potential approval of the State of Florida's request for assumption of administration of a CWA Section 404 program. The BE will consider whether EPA's potential approval of the assumption request (Action) may affect listed species or designated critical habitat and whether any such effects are likely to adversely affect species listed, or proposed to be listed under the Endangered Species Act (ESA), as well as designated critical habitat and proposed critical habitat for those species (50 Code of Federal Regulations [CFR] § 402.12). The EPA is the federal agency charged with approving or denying the State's request, pursuant to the CWA implementing regulations (40 CFR Part 233). The FDEP is the state agency requesting administration of a CWA Section 404 program (assumption).

Florida's request to assume the administration of a CWA Section 404 program only includes those WOTUS not retained by the USACE, referred to as assumed waters or State-assumed waters. The USACE will retain permitting responsibility for the discharges of dredged or fill material into those waters defined as "Retained Waters." The definition of retained waters can be found in FDEP's State 404 Handbook in Chapter 2.0, and the process to determine whether a project is located in, retained or assumed waters is described in Chapter 4.1 of FDEP's State 404 Handbook. In addition, Appendix A of the Handbook includes the Retained Waters List maintained by the USACE.

## 1.1    Objectives of Action

By assuming responsibilities under Section 404 of the CWA, the State of Florida would be able to have an active, major role in the implementation of the CWA within its jurisdiction. This would allow the State to more effectively and efficiently address regional issues by permitting discharges of dredged or fill material through the Florida Environmental Resource Permitting program (ERP) per Chapter 62-330, F.A.C. and State 404 program per Chapter 62-331, F.A.C. authorizations.

For Florida to assume administration of a CWA Section 404 program, pursuant to the provisions of 40 CFR § 233.10, the State must submit an application for assumption package to the EPA Region IV Administrator:

1.  Letter from the Governor of Florida requesting program approval;

2.  Complete program description as set forth in 40 CFR § 233.11;

3.  Attorney General's statement, as set forth in 40 CFR § 233.12;

4.  Memorandum of Agreement (MOA) with the EPA Regional Administrator, as set forth in Section 40 CFR § 233.13;

5.  MOA with the Secretary of the Army, as set forth in 40 CFR § 233.14; and

6.  Copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures.

The EPA has stated that it will voluntarily engage in consultation with the United State Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS) under Section 7 of the ESA in their letter dated December 13, 2019 to the FDEP. This allowed FDEP to act as a non-federal representative to develop a BA to assist in the EPA's review of potential impacts to ESA-listed species. If approved, the State's assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by

the State would be implemented by processes and procedures described in State regulations (Chapters 62-330, and 62-331, Florida Administrative Code [F.A.C.]), Memoranda of Agreement with the EPA and the United States Army Corps of Engineers (USACE), and a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission (FWC) and the USFWS. The EPA is requesting initiation of formal consultation with USFWS on the EPA's potential approval of Florida's request to assume administration of the CWA Section 404 program.

*The Programmatic Biological Evaluation*

In accordance with ESA Section 7 regulations, this BE only evaluates effects to ESA-listed species and those species proposed to be listed and their critical habitat or proposed critical habitat. For the sake of clarity in understanding the State's implementation of the State 404 program and the ERP program, the State 404 program would address species that may not be listed under the ESA, but are protected under other federal or State laws. Examples of these types of laws include the Bald and Golden Eagle Protection Act (16 USC § 668 et seq.) and the Migratory Bird Treaty Act of 1918 (16 USC §§ 703-712 (§ 709 omitted)).

Additionally, ESA proposed, candidate, and petitioned plant and animal species with ranges within Florida are discussed in this BE, to provide a thorough review of Florida's potentially at-risk species, and because the lists of species that are listed as threatened may be modified to include some or all of these petitioned species, depending on the outcome of the status review. This BE analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95) or threatened (44), or that are otherwise ESA-considered (96). The effects of the potential approval by the EPA for the State of Florida assuming administration of a CWA Section 404 program on listed species is discussed for present time and are estimated for the future. All species that are currently listed, proposed to be listed, or that might be listed in the future are discussed, with evaluations of effects on respective guilds. This review helps evaluate the effects of the proposed State 404 program on any species that are currently listed or those we are aware of that may become listed in the next 10 to 20 years.

Because the State 404 program would be implemented through future State-issued 404 permit actions, a programmatic BE is appropriate to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits. The BE will address how that subsequent process will consider effects to listed endangered and threatened species, or species proposed to be listed, so that the effects of this Action may be analyzed.

This BE addresses the future programmatic impacts and effects of the State of Florida's 404 permitting program. More specifically, the components of State 404 program establish the process and responsibilities for FDEP to follow to effectively implement the State 404 program. The programmatic consultation the EPA is requesting would examine whether and to what degree the EPA's approval of the State 404 program ensures that implementation of the program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat.

As recently recognized by the USFWS, "various forms of programmatic consultations have been successfully implemented for many years now" (84 CFR 44996).

Assumption under CWA Section 404 is guided by regulations found at 40 CFR Part 233, which contain specific requirements regarding the issuance of permits by a State 404 program. The State of Florida's 404 program (Chapter 62-331, F.A.C.) has a structure and technical assistance process that requires a review of species listed by the ESA at the time permit applications are received. This approach ensures that if a new

species is listed or a listed species' status changes between this ESA consultation and the time of permit application, the effects of any State 404 permit on the new species or its status change would be reviewed by USFWS. In addition, by taking a broad look at endangered, threatened, proposed, petitioned, and candidate species, this BE and any subsequent Biological Opinion will cover a broad range of species and habitat that may be listed or designated in the future, making for a more efficient permit review process. If the State 404 program's processes are proposed to be changed significantly in the future, those proposed changes would be submitted to the EPA for review before implementation and may trigger re- initiation of consultation with USFWS.

## 1.2   The History of Florida's Request for Assumption

On March 23, 2018, the Florida Governor signed into law Rule 2018-88, Laws of Florida, granting FDEP the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program (creating § 373.4146, F.S.). Since that time, FDEP has drafted Chapter 62-331, F.A.C. to implement the State 404 program, and drafted Memoranda of Agreement with the EPA and the USACE, as required by 40 CFR § 233.13. In addition, a Memorandum of Understanding has been drafted among FDEP, FWC, and USFWS to better facilitate post-assumption implementation.

On July 17, 2019, FDEP sent a request to the EPA that sought designation, pursuant to 50 CFR § 402.08, to serve as a non-federal representative to prepare a BA for possible ESA Section 7 consultation. The EPA designated FDEP as the non-federal representative to prepare a BA in a letter dated December 12, 2019, consistent with 50 CFR § 402.08. This designation allowed FDEP to consult informally with the USFWS and NMFS, to coordinate on the list of species that may be affected and to coordinate on potential processes for the review of State 404 permits.

A brief sequence of recent events and actions by the State of Florida pertaining to the assumption are as follows:

- On March 23, 2018, the Governor signed into law Rule 2018-88, Laws of Florida, which created § 373.4146, F.S., granting FDEP with the power and authority to adopt rules to assume and implement a CWA Section 404 dredge and fill program.

- In 2018 FDEP began work with both the EPA and the USACE to draft separate memoranda of agreement that describe the commitments and responsibilities of each agency, should the assumption be approved by the EPA. FDEP also began assembly of other required components that would constitute a complete assumption request package per 40 CFR § 233.10-14(b).

- In May 2018, FDEP published a Notice of Rule Development to implement the State 404 program and held three rulemaking workshops to collect public comment on the draft rule, Chapter 62-331, F.A.C. The workshops were held on May 5th, May 31st and June 1st, 2018. This rule has been created to implement the State 404 program and to include federal requirements that are not currently covered under the ERP program.

- On July 17, 2019, FDEP sent a request to the EPA that sought designation, pursuant to 50 CFR § 402.08, to serve as a non-federal representative for ESA Section 7 consultation to prepare a BA.

- On November 22, 2019, FDEP sent a request to USFWS and NMFS to review a preliminary list of affected species for the BA.

- On December 12, 2019, the FDEP Secretary received a response from the EPA Region IV Administrator approving the requested non-federal representative designation, allowing FDEP to move forward with the development of this BE. The letter indicated that at the request of FDEP, the EPA would voluntarily engage in consultation with the Services on approving Florida's program.

- In February 2020, FDEP published a Notice of Proposed Rule to implement the State 404 program and in April, held five rulemaking hearings to collect public comment on the draft rule, Chapter 62-331, F.A.C. The hearings occurred on April 2nd, April 6th, April 10th, April 24th, and April 27th.

- In February 2020, FDEP, FWC and USFWS began work to draft a Memorandum of Understanding (MOU) to describe commitments, roles and responsibilities in the State 404 program's species coordination process, should the assumption be approved by EPA.

- Additional public hearings were held in March and April 2020 regarding rulemaking for Chapter 62-331, F.A.C.

- On April 15, 2020, NMFS responded to FDEP's November 22, 2019, letter with the conclusion that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State.

- On June 8th, 2020, the Final Notice of Proposed Rule Change for Chapter 62-331, F.A.C. was published.

## 1.3   Organization of the Document

This BE is organized as follows:

- **Chapter 1** provides an overview of the objectives of the Action, whereby the State of Florida would assume the administration of Section 404 of the CWA in those waters not retained by the USACE and offers a history (timeline) of actions leading up to FDEP's request for assumption.

- **Chapter 2** provides descriptions and details of the request for assumption and describes the Action Area. It also identifies the ecosystems/habitats evaluated in the remainder of the document.

- **Chapter 3** identifies ESA-listed species evaluated in the remainder of the document and describes sources of information for the ESA-listed, NMFS-listed, and State-listed species, and critical habitat within the Action Area.

- **Chapter 4** develops the baseline environmental conditions prior to the Action. Further, it provides a brief history of the regulatory framework prior to (and leading up to) the Action.

- **Chapter 5** analyzes the potential effects of the Action on ESA-listed species and designated critical habitat.

- **Chapter 6** considers the cumulative effect of non-Federal actions that are reasonably certain to occur within the Action Area in the foreseeable future.

- **Chapter 7** discusses species coordination, avoidance and minimization measures, and obtaining USFWS technical assistance, and discusses various tools and guidelines for species review and decision making.

- **Chapter 8** provides an effects determination for ESA-listed species and their critical habitat

- **Chapter 9** provides a listing of the references used to prepare this document.

The April 15, 2020, letter from NMFS to FDEP stating that it does not have assets (ESA-listed species) that may be affected by this Action is provided in Appendix A. Species accounts on those ESA-listed, candidate, or under review species in Florida potentially affected by the Section 404 assumption are contained in Appendix B. Additional information pertaining to the effects of the Action on ESA-listed species, map figures, and a list of dredge and fill activities as described in the USACE database are contained in Appendices C, D, and E respectively.

# 2.     Action & Action Area

## 2.1  Description of Action

This BE analyzes the potential EPA Action, which is the approval of Florida's assumption of administration of a CWA Section 404 program in State-assumed waters. If the State of Florida's request for assumption is approved, FDEP would assume regulatory responsibility over all dredging and filling activities in WOTUS not retained by USACE pursuant to 33 USC § 1344(g) (see Chapter 2.3, Description of Action Area). The subsequent issuance of State 404 permits and any ensuing adverse effects to ESA-listed species or critical habitat caused by permitted activities is an effect or consequence of the EPA's approval of the State 404 program.

Per Section 404(g) of the CWA, 33 USC. § 1344(g), a state, with approval from the EPA, may be authorized to administer its own permit program for the discharge of dredge or fill material into certain WOTUS in lieu of the permitting program implemented by the USACE. The EPA has promulgated regulations at 40 CFR Part 233 outlining, among other things, its requirements for approving a State 404 program.

The Secretary of FDEP is the State official charged with administering the State 404 program when the program is approved in accordance with 40 CFR Part 233 and has authority to issue permits pursuant to Part IV of § 373, F.S. In accordance with § 373.4146, F.S., FDEP has the power and authority to issue permits for regulated activities conducted in State-assumed waters.

FDEP, the water management districts (WMDs), and certain local governments delegated by FDEP jointly implement Florida's Environmental Resource Permitting (ERP) program. The agencies' responsibilities are divided according to the Operating and Delegation Agreement (operating agreements) and the geographic regions of the WMDs. At this time, the administration and implementation of the State 404 program is limited to the FDEP. It is anticipated that the State 404 program may be delegated to the WMDs by FDEP in the future. If this is considered, approval from the EPA will be required prior to implementation. Upon approval, these agencies will be provided training and will be required to follow the same procedures outlined for the State 404 program.

If approved, Florida's State 404 program will regulate discharges of dredge or fill material in those areas where USACE does not retain jurisdiction (assumed waters). The EPA's review of the proposed State 404 program includes Chapter 62-331, F.A.C., which will include requirements of federal law that are not addressed in the currently effective State regulations for dredge and fill permitting (such as noticing provisions, alternatives analysis, and the federal mitigation hierarchy, etc.). The State 404 rule, Chapter 62-331, F.A.C., also includes definitions, procedures for review and agency action on exemption requests, processes for individual permits, public notice requirements, procedures regarding mitigation banking, and procedures and descriptions for general permits created to correspond to the federal nationwide permits and

appropriate regional general permits administered by the USACE. The EPA's review of this program will also include the FDEP's State 404 Handbook and new forms, incorporated by rule reference.

## 2.2   Types of Future Activities to be Authorized by Florida's 404 Program

This chapter discusses the different types of future proposed activities that may be authorized by State 404 program permits. A list of the types of future activities that may be authorized under the Section 404 assumption is included below. A more expansive list is available in Appendix E, which was derived from the USACE project information database. All the activities in the Appendix E list, however, may not be applicable to the State 404 program. Dredging and filling activities include but are not limited to:

- Discharge of fill material
- Dredging
- Ecological restoration
- Discharge of dredged material
- Excavation associated with the discharge of dredged or fill material
- Other (Aquaculture, Work, Aerial or Submarine cable crossings)
- Conversion of waters type (forested wetland to emergent wetland, stream to lake)
- Commercial developments
- Residential developments
- Single-family residence
- Agriculture
- Utilities
- Roadways
- Airports
- Marinas
- Docks
- Piers
- Boat Ramps
- Dams
- Levees
- Mining activities
- Mitigation
- Restoration

### *Proposed Activities Authorized or Exempt Under Program*

Types of activities the State 404 program would regulate include all dredge and fill activities within the State-assumed waters. Construction activities, including excavation and filling of wetlands, may impact ESA-listed species and habitat occurring in those areas. Other effects associated with dredge and fill construction include, but are not limited to, turbidity, decreased water quality, noise, pollution (including exhaust and new sources of light), short- or long-term hydrodynamic changes in the area and its surroundings, and changes in wet and dry periodicity. Permitted projects may have adverse impacts, and those impacts will be taken into consideration during the permitting process, with protection measures identified and implemented to avoid or reduce those impacts. The proposed activities and exemptions below are excerpts from 40 CFR Part 232 and select definitions from 40 CFR § 232.2, also summarized in Appendix B of FDEP's State 404 Handbook:

*Discharge of dredged material.*

(1) Except as provided below in paragraph (2), the term "discharge of dredged material" means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:

    (i) The addition of dredged material to a specified discharge site located in waters of the United States;

    (ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

    (iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:

    (i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to Section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.

    (ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chain sawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.

    (iii) Incidental fallback.

(3) Section 404 authorization is not required for the following:

    (i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized land clearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or the EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized land clearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.

    (ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at §232.2(r) of this chapter.

    (iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR § 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

> Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

(5) For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

*Discharge of fill material.*

(1) The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2) In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

(i) Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable waters of the United States, as that term is defined in 33 CFR part 329, require authorization under Section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

*40 CFR § 232.3 Activities not requiring permits.*

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under Section 307 of the Act, such discharge shall be subject to any applicable toxic effluent standard or prohibition and shall require a Section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

> Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of Section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from Section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

  (1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

  (ii) (A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (i.e., ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

  (B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a Section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

(2)   Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3)   Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4)   Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5)   Any activity with respect to which a State has an approved program under Section 208(b)(4) of the Act which meets the requirements of Section 208(b)(4)(B) and (C).

(6)   Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i)    Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii)   All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii)  The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv)  The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v)   Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or

other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi)   In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii)  The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix)   The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x)    Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi)   The discharge shall not be located in the proximity of a public water supply intake;

(xii)  The discharge shall not occur in areas of concentrated shellfish production;

(xiii) The discharge shall not occur in a component of the National Wild and Scenic Rivers System;

(xiv)  The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv)   All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d)  For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1)  Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2)  Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i) Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to affect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a Section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.

Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in

established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in Section 404(r) of the Act are exempt from Section 404 permit requirements but may be subject to other State or Federal requirements.

## 2.3   Description of Action Area

The Action Area is defined as "all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the Action" (50 CFR § 402.02; and Subsection 62-331.010(2), F.A.C.). For the review of this Action, the Action Area encompasses the geographic extent of the FDEP assumption of

Section 404 permitting within the entire State of Florida. The Action Area consists of, and is limited to, the State-assumed waters and areas affected directly or indirectly by the Federal Action.

Florida's request to assume the administration of a CWA Section 404 program only includes those waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters or State-assumed waters. The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "Retained Waters." This definition can be found in FDEP's State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in Chapter 4.1 of the 404 Handbook. In addition, Appendix A of the 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The USACE also retains permitting authority for projects within "Indian country" as that term is defined at 18 USC § 1151 (provided below):

> "Except as otherwise provided in Sections 1154 and 1156 of this title, the term "Indian country," as used in this chapter, means
>
> a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,
>
> b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
>
> c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
>
> A list of "Indian country" can be found online in the USACE Jacksonville District Regulatory Division Sourcebook.
>
> The boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA."

Federal- and State-approved dredge and fill activities may occur in isolation or adjacent to one another. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Figure 2-1). Projects that fall entirely outside of the 300-foot buffer of the retained waters will be permitted by the State 404 program (Project 3 in Figure 2-2). Linear projects that have some portion of dredge and fill activities in retained waters will be entirely authorized and permitted by the USACE, even if dredge and fill activities occur in wetlands landward of the 300-foot buffer (Figure 2-3).



**Figure 2-1   Example of activities authorized by the USACE 404 program**



**Figure 2-2  Example of activities authorized by USACE and FDEP**

Projects 1, 2, and 3 show the difference between retained and assumed waters responsibilities. Project 3 would be authorized by FDEP.



**Figure 2-3  Example of a linear project**

Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guideline within the project boundary, the project is considered within retained waters and will be processed by the USACE.

## 2.4    Ecosystems/Habitats Located Within the Action Area

The State of Florida has several widely used land cover classification systems that define habitat/land use across the entire state. Each classification plays an integral role in the FWC's Florida's State Wildlife Action Plan (Wildlife Plan). The Wildlife Plan was the main resource for descriptions of ecosystems within the proposed Action Area. The key systems referenced for this BE are the Natural Communities Classification developed by the Florida Natural Areas Inventory (FNAI) and the Florida Land Cover Classification System (FLCCS) developed by FWC. FLCCS is a combination of several systems to include the FNAI Natural Communities Classification. The discussion below summarizes major aquatic ecosystem types within Florida, including freshwater non-forested wetlands, freshwater forested wetlands, lakes, rivers and streams, and estuarine wetlands. Each of the major types includes a variety of more specific sub-types (Tables 2-1 through 2-6).

### 2.4.1   Discussion of Aquatic Ecosystems and Habitats

Florida's freshwater ecosystem includes 7,800 freshwater lakes, 700 springs, 11 million acres of wetlands, more than 1,700 rivers and streams, and numerous underground aquifers (Fernald and Purdum 1998) (Appendix D, Figure 1). It is through these systems that freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem.

#### Freshwater Non-Forested Wetlands

Florida's freshwater non-forested wetlands habitats include shrubby or herbaceous, non-tidal perennial communities in floodplains or depressions (Appendix D, Figure 2). In Florida, these habitats generally consist of sandy, clay, marl, and organic soils with a seven to 12-month hydroperiod. Fire in the summer months is often essential for these habitats to thrive. Freshwater non-forested wetlands can be divided into two major types: marshes and prairies/bogs (Table 2-1). Freshwater marshes are characterized by deeper, long inundation periods and tall emergent and floating-leaved species. Prairies and bogs are characterized by shallow, periodic inundation and are dominated by aquatic grasses, sedges, and/or titi (FWC 2019).

### Table 2-1    Freshwater Non-Forested Wetlands

| Major Type | Includes | Acres |
|---|---|---|
| Marshes | Depression Marsh, Basin Marsh, Coastal Interdunal Swale, Floodplain Marsh, and Glades Marsh | 2,743,064 |
| Prairies and Bogs | Wet Prairie, Shrub Bog, Marl Prairie, and Seepage Slope | 1,714,632 |

Source: FWC 2019

#### Freshwater Forested Wetlands

Freshwater forested wetlands occur in floodplains and depressional areas adjacent to large rivers, creeks, and lakes throughout Florida (Appendix D, Figure 3). The various types of freshwater forested wetlands are defined by their distinct fire frequency, hydroperiod, accumulated organic material, and water source. Areas with longer hydroperiods encourage the growth of cypress and tupelos, and areas with short hydroperiods support more hydrophytic hardwoods. Freshwater forested wetlands (Table 2-2) consist of a wide variety of soil types and diverse plant communities.

**Table 2-2   Freshwater Forested Wetlands**

| Major Type | Includes | Acres |
|---|---|---|
| Coniferous Dominated Wetlands | Wet Flatwoods, Pond Pine, Atlantic White Cedar, and Slash Pine Swamp Forest | 782,518 |
| Cypress/Tupelo | Dome Swamp, Basin Swamp, Strand Swamp, and Floodplain Swamp | 1,534,202 |
| Hardwood Dominated Wetlands | Baygall, Hydric Hammock, Bottomland Forest, and Alluvial Forest | 1,531,214 |
| Other Wetland Forested Mixed | Cypress/Hardwood Swamps and Cypress/Pine/Cabbage Palm | 1,514,386 |

Source: FWC 2019

### Lakes

Ponds and lakes are non-flowing water bodies in natural depressions but lacking persistent emergent vegetation except around their perimeters (Appendix D, Figure 4). Many of Florida's natural lakes are shallow and lack a natural surface outflow though some may be connected to aquatic caves. The majority of Florida's natural lakes are permanent, with some lakes thought to have held water for thousands of years (Table 2-3). Lakes provide essential habitat for a variety of terrestrial, semi-aquatic, and aquatic species.

**Table 2-3  Lakes**

| Major Type | Includes | Acres |
|---|---|---|
| Limnetic Lake | Clastic Upland Lake, Coastal Dune Lake, Flatwoods/Prairie Lake, Marsh Lake, River Floodplain Lake, Swamp Lake, Sinkhole Lake, Coastal Rockland Lake, and Sandhill Lake | 24,786 |

Source: FWC 2019

### Rivers and Streams

Florida's rivers and streams are characterized as natural, flowing waters from their source to the limits of tidal influence and bounded by channel banks (FNAI 2010) (Appendix D, Figure 5). Of the 1,700 rivers that flow through Florida, twenty-three are considered major rivers. Species such as the Okaloosa Darter and Shortnose Sturgeon rely on these waterways. Florida contains an abundance of springs that originate from the underground aquifer. These springs are noted for their high water clarity, low sedimentation, stable channels, and openings that are less than 40 feet wide. Table 2-4 below provides several habitat classes of rivers and streams in Florida.

**Table 2-4  Rivers and Streams**

| Major Type | Includes |
|---|---|
| River | Alluvial River |
| Streams | Blackwater Stream, Calcareous Stream, Seepage Stream, Spring-run Stream, and Tidally-influenced Stream |
| Springs | Major Springs – 32 count |

Source: FWC 2019

### Estuarine

The estuarine ecosystem is the tidally influenced zone landward to the point at which seawater becomes significantly diluted with freshwater inflow from the land (FNAI 2010) (Appendix D, Figure 6). This ecosystem occurs in the intertidal or supratidal zones, is dominated by herbaceous or woody halophytic vascular plants, and experiences salinity levels 0.5 parts per thousand and higher. Species diversity is low due to the extreme physiological stressors in these habitats.

Soils in mangrove swamps and salt marshes are typically muck/sand or limestone substrate and are inundated by daily tides with saltwater creating anoxic conditions. Both systems are found in relatively flat, low-wave energy areas. Salt marshes are dominated by vascular plants (saltmarsh cordgrass, needle rush, and saltwort). Mangrove swamps are usually stands of one of the three species present in Florida: red, white, and black mangroves (Table 2-5).

**Table 2-5  Estuarine Areas**

| Major Type | Acres |
|---|---|
| Mangrove Swamp | 614,097 |
| Salt Marsh | 378,677 |

Source: FWC 2019

### Subterranean

Natural chambers in the karstic limestone underlay much of northern and central Florida. These cavities are in the twilight, middle, and deep zones, and as such are characterized by animals that are in the trogloxenes, troglophiles, and troglobites groups. Many caves in Florida alternate between aquatic and terrestrial due to the rise and fall of water levels, though most cave systems are permanently inundated by groundwater (Table 2-6). Caves that are submerged are typically associated with spring systems. Due to the stability of conditions in caves, species that rely on these systems are very sensitive to any changes in environmental conditions. Caves provide supporting habitat for various salamanders, bats, crayfish, amphipods, and isopods.

**Table 2-6  Aquatic Caves**

| Major Type | Caves |
|------------|-------|
| Aquatic | 105 |
| Terrestrial | 64 |

Source: FWC 2019

### 2.4.2  Discussion of Terrestrial Ecosystems and Habitats

Although terrestrial habitats are not regulated under the CWA, many ESA-listed species that occupy assumed waters also require or utilize adjacent uplands. Upland portions of permitted activities are also subject to ESA consultation as part of permit review. Thus, terrestrial habitat types are briefly summarized below.

Florida's terrestrial ecosystem includes approximately 3.7 million acres of natural habitats that are essential breeding, foraging, and refuge areas for many species. Florida has very little topographic relief, with the highest point at 328 feet above sea level. Slight changes in elevation result in habitat changes, with some upland communities at an only slightly greater elevation than adjacent wetlands. Diverse terrestrial ecosystems provide important habitat for a large variety of wildlife, including the Florida Panther, Gopher Tortoise, salamanders and frogs breeding in inclusions of ephemeral wetlands, and bats and crayfish living in caves (FWC 2019). Though uphill terrestrial habitats help to filter rainwater to lower elevations connected to freshwater habitats, only select ecosystems from the Wildlife Plan are discussed herein due to their relation to the Action Area.

#### *High Pine and Scrub*

High pine and scrub ecosystems are uplands with deep, sandy soils and mesic to xeric woodlands or shrublands. If present, open canopies consist of pine or a mixture of pine and deciduous hardwoods. Upland natural pine is often associated with and grades into upland mixed woodland, upland hardwoods, or sandhill.

Sandhill and scrub are mostly present in the panhandle and central Florida in upland areas with sand substrates. Sandhill is dominated by widely spaced longleaf pine, a midstory of oaks, and an herbaceous understory, all that rely on a frequent fire regime. Temporary wetlands in sandhills provide essential breeding habitat for a number of animal species. Scrub habitats are characterized by open to dense shrub cover with or without a pine canopy, with the midstory typically consisting of evergreen scrubby oaks and/or Florida rosemary. Temporary wetlands found in scrub provide foraging and breeding habitat for numerous species (Table 2-7).

### Table 2-7  Sandhill and Scrub Areas

| Major Type | Acres |
|---|---|
| Sandhill | 775,775 |
| Scrub | 400,308 |
| Upland Coniferous | 444,728 |
| Upland Mixed Woodland | 10,939 |

Source: FWC 2019

#### *Dry Prairie and Pine Rockland*

Dry prairie and pine rockland are characterized by low to non-existent canopy cover with mixed shrubs and herbs in the understory. Dry prairies occur on very flat terrain with wetlands scattered throughout. Pine rocklands are extremely rare habitats that occur on shallow soils over elevated areas of limestone bedrock and are bordered by wet prairies, rockland hammock, or mangroves (Table 2-8).

### Table 2-8  Dry Prairie and Pine Rockland Areas

| Major Type | Acres |
|---|---|
| Dry Prairie | 155,891 |
| Pine Rockland | 16,867 |

Source: FWC 2019

## 3.     ESA-considered Species Potentially Affected by the Action

Table 3-1 includes 235 species: 139 listed and 96 considered by the ESA which occur or could occur within the Action Area and which may potentially be affected by the Action. Table 3-1 forms the basis of the analysis of the effects in Chapter 5. Species that have been petitioned for listing are included because some of these species may be added to the federal list in the future. The programmatic nature of this BE, and the proposed structure of the species coordination process address future listing status changes for listed species and any new species that may be listed that may not be included in this BE. At the time of a State 404 application review, any changes in listing status for affected species will be addressed during species coordination and technical assistance with the USFWS. Asterisks in this table indicate species that are also State-listed.

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| *MAMMALS* | | | | |
| Sherman's Short-tailed Shrew* | *Blarina brevicauda shermani* | Under review[1] | No | Yes |
| Gray Wolf | *Canis lupus* | Endangered | Yes | No |
| Red Wolf | *Canis rufus* | Endangered | No | Yes |
| Florida Bonneted Bat | *Eumops floridanus* | Endangered | No | Yes |
| Florida Salt Marsh Vole | *Microtus pennsylvanicus dukecampbelli* | Endangered | No | Yes |
| Gray Bat | *Myotis grisescens* | Endangered | No | Yes |
| Little Brown Bat | *Myotis lucifugus occultus* | Under review | No | Yes |
| Indiana Bat | *Myotis sodalis* | Endangered | Yes | No |
| Key Largo Woodrat | *Neotoma floridana smalli* | Threatened | No | Yes |
| Key Deer | *Odocoileus virginianus clavium* | Endangered | No | No |
| Rice Rat | *Oryzomys palustris natator* | Endangered | Yes | Yes |
| Pine Island Rice Rat | *Oryzomys palustris planirostris* | Under review[1] | No | Yes |
| Sanibel Island Rice Rat* | *Oryzomys palustris sanibeli* | Under review[1] | No | Yes |
| Tricolored Bat | *Perimyotis subflavus* | Under review[1] | No | Yes |
| Key Largo Cotton Mouse | *Peromyscus gossypinus allapaticola* | Endangered | No | Yes |
| Choctawhatchee Beach Mouse | *Peromyscus polionotus allophrys* | Endangered | No | No |
| Southeastern Beach Mouse | *Peromyscus polionotus niveiventris* | Threatened | No | No |
| St. Andrew Beach Mouse | *Peromyscus polionotus peninsularis* | Endangered | Yes | No |
| Anastasia Island Beach Mouse | *Peromyscus polionotus phasma* | Endangered | No | No |
| Perdido Key Beach Mouse | *Peromyscus polionotus trissyllepsis* | Endangered | No | No |
| Florida Panther | *Puma [=Felis] concolor coryi* | Endangered | No | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Insular Hispid Cotton Rat | *Sigmodon hispidus insulicola* | Under review[1] | No | No |
| Lower Keys Rabbit | *Sylvilagus palustris hefneri* | Endangered | No | Yes |
| West Indian Manatee | *Trichechus manatus* | Threatened | Yes | Yes |
| *BIRDS* | | | | |
| Cape Sable Seaside Sparrow | *Ammodramus maritimus mirabilis* | Endangered | Yes | Yes |
| Florida Grasshopper Sparrow | *Ammodramus savannarum floridanus* | Endangered | No | No |
| Saltmarsh Sparrow | *Ammospiza caudacutas* | Under review | No | Yes |
| Florida Scrub-Jay | *Aphelocoma coerulescens* | Threatened | No | No |
| Rufa Red Knot | *Calidris canutus rufa* | Threatened | No | Yes (tidal flats) |
| Ivory-billed Woodpecker | *Campephilus principalis* | Endangered | No | Yes |
| Piping Plover | *Charadrius melodus* | Threatened - Atlantic Coast DPS, which occurs in Florida | Yes | Yes (intertidal beaches) |
| Whooping Crane | *Grus americana* | Endangered | Yes | Yes |
| Eastern Black Rail | *Laterallus jamaicensis ssp. jamaicensis* | Under review[1] | No | Yes |
| Wood Stork | *Mycteria americana* | Threatened | No | Yes |
| Eskimo Curlew | *Numenius borealis* | Endangered | No | Yes |
| Red-cockaded Woodpecker | *Picoides borealis* | Endangered | No | No |
| Audubon's Crested Caracara | *Polyborus plancus audubonii* | Threatened | No | Yes |
| Black-capped Petrel | *Pterodroma hasitata* | Proposed for listing as Threatened | No | No |
| Everglade Snail Kite | *Rostrhamus sociabilis plumbeus* | Endangered | Yes | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Roseate Tern | *Sterna dougallii dougallii* | Threatened - Caribbean population, which occurs in Florida | No | No |
| Bachman's Wood Warbler | *Vermivora bachmanii* | Endangered | No | Yes |
| Golden-winged Warbler | *Vermivora chrysoptera* | Under review[1] | No | Yes |
| **REPTILES** | | | | |
| American Alligator | *Alligator mississippiensis* | Threatened - due to similarity of appearance | No | Yes |
| Spotted Turtle | *Clemmys guttata* | Under review[1] | No | Yes |
| American Crocodile | *Crocodylus acutus* | Threatened | Yes | Yes |
| Eastern Diamondback Snake | *Crotalus adamanteus* | Under review[1] | No | No |
| Key Ringneck Snake* | *Diadophis punctatus acricus* | Under review[1] | No | No |
| Eastern Indigo Snake | *Drymarchon corais couperi* | Threatened | No | Yes, especially in north Florida |
| Gopher Tortoise* | *Gopherus polyphemus* | Candidate - eastern population, which occurs in Florida (western population listed as Threatened) | No | No |
| Escambia Map Turtle | *Graptemys ernsti* | Under review[1] | No | Yes (streams) |
| Southern Hognose Snake | *Heterodon simus* | Not warranted 12-month finding | No | No |
| Apalachicola Common Kingsnake | *Lampropeltis getula meansi* | Under review[1] | No | Yes |
| Alligator Snapping Turtle | *Macrochelys termminckii* | Under review[1] | No | Yes (streams) |
| Atlantic Salt Marsh Snake | *Nerodia clarkii taeniata* | Threatened | No | Yes (streams) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Florida Pine Snake* | *Pituophis melanoleucus mugitus* | Under review[1] | No | No |
| Bluetail Mole Skink | *Plestiodon egregius lividus* | Threatened | No | No |
| Sand Skink | *Plestiodon reynoldsi* | Threatened | No | No |
| Florida Red-bellied (Florida Panhandle) Turtle | *Pseudemys nelsoni* | Under review[1] | No | Yes (streams) |
| Florida Scrub Lizard | *Sceloporus woodi* | Under review[1] | No | No |
| Short-tailed Snake* | *Stilosoma extenuatum* | Under review[1] | No | No |
| Rim Rock Crowned Snake* | *Tantilla oolitica* | Under review[1] | No | No |
| *AMPHIBIANS* | | | | |
| Reticulated Flatwoods Salamander | *Ambystoma bishopi* | Endangered | No | Yes |
| Frosted Flatwoods Salamander | *Ambystoma cingulatum* | Threatened | No | Yes |
| Georgia Blind Salamander* | *Eurycea wallacei* | Under review[1] | No | Yes (aquatic caves) |
| Gopher Frog | *Lithobates capito* | Under review[1] | No | Yes |
| Gulf Hammock Dwarf Siren | *Pseudobranchus striatus lustricolus* | Under review[1] | No | Yes |
| *FISH* | | | | |
| Shortnose Sturgeon | *Acipenser brevirostrum* | Endangered | No | Yes (streams) |
| Gulf Sturgeon | *Acipenser oxyrinchus [=oxyrhynchus] desotoi* | Threatened | Yes | Yes (streams) |
| Atlantic Sturgeon | *Acipenser oxyrinchus oxyrinchus* | Endangered - South Atlantic DPS, which occurs in Florida | Yes | Yes (streams) |
| Okaloosa Darter | *Etheostoma okalossae* | Threatened | No | Yes (streams) |
| Saltmarsh Topminnow* | *Fundulus jenkinsi* | Under review[1] | No | Yes (streams) |

### Table 3-1  ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Smalltooth Sawfish | *Pristis pectinate* | Endangered - US DPS (Bahaman DPS also listed as Endangered) | Yes | Yes (streams) |
| *MOLLUSKS* | | | | |
| Southern Elktoe | *Alasmidonta triangulata* | Under review[1] | No | Yes (streams) |
| Fat Threeridge | *Amblema neislerii* | Endangered | Yes | Yes (streams) |
| Rayed Creekshell | *Anodontoides radiatus* | Under review[1] | No | Yes (streams) |
| Pygmy Siltsnail Snail | *Cincinnatia parva* | Under review[1] | No | Yes (streams) |
| Ponderous Siltsnail Snail | *Cincinnatia ponderosa* | Under review[1] | No | Yes (streams) |
| Delicate Spike | *Elliptio arctata* | Under review[1] | No | Yes (streams) |
| Chipola Slabshell | *Elliptio chiplolaensis* | Threatened | Yes | Yes (streams) |
| Purple Bankclimber | *Elliptoideus sloatianus* | Threatened | Yes | Yes (streams) |
| Tapered Pigtoe | *Fusconaia burki* | Threatened | Yes | Yes (streams) |
| Narrow Pigtoe | *Fusconaia escambia* | Threatened | Yes | Yes (streams) |
| Round Ebonyshell | *Fusconaia rotulata* | Endangered | Yes | Yes (streams) |
| Southern Sandshell | *Hamiota australis* | Threatened | Yes | Yes (streams) |
| Shinyrayed Pocketbook | *Lampsilis subangulata* | Endangered | Yes | Yes |
| Gulf Moccasinshell | *Medionidus penicillatus* | Endangered | Yes | Yes (streams) |
| Ochlockonee Moccasinshell | *Medionidus simpsonianus* | Endangered | Yes | Yes (streams) |
| Suwannee Moccasinshell | *Medionidus walker* | Threatened | Yes | Yes (streams) |
| Stock Island Tree Snail | *Orthalicus reses [not incl. nesodryas]* | Threatened | No | Yes |
| Oval Pigtoe | *Pleurobema pyriforme* | Endangered | Yes | Yes (streams) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Fuzzy Pigtoe | *Pleurobema strodeanum* | Threatened | Yes | Yes (streams) |
| Southern Kidneyshell | *Ptychobranchus jonesi* | Endangered | Yes | Yes (streams) |
| Choctaw Bean | *Villosa choctawensis* | Endangered | Yes | Yes |
| *CRUSTACEANS* | | | | |
| Cypress Crayfish | *Cambarellus blacki* | Under review[1] | No | Yes |
| Florida Cave Amphipod | *Crangonyx grandimanus* | Under review[1] | No | Yes (aquatic caves) |
| Hobb's Cave Amphipod | *Crangonyx hobbsi* | Under review[1] | No | Yes (aquatic caves) |
| Squirrel Chimney Cave Shrimp | *Palaemonetes cummingi* | Threatened | No | Yes (aquatic caves) |
| Orange Cave Crayfish | *Procambarus acherontis* | Under review[1] | No | Yes |
| Coastal Flatwoods Crayfish | *Procambarus apalachicolae* | Under review[1] | No | Yes |
| Silver Glen Springs Crayfish | *Procambarus attiguus* | Under review[1] | No | Yes (aquatic caves) |
| Bigcheek Cave Crayfish | *Procambarus delicatus* | Under review[1] | No | Yes (aquatic caves) |
| Panama City Crayfish** | *Procambarus econfinae* | Proposed for listing as Threatened | No | Yes |
| Santa Fe Cave Crayfish* | *Procambarus erythrops* | Under review[1] | No | Yes (aquatic caves) |
| Orange Lake Cave Crayfish | *Procambarus franzi* | Under review[1] | No | Yes (aquatic caves) |
| Coastal Lowland Cave Crayfish | *Procambarus leitheuser* | Under review[1] | No | Yes (aquatic caves) |
| Florida Cave Crayfish | *Procambarus lucifugus* | Under review[1] | No | Yes (aquatic caves) |
| Miami Cave Crayfish | *Procambarus milleri* | Under review[1] | No | Yes (aquatic caves) |
| Putnam County Cave Crayfish | *Procambarus morrisi* | Under review[1] | No | Yes (aquatic caves) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Pallid Cave Crayfish | *Procambarus pallidus* | Under review[1] | No | Yes (aquatic caves) |
| Black Creek Crayfish | *Procambarus pictus* | Under review[1] | No | Yes (streams) |
| Spider Cave Crayfish | *Troglocambarus maclanei* | Under review[1] | No | Yes (aquatic caves) |
| *INSECTS* | | | | |
| Logan's Agarodes Caddisfly | *Agarodes logani* | Under review[1] | No | Yes (streams) |
| Florida Leafwing | *Anaea troglodyta floridalis* | Endangered | Yes | No |
| Frosted Elfin Butterfly | *Callophrys irus* | Under review | No | No |
| Miami Tiger Beetle | *Cicindelidia floridana* | Endangered | No | No |
| Nickerbean Blue Butterfly | *Cyclargus ammon* | Threatened - due to similarity of appearance | No | No |
| Miami Blue Butterfly | *Cyclargus thomasi bethunebakeri* | Endangered | No | No |
| Monarch Butterfly | *Danaus plexippus plexippus* | Under review[1] | No | No |
| Duke's Skipper Butterfly | *Euphyes dukesi calhouni* | Under review[1] | No | Yes |
| Palatka Skipper Butterfly | *Euphyes pilatka klotsi* | Under review[1] | No | Yes |
| Westfall's Clubtail Dragonfly | *Gomphus westfalli* | Under review[1] | No | Yes (streams) |
| Ceraunus Blue Butterfly | *Hemiargus ceraunus antibubastus* | Threatened - due to similarity of appearance | No | No |
| Schaus Swallowtail Butterfly | *Heraclides aristodemus ponceanus* | Endangered | No | No |
| Gulf Coast Solitary Bee | *Hesperapis oraria* | Under review[1] | No | No |
| Sykora's Hydroptila Caddisfly | *Hydroptila sykorai* | Under review[1] | No | Yes (streams) |
| Morse's Little Plain Brown Sedge Caddisfly | *Lepidostoma morsei* | Under review[1] | No | Yes (streams) |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cassius Blue Butterfly | *Leptotes cassius theonus* | Threatened - due to similarity of appearance | No | No |
| Purple Skimmer Dragonfly | *Libellula jesseana* | Under review[1] | No | Yes (lakes) |
| American Burying Beetle | *Nicrophorus americanus* | Endangered | No | No |
| Little Oecetis Longhorn Caddisfly | *Oecetis parva* | Under review[1] | No | Yes (lakes) |
| Southern Snaketail Dragonfly | *Ophiogomphus australis* | Under review[1] | No | Yes (streams) |
| Blue Calamintha Bee | *Osmia calaminthae* | Under review[1] | No | No |
| Calvert's Emerald Dragonfly | *Somatochlora calverti* | Under review[1] | No | Yes (streams) |
| Bartram's Scrub-hairstreak | *Strymon acis bartrami* | Endangered | Yes | No |
| Yellow-sided Clubtail Dragonfly | *Stylurus potulentus* | Under review[1] | No | Yes (streams) |
| Three-toothed Long-Horned Caddisfly | *Triaenodes tridontus* | Under review[1] | No | Yes (streams) |
| *PLANTS* | | | | |
| Meadow Joint-vetch | *Aeschynomene pratensis* | Under review[1] | No | Yes |
| Crenulate Lead-plant | *Amorpha crenulata* | Endangered | No | No |
| Blodgett's Silverbush | *Argythamnia blodgettii* | Threatened | No | No |
| Four-petal Pawpaw | *Asimina tetramera* | Endangered | No | No |
| Purpledisk Honeycombhead Sunflower | *Balduina atropurpurea* | Under review[1] | No | Yes |
| Apalachicola Wild Indigo | *Baptisia megacarpa* | Under review[1] | No | Yes |
| Florida Bonamia | *Bonamia grandiflora* | Threatened | No | No |
| Florida Brickell-bush | *Brickellia mosieri* | Endangered | Yes | No |
| Brooksville Bellflower | *Campanula robinsiae* | Endangered | No | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Fragrant Prickly-apple | *Cereus eriophorus var. fragrans* | Endangered | No | No |
| Deltoid Spurge | *Chamaesyce deltoidea ssp. deltoidea* | Endangered | No | No |
| Pineland Sandmat | *Chamaesyce deltoidea pinetorum* | Threatened | No | No |
| Wedge Spurge | *Chamaesyce deltoidea serpyllum* | Endangered | No | No |
| Garber's Spurge | *Chamaesyce garberi* | Threatened | No | No |
| Big Pine Partridge Pea | *Chamaecrista lineata keyensis* | Endangered | No | No |
| Pygmy Fringe-tree | *Chionanthus pygmaeus* | Endangered | No | No |
| Cape Sable Thoroughwort | *Chromolaena frustrata* | Endangered | Yes | No |
| Florida Golden Aster | *Chrysopsis floridana* | Endangered | No | No |
| Florida Perforate Cladonia | *Cladonia perforata* | Endangered | No | No |
| Pigeon Wings | *Clitoria fragrans* | Threatened | No | No |
| Short-Leaved Rosemary | *Conradina brevifolia* | Endangered | No | No |
| Etonia Rosemary | *Conradina etonia* | Endangered | No | No |
| Apalachicola Rosemary | *Conradina glabra* | Endangered | No | No |
| Florida Semaphore Cactus | *Consolea corallicola* | Endangered | Yes | No |
| Ciliate-Leaf Tickseed Sunflower | *Coreopsis integrifolia* | Endangered | Yes | Yes |
| Avon Park Harebells | *Crotalaria avonensis* | Endangered | No | No |
| Okeechobee Gourd | *Cucurbita okeechobeensis ssp. okeechobeensis* | Endangered | No | Yes |
| Florida Prairie-Clover | *Dalea carthagenensis floridana* | Endangered | No | No |
| Beautiful Pawpaw | *Deeringothamnus pulchellus* | Endangered | No | Yes |
| Rugel's Pawpaw | *Deeringothamnus rugelii* | Endangered | No | Yes |
| Garrett's Mint | *Dicerandra christmanii* | Endangered | No | No |

## Table 3-1  ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Longspurred Mint | *Dicerandra cornutissima* | Endangered | No | No |
| Scrub Mint | *Dicerandra frutescens* | Endangered | No | No |
| Lakela's Mint | *Dicerandra immaculata* | Endangered | No | No |
| Florida Pineland Crabgrass | *Digitaria pauciflora* | Threatened | No | Yes |
| Clam-shell Orchid | *Encyclia cochleata var. triandra* | Not warranted 12-month finding | No | No |
| Big Cypress Epidendrum Orchid | *Epidendrum strobiliferum* | Under review[1] | No | No |
| Blackbract Pipewort | *Eriocaulon nigrobracteatum* | Under review[1] | No | Yes |
| Scrub Buckwheat | *Eriogonum longifolium var. gnaphalifolium* | Threatened | No | No |
| Snakeroot (Wedgeleaf Eryngo) | *Eryngium cuneifolium* | Endangered | No | No |
| Telephus Spurge | *Euphorbia telephioides* | Threatened | No | No |
| Small's Milkpea | *Galactia smallii* | Endangered | No | No |
| Harper's Beauty | *Harperocallis flava* | Endangered | No | No |
| Aboriginal Prickly-apple | *Harrisia (=Cereus) aboriginum (=gracilis)* | Endangered | Yes | No |
| Florida Hartwrightia Sunflower | *Hartwrightia floridana* | Under review[1] | No | Yes |
| Henry's Spider-lily | *Hymenocallis henryae* | Under review[1] | No | No |
| Highlands Scrub Hypericum | *Hypericum cumulicola* | Endangered | No | No |
| Edison's Ascyrum St. Johns Wort | *Hypericum edisonianum* | Under review[1] | No | Yes |
| Smooth Barked St. Johns Wort | *Hypericum lissophloeus* | Under review[1] | No | Yes |
| Yellow Anisetree | *Illicium parviflorum* | Not warranted 12-month finding | No | Yes |
| Beach Jacquemontia | *Jacquemontia reclinata* | Endangered | No | No |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cooley's Water-willow | *Justicia cooleyi* | Endangered | No | Yes |
| Scrub Blazingstar | *Liatris ohlingerae* | Endangered | No | No |
| Panhandle Lily | *Lilium iridollae* | Under review[1] | No | Yes |
| Bog Spicebush | *Lindera subcoriacea* | Under review[1] | No | Yes |
| Sand Flax | *Linum arenicola* | Endangered | No | Yes |
| Carter's Small Flowered Flax | *Linum carteri carteri* | Endangered | Yes | Yes |
| West's Flax | *Linum westii* | Under review[1] | No | Yes |
| Boykin's Lobelia | *Lobelia boykinii* | Under review[1] | No | Yes |
| Raven's Seedbox | *Ludwigia ravenii* | Under review[1] | No | Yes |
| Scrub Lupine | *Lupinus aridorum* | Endangered | No | No |
| Curtis' Loosestrife | *Lythrum curtissii* | Under review[1] | No | Yes |
| Lowland Loosestrife | *Lythrum flagellare* | Under review[1] | No | Yes |
| White Birds-in-a-nest | *Macbridea alba* | Threatened | No | Yes |
| Godfrey's Stitchwort | *Minuartia godfreyi* | Under review[1] | No | Yes |
| Needleleaf or Narrowleaf Naiad Water-nymph | *Najas filifolia* | Under review[1] | No | Yes |
| Britton's Beargrass | *Nolina brittoniana* | Endangered | No | No |
| Cape Sable Orchid | *Oncidium undulatum* | Under review[1] | No | Yes |
| Papery Whitlow-wort | *Paronychia chartacea* | Threatened | No | No |
| Key Tree Cactus | *Pilosocereus robinii* | Endangered | No | No |
| Godfrey's Butterwort | *Pinguicula ionantha* | Threatened | No | Yes |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Lewton's Polygala Milkwort | *Polygala lewtonii* | Endangered | No | No |
| Tiny Polygala Milkwort | *Polygala smallii* | Endangered | No | No |
| Horton Wireweed (Small) | *Polygonella basiramia* | Endangered | No | No |
| Sandlace (Woody Wireweed) | *Polygonella myriophylla* | Endangered | No | No |
| Florida Pondweed | *Potamogeton floridanus* | Under review[1] | No | Yes |
| Scrub Plum | *Prunus geniculata* | Endangered | No | No |
| White Meadowbeauty | *Rhexia parviflora* | Under review[1] | No | Yes |
| Panhandle Meadowbeauty | *Rhexia salicifolia* | Under review[1] | No | Yes |
| Chapman Rhododendron | *Rhododendron chapmanii* | Endangered | Yes | Yes |
| Hairy Peduncled Beakrush | *Rhynchospora crinipes* | Under review[1] | No | Yes |
| Miccosukee Gooseberry | *Ribes echinellum* | Threatened | No | Yes |
| Eared Coneflower | *Rudbeckia auriculata* | Under review[1] | No | Yes |
| Florida Willow | *Salix floridana* | Under review[1] | No | Yes |
| Gulf Sweet Pitcherplant | *Sarracenia rubra ssp. gulfensis* | Under review[1] | No | Yes |
| American Chaffseed | *Schwalbea americana* | Endangered | No | Yes |
| Florida Skullcap | *Scutellaria floridana* | Threatened | No | Yes |
| Everglades Bully | *Sideroxylon reclinatum ssp. austrofloridense* | Threatened | No | Yes |
| Georgia Bully | *Sideroxylon thorne* | Under review[1] | No | No |
| Fringed Campion | *Silene polypetala* | Endangered | No | No |
| Gentian Pinkroot | *Spigelia gentianoides* | Endangered | No | No |

**Table 3-1  ESA Species Potentially Affected by the Action**

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cooley's Meadow Rue | *Thalictrum cooleyi* | Endangered | No | Yes,, |
| Florida Torreya | *Torreya taxifolia* | Endangered | No | No |
| Florida Bristle Fern | *Trichomanes punctatum ssp. floridanum* | Endangered | No | No |
| Ocala Vetch | *Vicia ocalensis* | Not warranted 12-month finding | No | Yes |
| Wide-leaf Warea | *Warea amplexifolia* | Endangered | No | No |
| Carter's Mustard | *Warea carteri* | Endangered | No | No |
| Karst Pond Xyris | *Xyris longisepala* | Under review[1] | No | Yes |
| Florida Ziziphus (Jujube) | *Ziziphus celata* | Endangered | No | No |

[1]Substantial 90-day Finding
*Species/subspecies is also State-listed in Florida (i.e., State threatened)
**State Species of Special Concern (SSC)

## 3.1    ESA-considered Species and Critical Habitat in the Action Area

All ESA-listed, proposed, candidate, and petitioned plant and animal species under USFWS jurisdiction and with ranges within Florida are discussed in this BE. The status of listed species can change from year to year, and species that have been petitioned for ESA listing have also been included because some of these species may be listed in the future. Including a comprehensive analysis in this BE for the list of species in Table 3-1 helps evaluate the effects of the State 404 program on any species that are currently listed or that are currently under review and may become listed in the future. Table 3-1 includes all species analyzed in Chapter 5, although a few species were determined to be likely "no effect" findings because they are believed to be extirpated in Florida or any effects were considered to be insignificant or discountable.

Species dependent on aquatic systems are more likely to be affected by the Action; however, upland species may also be present in staging areas or along access routes or otherwise within or affected by individual project action areas. If adverse impacts/effects to upland species would not occur "but for" the Action, those adverse impacts must be addressed. Thus, upland species have been retained in the analysis.

Information for the species analyzed in this document was gathered from the USFWS Environmental Conservation Online System (ECOS) and various documents linked from ECOS, including 5-year reviews, Recovery Plans, and Species Status Assessments. Secondary references cited in ECOS documents were

reviewed as necessary. For species under review for ESA listing, petitions to list and 90-day and/or 12-month findings were reviewed. The amount of information available for under-review species ranged from minimal to considerable, depending on the species. For some species, extensive additional literature was available; for others, relatively little is known.

As the precise locations of future permit applications are not known at this time, no attempt was made to generate detailed range maps or analyze species distributions relative to anticipated impacts. Without knowledge of future permit locations, it is impractical to determine the amount of overlap between project sites and species at this time. However, a relatively small number of species have repeatedly occurred in large numbers of past consultations, and these are identified in the effects analysis chapter (Chapter 5) of this BE.

Similarly, critical habitat was not mapped because the locations of future permit applications are not precisely known at this time. Conservation tools are available online, including Geographic Information System (GIS) downloads for critical habitats and habitat ranges, including the ECOS system mentioned above. Additional tools are also available at https://www.fws.gov/southeast/conservation-tools/. The USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) can also be used to determine whether critical habitats or habitat ranges exist within a project area. Table 3-1 identifies whether or not critical habitat has been designated for each ESA-listed species. For species with designated critical habitat, future State 404 permit review will evaluate whether the project location is within a critical habitat unit.

Each State 404 permit application within assumed waters will identify the location and extent of proposed activities, allowing identification of ESA-listed species present or potentially present, and presence or absence of designated critical habitat (using IPaC, FNAI database, etc.). This data will be used to determine potential effects on ESA-listed species on a project-specific basis.

## 3.2    NMFS-Listed Species

FDEP requested input on a draft species list for Florida's application package for assumption from the USFWS and the NMFS on November 22, 2019. On April 15, 2020, NMFS responded to FDEP with the conclusion that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State (See Appendix A). They stated that where there is shared jurisdiction for the Gulf Sturgeon between NMFS and USFWS, the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. While ESA-listed species under NMFS jurisdiction are anticipated to only occur in retained waters, they are included in this BE as part of the comprehensive review of all Florida's imperiled species. Based on NMFS' determination, the EPA therefore concludes that the EPA's approval of FDEP's assumption of the Section 404 program has no effect on NMFS jurisdictional species

## 3.3    State-Listed Species

Although this BE focuses on federal ESA-listed, proposed, or under review species, there is considerable overlap with Florida's State-listed species (FWC 2018). The current listing status of all of Florida's federal- and State-listed species is found in Chapter 68A-27, F.A.C. It is noteworthy that Florida's definition of "take" is identical to the federal definition (Chapter 68A-27.003, F.A.C.). See Chapter 7.1 for additional information regarding State-listed species.

# 4.    Baseline Conditions

This chapter identifies and describes all known natural and anthropogenic sources of impact on ESA-considered species and the condition of their habitats in the Action Area, except those caused by the Action. The purpose of the environmental baseline is to provide the context for the impacts of the Action with regard to the impacts of all the other human activities that are also affecting the ESA-considered species.

This environmental baseline describes wetlands status and trends within Florida, and implications for ESA-considered species. The baseline assessment focuses on factors influencing habitat and those which affect the distribution and abundance of ESA-considered species. The baseline also includes past and present impacts of federal, State, and private activities within the Action Area, and activities underway at present (i.e., coincident with assumption). The Action Area was previously defined and described in Chapter 2.

## 4.1    Regulatory Baseline

### 4.1.1   Federal Wetland Regulations

Section 404 of the CWA (33 USC § 1344) establishes a program to regulate the discharge of dredged or fill material into WOTUS. The Administrator of the EPA, in conjunction with the Secretary of the Army, acting through the Chief of Engineers, established guidelines for regulating such discharges under Section 404(b)(1) of the CWA (40 CFR Part 230). The EPA and the USACE jointly implement the regulation and permitting of such proposed activities. In Florida, the USACE Jacksonville District acts as the regulatory agency that issues Section 404 dredge and fill permits.

*Individual Permits*

To receive a dredge and fill permit authorization from the USACE, an applicant must demonstrate the following under 40 CFR § 230.10:

- No practicable alternative to the proposed activity exists that would have less adverse impact on the aquatic ecosystem;
- The proposed activity will not:
  - violate State water quality standards,
  - violate any applicable toxic effluent standard or prohibition,
  - jeopardize the continued existence of endangered and threatened species, or result in the likelihood of destruction or adverse modification of critical habitat
  - violate any requirement imposed to protect a marine sanctuary;
- The proposed activity will not cause or contribute to significant degradation of WOTUS; and
- The applicant has taken appropriate and practicable steps that will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

The USACE will request any additional information required to deem an application complete, typically within 15 days of receipt of the application. Once the agency deems the application to be complete, the USACE publishes a public notice within 15 days to receive comments from interested and/or affected parties on the proposed action.

Following receipt of an application and evaluation as to the completeness of the application, the USACE is charged with evaluating, among other considerations, the effects of the proposed action on ESA-listed species or designated critical habitat. Where a proposed action may affect a listed species or critical habitat, USACE coordinates and/or consults with the Services prior to issuing any permit. If the USACE determines the proposed activity may affect any endangered or threatened species or their critical habitat, beneficially or adversely, the USACE District Engineer will initiate consultation with the Services. If the USACE District Engineer makes a determination from the submitted application that the proposed activity would not affect ESA-listed species or their critical habitat, the public notice will contain a statement attesting to such and consultation with the Services is not required.

The comment period is typically 30 days; upon receipt of comments, the USACE evaluates the comments received, provides them to the applicant, and determines whether a public hearing is required. Following the comment period (and a public hearing if conducted), the USACE makes a determination as to whether the Section 404 permit should be issued. This determination is based on applicable regulations governing the activity as well as comments received as part of the record. The USACE District Engineer will either prepare a Statement of Findings or – where an Environmental Impact Statement (EIS) has been prepared – a Record of Decision on all permit decisions. The final action of the USACE is either the signature of the issuing official on the authorizing document (a USACE permit) or a signature on a letter notifying the applicant of the denial of the permit. An issued permit will contain conditions to follow in execution of the work; a denial will contain written documentation of the reason(s) for the denial.

### *General Permits*

A general permit is issued for structures, work, or discharges that will result in only minimal adverse effects. General permits are issued on a nationwide, regional, or state basis for particular categories of activities. There are three types of general permits: Nationwide Permits, Regional General Permits, and Programmatic General Permits. General permits (which are reviewed by the Services) are usually valid for five years and may be re-authorized by the USACE. (The Services will review the proposed reauthorizations).

### *Nationwide Permits*

On a five-year basis, the USACE issues Nationwide Permits (NWPs) pursuant to Section 404(e) of the CWA (33 USC § 1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 USC § 401 et seq.). As of January 6, 2017, there were a total of 52 NWPs. The NWPs streamline the requirements of the CWA and are informed by extensive feedback from the public and other key stakeholders. NWPs provide expedited review of projects that have minimal impact on the aquatic environment. Categories of activities that may be covered under the NWPs include, but are not limited to, linear transportation projects, bank stabilization activities, aquatic habitat restoration, residential development, commercial and industrial developments, aids to navigation, and certain maintenance activities.

In 2017, the USACE added two new NWPs in addition to the 50 that were in place in 2012. One addition provides a mechanism for an efficient authorization process for the removal of low-head dams to restore streams and enhance public safety; the second addition covers the construction and maintenance of living shorelines to control erosion in coastal areas.

*Regional General Permits*

As of February 2020, the USACE Jacksonville District has issued 18 general permits. Each regional general permit has specific terms and conditions, all of which must be met for project-specific actions to be verified as compliant with and covered by the respective general permit.

*Programmatic General Permits*

Programmatic General Permits are based on an existing state, local, or other federal programs and designed to avoid duplication of those programs. The USACE Jacksonville District lists 12 programmatic general permits, one of which is only applicable to Puerto Rico.

## 4.1.2   Florida Wetlands Regulations

Part IV of § 373, F.S. regulates dredging and filling in wetlands and other surface waters, such as the construction, alteration, operation, maintenance, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, works (including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other artificial structures), and appurtenant works (artificial improvements to a dam).

This statute authorizes FDEP and the five water management districts (WMDs) in the state to jointly implement Florida's ERP program. The responsibilities of the agencies are divided according to Operating Agreements between FDEP and the particular WMD. Provisions in the statute allow for FDEP to approve local government programs to implement the ERP program on behalf of the FDEP and the WMDs. As of January 2020, full delegation has been given to Broward County and minor works delegated to the Environmental Protection Commission for Hillsborough County.

The ERP program operates in addition to the USACE Section 404 program that regulates activities in WOTUS. All state, local, and regional governments in Florida delineate wetlands in accordance with State methodology (Chapter 62-340, F.A.C.) instead of the federal wetland delineation method (Section 404 of the CWA and the Federal Manual for Identifying and Delineating Jurisdictional Wetlands). While the ERP application is issued, withdrawn, or denied in accordance with State statutory and rule criteria (briefly summarized below), agency action on the ERP application also constitutes any needed water quality certification under Section 401 of the CWA, and coastal zone consistency concurrence statements with Florida's federally-approved Coastal Zone Management program under Section 307 (Coastal Zone Management Act). The USACE must take separate action to issue or deny any needed federal permit under Section 404 of the CWA and/or Section 10 of the Rivers and Harbors Act of 1899.

To receive an ERP, an applicant must demonstrate that the proposed activity will not be harmful to the water resources of the State and will not be inconsistent with the overall objectives of Florida rules and statutes. The applicant must provide reasonable assurance that the activity will not violate the applicable State water quality standards and that the activity is not contrary to the public interest for all waters that are not designated as Aquatic Preserves or Outstanding Florida Waters. For activities in those designated waters, the applicant must provide reasonable assurance that the proposed activity will be clearly in the public interest. Surface water quality standards are published in Chapter 62-302, F.A.C. In addition, FDEP provides policy guidance on anti-degradation in Rule 62-4.242, F.A.C., and in Rule 62-302.300, F.A.C, which allows for the protection of water quality above the minimum required for classification. Further, FDEP administers the Impaired Waters Rule (Chapter 62-303, F.A.C.), and has established Total Maximum Daily Load criteria (Chapter 62-304, F.A.C.) (FDEP 2020b). It is the intent of FDEP and the WMDs that these criteria are implemented in a

manner that achieves a programmatic goal and a project-permitting goal of no net loss in wetlands or other surface water functions.

To determine whether an activity is not contrary to the public interest or is clearly in the public interest, the FDEP must consider and balance the following criteria:

- Whether the activity will adversely affect the public health, safety, or welfare or the property of others;

- Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

- Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

- Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;

- Whether the activity will be of a temporary or permanent nature;

- Whether the activity will adversely affect or will enhance significant historical and archaeological resources; and

- The current condition and relative value of functions being performed by areas affected by the proposed activity.

FDEP provides a copy of all notices of ERP applications for individual permits that propose regulated activities in, on, or over wetlands or other surface waters to the FWC for review and comment. The FDEP and FWC frequently work together on non-regulatory as well as regulatory issues. Examples of the many collaboration efforts include habitat restoration projects, management of State parks and management of species on other State-owned easements and property.

In accordance with the provisions of § 373.4141, F.S., FDEP shall review the ERP application to determine if it is complete. If the application is incomplete, FDEP must request additional information (RAI) within 30 days. The applicant must respond to such requests within 90 days. Within 30 days after receipt of such additional information, FDEP must review the submitted material for completeness. The WMD processing procedures for ERP vary somewhat to accommodate the requirements of their specific Governing Boards.

In accordance with § 120, F.S., FDEP must decide whether it should issue or deny an ERP within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application. Application completeness is determined by whether the applicant has submitted all materials required for review as specified by rule and statute. The WMDs also are subject to this requirement, but their ERP processing procedures vary by each district to accommodate the requirements of their different Governing Boards. Pursuant to § 120.60(1), F.S., any application that FDEP or the WMD does not approve or deny within 60 days is considered approved by default.

Once issued, ERP permits are valid for the life of the system (which includes all structures and works authorized for construction or land alteration). The ERP permit does not automatically expire after the construction phase (typically five years) of a project but continues to cover operation (use) of the system in perpetuity.

Under current regulations for permit issuance, an applicant proposing any activity that is expected to result in impacts to both federal and State jurisdictional wetlands or other surface waters must obtain both a Section 404 permit from the USACE and an ERP permit from FDEP or the WMDs. There is the potential for duplication of effort to obtain what, in some cases, results in nearly identical permits for anticipated impacts to the same extent of wetlands and other surface waters. The timelines for review and issuance of a federal Section 404 permit and a State ERP permit can vary substantially. The State of Florida has an interest in assuming the federal permitting responsibility for Section 404 and will preserve the environmental protections afforded by federal law; the result should increase efficiency and consistency in the application review and issuance process while ensuring a framework that will maintain protections for listed species and their critical habitats.

## 4.2    Environmental Baseline

### Wetlands

In 1845, the State of Florida contained an estimated 20.3 million acres of wetlands (Dahl 2005). By 1996, only about half of the original wetlands remained (USFWS 1996). From the mid-1950s through the mid-1970s, prior to the CWA, the rate of wetland loss has been estimated at 72,000 acres per year (Hefner 1986). In the following decade, wetland loss decreased to an estimated 23,700 acres per year (Hefner et al. 1994).

As of 1996, an estimated 11.4 million acres of wetlands covered about 29 percent of the surface area of Florida, more than any other state in America at that time. Of these wetlands, 90 percent or about 10.2 million acres were freshwater wetlands. The average annual net loss of wetlands from 1985 through 1996 was 4,740 acres, and freshwater forested wetlands exhibited a net gain. During the 1985-1996 interval, 72 percent of wetland loss was attributed to development and 28 percent to agriculture (Dahl 2005).

### Central and Southern Florida Project

The Central and Southern Florida (C&SF) Project for flood control and other purposes was authorized by the Flood Control Act of 1948 as an improvement plan for flood control, drainage, and other purposes over an 18,000-square-mile area of central and south Florida. This project authorized the diversion of water to the Atlantic Ocean and the Gulf of Mexico through canals and the diversion of water southwest through the Everglades. The project provided benefits for human populations that were able to build, grow, and develop on these new lands. The Everglades Agricultural Area was developed for the production of food, and areas further east became densely populated cities, including Miami, Ft. Lauderdale, and West Palm Beach. Unfortunately, the project also resulted in the modification and loss of 2,400 square miles of freshwater wetlands, including in the Everglades (USACE 2019a). See Figure 4-1 for a comparison of historic freshwater flows compared to water flows today.



**Figure 4-1   Historic freshwater flows compared to freshwater flows
after C&SF Project**

Source: USACE and SFWMD 2007

*Everglades Restoration*

Florida's everglades are twice the size of New Jersey, composed of a mixture of dense forests and open prairies, sunny croplands and shady swamps, rural areas and cities. The South Florida Ecosystem Restoration Program, a partnership between the federal government and the State of Florida, consists of a suite of projects that focus on the C&SF system. In 2000, congressional authorization created the Comprehensive Everglades Restoration Plan (CERP), which is the single largest of the program's efforts. CERP is a 50/50 partnership between the federal government and the State of Florida. It is a program to restore, protect, and preserve water resources in central and southern Florida, including the Everglades. The USACE is the lead federal agency, and the South Florida Water Management District (SFWMD) is the lead State agency in this effort.

For 20 years, the CERP program has been designing, planning, and constructing multiple components of the South Florida Ecosystem Restoration Program. The goal of these efforts is to eventually improve 2.4 million acres of south Florida's wetlands ecosystems (including Everglades National Park), by reducing high volume discharges from Lake Okeechobee to the estuaries and improve water delivery to the Florida and Biscayne Bays, as well as enhance the freshwater supply (USACE 2019b). See Figure 4-2 for a depiction of the Everglades restoration project and the associated improvements to future ecosystem conditions.



**Figure 4-2  Future Ecosystem Conditions based on CERP**

Source: USACE and SFWMD 2007

### 4.2.1  Historical Federal Permitting: Habitat

The following discussion is based on data provided by the USACE and characterizes Section 404 permits issued from 2014 through 2018. The habitat types are from the Wildlife Plan and Guide to the Natural Communities of Florida (FNAI 2010), and each includes multiple subtypes. These are cross walked with Cowardin types used for USACE reporting; while similar definitions may not match entirely.

Table 4-1 summarizes wetland permits issued in Florida by the USACE over the most recently available five-year period, from FY 2014 through FY 2018. Permitted wetland fill is presented by type of wetland and acreage; the dataset is limited to wetlands mostly within the Action Area covered by the current document and does not include all wetlands in the State. For the first four years of the period, permitted wetland fill ranged from 1,587 to 2,417 acres per year, then more than doubled to 4,363 acres in FY 2018 reportedly because of a confluence of multiple larger one-time projects being permitted in that year. The mean annual permitted acreage for the period was 2,423 acres per year. This suggests that annual wetland loss has remained at or below levels identified in previous decades. The numbers in Table 4-1 do not include offsets from wetland mitigation, wetland dredge, or grant-funded restoration. Based on national data, mitigation and restoration likely result in lower net loss of wetlands and even net gains for some habitat types in some years (1998-2004), although in 2004-2009 there was a continued national net loss (Dahl 2011).

As indicated in Table 4-1, wetland fill impacts within the Action Area were primarily to palustrine wetlands. Impacts on other wetland types were considerably less in comparison. Palustrine wetlands provide habitat for numerous ESA-listed species.

**NOTES regarding interpretation of USACE data:**

A single 404 permit may authorize activities that affect multiple wetlands or surface waters areas within the project boundaries. The total number of areas will be larger than the total number of permits issued.

The USACE data assigns an ID number for each WOTUS that is delineated on a site, and that number is in the Table 4-1 under the column "Number of Areas". The acreages for these areas under the column "Total Acres" represent the entire footprint of the fill authorized for each area, not just the amount of WOTUS that was adversely impacted. (R. Barron, USACE, personal communication, April 16, 2020).

At the time of this analysis, the USACE was developing a GIS shapefile to generally depict the retained waters. The draft shapefile (February 2019) did not include all of the retained and tidal waters noted in the USACE list of retained water (particularly canal systems in southwest and south Florida). Because it was the best available information at the time, FDEP queried the USACE project data by overlaying it with the draft retained water shapefile. This was performed in order to estimate the number and types of projects in State-assumed waters, outside of boundaries of the draft USACE retained waters file. Due to the limitations of the geographically referenced shapefile, the USACE permit-related data in this BE does not accurately represent projects/permits in only assumed waters. Please note that this data was used to analyze and depict general data trends for this BE, and not serve as a source for definitive quantitative data. Tables and Figures in this BE that use this data likely overestimate the number of projects that will be in assumed waters but is presented here as best available information. The data provided in Table 4-1 and Figure 4-3 likely inadvertently include some retained waters and may include values for some Section 10 projects.

**Table 4-1     Authorized Areas and Acreages by Wetland Type, 2014 - 2018**

| Cowardin Type | FY 14 | | FY 15 | | FY 16 | | FY 17 | | FY 18 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number[1] of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres |
| Estuarine | 29 | 2.71 | 39 | 6.85 | 22 | 5.55 | 55 | 17.3 | 112 | 10.82 |
| Lacustrine | 29 | 10.39 | 26 | 48.86 | 35 | 9.29 | 24 | 17.45 | 32 | 12.46 |
| Marine | 6 | 0.46 | 2 | 0.03 | 4 | 3.08 | 11 | 59.91 | 15 | 10.58 |
| Palustrine | 740 | 1,491.65 | 788 | 1,452.29 | 786 | 2,162.99 | 990 | 1,851.78 | 1,234 | 4,141.19 |
| Riverine | 130 | 432.94 | 124 | 78.95 | 169 | 235.75 | 141 | 44.34 | 238 | 188.06 |
| **Total** | **934** | **1,938.15** | **979** | **1,586.98** | **1,016** | **2,416.66** | **1,221** | **1,990.78** | **1,631** | **4,363.11** |

[1]The Number of Areas represents the number of WOTUS areas with authorized activities. A single 404 permit may authorize activities in multiple WOTUS areas, so the number of areas will exceed the number of permits issued. Also see Notes subsection under 4.2.1 regarding areas and acreages. FY = Federal Fiscal Year (October through September)

Source: USACE Jacksonville District



**Figure 4-3   Acreage of Authorized Fill, by Wetland Type**

A single 404 permit may authorize multiple WOTUS areas, so the number of areas will exceed the number of permits issued. Also see Notes subsection under 4.2.1 regarding areas and acreages. FY = Federal Fiscal Year (October through September). Source: USACE Jacksonville District

### Freshwater Non-forested Wetlands – Palustrine Wetlands including Palustrine Emergent (PEM) and Palustrine Shrub Scrub (PSS)

As shown in Table 4-1, freshwater non-forested wetlands (assumed to be roughly equivalent to combined PEM and PSS Cowardin Types) are associated with a considerable number of the permitted activities in Florida from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 263 to 542, and the acreage ranged from 320 to 2,069 annually. Although freshwater non-forested wetlands are among the most extensive in Florida (about 5.4 million acres) (FWC 2019), Table 4-1 suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

### Freshwater Forested Wetlands

Freshwater forested wetlands (assumed to be roughly equivalent to Palustrine Forested (PFO) Cowardin Types) accounted for an even greater number of permitted fill activities from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 354 to 622, and the acreage ranged from 727 to 1,980.

Freshwater forested wetlands include about 4.2 million acres or about 10 percent of Florida's land area. Table 4-1 suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

### Lakes

Lakes (assumed to be roughly equivalent to lacustrine Cowardin Types) accounted for a relatively small proportion of permitted activities: 24 to 32 WOTUS areas authorized from FY 2014 through 2018, and nine to 48 acres. Lakes cover almost 1.3 million acres in Florida, with much of the surface area in public ownership.

### Rivers and Streams

Rivers and streams (assumed to be roughly equivalent to riverine Cowardin Types) accounted for 124 to 238 WOTUS areas authorized from FY 2014 through 2018, and 79 to 432 acres with considerable year to year variation. Estuarine Cowardin Type wetlands may also fall in this category, with a small area included in assumed waters; 22 to 112 WOTUS areas associated with permits were issued for estuarine wetlands, including three to 17 acres of impacts.

### Marine

Relatively small areas of marine habitat (assumed to be equivalent to marine Cowardin Types) are within assumed waters; WOTUS areas authorized ranged from two to 15 per year, including less than one to about 10 acres of impacts per year.

### Uplands

While uplands are not regulated under State wetland regulations, if uplands include listed species which can be adversely affected as a result of the Action, those impacts/effects should be addressed. ESA-listed species could be affected by Actions on uplands that are associated with wetlands permits such as construction of access roads or staging areas, and many species utilize both wetland and upland habitat. Thus, such features are often included as part of the species coordination process for a State 404 permit application review.

### Inventories and Surveys for Habitat Types and Quantities

The most current information on Florida habitat types is summarized in the Wildlife Plan and is also available as GIS layers from the FNAI. While this information is in some cases based on site-specific inventories or surveys, it is presented at the statewide level. A statewide approach is believed to be appropriate for this statewide Programmatic BE. Available GIS layers can be used to map specific wetlands, at a scale that can be presented in a statewide view or mapped on a finer scale when needed.

## 4.2.2   Historical Federal Permitting: ESA Consultations

Baseline conditions were derived from the USACE permit database provided by the Regulatory Division of the USACE Jacksonville District, which encompasses federal fiscal years 2014 through 2018. This database includes all temporary and permanent permitted wetland impacts by Cowardin code, permit authorization type, dredge or fill acreage approved, and a project site coordinate. The database also includes all ESA consultations by type, agency, closure method, ESA-listed species potentially affected, and a corresponding object identification number that links the ESA consultations with the permitted wetland impacts.

Please see the Notes subsection in 4.2.1 for details regarding interpretation of the data in this BE. Tables 4-2a and 4-2b show the types of consultations for ESA-listed species for the USACE consultation data involving permanent and temporary dredge and fill actions in Florida from 2014 through 2018. We estimate that out of those past Section 404 permit applications reviewed, 7.08 percent of reviews were reasonably certain to

result in take (n=~368 permit reviews out of 5,195). This percentage was calculated using the USACE Jacksonville District permitting database's "Formal" choice in the "Consultation Type" field, since most of the formal consultations can be assumed to be associated with activities that may cause incidental take. The percentages of all types of consultations are shown for the five-year period is shown in Table 4.2a.  In Table 2b, this data is shown annually for years 2014-2018. Approximately 14 percent resulted in "Informal" type consultations. As shown in Table 4.2, over ~79 percent of findings over the period 2014-2018 were covered by existing programmatic consultations or decision tools. For the USACE permit data collected during the years 2014-2018, a small proportion of the total number of ESA-listed species accounted for the majority of consultations. During this time, many of the species subject to frequent consultation had existing decisions tools such as consultation keys or programmatic biological opinions. For those species, such decision tools can help guide future consultations and assist FDEP when assessing potential effects of proposed actions.

Of the 139 listed and two (2) proposed species in the Action Area, 84 have been the subject of ESA consultations in the past five years. Two species (Eastern Indigo Snake and Wood Stork) accounted for 56.6 percent of species-level consultations, and just 15 species accounted for 93.3 percent of all species-level consultations (see Table 4-3a and Table 4-3b; note that most consultations include more than one species, therefore these numbers may represent a smaller number of consultations). Recent consultations are not distributed evenly within the Action Area and can be especially dense in areas of rapid growth and development (see Figures 8 and 9).

Discrepancies in the numbers between Tables 4-2 and Table 4-3 are explained as follows. Each permit may have several habitat types and species associated with it that may require input from either the USFWS or NMFS, sometimes both. Due to the availability of tools such as programmatic consultations and consultation keys, some species for a given permit may be covered under a programmatic consultation while others may require a formal or informal consultation. This results in the possibility of multiple species in the USACE database being associated with one USACE-assigned ESA Action Identification number based on their closure method and consultation type while other species associated with the permit fall into a different ESA Action Identification number.

**Table 4-2a  Consultation Types for Federal Actions Totals, FY 2014 – 2018**

| ESA Determination | Total # (2014-2018) | % of Total |
|---|---|---|
| Formal | 368 | 7.08 |
| Informal | 710 | 13.67 |
| Programmatic | 4117 | 79.25 |
| **Total** | **5195** | **100** |

Source: USACE Jacksonville District

**Table 4-3b  Consultation Types for Federal Actions by Year, FY 2014 – 2018**

| ESA Determination | Total # 2014 | Total # 2015 | Total # 2016 | Total # 2017 | Total # 2018 | % of Total |
|---|---|---|---|---|---|---|
| Formal | 41 | 61 | 63 | 80 | 123 | 7.08 |
| Informal | 137 | 131 | 127 | 131 | 184 | 13.67 |
| Programmatic | 811 | 738 | 740 | 883 | 945 | 79.25 |
| **Total** | **994** | **942** | **933** | **1096** | **1252** | **100** |

Source: USACE Jacksonville District

**Table 4-4a  ESA Consultations Without Programmatic, By Species, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| *Mammals* | | | |
| Florida Bonneted Bat, (*Eumops floridanus*) | 383 | Choctawhatchee Beach Mouse, (*Peromyscus polionotus allophrys*) | 1 |
| Key Largo Woodrat, (*Neotoma floridana smalli*) | 1 | Southeastern Beach Mouse, (*Peromyscus polionotus niveiventris*) | 2 |
| Key Deer, (*Odocoileus virginianus clavium*) | 2 | St. Andrew Beach Mouse, (*Peromyscus polionotus peninsularis*) | 3 |
| Rice Rat, (*Oryzomys palustris natator*) | 2 | Florida Panther, (*Puma (=felis*) | 108 |
| Key Largo Cotton Mouse, (*Peromyscus gossypinus allapaticola*) | 1 | Lower Keys Marsh Rabbit, (*Sylvilagus palustris hefneri*) | 2 |
| *Birds* | | | |
| Cape Sable Sparrow, Seaside (*Ammodramus maritimus mirabilis*) | 9 | Wood Stork, (*Mycteria americana*) | 216 |
| Florida Grasshopper Sparrow, (*Ammodramus savannarum floridanus*) | 45 | Red-Cockaded Woodpecker, (*Picoides borealis*) | 230 |

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Florida Scrub-Jay, (*Aphelocoma coerulescens*) | 143 | Audubon's Crested Caracara, (*Polyborus plancus audubonii*) | 142 |
| Red Knot, (*Calidris canutus rufa*) | 8 | Everglade Snail Kite, (*Rostrhamus sociabilis plumbeus*) | 121 |
| Piping Plover, (*Charadrius melodus*) | 19 | - | - |
| **Reptiles** | | | |
| American Alligator, (*Alligator mississippiensis*) | 2 | Gopher Tortoise, (*Gopherus polyphemus*) | 1 |
| American Crocodile, (*Crocodylus acutus*) | 12 | Atlantic Salt Marsh Snake, (*Nerodia clarkii taeniata*) | 6 |
| Eastern Indigo Snake, (*Drymarchon couperi*) | 207 | Bluetail Mole Skink, (*Plestiodon egregius lividus*) | 31 |
| Sand Skink, (*Plestiodon reynoldsi*) | 59 | - | - |
| **Amphibians** | | | |
| Reticulated Flatwoods Salamander, (*Ambystoma bishopi*) | 4 | - | - |
| **Fish** | | | |
| Shortnose Sturgeon, (*Acipenser brevirostrum*) | 5 | Atlantic Sturgeon, (*Acipenser oxyrinchus oxyrinchus*) | 6 |
| Smalltooth Sawfish, (*Pristis pectinata*) | 188 | Okaloosa Darter, (*Etheostoma okaloosae*) | 1 |
| **Mollusks** | | | |
| Fat threeridge, (*Amblema neislerii*) | 3 | Gulf Moccasinshell, (*Medionidus penicillatus*) | 4 |
| Chipola Slabshell, (*Elliptio chipolaensis*) | 3 | Ochlockonee Moccasinshell, (*Medionidus simpsonianus*) | 3 |
| Purple Bankclimber, (*Elliptoideus sloatianus*) | 5 | Choctaw Bean, (*Villosa chocctawensis*) | 6 |
| Tapered Pigtoe, (*Fusconaia burkei*) | 5 | Stock Island Tree Snail, (*Orthalicus reses* (not incl. nesodryas) | 1 |
| Narrow Pigtoe, (*Fusconaia escambia*) | 3 | Oval Pigtoe, (*Pleurobema pyriforme*) | 6 |
| Round Ebonyshell, (*Fusconaia rotulata*) | 2 | Fuzzy Pigtoe, (*Pleurobema strodeanum*) | 6 |
| Southern Sandshell, (*Hamiota australis*) | 6 | Southern Kidneyshell, (*Ptychobranchus jonesi*) | 6 |
| Shinyrayed Pocketbook, (*Lampsilis subangulata*) | 4 | - | - |

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| *Crustaceans* | | | |
| N/A | - | N/A | - |
| *Insects* | | | |
| Schaus Swallowtail Butterfly, (*Heraclides aristodemus ponceanus*) | 1 | - | - |
| *Plants* | | | |
| Telephus Spurge, (*Euphorbia telephioides*) | 12 | Miccosukee Gooseberry, (*Ribes echinellum*) | 2 |
| Florida Torreya, (*Torreya taxifolia*) | 1 | American Chaffseed, (*Schwalbea americana*) | 1 |
| Key Tree Cactus, (*Pilosocereus robinii*) | 2 | Fringed Campion, (*Silene polypetala*) | 1 |
| Chapman Rhododendron, (*Rhododendron chapmanii*) | 1 | - | - |

Source: USACE Jacksonville District

## Table 4-5b   ESA Consultations with Programmatic, 2014-2018

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| *Mammals* | | | |
| West Indian Manatee, (*Trichechus manatus*) | 493 | Choctawhatchee Beach Mouse, (*Peromyscus polionotus allophrys*) | 1 |
| Florida Bonneted Bat, (*Eumops floridanus*) | 411 | Southeastern Beach Mouse, (*Peromyscus polionotus niveiventris*) | 3 |
| Key Largo Woodrat, (*Neotoma floridana smalli*) | 1 | St. Andrew Beach Mouse, (*Peromyscus polionotus peninsularis*) | 4 |
| Key Deer, (*Odocoileus virginianus clavium*) | 5 | Florida Panther, (*Puma (=felis*) | 197 |
| Rice Rat, (*Oryzomys palustris natator*) | 5 | Lower Keys Marsh Rabbit, (*Sylvilagus palustris hefneri*) | 6 |
| Key Largo Cotton Mouse, (*Peromyscus gossypinus allapaticola*) | 1 | - | - |
| *Birds* | | | |
| Cape Sable Sparrow, Seaside (*Ammodramus maritimus mirabilis*) | 9 | Wood Stork, (*Mycteria americana*) | 2681 |

**Table 4-5b    ESA Consultations with Programmatic, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Florida Grasshopper Sparrow, (*Ammodramus savannarum floridanus*) | 57 | Red-Cockaded Woodpecker, (*Picoides borealis*) | 298 |
| Florida Scrub-Jay, (*Aphelocoma coerulescens*) | 199 | Audubon's Crested Caracara, (*Polyborus plancus audubonii*) | 175 |
| Red Knot, (*Calidris canutus rufa*) | 9 | Everglade Snail Kite, (*Rostrhamus sociabilis plumbeus*) | 159 |
| Ivory-Billed Woodpecker, (*Campephilus principalis*) | 1 | Kirtland's Warbler, (*Setophaga kirtlandii* (= *dendroica kirtlandii*) | 2 |
| Piping Plover, (*Charadrius melodus*) | 29 | Roseate Tern, (*Sterna dougallii dougallii*) | 1 |
| *Reptiles* | | | |
| American Alligator, (*Alligator mississippiensis*) | 2 | Gopher Tortoise, (*Gopherus polyphemus*) | 1 |
| American Crocodile, (*Crocodylus acutus*) | 33 | Atlantic Salt Marsh Snake, (*Nerodia clarkii taeniata*) | 6 |
| Eastern Indigo Snake, (*Drymarchon couperi*) | 2697 | Bluetail Mole Skink, (*Plestiodon egregius lividus*) | 31 |
| Sand Skink, (*Plestiodon reynoldsi*) | 66 | - | - |
| *Amphibians* | | | |
| Reticulated Flatwoods Salamander, (*Ambystoma bishopi*) | 6 | - | - |
| *Fish* | | | |
| Shortnose Sturgeon, (*Acipenser brevirostrum*) | 15 | Atlantic Sturgeon, (*Acipenser oxyrinchus oxyrinchus*) | 16 |
| Smalltooth Sawfish, (*Pristis pectinata*) | 305 | Okaloosa Darter, (*Etheostoma okaloosae*) | 1 |
| *Mollusks* | | | |
| Fat threeridge (*Amblema neislerii*) | 6 | Gulf Moccasinshell, (*Medionidus penicillatus*) | 6 |
| Chipola Slabshell, (*Elliptio chipolaensis*) | 6 | Ochlockonee Moccasinshell, | 6 |
| Purple Bankclimber, (*Elliptoideus sloatianus*) | 8 | Choctaw Bean, (*Villosa choctawensis*) | 9 |
| Tapered Pigtoe, (*Fusconaia burkei*) | 8 | Stock Island Tree Snail, (*Orthalicus reses* (not incl. nesodryas) | 2 |

**Table 4-5b    ESA Consultations with Programmatic, 2014-2018**

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Narrow Pigtoe, (*Fusconaia escambia*) | 3 | Oval Pigtoe, (*Pleurobema pyriforme*) | 11 |
| Round Ebonyshell, (*Fusconaia rotulata*) | 2 | Fuzzy Pigtoe, (*Pleurobema strodeanum*) | 7 |
| Southern Sandshell, (*Hamiota australis*) | 7 | Southern Kidneyshell, (*Ptychobranchus jonesi*) | 7 |
| Shinyrayed Pocketbook, (*Lampsilis subangulata*) | 6 | - | - |
| *Crustaceans* | | | |
| N/A | - | N/A | - |
| *Insects* | | | |
| Miami Blue Butterfly, (*Cyclargus* (=*hemiargus*) | 1 | Schaus Swallowtail Butterfly, (*Heraclides aristodemus ponceanus*) | 1 |
| *Plants* | | | |
| Beautiful Pawpaw, (*Deeringothamnus pulchellus*) | 1 | Chapman Rhododendron, (*Rhododendron chapmanii*) | 1 |
| Telephus Spurge, (*Euphorbia telephioides*) | 12 | Miccosukee Gooseberry, (*Ribes echinellum*) | 2 |
| Florida Torreya, (*Torreya taxifolia*) | 1 | American Chaffseed, (*Schwalbea americana*) | 1 |
| Aboriginal Prickly-Apple, (*Harrisia* (=*cereus*) | 0 | Fringed Campion, (*Silene polypetala*) | 1 |
| Key Tree Cactus, (*Pilosocereus robinii*) | 3 | - | - |

Source: USACE Jacksonville District

**Figure 4-4   Locations of ESA Consultations in Action Area, 2014 - 2018**



**Figure 4-5   Concentrations of ESA consultations in the Action Area, 2014 - 2018**



# 5.    Potential Effects on ESA-considered Species

Effects of an action are all consequences to listed species or critical habitat that are caused by the action, including the consequences of other activities that are caused by the action. A consequence is caused by the action if it would not occur but for the action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR §402.02). The Action studied in this BE is the EPA's approval of the State's assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. A direct consequence of the Action is that an applicant must go through the State 404 permitting process for a permit in waters assumed by the State and may not go directly to the USACE to get a 404 permit to place fill in State-assumed waters. Therefore, the effects of the EPA approving the Program assumption are FDEP will generally be the permitting authority in assumed waters. The impact of FDEP issuing 404 permits would be the placement of dredged or fill material into WOTUS, which in turn would alter the environment where ESA-considered species may exist or designated critical habitat may exist. Since states are not required to consult under Section 7 because there is no federal agency action, the lack of ESA consultation on State-issued permits is an effect of the EPA's approval of the State's CWA Section 404 program.

The Action is not expected to substantially increase or decrease the number of Section 404-type authorized activities post-Assumption as compared to before assumption, since the only expected change will be the entity processing the permits. The State 404 program's processes and structure will be consistent with CWA requirements and Section 404 analysis of species and aquatic resources and potential effects of proposed fill or dredge activities. It is reasonable to expect that permitting history available by the USACE for the interval 2014-2018 approximates the number and types of permitting activities that might be anticipated for the next five-year interval. See Chapter 4.2.1 regarding the limitations of the data used in the analyses of this BE, regarding the interpretations of the USACE database and shapefile.

The precise number and locations of future Section 404 permit applications are unknown. Some can be predicted well in advance, such as large public works projects with long lead times and planning horizons. However, most applications, especially from individuals or private entities, are less predictable. While precise locations are mostly unknown, as shown in Figures 8 and Figure 9 consultations related to Section 404 applications tend to cluster in rapidly developing regions of the State.

Using the best available data on recent (past five years) permitting activities as a baseline (see Chapter 4), as well as ecological theory, professional judgment, and the information included in the species accounts in Appendix B, this BE includes a qualitative assessment of the potential effects of the Action on species and designated critical habitat. The assessment does not distinguish direct and indirect effects based on 2019 updates to the Section 7 implementing regulations of the ESA (50 CFR § 402); however, both immediate impacts and those delayed in time were considered.

Table C.1 in Appendix C summarizes the potential impacts of dredge and fill activities on ESA-listed and proposed to be listed species. This stressor table is intended to identify potential effects and facilitate analysis of which effects are reasonably likely to occur as a result of activities authorized, if assumption of Section 404 is approved. A detailed analysis of potential effects in the future is not possible, because, as stated above, the exact locations, amounts, and types of impacts are not yet known. We briefly summarize major categories of impacts below, followed by a discussion of potential effects on major taxa.

## 5.1   Types of Effects

The following discussion is not exhaustive but includes some of the more common influencing factors and consequences to species that may result from dredge and fill activities. There is a spectrum of effects to consider, including beneficial effects, but for the purposes of this BE the focus will be on potential adverse effects. For example, there is a level of disturbance without a detectable sign of effect (e.g. a wood stork flushed off a nest but returns before the eggs are harmed). There is also disturbance with a detectable sign of effect (e.g. a wood stork is flushed off a nest and the eggs overheat and die). Heightened levels of effect include injury that is observable or detectable, such as a failure to reproduce because of physiological or ecological effects of the action, or the death of one or more individuals.

There is also a spectrum of likelihoods that an effect may occur from a theoretical or conceptual standpoint. The likelihood that an effect may occur can be described by how confident a reviewer may be that something is actually going to occur. These levels of likelihood that something will occur include potential, unlikely, possible, likely, more than likely, and reasonably certain. Potential stressors or effects to the species and to the essential physical and biological features of any critical habitat are discussed below and summarized in Appendix C, but also must be assessed during the review of State 404 permit applications.

### 5.1.1   Biotic Stressors

Biotic stress is stress that occurs as a result of damage done to an organism by other living organisms, such as bacteria, viruses, fungi, parasites, beneficial and harmful insects, weeds, and cultivated or native plants. Dredge and fill activities can alter competitive balances, change predator/prey relationships, or encourage the establishment of invasive plants or animals, which can alter habitat structure. Loss or decrease, or colonization or increase, of a species can cascade through multiple trophic levels and, in some cases, even contribute to habitat alteration (monotypic stands of invasive plants).

### 5.1.2   Physical Stressors

Physical stressors should be assessed individually and cumulatively, when assessing potential biological impacts. An example of a physical stressor could be the physical diversion of a stream to another location, which may adversely impact the habitat for the flora and fauna using the original location of the stream. Other examples include the construction of new, improvements to, and even the removal of dams, weirs, and culverts, the removal of wetlands and surface waters by filling with materials, and the creation of surface waters by dredging and excavation. Physical stressors include direct mortality (burying or trapping of individual animals by fill or equipment placing fill), especially for smaller, less mobile species; it can also result in loss of habitat and displacement of more mobile species able to escape the immediate effect. Fill of part of a wetland can contribute to loss of function even if most of the wetland remains intact.

Dredging can result in temporary to permanent loss of aquatic bottom communities, and sedimentation can reduce visibility, clog gills of aquatic species, and bury immobile organisms. Recovery from dredge effects may require hours to years, depending on the habitat, substrate type, and the extent of the disturbance.

Fragmentation can affect species that migrate seasonally between habitat types (pond breeding salamanders which spend the summer in uplands up to hundreds of feet away) or which have large home ranges and frequently move among resource types (Eastern Indigo Snake or Florida Panther). It can also disrupt metapopulations, especially for short-lived invertebrates dependent on stochastic environments, reducing the frequency of recolonization of otherwise suitable habitat.

Changes to hydrologic regime may include lowering of groundwater levels, increased runoff, or altered hydroperiod. Changes that result in early drying of ponds or wetlands may result in mortality to pond breeding amphibian larvae or small fish, while conversion of a seasonal wetland to a permanent pond may allow colonization by large predators, including stocking of game fish.

Some construction activities (e.g., pile driving or dredging) can result in air or underwater noise and vibration effects. Analysis of and attempting to reduce these effects has become more common in recent years. Construction activities such as noise, vibration, as well as visual disturbance, may alter the behavior of ESA-listed species.

Even measures intended to reduce effects can sometimes have unintended consequences. Some projects have relocated ESA-listed species, but little follow-up monitoring has been done to document success or failure of the translocations.

### 5.1.3  Physicochemical Water Quality Stressors

Physicochemical stress results from environmental factors such as food/nutrition, toxins, metabolic disorders, infections, and inflammation. Water quality changes are commonly associated with dredge and fill activities, although these are not always easy to describe. Effects can include changes in water temperature, gas or oil dripping from construction equipment or generators to fill of a wetland, eliminating or reducing natural filtration of sediment and pollutants and resulting in degradation of downstream habitat. Dredging may also re-suspend environmental contaminants in sediment (common in industrial areas). Changes to nutrient cycling or exchange are even less obvious and may result from new activities occurring on or adjacent to the filled areas.

## 5.2  Potential Effects

The following discussion is grouped by major taxa and discusses potential effects of the Action by future activities that may be authorized, should the State 404 program be approved, within guilds of species with similar habitat needs or life-history traits. These effects are similar to the effects of the current USACE Section 404 process for granting or denying permits, only will be performed by the State 404 program process as a consequence of the Action, if approved. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the general types of activities and overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for assumption.

### 5.2.1  Mammals

Twenty-four mammalian species/subspecies are included in Appendix C, Table C.1. Two of these mammals are extirpated from the State and are therefore excluded from further consideration in this BE. General habitat preferences in Florida can group the remaining twenty mammals into the following broad categories: wetland/marsh (six mammals), forests/grasslands/swamps (two mammals), tropical hardwood hammock/mangrove (three mammals), caves (four mammals), pine rockland (one mammal), beach/scrub dune (five mammals), and aquatic (one mammal). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Table C.1.

In general, all mammalian species under consideration in this BE that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories and behaviors may be disturbed by activities during periods when authorized activity-related noise and vibration exceed baseline levels. Such activities may also disturb the natural behavior of ESA-considered species due to visual disturbance during construction activities.

ESA-considered mammals that occupy wetlands and marshes in Florida include voles, rabbits, and rats. These species/subspecies may occupy or use wetland/marsh habitat during all or a portion of their life history (e.g., for breeding, foraging, or shelter). Marsh and wetland species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality associated with future authorized activities could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development. Development of marshes/wetlands may create suitable conditions for non-native predators (e.g., cats and dogs) and competitors (e.g., *Rattus rattus*), which would also impact these ESA-considered species via increased ecological pressures.

Carnivores with large home ranges (e.g., Florida Panther and Red Wolf) occupy a diverse range of habitats, such as forests, grasslands, and swamps in Florida (as well as pine rocklands). Due to the restricted range of the Red Wolf on protected land in Florida (limited to St. Vincent Island, a USFWS National Wildlife Refuge), future activities authorized by the State 404 program are not likely to adversely affect the species. However, future permitted activities may impact the Florida Panther through direct impacts to habitat (dredge and fill), habitat fragmentation, and changes to existing hydrological regimes/water quality. Habitat fragmentation is one of the primary threats to this subspecies and a limit to its recovery.

Tropical hardwood hammock/mangrove ESA-considered mammal species (bats, rats, and mice) are likely to be impacted by future permitted activities via habitat fragmentation from fill or impacts to hydrology/water quality. Several species require fresh sources of drinking water, and their prey items are also dependent on these landscape features. In addition, impacts to habitat, including fragmentation, may create opportunities for non-native predators (e.g., cats) to colonize/thrive. The extent of tropical hardwood hammock and mangrove, particularly in south Florida, has declined significantly over the last several decades as a result of development, and further fragmentation could have significant impacts on ESA-considered species (USFWS 1999).

Several ESA-considered bat species/subspecies occur in limestone karst cave regions of the Florida Panhandle. Most of these bats are rare/unlikely to occur in the State, and future permitted activities are unlikely to adversely affect them. However, the Tricolored Bat is a permanent resident throughout Florida and occupies caves as well as woodland habitat and urban landscapes. Water features are also important to the species as foraging habitat. Direct impacts on the species' habitat (fill) as well as an increase in habitat fragmentation or impacts to hydrological regimes/water quality, may adversely affect the species.

The Key Deer (as well as the Florida Panther) inhabits pine rocklands. Pine rockland (as well as hammock) contains a substantial portion of the deer's forage plants, freshwater, and cover, which is especially important for fawning. Ongoing threats to the species include urbanization. Through direct impacts to habitat via fill, as well as habitat fragmentation and impacts to water quality, future permitted activities could have an impact on the subspecies.

Several ESA-considered beach mice occupy dune systems vegetated by sea oats and adjacent scrub (dominated by oaks and sand pine or palmetto) in coastal Florida. The predominant factors of decline for

these mice are habitat loss due to alteration or conversion of dunes (from human development and use) as well as predation by non-native predators. Direct impacts to habitat via fill, dredging, and habitat fragmentation (which may make habitat for hospitable for non-native predators) could affect these species.

The West Indian Manatee is the only ESA-listed aquatic marine mammal considered in this BE. Florida manatees occur in freshwater, brackish, and marine environments, including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Future activities authorized by the State 404 program could affect this species from dredge and fill activities, increases in vessel storage and operation, and impacts on habitat, including changes in hydrologic regimes, water quality, water control structures, and habitat fragmentation.

## 5.2.2   Birds

Nineteen avian species/subspecies are included in Appendix C, Table C.1. Five of these birds are extirpated from the State and are therefore excluded from further impact analysis in this BE. The remaining 14 birds can be grouped by general habitat preferences in Florida into the following broad categories: marsh/wetland birds (five birds), upland scrub birds (one bird), coastal tidal/marine birds (four birds), grassland birds (two birds), pine savanna birds (one bird), and forest/forested wetlands birds (one bird). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is also presented in Appendix C, Table C.1.

In general, all avian species under consideration in this BE that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories may be disturbed by future permitted activities during periods of project noise and vibration exceed baseline levels. In addition, these activities may also alter the natural behavior of ESA-considered species via visual disturbance during construction activities.

Marsh/wetland avian species may be affected by any direct impacts to their habitat (nesting, foraging, roosting, overwintering, or stop-over site habitat). Physical impacts to their habitat associated with future State 404 permits may include fill, dredging, and habitat fragmentation. In addition, fill of marsh/wetland habitat may result in a change to existing hydrologic regimes that could impact prey availability, via providing better conditions for invasive/competing prey species or reducing habitat for prey). Changes in hydrology also have the potential to flood habitat and nesting areas (resulting in nest failure), allow aquatic or terrestrial predators easier access to nests (during flooding vs. receding water conditions), and change the existing nutrient cycle. Changes in hydrology may result in high nitrogen levels in marshes/wetlands. The habitat then may become choked by an overabundance of emergent vegetation. Future permitted activities may also result in changes to water quality that could impact existing marsh/wetland vegetation and prey items (reducing habitat suitability for the species).

The only upland scrub avian species under evaluation is the Florida Scrub-jay. Florida Scrub-jays occupy early successional xeric scrub and scrub flatwood habitat in relict sand dunes in north and central Florida. This xeric habitat is well-drained but may be interspersed with swale marshes. Direct impacts associated with permitted activities that could affect the species include placement of fill, alteration of hydrologic regimes, and habitat fragmentation (a major issue that hampers the recovery of this species).

Direct impacts of future permitted activities on coastal tidal/marine avian species may include fill, dredging, and habitat fragmentation of nesting and foraging habitat (beaches, mudflats, intertidal areas, and inlets).

Shoreline stabilization efforts, in particular, threaten several coastal avian species (i.e., fortification by riprap and other hardscape reduces available habitat). Permitted activities may also result in changes to hydrologic regimes and water quality in coastal areas.

Grassland (or dry prairie) avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes. Throughout Florida, grassland habitat is declining and highly fragmented. This habitat may also be mismanaged by suppression of natural fire regimes (USFWS 1999). Additional habitat loss and fragmentation may impact grassland species. Many grassland species also nest on or close to the ground and are highly susceptible to nest flooding (could occur with altered hydrological conditions in the grassland).

The only pine savanna avian species under evaluation is the Red-cockaded Woodpecker. Pine savanna ecosystems (or "high pine") are characterized by widely spaced pine trees and extensive ground cover. Wetlands may be interspersed in low-lying areas. This habitat is almost extinct and highly fragmented in Florida. Also, the quality of existing high pine forests may be hampered by fire suppression (USFWS 1999). Pine savanna avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes.

Forest/forested wetlands avian species may be impacted if future authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes and water quality. Many of the forest/forested wetland obligate species under evaluation are extirpated from the State of Florida. Habitat fragmentation may expose the remaining forest/forested wetland avian species to increased predation risk and nest failure (Stephens et al. 2004). Altered hydrology and water quality may impact prey availability as well.

### 5.2.3  Reptiles

Nineteen reptiles are included in Appendix C, Table C.1. These reptiles can be grouped by general habitat preferences in Florida into the following broad categories: wetland/marsh/freshwater (seven reptiles), swamp/saltwater (one reptile), pine flatwoods (two reptiles), pine rocklands (two reptiles), and sandhill/scrub flatwood (seven reptiles). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Wetland/marsh/freshwater reptile species in Florida may be affected by any direct impacts to their habitat (foraging, breeding, loafing, etc.). Dredge and fill activities in wetlands, marshes, and freshwater (ponds, rivers, streams), including ditching, diking, and impoundments, may result in habitat fragmentation and potentially impact both prey and predator populations (both native and invasive species). In addition, species that spend a large portion of their lives in water are likely to be impacted by changes in hydrological regimes, water quality, and vegetation composition (e.g., increased levels of sedimentation, impacts to burrowing mud substrate, and changes in emergent/submergent vegetation). Impacts are anticipated to be similar for species that inhabit swamps/forested wetlands and saltwater mangroves.

Pine flatwoods serve as a mesic successional stage between hardwood hammock and wet flatwoods (USFWS 1999). This habitat is threatened by conversion or loss and degradation from fire suppression. Species restricted to pine flatwoods are unlikely to be adversely affected by future State 404 permits. However, species that range between pine flatwoods and other habitat types such as wet flatwoods may be affected by direct impacts to habitat and habitat fragmentation.

In Florida, large areas of pine rockland habitats are protected on federal lands. However, particularly around Miami and the Keys, this habitat is on private land and under threat from development, conversion to agriculture, fire suppression, and invasive species (USFWS 1999). Pine rocklands are interspersed with areas of freshwater wetlands. Species associated with these wetland features may be affected by direct impacts to habitat as well as habitat fragmentation.

Sandhill/scrub flatwoods are xeric, well-drained areas of prairie, hammock, and scrub. These habitats are threatened by conversion, degradation, and fragmentation. The species that are found in sandhill/scrub flatwoods are not typically associated with wetlands or other waters during their life histories. The future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

## 5.2.4  Amphibians

Five amphibians are included in Appendix C, Table C.1. These include species that utilize seasonal wetlands to breed and then disperse into surrounding upland habitat (three amphibians); species restricted to aquatic caves (one amphibian); and subspecies that primarily utilize perennial wetlands but which always had a restricted distribution and may now be extirpated (one amphibian).

Pond breeding species are easily affected by direct fill of wetlands and by hydrology alteration, especially shortening of pond hydroperiod, which may strand aquatic larvae prior to metamorphosis. As these species move between upland and wetland habitat, fragmentation is a concern. In other parts of the United States, the USFWS sometimes explicitly considers fragmentation in making effects determinations and making conservation recommendations for pond-breeding ESA-listed amphibians (R. Henry pers. comm.). Fire suppression is believed to be a concern for some species in some habitat types. Pond breeding amphibians are also at risk because they utilize seasonal isolated wetlands, which often are not subject to CWA jurisdiction. For cave-dwelling amphibians, water quality degradation, both chemical and from sedimentation, could have adverse effects. Hydrology alteration is also a concern.

Most ESA-considered amphibians in Florida have relatively small distributions. Fully implemented safeguards, such as careful review to identify occurrences associated with future permitting and with adequate avoidance and minimization measures including minimization of fragmentation near utilized wetlands, would ensure that effects would remain at or below baseline conditions.

## 5.2.5  Fish

Six species/subspecies of fish are included in Appendix C, Table C.1 including three types of sturgeon associated with larger rivers and estuaries, two other coastal species, and one species associated with smaller streams. The stream species (Okaloosa Darter) is especially at risk of fragmentation or direct habitat loss because of a restricted range and very limited mobility; however, most populations are currently managed, and the species is considered to be stable at present. The estuarine and coastal species are less likely to be affected by small amounts of dredge or fill because they tend to occur in larger and more contiguous habitats, although sedimentation, water quality degradation, and to a lesser extent direct habitat loss are potential effects. As fish are, by definition, fully aquatic, they are frequently affected by CWA activities. Should these species be found in State-assumed waters, coordination with the Services and important safeguards may need to be identified during permit review, such as implementation of Best Management Practices (BMPs), and avoidance and minimization measures.

### 5.2.6  Insects

Twenty-five species/subspecies of insects are included in Appendix C, Table C.1 including 11 butterflies, five caddisflies, five dragonflies, two bees, and two beetles. Two of these insects, the American Burying Beetle and the Three-toothed Long-horned Caddisfly, are extirpated from the State and therefore excluded from further consideration in this BE. The majority of these ESA-considered insects are threatened by the use of pesticides for agricultural purposes (e.g., Monarch Butterfly's loss of milkweed host plant) and biocides/insecticides for mosquito control.

All of the caddisfly and dragonfly species face similar threats associated with spring, stream, river, and lake modifications. They may be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Given that both groups spend the larval stage of their life cycles in an aquatic habitat, they are especially vulnerable to changes in water quality conditions (e.g., siltation, pollution, and eutrophication) and changes to existing hydrological regimes. Thus, changes in existing hydrological regimes and water quality could also degrade the quality of aquatic habitat and vegetation (e.g., allow for invasion of non-native vegetation).

ESA-considered insects that occupy wetlands, marshes, and swamps in Florida include the Palatka Skipper and Duke's Skipper butterflies and the Calvert's Emerald Dragonfly. These species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development and, in turn, habitat fragmentation.

Species that occupy forests, woodlands, pine barrens, pine rocklands, and/or grasslands in Florida (e.g., Monarch Butterfly, Florida Leafwing, Frosted Elfin Butterfly, Ceraunus Blue Butterfly, Cassius Blue Butterfly, Bartram's Scrub-hairstreak, and Miami Tiger Beetle) do not use wetlands or WOTUS during any stage of their life history. Future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

Coastal or tropical hardwood hammocks, dunes, sand pine, and/or scrub obligate insect species (e.g., Gulf Coast Solitary Bee, Nickerbean Blue Butterfly, Miami Blue Butterfly, and Blue Calamintha Bee) may be impacted by habitat fragmentation from fill. These impacts may occur where waters/wetland habitat is interspersed with or border these habitat types. As insects are declining on a global scale, impacts to habitat and other resources that factor into species' life history could affect ESA-considered species recovery.

### 5.2.7  Crustaceans

Nineteen crustacean species/subspecies are included in Appendix C, Table C.1. These species can be grouped by general habitat preferences in Florida into the following broad categories: pond/river/stream species (four crustaceans) and cave/well/sinkhole species (15 crustaceans). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Future authorizations under the State 404 program may impact pond/river/stream crustaceans (crayfish) via direct mortality or physical alteration of habitat through dredge and fill activities. Dredge and fill activities may also fragment habitat, change existing hydrological regimes, and affect water quality. All of the crayfish species under consideration in the Action Area are highly sensitive to and already threatened by impacts to both surface and groundwater quality (e.g., changes in temperature, flow, siltation levels, etc.). Changes in

water quality (e.g., an increase in nitrogen levels) may also create favorable conditions for invasive aquatic vegetation or change existing levels and/or species composition of native vegetation. This could decrease the quality of the existing crayfish habitat.

Crustaceans (crayfish and amphipods) that inhabit caves, wells, sinkholes, and other subterranean water features may also experience indirect mortality and/or impacts to habitat as a result of dredge and fill activities in or adjacent to occupied areas. Many cave/well obligates are extremely restricted in range (some species are only known from one or two localities). Any changes in habitat conditions could potentially result in species extirpation. Cave/subterranean crustaceans are also highly threatened by changes in hydrology. Any future activities that would deplete groundwater/aquifers results in changes in flow and, in turn, impacts availability of detrital food items or burrowing habitat. Water quality impacts (increase in nitrogen or sediment levels) may also affect the species. In addition, many cave-dwelling species are dependent on cave-roosting bats, specifically their guano, as a food source. Impacts on cave-roosting bat populations may also affect these crustaceans by reducing food availability.

## 5.2.8  Mollusks

As freshwater mussels are, by definition, fully aquatic, they are likely to be impacted by dredge and fill activities. Twenty-one species of mollusks are included in Appendix C, Table C.1, including 18 types of freshwater mussels that are associated with varying sizes of springs, creeks, and rivers, two freshwater snails, and one tree snail. The freshwater mussel species all face similar threats associated with habitat modification. These include direct habitat modifications such as impoundments, dredging/channelization, stream bed destabilization, and streamflow depletion (e.g., water extraction). They are especially vulnerable to changes in water quality conditions (e.g., excessive sedimentation, environmental contaminants, and eutrophication) and changes to existing hydrological regimes. Similarly, as filter feeders, they are vulnerable to changes in nutrient cycling. Given the reliance all freshwater mussels have on host fish during the larval period of their life cycle, impoundments or other effects influencing host fish species may affect these species. Additionally, mollusk species may be threatened by the invasive species (e.g., Asiatic Clam (*Corbicula fluminea*)), which could be spread by dredge and fill activities. Tree Snails are less likely to be affected as they occur in terrestrial, arboreal environments; nonetheless, direct habitat fragmentation is possible.

## 5.2.9  Plants

Ninety-nine plants are included in Appendix C, Table C.1. These species/subspecies/varieties can be grouped by guild into the following categories: lichens, graminoids, annual forbs, perennial forbs, sub-shrubs, shrubs, cacti, and trees. These groups are intentionally broad for this macro analysis. Impact analysis on the species/subspecies/varietal level (that takes into consideration microhabitat preferences) is presented in Appendix C, Table C.1.

Nine annual forbs are included in this analysis. Five of these forbs occur primarily in wetland habitats, including non-forested wetlands such as prairies, as well as ponds and lakes, ditches, and road shoulders. Fifty-five perennial forbs are included, and roughly half of these occur in wetland habitats. They occur in a variety of specific habitats within freshwater non-forested and freshwater forested wetlands, including wet prairies, cypress swamps, bogs, fens, and seeps. Some occur in pond or lake habitats, and others occur in floodplains or along the banks of rivers or streams. Two epiphytic orchids in this category grow on trees in forested wetlands. One grass and one sedge species included in this analysis may be affected as well.

Four sub-shrubs, six shrubs, and two tree species considered in the analysis occur in wetland habitats, or in habitats which may border wetlands, and which may be affected by future activities that may be permitted under the State 404 program. These species occur in both freshwater non-forested and freshwater-forested wetlands. The sole lichen species and the four cacti species occur in upland habitats that are not likely to be affected.

Many of the species analyzed in this document have experienced substantial habitat loss and range restrictions due to a number of factors, including development and land conversion, alteration of fire regimes and fire suppression, threats from invasive species, and changes to hydrologic regimes. Some have been impacted by forestry practices or horticultural collection. Direct impacts to several of the plants may occur from future authorized fill or dredging activities (which could result in direct mortality or direct impact on wetland habitats). Indirect impacts from wetland dredge or fill activities may affect not only hydrophytes but also some upland species occurring in habitats that border wetlands, from the building of access roads or staging areas. Other indirect impacts include changes in hydrology, water quality, nutrient alteration, and competitive pressure that may arise from shifts in species composition.

# 6.    Cumulative Effects

Cumulative effects are defined as the effects of future non-federal activities, including Tribal, State, local, and private actions on ESA-considered species or their critical habitat that are reasonably certain to occur in the Action Area for this BE. While these effects will likely occur regardless of the agency responsible for administering the requirements in Section 404 of the CWA, they are considered during the analysis of this Action.  Any future State 404 program permits would also consider cumulative effects.

## 6.1    Effects of Non-Federal Activities

ESA regulations (50 CFR § 402.02; § 402.14) require the action agency to evaluate all effects of a proposed non-federal activity. Effects of an activity may occur later in time and may include consequences occurring outside the immediate area involved. Cumulative effects are those effects of future State or private activities, not involving federal activities, that are reasonably certain to occur within the Action Area of the federal Action subject to consultation 50 CFR § 402.02.

There are existing anthropogenic stressors currently impacting ESA-listed species. In addition, there are national-scale, non-federal activities that are reasonably certain to occur. These include watershed development, increased water use, and climate change (USEPA 2013). The "What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project," prepared by 1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services (2017), addresses the current anthropogenic stressors that will impact development and water use in Florida in the future.

### 6.1.1  Watershed Development

Florida's population continues to grow rapidly, and it is expected that 33.7 million people will reside in Florida by 2070 - nearly 15 million more than were in residence in 2010 (1000 Friends of Florida et al. 2017). The greatest projected population growth is observed in the Central region of Florida (Figure 6-1). If growth continues as projected, nearly one-third of Florida's land will be developed, and development-related water demand will more than double. Due to the significant increase of projected development, especially in the

Central region of Florida, agricultural lands will be consumed by residential, commercial, or industrial activity; therefore, agricultural irrigation development is expected to decrease except for the Southern region of Florida.



**Figure 6-1   Comparison of projected 2010-2070 population change in four Florida Regions**

Source: 1000 Friends of Florida et al. 2017

Projected development scenarios for the State of Florida depict a significant increase in land use between 2010 and 2070 (Figure 6-2). It is expected that by 2070, developed land in Florida will increase from 6,275,000 acres to 11,648,000 acres (1000 Friends of Florida, et al. 2016). As a result of increased civil and industrial development, land usage for agricultural purposes in the State of Florida is expected to decrease from 7,586,000 acres to 5,422,000 acres by 2070. However, increased development has the potential for various adverse effects in terms of water quality.

Developmental activity associated with new construction, as well as the overall growth of urban areas, directly affect the stormwater quality and can result in detrimental effects for aquatic communities. Not only does the increased flow from additional stormwater drainage systems affect receiving water bodies, but the stormwater runoff quality that is impacted by developmental activities such as litter, chemicals, metals, nutrients, pesticides, bacteria, sediment loads, and organic matter can harm biological health. These various pollutants and how they can impact water quality are discussed below.



**Figure 6-2 A comparison of the State development scenarios**

Source: 1000 Friends of Florida et al. 2016

Increased sedimentation loads in water systems can result from construction and agricultural activities. There are significant differences in suspended solid concentrations between urban and non-urban stream systems. For example, a study comparison in South Carolina documented a higher total suspended solid concentration value of 2.7 kilograms per square meter per year in an urbanized coastal stream compared to a nearby forested stream that reported a value of 1.6 kilograms per square meter per year (Nagy et al. 2011). Both suspended and accumulated sediment can have adverse impacts. Sedimentation can infill porous areas in a stream/riverbed, eliminating niche areas that multiple aquatic organisms use for egg protection and/or attachment surfaces. Suspended sedimentation can lead to increased turbidity, which not only decreases dissolved oxygen levels (one of the most critical components of water quality) but also can interfere with benthic organisms and their feeding abilities. Makepeace et al. (1995) found that turbid water can be detrimental to aquatic biota. The authors found that total suspended solids concentration between 25 and 100 milligrams per liter "could reduce a river's primary biological productivity by 13 percent to 50 percent" (Makepeace et al. 1995).

Pollutants, including chemicals, bacteria, metals, oils, and pesticides are commonly found in stormwater runoff. These substances and increased concentration levels in urban stormwater can be correlated with construction, developmental, and agricultural activities. Dependent on various factors, these chemicals and substances can result in either acute or chronic detrimental effects to biological life. Stream hydrologic, microbial, and physiochemical data collected in watershed areas in Florida with impervious surfaces ranging from 0-15 percent displayed higher pH, specific conductivity, elevated temperature, higher loads of nutrients ($Cl^-$, $NO_3^-$, $SO_4^{2-}$, $Na^+$, $K^+$, $Mg^{2+}$, $Ca^{2+}$, and total phosphorus), higher bacterial concentrations (fecal coliform and *Escherichia coli*,) and increased hydrologic flashiness in areas with greater impervious surfaces (Nagy et al. 2011). The expected trend of exponential developmental growth of approximately 15.55 percent by 2070 for the State of Florida will increase impervious surface areas; conversely, stormwater quality will decrease while flow rates will demonstrate hydrologic flashiness. The combined hydrologic flashes and influx of toxic substances in stormwater will negatively influence biological communities.

Heavy nutrient pollution is deemed one of America's most challenging environmental problems and is mainly influenced by nitrogen and phosphorus loading. Sources of heavy nutrient loading include but are not limited to agriculture, urban stormwater runoff, wastewater, power generation, and private fertilizer usage. Heavy concentrations of dissolved nitrogen and phosphorus in freshwater systems stimulate plant growth, especially algal growth, which ultimately can harm biological life due to the lack of available dissolved oxygen. A two-year monitoring study on reefs in Florida found that harmful algal blooms alter entire fish assemblages and can reduce both abundance and species richness (Baumberger 2008). With development in Florida increasing in the future, increased construction and higher rates of urban stormwater will consequently increase heavy nutrient loading in aquatic systems and reduce biotic diversity.

Another issue specific to Florida, related to watershed developmental concerns, is the potential for saltwater intrusion into confined aquifer systems. Historical evidence since the 1930s documents the concerns and issues related to saltwater intrusion in Florida as a result of encroaching development. In many areas around Florida, draining efforts were initiated to provide dry land for both developmental and agricultural purposes. There are severe and current concerns for the drinking water of nearly 2.5 million residents of Miami-Dade County, due to saltwater intrusion of the Biscayne aquifer stem (a consequence of the draining of the Everglades to allow for development) (Prinos 2014). As of 2011, Prinos determined that 463 square miles (mi$^2$) of the Biscayne aquifer had been intruded with saltwater. Further pump-out of wetland or lake areas in Florida to create additional areas for development could impact groundwater quality by saltwater intrusion mechanisms.

## 6.1.2   Increased Water Use

An increase in population size will place higher demands on the supply of water. Table 6-1 provides the historical water use data in Florida from 1975-2000. A large source of freshwater for the State of Florida is from underground aquifer systems. With growing pressures of climate change, influxes of anthropogenic demands, and unstable weather patterns, aquifer systems will be unable to meet recharge rates to suffice these conditions. Projected data report that by 2070, development-related freshwater demands will increase as much as 100 percent compared to 2010 (Figure 6-3). The Florida statewide demand for water in 2010 was 5,269,311,481 gallons per day; however, by 2070, the demand is expected to increase to 8,094,862,839 gallons per day (1000 Friends of Florida et al. 2017). It is estimated that approximately 90 percent of the consumed water in the State of Florida is sourced from groundwater, and only 10 percent is from surface water (Holt 2005).

**Table 6-1  Historic Water Use in Florida (millions of gallons per day)**

| Category | 1975 | 1980 | 1985 | 1990 | 1995 | 2000 |
|---|---|---|---|---|---|---|
| Public Supply | 1124 | 1406 | 1685 | 1925 | 2079 | 2437 |
| Domestic self-supplied | 228 | 243 | 259 | 299 | 297 | 199 |
| Commercial – industrial mining | 883 | 700 | 709 | 770 | 692 | 563 |
| Agricultural irrigation[a] | 2930 | 3026 | 2798 | 3495 | 3244 | 3923 |
| Recreational irrigation[b] | n/a | n/a | 182 | 310 | 281 | 411 |
| Power generation | 1608 | 1326 | 680 | 784 | 637 | 659 |
| **Total** | **6773** | **6701** | **6313** | **7583** | **7230** | **8192** |

n/a – Not available

a – Withdrawals for crops, livestock, and fish farming;

b – Withdrawals for turfgrass and landscaping;

Source: Holt 2005, reprinted from Bureau of Economic and Business Research, University of Florida, Table 8:40, Florida Statistical Abstracts 2003

The higher demands for groundwater result in the extensive pumping of aquifer systems, which can result in saltwater intrusion. Depleting existing aquifer storage potential and further, harming future aquifer water quality by saltwater intrusion is expected as a consequence of increased water demands for the State of Florida. Receiving an average of 4.6 feet of rainfall annually, Florida has the second-highest precipitation rate behind Louisiana. With climatic changes and differing seasonal patterns, precipitation is likely to be influenced in the future. Approximately 70 percent of annual rainfall in Florida is lost due to evaporation and the remaining 30 percent flows through pervious surfaces to aquifers, surface water bodies, or to impervious surfaces (Holt 2005). Rising temperatures associated with climate change will increase the evaporation rates of Florida precipitation, therefore reducing overall recharge rates of surface and groundwater systems.



**Figure 6-3    State Water Scenarios (gallons/day/acre)**

Source: 1000 Friends of Florida et al. 2016

Impacts of increased water demand may include reduced depth, areal coverage, and habitat quality for many aquatic communities and aquatic threatened and endangered species. Anthropogenic water demands are also likely to be exacerbated by climate change (see below), leading to greater hydrological variability with an increased probability of drought in many regions.

## 6.1.3  Climate Change

Florida is among the states in the United States most vulnerable to climate change. The extent of coastline in Florida, along with its low elevation and heavy development of coastal and inland areas, will result in large-scale impacts both to human development and biological habitat as climate changes and sea levels continue to rise. According to the Fourth National Climate Assessment (4th NCA), "The Southeast's diverse natural systems, which provide many benefits to society, will be transformed by climate change. Changing winter temperature extremes, wildfire patterns, sea levels, hurricanes, floods, droughts, and warming ocean temperatures are expected to redistribute species and greatly modify ecosystems. As a result, the ecological resources that people depend on for livelihood, protection, and well-being are increasingly at risk, and future generations can expect to experience and interact with natural systems that are much different than those that we see today."

Annual average temperatures throughout the Southeast United States have been increasing since the 1970s. The 2010-2019 decade through 2017 was warmer than any previous decade, with much of this warming being experienced as higher nighttime temperatures and longer freeze-free season lengths (4th NCA). Statistically significant warming is projected for all parts of the United States through the next century, although, in the Southeast, that trend will be somewhat mitigated by latent heat release from increases in evapotranspiration. Average annual temperatures are projected to increase by 3.4°F to 4.3°F by the middle of the 2000s, and between 4.4°F and 7.7°F by 2100 (Vose et al. 2017).

Warmer winter temperatures in Florida will drive some ecosystem changes, especially when combined with sea level rise. Mangroves are being documented in more northerly locations than previously, thanks to more winters without freeze events, and are beginning to replace *Spartina* marshes. As sea level rises, mangroves and other tidal marsh species may be blocked from migrating up-gradient by sea walls, roads, ditches, or other natural or manmade landscape features, and may drown in place.

Landfall of tropical storms and hurricanes has occurred more frequently in Florida than any other state and increasing sea surface temperatures are expected to increase the frequency of high-intensity tropical cyclones (Mendelsohn et al. 2012). Additionally, increasing sea surface temperature has already negatively impacted Florida's coral reefs. As the ocean becomes more acidic due to the uptake of atmospheric carbon, it will become increasingly difficult for a variety of marine invertebrates to produce calcium carbonate shells and skeletons. This will impact biodiversity, and the ecosystem services these species provide. These include shellfisheries production, wave and storm surge attenuation, water filtration, tourism, and transfer of energy via trophic processes to recreationally and commercially important finfish species.

Localized changes in precipitation regimes are also expected to occur due to climate change and will likely have a negative impact on a variety of habitats and species. Periods of unstable precipitation patterns of severe storms followed by longer drought periods pose not only risks for threatened and endangered species but also humans. Abiotic factors such as hydroperiod, water table height, salinity gradient, and surface water depth are likely to be disrupted as precipitation patterns change. Southeast Florida has already experienced hydroclimate variability, which has increased drought conditions causing decreased surface water levels,

decreased groundwater recharge rates, lower groundwater tables, and ultimately leads to higher risks of saltwater intrusion (Abiy 2019).

Climate change impacts associated with rising sea levels pose immediate and long-term risks for land management practices of Florida. Coastal degradation and land loss due to sea-level rise will result in land fragmentation and habitat loss for biological organisms. Changes in abiotic factors from a number of climate change-related drivers are likely to cause habitats and species to shift their ranges in response. In addition to biological habitat loss, rising sea levels will also reduce available land in Florida for development. A study of ESA-listed subspecies in Florida showed both high vulnerability and low adaptive capacity in response to rising sea levels and habitat fragmentation (Benscoter et al. 2013). This will be especially problematic for habitats that are unable to migrate because of natural or anthropogenic barriers, and for species that are rare, occur in isolated populations, and/or have poor dispersal capabilities. Sustainable and climate change specific planning should be at the forefront of developmental planning, conservation efforts, and land usage for the State of Florida. The FWC has an adaptation guide, *A Guide to Climate Change Adaptation for Conservation* that can be found on their website at https://myfwc.com/media/5864/adaptation-guide.pdf. For more information about what the FWC is doing to address the impacts of climate change on fish and wildlife in Florida, see their website at: https://myfwc.com/conservation/special-initiatives/climate-change/.

### 6.1.4  Summary of Cumulative Effects of Non-Federal Activities

As compared to the regulatory baseline, the Action does not authorize any new activities or increased discharge of pollutants that would significantly increase the magnitude of adverse cumulative environmental impacts to ESA-listed species, and the implementation of the State 404 program by FDEP will ensure effects on ESA-listed species will be evaluated and addressed at the project level.

# 7.    State 404 Program Species Coordination

*This Chapter is written as if the State has assumed the CWA 404 program*

The following chapter describes the ESA-listed species coordination process that will occur if the EPA were to approve FDEP's request to assume the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. The intention of presenting this section as if the State has assumed the CWA 404 program is to describe the effects of the Action by articulating the changes to the process that would occur as the result of the EPA's approval. It is also to establish a clear difference between the pre-Assumption coordination between federal agencies (Section 7 consultation between USFWS and the EPA), from the potential post-Assumption coordination between federal and State agencies (technical assistance between USFWS and FDEP as part of the State 404 program species coordination process).

The State 404 program rule [Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C] and the EPA regulations (40 CFR § 233.20, 40 CFR § 230) prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS and confirms that USFWS conclusions about the effects of 404 permits on listed species are determinative.

The USFWS will review State 404 permit applications and provide, through technical assistance, recommendations to FDEP on a project-by-project basis to ensure adverse effects to ESA-listed species are

avoided and minimized, and to ensure that no State 404 permits will be issued that will jeopardize the continued existence of a listed or proposed to be listed species, or result in adverse modification of critical habitat. This process will also assist USFWS in monitoring any incidental take that is reasonably certain to occur. However, the Section 9 exemption provided in the programmatic ITS is contingent on the EPA, FDEP, and the State 404 permit applicant complying with processes and conditions described in the BE, State rules, and any reasonable and prudent measures and terms and conditions provided in the USFWS Program assumption BiOp and it's ITS.

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C. that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. This is ensured by the technical assistance process between the FDEP and USFWS.

The scope of Chapter 62-331, F.A.C. is statewide, covering a wide range of construction activities that are reasonably certain to affect a wide variety of listed species and their habitats. The word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under the ESA. The terms "effect" and "impact" are used interchangeably throughout this document. The review will be in accordance with the requirements and processes specified in the BE, the MOAs, the MOU, Chapter 62-331, F.A.C., and the anticipated Program assumption BiOp. Figure 7-1 at the end of this chapter depicts an overview of the species coordination process.

## 7.1    Federally and State-listed Species Coordination Review

While this BE and this chapter focus on the species review coordination for federally listed species, it is important to note that both the State 404 permit and the State ERP program require protections for both federally listed and State-listed species. If a project requires both a State 404 permit and a State ERP permit, protection measures for federally listed species will be incorporated as permit conditions to both permits. In addition, protection measures for State-listed species will be incorporated as permit conditions to both permits. The species review processes for the State 404 permit and the species review processes for the ERP permit will be similar, with the FDEP permit processor and the FWC permit reviewer working together as a team to resolve issues related to both ESA-listed species and species listed in Chapter 68A-27, F.A.C. The species coordination process outlined in this BE as well as the Memorandum of Understanding between FDEP, FWC and the USFWS will ensure that measures for ESA-listed species that may conflict with measures for a State-listed species that use the same habitat types will be addressed.

The FWC is already involved in the review of many ERP applications and provides FDEP recommended wildlife-related permit conditions, including those that are federally proposed to be listed. In many cases, FWC is the lead conservation agency for federally proposed or candidate species in Florida. A number of species analyzed in this BE are State-listed and under federal review. FWC provides useful resources for State-listed species, including species summary pages with conservation goals, identification of threats, current protections, and links to species action plans and biological status review reports (FWC 2016). These resources include valuable information for future permit application reviews and can help to identify effective measures to reduce the adverse impacts resulting from project activities.

Florida's Imperiled Species Management Plan (FWC 2016) includes integrated conservation strategies as well as other useful material intended to benefit multiple species. Effective conservation strategies can

provide protections that improve the status of an imperiled species and contribute to a decision not to federally list the species.

## 7.2    State 404 Program and Prior-existing USFWS HCPs and BiOps

In some cases, a landowner or project proponent have a project that had undergone previous Section 7 consultation with the USFWS and is covered by a valid BiOp or is covered by a valid Habitat Conservation Plan (HCP) and Incidental Take Permit (ITP). Briefly, Congress recognized the need for a process to reduce conflicts between listed species and economic development, in addition to the permits to authorize take from scientific research or certain other conservation actions. As such, the ESA was amended to add an exemption for incidental take of listed species that would result from non-Federal activities (Section 10(a)(1)[B] of the ESA). To obtain a permit from USFWS for such take, an applicant must develop a HCP that meets specific requirements identified in Section 10(a)(2)(A) of the ESA and its implementing regulations at 50 CFR § 17.22 and § 17.32 and 50 CFR § 222.25, § 222.27, and § 222.31. HCPs are planning documents that describe the anticipated effects of the proposed taking; how those impacts will be minimized or mitigated; and how the HCP is to be funded. Additional information about Habitat Protection Planning can be found at: https://www.fws.gov/endangered/what-we-do/hcp-overview.html.

The Habitat Conservation Planning Handbook (December 2016) and a USFWS Memorandum dated April 22, 2020 provide guidance regarding how approved HCPs or new HCPs being developed are integrated with the ESA Section 7(a)(2) consultations with other federal agencies. This guidance specifically addresses potential federal agency permit actions within an HCP area for activities where take has been authorized in an ESA Section 10 permit.

In summary, the guidance provides the USACE the ability to recognize the pre-existing HCP/ITP and use it to comply with Section 7 of the ESA. Whether the USACE has been involved in the development of the HCP or not, there is still a streamlined Section 7 process that can occur if the USACE 404 permit application's activities are also covered by the HCP within the HCP plan area, and the effects to all ESA-listed species and/or critical habitat were analyzed in the USFWS's biological opinion. The streamlined process involves the USACE requesting consultation with the USFWS, describing the proposed activities and asking if those activities are consistent with those covered in the HCP and analyzed in the biological opinion. If so, the USFWS would issue a brief letter to the USACE agreeing that the proposed permit is consistent with the HCP and biological opinion, and that extends the exemption of the prohibition against take to the USACE. However, the streamlined process may not be available if a proposed USACE permit project's actions involve activities, species, or areas that were not covered in the biological opinion associated with the HCP, or the USACE intends to authorize the action in a manner that is inconsistent with biological opinion.

In accordance with Section 7.2.3 of the FDEP's State 404 Handbook, it is FDEP's intent to adopt this guidance for its species coordination process to insure consistent and adequate protections for species and regulatory certainty to the regulated community, satisfying the requirements in Chapters 62-331, and 62-330, F.A.C.  After technical assistance with the USFWS to confirm that the activities in the proposed State 404 permit are consistent with the HCP and biological opinion, FDEP will incorporate by reference in the State 404 permit, the terms and conditions contained in the approved HCP or biological opinion. Compliance with the HCP requires project applicants to implement the applicable and appropriate avoidance and minimization measures, and any other applicable terms and conditions as contained in the HCP. In addition, FDEP and/or FWC may participate in the development of HCPs when staff are available, to help ensure that all State requirements are covered appropriately under the HCP.

## 7.3   State 404 Program Species Coordination Process

The State 404 program (Chapter 62-331, F.A.C.) requires the analysis for whether effects to listed species and their critical habitats have reasonable potential to occur, and if so, further determines whether those effects are "likely to be an adverse effect" or "not likely to be an adverse effect." If adverse effects/impacts may occur, conditions or measures to avoid and minimize the impacts would be included as permit conditions and implemented by the Permittee. This State 404 program species assessment is modeled after the federal processes for determining, avoiding, and minimizing effects to listed species and ensures compliance with the ESA and the CWA during State 404 permit application review and permit issuance.

The resulting species coordination processes are intended to fulfill the following criteria when reviewing future State 404 permit applications: (1) the scope of the action is adequately described; (2) the physical, chemical, or biotic stressors to species that are likely to be produced as a result of the action is estimated; (3) the adverse effects of such activities on ESA-listed species and designated critical habitat is minimized; (4) applicants participating in permitted activities are informed, encouraged, and screened for potential incidental take exemption eligibility as required by permit issuance; (5) likely adverse effects on listed species and critical habitat are monitored and evaluated; (6) permit compliance is monitored and enforced; and (7) if new information becomes available (including inadequate protection for species or low levels of compliance), the action is re-evaluated and modified if warranted. For an example of a use of these criteria, see the Endangered Species Act Section 7 Consultation, Programmatic Biological Opinion on the U.S. Environmental Protection Agency's Issuance and Implementation of the Final Regulations, Section 316(b) of the Clean Water Act, dated May 19, 2014.

The FWC has partnered with FDEP to assist with the coordination of federally listed species reviews, which would take place concurrently with their review of impacts to State-listed species (per Chapters 62-330, F.A.C.  and 68A-27, F.A.C.) for the State 404 and ERP programs. The FWC may assist FDEP as the State's species coordination lead to be the point of contact for coordination with the USFWS. FWC may provide information and other preliminary assessment assistance to USFWS as USFWS reviews State 404 permit applications and develops recommendations for FDEP/FWC to avoid and minimize adverse impacts to listed species and their habitats.

### Key commitments for the species coordination process

As set forth in the Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the United States Fish & Wildlife Service, and the Florida Department of Environmental Protection, and in the FDEP's State 404 Handbook, the species coordination process includes a USFWS review of all State 404 permit applications for consistency with the ESA and an EPA review of applications with a reasonable potential to affect ESA-listed species. Key commitments between FDEP, FWC, and the USFWS to ensure a successful species coordination review process include:

- FDEP's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA requirements.

- FDEP, FWC, and USFWS will participate in a State 404 program species coordination technical team. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in

refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

- Prior to assuming 404 permitting, FDEP and FWC permit review staff will be trained in the new State 404 program species coordination procedures and processes. The FDEP, FWC and the USFWS will collaborate on developing the training materials, and the FWC and the USFWS be invited to participate in the in-person and/or virtual training meetings for FDEP permit review staff.

- All State 404 applications will be forwarded to USFWS for review, the majority of which will include FDEP or FWC preliminary determinations for effects to ESA-listed species or species proposed to be listed within a few days of the application provided to the USFWS. These preliminary determinations may include possible effects for species found onsite, potential impacts to critical habitat, and potential protective measures that may address the effects and impacts.

- Technical assistance in individual project-by-project reviews from the USFWS may be accomplished by individual USFWS staff or by USFWS-approved effect determination tools, as described below.

- FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat.  In addition, if:

    1) the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the USFWS and

    2) the species and activities described in the State 404 permit application are covered in the Program assumption BiOp, HCP/ITP (or similar agreement),

then no additional avoidance and minimization measures would be required. FDEP would provide the documentation in order for USFWS to review the project. If the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, FDEP will issue a Notice of Intent to Deny the permit.

## 7.4   Application Review

### *State 404 Program Application Review Process*

FDEP will review all submitted applications or additional information provided by the applicant in response to FDEP's request for additional information, for administrative and technical completeness. Upon receipt, submitted applications will be forwarded to all appropriate State and Federal agencies for comment, including FWC and USFWS. FDEP will request any additional information required to publish public notice pursuant to Rule 62-331.060, F.A.C. (administrative completeness), and to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. (technical completeness).

The provisions described in the FDEP Applicant's Handbook (Volume I, sections 5.5.3.5 through 5.5.3.7, which govern an applicant's timeframes to respond to requests for additional information) apply to applications for State 404 permits. Once FDEP has determined that an application is administratively complete, FDEP will provide public notice as described in Subsection 62-331.060(2), F.A.C.

Permit applications will not be considered technically complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C., and section 5 of the FDEP's State 404 Handbook). FDEP may request additional information as necessary during its review of any information it receives during the public comment period, at a public meeting, or during federal review.

*Application Timelines*

Pursuant to Rule 62-331.052, F.A.C., FDEP will review the application within 30 days of receipt of an application for a permit, or receipt of any additional information provided by the applicant in response to FDEP's request for additional information, for: 1) administrative and technical completeness; 2) request any additional information required to publish the public notice to determine if the proposed activity meets the conditions for issuance. The applicant may voluntarily submit a written waiver of the above 30-day time clock requirement to allow more time for FDEP to determine if additional information is required. However, FDEP is not obligated to accept the waiver or to delay sending the request for additional information. FDEP may request additional information as necessary during its review of any information that FDEP receives during the public comment period, at a public meeting, or during federal review.

Within 10 days of FDEP determining that an application is administratively complete pursuant to subsection 62-331.060(1), F.A.C, FDEP will provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, FDEP will send a copy of the public notice to the EPA for those projects that the EPA reviews, in accordance with section 5.2.5 of the FDEP's State 404 Handbook. The EPA review timelines and potential public meetings are discussed in section 7.4.2.

Pursuant to 62-311.060(1), FDEP will provide public notice within 10 days of the following: 1) FDEP determination that an application for an individual permit or major modification is administratively complete; 2) FDEP notification to a permittee of revocation or suspension of a permit; and 3) issuance of an emergency field authorization. The FDEP shall provide public notice 30 days prior to any scheduled public meeting for such projects.

From date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of 30 days, or 15 days for the projects listed in 62-331.060(b)(3)(b). The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting.

## 7.4.1  Technical Assistance with the USFWS

Similar to the USACE Section 404 permit review process, applicants submitting a State 404 permit application will be required to submit information that allows FDEP (and USFWS) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats. To that end, the FDEP may request the following information as part of the State 404 application:

- Description of the proposed activity

- Description of the specific areas affected by the activity

- Description of listed species/critical habitat that are present in the area affected by the activity

- Description on the manner in which species may be affected by the activity

- Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably certain to occur within the project area

- Relevant information (e.g., species surveys, etc.)

- When needed, proposed project designs and proposed conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.

If incomplete, additional information will be requested during the information gathering and review processes and forwarded by FDEP to the FWC and USFWS.

As part of the species coordination process and detailed in the Memorandum of Understanding Between Florida Fish and Wildlife Conservation Commission, the United States Fish and Wildlife Service, and the Florida Department of Environmental Protection , FDEP will provide copies of all State 404 permit applications to the USFWS and FWC. At the time each application is submitted to USFWS (or within a short period after submittal), FDEP or FWC will include a preliminary determination to the USFWS as to whether listed or proposed to be listed species are expected to be present, and whether the species will be affected. If this preliminary review finds that ESA-listed or proposed to be listed species may be affect, this effect determination from the State to the USFWS will also include a request for USFWS to review the forwarded information and submit questions or recommendations regarding the permit application in order to adequately review the project. In some cases, after all needed information about the application has been received, FDEP or FWC may provide the USFWS with a preliminary protective measure for the USFWS to review or develop the protective measures in coordination with the USFWS.

The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their habitats. Upon coordination with the USFWS on appropriate protection measures for federally listed species, FDEP will incorporate the USFWS-recommended measures as permit conditions or will issue a Notice of Intent to Deny the permit.

### *Estimated Species Review Timelines*

Time frames are identified in State regulations (see *Application Timelines* under 7.4 above); however, FDEP intends to adhere to some transitional timelines between these timeframes. According to FDEP, estimates for the transitional timelines are outlined in the steps below.

1) FDEP receives a permit application.

2) Within 3-5 days, FDEP sends a copy to USFWS and FWC. Within a day or two, FWC sends preliminary affected species list and type of effects determination to USFWS.

3) Within 10-15 days of receipt, USFWS may send to FDEP [no longer than 20 days from the date received by FDEP]:

a) For incomplete or General Permit applications: Provide comment or any questions it has about missing information; or

b) For complete applications: Provide comment or notify FDEP of intent to comment with request for notification of deadline.

4) Within 30 days from receipt, FDEP must request additional information (RAI) from applicant or deem the application complete.

5) After FDEP receives additional info, FDEP has 30 days to review the response and:

a) Request clarification of answers to the questions; or

b) Notify applicant their application is complete.

6) During the RAI process, FWC and USFWS determine affected species, affected critical habitats, types of effects, and potential protective measures. These determinations are forwarded to FDEP, preferably before the application is deemed complete.

7) After application is deemed complete, FDEP has 10 days to issue a public notice for applications for individual permits.

8) The public notice is provided to the EPA and USFWS.

9) The public notice comment period is 15 days for minor projects and 30 days for more complicated ones.

10) If the EPA has waived review, then after the public comment period closes, FDEP has either 60 or 90 days to issue or deny the permit.

11) If the EPA reviews the public notice, then the 40 CFR § 233.50 regulations and timeframes govern the timeframes and process of permit review.

a) The EPA has 10 days to send a copy of the public notice to USFWS.

b) USFWS has 15 days to notify EPA it intends to comment.

c) USFWS has 50 days from receipt of public notice from the EPA to send comments to the EPA.

d) The EPA has 90 days to send comments or objection to FDEP. The final decision to comment, object, or to require permit conditions will be made by the EPA.

12) Because applications that are deemed as "no effects" by FDEP will not be subject to the EPA review, the USFWS will have a shorter amount of time to review and provide FDEP with additional information to consider.

a) The total time that USFWS will have a permit application that is not subject to the EPA review is 15 days to send questions about missing information to FDEP, plus another 15 for FDEP to send that request to the applicant, plus the 20 days FDEP has to let the applicant know the permit is complete, plus 10 days for FDEP to issue the public notice, plus 15-30 days for the public comment period. Therefore, the potential maximum amount of time USFWS would have to review and comment on a

permit application that is not subject to the EPA review would be approximately 75-90 days, depending on whether the public comment period was 15 days or 30 days. If the application had all the necessary information at the start then the time for USFWS review and comment would be 55-70 days, depending on whether the public comment period was 15 days or 30 days.

b) Therefore, it will be important for FWC and USFWS to work with FDEP to develop an efficient system to promptly check applications for completeness and their potential to affect listed species to ensure "no effects" are accurate determinations.

### *Identifying applications that may pose adverse impacts*

The Memorandum of Understanding Between Florida Fish and Wildlife Conservation Commission, the United States Fish and Wildlife Service, and the Florida Department of Environmental Protection describes how FDEP and FWC will identify applications that may pose adverse impacts. The FDEP/FWC species coordination and technical assistance with the USFWS may begin before the application's public notice is posted. The USFWS will receive applications prior to FDEP posting a public notice and USFWS may submit information and questions to FDEP prior to FDEP posting a public notice. The public notice will also go to the USFWS, and details regarding the type of effects/impacts to species and their critical habitat as well as proposed protection measures that may have been suggested by USFWS will be included in the public notice. The technical assistance process between the USFWS, FDEP, and FWC will not be considered complete until any modifications are incorporated as a result of the public notice. If needed, technical assistance with the USFWS may continue during and after the public notice period.

Upon receiving an application, FDEP and FWC will review the submittal by the applicant and preliminarily identify the affected species, affected project area, and critical habitats. The species lead is responsible for making a preliminary determination for affected species, affected project area and critical habitats, and assess whether, and what type of, adverse impacts to endangered or threatened species and their critical habitats is expected. The FDEP will forward the application to FWC and the USFWS within three-five days of receipt. The species lead will contact the USFWS and send their preliminary assessments to the USFWS as soon as possible. Response from USFWS are due to FDEP within 20 days of FDEP's receipt of information.

For example, if FDEP received an application on June 1st and forwarded it to USFWS on June 5th, any questions USFWS needs to be answered must be relayed through the species coordinator by June 20th. If USFWS has no questions, technical assistance continues. All comment deadlines for USFWS's response will be included in FDEP/FWC request to USFWS.

- If FDEP/FWC does not get a response from the USFWS by the deadline for questions or comments, the lack of a response will be considered a "no comment" and no further information from the USFWS is needed. If the State species coordinator believes that effects may be significant and the lack of response may be in error, they will contact the USFWS as soon as possible to confirm. In addition, the USFWS will receive a copy of all public notices and may provide comments to the EPA and/or FDEP at that time.

- For the determination of potential affected species, project area or impact/effect on the species, if FDEP/FWC receives a response from USFWS with additional information to consider, the information will be re-evaluated and resubmitted to USFWS, if needed.

- Once it has been determined by FDEP/FWC that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) and the USFWS has not submitted information or questions that would lead the State to reconsider its determination, the species review concludes for that application. If the applicant modifies the project activities or increases the project area as the application is continued to be reviewed, FDEP/FWC/USFWS may re-evaluate the application with this information, if warranted.

- Once it has been determined by FDEP/FWC that an application may cause an adverse impact or adverse effect to federally listed endangered or threatened species (or species proposed to be listed), technical assistance with USFWS continues in order to determine if, and how, the impacts and effects can be addressed with protection measures.

### *Coordination of protective measures with the USFWS*

According to the Memorandum of Understanding Between Florida Fish and Wildlife Conservation Commission, the United States Fish and Wildlife Service, and the Florida Department of Environmental Protection, FDEP will follow the following procedures for coordinating protective measures with the USFWS:

- For applications determined to have an adverse impact to federally listed or species proposed to be listed, the species coordination lead will forward all available information to the USFWS with a request for additional technical assistance.

- The FDEP/FWC species coordination lead will compile additional information or questions needed to complete the review, including information or questions from the USFWS, to forward to FDEP. These questions and requested information will be incorporated into the FDEP's RAI to the applicant.

- The species coordination lead will coordinate with the USFWS regarding potential protection measures that may offset the anticipated adverse impacts. In some cases, depending upon the project, the USFWS may submit recommendations to FDEP/FWC.  In other cases, the species coordination lead will compile a package that presents the proposed protection measures and transmit the package to USFWS for their review and comment.

- After USFWS provides/agrees with recommended protection measures appropriate to offset the expected adverse impacts associated with the proposed project, the protection measures are incorporated into the public notice as proposed permit conditions.

  - If modifications are made during the public comment period that may change the original conclusion, FDEP reviewers will forward this information to FWC and USFWS for further review and comment.

  - If no modifications are made, or if the modifications during the public notice process can be addressed by FDEP/FWC/USFWS, protective measures are incorporated into the permit as special conditions and the species review concludes for that application.

- If the review by FDEP, FWC, and USFWS concludes that adverse impacts are likely to jeopardize the continued existence of a species, or will destroy, or adversely modify critical habitat, either of the following alternatives may occur, depending upon the project:

  - Additional protection measures that will satisfy the requirements of the ESA and avoid jeopardy or adverse modification are developed in coordination with or as recommended by

USFWS, FDEP incorporates those measures as permit conditions and processes the permit; or

- o The FDEP issues an "Intent to Deny" the application for a permit.

## 7.4.2  EPA Oversight and Review

In accordance with the FDEP-EPA MOA and governing federal regulations (40 CFR § 233), EPA will retain federal oversight authority on the issuance of State 404 permits, with the ability to review applications, review proposed protection measures/conditions and, if necessary, recommend additional protection measures if deemed prudent and practicable. The EPA's federal authority also allows the EPA to intervene in the application review process, if needed, where there may be disagreements or issues that need to be resolved. FDEP can also request the EPA's assistance in the application review process for the same reasons, if needed.

Pursuant to 40 CFR § 233.51(b)(2), there are specific categories of discharge the EPA can waive Federal review of State 404 permit applications. Discharges with reasonable potential for affecting endangered or threatened species, however, are not waived and must be reviewed. For those projects subject to the EPA review, FDEP will send a copy of the public notice to the EPA, in accordance with section 5.2.5 of the FDEP's State 404 Handbook (also 40 CFR § 233.50(a)(1)). Under the State 404 program, projects with reasonable potential for affecting listed or proposed to be listed species are the projects that have been determined by FDEP and FWC, in coordination with USFWS, to affect listed species. Details regarding the level of effects to species and their critical habitat as well as proposed protection measures will be included in the public notice.

Within 30 days of receipt of notice, the EPA will notify FDEP of the intent to comment upon, object to, or make recommendations with respect to a permit application, draft general permit or FDEP's failure to accept the recommendations of an affected state pursuant to § 233.31(a). Within this time period, the EPA may also request information from FDEP if the information provided is inadequate to determine whether the permit application or draft permit meets the requires of the CWA, 40 CFR § 233.50, and the 404(b)(1) Guidelines. The EPA may notify FDEP that there is no comment but reserves the right to object within 90 days of receipt, based on any new information brought out by the public during the comment period or at a hearing.

Pursuant to 40 CFR § 233.50(b), the EPA will provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the USACE, USFWS, and NMFS, within 10 days of receipt. These agencies will notify the EPA within 15 days of their receipt if they wish to comment on the public notice or draft general permit. Such agencies should submit their evaluation and comments to the EPA within 50 days of such receipt. The final decision to comment, object, or to require permit conditions will be made by the EPA.

If the EPA has given notice to FDEP of the intent to comment, those comments shall be submitted within 90 days of the receipt of the public notice, draft general permit, or FDEP's failure to accept the recommendations of an affected State. An FDEP permit shall not be issued until after the receipt of such comments or 90 days of the EPA's receipt of the public notice, draft general permit, or FDEP's response (§ 233.31(a), whichever comes first. Within 90 days, the EPA will provide a written statement with comments, objections, or recommendations; and the actions that must be taken by FDEP in order to eliminate any objections (see 40 CFR § 233.50(e) for more details). FDEP shall not issue a permit until steps required by the EPA to eliminate an objection or incorporate a requirement for a permit condition to a permit application or draft general permit.

Within 90 days of FDEP receipt of EPA's comments, the EPA may hold a public hearing on the objection or requirement (see 40 CFR § 233.50(g) and (h) for more details).

If no public hearing is held, within 90 days of receipt of the EPA's comments, FDEP shall either issue the permit revised to satisfy the EPA's objections or notify the EPA of its intent to deny the permit. In the event FDEP neither satisfies the EPA's objections, requirement for a permit condition, nor denies the permit, the EPA shall transfer the permit application to the USACE for processing.

**Figure 7-1  Species Coordination Overview**



## 7.5   Species Assessments

The structure of the species coordination process discussed in the previous section allows for the determination of effects regulated activities may have on a listed species and/or critical habitat that is consistent with past processes regulated by the CWA and the ESA. It also will identify, through coordination with USFWS, practicable, implementable process for developing protective measures that may avoid or minimize potential adverse impacts of the regulated activity consistent with past consultations under the USACE 404 program.

### 7.5.1   Identifying Project Area and Affected Species

The first step in assessing potential adverse impacts to listed species or those proposed to be listed as endangered or threatened, as well as their habitats, is to define the project area (similar to the "action area" during a federal Section 7 consultation). The project area can be larger than the immediate area of activity, since it is an identification of all areas that may affect listed species and their habitats directly or indirectly by the project's activities.

For species within the USFWS's jurisdiction, the USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) allows for the user to draw a polygon to represent the project area. The project area must include the proposed project's potential impacts to the affected species and their habitats, even those traditionally considered as offsite, if the impacts would occur as a result of approval of the project. By creating a polygon that is geographically referenced, the system will produce a preliminary list of resources for the area chosen. This list of species and habitats will be considered preliminary, because all potential adverse effects need to be determined (and some species may need to be confirmed by on-site surveys) and verified during the State and Federal species reviews. The result of this online search will also include critical habitats that overlap with the project area. While critical habitat is a special designation under the ESA, during project reviews all occupied habitat within the species range that may be adversely affected will be considered if the project's activity may affect listed species, even that which is not designated as critical habitat under the ESA.

### 7.5.2   Assessments Using Available Federal Decision Tools

As set forth in the Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the United States Fish & Wildlife Service, and the Florida Department of Environmental Protection, once there is a proposed affected species list, the State's species coordination lead determines (preliminarily or concurrently with the USFWS) whether adverse effects/impacts are likely to occur. According to FDEP, the types of impacts that may occur could be beneficial to species and their critical habitat or could adversely impact or adversely affect them. Adverse impacts to species include the potential for harm to members of the species, such as injury, death, or those that occur by loss of feeding, breeding, or sheltering resources due to a project's activities affecting habitat where members of the species exist. Adverse impacts also include the potential for jeopardizing the continued existence of a species, or adversely modifying critical habitat. Adverse effects/impacts, or types of harm to one or more individuals, can result directly from dredging and filling activities involved with construction or demolition proposed by the project, as well as secondary impacts caused by the ongoing operations of the project once constructed. Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the

impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur. Adverse impacts to habitats, particularly critical habitats, include alteration or destruction of the physical and biological characteristics of that habitat. These characteristics are important to the listed species using the area, and harm to species may occur temporarily during construction or permanently during operation or by alteration of the habitat.

For some species, the IPaC system provides Federal species guidelines. These guidelines include General Project Design Guidelines, Habitat Assessment Guidelines, Species Survey Guidelines, Effects Determination (consultation and/or dichotomous) Keys, conservation measures, guidance for determining whether a species 'may be present', proactive management suggestions, Species Assessment Guides (SAGs) or Standard Local Operating Procedures for Endangered Species (SLOPES).

Programmatic consultations, when available, help identify where impacts/effects will occur and whether technical assistance with the USFWS is needed. Some programmatic consultations do not exempt take; rather, they attempt to avoid take through setting project-specific criteria that either determines a project is "not likely to adversely affect" a listed species or critical habitat, or sets avoidance and minimization measures that allow a "not likely to adversely affect" determination to be made. Because these consultation keys and programmatic biological opinions cover many of the species which are most often the subject of ESA Section 7 consultations in Florida, they include many useful measures to identify, avoid, or minimize adverse effects to ESA-listed species.

These tools, particularly SLOPES, benefit the species, the USFWS, and the regulated community by:

- Increasing the effect determinations' accuracy and consistency;

- Improving completeness and efficiency in the documentation of the administrative record;

- Decreasing the amount of staff and time needed to complete coordination; and

- Improving ESA-listed species conservation and compliance with the ESA.

These tools also provide a major benefit to the regulated community because they are available to the public and may be used by the applicant during the pre-application and application phases. An applicant is often able to identify any potential effects of the proposed project and be able to consider whether effects could be avoided or minimized before a significant amount of planning resources have been expended.

Lists or links to other biological opinions, including a few additional examples of programmatic biological opinions, can be found on the USFWS Vero Beach Field Office website at https://www.fws.gov/verobeach/Programmatic%20Consultations.html. Additional information and tools can also be found at https://www.fws.gov/northflorida/Tools2Use/consult-landowner-refs.htm.  A few examples of these are included in Table 7-1 below.

## Table 7-1 Programmatic Consultations and Consultation Keys in Florida, 2010 - 2019

| Name of Consultation | Year Published | Species | Exempts Incidental Take |
|---|---|---|---|
| FEMA National Flood Insurance Program Projects (Florida Keys) | 2014 | American Crocodile | No |
| Eastern Indigo Snake Consultation Key | 2017 | Eastern Indigo Snake | No |

| Name of Consultation | Year Published | Species | Exempts Incidental Take |
|---|---|---|---|
| Florida Bonneted Bat Consultation Key | 2019 | Florida Bonneted Bat | No |
| Florida Panther Effect Determination Key | 2007 | Florida Panther | No |
| Natural Resources Conservation Services Working Lands for Wildlife Program | 2012 | Gopher Tortoise | No |
| Piping Plover Programmatic Biological Opinion | 2013 | Piping Plover | Yes |
| Sand Placement Programmatic Biological Opinion | 2015 | Sea Turtles and Beach Mice | Yes |
| Department of Housing and Urban Development Loan Projects | 2010 | Various | No |
| FEMA Conditional Letters of Map Revision | 2014 | Various | No |
| Clearance to Proceed with Federally Insured Loan and Grant Projects | 2016 | Various | No |
| West Indian Manatee Programmatic Biological Opinion | 2011 | West Indian Manatee | No |
| Guidance to Proceed with Events Authorized by the US Coast Guard | 2016 | West Indian Manatee and Sea Turtles | No |
| Wood Stork Programmatic Key (North and South Florida) | 2010 | Wood Stork | No |

Source: USFWS 2019a

Some types of guidelines are considered decision tools (i.e., SLOPES, dichotomous keys, etc.), and can assist in determining not only whether an impact/effect will likely occur, but also may also recommend protection measures appropriate for specific species and specific activities. For example, effect determinations for wide-ranging species such as the Eastern Indigo Snake rely on whether an individual was detected on site and the size of the habitat loss. The Wood Stork determination key is also used extensively and has had some success. As stated in chapter 4.2.2., the Eastern Indigo Snake and Wood Stork accounted for 56.6 percent of all species-level consultations in Florida between 2014 and 2018.  Species guidelines, or decision guidance tools, are also available independently from the IPaC system on the USFWS website.

These types of tools provide consistent criteria to reach impact/effect determinations and will be used by the State's species coordination lead to facilitate the USFWS's review. The review process for species with these types of decision tools will likely be slightly different and simplified compared to those species that do not have these tools. In the beginning of the review of a State 404 permit application, the State's species lead will use these decision tools to arrive at impact/effect determinations and potential protection measures. This preliminary review will be submitted to the USFWS with a request for technical assistance, allowing the USFWS to concur with the conclusions, or provide additional information that may change the conclusions. Once the species review outcome is finalized, technical assistance from the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued.

### 7.5.3   Case by Case Assessments When Tools Are Not Available

For those species or activities that do not have federal species guidelines or decision tools, a case by case assessment must be performed. A preliminary assessment will be performed by the applicant and verified or expanded upon by the FDEP/FWC species coordination lead. Applicants will need to provide all of the information necessary to perform an assessment of potential impacts to listed species and their habitats, as well as submitting proposed protection measures to avoid and minimize the anticipated impacts.

The following factors should be considered when evaluating the impacts/effects of the activity:

- Proximity of the activity to the species and/or designated critical habitat;

- Location and extent of the area of disturbance;

- Timing (with regards to sensitive periods of a species lifecycle);

- Duration of the activity or impact;

- Disturbance frequency, and

- Nature of the effect (elements of a lifecycle, population size, variability, or distribution, physical and biological features of habitat, etc.).

Federal species guidelines, information on IPaC, USFWS specific species webpages, the results of species surveys, (see Table 7.2 below for guidance), relevant scientific literature, species accounts in Appendix B of this document, stressors and effects in Appendix C with discussion in Chapter 5 of this document, and other available sources of information are reviewed to develop preliminary conclusions of impact/effect as well as develop any potential protection measures.

Physical or Biological Features essential to the conservation of the species as identified in the final rules designating critical habitat for specific listed species should be considered to determine whether there may be adverse modification of critical habitat.

**Table 7.2  Interpreting the results of species surveys**

| Suitable habitat present in the project area? | Species Survey Result | Conclusion | Next Step | Comments |
|---|---|---|---|---|
| No | N/A | Species unlikely to be present | No technical assistance needed. Document conclusion in project record | Consider the potential for the species habitat to become established in the project area before the activity is complete |
| Yes | Species not detected[1] | Species unlikely to be present | – | Review species-specific survey protocols; make sure survey methods and results are sufficient to support conclusion |
| Yes | No survey data or surveys inconclusive | Species unlikely to be present until new information shows it exists | Review potential impacts/effects to critical habitats | |
| Yes | Positive survey data | Species is present | | |

[1] Within species range and preferred habitat type

The species coordination lead will use the information from the applicant and assess all the data available to them to determine if there will be impacts to any listed species and the severity of adverse impacts to each species and habitats present in the project area. For projects with large amounts of acreage or that are intensive in the amount of activities proposed, or with multiple species and critical habitats, a written assessment determining preliminary anticipated adverse impacts and protection measures to avoid and minimize those impacts would be developed. This preliminary review will be submitted to the USFWS with a request for technical assistance or would be developed in coordination with the USFWS. The USFWS would agree with the conclusions and recommended protection measures or provide additional information that may change the conclusions and protective measures. Once the species coordination review and technical assistance with the USFWS is completed, the species coordination process with the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued. At any time during the review of State 404 permit applications, if modifications to the project are proposed after the species coordination process, the species review will be revisited with the USFWS. If modification occurs after the application is granted, and the modification causes effects not previously considered by USFWS, the applicant may be liable for any take under Section 9 of the ESA.

## 7.6   Impact/Affect Determinations and Protective Measures

The word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under ESA. Throughout this document, these terms are used interchangeably. The State 404 program has two standards of review regarding the protection of listed species: the species protections required under CWA and ESA, and the species protections required under State Chapters 62-330, and 62-331, F.A.C. Under State rules, the requirements of CWA and ESA are incorporated into the species review process for adverse impacts to listed species and their habitats. The State rules are broad; the ERP rule and State 404 program rule protect not only federally listed and State-listed species, but all fish and wildlife in Florida.

While the State 404 program has been developed to meet the requirements of CWA and ESA, it also relies on the requirements of the existing State ERP program. The ERP program requires the applicant to provide reasonable assurances that the proposed activities will not damage or harm the water resources of the State nor reduce the value of wetland functions including functions provided to fish, wildlife and listed species. A State or federally listed species' ability to nest or den cannot be interrupted by negative impacts to the uplands or wetlands a listed species uses. Subsection 62-330.301(1)(d), F.A.C. requires an applicant provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment "will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters" to obtain approval for a permit.  This review also includes consideration for secondary and cumulative impacts.

There is case law that has defined the terms "adversely impact" regarding listed species that should be considered while reviewing State 404 program and ERP program applications (*Metro. Dade County v. Coscan Florida*, 609 *So. 2d 644, 649-50 (Fla. Dist. Ct. App. 1992).* The Florida District Court of Appeals overruled the recommended order from the administrative hearing, finding that the hearing officer ruled under the federal standard rather than the Florida standard. The federal standard is stated as "whether the project would jeopardize the continued existence of an endangered species", whereas the Florida standard is stated as "whether the project would adversely impact" an endangered species. According to the District Court, any impacts that adversely affect a species should be considered (and addressed if warranted), regardless of whether those impacts result in jeopardizing the continued existence of the entire species. Therefore, under Florida law, the standards for addressing adverse impacts/effects to listed species includes not only a prohibition of issuing permits that may jeopardize the continued existence of the species, but it also includes a requirement to identify and address adverse impacts to ESA-listed species.

Protection measures are defined as those avoidance and minimization measures to address adverse impacts to listed species and critical habitat. Protection measures, in the form of avoidance and minimization measures recommended by the USFWS, are incorporated as conditions to the State 404 permit. Examples of protection measures include but are not limited to project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work).

For the purposes of the affected species list for this BE, anticipated stressors are outlined in Table C.1.a and anticipated effect determinations are noted in Table C.1.b in Appendix C. During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews.

### 7.6.1  Impact and Affect Determinations

When decision tools are not available, the determination of whether a project's activities will affect endangered or threatened species is preliminarily made by FDEP and FWC and confirmed with USFWS during the technical assistance process. Information about a species should be cross-referenced with knowledge of the project's activities and the project area to help predict whether and how the species at any life stage will respond when exposed to the effects of the activities. Based on best available data, if any of the following occurs it will be determined that the project will adversely impact/effect the species and technical assistance with the USFWS to determine possible protective measures is required. The following statements can be used as guidance for the determination of "may adversely impact":

- Data indicate the species may be exposed to the elements of the activity and respond deleteriously upon exposure to elements of the activity or to stressors produced by the activity; or

- Data indicate the proposed activity will cause changes to the physical and biological features of critical habitat and produces exposure or stressor to species.

As the species coordination process progresses during the review of a State 404 permit application, proposed activities will be assessed for potential effects to species. The USFWS will confirm whether adverse impacts are anticipated to occur, and how significant the impacts are expected to affect the species or critical habitats. These determinations can be categorized as follows:

- No Effect/No Impact

- Not Likely to Adversely Affect/Impact

- Likely to Adversely Affect/Impact

- Jeopardizes the Continued Existence of the Species, and/or Destroys or Adversely Modifies Critical Habitat


*No Effect/No Impact*

If physical or biological features essential to the conservation of the species are not present or are present but will not be affected in the project area, then no further review of effects/impacts to critical habitats is required. In addition, a determination of "No Effect/No Impact" would be made if listed species do not occur and do not have the potential to occur on a site. If neither the species nor the critical habitat will respond in any manner, no further review of adverse impacts to species is required and technical assistance with the USFWS is concluded.

*Not Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may affect a species or designated critical habitat, but the effect is not anticipated to cause harm to a member of the species, nor cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. The impact expected may not require protective measures (if discountable, or insignificant) or it may be deemed as not likely to adversely affect via required protective measures to avoid and minimize the effects.

*Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may adversely affect a species or designated critical habitat, and the effect is anticipated to cause harm to a member of the species and/or cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. Harm to an individual(s) means injury or death. The level of harm, however, may not result in jeopardizing the continued existence of the species or destroying or adversely modifying critical habitat. The adverse impact expected is likely to require protective measures to avoid and minimize the effects.

*Jeopardizes the Continued Existing of the Species and/or Destroys or Adversely Modifies Critical Habitat*

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C. that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. Through technical assistance with the USFWS, the FDEP and FWC will be informed of when a proposed project and its activities is anticipated to jeopardize the continued existence of the species, or if critical habitat is destroyed, or adversely modified. Under these circumstances, the FDEP, FWC, USFWS and the applicant will discuss to determine what, if any, protective measures may be appropriate.

It should be noted that the continued existence of a species could still be in question even without anticipated harm to individuals, but if there were harm to the resources the species depend on. An example would be a project site that includes pines trees that are 70-90 years old, and a listed species has been verified as being onsite with habitat requirements for that age of pine tree. The applicant proposes to cut all the trees before they reach the age of 70 or just after they reach the age of 90. The applicant's proposed protection measures only include making sure no species are present in each tree before they are cut down. This project area would leave only pine trees younger than 70 years old. If this activity was taken across the entire range of the listed species onsite, it could jeopardize the existence of the species without directly or indirectly taking (as defined by ESA Section 9) individual members of the species.

## 7.6.2  Developing and Ensuring Protective Measures

The Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the United States Fish & Wildlife Service, and the Florida Department of Environmental Protection outlines the process for developing protective measures for State 404 permits. According to FDEP, after the determination of "may adversely affect/impact" and the level of adverse impact, the species coordination process continues between the State species coordination lead and the USFWS during the review of a State 404 permit application. In order to move towards authorization of an activity, the project's adverse effects/impacts to species and habitat that have been identified must be avoided and minimized by implementing protective measures. Those protective measures may likely either modify the project design, modify the project operation, or follow species-specific protective measures. Early in the review process, the species lead will draft and compile the applicant's information as well as their own assessment and forward to the USFWS for review. The assessment may also be done in coordination with the USFWS, depending upon the project. The USFWS may agree with the proposed preliminary impact review and proposed protection measures, and the finalized assessment and recommendations will be provided to the applicant in the form of comments and

draft permit conditions. The USFWS may also recommend additional avoidance and minimization measures, provide recommendations for appropriate permit conditions if none were proposed in the informational package sent to them, or state that the proposed measures are not adequate.

Some of the federal species guidelines discussed in the previous subsection of this chapter provide minimization measures that are considered standard conditions for adverse effects associated with common, minor activities. For other species, there are typical minimization measures for common activities that are frequently incorporated into permits as standard conditions that may not be associated with programmatic guidance but can be found in biological opinions. Some projects, particularly those with a greater level of adverse impacts or multiple activities and/or multiple species that may be affected, have a need for a more comprehensive assessment and intensive coordination with USFWS.

In addition to species-specific protective measures, thorough assessments of adverse impacts to habitat must be performed in order to ensure alterations to habitat do not adversely affect listed species. There are various methods for avoiding and minimizing effects of dredge and fill activities within wetlands or other waters. Some impacts can be avoided or minimized through BMPs (e.g., silt fences, turbidity curtains, containing dredge materials during dewatering, transfer and storage), while others require administrative restrictions or permit conditions (e.g., contractor education, not refueling equipment within 100 feet of wetlands) to protect wetlands, waters, or "at-risk" species. A major administrative control that compensates for wetland destruction is wetland mitigation. Wetland mitigation includes the enhancement, restoration, establishment, and/or preservation of wetlands that serve to offset unavoidable impacts on wetlands (FDEP 2019b). Governments and agencies have used this policy across North America with notable levels of success (NAWCCC 2000). The species coordination process will avoid and minimize adverse impacts to habitat when practicable.

In addition, FDEP intends to incorporate adaptive management into the State 404 process as needed, particularly as it pertains to wetland compensatory mitigation projects. Per the FDEP's State 404 Handbook, wetland compensatory mitigation projects that cannot be constructed in accordance with the approved mitigation plans will require FDEP approval prior to any significant modifications. Wetland compensatory mitigation projects not progressing toward meeting their performance standards will be evaluated for measures to address deficiencies and a determination as to whether these modifications will result in the project meeting its original ecological objectives. These modifications/measures may include but are not limited to site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. Performance standards will be revised to address deficiencies in wetland compensatory mitigation projects and to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

### *Best Management Practices for Wetland Protection*

BMPs, including schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of WOTUS from discharges of dredged or fill material, will be implemented for all projects under the State 404 program. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with the Section 404(b)(1) Guidelines (40 CFR § 230), effluent limitations or prohibitions under Section 307(a), and applicable water quality standards.

Wetland mitigation measures included in a Section 404 application may also offset effects or result in longer-term beneficial effects to ESA-listed species; however, they are part of the wetland protection process of the State 404 and ERP processes and not a requirement of the ESA coordination.

*Protective Measures for Plants and Animals*

In Florida, fifty-four (54) plant species are on the federal list of endangered species and 14 are on the federal list of threatened species. The ESA (16 USC § 1531) provides protection to both endangered and threatened plants and animals. The ESA, however, does not prohibit the destruction, damage or transplantation of protected plants unless such activities involve an endangered species on federal land or if the activities occur in violation of state laws. If a person wishes to develop private land, with no federal jurisdiction involved, and if the proposal is in accordance with state law, then the potential destruction, damage, or movement of endangered or threatened plants does not violate ESA. Further, a Section 10 ESA incidental take permit is only needed in situations where a non-federal project is likely to result in "take" of a listed species of fish or wildlife; there is no such process for plants.

But while incidental take does not apply to plants, an assessment of jeopardy and adverse modification to critical habitat under Section 7(a)(2) applies to plants. For the State 404 program, 40 CFR § 233.51(2), and 40 CFR § 233.20(a) would prohibit issuance of a State 404 permit that will jeopardize a plant species or adversely modify its critical habitat. FDEP will incorporate any reasonable and prudent measures and terms and conditions provided by the USFWS into permit conditions for a State 404 permit for such a project.

Endangered, threatened and commercially exploited plant species in Florida are regulated by the Florida Department of Agriculture and Consumer Services, by their Division of Plant Industry. Florida's State ERP program under Chapter 62-330, F.A.C. and the State 404 program under Chapter 62-331, F.A.C. include plants in the definition of endangered and threatened species, which requires consideration of adverse impacts resulting from activities authorized under these programs. During the permit review process for each type of permit, FDEP will evaluate potential impacts and effects to listed plant species. This evaluation may include a request to the USFWS for recommendations to avoid and reduce anticipated impacts. For those types of projects where jeopardy is not expected to occur and no adverse modification to critical habitat is expected, some projects may still need protective measures incorporated as permit conditions in order to adequately conserve endangered and threatened plant species.

The State 404 program, the State ERP program, and the ESA provide protection to both endangered and threatened plants and animals. As with animals, there could be a situation in which a federally listed plant is located in the upland portion of the project area that is adjacent to assumable waters and would be affected by the permit. As discussed in subsection 3.1., the State 404 program is required to consider adverse impacts in uplands that would not occur except for the authorization of the proposed activity. In addition, while the State 404 program does not have jurisdiction in isolated wetlands, the ERP program does have jurisdiction and can address adverse impacts to animal and plant species dependent on these wetlands.

*Ensuring Protection for Endangered and Threatened Species in Florida*

The State of Florida is required to incorporate all USFWS recommendations for protection measures as State 404 program permit conditions (Subsection 62-331.054(1), F.A.C.). The existing working relationship and coordination during the review of projects would continue between the FDEP and the USACE. The FDEP will add fields in their permitting tracking database that will continue the collection of data done by the USACE for past Section 404 permits. This data will continue the monitoring of adverse effects on listed species and critical habitat, facilitating the State's ability to do compliance.

In the current ERP program, FWC provides recommendations to FDEP and the WMDs for State-listed species and some federally listed species, such as manatees and sea turtles. FWC has offered to assist FDEP in the State 404 program review for impacts to federally listed species, and the current collaboration between FDEP and FWC will be enhanced by the assumption. FWC and the USFWS have a long-standing partnership and a current ESA Section 6 Cooperative Agreement for conserving Florida's federally endangered and threatened wildlife. This relationship between FWC and USFWS will bring an existing level of cooperation, knowledge, and expertise to the State 404 program. In addition, FDEP, FWC and USFWS have entered into a Memorandum of Understanding to identify commitments, roles and responsibilities regarding species coordination for the State 404 program as well as the ERP program.

The State 404 program species coordination process involves the applicant, FDEP, FWC and USFWS, and encourages compliance by the applicant to avoid and minimize adverse effects, reducing the expected impacts to listed species and their habitats. The interactions between agencies and the applicant will inform applicants of the importance of this process in order to be eligible for authorization of their proposed activities and in order to ensure compliance with the ESA.

### 7.6.3    Statements of Adverse Impact in Public Notices

While many adverse effects can be avoided and minimized during the species coordination review process, impacts that are likely to adversely affect a species (e.g. likely to cause incidental take or jeopardy) or critical habitat (e.g. destroy or adversely modify critical habitat) must be recorded, monitored, provided to the USFWS for tracking and species conservation purposes. These types of projects will receive the most stringent review and be documented in the Public Notice as well as the FDEP database and project file.

The public notice, required by Rule 62-331.060, F.A.C., will include an effect determination statement and include the proposed protection measures, if known at the time of publication. The effect determinations statements for species may include one of the following: "No Effect/Impact", "Not Likely to Adversely Affect/Impact", "Likely to Adversely Affect/Impact", or "Jeopardizes the Continued Existence of the Species" for endangered or threatened species or species proposed to be listed. The effect determination statements for critical habitat may include one of the following: "Destroys Critical Habitat" or "Adversely Modifies Critical Habitat" for designated critical habitat or habitat proposed to be designated as critical.

The USFWS will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as "No Effect/No Impact". If the USFWS elected to not respond to these types of applications upon first submittal, they will still receive public notices for these applications and may elect to comment at that time. Receiving public notices for all applications also provides an opportunity for the USFWS to re-review all of the effect determinations made by the State and provide oversight of the species coordination process. Along with the public notice, the USFWS will receive copies of all applications and

supplemental information submitted for applications required to be publicly noticed, with all stated effect or no effect determinations.

With the public notice, the EPA will receive copies of all applications with a determination other than "No Effect/Impact". This provides an opportunity for the EPA to monitor the effectiveness of the species coordination process and to provide oversight for CWA and ESA compliance.

### 7.6.4    Dispute Resolution between FDEP and USFWS and USFWS-EPA Coordination

To be clear, as stated elsewhere in this BE, State 404 permits (as with USACE 404 permits) must comply with Section 404(b)(1) guidelines which include a stipulation that "Where consultation with the Secretary of the Interior occurs under Section 7 of the Endangered Species Act, the conclusions of the Secretary concerning the impact(s) of the discharge on threatened and endangered species and their habitat shall be considered final" (per 40 CFR § 230.30(c). Furthermore, per the State 404 Chapter 62-331, F.A.C. and CWA 404(g) and 404(b)(1) guidelines: 404 permits may not be issued if doing so jeopardizes the continued existence of species of plants and animals listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a designated critical habitat.

For permits that would result in injury or harm to individuals of a listed species but whose impacts would not jeopardize the continued existence of the species or cause adverse modifications to critical habitat, FDEP shall incorporate USFWS-recommended protection measures as permit conditions to fulfill compliance with the anticipated Program assumption BiOp and for any subsequent anticipated incidental take to be exempted from the prohibitions of Section 9.

In the event FDEP questions or disagrees with a local USFWS office about the necessity of project-specific, species-specific USFWS-recommended protection measures being added as permit conditions for the purpose of either 1) avoiding jeopardy to a ESA-listed species or adverse modification of critical habitat; or 2) for the purpose of minimizing incidental take to fish and wildlife, the following steps would guide the resolution process.

1.  If there is a dispute that occurs between FDEP and USFWS prior to FDEP issuing a public notice for a permit application, the dispute resolution process will only involve the State (FDEP and FWC) and the State-level USFWS Ecological Services (ES) office. The processes detailed in the 2020 FDEP, FWC, USFWS Endangered Species Coordination Memorandum of Understanding will be followed and the Florida 404 Endangered Species technical team composed of FDEP, FWC, and USFWS staff and decision-makers will assist in resolving any local disputes. The EPA will not be involved at this stage but may later be involved should it receive a copy of the public notice from FDEP. The EPA would engage per the requirements for oversight of permits (40 CFR § 233.50). In the highly unlikely event the dispute is not resolved between FDEP and USFWS prior to the State's deadline for issuing a public notice and the USFWS has not settled on a final conclusion (e.g., USFWS local office's recommendations are being reviewed by higher levels within USFWS), FDEP will prepare a public notice that reflects FDEP's position and submit that public notice to the EPA (per the EPA's regulations governing federal oversight of State 404 permits - 40 CFR § 233.50) along with a transmittal letter to the EPA that succinctly presents the relevant facts, FDEP's position, and conveys that the USFWS is formulating its position.

2. Per 40 CFR § 233.50, the EPA will then transmit FDEP's public notice to USFWS within 10 days of receipt. USFWS will notify the EPA within 15 days of receipt on whether it will submit comments. USFWS will have 50 days from receipt to provide comments to the EPA. The EPA shall make final decisions to comment, object or to require permit conditions (per 40 CFR § 233.50) and shall consider USFWS conclusions concerning impacts to ESA-listed species to be final (per CFR 230.30(c). FDEP or any interested person can ask the EPA to hold a public hearing on the EPA's objection or required permit conditions. At any point and whether or not the EPA has a public hearing, FDEP may accept the EPA's conditions and issue the permit, deny the permit, or notify the EPA that it is neither issuing or denying the permit. In the latter case, the EPA would transfer the permit application to the Corps for processing (per 40 CFR § 233.50).

# 8.   Conclusions

This BE evaluates the effects of the potential approval by the EPA for the State of Florida assuming Section 404 of the CWA on listed species in present time, and estimates effects into the future. All species that are currently listed, proposed to be listed or might be listed in the future are discussed, with evaluations of effects on respective guilds. This review helps evaluate the effects of the State 404 program on any species that are currently listed or may become listed in the future.

This BE analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or are otherwise ESA-considered. Species that must be addressed pursuant to Section 7 of the ESA, Section 404 of the CWA and Chapter 62-331, F.A.C. for the State 404 program, are federally listed species or species proposed to be listed under the ESA (a total of 141 species). If these listed species have designated critical habitats, or critical habitats proposed to be listed, the adverse effects and impacts to those habitats must also be analyzed and addressed under the State 404 program.

If approved, the State's assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in State regulations (Chapters 62-330, and 62-331, F.A.C.), MOAs with EPA and USACE, and an MOU with the FWC and the USFWS.

In implementing the State 404 program, FDEP will request technical assistance from the USFWS in order to address federally listed species and critical habitat issues. This coordination is to ensure that any permit issued by FDEP is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)). As such, FDEP will consider all information provided by USFWS and will include all species protection measures recommended by USFWS as conditions to the State 404 permit.

If Section 404 of the CWA is assumed by the State of Florida, it will allow the State to assess and regulate all activities that will occur in assumed waters, integrating protections that were previously regulated by two different programs. Chapter 62-331, F.A.C., by referencing much of the existing State ERP Chapter 62-330, F.A.C., will facilitate the State's implementation of the CWA requirements and provide a more comprehensive approach to the protection of WOTUS and Florida's habitats and species.

The State 404 program is designed to provide equivalent conservation of ESA-listed species as the currently operating USACE Section 404 program. The ability of the State of Florida to process applications with permitting authority equivalent to Section 404 of the CWA in conjunction with the State ERP program allows

for addressing potential adverse effects to both federally listed or State-listed species more comprehensively, consistently and efficiently. Conservation strategies for some species will benefit multiple species that share the same habitat. Some State-listed species are also proposed to be federally listed and assessing the expected adverse impacts from proposed projects for all listed species at the same time is likely to improve conservation efforts. It is also possible that the Action could improve efficiencies in processing applications as well as enhance the consistency of decision making, resulting in greater predictability to both the regulated and the conservation communities.

Florida's State ERP program is jointly implemented by FDEP, the WMDs and certain local governments delegated by FDEP. At this time, the administration and implementation of the State 404 program is limited to the FDEP. It is anticipated, however, that the State 404 program may be delegated to the WMDs by FDEP in the future. If this is considered, approval from the EPA will be required prior to implementation. Upon approval, these agencies will be provided training and will be required to follow the same procedures outlined for the State 404 program.

### *Effect of the Action on Tribal Resources or Interests*

Consultations on permit actions taking place on waters in Indian Country would continue to be conducted by the USACE, as they are at present. The Section 404 assumption rules include a procedure to offer an opportunity for tribal comment by the Seminole Tribe of Florida and the Miccosukee Tribe of Indians of Florida on any applications within a buffer zone around these lands.

A public notice will be sent to the Seminole Tribe of Florida Environmental Resource Management Department for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.

A public notice will be sent to the Miccosukee Tribe of Indians of Florida for any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also, for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A. With these provisions, no substantial difference in effects on tribal resources would be expected under the Action.

### *Uncertainty Associated with the Effects Determination*

The precise locations and types of activities included in future permit applications are unknown at this time. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the general types of activities and overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for assumption. The number of applications and the total quantities may vary over time and with economic fluctuations and would be greatest in areas of rapid growth where the number of proposed projects tends to be high. However, over shorter time frames, one or a few large projects (for example, a major infrastructure initiative) can result in a concentration of proposed impacts in a given area or a given set

of habitat types, with effects on one or a few species. Not all individual project proposals are known or can be anticipated in advance.

Other uncertainties can include the introduction of new invasive species, the spread of new pathogens, or other biotic or abiotic factors that can affect ESA-listed species or populations. For example, chytrid fungus and white-nose syndrome have contributed to the loss of populations of amphibians and bats, respectively, in recent years. Unexpected changes in the status of an ESA-listed species can lead to the increased importance of future project-level decisions, which under baseline conditions would have little effect on the species. Similarly, recovery of species can lead to increased resilience and, ultimately, in some cases, to delisting. If there are uncertainties, FDEP will work closely with the USFWS on a project by project basis to address those uncertainties and any impacts to ESA-listed species or their critical habitat to ensure effects are avoided and minimized.

### *Conclusions*

Historical Section 404 permitting by the USACE resulted in issuance of permits for one or more projects that adversely affected one or more listed species and their critical habitats. The USACE Section 404 process, in accordance with Section 7 of the ESA, employed various conservation measures to avoid and minimize adverse effects. And similar to the USACE 404 program, the State 404 program may result in permitting the discharge of dredged or fill material that may adversely affect one or more ESA-listed species and designated critical habitats. While State 404 permits can potentially have significant adverse effects on the aquatic environment and ESA-listed species, many effects can be avoided and minimized during the technical assistance process between FDEP and the USFWS, as demonstrated in the past through the USACE Section 404 review and permitting processes.

It is anticipated that with technical assistance to be set in place by a USFWS Program assumption biological opinion, Chapter 62-331 F.A.C., and Memorandums of Agreement provided in FDEP's assumption application package, the Action will result in procedural and substantive protections that are at least as protective as the protections afforded by the USACE Section 404 program and through Section 7 consultation with the USACE under the ESA. The State 404 program is prohibited from issuing a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats because of the prohibition in the 404(b) Guidelines. The State's assumption of CWA Section 404 permit program is not expected to result in significant changes from the number, type, or location of permit applications and proposed projects typically issued by the USACE.

Based on the findings of this BE, the EPA requests formal consultation with USFWS on the EPA's approval of the State's CWA Section 404 program.

# 9.   Literature Cited

16 United States Code (USC) Chapter 35, Sections 1531, 1532, and 1536. The Endangered Species Act of 1973.

18 United States Code (USC) Chapter 53, Section 1151. Indian Country Defined.

33 Code of Federal Regulations (CFR) Part 322. Permits for Structures or Work in or Affecting Navigable Waters of the United States.

40 Code of Federal Regulations (CFR) Part 232 and 233. 404 State Program Regulations.

50 Code of Federal Regulations (CFR) Part 402. Interagency Cooperation-Endangered Species Act of 1973, As Amended.

1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services. 2017. A Special Report – What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project. https://1000friendsofflorida.org/florida2070/ (01/15/2020).

Abiy, A. Z., A. M. Melesse, W. Abtew, and D. Whitman. 2019. Rainfall trend and variability in Southeast Florida: Implications for freshwater availability in the Everglades. *PLOS ONE* **14**(2): e0212008.

Baumberger, R. E. 2008. The impacts of harmful algal blooms on a Florida reef fish community. Master's thesis. Florida Atlantic University, Boca Raton, Florida, USA. https://fau.digital.flvc.org/islandora/object/fau%3A2853/datastream/OBJ/view/impacts_of_harmful_algal_blooms_on_a_Florida_reef_fish_community.pdf.

Benscoter, A. M., J. S. Reece, R. F. Noss, L.A. Brandt, F. J. Mazzotti, et al. 2013. Threatened and endangered subspecies with vulnerable ecological traits also have high susceptibility to sea level rise and habitat fragmentation. *PLOS ONE* **8**(8): e70647.

Dahl, T. E. 2005. Status and trends of wetland sin the conterminous United States 1998 to 2004. U.S. Fish and Wildlife Service, Fisheries and habitat Conservation, Washington, District of Columbia, USA.

Dahl, T. E. 2011. Status and trends of wetlands in the conterminous United States 2004-2009. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

Fernald, E. A., and E. D. Purdum. 1998. *Water resources atlas of Florida*. Institute of Science and Public Affairs, Florida State University, Tallahassee, Florida, USA.

Florida Administrative Code (FAC) Chapter 62-330. Environmental Resource Permitting.

Florida Administrative Code (FAC) Chapter 62-331. State 404 program.

Florida Administrative Code (FAC) Chapter 68A-27. Rules Relating to Endangered or Threatened Species.

Florida Department of Environmental Protection (FDEP). 2019b. Wetlands Mitigation. Available online at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/mitigation. Accessed January 27, 2020.

Florida Department of Environmental Protection (FDEP). 2020a. State 404 program applicant's handbook. FDEP. Version 02/11/2020. https://floridadep.gov/water/water/content/water-resource-management-rules-development. (02/24/2020).

Florida Department of Environmental Protection (FDEP). 2020b. Water Quality Standards. FDEP. floridadep.gov/DEAR/Water-Quality-Standards. (02/16/2020).

Florida Fish and Wildlife Conservation Commission (FWS). 2016. Florida's Imperiled Species Management Plan. November 2016, with amendments incorporated December 2018. Tallahassee.

Florida Fish and Wildlife Conservation Commission (FWC). 2018. Florida's endangered and threatened species. Updated December 2018. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2019. Florida's Wildlife Legacy Initiative: Florida's State Wildlife Action Plan. Tallahassee, Florida, USA.

Florida Natural Areas Inventory (FNAI). 2010. Guide to the natural communities of Florida. 2010 edition. Tallahassee, Florida, USA. http://fnai.org/PDF/FNAI-Natural-Community-ClassificationGuide-2010_20150218.pdf. (02/24/2020).

Florida Statutes (F.S.) Chapter 373. Water Resources.

Hefner, J. M. 1986. Wetlands of Florida, 1950s to 1970s. Pp. 23-31 *in:* E. D. Estevez, J. Miller, J. Morris, and R. Hamman (eds.), *Managing Cumulative Effects in Florida Wetlands*. New College Environmental Studies program Publication No. 37. Omnipress, Madison, Wisconsin, USA.

Hefner, J. M., B. O. Wilen, T. E. Dahl, and W. E. Frayer. 1994. Southeast wetlands; status and trends, mid-1970's to mid-1980's. Department of Interior, Fish and Wildlife Service, Atlanta, Georgia, USA.

Holt, L. 2005. Avoiding a water crisis in Florida: how should water resources be managed in response to growth? *Florida Water Resources Journal* (October):16-22.

Makepeace, D. K., D. W. Smith, and S. J. Stanley. 1995. Urban stormwater quality: summary of contaminant data. *Critical Reviews in Environmental Science and Technology* **25**:93-139.

Mendelsohn, R., K. Emauel, S. Chonabayshi, and L. Bakkenshen. 2012. The impacts of climate change on global tropical cyclone damage. *Nature Climate Change* **2**: 205-209.

Nagy, R. C., B. G. Lockaby, L. Kalin, and C. Anderson. 2011. Effects of Urbanization on Stream Hydrology and Water Quality: the Florida Gulf Coast. *Hydrological Processes* **26**:2019-2030.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (*Pristis pectinata*). Prepared by the smalltooth sawfish recovery team for the National Marine Fisheries Service, Silver Spring, Maryland, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Smalltooth sawfish. Species directory. https://www.fisheries.noaa.gov/species/smalltooth-sawfish#overview. (01/07/2020).

NatureServe. 2020. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/. (01/15/2020).

North American Wetlands Conservation Council (Canada) (NAWCCC). 2000. Wetland Mitigation in Canada. A Framework for Application. No. 2000-1 Available online at: http://nawcc.wetlandnetwork.ca/Wetland%20Mitigation%202000-1.pdf. Accessed January 28, 2020.

Prinos, S. T. 2014. Origins and delineation of saltwater intrusion in the Biscayne Aquifer and changes in the distribution of saltwater in Miami-Dade County, Florida. *Scientific Investigations Report*. doi:10.3133/sir20145025.

U.S. Army Corps of Engineers (USACE). 2019a. Central and Southern Florida (C&SF) project – fact sheet. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/About/Congressional-Fact-Sheets-2019/C-SF-Project-C/. (02/24/2020).

U.S. Army Corps of Engineers (USACE). 2019b. Ecosystem restoration. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem-Restoration/. (02/24/2020).

U.S. Army Corps of Engineers (USACE) and South Florida Water Management District (SFWMD). 2007. Broward County Water Preserve Areas Comprehensive Everglades Restoration Plan (CERP) Final Project Implementation Report and EIS Briefing to the Civil Works Review Board. https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/5154. (01/27/2020).

U.S. Environmental Protection Agency (USEPA). 2013. ESA biological evaluation for CWA section 316(b) rulemaking. USEPA, Office of Water Engineering and Analysis Division, Washington, District of Columbia, USA.

U. S. Fish and Wildlife Service. 1996. The South Florida ecosystem. South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (*Trichechus manatus latirostris*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019a. Consultation guidance - programmatic consultations. USFWS South Florida Ecological Services Field Office, Vero Beach, Florida, USA. https://www.fws.gov/verobeach/Programmatic%20Consultations.html. (02/24/2020).

U.S. Fish and Wildlife Service and National Marine Fisheries Service (USFWS and NMFS). 2014. Endangered Species Act Section 7 consultation, programmatic biological opinion on the U.S. Environmental Protection Agency's issuance and implementation of the final regulations Section 316(b) of the Clean Water Act. USFWS, Endangered Species Program, Division of Environmental Review, Arlington, Virginia, USA; NMFS, Office of Protected Resources, Endangered Species Act, Interagency Cooperation Division, Silver Spring, Maryland, USA.

Vose, R.S., D.R. Easterling, K.E. Kunkel, A.N. LeGrande, and M.F. Wehner, 2017: Temperature changes in the United States. In: *Climate Science Special Report: Fourth National Climate Assessment, Volume I* [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 185-206, doi: 10.7930/J0N29V45

FWS-005727

FWS-005728

# Appendix A
# April 15, 2020 Letter from
# NMFS to FDEP Regarding
# NMFS Jurisdiction

FWS-005729



**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

April 15, 2020

Heather Mason, PWS
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400

RE:     National Marine Fisheries Service in the Clean Water Act Section 404 Assumption by the
State of Florida

Dear Ms. Mason:

On November 22, 2019, the National Marine Fisheries Service (NMFS) received your request
for input on a draft species list for Florida's assumption of Clean Water Act Section 404
permitting from the U.S. Army Corps of Engineers (USACE). Through subsequent
communications with you and your staff, a review of state mapping products, NMFS' own
mapping analysis, and a review of state-provided documents about the assumption, we conclude
that Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in
waters that are assumable by the state.

We specifically analyzed the possible spatial overlap of the assumption with waters used by
shortnose sturgeon, Atlantic sturgeon, smalltooth sawfish, and Gulf sturgeon. Based on that
analysis, shortnose sturgeon and Atlantic sturgeon occur in the St. Marys and St. Johns Rivers,
which are included on the USACE retained waters list. Smalltooth sawfish occur in waters
"subject to the ebb and flow of the tide" which will also remain under the USACE's jurisdiction,
per the draft State 404 Program Applicant's Handbook definition of "Retained Waters."
Therefore, the USACE will retain ESA Section 7 responsibility for proposed Section 404 actions
in the waterways where NMFS's trust resources are most likely to occur.

For Gulf sturgeon, which has shared jurisdiction between NMFS and the U.S. Fish and Wildlife
Service, the U.S. Fish and Wildlife Service is responsible for all consultations regarding Gulf
sturgeon and critical habitat in riverine habitat units (final rule designating critical habitat for the
Gulf sturgeon – 68 FR 13370). Rivers in Florida that include riverine critical habitat units (i.e.,
Escambia, Yellow, Choctawhatchee, Apalachicola, and Suwannee rivers) and river areas where
Gulf sturgeon are known to occur (e.g., lower Ochlockonee River) are all listed by the USACE
as retained waters.

Based on this determination we also assume that the Environmental Protection Agency will
make a "no effect" determination for NMFS' ESA-listed species that were originally identified
as part of this proposed assumption.



We appreciate all the information and assistance you provided in making this determination. If you have any questions, please contact Dr. Pat Shaw-Allen at (301) 427-8473, or by e-mail at pat.shaw-allen@noaa.gov or me at (301) 427-8495 or by e-mail at cathy.tortorici@noaa.gov.

Sincerely,

TORTORICI.CAT
HRYN.E.136582
6850

Digitally signed by
TORTORICI.CATHRYN.E.13
65826850
Date: 2020.04.15 13:25:25
-04'00'

Cathryn E. Tortorici
Chief, ESA Interagency Cooperation Division
Office of Protected Resources

cc:   Karen Myers, US Fish and Wildlife Service
      Robert Tawes, US Fish and Wildlife Service
      David Bernhart, NMFS, Southeast Regional Office

2

# Appendix B
## Species Accounts

FWS-005732

**Vertebrates**

**MAMMALS**

**Sherman's Short-tailed Shrew**

Sherman's Short-tailed Shrew (*Blarina brevicauda shermani* = *Blarina carolinensis shermani*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The small range of the subspecies in southwestern Florida extends from Fort Myers to near Royal Palm in Lee County (Benedict et al. 2006), although it has not been located since 1955. Current status is unknown, and it is possible the species has been extirpated. Habitat is described as edges of marshes or shallow depressions, mesic flatwoods, with abundant grasses (FNAI 2001a); also, drainage ditches with abundant grass cover (Layne 1978). Threats include habitat loss and predation by cats (Layne 1992).

**Gray Wolf**

The Gray Wolf (*Canis lupus*), was first listed as endangered effective March 11, 1967 (32 FR 4001). Various populations throughout the west were listed after this date (43 FR 9607, 76 FR 25590, 43 FR 9607). Critical habitat has been designated in Michigan and Minnesota (43 FR 9607). There have been multiple proposals to delist the Gray Wolf (USFWS 2020a). On May 14, 2019, the US Fish and Wildlife Service (USFWS, the Service) announced a proposal to delist the Gray Wolf, except for the Mexican Wolf (*Canis lupus baileyi*) subspecies (84 FR 21312). This decision is controversial, and some organizations believe delisting is premature (CBD 2020a).

Gray Wolves are a keystone terrestrial predator. They feed primarily on ungulates, and utilize a wide range of habitats (USFWS 2020a). In North America, their historic range spanned much of Canada, the US, and Mexico (International Wolf Center 2020, NatureServe 2020). There is disagreement in the scientific community regarding Gray Wolf taxonomy and how many subspecies there are within the United States (International Wolf Center 2020). 'American' Gray Wolves were nearly driven extinct as a result of federal extermination programs. Protection of Gray Wolves has resulted in substantial increases to population numbers, in part due to reintroduction programs. However, Gray Wolves have only returned to an approximate 10 percent of their historic range in the US. Gray Wolves remain extirpated from Florida. Ongoing threats include direct persecution, often as a result of conflicts with livestock, and habitat fragmentation (limiting population growth and genetic diversity) (CBD 2020a).

**Red Wolf**

The Red Wolf (*Canis rufus*) is listed as endangered effective March 11, 1967 (32 FR 4001), except for experimental populations in areas of North Carolina and Tennessee (51 FR 26564). Critical habitat has not been designated (USFWS 2020a).

Red Wolves were nearly driven to extinction as a result of predator control programs and habitat loss (CBD 2019a). The historical range for Red Wolves included North Carolina, Tennessee, and Texas (USFWS 2020a), and may have been much larger spanning the Southeast, the lower Midwest, and into southern Pennsylvania and New York (Weller 2018). A captive breeding program began in 1973 and was largely successful until the mid-2000s (FWC 2020a, CBD 2019a). These captive-bred wolves were reintroduced as experimental populations on several National Wildlife Refuges in North Carolina. In addition, one breeding pair was introduced to St. Vincent Island, Florida (FWC 2020a, USFWS 2020c). A multi-generational pack was present on the island as of 2019 (USFWS 2020c). The species occupies coastal prairies, forests, and swamps within these areas. A major threat to Red Wolf populations is loss of genetic diversity from interbreeding with coyotes (*Canis latrans*) (FWC 2020a). Additionally, incidental take of Red Wolves (mistaken for coyotes) in North Carolina has caused substantial

declines in the reintroduced population (CBD 2019a).

**Florida Bonneted Bat**

The Florida Bonneted Bat (*Eumops floridanus*) was listed as endangered effective November 1, 2013 (78 FR 61003). Critical habitat has not been designated for this species, although designation was expected to occur in 2014 (FWC 2013).

The Florida Bonneted Bat (previously the Florida Mastiff Bat) is the largest bat species in Florida. The species has an extremely restricted range and only occupies pineland, tropical hardwood, and mangrove habitat in Charlotte, Collier, Lee, Monroe, and Miami-Dade counties. It is known from a total of nine locations. Areas of freshwater wetlands are also important to the species (78 FR 61003). Very limited information is available on the species' natural history. The Florida Bonneted Bat does not undergo periods of hibernation and the species is active year-round, although they may engage in torpor during cold weather. The bats roost singly or in small colonies in tree cavities (including Red-cockaded Woodpecker cavities), buildings, foliage, and rock crevices, as well as artificial roosts (FWC 2011a, 2013). Peak breeding season is in April (USFWS 2018a). Florida Bonneted Bats give birth from June through September (a second breeding season may also occur in January or February) (78 FR 61003, FWS 2013). They feed on insects primarily from the orders Coleoptera, Diptera, and Hemiptera (FWC 2013).

The species' range contracted due to habitat loss (urbanization) in the mid-1900s (FWC 2011a, 2013). Current threats to the species include a restricted range and small population size, loss of forested habitat via urbanization, limited roost sites, environmental stochasticity, and pesticides (FWC 2013, USFWS 2018a). The current population size is estimated to be a few hundred individuals and the species is considered to be critically endangered (FWC 2011a, 2013).

**Florida Salt Marsh Vole**

The Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) was listed as endangered effective February 13, 1991 (56 FR 1457). Critical habitat has not been designated (USFWS 2020a).

The Florida Salt Marsh Vole is a subspecies of the Meadow Vole. This subspecies is endemic to the central Gulf coast of Florida and is only known from 32 kilometers of salt marsh habitat. The species occurs between the Lower Suwannee River and the Withlacoochee River, Levy County, Florida, predominantly located on State or federal conservation lands. This distribution appears to be a relic from a formerly large range along the Gulf coast (when sea levels were lower and suitable habitat extended west of the current coastline of Florida) (USFWS 2019a).

Habitat for this species has been documented to include the following vegetation: saltgrass (*Distichlis spicata*), smooth cordgrass (*Spartina alterniflora*) and black needle rush (*Juncus roemerianus*) (USFWS 1997, 2019). Because of its rarity, the life history and reproductive behavior of the Florida Salt Marsh Vole have not been well studied. Life history of the Meadow Vole has been well studied and some aspects are expected to be similar to that of the Florida Salt Marsh Vole. Typically, Meadow Voles are active both day and night and feed on a variety of plant matter, including bark, grass, roots, and seeds. Voles have a high reproductive rate and breed throughout most the year with a peak of breeding activity occurring in the spring. The life span of voles is short; typically, few individuals live longer than six months (USFWS 2019a).

The decline of the species appears to be due to climatic changes and associated rise in sea level (USFWS 1997, 2019). Encroachment of mangroves into Florida Salt Marsh Vole habitat may be a new threat. Given a very limited range and only a few known locations within 32 kilometers of each other, an environmental or human-caused stochastic event could cause a catastrophic decline or possibly extinction of this subspecies (USFWS 2019a).

**Gray Bat**

The Gray Bat (*Myotis grisescens*) was listed as endangered effective May 3, 1976 (41 FR 17736). Critical habitat

has not been designated (USFWS 2020a).

The Gray Bat occurs in limestone karst regions of Alabama, Arkansas, Kentucky, Missouri, Tennessee, and Indiana (USFWS 1982). The species roosts colonially in caves year-round, occupying deep, vertical, colder caves and mines in the winter (hibernacula at 1 °C to -4 °C) and warmer caves with restricted rooms or domed ceilings during the summer. Environmental conditions aid in thermoregulation (USFWS 1982, USFWS 2009a). Summer caves are typically located near bodies of open fresh water (foraging habitat) (USFWS 1982). In Florida, the species occurs in a single county (Jackson) in the northwest Panhandle. Roosting (including some maternity roosts) has been documented in nine caves in this county (USACE 2007). The bats breed in early fall and then hibernate from October or November to March.

Females enter hibernation a few weeks before males (USFWS 1982). Pups are born in May or June. The species feeds on aquatic insects including mayflies, caddisflies, and stoneflies (USFWS 2009a).

The majority of high priority maternity sites for this species have been protected. Approximately 95 percent of the total population size is confined to nine caves. The species was increasing in the early 2000s (USFWS 2009a); however, nationwide population data is not available post the discovery of white- nose syndrome in Gray Bats. Although large declines have not yet been documented, they are possible (USFWS 2012a, Powers et al. 2016). Threats to the species include roost disturbance (environmental or human-caused) and white-nose syndrome (USFWS 1982, USFWS 2012a).

**Little Brown Bat**

The Little Brown Bat (*Myotis lucifugus lucifugus,* formerly *M. l. occultus*) is under review for listing by the USFWS (NatureServe 2020). On January 21, 2010, the Center for Biological Diversity petitioned the USFWS to close caves to protect bat species from becoming exposed to white-nose syndrome (caused by the fungus *Pseudogymnoascus destructans*) and petitioned for the listing of several other bat species. On June 29, 2011, the USFWS determined that the petition may be warranted, and a status review was initiated (however, not for the Little Brown Bat) (76 FR 38095).

The Little Brown Bat is widely distributed across North America with the exception of the southern Great Plains, southeastern California, and the coastal southeast, in regions with suitable hibernacula (caves and mines). There are currently five recognized subspecies of *Myotis lucifugus* although there is now evidence that these may be five distinct species (Morales and Carstens 2018, Kunz and Reichard 2010). The subspecies that occurs in Florida is *Myotis lucifugus lucifugus*. The northeastern US is considered to be the core range of the species. The Little Brown Bat has been occasionally detected in northern Florida, although it is not common in the state (Kunz and Reichard 2010). General habitat requirements include forested or herbaceous wetlands, hardwood and mixed forest, grassland, and scrub (NatureServe 2020).

The species migrates between winter hibernacula and summer roost sites. Mating occurs during fall swarming, from August through October. Females store sperm over the winter. Characteristics of winter hibernacula include caves or mines with high humidity and stable temperatures above freezing (typically between 2 °C to 12°C). Winter hibernacula may be located up to 300 kilometers from summer roosts. Summer maternity colonies are located in tree cavities and man-made structures such as barns and attics (Kunz and Reichard 2010). Females give birth in late spring or early summer (NatureServe 2020). The species feeds on a variety of insects from the orders Diptera, Lepidoptera, Coleoptera, Thrichoptera, Ephemeroptera, and Neuroptera (Kunz and Reichard).

Prior to the introduction of white-nose syndrome to the US, the species population was estimated to be greater than 6.5 million. This species appears to have experienced one of the highest mortality rates from white-nose syndrome in North America, and the population is in rapid decline. Current estimates put the northeast population at a 99 percent chance of extinction by 2026 (CBD 2010b, Kunz and Reichard 2010). Threats to the species

include white-nose syndrome, climate change, pesticides, mortality from wind turbines, and habitat modification or destruction (CBD 2010b, Kunz and Reichard 2010, NatureServe 2020).

**Indiana Bat**

The Indiana Bat (*Myotis sodalis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the species on September 24, 1976 (41 FR 41914).

The Indiana Bat is found in karst regions of the east-central US. There are no current records of the species in Florida (USFWS 2009b). However, there has been one historical winter record of the species in Old Indian Cave in Jackson County (pre 1995). During the winter, the species hibernates colonially in caves and mines (exhibits site fidelity). Winter hibernacula temperatures are above freezing but below 10 °C. The species hibernates from October through April. In the summer, the species roosts behind the bark of large trees (live trees or dead snags) in wooded wetlands, riparian forest, bottomland, floodplains, and uplands. Mating occurs shortly before hibernation in the fall (fall "swarming"). Breeding females may migrate up to 575 kilometers between winter and summer habitat. In contrast, non-breeding females and males remain close to their winter hibernacula and may roost singly in trees. Breeding females form maternity roosts. Maternity roost trees are typically next to an opening in the forest such as a forest edge, gap in the canopy, or along a fence line. Females give birth to one pup in June or July. Foraging habitat consists of open habitats or areas with an open understory in forests, along forest edges, and in riparian areas. The species feeds on prey items primarily from the orders Coleoptera, Diptera, Lepidoptera, and Trichoptera (USFWS 2007a).

The population size is currently estimated as 537,297 bats, with 71 percent of the population located in Indiana and Missouri. From the 1960s to the early 2000s, the species declined as a result of habitat destruction, habitat modification, and roost disturbance (USFWS 2007a). The total population size increased in the early 2000s, thanks to recovery efforts (USFWS 2009b); however, since 2007, the population declined again by 19 percent, primarily due to the spread of white-nose syndrome. Current threats to the species include roost disturbance, white-nose syndrome, climate change, environmental contaminants, collisions with man-made objects, mining operations, forest fragmentation, invasive species, and loss/degradation of habitat (including swarming and migration habitat; USFWS 2019b).

**Key Largo Woodrat**

The Key Largo Woodrat (*Neotoma floridana smalli*) was originally listed as threatened under the Endangered Species Conservation Act of 1969 (USFWS 1999a). It was listed as endangered under an emergency rule effective September 21, 1983 (48 FR 43040) and protection continued through a final rule in 1984 (49 FR 34504). The USFWS announced the initiation of the latest five-year review of the species in 2016 (81 FR 59650). Critical habitat has not been designated (USFWS 2020a). The subspecies was protected in conjunction with the Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) because of their similar habitat requirements.

The Key Largo Woodrat is a subspecies of the Eastern Woodrat (*Neotoma floridana*). The subspecies inhabits tropical hardwood hammock forests (48 FR 43040). The historic range of the Key Largo Woodrat spanned all of Key Largo. Unfortunately, as a result of development, much of the hammock forest habitats have been destroyed. Currently the subspecies is limited to North Key Largo, which is approximately half of its historical range (USFWS 1999a). Woodrats are well-known for their large stick nests (USFWS 1999a). The subspecies is omnivorous, with a diet primarily composed of buds, leaves, and fruit from a variety of plants (USFWS 1999a, 2020b).

Key Largo Woodrats were introduced to Lignumvitae Key in 1970 (48 FR 43040). Although the subspecies is not historically native there, it hosts similar hammock forest habitats as those found on Key Largo. Key Largo Woodrats appear to have been extirpated on Lignumvitae Key by 1990 (USFWS 1999a). A captive propagation program began in 2002 because the causes of continued decline were undetermined. The Key Largo Woodrat's

small and isolated populations are especially vulnerable to extinction because of a wide range of threats including demographic factors and natural catastrophes (USFWS 2018b). Predation poses another significant risk, as they are depredated by a wide range of raptorial, reptilian, and mammalian (including free-roaming cats) predators (USFWS 1999a).

Reintroduction efforts have been largely unsuccessful because of high predation (USFWS 2018b).

### Key Deer

The Key Deer (*Odocoileus virginianus clavium*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The Key Deer is found in the Florida Keys within 11 island complexes from Johnson Keys to Sugarloaf Key. Each of these complexes are considered a subpopulation which collectively form a metapopulation. Key Deer are concentrated on Big Pine Key and No Name Key, which are home to approximately three- quarters of the metapopulation. The historical range of the subspecies extended into Marathon and Key West; however, these areas are now too urbanized to support Key Deer populations. The subspecies selectively uses hammock and pine rockland upland habitats. These habitats contain a substantial portion of their forage plants, fresh water, and cover, which is especially important for fawning. The diet of Key Deer is primarily composed of red mangrove (*Rhizophora mangle*) as well as a wide variety of other plants (USFWS 2010a).

Roads and fences fragment deer habitat as well as cause direct mortality. Despite high annual mortality rates, the population growth rate appears stable (USFWS 2010a). Ongoing threats include urbanization (documented to increase deer habituation and result in conflicts between dogs and deer) and vehicular collisions. The Service has translocated animals from the core areas to periphery islands in an attempt to bolster the metapopulation (USFWS 2010a).

### Rice Rat

The Lower Keys population of the Rice Rat, also known as the Silver Rice Rat, (*Oryzomys palustris natator = O. argentatus*) was listed as endangered effective May 30, 1991 (56 FR 19809) due to its low population numbers (restricted to wetlands on eight of the Lower Keys, Florida). Rice Rats in mainland Florida are not listed. Critical habitat was designated in 1993 (58 FR 45030) and includes nine keys or groups of keys inhabited by the species.

Rice Rat habitat includes contiguous mangrove swamps, saltmarsh flats, buttonwood transition vegetation (Goodyear 1987), and fresh-water cattail marshes (56 FR 19809). Generally, the rats use mangrove habitats for foraging and higher elevation saltmarsh flats for nesting and foraging (Forys et al. 1996). They are primarily nocturnal and have large home ranges, with some individuals traveling up to 325 meters at a time (Spitzer 1983, Forys et al. 1996). Although Rice rats may breed throughout the year, few juveniles have been observed during population studies (Forys et al. 1996, NatureServe 2020). A reproduction rate may be due to limited resources. Rice Rats are impacted by the continued development of the Lower Keys, increased populations of predators (such as raccoons, cats, and dogs), and through competition with introduced Black Rats (*Rattus rattus*) (Goodyear 1992).

### Pine Island Rice Rat

The Pine Island Rice Rat (*Oryzomys palustris planirostris*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The subspecies is known from only two occurrences, on Pine Island and the adjacent mainland. The Pine Island Rice Rat has been found in a garbage dump, in an adjacent herbaceous wetland, and in runways with Cotton Rats (*Sigmodon*) (Layne 1978). Little is known about the species ecology, though they have been noted to feed on stems of cord-grass (*Spartina* spp.), smut grass (*Sporoborus* spp.), and shoreline purslane (*Sesuvium* spp.)

FWS-005737

(Hamilton 1955). To complete the species review, habitat requirements should be studied in more detail and additional taxonomic study has been recommended. The Pine Island Rice Rat's habitat is threatened with habitat destruction by filling and draining of wetlands and invasion of woody plants (NatureServe 2020).

### Sanibel Island Rice Rat

The Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The subspecies is known only from one Florida island that is currently being extensively developed (Sanibel Island). The Sanibel Island Rice Rat's preferred habitat is along the edge of freshwater swamps of artesian origin, including swales and cattail stands. While the subspecies is protected in part on Ding Darling National Wildlife Refuge, it is threatened by habitat destruction through drainage, filling of marshes, lowering of the water table for human use, and woody plant invasion. Due to the limited information available on this subspecies, ecological studies are required to establish comprehensive management plans and the effects of major hurricanes (NatureServe 2020).

### Tricolored Bat

The Tricolored Bat, formally known as the Eastern Pipistrelle, (*Perimyotis subflavus*) was petitioned for listing on June 14, 2016 (CBD and DOW 2016), and the 90-day finding found that listing may be warranted (82 FR 60362). The species remains under review at this time (USFWS 2020a).

The Tricolored Bat is found throughout eastern North and Central America and the US Midwest (CBD and DOW 2016). The species is a permanent resident throughout the Florida peninsula. However, the majority of records are from the Panhandle (CBD and DOW 2016, NatureServe 2020). Habitat preferences include open landscapes bordered by woodland (e.g., hardwood woodlands, grasslands, abandoned fields, and urban landscapes) (CBD and DOW 2016). The species migrates between summer roosting areas and winter hibernacula. Summer and winter sites are typically less than 100 kilometers apart. Winter hibernacula are located in the deepest part of caves and mines with high thermal stability and temperatures typically in the range of -6 °C to 14 °C (CBD and DOW 2016). Summer roosting sites, including maternity colonies, are located in barns and other man-made structures as well as tree foliage. Males and non-breeding females may also use the winter hibernacula as a roost during the summer (CBD and DOW 2016, NatureServe 2020). The species mates during fall "swarming" outside of winter hibernacula. Females store sperm, overwinter, and give birth to two pups in the later summer. Tricolored Bats forage near water and in early successional forests and feed on a variety of insects, primarily from the orders Homoptera, Coleopteran, and Diptera (CBD and DOW 2016, USFWS 2019c).

This species has experienced precipitous population declines resulting from white-nose syndrome mortality (CBD and DOW 2016). Threats to the species include white-nose syndrome, human disturbance of hibernacula, habitat loss and modification, pesticides, climate change, and mortality from wind energy (CBD and DOW 2016, USFWS 2019c).

### Key Largo Cotton Mouse

The Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) was listed as endangered under an emergency rule effective September 21, 1983 (48 FR 43040), and protection continued through a final rule in 1984 (49 FR 34504). The USFWS announced the initiation of the latest five-year review of the species in 2016 (81 FR 59650). Critical habitat has not been designated (USFWS 2020a). The species was protected simultaneously with the Key Largo Woodrat (*Neotoma floridana smalli*) because of similar habitat requirements and the fact that the Cotton Mouse constructs its leaf-lined lairs in close proximity to or within Key Largo Woodrat nests (48 FR 43040, USFWS 2015a).

FWS-005738

The Key Largo Cotton Mouse is a subspecies of the widespread southeastern species, *P. gossypinus*. The subspecies inhabits tropical hardwood hammock forests, one of the most limited and threatened ecosystem types in the State of Florida (48 FR 43040), as well as nearby Salicornia coastal strands. The historical range of the Key Largo Cotton Mouse spanned all of Key Largo to Tavernier on Plantation Key. Unfortunately, as a result of development, much of the hammock forest habitats have been destroyed and currently the species is limited to North Key Largo, an area delineated as north of the US Highway 1 and County Road 905 intersection (USFWS 2015a). Key Largo Cotton Mice were introduced to Lignumvitae Key in 1970 (48 FR 43040). Although the subspecies was not historically native there, it hosts similar hammock forest habitats as those found on Key Largo (USFWS 1999a).The Cotton Mouse is herbivorous, with a diet composed of fruits, seeds, and leaves (USFWS 2015a).

The last sighting of a Cotton Mouse on Lignumvitae Key was in 1977 (USFWS 2019d). Fortunately, much of their remaining habitat on Key Largo has been acquired and protected. However, free-roaming cats and loss of hammock forest habitat through sea level rise (e.g., salt intolerant forest) are ongoing threats to their populations (USFWS 2015a).

## Choctawhatchee Beach Mouse

The USFWS listed the Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) as Endangered effective June 6, 1985 (50 FR 23872). Critical habitat has not been designated (USFWS 2020a).

The historical distribution of the Choctawhatchee Beach Mouse included Florida's western Gulf Coast, as well as the barrier between Choctawhatchee Bay and St. Andrew Bay (USFW 1987). Remaining populations of this subspecies exist in the sand dunes on Shell Island, Grayton Beach, and Topsail Hill (FWC 2020b). This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and beach grasses, and adjacent interior scrub areas populated by oaks including yaupon (*Ilex vomitoria*), marsh-elder (*Iva spp.*), scrub oak (*Quercus myrtifolia),* sand-live oak (*Quercus virginiana var. maritima)* and sand pine (*Pinus clausa*), saw palmetto (*Sereona repens*), and slash pine (*Pinus elliotti*). Optimal habitat for the Choctawhatchee Beach Mouse should include: high maximum elevation of coastal sand dunes; relatively great difference between maximum dune height and minimum interdunal elevation; close proximity of forest; sparse ground cover; and relatively low cover of sea oats. The fruits of beach grass are readily available to the mice, but those of sea oats are usually obtainable only after they have been blown down by heavy winds. The Choctawhatchee Beach Mouse also likely eats invertebrates in the late winter or early spring when seeds are scarce (USFWS 1987). The breeding season for the subspecies starts in November and ends in early January. Females reach reproductive maturity at six weeks of age and produce two to seven mice per litter (70 FR 94426). The predominant factor of decline for this subspecies is habitat loss due to alteration or conversion of dunes for human development and use (USFWS 1987).

More than two-thirds of this species' habitat has been lost as a result of real estate development (USFWS 1987).

## Southeastern Beach Mouse

The Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) was listed as threatened effective June 12, 1989 (54 FR 20598). Critical habitat has not been designated (USFWS 2020a).

This Southeastern Beach Mouse is a coastal subspecies of the Oldfield Mouse (*Peromyscus polionotus*), (USFWS 2005a). The original distribution of the Southeastern Beach Mouse included approximately 280 kilometers of the central eastern coast of Florida from Ponce Inlet, Volusia County, southward to Hollywood, Broward County, and possibly as far south as Miami Beach in Dade County. Remaining populations of this species exist in Volusia County (Canaveral National Seashore to 11 kilometers north of the Volusia-Brevard County line); Brevard County (Canaveral National Seashore, Merritt Island National Wildlife Refuge, and Cape Canaveral Air Force Station); scattered localities in Indian River County (Sebastian Inlet State Recreation Area, Seavie Subdivision, Treasure Shores Park, and Turtle Trail Public Beach access area); and St. Lucie County (Pepper Park and Fort Pierce Inlet State Recreation Area). As of 1993, this species occupies approximately 80 kilometers of beach (USFWS 1993).

This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass (*Panicum* spp.), and adjacent interior scrub areas populated by oaks and sand pine (*Pinus clausa*) or palmetto (*Sabal* spp.; USFWS 2005a). The best habitat for Southeastern Beach Mouse is characterized by patches of bare, loose, sandy soil. Sea oats must be blown to the ground for the mice to eat, and during the spring and early summer; when seeds are scarce, beach mice may eat invertebrates. The breeding season for the Southeastern Beach Mouse starts in November and ends in early January.

Females reach reproductive maturity at six weeks of age, and produce two to seven mice per litter (USFWS 2005a). The predominant factors of decline for this species are habitat loss due to alteration or conversion of dunes due for human development and use, and destruction of habitat due to hurricanes and storms (USFWS 1993).

## St. Andrew Beach Mouse

The St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) was listed as endangered effective January 19, 1999 (63 FR 70053). Critical habitat has been designated and includes dunes in Bay and Gulf counties, Florida (71 FR 60238).The USFWS announced the initiation of the latest five-year review of the subspecies in 2018 (83 FR 38320).

The St. Andrew Beach Mouse is one of the eight beach mice subspecies. Its historical range spanned from East Pass of St. Andrew Bay, along the coastline of St. Joseph Bay to St. Joseph Peninsula, and east to Money Bayou. The two existing populations of St. Andrew Beach Mouse inhabit East Crooked Island in Bay County and St. Joseph Peninsula in Gulf County. Habitat requirements include primary and secondary scrub dune ecosystems. The subspecies constructs burrows within the dunes, especially in steep, well-vegetated areas. The Beach Mouse feeds primarily on the seeds and fruits of dune plants as well as insects (USFWS 2010b).

The St. Andrew Beach Mouse population on East Crooked Island was presumed extinct in 1994. However, reintroduction efforts have led to a reestablished population there. St. Andrew Beach Mice face a suite of threats primarily related to habitat loss or degradation via urbanization and stochastic environmental events. Predation by feral cats is also a significant threat (USFWS 2010b).

## Anastasia Island Beach Mouse

The Anastasia Island Beach Mouse (*Peromyscus polionotus phasma*) was listed as endangered effective June 12, 1989 (54 FR 20598). Critical habitat has not been designated (USFWS 2020a).

This species historically occurred from the Duval-St. Johns County line southward to Matanzas Inlet, St. Johns County along Florida's northern east coast (USFWS 1993). Currently, two populations of this species exist on Anastasia Island: at Anastasia Island State Park and Fort Matanzas National Monument (USFWS 1993, USFWS 2005a). This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass (*Panicum* spp.), and adjacent interior scrub areas populated by oaks and sand pine or palmetto (USFWS 2005a). Prime habitat for Anastasia Island Beach Mouse is characterized by patches of bare, loose, sandy soil. (USFWS 1993). Sea oats must be blown to the ground for the mice to eat. During the spring and early summer, when seeds are scarce, beach mice may eat invertebrates. The breeding season for beach mice starts in November and ends in early January.

Females reach reproductive maturity at six weeks of age and produce two to seven mice per litter (USFWS 2005a).

The predominant factors of decline for this species are habitat loss through alteration or conversion of dunes due to human development and use and destruction of habitat due to hurricanes and storms (USFWS 1993). In 1992, mice from Anastasia Island were reintroduced into suitable historical habitat between Ponte Vedra Beach and South Ponte Vedra Beach in north St. Johns County at the Guana-Tolomato-Matanzas National Estuarine

Research Reserve (formerly Guana River State Park). The reintroduced population is surviving, although in low numbers (USFWS 2005a).

## Perdido Key Beach Mouse

The Perdido Key Beach Mouse (*Peromyscus polionotus trissyllepsis*) was listed as endangered effective June 6, 1985 (50 FR 23872). Critical habitat was designated on June 6, 1985 (50 CFR § 17) and revised most recently in 2006 (71 FR 60238).

The species' current range is restricted to Perdido Key in Florida, with critical habitats identified in Gulf State Park, West Perdido Key, Perdido Key State Park, Gulf Beach, and Gulf Islands National Seashore. The Perdido Key Beach Mouse is a nocturnal herbivore that feeds primarily on dune plant seeds such as sea oats (*Uniola paniculata*) and beach grass (*Panicum amarum*); it is also known to prey on insects, likely as a result of seasonal fluctuations in seed availability. They require a mosaic of frontal and scrub dunes for food, burrow sites, and refuge habitat. The frontal dunes have a cover of sea oats, blue stem (*Schizachyrium scoparium*), beach grass, and beach goldenrod (*Chrysoma pauciflosculosa*) while the scrub dunes are dominated by scrub live oak (*Quercus geminata*) with gopher apple (*Licania michauxii*) and green briar (*Smilax* spp.) ground covers. The importance of scrub dunes for this species was recognized through the revision to its critical habitat in 2006 (71 FR 60238). Threats to the species include loss/fragmentation of habitat for land development, tropical storm damage and mortality, and predation by non-native species (71 FR 60238). In addition, predicted future sea level rise and associated flooding is expected to produce increased habitat fragmentation and isolation (USFWS 2019e).

## Florida Panther

Florida Panther (*Puma* (= *Felis*) *concolor coryi*) was listed as endangered effective March 10, 1967 (32 FR 4001). The Service announced the initiation of the latest five-year review of the species in 2017 (82 FR 29916). Critical habitat has not been designated (USFWS 2020a).

The historic range of the Florida Panther included Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, South Carolina, and Tennessee (USFWS 2020a). The subspecies is now limited to a single population in southern Florida (inhabits less than five percent of its historic range). Panther habitat preferences are closely associated with prey abundance (USFWS 2008a). Habitats with dense understory vegetation are also important as they provide cover for panthers to hunt, rest, and den (USFWS 2020a). Panthers have vast home ranges, occur at low densities, and require large swaths of contiguous habitat (USFWS 2008a). Although their population numbers have increased substantially from 12 to 20 individuals in the 1970s to 100 to 120 in 2007, Florida Panther incompatibility with urbanization continues to limit the recovery of this subspecies. Habitat fragmentation and loss also serve as significant threats to Florida Panthers. Additionally, vehicular collisions continue to limit the subspecies' population growth (USFWS 2020a).

## Insular Hispid Cotton Rat

The Insular Hispid Cotton Rat *(Sigmodon hispidus insulicola)* was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The Insular Hispid Cotton Rat currently has a range of <100-250 square kilometers within peninsular Florida and the Keys. The preferred habitat is herbaceous wetlands, grasslands, shrubland, and mixed woodlands (NatureServe 2020). Populations apparently undergo large annual fluctuations. Pregnant and lactating females have been recorded in May and August with a litter size of 2-4 young (Layne 1978).

Further research is required to determine subspecies life history, ecology, habitat requirements, and population sizes. The rat is threatened by habitat destruction from urbanization (NatureServe 2020).

FWS-005741

**Lower Keys Rabbit**

The Lower Keys Rabbit, also known as the Lower Keys Marsh Rabbit, *(Sylvilagus palustris hefneri*) was listed as endangered effective June 23, 1990 (55 FR 25588). Critical habitat has not been designated (USFWS 2020a).

The subspecies is endemic to a very small area (<100-250 square kilometers) in the Florida Keys (NatureServe 2020). The Lower Keys Rabbit likely breeds year-round, with a peak from December through to June. Gestation lasts approximately 30-37 days. The rabbit's habitat is at risk due to development, dredging and filling of wetlands, human exploitation of very limited fresh water, and impacts from predators such as cats, dogs, and human poachers (Wolfe 1992). The population has been categorized as "declining" (USFWS 1990). Recommended conservation efforts focus on protecting the rabbit's preferred marshland habitat and areas used in dispersal, including the lower-mangrove and upland-forest (Forys and Humphrey 1996).

**West Indian Manatee**

The West Indian Manatee *(Trichechus manatus)* was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Listing was revised in 1970 to include the Caribbean subspecies and South American subspecies *(T. m. manatus)* (35 FR 18319). The species was down-listed to Threatened on April 5, 2017 (82 FR 16668). Critical habitat was designated in 1976 (50 CFR § 17.95(a)).

There are two subspecies of West Indian Manatee, *T. m. manatus* and *T. m. latirostris*. The latter of these subspecies occurs in Florida and the Gulf of Mexico (USFWS 1999b, 2007). There are four unique Florida sub-populations/management units (there is genetic exchange amongst populations) that exhibit varying degrees of site fidelity: The Upper St. Johns River subpopulation, the Northwest subpopulation, the southwest subpopulation, and the Atlantic Coast subpopulation (USFWS 2007b). Florida manatees occur in freshwater, brackish and marine environments including coastal river estuaries, sloughs, canals, creeks, and lagoons (USFWS 1999b). The species requires a source of freshwater for drinking (USFWS 2001). They are not cold-tolerant, prefer waters with temperatures above 68°F, and remain in warm-water sites around the State during the winter (e.g. warm water springs and power plant outfall sites) (USFWS 2001, USFWS 2007b). Breeding may occur year-round, although peak breeding is suspected to occur from March through November. Manatees form "mating herds" (one female and multiple males) to breed. Manatees reach sexual maturity at around four years. Gestation is roughly 11 to 14 months, and females may give birth to one or two calves per litter. The species feeds on submerged and emergent floating vegetation such as seagrass, hydrilla (*Hydrilla verticillata*), and smooth cordgrass *(Spartina alterniflora)* (USFWS 2001).

The most recent population estimate (2015), put the Florida population at 6,350 manatees (82 FR 16668). Recent analysis indicates this population is stable or increasing throughout much of the State (USFWS 2014a). Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, and red tides (*Gymnodinium breve*) (USFWS 2007b, USFWS 2014a).

**BIRDS**

**Cape Sable Seaside Sparrow**

The Cape Sable Seaside Sparrow (*Ammodramus maritimus mirabilis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated in Collier, Dade, and Monroe counties in Florida in 1977 (42 FR 47840). This designation was revised in 2007 (72 FR 62736).

The Cape Sable Seaside Sparrow is non-migratory and inhabits freshwater marl prairies with muhly grass (*Muhlenbergia filipes*) in the Everglades National Park. These marl prairies are defined by short hydroperiods, densely clumped grasses, and periodic fires (USFWS 1999b). Within the park, populations are located at Shark River Slough, Big Cypress Preserve, and at Taylor Slough in the Southern Glades Wildlife and Environmental Area (the subspecies occurs entirely on public conservation lands) (USFWS 2019f). Nesting occurs from late February through early August and a pair may raise multiple broods per season (USFWS 1999b). The subspecies builds their nests in clumps of grass a few centimeters above the ground; nests are highly susceptible to floods during the breeding season (USFWS 2019f). The Cape Sable Seaside Sparrow will feed on a variety of invertebrate prey items including spiders, caterpillars, worms, beetles, and shrimp (USFWS 1999b). Subspecies recovery has been hampered by altered hydrology in the region which has impacted their prairie habitat (Central and Southern Florida Project) (USFWS 1999b, 2010). Threats to the subspecies include habitat loss and conversion, nest predation, climate change, fires, and sea level rise (USFWS 2019f, USFWS 2010c). This subspecies is considered to be in decline (USFWS 2010c).

**Florida Grasshopper Sparrow**

The Florida Grasshopper Sparrow (*Ammodramus savannarum floridanus*) was listed as endangered effective September 2, 1986 (51 FR 27492). Critical habitat has not been designated (USFWS 2020a).

The Florida Grasshopper is a non-migratory subspecies of grasshopper sparrow that inhabits dry, treeless, flat prairies in central and southern Florida. These prairies are dominated by saw palmetto (*Serenoa repens*), dwarf oaks (*Quercus minima*), bluestems (*Andropogon* spp.), St. John's wort (*Hypericum* spp.), and wiregrass (*Aristida stricta*). They avoid areas of dense vegetation and accumulated litter (breeding grasslands defined by a history of frequent fires) (51 FR 27492). The range of the Florida Grasshopper Sparrow is currently restricted to Avon Park Air Force Range, Kissimmee Prairie Preserve State Park, Three Lakes Wildlife Management Area, and three private ranches (USFWS 2019g). The Florida Grasshopper Sparrow was historically more widespread, but a 95 percent decrease in habitat since pre-settlement times has severely restricted the subspecies' distribution.

The Florida Grasshopper Sparrow breeds from early April through late June, although at some locations they breed through September. They are ground nesters. Nest structure includes a shallow scrape in sand substrate with a dome-shaped cup of woven grasses. Grasshopper Sparrows prey on insects (e.g., beetles, crickets, and moths) and will also feed on seeds (USFWS 1999b). Threats to the subspecies include habitat loss, degradation, fragmentation (conversion of native prairie to agriculture), unfavorable hydrology (though management or natural phenomena), and predation (particularly by the red imported fire ant, *Solenopsis invicta*). The subspecies also has a high risk of extinction due to factors such as environmental stochasticity and loss of genetic diversity (USFWS 2019g). The subspecies is in decline and there are only an estimated 23 breeding pairs remaining in the wild (USFWS 2008b, USFWS 2019g). The USFWS is currently engaged in a captive propagation program (USFWS 2019g).

**Saltmarsh Sparrow**

The Saltmarsh Sparrow, also known as the Saltmarsh Sharp-tailed Sparrow, (*Ammospiza caudacuta*) is proactively being assessed for listing by USFWS. The Service is currently conducting a Species Status Assessment (USFWS 2018c). The species remains under review at this time (USFWS 2020a).

As their name implies, this species has a strong habitat association with tidal saltmarshes. Their breeding range extends along the Atlantic Coast from Maine to Virginia. Their wintering range covers similar coastal habitats from Maryland to Florida, with concentrated numbers from South Carolina to northern Florida.

Their populations have experienced substantial declines since the 1990s or earlier, with an estimated 75 percent decline from 1998 to 2012. This decline was caused primarily by habitat degradation of coastal marshes. Other factors such as sea level rise are threats to their breeding populations (Greenlaw et al. 2018). Having been listed as Vulnerable (international status) for quite some time, the species was up- listed to Endangered during the latest assessment in 2018 (BirdLife International 2018).

**Florida Scrub-jay**

The Florida Scrub-jay (*Aphelocoma coerulescens*) was listed as threatened effective June 6, 1987 (52 FR 20715). Critical habitat has not been designated (USFWS 2020a).

The Florida Scrub-jay is a non-migratory corvid that serves as the State's only endemic bird species (USFWS 2019h). The species is restricted to early successional xeric scrub and scrub flatwood habitat in relict dunes located on Florida's central ridges and coasts, in areas defined by historic fires (USFWS 1999b, USFWS 2007c, USFWS 2019h). Habitat requirements include low densities of pine trees, a minimum of 50 percent scrub oak cover, and open areas of sand or minimal herbaceous vegetation (USFWS 2019h). Florida Scrub-jay's may live in pairs or family groups and the species engages in cooperative breeding with helpers at the nest (USFWS 2019h). Territory size is a minimum of 5 hectares. The species defends their territory year-round (USFWS 2015b). Nesting occurs from March through the end of July. Florida Scrub-jays typically construct their nests in sand live oak (*Quercus geminate*), scrub oak (*Q. inopina*), or myrtle oaks (*Q. myrtifolia*). Nests consist of a cup constructed out of oak twigs and woven with palmetto or cabbage palm (*Sabal palmetto*). The species feeds on insects such as grasshoppers, beetles, and butterfly or moth larvae (USFWS 2015b).

Historically, the Florida Scrub-jay occupied 39 counties in Florida. They have been functionally extirpated from nine of these counties and the species is in decline (USFWS 1999b, USFWS 2007c, USFWS 2019h). Currently, about 25 percent of the State's population is located in areas that have urbanized, and research indicates that these urban populations are not sustainable (USFWS 2014b). Threats to the species include habitat loss, fragmentation, degradation (through urbanization and fire suppression), predation, and epidemic diseases (USFWS 1999b, USFWS 2015b, USFWS 2019h).

**Rufa Red Knot**

The Rufa Red Knot (*Calidris canutus rufa*) was listed as threatened effective January 12, 2015 (79 FR 73705 73748). Critical habitat has not been designated (USFWS 2020a).

The Rufa Red Knot is one of the six subspecies of Red Knot (Baker et al. 2013). They follow one of the longest known migrations, traveling roughly 15,000 kilometers from their breeding grounds in the central Canadian arctic to their overwintering grounds as far south as Tierra del Fuego at the tip of South America (USFWS 2019i). Nests are constructed as scrapes on bare tundra habitat. Usually four eggs are laid which the male is left to care for after hatching (Baker et al. 2013). There are four concentrated overwintering areas, including the Southeast US, the Northwest Gulf of Mexico, the northern coast of South America, and Tierra del Fuego (USFWS 2019i). Delaware Bay is an important stopover site on their spring migration path (79 FR 73705).

FWS-005744

Overharvested by market hunting in the 19th Century, their populations seemed to have largely recovered after the passage of the Migratory Bird Treaty Act (USFWS 2019i). However, a crash in Horseshoe Crab population (*Limulus polyphemus*) during the 2000s (a primary prey item), caused Rufa Red Knot populations to plummet (79 FR 73705). Other prey items include marine invertebrates, such as bivalves and amphipods (Baker et al. 2013). Red Knots face a suite of ongoing environmental and anthropogenic threats across their range (79 FR 73705), specifically the threat of sea level rise inundating their coastal habitats (Kieffer 2014).

## Ivory-billed Woodpecker

The Ivory-billed Woodpecker (*Campephilus principalis*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a). The Service announced the initiation of the latest five-year review of the species in 2018 (83 FR 20092).

The Ivory-billed Woodpecker was the largest woodpecker species in North America. (Jackson 2002, USFWS 2020a). The historical range of the Ivory-billed Woodpecker included the southeast US (Arkansas, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas) and the main island of Cuba. It inhabited old-growth forests with abundant beetle larvae – its primary food source. Dense swamps were selected for nesting. Parents excavated nest cavities in dead portions of both live trees and snags, usually below a dead branch (Jackson 2002).

Ivory-billed Woodpeckers were historically harvested by humans for food and regalia (by Native Americans), souvenirs and trade, and as scientific specimens for personal natural history collections (Jackson 2002). This overexploitation along with habitat destruction led to the species' demise (USFWS 2010d). The last accepted sightings were in 1938 in the US and in 1948 in Cuba. There is a great deal of contention whether Ivory-billed Woodpeckers are still extant, given recent reported sightings; however, none of these sightings have been confirmed (Jackson 2002). Nonetheless, reports over the last several decades have prompted surveys across multiple states and some suggestive evidence has been found (USFWS 2010d).

## Piping Plover

The Piping Plover (*Charadrius melodus*) Great Lakes Distinct Population Segment (DPS; *C. m. circumcinctus*) was listed as endangered effective January 10, 1986 (50 FR 50726). The Atlantic Coast and Northern Great Plains populations (*C. m. melodus* and *C. m. circumcinctus*, respectively) were listed as threatened at the same time (50 FR 50726). Critical habitat was designated for this species on May 7, 2001 and September 11, 2002 (for separate breeding populations; 66 FR 22938, 67 FR 57637). Critical habitat for wintering populations was designated on July 10, 2001 (66 FR 36038). Critical habitat was revised several times via court rulings and final critical habitat was published on May 19, 2009 (74 FR 23476).

The Piping Plover is a migratory shorebird that breeds along the Atlantic Coast from Canada to North Carolina and along inland rivers and lakes in the Great Plains and Great Lakes regions (three independent populations with two subspecies). Piping Plovers winter along the Gulf Coast, Southern Atlantic Coast (including Florida), Bahamas, and the West Indies (USFWS 1999b). Fall migration occurs from June through August while peak spring migration occurs in April (Elliott-Smith and Haig 2004). The largest number of wintering birds are routinely found in Texas; however, a significant proportion of the species also winters in states along the Gulf Coast, including Florida (USFWS 2015c). The species exhibits site fidelity to migration and wintering sites (USFWS 2009c). On their breeding grounds, the species favor open, sparsely vegetated sand or gravel beaches for nesting. Nesting microhabitat within these larger landscape features includes open ground adjacent to bunches of grass, logs, or other conspicuous items in an otherwise barren landscape. Nest scrapes are also constructed in areas relatively free of vegetative cover. These scrapes are lined with debris such as shell fragments or pebbles. Both adults will share in incubating and parental care duties. The species typically forages within five meters of the water's edge and feeds on a variety of freshwater, saltwater, terrestrial, and benthic invertebrates (Elliot-Smith and Haig 2004). Wintering habitat preferences in Florida include bay beaches (vs. ocean facing beaches) and inlets with exposed

intertidal areas and tide cast wrack (USFWS 2009c).

Threats to the species include habitat loss and degradation from urbanization and some shoreline stabilization efforts, sea level rise, predation, and anthropogenic disturbance (USFWS 2009c, USFWS 2015c). A recent population viability analysis revealed that the species is highly sensitive to extinction risk (USFWS 2015c). Modeling of the Great Plains and Great Lakes populations have indicated that the species has a low probability of persisting for more than 100 years (Elliott-Smith and Haig 2004).

## Whooping Crane

The Whooping Crane (*Grus americana*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the species on May 15, 1978 (43 FR 20938). Critical habitat was revised on July 21, 1997 (62 FR 38932).

Brought back from the brink of extinction by intensive recovery efforts, the Whooping Crane is an environmental success story. Population declines (the population sank to only 15 individuals in 1941) were primarily the result of shooting and destruction of prairie habitat (CWS and USFWS 2007, USFWS 2012b). Historically, the documented breeding range of the Whooping Crane included tall and mixed-grass prairie marshes throughout the central US and Canada. Wintering locations included tall grass prairie, wetlands, deltas, and interior tablelands along the southeast and Gulf Coast, including Florida. Currently, four populations of Whooping Cranes exist in North America, only one of which is self- sustaining. This naturally occurring population, the Aransas/Wood Buffalo population, nests in in the Northwest Territories and Alberta within Wood Buffalo National Park and winters along the Texas Gulf Coast at the Aransas National Wildlife Refuge (Urbanek and Lewis 2015). Two reintroduction efforts (out of an initial four) are ongoing, the Eastern Migratory Population and the Louisiana non-migratory population (USFWS 2012b, Urbanek and Lewis 2015). Reintroduced Whooping Cranes in Florida, located in the Kissimmee Prairie area, are designated as an experimental, non-essential population (population size of five as of March 2019; 58 FR 5647, International Crane Foundation 2019). Reintroduction efforts in Florida were hampered by drought conditions and ceased in 2005 (USFWS 2012b). As of the winter of 2018/2019, the national wild population comprised of over 505 individuals (Butler and Harrell 2019).

Whooping Cranes breed in April and May (CWS and USFWS 2007). The preferred nesting habitat for the species is shallow, silty-bottom wetlands with trees such as willow, spruce, and birch. The species is well known for their elaborate courtship displays. Nests are constructed on shallow water islands out of surrounding vegetation (e.g., bulrush, cattail, etc.). The species is omnivorous and feeds on crustaceans, fish, amphibians, small reptiles, tubers, insects, berries, and grains (Urbanek and Lewis 2015). During fall migration, the Aransas/Wood Buffalo population leaves their breeding grounds in Canada between September and October. The birds take roughly 50 days to reach their wintering grounds at the Aransas National Wildlife Refuge on the Gulf Coast. Spring migration is initiated between late March and mid-April and may take as little as 10 days (CWS and USFWS 2007, Urbanek and Lewis 2015). The species remains at risk due to numerous factors such as environmental degradation, genetic bottlenecks, climate change, and natural disasters (USFWS 2012b). In addition, the slow reproductive rate of the species hampers breeding efforts (CWS and USFWS 2007).

## Eastern Black Rail

The Eastern Black Rail (*Laterallus jamaicensis jamaicensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

The Eastern Black Rail is a subspecies of the Black Rail that inhabits brackish, freshwater, and saltwater wetlands with dense vegetation cover in eastern North and Central American and the Caribbean. While some populations are migratory, in Florida the subspecies is present year-round. On the Florida Gulf Coast, breeding habitat is dominated by black needlerush (*Juncus roemerianus*) and cordgrass (*Spartina* spp.), coastal saltgrass (*Distichlis spicata*), Jamaican swamp sawgrass (*Cladium jamaicense*), and wax myrtle (*Myrica cerifera*). The breeding

season spans from March through August. Nest cups are built out of emergent, herbaceous plants in a clump of vegetation over mud or shallow water usually at higher elevations in the marsh; these are required refugia to survive high water events as these rails do not typically fly. Nest failure is common with flooding and heavy rain. Average clutch size is seven eggs (USFWS 2018d). Eastern Black Rails feed on seeds and a variety of invertebrate prey including aquatic beetles, weevils, and snails (Eddleman et al. 19994, USFWS 2018d).

The subspecies has undergone a significant range contraction in the last century. Historic and current threats to the subspecies include marsh habitat loss, degradation, fragmentation (conversion to urban or agricultural lands and sea level rise), stochastic events, and incompatible land management. Historically, mosquito abatement measures in the region may have also reduced habitat for the subspecies. Currently, there are an estimated 200 to 500 breeding pairs in Florida. The subspecies is considered to have a low level of resiliency in the southeast and further extirpations are anticipated (USFWS 2018d).

### Wood Stork

The Wood Stork (*Mycteria americana*) was listed as endangered effective March 29, 1984 (49 FR 7332). The species was downlisted to Threatened effective June 30, 2014 (79 FR 37077). Critical habitat has not been designated (USFWS 2020a).

The Wood Stork is a wading bird that occurs in the southeastern US, Cuba, Hispaniola, as well as Central and South America. The populations currently listed under the ESA are located in Florida, Georgia, the Carolinas, Alabama, and Mississippi (USFWS 2007d). The Wood Stork was originally listed due to population declines in the early and mid-1900s, stemming from inhibited/reduced natural wetland function in south Florida ecosystems tied to water management practices including the Central and Southern Florida project (USFWS 1999b, USFWS 2007d).

The species inhabits freshwater, estuarine wetlands, cypress and mangrove swamps, stock ponds, and seasonally flooded agricultural areas (USFWS 1996a, USFWS 1999b, USFWS 2007d). Wood Storks breed in colonies. In Florida, major colonies are located in the following counties: Broward, Charlotte, Collier, Miami-Dade, Hardee, Indian River, Lee, Monroe, Osceola, Palm Beach, Polk, St. Lucie, and Sarasota (USFWS 1999b). Nesting site features include tall trees either in water (swamps) or located on islands surrounded by water. In Florida, the nesting season runs from October to June (USFWS 1996a, USFWS 1999b). Nests are platforms constructed out of sticks, Spanish moss, and leaves and may be placed in a variety of tree species including bald cypress (*Taxodium distichum*), swamp black gum (*Nyssa biflora*), southern willow (*Salix carolina*), and red mangroves (*Rhizophora mangle*) (USFWS 1999b, USFWS 1996a). Wood Storks feed on fish, and the species is heavily dependent on hydrology (dropping water levels) to concentrate fish in foraging areas (USFWS 1996a). Although not a traditional migrant, the species tends to disperse following the breeding season and in response to local environmental conditions (Coulter et al. 1999). Since its initial listing, the species' status has improved, with an increase in breeding pairs and nesting colonies across the southeast. In addition, the species has undergone a range extension. Based on the most recent USFWS five-year review, 50 to 75 percent of recovery objectives have been achieved. Current threats to the species include wetland habitat loss, fragmentation, and modification (USFWS 2007d).

### Eskimo Curlew

The Eskimo Curlew (*Numenius borealis*) is listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The historical range for the Eskimo Curlew covered all 48 contiguous states (including Florida), as well as Alaska. Currently, the Eskimo Curlew may still occur in Alaska, Nebraska, and Texas (USFWS 2020a).

Eskimo Curlews were not well studied before their decline and little is known about their biology (USFWS 2016a). Only two confirmed breeding sites for Eskimo Curlews exist from tundra areas in the Northwest Territories of Canada (Gill et al. 1998, USFWS 2016a). Their breeding range likely included tundra habitats in the Northwest

Territories, Nunavut, and possibly Alaska and eastern Russia. Nests were constructed as simple scrapes on bare ground with typically four eggs (USFWS 2016a). As long-distant migrants, they traveled from their breeding grounds to overwinter in the Pampas regions of Argentina, Brazil, Uruguay, Chile, and Patagonia (Gill et al. 1998, USFWS 2016a). Their diet was based on an annual cycle with dependence on insect eggs, larvae, and adults during their northward migration and on ericaceous berries and marine invertebrates during their southward migration. They utilized prairie habitats in the Midwestern United States on their spring migration and a variety of terrestrial and coastal habitats on their fall migration (Gill et al. 1998).

Eskimo Curlew population numbers were once thought to range in the hundreds of thousands (USFWS 2016a). However, by the end of the 19th century, their populations had declined precipitously as a result of market hunting (USFWS 2016a, Lewis 2018). Other contributing factors were habitat loss with the conversion of grasslands for agricultural use and the extinction of one of their primary food sources, the Rocky Mountain Grasshopper (*Melanoplus spretus*) (Lewis 2018). The last confirmed sighting dates from 1963 from a specimen collected in Barbados.

Based on multiple analyses, the USFWS concluded the likelihood that Eskimo Curlews are extant is extremely low (USFWS 2016a). However, the Service has not declared the species extinct because of recent potential sightings in the last two decades (USFWS 2016a). At this time there is no expectation of presence in Florida.

## Red-cockaded Woodpecker

The Red-cockaded Woodpecker (*Picoides borealis*) was listed as endangered effective October 8, 1970 (35 FR 16047). Critical habitat has not been designated (USFWS 2020a).

The Red-cockaded Woodpecker is a keystone species endemic to old growth, pine savanna ecosystems in the southeastern US (USFWS 2003a). These pine ecosystems are defined by longleaf pine (*Pinus palustris*), shortleaf pine (*P. echinata*), loblolly (*P. taeda*), or slash pine (*P. elliottiil*) and abundant herbaceous groundcover. Red-cockaded Woodpeckers underwent precipitous population declines in the 1800s and 1900s due to habitat loss (logging and agriculture), incompatible forest management practices, and fire suppression (USFWS 2003a). There are currently 10 core populations of the species remaining, and the total population was estimated as 14,068 in 2003 (USFWS 2003a, USFWS 2006). In Florida, the largest populations occur in the Panhandle. Estimated population size for the state is roughly 1,500 pairs (USFWS 1999b). Red-cockaded Woodpeckers are non-migratory and territorial year-round. The species feeds on arthropods, beetles, moths, and a variety of other insects as well as fruits and seeds. They breed cooperatively in family groups (have helpers at the nest) (USFWS 2003a). The species is limited by the availability of old growth pines; the species excavates their own cavities, a process which may take several years. Nest trees are frequently infected with a heartwood fungus (*Phellinus pini*). These trees are in open stands with little to no hardwood midstory or overstory (Jackson 1994, USFWS 2003a). The nesting season in Florida runs from April through June (USFWS 1999b).

Threats to the species include suppression of natural fire regimes (which allows encroachment of hardwoods in habitat), genetic stochasticity, and habitat loss (USFWS 2003a). The species status is considered to be improving, bolstered by intensive management efforts including creation of artificial nest cavities, translocation, and prescribed burning (USFWS 2006).

## Audubon's Crested Caracara

Audubon's Crested Caracara (*Polyborus plancus audubonii*) was listed as threatened effective August 5, 1987 (52 FR 25229). Recent taxonomic data indicates that Florida caracaras should be recognized as a discrete population of the Northern Crested Caracara (*Caracara cheriway*) (Dove and Banks 1999, USFWS 2008c). Critical habitat has not been designated (USFWS 2020a).

The Northern Crested Caracara is a distinctive, medium-sized raptor that inhabits open, upland prairies, interspersed with ponds, marshes, and cabbage palm hammocks in south-central Florida. The species' current

range is limited to the following counties: Brevard, Charlotte, Collier, De Soto, Glades, Hardee, Hendry, Highlands, Indian River, Manatee, Martin, Okeechobee, Osceola, Palm Beach, Polk, and St. Lucie (Morrison and Dwyer 2012).

Northern Crested Caracaras in Florida are non-migratory (USFWS 2008c). The majority of occupied habitat and nesting occurs on private rather than public lands. Nests are built in tall trees (e.g., cabbage palms) bordering open habitat and nest fidelity is common (Morrison and Dwyer 2012). Crested Caracaras may breed year-round in Florida although the majority of nesting occurs from October through March (Dwyer 2010). The species feeds on road-kill carrion as well as invertebrates and a variety of vertebrate prey (fish, reptiles, birds, eggs, etc.) (USFWS 2008c, Morrison and Dwyer 2012). The species has declined throughout its range from the 1900s to the 1980s (USFWS 1999b). Threats to the species include habitat loss, degradation, and fragmentation, specifically from urbanization in south-central Florida (particularly loss or conversion of cattle ranches). Loss of natural fire regimes also have resulted in habitat homogeneity that threatens the species. In addition, this population is isolated from other breeding populations (closest is Cuba) and may be subjected to factors such as reduced gene flow and loss of genetic diversity (USFWS 2008c).

## Black-capped Petrel

The Black-capped Petrel (*Pterodroma hasitata*) was proposed for listing as Threatened under the Endangered Species Act on October 9, 2018 (83 FR 50560). The species remains under review at this time (USFWS 2020a).

The Black-capped Petrel, or regionally "diablotín" ("little devil"), is a pelagic seabird that nests on the island of Hispaniola and forages offshore of the southeastern US. The species exhibits nest site fidelity (83 FR 50560). The majority of nest sites are located in the Parc National La Visite. Nesting habitat includes high elevation montane forests. Nest burrows are located in rocky substrate on steep slopes, rock crevices, and caves and lined with twigs and pine needles. Black-capped Petrels lay one egg per breeding attempt; therefore, productivity and fecundity are inherently low. The species commonly forages in flocks at night or in the early morning in the Gulf Stream in areas with upwellings (USFWS 2018e). Prey items include crustaceans, squid, and fish (83 FR 50560). Historically, the species was harvested on Hispaniola for consumption. Current threats to the species include breeding habitat loss from deforestation and forest fires, climate change, invasive predators, and human population growth (USFWS 2018, NatureServe 2020). Currently, the estimated number of breeding birds on Hispaniola is 500 to 1,000 and population resiliency is considered to be low. Off the coast of Florida, Black-capped Petrels may be found year-round in relatively shallow waters near shore (USFWS 2018e, NatureServe 2020).

## Everglade Snail Kite

The Everglade Snail Kite, also known as the Snail Kite, (*Rostrhamus sociabilis plumbeus = Rostrhamus sociabilis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the subspecies on August 11, 1977 (42 FR 40685). The designation was revised on September 22, 1977 (42 FR 47840).

The Everglade Snail Kite is a non-migratory raptor that resides in central and South Florida, Cuba, and Honduras (AOU 1983, USFWS 1999b). In Florida, the historic distribution of the species was considerably larger than the current range and included most of the peninsula. The distribution of Everglade Snail Kite is currently limited to the following freshwater ecosystems: Upper St. Johns marshes, Kissimmee River Basin, Lake Okeechobee, Loxahatchee Slough, the Everglades, and Big Cypress basin. Species habitat preferences include freshwater marshes with shallow water, patchy emergent vegetation, and large expanses of open water for foraging. Emergent vegetation is important for nesting habitat. Other important habitat features include communal roosts, typically in riparian tree species within or bordering the marsh/lake, which are used throughout the year (USFWS 1999b). Snail Kites nest in patches of emergent marsh vegetation such as sawgrass (*Cladium jamaicense*) and cattails (*Typha* spp.) over water. The species may also nest in small trees such as willows (*Salix spp*), pond cypress (*Taxodium ascendens*), and paperbarks (*Melaleuca*). Nests are a loose platform of woven sticks and

herbaceous vegetation. The Snail Kite is a specialist that preys on the native Florida Apple Snail (*Pomacea paludosa*) but is also adapting to prey on the Exotic Apple Snail (*Pomacea insularum*; USFWS 2019j). Shallow, open, calm and clear water is required for foraging habitat (USFWS 1999b).

Threats to the species include habitat loss and fragmentation, hydrology management practices in the State (that may directly or indirectly impact both the kite and its prey), predation, invasive species (predators as well as the Exotic Apple Snail), and anthropogenic sources of disturbance. Another threat to the species is that designated critical habitat does not closely match habitat currently being used by the species (USFWS 2019j). The subspecies is considered to be in decline, and juvenile survival has been trending downward in the last decade (USFWS 2008d, USFWS 2019j).

### Roseate Tern

The Roseate Tern (*Sterna dougallii dougallii*) is managed as two separate populations. The Northeast population is listed as endangered and the Caribbean population as Threatened effective November 2, 1987 (52 FR 42064). The Service announced the initiation of a five-year species review in 2018 (83 FR 39113). Critical habitat has not been designated (USFWS 2020a).

The range of the Roseate Tern includes the two listed populations as well as populations in Britain, France, the Azores, Canary Islands, and southeastern Africa (USFWS 2010e). They almost solely breed in large colonies on islands (Nisbet et al. 2014). A metapopulation of the Caribbean Roseate Tern is known to breed in 12 areas of the Florida Keys (USFWS 2010e, Nisbet et al. 2014). High colony site fidelity has been documented in the Northeast population. Nests are simple scrapes on the ground comprised of sand, rock, or vegetation. The species feeds on small marine fish (Nisbet et al. 2014).

Historically, Roseate Terns suffered declines as a result of overharvesting for the millinery trade (52 FR 42064). The species continues to be particularly vulnerable because of its small and localized nesting populations. These habitats face a variety of threats such as erosion, invasive plant species, sea level rise, and intensification of storms. For instance, severe winter storms in 2005 substantially eroded colony sites within Florida, resulting in the species relocating to other areas for breeding. Additionally, breeding colonies often experience substantial pressure from mammalian predators. In Canada, displacement from colony sites by competing gulls is a significant threat (USFWS 2010e).

### Bachman's Wood Warbler

Bachman's Wood Warbler, hereafter Bachman's Warbler per recent naming standards, (*Vermivora bachmanii*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a). This species is considered to be extinct by most authorities (Hamel 2011).

Historically, this species bred in the southeastern US and wintered in Cuba and the Isle of Youth. However, habitat loss on both the breeding and wintering grounds and other population pressures beginning in the 1800s resulted in considerable species declines. The Bachman's Warbler is now considered to be one of the rarest passerines in North America. It has not been documented in the states since 1962 and the last sighting in Cuba is from 1981 (USFWS 2015d, Hamel 2018).

Habitat preferences and behavior of the species are not well understood. Breeding habitat likely consisted of bottomland hardwood forested wetlands with an understory of cane/bamboo (*Arundanaria gigantea*) or palmetto (*Sabal minor*). Longleaf pine forest and brackish marsh habitat may also have served as breeding habitat. All documented nests (cups of grass and leaves) have been located in dense understory close to the ground. Wintering habitat potentially included the Cuban lowlands, but this is not well documented (Hamel 2018). Historical threats to the species included habitat loss from palustrine forested wetland habitat conversion to agriculture (sugar cane production) as well as logging. Diet included invertebrates. Bachman's Warblers were previously documented in Florida while passing through on migration (breeding has not been documented in the State)

(Hamel 2011, USFWS 2015d). The species is not currently known to occur in Florida (USFWS 1999b).

## Golden-winged Warbler

The Golden-winged Warbler (*Vermivora chrysoptera*) was petitioned for listing on February 10, 2010 by a private citizen (Sewell 2010), and the 90-day finding determined that the listing may be warranted (76 FR 31920). The species remains under review at this time (USFWS 2020a).

The Golden-winged Warbler is a neotropical migrant that breeds in upland and wetland forest landscapes in the Great Lakes and Appalachian regions of North America and winters in Central and South America. The species occurs in Florida strictly during migration (Confer et al. 2011, Roth 2012). Migration records from the State are primarily clustered in the Panhandle with few records from the coast. Habitat on migration is not well documented but may include forest edge and second-growth forest (Confer et al. 2011). On their breeding grounds, the species is associated with early successional, disturbed habitats with dense shrubs, often near forest edges, with low to moderate canopy cover (76 FR 31920, Confer et al. 2011). Golden-winged Warblers construct their nests on the ground or in a grassy tussock. Nests are constructed out of woven plant material including leaves and bark (Confer et al. 2012). The species feeds on moths, larvae, and spiders (76 FR 31920, Confer et al. 2011)

This species is declining throughout its range as a result of habitat loss (on both the breeding and wintering grounds), degradation (through fire suppression and development), fragmentation, cowbird nest parasitism, and competition and hybridization with the co-occurring Blue-winged Warbler (*Vermivora cyanoptera*) (76 FR 31920, Confer 2011, Roth et al. 2012). This species also is known to have high levels of mortality during migration from building strikes (Roth et al. 2012). Extensive management of breeding habitat in the northeast and Great Lakes regions has successfully bolstered regional populations (McNeil et al. 2017).

## REPTILES

## American Alligator

The American Alligator (*Alligator mississippiensis*) was listed as endangered effective March 11, 1967 (32 FR 4001). This was prompted by decimation of their populations as a result of unregulated harvesting.

Federal protections and wide scale recovery efforts led to a swift recovery and the species is no longer considered to be "biologically endangered or threatened" (52 FR 21059). Based on similarity of appearance to the American Crocodile, which is currently listed under the Endangered Species Act, the American Alligator was reclassified to Threatened in 1975 (40 FR 44412). Critical habitat has not been designated (USFWS 2020a).

The American Alligator is one of the two native crocodilian species to North American, the other being the American Crocodile (70 FR 15052). The range of the American Alligator includes Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Florida, and Texas. The majority (83 percent) of Alligator habitat available within this range is concentrated in Florida, Louisiana, and Texas (52 FR 21059). They utilize a variety of wetland habitats including but not limited to marshes, ponds, lakes, rivers, swamps, bayous, and canals. Females construct nest mounds from debris (e.g., vegetation, rocks, mud, etc.), often in marshes or near lakes and rivers. As opportunistic predators, they feed on a wide array of prey from invertebrates as juveniles to deer as large adults (NatureServe 2020).

## Spotted Turtle

The Spotted Turtle (*Clemmys guttata*) was petitioned for listing on July 11, 2012 (CBD 2012) and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

Although the range of the Spotted Turtle is extensive and extends from the Great Lakes along the Atlantic Coast

and into northern Florida (Ernst and Lovich 2009), the species has apparently been extirpated from many regions resulting in disjunct populations (CBD 2012). Habitat includes a variety of shallow, isolated wetlands with clean water, soft substrate, and emergent or submerged vegetation (Ernst and Lovich 2009). The species may engage in terrestrial movements, especially in spring. In cold weather, hibernation occurs in water depths of 56 to 94 centimeters with muddy bottoms and dense vegetation (CBD 2012). Spotted Turtle populations tend to be small and isolated, and dispersal ability is limited (van Dijk 2010, Anthonysamy et al. 2014). Threats to the species include habitat destruction and loss of wetlands, collection for the pet trade, road mortality, and invasive species (Ernst and Lovich 2009, van Dijk 2010).

## American Crocodile

The American Crocodile (*Crocodylus acutus*) is managed as two separate populations, those in Florida and those that occur in the rest of the United States. The US population of American Crocodile was listed as endangered effective October 25, 1975 (40 FR 44149). The Florida population was classified as a distinct population segment and listed as threatened effective May 1, 2006 (71 FR 13027). In 1978, the Saltwater (estuarine) Crocodile (*Crocodylus porosus*) was listed as endangered because of the similarity in appearance (44 FR 75074, 70 FR 15052). Critical habitat has been designated (41 FR 41914, 42 FR 47840), and includes "portions of Biscayne Bay south of Turkey Point, northeast Florida Bay, including the Keys, and the mainland extending as far west as Flamingo" as well as Everglades National Park (70 FR 15052).

The American Crocodile is one of the two crocodilian species native to North America. The broader range of the American crocodile includes the Caribbean Islands and the Atlantic and Pacific coastal regions along southern Mexico, Central America, and northern South America. In Florida, at the northern extent of its range, it is limited to the southern tip of Florida and the Florida Keys, with the historic core concentrated in Miami-Dade, Broward, and Monroe Counties. Crocodile habitat includes mangrove-lined bays, swamps, and marshes (70 FR 15052). Adult crocodiles are powerful predators and feed primarily on fish (NatureServe 2020), as well as a wide array of prey including birds, mammals, crabs, and turtles. Young specialize in fish and aquatic invertebrates (USFWS 2020a). They are primarily nocturnal, aiding in prey ambush. Earthen nests are constructed on well-drained soils in close proximity to water, often along ditches and beaches. Females lay an average of 38 eggs, and often will not nest every year. The nest must be excavated by the female after the young have hatched (70 FR 15052).

The American Crocodile was historically common across southern Florida, with breeding records as far north as Lake Worth. Their populations were decimated because of habitat loss from development and excessive human persecution. At the time of listing in 1975, only an estimated 10 to 20 breeding females remained in Florida (40 FR 44149). Through the protections afforded by listing, their populations grew from 200 to 300 individuals in 1975 to 500 to 1,000 individuals in 2005 (70 FR 15052). As of 2005, the mainland shore of Florida Bay between Cape Sable and Key Largo makes up the majority of the current breeding range (70 FR 15052). They may be expanding their range back into the Florida Keys, but nesting is only known from Key Largo (70 FR 15052).

## Eastern Diamondback Rattlesnake

The Eastern Diamondback Rattlesnake (*Crotalus adamanteus*) was petitioned for listing on August 22, 2011 (CBD 2011a), and the 90-day finding determined that listing may be warranted (77 FR 27403). The species remains under review at this time (USFWS 2020a).

Although the species was historically distributed through much of the southeast from Louisiana to North Carolina, there have reportedly been considerable declines over much of the range (Means 1986, Waldron et al. 2008, CBD 2011a). In Florida, large sub-populations remain in the northern peninsula and the eastern and southern Panhandle (Timmerman and Martin 2003); however, populations in other parts of the State have been considerably reduced or in some cases extirpated (Means 2010). About half of the currently occupied range is in Florida (Timmerman and Martin 2003). The primary pre-settlement habitat was longleaf pine savanna (Means 2006), although other open-canopy habitats with a dense herbaceous understory are also utilized today. In

addition to habitat conversion or loss, rattlesnakes are actively targeted for malicious killing by humans (Means 2010).

## Key Ringneck Snake

The Key Ringneck Snake (*Diadophis punctatus acricus*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

Distribution is restricted to five Lower Keys: Key West, Big Pine, Little Torch, Middle Torch, and No Name keys. Presence on a few additional keys which have suitable habitat is possible but unverified (Weaver et al. 1992). Habitat includes pine rocklands and rockland hammocks, usually near permanent fresh water (Lazell 1989, FNAI 2001a). Up to 98 percent of pine rockland habitat has reportedly been lost (Bentzien 1987) and what remains has been fragmented. There have been few recent surveys for Key Ringneck Snakes (and relatively few individuals found) (CBD 2012). Storm surge and sea level rise could be a future risk given the low elevation of much of the remaining habitat (FWC 2011b).

## Eastern Indigo Snake

The Eastern Indigo Snake (Drymarchon couperi = Drymarchon corais couperi) was listed as threatened effective March 3, 1978 (43 FR 4026). Critical habitat has not been designated (USFWS 2020a).

Indigo Snakes are currently considered to be extirpated or very rare in the Florida Panhandle (Enge et al. 2013). The majority of recent records are in Peninsular Florida south of Gainesville. Indigo Snakes require large patches greater than 4000 hectares of contiguous, good quality habitat with few roads and sufficient shelter sites, such as Gopher Tortoise burrows (USFWS 2019k). Individual home ranges are large, from tens to several hundred hectares. A variety of upland and lowland habitat types are utilized, generally with a preference for upland habitat (Bauder et al. 2018). Winter shelter is a key structural component, and may include Gopher Tortoise burrows, hollowed root channels, hollow logs, stump holes, rodent or armadillo burrows, or other similar shelter (Hyslop et al. 2014, Bauder et al. 2017, USFWS 2019k).

There have been considerable Indigo Snake population declines reported, including a 97 percent loss in the Florida Panhandle and 56 percent loss in Peninsular Florida. Out of 83 total historic populations, 53 remain extant, although only four are considered to have high resiliency. Major threats to the species include habitat fragmentation, fire suppression leading to eventual habitat degradation, and road mortality (USFWS 2019k).

## Gopher Tortoise

The Gopher Tortoise (*Gopherus polyphemus*) is managed as two separate populations, western and eastern. The western Gopher Tortoise population was listed as threatened effective August 6, 1987 (52 FR 25376). The Gopher Tortoise eastern population was petitioned for listing on January 18, 2006 (USFWS 2018f). The listing was determined to be warranted; however, the species has been precluded from listing because of delays from higher priority listings (USFWS 2018f). Thus, the eastern population remains a Candidate for listing (USFWS 2020a). Critical habitat has not been designated (USFWS 2020a).

The western Gopher Tortoise population occurs west of the Mobile and Tombigbee Rivers in Alabama, Louisiana, and Mississippi (USFWS 2020a). The eastern Gopher Tortoise population occurs east of the Mobile and Tombigbee Rivers in Alabama, Georgia, Florida, and South Carolina (USFWS 2020a). The majority of the eastern population occurs in Florida (CBD 2020b). The species is associated with habitats characterized by dry sandy soils, open canopy cover, and abundant herbaceous vegetation (USFWS 2018f). Gopher Tortoises are considered a keystone species because the burrows they dig are utilized by 360 other species (CBD 2020b). The primary threats to Gopher Tortoise populations include habitat loss, degradation, and fragmentation (84 FR 54732).

**Escambia Map Turtle**

The Escambia Map Turtle (*Graptemys ernsti*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

This species is endemic to very few relatively small river systems in western Florida and adjacent southern Alabama where it is locally abundant, with populations appearing to be relatively stable (NatureServe 2020). The species usually favors areas with good flow, avoids backwaters and salt water, and nests along sandbars and river berms. Basking individuals are conspicuous from late spring to fall, despite being present year-round. Florida currently has a state possession limit of two turtles; however, it is illegal to buy or sell the species or its parts. Future management recommends the acquisition of remaining private floodplain and bordering uplands in both Escambia and Yellow river systems, and to identify and control sources of pollution within those river systems (FNAI 2001a).

**Southern Hognose Snake**

The Southern Hognose Snake (*Heterodon simus*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). Following further review in 2019, the USFWS announced that the listing was not warranted based on likely population persistence (84 FR 53336).

The Southern Hognose Snake is endemic to the Coastal Plain of the southeastern United States. The species range extent includes 200,000 to 2,500,000 square kilometers with a presumed population of at least several thousand. The main threats to the species are loss of habitat through fire and urban development, fragmentation, and invasive species such as red imported fire ants and feral hogs (USFWS 2019l). The Southern Hognose Snake inhabits open, xeric habitats with well-drained, sandy soils, dominated by pine or pine-oak woodland with an open canopy and grassy understory (Enge et al. 2016). They spend a considerable amount of time burrowed in the soil and may use their snout to excavate buried toads (NatureServe 2020). Further studies are required to determine the factor or combination of factors that have caused the population to decline. Once established, management strategies can be implemented.

**Apalachicola Kingsnake**

The Apalachicola Kingsnake (*Lampropeltis getula meansi*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a). The petition requested listing of the subspecies if recognized, or as a distinct population segment (DPS) level if not recognized. Krysko et al. (2017) presented further genetic evidence that the Apalachicola Kingsnake may be a distinct species.

Endemic to the Florida panhandle, the range of the Apalachicola Kingsnake is limited to Franklin and Liberty Counties between the Apalachicola and Ochlockonee Rivers and south of Telogia Creek. Some intergradation with the nominate subspecies has been reported in surrounding counties (Krysko and Judd 2006). Habitat has been described as wetland margins within longleaf pine flatwoods. The Apalachicola Kingsnake has been found in freshwater marshes in the Apalachicola River estuary and behind the Franklin County beachfront (Moler 1992). The subspecies has declined considerably since the 1970s in part due to extensive development in the southern Apalachicola region, where only two to three percent of the original longleaf pine savanna is estimated to remain intact (Noss et al. 1995, Krysko and Smith 2005).

**Alligator Snapping Turtle**

The Alligator Snapping Turtle (*Macrochelys temminckii*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). Despite a lawsuit filed by the Center for Biological Diversity in 2016 pressing for more timely protection, the species remains under review at this

time (CBD 2016, USFWS 2020a). A recent genetic study proposed two new species (*Macrochelys apalachicolae* and *Macrochelys suwanniensis*) that had previously been considered Alligator Snapping Turtle (Thomas et al. 2014, CBD 2016).

Alligator Snapping Turtles are fully aquatic (except while nesting), foraging on the bottom of permanent water bodies. Their diet consists primarily of aquatic animals, supplemented with carrion and plants (NatureServe 2020). They are secretive and occupy large home ranges (NatureServe 2020).

Alligator Snapping Turtle populations are experiencing drastic declines and the species has been extirpated from much of their historic range, including Iowa, Illinois, Kentucky, Missouri and Tennessee. Extant populations remain in Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Mississippi, Oklahoma, and Texas. Primary threats to their populations are overharvest in the exotic trade market and habitat loss (CBD 2012).

### Atlantic Salt Marsh Snake

The Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) was listed as threatened effective December 29, 1977 (42 FR 60743). Critical habitat has not been designated (USFWS 2020a). The 2008 and 2019 five-year reviews prioritized taxonomic and genetic analysis because status at both the specific and subspecific levels is unknown and in question. Analysis reportedly was scheduled for completion late in 2019 (USFWS 2019m) but is not yet available. Earlier work suggests that the subspecies may not be genetically, morphologically, or ecologically distinct (Territo 2013, Parkinson et al. 2016).

As currently defined, the range of the Atlantic Salt Marsh Snake is believed to be restricted to coastal marshes in Volusia County, Florida (Territo 2013). Habitat is described as brackish coastal marshes dominated by pickleweed (*Salicornia* spp.) and saltgrass (*Distichlis spicata*); black mangrove (*Avicennia* spp.) may also be present. Habitat loss due to development and habitat degradation resulting from ditching, diking, and impoundments has had a negative impact on the species, but these impacts have slowed in recent years (USFWS 2019m). Florida Natural Areas Inventory mapped 3,696 hectares of suitable habitat for the subspecies, of which 95 hectares are protected within public lands (FNAI 2007). Nearly 400 hectares of salt marsh have recently been restored in Volusia County. Northward encroachment of mangrove swamp replacing brackish marsh is reportedly a threat to subspecies habitat (USFWS 2019m).

### Florida Pine Snake

The Florida Pine Snake (*Pituophis melanoleucas mugita*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568).

This southeastern Coastal Plain species occurs from South Carolina to Alabama, including Florida north of the Everglades (Ernst and Ernst 2003). Preferred habitat is characterized by well-drained sandy soils and relatively open canopy, including sandhills, xeric hammock, scrubby flatwoods, and dry prairie (Enge 1997, Franz 2005). In northern Florida, most observational reports are from sandhill or high pine habitat. The number of reports has decreased over time, suggesting an ongoing population decline (Franz 2005). Major threats are thought to include collecting, road mortality, and habitat loss (Franz 1992, Golden et al. 2009).

### Bluetail Mole Skink

The Bluetail Mole Skink (*Plestiodon egregious lividus* = *Eumeces egregious lividus*) was listed as threatened effective December 7, 1987 (52 FR 42658). Critical habitat has not been designated (USFWS 2020a).

The subspecies has been reported from 23 localities, almost all of them on the Lake Wales Ridge in Highlands, Polk, and Osceola Counties; about half the localities are on public lands (Turner et al. 2006, USFWS 2007e). Because the subspecies is fossorial, spending much of its time underground, little abundance information is available. Populations are associated with scrub and sandhill habitat, and are believed to require loose soils, moderate soil temperatures, and presence of vegetation (although much of this information is inferred from studies

of related species) (Mushinsky and McCoy 1999, Gianopulos et al. 2001). Threats to the subspecies include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation.

## Sand Skink

The Sand Skink (*Plestiodon reynoldsi* = *Neoseps reynoldsi*) was listed as threatened effective December 7, 1987 (52 FR 42658). Critical habitat has not been designated (USFWS 2020a).

The species has been reported from 73 localities, 70 of them on the Lake Wales Ridge in central Florida (Turner et al. 2006, USFWS 2007e). The species is fossorial, spending much of its time underground; presence of loose, uncompacted, coarse-grained soil is thought to be an important habitat component. Populations are associated with scrub and sandhill habitat (Mushinsky and McCoy 1999, Gianopulos et al. 2001). Occasional fire is important to keep sites open, although Sand Skink densities tend to be somewhat higher on sites which have not burned in several years (Schrey et al. 2011), suggesting that there is a range of optimal fire frequency. Threats to the species include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. About 85 percent of pre-settlement sand scrub habitat has been lost to development, and only about six percent is currently protected (Turner et al. 2007). There is some evidence that populations may persist in lower densities in altered habitat as long as loose, dry soil is present (USFWS 2007e).

## Florida Red-Bellied (Florida Panhandle) Turtle

The Florida Red-bellied (Florida Panhandle) Turtle (*Pseudemys nelsoni* pop. 1) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (77 FR 27403). The species remains under review at this time (USFWS 2020a). There is no evidence of taxonomic distinctness between the Panhandle and peninsular populations in Florida; however, the populations are separated by a considerable physical distance (NatureServe 2020).

The Florida Panhandle population is restricted to the lower Apalachicola/Chipola River drainage, associated delta, and offshore islands in the Florida Panhandle (NatureServe 2020). The remainder of the population is found from Suwannee River area south, primarily in Florida with extensions into Georgia. The species inhabits water rich with aquatic plant life, such as streams, ponds, lakes, ditches, sloughs, marshes, and mangrove-bordered creeks (Gleaton 2020). It is threatened by drought, predators, and (though now illegal) harvesting for food by turtle trappers. The Florida Red-bellied (Florida Panhandle) Turtle requires extensive survey work to verify its occurrence, population size, habitat use, and ecological and biological processes to establish appropriate management plans (NatureServe 2020).

## Florida Scrub Lizard

The Florida Scrub Lizard (*Sceloporus woodi*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2016 determined that listing may be warranted (81 FR 63160). The species remains under review at this time (USFWS 2020a).

Endemic to Florida, the range consists of four disjunct areas: Ocala National Forest and vicinity in the northern Peninsula; portions of Polk and Highlands Counties in central inland Florida; Atlantic Coast scrub from Brevard to Broward Counties; and Gulf Coast scrub in Lee and Collier Counties (DeMarco 1992).

Habitat is limited to evergreen oak scrub and young sand pine scrub; and to a lesser extent sandhills adjacent to scrub or scrubby flatwoods. Both open areas and mature trees are required, and habitat is exclusively xeric (Hammerson 2007a). Density tends to be higher in recently burned areas (Tiebout and Anderson 2001, Schrey et al 2011). Declines are attributed to loss and fragmentation of sand scrub habitats and fire suppression (Whelan 1995).

## Short-tailed Snake

The Short-tailed Snake (*Stilosoma extenuatum = Lampropeltis extenuata*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted as of early 2020 (80 FR 56423). The species remains under review at this time (USFWS 2020a).

Found only in northern and central Florida, Short-tailed Snake preferred habitat includes dry upland habitats of sandhill, xeric hammock, and sand pine scrub (FNAI 2001a). They are rarely seen above ground and are known to burrow or use soil, fallen logs, or debris for shelter. Little is known about the ecology of this snake; as such, further studies on ecology, behavior, life history, movement patterns, and other natural history would be valuable to understand and effectively manage this species (NatureServe 2020).

### Rim Rock Crowned Snake

The Rim Rock Crowned Snake (*Tantilla oolitica*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

The range of the Rim Rock Crowned Snake is small, restricted to eastern Dade County around Miami and to several of the Keys. Most of the Dade County range is extirpated and what remains is fragmented, very few specimens have been collected from this area (Hammerson 2007b). Habitat includes pine rockland and rockland hammock as well as disturbed urban environments including vacant lots, roadsides, and pastures (Hines and Bradley 2009, CBD 2012). In natural habitat types, refugia include crevices in oolitic limestone, rock rubble, or accumulated organic matter in depressions within the rock (Enge et al. 2003).

Animals are sometimes found under surface cover including rocks, downed woody debris, or palmetto leaves (Rochford et al. 2010, Yirka et al. 2010). Habitat loss and fragmentation are the primary threats to the species (CBD 2012).

### AMPHIBIANS

### Reticulated Flatwoods Salamander

The Reticulated Flatwoods Salamander (*Ambystoma bishopi*) was listed as endangered effective March 12, 2009, and critical habitat was designated simultaneously (74 FR 6700).The listing recognized Flatwoods Salamanders west of the Apalachicola and Flint Rivers as a distinct species from the Frosted Flatwoods Salamander, as originally proposed by Pauly et al. (2007).

Breeding occurs in the fall in acidic seasonal wetlands; eggs are inundated and larvae hatch after subsequent rains. Breeding ponds range from relatively open-canopy to dense canopy cypress domes and are located within longleaf pine-dominated flatwoods or savannas with a predominantly wiregrass understory (Palis 1997, USFWS 2015e). Fire suppression may have led to increased canopy closure Gorman et al. 2013). Adults, and juveniles after leaving the ponds, spend most of their time underground in crayfish burrows or root channels (USFWS 2015e). The Florida range is entirely west of the Apalachicola River. Of the 20 populations known at the time of listing (11 on private land, nine on public land), only six were known to be extant as of 2014 (USFWS 2015e). All of these populations are on public land, and five of them are in Florida. Private lands have not been extensively surveyed and status there is unknown.

### Frosted Flatwoods Salamander

The Flatwoods Salamander (*Ambystoma cingulatum*) was listed as threatened effective May 3, 1999 (54 FR 15691). Following a taxonomic revision which recognized two species of Flatwoods Salamander (Pauly et al. 2007), the listing was revised with the Frosted Flatwoods Salamander retaining Threatened status and defined as including populations east of the Apalachicola River (74 FR 6700). Critical habitat was designated for the Frosted Flatwoods Salamander in 2009 (74 FR 6700).

FWS-005757

The Frosted Flatwoods Salamander has a disjunct range in parts of Florida, Georgia, and South Carolina; the historic Florida distribution included a band from the Apalachicola River to east of Tallahassee, and a separate area west of Jacksonville. Of the 25 populations identified in the original listing, only nine are confirmed extant (USFWS 2019n). In Florida, five populations are within Apalachicola National Forest, and two are within St. Marks National Wildlife Refuge.

The Frosted Flatwoods Salamander breeds in the fall, depositing eggs in small depressions which are inundated by subsequent rains (Palis 1995, 1997). Aquatic larvae metamorphose from March to May and disperse from the ponds (Palis 1995). Terrestrial adult habitat is typically within mesic longleaf pine (Pinus palustris)/wiregrass flatwoods or savanna, or slash pine (Pinus elliottii)/sawgrass (USFWS 2019n).

Juveniles and adults spend considerable time underground in crayfish burrows or root channels (Petranka 1998). The species' population is in decline (USFWS 2019n). Habitat management recommendations include actions to increase herbaceous vegetation cover (Gorman et al 2014).

### Georgia Blind Salamander

The Georgia Blind Salamander (*Eurycea wallacei* = *Hadeotriton wallacei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

Distribution is restricted to the karst region of the Marianna Lowlands-Dougherty Plain physiographic region of Florida and adjacent Georgia (NatureServe 2020). There are at least 22 localities in the Chipola River watershed of Jackson County, one in Calhoun County, and five in the Lower Choctawhatchee River watershed of Washington County (Fenolio et al 2013, NatureServe 2020). Georgia Blind Salamanders are fully aquatic, neotenic, and restricted to streams and pools within caves. Presence may be associated with bat droppings (Means 2005). Although density may be high at some localities, there are no reliable population estimates because of the difficulty of sampling within caves (Fenolio et al 2013). Primary threats include habitat loss and water quality degradation (NatureServe 2020).

### Gopher Frog

The Gopher Frog (*Lithobates capito*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

The Gopher Frog is a southeastern Coastal Plain species, extending from North Carolina to Florida with isolated populations in Alabama and Tennessee. Gopher Frogs historically occurred throughout Florida except in the Everglades (CBD 2012). Habitat is primarily fire-maintained xeric uplands (Greenberg and Tanner 2008), with breeding occurring in fishless semi-permanent emergent wetlands (Bailey 1991).

Gopher Frogs are commensal with Gopher Tortoises, relying on tortoise burrows for shelter (Kent et al 1997).

Although the historic range is extensive, Gopher Frog populations are thought to be in significant decline (Bailey 1991, CBD 2012). Threats include loss or degradation of longleaf pine (*Pinus palustris*) habitat as a result of logging and fire suppression, as well as wetland loss, introduction of fish into wetlands, ATV use, and reduced Gopher Tortoise populations (CBD 2012).

### Gulf Hammock Dwarf Siren

The Gulf Hammock Dwarf Siren (*Pseudobranchus striatus lustricolus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

The Gulf Hammock Dwarf Siren was described in 1951 from 11 specimens found in Levy and Citrus Counties and has not been observed since. The survival and even the validity of the subspecies is uncertain because of the small number of available specimens and long interval since detection (NatureServe 2020). Habitat is believed to be restricted to hydric hardwood hammocks within a small geographic area, where they burrow in the soft mud at wetland margins. Threats within the historic range include commercial forestry, habitat conversion for agriculture or development, and hydrology alteration (FWC 2008).

FWS-005759

**FISH**

**Shortnose Sturgeon**

The Shortnose Sturgeon *(Acipenser brevirostrum)* was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The Shortnose Sturgeon's historical range spans riverine and estuarine waters along the Atlantic coast of North America from the Indian River in Florida to the St. John River in Canada. There are three metapopulations distributed across this area: northern, mid-Atlantic, and southern. The current range is disjunct, with a 402-kilometer gap between the northern and mid-Atlantic metapopulations and the southern metapopulation (NOAA 2020). The species is managed across 19 distinct population segments (DPSs) (NMFS 1998).

As primarily an amphidromous fish, Shortnose Sturgeon are born in freshwater rivers in which they live and spend most of their adult lives, making short trips to marine waters for foraging (NOAA 2020). Some populations in the southern range exhibit estuarine anadromous life histories, but adults remain in estuaries rather than foraging offshore and only engage in short-distance migrations (NMFS 1998). In the southern portion of their range, spawning occurs from January to April (NOAA 2020). Spawning habitat typically includes the uppermost reach of a river (NMFS 1998). Adult sturgeons are characterized as benthic feeders, primarily upon mollusks and crustaceans (NOAA 2020).

Extensive overfishing contributed to initial declines. Pollution and habitat impediments as a result of industrial development has prevented the recovery of this species (NMFS 1998). Ongoing major threats include habitat impediment (e.g., dams), habitat degradation (e.g., dredging and poor water quality), and fisheries bycatch (NOAA 2020).

**Gulf Sturgeon**

The Gulf Sturgeon (*Acipenser oxyrinchus desotoi*, formerly known as *Acipenser oxyrhynchus desotoi*), was as Threatened effective October 30, 1991 (56 FR 49653). Critical habitat was designated for the Gulf Sturgeon on March 19, 2003 (68 FR 13370).

The Gulf Sturgeon is primarily confined to the eastern Gulf of Mexico and classified as a subspecies of Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) (NatureServe 2020). This anadromous fish spends much of its adult life foraging in the Gulf during colder months of the year, returning to natal freshwater river systems to spawn from February to April (FNAI 2001a). The species may migrate as far as 225 kilometers upriver to spawn. Spawning typically occurs over substrates consisting of hard clay, rubble, and gravel (NatureServe 2020). Adults return to the Gulf of Mexico in late fall and young-of-the-years remain in their natal rivers for as long as 12 months before moving into the lower estuarine habitats (68 FR 13370). Adult sturgeons are characterized as bottom feeders, utilizing their barbels to scan the benthos primarily in search of invertebrates such as brachiopods, insect larvae, mollusks, worms and crustaceans (56 FR 49653).

Initially, population declines were the product of overfishing for caviar, smoked fish, and isinglass. Damming and disconnection of spawning grounds from the Gulf of Mexico is one of the current major factors contributing to the species decline. Other factors such as habitat modification due to dredging, navigation maintenance activities, and water pollution also pose potential threats (68 FR 13370). In Florida, the Gulf Sturgeon distribution extends from all major Panhandle river systems east to the Suwannee River (FNAI 2001a). The species seen as far southeast as Florida Bay, although these observations coincide with especially cold years and are rare (68 FR 13370).

FWS-005760

**Atlantic Sturgeon**

The Atlantic Sturgeon *(Acipenser oxyrinchus oxyrinchus)* is managed across five distinct population segments (DPSs) all of which were federally listed in 2012: the Carolina DPS, Chesapeake Bay DPS, New York Bight DPS, and South Atlantic DPS are listed as endangered; and the Gulf of Maine DPS is listed as threatened (77 FR 5913, 77 FR 5880). The South Atlantic DPS was listed as endangered effective April 6, 2012 (77 FR 5913). Critical habitat was designated for all DPSs in 2017 (82 FR 39160). Critical habitat for the South Atlantic DPS includes the Edisto, Combahee-Salkehatchie, Savannah, Ogeechee, Altamaha, Ocmulgee, Oconee, Satilla, and St. Marys Rivers in South Carolina, Georgia, and Florida (82 FR 39160).

The species' historical range spans riverine and coastal waters along the Atlantic coast of North America from Florida to Canada. As an anadromous fish, adults spend their lives foraging in the Atlantic Ocean, with records as far north as Iceland. Adults return to their natal freshwater rivers to spawn in springtime everyone to five years. Adult sturgeons are characterized as bottom feeders, utilizing their barbels to scan the benthos primarily in search of invertebrates such as mollusks, worms, crustaceans, and fish (NOAA Fisheries 2020).

Extensive overfishing contributed to initial species declines (NOAA Fisheries 2020). Despite a moratorium on all Atlantic Sturgeon fisheries that began in 1998, some populations have continued to decline (77 FR 5913). Current threats include fisheries bycatch, habitat degradation (e.g., dredging and poor water quality), habitat impediment (e.g. dams), and vessel strikes (FWC 2020c, NOAA Fisheries 2020).

**Okaloosa Darter**

The Okaloosa Darter (*Etheostoma okaloosae*) was originally listed as endangered effective June 4, 1973 (38 FR 14678). The species was down listed to Threatened effective May 2, 2011 (76 FR 18087). Critical habitat has not been designated (USFWS 2020a).

The species occurs only in Florida, with the range limited to six streams (Toms, Turkey, Mill, Swift, East Turkey, and Rocky Creeks) in two Florida Panhandle counties (Walton and Okaloosa). An estimated 98.7 percent of the occupied range is within and managed by Eglin Air Force Base (76 FR 18087). Habitat is typically dense vegetation, root mats, and detritus along clear, flowing stream margins (FNAI 2001a). Holt et al. (2013) reported that individual fish remained within relatively small areas, with 22 percent of individuals remaining in the same 20-meter reach for one year; fish infrequently crossed open, sandy, mid-channel areas to the other side. Most populations are believed to be stable or increasing at present and vulnerability is primarily due to the small range and limited number of occurrences (NatureServe 2020).

**Saltmarsh Topminnow**

The Saltmarsh Topminnow (*Fundulus jenkinsi*) was petitioned for listing on September 3, 2010 (Wild Earth Guardians and Felsen 2010), and the 90-day finding determined that listing may be warranted (76 FR 49412). The species remains under review at this time (USFWS 2020a).

Habitat includes small meandering channels of brackish marshes dominated by cordgrass (*Spartina alterniflora*) and needle grass rush (*Juncus roemerianus*). Channel and marsh salinities are in the range of 1-4 parts per thousand (ppt) (Lopez et al. 2011). Patchy populations occur along the Gulf Coast from Texas (Galveston Bay) to Florida. In Florida, the species is restricted to the estuary of the Escambia River (Gilbert and Relyea 1992).

**Smalltooth Sawfish**

The US distinct population segment (DPS) of Smalltooth Sawfish (Pristis pectinate) was listed as endangered on April 1, 2003 (68 FR 15674). The Bahamian DPS was listed as endangered in 2014 (79 FR 73977). In 2009, two areas along the southwestern coast of Florida were designated as critical habitat for the US DPS (74 FR 45353).

This species has a circumtropical distribution, from Brazil through the Caribbean and Central America, the Gulf of Mexico and the Atlantic Coast of the United States (NMFS 2009). NMFS regulates the US DPS in four regions of the eastern US including Florida. Peninsular Florida has the largest number of capture records on the East Coast (NMFS 2018). The species occurs off the southwest coast of Florida from about Charlotte Harbor through the Everglades (NOAA Fisheries 2020). Currently, Smalltooth Sawfish can only be found with regularity in south Florida between the Caloosahatchee River and the Florida Keys (NMFS 2009). Their habitat includes shallow coastal waters of most warm seas. The species is found very close to shore in muddy and sandy bottoms, seldom descending to depths greater than 10 meters. They are often found in sheltered bays, on shallow banks, and in estuaries or river mouths (NMFS 2009). Juvenile Smalltooth Sawfish generally live in estuaries during their first two years (habitats fringed with vegetation, especially red mangroves (*Rhizophora mangle*)), and move into more coastal habitats upon reaching two meters in length. Female Smalltooth Sawfish may have 7 to 14 pups at a time, gestate for 12 months, and give birth every other year (NOAA Fisheries 2020). This species generally subsists on small schooling fish, crustaceans and other bottom-dwelling organisms (NMFS 2009) and utilize their rostra (or "saw") to slash through schools of fish and to find shrimp and crabs on the seafloor (NOAA Fisheries 2020).

The species has declined as a result of habitat loss (development of the Florida waterfront) and bycatch (NMFS 2009, NMFS 2018, NOAA Fisheries 2020). Historically, Smalltooth Sawfish were often accidentally caught in fishing nets, and often killed rather than released unharmed (NOAA Fisheries 2020). This threat has been reduced with the 1995 enactment of the Florida Net Ban Amendment and improved education reform (NMFS 2009, NOAA Fisheries 2020). It is likely that the population is currently at a level less than five percent of its size at the time of European settlement (NMFS 2009).

### Invertebrates

### MOLLUSKS

### Southern Elktoe

The Southern Elktoe (*Alasmidonta triangulata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Southern Elktoe is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, and Endangered by the American Fisheries Society (CBD 2010a, NatureServe 2010).

The Southern Elktoe is a rare freshwater mussel that lives in sandy substrates, such as sandbars, of rivers and larger creeks with moderate currents. Its range is limited to a single river system, the Apalachicola Basin, which includes the Chattahoochee River in Alabama and Georgia, the Flint River in Georgia, and the Apalachicola and lower Chipola rivers in Florida (CBD 2010a, NatureServe 2020).

Adults are detritivores and the glochidia (larvae) are parasitic, though specificity of fish hosts is not known (NatureServe 2020). The species has suffered severe declines (70 to 90 percent) and there are less than five populations remaining within its range. Major threats to the species include habitat degradation and fragmentation caused by dredging, impoundment, sedimentation, water extraction and drought (CBD 2010a).

### Fat Threeridge

The Fat Threeridge (*Amblema neislerii*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Fat Threeridge is endemic to Georgia and Florida. In Florida, their distribution is limited to the Chipola and Apalachicola rivers (FNAI 2001a). Fat Threeridge Mussels typically inhabit the main channels of small to large rivers where the current is slow to moderate and the substrate varies from gravel to cobble to a mixture of sand and sandy mud (Williams and Butler 1994).

Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). This mussel is a short-term brooder with gravid females observed in late May and June, suggesting the mussel releases glochidia in summer. Glochidia are parasitic and released in a white web-like structure to wrap around fish hosts. Fish hosts include Speckled Madtom (*Noturus leptocanthus*), Weed Shiner (*Notropis texanus*), Bluegill (*Lepomis macrochirus*), Redear sunfish (*Lepomis microlophus*), Largemouth Bass (*Micropterus salmoides*), and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adults are relatively nonmotile and significant dispersal only occurs via glochidia (NatureServe 2020). The primary factors contributing to population declines are anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants that alter water quality (USFWS 2003b).

**Rayed Creekshell**

The Rayed Creekshell (*Anodontoides radiates = A. radiatus*, formerly *Strophitus radiatus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Rayed Creekshell is listed by several other entities, including Imperiled by NatureServe, Near Threatened by the IUCN, and as a Special Concern species by the American Fisheries Society (CBD 2010a, NatureServe 2020).

The Rayed Creekshell has a sporadic distribution throughout Alabama, Florida, Georgia, Louisiana, and Mississippi. Specifically, it is known from the Apalachicola, Chattahoochee and Flint to Tickfaw River system, the Yazoo River (a tributary of the Mississippi drainage), as well as the Mobile and Apalachicola drainages. Recent surveys have also discovered Rayed Creekshells in several new locations. In Florida, they are known from only Gadsden County (NatureServe 2020). Rayed Creekshells live in the mud, sand, or gravel of large rivers as well as medium to small sized creeks in areas of moderate currents (CBD 2010a).

Rayed Creekshells are detritivores and the glochidia (larvae) are parasitic and feed on the outer gill of fish (though specificity of fish hosts is not known). Gravid females have been observed in September and December (NatureServe 2020). Although distribution historically may have always been sporadic and rare, recent survey efforts have resulted in low numbers at formerly known sites, suggesting up to a 30 percent population decline. Major threats to their populations are associated with stream modifications and come from a variety of sources including pesticide use, deforestation, damming, and water extraction for human consumption (CBD 2010a).

**Pygmy Siltsnail**

The Pygmy Siltsnail (*Cincinnatia parva = Floridobia parva*) was first petitioned for listing in 1984 (46 FR 21664), with multiple petitions since that point. The species was again petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The species is considered Critically Imperiled by NatureServe (NatureServe 2020).

This species is restricted to Blue Spring (St. John's River system) in Volusia County, Florida; specifically, the spring run section (approximately 0.5 kilometers long) (NatureServe 2020). Blue Spring is a freshwater karst spring run, characterized by clear circular pools with abundant aquatic vegetation and silty- sand/gravel substrate over limestone (CBD 2010a). Little to no information is available on the species' list history (NatureServe 2020). Threats to the species include recreational activities (Blue Spring is a popular recreation site), increased sedimentation from erosion and logging practices, invasive species, and any impacts to water quality. The single population also places the species at high risk of extinction from stochastic events. The population is considered in decline (CBD 2010a).

**Ponderous Siltsnail**

The Ponderous Siltsnail, formerly known as Ponderosa Spring Siltsnail, *(Cincinnatia ponderosa = Floridobia ponderosa)* was first petitioned for listing in 1984 (49 FR 21664). The species has been under review on several occasions (54 FR 554, 56 FR 58804, 59 FR 58982). The species was again petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Ponderous Siltsnail is listed by several other entities including as Critically Imperiled by NatureServe and as Vulnerable by the IUCN (CBD 2010a).

The Ponderous Siltsnail is a rare freshwater snail only known to occur in Sanlando Springs and the following approximate 450 meters of Little Wekiva River below it in Seminole County, Florida (NatureServe 2020). The species is commonly found in vegetated areas as well as in sand and gravel. The Ponderous Siltsnail is vulnerable due to its extremely limited range. In addition, habitat degradation (including water quality impacts from recreation and nearby urban areas) are threats to the species (CBD 2010a). Sanlando Springs has been dammed to be used as a recreational swimming hole (NatureServe 2020). Like other freshwater springs in Florida, there are many other threats to Ponderous Siltsnail habitat including saltwater intrusion, groundwater extraction for human consumption, and pollution from development (CBD 2010a).

**Delicate Spike**

The Delicate Spike (*Elliptio arctata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Delicate Spike is listed by several other entities, including Imperiled Globally and in Florida by NatureServe, and as a Special Concern species by the American Fisheries Society (CBD 2010a, NatureServe 2020).

The Delicate Spike is a river mussel. Adults are detritivores and glochidia (larvae) are parasitic on fish, though specificity of fish hosts is not known (NatureServe 2020). Its historic range included much of the eastern Gulf Coast drainages in Alabama, Florida, Georgia, Mississippi, and Tennessee. Specifically, it is known from the Apalachicola Basin in Georgia and Florida (Panhandle) west to the Pearl River drainage in Mississippi. Delicate Spike live in areas of moderate currents among large rocks or in the sand and gravel underneath them. Historically they were also common in headwater streams and river bars (CBD 2010a).

The Delicate Spike has been extirpated from many of its historic drainages and populations may become genetically isolated. The species is declining across its range, especially within the Coosa-Tallapoosa and Choctawhatchee-Escambia drainages. Delicate Spike populations face a wide array of threats related to habitat degradation including damming, eutrophication and pollution, water extraction, deforestation, bank scouring, and sedimentation (CBD 2010a).

**Chipola Slabshell**

The Chipola Slabshell (*Elliptio chipolaensis*) was listed as threatened effective April 15, 1998 (63 FR 12664). Critical habitat has been designated and encompasses several rivers and streams in Florida (as well as other states not described here) including: Econfina Creek, Chipola River, Apalachicola River, Upper Ochlockonee River, Ochlockonee River, and Santa Fe River and New River (72 FR 64286).

The Chipola Slabshell is one of seven rare and listed freshwater mussel species that are evaluated together because they are endemic to eastern Gulf Slope tributaries of the Apalachicolan Region in southeast Alabama, southwest Georgia, and north Florida. The Chipola Slabshell was named from the Chipola River in Florida where it was first described and thought to be endemic. Recent records have documented its presence in a tributary of the Chattahoochee River as well as in Alabama (63 FR 12664). It lives in muddy and silty-sand substrates in areas with slow to moderate currents (NatureServe 2020). It has been extirpated from approximately one-third of its historical range (USFWS 2007f). Bluegill (*Lepo mis macrochirus*) and centrarchids (sun fishes) are likely main host

fish species for parasitic larvae (glochidia) (63 FR 12664, USFWS 2007f). Like other freshwater mussels, adults are detritivores (filter feeders) and are likely very long-lived (examples of up to 130 years of age in other species (63 FR 12664). Given its extremely limited distribution and ongoing severe declines (over 75 percent of the population size), this species is particularly vulnerable to extinction. Ongoing threats include dams, stream channelization, pollution, and sedimentation (NatureServe 2020).

**Purple Bankclimber**

The Purple Bankclimber (*Elliptoideus sloatianus*) was listed as threatened effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Purple Bankclimber is endemic to Alabama, Georgia, and Florida, where they are found in the Apalachicola-Chattahoochee-Flint and Ochlockonee river basins (63 FR 12664). The species is believed to be extirpated from the Chipola and Chattahoochee rivers, making it no longer extant in Alabama (63 FR 12664). However, one individual was observed from the Chattahoochee River in December 2000; the most recent record from that river since the 1800s (Brim Box and Williams 2000). Depending on the river system, the preferred habitat of the Purple Bankclimber seems to vary slightly. In general, they are typically observed in small to large rivers, often in the main channels, where there is moderate current (Clench and Turner 1956, NatureServe 2020). They seem to prefer sand substrate but have also been observed in fine gravel, muddy sand, and sand/limestone. They are frequently observed at depths greater than three meters (Brim Box and Williams 2000).

This species is thought to be a summer releasing mussel as gravid females have been observed in the Ochlockonee River from February through April (NatureServe 2020). They produce parasitic glochidia (NatureServe 2020). Glochidia transformation has occurred on Eastern Mosquitofish (*Gambusia holbrooki*), Guppy (*Poecilia reticulata*), and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adult Bankclimbers are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively nonmotile and only move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs through glochidia transportation through infected fish movement (NatureServe 2020). The primary factors contributing to species decline are habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants (68 FR 42419).

**Tapered Pigtoe**

The Tapered Pigtoe (*Fusconaia burkei*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Tapered Pigtoe is an endemic species found in the Choctawhatchee River drainage in Alabama and Florida. Within this river drainage, its distribution also includes several oxbow lakes in Florida. Tapered Pigtoe are found in areas with slow to moderate currents in medium creeks to medium rivers, where the substrate is stable and consists of sand, small gravel, or sandy mud (77 FR 61663). They are also occasionally found in floodplain lakes (Williams and Butler 1994).

Little is known about the specific life history of this mussel, although, based on closely related species, they are thought to be short-term brooders (NatureServe 2020). Gravid females have been observed from mid-March through May, and possibly June (Pilarczyk et al. 2006).Their glochidia are parasitic. Blacktail Shiner (*Cyprinella venusta*) are confirmed to produce glochidia transformation (White et al. 2008). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively nonmotile and only move to burrow deeper into the sediment (NatureServe 2020). Dispersal occurs via glochidia transportation on parasitized fish. The primary factors contributing to their population decline are habitat degradation caused by excessive sedimentation,

streambed destabilization, and environmental contaminants (77 FR 61663).

## Narrow Pigtoe

The Narrow Pigtoe (*Fusconaia escambia*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Narrow Pigtoe is an endemic species with its presence limited to two river systems that drain through northwestern Florida: the Escambia River and Yellow River (77 FR 61663). This mussel is typically found in substrate consisting of sand, gravel, sandy gravel, or silty sand and prefers slow to moderate currents within small to medium sized streams and rivers (CBD 2010a). Little is known about the specific life history of this mussel, although they are thought to be short-term brooders, with gravid females observed in June containing eggs and glochidia (CBD 2010a, Mirarchi et al. 2004). Their glochidia are believed to be parasitic larvae, a common reproductive strategy shared among most freshwater mussels (NatureServe 2020). The host fish species for larvae development is currently unknown (77 FR 61663, Mirarchi et al. 2004). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974).

Threats to the species include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants altering the water quality (77 FR 61663). The total species population size of the Narrow Pigtoe is estimated to be low, around 2,500 to 10,000 individuals. Surveys of sites currently supporting the species averaged three individuals per site; this likely contributes to low recruitment (NatureServe 2020).

## Round Ebonyshell

The Round Ebonyshell (*Fusconaia rotulata*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Round Ebonyshell has one of the most restricted ranges of all North American unionids (NatureServe 2020). It is endemic to the Escambia River drainage in Alabama and Florida where it is only found in the main river channel (77 FR 61663). The habitat for this species consists of areas with moderate current on sand and gravel substrate (Williams and Butler 1994).

Little is known about the specific life history of this mussel, although based on closely related species, they are thought to be short-term brooders (NatureServe 2020). Gravid females have been observed in the spring and summer (77 FR 61663). Their glochidia are believed to be parasitic larvae, a common reproductive strategy shared among most freshwater mussels (NatureServe 2020). The host fish species for larvae development is currently unknown (77 FR 61663, NatureServe 2020). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller, 1974). Adults are relatively nonmotile but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). Primary factors contributing to the species decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Due to the limited species distribution, the Round Ebonyshell is at a high risk of catastrophic events such as flood scour, contaminated spills, and activities associated with streambed destabilization (77 FR 61663).

## Southern Sandshell

The Southern Sandshell (*Hamiota australis*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Southern Sandshell is an endemic species limited to the Escambia, Choctawhatchee, and Yellow River drainages that flow through Alabama and northwestern Florida. In Florida, the species has only been observed within

the Choctawhatchee and Yellow River drainages. Southern Sandshell habitat includes areas with slow to moderate currents in small creeks and rivers, where the substrate is stable and consists of sand or a mix of sand and fine gravel (77 FR 61663). This mussel also relies on clear water to complete its life cycle, as it is one of the few mussels to produce a super conglutinate lure to attract a host fish (NatureServe 2020).

This Southern Sandshell is believed to be a long-term brooder with females remaining gravid from late summer/autumn to the following spring (77 FR 61663, Blalock-Herod et al. 2002). This species produces parasitic glochidia (NatureServe 2020). A host fish species has not been identified, although predatory centrarchids such as basses are believed to be a suitable host based on closely related mussel species (77 FR 61663). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974).

Adults are relatively nonmotile but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). The primary factors contributing to the species' decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants (77 FR 61663, NatureServe 2020). In addition, habitat fragmentation is likely to limit the dispersal and reproductive capabilities of this species (Williams et al. 2008).

## Shinyrayed Pocketbook

The Shinyrayed Pocketbook (*Lampsilis subangulata*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Shinyrayed Pocketbook is endemic to Alabama, Georgia, and Florida, where they are found in the Apalachicola-Chattahoochee-Flint and Ochlockonee river systems. In Florida, their distribution is limited to the Chipola and Ochlockonee rivers (FNAI 2001a). Shinyrayed Pocketbook habitat includes areas with slow to moderate currents in medium sized creeks to rivers, where the substrate consists of clean sand or silty sand (Williams and Butler 1994). Individuals are often found in areas where the current strength and sediment particle size are transitional, such as the interface of stream channel and sloping bank habitats (NatureServe 2020).

Gravid females have been observed from December through August and it is suggested that nearly an entire year of incubation is required for glochidia to reach full maturity. Glochidia are parasitic and released from late May to early July to attract a host. The primary host fish for this mussel are Spotted Bass (*Micropterus punctulatus*) and Largemouth Bass (*Micrjjopterus salmoides*) (O'Brien and Brim Box 1999). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively non-motile and significant dispersal occurs via glochidia transportation on parasitized fish (NatureServe 2020). The primary factors contributing to their population decline are anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants (USFWS 2003b).

## Gulf Moccasinshell

The Gulf Moccasinshell (*Medionidus penicillatus*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

While the range of the Gulf Moccasinshell has been debated due to lack of strong populations and presence at sample sites, it is generally considered to be restricted to the Apalachicola-Chattahoochee- Flint river system and Ecofina Creek in Alabama, Georgia, and Florida (USFWS 2003b). In Florida, populations of this species are found in the Chipola River, Ecofina Creek, and potentially the Choctawhatchee, Yellow, and Apalachicola Rivers (may be extirpated; FNAI 2001a). Gulf Moccasinshell habitat includes areas with a slow to moderate current in medium-sized creeks to large rivers where the substrate consists of sand and gravel or silty sand (Williams and Butler 1994).

Gravid females have been observed in March, April, September, and November. Due to the timing of these gravid female observations, it is suggested that this species is an overwintering mussel and releases glochidia in the summer. Glochidia are parasitic and the primary fish host includes Brown Darter (*Etheostoma edwini*) and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974).

Adults are relatively nonmotile and typically only voluntarily move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs through glochidia transportation through infected fish movement (NatureServe 2020). The primary threats to the species include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants altering the water quality (USFWS 2003b).

## Ochlockonee Moccasinshell

The Ochlockonee Moccasinshell (*Medionidus simpsonianus*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Ochlockonee Moccasinshell is an endemic species. Its range is restricted to one river system, Ochlockonee River, in Florida and Georgia (FNAI 2001a). Most observations of this rare mussel have been from large creeks where there is current. The species seems to prefer substrates that are primarily sand with some gravel (William and Butler 1994).

Due to the rarity of the species, specific life history is not well understood but is assumed to be similar to related species. It likely overwinters glochidia and releases in summer, using darters as host fish (USFWS 2003b). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton for food (Fuller 1974). Adults are relatively non-motile and only move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs via glochidia transportation of parasitized fish (NatureServe 2020). The primary factors contributing to the species' decline is habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining and environmental contaminants altering water quality (USFWS 2003b).

## Suwannee Moccasinshell

The Suwannee Moccasinshell (*Medionidus walkeri*) was listed as threatened effective November 7, 2016 (81 FR 69417). Critical habitat was proposed on November 27, 2019 and is awaiting public comment and a final rule (84 FR 65325).

The Suwannee Moccasinshell is a rare freshwater mussel that lives in the mud, muddy sand, sand, and gravel of larger streams with moderate flows. The species generally occurs in proximity to large woody debris (80 FR 60335, CBD 2010a, NatureServe 2020). Its range is limited to a single river system in Florida and Georgia: the Suwannee River system. There are less than five populations within this range (CBD 2010a).

Adults are detritivores and the glochidia (larvae) are parasitic; main host species include the Blackbanded Darter (*Percina nigrofasciata*) and the Brown Darter (*Etheostoma edwini*) (84 FR 65325, NatureServe 2020). The following five criteria are required to support Suwannee Moccasinshell: stable stream, stable substrates, natural flow regimes, suitable water quality conditions, and presence of host fish species (84 FR 65325). The species has undergone extreme declines (70-90 percent), and it is now only known from the main channel of the Suwannee River and the lower Santa Fe River in Florida (CBD 2010a, 80 FR 60335). Population declines are the result of chemical pollution (e.g., industrial pulp mill in the Withlacoochee watershed), sedimentation from logging and agriculture, development, pollution from mining and agriculture, invasive species (Asiatic Clam (*Corbicula fluminea*)), stream channel instability, water extraction, and eutrophication (CBD 2010a, 81 FR 69417). Additionally, the species has been overharvested by shell collectors (CBD 2010a).

**Stock Island Tree Snail**

The Stock Island Tree Snail (*Orthalicus reses = O. s. reses*, [not incl. *nesodryas*]) was listed as threatened effective August 2, 1978 (43 FR 28932). Critical habitat has not been designated (USFWS 2020a). The Service announced the initiation of the latest five-year review on the species in 2018 (83 FR 38320). The Stock Island Tree Snail is also listed by the Florida Fish and Wildlife Conservation Commission as Endangered (USFWS 2009d).

The Stock Island Tree Snail is an arboreal snail endemic to tropical hammock hardwood trees (USFWS 2009d, NatureServe 2019). Its historical range included many of the western Florida Key islands, including Key West, the lower Keys, and Key Vaca. Its range was limited to Stock Island at the time of listing (43 FR 28932). As of 2006, the current range encompasses 25 known sites within the Florida Keys and two sites on the Florida mainland in Monroe and Miami-Dade counties (USFWS 2009d). The species feeds on lichens, fungi, and algae in the trees they live on (NatureServe 2020).

The Stock Island Tree Snail underwent a significant range reduction as a result of urbanization (43 FR 28932). Relocation efforts by hobbyists have spread Stock Island Tree Snails to areas beyond their historical range, particularly to Key Largo (USFWS 2009d). Current threats to the species include habitat degradation and loss. Additionally, poaching, hurricanes, and droughts are significant threats (NatureServe 2020).

**Oval Pigtoe**

The Oval Pigtoe (*Pleurobema pyriforme*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Oval Pigtoe is endemic to Georgia, Alabama, and Florida. Their center of distribution is generally limited to the Apalachicola-Chattahoochee-Flint and Ochlockonee river basins (63 FR 12664). In Florida, the species is found in the Apalachicola, Chipola, Suwanee, and Ochlockonee river systems, as well as Ecofina creek (63 FR 12664, NatureServe 2020). Oval Pigtoe habitat includes areas with slow to moderate current in medium-sized creeks to small rivers, where the substrate is silty sand to sand and gravel (Williams and Butler 1994).

Adults are relatively nonmotile and typically only move to burrow deeper into the sediment. Dispersal occurs via glochidia transportation on parasitized fish. Individuals observed in the Apalachicola- Chattahoochee-Flint basin were gravid between March through July, indicating that fertilization may take place in late winter to early spring and that the species is a summer releasing mussel (NatureServe 2020). Glochidia transformation has occurred on the gills of Sailfin Shiner (*Pteronotropis hypselopterus*), Eastern Mosquitofish (*Gambusia holbrooki*), and Guppy (*Poecilia reticulata*) (NatureServe 2020, O'Brien and Williams 2002). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). The primary factors contributing to species decline are habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants (68 FR 42419).

**Fuzzy Pigtoe**

The Fuzzy Pigtoe (*Pleurobema strodeanum*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Fuzzy Pigtoe is an endemic species with its presence limited to three river systems that drain through northwestern Florida: the Escambia, Choctawhatchee, and Yellow River. The species is exceedingly rare within the Yellow River, with only a single documented observation in 2010 (77 FR 61663). Fuzzy Pigtoe habitat includes areas with moderate flow in medium-sized creek and rivers where the substrate is sand to silty sand (Williams and Butler 1994, Williams et al. 2000).

The mussel is a short-term brooder, with gravid females observed from mid-March to May. Their glochidia are

parasitic, a common reproductive strategy shared among most freshwater mussels. Host species include the Blacktail Shiner (*Cyprinella venusta*) (White et al. 2008). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). Adults are relatively nonmotile and typically only move to burrow deeper into the sediment. Dispersal occurs via glochidia transportation through infected fish movement (NatureServe 2020). The primary factors contributing to population declines are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants altering the water quality (77 FR 61663).

**Southern Kidneyshell**

The Southern Kidneyshell (*Ptychobranchus jonesi*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The distribution of the Southern Kidneyshell is limited to the Escambia, Choctawhatchee, and Yellow River drainages that flow through Alabama and northwestern Florida. In Florida, recent occurrences of the Southern Kidneyshell have only been observed within the Choctawhatchee River drainage. Their habitat requirements are not fully understood; however, individuals are typically observed in areas with slow to moderate currents in medium creeks to small rivers, where the substrate consists of firm sand (77 FR 61663). Additionally, recent surveys conducted in the Choctawhatchee basin found their preferred habitat to be stable substrates near bedrock outcroppings (Gangloff and Hartfield 2009).

Little is known about the specific life history of this mussel although, based on closely related species, they are thought to be long-term brooders (Mirarchi et al. 2004, NatureServe 2020). Females are gravid from autumn through spring/summer of the following year. Their glochidia are believed to be parasitic. A host fish species has not been identified, although darters are believed to be a suitable host based on closely related mussel species (77 FR 61663). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller, 1974). Adults are relatively nonmotile, but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). Primary factors contributing to their population decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants (77 FR 61663, NatureServe 2020). In addition, habitat fragmentation and host fish disappearance will likely limit the dispersal and reproductive capabilities of this species (NatureServe 2020). Due to the limited species distribution, the Southern Kidneyshell is vulnerable to stochastic environmental and human-caused events (CBD 2010a).

**Choctaw Bean**

The Choctaw Bean (*Villosa choctawensis*, formerly *Obovaria choctawensis*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat has been designated and encompasses habitat in the following Florida counties: Bay, Escambia, Holmes, Jackson, Okaloosa, Santa Rosa, Walton, and Washington (as well as other rivers in Alabama not described here) (76 FR 61482). In 2019, the USFWS announced the initiation of the latest five-year review of the species (84 FR 14669).

The Choctaw Bean is one of eight listed freshwater mussel species that are endemic to the East Gulf Coastal Plain Physiographic Region. Its range includes the Escambia, Yellow, and Choctawhatchee rivers systems in Florida and Alabama. It lives in silty sand and sandy clay substrates in medium-sized creeks and rivers with moderate currents. Adults are detritivores and the glochidia (larvae) are parasitic, though specificity of fish hosts is not known (76 FR 61482). Despite still occurring across much of its historical range, population numbers are low and declining, and the Choctaw bean can no longer be found from many historical sites. Its populations within the Escambia River drainage have become fragmented (76 FR 61482). The primary threat to this species is habitat loss and degradation (NatureServe 2020).

**CRUSTACEANS**

**Cypress Crayfish**

The Cypress Crayfish (*Cambarellus blacki*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Cypress Crayfish is listed by several other entities, including Endangered by the IUCN, Endangered by the American Fisheries Society, and as Critically Imperiled by NatureServe (CBD 2010a).

The Cypress Crayfish is a rare freshwater crayfish that inhabits cypress ponds. It is usually found within submergent and emergent vegetation (CBD 2010a, NatureServe 2019). The species range is limited to one locality in Escambia County, Florida (CBD 2010a). Further surveys are needed to locate potential nearby populations (NatureServe 2019). Its limited range and number of populations make the species vulnerable. The major threat facing Cypress Crayfish is expansion of a nearby oil production facility (CBD 2010a).

**Florida Cave Amphipod**

The Florida Cave Amphipod (*Crangonyx grandimanus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). Despite the Service announcing the species review of Florida Cave Amphipod in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), it has yet to be listed and remains under review at this time (USFWS 2020a). The Florida Cave Amphipod is listed by several other entities, including Imperiled by NatureServe, as Vulnerable by the IUCN, and as a Species of Greatest Conservation Need in Florida (CBD 2010a, NatureServe 2020).

The Florida Cave Amphipod is a stygobitic amphipod which inhabits caves, wells, and karst springs. Its range spans 12 counties (Alachua, Citrus, Dade, Gilchrist, Hernando, Leon, Levy, Madison, Marion, Pasco, Suwannee, and Wakulla) in Florida, with the Ochlockonee River serving as its western boundary. Despite this seemingly large range, the species is uncommon and population numbers are low. The species is likely threatened by changes in detrital flows and depletion of aquifers (CBD 2010a).

**Hobb's Cave Amphipod**

The Hobb's Cave Amphipod (*Crangonyx hobbsi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835 59862). Listing was first deemed warranted but precluded in 1984 (49 FR 2485). Despite the Service announcing the species review of Florida Cave Amphipod in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), the species remains under review at this time (USFWS 2020a). The Hobb's Cave Amphipod is listed by several other entities, including Critically Imperiled by NatureServe and as Vulnerable by the IUCN (CBD 2010a).

The Hobb's Cave Amphipod is a troglobitic freshwater amphipod that inhabits subterranean caves and wells (NatureServe 2020). It is often associated with limestone and detritus, and found near cave entrances. Its range spans 13 counties (Alachua, Citrus, Columbia, Dade, Gilchrist, Hernando, Leon, Levy, Madison, Marion, Pasco, Suwannee, and Wakulla) in Florida, primarily in the northern portion of the peninsula as well as the Panhandle. It is likely threatened by changes in detrital flows and depletion of aquifers (CBD 2010a).

**Squirrel Chimney Cave Shrimp**

The Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) was listed as threatened effective June 23, 1990 (55 FR 25588). Critical habitat has not been designated (USFWS 2020). A petition to delist the species was put forth by the Florida Game and Freshwater Fish Commission in 1997. However, the USFWS found that the petition did not present substantial scientific or commercial information indicating that delisting this species due to extinction may be warranted (63 FR 67618).

The Squirrel Chimney Cave Shrimp was discovered in 1953 and is only known from the Squirrel Chimney, a small sinkhole that connects to a flooded cave system near Gainesville, Alachua County, Florida. Due to a lack of evidence of cave shrimp from other surveyed caves, it is believed that the Squirrel Chimney Cave Shrimp is the only cave shrimp in Florida (USFWS 2016b, 2018g). Habitat for this species includes groundwater within a flooded limestone cave (FNAI 2001a). The water temperature in Squirrel Chimney is approximately 20°C throughout the year. Other than an apparent drop in water levels between the 1970 surveys and 1990 surveys, there were no indications of any significant change in the physical environment at Squirrel Chimney; both water level and water quality have remained the same since 1992 (USFWS 2016b).Threats to the species include expanded development associated with the growth of Gainesville, Florida, which may alter land uses and groundwater in the vicinity of Squirrel Chimney (USFWS 2016b, 2018g). Stormwater runoff, septic tank drainage fields, aquifer recharge, herbicide/fertilizer use, and erosion/sediment deposition are some of the primary factors impacting groundwater quality. A small fish, the Redeye Chub (*Notropis harperi*), was detected in Squirrel Chimney during 1994 to 1996 surveys. This species is believed to prey on Squirrel Chimney Cave Shrimp; therefore, predation may also constitute a threat to the species (USFWS 2016b).

### Orlando Cave Crayfish

The Orlando Cave Crayfish (*Procambarus acherontis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). Listing was first deemed warranted but precluded in 1984 by the USFWS (Service) (49 FR 2485). Despite the Service announcing review of the species in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), the species remains under review at this time (USFWS 2020a). The Orlando Cave Crayfish is listed by several other entities, including Endangered by the IUCN, Endangered by the American Fisheries Society, Critically Imperiled by NatureServe, as Rare by the Florida Committee on Rare and Endangered Plants and Animals, and as a Species of Greatest Conservation Need by the State of Florida (CBD 2010a, NatureServe 2020).

The Orlando Cave Crayfish is a troglobitic freshwater crayfish that inhabits aquifers. It is associated with karst and the entrances of springs, sinkholes, and underground water features. Its range is limited to the central Florida Peninsula (Seminole and Orange counties). All of the four remaining populations are within the vicinity of Orlando. The species type locality was destroyed when the well they lived in collapsed. The major threat facing Orlando Cave Crayfish is expanding human populations and development (CBD 2010a).

### Coastal Flatwoods Crayfish

The Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). In the State of Florida, the species is listed as Imperiled (NatureServe 2020). It is listed as endangered on the IUCN Red List (Crandall 2010).

The species occurs in the Apalachicola coastal flatwoods of northwest Florida in Bay and Gulf Counties. Coastal Flatwoods Crayfish inhabit still waters when water levels are high and burrow when waters recede (USFWS 2014c). The species is usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence (Franz and Franz 1979). Coastal Flatwoods Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality.

### Silver Glen Springs Crayfish

The Silver Glen Springs Crayfish (*Procambarus attiguus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). In the State of Florida, the species is listed as Critically Imperiled (NatureServe 2020). It is listed as Critically Endangered on the IUCN Red List (USFWS 2020a).

This species has been documented from only one cave system in Ocala Natural Forest, Silver Glen Springs,

FWS-005772

Marion County, Florida. The species is potentially threatened by water pollution and disturbance from tourists (snorkelers and scuba divers, as the cave is a popular recreation area). This species may have late reproductive maturity and a long life span, which make it particularly susceptible to loss of individuals. As a cave species, Silver Glen Springs Crayfish are likely sensitive to changes in habitat, especially water quality (NatureServe 2020).

### Bigcheek Cave Crayfish

The Bigcheek Cave Crayfish (*Procambarus delicates*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The Service may drop the species from further review because it could already be extinct (this is not confirmed as its population has likely always been very small and difficult to detect due its deep-cave habitat) (CBD 2018, NatureServe 2019). The Bigcheek Cave Crayfish is listed by several other entities, including Critically Endangered by the IUCN, Endangered by the American Fisheries Society, and Critically Imperiled by NatureServe (Crandall and Cordeiro 2010, CBD 2018, NatureServe 2020). The species has not been seen in decades, with the last sighting dating 1976 or 1985 (CBD 2018, NatureServe 2020).

The Bigcheek Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves (BD 2018, NatureServe 2020). This species has extremely specific habitat requirements and they are limited to only one cave system at Alexander Springs within the Ocala National Forest, Lake County, Florida (Crandall and Cordeiro 2010, CBD 2018, NatureServe 2020). Their population is threatened by disturbance and habitat degradation from recreational use, as these cave systems are located within National Forest property readily accessible to the general public (CBD 2018, NatureServe 2020).

### Panama City Crayfish

The Panama City Crayfish (*Procambarus econfinae*) was proposed as Threatened on January 3, 2018 (83 FR 330). A formal listing decision has not been made as of January 2020 (USFWS 2020a).

This species occupies shallow, often ephemeral, vegetated, freshwater systems in pine flatwoods or wet prairie/marsh habitats of Bay County, Florida. After the majority of its habitat was converted to slash pine plantations or residential/commercial development, the species has been relegated to grassy ditches or swales of slash pine plantations, utility rights-of-way, and other relic wetland habitats protected on easements (83 FR 330, USFWS 2017a). These crayfish require specific types of substrate that allow them to burrow down to the water table, where they can remain hydrated to survive dry seasons or droughts. If soils are too sandy or do not hold water long enough, sustained colonization of this species is not supported. This species occupies the surface water primarily when it is present, and utilizes its burrows when surface water recedes (USFWS 2017a). Threats to this species include habitat loss, degradation, and fragmentation; development; hydrologic alterations; silviculture practices; and collection for fish bait (83 FR 330).

### Santa Fe Cave Crayfish

The Santa Fe Cave Crayfish (*Procambarus erythrops*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Santa Fe Cave Crayfish is listed by several other entities, including Endangered by the IUCN and the American Fisheries Society (CBD 2010a).

The Santa Fe Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean pools (CBD 2010a, NatureServe 2020). Its range is limited to five locations within southern Suwannee County, Florida (CBD 2010a). These may make up five populations or only one as they may be interconnected through passageways in the aquifer (NatureServe 2020). It lives within detritus at the entrances of subterranean caves and sinkholes. The Santa Fe Cave Crayfish requires waters with low flows so that detritus is able to build up. It is particularly long-lived, with documented recaptures of crayfish at least 16 years old. The species is threatened by hydrological changes, particularly pollution (there is a garbage dump at one of their known localities) and saltwater intrusion

(CBD 2010a).

**Orange Lake Cave Crayfish**

The Orange Lake Cave Crayfish (*Procambarus franzi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Orange Lake Cave Crayfish is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need in Florida (CBD 2010a).

The Orange Lake Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves (CBD 2010a, NatureServe 2020). It is associated with bat colonies and the detrital input provided. Its range is limited to Marion County, Florida, where it is known from three cave locations near Orange Lake. These three locations may represent a single population, as sites are part of the same chamber and likely interconnected. The species is particularly vulnerable because of its limited range and small numbers. The species may be sensitive to impacts to water quality from nearby quarrying (CBD 2010a).

**Coastal Lowland Cave Crayfish**

The Coastal Lowland Cave Crayfish (*Procambarus leitheuseri*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Coastal Lowland Cave Crayfish is listed by several other entities, including Vulnerable by the IUCN, Endangered by the American Fisheries Society, Critically Imperiled by NatureServe, as Rare by the Florida Committee on Rare and Endangered Plants, and as a Species of Greatest Conservation Need by the State of Florida (CBD 2010a).

The Coastal Lowland Cave Crayfish is a troglobitic freshwater crayfish that inhabits deep, subterranean, karst cave systems (CBD 2010a, NatureServe 2020). Most areas of occurrence are tidally influenced and associated with silt. Specimens have been documented at depths of over 60 meters. The species' range is limited to Pasco and Hernando counties, Florida. There are only eight known localities which may represent fewer populations, as five of these are within five kilometers of each other. Populations are threatened by changes in water quality such as increased saltwater intrusion resulting from extraction of groundwater for human consumption. The species is additionally threatened by rapid urbanization in this part of Florida (CBD 2010a).

**Florida Cave Crayfish**

The Florida Cave Crayfish (*Procambarus lucifugus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted for both the species and its two subspecies, Withlacoochee Light-fleeing Cave Crayfish (*P. l. lucifugus*) and Vampire Crayfish (*P. l. alachua*) (76 FR 59835). All three remain under review at this time (USFWS 2020a). The Florida Cave Crayfish is listed by several other entities, including Least Concern by the IUCN, Endangered and Threatened by the American Fisheries Society, and Imperiled by NatureServe (NatureServe 2020).

The Florida Cave Crayfish is a troglobitic freshwater crayfish that inhabits karstic subterranean caves and sinkholes (CBD 2010a, NatureServe 2020). Its range spans Florida counties from Citrus and Hernando north to Marion. It feeds primarily on bat guano, as well as invertebrates, and is associated with bat roosting caves. Populations are threatened directly by water quality degradation and indirectly by threats facing bat populations (CBD 2010a).

**Miami Cave Crayfish**

The Miami Cave Crayfish (*Procambarus milleri*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review

at this time (USFWS 2020a). The Miami Cave Crayfish is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need in Florida (CBD 2010a).

The Miami Cave Crayfish is a rare troglobitic freshwater crayfish that inhabits wells (CBD, NatureServe 2020). The species is likely recently adapted (from an evolutionary standpoint) to subterranean living based on a lack of blindness that typify troglobitic creatures. Until recently, the species range was known only from a single population in Miami, Florida, from a well on a nursery and garden store property (CBD 2010a). It has since been found at over a dozen sites and those sites may be interconnected, including populations within the nearby Everglades (NatureServe 2020). As the species has an extremely limited range and population size within a metropolitan area, with continually increasing human pressures on aquifers, this species is especially vulnerable to extinction (CBD 2010a).

### Putnam County Cave Crayfish

The Putnam County Cave Crayfish (*Procambarus morrisi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Putnam County Cave Crayfish is listed by several other entities, including Imperiled by NatureServe, Critically Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need by the State of Florida (CBD 2010a).

The Putnam County Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean sinkholes (CBD 2010a, NatureServe 2020). As their name implies, this species has extremely specific habitat requirements and they are limited to a single cave called Devil's Sink in Putnam County, Florida. This single population is particularly vulnerable to threats posed by water quality degradation as a result of heavy recreational use, pollution (including direct dumping), and groundwater depletion for human consumption (CBD 2010a). The population is at imminent risk of extinction if the entrance to the sinkhole is sealed by human-caused erosion (CBD 2010a).

### Pallid Cave Crayfish

The Pallid Cave Crayfish (*Procambarus pallidus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Pallid Cave Crayfish is listed by several other entities, including Imperiled by NatureServe, Vulnerable by the AFS, and as a Species of Greatest Conservation Need by the State of Florida (CBD 2010a).

The Pallid Cave Crayfish is a freshwater crayfish that inhabits caves (CBD 2010a, NatureServe 2020). It is associated with areas of high flows and karst. Its range is limited to Florida, with records from Alachua, Columbia, Gilchrist, Hamilton, Lafayette, Levy, Madison, and Suwannee counties.

Populations are threatened by pollution (because of their likely sensitivity to chemicals) and by disturbance from recreational diving. A large kill of Pallid Cave Crayfish in the upper Suwannee River was suspected to have been the result of a pollution event (CBD 2010a).

### Black Creek Crayfish

The Black Creek Crayfish, also known as the Spotted Royal Crayfish, (*Procambarus pictus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Black Creek Crayfish is listed by several other entities, including as a Species of Special Concern in the State of Florida and as Near Threatened by the IUCN (CBD 2010a).

The species occurs in a geographically small area of northeastern Florida – Clay, Putnam, and Duval counties (FNAI 2001a). Black Creek Crayfish inhabit small, relatively swift, sand-bottomed, tannic-stained streams, often

emanating from sandhills and flowing through or from swampy terrain. Black Creek Crayfish are usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence (Franz and Franz 1979). They are restricted to a few small stream systems. Most known localities are within the Black and Rice creek drainages. Black Creek Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Protection of inhabited headwater and secondary streams, especially within the Black and Rice creek drainages, is therefore critical to the species' survival (NatureServe 2020).

### Spider Cave Crayfish

The Spider Cave Crayfish (*Troglocambarus maclanei)* was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Spider Cave Crayfish is listed by several other entities, including as Imperiled by NatureServe, as Vulnerable by the AFS, and as a Species of Greatest Conservation Need by the State of Florida (CBD 2010a).

The Spider Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves and sinkholes near areas with fresh detrital input, such as bat caves (CBD 2010a, NatureServe 2020). Its range spans 16 localities from Suwannee County to Hernando County, along an approximate 130 kilometers area in Florida. It is often associated with karst and fine silt. The Spider Cave Crayfish is frequently seen hanging upside down from cave ceilings. It is likely an aquatic predator of smaller invertebrates. Major threats to the species include anthropogenic impacts on water quality and reduced detritus flows (CBD 2010a). Three of the species' known localities are popular sites for recreational diving and face acute degradation (NatureServe 2020).

### INSECTS

### Logan's Agarodes Caddisfly

Logan's Agarodes Caddisfly (*Agarodes logani*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The species has a very small range and has only been observed from one stream in Gadsden County, Florida (NatureServe 2020). The stream is spring-fed and runs through a deep ravine on the Florida Agriculture and Mechanical University Farm (CBD 2010a). As the population is restricted to such a small area and adjacent to an active farm, the species is at risk from farming practices, which may result in pollution, siltation, or habitat degradation (NatureServe 2020).

### Florida Leafwing Butterfly

The Florida Leafwing Butterfly (*Anaea troglodyta floridalis*) was listed as endangered effective September 11, 2014 (79 FR 47221). Critical habitat has been designated and includes areas of pine rockland habitat (79 FR 47179).

The historical range of the Florida Leafwing Butterfly spanned south Florida, including Miami-Dade, Monroe, Collier, Martin Palm Beach, and Broward counties (78 FR 49878). This may be the most imperiled butterfly subspecies given that it has experienced drastic declines and is now extirpated from nearly 96 percent of its historical range. No individuals have been detected since 2006 (78 FR 49878, NatureServe 2020) and the only population within Everglades National Park is known to be extant. The species has only one host plant, the pineland croton (*Croton linearis*), upon which larvae develop and feed (78 FR 49878). The species is highly restricted to pine rockland habitats which support its host plant. Adult diets are varied and include rotting fruit, dung, and nectar (NatureServe 2020). Both adults and larvae (instars) use cryptic mimicry to blend in with its host plant. Florida Leafwings are non-migratory butterflies with a multivoltine life history (multiple generations each year) (78 FR 49878). This species may be at imminent risk of extinction as the pine rockland habitats on which it

depends are very limited and continue to be destroyed by development and tropical storm events (NatureServe 2020).

### Frosted Elfin

The Frosted Elfin (*Callophrys irus*) is proactively being assessed for listing by USFWS and a listing determination is expected by September 30, 2023. An interim Species Status Assessment was completed in 2018 (USFWS 2018h). The species remains under review at this time (USFWS 2020a).

The current range of Frosted Elfin spans 25 states in the eastern US. The three described subspecies of Frosted Elfin (*Callophrys irus irus*, *C. i. hadros*, and *C. i. arsace*) occupy separate distributions. *C. i. irus* has the largest range, spanning interior areas from Florida to New York, and east through Ohio, Michigan, and Wisconsin. Frosted Elfins are small non-migratory butterflies with a univoltine lifespan (a single adult flight period) (USFWS 2018h). They are reliant on pine barren habitat which supports their host plants, blue lupine (*Lupinus* spp.) and wild indigo (*Baptisia* spp.; USFWS 2019o). They also need various nectar plants nearby in addition to their host plants (USFWS 2018h).

There are records from 20 counties in Florida (Thom 2013). The species has been extirpated from large portions of their historical range (USFWS 2018h, USFWS 2019p). The major causes of population decline are habitat loss caused by development, invasive species, succession, and incompatible vegetation management, as well as the limiting factor of small population sizes (USFWS 2018h, USFWS 2019o).

### Miami Tiger Beetle

The Miami Tiger Beetle (*Cicindelidia floridana*) was listed as endangered effective November 4, 2016 (81 FR 68985). Critical habitat has not been designated (USFWS 2020a).

This species was rediscovered in 2007 after not being seen since 1934 (and believed to be extinct). This species was first discovered in the Northern Biscayne Pinelands region, around Miami and North Miami Cities in Miami-Dade County, Florida. The region was known for its large, quartz sand areas within rare pine rockland habitat. The 2007 rediscovery of this species was made in the Richmond Heights area of south Miami, known as Richmond Pine Rocklands on Miami Rock Ridge. Limited studies on this species' microhabitat preferences suggest that it prefers open, bare, white to gray sandy areas of two to six square meters with less than five percent organic matter. There were only two known extant populations of this beetle at the time of listing (80 FR 79533).

This species is a day-active predator that moves quickly to seize other small arthropods, such as ants. The larvae of this species are grub-like with large mandibles. Larvae occupy a permanent ground burrow that is flush with the soil surface. The larvae anchor themselves in the burrow and ambush small arthropods when they come close. Efforts in the 1970s to relocate the species found that the type locality had been destroyed and developed. Threats to this species include habitat loss, degradation, and fragmentation; development; non-native species encroachment; and specimen collection by enthusiasts (80 FR 79533).

### Nickerbean Blue Butterfly

The Nickerbean Blue Butterfly (*Cyclargus ammon*) was listed as threatened effective April 6, 2012, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (77 FR 20948).
Critical habitat has not been designated (USFWS 2020a).

The range of the Nickerbean Blue Butterfly includes the Bahamas and Cuba, where it is native, as well as Big Pine Key in Florida, where it has colonized. It occupies tropical hardwood hammock forests, especially in forest openings and edges. Larvae develop and feed on Nickerbean (*Cesalpinia bahamensis*). Adults feed on a variety of nectar plants, including Croton (*Codiaeum variegatum*). Although listed because of similar appearance, this species seems to be stable as evidenced by range expansion and stable populations on Big Pine Key where other

butterfly species are declining (NatureServe 2020).

**Miami Blue Butterfly**

The Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) was listed as endangered on effective April 6, 2012. Critical habitat has not been designated (USFWS 2020a).

The Miami Blue Butterfly is a Florida endemic that occurs in open, sunny areas of coastal hardwood hammocks, dunes, and scrub habitat in the Florida Keys (Bahia Honda State Park and Key West National Wildlife Refuge; although the Bahia Honda population may now be extirpated). Research indicates that the species is non-migratory/sedentary, but additional studies are needed to confirm this information (77 FR 20948, CBD 2011b). The species is present year-round, with multiple overlapping generations (eight to 10 generations per year). Individuals are believed to be in diapause from December through April. Adult Miami Blue Butterflies only live around nine days in the wild (77 FR 20948, CBD 2011b). Generation time from egg to adults is roughly 30 to 40 days (77 FR 20948). The species lays eggs on the following host plants: blackbead (*Pithecellobium* spp.), nickerbean (*Caesalpinia* spp.), balloonvine (*Cardiospermum* spp.) and acacia (*Acacia* spp). The Miami Blue Butterfly has a symbiotic relationship with several ant species (commonly *Camponotus floridanus*), which tend the butterfly pupae/instars on host plants and feed on liquid from their nectary organ (77 FR 20948). The butterflies feed on nectar from plants in the Boraginaceae, Asteraceae, Fabaceae, Polygonaceae, and Verbenaceae families (77 FR 20948).

The range of the species has contracted significantly (originally found from Tampa Bay to the Keys). The species was believed to be extirpated in the early 1990s, until a small population was rediscovered in 1999 on Bahia Honda Key. Reintroduction efforts of the species have largely been unsuccessful (77 FR 20948). The Miami Blue Butterfly population size is estimated to be in the low hundreds. Current threats to the species include habitat loss and fragmentation, illegal collection, pesticides, impacts to host plants from introduced iguanas, loss of genetic diversity, and stochastic environmental events (natural or human- caused) (CDB 2011, USFWS 2012c).

**Monarch Butterfly**

The Monarch Butterfly (*Danaus plexippus plexippus*) was petitioned for listing on August 26, 2014 (CBD et al. 2014), and the 90-day finding determined that listing may be warranted (79 FR 78775). The listing decision has been delayed from June 2019 to December 2020 (Monarch Joint Venture 2019).

The subspecies, *D. p. plexippus*, is distributed across North America in the spring and summer months (Encyclopedia Britannica 2019). They rely on milkweed (*Asclepias* spp.) for larval development and various nectar plants for adult food (CBD et al. 2014). The Continental Divide splits their overwintering populations: those on the eastern side typically overwinter in Mexico, while those on the western side overwinter in California (Pelton et al. 2016). There are resident Monarch populations in southern Florida where growing seasons continue and climates remain temperate year-round (Williams 2015). Statewide, Florida Monarchs have experienced an 80 percent decline since 2005 (Marchese and Hoose 2018).

Monarch populations face many threats, but primary among these is the loss of their host plants (milkweed) as a result of intensive pesticide use, particularly glyphosate (CBD et al. 2014).

**Duke's Skipper Butterfly**

The Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). This subspecies may become elevated to the level of a full species and, should that occur, the Center for Biological Diversity petitioned for either the subspecies or species to be listed (CBD 2010a). The subspecies is remains under review at this time (USFWS 2020a). The Duke's Skipper Butterfly is considered Imperiled by NatureServe (CBD 2010a).

This subspecies is known from at least seven and up to 12 counties in the northern Florida peninsula including: Brevard, Dixie, Duval, Hernando, Hillsborough (thought to be extirpated), Orange, Pasco, Pinellas, Polk, Seminole, Sumter, Taylor, and Volusia (NatureServe 2020). There are 17 known occurrences of this butterfly. This subspecies inhabits sedge patches within wetlands and swamps dominated by cypress (*Cupressus* spp.), gum (*Eucalyptus* spp.), red maple (*Acer rubrum*), or mixed canopy (CBD 2010a). Larval foodplants are narrowfruit horned beaksedge (*Rynchospora inundata*), millet beaksedge (*Rynchospora miliacea*), and an unidentified sedge (*Carex*) species. Adults visit flowers such as buttonbush (*Cephalanthus occidentalis*) and pickerel weed (*Pontederia cordata*) (NatureServe 2020). Threats to the species include conversion of wetland habitat to urbanization, development, and pesticides (CBD 2010a).

**Palatka Skipper Butterfly**

The Palatka Skipper Butterfly (*Euphyes pilatka klotsi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Palatka Skipper Butterfly is listed by several other entities, including Critically Imperiled by NatureServe and as a Species of Greatest Conservation Need in Florida (CBD 2010a, NatureServe 2020).

The range of the Palatka Skipper Butterfly is limited to a few islands in the Florida Keys: Big Pine, Big Torch, Cudjoe, No Name, Sugarloaf, and Stock Island. They inhabit areas dominated by sawgrass near mangroves in tropical pinelands and sawgrass marshes (CBD 2010a). Larvae develop and feed on sawgrass leaves (NatureServe 2020). This species is rare, with only 10 adults detected during intensive surveys spanning two years. Major threats to the subspecies include habitat loss as a result of development and the use of insecticides (CBD 2010a).

## Westfall's Clubtail Dragonfly

The Westfall's Clubtail Dragonfly (*Gomphus westfalli*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Westfall's Clubtail Dragonfly is considered Critically Imperiled by Nature Serve (NatureServe 2020).

The Westfall's Clubtail Dragonfly is a small dragonfly which requires specialized habitat: sphagnum bog trickles and streams in areas that undergo periodic burning. Larvae develop in silt and adults forage in nearby forests. The species is limited to only four streams within or near Blackwater River State Forest in Santa Rosa County, Florida. The primary threats to their populations are "excessive clearcutting" and altered fire regimes. Their extremely limited range (only about 25 kilometers) makes their populations especially vulnerable (CBD 2010a).

## Ceraunus Blue Butterfly

The Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) was emergency listed as threatened effective August 10, 2011, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (76 FR 49408). Critical habitat has not been designated (USFWS 2020a).

The Ceraunus Blue is a neotropical butterfly that occurs in Arizona, California, Florida, Kansas, New Mexico, Nevada, and Texas (NatureServe 2020). In Florida, Ceraunus Blue Butterflies occur year-round and inhabit grasslands, parks, roadsides, and open woodlands. Host plants includes herbaceous legumes such as rosary pea (*Abrus precatorius*) (UF IFAS 2019). The population in Florida is considered Apparently Secure (NatureServe 2020).

## Schaus Swallowtail Butterfly

The Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) was listed as threatened effective May 4, 1976 (41 FR 17736). Due to continued declines after listing, its status was reclassified to Endangered effective

October 1, 1984 (49 FR 34501). Critical habitat has not been designated (USFWS 2020a).

The historical range of the Schaus Swallowtail Butterfly spanned Upper and Lower Matacumbe Keys and Lignumvitae Key north to areas surrounding Miami on the Florida mainland (USFWS 2008e). It is currently limited to Key Biscayne National Park (USFWS 2020a). Larvae develop and feed on torchwood (*Amyris elemifera*) (NatureServe 2020). Adults are nectivores (NatureServe 2008). The adult flight period spans late April to June, and occasionally into late summer. Although the subspecies is non-migratory, they are known to fly between islands. Populations are threatened by habitat destruction and biocides (as a result of mosquito control) (NatureServe 2020). This species is especially vulnerable to extinction because of its isolated and small populations and limited range. Reintroduction efforts have been somewhat successful, resulting in reproduction. However, these efforts have not improved long-term population trends (USFWS 2008e).

### Gulf Coast Solitary Bee

The Gulf Coast Solitary Bee (*Hesperapis oraria*) was petitioned for listing on March 27, 2019 (CBD 2019b), and the 90-day finding determined that listing may be warranted (84 FR 69713). The species remains under review at this time (USFWS 2020a). The Gulf Coast Solitary Bee is considered Critically Imperiled by NatureServe (NatureServe 2020).

The Gulf Coast Solitary Bee is extremely rare and the only known member of its family in the eastern US (CBD 2019b). The historical range of the Gulf Coast Solitary Bee was limited to barrier islands and a narrow shoreline band (one to two km) along the Gulf Coast from eastern Mississippi to northeastern Florida (Kopec and Burd 2017, NatureServe 2020). Currently it is only found in Florida in State and national parks and is reduced to a mere six populations (CBD 2019b). The species has one obligate host plant: The Coastal Plain Honeycombhead (*Balduina angustifolia*). It relies solely on this plant for all its pollen and nectar. The Coastal Plain Honeycombhead is reliant upon the Gulf Coast Solitary Bee to transfer its pollen and cannot reproduce without it (Kopec and Burd 2017). This plant only grows in sandy coastal dune habitats and the bee nests in these sandy soils (NatureServe 2020).

Given its extremely limited range and host specificity, this species is at imminent risk of extinction (Kopec and Burd 2017). Threats include habitat loss, degradation, and fragmentation as a result of development; pesticide use; competition with European honeybees; sea level rise and hurricanes (intensified by climate change); limited genetic diversity; and a lack of protection (Kopec and Burd 2017, CBD 2019b). The Gulf Coast Solitary Bee is considered a flagship species for habitat conservation and an indicator species of barrier island and Gulf Coast ecosystem health (CBD 2019b).

### Sykora's Hydroptila Caddisfly

Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Sykora's Hydroptila Caddisfly is considered Critically Imperiled by NatureServe (CBD 2010a).

This species has a very small range and is only known from two spring-run streams in Gadsden County, Florida. Both localities are located 25 kilometers apart, with one stream flowing through the Florida Agriculture and Mechanical University Farm (NatureServe 2020, CBD 2010a). The species is at risk of nearby farming practices which may result in pollution, siltation, or habitat degradation (CBD 2010a).

### Morse's Little Plain Brown Sedge Caddisfly

Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Morse's Little Plain Brown Sedge Caddisfly is listed by several other entities, including as Critically Imperiled in Florida by NatureServe and Threatened by the Florida Committee on

Rare and Endangered Plants and Animals (CBD 2010a).

This is an extremely rare species and its habitat is not well understood. This caddisfly occurs in flowing water habitats, typically soft blackwater streams, associated with decaying plant matter. Similar to other members of the Lepidostomatidae family, larvae are aquatic and produce protective tube-cases out of sand, vegetation, and other available materials. As caddisflies spend a large part of their life as aquatic larvae, this species is sensitive to siltation and pollution caused by practices such as unsustainable forestry and conversion of land to agricultural use (CBD 2010a). This species is endemic to the southeastern US in very limited locations within its range. In Florida, it is only known from Little Alaqua Creek in Walton County (NatureServe 2020).

## Cassius Blue Butterfly

The Cassius Blue Butterfly (*Leptotes cassius theonus*) was emergency listed as threatened effective August 10, 2011, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (76 FR 49408). Critical habitat has not been designated (USFWS 2020a).

The Cassius Blue Butterfly occurs in Florida, Texas, Virginia, and Kansas. The species may also pass through other southeast states during migration. The Florida subspecies, *theonus*, is a primarily non- migratory resident of coastal habitats in the central and south peninsula (although the species may engage in migratory movements during cold spurts). The subspecies occurs in grassland, urban areas, hardwood forests, and scrub (NatureServe 2020). Host plants for the subspecies include members of the pea family (Fabaceae) and leadwort (Plumbaginacea). Populations are considered to be secure (NatureServe 2020).

## Purple Skimmer Dragonfly

The Purple Skimmer Dragonfly (*Libellula jesseana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Purple Skimmer Dragonfly is listed by several other entities, including Critically Imperiled by NatureServe and Vulnerable by the IUCN (CBD 2010a, NatureServe 2020).

The Purple Skimmer Dragonfly is medium-sized, lacustrine, Florida-endemic dragonfly species. Its distribution includes nine eastern Peninsula counties, and two Panhandle counties (Bay and Washington). Historically, there were 15 known populations within this range. Currently, the species may only remain at a single lake within a State park. They utilize clear, sand-bottomed lakes bordered by maiden-cane grass and St. John's Wort shrubs (*Hypericum* spp.). Adults feed on invertebrates in nearby woodlands or shrublands. This species is extremely sensitive to pollution and eutrophication and is unable to survive in polluted habitats. In degraded habitats, even with only slight eutrophication, the common and closely related Golden-winged Skimmer (*L. auripennis*) outcompetes and displaces Purple. The major threat to Purple Skimmer populations is lakeshore development and impacts to water quality (CBD 2010a).

## American Burying Beetle

The American Burying Beetle (*Nicrophorus americanus*) was listed as endangered effective July 13, 1989 (54 FR 29652). Critical habitat has not been designated (USFWS 2020a). The species is under consideration for downlisting to Threatened status (84 FR 19013).

The historic range of the American Burying Beetle spanned 35 states. There are no known extant populations of this species in Florida. Current populations exist in Rhode Island, South Dakota, Nebraska, Texas, Oklahoma, and Arkansas (USFWS 2019q). A Michigan record from 2017 is under investigation (84 FR 19013).

The American Burying Beetle is a nocturnal carrion beetle species active from late spring through early fall. They bury themselves in moist soil to hibernate for the winter. Reproduction occurs in the spring and early summer. They are considered habitat generalists and do not appear to be limited by vegetation types as long as food,

shelter, and moisture are available. Its specialization toward the use of larger carrion compared to that used by other carrion beetles is suspected to be a factor in its decline. Changing land use practices and conversion of lands to intensive agriculture or for other development purposes fragments the habitat and reduces the availability of its preferred carrion, with other site-specific factors varying across its current range (USFWS 2019q).

**Little Oecetis Longhorn Caddisfly**

Little Oecetis Longhorn Caddisfly (*Oecetis parva*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Oecetis Longhorn Caddisfly is listed by several other entities, including as Critically Imperiled in Florida by NatureServe and a State Historical in Alabama (CBD 2010a).

This species is found in northern and central Florida with only one individual recorded outside of Florida, from Wright's Creek, Alabama (NatureServe 2020). In Florida, occurrences have been recorded in the Apalachicola River, Choctawhatchee River, Kissimmee River, Oklawaha River, upper St. Johns River, and St. Marks River (CBD 2010a). The species inhabits natural lakes and springs, especially within the Ocala National Forest (NatureServe 2020). Due to their high abundances in healthy lake systems, they are thought to be an excellent bioindicator of lake health in Florida (Rasmussen et al. 2008). It is thought that this species is sensitive to activities that affect water quality and hydrologic regimes such as agriculture, urban development, forestry, water withdrawal, and nutrient loading (CBD 2010a). The primary threat to their populations is negative changes to water quality (CBD 2010a).

Findings from Rasmussen at al. (2008) report indicate six new occurrences of this species. Based on these surveys, the population trend was recommended to be reassigned from unknown to stable (Rasmussen et al. 2008).

**Southern Snaketail Dragonfly**

The Southern Snaketail Dragonfly (*Ophiogomphus australis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Southern Snaketail Dragonfly is listed by several other entities, including Critically Imperiled by NatureServe and Endangered by the IUCN flows (CBD 2010a, NatureServe 2020).

The Southern Snaketail Dragonfly may be a subspecies of *O. incurvatus* (CBD 2010a). Its historical range encompassed Florida, Georgia, Louisiana, and Mississippi (NatureServe 2020). It is known from three streams and rivers in Louisiana and Mississippi. Additionally, previously misidentified specimens of *O. australis* have been documented at Eglin Air Force Base in Okaloosa County, Florida. It inhabits graveled streams and requires consistent water flows and clean water. Major threats to their populations are water quality degradation from a variety of sources including gravel mining, pesticide use, and deforestation. Recent population trends have shown an estimated 10 to 30 percent decline (CBD 2010a).

**Blue Calamintha Bee**

The Blue Calamintha Bee (*Osmia calaminthae*) was petitioned for listing on February 5, 2015 (DoW 2015), and the 90-day finding determined that listing may be warranted (80 FR 56423). The species remains under review at this time (USFWS 2020a). The Blue Calamintha Bee is considered Critically Imperiled by NatureServe (NatureServe 2020).

The Blue Calamintha Bee is restricted to sandy scrub habitats at four sites in the southern Lake Wales Ridge in Highlands County, Florida. The species is believed to be a specialist on the Florida State threatened Ashe's calamint (*Calamintha ashei*), which occurs in sand pine and scrub habitat in the Florida central highlands and southeastern Georgia. Some of the bee's known populations are within protected areas, but they are still subject to

pesticide drift and destructive off-road recreational activities. Other populations occur in unprotected lands (Rightmyer et al. 2011).

## Calvert's Emerald Dragonfly

Calvert's Emerald Dragonfly (*Somatochlora calverti*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835)). The species remains under review at this time (USFWS 2020a). Calvert's Emerald Dragonfly is listed by several other entities, including as Vulnerable in Florida by NatureServe and Near Threatened by the IUCN (CBD 2010a).

Habitat is unknown but is thought to include "boggy forest seepages" (CBD 2010a). Most North American Calvert's Emerald Dragonfly are associated with cool groundwater for breeding, with adult foraging taking place in surrounding wetland and upland habitats. Other species of Calvert's Emerald breed in graminoid fens and sedge meadows fed by cool groundwater, small streams in woody ravines, or boggy wooded seeps (Mierzwa et al. 1995, CBD 2010a). Due to the typically cool temperatures associated with groundwater sources, the larval period can be prolonged - up to three to five years in some species.

Related Hine's Emerald Dragonfly (*S. hineana*) larvae escape drought or extreme temperatures by retreating into crayfish burrows (Pintor and Soluk 2006).

Calvert's Emerald Dragonfly has been reported in Florida from a handful of localities in the Panhandle including Torreya State Park, Blackwater River State Forest, Ralph E. Simmons State Forest, and Apalachicola National Forest (CBD 2010a, Odonta Central 2019, USFWS 2019o). There is an unverified report from Apalachicola Bluffs Preserve (CBD 2010a). Populations are believed to be small, and breeding habitat is often limited in extent (Paulson 2018). The short adult flight season, cryptic behavior and difficulty of sampling larvae, and difficulty distinguishing *Somatochlora* species hampers survey efforts.

## Bartram's Scrub-hairstreak Butterfly

The Bartram's Scrub-hairstreak Butterfly (*Strymon acis bartrami*) was listed as endangered effective August 12, 2014 (79 FR 47221). Critical habitat was designated within Miami-Dade and Monroe Counties, specifically on Big Pine Key, Navy Wells Pineland Preserve, Richmond Pine Rocklands, and in Everglades National Park. (79 FR 47179).

The Bartram's Scrub-hairstreak is restricted to pine rockland habitat in southern Florida (USFWS 2015f). The subspecies occurs on Big Pine Key, Everglades National Park (Long Pine Key), and in Miami-Dade County (e.g., Navy Wells Pineland Preserve and the Richmond Pine Rocklands). The pineland croton is the host plant for Bartram's Scrub-hairstreak and occurrence records for the species are never more than five meters from host plants (the species is primarily sedentary/non-migratory). The subspecies is threatened by fire suppression, habitat loss, and climate change/sea level rise (USFWS 2015f).

## Yellow-sided Clubtail Dragonfly

The Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Westfall's Clubtail Dragonfly is listed by several other entities, including as Imperiled by NatureServe and Vulnerable by the IUCN (CBD 2010a, NatureServe 2020).

The Yellow-sided Clubtail is a medium-sized slender dragonfly. Its range extends through the Florida Panhandle and coastal Mississippi (NatureServe 2020). The species requires pristine stream and river habitats with sandy bottoms. Within its range, it occupies only seven streams and one river. The species is highly sensitive to impacts to water quality. The major threat to Yellow-sided Clubtail Dragonflies is pollution as a result of development, clearcutting, and pesticide use. Its limited range makes populations particularly vulnerable (CBD 2010a).

**Three-Toothed Long-horned Caddisfly**

The Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Three-toothed Long-horned Caddisfly is listed by several other entities, including as Critically Imperiled by NatureServe and Extinct by the IUCN (CBD 2010a).

The species is only known historically from Oklahoma, the Florida Panhandle, and the Coastal Plain of Alabama. However, the last occurrence in Florida was in 1938. It is believed that the only extant population occurs in Alabama, with the most recent observation of the species occurring in coastal plains streams in Clarke and Perry County in 1991 (NatureServe 2020). Due to this species rarity and few observations, little is known about the species' specific life history and habitat requirements other than it being an aquatic benthic dweller.

## PLANTS

### Meadow Jointvetch

Meadow Jointvetch (*Aeschynomene pratensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Meadow Jointvetch is listed by several other entities, including as Endangered by the State of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

In Florida, this plant only occurs in Collier, Dade, and Monroe Counties; there are 11 known populations (CBD 2010a). Its range outside of Florida extends to the Caribbean and South America (NatureServe 2020). Meadow Jointvetch is classified as a perennial herb species, often observed growing in pine rocklands, marl prairies, cypress domes, and swales (FNAI 2001b, NatureServe 2020). The primary threats to this species are the drainage and conversion of wetland habitat and competition with invasive exotic species (CBD 2010a).

### Crenulate Lead-plant

Crenulate Lead-plant (*Amorpha crenulata = Amorpha herbacea* var. *crenulata*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

Crenulate Lead-plant is characterized as a deciduous, perennial shrub, capable of growing 1.5 meters tall. There are currently only six known populations of this species, all located within Dade County, Florida (FNAI 2001b). It is restricted to poorly drained Opalocka sands within pine rocklands or in wet prairies with Opalocka-rock outcrop complex soils. Frequent fires are a natural process of pine rocklands, and it is presumed that Crenulate Lead-plant is adapted to this environment (USFWS 1999b). It is estimated that 99 percent of Crenulate Lead-plant habitat has been lost (FNAI 2001b). This is mainly the result of development, although remaining habitat is also at risk due to fire suppression (NatureServe 2020).

Current threats to the species include fire suppression in pine rocklands, which results in encroachment by tropical hardwood hammock (unsuitable habitat for the lead-plant), invasive species, and urbanization (50 FR 29345, NatureServe 2020).

### Blodgett's Silverbush

Blodgett's Silverbush, also known as Blodgett's Wild Mercury, (*Argythamnia blodgettii*) was listed as threatened effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

This species is restricted to the Florida mainland and the Florida Keys in Miami-Dade and Monroe counties. There are approximately 15-20 known occurrences, and fewer than 10,000 individual plants. The species grows in the low, moist limestone areas near margins of pine rocklands, rockland hammocks, and coastal berm; particularly in open sunny gaps or along edges (NatureServe 2020). It flowers and fruits all year (FNAI 2001b). This species has

a considerable amount of its habitat to urbanization. Fire suppression and exotic species invasion are immediate threats to the species. (NatureServe 2020).

## Four-petal Pawpaw

The Four-petal Pawpaw (*Asimina tetramera*) was listed as endangered effective September 26, 1986 (USFWS 2020a). Critical habitat has not been designated (USFWS 2020a).

This large shrub/tree (one to three meters) grows in sand pine scrub communities on the inland prehistoric dunes of Martin and Palm Beach Counties, Florida. It is adapted to disturbances such as fire and hurricanes and grows back from its root system (51 FR 34415). As of 2018, this species was known to be extant in only 15 locations out of 26 historically documented occurrence sites (USFWS 2019r). Threats to this species include fire suppression, overgrowth of surrounding trees, non-native species encroachment, development, habitat loss/degradation, and population fragmentation (51 FR 34415, USFWS 2009e, USFWS 2019r).

## Purpledisk Honeycombhead Sunflower

Purpledisk Honeycombhead Sunflower, also known as Purple Balduina, (*Balduina atropurpurea*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

Purpledisk Honeycombhead Sunflower is listed by several other entities, including as Endangered by the State of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).Purpledisk Honeycombhead Sunflower is a perennial member of the Asteraceae family that occurs in southeastern and southcentral Georgia and northeast Florida. It is possibly extirpated from the Florida Panhandle and adjacent Alabama. Disjunct historic occurrences were known in southeast North Carolina and northcentral South Carolina, but these occurrences have not been observed recently. Only seven populations are known in Florida (NatureServe 2020).

General habitat for Purpledisk Honeycombhead Sunflower is wet savanna and bog (Nature Serve 2020). Specific habitats include wet pine flatwoods and savannas, seepage slopes, pitcherplant bogs, and wet ditches (FNAI 2001b). Associated species usually include either longleaf pine (*Pinus palustris*) or slash pine (*Pinus elliotti*). Much of the naturally rare habitats of this species have been altered or destroyed by fire suppression or drained and converted for agriculture and pine plantations. This species is threatened by encroachment of woody vegetation and alterations to hydrology such as wetland drainage and improper firebreak construction (Nature Serve 2020).

## Apalachicola Wild Indigo

Apalachicola Wild Indigo (*Baptisia megacarpa*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Apalachicola Wild Indigo is listed by several other entities, including as Endangered by the State of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

This plant is characterized as a perennial herb capable of growing up to 1.2 meters tall. Its range is limited to southeast Alabama, southwest Georgia and in the adjacent Holmes, Gadsden, and Liberty Counties in Florida (NatureServe 2020). It is typically observed growing in mixed hardwood and hardwood-pine forests, often in close proximity to a floodplain, streams, or ravines (CBD 2010a). This species is primarily at risk due to habitat loss and fragmentation cause by land development, stream impoundment, and forestry management practices (NatureServe 2020). Competition with invasive species such as Japanese honeysuckle (*Lonicera japonica*) and human collection add additional pressure in some localities (NatureServe 2020). Approximately 20 known populations of this species exist, often with low number of individuals (CBD 2010a).

## Florida Bonamia

The Florida Bonamia (*Bonamia grandiflora*) was listed as threatened effective November 2, 1987 (52 FR 42068).

Critical habitat has not been designated (USFWS 2020a).

The Florida Bonamia is a perennial, herbaceous vine with prostrate stems reaching one meter or greater in length. The Florida Bonamia inhabits clearings or openings in shrublands and chaparral in deep, white, dry sands of ancient dunes and sandy ridges in central Florida. Species occurrences have been documented in the following counties: Hardee, Highlands, Lake, Marion, Orange, and Polk (NatureServe 2020). Fire stimulates flowering and seed production in mature plants, germination of seed, and causes turnover of the large seed bank mainly found in the top centimeter of soil surrounding the plant (USFWS 1996b). The species is in decline as approximately 62 percent of known populations occur on private, unprotected lands vulnerable to destruction if they are developed or continue to be unmanaged (USFWS 2017b).

### Florida Brickell-bush

The Florida Brickell-bush (*Brickellia mosieri*) was listed as endangered effective October 6, 2014 (78 FR 61273). Critical habitat was designated in Miami-Dade County in Florida (80 FR 49845). *Brickellia mosieri* is a synonym for the more recently accepted taxonomic name *B. eupatorioides* var. *floridana*.

Florida Brickell-bush is a perennial herb that is endemic to Miami Rock Ridge in Miami-Dade County, Florida. Older literature suggested this species had a wider distribution, occurring in surrounding states; however, this has since been proven false. Florida Brickell-bush habitat includes pine rockland communities with sandy soils dominated by open canopy slash pine (*Pinus elliottii* var. *densa*). In addition, an open shrub canopy is required; shrubs include saw palmetto (*Serenoa repens*) and wax myrtle (*Myrica cerifera*), among others (80 FR 49845). The remaining populations are under threat from housing development, fire suppression, and encroachment of invasive plants (NatureServe 2020).

### Brooksville Bellflower

Brooksville Bellflower (*Campanula robinsiae*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

Native to Brooksville Ridge, Hernando County, Florida, there are only four, possibly five, sites that are currently occupied by this species: one site at Burns Prairie (Florida Fish and Wildlife Conservation Commission Wildlife Management Area), one site on privately owned land known as the Young site, and three sites at Hillsborough River State Park. Only four of these sites, at Burns Prairie in Hernando County and Hillsborough River State Park in Hillsborough County, meet the recovery criteria of being protected.

The species is found in wet prairie and along the edges of ponds near pastureland or adjacent hardwood forests (NatureServe 2020). The population size of this species has fluctuated due to factors such as altered hydrology and drought. Seeds may remain dormant for long periods until high levels of cumulative rainfall stimulate germination and the annual life cycle. There has been a loss of large oaks that would historically have shaded the soil and kept soils moist, which is required for seed germination (USFWS 2019s). Urbanization and habitat alteration have resulted in poor water quality and low water levels resulting in the loss of populations. Cattle grazing and trampling are also threating to the species as well as invasive plant species (FNAI 2001b). Displacement by skunk vine (*Paederia foetida*) is an increasing problem. (NatureServe 2020).

### Fragrant Prickly-apple

The Fragrant Prickly-apple (*Cereus eriophorus* var. *fragrans = Harrisia fragrans*) was listed as endangered effective November 1, 1985. Critical habitat has not been designated (USFWS 2020a).

The Fragrant Prickly-apple occurs in at least 10 confirmed locations in Florida; nine of these are within an area of about 16 kilometers by one kilometer around Savannas Preserve State Park in St. Lucie County. There is also one disjunct population at Canaveral National Seashore in Volusia County, Florida, and one unconfirmed occurrence reported in Indian River County. Unraveling the historical distribution of this species was problematic due to

misidentification with the more common Simpson's prickly-apple (*Cereus gracilis* var. *simpsonii*). The range for the fragrant prickly-apple is hypothesized to included Volusia, St. Lucie, Brevard, and Indian River Counties. It prefers to grow in coastal hammock communities but is also found in sand pine habitats. It thrives in partial sun and mature climax communities that experience infrequent fires. Threats to this varietal include habitat loss/degradation, population fragmentation, poaching, insect predation, invasive species encroachment (plant species as well as feral hogs), herbicide, and stochastic events (USFWS 2010f, NatureServe 2020).

## Deltoid Spurge

The Deltoid Spurge (*Chamaesyce deltoidea* ssp. *deltoidea*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

The Deltoid Spurge is an herbaceous, mat-forming plant endemic to the pine rocklands with scattered shrubs and exposed limestone of Miami rock ridge in Miami-Dade County, Florida (FNAI 2001b, USFWS 2010g). The species underwent precipitous population declines as a result of urban expansion in the Miami area (USFWS 1999b). The species is threatened by habitat destruction, fire suppression (allows for encroachment of unsuitable tropical hammock), and by invasive species (NatureServe 2020).

## Pineland sandmat

Pineland sandmat (*Chamaesyce deltoidea pinetorum*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

Pineland sandmat is a perennial herbaceous species endemic to South Florida, occurring in Miami-Dade County. The historic and current range of pineland sandmat is restricted to an area of 68 kilometers, only within the southern portion of the Miami Rock Ridge, from Homestead to the Long Pine Key region of Everglades National Park. Pineland sandmat is most abundant within the Long Pine Key region of Everglades National Park. It also occurs on County-owned conservation lands adjacent to the Park (82 FR 46991). Pineland sandmat occurs in pine rocklands, which are characterized by an open canopy of South Florida slash pine (*Pinus elliottii* var. *densa*) with a patchy understory of tropical and temperate shrubs and palms, and a rich herbaceous layer containing many species that are endemic to South Florida.

Weathered oolitic limestone outcrops (known as pinnacle rock) are common in pine rocklands. Pine rocklands are maintained by regular fire, which historically occurred at three to seven-year intervals. This habitat is now maintained with prescribed fire, which prevents succession to rockland hammock, and reduces woody competition for pineland sandmat which is not shade tolerant. Pine rocklands are prone to annual flooding during the wet season; however, pineland sandmat generally occurs in higher elevation pine rocklands that are less subject to flooding (81 FR 70282). Ninety-eight percent of pine rocklands, the only habitat for pineland sandmat outside of Everglades National Park, has been lost to development (82 FR 46991). Habitat for pineland sandmat is also susceptible to natural disturbance such as hurricanes, frost events, and sea level rise (81 FR 70282, NatureServe 2020).

## Wedge spurge

The Wedge Spurge (*Chamaesyce deltoidea* ssp. *serpyllum*) was listed as endangered effective October 31, 2016. Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial, tap-rooted herb grows on upland, rocky soils in pine rocklands and along roadways where non-native lawn grasses are not the dominant vegetation. It is only known to occur on Big Pine Key in Monroe County, Florida. The spurge responds positively to fire. From 1996 to 2013, this species' population size fluctuated somewhat, but overall it has been relatively stable. Severe natural disturbances, such as hurricanes, have contracted and restricted the range and distribution of this plant on Big Pine Key (80 FR 58535). Threats to this species include habitat loss/degradation, development, roadside maintenance, invasive species

encroachment, fire suppression, over-shading, and stochastic events (81 FR 66842, NatureServe 2020).

## Garber's Spurge

Garber's Spurge (*Chamaesyce garberi* ≡ *Euphorbia garberi*) was listed as threatened effective July 18, 1985. Critical habitat has not been designated (USFWS 2020a).

As of the 2007 USFWS five-year review, this species consisted of 17 populations: 14 on the Keys of Monroe County, two in Miami-Dade County, and one at Cape Sable in Everglades National Park (USFWS 2007g). This short-lived herb grows on dry, sandy substrates in ecotone areas between hammocks and pine rocklands and coastal beach dune ridges (50 FR 29345, USFWS 2007g). Populations sprout vigorously in response to disturbances, e.g., after fires or hurricanes. Threats to this species include habitat destruction/degradation in the Keys (mainland populations exist on protected lands), fire suppression, invasive species encroachment, and possibly Key deer herbivory (USFWS 2007g).

## Big Pine Partridge Pea

Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) was listed as endangered effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

Formerly known from several Monroe County Keys, this species is now found only on Big Pine Key. There are an estimated 10,000 plants on the island, many in the National Key Deer Refuge (FNAI 2001b). The subspecies is shade intolerant and requires periodic burning to reduce competition. Required habitat is very uncommon; these plants occur only on the edges of rockland hammocks and pinelands in the pine rocklands. It occupies a narrow habitat range, and typically occurs in small numbers. Current fire management occurs in early summer/late winter (prescribed management of co-occurring federally endangered Key Deer). Competing invasive species include Brazilian pepper (*Schinus terebinthifolius*), earleaf acacia (*Acacia auriculiformis*), natal grass (*Rhynchelytrum repens*), shrub verbena (Lantana camara), and tongue tree (*Albezia lebbeck*). Some of these species are known to affect fire return interval because of their extreme flammability. The subspecies is threatened by habitat alteration, altered fire regimes, development, and non-native plants. Based on the extremely narrow range, catastrophic events such as hurricanes and tropical storms may also result in extirpation of the subspecies (FNAI 2001b, NatureServe 2020).

## Pygmy Fringe-tree

Pygmy Fringe-tree (*Chionanthus pygmaeus*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

Pygmy Fringe-tree is endemic to south-central peninsular Florida where it occurs primarily in sand pine scrub, as well as high pineland, dry hammocks, and transitional habitats (USFWS 1999b). Sand pine scrub vegetation consists of sand pine (*Pinus clausa*) with shrubby evergreen oaks (USFWS 1987).

Pygmy Fringe Tree is known from west of Lake Apopka in Lake County, northwestern Osceola County, and the Lake Wales Ridge in Polk and Highlands Counties, including the Saddle Blanket Lakes Scrub Preserve and Highlands Hammock State Park (USFWS 1999b), and in Orange County (Nature Serve 2020). One of the largest populations is in the Carter Creek scrubs in Highlands County where it occurs with turkey oak (*Quercus laevis*), a species more typical of a high-pine community (USFWS 1999b).

Pygmy Fringe-tree is a fire dependent, long-lived shrub or small tree, with stems rising from branches buried by blowing sand (USFWS 1999b). Sand pine scrub vegetation burns infrequently and intensely, approximately every 20 to 70 years, and Pygmy Fringe Tree reproduces from root sprouts post fire. It is also known to reproduce occasionally by seed. The species is similar to the widespread white fringe-tree (*Chionanthus virginicus*), whose range extends into central Florida. The two species appear to hybridize in habits other than scrub, though they are distinct species (USFWS 1999b). Threats to the Pygmy Fringe- tree include habitat loss to residential development

and conversion to citrus groves. It is also threatened by collection for horticultural use (USFWS 1987).

## Cape Sable Thoroughwort

Cape Sable Thoroughwort (*Chromolaena frustrata*) was listed as endangered effective November 25, 2013 (78 FR 63795). Critical habitat was designated on January 8, 2014 (79 FR 1551).

The species is endemic to South Florida and the Keys. Current occurrences are known from Boca Grande Key in the far west, Big Munson Island in the Newfound Harbor Keys, and a cluster of keys farther east: Long Key, Lignumvitae Key, Lower Matecumbe Key, and Upper Matecumbe Key. Cape Sable Thoroughwort is also known from the Flamingo/Cape Sable region on the mainland (NatureServe 2020). Habitat consists of coastal rock barrens and berms and the sunny edges of rockland hammock (FNAI 2001b).

The Cape Sable Thoroughwort is severely threatened by loss of habitat, fragmentation of populations, and invasion of exotic plants, especially Brazilian pepper (*Schinus terebinthifolius*), carrotwood (*Cupaniopsis anacardioides*), and latherleaf (*Colubrina asiatica*). Sea level rise is also a threat to this species. Given the species' narrow range, fragmented distribution, and the small population size, Cape Sable Thoroughwort is vulnerable to stochastic environmental events (NatureServe 2020).

## Florida Golden Aster

The Florida Golden Aster (*Chrysopsis floridana*) was listed as endangered effective May 16, 1986 (51 FR 17974). Critical habitat has not been designated (USFWS 2020a). The species has a high recovery potential and the Service recommended the species listing be reduced from Endangered to Threatened (USFWS 2009f). An initiation of review and request for information was published on September 23, 2014 (79 FR 56821).

The species is endemic to Florida and restricted to the west-central region of the State. It occurs in sunny habitats with bare patches of sand in sand pine scrub and on ecotones between this habitat and scrubby flatwoods. It also inhabits disturbed areas of loose sand (FNAI 2001b). The Florida Golden Aster is known from the following counties: Hardee, Highlands, Hillsborough, Manatee, and Pinellas (NatureServe 2020). The species is under threat due to habitat loss and degradation through residential development and suppression of natural fire regimes (USFWS 2009f). The Florida Golden Aster was introduced to 10 sites where the species was not known to occur naturally, increasing the estimated global population size from 21,000 to 46,000 individuals (NatureServe 2020).

## Florida Perforate Cladonia

The Florida Perforate Cladonia (*Cladonia perforata*) was listed as endangered effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The Florida Perforate Cladonia is a conspicuous lichen, endemic to Florida and restricted to small areas in northwest, central, and southeast portions of the State (NatureServe 2020). The species inhabits rosemary scrub on the Florida Pandhandle coasts, Lake Wales Ridge, and Atlantic Coastal Ridge and it is known from fewer than 30 populations (FNAI 2001b). Florida Perforate Cladonia is threatened by trampling, over- collection, fire, and habitat loss from urbanization (NatureServe 2020). The recovery potential of the species is also hampered by slow reproductive growth as well limited opportunities for dispersal and population expansion due to habitat loss and fragmentation (USFWS 2007h).

## Pigeon Wings

Pigeon Wings (*Clitoria fragrans*) was listed as threatened effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The species is a perennial herb that blooms from May to June (FNAI 2001b). Pigeon Wings are endemic to central Florida, inhabiting undisturbed clearings of xeric sandhill and scrub communities on well-drained soils, and turkey

FWS-005789

oak barrens with wire grass (*Aristida stricta*), bluejack (*Quercus incana*) and turkey oak (*Quercus laevis*) (FNAI 2001b, NatureServe 2020). Threats to the species include habitat loss from urbanization and agriculture (USFWS 2008f, NatureServe 2020).

## Short-leaved Rosemary

The Short-leaved Rosemary (*Conradina brevifolia*) was listed as endangered effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

Short-leaved Rosemary is a perennial, aromatic shrub growing from a woody root to one meter high. The species is known from approximately 30 occurrences on the Lake Wales Ridge of central Florida, with only a few of those populations having greater than 25 individuals (NatureServe 2020). The Short-leaved Rosemary inhabits xeric white sands supporting evergreen-Florida rosemary-sand pine scrub (USFWS 2008g). Populations are at risk of habitat loss due to conversion to citrus groves, residential, recreational, and commercial development. Short-leaved Rosemary is also a target of over-collection for horticulture (NatureServe 2020).

## Etonia Rosemary

The Etonia Rosemary (*Conradina etonia*) was listed as endangered effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

This shrub species was described relatively recently in 1991. There are two known populations, one in Etonia Creek State Forest and one in Interlachen Estates Subdivision, in Putnam County, Florida. Two populations were thought to have been found in Dunn's Creek State Park, but genetic research revealed these populations to be a separate species entirely (*C. cygniflora*). This species prefers sunny, disturbed sites in sand pine or shrubby oak communities. Within the subdivision, plants are found along roadsides or with subdivided lots of at least 0.4 hectare. Healthy populations are associated with natural fire regimes.

Threats to this species include habitat degradation due to lack of management and fire suppression (USFWS 2019t, NatureServe 2020).

## Apalachicola Rosemary

The Apalachicola Rosemary (*Conradina glabra*) was listed as endangered on August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

This shrub species was described relatively recently in 1962. Most of the known populations are currently found in an extremely limited area of 1,000 to 1,470 hectares in Liberty County, Florida. It is believed this species was more abundant across former sandhill habitats, but by the 1950s the silviculture industry had destroyed most of that habitat. This species is adapted to relatively frequent, low-intensity fires that maintain healthy mature populations. Historically in sandhill communities, these fires occurred on average every 1 to 10 years. A few populations of this plant occur on private land, two populations have been reintroduced on Nature Conservancy land, and only one population currently exists on public land at the Sweetwater Creek Track in Torreya State Park. Continuing threats to this species include habitat destruction/modification, range curtailment, and herbicide application (USFWS 2017c).

## Florida Semaphore Cactus

The Florida Semaphore Cactus (*Consolea corallicola = Opuntia corallicola*) was listed as endangered effective November 25, 2013 (78 FR 63795). Critical habitat was designated in the Florida Keys (81 FR 3865).

The Florida semaphore cactus is a Florida endemic cactus. The Florida Semaphore Cactus grows on bare rock or areas of loose rock such as talus and scree slopes. It is also found in shallow soil areas of hardwood hammocks near sea level. Only three naturally occurring populations of this species remain on Swan Key, Little Torch Key,

FWS-005790

and Key Largo. Reintroduction efforts have been initiated on other keys (USFWS 2013). Threats to the species include large hurricanes, its small population size, over-collection, urbanization, sea level rise, and introduced species, such as a moth that feeds on cacti (NatureServe 2020).

## Ciliate-leaf Tickseed Sunflower

Ciliate-leaf Tickseed Sunflower (*Coreopsis intergrifolia*) was listed as endangered effective October 6, 2014 (79 FR 52567). Critical habitat was designated effective September 16, 2015 (80 FR 49845).

This species occurs from southeastern South Carolina south to the Panhandle of Florida. It is reported from five counties in northern Florida (Calhoun, Jackson, Nassau, St. Johns, and Washington). Habitat consists of low floodplain woodlands, streambanks, floodplains of blackwater streams (especially over limestone), and the edges of swamp forests bordering longleaf pinelands or brackish marshes. Soil is characterized by moist, sandy loam. Threats to the species include damming of streams, clearcutting bottomlands, herbicides, cattle grazing, and anthropogenic disturbance at high use recreation areas (NatureServe 2020).

## Avon Park Harebells

The Avon Park Harebells (*Crotalaria avonensis*) was listed as endangered effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The Avon Park Harebells is endemic to Florida and known from only three sites in Polk and Highlands counties near Avon Park (58 FR 25746, NatureServe 2020). The species is found onlyon xeric white sand scrub. Avon Park Harebells are small, deciduous, perennial herbs that grow from a deep taproot, blooming from March to June. It is thought that the deep taproot, combined with being deciduous, helps the species survive the dry winter months and fires common for their habitat (NatureServe 2020).

Populations are threatened by fragmentation and habitat loss through the development of citrus groves, cattle pastures, and housing subdivisions (USFWS 1999c). A five-year review of the species indicated a need to preserve the remaining populations of Avon Park Harebells and to research the life history and propagation with and without disturbance (USFWS 1999c, NatureServe 2020).

## Okeechobee Gourd

The Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) was listed as endangered effective August 11, 1993 (58 FR 37432), and revised on April 1, 1994 (59 FR 15345), due to a technical correction to the scientific name. Critical habitat has not been designated (USFWS 2020a).

The Okeechobee Gourd is found in swampy forests and hammocks on muck soils and are restricted to disturbed, uncultivated areas (e.g., ditch banks, wet road shoulders; NatureServe 2020). There are only two natural populations known in Florida, one on Lake Okeechobee and the other along St. Johns River (USFWS 2009g). Threats to the species include habitat destruction and modification (USFWS 2019u).

## Florida Prairie-clover

The Florida Prairie-clover (*Dalea carthagenensis floridana*) was listed as endangered effective November 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial shrub is endemic to Florida. It grows in tropical savanna pine rockland, rockland hammock, marl prairie, and coastal berm habitats. This subspecies is likely extirpated from Everglades National Park. Only nine populations of this subspecies are currently extant. Florida Prairie-clover is threatened by habitat loss/fragmentation, fire suppression, non-native species encroachment, recreational activities, and stochastic events (82 FR 46691).

**Beautiful Pawpaw**

Beautiful Pawpaw (*Deeringothamnus pulchellus*) was listed as endangered effective September 26, 1986 (50 FR 45634). Critical habitat has not been designated (USFWS 2020a).

Half of the existing Beautiful Pawpaw shrubs are found in xeric, mesic, and hydric pine flatwoods on two preserves in western Charlotte and Lee counties (eastern Florida) (USFWS 2020a). Approximately 5,000 plants remain (FNAI 2001b). In 1996, 200 individual Beautiful Pawpaws were relocated from private agricultural land on Pine Island, where habitat destruction was anticipated, to unoccupied habitat in Lee County (USFWS 2020a).

Beautiful Pawpaw thrives alongside open slash pine (*Pinus elliotti*) or longleaf pine (*Pinus palustris*) flatwoods with evergreen blueberries (*Vaccinium myrsinites*), saw palmetto (*Serenoa repens*), wax myrtle, (*Myrica cerifera*), flag pawpaw (*Asimia reticulate*), and dwarf live oak (*Quercus minima*) in the understory. Soils in these habitats are poorly drained sandy substrates (FNAI 2001b).

Decline of the Beautiful Pawpaw is due to loss of available habitat from urbanization, degradation, and fire suppression (USFWS 1999). Fire not only creates clearings to let in sunlight, but the heat promotes germination as well. Other threats to the species include exotic invasive species such as the Brazilian pepper (*Schinus terebinthifolius*), the leafroller caterpillar (*Choristoneura parallela*), and feral pigs (FNAI 2001b).

**Rugel's Pawpaw**

The Rugel's Pawpaw (*Deeringothamnus rugelii*) was listed as endangered effective October 27, 1986 (51 FR 34415). Critical habitat has not been designated (USFWS 2020a).

The Rugel's Pawpaw is a low-growing shrub (USFWS 2009h). Its range is extremely limited and it can only be found in Volusia County in the northeastern Florida peninsula (USFWS 2018i, NatureServe 2020). Its historic range included Seminole County (NatureServe 2020). The species is known from approximately 33 occurrences, mostly in the vicinity of New Smyrna Beach (USFWS 2009h, USFWS 2018i). There are two additional sites with introduced populations. It thrives in mesic and wet flatwood habitats dominated by slash pine (*Pinus elliotttii* var. *densa*) or longleaf pine (*Pinus palustris*) and associated with poorly drained sandy soils. Additionally, it is sometimes found along roadsides. Rugel's Pawpaw is often associated with netted pawpaw (*Asimina reticulate*), common pawpaw (*A. triloba*), tarflower (*Bejaria racemose*), shiny liona/fetterbrush (*Lyonia lucida*), dwarf live oak (*Quercus minima*), saw palmetto (*Serenoa repens*), and shiny blueberry (*Vaccinnium myrsinites*). These natural communities require regular fire intervals (USFWS 2018i). This species is threatened by habitat loss from urbanization, industrial timber, and fire suppression (NatureServe 2020).

**Garrett's Mint**

Garrett's Mint (*Dicerandra christmanii*) was listed as endangered effective December 2, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

Garrett's Mint is a perennial shrub; flowering occurs from July through November. It is dependent on insects for pollination as well as on regular fire disturbance for long-term survival. Based on studies of a similar mint species, populations may decline after only five years without fire. Its range is limited to Highlands County in Florida, specifically, to a six-kilometer stretch along Lake Wales Ridge. This distribution has been fragmented by development. The species thrives in gaps within xeric oak-hickory scrub habitat. It grows exclusively on soils composed of fairly well-drained yellow sands (USFWS 2009i). The limited area where this species is found is threatened by habitat loss and degradation from urbanization (NatureServe 2020).

**Longspurred Mint**

The Longspurred Mint *(Dicerandra cornutissima)* was listed as endangered, effective November 1, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

This short-lived plant has 15 known occurances in Marion and Sumter Counties, Florida (USFWS 2005b). The majority of the occurances are on the Cross Florida Greenway State Recreation and Conservation area in Maron County. Unfortunately, the Marion County sites are no longer suitable habitat due to increasing development and road widening projects (USFWS 2005b). Fire suppression and invasive exotic species are also a factor. (USFWS 2005b).

Strongly aromatic, this low growing shrub is found alongside sand pine scrub and turkey oak communities. It can spread on the edges of roads and vigorously along streets (USFWS 2018j). It prefers forested woodland, shrub and chaparral communities throughout the scrub and sandhill in openings (USFWS 2018j).

### Scrub Mint

Scrub Mint (*Dicerandra frutescens*) was listed as endangered effective November 1, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

Scrub Mint is an aromatic shrub that blooms from August to February (FNAI 2001b). Scrub Mint is endemic to Highlands County in central Florida (NatureServe 2020) and inhabits yellow sand soil types supporting sand pine scrub or oak-hickory scrub vegetation. These habitats are currently threatened by residential, commercial, and agricultural development and modification due to long-term fire suppression (USFWS 2009j).

### Lakela's Mint

The Lakela's Mint (*Dicerandra immaculata*) was listed as endangered effective May 15, 1985 (50 FR 20212). Critical habitat has not been designated (USFWS 2020a).

This short, hemispheric shrub species grows in the disturbed, well-drained, sterile sand of ancient inland dunes. It is endemic to coastal sand pine scrub in Indian River and St. Lucie Counties in Florida (50 FR 20212, NatureServe 2020). Its historical range was limited to an area approximately three kilometers wide by five kilometers long. In 1991 and 1992, transplants were introduced to the Hobe Sound National Wildlife Refuge in Martin County. Similar to other scrub mints, it is believed this species is adapted to patchy, infrequent fires to maintain an open canopy and facilitate new recruitment. Threats to this species include habitat loss, degradation, and fragmentation; altered fire regimes; development; feral hogs; and non-native plant species encroachment (USFWS 2008h).

### Florida Pineland Crabgrass

Florida Pineland Crabgrass (*Digitaria pauciflora*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

The species is currently known only from one site of approximately 8,000 hectares in Everglades National Park, Florida (NatureServe 2020). Florida Pineland Crabgrass commonly occurs in the ecotone between pine rockland and grassy marl prairie habitats, extending somewhat into both (Bradley and Gann 1999). Florida Pineland Crabgrass is a perennial clump-forming grass. The main threat to this species is alteration of the hydrology of the Everglades National Park. Extensive urban development, rising sea levels, invasive species, and altered fire regimes also threaten the population (USFWS 2004).

### Clam-shell Orchid

The Clam-shell Orchid (*Encyclia cochleata* var. *triandra*) was petitioned for listing on April 20, 2010 (CBD 2010a). On October 7, 2019, listing was deemed not warranted after review (84 FR 53336). The Clam-shell Orchid is considered Imperiled by NatureServe (CBD 2010a).

The Clam-shell Orchid is relatively abundant in southern Florida from Ft. Lauderdale to further south, especially in Big Cypress and near West Lake in Everglades National Park (Dade, Collier, and Monroe counties). Habitat includes forested hardwood wetlands, hammocks, and buttonwood/cypress strands. The Clam-shell Orchid grows

on buttonwood and red mangroves. Although current population levels are adequate to sustain the variety, widespread collecting of the native form has significantly impacted populations. However, populations in very inaccessible portions of Big Cypress National Preserve and Everglades National Park are well-protected (NatureServe 2020).

## Big Cypress Epidendrum Orchid

The Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Big Cypress Epidendrum Orchid is listed by several other entities, including as Endangered by the State of Florida and Critically Imperiled by NatureServe (CBD 2010a).

Big Cypress Epidendrum Orchid is widespread in tropical America including Collier County in South Florida, the West Indies, Central and South America, Mexico to Brazil, and Cuba (USFWS 2020a). It is a very small, perennial epiphytic orchid that flowers through the winter and can be found in pop ash (*Fraxinus caroliniana*) and pond apple (*Annona glabra*) swamps and sloughs (FNAI 2001b, CBD 2010a). Big Cypress Epidendrum Orchid has been severely reduced by plant poaching and wetland habitat destruction (FNAI 2001b).

## Blackbract Pipewort

Blackbract Pipewort, also known as Dark Headed Hatpins, (*Eriocaulon nigrobracteatum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Blackbract Pipewort is listed by several other entities, including as Endangered by the State of Florida and Critically Imperiled by NatureServe (CBD 2010a).

The species is endemic to the Gulf Coast lowlands of the east-central Florida Panhandle in Bay, Calhoun, and Gulf counties (FNAI 2001b). The Florida Natural Areas Inventory reports 12 occurrence records in its database as of 2014 (NatureServe 2020). The Blackbract Pipework occurs in open wet bog/fen wetland habitat at stream heads or on open, grassy seepage slopes. In addition, habitat includes deep sapric muck soils of nutrient-poor, somewhat oxygen-rich and acidic mires, with little wood or Sphagnum moss present in the muck (poor fens; FNAI 2001b). Within this habitat, the plants are locally abundant in areas saturated by groundwater seepage and in seep spring rivulets (NatureServe 2020). The Blackbract Pipework flowers in March and goes to seed in April and May. This species is threatened by development and road and power line maintenance adversely affects the hydrology of seepage slope habitat in a number of the occurrences. Shading by shrubs is also a primary threat (the result of suppressed fire regimes) (NatureServe 2020).

## Scrub Buckwheat

Scrub Buckwheat (*Eriogonum longifolium* var. *gnaphalifolium*) was listed as threatened effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

Scrub Buckwheat is a perennial herb that blooms from May to October or after fire (FNAI 2001b). The species is endemic to central Florida and occurs in dry pinelands, sandhills, scrub, and ecotones between scrub and high pineland. The Scrub Buckwheat is threatened by habitat loss through development of citrus groves, pine plantations, and residential housing (USFWS 2018k, NatureServe 2020).

## Snakeroot

Snakeroot, also known as Wedge-leaf Eryngo, (*Eryngium cuneifolium*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This species has an extremely restricted range with approximately 20 occurrences, all occurring in Highlands County, central Florida. Most of these occurrences are located on three preserves (FNAI 2001b). It inhabits areas

of open sand, including blowouts and other highly disturbed soil surfaces such as road shoulders (Christman and Judd 1990). Snakeroot is currently threatened by habitat loss from development and modification due to long-term fire suppression (USFWS 2010h).

## Telephus Spurge

The Telephus Spurge (*Euphorbia telephioides*) was listed as threatened effective May 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

The Telephus Spurge is a perennial herb (NatureServe 2020). This species is currently only known from Bay, Gulf, and Franklin counties in Florida. It inhabits longleaf pine savannas, scrubby and mesic flatwoods, and coastal scrub on low sand ridges near the Gulf of Mexico (FNAI 2001b). It can be subdioecious (having separate male and female plants) or monoecious (having both male and female flowers on the same plant). Subdioecious plants ensure genetic variation through reducing outcrossing; however, this can also reduce the effective reproductive population if the population is comprised of only one sex (USFWS 2008i). The species needs fire to maintain community structure and is threatened by habitat degradation due to forestry practices, lack of prescribed fire, and by urban development (NatureServe 2020).

## Small's Milkpea

Small's Milkpea (*Galactia smallii*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has ot been designated (USFWS 2020a).

This species is known from only 11 occurrences, all located in a small area of Dade County, South Florida (NatureServe 2020). It inhabits redland pine rocklands with South Florida slash pine (*Pinus elliottii*), saw palmetto (*Serenoa repens*), willow bustic (*Dipholis saliciolia*), and poisonwood (*Metopium toxiferum*) (FNAI 2001b). The species prefers open sun and little shade and can be threatened by shading from hardwoods (USFWS 2010i). Threats to this species include residential, commercial, and agricultural development, succession in the absence of fire, and competition from invasive species (NatureServe 2020). Ninety-eight percent of the original pine rockland habitat has disappeared, resulting in just six remaining populations on five managed areas (FNAI 2001b).

## Harper's Beauty

The Harper's Beauty (*Harperocallis flava*) was listed as endangered effective November 1, 1979 (44 FR 56862). Critical habitat has not been designated (USFWS 2020a).

This species is a perennial herb that grows in the ecotones between sunny, open wet prairies and wetter shrub/tree areas, such as cypress swamps, roadside depressions, seepage savannas between pinelands, pine flatwood bogs, and ditches in the vicinity of pine plantations near flatwood habitats. Current occurrence records are known from Liberty, Franklin, and Bay Counties in Florida (USFWS 2016c).

Genetic studies on this plant show low genetic diversity within the species and some suggestions of instability within its genetics (e.g., a threat to the species) (NatureServe 2020). Other threats to Harper's Beauty include horticultural collection, timber production processes, habitat degradation due to lack of management, road widening, development, hydrology modification, and fire suppression (USFWS 2016c).

## Aboriginal Prickly-apple

The Aboriginal Prickly-apple (*Harrisia aboriginum*) was listed as endangered effective October 24, 2013 (78 FR 63795). Critical habitat was designated on January 22, 2016. (81 FR 3865).

The Aboriginal Prickly-apple is a cylindrical-stemmed cactus measuring up to six meters in height (78 FR 63804, USFWS 2020a). It occurs on Florida's southwest coast and is often established on shell mounds or shelly substrates (NatureServe 2020, USFWS 2020a). This species occurs in coastal berms, coastal grasslands (78 FR

63805), coastal strand vegetation, and tropical coastal hammocks, with trees such as gumbo limbo (*Bursera simaruba*), wild lime (*Zanthoxylum fagara*), and/or live oak (*Quercus virginiana*). It may be found near, but never within mangrove communities (USFWS 2020a). Threats to this species include the destruction and modification of habitat, bonfires, vandalism, and competition with non-native plants such as Brazilian pepper (*Schinus terebinthifolius*) and leather leaf (*Chamaedaphne calyculata*) (78 FR 63806).

FWS-005796

**Florida Hartwrightia**

Florida Hartwrightia (*Hartwrightia floridana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Florida Hartwrightia is considered Imperiled in Florida and Critically Imperiled in Georgia by NatureServe (NatureServe 2020).

This perennial herb species is known to inhabit areas near the Florida-Georgia border. Occurrences have been documented in the following Florida counties: Highlands, Clay, Nassau, Polk, and Putnam. The species grows in wet, organic mats such as peat bogs/fens or forested wetlands (e.g., slash pine/longleaf pine/saw palmetto flatwoods, pineland swamps/bogs), and seepage areas that are acidic. In the last 40 years, only 50 occurrences of this species have been reported. Threats to this species include incompatible hydrological practices, habitat conversion (pine plantations or pasture), fire suppression, and canopy encroachment (NatureServe 2020).

**Henry's Spider-lily**

Henry's Spider-lily (*Hymenocallis henryae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Henry's Spider-lily is considered Imperiled in Florida by NatureServe (NatureServe 2020).

This perennial, bulbous herb is known only from the south-central Florida Panhandle in Bay, Franklin, Gulf, Liberty, and Walton Counties. It grows at the edges of dome swamps, between these and flatwood or wet prairie habitats. Only 20 occurrences of this species are known. Threats to Henry's Spider-lily include horticultural collecting, development, hog damage, hydrology alteration, habitat conversion (pine plantations), fire suppression, and canopy encroachment (NatureServe 2020).

**Highlands Scrub Hypericum**

Highlands Scrub Hypericum (*Hypericum cumulicola*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This perennial, tap-rooted herb/subshrub grows in the openings of dry, upland sand pine, oak scrub, and rosemary scrub communities. It is known from a limited distribution in the southern Polk and Highlands Counties of Florida along the ancient, inland dune ridge or along sandy road edges (52 FR 2227, USFWS 2008j, NatureServe 2020). Populations of this species are invigorated following fire events, though effects are temporally delayed (15 years at least, but not more than 50 years between events; USFWS 2008j).

Threats to this species include citrus farming, urban development, off-highway-vehicle/trampling damage, invasive species encroachment, fire suppression, extreme climate conditions (droughts, flooding, and frost), and stochastic events (USFWS 2008j, NatureServe 2020).

**Edison's Ascyrum St. John's Wort**

Edison's Ascyrum St. John's Wort (*Hypericum edisonianum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Edison's Ascyrum St. John's Wort is considered Imperiled in Florida (CBD 2010a).

The species is endemic to central peninsular Florida and occurs in depressions in scrub, cutthroat seeps, flatwoods ponds, lake margins, and wet prairies. Although it is locally abundant due to its thicket-forming habit, it is only found at 25 sites and only in five of these sites are conservation areas (FNAI 2001b). The species has been documented in the following Florida counties: Polk, Highlands, Glades, and DeSoto.

The primary threat to the species is loss of habitat due to extreme development pressure, wetland drainage, fire

suppression, and agriculture (NatureServe 2020).

## Smooth-barked St. John's Wort

Smooth-barked St. John's Wort (*Hypericum lissophloeus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Smooth-barked St. John's Wort is listed by several other entities, including as Endangered by the State of Florida and Imperiled by NatureServe (CBD 2010a).

Smooth-barked St. John's Wort is endemic to the karst pond area of Bay and Washington Counties in the Florida Panhandle. It occurs on the fluctuating shores and shallow water of karst sinkhole ponds and small sandhill lakes (FNAI 2001b, NatureServe 2020). Although its range is limited, it may be locally abundant, even the most abundant shrub on the shores of the ponds where it occurs. Occurrences may number in the thousands. The species is known to form a solid ring around the ponds. Smooth-barked St. John's Wort is threatened by rapid lakeshore development in the region, disturbance of upland habitats leading to increased erosion into ponds, prolonged droughts, and increased recreational use of ponds (NatureServe 2020). Future recommendations include preservation of natural lakeshore vegetation, preventing conversion of lakeshores to sandy beaches, and halting the erosion into lakes from upland developments and logging practises (FNAI 2001b).

## Yellow Anisetree

The Yellow Anisetree, also known as Star Anise, (*Illicium parviflorum*) was petitioned for listing on September 27, 2011 (76 FR 59835). On October 7, 2019, listing was deemed not warranted based on the moderate to high resiliency of the species (84 FR 53336).

The Yellow Anisetree is widely used as an ornamental landscaping plant in southeastern US; however, it is only known from fewer than 20 native occurrences in central Florida (NatureServe 2020). The species blooms from April to June. Fruit are woody, star-shaped, and distinctive all year (FNAI 2001b). The Yellow Anisetree is restricted to habitats with continually moist soils, such as sandy loams or sandy peat mucks, on the banks of spring-run or seepage streams, hydric hammock, and bottomland forest (FNAI 2001b, NatureServe 2020). Threats to the species include logging or hydrology-altering practices in forested wetlands and collection by hobbyists (FNAI 2001b).

## Beach Jacquemontia

Beach Jacquemontia (*Jacquemontia reclinata*) was listed as endangered effective November 24, 1993 (58 FR 14357). Critical habitat has not been designated (USFWS 2020a).

Beach Jacquemontia is a perennial vine endemic to coastal vegetated dunes, disturbed marine hammock, and woodland habitat in Palm Beach, Broward, and Dade Counties, Florida. There were 22 occurrences of the species in 2018 (USFWS 1999, FNAI 2001b, NatureServe 2020). Common vegetative associates include sea grape (*Coccoloba uvifera*), cabbage palm (*Sabal palmetto*), poisonwood (*Metopium toxiferum*), Madagascar periwinkle (*Catharanthus roseus*), croton (*Croton involucrate*), gopher apple (*Licania michauxii*), prickly pear cactus (*Opuntia* spp.), sandspurs (*Cenchrus* spp.), sea oats (*Uniola paniculata*) and other shrubs and dwarfed trees (USFWS 2020a). Beach Jacquemontia population are in decline due to loss of available habitat from urbanization, degradation, beach erosion, and invasive species (NatureServe 2019).

## Cooley's Water-willow

Cooley's Water-willow (*Justicia cooleyi*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

This species occurs within an extremely limited range in central Florida flatwoods. The Cooley's Water-willow only occurs on Brooksville Ridge in Hernando County, Florida and at one location in Sumter County. (USFWS 2019v,

NatureServe 2020). The Cooley's Water-willow is a rhizomatous, perennial herb found in mesic hardwood hammocks and pine forests underlain by limestone (FNAI 2001b). Soil composition includes sandy loams or silty clay loams (FNAI 2001b, NatureServe 2020). The species has declined as a result of habitat loss via lime and phosphate mining, timber harvesting, and agricultural and urban development. Current threats to the species include habitat loss and encroachment of invasive species in Cooley's Water-willow habitat (USFWS 2019v).

## Scrub Blazingstar

Scrub Blazingstar (*Liatris ohlingerae*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

Scrub Blazingstar is characterized as an erect, perennial herb (NatureServe 2020). This species is endemic to Florida and has a limited range, occurring along the Lake Wales Ridge in Polk and Highlands counties (FNAI 2001b). It is restricted to sand pine and open oak-rosemary scrub habitats, often along the ecotone between rosemary balds and surrounding scrub habitats (USFWS 1999, NatureServe 2020). This habitat is often a dynamic vegetative complex dependent on the frequency and intensity of fires, which maintain ideal growing conditions for this species. The species is threatened by habitat loss due to agriculture, commercial, residential, and recreational purposes. Fire suppression is another factor that has caused habitat degradation as areas that were once used by this species are continually becoming overgrown (USFWS 1999).

## Panhandle Lily

Panhandle Lily (*Lilium iridollae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Panhandle Lily is considered Imperiled in Florida by NaturServe (CBD 2010a).

The range of the Panhandle Lily is contested due to taxonomic uncertainty regarding plants of the Carolinas and Virginia, which are treated by many as a distinct species (Sandhill Lily, *Lilium pyrophilum*) (Skinner and Sorrie 2002; Nature Serve 2020). Taking the broader view of the range, including plants that many consider to be the Sandhill Lily, the range for Panhandle Lily is discontinuous from southern Alabama and northwest Florida north to Virginia. If the Sandhill Lily is accepted as a distinct species, then the range of Panhandle Lily includes only four counties in the western Florida panhandle and three counties in adjacent southern Alabama. General habitats for Panhandle Lily include bogs and fens, herbaceous wetlands, and scrub-shrub wetlands. It inhabits baygalls, wet flatwoods, seepage slopes, and the edges of bottomland forests typically in sandy peat or loamy soils (Nature Serve 2020).

The quality and extent of potential habitat for Panhandle Lily has declined due to fire suppression and drainage for conversion to silviculture and agriculture (Nature Serve 2020). Habitat conversion has resulted in considerable permanent impacts to the species. Panhandle Lily has showy flowers that are attractive to collectors and an entire population was removed from the Conecuh National Forest by collectors. Additional threats include cattle grazing and potentially insect herbivory (CBD 2010a, Nature Serve 2020).

## Bog Spicebush

Bog Spicebush (*Lindera subcoriacea*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Bog Spicebush is considered Vulnerable by NatureServe (NatureServe 2020).

The Bog Spicebush occurs on the Atlantic and Gulf Coast plains from southern Virginia south to Florida and west to Louisiana. There are currently over 100 occurrences; most of them consist of very small populations located on sites that will require active management for the plants to persist. The plants occupy a relatively narrow ecological niche and have a correspondingly spotty distribution within the range. In the deep south, Bog Spicebush is not found outside the wettest portions of rare, sphagnum bog habitats. This species is found streamside and in

seepage bogs, with sphagnum moss, titi, and other evergreen shrubs. The species is clonal, and most sites have only one to five genetic individuals (FNAI 2001b).

The general lack of fire in these habitats during the last 50 or more years has placed the plants under increased stress from competing shrubs and trees. Restoring fire to the landscapes via controlled burns would reverse this trend. This is becoming increasingly difficult with continued development of surrounding longleaf pine/wiregrass uplands for housing, agriculture, timber management, and pinestraw raking. Other known or perceived threats to the species include siltation of streamheads, logging, road building, draining and of bogs and wetlands (NatureServe 2020).

### Sand Flax

Sand flax *(Linum arenicola,* formerly *Cathartolinum arenicola)* was listed as endangered, effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

Sand flax is a perennial herb that flowers from February to September. Its historical range encompasses Miami-Dade County and many islands in the Florida Keys. As of 2016, there were eight extant populations known from Miami-Dade County and four from the Florida Keys (80 FR 58535). Sand flax thrives in pine rockland and flatwoods, dry marl prairie, as well as in disturbed areas (e.g. roadsides) (80 FR 58535, FNAI 2001b, NatureServe 2020). It grows in rocky soils, often near exposed limestone. It has been described as occurring in solution pits and shallow soil of ephemeral pools on limerock in open pinelands, pineland clearings and adjacent roadsides (NatureServe 2020). These natural communities require regular fire intervals. Currently, it is more commonly found in disturbed areas than within intact pine rocklands (80 FR 58535). This species is threatened by habitat loss from urbanization, agriculture, and fire suppression (NatureServe 2020).

### Carter's Small Flowered Flax

Carter's Small Flowered Flax (*Linum carteri carteri*) was listed as endangered effective October 6, 2014 (79 FR 52567). Critical habitat was designated on August 17, 2015 (80 FR 49845).

The subspecies is restricted to eastern Miami-Dade County, Florida, in the vicinity of the Miami metropolitan area on conservation lands. Plants occur in highly disturbed margins of Miami Rockridge Pine Rocklands and in mowed open areas. Carter's Small Flowered Flax has declined as a result of habitat loss to residential and commercial development and agricultural conversion throughout South Florida pine rocklands. Pine rockland habitat in Miami-Dade County has been reduced to roughly 11 percent of its historical extent and, outside of Everglades National Park, only about one percent of these pinelands remain (as fragmented patches).The small number of populations and scarcity of individuals makes this species vulnerable to effects of stochastic processes and catastrophic phenomena. In addition, extant plants appear to exhibit somewhat weak reproduction: plants collected in August, at the end of the fruiting season, had few seeds (NatureServe 2020). Current threats to Carter's Small Flowered Flax include fire suppression and invasive species (FNAI 2000).

### West's Flax

The West's Flax (*Linum westii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). NatureServe ranks this species as Critically Imperiled (NatureServe 2020).

This perennial herb grows in full sun, sandy, meagerly vegetated edges of wetlands such as bogs, marshes, shallow ponds, slash pine-saw palmetto flatwoods, cypress ponds, ditches, and soggy prairies. There are 20 known extant populations scattered across northeast Florida in Liberty, Franklin, Gulf, Okaloosa, and Clay Counties. It is possibly under-reported because it only blooms at dusk and is not easily distinguished from similar species. Surveys in 2013 were not able to find plants at many of the historic locations. The species responds well to controlled burning every two to three years. Threats to West's Flax include fire suppression, changes in

FWS-005800

hydrology, and commercial logging operations (NatureServe 2020).

**Boykin's Lobelia**

Boykin's Lobelia (*Lobelia boykinii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Boykin's Lobelia is considered Imperiled by NatureServe (NatureServe 2020).

Boykin's Lobelia is a perennial herb, growing 40 to 80 centimeters tall. The species has blue flowers with a white eye at the throat. Blooming occurs from May through August; flowering is dependent on fluctuating water levels (NatureServe 2020). Boykin's Lobelia inhabits forested, herbaceous, or scrub-shrub wetlands and occurs throughout much of the Coastal Plain, from North Carolina south to Florida, and west to Mississippi (Weakley 2012). They are obligate outcrossers, meaning they may limit seed production in small populations to reduce inbreeding depression. As Boykin's Lobelia is a self-incompatible species, this can have drastic effects on population size and density across years (Bates 1996, Moreno 2003, Royo et al. 2008). The Boykin's Lobelia's wetland habitats are threatened with drainage and conversion to tree farms or agriculture; this has led to a decline in the species' populations (NatureServe 2020).

**Raven's Seedbox**

Raven's Seedbox (*Ludwigia ravenii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Raven's Seedbox is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

Raven's Seedbox is a perennial herb in the evening primrose family (*Primulaceae*) (Nature Serve 2020). Occurrences are known from the Coastal Plain of southeastern Virginia, eastern North Carolina, southeastern South Carolina, and northeastern Florida. At least 17 of the nearly 30 occurrences of this species are known to be historic and, at present, only five to six occurrences are known to be extant.

Extant occurrences are known from North Carolina and Virginia. Raven's Seedbox may be extirpated from Florida, where it has not been observed since 1982. The only record of Raven's Seedbox in Florida is from Clay County in the northeastern part of the State. Raven's Seedbox is a wetland obligate, and general habitat for this species include bogs, fens and forested wetlands. Specific habitat includes open, wet, peaty places such as ditches and the margins of swamps, ponds, or bogs. In Virginia, all extant populations are in ditches and power line right-of-ways (Nature Serve 2020).

Populations of Raven's Seedbox are composed of scattered individuals (Nature Serve 2020). The species is self-compatible, a trait that could result in low genetic diversity of the species and potentially influence its long-term survival. The ditches and power lines occupied by this species are threatened by herbicide use, excavation and deepening of ditches, and road widening and paving (Nature Serve 2020).

**Scrub Lupine**

The Scrub Lupine (*Lupinus aridorum* = *Lupinus westianus* var. *aridorum*) was listed as endangered effective April 7, 1987 (52 FR 11172). Critical habitat has not been designated (USFWS 2020a).

This short-lived perennial subshrub is currently known only from 12 extant populations in Orange and Polk Counties in Florida (USFWS 2016d). The Scrub Lupine grows on fine, well-drained, sandy soils in openings of sand pine scrub, oak scrub, and rosemary scrub, usually where there has been disturbance (USFWS 2016d, NatureServe 2020). Three natural populations and three introduced populations occur on protected lands, while the remaining populations exist on private land that is vulnerable to development (USFWS 2016d). Due to its short life cycle of four to six years, populations can fluctuate significantly from year to year, with some populations decreasing and increasing by hundreds from one year to the next (USFWS 2016d, NatureServe 2020). Excluding the three managed populations on protected sites, the species is declining (USFWS 2016d). Threats to this

species include urban development, recreational damage, disease, insect herbivory, fire suppression, and stochastic events (USFWS 2016d, NatureServe 2020).

**Curtis' Loosestrife**

Curtis' Loosestrife (*Lythrum curtissii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Curtis' Loosestrife is considered Critically Imperiled by NatureServe (NatureServe 2020).

This perennial herb species grows in wet areas, such as bogs, seeps, acid or calcareous swamps, karst ponds, creek swamps, floodplains, tidal flats, streambanks, and tidal river mouths of Florida and Georgia. In Florida, occurrences of this species are known from Liberty, Franklin, Gadsden, Putnam, and St. Johns counties, Florida. There are also vague, non-specific location reports from Bay, Calhoun, and Levy counties in Florida. Threats to this species are known to be soil disturbance (tilling, grading, etc.), herbicide application on roadsides, fire suppression, and hydrology alteration (NatureServe 2020).

**Lowland Loosestrife**

Lowland Loosestrife (*Lythrum flagellare*) was petitioned for listing in April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under at this time (USFWS 2020a). Lowland Loosestrife is listed by several other entities, including as Endangered by the State of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

This species is characterized as a sprawling perennial herb with a creeping rhizome (NatureServe 2020). It lives in herbaceous wetlands and is often observed growing in mucky or sandy-peat muck soils on the peripheries of ponds, ditch banks, and edges of cypress depressions (NatureServe 2020). This plant has a small range in the west central portion of the Florida peninsula, with individuals found in Charlotte, Collier, Dade, Desoto, Glades, Henry, Lee, Manatee, Okeechobee, and Sarasota Counties. The primary threat to Lowland Loosestrife is habitat loss through drainage, canopy closure, fire suppression, and logging (CBD 2010a).

**White Birds-in-a-nest**

The White Birds-in-a-nest (*Macbridea alba*) was listed as threatened effective June 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

The White Birds-in-a-nest is a perennial herb that blooms from May to mid-July. It is endemic to the Florida Panhandle, occurring in Bay, Gulf, Franklin, and Liberty counties (USFWS 2009k), and is threatened by habitat degradation due to intensive forestry practices and lack of prescribed fire (NatureServe 2020). This species inhabits wet to mesic pine flatwoods, seepage bogs, savannas, and occasionally drier sites with longleaf pine (*Pinus palustris*) and runner oaks (*Quercus pumila*) (FNAI 2001b, NatureServe 2020). It is capable of both sexual and vegetative (via rhizomes) reproduction; however, self-fertilized seeds have been observed to exhibit inbreeding depression (USFWS 2009k).

**Godfry's Stitchwort**

Godfry's Stitchwort (*Minuartia godfreyi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Godfry's Stitchwort is listed by several other entities, including as Endangered by the State of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This perennial herb grows in herbaceous wetlands such as creek banks, roadside ditches, tidal freshwater marshes, delta post oak flatwoods, saline wet prairies, and wet meadows. As of 2011, NatureServe reported between six and 20 known occurrences of this species ranging from central Tennessee to coastal North Carolina south to Florida, with only three populations believed to be of good viability/integrity. In Florida, the species is

restricted to Taylor County. Threats to this species include habitat destruction/conversion from roadside construction or commercial logging operations (NatureServe 2020).

## Needleleaf Waternymph

Needleleaf Waternymph, also known as Narrowleaf Naiad, (*Najas filifolia*) was petitioned for listing in April 20, 2010 (CBD 2010a), and the 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Needleleaf Waternymph is listed by several other entities, including as Threatened by the State of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This species is characterized as a floating annual plant, which typically inhabits shallow, dark, (tannic-acid tinted) water of ponds and lakes (FNAI 2001b). The range of the Needleleaf Waternymph extends from the Florida Panhandle down through the Florida peninsula and parts of southwestern Georgia (NatureServe 2020). As of 2000, this species was only reported in Santa Rosa and Leon Counties, Florida, and in Decatur County, Georgia (CBD 2010a). Occurrences have also been recorded in the Blackwater River (FNAI 2001b). This species is at risk due to habitat destruction caused by damming and other practices that alter hydrological regimes (NatureServe 2020). As an aquatic species, the Needleleaf Waternymph also faces risk of predation by grass carp (*Ctenopharyngodon idella*), an introduced/invasive herbivorous fish (CBD 2010a).

## Britton's Beargrass

Britton's Beargrass (*Nolina brittoniana*) was listed as endangered on April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The species is found in the following Florida counties: Hardee, Hernando, Highlands, Lake, Orange, Osceola, Polk, and Marion counties of Florida. Britton's Beargrass habitat includes forest/woodland, sand/dune, and shrubland/chaparral habitat with fine-textured, well-drained sands. Associated plant species include saw palmetoo (*Serenoa repens*), scrub palmetto (*Sabal etonia*), crooked-wood (*Lyonia ferruginea*), sand heath (*Ceratiola ericoides*), Feay's palafox (*Palafoxia feayi*), and pineland threeawn (*Aristida stricta*) (NatureServe 2020). The species flowers from March through May (USFWS 2020a).

More than 90 percent of Britton's Beargrass habitat has been lost to citrus agriculture and rapid urbanization. It is also declining due to fire suppression, which results in a dense canopy cover. About 100 populations remain, with half of these occurring on 10 conservation areas. The species has also been impacted by off-road vehicles in some locations (FNAI 2001b).

## Cape Sable Orchid

The Cape Sable Orchid (*Oncidium undulatum = Trichocentrum undulatum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Cape Sable Orchid is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

The Cape Sable Orchid is an epiphytic orchid that produces a large, showy, many-flowered inflorescence. From April to September, they produce many glossy brown to yellow-green flowers that are marked with brown (NAOCC 2019). It is known to inhabit buttonwood stands in southern Florida and is infrequently found in remote cypress sloughs in Big Cypress National Preserve (NatureServe 2020). The Cape Sable Orchid consists of a shoot with one tough leathery leaf; they grow on the trunks and branches of trees and can reach one to five meters in height. Although it is widely distributed in the West Indies, Mexico, Central America, and northern South America, it was been petitioned for federal listing based on its overutilization for commercial purposes and the inadequacy of existing regulatory mechanisms (76 FR 59835).

## Papery Whitlow-wort

The species *Paronychia chartacea* was listed as threatened effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

The species *Paronychia chartacea* is a small, herbaceous member of the pink family (Caryophyllaceae) that forms low mats. Papery Whitlow-wort (*Paronychia chartacea* ssp. *chartacea*), is a short-lived perennial subspecies which occurs in scrub habitats on the Lake Wales Ridge and adjacent uplands in central Florida. It occurs in Lake, Polk, Highland, Orange and Glade counties (USFWS 2008k). The natural habitat for Papery Whitlow-wort is rosemary scrub, which is also known as the rosemary phase of sand pine (*Pinus clausca*) scrub (USFWS 1999). Papery Whitlow-wort also occurs in scrubby flatwoods or adjacent firelines and sandy roads (USFWS 2008k). The subspecies depends on occasional fires, or equivalent mechanical land disturbance to maintain bare sand habitats. It is vulnerable to destruction by off-road vehicles that drive through openings between shrubs, and it is threatened by lack of fire or other disturbance (USFWS 1999). Crystal Lake Nailwort, (*P. c. minima*) was first recognized as a separate subspecies in 1991 and its prior range is unknown. The Crystal Lake Nailwort is an annual occurring almost exclusively on the sandy margins of karst ponds in the Florida Panhandle. It is currently known from only Washington and Bay Counties (USFWS 2008k). At the time of listing, the two distinct subspecies of *Paronychia chartacea* were not recognized. Both subspecies are endemic to Florida, and geographically isolated (USFWS 2008k). *Paronychia chartacea* is primarily threatened by habitat loss (USFWS 1999).

## Key Tree Cactus

The Key Tree Cactus (*Pilosocereus robinii* = *Cereus robinii*,) was listed as endangered effective July 19, 1984 (49 FR 29237). Critical habitat has not been designated (USFWS 2020a).

This tree-cactus is found only on the Keys of Monroe County, Florida and in Cuba; only seven populations are extant. It grows on sandy soils with limestone geology in hardwood hammocks and thorn scrub communities just above high tide levels. Threats to this species include illegal horticultural collection, development/habitat conversion, population fragmentation, sea level rise/increased soil salinity, deer herbivory, and stochastic events (USFWS 2010j, NatureServe 2020).

## Godfrey's Butterwort

Godfrey's Butterwort (*Pinguicula ionantha*) was listed as threatened effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

Godfrey's Butterwort is a perennial herb. Flowering occurs February to April (FNAI 2001b). This carnivorous plant thrives in bog habitats within longleaf pine savannas including bogs, seeps, wet pine flatwoods, wet prairies, and ditches; it is frequently seen growing directly in the water (FNAI 2001b, USFWS 2018l, NatureServe 2020). Godfrey's Butterwort may also occur in open peat or sandy peat soils (USFWS 2018l). It is highly dependent upon regular fire regimes for population growth (NatureServe 2020). Its range includes in Bay, Calhoun, Franklin, Gulf, Liberty, and Wakulla counties in Florida (USFWS 2018l). The main threats facing this species are habitat conversion and degradation associated with fire suppression and silviculture practices (NatureServe 2020). It has already been extirpated from several sites as a result of these threats. Recent survey efforts have documented 24 remaining populations out of 83 known historical occurrence sites (USFWS 2018l).

## Lewton's Polygala

The Lewton's Polygala, as known as Lewton's polygala milkwort, (*Polygala lewtonii*) was listed as endangered effective May 7, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial, tap-rooted herb grows exclusively on dry, well-drained, yellow sand areas of sandhill and oak-hickory scrub communities. In Florida, the species occurs in the following counties: Marion, Lake, Osceola, Orange, Polk, and Highlands. Its range includes the Lake Wales Ridge and Mount Dora Ridge. This species is adapted to patchy, infrequent fires to maintain an open canopy and facilitate new recruitment. While

mature plants rarely survive fires, seedlings sprout readily. Threats to this species include habitat loss, degradation, and fragmentation; altered fire regimes; urbanization; off-highway- vehicle/trampling damage; and non-native plant species encroachment (USFWS 2010k).

## Tiny Polygala Milkwort

The Tiny Polygala Milkwort (*Polygala smallii*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

The species is endemic to the southern portion of Florida's Atlantic Coastal Ridge, an area that is rapidly being converted into commercial and residential developments (NatureServe 2020). The Tiny Polygala Milkwort is a small perennial herb that grows up to 10 centimeters high and blooms year-round (FNAI 2001b). The species inhabits areas of open grassy pineland, sandy pine rockland, scrubby flatwoods, and sandhill. It is often found in disturbed areas and relies on fire or other means of suppressing competition from other plants (NatureServe 2020). Its distribution is fragmented and clusters of sites are separated by an average of 61 kilometers (USFWS 2010l). Threats to the species include urban development, invasive species, and fire suppression (FNAI 2001b).

## Horton Wireweed

Horton Wireweed (*Polygonella basiramia*) was listed as endangered effective February 20, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This species is a short-lived, tap-rooted herb that is endemic to central Florida's Polk and Highlands counties along the Winter Haven, Bombing Range, and Lake Wales Ridges. It grows only on moderately drained, white sand gaps, typically in rosemary scrub or oak scrub communities. It is semi-dependent on patchy, infrequent fire to maintain the open scrub canopy and the bare sand microhabitat it requires. Fire kills mature plants, and the species does not have a persistent soil seed bank. Reestablishment is reliant on neighboring, unburned plants for reseeding (USFWS 2010m). Threats to this species include off-road vehicle damage, habitat degradation due to lack of management/altered fire regimes, development, citrus grove conversion, pedestrian trampling, and non-native plant species encroachment (USFWS 2010m, NatureServe 2020).

## Sandlace

Sandlace, also known as Woody Wireweed or Small's Jointweed*, (Polygonella myriophylla*) was listed as endangered effective May 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

Sandlace is a sprawling perennial subshrub, which forms large mats along the ground through clonal growth (58 FR 25746, USFWS 2010n). It is a slow-growing and long-lived species. Flowering occurs throughout much of the year, except January and February (USFWS 2010n). Its range includes Orange, Osceola (just one location), and Polk counties in Florida (58 FR 25746). The species has been documented recently at 113 occurrences of 140 known historic occurrences. Sandlace inhabits sandy gaps in Florida scrublands (USFWS 2010n), as well as disturbed areas. The species prefers to grow in areas with xeric, white sandy soils. It is adapted to long intervals of eight to 30 years between fire disturbances (USFWS 2010n). This species is threatened by habitat loss from urbanization and agriculture (NatureServe 2020).

## Florida Pondweed

The Florida Pondweed (*Potamogeton floridanus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

This species is known from only four recorded occurrences within a single drainage (the Blackwater River and its tributaries) in Santa Rosa County, Florida (NatureServe 2020). It is a submerged aquatic herb that inhabits slow-moving blackwater streams and rivers (FNAI 2001b). The species is at risk of destruction, modification, or

curtailment of its habitat or range, and from inadequate protection under existing regulatory mechanisms (76 FR 59835).

## Scrub Plum

The Scrub Plum (*Prunus geniculata*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

The Scrub Plum is a deciduous shrub that blooms from January to February (FNAI 2001b). It is endemic to central Florida and inhabits fairly open areas of sandhill and oak scrub, responds vigorously to fire disturbance, and cannot withstand soil disturbance or shade (NatureServe 2020). The species is declining due to rapid loss of habitat from conversion to citrus groves and residential housing and fire suppression (NatureServe 2020). The Scrub Plum has extremely low recruitment, which impedes population growth (USFWS 2017d).

## White Meadowbeauty

White Meadowbeauty, also known as the Small-flowered Meadowbeauty, (*Rhexia parviflora*)) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). White Meadowbeauty is listed by several other entities, including as Endangered by the State of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

It is a perennial herb that blooms from June to August (FNAI 2001b). The species occurs mainly in the Florida Panhandle, southeast Alabama, and Georgia. It is uncommon within its known range and only a few individuals exist per population. The White Meadowbeauty inhabits seepage slopes, margins of ponds, and shallow depressions associated with pine-palmetto flatwoods and savannas of the Gulf Coastal Plain (NatureServe 2020). The species is sensitive to changes in ground and surface hydrology and has been nearly eliminated from private lands due to logging and wetland drainage (FNAI 2001b).

## Panhandle Meadowbeauty

Panhandle Meadowbeauty (*Rhexia salicifolia*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Panhandle Meadowbeauty is listed by several other entities, including as Threatened by the State of Florida, Imperiled in Florida by NatureServe, and a Species of Concern by the USFWS (CBD 2010a).

Panhandle Meadowbeauty is a tall, perennial, herbaceous species in the Melastomataceae (meadow beauty) family. It is known from approximately 50 to 80 occurrences scattered through the western and central Florida Panhandle and adjacent to Alabama, and from one location in Georgia (Nature Serve 2020). Panhandle Meadowbeauty is an obligate wetland species and grows in full sun in wet sandy or sandy-peaty areas of sinkhole pond shores, interdunal swales, margins of depression marshes, flatwood ponds, and sandhill upland lakes. Approximately half of the known occurrences of Panhandle Meadowbeauty are from the shores of private karst ponds that are often scraped to create "beaches" (FNAI 2001b). Panhandle Meadowbeauty is highly threatened by land use conversion, habitat fragmentation, and human disturbance (off-road vehicle use and mowing of pond margins), and threatened to a lesser extent by forest management practices. Additional threats include erosion and run- off from pine plantations and lakeside developments, which cause damage to shorelines and alter the hydrology of karst ponds (Nature Serve 2020).

## Chapman Rhododendron

Chapman Rhododendron (*Rhododendron chapmanii* = *R. minus* var. *chapmanii*) was listed as endangered effective May 23, 1979 (44 FR 24248). Critical habitat has not been designated (USFWS 2020a).

The Chapman Rhododendron is a perennial, evergreen shrub with egg-shaped or elliptic leaves alternately arranged on the stem; the plant can reach heights of three meters. It has a fairly narrow flowering period of two to three weeks beginning in mid-March or early-April (NatureServe 2020). The Chapman Rhododendron inhabits the transitional area between upland mesic or scrubby flatwoods and floodplain swamps or baygalls. The species is occasionally found within mesic pine flatwoods or on sandhills at low elevations. These habitats are fire-dependent and the species prolifically resprouts and flowers following fire (USFWS 2019w). Threats to the species include development, timber harvesting, agriculture, inadequate fire management, and invasive species (USFWS 2019w).

## Hairy-peduncled Beaked-rush

Hairy-peduncled Beaked-rush (*Rhynchospora crinipes*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Hairy-peduncled Beaked-rush is listed by several other entities, including as Endangered by the State of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This perennial sedge was first collected and described in the 1800s. Over 100 years passed before additional sightings were reported. Since then, 18 occurrences were discovered in Florida, 11 in Alabama, four in North Carolina, one in Mississippi, and eight in Georgia. The Hairy-peduncled Beaked rush is known to occur in Gulf, Liberty, Okaloosa, and Santa Rosa Counties in Florida. It grows in riparian habitats, along the stream channels and terraces, or sand-clay bars. Threats to the species include hydrology alteration (river damming and flow alteration), sand and gravel extraction, urbanization, military training activities, siltation from logging, and water quality degradation (NatureServe 2020).

## Miccosukee Gooseberry

Miccosukee Gooseberry (*Ribes echinellum*) was listed as threatened effective August 19, 1985 (50 FR 29338). Critical habitat has not been designated (USFWS 2020a).

This shrub was first discovered on the shores of Lake Miccosukee in Jefferson County, Florida. It has since been found at two more locations around the lake, and two locations 322 kilometers to the northeast in McCormick and Edgefield Counties, South Carolina. The Miccosukee Gooseberry grows in mesic forest communities, such as oak-hickory. Threats to this species include development, invasive species encroachment, and logging activity (NatureServe 2020, USFWS 2015g).

## Eared Coneflower

Eared Coneflower (*Rudbeckia auriculata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Eared Coneflower is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

The species is almost completely restricted to the Coastal Plain and has been reported in Alabama, Georgia, and Florida. In Florida, the species occurs in Walton County (Panhandle) (Wunderlin et al. 2020). It occurs in full sun in open bogs, seeps, swamps, ditches, swales, wet openings in woodlands, and occasionally in the partial shade at the edges of hardwood swamps. Only a few number of occurrences inhabit healthy native habitat, with the majority inhabiting highly modified habitat conditions such as utility corridors, roadsides, and pastures. Threats to this species include herbicide application, grazing, silviculture practices impacting soil hydrology, and encroachment of woody species into the open habitat (NatureServe 2020).

## Florida Willow

Florida Willow (*Salix floridana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90- day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Florida Willow is listed by several other entities, including as Imperiled in Florida by NatureServe

and Vulnerable by IUCN (CBD 2010a).

According to NatureServe, there are only 22 known occurrences of this species, with less than 500 individuals left. There are 18 extant populations in Florida, two in Alabama, and two in Georgia. Many of these populations are on protected lands. This small tree/shrub grows in saturated, calcareous soils. It is found growing in roadside ditches, near springs, hydric hammocks, and densely wooded floodplains.

Threats to this species include hydrology changes, ditch clearing, water quality degradation, invasive species encroachment, and pine plantation conversion (NatureServe 2020).

**Gulf Sweet Pitcherplant**

Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Gulf Sweet Pitcherplant is listed by several other entities, including as Imperiled in Florida by NatureServe and Endangered by the IUCN (CBD 2010a).

This perennial, carnivorous herb grows in saturated sandy-muck conditions. It thrives in full sunlight or partial shade; the subspecies is not drought tolerant. Habitat includes springhead bogs, the heads of small streams, shallow pond borders, or meandering watercourses. The subspecies occurs in Florida's western Panhandle from Holmes County to Santa Rosa County. There is little information on population size for this subspecies. Threats to Gulf Sweet Pitcherplant include urbanization, habitat destruction/conversion, and altered hydrological conditions (NatureServe 2020).

**American Chaffseed**

American Chaffseed (*Schwalbea americana*) was listed as endangered effective September 29, 1992 (57 FR 44703). Critical habitat has not been designated (USFWS 2020a).

American Chaffseed is a perennial herb that blooms from April to June/July along the eastern seaboard and Gulf Coast (USFWS 2019x). In Florida, the species is known from the following counties: Gadsden, Leon, Okaloosa, and Putnam in populations throughout the Southeastern US (NatureServe 2020). Recent surveys have documented only three extant populations in the State (all of which are protected, on Blackwater River State Forest and Horseshoe Plantation) (USFWS 2019y). Habitat consists of open landscapes dominated by frequent fire: pine flatwoods, savannas, and peaty wetlands (USFWS 1995). In terms of microhabitat, the species occurs in areas of disturbance (e.g., roadside ditches, canal banks, and railroad crossings) (USFWS 2019y). Soils are acidic and moist to dry and sandy, sandy/peat, or sandy loam (USFWS 1995). American Chaffseed is dependent on frequent fires to thrive (USFWS 2019y).

Historically, the species occurred along coastal plains from New England to Florida and along the Gulf to the west. Most populations were extirpated as a result of habitat loss from urban and agricultural development. Current threats to the species include habitat loss, collection by hobbyists, and fire suppression (NatureServe 2020). The species is currently in decline (USFWS 2019x).

**Florida Skullcap**

The Florida Skullcap (*Scutellaria floridana*) was listed as threatened effective May 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

This species is a Florida endemic that grows in only four counties of the Panhandle region: Bay, Gulf, Franklin, and Liberty. Since the 1980s, there has been a 30 percent decline in the species population size; many of the losses are due to development and timber harvest. This species grows in wet areas in longleaf pine flatwoods, prairies, and grassy bog communities near forests and shrub wetlands that are fire-dependent. It grows in sandy, acidic, low nutrient soils in the ecotones between wetlands and mesic areas. Florida Skullcap grows in full sun or light

shade and flowers vigorously after fire. The species is under threat from timber industry practices, habitat modification/destruction, and fire suppression (USFWS 2019z).

## Everglades Bully

The Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

There is some debate about the taxonomic distinction of this subspecies of the Everglades Bully (*S. reclinatum* ssp. *reclinatum*). The Everglades Bully is a Florida endemic shrub that grows only in tropical savanna pine rockland and marl prairie habitats of the southeastern peninsular Florida. The Everglades Bully is adapted to natural fire regimes, as well as the seasonal, months-long flooding of marl prairie communities. Its current range includes only Big Cypress National Park and Long Pine Key. This subspecies is threatened by habitat loss/fragmentation, fire suppression, non-native species encroachment, recreation activities, and stochastic events (82 FR 46691).

## Georgia Bully

Georgia Bully, also known as Swamp Buckthorn, (*Sideroxylon thornei*) has been under review for listing many times since 1975 (USFWS 2020a). It was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Georgia Bully is listed by several other entities including as Critically Imperiled in Florida by NatureServe, and as Endangered by the State of Georgia (CBD 2010a).

Georgia Bully is a thorny shrub (NatureServe 2020). Flowering occurs in May and June (CBD 2010a). It thrives in low-lying oak flatwoods. Soils in these habitats include wetlands atop limestone and areas of high moisture saturation. Its range covers southern Georgia and scattered locations in Alabama and Florida. In Florida, it is known from Franklin, Escambia, and Jackson Counties. The primary threat to this species is habitat degradation, particularly associated with hydrological shifts (e.g., conversion of wetlands for agricultural or silviculture uses) (CBD 2010a).

## Fringed Campion

The Fringed Campion (*Silene polypetala = Silene catesbaei*) was listed as endangered effective February 19, 1991 (56 FR 1932). Critical habitat has not been designated (USFWS 2020a).

This perennial herb grows in two disjunct areas, one in central Georgia and the other on the Georgia- Florida border near the Flint and Apalachicola Rivers (56 FR 1932). It grows on well-drained, sandy-loam soils in mesic hardwood forests, typically on north-facing slopes or in ravines (56 FR 1932, USFWS 2015h). Threats to this species include habitat loss/degradation, logging management practices, and invasive species, as well as population fragmentation/low genetic diversity, and deer herbivory (USFWS 2015h, NatureServe 2020).

## Gentian Pinkroot

Gentian Pinkroot (*Spigelia gentianoides*) was listed as endangered effective December 26, 1990 (55 FR 49046). Critical habitat has not been designated (USFWS 2020a).

Gentian Pinkroot is a perennial herb (FNAI 2001b). Flowering typically occurs in May and June, but may be observed earlier or later in the year. The species thrives in upland mixed oak-pine forests (FNAI 2001b, USFWS 2018m). Preferred soils are well-drained and commonly include exposed limestone and calcareous soil types, as well rich in humus (USFWS 2018m). This species is currently limited to Jackson and Calhoun counties, Florida. Its historic range encompasses several adjacent counties (55 FR 9472), including Washington, Calhoun, Jackson, Gadsden, and Liberty counties in Florida and Geneva County in southern Alabama (FNAI 2001b, USFWS 2018m, NatureServe 2020). There were only three populations at the time of listing (55 FR 9472). Since that time, five new

populations were discovered; however, two of them have been extirpated and currently only two remain (FNAI 2001b, NatureServe 2020). The main threat to these remaining populations is silviculture practices (NatureServe 2020).

A new variety of Gentian Pinkroot was described in 1996: *Spigelia gentianoides* var. *alabamensis* (USFWS 2018). This was included in recovery plan analyses. Based on recent genetic research, Spigelia gentianoides var. alabamensis is now considered a distinct species, pinkroot (*Spigelia alabamensis*). This species inhabits nearly treeless glades associated with Ketona Dolomite (USFWS 2018m).

## Cooley's Meadowrue

Cooley's Meadowrue (*Thalictrum cooleyi*) was listed as endangered effective February 7, 1989 (54 FR 5935). Critical habitat has not been designated (USFWS 2020a).

Cooley's Meadowrue is a perennial herb that occurs in grass-sedge bogs and wet pine savannahs, flatwoods, and seepage slopes in North Carolina, Florida, and Georgia. The species needs some type of disturbance such as fire or mowing to maintain its open habitat (FNAI 2001b, USFWS 2017e). In Florida, the species is restricted to one occurrence in Walton County on a timber company land utility right-of-way through former flatwoods. However, this occurrence may be extirpated (FNAI 2001b, USFWS 2009l, NatureServe 2020). Plants often found in association with Cooley's Meadowrue include tulip poplar (*Liriodendron tulipifera*), bald cypress (*Taxodium distichum*), and/or Atlantic white cedar (*Chamaecyparis thyoides*) (USFWS 2017e). The species is threatened by fire suppression, herbicides, urbanization, timber harvest, and utility maintenance in habitat areas (USFWS 2017e).

## Florida Torreya

The Florida Torreya (*Torreya taxifolia*) was listed as endangered effective January 23, 1984 (49 FR 2783). Critical habitat has not been designated (USFWS 2020a).

This conifer tree species is found only along ravine slopes on the eastern bank of the Apalachicola River in Florida and Georgia. In Florida, the species occurs in the Panhandle in Liberty and Gadsten counties. Before the 1950s, the Florida Torreya used to be one of the most abundant tree species in the Apalachicola Bluff region. Experts estimate that the species has lost at least 98.5 percent of its population since that time, with only an estimated 500 to 600 trees still left on the landscape. These remaining trees do not appear to reach reproductive maturity due to disease-related mortality, and all population viability models show that natural populations of this species will inevitably go extinct. Some conservationists are making controversial efforts to translocate this species to areas north of its current known range. Threats to this species include soil chemistry changes associated with hydrology disruption, fire suppression, and disease (USFWS 2010o).

### Florida Bristle Fern

The Florida Bristle Fern, also known as Florida Filmy Fern, (*Trichomanes punctatum* ssp. *floridanum*) was listed as endangered effective October 6, 2015 (80 FR 60440). Critical habitat has not been designated (USFWS 2020a).

The subspecies has two distinct metapopulations, one in Central and one is South Florida (Sumter and Miami-Dade Counties) (USFWS 2018n). Within these metapopulations, there are only six documented populations (USFWS 2018n). The subspecies inhabits tree trunks in hammocks, edges of limesinks, and limestone boulders, often with mosses and liverworts (FNAI 2001b). The Florida Bristly Fern is threatened by multiple factors: extreme curtailment of its habitat; habitat destruction, conversion and fragmentation; destruction or damage from foot traffic and recreational vehicles; invasive species; sea level rise; incompatible hydrological management strategies; and climatic changes in seasonal precipitation as well as temperature and storm cycles (USFWS 2018, NatureServe 2020).

## Ocala Vetch

Ocala Vetch (*Vicia ocalensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90- day finding determined that listing may be warranted (76 FR 59835). On October 10, 2019, the species was determined to not be warranted for listing (84 FR 53336).

This species is characterized as an herbaceous perennial vine. It is often observed growing in sandy peat of open, wet thickets along the margins of spring runs and streambanks. This plant has a small range and is only found in two Florida counties (Lake and Marion) (NatureServe 2020). All known occurrences are from Ocala National Forest and Lake Woodruff National Wildlife Refuge (FNAI 2001b). This species is not particularly vulnerable to agriculture and land development as it is currently only known to occur on federally protected land; however, hydrological changes caused by logging and competition with invasive species still pose a threat to this species (NatureServe 2020).

### Wide-leaf Warea

Wide-leaf Warea, also known as the Clasping Warea and Wideleaf Pinelandcress, (*Warea amplexifolia*) was listed as endangered effective April 29, 1987 (52 FR 15501). Critical habitat has not been designated (USFWS 2020a).

The Wide-leaf Warea is an annual herb growing from 30 to 100 centimeters high. It flowers in September and October (FNAI 2001b). Occurrence records are from the following Florida counties: Lake, Polk, Osceola, and Orange. The species is restricted to longleaf pine and turkey oak sandhill habitats in central Florida and requires frequent fire (every 1 to3 years) to maintain the open habitat in which it thrives. Microhabitat features include sandy substrate and direct sunlight. This habitat has been highly fragmented and degraded, and is threatened by the development of citrus groves and residential housing (NatureServe 2020).

### Carter's Mustard

Carter's Mustard (*Warea carteri*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

Carter's Mustard occurs along Lake Wales Ridge in central Florida. One occurrence is also known from coastal scrub habitat in Brevard County on Florida's Atlantic Coast (however, this occurrence has not been recently relocated). The species occurred historically in the Miami metropolitan area but is extirpated from that region (USFWS 2020a). The species occurs in xeric, shrub-dominated, sandhill, scrubby flatwood, inland, and coastal scrub habitats. Carter's Mustard appears only after fire (USFWS 1999). The primary threat to the species is habitat loss or modification (habitat frequently converted to citrus groves or urban development) (FNAI 2001b).

### Karst Pond Xyris

The Karst Pond Xyris (*Xyris longisepala*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). NatureServe has designated this species Imperiled in Florida (NatureServe 2020).

This perennial herb has between 50 to 90 known occurrences. Occurrences are from Bay, Leon, Okaloosa, Wakulla, Walton, and Washington counties in Florida, and two sites in Covington County, Alabama. It grows in open, sunny wetlands; along the edges of sandy lime-sink lakes/ponds; and upland, sandhill lakes. It usually grows in abundance along the shores of water. Threats to this species include vegetation removal/mowing associated with residential infrastructure, silt deposition from upland disturbance, and recreational activities (off-road vehicles and other shore edge trampling; NatureServe 2020).

### Florida Ziziphus

The Florida Ziziphus (*Ziziphus celata*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

This species was thought to be extinct when it was first described from a 36-year-old herbarium specimen in 1984. Since then, 14 locations of this species were discovered (USFWS 2009m). All remaining populations exist in Polk and Highlands Counties, on the Lake Wales Ridge in central Florida. It grows on the xeric, yellow sand paleo-dunes of Central Florida (USFWS 2019aa). Florida Ziziphus is a short (1.5 meter), thorny, clonal, hermaphroditic shrub. Research shows that this species is sterile when fertilized with its own pollen or with the pollen of an individual of the same genotype. Almost all the remaining wild populations have become so isolated from one another that they are now composed of genetically identical, fragmented individuals (USFWS 2009m, USFWS 2019aa). Since the most recent USFWS five- year review in 2009, four populations were reintroduced on protected lands (USFWS 2019aa). Threats to this species include habitat destruction/conversion, fire suppression, invasive plants, and genetic isolation (USFWS 2009m).

FWS-005812

**Literature Cited for Species Accounts**

American Ornithologists' Union (AOU). 1983. Check list of North-American birds. Sixth edition. American Ornithologists' Union, Baltimore, Maryland, USA.

Anthonysamy, W. J. B., M. J. Dreslik, D. Mauger, and C. A. Phillips. 2014. A preliminary assessment of habitat partitioning in a freshwater turtle community at an isolated preserve. Copeia 2014:269-278.

Bailey, M. A. 1991. The dusky gopher frog in Alabama. Journal of the Alabama Academy of Science 62: 28-34.

Baker, A., P. Gonzalez, R. I. G. Morrison, and B. A. Harrington. 2013. Red knot (Calidris canutus), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.563 (01/07/2020)

Bates, R. 1996. The reproductive biology of Lobelia boykinii. M.S. thesis, University of North Carolina at Greensboro, Greensboro, North Carolina, USA.

Bauder, J. M., D. J. Stevenson, C. S. Sutherland, and C. J. Jenkins. 2017. Occupancy of potential overwintering habitat on protected lands by two imperiled snake species in the coastal plain of the southeastern United States. Journal of Herpetology 51:73-88.

Bauder, J. M., D. R. Breininger, M. R. Bolt, R. Breininger, M. L. Legare, C.L. Jenkins, B. B. Rothermel, and K. McGarigal. 2018. Multi-level, multi-scale habitat selection by a wide-ranging, federally threatened snake. Landscape Ecology 33:743-763.

Benedict, R. A., H. H. Genoways, and J. R. Choate. 2006. Taxonomy of short-tailed shrews (genus Blarina) in Florida. Occasional Papers, Museum of Texas Tech University 251:1-19.

Bentzien, M. M. 1987. Agency draft recovery plan for five rockland plant species. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

BirdLife International. 2018. Ammospiza caudacuta. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. http://dx.doi.org/10.2305/IUCN.UK.2018-2.RLTS.T22721129A131887480.en (01/05/2020)

Blalock-Herod, H. N., J. J. Herod, and J. D. Williams. 2002. Evaluation of conservation status, distribution, and reproductive characteristics of an endemic Gulf Coast freshwater mussel, Lampsilis australis (Bivalvia: Unionidae). Biodiversity and Conservation 11:1877-1887.

Bocetti, C. I., D. M. Donner, and H. F. Mayfield. 2014. Kirtland's warbler (Setophaga kirtlandii), version 2.0. A. F. Poole, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.19 (01/14/2020)

Bradley, K. A., and G. D. Gann. 1999. Status summaries of 12 rockland plant taxa in southern Florida. The Institute for Regional Conservation. Report submitted to the U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

Brim Box, J. and J. D. Williams. 2000. Unionid mollusks of the Apalachicola Basin in Alabama, Florida, and Georgia. Alabama Museum of Natural History Bulletin 21:1-143.

Butler, M. J., and W. Harrell. 2019. Whooping Crane survey results: winter 2018-2019. U.S. Department of the Interior, Fish and Wildlife Service, National Wildlife Refuge System, Division of Biological Services, Albuquerque, New Mexico and U.S. Department of the Interior, Fish and Wildlife Service, Ecological

Services, Aransas National Wildlife, Austwell, Texas, USA.
https://www.fws.gov/uploadedFiles/WHCR_Winter_Update_2018_2019percent20(1).pdf (01/09/2020)
Canadian Wildlife Service and US Fish and Wildlife Service (CWS and USFWS). 2007. International
recovery plan for the whooping crane. Ottawa: Recovery of Nationally Endangered Wildlife (RENEW),
Ottawa, QC and U.S. Department of the Interior, Fish and Wildlife Service, Southwest Regional Office,
Albuquerque, New Mexico, USA.

Center for Biological Diversity (CBD). 2010a. Petition to list 404 aquatic, riparian and wetland species from
the southeastern United States as threatened or endangered under the Endangered Species Act. CBD,
Tucson, Arizona, USA.

Center for Biological Diversity (CBD). 2010b. Petition for rulemaking to enact immediate cave closures to
protect bat species from white-nose syndrome; to promulgate a rule governing the "take" of endangered bat
species; and to designate as significant all caves on federal lands in the continental United States.
CBD, Washington, District of Columbia, USA.

Center for Biological Diversity (CBD). 2011a. Petition to list the eastern diamondback rattlesnake (Crotalus
adamanteus) as threatened under the endangered species act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2011b. Emergency petition to list the Miami blue butterfly (Cyclargus
thomasi bethunebakeri) as endangered under the Endangered Species Act. CBD, Flagstaff, Arizona, USA.

Center for Biological Diversity (CBD). 2012. Petition to list 53 amphibians and reptiles in the United States as
threatened or endangered species under the Endangered Species Act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2016. Lawsuit filed to push alligator snapping turtles closer to
Endangered Species Act protection. CBD, Tucson, Arizona, USA.
https://www.biologicaldiversity.org/news/press_releases/2016/alligator-snapping-turtle-03-16-2016.html
(01/15/2020)

Center for Biological Diversity (CBD). 2018. Letter to FWS on reviews of Southeast species. CBD, Tucson,
Arizona, USA.

Center for Biological Diversity (CBD). 2019a. Red wolf revised recovery plan: notice of intent to sue for
violations of the Endangered Species Act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2019b. Petition to list the Gulf Coast solitary bee (Hesperapis oraria)
under the Endangered Species Act and concurrently designate critical habitat. CBD, Portland, Oregon, USA.

Center for Biological Diversity (CDB). 2020a. America's gray wolves: a long road to recovery. CBD, Tucson,
Arizona, USA. https://www.biologicaldiversity.org/campaigns/gray_wolves/. (01/09/2020).

Center for Biological Diversity (CBD). 2020b. Saving the gopher tortoise. CBD, Tucson, Arizona, USA.
https://www.biologicaldiversity.org/species/reptiles/gopher_tortoise/index.html (01/03/2020)

Center for Biological Diversity (CBD) et al. 2014. Petition to protect the monarch butterfly (Danaus plexippus
plexippus) under the Endangered Species Act. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD) and Defenders of Wildlife (DOW). 2016. Petition to list the tricolored bat
Perimyotis subflavus as threatened or endangered under the Endangered Species Act. CBD, Washington,
District of Columbia, USA.

Christman, S. P., and W. S. Judd. 1990. Notes on plants endemic to Florida scrub. Florida Scientist 53: 52-
73.

Clench, W. J. and R. D. Turner. 1956. Freshwater mollusks of Alabama, Georgia, and Florida from the Escambia to the Suwanee River. Bulletin of the Florida State Museum Biological Sciences 1:97-239.

Confer, J. L., P. Hartman, and A. Roth. 2011. Golden-winged warbler (Vermivora chrysoptera), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.20 (01/09/2020)

Coulter, M. C., J. A. Rodgers Jr., J. C. Ogden, and F. C. Depkin.1999. Wood stork (Mycteria americana), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.409 (01/13/2019)

Crandall, K. A. 2010. Procambarus apalachicolae. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2010-3.RLTS.T18191A7762594.en (01/13/2020)

Crandall, K. A. and J. Cordeiro. 2010. Procambarus delicatus. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3.http://dx.doi.org/10.2305/IUCN.UK.2010- 3.RLTS.T18196A7774195.en (01/07/2020)

Defenders of Wildlife (DoW). 2015. A petition to list the blue calamintha bee (Osmia calaminthae) as an endangered, or alternatively as a threatened, species pursuant to the endangered species act and for the designation of critical habitat for this species. DoW, Denver, Colorado, USA.

DeMarco, V. 1992. Florida scrub lizard Sceloporus woodi. Stejneger. Pages 141-145 in P. E. Moler, editor. Rare and endangered biota of Florida: Vol. III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Dove, C. J., and R. C. Banks. 1999. A taxonomic study of crested caracaras (Falconidae). Wilson Bulletin 111: 330-339.

Dwyer, J. F. 2010. Ecology of non-breeding and breeding crested caracaras (Caracara cheriway) in Florida. Doctoral dissertation, Virginia Polytechnic Institute and State University, Blacksburg, Virginia, USA.

eBird. 2019. An online database of bird distribution and abundance. http://www.ebird.org. (01/15/2020)

Eddleman, W. R., R. E. Flores, and M. Legare. 1994. Black rail (Laterallus jamaicensis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.123 (01/07/2020)

Elliott-Smith, E. and S. M. Haig. 2004. Piping Plover (Charadrius melodus), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.2 (01/10/2020)

Encyclopedia Britannica. 2019. Monarch Butterfly. Encyclopedia Britannica, Inc., Chicago, Illinois, USA. https://www.britannica.com/animal/monarch-butterfly (01/03/2020)

Enge, K. M. 1997. A standardized protocol for drift-fence surveys. Commission Technical Report No. 14. Florida Game and Fresh Water Fish Tallahassee, Florida, USA.

Enge, K. M., B. A. Millsap, T. J. Doonan, J. A Gore, N. J. Douglass, and G. L. Sprandel. 2003. Conservation plans for biotic regions in Florida containing multiple rare or declining wildlife taxa. Bureau of Wildlife Diversity Conservation Final Report. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Enge, K. M., D. J. Stevenson, M. J. Elliott, and J. M. Bauder. 2013. The historical and current distribution of the eastern indigo snake (Drymarchon couperi). Herpetological Conservation and Biology 8:288-307.

FWS-005815

Enge, K., J. D., Mays, R. Butryn, and E. P. Hill. 2016. Status assessments of the southern hognose snake, Florida pinesnake, short-tailed kingsnake, and eastern diamond-backed rattlesnake in Florida, Gainesville. Florida Fish and Wildlife Conservation Commission, Fish and Wildlife Research Institute, Gainesville, Florida, USA.

Ernst, C. H., and E. M. Ernst. 2003. Snakes of the United States and Canada. Smithsonian Books, Washington, District of Columbia, USA.

Ernst, C. H., and J. E. Lovich. 2009. Turtles of the United States and Canada. The John Hopkins University Press, Baltimore, Maryland, USA.

Fenolio, D. B., M. L. Niemiller, M. Levy, and B. Martinez. 2013. Conservation status of the Georgia blind salamander (Eurycea wallacei) from the Floridan Aquifer of Florida and Georgia. Reptiles and Amphibians Conservation and Natural History 20:97-111.

Florida Fish and Wildlife Conservation Commission (FWC). 2008. Wildlife habitats: Legacy natural lakes. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2011a. Florida bonneted bat biological status review report. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2011b. Key ringneck snake biological status review report. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2013. A species action plan for the Florida bonneted bat (Eumops floridanus). FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2020. Atlantic sturgeon. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/freshwater/atlantic-sturgeon/. (2/10/2020)

Forys, E. A., and S. R. Humphrey. 1996. Home range and movements of the Lower Keys marsh rabbit in a highly fragmented habitat. Journal of Mammalogy 77:1042-1048.

Florida Fish and Wildlife Conservation Commission (FWC). 2020a. Red wolf. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/mammals/land/red-wolf/ (01/03/2020)

Florida Fish and Wildlife Conservation Commission (FWC). 2020b. Choctawhatchee Beach Mouse. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/mammals/land/choctawhatchee-beach-mouse (01/19/2020)

Florida Fish and Wildlife Conservation Commission (FWC). 2020c. Atlantic Sturgeon. https://myfwc.com/wildlifehabitats/profiles/freshwater/atlantic-sturgeon (01/11/2020)

Florida Natural Areas Inventory (FNAI). 2001a. Field guide to the rare animals of Florida. FNAI, Florida Resources and Environmental Analysis Center, Florida State University, Tallahassee, Florida, USA. www.fnai.org (01/15/2020)

Florida Natural Areas Inventory (FNAI). 2001b. Field guide to the rare plants of Florida. FNAI, Florida Resources and Environmental Analysis Center, Florida State University, Tallahassee, Florida, USA. www.fnai.org (01/15/2020)

Florida Natural Areas Inventory (FNAI). 2007. Florida Forever conservation needs assessment technical report, version 2.2. FNAI, Tallahassee, Florida, USA.

FWS-005816

Forys, E. A., P. A. Frank, and R. S. Kautz. 1996. Recovery actions for the lower keys marsh rabbit, silver rice rat, and stock island tree snail. Unpublished report to Florida Game and Fresh Water Fish Commission, Cooperative Agreement No. 1448-0004-94-9164, Tallahassee, Florida, USA.

Franz, R. 1992. Florida pine snake Pituophis melanoleucus mugitus Barbour. Pages 254-258 in P. E. Moler, editor. Rare and endangered biota of Florida: Vol. III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Franz, R. D. 2005. Up close and personal: a glimpse into the life of the Florida pine snake in a North Florida sand hill. Pages 120-131 in W. E. Meshaka, Jr., and K. J. Babbitt, editors. Amphibians and reptiles: status and conservation in Florida. Krieger, Malabar, Florida, USA.

Franz, R., and L. M. Franz. 1979. Distribution, habitat preference and status of populations of the Black Creek crayfish, Procambarus (Ortmannicus) pictus (Decapoda: Cambaridae) Florida Science 42:13-18.

Fuller, S. L. H. 1974. Chapter 8: Clams and mussels (Mollusca: Bivalvia). Pages 215-273 in C.W. Hart, Jr. and S.L.H. Fuller, editors. Pollution ecology of freshwater invertebrates. Academic Press, New York, New York, USA.

Gangloff, M. M. and P. W. Hartfield. 2009. Seven populations of the southern kidneyshell (Ptychobranchus jonesi) discovered in the Choctawhatchee River basin, Alabama. Southeastern Naturalist 8:245-254.

Gianopulos, K. D., H. R. Mushinsky, and E. D. McCoy. 2001. Response of the threatened sand skink (Neoseps reynoldsi) to controlled burning and clear cutting in Florida sand pins scrub habitat. Proceedings of the Florida Scrub Symposium, Orlando, Florida, USA.

Gilbert, C. R., and K. Relyea. 1992. Saltmarsh topminnow, Fundulus jenkinsi. Pp 68-72 in: C. R. Gilbert, editor. Rare and endangered biota of Florida: Volume II. Fishes.

Gill, R. E., P. Canevari, and E. H. Iversen. 1998. Eskimo curlew (Numenius borealis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.347 (01/02/2020)

Gleaton, A. 2020. Species profile: Florida redbelly turtle (Pseudemys nelsoni). Savannah River ecology laboratory, University of Georgia, Athens, Georgia, USA. https://srelherp.uga.edu/turtles/psenel.htm. (01/08/2020)

Golden, D. M., P. Winkler, P. Woerner, G. Fowles, W. Pitts, and D. Jenkins. 2009. Status assessment of the northern pine snake (Pituophis m. melanoleucus) in New Jersey: an evaluation of trends and threats. New Jersey Department of Environmental Protection, Trenton, New Jersey, USA.

Goodyear, N. C. 1992. Spatial overlap and dietary selection of native rice rats and exotic black rats. Journal of Mammalogy 73:186-200.

Goodyear, N.C. 1987. Distribution and habitat of the silver rice rat, Oryzomys argentatus. Journal of Mammalogy 68:692-695.

Gorman, T. A., C. A. Hass, and J. G. Himes. 2013. Evaluating methods to restore amphibian habitat in fire-suppressed pine flatwoods wetlands. Fire Ecology 9:96-109.

Gorman, T. A., S. D. Powell, K. C. Jones, and C. A. Haas. 2014. Microhabitat characteristics of egg deposition sites used by Reticulated Flatwoods Salamanders. Herpetological Conservation and Biology 9:543-550.

FWS-005817

Greenberg, C. H., and G. W. Tanner. 2008. Long-term landscape scale monitoring of amphibians uplands of the Ocala National Forest, Florida. Final report. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Greenlaw, J. S., C. S. Elphick, W. Post, and J. D. Rising. 2018. Saltmarsh sparrow (Ammospiza caudacuta), version 2.1. P. G. Rodewald, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.sstspa.02.1 (01/05/2020)

Hamel, P. B. 2011. Bachman's warbler (Vermivora bachmanii), version 2.0. A. F. Poole, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.150 (01/07/2020)

Hamel, P. B. 2018. Bachman's warbler, a species in peril. 2nd edition. Smithsonian Institution Press, Washington, District of Columbia, USA.

Hamilton, W. J., Jr. 1955. Two new rice rats (genus Orzomys) from Florida. Proceedings of the Biological Society of Washington 78:83-86.

Hammerson, G. A. 2007a. Sceloporus woodi. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2007.RLTS.T64160A12742089.en (01/13/2020)

Hammerson, G.A. 2007b. Tantilla oolitica. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2007.RLTS.T63954A12731242.en (01/13/2020)

Hines, K. N., and K. A. Bradley. 2009. Assessment of the status and distribution of the endemic rim rock crowned snake (Tantilla oolitica) in Miami-Dade and Monroe counties, Florida. Final Report Grant Agreement No. 401817G006. The Institute for Regional Conservation, Miami, Florida, USA.

Hobbs, H. H., Jr. 1942. The crayfishes of Florida. University of Florida Biological Science Series 3:21-179.

Hobbs, H. H., Jr., and C. W. Hart, Jr. 1959. The freshwater decapod crustaceans of the Apalachicola drainage system in Florida, southern Alabama, and Georgia. Bulletin of the Florida State Museum 4:145-191.

Holt, D. E., H. L. Jelks, and F. Jordan. 2013. Movement and longevity of imperiled okaloosa darters (Etheostoma okaloosae). Copiea 2013:653-659.

Hyslop, N. L., J. M. Meyers, R. J. Cooper, and D. J. Stevenson. 2014. Effects of body size and sex of Drymarchon couperi (eastern indigo snake) on habitat use, movements, and home range size in Georgia. Journal of Wildlife Management 78:101-111.

International Crane Foundation. 2019. Whooping crane eastern population update - March 2019. International Crane Foundation, Barboo, Wisconsin, USA. https://www.savingcranes.org/whooping-crane-eastern-population-update-march-2019. (01/09/2020)

International Wolf Center. 2020. Types of wolves. International Wolf Center. Minneapolis, Minnesota, USA. https://wolf.org/wolf-info/basic-wolf-info/types-of-wolves/ (01/09/2020)

Jackson, J. A. 1994. Red-cockaded Woodpecker (Dryobates borealis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.85 (01/10/2020)

Jackson, J. A. 2002. Ivory-billed woodpecker (Campephilus principalis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.711 (01/13/2020)

Kent, D. M., M. A. Langston, and D. W. Hanf. 1997. Observations of vertebrates associated with gopher tortoise burrows in Orange County, Florida. Florida Scientist 60:197-201.

Kieffer, S. 2014. Rufa red knot gets listed. National Audubon Society, Manhattan, New York, USA. https://www.audubon.org/news/rufa-red-knot-gets-listed (01/07/2020)

Kopec, K., and L. A. Burd. 2017. A systematic status review of North American and Hawaiian native bees. Center for Biological Diversity, Tucson, Arizona, USA.
Krysko, K. L. and D. J. Smith. 2005. The decline and extirpation of kingsnakes, Lampropeltis getula, in Florida. Pp 132-141 in: W. E. Meshaka, Jr. and K. J. Babbitt, editors. Status and conservation of Florida amphibians and reptiles. Krieger, Malabar, Florida, USA.

Krysko, K. L. and W. S. Judd. 2006. Morphological systematics of kingsnakes, Lampropeltis getula complex (Serpentes: Colubridae), in the eastern United States. Zootaxa 1193: 1-39.

Krysko, K. L., L. P. Nunez, C. E. Newman, and B. W. Bowen. 2017. Phylogenetics of kingsnakes, Lampropeltis getula complex (Serpentes: Colubbridae), in eastern North America. Journal of Heredity 108:226-238.

Kunz, T. H., and J. D. Reichard. 2010. Status review of the little brown myotis (Myotis lucifugus) and determination that immediate listing under the Endangered Species Act is scientifically and legally warranted. Boston University, Boston, Massachusetts, USA.

Layne, J. N. 1992. Sherman's short-tailed shrew Blarina carolinensis shermani. Pages 328-334 in S. R. Humphrey, editor. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Layne, J. N., editor. 1978. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Lazell, J.D., Jr. 1984. A new marsh rabbit (Sylvilagus Palustris) from Florida's Lower Keys. Journal of Mammalogy 65:26-33.
Lazell, J. D., Jr. 1989. Wildlife of the Florida Keys: a natural history. Island Press, Covelo, California, USA.

Lewis, A. 2018. The Eskimo curlew hasn't been seen in 55 years. Is It Time to Declare It Extinct? National Audubon Society, Manhattan, New York, USA. https://www.audubon.org/news/the-eskimo-curlew-hasnt-been-seen-55-years-it-time-declare-it-extinct# (01/02/2020)

Lopez, J. D., M. S. Peterson, J. Walker, G. L. Grammer, and M. S. Woodrey. 2011. Distribution, abundance, and habitat characterization of the saltmarsh topminnow, Fundulus jenkinsi (Everman 1892). Estuaries and Coasts 34:148-158.

Marchese, H. and N. V. Hoose. 2018. Florida monarch butterfly populations have dropped 80 percent since 2005. Florida Museum of Natural History, Gainesville, Florida, USA. https://www.floridamuseum.ufl.edu/science/florida-monarch/ (01/03/2020)

McNeil, D. J., K. R. Aldinger, M. H. Bakermans, J. A. Lehman, A. C. Tisdale, J. A. Jones, P. B. Wood, D. A. Buehler, C. G. Smalling, L. Siefferman, and J. L. Larkin. 2017. An evaluation and comparison of conservation guidelines for an at-risk migratory songbird. Global Ecology and Conservation 9:90-103.

Means, D.B. 1986. Life history and ecology of the eastern diamondback rattlesnake (Crotalus adamanteus). Final Project Report. Florida Game and Fresh Water Fish Commission, Tallahassee, Florida, USA.

Means, D. B. 2005. Haideotriton wallacei Carr, 1939. Georgia blind salamander. Pages 779-780 in M. Lannoo, editor. Amphibian declines: the conservation status of United States species. University of California Press, Berkeley, California, USA.

Means, D. B. 2006. Vertebrate faunal diversity of longleaf pine ecosystems. In S. Jose et al., editors. The longleaf pine ecosystem: ecology, silviculture, and restoration. Springer, New York, New York, USA.

Means, D. B. 2010. Time to end rattlesnake roundups: the ecological impacts of a long tradition. The Wildlife Professional Winter 2010:65-67.

Mierzwa, K. S. (ed.). 1995. The hine's emerald dragonfly in Illinois: an assessment of population dynamics and habitat use. Unpublished report, TAMS Consultants, Chicago.

Mirarchi, R. E., J. T. Garner, M. F. Mettee, and P.E. O'Neil. 2004. Alabama wildlife. Volume 2. Imperiled aquatic mollusks and fishes. University of Alabama Press, Tuscaloosa, Alabama, USA.

Moler, P. E. 1992. Rare and endangered biota of Florida: Volume III. Amphibians and reptiles. University Press of Florida, Gainesville.

Moler, P., and K. A. Crandall. 2010. Procambarus pictus. In: IUCN 2019. The IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2010-3.RLTS.T18213A7811189.en. (01/13/2020)

Monarch Joint Venture. 2019. Monarch butterfly ESA listing decision deadline extended. Monarch Joint Venture, St. Paul, Minnesota, USA. https://monarchjointventure.org/news-events/news/monarch-butterfly-esa-listing-decision-deadline-extended (01/03/2019)

Morales, A. E. and B. C. Carstens. 2018. Evidence that Myotis lucifugus "subspecies" are five nonsister species, despite gene flow. Systematic Biology 67:756-769.

Moreno, R. 2003. Genetic variation in three populations of a rare plant Lobelia boykinii: A microsatellite analysis. M.S. thesis, University of North Carolina at Greensboro, Greensboro, North Carolina, USA.

Morrison, J. L., and J. F. Dwyer. 2012. Crested caracara (Caracara cheriway), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.249 (01/06/2019)

Mushinsky, H. R., and E. D. McCoy. 1999. Studies of the sand skink (Neoseps reynoldsi) in Central Florida. Final report to Walt Disney Imagineering. University of South Florida, Tampa, Florida, USA.

National Marine Fisheries Service (NMFS). 1998. Final Recovery Plan for the Shortnose Sturgeon Acipenser brevirostrum. NMFS, Silver Spring, Maryland, USA.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (Pristis pectinata). NMFS, Silver Spring, Maryland, USA.

National Marine Fisheries Service (NMFS). 2018. Smalltooth sawfish (Pristis pectinata) 5-year review: summary and evaluation of United States distinct population segment of smalltooth sawfish. NMFS, Southeast Regional Office, St. Petersburg, Florida, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Species Directory. NOAA Fisheries. NOAA Fisheries, Office of Protected Resources, Silver Spring, Maryland, USA. https://www.fisheries.noaa.gov/species (2/11/2020)

NatureServe. 2020: NatureServe Explorer An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/ (01/15/2020)

Nisbet, I. C. T., M. Gochfeld, and J. Burger. 2014. Roseate tern (Sterna dougallii), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.370 (01/10/2020)

North American Orchid Conservation Center (NAOCC). 2019. Trichocentrum undulatum. NAOCC, Smithsonian Environmental Research Center, Edgewater, Maryland, USA. https://goorchids.northamericanorchidcenter.org (12/ 23/2019)

Noss, R. F., E. T. LaRoe, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. Biological Report 28. U.S. Department of the Interiro, National Biological Service, Washington, District of Columbia, USA.
O'Brien, C. A. and J. Brim Box. 1999. Reproductive biology and juvenile recruitment of the shinyrayed pocketbook, Lampsilis subangulata (Bivalvia: Unionidae) in the Gulf Coastal Plain. The American Midland Naturalist 142:129-140.

O'Brien, C. A. and J. D. Williams. 2002. Reproductive biology of four freshwater mussels (Bivalvia: Unionidae) endemic to eastern gulf coastal plain drainages of Alabama, Florida, and Georgia. American Malacological Bulletin 17:147-158.

Odonata Central. 2019. Somatochlora calverti. www.odonatacentral.org (12/13/2019)

Palis, J. G. 1995. Larval growth, development, and metamorphosis of Ambystoma cingulatum on the Gulf Coastal Plain of Florida. Florida Scientist 58:352-358.

Palis, J. G. 1997. Distribution, habitat, and status of the flatwoods salamander (Ambystoma cingulatum) in Florida, USA. Herpetological Natural History 5:53-65.

Parkinson, C. L., M. DiMeo, and K. Mercier. 2016. Evaluating mole skink and salt marsh snake subspecific taxonomy in Florida using genomics. Interim Report Submitted to the U.S. Fish and Wildlife Service. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

Paulson, D. R. 2018. Somatochlora calverti. In: IUCN 2019. The IUCN Red List of threatened species. Version 2019.3 https://dx.doi.org/10.2305/IUCN.UK.2018-1.RLTS.T20341A80697450.en (12/13/2019)

Pauly, G. B., O. Piskurek, and H. B. Shaffer. 2007. Phylogeographic concordance in the southeastern United States: The flatwoods salamander, Ambystoma cingulatum, as a test case. Molecular Ecology 16:415-429.

Pelton, E., S. Jepsen, C. Schultz, C. Fallon, and S. H. Black. 2016. State of the monarch butterfly overwintering sites in California. Report to the U.S. Fish and Wildlife Service. The Xerces Society for Invertebrate Conservation, Portland, OR, USA.

Petranka, J. W. 1998. Salamanders of the United States and Canada. Smithsonian Institution Press, Washington, District of Columbia, USA.

Pilarczyk, M. M., P. M. Stewart, D. N. Shelton, and D. J. Williams. 2006. Current and recent historical freshwater mussel assemblages in the Gulf Coastal plains. Southeastern Naturalist 5: 205-226.

Pintor, L. M., and D. A. Soluk. 2006. Evaluating the non-consumptive, positive effects of a predator in the persistence of an endangered species. Biological Conservation 130:584-591.

Post, W. and J. S. Greenlaw. 2018. Seaside sparrow (Ammospiza maritima), version 2.1. P. G. Rodewald, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.seaspa.02.1 (01/07/2020)

Powers, K. E., R. J. Reynolds, W. Orndorff, B. A. Hyzy, C .S. Hobson, and W. M. Ford. 2016. Monitoring the status of gray bats (Myotis grisescens) in Virginia, 2009-2014, and potential impacts of white-nose Syndrome. Southeastern Naturalist 12:127-137.

Rasmussen, A. K., D. R. Denson, S. C. Harris. 2008. Status of caddisflies (Insecta: Trichoptera) in greatest conservation need in Florida. Final report, Agreement Number 06009.
Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Rightmyer, M. G, M. Deyrup, J. S. Ascher, and T. Griswold. 2011. Osmia species (Hymenoptera, Megachilidae) from the southeastern United States with modified facial hairs: taxonomy, host plants, and conservation status. Contributions Celebrating Kumar Krishna. ZooKeys 148:257-278.

Rochford, M., K. Hines, and F. J. Mazzotti. 2010. Tantilla oolitica (rim rock crowned snake). Defensive behavior. Herpetological Review 41: 99.

Roth, A. M., R. W. Rohrbaugh, T. Will, and D. A. Buehler, editors. 2012. Golden-winged warbler status review and conservation plan. Cornell Lab of Ornithology, Golden-winged Warbler Working Group, National Widlife Federation, U.S. Fish and Wildlife Service.

Royo, A. A., R. Bates, and E. P. Lacey. 2008. Demographic constraints in three populations of Lobelia boykinii: A rare wetland endemic. The Journal of the Torrey Botanical Society 135:189-199.

Schrey, A. W., A. M. Fox, H. R. Mushinsky, and E. D. McCoy. 2011. Fire increases variance in genetic characteristics of Florida sand skink (Plestiodon reynoldsi) local populations. Molecular Ecology 20:56-66.

Schrey, A. W., K. G. Ashton, S. Heath, E. D. McCoy, and H. R. Mushinsky. 2011. Fire alters patterns of genetic diversity among 3 lizard species in Florida scrub habitat. Journal of Heredity 102:399-409.

Skinner, M. W. and B. A. Sorrie. 2002. Conservation and ecology of Lilium pyrophilium, a new species of Liliaceae from the Sandhills region of the Carolinas and Virginia, U.S.A. Novon 12:94-105.

Sewell, A. 2010. Petition to List the Golden-winged Warlber (Vermivora chrysoptera) as a Threatened or Endangered Species under the U.S. Endangered Species Act. Sewell, State College, Pennsylvania, USA.

Spitzer, N. C., 1983. Aspects of the biology of the silver rice rat Oryzomys argentatus. M.S. Thesis, University of Rhode Island, South Kingstown, Rhode Island, USA.

Territo, G. P. 2013. Biogeography and systematics of Nerodia clarkia/Nerodia fasciata clade in Florida. M.S. Thesis. University of Central Florida, Orlando, Florida, USA.

Thom, M. D. 2013. The ecology and conservation of Callophrys irus godart: The role of fire and microhabitat. Doctoral dissertation, University of Florida, Gainesville, Florida, USA.

Thomas, T. M., M. C. Granatosky, J. R. Bourque, K. L. Krysko, P. E. Moler, T. Gamble, E. Suarez, E. Leone, K. M. Enge, and J. Roman. 2014. Taxonomic assessment of alligator snapping turtles (Chelydridae: Macrochelys), with the description of two new species from the southeastern United States. Zootaxa 3786:141-165.

Tiebout, H.M., III and R.A. Anderson. 2001. Mesocosm experiments on habitat choice by an endemic lizard: implications for timber management. Journal of Herpetology 35:173-185.

Timmerman, W. and W. Martin. 2003. Conservation guide to the eastern diamondback rattlesnake. Society for the Study of Amphibians and Reptiles, Shoreview, Minnesota, USA.

Turner, W. R., D. S. Wilcove, and H. M. Swaim. 2006. State of the scrub: Conservation progress, management responsibilities, and land acquisition priorities for imperiled species of Florida's Lake Wales Ridge. Final report to USFWS, South Florida Ecological Services Office, Vero Beach, Florida, USA.

University of Florida Institute of Food and Agricultural Sciences (UF IFAS). 2019. Cassius blue butterfly (Leptotes cassius theonus). UF IFAS, Gainesville, Florida, USA. http://entnemdept.ufl.edu/creatures/bfly/cassius_blue.htm (01/23/2020)

U.S. Army Corps of Engineers (USACE). 2007. Assessment of the population status of the Gray Bat (Myotis grisescens), status review, DOD initiatives, and results of a multi-agency effort to survey wintering populations at major hibernacula, 2005-2007. USACE, Army Endangered Species Research Program, US Army Engineer Research and Development Center, Vicksburg, Mississippi, USA.

U.S. Fish and Wildlife Service (USFWS). 1982. Gray bat recovery plan. U.S. Department of the Interior, Fish and Wildlife Reference Service, Colorado Ecological Services Office, Denver, Colorado, USA.

U.S. Fish and Wildlife Service (USFWS). 1987. Recovery plan for the Choctawhatchee, Perdido Key and Alabama beach mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1990. Endangered and threatened species recovery program: report to Congress. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

U.S. Fish and Wildlife Service (USFWS). 1993. Recovery plan for the Anastasia Island beach mouse and southeastern beach mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1995. American chaffseed (Schwalbea americana) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Field Office, Pleasantville, New Jersey, USA.

U.S. Fish and Wildlife Service. 1996a. Revised recovery plan for the US breeding population of the wood stork. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1996b. Recovery plan for nineteen central Florida scrub and high pineland plants (revised). USFWS, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1997. Recovery plan for the Florida salt marsh vole (Microtus pennsylvanicus dukecampbelli). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1999a. Key Largo woodrat (Neotoma floridana smalli) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999b. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

FWS-005823

U.S. Fish and Wildlife Service (USFWS). 1999c. Avon Park harebells (Crotalaria avonensis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (Trichechus manatus latirostris), Third Revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA

U.S. Fish and Wildlife Service. 2003a. Recovery plan for the red-cockaded woodpecker (Picoides borealis): second revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2003b. Agency draft recovery plan for endangered fat threeridge (Amblema neislerii), shinyrayed pocketbook (Lampsilis subangulata), gulf moccasinshell (Medionidus penicillatus), ochlockonee moccasinshell (Medionidus simpsonianus), and oval pigtoe (Pleurobema pyriforme); and threatened chipola slabshell (Elliptio chipolaensis), and purple bankclimber (Elliptoideus sloatianus). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2004. Species assessment and listing priority assignment form – Digitaria pauciflora. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2005a. Anastasia Island beach mouse (Peromyscus poliomotus phasma) and southeastern beach mouse (Peromyscus polionotus niveiventris). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2005b. Longspurred mint (Dicerandra cornutissima) species account biologue. Summary and Evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville Florida.

U.S. Fish and Wildlife Service (USFWS). 2006. Red-cockaded Woodpecker (Picoides borealis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service,Clemson Ecological Services Field Office, Clemson, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2007a. Indiana bat (Myotis sodalis) draft recovery plan: first revision. U.S. Department of the Interior, Fish and Wildlife Service, Great Lakes-Big Rivers Regional Office, Fort Snelling, Minnesota, USA.

U.S. Fish and Wildlife Service (USFWS). 2007b. West Indian manatee (Trichechus manatus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007c. Florida scrub-jay (Aphelocoma coerulescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007d. Wood Stork (Mycteria americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service Southeast Region, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007e. Bluetail mole skink (Eumeces egregious lividus) and sand skink (Neoseps reynoldsi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

FWS-005824

U.S. Fish and Wildlife Service (USFWS). 2007f. Fat threeridge (Amblema neislerii), shinyrayed pocketbook (Lampsilis subangulata), gulf moccasinshell (Ifedionidus penicillatus), ochlockonee moccasinshell (Medionidus simpsonianus), oval pigtoe (Pleurobema pyriforme), chipola slabshell (Elliptio chipolaensis), purple bankclimber (Elliptoideus sloatianus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007g. Garber's spurge (Chamaesyce garberi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007h. Florida perforate cladonia (Cladonia perforata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008a. Florida panther recovery plan, Third Revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2008b. Florida grasshopper sparrow (Ammodramus savannarum floridanus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008c. Florida population of the Audubon's crested caracara (Polyborus plancus audubonii) = northern crested caracara (Caracara cheriway) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008d. Everglade snail kite (Rostrhamus sociabilis plumbeus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008e. Schaus swallowtail butterfly (Heraclides aristodemus ponceanus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008f. Pigeon wings (Clitoria fragrans) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008g. Short-leaved rosemary (Conradina brevifolia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008h. Lakela's mint (Dicerandra immaculata) 5-Year Review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008i. Euphorbia telephioides (Telephus spurge) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008j. Highlands scrub hypericum (Hypericum cumulicola) 5- year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Region, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service. 2008k. Papery whitlow-wort (Paryonchia chartacea) 5-year Review: Summary and Evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida.

U.S. Fish and Wildlife Service (USFWS). 2009a. Gray bat (Myotis grisescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Missouri Ecological Services Field Office, Columbia, Missouri, USA.

U.S. Fish and Wildlife Service (USFWS). 2009b. Indiana bat (Myotis sodalis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Bloomington Ecological Services Field Office, Bloomington, Indiana, USA.

U.S. Fish and Wildlife Service (USFWS). 2009c. Piping plover (Charadrius melodus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Region, Hadley, Massachusetts, and the Midwest East Lansing Field Office, Michigan, USA.

U.S. Fish and Wildlife Service (USFWS). 2009d. Stock Island tree snail (Orthalicus reses (not including nesodryas)) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009e. Four-petal pawpaw (Asimina tetramera) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009f. Florida golden aster (Chrysopsis floridana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009g. Okeechobee gourd (Cucurbita okeechobeensis ssp. okeechobeensis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009h. Species account: Rugel's pawpaw (Deeringothamnus rugelii). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009i. Garrett's mint (Dicerandra christmanii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009j. Scrub mint (Dicerandra frutescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009k. Macbridea alba (white birds-in-a-nest) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2009l. Cooley's meadowrue (Thalictrum cooleyi) 5-year review, summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Carolina Ecological Services Office, Raleigh, North Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2009m. Florida ziziphus (Ziziphus celata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2010a. Key deer (Odocoileus virginianus clavium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Region, Atlanta, Georgia, USA.

U.S. Fish & Wildlife Service (USFWS). 2010b. The St. Andrew beach mouse (Peromyscus polionotus peninsularis) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010c. Cape Sable seaside sparrow (Ammodramus maritimus mirabilis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2010d. Recovery plan for the ivory-billed woodpecker (Campephilus principalis). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2010e. Caribbean roseate tern and North Atlantic roseate tern (Sterna dougallii dougallii), 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA and Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2010f. Fragrant prickly-apple (Cereus eriophorus var. fragrans) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010g. Deltoid Spurge (Chamaesyce deltoidea ssp. deltoidea) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010h. Snakeroot (Eryngium cuneifolium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010i. Small's milkpea (Galactia smallii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010j. Key tree-cactus (Pilosocereus robinii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010k. Lewton's polygala (Polygala lewtonii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010l. Tiny polygala (Polygala smallii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010m. Wireweed (Polygonella basiramia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS) 2010n. Sandlace (Polygonella myriophylla) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

US Fish and Wildlife Service (USFWS). 2010o. Torreya taxifolia (Florida torreya) 5-year review: summary and evaluation. September 2017. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2012a. White-nose syndrome confirmed in federally endangered gray bats. U.S. Department of the Interior, Fish and Wildlife Service, Office of Public Affairs, Falls Church, Virginia, USA. https://www.fws.gov/news/ShowNews.cfm?ID=348CC168-D4C6-F1B4- 4AF2C93DFD8E2473 (01/13/2020)

U.S. Fish and Wildlife Service (USFWS). 2012b. Whooping crane (Grus americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Aransas National Wildlife Refuge, Austwell, Texas, and Corpus Christi Ecological Service Field Office, Texas, USA.

U.S. Fish and Wildlife Service (USFWS). 2012c. Recovery outline for Miami blue butterfly (Cyclargus thomasi bethunebakeri). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2013. Recovery outline for Consolea corallicola (Florida semaphore cactus). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2014a. West Indian manatee (Trichechus manatus) Florida stock (Florida subspecies, Trichechus manatus latirostris), stock assessment report. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2014b. Florida scrub-jay umbrella Habitat Conservation Plan and Environmental Assessment. Revision 1. https://www.fws.gov/northflorida/Scrub-Jays/Docs/Umbrella/20121000_FSJ_Umbrella_HCP_EA_2014rev.pdf (01/09/2020)
U.S. Fish and Wildlife Service (USFWS). 2014c. At-risk species in Florida's Panhandle. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015a. Status of the species - Key Largo cotton mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2015b. Status of the species - Florida scrub-jay (Aphelocoma coerulescens). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015c. Recovery Plan for the Northern Great Plains piping plover (Charadrius melodus) in two volumes. Volume I: Draft breeding recovery plan for the Northern Great Plains piping plover (Charadrius melodus) and Volume II: Draft revised recovery plan for the wintering range of the Northern Great Plains piping plover (Charadrius melodus) and comprehensive conservation strategy for the piping plover (Charadrius melodus) in its coastal migration and wintering range in the continental United States. U.S. Department of the Interior, Fish and Wildlife Service, Colorado Ecological Services Office, Denver, Colorado, USA.

U.S. Fish and Wildlife Service (USFWS). 2015d. Bachman's warbler (Vermivora bachmanii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Office, Charleston, South Carolina, USA.

FWS-005828

U.S. Fish and Wildlife Service. 2015e. Reticulated flatwoods salamander (Ambystoma bishopi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015f. Status of the Species – Bartram's scrub-hairstreak (Strymon acis bartrami). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015g. Ribes echinellum (Miccosukee gooseberry) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015h. Fringed campion (Silene catesbaei = Silene polypetala) 5-year review: summary and evaluation., U.S. Department of the Interior, Fish and Wildlife Service, Georgia Ecological Services Field Office, Athens, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2016a. Eskimo curlew (Numenius borealis) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Fairbanks Fish and Wildlife Field Office, Fairbanks, Alaska, USA.

U.S. Fish and Wildlife Service (USFWS). 2016b. Squirrel chimney cave shrimp (Palaemonetes cummingi). 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2016c. Harperocallis flava-Harper's beauty 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2016d. Scrub lupine (Lupinus aridorum) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017a. Species status assessment report for the Panama City crayfish, Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.
U.S. Fish and Wildlife Service (USFWS). 2017b. Florida bonamia (Bonamia grandiflora) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017c. Conradina glabra (Apalachicola rosemary) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017d. Scrub plum (Prunus geniculata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

US Fish & Wildlife Service (USFWS). 2017e. Cooley's meadowrue (Thalictrum cooleyi). U.S. Department of the Interior, Fish and Wildlife Service, Raleigh Ecological Field Office, Raleigh, North Carolina, USA. https://www.fws.gov/raleigh/species/es_cooleys_meadowrue.html (01/24/2020)

U.S. Fish and Wildlife Service (USFWS). 2018a. Recovery outline for Florida bonneted bat (Eumops floridanus). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018b. Key Largo woodrat (Neotoma floridana smalli) 5-year review: summary and evaluation - 2018 update. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018c. U.S. Fish and Wildlife Service Region 5 Endangered Species Act Update July 25, 2018. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA.

U.S. Fish and Wildlife Service (USFWS). 2018d. Species status assessment for the eastern black rail (Laterallus jamaicensis jamaicensis). Version 1.2. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018e. Species status assessment report for the black-capped petrel (Pterodroma hasitata). Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018f. U.S. Fish and Wildlife listing species assessment and listing priority assignment form: Gopherus polyphemus. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018g. Species account: squirrel chimney cave shrimp. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018h. Species status assessment report for the frosted elfin (Callophrys irus), Version 1.2. U.S. Department of the Interior, Fish and Wildlife Service, New York Field Office, Cortland, New York, USA.

U.S. Fish and Wildlife Service (USFWS). 2018i. Rugel's pawpaw (Deeringothamnus rugelii) 5 year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018j. Longspurred mint (Dicerandra cornutissima) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville Florida, USA.
U.S. Fish and Wildlife Service (USFWS). 2018k. Scrub buckwheat (Eriogonum longifolium var. gnaphalifolium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018l. Pinguicula ionantha godfrey's butterwort 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018m. Spigelia gentianoides gentian pinkroot 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018n. Recovery outline for Florida bristle fern (Trichomanes punctatum ssp. floridanum). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019. Florida salt marsh vole (Microtus pennsylvanicus dukecampbelli) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Field Office, Jacksonville, Florida.

U.S. Fish and Wildlife Service (USFWS). 2019b. Indiana bat (Myotis sodalis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Indiana Ecological Services Field Office, Bloomington, Indiana, USA.

U.S. Fish and Wildlife Service (USFWS). 2019c. Conserving South Carolina's at-risk species: species facing threats to their survival - tricolored bat. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Field Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2019d. Recovery plan for the endangered Key Largo cotton mouse (Peromyscus gossypinus allapaticola) amendment. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019e. Perdido Key beach mouse recovery plan amendment. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019f. Recovery plan for Cape Sable seaside sparrow (Ammodramus maritimus mirabilis) draft amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019g. Recovery plan for Florida grasshopper sparrow (Ammodramus savannarum floridanus) Amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019h. Recovery plan for the Florida scrub-jay (Aphelocoma coerulescens). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019i. Recovery outline for the rufa red knot (Calidris canutus rufa). U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Field Office, Galloway, New Jersey, USA.

U.S. Fish and Wildlife Service (USFWS). 2019j. Recovery plan for the endangered everglade snail kite (Rostrhamus sociabilis plumbeus) Amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019k. Species status assessment (SSA) report for the eastern indigo snake (Drymarchon couperi). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019l. Species status assessment report for the southern hognose snake (Heterodon simus). Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019m. Atlantic salt marsh snake (Nerodia clarkii taeniata) 5- year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Field Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service. 2019n. Frosted Flatwoods salamander (Ambystoma cingulatum) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019o. Conserving South Carolina's at-risk species. U.S. Department of the Interior, Fish & Wildlife Service, South Carolina Field Office, Charleston, South Carolina, USA. www.fws.gov/southeast/endangered-species-act/at-risk-species (12/13/2019)

U.S. Fish and Wildlife Service (USFWS). 2019p. Frosted elfin. U.S. Department of the Interior, Fish & Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA. https://www.fws.gov/northeast/frosted-elfin/index.html (01/02/2020)

U.S. Fish and Wildlife Service (USFWS). 2019q. Species status assessment report for the American burying beetle Nicrophorus americanus. U.S. Department of the Interior, Fish and Wildlife Service, Oklahoma Ecological Services Field Office, Tulsa, Oklahoma, USA.

U.S. Fish and Wildlife Service (USFWS). 2019r. Recovery plan for the endangered Asimina tetramera (four-petal pawpaw). U U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019s. Brooks bellflower (Campanula robinsiae) 5-year review: summary and evaluations. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019t. Etonia rosemary (Conradina etonia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019u. Recovery plan amendment for the endangered Cucurbita okeechobeensis ssp. okeechobeensis (Okeechobee gourd). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

US Fish & Wildlife Service (USFWS). 2019v. Cooley's water-willow (Justicia cooleyi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019w. Rhododendron minus var. champanii (Chapman's Rhododendron) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019x. American chaffseed (Schwalbea americana) recovery plan amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Ecological Services Field Office, Pleasantville, New Jersey, USA.

U.S. Fish and Wildlife Service (USFWS). 2019y. American chaffseed (Schwalbea americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Field Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2019z. Scutellaria floridana (Florida skullcap) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019aa. Lake Wales Ridge plants recovery plan amendment. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2020a. Environmental Conservation Online System (ECOS). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA. https://ecos.fws.gov/ (01/15/2020)

U.S. Fish and Wildlife Service (USFWS). 2020b. Key Largo woodrat (Neotoma floridana smalli) 5-year review: summary and evaluation - 2018 update. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2020c. St. Vincent National Wildlife Refuge update. U.S. Department of the Interior, Fish and Wildlife Service, St. Vincent National Wildlife Refuge, Apalachicola, Florida, USA. https://www.fws.gov/refuge/st_vincent/ (01/20/2020)

Urbanek, R. P. and J. C. Lewis. 2015. Whooping crane (Grus americana), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.153 (01/09/2020)

van Dijk, P.P. 2011. Clemmys guttata. In: IUCN 2019. The IUCN Red List of Threatened Species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2011-1.RLTS.T4968A11103766.en (01/13/2020)

Waldron, J., S. Welch, and S. Bennett. 2008. Vegetation structure and habitat specificity of a declining North American reptile: A remnant of former landscapes. Biological Conservation 141:2477-82.

Weakley, A. S. 2012. Flora of the Carolinas, Virginia, Georgia, northern Florida, and surrounding areas. Working Draft of 30 November 2012. University of North Carolina Herbarium (NCU), North Carolina Botanical Garden, University of North Carolina at Chapel Hill, North Carolina, USA. http://herbarium.unc.edu/flora.htm (12/23/2019)

Weaver, W. G., S. P. Christman, and P. E. Moler. 1992. Big Pine Key ringneck snake, Diadophis punctatus acricus Paulson. Pages 146-149 in P. E. Moler, editor. Rare and endangered biota of Florida: Volume III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Weller, E. 2018. 5-year review: red wolf (Canis rufus). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

Whelan R. J. 1995. The ecology of fire. Cambridge University Press, Cambridge, UK.

White, M. P., H. N. Blalock-Herod, and P. M. Stewart. 2008. Life history and fish host identification for Fusconaia burkei and Pleurobema strodeanum (Bivalvia: Unionidae). American Malacological Bulletin 24:121-125.

White, M.P., H.N. Blalock-Herod, and P.M. Stewart. 2008. Life history and fish host identification for Fusconaia burkei and Pleurobema strodeanum (Bivalvia: Unionidae). American Malacological Bulletin 24:121-125.

WildEarth Guardians and S. Felsen. 2010. Petition to list the saltmarsh topminnow (Fundulus jenkinsi) under the US Endangered Species Act. WildEarth Guardians, Santa Fe, New Mexico, USA. Williams, J. D., A. E. Bogan, and J. T. Garner. 2008. Freshwater mussels of Alabama & the Mobile Basin in Georgia, Mississippi, & Tennessee. University of Alabama Press, Tuscaloosa, Alabama, USA.

Williams, J. D. and R. S. Butler. 1994. Class Bivalvia, Order Unionoida, freshwater bivalves. Pages 53- 128, 740-742 in M. Deyrup and R. Frantz, editors. Rare and endangered biota of Florida: Volume 4. Invertebrates. University Press of Florida, Gainesville, Florida, USA.

Williams, J. D., H. N. Blalock, A. Benson, and D. N. Shelton. 2000. Distribution of the freshwater mussel fauna (Bivalvia: Margaritiferidae and Unionidae) in the Escambia and Yellow river drainages in southern Alabama and western Florida. Final Report for the US Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

Williams, M. J. 2015. Monarchs make Florida home. U.S. Department of Agriculture, Natural Resources Conservation Service, Gainesville, Florida, USA. https://www.nrcs.usda.gov/wps/portal/nrcs/detail/fl/newsroom/releases/?cid=NRCSEPRD363613 (01/03/2020)

Wolfe, J. L. 1992. Lower Keys marsh rabbit Silvilagus palustris herneri. in S. R. Humphrey, editor. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Wunderlin, R. P., B.F. Hansen, A. R. Franck, and F. B. Essig. 2020. Atlas of Florida Plants. Institute for Systematic Botany, University of South Florida, Tampa, Florida, USA. http://florida.plantatlas.usf.edu/plant.aspx?id=4103 (01/24/2020)

Yirka, M. A., J. N. Flowers, M. D. Martin, K. R. Messenger, and N. A. Shepard. 2010. Geographic distribution: *Tantilla oolitica* (rim rock crowned snake). *Herpetological Review* 41:382.

# Appendix C

## Effects of the Action on ESA-listed Species

FWS-005835

## C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | | Chemical | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| **Mammals** | | | | | | | | | | | | | | | |
| Wetland/marsh | Sherman's Short-tailed Shrew (*Blarina brevicauda shermani*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Forest/grasslands/swamp | Gray Wolf (*Canis lupus*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Forest/grasslands/swamp | Red Wolf (*Canis rufus*) | E | N | Y | N/A | - | X | | | X | | X | | | |
| Tropical hardwood hammock/mangrove | Florida Bonneted Bat (*Eumops floridanus*) | E | N | Y | N/A | 411 | | | | X | | X | X | | X |
| Wetland/marsh | Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) | E | N | Y | N/A | - | | | | X | X | X | X | | X |
| Caves | Gray Bat (*Myotis grisescens*) | E | N | Y | N/A | - | | | | X | | X | | | |
| Caves | Little Brown Bat (*Myotis lucifugus occultus*) | UR | N | Y | N/A | - | | | | X | | X | X | | X |
| Caves | Indiana Bat (*Myotis sodalis*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Tropical hardwood hammock/mangrove | Key Largo Woodrat (*Neotoma floridana smalli*) | T | N | Y | N/A | 1 | | X | | X | | X | | | |

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic — Competition | Biotic — Predation | Biotic — Invasive Species | Physical — Fill | Physical — Dredging | Physical — Habitat Fragmentation | Chemical — Hydro | Chemical — Nutrients | Chemical — WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pine rockland | Key Deer (*Odocoileus virginianus clavium*) | E | N | N | N/A | 5 | | | | X | | X | X | X | X |
| Wetland/ marsh | Rice Rat (*Oryzomys palustris natator*) | E | Y | Y | N/A | 5 | X | | | X | X | X | X | X | X |
| Wetland/ marsh | Pine Island Rice Rat (*Oryzomys palustris planirostris*) | URS | N | Y | N/A | - | | X | | X | X | X | X | X | X |
| Wetland/ marsh | Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) | URS | N | Y | N/A | - | | | X | | | X | X | X | X |
| Caves | Tricolored Bat (*Perimyolis subflavus*) | URS | N | Y | N/A | - | | | X | X | | X | X | X | X |
| Tropical hardwood hammock/ mangrove | Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) | E | N | Y | N/A | 1 | | X | | X | X | X | X | X | X |
| Beach/ scrub dune | Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) | E | N | N | N/A | 1 | | | | X | X | X | | | |
| Beach/ scrub dune | Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) | T | N | N | N/A | 3 | | | | X | X | X | | | |
| Beach/ scrub dune | St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) | E | Y | N | N/A | 4 | | X | | X | X | X | | | |
| Beach/ scrub dune | Anastasia Island Beach Mouse | E | N | N | N/A | - | | | | X | X | X | | | |

FWS-005837

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | | Chemical | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (Peromyscus polionotus phasma) | | | | | | | | | | | | | | |
| Beach/scrub dune | Perdido Key Beach Mouse (Peromyscus polionotus trissyllepsis) | E | N | N | N/A | - | | X | X | | | | | | |
| Forests/grasslands/swamps | Florida Panther (Puma [=Felis] concolor coryi) | E | N | Y | N/A | 197 | | | | X | X | X | X | | |
| Wetland/marsh | Insular Hispid Cotton Rat (Sigmodon hispidus insulicola) | URS | N | N | N/A | - | | | | X | | X | X | | X |
| Wetland/marsh | Lower Keys Rabbit (Sylvilagus palustris hefneri) | E | N | Y | N/A | 6 | | X | X | X | X | X | X | | X |
| Aquatic | West Indian Manatee (Trichechus manatus) | T | Y | Y | N/A | 493 | | | | X | X | X | X | | X |
| **Birds** | | | | | | | | | | | | | | | |
| Wetland/marsh | Cape Sable Seaside Sparrow (Ammodramus maritimus mirabilis) | E | Y | Y | N/A | 9 | | | | X | X | X | X | | X |
| Grassland | Florida Grasshopper Sparrow (Ammodramus savannarum floridanus) | E | N | N | N/A | 57 | | | | X | | X | X | | |
| Wetland/marsh | Saltmarsh Sparrow (Ammospiza caudacutas) | UR | N | Y | N/A | - | | | | X | X | X | X | | X |

FWS-005838

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Upland scrub | Florida Scrub-jay (Aphelocoma coerulescens) | T | N | N | N/A | 199 | | | | X | | | X | | X |
| Coastal tidal/marine | Rufa Red Knot (Calidris canutus rufa) | T | N | Y (tidal flats) | N/A | 9 | | | | X | X | X | X | | X |
| Forest/forested wetland | Ivory-billed Woodpecker (Campephilus principalis) | E | N | T | N/A | 1 | | | | X | | X | X | | X |
| Coastal tidal/marine | Piping Plover (Charadrius melodus) | T* | Y* | Y (intertidal beaches) | N/A | 29 | | | | X | X | X | X | | X |
| Grassland | Whooping Crane (Grus americana) | E | Y | Y | N/A | | | | | X | X | X | X | | X |
| Wetland/marsh | Eastern Black Rail (Laterallus jamaicensis ssp. jamaicensis) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Wetland/marsh | Wood Stork (Mycteria americana) | T | N | Y | N/A | 2681 | | X | | X | X | X | X | | X |
| Grassland | Eskimo Curlew (Numenius borealis) | E | N | Y | N/A | - | | | | X | | X | X | | |
| Pine savanna | Red-cockaded Woodpecker (Picoides borealis) | E | N | N | N/A | 298 | | | | X | | X | X | | |
| Grassland | Audubon's Crested Caracara (Polyborus plancus audubonii) | T | N | Y | N/A | 175 | | X | | X | | X | X | | X |

FWS-005839

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | Hydro | Chemical | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Coastal tidal/marine | Black-capped Petrel (*Pterodroma hasitata*) | P | N | N | N/A | - | | | | | X | | X | | |
| Wetland/ marsh | Everglade Snail Kite (*Rostrhamus sociabilis plumbeus*) | E | Y | Y | N/A | 159 | | X | X | X | | X | X | X | X |
| Forest/ forested wetland | Kirtland's Warbler (*Setophaga kirtlandii = Dendroica kirtlandii*) | D | N | N | N/A | 2 | | | | X | | X | | | |
| Coastal tidal/marine | Roseate Tern (*Sterna dougallii dougallii*) | T* | N | N | N/A | 1 | | | | X | X | X | | | |
| Forest/ forested wetland | Bachman's Wood Warbler (*Vermivora bachmanii*) | E | N | Y | N/A | - | | | | X | | X | X | | |
| Forest/ forested wetland | Golden-winged Warbler (*Vermivora chrysoptera*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| **Reptiles** | | | | | | | | | | | | | | | |
| Wetland/ marsh/ freshwater | American Alligator (*Alligator mississippiensis*) | TS | N | Y | N/A | 2 | | X | | X | X | X | X | | X |
| Wetland/ marsh/ freshwater | Spotted Turtle (*Clemmys guttata*) | URS | N | Y | N/A | - | X | X | X | X | X | X | X | | X |
| Swamp/ saltwater | American Crocodile (*Crocodylus acutus*) | T | Y | Y | N/A | 33 | | X | | X | X | X | X | | X |
| Pine flatwoods | Eastern Diamondback Snake | URS | N | N | N/A | - | | | | X | | X | | | |

FWS-005840

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (Crotalus adamanteus) | | | | | | | | | | | | | | |
| Pine rocklands | Key Ringneck Snake (Diadophis punctatus acricus) | URS | N | N | N/A | - | | | | X | | X | | | |
| Pine flatwoods | Eastern Indigo Snake (Drymarchon corais couperi) | T | N | Y | N/A | 2697 | | | | X | | X | X | | |
| Sandhill/ scrub flatwoods | Gopher Tortoise (Gopherus polyphemus) | C* | N | N | N/A | 1 | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Escambia Map Turtle (Graptemys ernsti) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Southern Hognose Snake (Heterodon simus) | NW | N | N | N/A | - | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Apalachicola Common Kingsnake (Lampropeltis getula meansi) | URS | N | Y | N/A | - | | X | | X | X | X | X | | |
| Wetland/ marsh/ freshwater | Alligator Snapping Turtle (Macrochelys temminckii) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Wetland/ marsh/ freshwater | Atlantic Salt Marsh Snake (Nerodia clarkii taeniata) | T | N | Y (streams) | N/A | 6 | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Florida Pine Snake (Pituophis melanoleucus mugitus) | URS | N | N | N/A | - | | | | X | | X | | | |

*Major Stressors Associated with the Proposed Action — Biotic (Competition, Predation, Invasive Species); Physical (Fill, Dredging, Habitat Fragmentation, Hydro); Chemical (Nutrients, WQ)*

FWS-005841

FWS-005842

**C.1.a. – Effects of the Action on ESA-listed Species – Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
| | | | | | | | Biotic | | | Physical | | | Chemical | | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Sandhill/ scrub/ flatwoods | Bluetail Mole Skink (*Plestiodon egregius lividus*) | T | N | N | N/A | 31 | | | | X | | X | | | |
| Sandhill/ scrub/ flatwoods | Sand Skink (*Plestiodon reynoldsi*) | T | N | N | N/A | 66 | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Florida Red-bellied Turtle (*Pseudemys nelsoni*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sandhill/ scrub/ flatwoods | Florida Scrub Lizard (*Sceloporus woodi*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Sandhill/ scrub/ flatwoods | Short-tailed Snake (*Stilosoma extenuatum*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Pine rocklands | Rim Rock Crowned Snake (*Tantilla oolitica*) | URS | N | N | N/A | - | | | | X | | X | | | |
| ***Amphibians*[a]** | | | | | | | | | | | | | | | |
| Pond breeding | Reticulated Flatwoods Salamander (*Ambystoma bishopi*) | E | N | Y | N/A | 6 | | | | X | | X | X | X | X |
| Pond breeding | Frosted Flatwoods Salamander (*Ambystoma cingulatum*) | T | N | Y | N/A | - | | | | X | | X | X | X | X |
| Cave | Georgia Blind Salamander (*Eurycea wallacei*) | URS | N | Y (aquatic caves) | N/A | - | | | | | | | X | X | X |

**C.1.a. – Effects of the Action on ESA-listed Species – Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Biotic** | | | **Physical** | | | | **Chemical** | |
| Pond breeding | Gopher Frog (*Lithobates capito*) | URS | N | Y | N/A | - | | | | X | | | | | X |
| Aquatic | Dwarf Siren (*Pseudobranchus striatus lustricolus*) | URS | N | Y | N/A | - | | | X | X | X | X | X | X | X |
| **Fishes** | | | | | | | | | | | | | | | |
| Sturgeon | Shortnose Sturgeon (*Acipenser brevirostrum*) | E | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sturgeon | Gulf Sturgeon (*Acipenser oxyrinchus [=oxyrhynchus] desotoi*) | T | Y | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sturgeon | Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) | E* | Y | Y (streams) | N/A | - | | X | | | | | | | X |
| Benthic insectivore | Okaloosa Darter (*Etheostoma okaloosae*) | T | N | Y (streams) | N/A | 1 | X | X | X | X | X | X | X | X | X |
| Topminnow | Saltmarsh Topminnow (*Fundulus jenkinsi*) | URS | N | Y (streams) | N/A | - | X | X | X | X | X | X | X | X | X |
| Sawfish | Smalltooth Sawfish (*Pristis pectinata*) | E* | Y | Y (streams) | N/A | 305 | | X | | X | X | X | X | X | X |
| **Mollusks** | | | | | | | | | | | | | | | |
| Mussel | Southern Elktoe (*Alasmidonta triangulata*) | URS | N | Y (streams) | N/A | - | | X | | | | X | X | X | X |

FWS-005843

Appendix C | Page 111

**C.1.a.– Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic Competition | Biotic Predation | Biotic Invasive Species | Physical Fill | Physical Dredging | Physical Habitat Fragmentation | Physical Hydro | Chemical Nutrients | Chemical WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mussel | Fat Threeridge (*Amblema neislerii*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Rayed Creekshell (*Anodontoides radiatus*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Snail | Pygmy Siltsnail Snail (*Cincinnatia parva*) | URS | N | Y (streams) | N/A | - | | | | | X | X | X | X | X |
| Snail | Ponderous Siltsnail Snail (*Cincinnatia ponderosa*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Mussel | Delicate Spike (*Elliptio arctata*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Mussel | Chipola Slabshell (*Elliptio chipolaensis*) | T | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Purple Bankclimber (*Elliptoideus sloatianus*) | T | Y | Y (streams) | N/A | 8 | | X | | X | X | X | X | X | X |
| Mussel | Tapered Pigtoe (*Fusconaia burki*) | T | Y | Y (streams) | N/A | 8 | | X | | X | X | X | X | X | X |
| Mussel | Narrow Pigtoe (*Fusconaia escambia*) | T | Y | Y (streams) | N/A | 3 | | X | | X | X | X | X | X | X |
| Mussel | Round Ebonyshell (*Fusconaia rotulata*) | E | Y | Y (streams) | N/A | 2 | | X | | X | X | X | X | X | X |
| Mussel | Southern Sandshell (*Hamiota australis*) | T | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Shinyrayed Pocketbook (*Lampsilis subangulata*) | E | Y | Y | N/A | 6 | | X | | X | X | X | X | X | X |

FWS-005844

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action |||||||||
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic ||| Physical ||| Chemical ||
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Mussel | Gulf Moccasinshell (*Medionidus penicillatus*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Ochlockonee Moccasinshell (*Medionidus simpsonianus*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Suwannee moccasinshell (*Medionidus walkeri*) | T | Y | Y (streams) | N/A | 6 | X | X | X | X | X | X | X | X | X |
| Snail | Stock Island Tree Snail (*Orthalicus reses* [not incl. *nesodryas*]) | T | N | Y | N/A | 2 | | | | X | | X | X | X | X |
| Mussel | Oval Pigtoe (*Pleurobema pyriforme*) | E | Y | Y (streams) | N/A | 11 | | X | | X | X | X | X | X | X |
| Mussel | Fuzzy Pigtoe (*Pleurobema strodeanum*) | T | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Southern Kidneyshell (*Ptychobranchus jonesi*) | E | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Choctaw Bean (*Villosa choctawensis*) | E | Y | Y | N/A | 9 | | X | | X | X | X | X | X | X |
| **Crustaceans** ||||||||||||||||
| Pond /river/ stream | Cypress Crayfish (*Cambarellus blacki*) | URS | N | Y | N/A | - | | | | | X | | X | X | X |
| Cave/well/ sinkhole | Florida Cave Amphipod | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | X | X |

Appendix C | Page 113

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic Competition | Biotic Predation | Biotic Invasive Species | Physical Fill | Physical Dredging | Physical Habitat Fragmentation | Physical Hydro | Chemical Nutrients | Chemical WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cave/well/sinkhole | Hobb's Cave Amphipod (*Crangonyx grandimanus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/sinkhole | Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) | T | N | Y (aquatic caves) | N/A | - | | | X | X | | X | X | | X |
| Cave/well/sinkhole | Orange Cave Crayfish (*Procambarus acherontis*) | URS | N | Y | N/A | - | | | | X | | X | X | X | X |
| Pond/river/stream | Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Cave/well/sinkhole | Silver Glen Springs Crayfish (*Procambarus attiguus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | X | X | X | | X |
| Cave/well/sinkhole | Bigcheek Cave Crayfish (*Procambarus delicatus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Pond/river/stream | Panama City Crayfish (*Procambarus econfinae*) | P | N | Y | N/A | - | | | | X | X | X | X | | X |
| Cave/well/sinkhole | Santa Fe Cave Crayfish (*Procambarus erythrops*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |

FWS-005846

FWS-005847

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Cave/well/sinkhole | Orange Lake Cave Crayfish (*Procambarus franzi*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| Cave/well/sinkhole | Coastal Lowland Cave Crayfish (*Procambarus leitheuser*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | X | X |
| Cave/well/sinkhole | Florida Cave Crayfish (*Procambarus lucifugus*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| Cave/well/sinkhole | Miami Cave Crayfish (*Procambarus milleri*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | X | X |
| Cave/well/sinkhole | Putnam County Cave Crayfish (*Procambarus morrisi*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | X | X |
| Cave/well/sinkhole | Pallid Cave Crayfish (*Procambarus pallidus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | X | X |
| Cave/well/sinkhole | Black Creek Crayfish (*Procambarus pictus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | X | X | X | X | X |
| Cave/well/sinkhole | Spider Cave Crayfish (*Troglocambarus maclanei*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| **Insects** | | | | | | | | | | | | | | | |

Appendix C | Page 115

FWS-005848

## C.1.a. – Effects of the Action on ESA-listed Species – Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | Chemical | | |
| Caddisfly | Logan's Agarodes Caddisfly (Agarodes logani) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Butterfly | Florida Leafwing (Anaea troglodyta floridalis) | E | Y | N | N/A | - | | | | X | | X | | | |
| Butterfly | Frosted Elfin Butterfly (Callophrys irus) | UR | Y | N | N/A | - | | | X | X | | X | | | |
| Beetle | Miami Tiger Beetle (Cicindelidia floridana) | E | N | N | N/A | - | | | X | X | | X | | | |
| Butterfly | Nickerbean Blue Butterfly (Cyclargus ammon) | TS | N | N | N/A | - | | | | X | | X | | | |
| Butterfly | Miami Blue Butterfly (Cyclargus thomasi bethunebakeri) | E | N | N | N/A | 1 | | | X | X | | X | | | |
| Butterfly | Monarch Butterfly (Danaus plexippus plexippus) | URS | N | N | N/A | - | | | | X | | X | | | |
| Butterfly | Duke's Skipper Butterfly (Euphyes dukesi calhouni) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Butterfly | Palatka Skipper Butterfly (Euphyes pilatka klotsi) | URS | N | Y | N/A | - | | | | X | | X | X | | |
| Dragonfly | Westfall's Clubtail Dragonfly (Gomphus westfalli) | URS | N | Y (streams) | N/A | - | X | X | | | X | X | X | | X |
| Butterfly | Ceraunus Blue Butterfly (Hemiargus ceraunus antibubastus) | TS | N | N | N/A | - | | | | X | | X | | | |

FWS-005849

**C.1.a. - Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | Chemical | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Butterfly | Schaus Swallowtail Butterfly (Heraclides aristodemus ponceanus) | E | N | N | N/A | 1 | | | | X | | X | X | | |
| Bee | Gulf Coast Solitary Bee (Hesperapis oraria) | URS | N | N | N/A | - | | | | X | | X | | | |
| Caddisfly | Sykora's Hydroptila Caddisfly (Hydroptila sykora) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | | X |
| Caddisfly | Morse's Little Plain Brown Sedge Caddisfly (Lepidostoma morse) | URS | NN | Y (streams) | N/A | - | | | | X | X | X | X | | X |
| Butterfly | Cassius Blue Butterfly (Leptotes cassius theonus) | TS | N | N | N/A | - | | | | X | | X | | | |
| Dragonfly | Purple Skimmer Dragonfly (Libellula jesseana) | URS | N | Y (lakes) | N/A | - | X | X | | X | X | X | X | X | X |
| Beetle | American Burying Beetle (Nicrophorus americanus) | E | N | N | N/A | - | | | | | | X | | | |
| Caddisfly | Little oecetis longhorn caddisfly (Oecetis parva) | URS | N | Y (lakes) | N/A | - | | X | | X | X | X | X | X | X |
| Dragonfly | Southern Snaketail Dragonfly (Ophiogomphus australis) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Bee | Blue Calamintha Bee (Osmia calaminthae) | URS | N | N | N/A | - | | | | X | | X | | | |

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dragonfly | Calvert's Emerald Dragonfly (*Somatochlora calverti*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Butterfly | Bartram's Scrub-hairstreak (*Strymon acis bartrami*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Dragonfly | Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) | URS | N | Y (streams) | | - | | X | X | X | X | X | X | | X |
| Caddisfly | Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) | URS | N | Y (streams) | N/A | - | | X | X | X | X | X | X | | X |
| *Plants* | | | | | | | | | | | | | | | |
| Subshrub | Meadow Joint-vetch (*Aeschynomene pratensis*) | URS | N | Y | OBL | - | | | X | X | | | | | |
| Shrub | Crenulate Lead-plant (*Amorpha crenulata*) | E | N | N | FAC | 2 | | | | X | | X | | | |
| Perennial Forb | Blodgett's Silverbush (*Argythamnia blodgettii*) | T | N | N | NL (UPL) | - | | | X | | | X | | | |
| Shrub | Four-petal Pawpaw (*Asimina tetramera*) | E | N | N | NL (UPL) | - | | | X | | | X | | | |
| Perennial Forb | Purpledisk Honeycombhead Sunflower (*Balduina atropurpurea*) | URS | N | Y | FACW | - | | | | X | | | X | | |
| Perennial Forb | Apalachicola Wild Indigo (*Baptisia megacarpa*) | URS | N | Y | FACW | - | | | X | X | | X | X | | X |

Major Stressors Associated with the Proposed Action — Biotic (Competition, Predation, Invasive Species); Physical (Fill, Dredging, Habitat Fragmentation); Chemical (Hydro, Nutrients, WQ)

FWS-005850

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Biotic** | | | **Physical** | | | | **Chemical** | |
| Perennial Forb | Florida Bonamia (*Bonamia grandiflora*) | T | N | N | NL (UPL) | | | | | | | | | | |
| Substrub | Florida Brickell-bush (*Brickellia mosieri*) | E | Y | Y | NL (UPL) | | | | X | | | | | | |
| Annual Forb | Brooksville Bellflower (*Campanula robinsiae*) | E | N | Y | FACW | | | | | X | | | X | | X |
| Cactus | Fragrant Prickly-apple (*Cereus eriophorus var. fragrans*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Deltoid Spurge (*Chamaesyce deltoidea* ssp. *Deltoidea*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Pineland Sandmat (*Chamaesyce deltoidea pinetorum*) | T | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Wedge Spurge (*Chamaesyce deltoidea serpyllum*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Annual Forb | Garber's Spurge (*Chamaesyce garberi*) | T | N | N | NL (UPL) | | | | X | | | | | | |
| Substrub | Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Shrub | Pygmy Fringe-tree (*Chionanthus pygmaeus*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Substrub | Cape Sable Thoroughwort | E | N | N | NL (UPL) | 1 | | | X | | | | | | |

Major Stressors Associated with the Proposed Action

FWS-005852

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | | Chemical | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (Chromolaena frustrata) | | | | | | | | | | | | | | |
| Perennial Forb | Florida Golden Aster (Chrysopsis floridana) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Lichen | Florida Perforate Cladonia (Cladonia perforate) | E | N | N | N/A | | | | | | | X | | | |
| Perennial Forb | Pigeon Wings (Clitoria fragrans) | F | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Short-leaved Rosemary (Conradina brevifolia) | E | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Etonia Rosemary (Conradina etonia) | E | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Apalachicola Rosemary (Conradina glabra) | E | N | N | NL (UPL) | | | | | | | | | | |
| Cactus | Florida Semaphore Cactus (Consolea corallicola) | E | Y | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Ciliate-leaf Tickseed Sunflower (Coreopsis integrifolia) | E | Y | Y | FACW | | | | | X | | X | X | | |
| Perennial Forb | Avon Park Harebells (Crotalaria avonensis) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Annual Forb | Okeechobee Gourd (Cucurbita okeechobeensis ssp. okeechobeensis) | E | N | Y | OBL | | | | | X | | X | X | | |

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic Competition | Biotic Predation | Biotic Invasive Species | Physical Fill | Physical Dredging | Physical Habitat Fragmentation | Physical Hydro | Chemical Nutrients | Chemical WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shrub | Florida Prairie-Clover (*Dalea carthagenensis floridana*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Subshrub | Beautiful Pawpaw (*Deeringothamnus pulchellus*) | E | N | Y | FAC | | | | X | | | | | | |
| Subshrub | Rugel's Pawpaw (*Deeringothamnus rugelii*) | E | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Garrett's Mint (*Dicerandra christmanii*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Longspurred Mint (*Dicerandra cornutissima*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Scrub Mint (*Dicerandra frutescens*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Lakela's Mint (*Dicerandra immaculate*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Graminoid | Florida Pineland Crabgrass (*Digitaria pauciflora*) | T | N | Y | FACW | | | | X | X | | | X | | |
| Perennial Forb | Clam-shell Orchid (*Encyclia cochleata var. triandra*) | NW | N | N | NL (UPL) | | | | | X | | | X | | |
| Perennial Forb | Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) | URS | N | N | NL (UPL) | | | | | X | | | X | | |
| Perennial Forb | Blackbract Pipewort (*Eriocaulon nigrobracteatum*) | URS | N | Y | OBL | | | | | X | | | X | X | |

FWS-005853

**C.1.a. – Effects of the Action on ESA-listed Species – Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Biotic** | | | **Physical** | | | **Chemical** | | |
| Perennial Forb | Scrub Buckwheat (Eriogonum longifolium var. gnaphalifolium) | T | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Snakeroot (Wedgeleaf Eryngo) (Eryngium cuneifolium) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Telephus Spurge (Euphorbia telephioides) | T | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Small's Milkpea (Galactia smallii) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Harper's Beauty (Harperocallis flava) | E | N | N | FACW | | | | | X | | | X | | |
| Cactus | Aboriginal Prickly-apple (Harrisia (=Cereus) aboriginum (=gracilis)) | E | Y | N | FACU | 3 | | | X | | | | | | |
| Perennial Forb | Florida Hartwrightia Sunflower (Hartwrightia floridana) | URS | N | Y | OBL | | | | | X | | | | X | |
| Perennial Forb | Henry's Spider-lily (Hymenocallis henryae) | URS | N | N | OBL | | | | | X | | | | | |
| Perennial Forb | Highlands Scrub Hypericum (Hypericum cumulicola) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Shrub | Edison's Ascyrum St. Johns Wort | URS | N | Y | OBL | | | | | X | | | | | |

## C.1.a. – Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Substrub | (Hypericum edisonianum) Smooth Barked St. Johns Wort (Hypericum lissophloeus) | URS | N | Y | OBL | 1 | | | | X | | | X | | X |
| Tree | Yellow Anisetree (Illicium parviflorum) | NW | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Beach Jacquemontia (Jacquemontia reclinata) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Cooley's Water-willow (Justicia cooleyi) | E | N | Y | FACW | | | | X | X | | | X | | |
| Perennial Forb | Scrub Blazingstar (Liatris ohlingerae) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Panhandle Lily (Lilium iridollae) | URS | N | Y | OBL | | | | | X | | X | | | |
| Shrub | Bog Spicebush (Lindera subcoriacea) | URS | N | Y | OBL | 1 | | | | X | | | X | | |
| Perennial Forb | Sand Flax (Linum arenicola) | E | N | Y | OBL | | | | X | X | | | X | | |
| Annual Forb | Carter's Small Flowered Flax (Linum carteri carteri) | E | Y | Y | FACW | | | | X | X | | X | | | |
| Perennial Forb | West's Flax (Linum westii) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Boykin's Lobelia (Lobelia boykinii) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Raven's Seedbox (Ludwigia ravenii) | URS | N | Y | OBL | | | | | X | | | X | | |

FWS-005855

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Subshrub | Scrub Lupine (*Lupinus aridorum*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Curtis' Loosestrife (*Lythrum curtissii*) | URS | N | Y | OBL | 1 | | | | X | X | | X | | |
| Perennial Forb | Lowland Loosestrife (*Lythrum flagellare*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | White Birds-in-a-nest (*Macbridea alba*) | T | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Godfrey's Stitchwort (*Minuartia godfreyi*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Annual Forb | Needleleaf or Narrowleaf Naiad Water-nymph (*Najas filifolia*) | URS | N | Y | OBL | | | | X | X | | | X | | |
| Subshrub | Britton's Beargrass (*Nolina brittoniana*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Cape Sable Orchid (*Oncidium undulatum*) | URS | N | Y | NL (UPL) | | | | | X | | | X | | |
| Annual Forb | Papery Whitlow-wort (*Paronychia chartacea*) | T | N | N | NL (UPL) | | | | | X | | | X | | |
| Cactus | Key tree Cactus (*Pilosocereus robinii*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Godfrey's Butterwort (*Pinguicula ionantha*) | T | N | Y | OBL | | | | | X | | | | | |
| Perennial Forb | Lewton's Polygala Milkwort (*Polygala lewtonii*) | E | N | N | NL (UPL) | | | | X | | | | | | |

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Biotic** | | | **Physical** | | | | **Chemical** | |
| Perennial Forb | Tiny Polygala Milkwort (Polygala smallii) | E | N | N | FACU | | | | X | | | | | | |
| Annual Forb | Horton Wireweed (small) (Polygonella basiramia) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Sandlace (Woody Wireweed) (Polygonella myriophylla) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Florida Pondweed (Potamogeton floridanus) | URS | N | Y | OBL | | | | | X | | | X | | X |
| Shrub | Scrub Plum (Prunus geniculata) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | White Meadowbeauty (Rhexia parviflora) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Panhandle Meadowbeauty (Rhexia salicifolia) | URS | N | Y | OBL | | | | | X | | X | X | X | X |
| Shrub | Chapman Rhododendron (Rhododendron chapmanii) | E | Y | Y | FACW | 2 | | | X | X | | | | | |
| Graminoid | Hairy Peduncled Beakrush (Rhynchospora crinipes) | URS | N | Y | OBL | | | | | X | X | | X | | X |
| Shrub | Miccosukee Gooseberry (Ribes echinellum) | T | N | Y | FAC | 1 | | | X | X | | | | | |

Major Stressors Associated with the Proposed Action

FWS-005857

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic | | | Physical | | | Chemical | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Perennial Forb | Eared Coneflower (Rudbeckia auriculata) | URS | N | Y | FACW | | | | | X | | | X | | |
| Tree | Florida Willow (Salix floridana) | URS | N | Y | FACW | | | | X | X | | | X | | X |
| Perennial Forb | Gulf Sweet Pitcherplant (Sarracenia rubra ssp. gulfensis) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | American Chaffseed (Schwalbea americana) | E | N | Y | FAC | | | | | X | X | | X | | |
| Perennial Forb | Florida Skullcap (Scutellaria floridana) | T | N | Y | OBL | | | | | X | | | X | | |
| Shrub | Everglades Bully (Sideroxylon reclinatum ssp. austrofloridense) | T | N | Y | FAC | | | | | X | | | X | | |
| Shrub | Georgia Bully (Sideroxylon thorne) | URS | N | N | NL (UPL) | | | | | X | | | | | |
| Perennial Forb | Fringed Campion (Silene polypetala) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Gentian Pinkroot (Spigelia gentianoides) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Cooley's Meadow Rue (Thalictrum cooleyi) | E | N | Y | FACW | | | | | X | | | X | | |
| Tree | Florida Torreya (Torreya taxifolia) | E | N | N | NL (UPL) | | | | | | | | X | | |
| Perennial Forb | Florida Bristle Fern (Trichomanes) | E | N | N | NL (UPL) | | | | X | | | X | | | |

FWS-005858

## C.1.a. – Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Biotic Competition | Biotic Predation | Biotic Invasive Species | Physical Fill | Physical Dredging | Physical Habitat Fragmentation | Physical Hydro | Chemical Nutrients | Chemical WQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perennial Forb | *punctatum* ssp. *floridanum*<br>Ocala Vetch (*Vicia ocalensis*) | NW | N | Y | OBL | 3 | | | X | | | | X | | |
| Annual Forb | Wide-leaf Warea (*Warea amplexifolia*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Annual Forb | Carter's Mustard (*Warea carteri*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Karst Pond Xyris (*Xyris longisepala*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Shrub | Florida Ziziphus (Jujube) (*Ziziphus celata*) | E | N | N | NL (UPL) | 1 | | | X | | | X | | | |

**Header Key:**

CN (SN) – Common Name (Scientific Name)

FLS – Federal Listing Status under the Endangered Species Act (ESA)

CH? – Has critical habitat been designated?

Wetlands - Are wetlands or waters regularly utilized by the species?

# ESA – Number of ESA consultations for this species in Florida over the last five years

IS – Wetland indicator status (plant-specific)

Competition – Competitive balance alteration

Predation – Predator/prey relationship alteration

Invasive species – Invasive species introduction/colonization

Hydro – Changes in hydrologic regime

Nutrients – Nutrient cycle exchange/alteration

WQ – Water Quality

**Table Text Key:**

ª – Certain amphibian species may also be threatened by relocation during project activities (as this impact was not broadly applicable to other species, it was not included as a column in the table)

**C.1.a. – Effects of the Action on ESA-listed Species - Stressors**

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |

FLS – E (Endangered), T (Threatened), TS (Threatened due to Similarity of Appearance), C (Candidate), P (Proposed for listing), UR (Under Review), URS (Under Review, Substantial Finding), NW (Not Warranted Finding), * (Listing status of DPS that occurs in Florida. Other DPSs may have different listing statuses in other region).

CH? – Y (Yes), N (No)

IS – OBL (Obligate), FACW (Facultative Wetland), FAC (Facultative), UPL (Upland), FACU (Facultative Upland), NL UPL (Not Listed, Generally Assumed to be Upland)

## C.1.b.– Effects of the Action on ESA-listed Species - Findings

| Guild | CN (SN) | FLS | CHR? | Finding | Comments (ESA determinations made for all species, including proposed, to encompass possibility for future listings) |
|---|---|---|---|---|---|
| **Mammals** | | | | | |
| Wetland/ marsh | Sherman's Short-tailed Shrew (*Blarina brevicauda shermani*) | URS | N | No effect | Habitat is described as edges of marshes or shallow depressions, mesic flatwoods, with abundant grasses; also, drainage ditches with abundant grass cover. Threats include habitat loss and predation by cats. Current status is unknown, and it is possible the species has been extirpated (has not been located since 1995). As the species is likely extirpated, this action will have no effect on the subspecies. |
| Forest/ grasslands/ swamp | Gray Wolf (*Canis lupus*) | E | Y | No effect | As this species is extirpated from Florida, this action will have no effect on the species. |
| Forest/ grasslands/ swamp | Red Wolf (*Canis rufus*) | E | N | NLAA | The species occupies coastal prairies, forests, and swamps within these areas. In Florida, range limited to one island (St. Vincent; a USFWS National Wildlife Refuge). A major threat to Red Wolf populations is loss of genetic diversity from interbreeding with coyotes. As the species only occurs on protected lands, this action is NLAA the species. |
| Tropical hardwood hammock/ mangrove | Florida Bonneted Bat (*Eumops floridanus*) | E | N | LAA | Occupies pineland, tropical hardwood, and mangrove habitat. Areas of freshwater wetlands are also important to the species. The bats roost singly or in small colonies in tree cavities (including Red-cockaded Woodpecker cavities), buildings, foliage, and rock crevices, as well as artificial roosts. Current threats to the species include a restricted range and small population size, habitat loss, limited roost sites, environmental stochasticity, and pesticides. Through impacts to habitat (loss and fragmentation) and water quality, the action could result in a LAA determination. |
| Wetland/ marsh | Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) | E | N | LAA | Species occurs in salt marsh habitat. Decline of the species appears to be due to climatic changes and associated rise in sea level. Through impacts to habitat (loss and fragmentation) and water quality, the action could result in a LAA determination. |
| Caves | Gray Bat (*Myotis grisescens*) | E | N | NLAA | In Florida, the species occurs in a single county (Jackson) in the northwest Panhandle (limestone karst region). Threats to the species include roost disturbance (environmental or human-caused) and white-nose syndrome. Roosting (including some maternity roosts) has been documented in nine caves in this county (on both public and private and). Due to the restricted range of the species in Florida and the fact that the species has not recently used maternity caves in the State, the action is NLAA the species. |

FWS-005861

| Habitat | Species | | | | Narrative |
|---|---|---|---|---|---|
| Caves | Little Brown Bat (Myotis lucifugus occultus) | UR | N | NLAA | The Little Brown Bat has been occasionally detected in northern Florida, although it is not common in the State. General habitat requirements include forested or herbaceous wetlands, hardwood and mixed forest, grassland, and scrub. Threats to the species include white-nose syndrome, climate change, pesticides, mortality from wind turbines, and habitat modification or destruction. Species is extremely uncommon in Florida and the action is NLAA the subspecies. |
| Caves | Indiana Bat (Myotis sodalis) | E | Y | NLAA | There are no current records of the species in Florida. However, there has been one historical winter record of the species in Old Indian Cave in Jackson County. Due to the restricted range of the species in Florida and the fact that the species has not recently been detected in the State, the action is NLAA the species. |
| Tropical hardwood hammock/ mangrove | Key Largo Woodrat (Neotoma floridana smalli) | T | N | LAA | Inhabits tropical hardwood hammock forests. Currently the species is limited to North Key Largo, with is approximately half of its historical range. The woodrat's small and isolated populations are especially vulnerable to extinction because of a wide range of threats including demographic factors and natural catastrophes. Predation poses another significant risk, as they are depredated by a wide range of raptorial, reptilian, and mammalian (including free-roaming cats) predators. Based on the limited range and habitat preferences of the species, the action could result in a LAA determination. |
| Pine rockland | Key Deer (Odocoileus virginianus clavium) | E | N | LAA | Key Deer is found in the Florida Keys within 11 island complexes from Johnson Keys to Sugarloaf Key. Selectively uses hammock and pine rockland upland habitats. These habitats contain a substantial portion of their forage plants, fresh water, and cover, which is especially important for fawning. Ongoing threats include urbanization and vehicular collisions. Through direct impacts to habitat via fill, habitat fragmentation, and water quality, the action could result in a LAA determination. |
| Wetland/ marsh | Rice Rat (Oryzomys palustris natator) | E | Y | LAA | Inhabits mangrove swamps, saltmarsh flats, buttonwood transition vegetation, and fresh-water cattail marshes in the lower Florida Keys. Rice rats are impacted by the continued development of the Lower Keys (dredge and fill), increased populations of predators (such as raccoons, cats, and dogs), and through competition with introduced black rats (Rattus rattus). Based on all the above-listed threats and impacts, this action could result in a LAA determination. |
| Wetland/ marsh | Pine Island Rice Rat (Oryzomys palustris planirostris) | URS | N | LAA | Subspecies is known from only two occurrences: on Pine Island (Florida Keys) and the adjacent mainland. Occurs in herbaceous wetlands. The rat's habitat is threatened with habitat destruction by filling and draining of wetlands and invasion of woody plants. Through impacts to habitat, water quality, and introduction of invasive species, this action could result in a LAA determination. |

FWS-005863

| Habitat | Species | Status | | Determination | Narrative |
|---|---|---|---|---|---|
| Wetland/ marsh | Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) | URS | N | LAA | Restricted to Sanibel island. Occurs along the edge of freshwater swamps of artesian origin, including swales and cattail stands. While the subspecies is protected in part on Ding Darling National Wildlife Refuge, it is threatened by habitat destruction through drainage, filling of marshes, lowering of the water table for human use, and woody plant invasion. Through impacts to habitat, water quality, and introduction of invasive species, the action could result in a LAA determination. |
| Caves | Tricolored Bat (*Perimyotis subflavus*) | URS | N | LAA | The species is a permanent resident throughout the Florida peninsula. However, the majority of records are from the Panhandle. Habitat preferences include open landscapes bordered by woodland (e.g. hardwood woodlands, grasslands, abandoned fields, and urban landscapes. Roosts in caves and mines in the winter and trees, man-made structures, and caves in the summer. Tricolored Bats forage near water and in early successional forests. Threats to the species include white-nose syndrome, human disturbance of hibernacula, habitat loss and modification, pesticides, climate change, and mortality from wind energy . Action could result in habitat fragmentation for the species as well as impacts to hydrology and water quality. This could result in a LAA determination. |
| Tropical hardwood hammock/ mangrove | Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) | E | N | NLAA | Inhabits tropical hardwood hammock forests as well as nearby Salicornia coastal strands. Currently the species is limited to North Key Largo (mostly on protected habitat). Free-roaming cats, loss of hammock forest habitat through sea level rise (e.g., salt intolerant forest) are ongoing threats to their populations. Due to the species restricted range, primarily on protected land, the action is NLAA the subspecies. |
| Beach/ scrub dune | Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) | E | N | LAA | This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and beach grasses, and adjacent interior scrub areas populated by oaks and sand pine or palmetto. Remaining populations of this subspecies exist in the sand dunes on Shell Island, Grayton Beach, and Topsail Hill in Florida. The predominant factor of decline for this species is habitat loss due to alteration or conversion of dunes (from human development and use). Through direct impacts to habitat via fill, dredging, and habitat fragmentation, the action could result in a LAA determination. |
| Beach/ scrub dune | Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) | T | N | LAA | Species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass, and adjacent interior scrub areas populated by oaks and sand pine or palmetto. The predominant factors of decline for this species are habitat loss due to alteration of conversion of dunes due to human development and use, and destruction of habitat due to hurricanes and storms. Through direct impacts to habitat via fill, dredging, and habitat fragmentation, the action could result in a LAA determination. |
| Beach/ scrub dune | St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) | E | Y | LAA | Two existing populations of St. Andrew Beach Mouse inhabit East Crooked Island in Bay County and St. Joseph Peninsula in Gulf County. Habitat requirements include primary and secondary scrub dune ecosystems. St. Andrew Beach Mice face a suite of threats primarily related to habitat loss or degradation via urbanization and stochastic environmental events. Predation by feral cats is also a significant threat. Impacts to habitat could result in a LAA determination. |

| Habitat | Species | Status | | Det. | Description |
|---|---|---|---|---|---|
| Beach/ scrub dune | Anastasia Island Beach Mouse (Peromyscus polionotus phasma) | E | N | LAA | Currently, two populations of this subspecies exist on Anastasia Island: at Anastasia Island State Park and Fort Matanzas National Monument. This species occurs in beach dune systems vegetated by sea oats and dune panic grass and adjacent interior scrub areas populated by oaks and sand pine or palmetto. As the species strictly occurs on protected lands, the action is NLAA the subspecies. Possible adverse effects with restoration projects. |
| Beach/ scrub dune | Perdido Key Beach Mouse (Peromyscus polionotus trissyllepsis) | E | N | LAA | Restricted to Perdido Key in Florida. Requires a mosaic of frontal and scrub dunes for food, burrow sites, and refuge habitat. Threats to the species include loss/fragmentation of habitat for land development, tropical storm damage and mortality, and predation by non-native species. Impacts to could result in a LAA determination. |
| Forests/ grasslands/ swamps | Florida Panther (Puma [=Felis] concolor coryi) | E | N | LAA | Subspecies is limited to a single population in southern Florida. Panthers have vast home ranges, occur at low densities, and require large swaths of contiguous habitat. Incompatibility with urbanization continues to limit the recovery of this subspecies. Habitat fragmentation and loss also serve as significant threats to panthers. Additionally, vehicular collisions continue to limit panther population growth. Impacts to habitat (fragmentation) could result in a LAA determination. |
| Wetland/ marsh | Insular Hispid Cotton Rat (Sigmodon hispidus insulicola) | URS | N | LAA | Occurs within peninsular Florida and the Keys. The preferred habitat is herbaceous wetlands, grasslands, shrubland, and mixed woodlands. The rat is threatened by habitat destruction from urbanization. Impacts to habitat could result in a LAA determination. |
| Wetland/ marsh | Lower Keys Rabbit (Sylvilagus palustris hefneri) | E | N | LAA | Restricted to a small area of the Florida Keys. Occurs in saltmarsh, hammocks, and flatwoods. The rabbit's habitat is at risk due to development, dredging and filling of wetlands, human exploitation of very limited fresh water, and impacts from predators such as cats, dogs, and human poachers. Impacts to habitat could result in a LAA determination. |
| Aquatic | West Indian Manatee (Trichechus manatus) | T | Y | LAA | Florida manatees occur in freshwater, brackish and marine environments including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Impacts to habitat and water quality could result in a LAA determination. |
| **Birds** | | | | | |
| Wetland/ marsh | Cape Sable Seaside Sparrow (Ammodramus maritimus mirabilis) | E | Y | LAA | Non-migratory residents of freshwater to brackish marshes. Inhabits freshwater marl prairies with muhly grass (short-hydroperiods, densely clumped grasses, and periodic fires). Impacts to wetland habitat and changes in hydrological regimes and water quality could result in a LAA determination. |
| Grassland | Florida Grasshopper Sparrow (Ammodramus savannarum floridanus) | E | N | LAA | Inhabits dry, treeless, flat prairies in central and southern Florida. Species is a ground nester and changes in hydrologic regimes have resulted in nest loss via flooding. Action could result in habitat fragmentation and changes in hydrologic regimes. This could result in a LAA determination. |

FWS-005864

FWS-005865

| Determination | Description |
|---|---|
| LAA | Species inhabits coastal tidal marshes. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| LAA | Restricted to early successional xeric scrub and scrub flatwood habitat in relict dunes located on Florida's central ridges and coasts, in areas defined by historic fires. Habitat interspersed with wetlands/swales. Action could result in habitat fragmentation for the species. This could result in a LAA determination. |
| LAA | Any impacts to coastal waters (fill, dredging, etc.) could impact this species and could result in a LAA determination. |
| No effect | This species is extirpated and potentially extinct. The action will have no effect on this species. |
| LAA | Wintering habitat preferences in Florida include bay beaches (vs. ocean facing beaches) and inlets with exposed interdidal areas and tide cast wrack. Threats to the species include habitat loss and degradation from urbanization and some shoreline stabilization efforts and sea level rise. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| LAA | Wintering locations include tall grass prairie, wetlands, deltas, and interior tablelands along the southeast and Gulf Coast, including Florida. Reintroduced Whooping Cranes in Florida located in the Kissimmee Prairie area (State protected land), are designated as an experimental, non-essential population (outside of federal lands, treated as proposed species; within federal lands, treated as threatened). Population size in Florida was five as of March 2019. The species is extirpated from all other areas of Florida. If actions occur on Kissimmee Prairie, the action may affect but is not likely to adversely affect the species. |
| LAA | Inhabits brackish, freshwater, and saltwater wetlands with dense vegetation cover. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| LAA | Inhabits freshwater, estuarine wetlands, cypress and mangrove swamps, stock ponds, and seasonally flooded agricultural areas. Species dependent on hydrology to concentrate prey (fish). Altered hydrology regimes could impact foraging habitat. Impacts to prey resources, habitat, hydrology, and water quality could result in a LAA determination. |
| No effect | Extirpated (Florida likely only a historic stopover site only during migration). This action would have no effect on the species. |
| LAA | Endemic to old growth, pine savanna ecosystems. Action could result in habitat fragmentation for the species and could result in a LAA determination. |

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Grassland | Audubon's Crested Caracara (*Polyborus plancus audubonii*) | T | N | LAA | Inhabits open, upland prairies, interspersed with ponds, marshes, and cabbage palm hammocks in south-central Florida. The majority of occupied habitat and nesting occurs on private lands. The species feeds on road-kill carrion as well as invertebrates and a variety of vertebrate prey (fish, reptiles, birds, eggs, etc.). Impacts to prey, habitat, and water quality could result in a LAA determination. |
| Coastal tidal/marine | Black-capped Petrel (*Pterodroma hasitata*) | P | N | No effect. | Nests on the island of Hispaniola and forages offshore of the southeastern U.S. Off the coast of Florida, Black-capped Petrels may be found year-round in relatively shallow waters near shore. As this action does not encompass marine fill off the coast of Florida, the action will have no effect on this species. |
| Wetland/ marsh | Everglade Snail Kite (*Rostrhamus sociabilis plumbeus*) | E | Y | LAA | Species habitat preferences include freshwater marshes with shallow water, patchy emergent vegetation, and large expanses of open water for foraging. Threats to the species include habitat loss and fragmentation, hydrology management practices in the State (that may directly or indirectly impact both the kite and its prey), predation, invasive species (predators as well as the exotic apple snail (*Pomacea* spp.). Impacts associated with the action (including all of the above) could result in a LAA determination. |
| Coastal tidal/marine | Roseate Tern (*Sterna dougallii dougallii*) | T* | N | LAA | A metapopulation of the Caribbean Roseate Tern is known to breed in 12 areas of the Florida Keys. Species may nest on the ground or the roofs of buildings. Microhabitat features at nest sites include open sand, coral rubble, or rock. Impacts of the action associated with fill, and dredging in coastal areas could result in a LAA determination. |
| Forest/ forested wetland | Bachman's Wood Warbler (*Vermivora bachmanii*) | E | N | No effect. | The species is not known to currently occur in Florida. Species inhabited bottomland hardwood forested wetlands but is now believed to be extirpated. This action will have no effect on the species. |
| Forest/ forested wetland | Golden-winged Warbler (*Vermivora chrysoptera*) | URS | N | LAA | The species occurs in Florida strictly during migration. Habitat on migration is not well-documented, but may include forest edge and second-growth forest. Species hybridizes with Golden-winged Warbler, but this is not an issue in Florida as no breeding occurs in the State. Impacts to habitat, including fragmentation, and changes in hydrology/water quality could result in a LAA determination. |
| **Reptiles** | | | | | |
| Wetland/ marsh/ freshwater | American Alligator (*Alligator mississippiensis*) | TS | N | LAA | Inhabits variety of wetland habitats including but not limited to marshes, ponds, lakes, rivers, swamps, bayous, canals, and canals. The species is no longer considered to be "biologically endangered or threatened" but remains listed because of similarity of appearance. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Wetland/ marsh/ freshwater | Spotted Turtle (*Clemmys guttata*) | URS | N | LAA | Inhabits variety of shallow, isolated wetlands with clean water, soft substrate, and emergent or submerged vegetation. Major threats include habitat destruction and loss of wetlands, collection for the pet trade, road mortality, and invasive species. Through impacts to habitat, hydrology, and water quality, as well as aiding in the spread of invasive species, the action is LAA the species. |

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Swamp/ saltwater | American Crocodile (*Crocodylus acutus*) | T | Y | LAA | Inhabits mangrove-lined bays, swamps, creeks, and inland swamps. Major threats include habitat loss from development. Through impacts to habitat, hydrology, and water quality, the action is LAA the species. |
| Pine flatwoods | Eastern Diamondback Snake (*Crotalus adamanteus*) | URS | N | LAA | Inhabits longleaf pine savanna, and other open-canopy habitats with a dense herbaceous understory. Major threats include habitat conversion or loss, and malicious killing by humans. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands may be impacted. |
| Pine rocklands | Key Ringneck Snake (*Diadophis punctatus acricus*) | URS | N | LAA | Inhabits pine rocklands and rockland hammocks, usually near permanent fresh water in the Florida Keys. Storm surge and sea level rise could be a future risk given the low elevation of much of the remaining habitat. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Pine flatwoods | Eastern Indigo Snake (*Drymarchon corais couperi*) | T | N | LAA | Inhabits variety of upland and lowland habitat types. Major threats to the species include habitat fragmentation, fire suppression leading to eventual habitat degradation, and road mortality. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Gopher Tortoise (*Gopherus polyphemus*) | C* | N | LAA | Inhabits areas characterized by dry sandy soils, open canopy cover, and abundant herbaceous vegetation. Major threats include habitat loss, degradation, and fragmentation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Escambia Map Turtle (*Graptemys ernsti*) | URS | N | LAA | Inhabits rivers with good flow, avoids backwaters and salt water, and nests along sandbars and river berms. Major threats include pollution. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Southern Hognose Snake (*Heterodon simus*) | NW | N | LAA | Inhabits open, xeric habitats with well-drained, sandy soils, dominated by pine or pine-oak woodland with an open canopy and grassy understory. Further studies are required to determine the factor or combination of factors that have caused the population to decline. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Apalachicola Common Kingsnake (*Lampropeltis getula meansi*) | URS | N | LAA | Inhabits wetland margins within longleaf pine flatwoods. Major threats include habitat loss. Through impacts to habitat, and hydrology, the action could result in a LAA determination. |
| Wetland/ marsh/ freshwater | Alligator Snapping Turtle (*Macrochelys temminckii*) | URS | N | LAA | Inhabits permanent water bodies. Major threats include overharvest in the exotic trade market and habitat loss. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

FWS-005867

| Habitat | Species | Status | Y/N | Det. | Description |
|---|---|---|---|---|---|
| Wetland/ marsh/ freshwater | Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) | T | N | LAA | Inhabits brackish coastal marshes. Major threats include habitat loss due to development and habitat degradation resulting from ditching, diking, and impoundments. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Florida Pine Snake (*Pituophis melanoleucus mugitus*) | URS | N | LAA | Inhabits well-drained sandy soils and relatively open canopy, including sandhills, xeric hammock, scrubby flatwoods, and dry prairie. Major threats are thought to include collecting, road mortality, and habitat loss. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Bluetail Mole Skink (*Plestiodon egregius lividus*) | T | N | LAA | Inhabits scrub and sandhill habitat, and is believed to require loose soils, moderate soil temperatures, and presence of vegetation. Major threats include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Sand Skink (*Plestiodon reynoldsi*) | T | N | LAA | Inhabits scrub and sandhill habitat and loose, un-compacted, coarse-grained soil is thought to be an important habitat component. Major threats include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Florida Red-bellied Turtle (*Pseudemys nelsoni*) | URS | N | LAA | Inhabits water rich with aquatic plant life, such as streams, ponds, lakes, ditches, sloughs, marshes, and mangrove-bordered creeks. Major threats include drought, predators, and illegal harvesting for food by turtle trappers. Through impacts to habitat, and hydrology, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Florida Scrub Lizard (*Sceloporus woodi*) | URS | N | LAA | Inhabits evergreen oak scrub and young sand pine scrub; and to a lesser extent sandhills adjacent to scrub or scrubby flatwoods. Major threats include habitat loss and fragmentation, and fire suppression. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Short-tailed Snake (*Stilosoma extenuatum*) | URS | N | LAA | Inhabits dry upland habitats of sandhill, xeric hammock, and sand pine scrub. Little is known about threats to this species. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Pine rocklands | Rim Rock Crowned Snake (*Tantilla oolitica*) | URS | N | LAA | Inhabits pine rockland and rockland hammock as well as disturbed urban environments including vacant lots, roadsides, and pastures. Major threats include habitat loss and fragmentation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| **Amphibians** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Pond breeding | Reticulated Flatwoods Salamander (*Ambystoma bishopi*) | E | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Pond breeding | Frosted Flatwoods Salamander (*Ambystoma cingulatum*) | T | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Cave | Georgia Blind Salamander (*Eurycea wallacei*) | URS | N | NLAA | Limited to aquatic caves, alteration of hydrology or WQ is major concern. Based on habitat preferences, this action is NLAA the species. |
| Pond breeding | Gopher Frog (*Lithobates capito*) | URS | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Aquatic | Gulf Hammock Dwarf Siren (*Pseudobranchus striatus lustricolus*) | URS | N | No effect | Extirpated, limited historic range. The action will have no effect on this species. |
| **Fishes** | | | | | |
| Sturgeon | Shortnose Sturgeon (*Acipenser brevirostrum*) | E | N | No effect | Inhabits rivers and estuaries. Major threats include habitat impediment (e.g., dams), habitat degradation (e.g., dredging and poor water quality), and fisheries bycatch. Through impacts to aquatic habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sturgeon | Gulf Sturgeon (*Acipenser oxyrinchus* [=*oxyrhynchus*] *desotoi*) | T | Y | No effect | Inhabits rivers and Gulf of Mexico waters, but not expected in Action Area. Major threats include damming and disconnection of spawning grounds, as well as habitat modification due to dredging, navigation maintenance activities, and water pollution. Impacts to aquatic habitat, hydrology, and water quality. |
| Sturgeon | Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) | E* | Y | No effect | Inhabits riverine and Atlantic coast waters, but not expected in Action Area. Major threats include fisheries bycatch, habitat degradation (e.g., dredging and poor water quality), habitat impediment (e.g., dams), and vessel strikes. Impacts to aquatic habitat, hydrology, and water quality. |
| Benthic insectivore | Okaloosa Darter (*Etheostoma okaloosae*) | T | N | LAA | Inhabits dense vegetation, root mats, and detritus along clear, flowing stream margins in rivers. Most populations are believed to be stable or increasing at present, and vulnerability is primarily due to the small range and limited number of occurrences. Through impacts to aquatic habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Topminnow | Saltmarsh Topminnow (*Fundulus jenkinsi*) | URS | N | LAA | Inhabits small meandering channels of brackish marshes. Major threats include pollution and habitat destruction. Impacts to aquatic habitat, hydrology, and water quality. |
| Sawfish | Smalltooth Sawfish (*Pristis pectinata*) | E* | Y | No effect | Inhabits estuaries and coastal waters, but not expected in Action Area. Major threats include habitat loss and bycatch. Impacts to aquatic habitat, hydrology, and water quality. |
| **Mollusks** | | | | | |

| Group | Species | Status | Y/N | Determination | Description |
|---|---|---|---|---|---|
| Mussel | Southern Elktoe (*Alasmidonta triangulata*) | URS | N | LAA | Inhabits sandy substrates, such as sandbars, of rivers and larger creeks with moderate currents. Major threats include habitat degradation and fragmentation caused by dredging, impoundment, sedimentation, water extraction, and drought. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Fat Threeridge (*Amblema neislerii*) | E | Y | LAA | Inhabits the main channels of small to large rivers where the current is slow to moderate, and the substrate varies from gravel to cobble to a mixture of sand and sandy mud. Major threats include anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Rayed Creekshell (*Anodontoides radiatus*) | URS | N | LAA | Inhabits mud, sand, or gravel of large rivers as well as medium to small sized creeks in areas of moderate currents. Major threats are associated with stream modifications and come from a variety of sources including pesticide use, deforestation, damming, and water extraction. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Snail | Pygmy Siltsnail Snail (*Cincinatia parva*) | URS | N | LAA | Inhabits Blue Spring, a freshwater karst spring run. Major threats include recreational activities, increased sedimentation from erosion and logging practices, invasive species, and any impacts to water quality. Impacts to freshwater spring habitat, changes in hydrological regimes and water quality could result in a LAA determination. |
| Snail | Ponderous Siltsnail Snail (*Cincinnatia ponderosa*) | URS | N | LAA | Inhabits vegetated areas, as well as in sand and gravel, in springs and rivers. Major threats include saltwater intrusion, groundwater extraction for human consumption, and pollution from development. Impacts to freshwater spring and stream habitat, changes in hydrological regimes and water quality could result in a LAA determination. |
| Mussel | Delicate Spike (*Elliptio arctata*) | URS | N | LAA | Inhabits areas of moderate currents among large rocks or in the sand and gravel underneath them. Major threats are related habitat degradation including damming, eutrophication and pollution, water extraction, deforestation, bank scouring, and sedimentation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Chipola Slabshell (*Elliptio chipolaensis*) | T | Y | LAA | Inhabits muddy and silty-sandy substrates in areas with slow to moderate currents. Major threats include dams, stream channelization, pollution, and sedimentation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Purple Bankclimber (*Elliptoideus sloatianus*) | T | Y | LAA | Inhabits small to large rivers, often in the main channels, where there is moderate current. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |

FWS-005870

| | | | | |
|---|---|---|---|---|
| Mussel | Tapered Pigtoe (*Fusconaia burkei*) | T | Y | LAA | Inhabit areas with slow to moderate currents in medium rivers and occasionally floodplain lakes, where the substrate is stable and consists of sand, small gravel, or sandy mud. Major threats are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Narrow Pigtoe (*Fusconaia escambia*) | T | Y | LAA | Inhabits substrate consisting of sand, gravel, sandy gravel, or silty sand and prefers slow to moderate currents within small to medium sized streams and rivers. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Round Ebonyshell (*Fusconaia rotulata*) | E | Y | LAA | Inhabits areas in rivers with moderate current on sand and gravel substrate. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Southern Sandshell (*Hamiota australis*) | T | Y | LAA | Inhabits areas with slow to moderate currents in small creeks and rivers, where the substrate is stable and consists of sand or a mix of sand and fine gravel. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Shinyrayed Pocketbook (*Lampsilis subangulata*) | E | Y | LAA | Inhabits areas with slow to moderate currents in medium sized creeks to rivers, where the substrate consists of clean sand or silty sand. Major threats include anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could result in a LAA determination. |
| Mussel | Gulf Moccasinshell (*Medionidus penicillatus*) | E | Y | LAA | Inhabits areas with a slow to moderate current in medium sized creeks to large rivers where the substrate consists of sand and gravel or silty sand. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Ochlockonee Moccasinshell (*Medionidus simpsonianus*) | E | Y | LAA | Inhabits sand with some gravel substrates in large creeks with current. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |

FWS-005871

| | | | | | |
|---|---|---|---|---|---|
| Mussel | Suwannee moccasinshell (*Medionidus walkeri*) | T | Y | LAA | Inhabits mud, muddy sand, sand, and gravel of larger streams with moderate flows. Major threats include chemical pollution, sedimentation from logging and agriculture, development, pollution from mining and agriculture, invasive species (experiences with the Asiatic Clam (*Corbicula fluminea*)), stream channel instability, water extraction, and eutrophication. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Snail | Stock Island Tree Snail (*Orthalicus reses* [not incl. *nesodryas*]) | T | N | LAA | Inhabits tropical hammock hardwood trees. Major threats include habitat degradation and loss. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Mussel | Oval Pigtoe (*Pleurobema pyriforme*) | E | Y | LAA | Inhabits areas with slow to moderate current in medium-sized creeks to small rivers, where the substrate is silty sand to sand and gravel. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Fuzzy Pigtoe (*Pleurobema strodeanum*) | T | Y | LAA | Inhabits areas with moderate flow in medium sized creek and rivers where the substrate is sand to silty sand. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Southern Kidneyshell (*Ptychobranchus jonesi*) | E | Y | LAA | Inhabits areas with slow to moderate currents in medium creeks tor small rivers, where the substrate consists of firm sand and near bedrock outcroppings. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Choctaw Bean (*Villosa choctawensis*) | E | Y | LAA | Inhabits silty sand and sandy clay substrates in medium-sized creeks and rivers with moderate currents. Major threats are habitat loss and degradation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| **Crustaceans** | | | | | |
| Pond/river/stream | Cypress Crayfish (*Cambarellus blacki*) | URS | N | LAA | Inhabits cypress ponds. It is usually found within submergent and emergent vegetation. The major threat facing Cypress Crayfish is expansion of a nearby oil production facility. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Florida Cave Amphipod (*Crangonyx grandimanus*) | URS | N | LAA | Inhabits caves, wells, and karst springs. The species is likely threatened by changes in detrital flows and depletion of aquifers. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

FWS-005872

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Cave/well/ sinkhole | Hobb's Cave Amphipod (*Crangonyx hobbsi*) | URS | N | LAA | Inhabits subterranean caves and wells. It is often associated with limestone and detritus, and found near cave entrances. It is likely threatened by changes in detrital flows and depletion of aquifers. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) | T | N | LAA | Only known from the Squirrel Chimney, a small sinkhole that connects to a flooded cave system near Gainesville, Alachua County, Florida. Habitat for this species includes groundwater within a flooded limestone cave. Threats to the species include expanded development associated with the growth of Gainesville, Florida, which may alter land uses and groundwater in the vicinity of Squirrel Chimney. Stormwater runoff, septic tank drainage fields, aquifer recharge, herbicide/fertilizer use, and erosion/sediment deposition are some of the primary factors impacting groundwater quality. A small fish, the Redeye Chub (*Notropis harperi*), was detected in Squirrel Chimney during 1994-1996 surveys; this species is believed to prey on Squirrel Chimney Cave Shrimp. Therefore, predation may also constitute a threat to the species. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Orange Cave Crayfish (*Procambarus acherontis*) | URS | N | LAA | Inhabits aquifers. It is associated with karst and the entrances of springs, sinkholes, and underground water features. The major threat facing Orlando Cave Crayfish is expanding human populations and development. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Pond/river/ stream | Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) | URS | N | LAA | Inhabits still waters when water levels are high and burrows when waters recede. The species is usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence. They are restricted to a few small stream systems. Species is susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Protection of inhabited headwater and secondary streams is critical to the species' survival. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Silver Glen Springs Crayfish (*Procambarus attiguus*) | URS | N | LAA | This species has been documented from only one cave system in Ocala Natural Forest, Silver Glen Springs, Marion County, Florida. The species is threatened potentially by water pollution and disturbance from tourists (snorkelers and scuba divers, as the cave is a popular recreation area). Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Bigcheek Cave Crayfish (*Procambarus delicatus*) | URS | N | NLAA | Inhabits subterranean caves. Limited to only one cave system at Alexander Springs within the Ocala National Forest, Lake County, Florida. Their population is threatened by disturbance and habitat degradation from recreational use. As the species only occurs on federally-protect land, the action is NLAA the species. |

FWS-005873

FWS-005874

| Habitat | Species | | | | Description |
|---|---|---|---|---|---|
| Pond/river/ stream | Panama City Crayfish (*Procambarus econfinae*) | P | N | LAA | Occupies shallow, often ephemeral, vegetated, freshwater systems in pine flatwoods or wet prairie/marsh habitats of Bay County, Florida. Threats to this species include habitat loss/degradation/fragmentation, development, hydrologic alterations, silviculture practices, and collection for fish bait. Through impacts to habitat, hydrology, and water quality, the action is could result in a LAA determination. |
| Cave/well/ sinkhole | Santa Fe Cave Crayfish (*Procambarus erythrops*) | URS | N | LAA | Inhabits subterranean pools within southern Suwannee County, Florida. The Santa Fe Cave Crayfish requires waters with low flows. The species is threatened hydrological changes, pollution, and saltwater intrusion. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Orange Lake Cave Crayfish (*Procambarus franzi*) | URS | N | LAA | Inhabits subterranean caves. It is associated with bat colonies and the detrital input provided. Its range is limited to Marion County, Florida, where it is known from three cave locations near Orange Lake. The species is particularly vulnerable because of its limited range and small numbers. The species may be sensitive to impacts to water quality from nearby quarrying. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Coastal Lowland Cave Crayfish (*Procambarus leitheuser*) | URS | N | LAA | Inhabits deep, subterranean, karst cave systems. Most areas of occurrence are tidally influenced and associated with silt. Populations are threatened by changes in water quality such as increased saltwater intrusion resulting from extraction of groundwater for human consumption. The species is additionally threatened by rapid urbanization. Through impacts to habitat, hydrology, and water quality, the action is could result in a LAA determination. |
| Cave/well/ sinkhole | Florida Cave Crayfish (*Procambarus lucifugus*) | URS | N | LAA | Inhabits karstic subterranean caves and sinkholes. Populations are threatened directly by water quality degradation and indirectly by threats facing bat populations (species feeds on bat guano, "prey"). Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Miami Cave Crayfish (*Procambarus milleri*) | URS | N | LAA | Inhabits wells. It has been found at over a dozen sites, those these sites may be interconnected, including populations within the nearby Everglades As the species has an extremely limited range and population size within a metropolitan area, with continually increasing human pressures on aquifers, this species is especially vulnerable to extinction. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Putnam County Cave Crayfish (*Procambarus morrisi*) | URS | N | LAA | Limited to a single cave called Devil's Sink in Putnam County, Florida. This single population is particularly vulnerable to threats posed by water quality degradation as a result of heavy recreational use, pollution (including direct dumping), and groundwater depletion for human consumption. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Pallid Cave Crayfish (*Procambarus pallidus*) | URS | N | LAA | Inhabits caves. It is associated with areas of high flows and karst. Populations are threatened by pollution (because of their likely sensitivity to chemicals) and by disturbance from recreational diving. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| | | | | |
|---|---|---|---|---|
| Cave/well/sinkhole | Black Creek Crayfish (*Procambarus pictus*) | URS | N | LAA | Inhabits small, relatively swift, sand-bottomed, tannic-stained streams, often emanating from sandhills and flowing through or from swampy terrain. Black Creek Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/sinkhole | Spider Cave Crayfish (*Troglocambarus maclanei*) | URS | N | LAA | Inhabits subterranean caves and sinkholes near areas with fresh detrital input, such as bat caves. Major threats to the species include anthropogenic impacts on water quality and reduced detritus flows. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| **Insects** | | | | | |
| Caddisfly | Logan's Agarodes Caddisfly (*Agarodes logani*) | URS | N | LAA | Has only been observed from one stream in Gadsden County, Florida. As the population is restricted to such a small area and adjacent to an active farm, the species is at risk from farming practices which may result in pollution, siltation, or habitat degradation. Impacts to stream habitat near this species location, changes in hydrological regimes and water quality could result in a LAA determination. |
| Butterfly | Florida Leafwing (*Anaea troglodyta floridalis*) | E | Y | LAA | Inhabits pine rocklands. The species has only one host plant, the pineland croton (*Croton linearis*). Only one population within Everglades National Park is known to be extant. This species may be at imminent risk of extinction as the pinelands habitats on which it depends are very limited and continue to be destroyed by development and tropical storm events. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Frosted Elfin Butterfly (*Callophrys irus*) | UR | Y | LAA | Inhabits pine barrens. The major causes of population decline to their populations are habitat loss caused by development, invasive species, succession, and incompatible vegetation management, as well as the limiting factor of small population sizes. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Beetle | Miami Tiger Beetle (*Cicindelidia floridana*) | E | N | LAA | Prefers open, bare, white to gray sandy areas in pine rockland habitat. Threats to this species include habitat loss/degradation/fragmentation, development, non-native species encroachment, and specimen collection by enthusiasts. Habitat fragmentation could result in a LAA determination. |
| Butterfly | Nickerbean Blue Butterfly (*Cyclargus ammon*) | TS | N | LAA | Inhabits tropical hardwood hammock forests. Listed because of similar appearance, otherwise species seems stable. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

FWS-005875

| Group | Species | | | Determination | Notes |
|---|---|---|---|---|---|
| Butterfly | Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) | E | N | LAA | Inhabits coastal hardwood hammocks, dunes, and scrub habitats. Current threats to the species include habitat loss and fragmentation, illegal collection, pesticides, impacts to host plants from introduced iguanas, loss of genetic diversity, and stochastic environmental events (natural or human-caused). Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Monarch Butterfly (*Danaus plexippus plexippus*) | URS | N | LAA | Widespread. Monarch populations face many threats, but primary among these is the loss of their host plants (milkweed, *Asclepias* spp.) as a result of intensive pesticide use, particularly glyphosate. Habitat fragmentation associated with the action could result in a LAA determination. |
| Butterfly | Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) | URS | N | LAA | Inhabits sedge patches within wetlands and swamps. Threats include conversion of wetland habitat to urbanization, and pesticides. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Palatka Skipper Butterfly (*Euphyes pilatka klotsi*) | URS | N | LAA | Inhabits areas dominated by sawgrass near mangroves in tropical pinelands and sawgrass marshes. Major threats to the subspecies include habitat loss as a result of development, and the use of insecticides. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Dragonfly | Westfall's Clubtail Dragonfly (*Gomphus westfalli*) | URS | N | LAA | Inhabits sphagnum-bog trickles and streams. The primary threats to their populations are "excessive clearcutting" and altered fire regimes. Their extremely limited range (only about 25 kilometers) makes their populations especially vulnerable. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) | TS | N | LAA | Inhabits grasslands, parks, along roadsides, and open woodlands. Listed because of similar appearance. The population in Florida is considered secure. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) | E | N | LAA | It is currently limited to the Florida Keys. Populations are threatened by habitat destruction and biocides (as a result of mosquito control). This species is especially vulnerable to extinction because of its small size, isolated and small populations, and limited range. Through impacts to habitat (fragmentation and changes in hydrology), the action could result in a LAA determination. |
| Bee | Gulf Coast Solitary Bee (*Hesperapis oraria*) | URS | N | LAA | Inhabits sandy coastal dunes. Threats include: habitat loss, degradation, and fragmentation as a result of development; pesticide use; competition with European Honeybees; sea level rise and hurricanes (intensified by climate change); limited genetic diversity; and a lack of protection. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| Group | Species | | | | Description |
|---|---|---|---|---|---|
| Caddisfly | Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) | URS | N | LAA | This species has a very small range and is only known from two spring-run streams in Gadsden County, Florida. The species is at risk of nearby farming practices which may result in pollution, silation, or habitat degradation. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Caddisfly | Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morse*) | URS | NN | LAA | Inhabits flowing waters, typically soft blackwater streams. This species is sensitive to siltation and pollution caused by practices such as unsustainable forestry and conversion of land to agricultural use. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Cassius Blue Butterfly (*Leptotes cassius theonus*) | TS | | LAA | Inhabits grassland, urban areas, hardwood forests, and scrub. Listed because of similar appearance, otherwise species seems stable. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Dragonfly | Purple Skimmer Dragonfly (*Libellula jesseana*) | URS | N | LAA | Inhabits "clear-water, sand-bottomed lakes bordered by maiden-cane grass and St. John's Wort shrubs. Currently, the species might/may only remain at a single lake within a State park. This species is extremely sensitive to pollution and eutrophication. The major threat to populations is lakeshore development and impacts to water quality. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Beetle | American Burying Beetle (*Nicrophorus americanus*) | E | N | No effect | Extirpated in Florida. This action would have no effect on the species. |
| Caddisfly | Little oecelis longhorn caddisfly (*Oecetis parva*) | URS | N | LAA | Inhabits natural lakes and springs. This species is sensitive to activities that affect water quality and hydrologic regimes such as agriculture, urban development, forestry, water withdrawal, and nutrient loading. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Dragonfly | Southern Snaketail Dragonfly (*Ophiogomphus australis*) | URS | N | LAA | Inhabits graveled streams. Major threats to their populations are water quality degradation from a variety of sources including gravel mining, pesticide use, and deforestation. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Bee | Blue Calamintha Bee (*Osmia calaminthae*) | URS | N | LAA | Inhabits sand pine and scrub habitat, as a specialist on the threatened Asher's calamint (*Calamintha ashei*). Threats include pesticide drift and destructive off-road recreational activities. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Dragonfly | Calvert's Emerald Dragonfly (*Somatochlora calverti*) | URS | N | LAA | Habitat is unknown but is thought to include "boggy forest seepages." Little is known about the threats that affect this species. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Bartram's Scrub-hairstreak (*Strymon acis bartrami*) | E | Y | LAA | Inhabits pine rocklands. The pineland croton is the host plant. The subspecies is threated by fire suppression, habitat loss, and climate change/sea level rises. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

FWS-005877

| | Species | | | | |
|---|---|---|---|---|---|
| Dragonfly | Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) | URS | N | LAA | Inhabits pristine stream and river habitats with sandy bottoms. The major threat is pollution as a result of development, clearcutting, and pesticide use. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Caddisfly | Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) | URS | N | No effect | Extirpated in Florida. This action would have no effect on the species. |
| **Plants** | | | | | |
| Subshrub | Meadow Joint-vetch (*Aeschynomene pratensis*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and potential for invasive species introduction, the action could result in a LAA determination. |
| Shrub | Crenulate Lead-plant (*Amorpha crenulata*) | E | N | LAA | This species is restricted to poorly drained Opalocka sands within pine rocklands or in wet prairies with Opalocka-rock outcrop complex soil. Impacts to wetlands may affect this species. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Blodgett's Silverbush (*Argythamnia blodgettii*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Four-petal Pawpaw (*Asimina tetramera*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Purpledisk Honeycombhead Sunflower (*Balduina atropurpurea*) | URS | N | LAA | Habitat for this species includes wet pine flatwoods and savannas, seepage slopes, pitcherplant bogs, and wet ditches. Through impacts to habitat and changes in hydrologic regime, the action could result in a LAA determination. |
| Perennial Forb | Apalachicola Wild Indigo (*Baptisia megacarpa*) | URS | N | LAA | Habitat includes mixed hardwood and hardwood-pine forests, in proximity to floodplains, streams, or ravines. Through impacts to habitat, changes in hydrologic regime, and potential for invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Florida Bonamia (*Bonamia grandiflora*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Florida Brickell-bush (*Brickellia mosieri*) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Brooksville Bellflower (*Campanula robinsiae*) | E | N | LAA | There are only four, possibly five sites where this wetland dependent species occurs. Four of these sites meet recovery criteria of being protected. If wetland impacts occurred at the site on private land, this could result in a LAA determination. This species occurs in wet prairies and along the edges of ponds near pastureland or in adjacent hardwood forests. |

FWS-005878

| Growth Form | Species | Status | | Effect | Comment |
|---|---|---|---|---|---|
| Cactus | Fragrant Prickly-apple (*Cereus eriophorus* var. *fragrans*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the varietal. |
| Perennial Forb | Deltoid Spurge (*Chamaesyce deltoidea* ssp. *Deltoidea*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Perennial Forb | Pineland Sandmat (*Chamaesyce deltoidea pinetorum*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Perennial Forb | Wedge Spurge (*Chamaesyce deltoidea serpyllum*) | E | N | No effect | This species has a very restricted range. It is endemic to, and known only from Big Pine Key. However, habitat for this species is upland pine rocklands and along roadways. Based on habitat requirements, the action is anticipated to have no effect on the subspecies. |
| Annual Forb | Garber's Spurge (*Chamaesyce garberi*) | T | N | No effect. | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Pygmy Fringe-tree (*Chionanthus pygmaeus*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Cape Sable Thoroughwort (*Chromolaena frustrata*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Golden Aster (*Chrysopsis floridana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Lichen | Florida Perforate Cladonia (*Cladonia perforata*) | E | N | No effect. | Occurs in dry scrub environments. The action is anticipated to have no effect on the species. |
| Perennial Forb | Pigeon Wings (*Clitoria fragrans*) | F | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Short-leaved Rosemary (*Conradina brevifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

| | | E | N/Y | Effect | Comment |
|---|---|---|---|---|---|
| Shrub | Etonia Rosemary (*Conradina etonia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Apalachicola Rosemary (*Conradina glabra*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Cactus | Florida Semaphore Cactus (*Consolea corallicola*) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Ciliate-leaf Tickseed Sunflower (*Coreopsis integrifolia*) | E | Y | LAA | This species occurs in floodplain and streambank habitats, on the edges of swamp forests, and the borders of brackish marshes. Through impacts to habitat and changes in hydrology, the action could result in a LAA determination. |
| Perennial Forb | Avon Park Harebells (*Crotalaria avonensis*) | E | N | No effect | Habitat is xeric white sand scrub. However, this species is known from only three sites in Polk and Highlands Counties near Avon Park. The action is anticipated to have no effect on the species. |
| Annual Forb | Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) | E | N | LAA | There are only two natural populations of this annual vine in Florida. It is a wetland obligate formerly known from swampy forest and hammocks. This species is presently restricted to the banks of ditches and wet road shoulders. Through impacts to habitat and changes in hydrologic regime, the action is LAA the species. |
| Shrub | Florida Prairie-Clover (*Dalea carthagenensis floridana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Substrub | Beautiful Pawpaw (*Deeringothamnus pulchellus*) | E | N | LAA | This facultative species generally occurs in upland habitat in xeric and mesic pine flatwoods. As pine flatwoods are often bordered by wetlands, impacts to wetland habitats may affect this species. Through potential introduction of invasive species, the action could result in a LAA determination. |
| Substrub | Rugel's Pawpaw (*Deeringothamnus rugelii*) | E | N | LAA | This species occurs in mesic and wet flatwood habitats. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Garrett's Mint (*Dicerandra christmanii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Longspurred Mint (*Dicerandra cornutissima*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Scrub Mint (*Dicerandra frutescens*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

| | Species | Status | | Effect | Comment |
|---|---|---|---|---|---|
| Perennial Forb | Lakela's Mint (*Dicerandra immaculate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Graminoid | Florida Pineland Crabgrass (*Digitaria pauciflora*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, hydrology, and potential invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Clam-shell Orchid (*Encyclia cochleata* var. *triandra*) | NW | N | LAA | Epiphytic orchid occurring on trees in wetlands so impacts to wetlands may impact this species. Through impacts to habitat and changes in hydrologic regime, the action could result in a LAA determination. |
| Perennial Forb | Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) | URS | N | LAA | Habitat for this epiphytic orchid is generally pop ash and pond apple inhabiting swamps and sloughs which would be affected by impacts to wetlands. Impacts to habitat could result in LAA determination. |
| Perennial Forb | Blackbract Pipewort (*Eriocaulon nigrobracteatum*) | URS | N | LAA | This species is endemic to Florida and occurs in wetland habitats. Impacts to habitat and changes in hydrology/nutrient cycles could result in a LAA determination. |
| Perennial Forb | Scrub Buckwheat (*Eriogonum longifolium* var. *gnaphalifolium*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the varietal. |
| Perennial Forb | Snakeroot (Wedgeleaf Eryngo) (*Eryngium cuneifolium*) | E | N | No effect | This is an upland species and although it has an extremely restricted range, most of the 20 known occurrences are located on three preserves. The action is anticipated to have no effect on the species. |
| Perennial Forb | Telephus Spurge (*Euphorbia telephioides*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Small's Milkpea (*Galactia smallii*) | E | N | No effect | This Florida endemic species is known from only six populations in pine rockland habitat. However, five of these populations are on managed areas. Based on this restricted range on protected lands, the action is anticipated to have no effect on the species. |
| Perennial Forb | Harper's Beauty (*Harperocallis flava*) | E | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Impacts to habitat and changes in hydrology could result in a LAA determination. |
| Cactus | Aboriginal Prickly-apple (*Harrisia* (=*Cereus*) *aboriginum* (=*gracilis*)) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Hartwrightia Sunflower (*Hartwrightia floridana*) | URS | N | LAA | This species occurs in a variety of wetland habitats including acidic seeps and bogs among others. Impacts to habitat, hydrology, and nutrient cycles could result in a LAA determination. |

FWS-005881

| Group | Species | Code | N | Effect | Comment |
|---|---|---|---|---|---|
| Perennial Forb | Henry's Spider-lily (*Hymenocallis henryae*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Impacts to habitat and changes in hydrology could result in a LAA determination. |
| Perennial Forb | Highlands Scrub Hypericum (*Hypericum cumulicola*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Edison's Ascyrum St. Johns Wort (*Hypericum edisonianum*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Subshrub | Smooth Barked St. Johns Wort (*Hypericum lissophloeus*) | URS | N | LAA | This species occurs on the fluctuating shores of karst ponds and small sandhill lakes. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Tree | Yellow Anisetree (*Illicium parviflorum*) | NW | N | LAA | Occurs on the banks of spring run or seepage springs, hydric hammock, and bottomland forest. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Beach Jacquemontia (*Jacquemontia reclinata*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cooley's Water-willow (*Justicia cooleyi*) | E | N | LAA | This Florida endemic species occurs in several wetland habitats including streams, swamp woodlands, and also in mesic hammocks. Through impacts to habitat, hydrology, and the potential of invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Scrub Blazingstar (*Liatris ohlingerae*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Panhandle Lily (*Lilium iridollae*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, the action could result in a LAA determination. |
| Shrub | Bog Spicebush (*Lindera subcoriacea*) | URS | N | LAA | This species has a narrow ecological niche. It is often found in sphagnum bogs, or seepage bogs. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Sand Flax (*Linum arenicola*) | E | N | LAA | Nature Serve reports this species occurs in temporary pools of palustrine habitats, and further states that it is documented from solution pits and shallow soils of ephemeral pools on limerock or in open pinelands. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

FWS-005882

| Life Form | Species | Status | | Determination | Comment |
|---|---|---|---|---|---|
| Annual Forb | Carter's Small Flowered Flax (*Linum carteri carteri*) | E | Y | LAA | This species occurs in disturbed margins of pine rocklands. Pine rockland habitat has been greatly reduced, especially outside of Everglades National Park, where only one percent of pinelands remain as fragmented patches. Through impacts to habitat and potential for invasive species introduction, the action is LAA the species. |
| Perennial Forb | West's Flax (*Linum westii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Boykin's Lobelia (*Lobelia boykinii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Raven's Seedbox (*Ludwigia ravenii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Subshrub | Scrub Lupine (*Lupinus aridorum*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Curtis' Loosestrife (*Lythrum curtissii*) | URS | N | LAA | Occurs in bogs, seeps, acid or calcareous swamps, karst ponds, creek swamps, floodplains, tidal flats, streambanks, and tidal river mouths. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Lowland Loosestrife (*Lythrum flagellare*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | White Birds-in-a-nest (*Macbridea alba*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Godfrey's Stitchwort (*Minuartia godfreyi*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Annual Forb | Needleleaf or Narrowleaf Naiad Water-nymph (*Najas filifolia*) | URS | N | LAA | Habitat for this annual aquatic species is typically tannic-acid tinted ponds and lakes. Through impacts to habitat, hydrology, and potential invasive species introduction, the action is LAA the species. |
| Subshrub | Britton's Beargrass (*Nolina brittoniana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cape Sable Orchid (*Oncidium undulatum*) | URS | N | LAA | This is an epiphytic orchid that attaches to tree trunks in hammocks, cypress swamps, buttonwood forest, and cypress swamps. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

FWS-005883

| Group | Common name (Scientific name) | Status | N/Y | Effect | Description |
|---|---|---|---|---|---|
| Annual Forb | Papery Whitlow-wort (Paronychia chartacea) | T | N | LAA | There are two distinct subspecies, both are listed. *Paronychia chartacea* ssp. *minima* occurs almost exclusively on the sandy margins of karst ponds and impacts to Karst ponds could result in a LAA determination for this subspecies. |
| Cactus | Key tree Cactus (Pilosocereus robinii) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Godfrey's Butterwort (Pinguicula ionantha) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Lewton's Polygala Milkwort (Polygala lewtonii) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Tiny Polygala Milkwort (Polygala smallii) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Horton Wireweed (small) (Polygonella basiramia) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Sandlace (Woody Wireweed) (Polygonella myriophylla) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Pondweed (Potamogeton floridanus) | URS | N | LAA | Submerged aquatic herb inhabiting slow moving backwater streams and rivers. Known form only the Blackwater River and its tributaries. Through impacts to habitat and hydrology/water quality, the action could result in a LAA determination. |
| Shrub | Scrub Plum (Prunus geniculate) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | White Meadowbeauty (Rhexia parviflora) | URS | N | LAA | Occurs in wetland habitats and is sensitive to changes in ground and surface hydrology. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Panhandle Meadowbeauty (Rhexia salicifolia) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, hydrology, nutrient cycles, and water quality, the action could result in a LAA determination. |
| Shrub | Chapman Rhododendron (Rhododendron chapmanii) | E | Y | LAA | This species usually inhabits the transitional area between upland mesic or scrubby flatwoods and floodplain swamps or baygalls. Through impacts to habitat and potential introduction of invasive species, the action could result in a LAA determination. |

| Growth Form | Species | Status | | Determination | Comment |
|---|---|---|---|---|---|
| Graminoid | Hairy Peduncled Beakrush (*Rhynchospora crinipes*) | URS | N | LAA | Occurs in riparian habitats along stream channels and terraces and sand-clay bars. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Shrub | Miccosukee Gooseberry (*Ribes echinellum*) | T | N | LAA | This species occurs in mesic forest communities. Through impacts to habitat and potential introduction of invasive species, the action could result in a LAA determination. |
| Perennial Forb | Eared Coneflower (*Rudbeckia auriculata*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Tree | Florida Willow (*Salix floridana*) | URS | N | LAA | This species occurs in roadside ditches, near springs, hydric hammocks, and densely wooded floodplains. Through impacts to habitat, hydrology, and potential introduction of invasive species, the action could result in a LAA determination. |
| Perennial Forb | Gulf Sweet Pitcherplant (*Sarracenia rubra ssp. gulfensis*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | American Chaffseed (*Schwalbea americana*) | E | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Florida Skullcap (*Scutellaria floridana*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Shrub | Everglades Bully (*Sideroxylon reclinatum ssp. austrofloridense*) | T | N | LAA | This species occurs in low-lying oak flatwoods. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Shrub | Georgia Bully (*Sideroxylon thorne*) | URS | N | LAA | This species occurs in wet woods bordering streams or cypress ponds so there is potential for this species to be affected by impacts to wetlands. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Fringed Campion (*Silene polypetala*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Gentian Pinkroot (*Spigelia gentianoides*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cooley's Meadow Rue (*Thalictrum cooleyi*) | E | N | LAA | This species occurs in bogs and wet pine savannahs, flatwoods and seepage slopes. In Florida this species is known from only one occurrence, on a timber company land utility right of way through former flatwoods. This population may be extirpated (USFWS 2009). However, as this possible occurrence is on private property, impacts could occur. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| | | FLS | CH? | Finding | |
|---|---|---|---|---|---|
| Tree | Florida Torreya (*Torreya taxifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Bristle Fern (*Trichomanes punctatum* ssp. *floridanum*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on this subspecies. |
| Perennial Forb | Ocala Vetch (*Vicia ocalensis*) | NW | N | NLAA | All known occurrences of this obligate wetland species are from the Ocala National Forest and Lake Woodruff National Wildlife Refuge. It is threatened by hydrologic changes from logging. However, since all known occurrences are on protected land, the action is NLAA the species. |
| Annual Forb | Wide-leaf Warea (*Warea amplexifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Carter's Mustard (*Warea carteri*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

FLS – Federal Listing Status under the Endangered Species Act (ESA) CH? – Has critical habitat been designated?

**Table Text Key:**

FLS – E (Endangered), T (Threatened), TS (Threatened due to Similarity of Appearance), C (Candidate), P (Proposed for listing), UR (Under Review), URS (Under Review, Substantial Finding), NW (Not Warranted Finding).* (Listing status of DPS that occurs in Florida. Other DPSs may have different listing statuses in other region).

CH? – Y (Yes), N (No)

Finding – NLAA (May Affect Not Likely to Adversely Affect), LAA (May Affect Likely to Adversely Affect)

# Appendix D
## Figures 1 through 6

FWS-005887



Florida Department of Environmental Protection
404 Assumption Biological Assessment

Combined Freshwater Wetlands

FIGURE 1

Project No. 11206416
Revision No. -
Date June 16, 2020







Florida Department of Environmental Protection
404 Assumption Biological Assessment

Freshwater Habitats
Lakes

FIGURE 4



Freshwater Habitats
Rivers and Streams

FIGURE 5

FWS-005892



# Appendix E
# Dredge and Fill Activities as Defined in the Corps Database

FWS-005894

FWS-005895

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

- \ AGRICULTURE \ CONVERSION
- \ AGRICULTURE \ NON-EXEMPT
- \ AQUACULTURE \ FINFISH
- \ AQUACULTURE \ PLANTS
- \ AQUACULTURE \ SHELLFISH
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ COMMERCIAL
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ ENERGY GENERATION \ NUCLEAR
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ INTAKE/OUTFALL
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ ROADS \ CULVERT
- \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ UTILITY \ AERIAL
- \ DEVELOPMENT \ COMMERCIAL
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ INDUSTRIAL
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RECREATIONAL
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
- \ DEVELOPMENT \ COMMERCIAL, \ STRUCTURE \ BULKHEAD
- \ DEVELOPMENT \ COMMERCIAL, \ STRUCTURE \ INTAKE/OUTFALL
- \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ AIRPORT \ FACILITY
- \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ RAIL \ FACILITY
- \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ STRUCTURE \ INTAKE/OUTFALL
- \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ ROADS \ CULVERT
- \ DEVELOPMENT \ INDUSTRIAL
- \ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL

FWS-005896

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RECREATIONAL
\ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RECREATIONAL, \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ ENHANCEMENT
\ DEVELOPMENT \ RECREATIONAL, \ STRUCTURE \ BOAT RAMP
\ DEVELOPMENT \ RECREATIONAL, \ STRUCTURE \ DOCK FIXED , \ STRUCTURE \ BREAKWATER
\ DEVELOPMENT \ RECREATIONAL, \ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ BULKHEAD
\ DEVELOPMENT \ RECREATIONAL, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ MITIGATION \ ENHANCEMENT, \ MITIGATION \ CREATION
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ STRUCTURE \ MARINA, \ DREDGING \ NAVIGATION \ PRIVATE
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ STRUCTURE \ MARINA, \ STRUCTURE \ BOAT RAMP
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ UTILITY \ BURIED
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RECREATIONAL
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DREDGING \ CHANNELIZATION, \ STRUCTURE \ BOAT LIFT
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ OTHER \ BANK STABILIZATION
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ BULKHEAD
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ DOCK FIXED
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ MARINA

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ MISCELLANEOUS
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CULVERT
\ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ DREDGING \ BOAT SLIP
\ DREDGING \ CHANNELIZATION
\ DREDGING \ CHANNELIZATION, \ STRUCTURE \ WEIR
\ DREDGING \ DISPOSAL
\ DREDGING \ DISPOSAL, \ DREDGING \ MAINTENANCE, \ STRUCTURE \ INTAKE/OUTFALL
\ DREDGING \ GENERAL
\ DREDGING \ GENERAL, \ OTHER \ BANK STABILIZATION, \ MITIGATION \ ENHANCEMENT
\ DREDGING \ GENERAL, \ STRUCTURE \ BOAT RAMP, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ DREDGING \ GENERAL, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ OTHER \ BANK STABILIZATION
\ DREDGING \ MAINTENANCE
\ DREDGING \ MAINTENANCE, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ BOAT HOUSE
\ DREDGING \ MAINTENANCE, \ DREDGING \ CHANNELIZATION
\ DREDGING \ MAINTENANCE, \ DREDGING \ GENERAL
\ DREDGING \ MAINTENANCE, \ OTHER \ BANK STABILIZATION
\ DREDGING \ MAINTENANCE, \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ BULKHEAD
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ GABION
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL
\ DREDGING \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR
\ DREDGING \ MAINTENANCE, \ TRANSPORTATION \ PIPELINE \ MAINTENANCE
\ DREDGING \ NAVIGATION \ PRIVATE, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ ENERGY GENERATION \ NATURAL GAS
\ ENERGY GENERATION \ NATURAL GAS, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ ENERGY GENERATION \ NATURAL GAS, \ TRANSPORTATION UTILITY \ STRUCTURE
\ ENERGY GENERATION \ SOLAR
\ MINING AND DRILLING \ DRILLING \ ACCESS
\ MINING AND DRILLING \ DRILLING \ FACILITIES
\ MINING AND DRILLING \ MINING \ FACILITES
\ MINING AND DRILLING \ MINING \ GRAVEL, \ MINING AND DRILLING \ MINING \ SAND
\ MINING AND DRILLING \ MINING \ OTHER MINERAL
\ MINING AND DRILLING \ MINING \ PHOSPHATE

FWS-005897

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ MINING AND DRILLING \ MINING \ ROCK
\ MINING AND DRILLING \ MINING \ SAND
\ MINING AND DRILLING \ MINING \ SAND, \ MINING AND DRILLING \ MINING \ ROCK
\ MITIGATION \ CREATION
\ MITIGATION \ CREATION, \ DREDGING \ MAINTENANCE
\ MITIGATION \ ENHANCEMENT
\ MITIGATION \ ENHANCEMENT, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ MITIGATION \ FISH/WILDLIFE \ CREATION
\ MITIGATION \ FISH/WILDLIFE \ CREATION, \ OTHER \ BANK STABILIZATION
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ DEVELOPMENT \ RECREATIONAL
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ MITIGATION \ FISH/WILDLIFE \ CREATION, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ FISH/WILDLIFE \ CREATION
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ OTHER \ DAMS \ LOW WATER, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ TRANSPORTATION \ ROADS \ CULVERT
\ MITIGATION \ FISH/WILDLIFE \ PLANTING
\ MITIGATION \ FISH/WILDLIFE \ RESTORATION
\ MITIGATION \ MITIGATION BANK
\ MITIGATION \ MITIGATION BANK, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ MITIGATION \ MITIGATION BANK, \ MITIGATION \ PRESERVATION, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ STREAM
\ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ CREATION, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ RESTORATION \ WETLAND, \ OTHER \ DAMS \ REMOVAL
\ MITIGATION \ RESTORATION \ WETLAND
\ MITIGATION \ RESTORATION \ WETLAND, \ AGRICULTURE \ CONVERSION
\ MITIGATION \ RESTORATION \ WETLAND, \ DEVELOPMENT \ RECREATIONAL
\ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ CREATION, \ MITIGATION \ RESTORATION \ STREAM
\ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ RESTORATION \ STREAM
\ MITIGATION \ RESTORATION \ WETLAND, \ TRANSPORTATION \ ROADS \ CULVERT
\ MITIGATION \ WETLAND RECLAMATION
\ MITIGATION \ WETLAND RECLAMATION, \ DREDGING \ MAINTENANCE
\ OTHER \ BANK STABILIZATION
\ OTHER \ BANK STABILIZATION, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ OTHER \ BANK STABILIZATION, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY

FWS-005898

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ OTHER \ BANK STABILIZATION, \ DREDGING \ GENERAL
\ OTHER \ BANK STABILIZATION, \ DREDGING \ MAINTENANCE
\ OTHER \ BANK STABILIZATION, \ DREDGING \ NAVIGATION \ PRIVATE
\ OTHER \ BANK STABILIZATION, \ MITIGATION \ ENHANCEMENT
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BULKHEAD
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ GABION
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ INTAKE/OUTFALL
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ INTAKE/OUTFALL, \ DREDGING \ GENERAL
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MAINTENANCE
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MARINA, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ OTHER \ BANK STABILIZATION, \ STRUCTURE \ WATER CONTROL
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ MAINTENANCE
\ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ OTHER \ CLEANUP HAZARDOUS OR TOXIC WASTES
\ OTHER \ DAMS \ COFFER
\ OTHER \ DAMS \ COFFER, \ OTHER \ BANK STABILIZATION
\ OTHER \ DAMS \ GENERAL
\ OTHER \ DAMS \ LOW WATER, \ OTHER \ DAMS \ REMOVAL
\ OTHER \ DAMS \ MAINTENANCE
\ OTHER \ DAMS \ MAINTENANCE, \ STRUCTURE \ GABION, \ STRUCTURE \ WATER CONTROL
\ OTHER \ DAMS \ REMOVAL
\ OTHER \ DAMS \ REMOVAL, MITIGATION \ WETLAND RECLAMATION
\ OTHER \ DAMS \ RESERVOIR
\ OTHER \ DAMS \ WEIR
\ OTHER \ DAMS \ WEIR, \ OTHER \ DAMS \ MAINTENANCE
\ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM
\ OTHER \ RESTRICTED AREAS
\ OTHER \ SURVEY ACTIVITIES
\ STRUCTURE \ BOAT LIFT
\ STRUCTURE \ BOAT LIFT, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BOAT LIFT, \ STRUCTURE \ MISCELLANEOUS, \ STRUCTURE \ DOCK \ FIXED
\ STRUCTURE \ BOAT RAMP
\ STRUCTURE \ BOAT RAMP, \ DREDGING \ GENERAL, \ DEVELOPMENT \ COMMERCIAL
\ STRUCTURE \ BOAT RAMP, \ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ RECREATIONAL

FWS-005899

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ STRUCTURE \ BOAT RAMP, \ STRUCTURE \ MARINA

\ STRUCTURE \ BREAKWATER

\ STRUCTURE \ BREAKWATER, \ MITIGATION \ FISH/WILDLIFE \ CREATION

\ STRUCTURE \ BRIDGE/RELATED WORK

\ STRUCTURE \ BRIDGE/RELATED WORK, \ STRUCTURE \ INTAKE/OUTFALL

\ STRUCTURE \ BRIDGE/RELATED WORK, \ STRUCTURE \ MAINTENANCE

\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT

\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)

\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ ROADS \ CULVERT

\ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS

\ STRUCTURE \ BULKHEAD

\ STRUCTURE \ BULKHEAD, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY

\ STRUCTURE \ BULKHEAD, \ DREDGING \ BOAT SLIP

\ STRUCTURE \ BULKHEAD, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ DOCK \ FIXED

\ STRUCTURE \ BULKHEAD, \ DREDGING \ MAINTENANCE, \ STRUCTURE \ DOCK \ FIXED

\ STRUCTURE \ BULKHEAD, \ OTHER \ BANK STABILIZATION

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ DOCK \ FIXED

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BOAT LIFT

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ INTAKE/OUTFALL

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ MAINTENANCE

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ MARINA

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ UTILITY LINE OR STRUCTURE

\ STRUCTURE \ BULKHEAD, \ STRUCTURE \ WATER CONTROL

\ STRUCTURE \ DOCK \ FIXED

\ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ COMMERCIAL

\ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY

\ STRUCTURE \ DOCK \ FIXED, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BREAKWATER

\ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BOAT LIFT

\ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BULKHEAD

\ STRUCTURE \ DOCK \ FIXED, \ TRANSPORTATION \ AIRPORT \ RUNWAY, \ STRUCTURE \ BOAT RAMP

\ STRUCTURE \ DOCK \ FLOATING

\ STRUCTURE \ ELEV REC DECK

\ STRUCTURE \ GABION

\ STRUCTURE \ GABION, \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE

\ STRUCTURE \ GABION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT

\ STRUCTURE \ INTAKE/OUTFALL

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ COMMERCIAL
\ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ STRUCTURE \ INTAKE/OUTFALL, \ DREDGING \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ ENERGY GENERATION \ NATURAL GAS
\ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ DAMS \ WEIR
\ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ INTAKE/OUTFALL, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ STRUCTURE \ INTAKE/OUTFALL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ STRUCTURE \ MAINTENANCE
\ STRUCTURE \ MAINTENANCE, \ OTHER \ BANK STABILIZATION
\ STRUCTURE \ MAINTENANCE, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ INTAKE/OUTFALL
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR
\ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WEIR
\ STRUCTURE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT
\ STRUCTURE \ MARINA
\ STRUCTURE \ MARINA, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ STRUCTURE \ MARINA, \ DREDGING \ NAVIGATION \ PRIVATE
\ STRUCTURE \ MARINA, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ STRUCTURE \ MISCELLANEOUS
\ STRUCTURE \ MISCELLANEOUS, \ DEVELOPMENT \ RECREATIONAL
\ STRUCTURE \ MISCELLANEOUS, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BULKHEAD
\ STRUCTURE \ MISCELLANEOUS, \ STRUCTURE \ WATER CONTROL, \ OTHER \ DAMS \ WEIR
\ STRUCTURE \ PIER \ NON-RESIDENTIAL
\ STRUCTURE \ PILE/DOLPHIN, \ DREDGING \ BOAT SLIP
\ STRUCTURE \ RAMP
\ STRUCTURE \ RAMP , \ STRUCTURE \ RECREATIONAL
\ STRUCTURE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT
\ STRUCTURE \ MARINA

FWS-005901

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

- \ STRUCTURE \ RECREATIONAL
- \ STRUCTURE \ RECREATIONAL, \ DEVELOPMENT \ RECREATIONAL
- \ STRUCTURE \ RECREATIONAL, \ STRUCTURE \ PIER \ NON-RESIDENTIAL, \ OTHER \ BANK STABILIZATION
- \ STRUCTURE \ RECREATIONAL, \ STRUCTURE \ WATER CONTROL
- \ STRUCTURE \ REMOVAL
- \ STRUCTURE \ REMOVAL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
- \ STRUCTURE \ SCIENTIFIC DEVICE
- \ STRUCTURE \ UNSPECIFIED
- \ STRUCTURE \ UNSPECIFIED, \ DREDGING \ MAINTENANCE
- \ STRUCTURE \ UNSPECIFIED, \ STRUCTURE \ WATER CONTROL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ INDUSTRIAL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ RECREATIONAL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ ENERGY GENERATION \ OIL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ MITIGATION \ ENHANCEMENT
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ OTHER \ BANK STABILIZATION
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ INTAKE/OUTFALL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ MAINTENANCE
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ WATER CONTROL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ ACCESS ROAD
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ AERIAL
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ BURIED
- \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
- \ STRUCTURE \ WATER CONTROL
- \ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
- \ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
- \ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ RECREATIONAL
- \ STRUCTURE \ WATER CONTROL, \ DREDGING \ MAINTENANCE
- \ STRUCTURE \ WATER CONTROL, \ MITIGATION \ CREATION
- \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ INTAKE/OUTFALL
- \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ MAINTENANCE
- \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR
- \ STRUCTURE \ WATER CONTROL, \ TRANSPORTATION \ ROADS \ CULVERT
- \ STRUCTURE \ WEIR
- \ STRUCTURE \ WEIR, \ STRUCTURE \ BULKHEAD

FWS-005902

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ AIRPORT \ FACILITY
\ TRANSPORTATION \ AIRPORT \ FACILITY, \ TRANSPORTATION \ AIRPORT \ MAINTENANCE
\ TRANSPORTATION \ AIRPORT \ FACILITY, \ TRANSPORTATION \ AIRPORT \ ROADS \ CULVERT
\ TRANSPORTATION \ AIRPORT \ MAINTENANCE
\ TRANSPORTATION \ AIRPORT \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL
\ TRANSPORTATION \ AIRPORT \ RUNWAY
\ TRANSPORTATION \ AIRPORT \ RUNWAY, \ TRANSPORTATION \ AIRPORT \ FACILITY
\ TRANSPORTATION \ AIRPORT \ RUNWAY, \ TRANSPORTATION \ AIRPORT \ MAINTENANCE
\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ BRIDGE \ MAINTENANCE
\ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ STRUCTURE \ BRIDGE/RELATED WORK
\ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ TRANSPORTATION \ BRIDGE \ PROTECTION
\ TRANSPORTATION \ BRIDGE \ PROTECTION
\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT
\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ RAIL \ FACILITY
\ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ BRIDGE/RELATED WORK
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ MAINTENANCE
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ UNSPECIFIED
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ PIPELINE \ ACCESS ROAD
\ TRANSPORTATION \ PIPELINE \ ACCESS ROAD, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ STRUCTURE
\ TRANSPORTATION \ PIPELINE \ AERIAL
\ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ PIPELINE \ BURIED, \ OTHER \ DAMS \ COFFER
\ TRANSPORTATION \ PIPELINE \ BURIED, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ AERIAL
\ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS

FWS-005903

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ PIPELINE \ BURIED), \ TRANSPORTATION \ PIPELINE \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ PIPELINE \ MAINTENANCE
\ TRANSPORTATION \ PIPELINE \ MAINTENANCE, \ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ PIPELINE \ STRUCTURE
\ TRANSPORTATION \ PIPELINE \ STRUCTURE, \ DREDGING \ GENERAL
\ TRANSPORTATION \ PIPELINE \ STRUCTURE, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ ACCESS ROAD
\ TRANSPORTATION \ PIPELINE \ SUBMERGED
\ TRANSPORTATION \ RAIL \ BRIDGE
\ TRANSPORTATION \ RAIL \ FACILITY
\ TRANSPORTATION \ RAIL \ FACILITY, \ STRUCTURE \ WATER CONTROL
\ TRANSPORTATION \ RAIL \ MAINTENANCE
\ TRANSPORTATION \ RAIL \ MAINTENANCE, \ TRANSPORTATION \ RAIL \ BRIDGE
\ TRANSPORTATION \ RAIL \ TRACK
\ TRANSPORTATION \ RAIL \ TRACK, \ TRANSPORTATION \ RAIL \ BRIDGE, \ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ RAIL \ TRACK, \ TRANSPORTATION \ RAIL \ MAINTENANCE, \ DEVELOPMENT \ INDUSTRIAL
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ MINING AND DRILLING \ MINING \ PHOSPHATE
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ CULVERT, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY
\ TRANSPORTATION \ ROADS \ CULVERT, \ DREDGING \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ MITIGATION \ ENHANCEMENT
\ TRANSPORTATION \ ROADS \ CULVERT, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ WATER CONTROL
\ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ WEIR

FWS-005904

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ DEVELOPMENT \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ DEVELOPMENT \ RESIDENTIAL MULTI- FAMILY
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ STRUCTURE \ INTAKE/OUTFALL
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ STRUCTURE \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW)
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE)
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ LOGGING
\ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ DEVELOPMENT \ RECREATIONAL
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ OTHER \ BANK STABILIZATION
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ STRUCTURE \ BRIDGE/RELATED WORK
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ DOCK \ FLOATING
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ TRANSPORTATION \ UTILITY \ AERIAL
\ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ AERIAL

## Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx)

\ TRANSPORTATION \ UTILITY \ AERIAL, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ ACCESS ROAD
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ UTILITY \ BURIED
\ TRANSPORTATION \ UTILITY \ BURIED, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL MULTI- FAMILY
\ TRANSPORTATION \ UTILITY \ BURIED, \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ BURIED, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ UTILITY \ AERIAL
\ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ UTILITY \ BURIED
\ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ STRUCTURE
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ STRUCTURE \ REMOVAL
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ PIPELINE \ BURIED
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ UTILITY \ BURIED
\ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ UTILITY \ MAINTENANCE
\ TRANSPORTATION \ UTILITY \ SUBMERGED
\ TRANSPORTATION \ UTILITY \ SUBMERGED, \ STRUCTURE \ WEIR
\ TRANSPORTATION \ UTILITY \ SUBMERGED, \ TRANSPORTATION \ UTILITY \ AERIAL

FWS-005906

# EXHIBIT F

**Programmatic Biological Opinion for**

**U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act**

FWS Log #: 04E00000-2021-F-0001; 04E00000-2021-B-0001



Prepared by:

U.S. Fish and Wildlife Service
South-Atlantic Gulf and Mississippi Basin Interior Regions
1875 Century Blvd
Atlanta, GA 30345

11/17/2020
_____     _____
Leopoldo Miranda-Castro, Regional Director          Date

**TABLE OF CONTENTS**

**ACRONYMS (**adopted from EPA BE, p. ix - x) ........................................................................ **ii**

**GLOSSARY** (adopted from EPA BE p. xi – xv) ........................................................................ iv

**CONSULTATION HISTORY** ............................................................................ 1

**INTRODUCTION** ........................................................................................ 3

**DESCRIPTION OF THE PROPOSED ACTION** ................................................ 7

**ACTION AREA** .......................................................................................... 37

**APPROACH TO THE ASSESSMENT** ............................................................ 43

**STATUS OF SPECIES** ................................................................................ 45

**ENVIRONMENTAL BASELINE** .................................................................... 45

**EFFECTS OF THE ACTION** ....................................................................... 54

**CUMULATIVE EFFECTS** ............................................................................ 65

**INTEGRATION AND ANALYSIS OF EFFECTS** .............................................. 66

**CONCLUSION** .......................................................................................... 68

**INCIDENTAL TAKE STATEMENT** .............................................................. 69

**REINITIATION NOTICE** ............................................................................ 73

**LITERATURE CITED** ................................................................................. 73

FWS-006029

**ACRONYMS (**adopted from EPA BE, p. ix - x)

| | |
|---|---|
| **Assumption** | Assumption of Section 404 of CWA by the State of Florida |
| **BA** | Biological Assessment |
| **BE** | Biological Evaluation |
| **BMP** | Best Management Practices |
| **BiOp** | Biological Opinion |
| **C&SF** | Central and Southern Florida |
| **CERP** | Comprehensive Everglades Restoration Plan |
| **CFR** | Code of Federal Regulations |
| **CWA** | Clean Water Act |
| **EIS** | Environmental Impact Statement |
| **ECOS** | Environmental Conservation Online System |
| **EPA** | United States Environmental Protection Agency |
| **ERP** | Environmental Resource Permit |
| **ESA** | Endangered Species Act |
| **F.A.C.** | Florida Administrative Code |
| **FDEP** | Florida Department of Environmental Protection |
| **FEMA** | Federal Emergency Management Agency |
| **FLCCS** | Florida Land Cover Classification System |
| **FNAI** | Florida Natural Areas Inventory |
| **F.S.** | Florida Statutes |
| **FWC** | Florida Fish and Wildlife Conservation Commission |
| **GIS** | Geographic Information Systems |
| **HCP** | Habitat Conservation Plan |
| **IPaC** | Information for Planning and Consultation |
| **ITS** | Incidental Take Statement |
| **MOA** | Memorandum of Agreement |
| **NMFS** | National Marine Fisheries Service |
| **NOAA** | National Oceanic and Atmospheric Administration |

| | |
|---|---|
| **NWP** | Nationwide Permit |
| **PEM** | Palustrine Emergent |
| **PFO** | Palustrine Forested |
| **PSS** | Palustrine Shrub Scrub |
| **RAI** | Request for Additional Information |
| **SFWMD** | South Florida Water Management District |
| **SLOPES** | Standard Local Operating Procedures for Endangered Species |
| **USACE** | United States Army Corps of Engineers |
| **USC** | United States Code |
| **USFWS** | United States Fish and Wildlife Service |
| **Wildlife Plan** | Florida's State Wildlife Action Plan (FWC) |
| **WMDs** | Water Management Districts |
| **WOTUS** | Waters of the United States |

FWS-006031

**GLOSSARY** (adopted from EPA BE p. xi – xv)

**Action** means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon high seas (50 CFR § 402.02). For the purposes of this document, the proposed action is the EPA's potential approval of the State of Florida's request for the assumption of the administration and permitting of a CWA Section 404 program.

**Action Area** means all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (50 CFR § 402.02).

**Activity** for the purposes of the State 404 program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (Rule 62-331.030, F.A.C.).

**Administratively complete** means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

**Affect/effect** as a verb, to "affect" means is to bring about a change. The "effect" (usually a noun) is the result of a change. "Affect" appears in Section 7 of the ESA (16 USC § 1536) and "Effect" appears throughout ESA Section 7 regulations (50 CFR § 402 *et seq*) and guidance documents (ESA Section 7 Consultation Handbook).

**Assumed waters** (or **State-assumed waters**) State-assumed waters are all waters of the United States that are not retained waters (as identified in Chapter 62-331, F.A.C., and FDEP's State 404 Handbook).

**Avoidance** means mitigating a resource impact by selecting the least-damaging project type, spatial location and extent compatible with achieving the purpose of the project. Avoidance is achieved through an analysis of appropriate and practicable alternatives and a consideration of impact footprint.

**Assumption** means a state has requested and the EPA has approved a state dredge and fill permitting program to be administered in lieu of the Section 404 program administered by the USACE for discharges into assumed waters.

**Best available data** means data to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under Section 7(a)(2) of the ESA, the USFWS is required to use the best available science. In the context of the ESA, the USFWS and NMFS have a policy statement that further describes best available data (see Notice of Interagency Cooperative Policy on Information Standards Under the Endangered Species Act 1994).

**Biological opinion (BiOp)** means a document which includes 1) the opinion of the US Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; 2) a summary of information on which the opinion is

iv

based; and 3) a detailed discussion of the effects of the action on listed species or designated critical habitat (50 CFR § 402.02, 50 CFR § 402.14(h)).

**Candidate species** means plant and animal taxa considered for possible addition to the list of Endangered and Threatened Species. These are taxa for which USFWS has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is currently precluded by higher priority listing actions (See 50 CFR § 424.02, ESA Section 7 Consultation Handbook).

**Conservation** means to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which protective measures are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking (ESA 16 U.S.C. § 1532(3)).

**Critical habitat** for a threatened or endangered species means 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of Section 1533, on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protection; and 2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of Section 1533, upon a determination by the Secretary of the Interior or the Secretary of Commerce that such areas are essential for the conservation of the species (ESA 16 U.S.C. § 1532(5)).

**Cumulative effects** are those effects of future State or private activities, not involving federal activities that are reasonably certain to occur within the action area of the action subject to coordination. For the purposes of this document, this definition only applies to ESA Section 7 analyses (50 CFR § 402.02).

**CWA** means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 USC 1251, et seq. (Rule 62-331.030, F.A.C., FDEP's State 404 Handbook section 2.0(b)1.

**Destruction or adverse modification of critical habitat** means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species (50 CFR § 402.02).

**Effects of the action** are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR § 402.02).

**Endangered species** means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of Class Insecta determined by the Secretary to

constitute a pest whose protection under the provisions of the ESA would present an overwhelming and overriding risk to man (ESA 16 U.S.C. § 1532(6)).

**Endangered or threatened species** in this document refers to those animal species that are identified as federally endangered or threatened by the USFWS or NMFS, and those animal species that are identified as State-listed by the FWC; it also means plant species identified as endangered or threatened by the USFWS or by the Florida Department of Agriculture and Consumer Services when such plants are located in a wetland or other surface water (Rule 62-330.021, F.A.C.).

**Environmental baseline** refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early ESA Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR § 402.02).

**ESA-species of concern** refers to species that are either listed, proposed, petitioned, or considered candidates for listing under the Endangered Species Act.

**Fish or wildlife** means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof. (ESA 16 U.S.C. § 1532(8)).

**Incidental take** refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by a federal agency or applicant (50 CFR § 402.02).

**Jeopardize the continued existence of** means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR § 404.02).

**Listed species** refers to any species of fish, wildlife or plant which has been determined to be endangered or threatened under Section 4 of the ESA or under Chapter 68A-27, F.A.C.

**May affect** is the appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed species or designated critical habitat.

**Minimization** means mitigating an aquatic resource impact by managing the severity of a project's impact on resources at the selected site. Minimization is achieved through the incorporation of appropriate and practicable design and risk avoidance measures.

**No effect** is the appropriate conclusion when the action agency determines its action will not

affect a listed species or designated critical habitat per the ESA.

**Other Activities** are program and discharge activities that are caused or authorized by the proposed action. If other activities cause consequences to listed species or critical habitat, the consequences of these other activities would be considered as effects of the proposed action, pursuant to 50 CFR 402.02.

**Practicable** means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes (Rule 62-331.030, F.A.C.).

**Programmatic consultation** (under ESA implementing regulations 50 CFR § 402.02) is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the USFWS to consult on the effects of programmatic actions such as:
(1)  Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and
(2)  A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

**Project area** or **Project site** means that a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area (Rule 62-331.030, F.A.C.). In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas.

**Protection measures** means those avoidance and minimization measures to address adverse impacts to listed species and critical habitat under the State 404 program. Protection measures recommended by the USFWS are incorporated as conditions to the State 404 permit. Examples of protection measures include, but are not limited to, project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work as used in Chapter 62-331, F.A.C.).

**Proposed species** means any species of fish, wildlife or plant that is proposed in the Federal Register to be listed under Section 4 of the Endangered Species Act (50 CFR § 402.02).

**Reasonable potential to affect** for the purposes of this document and for the State of Florida's 404 program, refers to a project that has a reasonable potential for affecting endangered or threatened species (40 CFR § 233.51(b)(2)) where it has been determined during the species coordination process that the project may affect federally listed species or their critical habitat.

**Retained Waters** means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of the FDEP's State 404 Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high

water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Rule 62-331.030, F.A.C.). The USACE will also retain responsibility for permitting for the discharge of dredged or fill material in Indian Country, as defined in 18 U.S.C. § 1151.

**Section 7 consultation** refers to Section 7(a)(2) of the ESA that requires federal agencies to use their authorities to further the conservation of listed species, including the requirement to consult with the USFWS to ensure that they are not undertaking, funding, permitting or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.

**Section 404** is a section of the federal CWA that establishes a program to regulate the discharge of dredged and fill material into the WOTUS.

**Services(s)** describes the USFWS and/or the NMFS.

**Species coordination** is a process to address potential adverse effects to threatened or endangered species, ensuring compliance with Florida Chapter 62-331, F.A.C., and the ESA. This process includes coordination between the FDEP, FWC, and the USFWS during the review of submitted State 404 permit applications. Recommendations for avoiding and minimizing the effects of a project to federally listed species and their critical habitat is provided by technical assistance from the USFWS.

**Species coordination lead or State species lead** is the designated FDEP or FWC staff person who coordinates with the USFWS and is the point of contact for all ESA species issues during the review of a specific State 404 application. FDEP and FWC staff will decide on a project by project basis which agency will act as the State's species lead on the project when coordinating with the USFWS. Factors that will be considered in this decision include the complexity of the coordination and relative workloads.

**State 404 program** is the FDEP program (Chapter 62-331, F.A.C.) that fulfills the requirements of Section 404 of the CWA and its implementing regulations, if approved by EPA.

**Stream** means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel shall have been dredged or improved does not prevent the watercourse from being a stream (§ 373.019(20), F.S.).

**Stressors** are any physical, chemical, or biological alteration of resources (i.e., increase, decrease, or introduction) that can induce an adverse organism response. Stressors can act directly on an individual, or indirectly through impacts to resources.

**Surface water** means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water

viii

when it exits from the spring onto the earth's surface (§ 373.019(21), F.S.).

FWS-006037

**Take** means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct. (ESA 16 U.S.C. § 1532(19)) **Harass** is further defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include but are not limited to, breeding, feeding, or sheltering. **Harm** is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering (ESA implementing regulations 50 CFR § 17.3).

**Technical assistance** refers to a type of coordination process described in the ESA Section 7 Consultation Handbook (1998) that outlines a variety of ways in which the USFWS provides expertise and guidance on an individual project basis. In the context of FDEP's 404 permit application reviews, the USFWS will provide technical assistance to the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA, CWA, and Chapter 62-331, F.A.C.

**Technically complete** means a State 404 application where each application item is adequate to allow the FDEP to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 program authorization, the State 404 program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met (Rule 62-331.030, F.A.C.).

**Threatened species** means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range (ESA 16 U.S.C. § 1532(20)).

**Uplands** means areas that are not wetlands or other surface waters, as delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by § 373.4211, F.S.

**USACE 404 program** refers to the administration and permitting responsibilities by the USACE for Section 404 of the CWA, prior to any assumption by the State of Florida.

**Waters of the State** are as defined in § 403.031(13), F.S.

**Waters of the United States (WOTUS)** means those waters defined in the regulations under 40 CFR § 120.2.

**Wetland** means areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas (40 CFR § 120.2).

**Works** means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the State [§ 373.403(5), F.S.] and includes all types of dredging and filling to create, remove, or locate structures in, on, or over wetlands or other surface waters (Rule 62-330.021, F.A.C.).

x

CONSULTATION HISTORY

This section lists key events and correspondence during the course of this consultation. A complete administrative record of this consultation is on file in the Service's South-Atlantic Gulf and Mississippi Basin Interior Regions, 1875 Century Blvd, Atlanta, GA 30345.

On March 23, 2018, the Governor signed into law Rule 2018-88, Laws of Florida, which created section 373.4146, Florida Statutes (F.S.), granting Florida Department of Environmental Protection (FDEP) with the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program of the Clean Water Act (CWA).

In 2018 FDEP began coordinating with both the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (USACE) to draft separate memorandums of agreement that describe the commitments and responsibilities of each agency, should the Assumption be approved by the EPA. FDEP also began assembly of other required components that would constitute a complete Assumption request package per 40 CFR 233.10-14(b).

In May 2018, FDEP published a Notice of Rule Development to implement the State 404 program and held three rulemaking workshops to collect public comment on the draft rule, Chapter 62-331, Florida Administrative Code (F.A.C.). FDEP developed its rule to include federal requirements that are not currently covered under the Environmental Resource Permitting (ERP) program.

On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR 402.08, to serve as a non-Federal representative for informal ESA section 7 consultation to prepare a biological assessment (BA).

On September 18, 2019, EPA, FDEP, United States Department of Interior (DOI), U.S. Fish and Wildlife Service (USFWS), and USACE members attended a meeting to discuss Florida's proposal to use programmatic consultation for ESA purposes under the Section 404 Assumption.

On November 22, 2019, FDEP sent a request to USFWS and National Marine Fisheries Service (NMFS) to review a preliminary list of affected species for a BA.

On December 12, 2019, the FDEP Secretary received a response from the EPA Region IV Administrator approving the requested non-federal representative designation, allowing FDEP to move forward with the development of a BA. The EPA response indicated that EPA would voluntarily engage in informal consultation with the Services on its action on Florida's request to assume administration of a Section 404 program.

In February 2020, FDEP published a Notice of Proposed Rule to implement the State 404 program and in April, held five rulemaking hearings to collect public comment on the draft rule, Chapter 62-331, F.A.C.

In February 2020, FDEP, FWC and USFWS began work to draft a Memorandum of Understanding (MOU) to describe commitments, roles and responsibilities in the State 404

1

program's species coordination process to ensure species protection, should the Assumption be approved by the EPA.

On February 25, 2020, FDEP submitted first draft of BA to USFWS for review and comment. On March 24, 2020, USFWS submitted comments on draft BA to FDEP.

In March and April 2020, additional public hearings were held regarding rulemaking for Chapter 62-331, F.A.C.

On April 15, 2020, NMFS responded to FDEP's November 22, 2019 letter with the conclusion that ESA-Listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State.

On April 28, 2020, FDEP submitted a revised draft BA (draft BA 2.0) to USFWS for review and comment.

On May 21, 2020, EPA published a notice in the federal register requesting comment on whether EPA's approval of a Clean Water Act Section 404 program is nondiscretionary for purposes of Endangered Species Act section 7 consultation.

On May 28, 2020, USFWS submitted comments on the second draft of the BA to FDEP.

On June 8, 2020, the Final Notice of Proposed Rule Change for Chapter 62-331, F.A.C. was published.

On June 18, 2020, FDEP submitted its third draft of the BA (draft BA 3.0) to USFWS

On July 1, 2020, USFWS submitted comments on draft BA 3.0 to FDEP.

On July 24, 2020, FDEP sent EPA and USFWS a final draft BA (20200724_FDEP Final BA.docx)

On August 20, 2020, EPA received FDEP's application package requesting EPA's approval of the State's assumption of the administration of the CWA 404 program for assumable waters in Florida.

On August 28, 2020, EPA indicated its approval of a state 404 program was a discretionary action subject to compliance with the ESA. EPA also determined that the FDEP's application package was complete.

On September 2, 2020, EPA submitted its "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (BE) to USFWS and initiated formal consultation.

On October 2, 2020, USFWS sent its draft biological opinion (BiOp) addressing EPA's proposed action to the EPA

2

On October 29, 2020, EPA submitted comments on the draft BiOp.


**INTRODUCTION**

Section 7(a)(2) of the Endangered Species Act of 1973, as amended, (ESA; 16 United States Code [U.S.C] 1531 *et seq.*) requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any federally listed species or results in the destruction or adverse modification of designated critical habitat. The ESA's section 7 implementing regulations stipulate, "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control," (50 Code of Federal Regulations [CFR] 402.03) and that under certain conditions reinitiation of section 7 consultation may be required where discretionary Federal involvement or control over the action has been retained or is authorized by law (50 CFR 402.16). The USFWS and NMFS have been delegated the authority to administer the ESA.

Congress enacted the Clean Water Act (CWA; 33 U.S.C. 1251 et seq.) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters". The CWA (33 U.S.C 1344) establishes the basic structure for regulating discharges of pollutants into the waters of the United States and regulating quality standards for surface waters. With respect to discharges of dredged or fill material, Congress assigned certain authorities and responsibilities to the EPA and the U.S. Army Corps of Engineers (USACE), and authorizes the USFWS opportunity to provide comment on requests to assume the program and on certain draft permits or permit applications. In its regulations at 40 CFR 233, EPA has extended this opportunity to comment on certain state-issued permits and on program assumption requests to the NMFS. The roles and responsibilities for implementing the Act differ in scope among the involved Federal agencies, as well as between Federal agencies and states or tribes administering the Section 404 program.

For example, some of the respective roles include:

USACE
- Administers day-to-day 404 program in non-assumed waters, including individual and general permit decisions;
- Conducts or verifies jurisdictional determinations;
- Develops USACE policy and guidance; and
- Enforces USACE Section 404 permit provisions.

EPA
- Develops and interprets policy, guidance, and environmental criteria used in evaluating permit applications;
- Determines scope of geographic jurisdiction and applicability of exemptions;
- Approves and oversees State and Tribal assumption (33 U.S.C. 1344(g)-(l);
- Reviews and has opportunity to comment on non-waived permit applications;
- Has authority to prohibit, deny, or restrict the use of any defined area as a disposal site

3

(Section 404(c));
- Can elevate specific cases (Section 404(q));
- Enforces Section 404 provisions.

USFWS and NMFS
- Evaluate impacts on fish and wildlife of all new Federal projects and Federally permitted projects, including projects subject to the requirements of CWA's Section 404 (pursuant to the Fish and Wildlife Coordination Act);
- Elevate specific cases or policy issues pursuant to Section 404(q); and
- Address requests to consult under section 7 of the ESA on program assumption requests ; (EPA 2020, https://www.epa.gov/cwa404g/consultation-cwa-section-404-program-requests-endangered-species-act-and-national-historic, accessed August 8, 2020)
- Have opportunity to provide comment on proposed state 404 permits pursuant to procedures laid out in 40 CFR 233.50.

As noted above, EPA administers sections 404(g)-(*l*) (33 U.S.C. 1344(g)-(*l*)) of the CWA in accordance with its implementing regulations (40 CFR 233). Sections 404(g)-(*l*) provide States and Tribes the opportunity to request assumption of the administration of the CWA 404 program for assumable waters in lieu of the U.S. Army Corps of Engineers (USACE) 404 program. It is important to note that some waters of the U.S. are not assumable by a State or Tribe and are retained under the USACE 404 permitting program (referred to hereafter as "retained waters"). The EPA is required to follow procedures specified in 40 CFR 233 when evaluating, approving, reviewing, and withdrawing its approval of a State or Tribal 404 program, and when coordinating Federal review of State or Tribal 404 permit actions.

EPA has determined that its potential approval of any State or Tribe's request to assume the CWA 404 permit program is a discretionary action for purposes of consultation under section 7 of the ESA (Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals dated 8/27/2020). If EPA approves the Assumption, upon EPA's publication of its final approval of a State or Tribal assumption, the USACE would suspend its issuance of section 404 permits in assumed waters and the USACE would no longer receive CWA 404 permit applications from the regulated community in assumed waters. Finally, EPA will commence its  oversight of the administration of the State or Tribe's 404 program and coordinate Federal review of State or Tribal permit actions, in accordance with 33 U.S.C. 1344(g)-(l) of the Clean Water Act (CWA) and its implementing regulations (40 CFR 233). If EPA determines a state program no longer complies with the requirements of 40 CFR 233, EPA may initiate withdrawal proceedings pursuant to the procedures at 40 CFR 233.53.

On August 20, 2020, EPA received a package from the State of Florida requesting assumption of the administration of the dredge and fill permitting program under Section 404(g)-(l) of the CWA.

On September 2, 2020, EPA requested formal consultation with the USFWS and provided the USFWS with a complete section 7 consultation package that included a biological evaluation

4

(BE) and other information concerning the potential effects of its potential approval of Florida's assumption on ESA-listed species, pursuant to section 7 of the ESA (50 CFR 402).

The Federal action agency is the EPA and the applicant is the Florida Department of Environmental Protection (FDEP). The Federal action (action) that we are considering is EPA's potential approval of FDEP's request to assume the CWA 404 permit program in waters of the U.S. that will not be retained by the USACE 404 permitting program.

Approval of the action would change the permitting authority under section 404 of the CWA in State-assumed waters in Florida. The EPA's BE considers the effects of the state-issued permits on ESA-species of concern. Consistent with this biological opinion (BiOp) and a Memorandum of Understanding between USFWS, FDEP, and FWC, we will provide technical assistance to FDEP to insure that no State 404 permit action jeopardizes the continued existence of ESA-listed species or adversely modifies or destroys critical habitat, pursuant to 40 CFR 233.20(a).

Other activities (program activities) that would occur if EPA approved the State's 404 assumption request include the State's implementation of its section 404 program, EPA's oversight of the State 404 program, EPA's coordination of Federal review of State permit actions, and the execution of State-permitted activities by permit holders. The consequences of the potential approval of the State's assumption (including those related to any program activities caused by the potential approval) on ESA-listed species and critical habitat are considered as effects of the action, pursuant to 50 CFR 402.

Given the programmatic nature of the action, USFWS conducted a programmatic consultation, which is defined in 50 CFR 402.02 as: "a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions."

In conducting section 7 consultation, the USFWS must follow procedures described in the ESA (U.S.C. 1531 *et seq*) and its implementing regulations (50 CFR 402). Some of these requirements are noted below.

The USFWS must:
- "…use the best scientific and commercial data available," (16 U.S.C. 1536(a)(2).
- "…formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," (50 CFR 402.14(g)(4).
- "Formulate a statement concerning incidental take, if such take is reasonably certain to occur," (50 CFR 402.14(g)(7).

5

- Where "resultant incidental take of listed species will not violate section 7(a)(2)…, the Service will provide with the biological opinion a statement concerning incidental take…" (50 CFR 402.14(i)(1).

The USFWS has provided technical assistance to FDEP and EPA throughout the development of FDEP's BA that FDEP submitted to EPA as supplementary information in its assumption application package. EPA utilized FDEP's BA to develop its BE.

In addition, USFWS reviewed and commented on draft portions of Florida's 404 program rule (62-331, Florida Administrative Code [F.A.C.]; Florida's Environmental Resource Permit rule 62-330, F.A.C.; the Rules' associated Applicant Handbooks; and a Memorandum of Understanding (MOU) between FDEP, Florida Fish and Wildlife Conservation Commission (FWC), and USFWS concerning protected species coordination. The MOU provides a structured framework for coordinating review of State 404 permits to assess potential effects on State-listed and ESA-listed species and to insure that no State 404 permit action jeopardizes the continued existence of an ESA-listed species, or adversely modifies or destroys designated critical habitat.

The USFWS reviewed the EPA's section 7 consultation initiation package and found it complete. Information provided by EPA and FDEP is summarized below. This information was carefully considered by USFWS in formulating this BiOp:

- EPA's letter requesting formal consultation, pursuant to 50 CFR 402.14
- EPA's Biological Evaluation (BE): "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (dated July 2020, received September 2, 2020)
- EPA CWA 404 Regulations (40 CFR 230 and 233)
- USFWS ESA-listed Species Databases (e.g. ECOS)
- The State 404 Assumption Package submitted to EPA
    - Florida's State Statutes: Chapters: 120 – Florida Administrative Procedures Act; 373 – Water Resources; 403 – Environmental Control; Florida House of Representatives Bill 1091; Florida Senate Bill 712
    - Florida's Administrative Code (FAC) of regulations: 62-4 – Permits, 62-110 – Exceptions to the Uniform Rules of Procedure, 62-330 – Environmental Resource Permitting Rule, 62-331 – State 404 Permitting Rule, and 62-340 - Delineation of the Extent of Wetlands and Surface Waters.
    - Applicant's Handbooks that are incorporated into FAC: State 404 Program Applicant's Handbook, Environmental Resource Permit Applicant's Handbook
    - Florida General Counsel's Statement (dated July 31, 2020)
    - The FDEP-USACE Memorandum of Agreement (MOA)
    - The FDEP-EPA MOA
    - The FDEP-FWC-USFWS MOU for Protected Species Coordination

Pursuant to 50 CFR 402.14(h) (3), this BiOp formally adopts the EPA BE (Appendix I) and the FDEP, FWC, USFWS MOU (Appendix II), as part of this BiOp. For example, significant portions of the EPA BE and MOU will be used to describe the action (which includes program activities), and its potential effects on ESA-considered species and any designated critical

6

habitat, and proposed critical habitat. Note that ESA-considered species include ESA-listed species, ESA Candidate species, species proposed for listing, and petitioned species.

Although the USFWS has adopted and adapted various portions of the EPA's ESA consultation initiation package and the MOU in the BiOp, the USFWS has conducted its own analysis of the best scientific and commercial data available (which includes all the information noted above) and has given appropriate consideration to any beneficial actions as proposed or taken by the EPA and FDEP, including any actions taken prior to the initiation of consultation. Measures included in the proposed action (action) that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans. (50 CFR 402.14(g)(8)).

This USFWS BiOp will examine whether and to what degree FDEP's program, regulations, processes, and procedures insure that EPA's approval and FDEP's subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat.

## DESCRIPTION OF THE PROPOSED ACTION

An action, pursuant to 50 CFR 402.02, means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;
(b) the promulgation of regulations;
(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
(d) actions directly or indirectly causing modifications to the land, water, or air.

With respect to the action's indirect modifications (or effects) to the land, water, or air, such modifications are considered as effects of the action and include consequences caused by other activities that are, themselves, caused by the action (effects of the action are defined in 50 CFR 402.02, 402.17).

The action that this BiOp is analyzing is the EPA's potential approval of the State of Florida's request to assume the administration of section 404 of the CWA for the permitting of discharges of dredged or fill material into those waters under the jurisdiction of the State 404 program ("assumed waters"). The processes and procedures for approving State 404 programs are described in 40 CFR 233 Subpart B. If the assumption is approved by EPA, it will be effective on the date EPA publishes its approval in the Federal Register.

EPA Requirements for a State's Assumption of CWA 404 Program

Pursuant to 40 CFR 233.10, Florida submitted an application package to the EPA Region IV Administrator that included:

7

1. Letter from the Governor of Florida requesting program approval;

2. Complete program description in accordance with 40 CFR 233.11;

3. Attorney General's statement, in accordance with 40 CFR 233.12;

4. Memorandum of Agreement (MOA) with the EPA Regional Administrator, in accordance with Section 40 CFR 233.13;

5. MOA with the Secretary of the Army, in accordance with 40 CFR 233.14; and

6. Copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures.

Attached to the program description, FDEP sent EPA a copy of the FDEP-FWC-FWS MOU that describes how the State and USFWS would coordinate in evaluating State 404 permit applications. The action (EPA's approval of the State 404 program) would change the regulatory structure for approval of program activities. action These program activities consist of a number of activities related to the processing of State 404 permits, and importantly, as discussed briefly above and in more detail later, include a process by which the USFWS will receive and review all State 404 permit applications and provide technical assistance to the State, as needed, to insure State 404 permit actions are not likely to jeopardize a species or adversely modify or destroy critical habitat.

The following summarizes program activities (Fig. 1) that are reasonably certain to occur only because of the action:

1. CWA's requirement for EPA to coordinate federal review of State permit actions, and in accordance with 40 CFR 233.50 and 233.51
2. CWA's requirement to oversee the operation of the State's 404 program, and in accordance with 40 CFR 233.50 and 233.51.
3. FDEP's requirement to administer the State 404 program in accordance with:
   a. All applicable Federal regulations specified in 40 CFR 233
   b. The FDEP-USACE MOA
   c. The FDEP-EPA MOA
   d. The FDEP-FWC-USFWS MOU for Endangered Species Coordination
   e. Florida's Environmental Resource Permitting Rule (62-330, F.A.C.)
   f. Florida's 404 Permitting Rule (62-331, F.A.C.)
   g. Processes and procedures specified in the State 404 Program Applicant's Handbook and the ERP Program's Applicant's Handbook
4. A State Permittee's requirement to follow the State 404 program requirements when applying for a State 404 permit and to conduct permitted activities in accordance with the conditions in the State 404 permit.

8



Figure 1. The proposed action (EPA's approval of the State 404 program) and program activities that it will cause. Program activities will be subjected to coordination with USFWS to insure any State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical habitat.

9

FWS-006047

**Program activities that will only occur but for EPA approving the State's Assumption**

If the State of Florida's assumption is approved, FDEP would assume regulatory responsibility over all dredging and filling activities in WOTUS within Florida not retained by USACE. The implementation of the State's program in evaluating permit applications, issuing or denying permits, compliance and enforcement of permit conditions, and all the ensuing execution of permitted activities by permittees are considered program activities emanating from the action and have been considered under this programmatic consultation and BiOp. EPA will retain oversight of the State 404 program and coordinate review by USACE, USFWS, and NMFS of State permit actions that are not subject to being waived from EPA review.

The USFWS considers future State permit actions as program activities that are caused by the proposed action. For example, when the EPA approves the State 404 program, a State 404 permit issuance would be the only legal means for dredge and fill actions to occur in assumed waters and for those actions to potentially affect ESA-listed species or their designated critical habitats.

**State Processes for administering the State 404 program**

If Florida's program is approved by EPA in accordance with 40 CFR 233, the Secretary of FDEP will be the State official charged with administering the State 404 program when the program is approved and has authority to issue permits pursuant to Part IV of section 373 of the Florida Statutes (F.S.). In accordance with section 373.4146, F.S., FDEP has the power and authority to issue permits for regulated activities conducted in assumed waters following procedures stipulated in the State 404 Program Rule (62-331, F.A.C) and State Environmental Resource Permitting Rule (62-330, F.A.C.) and each Rule's respective Applicant's Handbook.

Florida's 404 Program Rule includes requirements of federal law that are not addressed in the existing state regulations for dredge and fill permitting (such as noticing provisions, alternatives analysis, and the federal mitigation hierarchy, etc.). The State 404 Rule, Chapter 62-331, F.A.C., also includes definitions, procedures for review of and agency action on exemption requests, processes for individual permits, public notice requirements, procedures regarding mitigation banking, and procedures and descriptions for general permits created to correspond to the USACE Nationwide Permits and appropriate regional general permits as granted by the USACE.

In describing the State's processes for administering the State 404 Program, this BiOp and information contained in EPA's consultation package focuses on describing activities that affect ESA-listed species, designated and proposed critical habitat, and ESA-considered species, as opposed to other resource issues such as insuring compliance with regulations specific to protection of cultural resources or water quality. Provisions and considerations for those other resource issues are detailed in Federal regulations (40 CFR 233) and State rules (62-330; 62-331, F.A.C.).

It is important to note the BE describes the relationship between FDEP and the State's water management districts (WMDs) and certain local governments whom have been delegated by FDEP to jointly implement Florida's Environmental Resource Permitting (ERP) program. The

agencies' various responsibilities are divided according to the Operating and Delegation Agreement (operating agreements) and the geographic regions of the WMDs.

The current State 404 Rule (62-331, F.A.C.) limits the administration and implementation of the State 404 Program to FDEP, but contains a provision that may allow the State 404 Program to be delegated to the WMDs by FDEP in the future. CWA regulations (40 CFR 233) would require this type of change to the State 404 Program to be approved by EPA prior to implementation.

Another important State agency that will be involved in the State 404 Program is the Florida Fish and Wildlife Conservation Commission (FWC). FWC has historically worked closely with FDEP in its implementation of the State's ERP program, which regulates discharge of fill into waters of the State. FWC has permitting authority over species identified in Chapter 68A-27, F.A.C., which include the species identified within FDEP's ERP program.

FDEP cannot authorize impacts, specifically incidental take, of State-listed species identified in Chapter 68A-27, F.A.C. Therefore, FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC. FWC's permit commenting authority was codified upon the agency's creation of Section 20.331(10), Fla. Stat. The FWC provides a list of potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP to minimize such effects. As described in the BE (Appendix A), FWC will continue to comment on ERP permits and will be commenting on State 404 permits should EPA approve FDEP's assumption of the 404 program, per the State 404 Program Rule (62-331, F.A.C.), the State ERP Rule (62-330, F.A.C), and the FDEP-FWC-USFWS MOU.

**Consideration of ESA-listed Species when processing State 404 permit applications**

The following is a summary description of how potential effects to ESA-listed species will be assessed and minimized when the State processes State 404 permit applications.

FDEP will review all submitted applications for administrative and technical completeness and forward submitted applications to FWC and USFWS. If FDEP, FWC, or USFWS require additional information, FDEP will request that the applicant supply any additional required information prior to publishing a public notice pursuant to Rule 62-331.060, F.A.C. (administrative completeness), and to determining if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. (technical completeness).

The provisions described in the Applicant's Handbook (Volume I, sections 5.5.3.5 through 5.5.3.7, which govern an applicant's timeframes to respond to requests for additional information) apply to applications for State 404 permits. Once FDEP has determined that an application is <u>administratively</u> complete, FDEP will provide public notice as described in Subsection 62-331.060(2), F.A.C.

Permit applications will not be considered <u>technically</u> complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C.,

11

and section 5 of the State 404 Handbook). FDEP may request additional information as necessary during its review of any information it receives during the public comment period, at a public meeting, or during Federal review. Importantly, Federal regulations (40 CFR 233.20) prohibit the issuance of a State 404 permit that is not in compliance with 40 CFR 230, or a permit that EPA has objected to under 40 CFR 233.50, or if discharges would occur in an area otherwise protected by 404(C), or in which anchorage or navigation in navigable waters would be substantially impaired.

**State 404 permit application timelines**

Pursuant to Rule 62-331.052, F.A.C., FDEP will review the application within 30 days of receipt of an application for a permit, or receipt of any additional information provided by the applicant in response to FDEP's request for additional information, for: 1) administrative and technical completeness; 2) request any additional information required to publish the public notice; and 3) determine if the proposed activity meets the requirements for issuance. The applicant may voluntarily submit a written waiver of the above 30-day deadline to allow more time for FDEP to determine if additional information is required.

Within 10 days of FDEP determining that an application is <u>administratively</u> complete pursuant to subsection 62-331.060(1), F.A.C., FDEP will provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, FDEP will send a copy of the public notice to EPA for those projects that EPA reviews, in accordance with section 5.2.5 of the State 404 Applicants' Handbook, the FDEP-EPA MOA, and Federal regulations (40 CFR 233.50 - .51). EPA review timelines and potential public meetings are discussed in section 7.4.2 of the BE.

FDEP issues public notices concerning the following FDEP actions: 1) a determination that an application for an individual permit or major modification is administratively complete; 2) notification to a permittee of revocation or suspension of a permit; and 3) issuance of an emergency field authorization.

From date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of 30 days, or 15 days for the projects listed in 62-331.060(b)(3)(b).

The USFWS will receive all permit applications and public notices directly from FDEP in accordance with the FDEP-FWC-FWS MOU and 62-331, F.A.C. USFWS will also receive species effect assessments from FWC or FDEP. USFWS will review all permit applications and effects assessments received from FDEP and FWC. USFWS will submit questions, information and comments or measures necessary to minimize effects to ESA-listed species as needed. FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from USFWS into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.).

In accordance with the FDEP-EPA MOA and governing federal regulations (40 CFR 233), EPA will retain federal oversight authority on the issuance of State 404 permits, with the ability to review applications, comment on, object to or make recommendations with respect to the permit including avoidance, minimization and compensation measures..

In some scenarios and situations, EPA can waive Federal review of State 404 permit applications pursuant to 40 CFR 233.51(b)(2). Applications for discharges with reasonable potential for affecting ESA-listed or ESA-proposed species or critical habitat, however, are not waived. For the discharges subject to EPA review, FDEP will send a copy of the public notice to EPA, in accordance with section 5.2.5 of the State 404 Handbook (also 40 CFR 233.50(a)(1)). Under the State 404 program, projects with reasonable potential for affecting ESA-listed or ESA-proposed species or critical habitat are defined as projects that have been determined by FDEP and FWC, in coordination with USFWS, to affect listed species and their critical habitats, whether effects are beneficial or adverse. Details regarding the types and magnitude of effects to species and their critical habitats, as well as proposed protection measures are to be included in the public notice.

As detailed in 40 CFR 233.50(b), if review is not waived, EPA will provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the USACE, USFWS, and NMFS, within 10 days of receipt. These agencies will notify the EPA within 15 days of their receipt if they wish to comment on the public notice or draft general permit. Such agencies shall submit any comments to EPA within 50 days of such receipt. The final decision to comment, object, or to require permit conditions will be made by EPA

Within 30 days of receipt of notice, EPA will notify FDEP whether it intends to comment upon, object to, or make recommendations with respect to 1) a permit application, or 2) a draft general permit. Within this time period, EPA may also request additional information from FDEP if the previously provided information is inadequate for determining whether the permit application or draft permit meets the requirements of the CWA, 40 CFR 233.50, and the 404(b)(1) Guidelines. EPA may notify FDEP of its intention to not comment but that it reserves the right to object within 90 days of receipt, based on any new information brought out by the public during the comment period or at a hearing.

If EPA has given notice to FDEP of the intent to comment, those comments shall be submitted within 90 days of the receipt of the public notice, draft general permit, or FDEP's failure to accept the recommendations of an affected State. . Within 90 days, the EPA will provide a written statement with comments, objections, or recommendations; and the actions that must be taken by FDEP in order to eliminate any objections (see 40 CFR 233.50(e) for more details). FDEP shall not issue a permit until steps required by EPA to eliminate an objection or incorporate a requirement for a permit condition to a permit application or draft general permit. Within 90 days of FDEP receipt of EPA's comments, FDEP or an interested party may request EPA may hold a public hearing on the objection or requirement (see 40 CFR 233.50(g) and (h) for more details).

If no public hearing is held, FDEP shall either issue the permit revised to satisfy EPA's objections, notify EPA of its intent to deny the permit, or notify EPA that it will not resolve the objection or deny the permit. In the event FDEP neither satisfies EPA's objections, requirement for a permit condition, nor denies the permit, EPA shall transfer the permit application to the USACE for processing.

13



Figure 2. Processes and timelines for processing State 404 permit applications. Subprocess 1-3 described on following page.

14

FWS-006052



FWS-006053

**Required information and agency review of State 404 permits**

Applicants submitting a State 404 permit application will be required to submit information that allows the State of Florida (FDEP and FWC) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats and allow the USFWS to review and provide technical assistance as needed (62-331.051, F.A.C.). To that end, the following information will be required as part of the State 404 application:

- Description of the proposed activity (including all activities reasonably related to the same project, timing and duration of project and related information as required in application)

- Description of the specific areas affected by the activity (e.g., site map)

- Description of listed species/critical habitat that are present in the area affected by the activity

- Description on the manner in which species may be affected by the activity

- Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably certain to occur within the project area

- Relevant information (e.g., species surveys, etc.)

- When needed, proposed project designs and proposed conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.

If incomplete, additional information will be requested during the information gathering and review processes and forwarded by FDEP to the FWC and USFWS in accordance with the FDEP-FWC-USFWS MOU.

As part of the State-listed and ESA-listed species coordination process, FDEP will provide copies of all State 404 permit applications to the FWC and USFWS. At the time each application is submitted to USFWS (or within a short period after submittal), FDEP or FWC will submit a preliminary determination to the USFWS as to whether ESA-listed species or their critical habitats are expected to be present and whether they are likely to be affected adversely or beneficially by the proposed State permit action. In some cases, FDEP or FWC may provide the USFWS with a list of preliminary protective measures to minimize impacts to ESA-listed species and critical habitats. The USFWS will review and may suggest modifications or recommend additional protective measures, as needed.

The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their critical habitats. Upon coordination with the USFWS on appropriate protection measures for federally listed species and their critical habitats, FDEP will incorporate the USFWS-recommended measures as permit conditions, or will issue a Notice of Intent to Deny the permit.

FWS-006054

**Review of estimated species coordination timeframes**

As presented in the flow chart (Fig. 2) and the BE (pp. 76-77), State regulations dictate the process and general timeframes, however, there are transitional periods between these timeframes, and these are summarized in the steps below (see *Application Timelines* under 7.4 of the BE).

1) FDEP receives a permit application.

2) Within approximately 3-5 days, FDEP will send a copy to USFWS and FWC. Within approximately 1 or 2 days of receiving the permit application, FWC will send a preliminary affected species list and type of effects determination to USFWS.

3) Within approximately 15 days of receipt, USFWS may send to FDEP any comments or questions it has about missing information, or potential affects to listed species or critical habitat, or protective measures to avoid or minimize effects.

4) Within 30 days from receipt, FDEP must either request additional information (RAI) from applicant or deem the application complete.

5) After FDEP receives additional info, FDEP has 30 days to review the response and:

   a) Request clarification of answers to the questions; or

   b) Notify applicant their application is complete.

6) Preferably before the application is deemed complete or before a public notice is issued, FWC and USFWS may determine whether there is reasonable potential to affect listed species, or critical habitats, and if so, the types of effects, and any appropriate potential protective measures. These determinations are forwarded to FDEP.

7) After the application is deemed complete, FDEP has 10 days to issue a public notice for applications for individual permits.

8) If the EPA has waived review, then after the public comment period closes, FDEP has either 60 or 90 days to issue or deny the permit.

9) If EPA reviews the public notice, then Federal regulations (40 CFR 233.50) will govern the process of State 404 permit review by EPA.

   a) EPA has 10 days to send a copy of the public notice to USFWS

   b) USFWS has 15 days to notify EPA it intends to comment

   c) USFWS has 50 days from receipt of public notice from EPA to send comments to EPA

   d) EPA has 90 days to send comments or objection to FDEP. The final decision to comment, object, or to require permit conditions will be made by EPA.

After considering the timeframes identified in the State regulations and the transitional periods described in the BE, we estimate the total time that USFWS will have to review and comment on a permit application that had all the necessary information at the start and where review has been waived by EPA, would be approximately 55-70 days, depending on whether the public comment period was 15 days or 30 days. However, if additional information was required before FDEP considered the application to be

FWS-006055

complete, the maximum amount of time USFWS would have to review and comment would be increased accordingly.

**Identifying applications that may pose adverse impacts**

The FDEP/FWC species coordination and technical assistance with the USFWS will begin before the application's public notice is posted. The USFWS will receive the application prior to FDEP posting a public notice and USFWS may submit information and questions to FDEP prior to FDEP posting a public notice. The public notice will also go to the USFWS, and provides details regarding the type of effects/impacts to species and their critical habitat and any proposed protection measures recommended by USFWS. The technical assistance process between the USFWS, FDEP, and FWC will not be considered complete until any modifications are incorporated as a result of the public notice. If needed, technical assistance with the USFWS may continue during and after the public notice period.

Upon receiving an application, FDEP and FWC will review the submittal by the applicant and preliminarily identify the affected species, affected project area, and critical habitats. The species lead is responsible for making a preliminary determination for affected species, affected project area and critical habitats, and assess whether, and what type of, adverse impacts to endangered or threatened species and their critical habitats is expected. FDEP will forward the application to FWC and the USFWS within three-five days of receipt. The species lead will contact the USFWS and send their preliminary assessments to the USFWS as soon as possible. USFWS may submit questions regarding missing information FDEP, but must do so within 20 days of receiving the permit application.

For example, if FDEP received an application on June 1st and forwarded it to USFWS on June 5th, any questions USFWS wishes to convey to the applicant must be relayed through the species coordinator by June 25th. If USFWS has no questions, technical assistance simply continues. All comment deadlines for USFWS's response will be included in FDEP/FWC initial submission of the permit application to USFWS.

- If FDEP/FWC does not get a response from the USFWS by the deadline for questions or comments, the lack of a response will be considered a "no comment" and no further information from the USFWS is needed. USFWS has internal processes in place to ensure that all applications are received and reviewed. As a fail-safe, USFWS may submit its questions during the public notice period for the State 404 application should USFWS not respond during the early phase of FDEP-USFWS coordination. If the State species coordinator believes that effects may be significant and the lack of response may be in error, they will contact the USFWS to confirm. In addition, the USFWS will receive a copy of all public notices and may provide comments to EPA and/or FDEP at that time, as needed.

- For the determination of potential affected species, project area or impact/effect on the species, if FDEP/FWC receives a response from USFWS with additional information to consider, the information will be re-evaluated and resubmitted to USFWS, if needed.

- Once it has been determined by FDEP/FWC that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, and the USFWS has not submitted information or questions that would lead the State to reconsider its determination, the species review concludes for that application. If the applicant modifies the project activities or increases the project area as the application is continued to be reviewed, FDEP/FWC/USFWS may re-evaluate the application

18

with this information, if warranted (e.g., if the new project area would include additional listed species or critical habitats not considered in the previous review).

- Once it has been determined by FDEP/FWC that an application may cause an adverse impact or adverse effect to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, technical assistance with USFWS continues in order to determine if, and how, the impacts and effects can be addressed with protection measures.

*Coordination of protective measures with the USFWS*

- For applications determined to have an adverse impact to federally listed species or species proposed to be listed or their critical habitats, the species coordination lead will forward all available information to the USFWS with a request for additional technical assistance.

- The FDEP/FWC species coordination lead will compile additional information or questions needed to complete the review, including information or questions from the USFWS, to forward to FDEP. These questions and requested information will be incorporated into the FDEP's RAI to the applicant.

- The species coordination lead will coordinate with the USFWS regarding potential protection measures that may avoid or minimize the anticipated adverse impacts. In some cases, depending upon the project, the USFWS may submit recommendations to FDEP/FWC. In other cases, the species coordination lead will compile a package that presents the proposed protection measures and transmit the package to USFWS for their review and comment.

- After USFWS provides/agrees with recommended protection measures appropriate to avoid or minimize the expected adverse impacts associated with the proposed project, the protection measures are incorporated into the public notice as proposed permit conditions.

  - If modifications are made during the public comment period that may change the original determination or anticipated effects to species or their critical habitats, FDEP reviewers will forward this information to FWC and USFWS for further review and comment.

  - If no modifications are made, or if the modifications during the public notice process can be addressed by FDEP/FWC/USFWS, protective measures are incorporated into the permit as special conditions and the species review concludes for that application.

- If the review by FDEP, FWC, and USFWS concludes that adverse impacts are likely to jeopardize the continued existence of a species, or will destroy, or adversely modify critical habitat, either of the following alternatives may occur, depending upon the project:

  - Additional protection measures that will satisfy the requirements of the ESA and avoid jeopardy or adverse modification are developed in coordination with or as recommended by USFWS, and FDEP incorporates those measures as permit conditions and processes the permit; or

  - The FDEP issues an "Intent to Deny" the application for a permit.

**Summary of USFWS commitments triggered by approval of the action**

If EPA approves FDEP's assumption of the 404 program, the State 404 program rule (62-331, F.A.C.), State ERP rule (62-330, F.A.C.), Federal oversight and coordination regulations (40 CFR 233), and the FDEP-FWC-FWS MOU will be activated and implemented. As a result of their activation and implementation, the USFWS will:

1. Receive all the 404 permit applications sent by FDEP.
2. Review all the 404 permit applications sent by FDEP.
3. Determine whether the permit application has the required information needed to assess:
   a. Whether or not issuing the permit is likely to jeopardize an ESA-listed or proposed species of fish, wildlife, or plant species or cause adverse modification to proposed or designated critical habitat of such species; and
   b. whether or not take, as defined by the ESA and it implementing regulations (50 CFR 402.02; 50 CFR 17.3) is reasonably certain to occur as a result of issuing the permit after taking into account all the protection measures that the FDEP and/or the applicant propose to implement.
4. If there is missing information necessary to complete the USFWS review, the USFWS will promptly notify FDEP.
5. If all the necessary information is provided to complete step 3, USFWS may provide FDEP with technical information regarding species biology, types and likelihoods of potential effects of the proposed permit on the species, and recommended measures that would avoid or minimize effects, as appropriate with the understanding that final FWS conclusions regarding effects to species are determinative. The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.
6. If USFWS has information that would disconfirm the State's effect determination, the USFWS will provide that information. Otherwise, the USFWS response may indicate the application had been received and reviewed by USFWS and USFWS has no comments.
7. Monitor and track the amount of anticipated take on a project by project basis in order to inform future species status assessments and future effects assessments.
8. Document all the above as events under the State 404 programmatic BiOp official file.

USFWS will be conducting the actions described above through the technical assistance process, and not through section 7 or section 10 of the ESA. To clarify that USFWS coordination through a technical assistance process, USFWS will not "concur" with any effect determinations made by the State of Florida, but rather may provide comments and conditions that must be implemented in order for the permit to be issued. This process of USFWS coordination and technical assistance operates similarly to a section 7 consultation because it has a similar objectives of 1) ensuring a State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical habitat, and 2) minimizing and tracking the amount of incidental take if take is reasonably certain to occur.

**Assessing potential effects of a State permit application**

The following description adopted from the BE presents the structure of the species coordination process and how potential impacts of regulated activities will be evaluated to insure compliance with Federal regulations (40 CFR 233; 50 CFR 402) and State rules (62-330; 62-331, F.A.C.).

*Identifying the Project Area and Affected Species*

The BE states the first step in assessing potential adverse impacts to listed species or those proposed to be listed as endangered or threatened, as well as their critical habitats, is to define the project area (similar to the "action area" during a federal section 7 consultation). The project area can be larger than the immediate area of activity, since it is an identification of all areas that may affect listed species and their critical habitats directly or indirectly by the project's activities.

20

For species within the USFWS's jurisdiction, the USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) allows for the user to draw a polygon to represent the project area. The project area must include the proposed project's potential impacts to the affected species and their habitats, and critical habitats, even those traditionally considered as offsite, if the impacts would occur as a result of approval of the project. By creating a polygon that is geographically referenced, the system will produce a preliminary list of resources for the area chosen. This list of species and critical habitats will be considered preliminary, because all potential adverse effects need to be determined (and some species may need to be confirmed by on-site surveys) and verified during the State and Federal species reviews. The result of this online search will also include critical habitats that overlap with the project area. While critical habitat is a special designation under the ESA, during project reviews all occupied habitat within the species range that may be adversely affected will be considered if the project's activity may affect listed species, even that which is not designated as critical habitat under the ESA.

**Available Federal decision tools**

Once there is a proposed affected species list, the State's species coordination lead determines (preliminarily or concurrently with the USFWS) whether adverse effects/impacts are likely to occur. The types of impacts that may occur could be beneficial to species and their critical habitat or could adversely impact or adversely affect them. Adverse impacts to species include the potential for harm to members of the species, such as injury, death, or those that occur by loss of feeding, breeding, or sheltering resources due to a project's activities affecting habitat where members of the species exist. Adverse impacts also include the potential for jeopardizing the continued existence of a species, or adversely modifying critical habitat. Adverse effects/impacts to one or more individuals, can result directly from dredging and filling activities involved with construction or demolition proposed by the project, as well as secondary impacts caused by the ongoing operations of the project once constructed. Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur. Adverse impacts to habitats, particularly critical habitats, include alteration or destruction of the physical and biological characteristics of that habitat. These characteristics are important to the listed species using the area, and harm to species may occur temporarily during construction or permanently during operation or by alteration of the habitat.

For some species, the IPaC system provides Federal species guidelines. These guidelines include General Project Design Guidelines, Habitat Assessment Guidelines, Species Survey Guidelines, Effects Determination (consultation and/or dichotomous) Keys, conservation measures, guidance for determining whether a species 'may be present', proactive management suggestions, Species Assessment Guides (SAGs) or Standard Local Operating Procedures for Endangered Species (SLOPES).

Programmatic consultations, when available, are anticipated to be used to help identify where impacts/effects will occur and whether technical assistance with the USFWS is needed. Some programmatic consultations do not exempt take; rather, they attempt to avoid take through setting project-specific criteria that either determines a project is "not likely to adversely affect" a listed species or critical habitat, or sets avoidance and minimization measures that allow a "not likely to adversely affect" determination to be made. Because these consultation keys and programmatic biological opinions cover many of the species which are most often the subject of ESA section 7 consultations in

Florida, they include many useful measures to identify, avoid, or minimize adverse effects to ESA-listed species.

The objectives of developing and using effect determination decision assistance tools, particularly SLOPES, are to:

- Increase the effect determinations' accuracy and consistency;

- Improve completeness and efficiency in the documentation of the administrative record;

- Decrease the amount of staff and time needed to complete certain types of consultation or species coordination; and

- Improve ESA-listed species conservation and the regulated community's compliance with the ESA.

For example, effect determinations for wide-ranging species such as the Wood Stork determination key has been used extensively and has had some success. As stated in chapter 4.2.2. of the BE, the Eastern Indigo Snake and Wood Stork accounted for 56.6% of all species-level consultations in Florida between 2014 and 2018 (BE, p. 47). Species guidelines, or decision guidance tools, are also available independently from the IPaC system on the USFWS website.

These types of tools are available to project proponents and permit reviewers and provide consistent criteria to reach impact/effect determinations. The State's species coordination lead to facilitate the USFWS's review. The review process for species with these types of decision tools will likely be slightly different and simplified compared to those species that do not have these tools. In the early stages of reviewing a State 404 permit application, the State's species lead will use these decision tools to arrive at impact/effect determinations and potential protection measures. This preliminary review will be submitted to the USFWS with a request for technical assistance, allowing the USFWS to ask questions or provide additional information that may change the conclusions. After the species review outcome is finalized, technical assistance from the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued.

**Project-by-project assessments when tools are not available**

The BE states for those species or activities that do not have federal species guidelines or decision tools, a case by case assessment must be performed. A preliminary assessment will be performed by the applicant and verified or expanded upon by the FDEP/FWC species coordination lead. Applicants will need to provide all of the information necessary to perform an assessment of potential impacts to listed species and their habitats, as well as submitting proposed protection measures to avoid and minimize the anticipated impacts.

The BE states the following factors will be considered when evaluating the impacts/effects of the activity:

- Proximity of the activity to the species and/or designated critical habitat;

- Location and extent of the area of disturbance;

- Timing (with regards to sensitive periods of a species lifecycle);

- Duration of the activity or impact;

22

- Disturbance frequency, and

- Nature of the effect (elements of a lifecycle, population size, variability, or distribution, physical and biological features of habitat, etc.).

Federal species guidelines, information on IPaC, USFWS specific species webpages, the results of species surveys, (see Table 7.2 of the BE for guidance), relevant scientific literature, species accounts in Appendix B of the BE, stressors and effects in Appendix C of the BE with discussion in Chapter 5 of the BE, and other available sources of information are reviewed to develop preliminary conclusions of impact/effect as well as develop any potential protection measures.

Physical or biological features essential to the conservation of the species as identified in the final rules designating critical habitat for specific listed species should be considered to determine whether there may be adverse modification of critical habitat.

The BE states the species coordination lead will use the information from the applicant and assess all the data available to them to determine if there will be impacts to any listed species and the severity of adverse impacts to each species and habitats present in the project area. For projects with large amounts of acreage or that are intensive in the amount of activities proposed, or with multiple species and critical habitats, a written assessment determining preliminary anticipated adverse impacts and protection measures to avoid and minimize those impacts would be developed. This preliminary review will be submitted to the USFWS with a request for technical assistance or would be developed in coordination with the USFWS. The USFWS may comment, provide recommended protection measures, or provide additional information that may change the conclusions and protective measures. Once the species coordination review and technical assistance with the USFWS is completed, the species coordination process with the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued. At any time during the review of State 404 permit applications, if modifications to the project are proposed after the species coordination process, the species review will be revisited with the USFWS. If modification occurs after the application is granted, and the modification causes effects not previously considered by USFWS, the applicant may not be in compliance with this BiOp and may any incidental take that occurs may not be exempt from being considered as prohibited undersection 9 of the ESA.

**Impact/effect determinations and protective measures**

The BE states the word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under ESA. Throughout this document, these terms are used interchangeably. The State 404 program has two standards of review regarding the protection of listed species: the species protections required under CWA and ESA, and the species protections required under State Chapters 62-330, and 62-331, F.A.C. Under State rules, the requirements of CWA and ESA are incorporated into the species review process for adverse impacts to listed species and their habitats. The State rules are broad; the ERP rule and State 404 program rule protect not only federally listed and State-listed species, but all fish and wildlife in Florida.

While the State 404 program has been developed to meet the requirements of CWA and ESA, it also relies on the requirements of the existing State ERP program. The ERP program requires the applicant to provide reasonable assurances that the proposed activities will not damage or harm the water resources of the State nor reduce the value of wetland functions including functions provided to fish, wildlife and listed species. A state or federally listed species' ability to nest or den cannot be interrupted by negative

impacts to the uplands or wetlands a listed species uses. Subsection 62-330.301(1)(d), F.A.C. requires an applicant provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment "will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters" to obtain approval for a permit.  This review also includes consideration for secondary and cumulative impacts.

The BE states the protection measures are defined as those avoidance and minimization measures to address adverse impacts to listed species and critical habitat. Protection measures, in the form of avoidance and minimization measures recommended by the USFWS, are incorporated as conditions to the State 404 permit. Examples of protection measures include but are not limited to project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work).

**Determining impacts and effects to ESA-listed species when decision assistance tools are not available**

The BE states when decision tools are not available, the determination of whether a project's activities will affect endangered or threatened species is preliminarily made by FDEP and FWC, and coordinated with USFWS during the technical assistance process. Information about a species should be cross-referenced with knowledge of the project's activities and the project area to help predict whether and how the species at any life stage will respond when exposed to the effects of the activities. Based on best available data, if any of the following occurs it will be determined that the project will adversely impact/effect the species and technical assistance with the USFWS to determine possible protective measures is required. The following is to be used as guidance for making a "may adversely impact" determination:

- Data indicate the species may be exposed to the elements of the activity and respond deleteriously upon exposure to elements of the activity or to stressors produced by the activity; or

- Data indicate the proposed activity will cause changes to the physical and biological features of critical habitat and produces exposure or stressor to species.

As the species coordination process progresses during the review of a State 404 permit application, proposed activities will be assessed for potential effects to species. The USFWS will review and may provide additional information on whether adverse impacts are anticipated to occur, and how significantly the impacts are expected to affect the species or critical habitats. These determinations can be categorized as follows:

- No Effect/No Impact

- Not Likely to Adversely Affect/Impact

- Likely to Adversely Affect/Impact

- Jeopardizes the Continued Existence of the Species, and/or Destroys or Adversely Modifies Critical Habitat

*No Effect/No Impact*

24

If physical or biological features essential to the conservation of the species are not present or are present but will not be affected in the project area, then no further review of effects/impacts to critical habitats is required. In addition, a determination of "No Effect/No Impact" would be made if listed or proposed species or critical habitats do not occur and do not have the potential to occur on a site. If neither the species nor the critical habitat will respond in any manner, no further review of adverse impacts to species is required and technical assistance with the USFWS is concluded.

### *Not Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may affect a species or designated critical habitat, but the effect is not anticipated to cause harm to a member of the species, nor cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. The impact expected may not require protective measures (if discountable, or insignificant) or it may be deemed as not likely to adversely affect via required protective measures to avoid and minimize the effects.

### *Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may adversely affect a species or designated critical habitat, and the effect is anticipated to cause harm to a member of the species and/or cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. Harm to an individual(s) means injury or death. The level of harm, however, may not result in jeopardizing the continued existence of the species or destroying or adversely modifying critical habitat. The adverse impact expected is likely to require protective measures to avoid and minimize the effects.

### *Jeopardizes the Continued Existing of the Species and/or Destroys or Adversely Modifies Critical Habitat*

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C.) that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.

Through technical assistance with the USFWS, the FDEP and FWC will be informed of when a proposed project and its activities is anticipated to jeopardize the continued existence of the species, or if critical habitat is destroyed, or adversely modified. Under these circumstances, the FDEP, FWC, USFWS and the applicant will discuss to determine what, if any, protective measures may be appropriate.

The BE lists anticipated stressors in Table C.1. of Appendix C and notes anticipated effect determinations in Table C.1.b of Appendix C. During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews.

**State 404 process for developing and ensuring implementation of protective measures**

The BE states after the determination of "may adversely affect/impact" and the level of adverse impact, the species coordination process continues between the State species coordination lead and the USFWS during the review of a State 404 permit application. In order to move towards authorization of an activity, the project's adverse effects/impacts to species and habitat that have been identified must be avoided and minimized by implementing protective measures. Those protective measures may likely either modify the project design, modify the project operation, or follow species-specific protective measures. Early in the review process, the species lead will draft and compile the applicant's information as well as their own assessment and forward to the USFWS for review. The assessment may also be done in coordination with the USFWS, depending upon the project. The USFWS may or may not comment on the proposed preliminary impact review and proposed protection measures, and the finalized assessment and recommendations may be provided to the applicant in the form of comments and draft permit conditions. The USFWS may also recommend additional avoidance and minimization measures, provide recommendations for appropriate permit conditions if none were proposed in the informational package sent to them, or state that the proposed measures are not adequate to avoid or minimize effects to species and their critical habitats.

Some of the Federal species guidelines discussed in the previous subsection of this chapter provide minimization measures that are considered standard conditions for adverse effects associated with common, minor activities. For other species, there are typical minimization measures for common activities that are frequently incorporated into permits as standard conditions that may not be associated with programmatic guidance but can be found in biological opinions. Some projects, particularly those with a greater level of adverse impacts or multiple activities and/or multiple species that may be affected, have a need for a more comprehensive assessment and intensive coordination with USFWS.

In addition to species-specific protective measures, thorough assessments of adverse impacts to habitat must be performed in order to ensure alterations to habitat do not adversely affect listed species. There are various methods for avoiding and minimizing effects of dredge and fill activities within wetlands. Some impacts can be avoided or minimized through BMPs (e.g., silt fences, turbidity curtains, containing dredge materials during dewatering, transfer and storage), while others require administrative restrictions or permit conditions (e.g., contractor education, not refueling equipment within 100 feet of wetlands) to protect wetlands, waters, or "at-risk" species. A major administrative control that compensates for wetland destruction is wetland mitigation. Wetland mitigation includes the enhancement, restoration, establishment, and/or preservation of wetlands that serve to offset unavoidable impacts on wetlands (FDEP 2019b). Governments and agencies have used this policy across North America with notable levels of success (NAWCCC 2000). The species coordination process will avoid and minimize adverse impacts to habitat when practicable.

In addition, FDEP intends to incorporate adaptive management into the State 404 process as needed, particularly as it pertains to wetland compensatory mitigation projects. Per the FDEP's State 404 Applicants' Handbook, wetland compensatory mitigation projects that cannot be constructed in accordance with the approved mitigation plans will require FDEP approval prior to any significant modifications. Wetland compensatory mitigation projects not progressing toward meeting their performance standards will be evaluated for measures to address deficiencies and a determination as to whether these modifications will result in the project meeting its original ecological objectives.

FWS-006064

These modifications/measures may include but are not limited to site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. Performance standards will be revised to address deficiencies in wetland compensatory mitigation projects and to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

**Best management practices for wetland protection**

BMPs, including schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of WOTUS from discharges of dredged or fill material, will be implemented for all projects under the State 404 program. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with the Section 404(b)(1) Guidelines (40 CFR 230), effluent limitations or prohibitions under Section 307(a), and applicable water quality standards.

Wetland mitigation measures included in a Section 404 application may also offset effects or result in longer-term beneficial effects to ESA-listed species; however, they are part of the wetland protection process of the State 404 and ERP processes and not a requirement of the ESA coordination.

**Protective measures for plants and animals**

In Florida, fifty-four (54) plant species are on the Federal list of endangered species and 14 are on the Federal list of threatened species. The ESA (16 USC section 1531) provides protection to both endangered and threatened plants and animals. The ESA, however, does not prohibit the destruction, damage or transplantation of protected plants unless such activities involve an endangered species on Federal land or if the activities occur in violation of state laws. If a person wishes to develop private land, with no Federal jurisdiction involved, and if the proposal is in accordance with state law, then the potential destruction, damage, or movement of endangered or threatened plants does not violate ESA. Further, a section 10 ESA incidental take permit is only needed in situations where a non-federal project is likely to result in "take" of a listed species of fish or wildlife; there is no such process for plants.

But while incidental take does not apply to plants, an assessment of jeopardy and adverse modification to critical habitat under section 7(a)(2) applies to plants. For the State 404 program, 40 CFR 233.51(2), and 40 CFR 233.20(a) would prohibit issuance of a State 404 permit that will jeopardize a plant species or adversely modify its critical habitat. FDEP will incorporate any reasonable and prudent measures and terms and conditions provided by the USFWS into permit conditions for a State 404 permit for such a project.

Endangered, threatened and commercially exploited plant species in Florida are regulated by the Florida Department of Agriculture and Consumer Services, by their Division of Plant Industry. Florida's State ERP program under Chapter 62-330, F.A.C. and the State 404 program under Chapter 62-331, F.A.C. include plants in the definition of endangered and threatened species, which requires consideration of adverse impacts resulting from activities authorized under these programs. During the permit review process for each type of permit, FDEP will evaluate potential impacts and effects to State and ESA-listed plant species. Similar to animal species, USFWS will provide recommendations as needed to avoid and reduce anticipated impacts. For those types of projects where jeopardy is not expected to

27

occur and no adverse modification to critical habitat is expected, some projects may still need protective measures incorporated as permit conditions in order to adequately conserve endangered and threatened plant species.

The State 404 program, the State ERP program, and the ESA provide protection to both endangered and threatened plants and animals. As with animals, there could be a situation in which a federally listed plant is located in the upland portion of the project area that is adjacent to assumable waters and would be affected by the permit. The State 404 program is required to consider adverse impacts in uplands that would not occur except for the authorization of the proposed activity. In addition, while the State 404 program does not have jurisdiction in isolated wetlands, the ERP program does have jurisdiction and can address adverse impacts to animal and plant species dependent on these wetlands.

**Ensuring protection for ESA-listed species in Florida**

The State of Florida is required to incorporate all USFWS recommendations for protection measures as State 404 program permit conditions (Subsection 62-331.054(1), F.A.C.). The existing working relationship and coordination during the review of projects would continue between the FDEP and the USACE. The FDEP will add fields in their permitting tracking database that will continue the collection of data done by the USACE for past Section 404 permits. This data will continue the monitoring of adverse effects on listed species and critical habitat, facilitating the State's ability to conduct its compliance obligations.

In the current ERP program, FWC provides recommendations to FDEP and the WMDs for State-listed species and some federally listed species that are also protected by Florida Statutes, such as manatees and sea turtles. FWC has committed to assist FDEP in the State 404 program review for impacts to ESA- listed species, and the current collaboration between FDEP and FWC will be enhanced by the State's Assumption of the 404 program if EPA approves it. FWC and the USFWS have a long-standing partnership and a current ESA section 6 Cooperative Agreement for conserving Florida's federally endangered and threatened wildlife. The BE anticipates the relationship between FWC and USFWS will bring an existing high level of cooperation, knowledge, and expertise to the State 404 program. In addition, FDEP, FWC and USFWS have entered into a Memorandum of Understanding to identify commitments, roles and responsibilities regarding species coordination for the State 404 program as well as the ERP program (Appendix II).

The BE and MOU indicate the State 404 program species coordination process involves the applicant, FDEP, FWC and USFWS, and encourages compliance by the applicant to avoid and minimize adverse effects, reducing the expected impacts to listed species and their critical habitats. The interactions between agencies and the applicant will inform applicants of the importance of this process in order to be eligible for authorization of their proposed activities and in order to ensure compliance with the ESA.

Finally, if the applicant for a State 404 permit is the holder of a pre-existing valid and active biological opinion with an incidental take statement, or a Habitat Conservation Plan with an Incidental Take Permit (HCP/ITP) that was issued by the USFWS and the species and activities described in the State 404 permit application are covered by that particular biological opinion, or HCP/ITP, then FDEP may stipulate as a permit condition that the applicant must comply with that biological opinion or ITP. FDEP will confirm the validity and applicability of the applicant's pre-existing biological opinion or HCP/ITP with the USFWS before taking any final action on the State 404 permit application.

28

**State 404 process regarding statements of adverse impact in public notices**

The BE states while many adverse effects can be avoided and minimized during the species coordination review process, impacts that are likely to adversely affect a species (e.g. likely to cause incidental take or jeopardy) or critical habitat (e.g. destroy or adversely modify critical habitat) must be recorded, monitored, provided to the USFWS for tracking and species conservation purposes. These types of projects will receive the most stringent review and be documented in the Public Notice as well as the FDEP database and project file.

The public notice, required by Rule 62-331.060, F.A.C., will include an effect determination statement and include the proposed protection measures, if known at the time of publication. The effect determinations statements for species and critical habitats would include one of the following: "No Effect/Impact", "May Affect, Not Likely to Adversely Affect/Impact", or "May Affect, Likely to Adversely Affect/Impact".

The USFWS will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as "No Effect/No Impact". If the USFWS elected to not respond to these types of applications upon first submittal, they will still receive public notices for these applications and may elect to comment at that time. Receiving public notices for all applications also provides an opportunity for the USFWS to re-review all of the effect determinations made by the State and provide oversight of the species coordination process. Along with the public notice, the USFWS will receive copies of all applications and supplemental information submitted for applications required to be publicly noticed, with all stated effect or no effect determinations.

With the public notice, EPA will receive copies of all applications with a determination other than "No Effect/Impact". This provides an opportunity for the EPA to monitor the effectiveness of the species coordination process and to provide oversight of State permit actions and State 404 program operations, including ESA compliance.

**Description of dispute resolution between FDEP and USFWS; and USFWS-EPA coordination**

As stated in the BE, State 404 permits (as with USACE 404 permits) must comply with Section 404(b)(1) guidelines which include a stipulation that prohibits the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 CFR 230.10(b)(3). Similarly, State 404 Chapter 62-331.053(3)(a)(4), 331.201(3)(k) and the State 404 Applicants' Handbook (sections 1.3.3, 5.2.3) include provisions that prohibit issuance of State 404 permits that are likely to jeopardize ESA-listed species and recognize USFWS conclusions regarding potential impacts and necessary measures to address impacts are determinative.

For permits that would result in injury or harm to individuals of a listed species but whose impacts would not jeopardize the continued existence of the species or cause adverse modifications to critical habitat, FDEP shall incorporate USFWS-recommended protection measures as permit conditions to fulfill compliance with the anticipated Program assumption BiOp and for any subsequent anticipated incidental take to be exempted from prohibition under section 9 of the ESA.

The BE and the FDEP-FWC-FWS MOU regarding species coordination states the following steps would guide the resolution process in the event FDEP questions or disagrees with a local USFWS office about the necessity of project-specific, species-specific USFWS-recommended protection measures as being added as permit conditions for the purpose of either 1) avoiding jeopardy to a ESA-listed or

29

proposed species or adverse modification of critical habitat; or 2) minimizing incidental take to fish and wildlife..

*Interagency Elevation Process* **(excerpt from the FDEP, FWC, USFWS MOU, Appendix II, pp. 9-10)**

"FDEP, FWC and USFWS intend to work cooperatively to achieve their mutually shared objectives of protecting the quality of waters of the United States and the species that depend on those waters. Collaboration among Technical Team members, agency district, regional, and field staff when resolving any potential conflicts or disagreements should be performed through a structured, time-sensitive process at the lowest possible level. During the review of State 404 permit applications and these elevation procedures, the following regulations will be followed: 40 CFR § 233.20; 40 CFR § 233.50; the 404(b)(1) Guidelines in 40 CFR § 230; and 40 CFR § 230.10(b)(3). The agencies will follow the procedures below to elevate any conflict or disagreement.

Any contentious issues, disagreements or conflicts between agencies, or between agencies and applicants, will be discussed with an attempt to resolve them at the lowest levels within the agencies without elevation (reviewers and their supervisors). If issues cannot be resolved at this level, reviewers and their supervisors will reach out to the Technical Team for assistance (Level 1). If there is no consensus resolution at that level, or if it is deemed prudent, the issues will be elevated to Level 2, which would include the USFWS State Supervisor, FDEP State 404 program Supervisor, FWC Conservation Planning Services Director, and EPA Florida State 404 program Supervisor. While anticipated to be very rare, issues can be elevated to Level 3 if needed, which would include the USFWS Regional Director, Atlanta; EPA Regional Administrator, Atlanta; FWC Executive Director and FDEP Secretary. The supervisory level staff may differ for each agency and may differ depending upon the issue in dispute or conflict that needs resolution. All agencies will be included in resolution discussions, even if the issue only involves two of the three partner agencies.

While decisions at all levels, including decisions to elevate, will be made by consensus to the greatest extent practicable, any one agency can initiate the elevation process or elevate to the next supervisor level. Agencies will jointly prepare a summary document that will contain a statement of facts and succinctly state each agency's position and recommendations for resolution. This summary document will be developed and shared when elevated to Level 2 or Level 3. If needed, the summary documents may be updated when elevated to Level 3. The overall goal is to jointly develop implementable actions to avoid and/or minimize adverse impacts to listed species to ensure the impacts of any given project are not likely to result in take, or likely to jeopardize the continued existence of any species or adversely modify its critical habitat. With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, the final USFWS position is determinative. With regard to conclusions about the potential effects of a project on State listed species or the effectiveness of proposed protection measures, the final FWC position is determinative.

Elevation should be initiated so that all applicable deadlines will be met, considering subsequent levels of review. If FDEP is aware of a dispute, they will resolve the dispute prior to taking final action. This is to ensure consistency with applicable legal deadlines, and to allow the issue to be resolved through the elevation process. When determined to be appropriate (e.g., where the results of the elevation would provide useful guidance to agency staff or transparency to the public), the decision on the elevation should be memorialized in writing, placed in the application's official file, and circulated among Agency staff to serve as guidance for future decisions."

**Dredge or fill material discharge activities regulated by the State 404 program**

After FDEP completes its permit evaluation process and issues a State 404 permit to a permittee, the permittee will be authorized to discharge dredge or fill material into assumed waters. The BE (Appendix A) describes the different types of actions that cause the discharge of dredge or fill material in assumed waters. The list of anticipated actions was derived from the USACE project information database. All the activities in the BE's Appendix E list, however, may not be applicable to the State 404 program.

Dredging and filling actions include but are not limited to:

- o  Discharge of fill material
- o  Dredging
- o  Ecological restoration
- o  Discharge of dredged material
- o  Excavation associated with the discharge of dredged or fill material
- o  Other (Aquaculture, Work, Aerial or Submarine cable crossings)
- o  Conversion of waters type (forested wetland to emergent wetland, stream to lake)
- o  Commercial developments
- o  Residential developments
- o  Single-family residence
- o  Agriculture
- o  Utilities
- o  Roadways
- o  Airports
- o  Marinas
- o  Docks
- o  Piers
- o  Boat Ramps
- o  Dams
- o  Levees
- o  Mining activities
- o  Mitigation
- o  Restoration

**Proposed dredge material discharge or fill activities authorized or exempt under the State 404 Program**

The BE (Appendix A) describes the types of actions the State 404 program will regulate include all dredge and fill activities within the assumed waters. The proposed activities and exemptions below are excerpts from 40 CFR 232 and select definitions from 40 CFR 232.2, also summarized in Appendix B of the State 404 Handbook:

*Discharge of dredged material.*

(1) Except as provided below in paragraph (2), the term "discharge of dredged material" means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:
   (i)  The addition of dredged material to a specified discharge site located in waters of the United States;
   (ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

31

(iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:
    (i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to Section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.
    (ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chain sawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.
    (iii) Incidental fallback.


(3) Section 404 authorization is not required for the following:

    (i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized land clearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized land clearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.
    (ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at section232.2(r) of this chapter.
    (iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

    Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

FWS-006070

(5) For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

*Discharge of fill material.*

(1) The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2) In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

(i) Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

*40 CFR 232.3 Activities not requiring permits.*

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be

33

subject to any applicable toxic effluent standard or prohibition and shall require a Section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

> Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of Section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from Section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

  (1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

  (ii) (A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (i.e., ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

  (B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a Section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

  (2)  Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

34

(3)   Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4)   Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5)   Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6)   Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i)    Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii)   All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii)  The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv)   The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v)    Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi)   In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii)  The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

35

(ix)   The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x)    Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi)   The discharge shall not be located in the proximity of a public water supply intake;

(xii)  The discharge shall not occur in areas of concentrated shellfish production;

(xiii) The discharge shall not occur in a component of the National Wild and Scenic Rivers System;

(xiv)  The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv)   All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d)   For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1) Cultivating means physical methods of soil treatment employed within established farming, ranching
and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i) Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a Section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.
Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where

such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to        be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an  established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, disking,     harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in Section 404(r) of the Act are exempt from Section 404 permit requirements but may be subject to other State or Federal requirements.

**ACTION AREA**

The action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR402.02). Delineating the action area is necessary for the Federal action agency to obtain a list of species and critical habitats that may occur in that area, which necessarily precedes any subsequent analyses of the effects of the action to particular species or critical habitats.

37

The action area determines any overlap with critical habitat and the physical or biological features therein that we defined as essential to the species' conservation in the final rule designating its critical habitat. For species, the action area establishes the bounds for an analysis of individuals' exposure to action-caused changes, but the subsequent consequences of such exposure to those individuals are not necessarily limited to the action area.

For the review of this action, the action area encompasses the geographic extent of the FDEP Assumption of Section 404 permitting within the entire State of Florida. The action area consists of, and is limited to, the State-assumed waters (assumed waters) and areas affected directly or indirectly by the action, including affected upland, terrestrial areas.

The State 404 Handbook section 1.1 states, "The CWA does not define State-assumed waters; rather, it describes waters that a state cannot assume and for which jurisdiction remains with the Corps (retained waters). State-assumed waters then are all waters of the United States that are not retained waters. Retained waters are defined in section 2.0 of this Handbook and listed in Appendix A. Activities within retained waters will generally still require a state ERP authorization and a separate federal authorization from the Corps.  To provide certainty, streamlining, and efficiency, the State will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C. that are regulated under Part IV of Chapter 373, F.S. could be considered Waters of the United States, and will treat them as if they are, unless the applicant clearly demonstrates otherwise."

The BE indicates Florida's request to assume the administration of the CWA Section 404 permitting includes those Waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters. The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "retained waters". This definition can be found in the State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in Chapter 4.1 of the State 404 Applicants' Handbook. In addition, Appendix A of the 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The USACE also retains permitting authority for projects within "Indian country" as that term is defined at 18 USC section 1151 (provided below):

"Except as otherwise provided in Sections 1154 and 1156 of this title, the term "Indian country," as used in this chapter, means

a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

FWS-006076

A list of "Indian country" can be found online in the USACE Jacksonville District Regulatory Division Sourcebook.

The boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA."

The BE also notes Federal and state-approved dredge and fill activities may occur in isolation or adjacent to one another. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (BE's Figure 2-1 noted below). Projects that fall entirely outside of the 300-foot buffer of the retained waters will be permitted by the State 404 program (Project 3 in Figure 2-2 of the BE). Linear projects that have some portion of dredge and fill activities in retained waters will be entirely authorized and permitted by the USACE, even if dredge and fill activities occur in wetlands landward of the 300-foot buffer (Figure 2-3 of the BE).

39

Excerpt from BE's Figure 0-1. Example of activities authorized by the USACE 404 program



Excerpt from BE's Figure 0-2. Example of activities authorized by USACE and FDEP

Projects 1, 2, and 3 show the difference between retained and assumed waters responsibilities. Project 3 would be authorized by FDEP.

41



Excerpt from BE's Figure 0-3. Example of a linear project

Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guideline within the project boundary, the project is considered within retained waters and will be processed by the USACE.

Section 2.4 of the BE (Appendix A) describes in detail the physical attributes of action area. A summary of this description is provided below.

Florida's freshwater ecosystem includes 7,800 freshwater lakes, 700 springs, 11 million acres of wetlands, more than 1,700 rivers and streams, and numerous underground aquifers (Fernald and Purdum 1998 as cited in the BE). It is through these systems that freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem.

42

Although terrestrial habitats are not regulated under the CWA, many ESA-listed species that occupy assumed waters also require or utilize adjacent uplands. Upland portions of permitted activities are also subject to ESA consultation as part of permit review.

As summarized in BE, "Florida's terrestrial ecosystem includes approximately 3.7 million acres of natural habitats that are essential breeding, foraging, and refuge areas for many species. Florida has very little topographic relief, with the highest point at 328 feet above sea level. Slight changes in elevation result in habitat changes, with some upland communities at an only slightly greater elevation than adjacent wetlands. Diverse terrestrial ecosystems provide important habitat for a large variety of wildlife, including the Florida Panther, Gopher Tortoise, salamanders and frogs breeding in inclusions of ephemeral wetlands, and bats and crayfish living in caves (FWC 2019). Though uphill terrestrial habitats help to filter rainwater to lower elevations connected to freshwater habitats, only select ecosystems from the Wildlife Plan are discussed herein due to their relation to the action area."

**APPROACH TO THE ASSESSMENT**

Section 7(a)(2) of the ESA requires every Federal agency, in consultation with and with the assistance of the Services (U.S. Fish and Wildlife Service and National Marine Fisheries Service), to insure that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated critical habitat. "'Jeopardize the continued existence of'" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." (50 C.F.R. § 402.02) "'Destruction or adverse modification'" means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." (50 C.F.R. § 402.02).

Because we are consulting on EPA's approval of FDEP's request to assume the CWA 404 program in Florida's assumable waters, in which FDEP would regulate a broad array of activities conducted over several geographic areas and long periods of time, there is substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. Therefore, we developed a programmatic consultation approach to determine whether and to what degree FDEP has structured their regulatory program and EPA has structured its oversight program to ensure approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat by assessing whether the following criteria are fulfilled: (1) understand the scope of its action; (2) reliably estimate the physical, chemical, or biotic stressors that are likely to be produced as a direct or indirect result of their action; (3) minimize adverse effects of such activities on ESA-listed species and designated critical habitat; (4) identify, inform, encourage, and screen applicants for potential eligibility under or participation in the permitted activity; (5) continuously monitor and evaluate likely adverse effects on listed species and critical habitat; (6) monitor and enforce permit compliance; and (7) modify its action if new information (including inadequate protection for species or low levels of compliance) becomes available.

This approach also recognizes that site- and species-specific considerations would be addressed with the USFWS in subsequent technical assistance efforts with the State of Florida through the FDEP, FWC, USFWS MOU, the State 404 rule (62-331, F.C.A), and EPA's oversight regulations (40 CFR 233).

**Jeopardy Determination**

The jeopardy analysis in this BiOp relies on four components: (1) the Status of the Species, which describes the range-wide condition of the species, the factors responsible for that condition, and its survival and recovery needs; (2) the Environmental Baseline, which analyzes the condition of the listed species in the action area, without the consequences to the listed species caused by the proposed action; (3) the Effects of the Action, which includes all consequences to listed species that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action; and (4) the Cumulative Effects, which evaluates the effects of future, non-Federal activities in the action area on the species.

For purposes of making the jeopardy determination, the Service: (1) reviews all the relevant information, (2) evaluates the current status of the species and environmental baseline, (3) evaluates the effects of the Action and cumulative effects, (4) add the effects of the action and cumulative effects to the environmental baseline and, in light of the status of the species, determines if the action is likely to jeopardize listed species.

We evaluated the effects of the action on guilds of ESA-proposed and -listed species and designated and proposed critical habitat. Assigning species to guilds based on life-history similarities allows for a thorough review of expected responses of similar species to stressors without redundantly discussing key impacts for each individual species. Analysis of effects using a guild approach is more appropriate at the programmatic level. Species-specific and site-specific analyses will occur during the technical assistance process conducted between the USFWS and FDEP, and whenever EPA coordinates with USFWS on State permit actions.

**Adverse Modification Determination**

The destruction or adverse modification analysis in this BiOp relies on four components: (1) the status of critical habitat, which describes the range-wide condition of the critical habitat in terms of the key components (i.e., essential habitat features, physical and biological features, or primary constituent elements) that provide for the conservation of the listed species, the factors responsible for that condition, and the intended value of the critical habitat overall for the conservation/recovery of the listed species; (2) the environmental baseline, which analyzes the condition of the designated critical habitat in the action area, without the consequences to the designated critical habitat caused by the proposed action; (3) the effects of the action, which includes all consequences to the critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action; and (4) cumulative effects, which evaluate the effects of future non-Federal activities that are reasonably certain to occur in the action area on the key components of critical habitat that provide for the conservation of the listed species and how those impacts are likely to influence the conservation value of the affected critical habitat.

For purposes of making the destruction or adverse modification determination, the USFWS: (1) reviews all relevant information, (2) evaluates the current status of the critical habitat and environmental baseline, (3) evaluates the effects of the proposed action and cumulative effects, (4) add the effects of the action and cumulative effects to the environmental baseline and, in light of the status of the critical habitat, determines if the proposed action is likely to result in the destruction or adverse modification of critical habitat.

Past designations of critical habitat have used the terms "primary constituent elements" (PCEs), "physical or biological features" (PBFs) or "essential features" to characterize the key components of

44

critical habitat that provide for the conservation of the listed species. Recent critical habitat regulations (50 C.F.R. § 402.02) discontinue use of the terms PCEs or essential features, and rely exclusively on use of the term PBFs for that purpose because that term is contained in the statute. However, the shift in terminology does not change the approach used in conducting a ''destruction or adverse modification'' analysis, which is the same regardless of whether the original designation identified PCEs, PBFs or essential features. For those reasons, in this USFWS, we use the term PBFs to characterize the key components of critical habitat that provide for the conservation of the listed species.

## STATUS OF SPECIES

In the BE, EPA identified 235 species that occur in the action area and may be affected by the action and program activities that occur because of the proposed action (Table 3-1 of BE, p. 22). Of the 235, 139 are listed as threatened or endangered under the ESA and the remainder are species which have been proposed for listing, petitioned for listing, are candidates for listing, and/or have reasonable potential to be considered for ESA listing in the future. This BiOp concurs with and adopts the BE's list of ESA-listed and ESA-considered species that occur in the action area and respective effect determinations regarding the effects of the action.

For more information regarding the ESA-listed  individual species and critical habitats and the factors affecting their conservation status, please refer to proposed and final listing determinations, critical habitat designations, recovery plans, and five-year reviews available at: http://ecos.fws.gov/ecos/indexPublic.do.

In regard to future listing actions that result in new species being added to the ESA list, the proposed State 404 program's species coordination framework requires that when a State 404 application is received a current list of ESA-listed species must be used at the time a State 404 application is received in determining potential effects to ESA-listed species. Therefore, the State 404 review process is capable of maintaining compliance with the ESA by adapting to future changes to the list of species classified as threatened or endangered under the ESA.

## ENVIRONMENTAL BASELINE

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the action (which includes consequences caused by program activities). The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR 402.02).

All of the endangered and threatened species and designated critical habitat considered in this BiOp depend on the health of aquatic and terrestrial ecosystems for their survival. These species were listed as endangered or threatened, at least in part, because of the consequences of human activities on the aquatic and terrestrial ecosystems to include estuaries, rivers, lakes, streams, and associated wetlands, floodplains, riparian, and terrestrial ecosystems of Florida. The status and trends of those aquatic and

45

terrestrial ecosystems determines the status and trends of these species and the critical habitat that has been designated for them.

The BE (Appendix A: section 4, pp. 36-54) includes a description of the baseline for 404 permitting in Florida and its past and ongoing effects on ESA-listed and considered species. This BiOp adopts the BE's detailed description of the environmental baseline, which addresses the baseline of 1) the listed species and 2) their habitats, and 3) the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the U.S., adjacent uplands, and the ESA-listed and considered species that reside therein.

The programmatic nature of the action would trigger a change in the framework and processes that affect the implementation of permitted actions that affect the physical environment and potentially affect ESA-listed species and their critical habitats. The BE considers the USACE 404 program and State ERP program as part of the procedural processing (regulatory) baseline.

For example, when EPA publishes its approval of FDEP's assumption of the 404 program in the Federal Register, the USACE will cease to directly administer 404 permits in assumed waters and FDEP would immediately assume administration of 404 permits in assumed waters and modifications to the administration of its ERP program to align it with the State 404 program will be effective.

**Procedural Baseline: past and current regulation of discharge of dredged and fill material in Florida**

**Federal Regulations**

The BE states that Section 404 of the CWA (33 USC section 1344) establishes a program to regulate the discharge of dredged or fill material into WOTUS, inclusive of wetlands. The Administrator of the EPA, in conjunction with the Secretary of the Army, acting through the Chief of Engineers, established guidelines for regulating such discharges under Section 404(b)(1) of the CWA (40 CFR 230). The EPA and the USACE jointly implement the regulation and permitting of such proposed activities. In Florida, the USACE Jacksonville District acts as the regulatory agency that issues Section 404 dredge and fill permits.

*Individual Permits*

To receive a dredge and fill permit authorization from the USACE, an applicant must demonstrate the following under 40 CFR 230.10:

- No practicable alternative to the proposed activity exists that would have less adverse impact on the aquatic ecosystem;

- The proposed activity will not:

  o violate State water quality standards,

  o violate any applicable toxic effluent standard or prohibition,

  o jeopardize the continued existence of Endangered and Threatened species, or result in the likelihood of destruction or adverse modification of critical habitat

  o violate any requirement imposed to protect a marine sanctuary;

46

- The proposed activity will not cause or contribute to significant degradation of WOTUS; and

- The applicant has taken appropriate and practicable steps that will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

The USACE will request any additional information required to deem an application complete, typically within 15 days of receipt of the application. Once the agency deems the application to be complete, the USACE publishes a public notice within 15 days to receive comments from interested and/or affected parties on the proposed action.

Following receipt of an application and evaluation as to the completeness of the application, the USACE is charged with evaluating the effects of the proposed action on ESA-listed species or designated critical habitat. Where a proposed action may affect a listed species or critical habitat, USACE coordinates and/or consults with the Services prior to issuing any permit. If the USACE determines the proposed activity may affect any endangered or threatened species or their critical habitat, beneficially or adversely, the USACE District Engineer will initiate consultation with the Services. If the USACE District Engineer makes a determination from the submitted application that the proposed activity would not affect ESA-listed species or their critical habitat, the public notice will contain a statement attesting to such and consultation with the Services is not required.

The comment period is typically 30 days; upon receipt of comments, the USACE evaluates the comments received, provides them to the applicant, and determines whether a public hearing is required. Following the comment period (and a public hearing if conducted), the USACE makes a determination as to whether the Section 404 permit should be issued. This determination is based on applicable regulations governing the activity as well as comments received as part of the record. The USACE District Engineer will either prepare a Statement of Findings or – where an Environmental Impact Statement (EIS) has been prepared – a Record of Decision on all permit decisions. The final action of the USACE is either the signature of the issuing official on the authorizing document (a USACE Permit) or a signature on a letter notifying the application of the denial of the permit. An issued permit will contain conditions to follow in execution of the work; a denial will contain written documentation of the reason(s) for the denial.

*General Permits*

A general permit is issued for structures, work, or discharges that will result in only minimal adverse effects. General permits are issued on a nationwide, regional, or state basis for particular categories of activities. There are three types of general permits – Nationwide Permits, Regional General Permits, and Programmatic General Permits. General permits (which are reviewed by the Services) are usually valid for five years and may be re-authorized by the USACE (the Services will review the proposed reauthorizations).

*Nationwide Permits*

On a five-year basis, the USACE issues Nationwide Permits (NWPs) pursuant to Section 404(e) of the CWA (33 USC section 1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 USC section 401 et seq.). As of January 6, 2017, there were a total of 52 NWPs. The NWPs streamline the requirements of the CWA and are informed by extensive feedback from the public and other key stakeholders. NWPs provide expedited review of projects that have minimal impact on the aquatic environment. Categories of activities that may be covered under the NWPs include linear transportation

projects, bank stabilization activities, aquatic habitat restoration, residential development, commercial and industrial developments, aids to navigation, and certain maintenance activities.

In 2017, the USACE added two new NWPs in addition to the 50 that were in place in 2012. One addition provides a mechanism for an efficient authorization process for the removal of low-head dams to restore streams and enhance public safety; the second addition covers the construction and maintenance of living shorelines to control erosion in coastal areas (adapted from USACE news release dated January 6, 2017) (https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/1043614/army-corps-of-engineers-revises-and-renews-nationwide-permits/; accessed January 30, 2020).

*Regional General Permits*

As of February 2020, the USACE Jacksonville District has issued 18 general permits. Each regional general permit has specific terms and conditions, all of which must be met for project-specific actions to be verified as compliant with and covered by the respective general permit.

*Programmatic General Permits*

Programmatic General Permits are based on an existing state, local, or other federal program and designed to avoid duplication of that program. The USACE Jacksonville District lists 12 programmatic general permits - one of which is only applicable to Puerto Rico (https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Obtain-a-Permit/; accessed January 30, 2020).

**Florida regulations**

Part IV of section 373, F.S. regulates dredging and filling in wetlands and other surface waters, such as: the construction, alteration, operation, maintenance, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, works (including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other artificial structures), and appurtenant works (artificial improvements to a dam).

This statute authorizes FDEP and the five water management districts (WMDs) in the state to jointly implement Florida's ERP program. The responsibilities of the agencies are divided according to Operating Agreements between FDEP and the particular WMD. Provisions in the statute allow for FDEP to approve local government programs to implement the ERP program on behalf of the FDEP and the WMDs. As of January 2020, full delegation has been given to Broward County and minor works delegated to the Environmental Protection Commission for Hillsborough County.

The ERP program operates in addition to the USACE Section 404 program that regulates activities in WOTUS. All state, local, and regional governments in Florida delineate wetlands in accordance with state methodology (Chapter 62-340, F.A.C.) instead of the federal wetland delineation method (Section 404 of the CWA and the Federal Manual for Identifying and Delineating Jurisdictional Wetlands). While the ERP application is issued, withdrawn, or denied in accordance with state statutory and rule criteria (briefly summarized below), agency action on the ERP application also constitutes any needed water quality certification (waiver thereto) under Section 401 of the CWA, and coastal zone consistency concurrence statements with Florida's federally-approved Coastal Zone Management program under section 307 (Coastal Zone Management Act). These State ERP reviews and approvals by FDEP, WMD, or delegated local governments are not connected to, dependent upon, nor do they influence the USACE

permit review processes under Section 404 of the CWA. Therefore, the USACE must take separate action to issue or deny any needed federal permit under Section 404 of the CWA and/or section 10 of the Rivers and Harbors Act of 1899, and the USACE decision to issue a permit may or may not be consistent with the State's decision to issue an ERP permit.

To receive an ERP, an applicant must demonstrate that the proposed activity will not be harmful to the water resources of the state and will not be inconsistent with the overall objectives of Florida rules and statutes. The applicant must provide reasonable assurance that the activity will not violate the applicable state water quality standards and that the activity is not contrary to the public interest for all waters that are not designated as Aquatic Preserves or Outstanding Florida Waters. For activities in those designated waters, the applicant must provide reasonable assurance that the proposed activity will be clearly in the public interest. Surface water quality standards are published in Chapter 62-302, F.A.C. In addition, FDEP provides policy guidance on anti-degradation in Rule 62-4.242, F.A.C., and in Rule 62-302.300, F.A.C, which allows for the protection of water quality above the minimum required for classification. Further, FDEP administers the Impaired Waters Rule (Chapter 62-303, F.A.C.), and has established Total Maximum Daily Load criteria (Chapter 62-304, F.A.C.) (FDEP 2020b). It is the intent of FDEP and the WMDs that these criteria are implemented in a manner that achieves a programmatic goal and a project-permitting goal of no net loss in wetlands or other surface water functions.

To determine whether an activity is not contrary to the public interest or is clearly in the public interest, the FDEP must consider and balance the following criteria:

- Whether the activity will adversely affect the public health, safety, or welfare or the property of others;

- Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

- Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

- Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;

- Whether the activity will be of a temporary or permanent nature;

- Whether the activity will adversely affect or will enhance significant historical and archaeological resources; and

- The current condition and relative value of functions being performed by areas affected by the proposed activity.

FDEP provides a copy of all notices of ERP applications for individual permits that propose regulated activities in, on, or over wetlands or other surface waters to the FWC for review and comment. The FDEP and FWC frequently work together on non-regulatory issues as well as regulatory. Examples of the many collaboration efforts include habitat restoration projects, management of State Parks and management of species on other State-owned easements and property.

In accordance with the provisions of section 373.4141, F.S., the FDEP shall review the ERP application to determine if it is complete. If the application is incomplete, FDEP must request additional information (RAI) within 30 days. The applicant must respond to such requests within 90 days. Within 30 days after receipt of such additional information, FDEP must review the submitted material for completeness. The

WMD processing procedures for ERP vary somewhat to accommodate the requirements of their specific Governing Boards.

In accordance with section 120, F.S., FDEP must decide whether it should issue or deny an ERP within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application. Application completeness is determined by whether the applicant has submitted all materials required for review as specified by rule and statute. The WMDs also are subject to this requirement, but their ERP processing procedures vary by each district to accommodate the requirements of their different Governing Boards. Pursuant to section 120.60(1), F.S., any application that FDEP or the WMD does not approve or deny within 60 days is considered approved by default.

Once issued, ERP permits are valid for the life of the system (which includes all structures and works authorized for construction or land alteration). The ERP permit does not automatically expire after the construction phase (typically five years) of a project but continues to cover operation (use) of the system in perpetuity.

Under current regulations for permit issuance, an applicant proposing any activity that is expected to result in impacts to both federal and state jurisdictional wetlands or other surface waters must obtain both a Section 404 permit from the USACE and an ERP permit from FDEP or the WMDs. There is the potential for duplication of effort to obtain what, in some cases, results in nearly identical permits for anticipated impacts to the same extent of wetlands and other surface waters. The timelines for review and issuance of a federal Section 404 Permit and a State ERP permit can vary substantially. The State of Florida has an interest in assuming the federal permitting responsibility for Section 404 and will preserve the environmental protections afforded by federal law; the result should increase efficiency and consistency in the application review and issuance process while ensuring a framework that will maintain protections for listed species and their critical habitats.

**Ecological Baseline**

*Wetlands*

In 1845, the State of Florida contained an estimated 20.3 million acres of wetlands (Dahl 2005). By 1996, the BE notes only about half of the original wetlands remained (USFWS 1996). From the mid-1950s through the mid-1970s, prior to the CWA, the rate of wetland loss has been estimated at 72,000 acres per year (Hefner 1986). In the following decade, wetland loss decreased to an estimated 23,700 acres per year (Hefner et al. 1994).

As of 1996, an estimated 11.4 million acres of wetlands covered about 29 percent of the surface area of Florida, more than any other state in America at that time. Of these wetlands, 90 percent or about 10.2 million acres were freshwater wetlands. The average annual net loss of wetlands from 1985 through 1996 was 4,740 acres, and freshwater forested wetlands exhibited a net gain. During the 1985-1996 interval, 72 percent of wetland loss was attributed to development and 28 percent to agriculture (Dahl 2005).

*Central and Southern Florida Project*

The Central and Southern Florida (CS&F) Project for flood control and other purposes was authorized by the Flood Control Act of 1948 as an improvement plan for flood control, drainage, and other purposes over an 18,000-square-mile area of central and south Florida. This project authorized the

diversion of water to the Atlantic Ocean and the Gulf of Mexico through canals and the diversion of water southwest through the Everglades. The project provided benefits for human populations that were able to build, grow, and develop these new lands. The Everglades Agricultural Area was developed for the production of food, and areas further east became densely populated cities, including Miami, Ft. Lauderdale, and West Palm Beach. Unfortunately, the project also resulted in the modification and loss of 2,400 square miles of freshwater wetlands, including the Everglades (USACE 2019a). See Figure 4-1 of the BE for a comparison of historic freshwater flows compared to water flows today.

*Everglades Restoration*

Florida's everglades are twice the size of New Jersey, comprised of a mixture of dense forests and open prairies, sunny croplands and shady swamps, rural areas and cities. The South Florida Ecosystem Restoration Program, a partnership between the federal government and the State of Florida, consists of a suite of projects that focus on the C&SF system. In 2000, congressional authorization created the Comprehensive Everglades Restoration Plan (CERP), which is the single largest of the program's efforts. CERP is a 50/50 partnership between the federal government and the State of Florida. It is a program to restore, protect, and preserve water resources in central and southern Florida, including the Everglades. The USACE is the lead federal agency, and the South Florida Water Management District (SFWMD) is the lead State agency in this effort.

For 20 years, the CERP program has been designing, planning, and constructing multiple components of the South Florida Ecosystem Restoration Program. The goal of these efforts is to eventually improve 2.4 million acres of south Florida's wetlands ecosystems (including Everglades National Park), by reducing high volume discharges from Lake Okeechobee to the estuaries and improve water delivery to the Florida and Biscayne Bays, as well as enhance the freshwater supply (USACE 2019b). See Figure 4-2 of the BE for a depiction of the Everglades restoration project and the associated improvements to future ecosystem conditions.

**Historical Federal Permitting: Habitat**

WOTUS, as defined under currently applicable regulations and guidance, are regulated by the USACE under Section 404 of the CWA, and by FDEP and the WMDs. The following discussion is based on data provided by the USACE and characterizes Section 404 permits issued from 2014 through 2018. The habitat types are from Wildlife Plan and Guide to the Natural Communities of Florida (FNAI 2010), and each includes multiple subtypes. The BE cross walked with Cowardin types used for USACE reporting; while similar, definitions may not match entirely.

A single 404 permit may authorize activities that affect multiple wetlands or surface waters areas within the project area. So, the total number of areas will be larger than the total number of permits issued.

Please note that this data contained in the BE was used to analyze and depict general data trends for this BiOp to use, and not serve as a source for definitive quantitative data. The data summarized from the BE likely overestimate the number of projects that will be in assumed waters but is considered by USFWS to be the best available information.

The BE assessed the impact of the various types of wetlands. These impacts are summarized below.

Freshwater Non-forested Wetlands

Freshwater non-forested wetlands (assumed to be roughly equivalent to combined PEM and PSS Cowardin Types) are associated with a considerable number of the permitted activities in Florida from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 263 to 542, and the acreage ranged from 320 to 2,069 annually. Although freshwater non-forested wetlands are among the most extensive in Florida (about 5.4 million acres) (FWC 2019), Table 4-1 of the BE suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

*Freshwater Forested Wetlands*

Freshwater forested wetlands (to be roughly equivalent to Palustrine Forested (PFO) Cowardin Types) accounted for an even greater number of permitted fill activities from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 354 to 622, and the acreage ranged from 727 to 1,980.

Freshwater forested wetlands include about 4.2 million acres or about 10 percent of Florida's land area. Table 4-1 of the BE suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

*Lakes*

Lakes (assumed to be roughly equivalent to lacustrine Cowardin Types) accounted for a relatively small proportion of permitted activities: 24 to 32 WOTUS areas authorized from FY 2014 through 2018, and nine to 48 acres. Lakes cover almost 1.3 million acres in Florida, with much of the surface area in public ownership.

*Rivers and Streams*

Rivers and streams (assumed to be roughly equivalent to riverine Cowardin Types) accounted for 124 to 238 WOTUS areas authorized from FY 2014 through 2018, and 79 to 432 acres with considerable year to year variation. Estuarine Cowardin Type wetlands may also fall in this category, with a small area included in assumed waters; 22 to 112 WOTUS areas associated with permits were issued for estuarine wetlands, including three to 17 acres of impacts.

*Marine*

Relatively small areas of marine habitat (assumed to be equivalent to marine Cowardin Types) are within assumed waters; WOTUS areas authorized ranged from two to 15 per year, including less than one to about 10 acres of impacts per year.

*Uplands*

While uplands are not regulated under state wetland regulations, under the CWA and ESA, if uplands include listed species which can be adversely affected as a result of the action, those impacts/effects must be addressed. ESA-listed species could be affected by actions on uplands that are associated with wetlands permits such as construction of access roads or staging areas, and many species utilize both wetland and upland habitat. Thus, such features are often included as part of the species coordination process for a State 404 permit application review.

*Inventories and Surveys for Habitat Types and Quantities*

The most current information on Florida habitat types is summarized in the Wildlife Plan and is also available as GIS layers from the FNAI. While this information is in some cases based on site-specific inventories or surveys, it is presented at the statewide level. A statewide approach is believed to be

appropriate for the statewide Programmatic BE. Available GIS layers can be used to map specific wetlands, at a scale that can be presented in a statewide view or mapped on a finer scale when needed.

Historical ESA Consultations Triggered by Federal Wetland Permitting

The BE used the USACE permit database provided by the Regulatory Division of the USACE Jacksonville District, to examine consultations from fiscal years 2014 through 2018. This database includes all temporary and permanent permitted wetland impacts by Cowardin code, permit authorization type, dredge or fill acreage approved, and a project site coordinate. The database also includes all ESA consultations by type, agency, closure method, ESA-listed species potentially affected, and a corresponding object identification number that links the ESA consultations with the permitted wetland impacts.

The BE estimates that out of those past Section 404 permit applications reviewed, 7% of reviews were reasonably certain to result in incidental take (n=~368 permit reviews out of 5,195). This percentage was calculated using the USACE Jacksonville District permitting database's "Formal" choice in the "Consultation Type" field, since most of the formal consultations can be assumed to be associated with activities that may cause incidental take. Approximately 14% resulted in "Informal" type consultations. Approximately 79% of consultations from 2014-2018 were covered by existing programmatic consultations or effect decision tools.

For the USACE permit data collected during the years 2014-2018, a small proportion of the total number of ESA-listed species accounted for the majority of consultations. During this time, many of the species subject to frequent consultation had existing decisions tools such as consultation keys or programmatic biological opinions. For those species, such decision tools can help guide future consultations and assist FDEP when assessing potential effects of proposed actions.

Of the 139 listed and two (2) proposed species in the action area, 84 have been the subject of ESA consultations in the past five years. Two species (Eastern Indigo Snake and Wood Stork) accounted for 56.6% of species-level consultations, and just 15 species accounted for 93.3 percent of all species-level consultations. Recent consultations are not distributed evenly within the action area and can be especially dense in areas of rapid growth and development.

Excerpt from the BE (Table 0-1a).    Consultation Types for Federal actions Totals, FY 2014 – 2018

| ESA Determination | Total # (2014-2018) | % of Total |
|---|---|---|
| Formal | 368 | 7.08 |
| Informal | 710 | 13.67 |
| Programmatic | 4117 | 79.25 |
| Total | 5195 | 100 |

Source: USACE Jacksonville District

FWS-006091



Excerpt from BE (Figure 0-1). Locations of ESA Consultations in actionarea, 2014 – 2018

**EFFECTS OF THE ACTION**

Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See 50 C.F.R. § 402.17).

**Programmatic Approach**

As noted above, the scope of EPA's approval of FDEP's request to administer the CWA 404 program in assumable waters is essentially statewide, covering an array of operations that may affect a wide variety of ESA-proposed and -listed species and proposed and designated critical habitat. Because this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp. Therefore, the USFWS determined that a programmatic consultation is appropriate in determining whether FDEP's 404 program and EPA's oversight of FDEP's 404 program is structured to insure that no permit will be issued that is likely to jeopardize threatened and endangered species and destroy or adversely modify critical habitat. For future permits issued under the State 404 program, site-specific and species-specific information will be

54

available and assessed through the technical assistance process with the State and/or through coordination with the EPA, when EPA has not waived its review of the State permit action.

**Key Assumptions for the Effects Analysis**

In developing this analysis, we made a number of key assumptions due to the lack of information and uncertainties surrounding the location, timing, frequency, and intensity of State 404 permit actions. If these assumptions prove incorrect or warrant changes during implementation of the State 404 Program, it could affect the validity of this analysis and trigger re-initiation of ESA section 7 consultation if it results in effects that were not considered herein pursuant to 50 CFR 402.16.

As stated in the BE and the MOU, FDEP will provide USFWS with copies of all permit applications for review and comment, and to include in the record for the draft permit any species protection measures that the FWS recommends.

USFWS views this exchange of information and any resulting coordination as falling within the broad scope of "technical assistance" as described in the USFWS section 7 Consultation Handbook.

Key Assumptions of this BiOp in determining whether the proposed Federal action complies with section 7(a)(2) of the ESA.

1. USFWS will receive all State 404 permit applications upon receipt by the FDEP and all public notices issued by FDEP in accordance with timelines established by State and Federal regulations.
2. Where necessary, FDEP will incorporate the species protection measures, monitoring, and reporting recommendations provided by the USFWS through technical assistance facilitated by the exchange of information between the State (FDEP and FWC) and the USFWS
3. The species protection measures, monitoring, and reporting developed by FDEP, FWC, and/or recommended by USFWS and implemented by FDEP and the permittee will minimize the adverse effects to levels that will avoid jeopardy to species and/or destruction and adverse modification of critical habitat
4. For any existing 404 permit applications that are transferred from the Corps to FDEP upon assumption, FDEP may adopt any conditions that USFWS previously provided to the Corps in order to fulfill compliance with this PBO or may coordinate with USFWS to modify or amend the earlier conditions recommended by USFWS. The USFWS assumes this process will resolve any concerns regarding adverse effects to ESA-listed species and designated critical habitat that weren't previously considered on the original section 7 with the Corps.
5. FDEP and EPA will use their respective authorities to minimize adverse effects of State permit actions and ensure compliance with all permit conditions and/or conservation measures that are included as part of the State 404 permit action.

**Evaluation of the Programmatic Consultation Criteria**

We use a programmatic approach to determine whether and to what degree the FDEP 404 program and the EPA oversight of the FDEP 404 program have the structures needed to insure the issuance of State 404 permits is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat. In this evaluation, we

assess whether the State 404 program, as implemented by FDEP and overseen by EPA, fulfills the following criteria: (1) understand the scope of its action; (2) reliably estimate the physical, chemical, or biotic stressors that are likely to be produced as a direct or indirect result of their action; (3) minimize adverse effects of such activities on ESA-listed species and designated critical habitat; (4) identify, inform, encourage, and screen applicants for potential eligibility under or participation in the permitting activity; (5) continuously monitor and evaluate likely adverse effects on listed species and critical habitat; (6) monitor and enforce permit compliance; and (7) modify its action if new information (including inadequate protection for species or low levels of compliance) becomes available. While we recognize that site-specific activities would be addressed on a permit-specific basis during the technical assistance process with the State and coordination with EPA (when EPA has not waived review of the state permit action), this 7- question approach allows us to consider how the overall implementation of EPA's proposed action (which would include these site-specific processes) avoids jeopardy and adverse modification. We discuss each criterion and its applicability to the proposed action in the following paragraphs.

**Description of effects of the action**

The BE states the action studied in the BE is EPA's approval of the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. Inherent with the action is that the USACE would no longer accept 404 permit applications from the regulated community in assumed waters. The 404 program activities caused by the EPA approving the States 404 Program are: 1) FDEP would begin processing 404 permits in assumed waters, 2) FDEP would be required to coordinate with USFWS in reviewing permit applications in order to avoid or minimize effects to ESA-listed species and insure FDEP permit actions are not likely to jeopardize a species or adversely modify its critical habitat, and 3) the consequence of FDEP issuing 404 permits would be the placement of dredged or fill material into waters of the United States, which in turn would alter the environment where ESA-considered species may exist or designated critical habitat may exist.

The USFWS has determined that the endangered species coordination processes required in the State's operation of the State 404 program (as detailed in this BiOp's Description of the action and in the BE) are as protective as the section 7 interagency consultation processes that occur in the operation of the USACE 404 Program (as detailed in this BiOp's description of the environmental baseline).

The EPA action is not expected to increase or decrease the future number of CWA section 404 regulated activities. It is reasonable to expect that the permitting history presented in the BE for the years 2014-2018 approximates the number and types of permitting activities that could occur over the next five years. See Chapter 4.2.1 of the BE regarding the limitations of the data used in the analyses of the BE, regarding the interpretations of the USACE database and shapefile.

Because the precise number and locations of future State section 404 permit applications are unknown, the exact effects to ESA-species cannot be accurately determined. However, this BiOp and the BE examined the history of section 7 consultations related to CWA 404 applications and the data indicates 404 permits tend to cluster in rapidly developing regions of Florida.

Using the best available information on recent (2014 - 2018) permitting activities as a baseline (see Chapter 4 of the BE), and the information included in the species accounts in Appendix B of the BE, a qualitative assessment of the potential effects of the action on listed and proposed species and designated and proposed critical habitat was presented in the BE. The BE did not distinguish direct and

56

indirect effects based on 2019 revisions to the ESA's section 7 implementing regulations (50 CFR 402); however, both immediate impacts and impacts that are reasonably certain to occur later in time were considered.

Table C.1 in Appendix C of the BE summarizes the potential impacts of dredge and fill activities on ESA-listed and proposed to be listed species. This stressor table is intended to identify potential effects and facilitate analysis of which effects are reasonably certain to occur if EPA approves Florida's assumption of the CWA section 404 Program in assumed waters. A detailed analysis of potential effects in the future is not possible, because, as stated above, the exact locations, amounts, and types of impacts are not yet known. The BE briefly summarizes major categories of impacts and those are presented below, followed by a discussion of potential effects on major taxa.

**Types of Effects**

The following discussion is presented in the BE. This description of effects is not exhaustive but includes some of the more common influencing factors and consequences to species that may result from activities associated with the placement of dredge and fill material in waters of the U.S. There is a spectrum of effects to consider, including beneficial effects. For example, there is a level of disturbance without a detectable sign of effect (e.g. a wood stork flushed off a nest but returns before the eggs are harmed). There is also disturbance with a detectable sign of effect (e.g. a wood stork is flushed off a nest and the eggs overheat and die). Heightened levels of effect include injury that is observable or detectable, such as a failure to reproduce because of physiological or ecological effects of the action, or the death of one or more individuals.

There is also a theoretical spectrum of likelihoods regarding the probability that a given event or consequence might occur. These levels of likelihood that a consequence will occur include potential, unlikely, possible, likely, more than likely, and reasonably certain. With respect to a potential consequence meeting the definition of an Effect of the action, the consequence must be reasonably certain to occur which requires clear and substantial information to support that conclusion (50 CFR 402.02, 402.17). Potential stressors or effects to the species and to the essential physical and biological features of any critical habitat are discussed below and summarized in Appendix C, and we note that these same factors are evaluated during the review of State 404 permit applications and actions.

**Biotic Stressors**

Biotic stress is stress that occurs as a result of damage done to an organism by other living organisms, such as bacteria, viruses, fungi, parasites, beneficial and harmful insects, weeds, and cultivated or native plants. Dredge and fill activities can alter competitive balances, change predator/prey relationships, or encourage the establishment of invasive plants or animals, which can alter habitat structure. Loss or decrease, or colonization or increase, of a species can cascade through multiple trophic levels and, in some cases, even contribute to habitat alteration (monotypic stands of invasive plants).

**Physical Stressors**

Physical stressors should be assessed individually and cumulatively, when assessing potential biological impacts. An example of a physical stressor could be the physical diversion of a stream to another location, which may adversely impact the habitat for the flora and fauna using the original location of the stream. Other examples include the construction of new, improvements to, and even the removal of dams, weirs, and culverts, the removal of wetlands and surface waters by filling with materials, and the

creation of surface waters by dredging and excavation. Physical stressors include direct mortality (burying or trapping of individual animals by fill or equipment placing fill), especially for smaller, less mobile species; it can also result in loss of habitat and displacement of more mobile species able to escape the immediate effect. Fill of part of a wetland can contribute to loss of function even if most of the wetland remains intact.

Dredging can result in temporary to permanent loss of aquatic bottom communities, and sedimentation can reduce visibility, clog gills of aquatic species, and bury immobile organisms. Recovery from dredge effects may require hours to years, depending on the habitat, substrate type, and the extent of the disturbance.

Fragmentation can affect species that migrate seasonally between habitat types (pond breeding salamanders which spend the summer in uplands up to hundreds of feet away) or which have large home ranges and frequently move among resource types (Eastern Indigo Snake or Florida Panther). It can also disrupt metapopulations, especially for short-lived invertebrates dependent on stochastic environments, reducing the frequency of recolonization of otherwise suitable habitat.

Changes to hydrologic regime may include lowering of groundwater levels, increased runoff, or altered hydroperiod. Changes that result in early drying of ponds or wetlands may result in mortality to pond breeding amphibian larvae or small fish, while conversion of a seasonal wetland to a permanent pond may allow colonization by large predators, including stocking of game fish.

Some construction activities (e.g., pile driving or dredging) can result in air or underwater noise and vibration effects. Analysis of and attempting to reduce these effects has become more common in recent years. Construction activities such as noise, vibration, as well as visual disturbance, may alter the behavior of ESA-listed species.

Even measures intended to reduce effects can sometimes have unintended consequences. Some projects have relocated ESA-listed species, but little follow-up monitoring has been done to document success or failure of the translocations.

**Physicochemical Water Quality Stressors**

Physicochemical stress results from environmental factors such as food/nutrition, toxins, metabolic disorders, infections, and inflammation. Water Quality changes are commonly associated with dredge and fill activities, although these are not always easy to describe. Effects can include changes in water temperature, gas or oil dripping from construction equipment or generators to fill of a wetland, eliminating or reducing natural filtration of sediment and pollutants and resulting in degradation of downstream habitat. Dredging may also re-suspend environmental contaminants in sediment (common in industrial areas). Changes to nutrient cycling or exchange are even less obvious and may result from new activities occurring on or adjacent to the filled areas.

**Potential Effects**

The following discussion is grouped by major taxa and discusses potential effects of the action by future activities that may be authorized, should the State 404 program be approved, within guilds of species with similar habitat needs or life-history traits. These effects are similar to the effects of the current USACE Section 404 process for granting or denying permits, only will be performed by the State 404 program process as a consequence of the action, if approved. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the general types of activities and

overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for Assumption.

**Mammals**

Twenty-four mammalian species/subspecies are included in Appendix C, Table C.1. Two of these mammals are extirpated from the state and are therefore excluded from further consideration in this BE. General habitat preferences in Florida can group the remaining twenty mammals into the following broad categories: wetland/marsh (six mammals), forests/grasslands/swamps (two mammals), tropical hardwood hammock/mangrove (three mammals), caves (four mammals), pine rockland (one mammal), beach/scrub dune (five mammals), and aquatic (one mammal). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Table C.1.

In general, all mammalian species under consideration in this BE that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories and behaviors may be disturbed by activities during periods when authorized activity-related noise and vibration exceed baseline levels. Such activities may also disturb the natural behavior of ESA-considered species due to visual disturbance during construction activities.

ESA-considered mammals that occupy wetlands and marshes in Florida include voles, rabbits, and rats. These species/subspecies may occupy or use wetland/marsh habitat during all or a portion of their life history (e.g., for breeding, foraging, or shelter). Marsh and wetland species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality associated with future authorized activities could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development. Development of marshes/wetlands may create suitable conditions for non-native predators (e.g., cats and dogs) and competitors (e.g., *Rattus rattus*), which would also impact these ESA-considered species via increased ecological pressures.

Carnivores with large home ranges (e.g., Florida Panther and Red Wolf) occupy a diverse range of habitats, such as forests, grasslands, and swamps in Florida (as well as pine rocklands). Due to the restricted range of the Red Wolf on protected land in Florida (limited to St. Vincent Island, a USFWS National Wildlife Refuge), future activities authorized by the State 404 program are not likely to adversely affect the species. However, future permitted activities may impact the Florida Panther through direct impacts to habitat (dredge and fill), habitat fragmentation, and changes to existing hydrological regimes/water quality. Habitat fragmentation is one of the primary threats to this subspecies and a limit to its recovery.

Tropical hardwood hammock/mangrove ESA-considered mammal species (bats, rats, and mice) are likely to be impacted by future permitted activities via habitat fragmentation from fill or impacts to hydrology/water quality. Several species require fresh sources of drinking water, and their prey items are also dependent on these landscape features. In addition, impacts to habitat, including fragmentation, may create opportunities for non-native predators (e.g., cats) to colonize/thrive. The extent of tropical hardwood hammock and mangrove, particularly in south Florida, has declined significantly over the last several decades as a result of development, and further fragmentation could have significant impacts on ESA-considered species (USFWS 1999).

59

Several ESA-considered bat species/subspecies occur in limestone karst cave regions of the Florida Panhandle. Most of these bats are rare/unlikely to occur in the state, and future permitted activities are unlikely to adversely affect them. However, the Tricolored Bat is a permanent resident throughout Florida and occupies caves as well as woodland habitat and urban landscapes. Water features are also important to the species as foraging habitat. Direct impacts on the species' habitat (fill) as well as an increase in habitat fragmentation or impacts to hydrological regimes/water quality, may adversely affect the species.

The Key Deer (as well as the Florida Panther) inhabits pine rocklands. Pine rockland (as well as hammock) contains a substantial portion of the deer's forage plants, freshwater, and cover, which is especially important for fawning. Ongoing threats to the species include urbanization. Through direct impacts to habitat via fill, as well as habitat fragmentation and impacts to water quality, future permitted activities could have an impact on the subspecies.

Several ESA-considered beach mice occupy dune systems vegetated by sea oats and adjacent scrub (dominated by oaks and sand pine or palmetto) in coastal Florida. The predominant factors of decline for these mice are habitat loss due to alteration or conversion of dunes (from human development and use) as well as predation by non-native predators. Direct impacts to habitat via fill, dredging, and habitat fragmentation (which may make habitat for hospitable for non-native predators) could affect these species.

The West Indian Manatee is the only ESA-listed aquatic marine mammal considered in this BE. Florida manatees occur in freshwater, brackish, and marine environments, including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Future activities authorized by the State 404 program could affect this species from dredge and fill activities, increases in vessel storage and operation, and impacts on habitat, including changes in hydrologic regimes, water quality, water control structures, and habitat fragmentation.

**Birds**

Nineteen avian species/subspecies are included in Appendix C, Table C.1. Five of these birds are extirpated from the state and are therefore excluded from further impact analysis in this BE. The remaining 14 birds can be grouped by general habitat preferences in Florida into the following broad categories: marsh/wetland birds (five birds), upland scrub birds (one bird), coastal tidal/marine birds (four birds), grassland birds (two birds), pine savanna birds (one bird), and forest/forested wetlands birds (one bird). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is also presented in Appendix C, Table C.1.

In general, all avian species under consideration in this BE that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories may be disturbed by future permitted activities during periods project noise and vibration exceed baseline levels. In addition, these activities may also alter the natural behavior of ESA-considered via visual disturbance during construction activities.

Marsh/wetland avian species may be affected by any direct impacts to their habitat (nesting, foraging, roosting, overwintering, or stop-over site habitat). Physical impacts to their habitat associated with future State 404 permits may include fill, dredging, and habitat fragmentation. In addition, fill of

60

marsh/wetland habitat may result in a change to existing hydrologic regimes that could impact prey availability, via providing better conditions for invasive/competing prey species or reducing habitat for prey). Changes in hydrology also have the potential to flood habitat and nesting areas (resulting in nest failure), allow aquatic or terrestrial predators easier access to nests (during flooding vs. receding water conditions), and change the existing nutrient cycle. Changes in hydrology may result in high nitrogen levels in marshes/wetlands. The habitat then may become choked by an overabundance of emergent vegetation. Future permitted activities may also result in changes to water quality that could impact existing marsh/wetland vegetation and prey items (reducing habitat suitability for the species).

The only upland scrub avian species under evaluation is the Florida Scrub-jay. Florida Scrub-jays occupy early successional xeric scrub and scrub flatwood habitat in relict sand dunes in north and central Florida. This xeric habitat is well-drained but may be interspersed with swale marshes. Direct impacts associated with permitted activities that could affect the species include placement of fill, alteration of hydrologic regimes, and habitat fragmentation (a major issue that hampers the recovery of this species).

Direct impacts of future permitted activities on coastal tidal/marine avian species may include fill, dredging, and habitat fragmentation of nesting and foraging habitat (beaches, mudflats, intertidal areas, and inlets). Shoreline stabilization efforts, in particular, threaten several coastal avian species (i.e., fortification by riprap and other hardscape reduces available habitat). Permitted activities may also result in changes to hydrologic regimes and water quality in coastal areas.

Grassland (or dry prairie) avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes. Throughout Florida, grassland habitat is declining and highly fragmented. This habitat may also be mismanaged by suppression of natural fire regimes (USFWS 1999). Additional habitat loss and fragmentation may impact grassland species. Many grassland species also nest on or close to the ground and are highly susceptible to nest flooding (could occur with altered hydrological conditions in the grassland).

The only pine savanna avian species under evaluation is the Red-cockaded Woodpecker. Pine savanna ecosystems (or "high pine") are characterized by widely spaced pine trees and extensive ground cover. Wetlands may be interspersed in low-lying areas. This habitat is almost extinct and highly fragmented in Florida. Also, the quality of existing high pine forests may be hampered by fire suppression (USFWS 1999). Pine savanna avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes.

Forest/forested wetlands avian species may be impacted if future authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes and water quality. Many of the forest/forested wetland obligate species under evaluation are extirpated from the State of Florida. Habitat fragmentation may expose the remaining forest/forested wetland avian species to increased predation risk and nest failure (Stephens et al. 2004). Altered hydrology and water quality may impact prey availability as well.

**Reptiles**

Nineteen reptiles are included in Appendix C, Table C.1 of the BE. These reptiles can be grouped by general habitat preferences in Florida into the following broad categories: wetland/marsh/freshwater (seven reptiles), swamp/saltwater (one reptile), pine flatwoods (two reptiles), pine rocklands (two reptiles), and sandhill/scrub flatwood (seven reptiles). These groups are intentionally broad for this

macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Wetland/marsh/freshwater reptile species in Florida may be affected by any direct impacts to their habitat (foraging, breeding, loafing, etc.). Dredge and fill activities in wetlands, marshes, and freshwater (ponds, rivers, streams), including ditching, diking, and impoundments, may result in habitat fragmentation and potentially impact both prey and predator populations (both native and invasive species). In addition, species that spend a large portion of their lives in water are likely to be impacted by changes in hydrological regimes, water quality, and vegetation composition (e.g., increased levels of sedimentation, impacts to burrowing mud substrate, and changes in emergent/submergent vegetation). Impacts are anticipated to be similar for species that inhabit swamps/forested wetlands and saltwater mangroves.

Pine flatwoods serve as a mesic successional stage between hardwood hammock and wet flatwoods (USFWS 1999). This habitat is threatened by conversion or loss and degradation from fire suppression. Species restricted to pine flatwoods are unlikely to be adversely affected by future State 404 permits. However, species that range between pine flatwoods and other habitat types such as wet flatwoods may be affected by direct impacts to habitat and habitat fragmentation.

In Florida, large areas of pine rockland habitats are protected on federal lands. However, particularly around Miami and the Keys, this habitat is on private land and under threat from development, conversion to agriculture, fire suppression, and invasive species (USFWS 1999). Pine rocklands are interspersed with areas of freshwater wetlands. Species associated with these wetland features may be affected by direct impacts to habitat as well as habitat fragmentation.

Sandhill/scrub flatwoods are xeric, well-drained areas of prairie, hammock, and scrub. These habitats are threatened by conversion, degradation, and fragmentation. The species that are found in sandhill/scrub flatwoods are not typically associated with wetlands/WOTUS during their life histories. The future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

**Amphibians**

Five amphibians are included in Appendix C, Table C.1 of the BE. These include species that utilize seasonal wetlands to breed and then disperse into surrounding upland habitat (three amphibians); species restricted to aquatic caves (one amphibian); and subspecies that primarily utilize perennial wetlands but which always had a restricted distribution and may now be extirpated (one amphibian).

Pond breeding species are easily affected by direct fill of wetlands and by hydrology alteration, especially shortening of pond hydroperiod, which may strand aquatic larvae prior to metamorphosis. As these species move between upland and wetland habitat, fragmentation is a concern. In other parts of the United States, the USFWS sometimes explicitly considers fragmentation in making effects determinations and making conservation recommendations for pond-breeding ESA-listed amphibians (R. Henry pers. comm.). Fire suppression is believed to be a concern for some species in some habitat types. Pond breeding amphibians are also at risk because they utilize seasonal isolated wetlands, which often are not subject to CWA jurisdiction. For cave-dwelling amphibians, water quality degradation, and both chemical and from sedimentation, could have adverse effects. Hydrology alteration is also a concern.

Most ESA-considered amphibians in Florida have relatively small distributions. Fully implemented safeguards, such as careful review to identify occurrences associated with future permitting and with adequate avoidance and minimization measures including minimization of fragmentation near utilized wetlands, would ensure that effects would remain at or below baseline conditions.

**Fish**

Six species/subspecies of fish are included in Appendix C, Table C.1 including three types of sturgeon associated with larger rivers and estuaries, two other coastal species, and one species associated with smaller streams. The stream species (Okaloosa Darter) is especially at risk of fragmentation or direct habitat loss because of a restricted range and very limited mobility; however, most populations are currently managed, and the species is considered to be stable at present. The estuarine and coastal species are less likely to be affected by small amounts of dredge or fill because they tend to occur in larger and more contiguous habitats, although sedimentation, water quality degradation, and to a lesser extent direct habitat loss are potential effects. As fish are, by definition, fully aquatic, they are frequently affected by CWA activities. Should these species be found in State-assumed waters, coordination with the Services and important safeguards may need to be identified during permit review, such as implementation of Best Management Practices (BMPs), and avoidance and minimization measures.

**Insects**

Twenty-five species/subspecies of insects are included in Appendix C, Table C.1 including 11 butterflies, five caddisflies, five dragonflies, two bees, and two beetles. Two of these insects, the American Burying Beetle and the Three-toothed Long-horned Caddisfly, are extirpated from the state and therefore excluded from further consideration in this BE. The majority of these ESA-considered insects are threatened by the use of pesticides for agricultural purposes (e.g., Monarch Butterfly's loss of milkweed host plant) and biocides/insecticides for mosquito control.

All of the caddisfly and dragonfly species face similar threats associated with spring, stream, river, and lake modifications. They may be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Given that both groups spend the larval stage of their life cycles in an aquatic habitat, they are especially vulnerable to changes in water quality conditions (e.g., siltation, pollution, and eutrophication) and changes to existing hydrological regimes. Thus, changes in existing hydrological regimes and water quality could also degrade the quality of aquatic habitat and vegetation (e.g., allow for invasion of non-native vegetation).

ESA-considered insects that occupy wetlands, marshes, and swamps in Florida include the Palatka Skipper and Duke's Skipper butterflies and the Calvert's Emerald Dragonfly. These species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development and, in turn, habitat fragmentation.

Species that occupy forests, woodlands, pine barrens, pine rocklands, and/or grasslands in Florida (e.g., Monarch Butterfly, Florida Leafwing, Frosted Elfin Butterfly, Ceraunus Blue Butterfly, Cassius Blue Butterfly, Bartram's Scrub-hairstreak, and Miami Tiger Beetle) do not use wetlands or WOTUS during any stage of their life history. Future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

63

Coastal or tropical hardwood hammocks, dunes, sand pine, and/or scrub obligate insect species (e.g., Gulf Coast Solitary Bee, Nickerbean Blue Butterfly, Miami Blue Butterfly, and Blue Calamintha Bee) may be impacted by habitat fragmentation from fill. These impacts may occur where waters/wetland habitat is interspersed with or border these habitat types. As insects are declining on a global scale, impacts to habitat and other resources that factor into species' life history could affect ESA-considered species recovery.

**Crustaceans**

Nineteen crustacean species/subspecies are included in Appendix C, Table C.1. These species can be grouped by general habitat preferences in Florida into the following broad categories: pond/river/stream species (four crustaceans) and cave/well/sinkhole species (15 crustaceans). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Future authorizations under the State 404 program may impact pond/river/stream crustaceans (crayfish) via direct mortality or physical alteration of habitat through dredge and fill activities. Dredge and fill activities may also fragment habitat, change existing hydrological regimes, and affect water quality. All of the crayfish species under consideration in the action area are highly sensitive to and already threatened by impacts to both surface and groundwater quality (e.g., changes in temperature, flow, and siltation levels, etc.). Changes in water quality (e.g., an increase in nitrogen levels) may also create favorable conditions for invasive aquatic vegetation or change existing levels and/or species composition of native vegetation. This could decrease the quality of the existing crayfish habitat.

Crustaceans (crayfish and amphipods) that inhabit caves, wells, sinkholes, and other subterranean water features may also experience indirect mortality and/or impacts to habitat as a result of dredge and fill activities in or adjacent to occupied areas. Many cave/well obligates are extremely restricted in range (some species are only known from one or two localities). Any changes in habitat conditions could potentially result in species extirpation. Cave/subterranean crustaceans are also highly threatened by changes in hydrology. Any future activities that would deplete groundwater/aquifers results in changes in flow and, in turn, impacts availability of detrital food items or burrowing habitat. Water quality impacts (increase in nitrogen or sediment levels) may also affect the species. In addition, many cave-dwelling species are dependent on cave-roosting bats, specifically their guano, as a food source. Impacts on cave-roosting bat populations may also affect these crustaceans by reducing food availability.

**Mollusks**

As freshwater mussels are, by definition, fully aquatic, they are likely to be impacted by dredge and fill activities. Twenty-one species of mollusks are included in Appendix C, Table C.1, including 18 types of freshwater mussels that are associated with varying sizes of springs, creeks, and rivers, two freshwater snails, and one tree snail. The freshwater mussel species all face similar threats associated with habitat modification. These include direct habitat modifications such as impoundments, dredging/channelization, stream bed destabilization, and streamflow depletion (e.g., water extraction). They are especially vulnerable to changes in water quality conditions (e.g., excessive sedimentation, environmental contaminants, and eutrophication) and changes to existing hydrological regimes. Similarly, as filter feeders, they are vulnerable to changes in nutrient cycling. Given the reliance all freshwater mussels have on host fish during the larval period of their life cycle, impoundments or other effects influencing host fish species may affect these species. Additionally, mollusk species may be threatened by the invasive species (e.g., Asiatic Clam (*Corbicula fluminea*)), which could be spread by

64

dredge and fill activities. Tree Snails are less likely to be affected as they occur in terrestrial, arboreal environments; nonetheless, direct habitat fragmentation is possible.

**Plants**

Ninety-nine plants are included in Appendix C, Table C.1. These species/subspecies/varieties can be grouped by guild into the following categories: lichens, graminoids, annual forbs, perennial forbs, sub-shrubs, shrubs, cacti, and trees. These groups are intentionally broad for this macro analysis. Impact analysis on the species/subspecies/varietal level (that takes into consideration microhabitat preferences) is presented in Appendix C, Table C.1.

Nine annual forbs are included in this analysis. Five of these forbs occur primarily in wetland habitats, including non-forested wetlands such as prairies, as well as ponds and lakes, ditches, and road shoulders. Fifty-five perennial forbs are included, and roughly half of these occur in wetland habitats. They occur in a variety of specific habitats within freshwater non-forested and freshwater forested wetlands, including wet prairies, cypress swamps, bogs, fens, and seeps. Some occur in pond or lake habitats, and others occur in floodplains or along the banks of rivers or streams. Two epiphytic orchids in this category grow on trees in forested wetlands. One grass and one sedge species included in this analysis may be affected as well.

Four sub-shrubs, six shrubs, and two tree species considered in the analysis occur in wetland habitats, or in habitats which may border wetlands, and which may be affected by future activities that may be permitted under the State 404 program. These species occur in both freshwater non-forested and freshwater-forested wetlands. The sole lichen species and the four cacti species occur in upland habitats that are not likely to be affected.

Many of the species analyzed in this document have experienced substantial habitat loss and range restrictions due to a number of factors, including development and land conversion, alteration of fire regimes and fire suppression, threats from invasive species, and changes to hydrologic regimes. Some have been impacted by forestry practices or horticultural collection. Direct impacts to several of the plants may occur from future authorized fill or dredging activities (which could result in direct mortality or direct impact on wetland habitats). Indirect impacts from wetland dredge or fill activities may affect not only hydrophytes but also some upland species occurring in habitats that border wetlands, from the building of access roads or staging areas. Other indirect impacts include changes in hydrology, water quality, nutrient alteration, and competitive pressure that may arise from shifts in species composition.

**CUMULATIVE EFFECTS**

This BiOp must evaluate the consequences to species caused by future non-Federal activities within the action area, *i.e.,* cumulative effects. "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation" (50 CFR 402.02). Additional regulations at 50 CFR 402.17(a) identify factors to consider when determining whether activities are reasonably certain to occur. These factors include, but are not limited to: existing plans for the activity; and any remaining economic, administrative, and legal requirements necessary for the activity to go forward. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA.

Within the action area (the assumed waters and their adjacent uplands in Florida), declines in the abundance or range of many federally-threatened, endangered, and other special status species are attributable to various human activities on Federal, State, and private lands, such as human population expansion and associated infrastructure development; construction and operation of dams along major waterways; water retention, diversion, or dewatering of springs, wetlands, or streams; recreation, including off-road vehicle activity; expansion of agricultural or grazing activities, including alteration or clearing of native habitats for domestic animals or crops; and introductions of non-native plant, wildlife, or fish or other aquatic species, which can alter native habitats or out-compete or prey upon native species. Many of these activities are expected to continue within the range of various federally protected wildlife, fish, and plant species, and could contribute to cumulative effects to the species within the action area. Species with small population sizes, endemic locations, or slow reproductive rates will generally be more susceptible to cumulative effects.

The BE (Appendix A) has a section that describes the effects of non-Federal activities that are reasonably certain to occur in the action area. The BE states as compared to the regulatory baseline, the action does not authorize any new activities or increased discharge of pollutants that would significantly increase the magnitude of adverse cumulative environmental impacts to ESA-listed species, and the implementation of the State 404 program by FDEP will ensure effects on ESA-listed species will be evaluated and addressed at project-level. Lastly, as noted in this BiOp's Description of the action, the USFWS's project-specific, species-specific, review of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.

## INTEGRATION AND ANALYSIS OF EFFECTS

The action this BiOp is evaluating is the EPA's potential approval of Florida's request to assume administration of the CWA 404 program in assumed waters, defined as waters not retained by the USACE 404 program. The action will occur throughout Florida in assumed waters and may affect them and their adjacent uplands, which is considered the action area. The action is likely to adversely affect the species and critical habitats listed in this BiOp and the BE. This section of the BiOp integrates information presented in this BiOp to summarize stressors and the likely consequences of exposing ESA-listed species to these stressors.

This programmatic BiOp's effects analysis assesses whether, and to what degree, FDEP has structured its 404 program to establish processes that provide EPA , FWC, USFWS, and the 404 permit applicant to collectively implement the provisions of section 404(g)-(l) of the CWA and the State's 404 Program Rule (62-331 F.A.C.), and the FDEP-FWC-FWS Endangered Species Coordination Memorandum of Understanding in a manner that addresses adverse effects to listed species and their critical habitats, and ensures the regulated activities that require State 404 permits are not likely to jeopardize the continued existence of endangered or threatened species or destroy or adversely modify designated critical habitat.

As described in the BE, the State 404 Program requires the analysis for whether effects to listed species and their critical habitats have "reasonable potential" to occur (62-331, F.A.C.; 40 CFR 233.51), and if so, to further determine whether those effects are "likely to be an adverse effect", or "not likely to be an adverse effect". If adverse effects/impacts may occur, conditions or measures to avoid and minimize the impacts would be included as permit conditions and implemented by the permittee. The State 404

66

program species assessment is modeled after the Federal processes for determining, avoiding, and minimizing effects to listed species and ensures compliance with the ESA and the CWA during State 404 permit application review and permit issuance.

This BiOp confirms the resulting species coordination processes fulfill the following criteria when reviewing future State 404 permit applications:

1.  The scope of the action is adequately described;
2.  The physical, chemical, or biotic stressors to species that are likely to be produced as a result of the action is estimated;
3.  The adverse effects of such activities on ESA-listed species and designated critical habitat is minimized;
4.  The applicants participating in permitted activities are informed, encouraged, and screened for potential incidental take exemption eligibility as required by permit issuance;
5.  Likely adverse effects on listed species and critical habitat are monitored and evaluated;
6.  Permit compliance is monitored and enforced; and
7.  If new information becomes available (including inadequate protection for species or low levels of compliance), the action is re-evaluated and modified if warranted.

The FWC will assist FDEP with the coordination of ESA- listed species reviews, which would take place concurrently with their review of impacts to State-listed species (per Chapters 62-330, F.A.C. and 68A-27, F.A.C.) for the State 404 and ERP programs. The FWC may assist FDEP as the State's species coordination lead to be the point of contact for coordination with the USFWS. FWC may provide information and other preliminary assessment assistance to USFWS as USFWS reviews State 404 permit applications and develops recommendations for FDEP/FWC to avoid and minimize adverse impacts to listed species and their habitats.

**Key commitments by FDEP, FWC, FWS that ensure ESA-listed species coordination and conservation**

The species coordination process includes a USFWS review of all State 404 permit applications for consistency with the ESA and an EPA review (including consideration of USACE, USFWS, and NMFS comments provided to EPA) of applications with a reasonable potential to affect ESA-listed species. Key commitments between FDEP, FWC, and the USFWS to ensure a successful species coordination and conservation related to State 404 permit reviews include:

1)  FDEP's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA requirements.

2)  FDEP, FWC, and USFWS will participate in a State 404 program species coordination technical team. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

3)  Prior to assuming 404 permitting, FDEP and FWC permit review staff will be trained in the new State 404 program species coordination procedures and processes. The FDEP, FWC and the USFWS will collaborate on developing the training materials, and the FWC and the USFWS will be invited to participate in the in-person and/or virtual training meetings for FDEP permit review staff.

FWS-006105

4) All State 404 applications will be forwarded to USFWS for review, the majority of which will include FDEP or FWC preliminary determinations for effects to ESA-listed species or species proposed to be listed within a few days of the application provided to the USFWS. These preliminary determinations may include possible effects for species found onsite, potential impacts to critical habitat, and potential protective measures that may address the effects and impacts.

5) Technical assistance in individual project-by-project reviews from the USFWS may be accomplished by individual USFWS staff or by USFWS-approved effect determination tools, as described below.

6) FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat.  In addition, if:

   a) the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the USFWS and

   b) the species and activities described in the State 404 permit application are covered in the Program assumption BiOp, HCP/ITP (or similar agreement), then no additional avoidance and minimization measures would be required. FDEP would provide the documentation in order for USFWS review the project. If the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, FDEP will issue a Notice of Intent to Deny the permit.

## CONCLUSION

After reviewing the current status of the species, the environmental baseline for the action area, the effects of the potential action, and the cumulative effects, it is the USFWS's biological opinion that EPA's action, as proposed, is not likely to jeopardize the continued existence of ESA-listed species listed identified in this BiOp and is not likely to destroy or adversely modify designated critical habitat identified in this BiOp.

As described in the BE and this BiOp, activities regulated by section 404 of the CWA can have significant adverse effects on ESA-listed species and their critical habitats. EPA's approval of the State's 404 program activates the FDEP-FWC-USFWS MOU which establishes a process whereby the USFWS will be provided an opportunity to review all State 404 permit applications, and analyze impacts to ESA-listed species and designated critical habitat that may result from activities permitted by the State 404 program and provide technical assistance to FDEP with respect to avoiding and minimizing effects on .ESA-listed species and their critical habitats During this review, the USFWS will have an opportunity to provide additional information concerning potential effects to ESA-listed species, recommend measures to minimize effects, and provide monitoring and reporting recommendations on a project-specific and species-specific basis.

Our opinion is that the proposed action (including the subsequent program activities it will cause) has built in a sufficiently structured process to insure that the State's administration of section 404 of the CWA in assumed waters is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species by reducing the reproduction, numbers or distribution of that

species. It is also our opinion that the proposed action has built in a sufficiently structured process to insure State's administration of section 404 of the CWA in assumed waters is not likely to result in destruction or adverse modification of critical habitat.

## INCIDENTAL TAKE STATEMENT

Section 9 of the ESA and Federal regulations pursuant to section 4(d) of the ESA prohibit the "take" of endangered and threatened species, respectively, without special exemption. "Take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the USFWS as an act which actually kills or injures wildlife, which may include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.  Harass is defined by the USFWS as actions that create the likelihood of injury to listed species by annoying them to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of sections 7(b)(4) and 7(o)(2), taking that is incidental and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

Section 7(b)(4) and 7(o)(2) of the ESA generally do not apply to listed plant species. However, protection of listed plants from take is provided to the extent that the ESA prohibits the removal and reduction to possession of Federally listed endangered plants or the malicious damage of such plants on areas under Federal jurisdiction, or the destruction of endangered plants on non-Federal areas in violation of State law or regulation or in the course of any violation of a State criminal trespass law.

For species proposed for listing under the ESA, the prohibitions against taking endangered species under section 9 of the ESA or under a Section 4(d) rule for threatened species do not apply until the species is listed. If the conference opinion is adopted as a biological opinion following a listing or designation under section 4 of the ESA, the Reasonable and Prudent Measures, with their implementing Terms and Conditions, will be nondiscretionary. Terms and Conditions must be undertaken, for the exemption in section 7(o)(2) to apply.

For proposed activities in which the State has permitting authority and for which incidental take of ESA-listed species is reasonably certain to occur, the amount and extent of incidental take anticipated from these proposed activities will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the USFWS and the State.

### Amount or Extent of Take Anticipated

While the BE provided a detailed analysis of typical impacts related to stressors to ESA-listed species, inability to anticipate the locations of future State 404 permit applications did not allow the Service to conduct site- and species-specific analyses to estimate the number of individuals that might be affected by the permitted activities. .

However, through implementation of the State 404 program (62-331, F.A.C.) and EPA's oversight of the State 404 program and coordination of Federal review of state permit actions (40 CFR 233), this

69

project-specific information will be provided to the USFWS because USFWS will receive all State 404 permit applications.

This affords the USFWS the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis. This review will allow the USFWS to provide technical assistance to the State to adjust an action that may result in the take of ESA-listed species. As described in our conclusion, we assume that through technical assistance with the State, appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State 404 program will be developed by the USFWS, and that these measures will ensure that each permit will minimize adverse effects and thereby avoid jeopardy to ESA-listed species and avoid destruction or adverse modification of critical habitat.

If it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement.

Incidental take exemption will be afforded to EPA when its approval of the State's assumption of the administration of section 404 of the CWA, including its implementation process, is carried out as described in this BiOp. In addition, any take incidental to the execution of activities permitted by a State 404 permit issued through the implementation process described in this BiOp will be exempt from Section 9 and Section 4(d) prohibitions if the permittee implements all permit conditions such as effect minimization measures, monitoring, and reporting as agreed upon by the State, and the USFWS.

If FDEP chooses not to follow, or is unable to comply with the Reasonable and Prudent Measures and associated Terms and Conditions of this Incidental Take Statement, they may seek protections from the take prohibitions of the ESA by obtaining take authorization pursuant to section 10(a)(1)(A) and 10(a)(1)(B) of the ESA or exemption through a separate ESA Section 7(a)(2) consultation if another Federal nexus exists.

In summary, because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the USFWS to accurately estimate the specific amount of incidental take at this time that is anticipated to occur as a result of the action. However, the amount or extent of incidental take of listed species will be quantified during the technical assistance process that is required in accordance with the State 404 program rule (62-331, F.A.C.), the FDEP, FWC, USFWS MOU, and EPA oversight regulations (40 CFR 233). This Incidental Take Statement does not apply in the absence of any take prohibited under Section 9 or Section 4(d) of the ESA.

**Reasonable and Prudent Measures**

The following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take to species identified in this BiOp.

1.  EPA (the action Agency) will use its authorities under the CWA to minimize impacts to listed

species pursuant to its oversight of the State's 404 Program.

2. The State of Florida (the Applicant) will use its authorities under the State of Florida 404 Program Rule (62-331) and other authorities pertaining to the protection of fish, wildlife, and plants to minimize impacts to ESA-listed species pursuant to its administration of the State's 404 Program.

3. The parties (FDEP, FWC, and USFWS) will implement the FDEP, FWC, USFWS MOU.

## Terms and Conditions

In order to be exempt from the prohibitions of section 9 of the ESA, the Action Agency (EPA) and the Applicant (FDEP) must comply with the following terms and conditions, which implement the reasonable and prudent measure described above and outline required reporting/monitoring requirements. In accordance with 50 CFR 402.14(i)(1)(iv), these terms and conditions are non-discretionary and must be complied with by EPA or FDEP, as indicated below.

Terms and Conditions the EPA must comply with:

1. EPA shall oversee the operation of the State 404 program to ensure the State 404 program operates in accordance with the requirements stipulated in 40 CFR 233.

2. EPA shall coordinate Federal review of State 404 permit actions in accordance with the requirements stipulated in 40 CFR 233.50.

Terms and Conditions the FDEP must comply with:

1. FDEP shall participate in a State 404 program species coordination technical team with FWC and USFWS per the FDEP-FWC-USFWS MOU. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

2. FDEP shall implement a training program to familiarize FDEP and FWC permit review staff with the State 404 program species coordination procedures and processes. FDEP shall collaborate with FWC and USFWS on developing the training materials, and shall invite FWC and USFWS to participate in the in-person and/or virtual training meetings for FDEP permit review staff.

3. FDEP shall forward all State 404 applications to USFWS for review, in accordance with the timeframes and processes described in the BE and this BiOp's description of the proposed Action.

4. FDEP shall accept technical assistance in individual project-by-project reviews from the USFWS via individual USFWS staff coordination or by USFWS-approved effect determination tools.

5. FDEP shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided to FDEP by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat.

6. If the applicant for a State 404 permit is the holder of a pre-existing valid and active biological opinion with an incidental take statement, or a Habitat Conservation Plan with an Incidental Take Permit (HCP/ITP) that was issued by the USFWS and the species and activities described

in the State 404 permit application are covered by that particular biological opinion, or HCP/ITP, then FDEP may stipulate as a permit condition that the applicant must comply with that biological opinion or ITP. FDEP will confirm the validity and applicability of the applicant's pre-existing biological opinion or HCP/ITP with the USFWS before taking any final action on the State 404 permit application.

7. FDEP will issue a Notice of Intent to Deny the permit if the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level.

8. FDEP will provide an annual report to the USFWS that:
   a. Summarizes the number and types of State 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat.
   b. Includes a table that identifies all ESA-listed species taken by State 404 permitted activities along with the amount or extent of such take.
   c. Identifies any permits that were elevated in accordance with the FDEP-FWC-USFWS MOU and how those elevations were resolved.

9. If prior to the completion of a permitted activity, new information (e.g. listing of new species, new critical habitat, or modifications to permitted activity) shows that the magnitude of impacts to listed species is greater than originally anticipated by USFWS, or that the amount of incidental take originally anticipated by USFWS is exceeded, FDEP, in accordance with its authority under 62-331.080, F.A.C., will reopen the permit and coordinate with the USFWS to: 1) determine if the additional impacts are likely to jeopardize any species; and 2) determine if additional minimization measures, reporting, or monitoring are required as deemed necessary by USFWS.

10. FDEP will inform 404 permittees that if a permittee locates dead or injured ESA-listed species, immediate notification must be made to the appropriate Field Office of the USFWS. Pertinent information including the date, time, location, and possible cause of injury or mortality (e.g. impingement or entrainment) of each species shall be recorded and provided to the USFWS. Instructions for proper care, handling, transport, and disposition of such specimens will be issued by the Services. Care must be taken in handling sick or injured animals to ensure effective treatment and in handling dead specimens to preserve biological material in the best possible state.

**Conservation Recommendations**

Section 7(a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. We recommend that EPA, FDEP, and State 404 permit applicants implement the following actions:

1. In consultation with the Service, develop a conservation program for threatened and endangered species and develop conservation plans that specifically addresses threats to listed species and how implementation of CWA programs can ameliorate those threats;

2. EPA and FDEP may further aid the recovery of ESA-listed species by sponsoring additional research and development that improves the wildlife value of activities regulated by the CWA 404 program (e.g., creation of shallow-water littoral shelves in stormwater retention ponds for the benefit of wading birds).

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or

benefitting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the action. As described in 50 CFR §402.16, reinitiation of consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed.

## LITERATURE CITED

16 United States Code (USC) Chapter 35, Sections 1531, 1532, and 1536. The Endangered Species Act of 1973.

18 United States Code (USC) Chapter 53, Section 1151. Indian Country Defined.

33 Code of Federal Regulations (CFR) Part 322. Permits for Structures or Work in or Affecting Navigable Waters of the United States.

40 Code of Federal Regulations (CFR) Part 232 and 233. 404 State Program Regulations.

50 Code of Federal Regulations (CFR) Part 402. Interagency Cooperation-Endangered Species Act of 1973, As Amended.

1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services. 2017. A Special Report – What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project. https://1000friendsofflorida.org/florida2070/ (01/15/2020).

Abiy, A. Z., A. M. Melesse, W. Abtew, and D. Whitman. 2019. Rainfall trend and variability in Southeast Florida: Implications for freshwater availability in the Everglades. *PLOS ONE* **14**(2): e0212008.

Baumberger, R. E. 2008. The impacts of harmful algal blooms on a Florida reef fish community.

73

Master's thesis. Florida Atlantic University, Boca Raton, Florida, USA.
https://fau.digital.flvc.org/islandora/object/fau%3A2853/datastream/OBJ/view/impacts_of_harmful_al
g al_blooms_on_a_Florida_reef_fish_community.pdf.

Benscoter, A. M., J. S. Reece, R. F. Noss, L.A. Brandt, F. J. Mazzotti, et al. 2013. Threatened and
endangered subspecies with vulnerable ecological traits also have high susceptibility to sea level
rise and habitat fragmentation. *PLOS ONE* **8**(8): e70647.

Dahl, T. E. 2005. Status and trends of wetland sin the conterminous United States 1998 to 2004. U.S.
Fish and Wildlife Service, Fisheries and habitat Conservation, Washington, District of Columbia,
USA.

Dahl, T. E. 2011. Status and trends of wetlands in the conterminous United States 2004-2009. U.S.
Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

Fernald, E. A., and E. D. Purdum. 1998. *Water resources atlas of Florida*. Institute of Science and
Public Affairs, Florida State University, Tallahassee, Florida, USA.

Florida Administrative Code (FAC) Chapter 62-330. Environmental Resource Permitting.

Florida Administrative Code (FAC) Chapter 62-331. State 404 program.

Florida Administrative Code (FAC) Chapter 68A-27. Rules Relating to Endangered or Threatened
Species.

Florida Department of Environmental Protection (FDEP). 2019b. Wetlands Mitigation. Available online
at: https://floridadep.gov/water/submerged-lands-environmental-resources-
coordination/content/mitigation. Accessed January 27, 2020.

Florida Department of Environmental Protection (FDEP). 2020a. State 404 program applicant's
handbook. FDEP. Version 02/11/2020. https://floridadep.gov/water/water/content/water-
resource-management- rules-development. (02/24/2020).

Florida Department of Environmental Protection (FDEP). 2020b. Water Quality Standards. FDEP.
floridadep.gov/DEAR/Water-Quality-Standards. (02/16/2020).

Florida Fish and Wildlife Conservation Commission (FWS). 2016. Florida's Imperiled Species
Management Plan. November 2016, with amendments incorporated December 2018.
Tallahassee.

Florida Fish and Wildlife Conservation Commission (FWC). 2018. Florida's endangered and threatened
species. Updated December 2018. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2019. Florida's Wildlife Legacy Initiative:
Florida's State Wildlife action Plan. Tallahassee, Florida, USA.

FWS-006112

Florida Natural Areas Inventory (FNAI). 2010. Guide to the natural communities of Florida. 2010 edition. Tallahassee, Florida, USA. http://fnai.org/PDF/FNAI-Natural-Community-ClassificationGuide- 2010_20150218.pdf. (02/24/2020).

Florida Statutes (F.S.) Chapter 373. Water Resources.

Hefner, J. M. 1986. Wetlands of Florida, 1950s to 1970s. Pp. 23-31 *in:* E. D. Estevez, J. Miller, J. Morris, and R. Hamman (eds.), *Managing Cumulative Effects in Florida Wetlands*. New College Environmental Studies program Publication No. 37. Omnipress, Madison, Wisconsin, USA.

Hefner, J. M., B. O. Wilen, T. E. Dahl, and W. E. Frayer. 1994. Southeast wetlands; status and trends, mid- 1970's to mid-1980's. Department of Interior, Fish and Wildlife Service, Atlanta, Georgia, USA.

Holt, L. 2005. Avoiding a water crisis in Florida: how should water resources be managed in response to growth? *Florida Water Resources Journal* (October):16-22.

Makepeace, D. K., D. W. Smith, and S. J. Stanley. 1995. Urban stormwater quality: summary of contaminant data. *Critical Reviews in Environmental Science and Technology* **25**:93-139.

Mendelsohn, R., K. Emauel, S. Chonabayshi, and L. Bakkenshen. 2012. The impacts of climate change on global tropical cyclone damage. *Nature Climate Change* **2**: 205-209.

Nagy, R. C., B. G. Lockaby, L. Kalin, and C. Anderson. 2011. Effects of Urbanization on Stream Hydrology and Water Quality: the Florida Gulf Coast. *Hydrological Processes* **26**:2019-2030.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (*Pristis pectinata*). Prepared by the smalltooth sawfish recovery team for the National Marine Fisheries Service, Silver Spring, Maryland, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Smalltooth sawfish. Species directory. https://www.fisheries.noaa.gov/species/smalltooth-sawfish#overview. (01/07/2020).

NatureServe. 2020. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/. (01/15/2020).

North American Wetlands Conservation Council (Canada) (NAWCCC). 2000. Wetland Mitigation in Canada. A Framework for Application. No. 2000-1 Available online at: http://nawcc.wetlandnetwork.ca/Wetland%20Mitigation%202000-1.pdf. Accessed January 28, 2020.

Prinos, S. T. 2014. Origins and delineation of saltwater intrusion in the Biscayne Aquifer and changes in the distribution of saltwater in Miami-Dade County, Florida. *Scientific Investigations Report*. doi:10.3133/sir20145025.

U.S. Army Corps of Engineers (USACE). 2019a. Central and Southern Florida (C&SF) project – fact

FWS-006113

sheet. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/About/Congressional-Fact-Sheets-2019/C-SF-Project-C/. (02/24/2020).

U.S. Army Corps of Engineers (USACE). 2019b. Ecosystem restoration. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem- Restoration/. (02/24/2020).

U.S. Army Corps of Engineers (USACE) and South Florida Water Management District (SFWMD). 2007. Broward County Water Preserve Areas Comprehensive Everglades Restoration Plan (CERP) Final Project Implementation Report and EIS Briefing to the Civil Works Review Board. https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/5154. (01/27/2020).

U.S. Environmental Protection Agency (USEPA). 2020. Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals. https://www.epa.gov/sites/production/files/2020-08/documents/esa_consultation_policy_for_404g.pdf. (08/27/2020).

U. S. Fish and Wildlife Service. 1996. The South Florida ecosystem. South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (*Trichechus manatus latirostris*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019a. Consultation guidance - programmatic consultations. USFWS South Florida Ecological Services Field Office, Vero Beach, Florida, USA. https://www.fws.gov/verobeach/Programmatic%20Consultations.html. (02/24/2020).

Vose, R.S., D.R. Easterling, K.E. Kunkel, A.N. LeGrande, and M.F. Wehner, 2017: Temperature changes in the United States. In: *Climate Science Special Report: Fourth National Climate Assessment, Volume I* [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)].

U.S. Global Change Research Program, Washington, DC, USA, pp. 185-206, doi: 10.7930/J0N29V45

76

77

# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL FRAMEWORK ..................................................................................................... 3

    I.    The Clean Water Act. ............................................................................................. 3

    II.   The Endangered Species Act. ............................................................................... 5

    III.  The Rivers and Harbors Act. ................................................................................ 7

STATEMENT OF FACTS ................................................................................................. 8

    I.    Florida's Vast Waterways. ..................................................................................... 8

    II.   Florida's Abysmal Environmental Record. ..................................................... 10

    III.  Florida's Pursuit of 404 Assumption. ............................................................. 10

    IV.  The Corps' Retained Waters List. .................................................................... 12

    V.   Endangered Species Act Consultation. .......................................................... 15

    VI.  EPA's Approval of the State's Application. .................................................... 20

PROCEDURAL BACKGROUND .................................................................................. 21

STANDARD OF REVIEW ............................................................................................... 22

ARGUMENT ...................................................................................................................... 23

    I.    USFWS Violated the ESA by Substituting a Non-Statutory Technical Assistance Process for the ESA's Statutory Framework. ............................... 24

        A.   USFWS Abdicated Its Duties to Abide by the ESA's Requirements. ................. 25

        B.   USFWS' ITS Unlawfully Extended Take Liability Exemptions Without Creating ESA-Mandated Guardrails. ............................................. 30

        C.   USFWS Unlawfully Relied on a Novel Technical Assistance Process to Avoid the Mandates of Section 7 Consultation. ..................................... 33

    II.   EPA Unlawfully Relied on USFWS' Arbitrary and Capricious BiOp and ITS. ........... 39

    III.  EPA Arbitrarily and Capriciously Determined "No Effect" to NMFS Species. ........... 40

    IV.  EPA Unlawfully Approved a State Program that is Less Stringent Than Federal Law. ........................................................................................................ 43

        A.   EPA Approved a State Program That Failed to Meet Minimum Enforcement Standards Required to Abate Violations of a Permit or the Permit Program. ...... 44

        B.   EPA Approved a State Program That Relied on Applicants' "Assurances" In Lieu of the Federal 404(b)(1) Guidelines' Requirement that the Permitting Authority Independently Make Factual Determinations. ...................................... 49

i

C.  EPA Approved a State Program with a Narrow View of Water Quality Effects
Determinations Contrary to the Federal 404(b)(1) Guidelines. ........................... 52

D.  EPA Approved a State Program That Failed to Comply with 404(b)(1)
Guideline to Ensure No Jeopardy from State Permits. ........................................ 54

E.  EPA Approved a State Program That Failed to Demonstrate That Assumable
Waters Would be Regulated and Transferred Authority over Non-Assumable
Waters to the State. ........................................................................................... 55

V.  The Corps Unlawfully Relinquished 404 Jurisdiction Over Certain Waters................. 58

VI.  EPA Arbitrarily and Capriciously Determined the State's Inadequate Application
Was Complete. ...................................................................................................... 60

STANDING ............................................................................................................................ 63

CONCLUSION ....................................................................................................................... 69

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                   **Page(s)**

*Akiak Native Cmty. v. EPA*,
   625 F.3d 1162 (9th Cir. 2010) ...................................................................48

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*,
   140 S. Ct. 2792 (2020) ...............................................................................43

\*   *Am. Rivers v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018) ..............................................22, 29, 39, 42

\*   *Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ..........................................................33

*Appalachian Voices v. U.S. Dep't of Interior*,
   25 F.4th 259 (4th Cir. 2022) .....................................................................29

*Arizona Cattle Growers' Ass'n v. USFWS*,
   273 F.3d 1229 (9th Cir. 2001) ...............................................................7, 32

\*   *Bennett v. Spear*,
   520 U.S. 154 (1997)..............................................................................58, 59

\*   *Chesapeake Bay Found. v. Bethlehem Steel Corp.*,
   608 F. Supp. 440 (D. Md. 1985) ...............................................................49

\*   *City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ..............................................................39, 42

*In re Clean Water Act Rulemaking*,
   568 F. Supp. 3d 1013 (N.D. Cal. 2021) ......................................................3

\*   *Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ............................................................30, 34

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018)...................................................................37, 38

*Ctr. for Biological Diversity v. EPA*,
   56 F.4th 55 (D.C. Cir. 2022)......................................................................65

\*   *Ctr. for Biological Diversity v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017) ...................................................................68

\*   *Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 173 (D.D.C. 2022)......................................................58, 63

*Ctr. for Biological Diversity v. Rumsfeld*,
   198 F. Supp. 2d 1139 (D. Ariz. 2002) ................................................34

*Ctr. for Biological Diversity v. Salazar*,
   695 F.3d 893 (9th Cir. 2012) ................................................................7

\*   *Ctr. for Biological Diversity v. Zinke*,
   369 F. Supp. 3d 164 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*,
   961 F.3d 1197 (D.C. Cir. 2020) ..........................................................65

*Defs. of Crooked Lake, Inc., v. FDEP*,
   2018 WL 3387900 (Fla. Div. Admin. Hearings May 7, 2018) ..............51

\*   *Defs. of Wildlife v. Babbitt*,
   130 F. Supp. 2d 121 (D.D.C. 2001) .............................................27, 28, 41

*Defs. of Wildlife v. U.S. Dep't of Interior*,
   931 F.3d 339 (4th Cir. 2019) ................................................................27

*Env't Def. v. U.S. Army Corps of Eng'rs*,
   515 F. Supp. 2d 69 (D.D.C. 2007) ........................................................52

*EPA v. California*,
   426 U.S. 200 (1976) ................................................................................3

*Fisher v. Pension Benefit Guar. Corp.*,
   468 F. Supp. 3d 7 (D.D.C. 2020) ..........................................................22

\*   *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
   726 F. Supp. 2d 1195 (D. Mont. 2010) ............................................28, 34

\*   *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ............................................................................45, 64

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ..............................................................35

*Gifford Pinchot Task Force v. USFWS*,
   378 F.3d 1059 (9th Cir. 2004) ..............................................................34

\*   *Growth Energy v. EPA*,
   5 F.4th 1 (D.C. Cir. 2021) ..............................................................42, 43

*Hawaii Longline Ass'n. v. NMFS*,
   281 F. Supp. 2d 1 (D.D.C. 2003), *on reconsideration in part sub nom. Hawaii Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1 (D.D.C. 2003)....................................39

\*    *Idaho Conservation League v. EPA,*
     820 F. App'x 627 (9th Cir. 2020) .......................................................22, 46

     *Karuk Tribe of Cal. v. U.S. Forest Serv.,*
     681 F.3d 1006 (9th Cir. 2012) .......................................................29, 43

\*    *Lujan v. Defs. of Wildlife,*
     504 U.S. 555 (1992).......................................................................66

     *Massachusetts v. EPA,*
     549 U.S. 497 (2007).......................................................................65

\*    *Mayo v. Jarvis,*
     177 F. Supp. 3d 91 (D.D.C. 2016).......................................................40

\*    *Menominee Indian Tribe v. EPA,*
     947 F.3d 1065 (7th Cir. 2020) .......................................................58

\*    *N. Slope Borough v. Andrus,*
     642 F.2d 589 (D.C. Cir. 1980).......................................................34

     *Nat. Res. Def. Council, Inc. v. EPA,*
     859 F.2d 156 (D.C. Cir. 1988).......................................................48

     *Nat'l Ass'n of Clean Air Agencies v. EPA,*
     489 F.3d 1221 (D.C. Cir. 2007).......................................................22

     *Nat'l Wildlife Fed'n v. Brownlee,*
     402 F. Supp. 2d 1 (D.D.C. 2005).......................................................34

\*    *Nat'l Wildlife Fed'n v. Norton,*
     332 F. Supp. 2d 170 (D.D.C. 2004).......................................................29, 40

     *Native Ecosystems Council v. Dombeck,*
     304 F.3d 886 (9th Cir. 2002) .......................................................42

\*    *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.,*
     496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed,* No. 20-5369, 2021 WL
     161666 (D.C. Cir. Jan. 12, 2021).......................................................64, 65, 66

\*    *Oceana, Inc. v. Pritzker,*
     125 F. Supp. 3d 232 (D.D.C. 2015).......................................................67

\*    *Oceana, Inc. v. Ross,*
     No. CV 15-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...........................27, 28, 31

     *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior,*
     144 F. Supp. 3d 35 (D.D.C. 2015).......................................................64

\*   *Pasqua Yaqui Tribe v. EPA*,
      557 F. Supp. 3d 949 (D. Ariz. 2021) ......................................56

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*,
      511 U.S. 700 (1994)............................................................3

*Res. Ltd., Inc. v. Robertson*,
      35 F.3d 1300 (9th Cir. 1993) .............................................40

\*   *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
      992 F.3d 1071 (D.C. Cir. 2021) .........................................39

*Sierra Club v. Chevron U.S.A., Inc.*,
      834 F.2d 1517 (9th Cir. 1987) ...........................................49

\*   *Sierra Club v. Jewell*,
      764 F.3d 1 (D.C. Cir. 2014) ...............................................66

\*   *Sierra Club v. U.S. Dep't of the Interior*,
      899 F.3d 260 (4th Cir. 2018) .............................................31

\*   *Small Refiner Lead Phase-Down Task Force v. EPA*,
      705 F.2d 506 (D.C. Cir. 1983) ......................................62, 65

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
      531 U.S. 159 (2001)............................................................4

*Spokeo, Inc. v. Robins*,
      578 U.S. 330 (2016)..........................................................64

\*   *State v. Greene*,
      348 So. 2d 3 (Fla. 1977)....................................................46

\*   *State v. Hamilton*,
      388 So. 2d 561 (Fla. 1980)................................................46

*Summers v. Earth Island Inst.*,
      555 U.S. 488 (2009)..........................................................65

*Tenn. Valley Auth. v. Hill*,
      437 U.S. 153 (1978).......................................................5, 6

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
      967 F.2d 598 (D.C. Cir. 1992) ...........................................34

*United States v. Earth Sciences, Inc.*,
      599 F.2d 368 (10th Cir. 1978) ...........................................45

\*       *United States v. Hanousek,*
         176 F.3d 1116 (9th Cir. 1999) ......................................................46, 47

\*       *United States v. Maury,*
         695 F.3d 227 (3d Cir. 2012)................................................................45

\*       *United States v. Ortiz,*
         427 F.3d 1278 (10th Cir. 2005) .........................................................45

\*       *United States v. Pruett,*
         681 F.3d 232 (5th Cir. 2012) ..............................................................45

\*       *United States v. Ursitti,*
         543 F. Supp. 2d 971 (C.D. Ill. 2008) .................................................48

         *Wild Fish Conservancy v. Salazar,*
         628 F.3d 513 (9th Cir. 2010) ..............................................................26

\*       *WildEarth Guardians v. Jewell,*
         738 F.3d 298 (D.C. Cir. 2013)............................................................66

         *WildEarth Guardians v. Salazar,*
         741 F. Supp. 2d 89 (D.D.C. 2010) .....................................................22

**Federal Statutes**

5 U.S.C. § 553 .................................................................................20, 62, 65

5 U.S.C. § 704 ..........................................................................................58

5 U.S.C. § 706 .....................................................................................22, 51

16 U.S.C. § 1531 .........................................................................................5

16 U.S.C. § 1532 .....................................................................................5, 9

16 U.S.C. § 1536 ...............................................................................*passim*

16 U.S.C. § 1538 .........................................................................................5

16 U.S.C. § 1539 .....................................................................................5, 7

16 U.S.C. § 1540 .........................................................................................5

18 U.S.C. § 3282 .......................................................................................48

33 U.S.C. § 401 ......................................................................................8, 59

33 U.S.C. § 403 ......................................................................................8, 59

33 U.S.C. § 407 ...................................................................................................8

33 U.S.C. § 1251 .............................................................................................3, 4

33 U.S.C. § 1311 ...................................................................................................3

33 U.S.C. § 1319 ................................................................................24, 45, 48

33 U.S.C. § 1344 ...........................................................................................*passim*

33 U.S.C. § 1362 ...................................................................................................3

**Federal Regulations**

33 C.F.R. § 230.4 .................................................................................................8

33 C.F.R. § 328.3 ..........................................................................................15, 59

33 C.F.R. § 328.3 (2020) .................................................................................59

33 C.F.R. § 329.4 ..........................................................................................8, 59

33 C.F.R. § 329.15 .............................................................................................59

33 C.F.R. § 329.16 .............................................................................................59

40 C.F.R. pt. 230 .........................................................................................4, 44

40 C.F.R. pt. 233 .........................................................................................4, 44

40 C.F.R. § 125.94 .............................................................................................38

40 C.F.R. § 230.1 .................................................................................................4

40 C.F.R. § 230.3 (2015) .................................................................................8

40 C.F.R. § 230.3 ...............................................................................................53

40 C.F.R. § 230.10 ..............................................................................50, 54, 60

40 C.F.R. § 230.11 .............................................................................................50

40 C.F.R. § 230.20 .............................................................................................50

40 C.F.R. § 230.21 .............................................................................................50

40 C.F.R. § 230.22 ......................................................................................50, 53

40 C.F.R. § 230.23 .............................................................................................50

40 C.F.R. § 230.24 ..................................................................................................50

40 C.F.R. § 230.25 ..................................................................................................50

40 C.F.R. § 230.30 ..................................................................................................50

40 C.F.R. § 230.31 ..................................................................................................50

40 C.F.R. § 230.32 ..................................................................................................50

40 C.F.R § 230.40 ...................................................................................................50

40 C.F.R § 230.41 ...................................................................................................50

40 C.F.R § 230.42 ...................................................................................................50

40 C.F.R § 230.43 ...................................................................................................50

40 C.F.R § 230.44 ...................................................................................................50

40 C.F.R § 230.45 ...................................................................................................50

40 C.F.R § 230.50 ...................................................................................................50

40 C.F.R. § 230.51 ..................................................................................................50

40 C.F.R. § 230.52 ..................................................................................................50

40 C.F.R. § 230.53 ..................................................................................................50

40 C.F.R. § 230.54 ..................................................................................................50

40 C.F.R. § 230.60 ..................................................................................................53

40 C.F.R. § 230.61 ..................................................................................................53

40 C.F.R. § 232.2 ....................................................................................................55

40 C.F.R. § 233.1 .............................................................................................45, 55

40 C.F.R. § 233.10 ..................................................................................................60

40 C.F.R. § 233.12 ..................................................................................................60

40 C.F.R. § 233.15 ..............................................................................................*passim*

40 C.F.R. § 233.20 ..................................................................................................55

40 C.F.R. § 233.30 ..................................................................................................55

40 C.F.R. § 233.34 ..................................................................................................54

40 C.F.R. § 233.40 ..................................................................................................55

40 C.F.R. § 233.41 ....................................................................................45, 46, 49

50 C.F.R. § 17.22 ......................................................................................................7

50 C.F.R. § 17.31 ......................................................................................................5

50 C.F.R. § 402.02 ...........................................................................................*passim*

50 C.F.R. § 402.13 ............................................................................................6, 41

50 C.F.R. § 402.14 ...........................................................................................*passim*

50 C.F.R. § 402.16 ........................................................................................7, 31

45 Fed. Reg. 85,336 (Dec. 24, 1980) ....................................................................51

84 Fed. Reg. 44,976 (Aug. 27, 2019) ....................................................................33

85 Fed. Reg. 57,853 (Sept. 16, 2020) ....................................................................60

**State Statutes**

Fla. Stat. § 373.430 .........................................................................................46, 48

Fla. Stat. § 373.4146 ......................................................................................50, 55

Fla. Stat. § 775.15 ...................................................................................................48

**State Regulations**

Fla. Admin. Code R. 62-330.301 ....................................................................50, 53

Fla. Admin. Code R. 62-331.051 ............................................................................61

Fla. Admin. Code R. 62-331.053 ....................................................................51, 62

**Other Authorities**

EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's
Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2,
2008) .............................................................................................................59

State Assumption of Federal Section 404 Dredge and Fill Permitting Authority,
S.B. 1402, 2017 Leg. (2018 Fla. Laws 2018-88) ................................................10

USFWS, *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* (Dec. 16, 2016)........................................................................................7

USFWS & NMFS, *Endangered Species Consultation Handbook* (1998)....................................35

## PRELIMINARY STATEMENT

Plaintiff conservation organizations bring this action to protect our Nation's waters and the endangered species that rely on them.  During the Trump Administration, Florida worked hand in glove with developers to achieve developers' "holy grail":[1] state assumption over Section 404 of the Clean Water Act—which governs dredging and filling of many sensitive wetlands—in one of the most biodiverse states in the country.  Between 2017 and 2020, the State and the U.S. Environmental Protection Agency ("EPA"), U.S. Fish and Wildlife Service ("USFWS"), and the U.S. Army Corps of Engineers ("Corps"), worked to make this dream a reality.  The Defendants' actions, however, violated multiple federal laws and must be set aside.

EPA's approval of Florida's 404 program is based upon multiple legal errors.  First, EPA failed to ensure that the state program is as stringent as, and equivalent to, federal law.  Second, EPA relied on USFWS' inadequate biological opinion ("BiOp") to determine the state program would not jeopardize threatened and endangered species, even though the BiOp unlawfully replaced the statutory framework and analyses Congress required in the Endangered Species Act ("ESA") with a non-statutory technical assistance process lacking those guardrails.  USFWS then unlawfully extended broad liability coverage for harm to protected species from administration of the state program to EPA, the State, and state permittees, for the life of the program.  Third, EPA allowed the State to assume authority over waters required by law to remain under the Corps' exclusive jurisdiction.  Defendants' actions threaten to open the floodgates for other states to seek assumption without complying with federal standards, further imperiling our Nation's waters and the ESA-listed species that rely on them.

---

[1] *See* Ex. 10 at 5 (Umpierre Dec. ¶ 14).

The improper delegation of a core Clean Water Act program poses a significant threat in Florida, a state whose waters are a national treasure and economic mainstay; a state that is home to more than 130 threatened and endangered species; and a state where these assets and resources face intense ecological pressure as a result of mining, development, and other industry projects. The epicenter of this crisis may well be Southwest Florida, a richly biodiverse corner of the world that also provides the last remaining habitat for the critically endangered Florida panther. Panthers are one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.

The State is currently considering Section 404 permits for several projects that threaten to destroy habitat and breeding ground essential to the Florida panther. These include Troyer Mine (a lime rock and fill dirt mine), Bellmar Development (a mixed-use community covering 1,500 acres), and Immokalee Road Rural Village (a mixed-use residential and commercial development over 2,780 acres). These projects also threaten harm to other listed species, including Audubon's crested caracara, the Everglade snail kite, and the Florida scrub jay. Many other projects that pose major threats to listed species are in the same pipeline.

Congress enacted the ESA to ensure that federal actions would not jeopardize the continued existence of threatened and endangered species, like the Florida panther, and mandated specific processes for federal wildlife agencies to fulfill this promise. But EPA's unlawful transfer of authority to Florida gave away the keys to kingdom, putting the panther—and the more than 130 other listed species in Florida—in peril.

The Federal Defendants' actions are unlawful and must be set aside.  Given the severity

of the violations and the harms to Plaintiffs, EPA's approval of Florida's program should be

vacated, restoring 404 authority over assumable waters in Florida to the Corps.[2]

## LEGAL FRAMEWORK

### I.   The Clean Water Act.

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical,

and biological integrity of the Nation's waters" after states had failed to control water pollution

as evidenced by disasters like the Cuyahoga River catching on fire and the Hudson River filling

with raw sewage and toxic waste.  33 U.S.C. § 1251; *In re Clean Water Act Rulemaking*, 568 F.

Supp. 3d 1013, 1018 (N.D. Cal. 2021).  *See also EPA v. California*, 426 U.S. 200, 202–09

(1976).  Congress thus strengthened the laws protecting the Nation's waters because previously,

it only provided assistance to states, seeking to incentivize them to protect and clean up the

water.  *Id*.  That state-dependent system had failed, necessitating more thorough measures.  *Id.*

Based upon this history and Congress' direction, a fundamental tenet of the Clean Water

Act is that the Act is a *floor*, a minimum baseline in all respects for protection of the Nation's

waters.  States retain only the flexibility to be more, but never less, protective than the Clean

Water Act's foundational protections.  *See* 33 U.S.C. § 1311(b)(1)(C); *PUD No. 1 of Jefferson*

*Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 705–07 (1994).

At its heart, the Clean Water Act prohibits the unpermitted discharge of pollution

(defined broadly to include dredge and fill material) into waters of the United States.  33 U.S.C.

§§ 1311(a), 1362(6), (12), (19).[3]  It is thus a vital tool to meet the Clean Water Act's goals.  *See*

---

[2] Plaintiffs respectfully request the opportunity to brief the appropriate remedy following the
Court's ruling on summary judgment.

[3] The Clean Water Act defines limited circumstances where a permit would not be required.  33
U.S.C. § 1344(f).

*id.* § 1251.  Waters of the United States are defined to include wetlands, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001), and the Clean Water Act recognizes that the degradation and destruction of wetlands is "among the most severe environmental impacts."  40 C.F.R. § 230.1(a).

Section 404 authorizes the Corps to issue permits regulating the discharge of dredge or fill materials into waters of the United States, including wetlands, 33 U.S.C. § 1344(a).  The Clean Water Act allows states to administer their own dredge and fill permit program, excepting "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto."  *Id*. § 1344(g)(1).  The Corps retains 404 jurisdiction over waters not assumable by the State.  *Id.* § 1344(h)(3)–(4); 40 C.F.R. § 233.15(h).

The Clean Water Act requires that any state 404 program be at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  EPA must determine that a state has authority to, among other things:  (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(C), (1)(G); 40 C.F.R. pt. 233.  EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).  EPA's approval requires the Corps to suspend issuance of 404 permits for activities covered by the state program.  *Id*. § 1344(h)(2)(A), (4)–(5).

## II.     The Endangered Species Act.

Almost fifty years ago, Congress enacted the ESA to provide for the conservation of threatened and endangered species and their habitats.  16 U.S.C. § 1531.  Congress created this regime in response to increasing concerns about how many "species of fish, wildlife, and plants" had been rendered extinct "as a consequence of economic growth and development untempered by adequate concern and conservation."  *Id*. § 1531(a)(1).  With this legislation, Congress made a "conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Indeed, an "examination of the language, history, and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities."  *Id.* at 174.

Section 9 of the ESA prohibits any person, including private parties, states, and federal agencies, from "taking" a protected species.  16 U.S.C. § 1538(a)(1)(B).[4]  "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  *Id.* § 1532(19).  Congress established civil and criminal penalties for illegal take and authorized the public to bring civil suits to ensure compliance with the Act.  *Id.* § 1540(a)–(b), (g).

Recognizing that take may still occur as a result of otherwise lawful activities, Congress created two distinct paths to ensure that this "incidental take" would not jeopardize protected species or adversely modify or destroy critical habitat:  (1) Section 7, which applies to federal agency actions, *id.* § 1536; and (2) Section 10, which applies to non-federal actions, *id.* § 1539.  These mechanisms exempt liability for incidental take only so long as the wildlife agencies and consulting agencies abide by the specific measures and standards developed by Congress.

---

[4] USFWS and NMFS have extended take prohibitions by regulation to most threatened species under their respective jurisdictions.  *See* 50 C.F.R. § 17.31(a).

Whenever a federal agency action may affect protected species or critical habitat, the action agency must consult with wildlife agencies—USFWS and National Marine Fisheries Service ("NMFS")—pursuant to Section 7. *Id.* § 1536; 50 C.F.R. §§ 402.13, 402.14. Section 7 creates affirmative duties for both the action agency and wildlife agencies. The Act prescribes the analysis that the wildlife agencies must undertake during consultation, which includes a requirement that the wildlife agencies provide a BiOp detailing how the agency action affects protected species and critical habitat. 16 U.S.C. § 1536(b)(3)(A). *Accord* 50 C.F.R. § 402.14(g), (h). Section 7 requires that the wildlife agencies and action agency employ the "best scientific and commercial data available" during consultation. 16 U.S.C. § 1536(a)(2). It sets the standard for the wildlife agencies' ultimate opinion, determining whether the action would (1) jeopardize protected species or (2) destroy or adversely modify critical habitat. *Id.* § 1536(a)(2). And Section 7 mandates that action agencies, through consultation, must ensure their actions are not likely to jeopardize protected species or adversely modify or destroy critical habitat. *Id.* The obligation to ensure against a likelihood of jeopardy or adverse modification requires agencies to give the benefit of the doubt to protected species. *See Tenn. Valley Auth.*, 437 U.S. at 174–84.

Additionally, Section 7 creates guidelines and requirements whenever the wildlife agencies intend to extend incidental take liability exemption. 16 U.S.C. § 1536(b)(4). If the wildlife agencies determine that incidental take is reasonably certain to occur, they must formulate an incidental take statement ("ITS") that specifies (1) the amount or extent of incidental take; (2) reasonable and prudent measures required to minimize take impacts; and (3) implementing terms and conditions with which the action agency must comply. *Id. Accord* 50 C.F.R. § 402.14(g)(7), (i). "The [ITS] functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are

otherwise lawful and in compliance with its terms and conditions." *Arizona Cattle Growers'*
*Ass'n v. USFWS*, 273 F.3d 1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)). And an ITS
serves as a check on the BiOp, acting as a "trigger" by denoting when an unacceptable level of
take has occurred, which then invalidates the safe harbor provision and requires the action
agency to (1) reinitiate consultation to reevaluate the action; (2) determine if the action may now
jeopardize protected species or critical habitat; and (3) determine what additional protective
measures may be required to reduce impacts from the action. 50 C.F.R. §§ 402.14(i)(3), (4),
402.16(a); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 910–11 (9th Cir. 2012).

　　　As it did for Section 7 consultation, Congress mandated robust analyses and standards for
wildlife agencies when they extend incidental take liability exemption to a non-federal entity
pursuant to Section 10 of the ESA. 16 U.S.C. § 1539(a).[5] The Act creates binding requirements
on a non-federal applicant to submit an application along with enumerated analyses, protective
measures, and a demonstration of funding to implement required protective measures. *Id.*
§ 1539(a)(2)(A).[6] And Section 10 establishes the standard for the wildlife agencies to issue an
incidental take permit, including the requirement that the taking will not appreciably reduce the
likelihood of the survival and recovery of protected species. *Id.* § 1539(a)(2)(B).

### III.　　The Rivers and Harbors Act.

　　　The Rivers and Harbors Act ("RHA") grants the Corps exclusive jurisdiction over certain
waterways. Section 10 prohibits the excavation or fill of any canal, lake, harbor, "or inclosure

---

[5] *See also* 50 C.F.R. § 17.22 (detailing the robust analysis and process for obtaining a Section 10
incidental take permit).

[6] *See* USFWS, *Habitat Conservation Planning and Incidental Take Permit Processing Handbook*
at 7-1, 14-8 (Dec. 16, 2016), https://www.fws.gov/media/habitat-conservation-planning-and-
incidental-take-permit-processing-handbook ("robust" analysis must be more than a mere "tally"
of take and often requires biological studies, species population surveys, species distribution
information, and/or habitat modeling and distribution to obtain the "thorough, up-to-date
biological information" required).

within the limits of any breakwater, or of the channel of any navigable water" without the

consent of the Corps.  33 U.S.C. § 403.  Section 9 grants the Corps jurisdiction over construction

in navigable waters, except for "waters that are not subject to the ebb and flow of the tide and

that are not used and are not susceptible to use in their natural condition or by reasonable

improvement as a means to transport interstate or foreign commerce."  *Id.* § 401.  And Section

13 prohibits the discharge of any refuse into navigable waters.  *Id.* § 407.  Although the Corps'

authority under the Clean Water Act is broader than under the RHA, the Corps defines navigable

waters under the RHA and traditionally navigable waters under the Clean Water Act the same.[7]

## STATEMENT OF FACTS

Florida's vast waterways, and the endangered and threatened species that rely on them,

have long depended on the protections of federal law.  But as the record shows, the EPA,

USFWS, and the Corps skirted those laws to allow an unlawful state 404 program to take effect.[8]

### I.  Florida's Vast Waterways.

Water is one of Florida's most prominent features, with almost 1,200 miles of coastline,

more than 7,500 major lakes, thirty-three first magnitude springs, and approximately 27,500

linear miles of rivers and streams.  EPA-HQ-OW-2018-0640-0386-A2, at 49 (*Florida Waters: A*

---

[7] *Compare* 33 C.F.R. § 329.4 (defining RHA navigable waters as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce") *with id.* § 328.3(a)(1) (2020) (defining traditionally navigable waters under Clean Water Act as "waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.").

[8] In this motion, EPA records are identified by their document ID on the administrative record index.  *See* Dkt. 95-2 (*e.g.*, EPA-HQ-OW-2018-0640-0001).  Because EPA documents are not bates-stamped, Plaintiffs cite page numbers corresponding to the PDF page number of each document.  Corps and USFWS records are identified by the beginning bates number as indicated on the index, *see* Dkt. 94-2 (*e.g.*, CORPS000001), 93-2 (*e.g.*, FWS-000001), followed by a pin cite to the corresponding bates number within the document.  Administrative record cites are followed by a title or brief description of the document when necessary for context.

*Water Resources Manual*).  Countless valuable wetlands are widely distributed throughout the

State, including the renowned Everglades and the Big Cypress Swamp.  EPA-HQ-OW-2018-

0640-0386-A3, at 20–21 (*Geology of Florida*).  With approximately eleven million acres of

wetlands, Florida has more wetlands than any of the other lower forty-eight states.  EPA-HQ-

OW-2018-0640-0386-A4, at 11 (USFWS, *Florida's Wetlands: An Update on Status and Trends*

*1985–1996* (document continues to EPA-HQ-OW-2018-0640-0386-A5)).

     Florida's waters help sustain some of the world's most renowned biodiversity.  Florida

lies within the North American Coastal Plan, the World's Thirty-Sixth Biodiversity Hotspot, and

is considered the richest area biologically for endemic species.  EPA-HQ-OW-2018-0640-0386-

A6 (*Florida Declared a Global Biodiversity Hotspot*).  Freshwater resources in Florida provide

nesting, foraging, wintering, and migrating habitats for numerous species of fish and wildlife.

EPA-HQ-OW-2018-0640-0386-A1, at 4 (citing *Florida's Freshwater Priority Resources: A*

*Guide for Future Management* at 1, EPA-HQ-OW-2018-0640-0386-A7).

     And these waters support the more than 130 ESA-listed species in Florida, as well as

another 96 under consideration for listing.  *See* FWS-005610, at FWS-005647 (EPA Biological

Evaluation [hereinafter "BE"]).  These include the critically endangered Florida panther, as well

as the West Indian manatee, Key deer, Everglade snail kite, Audubon's crested caracara,

bonneted bat, and smalltooth sawfish.  *Id.* at FWS-005734, FWS-005737, FWS-005741, FWS-

005742, FWS-005748–50, FWS-005761–62.  USFWS has also designated "critical habitat"[9] for

more than thirty ESA-listed species in Florida.  *See id.* at FWS-005648–60 (chart of ESA-listed

species also indicating those with designated critical habitat).  With one of the highest rates of

---

[9] Critical habitat means areas containing the features essential to conservation of species which
may require special management considerations as identified based on wildlife agencies'
decision that such areas are essential to the conservation of the species.  16 U.S.C. § 1532(5)(A).

habitat loss, Florida's water resources and the species that depend on them are some of the most threatened.  *See* EPA-HQ-OW-2018-0640-0386-A8 (*Threats to Florida's Biodiversity*).

## II.      Florida's Abysmal Environmental Record.

Despite the importance of environmental protection to the State's biodiversity and waters, leading up to Florida's request to assume 404 permitting authority, the State slashed staff and funding for its Department of Environmental Protection ("FDEP"), including in its wetlands division.  EPA-HQ-OW-2018-0640-0386-A1, at 5 (Plaintiffs' Comments).  Florida's leading paper called FDEP's recent record "an environmental disaster" because of reduced budgets, rushed permitting, weakened enforcement, and widespread layoffs of experts who were replaced with political appointees focused on advancing business interests.  EPA-HQ-OW-2018-0640-0385-A1 (*The Rick Scott Record: An Environmental Disaster*).

A 2016 Public Employees for Environmental Responsibility ("PEER") analysis found that FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines in twenty-eight years, and assessed no penalties in a third of cases.  EPA-HQ-OW-2018-0640-0385-A2 (*Scott's Undeclared Polluters' Holiday Stains Florida*); EPA-HQ-OW-2018-0640-0385-A3 (*Report on Enforcement Efforts by the Florida Department of Environmental Protection Calendar Year 2015*); EPA-HQ-OW-2018-0640-0385-A4 (*State Failing to Protect Our Waterways*) (collecting articles describing the State's environmental record).

## III.      Florida's Pursuit of 404 Assumption.

It was against this backdrop that in late 2017, the Florida legislature quietly introduced a bill to authorize FDEP to pursue assumption over Section 404 assumable waters.  State Assumption of Federal Section 404 Dredge and Fill Permitting Authority, S.B. 1402, 2017 Leg. (2018 Fla. Laws 2018-88), https://www.flsenate.gov/Session/Bill/2018/1402.

The legislature considered but rejected a similar effort in 2005, after FDEP concluded

that for assumption in Florida to be feasible, several changes to state and federal statutes would

be required.  EPA-HQ-OW-2018-0640-0385-A6, at 4–6 (FDEP, *Consolidation of State and*

*Federal Wetland Permitting Programs Implementation of House Bill 759*).  In 2005, FDEP also

recognized that assumption would require "substantial staff resources" for the State to be able to

take on the additional responsibilities and workload required under federal law.  *Id.* at 4–5.

An analysis of the 2017 bill also recognized that assumption would generate costs.  EPA-

HQ-OW-2018-0640-0385-A7, at 3, 14, 17 (*Bill Analysis and Fiscal Impact Statement: S.B.*

*1402*).  FDEP claimed, however, that it did "not anticipate" an increase in expenditures with

assumption, and that it believed administration and enforcement of the 404 program could be

"absorbed without an increase in staffing or administrative costs." *Id.* at 17.  FDEP sought no

funding and advised that it would charge no fees.  *Id.*

There was great public outcry.  Waterkeepers across Florida urged legislators to reject the

proposed legislation, citing concerns about FDEP taking on an additional program without

additional resources and its woefully inadequate regulation of another delegated Clean Water Act

program.  EPA-HQ-OW-2018-0640-0385-A8 (Letter from Miami Waterkeeper).  On behalf of

its more than sixty member organizations, the Everglades Coalition issued a resolution opposing

the legislation, identifying concerns regarding state assumption and the risk to Florida's

remaining wetlands, which are critical to cleansing water, recharging groundwater, providing

fish and wildlife habitat, and storm resiliency.  EPA-HQ-OW-2018-0640-0385-A10 (Everglades

Coal., *Resolution Opposing SB1402 and HB7043*).

And former FDEP Secretary Victoria Tschinkel urged the Governor to veto the bill,

which she observed had been pushed for "fast and simple permitting" rather than being in the

best interests of the State.   EPA-HQ-OW-2018-0640-0392-A2 (*Florida's Treasured Wetlands on the Eve of Destruction—We Cannot Allow It*).   Former Secretary Tschinkel noted, among other things, that "Florida has already lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control." *Id.  See also* EPA-HQ-OW-2018-0640-0385-A9 (*Don't Let Florida Take Over Wetlands Permitting*) (raising concerns about FDEP's workforce and funding; "There is no reason to have confidence that the state agency is prepared to take on this obligation ... The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

Over these objections and concerns, on March 23, 2018, Governor Rick Scott signed the bill authorizing FDEP "to explore whether the state should issue 404 permits."   EPA-HQ-OW-2018-0640-0392-A3.   In 2019, Ron DeSantis became governor and continued these efforts.

## IV.    The Corps' Retained Waters List.

As the State began pursuing 404 program assumption, the Corps began to evaluate the Florida waters over which it would retain jurisdiction upon assumption.   On March 19, 2018, the Corps initiated a thirty-day comment period to identify navigable waters in the State, including "those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities."   CORPS003213, at CORPS003214 (Public Notice).   The Corps sought to determine "which waters are subject to permitting authority under Section 10" of the RHA and which "would be retained" after state assumption.   *Id.*

By March 20, 2018, the Corps had provided FDEP with two lists of navigable waters in Florida.   CORPS003215, at CORPS3215, CORPS003217 (Corps email) (map).   The first was dated 2014 and identified more than 480 navigable rivers, creeks, and lakes.   CORPS002987, at CORPS002987 (Jacksonville District Navigable Waters Lists).   The second was dated 2017 and

12

identified more than 1,700 navigable rivers, creeks, and lakes in Florida.  CORPS003117, at

CORPS003117 (Supplement to the Jacksonville District Navigable Waters Lists).

        In response to the Corps' public notice, members of the public began submitting

information on Florida's navigable waters.  CORPS003227, at CORPS00327 (Seminole Tribe of

Florida email) (historic use of Florida waterways for canoe travel and trade); CORPS003617, at

CORPS3617–708 (same) (navigability in the Florida Everglades for sugar cane production);

CORPS003230, at CORPS003230–616 (same) (canoe exploration through, and navigability of,

the Everglades); CORPS003709, at CORPS003709 (Florida Division of Recreation and Parks)

(updated paddling trails information).

        Unbeknownst to the public, however, FDEP's Secretary asked the Corps to stop the

navigability studies, and the Corps acquiesced.  CORPS003714, at CORPS003714 (April 9,

2018, Email) (stating that, per their discussion FDEP would send written request that the Corps

"cease the navigation studies").  Corps leadership quickly responded to this "clear guidance,"

stated they would "direct [their] team to execute as directed," and directed that the Corps

"CEASE WORK on all actions related to the NAVIGABLE WATERS STUDIES to support

ASSUMABLE WATERS STUDY leading to assumption of 404 permit authorities by the

STATE of FLORIDA."  *Id.* at CORPS003714 (capitalization in original).

        The next day, the Corps issued a public notice summarily terminating the comment

period.  CORPS003717, at CORPS003717 (Updated Public Notice) (terminating comment

period "until further notice").  The public, undeterred, continued to submit comments through the

original deadline of April 20, 2018.  CORPS003724, at CORPS003725–29 (Sierra Club) (asking

that the Corps ensure a complete inventory of navigable waters in Florida prior to assumption);

CORPS003843, at CORPS003844 (Audubon Florida); CORPS003846, at CORPS003846

(Center for Biological Diversity); CORPS003850, at CORPS003892–99 (Conservancy of Southwest Florida) (identifying dozens of additional waterways in Florida counties that should be reviewed for navigability); CORPS003900, at CORPS003900–4064 (Earthjustice); CORPS004065, at CORPS004067–68 (Florida Conservation Coalition) (former U.S. Senator and Florida Governor Bob Graham, urging the Corps to recognize the vast network of navigable waterways in Florida over which the Corps would have to retain jurisdiction); CORPS004069, at CORPS004069–74 (Florida Keys Environmental Fund); CORPS004085, at CORPS004085–87 (Waterkeepers Florida).[10]

On June 18, 2018, Corps leadership directed staff to "suspend its efforts relating to a navigability study of waters" in response to Florida's proposal to assume 404 authority. CORPS004093, at CORPS004094–95 (Corps email).  The Corps acknowledged that it had "initiated a navigability study" to identify retained waters but now cited a forthcoming rulemaking to revise the definition for "waters of the United States" as justification to "suspend the current navigability studies."  *Id.*

Then, on July 30, 2018, the Corps issued a memorandum on "non-assumable waters." CORPS004096, at CORPS004097–98 (Corps Memorandum).  The Corps asserted it would use existing RHA Section 10 lists as a "starting point" for 404 retained waters lists, subject to amendments by the Corps.  *Id.*, at CORPS004098.  The memo, however, also directed that the Corps would not retain 404 jurisdiction over Section 10 waters that "qualify as 'navigable' solely because they were 'used in the past' to transport interstate or foreign commerce."  *Id.* at CORPS004097–98.  This reversed the position the Corps had taken while participating on an

---

[10] The comments submitted by Conservancy of Southwest Florida and by Earthjustice (on behalf of some of the Plaintiffs) were also copied to EPA at the time.

EPA Assumable Waters Subcommittee based on its own regulations and guidance.[11]  The Corps'

memorandum also stated that while EPA intended to address assumable waters in a rule, it was

not necessary to wait for "any such rulemaking."  *Id.*, at CORPS004096–97.

In 2019, the Corps provided FDEP with a four-page "Retained Waters List" that the State

included in its draft "State 404 Program Handbook" which it adopted through state rulemaking

for the purpose of its 404 application to EPA.  EPA-HQ-OW-2018-0640-0002-A20, at 43–46.

The Corps' Retained Waters List was based on the 2014 (and not 2017) navigable waters list,

CORPS004149, at CORPS004149, and "remove[d] … Historic Navigation Segments" from the

list.  CORPS004238, at CORPS004238–4264.  On August 5, 2020, the Corps executed a

memorandum of agreement ("MOA") with FDEP, which attached the final Retained Waters List

(now dated August 5, 2020).  CORPS004322, at CORPS004322–34.

## V.  Endangered Species Act Consultation.

When it came to protected species issues, EPA and USFWS also changed course

expressly at Florida's request and for the purpose of its assumption aspirations.  Since at least

2010, EPA had taken the position that its approval of a state 404 program was a non-

discretionary decision, and that therefore consultation under Section 7 of the Endangered Species

Act ("ESA") for the review of an assumption application was not required.  EPA-HQ-OW-2018-

0640-0690, at 1–2 (EPA ESA Consultation Position Memo).

---

[11] According to the Subcommittee Report, EPA formed the subcommittee to "clarify" which waters could be assumed under Section 404 under 33 U.S.C. 1344(g)(1).  The majority proposed that the Corps not retain jurisdiction over "historic use" waters, CORPS002999, at CORPS 003017–21, while the Corps recommended that it retain jurisdiction over all Traditional Navigable Waters (TNWs) under the Clean Water Act in accordance with 33 C.F.R. § 328.3(a)(1) and the agency's *Rapanos* guidance.  CORPS002999, at CORPS003015–16, CORPS003021–22.

But in its quest to ensure a "streamlined" approach for state 404 permittees to receive liability coverage for incidental take, Florida asked EPA to change course on whether Section 7 consultation was required when it approved state 404 programs.  EPA-HQ-OW-2018-0640-0670 (email from Florida to EPA attaching "Florida's First White Paper"); EPA-HQ-OW-2018-0640-0670-A5 (Florida White Paper I).  As later outlined in another of Florida's white papers, Florida proposed that EPA engage in a "one-time" programmatic consultation that would result in a programmatic ITS extending take liability coverage to EPA, the State, and state permittees following a "technical assistance" process.  EPA-HQ-OW-2018-0640-0388-A7, at 2 (FDEP White Paper II).

Florida complained that currently, "where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10."  *Id.*  Florida sought an out from this "dynamic" precisely because there are so many ESA-listed species in the State.  *Id.*  Florida estimated that about 10% of 404 permits in Florida required some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects[.]"  *Id.*

Other options were available to protect permittees from incidental take liability while also complying with the ESA.  EPA acknowledged that state programs can (1) entirely avoid impacts to protected species; (2) federalize state 404 permits when they may impact species (passing those permits to the Corps);[12] or (3) require state permittees to engage in ESA Section 10 review,

---

[12] This was the approach taken by New Jersey in its state program.  FWS-006144, at FWS-006149–50 (NJ MOU).

the process Congress designed to extend incidental take liability exemption to non-federal actors. EPA-HQ-OW-2018-0640-0686, at 1–2 (EPA response to comments).[13]

On December 12, 2019, EPA designated FDEP as the non-federal representative for "informal" consultation with USFWS. FWS-000001, at FWS-000001–02 (EPA letter). EPA stated that it was voluntarily initiating informal consultation while it gave "further consideration" to its position on whether consultation was required for approving a state 404 program. *Id.*

But as early as November 2019, FDEP was already telling the Corps that the State had hired a contractor to prepare a biological assessment ("BA"), and that EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the program level. CORPS004318, at CORPS004318 (Corps email). In December 2019, FDEP further advised the Corps that EPA would use the BA to request consultation and produce a programmatic BiOp. CORPS004319, at CORPS004320–21 (Corps email) (sending meeting notes). And on April 1, 2020, USFWS staff also made explicit to FDEP the plan that was already in the works:

> After assumption, [USFWS] will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit. [USFWS] will merely be providing technical assistance on the project by project reviews to [FDEP], [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [FDEP] issuing any particular 404 permit.

FWS-000749–751, at FWS-000749 (USFWS email).

---

[13] As Florida itself acknowledged, there was a fourth approach available where EPA would consult with USFWS on individual state 404 permits based on its oversight of state permits that have the reasonable potential to affect protected species. EPA-HQ-OW-2018-0640-0670-A3, at 1–2 (ESA Compromise).

Still, on May 21, 2020, EPA invited public comment on whether EPA's approval of a Section 404 program is nondiscretionary for purposes of ESA Section 7 consultation, representing to the public that this was still an open question on which they could be heard.[14] EPA-HQ-OW-2018-0640-0637 (85 Fed. Reg. 30,953).

In the meantime, on July 24, 2020, Florida sent EPA its BA.  EPA-HQ-OW-2018-0640-0387-A8 (BA).  And the State worked with USFWS to draft a Memorandum of Understanding ("MOU") that claimed the State would ensure permits would not jeopardize species based on a "technical assistance" process that it predicted would be articulated in an "anticipated" BiOp. EPA-HQ-OW-2018-0640-0016-A2, at 5 (Application MOU) (unexecuted).

On August 27, 2020, EPA announced the reversal of its longstanding position for purposes of considering the state's application, so that EPA could use Section 7 consultation to deliver broad protection to the State and its permittees for incidental take.  EPA-HQ-OW-2018-0640-0660-A1, at 1 (ESA Consultation Memo).  But EPA did not stop there.  Instead, the agency also articulated exactly how the wildlife agencies would perform their consultation duties.  EPA explained that it had been persuaded by Florida's advocacy for a one-time ESA Section 7 programmatic consultation in conjunction with EPA's initial review "as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies" by providing a programmatic ITS, preferable to the status quo of requiring permittees to "avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10."  *Id.* at 3.

---

[14] Several Plaintiffs agreed that EPA's action was discretionary, thereby requiring Section 7 consultation, but opposed the use of Section 7 to follow the path advocated by Florida (and on which EPA also sought comment) as unlawful under the ESA.  EPA-HQ-OW-2018-0640-0388-A2 (Conservation Groups' comment letter).

Just four business days later, on September 2, 2020, EPA submitted a biological

evaluation ("BE") to USFWS to initiate formal consultation on Florida's application.  FWS-

005608, at FWS-005608–09 (submittal letter); FWS-005610, at FWS005610–906 (BE).  EPA's

BE was largely a cut and paste of the State's BA, which was not independently assessed by EPA.

*Compare* EPA-HQ-OW-2018-0640-0387-A8 (BA) *with* FWS-005610–5906 (BE).

Also, on September 2, 2020, EPA sent a letter to NMFS summarily concluding that

approval of the state program would have "no effect" on NMFS' jurisdictional marine and

anadromous species.  EPA-HQ-OW-2018-0640-0617 (EPA letter).  EPA's conclusion was solely

based on an April 15, 2020, letter by NMFS to Florida, stating that no species in NMFS'

exclusive jurisdiction would be present "in assumable waters."  EPA-HQ-OW-2018-0640-0638

(NMFS letter).  *See also* EPA-HQ-OW-2018-0640-0649 at 52 (BE) (EPA explaining basis for no

effect determination).  NMFS' letter, however, did not consider the entire action area, including

areas indirectly affected by the federal action, as required by law.  50 C.F.R. § 402.02.  On

September 3, 2020, NMFS concurred with EPA's determination.  *See* EPA-HQ-OW-2018-0640-

0618 (NMFS letter).

On November 17, 2020, USFWS produced a programmatic BiOp and ITS for EPA's

approval of Florida's application.  FWS-006028 (BiOp).  The BiOp did not conduct species-

specific analyses of the baseline status of species or impacts of EPA's action.  *See id.* at FWS-

006092, FWS-006094–95 (stating USFWS would not and was not "required" to analyze species-

specific effects).  Instead, the BiOp devoted nearly half its length describing the technical

assistance process by which the State would take the lead in considering and addressing impacts

to listed species and critical habitat for individual permit decisions.  *Id.* at FWS-006045–75.

USFWS would have "opportunities" to engage in this process but would only be required to

19

receive and review permit applications.  USFWS then granted broad incidental take exemption to

EPA for its approval and oversight of the state program, to the State for its role as the

"applicant," and to state permittees for any take of listed species incidental to state-permitted

activities, without specifying the extent of that incidental take, adequate monitoring of take, or

terms and conditions that would meaningfully limit incidental take.[15]

## VI.    EPA's Approval of the State's Application.

On August 20, 2020, the State submitted its application to EPA.  *See* EPA-HQ-OW-

2018-0640-0001, at 1 (Federal Register notice).  The application relied on a technical assistance

process that would be outlined in a later programmatic BiOp, failed to adopt Section 404(b)(1)

Guidelines, failed to adequately identify waters to be assumed, and relied on lesser enforcement

standards.  Ensuring a decision would be made before any change in administration, on August

28, 2020, EPA determined that Florida's application was "complete" as of the submission date.

EPA-HQ-OW-2018-0640-0641, at 1–2 (Completeness Determination).  EPA's "completeness"

determination triggered a 120-day deadline to approve or deny the application by December 18,

2020, unless EPA and Florida agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40

C.F.R. § 233.15(a), (c).  And on September 16, 2020, EPA initiated a public comment period on

Florida's assumption application that would conclude on November 2, 2020.  EPA-HQ-OW-

2018-0640-0001, at 1 (Federal Register notice).  *See* 40 C.F.R. § 233.15(e); 5 U.S.C. § 553.

In an October 23, 2020, letter, Plaintiffs' counsel urged EPA to reverse its completeness

determination considering critical omissions in Florida's application and requested suspension of

the public comment period until the deficiencies were cured, including as to the treatment of

---

[15] Although USFWS stated that permittees would be required to comply with species-related
permit conditions, USFWS extended take liability coverage without any terms and conditions
requiring that permittees do so.  *See* 16 U.S.C. § 1536(o).

ESA-listed species.  EPA-HQ-OW-2018-0640-0051, at 1–9 (Completeness Letter).  *See* 40

C.F.R. § 233.15(a) (review period begins only if EPA finds state application complete).

On November 2, 2020, Plaintiffs and many other members of the public submitted

comments opposing the state program, citing, among other things, the absence of required

components which prejudiced the opportunity for public comment, and the proposal's failure to

meet the requirements for a state-assumed program, particularly as relates to the protection of

listed species, the failure to adopt the federal 404(b)(1) Guidelines, and enforcement.  *See, e.g.*,

EPA-HQ-OW-2018-0640-0386-A1 (Plaintiffs' Comments). 33 U.S.C. § 1344(g)–(h).

On December 17, 2020, EPA approved Florida's application.  EPA-HQ-OW-2018-0640-

0566 (Approval Letter).  On December 22, 2020, EPA published its approval with an immediate

effective date, in violation of 553(d), ensuring the transfer of authority would occur before the

next administration took office.  EPA-HQ-OW-2018-0640-0564 (85 Fed. Reg. 83,553).

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on January 14, 2021, alleging that the Federal Defendants

violated the Clean Water Act, ESA, RHA, and Administrative Procedure Act ("APA").  Dkt. 1.

On February 1, 2021, the Court granted the Motion to Intervene by the State of Florida and

FDEP ("Florida" or "Intervenors").  Minute Order.

On March 5, 2021, Plaintiffs filed a Motion for Partial Summary Judgment on Claims

Eight and Nine.  Dkt. 31.  On April 26, 2021, Defendant EPA cross-moved, Dkt. 34, and

Intervenors filed a Cross-Motion to Dismiss, Dkt. 36.  On March 30, 2022, the Court entered

summary judgment in favor of EPA on Claim Nine, reserved ruling on Claim Eight pending

further briefing on redressability, and denied Florida's Motion to Dismiss on all claims.  Dkt. 73.

On April 19, 2022, Plaintiffs filed an Amended Complaint asserting additional claims against

EPA and USFWS.  Dkt. 77.

On November 1, 2022, the Federal Defendants each filed a Certified Index to their

respective Revised Administrative Record.  Dkt. 93, 94, and 95.  On November 15, 2022, the

parties filed a status report requesting to propose a case management order following the Court's

decision on Claim Eight.  Dkt. 96.  On January 30, 2023, the parties filed a Joint Motion for a

Summary Judgment Scheduling Order, Dkt. 97, which the Court granted.  Jan. 31, 2023, Minute

Order.  This motion is filed in accordance with that Order.

## STANDARD OF REVIEW

In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of

law, whether the agency action is ... consistent with the APA standard of review.'"  *Fisher v.

Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v.

Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).  The APA provides that a court shall "hold

unlawful and set aside agency action" that is (1) "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," (2) "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right," or (3) "without observance of procedure required by

law."  5 U.S.C. § 706(2)(A), (C)–(D).  *See also WildEarth Guardians v. Salazar*, 741 F. Supp. 2d

89, 97 (D.D.C. 2010) (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983)); *Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th

Cir. 2020) (EPA abused its discretion approving a state-delegated Clean Water Act program that

was less stringent than federal law).  Courts apply the same APA standard for ESA citizen suit

claims.  *Am. Rivers v. FERC*, 895 F.3d 32, 44–45 (D.C. Cir. 2018).  Questions of statutory

interpretation are reviewed de novo.  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221,

1228 (D.C. Cir. 2007).

## ARGUMENT

From 2017 to 2020, the Federal Defendants created unlawful regulatory shortcuts to allow Florida to assume Section 404 authority without meeting the standards of federal law.  The agencies' actions violated not only the Clean Water Act, but also the ESA, RHA, and APA. These unlawful agency actions harmed Plaintiffs' interests, and those of the tens of thousands of members they represent.

First, USFWS—the entity Congress directed to administer the ESA—produced a shallow programmatic BiOp that relied on a state-driven, non-statutory technical assistance process that itself does not require the same rigorous analyses Congress established in the ESA.  Based on this unlawful BiOp, USFWS then granted broad take liability exemption to EPA, the State, and all future state permittees for the life of the state program.

Second, once Florida's application was submitted, EPA moved at breakneck speed to approve the program before a change in administration.  EPA ignored Plaintiffs' request to reverse its "completeness" determination as to Florida's application, which triggered a 120-day decision clock, even though the State had failed to demonstrate authority to ensure against jeopardy of protected species and modification or destruction of critical habitat and had failed to adequately describe the waters over which it would assume jurisdiction.  EPA closed the public comment period more than two weeks before USFWS produced the BiOp that would contain the technical assistance process on which Florida (and EPA) relied to support the program's adequacy as to protected species.  And EPA did not complete consultation with NMFS, relying on an unlawful "no effects" determination as to species under that agency's jurisdiction.

EPA failed to require Florida's program to come into compliance with federal law even after Plaintiffs notified the agency of its inadequacies, including a criminal intent standard already found by a U.S. Court of Appeals to have constituted an abuse of discretion in EPA's

approval of another state's Clean Water Act program.  In December 2020, EPA approved the application "effective immediately," depriving Plaintiffs of the right to seek an agency stay pending judicial review as a new administration was taking office.

Third, the Corps unlawfully washed its hands of exclusive jurisdiction over certain navigable waters by failing to perform navigability studies to determine the scope of its authority post-assumption and arbitrarily creating a "Retained Waters List" that rendered hundreds of those waterways assumable by the State.  EPA abused its discretion by failing to ensure that the state program only assumed authority over assumable waters.  In approving Florida's program, EPA unlawfully delivered non-assumable waterways to state 404 jurisdiction and away from further federal protection under NEPA and the ESA.

While Congress preserved important roles for states under the Clean Water Act, including the ability to administer permit programs when certain criteria are met, any state program authorized under the Clean Water Act must be as stringent as federal law.  33 U.S.C. § 1344(h)(1).  Congress made plain that the Clean Water Act set the minimum standards to address previous shortcomings in state clean water efforts.  *See id.* §§ 1319, 1344.

The Federal Defendants' actions were unlawful.  While Congress created a path for states to assume 404 jurisdiction, federal agencies are not authorized to disregard federal law to grease the skids.  The Federal Defendants' actions must therefore be vacated and set aside.

I.      **USFWS Violated the ESA by Substituting a Non-Statutory Technical Assistance Process for the ESA's Statutory Framework.**

USFWS violated the ESA by substituting an inadequate, non-statutory technical assistance process for the statutory framework established by Congress in Sections 7 and 10 of the ESA.  USFWS's non-statutory approach abandoned key protections for threatened and endangered species that would be afforded to them if the statutory process were followed.  There

24

were other options for the State to obtain take liability exemption for state permittees—such as federalizing permits that would impact species, thereby triggering Section 7 consultation, or obtaining Section 10 authorization—which would include statutory safeguards at the permit level to minimize and mitigate take and use the best scientific and commercial data available.

USFWS' approach here, however, discarded both statutory avenues to rely on a novel procedure for state 404 permits to issue without the key statutory protections congressionally mandated by the ESA.  First, at the programmatic level, USFWS produced a programmatic BiOp that was devoid of the analyses and rigor required under Section 7 of the ESA, and without regard to the quantity, location, scope, methods, species, and habitat impacts, or any other details about these future wetland-filling projects.  Second, USFWS extended broad take liability exemption to all parties involved, in perpetuity, relying on a technical assistance process that lacks the statutory guardrails that specify the extent of take permitted, require the monitoring of take, and establish meaningful terms and conditions to implement the ITS.  Third, USFWS wrongly claimed that the technical assistance process would provide the same level of species and habitat protection as the Section 7 consultation process would have provided had the Corps retained 404 permitting authority.  At both the programmatic and permit level, USFWS gave away the keys to the kingdom in violation of the ESA and APA (Claims 3, 4, 6, 12, and 13).

### A.    USFWS Abdicated Its Duties to Abide by the ESA's Requirements.

By adopting the State's approach, USFWS did not abide by the standards and procedures laid out in Section 7.  It failed to analyze the full extent of the agency action, failed to evaluate the baseline status of the species affected, and failed to assess the effect of EPA's action on protected species.  USFWS then arbitrarily and capriciously opined that EPA's action would not jeopardize protected species or adversely modify or destroy critical habitat.  USFWS' actions violated the direct mandates of the ESA and its implementing regulations and must be vacated.

First, a core flaw in USFWS' BiOp was its evaluation of only the process the State would undertake when issuing individual Section 404 permits and authorizing new general 404 permits, rather than the State's program as a whole.  FWS-006028, at FWS-006043, FWS-006045–69 (BiOp).  Agency action is defined broadly, because "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action."  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010).  USFWS' narrow view excluded the impact on species that would occur through the State's (1) application of existing general permits across the State; (2) decisions on when permits would not be required, including those based on the State's evaluation of whether the wetlands at issue are assumed "waters of the United States;" and (3) compliance and enforcement activities.  Nor did USFWS consider the impacts to species that result from the loss of NEPA review and ESA Section 7 consultations at the site-specific level.

Second, USFWS failed to evaluate the baseline status of protected species and critical habitat.  *Contra* 50 C.F.R §§ 402.14(g)(2), 402.02.  USFWS vaguely listed information devoid of any analysis or connection to protected species, critical habitat, or the past, present, and anticipated impacts on protected species and critical habitat.  The "Environmental Baseline" section contained only (1) an introductory section that includes the unremarkable premise that species are affected when their habitats are affected and then adopts, without explanation or independent analysis, sections of the BE, FWS-006028, at FWS-006083–84 (BiOp); (2) a "procedural baseline" section describing the regulatory structure in place before assumption by the State, *id.* at FWS-006084–88; (3) an "ecological baseline" section that generally describes the existing acreage of different types of wetlands without mentioning or connecting those wetlands to a single protected species or critical habitat area, *id.* at FWS-006089–91; and (4) a generic description from EPA's BE of estimates about a subset of Corps permitting data focused

on the number and type of ESA consultations conducted, not species impacts, *id.* at FWS-006091.  Of the 139 protected species at risk, *id.* at FWS-006083, only two species were named in this section, *id.* at FWS-006091.  And even there, USFWS made no mention of the information required in a baseline analysis.  *Id.*

USFWS thus failed to "evaluate the current status and environmental baseline of affected species or critical habitats."  50 C.F.R. §§ 402.14(g), 402.02.  *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) (requiring USFWS to conduct an "analysis of the status of the environmental baseline given the listed impacts, not simply a recitation of the activities of the agency"); *Oceana, Inc. v. Ross*, No. CV 15-0555 (PLF), 2020 WL 5995125, at *11 (D.D.C. Oct. 9, 2020) (USFWS cannot just "list and describe data that it purported to incorporate into its jeopardy analysis—without indicating how that data actually factors into the analysis"); *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353 (4th Cir. 2019) (short, perfunctory statements do not suffice).

Third, rather than evaluating and analyzing the impact of EPA's action on protected species and critical habitat, USFWS stated that it was "not feasible, *nor is it required*" to detail or analyze any "species-specific effects."  FWS-006028, at FWS-006092, FWS-006094–95 (BiOp) (emphasis added).  But evaluating the individual and cumulative effects on protected species is exactly what the ESA demanded.  16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g)(3).  Rather than conduct the analyses required by law, however, USFWS (1) relied on sections of EPA's BE that it incorporated without analysis or explanation, including the assessment of general "stressors" and summary table, FWS-006028, at FWS-006092, FWS-006094–96 (BiOp); (2) made unfounded and unsupported assumptions that failed to evaluate the effects of the action, *id.* at FWS-006093; and (3) provided a generic, 30,000-foot view of

stressors, *id.* at FWS-006095–96 (*e.g.*, "Biotic Stressors" are harms to organisms from other

organisms; "Physical Stressors" are physical changes that have biological impacts); and (4) taxa-

level impacts that provided nothing more than general information without meaningful

connection to the proposed action, *see, e.g.*, *id.* at FWS-006097–98 (mammals may occupy

waters of the United States; dredge and fill activities may affect habitat in terms of water quality

or habitat fragmentation).[16]  And nowhere does USFWS evaluate cumulative impacts.

Even where the BiOp named particular species, it fell far short of considering the most

concerning impacts that result from 404 permits.  For example, the BiOp mentioned panthers, *id.*

at FWS-006097, but omitted the leading cause of death for panthers: vehicle strikes, which often

increase as a result of development or road projects that must clear wetlands and obtain Section

404 permits.  *See* EPA-HQ-OW-2018-0640-0388-A9, at 35–41, 87–94 (Panther Recovery Plan);

EPA-HQ-OW-2018-0640-0388-A10, at 12–15, 16–17 (Panther Five-Year Review).

The BiOp's vague listing of potential impacts at the taxa level was insufficient.  *See Defs.*

*of Wildlife*, 130 F. Supp. 2d at 127–28 (requiring analysis of effects, not mere listing, and

analysis of effects cannot simply address the impacts of the particular agency action in isolation);

*Oceana*, 2020 WL 5995125, at *20 (listing without connecting information to analysis is

insufficient); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195,

1224 (D. Mont. 2010) (rejecting a programmatic BiOp that failed "to explain how a discussion of

---

[16] *Accord id.* at FWS-006098–99 (BiOp) (dredge and fill may disturb birds, alter water quality, and affect their habitats); *id.* at FWS-006099–100 (reptiles may be affected by impacts to their habitats); *id.* at FWS-006100–01 (amphibians may be affected by fill of wetlands, hydrology alteration, habitat fragmentation); *id.* at FWS-0060101 (fish may be affected by sedimentation, water quality degradation, and habitat loss); *id.* at FWS-006101–02 (insects may be affected by habitat impacts); *id.* at FWS-006102 (crustaceans may be affected "via direct mortality" or habitat alteration and water quality changes); *id.* at FWS-006102 (mollusks are likely to be impacted by dredge and fill activities); *id.* at FWS-006103 (plants may be affected by direct mortality, habitat loss, water quality).

the effects on an entire taxonomic group can support a finding as to the effects on the value for

recovery of specific designated critical habitat for a specific species"); *Am. Rivers*, 895 F.3d at

47 (USFWS must "analyze the effects" of the proposed action, not merely list some effects and

omit others); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 176–77  (D.D.C. 2004)

(rejecting BiOp that failed to evaluate reasonably likely impacts).

> Moreover, USFWS ignored how Section 404 permitting actions that occur in state-

assumed waters may affect nesting sea turtles, e.g., from light pollution or sedimentation.  By

this omission, USFWS violated its obligations under the ESA.  EPA violated its independent

duty to consult, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a), by omitting nesting sea turtles

from its BE and relying on an insufficient BiOp, *see Karuk Tribe of Cal. v. U.S. Forest Serv.*,

681 F.3d 1006, 1027 (9th Cir. 2012) (agency must consult when action may affect species).

> Fourth, after failing to undertake ESA-mandated analyses, USFWS made a blanket "no

jeopardy" determination for over a hundred protected species in one fell swoop.  FWS-006028,

at FWS-006106–07 (BiOp).  USFWS did not attempt to conduct the mandated jeopardy analysis,

nor could it given its refusal to assess species-specific effects.  *Cf.* 50 C.F.R. § 402.14(g)(4)

(requiring USFWS to "[a]dd the effects of the action and cumulative effects to the environmental

baseline and in light of this information, formulate its opinion as to whether the action is likely to

jeopardize the continued existence of a protected species or result in the destruction or adverse

modification of critical habitat").  USFWS' blanket jeopardy determination failed to employ the

best available science or otherwise comply with the ESA.  16 U.S.C. § 1536(a)(2), (b).  *See*

*Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) ("These are not

passive directives; rather, [USFWS] 'must seek out and consider all existing scientific data

relevant to the decision it is tasked with making.'").

**B.      USFWS' ITS Unlawfully Extended Take Liability Exemptions Without Creating ESA-Mandated Guardrails.**

Next, despite not having performed the required statutory analyses, USFWS then

extended broad take liability exemption to EPA, the State, and all future state 404 permittees, in

perpetuity, without the ESA-mandated guardrails, which include: (1) identifying the amount or

extent of take that serves as an adequate trigger for reinitiation; (2) requiring adequate take

monitoring; and (3) creating adequate terms and conditions to limit take and justify the broad

safe harbor it created for EPA, the State, and state permittees.

First, the ITS failed to specify the amount or extent of incidental take and instead merely

asserted, without explanation, that the information provided by EPA and Florida "did not allow

[USFWS] to ... estimate the number of individuals that might be affected by the permitted

activities." FWS-006028, at FWS-006107 (BiOp). *Contra* 16 U.S.C. § 1536(b)(4); 50 C.F.R.

§ 402.14(i)(1)(i). But USFWS itself was a hub of data on Section 7 consultations for Section

404 permits in Florida given its decades of consulting with the Corps on those permits. Despite

the wealth of information at its fingertips, USFWS baldly asserted it lacked the information

necessary to comply with the ESA's mandate. *See Conner v. Burford*, 848 F.2d 1441, 1453 (9th

Cir. 1988) (rejecting USFWS' position that there was insufficient information on site-specific

activities, because although the "precise location and extent" of such activities may be "unknown

at the time, extensive information about the behavior and habitat of the species in the areas

covered by" potential site-specific activities "was available"). Nor did USFWS identify or

justify the use of a surrogate. *Contra* 50 C.F.R. § 402.14(i)(1)(i).

One of the consequences of the ITS' failure to specify the amount of take is that the ITS

contained no adequate "trigger" for reinitiation. Without specifying the amount or extent of take,

there is no way to say when it has been exceeded such that reinitiation of consultation would be

required.  50 C.F.R. § 402.16(a)(1).  The ITS provided no other clear reinitiation triggers either.

For example, although "new" information requires reinitiation, given USFWS' failure to

evaluate the information at its disposal, it is unclear what new information would trigger

reinitiation.  *Id.* § 402.16(a)(2).  Moreover, USFWS' "reinitiation notice" stated that (1) any

exceedance of take anticipated in a Section 404 permit would not require reinitiation, but rather

the reopening of only that permit, FWS-006028, at FWS-006111 (BiOp); and that (2) the listing

of a new species—a condition for reinitiation under ESA regulations, 50 C.F.R. § 402.16(a)(4)—

would *not* require reinitiation either, *id.*  But reinitiation cannot "be left to 'the unfettered

discretion of [USFWS], leaving no method by which the applicant or the action agency can

gauge their performance.'"  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir.

2018) (requiring USFWS to set "a clear standard for determining when the level of anticipated

take has been exceeded" that will "adequately trigger reinitiation of consultation" and cannot be

based on "vague and undetectable criteria").  "This lack of a clear standard also create[d] a

transparency problem," because now, "the agency makes the decision about whether to reinitiate

consultation behind closed doors and without a record."  *Oceana*, 2020 WL 5995125, at \*13.

　　Second, after failing to identify any incidental take limit, the ITS then failed to require

adequate monitoring or reporting of incidental take at the permit level.  An ITS must establish an

adequate monitoring mechanism.  *Id.* at \*15.  The ITS noted only that USFWS would track take

levels through the technical assistance process.  It did not explain how those take numbers would

be estimated, how it would determine if a specific project's anticipated take individually and

cumulatively fell below USFWS' "anticipated take limit" at the programmatic level, or what it

would do with that information (e.g., would the public have access to it to ensure the ITS is

working and enforced).

Third, and most fundamentally, the ITS established no meaningful reasonable and prudent measures nor implementing terms and conditions that the parties must abide by to stay within the safe harbor of the ITS.  16 U.S.C. § 1536(o).  Under the ESA, USFWS must include specific terms and conditions and articulate a rational connection between these terms and conditions and the taking of species.  *Arizona Cattle Growers'*, 273 F.3d at 1251.  Rather than abiding by the ESA's mandates, 16 U.S.C. § 1536(b)(4)(ii), (iv), the BiOp merely required EPA to take actions already required by law and required only that the State (1) follow the technical assistance process described in the BiOp; (2) provide training on that process; (3) provide an annual summary report; and (4) inform permittees to notify USFWS of dead or injured protected species.  FWS-006028, at FWS-006109–10 (BiOp).  In other words, the ITS created no new or additional requirements on EPA and no meaningful conditions for the State.  As for USFWS, no terms and conditions required the agency to engage in the technical assistance process laid out in the BiOp, participate robustly in that process, or take all "opportunities" that are available under the process.  *Id.*  Nor were any terms and conditions that apply to future 404 permittees, such as requiring compliance with state 404 permit terms and conditions.  *Id.*  Such vague, empty promises were insufficient to satisfy the law.  *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv).

USFWS' BiOp and ITS also relied on wholesale compliance by EPA (oversight), compliance by Florida (minimizing impacts and abiding by its role in the "technical assistance" process), compliance by USFWS (in taking all "opportunities" to engage in the "technical assistance" process), compliance by all future permittees, and (presumably) compliance by all others who would dredge and fill wetlands in Florida so that they obtain all necessary Section 404 permits before dredging and filling wetlands in WOTUS.  *See* FWS-006028, at FWS-006093 (BiOp).  But because the terms and conditions did nothing to guarantee this compliance,

32

at any level or across the board, these assumptions on "purely speculative actions" could not support a no jeopardy determinations. *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 253–54 (D.D.C. 2003) (rejecting a BiOp dependent on the Corps' "purely speculative" compliance with USFWS' terms and conditions).

### C.      USFWS Unlawfully Relied on a Novel Technical Assistance Process to Avoid the Mandates of Section 7 Consultation.

Having failed to produce an adequate BiOp at the programmatic level, USFWS could not then rely on an inadequate "technical assistance" process at the permit-level.  USFWS had a mandatory duty to comply with the ESA, and it failed twice.  To grant the State's wish and extend broad take liability coverage to state permittees without requiring the robust analysis of Section 10, USFWS produced a Section 7 programmatic BiOp but then claimed it could rely on a non-statutory technical assistance process as a substitute for its Section 7 duties.  This approach was in direct conflict with the ESA and undermined the specific requirements Congress put in place before allowing incidental take liability exemptions.  USFWS' programmatic BiOp must therefore be set aside.

First, USFWS was required to conduct the ESA-mandated analyses at the programmatic level and failed to do so as described above.  Congress did not distinguish between consultation that is programmatic in nature as opposed to site-specific, but mandated that the processes, standards, and findings required by statute apply to consultation, period.  16 U.S.C. § 1536.  And although the ESA regulations contemplate programmatic BiOps, those rules still bind USFWS to conduct an analysis based on the "best scientific and commercial data available," considering the effects of a proposed federal action "*as a whole.*"  50 C.F.R. § 402.14(c)(4), (d) (emphasis added).  *See* 84 Fed. Reg. 44,976, 44,996 (Aug. 27, 2019) (codified at 50 C.F.R. § 402.02)

33

(describing the added definition of "programmatic consultation" as consultation used to "assess the effects of a program, plan, or set of activities *as a whole*" (emphasis added)).

And as courts have explained, it is permissible to tier site-specific BiOps to programmatic BiOps only where (1) USFWS evaluates the federal agency action *as a whole* at the programmatic level—which USFWS did not do here; and (2) the action agency engages in site-specific consultation to produce site-specific BiOps and ITSs—which USFWS claimed it would do through the insufficient technical assistance process. *See N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980) (multi-stage actions do not excuse failure to consider effects at the earliest stage).[17] Step two is critical for USFWS to comply with its continuing duty to ensure all effects are properly considered as required by the ESA. *See* 50 C.F.R. § 402.14(k).

Second, the non-statutory technical assistance process was not an adequate stand in for the robust analysis required by Section 7 consultation because it is not subject to the requirements and mandates in the ESA. No regulation or statutory provision affirmatively authorizes a "technical assistance" process for ESA consultations.[18] Nor are there any statutory or regulatory standards that applied to USFWS' approach here, such as Section 7's requirement to consider the best available scientific and commercial information. The most authoritative legal source that discusses "technical assistance" is an agency guidance document, which merely

---

[17] *See, e.g.*, *Conner*, 848 F.2d at 1453–54 (ESA Section 7 "on its face requires the FWS in this case to consider all phases of the agency action, which includes post-leasing activities, in its biological opinion."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1063 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004) (tiering site-specific BiOp to programmatic BiOp); *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10–11 (D.D.C. 2005) (future analyses considering species effects would "not relieve the Federal agency of the requirements for considering the effects of the action as a whole"); *Forest Serv. Emps.*, 726 F. Supp. 2d at 1229–32 (programmatic BiOp can tier only with full BiOps); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002) (staged analysis not allowed by ESA).
[18] USFWS' actions are thus also ultra vires and must be set aside. *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). (Claim 13).

shows it was created for an entirely different use: as a preliminary step available during *informal* consultation with *federal* agencies to allow USFWS to assist agencies in that process, not as an alternative to the ESA-mandated procedures and standards pursuant to Section 7 (for federal actions) or Section 10 (for non-federal actions).  USFWS & NMFS, *Endangered Species Consultation Handbook* (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

And in fact, there are no statutory or regulatory guidelines to bind the process or manner of USFWS' engagement in the technical assistance process here.  USFWS is not required to evaluate the baseline status of protected species that may be affected by state permits.  The agency need not evaluate the effects of the permit on protected species and critical habitat.  There is no requirement that USFWS evaluate jeopardy or the potential to adversely modify or destroy critical habitat.  And the agency need not apply the best available science in its assessment, if any, of state 404 permits.  There are therefore no guardrails for how USFWS would make determinations for state 404 permits.

Third, the technical assistance process that USFWS created is State led, with only "opportunities" for USFWS to be involved.  "When a statute requires an agency to make a finding as a prerequisite to action, it must do so.  *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (USFWS violated ESA by allowing regulated entity to make findings USFWS was required to make under Section 10 of the ESA).  Here, the State (not USFWS) determines whether a permit application will have adverse impacts on protected species or critical habitat and may stick to that determination even if USFWS provides information contrary to that conclusion.  FWS-006028, at FWS-006056, FWS-006058 (BiOp).  If the State concludes there

will be no adverse impacts, the technical assistance process concludes.[19]  *Id.* at FWS-006056.  If

the State finds there will be an adverse impact, it will send information to USFWS requesting

technical assistance.  *Id.* at FWS-006057.  The State then coordinates with USFWS on potential

protective measures, which the State may propose to USFWS; it is voluntary for USFWS to

respond.  *Id.* at FWS-006057–58.  Where a permit is likely to jeopardize protected species or

destroy or adversely modify critical habitat, the State need only "coordinate" with USFWS to

develop measures that must be incorporated into the permit (meaning the State may be the one to

develop those measures), but there is no obligation on USFWS' part to engage and no parameters

for USFWS to follow if it does engage.  *Id.* at FWS-006057.

As for USFWS' role under the technical assistance process, its only mandatory duty is to

receive and review complete permit applications.  *Id.* at FWS-006049.  USFWS may, but is not

required to, request additional information to ensure the applicant provides the information

necessary to assess the species impacts of the proposed permit.  *Id.*  USFWS' review of permit

applications, *id.* at FWS-006050, is bereft of any enumerated process or standards.  USFWS is

not required to follow and abide by any of the guardrails the ESA requires (such as baseline,

effects analyses, best available science, and cumulative effects) to inform USFWS' opinions and

recommended protective measures.  USFWS has the "opportunity" to provide comments during

the public comment period but is not required to do so.  *Id.* at FWS-006057.  USFWS "may"

suggest measures to protect species, "as needed," but is not required to do so.  *Id.* at FWS-

006054.  *Accord id.* at FWS-006055, FWS-006058.[20]  Even if a permit will lead to incidental

---

[19] While the BiOp asserted USFWS' determinations as to species effects are "determinative," that only applies if and when the State has already made the determination that a state permit will affect species, and it assumes that USFWS will weigh in.  FWS-006028, at FWS-006058 (BiOp).
[20] Although not required to do so, if USFWS does decide to recommend protective measures, the State must incorporate them or deny the permit.  FWS-006028, at FWS-006054 (BiOp).

take, the BiOp stated USFWS will establish take limits "in coordination with" the State, without USFWS meeting any of the underlying ESA requirements to quantify take and set take limits that would trigger reinitiation.  *Id.* at FWS-006108.  Even in the BiOp, USFWS explicitly relied on its own "assumption" that it would later develop appropriate measures to minimize take, but nothing in the BiOp, the technical assistance process, or the law committed the agency to do so. And nothing in the process requires USFWS to follow the ESA when it does.  *Id.*

USFWS modeled their approach on its programmatic BiOp assessing EPA's 316(b) regulations, which codified a technical assistance process in very different circumstances.  *See* FWS-000113, at FWS-000113–16 (USFWS email); FWS-000129, at FWS-000129 (same); FWS-006523, at FWS-006523 (same).  That programmatic BiOp was upheld in *Cooling Water*, but the circumstances and case are inapposite for three key reasons.  *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 63, 72 (2d Cir. 2018).[21]

First, the federal action at issue was much narrower in scope.  *Cooling Water* involved regulations EPA promulgated to create a technology standard aimed at reducing impacts to aquatic species from the operation of cooling water intake structures at select existing facilities that operate in similar ways (e.g., power plants) with similar effects.  *Id.* at 59–60.  That standard would then be implemented as a permit condition in a facility's National Pollutant Discharge Elimination System permit.  *Id.* at 59.  *Cooling Water* was thus similar to other programmatic BiOps that address the same type of action across different locations (e.g., the same technology operating in the same way at multiple facilities).  Here, by contrast, Section 404 dredge and fill

---

[21] Plaintiffs also submit that *Cooling Water* was an outlier that was wrongly decided and is inconsistent with the ESA and the weight of authority, for the reasons articulated above.  But the Court need not reach that issue because the case is also distinguishable.

activities cover a broad spectrum (ranging from building a house to large-scale residential, commercial, or industrial developments and road projects) which impact species in distinct ways.

Second, the 316(b) regulations served a very different purpose: they codified prescriptive measures designed to *reduce* impacts to aquatic species, *see* 40 C.F.R. § 125.94(c), and would cause a *net reduction* in incidental take, *Cooling Water*, 905 F.3d at 81. The 404 program, however, will necessarily harm species because it authorizes dredge and fill activities that destroy wetlands (habitat) and replace them with roads, developments, industrial facilities, etc. (causing secondary impacts like vehicle strikes, habitat segmentation, and pollution). *See* FWS-006028, at FWS-006096–103 (BiOp) (generally listing the potential effects from Section 404 permits); EPA-HQ-OW-2018-0640-0388-A9, at 35–41, 87–94 (Panther Recovery Plan); EPA-HQ-OW-2018-0640-0388-A10, at 12–15, 16–17 (Panther Five-Year Review).

Third, the 316(b) technical assistance process was codified as part of the 316(b) rulemaking, creating legally binding responsibilities for all parties. *Cooling Water*, 905 F.3d at 72. And the court explicitly upheld the 316(b) BiOp's programmatic approach because the 316(b) rules "*require[d]* [USFWS'] participation in the technical assistance process." *Id.* (emphasis in original).[22] Here, the technical assistance process was both created in, and relied upon by, the programmatic BiOp. There is no regulatory framework binding the parties' actions as in *Cooling Water*.[23] Further, as demonstrated above, the technical assistance process here does not require USFWS' participation, unlike in *Cooling Water*. The circumstances in *Cooling*

---

[22] USFWS also verified this commitment to the court. *Cooling Water*, 905 F.3d at 72.
[23] The USFWS MOU contemplated a technical assistance process being created but explained that the process would be outlined in the BiOp. EPA-HQ-OW-2018-0640-0016-A2, at 5 (Application MOU).

*Water* are too far afield from 404 permitting to support the breathtaking approach the Federal

Defendants adopted here.  Defendants' actions thus violated the ESA.

## II.    EPA Unlawfully Relied on USFWS' Arbitrary and Capricious BiOp and ITS.

Because the BiOp was facially flawed, it was arbitrary and capricious for EPA to rely on

it.  As detailed above, Section 7 of the ESA required EPA to ensure that the State's assumption,

and implementation of the program, would not jeopardize the survival and recovery of listed

species or adversely modify or destroy critical habitat.  16 U.S.C. § 1536(a)(2).  *See City of*

*Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006);[24] *Am. Rivers*, 895 F.3d at 55 (reliance on

legally flawed BiOp in NEPA document was arbitrary because it incorporated opinion's

inadequate consideration of cumulative impacts); *Hawaii Longline Ass'n. v. NMFS*, 281 F. Supp.

2d 1, 27 (D.D.C. 2003), *on reconsideration in part sub nom. Hawaii Longline Ass'n v. NMFS*,

288 F. Supp. 2d 7 (D.D.C. 2003) (reliance on vacated, procedurally invalid BiOp as legal basis

for continued application of regulations was arbitrary).

As the action agency, EPA bore the "ultimate responsibility for compliance with the

ESA." *City of Tacoma*, 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)–(2)).  But EPA blindly

adopted the pre-ordained (and unsupported) conclusions of USFWS.  *Contra id.* (agency must

not blindly adopt consultant agency's conclusions).  Here, EPA failed to assess the impacts of its

actions, because it relied entirely on USFWS' wholly inadequate BiOp which in turn unlawfully

sought to punt its ESA duties to a non-statutory technical assistance process that itself was

inadequate.  It was unreasonable for EPA to rely on the BiOp to conclude that its actions would

---

[24] While in that case the court found that reliance was lawful where the plaintiffs could point to
no "new" information the action agency should have considered, this standard has not been
applied when a BiOp is facially invalid because of missing analysis or incorporation of
inadequate analysis, as is the case here.  *Shafer & Freeman Lakes Env't Conservation Corp. v.
FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *Am. Rivers*, 895 F.3d at 55.

avoid jeopardy or to satisfy its procedural duties under the ESA.  *Id.  See also Mayo v. Jarvis*,

177 F. Supp. 3d 91, 146 (D.D.C. 2016) (reliance on facially flawed addendum to BiOp was

arbitrary where addendum failed to explicitly discuss all effects); *Nat'l Wildlife Fed'n*, 332 F.

Supp. 2d at 182 (BiOp was unlawful for failing to provide proper analysis of cumulative impacts

and make rational connection between facts and no jeopardy finding, therefore reliance on it for

NEPA assessment was arbitrary).

Moreover, the BiOp asserted that the information EPA and Florida provided did not

allow USFWS to "estimate the number of individuals that might be affected by the permitted

activities."  FWS-006028, at FWS-006107 (BiOp).  This too rendered EPA's reliance on the

BiOp arbitrary.  *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1993) (reliance on

BiOp arbitrary because of action agency's failure to give expert agency all relevant data and

information).  EPA's reliance was therefore unlawful and must be set aside (Claim 10).

### III.    EPA Arbitrarily and Capriciously Determined "No Effect" to NMFS Species.

EPA also made an unlawful "no effect" determination for protected species that are under

NMFS jurisdiction, omitting potential indirect effects by relying on an improperly narrow

definition of the "action area."  Both EPA and NMFS ignored the fact that, while no NMFS-

protected species may be found in the waters over which Florida would assume jurisdiction, such

species may nonetheless be impacted by the 404 assumption because they are found in waters

that are fed by state-assumed waters.  The ESA prohibits making a "no effect" determination—

and thus bypassing further consultation—when an action has even the potential for such indirect

effects on protected species.  Because of this unlawful "no effect" determination, EPA failed to

properly consult with NMFS and its actions must be vacated (Claims 5 and 11).

EPA had a duty under the ESA to consult with NMFS and ensure its action—approval of

Florida's program—would not jeopardize the survival and recovery of protected species or

adversely modify or destroy their critical habitat *in the area of the proposed action*.  16 U.S.C. § 1536(a)(2), (c)(1); 50 C.F.R. §§ 402.13(a), 402.14(a).  "Action area" is defined to be broader than simply the project area: it means "all areas to be affected directly *or indirectly* by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02 (emphasis added).  *Accord Defs. of Wildlife*, 130 F. Supp. 2d at 128–29 ("action area" more than the "immediate area").

EPA based its "no effect" determination solely on NMFS' April 15, 2020, letter stating that ESA-listed species under NMFS' jurisdiction "do not occur *in* waters that are assumable by the state."  EPA-HQ-OW-2018-0640-0617 (EPA Letter) (emphasis added).  *See also* EPA-HQ-OW-2018-0640-0649, at 52 (BE).  EPA's determination was arbitrary and capricious given that NMFS' statement ignored areas that would be *indirectly* impacted by the federal action, including retained waters where NMFS species are present.  *See* 50 C.F.R. § 402.02.  As a matter of law, the relevant action area was not only "assumed" waters, or even just the "immediate area" of assumed waters.  *See Defs. of Wildlife*, 130 F. Supp. 2d at 128–29.  The "action area" included areas that would be *indirectly* impacted by the federal action, like waters downstream of assumed waters, where species under NMFS jurisdiction are found.

On its face, NMFS' determination that was limited to "assumed waters" failed to consider, much less analyze, all areas that would be indirectly affected by Florida's program.  *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  In relying solely on NMFS' jurisdictional determination, EPA also failed in its independent duty to consider, much less analyze, the proper action area—and the listed species that live there—as required under federal law.  *See* 16 U.S.C.

§ 1536(a)(2); 50 C.F.R. § 402.02(d).[25]  And EPA failed to provide a rational basis for its

determination.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002)

(agency must justify no effect determination with methodology, facts, or rational connections).

Moreover, EPA had ample evidence of the connections linking the action's potential

impacts to NMFS jurisdictional species and habitats within the action area.[26]  *See, e.g.*, EPA-

HQ-OW-2018-0640-0649, at 255–58 (BE) (finding action was likely to adversely affect several

species that inhabit the same coastal waters as NMFS jurisdictional species); *id.* at 151–153

(discussing certain NMFS jurisdictional species that exist in Florida waters).  In particular,

dredge and fill in assumed waters can affect downstream estuarine, marine, and tidal waters and

the species that inhabit them.  *See, e.g.*, EPA-HQ-OW-2018-0640-0642, at 42 (BiOp) (explaining

how "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and

marine ecosystem"); EPA-HQ-OW-2018-0640-0649, at 58 (BE) (Fig. 4-1) (Historic freshwater

flows compared to freshwater flows after C&SF Project); *id.* at 256 (describing adverse impacts

to coastal and marine birds).  For example, these activities impact habitat (including critical

habitat), hydrology, and water quality in coastal areas where NMFS species, such as smalltooth

sawfish and sea turtles, dwell.  *See, e.g.*, EPA-HQ-OW-2018-0640-0642, at 61 (BiOp)

("Permitted activities may also result in changes to hydrologic regimes and water quality in

---

[25] Just as EPA could not blindly rely on the BiOp, it could not rely on NMFS' facially invalid
jurisdictional determination to issue a "no effects" determination and avoid consultation with
NMFS.  An action agency (here, EPA) acts arbitrarily and capriciously when it relies on a
"facially flawed BiOp" or when "blindly adopt[ing]" the faulty conclusions of the consulting
agency (here, NMFS).  *See City of Tacoma*, 460 F.3d at 75–76; *Am. Rivers*, 895 F.3d at 55.
[26] "'May affect' sets a low bar: 'Any possible effect, whether beneficial, benign, adverse or of an
undetermined character, triggers the formal consultation requirement.  Thus, actions that have
any chance of affecting listed species or critical habitat—even if it is later determined that the
actions are 'not likely' to do so—require at least some consultation under the ESA.'"  *Growth
Energy v. EPA*, 5 F.4th 1, 30 (D.C. Cir. 2021) (internal citations omitted).

coastal areas."); EPA-HQ-OW-2018-0640-0649, at 256 (BE) (stating action could impact "habitat, hydrology, and water quality" affecting birds in coastal and marine habitats).

Despite this evidence of potential impacts to NMFS-regulated species, EPA failed to explain how it could reach the conclusion that its action would have "no effect" on NMFS species.  EPA's determination was therefore arbitrary and must be set aside.  *See Growth Energy*, 5 F.4th at 31–33; *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) (EPA should have consulted; not "attribut[ing]" harm "with reasonable certainty" is not the same "no effect").

Because of EPA's unlawful "no effect" determination, the agency failed to properly consult with NMFS, in violation of the ESA.  *Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA.").

## IV.   EPA Unlawfully Approved a State Program that is Less Stringent Than Federal Law.

In addition to the ESA violations, EPA's approval of Florida's program was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, because it authorized a state program that is not as stringent as federal law requires, in violation of the Clean Water Act and APA (Claim 2).[27]

---

[27] Plaintiffs submitted comments to EPA raising these issues.  EPA's administrative record divided Plaintiffs' comments and exhibits into multiple non-sequential parts.  In order, the comments appear as follows:  EPA-HQ-OW-2018-0640-0386 [Part 1] (Comment Letter and Exhibits 1-8); EPA-HQ-OW-2018-0640-0385 [Part 2] (Exhibits 9-18); EPA-HQ-OW-2018-0640-0392 [Part 3] (Exhibits 19-30); EPA-HQ-OW-2018-0640-0393 [Part 4] (Exhibits 31-40); EPA-HQ-OW-2018-0640-0391 [Part 5] (Exhibits 41-50); EPA-HQ-OW-2018-0640-0387 [Part 6] (Exhibits 51-60); EPA-HQ-OW-2018-0640-0388 [Part 7] (Exhibits 61-70); EPA-HQ-OW-2018-0640-0389 [Part 8] (Exhibits 71-80); EPA-HQ-OW-2018-0640-0394 [Part 9] (Exhibits 81-99); EPA-HQ-OW-2018-0640-0390 [Part 10] (Exhibits 100-103).

Any state 404 program must be at least as stringent as the federal program.  33 U.S.C.
§ 1344(h)(1).  EPA must determine that a state has authority to, among other things: (1) issue
permits "which apply, and assure compliance with" all Section 404 requirements, including the
Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the
permit program, including civil and criminal penalties and other ways and means of
enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(C), (1)(G); 40 C.F.R. pt. 233.  EPA may only
approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).

Yet, here, EPA unlawfully approved the State's application, because the program failed
to: (1) provide for enforcement as stringent as federal law to abate violations of a permit or the
permit program; (2) adopt the Section 404(b)(1) Guidelines or create equivalent standards
requiring the permitting authority to conduct the evaluations and factual determinations required
by federal law; (3) determine water quality impacts other than those that would violate water
quality standards or toxic effluent guidelines, contrary to the 404(b)(1) Guidelines; (4) ensure
that state permits would not jeopardize protected species or adversely modify or destroy critical
habitat, as required by the Section 404(b)(1) Guidelines; and (5) properly define the scope of its
jurisdiction over assumable waters of the United States.  EPA's action was thus arbitrary,
capricious, an abuse of discretion, not in accordance with the law, and otherwise in violation of
the Clean Water Act and APA.

### A.   EPA Approved a State Program That Failed to Meet Minimum Enforcement Standards Required to Abate Violations of a Permit or the Permit Program.

First, although federal law criminalizes negligent violations of the Clean Water Act,
Florida's 404 program does not.  Instead, Florida law requires a higher level of culpability to
establish a criminal 404 violation.  Florida's enforcement scheme thus excludes an entire class of

violators from criminal liability, rendering its program less stringent than the federal program and undermining the deterrent effect of the Clean Water Act's enforcement mechanisms.

Enforcement serves as a critical safeguard and deterrent to violations of the Clean Water Act. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1978) ("The [Clean Water] Act would be severely weakened if only intentional acts were proscribed.  We will not interpret it that narrowly, particularly when the legislative history is clear Congress intended strong regulatory enforcement.").

EPA regulations require that "the burden of proof and degree of knowledge or intent required under State law for establishing violations under … this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act."  40 C.F.R. § 233.41(b)(2).  *See also id.* § 233.1(d) (state 404 program "may not impose any less stringent requirements for any purpose").

In Section 309(c)(1), Congress spoke directly and unambiguously to the mens rea requirement for Clean Water Act violations.  Section 309(c)(1) states: "[a]ny person who ... negligently violates ... any requirement imposed ... in a permit issued under [sections 402 or 404] of this title by the Secretary of the Army or by a State ... shall be punished[.]"  33 U.S.C. § 1319(c)(1).  Every federal circuit court to have considered this language has held that its plain meaning establishes liability for simple or ordinary negligence for Clean Water Act violations, rather than a higher criminal negligence standard, such as gross negligence.  *See United States v. Maury*, 695 F.3d 227, 259 (3d Cir. 2012) (plain language of "negligence" means ordinary negligence); *United States v. Pruett*, 681 F.3d 232, 243 (5th Cir. 2012) (same); *United States v.*

*Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (same); *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) (same).  No other court has interpreted this statutory provision otherwise.

The intent standard under Florida law, on the other hand, is gross or culpable (criminal) negligence.  *See* Fla. Stat. § 373.430(1)(a), (3)–(4) (requiring willfulness, reckless indifference, or gross careless disregard to establish criminal liability for a pollution offense); *id.* § 373.430(1)(b)–(c), (5) (requiring willfulness to establish criminal liability for permit violations and false statements).[28]  Indeed, under Florida law it is unconstitutional to criminally penalize "mere negligent conduct."  *State v. Hamilton*, 388 So. 2d 561, 563–64 (Fla. 1980).  In Florida, culpable negligence is "reckless indifference or grossly caress disregard of the safety of others." *State v. Greene*, 348 So. 2d 3, 4 (Fla. 1977).  It has also been defined as "a gross and flagrant character, evincing reckless disregard for human life or of the safety of persons exposed to its dangerous effects;" or "the entire want of care which would raise the presumption of indifference to consequences;" or "reckless indifference to the rights of others, which is equivalent to an intentional violation of them."  *Id.*

Florida law therefore is not as stringent as to criminal enforcement as is the Clean Water Act.  It excludes from criminal liability an entire class of permit violations that are subject to criminal penalty under federal law.  EPA therefore abused its discretion in approving Florida's program.  *See Idaho Conservation League*, 820 F. App'x 627 (EPA abused its discretion in

---

[28] Under 40 C.F.R. § 233.41(a)(3)(ii), for example, a state agency must show it has authority to "seek criminal fines against any person who willfully or with criminal negligence discharges dredged or fill material without a required permit or violates any permit condition issued under section 404[.]"  But Florida law requires more than simple negligence to establish a criminal permit violation subject to punishment.  *See* Fla. Stat. § 373.430(1)(b) (making permit violations unlawful); *id.* § 373.430(4) (providing that (1)(b) violation with reckless indifference or gross careless disregard is misdemeanor in the second degree); *id.* § 373.430(5) (providing that willful Section 373.430(1)(b) violation is misdemeanor in the first degree).

approving a state delegated program with a mens rea standard greater than the burden of proof required under the Clean Water Act); EPA-HQ-OW-2018-0640-0681 (copy of decision).

Moreover, EPA's action undermined the deterrent effect that Congress sought by prohibiting negligent violations of Section 404 and the incentives to ensure full compliance with the 404 program.  Ordinary negligence is the lowest form of criminal mens rea aside from strict liability.  It is the failure to use care that a reasonably prudent and careful person would under similar circumstances. *Hanousek*, 176 F.3d at 1120.  This mens rea standard allows robust criminal enforcement of permit violations—and therefore greater environmental protections— because it sets a lower bar the government must meet to bring and prevail in an enforcement action and promotes compliance through deterrence.

EPA was aware of this deficiency in Florida law and willfully disregarded it in approving Florida's program.  *See* EPA-HQ-OW-2018-0640-0665, at 1 (EPA email) ("[EPA's] criminal folks view 'reckless indifference' or 'gross careless disregard' as a different standard than simple or ordinary criminal negligence."); EPA-HQ-OW-2018-0640-0666, at 2 (EPA email) ("[G]iven [Florida case law] ... it does seem like there is a real question in FL as to whether a statute can constitutionally provide criminal penalties for simply negligent conduct."); EPA-HQ-OW-2018-0640-0667 & EPA-HQ-OW-2018-0640-0667-A1, at 1 ("EPA has concluded that Idaho must revise the statutory language for the criminal intent standard in order for the EPA to approve the IPDES program.").[29]  The deficiency was also brought to EPA's attention during public comment on Florida's application.  EPA-HQ-OW-2018-0640-0386-A1, at 32–34.

---

[29] As noted above, EPA went on to approve Idaho's program anyway, something the Ninth Circuit Court of Appeals subsequently held to be an abuse of discretion.  Still, EPA was undeterred and willfully abused its discretion again in approving Florida's program.

In its response to comments, EPA-HQ-OW-2018-0640-0568, at 75–76, EPA relied on inapposite cases that posed the question whether states might impose different *penalties* for certain violations, not whether state could impose a higher criminal intent before a violation could be established in the first place.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 180 (D.C. Cir. 1988) (penalties); *Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1171–72 (9th Cir. 2010) (civil administrative penalties).  EPA dismissed the Ninth Circuit's decision which found the agency had *abused its discretion in identical circumstances* as merely "unpublished and non-binding."  EPA-HQ-OW-2018-0640-0568, at 76.  And then, by approving Florida's program anyway, EPA abused its discretion again.

In addition, Florida law is not as stringent as federal law because it provides a shorter statutes of limitation for enforcement of environmental crimes.  Under federal law, criminal enforcement actions brought under 33 U.S.C. § 1319(c) are generally subject to a five-year statute of limitations.  *See United States v. Ursitti*, 543 F. Supp. 2d 971, 974 (C.D. Ill. 2008) (case involving Clean Water Act criminal violation, citing to 18 U.S.C. § 3282(a) and stating "[t]here is a five-year statute of limitations for criminal offenses, which is applicable to the offenses charged in this case"); *see also* Joseph J. Lisa, *Negligence-Based Environmental Crimes: Failing to Exercise Due Care Can Be Criminal*, 18 Vill. Env't L.J. 1, 43 n.109 (2007) (citing 18 U.S.C. § 3282(a) as statute of limitations for Section 1319(c) enforcement actions).

The statutes of limitation applicable to violations under state law, however, are between one and three years depending on the severity of the offense.  Fla. Stat. § 373.430(1)(a)–(c) (identifying crimes relating to pollution, failure to comply with permit requirements, and fraud); *id.* § 373.430(3)–(5) (setting degree of offense depending on the crime); *id.* § 775.15 (setting for statute of limitations depending on the severity of the offense).  State law regarding criminal

48

enforcement is therefore deficient also in this regard, making its program less stringent than federal law. *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F. Supp. 440, 447–48 (D. Md. 1985) (recognizing in the citizen suit context that shorter state statutes of limitations under Clean Water Act would "frustrate several policies" of the Clean Water Act, including a lack of uniformity from state to state and that shorter statutes of limitation would be "very hospitable to industries that violate the Act" and could make violators nearly immune); *see also Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522–23 (9th Cir. 1987) (same; applying shorter state statutes of limitations would "diminish the effective enforcement" of the Clean Water Act).

Although 40 C.F.R. § 233.41(d)(1) authorizes EPA to approve a state program that has less stringent *penalties* than federal law provides,[30] the Clean Water Act does not authorize approval of a state program with a less stringent enforcement scheme in terms of criminal culpability and statutes of limitations. To the contrary, these failures rendered the program non-approvable, and it was an abuse of discretion for EPA to approve the program anyway.

### B. EPA Approved a State Program That Relied on Applicants' "Assurances" In Lieu of the Federal 404(b)(1) Guidelines' Requirement that the Permitting Authority Independently Make Factual Determinations.

Further, rather than adopting the federal 404(b)(1) Guidelines, which create duties and obligations for the permitting authority to evaluate the potential impacts of a Section 404 permit and to make factual determinations about those effects, Florida chose to rely on an existing state regulatory program, which merely asks the applicant to provide the permitting authority with the applicant's "reasonable assurances."

The federal 404(b)(1) Guidelines require that the permitting authority "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill

---

[30] Note that the State has claimed that this regulatory provision was "not applicable" to the State's application. EPA-HQ-OW-2018-0640-0016-A3, at 54.

material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F." 40 C.F.R. § 230.11. Subparts C through F deal with a detailed list of the ways that dredge and fill activities may affect (1) physical and chemical characteristics (including substrate and salinity levels), *id.* §§ 230.20–230.25; (2) biological characteristics (including protected species, fish and other aquatic species, and other wildlife), *id.* §§ 230.30–230.32; (3) special aquatic sites (including wetlands), *id.* §§ 230.40–230.45; and (4) human use (including municipal water supplies, fisheries, recreation, aesthetics, and parks), *id.* §§ 230.50–230.54. The permitting authority's factual determinations and evaluations of those effects then form the basis for the agency's decision about whether a discharge of dredge and fill material will cause or contribute to significant degradation of the waters of the United States. *Id.* § 230.10(c). If the answer is yes, the Guidelines prohibit the issuance of the permit. *Id.*

The State, however, did not adopt the federal 404(b)(1) Guidelines. Instead, the state program incorporated non-equivalent provisions from its existing state Environmental Resource Program, which only require that an "[a]pplicant provide reasonable assurance" about the potential adverse impacts of their project. *See, e.g.*, Fla. Stat. § 373.4146; Fla. Admin. Code R. 62-330.301. Under state law, the agency's job is merely to determine whether the reasonable assurances required have been provided. EPA-HQ-OW-2018-0640-0002-A1, at 64 (ERP Handbook 5.5.4.1) ("The decision to issue or deny a permit will be based on a determination of whether the reasonable assurances required in the above rules and the Handbook have been provided."). *Accord id.* at 81 (ERP Handbook 8.1) ("The staff recommendation to approve any individual or conceptual approval permit will be based upon a determination of whether reasonable assurance has been provided that the activity meets the criteria for evaluation, and whether the applicable permit fee has been submitted."). Although the State does prohibit

permits that cause or contribute to significant degradation of wetlands, Fla. Admin. Code R. 62-331.053(3)(a)(6), that determination is based on an applicant's "reasonable assurances."

The state program thus does not require FDEP to make findings of its own or even to independently evaluate and make findings as to the applicant's reasonable assurances. *See, e.g.*, *Defs. of Crooked Lake, Inc., v. FDEP*, 2018 WL 3387900, at *3 (Fla. Div. Admin. Hearings May 7, 2018) (asking only whether evidence showed the applicant provided reasonable assurances). There is no legally binding requirement that *the permitting authority* evaluate the project's effects or even the adequacy of the applicant's reasonable assurances. Nor is there a requirement that *the permitting authority* make written factual determinations about either.

As EPA explained when issuing the 404(b)(1) Guidelines, it purposefully placed the duty on the permitting authority because "[s]pecific documentation is important to ensure an understanding of the basis for each decision to allow, condition, or prohibit a discharge through application of the Guidelines." 45 Fed. Reg. 85,336, 85,343 (Dec. 24, 1980). EPA explained that this documentation "provides a record of actions taken that can be evaluated for adequacy and accuracy and ensures consideration of all important impacts in the evaluation of a proposed discharge of dredge or fill material." *Id.* Without FDEP making the 404(b)(1) Guidelines' factual determinations, the public cannot ensure an understanding of FDEP's decisions, and are hamstrung in evaluating the adequacy and accuracy of FDEP's permitting decisions. And FDEP cannot ensure that all important impacts have been considered.

Further, when a duty falls on a federal agency, the public can ensure that the agency undertake reasoned actions that comply with the agency's legal authority and the APA. *See* 5 U.S.C. § 706. This proves to be a strong incentive for federal agencies to follow the law. And it provides an opportunity for the public to step in when a federal agency fails at that duty. *See*

*Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 77–79 (D.D.C. 2007) (Corps'

factual determinations arbitrary and capricious).  Because the only obligations under the state

program fall with the *applicant*, those incentives and enforcement opportunities do not exist.

Additionally, unlike the clear, prescriptive requirements in the federal program, the state

program's use of the term "reasonable assurance" leaves space for interpretation.  A reasonable

assurance by a self-interested applicant that there will not be significant adverse effects is not the

same as the rigorous evaluations and determinations that must be made by an independent

agency as required under the Section 404(b)(1) Guidelines.

This subjective, vague, and applicant-driven process is thus not equivalent to the federal

program's prescriptive and clear requirements.  EPA's approval was thus arbitrary, capricious,

and an abuse of discretion.

### C.  EPA Approved a State Program with a Narrow View of Water Quality Effects Determinations Contrary to the Federal 404(b)(1) Guidelines.

Another stringency issue with the state program is that it limits consideration of water

quality impacts to situations where the high bar of water quality standards or toxic effluent limits

will be violated.  Federal law prohibits the introduction of any pollutant without a permit.  But in

the state program, the water quality impacts that result from dredge and filled material into

waterways only matter if and when that introduction would violate water quality standards or

toxic effluent limitations.  Such a narrow view is less stringent than what federal law requires.

The federal 404(b)(1) Guidelines rightly focus on the introduction of pollutants—defined

broadly—into waters of the United States, recognizing the threat of harm that this poses.  The

Guidelines do not limit that concern only to situations where specific water quality standards or

toxic effluent limitations are or may be violated.  That would be overly narrow for the purpose

and intent of the Clean Water Act as a whole.  Yet that is exactly the narrowing effect of the state program, rendering EPA's decision to approve it arbitrary, capricious, and an abuse of discretion.

While the federal 404(b)(1) Guidelines include many provisions focused on water quality generally, many of the state program's "parallels" limit those considerations to situations where specific water quality standards or toxic effluent limitations may or will be violated.  For example, the federal 404(b)(1) Guidelines require that the permitting authority evaluate and determine the potential impacts on water, generally.  40 C.F.R. § 230.22.  The state program, however, focuses instead on adverse effects to receiving waters "such that the state water quality standards … and any special standards … will be violated."  Fla. Admin. Code R. 62-330.301(1)(e); EPA-HQ-OW-2018-0640-0002-A1, at 93 (ERP Handbook 10.2.4).  This means that the same dredge and fill activity that the federal program would deem as having negative impacts on water quality, which must be mitigated, would not necessarily receive the same treatment under the state program.  And this allows dredge and fill activities under the state program that under the federal program would either not be permitted or would require measures, mitigation, or controls.

As another illustration, the federal 404(b)(1) Guidelines require the permitting authority to evaluate the material to be discharged to "determine the possibility of chemical contamination or physical incompatibility," generally.  40 C.F.R. § 230.60.  *See id.* § 230.61(b)(1) (explaining that the evaluation required by Section 230.60 concerns the "potential effects on the water column and on communities of aquatic organisms" with no mention of water quality standard or toxic effluent limitation violations); *id.* § 230.3(d) (defining "contaminant" broadly as "a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic

environment, and includes but is not limited to the [toxic pollutants]").  The state program, by

contrast, requires evaluation of material to be dredged or filled for chemical contamination "that

may violate state water quality standards…, or any toxic effluent standards or prohibition."

EPA-HQ-OW-2018-0640-0002-A20, at 32 (404 Handbook 8.2(g)).  Again, this means that the

same fill material may be considered as creating the possibility of chemical contamination under

the federal program but not under the state program.  And again, that contaminated fill material

may require additional controls, cleanup, or even prohibitions for use under federal law which

would not be required under the state program.

By limiting its assessment of water quality impacts to situations where water quality

standards or toxic effluent limitations may be violated, the state program is more narrow, and

thus less stringent, than federal law requires.  EPA's decision to approve it in spite of these

differences was arbitrary, capricious, and an abuse of discretion that must be vacated.

### D.     EPA Approved a State Program That Failed to Comply with 404(b)(1) Guideline to Ensure No Jeopardy from State Permits.

Next, EPA abused its discretion in approving Florida's program because the State's

application failed to show the authority on which it would rely to claim that the state program

would ensure no jeopardy to protected species and critical habitat.  EPA may only approve a

state program if it determines that no state permit will issue that would jeopardize the continued

existence of protected species or adversely modify or destroy critical habitat.  40 C.F.R.

§§ 230.10(b)(3), 233.34(a).  The State, however, relied on a technical assistance process to be

laid out in the anticipated, future programmatic BiOp that was not part of the program

application, as discussed below.  Further, the technical assistance process established by the

BiOp was insufficient to ensure no jeopardy, as described above.

**E.**    **EPA Approved a State Program That Failed to Demonstrate That**
**Assumable Waters Would be Regulated and Transferred Authority over**
**Non-Assumable Waters to the State.**

Finally, EPA's approval of the state program violated the Clean Water Act because the

State failed to demonstrate that it would regulate all assumable waters of the United States, and

only those waters.  EPA can only approve a state program if the state demonstrates it has

authority to regulate the proper scope of waters.  33 U.S.C. § 1344(g)(1), (h)(1)(A)(i), (h)(1)(G);

40 C.F.R. §§ 233.20(a), 233.30(a), 233.40(a).  A state program must regulate *all* assumable

waters of the United States as defined in Section 404(g)(1).  *See* 40 C.F.R. § 233.1(b) (partial

programs are not approvable).  And a state 404 program can only regulate assumable waters.

Section 404 authority "cannot be transferred for those waters" required by law to remain under

the Corps' exclusive jurisdiction.  *See* 40 C.F.R. § 232.2 (defining waters that can be state

regulated).  Yet, here, the state program failed to demonstrate it would regulate all assumable

waters.  Further, EPA's approval of the program also transferred authority over non-assumable

waters to the State.

First, Florida's program did not demonstrate authority to regulate all assumable waters of

the United States.  As a result, the State has failed to exercise jurisdiction over assumable waters,

leaving those waters unregulated.  The state program claimed it would assume jurisdiction over

"state-assumed waters," which it described as "all waters of the United States that are not

retained waters."  EPA-HQ-OW-2018-0640-0002-A20, at 4–5 (404 Handbook 1.1).  *Accord* Fla.

Stat. § 373.4146(1) (defining "state-assumed waters" as "waters of the United States that the

state assumes permitting authority over pursuant to s. 404 of the Clean Water Act … and rules

promulgated thereunder").  However, the state program did not define "waters of the United

States."  *See* EPA-HQ-OW-2018-0640-0016-A3, at 11 (Comparison Table) ("No state

definition" for "waters of the United States").[31]  The State therefore did not demonstrate what waters constituted "waters of the United States" for purposes of its application.  Although state regulations could have affirmed that "waters of the United States" are those waters as defined by federal law, or incorporated the federal definition, the State did neither.

As Plaintiffs feared, the State has exploited this gap and abrogated its authority over assumable waters by failing to require permits for discharges in all assumable waters.  Indeed, the State has continued applying the Trump-era definition—which substantially reduced waters covered by the Clean Water Act—after it was vacated by a federal court as unlawful.  *Pasqua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 955 (D. Ariz. 2021); Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  The State continued to do so even after EPA (repeatedly) told the State that the State was required to cease applying the vacated Trump definition and that it was required to apply the controlling federal definition of waters of the United States (the pre-2015 regulatory regime).  Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  *See also* Dkt. 59.

Despite the federal agency's directives, the State has continued making "no permit required" decisions for discharges into assumable waters when those waters are excluded pursuant to the vacated, Trump-era definition of "waters of the United States."  Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  By claiming these waters are not under its jurisdiction, based on the vacated definition, the State is also abdicating its duty to enforce against unpermitted discharges in all assumable waters because the State does not consider those discharges to be in violation of Section 404.

---

[31] Although the State application claimed the program would use the federal definition, nothing in the program incorporates, adopts, or ensures the State will follow the federal definition.

EPA's approval of a state program that failed to demonstrate it would adhere to the federal definition of waters of the United States violated the Clean Water Act.  EPA thus unlawfully approved a partial 404 program and left assumable waters in Florida unregulated.[32]

Second, EPA was not authorized to transfer Section 404 authority to the State over waters that federal law requires remain under the Corps' exclusive jurisdiction.  Specifically, the Clean Water Act prohibited EPA from allowing the State to administer Section 404 over "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto."  33 U.S.C. § 1344(g)(1).

Yet, EPA failed to ensure that its approval of Florida's program met this requirement of the Clean Water Act.  There is no record evidence that EPA undertook any independent action to ensure its approval of Florida's application complied with its duty under Section 404(g)(1).  To the contrary, EPA took no action when the Corps summarily and arbitrarily terminated its 2018 navigability studies to determine the extent of non-assumable waters in Florida.  EPA also was copied on public comments to the Corps identifying the need for these navigability assessments but ignored them.  EPA determined Florida's 404 application was "complete" even (1) though the Corps' navigability assessments were never completed; (2) Florida's application relied on a truncated "Retained Waters List" that omitted navigable waterways listed by the Corps as recently as 2017; (3) the public identified numerous waterways that should be deemed non-

---

[32] Because the Corps cannot regulate assumable waters once a State has assumed the Section 404 program, the Corps too is not exercising jurisdiction over those waters.  EPA's unlawful action means no one is regulating those waters while Florida administers its 404 program.

assumable; and (4) substantial questions remained over which waters the State would regulate. EPA-HQ-OW-2018-0640-0051, at 4–6 (Completeness Letter).  EPA abused its discretion by approving Florida's application based solely on the Corps' unlawful "Retained Waters List."

EPA's failure to undertake any inquiry to ensure compliance with Section 404(g)(1) and its unreasonable reliance on arbitrary and capricious actions by the Corps were unlawful.  EPA's action had the legal effect of transferring 404 authority from the Corps to the State, cementing the allocation of authority between those two entities.[33]  EPA's action also affected which projects would continue to be subject to additional environmental protections, including Section 7 of the ESA and NEPA review.  EPA had a duty to independently determine that only assumable waters were transferred to State authority, including by evaluating Florida's reliance on the Corps' "Retained Waters List" on its own and in light of the concerns raised by others. EPA's approval of Florida's program thus unlawfully transferred 404 authority from the Corps to the State over "non-assumable" waters in violation of the Clean Water Act.

**V.      The Corps Unlawfully Relinquished 404 Jurisdiction Over Certain Waters.**

Further, the Corps' "Retained Waters List" constituted a final agency action which, when adopted by EPA, unlawfully rendered certain waters "assumable" by the State, contrary to the RHA, CWA, and APA (Claim 7).  *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  It marked the consummation of the agency's decision-making (as to which waters would be retained for purposes of Florida's 404 assumption application) and was an action by which "rights or obligations have been determined" or from which "legal consequences will flow" (because it set forth the scope of retained waters, i.e., it altered the legal status of those waters,

---

[33] Indeed, EPA has argued that after assumption, changes to the list require modification of the program (which only EPA can approve).  *Menominee Indian Tribe v. EPA*, 947 F.3d 1065, 1074–75 (7th Cir. 2020) (Hamilton, J. concurring) (cited by *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 212 n.9 (D.D.C. 2022)); EPA-HQ-OW-2018-0640-0568, at 66.

rendering others assumable). *See Bennett*, 520 U.S. at 177–78. Once EPA approved Florida's program, the State assumed 404 jurisdiction over waters not retained. That change also had legal consequences for the public, who are subject to different rules and legal regimes depending on whether the Corps or the State has jurisdiction over a particular waterway.

Under Section 404(g)(1) the Clean Water Act, the Corps must retain exclusive jurisdiction over navigable waters related to commerce. The Clean Water Act also provides for more expansive authority by requiring the Corps also to retain 404 jurisdiction over dredge and fill in adjacent wetlands. *See id.* § 1344(g)(1).

The RHA similarly provides for the Corps' exclusive jurisdiction over construction and fill in navigable waters amenable to commerce. 33 U.S.C. § 401 (Section 9, construction); *id.* § 403 (Section 10, fill); *id.* § 407 (Section 13, discharges). Under the RHA, the Corps has a duty to maintain lists of Section 10 navigable waters, not to remove waterbodies from its lists without following a procedure absent here, and to make findings and determinations "whenever a question arises regarding the navigability of a waterbody." 33 C.F.R. §§ 329.15(a), 329.16(a), 329.16(c). Finally, the Corps' regulations under both the Clean Water Act and the RHA define navigable waters under its exclusive jurisdiction as including "historic use" waters. *Compare id.* § 328.3(a)(1) (2015)[34] *with id.* § 329.4.[35]

---

[34] The Trump Administration's definition did not materially alter this part of the definition. *See* 33 C.F.R. § 328.3(a)(1) (2020) ("The territorial seas, and waters which are currently used, or *were used in the past*, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." (emphasis added)).

[35] *See also Subcommittee Report*, CORPS002993, at CORPS002999, CORPS003015–16, CORPS003021–22 (citing 33 C.F.R. § 328.3(a)(1) and *Rapanos* guidance). *See also* EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008), https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf (waters are considered "traditional navigable waters" if they are subject to Section 9 or Section 10 of the RHA).

The Corps violated the Clean Water Act, RHA, and APA by arbitrarily and capriciously (1) failing to complete navigability assessments necessary to ascertain the scope of its 404 jurisdiction post-assumption; (2) relying on an outdated and incomplete RHA Section 10 list from 2014 as the basis for its Clean Water Act "Retained Waters List;" (3) omitting waterways identified on the 2017 list without justification; and (4) removing "historic use" navigable waters from the list.  The "Retained Waters List" should therefore be set aside.

## VI.   EPA Arbitrarily and Capriciously Determined the State's Inadequate Application Was Complete.

EPA also acted arbitrarily and capriciously by deeming Florida's application complete when submitted (Claim 1).  Eight days after receiving Florida's application, EPA deemed the application complete as of the date of submission, EPA-HQ-OW-2018-0640-0608, thereby triggering a statutory 120-day deadline to approve or deny the application unless EPA and the State agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).  On September 16, 2020, EPA issued a notice and request for comment on the application with the opportunity to comment closing on November 2, 2020.  85 Fed. Reg. 57,853 (Sept. 16, 2020).

But the public was deprived of an adequate opportunity to comment on the application because the application was not, in fact, complete at the time of submission.  The elements required for a state submission included "a complete program description" and a statement from the Attorney General showing that the State had "adequate authority to carry out the program and meet the applicable requirements of this part."  40 C.F.R. §§ 233.11(b)–(c), 233.12(a).  An integral part of any 404 program is demonstrating that state-issued permits will result in no jeopardy to listed species.  33 U.S.C. § 1344(h)(1)(A)(i) (state must show it has authority to comply with 404(b)(1) Guidelines); 40 C.F.R. § 230.10(b)(3) (404(b)(1) Guideline requiring that no permit jeopardizes a listed species or destroys or adversely modifies critical habitat).

60

Florida's submission, however, did not demonstrate this authority.  The application included an unexecuted MOU between state and federal agencies stating that USFWS would give "technical assistance" to state agencies for purposes of ensuring no jeopardy to listed species.[36]  EPA-HQ-OW-2018-0640-0016-A2, at 12 (Application MOU) (unexecuted).  What this process would entail, however, was not defined.  Instead, the MOU stated that "the technical assistance" process was "anticipated to be outlined in the USFWS' BiOp based on information included in the [BA] submitted by EPA."  *Id.* at 5.  And so it would be, but not until November 17, 2020, two weeks after public comment closed.

Florida's submission also included, and relied on, state-promulgated regulations.  But those too only referenced a "technical assistance" that would later be defined; they did not themselves define it.  *See* Fla. Admin. Code R. 62-331.051 (applicants for individual permits will be required to provide "data and information for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable requirements resulting from consultation with, or technical assistance by," the state agencies and USFWS); *id.* 62-331.053(3)(a) (no permit shall be issued that causes jeopardy to listed species or results in adverse modification of critical habitat as determined by compliance with "any requirements resulting from consultation with, or technical assistance by" the state agencies and USFWS); *id.* 62-331.010(5) (incorporating State 404 Handbook); EPA-HQ-OW-2018-0640-0002-A20, at 6 (404 Handbook 1.3.33) (requiring compliance with requirements resulting from the "technical

---

[36] EPA dismissed the objection that the unexecuted MOU or absence of the BiOp rendered Florida's application incomplete on the basis that these are not required for a program submission.  EPA-HQ-OW-2018-0640-0568, at 19.  EPA's position, however, did not address the fact that *Florida* relied on the MOU to establish its authority for a component of the program, and that the MOU in turn relied on a "forthcoming" technical assistance process that it said would be produced in a later BiOp.

assistance" process); *id.* at 23 (404 Handbook 5.2.3) (referring to the "technical assistance"

process)).  The Attorney General's statement only made general references to the 404(b)(1)

Guidelines and to the state individual permit conditions rule, Fla. Admin. Code R. 62-331.053.

*See* EPA-HQ-OW-2018-0640-0017, at 7 (AG Statement).

　　　EPA's reliance on Florida's program description failed too, since the program description

itself relied on the unexecuted MOU, which relied on the then non-existent BiOp to define the

technical assistance process.  EPA-HQ-OW-2018-0640-0568, at 19–20 (Response to

Comments).  Moreover, EPA's view that these materials described how "reviews" would be

"handled" itself fell short of claiming that they established the State's authority to ensure that

there would be no jeopardy to listed species.  Indeed, in defending Florida's authority to protect

listed species, EPA itself relied on the BiOp.[37]

　　　By relying on processes that had not yet been articulated or produced, Florida's

application could not demonstrate the State's authority to ensure protection of listed species, and

so its application was not complete.  EPA's completeness determination was therefore arbitrary

and capricious.  It deprived the public of the opportunity to comment on an integral component

of Florida's program.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1); *Small Refiner Lead Phase-*

*Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983).  And it unlawfully set in motion a

---

[37] EPA-HQ-OW-2018-0640-0568, at 95 (Response to Comments) (citing BiOp to describe state process for evaluating impacts to listed species and designated critical habitat); *id.* at 95–96 (citing BiOp for FDEP's duty to follow USFWS' recommended measures as permit conditions); *id.* at 97 (citing BiOp for conclusion "that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat"); *id.* at 98 (citing BiOp for conclusion that state process is adequate to protect listed species); *id.* at 99 (citing BiOp in paragraph concluding that state process "is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat"); *id.* at 101 (citing BiOp to defend how State will comply with 404(b)(1) Guidelines); *id.* at 102 (stating that "as a result" of EPA's consultation and resulting BiOp state and federal agencies will coordinate on state permits to avoid jeopardy).

120-day clock ending December 17, 2020.  Had EPA found the application complete when it received the programmatic BiOp containing the technical assistance process on which Florida's program relied (November 19, 2020), the public would have had at least until January 4, 2021, to comment (forty-five days), and the 120-day clock would not have run until Friday, March 19, 2021, well into the next Presidential administration.

Lastly, for the reasons demonstrated above, EPA's conclusion that Florida's application was complete as submitted was also unlawful based on the State's failure to demonstrate that it would assume authority over all assumable waters, and only assumable waters.

### STANDING

Plaintiffs have been injured by the Federal Defendants' actions and have standing to pursue their claims.  As demonstrated in Plaintiffs' Motion for Partial Summary Judgment, EPA's transfer of 404 authority to Florida threatens Plaintiffs' organizational and associational interests in protecting Florida's valuable waterways, including the endangered and threatened species that rely on them.  Dkt. 31 at 32–51.  The loss of ESA Section 7 consultation on 404 permits in assumed waters and the loss of NEPA analysis have (1) eliminated levels of environmental review to which Plaintiffs would otherwise be entitled; (2) limited Plaintiffs' statutory avenues to advocate for robust environmental protection; (3) removed Plaintiffs' access to critical environmental analyses that Plaintiffs use to educate the public, engage in advocacy, and seek redress for environmental harm;[38] and (4) unduly restricted Plaintiffs' access to courts

---

[38] *See Ctr. for Biological Diversity*, 597 F. Supp. 3d at 190 (finding Florida's challenge to Plaintiffs' asserted informational injury unavailing).

to challenge inadequate environmental protection.[39]  Plaintiffs are also harmed by USFWS' and

EPA's failures to comply with the ESA, and the Corps' abdication of jurisdiction over certain

navigable waters.

To establish standing, Plaintiffs must show, "by a preponderance of the evidence," *Otay*

*Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 56 (D.D.C. 2015), that they "have

(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the

defendant; and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v.*

*Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  An association may bring suit on its

members behalf when (1) "its members would otherwise have standing to sue in their own

right;" (2) "the interests at stake are germane to the organization's purpose;" and (3) "neither the

claim asserted nor the relief requested requires the participation of individual members in the

lawsuit." *Friends of the Earth*, 528 U.S. at 181.

"'[T]o establish organizational standing a party must show that it suffers' or will

imminently suffer 'a concrete and demonstrable injury to its activities, distinct from a mere

setback to the organization's abstract social interests.'" *Nw. Immigrant Rights Project v. U.S.*

*Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46 (D.D.C. 2020), *appeal dismissed*, No. 20-

5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021) (quoting *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d

1249, 1255 (D.C. Cir. 2018)) (alterations in original).  First, a plaintiff "must show a 'direct

conflict between the defendant's conduct and the organization's mission.'" *Id.* (citation

---

[39] *See* Dkt. 31 at 35–48 (discussing harms resulting from EPA's transfer of authority in context of Claims 8 and 9; same applies to other claims based on EPA's approval of Florida's program); Dkt. 43 at 67–74 (discussing informational standing as to all claims).  Plaintiffs hereby adopt and incorporate these showings as to all claims related to EPA's approval of Florida's program.

omitted).  Second, a "plaintiff must show that it has 'used its resources to counteract [the asserted] harm.'"  *Id.* (alterations in original) (citation omitted).

A person who has been accorded a procedural right to protect their concrete interests may "assert that right without meeting all the normal standards for redressability and immediacy." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (emphasis omitted) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).  A plaintiff has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). "A plaintiff asserting procedural injury 'never has to prove that if he had received the procedure the substantive result would have been altered.'"  *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 68 (D.C. Cir. 2022).

Plaintiffs have standing to challenge EPA's interlocutory completeness determination as a procedural injury (Claim 1).  Among other things, to be deemed complete, Florida's application was required to demonstrate authority to ensure that its permit actions would not result in jeopardy to listed species or adverse modification to critical habitat.  But for this requirement, the application relied on a technical assistance process in a forthcoming BiOp that was not produced until more than two weeks after the public comment period concluded.  EPA's completeness determination initiated the public comment period while depriving Plaintiffs of the opportunity to comment on an integral component of Florida's program.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1); *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 547.  The inability to review and comment on Florida's claimed authority to ensure no jeopardy to listed species or adverse modification to critical habitat from its state permits created a demonstrable risk to Plaintiffs' aesthetic and recreational interests in listed species.  *Ctr. for Biological*

*Diversity v. Zinke*, 369 F. Supp. 3d 164, 179 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v.*

*Bernhardt*, 961 F.3d 1197 (D.C. Cir. 2020).  Ex. 1 at 6–7 (Crooks Dec. ¶ 23); Ex. 2 at 7–8

(Carter Dec. ¶¶ 26, 28); Ex. 6 at 6–7 (Rinaman Dec. ¶¶ 24–25); Ex. 8 at 6 (Robertson Dec. ¶ 19);

Ex. 9 at 3 (Gledhill Dec. ¶ 8).

 Plaintiffs have standing to challenge EPA's unlawful approval of Florida's 404 program

(Claim 2) and the deficiencies underlying that approval.  *See WildEarth Guardians v. Jewell*, 738

F.3d 298, 308 (D.C. Cir. 2013).  As a result of EPA's action, the State is considering (and

approving) permit applications that substantially risk harm to their members' aesthetic,

recreational, and other interests by authorizing developers to fill precious wetland habitat for

projects that will harm threatened and endangered species.  *Lujan*, 504 U.S. at 562–63 ("[T]he

desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a

cognizable interest for purpose of standing."); *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir.

2014) ("impairment of the affiant's ability to enjoy the 'natural vistas' of the nearby hills from

her own home, regardless of the absence (or existence) of any legal right on her part to view or

make an entry onto the nearby hills" is sufficiently concrete for injury-in-fact (citing *Nat'l*

*Wildlife Fed'n v. Hodel*, 839 F.2d 694, 715 (D.C. Cir. 1988)).  Ex. 1 at 1–3, 16–29 (Crooks Dec.

¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–13 (Fleming Dec. ¶¶ 6–

36); Ex. 4 at 9–11 (Hartl Dec. ¶¶32–37); Ex. 5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Ex. 6 at

1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Ex. 7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–

26, 28, 30–36); Ex. 10 at 1, 3–14, 24–25 (Umpierre Dec. ¶¶ 2–3, 10–11, 15–40, 73).

 In addition, EPA's approval of Florida's program poses a direct conflict with Plaintiffs'

organizational missions, and Plaintiffs have used their resources to counteract the resulting harm.

*Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 6.  Plaintiffs' missions, writ large, are to

ensure environmental protection, something they accomplish through citizen engagement, education, and outreach, scientific research, advocacy, and legal challenges.  EPA's approval of Florida's program has impaired Plaintiffs' missions by (1) causing them to lose the benefit of federal requirements, rights, and remedies available under NEPA and Section 7 of the ESA; (2) causing a loss of access to information essential to accomplishing their missions; and (3) substantially limiting their ability to protect wetlands and species through litigation because of restrictive access to the courts.  Plaintiffs have had to use and will continue to use their resources to counteract these harms and/or divert resources away from their core program work. Ex. 1 at 1–3, 6–30 (Crooks Dec. ¶¶ 4–12, 21–53, 55–63, 65–85); Ex. 2 at 2–11 (Carter Dec. ¶¶ 5–7, 11–17, 20–25, 27, 29–34, 38); Ex. 3 at 2, 10–11, 13 (Fleming Dec. ¶¶ 4–5, 30–33, 37); Ex. 4 at 2–9, 11 (Hartl Dec. ¶¶ 6–7, 9–16, 22–31, 38); Ex. 6 at 3–6, 9–10 (Rinaman Dec. ¶¶ 10–23, 31, 33–34); Ex. 7 at 1–14 (Silverstein Dec. ¶¶ 3–27, 29–36); Ex. 8 at 1–10 (Robertson Dec. ¶¶ 4–7, 9–18, 22–29); Ex. 9 at 2–3 (Gledhill Dec. ¶¶ 4–8); Ex. 10 at 1–5, 19–25 (Umpierre Dec. ¶¶ 1, 4, 6–9, 12–14, 60–74).

Plaintiffs have standing to challenge USFWS' BiOp and ITS (Claims 3 and 4), as well as USFWS' attempt to use a non-statutory "technical assistance" process as a proxy for ESA consultation (Claims 6 and 13).  *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015).  Plaintiffs' members have an interest in the enjoyment of listed species, and this interest is germane to Plaintiffs' organizational interests.  USFWS' unlawful BiOp and ITS threatens Plaintiffs' interests by failing to (1) analyze the impact of Florida's program on listed species and critical habitat; (2) render a lawful jeopardy determination; and (3) set limits on incidental take. Vacating the BiOp and ITS would redress Plaintiffs' injuries by requiring reinitiation of consultation to assess the impacts to species and habitat and requiring EPA to reconsider its

assessment of Florida's program. USFWS' unlawful "technical assistance" proxy threatens

Plaintiffs' interests by failing to ensure Florida's program would not jeopardize listed species or

adversely modify or destroy critical habitat and giving a blank check on incidental take. Ex. 1 at

1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–

13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶ 32–37); Ex. 5 at 3–18 (Schwartz Dec.

¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Ex. 7 at 1, 4, 9–14

(Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1–14 (Umpierre Dec. ¶¶ 2–3, 6–40).

Plaintiffs have standing to challenge EPA's reliance on that BiOp to approve Florida's

program (Claim 10), as EPA similarly harmed Plaintiffs' interests by failing to ensure that

Florida's program would not jeopardize listed species or adversely modify critical habitat.

Vacating EPA's reliance on the BiOp would redress Plaintiffs' injuries by invalidating EPA's

approval of Florida's program and requiring reinitiation of consultation. Plaintiffs also have

standing on this claim for the same reasons as they have standing to challenge EPA's approval of

Florida's program (Claim 2). Ex. 1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62,

64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶

32–37); Ex. 5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9,

26–29, 32); Ex. 7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1–14

(Umpierre Dec. ¶¶ 2–3, 6–40).

Plaintiffs have standing to challenge EPA's "no effect" determination as to NMFS (Claim

5), failure to engage in adequate consultation with NMFS (Claim 11), and failure to consult with

USFWS on the agency action's impact on nesting sea turtles (Claim 12). *Ctr. for Biological*

*Diversity v. EPA*, 861 F.3d 174, 182–84 (D.C. Cir. 2017) (failure to meet statutory consultation

obligations constitutes archetypal procedural injury; environmental organization has obvious

interest in failure to consult; neither action nor relief requested requires participation of individual members).  Ex. 1 at 2–3, 29–30 (Crooks Dec. ¶¶ 8–12, 85(d)); Ex. 7 at 1, 4, 9–11 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28); Ex. 3 at 1–3, 4–10, 13 (Fleming ¶¶ 1, 7–9, 14–29, 36).

Lastly, Plaintiffs have standing to challenge EPA's failure to ensure that all assumable waters, and only assumable waters, would be assumed by the State (Claims 2 and 7) and EPA's determination that the State's application was complete when the State had failed to adequately identify the waters over which it would assume jurisdiction (Claim 1).  In addition to the harms sustained as a result of EPA's unlawful approval of the state program, as shown above, Plaintiffs' aesthetic and recreational interests are harmed by the Corps' "Retained Waters List" and EPA's reliance on it, which rendered assumable by the State scores of waterways that should have remained under the Corps' jurisdiction.  As a result of the Corps' abdication of jurisdiction, Plaintiffs' interests in those waterways are at risk from the State's 404 permitting program, inadequate enforcement, and unlawful granting of "no permit required" determinations, all without access to Section 7 consultation or NEPA processes.  Ex. 6 at 7 (Rinaman Dec. ¶ 25); Ex. 10 at 1–3, 14–19 (Umpierre Dec. ¶¶ 1, 4, 6–7, 41–59); Ex. 11 at 1–3 (Hamann Dec. ¶¶ 3–8); Ex. 12 at 1–3 (Hollenhorst Dec. ¶¶ 3–8); Ex. 13 at 1–3 (Knight Dec. ¶¶ 2–8).

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on their Claims One through Seven and Ten through Thirteen.[40]

Dated: February 28, 2023

---

[40] Plaintiffs also respectfully renew their motion for summary judgment as to Claim Eight, Dkt. 31, which the Court has taken under advisement, Minute Orders Apr. 19, 2022, Oct. 17, 2022; *see also* Dkt. 78, 82, 83, 87, and request that the Court grant that motion as well.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February 2023, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

    Plaintiffs,

        v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al*.

    Defendants.

Case No. 1:21-cv-0119 (RDM)

## DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

GLOSSARY ................................................................................................................ xiv

INTRODUCTION ........................................................................................................... 1

LEGAL FRAMEWORK ................................................................................................. 2

   I.    The Clean Water Act ....................................................................................... 2

   II.   The Endangered Species Act ........................................................................... 6

   III.   The Rivers and Harbors Act ............................................................................ 9

FACTUAL BACKGROUND ......................................................................................... 10

   I.    Florida's Section 404 Assumption Request .................................................... 10

   II.   Development of the Corps' Retained Waters List ............................................ 12

   III.   Consideration of Endangered and Threatened Species and Critical Habitat ................. 14

STANDARD OF REVIEW ............................................................................................ 18

ARGUMENT ............................................................................................................... 19

   I.    EPA Reasonably Concluded That Florida's Submission Was Complete. ......................... 23

     A.   The BiOp was not a required element of Florida's assumption request. ..................... 23

     B.   Plaintiffs had sufficient notice and opportunity to comment. ............................. 25

   II.   EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines. ................................................... 30

     A.   FDEP must make written determinations, which are subject to judicial review. ........... 31

     B.   FDEP must consider effects on water quality generally. .................................. 33

     C.   EPA reasonably concluded that FWS's review of state permit applications would safeguard species and habitat. ................................................................. 34

   III.   EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements. ...................................................................... 35

     A.   The CWA does not preclude Section 404 assumption in states with a gross negligence culpability standard or a statute of limitations of less than five years. ................... 35

     B.   EPA's regulations do not establish simple negligence as a precondition for state assumption. ...................................................................................... 39

   IV.   EPA Reasonably Did Not Demand that Florida Affirm or Incorporate the Federal Definition of "Waters of the United States" in State Regulations. ........................... 42

   V.   The Corps Reasonably Defined Retained Waters. ............................................... 43

   VI.   The BiOp Complies with the ESA. ................................................................ 47

   VII.   The Technical Assistance Process Complies with the ESA. ...................................... 55

VIII.   The Incidental Take Statement Complies with the ESA and Is Reasonable.................. 61

IX.     EPA Rationally Relied on FWS's BiOp. ..................................................................... 67

X.   EPA's No-Effect Determination For NMFS Species Was Reasonable............................ 68

CONCLUSION............................................................................................................... 70

# TABLE OF AUTHORITIES

**Cases**

*1902 Atl. Ltd. v. Hudson*,
   574 F. Supp. 1381 (E.D. Va. 1983) ........................................................ 46

*Air Transp. Ass'n of Am. v. FAA*,
   169 F.3d 1 (D.C. Cir. 1999) ................................................ 26, 27, 28

*Akiak Native Cmty. v. EPA*,
   625 F.3d 1162 (9th Cir. 2010) .............................................................. 37

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) ............................................................................. 41

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ........................................................... 19

*Am. Coke & Coal Chemicals v. EPA*,
   452 F.3d 930 (D.C. Cir. 2006) ............................................................. 30

*Appalachian Power Co. v. EPA*,
   135 F.3d 791 (D.C. Cir. 1998) ............................................................. 54

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
   Serv., 273 F.3d 1229 (9th Cir. 2001) ................................................... 61

*Arkansas v. Oklahoma*,
   503 U.S. 91 (1992) ............................................................................... 20

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) ............................................................................... 19

*Cabinet Mountains Wilderness v. Peterson*,
   685 F.2d 678 (D.C. Cir.1982) .............................................................. 19

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ............................................................................. 19

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ............................................................. 19

*City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ......................................................... 67, 68

iii

*City of Waukesha v. EPA,*
   320 F.3d 228 (D.C. Cir. 2003) ................................................................. 29, 30

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) ..................................................................... 63

*Cooling Water Intake Structure Coal. v. EPA,*
   905 F.3d 49 (2d Cir. 2018) ...................................................................... passim

*Crutchfield v. Cnty. of Hanover,*
   325 F.3d 211 (4th Cir. 2003) ....................................................................... 32

*CSX Transp. Inc. v. Surface Trans. Bd.,*
   584 F.3d 1076 (D.C. Cir. 2009) ................................................................... 28

*Ctr. For Biological Diversity v. U.S. Dep't of Interior,*
   563 F.3d 466 (D.C. Cir. 2009) ...................................................................... 8

*CTS Corp. v. EPA,*
   759 F.3d 52 (D.C. Cir. 2014) ...................................................................... 43

*Defs. of Wildlife v. Babbitt,*
   130 F. Supp. 2d 121 (D.D.C. 2011) ............................................................ 54

*Defs. of Crooked Lake, Inc. v. FDEP,*
   Nos. 17-5328, 17-0972, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) ............. 33

*Defs. of Wildlife v. U.S. Dep't of Interior,*
   931 F.3d 339 (4th Cir. 2019) ....................................................................... 54

*Duval Util. Co. v. Fla. Pub. Serv. Comm'n,*
   380 So. 2d 1028 (Fla. 1980) ........................................................................ 33

*Edmond v. United States,*
   117 S. Ct. 1573 (1997) ................................................................................ 41

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.,*
   726 F. Supp. 2d 1195 (D. Mont. 2010) ......................................................... 50

*Friends of the Earth v. Hintz,*
   800 F.2d 822 (9th Cir.1986) ........................................................................ 32

*Hardy Salt Co. v. S. Pac. Trans. Co.,*
   501 F.2d 1156 (10th Cir. 1974) ................................................................... 46

iv

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
 452 U.S. 264 (1981) ........................................................................... 20

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
 722 F.3d 1053 (7th Cir. 2013) ........................................................... 32

*Idaho Conservation League v. EPA*,
 820 F. App'x 627 (9th Cir. 2020) ...................................................... 41

*Innovator Enters., Inc. v. Jones*,
 28 F. Supp. 3d 14 (D.D.C. 2014) ....................................................... 19

*Jama v. Immigr. & Customs Enf't*,
 543 U.S. 335 (2005) ........................................................................... 36

*Louisiana v. Salazar*,
 170 F. Supp. 3d 75 (D.D.C. 2016) ..................................................... 19

*Marsh v. Or. Nat. Res. Council*,
 490 U.S. 360 (1989) ........................................................................... 19

*Marx v. Gen. Revenue Corps.*,
 568 U.S. 371 .......................................................................................... 41

*Mia. Valley Conservancy Dist. v. Alexander*,
 692 F.2d 447 (6th Cir. 1982) ............................................................. 10

*Miccosukee Tribe of Indians v. United States*,
 556 F.3d 1257 (11th Cir. 2009) ........................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ............................................................................. 19

*NRDC v. EPA*,
 859 F.2d 156 (D.C. Cir. 1988) ................................................. 36, 37, 45

*NRDC v. Houston*,
 146 F.3d 1118 (9th Cir. 1998) ........................................................... 69

*Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*,
 551 U.S. 644 ................................................................................. 26, 52

*New York v. United States*,
 505 U.S. 144 (1992) ........................................................................... 20

*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C Cir. 1980) ............................................................ 58, 59

*Oceana v. Pritzker*,
  75 F. Supp. 3d 469 (D.D.C. 2014) ........................................................ 61

*Oceana, Inc. v. Ross*,
  No. 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...................... 54, 64

*Or. Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ............................................................... 66

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
  144 F. Supp. 35 (D.D.C. 2015) .............................................................. 55

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
  538 F. Supp. 2d 242 (D.D.C. 2008) ....................................................... 61

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ............................................................... 67

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ................................................................. 48

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
  992 F.3d 1071 (D.C. Cir. 2021) ......................................................... 67, 68

*Solite Corp. v. EPA*,
  952 F.2d 473 (D.C. Cir. 1991) ............................................................... 28

*United States v. Hanousek*,
  176 F.3d 1116 (9th Cir. 1999) ............................................................ 3, 38

*United States v. Ortiz*,
  427 F.3d 1278 (10th Cir. 2005) .............................................................. 3

*United States v. Pruett*,
  681 F.3d 232 (5th Cir. 2012) ................................................................. 3

*Wildearth Guardians v. Salazar*,
  880 F. Supp. 2d 77 (D.D.C. 2012) ......................................................... 69

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967) .............................................................................. 9

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................... 19

16 U.S.C. § 1531(b) ...................................................................................... 6

16 U.S.C. § 1532(3) ...................................................................................... 6

16 U.S.C. § 1532(7) ...................................................................................... 7

16 U.S.C. § 1532(13) ..................................................................................... 7

16 U.S.C. § 1532(15) ..................................................................................... 6

16 U.S.C. § 1532(19) ..................................................................................... 6

16 U.S.C. § 1533(b)(4) ................................................................................. 26

16 U.S.C. § 1533(b)(5) ................................................................................. 26

16 U.S.C. § 1536(a)(2) .................................................................... 7, 52, 54

16 U.S.C. § 1536(a)(3) ................................................................................. 26

16 U.S.C. § 1536(b) ..................................................................................... 26

16 U.S.C. § 1536(b)(3)(A) ............................................................................ 9

16 U.S.C. § 1536(b)(4) .................................................................................. 9

16 U.S.C. § 1536(b)(4)(A) ............................................................................ 9

16 U.S.C. § 1536(b)(4)(C)(i) ....................................................................... 61

16 U.S.C. § 1536(b)(4)(C)(ii) ...................................................................... 65

16 U.S.C. § 1536(b)(4)(C)(iv) ................................................................ 65, 66

16 U.S.C. § 1536(o)(2) .................................................................................. 9

16 U.S.C. § 1538(a)(1)(B) ............................................................................. 7

16 U.S.C. § 1538(a)(1)(G) ............................................................................. 7

16 U.S.C. § 1539(a)(1)(B) ............................................................................. 7

16 U.S.C. § 1540(e)(6) ................................................................................ 57

16 U.S.C. § 1540(g) ............................................................................................ 57

18 U.S.C. § 3282 ........................................................................................... 35, 36

33 U.S.C. § 1251(a) ............................................................................................... 2

33 U.S.C. § 1251(b) ..................................................................................... passim

33 U.S.C. § 1251(b)(1) .................................................................................... 3, 37

33 U.S.C. § 1311(a) ............................................................................................... 1

33 U.S.C. § 1319 .......................................................................................... passim

33 U.S.C. § 1319(c)(1) .......................................................................................... 3

33 U.S.C. § 1342 ................................................................................................... 3

33 U.S.C. § 1342(b) .............................................................................................. 3

33 U.S.C. § 1342(b)(7) ........................................................................................ 36

33 U.S.C. § 1344(a) ............................................................................................... 3

33 U.S.C. § 1344(g)-(l) ....................................................................................... 52

33 U.S.C. § 1344(g) ......................................................................................... 3, 24

33 U.S.C. § 1344(g)(1) ................................................................................. passim

33 U.S.C. § 1344(h) ....................................................................................... 20, 24

33 U.S.C. § 1344(h)(1)(A)(i) ..................................................................... 5, 20, 36

33 U.S.C. § 1344(h)(1)(B) ................................................................................... 36

33 U.S.C. § 1344(h)(1)(G) ............................................................................... 5, 36

33 U.S.C. § 1344(h)(2)(A) ............................................................................... 5, 21

33 U.S.C. § 1344(h)(3) .......................................................................................... 5

33 U.S.C. § 1344(h)(4) .......................................................................................... 6

33 U.S.C. § 1344(i) ................................................................................................ 6

33 U.S.C. §§ 1344(j)-(*l*) ........................................................................... 6

33 U.S.C. § 1344(n) .......................................................................... 6, 39

33 U.S.C. § 1362(6) ............................................................................... 2

33 U.S.C. § 1362(7) ............................................................................... 2

33 U.S.C. § 1362(12)(A) ........................................................................ 2

33 U.S.C. § 1377(e) ............................................................................... 3

**Legislative Materials**

H.R. Rep. No. 95–830 (1977) ................................................................. 3

H.R. Rep. No. 97-567, reprinted in 1982 U.S.C.C.A.N. 2807 ................. 61

Model Penal Code § 2.02(d) .................................................................. 38

**State Statutes**

Fla. Stat. § 373.4146(2) ........................................................................ 11

Fla. Stat. § 120.68(7)(b) ....................................................................... 33

**State Administrative Code**

F.A.C. 62-331.051(4) ............................................................................ 24

F.A.C. 62-331.052(1)(a) ........................................................................ 24

F.A.C. 62-331.052(1)(c) ........................................................................ 24

F.A.C. 62-331.053(1) ............................................................................ 31

F.A.C. 62-331.053(3)(a)1-3 ................................................................... 33

F.A.C. 62-331.053(3)(a)1-4 ................................................................... 31

F.A.C. 62-331.053(3)(a)4 ...................................................................... 24

F.A.C. 62-331.053(3)(a)6 ...................................................................... 31

F.A.C. 62-331.053(3)(a)6.i-iv ............................................................... 31

F.A.C. 62-331.053(3)(a)6.i ........................................................ 34

F.A.C. 62-331.053(3)(a)6.ii ....................................................... 34

F.A.C. 62-331.053(3)(a)6.iii ...................................................... 34

F.A.C. 62-331.053(3)(a)6.iv ...................................................... 34

F.A.C. 62-33.053(3)(b) ............................................................ 34

**Code of Federal Regulations**

33 C.F.R. pt. 328 ...................................................................... 2

33 C.F.R. § 329.4 ................................................................ 10, 45

33 C.F.R. § 329.14(b) ............................................................. 10

33 C.F.R. § 329.16(a) ............................................................. 10

33 C.F.R. § 329.16(b) ......................................................... 10, 44

33 C.F.R. § 329.16(c) ......................................................... 10, 44

40 C.F.R. pt. 120 ...................................................................... 2

40 C.F.R. § 120.2(a)(1)(i) ......................................................... 2

40 C.F.R. § 127.27(b)(2) .......................................................... 41

40 C.F.R. pt. 230 ...................................................................... 5

40 C.F.R. § 230.10(a) ............................................................. 31

40 C.F.R. § 230.10(b)(1)-(4) ................................................... 31

40 C.F.R. § 230.10(b)(1)-(2) ................................................... 33

40 C.F.R. § 230.10(b)(3) ........................................................... 5

40 C.F.R. § 230.10(c) ............................................................. 31

40 C.F.R. § 230.10(c)(1)-(4) ................................................... 31

40 C.F.R. § 230.10(c)(1) ......................................................... 34

40 C.F.R. § 230.10(c)(2) ......................................................... 34

40 C.F.R. § 230.10(c)(3) ................................................................................ 34

40 C.F.R. § 230.10(d) .................................................................................... 34

40 C.F.R. pt. 233 ..................................................................................... 11, 67

40 C.F.R. § 233.2 ............................................................................................ 4

40 C.F.R. § 233.10–.14 .......................................................................... 11, 24

40 C.F.R. § 233.11(a)-(b) .............................................................................. 24

40 C.F.R. § 233.11(h) .................................................................................... 42

40 C.F.R. § 233.11–.12 ................................................................................... 4

40 C.F.R. § 233.12(a) .................................................................................... 24

40 C.F.R. § 233.14 ........................................................................................ 22

40 C.F.R. § 233.14(b)(1) .......................................................................... 4, 44

40 C.F.R. § 233.15(a) ...................................................................................... 5

40 C.F.R. § 233.15(e)(1) ................................................................................. 5

40 C.F.R. § 233.15(e)(2) ................................................................................. 5

40 C.F.R. § 233.15(g) ..................................................................................... 5

40 C.F.R. § 233.41 ........................................................................... 39, 41, 42

40 C.F.R. § 233.41(a)(3)(i)-(iii) .................................................................... 40

40 C.F.R. § 233.41(b)(2) .......................................................................... 40, 42

40 C.F.R. § 233.50 ........................................................................................ 67

50 C.F.R. § 17.11 ............................................................................................ 6

50 C.F.R. § 402 ............................................................................................. 16

50 C.F.R. § 402.01(b) ..................................................................................... 6

50 C.F.R. § 402.02 .............................................................................. 7, 9, 53

50 C.F.R. § 402.03 ............................................................................................ 7

50 C.F.R. § 402.12(b) ........................................................................................ 8

50 C.F.R. § 402.12(j) ......................................................................................... 8

50 C.F.R. § 402.12(k) ........................................................................................ 8

50 C.F.R. § 402.13 ............................................................................................ 8

50 C.F.R. § 402.13(a) ........................................................................................ 8

50 C.F.R. §§ 402.14(a)-(b) ................................................................................ 8

50 C.F.R. § 402.14 ............................................................................................ 8

50 C.F.R. § 402.14(b)(1) ................................................................................... 8

50 C.F.R. § 402.14(c)(4) .................................................................................. 57

50 C.F.R. § 402.14(d) ...................................................................................... 57

50 C.F.R. § 402.14(g) ................................................................................. 8, 53

50 C.F.R. § 402.14(g)(4) ................................................................................... 9

50 C.F.R. § 402.14(g)(8) ................................................................................... 9

50 C.F.R. § 402.14(i)(I)(iv) ............................................................................. 66

50 C.F.R. § 402.14(i)(2) .................................................................................. 65

50 C.F.R. § 402.14(i)(3) .................................................................................. 66

50 C.F.R. § 402.16 .......................................................................................... 64

**Federal Register**

51 Fed. Reg. 19,926 (June 3, 1986) ........................................................... 26, 69

85 Fed. Reg. 30,953 (May 21, 2020) .......................................................... 15, 29

85 Fed. Reg. 57,853 (Sept. 16, 2020) .................................................... 11, 12, 29

85 Fed. Reg. 80,713 (Dec. 14, 2020) ............................................................... 42

85 Fed. Reg. 83,553 (Dec. 22, 2020) ............................................................................. 12

88 Fed. Reg. 3004 (Jan. 18, 2023) ................................................................................. 2

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| ESA | Endangered Species Act |
| FDEP | Florida Department of Environmental Protection |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWS | U.S. Fish and Wildlife Commission |
| ITS | Incidental Take Statement |
| MOU | Memorandum of Understanding |
| NMFS | National Marine Fisheries Service |
| NPDES | National Pollutant Discharge Elimination System |
| RHA | Rivers and Harbors Act |
| RTC | Response to Comments |
| TNWs | Traditionally Navigable Waters |

## INTRODUCTION

The Clean Water Act ("CWA" or "the Act") establishes permitting programs that govern the discharge of pollutants to waters of the United States, and the Act authorizes the federal government to administer those programs. But Congress wished to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), and so the CWA also authorizes states deemed qualified by the U.S. Environmental Protection Agency ("EPA") to administer CWA permitting programs under state law. Starting in 2018, Florida enacted statutes and regulations to implement a state law CWA permitting program and, in summer 2020, the State requested EPA's approval to issue permits for discharges of dredge or fill material into certain waters within its borders. EPA granted that request after concluding, based on the information then before it, that Florida' proposed program satisfied statutory and regulatory requirements. Plaintiffs challenge EPA's approval and a related action by the U.S. Army Corps of Engineers ("the Corps"). But both actions are consistent with governing law and are supported by the administrative record. Plaintiffs' CWA-related challenges thus fail.

Before approving Florida's request to assume CWA permitting authority, EPA consulted with the U.S. Fish and Wildlife Service ("FWS") to determine whether a Florida-administered permitting program would likely to jeopardize the continued existence of species listed under the Endangered Species Act ("ESA") or would destroy or adversely modify designated critical habitat. FWS found that it would not, a conclusion that it explained in a programmatic Biological Opinion ("BiOp"). In the BiOp, FWS examined Florida's permit review procedures, and EPA's procedures for overseeing Florida's implementation of its program, and it found that so long as those procedures were followed, permits issued by Florida would comply with the ESA. That finding was reasonable, EPA's reliance on the BiOp was reasonable, and EPA also reasonably determined

that its approval of Florida's permitting program would have no effect on ESA-listed species under

the jurisdiction of the National Marine Fisheries Service ("NMFS"). Plaintiffs' challenges under

the ESA also fail.

Accordingly, the Court should enter summary judgment for EPA, FWS, and the Corps

(collectively, "Federal Defendants") on all remaining claims.

## LEGAL FRAMEWORK

### I.      The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological

integrity of the Nation's waters," 33 U.S.C. § 1251(a), while also "recogniz[ing], preserv[ing], and

protect[ing] the primary responsibilities and rights of States to prevent, reduce, and eliminate

pollution," *id.* § 1251(b). The CWA prohibits the unauthorized "discharge of any pollutant." *Id.*

§ 1311(a). "Discharge" includes "any addition of any pollutant to navigable waters from any point

source." *Id.* § 1362(12)(A). The term "pollutant" includes "dredged spoil" and fill material, such

as "rock" and "sand." *Id.* § 1362(6). And "navigable waters" is broadly defined as "the waters of

the United States, including the territorial seas." *Id.* § 1362(7). EPA and the Corps have issued

regulations interpreting the phrase "waters of the United States." 40 C.F.R. Part 120 (EPA) and 33

C.F.R. Part 328 (Corps). As relevant here, those regulations have consistently defined "waters of

the United States" to include waters which "are [c]urrently used, or were used in the past, or may

be susceptible to use in interstate or foreign commerce, including all waters which are subject to

the ebb and flow of the tide." 40 C.F.R. § 120.2(a)(1)(i).[1]  Waters in this category are known as

"TNWs" (short for "traditionally navigable waters").

---

[1] On January 18, 2023, EPA and the Department of the Army issued a revised definition of
"waters of the United States," which took effect on March 20, 2023. 88 Fed. Reg. 3004. The
2023 rule is the latest in a series of changing regulatory definitions dating back to 2015.  In light

The CWA establishes two permitting programs for authorizing discharges. Under Section 404, the Corps may issue a permit "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Under Section 402, EPA may issue a "National Pollutant Discharge Elimination System," or "NPDES," permit for the discharge of other pollutants, such as chemical waste or sewage. *Id.* § 1342.

CWA Section 309, 33 U.S.C. § 1319 authorizes certain administrative, civil, and criminal penalties for discharges without, or in violation of, a permit. Penalties include fines of up to $25,000 per day of violation, or up to one year of prison, for anyone who "negligently" violates a Section 404 or NPDES permit, or negligently violates the Act's prohibition on unauthorized discharges. 33 U.S.C. § 1319(c)(1). All courts of appeals to consider the issue have held that Section 309 requires only a showing of "simple" negligence to establish criminal liability.[2]

While the CWA authorizes federal implementation of the Section 404 and NPDES permitting programs, it "is the policy of Congress that the States . . . implement" those programs. 33 U.S.C. § 1251(b). To that end, the Act allows states and tribes to assume primary responsibility for NPDES and Section 404 permitting programs for waters within their jurisdictions. *Id.* §§ 1342(b), 1344(g), 1377(e). The transfer of CWA permitting authority from the federal government to states or tribes "is not a delegation of Federal authority." H.R. Rep. No. 95–830 at

---

of court orders preliminarily enjoining the 2023 rule, EPA and the Corps are currently interpreting "waters of the United States" consistent with the pre-2015 regulatory regime in 27 States, including Florida. The differences between the 2023 rule and the pre-2015 regulatory regime are minor and are not relevant to the Court's assessment of EPA's approval action.

[2]   *See United States v. Hanousek*, 176 F.3d 1116, 1121 (9th Cir. 1999); *United States v. Ortiz*, 427 F.3d 1278, 1282 (10th Cir. 2005); *United States v. Pruett*, 681 F.3d 232, 242 (5th Cir. 2012).

104 (1977). Rather, states "establish[] programs under State law," which "function[] in lieu of the Federal program." *Id.* In the Section 404 context, this is known as state or tribal "assumption."[3]

States may not assume Section 404 permitting authority for all waters of the United States within their borders. The Corps continues to administer the Section 404 program in "waters which are presently used, or are susceptible to use . . . as a means to transport interstate or foreign commerce," in "waters which are subject to the ebb and flow of the tide," or in "wetlands adjacent thereto." *Id.* § 1344(g)(1). Waters over which the Corps continues to exercise Section 404 permitting authority following assumption are known as "retained waters," while waters under state jurisdiction are known as "assumed waters."

A state seeking to assume Section 404 permitting authority must submit an assumption request to EPA. That submission must include "a full and complete description of the program" that the state "proposes to establish and administer under State law" and "a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), . . . that the laws of such State . . . provide adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1). EPA regulations elaborate on those general statutory requirements, prescribing, for example, eight required elements of a "full and complete" program description, and four required elements of the "attorney general's statement." 40 C.F.R. § 233.11–.12. EPA regulations also require states to submit a "Memorandum of Agreement with the Secretary [of the Army]" that includes a "description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary." *Id.* § 233.14(b)(1). That description typically includes a list of Corps-retained waters, known as a "retained waters list."

---

[3] The CWA refers to "State" assumption of the Section 404 program. EPA's regulations define "State" to include Indian Tribes meeting certain requirements. 40 C.F.R. § 233.2. The references to "States" in the statute and regulations are therefore to be interpreted to include Tribes.

Once EPA receives a Section 404 assumption request, it has 30 days to "determine whether the submission is complete." 40 C.F.R. § 233.15(a). If so, the Agency will publish a notice to that effect in the Federal Register and must solicit comments from members of the public and federal agencies and hold a public hearing. *Id.* § 233.15(e)(1), (2). Within 120 days of receipt of a complete application, EPA must "approve or disapprove" the State's Section 404 assumption request, unless the State agrees to an extension. 40 C.F.R. § 233.15(g). If EPA fails to act within that period, and a state does not agree to an extension, then the state's assumption request is "deemed approved" by operation of law. 33 U.S.C. § 1344(h)(3).

EPA "shall approve" a state assumption request if, based on the materials submitted and comments received, it determines that the state's program meets the eight criteria at CWA Section 404(h)(1). *Id.* § 1344(h)(2)(A). These criteria define the minimum standards that a state Section 404 program must satisfy. For instance, Section 404(h)(1)(G) requires that a state have the authority to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1344(h)(1)(G). While Section 404(h)(1)(A)(i) requires EPA to determine if state-issued permits would "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title [referring, respectively to toxic pollutant standards and ocean discharge criteria]" *Id.* § 1344(h)(1)(A)(i). The "guidelines established under subsection (b)(1)" refer to regulations codified at 40 C.F.R. Part 230, which are known as the "404(b)(1) Guidelines." Among other things, the 404(b)(1) Guidelines bar Section 404 permits for discharges that "[j]eopardize[] the continued existence" of ESA listed-species or "result[] in likelihood of the destruction or adverse modification" of critical habitat. 40 C.F.R. § 230.10(b)(3).

Following EPA approval (or deemed approval through inaction), the Corps suspends its Section 404 permitting activity in waters subject to the state's authority. 33 U.S.C. § 1344(h)(4). EPA then exercises oversight of the state-administered Section 404 program, including by reviewing and, if warranted, objecting to permits. *Id.* § 1344(j)–(*l*). If EPA objects to a permit and the state does not address its objection, then authority to issue that permit reverts to the Corps. *Id.* EPA also retains its enforcement authority even after state assumption, which in no way "limit[s] the authority of the Administrator to take action" under 33 U.S.C. § 1319. 33 U.S.C. § 1344(n). Finally, if the Agency determines that a state "is not administering" its Section 404 program "in accordance with" the requirements of the CWA, then it may withdraw its approval and return the program to the Corps. *Id.* § 1344(i).

## II.     The Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to bring such species "to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. §§ 1531(b), 1532(3). The Secretary of the Interior is generally responsible for listed terrestrial and inland fish species and administers the ESA through FWS, while the Secretary of Commerce is generally responsible for listed marine species and administers the ESA through NMFS (jointly, "the Services"). *Id.* at § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b). Once a species is listed, it receives the protections afforded by the ESA.

ESA Section 9 prohibits the "take" of endangered species within the United States, as well as those threatened species to which the Services have extended the protections.[4] 16 U.S.C.

---

[4] The ESA term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

§ 1538(a)(1)(B) and (G).  This prohibition applies to any "person," including corporations, States and their instrumentalities, and the United States and its agencies. *Id.* § 1532(13). Take that is "incidental" [5] to an otherwise lawful activity may be exempted pursuant to the procedures set forth in ESA Sections 7 or 10. ESA Section 10 sets forth a permit process through which private actors with no Federal nexus may obtain an incidental take permit. *Id.* § 1539(a)(1)(B).

ESA Section 7 addresses the obligations of Federal agencies. Section 7(a)(2) directs each federal agency, in consultation with FWS or NMFS (the "consulting agency"), to "insure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat that has been designated for such species. *Id.* § 1536(a)(2). [6]  "Federal agency" is defined as "any department, agency, or instrumentality of the United States." *Id.* § 1532(7). Neither States nor State agencies come within this definition thus, ESA Section 7(a)(2)'s requirements do not extend to State actions. ESA Section 7(a)(2)'s obligations are triggered only by those Federal actions over which the agency has discretionary involvement or control. 50 C.F.R. § 402.03.

The Services have issued implementing regulations governing the ESA consultation process. [7] Consultation is required if the agency proposing action ("action agency") determines that

---

[5] "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

[6] The regulations further define the statutory phrase "[j]eopardize the continued existence of" to mean "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

[7] The Services also have jointly issued a "Consultation Handbook" that "provides internal guidance and establishes national policy for conducting consultation" pursuant to ESA Section 7. https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf (last visited Apr. 26, 2023); *see* EPA-HQ-OW-2018-0640-0387_attachment_10. The Services' views in the Consultation Handbook are entitled to deference. *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009).

the action "may affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. If the action will have no effect on a listed species, the consultation requirement is not triggered. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009).

If the action agency determines that its action "may affect" listed species, it must pursue either informal or formal consultation as appropriate. Informal consultation is an optional process comprised of all discussions and correspondence between the resource agency and the action agency in order to determine whether formal consultation is necessary. 50 C.F.R. § 402.13(a). The action agency may prepare a "biological assessment" ("BA," sometimes called a "biological evaluation" or "BE," as here) to assist in determining whether formal consultation is required. *Id.* § 402.12(b) (pointing out that any person "may" but is not required to prepare a BA for Federal actions that are not "major construction activities."). If the action agency determines, with the written concurrence of the Service(s), that the action "is not likely to adversely affect" the listed species or critical habitat, the consultation process is terminated and formal consultation is not necessary. 50 C.F.R. §§ 402.12(j), (k), 402.13, 402.14(b)(1).

If either the action agency or the Service(s) determines that the proposed action is "likely to adversely affect" listed species or designated critical habitat, the agencies must engage in formal consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). During formal consultation, the Service evaluates the agency's proposed action in the context of the current status of the species or critical habitat, the environmental baseline, the effects of the action, and the cumulative effects. 50 C.F.R. § 402.14(g). Effects of the action

> are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.

8

*Id*. § 402.02. At the conclusion of formal consultation, the Service issues its biological opinion as to whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. *Id*. § 402.14(g)(4); 16 U.S.C. § 1536(b)(3)(A). If the action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat, the biological opinion will set forth a reasonable and prudent alternative to the action, if any is available. 50 C.F.R. § 402.14(g)(8).

If the Service determines at the conclusion of the consultation that the action is not likely to jeopardize the species, but "incidental take" of individuals of the species caused by the action is reasonably certain to occur, it will issue a written "incidental take statement" ("ITS") that specifies the impact of the incidental taking on the species, those "reasonable and prudent measures" necessary or appropriate to minimize such impact, measures necessary to comply with any take authorizations issued under the Marine Mammal Protection Act, as relevant, and any terms and conditions required to implement these measures. 16 U.S.C. § 1536(b)(4)(A). Any taking that is in compliance with the terms and conditions specified in the ITS is not considered to be a prohibited taking of the species. *Id*. § 1536(o)(2). This exemption may extend to private applicants covered by the Federal action. *Id*. § 1536(b)(4).

## III.  The Rivers and Harbors Act

Congress enacted the Rivers and Harbors Act of 1899 ("RHA") "to prevent obstructions in the Nation's waterways." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). RHA Section 10 makes it illegal to, among other things, "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States" except as authorized by the Corps of Engineers. "Navigable waters of the United States" subject to Corps RHA Section 10 jurisdiction—"Section 10 waters"—are "those waters

that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the

past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4.

As indicated by the phrase "or have been used in the past," Section 10 waters include "historic

use" waters that are not, and cannot be, used to transport interstate commerce, but were used for

that purpose. *See Mia. Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 450 (6th Cir. 1982).

Determinations of "whether a waterbody is a navigable water of the United States will be

made by the division engineer," based on a "report of findings" prepared "by the district engineer,

accompanied by an opinion of the district counsel." 33 C.F.R. § 329.14(b).[8] These reports are

known as "navigability studies." Each district maintains "[t]abulated lists of final determinations

of navigability," to be updated "by court decisions, jurisdictional inquiries, or other changed

conditions." *Id.* § 329.16(a). These lists are known as "Section 10 lists." Section 10 lists are not

presumed to be exhaustive and a waterbody's "absence from" such a list "should not be taken as

an indication that the waterbody is not navigable." *Id.* § 329.16(b). A "change in status of a

waterbody from navigable to non-navigable" is "not considered final until a determination has

been made by the division engineer." *Id.* § 329.16(c).

## FACTUAL BACKGROUND

### I.    Florida's Section 404 Assumption Request

More than 40 years after Congress enacted Section 404(g)(1), just two states—New Jersey

(1994) and Michigan (1984)—had assumed Section 404 permitting authority. Then, in 2018,

Florida's Legislature passed a law conferring on the Florida Department of Environmental

Protection ("FDEP") "the power and authority to assume, in accordance with 40 C.F.R. part 233,

---

[8] The Corps is divided into "divisions" and its divisions are sub-divided by "district." *See*
https://www.usace.army.mil/Missions/Locations/ (last visited Apr. 25, 2023).

the dredge and fill permitting program established in s. 404 of the Clean Water Act." Fla. Stat. § 373.4146(2). Over the ensuing years, FDEP enacted new regulations, modified existing regulations, and developed other elements of its Section 404 program.

On August 20, 2020, Florida submitted to EPA a formal assumption request. 85 Fed. Reg. 57,853 (Sept. 16, 2020). The State's submittal, comprising over 100 documents, was organized by reference to EPA's assumption regulations (40 C.F.R. § 233.10–.14) and included materials responsive to each of the required elements in those regulations. *See* Dkt. 95-2 at 1–5 (EPA Record Index listing submission documents); *see also* EPA-HQ-OW-2018-0640-0003 (table of contents). Among many other things, it included hundreds of pages of existing and newly enacted sections of the Florida Administrative Code, and a new State 404 Program Applicant's Handbook outlining various guidelines and procedures that are incorporated by reference in state regulations. EPA-HQ-OW-2018-0640-A20 ("State 404 Handbook"). It also included a 155-page table showing how those state regulations compare to analogous provisions of the 404(b)(1) Guidelines. EPA-HQ-OW-2018-0640-0016-A3, at 55–155. And it included a Memorandum of Understanding ("MOU") among FDEP, FWS, and the Florida Fish and Wildlife Conservation Commission ("FWC") detailing procedures for coordinated interagency review and assessment of potential species and habitat impacts from state-issued Section 404 permits. EPA-HQ-OW-2018-0640-0016-A2.[9]

Because Florida's submission included every element required by EPA's Section 404 assumption regulations, the Agency declared the submission complete as of the date of submission. EPA-HQ-OW-2018-0640-0641. EPA posted Florida's complete submission on a public non-

---

[9] The FWS-FDEP-FWS MOU included in Florida's submission was signed by FDEP's Secretary and FWC's Executive Director. EPA-HQ-OW-2018-0640-0016-A2, at 12. An otherwise identical version of the same MOU that was also signed by FWS's Regional Director is included in FWS's record at FWS-006015.

rulemaking docket, and on September 16, it published a Federal Register notice of its receipt of a complete assumption request package and opened a 45-day public comment period during which it scheduled two virtual public hearings. 85 Fed. Reg. at 57,853.

EPA received and reviewed over 3,000 comments submitted during the comment period and public hearings. EPA-HQ-OW-2018-0640-0568, at 1. In the roughly six weeks allotted under the statute, the Agency summarized and responded to significant comments in a 113-page Response to Comments ("RTC"). *Id.* at 1–113. Based on its review of Florida's submission and the comments received, the Agency concluded that the State had "the necessary authority to operate a program in accordance with the requirements in CWA Section 404 and 40 C.F.R. part 233," and on December 22, 2020, it published notice of its approval. 85 Fed. Reg. 83,553.

## II.   Development of the Corps' Retained Waters List

As part of its years-long effort to develop a state Section 404 program, in 2017 FDEP reached out to the Corps' Jacksonville District to identify the scope of assumable and retained waters in Florida. *See* CORPS003115–16. In response, the District sought to augment its Section 10 list, which was last updated in 2014 ("2014 Section 10 List"). *See* CORPS003115. On October 3, 2017, a manager in the Jacksonville District directed a staff member to add to that list "whatever additional waterbodies, tributaries we think might be remotely section 10 OR TNWs. Whether there is an approved navigability study or not, put it on the website." *Id.* The resulting list—dated October 5, 2017, and titled "Supplement to the Jacksonville District Navigable Waters Lists" ("2017 Supplement")—described itself as a "first preliminary increment of an effort to update" the 2014 Section 10 List. CORPS003117.

Florida's interest in Section 404 assumption also prompted the Jacksonville District to plan new navigability studies and to issue a public notice in March 2018 seeking information in support

of its "analysis of waterways in the state of Florida to determine the extent of navigability."
CORPS003213. A few weeks later, however, the Corps' leadership directed the Jacksonville
District to suspend work on its pre-assumption navigability studies, CORPS003714, and the
District retracted its call for public comment, CORPS003717.

Then, in July 2018, the Assistant Secretary of the Army for Civil Works issued a guidance
document stating that the Corps would henceforth "use existing RHA Section 10 lists of waters"
to develop retained waters lists when approached by a state seeking to pursue Section 404
assumption. In so doing, the Assistant Secretary endorsed the findings and recommendations of
the Assumable Waters Subcommittee, a group that EPA convened in 2015 after several states
complained that "uncertainty over the scope of assumable waters" had hindered their efforts to
pursue assumption, CORPS002997, because their discussions with Corps district offices had
"broken down or stopped due to lack of clarity, uncertainty, or disagreement over the scope of
retained waters or wetlands," CORPS003005. The Subcommittee's charge was to recommend a
way in which EPA could clarify which waters are assumable. CORPS003053. In May 2017, 21 of
the subcommittee's 22-members—all but the Corps' representative—recommended, among other
things: (1) that retained waters comprise only Section 10 waters, but not those Section 10 waters
deemed navigable based solely on historic use; and (2) that the Corps base its retained waters lists
on existing Section 10 lists, rather than on a more open-ended inquiry into the scope of retained
waters. CORPS003013–22. In the majority's view, that more streamlined approach was both
necessary to facilitate state assumption, and consistent with the text and legislative history of
Section 404(g)(1). *Id.* The Assistant Secretary agreed on both counts and noted in his guidance
memorandum that he had "personally heard from state officials who—but for . . . uncertainty
[about the scope of retained waters]—would pursue Section 404(g) assumption." CORPS004096.

13

Following the Assistant Secretary's guidance, the Jacksonville District stated in an August 2018 memorandum that it would use the 2014 Section 10 List as "the basis of the list of retained waters" in Florida. CORPS004149. The District refined that list over the course of 2018 and 2019, removing duplicate listings and waters deemed navigable based solely on historic use. *See, e.g.*, CORPS004238–64; CORPS004265–4312.

The final version of the Retained Waters List was appended to a Memorandum of Agreement between FDEP and the Corps dated August 5, 2020. CORPS004322–34. That Memorandum explained that the Corps would "retain responsibility" for Section 404 permitting "in those waters identified in the Retained Waters List . . . , as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary," and in waters of the United States within " 'Indian Country,' as that term is defined at 18 U.S.C. § 1151." CORPS004323. FDEP would assume permitting responsibility in "[a]ll waters of the United States not retained by the Corps." *Id.* And the Corps would update the Retained Waters List based on new navigability determinations or by agreement of FDEP and the Corps that a proposed project lay "within the Corps' jurisdiction," as defined in 33 U.S.C. § 1344(g), "but is not within the Retained Waters List." CORPS004324.

## III.   Consideration of Endangered and Threatened Species and Critical Habitat

In a 2010 guidance letter, EPA took the position that Section 7 consultation was not required before approving a Section 404 assumption request. EPA-HQ-OW-2018-0640-0689-A3. But Florida urged EPA to reconsider that position, and on May 21, 2020, EPA published a request for comment on whether its approval of a CWA Section 404 Program is discretionary for the purposes of ESA consultation. 85 Fed. Reg. 30,953. While EPA was reconsidering its policy

position, FDEP developed a draft BA. FWS-006040; *see* EPA-HQ-OW-2018-040-617. Following

several rounds of comments from FWS, FDEP submitted a final BA to EPA and FWS on July 24,

2020. *Id.*

On August 27, 2020, EPA issued a memorandum announcing that it had reconsidered its

prior position on consultation and, "[f]or Florida and other states and tribes seeking to assume the

CWA Section 404 program," EPA intended "to engage in a one-time ESA Section 7 programmatic

consultation with the Services in connection with the initial review of an assumption request if a

decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or

designated critical habitat."[10]   EPA-HQ-OW-2018-0640-0660-A1 at 6–7. This process, EPA

explained, would allow the Services "to issue a programmatic biological opinion and

programmatic incidental take statement" for a state Section 404 program based on "procedural

requirements and permitting conditions or measures" to safeguard listed species and critical

habitat. *Id.* at 7. EPA concluded that approval of Florida's assumption request may affect species

listed as threatened or endangered under the ESA or designated critical habitat under the

jurisdiction of FWS, but made a "no effect" determination with respect to species under the

jurisdiction of NMFS. Thus, EPA prepared a BE based on FDEP's BA, which it transmitted to

FWS on September 2, 2020, with a request to initiate a programmatic consultation on the possible

effects of EPA's potential approval of Florida's assumption request on federally listed species,

proposed species, designated critical habitat, and proposed critical habitat under FWS's

jurisdiction. FWS-005608-09; FWS-005610-5906.

---

[10]   A programmatic consultation addresses an agency's multiple actions on a program, region, or
other basis. FWS-006043. Programmatic consultations allow the Services to consult on the effects
of programmatic actions, such as multiple similar, frequently occurring, or routine actions
expected to be implemented in particular geographic areas, and a proposed program, plan, policy,
or regulation providing a framework for future proposed actions. FWS-006035.

Consultation concluded on November 17, 2020, when FWS issued a programmatic Biological Opinion in which it determined that EPA's action would not jeopardize listed species under its jurisdiction. FWS-006108–6115. The BiOp analyzed the change in Section 404 permitting authority in assumed waters in Florida, including the effect of the state-issued permits on ESA-considered species[11] and critical habitat. FWS-006043. Based on the information available, the BiOp assessed other program activities that would occur if EPA approved the State's assumption request, including the State's implementation of its Section 404 program, EPA's oversight of the State's program, EPA's coordination of federal review of state permit actions, and the execution of state-permitted activities by permit holders. FWS-006043-45; FWS-006048. FWS considered the consequences of the potential approval of the State's assumption (including those related to any program activities caused by the potential approval) on ESA-considered species and critical habitat to be effects of the action, pursuant to 50 C.F.R. § 402. FWS-006043; FWS-006048.

As described in the BiOp, FWS will receive and review all State Section 404 permit applications when submitted, including those that FDEP or FWC has preliminarily determined as "no effect/no impact." FWS-006067. FWS will provide technical assistance to the State to ensure that State 404 permit actions are not likely to jeopardize a species or destroy or adversely modify critical habitat. FWS-006046; FWS-006047 (flow chart identifying FWS's role in the State's permitting program); FWS-006106. FDEP committed that its processes and procedures to review State Section 404 applications "will be similar to and will utilize [FWS]-approved permitting guidance that currently is used by the [Corps], to ensure consistency with CWA and ESA requirements." FWS-006105; *see also* FWS-006048 (describing Florida's 404 Program Rule at

---

[11]   The BiOp used the term "ESA-considered species" to "include ESA-listed species [i.e., those listed as threatened or endangered], ESA Candidate species, species proposed for listing, and petitioned species." FWS-006045. We use that term for purposes of consistency with the BiOp.

62-331, F.A.C.).[12] FDEP, FWC, and FWS will participate in a State Section 404 program species coordination technical team to oversee the species coordination process, including assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decisionmaking to a group with technical expertise, and assist in refining coordination processes, procedures, and future improvements, as needed, related to the State's permitting. FWS-006105. State permit review staff will be trained in the new State Section 404 program species coordination procedures and processes, and FDEP, FWC, and FWS will collaborate on the development of training material. *Id*. Most importantly, FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by FWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat and EPA will maintain oversight authority over the program. FWS-006057; FWS-006066; FWS-006106; *see also* FWS-006050 ("FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from [FWS] into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.)").

In FWS's opinion, the proposed action, including the associated subsequent program activities, had a sufficiently structured process to ensure that the State's Section 404 program is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species by reducing the reproduction, numbers, or distribution of that species. FWS-006106–07. FWS also opined that the proposed action had a sufficiently structured process to ensure the State's Section 404 program was not likely to result in destruction or adverse

---

[12] Record documents cite to the Florida Administrative Code as "[section number], F.A.C." For consistency, this brief employs the same citation format.

modification of critical habitat. FWS-006107. The BiOp included an Incidental Take Statement ("ITS"), which stated that the amount and extent of incidental take anticipated from these proposed activities in which the State has permitting authority will be quantified and evaluated on a project-specific basis through the technical assistance process between FWS and the State. FWS-006107. The BiOp also found that through implementation of Florida's Section 404 program, and EPA's oversight of the program and coordination of Federal review of state permit actions, project-specific information would be provided to FWS through its receipt of all State 404 permit applications. FWS-006107–08. Through the technical assistance process, FWS would provide input so that the State can adjust an action that may result in the take of ESA-listed species, and identify appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State Section 404 program. FWS-006108. If it is determined during the technical assistance process that take of ESA-listed species still is expected to occur after implementation of recommended minimization measures, FWS would quantify the amount or extent of incidental take in coordination with FDEP. FWS-006108. Levels of take would be reported and tracked through the technical assistance process and exempted by the ITS. *See id*. As set forth in the terms and conditions, if new information shows that the magnitude of impacts to ESA-considered species is greater than anticipated or the amount of incidental take originally anticipated is exceeded, FDEP will re-open the permit to determine if any additional impacts are likely to jeopardize species and if additional minimization measures, reporting, or monitoring are required. FWS-006110.

## STANDARD OF REVIEW

"[W]hen a party seeks review of agency action under the" Administrative Procedure Act ("APA"), "the district judge sits as an appellate tribunal" and the " 'entire case' on review is a

question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

"Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and otherwise consistent with the APA

standard of review." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014). But the

ordinary Rule 56 standard does not apply. *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C.

2016). Instead, the APA provides the governing standard. *Id.*; *see also Cabinet Mountains

Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) (judicial review of ESA claims

governed by APA standard of review).

 Under that deferential standard, agency action can be overturned only if it is found to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). "The scope of review" is "narrow and a court is not to substitute its judgment for that

of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983). Where, as here, an agency's technical expertise is involved, the reviewing court should be

particularly zealous in guarding the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S.

360, 376-77 (1989); *accord Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). Agency

action "is entitled to a presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*,

401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977),

and so the "party challenging an agency's action . . . bears the burden of proof," *City of Olmsted

Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (internal quotation marks omitted).

## ARGUMENT

 The Court should grant summary judgment to Federal Defendants on all claims.[13]

---

[13] Plaintiffs have "request[ed] the opportunity to brief the appropriate remedy following the
Court's ruling on summary judgment." Dkt. 98 at 15 n.2. Federal Defendants join Plaintiffs'
request for supplemental briefing on remedy should the Court be inclined to grant them any relief.

Section 404 assumption is not a delegation of federal authority; rather, it is one way that Congress "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" within the framework of a federal statutory scheme. 33 U.S.C. § 1251(b); *cf. Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (The CWA "anticipates a partnership between the States and the Federal Government"); *New York v. United States*, 505 U.S. 144, 167 (1992) (describing the CWA as an example of "cooperative federalism"). In such "a program of cooperative federalism," states, "within limits established by federal minimum standards," can "enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981).

Congress called on EPA to determine whether a state's Section 404 program satisfies the Act's minimum standards. 33 U.S.C. § 1344(h). Those standards are broad and, in some cases, defined by reference to complex federal statutory and regulatory regimes, such as the 404(b)(1) Guidelines. *See id.* § 1344(h)(1)(A)(i). To apply those standards, EPA must decide whether the state laws that make up a state's Section 404 program would be consistent with and no less stringent than non-identical federal laws. That is no simple task. In carrying it out, the Agency must make discretionary judgments that balance the CWA's competing policy aims of respecting state autonomy and ensuring the minimum thresholds set by the federal standards are met.

At the same time, however, Congress made clear that EPA "shall approve" a state's assumption request if the state's Section 404 program satisfies statutory and regulatory criteria. *Id.* § 1344(h)(2)(A). Conversely, then, EPA cannot deny a request based on its noncompliance with an unwritten rule. *See id.* And for good reason. As Florida's experience demonstrates, preparing a state Section 404 program requires years of regulatory and legislative groundwork. *See supra* pp. 10–12. In undertaking that effort, states necessarily rely on statutory and regulatory criteria to

shape an approvable program. EPA cannot undercut that reliance by denying an assumption request by reading into the statute and regulations preconditions that are not there.

In approving Florida's Section 404 program in 2020, EPA acted reasonably within the circumscribed scope of its authority based on the applicable regulatory criteria. Plaintiffs disagree and point to differences between Florida's program and the federal Section 404 program. But the very point of state assumption—or any exercise in cooperative federalism—is to allow for some degree of variation subject to minimum federal standards. And EPA permissibly concluded that the differences in Florida's program did not fall outside the boundaries set by statute and regulation. Plaintiffs also point to problems with Florida's implementation of its Section 404 program. But those problems post-date the approval action challenged here and so lie outside the administrative record and beyond the scope of this litigation. EPA need not, and does not, defend Florida's post-decisional implementation of its Section 404 program. For present purposes, what matters is that the Agency's approval of that program was reasonable based on information available at the time of its decision. Plaintiffs fail to show otherwise and so their CWA-based claims against EPA (Claims 1 and 2) fail.

Plaintiffs' claim against the Corps (Claim 7) betrays a similar misapprehension of state assumption generally, and the Corps' limited role in the state assumption process. Congress wanted the Corps to permanently retain Section 404 authority in a subset of the waterbodies subject to the Corps' Section 10 permitting authority, "and in wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1). So, before a state can assume Section 404 permitting authority, the Corps must first identify retained waters. 40 C.F.R. § 233.14. According to Plaintiffs, this meant that the Corps had to conduct a statewide Section 10 navigability determination to support the Retained Waters List. But experience strongly suggests that this kind of comprehensive investigation would have

substantially hindered, or effectively defeated, Florida's assumption bid. *See supra* p. 13. The Corps rightly refused to let the retained waters tail wag the state assumption dog. Instead, it developed the Retained Waters List using the information on Section 10 waters already in its possession. That decision gave effect to Section 404(g)(1)'s parenthetical definition of retained waters without also undermining Section 404(g)'s broader aim of facilitating state assumption. Claim 7 therefore fails.

Plaintiffs' ESA-related claims fare no better. FWS prepared a programmatic biological opinion that reasonably assessed whether, and to what degree, FDEP structured its regulatory program and EPA structured its oversight program to ensure that approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species, or to destroy or adversely modify designated critical habitat. This programmatic approach was appropriate, and properly tailored to address information available and uncertainties regarding the location, timing, frequency, and intensity of future State Section 404 permit actions. As the BiOp explained, FWS will evaluate permits on a site- and species-specific basis through a defined technical assistance process during which FWS's position on the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures is determinative. That process is not optional, as Plaintiffs suggest; it is part of the action and binding on FWS.

Nor is there any merit to Plaintiffs' attacks on the ITS. As FWS explained, it is not feasible at this time to anticipate the location of all future State 404 permit activities; thus, take will be determined, calculated, and tracked through the technical assistance process. The ITS has an appropriate reinitiation trigger and contained both reasonable and prudent measures and terms and conditions. Notably, this very programmatic approach and the technical assistance process were approved by the U.S. Court of Appeals for the Second Circuit in a 2018 case, involving another

EPA CWA action. The Court should follow the reasoning in that decision and reject Plaintiffs' challenges to the BiOp, the ITS, and the technical assistance process in Claims 3, 4, 6, 12, and 13.

Similarly, there is no merit to Plaintiffs' argument that EPA improperly relied on the BiOp. EPA acted reasonably in doing so and Plaintiffs have not identified any new, contrary information that FWS did not take into account. Claim 10 therefore fails.

Finally, EPA's determination that approval of Florida's assumption request would have no effect on ESA-listed species under NMFS's jurisdiction was reasonable, and does not violate the CWA, the APA, nor the ESA. Nonetheless, while not required to do so, after Plaintiffs notified EPA of their intent to sue regarding the determination, EPA has initiated a process to address the issue of potential effects downstream of assumed waters. EPA is evaluating the effects of its approval on species under NMFS's jurisdiction and preparing a biological evaluation that ultimately should resolve the matter. Claims 5 and 11 also fail.

## I.      EPA Reasonably Concluded That Florida's Submission Was Complete.

Claim 1 of the Complaint disputes EPA's threshold determination that Florida submitted a complete assumption request. Plaintiffs note that Florida's submission did not include FWS's BiOp, and on that basis, they argue that Florida's submission was incomplete and, relatedly, deprived them of their right to provide comment on the process of interagency permit review outlined in the BiOp. Dkt. 98 at 72–75. Neither claim succeeds.

### A.   The BiOp was not a required element of Florida's assumption request.

Neither the CWA nor EPA's assumption regulations require states to include a biological opinion as part of their assumption request. *See* 33 U.S.C. §§ 1344(g), (h); 40 C.F.R. §§ 233.10–.14. Thus, as EPA explained in response to comments, Florida's submission was not incomplete simply because it did not include the BiOp. EPA-HQ-OW-2018-0640-0568, at 13 (RTC).

What EPA's regulations did require is a "description" of the "coordination" activities, "permit review criteria," "procedures," and enforceable "statutes and administrative regulations" that Florida would implement to satisfy the substantive requirements of the 404(b)(1) Guidelines, including the prohibition on discharges that jeopardize the continued existence of ESA-listed species or result in likelihood of the destruction or adverse modification of critical habitat. 40 C.F.R. § 233.11(a)–(b); *id.* § 233.12(a). Florida's submission satisfied that requirement by detailing, at length, how FDEP would safeguard listed species and critical habitat, including by working with FWS to review individual permits.

As the regulations contained in that submission make clear, FDEP may not issue any permit that "[j]eopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of . . . critical habitat." 62-331.053(3)(a)4, F.A.C. Thus, all permit applicants must provide any "data and information necessary for purposes of reviewing impacts to state and federal listed species," *id.* 62-331.051(4), including any additional information sought by FDEP within a 30-day window, *id.* 62-331.052(1)(a), (c). And state regulators must determine—based on a review of "scientific literature, species keys, . . . habitat maps, or" observations during a site visit—whether a proposed project "may" affect listed species. EPA-HQ-OW-2018-0640-A20 at 23 (State 404 Handbook § 5.2.3.). If so, FDEP must "seek consultation with or technical assistance by" FWS. *Id.* And if, through that process, FWS identifies measures necessary "to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat," then FDEP "shall incorporate as permit conditions all" such "recommended impact avoidance and minimization measures." *Id.* But if FWS finds that "no protection measures are available to reduce the risk" of jeopardy or adverse habitat modification "to an acceptable level," then FDEP "shall deny the permit or shall take no action." *Id.* at 23–24.

The MOU among FWC, FWS, and FDEP, which was also included in Florida's submission, provides additional details on the contemplated inter-agency permit review process. As the MOU explains, FDEP would send all permit applications to FWS and FWC "as soon as possible after receipt" and FWS and FWC would make requests for additional information within 20 days so that FDEP could relay the request to the applicant within the 30 days allotted under state regulations. EPA-HQ-OW-2018-0640-0016-A2, at 5. A state regulator's initial assessment of species or habitat impacts would be "preliminary" and subject to review by FWS. *Id.* at 5–6. The public would have an opportunity to comment on "the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts." *Id.* at 6. And while interagency disputes could be elevated within each agency, "the final FWS position [would be] determinative" as to "the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures." *Id.* at 10.

EPA reviewed all of this and concluded that "Florida's rules, Program Description, and other documents provide sufficient details for the public to assess how the state plans to handle listed species issues." EPA-HQ-OW-2018-0640-0568, at 20 (RTC). EPA's regulations demanded nothing more for a threshold showing of completeness, and so EPA reasonably concluded that Florida's application was complete.

B.  Plaintiffs had sufficient notice and opportunity to comment.

Approaching the same issue from a different angle, Plaintiffs also claim that they were denied their right to comment on information contained in the BiOp. But neither the ESA nor the APA confers such a right.

The ESA requires notice and comment for proposed rules that list species and designate critical habitat, 16 U.S.C. § 1533(b)(4) & (5), but Section 7 consultation has no parallel notice and

25

comment requirement, *see id.* §1536(a)(3), (b); *see also* 51 Fed. Reg. 19,926, 19,928 (June 3, 1986) ("Nothing in section 7 authorizes or requires the Service to provide for public involvement (other than that of an applicant) in the 'interagency' consultation process."). Indeed, Section 7 consultation is routinely conducted without public notice and comment. And courts have repeatedly upheld that practice in the face of procedural arguments like those that Plaintiffs raise here. *See, e.g.*, *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 78 (2d Cir. 2018) (holding that "no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services"); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (holding that there is no "independent right to public comment with regard to consultations conducted under § 7(a)(2)").

Nor did the APA's rulemaking procedures entitle Plaintiffs to comment on the BiOp. Only "the most critical factual material that is used to support the agency's position" must be submitted for public comment during the administrative proceeding. *Air Transp. Ass'n of Am. v. F.A.A.*, 169 F.3d 1, 7 (D.C. Cir. 1999). And the focus in rulemaking cases "is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not published for comment." *Id.* In *Air Transportation Association of America*, the D.C. Circuit applied this legal framework to a fact pattern like the one here. That case, like this one, involved an agency's review and approval of an application following notice and comment. *Id.* at 3–4. And there, as here, parties objected to the agency's consideration of documents that were not included with the application on which comment was sought. *Id.* at 4. In this context, the D.C. Circuit reasoned that "the application itself . . . is the analogy to the proposed rule," and the "the question . . . is whether" the extra-application material "critically deviated from" anything in the "application itself." *Id.* at 7.

By that logic—and assuming without conceding that EPA's approval action was a rulemaking—then EPA's posting of Florida's submission on its public docket "is analogous to a notice of proposed rulemaking." *See id.* at 6. And the question is whether the BiOp's discussion of interagency permit review "critically deviated" from the process of interagency permit review described in the submission materials, *see id.* at 7.

It did not. The essential elements of interagency permit review—the participants, timing, subject matter, dispute resolution mechanisms, and binding effect—are all set forth in Florida's assumption request. *See supra* pp.24–25. In describing how FWS would provide "technical assistance," the BiOp simply summarizes that submission's interagency framework while filling in certain technical details. For instance, while noting that "State regulations dictate the process and general timeframes" for permit review, the BiOp estimates the duration of certain gap-filling interim steps between regulatory milestones. *See* FWS-006055–56 (noting, for example, that FDEP would provide permits to FWS within "3–5 days" of receipt). Similarly, while the Florida Administrative Code requires state regulators to make an initial determination of whether a proposed project might affect ESA-listed species, the BiOp lists existing "Federal decision tools" that can aid the State in making that determination and aid FWS's review of the State's findings, *see* FWS-006058–60 (discussing, among other things, FWS's "Information for Planning and Consultation (IpaC) website," which allows users to draw a "geographically referenced" polygon representing a project area). And while the FWS-FWC-FDEP MOU makes clear that FWS will review all permits shortly after they are submitted, the BiOp notes that FWS may also "submit its questions during the public notice period for the State 404 application should [it] not respond during the early phase of FDEP-USFWS coordination," FWS-006056.

These statements in the BiOp and others like them, "expand[] on and confirm[]" what Florida submitted in its application, but in no way depart from that application's discussion of interagency permit review. *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991). Agencies need not solicit comment on such "supplementary" information during a rulemaking proceeding. *Air Transp. Ass'n of Am.*, 169 F.3d at 7.

Plaintiffs do not demonstrate otherwise by insisting that EPA "relied on the BiOp." Dkt. 98 at 74. A biological opinion is, by definition, the consulting agency's opinion "as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat." FWS-006032. EPA of course relied on the BiOp, but so too does virtually every action agency that issues a rule following a no-jeopardy determination by one of the consulting agencies. Yet Plaintiffs cite no case—and we are aware of none—in which a court has grafted the APA's notice and comment requirements onto ESA Section 7 consultation by declaring a biological opinion to be "critical factual material" on which public comment must be sought.

The Court should not do so here. The APA's notice and comment requirements are satisfied when an agency asks the public "for comments on a particular issue or otherwise ma[kes] clear that" it is "contemplating" a course of action. *CSX Transp. Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). Plaintiffs knew how Florida and FWS would handle permit review because Florida's submission described those interagency coordination procedures in detail. And Plaintiffs "should have anticipated" that the BiOp would consider those permit review procedures because EPA twice gave notice that this would likely be the case. *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003).

First, in May 2020, when EPA sought comment on whether it should reconsider its prior position on ESA consultation (85 Fed. Reg. 30,953), it posted on its public docket an FDEP-authored white paper advocating the issuance of "a programmatic Biological Opinion . . . and a programmatic incidental take statement" that "identif[ied] procedural requirements for state permitting under Section 404." EPA-HQ-OW-2018-0640-0388-A7, at 1–2. A few months later, when EPA solicited comments on Florida's Section 404 application, it also explained its intent to seek Section 7 consultation, identified its August 27, 2020 memorandum as a source of "more information regarding EPA's position on ESA Section 7 consultation under CWA Section 404(g)," and provided a link to the memo. 85 Fed. Reg. at 57,856.

   Plaintiffs responded to both notices with comment letters in which they supported the agencies' ESA Section 7 consultation process but opposed incidental take protection based on permit-by-permit interagency review. *See* EPA-HQ-OW-2018-0640-0388-A2 (July 6, 2020 letter); EPA-HQ-OW-2018-0640-0386-A1, at 35–42. The arguments that Plaintiffs raised in those comment letters mirror the arguments in their summary judgment brief, down to the cases cited. *Compare* EPA-HQ-OW-2018-0640-0386-A1, at 35–41 *with* Dkt. 98 at 45–51. That symmetry underscores the extent to which the BiOp's outline of "technical assistance" tracks the description of interagency permit review contained in the materials on which Plaintiffs commented. Under these circumstances, Plaintiffs cannot now claim undue surprise at the BiOp's discussion of interagency permit review. *See Cooling Water Intake Structure.,* 905 F.3d at 78 (finding under similar circumstances that EPA's proposed rule fairly apprised interested persons of the subjects and issues of its rulemaking). Claim 1 therefore fails.

Even if Plaintiffs *could* demonstrate a lack of proper notice, they could not show prejudice. *See Am. Coke & Coal Chemicals v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006) (showing of prejudice

required in procedural challenges to adequacy of notice). Plaintiffs raised objections to interagency permit review in their comment letters, which EPA considered and rejected. EPA-HQ-OW-2018-0640-0568, at 90–103 (RTC). After reviewing the BiOp, Plaintiffs raise essentially the same arguments in their brief. Thus, they have not shown that but for the purported lack of notice regarding the BiOp, they "would have submitted additional, different comments that could have invalidated the rationale" for EPA's approval action. *City of Waukesha*, 320 F.3d at 246. Any claim of prejudice therefore fails, and with it Claim 1 fails as well.

## II.  EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines.

On the merits, Plaintiffs repeatedly fault EPA for approving a program that did not "adopt[] the federal 404(b)(1) Guidelines." Dkt. 98 at 61; *see also id.* at 61–64. But Congress did not require verbatim incorporation of the 404(b)(1) Guidelines as a precondition of assumption. Instead, it allowed states leeway to adopt their own programs, and left it to EPA to determine whether those state programs will ensure compliance the 404(b)(1) Guidelines' requirements. EPA reasonably concluded that Florida's regulations and procedures, as drafted, would meet that standard.

Although Florida did not (and was not required to) adopt the Section 404(b)(1) Guidelines into state law, the State's regulations overlap considerably with their federal analogs. For instance, both Florida's regulations and the 404(b)(1) Guidelines prohibit any discharge of dredge or fill material that "causes or contributes to violations of" an applicable water quality standard, "violates any applicable toxic effluent standard," "jeopardizes" listed species, and threatens "critical habitat." 62-331.053(3)(a)1–4, F.A.C.; *accord* 40 C.F.R. § 230.10(b)(1)–(4). Both the federal and state regulations also bar any discharge that "[c]auses or contributes to significant degradation of wetlands or other surface waters." 62-331.053(3)(a)6, F.A.C.; *accord* 40 C.F.R. § 230.10(c). Both sets of regulations define "significant degradation" by reference to the same criteria. 62-

331.053(3)(a)6.i.–iv, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(1)–(4). And both bar any discharge if there is "a practicable alternative to the proposed activity" that would "have less adverse impact on the aquatic ecosystem." 62-331.053(1), F.A.C.; *accord* 40 C.F.R. § 230.10(a). Based on these and other parallels, EPA concluded that the State's Section 404 regulations, as submitted, satisfied the requirements of the 404(b)(1) Guidelines. EPA-HQ-OW-2018-0640-0568, at 27 (RTC).

Plaintiffs fail to acknowledge the substantial similarities between Florida's regulations and the 404(b)(1) Guidelines and focus instead on what they claim are two differences that render the federal and state regulations "non-equivalent." Dkt. 98 at 62. First, Plaintiffs claim that while the Corps must make written determinations and findings of fact, FDEP bases its permit decisions solely on permit applicants' "reasonable assurances." *Id.* at 61–64. Second, Plaintiffs insist that while federal law "focuse[s] on water quality generally," under Florida's program, discharges of dredge and fill material "only matter if and when" they "would violate water quality standards or toxic effluent limitations." *Id.* at 64–66. Plaintiffs also rehash their argument about the completeness of Florida's application, again contending that Florida's submission did not demonstrate compliance with the 404(b)(1) Guidelines because it did not include the BiOp. *Id.* at 66. None of these arguments withstand scrutiny.

### A. FDEP must make written determinations, which are subject to judicial review.

Plaintiffs mischaracterize the record when they claim that Florida's program does not require FDEP to "evaluate [a proposed] project's effects," or "make written factual determinations" or "findings of its own." *Id.* at 63. In fact, upon receipt of a permit application, FDEP must: (1) "Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.," which include the state law analogs the 404(b)(1) Guidelines, described above; (2) "Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-

31

331.053, F.A.C."; and (3) "Prepare a written determination on each application outlining the permitting decision and the rationale for the decision," which it must "include[] in the official record prior to final action on the application," along with its "Technical Staff Report." EPA-HQ-OW-2018-0640-A20 at 32 (State 404 Handbook § 8.2(j)-(*l*)).

That FDEP bases its written findings on information submitted by the project applicant does nothing to distinguish Florida's Section 404 program from the federal program. By necessity, the Corps also relies on applicant-supplied information in making its permit determinations. *See, e.g.*, *Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 223–24 (4th Cir. 2003) (The Corps "receives thousands of [Section 404] permit applications per year" and so "reasonably rel[ies]" on "studies given to them by applicants"); *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–36 (9th Cir. 1986) ("The Corps is not a business consulting firm" and may therefore base its analysis "entirely upon information supplied by the applicant."). Of course, the Corps may not rely "uncritically" on applicant's supporting documentation. *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013). But then neither may FDEP, which must "determine whether the information provided by the applicant is sufficient to provide reasonable assurance that the applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C., will be met." EPA-HQ-OW-2018-0640-A20 at 32 (State 404 Handbook § 8.2(f)).

And while Plaintiffs say otherwise, Dkt. 98 at 63–64, FDEP's determinations *are* subject to judicial review. An FDEP-issued permit can be "set aside" if, among other things, it "depends on any finding of fact that is not supported by competent, substantial evidence." Fl. St. § 120.68(7)(b). "Competent substantial evidence is such evidence as will establish a substantial basis of fact from which the fact at issue can reasonably be inferred or such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Duval Util. Co. v. Fl. Pub.*

32

*Serv. Comm'n*, 380 So. 2d 1028, 1031 (Fla. 1980) (cleaned up). It is not, in other words, "evidence which is incredible, mere speculation, or unreliable." *Defs. Of Crooked Lake, Inc. v. FDEP*, Nos. 17-5328, 17-0972, 2018 WL 3387900, at *7 (Fla. Div. Admin. Hrgs., May 7, 2018). Plaintiffs are thus wrong to suggest that any "subjective, vague" promise by a "self-interested applicant" will rise to the level of a "reasonable assurance." Dkt. 98 at 64. And EPA was right to conclude that Florida's "'reasonable assurance' language" did not render the State's program "[in]consistent with federal requirements." EPA-HQ-OW-2018-0640-0568, at 27 (RTC).

      B.   <u>FDEP must consider effects on water quality generally.</u>

      Plaintiffs also argue that Florida's Section 404 program is less stringent than the federal program because, they assert, it is concerned only with discharges that violate water quality standards or toxic effluent limitations. Dkt. 98 at 64–66. That assertion is belied by the record.

      Just like the 404(b)(1) Guidelines, Florida's regulations prohibit any discharge that "causes or contributes to" violations of state water quality standards or that violates toxic effluent limitations. 62-331.053(3)(a)1–3, F.A.C.; *accord* 40 C.F.R. § 230.10(b)(1)–(2). So, like the Corps, FDEP must determine a proposed project's effect on water quality by reference to those standards and limitations. But that is not FDEP's sole focus, as Plaintiffs suggest. Dkt. 98 at 65. Rather, just like the Corps, FDEP must also assess a proposed project's impact on water quality based on its:

- "effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites," 62-331.053(3)(a)6.i, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(1);

- "effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of

the project site through biological, physical, and chemical processes," 62-331.053(3)(a)6.ii, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(2);

- "effects on aquatic ecosystem diversity, productivity, and stability," including "loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy," 62-331.053(3)(a)6.iii, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(3); and

- "effects on recreational, aesthetic, and economic values," 62-331.053(3)(a)6.iv, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(4).

In other words, just like the 404(b)(1) Guidelines, Florida's regulations demand an examination of a proposed project's effect "on water quality generally." Dkt. 98 at 65.

And just like the 404(b)(1) Guidelines, Florida's regulations bar discharges unless the permit applicant takes "appropriate and practicable steps" to "minimize potential adverse impacts of the activity on the aquatic ecosystem." 62-331.053(3)(b), F.A.C.; *accord* 40 C.F.R. § 230.10(d). There is thus no reason to assume, based on the text of Florida's regulations, that "negative impacts on water quality" that "must be mitigated" under the federal program would somehow escape regulation under Florida's program. Dkt. 98 at 65.

C.   EPA reasonably concluded that FWS's review of state permit applications would safeguard species and habitat.

Briefly reprising their argument about completeness, Plaintiffs again argue that because Florida's assumption request did not include the BiOp, the State failed to demonstrate how it would avoid issuing permits that jeopardize the continued existence of ESA-listed species or result in likelihood of the destruction or adverse modification of critical habitat, as required by the 404(b)(1) Guidelines, *Id.* at 66. That argument rests on a flawed premise. As explained above, while Florida's submission did not include the BiOp, it did explain how FDEP, FWC, and FWS would jointly review permits. *Supra* pp.24–25. Based on that process of interagency coordination—one in which

34

FWS would have the last word on species and habitat impacts—EPA reasonably concluded that Florida-issued permits would neither jeopardize listed species, nor harm critical habitat.

## III.   EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements.

Plaintiffs next argue that EPA erred in approving Florida's assumption request because the State's criminal enforcement authority differs from federal enforcement authority in two respects. Dkt. 98 at 56–61. First, Florida, has a graduated one-to-three-year statute of limitations applicable to environmental crimes, while 18 U.S.C. § 3282 creates a default five-year statute of limitations for non-capital federal crimes. Second, criminal convictions in Florida generally require a minimum showing of "gross or culpable (criminal) negligence," Dkt. 98 at 58, while 33 U.S.C. § 1319, authorizes criminal convictions on a showing of simple negligence. Plaintiffs contend that these differences preclude state assumption. In so doing they raise statutory and regulatory arguments; both fail.

### A.   The CWA does not preclude Section 404 assumption in states with a gross negligence culpability standard or a statute of limitations of less than five years.

Plaintiffs' statutory argument—that the CWA itself precludes Section 404 assumption in states with a less-than-five-year statute of limitations or a gross negligence culpability standard— is unsupported by the text and purpose of the Act, and at odds with Circuit precedent.

Under CWA Section 404(h)(1), a state need only demonstrate authority necessary to "abate violations of" its permitting program, "including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G). That broad language suggests that states have some flexibility in devising criminal enforcement regimes, and, relatedly, that EPA has discretion to approve state programs that deviate in at least some respects from the federal enforcement model. *See* EPA-HQ-OW-2018-0640-0568, at 75 (RTC).

35

Considerations of statutory context bolster those inferences. Where Congress demanded equivalence between state and federal law, it made plain its intent. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). Elsewhere in Section 404(h)(1), Congress required that state-issued permits "assure compliance with any applicable requirements" of "sections 1317 and 1343 of this title." 33 U.S.C. § 1344(h)(1)(A)(i). Congress also required that state-issued permits include inspection, monitoring, entry, and reporting requirements "to at least the same extent as required in section 1318 of this title." *Id.* § 1344(h)(1)(B). The lack of any reference to 33 U.S.C. § 1319 or 18 U.S.C. § 3282 is good reason not to read the CWA to foreclose assumption in states with less-than-five-year statutes of limitations or culpability standards higher than simple negligence.

This reading of the statute is entirely consistent with the D.C. Circuit's decision in *NRDC v. EPA*, 859 F.2d 156 (D.C. Cir. 1988). That case involved CWA Section 402(b)(7), which, like Section 404(h)(1)(G), requires states seeking to assume NPDES permitting authority to demonstrate "adequate authority" to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1342(b)(7). Acting under Section 402(b)(7), EPA established minimum criminal penalties for state NPDES programs at levels below the federal penalties authorized under 33 U.S.C. § 1319. The petitioners in *NRDC* challenged those regulations, arguing (much like Plaintiffs) that state criminal penalties needed to mirror federal penalties to effectively abate violations.

The D.C. Circuit disagreed. While acknowledging that "[u]niformity is indeed a recurrent theme in the Act," the court stressed that Congress's "quest for homogeneity is in tension with its

36

independent emphasis on state autonomy, which is repeated throughout the legislative history of the Act, is enshrined in the Act as the basic policy to 'recognize, preserve, and protect the primary responsibilities and rights of States,' and is the very foundation of the [state-assumed] permit program." 859 F.2d at 175 (quoting 33 U.S.C. § 1251(b)(1)). Noting that criminal penalties "are traditionally under control of the individual states," and that the statute affords EPA "broad[] discretion to respect state autonomy in the criminal sector," the court declined to infer "an unexpressed congressional intent that state requirements must mirror the federal ones." *Id.* at 180.[14]

The statute-based reasoning in *NRDC* applies with equal force here. The CWA makes no mention of statutes of limitations or state culpability standards. So, EPA may exercise its "broad discretion" to allow Section 404 assumption in states that depart from the federal simple negligence standard or five-year statute of limitations. Indeed, in keeping with its long-held view that the CWA "does not require total uniformity between federal and state enforcement authorities," EPA-HQ-OW-2018-0640-0568, at 76 (RTC), the Agency has never in 50 years denied a state Section 404 assumption request or NPDES program application because the state provided for criminal prosecution based on a standard more demanding than simple negligence or employed a less-than-five-year statute of limitations.

That is not for want of opportunity. For instance, three states that assumed NPDES permitting authority relatively recently—Idaho (2018), Arizona (2002), and Maine (2001)—do not authorize prosecutions based on simple negligence. *See* Exhibit A at 1–3. Neither does New Jersey

---

[14] For similar reasons, the Ninth Circuit rejected a challenge to EPA's approval of Alaska's state NPDES program in *Akiak Native Community v. EPA*, 625 F.3d 1162, 1171–72 (9th Cir. 2010). The petitioners there argued that Alaska lacked adequate enforcement authority because—unlike EPA—the State could not assess administrative penalties and could recover penalties only by initiating a court proceeding. *Id.* at 1171. But the court noted that "[t]here is no requirement in the CWA . . . that state officials have the authority to impose an administrative penalty," and so it found no "reason to conclude" that EPA's approval violated the Act. *Id.* at 1171–72.

(1994), the last state before Florida to assume Section 404 permitting authority. *See id.* at 4. And of those four states, three have statutes of limitations of less than five years for at least some environmental crimes. *See id.* at 6.

This is unsurprising. The definition of "negligence" sufficient to give rise to criminal penalties varies significantly by jurisdiction. "Simple" or "ordinary" negligence is the rule in federal prosecutions of certain misdemeanor offenses under the CWA. *Hanousek*, 176 F.3d at 1121; 33 U.S.C. § 1319. But at least 25 states, including Florida, require a heightened showing of "gross" or "culpable" negligence to establish criminal liability. *See* Exhibit A at 1–5. So too does the Model Penal Code, which defines "negligently" as follows:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves *a gross deviation from the standard of care* that a reasonable person would observe in the actor's situation.

Model Penal Code § 2.02(d) (emphasis added). Similarly, 38 states have a statute of limitations of less than five years for at least some environmental crimes. *See* Exhibit A at 6–7. EPA has declined to treat those deviations from federal enforcement authority as insuperable boundaries to state NPDES or Section 404 assumption, and it reasonably declined to do so here.

Plaintiffs' counter arguments exaggerate the legal and practical effects of Florida's criminal negligence standard on CWA enforcement. Dkt. 98 at 56–59. While states must assume primary enforcement responsibility over their Section 404 programs, state assumption does not "limit the authority of the Administrator to take action pursuant to" 33 U.S.C. § 1319, with its simple negligence standard. 33 U.S.C. § 1344(n). Plaintiffs are thus wrong to insist that Florida's definition of negligence removes "an entire class of violators from criminal liability." Dkt. 98 at 56–57. Moreover, any theoretical gap between gross or culpable negligence and simple negligence

38

narrows considerably in practice. A study of federal criminal enforcement of the CWA, cited in a

law review article in the record, found that over a six-year period, just 3.9% of prosecutions—12

out of 307—were brought solely for simple negligence, without any aggravating factors like

knowing violations, deceptive conduct, or substantial harm. EPA-HQ-OW-2018-0640-0668-A2,

at 9.[15]  There is thus good reason to doubt Plaintiffs' suggestion that Florida's negligence standard

would, by itself, vastly erode the scope of Section 404 enforcement.

In sum, EPA's longstanding approach of extending some measure of deference to states in

matters of criminal enforcement is entirely consistent with the relevant statutory text and with the

federal-state partnership that Congress envisioned. Plaintiffs' inflexible reading of the CWA is

not. Their statutory argument fails.

### B. EPA's regulations do not establish simple negligence as a precondition for state assumption.

Plaintiffs' regulatory argument fares no better. They contend that EPA violated 40 C.F.R.

§ 233.41 by approving Florida's assumption request despite the state's "gross or culpable

(criminal) negligence" standard. Dkt. 98 at 57–58. But that contention rests on a selective reading

of the regulatory text.

Section 233.41 sets out the "[r]equirements for enforcement authority" necessary to satisfy

Section 404(h)(1)(G). Two of its subparagraphs, (a)(3) and (b)(2), are relevant here. Subparagraph

(a)(3) requires that states have the authority to: (i) seek civil fines of at least $5,000 per day against

anyone who illegally discharges or violates a discharge permit condition; (ii) seek criminal fines

of at least $10,000 per day against anyone who illegally discharges or violates a permit condition,

---

[15] As the Principal Deputy Solicitor General explained during argument last October, under the CWA, it is "very unusual for simple negligence to give rise to criminal liability," and federal "criminal prosecutions are brought only when there's some sort of serious aggravating conduct." Transcript of Oral Argument at 114, *Sackett v. EPA*, 21-454.

if they do so with "*criminal negligence*"; and (iii) seek criminal fines of at least $5,000 per day against anyone who engages in certain deceptive conduct, if they do so "knowingly." 40 C.F.R. § 233.41(a)(3)(i)–(iii) (emphasis added). Subparagraph (b)(2) then requires that the "burden of proof and degree of knowledge or intent required under State law for establishing violations under paragraph (a)(3) of this section, shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." *Id.* § 233.41(b)(2).

Plaintiffs focus only on sub-paragraph (b)(2), which they read to bar Section 404 assumption in any state that fails to conform its criminal code to the "mens rea," or "level of culpability," applicable under 33 U.S.C. § 1319. Dkt. 98 at 56–57. Thus, according to Plaintiffs, because that provision authorizes EPA to seek criminal penalties from anyone who, acting with ordinary negligence, discharges without a permit or violates a permit condition, states must be able to prosecute the same misconduct based only on a showing of simple negligence. But that argument runs headlong into sub-paragraph (a)(3)(ii), which demands only that states seek criminal fines from those who illegally discharge or violate permit conditions "with criminal negligence."

Black's defines "criminal negligence" as "[g]ross negligence so extreme that it is punishable as a crime," or (referencing the Model Penal Code) as the "objectively assessed mental state of an actor" who engages in prohibited conduct despite "a substantial and unjustifiable risk that the social harm that the law is designed to prevent will occur." NEGLIGENCE, Black's Law Dictionary (11th ed. 2019). Under Plaintiffs' reading of Section 233.41, a state could satisfy the express terms of (a)(3)(ii) by providing for prosecution of "criminal negligence," as that term is widely understood, and *in so doing*, violate the requirements of (b)(2). That cannot be right.

"Ordinarily, where a specific provision conflicts with a general one, the specific governs." *Edmond v. United States*, 520 U.S. 651, 657 (1997). That interpretive principle resolves any

superficial inconsistency within Section 233.41. The general language in sub-paragraph (b)(2) should be read to complement rather than contradict the more specific text of sub-paragraph (a)(3). To illustrate, where sub-paragraph (a)(3)(i) requires authority to seek civil fines but establishes no culpability standard, (b)(2) clarifies that those penalties must be assessable consistent with the federal standard of strict liability. Similarly, where sub-paragraph (a)(3)(iii) requires authority to seek criminal fines for certain "knowing[]" violations, (b)(2) clarifies that, as in the federal context, "knowingly" means something less than "intentionally." But where (a)(3)(ii) requires authority to bring prosecutions based on a showing of "criminal negligence," (b)(2) should not be read to strike the word "criminal" from the regulation. Rather, any form of negligence will suffice.

This understanding of Section 233.41 gives effect to every word in that provision. *See Marx v. Gen. Revenue Corps.*, 568 U.S. 371, 386 (2013) ("the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"). It also ensures that Section 233.41 coheres. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (laws "must, to the extent possible," be construed to "ensure that the statutory scheme is coherent and consistent"). Neither of these things can be said of Plaintiffs' reading of Section 233.41.

That reading finds little support in *Idaho Conservation League v. EPA*, 820 F. App'x 627 (9th Cir. 2020). There, the Ninth Circuit summarily held that under 40 C.F.R. § 127.27(b)(2), a state must have a simple negligence culpability standard to implement a state NPDES program. But that decision is thinly reasoned and thus unpersuasive. And while Plaintiffs' reading of 40 C.F.R. § 233.41 may be consistent with an unpublished out-of-circuit decision, EPA's conclusion that Florida's "culpable negligence" standard satisfied the requirements of 40 C.F.R. § 233.41 is consistent with the CWA's text and purpose, with EPA's past practice of approving state NPDES

41

and Section 404 programs that employ a gross negligence standard, and with the better reading of the regulatory text. Plaintiffs' regulatory argument therefore fails.[16]

## IV.   EPA Reasonably Did Not Demand that Florida Affirm or Incorporate the Federal Definition of "Waters of the United States" in State Regulations.

Plaintiffs next contend that EPA erred in approving Florida's assumption request because Florida neither "affirm[ed]" in its regulations "that 'waters of the United States' are those waters as defined by federal law," nor did it "incorporate the federal definition" of "waters of the United States" into state law. Dkt. 98 at 68. This argument is meritless.

Florida made clear that it would assume Section 404 permitting authority in all " 'waters of the United (WOTUS) as defined at 40 C.F.R. Part 120,' " other than those waters over which the Corps would retain Section 404 permitting authority. EPA-HQ-OW-2018-0640-0568, at 65 (RTC quoting FDEP's Program Description); *accord* CORPS004323. Neither the CWA nor EPA's Section 404 assumption regulations demanded anything more. *See generally* 33 U.S.C. § 1344(g)(1); 40 C.F.R. § 233.11(h). They certainly did not require Florida to define the phrase "waters of the United States." That definition is a matter of federal law. Florida's assumption in no way altered it. State assumption only shifted "responsibility for administering the Section 404 program for certain waters of the United States." EPA-HQ-OW-2018-0640-0568, at 67 (RTC). The federal definition thus remains binding in Florida regardless of whether the State "affirm[s]" or "incorporate[s]" it. And EPA reasonably declined to treat Florida's affirmation or incorporation of an already applicable federal standard as a precondition for assumption.

---

[16] EPA proposed amending 40 C.F.R. § 233.41(b)(2) to clarify that "any form or type of negligence" is sufficient for state Section 404 assumption. 85 Fed. Reg. 80,713, 80,718 (Dec. 14, 2020). It is currently preparing to propose updated changes to its Section 404 assumption regulations. *See* https://www.reginfo.gov/public/do/eoDetails?rrid=300864 (last visited Apr. 25, 2023). EPA will keep the parties and the Court apprised of any developments.

Plaintiffs do nothing to advance their argument by noting that, in some instances, Florida has continued to rely on a regulatory definition of "waters of the United States" that was vacated in 2021. Dkt. 98 at 68. The outdated regulatory definition, known as the Navigable Waters Protection Rule, was operative at the time that Florida requested assumption. EPA-HQ-OW-2018-0640-0568, at 67 (RTC). And the problem is not that Florida failed to "affirm" or "incorporate" that outdated definition in state law (which would have only compounded the concern Plaintiffs raise), but rather that Florida fails to acknowledge intervening changes in binding federal law.

EPA believes that Florida's continued reliance on the Navigable Waters Protection Rule is problematic. But it is a problem that arose after EPA's approval and one that EPA is addressing through its oversight authority. Most importantly for present purposes, it is a problem that is beyond the scope of this litigation. As a matter of "black-letter administrative law," the reviewing court in APA cases like this one "should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (cleaned up). Information concerning Florida's implementation of its Section 404 program is not part of the administrative record. And Plaintiffs do not even attempt to justify the inclusion of post-decision extra-record evidence under one of the "narrow and rarely invoked" exceptions to record review. *Id.* Florida's implementation track record is simply not at issue here.

## V.   The Corps Reasonably Defined Retained Waters.

Plaintiffs attack the Corps' Retained Waters List. Dkt. 98 at 67–72. The crux of their complaint is that the list was based on less-than-perfect information about which of Florida's "7,500 major lakes, thirty-three first magnitude springs, and approximately 27,500 linear miles of rivers and streams" are in fact Section 10 waters. *Id.* at 20. But experience and commonsense both

suggest that the pursuit of an exhaustive retained waters list will come at the expense of state assumption, and so the Corps reasonably opted for a different approach here.[17]

Rather than undertaking the state-wide navigability study that Plaintiffs demand, the Jacksonville District used the 2014 Section 10 List to develop the Retained Waters List. CORPS004149. The 2014 Section 10 List drew on navigability determinations, was familiar to the regulated community, and reflected the District's informed judgments about the Section 10 status of many waters within Florida. It was, in short, the best currently available information on the scope of Section 10 waters. The 2014 Section 10 List thus served as a reasonable basis for developing the "description of" retained waters required for state assumption. 40 C.F.R. § 233.14(b)(1).

That list was not exhaustive, nor was it intended to be static. *See* 33 C.F.R. § 329.16(b) (noting that a waterbody's "absence from" from a Section 10 list "should not be taken as an indication that the waterbody is not navigable"); *see id.* § 329.16(c) (procedures for updating Section 10 lists). Rather, it was the product of an iterative approach to identifying Section 10 waters. The Corps developed that approach through its long experience implementing the RHA and it reasonably employed a similar approach to identifying retained waters in Florida. While using the 2014 Section 10 List as an off-the-shelf starting point for the Retained Waters List, the Memorandum of Agreement among FDEP and the Corps provides mechanisms for updating the Retained Waters List as new information comes to light. CORPS004324.

The record of state assumption (or the lack thereof) supports the pragmatic approach that the Corps employed here. As noted in the Assumable Waters Subcommittee Report, the Corps'

---

[17] Plaintiffs contend that the Corps' development of the Retained Waters List was a final agency action. Dkt. 98 at 70–71. Assuming without conceding that it was, the Corps' action was reasonable for the reasons discussed in the text.

prior, open-ended inquiries into the scope of retained waters had effectively, if inadvertently, discouraged states from pursuing assumption. CORPS003001, CORPS003005. When the Assistant Secretary of the Army for Civil Works adopted the report's majority recommendations, he referenced that past experience, noting that he had "personally heard from state officials who—but for . . . uncertainty [about the scope of the Corps' retained waters]—would pursue Section 404(g) assumption on behalf of their state." CORPS004096. The Assistant Secretary sought to address this problem by directing the Corps to use existing Section 10 lists (here the 2014 Section 10 List) as the basis for retained waters lists. That decision struck a balance between Congress's twin goals of maintaining federal oversight in channels of interstate or foreign commerce and facilitating Section 404 assumption. The Court should "not disturb this reasonable accommodation of manifestly competing interests." *NRDC*, 859 F.2d at 181 (internal quotation marks omitted).

Though Plaintiffs argue otherwise, Dkt. 98 at 72, the Corps properly excluded "historic use" Section 10 waters from the Retained Waters List. Section 404(g)(1), which defines the scope of retained waters, reflects Congress's concern with channels of current or future—not historic—interstate and foreign commerce. That provision retains the Corps' jurisdiction over "waters which *are presently* used, or *are susceptible to use* in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . and wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1) (emphasis added). Unlike the definition of RHA Section 10 "navigable waters of the United States" that it otherwise closely tracks, Section 404(g) makes no mention of waters that "have been used in the past" to "transport interstate or foreign commerce." 33 C.F.R. § 329.4. The statutory text is thus clear: Congress did not want the Corps to retain CWA jurisdiction over waters deemed navigable based solely on historic practice. The Corps gave effect

to that clear congressional intent when it declined to include on its retained waters list " 'historic use' navigable waters." Dkt. 98 at 72.

The Corps also reasonably declined to include on the Retained Waters List every water that appeared on the 2017 Supplement. Unlike the 2014 Section 10 List, the 2017 Supplement was avowedly a draft—the "first preliminary increment of an effort" to update the District's list of Section 10 waters. CORPS003117. And the 2017 Supplement's deliberately over-inclusive scope—"whatever" waters the Jacksonville District thought "might be remotely . . . *TNWs*," CORPS003115 (emphasis added)—far exceeded that of any retained waters list.

Section 10 waters and TNWs are not co-extensive. "The term 'navigable waters of the United States' as used in the [RHA] has a substantially different, and more limited, meaning than" navigable waters under the CWA. *1902 Atl. Ltd. v. Hudson*, 574 F.Supp. 1381, 1392 (E.D. Va. 1983). The RHA "contemplat[es] . . . a body of water forming a continued highway over which commerce is or may be carried on with other states or foreign countries, by water." *Hardy Salt Co. v. S. Pac. Transp. Co.*, 501 F.2d 1156, 1169 (10th Cir. 1974). But under longstanding agency guidance, a TNW need only be "navigable-in-fact." *Waters that Qualify as "Traditional Navigable Waters" Under Section (a)(1) of the Agencies' Regulations*, available at https://www.epa.gov/wotus/waters-qualify-traditional-navigable-waters-under-section-a1-agencies-regulations; *see also id.* (noting that TNWs "include but are not limited to," Section 10 waters). Thus, as the Assumable Waters Subcommittee Report noted, "there are more . . . TNW waters" than Section 10 waters. CORPS003021. Unsurprisingly, the Jacksonville District more-than-doubled the number of waterbodies named on the 2014 Section 10 List by including on the 2017 Supplement everything that "might . . . remotely" be a TNW. Sorting retained waters from a

list of speculative TNWs would have been time-consuming and, likely, contentious. The Corps relied instead on the 2014 Section 10 List. That decision was reasonable; Claim 7 therefore fails.

Because the Corps' Retained Waters list was reasonable, EPA acted reasonably in approving Florida's assumption request based in part on the Retained Waters list, and Plaintiffs' argument to contrary, Dkt. 98 at 69–70, fails as well.

## VI.    The BiOp Complies with the ESA.

Plaintiffs take issue with the BiOp's programmatic approach, which evaluated whether and to what degree FDEP and EPA structured their regulatory and oversight programs, respectively to ensure that approval and implementation of Florida's Section 404 program is not likely to jeopardize the continued existence of ESA-considered species (as the BiOp defined that term (FWS-006045)) or destroy or adversely modify designated critical habitat. *See also* n.11, *supra*. As explained below, the BiOp outlined the technical assistance process in which FWS will engage with FDEP to evaluate permits on a site-specific and species-specific basis. Plaintiffs accuse FWS of unlawfully abdicating its duties, and argue that every future permit issued by FDEP is required to either undergo ESA Section 7 consultation or obtain a permit under ESA Section 10. Dkt. 98 at 36–50. These arguments lack merit.

At the threshold, Plaintiffs' overriding criticism of the BiOp rests on their belief that neither EPA nor FWS can satisfy ESA Section 7 by relying on a programmatic or process-based approach. Instead, in their view, the only valid approach would be to undertake an analysis encompassing individualized, site-specific impacts for every permit Florida will issue after assumption of the program. But the ESA does not prohibit use of a programmatic approach. EPA is free to choose how to structure its action to meet its obligations under ESA Section 7(a)(2). In turn, FWS's sole responsibility is to determine whether the agency action as structured satisfies Section 7(a)(2)'s

command. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 624 (9th Cir. 2014)

(FWS does not need to pick an approach that may more effectively protect a species from jeopardy;

FWS need only find that the final action complies with the jeopardy standard) (citation omitted).

Here, the action presented for consultation was EPA's approval of FDEP's request to assume the

Section 404 program in all assumable waters, which included process-based protections and

conditions directed at ESA considered species. FWS-006081. FWS properly concluded that this

action is not likely to cause jeopardy or adverse modification. That is all that is required.

As explained in the BiOp, approval of Florida's request would result in FDEP regulating a

broad array of activities conducted over several geographic areas and for long periods of time. *Id*.

The BiOp specifically acknowledged that, as a result, there was substantial uncertainty about the

number, location, timing, frequency, and intensity of regulated activities. *Id*. In lieu of site-specific

or species-specific analyses, FWS determined that a programmatic or process-based approach to

EPA's potential approval of FDEP's request was appropriate. Accordingly, FWS "examin[ed]

whether and to what degree FDEP's program, regulations, processes, and procedures insure that

EPA's approval and FDEP's subsequent assumption and implementation of the 404 program is

not likely to jeopardize the continued existence of endangered or threatened species or result in the

destruction or adverse modification of critical habitat." FWS-006045. With this programmatic

approach, species-specific analyses were deferred, to be assessed on a permit-by-permit basis

through the technical assistance process. FWS-006081. As the BiOp explained at length, that

process requires all permit applications to be forwarded to FWS for review and provides a

structured framework for coordinating review of State 404 permits to assess potential effects on

ESA-considered species to ensure that no Section 404 permit action jeopardizes the continued

existence of listed species or adversely destroys or modifies critical habitat. FWS-006049–58.

FWS previously utilized a similar programmatic approach for a one-time EPA nationwide action that would result in a wide array of subsequent implementation actions where impacts similarly were unknown at the time of consultation. When FWS's approach was challenged in court, the Second Circuit held both that approach and the determinations set forth in that biological opinion were reasonable. In that case, environmental petitioners brought nearly identical complaints, alleging that the consulting agencies' (FWS and NMFS) use of a structured and programmatic approach that deferred species-specific analysis until a later time was unlawful. *Cooling Water Intake Structure*, 905 F.3d at 73-74. The Second Circuit rejected those arguments and held that the lack of available data and uncertainties as to how and where the rule would be implemented did not allow for a meaningful assessment of impacts on a national scale. Therefore, it was reasonable for the consulting agencies to defer consideration of those impacts to the site-specific permitting process. *See id*. Here too, FWS determined that it was not feasible to conduct a meaningful site-specific and species-specific effects analysis in the BiOp nor was it required to do so. FWS-006092. To the contrary, the scope of EPA's approval of FDEP's request to administer the Section 404 program in assumable waters was statewide, covering an array of operations that may affect a wide variety of ESA-considered species and proposed and designated critical habitat depending on the site-specific action, making it an appropriate action for consideration at the programmatic level. *Id*. Thus, FWS properly assessed whether FDEP had structured its regulatory program and EPA structured its oversight program to ensure that approval and implementation of the State 404 program satisfied ESA Section 7. FWS-006081; FWS-006093; FWS-006104. Like the Second Circuit, this Court should uphold that approach.

Plaintiffs assert at least seven different specific arguments in support of their claim that the BiOp failed to comply with the ESA; none of them has merit. First, despite Plaintiffs' efforts to

draw similarities between this programmatic consultation and the one in *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), the two cases are plainly different. Dkt. 98 at 40–41. There, both consulting agencies envisioned that take would be authorized through emergency consultation on a case-by-case basis.  726 F. Supp. 2d at 1203, 1205. In analyzing the reasonable and prudent alternative challenged by the plaintiffs, the court held that FWS had deferred improperly to the action agency on whether to impose restrictions for the benefit of listed species, and that unwarranted deference suggested that FWS would not impose meaningful restrictions during future emergency consultations. *Id*. at 1228. Here, FWS has reserved to itself the final say on protective measures; there simply is no deference to FDEP. *See* FWS-006050; FWS-006057; FWS-006066; FWS-006106; (requiring FDEP to incorporate all recommended protection measures as permit conditions). The circumstances are inapposite.

Second, for the same reasons, Plaintiffs' contention that FWS unlawfully made a "no jeopardy" determination is flawed. Dkt. 98 at 41. The proposed programmatic action and its related activities provided FWS with enough information to analyze effects at the programmatic level, while analysis of specific projects (and impacts of those projects on specific species) will be addressed in the technical assistance process. FWS-006081. As explained, there was substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. *Id*. While Plaintiffs characterize this approach as a "refusal to assess species-specific affects," Dkt. 98 at 41, FWS exercised its expertise and discretion and made a determination using the information that it had about Florida's proposed program and EPA's intended oversight of that program under the CWA. FWS-006081. The Second Circuit rejected similar arguments in *Cooling Water Intake Structure*, holding that "[n]othing in the ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis." 905 F.3d at 73. Instead, the Second

Circuit held that it was proper to construe the agency action as promulgation of standards under Section 316(b) of the CWA, rather than a phased action consisting of both the promulgation of standards and the states' later implementation of those standards. Having properly defined the scope of the action at issue, the Court held that the consulting agencies' biological opinions discharged their duty to assess the effects of the action as a whole. *Id.* So too here, where FWS properly construed the agency action as EPA's approval of Florida's request to assume Section 404 permitting at the state level and assessed the entirety of the effects of that action.

Third, Plaintiffs argue FWS failed to analyze the full extent of the action because it did not consider potential impacts to species from existing general permits, decisions on when permits would not be required, and compliance and enforcement activities. Dkt. 98 at 38. Yet Plaintiffs overlook that Florida had issued no Section 404 general permits prior to EPA's approval of Florida's assumption request. Thus, an assessment of impacts from "existing" state general permits was not possible. The BiOp did, however, contemplate the proposed issuance of permits as described in the State's Section 404 program rule, which allows special conditions to be attached to such permits if needed. FWS-003408-09 (Florida rules 62-4.070 and 62-4.080); *see also* FWS-006110 (BiOp's terms and conditions, referencing 62-331.080, F.A.C., which allows FDEP to reevaluate the circumstances and conditions of a permit at any time for sufficient cause); FWS-005631–32. The State 404 Handbook also described how projects that apply for general permits will be evaluated for consistency with those proposed general permits and how proposed general permits would be processed and their effects reviewed by FWS. FWS-005631–32; FWS-006048; FWS-006051; FWS-006085–86. Moreover, FWS determined that permit compliance would be monitored and enforced through the species coordination process. FWS-006105. As explained in the BiOp, FWS assessed monitoring and enforcement compliance actions, including EPA's receipt

of all applications with a determination other than no effect/impact, which allows EPA to monitor the effectiveness of the species coordination process and oversee State permit actions and program operations. FWS-006067; FWS-006081. As part of the overall action, FWS reasonably evaluated the process for issuing general permits and EPA's oversight of that process.

Plaintiffs wrongly contend that FWS should have evaluated the impact on species from "decisions on when permits would not be required,"[18] and considered impacts that will result from "the loss of NEPA review and ESA Section 7 consultations."[19] Dkt. 98 at 38. The BiOp considered a programmatic action that included the process by which FDEP would determine if a project required a Section 404 permit. FWS-006086–88. If a project requires a Section 404 permit, the BiOp considered how that permit would be evaluated for effects to federally listed species and designated critical habitat, and what conditions would be imposed as outlined in coordination with FWS to insure that listed species would not be jeopardized and critical habitat would not be destroyed or adversely modified. FWS-006105-06. Conversely, if Florida finds that a project does not require a State Section 404 permit, then the project is beyond the regulatory reach of its Section 404 permitting program, and not part of the species' coordination process considered in the BiOp.[20]

_____

[18] This argument is a red herring in any event. If an agency determines that no permit is required, then it never had discretionary control over a project in the first place and, therefore, cannot cause any effects to listed species in the first place. *See* 16 U.S.C. § 1536(a)(2). This is so when the Corps issued Section 404 permits and remains true now that FDEP is issuing Section 404 permits.

[19] Arguments as to "the loss of NEPA review and ESA Section 7 consultations at the site-specific level" fail to acknowledge that the CWA allows states to apply to assume the Section 404 permitting process at the state level. 33 U.S.C. § 1344(g)–(l). In such circumstances, Congress decided that neither NEPA review nor ESA Section 7 consultation is required. *Nat'l Ass'n of Home Builders*, 551 U.S. at 653 n.4 (the ESA's consultation requirement "does not apply to permitting decisions by state authorities").

[20]   To the extent Plaintiffs are criticizing how Florida decides that a project does not require a permit, the BiOp considered the relevant portions of Florida's Administrative Code, FWS-006044, and found the FDEP's 404 program was structured to ensure that no permit will be issued that is likely to jeopardize listed species and adversely destroy or modify critical habitat. FWS-006092.

Nor is there any merit to Plaintiffs' additional argument that FWS failed to evaluate the environmental baseline. Dkt. 98 at 38–39. The environmental baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that already have undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. The BiOp properly considered the environmental baseline. *See* FWS-006044–45 (BiOp, explaining that it adopted and adapted various portions of the BE, which it considered to be the best scientific and commercial data available); FWS-006084; FWS-005662–80 (BE, devoting an entire chapter to the environmental baseline). The BiOp adopted the BE's detailed description of the environmental baseline, which addressed the baseline of listed species, their habitats, and the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the United States, adjacent uplands, and the ESA-considered species that reside in them. FWS-006084. The BiOp specifically cited the BE's description of the baseline for Section 404 permitting in Florida and its past and ongoing effects on ESA-considered species. *Id.* FWS further separately addressed ecological aspects of the environmental baseline, including the Everglades Restoration, the Central and Southern Florida Project, and other historical ESA consultations triggered by federal wetlands permitting. FWS-006094.[21]  This thorough analysis was more than sufficient to satisfy the requirements of 50 C.F.R. § 402.14(g), particularly given the programmatic nature of

---

[21]  Plaintiffs do not appear to identify any actions or human activities that they believe were omitted improperly from the environmental baseline. Dkt. 98 at 38-39.

the BiOp and future consideration of projects for site-specific and species-specific impacts.[22] FWS-006086–87; FWS-006092–93.

Plaintiffs also contend that FWS improperly relied on EPA's BE and incorporated sections of it "without analysis or explanation." Dkt. 98 at 39.[23] As explained above, FWS explained in the BiOp that it adopted and adapted various portions of ESA's consultation package, which it considered the best available scientific and commercial data. FWS-006044–45. FWS also explained that it conducted its own analysis of the best scientific and commercial data available as required by the ESA, *id.*, thus Plaintiffs' assertion that FWS did no analysis is inaccurate. This fulfilled the ESA's mandate that FWS's opinion be based on the best available scientific and commercial data available, 16 U.S.C. § 1536(a)(2), and its determination is entitled to deference. *Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998).

---

[22]    The cases cited by Plaintiffs are inapposite. None of them concerned programmatic consultations such as the one in this case, where FWS will conduct site-specific and species-specific analyses of each permit through the technical assistance process. To the contrary, the individual biological opinions at issue in *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) addressed the effects of individual agency actions on a single species, which the Court held simply provided a "recitation of the activities of the agencies." This BiOp delved into the environmental baseline and, for that reason, is distinguishable on the facts. Nor does *Oceana, Inc. v. Ross*, No. 15-055, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) apply. There, the Court found that the consulting agency listed and described data without indicating how it factored into its jeopardy analysis. But here, FWS discussed, for example, data on Section 404 permits issued from 2014 through 2018; stated its relevance to the action under review (namely, EPA's approval of Florida's assumption request) and that it likely approximates the number and types of permitting activities that could occur in the next five years. FWS-006081; FWS-006094. There is simply no basis to describe the BiOp's evaluation of the environmental baseline as short or perfunctory. *Cf.* Dkt. 98 at 39 (citing *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339 (4th Cir. 2019)).

[23]   Plaintiffs also ignore those parts of the BiOp where FWS discussed data from the BE on Section 404 permits issued from 2014 through 2018 that the Corps provided and explained that the permitting history approximates permitting activities that could occur in the next five years, although the precise number and location of future permit applications are unknown. FWS-006089; FWS-006094.

Finally, Plaintiffs devote just three sentences of argument in their brief in support of Claim 12, in which they allege that EPA failed to consult on ESA-listed sea turtles and their designated critical habitats under FWS's jurisdiction. Dkt. 98 at 41; *see* Dkt. 77 (Am. Complaint ¶¶ 288–294). As explained at length above, the BiOp includes all ESA-considered species and their critical habitat; species-specific impacts will be addressed in the technical assistance process and on a permit-by-permit basis. Neither EPA nor FWS violated their obligation to comply with the ESA in this regard. The Court should enter judgment for Federal Defendants on Claims 3 and 12.

**VII.    The Technical Assistance Process Complies with the ESA.**

Throughout their brief, Plaintiffs contend that the technical assistance process is merely voluntary, questioning whether it will be followed and whether FWS and the other agencies will participate in the process as outlined. *E.g.*, Dkt. 98 at 44, 48. Plaintiffs' arguments on this point are easily resolved in favor of Federal Defendants.

At the threshold, the agencies' commitments to the technical assistance process are entitled to a presumption of regularity, which Plaintiffs cannot overcome with mere speculation. *Overton Park,* 401 U.S. at 415; *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 54 (D.D.C. 2015). The plaintiffs made similar arguments in *Cooling Water Intake Structure*, claiming that the technical assistance process was "wholly voluntary" and "not designed to provide meaningful species protection." 905 F.3d at 76. The Second Circuit rejected those arguments, however, holding that the technical assistance process involved a binding commitment by the consulting agencies in that case. *Id*. Here, the BiOp's no jeopardy determination similarly was conditioned on compliance with specific procedures that are part of the description of the action, and the agencies' commitment to them. FWS-006106–07. The agency participants—EPA, FDEP, and FWS—must abide by the commitments made and considered in the BiOp. FWS-006104–05;

FWS-006106–07. Just as the Second Circuit held that the rule at issue in *Cooling Water Intake Structure* was interpreted to require participation in the technical assistance process, so too here that process was part of the action that was approved in this programmatic consultation. *See* 905 F.3d at 72. While Plaintiffs insist that FWS's involvement is simply optional, Dkt. 98 at 47–48, their suggestion that FWS is not committed to the process has no basis in fact. To the contrary, the BiOp contemplated that the express purpose of the technical assistance process was to allow FWS to determine if state-issued 404 permits are likely to jeopardize species or destroy or adversely modify critical habitat. FWS-006056–57. That is the standard that FWS will apply in its review of permits, as expressly stated in the BiOp, thus clearly incorporating the meaning of those terms from the ESA and its implementing regulations.[24] *See id*. Plaintiffs' statement that FWS "need not evaluate the effects of the permit on protected species and critical habitat" nor "evaluate jeopardy or the potential to adversely modify or destroy critical habitat," Dkt. 98 at 47, is pure speculation.

Nor is it true that FDEP "determines whether a permit application will have adverse impacts . . . and may stick to that determination even if USFWS provides information contrary to that conclusion." *Id.* at 47. To the contrary, Florida must comply with the technical assistance process, FWS-006109, and the BiOp explicitly stated that FWS's final conclusions regarding potential impacts and necessary measures to address impacts are "determinative," FWS-006056, FWS-006068, a provision to which the state agencies agreed. EPA-HQ-OW-2018-0640-0623, at 10 (MOU among FDEP, FWC, and FWS). FDEP must "incorporate any reasonable and prudent measures and terms and conditions provided by [FWS] into permit conditions for a State 404 permit" and "will incorporate as permit conditions all recommended impact avoidance and

---

[24]   In addition, both federal regulations and the State 404 applicant handbook state that issuance of a State 404 permit that is likely to jeopardize ESA-listed species is prohibited. FWS-006067.

minimization measures (protection measures)" provided by FWS to avoid jeopardy to species and/or adverse modification or destruction of critical habitat. FWS-006065; FWS-006106. This means that FWS, utilizing its expertise, has the final say.[25] Nor is it accurate for Plaintiffs to say that if the FDEP concludes there will be no adverse impacts, the technical assistance process automatically concludes. Dkt. 98 at 47–48. To the contrary, the BiOp contemplated that FWS "will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as 'No Effect/No Impact.' " FWS-006067; *see also* EPA-HQ-OW-2018-0640-0623, at 13 (MOU among FDEP, FWC, and FWS). If FWS does not respond to such applications upon first submittal, FWS "will still receive public notices for these applications and may elect to comment at that time." FWS-006067. As stated in the BiOp, receipt of public notices for "all applications also provides an opportunity for [FWS] to re-review all of the effect determinations made by the State and provide oversight of the species coordination process." *Id*. (emphasis added).

Plaintiffs' argument that FWS should have considered the effects of the action "as a whole," Dkt. 98 at 45 (citing 50 C.F.R. § 402.14(c)(4), (d)), is just another attack on FWS's programmatic approach. FWS did not have information to allow it to predict every future Section 404 permit application, its location, or its potential overlap with listed species or designated critical habitat. FWS properly recognized the inherent uncertainties and made a decision based on the best

---

[25]     To the extent that Plaintiffs are implying that unlawful take will be permitted to occur notwithstanding the extensive technical assistance process outlined in and committed to in the BiOp, Dkt. 98 at 49, nothing in EPA's approval of Florida's assumption request or the BiOp itself changes the ESA's prohibition of take of listed species. This prohibition operates independently of EPA's approval and the BiOp. If unauthorized take of ESA-listed species occurs, Congress authorized Plaintiffs, other citizens, or the United States to file an action directly against the person or entity responsible to enjoin such take. 16 U.S.C. §§ 1540(g), (e)(6); *see Cooling Water Intake Structure*, 905 F.3d at 75 n.16.

available information. FWS-006093. Accordingly, the action subject to consultation here is EPA's approval of Florida's request to assume its CWA 404 program, not the actual issuance of permits for dredging and filling activities in assumed waters. *See* FWS-006046–48. FWS properly analyzed the effect of that approval, namely Florida's assumption of permitting authority on ESA-species of concern, and that future state permit actions are program activities caused by the proposed action. FWS-006043; FWS-006048. The environmental baseline addressed the baseline of listed species and their habitats, and the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the U.S., adjacent uplands, and the ESA-listed and considered species that reside there. FWS-006084. The analysis of effects assessed EPA's oversight authority and whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat. FWS-006104. The ESA does not mandate an assessment of effects on a site-specific and species-specific basis where the specifics of future projects are uncertain.

In addition to contending that FWS must analyze a programmatic action "as a whole," Plaintiffs argue that FWS must engage in site-specific consultations and produce site-specific biological opinions. Dkt. 98 at 46 (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C Cir. 1980)) & n.17 (citing cases). But *North Slope* simply said that a biological opinion "may not deal exclusively with any one particular stage of an outer continental shelf project." 642 F.2d at 608. The "foresight" that the D.C. Circuit held is required by the ESA is built into the BiOp at issue in

this case, mandating processes and giving FWS final say on potential effects and proposed protective measures to elevate protection of listed species to the highest priority. While Plaintiffs also cite the Ninth Circuit's decision in *Conner v. Burford* and other cases for the proposition that a court must consider all phases of an agency action, Dkt. 98 at 46 n.17, the D.C. Circuit has held that ESA compliance must be assessed in the context of the applicable statutory scheme and future checks and balances and mitigating measures "adopted in pursuance thereof." *North Slope*, 642 F.2d at 609. That is precisely what the BiOp does here. Indeed, the Second Circuit rejected this same argument (and specifically declined to follow *Conner*) in *Cooling Water Intake Structure*, holding that "the rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA." 905 F.3d at 73. Plaintiffs' arguments on this point lack legal support, and their claim that the technical assistance process is not "an adequate stand in for the robust analysis required by Section 7 consultation," Dkt. 98 at 46, misses the point. Federal Defendants do not claim that the technical assistance process equals Section 7 consultation, and the law is clear that absent any further federal permitting, no further Section 7 consultation is required. Under these circumstances, FWS properly treated and analyzed the future impacts of state-issued 404 permits as effects of the action.

Plaintiffs correctly state that the approach taken in this BiOp follows the programmatic approach taken in the *Cooling Water Intake Structure* case. Dkt. 98 at 49. To do so was reasonable, given the Second Circuit's rejection of the attacks on the biological opinion there. Plaintiffs assert three arguments in an effort to distinguish this BiOp from the consultation in that case, all of which fall flat. First, the federal action in *Cooling Water Intake Structure* was a nationwide consultation on EPA's promulgation of a final rule under CWA Section 316(b); the one at issue in this case is limited to approval of Florida's request to assume CWA Section 404 permitting in waters of the

United States within the State of Florida. On its face, the federal action in *Cooling Water Intake Structure* cannot seriously be characterized as "much narrower in scope." Dkt. 98 at 49.

Second, the Court should dismiss any suggestion that the CWA Section 316(b) regulations at issue in *Cooling Water Intake Structure* "served a very different purpose." *Id.* at 98 at 50. The measures in the 316(b) rule were codified to ensure that any NPDES permit issued by either the EPA or a state that had assumed NPDES permitting authority would not jeopardize listed species or adversely modify or destroy critical habitat, with the goal of reducing impacts of the ongoing operation of NPDES permitted facilities over time. *See* 905 F.3d at 71–72. The purpose of the BiOp in analyzing EPA's approval of Florida's assumption request is the same: to ensure that permitted activities do not jeopardize ESA-listed species or adversely modify or destroy critical habitat as a result of dredge or fill activities. *See* FWS-006103. Both agency actions arise under the CWA and both allow the permitting of otherwise prohibited discharges of pollutants under the CWA subject to certain conditions. Even if the two agency actions could be found to have differences, they are inconsequential considering their common goal as to listed species and designated critical habitat.

Finally, there is no merit to Plaintiffs' claim that the obligations in *Cooling Water Intake Structure* were "legally binding" only because they were codified in a rulemaking, whereas the obligations here are not because EPA did not codify its approval of Florida's assumption request. Dkt. 98 at 50-51. EPA's incidental take coverage is conditioned on the agency's continued oversight of Florida's implementation of the State 404 program, as well as its coordination of federal review of State Section 404 permit actions. *See* FWS-006109 (setting forth these requirements in Terms and Conditions and citing 40 C.F.R. Part 233). Florida's incidental take coverage is similarly conditioned on its compliance with an extensive list of terms and conditions

in the BiOp, FWS-006109–10, as well as use of its authorities in the State Section 404 program rule. FWS-006109. By attempting to distinguish the *Cooling Water Intake Structure* case, Plaintiffs implicitly concede that the holding would apply, absent the distinctions they try to draw. But any distinctions are easily dispensed with, and Plaintiffs' arguments have no merit. The Court should grant judgment in favor of FWS on Claims 6 and 13.

## VIII.   The Incidental Take Statement Complies with the ESA and Is Reasonable.

Much like their general attacks on the BiOp, *see* Section VI, *supra*, Plaintiffs disagree with the approach in FWS's ITS. These arguments also lack merit.

Plaintiffs first argue that the ITS failed to specify the amount or extent of incidental take and seem to contend that FWS had sufficient information to allow FWS to estimate the number of individuals that might be affected by future permitted activities. Dkt. 98 at 42. This argument lacks legal and factual support. The ESA provides that an incidental take statement shall, among other things, specify the impact of incidental take on species. 16 U.S.C. § 1536(b)(4)(C)(i). Although Congress expressed a preference for quantifying take in the incidental take statement, it recognized that such specificity is not always possible. *See* Endangered Species Act of 1982, H.R. Rep. No. 97-567, at 27, reprinted in 1982 U.S.C.C.A.N. 2807, 2827; *see Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 257 (D.D.C. 2008); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001) ("We have never held that a numerical limit is required."). An ITS that has no numerical cap is considered adequate if it explains why it was impracticable to express a numerical measure of take. *Cf. Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 498-99 (D.D.C. 2014).

Consistent with these authorities, FWS explained in the BiOp that it was unable to anticipate the locations of future State Section 404 permit applications, thus it could not conduct a site-specific or species-specific analysis to estimate the number of individuals that may be affected

61

by the permitted activities. FWS-006081; FWS-006107. Project-specific information will be provided to FWS in the future because FWS will receive all State Section 404 permit applications. FWS-006107–08. This will afford FWS the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis. FWS-006108. The ITS further stated: "we assume that through technical assistance with the State, appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State 404 program will be developed by [FWS], and these measures will ensure that each permit will minimize adverse effects and therefore avoid jeopardy to ESA-considered species or destruction or adverse modification to critical habitat." *Id*. The ITS further explained that "[i]f it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement." FWS-006108; *see also id*. ("the amount or extent of incidental take of listed species will be quantified during the technical assistance process that is required" by Florida's 404 program rule, the MOU signed by FDEP, FWS and FWC, and EPA oversight regulations (40 C.F.R. § 233)). Through this process, take will be quantified and monitoring will track the levels of take estimated through the technical assistance process and exempted by the ITS. FWS-006108.

Plaintiffs nonetheless insist that prior consultations with the Corps on past Section 404 permit applications provided sufficient information to establish numeric take limits and/or identify a surrogate. Dkt. 98 at 42. But prior consultations could have provided only information about the types of impacts from specific <u>past</u> projects, not projects that will be proposed and considered in

the future.[26]   Plaintiffs' citation to *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), does not

change this result. There, the court held that there was sufficient information about behavior and

habitat of species in areas covered by potential site-specific activities because the areas already

had been leased; thus, the agencies knew the specific areas where future oil and gas activities were

likely to occur. *See id*. at 1453–54. This fact-specific holding does not apply here, where there is

no information to allow FWS to predict who will apply for permits, what activities will be the

subject of permit applications, or the location of the proposed activities, which impairs FWS's

ability to make a reasonable estimate of potential take. The Second Circuit rejected similar

arguments in *Cooling Water Intake Structure*, 905 F.3d at 73, finding that it was reasonable for

FWS and NMFS to defer consideration of how pollution would affect aquatic ecosystems. The

court held that it was rational for the consulting agencies to engage in a technical assistance process

carefully defined in a programmatic biological opinion, which would allow the agencies to more

reliably estimate the stressors that are likely to be produced as a direct or indirect result of thermal

discharge activities at individual facilities. *See id*. In so ruling, the Second Circuit rejected the

plaintiffs' argument that FWS and NMFS had failed to seek out and consider existing scientific

data, instead agreeing with the agencies that the exact nature of future impacts would be species-

specific and require individual analyses. *Id*. This reasoning also applies here.

---

[26]   FWS considered information presented in EPA's BE about ESA consultations triggered by
federal wetlands permitting between 2014 and 2018 and incorporated it in the BiOp. FWS-006091.
As stated above, this information was not used to generate take limits. Rather, the analysis of
former consultations (i.e., the percentage of permit applications that resulted in formal or informal
consultations or were covered by existing programmatic consultations) provided information about
long-term implementation of the Section 404 assumption process. *Id*. FWS properly relied on this
information to determine that it approximates the number and types of permitting activities that
could occur over the next five years, FWS-006094, and properly deferred setting take limits to the
species-specific analysis that will occur on individual permit applications.

Plaintiffs' complaint that the ITS did not have an "adequate trigger for reinitiation," Dkt. 98 at 42, is similarly flawed. FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance. FWS-006081. If assumptions about those processes prove incorrect or warrant changes during implementation of the State program, it could affect the validity of the analysis and trigger reinitiation of consultation if effects occur that were not considered. FWS-006093 (citing 50 C.F.R. § 402.16); *see* FWS-006110 (if new information shows that magnitude of impacts to species is greater than originally anticipated or amount of incidental take is exceeded, FDEP will re-open the permit and coordinate further with FWS). This is the sort of "new" information that could trigger reinitiation. *Cf.* Dkt. 98 at 43.

Nor was it unreasonable for FWS to determine that the listing of a new species alone would not require reinitiation of this programmatic consultation. FWS-006111. FWS evaluated the proposed State 404 program's species coordination framework, which requires that a current list of ESA-listed species be used when a State 404 permit application is received. FWS-006083. Thus, the State 404 review process can maintain compliance with the ESA by adapting to future changes to the list of species listed as threatened or endangered under the ESA, and reinitiation of consultation may not be required or necessary. *Id.* Furthermore, as explained in the BiOp, Florida's regulations require the State to comply with the technical assistance process for ESA-listed species and critical habitat, and any effects to newly listed species or their critical habitat would be sufficiently considered and addressed through the same technical assistance process. FWS-006111. The cases cited by Plaintiffs address biological opinions on individual agency actions, not programmatic biological opinions that include a site-specific and species-specific evaluation via a technical assistance process. *See* Dkt. 98 at 43 (citing, *e.g.*, *Oceana v. Ross*, 2020 WL 5995125, at

*13 (D.D.C. Oct. 9, 2020)). The events triggering reinitiation of consultation were announced clearly; nothing was done "behind closed doors" in this regard. *Cf.* Dkt. 98 at 43.

Plaintiffs next incorrectly contend that the ITS established "no meaningful reasonable and prudent measures nor implementing terms and conditions." Dkt. 98 at 44. The ESA does not mandate any particular form or content for "reasonable and prudent measures," directing only that a biological opinion authorizing incidental take specify the measures "that the Secretary considers necessary or appropriate" to minimize the impact of the incidental taking. 16 U.S.C. § 1536(b)(4)(C)(ii); *see Cooling Water Intake Structure*, 905 F.3d at 77. The ESA similarly vests FWS with broad discretion under the statutory phrase "terms and conditions," which are those necessary to comply with the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C)(iv). The implementing regulations provide some additional substance by stating that both reasonable and prudent measures and terms and conditions "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2).

Here, the ITS requires EPA to use its authorities under the CWA to minimize impacts to listed species pursuant to its oversight of the State's 404 Program, which in turn incorporates FWS's expertise in determining measures to eliminate or minimize take. FWS-006108-09. The ITS also requires FDEP "to participate in [the] State 404 program species coordination technical team" with FWC and FWS per their MOU, which provides a structured framework for coordinating review of State 404 permits to assess potential effects on ESA-considered species and critical habitat and to ensure that no State 404 permit action jeopardizes the continued existence of an ESA-listed species (as well as species listed under Florida's endangered species statute), or adversely modifies or destroys designated critical habitat. FWS-006109; *see* FWS-006110, FWS-006043–44. The ITS states that all protection measures recommended by FWS shall

be incorporated as permit conditions. FWS-006109. Plaintiffs' demand that "new or additional requirements" be imposed on EPA or FDEP has no basis in the ESA or its implementing regulations, particularly where FWS determined that the commitments made by state and federal agencies, and memorialized in the ITS, were sufficient. In *Cooling Water Intake Structure*, the Second Circuit held that a nearly identical reasonable and prudent measure regarding EPA's use of its oversight authority satisfied the ESA because "reliance on the binding technical assistance process was a 'meaningful attempt to minimize incidental takings associated with the project.'" 905 F.3d at 77 (quoting *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007)).

The ITS also contains terms and conditions prescribed to implement the reasonable and prudent measures, which more than satisfy the scarce guidance provided in the ESA and its implementing regulations. The only example of terms and conditions given in the statute and regulations is "reporting requirements." 16 U.S.C. § 1536(b)(4)(C)(iv); 50 C.F.R. § 402.14(i)(1)(iv). Similarly, the regulations require the action agency to "report the progress of the action and its impact on the species to the Service as specified in the incidental take statement." *Id.* § 402.14(i)(3). The terms and conditions proscribed here impose a detailed annual reporting requirement on FDEP, requiring a summary of the number and types of 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat. FWS-006110. The ITS further contains a lengthy list of additional terms and conditions for FDEP, including that it oversee the species coordination process; implement a training program; forward all applications to FWS for review according to the timeframes and processes in the BE and in the BiOp's description of the action; accept the technical assistance process; and incorporate as permit conditions all protection measures that FWS provides to FDEP. FWS-006109–10. If FWS concludes that a permit is likely to jeopardize a listed species or adversely destroy or modify critical habitat, then

FDEP must issue a notice of intent to deny the permit. FWS-006110. The terms and conditions contain other mandatory measures, namely that EPA oversee operation of Florida's 404 program to ensure that it operates in accordance with the requirements of 40 C.F.R. pt. 233 and coordinate federal review of State Section 404 permit actions pursuant to 40 C.F.R. § 233.50. FWS-006109. *In Cooling Water Intake Structure*, the Second Circuit held that "various administrative conditions, like a detailed annual reporting requirement, and several substantive implementing conditions" were sufficient to satisfy the "terms and conditions" requirement. *See* 905 F.3d at 77. The same conclusion should be applied in this case. For these reasons, the Court should reject Plaintiffs' claim that the ITS fails to comply with the ESA and enter judgment for FWS on Claim 4.

## IX.    EPA Rationally Relied on FWS's BiOp.

Under the ESA, EPA is fully entitled to rely on FWS's expert analysis and conclusions contained in a BiOp to ensure its compliance with the ESA. In reviewing EPA's approval of Florida's assumption request, "the critical question is whether the action agency's reliance was arbitrary and capricious, not whether [the BiOp] itself is somehow flawed." *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006). Even in situations where the consulting agency's opinion "is based on 'admittedly weak' information," an action agency satisfies its obligations under the ESA "if a challenging party can point to no 'new' information—i.e., information the [Service] did not take into account—which challenges the [biological] opinion's conclusions." *Id*. at 76 (citing *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021).[27]

---

[27]   Plaintiffs argue that this standard "has not been applied when a BiOp is facially invalid because of missing analysis or incorporation of inadequate analysis, as is the case here." Dkt. 98 at 51 n.24 (citing *Shafer & Freeman Lakes*, 992 F.3d at 1096). But the D.C. Circuit held in *Shafer & Freeman Lakes* that the plaintiffs failed to show that the action agency overlooked new information in the administrative record that had been unavailable to the consulting agency, therefore, the action

Plaintiffs fail to meet the relevant standard, which requires them to identify "new information" that FWS failed to consider in its BiOp. Here, EPA rationally relied on FWS's BiOp. Plaintiffs' claim that the BiOp arbitrarily and capriciously asserted that FWS could not estimate the number of individuals that might be affected by permitted activities, which in turn rendered EPA's reliance on the BiOp arbitrary, is a thinly disguised argument that the BiOp itself is flawed. This is not the proper focus in assessing whether EPA rationally relied on the BiOp. The law does not require EPA to "'undertake a separate, independent analysis' of the issues addressed in the BiOp." *City of Tacoma*, 460 F.3d at 75. Plaintiffs' "reargu[ment] of factual issues [that FWS] already took into consideration" is insufficient to show that EPA should have rejected the BiOp. *Id*. at 76. The Court should grant judgment for EPA on Claim 10.

## X. EPA's No-Effect Determination For NMFS Species Was Reasonable.

EPA determined that its approval of Florida's assumption request would have no effect on ESA-listed species that are under NMFS's jurisdiction. The allegations in Claim 5 that this no effect determination violates the CWA and APA, and in Claim 11 that this no effect determination violates the ESA, lack merit.

In a letter dated November 19, 2019, EPA requested that NMFS identify any species under its jurisdiction that existed in waters that are assumable by the state. EPA-HQ-OW-2018-0640-0638 (20200415 Ltr. from NMFS to EPA). After communications between the two agencies, a review of state mapping products, NMFS's own mapping analysis, and a review of state-provided

---

agency reasonably relied on the consulting agency's scientific judgments and properly granted a license. *Id*. at 1093. Contrary to Plaintiffs' contention, the Court did not reject the "no new information standard" or otherwise discuss it. The "missing analysis" cited by Plaintiffs in that case was the consulting agency's failure to analyze whether its proposal of a specific reasonable and prudent measure "satisfied its own governing regulation" that such measures "qualif[y] as only a minor change within the meaning of 50 C.F.R. § 402.14(i)(2)." *Id*. at 1095. This is a significantly different issue than the one presented here, where Plaintiffs allege that FWS failed to comply with ESA Section 7, even though it followed an approach specifically upheld by the Second Circuit.

documents about the assumption, NMFS concluded that ESA-listed species under NMFS's jurisdiction do not occur in waters that are assumable by the state. EPA-HQ-OW-2018-0640-0638 (20200415 Ltr. from NMFS to EPA); *see also* FWS-005931. In making this determination, NMFS stated that it specifically analyzed the possible spatial overlap of the assumption with waters used by certain sturgeon species that occur in waters that will remain under USACE's jurisdiction. *See id*. NMFS concluded by stating that it assumed that EPA would make a "no effect" determination for NMFS's ESA-listed species that were identified as part of the proposed assumption. *See id*. And EPA did so, ultimately deciding that its approval or disapproval of FDEP's assumption of the Section 404 program would have no effect on ESA-listed species under NMFS's jurisdiction. EPA-HQ-OW-2018-0640-0617 (Sept. 2, 2020 Ltr. from NMFS to EPA). NMFS acknowledged receipt of EPA's "no effect" determination, stating that such determinations do not require NMFS's concurrence nor does the agency provide concurrence on them. EPA-HQ-OW-2018-0640-0663. NMFS, however, did confirm that it had coordinated closely with FDEP on the potential for effects to endangered and threatened species under NMFS's jurisdiction. *See id*.

With its no effect determination, EPA fulfilled its procedural obligation to review its action and determine whether consultation with NMFS was required. *See* 51 Fed. Reg. at 19,945; *see also NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (before initiating any agency action in an area that contains threatened or endangered species or a critical habitat, the action agency must either "(1) make an independent determination of whether its action 'may affect' a protected species or habitat, or (2) initiate a formal consultation with the agency that has jurisdiction over the species"). If an action agency makes a "no effect" determination, there is no trigger for formal consultation. *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 94 (D.D.C. 2012). EPA explained its decision, namely that ESA-listed species under NMFS's jurisdiction do not occur in

waters that are assumable by the State, and its determination that approval of FDEP's assumption request would have no effect on such species was reasonable. EPA-HQ-OW-2018-0640-617.

Nevertheless, recognizing that Plaintiffs raised issues about potential effects downstream of assumed waters, EPA has undertaken to address that issue. EPA-HQ-OW-2018-0640-664. In March 2021, Plaintiffs sent EPA (as well as several other agencies) a notice of intent to sue for alleged violations of the ESA, contending (among other things) that EPA's no effect determination was arbitrary and capricious. Out of an abundance of caution, EPA, in its response to this notice, stated that it had considered the issue further and would prepare a biological evaluation and effects determinations for NMFS-listed species and critical habitats within that evaluation. EPA-HQ-OW-2018-0640-664 (Dec. 20, 2021 Ltr. EPA to Plaintiffs). Once EPA has prepared the BE, it will initiate consultation with NMFS, as appropriate. *Id*. EPA further explained that it would consider issues raised in the notice of intent to sue, including potential impacts to listed marine species and their critical habitats downstream of assumed waters. *Id*. EPA's work on the biological evaluation is ongoing and includes coordination with NMFS. *See* Exhibit B (Declaration of D. Diaz at ¶ 6). EPA expects to complete its biological evaluation on or about July 14, 2023. *Id*. ¶ 7. Thus, while EPA's initial "no effect" determination was reasonable, should the Court determine otherwise, EPA's ongoing work should provide a more fulsome analysis and ultimately resolve the matter.

## CONCLUSION

For these reasons, the Court should enter summary judgment for Federal Defendants on Plaintiffs' Claims One through Seven and Ten through Thirteen.

Respectfully Submitted,

Dated: April 26, 2023

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/Andrew S. Coghlan
Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: andrew.coghlan@usdoj.gov

Alison Finnegan (PA Bar 88519)
United States Department of Justice
Environment & Natural Resources
Division Wildlife & Marine Resources
Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov

*Attorneys for Federal Defendants*

**Certificate of Service**

I certify that on April 26, 2023, I filed the foregoing with the Court's CMS/ECF system, which will notify each party.

/s/Andrew S. Coghlan
ANDREW S. COGHLAN

# EXHIBIT I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.

Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.

Defendants,

STATE OF FLORIDA, ET AL.

Intervenors.

**CASE NO.** 1:21-cv-00119 (RDM)

_____

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

_____

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................1

    I.     Legal & Factual Background ....................................................... 4

          A.    Florida's Comprehensive Approach to Environmental Protection and Conservation of Water Resources ........................................5

          B.    FDEP's Early Efforts to Prepare its Proposed Section 404 Program ..........7

          C.    Florida's 404 Handbook is a Binding Rule that Helpfully Summarizes the Key Aspects of the Program...........................................10

          D.    FDEP's Close Coordination with Federal & State Wildlife Agencies...............................................................................11

          E.    Public Access to Environmental Information in Florida ..........................15

          F.    Florida's Authority to Enforce Section 404................................................18

          G.    Plaintiffs' Ability to Impact FDEP Permit Actions and to Challenge FDEP 404 Permits under Florida Law....................................19

          H.    EPA Oversight of FDEP Permit Decisions................................................23

STANDARD OF REVIEW ...................................................................................26

ARGUMENT ........................................................................................................27

    I.     Plaintiffs' Claims Are Not Subject to Judicial Review Due to Lack of Standing, Lack of Final Agency Action, or Lack of Ripeness. .......................... 27

          A.    Plaintiffs Lack Standing For All Claims Based on Purported Informational Injuries. ...........................................................................27

          B.    Plaintiffs Cannot Challenge EPA's Completeness Determination (Claim 1). .........................................................................................32

          C.    Plaintiffs Suffer No Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority (Claim 2). ................................................................34

               1.    Plaintiffs Lack Standing to Challenge State 404 Assumption Generally. ...................................................................34

               2.    Plaintiffs Lack Standing to Challenge EPA's Approval Based on Concerns with Criminal Negligence & Statute of Limitations. ...................................................................39

D.    Many of Plaintiffs' Attacks Are Not Ripe For Review (Claims 3 to 5, 7, 11-12)....................................................................................41

    1.    Plaintiffs' Claim That FWS "Unlawfully Extended Take Liability Exemptions" Is Not Ripe For Review (Claims 3 and 4). ...........................................................................43

    2.    Plaintiffs' Challenge to the Corps' List Of "Retained Waters" Is Neither Ripe Nor Based on "Final Agency Action" (Claim 7). ..................................................45

    3.    Plaintiffs' Claims Based on NMFS Species Are Unripe and Likely Moot (Claims 5, 11, and 12)...............................................49

CONCLUSION.....................................................................................................50

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*,
 387 U.S. 136 (1967)........................................................................................41, 42

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
 406 So. 2d 478 (Fla. 2d DCA 1981) ...................................................................20

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
 No. 83-2708, 1984 WL 54261 (Fla. Div. of Admin. Hr'g, June 27, 1984) ............................36

*Am. Oversight v. U.S. Dep't of Veterans Affairs*,
 498 F. Supp. 3d 145 (D.D.C. 2020) (Moss, J.) ......................................................41

*Am. Petroleum Inst. v. EPA*,
 683 F.3d 382 (D.C. Cir. 2012)............................................................................42

*Am. Tunaboat Ass'n v. Ross*,
 391 F. Supp. 3d 98 (D.D.C. 2019) ......................................................................44

*Ass'n of Am. Physicians & Surgeons v. Sebelius*,
 901 F. Supp. 2d 19 (D.D.C. 2012) ......................................................................29

*Bennett v. Spear*,
 520 U.S. 154 (1997)..........................................................................................33

*Capeletti Bros. v. Dep't of Gen. Servs.*,
 432 So.2d 1359 (Fla. 1st DCA 1983) ..................................................................21

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)..........................................................................................35

*Coal. to Save Menominee River Inc. v. U.S. Env't. Prot. Agency*,
 423 F. Supp. 3d 560 (E.D. Wis. 2019)................................................................47

*Cooling Water Intake Structure Coal. v. EPA*,
 905 F.3d 49 (2d Cir. 2018)................................................................15, 31, 43

*Crow Creek Sioux Tribe v. Brownlee*,
 331 F.3d 912 (D.C. Cir. 2003) ..........................................................................2, 38

*Ctr. for Biological Diversity v. Regan*,
 597 F. Supp. 3d 173 (D.D.C. 2022)..............................................1, 27, 34, 40, 48

*Ctr. for Biological Diversity v. Zinke*,
 369 F. Supp. 3d 164 (D.D.C. 2019) ..............................................................29, 34

*Defs. of Wildlife v. Dep't of Navy*,
    733 F.3d 1106 (11th Cir. 2013) ................................................................15

*Devia v. NRC*,
    492 F.3d 421 (D.C. Cir. 2007) .................................................................41

*Ecological Rights Found. v. EPA*,
    No. CV 19-2181, 2022 WL 4130818 (D.D.C. Sept.12, 2022) .................29

*Elec. Priv. Info. Ctr. v. FAA*,
    892 F.3d 1249 (D.C. Cir. 2018) ...............................................................34

*Env't Integrity Project v. McCarthy*,
    139 F. Supp. 3d 25 (D.D.C. 2015) ...........................................................34

*Fed. Trade Comm'n v. Standard Oil Co.*,
    449 U.S. 232 (1980) .................................................................................33

*Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*,
    412 So. 2d 351 (Fla. 1982) .......................................................................20

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016) .................................................................29

*Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Env't Regul.*,
    587 So.2d 1378 (Fla. 1st DCA 1991) .......................................................21

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................................40

*Hous. Study Grp. v. Kemp*,
    736 F. Supp. 321 (D.D.C. 1990) ..............................................................33

*Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*,
    No. 91-8088, 1992 WL 322912 (Fla. Div. of Admin. Hr'g, July 23, 1984) ...........................36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................26, 27, 40, 46

*McCray v. Biden*,
    574 F. Supp. 3d 1 (D.D.C. 2021) (Moss, J.) ......................................41, 46

*Menominee Indian Tribe of Wis. v. Env't. Prot. Agency*,
    947 F.3d 1065 (7th Cir. 2020) .............................................24, 36, 48

*NAACP, Inc. v. Fla. Bd. of Regents*,
    863 So. 2d 294 (Fla. 2003) .......................................................................22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)................................................................31

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)................................................................42

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C. 2005) ................................42, 46

*Palm Beach Cnty. Env't Coal. v. Fla. Dep't of Env't Prot.*,
    14 So.3d 1076 (Fla. 4th DCA 2009) ..................................22

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    740 F.2d 21 (D.C. Cir. 1984) .............................................42

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002)......................................26, 27

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ...........................................34

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2015)............................................................26

*Suburban Trails, Inc. v. New Jersey Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986)................................................44

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015)............................................27

*Texas v. United States*,
    523 U.S. 295 (1998)............................................................41

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)..................................................26, 28

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)......................................................33, 47

*Waterkeeper All., Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022)..............................................2

*Wyo. Outdoor Council v. Dombeck*,
    148 F. Supp. 2d 1 (D.D.C. 2001) .......................................43

**Federal Statutes**

5 U.S.C. § 551(6) ...................................................................11

5 U.S.C. § 551(8) ...................................................................................................11

5 U.S.C. § 704...........................................................................................................47

16 U.S.C. § 1531(a)(5)............................................................................................12

16 U.S.C. § 1536(a)(2)............................................................................................28

16 U.S.C. § 1540(g)................................................................................................43

33 U.S.C. § 1251(b).................................................................................................4

33 U.S.C. § 1319...............................................................................................38, 41

33 U.S.C. § 1341....................................................................................................26

33 U.S.C. § 1342.....................................................................................................4

33 U.S.C. § 1344....................................................................................................35

33 U.S.C. § 1344(a)...............................................................................................26

33 U.S.C. § 1344(g)........................................................................................3, 4, 38

33 U.S.C. § 1344(g)(1)...........................................................................................49

33 U.S.C. § 1344(h)..........................................................................................23, 39

33 U.S.C. § 1344(h)(1)(F)......................................................................................24

33 U.S.C. § 1344(h)(1)(G)......................................................................................39

33 U.S.C. § 1344(i)...........................................................................................23, 25

33 U.S.C. § 1344(j)...........................................................................................13, 23

33 U.S.C. § 1344(k)...............................................................................................13

33 U.S.C. § 1344(l)................................................................................................13

33 U.S.C. § 1344(m)..............................................................................................24

33 U.S.C. § 1344(n)..........................................................................................38, 40

**Florida Statues**

Fla. Stat. § 119.07(1)(a).........................................................................................16

Fla. Stat. § 119.011(12)..........................................................................................16

Fla. Stat. § 120.56(1)(a) ..................................................................22

Fla. Stat. § 120.56(3) ......................................................................22

Fla. Stat. § 120.57 .......................................................................21, 22

Fla. Stat. § 120.57(1)(b) ..........................................................20, 21, 36

Fla. Stat. § 120.68 .......................................................................22, 23

Fla. Stat. § 120.68(6)(a) ...............................................................22, 23

Fla. Stat. § 120.569 .....................................................................21, 22

Fla. Stat. § 373.129(7) .....................................................................18

Fla. Stat. § 373.430 .........................................................................18

Fla. Stat. § 373.430(1)(b) .................................................................19

Fla. Stat. § 373.430(1)(c) .................................................................19

Fla. Stat. § 373.430(4) .....................................................................19

Fla. Stat. § 373.430(5) .....................................................................19

Fla. Stat. § 373.4146(2) ..................................................................7, 8

Fla. Stat. § 403.021(2) .......................................................................5

Fla. Stat. § 403.121(1) .....................................................................18

Fla. Stat. § 403.161 .........................................................................18

Fla. Stat. § 403.412(6) .....................................................................20

Fla. Stat. § 403.412(7) .................................................................20, 37

**Cod of Federal Regulations**

40 C.F.R. § 147.500 ..........................................................................6

40 C.F.R. § 233 ...............................................................................13

40 C.F.R. § 233.10 .............................................................................8

40 C.F.R. § 233.11 .............................................................................8

40 C.F.R. § 233.12 .............................................................................8

40 C.F.R. § 233.13 .................................................................................8, 24

40 C.F.R. § 233.14 ......................................................................................8

40 C.F.R. § 233.15(d) ...............................................................................24

40 C.F.R. § 233.15(g) ...............................................................................24

40 C.F.R. § 233.15(h) ...............................................................................11

40 C.F.R. § 233.16(d) ...............................................................................47

40 C.F.R. § 233.41 ....................................................................................18

40 C.F.R. § 233.41(a)(3) ...........................................................................19

40 C.F.R. § 233.41(b)(2) ...........................................................................19

40 C.F.R. § 233.50(j) .................................................................................13

40 C.F.R. § 233.53(b) ...............................................................................25

40 C.F.R. § 233.53(c) ...............................................................................25

50 C.F.R. § 402.02 ....................................................................................15

50 C.F.R. § 402.12 ....................................................................................31

**Federal Register**

85 Fed. Reg. 57,853 (Sept. 16, 2020) ........................................................9

85 Fed. Reg. 83,553 (Dec. 22, 2020) .......................................................11

**State Executive Order**

Executive Order No. 23-06 (Fla. Jan. 10, 2023)..........................................5

**State Constitutional Provisions**

Fla. Const. Art. I, § 24 ..............................................................................16

Fla. Const. Art. II, § 7(a)............................................................................5

Fla. Const. Art. V, § 21 .............................................................................23

**Other Authorities**

Congressional Research Service, *Federal Land Ownership: Overview and Data*
     (Feb. 21, 2020)....................................................................................30

NOAA, *Coastal Zone Management Programs,*
https://coast.noaa.gov/czm/mystate/ ........................................................6

Fla. Dep't Env't Prot, *Source & Drinking Water Program,*
https://floridadep.gov/water/source-drinking-water ................................6

U.S. Army Corps of Eng'rs, Jurisdictional Determinations & Permit Decisions
https://permits.ops.usace.army.mil/orm-public# ..................................17

ECOS, *Resolution 08-3: State Assumption of Clean Water Act Section 404 Permit
Program,* https://www.ecos.org/documents/resolution-08-3-state-delegation-
of-clean-water-act-section-404-permit-program/ ...................................4

Fla. Dep't of State, *404 Handbook*
https://www.flrules.org/gateway/reference.asp?No=Ref-12064 ............9

*EPA, NPDES State Program Authorization Information*,
https://www.epa.gov/npdes/npdes-state-program-authorization-information ........................6

EPA, *Clean Air Act Permitting in Florida,*  https://www.epa.gov/caa-
permitting/clean-air-act-permitting-florida ............................................6

NOAA, *Species Directory*, https://www.fisheries.noaa.gov/species-
directory/threatened-endangered ............................................................49

EPA, *State Authorization under the Resource Conservation and Recovery Act*,
https://www.epa.gov/rcra/state-authorization-under-resource-conservation-
and-recovery-act-rcra ...............................................................................6

## INTRODUCTION

For many years, the State of Florida has administered most federal environmental programs that are subject to state delegation or assumption. In 2020, after enacting new state legislation, adopting state regulations, and expending substantial resources over the course of several years to develop a new comprehensive permit program, Florida sought and obtained federal approval – the first such state to do so in almost thirty years – to administer the Clean Water Act (CWA) Section 404 dredge-and-fill permit program. This effort was part and parcel of Florida's longstanding commitment – based in the Florida Constitution – to environmental conservation. Here, Plaintiffs challenge Florida's right to administer this permit program.

Florida fully agrees with Federal Defendants on the merits. Plaintiffs ignore Congress' clear objective that CWA Section 404 programs should be administered through a system of cooperative federalism, with states holding the primary role in processing permits subject to ongoing federal oversight. Likewise, Plaintiffs' 13-count complaint contravenes this clear intent by mounting a broad attack on virtually all aspects of the Federal Defendants' review and approval of Florida's program. Two procedural claims (Claims 8 and 9) were taken up separately by this Court. The remaining eleven claims are all entirely without merit for the reasons Federal Defendants provide.

Yet this Court need not reach the merits of these eleven claims because Plaintiffs do not meet their burden to prove that each claim is justiciable.[1] Plaintiffs are uninjured in any legally cognizable manner by Florida administering a program under federal standards where EPA has

---

[1] At the motion to dismiss stage, this Court decided to "defer ruling on this particular flavor of Florida's standing-related arguments [i.e., that Plaintiffs lack standing to challenge the mere transfer of permit authority where EPA oversight ensures a compliant program] until Plaintiffs press the merits of their claims as to the substance of the EPA's decision." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 190 (D.D.C. 2022) (Dkt. 73 at 21).

continuous oversight and enforcement responsibility on a program level and permit-by-permit. The D.C. Circuit has been skeptical of standing in contexts involving transfers of federal roles or responsibilities to states where federal standards remained applicable and/or the federal agency had oversight and enforcement authority. *See Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 661 (D.C. Cir. 2022) (dismissing *sua sponte* an environmental group's challenge to EPA's approval of Oklahoma's state coal ash program for lack of standing); *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 917 (D.C. Cir. 2003) (holding that Indian tribe lacked standing to challenge transfer of federal lands to state government where the federal land transfer statute ensured continued enforcement of cultural protection requirements).

Many of Plaintiffs' other individual claims also should not be entertained by this Court. Plaintiffs clearly lack standing to challenge the adequacy of criminal enforcement – a function solely within the unreviewable discretion of the Executive Branch at both the federal and state levels. They are also uninjured by a loss of environmental information, as coextensive information is either readily available via Florida's program or is information that Congress, by statute, has decided is not required for a state program. Florida previously filed a supplemental brief addressing environmental informational standing (Dkt. 72)[2], and as part of this motion, Florida provides an additional declaration showing that, among other things, Plaintiffs' assertions of "losses" of environmental information do not hold water. *See* Declaration of Justin Wolfe, Florida Department of Environmental Protection (FDEP) General Counsel (Wolfe Dec.) attached as Exhibit A.

And certain other claims – such as Plaintiffs' challenge to the incidental take statement – are based on speculations of harm that may never arise (e.g., that Florida will issue a 404 permit for a project that causes an unlawful take of species without interdiction by the federal oversight

---

[2] For citations to filings in this case, Florida cites to the docket number and the relevant PDF page number.

agencies). Such claims are not ripe for review at this early point in the implementation of Florida's program, though Plaintiffs are certainly free to bring a legal challenge to a specific permit action down the road that actually involves claims of unlawful take of species.

Likewise, whether particular waterbodies should be added or removed from the list of "retained waters" is not an issue that this Court can or should take up here. Florida is home to thousands of waterbodies. As part of the assumption process, the Corps of Engineers (Corps) provided an initial list of over 500 rivers, lakes, streams, and creeks in Florida that, based on available information, reasonably constituted waters that could not be assumed by the State under CWA Section 404(g). But this list was not meant to be the final word. Some waters, like the St. John's River and Lake Okeechobee, are easy to classify as "retained waters," but many others require an intensive analysis as to, for example, whether the waterbodies are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce..." 33 U.S.C. § 1344(g). In fact, the list (and its related Memorandum of Agreement (MOA)) expressly include all other waters found to be non-assumable waters (even if not listed), and the Corps and Florida agreed to a process for regularly updating the list to ensure that waters are properly classified. Thus, the retained waters list is not "final agency action," but even if it were, Plaintiffs' concerns that certain waters are classified incorrectly can and should wait for an as-applied challenge to a particular permit involving a particular waterbody.

Similar ripeness concerns (and ongoing activity that is likely to trigger mootness) support dismissal of the claims based on protection of marine and coastal species under the jurisdiction of the National Marine Fisheries Service (NMFS).

For these reasons, and for the reasons set forth in the Federal Defendants' summary judgment brief, Florida respectfully requests that the Court deny Plaintiffs' motion for summary

judgment and enter judgment for the Federal Defendants and Florida Intervenors on all claims. [3]

## I.      Legal & Factual Background

Built on cooperative federalism, the CWA shares stewardship responsibilities for water resources among the States and Federal government. 33 U.S.C. § 1251(b). Congress created two CWA permit programs: one program under Section 402 to control point-source pollution to surface waters (known as the National Pollutant Discharge Elimination System, or NPDES, program) and another under Section 404 to regulate the dredge or fill of surface waters (including wetlands) constituting "waters of the United States." *Id.* §§ 1342, 1344.

**"It is the policy of Congress that the States . . . implement the permit programs under sections [402] and [404]." *Id*. § 1251(b).** To that end, Sections 402 and 404 invite States to seek EPA's approval to administer State-level permit programs in place of the federal permit programs. *Id*. §§ 1342(b), 1344(g). Over 40 States have obtained approval to administer State NPDES programs under Section 402, while just three States—Michigan, New Jersey, and Florida—have assumed responsibility for administering their own Section 404 programs. [4] The Federal Defendants' brief provides a thorough explanation of Section 404 and the regulations governing 404 assumption (40 C.F.R. Part 233). In this brief, Florida provides further details about Florida's statutes, regulations, policies, and other relevant background legal principles, while also sharing additional factual details about Florida's Section 404 program.

---

[3] Florida Intervenors are filing a *consolidated* opposition brief and cross-motion for summary judgment, total combined length not to exceed 50 pages consistent with this Court's order of January 31, 2023. *See* Dkt. 33.

[4] The Environmental Council of the States (ECOS), which is the nonpartisan association comprised of environmental agency leaders from *all 50 states*, recently adopted a resolution supporting state assumption of CWA 404 programs. The resolution is available at https://www.ecos.org/documents/resolution-08-3-state-delegation-of-clean-water-act-section-404-permit-program/ (last visited May 10, 2023).

### A. Florida's Comprehensive Approach to Environmental Protection and Conservation of Water Resources[5]

The Florida Constitution establishes the "policy of the state to conserve and protect its natural resources and scenic beauty," with "[a]dequate provision" for the "conservation and protection of natural resources." Fla. Const. Art. II, Sec. 7(a). The "public policy of [Florida] [is] to conserve the waters of the state," Fla. Stat. § 403.021(2), and "to provide for the management of water and related land resources," *id.* § 373.016(3)(a). On this basis, Florida takes a comprehensive approach to protecting wetlands and other water resources. Those efforts have accelerated in recent years, with Florida dedicating an unprecedented amount of state funding to the restoration and protection of the Florida Everglades (over $3.3 billion since 2019), increasing investment in state environmental permitting programs, and completing efforts to obtain federal approval to administer the Section 404 permit program.[6] Uniquely, for water resource management purposes, Florida has divided the State into five "Water Management Districts," or "WMDs," each with technical staff trained to supplement the work of the Florida Department of Environmental Protection (FDEP) in conserving water resources in Florida.

Even before obtaining authority to administer the CWA Section 404 program, Florida had already spent many years (in some cases, decades) administering most other major federal environmental programs capable of state delegation/assumption, including:

- CWA Section 402 National Pollutant Discharge Elimination System (NPDES) Program;
- Clean Air Act (CAA) permit program including construction permits for minor sources,

---

[5] While Florida provides additional context in its background section, Federal Defendants' brief helpfully summarizes key aspects of Florida's Section 404 program. *See, e.g.,* Dkt. 99 at 45-46 (describing provisions of Florida's program that satisfy the 404(b)(1) requirements); Dkt. 99 at 46-48 (describing provisions of Florida law requiring FDEP to give written determinations that are subject to judicial review); Dkt. 99 at 48-50 (describing provisions of Florida's program addressing impacts to water quality from proposed 404 projects).

[6] *See* Executive Order No. 23-06 Signed by Governor Ron DeSantis (Jan. 10, 2023), available at https://www.flgov.com/wp-content/uploads/2023/01/EO-23-06.pdf (last visited May 10, 2023).

major source PSD and nonattainment permitting and Title V operating permits;

- Resource Conservation Recovery Act (RCRA) Subtitle C Program (Hazardous Waste);
- Coastal Zone Management Act (CZMA) Program (approved by the National Oceanic and Atmospheric Administration);
- Safe Drinking Water Act (SDWA) Program for regulating public water systems in Florida; and
- Underground Injection Control (UIC) Program.[7]

On top of these federally-approved programs, FDEP has administered various other state-specific environmental programs. For decades, FDEP has administered the State Environmental Resource Permit (ERP) Program, which is broader in scope than the federal Section 404 program because, among other things, ERP regulates dredging or filling of *all waters* in the State, not merely the narrower category of "waters of the United States" regulated under Section 404. EPA-HQ-OW-2018-0640-0007-A1 at 5-6; EPA-HQ-OW-2018-0640-0016-A-3 at App. J-3, ERP Comparison with Federal Requirements"; EPA-HQ-OW-2018-0017 at 3.

At the same time, Florida and its citizens experienced significant permit delays and other challenges with the Corps of Engineers' administration of the CWA Section 404 program within the State.[8] Florida believed that, consistent with the cooperative federalism framework of the CWA, FDEP and its staff would be better suited to administer the Section 404 program,

---

[7] *See* EPA, *NPDES State Program Authorization Information*, available at https://www.epa.gov/npdes/npdes-state-program-authorization-information (last visited May 10, 2023); EPA, *Clean Air Act Permitting in Florida*, available at https://www.epa.gov/caa-permitting/clean-air-act-permitting-florida (last visited May 10, 2023); *see* EPA, *State Authorization under the Resource Conservation and Recovery Act (RCRA)*, available at https://www.epa.gov/rcra/state-authorization-under-resource-conservation-and-recovery-act-rcra (last visited May 10, 2023); *see* NOAA, *Coastal Zone Management Programs*, available https://coast.noaa.gov/czm/mystate/ (last visited May 10, 2023); FDEP SDWA approval available at https://floridadep.gov/water/source-drinking-water (last visited May 10, 2023); EPA UIC program approval issued via regulation at 40 C.F.R. § 147.500.

[8] *See, e.g.,* Letter from Rep. Diaz-Balart (R-FL) and Rep. Alcee Hastings (D-FL) (Nov. 2, 2020). EPA-HQ-OW-2018-0640-0416-A2 (explaining that Everglades restoration projects have been "plagued by design, permitting, and construction delays under the U.S. Army Corps of Engineers").

particularly in light of FDEP's longstanding implementation of the ERP program, localized knowledge and experience, a larger number of FDEP offices and staff spread throughout the State, and the availability of Florida's five Water Management Districts. Florida also hoped to benefit from the improved economic climate that comes from more efficient government permit programs of any kind. In 2017, FDEP started efforts to obtain approval for its own Section 404 program. EPA-HQ-OW-2018-0640-0006 at 2; EPA-HQ-OW-2018-0640-0007-A1 at 5-6.

### B.      FDEP's Early Efforts to Prepare its Proposed Section 404 Program

For many years, the State of Florida considered the possibility of assuming the federal 404 program. *See, e.g.*, Chapter 2016-195, Law of Florida (legislation in 2016 authorizing FDEP to pursue assumption). In March 2018, the Governor of Florida signed into law a new statute again authorizing FDEP to establish a Section 404 Program. *See* Chapter 2018-88, Laws of Florida (codified at Fla. Stat. § 373.4146). This new state law, which expanded upon previous state laws allowing for the pursuit of assumption, sought to "enable the [FDEP] to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program.…" Fla. Stat. § 373.4146(2).

In early 2018, FDEP began to discuss 404 assumption with the Jacksonville District of the Corps of Engineers as well as EPA (CORPS003213, at 1-2; EPA-HQ-OW-2018-0640-0649 at 20-21, providing a timeline of key events). In February 2020, after almost two full years of work by FDEP staff, FDEP initially proposed Section 404 regulations at the state level. EPA-HQ-OW-2018-0640-0006 at 2-3. An extensive state-level public notice and comment process ensued. *Id.* at 3. This included multiple public workshops and public meetings in April 2020. *Id.*  In response to the public notice process, FDEP modified the proposed regulations in various respects and ultimately finalized the State 404 regulations in June 2020. *Id.* at 3-4. The state regulations were adopted into the Florida Administrative Code (F.A.C.) but, by express statutory provision, were

not effective unless and until EPA approved Florida's program. *See* Fla. Stat. § 373.4146(2) ("…Any rule, standard, or other requirement adopted pursuant to the authority granted in this subsection for purposes of obtaining assumption may not become effective or otherwise enforceable until [EPA] has approved the state's assumption application."). FDEP's regulations creating the State 404 Program are now codified primarily at Chapter 62-331 of the Florida Administrative Code. EPA-HQ-OW-2018-0640-0006 at 3; EPA-HQ-OW-2018-0640-0002-A48.[9]

On August 20, 2020, Florida filed a complete application with EPA to administer a Section 404 Program. *See* EPA-HQ-OW-2018-0640-0002 through EPA-HQ-OW-2018-0640-0020 (including attachments). Florida's application contained all of the required elements of a State 404 program as set forth in 40 C.F.R. § 233.10. This included (among other things): (a) a letter from Florida's Governor requesting program approval; (b) a complete program description as set forth in 40 C.F.R. § 233.11; (c) a State legal opinion as set forth in 40 C.F.R. § 233.12; (d) a MOA with the EPA Regional Administrator as set forth in 40 C.F.R. § 233.13; (e) a MOA with the Corps of Engineers as set forth in 40 C.F.R. § 233.14; and (f) copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures. Florida's application was available for public review via FDEP's website, EPA's website, and the Federal government's regulatory docket website.

The application documents comprehensively described and delineated Florida's 404 program. To help the public "understand the rules, procedures, standards, and criteria that apply to the State 404 Program," FDEP developed the "State 404 Program Applicant's Handbook." EPA-

---

[9] Plaintiffs in this action filed comments in the state rulemaking process opposing FDEP's assumption rules, but they did not seek further administrative or judicial review of the final State regulations. *See, e.g.,* EPA-HQ-OW-2018-0640-0391-A6.

HQ-OW-2018-0640-0002-A20 at 4. [10] More than mere guidance, the 404 Handbook is

"incorporated by reference" into FDEP's regulations (*see* F.A.C. 62-331.010(5)), and "therefore

operates as a rule of the Agencies." *Id.* As such, the Handbook was itself subject to public review

and comment before adoption and serves as an authoritative compendium for reference by this

Court (and for others seeking to understand how the State 404 Program is administered in Florida).

This Handbook was included in the State's 404 application and was at all times available to the

public, along with the other application materials.

On August 28, 2020, EPA acknowledged receipt of Florida's complete application (EPA-

HQ-OW-2018-0640-0641), and promptly opened a public comment period and scheduled public

hearings. 85 Fed. Reg. 57,853 (Sept. 16, 2020). Over 3,000 comments were submitted. EPA-HQ-

OW-2018-0640-0568 at 1, 10-13. EPA held public hearings on Florida's Section 404 Program

application on October 21 and October 27, 2020, via virtual platforms that allowed remote

participation by any member of the public. EPA-HQ-OW-2018-0640-0429, 0430, 0574, 0575,

0589 and 0604. The State of Florida and FDEP consulted with the Seminole Tribe of Florida,

Miccosukee Tribe of Indians of Florida, and other Indian tribes concerning Florida's assumption

of the Section 404 Program. *See*, *e.g.*, EPA-HQ-OW-2018-0640-0223 at 6 (discussing Florida's

cooperative engagement with tribes). FDEP entered into an Operating Agreement whereby FDEP

committed to direct engagement with the Florida State Historic Preservation Officer (Florida

SHPO) and interested Indian tribes early in the permit application review process. EPA-HQ-OW-

2018-0640-0016-A1. FDEP also entered a Programmatic Agreement with EPA, the Advisory

Council on Historic Preservation, and the Florida SHPO for purposes of Section 106 of the

---

[10] The currently applicable "404 Handbook" is available on the State of Florida administrative
regulation website found at https://www.flrules.org/gateway/reference.asp?No=Ref-12064 (last
visited May 10, 2023).

National Historic Preservation Act. EPA-HQ-OW-2018-0640-0595, 0630, and 0639.

Furthermore, Florida invested significant time and resources in preparing to assume authority to establish and implement the CWA Section 404 program. For example, in addition to obtaining statutory authority from the State legislature, adopting State regulations via the State of Florida's administrative rulemaking process, preparing all requisite application materials, and complying with extensive federal regulatory requirements, FDEP held more than a dozen staff training sessions beginning in August 2020 covering all aspects of the Section 404 program, as well as many meetings and interactions with outside stakeholders concerning the establishment and implementation of a Section 404 Program in Florida. EPA-HQ-OW-2018-0640-0006 at 3; *see also* Dkt. 4-2 at 6. The State of Florida and FDEP also ensured that the program would have the necessary resources. EPA-HQ-OW-2018-0640-0223 at 6-7.

Since assumption of the Section 404 program in December 2020, FDEP has received over 7,700 applications. *See* Wolfe Decl. ¶ 10. Currently, over 1,780 applications are pending review and determination by FDEP. *Id.* ¶ 11. To date, FDEP has issued 460 individual permits (including permit modifications) under the Section 404 program. FDEP has denied 168 applications (including individual permits, regional and general permit requests, and NPR requests). *Id.* ¶ 12. Approximately 2,900 applications have been withdrawn by permit applicants (in many instances, applications are withdrawn after FDEP staff submit requests for additional information or flag concerns with project proposals). *Id.* ¶ 13.

## C.     Florida's 404 Handbook is a Binding Rule that Helpfully Summarizes the Key Aspects of the Program.

As explained in the 404 Handbook, ERP permits are required for projects impacting any surface water in the State of Florida, while 404 permits are required for projects discharging dredged or fill material into "waters of the United States." EPA-HQ-OW-2018-0640-0002-A20 at

4-5. Any surface water in the State is, for 404 permitting purposes, "considered Waters of the United States" and FDEP "will treat them as if they are, *unless the applicant clearly demonstrates otherwise.*" *Id.* at 5 (emphasis added). In other words, the presumption is that any project requiring an ERP will also require a Section 404 permit. And "[a]ctivities that require both an ERP and a State 404 permit shall not commence before both permits are issued." *Id.* As explained in further detail below, the Handbook and other Florida 404 Program-related materials specifically address how impacts to species and habitat are considered and addressed.

On December 17, 2020, EPA issued a notice determining that the State of Florida "has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g-l) and EPA's implementing regulations," and therefore approved Florida's assumption of the program. *See* EPA-HQ-OW-2018-0640-0566; *see also* 85 Fed. Reg. 83,553-54 (Dec. 22, 2020) at EPA-HQ-OW-2018-0640-0564.[11] The approval notice was sent from the EPA Regional Administrator to the Governor of Florida on December 17, 2020. EPA-HQ-OW-2018-0640-0566. Approval of the program became effective upon publication in the Federal Register on December 22, 2020, *see* 85 Fed. Reg. at 83,553, as provided under 40 C.F.R. § 233.15(h).

FDEP now administers two separate (yet overlapping) wetlands protection programs: the State's 404 Program and the State's ERP program. Projects within State-assumed waters require both an ERP and a State 404 Program authorization.

### D.     FDEP's Close Coordination with Federal & State Wildlife Agencies

Section 2(a)(5) of the Endangered Species Act (ESA) provides: "Federal agencies shall cooperate with [s]tate and local agencies to resolve water resource issues in concert with

---

[11] The parties dispute whether this "notice" constitutes an "order" under the APA. *See* 5 U.S.C. § 551(6), (8) (defining "order" and "license," respectively).

conservation of endangered species." 16 U.S.C. § 1531(a)(5). At Florida's request, EPA engaged

in Section 7 consultation because EPA's review of Florida's Section 404 program application

requires considering impacts to listed species and habitat.  Dkt. 99 at 29-30. EPA designated FDEP

as the non-Federal representative for purposes of engaging in consultation with the U.S. Fish &

Wildlife Service (FWS). EPA-HQ-OW-2018-0640-0635, -0636. FDEP submitted a Biological

Assessment (BA) to EPA concerning the impact of Florida's Section 404 Program on federally

listed species and critical habitat. FWS-006040. In turn, EPA prepared a Biological Evaluation

(BE) and submitted it to EPA. EPA-HQ-OW-2018-0640-0649; FWS-005610.[12]

On November 17, 2020, FWS issued a Biological Opinion (BiOp) to accompany EPA's

determination concerning Florida's 404 assumption request. EPA-HQ-OW-2018-0640-0642 at

12-14; FWS-006028. As is appropriate for programmatic consultations, the FWS BiOp with

Incidental Take Statement (ITS) established procedures, terms, and conditions governing the

review of state 404 permit applications with regard to impacts to federally-listed species and

habitat. EPA-HQ-OW-2018-0640-0642. This included adoption of a "technical assistance

process" - modeled after other programmatic consultation processes used by EPA - that brings

together all relevant federal and state agencies to review projects for potential impacts to species

and habitat. *Id.* at 31-35, 66-67, 80-83.

The "BiOp/ITS" explains that the Biological Evaluation "provided a detailed analysis of

---

[12] Based on information from the National Marine Fisheries Service (NMFS), which has
jurisdiction over coastal and marine species, EPA reached the reasonable conclusion that federal
approval of Florida's 404 permit program for assumable waters (i.e., not coastal or marine waters)
would not be expected to have adverse impacts to species under NMFS jurisdiction. EPA-HQ-
OW-2018-0640-0638;  EPA-HQ-OW-2018-0640-0663;  EPA-HQ-OW-2018-0640-0617;  EPA-
HQ-OW-2018-0640-0572. Section 3.2 of the Biological Evaluation discusses NMFS species,
noting: "While ESA-listed species under NMFS jurisdiction are anticipated to occur only in
retained waters, they are included in the BE as part of the comprehensive review of all Florida's
imperiled species." EPA-HQ-OW-2018-0640-0649 at 52.

typical impacts related to stressors to ESA-listed species," while also explaining that the programmatic nature of the consultation does not allow for an actual estimate of the number of species individuals that might be affected by permitted activities. EPA-HQ-OW-2018-0640-0642 at 80. Instead, the BiOp/ITS explains: "through implementation of the State 404 program (62-331, F.A.C.) and EPA's oversight of the State 404 program and coordination of Federal review of state permit actions (40 C.F.R. § 233), this project-specific information will be provided to the USFWS because USFWS will receive all State 404 permit applications." *Id.* at 80-81.

The BiOp/ITS (and the technical assistance process that it utilizes) is well explained in the Federal Defendants' brief, with which Florida fully concurs. Dkt. 99 at 22-24. The main upshot, of course, is that, in all respects related to impacts to federally-protected species or habitat, the position of the federal agencies always controls: "With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, the final USFWS position is determinative." EPA-HQ-OW-2018-0640-0642, at 41.  The BiOp/ITS repeats this point to make it abundantly clear. EPA-HQ-OW-2018-0640-0642, at 31 ("…final FWS conclusions regarding effects to species are determinative"); *id.* at 40 ("USFWS conclusions regarding potential impacts and necessary measures to address impacts are determinative"). The Memorandum of Understanding between FDEP, Florida Fish & Wildlife Conservation Commission (FWC), and FWS also expressly states that "the final FWS position" is "determinative" for purposes of "potential effects on ESA-listed species or the effectiveness of proposed mitigation measures." EPA-HQ-OW-2018-0640-0016-A2, at 10. As such, FDEP administers the 404 program fully committed to the requirement that any such determinations by FWS are binding. In the event FDEP did not accept or adopt any such requirement, EPA would be authorized to transfer the permit to the Corps.  33 U.S.C. § 1344(j)-(*l*); 40 C.F.R. § 233.50(j).

This reality is also made abundantly plain in the Florida 404 Handbook, which addresses reviews associated with protected species and habitat. Specifically, the Handbook explains that "[c]ompliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Service (NMFS) for permits reviewed under the State 404 Program." EPA-HQ-OW-2018-0640-0002-A20 at 6. FDEP provides FWS, NMFS, and FWC with the opportunity to review all applications for projects "with reasonable potential for affecting endangered or threatened species." *Id.* at 23. FDEP is required to consult with or obtain technical assistance from these three agencies whenever FDEP "determines that the project may have the potential to affect listed species." *Id.* FDEP "shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat." *Id.* Importantly, "[i]f the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, [FDEP] shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C." *Id.*

Programmatic consultation, as used here, is firmly engrained in the existing regulatory landscape as a means to streamline ESA consultation and improve conservation outcomes. As defined in the ESA regulations, "programmatic consultation" means "a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as: (1) Multiple similar,

14

frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. § 402.02.

The programmatic approach used here was built upon and supported by the approach discussed in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49, 76-77 (2d Cir. 2018), where the Second Circuit upheld the use of programmatic consultation for an EPA water quality permit program that applied to state and EPA permitting actions, covered the entire country, and provided an incidental take statement that, using a technical assistance process, did not set a numerical cap on take but used a process for evaluating and limiting take on a permit-by-permit basis as the program was being implemented. Federal Defendants have fully explained why *Cooling Water* gives a solid basis for the kind of approach used here. Dkt. 99 at 75-76, 78-82.[13]

### E.    Public Access to Environmental Information in Florida

Florida's 404 program provides extensive, readily available, real-time information to interested members of the public, as well as a robust opportunity for involvement in the permit process. *See* Wolfe Dec. at ¶¶ 16-33. The 404 Handbook fully describes the public notice and comment process for FDEP 404 permits. EPA-HQ-OW-2018-0640-0002-A20 at 26-27. The

---

[13] The programmatic approach here is also supported by the Eleventh Circuit's decision in *Defs. of Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1112-13 (11th Cir. 2013), which the Second Circuit relied upon. There, the Eleventh Circuit considered an ESA challenge to the Navy's undersea warfare training range off the coast of Florida. Environmental plaintiffs contended that a BiOp issued by NMFS failed to "meaningfully analyze" the "entire action" that was "proposed by the Navy," including the "the installation and the operation phases" of the training range. 733 F.3d at 1118. The Eleventh Circuit denied this challenge, rejecting the notion that BiOps "must be coextensive in scope with the 'entire action'." *Id.* at 1121. "It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Id.* (explaining that NMFS' decision was "due deference" as "there is no statutory basis for ordering that the consultation be carried out in some other manner"). The Eleventh Circuit was persuaded that, by leaving room for subsequent consultation activities to address future undersea training range operations, NMFS would "ensure that any adverse impacts to listed species will be considered closer in time to when operations will actually commence." *Id.* at 1122.

Handbook also describes the information that is developed as part of the permit review process, which includes, among other things, an analysis of project alternatives that would avoid impacts to wetlands; an analysis of environmental impacts (including cumulative and secondary effects, where appropriate); a review of impacts on state water quality; and written documentation on each application outlining the permitting decision and the rationale for the decision. All of this, and more, is made publicly available. Wolfe Dec. ¶¶ 18-23. In addition, Florida's Sunshine Laws (found at Chapter 119, Florida Statutes) provide very broad access to governmental records and information. Access to state records is a state constitutional right and Florida's Sunshine laws are broader than the federal corollary statute, the Freedom of Information Act, 5 U.S.C. § 552.[14]

Likewise, Florida provides *real-time access* to state permit records related to Section 404 permit applications via publicly accessible DEP websites. Written communications to or from state officials (including permitting staff) regarding state business are available to the public. Wolfe Dec. ¶ 20. Records and information are readily available at no cost via any one of four FDEP's online resources that contain detailed information about (1) areas classified as "assumable waters" (FDEP 404 permitting) versus "retained waters" (Corps 404 permitting); and (2) provides site-specific information about permit applications (including those that have been withdrawn, remain pending, etc.) and links to download the permit file. *Id.* These online resources are Florida's "Oculus" System, DEP Information Portal, FDEP Permitting Information

---

[14] See Fla. Const. Art. I, § 24 (establishing constitutional right of access to public records in Florida); Fla. Stat. § 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied by any person desiring to do so, at any reasonable time, under reasonable conditions, and under supervision by the custodian of the public records."); Fla. Stat. § 119.011(12) (broadly defining a "public record").

Database and FDEP ARCGIS Mapping Tool.[15] *Id.*

For example, a member of the public can go to a project location on the FDEP mapping tool (such as the "Troyer Mine" located in Lee County, which is cited in Plaintiffs' standing declarations), and, from there, access substantial information about the project. *Id.* ¶ 22. The public databases for this project provide extensive materials, including thousands of pages of permit application records, environmental reports, biological assessments, correspondence between federal and state agencies, public notice information, requests for additional information, and a host of other points of information. *Id.* For example, Troyer Mine project remains in "pending" status as FDEP is awaiting a response to its request for additional information. *Id.*

All major categories of environmental information available to the public under the Corps-led 404 program are also available to the public in a comparable manner after Florida's assumption of the Section 404 program.[16] *Id.* ¶¶ 24-30 and Enclosure D. This includes the essential contents of a NEPA Environmental Impact Statement (EIS) and/or Environmental Assessment, such as purpose and need for a project, alternatives to the project, information about the affected environment, environmental impacts (including cumulative effects, secondary effects, etc.), mitigation measures, socioeconomic information, historic/cultural/tribal information, species and habitat information, coastal zone impacts, and a wide range of "public interest" information. *Id.* ¶ 28 and Enclosure D.

---

[15] These databases provide more information on a real-time basis than is available from the Corps, which has an on-line permit database searching system available at https://permits.ops.usace.army.mil/orm-public# (last visited May 10, 2023).

[16] In response to this Court's request at the March 15, 2022 motions hearing, Florida Intervenors submitted a supplemental brief providing a "side-by-side" comparison of the environmental information available to the public that was available to Plaintiffs by virtue of NEPA review and ESA consultation when the Corps led the Section 404 program versus what is available now under the Florida-led program. *See* Dkt. 72.

## F.        Florida's Authority to Enforce Section 404

As part of its application, FDEP had to satisfy federal requirements related to the State's authority to enforce the Section 404 program. Section 373.129(7), Fla. Stat., authorizes enforcement of the State 404 Program in the same manner and to the same extent as provided in other relevant parts of Florida's environmental laws. This includes reference to Sections 373.430 (criminal remedies water resources), 403.121(1) and (2) (civil and administrative remedies), 403.131 (injunctive relief), 403.141 (civil liability), and 403.161 (criminal remedies pollution control). EPA-HQ-OW-2018-0640-0013 at 6.

As in the federal system, enforcement in Florida can take the form of administrative, civil and/or criminal proceedings. Fla. Stat. § 403.121(1) (administrative, civil); Fla. Stat. § 403.161 and Fla. Stat. § 373.430 (criminal). Enforcement of the State 404 Program is implemented through FDEP's six regulatory district offices with the Office of General Counsel or the Office of the State Attorney providing legal support depending on the type of enforcement initiated. EPA-HQ-OW-2018-0640-0013 at 2, 6; Wolfe Dec. ¶ 34.

As required by 40 C.F.R § 233.41, FDEP is empowered to restrain unauthorized activity, (§§ 373.129(1) and 373.430(1)); to enjoin and abate violations of statutes, rules, and orders adopted pursuant to Chapter 373 (§ 373.129(2)); and to recover civil penalties up to $15,000 per violation (§ 373.129(5)). EPA-HQ-OW-2018-0640-0017 at 10; EPA-HQ-OW-2018-0640-0002-A51 at 50; EPA-HQ-OW-2018-0640-0002-A53 at 8. FDEP is also authorized to seek criminal remedies against someone who:

- with criminal negligence (reckless indifference or gross careless disregard) discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(4));

- willfully discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(5)); or

18

- knowingly makes false statements, representation or certification in any application, record, report, plan, or other document filed or required to be maintained part IV, Chapter 373, or falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under the permit in an amount of $10,000. (§ 373.430(1)(c) & (5)).[17]

*See also* EPA-HQ-OW-2018-0640-0017 at 10; EPA-HQ-OW-2018-0640-0002-A51 at 140; EPA-HQ-OW-2018-0640-0002-A53 at 10.

Additionally, EPA may file its own enforcement actions, even where there is a state program in place, pursuant to EPA's authority under Section 309 and 404(n) of the CWA. In other words, though rarely exercised in most state program contexts, EPA may initiate independent or parallel enforcement actions to any Florida enforcement action involving the Section 404 program. EPA-HQ-OW-2018-0640-0017 at 10; *see also* EPA-HQ-OW-2018-0640-0018 at 10; EPA-HQ-OW-2018-0640-0568 at 72.

### G.    Plaintiffs' Ability to Impact FDEP Permit Actions and to Challenge FDEP 404 Permits under Florida Law

As Federal Defendants correctly observed (Dkt. 99 at 47-48), Florida's program includes a system of administrative checks that allow the public to hold the State accountable if it errs in granting or denying a permit. Likewise, Florida's program gives many opportunities for public engagement throughout the permitting process as well as ample opportunities to bring permit

---

[17] In relevant part, 40 C.F.R. § 233.41(a)(3) requires a state agency to have authority to "seek criminal fines against any person who *willfully* or with *criminal negligence* discharges dredged or fill material without a required permit or violates any permit condition issued under section 404." Emphasis added. Further, 40 C.F.R. § 233.41(b)(2) requires "[t]he *burden of proof* and *degree of knowledge or intent required under State law* for establishing violations under paragraph (a)(3) of this section, shall be *no greater* than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." Emphasis added. Florida statutes §§ 373.430(1)(b), (1)(c), (4) & (5) as summarized in the text above comply with this requirement. The requirements in 40 C.F.R. § 233.41(b)(2) related to the degree of knowledge or intent are only applicable to crimes requiring willfulness or knowledge and not criminal negligence, which does not require intent or knowledge by definition.

challenges under the Florida APA (Fla. Stat. Ch. 120) and the Florida Environmental Protection

Act (Fla. Stat. § 403.412). In fact, just as environmental groups have a right to broader information

under Florida's Sunshine laws, Florida administrative law also gives them greater opportunities to

use that information to advance their interests in permit challenges. Consistent with the federal

process, an environmental group (or other person) may submit any information that they would

like during the public notice and comment process. *See* F.A.C. § 62-331.060 (describing public

notice and comment procedures).

Florida law also provides for a *de novo* permit hearing before a Florida 404 permit becomes

effective, which provides affected parties with an additional opportunity to obtain and submit even

more information (including via depositions and interrogatories) and to ensure consideration of

that additional information in the hearing record. *See* Fla. Stat. § 120.57(1)(b). Environmental

groups have at least three avenues for establishing standing to challenge state 404 permit actions

under Florida law. But most importantly for this case, Florida law expressly provides that, "[i]n a

matter pertaining to a federally delegated or approved program," like Florida's Section 404

program, "a citizen of the state may initiate an administrative proceeding under this subsection *if*

*the citizen meets the standing requirements for judicial review of a case or controversy pursuant*

*to Article III of the United States Constitution.*"[18] Fla. Stat. § 403.412(7) (emphasis added). In

---

[18] In addition, environmental groups can also establish standing under state law in several other ways. First, under the seminal case in Florida known as *Agrico Chem. Co. v. Dep't of Env't Regul.*, 406 So. 2d 478 (Fla. 2d DCA 1981), plaintiffs have standing to challenge permitting actions if they can demonstrate that their "substantial interests" are determined or affected by the action and their interests fall within the zone of interests of the relevant program. Under the *Agrico* framework, associations have standing if a "substantial number of its members, although not necessarily a majority, are substantially affected'...." *Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*, 412 So. 2d 351, 353-54 (Fla. 1982). This is the traditional avenue for environmental plaintiffs to obtain standing in Florida. Second, under separate statutory authority, environmental groups in Florida with "at least 25 current members residing within the county where the activity is proposed" have *automatic standing* to challenge a permitting action. *See* Fla. Stat. § 403.412(6).

other words, if Plaintiffs seek to challenge a permitting decision by FDEP under Florida's Section 404 Program, Florida law will simply require them to satisfy Federal standing doctrine. *Id.*

Environmental groups can build the administrative record in a *de novo* hearing, with testimony, presentation of experts, and questions directed toward state environmental officials and permit writers, something that is not available to them under federal procedures. Of course, nothing prevents them from using the same information that they provided during the public comment process during an administrative hearing.

Likewise, FDEP's issuance of a permit is not final agency action if an administrative challenge is timely filed (meaning that the permit is automatically stayed pending resolution of the administrative challenge). *See* Fla. Stat. § 120.569, § 120.57. In Florida, the "administrative hearing process is designed to formulate agency action" so FDEP's "final action may be different from the proposed agency action and may result in the issuance of a permit as requested by the applicant or as modified in the course of the [administrative] proceeding or by settlement." F.A.C. § 62-110.106(7)(e)(2). Since permit challenges in Florida are *de novo* proceedings, FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence. . . ." *Id.* § 120.57(1)(b); *see*, *e.g.*, *Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Env't Regul.*, 587 So.2d 1378, 1387-88 (Fla. 1st DCA 1991). In other words, these *de novo* administrative proceedings are designed to give aggrieved "parties an opportunity to change the agency's mind." *Capeletti Bros. v. Dep't of Gen. Servs.*, 432 So.2d 1359, 1363 (Fla. 1st DCA 1983). If the administrative process results in a final order issuing the permit, Florida law provides for a right to seek judicial review.

*See* Fla. Stat. § 120.68.[19]

In Florida, the "reviewing court's decision may be mandatory, prohibitory, or declaratory in form, and it shall provide whatever relief is appropriate irrespective of the original form of the petition." Fla. Stat. § 120.68(6)(a). Florida courts may, among other things, "[o]rder agency action required by law; order agency exercise of discretion when required by law; set aside agency action; remand the case for further agency proceedings; or decide the rights, privileges, obligations, requirements, or procedures at issue between the parties; and [o]rder such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld." *Id.* If the "court sets aside agency action or remands the case to the agency for further proceedings, it may make such interlocutory order as the court finds necessary to preserve the interests of any party and the public pending further proceedings or agency action." *Id.* § 120.68(6)(b). And as Federal Defendants also noted, the court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds the "agency's action depends on any finding of fact that is not supported by competent, substantial evidence in the record of a hearing conducted pursuant to §§ 120.569 and 120.57; however, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." *Id.* § 120.68(7)(b).

Likewise, if the "fairness of the proceedings or correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure," the court

---

[19] Under Florida law, any person "substantially affected" by an FDEP rule or proposed rule may seek an administrative determination that the rule is invalid. *See* Fla. Stat. § 120.56(1)(a); § 120.569(1). Florida courts have interpreted Chapter 120 liberally to achieve the statutory purpose of increasing public participation in agency decisions. *NAACP, Inc. v. Fla. Bd. of Regents*, 863 So. 2d 294, 298 (Fla. 2003); *Palm Beach Cnty. Env't Coal. v. Fla. Dep't of Env't Prot.*, 14 So.3d 1076 (Fla. 4th DCA 2009). This includes the opportunity to challenge the validity of an existing rule "at any time during which the rule is in effect." Fla. Stat. § 120.56(3).

may set it aside. *Id*. And the same is true if the "agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action…" *Id*. The same is true if the "agency's exercise of discretion was," among other things, "[o]utside the range of discretion delegated to the agency by law" or "inconsistent with agency rule," such as FDEP's Section 404 program rules or handbook. Id. § 120.68(8). And under Florida law, unlike federal law, agencies do not receive any deference to their interpretations. Fla. Const. Art. V, § 21 ("In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo.").

### H.      EPA Oversight of FDEP Permit Decisions

After approving a State program, EPA maintains an active role to ensure compliance with the requirements of Federal law. *Id*. § 1344(i)-(j). First, EPA oversees the State permitting process – both on a program level as well as permit-by-permit basis – to ensure continued compliance with Federal requirements. *Id*. § 1344(h); 40 C.F.R. § 233, Subpart F (Federal Oversight). For example, unless a kind of activity is exempted by EPA under Section 404(k)(1), a State must provide EPA with a "copy of each permit application received by such State and provide notice to [EPA] of every action related to the consideration of such permit application, including each permit proposed to be issued by such State," along with a "copy of each proposed general permit which such State intends to issue." *Id*. § 1344(j). EPA may provide comments or otherwise "object" to the issuance of any permit by the State. *Id*. And EPA may hold a public hearing on its objection. *Id*. Ultimately, if the State rejects EPA's comments or changes, the State must deny the permit or that particular permit must be federalized (*i.e.*, the Corps takes over issuance of that particular

permit).[20] *Id.*; *see also* Mem. of Agreement between FDEP and EPA (July 31, 2020) at EPA-HQ-OW-2018-0640-0018 at 7-9; F.A.C. § 331.052(3)(b) at EPA-HQ-OW-2018-0640-0002-A48 at 8-9. Besides EPA and the Corps, other Federal agencies also have significant opportunities for involvement in State 404 permits. *See, e.g.*, 33 U.S.C. §§ 1344(h)(1)(F) (U.S. Coast Guard); 1344(m) (FWS); *see also* 40 C.F.R. § 233.15(d) (requiring EPA to submit copies of the State's submission to the Corps, FWS, and NMFS); 40 C.F.R. § 233.15(g) (requiring EPA to respond to comments from those agencies).

Second, EPA remains actively involved in the administration of the State program as a whole. Any State seeking to administer its own Section 404 program must enter a memorandum of agreement with EPA that, among other things, requires submission of regular "reports, documents and other information" to EPA along with an "annual report" documenting the State's administration of its program. 40 C.F.R. § 233.13. States are also required to "allow EPA routinely to review State records, reports and files relevant to the administration and enforcement of the approved program." *Id.* § 233.13(b)(2); *see also id.* § 233.52 ("Program reporting"). As part of this oversight function, Florida provides EPA with copies of No Permit Required (NPR) letters for review as requested (although all NPR information is publicly accessible on FDEP's website).[21] Wolfe Dec. ¶¶ 41, 45. An applicant may apply for a State 404 NPR verification when the activity

---

[20] Since program approval, EPA has raised objections to some of Florida's proposed decisions on Section 404 permits. In just three instances, however, EPA has determined that Florida had not, in EPA's view, adequately addressed EPA's concerns, and thus, EPA transferred processing of the permit to the Corps (i.e., federalized the permit application). Wolfe Dec. ¶ 31. While Florida disagreed with EPA's decision in those instances, this is how the oversight mechanism in the CWA Section 404 program is designed to work. *Menominee Indian Tribe of Wis. v. Env't. Prot. Agency*, 947 F.3d 1065, 1071 (7th Cir. 2020) ("where Section 404 permitting authority has been delegated to a state, the EPA retains an oversight role… The EPA reviews, and can object to, proposed permits…If the agency lodges objections, the state cannot issue a permit without revising and resubmitting it for approval…").

[21] *See* https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp (last visited May 10, 2023)

has avoided all impacts to wetland or surface waters delineated using 62-340, F.A.C., or when the activity has been designed to only impact wetlands or surface waters that are excluded from jurisdiction as waters of the United States. *Id.* ¶ 43. NPR verifications are voluntary, non-binding advisory letters designed to assist the regulated community and help to promote overall compliance with the law. *Id.* ¶ 42.

Third, where a State program does not comply with Federal standards, EPA may seek to withdraw the program. 33 U.S.C. § 1344(i). EPA regulations set forth the withdrawal process, which includes an opportunity for the State to "take corrective action"; an "informal review" to determine whether "cause exists" to commence formal proceedings; a formal hearing on the record that is announced in the Federal Register; completion of proceedings in general conformance with EPA's Consolidated Rules of Practice found at 40 C.F.R. Part 22 (with opportunities for interested parties to intervene as parties or participate as *amici curiae*); a recommended decision by a hearing officer with compilation of a full hearing record; and ultimately a determination by the Administrator of EPA with a "list" of "deficiencies in the program" (if any) and "providing the State a reasonable time, not to exceed 90 days, to take such appropriate corrective action as the Administrator determines necessary." 40 C.F.R. § 233.53(b)-(c). If the State fails to correct the deficiencies, EPA "shall issue a supplementary order withdrawing approval of the State program," and such order "shall constitute final Agency action" subject to judicial review under the Administrative Procedure Act. *Id.* § 233.53(c)(8)(vi)-(vii). Withdrawal proceedings can be initiated by EPA "or in response to a petition from an interested person alleging failure of the State to comply" with Federal requirements. 40 C.F.R. § 233.53(c). Thus, the Section 404 assumption process ensures expedited admission of States into the program, with ongoing federal oversight and a careful, deliberate process for correcting or withdrawing deficient State programs.

Where a State has not assumed responsibility for its own Section 404 program or has its program withdrawn, the Corps retains responsibility to issue permits authorizing the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In that context, where the federal-state roles are reversed from Congress' preferred alignment, States play a supplementary role in the Federal 404 permitting process, including, for example, through the process of certifying that Corps permitting actions comply with State water quality standards pursuant to CWA Section 401, 33 U.S.C. § 1341, and state concurrence review under the Coastal Zone Management Act, 16 U.S.C. §§ 1451, et seq.

Taken together, Florida administrative and environmental law-including Florida's new Section 404 program combined with the federal overlay arising from EPA oversight of Florida's Section 404 Program-ensures that Florida's water resources are conserved and protected consistent with federal standards.

## STANDARD OF REVIEW

Standing is an "essential and unchanging" requirement for judicial review in any case, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). It must be "demonstrate[d] for each claim" and "for each form of relief that [Plaintiffs] seek." *Id.* at 2208. The "irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each claim, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2015) (citing *Lujan*, 504 U.S. at 560).

Plaintiffs bear the burden of establishing that a court has jurisdiction to hear each of their claims. *See Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002). In the D.C. Circuit, Plaintiffs must include in their opening briefs sufficient evidence to demonstrate their standing where it is

not self-evident. *Id.* at 900. Moreover "[a]bsent good cause shown," Plaintiffs should not expect

the court to allow them to submit evidence of standing for the first time in their reply brief or after

oral argument. *Id.*

Plaintiffs must satisfy each element of standing "in the same way as any other matter on

which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required

at the successive stages of the litigation." *Lujan,* 504 U.S. at 561. While general factual allegations

of harm may suffice at the pleading stage, such "mere allegations" are insufficient to support

standing at the summary judgment stage. *See id.* Instead, a plaintiff "must provide affidavits or

other evidence to demonstrate the specific facts necessary to support standing," *Ctr. for Biological*

*Diversity v. Regan*, 597 F. Supp. 3d 173, 188 (D.D.C. 2022) (citing *Swanson Grp. Mfg. LLC v.*

*Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

Florida adopts and incorporates by reference the Standard of Review for summary judgment

as set forth in the Federal Defendants' brief. *See* Dkt. 99 at 33-34.

## ARGUMENT

I. **Plaintiffs' Claims Are Not Subject to Judicial Review Due to Lack of Standing, Lack of Final Agency Action, or Lack of Ripeness.**

A. **Plaintiffs Lack Standing For All Claims Based on Purported Informational Injuries.**

Plaintiffs seem to suggest that certain alleged informational losses provide standing to

support all of their claims in gross. Dkt. 98 n.39 at 76. They make no effort to expressly connect

their alleged informational losses to specifically numbered claims in the Amended Complaint, but

it appears that they want this Court to assume that their "loss" of environmental information creates

standing to challenge essentially everything: EPA's approval of Florida's program in totality, the

programmatic consultation approach, and the Corps' approach to assumable waters (i.e., all claims

except Claims 1, 8, 9). However, by alleging informational injury for *all of these claims*, Plaintiffs have made no direct showing of harm for *any specific claim*. *TransUnion,* 141 S. Ct. at 2207. Since standing is not dispensed in gross, this Court must find that, as alleged, Plaintiffs' informational losses do not support standing here.

To the extent the Court considers the informational standing arguments further, they should be rejected as to each claim. Contrary to Plaintiffs' assertions, their purported informational injuries do not support standing for any claims asserted here. Indeed, there is no actual loss of meaningful information for which Plaintiffs experience cognizable injuries. To support standing for informational injury, Plaintiffs assert a loss of information in two respects: first, the "loss of ESA Section 7 consultation on 404 permits in assumed waters"; and second, "the loss of NEPA analysis..." Dkt. 98 at 75. Neither works.

 Florida Intervenors have previously briefed this question in significant detail and re-adopt those points here. *See* Dkt. 37 at 56-57; Dkt. 46 at 23-25; Dkt. 72 (Florida's supplemental brief concerning availability of environmental information). These "losses" of information are not cognizable grounds for asserting standing because Congress, not EPA, decided that state programs are not subject to the NEPA provisions that may trigger environmental impact statements. Nor are they subject to ESA Section 7's provisions that may result in biological assessments and the ensuing BiOps. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall … insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any [listed] species…") and 16 U.S.C. § 1536(a)(2) ("…Each Federal agency shall…conduct a biological assessment…"). Thus, EPA did not cause any purported loss of information; Congress did. Dkt. 99 at 67 n.19 (explaining that "Congress decided that neither NEPA review nor ESA consultation is required" for state permits). The "levels of environmental

review," which Plaintiffs believe are missing are only missing, if at all, by congressional design. *See Ass'n of Am. Physicians & Surgeons v. Sebelius*, 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (holding that injuries "caused by statutes and regulations that pre-date the agency actions plaintiffs' challenge" suffered from "a causation problem" and the harms were "not redressable"); *Ecological Rights Found. v. EPA*, No. CV 19-2181, 2022 WL 4130818 , at *14 (D.D.C. Sept.12, 2022) (finding no injury where "EPA followed Congress's instructions to the letter" and authority for the decision being challenged was bestowed by Congress); *see also Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 181 n.5 (D.D.C. 2019) ("Although the federal defendants mention informational standing in their motion to dismiss, . . . plaintiffs put forth no argument for informational standing in their opposition and fail to identify any statute entitling them to any information deprived under the Service's new policy); *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (stating that in order to claim informational standing, a plaintiff must allege: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.").

But even if that was not determinative here, Florida Intervenors have shown how Plaintiffs do not actually suffer the loss of information they claim. Dkt. 72. With this brief, Florida Intervenors have provided a declaration by the General Counsel of FDEP addressing, among other things, the alleged loss of environmental information and access to permit records. Wolfe Dec. ¶¶ 24-30.

First, Plaintiffs contend that EPA's approval of Florida's program "removed Plaintiffs' access to critical environmental analyses that Plaintiffs use to educate the public, engage in advocacy, and seek redress for environmental harm." Dkt. 98 at 76. But Plaintiffs receive the same

kinds of environmental information under the Florida-led program as they did under the Corps-led program, and in many respects, they receive *more information more quickly*. Wolfe Dec. ¶¶ 25, 28. The side-by-side comparison demonstrates Florida's point here. *Id.* at Enclosure D.

Moreover, in asserting informational injuries, Plaintiffs vastly overstate the extent to which an EIS or biological opinion is prepared for Corps-led 404 permits. In fact, relatively few permit applications under the Corps-led program in Florida resulted in preparation of a BiOp and/or EIS. Wolfe Dec. ¶¶ 26-27. And for that narrow category of projects, many (if not most) would still generate the exact same federal BiOp and EIS *after assumption* because of some other federal nexus. Wolfe Dec. ¶ 27; Dkt. 72 at 5-8. That is because Section 404 permitting is usually *not* the only federal nexus for the kinds of major projects that result in a BiOp and/or EIS. Projects that involve use of federal lands (4.5 million acres of federal lands in Florida),[22] use of federal funds (such as major transportation projects), or other federal "hooks" will likely continue to require the same BiOp or EIS that they required pre-assumption. Some projects that Plaintiffs listed in their brief and/or standing declarations, such as the withdrawn application for an oil development project (Nobles Grade/Burnett Oil) in South Florida, would be located on federal lands within the Big Cypress National Preserve and, thus, would likely require NEPA and ESA compliance on that basis (independent of a Section 404 permit).

And while Plaintiffs make much in their briefs on the lack of NEPA review, that point is glaringly omitted from their Amended Complaint, which only contains one minor reference to NEPA – and that reference is in relation to the already resolved Claim 8. Dkt. 77 at 47 (Amended Complaint) (listing removal of citizen's NEPA rights as a substantive legal effect of EPA's giving

_____

[22] Congressional Research Service, *Federal Land Ownership: Overview and Data*, at 7 (Feb. 21, 2020) (showing approximately 12.9% of the surface area of Florida as owned or managed by federal agencies) (https://sgp.fas.org/crs/misc/R42346.pdf (lasted visited May 10, 2023)).

its approval an immediate effective date when published in the Federal Register).

Likewise, nothing in the ESA provides any right of access to review and comment on BiOps. Dkt. 99 at 38-40. Under ESA Section 7 and its regulations, formal consultation is between the action agency (here, EPA) and the consulting agency (here, FWS), and there is no requirement for public notice and comment or public access to the action agency's biological assessment or the consulting agency's BiOp during the consultation process. *See* 50 C.F.R. § 402.12 (setting forth procedures for biological assessments and not requiring publication or public notice and comment); *id.* § 402.14(g)(5) ("The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft BiOp must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service."). Thus, for purposes of consultation under the Corps-led 404 program, while the project applicant may be involved, there is no *right* of notice and comment for the public within the Section 7 consultation process. *Cooling Water Intake Structure Coal.*, 898 F.3d 173, amended, 905 F.3d 49, 78 (2nd Cir. 2018) ("[T]here is no independent right to public comment with regard to consultations conducted under §7(a)(2) of the ESA…So no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services."); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (explaining that there is not an "independent right to public comment with regard to consultations conducted under § 7(a)(2)" of the ESA).

In their declarations, Plaintiffs now point to a long list of specific projects that they claim as a basis for injury. The Wolfe Declaration provides an update on the status of each of those projects with pending applications. Wolfe Dec. ¶ 17 and Enclosure A. Plaintiffs referenced several proposed projects for which a Section 404 application has *not* been submitted. Various other

projects referenced in Plaintiffs' declarations have been *withdrawn* by the permit applicant and are

no longer pending (*e.g.*, Nobles Grade/Burnett Oil; Tamiami Prospect; State Road 836, Port 1850).

Plaintiffs also referenced the CPN West LLC project, a commercial development that met the

requirements for a No Permit Required letter. None of these projects can supply the basis for

standing. Each of the active applications seeking Section 404 permits, as referenced by Plaintiffs

for standing, are described in Enclosure A of the Wolfe Declaration, with a link to the relevant

FDEP online permit files, which clearly demonstrate that each of these projects are in the midst of

a pending review process with direct involvement by state and federal agencies, including FWS

and FWC. Those agencies are actively involved in evaluating projects and providing the technical

assistance contemplated by the BiOp/ITS. As just one example (among several described in

Enclosure A), the permit file for the FFD (Orchid) project, with FDEP Permit No. 0291030-004-

SFI, contains an applicant-prepared Biological Assessment (with over 1,100 pages of

documentation) as well as an environmental site assessment of more than 200 pages (completed at

the request of FWS). As a careful review of FDEP's publicly-available permitting records show,

FWS and FWC are clearly engaged in reviewing and evaluating the projects, and the same kinds

of information that Plaintiffs decry as lacking are available for them to review, or will be through

the completion of the permit process.

### B.        Plaintiffs Cannot Challenge EPA's Completeness Determination (Claim 1).

Plaintiffs also challenge EPA's finding that Florida's application was "complete" for

purposes of allowing EPA to begin the process of evaluating whether to approve or disapprove the

program. Dkt. 99 at 38-45. Florida Intervenors concur with Federal Defendants' argument that

Florida's application was complete, and certainly EPA's decision to find it complete was not

arbitrary. But before reaching the merits of this issue, the Court should carefully weigh whether

such claims are even properly subject to judicial review. Here, Florida suggests at least two

grounds for finding this claim non-justiciable.

One, the finding by an agency of an application's completeness lacks the hallmarks of "final agency action" for purposes of the Administrative Procedure Act (APA). Agency actions are "final" under the APA if, first, it "marks the consummation of the agency's decisionmaking process—*it must not be of a merely tentative or interlocutory nature*," and second, it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 592 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added).

Taking those two elements in turn, the first is not met here as the "completeness" determination is not the "consummation of the agency's decisionmaking process." It is just the beginning of the process - the very first step in EPA's process for reaching a final determination. *See Fed. Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (explaining that a "threshold determination that further inquiry is warranted" is not a "definitive statement of position," thus it is not final agency action); *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 331 (D.D.C. 1990) ("Agency action which merely initiates proceedings has no legal force, is not a definitive statement of position, and therefore is not final agency action ripe for review.").

But even on the second step, though consequences may flow from a completeness determination – namely, the triggering of a 120-day clock for EPA to make a final decision - that is it. And that 120-day clock was created by congressional design to protect the interests of the State applicants, not the public. Dkt. 37 at 15-16. There are no consequences *impactful to Plaintiffs* that would give rise to standing here. The completeness determination merely gets folded into the final approval determination, which becomes the final agency action subject to review. Plaintiffs cite no cases recognizing that an agency's finding of completeness is reviewable.

Two, even if the "completeness" finding is final agency action, Plaintiffs fail to show how *they* suffer any cognizable injury related to EPA's completeness determination. Indeed, Plaintiffs have not cited, and Florida Intervenors have not located, any case law standing for the proposition that a non-applicant would have standing to challenge an agency's finding that an application is complete.[23] The absence of precedent is telling here.

### C. Plaintiffs Suffer No Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority (Claim 2).

#### 1. Plaintiffs Lack Standing to Challenge State 404 Assumption Generally.

Plaintiffs assert both organizational and associational standing "to challenge EPA's unlawful approval of Florida's 404 program (Claim 2)" based on alleged informational injuries from the transfer of the primary permitting authority to the State.[24] Dkt. 98 at 78. However, as shown in Argument Section I.A above, there is no actual loss of meaningful information for which Plaintiffs experience cognizable standing injuries.

Plaintiffs also allege that their members have standing for Claim 2 because "as a result of EPA's action, the State is considering (and approving) permit applications that substantially risk

---

[23] In its argument concerning standing to challenge the completeness of the application, Plaintiffs cite two cases, Dkt. 98 at 77-78, none of which address standing to challenge the completeness of an application. Neither *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983), nor *Center for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 179 (D.D.C. 2019), involved a challenge to the completeness of an application.

[24] To establish organizational standing a party "must show that it suffers or will imminently suffer 'a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests [and] the presence of a direct conflict between the defendant's conduct and the organization's mission.'" *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 194 (quoting *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (cleaned up). "To establish associational standing, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Dkt. 30 at 2 (quoting *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 38 (D.D.C. 2015)).

harm to their members' aesthetic, recreational, and other interests by authorizing developers to fill precious wetland habitat for projects that will harm threatened and endangered species." *Id.* In truth, Florida's expanded role causes no increased risk of injury relative to the pre-assumption 404 program, especially because EPA maintains oversight on a permit-by-permit basis.[25] To be sure, if Florida approved a proposed project without appropriate mitigation, that could result in harm to Plaintiffs' aesthetic, recreational, and other interests in wetlands or protected species. But that would be equally true if the Corps approved such a proposed project before assumption. Thus, any such harm is not specific to the State issuing the permit instead of the federal government, and thus is not an injury fairly traceable to EPA's approval of Florida's 404 Program.

On that relevant metric, Plaintiffs have not established any proof that state permitting will be less rigorous than pre-assumption federal permitting--especially given that the EPA retains permit-level review and oversight more generally over Florida's actions. Mere speculation of future harm cannot support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient") (internal quotations and citations omitted). Because Plaintiffs have proffered no evidence of any concrete, particularized harms caused by Florida making a Section 404 permitting decision instead of the federal government, they have failed to meet their burden of proof on standing.

Next, Plaintiffs' standing declarations assert injury from EPA's approval of Florida's 404 Program because now any challenge to 404 permitting decisions must be filed in state court rather

---

[25] Though Florida does not rehash the argument here, Florida preserves and incorporates by reference its previously-made argument that Plaintiffs' claims are not redressable because of the "deemed approved" provision found in 33 U.S.C. § 1344. Dkt. 37 at 59-64.

than federal court, which allegedly has a different standard of review,[26] fee shifting provisions, and more restrictive standing requirements.[27] Plaintiffs aversion to state courts and preference for federal courts is baseless. *Menominee Indian Tribe*, 947 F.3d at 1071 ("It is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act…Nothing has been brought to our attention to suggest that the Tribe cannot receive full and fair review in a Michigan court."). Plaintiffs do not identify any pending or planned state court litigation, much less explain how these supposed differences constitute a cognizable Article III injury. In fact, as discussed above, the fee shifting provision at Section 403.412(2)(f) "applies only to circuit court actions for injunctive relief," not administrative actions,[28] and there is no difference in standing because Florida law expressly provides that, "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an

---

[26] Plaintiffs provide no actual evidence beyond general speculation that the *de novo* standard of review in state court would negatively impact unidentified future litigation involving state issued 404 permits. First, as explained above, Plaintiffs are free to submit comments, including technical information, to FDEP during the administrative review of the permit application, similar to the federal process, which will be part of the administrative record of the agency. If Plaintiffs chose to challenge the FDEP's permit decision, they have the option in a *de novo* proceeding to supplement the administrative record if they wish. But this is not a requirement and Plaintiffs can rely on documents submitted in the notice and comment process to litigate their claim. Second, under the *de novo* standard, FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence….". F.S § 120.57(1)(b). This is an advantage for Plaintiffs seeking to challenge FDEP 404 permits, not an injury.

[27] *See* Carter Dec. ¶ 25; Crooks Dec. ¶¶ 37-40; Hartl Dec. ¶¶ 26, 28; Rinaman Dec. ¶¶ 21-22; Silverstein Dec. ¶¶ 12-14; Robertson Dec. ¶¶ 18, 27; and Umpierre Dec. ¶¶ 70-72 regarding higher costs of state court. See Carter Dec. ¶ 25; Crooks Dec. ¶ 41; Hartl Dec. ¶ 27; Rinaman Dec. ¶ 23; Silverstein Dec. ¶ 15; Robertson Dec. ¶ 18; and Umpierre Dec. ¶ 71 regarding standing in state court.

[28] *See Agrico Chem. Co. v. Dep't of Env't Regul.*, No. 83-2708, 1984 WL 54261, at *2 (Fla. Div. of Admin. Hr'g, June 27, 1984); *accord Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*, No. 91-8088, 1992 WL 322912, at *13 (Fla. Div. of Admin. Hr'g, July 23, 1984); (explaining that Section 403.412(2)(f) only "relates to a civil injunction action and not to an administrative proceeding").

administrative proceeding under this subsection *if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution*." Fla. Stat. § 403.412(7) (emphasis added). Plaintiffs simply have not shown a reasonable prospect that they would bring a Florida state court action and lose that action even though they would have prevailed under federal standards.

Crucially, this Court held earlier in this case that an almost identical argument from the Florida Chamber of Commerce (Chamber) and the Association of Florida Community Developers (AFCD) was too speculative to support standing. In their renewed motion to intervene, the Chamber and AFCD argued that the loss of "the right to a de novo proceeding under the Florida APA, complete with discovery and fact-finding adduced through the presentation of evidence before an impartial administrative law judge" if EPA's approval was vacated constitutes a cognizable, Article III injury. Dkt. 32-1 at 12. In denying the motion for lack of standing, this court held that "Movants' members do not aver that they are currently bringing (or are likely soon to bring) proceedings under the Florida APA. . . .And the mere prospect that the Florida permitting authorities *might* rule against one of Movants' members in the future on an issue that the member *might* then raise under the Florida APA, where that member would be unable to raise a similar (or equally effective) challenge under the federal APA, is too speculative to support Article III jurisdiction." Dkt. 39 at 7-8 (emphasis in original). Applying this same logic to Plaintiffs' arguments necessitates dismissing Claim 2 for lack of standing as well.

Even if there were some theoretical differences between Florida and federal law, or Florida and federal enforcement practices,[29] Plaintiffs would still lack standing. That is because Congress

---

[29] *See e.g.,* Rinaman Dec. ¶¶ 26-27, Silverstein Dec. ¶¶ 17-18 (referencing FDEP enforcement related to stormwater permits issued under Section 402, which like the Section 404 program, has been assumed from EPA).

explicitly provided that EPA retains independent enforcement authority under CWA Section 309 and 404(n) when a state assumes a 404 program.[30] As a result, federal authorities review every permit that Florida proposes to issue as well as the validity of Florida's overall program on an ongoing basis, including issuance of No Permit Required verifications. EPA-HQ-OW-2018-0640-0018 at 4-9, 11-12; Wolfe Dec. ¶¶ 41, 45.

Binding precedent teaches that a transfer from federal to state authority cannot support standing where the federal government maintains the ability to apply federal law. *See Crow Creek Sioux Tribe,* 331 F.3d at 917. In *Crow Creek,* an Indian Tribe argued that the transfer of lands from U.S. Army Corps of Engineers to the State of South Dakota would impede or reduce the likelihood of enforcement of federal cultural protection statutes on the transferred lands by federal agencies, injuring the Tribe's rights under those statutes. *Id.* at 913. The D.C. Circuit found that the Tribe lacked standing because the statute that required the land to be transferred explicitly provided that the federal cultural protection statutes continue to apply on the transferred lands. *Id.* In addition, the court deemed "purely speculative" assertions that transfer of the land to the State would diminish enforcement because the federal government retained full legal enforcement authority. *Id.* at 917. Where a statute provides that the federal government "will have an ongoing and undiluted enforcement role," concerns about reduced enforcement were simply "unsupported conjecture" that do not constitute an injury for Article III standing purposes. *Id.* Accordingly, the D.C. Circuit dismissed the case. Likewise, this Court should dismiss Claim 2 for the same reason given EPA's independent enforcement authority pursuant to CWA Section 309 and 404(n).

---

[30] Section 404(g) sets forth the requirements for state assumption of 404 permitting. 33 U.S.C. § 1344(g). Section 404(n) states "[n]othing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title." 33 U.S.C. § 1344(n). Section 309 sets forth the scope of the Administrator's enforcement authority, including for violations of permits issued under state assumed 404 programs. *See* 33 U.S.C. § 1319.

      **2.**      **Plaintiffs Lack Standing to Challenge EPA's Approval Based on Concerns with Criminal Negligence & Statute of Limitations.**

*Crow Creek* is particularly instructive here as Plaintiffs' challenge to EPA's approval of Florida's 404 program is based in part on the state's criminal enforcement standard and criminal statute of limitations, which Plaintiffs assert provides harm sufficient for standing. Specifically, Plaintiffs refer to criminal enforcement in a couple of sentences in two standing declarations—one by Lisa Rinaman, a member of St. Johns Riverkeeper, and another by Rachel Silverstein, a member of Miami Waterkeeper. *See* Dkt. 98 at 78. In relevant part, Ms. Rinaman declares

> The state's enforcement of its section 404 program also harms St. Johns Riverkeeper . . . When appropriate, we refer issues to the authorities for investigation and criminal prosecution, for which we provide any necessary assistance. The state program, however, does not include the same enforcement standards and requirements as federal law.

Dkt. 98-6 at 7 (Rinaman Decl. ¶ 26). And, in relevant part, Ms. Silverstein declares

> Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations. For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

Dkt. 98-7 at 6 (Silverstein Decl. ¶ 16) (emphasis added).

First, neither declaration demonstrates (or even suggests) that the individuals or their respective organizations suffered (or will suffer) any actual, imminent, or concrete injuries that are remotely traceable to application of Florida's criminal enforcement regime instead of the federal enforcement regime to CWA Section 404 violations. At most, Ms. Rinaman's declaration simply states that the state program is not the "same" as the federal program. However, the CWA does not require that a state program be identical to the federal program. It simply requires that a state program "abate violations of the permit or the permit program including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G); *see also* Federal

Defendants' Brief, Dkt. 99 at 50-54.

Plaintiffs' broader, unsupported allegations concerning Florida's statute of limitations fare no better. Though Plaintiffs argue that "Florida law is not as stringent as federal law because it provides a shorter statute[] of limitation for enforcement of environmental crimes," Dkt. 98 at 48, none of the standing declarations assert any harm that can be traced to these "shorter statutes of limitation." Thus, Plaintiffs have also failed to meet their burden of proof for standing as to Claim 2 based on Florida's criminal statute of limitations. "Standing is not 'an ingenious academic exercise in the conceivable,' but . . . requires . . . a factual showing." *Lujan*, 504 U.S. at 566 (citation omitted); *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 188 (explaining that a plaintiff "must provide affidavits or other evidence to demonstrate the specific facts necessary to support standing").

Second, neither Ms. Rinaman's nor Ms. Silverstein's declaration attempt to explain how the difference between the federal ordinary negligence and state gross negligence definitions, as applied to criminally negligent discharges in violation of the CWA, could result in a legally cognizable injury to them sufficient for standing purposes. This may be because under *Crow Creek*, Plaintiffs cannot suffer such an injury here as EPA retains independent federal criminal (and civil) enforcement authority relating to both unpermitted discharges and conditions or limitations in permits issued by a state under CWA Section 404. Thus, Ms. Rinaman and Ms. Silverstein can continue to refer criminal enforcement matters to EPA, and Congress has authorized EPA to bring a CWA enforcement action if it chooses based on the federal definition of negligence and the federal statute of limitations even after Florida's assumption of the 404 program regardless of

whether the state brings its own enforcement action under state law.[31] *See* 33 U.S.C. §§ 1319, 1344(n).

Because Plaintiffs' standing declarations are deficient on their face and fail to meet Plaintiffs' burden of proof, this Court does not have jurisdiction to determine the merits of Plaintiffs' challenge to EPA's approval of Florida's 404 program.

### D.   Many of Plaintiffs' Attacks Are Not Ripe For Review (Claims 3 to 5, 7, 11-12).

"Ripeness is a justiciability doctrine designed to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (Moss, J.) (internal quotations and citations omitted). Ripeness is assessed under the two-pronged test established by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *McCray,* 574 F. Supp. 3d at 12 (quoting *Texas v. United States*, 523 U.S. 295, 300 (1998)) (internal quotations omitted). This test is based on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Am. Oversight v. U.S. Dep't of Veterans Affairs*, 498 F. Supp. 3d 145, 157 (D.D.C. 2020) (Moss, J.) (citing *Abbott Labs.*, 387 U.S. at 149) (internal quotation marks omitted).

First, the agency action must have a "sufficiently direct and immediate" impact on the party challenging the action. *Abbott Labs.*, 387 U.S. at 152. A "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (internal quotation marks omitted). Second, the court must determine

---

[31] Of course, the federal government's decision as to whether to bring a civil or criminal enforcement action is not subject to judicial review under the APA. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985).

whether withholding judicial review would cause hardship to the parties. *Abbott Labs.*, 387 U.S. at 136. Any hardship caused by the deferral of adjudication must be "immediate and significant," to warrant judicial intervention. *Devia v. NRC,* 492 F.3d 421, 424 (D.C. Cir. 2007). However, the consideration of hardship "will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Pub. Citizen Health Rsch. Grp. v. FDA,* 740 F.2d 21, 30 (D.C. Cir. 1984). An agency action that "does not require [plaintiff's] to engage in, or to refrain from, any conduct, and [where] plaintiff does not identify any other imminent harm" does not constitute sufficient hardship for the purposes of ripeness. *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 254-55 (D.D.C. 2005).

Part of the ripeness doctrine in both these factors is "subsumed into the Article III requirement of standing," whereby a petitioner must show injury-in-fact. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). However, "[e]ven if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Id.* (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003)). Accordingly, the doctrine of prudential ripeness attempts to avoid inefficient and unnecessary "piecemeal review" and "ensures that Article III courts make decisions only when they have to, and then, only once." *Pub. Citizen,* 740 F.2d at 30; *Am. Petroleum Inst.*, 683 F.3d at 387. In challenges to agency action, the ripeness doctrine protects agencies from judicial interference until their decisions have been formalized and their effects have been felt in a concrete way. As the Supreme Court explained in *Abbott Laboratories*, ripeness helps to prevent premature judicial interference with agency decision-making, which could lead to "abstract disagreements over administrative policies." *Abbott Labs.*, 387 U.S. at 148. By promoting administrative efficiency and preventing unnecessary litigation, the ripeness doctrine helps to ensure that agencies can effectively carry out their

statutory duties.

Here, Plaintiffs have asserted several claims that are not presently ripe for review in this case, including (1) Plaintiffs' claim that FWS unlawfully extended "take liability" protection; (2) Plaintiffs' claim that the Corps' list of "retained waters" incorrectly omits certain waterbodies; and (3) Plaintiffs' claim related to consultation over impacts to species under NMFS jurisdiction. Each of these claims should be dismissed on ripeness grounds.

        **1.**       **Plaintiffs' Claim That FWS "Unlawfully Extended Take Liability Exemptions" Is Not Ripe For Review (Claims 3 and 4).**

Plaintiffs contend that FWS "extended broad take liability exemption to EPA, the State, and all future state 404 permittees" without including "ESA-mandated guardrails." Dkt. 98 at 42. Federal Defendants have fully explained why FWS' Incidental Take Statement complies with the ESA's requirements. Dkt. 99 at 76-82. Any challenge to the scope of incidental take coverage (including the terms and conditions that ensure that activities do not jeopardize federally-listed species or adversely modify designated critical habitat) should await an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate. Given the project-by-project involvement and oversight of EPA and FWS, *see supra* at 23-26, any such scenario is speculative at best and unripe for review at this stage. *See Cooling Water Intake Structure Coal.,* 905 F.3d at 79 n.19 (finding claim "unripe" where "EPA may still veto the permit" and "[i]f EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge"); *see also Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9, 2001 (D.D.C. 2001) (finding environmental challenge, which was based on ESA Section 7 to agency approval of oil and gas leases on federal lands, unripe where leases had not yet been issued). Indeed, to the extent a particular permit application creates an unlawful risk of take, Plaintiffs would have at least two viable, as-applied legal options at their disposal: first, they

could challenge the FDEP 404 permit under Florida administrative and judicial review processes *(see supra* at 19-23); and (2) second, Plaintiffs could sue in federal court under the ESA's citizen suit provisions. 16 U.S.C. § 1540(g).

This case resembles the Third Circuit's decision in *New Hanover Township v. U.S. Army Corps of Engineers.* There, the court dismissed as unripe a citizen group challenge to the Corps' use of a nationwide permit (under CWA Section 404) to authorize a city landfill project because a necessary state water quality certification (under CWA Section 401) had not yet been granted. 992 F.2d 470, 473-74 (3d Cir. 1993). The Third Circuit explained that the "results of the [state water quality certification] process cannot be predicted." *Id*. In that situation, "[b]ecause neither the [plaintiffs] nor anyone else will experience any effects from the Corps' decision [to approve use of the nationwide permit to authorize the project] unless and until Pennsylvania grants a water quality certificate, when fill work can begin, this case is not ripe." *Id*. The Third Circuit instructed that the citizen group in that case "should wait until Pennsylvania makes its decision [to approve or deny a water quality certificate] and then, assuming that injury is impending, file suit." *Id*. (relying upon *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 367 (3d Cir. 1986), where the Third Circuit "ruled that a challenge to a state agency's decision regarding the allocation of new buses among transportation companies was not ripe *because a federal agency possessed veto power over the state agency's decision*" (emphasis added)).

The crucial point is that no harm to Plaintiffs from the Incidental Take Permit would arise unless and until FDEP takes a particular action that implicates take liability in the first instance.[32]

---

[32] In *Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 110 (D.D.C. 2019), a district court found that, in the context of ESA Section 7 consultation related to continuation of an approved tuna fishery, NMFS's refusal to treat a fishing industry association as an "applicant" in the consultation process was ripe for review. Of course, here, Plaintiffs do not claim to be an applicant in an ongoing consultation process.

That outcome is contingent upon how FWS and EPA exercise their oversight authority, which allows these federal agencies to impose requirements necessary to protect federally-listed species and habitat. In other words, any harm arising from the Incidental Take Statement is multiple steps away: at step one, it requires FDEP to propose to issue a new 404 permit that would cause take of species; at step two, it requires FWS to take inadequate action to protect federally-listed species and habitat; and at step three, it requires EPA to concur and also decline to impose protective measures in its oversight capacity. While Plaintiffs may eventually encounter a situation where they may want to challenge an FDEP 404 permit for allowing unacceptable adverse impacts to federally-listed species, no such situation is presented here. The Court should decline to review an abstract, unripe claim, when concrete, as-applied challenges will be available later.

### 2. Plaintiffs' Challenge to the Corps' List Of "Retained Waters" Is Neither Ripe Nor Based on "Final Agency Action" (Claim 7).

Plaintiffs contend that the Corps violated the law when it approved the list of "retained waters" in Florida.[33] Dkt. 98 at 70-72. In their view, the Corps should have completed "navigability assessments" or "studies" of every waterbody in the State of Florida to ensure that it correctly captured all "historic use" waters and any other waters that fall within the statutory definition for

---

[33] Plaintiffs separately argue in (Part IV.E) that "Florida's program did not demonstrate authority to regulate all assumable *waters of the United States*." Dkt. 98 at 67-70. This argument, however, is focused on the scope of "waters of the United States" under Florida's program, particularly on the impact of post-decisional litigation regarding the definition of this phrase. Federal Defendants have explained that these concerns are not relevant here. Dkt. 99 at 58. Florida's program requires permit coverage for "waters of the United States," and going beyond that, Florida requires Section 404 permits for *all waters*, unless the applicant "clearly demonstrates" that "waters of the United States" are not present. *See* Florida 404 Handbook at pages 4-5 (codified at F.A.C. 62-331.010(5); EPA-HQ-OW-2018-0640-0002-A20). While post-approval disagreements have arisen between Florida and EPA over the proper interpretation of "waters of the United States," particularly in light of various recent district court orders, these post-decisional issues are not relevant to the merits in this matter, nor do they provide Plaintiffs a basis for standing. For the Court's awareness, in October 2022, the Supreme Court heard argument in *Sackett v. EPA*, No. 21-454, which involves the proper interpretation of "waters of the United States," and a decision is expected by the end of the current term.

non-assumable waters. Again, Federal Defendants have fully and persuasively explained why this

claim lacks merit. Dkt. 99 at 43-47. But this is yet another issue that this Court need not reach,

because it is not ripe.

This is precisely the kind of issue that the *Abbott Labs'* ripeness test rules out. The Corps'

approval of the retained waters list does not have a "sufficiently direct and immediate" impact on

Plaintiffs unless and until they challenge a specific project involving a specific waterbody that they

believe is incorrectly excluded from the list. This "claim is not ripe for adjudication [because] it

rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

all." *McCray*, 574 F. Supp. 3d at 12. Awaiting such a scenario would ensure that the "scope of the

controversy" and "factual components" are "fleshed out, by some concrete action applying the

regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan*, 497

U.S. at 891 .

Even if the list were faulty in its current state, which Florida does not believe to be true, an

agency action that "does not require [plaintiffs] to engage in, or to refrain from, any conduct, and

plaintiff does not identify any other imminent harm" does not constitute sufficient hardship for the

purposes of ripeness. *Oceana*, 384 F. Supp. 2d at 255. Ruling now on the correctness of the

Retained Waters List, when a waterbody's inclusion on the list is an exceedingly fact-specific issue

involving analysis of historic and current navigation and other factors, would be a fruitless and

hypothetical exercise in the abstract. This is especially true where, as here, Florida's program

includes a process for updating the Retained Waters List, as needed and as warranted.

Separately, and contrary to Plaintiffs' assertion in their summary judgment motion (Dkt.

98 at 70-71), Plaintiffs are very likely challenging a list that does not actually constitute final

agency action under the APA.[34] The Retained Waters List is attached to the MOA between FDEP and the Corps (CORPS004322-CORPS004334). The list (which includes over 500 rivers, lakes, creeks, and streams – spread across the State of Florida – that are considered, for purposes of Section 404(g), to be "retained waters" (non-assumable waters)) expressly includes "all waters subject to the ebb and flow of the tide shoreward to their high water mark *that are not specifically listed* …, including wetlands adjacent thereto landward to the administrative boundary." CORPS004331. This same understanding is reflected in the MOA itself, CORPS004323, which also provides that the list will be updated when: "the Corps makes a navigability determination," "a Federal court makes a navigability determination," "Congress makes" such a determination, or "there are applicable rule changes." Additionally, the MOA explains that the list will be updated, as appropriate, through "Joint Coordination Procedures" between the Corps and FDEP. CORPS004324. And the MOA recognizes that modifications to the Retained Waters List are subject to EPA approval under 40 C.F.R. § 233.16(d). CORPS004324.

Whether this list meets the test for final agency action is suspect. *Hawkes*, 578 U.S. 590, 597 (2016) (applying *Bennett v. Spear's* two-part test to find that Corps' approved jurisdictional determinations, which are binding on the Corps and subject landowners to potential enforcement action, constitute final agency action subject to judicial review). "Even if final, an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *Id.* at 600 (citing 5 U.S.C. § 704). And here, any person (including Plaintiffs) may seek a modification to the list of retained waters in any circumstance.[35]

---

[34] *See* Dkt. 99 at 59 n.17 (Federal Defendants note that they have not conceded that the retained waters list was final agency action reviewable under the APA).

[35] In 2019, a district court in Wisconsin found that the retained waters list approved for the Michigan 404 program constituted final agency action. *See Coal. to Save Menominee River Inc. v. U.S. Env't. Prot. Agency*, 423 F. Supp. 3d 560, 568 (E.D. Wis. 2019) ("The final agency action,

Plaintiffs point out that "EPA has argued [in other cases] that after assumption, changes to the [retained waters] list require modification of the program (which only EPA can approve)." Dkt. 98 at 70 n.33 (citing *Menominee Indian Tribe,* 947 F.3d at 1074–75  (Hamilton, J. concurring) (cited by *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 212 n.9 (D.D.C. 2022))). That may have been true for the Michigan program, but the Florida 404 Program, as approved by EPA, allows the Corps and Florida to cooperatively resolve issues involving whether particular projects are inside or outside of "retained waters," as noted above. This is entirely logical as the exercise of identifying "retained versus assumable waters" in theory is easier than in actual project-specific situations, which inherently involve line-drawing based on a close review of individual projects' location and impacts. In Florida's program, the Corps and Florida are working collaboratively to address the status of waters when needed. Wolfe Dec. ¶ 48. Certainly, EPA can and should reassess the list of retained waters at a program level where warranted, but nothing in the statute or regulations preclude the Corps and Florida from collaborating to ensure that lines are properly drawn with regard to classification of specific projects. Here, where a project sits on both sides of the administrative line demarcating the divide between retained and assumable waters, the default rule under the MOA is that the permit application is processed by the Corps of Engineers. CORPS004323.

Whether as a matter of ripeness or lack of final agency action, the Corps' list of retained waters is not properly subject to judicial review at this juncture. Plaintiffs are free to bring a

---

here, is the EPA's 1984 decision allowing Michigan to assume permitting authority over Section 404 permits related to the Menominee River, and the statute of limitations period to challenge that action has long expired."). But that was in the context of an as-applied challenge to EPA's decision in 2018 to not object to a state 404 permit for a river that the plaintiff believed should have been classified as a retained water. There was also no discussion in that case as to whether the Michigan program defined the list of retained waters in the same manner (i.e., with a list of rivers, lakes, creeks, and streams along with a catch-all for any other water that meets the definition). The approach to retained waters lists has improved since 1984. Dkt. 99 at 59-62.

separate challenge later to a permit action involving a particular waterbody that they believe should be removed from the list. In fact, a plaintiff "may argue in state court that [the State] lacks permitting jurisdiction over [a specific] portion of [a] River under § 1344(g)(1)" and "a state court will need to decide it." *Id.* at 1075 (Hamilton, J., concurring) (noting that "Michigan courts have heard Clean Water Act challenges to state actions").

### 3. Plaintiffs' Claims Based on NMFS Species Are Unripe and Likely Moot (Claims 5, 11, and 12).

Plaintiffs assert several claims (Claims 5, 11, 12) related to the decision by EPA and/or NMFS to not engage in formal consultation. These claims are specific to listed marine or coastal species in Florida under NMFS jurisdiction.[36] For the same reasons explained above, claims related to adverse impacts to NMFS species are not ripe for review here.

Florida's 404 program is limited to "assumable waters," which includes *no coastal or marine waters*. NMFS species would be anticipated to occur in marine waters, coastal waters, or other areas subject to the ebb and flow of the tide, which would all be classified as "retained waters" for these purposes (and thus, subject to Corps Section 404 permitting, not Florida 404 permitting). To the extent a proposed Florida 404 permit may eventually affect NMFS species, the federal agencies (EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns at that time. Otherwise, such a decision would be subject to challenge at that time.

But again, a scenario where Florida approves a 404 permit that causes harm to marine or coastal species is unlikely to occur given the assignments of regulatory jurisdiction here among the federal and state agencies. Certainly, any such scenario would be highly species-specific,

---

[36] NMFS (also known as "NOAA Fisheries") currently has regulatory jurisdiction "over 163 endangered and threatened marine species (79 endangered; 84 threatened), including 65 foreign species (39 endangered; 26 threatened)." NMFS, *Species Directory*, available at https://www.fisheries.noaa.gov/species-directory/threatened-endangered.

project-specific, and location-specific. All federal agencies have a duty under ESA Section 7(a)(1) to exercise their authorities to ensure conservation of species. Nothing about Florida's Section 404 program triggers new or unique impacts to NMFS species. Moreover, these NMFS-based claims are likely moot due to EPA's decision to initiate consultation with NMFS at this time. Dkt. 99 at 85; Wolfe Dec. ¶ 50.

## CONCLUSION

For the foregoing reasons, Florida Intervenors are entitled to summary judgment on all claims and Plaintiffs' motion for summary judgment should be denied. With regard to the litany of extra-record, post-hoc arguments asserted by Plaintiffs in the context of merits arguments, this Court should ignore them. The record before the Court strongly supports the validity of EPA's approval of Florida's Section 404 Program and the related Programmatic BiOp, as well as the actions by the Corps. Though Plaintiffs are not entitled to any relief, if this Court is inclined to find in favor of Plaintiffs with respect to any particular claim, Florida Intervenors concur with the Federal Defendants that the Parties should be afforded an opportunity to brief remedy separately.

Dated: May 10, 2023

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)

50

(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May 2023, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

    *Plaintiffs*,

    v.                                                   Civil Action No. 21-119 (RDM)

MICHAEL S. REGAN, *et al.*,

    *Defendants.*

**<u>MEMORANDUM OPINION</u>**

Plaintiffs the Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the

Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St.

Johns Riverkeeper ("Plaintiffs") bring this challenge to various agency actions relating to the

Environmental Protection Agency's ("EPA") approval of the State of Florida's application to

assume (from the U.S. Army Corps of Engineers ("Corps")) permitting authority under Section

404 of the Clean Water Act ("CWA") within the State.  *See Ctr. for Biological Diversity v.*

*Regan*, 597 F. Supp. 3d 173, 179 (D.D.C. 2022) ("*CBD I*").  Defendants include the EPA, the

Corps, the U.S. Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service

("NMFS"), and several federal officials sued in their official capacities (collectively, the

"Federal Defendants").  Defendants also include the State of Florida and the Florida Department

of Environmental Protection ("FDEP") (collectively, "Florida" or the "State"), which have

intervened to defend the assumption and resulting permitting program.

Plaintiffs allege that the Federal Defendants violated the Administrative Procedure Act

("APA"), 5 U.S.C. § 551 *et seq*., the Clean Water Act, 33 U.S.C. § 1251 *et seq*., the Endangered

Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq*., in their rush to transfer this permitting authority to Florida in the final days of the last administration.  In prior opinions, the Court addressed some, but not all, of Plaintiffs' APA claims.  This opinion addresses only Plaintiffs' claims involving the Endangered Species Act; the Court will, if necessary, address the remaining claims in a subsequent opinion.

Given the complexity of the relevant statutory and regulatory background, it is necessary to provide somewhat greater detail than usual to introduce the questions presented.  Under the ESA's implementing regulations, an "action agency"—here, the EPA—is required to "review its [contemplated] actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines that an "action may affect a listed species or critical habitat," *id.*, the agency must consult with the FWS and/or the National Marine Fisheries Service ("NMFS") (collectively, the "Service" or "Services") to ensure that its contemplated action "is not likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).  That process, which is referred to as "Section 7 consultation," requires the "consulting agency"—that is, the FWS and/or the NMFS—to prepare a Biological Opinion ("BiOp"), which details "how the agency action [at issue] affects the species or its critical habitat" and to determine whether the proposed action is likely to jeopardize the continued existence of any listed species.  *Id.* § 1536(b)(3)(A).  "If jeopardy . . . is found," the consulting agency is required to "suggest those reasonable and prudent alternatives which [the consulting agency] believes would not violate [the ESA] and [that] c[ould] be taken by the [action] agency or applicant in implementing the agency action."  *Id.*  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the

2

Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).

On the other hand, if the Service determines that the agency action will not violate the ESA (*i.e.*, that no "jeopardy" is likely) or that "reasonable and prudent alternatives" would avoid any such violation, the consulting agency must determine whether any "incidental take" of a listed species is nevertheless "likely to occur."  50 C.F.R. § 402.14(g)(5)–(7).  The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, trap, kill, capture, or collect, or to attempt to engage in any such conduct" with respect to a listed species.  16 U.S.C. § 1532(19).  "Take" is incidental if it "results from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.

If "incidental take" is "reasonably certain to occur," *id.* § 402.14(g)(7); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021), the consulting agency is required to issue an Incidental Take Statement ("ITS"), which, among other things, "specifies the impact of such incidental taking on the species" and "sets forth the terms and conditions . . . that must be complied with by the [action] agency or applicant (if any), or both," in order to "minimize such impact," 16 U.S.C. § 1536(b)(4).  Significantly, the ITS must specify "the amount or extent[] of such incidental taking on the species" or must use a "surrogate (e.g., similarly affected species or habitat or ecological conditions)" that can "be used to express the amount or extent of anticipated take" and that "sets a clear standard for determining when the level of anticipated take has been exceeded."  50 C.F.R. § 402.14(i).  The ITS serves the ESA's mandate "to give endangered species priority over the 'primary missions' of federal agencies," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978) ("*TVA*"), because, if the incidental take limit

is exceeded, the action agency "must reinitiate consultation *immediately*."  50 C.F.R.

§ 402.14(i)(4) (emphasis added).

The ITS is also important to regulated parties and serves their need for clarity, because

"any taking that is in compliance with the terms and conditions specified in the [ITS] shall not be

considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(2).  As

discussed further below, however, formal consultation under Section 7 is not the only way a

State or permittee can obtain liability protection:  Under Section 10 of the ESA, a State or private

party may seek a permit that allows "any taking otherwise prohibited by" the ESA and that,

accordingly, provides protection from liability for incidental take, *id.* § 1539(a)(1)(B).  But

absent liability protection of some sort, anyone who violates the ESA by taking an endangered or

listed "species within the United States," *id.* § 1538(a)(1)(B), risks civil penalties, criminal

liability, and "[c]itizen suits," *id.* § 1540(a), (b) & (g).

This case turns on the meaning and operation of these provisions, along with the

subsection of the CWA that authorizes a State to apply to the EPA to assume Section 404

permitting authority from the Corps.  *See* 33 U.S.C. § 1344(g).  Here, Florida submitted an

assumption application on August 20, 2020.  Only twice before has the EPA approved a State's

assumption application—it approved Michigan's application in 1984 and New Jersey's

application in 1994.  *See* 40 C.F.R. § 233.70 (Michigan); *id.* § 233.71 (New Jersey).  In this case,

however, Florida proposed something novel:  It sought to confer, through the Section 7

mechanism, broad ESA liability protection on all future state permittees for incidental take

resulting from *state*-issued dredge and fill permits.  Under the approach that Florida proposed,

the EPA would engage in Section 7 consultation with the FWS at the outset.  The agency action

under review would be the EPA's approval of Florida's assumption application, and the FWS

4

would issue a "programmatic" BiOp finding no jeopardy followed by a "programmatic" ITS that would protect all future state Section 404 permittees.

As Florida explained during the administrative process, "where a state administers the Section 404 program, permittees" who cannot "avoid entirely adverse impacts to listed species" must "seek an incidental take permit under ESA Section 10," Dkt. 112-2 at 3, or, as in New Jersey, the EPA can federalize those applications likely to adversely affect listed species, thereby triggering Section 7 consultation, Dkt. 112-3 at 369.  But because those paths to ESA liability protection were, in Florida's view, "burdensome," "time consuming[,] and resource-intensive," Dkt. 112-2 at 3–4, the State suggested a third option: a one-time Section 7 programmatic consultation in connection with the EPA's review of Florida's assumption application, thus allowing the FWS to issue a programmatic BiOp and a programmatic ITS, which would provide Florida permittees with liability protection under the ESA for all future permits issued under the state program—without requiring future Section 7 or Section 10 consultation.

This, then, brings the Court to the crux of the current dispute.  In Plaintiffs' view, the EPA and the FWS failed in this programmatic effort because neither the programmatic BiOp nor the programmatic ITS satisfies the demanding standards set by the ESA.  Neither, in their view, includes the ESA-mandated species-specific analysis, effects analysis, numerical quantification of take, and related statutory and regulatory requirements.  In short, neither document wrestles with the core ESA considerations or includes the fundamental ESA safeguards.

Defendants respond that, even if the programmatic BiOp and programmatic ITS lack these ESA-mandated elements, the FWS (and the EPA) permissibly deferred the relevant considerations to a "technical assistance process" involving Florida, the FWS, and the EPA. That technical assistance process, in their view, promises to address all of the ESA requirements

down the road, on a permit-by-permit basis—and they contend (over Plaintiffs' dissent) that the technical assistance process has successfully done so to date.  Under this process, Florida is required to consult with the FWS regarding each permit application, the FWS is provided the "opportunity" to specify take limits, and the State is required to include those limits, if supplied, in its state-issued permits.  In Defendants' view, this alternative process was not only justified, but necessary, because it would have been too difficult to conduct the required species-specific analyses, to quantify take, and to address similar concerns at the programmatic level given the scope of the agency action at issue.

To this, Plaintiffs reply:  If the FWS lacked the time, information, or ability to make the assessments and to set the limits required by the ESA and its implementing regulations, the FWS acted beyond its authority in purporting to make a no jeopardy finding and in conferring blanket ESA immunity on all future Florida Section 404 permittees.  The difficulty in their view, moreover, was not merely a product of the rush to finish the BiOp and ITS in the waning days of the last administration but, more fundamentally, was a product of the fact that the BiOp and ITS seek to attain an unlawful goal—that is, take liability protection premised on something other than the rigors of Section 7 or Section 10 of the ESA.

Now before the Court are the parties' cross-motions for summary judgment, Dkt. 98; Dkt. 99; Dkt. 101; Dkt. 102, and the Center for Biological Diversity ("CBD") and Sierra Club's motion for a temporary restraining order and preliminary injunction, Dkt 135.  CBD and the Sierra Club's motion seeks to enjoin Florida from issuing Section 404 permits for two developments, which they contend pose an imminent threat to the critically endangered Florida

panther and the threatened crested caracara, a rare bird of prey similar to a falcon.[1]  On October

19, 2023, the Court heard oral argument on the parties' cross-motions for summary judgment

and, on January 30, 2024, the Court heard oral argument on CBD and the Sierra Club's motion

for a preliminary injunction.  In addition to the administrative record, the parties, intervenors,

and amici have submitted many hundreds of pages of briefs and exhibits.

For the following reasons, the Court will **GRANT** Plaintiffs' motion for partial summary

judgment with respect to Counts 3, 4, 6, 10–13 of the Third Amended Complaint, Dkt. 77, and

will **DENY** the Federal Defendants' and Florida's cross-motions with respect to those Counts.

In short, the Court is persuaded that the FWS's programmatic BiOp and ITS fail to satisfy the

requirements of the ESA, and the Court is unpersuaded that the non-statutory technical assistance

process is a lawful substitute for the procedures and remedies that Congress enacted in the ESA

and that the Services established in the implementing regulations.  The Court previously

dismissed Counts 8 and 9 and, at least for now, defers addressing Counts 1, 2, 5, and 7 of the

Amended Complaint.  Because the Court grants substantive relief on the merits of Plaintiffs'

ESA-related claims, the Court will **DENY** as moot CBD and the Sierra Club's motion for a

temporary restraining order and preliminary injunction, Dkt. 135, on the ground that the relief

granted on summary judgment will address the risk of imminent harm raised in that motion.

## I. BACKGROUND

This is the Court's third opinion addressing the merits of this case—and probably not the

last.  In the Court's first merits decision, it rejected Florida's threshold challenge to Plaintiffs'

standing to bring this action; rejected Defendants' contention that the EPA's decision to grant

---

[1] The Court granted both developers—Tarpon Blue Silver King I, LLC and Cameratta
Companies LLC—leave to intervene for the limited purpose of opposing this motion.  *See* Dkt.
145; Dkt. 146; Min. Order (Jan. 24, 2024).

Florida's assumption application was an adjudication, rather than a rulemaking; granted Defendants' motions for summary judgment with respect to Count Nine, which challenged EPA's failure to codify Florida's Section 404 program; and denied without prejudice Defendants' motions for summary judgment with respect to Count Eight, which challenged the EPA's decision to give immediate effect to its decision, on the ground that the Court required further briefing to determine whether that claim was redressable. *CBD I*, 597 F. Supp. 3d at179–80.  The second opinion picked up where the first left off and further considered whether the EPA's failure to provide 30 days' notice before its assumption decision took effect was redressable—or whether that action constituted "a bell that cannot be unrung." *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, *4 (D.D.C. Aug. 23, 2023) ("*CBD II*").  Concluding that it lacked authority to remedy the alleged wrong, the Court granted the Federal Defendants' renewed motion for summary judgment and Florida's renewed motion to dismiss with respect to Count Eight for lack of jurisdiction. *Id.* at *10.

Having rejected Plaintiffs' procedural objections under the APA, the Court now turns to the question whether the FWS and the EPA violated the ESA in approving Florida's assumption application.  Central to that question are the "programmatic" BiOp and "programmatic" ITS issued by the FWS—both lack, among other things, required species-specific analyses and take limits, and they purport to confer ESA liability protection on, among others, future Florida Section 404 permittees without complying with the dictates of Section 7 or Section 10 of the ESA.

**A.      Statutory and Regulatory Landscape**

        1.      *The Endangered Species Act*

Almost fifty years ago, Congress enacted the Endangered Species Act "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). With that legislation, Congress made a "conscious decision . . . to give endangered species priority over the 'primary missions' of federal agencies," *TVA*, 437 U.S. at 185, and to afford "endangered species the highest of priorities," *id.* at 194. The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

Under the ESA, a species may be listed as either "endangered" or "threatened." *See* 16 U.S.C. § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The ESA is administered by two federal agencies: the FWS and the NMFS. 50 C.F.R. § 402.01(b). The FWS administers the statute with respect to species under the jurisdiction of the Secretary of the Interior, while the NMFS does so with respect to species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.

Section 9 of the ESA prohibits any person, including private parties, States, and federal agencies, from "taking" a protected species. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or

degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

To enforce Section 9's prohibition on take, the Secretary of the Interior or the Secretary of Commerce (collectively, the "Secretary") may assess civil penalties against alleged violators through administrative, trial-like proceedings.  *See* 16 U.S.C. § 1540(a)(1)–(2).  The ESA also authorizes the imposition of criminal penalties on those who knowingly violate the Act, a permit issued under the Act, or certain regulations, *id.* § 1540(b), and it authorizes the Attorney General to bring civil actions for injunctive relief, *id.* § 1540(e)(6).  Finally, the ESA authorizes citizen suits, which allow private parties to bring suit in federal district court to enforce the substantive provisions of the ESA and its implementing regulations against regulated parties, 16 U.S.C. § 1540(g)(1)(A); *see Bennett v. Spear*, 520 U.S. 154, 173–74 (1997), or to compel the Secretary to apply the prohibition on the taking of listed species in any State, 16 U.S.C. § 1540(g)(1)(B).

Recognizing that some take can occur as a result of otherwise lawful activities, Congress created two paths to ensure that "incidental take" does not jeopardize protected species or adversely modify or destroy critical habitat:  The first path, under Section 7, applies to federal agency actions, *id.* § 1536; and the second, under Section 10, applies to non-federal actions, *id.* § 1538.  Both mechanisms offer the promise of liability protection for incidental take if, but only if, those involved abide by the specific measures and standards specified by Congress and the Services.  *See id.* § 1536(o)(2); *id.* § 1539(a); 50 C.F.R. § 402.14(i)(5).

2.    *Section 7 and Formal Consultation*

"Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora."  *Nat'l Ass'n of Home Builders*, 551 U.S. at 652; *see* 16 U.S.C. § 1536.  An action "jeopardize[s] the continued existence of" a

species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  Section 7 applies only to "actions in which there is discretionary Federal involvement or control," *Id.* § 402.03, however, because if a statute mandates that an agency act in a specified manner, the consultation process would "override" that statutory mandate "by subjecting such [agency] action to the further condition that it pose no jeopardy to endangered species," *Nat'l Ass'n of Home Builders*, 551 U.S. at 664.  That conclusion applies, moreover, even when the statutory mandate "is not entirely mechanical"—that is, even when "it involves some exercise of judgment" on the agency's part "as to whether" the statutory criteria have been met—because, even then, the statute "does not grant [the agency] discretion to add another entirely separate prerequisite to [the] list" of relevant criteria, namely consideration of "the protection of threatened and endangered species as an end in itself."  *Id.* at 671.

Under Section 7(a)(2), "[e]ach Federal agency shall, in consultation with and with the assistance of [Service], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).  To achieve that end, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines—and the consulting agency concurs—that "the proposed action is not likely to adversely affect any listed species or critical habitat," then no formal consultation is required.  *Id.* § 402.14(b)(1).  But if a federal agency

11

concludes after an initial review that its action "may affect listed species or critical habitat," that agency must engage in "consultation" with the Service.  *Id.* § 402.14(a).

The agency that proposes to act in a manner that might affect listed species or critical habitat is referred to as the "action agency," while either the FWS and/or the NMFS serves at the "consulting agency."  *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 474 n.3 (D.D.C. 2014). In this case, the EPA was the "action agency," the FWS was the "consulting agency" (although, in Plaintiffs' view, the EPA should have also engaged in formal consultation with the NMFS), and the agency action subject to consultation was the EPA's approval of Florida's assumption application.

"Broadly speaking, the object of consultation under the statute is for the [consulting] agency to determine whether the project will violate [Section 7's] prohibition on jeopardizing the continued existence of endangered and threatened species."  *Ctr. for Biological Diversity v. Ross*, 2020 WL 1809465, at *2 (D.D.C. Apr. 9, 2020).  At the conclusion of the Section 7 consultation process, the consulting agency must issue a biological opinion—that is, a BiOp—"setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

<u>The Biological Opinion</u>

The consulting agency's BiOp must "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C § 1536(b)(3)(A).  To prepare the required BiOp, the consulting agency must:

> (1)   Review all relevant information provided by the [action] agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.

(2)     Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3)     Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4)     Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat[,] [and]

. . .

(7)     Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

50 C.F.R. § 402.14(g).  "In formulating its [a] biological opinion, [b] any reasonable and prudent alternatives, and [c] any reasonable and prudent measures, the Service" is required to "use the best scientific and commercial data available." *Id.* § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

Establishing the "environmental baseline of the listed species or critical habitat" is a substantial undertaking.  The "environmental baseline" is "the condition of the listed species . . . without the consequences to the listed species . . . caused by the proposed action."  50 C.F.R. § 402.02.  It includes (a) "the past and present impacts of all Federal, State, or private actions and other human activities in the action area;" (b) "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation;" and (c) "the impact of State or private actions which are contemporaneous with the consultation in process."  *Id.*  The environmental baseline considers "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify."  *Id.*

13

The consulting agency must then "[e]valuate the effects of the action and cumulative effects on the listed species." *Id.* § 402.14(g)(3). The "effects of the action" include "all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02. A consequence is "caused by" the proposed action if (a) "it would not occur but for the proposed action" and (b) "it is reasonably certain to occur." *Id.* "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* "Cumulative effects" on the listed species, by contrast, are "those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* (emphasis added).

It is only after engaging in this detailed analysis that the consulting agency can "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4). With that analysis complete, the consulting agency must then offer its "opinion on whether the action" will violate Section 7, *i.e.*, will cause jeopardy to a listed species or result in destruction or adverse modification of a critical habitat. *Id.* § 402.14(h)(1); *see also* 16 U.S.C. § 1536(a)(2).

In sum, a BiOp (a) must use the best scientific data available, (b) must determine the environmental baseline of the listed species or critical habitat, (c) must evaluate the effects of the action and cumulative effects on the listed species or critical habitat, and (d) must add that baseline to the effects of the action and cumulative effects on the listed species or critical habitat (in light of the status of the species and critical habitat), 50 C.F.R. § 402.14(g), and (e) must then use this data and analysis to determine whether the action at issue  is "[l]ikely to jeopardize the

continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'jeopardy' biological opinion," or is "[n]ot likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'no jeopardy' biological opinion," *id.* § 402.14(h)(1)(iv).

In the event of a "jeopardy biological opinion," the consulting agency "shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(3), (g)(5). "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Nat'l Ass'n of Home Builders*, 551 U.S. at 652.

<u>The Incidental Take Statement</u>

In the event of a "no jeopardy biological opinion," the consulting agency must provide an incidental take statement, 16 U.S.C. § 136(b)(4); 50 C.F.R. § 402.14(i), if it concludes that take is "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7); *Shafer & Freeman Lakes Env't Conservation Corp*, 992 F.3d at 1080. "Incidental take" refers "to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. The ESA requires that the ITS:

(i)      specif[y] the impact of such incidental taking on the species,

(ii)     specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii)    in the case of marine mammals, specif[y] those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

     (iv)    set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C.A. § 1536(4).

The governing regulations define "the impact" of the incidental take to mean "the amount or extent[] of such incidental taking on the species."  50 C.F.R. § 402.14(i)(1)(i).  If necessary, the consulting agency may use a "surrogate (e.g., similarly affected species or habitat or ecological conditions) . . . to express the amount or extent of anticipated take," but only if the BiOp or ITS "[d]escribe[s] the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take . . . and sets a clear standard for determining when the level of anticipated take has been exceeded."  *Id.*  The regulations also require monitoring of incidental take and provide that "the Federal agency or any applicant must report the progress of the action and its impact on the species to the [FWS or NMFS] as specified in the incidental take statement."  *Id.* § 402.14(i)(3).  Most significantly, the action agency and consulting agency "must reinitiate consultation *immediately*" if the "amount or extent of incidental taking" specified in the ITS, as required by the regulations, "is exceeded."  *Id.* § 402.14(i)(4) (emphasis added); *id.* § 402.16(a).  Finally, as discussed more fully below, "any taking that is in compliance with the terms and conditions specified" in an ITS "shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1563(o)(2).

<u>Framework Programmatic Action</u>

The Services have jointly issued a "Consultation Handbook," which defines programmatic consultation as a "consultation addressing an agency's multiple actions on a

program, regional or other basis." Dkt. 112-1 at 195 (ESA Section 7 Consultation Handbook).[2]

The ESA's implementing regulations further explain that "[f]or a framework programmatic

action, an incidental take statement is not required at the programmatic level." 50 C.F.R.

§ 402.14(i)(6).  This is because "any incidental take resulting from any action subsequently

authorized, funded, or carried out under the program will be addressed in subsequent section 7

consultation, as appropriate." *Id.*  "For a mixed programmatic action, an incidental take

statement is required at the programmatic level only for those program actions that are

reasonably certain to cause take *and* are not subject to further section 7 consultation." *Id.*

(emphasis added).

The regulations define a "[f]ramework programmatic action" to mean "a Federal action

that approves a framework for the development of future action(s) that are authorized, funded, or

carried out at a later time," where "any take of a listed species would not occur unless and until

those future action(s) are authorized, funded, or carried out and subject to further section 7

consultation." *Id.* § 402.02.  Similarly, a "[m]ixed programmatic action" is defined to mean "a

Federal action that approves action(s) that will not be subject to further section 7 consultation,

and also approves a framework for the development of future action(s) that" will be "authorized,

funded, or carried out at a later time" and that will be "subject to further section 7 consultation."

*Id.*  In short, the regulations recognize that certain framework programmatic actions might not be

ripe for meaningful Section 7 consultation at the outset and thus permit the required consultation

to occur in stages, as the future federal actions are authorized, funded, or carried out.

---

[2] The Federal Defendants argue that the "Services' views in the Consultation Handbook are
entitled to deference." Dkt. 99 at 22 n.7 (citing *Miccosukee Tribe of Indians v. United States*,
566 F.3d 1257, 1273 (11th Cir. 2009)).

Section 7 Liability Protection

Section 9 of the ESA provides that "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any [listed endangered species] within the United States or the territorial sea of the United States," 16 U.S.C. § 1538(a)(1)(B), and this prohibition, in turn, triggers potential civil or criminal liability under Section 11 of the Act, *id.* § 1540. Section 7, however, provides an escape hatch for "any taking that is in compliance with the terms and conditions specified" in an ITS.  16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).  Importantly, compliance with the terms and conditions specified in an ITS provides take liability protection not just to the federal agency and applicant, but to any party who "engage[s] in incidental takes consistent with the statement without applying for section 10 permits."  *Ramsey v. Kantor*, 96 F.3d 434, 437 (9th Cir. 1996).

The ITS thus acts as both a safe harbor and as a check.  Private entities and individuals (as well as government officers and employees) can avoid Section 9 liability for take in compliance with the terms and conditions of an applicable ITS—but, as soon as the take limit specified in the ITS is exceeded, the action and consulting agencies must "immediately" reinitiate consultation, 50 C.F.R. § 402.14(i)(4), thereby allowing the Service to reassess whether its original "no jeopardy" determination still holds in light of the unanticipated take and, if not, whether additional limitations and conditions are necessary to protect the species.

3.      *Section 10 and Incidental Take Permits*

Not all acts that result in incidental take involve a federal agency action, and thus not all such acts fall within the scope of the Section 7 consultation process.  For non-federal action, Section 10 of the ESA authorizes the Services to issue permits, "under such terms and conditions

as [the Service] shall prescribe," that allow "any taking otherwise prohibited by" Section 9, but

only "if such taking is incidental to, and not the purposes of, the carrying out of an otherwise

lawful activity." 16 U.S.C. § 1539(a)(1)(B). As with Section 7 consultation, however, Congress

mandated robust analyses and standards that the Services must satisfy before permitting

incidental take pursuant to Section 10. *See id.* § 1539(a).

To obtain a Section 10 permit, the applicant must submit a conservation plan, known as a

"Habitat Conservation Plan" or "HCP," that describes:

(i)     the impact which will likely result from such taking;

(ii)    what steps the applicant will take to minimize and mitigate such impacts,
        and the funding that will be available to implement such steps;

(iii)   what alternative actions to such taking the applicant considered and the
        reasons why such alternatives are not being utilized; and

(iv)    such other measures that the [Service] may require as being necessary or
        appropriate for purposes of the plan.

*Id*. § 1539(a)(2)(A). The Service must publish notice of the permit application in the Federal

Register, and "[i]nformation received by the [Service] as part of [the] application shall be

available to the public as a matter of public record at every stage of the proceeding." *Id*.

§ 1539(c). The Service must also provide an "opportunity for public comment" on the

application and related conservation plan. *Id*. § 1539(a)(2)(B). Finally, before issuing the

permit, the Service must make certain findings, including findings that the taking will be

incidental, that it "will not appreciably reduce the likelihood of the survival and recovery of the

species in the wild," and that "the applicant will, to the maximum extent practicable, minimize

and mitigate the impacts of such taking." *Id*.

Section 10 requires all incidental take permits to include "such terms and conditions as

the [Service] deems necessary or appropriate" and directs that the Service "*shall* revoke a

permit . . . if he finds that the permittee is not complying with the terms and conditions of the permit." *Id.* § 1539(a)(2)(B)–(C) (emphasis added).

## B.      Administrative Background

Under Section 404 of the Clean Water Act, the Army Corps of Engineers is authorized to issue permits, "after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a); *see also id.* § 1344(d) ("The term 'Secretary' as used in this section means the Secretary of the Army, acting through the Chief of Engineers."). When Congress enacted the CWA, however, it "expressed its desire 'to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution,'" and it thus established a process to allow States to implement the Section 404 permit program on their own, "so long as the EPA first gives them permission to do so." *CBD I*, 539 F. Supp.3d at 139 (quoting 33 U.S.C. § 1251(a)). To apply, a State must submit an application to the EPA containing "a full and complete description of the program it proposes to establish and administer under State law" and "a statement from the attorney general" affirming that "the laws of such State . . . provide adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1). After determining that the State's "submission is complete," 40 C.F.R. § 233.15(a), the EPA must publish the application in the Federal Register for public comment and must provide copies of the application to the Corps, the FWS, and the NMFS for comment, *id.* § 233.15(d)–(f); *see also* 33 U.S.C. § 1344(g). Then, "[w]ithin 120 days of receipt of a complete program submission (unless an extension is agreed to by the State), the Regional Administrator [of the EPA] shall approve or disapprove the program based on whether the State's program fulfills the requirements of [the governing regulations] and

the [CWA], taking into consideration all comments received."  40 C.F.R. § 233.15(g); *see also* 33 U.S.C. § 1344(h)(1).

After the EPA has transferred permitting authority to a State, the agency continues to oversee that State's permitting program.  The State must transmit copies of each permit application to the EPA; the EPA must then provide copies of each permit application to the FWS and the NMFS; the EPA may also "provide written comments to such State with respect to such permit application" within 90 days; and, if the EPA objects to the issuance of the permit, the State may not issue the permit "unless it modifies [the] proposed permit in accordance with [the agency's] comments."  33 U.S.C. § 1344(j).  "In the event that the [State] neither satisfies EPA's objections or requirement for a permit condition nor denies the permit, the Secretary [of the Army] shall process the permit application."  40 C.F.R. § 233.50(j); *see also id.* § 233.2; *id.* § 233.1(a).  In other words, permitting authority power reverts to the Corps for that particular permit.  To facilitate this ongoing oversight, an EPA regulation requires participating States to enter into a Memorandum of Agreement ("MOA") with the EPA that "set[s] out the State and Federal responsibilities for program administration and enforcement" and that specifies the "classes and categories of permit applications for which EPA will waive Federal review."  40 C.F.R. § 233.13(b), (b)(1).  Finally, if the EPA determines "after public hearing that a State is not administering" its Section 404 program "in accordance with" the requirements of the CWA, and if the State does not take "appropriate corrective action . . . within a reasonable time," the EPA "shall . . . withdraw approval of such program until [it] determines" that the State has taken the required "corrective action."  33 U.S.C. § 1344(i).  During any period of withdrawal, the Corps "shall resume" administration and enforcement of the Section 404 program in the relevant jurisdiction.  *Id.*

On August 18, 2020, the State of Florida submitted to the EPA an application to administer the Section 404 permitting program within its borders, and, just two days later, the EPA determined that the application was complete, thus triggering the 120-day review period. *See CBD I*, 597 F. Supp. 3d at 182; *see also* 33 U.S.C. § 1344(h)(3).  Roughly four months later, in December 2020, the EPA published a notice in the Federal Register approving Florida's application, making it the first State to assume Section 404 authority in nearly thirty years.  *CBD I*, 597 F. Supp. 3d at 183.  Other than Florida, just two other states, New Jersey in 1994 and Michigan in 1984, have assumed Section 404 permitting authority.  *Id.* at 182 (citing 40 C.F.R. § 233.70 (Michigan); 40 C.F.R. § 233.71 (New Jersey)).

Notably, the EPA did not engage in formal Section 7 consultation before approving either prior application.  *See* Dkt. 104 at 63 n.35.  When New Jersey applied to assume Section 404 permitting authority, the EPA undertook only informal Section 7 consultation.[3]  Formal

---

[3] As explained further below, at that time, the EPA's view was that its approval of a Section 404 assumption application was discretionary and therefore subject to Section 7 of the ESA.  *Cf.* Dkt. 112-3 at 373–74.  The EPA changed its view following the Supreme Court's decision in *National Association of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644 (2007), *see* Dkt. 112-3 at 373, and then subsequently reversed position again at Florida's urging, *see* Dkt. 56-1 at 775 (ESA Consultation Memo).  Because Plaintiffs and Defendants agree that the EPA's approval of a State's Section 404 assumption application is discretionary and, accordingly, that it triggers the Section 7 consultation process, the Court need not—and does not—express a view on that question.

The Court notes, however, that the EPA premised its most recent view—that its approval of a State's 404 assumption application is discretionary and thus triggers Section 7 consultation—on the fact that the EPA is required "to consider the Services' comments before deciding to approve an assumption request, and [the requirement that] states . . . comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program."  Dkt. 56-1 at 779.  The first of these premises, however, is in significant tension with the Federal Defendants' recent assertion that its decision to grant Florida's assumption application was not "based on its review of . . . the BiOp."  Dkt. 158 at 6.  Nor is it clear that the second of these premises shows that approving a State's Section 404 assumption application is "discretionary" under the reasoning of *National Association of Homebuilders*.  There, the Supreme Court explained that the relevant

consultation was not required because the EPA determined, during informal consultation, that its approval of New Jersey's assumption application would not adversely affect any species. *See* 50 C.F.R. § 402.14(b)(1) ("A federal agency need not initiate formal consultation if . . . the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.").  In particular, because the State had agreed to "federalize"—that is, pass to the FWS and NMFS for review—any permits that might affect protected species, Dkt. 112-3 at 369; *see also* Dkt. 112-5 at 149, 152–54 (New Jersey MOA describing the process for federalizing permits), and because the State had agreed that, when the "[c]oordination process under the MOA" failed to eliminate adverse effects to listed species, it would ensure that it or the permit applicant would "seek authorization for [] incidental take" under Section 10, Dkt. 112-5 at 160, the assumption of Section 404 permitting authority would have no effect on any species.  Because neither the FWS nor the NMFS prepared a BiOp or ITS, New Jersey permit applicants did not receive federal incidental take liability protection under Section 7 as part of New Jersey's assumption.  To the contrary, the governing MOA states: "Nothing in this MOA authorizes any take of federally listed threatened

---

question is whether, as a matter of statutory interpretation, formal consultation would "override" the statutory text by "subjecting" the relevant agency action (here, the EPA's approval of a state Section 404 assumption application) to the "further condition that it pose no jeopardy to endangered species."  551 U.S. at 664.

Here, the EPA says that the statutory text effectively includes a no-jeopardy condition because Section 404 requires the EPA "to determine whether [the] [S]tate [submitting the application] . . . has the authority to issue permits which," among other things, prohibit the issuance of any permit that could "jeopardize the continued existence of" a listed species.  Dkt. 56-1 at 778 (citing 40 C.F.R. § 230.10(b)(3)).  The question whether a State has adequate *authority* to ensure that no state-issued permit causes jeopardy, however, at least arguably differs from the question whether the federal action—here, the approval of the assumption application—is likely to jeopardize a listed species.

or endangered spec[ies]."  Dkt. 112-5 at 157 (New Jersey MOA).  Thus, any take liability

protection would flow from either Section 7 (through a federalized permit) or Section 10.

     Although the record is less revealing with respect to Michigan, all agree that it also

assumed Section 404 permitting authority without the EPA engaging in Section 7 consultation

and, accordingly, without the benefit of Section 7 liability protection for future, Michigan

permittees.  According to the Plaintiffs, this is because Michigan entered into a cooperative

agreement with the Services pursuant to Section 6 of the ESA.  *See* 16 U.S.C. 1535.  For present

purposes, however, the Court need not go beyond what is disclosed by the administrative record

and the parties' agreement—that is, that Florida is the first State to seek protection for the State

and future Section 404 permittees based on a programmatic BiOp and ITS issued pursuant to

Section 7 of the ESA.  *See, e.g.*, Dkt. 156 at 7, 87 (Oct. 19, 2023 Hrg. Tr.).

     In 2010—long after Michigan and New Jersey had assumed Section 404 permitting

authority—the EPA concluded in a letter memorandum that its decision whether to approve a

state application to assume Section 404 permitting authority constituted a non-discretionary

federal action and, accordingly, was not subject to Section 7 of the ESA.  *See* Dkt. 112-3 at 375–

76 (2010 EPA ESA Consultation Position Memo).  The EPA explained that, based on its reading

of the Supreme Court's decision in *National Association of Home Builders v. Defenders of

Wildlife*, 551 U.S. 644 (2007), the decision to transfer Section 404 authority to a State is non-

discretionary because once a State satisfies the statutory criteria, the EPA *must* approve the

State's application.  Dkt. 112-3 at 375 (2010 EPA ESA Consultation Position Memo).  Indeed, if

the EPA does not act on a complete application within 120 days, the "program shall be deemed

approved."  33 U.S.C. § 1344(h)(3).

To achieve a "streamlined" process for Section 404 permittees to receive liability protection for incidental take, Florida asked the EPA to reconsider its 2010 conclusion that the Section 404 assumption process was non-discretionary under N*ational Association of Home Builders* and to conclude that the assumption process requires Section 7 consultation and can, accordingly, yield programmatic ESA liability protection. *See, e.g.*, Dkt. 112-2 at 3 (Florida white paper "Streamlined Approach to Address Endangered Species Act Incidental Take Coverage"); Dkt. 112-3 at 344 ("Potential Endangered Species Act Compromise"). Florida argued that the EPA's 2010 analysis "resulted from a rushed review, ignored the actual text and legislative history of Section 404, and misapplied Supreme Court precedent" in *National Association of Home Builders*, which had considered Section 402, not Section 404, of the CWA. Dkt. 112-2 at 4. Florida further argued that the ESA is "*at least ambiguous*" and that, as a result, if the EPA agreed to change its position, it would "likely receive deference under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Id.* at 11 (emphasis in original).

Building on this argument, Florida proposed that the EPA engage in a "one time" "programmatic consultation" under Section 7 "in connection with [the] EPA's initial review of a state [Section 404 assumption] application." *Id.* at 3, 11. According to Florida's submission:

> This would allow the Services to issue a programmatic Biological Opinion ('BiOp') and a programmatic incidental take statement ('ITS'), which would identify procedural requirements for state permitting under Section 404 . . . . Provided these requirements are followed, the programmatic ITS would bring state Section 404 permits within the Section 7(o)(2) exemption from take liability.

*Id.* at 4. By taking this approach, the State posited, the EPA and Service could "provide project applicants the needed liability protection from claims arising under the ESA even though the activity is authorized pursuant to a state permit." Dkt. 112-3 at 345. To support its contention

that the EPA and the Services have the authority to issue programmatic BiOps and programmatic ITSs, which defer species-specific analyses and take limitations to a "technical assistance process," Dkt. 112-2 at 11–14, Florida invoked the Second Circuit's decision in *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76–77 (2d Cir. 2018).  The State stressed that the Second Circuit had upheld the use of a programmatic ITS in that case "despite its failure to numerically quantify the impacts" of take.  Dkt. 112-2 at 14.

Florida further argued that this programmatic approach was needed because, "thus far, where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10 separate and apart from the Section 404 permit process, which can take years to complete in contrast to the Section 7 process and is more burdensome for all involved."  Dkt. 112-2 at 3. According to the State, around ten percent of the Section 404 permits in Florida would require some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects with significant economic benefits to the State."  *Id.* at 3.  Moreover, to "facilitate the process" that it had proposed, Florida volunteered to "develop [a biological] assessment on [the] EPA's behalf or in cooperation with [the] EPA."  *Id.* at 14 & n.25; *see* 50 C.F.R. § 402.08.  A biological assessment ("BA") is "information prepared by or under the direction of" a federal agency to determine whether a proposed action may affect listed species. 50 C.F.R. § 402.02.  The EPA later used that BA (or, in Plaintiffs' words, "largely . . . cut and paste[d] it," Dkt. 98 at 31) to prepare its biological evaluation ("BE"), which it submitted to the FWS to assist in evaluating "the possible effects of [its] potential approval of . . . Florida's assumption" application.  Dkt. 112-4 at 89.

As the EPA acknowledged, there were other options available to protect state permittees from incidental take liability under the ESA.  It observed that state programs can (1) "completely avoid[] impacts" to protected species; (2) "federaliz[e]" all state 404 permits that may impact species, as occurs in New Jersey under its assumption program; or (3) require state permittees to engage in Section 10 review.  *See* Dkt. 112-3 at 368 (EPA response to comments).[4]  On December 12, 2019, however, the EPA agreed to Florida's "request[] that the [EPA] initiate an informal" ESA Section 7 consultation with the Services and "designate FDEP as the non-Federal representative to conduct informal consultation."  Dkt. 112-4 at 2 (EPA letter to FDEP).  The EPA explained that it was voluntarily initiating informal consultation while it gave "further consideration to [its] position" on whether consultation was required for approving a state 404 program.  *Id.*; *see also* Dkt. 112-2 at 351 (EPA letter to NMFS).

As early as November 2019, the FDEP told the Corps that the EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the programmatic level, and that the State had hired a contractor to prepare a BA.  Dkt. 112-8 at 106 (Corps email).  During a December 2019 meeting about Florida's assumption application, the FDEP further advised the Corps that the EPA would use that BA "to request consultation and produce a programmatic B[i]O[p]."  *Id.* at 107–09 (Corps email sending meeting notes).  Then, in February 2020, an FWS deputy field supervisor stated as follows in an email:

---

[4] At one point, the EPA expressed "institutional concerns regarding [Florida's] initial proposal to provide ESA Incidental Take authorization to permit applicants through the Section 7 consultation process."  Dkt. 112-3 at 344.  In response, Florida suggested yet a different approach under which the EPA would consult with the FWS on individual state 404 permits based on the EPA's oversight of state permits, *id.* at 344–45, essentially federalizing those permits.

> FYI—we had a good meeting yesterday with FWC, FDEP, EPA, and FDEP's consultants—GHD . . . .  They went through the draft BA but I was not given a copy.  The draft BA follows the [*Cooling Water*] BE as expected.  We provided some suggestions like "be careful of using words like consultation when you really mean coordination and technical assistance" . . . .
>
> I've already started writing parts of the B[i]O[p] by adapting generic standard language from the [*Cooling Water*] B[i]O[p] where appropriate.

Dkt. 112-5 at 170.  On April 1, 2020, FWS staff described the plan as follows:

> After assumption, FWS will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit.  FWS will merely be providing technical assistance on the project by project reviews to [F]DEP, [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [F]DEP issuing any particular 404 permit.

Dkt. 112-4 at 9 (FWS email to FDEP and FWC staff).  During that period, the EPA's formal position, remained that Section 7 did not apply to the agency's approval of a Section 404 assumption application, because such approvals were non-discretionary.

That changed when, five months after the EPA had initiated informal consultation and had designated the FDEP as its non-federal representative for consultation, it solicited public comment on "whether EPA's approval of a Clean Water Act Section 404 Program is non-discretionary for purposes of Endangered Species Act Section 7 consultation."  Dkt. 112-2 at 367 (85 Fed. Reg. 99 at 30,953 (May 21, 2020)) (capitalization altered).  The EPA expressly referenced Florida's white paper in its request for comment, seeking public comment on whether it "should . . . adopt the position articulated in the FDEP white paper."  Dkt. 112-2 at 369.  That is, the EPA requested comment on the programmatic BiOp-plus-ITS model that Florida had proposed.

On July 24, 2020, Florida submitted its completed BA to the EPA, "as the non-federal representative" designated by the EPA "to prepare this BA." *See* Dkt. 56-1 at 66, 68 (Florida BA). That document explained that, "[b]ecause of the statewide nature of [the State's assumption application], the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis [was] not possible in th[e] BA." *Id.* at 69. Instead, the BA set out "to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits." *Id.* Under that process, the FDEP proposed to "send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the []FWS for review and comment," to "consider any information that the []FWS provides as technical assistance," and to "include all species protection measures that the []FWS may recommend as permit conditions or [to] deny the request for a permit." *Id.* at 70. The BA concluded that "[i]t is anticipated" that a programmatic approach and technical assistance process "will result in procedural and substantive protections that are at least as protective as the protections afforded by the [Corps] Section 404 program and through section 7 consultation with the [Corps] under the ESA." *Id.* at 179.

On August 20, 2020, the State submitted its Section 404 assumption application to the EPA, and the EPA deemed the submission complete two days later. *See CBD I*, 597 F. Supp. 3d at 182–83; Dkt. 112-4 at 85. A draft Memorandum of Understanding ("MOU") was among the materials the State submitted. Dkt. 55-1 at 120 (unexecuted application MOU). As that document explained, "[u]pon assumption of the Section 404 Program, coordination between the []FWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, *which is anticipated to be outlined* in the []FWS's biological

opinion based on information included in the biological assessment," which Florida prepared,

and the EPA "submitted" to the FWS. *Id.* at 124 (emphasis added). The BiOp was not,

however, complete at that time and, therefore, was not included in Florida's assumption

application.

A week later, on August 27, 2020, the EPA announced the reversal of its prior position

regarding the applicability of the Section 7 consultation process to the EPA's consideration of

Section 404 assumption applications. Agreeing with Florida, the EPA concluded that the Section

7 process—including the issuance of a programmatic BiOp and ITS, and the extension of

"Section 9 liability protections to individual permits issued pursuant to the state . . . program"—

would apply. Dkt. 56-1 at 775, 778, 781 (ESA Consultation Memo). In its response to public

comments, the EPA stressed that neither federalizing permits nor Section 10 consultation was

"realistically feasible for states with an abundance of ESA listed species like Florida," Dkt. 112-

3 at 368, and in its final decision, the EPA explained that the "streamlined permitting process"

that the programmatic BiOp and ITS would put in place "would reduce costs and duplication of

efforts by state . . . and federal authorities and facilitate more effective and efficient state . . .

CWA Section 404 programs."[5]  Dkt. 56-1 at 781. Later, the EPA wrote that "requiring Florida's

permittees to seek an ESA Section 10 Incidental Take Permit, with the requirement to prepare a

Habitat Conservation Plan, would be extremely costly and take years to complete and therefore

is . . . not an option that Florida would pursue." Dkt. 112-3 at 369.

---

[5] Although several of the Plaintiffs in this case agreed with the EPA's new view that approval of
a State's assumption application was *discretionary*, thereby requiring Section 7 consultation, all
opposed the use of Section 7 in the programmatic manner advocated by Florida as unlawful
under the ESA. *See* Dkt. 56-1 at 785.

A few days later, on September 2, 2020, the EPA submitted a request for formal consultation under Section 7(a)(2) to the FWS.  Dkt. 112-4 at 85 (EPA letter).  Enclosed with the EPA's letter to the FWS was the EPA's Biological Evaluation.  *Id.*; *see also* Dkt. 112-4 at 87 (EPA BE).  The EPA stated that it was "requesting a *programmatic* consultation."  *Id.* at 85 (EPA letter) (emphasis added).

That same day, the EPA also sent a letter to the NMFS, but it did not request formal Section 7 consultation from the NMFS.  Dkt. 112-2 at 351 (EPA letter to the NMFS).  Rather, the EPA explained that, in its view, its decision whether to approve Florida's assumption application would have "no effect" on any species within the NMFS's jurisdiction.  *Id.*  The next day, the NMFS concurred with the EPA's "no effect" determination.  *See* Dkt. 112-2 at 352 (September 2020 NMFS letter to EPA).

On November 17, 2020, the FWS finalized its programmatic BiOp and programmatic ITS.  Dkt. 112-5 at 60 (BiOp); Dkt. 112-5 at 139 (ITS).  The BiOp did not include any species-specific analyses of the baseline status of species or effects of the EPA's action; instead, it explained that "[s]pecies-specific and site-specific analyses will occur during the technical assistance process conducted between the []FWS and FDEP, and whenever EPA coordinates with []FWS on State permit actions."  Dkt. 112-5 at 114 (BiOp).  The BiOp further explained that it was "not feasible, nor [wa]s it required" to detail or analyze any "species-specific effects." *Id.* at 124 (BiOp).  Like the BA that Florida had prepared, the BiOp explained that "[b]ecause the precise number and locations of future State 404 permit applications are unknown, the exact effects to ESA-species cannot be accurately determined."  *Id.* at 126 (BiOp).  Instead of species-specific analysis, the BiOp analyzed whether the Florida program was "structured" to ensure that no future permit would likely jeopardize ESA-listed species.  *Id.* (BiOp).  The FWS ultimately

"determined that the endangered species *coordination processes*" set out in the technical assistance process ("TAP") were "as protective" as Section 7(a)(2) of the ESA. *Id.* (BiOp).

The final portion of the BiOp contained the FWS's programmatic ITS, which extended ESA liability protection to (1) the EPA; (2) the State of Florida; and (3) any and all individual state permittees for all take of listed species incidental to state-permitted activities so long as that take is in compliance the "terms and conditions" of the ITS.  Notably, however, none of the listed "terms and condition" govern the conduct of state permittees; instead, the "terms and conditions" bind only the EPA and FDEP. *Id.* at 141–42 (ITS).  The ITS also does not specify the amount or extent of permissible take or set a trigger for the reinitiation of consultation. *Id.* at 139–40 (ITS).

On December 17, 2020, then-EPA Administrator Andrew Wheeler announced approval of Florida's assumption application, and the agency published a notice of approval in the Federal Register on December 22, 2020.  Dkt. 56-1 at 433–34; *see also* 85 Fed. Reg. 83,553 (Dec. 22, 2020).  Among other things, that notice asserted that the EPA had "determined that the State of Florida ha[d] the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g)–(l) and EPA's implementing regulations."  Dkt. 56-1 at 433.  The notice further stated that the "EPA has taken final action to approve Florida's assumption of the program" and that "Florida's program assumption" took immediate effect on December 22, 2020, *id.*, which was the day the notice was published in the Federal Register, *see* 85 Fed. Reg. 83,553 (Dec. 22, 2020).  Because the decision purported to constitute an adjudication, rather than a rule, and was made immediately effective, it was not subject to the regulatory freeze, which took effect on January 20, 2021. *But see CBD I*, 597 F. Supp. 3d at 173,

212 (concluding "that the EPA's approval of Florida's Section 404 program constituted a rule, rather than an adjudication").

## C.    Procedural Background

Plaintiffs filed this suit on January 14, 2021, alleging that "[t]he EPA's actions failed to effectuate a lawful transfer of [Section 404 permitting] authority" to Florida.  Dkt. 1 at 3, 10–14 (Compl. ¶¶ 1, 40–53).  Plaintiffs' original Complaint included nine claims.  *See* Dkt. 1 at 25–48 (Compl. ¶¶ 100–248).  As explained above, however, the Court already granted summary judgment in Defendants' favor with respect to Count Nine and held that Plaintiffs lack standing to pursue Count Eight.  *See CBD I*, 597 F. Supp. 3d at 179–80; *CBD II*, 2023 WL 5437496, at *9–10.  Seven of Plaintiffs' original claims, plus four additional claims that Plaintiffs later added to their Complaint, remain pending.  *See generally* Dkt. 77 (Am. Compl).  For present purposes, however, the Court addresses only Plaintiffs' ESA claims.

Plaintiffs' ESA claims against the FWS challenge the adequacy and lawfulness of that agency's programmatic BiOp and no-jeopardy decision (Count 3), the adequacy and lawfulness of its programmatic ITS (Count 4), and the adequacy and lawfulness of the combination of the ITS, the BiOp, and the technical assistance process (Counts 6 and 13), which Plaintiffs argue, "create an ESA scheme that is not authorized by law," *id.* at 44, 56 (Am. Compl.  ¶¶ 214, 297), and "give [Florida] a workaround regarding the mechanisms that Congress provided for establishing take limits, extending liability coverage, and determining jeopardy to species," *id.* at 44 (Am. Compl. ¶ 215).  Plaintiffs further allege that the EPA violated the ESA by relying on the facially deficient BiOp and ITS, *id.* at 49–52 (¶¶ 249–73) (Count 10); by failing to consult with the NMFS, *id.* at 53–55 (¶¶ 274–87) (Count 11); and by failing to consult with the FWS regarding "ESA-listed sea turtles that nest on Florida's beaches," *id.* at 55 (¶¶ 288–94) (Count

33

12).  Plaintiffs' Amended Complaint asks the Court to, among other things, "[v]acate and set aside [the] []FWS' programmatic biological opinion and incidental take statement for the challenged EPA decision and [to] remand with instructions for reopening and reinitiating consultation" and to "[e]njoin the EPA's approval and transfer of authority to the state."  *Id.* at 58 (Am. Compl. ¶¶ (m), (p)).

On February 28, 2023, Plaintiffs moved for summary judgment as to the remaining counts contained in the Amended Complaint.  Dkt. 98.  The Federal Defendants cross-moved for summary judgment, Dkt. 99, as did Florida, Dkt. 101.  The Court heard oral argument on October 19, 2023.[6]

On December 4, 2023, CBD and the Sierra Club moved for a temporary restraining order and/or preliminary injunction, seeking to preclude Florida from issuing two Section 404 permits that, according to Plaintiffs, will cause irreparable harm to the endangered Florida panther and the threatened crested caracara.  Dkt. 135.  Following a scheduling conference at which the EPA indicated that it intended to comment on the permits in question (thereby delaying their issuance), the parties agreed to a briefing schedule.  Min. Entry (Dec. 5, 2023); Dkt. 138 at 1–2.  The Court granted leave to intervene to the two developers whose permits CBD and the Sierra Club sought to enjoin, Min. Order (Dec. 22, 2023); Min. Order (Jan. 24, 2024) and heard oral

---

[6] Before argument, the Court granted Plaintiffs' motion for leave to file a surreply, which they filed on October 12, 2023.  *See* Dkt. 123; Min. Order (Oct. 6, 2023); Min. Order (Oct. 5, 2023).  After oral argument, the Court granted Defendant-Intervenors' motion for leave to file a post-hearing memorandum, Dkt. 127, and provided Plaintiffs an opportunity to respond, which they did on October 30, 2023, Dkt. 129.  *See* Min. Order (Oct. 27, 2023); *see also* Dkt. 130 (separately filing the memorandum originally attached to the Defendant-Intervenors' motion, Dkt. 127).  The Federal Defendants then sought leave to file a supplemental response to Plaintiffs' supplemental filing, Dkt. 131, which the Court granted, *see* Min. Order (Nov. 7, 2023); *see also* Dkt. 134 (separately filing the memorandum originally attached to the Federal Defendants' motion, Dkt. 131).  The Court also allowed Plaintiffs to submit a short response, Min. Order (Nov. 7, 2023), which Plaintiffs filed on November 9, 2023, Dkt. 133.

argument from all parties on January 30, 2024.  At that time, Florida indicated that the two

permits in question would issue no sooner than February 16, 2024.  Jan. 30, 2024 Hrg. Tr.

(Rough at 25:9–13).[7]

## II.  LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA[,] the district judge sits as

an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am.

Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The general standard for

summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to

a review of agency action.  But summary judgment nonetheless "serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F.

Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir.

---

[7] In resolving the pending motions, the Court has considered over twenty briefs: Dkt. **98**
(Plaintiffs' Motion for Summary Judgment); Dkt. **99** (Federal Defendants' Cross-Motion for
Summary Judgment); Dkt. **102** (Defendant-Intervenors' Cross-Motion for Summary Judgment
and Opposition); Dkt. **104** (Plaintiffs' Consolidated Reply); Dkt. **106** (Federal Defendants' Reply
in Support of Cross-Motion for Summary Judgment); Dkt. **107** (Defendant-Intervenors' Reply in
Support of Cross-Motion for Summary Judgment); Dkt. **123** (Plaintiffs' Sur-Reply); Dkt. **127-
1**/Dkt. **130** (Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **129** (Plaintiffs' Response
to Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **131-1**/Dkt. **134** (Federal
Defendants' Supplemental Brief); Dkt. **133** (Plaintiffs' Response to Federal Defendants'
Supplemental Brief); Dkt. **135** (CBD and Sierra Club's Motion for TRO and PI); Dkt. **145**
(Limited-Intervenor Tarpon Blue Silver King I's Memorandum in Opposition to TRO and PI);
Dkt. **146** (Limited-Intervenor Cameratta's Memorandum in Opposition to TRO and PI); Dkt. **148**
(Federal Defendants' Memorandum in Opposition to TRO and PI); Dkt. **149** (Defendant-
Intervenors' Memorandum in Opposition to TRO and PI); Dkt. **153** (Plaintiffs' Reply); Dkt. **157**
(Limited-Intervenor Cameratta's Supplemental Remedy Brief); Dkt. **158** (Federal Defendant's
Supplemental Remedy Brief); Dkt. **159** (Limited-Intervenor Tarpon Blue Silver King I's
Supplemental Remedy Brief); Dkt. **160** (Defendant-Intervenors' Supplemental Remedy Brief);
Dkt. **161** (Plaintiffs' Supplemental Remedy Brief).  The Court also received and has considered
two briefs from the Florida Chamber of Commerce and the Association of Florida Community
Developers.  Dkt. **103**; Dkt. **108**; *see CBD I*, 597 F. Supp. 3d at 185 n.3.

1977)).  In other words, "[t]he entire case on review is a question of law."  *Marshall Cnty.*

*Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

  Under the APA, a reviewing court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The arbitrary and capricious

standard is deferential; it requires that agency action simply be 'reasonable and reasonably

explained.'"  *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting

*Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009)); *see also Kennecott Greens*

*Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The]

standard of review under the arbitrary and capricious test is only reasonableness, not

perfection.").  A "court is not to substitute its judgment for that of the agency" if the agency

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including

a rational connection between the facts found and the choice made.  *Airmotive Eng'g Corp. v.*

*Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (alterations in original) (internal

quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983)).

  "The Court's review, however, must be 'searching and careful.'"  *Colo. River Cutthroat*

*Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't. Dev. Ass'n's*

*Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is arbitrary

and capricious if it 'relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise.'"  *Cablevision Sys. Corp. v. FCC*, 649

F.3d 695, 714 (D.C. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43).  Just as the Court may not

"substitute [its] judgment for that of the agency" to set aside an agency action, *Rural Cellular*

*Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also typically may not "affirm an agency

decision on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety*

*Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## III. ANALYSIS

The Court starts with standing and ripeness and then turns to the merits of the parties

ESA arguments.

### A.      Justiciability

Although Florida previously argued that Plaintiffs lack standing to pursue any of their

claims, it now appears to limit its standing challenge (other than its general challenge to

informational standing) to Counts One and Two, which are not presently at issue.  *See generally*

Dkt. 102; Dkt. 107; Dkt. 127-2 at 2.  With respect to Plaintiffs' ESA claims, Florida instead

argues that at least some—Counts Three, Four, Eleven, and Twelve—are not ripe.  *See generally*

Dkt. 102; Dkt. 107.  It does not, however, include other ESA claims—that is, Counts Six, Ten,

and Thirteen—in that ripeness challenge.  *Id.*; *but see* Dkt. 127-2 at 2 (labelling these claims

"arguably not ripe").  The Federal Defendants and the more recent intervenors, for their part,

raise no justiciability defenses at all.  But because the Court has an independent duty to ensure

that it has subject-matter jurisdiction, *see Attias v. Carefirst, Inc.*, 865 F.3d 620, 623 (D.C. Cir.

2017), the Court will address both standing and ripeness.

1.      *Standing*

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6

(1996), the Court must assess Plaintiffs' standing with respect to "each claim" currently at issue

and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). The "irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each claim, that they have (1) "suffered an 'injury in fact'" (2) that is "fairly . . . trace[able] to the challenged action of the defendant," and (3) that is "'likely' . . . that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555. 560–61 (1992) (citations omitted). At the summary judgment stage, Plaintiffs bear the burden of proffering "affidavits or other evidence to demonstrate the specific facts necessary to support standing." *CBD I*, 597 F. Supp. 3d at 188 (citing *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

When an association seeks to invoke the jurisdiction of a federal court, it can establish standing in one of two ways. It can assert "associational standing" to sue on behalf of its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Or it can assert "organizational standing" to sue on its own behalf. *See People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Because Plaintiffs' invocation of associational standing suffices on the facts of this case, the Court need not consider whether Plaintiffs also have organizational standing.

Associational standing requires that "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation." *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022) (citing *Hunt*, 432 U.S. at 343). "When more than one association brings suit, '[the Court] need only find one party with standing' to satisfy the requirement." *Ctr. for Biological*

*Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013)).

Here, the Court concludes that at least the Conservancy of Southwest Florida ("the Conservancy"), the Defenders of Wildlife ("the Defenders"), and CBD satisfy the requirements of associational standing.  To start, each of these Plaintiffs easily meets the second and third requirements for associational standing.  The missions of all three associations include the protection of the diverse species and habitats, including listed species in Florida.  *See, e.g.*, Dkt. 98-1 at 1 (Crooks Decl. ¶ 4); Dkt. 98-3 at 2 (Fleming Decl. ¶¶ 4, 6); Dkt. 98-4 at 2, 3–4 (Hartl Decl. ¶¶ 7, 11–12).  The claims that they assert, moreover, do not require the participation of individual members.  *See Ctr. for Biological Diversity*, 56 F.4th at 67.

The Court is also satisfied that all three associations have carried their burden of demonstrating that at least one, identified member has suffered or faces an imminent risk of suffering an injury-in-fact that is fairly traceable to the challenged actions and that a favorable decision is likely to redress.[8]

> a.    Counts 3, 4, 6, 10, 12, and 13

The Court will analyze Counts Three, Four, Six, and Thirteen together because each challenges the FWS's programmatic approach, including the issuance of a programmatic BiOp, a programmatic ITS, and the use of a "technical assistance process" in lieu of the statutorily mandated approach.  And because Counts Ten and Twelve challenge the EPA's reliance on that

---

[8] The Court previously noted that there are grounds to conclude that Plaintiffs also have informational standing.  *CBD I*, 597 F. Supp. 3d at 179.  Florida responds by offering additional evidence regarding its provision of information to members of the public relating to permitting decisions.  Given the Court's finding that Plaintiffs have established their standing to sue on other grounds, the Court need not reach this issue and expresses no view on the sufficiency of Florida's additional evidence.

same, allegedly unlawful approach, the Court considers Plaintiffs' standing to pursue those claims at the same time. Each of these Counts rests on a similar premise—that the BiOp and ITS prepared by the FWS failed to satisfy the dictates of the ESA—and each seeks the same remedy—vacatur of the BiOp and ITS and remand for reinitiation of consultation, *see* Dkt. 77 at 58 (Am. Compl. ¶¶ (m), (n)).

As the D.C. Circuit has held, "[a] claim of failure to fulfill the statutory consultation obligation under the ESA is at least in significant part a claim of procedural injury, as to which [courts] 'relax the redressability and imminence requirements' of standing." *Ctr. for Biological Diversity*, 56 F.4th at 67 (quoting *Ctr. for Biological Diversity*, 861 F.3d at 182) (citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 667). Indeed, the D.C. Circuit has described an agency's failure to meet its statutory consultation requirement as the "archetypal procedural injury." *Ctr. for Biological Diversity*, 861 F.3d at 182 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). These precedents involved challenges to the action agency's failure to meet its consultation requirement, while, here, Plaintiffs challenge the failure of both the action agency (the EPA) and the consulting agency (the FWS) to comply with the ESA. But the Court can discern no material difference when it comes to standing. *See Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015) (holding that conservation groups had standing to challenge a BiOp in which the NMFS concluded that the combined operation of seven fisheries was not likely to jeopardize the continued existence of certain sea turtles because, by permitting "an unlawfully excessive amount of harm to [the turtles], [the BiOp] threaten[ed] Plaintiffs'] enjoyment and study of those animals"); *Oceana, Inc. v. Ross*, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) (same). Even with relaxed redressability and imminence requirements that come with a procedural injury, however, "the injury in fact requirement [remains] a hard floor of Article III

jurisdiction," and "a plaintiff alleging a procedural violation" is not "freed" of the burden of establishing causation. *Ctr. for Biological Diversity*, 861 F.3d at 182–83.

Starting with injury, the administrative record and the declarations submitted by members of the Conservancy, the Defenders, and CBD amply support Plaintiffs' claims of injury in fact. The declarations show that members of the associations have concrete interests in minimizing the loss of listed species in the State, including, among others, the Florida panther, the crested caracara, and sea turtles. *See*, *e.g.*, Dkt. 98-1 (Crooks Decl.); Dkt. 98-3 (Fleming Decl.); Dkt. 98-5 (Schwartz Decl.); *cf. Lujan*, 504 U.S. at 562–63. When the FWS concluded that it was necessary to issue an ITS, the FWS concluded that approval of Florida's assumption application was "reasonably certain" to result in some take of all 139 listed species present in the State. *See* 50 C.F.R. § 402.14(g)(7). The FWS's preparation of a no-jeopardy BiOp and ITS that "bypass[es]" the core requirements of the ESA, and the EPA's approval of Florida's Section 404 assumption application based on that BiOp and ITS poses a material risk to the declarants' work and recreational interests in areas of Florida that will be directly affected. *Cf. Ctr. for Biological Diversity*, 56 F.4th at 67–68. Assuming that Plaintiffs will prevail on the merits, as the Court must for purposes of assessing standing, *see In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)), Plaintiffs' allegations demonstrate a concrete injury in fact.

Without developing an objection as to the ESA claims specifically, Florida broadly objects to the idea that the Plaintiffs will suffer an injury from having Florida administer the 404 program rather than the federal agencies. For example, the State argues that "Plaintiffs 'must be able to sufficiently answer the question: What's it to you,' if Florida—instead of the Corps—has the primary role in administering the Section 404 Program for assumable waters in Florida where

EPA retains oversight responsibility?"  *See* Dkt. 107 at 10.  This is a version of Florida and the

Federal Defendants' argument that whatever ESA requirements may have been omitted from the

programmatic BiOp and programmatic ITS will be sufficiently addressed at the individual permit

level through consultation with the FWS via the "technical assistance process."  But, contrary to

Defendants' position, as more fully discussed in the merits section, that process does not

eliminate the "'substantial probability' that the [Plaintiffs'] cognizable interests will be

'adversely affected.'"  *Id.*  In their briefing and their standing declarations, Plaintiffs aver to the

multitude of ways that the technical assistance process has proven inadequate.  Conservancy

member Amber Crooks recounts, for example, how "[o]n at least one occasion, the State failed to

include a permit condition required by [the] []FWS to protect species on a project of concern to

the Conservancy."  Dkt. 98-1 at 11 (Crooks Decl. ¶ 31).  She also discusses at length her

"concerning" experience with the technical assistance process that occurred in the State's

consideration of a particular permit application.  *Id.* (Crooks Decl. ¶ 32).  During that application

process, the Conservancy voiced concerns over potential harms to the crested caracara and the

Florida bonneted bat.  *Id.*  The FWS shared these concerns, writing in an email that it was unable

to submit a comment on the FDEP's website but that, in the agency's words: "We know there

will be take of Florida bonneted bats."  Dkt. 98-1 at 38 (Attachment A to Crooks Decl.).  Florida

permitted the project even though the state-issued permit "d[id] not assess take to [the] Florida

bonneted bat *or* provide a take limit."  *Id.* at 12 (Crooks Decl. ¶ 33) (emphasis added).[9]  Florida

---

[9] Crooks further avers that the Conservancy "could not locate any information—not in the
permit, not in FWC comments, and not in the public record—that assured [the Conservancy that
the] []FWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat
for this project, or a proper analysis of whether or not take would occur, or if they adequately
assessed take associated with this project." *Id.* at 11 (Crooks Decl. ¶ 32).  For instance, the
permit "acknowledge[d] an estimated take of up to five different pairs of caracara, but stop[ped]

offers no evidentiary response to these assertions of fact: Neither of the two declarations from

Justin Wolfe, the General Counsel of the FDEP, submitted by the State addresses the project.

*See* Dkt. 102-1 (Wolfe Decl.); Dkt. 107-1 (Supplemental Wolfe Decl.).

Even more fundamentally, the technical assistance process is no substitute for what

Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that

the FWS must conduct *before* it can make a no-jeopardy finding and accord incidental take

protection on the EPA, the State, and future state-permittees. *See* Dkt. 112-1 at 202 (ESA

Section 7 Consultation Handbook instructing the Services to "[n]ever determine the conclusion

of a biological opinion before completing the analysis of the best available data"). Plaintiffs

allege, for example, that the technical assistance program does not require the FWS (or the

NMFS) to evaluate the "effects of the action and cumulative effects to the environmental

baseline" using "the best scientific and commercial data available," 50 C.F.R. § 402.14(g); *see

also* 16 U.S.C. § 1536(a)(2), and they allege that the BiOp that the FWS did prepare was wholly

deficient. They allege that Florida's Section 404 program is less protective of listed species than

the Corps' program. And they allege that the FWS's ITS failed to satisfy ESA standards

because, among other things, it was not founded on an adequate BiOp, and—most critically—it

omitted any limit on incidental take, which functions to trigger reinitiation of consultation in

order to ensure that the Service's initial determination of no jeopardy remains sound. Each of

these allegations supports a concrete injury in fact that is not avoided through the technical

assistance program.

---

short of setting a take limit for th[e] project." *Id*. at 12 (Crooks Decl. ¶ 32). If the Corps, instead
of Florida, permitted the project in question, it would have been subject to Section 7 of the
ESA—not the "technical assistance" process.

Two additional procedural injuries merit brief mention.  First, because the allegedly deficient ITS purports to bestow ESA liability protection on future, state-permittees, those permittees will be relieved of the need to seek protection under Section 10 of the ESA; indeed, one of the two private intervenors in this case was in the process of seeking a Section 10 permit before the ITS issued, Jan. 30, 2024 Hrg. Tr. (Rough at 70:6–9).  Plaintiffs, however, would receive far greater protection under the Section 10 process than under the technical assistance process.  Section 10, for example, requires the applicant to prepare a Habitat Conservation Plan that includes steps to "minimize and mitigate" takings, "funding that will be available to implement such steps," and an explanation for why "alternative actions" were "not being utilized," 16 U.S.C. § 1539(a)(2)(A), and—significantly—it requires the Service to provide notice and an opportunity for public comment on the plan, *see id.* § 1539(a)(2)(B).

Second, because the ITS lacks both any take limits *and* any terms and conditions which bind individual permittees, Plaintiffs cannot bring citizen suits pursuant to Section 11 of the ESA against permittees who engage in excess take.  *See* 16 U.S.C. § 1540(g).  Florida responds that a violation of a take limit included in a state-issued permit, to the extent the permit contains one, would open the door to a citizen suit, but its argument turns on the mistaken premise that the "terms and conditions" set forth in the ITS impose duties on state permittees.  Dkt. 112-5 at 141–42 (ITS).  The Federal Defendants, nonetheless, suggested at oral argument that a court could, in the future, read *other* language included elsewhere in the ITS to create implied "terms and conditions," which would bind state permittees and provide a basis for bringing a citizen suit. Jan. 30, 2024 Hrg. Tr. (Rough at 31–32, 59–64).  But that argument both ignores the plain language of the ITS and is itself unduly speculative.

Plaintiffs have also established causation and redressability.  As to causation, a plaintiff asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered."  *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting *Sugar Cane Growers Coop. v. Veneman,* 289 F.3d 89, 94 (D.C. Cir. 2002)).  Rather, causation in the context of a procedural injury requires a showing of two causal links:  First that the omitted procedural step is connected to some substantive government decision that may have been wrongly decided because of the omission, and second, that that substantive government decision is connected to the plaintiff's harm.  *Ctr. for Biological Diversity*, 861 F.3d at 184.  Plaintiffs do not need to show but-for causation, only that the procedure and substance are connected and that there is a "substantial probability" that the procedural failure will create an adverse effect.  *Id.* at 184–85.  Here, it suffices that the FWS's bypassing of its ESA obligations led to the approval of Florida's Section 404 program and led to the ITS' authorization for the taking of listed species, without due attention to the risks posed to those species.

As for redressability, when a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing is "ordinarily 'substantially more difficult' to establish."  *Lujan*, 504 U.S. at 562.  When "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction," *id.*, the plaintiff must establish "facts . . . sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought."  *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).  Here, the ultimate injury that Plaintiffs assert is the increased risk that Florida's program will jeopardize listed species, which

45

will result in losses to their aesthetic, scientific, and occupational endeavors. *See, e.g.*, Dkt. 98 at 79–80. The question, then, is whether vacating the allegedly deficient programmatic BiOp and ITS and/or setting aside the EPA's assumption decision is likely to result in take limits that would not otherwise apply or is otherwise likely to reduce the risk of jeopardy and take to listed species in Florida. Although the redressability requirement is relaxed in a case alleging procedural injury, it is not "wholly eliminat[ed]." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). The Court is satisfied that Plaintiffs have met their burden.

Notably, if the Court vacates the BiOp and ITS, the ESA liability protection that currently protects the State and state-permittees will no longer apply. At the very least, this means that for projects that may affect listed species, and where the permittee is unwilling to risk civil and criminal liability under the ESA, permittees will need to follow the process set forth in Section 10 of the ESA (or hope that the EPA federalizes the permit in question through its objection power).[10] In either case, both Section 7 and Section 10 are demanding processes, and there is at least "some possibility," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)—and, indeed, it seems likely—that the process will result in greater protection for listed species in at least some cases.

On the programmatic level, there is also "some possibility"—and, again, a likelihood— that the FWS and the EPA would conclude during any renewed Section 7 consultation that the prospect of developing a legally and factually sufficient programmatic BiOp and programmatic ITS is simply too daunting and that, instead, they should either create a process for federalizing

---

[10] *Cf.* Dkt. 112-3 at 344 ("[The] EPA's initial draft MOA . . . directs the Corps to take over processing of any permit application where EPA's objections are not satisfied. The Corps could still process any permit application where an applicant does not agree to include the reasonable and prudent measures as special permit conditions. This will provide permit applicants for large scale projects, which typically have endangered species impacts, the choice to have their permit processed by [F]DEP or transferred to the Corps.").

permits that may affect listed species (as was done in New Jersey) or leave it to Florida

permittees to seek protection under Section 10.  In either scenario, however, the FWS would be

required to engage in far more detailed consideration of the risks posed by particular projects to

listed species, and there is "some possibility"—and, indeed, a likelihood—that this more

searching analysis would lead to greater protection for at least some listed species.  Moreover,

and of equal importance, actually setting take limits in a Section 7 ITS or Section 10 incidental

take permit would require, respectively, that the action agency and the FWS immediately

reinitiate consultation or revoke the permit if that limit is exceeded.  Those take limits, if

exceeded, would also unambiguously—and in stark contrast to the instant ITS—provide grounds

under which Plaintiffs could bring citizen suits under the ESA.

        In addition, if the FWS prepares a new BiOp that finds jeopardy, that finding might

provide a basis for the EPA to withdraw its approval of Florida's program.  *See Nat'l Ass'n of*

*Home Builders*, 55 U.S. at 652 ("Following the issuance of a 'jeopardy' opinion, the agency

must either terminate the action, implement the proposed alternative, or seek an exemption from

the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."); Dkt. 102 at

35 ("[W]here a State program does not comply with Federal standards, [the] EPA may seek to

withdraw the program." (citing 33 U.S.C. § 1344(i))).[11]  If the EPA withdraws its approval of the

Florida program—or if the Court sets aside the assumption decision—Section 404 permitting

authority would revert to the Corps.  That reversion, in turn, would satisfy redressability by

providing a process that will result, where appropriate, in the issuance of individual ITSs that

---

[11] Although Defendants maintain that the EPA's assumption decision is not dependent on the
BiOp or the ITS, that is a disputed question in the case, which the Court defers to the merits.

contain take limits, which, if exceeded, will require reinitiation of the consultative process as mandated by the ESA.

To be sure, it is possible that the Court might set aside the BiOp and ITS and that the EPA, the State, and future state permittees will simply decide to proceed without protection from potential ESA liability.  But that prospect is extremely remote.  A BiOp and ITS have "'powerful coercive effect,'" since those who engage the take of one or more listed species "risk civil and criminal penalties."  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023) (quoting *Bennett*, 520 U.S. at 169).  The prospect that the EPA, the State, and future state permittees would run that risk here, moreover, seems particularly unlikely, given the breadth of the agency action at issue, the large number of listed species, and the fact that the EPA, the FWS, and the State went to extraordinary lengths to put a programmatic ITS in place precisely to avoid such risks.

> b.      Count 11

Count Eleven raises slightly different issues, which merit brief discussion.  That Count alleges that the EPA was required to consult with the NMFS because the marine species under the NMFS's jurisdiction, even if not found in assumed waters, could be affected downstream of assumed waters.  Dkt. 77 at 53–55 (Am. Compl. ¶¶ 274–87).  This claim, once again, turns in substantial part on an alleged, procedural injury, so the Court will address it with that framework in mind.  *See Ctr. for Biological Diversity*, 861 F.3d at 182 (describing an action agency's failure to consult as the "archetypal procedural injury").

Because a procedural right "*in vacuo*" is insufficient to create Article III standing, *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009), Plaintiffs must show that the failure to initiate consultation affects its members' concrete interests.  They have done so.  Plaintiffs

have submitted declarations showing that their members have concrete research, conservation, aesthetic, and moral interests in various marine species.  One declaration, for example, describes the enjoyment the declarant derives from viewing marine wildlife and recreating in places where she can observe them in the wild.  Dkt. 98-3 at 7–10 (Fleming Decl. ¶¶ 20–28).  And another declaration describes how the declarant's work focuses on the smalltooth sawfish, Dkt. 98-1 at 3 (Crooks Decl. ¶ 11), which is "listed as endangered under the [ESA] by [the NMFS]," Dkt. 98-7 at 10 (Silverstein Decl. ¶ 24).  As the Executive Director of Miami Waterkeeper attests, she is a resident of Coral Gables, Florida, who (1) uses her Ph.D. in marine biology and fisheries to research aquatic species, (2) "enjoy[s] observing listed coral and other marine wildlife," and (3) tries to "observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and dolphins."  Dkt. 98-7 at 1, 2, 11 (Silverstein Decl. ¶¶ 2–4, 7, 28).  The EPA's approval of Florida's Section 404 program without engaging in the requisite consultation with the NMFS created a risk of harm to the endangered and threatened marine species of Florida.

Plaintiffs have also established a causal link between the EPA's decision and their alleged injury.  The EPA's omitted procedural step of consulting with the NMFS is connected to the substantive government decision that Plaintiffs challenge—that is, the EPA's approval of Florida's Section 404 program without considering what effects, if any, that decision would have on marine life and without obtaining expert input from the NMFS regarding the approval's ecological impact.  Those "omitted steps," moreover, "unquestionably connect to the EPA's decision," *Ctr. for Biological Diversity*, 861 F.3d at 184, to approve Florida's program.  The Court is also persuaded that the EPA's failure to consult regarding listed marine species poses a substantial risk to Plaintiffs' aesthetic, scientific, and professional interest in those animals.  And, the Court is unpersuaded that this causal link fails because the Corps might have issued the same

49

permits without consulting with the NMFS. The simple answer is that, had the Corps done so, Plaintiffs could have challenged that allegedly unlawful conduct.

Turning to redressability, Plaintiffs ask the Court to "[i]ssue a declaratory judgment declaring that [the] EPA violated the ESA by failing to consult with NMFS" and to "[i]ssue any other appropriate injunctive relief." Dkt. 77 at 57–58 (Am. Compl. ¶¶ (e), (q)). As noted, a procedural-rights plaintiffs need not show that court-ordered compliance with the procedure would alter the outcome. Instead, all Plaintiffs need to show is that "any required consultation would redress [Plaintiffs'] members' injury because the EPA *could* reach a different conclusion." *Ctr. for Biological Diversity*, 861 F.3d at 185 (emphasis in original). They have made that showing since "there remains at least the possibility that" the EPA could reach a different conclusion or modify its approval of Florida's Section 404 program based on its consultation with the expert agency. *Id.*

2.      *Ripeness*

Although Florida does not dispute that Plaintiffs have met their summary judgment burden of establishing standing to pursue their ESA claims, it maintains that at least some of those claims are not ripe for review. In particular, Florida argues that Plaintiffs' ESA claims related to the ITS (Counts Three and Four) and to consultation for the NMFS-listed species (Count Eleven) are not ripe for review because they are "based on speculations of harm that may never arise." Dkt. 102 at 12. The Court is unpersuaded with respect to Counts Three and Four and agrees only in part with respect to Count Eleven.[12]

---

[12] Florida mistakenly labels Count Twelve as an "NMFS-based" claim. *See* Dkt. 102 at 59. But Count Twelve asserts that the EPA was required to consult with the FWS, not the NMFS, regarding ESA-listed sea turtles. *See* Dkt. 77 at 55 (Am. Compl. ¶¶ 288–94). That claim is ripe for the same reasons that Plaintiffs' challenges to the BiOp and ITS, asserted with respect to *all*

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'"  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807, (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)); *see also Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007).  "The doctrine is premised, in part, on Article III's case or controversy limitation and, in part, on prudential considerations 'for refusing to exercise jurisdiction.'"  *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (citation omitted).  Prudential ripeness is assessed under the two-pronged test established in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967).  The Court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 149.

With respect to Counts Three and Four, Florida argues that Plaintiffs must wait to bring a legal challenge to "an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate."  Dkt. 107 at 28.  In the State's view, without that context, the Court will be unable to assess whether and how the supplanting of the usual ESA processes with the technical assistance process affects Plaintiffs' rights.  Plaintiffs disagree and observe that they have already identified two projects that the State permitted where the record showed that take was likely to occur, but the permit failed to include a take limit.  *See* Dkt. 123 at 24–25 (citing Dkt. 98-1 at 9–12 (Crooks Decl. ¶¶ 28–33)).  The Court is persuaded that Plaintiffs' challenges to the biological opinion and programmatic ITS are ripe.

---

FWS-listed species, are ripe.  Plaintiffs' "NMFS-based" claim is set forth in Count Eleven, which is addressed below.

First, the programmatic ITS is likely to cause "hardship" to Plaintiffs because it creates a legal right at odds with Plaintiffs' interests in preserving listed species:  It authorizes the incidental taking of all listed species in Florida, subject only to the non-statutory technical assistance process.  The FWS's action constitutes "a definitive statement of [the] agency's position, has direct and immediate effect on the complaining parties, and has the status of law." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted) (holding that claim challenging ITS was ripe for review).  Second, prompt judicial review of Plaintiffs' claim "will not interfere with further administrative action." *Id.*  The FWS's position in the programmatic ITS "will not be reconsidered because the consultation process is complete once the biological opinion is issued." *Id.*  To be sure, the FWS may have further involvement in the technical assistance process, but it will not have any further input on the ITS itself, and it is the programmatic ITS that Plaintiffs challenge.  Third, "further factual development will not assist [the Court] in resolving the legal question at issue," *id.* at 941, which concerns the statutory authorization for extending, as the FWS did here, broad immunity from take liability through a technical assistance process distinct from and not authorized by the Section 7 process.

More generally, Florida's ripeness argument misapprehends the nature of Plaintiffs' challenges to the ITS.  Plaintiffs challenge the ITS because it has conferred liability protection for incidental take on the EPA, the State, and state permittees without setting any statutorily-required take limits and without the necessary scientific, species-specific and effects analysis. The crux of Plaintiffs' claim, and the root of their alleged harm, is the fact that the programmatic ITS "creates an unlawful risk of take for Florida's program *as a whole* by failing to set limits on incidental take for the program *as a whole*, in contravention of the ESA."  Dkt. 104 at 109

(internal quotation marks and citation omitted).  Plaintiffs correctly observe that the possibility that they might be able to bring a state-court challenge to a particular permit, or the possibility that the FWS and/or the EPA might prevent an individual permit from issuing, does not render their challenge to the administrative action that the EPA and the FWS have already taken— authorizing take without the risk of ESA liability and thereby supplanting the Section 7 and Section 10 processes—unripe for review.

But even placing those broader—and dispositive—considerations aside, the Court agrees with Plaintiffs that they have identified particular Florida-issued permits without take limits. *Contra* Dkt. 107 at 27 ("[T]he outcome of the agencies' technical assistance process as well as [the] EPA's Section 404 oversight role cannot be predicted and no harm will be caused to Plaintiffs' interest unless and until they show inadequate take protection will occur."); *id.* at 28 ("Plaintiffs . . . cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions.").  Florida contends that Plaintiffs can bring suit in Florida court to challenge permits that pose a risk of jeopardy to listed species, but that state-court remedy is not a substitute for the rights and remedies provided in the ESA.  Although Florida also suggested during oral argument that Plaintiffs might be able to bring a citizen suit under the ESA, for the reasons discussed above, the Court is not so sure.  *See infra* 44.  And, in any event, the remote possibility that a federal court might someday entertain a collateral challenge to the FWS's ITS based on the State's failure to include or to enforce a state-take-limit in a state-issued permit, hardly shows that the legal question presented in this case is not fit for judicial review or is unlikely to result in any hardship to Plaintiffs.

Florida argues that this case is like *Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9–10 (D.D.C. 2001), where the Court held that an ESA Section 7 claim was not ripe for

review because the relevant oil and gas leases had not yet issued.  But, here, Florida has issued

permits—more specifically, over 700 individual permits as of February 2024, Dkt. 160 at 5.  And

in *Wyoming Outdoor Council*, unlike here, the FWS "was free to engage in further efforts to

fulfill its [statutory] obligations before the leases were issued."  148 F. Supp. 2d at 10 (quoting

*Wyo. Outdoor Council v. U.S. For. Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)).  The ripeness

requirement is intended to "protect . . . agencies from judicial interference until an administrative

decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (internal quotation marks and

citation omitted).  There is little doubt that the FWS's issuance of its programmatic ITS clears

that hurdle.  Finally, because the FDEP has issued hundreds of permits, Florida's reliance on

*New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470 (3d Cir. 1993), is

similarly misplaced.  There, the Third Circuit reasoned that because "neither the Township nor

anyone else will experience any effects from the Corps' decision *unless and until* Pennsylvania

grants a water quality certificate, when fill work can begin, this case is not ripe."  *Id.* at 473

(emphasis added); *see also Ctr. for Biological Diversity*, 450 F.3d at 941 (holding that challenge

to an ITS was ripe and distinguishing *New Hanover Township* on similar grounds).

    With respect to Count Eleven, Florida argues that Plaintiffs' claims related to adverse

effects to species within the jurisdiction of the NMFS are not ripe because marine species under

NMFS' jurisdiction are "unlikely to be found in any assumable waters because the Corps retains

jurisdiction over" tide waters and adjacent wetlands.  Dkt. 107 at 30.  Florida asserts that if a

proposed Florida Section 404 permit "may eventually affect NMFS species, the federal agencies

(EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns

at that time.  Otherwise, such a decision would be subject to challenge at that time."  Dkt. 102 at

59; *see also* Dkt. 107 at 30 (asserting that Plaintiffs have not been harmed by the EPA's decision "to defer NMFS consultation").  This argument, however, ignores the fact that the EPA was required to consult with the NMFS *before* approving Florida's Section 404 program.  Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species." *Lujan*, 504 U.S. at 603 (Blackmun, J., dissenting).  That procedural harm has already occurred—no further factual development is necessary or helpful.  Indeed, by Florida's logic no claim for failure to consult would ever be ripe for review unless and until the federal action was complete.  That contention is untenable.

The Court does agree with the State, however, that Plaintiffs' NMFS-based challenge is at least arguably unripe in one respect.  Apparently recognizing its fault, the EPA has initiated informal consultation with NMFS, and that consultation is still ongoing.  It requires no further analysis to conclude that, to the extent Plaintiffs seek to challenge the adequacy of that not-yet-complete consultation, their claim is unripe.

     3.    *Mootness*

Finally, Florida argues that Count Eleven is moot to the extent it challenges the EPA's failure to consult with the NMFS.  Dkt. 102 at 60.  As further explained below, however, that argument fails to confront the thrust of Plaintiffs' claim—which is that the EPA was required to consult with the NMFS *before* approving Florida's assumption application—and it fails to confront the State's own observation (just discussed) that any post-approval consultation has yet to reach fruition.

**B.     Merits**

This, then, brings the Court to the merits of Plaintiffs' ESA claims.  The Court will first address Plaintiffs' challenges to the FWS's programmatic BiOp, will then address the FWS's no-jeopardy determination and programmatic ITS, along with the related technical assistance process, and, finally, will turn to Plaintiffs' challenges to the EPA's related actions.

1. *ESA Claims Against the FWS*

The parties disagree about many things.  But they agree that the EPA was required to engage in a meaningful Section 7 consultation with the FWS (and perhaps the NMFS) where the Service(s) would determine (as reflected in a biological opinion) whether the EPA's approval of Florida's Section 404 program threatened to jeopardize ESA-listed species and/or to adversely modify or destroy their critical habitat.  If the FWS concluded that EPA's action was not likely to jeopardize a listed species or to threaten a critical habitat but that the EPA's action was likely to lead to incidental take of a protected species, the FWS was required to issue an ITS setting limits on that take, which, if exceeded, would trigger immediate reinitiation of the consultative process.  Plaintiffs allege that the FWS failed at these tasks, and they argue that the non-statutory technical assistance process is—as both a matter of law and as applied here—no substitute for the procedural and substantive requirements of Section 7.

a.     Challenges to the Biological Opinion

Plaintiffs first argue that the FWS's programmatic BiOp failed to include the analysis and data required to determine whether the EPA's action in approving Florida's program—as opposed to the State's action in issuing individual permits—would jeopardize a listed species.  The Court agrees.  Under the plain language of the statute, the FWS was required to prepare a BiOp "detailing how the agency action affects the species or its critical habitat," 16 U.S.C.

§ 1536(b)(3)(A), but, here, the FWS did not do so.  Under the regulations, the BiOp "shall

include" a "detailed discussion of the environmental baseline of the listed species and critical

habitat" and a "detailed discussion of the effects of the action on listed species or critical

habitat."  50 C.F.R. § 402.14(h).  The FWS is expressly required to "[r]eview all relevant

information . . . available;" to "[e]valuate the current status and environmental baseline of the

listed species;" to "[e]valuate the effects of the action and cumulative effects on the listed

species;" and, in the end, to "[a]dd the effects of the action and cumulative effects to the

environmental baseline and in light of the status of the species . . . formulate the Service's

opinion as to whether the action is likely to jeopardize the continued existence of listed species."

*Id.* § 402.14(g).  And, the ESA and the implementing regulations require the Service to "use the

best scientific and commercial data available" in making these assessments.  *Id*. § 402.14(g)(8);

*accord* 16 U.S.C. § 1536(a)(2).

  For present purposes, the Court need not address every asserted shortcoming in the

FWS's programmatic BiOp because it is clear that, at the very least, the FWS failed to undertake

*any* species-specific analysis.  The most compelling evidence in support of this aspect of

Plaintiffs' claim are the words of the BiOp itself.  To start, the BiOP states that the FWS merely

"evaluated the effects of the action on *guilds* of ESA-proposed and -listed species and designated

and proposed critical habitat."  Dkt. 112-5 at 114 (BiOp) (emphasis added); *see also supra* 31.

The BiOp does not define "guild"—nor does the ESA or the implementing regulations—but,

according to Merriam-Webster, a "guild" is "a group of organisms that use the same ecological

resource in a similar way."  "Guild," *Meriam Webster*, www.merriam-

webster.com/dictionary/guild (last visited Feb. 11, 2024).  The BiOp explains that, in the FWS's

view, "[a]nalysis of effects using a guild approach is more appropriate at the programmatic

level," leaving the mandated "[s]pecies-specific and site-specific analyses [to] occur during the technical assistance process."  Dkt. 112-5 at 114 (BiOp).  But an analysis at the guild-level fails the statutory and regulatory demand to assess the environmental baseline, effects, and cumulative effects at the species-level.

Throughout, the BiOp is forthright that the FWS did not endeavor to address species-specific considerations, opting instead to defer analysis to the technical assistance process.  Here is a non-exhaustive sampling:

- "Because this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp.  Therefore, the []FWS determined that a programmatic consultation is appropriate in determining whether FDEP's 404 program and EPA's oversight of FDEP's 404 program is structured to insure that no permit will be issued that is likely to jeopardize threatened and endangered species and destroy or adversely modify critical habitat.  For future permits issued under the State 404 program, site-specific and species-specific information will be available and assessed through the technical assistance process with the State and/or through coordination with the EPA, when EPA has not waived its review of the State permit action."  Dkt. 112-5 at 124–25 (BiOp).

- "We developed a programmatic consultation approach to determine whether and to what degree FDEP has structured their regulatory program and EPA has structured its oversight program to ensure approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species . . . . This approach also recognizes that site- and species-specific considerations would be addressed with the []FWS in subsequent technical assistance efforts . . . ."  Dkt. 112-5 at 113 (BiOp).

- "The [biological evaluation] lists anticipated stressors in Table C.1. of Appendix C and notes anticipated effect determinations in Table C.1.b of Appendix C.  During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews."  Dkt. 112-5 at 95 (BiOp).

Against this backdrop, it comes as no surprise that of the over one hundred protected species in Florida, the BiOp names just a handful and, even for those, offers little analysis.  Dkt. 112-5 at

123, 129 (BiOp).  Instead, it merely addresses the effects on "mammalian species/subspecies,"

"birds," "reptiles," "amphibians," "fish," "insects," "crustaceans," "mollusks," and "plants."  *Id.*

at 129–35.  The ESA demands far more specific and detailed analysis of the effects of an agency

action to satisfy Section 7.

          At first, the Federal Defendants seemed to concede that the BiOp failed to consider

species-specific baselines and effects.  They wrote that, "[i]n lieu of site-specific or species-

specific analyses, [the] FWS determined that a programmatic or process-based approach to

EPA's potential approval of FDEP's request was appropriate" and that, "[w]ith this

programmatic approach, species-specific analyses were deferred, to be assessed on a permit-by-

permit basis through the technical assistance process."  Dkt. 99 at 63.  Later, however, the

Federal Defendants double back, arguing that there is "no merit" to Plaintiffs' contention that the

FWS failed to evaluate the environmental baseline because the BiOp "adopted the BE's detailed

description of the environmental baseline, which addressed the baseline of listed species."  *Id.* at

68.

          Even if such incorporation by reference were proper (which Plaintiffs dispute) and even

assuming that the BE's analysis satisfied the ESA's requirement for setting a species-specific

environmental baseline (which is far from clear), the argument nonetheless fails for two reasons.

First, although the BiOp purports to adopt the BE and its "detailed description of the

environmental baseline," Dkt. 112-5 at 116 (BiOp); *see also id.* at 76, it simultaneously disavows

any ability to engage in "site- and species-specific considerations," which it defers to the

technical assistance process, *id.* at 113 (BiOp).  Second, even if the BiOp adequately addressed

the environmental *baseline*, there is no dispute that it fails to consider any species-specific

effects or the cumulative effects of the EPA's action.  Without those essential components, the BiOp fails to meet the minimum statutory and regulatory requirements.

In response, the Federal Defendants make two principal arguments.  First, they argue that "[n]othing in the ESA requires the [FWS] assess every future phase of an agency action" and that, here, the relevant action was the EPA's transfer of permitting authority from the Corps to Florida, which was assessed, in FWS's discretion and expertise, only at the programmatic level.  Dkt. 99 at 65 (quoting *Cooling Water*, 905 F.3d at 73).  In the words of the Federal Defendants, the FWS's analysis passes muster because the only "effect" that it assessed was the transfer of permitting authority from the Corps to the FDEP and

> whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and [the] FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat.

Dkt. 99 at 73.

The problem with this framing is that the EPA and the FWS cannot have it both ways: they accepted Florida's request that they engage in Section 7 consultation in order to provide the State and future state-permittees with Section 7 liability protection.  *See, e.g.*, Dkt. 112-2 at 3.  But to do so, they were required to make a finding that the proposed action—here, granting Florida's assumption application and adopting a technical assistance process—"may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  Indeed, formal consultation is not required if "as a result of the preparation of a biological assessment . . . the Federal agency determines, with the written concurrence of the [Service], that the proposed action is *not* likely to adversely affect any listed species or critical habitat."  *Id.* § 402.14(b)(1).  That was not their determination.

Having concluded that the proposed action *was* likely to adversely affect one or more listed species, the Federal Defendants cannot now argue that a detailed BiOp is unnecessary because the technical assistance process, which purports to replicate traditional FWS review under Section 7, will (as a matter of process) preclude any adverse effects on listed species.  If the assumption and technical assistance process "may affect listed species," *id.*, the FWS is required to engage in the detailed, species-specific analysis necessary to evaluate whether those contemplated effects are "likely to jeopardize the continued existence of any [listed] species," 16 U.S.C. § 1536(a)(2).

To the extent this sounds like circular logic, that is the Federal Defendants' doing.  As the EPA explained in its response to comments regarding its proposal to engage in Section 7 consultation:

> As set forth in the FDEP White Paper and in Federal Register notice, EPA has *the discretion to consider impacts to listed species* and critical habitat when deciding whether to approve a state's Section 404 program.  However, *whether [the] EPA is ultimately required to engage in Section 7 consultation when approving a State 404 program is a factual case-by-case determination and will depend on how a state chooses to develop its 404 program and whether [the] EPA's approval of that program may affect listed species and critical habitat*.  States remain free to fashion their particular programs in such a way *as to avoid any possibility of effect on species or habitat* as part of the assumption process by, for example, mandating that their state permittees entirely avoid impacts to listed species or critical habitat or require federalizing state 404 permits where such impacts may occur.  But Florida's program is not fashioned in this manner, for the reasons set forth in the White Paper, and we believe the approach Florida would take provides for a more effective and streamlined program.

Dkt. 112-3 at 368 (emphases added).  The bottom line is that Federal Defendants were required to conduct the required species-specific analyses because Florida structured, designed, and implemented its program so as to provide incidental take liability upfront to itself and all future state permittees.  But incidental take liability protection flows from the rigorous analysis required by Section 10 (for private actions) or Section 7 (for federal agency actions).  Congress did not

codify a third option, whereby incidental take liability might flow from an alternative set of arguably similar procedures.

The Federal Defendants' argument, accordingly, boils down to this: We exercised our discretion to cast Florida's assumption program in a manner designed to confer ESA liability protection on future, state-permittees by inviting Section 7 consultation; to trigger the Section 7 process, we had to determine that the proposed technical assistance process would likely adversely affect species; during consultation, the FWS was unable meaningfully to assess the species-specific effects of that decision because, in our discretion, we have deferred species-specific review to the technical assistance process; but we should nonetheless be allowed to take advantage of Section 7 liability protection even though we did not engage in any species-specific analysis in the BiOp or engage in a consultation that went beyond assessing whether the proposed technical assistance process is an adequate proxy for Section 7 consultation. That argument is untenable.

The Federal Defendants' second argument is that the FWS was unable to conduct any species-specific analysis because it lacked sufficient information to anticipate the effects of every future Section 404 permit application. *See, e.g.*, Dkt. 99 at 72–73. But "Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion on that basis." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). To the contrary, Section 7 "admits of no exception." *Nat'l Ass'n of Home Builders*, 551 U.S. at 674 (Stevens, J., dissenting) (quoting *TVA*, 437 U.S. at 173). Nor is the hurdle quite as high as Defendants suggest; Plaintiffs point, for example, to the programmatic BiOp that the FWS prepared for the Jacksonville District to demonstrate what the FWS can—and must—do to prepare a legally and factually sufficient programmatic BiOp. Dkt. 125 at 1 (the programmatic

BiOp based on the FWS's review of the impacts associated with the Corps' Jacksonville District

can be found at cdm16021.contentdm.oclc.org/utils/getfile/collection

/p16021coll3/id/577 (last visited Feb. 11, 2024)); *see also* Dkt. 140 at 40–42.

The ESA does not require perfect foresight—only that the FWS use the best available

information to create an assessment of jeopardy.  In light of the ESA requirement that the FWS

use the best scientific and commercial data available to insure that protected species are not

jeopardized, 16 U.S.C. § 1536(a)(2), the FWS cannot simply "ignore available biological

information or fail to develop projections" of the effects of the agency action, *Conner*, 848 F.2d

at 1454.  Here, it is undeniable that the FWS had at its disposal reams of data from previous

Section 7 consultations, which it tabulated but did not meaningfully discuss or analyze.  Many

species in Florida have been the subject of hundreds of prior Section 7 consultations—the

panther alone had 108 consultations, the bonneted bat had 383 consultations, and the wood stork

had 216 consultations, to name a few.  *See* Dkt. 112-4 at 151 (EPA BE).  The information was

available to the FWS, but the agency did not give it meaningful consideration.

Simply put, incomplete information about future Section 404 permits that the State might

issue does not excuse the FWS's failure to comply with the statutory requirement that it prepare

a comprehensive biological opinion.  With the biological information that was available,

moreover, the Court is persuaded that the FWS "could have determined whether post-

[assumption] activities in particular areas were fundamentally incompatible with the continued

existence of the species."  *Conner*, 848 F.2d at 1454.  For instance, in some areas, even minimal

permitted activities likely would be "incompatible with the conservation of the species," *id.*—

those areas could have been identified before any future permit location was known, and if they

could not have been the FWS failed to explain why.  *Id.*; *see also* Dkt. 156 at 14–16 (Oct. 19, 2023 Hrg. Tr.)

Regardless of how Defendants got here, district courts across the nation have rejected similar abdications in the past.  In *Forest Service Employees for Environmental Ethics v. U.S. Fish & Wildlife Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), for example, the court evaluated a BiOp analyzing the use of chemical fire retardant to fight wildfires.  The court held that the FWS had failed to consider, among other things, critical habitat when it applied a "coarse filter" and analyzed species at only the "taxonomic group-level."  *Id.* at 1204, 1224–25.  The FWS argued that it was both rational and necessary to proceed as it had given that the chemical retardant had the potential to affect 387 species, spread out over 192 million acres.  *Id.* at 1224.  But the court disagreed, holding that the FWS could not "excuse the failure to comply with the law Congress [enacted] by arguing that compliance would be too hard."  *Id.* at 1224.  The same holds true here.

The Federal Defendants' sole remaining argument is that the approach they took mirrors the approach that the Second Circuit approved in *Cooling Water*, 905 F.3d at 49.  *Cooling Water*, however, is distinguishable on its facts.  In that case, the federal agency action under review was not the approval of a state assumption application but, instead, the promulgation of a final rule pursuant to Section 316(b) of the CWA, 33 U.S.C. § 1326(b).  *Cooling Water*, 905 F.3d at 58. The rule established requirements for cooling water intake structures at power plants and manufacturing facilities and was intended to address impacts to aquatic life from entrainment or impingement of fish and shellfish.  *Id.*; 79 Fed. Reg. 48,300 (Aug. 15, 2014).  The standards promulgated under Section 316(b) of the CWA are implemented by permits issued through the National Pollutant Discharge Elimination System ("NPDES")—at the time that *Cooling Water*

was decided, 47 states administered NPDES permitting programs.  *Cooling Water*, 905 F.3d at 59 & n.2.[13]

Notably, the requirements of the 316(b) technical assistance process were codified as part of the rulemaking, creating legally binding responsibilities for all parties.  *Cooling Water*, 905 F.3d at 72 ("[T]he Rule obligates the Services to abide by those procedures.").  Here, in contrast, the "Final Notice" published in the Federal Register approving Florida's program makes no mention of the technical assistance process or any of its procedures, stating only: "[The] EPA has met its requirements under ESA section 7(a)(2) by completing ESA consultation and receiving a 'no jeopardy' Biological Opinion from the []FWS on November 17, 2020."  85 Fed. Reg. 83,553 (Dec. 22, 2020).  The technical assistance process is, instead, set out in the programmatic BiOp, that is itself evaluating the efficacy and protectiveness of those same procedures, and discussed in various memoranda.  In other words, here, there is no regulatory framework binding the parties' actions as in *Cooling Water*.  When the Court inquired of counsel for the FWS whether anything in the technical assistance process is "legally enforceable," counsel responded:  "So it's [FWS's] own biological opinion.  Of course, it's going to comply with it.  It's in an MOU.  It's committed to that, Your Honor."  Dkt. 156 at 95 (Oct. 19, 2023 Hrg. Tr.); *see also id.* at 98–99, 111.  But there is a fundamental difference between a notice and comment rulemaking of the sort at issue in *Cooling Water*, which adopted a "legislative" rule requiring state officials to send applications "to the Services for a sixty-day review period, after which [the state official] must

---

[13] One law review article has observed that state assumption of 402 permitting authority is more common in part because of "the attitude of [the] EPA, which might feel more comfortable delegating a program that will continue to operate on the basis of objective, numerical federal standards; the decisions to be made under section 404 are both far more subjective and susceptible to influence by local politics."  Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States*, 54 Md. L. Rev. 1242, 1293 (1995).

publish any information or recommendation the Services provide," 905 F.3d at 72, and the technical assistance process employed here, which was adopted without the benefit of a notice and comment rulemaking and which binds only the signatories.

To be sure, the programmatic BiOp and ITS of *Cooling Water* are similar to those now before the Court. That is not a coincidence. As the record makes clear, Florida modeled its proposal on the path charted in *Cooling Water*. *See, e.g.*, Dkt. 112-5 at 170 (email from FWS supervisor) ("The draft BA follows the 316b BE as expected."); Dkt. 112-4 at 4 (FWS email setting as an agenda item for discussion "the key assumptions used in the nationwide 316b consultation, as much as that consultation serves as a model for this one"); Dkt. 112-4 at 8 (FWS email discussing the claims that the "enviro-oriented litigants" raised before the Second Circuit in *Cooling Water*); Dkt. 112-2 at 14 (Florida white paper highlighting that the *Cooling Water* ITS was held "valid despite its failure to numerically quantify the impacts of the rule on take"). But, as counsel for both sides have confirmed, *Cooling Water* stands alone as the only case concerning, much less approving, a programmatic biological opinion and incidental take statement of this sort: To quote counsel for the Federal Defendants, this case represents the "first next time" that an agency has deployed this type of programmatic approach. Dkt. 156 at 87 (Oct. 19, 2023 Hrg. Tr.).

More importantly, *Cooling Water* is at odds with the statute, regulations, and caselaw. The critical misstep in *Cooling Water* occurs in the following passage:

> According to the Environmental Petitioners, the Services improperly disregarded their obligation to "consider all phases" of the agency action in their initial biological opinion, as the Ninth Circuit appears to require. Envtl. Br. 100 (citing *Connor v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988)). But "the rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA," *Defs. of Wildlife*, 733 F.3d at 1121. . . , and like the Eleventh Circuit, we decline to adopt such a rule here.[] Nothing in the ESA requires that the Services assess

> every future "phase" of an agency action on a site-specific or species-specific
> basis.

905 F.3d at 73.  That is, according to *Cooling Water*, an agency need not "assess every future"

species-specific effect of an action in its "initial" BiOp.  That much is true.  The governing

regulations permit "[p]rogrammatic consultation" when "[a] proposed program" sets forth "a

framework for future proposed actions."  50 C.F.R. § 402.02 ("Programmatic consultation").

But what *Cooling Water* (like Defendants in this case) fails to confront is that a "phase[d]"

approach to consultation requires either (1) complete and adequate consultation at the outset;

(2) partial consultation at the outset, followed by the remaining Section 7 consultation at the later

"phase" or "phases;" or (3) complete and adequate consultation solely at the later "phase," if that

is the phase likely to adversely affect listed species.  What matters is that adequate consultation

occur *at some point*; the ESA does not permit an agency to bypass the Section 7 consultative

process by postponing the required, "detailed discussion of the effects of the action on listed

species," 50 C.F.R. § 402.14(g), to a later phrase, only to conclude—as in *Cooling Water* and

here—that the later phase involves state, rather than federal, action and thus lies beyond the

reach of Section 7, *Cooling Water*, 905 F.3d at 73 n.15.

    This understanding of the ESA is not only consistent with, but compelled by, the

Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d

1106 (11th Cir. 2013), which is the sole precedent—and the only authority—that *Cooling Water*

cites in support of its contrary holding.  That case involved the Navy's installation and operation

of an underwater submarine warfare training range ("USWTR").  The NMFS prepared an

"initial" BiOp, which concluded "that *installation* of the USWTR [was] not likely to adversely

affect listed species," but that "*operations* on the USWTR [were] likely to adversely affect listed

species."  *Id*. at 1113 (emphasis added).  For reasons that are not relevant here, the Navy and the

NMFS decided that, even though the initial BiOp considered the "impacts of the expected

operations" of the USWTR, they would not rest on that early assessment alone and would, in

addition, conduct a "new" Section 7 consultation in the future "before operational activities

commence[d]." *Id.* at 1122. It was in that context that the Eleventh Circuit opined that it was

permissible for the Navy and the NMFS to structure the consultative process in phases. *Id.* As

the court explained, "[i]t is for the agencies to determine how best to structure consultation *to*

*fulfill Section 7(a)(2)'s mandate*," and the approach crafted in that case, if anything, better served

that mandate than a single, early consultation. *Id.* at 1121–22 (emphasis added). The essential

point, though, is that the consulting Service must prepare one or more BiOps—even if in

phases—that employ "the best scientific and commercial data available" to offer a "detailed

discussion of the effects of the action on listed species." *Id.* at 1112 (internal quotation marks

omitted).

    This understanding of the ESA is not only consistent with the statutory text and

purpose but finds further, compelling support in the governing regulations. Here, as in *Cooling*

*Water*, the government characterizes the BiOp as a form of "programmatic consultation." That

phrase is defined in the regulations, and applies to "a consultation addressing an agency's

multiple actions," 50 C.F.R. § 402.02—not a single agency action followed by state-licensing

decisions that may occur years later and that, on Defendants' own telling, do not constitute

federal action subject to Section 7 consultation. That understanding of "programmatic

consultation," moreover, finds additional support in the definition of "[f]ramework programmatic

action," which means "a framework for the development of future action(s) that are . . . carried

out at a later time," where "any take of a listed species [will] not occur unless and until those

future action(s) are . . . carried out and *subject to further section 7 consultation*." *Id.* (emphasis

added); *see also id.* ("Mixed programmatic action means, for purposes of an incidental take

statement, a Federal action that approves action(s) that [1] will not be subject to further section 7

consultation, and also approves [2] a framework for the development of future action(s) [for

which . . .] any take of a listed species [will be . . .] subject to further section 7 consultation.").

      D.C. Circuit precedent, although not directly on point, further supports the sensible

conclusion that an agency may not avoid its obligation to engage in meaningful Section 7

consultation by deferring detailed, species-specific analysis for another day—particularly when,

by the time that day arrives, the relevant action will be out of the agency's hands and beyond the

reach of Section 7.  In *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), the D.C.

Circuit considered the interaction between the ESA and the Outer Continental Shelf Lands Act

("OCSLA") in the context of a lease sale for the development of oil and gas properties in waters

north of Alaska.  Under the OCSLA, the lease sale itself is, as the court explained, "only a

preliminary and relatively self-contained stage within an overall oil and gas development

program which requires substantive approval and review prior to the implementation of each of

the major stages: leasing, exploring, and producing."  *Id.* at 593 (emphasis omitted).  The district

court had held that the biological opinion at issue violated the ESA because it considered *only*

the leasing stage, and it had "rejected the defendant's contention that the multistage flexibility

contemplated within the OCSLA framework was an indication that ESA 'endangered life'

considerations should be entertained stage-by-stage."  *Id.* at 608.

      The D.C. Circuit agreed, holding that it was in "qualified agreement with the district

court's ruling that a 'biological opinion' may not deal exclusively with any one particular stage

of an outer continental shelf project."  *Id.*  In the end, however, the *North Slope* court concluded

that the "[m]andatory stage-by-stage review" required by the OCSLA meant that the consultation

before it did not violate the ESA when viewed in light of the "full contingent of OCSLA checks and balances." *Id.* at 609. Fairly construed, the D.C. Circuit's opinion requires courts to consider whether "stage-by-stage" consultation under Section 7 is consistent with the ESA's mandate to consider the "agency action" as a whole. *See Conner*, 848 F.2d at 1453–54 (so reading *North Slope*). The programmatic approach applied here fails that test by a wide margin, since the FWS never considered the EPA's action as a whole, and deferring that consideration to a non-statutory technical assistance process cannot substitute for what the statute requires. *See also National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 10 & n.15 (D.D.C. 2005) (distinguishing *North Slope* and holding that the Corps violated the ESA by seeking to defer consultation with the FWS regarding the effects of individual actions authorized under four general permits, which the Corps was aware "m[ight] affect" the Florida panther). *Id.*[14]

Ultimately, however, *Defenders of Wildlife* and *North Slope* both address a distinct question: Whether *federal* agencies conducting *federal* actions that proceed in tiers or stages can engage in Section 7 consultation at each tier, or instead whether the initial Section 7 consultation must evaluate the proposed agency action *in toto*, all tiers included. The question in those cases was simply whether Section 7 consultation could be phased, or whether doing so might lead to "piecemeal chipping away of habitat." *Conner*, 848 at 1454. The Court's conclusion that the BiOp at issue here was inadequate, however, follows *a fortiori*: If a phased assessment of federal action is suspect, even when each phase will receive review under Section 7, a

---

[14] Although no party makes the point, the Court notes for completeness that the FWS, at least according to its handbook, views the consultation at issue in *Conner* as an "incremental step," not a programmatic, consultation under 50 C.F.R. § 402.14(k). *See* Dkt. 112-1 at 332–34 (ESA Section 7 Consultation Handbook).

programmatic BiOp that fails to adequately address the effects of the agency action of listed species and that provides no further opportunity for Section 7 consultation cannot stand.

For all of these reasons, the Court concludes that the FWS was not free to disregard the ESA's mandate that it "detail[] how the agency action affects the species," 16 U.S.C. § 1536. The Court, accordingly, concludes that the BiOp is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law" and must be set aside.  5 U.S.C. § 706(2).

### b.   Challenges to the Incidental Take Statement

As explained above, formal consultation under Section 7 is required if the action agency concludes that its action "may affect listed species or critical habitat"—unless that agency determines, with the Service's concurrence, that the "action is not likely to adversely affect any listed species." 50 C.F.R. § 402.14(a) & (b).  Absent a finding that listed species may be affected, the Section 7 process never commences: the Service never prepares a BiOp and never opines on the question of jeopardy and—most importantly for present purposes—the Service never issues an ITS.  Before issuing an ITS, moreover, the Service must determine that incidental "take is reasonably certain to occur." *Id.* § 402.14(g)(7).  The Court considers the adequacy of the programmatic ITS at issue here against this backdrop.  Consistent with this understanding, Defendants cannot plausibly argue both (1) that it was necessary to issue an ITS (resulting in take protection for future permittees) and (2) that the technical assistance process replicates the Section 7 consultation process (thereby obviating the need for any species-specific analyses or take limits).  *Cf.* Dkt. 107 at 8 ("Plaintiffs have not shown a single situation where the Corps would decide a permit differently than Florida . . . ."); *see also id.* at 21 ("[Plaintiffs] make no showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim arise from FDEP permits . . . .").

The ITS is crucial in a no-jeopardy BiOp.  It defines the extent of the permissible incidental take of listed species resulting from the agency action, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), and it ensures that the level of incidental take will not jeopardize any species in violation of the ESA, 16 U.S.C. § 1536(b)(4)(B).  When the Service issues a no-jeopardy BiOp, the ITS serves to monitor the impact that the approved action has on the listed species in real time.  50 C.F.R. § 402.14(i)(3).  And "[i]f during the course of the action the amount or extent of incidental taking, as specified [in the ITS], is exceeded"—in other words, if the effect on the species from the action is greater than anticipated and permitted by the Service—then "the Federal agency must reinitiate consultation *immediately*."  50 C.F.R. § 402.14(i)(4) (emphasis added).  Here, Plaintiffs challenge the FWS's programmatic ITS on numerous grounds, including that it fails to quantify the permissible take, and thus fails to set a reinitiation trigger.  For the reasons set forth below, the Court agrees that the FWS's programmatic ITS is unlawful.

The analysis here "is not taxing."  *Center for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 345 (D.D.C. 2020).  The ESA requires the Service to specify "the impact of [the] incidental taking on the species," 16 U.S.C. § 1536(b)(4)(C)(i), and the implementing regulations define "the impact" to mean "the amount or extent[] of such incidental taking on the species," 50 C.F.R. § 402.14(i)(1)(i).  The regulations further provide that the Service may use a "surrogate . . . to express the amount or extent of anticipated take," if it "explains why it is not practical to express the amount or extent of anticipated take," and it "sets a clear standard for determining when the level of . . . take has been exceeded."  *Id.*  In selecting an appropriate "surrogate," the Service can look to "similarly affected species," *id.*, or to measurable "changes in ecological conditions affecting the species," *Wildlife Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th

Cir. 2010).[15]  But whether the Service sets a numerical take limit for the listed species or, if

necessary, uses a surrogate, the regulations unambiguously require that it to set "a clear standard

for determining when the level of anticipated take has been exceeded."  50 C.F.R.

§ 402.14(i)(1)(i).  Under no circumstances may the Service fail, in any way, to "specif[y] the

impact."  16 U.S.C. § 1536(b)(4).

As discussed above, the ITS serves two functions:  It provides a safe harbor for regulated

parties, while ensuring that the ESA's core goal of "afford[ing] first priority to . . . saving

endangered species," *TVA*, 437 U.S. at 185, remains front and center.  *See CBD v. Salazar*, 695

F.3d 893, 911 (9th Cir. 2012) (explaining that the ITS "serves as a check on the agency's original

decision that the incidental take of listed species resulting from the proposed action will not

[jeopardize the continued existence of the species]" (alteration in original)).  Those who comply

with the terms and conditions set forth in an ITS—including its numerical take limits—are

protected from Section 9 liability.  16 U.S.C. § 1536(o).  But when the numerical take limit (or

its surrogate) is exceeded, the safe harbor offers no shelter, and the Service and action agency

must *immediately* reinitiate consultation to determine whether the original "no jeopardy"

determination remains valid.  *See Salazar*, 695 F.3d at 909; 50 C.F.R. § 402.14(i)(4); *id.*

§ 402.16(a)(1) (requiring reinitiation "[i]f the amount or extent of taking specified in the

incidental take statement is exceeded; *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038–39

(9th Cir. 2007) (rejecting ITS for using improper surrogate that authorized the take of all spotted

---

[15] *See also Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Engineers*, 538 F.
Supp. 2d 242, 257 (D.D.C. 2008) (accepting ecological surrogate of harm to habitat as a
permissible surrogate for quantifying take); *but cf. Oceana, Inc. v. Ross*, 2020 WL 5995125, at
*12–13 (D.D.C. Oct. 9, 2020) (rejecting shrimp fishing "effort" as an inadequate surrogate for
turtle take based on insufficient explanation); *Pritzker*, 75 F. Supp. 3d at 497 (rejecting surrogate
that pegged 161 turtle takes to 252,323 dredge hours without sufficient explanation);

owls in certain acreage, which could not be measured during the course of the project and thus did not set forth an adequate reinitiation trigger).

Here, the FWS's programmatic ITS omits this essential term. *See Oceana*, 2020 WL 5995125, at *23 (holding that the ITS included in a shrimp BiOp was inherently flawed because it did "not function as an automatic trigger and no amount of further explanation by the agency" could remedy that flaw). It sets no numerical take limit, offers no surrogate, and provides no "clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). Instead, the BiOp and ITS once again fall back on a claimed inability to make the necessary determinations at the programmatic level and once again look to the non-statutory technical assistance process to fill the scientific and regulatory gap. Dkt. 112-5 at 139–40 (BiOp). Neither argument can withstand scrutiny.

To start, as Plaintiffs persuasively argue, it is difficult to believe that the FWS lacked information sufficient to permit it to quantify numerical take for *any* species given the wealth of previous permit and ESA consultation data at their disposal. *See* Dkt. 98 at 42. The FWS's stated "inability to anticipate the *locations* of future State 404 permit applications," Dkt. 112-5 at 139 (BiOp) (emphasis added), moreover, is both implausible (the Corps was in the midst of reviewing permit applications at the time the assumption application was approved) and beside the point. The FWS failed to explain why or how the *location* of future projects is inescapably tied to incidental take limits for *all* endangered or threatened species in the State. *See Conner*, 848 F.2d at 1454. Consider the Florida panther, for example. The FWS failed to explain why it was unable to set a numerical limit on incidental take based on previously issued BiOps and incidental take statements. If there are about 150 panthers left in Florida, for example, it is not

difficult to imagine a cumulative take limit per year for the entire State (or for particular regions of the State).

Given the wealth of information and experience that the FWS has in assessing threats to listed species in Florida, the FWS was at least required to offer *some* meaningful explanation for why it could not do more.  *See State Farm Mutual Automobile Ins. Co.*, 463 U.S. at 52 ("The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" (citation omitted)).  By any measure, it is not enough—on a question of this importance—merely to assert in conclusory terms that "because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the []FWS to accurately estimate the specific amount of incidental take at this time that is anticipated to occur as a result of the action."  Dkt. 112-5 at 140 (ITS).

The Federal Defendants offer little by way of response.  They cite to cases holding that numerical take limits are not always required and that surrogates may at times be used.  Dkt. 99 at 76 (collecting cases).  That assertion is literally correct, but it overstates the precedential support for what the EPA and the FWS have sought to do here—namely, issue an ITS intended to confer ESA immunity on the EPA, the State, and future state-permittees, without (1) setting a take limit or (2) employing a surrogate.  Notably, in a case that has been briefed beyond the point of exhaustion, the parties have identified only one case—*Cooling Water*—in which a court has upheld a final ITS that lacked either a numerical take limit or a surrogate.  For the reasons explained above, however, that case is both distinguishable and unpersuasive.

A couple of additional observations regarding *Cooling Water*, moreover, bear on the present discussion.  First, *Cooling Water* itself recognizes that "an ITS that 'contains no

numerical cap . . . *normally* violates the ESA.'"  905 F.3d at 77 (emphasis added) (quoting *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012)).  To be sure, the case that *Cooling Water* cites for this proposition also held, as the Second Circuit noted, that an ITS need not set a numerical take limit if it explains "why it was impractical to" do so. *Ctr. for Bio. Diversity*, 698 F.3d at 1127.  But in that case, *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012), the Ninth Circuit held that the impracticality of setting a numerical limit was "self-evident, in light of the very large number and minute size of [the] fish eggs and fry" at issue, and, more importantly, stressed that the ITS "did not ignore the incidental take issue, *but instead used a surrogate for determining incidental take levels*."  *Id.* at 1127 (emphasis added).

Second, the Eleventh Circuit's decision in *Defenders of Wildlife* is once again more persuasive than *Cooling Water*.  Recall that *Defenders of Wildlife* involved a Navy project that involved two stages: the (1) installation and (2) operation of an Undersea Warfare Training Range.  733 F.3d at 1113.  Although the initial BiOp did not include an ITS for the operation phase, the Eleventh Circuit concluded that "the NMFS provided a valid reason" for this omission—and, more importantly, the court stressed that the NMFS merely "postpone[d] the issuance of an incidental take statement" until the operation stage was scheduled to occur years later.  *Id.* at 1123.  As the Eleventh Circuit explained, the absence of an ITS meant that *any* take would require "reinitiating consultation" and that, in any event, "the Navy ha[d] repeatedly committed to obtaining the required . . . incidental take statement during a future consultation with the NMFS, prior to operations on the range commencing."  *Id.* at 1124.  The ITS in *Cooling Water* and the ITS in the instant case, in contrast, extend take liability protection through

incidental take statements that lack a numerical take limit or a surrogate.  In this respect, *Cooling Water*—and this case—stand alone.

Ultimately, the Federal Defendants once again fall back on the technical assistance process and argue that the "FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance."  *See* Dkt. 99 at 79.  As previously explained, that argument improperly seeks to replace the statutory and regulatory ESA regime with a process defined in a BiOp and various memoranda that differs in important respects from the governing law.  Most notably, when the take limit set forth in an ITS is exceeded, the action and consulting agencies are required immediately to reinitiate consultation under Section 7.  50 C.F.R. §§ 402.14(i)(4), 402.16(a)(1).  The Federal Defendants' assertion that, "[i]f [the] FWS's assumptions about [the technical assistance process] prove incorrect or warrant changes to the implementation of the State program, it *could* . . . trigger reinitiation of consultation if effects occur that were not considered," Dkt. 106 at 38 (emphasis added), is both hopelessly noncommittal and, in any event, at odds with the terms of the ITS, which contain no program-level reinitiation trigger and, indeed, expressly disavows any such obligation.

After reciting the regulatory standard for reinitiation, the ITS provides as follows:

> For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9.  Additionally, the listing of a new species or critical habitat *shall not trigger reinitiation* of consultation on this action (approval of Florida's assumption of the CWA 404 program).  Since the State would administer the CWA 404 program, the []FWS has *no obligation to conduct section 7 consultation* on individual permits because the issuance of such a permit is not a Federal action.  However, the State's regulations require that the State comply with the technical assistance process with [the] []FWS for ESA listed species and critical habitat.  Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed.

Dkt. 112-5 at 143 (ITS) (emphases added).  Term and Condition 9, in turn, provides that

*Florida*—not the FWS—will "reopen" *individual permits*—not Section 7 consultation at the

program-level—in the event of new information or exceedance of take as authorized in the

original permit.  *Id.* at 142 (BiOp).  So, in short, the ITS provides that the federal agencies—the

FWS and the EPA—will *not* reinitiate formal consultation, (1) even if the take limits set in the

state-issued permits (with input from the FWS) are exceeded and (2) even if new species found

in Florida are listed as endangered or threatened.  In the words of the ITS, "[s]ince the State

[will] administer the CWA 404 program, the []FWS has *no obligation* to conduct section 7

consultation on individual permits."  *Id.* at 143 (emphasis added).  Thus, in this and in other

respects,[16] the technical assistance process provides far less robust ESA protection of listed

species than the ESA procedures it supplants.  *See* 50 C.F.R. § 402.16(a)(1) (requiring

reinitiation of formal consultation "[i]f the amount or extent of taking specified in the incidental

take statement is exceeded"); *id.* § 402.16(a)(4) (requiring reinitiation "[i]f a new species is listed

. . . that may be affected by the identified action"); *see also Am. Rivers v. FERC*, 895 F.3d 32,

48–49 (D.C. Cir. 2018) (stressing the need for a trigger to reinitiate formal consultation).[17]

---

[16] Plaintiffs also challenge the ITS's "reasonable and prudent measures" and terms and
conditions on the ground that neither created new, additional requirements on the EPA or
Florida.  Dkt. 98 at 44.  An ITS must specify "reasonable and prudent measures" deemed
"necessary or appropriate" to minimize incidental take from the action in question.  16 U.S.C.
§ 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(ii).  And an ITS must also set forth "terms and
conditions (including, but not limited to, reporting requirements) that must be complied with" in
order to implement the reasonable and prudent measures specified.  16 U.S.C. § 1536(b)(4)(iv);
50 C.F.R. § 402.14(i)(1)(iv).

[17] As the Federal Defendants point out, *see* Dkt. 106 at 39, the BiOp requires *Florida* to provide
the FWS with an annual report summarizing the number of permits issued or denied and a "table
that identifies all ESA-listed species taken by state 404 permitted activities along with the
amount or extent of such take," Dkt. 112-5 at 142 (BiOp).  Florida's reporting requirement,
however, is not the equivalent of a reinitiation trigger which ordinarily serves to compel the FWS
to immediately reinitiate consultation and reasses its original no jeopardy determination.

The District Court for the District Court of Montana's analysis in *Forest Service Employees for Environmental Ethics*, which rejected a similar scheme, is again persuasive. There, the court considered a biological opinion prepared by the FWS for use of chemical fire retardant. 726 F. Supp. 2d at 1195. The FWS's BiOp in that case did not include an ITS, instead explaining that take would be "authorized through emergency consultation on a case-by-case basis" because of uncertainty over where and to what extent the fire retardant would be used. *Id.* at 1205, 1231. The court rejected this approach as inconsistent with the ESA. "The problem with the ESA agencies' approach," the court explained, "is that it means that the first and only meaningful analysis under Section 7(a)(2) will occur during emergency consultation." *Id.* at 1231. The result is "biological opinions that purportedly constitute Section 7 consultation" but "defer[] significant aspects of the required Section 7 analysis until emergency consultation." *Id.* There, all that stood "between the listed species and take from exposure to fire retardant is an undefined emergency consultation process," in contrast to cases like *Conner*, *Defenders of Wildlife*, and *North Slope*, where, as discussed above, future site-specific biological opinions will be prepared in full compliance with Section 7. *Id.* at 1232.

The Federal Defendants' final argument is that the EPA's continued oversight of Florida's implementation of the Section 404 program saves the above-identified deficiencies in the programmatic BiOp and ITS. *E.g.*, Dkt. 99 at 62; Dkt. 106 at 29, 41. The Federal Defendants point to, for example, the EPA's right to review those permits with "reasonable potential for affecting endangered or threatened species," as determined during the technical assistance process. *See* Dkt. 55-1 at 304 & n.2 (MOA between the EPA and FDEP); *see also* 33 U.S.C. § 1344(j); 40 C.F.R. § 233.51. To be sure, if the EPA objects to a permit and the State does not address its objection, the authority to issue that permit reverts to the Corps. 33 U.S.C.

§ 1344(j); 40 C.F.R. § 233.20(b); *id.* § 233.50(j) ("In the event that the Director neither satisfies [the] EPA's objections or requirement for a permit condition nor denies the permit, the Secretary shall process the permit application.").[18]  Similarly, at the program-level, if the EPA determines that Florida is "not administering" its 404 program "in accordance with" the requirements of the CWA, then the EPA may withdraw its approval and return the program to the Corps.  33 U.S.C. § 1344(i).

But the EPA's oversight of individual permits and authority to withdraw its approval of an assumption application, as established under the CWA, are not substitutes for the FWS's distinct duty under the ESA.  The EPA's oversight pursuant to a different statute—the CWA— serves a different purpose and does not determine whether and when incidental take liability protection is available under the ESA.  Oversight is intended to ensure that a state program is operating as approved, not to remedy a violation of the ESA.

The long and short of it is that the ESA creates two paths for extending take liability coverage: Section 7 (consultation for federal actions) and Section 10 (incidental take permits for non-federal actions).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that the EPA and the FWS constructed in the ITS at issue in this case.  That ITS was issued without the benefit of any species-specific analysis in the BiOp; it contains no numerical take limit and provides no surrogate for one; and it expressly disavows any duty to reinitiate formal consultation pursuant to Section 7 should the EPA's approval of the State's Section 404 program result in excess take or otherwise jeopardize the continued existence of an endangered species.  It

---

[18] Director means the state director, *see* 40 C.F.R. 233.2, and Secretary means Secretary of the Army, *see* 40 C.F.R. 233.1(a) (first mention).

is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be set aside.  5 U.S.C. § 706(2)(A).

*   *   *

For all of these reasons, Plaintiffs are entitled to summary judgment on Counts Three, Four, Six, and Thirteen.

### 2. *ESA Claims Against the EPA*

Plaintiffs bring two ESA claims against the EPA:  First, they allege that the EPA unlawfully relied on the FWS's BiOp when it approved Florida's assumption application. Second, they allege that the EPA failed to consult on nesting sea turtles and other species under the jurisdiction of the NMFS.  The Court addresses each claim in turn.

### a.   The EPA's Reliance on the Biological Opinion

The EPA was required, pursuant to the ESA, to ensure that its approval of Florida's assumption application would not jeopardize any listed species.  16 U.S.C. § 1536(a)(2).  As the action agency, the EPA bore the "ultimate responsibility for compliance with the ESA."  *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006).  Arbitrarily relying on a faulty BiOp violates that duty.  *Id.*  Plaintiffs and the Federal Defendants, however, dispute the standard that this Court should apply.  The Federal Defendants argue that Plaintiffs must point to some "new" information that the Service should have considered in order to succeed on this claim; Plaintiffs argue that the "new" information standard does not apply to a facially invalid BiOp.

To an extent, each side has a point.  The Federal Defendants are correct that an agency can withstand an arbitrary and capricious challenge to an "admittedly weak" BiOp, if there is "no 'new' information . . . the [Service] did not take into account[,] which challenges the [biological] opinion's conclusions."  *Id.* at 76 (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of*

*Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) and then citing *Defs. of Wildlife v. EPA*, 420 F.3d

946, 959, 976 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Assoc. of Home Builders*, 551 U.S.

644 (2007); and *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459–60 (9th Cir. 1984)).  As the D.C.

Circuit explained in *City of Takoma v. FERC*, this rule strikes a balance between two competing

sets of considerations.  *Id.* at 75–76.  On the one hand, a court's review of an action agency's

reliance on a BiOp differs from its review of the sufficiency of the BiOp itself.  *Id.* at 75.  The

question is not "whether the BiOp itself is somehow flawed," but "whether the action agency's

reliance [on it] was arbitrary and capricious."  *Id.* (emphasis omitted).  That assessment must be

made, moreover, in light of the unique "expertise of the consultant agency," which "would be

seriously undermined" if the action agency was required "to undertake an independent analysis"

of the relevant data and science.  *Id.* at 76.  On the other hand, however, "the two inquiries

[necessarily] overlap to some extent, because reliance on a facially flawed BiOp would likely be

arbitrary and capricious."  *Id.* at 75.  And given the action agency's "ultimate responsibility for

compliance with the ESA," "the action agency must not blindly adopt the conclusions of the

consultant agency."  *Id.* at 76.

The "new" information rule makes eminent sense when dealing with the types of expert,

technical, and scientific judgments made by consulting agencies.  In those circumstances, the

action agency can and should typically defer to the reasoned conclusions of the experts.  But that

logic fails when a BiOp is "facially flawed" or when the alleged flaw in a BiOp is legal in nature,

because discerning this type of flaw "requires no technical or scientific expertise," *Defs. of*

*Wildlife*, 420 F.3d at 976.  In observing that an action agency's "reliance on a facially flawed

BiOp would likely be arbitrary and capricious," *City of Tacoma* makes just this point.  460 F.3d

at 75.  The distinction finds additional support, moreover, in the D.C. Circuit's decision in *Shafer*

*& Freeman Lakes Environmental Conservation Corporation v. FERC*, 992 F.3d 1071 (D.C. Cir.

2021).

In that case, the D.C. Circuit considered whether the action agency, the Federal Energy

Regulatory Commission ("FERC"), unreasonably relied on a BiOp prepared by the FWS.  With

respect to the FWS's scientific judgments, the *Shafer* court applied the "no new information"

standard.  The court explained, "because the Service acted reasonably in using a linear scaling

methodology, [FERC] too acted reasonably in relying on the Service's resulting scientific

judgments in the Biological Opinion."  992 F.3d at 1093.  Quoting *City of Tacoma*, the *Shafer*

court once again stressed that in deciding whether FERC acted reasonably, "'the critical question

[was] whether [FERC's] *reliance* [on the Service's BiOp] was arbitrary and capricious.'"  *Id.*

(internal citation omitted).

But that did not end the *Shafer* court's relevant analysis.  In the following section of the

opinion, the court took up the plaintiffs' distinct "*legal objection* to the Biological Opinion and

[FERC]'s reliance on it."  *Id.* at 1093 (emphasis added).  And, in considering that question, the

court applied the "facially flawed" standard and held that FERC's reliance on the BiOp was

unreasonable.  *Id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75).  The *Shafer* court did not ask

whether the plaintiffs had identified any new information not considered, concluding instead that

"the Service's complete failure to address an important issue was apparent on the face of the

Biological Opinion."  *Id.*  In sum, then, when confronted with a *scientific* or *technical* challenge

to a BiOp, the *Shafer* court applied the "new information" standard, and, when confronted with a

*legal* challenge to the BiOp, the court applied the "facially flawed" standard.  *Shafer*, 992 F.3d at

1093 (citing *City of Tacoma*, 460 F.3d at 75); *see id.* at 1096 (citing *City of Tacoma*, 460 F.3d at

75).

Applying that same distinction here, the Court is persuaded that the EPA impermissibly relied on a facially flawed BiOp.  As in the final section of the *Shafer* decision, the programmatic BiOp at issue here entirely fails to address essential questions, and, instead, defers those question for another day and another process that is untethered to Section 7.  The Court will not repeat its critique of the FWS's BiOp here but, instead, simply notes that the deficiencies do not involve scientific or technical judgments about which fair minds might differ.  To the contrary, major swaths of what the ESA and its governing regulations require a consulting agency to consider in a BiOp are simply absent.  Indeed, for example, the BiOp makes no effort to undertake *any* species-specific effects analyses whatsoever.  *See, e.g.*, Dkt. 112-5 at 129–30 (BiOp).  As in the final section of the *Shafer* opinion, these inadequacies raise questions of law, rather than science.

The EPA was as well situated as the FWS, for example, to decide whether the ESA permits the consulting and action agencies to defer all species-specific effects analyses to a non-statutory, technical assistance process that does not occur until after the federal action is complete and that lacks a trigger for reinitiating consultation because it does not specify any take limits, numerical or otherwise.  In fact, if anything, this case flips the usual presumption on its head:  Here, it was the action agency (the EPA) and the applicant (Florida) that proposed the technical assistance process to the consulting agency (the FWS) and that performed the initial legal analysis.  As a result, this case is a far cry from one in which the action agency can reasonably claim that it deferred to the expertise of the consulting agency.  *City of Tacoma*, 460 F.3d at 75–76 (rationale for "new information" standard is to give action agency a basis for doubting the expert conclusions).

Because the BiOp and ITS that the FWS issued in this case were facially and legally flawed, the EPA unreasonably relied on those documents in approving Florida's assumption application.  Plaintiffs are entitled to summary judgment on Count Ten.[19]

        b.    <u>The EPA's "No Effect" Determination</u>

Whenever an agency action "may affect" a listed species in the "action area," the agency must consult, as applicable, with the FWS, which administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, and with the NMFS, which administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce.[20]  *See* 16 U.S.C. § 1536; *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.  Only if the action agency determines that its actions will have *no* effect on listed species or critical habitat may it forego consultation.  50 C.F.R. § 402.14(a), (b).  The "action area" includes "all areas to be affected directly *or indirectly* by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02 (emphasis added).  "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."  *Id.*

_____

[19] Plaintiffs separately allege in Count Twelve that the EPA failed to consult with the FWS regarding Florida's nesting sea turtles.  Plaintiffs explain that more than 90% of all sea turtle nesting in the continental U.S. occurs in Florida, and yet, the record contains no mention of them.  *See* Dkt. 98 at 41; Dkt. 104 at 29–30.  The Federal Defendants respond that Plaintiffs have not identified "any habitat that would be in or near assumed waters," the action area in question.  Dkt. 106 at 36.  The Court views Plaintiffs' turtle-specific challenge as subsumed by their larger claims that the FWS failed to evaluate the effects of the agency action on *any* species and that the EPA relied on the FWS's facially invalid BiOp and ITS.  For these reasons, Plaintiffs are entitled to summary judgment on Count Twelve.

[20] The NMFS (also known as "NOAA Fisheries") currently has jurisdiction "over 164 endangered and threatened marine species (79 endangered; 85 threatened)."  NMFS, *Species Directory*, https://www.fisheries.noaa.gov/species-directory/threatened-endangered?oq=&field_species_categories_vocab=All&field_region_vocab=All&items_per_page=350 (last visited Feb. 15, 2024).

Here, the EPA requested formal Section 7 consultation with FWS.  It did not, however,
request consultation with the NMFS.  As the EPA explained in its September 2, 2020 letter to the
NMFS, the NMFS had previously informed the State that no "ESA-listed species under [the]
NMFS'[s] jurisdiction . . . occur in waters that are assumable by the [S]tate based on the ESA-
listed species that were identified . . . as part of th[e] proposed assumption."  Dkt. 112-2 at 351.
The NMFS had concluded, based on discussions with the State, a review of various mapping
products and analysis, and a review of documentation provided by the State, that no ESA-listed
species "under NMFS'[s] jurisdiction" are found "in the waters that are assumable by the
[S]tate."  Dkt. 112-4 at 207.  Unsurprisingly, then, the day after the NMFS received the EPA's
September 2, 2020 letter, it "provided a courtesy concurrence of this determination."  Dkt. 112-2
at 352.  What matters for present purposes is that the EPA's no-effect determination, and the
NMFS's "courtesy concurrence," were based on the premise that no listed-species within NMFS
jurisdiction "occur" *in* the assumable waters.

The problem with this determination is that it misapprehends the relevant "action area."
As explained above, the relevant "action area" is not limited to areas that are directly affected by
the agency action but also includes areas indirectly affected, including areas outside the
"immediate area involved in the action."  50 C.F.R. § 402.02.  Nor was that error self-evidently
harmless; to the contrary, the record suggests that listed species under NMFS jurisdiction may
well have been affected by the EPA's decision.  The BiOp observes, for example, that
"freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine
ecosystem," Dkt. 112-5 at 112 (BiOp), raising the prospect that the EPA's action might affect
listed species outside assumable waters.  At a minimum, the EPA was required to provide a
reasoned basis for considering affects only in the assumable waters and failing to consider "an

important aspect of the problem," *State Farm Mut Auto. Ins. Co.*, 463 U.S. at 43—that is whether species found in areas beyond the assumable waters might be "indirectly" affected by the agency action.  The EPA's failure to consider the potential effects on any listed species under the jurisdiction of the NMFS that occur outside the assumable waters, but within the action area as defined by 50 C.F.R. § 402.02, and failure to offer a reasoned basis for that omission, runs afoul of the APA's arbitrary and capricious standard.

Although the Federal Defendants continue to maintain that the EPA's initial "no effect" determination was reasonable, the EPA has, "[o]ut of an abundance of caution," "undertaken to address [the] issue."  Dkt. 99 at 85.  In response to Plaintiffs' notice of intent to sue, the EPA stated that it had "considered th[e] issue further" and was "preparing a Biological Evaluation." Dkt. 112-3 at 301.  Nearly two years later, the EPA informed the Court that its biological evaluation was complete and had been transmitted to the NMFS.  *Compare id.* (dated December 20, 2021) *with* Dkt. 113 ("Notice of Completion of Biological Evaluation" filed July 19, 2023). At oral argument another three months later, in October 2023, counsel for the Federal Defendants informed the Court that the NMFS did "not have a timeline for completion of any consultation at this time."  Dkt. 156 at 87 (Oct. 19, 2023 Hrg. Tr.).

For the reasons explained above, the EPA's "no effect" determination was arbitrary and capricious at the time it was made—and at the time the agency approved the State's assumption application without the benefit of consultation with the NMFS.  The EPA may be correct that its "ongoing work should provide a more fulsome analysis and ultimately resolve the matter," Dkt. 99 at 85, but Plaintiffs are not required to wait forever, and the EPA has had years to correct is omission.  Nor can the Court conclude that this claim is "likely moot," Dkt. 102 at 60, based on the EPA's ongoing informal consultation with the NMFS.  *See, e.g.*, *Ctr. for Biological*

*Diversity v. EPA*, 316 F. Supp. 3d 1156, 1174–75 (N.D. Cal. 2018) (claim of failure to consult not mooted by reinitiation because relief is available in injunctions and vacatur). Because the EPA has not issued a superseding effects determination or BiOp addressing NMFS-listed species and because the EPA was required to complete the Section 7 process before deciding to approve Florida's application, Plaintiffs' claims are not moot. *Cf. Oceana*, 2020 WL 5834832, at *4 (agreeing with NMFS argument that reinitiation alone did not moot case, but the issuance of a new, superseding BiOp would).

Plaintiffs are entitled to summary judgment on Count Eleven.

## C.        Remedy

That brings the Court to the question of remedy. Although the parties asked to brief remedy following the Court's ruling on summary judgment, Dkt. 98 at 15 n.2 (Plaintiffs); Dkt. 99 at 34 n.13 (Federal Defendants); Dkt. 102 at 60 (Florida), the posture of the case shifted with CBD and Sierra Club's motion for a temporary restraining order or preliminary injunction, Dkt. 135. At the January 30, 2024 hearing on that motion, the Court sought the parties' views on what remedy would be appropriate if the Court were to identify substantial flaws in the programmatic BiOp and ITS. The Court subsequently authorized and the parties submitted supplemental briefs on that question. Dkt. 157 (Intervenor Cameratta); Dkt. 158 (Federal Defendants); Dkt. 159 (Intervenor Tarpon Blue Silver King I); Dkt. 160 (Florida); Dkt. 161 (Plaintiffs).

The APA directs that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "[A]lthough vacatur is the normal remedy," courts in this circuit "sometimes decline to vacate an agency's action." *Allina Health*

*Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The decision whether to vacate turns

on the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d

146 (D.C. Cir. 1993), which consider (1) the "seriousness of the order's deficiencies" and (2) the

likely "disruptive consequences" of vacatur.  *Id.* at 150–51 (internal citation omitted).

    The Court has now held that the FWS's programmatic BiOp and ITS, and the EPA's

reliance on those documents in approving Florida's assumption application, violate both the ESA

and the APA.  Under the APA, the normal remedy is vacatur of the FWS's BiOp and ITS, as

well as the EPA's approval of Florida's program.  Defendants, nonetheless, argue that vacatur is

not warranted and that the Court should, instead, remand the matter for further consideration.

Dkt. 158 at 2; Dkt. 160 at 3.  Doing so, they explain, would prompt the FWS to reopen formal

consultation with the EPA and would allow the FWS to "correct any errors or deficiencies

identified by the Court."  Dkt. 158 at 4.  The FWS could, in their view, "clarify that the ESA

obliges it to use the best available science in providing technical assistance to FDEP," *id.*, and

"strik[e] particular language in the ITS," Dkt. 160 at 3.

    With respect to the first *Allied-Signal* factor, Defendants argue that any deficiencies are

not serious because the FWS and the EPA had a good faith and reasonable belief, based on

*Cooling Water*, that the programmatic approach taken in the BiOp and ITS, and the technical

assistance process, were lawful.  Dkt. 158 at 3–4; Dkt. 160 at 3–4 (discussing *Cooling Water* and

arguing that this case presents "*at least* a close call" (emphasis in original)).  On the second

factor, they argue that vacatur would be highly disruptive because it would introduce regulatory

uncertainty in Florida regarding "how to seek incidental take coverage under the ESA,"

particularly given the "successful implementation of the program for the past three years."  Dkt.

158 at 5; *see also* Dkt. 160 at 5 ("Over 1,130 days have elapsed since Florida's Section 404

program commenced.").  To this, the State adds that remand without vacatur would pose little, if any, harm to Plaintiffs or the public because the technical assistance process "remains protective of listed species and ensures no jeopardy."  Dkt. 160 at 6.[21]

As for the EPA's approval of Florida's assumption application, the Federal Defendants argue that any deficiencies in the BiOp and ITS—no matter how grave—did not infect the EPA's approval of Florida's assumption because the EPA did not rely on the BiOp in approving Florida's program.  Dkt. 158 at 6.  On their telling:

> EPA's approval action rested, in relevant part, on the agency's determination that Florida had "the authority" to "issue permits which . . . apply and ensure compliance with . . . the [404(b)(1)] [G]uidelines," 33 U.S.C. § 1344(h)(1)(A)(i), including the requirement that no permit shall issue that "[j]eopardizes the continued existence of" ESA-listed species or "results in likelihood of the destruction or adverse modification" of critical habitat, 40 C.F.R. § 230.10(5)(b)(3).  EPA reached that determination based on its review of the regulations in Florida's program submittal, not in the BiOp.

Dkt. 158 at 6.  But that argument is belied by the Federal Defendants own words in this very case.  They observed in their cross-motion for summary judgment that the "EPA of course relied on the BiOp, but so too does virtually every action agency that issues a rule following a no-jeopardy determination by one of the consulting agencies."  Dkt. 99 at 43.  It is also belied by the fact that the consultation considered one—and only one—federal action, the EPA's decision to approve Florida's Section 404 assumption application.  And it is further belied by the fact that the Federal Defendants and Florida justified the issuance of an ITS, which accorded incidental take protection on the EPA, Florida, and future, state-permittees, on a theory that required far

---

[21] The intervenors join in these arguments.  *See generally* Dkt. 157; Dkt. 159.  Cameratta seems to suggest that the Court should allow its permit to move forward based on assurances provided in its brief, but it identifies no legal basis for such a remedy.  *See* Dkt. 157 at 2 ("In the interim of the remand, Cameratta would prepare and submit to [the FWS] and [the FWC] a site-specific biological assessment . . . .").

more than assessment of whether Florida had the authority, under state regulations, to protect ESA-listed species.

Plaintiffs' operative complaint asks the Court, among other things, to "[v]acate and set aside []FWS' programmatic biological opinion and incidental take statement for the challenged EPA decision and remand with instructions for reopening and reinitiating consultation" and "[e]njoin the EPA's approval and transfer of authority to the state."  Dkt. 77 at 58 (Am. Compl. ¶¶ (m), (p)).  In their supplemental brief, Plaintiffs renew those requests and argue that the Court should vacate the BiOp, technical assistance process, and ITS.  Dkt. 161 at 7.  Plaintiffs also argue that because the EPA relied on an invalid BiOp and ITS to justify its approval of Florida's program, that approval must be set aside as unlawful as well.  *Id.* at 12–13.  The Plaintiffs also seek, for the first time, injunctive relief that "restores the Corps' authority over permits that may affect ESA-listed species."  Dkt. 161 at 12.

      1.     *The Biological Opinion and ITS*

The Court concludes that it should vacate the BiOp and ITS.  The Court agrees, as all parties request, that this vacatur should be prospective and should not call into question previously issued Section 404 permits.  Dkt. 158 at 5; Dkt. 160 at 7; Dkt. 161 at 11 & n.12.

With respect to the first *Allied-Signal* factor, the Court concludes that the flaws in those documents are serious, and that these flaws cannot be cured merely by further explanation or changes to the technical assistance process on remand.  *See Conservation Law Found.*, 37 F. Supp. 3d at 271 (vacating agency action is proper where there is "no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand"); *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (vacating biological opinion because "neither *Allied-Signal* factor provides a reason to depart from the standard

vacatur remedy"); *Forest Serv. Emps for Env't Ethics*, 726 F. Supp. 2d at 1232 (vacating

programmatic biological opinion that deferred analysis to later, site-specific FWS review).

Nor is the gravity of those flaws mitigated by the fact that the Federal Defendants and

Florida modeled the programmatic BiOp and ITS on *Cooling Water*.  As explained at length

above, *Cooling Water* is both distinguishable and the lone decision that has ever approved the

use of a programmatic BiOp and ITS that fails to undertake any species-specific analysis, fails to

set any numerical take limits or to employ surrogates to set a clear standard for determining

when the level of anticipate take has been exceeded, and that purports to accord ESA-liability

protection on future permittees without those limits.  Other settled precedent, moreover, has long

raised serious questions about the approach the EPA and the FWS took here.  Finally,

Defendants cite no authority for the proposition that vacatur is not required when an agency acts

with some good faith basis to believe that its actions are lawful.  To the contrary, such good faith

is generally presumed, yet the presumptive remedy under the APA remains vacatur.

With respect to the second *Allied-Signal* factor, courts typically focus on the disruption

that might result from "an interim change," which "may itself be changed" at a later date—that

is, the disruption that might result from flipflopping policies.  *Ross*, 180 F. Supp. 3d at 246

(internal quotations omitted) (quoting *Allied-Signal*, 988 F.2d at 150–51).  Here, Defendants

have failed to show that the EPA can—and is likely to—reinstate the type of non-statutory

incidental take protection that applied under the technical assistance program.  This does not

leave the Federal Defendants, the State, or state-permittees without options, moreover.  A

permittee can still, for example, seek protection under Section 10, and, indeed, one of the two

developers that has intervened here was in the midst of doing so when the FWS issued is

programmatic ITS.  *See* Dkt. 135-8 at 29 (Tarpon Blue Silver King I, LLC).  In addition, as the

New Jersey model and the administrative record in this very case show, the EPA and the State

can pursue other options. Those options, however, are appropriately explored and crafted by the

administrative agencies and the State—and not by the Court.

Finally, the Federal Defendants point to a "prolonged delay in the issuance of individual

Section 404 permits in Florida now pending with the State." Dkt. 158 at 8. The Court does not

doubt that some disruption will occur, but the record says little about the extent of that

disruption, and, in any event, setting aside unlawful agency action almost always results in some

disruption. Here, moreover, as discussed below, only a small percentage of state-permits require

some form of ESA incidental take protection. Finally, the type of disruption that Defendants

invoke is inherent in the Section 404 program. The Court is unaware of any complaints of

disruption that were lodged when the EPA transferred Section 404 permitting authority from the

Corps to the State, and the CWA anticipates that, if the State does not administer the program in

accordance with the CWA, the EPA can—and should—withdraw its approval of the assumption.

The Court will, accordingly, **VACATE** effective immediately the FWS's programmatic

BiOp and ITS.

> 2.  *The EPA's approval of Florida's assumption application*

Next, the Court must consider how the *Allied-Signal* factors apply to the EPA's

decision granting Florida's assumption application and whether the Court should vacate that

decision, in whole or in part, pending further consideration on remand.

Here, the Federal Defendants' principal argument for why the ordinary remedy of vacatur

is unwarranted is that the EPA did not rely on the programmatic BiOp and ITS in approving

Florida's assumption application under the CWA. But, as explained above, that argument carries

little weight. *Cf. Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601–02 (D.C. Cir. 2023)

(directing district court to vacate BiOp but allowing challenged rule to stay in place because the court was "not convinced the error [in the BiOp] is fatal to the rule").  The Court, accordingly, undertakes its own analysis of whether to vacate the assumption decision.

With respect to the first *Allied-Signal* factor, the Court remains convinced that the ESA violation was a serious one, which will not easily be remedied on remand.  "In such circumstances—where there is no question that the agency has violated the law and [there is] absolutely no possibility of the [agency action's] survival on remand—the D.C. Circuit has suggested that the rule ought to be vacated."  *Conservation Law Found.*, 37 F. Supp. 3d at 271 (citing *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).  "Section 7 of the ESA is the most powerful safeguard in environmental law, and in the section 404 program," Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States*, 54 Md. L. Rev. 1242, 1259 (1995), and by eliding the requirements of Section 7, the Federal Defendants committed a serious error.  In the ordinary course, the Court would have little difficulty in concluding that error of this magnitude requires vacatur.

Here, however, the extent to which the ESA violations infect the overall Florida assumption program is far from clear.  Most recently, Florida has told the Court that "just 1.4% of Florida 404 permit applications" are likely to adversely affect species.  Dkt. 160 at 8.  That estimate, however, is considerably smaller than the State's representation leading up to the adoption of the assumption program "that approximately ten percent of Section 404 permits issued in Florida require some form of incidental take coverage."  Dkt. 112-2 at 3.  But, either way, it seems likely that a large percentage of the permits at issue will have no effect on listed species.  It is even less clear, though, whether the EPA would have approved—or Florida would

have asked the EPA to approve—an assumption application that did not provide incidental take protection to Florida permittees through the programmatic ITS and technical assistance program. *See, e.g.*, Dkt. 112-3 at 369.

For similar reasons, it is also difficult to make a definitive determination regarding the second *Allied-Signal* factor on the present record.  To start, the assumption has been in place now for over three years, giving rise to some expectation interests among the affected parties.  The Court also recognizes that Florida has expended funds to implement its 404 permitting program and that some, although far from insurmountable, administrative difficulties would result from returning the permitting authority to the Corps.  But the real question comes down to whether, and, if so, the extent to which vacatur could lead to further administrative flipflopping and confusion.  For the reasons explained throughout this opinion, the Court is skeptical that the EPA and the FWS will be able to replicate the current assumption program on remand and, more generally, is skeptical that the FSW and the EPA can accord incidental take liability protection on future, state-permittees without requiring Section 10 consultation, without federalizing permits likely to adversely affect species (as in New Jersey), or, at the very least, preparing a dramatically different BiOp and ITS than those addressed above.  The question whether the EPA could authorize a more modest assumption—and whether Florida would want it to do so—thus, cannot be answered on the present record.

Anticipating these issues, the Federal Defendants and Florida request that, if the Court is inclined to vacate the assumption decision, (1) it vacate the approval only as to those projects in the "may affect, likely to adversely affect" category, as those are the projects "*indicating incidental take*," Dkt. 160 at 7–8 (emphasis in original) (Florida); (2) it stay the order of vacatur for at least six months "to allow the federal and state agencies to chart a new course," *id.* at 7

(Florida); and (3) it postpone the effective date of its vacatur by at least 180 days, Dkt. 158 at 8 (Federal Defendants).

After considering these requests and weighing the seriousness of the defects as well as the potential disruptive consequences of vacatur, the Court concludes that the appropriate remedy is to **VACATE** the EPA's approval of Florida's assumption application.  The Court will, however, permit Defendants to seek a limited stay of that vacatur within ten days of this decision.  Any such request should exempt all pending and future permit applications that "may affect" any listed species under the jurisdiction of the FWS or the NMFS and should propose a mechanism for determining which permit applications "may affect" listed species.  Because the APA does not "contemplate that a court should substitute its judgment for that of the agency," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*., 435 U.S. 519, 555 (1978), the Court will leave it to the administrative agencies to determine, at least in the first instance, whether any such stay is desirable and workable, and, if so, how it should work.  Finally, the Court notes that this invitation to seek a limited stay is not intended to foreclose any arguments Plaintiffs may have to the contrary or to pretermit Plaintiffs' remaining claims, which challenge the assumption decision more broadly.

Having vacated the BiOp, ITS, and assumption decision, the Court will **DENY** as moot CBD and the Sierra Club's motion for a temporary restraining order and preliminary injunction.  Given the Court's decision, neither of the two permits that they seek to enjoin can issue, and, even if the Court eventually grants a limited stay of its vacatur of the assumption decision, and even if those permittees were willing to risk ESA liability without the protection of the ITS or a Section 10 permit, the State will lack authority under Section 404 to issue those permits.

Finally, the State requests that the Court enter partial final judgment pursuant to Federal Rule of Civil Procedure 54(b).  Dkt. 160 at 2 n.1.  The Court will **DENY** that request as premature but will permit the State to renew its request after the parties have reviewed this decision and have decided whether to seek a limited stay of the Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has decided how to proceed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, Dkt. 98, is hereby **GRANTED** with respect to Counts 3, 4, 6 and 10–13 of Plaintiffs' Amended Complaint, Dkt. 77.  The Federal Defendants' cross-motion for summary judgment, Dkt. 99, and Defendant-Intervenors' cross-motion for summary judgment, Dkt. 101; Dkt. 102, are hereby **DENIED**  as to those same Counts.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 15, 2024

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

       *Plaintiffs*,

  v.

MICHAEL S. REGAN, *et al.*,

       *Defendants.*

Civil Action No. 21-119 (RDM)

---

**MEMORANDUM OPINION**

Two motions are currently before the Court: (1) the State of Florida's motion, Dkt. 166, for a limited stay of the Court's February 15, 2024 order, Dkt. 164, which both Plaintiffs and the Federal Defendants oppose, Dkt. 165; Dkt. 169, and (2) Florida's expedited motion for entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d), or, in the alternative, entry of partial, final judgment pursuant to Rule 54(b), Dkt. 171, which Plaintiffs oppose, Dkt. 178, and which the Federal Defendants support in part and "take no position on" in part, Dkt. 175 at 1.

For the reasons that follow, the Court will deny Florida's motion for a limited stay, Dkt. 166. With respect to Florida's second motion, however, the Court will dismiss as prudentially moot Counts 1, 2 and 5 of the Amended Complaint, Dkt. 77; will deny Florida's motion for entry of final judgment pursuant to Rule 58(d); and will grant Florida's motion for entry of partial, final judgment as to Counts 1–6 and 8–13 of the Amended Complaint pursuant to Rule 54(b).

**I. PROCEDURAL BACKGROUND**

The Court's analysis of the substantive issues presented by this case has filled many pages. For present purposes, however, the Court need only briefly summarize some of the

central holdings in those decisions.  Two years ago, the Court granted partial summary judgment

in favor of the Federal Defendants and granted Florida's motion to dismiss with respect to Count

9 of the original complaint, which alleged that the Environmental Protection Agency's ("EPA")

failure to codify Florida's Section 404 program was arbitrary and capricious and not in

accordance with law.  *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 213

(D.D.C. 2022) ("*CBD I*").  Then, about a year later, the Court granted the Federal Defendants'

renewed motion for partial summary judgment and Florida's renewed motion to dismiss with

respect to Count 8 of the original complaint, which alleged that the EPA had unlawfully treated

its approval of Florida's Section 404 assumption application as an adjudication, rather than a

rulemaking, to avoid the 30-day notice requirement found in 5 U.S.C. § 706(2).  *See Ctr. for

Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, at *9–*10 (D.D.C. Aug.

23, 2023) ("*CBD II*").  Although the Court had previously held, in considering the challenge to

Count 9, that the approval of Florida's assumption application was a rulemaking, *see CBD I*, 597

F. Supp. 3d at 212, the Court concluded that Plaintiffs' corresponding injury was non-redressable

and that, as a result, Plaintiffs lacked Article III standing to pursue Count 8.  *See CBD II*, 2023

WL 5437496, at *4–9.  And, most recently, on February 15, 2024, the Court granted summary

judgment in Plaintiffs' favor on Counts 3, 4, 6 and 10–13 of the Amended Complaint.  *See Ctr.

for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 655368, at *4 (D.D.C. Feb. 15,

2024) ("*CBD III*").

　　　While *CBD I* and *II* addressed Plaintiffs' procedural challenges brought under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, *CBD III* focused exclusively on a

subset of Plaintiffs' substantive challenges under the APA to certain actions taken by the Fish

and Wildlife Service ("FWS") pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §

1531 *et seq.*, and the EPA's reliance on those actions in its approval of Florida's Section 404 assumption application.  Without repeating the extensive analysis contained in that opinion, it suffices for present purposes to note that, at Florida's request, the EPA "exercised [its] discretion to cast Florida's assumption program in a manner designed to confer ESA liability protection on future, state-permittees by inviting Section 7 consultation," which, in turn, required a determination that the proposed program "would likely adversely affect" listed species, *CBD III*, 2024 WL 655368, at *28—but, having triggered the formal Section 7 process, the FWS failed to prepare a Biological Opinion ("BiOp") containing the required species-specific analysis, *id.* at *26–32, and failed to issue an Incidental Take Statement ("ITS") that included, among other things, numerical take limits for listed species or surrogates for such limits, *id.* at *32–36.  The Court, accordingly, set aside the BiOp and ITS, and, having done so, also set aside the EPA's approval of Florida's Section 404 assumption application on the ground that the "the EPA impermissibly relied on a facially flawed BiOp" (and ITS) in taking that action, and thus also violated the APA.  *Id.* at *38; *see id.* at *37–39, *41–42.  Finally, after considering the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993), the Court concluded that vacatur was required.  *See CBD III*, 2024 WL 655368, at *41–45 (citing 5 U.S.C. § 706).[1]

The Court, however, left open the possibility of staying its vacatur order in part, in light of the fact that not all permits issued pursuant to Section 404 of the Clean Water Act ("CWA") implicate the ESA.  *Id.* at *44.  At the same time, the Court recognized that the parties had not

---

[1] The Court also denied as premature Florida's request for entry of partial final judgment pursuant to Federal Rule of Civil Procedure 54(b) but invited the State to "renew its request after the parties have reviewed this decision and have decided whether to seek a limited stay of the Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has decided how to proceed."  *Id.* at *45.

briefed the desirability or workability (or, as the parties now stress, the legality) of crafting a program that would permit Florida to continue to process some, but not all, Section 404 permit applications. *Id.* The Court was also cognizant that crafting such a program, even if possible and desirable, would require the exercise of administrative discretion and that courts must take care not to "substitute [their] judgment for that of the agency." *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)). Finally, the Court acknowledged that, if it were inclined to grant a limited stay, it might need to go on to consider Plaintiffs' remaining claims, which challenge the Section 404 assumption decision in other respects. *Id.*

To provide the parties with an opportunity to consider—and, if necessary, to brief—these issues, the Court gave Defendants ten days to seek a limited stay but made clear that, unless and until a stay was granted, Florida lacked authority to issue Section 404 permits and that "all [relevant] Section 404 permitting authority . . . is vested in the Army Corps of Engineers." Dkt. 164 at 1. On February 26, 2024, the Federal Defendants informed the Court that, in their view, a limited stay was neither workable nor lawful. Dkt. 165 at 1–2. Florida disagreed and moved for a limited stay of at least six months. Dkt. 166 at 13, 19. Plaintiffs opposed Florida's motion for a limited stay, Dkt. 169 and, finally, Florida filed a reply brief in support of its motion, Dkt. 170. Given the significant concerns about the workability (and legality) of the requested stay raised by the parties—and, in particular, given the opposition of the federal agencies that would be responsible for implementing such a program—the Court directed the parties to appear for a hearing on the motion. *See* Min. Order (Mar. 8, 2024).

Before that hearing could take place, Florida filed a second motion—this time seeking immediate entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d) or, in the

alternative, entry of partial, final judgment pursuant to Rule 54(b).  Dkt. 171.  And, failing either, Florida "reserved the right" to ask the Court to certify the questions decided in the February 15, 2024 opinion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  *Id.* at 4 n.3.  Plaintiffs opposed both requests, Dkt. 178, and the Federal Defendants took a middle path, agreeing with Florida that the Court should enter final judgment pursuant to Rule 58(d) while taking "no position on Florida's [other] . . . requests," Dkt. 175 at 1.  Briefing closed on March 25, 2024, when Florida filed a reply brief in support of its motion, Dkt. 179, and the Court held a hearing on April 4, 2024, *see* Min. Entry (Apr. 4, 2024).

Both of Florida's motions are now ripe for decision.

## II.  ANALYSIS

### A.    Florida's Motion for a Limited Stay

All agree that district courts, in general, have authority to stay vacatur orders, whether as an exercise of the court's inherent authority or based on the *Allied-Signal* factors.  *See* Dkt. 166 at 3; Dkt. 169 at 6.  The parties disagree, however, about whether it would be wise (or lawful) for the Court to do so under the present circumstances.  In Florida's view, a limited stay is needed to avoid undue disruption, confusion, and delay in Section 404 permitting within the State.  Dkt. 166 at 3–7.  Plaintiffs and the Federal Defendants take the opposite view.  They contend that a limited stay would be unworkable, would result in increased confusion and would, if anything, increase delays in the Section 404 permitting process.  *See* Dkt. 165 at 2; Dkt. 169 at 6–7.  The Federal Defendants, moreover, point to a regulation that precludes the EPA from approving "[p]artial State programs . . . under section 404," Dkt. 165 at 3 (alteration in original) (quoting 40 C.F.R. § 233.1(b)), and they argue that a limited stay would, in effect, create the type of "partial State program" that the regulation precludes.

5

The Court is persuaded that a limited stay is neither workable nor desirable.  The Court

begins, once again, with the core tenet of administrative law that a court should not "substitute its

judgment for that of the agency." *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 555 (quoting

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  That principle applies here because a

limited stay would require more than simply holding the Court's order in partial abeyance; it

would require that various federal agencies, including the EPA, the FWS, and the U.S. Army

Corps of Engineers ("Corps"), work with the State of Florida to design mechanisms and

procedures that would permit the State to continue processing Section 404 applications that do

not implicate the ESA, while requiring the Corps to process those that do implicate the ESA.  It

is not the Court's role to develop such a program over the objection of the federal agencies, nor

would such a judicially mandated approach come dressed for success.

Significantly, the Federal Defendants stress just how real these concerns are.  They

observe:

> As a practical matter, it is unclear how, or even if, Florida and the Corps could
> divide permitting responsibilities for projects in state-assumed waters depending
> on whether those projects "may affect" listed species.  Under such an
> arrangement, would applicants apply to Florida or the Corps in the first instance?
> Who would then determine impacts on ESA-listed species?  And what would
> happen if Florida and the Corps disagreed on that determination?  The time
> needed to answer these, and many other difficult questions could exceed the
> uncertain duration of a limited stay and would consume considerable agency
> resources that might otherwise go toward processing permits in the meantime.

Dkt. 165 at 2.  Nor do they stop there.  The Federal Defendants further observe that a limited stay

would result in needless "redundancy"—for instance, if review of a proposed permit commences

at the state level, only to then be transferred to the Corps later if it is determined that the

proposed project "may affect" listed species.  *Id.*  Florida, for its part, agrees that a limited stay

would raise a host of questions, including: how to define "a 'may affect' situation for these

purposes;" what "mechanism should be used to identify a 'may affect' situation;" "[w]hat options [would be] available to 'may affect' permit applicants;" and "[h]ow should a limited stay address permit applications that otherwise already trigger Section 7 procedures and/or will obtain Section 10 permit coverage." Dkt. 166 at 8. Although Florida proposes answers to some of these questions (and asks the Court to answer others), the Court will not step into the shoes of the federal agencies and design a new or modified Section 404 assumption program, which those agencies submit is neither workable nor lawful.

Recognizing these hurdles, Florida suggests a "second proposed option," which it submits is similar to the Section 404 programs currently in place in Michigan and New Jersey. Dkt. 170 at 9. Under that approach, Florida "would continue to implement both the existing technical assistance process . . . as supplemented by the same basic 'Procedures' set forth in Section III of the New Jersey-EPA-FWS MOA." Dkt. 166 at 14. There are several problems, however, with this alternative. First, and foremost, it is not the program that the EPA approved in response to Florida's Section 404 assumption application. Notably, unlike the program that the EPA approved, this approach would provide no incidental take liability protection to Florida permittees. *Id.* at 15. That is a critical difference because incidental take protection is vastly more important in Florida than it is in Michigan and New Jersey; as Florida itself stressed at an earlier stage of the proceedings, New Jersey "has only 17 listed species and less than 1,400 square miles of water area," while "Florida has *over 130 listed species* and *over 12,000 square miles* of water area." Dkt. 127-1 at 5 (emphasis in original). Indeed, during the administrative process preceding the EPA's decision on Florida's Section 404 assumption application, the State represented that operating a state program without Section 7 incidental take protection at the program level would be "*more burdensome* than the existing federal program," due to the

prevalence of listed species in Florida.  *See* Dkt. 112-2 at 4 (emphasis added).  The EPA

similarly explained that in States, like Florida, with "an abundance of ESA listed species," the

absence of program-level incidental take protection would "present a significant obstacle to

assuming the 404 program."  Dkt. 112-3 at 368.  It follows that a stay that would allow Florida to

process Section 404 permit applications without incidental take protection would likely hinder—

rather than grease—the wheels of progress, since few developers would "risk civil and criminal

penalties."  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023).

     In response, Florida insists that the "vast majority of the projects in Florida don't

implicate incidental take."  Dkt. 181 at 11 (Apr. 4, 2024 Hrg. Tr.).  It estimates that on average

only about 15% of Florida Section 404 permit applications would likely trigger a "may affect"

finding.  Dkt. 166 at 11; Dkt. 166-1 at 4 (Wolfe Decl. ¶ 13).  The United States disagrees with

this estimate and would, instead, place the figure as high as 85%.  Dkt. 181 at 35–36 (Apr. 4,

2024 Hrg. Tr.).  That disagreement itself raises red flags about the workability of the proposed

stay, which would require considerable federal-state cooperation and agreement on key aspects

of the modified program.  But, even setting aside that concern, neither of Florida's proposed

approaches makes sense.

     To take just one significant example, under its first proposed approach, Florida argues

that the need for incidental take protection—which it deemed an essential component of its

assumption application—can be addressed by providing "may affect" permit applicants with

several options, including the option to hold an application in abeyance with the State, to amend

an application to ensure that the proposed project would have "no effect" on listed species, to

withdraw an application, or to request that the State "transfer the permit application file to the

Corps of Engineers for processing."  Dkt. 166 at 11–12.  It goes without saying, however, that

the first three options are unlikely to result in greater ease of administration, efficiency, or

expedition than simply allowing the Corps to process all Florida Section 404 permits—with the

concomitant benefit, where appropriate, of incidental take protection.  The fourth option,

moreover, runs head-on into Florida's contention that Plaintiffs have somehow misled the Court

about how the New Jersey program works.  Dkt. 170 at 1–3.

For present purposes, the Court need not address Florida's accusation in any detail, other

than to note that the Court was not, in fact, misled.[2]  What does matter for present purposes is

that Florida maintains (and the Federal Defendants agree) that under Section 404 of the CWA

and the relevant implementing regulations, the EPA may transfer a permit application from a

State to the Corps only if "the proposed permit is (1) the subject of an interstate dispute under

§ 233.31(a) and/or (2) outside requirements of the Act, these regulations, or the 404(b)(1)

Guidelines[,]" 40 C.F.R. § 233.50(e), and the State is provided an opportunity to amend the

---

[2] Without going too far down this tangent, the Court notes that it had before it the New Jersey
Memorandum of Agreement, which it reviewed and relied upon in its opinion.  The Court also
notes that Florida did not take issue with Plaintiffs' (admittedly abbreviated) description of the
New Jersey program until after the Court issued its February 15, 2024 decision.  And, although
Florida spends pages chastising Plaintiffs for mischaracterizing the New Jersey program as
allowing for the "federalization" of Section 404 permit applications, *see* Dkt. 170 at 1–6; Dkt.
171 at 2 n.2; Dkt. 179 at 10–11, the Court notes that it was the EPA—and not Plaintiffs—that
first referred to "federalizing" Section 404 permit applications and that first treated the
"federalizing" of permit applications as one of "[t]he limited options" that was available "for
states seeking to assume the 404 program."  *See* Dkt. 112-3 at 368.  To the extent any blame can
be assigned regarding this issue—and, to be clear, in the Court's view, no blame is due—it lies in
the failure of all of the parties to add to the many hundreds of pages of briefing (and thousands of
pages of administrative documents) before the Court by providing additional detail about a
decades-old program not directly at issue in this litigation and in the failure of the Court to
describe that program more precisely in its opinion.

To put this issue firmly to rest, however, and to avoid any continuing confusion regarding the
New Jersey program, the Court has amended its February 15, 2024 opinion, in minor respects, to
add the further detail omitted in the parties' filings and the Court's original opinion.  *See* Dkt.
182.  None of these changes have any bearing on the Court's conclusions.

permit to address those objections, 33 U.S.C. § 1344(j).  *See* Dkt. 165 at 2–3 (Federal

Defendants); Dkt. 170 at 3, 6 (Florida).  Whether that view is correct, how those principles apply

in practice, and whether adoption of such a program would result in an impermissible "[p]artial

State program[]," 40 C.F.R. § 233.1(b), are questions beyond the scope of this opinion.[3]  For

present purposes it suffices to note that Florida's proposal that permittees simply "[r]equest that

[the State] transfer the permit application file to the Corps of Engineers for processing," Dkt. 166

at 12, is of dubious legality and, in any event, is unworkable given the opposition of the Federal

Defendants.  To the extent that Florida asks the Court to utilize its broad, equitable authority to

craft a limited stay that differs from the type of Section 404 program that the EPA would have

the authority to approve, the Court is unpersuaded that such a novel approach is warranted on the

facts of this case, particularly given the serious concerns raised by the federal agencies that

would need to implement that approach.

　　　　For all of these reasons, the Court concludes that a limited stay—in any form—would not

alleviate disruption, ameliorate confusion (to the extent any exists), or avoid delays in the

processing of Section 404 permit applications.  If anything, a limited stay would have just the

opposite effect.  Moreover, and of equal importance, the Court notes that the Corps stands ready

and able to process the outstanding permit applications and that, to date, any delay in processing

those applications is a result of Florida's effort to keep some semblance of the Section 404

assumption in place—even if only temporarily.  In these respects, the representations made by

counsel for the Federal Defendants at the most recent hearing bear repeating at length:

---

[3] *Cf.* Dkt. 112-5 at 154–56 (New Jersey MOA stating that the EPA "*will* object" to any
individual permit that the FWS determines is "likely to adversely affect federally-listed species"
and if New Jersey "neither satisfies the EPA's objections or requirements for a permit
condition . . . nor denies the permit, the permit application *will* be transferred to the Corps for
processing" (emphases added)).

[A]s of February 15, there were about 1,000 permit applications pending before the State of Florida. The Corps has identified and allocated resources to process those permits. And it starts with the Jacksonville District of the Corps, which is the office that has hand[l]ed Section 404 permitting in Florida since forever, pre-assumption . . . . [T]here are more people in the Jacksonville district today to process [S]ection 404 permits than there were before state assumption. And it is not just a couple more, it is a couple dozen more. In addition to the Jacksonville district, there are four other districts within the South Atlantic division. And the Corps has identified people in the other districts and the South Atlantic division as well as [at] Corps headquarters who can help with the anticipated surge of permits given the number of permits that were pending before Florida.

And I say the anticipated surge, Your Honor, because Florida has not transferred permits to the Corps yet. The Corps is prepared to process those permits. But if those permits exist in a state of regulatory limbo today, I want the Court to understand it is not because the Corps has not taken steps to comply with the Court's Order of February 15th. The Corps is ready to process permits.

Now, notwithstanding the fact that we haven't gotten permits from Florida yet. We have had meetings at the Corps with quite a few project proponents, including project proponents who have permits that were pending before Florida as of February 15th. And a number of those entities have congressionally approved agreements with the Corps to seek expedited Corps review of Section 404 permit applications for priority projects.

. . . . For those folks who don't have one of the congressionally approved expedited review agreements, I want to emphasize that a project will not go to the back of the line just because the applicant had previously applied to Florida. The idea here is that the Corps will, as much as possible, pick up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements. And I think the Corps' hope here is that a project that got pretty close to the end of the line in Florida, because of the work that went into preparing the documents for Florida, will get through the Corps' process faster. That is the hope. But I just want to emphasize again . . . the Corps' intention here is not to make people start from square one, it is to do this as efficiently as possible.

. . . . [T]he state of play is [that] the Corps [is] processing permits. It has done that for decades. It is familiar to the regulated community. I think the efforts the Corps has made really cut against granting the limited stay of the vacatur.

Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.); *contra id.* at 5 (Florida asserting that "permit applicants are faced with the dilemma currently of being required to go back to square one [and]

have their permits restarted" by the Corps).  In short, the Corps is "open for business today," *id.*
at 31; it has unquestionable legal authority to act; it has substantial experience processing Section
404 permit applications; it can, if appropriate, trigger the Section 7 consultative process; and,
where appropriate, that process will lead to issuance by the FWS of incidental take statements
and any corresponding liability protection.

The Court will, accordingly, deny Florida's motion for a limited stay.

### B.    Florida's Motion for Entry of Final Judgment

Florida also moves for entry of final judgment pursuant to Federal Rule of Civil
Procedure 58(d) or for entry of partial, final judgment pursuant to Rule 54(b).  For the reasons
explained below, the Court will dismiss Counts 1, 2, and 5 as moot, but because Count 7
remains, the Court will deny Florida's request for entry of final judgment pursuant to Rule 58(d).
The Court will, however, enter partial, final judgment as to Counts 1–6 and 8–13 of the
Amended Complaint pursuant to Rule 54(b).

### 1.

Florida first argues (with the concurrence of the Federal Defendants) that the Court
should enter final judgment pursuant to Rule 58(d) because, in its view, Plaintiffs have received
all the relief that they sought and, as a result, their remaining claims are moot. Dkt. 171 at 8–11
(Florida); Dkt. 175 at 1 (Federal Defendants).[4]  Rule 58(d) provides that a "party may request
that judgment be set out in a separate document as required by Rule 58(a)."  As used in the
Federal Rules of Civil Procedure, the term "judgment" means "any order from which an appeal
lies," Fed. R. Civ. P. 54(a), and, in the usual course, an appeal must await the entry of a "final

---

[4] The Federal Defendants argue that Plaintiffs' remaining claims are moot but take no position
on Florida's request for partial final judgment under Rule 54(b).  *See* Dkt. 181 at 36 (Apr. 4,
2024 Hrg. Tr.); Dkt. 175 at 1.

decision," 28 U.S.C. § 1291.  A "final decision," under 28 U.S.C. § 1291, "ordinarily must resolve every claim of every party in a case."  *Attias v. CareFirst, Inc.*, 969 F.3d 412, 416 (D.C. Cir. 2020).

Because the Court has yet to resolve every claim involving every party in the case, the Court cannot enter final judgment on the present record.  Recognizing as much, Florida asks the Court to dismiss the remaining claims as moot and, after having done so, to enter final judgment pursuant to Rule 58(d).  Dkt. 171 at 9–10.  According to Florida, the remaining claims are moot because nothing remains for the Court to adjudicate in this case; it argues that because the Court has set aside the BiOp, the ITS, and the Section 404 assumption determination, Plaintiffs have obtained all the relief that they sought and thus, even were they to prevail on the remaining claims, there is no additional relief that the Court could grant.  As a fallback position, Florida argues that "[r]egardless of whether [Plaintiffs'] remaining claims are formally 'moot' or not . . . this Court, at least, has *discretion* to enter final judgment at this point."  Dkt. 179 at 3 (emphasis in original).  Under either formulation of the argument, Florida bears the burden of convincing the Court to dismiss the claims.  *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 569–70 (1984).

As the D.C. Circuit has recognized, the doctrine of mootness has "two distinct branches."  *Chamber of Com. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).  The first branch is "grounded in the jurisdictional limitations dictated by the Constitution:  Under Article III, a federal court is without power to act unless it is presented with a live 'case or controversy.'"  *City of New York v. Baker*, 878 F.2d 507, 509 (D.C. Cir. 1989) (first citing *Chamber of Com.*, 628 F.2d at 291; and then citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)).  The second branch is often termed "prudential mootness."  *Id.*  It "does not concern [the] [C]ourt's power to

grant relief, but rather its exercise of discretion in the use of that power." *Id.* "Where it is so unlikely that the court's grant of [remedy] will actually relieve the injury," *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991), the court has discretion to "stay its hand, and to withhold relief it has the power to grant," *Chamber of Com.*, 627 F.2d at 291. "The cousin of the mootness doctrine, in its strict Article III sense," prudential mootness is "a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration." *Id.* (citing 13C A. Miller Wright & E. Cooper, Federal Practice and Procedure § 3533 (1975)). As a leading treatise explains:

> Despite the clear separation in received theory between mootness principles mandated by Article III and principles merely of remedy or judicial administration, most decisions do not undertake any explanation of the sources drawn upon. At times, to be sure, a court may take pains to explain that it need not choose between Article III and prudential concerns in finding a case moot. It is more common, however, to focus instead on the ability to provide any presently meaningful remedy, in light of the court's ability to surmise continuing effects or to forecast possible future effects. Probably this focus reflects a disposition to exercise remedial discretion in favor of the litigant who has once had a living claim for relief, or to withhold possible remedies that seem too drastic in relation to current circumstances.

13B Edward H. Cooper, Federal Practice and Procedure § 3533.1 (3d ed. 2023). For the reasons explained below, the Court concludes that Counts 1, 2, and 5 of the Amended Complaint are, at the very least, prudentially moot. The Court is unpersuaded, however, that Count 7 is either jurisdictionally or prudentially moot.

The Court's analysis of jurisdictional mootness begins with the Seventh Circuit's decision in *Air Line Pilots Association, Int'l v. UAL Corp.*, 897 F.2d 1394 (7th Cir. 1990). In that case, the Seventh Circuit held that a provision of a collective bargaining agreement violated the Railway Labor Act ("RLA") and then remanded the case to the district court to determine whether that provision and another provision violated state law. *Id.* at 1396. The district court

concluded that both provisions violated state law, and, on a subsequent appeal, the employer

argued that the case had become moot because the time to petition for a writ of certiorari

regarding the Seventh Circuit's earlier RLA holding had expired, and "no purpose could be

served . . . by a declaration that" the same provision of the collective bargaining agreement that

the circuit had already held violated federal law also violated state law.  *Id.*  For two reasons, the

Seventh Circuit was unpersuaded.  First, the court noted that the time to file a petition for

certiorari had not, in fact, expired, because the prior decision was not final.  *Id.* at 1397.  Second,

and of greater importance here, the court held that a case does not become moot simply because

a court grants complete relief based on one theory of recovery.  *Id.*  As the Seventh Circuit

explained, "it is cases rather than reasons that become moot," and "[w]hether a court gives one or

ten grounds for its result is not a question to which Article III prescribes an answer."  *Id.*  "The

practical reason" for this rule "is that the alternative grounds are ripe for decision and deciding

them may help a higher or a subsequent court" decide the case.  *Id.*

   In *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 587 (D.C. Cir. 2001), the D.C. Circuit

cited *Air Line Pilots Association* with approval and adopted the Seventh Circuit's reasoning.

Echoing the Seventh Circuit, the court wrote:  "If a plaintiff presents two or more alternative

grounds as routes to its hoped-for ultimate victory, a court does not lose jurisdiction over the

second claim once it has ruled in the plaintiff's favor on the first claim; victory on the first claim

doesn't moot the second."  *Id.*  The D.C. Circuit had faced a similar question several months

earlier in *WorldCom, Inc. v. FCC*, 246 F.3d 690 (D.C. Cir. 2001), where the court declared it

"settled law" that resolution of one basis for granting relief does not moot a second ground for

granting that same relief.  *Id.* at 695 (citing *Air Line Pilots Ass'n*, 897 F.2d at 1397).  Embracing

the Seventh Circuit's "practical reason" for this rule, the D.C. Circuit observed that "[b]y

15

considering both bases, there is obviously potential for economy by the inferior federal courts, as higher-level review might remove the first basis for the outcome." *Id.*

This line of authority provides ample support for the notion that this Court could have—consistent with Article III—resolved all of Plaintiffs' claims and could have, if supported by the law and facts, provided alternative grounds for awarding the same relief.  As the Seventh Circuit observed in *Air Line Pilots Association*, "in a vast number of cases the court, having decided that the defendant's conduct is unlawful on ground A, goes on to decide that it is also unlawful on ground B."  897 F.2d at 1397.  That is certainly correct.  But, as the Seventh Circuit also observed, courts are not "compelled" to reach alternative theories that might, at most, provide a second or third rationale for granting the same relief already justified on the basis of the first theory.  *Id.*  To continue the Seventh Circuit's observation of common practice, courts will often decide that a defendant's conduct is unlawful on ground A and will decline to go on to consider whether it is also unlawful on grounds B, C, and D.  *See id.* (explaining that courts often use the word "moot" "to refer to an issue that need not be decided in light of the resolution in the same opinion of another issue," even though they do not mean moot in an Article III sense (citing *Bazemore v. Friday,* 478 U.S. 385, 387 n.2 (1986))).  In other words, courts often have the discretion to treat alternative claims, which offer the plaintiff no prospect of obtaining any further relief, as prudentially moot.

By way of analogy, this is the same thing that the D.C. Circuit does when it affirms a lower court's decision without reaching the merits of a cross-appeal.  As the court has explained:

> [W]here . . . the losing party's theories are rejected, courts appear uniformly to dismiss a conditional cross-appeal. . . .  While characterizing such a cross-appeal as moot may be in tension with the general recognition that a court's acceptance of one of an appellant's two independent bases for attack does not render the second basis moot, *see Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1397 (7th Cir. 1990), this case presents no reason to break out of conventional

16

> practice.  Thus, on affirming the [agency's] decision . . . , we dismiss [this unconditional cross-appeal] without reaching the merits.

*Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 649–50 (D.C. Cir. 1998); *cf. Belton v. WMATA*, 20 F.3d 1197, 1203 (D.C. Cir. 1994) (treating an issue as "moot as a practical matter," even though the appellate court could have reached the issue under *Air Line Pilots Ass'n*).

 The fact that courts have discretion to reach alternative legal theories supporting the same relief, accordingly, does not mean that they must always utilize that authority.  Judges "[f]requently . . . decide no more than they have to decide," Cass R. Sunstein, *Foreword: Leaving Things Undecided*, 110 Harv. L. Rev. 4, 6 (1996), and they often have very good reasons for doing so.  This is a common practice in the district courts,[5] and, at least in cases involving pure questions of law, it does not necessarily preclude an appellate court from reaching the claims left undecided by the district court.[6]  The practice ensures that judicial decisions are rendered only after careful consideration, and it permits courts to avoid the pointless—and at times jurisdictionally dubious—task of deciding a broad array of legal and factual issues (including difficult and time-consuming ones) that, in the parlance of mootness, will "make [no] difference to the legal interests of the parties," *Air Line Pilots Ass'n*, 897 F.2d at 1396.

---

[5] *See, e.g.*, *Lewis v. Becerra*, 2023 WL 3884595, at *6 n.6 (D.D.C. June 8, 2023) ("[T]he Court need not reach the plaintiffs' other arguments under alternative provisions of the APA, which request the same relief."); *Dist. Hosp. Partners, L.P. v. Sebelius*, 932 F. Supp. 2d 194, 199 n.5 (D.D.C. 2013) (declining to reach alternative grounds under the APA asserted by plaintiff in vacating an administrative decision); *Burke v. Coggins*, 521 F. Supp. 3d 31, 45 (D.D.C. 2021) (declining to reach plaintiffs' first amendment and appointments clause arguments given complete relief on APA challenge); *Poett v. United States*, 657 F. Supp. 2d 230, 242 (D.D.C. 2009) (denying without prejudice plaintiff's constitutional claims for same reasons).

[6] *See, e.g.*, *Hutchins v. District of Columbia*, 188 F.3d 531, 547–48 (D.C. Cir. 1999) ("Appellees argued before the district court that the curfew also violated their First and Fourth Amendment rights, but because the district court found the curfew unconstitutional on equal protection and due process grounds, it did not reach these additional constitutional claims.  We exercise our discretion to resolve these purely legal claims in the interest of judicial economy.").

Applying these considerations, the Court will exercise its discretion—as a matter of prudential mootness and 5 of the Amended Complaint, but will decline to dismiss Count 7. Counts 1, 2, and 5 are each asserted against the EPA, each challenges the EPA's decision-making process leading up to its decision to approve Florida's Section 404 assumption application, and each seeks vacatur of that approval.  Dkt. 77 at 25–27 (Compl. ¶¶ 104–17) (Count 1) (challenging the EPA's interlocutory completeness determination); *id.* at 27–35 (Compl. ¶¶ 118–61) (Count 2) (challenging the EPA's approval of Florida's program on a variety of theories); *id.* at 42–43 (Compl. ¶¶ 202–12) (Count 5) (challenging the EPA's "no effect" determination with respect to species under the jurisdiction of the National Marine Fisheries Service ("NMFS")); *see id.* at 56–58 (Prayer).  For the reasons given in *CBD III*, the Court has already ruled against the EPA and has already granted Plaintiffs the relief that they seek in Counts 1, 2, and 5—vacatur of the assumption determination.  Dkt. 164.  The Court's vacatur order, moreover, does not merely embody that legal conclusion; it has current, operative effect, and it has fully redressed the injuries alleged in Counts 1, 2, and 5.  That is the ultimate relief to which Plaintiffs are entitled, and, accordingly, reaching the merits of Counts 1, 2, and 5 is unlikely to "make a difference to the legal interests of the parties," *Air Line Pilots Ass'n*, 897 F.2d at 1396.  There is, in short, no assumption program left for Plaintiffs to challenge.

Plaintiffs argue that their claims are not moot "in light of the State's intention to appeal." Dkt. 178 at 7.  But that argument speaks only of jurisdictional mootness and ignores the prudential considerations described above.  Considered in that light, Plaintiffs' argument proves too much; it would require district courts to address all alternative grounds for relief in every case in which an appeal is reasonably anticipated.  The real question is whether reaching the alternative grounds presented will likely assist the court of appeals in its consideration of the

case or avoid an unnecessary remand, and the corresponding delay and expenditure of judicial resources.  Here, however, the Court concludes that the additional judicial time and resources necessary to resolve Plaintiffs' alternative theories (all of which are premised on the APA) is unlikely to be justify by the remote possibility that these alternative rulings would assist the court of appeals or would, in the end, conserve judicial resources.

Plaintiffs also argue that a decision granting them declaratory relief on Counts 1 and 2 would provide additional relief, beyond that which the Court has already granted.  *Id.* at 11.  But the Declaratory Judgment Act provides only that a court "*may* declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a) (emphasis added).  And "[w]here it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers."  *Penthouse*, 939 F.2d at 1020 (affirming district court's denial of request for declaratory judgment on prudential mootness grounds).  Here, where the challenged program no longer exists (and may never again exist), it is "uncertain"—to say the least—that a declaratory judgment would meaningfully benefit Plaintiffs.  *Cf. Baker*, 878 F.2d at 510 (1989) ("[D]eclaratory judgment is [a] discretionary remedy that may be withheld where challenged practice is undergoing significant change so that its ultimate form cannot be predicted." (citing *Mechling Barge Lines, Inc. v United States*, 368 U.S. 324, 331 (1961))).  Thus, even "assuming that there is some trace of a continuing injury sufficient to satisfy Article III," declaratory relief would not be "appropriate as an exercise of the court's discretionary, equitable powers."  *Penthouse*, 939 F.2d at 1019.

The Court recognizes that the remaining claims do not precisely duplicate the claims that the Court has resolved to date; the remaining claims against the EPA are premised on the APA and the CWA, while the claims that the Court has already adjudicated are premised either

exclusively on the APA or on the APA and the ESA.  But they are all APA claims—there is no available cause of action under the CWA or the ESA.  *See Nat'l Ass'n of Homebuilders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005).  And, in any event, the line between Plaintiffs' CWA and ESA claims is, as Plaintiffs themselves acknowledge, a blurry one.  *See* Dkt. 178 at 28 ("The claims at issue here are inextricably linked . . . .").  In Count 1, for example, Plaintiffs allege (among other things) that the EPA violated the APA by treating Florida's Section 404 assumption application as complete before the BiOp—which is discussed at length in the Court's February 15, 2024 opinion—was itself complete.  Dkt. 77 at 25 (Compl. ¶ 108); *see also* Dkt. 178 at 28–31.  Similarly, Count 2 alleges that the EPA erred in approving Florida's assumption application, which, on Plaintiffs' telling, failed (among other things) to comply with certain requirements relating to the protection of listed species.  Dkt. 77 at 34 (Compl. ¶ 154); Dkt. 178 at 29–30.  Finally, Count 5 alleges that the EPA's "no effect" determination relating to species under the jurisdiction of the NMFS violated the APA and the CWA.  Dkt. 77 at 42–43 (Compl. ¶¶ 202–12); Dkt. 178 at 31.  In short, Counts 1, 2, and 5 not only seek the same relief (vacatur of the EPA's approval of Florida's assumption application) from the same party (the EPA) as the Court has already awarded, but they tread much of the same ground.

Under these circumstances, devoting time and resources to resolve the remaining claims will not accord Plaintiffs any meaningful relief beyond that which they have already achieved, will provide little (if any) assistance to the D.C. Circuit in its consideration of the case on appeal, and, based on the Court's assessment of the various claims, will not serve judicial economy by protecting against the possibility that appellate "review might remove the first basis for the

outcome," *WorldCom, Inc.*, 246 F.3d at 695.[7]  The Court will, accordingly, dismiss Counts 1, 2 and 5 without prejudice.

Count 7, however, presents a different story.  That count is brought against a different defendant—the Army Corps of Engineers—and it challenges a different agency action—the Corps' retained waters determination.  Dkt. 77 at 45 (Compl. ¶¶ 222–27).  Although this count is also brought under the APA, it is supported by an entirely distinct legal theory arising under the Rivers and Harbors Act ("RHA"), *id.*, and it involves distinct portions of the administrative record prepared by the Army Corps, *see* Dkt. 126-1 at 14–16.  Most importantly, this count seeks relief—vacatur of the Corps' retained waters list, Dkt. 77 at 58 (Prayer)—that the Court has not already granted to Plaintiffs.  Unlike with respect to Counts 1, 2 and 5, the Court is persuaded that if Plaintiffs prevail on this claim (and the Court expresses no view on that question at this point), they will be entitled to relief that would "have a more-than-speculative chance of affecting" the legal rights and interests of the parties "in the future."  *Adbelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015).

Under these circumstances, a real controversy continues to exist, and the Court will decline Florida's invitation to dismiss Count 7 as moot, either as a matter of jurisdiction or

---

[7] Even assuming that the exceptions to jurisdictional mootness apply to prudential mootness as well, no exception is available here.  Plaintiffs concede that the voluntary cessation exception is inapplicable but urge that their remaining claims qualify for the "capable of repetition yet evading judicial review" exception.  Dkt. 178 at 18–19.  But, even if the Court's order vacating the BiOp, the ITS, and the EPA's approval of Florida's assumption application were set aside, it is unlikely that Plaintiffs would lose the opportunity to press their alternative claims on remand or in a separate suit.  Plaintiffs maintain that the statute of limitations "*could* result in complete evasion of review" down the line, Dkt. 178 at 19 (emphasis added), but the statute of limitations is not jurisdictional, *see Jackson v. Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020) ("[W]e hold that § 2401(a)'s time bar is nonjurisdictional and subject to equitable tolling."), and, in any event, the six-year period would not run until the end of 2026, and would, of course, restart from any new agency action.  Finally, Plaintiffs can further avoid any risk that their claims would "evade review" by filing a conditional cross-appeal.

prudence. Because the Court has yet to render a "final decision" resolving "every claim of every party in [the] case," *Attias*, 969 F.3d at 416, which would permit Florida to file an appeal pursuant to 28 U.S.C. § 1291, the Court cannot enter final judgment pursuant to Rule 58(d) and must go on to consider whether to issue partial, final judgment pursuant to Rule 54(b).

## 2.

Normally, an order in a case involving multiple claims or defendants is not "final" (and therefore not appealable) until the district court has "disposed of all claims against all parties." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 221 (D.C. Cir. 2011). Rule 54(b) relaxes this requirement by allowing the district court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties" upon an express finding that "there is no just reason for delay." Rule 54(b) allows district courts to balance "the demonstrated need for flexibility in providing for appellate review in complex cases," *Blue v. D.C. Pub. Schs.*, 764 F.3d 11, 15 (D.C. Cir. 2014) (internal quotation marks omitted), against the goal of "avoiding piecemeal appeals," *Taylor v. FDIC*, 132 F.3d 753, 760 (D.C. Cir. 1997). "Rule 54(b) is the key to the problem of appealability when summary judgment is granted on less than the entire suit in multiple-party or multiple-claim litigation." *See* 10A Charles Alan Wright, Arthur R. Miller, & Adam N. Steinman, Federal Practice and Procedure § 2715 (4th ed. 2023). "It is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (citation omitted).

Rule 54(b) "establishes three requirements for an otherwise interlocutory order to be certified as a final judgment." *Attias*, 969 F.3d at 417. First, "the order must resolve a distinct 'claim for relief;'" second, "the order must be 'final' with respect to that claim;" and, third, "the

district court must permissibly determine that there is 'no just reason for delay' in entering

judgment." *Id.* (citation omitted).  The first two requirements serve a jurisdictional function:  If

there is no final judgment on one or more distinct claims, the court of appeals lacks appellate

jurisdiction.  *See id.*  If the jurisdictional requirements are met, the court must then "weigh[] both

'justice to the litigants' and 'the interest of sound judicial administration'" to determine whether

there is "no just reason for delay" in entering the judgment.  *Brooks v. Dist. Hosp. Partners, L.P.*,

606 F.3d 800, 806 (D.C. Cir. 2010) (quoting *Curtiss-Wright Corp.*, 446 U.S. at 6, 8).

There is no set formula for deciding whether there is "no just reason" for delay in

entering partial, final judgment, and the relevant factors "will inevitably differ from case to

case."  *Id.* (internal quotation marks omitted).  The factors pertaining to "sound judicial

administration" include "whether the claims under review were separable from the others

remaining to be adjudicated and whether the nature of the claims already determined was such

that no appellate court would have to decide the same issues more than once even if there were

subsequent appeals."  *Curtiss-Wright Corp.*, 446 U.S. at 8.  How best to balance these factors is

left to the district court's discretion.  *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956).

No one factor is dispositive, but where any of the factors pertaining to judicial administration

point against certification, the court should not enter partial, final judgment unless it "find[s] a

sufficiently important reason for nonetheless granting certification."  *Curtiss-Wright Corp.*, 446

U.S. at 8 n.2.

Applying this test, the Court is persuaded that the order entered today, as well as the

orders entered on February 15, 2024, Dkt. 164, on August 23, 2023, Dkt. 119, and on March 30,

2022, Dkt. 73, resolve distinct claims (*i.e.*, Counts 1–6 and 8–13 of the Amended Complaint,

Dkt. 77), are final with respect to those claims, and that there is no just reason to delay entry of final judgment with respect to those claims.[8]

For the reasons explained above, the only count of the Amended Complaint that remains pending is Count 7, which alleges that the Army Corps of Engineers violated the APA and the RHA when it made its retained waters determination.  Plaintiffs, for their part, seem to concede that Count 7 asserts a distinct claim for relief for purposes of Rule 54(b), Dkt. 178 at 27 n.15— and for good reason.  That count is asserted against a different defendant than the defendants named in the adjudicated counts, it turns on different facts, and it seeks different relief. Applying the D.C. Circuit's decision in *Attias v. Carefirst, Inc.*, 969 F.3d 412, 417–18 (D.C. Cir. 2020), the claim involves a distinct transaction and nucleus of operative facts and, as such, would not "fall afoul of the rule against splitting claims if brought separately," *Tolson v. United States*, 732 F.2d 998, 1001 (D.C. Cir. 1984) (internal quotation marks and citation omitted); *see also Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004); *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002).

The Court also concludes that there is no just reason to delay entering final judgment with respect to the orders entered today, on February 15, 2024, Dkt. 164, on August 23, 2023,

---

[8] Although Florida's motion concerns only the Court's February 15, 2024 order, *see* Dkt. 171, a district court may *sua sponte* direct entry of final judgment under Rule 54(b), *see, e.g.*, *Bank of Lincolnwood v. Fed. Leasing*, 622 F.2d 944, 947, 952 (7th Cir. 1980) (affirming district court's *sua sponte* entry of final judgment pursuant to Rule 54(b)); *Mitchell v. Lyons Pro. Servs., Inc.*, 727 F. Supp. 2d 116, 119–20 (E.D.N.Y. 2010) ("[T]he Court has broad discretion in determining whether to make the [Rule 54(b)] certification . . . and may do so *sua sponte*."); *Guinan v. A.I. duPont Hosp. for Child.*, 2009 WL 2877595, at *3 (E.D. Pa. Aug. 28, 2009) ("[A] district court may *sua sponte* direct entry of final judgment under Federal Rule of Civil Procedure 54(b).") (collecting cases).  In the present circumstances, the Court concludes that the fair administration of justice, and judicial efficiency, would be served by entering partial, final judgment as to each of the claims adjudicated to date.  As explained below, each claim is distinct and separable from Count 7, and there is "no just reason for delay[ing]" the entry of final judgment as to all of the adjudicated claims.

Dkt. 119, and on March 30, 2022, Dkt. 73.  The Court's March 30, 2022 and August 23, 2023 opinions and orders fully resolved Plaintiffs' procedural challenges brought under the APA, and nothing remains to be resolved with respect to those claims.  Those claims, moreover, do not overlap in any way with Plaintiffs' retained waters claim.  Similarly, for the reasons explained above, the Court's February 15, 2024 opinion and order fully resolved all of Plaintiffs' APA claims against the EPA and FWS, even if that order left some counts presenting alternative theories for relief unresolved.  Those counts seeking the same ultimate relief on alternative grounds, moreover, have now been dismissed, and have thus also been fully resolved.

The Court is further persuaded that entry of partial, final judgment on all of Plaintiffs' claims, with the exception of their retained waters claim, would serve the interests of justice and judicial administration.  As Florida and the other interveners and amici stress, there is an important interest in achieving the certainty that will come with prompt appellate review.  In the words of a Florida developer, who the Court permitted to intervene in this case, "[i]t just needs to know the rules" that will govern Section 404 permit applications.  Dkt. 177 at 2.  In structuring the litigation, moreover, the Court has attempted to reach and to resolve the core and most far-reaching claims first—and it has finally done so.  All that remains is a stand-alone claim that is unlikely to have any bearing on the issues now subject to appeal, and the issues likely to be raised on appeal are unlikely to have any bearing on Plaintiffs' retained waters claim.

Finally, the Court is persuaded that entering partial, final judgment will substantially advance the interests of justice.  The Court has set aside the BiOp, the ITS, and the EPA's approval of Florida's Section 404 assumption application, and, for the reasons explained above, even staying that order in limited fashion will result in confusion, delay, and inefficiency.  That decision is operative now, and, in the Court's view, Florida should be allowed to appeal it

without delay.  Nor do Plaintiffs identify any countervailing concerns premised on "miscellaneous factors such as delay, economic and solvency considerations, or expense." *SEIU Nat'l Indus. Pension Fund v. Sci &Comp. Sys. Corp.*, 249 F. Supp. 3d 130, 136 (D.D.C. 2017). They instead argue that Florida will not be prejudiced if partial, final judgment is denied.  The Court disagrees.  Although the Court's decision is unlikely to result in the dire consequences that Florida proffers—as noted above, the Corps stands ready, willing, and able to issue Section 404 permits in Florida, as it did for decades before the EPA approved Florida's assumption application and as it does in 47 other States—Florida nonetheless has a legitimate and substantial interest in obtaining prompt appellate review of a decision and order that set aside a program to which it has devoted extensive time and effort.  Florida may or may not prevail on appeal, but there is no just reason to delay its ability to seek review.

The Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  Here, that guidance and the dictates of Rule 54(b) militate in favor of the entry of partial, final judgment.

**CONCLUSION**

For the foregoing reasons, Florida's motion for a limited stay, Dkt. 166, will be denied.

The Court will also dismiss without prejudice Counts 1, 2, and 5 of Plaintiffs' Amended

Complaint, Dkt. 77.  Finally, Florida's motion for entry of final judgment pursuant to Rule 58(d)

will be denied, its motion for the entry of partial, final judgment pursuant to Rule 54(b) will be

granted, Dkt. 171, and the Court will enter partial, final judgment as to Counts 1-6, 8-13 of the

Amended Complaint.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 12, 2024

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| *Plaintiffs,* | |
| v. | Civil Action No. 21-119 (RDM) |
| MICHAEL S. REGAN, *et al.*, | |
| *Defendants.* | |

## <u>AMENDED MEMORANDUM OPINION</u>

Plaintiffs the Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper ("Plaintiffs") bring this challenge to various agency actions relating to the Environmental Protection Agency's ("EPA") approval of the State of Florida's application to assume (from the U.S. Army Corps of Engineers ("Corps")) permitting authority under Section 404 of the Clean Water Act ("CWA") within the State. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 179 (D.D.C. 2022) ("*CBD I*"). Defendants include the EPA, the Corps, the U.S. Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS"), and several federal officials sued in their official capacities (collectively, the "Federal Defendants"). Defendants also include the State of Florida and the Florida Department of Environmental Protection ("FDEP") (collectively, "Florida" or the "State"), which have intervened to defend the assumption and resulting permitting program.

Plaintiffs allege that the Federal Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Endangered

Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq.*, in their rush to transfer this permitting authority to Florida in the final days of the last administration.  In prior opinions, the Court addressed some, but not all, of Plaintiffs' APA claims.  This opinion addresses only Plaintiffs' claims involving the Endangered Species Act; the Court will, if necessary, address the remaining claims in a subsequent opinion.

Given the complexity of the relevant statutory and regulatory background, it is necessary to provide somewhat greater detail than usual to introduce the questions presented.  Under the ESA's implementing regulations, an "action agency"—here, the EPA—is required to "review its [contemplated] actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines that an "action may affect a listed species or critical habitat," *id.*, the agency must consult with the FWS and/or the National Marine Fisheries Service ("NMFS") (collectively, the "Service" or "Services") to ensure that its contemplated action "is not likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).  That process, which is referred to as "Section 7 consultation," requires the "consulting agency"—that is, the FWS and/or the NMFS—to prepare a Biological Opinion ("BiOp"), which details "how the agency action [at issue] affects the species or its critical habitat" and to determine whether the proposed action is likely to jeopardize the continued existence of any listed species.  *Id.* § 1536(b)(3)(A).  "If jeopardy . . . is found," the consulting agency is required to "suggest those reasonable and prudent alternatives which [the consulting agency] believes would not violate [the ESA] and [that] c[ould] be taken by the [action] agency or applicant in implementing the agency action."  *Id.*  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the

Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).

On the other hand, if the Service determines that the agency action will not violate the ESA (*i.e.*, that no "jeopardy" is likely) or that "reasonable and prudent alternatives" would avoid any such violation, the consulting agency must determine whether any "incidental take" of a listed species is nevertheless "likely to occur." 50 C.F.R. § 402.14(g)(5)–(7). The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, trap, kill, capture, or collect, or to attempt to engage in any such conduct" with respect to a listed species. 16 U.S.C. § 1532(19). "Take" is incidental if it "results from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

If "incidental take" is "reasonably certain to occur," *id.* § 402.14(g)(7); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021), the consulting agency is required to issue an Incidental Take Statement ("ITS"), which, among other things, "specifies the impact of such incidental taking on the species" and "sets forth the terms and conditions . . . that must be complied with by the [action] agency or applicant (if any), or both," in order to "minimize such impact," 16 U.S.C. § 1536(b)(4). Significantly, the ITS must specify "the amount or extent[] of such incidental taking on the species" or must use a "surrogate (e.g., similarly affected species or habitat or ecological conditions)" that can "be used to express the amount or extent of anticipated take" and that "sets a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i). The ITS serves the ESA's mandate "to give endangered species priority over the 'primary missions' of federal agencies," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978) ("*TVA*"), because, if the incidental take limit

is exceeded, the action agency "must reinitiate consultation *immediately*." 50 C.F.R.

§ 402.14(i)(4) (emphasis added).

The ITS is also important to regulated parties and serves their need for clarity, because
"any taking that is in compliance with the terms and conditions specified in the [ITS] shall not be
considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).  As
discussed further below, however, formal consultation under Section 7 is not the only way a
State or permittee can obtain liability protection:  Under Section 10 of the ESA, a State or private
party may seek a permit that allows "any taking otherwise prohibited by" the ESA and that,
accordingly, provides protection from liability for incidental take, *id.* § 1539(a)(1)(B).  But
absent liability protection of some sort, anyone who violates the ESA by taking an endangered or
listed "species within the United States," *id.* § 1538(a)(1)(B), risks civil penalties, criminal
liability, and "[c]itizen suits," *id.* § 1540(a), (b) & (g).

This case turns on the meaning and operation of these provisions, along with the
subsection of the CWA that authorizes a State to apply to the EPA to assume Section 404
permitting authority from the Corps.  *See* 33 U.S.C. § 1344(g).  Here, Florida submitted an
assumption application on August 20, 2020.  Only twice before has the EPA approved a State's
assumption application—it approved Michigan's application in 1984 and New Jersey's
application in 1994.  *See* 40 C.F.R. § 233.70 (Michigan); *id.* § 233.71 (New Jersey).  In this case,
however, Florida proposed something novel:  It sought to confer, through the Section 7
mechanism, broad ESA liability protection on all future state permittees for incidental take
resulting from *state*-issued dredge and fill permits.  Under the approach that Florida proposed,
the EPA would engage in Section 7 consultation with the FWS at the outset.  The agency action
under review would be the EPA's approval of Florida's assumption application, and the FWS

would issue a "programmatic" BiOp finding no jeopardy followed by a "programmatic" ITS that would protect all future state Section 404 permittees.

As Florida explained during the administrative process, "where a state administers the Section 404 program, permittees" who cannot "avoid entirely adverse impacts to listed species" must "seek an incidental take permit under ESA Section 10," Dkt. 112-2 at 3, or, as in New Jersey, the EPA can, at least at times, federalize those applications likely to adversely affect listed species (*i.e.*, when the State neither satisfies the EPA's objections or requirements for a permit condition nor denies the permit) thereby triggering Section 7 consultation, Dkt. 112-3 at 369. But because those paths to ESA liability protection were, in Florida's view, "burdensome," "time consuming[,] and resource-intensive," Dkt. 112-2 at 3–4, the State suggested a third option: a one-time Section 7 programmatic consultation in connection with the EPA's review of Florida's assumption application, thus allowing the FWS to issue a programmatic BiOp and a programmatic ITS, which would provide Florida permittees with liability protection under the ESA for all future permits issued under the state program—without requiring future Section 7 or Section 10 consultation.

This, then, brings the Court to the crux of the current dispute. In Plaintiffs' view, the EPA and the FWS failed in this programmatic effort because neither the programmatic BiOp nor the programmatic ITS satisfies the demanding standards set by the ESA. Neither, in their view, includes the ESA-mandated species-specific analysis, effects analysis, numerical quantification of take, and related statutory and regulatory requirements. In short, neither document wrestles with the core ESA considerations or includes the fundamental ESA safeguards.

Defendants respond that, even if the programmatic BiOp and programmatic ITS lack these ESA-mandated elements, the FWS (and the EPA) permissibly deferred the relevant

considerations to a "technical assistance process" involving Florida, the FWS, and the EPA.

That technical assistance process, in their view, promises to address all of the ESA requirements

down the road, on a permit-by-permit basis—and they contend (over Plaintiffs' dissent) that the

technical assistance process has successfully done so to date.  Under this process, Florida is

required to consult with the FWS regarding each permit application, the FWS is provided the

"opportunity" to specify take limits, and the State is required to include those limits, if supplied,

in its state-issued permits.  In Defendants' view, this alternative process was not only justified,

but necessary, because it would have been too difficult to conduct the required species-specific

analyses, to quantify take, and to address similar concerns at the programmatic level given the

scope of the agency action at issue.

To this, Plaintiffs reply:  If the FWS lacked the time, information, or ability to make the

assessments and to set the limits required by the ESA and its implementing regulations, the FWS

acted beyond its authority in purporting to make a no jeopardy finding and in conferring blanket

ESA immunity on all future Florida Section 404 permittees.  The difficulty in their view,

moreover, was not merely a product of the rush to finish the BiOp and ITS in the waning days of

the last administration but, more fundamentally, was a product of the fact that the BiOp and ITS

seek to attain an unlawful goal—that is, take liability protection premised on something other

than the rigors of Section 7 or Section 10 of the ESA.

Now before the Court are the parties' cross-motions for summary judgment, Dkt. 98; Dkt.

99; Dkt. 101; Dkt. 102, and the Center for Biological Diversity ("CBD") and Sierra Club's

motion for a temporary restraining order and preliminary injunction, Dkt 135.  CBD and the

Sierra Club's motion seeks to enjoin Florida from issuing Section 404 permits for two

developments, which they contend pose an imminent threat to the critically endangered Florida

panther and the threatened crested caracara, a rare bird of prey similar to a falcon.[1]  On October

19, 2023, the Court heard oral argument on the parties' cross-motions for summary judgment

and, on January 30, 2024, the Court heard oral argument on CBD and the Sierra Club's motion

for a preliminary injunction.  In addition to the administrative record, the parties, intervenors,

and amici have submitted many hundreds of pages of briefs and exhibits.

For the following reasons, the Court will **GRANT** Plaintiffs' motion for partial summary

judgment with respect to Counts 3, 4, 6, 10–13 of the Third Amended Complaint, Dkt. 77, and

will **DENY** the Federal Defendants' and Florida's cross-motions with respect to those Counts.

In short, the Court is persuaded that the FWS's programmatic BiOp and ITS fail to satisfy the

requirements of the ESA, and the Court is unpersuaded that the non-statutory technical assistance

process is a lawful substitute for the procedures and remedies that Congress enacted in the ESA

and that the Services established in the implementing regulations.  The Court previously

dismissed Counts 8 and 9 and, at least for now, defers addressing Counts 1, 2, 5, and 7 of the

Amended Complaint.  Because the Court grants substantive relief on the merits of Plaintiffs'

ESA-related claims, the Court will **DENY** as moot CBD and the Sierra Club's motion for a

temporary restraining order and preliminary injunction, Dkt. 135, on the ground that the relief

granted on summary judgment will address the risk of imminent harm raised in that motion.

## I. BACKGROUND

This is the Court's third opinion addressing the merits of this case—and probably not the

last.  In the Court's first merits decision, it rejected Florida's threshold challenge to Plaintiffs'

standing to bring this action; rejected Defendants' contention that the EPA's decision to grant

---

[1] The Court granted both developers—Tarpon Blue Silver King I, LLC and Cameratta
Companies LLC—leave to intervene for the limited purpose of opposing this motion.  *See* Dkt.
145; Dkt. 146; Min. Order (Jan. 24, 2024).

Florida's assumption application was an adjudication, rather than a rulemaking; granted

Defendants' motions for summary judgment with respect to Count Nine, which challenged

EPA's failure to codify Florida's Section 404 program; and denied without prejudice

Defendants' motions for summary judgment with respect to Count Eight, which challenged the

EPA's decision to give immediate effect to its decision, on the ground that the Court required

further briefing to determine whether that claim was redressable.  *CBD I*, 597 F. Supp. 3d at 179–

80.  The second opinion picked up where the first left off and further considered whether the

EPA's failure to provide 30 days' notice before its assumption decision took effect was

redressable—or whether that action constituted "a bell that cannot be unrung."  *Ctr. for

Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, *4 (D.D.C. Aug. 23,

2023) ("*CBD II*").  Concluding that it lacked authority to remedy the alleged wrong, the Court

granted the Federal Defendants' renewed motion for summary judgment and Florida's renewed

motion to dismiss with respect to Count Eight for lack of jurisdiction.  *Id.* at *10.

Having rejected Plaintiffs' procedural objections under the APA, the Court now turns to

the question whether the FWS and the EPA violated the ESA in approving Florida's assumption

application.  Central to that question are the "programmatic" BiOp and "programmatic" ITS

issued by the FWS—both lack, among other things, required species-specific analyses and take

limits, and they purport to confer ESA liability protection on, among others, future Florida

Section 404 permittees without complying with the dictates of Section 7 or Section 10 of the

ESA.

A.      **Statutory and Regulatory Landscape**

1.      *The Endangered Species Act*

Almost fifty years ago, Congress enacted the Endangered Species Act "to provide a

means whereby the ecosystems upon which endangered species and threatened species depend

may be conserved" and "to provide a program for the conservation of such endangered species

and threatened species." 16 U.S.C. § 1531(b). With that legislation, Congress made a

"conscious decision . . . to give endangered species priority over the 'primary missions' of

federal agencies," *TVA*, 437 U.S. at 185, and to afford "endangered species the highest of

priorities," *id.* at 194. The ESA is "the most comprehensive legislation for the preservation of

endangered species ever enacted by any nation." *Id.* at 180.

Under the ESA, a species may be listed as either "endangered" or "threatened." *See* 16

U.S.C. § 1533. An endangered species is "any species which is in danger of extinction

throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any

species which is likely to become an endangered species within the foreseeable future throughout

all or a significant portion of its range." *Id.* § 1532(20). The ESA is administered by two federal

agencies: the FWS and the NMFS. 50 C.F.R. § 402.01(b). The FWS administers the statute

with respect to species under the jurisdiction of the Secretary of the Interior, while the NMFS

does so with respect to species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n*

*of Home Builders*, 551 U.S. at 651.

Section 9 of the ESA prohibits any person, including private parties, States, and federal

agencies, from "taking" a protected species. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to

harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

any such conduct." *Id.* § 1532(19). "Harm in the definition of 'take' in the Act means an act

which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

To enforce Section 9's prohibition on take, the Secretary of the Interior or the Secretary of Commerce (collectively, the "Secretary") may assess civil penalties against alleged violators through administrative, trial-like proceedings.  *See* 16 U.S.C. § 1540(a)(1)–(2).  The ESA also authorizes the imposition of criminal penalties on those who knowingly violate the Act, a permit issued under the Act, or certain regulations, *id.* § 1540(b), and it authorizes the Attorney General to bring civil actions for injunctive relief, *id.* § 1540(e)(6).  Finally, the ESA authorizes citizen suits, which allow private parties to bring suit in federal district court to enforce the substantive provisions of the ESA and its implementing regulations against regulated parties, 16 U.S.C. § 1540(g)(1)(A); *see Bennett v. Spear*, 520 U.S. 154, 173–74 (1997), or to compel the Secretary to apply the prohibition on the taking of listed species in any State, 16 U.S.C. § 1540(g)(1)(B).

Recognizing that some take can occur as a result of otherwise lawful activities, Congress created two paths to ensure that "incidental take" does not jeopardize protected species or adversely modify or destroy critical habitat:  The first path, under Section 7, applies to federal agency actions, *id.* § 1536; and the second, under Section 10, applies to non-federal actions, *id.* § 1538.  Both mechanisms offer the promise of liability protection for incidental take if, but only if, those involved abide by the specific measures and standards specified by Congress and the Services.  *See id.* § 1536(o)(2); *id.* § 1539(a); 50 C.F.R. § 402.14(i)(5).

2.     *Section 7 and Formal Consultation*

"Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora."  *Nat'l Ass'n of Home Builders*,

551 U.S. at 652; *see* 16 U.S.C. § 1536.  An action "jeopardize[s] the continued existence of" a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  Section 7 applies only to "actions in which there is discretionary Federal involvement or control," *Id.* § 402.03, however, because if a statute mandates that an agency act in a specified manner, the consultation process would "override" that statutory mandate "by subjecting such [agency] action to the further condition that it pose no jeopardy to endangered species," *Nat'l Ass'n of Home Builders*, 551 U.S. at 664.  That conclusion applies, moreover, even when the statutory mandate "is not entirely mechanical"—that is, even when "it involves some exercise of judgment" on the agency's part "as to whether" the statutory criteria have been met—because, even then, the statute "does not grant [the agency] discretion to add another entirely separate prerequisite to [the] list" of relevant criteria, namely consideration of "the protection of threatened and endangered species as an end in itself."  *Id.* at 671.

Under Section 7(a)(2), "[e]ach Federal agency shall, in consultation with and with the assistance of [Service], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).  To achieve that end, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines—and the consulting agency concurs—that "the proposed action is not likely to adversely affect any listed species or critical habitat," then no formal consultation is required.  *Id.* § 402.14(b)(1).  But if a federal agency

concludes after an initial review that its action "may affect listed species or critical habitat," that agency must engage in "consultation" with the Service. *Id.* § 402.14(a).

The agency that proposes to act in a manner that might affect listed species or critical habitat is referred to as the "action agency," while either the FWS and/or the NMFS serves at the "consulting agency." *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 474 n.3 (D.D.C. 2014). In this case, the EPA was the "action agency," the FWS was the "consulting agency" (although, in Plaintiffs' view, the EPA should have also engaged in formal consultation with the NMFS), and the agency action subject to consultation was the EPA's approval of Florida's assumption application.

"Broadly speaking, the object of consultation under the statute is for the [consulting] agency to determine whether the project will violate [Section 7's] prohibition on jeopardizing the continued existence of endangered and threatened species." *Ctr. for Biological Diversity v. Ross*, 2020 WL 1809465, at *2 (D.D.C. Apr. 9, 2020). At the conclusion of the Section 7 consultation process, the consulting agency must issue a biological opinion—that is, a BiOp—"setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

<u>The Biological Opinion</u>

The consulting agency's BiOp must "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C § 1536(b)(3)(A). To prepare the required BiOp, the consulting agency must:

(1) Review all relevant information provided by the [action] agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.

(2)     Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3)     Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4)     Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat[,] [and]

. . .

(7)     Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

50 C.F.R. § 402.14(g).  "In formulating its [a] biological opinion, [b] any reasonable and prudent alternatives, and [c] any reasonable and prudent measures, the Service" is required to "use the best scientific and commercial data available." *Id.* § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

Establishing the "environmental baseline of the listed species or critical habitat" is a substantial undertaking.  The "environmental baseline" is "the condition of the listed species . . . without the consequences to the listed species . . . caused by the proposed action."  50 C.F.R. § 402.02.  It includes (a) "the past and present impacts of all Federal, State, or private actions and other human activities in the action area;" (b) "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation;" and (c) "the impact of State or private actions which are contemporaneous with the consultation in process."  *Id.*  The environmental baseline considers "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify."  *Id.*

13

The consulting agency must then "[e]valuate the effects of the action and cumulative effects on the listed species." *Id.* § 402.14(g)(3). The "effects of the action" include "all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02. A consequence is "caused by" the proposed action if (a) "it would not occur but for the proposed action" and (b) "it is reasonably certain to occur." *Id.* "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* "Cumulative effects" on the listed species, by contrast, are "those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* (emphasis added).

It is only after engaging in this detailed analysis that the consulting agency can "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4). With that analysis complete, the consulting agency must then offer its "opinion on whether the action" will violate Section 7, *i.e.*, will cause jeopardy to a listed species or result in destruction or adverse modification of a critical habitat. *Id.* § 402.14(h)(1); *see also* 16 U.S.C. § 1536(a)(2).

In sum, a BiOp (a) must use the best scientific data available, (b) must determine the environmental baseline of the listed species or critical habitat, (c) must evaluate the effects of the action and cumulative effects on the listed species or critical habitat, and (d) must add that baseline to the effects of the action and cumulative effects on the listed species or critical habitat (in light of the status of the species and critical habitat), 50 C.F.R. § 402.14(g), and (e) must then use this data and analysis to determine whether the action at issue is "[l]ikely to jeopardize the

continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'jeopardy' biological opinion," or is "[n]ot likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'no jeopardy' biological opinion," *id.* § 402.14(h)(1)(iv).

In the event of a "jeopardy biological opinion," the consulting agency "shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]."  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(3), (g)(5).  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."  *Nat'l Ass'n of Home Builders*, 551 U.S. at 652.

<u>The Incidental Take Statement</u>

In the event of a "no jeopardy biological opinion," the consulting agency must provide an incidental take statement, 16 U.S.C. § 136(b)(4); 50 C.F.R. § 402.14(i), if it concludes that take is "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7); *Shafer & Freeman Lakes Env't Conservation Corp*, 992 F.3d at 1080.  "Incidental take" refers "to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.  The ESA requires that the ITS:

(i)     specif[y] the impact of such incidental taking on the species,

(ii)    specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii)   in the case of marine mammals, specif[y] those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv)    set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C.A. § 1536(4).

The governing regulations define "the impact" of the incidental take to mean "the amount or extent[] of such incidental taking on the species."  50 C.F.R. § 402.14(i)(1)(i).  If necessary, the consulting agency may use a "surrogate (e.g., similarly affected species or habitat or ecological conditions) . . . to express the amount or extent of anticipated take," but only if the BiOp or ITS "[d]escribe[s] the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take . . . and sets a clear standard for determining when the level of anticipated take has been exceeded."  *Id.*  The regulations also require monitoring of incidental take and provide that "the Federal agency or any applicant must report the progress of the action and its impact on the species to the [FWS or NMFS] as specified in the incidental take statement."  *Id.* § 402.14(i)(3).  Most significantly, the action agency and consulting agency "must reinitiate consultation *immediately*" if the "amount or extent of incidental taking" specified in the ITS, as required by the regulations, "is exceeded." *Id.* § 402.14(i)(4) (emphasis added); *id.* § 402.16(a).  Finally, as discussed more fully below, "any taking that is in compliance with the terms and conditions specified" in an ITS "shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1563(o)(2).

<u>Framework Programmatic Action</u>

The Services have jointly issued a "Consultation Handbook," which defines programmatic consultation as a "consultation addressing an agency's multiple actions on a

program, regional or other basis."  Dkt. 112-1 at 195 (ESA Section 7 Consultation Handbook).[2]

The ESA's implementing regulations further explain that "[f]or a framework programmatic

action, an incidental take statement is not required at the programmatic level."  50 C.F.R.

§ 402.14(i)(6).  This is because "any incidental take resulting from any action subsequently

authorized, funded, or carried out under the program will be addressed in subsequent section 7

consultation, as appropriate."  *Id.*  "For a mixed programmatic action, an incidental take

statement is required at the programmatic level only for those program actions that are

reasonably certain to cause take *and* are not subject to further section 7 consultation."  *Id.*

(emphasis added).

The regulations define a "[f]ramework programmatic action" to mean "a Federal action

that approves a framework for the development of future action(s) that are authorized, funded, or

carried out at a later time," where "any take of a listed species would not occur unless and until

those future action(s) are authorized, funded, or carried out and subject to further section 7

consultation."  *Id.* § 402.02.  Similarly, a "[m]ixed programmatic action" is defined to mean "a

Federal action that approves action(s) that will not be subject to further section 7 consultation,

and also approves a framework for the development of future action(s) that" will be "authorized,

funded, or carried out at a later time" and that will be "subject to further section 7 consultation."

*Id.*  In short, the regulations recognize that certain framework programmatic actions might not be

ripe for meaningful Section 7 consultation at the outset and thus permit the required consultation

to occur in stages, as the future federal actions are authorized, funded, or carried out.

---

[2] The Federal Defendants argue that the "Services' views in the Consultation Handbook are
entitled to deference."  Dkt. 99 at 22 n.7 (citing *Miccosukee Tribe of Indians v. United States*,
566 F.3d 1257, 1273 (11th Cir. 2009)).

<u>Section 7 Liability Protection</u>

Section 9 of the ESA provides that "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any [listed endangered species] within the United States or the territorial sea of the United States," 16 U.S.C. § 1538(a)(1)(B), and this prohibition, in turn, triggers potential civil or criminal liability under Section 11 of the Act, *id.* § 1540. Section 7, however, provides an escape hatch for "any taking that is in compliance with the terms and conditions specified" in an ITS.  16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).  Importantly, compliance with the terms and conditions specified in an ITS provides take liability protection not just to the federal agency and applicant, but to any party who "engage[s] in incidental takes consistent with the statement without applying for section 10 permits."  *Ramsey v. Kantor*, 96 F.3d 434, 437 (9th Cir. 1996).

The ITS thus acts as both a safe harbor and as a check.  Private entities and individuals (as well as government officers and employees) can avoid Section 9 liability for take in compliance with the terms and conditions of an applicable ITS—but, as soon as the take limit specified in the ITS is exceeded, the action and consulting agencies must "immediately" reinitiate consultation, 50 C.F.R. § 402.14(i)(4), thereby allowing the Service to reassess whether its original "no jeopardy" determination still holds in light of the unanticipated take and, if not, whether additional limitations and conditions are necessary to protect the species.

3. *Section 10 and Incidental Take Permits*

Not all acts that result in incidental take involve a federal agency action, and thus not all such acts fall within the scope of the Section 7 consultation process.  For non-federal action, Section 10 of the ESA authorizes the Services to issue permits, "under such terms and conditions

as [the Service] shall prescribe," that allow "any taking otherwise prohibited by" Section 9, but

only "if such taking is incidental to, and not the purposes of, the carrying out of an otherwise

lawful activity."  16 U.S.C. § 1539(a)(1)(B).  As with Section 7 consultation, however, Congress

mandated robust analyses and standards that the Services must satisfy before permitting

incidental take pursuant to Section 10.  *See id.* § 1539(a).

To obtain a Section 10 permit, the applicant must submit a conservation plan, known as a

"Habitat Conservation Plan" or "HCP," that describes:

(i)     the impact which will likely result from such taking;

(ii)    what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;

(iii)   what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

(iv)    such other measures that the [Service] may require as being necessary or appropriate for purposes of the plan.

*Id*. § 1539(a)(2)(A).  The Service must publish notice of the permit application in the Federal

Register, and "[i]nformation received by the [Service] as part of [the] application shall be

available to the public as a matter of public record at every stage of the proceeding."  *Id*.

§ 1539(c).  The Service must also provide an "opportunity for public comment" on the

application and related conservation plan.  *Id*. § 1539(a)(2)(B).  Finally, before issuing the

permit, the Service must make certain findings, including findings that the taking will be

incidental, that it "will not appreciably reduce the likelihood of the survival and recovery of the

species in the wild," and that "the applicant will, to the maximum extent practicable, minimize

and mitigate the impacts of such taking."  *Id*.

Section 10 requires all incidental take permits to include "such terms and conditions as

the [Service] deems necessary or appropriate" and directs that the Service "*shall* revoke a

permit . . . if he finds that the permittee is not complying with the terms and conditions of the permit." *Id.* § 1539(a)(2)(B)–(C) (emphasis added).

**B.**    **Administrative Background**

Under Section 404 of the Clean Water Act, the Army Corps of Engineers is authorized to issue permits, "after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a); *see also id.* § 1344(d) ("The term 'Secretary' as used in this section means the Secretary of the Army, acting through the Chief of Engineers.").  When Congress enacted the CWA, however, it "expressed its desire 'to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution,'" and it thus established a process to allow States to implement the Section 404 permit program on their own, "so long as the EPA first gives them permission to do so."  *CBD I*, 539 F. Supp.3d at 139 (quoting 33 U.S.C. § 1251(a)).  To apply, a State must submit an application to the EPA containing "a full and complete description of the program it proposes to establish and administer under State law" and "a statement from the attorney general" affirming that "the laws of such State . . . provide adequate authority to carry out the described program."  33 U.S.C. § 1344(g)(1).  After determining that the State's "submission is complete," 40 C.F.R. § 233.15(a), the EPA must publish the application in the Federal Register for public comment and must provide copies of the application to the Corps, the FWS, and the NMFS for comment, *id.* § 233.15(d)–(f); *see also* 33 U.S.C. § 1344(g).  Then, "[w]ithin 120 days of receipt of a complete program submission (unless an extension is agreed to by the State), the Regional Administrator [of the EPA] shall approve or disapprove the program based on whether the State's program fulfills the requirements of [the governing regulations] and

the [CWA], taking into consideration all comments received."  40 C.F.R. § 233.15(g); *see also*

33 U.S.C. § 1344(h)(1).

 After the EPA has transferred permitting authority to a State, the agency continues to

oversee that State's permitting program.  The State must transmit copies of each permit

application to the EPA; the EPA must then provide copies of each permit application to the FWS

and the NMFS; the EPA may also "provide written comments to such State with respect to such

permit application" within 90 days; and, if the EPA objects to the issuance of the permit, the

State may not issue the permit "unless it modifies [the] proposed permit in accordance with [the

agency's] comments."  33 U.S.C. § 1344(j).  "In the event that the [State] neither satisfies EPA's

objections or requirement for a permit condition nor denies the permit, the Secretary [of the

Army] shall process the permit application."  40 C.F.R. § 233.50(j); *see also id.* § 233.2; *id.*

§ 233.1(a).  In other words, permitting authority power reverts to the Corps for that particular

permit.  To facilitate this ongoing oversight, an EPA regulation requires participating States to

enter into a Memorandum of Agreement ("MOA") with the EPA that "set[s] out the State and

Federal responsibilities for program administration and enforcement" and that specifies the

"classes and categories of permit applications for which EPA will waive Federal review."  40

C.F.R. § 233.13(b), (b)(1).  Finally, if the EPA determines "after public hearing that a State is not

administering" its Section 404 program "in accordance with" the requirements of the CWA, and

if the State does not take "appropriate corrective action . . . within a reasonable time," the EPA

"shall . . . withdraw approval of such program until [it] determines" that the State has taken the

required "corrective action."  33 U.S.C. § 1344(i).  During any period of withdrawal, the Corps

"shall resume" administration and enforcement of the Section 404 program in the relevant

jurisdiction.  *Id.*

On August 18, 2020, the State of Florida submitted to the EPA an application to administer the Section 404 permitting program within its borders, and, just two days later, the EPA determined that the application was complete, thus triggering the 120-day review period. *See CBD I*, 597 F. Supp. 3d at 182; *see also* 33 U.S.C. § 1344(h)(3).  Roughly four months later, in December 2020, the EPA published a notice in the Federal Register approving Florida's application, making it the first State to assume Section 404 authority in nearly thirty years. *CBD I*, 597 F. Supp. 3d at 183.  Other than Florida, just two other states, New Jersey in 1994 and Michigan in 1984, have assumed Section 404 permitting authority.  *Id.* at 182 (citing 40 C.F.R. § 233.70 (Michigan); 40 C.F.R. § 233.71 (New Jersey)).

Notably, the EPA did not engage in formal Section 7 consultation before approving either prior application.  *See* Dkt. 104 at 63 n.35.  When New Jersey applied to assume Section 404 permitting authority, the EPA undertook only informal Section 7 consultation.[3]  Formal

---

[3] As explained further below, at that time, the EPA's view was that its approval of a Section 404 assumption application was discretionary and therefore subject to Section 7 of the ESA. *Cf.* Dkt. 112-3 at 373–74.  The EPA changed its view following the Supreme Court's decision in *National Association of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644 (2007), *see* Dkt. 112-3 at 373, and then subsequently reversed position again at Florida's urging, *see* Dkt. 56-1 at 775 (ESA Consultation Memo).  Because Plaintiffs and Defendants agree that the EPA's approval of a State's Section 404 assumption application is discretionary and, accordingly, that it triggers the Section 7 consultation process, the Court need not—and does not—express a view on that question.

The Court notes, however, that the EPA premised its most recent view—that its approval of a State's 404 assumption application is discretionary and thus triggers Section 7 consultation—on the fact that the EPA is required "to consider the Services' comments before deciding to approve an assumption request, and [the requirement that] states . . . comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program."  Dkt. 56-1 at 779.  The first of these premises, however, is in significant tension with the Federal Defendants' recent assertion that its decision to grant Florida's assumption application was not "based on its review of . . . the BiOp."  Dkt. 158 at 6.  Nor is it clear that the second of these premises shows that approving a State's Section 404 assumption application is "discretionary" under the reasoning of *National Association of Homebuilders*.  There, the Supreme Court explained that the relevant

consultation was not required because the EPA determined, during informal consultation, that its approval of New Jersey's assumption application would not adversely affect any species. *See* 50 C.F.R. § 402.14(b)(1) ("A federal agency need not initiate formal consultation if . . . the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat."). That was so for two reasons: First, because the "EPA ha[d] committed to ensuring that a State permit w[ould] be issued only if it [wa]s not likely to jeopardize the continued existence of federally-listed species . . . and if it avoid[ed] or minimize[d] incidental take of federally listed species"—if the State "disagreed with [the] EPA's decision, the permit application w[ould] be transferred to the Corps of Engineers for processing under Section 404 of the Clean Water Act." Dkt. 112-5 at 161 (FWS letter to the EPA concurring that the EPA's approval of New Jersey's assumption application was not likely to adversely affect listed species); *see also* Dkt. 112-5 at 149, 152–56 (New Jersey MOA describing the process for federalizing permits).[4]  And, second, because the State had agreed

_____

question is whether, as a matter of statutory interpretation, formal consultation would "override" the statutory text by "subjecting" the relevant agency action (here, the EPA's approval of a state Section 404 assumption application) to the "further condition that it pose no jeopardy to endangered species." 551 U.S. at 664.

Here, the EPA says that the statutory text effectively includes a no-jeopardy condition because Section 404 requires the EPA "to determine whether [the] [S]tate [submitting the application] . . . has the authority to issue permits which," among other things, prohibit the issuance of any permit that could "jeopardize the continued existence of" a listed species. Dkt. 56-1 at 778 (citing 40 C.F.R. § 230.10(b)(3)). The question whether a State has adequate *authority* to ensure that no state-issued permit causes jeopardy, however, at least arguably differs from the question whether the federal action—here, the approval of the assumption application—is likely to jeopardize a listed species.

[4] Under the terms of the governing MOA, New Jersey provides the FWS with "a copy of all applications for individual permits." Dkt. 112-5 at 153. The MOA details several layers of mandated FWS review and determinations. *Id.* at 153–54. Ultimately, if the FWS determines that the "proposed permit action is likely to adversely affect federally-listed species or critical

that, when the "[c]oordination process under the MOA" failed to eliminate adverse effects to

listed species, it would ensure that it or the permit applicant would "seek authorization for []

incidental take" under Section 10. Dkt. 112-5 at 160; *see also id.* at 161 ("Any residual

incidental take *must be dealt with* under section 10(a)(1)(B) of the ESA if not addressed through

section 7 consultation with the Corps." (emphasis added)). Because neither the FWS nor the

NMFS prepared a BiOp or ITS, New Jersey permit applicants did not receive federal incidental

take liability protection under Section 7 as part of New Jersey's assumption. To the contrary, the

governing MOA states: "Nothing in this MOA authorizes any take of federally listed threatened

or endangered spec[ies]." Dkt. 112-5 at 157 (New Jersey MOA). Thus, any take liability

protection would flow from either Section 7 (through a federalized permit) or Section 10.

Although the record is less revealing with respect to Michigan, all agree that it also

assumed Section 404 permitting authority without the EPA engaging in formal Section 7

consultation and, accordingly, without the benefit of Section 7 liability protection for future,

Michigan permittees. According to the Plaintiffs, this is because Michigan entered into a

cooperative agreement with the Services pursuant to Section 6 of the ESA. *See* 16 U.S.C. 1535.

For present purposes, however, the Court need not go beyond what is disclosed by the

administrative record and the parties' agreement—that is, that Florida is the first State to seek

liability protection for the State and future Section 404 permittees based on a programmatic

BiOp and ITS issued pursuant to Section 7 of the ESA. *See, e.g.*, Dkt. 156 at 7, 87 (Oct. 19,

2023 Hrg. Tr.).

---

habitat," the EPA "*will* object to permit issuance." *Id.* at 155 (emphasis added). And, if New
Jersey "neither satisfies the EPA's objections or requirements for a permit condition . . . nor
denies the permit, the permit application *will* be transferred to the Corps for processing pursuant
to 40 CFR Part 233.50(j)." *Id.* at 156 (emphasis added).

In 2010—long after Michigan and New Jersey had assumed Section 404 permitting authority—the EPA concluded in a letter memorandum that its decision whether to approve a state application to assume Section 404 permitting authority constituted a non-discretionary federal action and, accordingly, was not subject to Section 7 of the ESA.  *See* Dkt. 112-3 at 375–76 (2010 EPA ESA Consultation Position Memo).  The EPA explained that, based on its reading of the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the decision to transfer Section 404 authority to a State is non-discretionary because once a State satisfies the statutory criteria, the EPA *must* approve the State's application.  Dkt. 112-3 at 375 (2010 EPA ESA Consultation Position Memo).  Indeed, if the EPA does not act on a complete application within 120 days, the "program shall be deemed approved."  33 U.S.C. § 1344(h)(3).

To achieve a "streamlined" process for Section 404 permittees to receive liability protection for incidental take, Florida asked the EPA to reconsider its 2010 conclusion that the Section 404 assumption process was non-discretionary under N*ational Association of Home Builders* and to conclude that the assumption process requires Section 7 consultation and can, accordingly, yield programmatic ESA liability protection.  *See, e.g.*, Dkt. 112-2 at 3 (Florida white paper "Streamlined Approach to Address Endangered Species Act Incidental Take Coverage"); Dkt. 112-3 at 344 ("Potential Endangered Species Act Compromise").  Florida argued that the EPA's 2010 analysis "resulted from a rushed review, ignored the actual text and legislative history of Section 404, and misapplied Supreme Court precedent" in *National Association of Home Builders*, which had considered Section 402, not Section 404, of the CWA.  Dkt. 112-2 at 4.  Florida further argued that the ESA is "*at least ambiguous*" and that, as a result, if the EPA agreed to change its position, it would "likely receive deference under *Chevron*

*U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Id.* at 11 (emphasis in original).

Building on this argument, Florida proposed that the EPA engage in a "one time" "programmatic consultation" under Section 7 "in connection with [the] EPA's initial review of a state [Section 404 assumption] application." *Id.* at 3, 11.  According to Florida's submission:

> This would allow the Services to issue a programmatic Biological Opinion ('BiOp') and a programmatic incidental take statement ('ITS'), which would identify procedural requirements for state permitting under Section 404 . . . . Provided these requirements are followed, the programmatic ITS would bring state Section 404 permits within the Section 7(o)(2) exemption from take liability.

*Id.* at 4.  By taking this approach, the State posited, the EPA and Service could "provide project applicants the needed liability protection from claims arising under the ESA even though the activity is authorized pursuant to a state permit."  Dkt. 112-3 at 345.  To support its contention that the EPA and the Services have the authority to issue programmatic BiOps and programmatic ITSs, which defer species-specific analyses and take limitations to a "technical assistance process," Dkt. 112-2 at 11–14, Florida invoked the Second Circuit's decision in *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76–77 (2d Cir. 2018).  The State stressed that the Second Circuit had upheld the use of a programmatic ITS in that case "despite its failure to numerically quantify the impacts" of take.  Dkt. 112-2 at 14.

Florida further argued that this programmatic approach was needed because, "thus far, where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10 separate and apart from the Section 404 permit process, which can take years to complete in contrast to the Section 7 process and is more burdensome for all involved."  Dkt. 112-2 at 3. According to the State, around ten percent of the Section 404 permits in Florida would require

26

some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects with significant economic benefits to the State." *Id.* at 3. Moreover, to "facilitate the process" that it had proposed, Florida volunteered to "develop [a biological] assessment on [the] EPA's behalf or in cooperation with [the] EPA." *Id.* at 14 & n.25; *see* 50 C.F.R. § 402.08. A biological assessment ("BA") is "information prepared by or under the direction of" a federal agency to determine whether a proposed action may affect listed species. 50 C.F.R. § 402.02. The EPA later used that BA (or, in Plaintiffs' words, "largely . . . cut and paste[d] it," Dkt. 98 at 31) to prepare its biological evaluation ("BE"), which it submitted to the FWS to assist in evaluating "the possible effects of [its] potential approval of . . . Florida's assumption" application. Dkt. 112-4 at 89.

As the EPA acknowledged, there were other options available to protect state permittees from incidental take liability under the ESA. It observed that state programs can (1) "completely avoid[] impacts" to protected species; (2) "concede to 'federalizing' permit applications that may adversely impact listed species;" or (3) require state permittees to engage in Section 10 review. *See* Dkt. 112-3 at 368 (EPA response to comments).[5] On December 12, 2019, however, the EPA agreed to Florida's "request[] that the [EPA] initiate an informal" ESA Section 7 consultation with the Services and "designate FDEP as the non-Federal representative to conduct informal consultation." Dkt. 112-4 at 2 (EPA letter to FDEP). The EPA explained that it was voluntarily initiating informal consultation while it gave "further consideration to [its] position" on whether

---

[5] At one point, the EPA expressed "institutional concerns regarding [Florida's] initial proposal to provide ESA Incidental Take authorization to permit applicants through the Section 7 consultation process." Dkt. 112-3 at 344. In response, Florida suggested yet a different approach under which the EPA would consult with the FWS on individual state 404 permits based on the EPA's oversight of state permits. *Id.* at 344–45.

consultation was required for approving a state 404 program.  *Id.*; *see also* Dkt. 112-2 at 351 (EPA letter to NMFS).

    As early as November 2019, the FDEP told the Corps that the EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the programmatic level, and that the State had hired a contractor to prepare a BA. Dkt. 112-8 at 106 (Corps email).  During a December 2019 meeting about Florida's assumption application, the FDEP further advised the Corps that the EPA would use that BA "to request consultation and produce a programmatic B[i]O[p]."  *Id.* at 107–09 (Corps email sending meeting notes).  Then, in February 2020, an FWS deputy field supervisor stated as follows in an email:

> FYI—we had a good meeting yesterday with FWC, FDEP, EPA, and FDEP's consultants—GHD . . . .  They went through the draft BA but I was not given a copy.  The draft BA follows the [*Cooling Water*] BE as expected.  We provided some suggestions like "be careful of using words like consultation when you really mean coordination and technical assistance" . . . .
>
> I've already started writing parts of the B[i]O[p] by adapting generic standard language from the [*Cooling Water*] B[i]O[p] where appropriate.

Dkt. 112-5 at 170.  On April 1, 2020, FWS staff described the plan as follows:

> After assumption, FWS will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit. FWS will merely be providing technical assistance on the project by project reviews to [F]DEP, [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [F]DEP issuing any particular 404 permit.

Dkt. 112-4 at 9 (FWS email to FDEP and FWC staff).  During that period, the EPA's formal position remained that Section 7 did not apply to the agency's approval of a Section 404 assumption application, because such approvals were non-discretionary.

That changed when, five months after the EPA had initiated informal consultation and had designated the FDEP as its non-federal representative for consultation, it solicited public comment on "whether EPA's approval of a Clean Water Act Section 404 Program is non-discretionary for purposes of Endangered Species Act Section 7 consultation."  Dkt. 112-2 at 367 (85 Fed. Reg. 99 at 30,953 (May 21, 2020)) (capitalization altered).  The EPA expressly referenced Florida's white paper in its request for comment, seeking public comment on whether it "should . . . adopt the position articulated in the FDEP white paper."  Dkt. 112-2 at 369.  That is, the EPA requested comment on the programmatic BiOp-plus-ITS model that Florida had proposed.

On July 24, 2020, Florida submitted its completed BA to the EPA, "as the non-federal representative" designated by the EPA "to prepare this BA."  *See* Dkt. 56-1 at 66, 68 (Florida BA).  That document explained that, "[b]ecause of the statewide nature of [the State's assumption application], the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis [was] not possible in th[e] BA."  *Id.* at 69.  Instead, the BA set out "to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits."  *Id.*  Under that process, the FDEP proposed to "send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the []FWS for review and comment," to "consider any information that the []FWS provides as technical assistance," and to "include all species protection measures that the []FWS may recommend as permit conditions or [to] deny the request for a permit."  *Id.* at 70.  The BA concluded that "[i]t is anticipated" that a programmatic approach and technical assistance process "will result in procedural and substantive protections

that are at least as protective as the protections afforded by the [Corps] Section 404 program and through section 7 consultation with the [Corps] under the ESA." *Id.* at 179.

On August 20, 2020, the State submitted its Section 404 assumption application to the EPA, and the EPA deemed the submission complete two days later. *See CBD I*, 597 F. Supp. 3d at 182–83; Dkt. 112-4 at 85. A draft Memorandum of Understanding ("MOU") was among the materials the State submitted. Dkt. 55-1 at 120 (unexecuted application MOU). As that document explained, "[u]pon assumption of the Section 404 Program, coordination between the []FWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, *which is anticipated to be outlined* in the []FWS's biological opinion based on information included in the biological assessment," which Florida prepared, and the EPA "submitted" to the FWS. *Id.* at 124 (emphasis added). The BiOp was not, however, complete at that time and, therefore, was not included in Florida's assumption application.

A week later, on August 27, 2020, the EPA announced the reversal of its prior position regarding the applicability of the Section 7 consultation process to the EPA's consideration of Section 404 assumption applications. Agreeing with Florida, the EPA concluded that the Section 7 process—including the issuance of a programmatic BiOp and ITS, and the extension of "Section 9 liability protections to individual permits issued pursuant to the state . . . program"— would apply. Dkt. 56-1 at 775, 778, 781 (ESA Consultation Memo). In its response to public comments, the EPA stressed that neither relying on federalized permits nor Section 10 consultation was "realistically feasible for states with an abundance of ESA listed species like Florida," Dkt. 112-3 at 368, and in its final decision, the EPA explained that the "streamlined permitting process" that the programmatic BiOp and ITS would put in place "would reduce costs

and duplication of efforts by state . . . and federal authorities and facilitate more effective and

efficient state . . . CWA Section 404 programs."[6]  Dkt. 56-1 at 781.  Later, the EPA wrote that

"requiring Florida's permittees to seek an ESA Section 10 Incidental Take Permit, with the

requirement to prepare a Habitat Conservation Plan, would be extremely costly and take years to

complete and therefore is . . . not an option that Florida would pursue."  Dkt. 112-3 at 369.

A few days later, on September 2, 2020, the EPA submitted a request for formal

consultation under Section 7(a)(2) to the FWS.  Dkt. 112-4 at 85 (EPA letter).  Enclosed with the

EPA's letter to the FWS was the EPA's Biological Evaluation.  *Id.*; *see also* Dkt. 112-4 at 87

(EPA BE).  The EPA stated that it was "requesting a *programmatic* consultation."  *Id.* at 85

(EPA letter) (emphasis added).

That same day, the EPA also sent a letter to the NMFS, but it did not request formal

Section 7 consultation from the NMFS.  Dkt. 112-2 at 351 (EPA letter to the NMFS).  Rather,

the EPA explained that, in its view, its decision whether to approve Florida's assumption

application would have "no effect" on any species within the NMFS's jurisdiction.  *Id.*  The next

day, the NMFS concurred with the EPA's "no effect" determination.  *See* Dkt. 112-2 at 352

(September 2020 NMFS letter to EPA).

On November 17, 2020, the FWS finalized its programmatic BiOp and programmatic

ITS.  Dkt. 112-5 at 60 (BiOp); Dkt. 112-5 at 139 (ITS).  The BiOp did not include any species-

specific analyses of the baseline status of species or effects of the EPA's action; instead, it

explained that "[s]pecies-specific and site-specific analyses will occur during the technical

_____

[6] Although several of the Plaintiffs in this case agreed with the EPA's new view that approval of
a State's assumption application was *discretionary*, thereby requiring Section 7 consultation, all
opposed the use of Section 7 in the programmatic manner advocated by Florida as unlawful
under the ESA.  *See* Dkt. 56-1 at 785.

assistance process conducted between the []FWS and FDEP, and whenever EPA coordinates

with []FWS on State permit actions." Dkt. 112-5 at 114 (BiOp). The BiOp further explained

that it was "not feasible, nor [wa]s it required" to detail or analyze any "species-specific effects."

*Id.* at 124 (BiOp). Like the BA that Florida had prepared, the BiOp explained that "[b]ecause the

precise number and locations of future State 404 permit applications are unknown, the exact

effects to ESA-species cannot be accurately determined." *Id.* at 126 (BiOp). Instead of species-

specific analysis, the BiOp analyzed whether the Florida program was "structured" to ensure that

no future permit would likely jeopardize ESA-listed species. *Id.* (BiOp). The FWS ultimately

"determined that the endangered species *coordination processes*" set out in the technical

assistance process ("TAP") were "as protective" as Section 7(a)(2) of the ESA. *Id.* (BiOp).

The final portion of the BiOp contained the FWS's programmatic ITS, which extended

ESA liability protection to (1) the EPA; (2) the State of Florida; and (3) any and all individual

state permittees for all take of listed species incidental to state-permitted activities so long as that

take is in compliance the "terms and conditions" of the ITS. Notably, however, none of the

listed "terms and condition" govern the conduct of state permittees; instead, the "terms and

conditions" bind only the EPA and FDEP. *Id.* at 141–42 (ITS). The ITS also does not specify

the amount or extent of permissible take or set a trigger for the reinitiation of consultation. *Id.* at

139–40 (ITS).

On December 17, 2020, then-EPA Administrator Andrew Wheeler announced approval

of Florida's assumption application, and the agency published a notice of approval in the Federal

Register on December 22, 2020. Dkt. 56-1 at 433–34; *see also* 85 Fed. Reg. 83,553 (Dec. 22,

2020). Among other things, that notice asserted that the EPA had "determined that the State of

Florida ha[d] the necessary authority to operate a CWA Section 404 program in accordance with

the requirements found in CWA section 404(g)–(l) and EPA's implementing regulations." Dkt. 56-1 at 433. The notice further stated that the "EPA has taken final action to approve Florida's assumption of the program" and that "Florida's program assumption" took immediate effect on December 22, 2020, *id.*, which was the day the notice was published in the Federal Register, *see* 85 Fed. Reg. 83,553 (Dec. 22, 2020). Because the decision purported to constitute an adjudication, rather than a rule, and was made immediately effective, it was not subject to the regulatory freeze, which took effect on January 20, 2021. *But see CBD I*, 597 F. Supp. 3d at 173, 212 (concluding "that the EPA's approval of Florida's Section 404 program constituted a rule, rather than an adjudication").

### C.  Procedural Background

Plaintiffs filed this suit on January 14, 2021, alleging that "[t]he EPA's actions failed to effectuate a lawful transfer of [Section 404 permitting] authority" to Florida. Dkt. 1 at 3, 10–14 (Compl. ¶¶ 1, 40–53). Plaintiffs' original Complaint included nine claims. *See* Dkt. 1 at 25–48 (Compl. ¶¶ 100–248). As explained above, however, the Court has already granted summary judgment in Defendants' favor with respect to Count Nine and has held that Plaintiffs lack standing to pursue Count Eight. *See CBD I*, 597 F. Supp. 3d at 179–80; *CBD II*, 2023 WL 5437496, at *9–10. Seven of Plaintiffs' original claims, plus four additional claims that Plaintiffs later added to their Complaint, remain pending. *See generally* Dkt. 77 (Am. Compl). For present purposes, however, the Court addresses only Plaintiffs' ESA claims.

Plaintiffs' ESA claims against the FWS challenge the adequacy and lawfulness of that agency's programmatic BiOp and no-jeopardy decision (Count 3), the adequacy and lawfulness of its programmatic ITS (Count 4), and the adequacy and lawfulness of the combination of the ITS, the BiOp, and the technical assistance process (Counts 6 and 13), which Plaintiffs argue,

"create an ESA scheme that is not authorized by law," *id.* at 44, 56 (Am. Compl.  ¶¶ 214, 297),

and "give [Florida] a workaround regarding the mechanisms that Congress provided for

establishing take limits, extending liability coverage, and determining jeopardy to species," *id.* at

44 (Am. Compl. ¶ 215).  Plaintiffs further allege that the EPA violated the ESA by relying on the

facially deficient BiOp and ITS, *id.* at 49–52 (¶¶ 249–73) (Count 10); by failing to consult with

the NMFS, *id.* at 53–55 (¶¶ 274–87) (Count 11); and by failing to consult with the FWS

regarding "ESA-listed sea turtles that nest on Florida's beaches," *id.* at 55 (¶¶ 288–94) (Count

12).  Plaintiffs' Amended Complaint asks the Court to, among other things, "[v]acate and set

aside [the] []FWS' programmatic biological opinion and incidental take statement for the

challenged EPA decision and [to] remand with instructions for reopening and reinitiating

consultation" and to "[e]njoin the EPA's approval and transfer of authority to the state."  *Id.* at

58 (Am. Compl. ¶¶ (m), (p)).

On February 28, 2023, Plaintiffs moved for summary judgment as to the remaining

counts contained in the Amended Complaint.  Dkt. 98.  The Federal Defendants cross-moved for

summary judgment, Dkt. 99, as did Florida, Dkt. 101.  The Court heard oral argument on

October 19, 2023.[7]

---

[7] Before argument, the Court granted Plaintiffs' motion for leave to file a surreply, which they
filed on October 12, 2023.  *See* Dkt. 123; Min. Order (Oct. 6, 2023); Min. Order (Oct. 5, 2023).
After oral argument, the Court granted Defendant-Intervenors' motion for leave to file a post-
hearing memorandum, Dkt. 127, and provided Plaintiffs an opportunity to respond, which they
did on October 30, 2023, Dkt. 129.  *See* Min. Order (Oct. 27, 2023); *see also* Dkt. 130
(separately filing the memorandum originally attached to the Defendant-Intervenors' motion,
Dkt. 127).  The Federal Defendants then sought leave to file a supplemental response to
Plaintiffs' supplemental filing, Dkt. 131, which the Court granted, *see* Min. Order (Nov. 7,
2023); *see also* Dkt. 134 (separately filing the memorandum originally attached to the Federal
Defendants' motion, Dkt. 131).  The Court also allowed Plaintiffs to submit a short response,
Min. Order (Nov. 7, 2023), which Plaintiffs filed on November 9, 2023, Dkt. 133.

On December 4, 2023, CBD and the Sierra Club moved for a temporary restraining order and/or preliminary injunction, seeking to preclude Florida from issuing two Section 404 permits that, according to Plaintiffs, will cause irreparable harm to the endangered Florida panther and the threatened crested caracara.  Dkt. 135.  Following a scheduling conference at which the EPA indicated that it intended to comment on the permits in question (thereby delaying their issuance), the parties agreed to a briefing schedule.  Min. Entry (Dec. 5, 2023); Dkt. 138 at 1–2.  The Court granted leave to intervene to the two developers whose permits CBD and the Sierra Club sought to enjoin, Min. Order (Dec. 22, 2023); Min. Order (Jan. 24, 2024) and heard oral argument from all parties on January 30, 2024.  At that time, Florida indicated that the two permits in question would issue no sooner than February 16, 2024.  Jan. 30, 2024 Hrg. Tr. (Rough at 25:9–13).[8]

---

[8] In resolving the pending motions, the Court has considered twenty briefs: Dkt. **98** (Plaintiffs' Motion for Summary Judgment); Dkt. **99** (Federal Defendants' Cross-Motion for Summary Judgment); Dkt. **102** (Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition); Dkt. **104** (Plaintiffs' Consolidated Reply); Dkt. **106** (Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment); Dkt. **107** (Defendant-Intervenors' Reply in Support of Cross-Motion for Summary Judgment); Dkt. **123** (Plaintiffs' Sur-Reply); Dkt. **127-1**/Dkt. **130** (Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **129** (Plaintiffs' Response to Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **131-1**/Dkt. **134** (Federal Defendants' Supplemental Brief); Dkt. **133** (Plaintiffs' Response to Federal Defendants' Supplemental Brief); Dkt. **135** (CBD and Sierra Club's Motion for TRO and PI); Dkt. **145** (Limited-Intervenor Tarpon Blue Silver King I's Memorandum in Opposition to TRO and PI); Dkt. **146** (Limited-Intervenor Cameratta's Memorandum in Opposition to TRO and PI); Dkt. **148** (Federal Defendants' Memorandum in Opposition to TRO and PI); Dkt. **149** (Defendant-Intervenors' Memorandum in Opposition to TRO and PI); Dkt. **153** (Plaintiffs' Reply); Dkt. **157** (Limited-Intervenor Cameratta's Supplemental Remedy Brief); Dkt. **158** (Federal Defendant's Supplemental Remedy Brief); Dkt. **159** (Limited-Intervenor Tarpon Blue Silver King I's Supplemental Remedy Brief); Dkt. **160** (Defendant-Intervenors' Supplemental Remedy Brief); Dkt. **161** (Plaintiffs' Supplemental Remedy Brief).  The Court also received and has considered two briefs from the Florida Chamber of Commerce and the Association of Florida Community Developers.  Dkt. **103**; Dkt. **108**; *see CBD I*, 597 F. Supp. 3d at 185 n.3.

## II.  LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA[,] the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to a review of agency action.  But summary judgment nonetheless "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  In other words, "[t]he entire case on review is a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is deferential; it requires that agency action simply be 'reasonable and reasonably explained.'" *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009)); *see also Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only reasonableness, not perfection.").  A "court is not to substitute its judgment for that of the agency" if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Airmotive Eng'g Corp. v. Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (alterations in original) (internal

quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"The Court's review, however, must be 'searching and careful.'"  *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43).  Just as the Court may not "substitute [its] judgment for that of the agency" to set aside an agency action, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also typically may not "affirm an agency decision on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

### III. ANALYSIS

The Court starts with standing and ripeness and then turns to the merits of the parties ESA arguments.

### A.    Justiciability

Although Florida previously argued that Plaintiffs lack standing to pursue any of their claims, it now appears to limit its standing challenge (other than its general challenge to informational standing) to Counts One and Two, which are not presently at issue.  *See generally* Dkt. 102; Dkt. 107; Dkt. 127-2 at 2.  With respect to Plaintiffs' ESA claims, Florida instead argues that at least some—Counts Three, Four, Eleven, and Twelve—are not ripe.  *See generally*

Dkt. 102; Dkt. 107.  It does not, however, include other ESA claims—that is, Counts Six, Ten,

and Thirteen—in that ripeness challenge.  *Id.  But see* Dkt. 127-2 at 2 (labelling these claims

"arguably not ripe").  The Federal Defendants and the more recent intervenors, for their part,

raise no justiciability defenses at all.  But because the Court has an independent duty to ensure

that it has subject-matter jurisdiction, *see Attias v. Carefirst, Inc.*, 865 F.3d 620, 623 (D.C. Cir.

2017), the Court will address both standing and ripeness.

      1.    *Standing*

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6

(1996), the Court must assess Plaintiffs' standing with respect to "each claim" currently at issue

and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  The

"irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each

claim, that they have (1) "suffered an 'injury in fact'" (2) that is "fairly . . . trace[able] to the

challenged action of the defendant," and (3) that is "'likely' . . . that the injury will be 'redressed

by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555. 560–61 (1992) (citations

omitted).  At the summary judgment stage, Plaintiffs bear the burden of proffering "affidavits or

other evidence to demonstrate the specific facts necessary to support standing." *CBD I*, 597 F.

Supp. 3d at 188 (citing *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

When an association seeks to invoke the jurisdiction of a federal court, it can establish

standing in one of two ways.  It can assert "associational standing" to sue on behalf of its

members.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Or it can

assert "organizational standing" to sue on its own behalf.  *See People for the Ethical Treatment

of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Because Plaintiffs' invocation of

associational standing suffices on the facts of this case, the Court need not consider whether
Plaintiffs also have organizational standing.

Associational standing requires that "(1) at least one member of the association has
standing to sue in her own right (based on a showing of harm, causation, and redressability), (2)
the interests the association seeks to protect by suing on its members' behalf are germane to its
purpose, and (3) neither the asserted claim nor the relief requested requires individual members
to participate in the litigation." *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C.
Cir. 2022) (citing *Hunt*, 432 U.S. at 343). "When more than one association brings suit, '[the
Court] need only find one party with standing' to satisfy the requirement." *Ctr. for Biological
Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Ams. for Safe Access v. DEA*, 706
F.3d 438, 443 (D.C. Cir. 2013)).

Here, the Court concludes that at least the Conservancy of Southwest Florida ("the
Conservancy"), the Defenders of Wildlife ("the Defenders"), and CBD satisfy the requirements
of associational standing. To start, each of these Plaintiffs easily meets the second and third
requirements for associational standing. The missions of all three associations include the
protection of the diverse species and habitats, including listed species in Florida. *See, e.g.*, Dkt.
98-1 at 1 (Crooks Decl. ¶ 4); Dkt. 98-3 at 2 (Fleming Decl. ¶¶ 4, 6); Dkt. 98-4 at 2, 3–4 (Hartl
Decl. ¶¶ 7, 11–12). The claims that they assert, moreover, do not require the participation of
individual members. *See Ctr. for Biological Diversity*, 56 F.4th at 67.

The Court is also satisfied that all three associations have carried their burden of
demonstrating that at least one, identified member has suffered or faces an imminent risk of

suffering an injury-in-fact that is fairly traceable to the challenged actions and that a favorable decision is likely to redress.[9]

     a.    Counts 3, 4, 6, 10, 12, and 13

The Court will analyze Counts Three, Four, Six, and Thirteen together because each challenges the FWS's programmatic approach, including the issuance of a programmatic BiOp, a programmatic ITS, and the use of a "technical assistance process" in lieu of the statutorily mandated approach. And because Counts Ten and Twelve challenge the EPA's reliance on that same, allegedly unlawful approach, the Court considers Plaintiffs' standing to pursue those claims at the same time. Each of these Counts rests on a similar premise—that the BiOp and ITS prepared by the FWS failed to satisfy the dictates of the ESA—and each seeks the same remedy—vacatur of the BiOp and ITS and remand for reinitiation of consultation, *see* Dkt. 77 at 58 (Am. Compl. ¶¶ (m), (n)).

As the D.C. Circuit has held, "[a] claim of failure to fulfill the statutory consultation obligation under the ESA is at least in significant part a claim of procedural injury, as to which [courts] 'relax the redressability and imminence requirements' of standing." *Ctr. for Biological Diversity*, 56 F.4th at 67 (quoting *Ctr. for Biological Diversity*, 861 F.3d at 182) (citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 667). Indeed, the D.C. Circuit has described an agency's failure to meet its statutory consultation requirement as the "archetypal procedural injury." *Ctr. for Biological Diversity*, 861 F.3d at 182 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298,

---

[9] The Court previously noted that there are grounds to conclude that Plaintiffs also have informational standing. *CBD I*, 597 F. Supp. 3d at 179. Florida responds by offering additional evidence regarding its provision of information to members of the public relating to permitting decisions. Given the Court's finding that Plaintiffs have established their standing to sue on other grounds, the Court need not reach this issue and expresses no view on the sufficiency of Florida's additional evidence.

305 (D.C. Cir. 2013)).  These precedents involved challenges to the action agency's failure to

meet its consultation requirement, while, here, Plaintiffs challenge the failure of both the action

agency (the EPA) and the consulting agency (the FWS) to comply with the ESA.  But the Court

can discern no material difference when it comes to standing.  *See Oceana, Inc. v. Pritzker*, 125

F. Supp. 3d 232, 241 (D.D.C. 2015) (holding that conservation groups had standing to challenge

a BiOp in which the NMFS concluded that the combined operation of seven fisheries was not

likely to jeopardize the continued existence of certain sea turtles because, by permitting "an

unlawfully excessive amount of harm to [the turtles], [the BiOp] threaten[ed] Plaintiffs']

enjoyment and study of those animals"); *Oceana, Inc. v. Ross*, 2020 WL 5995125 (D.D.C. Oct.

9, 2020) (same).  Even with relaxed redressability and imminence requirements that come with a

procedural injury, however, "the injury in fact requirement [remains] a hard floor of Article III

jurisdiction," and "a plaintiff alleging a procedural violation" is not "freed" of the burden of

establishing causation.  *Ctr. for Biological Diversity*, 861 F.3d at 182–83.

      Starting with injury, the administrative record and the declarations submitted by members

of the Conservancy, the Defenders, and CBD amply support Plaintiffs' claims of injury in fact.

The declarations show that members of the associations have concrete interests in minimizing

the loss of listed species in the State, including, among others, the Florida panther, the crested

caracara, and sea turtles.  *See*, *e.g*., Dkt. 98-1 (Crooks Decl.); Dkt. 98-3 (Fleming Decl.); Dkt.

98-5 (Schwartz Decl.); *cf. Lujan*, 504 U.S. at 562–63.  When the FWS concluded that it was

necessary to issue an ITS, the FWS concluded that approval of Florida's assumption application

was "reasonably certain" to result in some take of all 139 listed species present in the State.  *See*

50 C.F.R. § 402.14(g)(7).  The FWS's preparation of a no-jeopardy BiOp and ITS that

"bypass[es]" the core requirements of the ESA, and the EPA's approval of Florida's Section 404

assumption application based on that BiOp and ITS poses a material risk to the declarants' work and recreational interests in areas of Florida that will be directly affected.  *Cf. Ctr. for Biological Diversity*, 56 F.4th at 67–68.  Assuming that Plaintiffs will prevail on the merits, as the Court must for purposes of assessing standing, *see In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)), Plaintiffs' allegations demonstrate a concrete injury in fact.

Without developing an objection as to the ESA claims specifically, Florida broadly objects to the idea that the Plaintiffs will suffer an injury from having Florida administer the 404 program rather than the federal agencies.  For example, the State argues that "Plaintiffs 'must be able to sufficiently answer the question: What's it to you,' if Florida—instead of the Corps—has the primary role in administering the Section 404 Program for assumable waters in Florida where EPA retains oversight responsibility?"  *See* Dkt. 107 at 10.  This is a version of Florida and the Federal Defendants' argument that whatever ESA requirements may have been omitted from the programmatic BiOp and programmatic ITS will be sufficiently addressed at the individual permit level through consultation with the FWS via the "technical assistance process."  But, contrary to Defendants' position, as more fully discussed in the merits section, that process does not eliminate the "'substantial probability' that the [Plaintiffs'] cognizable interests will be 'adversely affected.'"  *Id.*  In their briefing and their standing declarations, Plaintiffs aver to the multitude of ways that the technical assistance process has proven inadequate.  Conservancy member Amber Crooks recounts, for example, how "[o]n at least one occasion, the State failed to include a permit condition required by [the] []FWS to protect species on a project of concern to the Conservancy."  Dkt. 98-1 at 11 (Crooks Decl. ¶ 31).  She also discusses at length her "concerning" experience with the technical assistance process that occurred in the State's

consideration of a particular permit application.  *Id.* (Crooks Decl. ¶ 32).  During that application

process, the Conservancy voiced concerns over potential harms to the crested caracara and the

Florida bonneted bat.  *Id.*  The FWS shared these concerns, writing in an email that it was unable

to submit a comment on the FDEP's website but that, in the agency's words: "We know there

will be take of Florida bonneted bats."  Dkt. 98-1 at 38 (Attachment A to Crooks Decl.).  Florida

permitted the project even though the state-issued permit "d[id] not assess take to [the] Florida

bonneted bat *or* provide a take limit."  *Id.* at 12 (Crooks Decl. ¶ 33) (emphasis added).[10]  Florida

offers no evidentiary response to these assertions of fact:  Neither of the two declarations from

Justin Wolfe, the General Counsel of the FDEP, submitted by the State addresses the project.

*See* Dkt. 102-1 (Wolfe Decl.); Dkt. 107-1 (Supplemental Wolfe Decl.).

    Even more fundamentally, the technical assistance process is no substitute for what

Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that

the FWS must conduct *before* it can make a no-jeopardy finding and accord incidental take

protection on the EPA, the State, and future state-permittees.  *See* Dkt. 112-1 at 202 (ESA

Section 7 Consultation Handbook instructing the Services to "[n]ever determine the conclusion

of a biological opinion before completing the analysis of the best available data").  Plaintiffs

allege, for example, that the technical assistance program does not require the FWS (or the

NMFS) to evaluate the "effects of the action and cumulative effects to the environmental

---

[10] Crooks further avers that the Conservancy "could not locate any information—not in the permit, not in FWC comments, and not in the public record—that assured [the Conservancy that the] []FWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat for this project, or a proper analysis of whether or not take would occur, or if they adequately assessed take associated with this project."  *Id.* at 11 (Crooks Decl. ¶ 32).  For instance, the permit "acknowledge[d] an estimated take of up to five different pairs of caracara, but stop[ped] short of setting a take limit for th[e] project."  *Id*. at 12 (Crooks Decl. ¶ 32).  If the Corps, instead of Florida, permitted the project in question, it would have been subject to Section 7 of the ESA—not the "technical assistance" process.

baseline" using "the best scientific and commercial data available," 50 C.F.R. § 402.14(g); *see also* 16 U.S.C. § 1536(a)(2), and they allege that the BiOp that the FWS did prepare was wholly deficient.  They allege that Florida's Section 404 program is less protective of listed species than the Corps' program.  And they allege that the FWS's ITS failed to satisfy ESA standards because, among other things, it was not founded on an adequate BiOp, and—most critically—it omitted any limit on incidental take, which functions to trigger reinitiation of consultation in order to ensure that the Service's initial determination of no jeopardy remains sound.  Each of these allegations supports a concrete injury in fact that is not avoided through the technical assistance program.

Two additional procedural injuries merit brief mention.  First, because the allegedly deficient ITS purports to bestow ESA liability protection on future, state-permittees, those permittees will be relieved of the need to seek protection under Section 10 of the ESA; indeed, one of the two private intervenors in this case was in the process of seeking a Section 10 permit before the ITS issued, Jan. 30, 2024 Hrg. Tr. (Rough at 70:6–9).  Plaintiffs, however, would receive far greater protection under the Section 10 process than under the technical assistance process.  Section 10, for example, requires the applicant to prepare a Habitat Conservation Plan that includes steps to "minimize and mitigate" takings, "funding that will be available to implement such steps," and an explanation for why "alternative actions" were "not being utilized," 16 U.S.C. § 1539(a)(2)(A), and—significantly—it requires the Service to provide notice and an opportunity for public comment on the plan, *see id.* § 1539(a)(2)(B).

Second, because the ITS lacks both any take limits *and* any terms and conditions which bind individual permittees, Plaintiffs cannot bring citizen suits pursuant to Section 11 of the ESA against permittees who engage in excess take.  *See* 16 U.S.C. § 1540(g).  Florida responds that a

violation of a take limit included in a state-issued permit, to the extent the permit contains one, would open the door to a citizen suit, but its argument turns on the mistaken premise that the "terms and conditions" set forth in the ITS impose duties on state permittees. *See* Dkt. 112-5 at 141–42 (ITS). The Federal Defendants, nonetheless, suggested at oral argument that a court could, in the future, read *other* language included elsewhere in the ITS to create implied "terms and conditions," which would bind state permittees and provide a basis for bringing a citizen suit. Jan. 30, 2024 Hrg. Tr. (Rough at 31–32, 59–64). But that argument both ignores the plain language of the ITS and is itself unduly speculative.

Plaintiffs have also established causation and redressability. As to causation, a plaintiff asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting *Sugar Cane Growers Coop. v. Veneman,* 289 F.3d 89, 94 (D.C. Cir. 2002)). Rather, causation in the context of a procedural injury requires a showing of two causal links: First that the omitted procedural step is connected to some substantive government decision that may have been wrongly decided because of the omission, and second, that that substantive government decision is connected to the plaintiff's harm. *Ctr. for Biological Diversity*, 861 F.3d at 184. Plaintiffs do not need to show but-for causation, only that the procedure and substance are connected and that there is a "substantial probability" that the procedural failure will create an adverse effect. *Id.* at 184–85. Here, it suffices that the FWS's bypassing of its ESA obligations led to the approval of Florida's Section 404 program and led to the ITS' authorization for the taking of listed species, without due attention to the risks posed to those species.

As for redressability, when a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing is "ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562.  When "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction," *id.*, the plaintiff must establish "facts . . . sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought."  *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).  Here, the ultimate injury that Plaintiffs assert is the increased risk that Florida's program will jeopardize listed species, which will result in losses to their aesthetic, scientific, and occupational endeavors.  *See, e.g.*, Dkt. 98 at 79–80.  The question, then, is whether vacating the allegedly deficient programmatic BiOp and ITS/or setting aside the EPA's assumption decision is likely to result in take limits that would not otherwise apply or is otherwise likely to reduce the risk of jeopardy and take to listed species in Florida.  Although the redressability requirement is relaxed in a case alleging procedural injury, it is not "wholly eliminat[ed]."  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).  The Court is satisfied that Plaintiffs have met their burden.

Notably, if the Court vacates the BiOp and ITS, the ESA liability protection that currently protects the State and state-permittees will no longer apply.  At the very least, this means that for projects that may affect listed species, and where the permittee is unwilling to risk civil and criminal liability under the ESA, permittees will need to follow the process set forth in Section 10 of the ESA (or hope that the EPA federalizes the permit in question through its objection

power).[11]   In either case, both Section 7 and Section 10 are demanding processes, and there is at

least "some possibility," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)—and, indeed, it seems

likely—that the process will result in greater protection for listed species in at least some cases.

On the programmatic level, there is also "some possibility"—and, again, a likelihood—

that the FWS and the EPA would conclude during any renewed Section 7 consultation that the

prospect of developing a legally and factually sufficient programmatic BiOp and programmatic

ITS is simply too daunting and that, instead, they should either: (1) rely on the CWA process that

allows for the federalizing of permits (at least when certain conditions are met) or (2) leave it to

Florida permittees to seek protection under Section 10.  *See* Dkt. 112-5 at 161.  In either

scenario, however, the FWS would be required to engage in far more detailed consideration of

the risks posed by particular projects to listed species, and there is "some possibility"—and,

indeed, a likelihood—that this more searching analysis would lead to greater protection for at

least some listed species.  Moreover, and of equal importance, actually setting take limits in a

Section 7 ITS or Section 10 incidental take permit would require, respectively, that the action

agency and the FWS immediately reinitiate consultation or revoke the permit if that limit is

exceeded.  Those take limits, if exceeded, would also unambiguously—and in stark contrast to

the instant ITS—provide grounds under which Plaintiffs could bring citizen suits under the ESA.

In addition, if the FWS prepares a new BiOp that finds jeopardy, that finding might

provide a basis for the EPA to withdraw its approval of Florida's program.  *See Nat'l Ass'n of*

---

[11] *Cf.* Dkt. 112-3 at 344 ("[The] EPA's initial draft MOA . . . directs the Corps to take over
processing of any permit application where EPA's objections are not satisfied.  The Corps could
still process any permit application where an applicant does not agree to include the reasonable
and prudent measures as special permit conditions.  This will provide permit applicants for large
scale projects, which typically have endangered species impacts, the choice to have their permit
processed by [F]DEP or transferred to the Corps.").

*Home Builders*, 55 U.S. at 652 ("Following the issuance of a 'jeopardy' opinion, the agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."); Dkt. 102 at 35 ("[W]here a State program does not comply with Federal standards, [the] EPA may seek to withdraw the program." (citing 33 U.S.C. § 1344(i))).[12]  If the EPA withdraws its approval of the Florida program—or if the Court sets aside the assumption decision—Section 404 permitting authority would revert to the Corps.  That reversion, in turn, would satisfy redressability by providing a process that will result, where appropriate, in the issuance of individual ITSs that contain take limits, which, if exceeded, will require reinitiation of the consultative process as mandated by the ESA.

To be sure, it is possible that the Court might set aside the BiOp and ITS and that the EPA, the State, and future state permittees will simply decide to proceed without protection from potential ESA liability.  But that prospect is extremely remote.  A BiOp and ITS have "'powerful coercive effect,'" since those who engage the take of one or more listed species "risk civil and criminal penalties."  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023) (quoting *Bennett*, 520 U.S. at 169).  The prospect that the EPA, the State, and future state permittees would run that risk here, moreover, seems particularly unlikely, given the breadth of the agency action at issue, the large number of listed species, and the fact that the EPA, the FWS, and the State went to extraordinary lengths to put a programmatic ITS in place precisely to avoid such risks.

---

[12] Although Defendants maintain that the EPA's assumption decision is not dependent on the BiOp or the ITS, that is a disputed question in the case, which the Court defers to the merits.

b.     Count 11

Count Eleven raises slightly different issues, which merit brief discussion.  That Count
alleges that the EPA was required to consult with the NMFS because the marine species under
the NMFS's jurisdiction, even if not found in assumed waters, could be affected downstream of
assumed waters.  Dkt. 77 at 53–55 (Am. Compl. ¶¶ 274–87).  This claim, once again, turns in
substantial part on an alleged, procedural injury, so the Court will address it with that framework
in mind.  *See Ctr. for Biological Diversity*, 861 F.3d at 182 (describing an action agency's failure
to consult as the "archetypal procedural injury").

Because a procedural right "*in vacuo*" is insufficient to create Article III standing,
*Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009), Plaintiffs must show that the failure
to initiate consultation affects its members' concrete interests.  They have done so.  Plaintiffs
have submitted declarations showing that their members have concrete research, conservation,
aesthetic, and moral interests in various marine species.  One declaration, for example, describes
the enjoyment the declarant derives from viewing marine wildlife and recreating in places where
she can observe them in the wild.  Dkt. 98-3 at 7–10 (Fleming Decl. ¶¶ 20–28).  And another
declaration describes how the declarant's work focuses on the smalltooth sawfish, Dkt. 98-1 at 3
(Crooks Decl. ¶ 11), which is "listed as endangered under the [ESA] by [the NMFS]," Dkt. 98-7
at 10 (Silverstein Decl. ¶ 24).  As the Executive Director of Miami Waterkeeper attests, she is a
resident of Coral Gables, Florida, who (1) uses her Ph.D. in marine biology and fisheries to
research aquatic species, (2) "enjoy[s] observing listed coral and other marine wildlife," and (3)
tries to "observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and
dolphins."  Dkt. 98-7 at 1, 2, 11 (Silverstein Decl. ¶¶ 2–4, 7, 28).  The EPA's approval of

Florida's Section 404 program without engaging in the requisite consultation with the NMFS created a risk of harm to the endangered and threatened marine species of Florida.

Plaintiffs have also established a causal link between the EPA's decision and their alleged injury. The EPA's omitted procedural step of consulting with the NMFS is connected to the substantive government decision that Plaintiffs challenge—that is, the EPA's approval of Florida's Section 404 program without considering what effects, if any, that decision would have on marine life and without obtaining expert input from the NMFS regarding the approval's ecological impact. Those "omitted steps," moreover, "unquestionably connect to the EPA's decision," *Ctr. for Biological Diversity*, 861 F.3d at 184, to approve Florida's program. The Court is also persuaded that the EPA's failure to consult regarding listed marine species poses a substantial risk to Plaintiffs' aesthetic, scientific, and professional interest in those animals. And, the Court is unpersuaded that this causal link fails because the Corps might have issued the same permits without consulting with the NMFS. The simple answer is that, had the Corps done so, Plaintiffs could have challenged that allegedly unlawful conduct.

Turning to redressability, Plaintiffs ask the Court to "[i]ssue a declaratory judgment declaring that [the] EPA violated the ESA by failing to consult with NMFS" and to "[i]ssue any other appropriate injunctive relief." Dkt. 77 at 57–58 (Am. Compl. ¶¶ (e), (q)). As noted, a procedural-rights plaintiffs need not show that court-ordered compliance with the procedure would alter the outcome. Instead, all Plaintiffs need to show is that "any required consultation would redress [Plaintiffs'] members' injury because the EPA *could* reach a different conclusion." *Ctr. for Biological Diversity*, 861 F.3d at 185 (emphasis in original). They have made that showing since "there remains at least the possibility that" the EPA could reach a different

conclusion or modify its approval of Florida's Section 404 program based on its consultation with the expert agency.  *Id.*

2.   *Ripeness*

Although Florida does not dispute that Plaintiffs have met their summary judgment burden of establishing standing to pursue their ESA claims, it maintains that at least some of those claims are not ripe for review.  In particular, Florida argues that Plaintiffs' ESA claims related to the ITS (Counts Three and Four) and to consultation for the NMFS-listed species (Count Eleven) are not ripe for review because they are "based on speculations of harm that may never arise."  Dkt. 102 at 12.  The Court is unpersuaded with respect to Counts Three and Four and agrees only in part with respect to Count Eleven.[13]

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'"  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807, (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)); *see also Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007).  "The doctrine is premised, in part, on Article III's case or controversy limitation and, in part, on prudential considerations 'for refusing to exercise jurisdiction.'"  *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (citation omitted).  Prudential ripeness is assessed under the two-pronged test established in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967).  The Court must "evaluate both the fitness of the

---

[13] Florida mistakenly labels Count Twelve as an "NMFS-based" claim.  *See* Dkt. 102 at 59.  But Count Twelve asserts that the EPA was required to consult with the FWS, not the NMFS, regarding ESA-listed sea turtles.  *See* Dkt. 77 at 55 (Am. Compl. ¶¶ 288–94).  That claim is ripe for the same reasons that Plaintiffs' challenges to the BiOp and ITS, asserted with respect to *all* FWS-listed species, are ripe.  Plaintiffs' "NMFS-based" claim is set forth in Count Eleven, which is addressed below.

issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

With respect to Counts Three and Four, Florida argues that Plaintiffs must wait to bring a legal challenge to "an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate." Dkt. 107 at 28. In the State's view, without that context, the Court will be unable to assess whether and how the supplanting of the usual ESA processes with the technical assistance process affects Plaintiffs' rights. Plaintiffs disagree and observe that they have already identified two projects that the State permitted where the record showed that take was likely to occur, but the permit failed to include a take limit. *See* Dkt. 123 at 24–25 (citing Dkt. 98-1 at 9–12 (Crooks Decl. ¶¶ 28–33)). The Court is persuaded that Plaintiffs' challenges to the biological opinion and programmatic ITS are ripe.

First, the programmatic ITS is likely to cause "hardship" to Plaintiffs because it creates a legal right at odds with Plaintiffs' interests in preserving listed species: It authorizes the incidental taking of all listed species in Florida, subject only to the non-statutory technical assistance process. The FWS's action constitutes "a definitive statement of [the] agency's position, has direct and immediate effect on the complaining parties, and has the status of law." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted) (holding that claim challenging ITS was ripe for review). Second, prompt judicial review of Plaintiffs' claim "will not interfere with further administrative action." *Id.* The FWS's position in the programmatic ITS "will not be reconsidered because the consultation process is complete once the biological opinion is issued." *Id.* To be sure, the FWS may have further involvement in the technical

assistance process, but it will not have any further input on the ITS itself, and it is the

programmatic ITS that Plaintiffs challenge.  Third, "further factual development will not assist

[the Court] in resolving the legal question at issue," *id.* at 941, which concerns the statutory

authorization for extending, as the FWS did here, broad immunity from take liability through a

technical assistance process distinct from and not authorized by the Section 7 process.

  More generally, Florida's ripeness argument misapprehends the nature of Plaintiffs'

challenges to the ITS.  Plaintiffs challenge the ITS because it has conferred liability protection

for incidental take on the EPA, the State, and state permittees without setting any statutorily-

required take limits and without the necessary scientific, species-specific and effects analysis.

The crux of Plaintiffs' claim, and the root of their alleged harm, is the fact that the programmatic

ITS "creates an unlawful risk of take for Florida's program *as a whole* by failing to set limits on

incidental take for the program *as a whole*, in contravention of the ESA."  Dkt. 104 at 109

(internal quotation marks and citation omitted).  Plaintiffs correctly observe that the possibility

that they might be able to bring a state-court challenge to a particular permit, or the possibility

that the FWS and/or the EPA might prevent an individual permit from issuing, does not render

their challenge to the administrative action that the EPA and the FWS have already taken—

authorizing take without the risk of ESA liability and thereby supplanting the Section 7 and

Section 10 processes—unripe for review.

  But even placing those broader—and dispositive—considerations aside, the Court agrees

with Plaintiffs that they have identified particular Florida-issued permits without take limits.

*Contra* Dkt. 107 at 27 ("[T]he outcome of the agencies' technical assistance process as well as

[the] EPA's Section 404 oversight role cannot be predicted and no harm will be caused to

Plaintiffs' interest unless and until they show inadequate take protection will occur."); *id.* at 28

("Plaintiffs . . . cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions.").  Florida contends that Plaintiffs can bring suit in Florida court to challenge permits that pose a risk of jeopardy to listed species, but that state-court remedy is not a substitute for the rights and remedies provided in the ESA.  Although Florida also suggested during oral argument that Plaintiffs might be able to bring a citizen suit under the ESA, for the reasons discussed above, the Court is not so sure.  *See infra* 44.  And, in any event, the remote possibility that a federal court might someday entertain a collateral challenge to the FWS's ITS based on the State's failure to include or to enforce a state-take-limit in a state-issued permit, hardly shows that the legal question presented in this case is not fit for judicial review or is unlikely to result in any hardship to Plaintiffs.

Florida argues that this case is like *Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9–10 (D.D.C. 2001), where the Court held that an ESA Section 7 claim was not ripe for review because the relevant oil and gas leases had not yet issued.  But, here, Florida has issued permits—more specifically, over 700 individual permits as of February 2024, Dkt. 160 at 5.  And in *Wyoming Outdoor Council*, unlike here, the FWS "was free to engage in further efforts to fulfill its [statutory] obligations before the leases were issued."  148 F. Supp. 2d at 10 (quoting *Wyo. Outdoor Council v. U.S. For. Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)).  The ripeness requirement is intended to "protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (internal quotation marks and citation omitted).  There is little doubt that the FWS's issuance of its programmatic ITS clears that hurdle.  Finally, because the FDEP has issued hundreds of permits, Florida's reliance on *New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470 (3d Cir. 1993), is

similarly misplaced.  There, the Third Circuit reasoned that because "neither the Township nor anyone else will experience any effects from the Corps' decision *unless and until* Pennsylvania grants a water quality certificate, when fill work can begin, this case is not ripe."  *Id.* at 473 (emphasis added); *see also Ctr. for Biological Diversity*, 450 F.3d at 941 (holding that challenge to an ITS was ripe and distinguishing *New Hanover Township* on similar grounds).

With respect to Count Eleven, Florida argues that Plaintiffs' claims related to adverse effects to species within the jurisdiction of the NMFS are not ripe because marine species under NMFS' jurisdiction are "unlikely to be found in any assumable waters because the Corps retains jurisdiction over" tide waters and adjacent wetlands.  Dkt. 107 at 30.  Florida asserts that if a proposed Florida Section 404 permit "may eventually affect NMFS species, the federal agencies (EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns at that time.  Otherwise, such a decision would be subject to challenge at that time."  Dkt. 102 at 59; *see also* Dkt. 107 at 30 (asserting that Plaintiffs have not been harmed by the EPA's decision "to defer NMFS consultation").  This argument, however, ignores the fact that the EPA was required to consult with the NMFS *before* approving Florida's Section 404 program.  Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species."  *Lujan*, 504 U.S. at 603 (Blackmun, J., dissenting).  That procedural harm has already occurred—no further factual development is necessary or helpful.  Indeed, by Florida's logic no claim for failure to consult would ever be ripe for review unless and until the federal action was complete.  That contention is untenable.

The Court does agree with the State, however, that Plaintiffs' NMFS-based challenge is at least arguably unripe in one respect.  Apparently recognizing its fault, the EPA has initiated

informal consultation with NMFS, and that consultation is still ongoing.  It requires no further analysis to conclude that, to the extent Plaintiffs seek to challenge the adequacy of that not-yet-complete consultation, their claim is unripe.

      3.    *Mootness*

Finally, Florida argues that Count Eleven is moot to the extent it challenges the EPA's failure to consult with the NMFS.  Dkt. 102 at 60.  As further explained below, however, that argument fails to confront the thrust of Plaintiffs' claim—which is that the EPA was required to consult with the NMFS *before* approving Florida's assumption application—and it fails to confront the State's own observation (just discussed) that any post-approval consultation has yet to reach fruition.

**B.    Merits**

This, then, brings the Court to the merits of Plaintiffs' ESA claims.  The Court will first address Plaintiffs' challenges to the FWS's programmatic BiOp, will then address the FWS's no-jeopardy determination and programmatic ITS, along with the related technical assistance process, and, finally, will turn to Plaintiffs' challenges to the EPA's related actions.

      1.  *ESA Claims Against the FWS*

The parties disagree about many things.  But they agree that the EPA was required to engage in a meaningful Section 7 consultation with the FWS (and perhaps the NMFS) where the Service(s) would determine (as reflected in a biological opinion) whether the EPA's approval of Florida's Section 404 program threatened to jeopardize ESA-listed species and/or to adversely modify or destroy their critical habitat.  If the FWS concluded that EPA's action was not likely to jeopardize a listed species or to threaten a critical habitat but that the EPA's action was likely to lead to incidental take of a protected species, the FWS was required to issue an ITS setting limits

on that take, which, if exceeded, would trigger immediate reinitiation of the consultative process. Plaintiffs allege that the FWS failed at these tasks, and they argue that the non-statutory technical assistance process is—as both a matter of law and as applied here—no substitute for the procedural and substantive requirements of Section 7.

  a. <u>Challenges to the Biological Opinion</u>

  Plaintiffs first argue that the FWS's programmatic BiOp failed to include the analysis and data required to determine whether the EPA's action in approving Florida's program—as opposed to the State's action in issuing individual permits—would jeopardize a listed species. The Court agrees.  Under the plain language of the statute, the FWS was required to prepare a BiOp "detailing how the agency action affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A), but, here, the FWS did not do so.  Under the regulations, the BiOp "shall include" a "detailed discussion of the environmental baseline of the listed species and critical habitat" and a "detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h).  The FWS is expressly required to "[r]eview all relevant information . . . available;" to "[e]valuate the current status and environmental baseline of the listed species;" to "[e]valuate the effects of the action and cumulative effects on the listed species;" and, in the end, to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species . . . formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g).  And, the ESA and the implementing regulations require the Service to "use the best scientific and commercial data available" in making these assessments.  *Id*. § 402.14(g)(8); *accord* 16 U.S.C. § 1536(a)(2).

For present purposes, the Court need not address every asserted shortcoming in the FWS's programmatic BiOp because it is clear that, at the very least, the FWS failed to undertake *any* species-specific analysis. The most compelling evidence in support of this aspect of Plaintiffs' claim are the words of the BiOp itself. To start, the BiOP states that the FWS merely "evaluated the effects of the action on *guilds* of ESA-proposed and -listed species and designated and proposed critical habitat." Dkt. 112-5 at 114 (BiOp) (emphasis added); *see also supra* 31. The BiOp does not define "guild"—nor does the ESA or the implementing regulations—but, according to Merriam-Webster, a "guild" is "a group of organisms that use the same ecological resource in a similar way." "Guild," *Meriam Webster*, www.merriam-webster.com/dictionary/guild (last visited Feb. 11, 2024). The BiOp explains that, in the FWS's view, "[a]nalysis of effects using a guild approach is more appropriate at the programmatic level," leaving the mandated "[s]pecies-specific and site-specific analyses [to] occur during the technical assistance process." Dkt. 112-5 at 114 (BiOp). But an analysis at the guild-level fails the statutory and regulatory demand to assess the environmental baseline, effects, and cumulative effects at the species-level.

Throughout, the BiOp is forthright that the FWS did not endeavor to address species-specific considerations, opting instead to defer analysis to the technical assistance process. Here is a non-exhaustive sampling:

- "Because this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp. Therefore, the []FWS determined that a programmatic consultation is appropriate in determining whether FDEP's 404 program and EPA's oversight of FDEP's 404 program is structured to insure that no permit will be issued that is likely to jeopardize threatened and endangered species and destroy or adversely modify critical habitat. For future permits issued under the State 404 program, site-specific and species-specific information will be available and assessed through the technical assistance process with the State and/or through coordination with the EPA,

when EPA has not waived its review of the State permit action." Dkt. 112-5 at 124–25 (BiOp).

- "We developed a programmatic consultation approach to determine whether and to what degree FDEP has structured their regulatory program and EPA has structured its oversight program to ensure approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species . . . . This approach also recognizes that site- and species-specific considerations would be addressed with the []FWS in subsequent technical assistance efforts . . . ." Dkt. 112-5 at 113 (BiOp).

- "The [biological evaluation] lists anticipated stressors in Table C.1. of Appendix C and notes anticipated effect determinations in Table C.1.b of Appendix C.  During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews." Dkt. 112-5 at 95 (BiOp).

Against this backdrop, it comes as no surprise that of the over one hundred protected species in Florida, the BiOp names just a handful and, even for those, offers little analysis.  Dkt. 112-5 at 123, 129 (BiOp).  Instead, it merely addresses the effects on "mammalian species/subspecies," "birds," "reptiles," "amphibians," "fish," "insects," "crustaceans," "mollusks," and "plants." *Id.* at 129–35.  The ESA demands far more specific and detailed analysis of the effects of an agency action to satisfy Section 7.

At first, the Federal Defendants seemed to concede that the BiOp failed to consider species-specific baselines and effects.  They wrote that, "[i]n lieu of site-specific or species-specific analyses, [the] FWS determined that a programmatic or process-based approach to EPA's potential approval of FDEP's request was appropriate" and that, "[w]ith this programmatic approach, species-specific analyses were deferred, to be assessed on a permit-by-permit basis through the technical assistance process."  Dkt. 99 at 63.  Later, however, the Federal Defendants double back, arguing that there is "no merit" to Plaintiffs' contention that the FWS failed to evaluate the environmental baseline because the BiOp "adopted the BE's detailed

description of the environmental baseline, which addressed the baseline of listed species." *Id.* at 68.

Even if such incorporation by reference were proper (which Plaintiffs dispute) and even assuming that the BE's analysis satisfied the ESA's requirement for setting a species-specific environmental baseline (which is far from clear), the argument nonetheless fails for two reasons. First, although the BiOp purports to adopt the BE and its "detailed description of the environmental baseline," Dkt. 112-5 at 116 (BiOp); *see also id.* at 76, it simultaneously disavows any ability to engage in "site- and species-specific considerations," which it defers to the technical assistance process, *id.* at 113 (BiOp). Second, even if the BiOp adequately addressed the environmental *baseline*, there is no dispute that it fails to consider any species-specific effects or the cumulative effects of the EPA's action. Without those essential components, the BiOp fails to meet the minimum statutory and regulatory requirements.

In response, the Federal Defendants make two principal arguments. First, they argue that "[n]othing in the ESA requires the [FWS] assess every future phase of an agency action" and that, here, the relevant action was the EPA's transfer of permitting authority from the Corps to Florida, which was assessed, in FWS's discretion and expertise, only at the programmatic level. Dkt. 99 at 65 (quoting *Cooling Water*, 905 F.3d at 73). In the words of the Federal Defendants, the FWS's analysis passes muster because the only "effect" that it assessed was the transfer of permitting authority from the Corps to the FDEP and

> whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and [the] FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat.

Dkt. 99 at 73.

The problem with this framing is that the EPA and the FWS cannot have it both ways: they accepted Florida's request that they engage in Section 7 consultation in order to provide the State and future state-permittees with Section 7 liability protection. *See, e.g.*, Dkt. 112-2 at 3. But to do so, they were required to make a finding that the proposed action—here, granting Florida's assumption application and adopting a technical assistance process—"may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Indeed, formal consultation is not required if "as a result of the preparation of a biological assessment . . . the Federal agency determines, with the written concurrence of the [Service], that the proposed action is *not* likely to adversely affect any listed species or critical habitat." *Id.* § 402.14(b)(1) (emphasis added). That was not their determination. Having concluded that the proposed action *was* likely to adversely affect one or more listed species, the Federal Defendants cannot now argue that a detailed BiOp is unnecessary because the technical assistance process, which purports to replicate traditional FWS review under Section 7, will (as a matter of process) preclude any adverse effects on listed species. If the assumption and technical assistance process "may affect listed species," *id.*, the FWS is required to engage in the detailed, species-specific analysis necessary to evaluate whether those contemplated effects are "likely to jeopardize the continued existence of any [listed] species," 16 U.S.C. § 1536(a)(2).

To the extent this sounds like circular logic, that is the Federal Defendants' doing. As the EPA explained in its response to comments regarding its proposal to engage in Section 7 consultation:

> As set forth in the FDEP White Paper and in Federal Register notice, EPA has *the discretion to consider impacts to listed species* and critical habitat when deciding whether to approve a state's Section 404 program. However, *whether [the] EPA is ultimately required to engage in Section 7 consultation when*

> approving a State 404 program is a factual case-by-case determination and will
> depend on how a state chooses to develop its 404 program and whether [the]
> EPA's approval of that program may affect listed species and critical habitat.
> States remain free to fashion their particular programs in such a way *as to avoid
> any possibility of effect on species or habitat* as part of the assumption process
> by, for example, mandating that their state permittees entirely avoid impacts to
> listed species or critical habitat or require federalizing state 404 permits where
> such impacts may occur.  But Florida's program is not fashioned in this manner,
> for the reasons set forth in the White Paper, and we believe the approach Florida
> would take provides for a more effective and streamlined program.

Dkt. 112-3 at 368 (emphases added).  The bottom line is that Federal Defendants were required

to conduct the required species-specific analyses because Florida structured, designed, and

implemented its program so as to provide incidental take liability upfront to itself and all future

state permittees.  But incidental take liability protection flows from the rigorous analysis required

by Section 10 (for private actions) or Section 7 (for federal agency actions).  Congress did not

codify a third option, whereby incidental take liability might flow from an alternative set of

arguably similar procedures.

The Federal Defendants' argument, accordingly, boils down to this:  We exercised our

discretion to cast Florida's assumption program in a manner designed to confer ESA liability

protection on future, state-permittees by inviting Section 7 consultation; to trigger the Section 7

process, we had to determine that the proposed technical assistance process would likely

adversely affect species; during consultation, the FWS was unable meaningfully to assess the

species-specific effects of that decision because, in our discretion, we have deferred species-

specific review to the technical assistance process; but we should nonetheless be allowed to take

advantage of Section 7 liability protection even though we did not engage in any species-specific

analysis in the BiOp or engage in a consultation that went beyond assessing whether the

proposed technical assistance process is an adequate proxy for Section 7 consultation.  That

argument is untenable.

The Federal Defendants' second argument is that the FWS was unable to conduct any species-specific analysis because it lacked sufficient information to anticipate the effects of every future Section 404 permit application. *See, e.g.*, Dkt. 99 at 72–73. But "Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion on that basis." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). To the contrary, Section 7 "admits of no exception." *Nat'l Ass'n of Home Builders*, 551 U.S. at 674 (Stevens, J., dissenting) (quoting *TVA*, 437 U.S. at 173). Nor is the hurdle quite as high as Defendants suggest; Plaintiffs point, for example, to the programmatic BiOp that the FWS prepared for the Jacksonville District to demonstrate what the FWS can—and must—do to prepare a legally and factually sufficient programmatic BiOp. Dkt. 125 at 1 (the programmatic BiOp based on the FWS's review of the impacts associated with the Corps' Jacksonville District can be found at cdm16021.contentdm.oclc.org/utils/getfile/collection /p16021coll3/id/577 (last visited Feb. 11, 2024)); *see also* Dkt. 140 at 40–42.

The ESA does not require perfect foresight—only that the FWS use the best available information to create an assessment of jeopardy. In light of the ESA requirement that the FWS use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. § 1536(a)(2), the FWS cannot simply "ignore available biological information or fail to develop projections" of the effects of the agency action, *Conner*, 848 F.2d at 1454. Here, it is undeniable that the FWS had at its disposal reams of data from previous Section 7 consultations, which it tabulated but did not meaningfully discuss or analyze. Many species in Florida have been the subject of hundreds of prior Section 7 consultations—the panther alone had 108 consultations, the bonneted bat had 383 consultations, and the wood stork

had 216 consultations, to name a few.  *See* Dkt. 112-4 at 151 (EPA BE).  The information was available to the FWS, but the agency did not give it meaningful consideration.

Simply put, incomplete information about future Section 404 permits that the State might issue does not excuse the FWS's failure to comply with the statutory requirement that it prepare a comprehensive biological opinion.  With the biological information that was available, moreover, the Court is persuaded that the FWS "could have determined whether post-[assumption] activities in particular areas were fundamentally incompatible with the continued existence of the species."  *Conner*, 848 F.2d at 1454.  For instance, in some areas, even minimal permitted activities likely would be "incompatible with the conservation of the species," *id.*— those areas could have been identified before any future permit location was known, and if they could not have been the FWS failed to explain why.  *Id.*; *see also* Dkt. 156 at 14–16 (Oct. 19, 2023 Hrg. Tr.)

Regardless of how Defendants got here, district courts across the nation have rejected similar abdications in the past.  In *Forest Service Employees for Environmental Ethics v. U.S. Fish & Wildlife Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), for example, the court evaluated a BiOp analyzing the use of chemical fire retardant to fight wildfires.  The court held that the FWS had failed to consider, among other things, critical habitat when it applied a "coarse filter" and analyzed species at only the "taxonomic group-level."  *Id.* at 1204, 1224–25.  The FWS argued that it was both rational and necessary to proceed as it had given that the chemical retardant had the potential to affect 387 species, spread out over 192 million acres.  *Id.* at 1224.  But the court disagreed, holding that the FWS could not "excuse the failure to comply with the law Congress [enacted] by arguing that compliance would be too hard."  *Id.* at 1224.  The same holds true here.

The Federal Defendants' sole remaining argument is that the approach they took mirrors the approach that the Second Circuit approved in *Cooling Water*, 905 F.3d at 49.  *Cooling Water*, however, is distinguishable on its facts.  In that case, the federal agency action under review was not the approval of a state assumption application but, instead, the promulgation of a final rule pursuant to Section 316(b) of the CWA, 33 U.S.C. § 1326(b).  *Cooling Water*, 905 F.3d at 58. The rule established requirements for cooling water intake structures at power plants and manufacturing facilities and was intended to address impacts to aquatic life from entrainment or impingement of fish and shellfish.  *Id.*; 79 Fed. Reg. 48,300 (Aug. 15, 2014).  The standards promulgated under Section 316(b) of the CWA are implemented by permits issued through the National Pollutant Discharge Elimination System ("NPDES")—at the time that *Cooling Water* was decided, 47 states administered NPDES permitting programs.  *Cooling Water*, 905 F.3d at 59 & n.2.[14]

Notably, the requirements of the 316(b) technical assistance process were codified as part of the rulemaking, creating legally binding responsibilities for all parties.  *Cooling Water*, 905 F.3d at 72 ("[T]he Rule obligates the Services to abide by those procedures.").  Here, in contrast, the "Final Notice" published in the Federal Register approving Florida's program makes no mention of the technical assistance process or any of its procedures, stating only: "[The] EPA has met its requirements under ESA section 7(a)(2) by completing ESA consultation and receiving a 'no jeopardy' Biological Opinion from the []FWS on November 17, 2020."  85 Fed. Reg. 83,553

---

[14] One law review article has observed that state assumption of 402 permitting authority is more common in part because of "the attitude of [the] EPA, which might feel more comfortable delegating a program that will continue to operate on the basis of objective, numerical federal standards; the decisions to be made under section 404 are both far more subjective and susceptible to influence by local politics."  Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States*, 54 Md. L. Rev. 1242, 1293 (1995).

(Dec. 22, 2020).  The technical assistance process is, instead, set out in the programmatic BiOp, that is itself evaluating the efficacy and protectiveness of those same procedures, and discussed in various memoranda.  In other words, here, there is no regulatory framework binding the parties' actions as in *Cooling Water*.  When the Court inquired of counsel for the FWS whether anything in the technical assistance process is "legally enforceable," counsel responded:  "So it's [FWS's] own biological opinion.  Of course, it's going to comply with it.  It's in an MOU.  It's committed to that, Your Honor."  Dkt. 156 at 95 (Oct. 19, 2023 Hrg. Tr.); *see also id.* at 98–99, 111.  But there is a fundamental difference between a notice and comment rulemaking of the sort at issue in *Cooling Water*, which adopted a "legislative" rule requiring state officials to send applications "to the Services for a sixty-day review period, after which [the state official] must publish any information or recommendation the Services provide," 905 F.3d at 72, and the technical assistance process employed here, which was adopted without the benefit of a notice and comment rulemaking and which binds only the signatories.

To be sure, the programmatic BiOp and ITS of *Cooling Water* are similar to those now before the Court.  That is not a coincidence.  As the record makes clear, Florida modeled its proposal on the path charted in *Cooling Water*.  *See, e.g.*, Dkt. 112-5 at 170 (email from FWS supervisor) ("The draft BA follows the 316b BE as expected."); Dkt. 112-4 at 4 (FWS email setting as an agenda item for discussion "the key assumptions used in the nationwide 316b consultation, as much as that consultation serves as a model for this one"); Dkt. 112-4 at 8 (FWS email discussing the claims that the "enviro-oriented litigants" raised before the Second Circuit in *Cooling Water*); Dkt. 112-2 at 14 (Florida white paper highlighting that the *Cooling Water* ITS was held "valid despite its failure to numerically quantify the impacts of the rule on take").  But, as counsel for both sides have confirmed, *Cooling Water* stands alone as the only case

concerning, much less approving, a programmatic biological opinion and incidental take

statement of this sort:  To quote counsel for the Federal Defendants, this case represents the "first

next time" that an agency has deployed this type of programmatic approach.  Dkt. 156 at 87 (Oct.

19, 2023 Hrg. Tr.).

     More importantly, *Cooling Water* is at odds with the statute, regulations, and caselaw.

The critical misstep in *Cooling Water* occurs in the following passage:

> According to the Environmental Petitioners, the Services improperly
> disregarded their obligation to "consider all phases" of the agency action in their
> initial biological opinion, as the Ninth Circuit appears to require.  Envtl. Br. 100
> (citing *Connor v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988)).  But "the
> rule that biological opinions must be coextensive in scope with the entire action
> or else violate the ESA is nowhere to be found in the language of the ESA,"
> *Defs. of Wildlife*, 733 F.3d at 1121. . . , and like the Eleventh Circuit, we decline
> to adopt such a rule here.[]  Nothing in the ESA requires that the Services assess
> every future "phase" of an agency action on a site-specific or species-specific
> basis.

905 F.3d at 73.  That is, according to *Cooling Water*, an agency need not "assess every future"

species-specific effect of an action in its "initial" BiOp.  That much is true.  The governing

regulations permit "[p]rogrammatic consultation" when "[a] proposed program" sets forth "a

framework for future proposed actions."  50 C.F.R. § 402.02 ("Programmatic consultation").

But what *Cooling Water* (like Defendants in this case) fails to confront is that a "phase[d]"

approach to consultation requires either (1) complete and adequate consultation at the outset;

(2) partial consultation at the outset, followed by the remaining Section 7 consultation at the later

"phase" or "phases;" or (3) complete and adequate consultation solely at the later "phase," if that

is the phase likely to adversely affect listed species.  What matters is that adequate consultation

occur *at some point*; the ESA does not permit an agency to bypass the Section 7 consultative

process altogether by postponing the required, "detailed discussion of the effects of the action on

listed species," 50 C.F.R. § 402.14(g), to a later phase, only to conclude—as in *Cooling Water*

and here—that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7, *Cooling Water*, 905 F.3d at 73 n.15.

This understanding of the ESA is not only consistent with, but compelled by, the Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), which is the sole precedent—and the only authority—that *Cooling Water* cites in support of its contrary holding. That case involved the Navy's installation and operation of an underwater submarine warfare training range ("USWTR"). The NMFS prepared an "initial" BiOp, which concluded "that *installation* of the USWTR [was] not likely to adversely affect listed species," but that "*operations* on the USWTR [were] likely to adversely affect listed species." *Id*. at 1113 (emphases added). For reasons that are not relevant here, the Navy and the NMFS decided that, even though the initial BiOp considered the "impacts of the expected operations" of the USWTR, they would not rest on that early assessment alone and would, in addition, conduct a "new" Section 7 consultation in the future "before operational activities commence[d]." *Id.* at 1122. It was in that context that the Eleventh Circuit opined that it was permissible for the Navy and the NMFS to structure the consultative process in phases. *Id.* As the court explained, "[i]t is for the agencies to determine how best to structure consultation *to fulfill Section 7(a)(2)'s mandate*," and the approach crafted in that case, if anything, better served that mandate than a single, early consultation. *Id.* at 1121–22 (emphasis added). The essential point, though, is that the consulting Service must prepare one or more BiOps—even if in phases—that employ "the best scientific and commercial data available" to offer a "detailed discussion of the effects of the action on listed species." *Id.* at 1112 (internal quotation marks omitted).

This understanding of the ESA is not only consistent with the statutory text and purpose but finds further, compelling support in the governing regulations.  Here, as in *Cooling Water*, the government characterizes the BiOp as a form of "programmatic consultation."  That phrase is defined in the regulations, and applies to "a consultation addressing an agency's multiple actions," 50 C.F.R. § 402.02—not a single agency action followed by state-licensing decisions that may occur years later and that, on Defendants' own telling, do not constitute federal action subject to Section 7 consultation.  That understanding of "programmatic consultation," moreover, finds additional support in the definition of "[f]ramework programmatic action," which means "a framework for the development of future action(s) that are . . . carried out at a later time," where "any take of a listed species [will] not occur unless and until those future action(s) are . . . carried out and *subject to further section 7 consultation*."  *Id.* (emphasis added); *see also id*. ("Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that [1] will not be subject to further section 7 consultation, and also approves [2] a framework for the development of future action(s) [for which . . .] any take of a listed species [will be . . .] subject to further section 7 consultation.").

D.C. Circuit precedent, although not directly on point, further supports the sensible conclusion that an agency may not avoid its obligation to engage in meaningful Section 7 consultation by deferring detailed, species-specific analysis for another day—particularly when, by the time that day arrives, the relevant action will be out of the agency's hands and beyond the reach of Section 7.  In *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), the D.C. Circuit considered the interaction between the ESA and the Outer Continental Shelf Lands Act ("OCSLA") in the context of a lease sale for the development of oil and gas properties in waters north of Alaska.  Under the OCSLA, the lease sale itself is, as the court explained, "only a

preliminary and relatively self-contained stage within an overall oil and gas development

program which requires substantive approval and review prior to the implementation of each of

the major stages: leasing, exploring, and producing." *Id.* at 593 (emphasis omitted).  The district

court had held that the biological opinion at issue violated the ESA because it considered *only*

the leasing stage, and it had "rejected the defendant's contention that the multistage flexibility

contemplated within the OCSLA framework was an indication that ESA 'endangered life'

considerations should be entertained stage-by-stage." *Id.* at 608.

The D.C. Circuit agreed, holding that it was in "qualified agreement with the district

court's ruling that a 'biological opinion' may not deal exclusively with any one particular stage

of an outer continental shelf project." *Id.*  In the end, however, the *North Slope* court concluded

that the "[m]andatory stage-by-stage review" required by the OCSLA meant that the consultation

before it did not violate the ESA when viewed in light of the "full contingent of OCSLA checks

and balances." *Id.* at 609.  Fairly construed, the D.C. Circuit's opinion requires courts to

consider whether "stage-by-stage" consultation under Section 7 is consistent with the ESA's

mandate to consider the "agency action" as a whole.  *See Conner*, 848 F.2d at 1453–54 (so

reading *North Slope*).  The programmatic approach applied here fails that test by a wide margin,

since the FWS never considered the EPA's action as a whole, and deferring that consideration to

a non-statutory technical assistance process cannot substitute for what the statute requires.  *See

also National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 10 & n.15 (D.D.C. 2005)

(distinguishing *North Slope* and holding that the Corps violated the ESA by seeking to defer

consultation with the FWS regarding the effects of individual actions authorized under four general permits, which the Corps was aware "m[ight] affect" the Florida panther). *Id.*[15]

Ultimately, however, *Defenders of Wildlife* and *North Slope* both address a distinct question: Whether *federal* agencies conducting *federal* actions that proceed in tiers or stages can engage in Section 7 consultation at each tier, or instead whether the initial Section 7 consultation must evaluate the proposed agency action *in toto*, all tiers included. The question in those cases was simply whether Section 7 consultation could be phased, or whether doing so might lead to "piecemeal chipping away of habitat." *Conner*, 848 at 1454. The Court's conclusion that the BiOp at issue here was inadequate, however, follows *a fortiori*: If a phased assessment of federal action is suspect, even when each phase will receive review under Section 7, a programmatic BiOp that fails to adequately address the effects of the agency action of listed species and that provides no further opportunity for Section 7 consultation cannot stand.

For all of these reasons, the Court concludes that the FWS was not free to disregard the ESA's mandate that it "detail[] how the agency action affects the species," 16 U.S.C. § 1536. The Court, accordingly, concludes that the BiOp is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law" and must be set aside. 5 U.S.C. § 706(2).

>    b.   Challenges to the Incidental Take Statement

As explained above, formal consultation under Section 7 is required if the action agency concludes that its action "may affect listed species or critical habitat"—unless that agency determines, with the Service's concurrence, that the "action is not likely to adversely affect any

---

[15] Although no party makes the point, the Court notes for completeness that the FWS, at least according to its handbook, views the consultation at issue in *Conner* as an "incremental step," not a programmatic, consultation under 50 C.F.R. § 402.14(k). *See* Dkt. 112-1 at 332–34 (ESA Section 7 Consultation Handbook).

listed species."  50 C.F.R. § 402.14(a) & (b).  Absent a finding that listed species may be affected, the Section 7 process never commences: the Service never prepares a BiOp and never opines on the question of jeopardy and—most importantly for present purposes—the Service never issues an ITS.  Before issuing an ITS, moreover, the Service must determine that incidental "take is reasonably certain to occur."  *Id.* § 402.14(g)(7).  The Court considers the adequacy of the programmatic ITS at issue here against this backdrop.  Consistent with this understanding, Defendants cannot plausibly argue both (1) that it was necessary to issue an ITS (resulting in take protection for future permittees) and (2) that the technical assistance process replicates the Section 7 consultation process (thereby obviating the need for any species-specific analyses or take limits).  *Cf.* Dkt. 107 at 8 ("Plaintiffs have not shown a single situation where the Corps would decide a permit differently than Florida . . . ."); *see also id.* at 21 ("[Plaintiffs] make no showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim arise from FDEP permits . . . .").

The ITS is crucial in a no-jeopardy BiOp.  It defines the extent of the permissible incidental take of listed species resulting from the agency action, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), and it ensures that the level of incidental take will not jeopardize any species in violation of the ESA, 16 U.S.C. § 1536(b)(4)(B).  When the Service issues a no-jeopardy BiOp, the ITS serves to monitor the impact that the approved action has on the listed species in real time.  50 C.F.R. § 402.14(i)(3).  And "[i]f during the course of the action the amount or extent of incidental taking, as specified [in the ITS], is exceeded"—in other words, if the effect on the species from the action is greater than anticipated and permitted by the Service—then "the Federal agency must reinitiate consultation *immediately*."  50 C.F.R. § 402.14(i)(4) (emphasis added).  Here, Plaintiffs challenge the FWS's programmatic ITS on

numerous grounds, including that it fails to quantify the permissible take, and thus fails to set a

reinitiation trigger.  For the reasons set forth below, the Court agrees that the FWS's

programmatic ITS is unlawful.

The analysis here "is not taxing."  *Center for Biological Diversity v. Ross*, 613 F. Supp.

3d 336, 345 (D.D.C. 2020).  The ESA requires the Service to specify "the impact of [the]

incidental taking on the species," 16 U.S.C. § 1536(b)(4)(C)(i), and the implementing regulations

define "the impact" to mean "the amount or extent[] of such incidental taking on the species," 50

C.F.R. § 402.14(i)(1)(i).  The regulations further provide that the Service may use a "surrogate

. . . to express the amount or extent of anticipated take," if it "explains why it is not practical to

express the amount or extent of anticipated take," and it "sets a clear standard for determining

when the level of . . . take has been exceeded."  *Id.*  In selecting an appropriate "surrogate," the

Service can look to "similarly affected species," *id.*, or to measurable "changes in ecological

conditions affecting the species," *Wildlife Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th

Cir. 2010).[16]  But whether the Service sets a numerical take limit for the listed species or, if

necessary, uses a surrogate, the regulations unambiguously require that it to set "a clear standard

for determining when the level of anticipated take has been exceeded."  50 C.F.R.

§ 402.14(i)(1)(i).  Under no circumstances may the Service fail, in any way, to "specif[y] the

impact."  16 U.S.C. § 1536(b)(4).

---

[16] *See also Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Engineers*, 538 F.
Supp. 2d 242, 257 (D.D.C. 2008) (accepting ecological surrogate of harm to habitat as a
permissible surrogate for quantifying take); *but cf. Oceana, Inc. v. Ross*, 2020 WL 5995125, at
*12–13 (D.D.C. Oct. 9, 2020) (rejecting shrimp fishing "effort" as an inadequate surrogate for
turtle take based on insufficient explanation); *Pritzker*, 75 F. Supp. 3d at 497 (rejecting surrogate
that pegged 161 turtle takes to 252,323 dredge hours without sufficient explanation);

As discussed above, the ITS serves two functions:  It provides a safe harbor for regulated parties, while ensuring that the ESA's core goal of "afford[ing] first priority to . . . saving endangered species," *TVA*, 437 U.S. at 185, remains front and center.  *See CBD v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (explaining that the ITS "serves as a check on the agency's original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species]" (alteration in original)).  Those who comply with the terms and conditions set forth in an ITS—including its numerical take limits—are protected from Section 9 liability.  16 U.S.C. § 1536(o).  But when the numerical take limit (or its surrogate) is exceeded, the safe harbor offers no shelter, and the Service and action agency must *immediately* reinitiate consultation to determine whether the original "no jeopardy" determination remains valid.  *See Salazar*, 695 F.3d at 909; 50 C.F.R. § 402.14(i)(4); *id.* § 402.16(a)(1) (requiring reinitiation "[i]f the amount or extent of taking specified in the incidental take statement is exceeded; *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038–39 (9th Cir. 2007) (rejecting ITS for using improper surrogate that authorized the take of all spotted owls in certain acreage, which could not be measured during the course of the project and thus did not set forth an adequate reinitiation trigger).

Here, the FWS's programmatic ITS omits this essential term.  *See Oceana*, 2020 WL 5995125, at *23 (holding that the ITS included in a shrimp BiOp was inherently flawed because it did "not function as an automatic trigger and no amount of further explanation by the agency" could remedy that flaw.  It sets no numerical take limit, offers no surrogate, and provides no "clear standard for determining when the level of anticipated take has been exceeded."  50 C.F.R. § 402.14(i)(1)(i).  Instead, the BiOp and ITS once again fall back on a claimed inability to make the necessary determinations at the programmatic level and once again look to the non-

74

statutory technical assistance process to fill the scientific and regulatory gap.  Dkt. 112-5 at 139–40 (BiOp).  Neither argument can withstand scrutiny.

To start, as Plaintiffs persuasively argue, it is difficult to believe that the FWS lacked information sufficient to permit it to quantify numerical take for *any* species given the wealth of previous permit and ESA consultation data at their disposal.  *See* Dkt. 98 at 42.  The FWS's stated "inability to anticipate the *locations* of future State 404 permit applications," Dkt. 112-5 at 139 (BiOp) (emphasis added), moreover, is both implausible (the Corps was in the midst of reviewing permit applications at the time the assumption application was approved) and beside the point.  The FWS failed to explain why or how the *location* of future projects is inescapably tied to incidental take limits for *all* endangered or threatened species in the State.  *See Conner*, 848 F.2d at 1454.  Consider the Florida panther, for example.  The FWS failed to explain why it was unable to set a numerical limit on incidental take based on previously issued BiOps and incidental take statements.  If there are about 150 panthers left in Florida, for example, it is not difficult to imagine a cumulative take limit per year for the entire State (or for particular regions of the State).

Given the wealth of information and experience that the FWS has in assessing threats to listed species in Florida, the FWS was at least required to offer *some* meaningful explanation for why it could not do more.  *See State Farm Mutual Automobile Ins. Co.*, 463 U.S. at 52 ("The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" (citation omitted)).  By any measure, it is not enough—on a question of this importance—merely to assert in conclusory terms that "because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the []FWS to accurately estimate the specific amount of

incidental take at this time that is anticipated to occur as a result of the action."  Dkt. 112-5 at 140 (ITS).

The Federal Defendants offer little by way of response.  They cite to cases holding that numerical take limits are not always required and that surrogates may at times be used.  Dkt. 99 at 76 (collecting cases).  That assertion is literally correct, but it overstates the precedential support for what the EPA and the FWS have sought to do here—namely, issue an ITS intended to confer ESA immunity on the EPA, the State, and future state-permittees, without (1) setting a take limit or (2) employing a surrogate.  Notably, in a case that has been briefed beyond the point of exhaustion, the parties have identified only one case—*Cooling Water*—in which a court has upheld a final ITS that lacked either a numerical take limit or a surrogate.  For the reasons explained above, however, that case is both distinguishable and unpersuasive.

A couple of additional observations regarding *Cooling Water*, moreover, bear on the present discussion.  First, *Cooling Water* itself recognizes that "an ITS that 'contains no numerical cap . . . *normally* violates the ESA.'"  905 F.3d at 77 (emphasis added) (quoting *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012)).  To be sure, the case that *Cooling Water* cites for this proposition also held, as the Second Circuit noted, that an ITS need not set a numerical take limit if it explains "why it was impractical to" do so.  *Ctr. for Bio. Diversity*, 698 F.3d at 1127.  But in that case, *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012), the Ninth Circuit held that the impracticality of setting a numerical limit was "self-evident, in light of the very large number and minute size of [the] fish eggs and fry" at issue, and, more importantly, stressed that the ITS "did not ignore the incidental take issue, *but instead used a surrogate for determining incidental take levels*."  *Id.* at 1127 (emphasis added).

Second, the Eleventh Circuit's decision in *Defenders of Wildlife* is once again more persuasive than *Cooling Water*.  Recall that *Defenders of Wildlife* involved a Navy project that involved two stages: the (1) installation and (2) operation of an Undersea Warfare Training Range.  733 F.3d at 1113.  Although the initial BiOp did not include an ITS for the operation phase, the Eleventh Circuit concluded that "the NMFS provided a valid reason" for this omission—and, more importantly, the court stressed that the NMFS merely "postpone[d] the issuance of an incidental take statement" until the operation stage was scheduled to occur years later.  *Id.* at 1123.  As the Eleventh Circuit explained, the absence of an ITS meant that *any* take would require "reinitiating consultation" and that, in any event, "the Navy ha[d] repeatedly committed to obtaining the required . . . incidental take statement during a future consultation with the NMFS, prior to operations on the range commencing."  *Id.* at 1124.  The ITS in *Cooling Water* and the ITS in the instant case, in contrast, extend take liability protection through incidental take statements that lack a numerical take limit or a surrogate.  In this respect, *Cooling Water*—and this case—stand alone.

Ultimately, the Federal Defendants once again fall back on the technical assistance process and argue that the "FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance."  *See* Dkt. 99 at 79.  As previously explained, that argument improperly seeks to replace the statutory and regulatory ESA regime with a process defined in a BiOp and various memoranda that differs in important respects from the governing law.  Most notably, when the take limit set forth in an ITS is exceeded, the action and consulting agencies are required immediately to reinitiate consultation under Section 7.  50 C.F.R. §§ 402.14(i)(4), 402.16(a)(1).  The Federal Defendants' assertion that, "[i]f [the] FWS's

assumptions about [the technical assistance process] prove incorrect or warrant changes to the implementation of the State program, it *could* . . . trigger reinitiation of consultation if effects occur that were not considered," Dkt. 106 at 38 (emphasis added), is both hopelessly noncommittal and, in any event, at odds with the terms of the ITS, which contain no program-level reinitiation trigger and, indeed, expressly disavows any such obligation.

> After reciting the regulatory standard for reinitiation, the ITS provides as follows:

> For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat *shall not trigger reinitiation* of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the []FWS has *no obligation to conduct section 7 consultation* on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with [the] []FWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed.

Dkt. 112-5 at 143 (ITS) (emphases added). Term and Condition 9, in turn, provides that *Florida*—not the FWS—will "reopen" *individual permits*—not Section 7 consultation at the program-level—in the event of new information or exceedance of take as authorized in the original permit. *Id.* at 142 (BiOp). So, in short, the ITS provides that the federal agencies—the FWS and the EPA—will *not* reinitiate formal consultation, (1) even if the take limits set in the state-issued permits (with input from the FWS) are exceeded and (2) even if new species found in Florida are listed as endangered or threatened. In the words of the ITS, "[s]ince the State [will] administer the CWA 404 program, the []FWS has *no obligation* to conduct section 7 consultation on individual permits." *Id.* at 143 (emphasis added). Thus, in this and in other

respects,[17] the technical assistance process provides far less robust ESA protection of listed species than the ESA procedures it supplants. *See* 50 C.F.R. § 402.16(a)(1) (requiring reinitiation of formal consultation "[i]f the amount or extent of taking specified in the incidental take statement is exceeded"); *id.* § 402.16(a)(4) (requiring reinitiation "[i]f a new species is listed . . . that may be affected by the identified action"); *see also Am. Rivers v. FERC*, 895 F.3d 32, 48–49 (D.C. Cir. 2018) (stressing the need for a trigger to reinitiate formal consultation).[18]

The District Court for the District Court of Montana's analysis in *Forest Service Employees for Environmental Ethics*, which rejected a similar scheme, is persuasive. There, the court considered a biological opinion prepared by the FWS for use of chemical fire retardant. 726 F. Supp. 2d at 1195. The FWS's BiOp in that case did not include an ITS, instead explaining that take would be "authorized through emergency consultation on a case-by-case basis" because of uncertainty over where and to what extent the fire retardant would be used. *Id.* at 1205, 1231. The court rejected this approach as inconsistent with the ESA. "The problem with the ESA agencies' approach," the court explained, "is that it means that the first and only meaningful analysis under Section 7(a)(2) will occur during emergency consultation." *Id.* at

---

[17] Plaintiffs also challenge the ITS's "reasonable and prudent measures" and terms and conditions on the ground that neither created new, additional requirements on the EPA or Florida. Dkt. 98 at 44. An ITS must specify "reasonable and prudent measures" deemed "necessary or appropriate" to minimize incidental take from the action in question. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(ii). And an ITS must also set forth "terms and conditions (including, but not limited to, reporting requirements) that must be complied with" in order to implement the reasonable and prudent measures specified. 16 U.S.C. § 1536(b)(4)(iv); 50 C.F.R. § 402.14(i)(1)(iv).

[18] As the Federal Defendants point out, *see* Dkt. 106 at 39, the BiOp requires *Florida* to provide the FWS with an annual report summarizing the number of permits issued or denied and a "table that identifies all ESA-listed species taken by state 404 permitted activities along with the amount or extent of such take," Dkt. 112-5 at 142 (BiOp). Florida's reporting requirement, however, is not the equivalent of a reinitiation trigger which ordinarily serves to compel the FWS to immediately reinitiate consultation and reasses its original no jeopardy determination.

1231.  The result is "biological opinions that purportedly constitute Section 7 consultation" but "defer[] significant aspects of the required Section 7 analysis until emergency consultation."  *Id.*  There, all that stood "between the listed species and take from exposure to fire retardant is an undefined emergency consultation process," in contrast to cases like *Conner*, *Defenders of Wildlife*, and *North Slope*, where, as discussed above, future site-specific biological opinions will be prepared in full compliance with Section 7.  *Id.* at 1232.

The Federal Defendants' final argument is that the EPA's continued oversight of Florida's implementation of the Section 404 program saves the above-identified deficiencies in the programmatic BiOp and ITS.  *E.g.*, Dkt. 99 at 62; Dkt. 106 at 29, 41.  The Federal Defendants point to, for example, the EPA's right to review those permits with "reasonable potential for affecting endangered or threatened species," as determined during the technical assistance process.  *See* Dkt. 55-1 at 304 & n.2 (MOA between the EPA and FDEP); *see also* 33 U.S.C. § 1344(j); 40 C.F.R. § 233.51.  To be sure, if the EPA objects to a permit and the State does not address its objection, the authority to issue that permit reverts to the Corps.  33 U.S.C. § 1344(j); 40 C.F.R. § 233.20(b); *id.* § 233.50(j) ("In the event that the Director neither satisfies [the] EPA's objections or requirement for a permit condition nor denies the permit, the Secretary shall process the permit application.").[19]  Similarly, at the program-level, if the EPA determines that Florida is "not administering" its 404 program "in accordance with" the requirements of the CWA, then the EPA may withdraw its approval and return the program to the Corps.  33 U.S.C. § 1344(i).

---

[19] Director means the state director, *see* 40 C.F.R. 233.2, and Secretary means Secretary of the Army, *see* 40 C.F.R. 233.1(a) (first mention).

But the EPA's oversight of individual permits and authority to withdraw its approval of an assumption application, as established under the CWA, are not substitutes for the FWS's distinct duty under the ESA.  The EPA's oversight pursuant to a different statute—the CWA—serves a different purpose and does not determine whether and when incidental take liability protection is available under the ESA.  Oversight is intended to ensure that a state program is operating as approved, not to remedy a violation of the ESA.

The long and short of it is that the ESA creates two paths for extending take liability coverage: Section 7 (consultation for federal actions) and Section 10 (incidental take permits for non-federal actions).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that the EPA and the FWS constructed in the ITS at issue in this case.  That ITS was issued without the benefit of any species-specific analysis in the BiOp; it contains no numerical take limit and provides no surrogate for one; and it expressly disavows any duty to reinitiate formal consultation pursuant to Section 7 should the EPA's approval of the State's Section 404 program result in excess take or otherwise jeopardize the continued existence of an endangered species.  It is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be set aside.  5 U.S.C. § 706(2)(A).

\*   \*   \*

For all of these reasons, Plaintiffs are entitled to summary judgment on Counts Three, Four, Six, and Thirteen.

2. *ESA Claims Against the EPA*

Plaintiffs bring two ESA claims against the EPA:  First, they allege that the EPA unlawfully relied on the FWS's BiOp when it approved Florida's assumption application.

Second, they allege that the EPA failed to consult on nesting sea turtles and other species under the jurisdiction of the NMFS.  The Court addresses each claim in turn.

a.    The EPA's Reliance on the Biological Opinion

The EPA was required, pursuant to the ESA, to ensure that its approval of Florida's assumption application would not jeopardize any listed species.  16 U.S.C. § 1536(a)(2).  As the action agency, the EPA bore the "ultimate responsibility for compliance with the ESA."  *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006).  Arbitrarily relying on a faulty BiOp violates that duty.  *Id.*  Plaintiffs and the Federal Defendants, however, dispute the standard that this Court should apply.  The Federal Defendants argue that Plaintiffs must point to some "new" information that the Service should have considered in order to succeed on this claim; Plaintiffs argue that the "new" information standard does not apply to a facially invalid BiOp.

To an extent, each side has a point.  The Federal Defendants are correct that an agency can withstand an arbitrary and capricious challenge to an "admittedly weak" BiOp, if there is "no 'new' information . . . the [Service] did not take into account[,] which challenges the [biological] opinion's conclusions."  *Id.* at 76 (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) and then citing *Defs. of Wildlife v. EPA*, 420 F.3d 946, 959, 976 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Assoc. of Home Builders*, 551 U.S. 644 (2007); and *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459–60 (9th Cir. 1984)).  As the D.C. Circuit explained in *City of Takoma v. FERC*, this rule strikes a balance between two competing sets of considerations.  *Id.* at 75–76.  On the one hand, a court's review of an action agency's reliance on a BiOp differs from its review of the sufficiency of the BiOp itself.  *Id.* at 75.  The question is not "whether the BiOp itself is somehow flawed," but "whether the action agency's reliance [on it] was arbitrary and capricious."  *Id.* (emphasis omitted).  That assessment must be

made, moreover, in light of the unique "expertise of the consultant agency," which "would be seriously undermined" if the action agency was required "to undertake an independent analysis" of the relevant data and science.  *Id.* at 76.  On the other hand, however, "the two inquiries [necessarily] overlap to some extent, because reliance on a facially flawed BiOp would likely be arbitrary and capricious."  *Id.* at 75.  And given the action agency's "ultimate responsibility for compliance with the ESA," "the action agency must not blindly adopt the conclusions of the consultant agency."  *Id.* at 76.

The "new" information rule makes eminent sense when dealing with the types of expert, technical, and scientific judgments made by consulting agencies.  In those circumstances, the action agency can and should typically defer to the reasoned conclusions of the experts.  But that logic fails when a BiOp is "facially flawed" or when the alleged flaw in a BiOp is legal in nature, because discerning this type of flaw "requires no technical or scientific expertise," *Defs. of Wildlife*, 420 F.3d at 976.  In observing that an action agency's "reliance on a facially flawed BiOp would be arbitrary and capricious," *City of Tacoma* makes just this point.  460 F.3d at 75.  The distinction finds additional support, moreover, in the D.C. Circuit's decision in *Shafer & Freeman Lakes Environmental Conservation Corporation v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021).

In that case, the D.C. Circuit considered whether the action agency, the Federal Energy Regulatory Commission ("FERC"), unreasonably relied on a BiOp prepared by the FWS.  With respect to the FWS's scientific judgments, the *Shafer* court applied the "no new information" standard.  The court explained, "because the Service acted reasonably in using a linear scaling methodology, [FERC] too acted reasonably in relying on the Service's resulting scientific judgments in the Biological Opinion."  992 F.3d at 1093.  Quoting *City of Tacoma*, the *Shafer*

court once again stressed that in deciding whether FERC acted reasonably, "'the critical question [was] whether [FERC's] *reliance* [on the Service's BiOp] was arbitrary and capricious.'" *Id.* (internal citation omitted).

But that did not end the *Shafer* court's relevant analysis.  In the following section of the opinion, the court took up the plaintiffs' distinct "*legal objection* to the Biological Opinion and [FERC]'s reliance on it."  *Id.* at 1093 (emphasis added).  And, in considering that question, the court applied the "facially flawed" standard and held that FERC's reliance on the BiOp was unreasonable.  *Id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75).  The *Shafer* court did not ask whether the plaintiffs had identified any new information not considered, concluding instead that "the Service's complete failure to address an important issue was apparent on the face of the Biological Opinion."  *Id.*  In sum, then, when confronted with a *scientific* or *technical* challenge to a BiOp, the *Shafer* court applied the "new information" standard, and, when confronted with a *legal* challenge to the BiOp, the court applied the "facially flawed" standard.  *Shafer*, 992 F.3d at 1093 (citing *City of Tacoma*, 460 F.3d at 75); *see id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75).

Applying that same distinction here, the Court is persuaded that the EPA impermissibly relied on a facially flawed BiOp.  As in the final section of the *Shafer* decision, the programmatic BiOp at issue here entirely fails to address essential questions, and, instead, defers those question for another day and another process that is untethered to Section 7.  The Court will not repeat its critique of the FWS's BiOp here but, instead, simply notes that the deficiencies do not involve scientific or technical judgments about which fair minds might differ.  To the contrary, major swaths of what the ESA and its governing regulations require a consulting agency to consider in a BiOp are simply absent.  Indeed, for example, the BiOp makes no effort to undertake *any*

species-specific effects analyses whatsoever. *See, e.g.*, Dkt. 112-5 at 129–30 (BiOp). As in the final section of the *Shafer* opinion, these inadequacies raise questions of law, rather than science.

The EPA was as well situated as the FWS, for example, to decide whether the ESA permits the consulting and action agencies to defer all species-specific effects analyses to a non-statutory, technical assistance process that does not occur until after the federal action is complete and that lacks a trigger for reinitiating consultation because it does not specify any take limits, numerical or otherwise. In fact, if anything, this case flips the usual presumption on its head: Here, it was the action agency (the EPA) and the applicant (Florida) that proposed the technical assistance process to the consulting agency (the FWS) and that performed the initial legal analysis. As a result, this case is a far cry from one in which the action agency can reasonably claim that it deferred to the expertise of the consulting agency. *See City of Tacoma*, 460 F.3d at 75–76 (rationale for "new information" standard is to give action agency a basis for doubting the expert conclusions).

Because the BiOp and ITS that the FWS issued in this case were facially and legally flawed, the EPA unreasonably relied on those documents in approving Florida's assumption application. Plaintiffs are entitled to summary judgment on Count Ten.[20]

---

[20] Plaintiffs separately allege in Count Twelve that the EPA failed to consult with the FWS regarding Florida's nesting sea turtles. Plaintiffs explain that more than 90% of all sea turtle nesting in the continental U.S. occurs in Florida, and yet, the record contains no mention of them. *See* Dkt. 98 at 41; Dkt. 104 at 29–30. The Federal Defendants respond that Plaintiffs have not identified "any habitat that would be in or near assumed waters," the action area in question. Dkt. 106 at 36. The Court views Plaintiffs' turtle-specific challenge as subsumed by their larger claims that the FWS failed to evaluate the effects of the agency action on *any* species and that the EPA relied on the FWS's facially invalid BiOp and ITS. For these reasons, Plaintiffs are entitled to summary judgment on Count Twelve.

b.    The EPA's "No Effect" Determination

Whenever an agency action "may affect" a listed species in the "action area," the agency

must consult, as applicable, with the FWS, which administers the ESA with respect to species

under the jurisdiction of the Secretary of the Interior, and with the NMFS, which administers the

ESA with respect to species under the jurisdiction of the Secretary of Commerce.[21]  *See* 16

U.S.C. § 1536; *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.  Only if the action agency

determines that its actions will have *no* effect on listed species or critical habitat may it forego

consultation.  50 C.F.R. § 402.14(a), (b).  The "action area" includes "all areas to be affected

directly *or indirectly* by the Federal action and not merely the immediate area involved in the

action."  50 C.F.R. § 402.02 (emphasis added).  "Effects of the action may occur later in time

and may include consequences occurring outside the immediate area involved in the action."  *Id.*

Here, the EPA requested formal Section 7 consultation with FWS.  It did not, however,

request consultation with the NMFS.  As the EPA explained in its September 2, 2020 letter to the

NMFS, the NMFS had previously informed the State that no "ESA-listed species under [the]

NMFS'[s] jurisdiction . . . occur in waters that are assumable by the [S]tate based on the ESA-

listed species that were identified . . . as part of th[e] proposed assumption."  Dkt. 112-2 at 351.

The NMFS had concluded, based on discussions with the State, a review of various mapping

products and analysis, and a review of documentation provided by the State, that no ESA-listed

species "under NMFS'[s] jurisdiction" are found "in the waters that are assumable by the

[S]tate."  Dkt. 112-4 at 207.  Unsurprisingly, then, the day after the NMFS received the EPA's

---

[21] The NMFS (also known as "NOAA Fisheries") currently has jurisdiction "over 164
endangered and threatened marine species (79 endangered; 85 threatened)."  NMFS, *Species
Directory*, https://www.fisheries.noaa.gov/species-directory/threatened-
endangered?oq=&field_species_categories_vocab=All&field_region_vocab=All&items_per_pag
e=350 (last visited Feb. 15, 2024).

September 2, 2020 letter, it "provided a courtesy concurrence of this determination."  Dkt. 112-2 at 352.  What matters for present purposes is that the EPA's no-effect determination, and the NMFS's "courtesy concurrence," were based on the premise that no listed-species within NMFS jurisdiction "occur" *in* the assumable waters.

The problem with this determination is that it misapprehends the relevant "action area." As explained above, the relevant "action area" is not limited to areas that are directly affected by the agency action but also includes areas indirectly affected, including areas outside the "immediate area involved in the action."  50 C.F.R. § 402.02.  Nor was that error self-evidently harmless; to the contrary, the record suggests that listed species under NMFS jurisdiction may well have been affected by the EPA's decision.  The BiOp observes, for example, that "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem," Dkt. 112-5 at 112 (BiOp), raising the prospect that the EPA's action might affect listed species outside assumable waters.  At a minimum, the EPA was required to provide a reasoned basis for considering affects only in the assumable waters and failing to consider "an important aspect of the problem," *State Farm Mut Auto. Ins. Co*., 463 U.S. at 43—that is whether species found in areas beyond the assumable waters might be "indirectly" affected by the agency action.  The EPA's failure to consider the potential effects on any listed species under the jurisdiction of the NMFS that occur outside the assumable waters, but within the action area as defined by 50 C.F.R. § 402.02, and failure to offer a reasoned basis for that omission, runs afoul of the APA's arbitrary and capricious standard.

Although the Federal Defendants continue to maintain that the EPA's initial "no effect" determination was reasonable, the EPA has, "[o]ut of an abundance of caution," "undertaken to address [the] issue."  Dkt. 99 at 85.  In response to Plaintiffs' notice of intent to sue, the EPA

stated that it had "considered th[e] issue further" and was "preparing a Biological Evaluation." Dkt. 112-3 at 301.  Nearly two years later, the EPA informed the Court that its biological evaluation was complete and had been transmitted to the NMFS.  *Compare id.* (dated December 20, 2021) *with* Dkt. 113 ("Notice of Completion of Biological Evaluation" filed July 19, 2023). At oral argument another three months later, in October 2023, counsel for the Federal Defendants informed the Court that the NMFS did "not have a timeline for completion of any consultation at this time."  Dkt. 156 at 87 (Oct. 19, 2023 Hrg. Tr.).

For the reasons explained above, the EPA's "no effect" determination was arbitrary and capricious at the time it was made—and at the time the agency approved the State's assumption application without the benefit of consultation with the NMFS.  The EPA may be correct that its "ongoing work should provide a more fulsome analysis and ultimately resolve the matter," Dkt. 99 at 85, but Plaintiffs are not required to wait forever, and the EPA has had years to correct is omission.  Nor can the Court conclude that this claim is "likely moot," Dkt. 102 at 60, based on the EPA's ongoing informal consultation with the NMFS.  *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 316 F. Supp. 3d 1156, 1174–75 (N.D. Cal. 2018) (claim of failure to consult not mooted by reinitiation because relief is available in injunctions and vacatur).  Because the EPA has not issued a superseding effects determination or BiOp addressing NMFS-listed species and because the EPA was required to complete the Section 7 process before deciding to approve Florida's application, Plaintiffs' claims are not moot.  *Cf. Oceana*, 2020 WL 5834832, at *4 (agreeing with NMFS argument that reinitiation alone did not moot case, but the issuance of a new, superseding BiOp would).

Plaintiffs are entitled to summary judgment on Count Eleven.

C.        **Remedy**

That brings the Court to the question of remedy.  Although the parties asked to brief

remedy following the Court's ruling on summary judgment, Dkt. 98 at 15 n.2 (Plaintiffs); Dkt.

99 at 34 n.13 (Federal Defendants); Dkt. 102 at 60 (Florida), the posture of the case shifted with

CBD and Sierra Club's motion for a temporary restraining order or preliminary injunction, Dkt.

135.  At the January 30, 2024 hearing on that motion, the Court sought the parties' views on

what remedy would be appropriate if the Court were to identify substantial flaws in the

programmatic BiOp and ITS.  The Court subsequently authorized and the parties submitted

supplemental briefs on that question.  Dkt. 157 (Intervenor Cameratta); Dkt. 158 (Federal

Defendants); Dkt. 159 (Intervenor Tarpon Blue Silver King I); Dkt. 160 (Florida); Dkt. 161

(Plaintiffs).

The APA directs that "[t]he reviewing court shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706.  "[A]lthough vacatur is the normal

remedy," courts in this circuit "sometimes decline to vacate an agency's action."  *Allina Health

Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The decision whether to vacate turns

on the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d

146 (D.C. Cir. 1993), which consider (1) the "seriousness of the order's deficiencies" and (2) the

likely "disruptive consequences" of vacatur.  *Id.* at 150–51 (internal citation omitted).

The Court has now held that the FWS's programmatic BiOp and ITS, and the EPA's

reliance on those documents in approving Florida's assumption application, violate both the ESA

and the APA.  Under the APA, the normal remedy is vacatur of the FWS's BiOp and ITS, as

well as the EPA's approval of Florida's program.  Defendants, nonetheless, argue that vacatur is

not warranted and that the Court should, instead, remand the matter for further consideration.
Dkt. 158 at 2; Dkt. 160 at 3.  Doing so, they explain, would prompt the FWS to reopen formal
consultation with the EPA and would allow the FWS to "correct any errors or deficiencies
identified by the Court."  Dkt. 158 at 4.  The FWS could, in their view, "clarify that the ESA
obliges it to use the best available science in providing technical assistance to FDEP," *id.*, and
"strik[e] particular language in the ITS," Dkt. 160 at 3.

With respect to the first *Allied-Signal* factor, Defendants argue that any deficiencies are
not serious because the FWS and the EPA had a good faith and reasonable belief, based on
*Cooling Water*, that the programmatic approach taken in the BiOp and ITS, and the technical
assistance process, were lawful.  Dkt. 158 at 3–4; Dkt. 160 at 3–4 (discussing *Cooling Water* and
arguing that this case presents "*at least* a close call" (emphasis in original)).  On the second
factor, they argue that vacatur would be highly disruptive because it would introduce regulatory
uncertainty in Florida regarding "how to seek incidental take coverage under the ESA,"
particularly given the "successful implementation of the program for the past three years."  Dkt.
158 at 5; *see also* Dkt. 160 at 5 ("Over 1,130 days have elapsed since Florida's Section 404
program commenced.").  To this, the State adds that remand without vacatur would pose little, if
any, harm to Plaintiffs or the public because the technical assistance process "remains protective
of listed species and ensures no jeopardy."  Dkt. 160 at 6.[22]

As for the EPA's approval of Florida's assumption application, the Federal
Defendants argue that any deficiencies in the BiOp and ITS—no matter how grave—did not

---

[22] The intervenors join in these arguments.  *See generally* Dkt. 157; Dkt. 159.  Cameratta seems
to suggest that the Court should allow its permit to move forward based on assurances provided
in its brief, but it identifies no legal basis for such a remedy.  *See* Dkt. 157 at 2 ("In the interim of
the remand, Cameratta would prepare and submit to [the FWS] and [the FWC] a site-specific
biological assessment . . . .").

infect the EPA's approval of Florida's assumption because the EPA did not rely on the BiOp in

approving Florida's program.  Dkt. 158 at 6.  On their telling:

> EPA's approval action rested, in relevant part, on the agency's determination
> that Florida had "the authority" to "issue permits which . . . apply and ensure
> compliance with . . . the [404(b)(1)] [G]uidelines," 33 U.S.C. § 1344(h)(1)(A)(i),
> including the requirement that no permit shall issue that "[j]eopardizes the
> continued existence of" ESA-listed species or "results in likelihood of the
> destruction or adverse modification" of critical habitat, 40 C.F.R.
> § 230.10(5)(b)(3).  EPA reached that determination based on its review of the
> regulations in Florida's program submittal, not in the BiOp.

Dkt. 158 at 6.  But that argument is belied by the Federal Defendants own words in this very

case.  They observed in their cross-motion for summary judgment that the "EPA of course relied

on the BiOp, but so too does virtually every action agency that issues a rule following a no-

jeopardy determination by one of the consulting agencies."  Dkt. 99 at 43.  It is also belied by the

fact that the consultation considered one—and only one—federal action, the EPA's decision to

approve Florida's Section 404 assumption application.  And it is further belied by the fact that

the Federal Defendants and Florida justified the issuance of an ITS, which accorded incidental

take protection on the EPA, Florida, and future, state-permittees, on a theory that required far

more than assessment of whether Florida had the authority, under state regulations, to protect

ESA-listed species.

 Plaintiffs' operative complaint asks the Court, among other things, to "[v]acate and set

aside []FWS' programmatic biological opinion and incidental take statement for the challenged

EPA decision and remand with instructions for reopening and reinitiating consultation" and

"[e]njoin the EPA's approval and transfer of authority to the state."  Dkt. 77 at 58 (Am. Compl.

¶¶ (m), (p)).  In their supplemental brief, Plaintiffs renew those requests and argue that the Court

should vacate the BiOp, technical assistance process, and ITS.  Dkt. 161 at 7.  Plaintiffs also

argue that because the EPA relied on an invalid BiOp and ITS to justify its approval of Florida's

program, that approval must be set aside as unlawful as well.  *Id.* at 12–13.  The Plaintiffs also

seek, for the first time, injunctive relief that "restores the Corps' authority over permits that may

affect ESA-listed species."  Dkt. 161 at 12.

> 1.      *The Biological Opinion and ITS*

The Court concludes that it should vacate the BiOp and ITS.  The Court agrees, as all

parties request, that this vacatur should be prospective and should not call into question

previously issued Section 404 permits.  Dkt. 158 at 5; Dkt. 160 at 7; Dkt. 161 at 11 & n.12.

With respect to the first *Allied-Signal* factor, the Court concludes that the flaws in those

documents are serious, and that these flaws cannot be cured merely by further explanation or

changes to the technical assistance process on remand.  *See Conservation Law Found.*, 37 F.

Supp. 3d at 271 (vacating agency action is proper where there is "no question that the agency has

violated the law and absolutely no possibility of the [agency action's] survival on remand"); *Ctr.*

*for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (vacating biological

opinion because "neither *Allied-Signal* factor provides a reason to depart from the standard

vacatur remedy"); *Forest Serv. Emps for Env't Ethics*, 726 F. Supp. 2d at 1232 (vacating

programmatic biological opinion that deferred analysis to later, site-specific FWS review).

Nor is the gravity of those flaws mitigated by the fact that the Federal Defendants and

Florida modeled the programmatic BiOp and ITS on *Cooling Water*.  As explained at length

above, *Cooling Water* is both distinguishable and the lone decision that has ever approved the

use of a programmatic BiOp and ITS that fails to undertake any species-specific analysis, fails to

set any numerical take limits or to employ surrogates to set a clear standard for determining

when the level of anticipate take has been exceeded, and that purports to accord ESA-liability

protection on future permittees without those limits.  Other settled precedent, moreover, has long

raised serious questions about the approach the EPA and the FWS took here.  Finally,

Defendants cite no authority for the proposition that vacatur is not required when an agency acts

with some good faith basis to believe that its actions are lawful.  To the contrary, such good faith

is generally presumed, yet the presumptive remedy under the APA remains vacatur.

With respect to the second *Allied-Signal* factor, courts typically focus on the disruption

that might result from "an interim change," which "may itself be changed" at a later date—that

is, the disruption that might result from flipflopping policies.  *Ross*, 180 F. Supp. 3d at 246

(internal quotations omitted) (quoting *Allied-Signal*, 988 F.2d at 150–51).  Here, Defendants

have failed to show that the EPA can—and is likely to—reinstate the type of non-statutory

incidental take protection that applied under the technical assistance program.  This does not

leave the Federal Defendants, the State, or state-permittees without options, moreover.  A

permittee can still, for example, seek protection under Section 10, and, indeed, one of the two

developers that has intervened here was in the midst of doing so when the FWS issued is

programmatic ITS.  *See* Dkt. 135-8 at 29 (Tarpon Blue Silver King I, LLC).  In addition, as the

New Jersey model and the administrative record in this very case show, the EPA and the State

can pursue other options.  Those options, however, are appropriately explored and crafted by the

administrative agencies and the State—and not by the Court.

Finally, the Federal Defendants point to a "prolonged delay in the issuance of individual

Section 404 permits in Florida now pending with the State."  Dkt. 158 at 8.  The Court does not

doubt that some disruption will occur, but the record says little about the extent of that

disruption, and, in any event, setting aside unlawful agency action almost always results in some

disruption.  Here, moreover, as discussed below, only a small percentage of state-permits require

some form of ESA incidental take protection.  Finally, the type of disruption that Defendants

invoke is inherent in the Section 404 program.  The Court is unaware of any complaints of

disruption that were lodged when the EPA transferred Section 404 permitting authority from the

Corps to the State, and the CWA anticipates that, if the State does not administer the program in

accordance with the CWA, the EPA can—and should—withdraw its approval of the assumption.

The Court will, accordingly, **VACATE** effective immediately the FWS's programmatic

BiOp and ITS.

> 2.   *The EPA's approval of Florida's assumption application*

Next, the Court must consider how the *Allied-Signal* factors apply to the EPA's

decision granting Florida's assumption application and whether the Court should vacate that

decision, in whole or in part, pending further consideration on remand.

Here, the Federal Defendants' principal argument for why the ordinary remedy of vacatur

is unwarranted is that the EPA did not rely on the programmatic BiOp and ITS in approving

Florida's assumption application under the CWA.  But, as explained above, that argument carries

little weight.  *Cf. Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601–02 (D.C. Cir. 2023)

(directing district court to vacate BiOp but allowing challenged rule to stay in place because the

court was "not convinced the error [in the BiOp] is fatal to the rule").  The Court, accordingly,

undertakes its own analysis of whether to vacate the assumption decision.

With respect to the first *Allied-Signal* factor, the Court remains convinced that the

ESA violation was a serious one, which will not easily be remedied on remand.  "In such

circumstances—where there is no question that the agency has violated the law and [there is]

absolutely no possibility of the [agency action's] survival on remand—the D.C. Circuit has

suggested that the rule ought to be vacated."  *Conservation Law Found.*, 37 F. Supp. 3d at 271

(citing *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).  "Section 7 of the

ESA is the most powerful safeguard in environmental law, and in the section 404

program," Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A*

*Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the*

*States*, 54 Md. L. Rev. 1242, 1259 (1995), and by eliding the requirements of Section 7, the

Federal Defendants committed a serious error.  In the ordinary course, the Court would have

little difficulty in concluding that error of this magnitude requires vacatur.

Here, however, the extent to which the ESA violations infect the overall Florida

assumption program is far from clear.  Most recently, Florida has told the Court that "just 1.4%

of Florida 404 permit applications" are likely to adversely affect species.  Dkt. 160 at 8.  That

estimate, however, is considerably smaller than the State's representation leading up to the

adoption of the assumption program "that approximately ten percent of Section 404 permits

issued in Florida require some form of incidental take coverage."  Dkt. 112-2 at 3.  But, either

way, it seems likely (or at least possible) that a large percentage of the permits at issue will have

no effect on listed species.  It is even less clear, though, whether the EPA would have

approved—or Florida would have asked the EPA to approve—an assumption application that did

not provide incidental take protection to Florida permittees through the programmatic ITS and

technical assistance program.  *See, e.g.*, Dkt. 112-3 at 369.

For similar reasons, it is also difficult to make a definitive determination regarding the

second *Allied-Signal* factor on the present record.  To start, the assumption has been in place now

for over three years, giving rise to some expectation interests among the affected parties.  The

Court also recognizes that Florida has expended funds to implement its 404 permitting program

and that some, although far from insurmountable, administrative difficulties would result from

returning the permitting authority to the Corps.  But the real question comes down to whether,

and, if so, the extent to which vacatur could lead to further administrative flipflopping and confusion. For the reasons explained throughout this opinion, the Court is skeptical that the EPA and the FWS will be able to replicate the current assumption program on remand and, more generally, is skeptical that the FSW and the EPA can accord incidental take liability protection on future, state-permittees without requiring Section 10 consultation, without relying on the CWA process for federalizing permits where appropriate (as in New Jersey), or, at the very least, preparing a dramatically different BiOp and ITS than those addressed above. The question whether the EPA could authorize a more modest assumption—and whether Florida would want it to do so—thus, cannot be answered on the present record.

Anticipating these issues, the Federal Defendants and Florida request that, if the Court is inclined to vacate the assumption decision, (1) it vacate the approval only as to those projects in the "may affect, likely to adversely affect" category, as those are the projects "*indicating incidental take*," Dkt. 160 at 7–8 (emphasis in original) (Florida); (2) it stay the order of vacatur for at least six months "to allow the federal and state agencies to chart a new course," *id.* at 7 (Florida); or (3) it postpone the effective date of its vacatur by at least 180 days, Dkt. 158 at 8 (Federal Defendants).

After considering these requests and weighing the seriousness of the defects as well as the potential disruptive consequences of vacatur, the Court concludes that the appropriate remedy is to **VACATE** the EPA's approval of Florida's assumption application. The Court will, however, permit Defendants to seek a limited stay of that vacatur within ten days of this decision. Any such request should exempt all pending and future permit applications that "may affect" any listed species under the jurisdiction of the FWS or the NMFS and should propose a mechanism for determining which permit applications "may affect" listed species. Because the

APA does not "contemplate that a court should substitute its judgment for that of the agency," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978), the Court will leave it to the administrative agencies to determine, at least in the first instance, whether any such stay is desirable and workable, and, if so, how it should work.  Finally, the Court notes that this invitation to seek a limited stay is not intended to foreclose any arguments Plaintiffs may have to the contrary or to pretermit Plaintiffs' remaining claims, which challenge the assumption decision more broadly.

Having vacated the BiOp, ITS, and assumption decision, the Court will **DENY** as moot CBD and the Sierra Club's motion for a temporary restraining order and preliminary injunction. Given the Court's decision, neither of the two permits that they seek to enjoin can issue, and, even if the Court eventually grants a limited stay of its vacatur of the assumption decision, and even if those permittees were willing to risk ESA liability without the protection of the ITS or a Section 10 permit, the State will lack authority under Section 404 to issue those permits.

Finally, the State requests that the Court enter partial final judgment pursuant to Federal Rule of Civil Procedure 54(b).  Dkt. 160 at 2 n.1.  The Court will **DENY** that request as premature but will permit the State to renew its request after the parties have reviewed this decision and have decided whether to seek a limited stay of the Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has decided how to proceed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, Dkt. 98, is hereby

**GRANTED** with respect to Counts 3, 4, 6 and 10–13 of Plaintiffs' Amended Complaint, Dkt.

77.  The Federal Defendants' cross-motion for summary judgment, Dkt. 99, and Defendant-

Intervenors' cross-motion for summary judgment, Dkt. 101; Dkt. 102, are hereby **DENIED**  as to

those same Counts.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 15, 2024

# EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al*.,

         *Plaintiffs*,

    v.

MICHAEL S. REGAN, *et al*.,

         *Defendants*.

Civil Action No. 21-119 (RDM)

---

## FLORIDA INTERVENORS' MOTION FOR STAY OF VACATUR ORDER PENDING APPEAL (EXPEDITED RULING REQUESTED)

---

Pursuant to Federal Rule of Appellate Procedure 8, the State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively Florida Intervenors) respectfully request an order staying, *in full*, this Court's February 15, 2024 order vacating the Environmental Protection Agency's (EPA's) approval of Florida's Clean Water Act (CWA) Section 404 assumption application, pending resolution of Florida Intervenors' appeal to the United States Court of Appeals for the District of Columbia Circuit.

Over two months ago, this Court rejected Florida Intervenors' request in remedy briefing for a stay of any *eventual* vacatur order and, after issuing the vacatur order, the Court permitted Florida Intervenors to seek *only* a "limited stay" of the vacatur order subject to specific Court-imposed "conditions" for any such stay. Dkt. 163 at 96. Via motion filed on February 26, 2024, Florida Intervenors promptly sought the conditional limited stay that this Court said it would be willing to consider. Dkt. 166. Florida Intervenors repeatedly urged a swift ruling on the stay

motion. The Court did not rule until April 12, 2024, when it denied Florida's limited stay motion. Dkt. 184. On the same date, this Court dismissed Counts 1, 2 and 5 as prudentially moot, and recognizing that "Florida should be allowed to appeal" the February 15 ruling "without delay," Dkt. 183 at 25, and that Florida has "a legitimate and substantial interest in obtaining prompt appellate review of a decision and order that set aside a program to which it has devoted extensive time and effort," *id.* at 26, this Court entered partial final judgment as to Counts 1-6 and 8-13 pursuant to Rule 54(b). Dkt. 184.

Florida Intervenors have filed a Notice of Appeal. Dkt. 185. Given the urgency of the situation, Florida Intervenors submit this request for a full stay of the Court's vacatur order pending appeal and request a ruling on this motion within seven (7) days (by April 23, 2024), at which time Florida Intervenors would intend to seek a full stay of this Court's vacatur order from the D.C. Circuit. Florida Intervenors sought the position of the other parties on Florida's request for a full stay and for expedited ruling from this Court. Plaintiffs oppose Florida's request for a stay pending appeal and for a decision within 7 days, which Plaintiffs argue would not allow Plaintiffs adequate time to respond. Plaintiffs aver that they requested, but did not receive, any new information from Florida that would support a request for a stay or for urgent relief.  Plaintiffs therefore request that they be provided at least 10 days to respond once they have seen the motion.  Federal Defendants reserve their position until after they review this motion.

## I.     LEGAL STANDARD

This Court has authority to stay its vacatur order pending appeal.  *NAACP, v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018) ("Under Federal Rule of Civil Procedure 62(c), district courts generally have the authority to stay their orders pending appeal."). Courts "may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities

of the case suggest that the status quo should be maintained." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 844–45 (D.C. Cir. 1977).

Courts consider four factors when deciding whether to grant a stay of a vacatur order pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In recent cases, courts in this Circuit continue to consider these factors on a "sliding scale," whereby "a strong showing on one factor could make up for a weaker showing on another." *NAACP*, 321 F. Supp. 3d at 146. Accordingly, a court may issue a stay pending appeal "if a serious legal question is presented, little if any harm will befall other interested persons or the public, and denial of the order would inflict irreparable injury on [movants]." *Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555, 560–61 (D.D.C. 2018) (cleaned up) (citing *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844).

## II.  ARGUMENT

### A.  Likelihood of Success on the Merits

In the D.C. Circuit, to satisfy the "likelihood of success" factor, the movant must show only "that the issue on appeal presents a 'serious legal question' on the merits." *Cigar Ass'n of Am.,* 317 F. Supp. 3d at 560 (citing *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844; *see also Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 211, 216 (D.D.C. 2021) ("[I]n this Circuit a movant's failure to demonstrate a likelihood of success on the merits does not preclude a stay if they have raised a 'serious legal question on the merits.'" (internal citations omitted)). Courts may look to "the complexity of the issues raised by [Movants] on

appeal" to determine whether the "case presents serious legal questions on the merits." *Cigar Ass'n of Am.,* 317 F. Supp. 3d at 562. Under this standard, Florida Intervenors easily demonstrate a substantial likelihood of success on appeal. Serious legal questions exist concerning several central issues. These reasons, taken alone or together, demonstrate a substantial likelihood of success for purposes of this stay factor.

### i. This Court's Decision Conflicts with *Cooling Water*

Florida Intervenors have a substantial likelihood of persuading the Court of Appeals that this Court erred by rejecting Judge Lohier's unanimous opinion in *Cooling Water Intake Structure Coal. v. EPA,* 905 F.3d 49, 61, 71-78 (2d Cir. 2018), as well as distinguishing it on its facts.

In *Cooling Water*, the Second Circuit upheld a programmatic biological opinion/incidental take statement (BiOp/ITS) used in an analogous circumstance (i.e., a programmatic BiOp/ITS that applied to EPA's adoption of a program that allowed states to issue permits where species impacts would be addressed through state permits on a site-specific basis with "technical assistance" from federal agencies and incidental take coverage for state permittees). This Court, however, found that "*Cooling Water* is at odds with the statute, regulations, and caselaw." Dkt 163 at 66. When a district court disagrees with the decision of another court addressing a "serious legal question," especially where that disagreement is with a unified panel of a court of appeals, district courts have found that the likelihood of success factor favors a stay. *See Cigar Ass'n of Am.,* 317 F. Supp. 3d at 561-62 (holding that low likelihood of success on the merits was not fatal to motion for stay pending appeal, where issues being appealed presented complex and serious legal questions). This Court's fundamentally different legal approach from that taken by the Second Circuit shows "there is potentially persuasive authority for [Florida's] legal position" and the issues being appealed "present[] serious legal questions on the merits," which favors granting a stay pending appeal.

*Cigar Ass'n of Am.*, 317 F. Supp. 3d at 561-62 (internal citations omitted). Florida Intervenors and Federal Defendants both relied heavily on the Second Circuit's analysis and holding in *Cooling Water* to defend the agency actions at issue in this litigation. *See, e.g.,* Dkt. 46 at 14; Dkt. 81 at 29.

The Second Circuit explained the ESA take liability framework in the programmatic context and addressed FWS's *requirement* under Section 7(b)(4) to "provide an [ITS]" and Section 7(o)(2)'s broad coverage for any "taking that complies with measures specified in an ITS." *Cooling Water*, 905 F.3d at 61, 71-78. The Second Circuit also discussed the programmatic BiOp/ITS and noted that quantification of incidental take would be addressed as part of the "site-specific permitting process." *Id.* at 63. Under that BiOp/ITS, the ESA's incidental take exemption extends to "any take incidental to the operation of a CWIS permitted under the Rule *through the implementation process*" if a permittee complies with the species-related provisions "as reflected in the permit." EPA-HQ-OW-2018-0640-0688-A5 at 75-76. And, as noted previously, this issue of extending take liability coverage to state permittees was briefed to the Second Circuit. EPA-HQ-OW-2018-0640-0673 at 11 n.23. The Second Circuit specifically noted that the CWIS Rule itself did not "independently authorize take," and the court cited the portion of the CWIS Rule preamble found at "79 Fed. Reg. at 48,382," where EPA explained FWS' commitment as part of the technical assistance process to provide the reasonable and prudent measures necessary for authorizing take. *Cooling Water*, 905 F.3d at 75 n.16.

The Second Circuit correctly upheld the 316(b) BiOp/ITS, expressly holding that the BiOp is "consistent with the ESA and its implementing regulations," that the ITS is also "consistent with the ESA," that the "EPA and the Services acted within, and did not unlawfully delegate its statutory authority by including provisions in the [316(b) rule] that allow the Services to advise the EPA and [States] on the site-specific impacts of [cooling water structures on listed species]," and that

"the EPA and the Services did not violate the ESA by engaging in formal consultation on the proposed rule." *Id.* at 84.

This Court also disagreed with the Second Circuit's reliance on the Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013). Both Florida and Federal Defendants have relied on the Eleventh Circuit's decision in *Navy* to support the flexible programmatic consultation approach here. *See* Dkt. 100 at 82; Dkt. 102 at 25 n.13; Dkt. 106 at 43. This Court's view of *Navy* is, at least, debatable, which further supports a stay pending appeal. 733 F.3d at 1121 (finding that a programmatic BiOp/ITS does *not* need to ensure that review of species impacts is "coextensive in scope with the entire action," and explaining that "[i]t is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate").

While this Court also distinguished the current facts from the situation in *Cooling Water*, there are serious contrary arguments that make it at least debatable whether the state 404 and state 316(b) contexts are, in fact, distinguishable such that a BiOp/ITS in one context cannot serve as an exemplar for the other. Dkt. 163 at 64. As Florida Intervenors and Federal Defendants have consistently argued, the BiOp/ITS at issue in *Cooling Water* closely mirrors the Florida 404 program BiOp/ITS – indeed, that was *intentional*, as this Court itself has recognized. Dkt. 163 at 66 ("[T]he programmatic BiOp and ITS of *Cooling Water* are similar to those now before the Court."). In virtually all significant respects, the Florida 404 BiOp/ITS mirrors the 316(b) BiOp/ITS. For instance, the *Cooling Water* BiOp/ITS involved a federal water discharge permit program implemented *in 47 states through state-issued permits* with ongoing federal review procedures very similar to those at issue here. And the *Cooling Water* BiOp/ITS employed a "technical assistance process" – with features going above and beyond what is otherwise required

for mere CWA compliance purposes – for ensuring that state permits were adequately protective of listed species *as determined by federal agencies*, with federal (EPA) oversight on a permit-by-permit basis, as well as incidental take coverage for state permittees who complied with the ITS terms and conditions. These are all of the same basic features of the Florida 404 BiOp/ITS.

This Court's rationale for distinguishing these two situations is incorrect, or at least debatable. First, this Court's "rule promulgation/application approval" distinction is not relevant to whether consultation is triggered under Section 7 of the ESA and the ultimate form of that consultation. Section 7 consultation is triggered based on whether an "***agency action***" (which includes both rules and approval of program applications) may affect listed species (informal) and/or "are likely to adversely affect" listed species (formal). 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that ***any action authorized, funded, or carried out by such agency*** (hereinafter in this section referred to as an "***agency action***") is not likely to jeopardize the continued existence of any endangered species or threatened species...") (emphasis added). Here, it is undisputed that EPA's review of Florida's Section 404 program application appropriately triggered Section 7 formal consultation. And because EPA was reviewing a program where species impacts would be determined on site-specific actions under the program, EPA and FWS properly engaged in programmatic formal consultation. Whether an "agency action" is "carried out" via "rule promulgation" or "application approval" (or via other means for that matter) is simply not a relevant distinction. Second, this Court distinguished *Cooling Water* based on the notion that "the requirements of the 316(b) technical assistance process were codified as part of the rulemaking, creating ***legally binding responsibilities for all parties***," whereas the "'Final Notice' published in the Federal Register approving Florida's program makes no mention of the technical assistance process or any of its

procedures.…" Dkt. 163 at 65 (emphasis added). This, too, is not a relevant distinction, nor is it correct. As previously briefed, the Florida 404 species review process was comprehensively described in the State's program application including (among other places) in the MOU entered between FDEP, FWS, and the Florida Fish and Wildlife Conservation Commission (EPA-HQ-OW-2018-0640-0016-A2); and in the Florida 404 Handbook (HQ-OW-2018-0640-0002-A20 at 6, 23-24). EPA reviewed the anticipated technical assistance procedures described in the Florida 404 application documents. Ultimately, this process was integrated with the technical assistance process established in the BiOp/ITS.  FDEP and FWS *must and do* participate in the species review process as part of the Florida 404 program, including the technical assistance process. *See* Dkt. 127-1 at 3-4 (reciting obligations to participate in species review process). It is a binding process.

### ii.  This Court's interpretation of Section 7 of the ESA, at a minimum, raises serious legal questions.

This Court's approach to Section 7 consultation is also in conflict with the text of ESA Section 7.[1] At the threshold level, ESA Section 7(a)(2) applies to "any action authorized" by a federal agency, 16 U.S.C. § 1536(a)(2), which encompasses EPA's approval of a state program. Where that agency action is likely to adversely affect but not jeopardize listed species or adversely modify critical habitat, Section 7(b)(4) provides that FWS/NMFS "shall provide" a written incidental take statement to not just "the Federal agency" (here, EPA) but also to "the applicant concerned" (here, FDEP as the applicant for EPA approval). 16 U.S.C. § 1536(b)(4)(C). That written statement must, among other things, "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or

---

[1] In its ESA analysis, this Court focused on the species "conservation" aspects of the ESA while omitting any mention or discussion of Section 2(c) of the ESA, which expressly recognizes congressional policy that "[f]ederal agencies shall *cooperate with [s]tate and local agencies* to resolve water resource issues in concert with conservation of endangered species." 16 U.S.C. § 1531(c)(2) (emphasis added).

applicant (if any), or both.…" *Id*. § 1536(b)(4)(C)(iv). In turn, Section 7(o)(2) provides incidental

take coverage in broad fashion for "any taking" resulting from that action so long as it "is in

compliance with the terms and conditions specified in [FWS's] written statement.…" *Id*. §

1536(o)(2). This is the textual basis for extending incidental take coverage to state permittees in

this context.

Rejecting that interpretation, this Court adopted Plaintiffs' view that the *only* avenue for

incidental take liability coverage for state 404 permittees is an incidental take permit under ESA

Section 10(a)(1)(b), 16 U.S.C. § 1539(a)(1)(b). But that narrow view ignores the broad text of ESA

Section 7(o)(2) exempting "any" incidental take in compliance with terms and conditions in an

ITS. *See* 50 C.F.R. § 402.14(i)(5); *see also* EPA-HQ-OW-2018-0640-0660-A1 at 6-7 (explaining

why incidental take coverage extends to state permittees in this context). While FWS "shall" issue

an ITS, FWS "may" issue an ITP. In fact, an ITP is a potential avenue for obtaining take liability

protection where no federal involvement exists that would otherwise ensure that a private activity

does not jeopardize listed species; of course, in the 404 assumption context, there is *extensive*

*ongoing federal involvement* in the form of federal approval of the state 404 program application,

along with continuous federal review of impacts to species on a permit-by-permit basis and

continuous EPA oversight on a permit-by-permit basis. In a context with such extensive ongoing

federal involvement, Section 7 is the better fit.

### iii.  Plaintiffs lack standing for these claims.

Florida Intervenors have a substantial likelihood of success in showing that Plaintiffs lack

Article III standing. Dkt. 102 at 13-15, 27-41; Dkt. 107 at 5-19. At a minimum, whether Plaintiffs

have standing for these claims raises serious legal questions. Appellate courts frequently review

standing to determine the "success on the merits" prong. *See, e.g., I.N.S. v. Legalization Assistance*

*Project of L.A. Cty. Fed. of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, Cir. J., in chambers) (granting application to stay district court order pending final disposition by the Court of Appeals because the plaintiff likely lacked standing); *Tex. Dem. Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020) (discussing standing in the context of likelihood of success on the merits); *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 323 (D.D.C. 2018) (same). As argued thoroughly in prior briefing, Plaintiffs lack Article III standing in this case. Florida Intervenors are substantially likely to succeed in showing that the District Court ignored good reasons to deny standing for these claims and that the Court erroneously based standing injury on facts arising after the complaint was filed. Plaintiffs have not shown standing as to their substantive claims, nor have they carried their burden of proving standing for procedural claims built on theories of informational injury. Though this Court rejected the Article III-based challenges raised by Florida Intervenors, the substantial legal questions involving standing further support a stay.

### iv. Vacatur is an Improper Remedy in this Cooperative Federalism Context Where the Federally-Approved State Program Has Been in Place for Over Three Years with Thousands of Permit Actions Completed and Thousands Pending.

Whether this Court should have vacated the program also raises serious legal questions. This Court conceded that it was "difficult to make a definitive determination" on whether vacatur was appropriate, yet the Court still determined that vacatur of the entire Florida 404 program was the proper remedy. Dkt. 163 at 95. Under *Allied Signal*, a court must assess "the seriousness of the order's deficiencies" and the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted). Here, both factors strongly favored remand without vacatur. Despite the fact that the influence of the BiOp/ITS on "the overall Florida assumption program is far from clear," this Court still decided to impose the most extreme remedy possible: vacating the

entire program, not just vacating and/or remanding the allegedly flawed BiOp/ITS. Dkt. 163 at 94. This remedy not only misapplied the *Allied-Signal* factors, but this Court's underlying analysis for vacatur was premised on a misunderstanding of other state 404 programs. Vacatur places Florida on unequal footing with other states.

For the litany of reasons already provided to this Court, Florida Intervenors have demonstrated that they are likely to succeed on the merits, or at a minimum, that the appeal raises a "serious legal question on the merits." *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844.

### B.  Irreparable Harm

"Where a party can demonstrate 'probable success on the merits," the party need only establish a "possibility of irreparable injury.'" *Fund For Animals v. Norton,* 281 F. Supp. 2d 209, 219 (D.D.C. 2003) (internal citations omitted). Here, Florida Intervenors easily satisfy the irreparable harm requirement. As discussed in earlier briefs and as supported by the multiple declarations submitted by the Florida Intervenors over the course of this litigation,[2] vacatur of the Florida 404 program has caused irreparable harm and will continue to do so.

First, the State of Florida has experienced and continues to experience irreparable harm to the State's sovereign interests in the conservation and management of water resources and wildlife – both areas of traditional state responsibility. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 161 (2001) (recognizing "States' traditional and primary power over land and water use"). The vacatur order pulled the plug on Florida's 404 program governing water resources throughout the State of Florida after that program had been firmly in place *for over three years*, with thousands of permitting actions throughout the state. Courts have frequently held that the loss of state sovereignty in cooperative-federalism programs constitutes irreparable

---

[2] *E.g.,* Dkt. 149-1, Dkt. 160-1, Dkt. 166-1.

harm. *See e.g., Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of "state sovereignty and state management of land" as an irreparable harm); *Kentucky v. Biden*, 23 F.4th 585, 611–12 n.19 (6th Cir. 2022) (discussing "invasions of state sovereignty" as harms that cannot be monetarily addressed); *West Virginia v. U.S. EPA*, 669 F. Supp. 3d 781, 807 (D.N.D. 2023) (holding that "the loss of the State's sovereignty is an irreparable harm"); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (holding that an "increase in [federal] CWA jurisdiction by 2.84 to 4.65% annually" would cause "[l]oss of sovereignty [which] is an irreparable harm."). In *Georgia v. Pruitt*, the court specifically found that a state losing sovereignty over 1.81% of its waters was irreparable harm. 326 F. Supp. 3d at 1367. Losing primary state responsibility over all assumed waters to the Corps of Engineers, after more than three years of state program implementation, causes Florida a unique, irreparable, and ongoing injury to its sovereign interests.

Second, although the Court's February 15 vacatur does not retroactively impact existing Florida 404 permit holders, it does impede FDEP's authority to enforce the 404 program for all permittees. At the time of the vacatur, FDEP was forced to cease operating the Florida 404 permitting program, which included the immediate pause of investigations for any potential violations of the 404 program. It is unclear whether FDEP has legal authority to take actions to ensure compliance and/or pursue enforcement actions for any 404 violations in Florida. This confusion is even more pronounced where, as a result of this Court's vacatur order, FDEP appears to have no enforcement authority over potential violations of 404 permits issued by FDEP.

Even if the Jacksonville District of the Corps has added a handful of new employees recently, the District serves four separate states and territories with a mission that encompasses much more than just processing 404 permits in assumable waters within Florida. Nor do those

staffing numbers compare favorably to the more than 300 FDEP certified wetlands evaluators, compliance and enforcement personnel, and other FDEP staff working on the Florida 404 program. These impacts to Florida's ability to process permits for water resources, ensure compliance with those permits, and enforce violations within its boundaries is an irreparable harm that cannot be monetarily addressed.

Third, over 1,000 permit applications were pending in the FDEP 404 process and as a result of the vacatur order these projects face delay, regulatory limbo and/or will be forced to start their 404 application process essentially from "square one" with the Corps.  Indeed, over the last two months since vacatur of the program, it is expected that at least fifty state 404 individual permits and modifications would have been issued by FDEP.[3] Florida Intervenors' prior briefs recount the state's extensive work over of the course of several years to prepare and apply for assumption of the Section 404 permit. Dkt. 37 at 20-37; Dkt. 102 at 14-36. Among the over 1,000 permit applications that were pending in Florida at the time of the vacatur order, many involved high-value projects including everglades restoration work, transportation projects, grid reliability projects, new medical facilities, new school projects, sewer system improvement projects, housing projects, and over 200 other public projects. This means the State of Florida has lost the benefit of these projects moving forward in a timely manner, has lost the time and resources expended on the processing of more than a thousand 404 permits, and has lost the additional time expended applying for and generally administering the 404 program in Florida.

---

[3] In the two-year period immediately preceding the February 15 vacatur order, FDEP issued 634 individual final permits or individual permit modifications under the 404 program. This averages to approximately 26 individual permits or permit modifications issued each month by FDEP and does not include the numerous general permits or other 404 permitting actions taken by FDEP. Accordingly, in the two months since vacatur, it is likely that at least 50 individual permits or permit modifications would have been issued by FDEP.

Fourth, there are significant fiscal impacts to the State of Florida arising from the vacatur of EPA's approval of Florida's 404 program. Florida expended substantial resources applying for and obtaining approval of its 404 program application. After EPA's approval, Florida expended even more resources on staffing, organizing, and implementing the 404 program.

Fifth, vacatur also eliminates critical efficiencies gained in the 404 permitting process in Florida. One of the central rationales behind seeking 404 assumption was the regulatory efficiencies to be gained from coordinating the issuance of Florida Environmental Resource Permit permits and 404 permits. For many years prior to assumption of the program, Florida and its citizens experienced significant permit delays, high costs, inefficient processes, and other challenges with the Corps' administration of the Section 404 program. Vacatur resurrects those concerns.

### C.  Balance of Harms and Public Interest

When assessing whether to grant a stay, courts frequently combine their analysis of the third and fourth factors. "Before issuing a stay, it is ultimately necessary ... to balance the equities—to explore the relative harms … as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (citing *Barnes v. E–Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)).  As discussed above, many of the irreparable harms arising from the vacatur order are inflicted on citizens in Florida who are permittees, permit applicants, and potential permit applicants, as well as the beneficiaries of those projects such as residents in senior living communities or affordable housing projects, commuters who would experience reduced traffic congestion and safer roads and sidewalks from proposed projects, communities who would benefit from post-hurricane restoration work, and many other beneficiaries of projects that are currently on hold because of the vacatur order. The disruption of

the state 404 permit process for over a thousand pending applicants, the regulatory uncertainty for all current and future permittees, and the interruption of the state's authority to implement the program will continue to severely harm the public. One of the most significant impacts, of course, is the prolonged postponement of as many as a thousand public projects including environmental restoration projects, roads, bridges, hospitals, housing, schools, and military projects. The vacatur order necessarily requires that *all of these projects* – many of which were far into the lengthy 404 permit process in Florida – to return to square one by refiling their applications with the Corps of Engineers. Recent statements by the Corps, which are not consistent with on-the-ground realities or past experiences, give little comfort to Florida permittees. Permit applicants for these projects have expended significant resources and time in submitting permit applications and responding to additional FDEP requests for information, and with Florida stripped of its authority, these applicants are without reprieve. The harm caused by depriving the public of the benefits of these projects and derailing permit applicants' projects strongly favor a stay.

Absent a stay, the public will also be harmed by the absence of FDEP's authority to enforce the 404 program. As discussed above, Florida's authority to pursue ongoing investigations over non-compliance is hindered. The public interest clearly supports the State of Florida administering and enforcing its Section 404 program, at least for the pending of the appeal of these significant legal questions.

Most significantly, as discussed above, the vacatur order irreparably harms Florida's sovereign interests in the management and conservation of water resources and wildlife in the state, all of which fall squarely in the traditional authority of the states, not the federal government. *Akiachak Native Cmty.*, 995 F. Supp. 2d at 17. Congress made clear that cooperative federalism is at the heart of the CWA, which is why Congress designed its key permit programs to be

implemented and enforced primarily by states. The public benefits when federal and state agencies work cooperatively to achieve shared environmental goals, as has been the case with FDEP, EPA, FWS, FWS, and other agencies working cooperatively to successfully implement the 404 program in Florida.

### III.    CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully request an expedited order granting a full stay of the February 15, 2024 vacatur order pending resolution of their appeal. To the extent this Court intends to deny this motion for a full stay (consistent with its prior rulings on Florida's remedy and limited stay requests), Florida Intervenors respectfully request that such a denial be rendered within seven days (by April 23, 2024), at which time Florida Intervenors intend to seek a full stay of this Court's vacatur order from the Court of Appeals.

Dated:  April 16, 2024                          Respectfully submitted,


                                                BAKER BOTTS L.L.P.

                                                */s/ Jeffrey H. Wood*
                                                Jeffrey H. Wood (D.C. Bar No. 1024647)
                                                700 K Street, NW
                                                Washington, D.C. 20001
                                                Phone: (202) 639-7700
                                                jeff.wood@bakerbotts.com

                                                Aaron M. Streett (TX Bar No. 24037561)
                                                Harrison Reback (TX Bar No. 24012897)
                                                (*pro hac vice*)
                                                910 Louisiana Street
                                                Houston, TX 77002-4995
                                                Phone: (713) 229-1234
                                                aaron.streett@bakerbotts.com
                                                harrison.reback@bakerbotts.com

**CERIFICATE OF SERVICE**

I hereby certify that on this the 16th day of April 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

                                    Respectfully submitted,
                                    BAKER BOTTS L.L.P.

                                    */s/ Jeffrey H. Wood*
                                    Jeffrey H. Wood (D.C. Bar No. 1024647)
                                    700 K Street, NW
                                    Washington, D.C. 20001
                                    Phone: (202) 639-7700
                                    jeff.wood@bakerbotts.com

# EXHIBIT N

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

       *Plaintiffs*,

   v.                                                    Civil Action No. 21-119 (RDM)

MICHAEL S. REGAN, *et al.*,

       *Defendants.*

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the motion of Defendant-Intervenors the State of Florida and the Florida Department of Environmental Protection (hereinafter "Florida") for a stay pending appeal. Dkt. 187. The Federal Defendants "take no position on Florida's motion," Dkt. 188 at 1, and Plaintiffs oppose the motion, Dkt. 189 at 9. For the reasons explained below, the Court will **DENY** Florida's motion.

## I.

Over the past two years, the Court has issued four decisions resolving all but one of Plaintiffs' claims in this case. In March 2022, the Court ruled in favor of the Federal Defendants and Florida with respect to Count 9 of Plaintiffs' original complaint. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022) ("*CBD I*"). Then, in August 2023, the Court held that Count 8 of Plaintiffs' original complaint was non-redressable and, accordingly, dismissed that count for lack of Article III standing. *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496 (D.D.C. Aug. 23, 2023) ("*CBD II*"). In February 2024, the Court issued a decision resolving all of Plaintiffs' claims under the Endangered Species Act

("ESA"), 16 U.S.C. § 1531 *et seq.*  Ruling in favor of Plaintiffs on Counts 3, 4, 6 and 10–13 of their amended complaint, Dkt. 77 (Am. Compl.), the Court set aside the U.S. Fish and Wildlife Service's ("FWS") programmatic Biological Opinion ("BiOp") and Incidental Take Statement ("ITS") and the Environmental Protection Agency's ("EPA") approval of Florida's Section 404 assumption application. *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 655368 (D.D.C. Feb. 15, 2024), *amended by* ___ F. Supp. 3d ___, 2024 WL 1602457 (D.D.C. Apr. 12, 2024) ("*CBD III*").  Finally, on April 12, 2024, the Court dismissed Counts 1, 2 and 5 of the amended complaint on prudential mootness grounds. *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 1591671 (D.D.C. Apr. 12, 2024) ("*CBD IV*").

After resolving all but one count of Plaintiffs' sprawling complaint, at Florida's request, the Court entered partial final judgment as to Counts 1–6 and 8–13 of the amended complaint, concluding that the parties should be permitted to appeal the Court's final decisions on those counts "without delay." *Id.* at *12; Dkt. 184.  On April 15, 2024, Florida noticed its appeal, Dkt. 185, and, the following day, it filed the present motion, which asks the Court to stay its "vacatur order" pending appeal.[1]  Dkt. 187 at 1.  Because Florida requested a ruling on its motion by April 23, 2024, *id.* at 2, the Court directed "any party wishing to be heard on th[e] motion [to] file a response on or before April 22, 2024 at 3:00 p.m.," Min. Order (Apr. 17, 2024).

In response, the Federal Defendants filed a notice taking "no position on Florida's motion for a stay pending appeal," but observing that the U.S. Army Corps of Engineers ("Corps") is currently administering the Section 404 permitting program "in a way that serves the public" and

---

[1] As discussed further below, it is unclear whether Florida is seeking a stay of the Court's order vacating the EPA's approval of Florida's Section 404 assumption application or a stay of that order as well as a stay of the Court's order vacating the BiOp and ITS.  *See generally CBD III*, 2024 WL 1602457, at *43–45.

"is diligently processing permit applications and will continue to do so to mitigate any disruption and delay to applicants."  Dkt. 188 at 1.  Plaintiffs oppose Florida's motion for a stay pending appeal, arguing that a stay would create regulatory uncertainty by allowing Florida to "issue permits pursuant to a program already found to be unlawful, creating questions about the legality of those permits, any incidental take they may purportedly authorize, and any exemption from liability for incidental take that the program might purport to ensure."  Dkt. 189 at 6.

## II.

To obtain the relief it seeks, Florida bears the burden of satisfying "the stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016 (D.C. Cir. 2018); *Archdiocese of Wash. v. WMATA*, 877 F.3d 1066, 1066 (D.C. Cir. 2017).  In deciding whether to grant a stay, the Court must consider four factors: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits;" (2) "whether the applicant will be irreparably injured absent a stay;" (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and (4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  As the Supreme Court has observed, "[t]here is substantial overlap between these [factors] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  "The first two factors of the traditional standard are the most critical," and they require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some 'possibility of irreparable injury.'" *Id.* (internal citations omitted).

3

As an initial matter, Florida submits that the "sliding-scale" approach applies here. Under that approach, Florida argues, it need establish only "a serious legal question on the merits" at the first step, and, (conversely) if it "can demonstrate probable success on the merits," then it need establish only "a possibility of irreparable injury" at the second step.  Dkt. 187 at 3, 11 (internal citations and quotation marks omitted).  Florida is correct that prior to the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the D.C. Circuit applied a "sliding-scale" approach, under which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Since *Winter*, however, the D.C. Circuit has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93); *see also Archdiocese of Wash v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (suggesting that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").  "[I]t remains an open question," however, "whether the 'likelihood of success' factor is an 'independent, free-standing requirement,' or whether, in cases where the three other factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 393, 398).

Despite this uncertainty, two propositions are settled.  First, *Winter* leaves no doubt that a mere "possibility" of irreparable injury is not enough, regardless of the movant's likelihood of success on the merits.  555 U.S. at 22.  As the Supreme Court explained, "[i]ssuing a preliminary

injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*  In short, "a showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted).  That same principle also applies to stays pending appeal.  *See Nken*, 556 U.S. at 434 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor." (internal citation and quotation marks omitted)).  Second, even if the sliding-scale approach *did* apply to irreparable injury, double dipping—or double sliding—is not allowed: that is, a movant cannot argue at the likelihood-of-success-on-the-merits step that a "serious legal question" suffices, and then argue at the irreparable-injury step that a "possibility of irreparable injury" also suffices.  *Contra* Dkt. 187 at 3, 11.

For present purposes, however, none of this matters, because Florida has failed to carry its burden with respect to any of the four factors, even assuming that the sliding-scale approach still applies.

## III.

Although Florida asserts in conclusory terms that it has a "substantial likelihood of success" on the merits, Dkt. 187 at 4, most—if not all—of its argument seeks to clear the lower hurdle of showing that its appeal raises a "serious legal question," *id.* at 4–9.  Florida's argument is based almost entirely on this Court's disagreement with the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018).  But Florida's argument fails to address other portions of the Court's opinion, which explain in detail why the BiOp and ITS at issue in this case failed to comply with ESA and its governing regulations.  *See*

*CBD III*, 2024 WL 1602457, at *25–29, *32–34.  To take one example, the regulations provide

that a BiOp "shall include" a "detailed discussion of the environmental baseline of the listed

species" and a "detailed discussion of the effects of the action on listed species," 50 C.F.R.

§ 402.14(h), yet the BiOp at issue here failed to include "*any* species-specific analysis," *CBD III*,

2024 WL 1602457, at *26 (emphasis in original).  Or, to take another example, "the regulations

unambiguously require that [an ITS] set 'a clear standard for determining when the level of

anticipated take has been exceeded,'" yet the ITS at issue here "omit[ted] this essential term."

*Id.* at *33 (quoting 50 C.F.R. § 402.14(i)(1)(i)).

Moreover, although Florida focuses on the differences between the Court's opinion and

the Second Circuit's opinion in *Cooling Water*, it never explains why this Court's analysis is

wrong—or even subject to serious dispute.  As the Court observed in *CBD III*, the Second

Circuit's analysis of the programmatic BiOp and ITS before it came down to a single paragraph

in the decision.  In that paragraph, the court cited the Eleventh Circuit's decision in *Defenders of

Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), for the following

proposition:  "'[T]he rule that biological opinions must be coextensive in scope with the entire

action or else violate the ESA is nowhere to be found in the language of the ESA.'"  *CBD III*,

2024 WL 1602457, at *30 (quoting *Cooling Water*, 905 F.3d at 73, quoting in turn *Defs. of

Wildlife*, 733 F.3d at 1121).  But, as this Court explained, *Defenders of Wildlife* does not stand

for the proposition that the FWS may, at times, ignore the requirement of preparing a legally

sufficient BiOp—instead, that court merely held that the National Marine Fisheries Service (the

FWS's marine counterpart) may address species-specific effects in phases, as a federal project

moves from planning to implementation.  *Id.*; *see also North Slope Borough v. Andrus*, 642 F.2d

589, 593 (D.C. Cir. 1980).  That phased approach differs markedly from the present context,

where the BiOp and ITS at issue purported to extend ESA liability protection to all future Section 404 permittees in Florida, without *ever* conducting *any* species-specific analysis or including *any* numerical take limits (or surrogates) in the ITS.  As the Court explained, "the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required, 'detailed discussion of the effects of the action on listed species,' 50 C.F.R. § 402.14(g), to a later phase, only to conclude" "that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7."  *CBD III*, 2024 WL 16022457, at *30.

The Court's conclusion followed from the statutory text and implementing regulations. *See id.* at *31.  The Court will not repeat its analysis here but notes that the regulations define "programmatic consultation" and "framework programmatic action" in a manner that permits phased review but that leaves little doubt that the FWS (or the National Marine Fisheries Service) will engage in the required species-specific analysis at some point down the line.  *Id.* Under Florida's reading of the law, in contrast, the core requirements of liability protection under the ESA—that the FWS prepare a detailed BiOp containing the required species-specific analyses and that it issue an ITS containing numerical take limits or their surrogates—can be replaced with a non-statutory, non-regulatory "technical assistance" process.  That might (or might not) make policy sense.  But it is not the law that Congress enacted or that the relevant agencies included in the implementing regulations.  In seeking a stay, Florida never explains why any of the above-described analysis—or any of the other analysis contained in *CBD III*—is incorrect.

As a fallback, Florida argues that it is likely to prevail by showing that Plaintiffs lack standing—or at least that their standing "raises serious legal questions."  Dkt. 187 at 9–10.

7

Notably, the Federal Defendants have never questioned Plaintiffs' standing, and, in the most recent round of briefing, Florida pressed only a narrow challenge to Plaintiffs' standing. *See CBD III*, 2024 WL 1602457, at *17.  For present purposes, apart from referencing its prior arguments, Florida simply asserts that the "Court erroneously based standing injury on facts arising after the complaint was filed."  Dkt. 187 at 10.  In pressing that argument, however, Florida ignores the very next paragraph of the Court's opinion, which points to independent grounds to support Plaintiffs' standing, and Florida ignores the fact that the Plaintiffs' declarations—which were properly offered at the summary judgment stage—merely responded to Florida's own contention that it was administering the Section 404 program in a manner that accorded Plaintiffs all the protection that they would otherwise have received under federal law. *CBD III*, 2024 WL 1602457, at *19–20.

Finally, Florida argues that the Court's decision to set aside the Section 404 assumption decision, rather than remanding without vacatur, "raises serious legal questions."  Dkt. 187 at 10.  But that argument ignores the plain language of the APA, which treats vacatur as the presumptive or "normal" remedy, *see Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020); it ignores D.C. Circuit precedent holding that "remand without vacatur remains an exceptional remedy," *id.* at 519; and, beyond observing that the Court gave serious consideration to whether to limit its vacatur to the BiOp and ITS, it offers no reason to question the Court's ruling, Dkt. 187 at 10.  Even more importantly, it ignores the Court's decision in *CBD IV*, which provides ample reason to conclude that vacating the BiOp and the ITS, but not vacating the Section 404 assumption decision, would invite confusion and inefficiency and would do little, if anything, to preserve the program. *See* 2024 WL 1591671, at *3–4.

For all of these reasons, the Court concludes that Florida has failed to identify any theory of appeal on which it is likely to prevail or that even raises a serious legal question.

## IV.

Florida has also failed to demonstrate that it is likely to suffer an irreparable injury if the Court declines to grant a stay.  As explained above, irreparable injury is the *sine qua non* for injunctive relief and for a stay pending appeal.  *See Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 167.  Here, however, the federal agencies that issued the BiOp and the ITS and that approved Florida's Section 404 assumption application represent that the Corps is ready, willing, and able to administer the Section 404 permitting program in Florida during the pendency of an appeal—as the Corps did for decades before Florida's assumption application was approved and as it does in 47 other States.  The further representations that the Federal Defendants made for purposes of *CBD IV* bear repeating here:

> [A]s of February 15, there were about 1,000 permit applications pending before the State of Florida.  The Corps has identified and allocated resources to process those permits.  And it starts with the Jacksonville District of the Corps, which is the office that has hand[l]ed Section 404 permitting in Florida since forever, pre-assumption . . . .  [T]here are more people in the Jacksonville district today to process [S]ection 404 permits than there were before state assumption.  And it is not just a couple more, it is a couple dozen more.  In addition to the Jacksonville district, there are four other districts within the South Atlantic division.  And the Corps has identified people in the other districts and the South Atlantic division as well as [at] Corps headquarters who can help with the anticipated surge of permits given the number of permits that were pending before Florida.

> And I say the anticipated surge, Your Honor, because Florida has not transferred permits to the Corps yet.  The Corps is prepared to process those permits.  But if those permits exist in a state of regulatory limbo today, I want the Court to understand it is not because the Corps has not taken steps to comply with the Court's Order of February 15th.  The Corps is ready to process permits.

> Now, notwithstanding the fact that we haven't gotten permits from Florida yet.  We have had meetings at the Corps with quite a few project proponents, including project proponents who have permits that were pending before Florida

9

as of February 15th.  And a number of those entities have congressionally approved agreements with the Corps to seek expedited Corps review of Section 404 permit applications for priority projects.

2024 WL 1591671, at *5 (quoting Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.)).  Against this backdrop, Florida offers three arguments in support of its claim of irreparable injury, none of which is persuasive.

First, Florida argues that a stay is required to prevent "irreparable harm to [its] sovereign interests in the conservation and management of water resources and wildlife," which are "both areas of traditional state responsibility."  Dkt. 187 at 11.  But that overstates the State's interest in administering the Section 404 permitting program pursuant to the Clean Water Act.  To be sure, Section 404 of the Clean Water Act, 33 U.S.C. § 1344(g), recognizes that some states may have an interest in administering their "own individual and general permit program[s] for the discharge of dredged or fill material into the navigable waters" of the United States, and it provides a process by which a State may assume the Section 404 permitting authority typically exercised at the federal level by the Corps.  *See also id.* § 1251(b) ("It is the policy of Congress that the States . . . implement the permit programs under sections 1342 and 1344 of this title.").  But the Clean Water Act is a federal statute that protects the navigable waters of the United States.  *See Sackett v. EPA*, 598 U.S. 651, 671 (2023).  In the words of the Supreme Court, it is "the principal federal law regulating water pollution in the United States."  *Id.* at 657–58.  Regardless of whether Florida is authorized to implement that *federal* law with respect to the navigable waters of the United States, it remains free to enforce *state* law and to exercise its traditional sovereign authority to prevent pollution and other environmental harms in the State.  *See, e.g.*, Fla. Stat. § 403.161(1); *id.* § 403.121.  Indeed, as Florida stressed when it filed its Section 404 assumption application, it "administers the comprehensive state Environmental

10

Resource Permitting (ERP) program, which includes permitting dredge and fill activities" and "overlap[s] with the federal Clean Water Act (CWA) Section 404 permitting program approximately 85%." Dkt. 55 at 501. Nothing that the Court has decided curtails in any manner the State's authority to exercise this traditional sovereign authority. In the State's view, it would promote efficiency for a single regulator to administer the federal and state permitting programs—but that is a question of efficiency, not sovereignty.

Second, Florida argues that a stay is necessary to ensure that it has "authority to enforce the [Section] 404 program for all" permits that it has already issued. Dkt. 187 at 12. That, again, raises (at most) an efficiency concern and does not constitute the type of "certain and great" injury necessary to support a stay. *Chaplaincy of Full Gospel Church v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Nor is it even clear that a stay is necessary to promote efficiency in the enforcement of Section 404, since the Corps is currently administering the Section 404 program—as it did before assumption, as it would do in the case of a withdrawal of assumption approval, *see* 33 U.S.C. § 1344(i), and as it does in 47 other States—and it is fully capable of enforcing Section 404 during the pendency of Florida's appeal.

Third, Florida argues that it will suffer irreparable injury in the absence of a stay because "over 1,000 permit applications were pending in the [state Section] 404 process and as a result of the vacatur order these projects face delay, regulatory limbo and/or will be forced to start their [Section] 404 application process essentially from 'square one' with the Corps." Dkt. 187 at 13. But the Federal Defendants have represented to the Court that the Corps will move expeditiously to process the pending applications; that "a project will not go to the back of the line just because the applicant had previously applied to Florida;" and that, "as much as possible," the Corps

11

intends to "pick up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements." *See* Dkt. 181 at 30–31 (Apr. 4, 2024 Hrg. Tr.). Notably, counsel for the Federal Defendants specifically addressed Florida's "square one" argument in the context of *CBD IV*: The "Corps' intention here is not to make people start from square one" but, rather, "to do this as efficiently as possible. *Id.* at 31 (Apr. 2, 2024 Hrg. Tr.).

Finally, Florida argues (1) that a stay is required because the State has "expended substantial resources applying for and obtaining approval of its [Section] 404 program application" and in "staffing, organizing, and implementing the . . . program," and (2) that permitting the Court's vacatur order to stand would "eliminate[] critical efficiencies gained in the [Section] 404 permitting process in Florida." Dkt. 187 at 14. It goes without saying that a stay would do nothing to make Florida whole for its past expenditures and that neither the loss of the benefit that Florida anticipated achieving based on those expenditures nor the efficiencies that it hopes to bestow on future Section 404 permit applicants constitutes "certain and great" harm necessary to support emergency relief. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. It is well settled that neither the "expense" nor the "annoyance of litigation . . . constitute[s] irreparable injury," *United States v. Facebook, Inc.*, 2024 U.S. App. LEXIS 5979, at *2 (D.C. Cir. Mar. 12, 2024) (per curiam), and it follows with even greater force that past expenditures pursuing an application before an administrative agency do not support the issuance of prospective, emergency relief.

The Court, accordingly, concludes that Florida has failed to demonstrate that it is likely to suffer irreparable harm if the Court's vacatur order is not stayed pending appeal.

# V.

With respect to the final two factors, the risk of injury to Plaintiffs and the public interest, Florida reprises many of the arguments discussed above.  In particular, it argues that the public interest is and will continue to be jeopardized by (1) the delays and disruption faced by permit applicants forced to "return to square one by refiling their applications with the Corps;" (2) the absence of State Section 404 enforcement authority in the waters of the United States; and (3) the harm to "Florida's sovereign interests in the management and conservation of water resources and wildlife in the state, all of which fall squarely in the traditional authority of the states, not the federal government."  Dkt. 187 at 15.  Those arguments are unpersuasive for the same reasons explained above.  *See also, e.g.*, Dkt. 188 at 1; Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.).

Finally, the Court notes that it is unclear whether Florida seeks to stay the Court's vacatur of the EPA's Section 404 assumption decision alone or whether it also seeks to stay the Court's vacatur of the FWS's programmatic BiOp and ITS.  *But see* Dkt. 187 at 1 (requesting that the Court stay its "order vacating the Environmental Protection Agency's . . . approval of Florida's Clean Water Act . . . Section 404 assumption application").  That distinction matters.  As explained in *CBD IV*, it is far from clear that leaving Florida with Section 404 permitting authority in the absence of incidental take protection for Florida's developers would serve anyone's interests.  2024 WL 1591671 at *4.  Among other things, few developers would "risk civil and criminal penalties" by engaging in conduct likely to affect listed species without first obtaining incidental take protection.  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023).  But, on the other hand, an order staying the Court's vacatur of the FWS's ITS would have significant repercussions, affecting interests well beyond those identified in Florida's motion.  For example, as Plaintiffs point out, the Court denied as moot the motion for a

temporary restraining order and preliminary injunction, Dkt. 135, which sought to enjoin two permits from issuing that the Center for Biological Diversity and the Sierra Club argued would cause irreparable harm to the critically endangered Florida panther and threatened crested caracara. Dkt. 189 at 32.[2] Having decided the merits of Plaintiffs' summary judgment motion, the Court had no occasion to reach Plaintiffs' motion for a preliminary injunction. *See CBD III*, 2024 WL 1602457, at \*45. But were the Court to stay its decision pending appeal, the Court would, in effect, deny Plaintiffs the preliminary relief that they sought, notwithstanding their likelihood (indeed, certainty) of success on the merits and without ever reaching their claim of irreparable harm.

The Court, accordingly, concludes that factors three and four also weigh against issuing a stay pending appeal.

## CONCLUSION

On a motion for a stay, "it is the movant's obligation to justify the [C]ourt's exercise of such an extraordinary remedy." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). Florida has failed to carry that heavy burden here. Accordingly, Florida's motion for a stay pending appeal, Dkt. 187, is hereby **DENIED**.

**SO ORDERED**.


 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  April 23, 2024

_____

[2] The motion for a temporary restraining order and preliminary injunction, Dkt. 135, was filed by two of the plaintiffs in this case, the Center for Biological Diversity and the Sierra Club.

# EXHIBIT O

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3   CENTER FOR BIOLOGICAL          ) Civil Action
     DIVERSITY, et al.,             ) No. 1:21-CV-119
 4                                  )
                    Plaintiffs,     ) MOTION HEARING
 5                                  )
     vs.                            )
 6                                  ) Washington, D.C.
     ANDREW WHEELER, et al.,        ) October 19, 2023
 7                                  ) Time:  2:08 P.M.
                    Defendants.     )
 8   _____

 9

10                TRANSCRIPT OF MOTION HEARING
         HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
11                UNITED STATES DISTRICT JUDGE

12   _____

13                   A P P E A R A N C E S

14

15   For Plaintiffs:          TANIA GALLONI
                              CHRISTINA REICHERT
16                            BONNIE MALLOY
                              Earthjustice
17                            4500 Biscayne Boulevard
                              Suite 201
18                            Miami, FL 33137

19   For Defendants:          ANDREW COGHLAN
                              ALISON C. FINNEGAN
20                            U.S. Department of Justice
                              P.O. Box 7611
21                            4 Constitution Square
                              150 M Street, NE
22                            Washington, DC 20002

23

24

25
```

2

```
 1                   A P P E A R A N C E S (CONT'D.)

 2

 3       For Intervenor:          JEFFREY H. WOOD
                                  Baker Botts, LLP
                                  700 K Street, NW
 4                                Washington, DC 20001

 5                                LILY N. CHINN
                                  Baker Botts, LLP
 6                                101 California Street
                                  Suite 3200
 7                                San Francisco, CA 94111

 8

 9       Also Present:           AMBER CROOKS, Conservancy of Southwest
                                  Florida;
10
                                  ELISE BENNETT, Center of Biological
11                                Diversity;

12                                DANIEL FRANZ, Defenders of Wildlife;

13                                JUSTIN WOLFE, Florida Department of
                                  Environmental Protection;
14
                                  ERICA ZILIOLI, Army Corps of Engineers;
15
                                  SIMMA KUPCHAN, EPA Office of General
16                                Counsel.

17

18

19

20
         Court Reporter:          Tamara M. Sefranek, RMR, CRR, CRC
21                                Official Court Reporter
                                  United States Courthouse, Room 6714
22                                333 Constitution Avenue, NW
                                  Washington, D.C. 20001
23                                202-354-3246

24

25
```

3

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're here on
 3      Civil Case 21-119, Center for Biological Diversity, et al. v.
 4      Leopoldo Miranda-Castro, et al.
 5              Would counsel please state their names for the record
 6      at the podium, starting with plaintiffs' counsel.
 7              MS. GALLONI:  Good afternoon, Your Honor.  Tania
 8      Galloni on behalf of the plaintiffs.
 9              THE COURT:  Good afternoon to you.
10              MS. REICHERT:  Good afternoon, Your Honor.  Christina
11      Reichert on behalf of the plaintiffs.
12              THE COURT:  Good afternoon.
13              MS. MALLOY:  Good afternoon, Your Honor.  Bonnie
14      Malloy on behalf of the plaintiffs.
15              THE COURT:  Good afternoon.
16              MS. MALLOY:  I'd also like to introduce our clients
17      that are here with us.  Amber Crooks with the Conservancy of
18      Southwest Florida; Elise Bennett with Center of Biological
19      Diversity; and Daniel Franz with Defenders of Wildlife.
20              THE COURT:  Great.  Thank you.
21              MS. FINNEGAN:  Good afternoon, Your Honor.  Alison
22      Finnegan for the federal agencies.
23              THE COURT:  Good afternoon to you.
24              MR. COGHLAN:  Good afternoon, Your Honor.  Andrew
25      Coghlan for federal defendants.
```

1          THE COURT:  Good afternoon.

2          MR. COGHLAN:  And with Ms. Finnegan and I at

3    counsel's table is Simma Kupchan from EPA's Office of General

4    Counsel; and Erica Zilioli from the Army Corps of Engineers

5    counsel's office.

6          THE COURT:  All right.  Thank you for being here.

7          MS. CHINN:  Good afternoon, Your Honor.  Lily Chinn

8    for the intervenors.

9          THE COURT:  Good afternoon.

10         MR. WOOD:  Good afternoon, Your Honor.  Jeff Wood for

11   the State of Florida and the Florida DEP, intervenors.  We're

12   joined here today by Mr. Justin Wolfe, the general counsel of

13   the Florida DEP.

14         THE COURT:  Okay.  Well, welcome to all of you.

15   Thank you.

16         All right.  Well, we're here for argument on

17   plaintiffs' motion for summary judgment, the defendants'

18   cross-motion for summary judgment, and intervenor's motion for

19   summary judgment.

20         There's, obviously, a lot here.  I'll leave it up to

21   you to figure out how you want to organize things, and I will

22   go ahead and start with counsel for the plaintiffs.

23         MS. REICHERT:  Thank you, Your Honor.  Because of the

24   complexity and number of issues in this case, we'd like to

25   divide our argument between the Endangered Species Act claims,

5

1    which I would cover, and the Clean Water Act and Rivers and

2    Harbors Act claims, which my colleague Ms. Galloni would

3    address.

4                    THE COURT:  Okay.  That's fine.

5                    MS. REICHERT:  We would also like to reserve time for

6    rebuttal.

7                    THE COURT:  I will do my best in that regard.  It

8    depends on, I think, how long you-all go and just whether we

9    have enough time left at the end of the day.  But if we do, I'd

10   be happy to allow that.

11                   MS. REICHERT:  Thank you, Your Honor.  And I'd like

12   to start with a quick roadmap of our case in its entirety and

13   then turn to the Endangered Species Act.

14                   THE COURT:  Okay.

15                   MS. REICHERT:  The agency's actions here represent a

16   massive undermining of our core environmental laws, including

17   the Endangered Species Act, the Clean Water Act, and the Rivers

18   and Harbors Act.  It is alarming because the Florida model can

19   be used and applied across our country, including in other

20   areas that are very important to our nation's wetlands and by

21   diversity.

22                   THE COURT:  Isn't -- hasn't it been applied for many

23   years, at least in similar form, for purposes of Section 402

24   permitting?

25                   MS. REICHERT:  Which aspect, Your Honor?

6

1    THE COURT:  Well, I mean, obviously, there's certain

2  aspects, I guess, that don't apply to the source context.  But

3  there are a number of aspects of this that seem to track what

4  is done under Section 402 or what the agency has done --

5  permitted under 402 in the past; the programmatic biological

6  opinions, the programmatic ITS, the reliance on various state

7  enforcement authorities, and things of that nature.

8    MS. REICHERT:  I see.  I'm happy to address, first,

9  the Endangered Species Act portion.

10    For approval of a State 402 program, there is not

11  consultation under the Endangered Species Act, and there's not

12  a programmatic Incidental Take Statement that covers all

13  permitting that undergoes state permitting under a State 402

14  program.  So this is unique.

15    This is also not what has happened for other 404

16  programs that were approved.  The cooling water case, which is

17  cited extensively by the defendants, involves a particular

18  regulatory provision to create technology standards for State

19  402 programs, but it's not about an assumption of a 402

20  program.

21    THE COURT:  I recognize, I guess, the case is not

22  about the assumption of a 402 program, but it's implicit in the

23  analysis from the Second Circuit; at least, where the Second

24  Circuit concludes that the Endangered Species Act requirements

25  are satisfied where the actual permitting decisions are going

 1    to be made, in most cases, by the states.  And that there's

 2    going to be a -- there was only a programmatic Incidental Take

 3    Statement in that case and only a programmatic biological

 4    opinion in that case.

 5         MS. REICHERT:  Your Honor, as we've put forward in

 6    the briefs, cooling water is wrongly decided, and it's contrary

 7    to the law of this circuit, including *North Slope* and *Brownlee*,

 8    where courts here have applied the Connor rule that the agency

 9    must consider all aspects of a federal action before

10    authorizing it under a programmatic biological opinion.

11         THE COURT:  I'm curious whether cooling water is a

12    standalone exception to the rule as far as you're concerned or

13    whether there are other programs under Section 402 -- I assume

14    not under 404 -- but other 402 permitting programs or anything

15    similar to that where the EPA has assigned or allowed a state

16    to assume permitting authority using a similar model.

17         MS. REICHERT:  To our knowledge, Your Honor, the

18    cooling water case stands alone in both the approach of the

19    programmatic opinion and programmatic ITS and also the holdings

20    of the Court.

21         THE COURT:  So, I mean, I read in your briefs, I

22    think, where you indicated that -- well, I'm trying to -- I

23    thought -- and maybe I'm mistaken about this.

24         I thought the defendants represented that, even

25    though there may not be judicial decisions on it, that there

8

1    were other programs that have followed the cooling water model

2    or taken a similar approach, and they may not have been

3    challenged.  But if there are others out there -- I just don't

4    know the answer to that question, whether there are or not.

5           MS. REICHERT:  There haven't been any that have been

6    introduced in briefing as examples of this being done, Your

7    Honor.

8           THE COURT:  Okay.  Thank you.  I apologize for

9    interrupting you so early.

10          MS. REICHERT:  That's all right.  Turning back to the

11    affirmative case, Congress in the Clean Water Act created a

12    minimum set of standards that all state programs must apply and

13    comply with in order to take over the 404 program.

14          Congress also ensured that the Corps would retain

15    jurisdiction over all traditionally navigable waters, and in

16    the ESA, Congress created strong protections for our most

17    imperiled species.  Because the agency's actions here failed to

18    abide by those congressional mandates, they are unlawful and

19    must be vacated.

20          Turning to the ESA, in particular, Florida's wetlands

21    support more than 130 threatened and endangered species,

22    including sea turtles, the West Indies manatee, and the

23    critically endangered Florida panther.  Southwest Florida, in

24    particular, is the last remaining habitat area for the Florida

25    panther, with population estimates as low as 120 species --

 1    adults left in the wild.  The agency actions here threatened

 2    this species, in particular, to the brink of extinction.

 3          U.S. Fish and Wildlife Service here consulted on

 4    EPA's action, which included the transfer of authority to the

 5    state of Florida, as well as the implementation of that

 6    decision; however, it violated the ESA in three ways.

 7          First, U.S. Fish and Wildlife Service discarded the

 8    clear mandates of the Endangered Species Act and its

 9    implementing regulations when it refused to consider the entire

10    action, including general permits, no permit required

11    decisions, and the loss of NEPA and ESA consultation.

12          It also failed to analyze the baseline status of the

13    species considering all current and past activities in the

14    action area.

15          THE COURT:  So I had some questions for you about

16    this topic.  One question I had was, in your view, in engaging

17    in the analysis required in the biological opinion and

18    analyzing the agency action here, is the baseline that Fish and

19    Wildlife should have looked at -- in your view, what were the

20    risks and impacts of taking the program and transferring it

21    from the Corps to the state, or is the baseline that should be

22    looked at no permits are being granted versus these permits

23    being granted for purposes of that type of analysis?

24          In other words, are you supposed to say, well -- for

25    example, if the EPA were of the view that the state was going

1   to do the job just as well as the federal authorities and the

2   Corps, would the answer simply be there's not any impact on any

3   endangered species from this agency action because we think

4   that the state is going to do the job just as well as we're

5   going to do it?  Or is it, instead, you look at and you say the

6   action here is granting permitting authority to the state, the

7   state is going to grant permits, and what they have to look at

8   is -- in granting those permits is the -- the granting the

9   permits going to result in jeopardy to any endangered species?

10          MS. REICHERT:  Yes, Your Honor.  The latter.  Under

11   the Endangered Species Act, the way the baseline is defined is

12   all past and present activities that are done by private,

13   state, and federal actors.  And so that is backward-looking and

14   focused on status of the species themselves at the point where

15   the decision is made.

16          And the impacts of the action are also defined very

17   broadly in terms of what Fish and Wildlife Service was required

18   to consider.  It includes all reasonably foreseeable but-for

19   actions that flow from the agency decision.

20          And so that would include the state issuing permits

21   on areas within the state and the impacts on species from those

22   permits

23          THE COURT:  So what would I look to; just the

24   language of the statute?  Or where would I look to confirm that

25   the baseline is no permit versus issuance of permits versus

1    issuance of permits by the Corps versus issuance of permits

2    issued by the state?

3              MS. REICHERT:  The definitions would be in the

4    federal regulations in 50 CFR 402.02.  And then I think the

5    Court could look to case law, especially the nationwide permit

6    case law, including *Brownlee*, where the Corps was creating new

7    nationwide permits to cover a set of actions that, you know,

8    theoretically, would have been permitted otherwise had the

9    nationwide permit not been created.

10             THE COURT:  And then my other question for you is, if

11   it's the latter and that you -- the baseline is no permit and

12   then you analyze what the issuance of the permits would -- what

13   threat issuance of permits would pose, what would that look

14   like at a programmatic level, that type of analysis?

15             Because you can imagine that it could be a

16   breathtaking challenge.  There are hundreds, if not thousands,

17   of waterways -- probably thousands in Florida.  There are

18   critical habitats.  The program -- the assumption is for time

19   immemorial; it's going to go on forever.

20             And how would Fish and Wildlife go about saying,

21   okay, what is the development going to look like -- all

22   development going to look like with respect to endangered

23   species in the state of Florida over the next 25 years?  And

24   we're going to have to go waterway by waterway and critical

25   habitat by critical habitat and endangered species by

1    endangered species.  I'm trying to get a sense of, if I agree

2    with you, what it means they would have to do and what it would

3    look like.

4         MS. REICHERT:  Thank you, Your Honor.  First, I would

5    say that the Endangered Species Act doesn't require perfect

6    foresight.  It requires them to use the best available

7    information they have to create an assessment of jeopardy.

8         And then the ESA creates reinitiation requirements

9    for when the new information arises or when take limits are

10   exceeded to have the agency look back and reassess and

11   determine if there needs to be changes to protective measures

12   placed in the initial biological opinion so that jeopardy

13   doesn't occur.

14        In terms of a particular example, Your Honor,

15   plaintiffs pointed to the JAXBO Bi Op in our briefs.  This was

16   a biological opinion conducted by the National Marine Fisheries

17   Service.  It covered 10n categories of 404 permits that the

18   Corps would issue in Florida and the Caribbean.  The agency

19   looked at historic permitting data and historic consultations

20   to project future permitting; also adjusted that projection

21   based on development trends.

22        And then the agency analyzed the effects of that

23   future permitting on eight -- on species in particular and

24   created design criteria to minimize the impacts of those

25   permitting actions on species.

13

1            The agency also looked at habitat areas that may be

2    incredibly valuable for these species and created exclusion

3    zones where permitting could not occur, and the agency created

4    protective zones that would require a closer look when

5    permitting occurred in those areas.

6            So it has happened already in Florida using 404

7    permitting data to do the exact analysis that the ESA requires.

8            THE COURT:  And prior to the assumption, is the way

9    this worked is that the Army Corps would have to consult with

10   Fish and Wildlife before granting each and every permit?

11           MS. REICHERT:  No, Your Honor.  There were some

12   programmatic biological opinions in place for particular

13   species where the Corps could use consultation keys to

14   determine, based on those programmatic consultations, whether

15   there would need to be further protections and further

16   consultation with Fish and Wildlife Service.

17           Under those systems, concurrence was still required

18   for Fish and Wildlife.  They couldn't just operate under their

19   own autonomy.  And if they found that there would need to be

20   additional consultation, they would conduct that consultation

21   as required.

22           THE COURT:  Can you give me an example of one of the

23   programmatic ones?

24           MS. REICHERT:  Yes, Your Honor.  There's one for the

25   indigo snake in Florida.  So it would ask questions of the

 1    Corps as to what size of project it was, the location of the

 2    project, whether there were locations of burrows where the

 3    snakes reside.

 4         And then, depending on the answers to those

 5    questions, the agency would calculate the mitigation that was

 6    required and/or find that they have to consult with Fish and

 7    Wildlife Service because there would be an impact of a

 8    magnitude that would require that.

 9         THE COURT:  So here, what they would have had to have

10    done would, essentially, do that, but 130 times over then?

11         MS. REICHERT:  Well, I think, in terms of how the

12    permitting itself would occur, it may not have to be done in a

13    species-specific level.  I think that there could be some form

14    of a technical assistance process where Fish and Wildlife

15    Service is actually required to be engaged on permits and

16    concur on decisions that the state is making where that would

17    be allowable under a programmatic opinion that has real binding

18    requirements on the state as well, like a take limit,

19    mitigation measures, and so forth.

20         THE COURT:  So on the take limit, using that as an

21    example -- for example, if this had been done here and there

22    actually had been the type of biological assessment and the

23    type of Incidental Take Statement that you submit is required

24    here, would it say that -- for example, with respect to the

25    black panther -- is that what it is?

15

1          MS. REICHERT:  The Florida panther.

2          THE COURT:  Florida panther.  I'm sorry.  The Florida

3     panther.

4          With respect to the Florida panther, that that

5     species is so in danger that the incidental take is zero, and

6     we will not -- and that any incidental killing of the Florida

7     panther would constitute a violation.  On the other hand, with

8     respect to the --

9          MS. REICHERT:  Indigo snake could be another example.

10          THE COURT:  The indigo snake, not as endangered.  The

11     species would not be put at risk itself by the loss of a few

12     snakes.  But if a project of X magnitude would result in the

13     incidental taking of more than five snakes or one snake nest,

14     or whatever it might be, that under those circumstances, you

15     could not proceed without further conditions and restrictions.

16     Is that the sort of thing -- and then you go species -- not

17     necessarily species by species, but at least group of species

18     by species and habitat by habitat as -- or critical habitat by

19     critical habitat as well.

20          And they say this particular critical habitat is so

21     at risk in Florida that you just need to -- there's a bright

22     red line around that.  Not only can there not be any actual

23     development in that habitat without risking violating the

24     Endangered Species Act, and we're certainly not going to give

25     you liability protection with respect to anything there; and,

1   indeed, if there's runoff into that area, here are the

2   following restrictions that would have to apply.

3           MS. REICHERT:  Yes, Your Honor.  I believe that is

4   what the JAXBO Bi Op shows was done, because that is what the

5   National Marine Fisheries Service did in terms of habitat and

6   species.

7           THE COURT:  Do I have -- I remember reading about

8   this in your briefs.  Do I actually have a citation to that

9   document?

10          MS. REICHERT:  Yes, Your Honor.  I'm happy to provide

11  that to you with a hyperlink to the access on the Corps'

12  website.

13          THE COURT:  If it's in the briefing, we can find it.

14  If it's not, I can just ask that you give that to me.  I would

15  like to see -- have in mind what you think they should have

16  done here.

17          MS. REICHERT:  Yes, Your Honor.

18          THE COURT:  Okay.  You can go ahead and continue.

19          MS. REICHERT:  Thank you.  In addition, Fish and

20  Wildlife Service affirmatively disavowed any duty to analyze

21  the effects of this action on species, claiming that it lacked

22  sufficient information.

23          However, as I just explained to the Court, that is

24  undermined by the fact that the National Marine Fisheries

25  Service did this exact analysis using the same kind of data.

1           Second, despite having not done the analysis required

2     under the ESA and its implementing regulations, U.S. Fish and

3     Wildlife Service created an unlimited incidental take liability

4     exemption that covered EPA, the state, and all future

5     permittees for the life of the program.  However, the ESA very

6     clearly requires that a take limit be instituted.

7           Also, the agency created no triggers for

8     reinitiation.  So that if in the future it turns out the take

9     is happening at a level that even could jeopardize species,

10    there's no mechanism in the ITS that would require consultation

11    to occur.

12          Finally, the --

13          THE COURT:  Do you know if, in practice, the permits

14    or some of the permits that Florida is issuing, after

15    submitting them to the EPA for the EPA's review, and permitting

16    Fish and Wildlife the opportunity to review it, do you know if

17    they're including in those permits the equivalent of a take

18    limitation?

19          MS. REICHERT:  Yes, Your Honor.  We know of at least

20    one example where take was anticipated based on the record for

21    the permit; and this is the Babcock project in our plaintiff --

22    Ms. Crooks' declaration, where take was anticipated in the

23    record, but there was no take limit created in the final

24    permit.

25          And we can show Your Honor as well -- I'm happy to

1    provide this -- the annual reporting that Florida has sent to

2    U.S. Fish and Wildlife Service and EPA that, similarly, does

3    not have evidence of take limits being created at the permit

4    level.

5         THE COURT:  I'll, obviously, ask counsel for Florida

6    and for the United States the same question.

7         At least, to your knowledge, are you aware of any

8    permits that have included take limitations in them?

9         MS. REICHERT:  I think there were two permits noted

10   on the annual report where they had mitigation requirements

11   listed as the take limits, but that's not the same as what is

12   required under the Endangered Species Act.

13        So it's unclear -- I haven't looked at those two

14   particular permits to assess whether they're equivalent to what

15   a take limit would be if the consultation had occurred.  But

16   those are the only two examples that I'm aware of.

17        THE COURT:  If there is a take limitation that is

18   imposed at the federal level, so the Corps is issuing permits,

19   the Corps includes -- or Fish and Wildlife includes a take

20   limitation, along with the issuance of a Corps permit, if that

21   take limitation is violated, obviously, the United States has

22   enforcement authority.

23        Do environmental groups like yours have some type of

24   ability to either petition Fish and Wildlife or the EPA to take

25   action?  Is there a citizen suit-type approach, or can you

1    actually bring an action to challenge the violation of the take

2    limitation?

3           MS. REICHERT:  Yes, Your Honor.  I think there are

4    lots of examples where environmental groups have sued the

5    wildlife agencies, either U.S. Fish and Wildlife Service or the

6    National Marine Fisheries Service, for failing to reinitiate

7    consultation when it was required based on new information or

8    when take limits were exceeded.

9           As far as approaches towards the permitted

10   individuals themselves, any future activity that would be in

11   violation of an ITS would be liable for Section 9 take

12   prohibition.  However, that requires evidence of take having

13   occurred.

14          And so rather than -- the way that consultation

15   works, which is to prevent take from happening, you wouldn't be

16   able to bring an action until it has already happened and the

17   species has been impacted.

18          THE COURT:  And could an environmental group bring

19   that action, or is that only in the -- only up to the justice

20   department to do that?

21          MS. REICHERT:  For a Section 9?

22          THE COURT:  Yes.

23          MS. REICHERT:  Yes.  After filing a 60-day notice,

24   which would allow the federal agencies to intervene, yes, Your

25   Honor.

1          THE COURT:  Okay.  Now, how does this work with

2     Florida?  I take it that it may well be the position of the

3     government and we'll -- or the government's -- and I'll hear

4     from them on this -- but that the rules that apply in Florida

5     are all part and parcel of the federal program, and I know that

6     you take the position that, well, it couldn't possibly be

7     because the biological opinion wasn't issued until after the

8     comment period had closed.  But assume that I disagree on that

9     for present purposes.

10          And their view is, you can do exactly the same thing

11     with Florida because if there is a take limitation that is

12     included in a permit, that is all being done pursuant to the

13     memorandum agreement and the biological opinion and the ITS

14     and, therefore, if -- and I'll have to ask them the same

15     question.  But at least, hypothetically, the Florida developer

16     who doesn't comply with the conditions that are intended to

17     ensure the take limitation or doesn't comply with the ITS

18     conditions, can you do anything about that, or are your hands

19     tied?

20          Or would you just have to bring a Florida action in

21     Florida state court instead of an action in federal court

22     against -- in which Fish and Wildlife might be a party?

23          MS. REICHERT:  Thank you, Your Honor.  In terms of

24     the Endangered Species Act, if there -- there's a few different

25     parts to this answer.

1          So, first of all, your hypothetical would mean that a

2     take limit was created at the permit level, which, as I've

3     said, is not what's happening.

4          THE COURT:  Right.

5          MS. REICHERT:  And the way that the ITS covers the

6     state program is, as long as any action in compliance with the

7     ITS occurs, it's covered and exempt from liability coverage.

8     The ITS terms and conditions don't have any requirements for

9     permittees.  The only requirements are on EPA and the State of

10    Florida.

11         So it's unclear whether there is this opportunity, if

12    a permit violates a take limit, whether the ITS covers -- would

13    lead to that being a Section 9 violation because the terms and

14    conditions are only as to EPA and Florida.  And their job for

15    EPA is to use its Clean Water Act oversight authority; and for

16    Florida, it's to engage in this technical assistance process.

17         There are parts of the biological opinion where Fish

18    and Wildlife assumes compliance with permit conditions that are

19    created.  So there may be an opportunity, but it's not as clear

20    as a take limit that is created in the ITS where it's very

21    clearly a requirement that would be violated.

22         THE COURT:  How does this work in -- in New Jersey

23    and Michigan?

24         MS. REICHERT:  Michigan has its own state Endangered

25    Species Act program, which is what it uses to ensure no

22

1    jeopardy at the permit level.  They didn't do consultation

2    under the Endangered Species Act, and so any take liability

3    coverage is due to their own already preexisting agreement on

4    their state program -- their state endangered species program.

5          THE COURT:  I take it that was because at that point

6    in time the EPA was of the view that the assumption authority

7    was nondiscretionary?

8          MS. REICHERT:  Right, Your Honor.

9          THE COURT:  And the same thing for New Jersey?

10          MS. REICHERT:  No.  For New Jersey, Your Honor, they

11    initiated consultation.  And during that process, New Jersey

12    shifted its program so that any permit that may affect species

13    would go through the federal agencies and, therefore, they

14    found there would be no effect on any protected species through

15    their program, so they did not complete consultation.

16          THE COURT:  I see.  Which, I take it, is -- your

17    bottom line here is that Florida or the EPA, in conjunction

18    with Fish and Wildlife, could have done either of those two

19    things here, but what they can't do is, in your view, abdicate

20    the Endangered Species Act consultation process?

21          MS. REICHERT:  Right, Your Honor.  There are more

22    options also.  States have been working on this issue for years

23    and have proposed doing statewide Section 10 permits having an

24    off-ramp for federal permitting.

25          Florida advocated for this approach to get the

23

1    broadest incidental take liability exemption it could get

2    without doing the required analysis of Section 7 or Section 10.

3              THE COURT:  All right.

4              MS. REICHERT:  Third, Your Honor, Fish and Wildlife

5    Service ignored the plain language of the Endangered Species

6    Act in its implementing regulations, as well as the sea of

7    authority on consultation, both programmatic and site-specific.

8    And, instead, it relied on the single outlier case that is

9    contrary to the law of this circuit, was wrongly decided and

10   distinguishable on its facts.

11             THE COURT:  I know what case you're going to say.

12             MS. REICHERT:  That would be the cooling water case,

13   Your Honor.

14             However, the ESA creates no exceptions for

15   programmatic or site-specific consultation.  It applies with

16   equal force to both, and that's what the most recent

17   regulations from Fish and Wildlife Service said explicitly.

18             And the TA process as well is not a stand-in for the

19   programmatic consultation that should have occurred here, and

20   the defendants don't argue that it is.

21             In reality, U.S. Fish and Wildlife Service is

22   required to only receive and review permit applications.  It's

23   not required to use the best available science.  The agency

24   need not analyze the baseline status of species.  The agency

25   does not need to analyze impacts to species from the permit or

24

1    cumulatively across the program.  They're not required to come

2    to a jeopardy determination or to issue take limits.

3         In this program, U.S. Fish and Wildlife Service would

4    never follow the ESA's mandates, not at the programmatic, nor

5    at the permit level.  This is a clear violation of the

6    Endangered Species Act.

7         For its part, EPA unlawfully relied on Fish and

8    Wildlife Service's actions when approving the State 404

9    program, and it failed to consult on nesting sea turtles and

10   species under the jurisdiction of the National Marine Fisheries

11   Service.

12        THE COURT:  What is the status of the further review

13   that the NMFS is doing or what it promised to do with respect

14   to the non-assumed but, potentially, affected waters?

15        MS. REICHERT:  I'm happy to let the defendants

16   address that one in terms of what the National Marine Fisheries

17   Service is doing.

18        I know that EPA has completed its biological

19   evaluation and submitted that to NMFS, identifying impacts to

20   some of the species that are under the jurisdiction of NMFS.

21        THE COURT:  Okay.  I think this is the one that we

22   would hope might be done by July.

23        MS. REICHERT:  Uh-huh.

24        THE COURT:  I take it your view is that, to the

25   extent that the -- that Florida's application relied on the

1   memorandum agreement and to the extent the memorandum agreement

2   anticipated these various studies, that this isn't the sort of

3   thing that can be cured after the fact.  I want to make sure --

4   and that your concern is that without it -- that there's a --

5   essentially, a notice and comment problem if it's done now.

6           Even if -- you probably will have objections to

7   whatever is done, but even assuming you didn't have objections

8   to the substance of it, that there would be a notice and

9   comment problem; do I understand your position right on that?

10          MS. REICHERT:  Yes.  I think there's a few problems

11  with the reliance on -- if we're talking about the -- I'll

12  start with just NMFS in particular.

13          THE COURT:  Okay.

14          MS. REICHERT:  So one problem is that approval

15  itself, the program itself is required to show that no permit

16  would issue that would jeopardize a species.

17          EPA, in approving that program, finding that

18  404(b)(1) guideline was met relied on the biological opinion

19  and the no-effect determination.  And so the entire approval,

20  and that provision in particular, is tainted by the fact that

21  the no-effect determination was unlawful and also the

22  biological opinion and TA process would be unlawful.

23          THE COURT:  I think you said -- you just said better

24  what I was trying to ask you as to whether that was your

25  position.  Okay.  That's helpful.  Thank you.

```
 1              MS. REICHERT:  Yes, Your Honor.  And that -- I'm
 2   happy to turn the podium over to Ms. Galloni if you have no
 3   further questions on the Endangered Species Act.
 4              THE COURT:  Why don't we do that.  We have a lot of
 5   ground to cover today.  Thank you.  It was very helpful.
 6              MS. REICHERT:  Thank you.
 7              THE COURT:  Ms. Galloni.
 8              MS. GALLONI:  Thank you, Your Honor.  EPA's approval
 9   of Florida's 404 program also violated the Clean Water Act in
10   three ways.
11              First, it approved a state program that did not meet
12   federal criteria, including as to criminal enforcement and the
13   404(b)(1) guidelines.
14              Second, it transferred authority to the state over
15   non-assumable waters.
16              And third, EPA was only authorized to approve a
17   complete program submission, but Florida's program submission
18   failed to adequately describe the waters that would be assumed
19   and demonstrate that its permits would not jeopardize species.
20              I'll start first with criminal enforcement, Your
21   Honor.  EPA violated Section 1344(h), which is the provision
22   that requires that state programs demonstrate adequate
23   authority to abate violations under the act under both civil
24   and criminal penalties.
25              The criminal violations, Your Honor, are enumerated
```

1    in Section 1319(c), and the floor for criminal liability under

2    the act is simple negligence.  That's not in dispute.

3        THE COURT:  I take it your position, then, is that

4    there never could be an assumption in Florida absent an

5    amendment to the Florida Constitution?

6        MS. GALLONI:  The position of Florida has been that

7    it is unconstitutional to criminalize simple negligence.  I

8    will say that the Florida Constitution has been amended many

9    times and, in fact, built into the constitution is a revision

10   every 20 years; there's a constitutional revision commission

11   that proposes changes to the constitution.  So amending the

12   constitution is a regular process in Florida.

13        But, yes, at the current position.

14        THE COURT:  Okay.  All right.  Thank you.

15        MS. GALLONI:  This goes to one of our points, Your

16   Honor.  If states want to assume the 404 program, they have to

17   get up to the federal floor those minimum criteria, and that's

18   something Florida did not do here.

19        Criminal liability under Section 1319(c) attaches a

20   permit whether it's issued by the Corps or the state.  And,

21   therefore, as I've said, a state must demonstrate that

22   authority to abate simple negligence violations.

23        If Congress intended for the states to take over 402

24   and take over 404, as the defendants have said, and be

25   primarily responsible for enforcement, it would make little

1    sense to interpret that abate violations provision or to

2    interpret 1319(c) as applying only to enforcement actions by

3    EPA.

4          THE COURT:  In your view, is the difference between

5    criminal negligence and negligence a difference of intent?

6    Because I think that's the language in the reg, right?

7          MS. GALLONI:  Yes, it is a difference of intent.  The

8    regulation says the burden of proof for state programs shall be

9    no greater than the burden of proof required for EPA under the

10   act.  And the burden of proof required under the act is simple

11   negligence.

12         THE COURT:  Although the burden of proof usually

13   would mean a preponderance of the evidence, clear and

14   convincing evidence, beyond a reasonable doubt.  That's the way

15   I would usually use the word -- the phrase burden of proof.

16         That's why I was asking you about -- I thought there

17   was some other language in the regulation that went beyond

18   burden of proof and talked about intent.  I was trying to put

19   my finger on which aspect of the reg you were relying on.

20         MS. GALLONI:  I will say, primarily, Your Honor,

21   we're relying on the plain language of the provision.

22         THE COURT:  Oh, here it is.  Let's see.  I think the

23   language is the burden of proof and degree of knowledge or

24   intent required under state law.

25         MS. GALLONI:  Right.  Shall be no greater than that

29

1     required of the EPA under the act.

2              THE COURT:  Right.

3              MS. GALLONI:  And the act, again, the burden of proof

4     or the intent -- the intent under the act is simple negligence.

5              THE COURT:  Right.

6              MS. GALLONI:  Defendants argued at one point that

7     Section 1319 does not define the violations of the act; that

8     only Section 1311 does that, or that Section 1311 also does

9     that.  But Section 1311 only relates to discharges of a

10    pollutant.  It's not cross-referenced in Section 1344(h) any

11    more than Section 1319 is.

12             We think Congress spoke very plainly by saying that

13    states must be able to abate violations of the act, and we know

14    where those are found; Section 1311 and Section 1319.

15             THE COURT:  Is the standard, as far as you know, in

16    New Jersey and Michigan simple negligence?

17             MS. GALLONI:  I can look.  According to the

18    government's submission, it looks like it may be in Michigan,

19    but not in New Jersey.

20             THE COURT:  Okay.

21             MS. GALLONI:  I will point out, though, Your Honor, I

22    know that the government had that addendum -- right? -- with

23    the states -- with 25 states that have a higher --

24             THE COURT:  I know your point is that most of it was

25    adopted before it was clarified in the circuits.

1      MS. GALLONI:  Right.  23 of them were adopted -- 21
2  of them were adopted.

3      THE COURT:  21 of 25?

4      MS. GALLONI:  Well, one of the states doesn't have a
5  program.  That's New Hampshire.  So that brings us down to 24.

6      So 22 of the 402 programs were approved before the
7  first circuit court announced that the standard was simple
8  negligence in 1999.

9      THE COURT:  Okay.

10     MS. GALLONI:  And, again, the only evidence that's in
11 the record that EPA ever gave this any thought is with regard
12 to the Idaho program where EPA said, oh, Idaho, your intent
13 standard is higher than what's required of EPA; we're not going
14 to be able to approve your program.

15     Then there was a change in administration, change in
16 position; they went forward with it.  Got challenged in the
17 Ninth Circuit, and the Ninth Circuit held their ground and
18 said, no, the burden of proof can't be any greater -- the
19 intent standard can't be any greater.

20     THE COURT:  Right.

21     MS. GALLONI:  On the statute of limitations, Your
22 Honor, Florida also has a shorter statute of limitations for
23 enforcement; one to three years, compared to the five-year
24 statute of limitations.  EPA's regulations provide that a state
25 program cannot be any less stringent than federal law requires,

1    but a shorter statute of limitations is less stringent because

2    it requires prosecutors to act quicker than they would be

3    required to under the federal standard.

4           I'll move on to the 404(b)(1) guidelines, if you

5    don't have any further questions on enforcement

6           THE COURT:  I'm sure I do, but let's move on.

7           MS. GALLONI:  I'll be here all day.  So on the

8    issuance of permits, Florida's program also failed to meet the

9    404(b)(1) guidelines.  And Section 1344(h) requires that state

10   permits -- I'm sorry -- that state programs show they will

11   issue permits that apply to 404(b)(1) guidelines.

12          The 404(b)(1) guidelines, in turn, require the

13   permitting authority to make factual determinations on a whole

14   series of issues related to the issuance of a permit.  But

15   nothing in the Florida program requires DEP to make factual

16   determinations.

17          Instead, the state relies on the applicant's

18   reasonable assurances that permit requirements will be met.

19   This is a feature and not a bug of Florida's program.  The

20   standard is vague, subjective, and deferential to applicants.

21          So regardless of whatever substantive criteria DOJ

22   can point to that parallels in the state and federal program,

23   at the end of the day, the state is still relying on the

24   applicant's reasonable assurances; whereas, the Corps is

25   required to make factual determinations.

1          And every subpart of Section -- of the 404(b)(1)

2     guidelines expressly states that the Corps must make factual

3     determinations regarding all of these issues and then use those

4     factual determinations to inform its finding of compliance or

5     noncompliance.

6          DEP -- the issue is not whether DEP can rely on

7     applicant information.  It can.  But the duty on the Corps is

8     to make an independent assessment, an independent analysis, and

9     independent factual determinations.

10         THE COURT:  What is the nexus between the

11    different -- that difference and any cognizable injury to any

12    of your clients?

13         MS. GALLONI:  So the --

14         THE COURT:  In other words, what's the standing on

15    that claim?

16         MS. GALLONI:  Sure.  This claim goes to the

17    sufficiency of the program, and the sufficiency of the program

18    turns on whether the state met the statutory criteria.  This is

19    one of the enumerated criteria that a state must meet.

20         So the harm to the plaintiffs is from the sufficiency

21    of the program which led to the approval which now has this

22    score of permits that are threatening plaintiffs' injuries.  We

23    also have our organizational harm from the loss of information

24    that also stems from the transfer of the program which we've

25    addressed fully in briefing.

1           THE COURT:  Right.  Okay.

2           MS. GALLONI:  But the concern, of course, is we have

3      and we've identified specific permits, and some that are very

4      close to issuance that we're concerned about; we're relying on

5      an applicant's reasonable assurances versus requiring the

6      agency to make factual determinations as to the impacts of

7      those permits is very concerning to us.

8           THE COURT:  Okay.

9           MS. GALLONI:  I'll move on briefly to water quality,

10     Your Honor, because this factual determination and reasonable

11     assurance difference is magnified in the water quality context.

12     Again, the applicant only needs to provide reasonable assurance

13     that the project will not adversely affect water quality.

14          But federal law is designed to address water quality

15     very broadly.  And the defendants have pointed to places,

16     again, where they say there's equivalence between the

17     prohibitions in Florida law versus the prohibitions in federal

18     law.

19          But, again, under Florida law, those decisions --

20     those determinations are based on the applicant's reasonable

21     assurances rather than their findings on whether a project will

22     run afoul of the requirements.  There are only three

23     determinations Florida's program can be said to require.

24          The first is whether the applicant can get away with

25     an exemption and not need a permit at all or whether they can

34

1    qualify under a general permit.  That's a determination.

2            The second is whether there are contaminants that may

3    be present that rise to the level of water quality standard or

4    toxic effluent limitation violations.

5            And the third is the ultimate decision on the permit.

6    Everything else is based on reasonable assurances.

7            I'd like to move next, Your Honor, to retained waters

8    and to the transfer of non-assumable --

9            THE COURT:  I have one question for you, though,

10   which I think --

11           MS. GALLONI:  Yes.

12           THE COURT:  -- applies perhaps to all these

13   arguments.

14           My understanding is that your challenge is both a

15   procedural and a substantive one and that the -- in your view,

16   the application wasn't complete on the date that it was treated

17   as complete; that it was approved notwithstanding the fact that

18   it was missing critical elements.

19           And, procedurally, that -- to the extent the agency

20   relied on the biological opinions that were not made available

21   and were not done by the close of the comment period, that that

22   interfered with your clients' abilities to engage in meaningful

23   notice and comment, and perhaps there's some other aspects as

24   well.

25           The question for you is, as you know, I have

1    previously indicated my view that this was a rulemaking and it

2    was not an adjudication.  If I'm wrong about that or if I have

3    further thoughts and then say, well, maybe it was an

4    adjudication, does that change anything; because you might not

5    have a claim under 553 of the APA or Title 5, but would you

6    still have the same claim under the Clean Water Act itself

7    which requires an opportunity for notice and comment?

8        So does it matter, I guess, is my -- for the

9    remaining claims, does it matter?

10       MS. GALLONI:  I think it may matter.  I would say

11   there is also a separate right to notice and comment under the

12   Clean Water Act.

13       So that aspect of it, the fact that the application

14   was not complete when submitted, then the deficiencies in the

15   application itself are substantive, the ESA violations about

16   the adequacy of the biological opinion, and then the inadequacy

17   of the technical assistance process within that.  And I think

18   that there is still notice and comment violation under the

19   Clean Water Act.

20       I may have to give that more thought about -- under

21   the APA and what impact that would have.  I don't think it's

22   anything that we've briefed.

23       THE COURT:  I don't think it's briefed either.  I

24   guess I have a whole -- I'm not saying that I've changed my

25   mind on this, but I want to keep an open mind on these things

1    and think hard about it.

2         I suppose if it's under the Clean Water Act instead

3    of under the APA, I guess it would raise the question in my

4    mind of whether the rule of prejudicial error applies or not.

5    I don't know if there's any law on whether the rule of

6    prejudicial error applies outside of the APA context or whether

7    it's only -- whether there's a standalone or similar provision

8    that would apply under the Clean Water Act.  I just don't know

9    the answer to that question.

10         MS. GALLONI:  Right.

11         THE COURT:  And then, as we live in a day and age in

12    which there are questions about the status of Chevron if it's

13    not a rulemaking, that may raise some additional questions in

14    my mind about what level of deference would apply, and we may

15    get some guidance from the Supreme Court, at least, on the

16    status of Chevron as we go forward.

17         MS. GALLONI:  I will say, though, that your finding

18    on it being a rulemaking is soundly supported by the case law

19    in this circuit.

20         THE COURT:  Yes.

21         MS. GALLONI:  Mostly because it affected a change in

22    the legal relationship, the requirements, all of those aspects

23    that applicants -- that affect everybody, the public, the way

24    we interface, applicants, the rules, the regime, everything

25    changed, and that is definitely consistent with the rulemaking,

1   not to mention prior decisions that have referred to this as a

2   rulemaking.

3           THE COURT:  Understood.  And that was my reasoning.

4   I did notice that I think the Department of Justice in one of

5   its briefs, just in passing, referred to the fact that this was

6   placed on the non-rulemaking docket at the time that the

7   proceedings began.  Although there, obviously, were other

8   statements that were made indicating that the --

9           MS. GALLONI:  They referred to it as a rulemaking in

10  some other places and so on.

11          THE COURT:  Okay.

12          MS. GALLONI:  So next, I'll just move on to the

13  transfer of non-assumable waters to the state.  The definition

14  of retained waters is in Section 1344(g)(1); waters of the

15  United States that are presently used or are susceptible to use

16  in their natural condition or by reasonable improvement as a

17  means to transport interstate or foreign commerce, as well as

18  tidal waters and adjacent wetlands.

19          Those waters, Your Honor, are the traditionally

20  navigable waters, which include, but are not limited to, all

21  Rivers and Harbors Act waters.  The defendants argue that

22  Congress intended for the Corps only to retain jurisdiction

23  over Rivers and Harbors Act waters except for those that are

24  based on only historic use.  But Congress didn't say anything

25  of the sort.

1          The retained waters provision makes no reference to

2    the Rivers and Harbors Act and makes no reference to excluding

3    historic use waters.  Instead --

4          THE COURT:  Although, it doesn't refer to historic

5    use either.  I think it -- I don't have the language in front

6    of me.  But it uses a slightly different phrase, which seems

7    not as clearly to capture waters that in the past may have been

8    used for navigation purposes.

9          MS. GALLONI:  Right.  The clarity really comes from

10   the Supreme Court's articulation of this.  So the provision

11   uses terms that are -- that come from the case law that

12   originated with *The Daniel Ball* and so on in admiralty.

13          But what the Court did is in *Economy, Power & Light*,

14   it took that language, susceptible of use in its natural

15   condition, to say that that encompasses waters used in the past

16   for commerce.

17          THE COURT:  I see.

18          MS. GALLONI:  So when Congress used the same terms

19   that have been used in the case law to define retained waters,

20   it necessarily included historic waters, but it also included

21   other traditionally navigable waters.

22          EPA and the Corps have relied on those same judicial

23   precedents to define traditional navigable waters.  They've

24   used it to define -- the Corps has used it to define its Rivers

25   and Harbors Act jurisdiction, and then the EPA and the Corps

1    have used it to define the (a)(1) waters -- what we call the

2    (a)(1) waters, the traditionally navigable waters under the

3    Clean Water Act.  These are the waters that the Corps retains

4    jurisdiction over after state assumption.

5         But again, in the case of Florida, the Corps and EPA

6    allowed the state to assume authority over all waters except

7    Rivers and Harbors Act waters, and not including the historic

8    use waters.

9         So as a result of EPA's action, EPA transferred

10   authority over waterways to the state that should have remained

11   with the Corps.  The defendants have said, well, the MOA gives

12   us a process to address this, it's fluid and so forth; but it's

13   not.  If you read the MOA, in you read the application, if you

14   read the retained waters list, it says, "The Corps retains

15   jurisdiction over these waters on the retained waters list,

16   plus some unnamed tidal waters and wetlands, and everything

17   else goes to the state."  And that's what happened here.

18        THE COURT:  I thought that they actually, at least in

19   some places, just incorporated the statutory definition.  And

20   that was part of the problem, was that they didn't actually

21   spell out what that meant.  They just said whatever the statute

22   says, that's what we're going to do.

23        MS. GALLONI:  Right.  And it would be one thing if

24   they had said we're just going to do what the statute says and

25   left it at that, but they didn't.  They then said, here are the

1    waters the Corps retains jurisdiction over; all other waters

2    are assumed by the state.  So they did not -- they have that

3    catchall phrase in there, but that's not enough, especially in

4    the face of an MOA that specifically says the Corps is going to

5    retain jurisdiction over these waters and everything else is

6    assumed by the state.

7         Because we know that, in fact, happened, and we have

8    declarations identifying specific waterways that were not

9    retained by the Corps that should have been.

10        THE COURT:  One of the things I was wondering about

11   this argument -- again, this strikes me as you both have

12   perhaps a procedural and a substantive argument here.

13   Obviously, to the extent that waters or permitting authority

14   with respect to waters was assumed where those were retained

15   waters, that's a problem.  Although, it might be -- the remedy

16   for that would be simply to issue an order directing that the

17   retained waters, in fact, are retained.

18        But I took it that you were raising also more of a

19   procedural -- in addition, at least a procedural argument

20   saying there's a really good reason why the statute and

21   regulations require you to spell out what the waters are and

22   not to simply just incorporate the statutory test because the

23   public and the state and the Corps and all the other agencies

24   need to know what waters there are.

25        And it's a big problem, and perhaps it's something

1    that's happened here, if after this is all done, there's not

2    agreement about which waters are at issue, and I don't know if

3    this has happened here or not.  But where you have a situation

4    where the state is saying, not us, and the Corps is saying, not

5    us; and then there is nobody to issue permits with respect to

6    those waters.

7         And that that's one of the reasons -- I haven't gone

8    back to look at the legislative history or the regulatory

9    history to see if it's spelled out, but just in reading it, I

10   at least infer the possibility that one of the reasons it's

11   spelled out as a requirement is to avoid exactly that type of

12   uncertainty as you administer the programs.

13         MS. GALLONI:  Yes.  And that's exactly what EPA said

14   when it promulgated these regulations in the program

15   requirements.  I think it's 233.11 and .12, or it could be 230.

16         But what the EPA said was the state has to provide a

17   description of the retained waters that includes a list or a

18   description from the Army Corps of what those waters are.  And

19   then, separately, has to identify what the assumed waters are.

20   And EPA said exactly that.

21         It said, because this transparency is necessary for

22   the public to know what is being regulated by which entity.

23         THE COURT:  The language, I think, you're talking

24   about is in 233.11(h):  "A description of the waters of the

25   United States within a state over which the state assumes

1    jurisdiction under the approved program; a description of

2    waters of the United States within a state over which the

3    secretary retains jurisdiction, subsequent to the program

4    approval."

5            MS. GALLONI:  Right.  And in the explanation in the

6    preamble for that regulation, EPA expressly said the assumed

7    waters have to be separately described.

8            We would submit, it is, again, not sufficient to do

9    what happened here, which is to say, well, the assumed waters

10   are all the waters that aren't retained.

11           THE COURT:  Do you know what the status is of the

12   state and the Corps working out those demarcations after the

13   fact now?

14           MS. GALLONI:  The only thing I know, Your Honor, is

15   that I think Mr. Wolfe gave an example in his declaration of an

16   issue that had come up that they resolved.  But it was over a

17   tidal water.

18           So, again, the MOA and the retained waters list don't

19   describe the tidal waters at all.  So they had an issue and,

20   presumably, they decided who would have jurisdiction over

21   that -- or coastal water, I should say.  If it's tidal, it

22   should be retained

23           THE COURT:  But is there any dispute, as far as you

24   know, between the state and the Corps as to who has authority

25   or jurisdiction with respect to which waters at this point?

1      MS. GALLONI:  I don't know, Your Honor.  But I do

2  know that when this process started and the Corps was taking

3  the position that all the traditionally navigable waters, the

4  (a)(1) waters had to be retained, that there was a dispute, and

5  that's something that Florida fought against.  And we submit

6  this is another one of those shortcuts to get the assumption

7  done quickly that resulted, unfortunately, in a very truncated

8  list of retained waters and an unworkable process.

9      THE COURT:  Although, I suppose what they would say

10  in response to that is, we didn't just defer, we had the best

11  list that was available at the time.  And that's subject, of

12  course, to your argument about whether the historic waters

13  should be included or not.

14      But if you're wrong about the historic waters, they'd

15  say, yeah, it's not a perfect list; we know.  But we're never

16  going to have a perfect list.  By the time we're done with the

17  list, it's going to be time to start the next list.  And so you

18  can't require perfection here, and we used the best one we had

19  at the time.

20      MS. GALLONI:  I think that would be persuasive if the

21  Corps hadn't admitted that the 2014 list was already out of

22  date by the time they decided to use it.

23      So their own internal correspondence shows that they

24  believe that list was out of date and that they had begun to

25  prepare a supplement that would update the list with other

1    retained waters.  But when push came to shove, they pushed that

2    list to the side, and they did not consider it.

3            They also got scores of public comments, including

4    from the plaintiffs, identifying specific waters that should be

5    included in the retained waters list.  And they did nothing

6    with that information either.

7            THE COURT:  Thank you.  For some reason that reminded

8    me, I had a question -- and this may be for your colleague who

9    can look this up while you're at the podium -- Docket 104,

10   which is your lengthy reply brief at -- Docket 104 at docket

11   page 35, which is Note 13.

12           There's a reference to the administrative record at

13   FWS 6639, and I don't seem to have those pages.  I didn't think

14   that -- or, actually, the Fish and Wildlife Service portion of

15   the administrative record got to that page.  I was wondering if

16   that was a typo.  Someone can get back to me on that.  It's not

17   pressing.

18           MS. GALLONI:  Thank you.  We'll take a look at that.

19   Yes, we'll take a look at that.

20           THE COURT:  Okay.  Thank you.

21           MS. GALLONI:  I will also add that EPA made no

22   independent judgment about the waters, Your Honor.  EPA was the

23   one with the ultimate authority.  Its action is the one that

24   transferred authority over the waters.

25           We're not saying that perfection was required, but if

1    the agency is going to transfer all other waters to the state,

2    there has --

3              (Technical difficulties.)

4         MS. GALLONI:  So as I was saying, if the agency is

5    going to transfer all the other waters to the state, there has

6    to be a reasonable process.  Relying on an outdated list,

7    ignoring other information that's readily available, ignoring

8    public comment was not a reasonable process.  And if there were

9    many unknowns, then the answer would not have been to transfer

10   all the other waters to the state.  There could have been other

11   ways to handle that.

12             But it's unlawful to transfer those waters to the

13   state if they are, in fact, retained by law.

14             THE COURT:  Is the -- is your theory on that, under

15   the APA, it's unreasonable to rely on a list that you yourself

16   had conceded was outdated, and that under the Clean Water Act,

17   it is -- shows that the application was not complete because

18   the EPA itself conceded the list was not up to date?

19             I'm just trying to figure out which buckets you're

20   putting the arguments in.

21        MS. GALLONI:  The Corps is the one that conceded the

22   list was out of date.  The Corps also had a duty under the

23   Rivers and Harbors Act to update its Section 10 list whenever

24   there was a question about jurisdiction.

25             So there was a separate duty by the Corps to update

1    its list.  It began that when it started a navigability

2    assessment for Florida, but then abruptly terminated that

3    process.  And then there's a completeness issue with not having

4    adequately identified the waterways in the application.

5            THE COURT:  But the argument under the Rivers and

6    Harbors Act is an independent argument where you would not

7    invalidate the assumption here.  It would just -- if I were

8    convinced on that -- it would prompt me to issue an order

9    directing that they do what they're supposed to do, which is, I

10    guess, an agency action wrongfully withheld or something along

11    those lines.

12            MS. GALLONI:  Correct.  And it would at least remove

13    those waterways from the situation that all the state-assumed

14    waters are in, which is no ESA consultation for projects that

15    occur on those waters, no NEPA review, and all of those

16    consequences that flow.

17            So it's still very important.  You had

18    mentioned there --

19            THE COURT:  Although, the remedy would not be for me

20    to define the waters.  It would be to simply send it back to

21    the agency to do so.

22            MS. GALLONI:  You had mentioned earlier the problem

23    of if you're left with a water that isn't regulated by the

24    state or the Corps.  I wanted to just briefly mention -- this

25    is an issue that came up when the state's application did

1    not commit to abiding by the federal definition of waters of

2    the United States.

3         When a district court vacated the navigable waters

4    protection rule and expanded the scope of the waterways that

5    are covered under the Clean Water Act, Florida defied that;

6    defied EPA when EPA said you have to apply the now-governing

7    definition of waters of the United States.

8         And we were left in exactly that situation, where the

9    state said we're not covering X waters because we're going to

10   apply the old rule; and the Corps said, well, we're not

11   covering them either because they should have been assumed by

12   the state.  They're not retained waters.

13        THE COURT:  Has *Sackett* had any bearing on this?

14        MS. GALLONI:  No, Your Honor.

15        THE COURT:  Okay.

16        MS. GALLONI:  And the last point I'd like to make is

17   just briefly on the completeness of the application.

18        I think that the defendants at one point had argued

19   that we had not shown prejudice on not having access to the

20   information in the biological opinion.  I think the one place

21   that is indisputable -- and, in fact, they didn't dispute it on

22   reply -- is the terms and conditions of the biological opinion.

23        In our comment letter, we said the ESA requires terms

24   and conditions, and Florida had said in its biological

25   assessment, we'll be able to show that our permits will comply,

1    will not jeopardize species based on the terms and conditions

2    in this upcoming biological opinion.  We were not able to

3    comment on those.  There was no reasonable way for us to

4    anticipate or guess what they might be.

5         This is also not a typical situation where the

6    agency's changing its mind about a rule.  It's not.  It knew

7    this document was coming.  It didn't make it available.  It

8    closed the comment period.  We weren't able to comment on that.

9    And, as we've discussed, we weren't able to comment on the

10   inadequate waters list.

11        THE COURT:  Great.  Thank you.  I'd like to take a

12   break for ten minutes now, and then I'll hear from the

13   Department of Justice and then hear from the state of Florida

14   after that.

15        And if I can ask everyone, to the extent there are

16   technical terms they're using, just during a break, if you can

17   make sure the court reporter has those, that will be helpful.

18   All right.  I'll see you all in about ten minutes.

19        (Recess taken.)

20        THE COURT:  All right.  So I will hear from the

21   government now; the federal government.

22        MR. COGHLAN:  Thank you, Judge Moss.  Andrew Coghlan

23   for the United States.

24        And I'm going to be addressing plaintiffs' arguments

25   under the Clean Water Act and then, once my presentation

1    concludes, I'll hand it over to my colleague, Ms. Finnegan, to

2    address the Endangered Species Act arguments.  If you'd rather

3    we do it in the opposite order --

4              THE COURT:  That's fine.

5              MR. COGHLAN:  Okay.  Great.  I do want to delve into

6    details, Your Honor, but before I do, I want to take a step

7    back and just make two brief framing points, if I might?

8              THE COURT:  Please.

9              MR. COGHLAN:  They're points that I think are

10   essential to considering the Clean Water Act claimed here.

11             The first point is that Congress wanted states to

12   take the lead in regulating discharges of dredged and fill

13   material and to do so under state law.  We know that because

14   Congress told us that explicitly in the statute.

15             The second framing point I want to make is that

16   Congress defined certain minimum standards that state

17   Section 404 programs had to meet.  That's in Section 404(h)(1).

18   And then in Section 404(h)(2)(a), it told EPA, EPA, you have to

19   approve a state program that satisfies these minimum

20   requirements.

21             And so the question here is not whether state

22   assumption is good as a policy matter, because Congress already

23   made that policy call.  And the question is not whether

24   Florida's program is, in some general sense, better than the

25   federal program.

1    The question -- the central question on the Clean

2    Water Act piece of things is did EPA reasonably conclude that

3    Florida's program, as submitted, satisfied the act's minimum

4    requirements.  We would submit that it did, and that the Court

5    should, therefore, grant summary judgments on Claims 1, 2, and

6    7.

7    I can turn now to the specifics of plaintiffs'

8    arguments under those claims.  I'm happy to take it point by

9    point; I can also drill down wherever you have questions.

10    THE COURT:  Just to start with, I had two update

11    questions.  One is I know that EPA was considering an amendment

12    to 40 CFR 233.41, which is the burden of proof or the standard

13    of liability regulation.  Where is that?

14    MR. COGHLAN:  So EPA proposed a rule.  The comment

15    period closed, I believe it was, last week or immediately

16    before that.  And EPA is now considering comments on that

17    proposed rule.

18    The proposed rule clarifies EPA's long-standing

19    position, which is that a state can assume Section 404 or 402

20    permitting programs with any form of negligence requirement.

21    THE COURT:  Okay.  And then where are we with respect

22    to the further review by the Marine Fisheries Service?

23    MR. COGHLAN:  I'm going to let Ms. Finnegan address

24    that.  That's in her purview.

25    THE COURT:  Okay.  Go ahead.

51

1    MR. COGHLAN:  I'll take it point by point, and maybe

2    starting with the first claim that plaintiffs bring here, which

3    is their argument that Florida's application was incomplete as

4    submitted.

5        And the crux of that argument is that the application

6    had to submit the Bi Op.  And the reasoning there is that the

7    Bi Op, and the Bi Op alone, outlines the interagency permit

8    review process that Florida intended to use to safeguard

9    species and habitat.  But that's just not true.

10       I mean, the process that Florida intended to use, the

11   interagency permit review process, that the Bi Op calls

12   technical assistance, that's laid out in great detail in the

13   regulations that were included in Florida's program.  And I

14   haven't heard plaintiffs identify any substantive element

15   included in the Bi Op that wasn't included in those regulations

16   on which they had an opportunity to --

17       THE COURT:  Well, how can Florida's regulations

18   dictate what Fish and Wildlife do?  There's that supremacy

19   clause thing.

20       MR. COGHLAN:  Yeah.  Well, fair enough, Judge Moss.

21   What Florida's program is saying is -- Florida's submission is

22   saying is if we assume this program, then our intention is to

23   work with Fish and Wildlife in this process.

24       I mean, at the point that Florida is proposing the

25   program, it's just a proposed program.  None of it has been

1    codified in Florida's regulations.  So they're saying, here's

2    how we intend to do things if our program is approved.  And

3    plaintiffs then had every opportunity to say, no, that process

4    is insufficient for whatever reason.

5          THE COURT:  But, I mean -- I didn't mean to be flip

6    about that.  Do the Florida regulations really say, and this is

7    what the -- what we're proposing that Fish and Wildlife -- the

8    Fish and Wildlife Service will do the following things, and

9    it's actually in a Florida regulation?  That would be an odd

10    thing.

11          MR. COGHLAN:  We've laid out in our brief the

12    provisions of the Florida administrative code and the

13    Section 404 handbook, which are incorporated by reference into

14    Florida's regulations.  And they do lay out in a lot of detail,

15    we're going to get a permit, we're going to look at it, we're

16    then going to pass it along to Fish and Wildlife.  I'm

17    paraphrasing here, of course.

18          It basically says, whatever Fish and Wildlife Service

19    tells us to do, we'll do it, and we have to do it.  Even if we

20    don't like it, Fish and Wildlife Service, ultimately, gets the

21    ultimate call.  That's how we intend to address species issues.

22          THE COURT:  Okay.

23          MR. COGHLAN:  You know, I don't think it's surprising

24    that plaintiffs haven't identified a substantive requirement of

25    that interagency permit review process that wasn't contained in

1    Florida's application.  And that's because biological opinions

2    are opinions by the rendering agency that a proposed action

3    will or won't impact species and habitat.

4         So the agency, in this case Fish and Wildlife

5    Service, that renders that opinion, sort of, takes the proposed

6    action as it finds it.  In other words, the Bi Op doesn't

7    dictate the critical elements of a proposed action.  It just

8    summarizes those critical elements.  I think that's all the

9    Bi Op did here.

10        I don't think plaintiffs have a legal right to

11   comment on the Bi Op summary of the interagency permit review

12   process.  There's no statutory or regulatory requirement for

13   Florida to include the Bi Op in its application.  So the lack

14   of the Bi Op from that application submittal didn't render it

15   incomplete, and plaintiffs weren't denied an opportunity to

16   comment on that interagency permit review process.

17        THE COURT:  Okay.  I'll just have to do that work.  I

18   guess I'll have to go look at each of the regs and then compare

19   them to the Bi Op and see if there's -- if they match up.

20        MR. COGHLAN:  That's fair.  Yeah.  I'll move on to

21   Claim 2, Your Honor.  This is, sort of, an omnibus claim.

22   There are a lot of sub-arguments embedded in it.

23        One of those arguments is that EPA failed to ensure

24   that Florida permits would satisfy applicable requirements of

25   the 404(b)(1) guidelines.  And even within that, there are a

1    couple of sub-arguments that I'll unpack a little bit.

2        The first argument there that the plaintiffs make is

3    that Florida's program is unconcerned with discharges unless

4    those discharges would threaten water quality standards.  The

5    second argument that they make is that FDEP, the Florida

6    Department of Environmental Protection, the permitting agency

7    in the state, that FDEP does not have to make factual

8    determinations to support its permits.

9        And then the third argument they make under that

10    heading is that that technical assistance process is inadequate

11    to safeguard species and habitat.  Now, that third argument,

12    I'm going to let Ms. Finnegan address in her presentation.

13    It's really a cross-reference to their ESA argument.  So I'll

14    address those first two arguments.

15        I think our primary submission for both of those

16    arguments is that they're belied by the record.  I mean,

17    Florida's regulations are clear on their face that the state

18    has to consider impacts from all discharges of pollutants, not

19    just those discharges of pollutants that threaten water quality

20    standards.  We've, again, cited in our brief the regulatory

21    provisions.

22        THE COURT:  I'm looking at the regs here.  And

23    Section 230.11 and 230.22 of the EPA reg -- I'm sorry.  Those

24    must be the Fish and Wildlife regs -- say that the permitting

25    authority shall determine in writing -- no.  This must be EPA.

1    I'm sorry.

2        "The permitting authority shall determine in writing

3    potential short-term or long-term effects of a proposed

4    discharge of dredged or fill material on the physical,

5    chemical, and biological components of the aquatic environment

6    in light of subpart C, which includes a broad array of water

7    quality impacts."

8        The Florida analog to that says, "An application must

9    provide reasonable assurances that the project will not

10    adversely affect the quality of receiving waters such that the

11    state quality standards will be violated."

12        It's that "such that" language which I think is --

13    what the plaintiffs were relying on.  Similar argument with

14    respect to 230.11(d).

15        MR. COGHLAN:  I think the problem there, Your Honor,

16    is that is a very, very selective reading of Florida's

17    regulations.

18        I would refer you to the pages in our brief where we

19    directly address this argument.  This is in our reply brief.  I

20    don't have a pin cite for it off the top of my head, but I'm

21    happy to find it for you.

22        THE COURT:  Okay.

23        MR. COGHLAN:  If you walk through what Florida's

24    regulations say in full, it is abundantly clear that it is not

25    just discharges that violate water quality standards.  It is

1    that Florida has to ensure -- Florida has to assess whether

2    there may be a pollutant present that might violate water

3    quality standards.  And if you line that up with the analogous

4    provision under the (b)(1) guidelines, which is work that we do

5    in our brief in response to the point that you're getting at

6    there, I think you'll find that they're materially identical.

7    There really isn't any daylight between --

8          THE COURT:  But it seems to me what you just

9    described to me is not different than what plaintiffs say the

10    Florida rule is.  They say that that's the problem.  Because

11    you have to find that it might violate the water quality

12    standards.

13          And I need to go back and look at this all more

14    carefully.  There's a heck of a lot here.  But plaintiffs say

15    to me that the federal rule is -- doesn't turn on whether it

16    might violate its -- if it's anything that is contributing to

17    or affects the water quality, period, even if it wouldn't

18    violate.  Even -- there's no way in the world this will

19    violate.

20          We agree, this is a drop in the bucket; it will not

21    violate.  We're completely with you.  But, yes, you need to

22    submit this to us, and we need to consider it, I think what

23    they're saying is; but Florida doesn't do that.

24          MR. COGHLAN:  Well, I just don't think that's an

25    accurate reading of the regulations, Judge Moss, and I think --

1          THE COURT:  Which side, though?  I was starting from

2     your description of the Florida rule.  So I think you must be

3     saying their description of the federal rule is not correct

4     then and the federal rule doesn't require that.

5          MR. COGHLAN:  I don't think that -- if you're

6     repeating my description, my description was inaccurate, and

7     that's my mistake.  I think what Florida's rules say -- and

8     this is the -- I want to be clear that we're dealing with a

9     very particular sub-issue here.  This is not whether discharges

10    matter, writ large.

11          I mean, there are tons of Florida regulations that

12    make clear that all discharges have to be looked at.  There

13    isn't just some blanket rule that only bad discharges somehow

14    matter under Florida's regime.

15          I think the point that plaintiffs make here is when

16    do you have to analyze the constituent pieces of that

17    discharge; when do you have to do an analysis of the material

18    to be discharged; and what -- going from memory here -- it's

19    all laid out in our brief; again, I'll rest on that.

20          But going from memory here, what the federal

21    regulations say is that the Army Corps has to assess, I think

22    it's something like the potential for violations of -- they

23    have to look at any -- they have to look at material in the

24    discharge, and they have to assess whether there's any

25    potential there for violation of water quality standard.

 1     Doesn't have any requirement that it's only if there's a

 2     possibility of water quality standard.  If there's material and

 3     discharge, they have to identify potential water quality

 4     standard.

 5          I believe what Florida's regs say is that the state

 6     has to look at whether there is present in the discharge

 7     material some constituent.  So it's the question, is there a

 8     presence of some constituent that has the possibility of

 9     affecting the water quality standard?  I mean, I think those

10     are the two pieces that are the comparison.

11          And if the answer to that is yes, then there's

12     additional testing that the state has to require the applicant

13     to perform and to submit to the state.

14          THE COURT:  Okay.

15          MR. COGHLAN:  You know, the other argument that they

16     make under the (b)(1) guidelines heading is that Florida

17     doesn't have to make factual determinations to support its

18     permitting decision.  Here again, I think -- we think it's

19     clear on the face of Florida's regulations -- we've cited them

20     in our brief -- there are ample sections of the 404(g) handbook

21     that are, again, incorporated by reference into the

22     administrative code that say to Florida DEP, you have to assess

23     whether the information provided to you is sufficient to ensure

24     that the state -- that the proposed discharge meets substantive

25     standards that are materially identical to the substantive

 1    standards under the (b)(1) guidelines.

 2            Now, I realize that the plaintiffs say that that's

 3    not good enough because there's this independent analysis

 4    criteria.  I'm not really sure where they're getting that from,

 5    but I can tell you that there is no mention in the (b)(1)

 6    guidelines of any requirement by the Court to conduct

 7    independent analysis.

 8            I think what the Corps has to do under the (b)(1)

 9    guidelines is it has to look at the information that applicants

10    provide, and it has to draw a rational connection between the

11    information that applicants provide and its ultimate permit

12    determination, which is just administrative law 101.

13            And that's the same thing that Florida has to do

14    under its permitting regime.  There's really no daylight there

15    either.

16            If there's any interest here, they raise a number of

17    arguments alleging post hoc rationalizations on those points

18    and go into some detail in their surreply.  I'm happy to

19    address those here if you want me to.

20            THE COURT:  You're welcome to do so.  I do think that

21    it's not a substantial argument.  So if you want to address it,

22    you may do so.

23            MR. COGHLAN:  Sure.  So I don't think the post hoc

24    charge fits here.  Their argument is that -- the arguments

25    about reasonable assurance language that we make in our brief

60

1    go beyond what EPA said in its response to comments.

2         But I think context is really important here.  And if

3    you look at plaintiffs' comment letter, it was a 55-page

4    single-spaced letter.  There were two sentences in that letter

5    that mentioned reasonable assurances, and those two sentences

6    were sandwiched in four or five paragraphs that looked at

7    specific factual determinations required under 230.11 of the

8    (b)(1) guidelines and said that there are no factual

9    determination analogs under Florida's program.

10        And look at what EPA said in response to that

11   comment.  The agency said, "We've reviewed appendix J3 to the

12   state's program description.  This is the 155-page crosswalk

13   that lays out the federal requirements in their state law

14   analogs.  And we have concluded that the factual determinations

15   required under Florida's program, while not the same as the

16   factual determinations required under the federal program, are

17   consistent with and no less stringent than the factual

18   determinations required under the federal program."

19        And then if you look at the sections that we cited in

20   our brief, those are the exact sections that Appendix J3

21   discusses as relevant to the analysis of 230.1, which is

22   nothing post hoc about that.

23        I also do want to emphasize here that, when we were

24   writing our opening brief, we were not responding to

25   plaintiffs' two-sentence comment letter.  We were responding to

1    three pages of briefing in their opening brief on this issue.

2    And you don't get from two sentences to three pages without

3    elaborating and adding on and expanding on an argument.  I

4    think if they do that, it's only fair that we would get to do

5    so in our response to their argument.

6          So for all of those reasons, I just don't think that

7    this is a valid, sort of, post hoc argument.  I think the

8    argument rings hollow.

9          I do want to address enforcement authority because

10   that's, obviously, a big issue here.  I think plaintiffs'

11   argument is that the Clean Water Act itself unambiguously

12   requires that a state have a simple negligence mens rea

13   requirement or statute of limitations of more than five years.

14   I just don't think that's true.

15         If you look at Section 404(h)(1), which, again, is

16   the section where Congress provided minimum standards for state

17   assumption, what Congress said there was that states have to

18   have authority to abate violations of the state program.

19   That's the statutory text.

20         And I will note that elsewhere in Section 404(h)(1),

21   Congress was extremely prescriptive.  It explicitly referenced

22   sections of the Clean Water Act that states had to meet or beat

23   in order to assume Section 404 permitting authority.  They said

24   nothing of the sort about the simple negligence mens rea

25   requirement in 1319.  They said nothing whatsoever about

1    statutes of limitations.  I think the --

2            THE COURT:  So the reg at 23- -- 233.41, does that

3    reg apply beyond the scope of this provision?  What does the

4    reg -- because the reg has the broader language in it.

5            MR. COGHLAN:  The plaintiffs do have a regulatory

6    argument here, Your Honor.  But I think to accept their

7    argument of 233.41, you have to read subparagraph (b)(2) to,

8    essentially, negate subparagraph (a)(3)(ii), which says that a

9    state has to have authority to issue -- excuse me -- authority

10   to bring criminal prosecutions based on a showing of criminal

11   negligence.

12            That's for unpermitted discharges and permit

13   violations; criminal negligence is the key term there.

14   Criminal negligence is a term of art.  I mean, it's defined in

15   Black's, it's defined in dozens of state criminal codes to mean

16   a heightened form of negligence.

17            And so what (b)(2) does, it's a gloss on subparagraph

18   (a)(3), and it says, "As a general matter, the degree of

19   knowledge or intent or burden of proof that a state brings in

20   pursuing a violation under (a)(3) can be no greater than under

21   the federal standard."

22            THE COURT:  But -- I mean, just to back up for a

23   second, though, here.  You're telling me that the statute

24   doesn't require particular criminal standards, correct?

25            MR. COGHLAN:  That is correct.

63

1        THE COURT:  Okay.  And you've also told me that if

2    the state does what the statute requires, done, and you have to

3    approve, you have no choice.  So are you telling me that your

4    regulation is ultra vires then?  Because ultra vires, the

5    regulation says that there are requirements with respect to the

6    particular types of criminal and civil remedies that are

7    available.

8        MR. COGHLAN:  No, Judge Moss.  That's not what I'm

9    saying.  Our argument is this.  That the statute is not

10    extremely prescriptive about what criminal negligence standard

11    the state has to employ.  What it says is it has to have

12    authority to abate violations.

13        THE COURT:  Right.

14        MR. COGHLAN:  Now, our submission is that that broad

15    language leaves a lot of play in the joints for EPA to decide

16    in its discretion what constitutes adequate authority to abate

17    violations.  And EPA's consistent approach on that issue has

18    been to say, well, any form of negligence suffices; and I think

19    that's embedded in the language in 233.41(a)(3)(ii), which says

20    that a state has to have authority to pursue criminal

21    prosecution based on the showing of criminal negligence.

22        I do want to reference that -- sorry.  Go ahead.

23        THE COURT:  I just -- I wonder whether -- there,

24    obviously, are a range of arguments you can make with respect

25    to the regulations.  You make the argument and say, well, you

64

1    read criminal negligence, you go look at Black's, you know what

2    criminal negligence means, and, therefore, (b)(1)(2) [sic]

3    can't really be more expansive than that.

4            I think the other -- the flip side -- and maybe this

5    is what the plaintiffs argue -- is to say you got it just

6    backwards.  The phrase criminal negligence itself is not

7    entirely clear; it means negligence.  It could mean simply

8    negligence which is criminal, which is what the federal

9    standard is here.

10           And when you read that language in light of (b)(2),

11   it must mean not criminal negligence as defined in Black's, but

12   negligence which is criminal and under the federal system we

13   now know under federal circuit case -- under circuit case law

14   that it is negligence which is criminal for purposes of the

15   Clean Water Act to engage in simple negligence.

16           MR. COGHLAN:  I'd make two points on that, Judge

17   Moss.  I mean, on the textual point, I don't think that's the

18   best reading of the regulations.  And one of the reasons for

19   that is because, if you look at (a)(3), it talks in the first

20   instance about authority to bring criminal fines for violations

21   committed with criminal negligence.

22           So if the only work that the word criminal is doing

23   in criminal negligence is to tell you that we're talking about

24   authority to bring criminal penalties, then it's really not

25   doing any work at all because the beginning of that sentence

65

1    has already clearly stated we're talking here about authority

2    to bring criminal penalties.

3              THE COURT:  Well, civil penalties or -- civil or

4    criminal; it's both.

5              MR. COGHLAN:  Yes, that's true.  But if we're talking

6    about -- specifically about (a)(3)(ii), which I think is the

7    provision that we're talking about here, you'll see that the

8    agency shall have authority to seek criminal fines.  So this is

9    a specific provision about authority to seek criminal fines.

10   And it already tells you that it's about criminal fines in the

11   first --

12             THE COURT:  When was this reg originally adopted?

13             MR. COGHLAN:  This reg was originally adopted, I

14   believe it was, in 1980.  That actually brings me --

15             THE COURT:  I could be wrong about this.  I think

16   maybe 1993.  Is that not right?

17             MR. COGHLAN:  Well, so I think that's when it was

18   originally brought.  And in its -- in more or less this form,

19   the first iteration of this reg, when you put it that way, was

20   brought in 1980; it was amended in 1988.  There may have been a

21   subsequent amendment in 1993.  But I think that the language

22   that is in the Code of Federal Regulations now was adopted in

23   1988.

24             You know, I think this actually brings me to another

25   point of why our reading of the reg is better.  And that's the

1    regulatory history that we discuss in our briefs.  So when the

2    reg was first adopted in 1980, EPA did not have the word

3    criminal negligence in what is now (a)(3)(ii).  But what was in

4    the reg was a note in -- under what is now (b)(2), and the note

5    said, when we're talking about authority to bring civil or

6    criminal penalties and we're talking about a form of

7    negligence, it's okay for a state to have criminal negligence

8    or gross negligence as its standard.

9            So that was EPA's understanding as of the passage of

10   the regs in 1980.  Fast forward to 1988, EPA added the word

11   criminal in front of negligence in (a)(3)(ii).  And it said in

12   the preamble to that regulation, we're not making substantive

13   changes to this provision.

14           And I think the clear inference from that course of

15   history is that EPA understood its regulations to allow for a

16   heightened form of negligence, not just simple negligence.  I

17   think EPA's course of dealing over the years has also

18   illustrated that this has been its long-standing view of the

19   regulation.

20           Plaintiffs mentioned that many of the approved NPDES

21   and 404 programs predate the Ninth Circuit's decision in

22   *Hanousek*, and that's true.  That's why we, in our brief, cited

23   three -- not two -- three that had been approved since the

24   *Hanousek* decision.  There's just an unbroken line of approvals

25   of state programs that have this more than simple negligence

67

1    mens rea requirement.

2    So this has been EPA's long-standing interpretation.

3    The preamble -- excuse me.  The proposed rule that you asked

4    about at the outset just clarifies what has been EPA's view all

5    along here.

6    You know, I do want to just make one other point and

7    revert back to a colloquy you had with Ms. Galloni.  If you

8    don't believe our way of reading the regs where (b)(2) is the

9    general rule, then the specific in (a)(3)(ii) controls the

10   general rule, then I think you put your finger on another way

11   to read this regulation, which is that the regulation speaks of

12   a requirement about the degree of knowledge or intent required

13   under state law shall be no greater than federal law.  That's

14   what (b)(2) says.

15   I mean, you can have different degrees of negligence,

16   but the common denominator of any form of negligence is that

17   there isn't any intent requirement.  I mean --

18   THE COURT:  Well, it's degree of knowledge or intent.

19   MR. COGHLAN:  Yeah.

20   THE COURT:  I think that that is probably in these

21   cases typically what negligence is about, where someone says we

22   weren't aware of what was going on.  We didn't know there were

23   turtles there when that happened.

24   And this is saying, it's the same -- if the lack of

25   knowledge is not a defense in the federal system, then that

1    lack of knowledge under the state system shouldn't be a problem

2    as well.

3             MR. COGHLAN:  Well, I guess, my point is that's going

4    to be true whether the mens rea requirement is gross negligence

5    or simple negligence.

6             I mean, any form of negligence does not require a

7    showing of knowledge or intent.  It's just an objective

8    standard.  That's the point I was trying to make there.

9             THE COURT:  I guess I'm not so convinced on -- on the

10   other issues, I need to go back and work my way through the

11   regulatory history on all of this.

12            But it strikes me that the way these things would

13   ordinarily play out, if it's a gross negligence one -- for

14   example, case, you would -- or other colleagues at the justice

15   department would be in court and arguing and saying, of course,

16   this was gross negligence here because -- they may not have

17   known that there were turtles there, but they knew there were

18   nests.

19            They knew that there had been turtles there in the

20   past, and it was gross negligence for them not to go look to

21   see if there were turtles there when they knew all these other

22   things.  So knowledge is always, I think, going to come into

23   play.

24            MR. COGHLAN:  Fair enough.  I don't want to rest the

25   case on this because this wasn't our primary submission.  I

1    wanted to relate back to the argument you had raised with

2    Ms. Galloni there.

3              THE COURT:  Fair enough.

4              MR. COGHLAN:  I think, if there aren't any other

5    questions on criminal enforcement -- well, actually I do want

6    to address another issue on criminal enforcement that

7    Ms. Galloni made.

8              THE COURT:  Okay.

9              MR. COGHLAN:  There's an argument, I think in their

10   surreply, which says EPA's long-standing position has been it

11   doesn't want to have to be the enforcer for a state program.

12   So a state program has to, actually, have a robust enough

13   enforcement mechanism so the federal government isn't

14   constantly rushing in to fill the void.

15              And I think that's a fair point.  I think that's been

16   EPA's long-standing view.  But what I'd say there is that the

17   real-world difference between cases that might be brought under

18   a simple negligence standard but not under a gross negligence

19   standard is likely to be vanishingly small, and -- I mean, we

20   addressed this point in our brief.

21              The federal government has stated in other settings,

22   including before the Supreme Court, that we almost never bring

23   prosecutions under simple negligence.  And when we do, it's

24   only when there's some aggravating conduct.  And there's a law

25   review article in the record that we discuss in our brief that

 1    analyzes all prosecutions under the Clean Water Act.

 2            I think only something like three percent of those

 3    prosecutions involved, sort of, a pure, simple negligence claim

 4    with no aggravating --

 5            THE COURT:  Although, what I will say, though, is,

 6    putting aside how often the department actually brings those

 7    cases, it strikes me as almost certainly the case that there is

 8    a substantial deterrent effect.

 9            MR. COGHLAN:  Yeah.

10            THE COURT:  And that is, presumably, why the justice

11    department in at least those three appellate cases went to the

12    trouble of arguing and winning those cases in the courts of

13    appeals to establish that the standard was, in fact,

14    negligence.

15            Because when you're dealing with an enforcement

16    regime where people get away with what they can, oftentimes

17    having a negligence standard is going to keep people much more

18    in line than a gross negligence standard.  You go to your

19    lawyer and you say, can we do this?  Oh, you know, it's

20    negligence; you better be darn careful.  Versus gross

21    negligence; I think you're okay.

22            MR. COGHLAN:  I think that's a fair point.  But what

23    I'd say in response to that is I don't think you lose any of

24    that deterrence value by allowing states to assume Clean Water

25    Act permitting programs with a gross negligence requirement.

1    And the reason is because EPA always has the authority to bring

2    a criminal prosecution under Section 1319 even in a state

3    that's assumed a permitting program.

4         THE COURT:  Although, I think this gets back to your

5    opening point where you said it's not my job to decide what's

6    good policy and what's bad policy or what works better.  I just

7    have to decide what's consistent with the statute.

8         If the statute or the regs say it has to be the same

9    standard, then the fact that EPA could step in and fix it

10   doesn't really answer -- I also do think, as a matter of

11   political reality as well -- and I'm using the small P,

12   political there.  That just with respect to the allocations of

13   responsibility, once an application to assume permitting

14   authority is granted, I think the EPA loses some of its

15   accountability at that point in time.  They can point to the

16   state and say, look, they're the ones administering that

17   program.  Yes, this horrible thing happened; not on our watch.

18   It was on their watch.

19        And maybe you say, well, we had oversight authority,

20   but it gets a lot hazier and muckier once there's been an

21   assumption.  And the EPA, under those circumstances, is less

22   accountable and less likely to step in and probably also less

23   of a worry.

24        If you're a developer in Florida, you're probably a

25   little less worried that the EPA is going to bring an

1    enforcement action against you even on a negligence theory

2    after there's been an assumption and the state is actually

3    administering the permitting program.  It's possible.  But,

4    again, it's diminished risk at that point.

5              MR. COGHLAN:  I'm not going to concede that point,

6    Judge Moss, but there's nothing in the record that I can point

7    to to dispute it, so I'll move on.

8              THE COURT:  Fair enough.  Fair enough.

9              MR. COGHLAN:  I do want to get to the plaintiffs'

10   arguments about the retained waters list.  They spent a fair

11   amount of time on that.

12             I think their first two arguments are that the

13   retained waters list had to include what I'm going to call

14   historic use Section 10 waters.

15             THE COURT:  Yes.

16             MR. COGHLAN:  Those are Section 10 waters that are

17   only defined as navigable waters of the United States because

18   they may have been used in the past to transport interstate and

19   foreign commerce but can't be used now or used in the future to

20   transport interstate commerce.  So they say historic use

21   Section 10 waters had to be included.

22             They also say that the complete universe of what I'm

23   going to call (a)(1) TNWs -- those are the, sort of,

24   traditionally navigable waters -- also had to be included on

25   the retained waters list.

1        We think that both of those arguments are foreclosed

2    by statutory text here.  The text is actually pretty clear.

3    And Congress in Section 404(g)(1) defined what retained waters

4    are; and it said that retained waters are waters that are

5    tidally influenced, waters that are used to transport

6    interstate or foreign commerce, or waters that could be used.

7        THE COURT:  Susceptible, is -- could be is the

8    language or is --

9        MR. COGHLAN:  Susceptible to use -- actually, let me

10   be precise about this and look at the actual text because I

11   think precision is important in this area here.

12       Section 404(g)(1) says, the parenthetical, "Those

13   waters which are presently used or are susceptible to use."

14   So, yeah, that's what I was --

15       THE COURT:  Right.  Again, this is an issue that I

16   have to run down.  There's a lot I have to run down on this

17   case still.  But I take it from -- Ms. Galloni's argument was

18   that that language comes from Supreme Court precedent, and that

19   Supreme Court precedent employed a historic use test.

20       MR. COGHLAN:  I don't think that's accurate, Your

21   Honor.  I think they've got it exactly backwards.  I think

22   we've run through why that is in the brief.

23       I mean, to briefly summarize the argument, the Rivers

24   and Harbors Act of 1899 gives the Army Corps jurisdiction over

25   navigable waters of the United States.  Doesn't define that

1    term.  There's a body of case law that evolves over time.  The

2    body of case law says, well, a water can be legally navigable

3    if it was used in the past for the transport of interstate and

4    foreign commerce.

5          The Corps adopts a regulation that adopts that case

6    law definition, says a navigable water for purposes of the RHA

7    is a water that was used, is used, or could be used -- again,

8    paraphrasing; susceptible to use is what I mean by could be

9    used -- in interstate or foreign commerce.

10         And I think all of that matters because if Congress,

11    when they were enacting Section 404(g), wanted to include in

12    the scope of retained waters all waters that had been

13    understood to be navigable under the Rivers and Harbors Act,

14    they could have just used the phrase navigable waters of the

15    United States.  I mean, that would have encompassed the Supreme

16    Court language.

17         THE COURT:  Well, assuming you're right about that,

18    isn't there still a problem here?  If you take a list and the

19    list has on it waters that are used for interstate commerce and

20    waters that are -- that are -- historically, have been used for

21    that purpose, and you say, oh, we're not covering historic;

22    let's cross all the historics off the list, it's got to be the

23    case -- I'm willing to grant you that some of the ones that

24    historically were used maybe, due to shifts in sedimentation or

25    whatever it may be, it once was navigable; that waterway is no

1    longer navigable.  Some of them probably still are navigable

2    unless you go and look at them.

3          If it's historically used, there's at least a

4    significant possibility that, even if it's not today being used

5    for that purpose, that it's susceptible to that purpose.

6          If you just cross it off the list without looking at

7    it, isn't that sort of the very definition of arbitrary and

8    capricious?

9          MR. COGHLAN:  Maybe.  But I don't think the record

10   reflects that that's what happened here.

11         I mean -- well, I guess two points.  First, the

12   record reflects that the Corps went through over a period of

13   some months and removed historic use waters based on its

14   assessment of materials in its records.

15         I think to your broader point, though, when the

16   Corps --

17         THE COURT:  Didn't they take all the historic --

18   maybe I'm misunderstanding the record.  I thought they took all

19   the historical use waters off the list.

20         MR. COGHLAN:  Yeah.  When the Corps designates

21   something as a navigable water of the United States, it has to

22   elucidate the basis for why it's designated as a navigable

23   water of the United States.

24         So it's a navigable water of the United States if it

25   could be used to transport interstate commerce with reasonable

1    improvements, if it is or if it was.  And when the Corps makes

2    a navigability determination, it says which of those it's based

3    on.

4         Actually, I don't think it's all that complicated for

5    the Corps to go back through its navigability studies and

6    identify those waters that were deemed navigable based solely

7    on historic use, not because they are used, not because they

8    could be used, and not because they're tidally influenced.

9         THE COURT:  So if you look at the list, then the list

10   would have said -- the equivalent of columns, is, could be,

11   historically was.  And you would check if all three were the

12   case, if this was a major -- this is the Mississippi River, all

13   three of those get checked.

14        MR. COGHLAN:  That's right.

15        THE COURT:  But there's some where it's only going to

16   say historically was checked, and that means that someone

17   actually made a determination, went out and looked at it and

18   said, we have determined that it could not be used for that

19   purpose.

20        MR. COGHLAN:  Yes, that's correct.  That's what I'm

21   telling you.

22        I think it's even more nuanced than that.  I think

23   some waters probably have reaches that were only historic,

24   were -- the only basis for Corps jurisdiction is historic

25   navigability.

1        So you can imagine a waterway at some point was

2    free-flowing but then was dammed or there was a low bridge or

3    berm or something like that, that cuts off the head of

4    navigation.  So above that obstruction, it's going to be a

5    historic use water; below that obstruction, it's going to be a

6    current use or susceptible to future use.

7        The Corps is going through and it's making those

8    cutoffs in its development of the retained waters list.  So

9    it's not just waters are off entirely.  It's also, sort of,

10   saying, well, up to this head of navigation.

11        THE COURT:  The list that is in the record would show

12   me, if I look at it, that there are cases in which they're

13   making all three designations, some cases where they're making

14   two designations, and some where they're making one

15   designation?

16        MR. COGHLAN:  You're not going to find that from the

17   list, Your Honor, but you're going to find that from the

18   navigability studies that are in the record.  So you would

19   actually have to go through and look.

20        I should say, you'd have to go through the

21   navigability studies and actually dig into what the Corps'

22   decision is as to each of those waters.

23        THE COURT:  Okay.

24        MR. COGHLAN:  You know, I think that the cases that

25   plaintiffs cite in their surreply, *The Daniel Ball* and the

1    *Economy, Light & Power* case, they're not wrestling with what is

2    and what isn't retained water.  They're trying to define what

3    is a navigable water.

4           That's a different question than what the Corps has

5    to do in developing a retained waters list.  A retained water

6    is a subset of navigable waters.  So the way Section 404(g) is

7    set up is that states can assume navigable waters except for

8    the subset of navigable waters that meet the criteria that

9    Congress specified.

10          So to say that, well, navigable waters include

11   historic use waters just doesn't really answer the question of

12   whether those historic use waters are in the carve-out

13   contained in the parenthetical in (g)(1).

14          THE COURT:  So has the list of retained waters

15   evolved or become more specific since the application was

16   approved here or has it just been static since then?

17          MR. COGHLAN:  There hasn't been a change to the

18   retained waters list itself.  To your question about

19   implementation, I think what the Corps and Florida have done

20   over the course of Florida's implementation is developed a GIS

21   mapping tool.  So that if the public is interested in figuring

22   out whether or not a potential project lies in assumed or

23   retained waters, it goes on to this website.  It can click on

24   the map, and that map will outline whether -- as a preliminary

25   cut, the Corps and Florida believe the jurisdictional line

 1    falls on the federal side or the state side.

 2              THE COURT:  With the exception of the regulation that

 3    was set aside, is there any other area of disagreement between

 4    the Corps and Florida with respect to what the retained waters

 5    are?

 6              MR. COGHLAN:  I'm not aware of any, Your Honor.  My

 7    understanding is that the Corps and Florida regularly confer on

 8    close calls when there's a question about whether, say, a

 9    project is in a tidal water; and that process has been working

10    as far as I know.  I haven't heard any --

11              THE COURT:  But does the list that was provided

12    answer those questions, or do they have to go out and look at

13    it together and figure out the answer?

14              MR. COGHLAN:  Well, the list provides, I think it's

15    602, waters that are named.  And then it says this also -- the

16    scope of retained waters also includes tidal waters.

17              And so there might be some questions about a tidal

18    water or about the head of tide in a specific water where that

19    lies, and that's something that the Corps and Florida have to

20    figure out on a permit-by-permit process.

21              But I think that's just a practical accommodation to

22    reality.  I mean, when you're dealing with a state like Florida

23    that has as much water as it does, I mean, the Corps has been

24    administering the RHA for over a century.  This is the best

25    information that it has on the subject.

1          To their point about the Corps admitting that the

2    2014 Section 10 list was out of date, I strongly dispute that

3    there's any such admission of that in the record.  I think what

4    they're referring to is an email from 2017 where somebody in

5    the Jacksonville District said it is imperative that we add to

6    our Section 10 list all waters that might remotely be TNWs or

7    Section 10 waters whether or not we have a navigability study.

8          That is not a list of waters that the Corps believes

9    to be Section 10 waters.  The universe of Section 10 waters

10   that are not on the current Section 10 list is a null set.

11          THE COURT:  Why were they told to stop that process?

12          MR. COGHLAN:  Well, they were told to stop that

13   process because -- this is spelled out in the record.  But I

14   think when the Corps began initiating that process, they

15   contemplated a process whereby (a)(1) TNWs would be added to

16   the retained waters list and where there would be, sort of, a

17   more start-from-scratch process to develop the retained waters

18   list.

19          The backstory here is that, while this process is

20   going on, EPA has convened a subcommittee; it's called the

21   assumable waters subcommittee.  This is a body that the Corps

22   served on in parts of 2015 to 2017.  The charge of the

23   subcommittee was to make recommendations to EPA about how to

24   define the scope of retained waters and how Corps districts

25   ought to go about putting together their retained waters list.

81

1          It's true that the Corps' representative on that

2     subcommittee advocated an approach that would have brought in

3     all (a)(1) TNWs to retained waters lists and advocated an

4     approach that would have had the Corps, essentially, develop

5     all of its retained waters lists from scratch when approached

6     by a state interested in state assumption.

7          But I think there are a couple of points I have to

8     emphasize about that.  The first is that that was not a

9     long-standing Corps position on how this is supposed to happen.

10    The whole point of the assumable waters subcommittee was that

11    there was no policy guidance on these issues from EPA or the

12    Corps.  So the subcommittee was convened to provide

13    recommendations on how this process should be addressed.

14         The other point I have to emphasize is that the Corps

15    stood alone in making the recommendations that it did.  The

16    other 21 members of the assumable waters subcommittee, which

17    were members of red states and blue states, and environmental

18    organizations and industry organizations, groups that don't

19    often see eye to eye on a set of policy recommendations,

20    unanimously agreed that, based on considerations of policy and

21    based on the plain text, that the appropriate scope of retained

22    waters was Section 10 waters, less historic use waters, and

23    that the way to go about developing retained waters lists was

24    for the Corps districts to use their existing Section 10 lists

25    as the basis.

1          Now, they published that report in 2017.  The

2     assistant secretary of the Army for Civil Works reads that

3     report, and then in 2018 he says, you know what, the majority

4     was correct; the Corps got this one wrong.  The majority

5     explains at length in its report why it thought the Corps was

6     wrong.

7          So there's a fully fleshed-out basis for why the

8     Corps changed its position to the extent that it was a change

9     in position.  And the assistant secretary of the Army for Civil

10    Works says this is Corps policy now; Jacksonville District, use

11    your existing Section 10 list.  And Jacksonville District said,

12    so we shall.  That's why there was a change in position.

13         THE COURT:  What about the extent to which there was

14    not agreement on the retained waters at the time that the

15    notice and comment occurred?  Is that a procedural violation?

16         MR. COGHLAN:  I don't think so.  So there was no

17    notice and comment process as to the retained waters list when

18    the Corps was developing it.

19         THE COURT:  But that's one of the requirements of the

20    application, is that it identifies --

21         MR. COGHLAN:  Oh, I see.  You're saying, is it a

22    procedural violation if there was a dispute about retained

23    waters?

24         THE COURT:  Yes.

25         MR. COGHLAN:  I think all of those comment letters

83

1    are contained in the record that the Corps submitted.  All

2    those comment letters would be contained in EPA's record.  I

3    mean, they're in those records because they were considered.

4         The person who developed the retained waters list at

5    the Corps was also the person who developed the 2017

6    supplement.  If the agencies made a mistake in leaving off a

7    water that the plaintiffs think should be on that list, then

8    the plaintiffs have had every opportunity to make that argument

9    here, but they haven't.

10        THE COURT:  No.  But I -- perhaps I misunderstood.  I

11   thought you agreed that there were at least -- there were 602

12   waters that were named.  There are other waters that are still

13   retained waters that were not on the list that still have to be

14   decided on, perhaps, a case-by-case basis.

15        MR. COGHLAN:  Well, I think all tidally influenced

16   waters are retained waters, if that's what you're getting at.

17        THE COURT:  Okay.

18        MR. COGHLAN:  If a water is subject to the ebb and

19   flow of the tide, then it's a retained water.

20        THE COURT:  And that wasn't settled at the time that

21   the application was submitted, so does that mean the

22   application was incomplete?  Because it's pretty clear from the

23   statute, from 1344(h) that the applicant is required to

24   describe the waters.  So is it incomplete?

25        And also, was there -- is the notice and comment a

1    problem if various parties weren't in a position which they

2    could say, well, wait a second, all those, we think, are tidal

3    waters.  They should have been included.  And they just never

4    had the opportunity to do that.

5         MR. COGHLAN:  Well, a couple points on that.  One

6    clarifying point.

7         I think the legal basis comes from EPA's regs.  It's

8    not from the statute.  So this is an EPA regulation.

9         THE COURT:  Okay.

10         MR. COGHLAN:  That's a minor point.  EPA's

11    regulations require a description of waters to be retained and

12    waters to be assumed.

13         THE COURT:  Right.

14         MR. COGHLAN:  And I think that a 602-water list of --

15    is an adequate description.  Now, it's not going to be a

16    perfect description.

17         I guess my point there has to be, if you have to have

18    a completely exhaustive list of every single water that's

19    tidally influenced in the state of Florida, that's just a

20    massive undertaking.  There are tens of thousands of waters

21    that would have to be assessed.

22         You'd have to establish the head of tide for each of

23    those; you'd have to document it.  Presumably, it would be a

24    final agency action.  There'd be a litigation over each of

25    those.  You'd never have state assumption if that's the

1    requirement.  So I think there's a rule of reason that has to

2    apply here.

3              I think a 600-water list based on over a century of

4    administering the Rivers and Harbors Act is a pretty reasonable

5    basis for developing a retained waters --

6              THE COURT:  But were all tidal waters excluded?

7              MR. COGHLAN:  Yes.

8              THE COURT:  So of those, there must have been some

9    that would not have been terribly hard to include that were

10   pretty obvious, right?

11             MR. COGHLAN:  Oh, I'm sorry.  I don't think I

12   understood the question.

13             THE COURT:  I excluded -- I didn't mean retained.

14   What I meant to say was not included on the list.

15             MR. COGHLAN:  All tidal waters are retained.  I don't

16   think it's the case that the Corps just went through and didn't

17   include any tidal waters on that list.  There are some big

18   waters on that list.

19             Like, the Gulf of Mexico is not a retained water.

20   But I also think it's pretty obvious to anyone who is going to

21   seek a Section 404 permit that the Gulf of Mexico is tidally

22   influenced.  If there's any doubt about that, you go on FDEP's

23   website, and you'll see that that's on the federal jurisdiction

24   side of the line.

25             THE COURT:  Okay.

1      MR. COGHLAN:  I'm happy to address any other

2    questions --

3      THE COURT:  I want to make sure there's time for your

4    colleague here as well, or your colleagues.

5      MR. COGHLAN:  Yes.  Thank you.

6      THE COURT:  Anything else you want to add?

7      MR. COGHLAN:  No, Your Honor.  I think that covers

8    it.  Thank you.

9      THE COURT:  Thank you.  All right.  Ms. Finnegan.

10      MS. FINNEGAN:  Good afternoon again, Your Honor.

11    I've heard you pose this question to my colleague and to

12    plaintiffs, so I'd like to start with the question that you

13    have about EPA's biological evaluation and where things stand.

14      THE COURT:  Yes, thank you.

15      MS. FINNEGAN:  Okay.  Great.  We filed a notice in

16    July, Docket No. 103, indicating that EPA completed its

17    biological evaluation, its requested initiation of

18    consultation, and EPA's engaged in conversations with the

19    National Marine Fisheries Service, which will inform a timeline

20    for consultation, as the agencies are still working together to

21    evaluate that biological evaluation.

22      Does that answer --

23      THE COURT:  Well, what I'm taking from what you're

24    telling me is you don't really have a timeline because you

25    don't know?

1          MS. FINNEGAN:  I do not have a timeline for

2     completion of any consultation at this time.

3          THE COURT:  Okay.

4          MS. FINNEGAN:  Okay.  So I started from the back of

5     my notebook.  I'd like to start from the beginning of my

6     notebook, if that's okay.

7          THE COURT:  Before you do that, let me ask you one

8     preliminary question.

9          MS. FINNEGAN:  Sure.

10          THE COURT:  I asked, I think it was Ms. Reichert,

11     about the cooling waters and whether that model has been

12     employed elsewhere of the programmatic biological opinion and

13     leaving it up to the states through consultation and the ITS

14     and the technical assistance program to actually implement

15     the -- or to ensure that the incidental takings are not -- are

16     properly implemented.

17          MS. FINNEGAN:  To my knowledge, the structure that

18     was set out in the cooling water intake decision, I believe

19     this is the first next time that it's been employed here for

20     Florida's assumption.

21          THE COURT:  Okay.  Thank you.

22          MS. FINNEGAN:  As the Court's aware, the final agency

23     action by the Fish and Wildlife Service in this case is the

24     biological opinion.  It's a programmatic biological opinion.

25     The Fish and Wildlife Service analyzed the change in

1      Section 404 permitting authority and assumed waters in Florida.

2           As part of its analysis, the Fish and Wildlife

3      Service recognized that approval of Florida's request would

4      result in Florida DEP regulating a broad array of activities

5      over a long period of time.  And as is stated throughout the

6      biological opinion, there's substantial uncertainty about the

7      number, location, timing, and intensity of regulated activities

8      going forward.  And that's why the Fish and Wildlife Service

9      determined that a programmatic or process-based approach was

10     the most appropriate.

11          So, in turn, the biological opinion described how

12     potential effects to ESA -- and I hope it's okay I'm using the

13     short term ESA for the court reporter -- ESA-listed species

14     will be assessed and minimized when the state processes

15     Section 404 permit applications and described a technical

16     assistance process in which the Fish and Wildlife Service will

17     provide assistance to the state to ensure that State 404 permit

18     actions comply with ESA Section 7.

19          It's clear the Court has read the briefs.  I think

20     it's important to give a couple of highlight items about what

21     that technical assistance process looks like.  And the

22     technical assistance process in the biological opinion, in

23     turn, was based on a memorandum of understanding that was

24     entered into between the Fish and Wildlife Service, the Florida

25     DEP, and the Florida Fish and Wildlife Conservation Commission,

89

1    also referred to in our briefs as just -- by the acronym FWC.

2            At the threshold, all State 404 applications,

3    including project-specific information, are supposed to be

4    provided to the Fish and Wildlife Service, and the Fish and

5    Wildlife Service has committed to review them.  You'll see in

6    the biological opinion that the Fish and Wildlife Service --

7            THE COURT:  When you say they've committed to review

8    them, where is that?  One question I have, are they actually

9    under a legal obligation to do so?  And if so, if you can point

10   me to where it says that.

11           MS. FINNEGAN:  Well, I can point you to where it says

12   it in the biological opinion.  Is that what you have and what

13   you're looking at, Your Honor?

14           THE COURT:  I have the biological opinion in front of

15   me.

16           MS. FINNEGAN:  Do you have the Bates-numbered

17   version?

18           THE COURT:  6032.

19           MS. FINNEGAN:  That's the first page.  So if you look

20   at page 18 or Bates No. 6056.  And it starts out, as you go

21   through -- this is one of the places.  It's listed throughout,

22   but this is the one I was looking at, at my seat.  Hopefully,

23   you can work with this one.

24           It describes how the Fish and Wildlife Service will

25   get the applications -- well, take two steps back.  It

 1    describes how initially Florida DEP and the Fish and Wildlife

 2    Conservation Commission -- and I'm in the second paragraph

 3    under the bolded heading.

 4              You should see a bolded heading that says,

 5    "Identifying applications that may pose adverse impacts."  Are

 6    you with me, Your Honor?

 7              THE COURT:  No, I'm not.  I'm on page 6056.  The

 8    third paragraph has some bullets underneath it.

 9              MS. FINNEGAN:  Yeah.  Can I point you to the second

10    paragraph.

11              THE COURT:  Second.  Okay.  Okay.  I got that.

12              MS. FINNEGAN:  "Upon receiving an application,

13    Florida DEP and FWC will review the submittal by the applicant

14    and preliminarily identify the affected species, affected

15    project area, and critical habitats," and so forth.

16              THE COURT:  I'm sorry.  I'm not seeing what you're --

17    do you have this same page?

18              MS. FINNEGAN:  I absolutely do.  Let's not --

19              THE COURT:  Oh, it's at the top.  Okay.  I'm sorry.

20              MS. FINNEGAN:  This heading, skip this paragraph, go

21    to this one.  It starts, "Upon receiving."

22              THE COURT:  Okay.  I'm with you now.

23              MS. FINNEGAN:  All right.  So that describes for you

24    what the state agencies are going to do.

25              THE COURT:  Okay.

1          MS. FINNEGAN:  All right.  Skip down to the middle of

2     the paragraph.  It says, "Florida DEP, or FDEP, will forward

3     the application to Florida Fish and Wildlife Commission and the

4     USFWS, Fish and Wildlife Service, within three to five days of

5     receipt."

6          THE COURT:  Okay.

7          MS. FINNEGAN:  And then it describes further

8     thereafter what it will do.

9          The closing sentence of that paragraph says that the

10    Fish and Wildlife Service may submit questions regarding

11    missing information and must do so within a particular period

12    of time.  We're going to go down to the bullets now.

13         THE COURT:  Okay.

14         MS. FINNEGAN:  "If the state agencies, Florida DEP

15    and Fish and Wildlife Conservation Commission, do not get a

16    response from the U.S. Fish and Wildlife Service by the

17    deadline for questions or comments, the lack of a response will

18    be considered no comment and no further information from the

19    U.S. Fish and Wildlife Service is needed.  U.S. Fish and

20    Wildlife Service has internal processes in place to ensure that

21    all applications are received and reviewed."

22         And then as a fail-safe, "Fish and Wildlife Service

23    may submit its questions during the public notice period for

24    the State 404 application should the Fish and Wildlife Service

25    not respond during the early phase of FDEP and Fish and

92

1    Wildlife Service coordination."  Okay?

2                 THE COURT:  Okay.

3                 MS. FINNEGAN:  Is that sufficient to answer your

4    question?

5                 THE COURT:  It answers my question.  I'm not sure

6    whether it's sufficient or not.  I have to think about that.

7                 MS. FINNEGAN:  What can I do to further answer?

8                 THE COURT:  Well, I guess, what's bothering me about

9    this whole issue here or at least, sort of, fundamentally, is I

10   take it, it is a big deal to give somebody liability protection

11   under the Endangered Species Act.  It's not something that's

12   done lightly.

13               The model in the statute and the way that it's

14   conceived in the statute is you go to the agency; I want to --

15   I'm going to -- I need to build a dam.  The agency decides

16   whether to license you to build a dam or not.

17               They then go to the Fish and Wildlife Service and

18   consult with the Fish and Wildlife Service and say there's

19   snail darters there.  If you build that dam, it's going to be

20   a real problem for the snail darters and they're an endangered

21   species.  It's going to have a significant impact on the snail

22   darters if you build that dam.

23               Here are the conditions.  If you build a run on the

24   side that does the following things that allows the snail

25   darters to get through -- we understand that a handful of snail

1    darters may perish in that run on the side, but we think that

2    that's sufficient.  And if you do that, we're not going to hold

3    you liable for the incidental take of killing those handful of

4    snail darters that are going through the run.

5        That's, I take it, what, sort of, the paradigm of how

6    this works and it's intended to work is.  It strikes me as --

7    it's troubling to me to say that -- I'm a Florida developer

8    now, and I'm going to get liability protection and not be

9    subject to liability for incidental take under the Endangered

10   Species Act because there's this programmatic biological

11   opinion that doesn't really talk at all about what I'm doing or

12   anything that's occurring on this land here, any of the species

13   are not discussed here.

14       But I'm going to get protection because the --

15   Florida has entered into a memorandum of agreement, and I

16   have -- Fish and Wildlife Service has issued a biological

17   opinion that says that Florida will send these applications to

18   us, and we will review them.  Doesn't say what we'll do,

19   doesn't say what standards we'll apply.  We're certainly not

20   the ones who are then directing and issuing, sort of, what

21   conditions apply on any of this.

22       None of those types of procedural protections, and I

23   think, as the plaintiffs put it, guardrails that apply

24   ordinarily are there.  But the state of Florida sends the

25   application in.  Someone at Fish and Wildlife may look at it;

1    maybe they're required to.  It's not at all clear to me that

2    this biological opinion gives rise to a legal obligation that

3    is enforceable in a court of law that they do so the same way

4    that the statute would be.

5            But they may look at it.  It's not clear that anyone

6    can sue if they don't look at it and would have a basis to do

7    so and an enforceable right.  They look at it and they then say

8    to Florida, here are some concerns we have.  Then Florida puts

9    something into a permit, and then there's an incidental take.

10   Someone says, you know, I have absolute protection.

11           It seems fairly removed from the scheme that Congress

12   had in mind for providing that really serious step.  You're out

13   there killing endangered species.  But you know what, it's okay

14   because Fish and Wildlife Service looked at it and set out the

15   conditions that do so -- that said so.

16           But it's nothing -- for example, it doesn't say what

17   standard the Fish and Wildlife Service is going to apply in

18   doing so.  That is causing me some concern here.

19           MS. FINNEGAN:  All right.  So let me try and unpack

20   things one at a time.  I'm going to go a little -- I'm going to

21   start at the end and go back to the beginning.

22           THE COURT:  Okay.

23           MS. FINNEGAN:  First of all, no one is intending for

24   intentional take of listed species.  I think the Court --

25           THE COURT:  Incidental take.  I understand.

1          MS. FINNEGAN:  Okay.  Just making sure.  I heard you

2     say killing endangered species.

3          THE COURT:  But incidental take is killing.

4          MS. FINNEGAN:  Okay.  Well, it takes up a whole lot

5     of other things, too.  I want to make sure you and I are on the

6     same page.  We're talking about --

7          THE COURT:  You're right, it could be harming.

8     You're right.  It's not just killing, but it could be harming

9     as well.

10          MS. FINNEGAN:  In the beginning you asked me where is

11    the commitment that the Fish and Wildlife Service will review

12    the permits, and it's throughout the biological opinion.  I can

13    give you a couple of pinpoint cites if you want them right now.

14          THE COURT:  I should have all that to look at.  There

15    may be more like this, but it still leads me to the question

16    of, is this anything that is legally enforceable, and does it

17    require Fish and Wildlife Service to actually comply with all

18    the ordinary guardrails that would apply with respect to the

19    best scientific methods or whatever the rules are that apply?

20          MS. FINNEGAN:  Okay.  So it's its own biological

21    opinion.  Of course, it's going to comply with it.  It's in an

22    MOU.  It's committed to that, Your Honor.  It's committed to --

23          THE COURT:  Come on.  Are you willing to commit to me

24    here that the United States concedes that someone can sue them

25    if they don't comply with this?

96

1          MS. FINNEGAN:  If the Fish and Wildlife Service

2     doesn't review the permit?

3          THE COURT:  Yes.  Not only doesn't review the permit,

4     but doesn't apply the best scientific standards or whatever the

5     requirements are ordinarily, and doesn't do all those things,

6     that someone would have a basis to sue the Fish and Wildlife

7     Service, and say, well, you put it in your biological opinion.

8          MS. FINNEGAN:  Well, I'm not sure what the cause of

9     action would be for that, Your Honor.  But in terms of the

10    standards, the express purpose of the technical assistance

11    process is to determine if state-issued 404 permits would

12    jeopardize species or adversely modify or destroy critical

13    habitats.

14          That's the standard the Fish and Wildlife Service is

15    going to apply.  And it clearly incorporates the meaning of

16    those terms from the Endangered Species Act and its

17    implementing regulations.  That interpretation is reinforced by

18    the fact that federal regulations that apply to EPA, the state

19    program rule, State 404 applicant handbook, all prohibit

20    issuance of a State 404 permit that's likely to jeopardize

21    ESA-listed species.

22          Those permits are not -- it's not just the biological

23    opinion that binds them to that, Your Honor.  It's not just the

24    memorandum of understanding.  That's what makes it a little

25    tiny bit different than the cooling water case.

1          In the cooling water case, you had disagreement by

2     the agencies.  Here, it's set out in the program rule as well

3     in Florida.  And another key difference -- I believe a key

4     difference between cooling water intake structures and this

5     case is that Florida agreed that the Fish and Wildlife Services

6     input is determinative.

7          If they do not agree to put the measures in place

8     that the Fish and Wildlife Service identifies, then Florida has

9     to issue a notice of intent to deny the permit.  These are not

10    optional issues.

11         THE COURT:  Let me ask you.  The guard- -- the

12    conditions that are imposed are then conditions -- well, I'll

13    put this into a question.

14         Are those conditions ones that are imposed by the

15    Fish and Wildlife Service or are they conditions that are

16    imposed by the state of Florida?  I guess what I'm wondering is

17    if someone then violates those conditions, who goes after them

18    or who has the authority to say, is it a power of the state, or

19    is it a power of the Fish and Wildlife Service?

20         MS. FINNEGAN:  So I'm going to get down -- I'm going

21    to try and answer because I think you're interested in the

22    mechanics.

23         THE COURT:  I am.

24         MS. FINNEGAN:  This is post-decisional, so there's

25    not necessarily information in the record.  But my

1    understanding of how it works is that the Fish and Wildlife

2    Service receives the permit, reviews it, provides a memorandum

3    that I believe goes to Florida.  I believe Florida then puts it

4    on its website and indicates what the Fish and Wildlife

5    Service's opinion is and what the measures are, and that those

6    are then incorporated into the permit that Florida issues.

7            As far as who is responsible for enforcement, I

8    believe it likely would be Florida DEP in the first instance,

9    but EPA also has oversight authority under its regulations and

10   guidelines.

11           THE COURT:  What about the Fish and Wildlife Service

12   just for an unlawful incidental taking?

13           MS. FINNEGAN:  Correct.  So if -- this is addressed

14   in the biological opinion.  So let me make sure that I'm

15   getting it exactly right.

16           I'm making sure I'm in the right spot, Your Honor.

17   If the permit conditions are not complied with or if the amount

18   or extent of incidental take is exceeded during the activity

19   that is being permitted, then there's a -- this is addressed in

20   the reinitiation statement -- then that permit, in and of

21   itself, can be reopened.

22           THE COURT:  Right.  So let me ask you this.  I

23   understand that Fish and Wildlife has agreed to receive and

24   review the permit applications.

25           MS. FINNEGAN:  Yes.

1          THE COURT:  But is there anything that says that

2     they're obligated, the Fish and Wildlife Service, other than

3     just the fact that it's the agency's mission?  Is there

4     anything that says, with respect to these applications, it's

5     actually obligated to weigh in?

6          So if it sees what it views as a risk to an

7     endangered species, is there something that says that Fish and

8     Wildlife Service is obligated to do something?

9          MS. FINNEGAN:  So I think -- I don't want to profess

10    to understand why the Court is asking the question.

11         But I did hear Ms. Reichert's discussion about the

12    fact that there was a permit application that had come in that

13    indicated there might be incidental take and that when it went

14    out -- when the permit was issued, there was no incidental take

15    limit.

16         I can't speak to that specific permit for two

17    reasons.  First, I didn't quite hear which one she identified,

18    and, second, I just don't have the information.

19         THE COURT:  That's not what the basis for my question

20    was.

21         MS. FINNEGAN:  I don't want to misapprehend what the

22    process is here.  The Florida DEP and the Florida Fish and

23    Wildlife Conservation Commission are supposed to review those

24    in the first instance.  That's what I was pointing to in Bates

25    No. 6056.

```
 1              And they are supposed to propose in the first

 2     instance that certain protection measures be implemented, and

 3     that's what goes to the Fish and Wildlife Service for review.

 4     So the Fish and Wildlife Service may -- if it reviews that, and

 5     it deems them sufficient, then no, it may not comment.  The

 6     idea is that --

 7              THE COURT:  No, no, no.

 8              MS. FINNEGAN:  -- comment as needed --

 9              THE COURT:  I'm sorry to interrupt.

10              MS. FINNEGAN:  -- and put measures in place as

11     needed.  I'm so sorry.  I don't mean to interrupt you.

12              THE COURT:  What I was going to say is -- really, my

13     question, though, is there some documentation other than just

14     our confidence in the goodwill and good intentions of the Fish

15     and Wildlife Service -- which I'm not doubting -- but is there

16     some document that you can point to that says where the Fish

17     and Wildlife Service sees that the following standard is

18     violated, it will -- it must weigh in under those

19     circumstances?  That's different than saying that it will

20     review it.

21              MS. FINNEGAN:  I guess I'm not sure where in the

22     process Your Honor thinks that that is not going to happen.

23     Because the process is designed specifically to make sure that

24     the Fish and Wildlife Service does, in fact, do that and that

25     the Fish and Wildlife Service has, in fact, committed through
```

1    this biological opinion to do that.

2            THE COURT:  But that's what I'm wondering.  I don't

3    see that, actually, said somewhere, that they're committing to

4    do that.

5            It raises just, also, to me kind of another, sort of,

6    broader question here about this, which is there's a lot of

7    very knowledgeable people in this room about these laws, and

8    I'm not among them.  I apologize for that.

9            But what bothers me here about this is there is a

10   statute that provides a mechanism for EPA to permit a state to

11   assume the Army Corps of Engineers permitting.  There's a whole

12   process that you go through that does that, and there are

13   procedures and standards that deal with that.

14           It feels to me a little bit like there is a partial

15   delegation to the state or assumption by the state of the

16   authority to set the guardrails in ways that -- not set the

17   guardrails -- to, in essence, provide that very valuable

18   liability protection for incidental take that is usually in the

19   hands and protection of the Fish and Wildlife Service.

20           It's just not spelled out in the type of detail --

21   I'm left wondering, why not just -- why didn't you just do what

22   was done in New Jersey?  And if the Fish and Wildlife Service

23   is doing this and if somebody is getting protection, have the

24   Fish and Wildlife Service do it.

25           But I'm just left wondering if the Fish and Wildlife

1    Service doesn't get back to the state and the state issues a

2    permit, I think that person who got the permit probably has

3    liability protection and can't be -- no one can go after them

4    for any incidental take for that project, but without all of

5    the procedural protections and rules that are usually in place

6    when the Fish and Wildlife Service is according someone that

7    type of protection.

8             MS. FINNEGAN:  Well, I think what Your Honor is

9    failing to assess is that when you have an agency that's taking

10   an action --

11            THE COURT:  Right.

12            MS. FINNEGAN:  -- the statute itself -- right? -- put

13   aside cooling water, which we do think was correctly decided.

14   But the statute itself lets the action agency decide how to

15   structure its action to meet its obligation.

16            THE COURT:  Right.

17            MS. FINNEGAN:  Fish and Wildlife Service or the

18   National Marine Fisheries Service, whoever the consulting

19   agency is, that is its responsibility to determine whether that

20   action, as defined by the action agency, satisfies the

21   standards of ESA Section 782.

22            THE COURT:  Okay.  You're putting your finger on

23   the nail -- hammer on the nail -- whatever the expression is.

24   I think you're helping me refine what's bothering me.

25            MS. FINNEGAN:  Okay.  Well, that's good.

1          THE COURT:  I think the way the plaintiffs put this

2     in their briefs is you can't have your cake and eat it too.

3          I think it's fair to say that the Fish and Wildlife

4     Service is not making the type of determination that Congress

5     had in mind to provide liability protection to the developer in

6     Florida who is building the condos and needs the permit to do

7     that.  No one thinks that Congress intended, when the Fish and

8     Wildlife Service does a systematic biological statement or

9     opinion where there's no mention of any of the species that may

10    be at issue, that particular area, that's intended to

11    provide the -- so that's not the -- that can't be the agency

12    action that is at issue.

13          So then the question is, is the agency action, the

14    EPA's decision to let the permit application go through and not

15    step in, you know, what is the agency action at that point, and

16    is Fish and Wildlife Service at that second step doing what

17    it's supposed to do under the statute in order to accord the

18    protection?

19          MS. FINNEGAN:  Well, the action here is EPA's

20    approval of Florida's program as defined, and the way it's

21    defined is with a structure in which it's made all the

22    commitments that I've already identified to you.  I won't go

23    through them again.  Share the permits with the Fish and

24    Wildlife Service, Fish and Wildlife Service will review them,

25    will weigh in as needed if there are protection measures

1    needed, will set an incidental take limit if that is needed.

2        We'll -- if the provisions are not entered into the

3    permit, notice that -- I shouldn't use the word notice because

4    I don't want to imply there's an actual -- I mean that as the

5    legal term.  That permittee does not have take -- take

6    protection if it does not comply with the terms of the permit.

7        And that's another important point, Your Honor, that

8    I skipped in the beginning when you asked what it was that Fish

9    and Wildlife Service was going to do.  If the permittee does

10    not comply or Florida DEP acts without providing the permit

11    conditions, they don't have take protection.  If EPA doesn't

12    exercise its oversight authority as it's committed to do in the

13    terms and conditions, it, too, does not have take protection.

14        To go back to the nail on the head, if I can get back

15    there for you.

16        THE COURT:  Okay.  That's fine.

17        MS. FINNEGAN:  The action agency is free to define

18    the action, and that that's what the Fish and Wildlife Service

19    reviews.  And I've just described for you all the components of

20    the action.

21        And so for the Fish and Wildlife Service to review it

22    as it did, the Fish and Wildlife Service concluded that that

23    action is not likely to cause jeopardy or adverse modification

24    or destroy critical habitat.  That that action, as defined,

25    satisfies Section 7.

 1              THE COURT:  Okay.  So that's fine.  If I go back to

 2      the statute --

 3              MS. FINNEGAN:  Yes.

 4              THE COURT:  -- under 1536(b)(4).

 5              MS. FINNEGAN:  Do you mind if I get my copy?

 6              THE COURT:  Go ahead.  This is the trigger for

 7      getting the liability protection.

 8              The secretary shall provide the federal agency and

 9      the applicant concerned -- and I think in my hypothetical from

10      before with building the dam, that's going to be whoever is

11      building the dam, but -- if any, with a written statement that

12      specifies the impact of such incidental taking on the species.

13              Species -- specifies those reasonable and prudent

14      measures the secretary considers necessary or appropriate to

15      minimize such impact on the species and then sets forth the

16      terms, conditions that must be complied with by the federal

17      agency or applicant, if any, or both to implement the measures

18      specified in 2 and 3.

19              And 2 is, specifies the reasonable and prudent

20      measures the secretary considers necessary or appropriate to

21      minimize such impact.

22              And where is that done here?  I mean, I think that's

23      the having your cake and eating it too.  It really wasn't -- no

24      one looked at any particular species.  It says the species.  It

25      doesn't say anything about particular species in the

1    programmatic or the biological opinion in this case.

2            MS. FINNEGAN:  Well, you know, Your Honor, we agree

3    that Congress expressed a preference for quantifying take in an

4    Incidental Take Statement and expressed a preference that it be

5    a number.  It also recognized that's not always possible.

6            So an ITS, Incidental Take Statement, that has no

7    numerical cap is adequate.

8            THE COURT:  But it has no analysis at all, really, of

9    a particular species or particular ecosystems.

10           MS. FINNEGAN:  But if it explains why it was

11   impractical to express a numerical take measure, then it is

12   permissible.

13           THE COURT:  Why couldn't the Fish and Wildlife

14   Service have said that incidental take of a single Florida

15   panther is -- you're not going to get protection, for example?

16           MS. FINNEGAN:  Just -- but, Your Honor, it's

17   impossible to know where these permits are going to apply for,

18   what activities they're going to cover, how frequently they're

19   going to occur, where they're going to be.  It's impossible to

20   predict --

21           THE COURT:  I'm completely with you on that.  I'm

22   wondering why not, then, do it the way it's done in Florida

23   [sic].  And then say, if somebody wants liability protection,

24   then they come to Fish and Wildlife and they say, here's the

25   project, and there are some Florida panthers in the region;

1     this is what we're planning on doing.  And the Fish and

2     Wildlife Service looks at it and says, okay, you know, as long

3     as you take these protections, we're okay with it.

4          MS. FINNEGAN:  Do you mean in New Jersey, Your Honor?

5          THE COURT:  I'm saying, why not do something like the

6     New Jersey model here.  It's just not -- I think -- I don't

7     think that the biological opinion and the Incidental Take

8     Statement at the generic level here does anything to really

9     promote the purposes of the Endangered Species Act or to

10    comply, frankly, with the language, which is much more specific

11    than that other than, perhaps, setting up a process.

12          And the question is, does the process itself provide

13    an adequate substitute for this, and is the process itself set

14    up consistent with the Endangered Species Act?  It seems to me

15    that for that to be the case, at least there's a substantial

16    argument, that Fish and Wildlife Service would have to do the

17    things that are typically required and, actually, put its name

18    to it.

19          Maybe it's doing it if it's posting it on the

20    website, saying that it is the opinion of the Fish and Wildlife

21    Service that this project is okay to go forward following to --

22    we've looked at it, we've considered it, we've applied the best

23    scientific methodology, whatever the standard is that you're

24    supposed to apply, we've done all those things, and we've

25    looked at it, and it is our assessment that it can go forward

1    subject to the following conditions.  And if you comply with

2    these conditions, then you have liability protection.

3            But this all just feels much looser than that.

4            MS. FINNEGAN:  I'm not sure where the disconnect is,

5    Your Honor, between what you just described and what you think

6    is actually happening.  I realize that we have a little bit of

7    a post-decisional line here, right?  Because the action

8    concluded with issuance of the biological opinion, and we don't

9    necessarily want to get into a disagreement about what's

10   happening with the facts on the ground because those issues are

11   not in the administrative record or before the Court.

12           But I will say that the technical assistance process

13   is not without standards, as I've explained.  The agencies have

14   committed themselves to the process in a similar situation in

15   the cooling water case.  The Court found that the paucity of

16   information, which is the same scenario that we have here, and

17   the agency's commitment to the technical assistance process

18   complied with the Endangered Species Act.

19           When you're presented with a similar action by the

20   same agency, you know, recognizing it was a one-time approval

21   with subsequent implementation actions, I can't think of

22   anything more reasonable than an agency not only following what

23   it believes the law is, but what a court specifically told it

24   no less than five years ago was appropriate to do.

25           THE COURT:  Okay.  Let me ask you, for the

1    intersection of the Endangered Species Act and the Clean Water

2    Act, is it a requirement for the EPA's approval of the

3    assumption application that there be adequate procedures in

4    place to protect endangered species?

5            MS. FINNEGAN:  I believe so.  But I might just want

6    to confer with my co-counsel as we sit down.

7            THE COURT:  Fair enough.

8            MS. FINNEGAN:  They have guidelines that require that

9    species not be jeopardized or habitat adversely modified or

10   destroyed.  So I believe the standard is cross-referenced.

11           THE COURT:  Okay.

12           MS. FINNEGAN:  I've already spoken with Your Honor

13   about the technical assistance process.  Again, the agency's

14   commitments to the process, as we've described in our briefs,

15   is entitled to a presumption of regularity.  Really, plaintiffs

16   here have brought nothing forward to indicate that any of the

17   agencies are not going to do what they say they're going to do.

18   EPA is bound by its regulations.  Florida DEP is bound by its

19   State 404 rule.

20           As the Court is aware, the Second Circuit rejected

21   similar arguments in the cooling water take.

22           THE COURT:  But what the agency is required to do

23   under the statute is when a federal agency comes to the

24   secretary and says here is an agency action that we think may

25   have an adverse effect on an endangered species, we'd like to

1    consult with you, you have an informal consultation, you have a
2    formal consultation, if need be, and then the secretary makes a
3    determination and, if necessary, sets certain conditions and
4    rules.

5          Here, there's not a federal agency that's coming to
6    Fish and Wildlife Service and consulting.  It's -- Florida is
7    just sending a copy of an application that they're getting
8    filed by a private party saying we're going to pass this along
9    to you, and we'd like your take on this.

10          I mean, how does that work normally if there's a
11    private party?  If there's -- it's not a federal agency that's
12    undertaking a project, but is just a developer and they're
13    concerned about liability for incidental take; is there a
14    process for them to come to you and get an opinion from the
15    secretary and conditions from the secretary?

16          MS. FINNEGAN:  Then what you're talking about, Your
17    Honor, is an incidental take permit under Section 10 --

18          THE COURT:  Right.

19          MS. FINNEGAN:  -- that the Fish and Wildlife Service
20    or the National Marine Fisheries Service, whichever one would
21    be considering and evaluating.  And since the Fish and Wildlife
22    Service would be the action agency issuing the permit, they
23    have intra-agency consultation in that scenario where they --
24    the office that issues the permits consults with the office
25    that forms the biological opinion.

1              THE COURT:  Right.

2              MS. FINNEGAN:  So that's what the case would be in

3    that scenario.

4              THE COURT:  Okay.

5              MS. FINNEGAN:  I think Your Honor understands my main

6    point, which is that the technical assistance process is not,

7    in fact, voluntary; and is, in fact, designed to provide

8    meaningful species protection.

9              THE COURT:  Just before we leave that topic -- and I

10   know we're running late on time here.  We'll -- I will make

11   sure that everyone has a chance to be heard even if we have to

12   come back or do something else on this, so don't worry about

13   that.

14             But I just want to make sure that I have your best

15   answer on where in the record it says that Fish and Wildlife

16   Service is actually obligated versus, say -- obligated to weigh

17   the -- to, actually, consider the environmental impacts and to

18   engage in the type of analysis that is typically required under

19   the Endangered Species Act.

20             I see where it says they're required -- or they agree

21   they will receive and review the permit application.  But where

22   does it say they're going to do, if anything, beyond that,

23   where they say they're going to actually engage in the type of

24   weighing or scientific analysis that is typically required

25   under the Endangered Species Act?

1        MS. FINNEGAN:  The best place that I can at this time

2   direct you to, Your Honor, is Bates No. 6057 through -58 where

3   the biological opinion explains the coordination, the technical

4   assistance process, and states that it has similar objectives

5   ensuring that Section 7 standards are applied and to minimize

6   and track take.

7        I'm sorry.  My handwriting is a little bad, so I

8   might not be following the quote exactly as it appears.

9        THE COURT:  Okay.  That's helpful.  Thank you.

10       MS. FINNEGAN:  We talked briefly, Your Honor, about

11  the Incidental Take Statement, and I've explained to you our

12  position as to why it's reasonable for there to be a

13  numerical -- for the absence of a numerical number here.

14       We touched on, although not specifically, both

15  reasonable and prudent measures in terms and conditions.  The

16  reasonable and prudent measures in the Incidental Take

17  Statement require EPA to use its authority under the Clean

18  Water Act to minimize impacts to species pursuant to its

19  oversight of the program.

20       Florida DEP, to use its authority under the state of

21  Florida 404 program rule and other authorities to minimize

22  impacts on listed species.  And the Fish and Wildlife Service,

23  Florida DEP, and the Fish and Wildlife Conservation Commission

24  to implement the memorandum of understanding.

25       These reasonable and prudent measures are legally

1   sufficient, most in part because the Endangered Species Act

2   doesn't mandate any particular form or content for reasonable

3   and prudent measures.  The ESA just says that a Bi Op that

4   authorizes incidental take should specify the measures that the

5   secretary considers necessary or appropriate and those, in

6   fact, are the measures that the secretary considered necessary

7   and appropriate here.

8           In the cooling water case, nearly identical

9   reasonable and prudent measures regarding EPA's oversight

10  authority satisfied the Endangered Species Act.  I think the

11  Court also has our argument on terms and conditions, as well,

12  set forth in our briefs.

13          With that, if you don't have any other questions --

14          THE COURT:  I have lots of questions, but there's

15  only so much time in a day.

16          MS. FINNEGAN:  Well, I'm here for them.

17          THE COURT:  Thank you.

18          MS. FINNEGAN:  Thank you, Your Honor.

19          THE COURT:  Give me just a second here.  I don't know

20  how much time you feel that you need.  I think we could

21  probably go for no more than maybe 20 minutes tonight.  I'd

22  like to give the plaintiffs a few minutes for rebuttal.

23          Also, if everyone wants to come back tomorrow morning

24  at 9:00 a.m., I'm free from 9:00 until 10:00.  I know you have

25  people in from out of town, so I don't want to make you fly

1    back another day, but I also don't want you to feel as though

2    you're rushed and don't have the opportunity to make your

3    points.

4            MR. WOOD:  If I could have 15 minutes, Your Honor, I

5    think that would be plenty, and I'm glad to indulge your

6    questions.  I'll be as brief as possible.  I do think there's

7    some important points --

8            THE COURT:  I'll try and keep my questions as brief

9    as possible.

10           MR. WOOD:  Happy to answer any questions you have.

11           THE COURT:  All right.  Why don't I give you 15

12    minutes and I'll give the plaintiffs 5 minutes for rebuttal.

13           MR. WOOD:  Okay.  Thank you, Your Honor.  I did want

14    to begin by -- I think what I'd like to try to do is hit

15    quickly the ESA, the clean water issues, and the retained

16    waters, and the standing, Your Honor, which we've raised.  I do

17    want to encourage, Your Honor, with regard to the key document

18    that the state of Florida believes you should consider as you

19    evaluate this case.

20           We do think the Florida 404 handbook, which is a

21    summation of the regulations -- Your Honor, I have before the

22    regulations.  It's voluminous.  The application itself was

23    voluminous.  But the handbook itself goes through the criteria

24    and the process that's used.  It's not nearly as simple and as

25    jaded as plaintiffs would like to present.

1          It's a comprehensive process that folds together the

2     environmental resource permit program, as well as the Florida

3     404 program.  I'll go into that in more detail in a moment.

4          Your Honor, we also would want to highlight for you

5     the biological opinion combined with Florida's BA.  This is it

6     here, Your Honor.  The EPA BA and the Fish and Wildlife Service

7     biological opinion.

8          I want to direct you to page 67 of the biological

9     opinion where it lays out the way the technical assistance

10    process will work.  And technical assistance goes back to 1998

11    when the original ESA consultation handbook was put in place.

12    It's not a new invention.  It says here, FDEP, FWC -- that's

13    the Florida Fish and Wildlife Commission -- and USFWS will

14    participate in a State 404 program species coordination

15    technical team.  And then it lays out exactly how that process

16    works.

17         They get every application.  And then when they get

18    the application, any condition, any term, any measure Fish and

19    Wildlife Service wants to include is included.  They have to

20    commit -- they've committed to participate in the Bi Op, which

21    has been approved as a matter of federal law.  They've

22    committed an MOU.

23         And then they are, in fact, are receiving these

24    applications, and we have lots of examples now, Your Honor,

25    including -- the Belmar project is a good example where Fish

1   and Wildlife Service has produced significant reports.  The

2   state fish and wildlife agency has also produced significant

3   reports.  It includes specific take amounts that are authorized

4   and lots of terms and conditions in terms of setbacks and

5   things like that.

6           THE COURT:  Can you give me the page number from the

7   biological opinion.

8           MR. WOOD:  It's the biological opinion, page 67.

9   It's paragraph 2.

10          THE COURT:  Page 67.  Hold on a second here.

11          MR. WOOD:  Under key commitments by the agency.  Key

12  commitments by FDEP, FWC, FWS that -- I'm sorry.  I have 15

13  minutes.  I have literally, Your Honor, seven years of work in

14  15 minutes.  That's the situation I'm in.

15          THE COURT:  No, you're not.  I'll let you come back

16  if you'd like to.

17          MR. WOOD:  Okay.  Thank you.

18          THE COURT:  I see what you're talking about.  I just

19  want to make sure that's in front of me.

20          MR. WOOD:  They will participate.  Fish and Wildlife

21  Service will participate in a state program process.  Their

22  determinations are controlling; whatever Fish and Wildlife

23  Service says about projects.  They use the same standard under

24  Section 7.  It's the same consultation process.

25          May affect, not likely to adversely affect, adversely

1     affect, jeopardy; it's all the same standard, and they --

2     whatever they say gets folded into the permit.  If they don't,

3     if DEP -- and they haven't done this.  If DEP said, you know

4     what, thanks but no thanks -- this goes to the cake and eat it

5     too thing.  Fish and Wildlife Service gets to have its cake and

6     eat it too.  Whatever condition they want gets folded into it.

7     If DEP doesn't accept it, EPA can veto it or federalize it or

8     they can sue for take.

9            THE COURT:  I understand that there's -- at least I

10    believe there's not notice and comment with respect to the Fish

11    and Wildlife process and the ITS and the biological opinion.

12    But to the extent that those were necessary elements of the

13    assumption here, and to the extent that the Clean Water Act

14    does require and the EPA regulations require consideration of

15    the effect on -- of the assumption on endangered species, why

16    isn't it problematic that this wasn't available as part of the

17    notice and comment process for the assumption?

18            MR. WOOD:  The application Florida submitted had a

19    very robust -- thousands of pages, robust record.  It included

20    the Fish and Wildlife Service agreement, and it included within

21    the record --

22            THE COURT:  The agreement is pretty thin.

23            MR. WOOD:  But the agreement, Your Honor, reflects

24    the biological assessment.  First of all --

25            THE COURT:  No.  The assessment wasn't done yet.  I'm

1    sorry.  The biological --

2            MR. WOOD:  There's actually three documents.  The

3    state of Florida put together a biological evaluation, a

4    comprehensive review, listed 230 species, went through where

5    they're located, provided data on where they're at, and then

6    provided an assessment for how this program was going to work

7    if EPA approved it.

8            Then EPA did a biological -- a BE -- BA, and that was

9    the second half of this document, Your Honor --

10           THE COURT:  Okay.

11           MR. WOOD:  -- that goes through all of that.

12           And then Fish and Wildlife Service received it and

13    they put together a third document, which is the biological

14    opinion with the Incidental Take Statement that says, no matter

15    what Fish and Wildlife Service says goes.  They're going to

16    protect species.  I would like to add, with regard to their

17    duty --

18           THE COURT:  I'm sorry.  Before you go on to that, if

19    I go and look at the biological assessment that was included as

20    part of the record --

21           MR. WOOD:  It's in the record, yes, sir.

22           THE COURT:  -- that will include the detail that's

23    all been set forth for me about how it's going to work?

24           MR. WOOD:  Absolutely.  It provides the framework and

25    additional detail on how the process would work.  I do want to

1    provide context for why this was used because I do think it's

2    super-important that the Court understand.

3            The Supreme Court issued a decision in the

4    *Homebuilders* case in 2007.  And that created a sea change in

5    what was understood about how consultation was supposed to

6    work.  The only program that EPA delegates to the state that

7    basically requires an agency or gives agency discretion to

8    consider impacts to species is the 404 program.

9            The 402 program, which is what the Supreme Court

10   said, does not give them discretion to consider impacts to

11   species.  Therefore, 402 doesn't go through consultation.  The

12   same with the solid waste program, the same with the Clean Air

13   Act program.

14           The other programs don't have discretion to consider

15   impacts to species.  404, which incorporates the 404(b)(1)

16   guidelines, which says you have to consider impact to species,

17   that was the hook that gave EPA the obligation to engage in

18   consultation.

19           So it's only under 404 where this comes up, and only

20   in 404 after the Supreme Court ruled in 2007.  That decision,

21   the way that approach was developed, was the subject of notice

22   and comment process by EPA to develop that understanding.

23   That's the understanding they adopted, and that's what Florida

24   used here in this process with EPA; was, okay, EPA has

25   discretion to consider impact to species.  Therefore, we have

1    to consult; therefore you're in the programmatic world.

2        THE COURT:  I'm sorry.  What regulation are you

3    talking about?

4        MR. WOOD:  I'm talking about the Clean Water Act,

5    Section 404 that says you consider impact to species when

6    you're approving a program.

7        THE COURT:  No.  I thought you said there was notice

8    and comment for rulemaking.  What rulemaking is it?

9        MR. WOOD:  This is the rulemaking that resulted in

10   EPA taking the position that they had to consult for a state

11   assumption.  They used notice and comment process, Your Honor,

12   on the decision to adopt a legal memo.

13       THE COURT:  Okay.  Thank you.

14       MR. WOOD:  So all that was done out in the open; it's

15   by legal memo.

16       The reason why I think that's important is because

17   programmatic consultation is not an invention that artifice to,

18   sort of, help out with the situation.  Programmatic

19   consultation has been used in many contexts, and the questions

20   the Court has raised today, I do want to emphasize, go to the

21   fundamentals of not Florida's program, but the fundamentals of

22   programmatic consultation.

23       The Department of Navy case cited in our decision,

24   programmatic consultation for the Navy's undersea program.  The

25   cooling water intake structure case, Second Circuit.  Another

1     example, the stream buffer rule used a programmatic

2     consultation approach.  That involves delegated state programs.

3     That's under the mining statutes; a little different.

4          But this was not an invention just to help out this

5     one situation.  This is consistent with technical assistance

6     approaches going back to 1998; consistent with programmatic

7     consultation policies and consistent with the Supreme Court's

8     decision in *Homebuilders* 2007, which is really the pivotal

9     defining point into how this is treated.

10          THE COURT:  Okay.

11          MR. WOOD:  If I could move forward, Your Honor --

12     because I know time is limited -- into the Clean Water Act

13     criteria.  You had expressed, I think, very significant

14     concerns about whether Florida's criteria was appropriate for

15     granting permits and whether it complied with the Clean Water

16     Act and 404(b)(1) requirements.

17          So with that, again, I would refer you to the 404

18     handbook, which is a summation of the regulations.  But the

19     criteria for issuing a permit is more than just will it or may

20     it affect water quality criteria.  It's spelled out entirely in

21     several pages in the handbook the process that they will go

22     through.  And, Your Honor, it is all-encompassing.

23          THE COURT:  You want to give me the page citations.

24          MR. WOOD:  I'll point you to page 31 through 32,

25     which is the sequence of review for the issuance of a 404

1    permit; and then pages 32 to 33; and then all the way --

2    actually, Your Honor, going all the way through -- frankly,

3    it's half the handbook, Your Honor, the criteria that they go

4    through.  Maybe the table of contents is the best spot to look.

5         There's a whole section on the processing, the

6    criteria, the way they review with agencies.  It's Section 8,

7    Your Honor, of the handbook, pages 31 to 42.  Sequence of

8    review, alternatives analysis, aesthetics reviews, mitigation,

9    cumulative effect, secondary effects.

10        It also folds in -- and this is important because

11   it's unique in Florida.  We have an environmental resource

12   permit program that protects every water in the state, not just

13   water in the U.S.  And that entire program is folded into this

14   requirement.  So if you're going to go to 404, you also have to

15   go to state ERP, so that criteria is in there.

16        I think the plaintiffs paint a caricature of what the

17   Florida program is, and it's flat-out not consistent with what

18   the actual regulations provide, and I do think the handbook is

19   the best place to look for -- the quickest place for that.

20        THE COURT:  I will do that.

21        MR. WOOD:  The same is true, Your Honor, with the

22   retained waters list.  I think there was a lot of questions

23   about that.  Appendix A of the handbook contains the retained

24   waters list.

25        Florida is Number 3 in terms of the size of water

1   area coverage in the state.  It would be truly unworkable and

2   impossible to require a perfect retained waters list.  The list

3   itself does include over 600 bodies of water.  This includes

4   many rivers, creeks, lakes, bays of all kinds.  And then it

5   does have the catchall provision that includes everything else

6   that meets the statutory requirements.

7          There have been some instances where projects have

8   come up and there's a question; it's on one side of the line or

9   the other.  The Corps and Florida DEP have worked together to

10  address which line they should go on.  Tie goes to the Corps.

11  There's a 300-foot administrative boundary.  So if a project

12  exists on both sides of that boundary, the Corps keeps it.

13         If it's -- so there's a workable set of procedures

14  that the agencies are following.  I'm not aware of any

15  situation yet where there's been a water where they're able to

16  say, well, we got it wrong or shouldn't be treated one way or

17  the other.

18         I think all that, Your Honor, brings me back to --

19  what I guess I would like to finish my time with -- is

20  standing.  We do believe, Your Honor, that you should grapple

21  with three cases.  The first is *Crow Creek* involving a transfer

22  of lands from the Army Corps of Engineers to the state of South

23  Dakota.

24         And in that case the D.C. Circuit said the Indian

25  tribe lacked standing to challenge the transfer because there

1    was ongoing, continuous, federal enforcement and oversight.

2    That is the exact same scenario we have here.

3         The second case, Your Honor, is another D.C. Circuit

4    case, *Waterkeeper Alliance*, which just came out last summer.

5    No party briefed standing in that case.  There were four

6    claims; three of them were APA claims.  One was procedural APA,

7    and two were substantive APA claims.

8         The D.C. Circuit, sua sponte -- and it's important, I

9    should say.  It was a challenge to EPA's approval of Oklahoma's

10   environmental program for governing coal ash.  So pretty

11   similar context.

12        And the D.C. Circuit said, not only do you lack

13   standing -- this is sua sponte.  Not only do you lack standing

14   for your non-APA claims, you lack standing for all of your APA,

15   your procedural and your substantive, because of the fact that

16   EPA enforcement was there every step of the way.

17        I do believe, Your Honor, you should grapple with

18   *Crow Creek* and *Waterkeeper*.  And if those cases don't convince

19   you that they don't have standing here, Your Honor -- I'm

20   speaking too fast for the court reporter.  I apologize -- then

21   there's *Clapper*.  And *Clapper*, Your Honor, is the case --

22        THE COURT:  I know *Clapper* well.

23        MR. WOOD:  I know you do.  It's a surveillance case.

24   I just want you to think about the dominos.  We have a

25   demonstrative.  We can hand it out to everybody, but I know

1    time is limited.

2              In *Clapper* there were five dominos, Your Honor; five

3    dominos, and the Court said that's too speculative.  The chain

4    of events is too long.  Our brief and the reply brief explains

5    why we think that applies here.

6              Number one, for there to be injury, you have to have

7    five dominos that fall.  The first, DEP proposes to issue a 404

8    permit that would harm plaintiffs, and plaintiffs submit

9    comment.

10             Number two, EPA -- which receives the application --

11   fails to convince DEP to resolve the issue, and EPA neither

12   objects nor federalizes the permit.  EPA has already

13   federalized 3 permits in Florida, so they are actually

14   involved.  They've objected to 30.  They've worked out the

15   problem.  Only had to federalize 3.

16             Number three, DEP proceeds to issue the permit

17   without correcting the concerns submitted in public comment

18   process.

19             Number four, the plaintiffs file an administrative

20   challenge.  In Florida, if you file an administrative

21   challenge, it's like an automatic injunction.  It does not

22   become final agency action until a third-party administrative

23   law judge at the Florida Division of Administrative Hearings

24   takes the case and hears it.  Then you get judicial review.

25   That's number four.

1          And then, Number five --

2          THE COURT:  Who has standing under Florida law to

3    bring a challenge like that?

4          MR. WOOD:  There are three avenues for standing.

5    Plaintiffs would have standing in almost every instance, Your

6    Honor.  There are three avenues.  *Agrico*, which is a Florida

7    Supreme Court case that addresses the standing principles in

8    Florida.  Primarily, it's the main tests for substantial

9    effects.

10          Number two, if you're in association with more than

11    25 members, and a couple of other requirements, you've --

12          THE COURT:  I remember reading this now.

13          MR. WOOD:  Number three, the best one for you, is if

14    it involves a federal program like this one and you meet

15    Article III standing, you're in.  So plaintiffs have nothing to

16    worry about in that regard.

17          The fifth domino is the project actually goes forward

18    in a manner that harms their interests.  So we think this puts

19    us right in *Clapper*, and we don't think they -- at least for

20    substantive standing; I understand informational is separate.

21    For substantive injury, they haven't asserted standing, Your

22    Honor.

23          And then the last thing I'll point you to -- because

24    I know my time is up -- during the first round with you, Your

25    Honor, you asked us to provide a supplemental brief on

1    informational injury, and we did.  It didn't -- not to say my

2    feelings were hurt, but it didn't make an appearance in your

3    opinion.

4           THE COURT:  You didn't read the appendix to my

5    opinion?

6           MR. WOOD:  That's right.  But I would point you to

7    the declaration of Mr. Wolfe, which summarizes and provides a

8    side-by-side comparison -- and, again, we're at the summary

9    judgment stage on different claims that were at issue earlier,

10   so I think you're free to reevaluate standing.  And we would

11   encourage the Court to look at it.

12          Mr. Wolfe has submitted a signed declaration that

13   goes through every piece of information you can get under the

14   Corps-led program and compares it with every piece of

15   information you get now under the Florida-led program.  And

16   under the Florida program, you get every kind of information

17   that you get in the program, but you get it a lot more quickly.

18   It's online, literally real-time basis.  You can see the permit

19   writer's file.

20          You have all these examples.  It's in his

21   declaration, Your Honor.  There are examples already.  The

22   program is young, but there are examples already where

23   applications have gone through the process, and there are

24   literally thousands of pages of environmental impact analysis

25   studies, Fish and Wildlife analysis, and studies of all sorts

1    of other aesthetic reviews.

2           The things that they seem to be concerned about on

3    the informational side, we don't think they pass muster now at

4    the summary judgment stage on informational standing.  We'd

5    encourage you to, sort of, grapple with the testimony in that

6    declaration.

7           THE COURT:  I will do so.

8           MR. WOOD:  With that, Your Honor, any other questions

9    you have?  I know you've had a long afternoon as well.

10          THE COURT:  As to all of this, I still have

11   questions.  This is not an easy case, but I will spare you for

12   now.

13          MR. WOOD:  Okay.  Thank you.  We're glad to come back

14   tomorrow if you'd like to have us.

15          THE COURT:  Probably no need to come back tomorrow.

16   If I'm working through this, if I think it would be helpful to

17   hear from you more, either on paper or otherwise, I'll let you

18   know.

19          MR. WOOD:  We would submit a brief.  Thank you.

20          THE COURT:  I'll give the plaintiffs five more

21   minutes.

22          MS. GALLONI:  Thank you, Your Honor.  Just to

23   conclude and wrap up a few things.  I want to make sure we've

24   conveyed that Congress did not approve assumption at all costs.

25   Congress was very clear about the statutory criteria that a

1    state has to meet.  Congress was very clear in the Endangered

2    Species Act.

3          So as much as assumption is encouraged, it was not at

4    all costs.  And there are bedrock environmental legal

5    principles that have to be -- and standards that have to be

6    met.

7          I think, just to hit on a couple of points that have

8    come up, one is the government on criminal intent has taken the

9    position that any form of negligence will suffice.  And they

10   cite Section 1319.  But, again, the form of negligence that is

11   under 1319 is simple negligence, as the circuit courts have

12   uniformly held.

13         The government disavowed that there's any independent

14   duty to verify applicant-submitted information.  But that is

15   inconsistent with the 404(b)(1) guidelines, which require

16   factual determinations.  I would direct the Court to the *Hintz*

17   case in the Ninth Circuit that very clearly spoke about the

18   independent verification that the Corps is required to

19   undertake.

20         On whether the retained waters -- the 2014 list that

21   the Corps used as the basis for the retained waters list, the

22   email the government mentioned did not only say what other

23   waters should we consider, it also said it's imperative that we

24   tell Florida that this list, the 2014 list, is not up to date.

25   That was a concession that that list was not up to date.

1     Mr. Coghlan mentioned the assumable waters

2     subcommittee.  I would like to just point out -- this is

3     probably obvious -- but that body has no legal authority to

4     interpret the Clean Water Act.  It gave a version of the

5     legislative history that was cherry-picked and not complete.

6     And that's something that we can address if it would be of

7     interest.

8     I will just say that it had no authority.  The only

9     entity on that body that had authority to interpret any of

10     these statutes was the Corps, and it put forward a position

11     that was consistent with us for the most part.

12     On the Endangered Species Act, I will just mention

13     that I think you've honed in on one of the key differences,

14     which is that under the federal system, U.S. Fish and Wildlife

15     Service has to act and, in fact, a permit can't issue unless it

16     does.  Under the state process, the state can issue if it

17     doesn't hear from Fish and Wildlife Service, and nothing

18     requires Fish and Wildlife Service to act.

19     THE COURT:  With respect to the Endangered Species

20     Act, what do you say in response to Mr. Wood's point that there

21     are lots of programs or other areas where there are

22     programmatic either ITS or biological opinions and that I need

23     to be careful that I'm not saying something that has reached

24     way beyond this case?

25     MS. GALLONI:  I think, by and large -- and you'll see

1    this in the cases that we've cited.  By and large, programmatic

2    biological opinions arise in the context where it's a federal

3    action and there's tiering.  There's a programmatic biological

4    opinion, but there's also consultation at the permit level

5    because it is still a federal action.  It's still a federal

6    permitting.  As Ms. Finnegan pointed out, this situation is the

7    second time that's a cooling water-type system.

8             Again, there are no guardrails on what Fish and

9    Wildlife needs to do here.  They're not required to use the

10   best available science; they're not required to do an

11   assessment baseline of the species; determine the effects to

12   the species.  They're not required to do any of the analysis

13   that is provided by -- in the Endangered Species Act.

14            I will also point out, Ms. Finnegan mentioned that

15   there's a paucity of information similar to cooling water.

16   We've pointed out in this case, when it came to permitting, the

17   Fish and Wildlife Service actually had complete information

18   because it had undertaken all the consultations.  And there

19   were about 50 to 60 biological opinions, I think, during the

20   period that they looked at.

21            They used that historical data to -- in developing

22   the biological opinion, or they said they did.  But then they

23   wouldn't use it for projections.  Again, they didn't have to

24   choose this path.  They could have done the New Jersey model.

25   But if they chose to do the hard thing, then they had to do the

1    hard analysis that comes under the Endangered Species Act.

2         Just a couple points on the cases that Mr. -- let me

3    turn to Ms. Reichert.  Anything else?

4         THE COURT:  Did you find that citation that I was

5    asking about?

6         MS. GALLONI:  Yes.  It's in the record.  It's not the

7    joint appendix.  I apologize for that.  If you'd like, we can

8    amend it and file it.

9         THE COURT:  Yes.  If it's something that's cited, I'd

10   like to have a copy of it.  Thank you.

11        MS. GALLONI:  Yes.  I apologize for that, Your Honor.

12        On standing, I will mention briefly that when you

13   decided Claim 8 and 9, those were on a summary judgment

14   standard; it was not a different standard.  You very clearly

15   laid out in your opinion that you were considering the

16   summary -- our standing under the summary judgment standard and

17   not under the motion to dismiss standard.

18        Florida had filed a motion to dismiss all claims, but

19   Claims 8 and 9 were at summary judgment when you made that

20   determination.

21        On some of the cases that Mr. Wood brought up, I'll

22   just point out some of the differences here.  *Clow Creek* was a

23   transfer of land to the state of South Dakota that left the

24   Corps with undiluted enforcement authority.  That's not the

25   case here.  Here, Florida has primary enforcement authority.

1    Just because a federal agency can serve as a backstop, it's not

2    the same at all.

3        The *Waterkeeper Alliance* case, if I remember

4    correctly, the Corps determined that even if the plaintiffs

5    prevailed, the system that would result by the vacater of that

6    action would actually put them in a worse position than they

7    are now; very different circumstances.

8        In *Clapper*, I think we've laid out in the briefing

9    pretty well why our circumstances are different than the

10    situation in *Clapper*.

11        I would also just mention that -- you had asked

12    earlier about the basis for standing.  We have identified a

13    series of projects that threatened our plaintiff organizations

14    and also the recreational and aesthetic interests of their

15    members.  We have discussed informational harm, and we have

16    also addressed the harm from access to the courts and it not

17    being comparable.  You mentioned that earlier.

18        I will just point out the *Agrico* standing, the *Agrico*

19    test is not a separate standing test.  It did not address

20    associational standing on which our clients typically rely.  It

21    did not address the citizen of the state requirement, which is

22    a requirement under the administrative code and for

23    intervention as well.

24        THE COURT:  All right.  One final question before we

25    adjourn.  There are a lot of issues in this case.

1    Are there certain ones that you think are necessary

2    for the Court to wrestle with and other ones that are backup

3    arguments that you're making or less necessary for the Court to

4    wrestle with?

5    MS. GALLONI:  I would say --

6    THE COURT:  Where should I start, in other words?

7    MS. GALLONI:  I would start with the ESA, Your Honor.

8    I say that partly because there are massive projects in panther

9    habitat; they're on the cusp of being permitted.  We're very

10    concerned about being in a position of having to determine

11    whether to seek emergency relief.

12    These are projects that are in the last remaining

13    habitat where take is a real concern.  And there are others in

14    the pipeline, but we've been told by Florida that that -- there

15    will be a public hearing, there will be 30 days.  So,

16    presumably, there's some time because we haven't seen that

17    public notice yet.  But those issues are paramount and

18    time-sensitive.

19    THE COURT:  And is your theory of standing with

20    respect to those claims, one, just the loss of the aesthetic

21    value of potentially losing species, but is there also a

22    procedural standing issue that you raise as well or is it just

23    the aesthetic injury?

24    MS. GALLONI:  It is also the inability to have the

25    same remedies available and challenge those permits and the

1   access to courts and the availability of remedies.

2            THE COURT:  All right.  Thank you.

3            MS. GALLONI:  Thank you.

4            THE COURT:  Thank you, all.  And thank you most of

5   all to the staff who not only stayed late but had to write down

6   a lot of words.  So this has been super helpful to me.

7            This is, obviously, a challenging case.  And as I

8   continue to work my way through it -- and a lot of these things

9   I'm just going to have to put regulations next to one another

10  and, really, just do the heavy lifting.

11           But if I conclude that it would be helpful to either

12  get any additional briefing on anything or to hear from you

13  further on anything, I will let you know.  If I do conclude

14  it's -- I want to hear more from you, I'm happy to do it by

15  Zoom if it's easier for people so they don't have to travel.

16           Well, thank you, all.  Have a good night.

17           (The hearing adjourned at 5:20 p.m.)

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7              Dated this 30th day of October, 2023.

8

9                        /s/ Tamara M. Sefranek_____
                         Tamara M. Sefranek, RMR, CRR, CRC
10                       Official Court Reporter
                         Room 6714
11                       333 Constitution Avenue, N.W.
                         Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**/**

**/s** [1] - 136:9

**1**

**1** [1] - 50:5
**10** [16] - 22:23, 23:2, 45:23, 72:14, 72:16, 72:21, 80:2, 80:6, 80:7, 80:9, 80:10, 81:22, 81:24, 82:11, 110:17
**101** [2] - 2:6, 59:12
**103** [1] - 86:16
**104** [2] - 44:9, 44:10
**10:00** [1] - 113:24
**10n** [1] - 12:17
**12** [1] - 41:15
**120** [1] - 8:25
**13** [1] - 44:11
**130** [2] - 8:21, 14:10
**1311** [4] - 29:8, 29:9, 29:14
**1319** [7] - 29:7, 29:11, 29:14, 61:25, 71:2, 129:10, 129:11
**1319(c** [3] - 27:1, 27:19, 28:2
**1344(g)(1** [1] - 37:14
**1344(h** [4] - 26:21, 29:10, 31:9, 83:23
**15** [4] - 114:4, 114:11, 116:12, 116:14
**150** [1] - 1:21
**1536(b)(4)** [1] - 105:4
**155-page** [1] - 60:12
**18** [1] - 89:20
**1899** [1] - 73:24
**19** [1] - 1:6
**1980** [4] - 65:14, 65:20, 66:2, 66:10
**1988** [3] - 65:20, 65:23, 66:10
**1993** [2] - 65:16, 65:21
**1998** [2] - 115:10, 121:6
**1999** [1] - 30:8
**1:21-CV-119** [1] - 1:3

**2**

**2** [5] - 50:5, 53:21, 105:18, 105:19, 116:9
**20** [2] - 27:10, 113:21
**20001** [3] - 2:4, 2:22, 136:11
**20002** [1] - 1:22
**2007** [3] - 119:4,

119:20, 121:8
**201** [1] - 1:17
**2014** [4] - 43:21, 80:2, 129:20, 129:24
**2015** [1] - 80:22
**2017** [4] - 80:4, 80:22, 82:1, 83:5
**2018** [1] - 82:3
**202-354-3246** [1] - 2:23
**2023** [2] - 1:6, 136:7
**21** [3] - 30:1, 30:3, 81:16
**21-119** [1] - 3:3
**22** [1] - 30:6
**23** [2] - 30:1, 62:2
**230** [2] - 41:15, 118:4
**230.1** [1] - 60:21
**230.11** [2] - 54:23, 60:7
**230.11(d)** [1] - 55:14
**230.22** [1] - 54:23
**233.11** [1] - 41:15
**233.11(h** [1] - 41:24
**233.41** [3] - 50:12, 62:2, 62:7
**233.41(a)(3)(ii** [1] - 63:19
**24** [1] - 30:5
**25** [4] - 11:23, 29:23, 30:3, 126:11
**2:08** [1] - 1:7

**3**

**3** [4] - 105:18, 122:25, 125:13, 125:15
**30** [2] - 125:14, 134:15
**300-foot** [1] - 123:11
**30th** [1] - 136:7
**31** [2] - 121:24, 122:7
**32** [2] - 121:24, 122:1
**3200** [1] - 2:6
**33** [1] - 122:1
**33137** [1] - 1:17
**333** [2] - 2:22, 136:11
**35** [1] - 44:11

**4**

**4** [1] - 1:21
**40** [1] - 50:12
**402** [15] - 5:23, 6:4, 6:5, 6:10, 6:13, 6:19, 6:22, 7:13, 7:14, 27:23, 30:6, 50:19, 119:9, 119:11
**402.02** [1] - 11:4
**404** [37] - 6:15, 7:14, 8:13, 12:17, 13:6,

24:8, 26:9, 27:16, 27:24, 49:17, 50:19, 52:13, 61:23, 66:21, 85:21, 88:1, 88:15, 88:17, 89:2, 91:24, 96:11, 96:19, 96:20, 109:19, 112:21, 114:20, 115:3, 115:14, 119:8, 119:15, 119:19, 119:20, 120:5, 121:17, 121:25, 122:14, 125:7
**404(b)(1** [11] - 25:18, 26:13, 31:4, 31:9, 31:11, 31:12, 32:1, 53:25, 119:15, 121:16, 129:15
**404(g** [3] - 58:20, 74:11, 78:6
**404(g)(1** [2] - 73:3, 73:12
**404(h)(1** [2] - 61:15, 61:20
**404(h)(1)** [1] - 49:17
**404(h)(2)(a** [1] - 49:18
**42** [1] - 122:7
**4500** [1] - 1:16

**5**

**5** [2] - 35:5, 114:12
**50** [1] - 114:4, 131:19
**55-page** [1] - 60:3
**553** [1] - 35:5
**58** [1] - 112:2
**5:20** [1] - 135:17

**6**

**60** [1] - 131:19
**60-day** [1] - 19:23
**600** [1] - 123:3
**600-water** [1] - 85:3
**602** [2] - 79:15, 83:11
**602-water** [1] - 84:14
**6032** [1] - 89:18
**6056** [3] - 89:20, 90:7, 99:25
**6057** [1] - 112:2
**6639** [1] - 44:13
**67** [3] - 115:8, 116:8, 116:10
**6714** [2] - 2:21, 136:10

**7**

**7** [6] - 23:2, 50:6, 88:18, 104:25, 112:5, 116:24

**700** [1] - 2:3
**7611** [1] - 1:20
**782** [1] - 102:21

**8**

**8** [3] - 122:6, 132:13, 132:19

**9**

**9** [5] - 19:11, 19:21, 21:13, 132:13, 132:19
**94111** [1] - 2:7
**9:00** [2] - 113:24

**A**

**a)(1** [6] - 39:1, 39:2, 43:4, 72:23, 80:15, 81:3
**a)(3** [2] - 62:18, 62:20, 64:19
**a)(3)(ii** [2] - 62:8, 65:6, 67:9
**a)(3)(ii)** [2] - 66:3, 66:11
**a.m** [1] - 113:24
**abate** [7] - 26:23, 27:22, 28:1, 29:13, 61:18, 63:12, 63:16
**abdicate** [1] - 22:19
**abide** [1] - 8:18
**abiding** [1] - 47:1
**abilities** [1] - 34:22
**ability** [2] - 18:24, 136:6
**able** [8] - 19:16, 29:13, 30:14, 47:25, 48:2, 48:8, 48:9, 123:15
**abruptly** [1] - 46:2
**absence** [1] - 112:13
**absent** [1] - 27:4
**absolute** [1] - 94:10
**absolutely** [2] - 90:18, 118:24
**abundantly** [1] - 55:24
**accept** [2] - 62:6, 117:7
**access** [4] - 16:11, 47:19, 133:16, 135:1
**accommodation** [1] - 79:21
**accord** [1] - 103:17
**according** [2] - 29:17, 102:6
**accountability** [1] - 71:15
**accountable** [1] -

71:22
**accurate** [3] - 56:25, 73:20, 136:4
**acronym** [1] - 89:1
**Act** [76] - 4:25, 5:1, 5:2, 5:13, 5:17, 5:18, 6:9, 6:11, 6:24, 8:11, 9:8, 10:11, 12:5, 15:24, 18:12, 20:24, 21:15, 21:25, 22:2, 22:20, 23:6, 24:6, 26:3, 26:9, 35:6, 35:12, 35:19, 36:2, 36:8, 37:21, 37:23, 38:2, 38:25, 39:3, 39:7, 45:16, 45:23, 46:6, 47:5, 48:25, 49:2, 49:10, 50:2, 61:11, 61:22, 64:15, 70:1, 70:25, 73:24, 74:13, 85:4, 92:11, 93:10, 96:16, 107:9, 107:14, 108:18, 109:1, 109:2, 111:19, 111:25, 112:18, 113:1, 113:10, 117:13, 119:13, 120:4, 121:12, 121:16, 129:2, 130:4, 130:12, 130:20, 131:13, 132:1
**act** [42] - 26:23, 27:2, 28:10, 29:1, 29:3, 29:4, 29:7, 29:13, 31:2, 130:15, 130:18
**act's** [1] - 50:3
**Action** [1] - 1:3
**action** [48] - 7:9, 9:4, 9:10, 9:14, 9:18, 10:3, 10:6, 10:16, 16:21, 18:25, 19:1, 19:16, 19:19, 20:20, 20:21, 21:6, 39:9, 44:23, 46:10, 53:2, 53:6, 53:7, 72:1, 84:24, 87:23, 96:9, 102:10, 102:14, 102:15, 102:20, 103:12, 103:13, 103:15, 103:19, 104:17, 104:18, 104:20, 104:23, 104:24, 108:7, 108:19, 109:24, 110:22, 125:22, 131:3, 131:5, 133:6
**actions** [10] - 5:15, 8:17, 9:1, 10:19, 11:7, 12:25, 24:8,

28:2, 88:18, 108:21
**activities** [5] - 9:13, 10:12, 88:4, 88:7, 106:18
**activity** [2] - 19:10, 98:18
**actors** [1] - 10:13
**acts** [1] - 104:10
**actual** [5] - 6:25, 15:22, 73:10, 104:4, 122:18
**add** [4] - 44:21, 80:5, 86:6, 118:16
**added** [2] - 66:10, 80:15
**addendum** [1] - 29:22
**adding** [1] - 61:3
**addition** [2] - 16:19, 40:19
**additional** [5] - 13:20, 36:13, 58:12, 118:25, 135:12
**address** [20] - 5:3, 6:8, 24:16, 33:14, 39:12, 49:2, 50:23, 52:21, 54:12, 54:14, 55:19, 59:19, 59:21, 61:9, 69:6, 86:1, 123:10, 130:6, 133:19, 133:21
**addressed** [6] - 32:25, 69:20, 81:13, 98:13, 98:19, 133:16
**addresses** [1] - 126:7
**addressing** [1] - 48:24
**adequacy** [1] - 35:16
**adequate** [6] - 26:22, 63:16, 84:15, 106:7, 107:13, 109:3
**adequately** [2] - 26:18, 46:4
**adjacent** [1] - 37:18
**adjourn** [1] - 133:25
**adjourned** [1] - 135:17
**adjudication** [2] - 35:2, 35:4
**adjusted** [1] - 12:20
**administer** [1] - 41:12
**administering** [4] - 71:16, 72:3, 79:24, 85:4
**administration** [1] - 30:15
**administrative** [11] - 44:12, 44:15, 52:12, 58:22, 59:12, 108:11, 123:11, 125:19, 125:20, 125:22, 133:22
**Administrative** [1] -

125:23
**admiralty** [1] - 38:12
**admission** [1] - 80:3
**admitted** [1] - 43:21
**admitting** [1] - 80:1
**adopt** [1] - 120:12
**adopted** [8] - 29:25, 30:1, 30:2, 65:12, 65:13, 65:22, 66:2, 119:23
**adopts** [2] - 74:5
**adults** [1] - 9:1
**adverse** [3] - 90:5, 104:23, 109:25
**adversely** [6] - 33:13, 55:10, 96:12, 109:9, 116:25
**advocated** [3] - 22:25, 81:2, 81:3
**aesthetic** [4] - 128:1, 133:14, 134:20, 134:23
**aesthetics** [1] - 122:8
**affect** [8] - 22:12, 33:13, 36:23, 55:10, 116:25, 117:1, 121:20
**affected** [4] - 24:14, 36:21, 90:14
**affecting** [1] - 58:9
**affects** [1] - 56:17
**affirmatively** [1] - 16:20
**afoul** [1] - 33:22
**afternoon** [15] - 3:7, 3:9, 3:10, 3:12, 3:13, 3:15, 3:21, 3:23, 3:24, 4:1, 4:7, 4:9, 4:10, 86:10, 128:9
**age** [1] - 36:11
**agencies** [14] - 3:22, 19:5, 19:24, 22:13, 40:23, 83:6, 86:20, 90:24, 91:14, 97:2, 108:13, 109:17, 122:6, 123:14
**agency** [55] - 6:4, 7:8, 9:1, 9:18, 10:3, 10:19, 12:10, 12:18, 12:22, 13:1, 13:3, 14:5, 17:7, 23:23, 23:24, 33:6, 34:19, 45:1, 45:4, 46:10, 46:21, 53:2, 53:4, 54:6, 60:11, 65:8, 84:24, 87:22, 92:14, 92:15, 102:9, 102:14, 102:19, 102:20, 103:11, 103:13, 103:15,

104:17, 105:8, 105:17, 108:20, 108:22, 109:22, 109:23, 109:24, 110:5, 110:11, 110:22, 110:23, 116:2, 116:11, 119:7, 125:22, 133:1
**agency's** [6] - 5:15, 8:17, 48:6, 99:3, 108:17, 109:13
**aggravating** [2] - 69:24, 70:4
**ago** [1] - 108:24
**agree** [5] - 12:1, 56:20, 97:7, 106:2, 111:20
**agreed** [4] - 81:20, 83:11, 97:5, 98:23
**agreement** [10] - 20:13, 22:3, 25:1, 41:2, 82:14, 93:15, 117:20, 117:22, 117:23
**Agrico** [3] - 126:6, 133:18
**ahead** [5] - 4:22, 16:18, 50:25, 63:22, 105:6
**Air** [1] - 119:12
**al** [4] - 1:3, 1:6, 3:3, 3:4
**alarming** [1] - 5:18
**ALISON** [1] - 1:19
**Alison** [1] - 3:21
**all-encompassing** [1] - 121:22
**alleging** [1] - 59:17
**Alliance** [2] - 124:4, 133:3
**allocations** [1] - 71:12
**allow** [3] - 5:10, 19:24, 66:15
**allowable** [1] - 14:17
**allowed** [2] - 7:15, 39:6
**allowing** [1] - 70:24
**allows** [1] - 92:24
**almost** [3] - 69:22, 70:7, 126:5
**alone** [3] - 7:18, 51:7, 81:15
**alternatives** [1] - 122:8
**AMBER** [1] - 2:9
**amber** [1] - 3:17
**amend** [1] - 132:8
**amended** [2] - 27:8, 65:20
**amending** [1] - 27:11

**amendment** [3] - 27:5, 50:11, 65:21
**amount** [2] - 72:11, 98:17
**amounts** [1] - 116:3
**ample** [1] - 58:20
**analog** [1] - 55:8
**analogous** [1] - 56:3
**analogs** [2] - 60:9, 60:14
**analysis** [22] - 6:23, 9:17, 9:23, 11:14, 13:7, 16:25, 17:1, 23:2, 32:8, 57:17, 59:3, 59:7, 60:21, 88:2, 106:8, 111:18, 111:24, 122:8, 127:24, 127:25, 131:12, 132:1
**analyze** [6] - 9:12, 11:12, 16:20, 23:24, 23:25, 57:16
**analyzed** [2] - 12:22, 87:25
**analyzes** [1] - 70:1
**analyzing** [1] - 9:18
**Andrew** [2] - 3:24, 48:22
**ANDREW** [2] - 1:6, 1:19
**announced** [1] - 30:7
**annual** [2] - 18:1, 18:10
**answer** [16] - 8:4, 10:2, 20:25, 36:9, 45:9, 58:11, 71:10, 78:11, 79:12, 79:13, 86:22, 92:3, 92:7, 97:21, 111:15, 114:10
**answers** [2] - 14:4, 92:5
**anticipate** [1] - 48:4
**anticipated** [3] - 17:20, 17:22, 25:2
**APA** [10] - 35:5, 35:21, 36:3, 36:6, 45:15, 124:6, 124:7, 124:14
**apologize** [5] - 8:8, 101:8, 124:20, 132:7, 132:11
**appeals** [1] - 70:13
**appearance** [1] - 127:2
**appellate** [1] - 70:11
**appendix** [4] - 60:11, 122:23, 127:4, 132:7
**Appendix** [1] - 60:20
**applicable** [1] - 53:24
**applicant** [10] - 32:7,

33:12, 33:24, 58:12, 83:23, 90:13, 96:19, 105:9, 105:17, 129:14
**applicant's** [4] - 31:17, 31:24, 33:5, 33:20
**applicant-submitted** [1] - 129:14
**applicants** [5] - 31:20, 36:23, 36:24, 59:9, 59:11
**application** [34] - 24:25, 34:16, 35:13, 35:15, 39:13, 45:17, 46:4, 46:25, 47:17, 51:3, 51:5, 53:1, 53:13, 53:14, 55:8, 71:13, 78:15, 82:20, 83:21, 83:22, 90:12, 91:3, 91:24, 93:25, 99:12, 103:14, 109:3, 110:7, 111:21, 114:22, 115:17, 115:18, 117:18, 125:10
**applications** [11] - 23:22, 88:15, 89:2, 89:25, 90:5, 91:21, 93:17, 98:24, 99:4, 115:24, 127:23
**applied** [5] - 5:19, 5:22, 7:8, 107:22, 112:5
**applies** [5] - 23:15, 34:12, 36:4, 36:6, 125:5
**apply** [22] - 6:2, 8:12, 16:2, 20:4, 31:11, 36:8, 36:14, 47:6, 47:10, 62:3, 85:2, 93:19, 93:21, 93:23, 94:17, 95:18, 95:19, 96:4, 96:15, 96:18, 106:17, 107:24
**applying** [1] - 28:2
**approach** [10] - 7:18, 8:2, 18:25, 22:25, 63:17, 81:2, 81:4, 88:9, 119:21, 121:2
**approached** [1] - 81:5
**approaches** [2] - 19:9, 121:6
**appropriate** [8] - 81:21, 88:10, 105:14, 105:20, 108:24, 113:5, 113:7, 121:14
**approval** [11] - 6:10, 25:14, 25:19, 26:8,

32:21, 42:4, 88:3, 103:20, 108:20, 109:2, 124:9
**approvals** [1] - 66:24
**approve** [5] - 26:16, 30:14, 49:19, 63:3, 128:24
**approved** [11] - 6:16, 26:11, 30:6, 34:17, 42:1, 52:2, 66:20, 66:23, 78:16, 115:21, 118:7
**approving** [3] - 24:8, 25:17, 120:6
**aquatic** [1] - 55:5
**arbitrary** [1] - 75:7
**area** [8] - 8:24, 9:14, 16:1, 73:11, 79:3, 90:15, 103:10, 123:1
**argue** [3] - 23:20, 37:21, 64:5
**argued** [2] - 29:6, 47:18
**arguing** [2] - 68:15, 70:12
**argument** [36] - 4:16, 4:25, 40:11, 40:12, 40:19, 43:12, 46:5, 46:6, 51:3, 51:5, 54:2, 54:5, 54:9, 54:11, 54:13, 55:13, 55:19, 58:15, 59:21, 59:24, 61:3, 61:5, 61:7, 61:8, 61:11, 62:6, 62:7, 63:9, 63:25, 69:1, 69:9, 73:17, 73:23, 83:8, 107:16, 113:11
**arguments** [18] - 34:13, 45:20, 48:24, 49:2, 50:8, 53:22, 53:23, 54:1, 54:14, 54:16, 59:17, 59:24, 63:24, 72:10, 72:12, 73:1, 109:21, 134:3
**arise** [1] - 131:2
**arises** [1] - 12:9
**Army** [10] - 2:14, 4:4, 13:9, 41:18, 57:21, 73:24, 82:2, 82:9, 101:11, 123:22
**array** [2] - 55:6, 88:4
**art** [1] - 62:14
**Article** [1] - 126:15
**article** [1] - 69:25
**articulation** [1] - 38:10
**artifice** [1] - 120:17
**ash** [1] - 124:10

**aside** [3] - 70:6, 79:3, 102:13
**aspect** [3] - 5:25, 28:19, 35:13
**aspects** [5] - 6:2, 6:3, 7:9, 34:23, 36:22
**asserted** [1] - 126:21
**assess** [8] - 18:14, 56:1, 57:21, 57:24, 58:22, 102:9
**assessed** [2] - 84:21, 88:14
**assessment** [12] - 12:7, 14:22, 32:8, 46:2, 47:25, 75:14, 107:25, 117:24, 117:25, 118:6, 118:19, 131:11
**assigned** [1] - 7:15
**assistance** [19] - 14:14, 21:16, 35:17, 51:12, 54:10, 87:14, 88:16, 88:17, 88:21, 88:22, 96:10, 108:12, 108:17, 109:13, 111:6, 112:4, 115:9, 115:10, 121:5
**assistant** [2] - 82:2, 82:9
**association** [1] - 126:10
**associational** [1] - 133:20
**assumable** [7] - 26:15, 34:8, 37:13, 80:21, 81:10, 81:16, 130:1
**assume** [12] - 7:13, 7:16, 20:8, 27:16, 39:6, 50:19, 51:22, 61:23, 70:24, 71:13, 78:7, 101:11
**assumed** [14] - 24:14, 26:18, 40:2, 40:6, 40:14, 41:19, 42:6, 42:9, 46:13, 47:11, 71:3, 78:22, 84:12, 88:1
**assumes** [2] - 21:18, 41:25
**assuming** [2] - 25:7, 74:17
**assumption** [24] - 6:19, 6:22, 11:18, 13:8, 22:6, 27:4, 39:4, 43:6, 46:7, 49:22, 61:17, 71:21, 72:2, 81:6, 84:25, 87:20, 101:15,

109:3, 117:13, 117:15, 117:17, 120:11, 128:24, 129:3
**assurance** [3] - 33:11, 33:12, 59:25
**assurances** [7] - 31:18, 31:24, 33:5, 33:21, 34:6, 55:9, 60:5
**attaches** [1] - 27:19
**authorities** [3] - 6:7, 10:1, 112:21
**authority** [49] - 7:16, 9:4, 10:6, 18:22, 21:15, 22:6, 23:7, 26:14, 26:23, 27:22, 31:13, 39:6, 39:10, 40:13, 42:24, 44:23, 44:24, 54:25, 55:2, 61:9, 61:18, 61:23, 62:9, 63:12, 63:16, 63:20, 64:20, 64:24, 65:1, 65:8, 65:9, 66:5, 71:1, 71:14, 71:19, 88:1, 97:18, 98:9, 101:16, 104:12, 112:17, 112:20, 113:10, 130:3, 130:8, 130:9, 132:24, 132:25
**authorized** [2] - 26:16, 116:3
**authorizes** [1] - 113:4
**authorizing** [1] - 7:10
**automatic** [1] - 125:21
**autonomy** [1] - 13:19
**availability** [1] - 135:1
**available** [10] - 12:6, 23:23, 34:20, 43:11, 45:7, 48:7, 63:7, 117:16, 131:10, 134:25
**Avenue** [2] - 2:22, 136:11
**avenues** [2] - 126:4, 126:6
**avoid** [1] - 41:11
**aware** [7] - 18:7, 18:16, 67:22, 79:6, 87:22, 109:20, 123:14

## B

**b)(1** [6] - 56:4, 58:16, 59:1, 59:5, 59:8, 60:8
**b)(1)(2** [1] - 64:2
**b)(2** [6] - 62:7, 62:17,

64:10, 66:4, 67:8, 67:14
**BA** [2] - 115:5, 115:6, 118:8
**Babcock** [1] - 17:21
**backstop** [1] - 133:1
**backstory** [1] - 80:19
**backup** [1] - 134:2
**backward** [1] - 10:13
**backward-looking** [1] - 10:13
**backwards** [2] - 64:6, 73:21
**bad** [3] - 57:13, 71:6, 112:7
**Baker** [2] - 2:3, 2:5
**Ball** [2] - 38:12, 77:25
**based** [18] - 12:21, 13:14, 17:20, 19:7, 33:20, 34:6, 37:24, 48:1, 62:10, 63:21, 75:13, 76:2, 76:6, 81:20, 81:21, 85:3, 88:9, 88:23
**baseline** [8] - 9:12, 9:18, 9:21, 10:11, 10:25, 11:11, 23:24, 131:11
**basis** [13] - 75:22, 76:24, 81:25, 82:7, 83:14, 84:7, 85:5, 94:6, 96:6, 99:19, 127:18, 129:21, 133:12
**Bates** [4] - 89:16, 89:20, 99:24, 112:2
**Bates-numbered** [1] - 89:16
**bays** [1] - 123:4
**BE** [1] - 118:8
**bearing** [1] - 47:13
**beat** [1] - 61:22
**become** [2] - 78:15, 125:22
**bedrock** [1] - 129:4
**BEFORE** [1] - 1:10
**began** [3] - 37:7, 46:1, 80:14
**begin** [1] - 114:14
**beginning** [5] - 64:25, 87:5, 94:21, 95:10, 104:8
**begun** [1] - 43:24
**behalf** [3] - 3:8, 3:11, 3:14
**belied** [1] - 54:16
**believes** [3] - 80:8, 108:23, 114:18
**Belmar** [1] - 115:25
**below** [1] - 77:5

**BENNETT** [1] - 2:10
**Bennett** [1] - 3:18
**berm** [1] - 77:3
**best** [17] - 5:7, 12:6, 23:23, 43:10, 43:18, 64:18, 79:24, 95:19, 96:4, 107:22, 111:14, 112:1, 122:4, 122:19, 126:13, 131:10, 136:6
**better** [5] - 25:23, 49:24, 65:25, 70:20, 71:6
**between** [12] - 4:25, 28:4, 32:10, 33:16, 42:24, 56:7, 59:10, 69:17, 79:3, 88:24, 97:4, 108:5
**beyond** [6] - 28:14, 28:17, 60:1, 62:3, 111:22, 130:24
**Bi** [15] - 12:15, 16:4, 51:6, 51:7, 51:11, 51:15, 53:6, 53:9, 53:11, 53:13, 53:14, 53:19, 113:3, 115:20
**big** [4] - 40:25, 61:10, 85:17, 92:10
**binding** [1] - 14:17
**binds** [1] - 96:23
**BIOLOGICAL** [1] - 1:3
**biological** [66] - 6:5, 7:3, 7:10, 9:17, 12:12, 12:16, 13:12, 14:22, 20:7, 20:13, 21:17, 24:18, 25:18, 25:22, 34:20, 35:16, 47:20, 47:22, 47:24, 48:2, 53:1, 55:5, 86:13, 86:17, 86:21, 87:12, 87:24, 88:6, 88:11, 88:22, 89:6, 89:12, 89:14, 93:10, 93:16, 94:2, 95:12, 95:20, 96:7, 96:22, 98:14, 101:1, 103:8, 106:1, 107:7, 108:8, 110:25, 112:3, 115:5, 115:7, 115:8, 116:7, 116:8, 117:11, 117:24, 118:1, 118:3, 118:8, 118:13, 118:19, 130:22, 131:2, 131:3, 131:19, 131:22
**Biological** [3] - 2:10, 3:3, 3:18
**Biscayne** [1] - 1:16

**bit** [4] - 54:1, 96:25, 101:14, 108:6

**black** [1] - 14:25

**Black's** [3] - 62:15, 64:1, 64:11

**blanket** [1] - 57:13

**blue** [1] - 81:17

**bodies** [1] - 123:3

**body** [5] - 74:1, 74:2, 80:21, 130:3, 130:9

**bolded** [2] - 90:3, 90:4

**Bonnie** [1] - 3:13

**BONNIE** [1] - 1:15

**bothering** [2] - 92:8, 102:24

**bothers** [1] - 101:9

**bottom** [1] - 22:17

**Botts** [2] - 2:3, 2:5

**Boulevard** [1] - 11:6

**bound** [2] - 109:18

**boundary** [2] - 123:11, 123:12

**Box** [1] - 1:20

**break** [2] - 48:12, 48:16

**breathtaking** [1] - 11:16

**bridge** [1] - 77:2

**brief** [23] - 44:10, 49:7, 52:11, 54:20, 55:18, 55:19, 56:5, 57:19, 58:20, 59:25, 60:20, 60:24, 61:1, 66:22, 69:20, 69:25, 73:22, 114:6, 114:8, 125:4, 126:25, 128:19

**briefed** [3] - 35:22, 35:23, 124:5

**briefing** [6] - 8:6, 16:13, 32:25, 61:1, 133:8, 135:12

**briefly** [6] - 33:9, 46:24, 47:17, 73:23, 112:10, 132:12

**briefs** [11] - 7:6, 7:21, 12:15, 16:8, 37:5, 66:1, 88:19, 89:1, 103:2, 109:14, 113:12

**bright** [1] - 15:21

**bring** [14] - 19:1, 19:16, 19:18, 20:20, 51:2, 62:10, 64:20, 64:24, 65:2, 66:5, 69:22, 71:1, 71:25, 126:3

**brings** [6] - 30:5, 62:19, 65:14, 65:24, 70:6, 123:18

**brink** [1] - 9:2

**broad** [3] - 55:6, 63:14, 88:4

**broader** [3] - 62:4, 75:15, 101:6

**broadest** [1] - 23:1

**broadly** [2] - 10:17, 33:15

**brought** [6] - 65:18, 65:20, 69:17, 81:2, 109:16, 132:21

**Brownlee** [2] - 7:7, 11:6

**bucket** [1] - 56:20

**buckets** [1] - 45:19

**buffer** [1] - 121:1

**bug** [1] - 31:19

**build** [5] - 92:15, 92:16, 92:19, 92:22, 92:23

**building** [3] - 103:6, 105:10, 105:11

**built** [1] - 27:9

**bullets** [2] - 90:8, 91:12

**burden** [11] - 28:8, 28:9, 28:10, 28:12, 28:15, 28:18, 28:23, 29:3, 30:18, 50:12, 62:19

**burrows** [1] - 14:2

**but-for** [1] - 10:18

**C**

**CA** [1] - 2:7

**cake** [4] - 103:2, 105:23, 117:4, 117:5

**calculate** [1] - 14:5

**California** [1] - 2:6

**cannot** [1] - 30:25

**cap** [1] - 106:7

**capricious** [1] - 75:8

**capture** [1] - 38:7

**careful** [2] - 70:20, 130:23

**carefully** [1] - 56:14

**Caribbean** [1] - 12:18

**caricature** [1] - 122:16

**carve** [1] - 78:12

**carve-out** [1] - 78:12

**Case** [1] - 3:3

**case** [62] - 4:24, 5:12, 6:16, 6:21, 7:3, 7:4, 7:18, 8:11, 11:5, 11:6, 23:8, 23:11, 23:12, 36:18, 38:11, 38:19, 39:5, 53:4, 64:13, 68:14, 68:25, 70:7, 73:17, 74:1, 74:2, 74:5, 74:23,

76:12, 78:1, 83:14, 85:16, 87:23, 96:25, 97:1, 97:5, 106:1, 107:15, 108:15, 111:2, 113:8, 114:19, 119:4, 120:23, 120:25, 123:24, 124:3, 124:4, 124:5, 124:21, 124:23, 125:24, 126:7, 128:11, 129:17, 130:24, 131:16, 132:25, 133:3, 133:25, 135:7

**case-by-case** [1] - 83:14

**cases** [14] - 7:1, 67:21, 69:17, 70:7, 70:11, 70:12, 77:12, 77:13, 77:24, 123:21, 124:18, 131:1, 132:2, 132:21

**Castro** [1] - 3:4

**catchall** [2] - 40:3, 123:5

**categories** [1] - 12:17

**causing** [1] - 94:18

**CENTER** [1] - 1:3

**Center** [3] - 2:10, 3:3, 3:18

**central** [1] - 50:1

**century** [2] - 79:24, 85:3

**certain** [5] - 6:1, 49:16, 100:2, 110:3, 134:1

**certainly** [3] - 15:24, 70:7, 93:19

**CERTIFICATE** [1] - 136:1

**certify** [1] - 136:3

**CFR** [2] - 11:4, 50:12

**chain** [1] - 125:3

**challenge** [9] - 11:16, 19:1, 34:14, 123:25, 124:9, 125:20, 125:21, 126:3, 134:25

**challenged** [2] - 8:3, 30:16

**challenging** [1] - 135:7

**chance** [1] - 111:11

**change** [9] - 30:15, 35:4, 36:21, 78:17, 82:8, 82:12, 87:25, 119:4

**changed** [3] - 35:24, 36:25, 82:8

**changes** [3] - 12:11, 27:11, 66:13

**changing** [1] - 48:6

**charge** [2] - 59:24, 80:22

**check** [1] - 76:11

**checked** [2] - 76:13, 76:16

**chemical** [1] - 55:5

**cherry** [1] - 130:5

**cherry-picked** [1] - 130:5

**Chevron** [2] - 36:12, 36:16

**Chinn** [1] - 4:7

**CHINN** [2] - 2:5, 4:7

**choice** [1] - 63:3

**choose** [1] - 131:24

**chose** [1] - 131:25

**CHRISTINA** [1] - 1:15

**Christina** [1] - 3:10

**Circuit** [11] - 6:23, 6:24, 30:17, 109:20, 120:25, 123:24, 124:3, 124:8, 124:12, 129:17

**circuit** [7] - 7:7, 23:9, 30:7, 36:19, 64:13, 129:11

**Circuit's** [1] - 66:21

**circuits** [1] - 29:25

**circumstances** [5] - 15:14, 71:21, 100:19, 133:7, 133:9

**citation** [2] - 16:8, 132:4

**citations** [1] - 121:23

**cite** [3] - 55:20, 77:25, 129:10

**cited** [8] - 6:17, 54:20, 58:19, 60:19, 66:22, 120:23, 131:1, 132:9

**cites** [1] - 95:13

**citizen** [2] - 18:25, 133:21

**civil** [5] - 26:23, 63:6, 65:3, 66:5

**Civil** [4] - 1:3, 3:3, 82:2, 82:9

**claim** [7] - 32:15, 32:16, 35:5, 35:6, 51:2, 53:21, 70:3

**Claim** [1] - 53:21, 132:13

**claimed** [1] - 49:10

**claiming** [1] - 16:21

**claims** [11] - 4:25, 5:2, 35:9, 50:8, 124:6, 124:7, 124:14, 127:9, 132:18,

**changes** continued...

**134:20**

**Claims** [2] - 50:5, 132:19

**Clapper** [7] - 124:21, 124:22, 125:2, 126:19, 133:8, 133:10

**clarified** [1] - 29:25

**clarifies** [2] - 50:18, 67:4

**clarifying** [1] - 84:6

**clarity** [1] - 38:9

**clause** [1] - 51:19

**clean** [1] - 114:15

**Clean** [29] - 5:1, 5:17, 8:11, 21:15, 26:9, 35:6, 35:12, 35:19, 36:2, 36:8, 39:3, 45:16, 47:5, 48:25, 49:10, 50:1, 61:11, 61:22, 64:15, 70:1, 70:24, 109:1, 112:17, 117:13, 119:12, 120:4, 121:12, 121:15, 130:4

**clear** [18] - 9:8, 21:19, 24:5, 28:13, 54:17, 55:24, 57:8, 57:12, 58:19, 64:7, 66:14, 73:2, 83:22, 88:19, 94:1, 94:5, 128:25, 129:1

**clearly** [7] - 17:6, 21:21, 38:7, 65:1, 96:15, 129:17, 132:14

**click** [1] - 78:23

**clients** [3] - 3:16, 32:12, 133:20

**clients'** [1] - 34:22

**close** [3] - 33:4, 34:21, 79:8

**closed** [3] - 20:8, 48:8, 50:15

**closer** [1] - 13:4

**closing** [1] - 91:9

**Clow** [1] - 132:22

**co** [1] - 109:6

**co-counsel** [1] - 109:6

**coal** [1] - 124:10

**coastal** [1] - 42:21

**code** [3] - 52:12, 58:22, 133:22

**Code** [1] - 65:22

**codes** [1] - 62:15

**codified** [1] - 52:1

**COGHLAN** [63] - 1:19, 3:24, 4:2, 48:22, 49:5, 49:9, 50:14,

50:23, 51:1, 51:20, 52:11, 52:23, 53:20, 55:15, 55:23, 56:24, 57:5, 58:15, 59:23, 62:5, 62:25, 63:8, 63:14, 64:16, 65:5, 65:13, 65:17, 67:19, 68:3, 68:24, 69:4, 69:9, 70:9, 70:22, 72:5, 72:9, 72:16, 73:9, 73:20, 75:9, 75:20, 76:14, 76:20, 77:16, 77:24, 78:17, 79:6, 79:14, 80:12, 82:16, 82:21, 82:25, 83:15, 83:18, 84:5, 84:10, 84:14, 85:7, 85:11, 85:15, 86:1, 86:5, 86:7

**Coghlan** [3] - 3:25, 48:22, 130:1

**cognizable** [1] - 32:11

**colleague** [5] - 5:2, 44:8, 49:1, 86:4, 86:11

**colleagues** [2] - 68:14, 86:4

**colloquy** [1] - 67:7

**COLUMBIA** [1] - 1:1

**columns** [1] - 76:10

**combined** [1] - 115:5

**coming** [2] - 48:7, 110:5

**comment** [35] - 20:8, 25:5, 25:9, 34:21, 34:23, 35:7, 35:11, 35:18, 45:8, 47:23, 48:3, 48:8, 48:9, 50:14, 53:11, 53:16, 60:3, 60:11, 60:25, 82:15, 82:17, 82:25, 83:2, 83:25, 91:18, 100:5, 100:8, 117:10, 117:17, 119:22, 120:8, 120:11, 125:9, 125:17

**comments** [4] - 44:3, 50:16, 60:1, 91:17

**commerce** [9] - 37:17, 38:16, 72:19, 72:20, 73:6, 74:4, 74:9, 74:19, 75:25

**Commission** [7] - 88:25, 90:2, 91:3, 91:15, 99:23, 112:23, 115:13

**commission** [1] - 27:10

**commit** [3] - 47:1,

95:23, 115:20

**commitment** [2] - 95:11, 108:17

**commitments** [4] - 103:22, 109:14, 116:11, 116:12

**committed** [10] - 64:21, 89:5, 89:7, 95:22, 100:25, 104:12, 108:14, 115:20, 115:22

**committing** [1] - 101:3

**common** [1] - 67:16

**comparable** [1] - 133:17

**compare** [1] - 53:18

**compared** [1] - 30:23

**compares** [1] - 127:14

**comparison** [2] - 58:10, 127:8

**complete** [10] - 22:15, 26:17, 34:16, 34:17, 35:14, 45:17, 72:22, 130:5, 131:17, 136:5

**completed** [2] - 24:18, 86:16

**completely** [3] - 56:21, 84:18, 106:21

**completeness** [2] - 46:3, 47:17

**completion** [1] - 87:2

**complexity** [1] - 4:24

**compliance** [3] - 21:6, 21:18, 32:4

**complicated** [1] - 76:4

**complied** [4] - 98:17, 105:16, 108:18, 121:15

**comply** [12] - 8:13, 20:16, 20:17, 47:25, 88:18, 95:17, 95:21, 95:25, 104:6, 104:10, 107:10, 108:1

**components** [2] - 55:5, 104:19

**comprehensive** [2] - 115:1, 118:4

**concede** [1] - 72:5

**conceded** [3] - 45:16, 45:18, 45:21

**concedes** [1] - 95:24

**conceived** [1] - 92:14

**concern** [4] - 25:4, 33:2, 94:18, 134:13

**concerned** [6] - 7:12, 33:4, 105:9, 110:13, 128:2, 134:10

**concerning** [1] - 33:7

**concerns** [3] - 94:8,

121:14, 125:17

**concession** [1] - 129:25

**conclude** [4] - 50:2, 128:23, 135:11, 135:13

**concluded** [3] - 60:14, 104:22, 108:8

**concludes** [2] - 6:24, 49:1

**concur** [1] - 14:16

**concurrence** [1] - 13:17

**condition** [4] - 37:16, 38:15, 115:18, 117:6

**conditions** [28] - 15:15, 20:16, 20:18, 21:8, 21:14, 21:18, 47:22, 47:24, 48:1, 92:23, 93:21, 94:15, 97:12, 97:14, 97:15, 97:17, 98:17, 104:11, 104:13, 105:16, 108:1, 108:2, 110:3, 110:15, 112:15, 113:11, 116:4

**condos** [1] - 103:6

**conduct** [3] - 13:20, 59:6, 69:24

**conducted** [1] - 12:16

**confer** [2] - 79:7, 109:6

**confidence** [1] - 100:14

**confirm** [1] - 10:24

**Congress** [25] - 8:11, 8:14, 8:16, 27:23, 29:12, 37:22, 37:24, 38:18, 49:11, 49:14, 49:16, 49:22, 61:16, 61:17, 61:21, 73:3, 74:10, 78:9, 94:11, 103:4, 103:7, 106:3, 128:24, 128:25, 129:1

**congressional** [1] - 8:18

**conjunction** [1] - 22:17

**connection** [1] - 59:10

**Connor** [1] - 7:8

**consequences** [1] - 46:16

**Conservancy** [2] - 2:9, 3:17

**Conservation** [5] - 88:25, 90:2, 91:15, 99:23, 112:23

**consider** [15] - 7:9,

9:9, 10:18, 44:2, 54:18, 56:22, 111:17, 114:18, 119:8, 119:10, 119:14, 119:16, 119:25, 120:5, 129:23

**consideration** [1] - 117:14

**considerations** [1] - 81:20

**considered** [4] - 83:3, 91:18, 107:22, 113:6

**considering** [6] - 9:13, 49:10, 50:11, 50:16, 110:21, 132:15

**considers** [3] - 105:14, 105:20, 113:5

**consistent** [10] - 36:25, 60:17, 63:17, 71:7, 107:14, 121:5, 121:6, 121:7, 122:17, 130:11

**constantly** [1] - 69:14

**constituent** [3] - 57:16, 58:7, 58:8

**constitute** [1] - 15:7

**constitutes** [2] - 63:16, 136:4

**Constitution** [5] - 1:21, 2:22, 27:5, 27:8, 136:11

**constitution** [3] - 27:9, 27:11, 27:12

**constitutional** [1] - 27:10

**consult** [7] - 13:9, 14:6, 24:9, 92:18, 110:1, 120:1, 120:10

**consultation** [37] - 6:11, 9:11, 13:13, 13:16, 13:20, 17:10, 18:15, 19:7, 19:14, 22:1, 22:11, 22:15, 22:20, 23:7, 23:15, 23:19, 46:14, 86:18, 86:20, 87:2, 87:13, 110:1, 110:2, 110:23, 115:11, 116:24, 119:5, 119:11, 119:18, 120:17, 120:19, 120:22, 120:24, 121:2, 121:7, 131:4

**consultations** [3] - 12:19, 13:14, 131:18

**consulted** [1] - 9:3

**consulting** [2] - 102:18, 110:6

**consults** [1] - 110:24

**CONT'D** [1] - 2:1

**contained** [4] - 52:25, 78:13, 83:1, 83:2

**contains** [1] - 122:23

**contaminants** [1] - 34:2

**contemplated** [1] - 80:15

**content** [1] - 113:2

**contents** [1] - 122:4

**context** [7] - 6:2, 33:11, 36:6, 60:2, 119:1, 124:11, 131:2

**contexts** [1] - 120:19

**continue** [2] - 16:18, 135:8

**continuous** [1] - 124:1

**contrary** [2] - 7:6, 23:9

**contributing** [1] - 56:16

**controlling** [1] - 116:22

**controls** [1] - 67:9

**convened** [2] - 80:20, 81:12

**conversations** [1] - 86:18

**conveyed** [1] - 128:24

**convince** [2] - 124:18, 125:11

**convinced** [2] - 46:8, 68:9

**convincing** [1] - 28:14

**cooling** [18] - 6:16, 7:6, 7:11, 7:18, 8:1, 23:12, 87:11, 87:18, 96:25, 97:1, 97:4, 102:13, 108:15, 109:21, 113:8, 120:25, 131:7, 131:15

**coordination** [3] - 92:1, 112:3, 115:14

**copy** [3] - 105:5, 110:7, 132:10

**core** [1] - 5:16

**Corps** [88] - 2:14, 4:4, 8:14, 9:21, 10:2, 11:1, 11:6, 12:18, 13:9, 13:13, 14:1, 18:18, 18:19, 18:20, 27:20, 31:24, 32:2, 32:7, 37:22, 38:22, 38:24, 38:25, 39:3, 39:5, 39:11, 39:14, 40:1, 40:4, 40:9, 40:23, 41:4, 41:18, 42:12, 42:24, 43:2, 43:21, 45:21, 45:22,

45:25, 46:24, 47:10, 57:21, 59:8, 73:24, 74:5, 75:12, 75:16, 75:20, 76:1, 76:5, 76:24, 77:7, 78:4, 78:19, 78:25, 79:4, 79:7, 79:19, 79:23, 80:1, 80:8, 80:14, 80:21, 80:24, 81:4, 81:9, 81:12, 81:14, 81:24, 82:4, 82:5, 82:8, 82:10, 82:18, 83:1, 83:5, 85:16, 101:11, 123:9, 123:10, 123:12, 123:22, 127:14, 129:18, 129:21, 130:10, 132:24, 133:4

**Corps'** [3] - 16:11, 77:21, 81:1

**Corps-led** [1] - 127:14

**correct** [7] - 46:12, 57:3, 62:24, 62:25, 76:20, 82:4, 98:13

**correcting** [1] - 125:17

**correctly** [2] - 102:13, 133:4

**correspondence** [1] - 43:23

**costs** [2] - 128:24, 129:4

**Counsel** [2] - 2:16, 4:4

**counsel** [6] - 3:5, 3:6, 4:12, 4:22, 18:5, 109:6

**counsel's** [2] - 4:3, 4:5

**country** [1] - 5:19

**couple** [8] - 54:1, 81:7, 84:5, 88:20, 95:13, 126:11, 129:7, 132:2

**course** [8] - 33:2, 43:12, 52:17, 66:14, 66:17, 68:15, 78:20, 95:21

**COURT** [249] - 1:1, 3:9, 3:12, 3:15, 3:20, 3:23, 4:1, 4:6, 4:9, 4:14, 5:4, 5:7, 5:14, 5:22, 6:1, 6:21, 7:11, 7:21, 8:8, 9:15, 10:23, 11:10, 13:8, 13:22, 14:9, 14:20, 15:2, 15:10, 16:7, 16:13, 16:18, 17:13, 18:5, 18:17, 19:18, 19:22, 20:1, 21:4, 21:22, 22:5, 22:9, 22:16, 23:3, 23:11,

24:12, 24:21, 24:24, 25:13, 25:23, 26:4, 26:7, 27:3, 27:14, 28:4, 28:12, 28:22, 29:2, 29:5, 29:15, 29:20, 29:24, 30:3, 30:9, 30:20, 31:6, 32:10, 32:14, 33:1, 33:8, 34:9, 34:12, 35:23, 36:11, 36:20, 37:3, 37:11, 38:4, 38:17, 39:18, 40:10, 41:23, 42:11, 42:23, 43:9, 44:7, 44:20, 45:14, 46:5, 46:19, 47:13, 47:15, 48:11, 48:20, 49:4, 49:8, 50:10, 50:21, 50:25, 51:17, 52:5, 52:22, 53:17, 54:22, 55:22, 56:8, 57:1, 58:14, 59:20, 62:2, 62:22, 63:1, 63:13, 63:23, 65:3, 65:12, 65:15, 67:18, 67:20, 68:9, 69:3, 69:8, 70:5, 70:10, 71:4, 72:8, 72:15, 73:7, 73:15, 74:17, 75:17, 76:9, 76:15, 77:11, 77:23, 78:14, 79:2, 79:11, 80:11, 82:13, 82:19, 82:24, 83:10, 83:17, 83:20, 84:9, 84:13, 85:6, 85:8, 85:13, 85:25, 86:3, 86:6, 86:9, 86:14, 86:23, 87:3, 87:7, 87:10, 87:21, 89:7, 89:14, 89:18, 90:7, 90:11, 90:16, 90:19, 90:22, 90:25, 91:6, 91:13, 92:2, 92:5, 92:8, 94:22, 94:25, 95:3, 95:7, 95:14, 95:23, 96:3, 97:11, 97:23, 98:11, 98:22, 99:1, 99:19, 100:7, 100:9, 100:12, 101:2, 102:11, 102:16, 102:22, 103:1, 104:16, 105:1, 105:4, 105:6, 106:8, 106:13, 106:21, 107:5, 108:25, 109:7, 109:11, 109:22, 110:18, 111:1, 111:4, 111:9, 112:9, 113:14, 113:17, 113:19, 114:8, 114:11,

116:6, 116:10, 116:15, 116:18, 117:9, 117:22, 117:25, 118:10, 118:18, 118:22, 120:2, 120:7, 120:13, 121:10, 121:23, 122:20, 124:22, 126:2, 126:12, 127:4, 128:7, 128:10, 128:15, 128:20, 130:19, 132:4, 132:9, 133:24, 134:6, 134:19, 135:2, 135:4, 136:1

**court** [10] - 20:21, 30:7, 47:3, 48:17, 68:15, 88:13, 94:3, 108:23, 124:20

**Court** [32] - 2:20, 2:21, 7:20, 11:5, 16:23, 36:15, 38:13, 50:4, 59:6, 69:22, 73:18, 73:19, 74:16, 88:19, 94:24, 99:10, 108:11, 108:15, 109:20, 113:11, 119:2, 119:3, 119:9, 119:20, 120:20, 125:3, 126:7, 127:11, 129:16, 134:2, 134:3, 136:10

**Court's** [3] - 38:10, 87:22, 121:7

**Courthouse** [1] - 2:21

**COURTROOM** [1] - 3:2

**courts** [5] - 7:8, 70:12, 129:11, 133:16, 135:1

**cover** [4] - 5:1, 11:7, 26:5, 106:18

**coverage** [3] - 21:7, 22:3, 123:1

**covered** [4] - 12:17, 17:4, 21:7, 47:5

**covering** [3] - 47:9, 47:11, 74:21

**covers** [4] - 6:12, 21:5, 21:12, 86:7

**CRC** [2] - 6:18, 12:7

**create** [2] - 6:18, 12:7

**created** [14] - 8:11, 8:16, 11:9, 12:24, 13:2, 13:3, 17:3, 17:7, 17:23, 18:3, 21:2, 21:19, 21:20, 119:4

**creates** [2] - 12:8,

23:14

**creating** [1] - 11:6

**Creek** [3] - 123:21, 124:18, 132:22

**creeks** [1] - 123:4

**criminal** [42] - 26:12, 26:20, 26:24, 26:25, 27:1, 27:19, 28:5, 62:10, 62:13, 62:14, 62:15, 62:24, 63:6, 63:10, 63:20, 63:21, 64:1, 64:2, 64:6, 64:8, 64:11, 64:12, 64:14, 64:20, 64:21, 64:22, 64:23, 64:24, 65:2, 65:4, 65:8, 65:9, 65:10, 66:3, 66:6, 66:7, 66:11, 69:5, 69:6, 71:2, 129:8

**criminalize** [1] - 27:7

**criteria** [17] - 12:24, 26:12, 27:17, 31:21, 32:18, 32:19, 59:4, 78:8, 114:23, 121:13, 121:14, 121:19, 121:20, 122:3, 122:6, 122:15, 128:25

**critical** [12] - 11:18, 11:24, 11:25, 15:18, 15:19, 15:20, 34:18, 53:7, 53:8, 90:15, 96:12, 104:24

**critically** [1] - 8:23

**Crooks** [1] - 3:17

**CROOKS** [1] - 2:9

**crooks'** [1] - 17:22

**cross** [6] - 4:18, 29:10, 54:13, 74:22, 75:6, 109:10

**cross-motion** [1] - 4:18

**cross-reference** [1] - 54:13

**cross-referenced** [2] - 29:10, 109:10

**crosswalk** [1] - 60:12

**Crow** [1] - 123:21, 124:18

**CRR** [2] - 2:20, 136:9

**crux** [1] - 51:5

**cumulative** [1] - 122:9

**cumulatively** [1] - 24:1

**cured** [1] - 25:3

**curious** [1] - 7:11

**current** [4] - 9:13, 27:13, 77:6, 80:10

**cusp** [1] - 134:9

**cut** [1] - 78:25

**cutoffs** [1] - 77:8

**cuts** [1] - 77:3

**D**

**D.C** [7] - 1:6, 2:22, 123:24, 124:3, 124:8, 124:12, 136:11

**Dakota** [2] - 123:23, 132:23

**dam** [6] - 92:15, 92:16, 92:19, 92:22, 105:10, 105:11

**dammed** [1] - 77:2

**danger** [1] - 15:5

**DANIEL** [1] - 2:12

**Daniel** [3] - 3:19, 38:12, 77:25

**darn** [1] - 70:20

**darters** [6] - 92:19, 92:20, 92:22, 92:25, 93:1, 93:4

**data** [5] - 12:19, 13:7, 16:25, 118:5, 131:21

**date** [8] - 34:16, 43:22, 43:24, 45:18, 45:22, 80:2, 129:24, 129:25

**Dated** [1] - 136:7

**daylight** [2] - 56:7, 59:14

**days** [2] - 91:4, 134:15

**DC** [2] - 1:22, 2:4

**deadline** [1] - 91:17

**deal** [2] - 92:10, 101:13

**dealing** [4] - 57:8, 66:17, 70:15, 79:22

**decide** [4] - 63:15, 71:5, 71:7, 102:14

**decided** [7] - 7:6, 23:9, 42:20, 43:22, 83:14, 102:13, 132:13

**decides** [1] - 92:15

**decision** [15] - 9:6, 10:15, 10:19, 34:5, 58:18, 66:21, 66:24, 77:22, 87:18, 103:14, 119:3, 119:20, 120:12, 120:23, 121:8

**decisional** [2] - 97:24, 108:7

**decisions** [6] - 6:25, 7:25, 9:11, 14:16, 33:19, 37:1

**declaration** [6] - 17:22, 42:15, 127:7,

127:12, 127:21, 128:6
**declarations** [1] - 40:8
**deemed** [1] - 76:6
**deems** [1] - 100:5
**Defendants** [2] - 1:7, 1:19
**defendants** [11] - 3:25, 6:17, 7:24, 23:20, 24:15, 27:24, 29:6, 33:15, 37:21, 39:11, 47:18
**defendants'** [1] - 4:17
**Defenders** [2] - 2:12, 3:19
**defense** [1] - 67:25
**defer** [1] - 43:10
**deference** [1] - 36:14
**deferential** [1] - 31:20
**deficiencies** [1] - 35:14
**defied** [2] - 47:5, 47:6
**define** [11] - 29:7, 38:19, 38:23, 38:24, 39:1, 46:20, 73:25, 78:2, 80:24, 104:17
**defined** [12] - 10:11, 10:16, 49:16, 62:14, 62:15, 64:11, 72:17, 73:3, 102:20, 103:20, 103:21, 104:24
**defining** [1] - 121:9
**definitely** [1] - 36:25
**definition** [6] - 37:13, 39:19, 47:1, 47:7, 74:6, 75:7
**definitions** [1] - 11:3
**degree** [4] - 28:23, 62:18, 67:12, 67:18
**degrees** [1] - 67:15
**delegated** [1] - 121:2
**delegates** [1] - 119:6
**delegation** [1] - 101:15
**delve** [1] - 49:5
**demarcations** [1] - 42:12
**demonstrate** [3] - 26:19, 26:22, 27:21
**demonstrative** [1] - 124:25
**denied** [1] - 53:15
**denominator** [1] - 67:16
**deny** [1] - 97:9
**DEP** [25] - 4:11, 4:13, 31:15, 32:6, 58:22, 88:4, 88:25, 90:1, 90:13, 91:2, 91:14,

98:8, 99:22, 104:10, 109:18, 112:20, 112:23, 117:3, 117:7, 123:9, 125:7, 125:11, 125:16
**Department** [6] - 1:20, 2:13, 37:4, 48:13, 54:6, 120:23
**department** [1] - 19:20, 68:15, 70:6, 70:11
**DEPUTY** [1] - 3:2
**describe** [3] - 26:18, 42:19, 83:24
**described** [7] - 42:7, 56:9, 88:11, 88:15, 104:19, 108:5, 109:14
**describes** [4] - 89:24, 90:1, 90:23, 91:7
**description** [12] - 41:17, 41:18, 41:24, 42:1, 57:2, 57:3, 57:6, 60:12, 84:11, 84:15, 84:16
**design** [1] - 12:24
**designated** [1] - 75:22
**designates** [1] - 75:20
**designation** [1] - 77:15
**designations** [2] - 77:13, 77:14
**designed** [3] - 33:14, 100:23, 111:7
**despite** [1] - 17:1
**destroy** [2] - 96:12, 104:24
**destroyed** [1] - 109:10
**detail** [7] - 51:12, 52:14, 59:18, 101:20, 115:3, 118:22, 118:25
**details** [1] - 49:6
**determination** [12] - 24:2, 25:19, 25:21, 33:10, 34:1, 59:12, 60:9, 76:2, 76:17, 103:4, 110:3, 132:20
**determinations** [17] - 31:13, 31:16, 31:25, 32:3, 32:4, 32:9, 33:6, 33:20, 33:23, 54:8, 58:17, 60:7, 60:14, 60:16, 60:18, 116:22, 129:16
**determinative** [1] - 97:6
**determine** [8] - 12:11, 13:14, 54:25, 55:2, 96:11, 102:19,

131:11, 134:10
**determined** [3] - 76:18, 88:9, 133:14
**deterrence** [1] - 70:24
**deterrent** [1] - 70:8
**develop** [3] - 80:17, 81:4, 119:22
**developed** [4] - 78:20, 83:4, 83:5, 119:21
**developer** [5] - 20:15, 71:24, 93:7, 103:5, 110:12
**developing** [5] - 78:5, 81:23, 82:18, 85:5, 131:21
**development** [5] - 11:21, 11:22, 12:21, 15:23, 77:8
**dictate** [1] - 51:18, 53:7
**difference** [8] - 28:4, 28:5, 28:7, 32:11, 33:11, 69:17, 97:3, 97:4
**differences** [2] - 130:13, 132:22
**different** [13] - 20:24, 32:11, 38:6, 56:9, 67:15, 78:4, 96:25, 100:19, 121:3, 127:9, 132:14, 133:7, 133:9
**difficulties** [1] - 45:3
**dig** [1] - 77:21
**diminished** [1] - 72:4
**direct** [3] - 112:2, 115:8, 129:16
**directing** [3] - 40:16, 46:9, 93:20
**directly** [1] - 55:19
**disagree** [1] - 20:8
**disagreement** [3] - 79:3, 97:1, 108:9
**disavowed** [2] - 16:20, 129:13
**discarded** [1] - 9:7
**discharge** [6] - 55:4, 57:17, 57:24, 58:3, 58:6, 58:24
**discharged** [1] - 57:18
**discharges** [11] - 29:9, 49:12, 54:3, 54:4, 54:18, 54:19, 55:25, 57:9, 57:12, 57:13, 62:12
**disconnect** [1] - 108:4
**discretion** [5] - 63:16, 119:7, 119:10, 119:14, 119:25
**discuss** [2] - 66:1,

69:25
**discussed** [3] - 48:9, 93:13, 133:15
**discusses** [1] - 60:21
**discussion** [1] - 99:11
**dismiss** [2] - 132:17, 132:18
**dispute** [7] - 27:2, 42:23, 43:4, 47:21, 72:7, 80:2, 82:22
**distinguishable** [1] - 23:10
**district** [1] - 47:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 80:5, 82:10, 82:11
**districts** [2] - 80:24, 81:24
**diversity** [1] - 5:21
**Diversity** [3] - 2:11, 3:3, 3:19
**DIVERSITY** [1] - 1:3
**divide** [1] - 4:25
**Division** [1] - 125:23
**docket** [2] - 37:6, 44:10
**Docket** [3] - 44:9, 44:10, 86:16
**document** [7] - 16:9, 48:7, 84:23, 100:16, 114:17, 118:9, 118:13
**documentation** [1] - 100:13
**documents** [1] - 118:2
**DOJ** [1] - 31:21
**domino** [1] - 126:17
**dominos** [4] - 124:24, 125:2, 125:3, 125:7
**done** [30] - 6:4, 8:6, 10:12, 14:10, 14:12, 14:21, 16:4, 16:16, 17:1, 20:12, 22:18, 24:22, 25:5, 25:7, 34:21, 41:1, 43:7, 43:16, 63:2, 78:19, 92:12, 101:22, 105:22, 106:22, 107:24, 117:3, 117:25, 120:14, 131:24
**doubt** [2] - 28:14, 85:22
**doubting** [1] - 100:15
**down** [9] - 30:5, 50:9, 73:16, 91:1, 91:12, 97:20, 109:6, 135:5
**dozens** [1] - 62:15
**draw** [1] - 59:10

**dredged** [2] - 49:12, 55:4
**drill** [1] - 50:9
**drop** [1] - 56:20
**due** [2] - 22:3, 74:24
**during** [7] - 22:11, 48:16, 91:23, 91:25, 98:18, 126:24, 131:19
**duty** [6] - 16:20, 32:7, 45:22, 45:25, 118:17, 129:14

# E

**early** [2] - 8:9, 91:25
**Earthjustice** [1] - 1:16
**easier** [1] - 135:15
**easy** [1] - 128:11
**eat** [3] - 103:2, 117:4, 117:6
**eating** [1] - 105:23
**ebb** [1] - 83:18
**Economy** [2] - 38:13, 78:1
**ecosystems** [1] - 106:9
**effect** [7] - 22:14, 25:19, 25:21, 70:8, 109:25, 117:15, 122:9
**effects** [7] - 12:22, 16:21, 55:3, 88:12, 122:9, 126:9, 131:11
**effluent** [1] - 34:4
**eight** [1] - 12:23
**either** [11] - 18:24, 19:5, 22:18, 35:23, 38:5, 44:6, 47:11, 59:15, 128:17, 130:22, 135:11
**elaborating** [1] - 61:3
**element** [1] - 51:14
**elements** [4] - 34:18, 53:7, 53:8, 117:12
**ELISE** [1] - 2:10
**Elise** [1] - 3:18
**elsewhere** [2] - 61:20, 87:12
**elucidate** [1] - 75:22
**email** [2] - 80:4, 129:22
**embedded** [2] - 53:22, 63:19
**emergency** [1] - 134:11
**emphasize** [4] - 60:23, 81:8, 81:14, 120:20
**employ** [1] - 63:11
**employed** [3] - 73:19,

87:12, 87:19
**enacting** [1] - 74:11
**encompassed** [1] - 74:15
**encompasses** [1] - 38:15
**encompassing** [1] - 121:22
**encourage** [3] - 114:17, 127:11, 128:5
**encouraged** [1] - 129:3
**end** [3] - 5:9, 31:23, 94:21
**endangered** [16] - 8:21, 8:23, 10:3, 10:9, 11:22, 11:25, 12:1, 15:10, 22:4, 92:20, 94:13, 95:2, 99:7, 109:4, 109:25, 117:15
**Endangered** [35] - 4:25, 5:13, 5:17, 6:9, 6:11, 6:24, 9:8, 10:11, 12:5, 15:24, 18:12, 20:24, 21:24, 22:2, 22:20, 23:5, 24:6, 26:3, 49:2, 92:11, 93:9, 96:16, 107:9, 107:14, 108:18, 109:1, 111:19, 111:25, 113:1, 113:10, 129:1, 130:12, 130:19, 131:13, 132:1
**enforceable** [3] - 94:3, 94:7, 95:16
**enforcement** [19] - 6:7, 18:22, 26:12, 26:20, 27:25, 28:2, 30:23, 31:5, 61:9, 69:5, 69:6, 69:13, 70:15, 72:1, 98:7, 124:1, 124:16, 132:24, 132:25
**enforcer** [1] - 69:11
**engage** [6] - 21:16, 34:22, 64:15, 111:18, 111:23, 119:17
**engaged** [2] - 14:15, 86:18
**engaging** [1] - 9:16
**Engineers** [4] - 2:14, 4:4, 101:11, 123:22
**ensure** [8] - 20:17, 21:25, 53:23, 56:1, 58:23, 87:15, 88:17,

91:20
**ensured** [1] - 8:14
**ensuring** [1] - 112:5
**entered** [3] - 88:24, 93:15, 104:2
**entire** [3] - 9:9, 25:19, 122:13
**entirely** [3] - 64:7, 77:9, 121:20
**entirety** [1] - 5:12
**entitled** [1] - 109:15
**entity** [2] - 41:22, 130:9
**enumerated** [2] - 26:25, 32:19
**environment** [1] - 55:5
**Environmental** [2] - 2:13, 54:6
**environmental** [11] - 5:16, 18:23, 19:4, 19:18, 81:17, 111:17, 115:2, 122:11, 124:10, 127:24, 129:4
**EPA** [82] - 2:15, 7:15, 9:25, 17:4, 17:15, 18:2, 18:24, 21:9, 21:14, 21:15, 22:6, 22:17, 24:7, 24:18, 25:17, 26:16, 26:21, 28:3, 28:9, 29:1, 30:11, 30:12, 30:13, 38:22, 38:25, 39:5, 39:9, 41:13, 41:16, 41:20, 42:6, 44:21, 44:22, 45:18, 47:6, 49:18, 50:2, 50:11, 50:14, 50:16, 53:23, 54:23, 54:25, 60:1, 60:10, 63:15, 66:2, 66:10, 66:15, 71:1, 71:9, 71:14, 71:21, 71:25, 80:20, 80:23, 81:11, 84:8, 86:16, 96:18, 98:9, 101:10, 104:11, 109:18, 112:17, 115:6, 117:7, 117:14, 118:7, 118:8, 119:6, 119:17, 119:22, 119:24, 120:10, 124:16, 125:10, 125:11, 125:12
**ePA's** [1] - 84:10
**EPA's** [23] - 4:3, 9:4, 17:15, 26:8, 30:24, 39:9, 50:18, 63:17, 66:9, 66:17, 67:2, 67:4, 69:10, 69:16, 83:2, 84:7, 86:13,

86:18, 103:14, 103:19, 109:2, 113:9, 124:9
**equal** [1] - 23:16
**equivalence** [1] - 33:16
**equivalent** [3] - 17:17, 18:14, 76:10
**ERICA** [1] - 2:14
**Erica** [1] - 4:4
**ERP** [1] - 122:15
**error** [2] - 36:4, 36:6
**ESA** [23] - 8:16, 8:20, 9:6, 9:11, 12:8, 13:7, 17:2, 17:5, 23:14, 35:15, 46:14, 47:23, 54:13, 88:12, 88:13, 88:18, 96:21, 102:21, 113:3, 114:15, 115:11, 134:7
**ESA's** [1] - 24:4
**ESA-listed** [2] - 88:13, 96:21
**especially** [2] - 11:5, 40:3
**essence** [1] - 101:17
**essential** [1] - 49:10
**essentially** [4] - 14:10, 25:5, 62:8, 81:4
**establish** [2] - 70:13, 84:22
**estimates** [1] - 8:25
**et** [4] - 1:3, 1:6, 3:3, 3:4
**evaluate** [2] - 86:21, 114:19
**evaluating** [1] - 110:21
**evaluation** [5] - 24:19, 86:13, 86:17, 86:21, 118:3
**events** [1] - 125:4
**evidence** [5] - 18:3, 19:12, 28:13, 28:14, 30:10
**evolved** [1] - 78:15
**evolves** [1] - 74:1
**exact** [4] - 13:7, 16:25, 60:20, 124:2
**exactly** [9] - 20:10, 41:11, 41:13, 41:20, 47:8, 73:21, 98:15, 112:8, 115:15
**example** [14] - 9:25, 12:14, 13:22, 14:21, 14:24, 15:9, 17:20, 42:15, 68:14, 94:16, 106:15, 115:25, 121:1

**examples** [7] - 8:6, 18:16, 19:4, 115:24, 127:20, 127:21, 127:22
**exceeded** [3] - 12:10, 19:8, 98:18
**except** [3] - 37:23, 39:6, 78:7
**exception** [2] - 7:12, 79:2
**exceptions** [1] - 23:14
**excluded** [2] - 85:6, 85:13
**excluding** [1] - 38:2
**exclusion** [1] - 13:2
**excuse** [2] - 62:9, 67:3
**exempt** [1] - 21:7
**exemption** [3] - 17:4, 23:1, 33:25
**exercise** [1] - 104:12
**exhaustive** [1] - 84:18
**existing** [2] - 81:24, 82:11
**exists** [1] - 123:12
**expanded** [1] - 47:4
**expanding** [1] - 61:3
**expansive** [1] - 64:3
**explained** [3] - 16:23, 108:13, 112:11
**explains** [4] - 82:5, 106:10, 112:3, 125:4
**explanation** [1] - 42:5
**explicitly** [3] - 23:17, 49:14, 61:21
**express** [2] - 96:10, 106:11
**expressed** [3] - 106:3, 106:4, 121:13
**expression** [1] - 102:23
**expressly** [2] - 32:2, 42:6
**extensively** [1] - 6:17
**extent** [10] - 24:25, 25:1, 34:19, 40:13, 48:15, 82:8, 82:13, 98:18, 117:12, 117:13
**extinction** [1] - 9:2
**extremely** [2] - 61:21, 63:10
**eye** [2] - 81:19

## F

**face** [3] - 40:4, 54:17, 58:19
**fact** [25] - 16:24, 25:3, 25:20, 27:9, 34:17, 35:13, 37:5, 40:7,

40:17, 42:13, 45:13, 47:21, 70:13, 71:9, 96:18, 99:3, 99:12, 100:24, 100:25, 111:7, 113:6, 115:23, 124:15, 130:15
**facts** [2] - 23:10, 108:10
**factual** [16] - 31:13, 31:15, 31:25, 32:2, 32:4, 32:9, 33:6, 33:10, 54:7, 58:17, 60:7, 60:8, 60:14, 60:16, 60:17, 129:16
**fail** [1] - 91:22
**fail-safe** [1] - 91:22
**failed** [8] - 8:17, 9:12, 24:9, 26:18, 31:8, 53:23
**failing** [2] - 19:6, 102:9
**fails** [1] - 125:11
**fair** [12] - 51:20, 53:20, 61:4, 68:24, 69:3, 69:15, 70:22, 72:8, 72:10, 103:3, 109:7
**fairly** [1] - 94:11
**fall** [1] - 125:7
**falls** [1] - 79:1
**far** [6] - 7:12, 19:9, 29:15, 42:23, 79:10, 98:7
**fast** [2] - 66:10, 124:20
**FDEP** [6] - 54:5, 54:7, 91:2, 91:25, 115:12, 116:12
**FDEP's** [1] - 85:22
**feature** [1] - 31:19
**federal** [53] - 3:22, 3:25, 7:9, 10:1, 10:13, 11:4, 18:18, 19:24, 20:5, 20:21, 22:13, 22:24, 26:12, 27:17, 30:25, 31:3, 31:22, 33:14, 33:17, 47:1, 48:21, 49:25, 56:15, 57:3, 57:4, 57:20, 60:13, 60:16, 60:18, 62:21, 64:8, 64:12, 64:13, 67:13, 67:25, 69:13, 69:21, 79:1, 85:23, 96:18, 105:8, 105:16, 109:23, 110:5, 110:11, 115:21, 124:1, 126:14, 130:14, 131:2, 131:5, 133:1
**Federal** [1] - 65:22

**federalize** [2] - 117:7, 125:15
**federalized** [1] - 125:13
**federalizes** [1] - 125:12
**feelings** [1] - 127:2
**few** [5] - 15:11, 20:24, 25:10, 113:22, 128:23
**fifth** [1] - 126:17
**figure** [4] - 4:21, 45:19, 79:13, 79:20
**figuring** [1] - 78:21
**file** [4] - 125:19, 125:20, 127:19, 132:8
**filed** [3] - 86:15, 110:8, 132:18
**filing** [1] - 19:23
**fill** [3] - 49:12, 55:4, 69:14
**final** [5] - 17:23, 84:24, 87:22, 125:22, 133:24
**finally** [1] - 17:12
**findings** [1] - 33:21
**fine** [4] - 5:4, 49:4, 104:16, 105:1
**fines** [4] - 64:20, 65:8, 65:9, 65:10
**finger** [3] - 28:19, 67:10, 102:22
**finish** [1] - 123:19
**Finnegan** [8] - 3:22, 4:2, 49:1, 50:23, 54:12, 86:9, 131:6, 131:14
**FINNEGAN** [63] - 1:19, 3:21, 86:10, 86:15, 87:1, 87:4, 87:9, 87:17, 87:22, 89:11, 89:16, 89:19, 90:9, 90:12, 90:18, 90:20, 90:23, 91:1, 91:7, 91:14, 92:3, 92:7, 94:19, 94:23, 95:1, 95:4, 95:10, 95:20, 96:1, 96:8, 97:20, 97:24, 98:13, 98:25, 99:9, 99:21, 100:8, 100:10, 100:21, 102:8, 102:12, 102:17, 102:25, 103:19, 104:17, 105:3, 105:5, 106:2, 106:10, 106:16, 107:4, 108:4, 109:5, 109:8, 109:12, 110:16, 110:19,

111:2, 111:5, 112:1, 112:10, 113:16, 113:18
**first** [29] - 6:8, 9:7, 12:4, 21:1, 26:11, 26:20, 30:7, 33:24, 49:11, 51:2, 54:2, 54:14, 64:19, 65:11, 65:19, 66:2, 72:12, 81:8, 87:19, 89:19, 94:23, 98:8, 99:17, 99:24, 100:1, 117:24, 123:21, 125:7, 126:24
**First** [1] - 75:11
**fish** [2] - 116:2, 116:20
**Fish** [127] - 9:3, 9:7, 9:18, 10:17, 11:20, 13:10, 13:16, 13:18, 14:6, 14:14, 16:19, 17:2, 17:16, 18:2, 18:19, 18:24, 19:5, 20:22, 21:17, 22:18, 23:4, 23:17, 23:21, 24:3, 24:7, 44:14, 51:18, 51:23, 52:7, 52:8, 52:16, 52:18, 52:20, 53:4, 54:24, 87:23, 87:25, 88:2, 88:8, 88:16, 88:24, 88:25, 89:4, 89:6, 89:24, 90:1, 91:3, 91:4, 91:10, 91:15, 91:16, 91:19, 91:22, 91:24, 91:25, 92:17, 92:18, 93:16, 93:25, 94:14, 94:17, 95:11, 95:17, 96:1, 96:6, 96:14, 97:5, 97:8, 97:15, 97:19, 98:1, 98:4, 98:11, 98:23, 99:2, 99:7, 99:22, 100:3, 100:4, 100:14, 100:16, 100:24, 100:25, 101:19, 101:22, 101:24, 101:25, 102:6, 102:17, 103:3, 103:7, 103:16, 103:23, 103:24, 104:8, 104:18, 104:21, 104:22, 106:13, 106:24, 107:1, 107:16, 107:20, 110:6, 110:19, 110:21, 111:15, 112:22, 112:23, 115:6, 115:13, 115:18, 115:25, 116:22, 117:5,

117:10, 117:20, 118:12, 118:15, 127:25, 130:14, 130:17, 130:18, 131:8, 131:17
**Fisheries** [10] - 12:16, 16:5, 16:24, 19:6, 24:10, 24:16, 50:22, 86:19, 102:18, 110:20
**fits** [1] - 59:24
**five** [11] - 15:13, 30:23, 60:6, 61:13, 91:4, 108:24, 125:2, 125:7, 126:1, 128:20
**five-year** [1] - 30:23
**fix** [1] - 71:9
**FL** [1] - 1:17
**flat** [1] - 122:17
**flat-out** [1] - 122:17
**fleshed** [1] - 82:7
**fleshed-out** [1] - 82:7
**flip** [2] - 52:5, 64:4
**floor** [2] - 27:1, 27:17
**Florida** [136] - 2:9, 2:13, 3:18, 4:11, 4:13, 5:18, 8:23, 8:24, 9:5, 11:17, 11:23, 12:18, 13:6, 13:25, 15:1, 15:2, 15:4, 15:6, 15:21, 17:14, 18:1, 18:5, 20:2, 20:4, 20:11, 20:15, 20:20, 20:21, 21:10, 21:14, 21:16, 22:17, 22:25, 27:4, 27:5, 27:6, 27:8, 27:12, 27:18, 30:22, 31:15, 33:17, 33:19, 39:5, 43:5, 46:2, 47:5, 47:24, 48:13, 51:8, 51:10, 51:24, 52:6, 52:9, 52:12, 53:13, 53:24, 54:5, 55:8, 56:1, 56:10, 56:23, 57:2, 57:11, 58:16, 58:22, 59:13, 71:24, 78:19, 78:25, 79:4, 79:7, 79:19, 79:22, 84:19, 88:1, 88:4, 88:24, 88:25, 90:1, 90:13, 91:2, 91:3, 91:14, 93:7, 93:15, 93:17, 93:24, 94:8, 97:3, 97:5, 97:8, 97:16, 98:3, 98:6, 98:8, 99:22, 103:6, 104:10, 106:14, 106:22, 106:25, 109:18,

110:6, 112:20, 112:21, 112:23, 114:18, 114:20, 115:2, 115:13, 117:18, 118:3, 119:23, 122:11, 122:17, 122:25, 123:9, 125:13, 125:20, 125:23, 126:2, 126:6, 126:8, 127:15, 127:16, 129:24, 132:18, 132:25, 134:14
**florida** [1] - 15:2
**Florida's** [34] - 8:20, 24:25, 26:9, 26:17, 31:8, 31:19, 33:23, 49:24, 50:3, 51:3, 51:13, 51:17, 51:21, 52:1, 52:14, 53:1, 54:3, 54:17, 55:16, 55:23, 57:7, 57:14, 58:5, 58:19, 60:9, 60:15, 78:20, 87:20, 88:3, 103:20, 115:5, 120:21, 121:14
**Florida-led** [1] - 127:15
**flow** [3] - 10:19, 46:16, 83:19
**flowing** [1] - 77:2
**fluid** [1] - 39:12
**fly** [1] - 113:25
**focused** [1] - 10:14
**folded** [3] - 117:2, 117:6, 122:13
**folds** [2] - 115:1, 122:10
**follow** [1] - 24:4
**followed** [1] - 8:1
**following** [9] - 16:2, 52:8, 92:24, 100:17, 107:21, 108:1, 108:22, 112:8, 123:14
**FOR** [2] - 1:1, 1:3
**force** [1] - 23:16
**foreclosed** [1] - 73:1
**foregoing** [1] - 136:4
**foreign** [5] - 37:17, 72:19, 73:6, 74:4, 74:9
**foreseeable** [1] - 10:18
**foresight** [1] - 12:6
**forever** [1] - 11:19
**form** [13] - 5:23, 14:13, 50:20, 62:16, 63:18, 65:18, 66:6, 66:16, 67:16, 68:6, 113:2,

110:6, 112:20, 112:21, 112:23, 114:18, 114:20, 115:2, 115:13, 117:18, 118:3, 119:23, 122:11, 122:17, 122:25, 123:9, 125:13, 125:20, 125:23, 126:2, 126:6, 126:8, 127:15, 127:16, 129:24, 132:18, 132:25, 134:14
**formal** [1] - 110:2
**forms** [1] - 110:25
**forth** [6] - 14:19, 39:12, 90:15, 105:15, 113:12, 118:23
**forward** [12] - 7:5, 30:16, 36:16, 66:10, 88:8, 91:2, 107:21, 107:25, 109:16, 121:11, 126:17, 130:10
**fought** [1] - 43:5
**four** [4] - 60:6, 124:5, 125:19, 125:25
**framework** [1] - 118:24
**framing** [2] - 49:7, 49:15
**Francisco** [1] - 2:7
**frankly** [2] - 107:10, 122:2
**FRANZ** [1] - 2:12
**Franz** [1] - 3:19
**free** [4] - 77:2, 104:17, 113:24, 127:10
**free-flowing** [1] - 77:2
**frequently** [1] - 106:18
**front** [4] - 38:5, 66:11, 89:14, 116:19
**full** [2] - 55:24, 136:5
**fully** [2] - 32:25, 82:7
**fundamentally** [1] - 92:9
**fundamentals** [2] - 120:21
**future** [7] - 12:20, 12:23, 17:4, 17:8, 19:10, 72:19, 77:6
**FWC** [4] - 89:1, 90:13, 115:12, 116:12
**FWS** [2] - 44:13, 116:12

## G

**g)(1)** [1] - 78:13
**Galloni** [7] - 3:8, 5:2, 26:2, 26:7, 67:7, 69:2, 69:7
**GALLONI** [52] - 1:14, 3:7, 26:8, 27:6, 27:15, 28:7, 28:20, 28:25, 29:3, 29:6, 29:17, 29:21, 30:1, 30:4, 30:10, 30:21, 31:7, 32:13, 32:16, 33:2, 33:9, 34:11, 35:10, 36:10, 36:17,

36:21, 37:9, 37:12, 38:9, 38:18, 39:23, 41:13, 42:5, 42:14, 43:1, 43:20, 44:18, 44:21, 45:4, 45:21, 46:12, 46:22, 47:14, 47:16, 128:22, 130:25, 132:6, 132:11, 134:5, 134:7, 134:24, 135:3
**Galloni's** [2] - 73:17
**general** [7] - 4:12, 9:10, 34:1, 49:24, 62:18, 67:9, 67:10
**General** [2] - 2:15, 4:3
**generic** [1] - 107:8
**GIS** [1] - 78:20
**glad** [2] - 114:5, 128:13
**gloss** [1] - 62:17
**goodwill** [1] - 100:14
**governing** [2] - 47:6, 124:10
**government** [9] - 20:3, 29:22, 48:21, 69:13, 69:21, 129:8, 129:13, 129:22
**government's** [2] - 20:3, 29:18
**grant** [3] - 10:7, 50:5, 74:23
**granted** [3] - 9:22, 9:23, 71:14
**granting** [5] - 10:6, 10:8, 13:10, 121:15
**grapple** [3] - 123:20, 124:17, 128:5
**Great** [1] - 49:5
**great** [4] - 3:20, 48:11, 51:12, 86:15
**greater** [6] - 28:9, 28:25, 30:18, 30:19, 62:20, 67:13
**gross** [9] - 66:8, 68:4, 68:13, 68:16, 68:20, 69:18, 70:18, 70:20, 70:25
**ground** [2] - 26:5, 30:17, 108:10
**group** [2] - 15:17, 19:18
**groups** [3] - 18:23, 19:4, 81:18
**guard** [1] - 97:11
**guardrails** [5] - 93:23, 95:18, 101:16, 101:17, 131:8
**guess** [16] - 6:2, 6:21, 35:8, 35:24, 36:3, 46:10, 48:4, 53:18,

68:3, 68:9, 75:11, 84:17, 92:8, 97:16, 100:21, 123:19
**guidance** [2] - 36:15, 81:11
**guideline** [1] - 25:18
**guidelines** [17] - 26:13, 31:4, 31:9, 31:11, 31:12, 32:2, 53:25, 56:4, 58:16, 59:1, 59:6, 59:9, 60:8, 98:10, 109:8, 119:16, 129:15
**Gulf** [2] - 85:19, 85:21

## H

**habitat** [18] - 8:24, 11:25, 13:1, 15:18, 15:19, 15:20, 15:23, 16:5, 51:9, 53:3, 54:11, 104:24, 109:9, 134:9, 134:13
**habitats** [3] - 11:18, 90:15, 96:13
**half** [2] - 118:9, 122:3
**hammer** [1] - 102:23
**Hampshire** [1] - 30:5
**hand** [3] - 15:7, 49:1, 124:25
**handbook** [12] - 52:13, 58:20, 96:19, 114:20, 114:23, 115:11, 121:18, 121:21, 122:3, 122:7, 122:18, 122:23
**handful** [2] - 92:25, 93:3
**handle** [1] - 45:11
**hands** [2] - 20:18, 101:19
**handwriting** [1] - 112:7
**Hanousek** [2] - 66:22, 66:24
**Happy** [1] - 114:10
**happy** [11] - 5:10, 6:8, 16:10, 17:25, 24:15, 26:2, 50:8, 55:21, 59:18, 86:1, 135:14
**Harbors** [12] - 5:2, 5:18, 37:21, 37:23, 38:2, 38:25, 39:7, 42:23, 46:6, 73:24, 74:13, 85:4
**hard** [4] - 36:1, 85:9, 131:25, 132:1
**harm** [5] - 32:20, 32:23, 125:8,

133:15, 133:16
**harming** [2] - 95:7, 95:8
**harms** [1] - 126:18
**hazier** [1] - 71:20
**head** [6] - 55:20, 77:3, 77:10, 79:18, 84:22, 104:14
**heading** [5] - 54:10, 58:16, 90:3, 90:4, 90:20
**hear** [10] - 20:3, 48:12, 48:13, 48:20, 99:11, 99:17, 128:17, 130:17, 135:12, 135:14
**heard** [5] - 51:14, 79:10, 86:11, 95:1, 111:11
**HEARING** [2] - 1:4, 1:9
**hearing** [2] - 134:15, 135:17
**Hearings** [1] - 125:23
**hears** [1] - 125:24
**heavy** [1] - 135:10
**heck** [1] - 56:14
**heightened** [2] - 62:16, 66:16
**held** [2] - 30:17, 129:12
**HELD** [1] - 1:10
**help** [2] - 120:18, 121:4
**helpful** [7] - 25:25, 26:5, 48:17, 112:9, 128:16, 135:6, 135:11
**helping** [1] - 102:24
**hereby** [1] - 136:3
**higher** [2] - 29:23, 30:13
**highlight** [2] - 88:20, 115:4
**Hintz** [1] - 129:16
**historic** [22] - 12:19, 37:24, 38:3, 38:4, 38:20, 39:7, 43:12, 43:14, 72:14, 72:20, 73:19, 74:21, 75:13, 75:17, 76:7, 76:23, 76:24, 77:5, 78:11, 78:12, 81:22
**historical** [2] - 75:19, 131:21
**historically** [5] - 74:20, 74:24, 75:3, 76:11, 76:16
**historics** [1] - 74:22
**history** [6] - 41:8,

41:9, 66:1, 66:15, 68:11, 130:5
**hit** [2] - 114:14, 129:7
**hoc** [4] - 59:17, 59:23, 60:22, 61:7
**hold** [2] - 93:2, 116:10
**holdings** [1] - 7:19
**hollow** [1] - 61:8
**Homebuilders** [2] - 119:4, 121:8
**honed** [1] - 130:13
**Honor** [108] - 3:2, 3:7, 3:10, 3:13, 3:21, 3:24, 4:7, 4:10, 4:23, 5:11, 5:25, 7:5, 7:17, 8:7, 10:10, 12:4, 12:14, 13:11, 13:24, 16:3, 16:10, 16:17, 17:19, 17:25, 19:3, 19:25, 20:23, 22:8, 22:10, 22:21, 23:4, 23:13, 26:1, 26:8, 26:21, 26:25, 27:16, 28:20, 29:21, 30:22, 33:10, 34:7, 37:19, 42:14, 43:1, 44:22, 47:14, 49:6, 53:21, 55:15, 62:6, 73:21, 77:17, 79:6, 86:7, 86:10, 89:13, 90:6, 95:22, 96:9, 96:23, 98:16, 100:22, 102:8, 104:7, 106:2, 106:16, 107:4, 108:5, 109:12, 110:17, 111:5, 112:2, 112:10, 113:18, 114:4, 114:13, 114:16, 114:17, 114:21, 115:4, 115:6, 115:24, 116:13, 117:23, 118:9, 120:11, 121:11, 121:22, 122:2, 122:3, 122:7, 122:21, 123:18, 123:20, 124:3, 124:17, 124:19, 124:21, 125:2, 126:6, 126:22, 126:25, 127:21, 128:8, 128:22, 132:11, 134:7
**HONORABLE** [1] - 1:10
**hook** [1] - 119:17
**hope** [2] - 24:22, 88:12
**hopefully** [1] - 89:22

**horrible** [1] - 71:17
**hundreds** [1] - 11:16
**hurt** [1] - 127:2
**hyperlink** [1] - 16:11
**hypothetical** [2] - 21:1, 105:9
**hypothetically** [1] - 20:15

## I

**Idaho** [2] - 30:12
**idea** [1] - 100:6
**identical** [3] - 56:6, 58:25, 113:8
**identified** [6] - 33:3, 46:4, 52:24, 99:17, 103:22, 133:12
**identifies** [2] - 82:20, 97:8
**identify** [5] - 41:19, 51:14, 58:3, 76:6, 90:14
**identifying** [3] - 24:19, 40:8, 44:4
**Identifying** [1] - 90:5
**ignored** [1] - 23:5
**ignoring** [2] - 45:7
**Ill** [1] - 126:15
**illustrated** [1] - 66:18
**imagine** [2] - 11:15, 77:1
**immediately** [1] - 50:15
**immemorial** [1] - 11:19
**impact** [12] - 10:2, 14:7, 35:21, 53:3, 92:21, 105:12, 105:15, 105:21, 119:16, 119:25, 120:5, 127:24
**impacted** [1] - 19:17
**impacts** [16] - 9:20, 10:16, 10:21, 12:24, 23:25, 24:19, 33:6, 54:18, 55:7, 90:5, 111:17, 112:18, 112:22, 119:8, 119:10, 119:15
**imperative** [2] - 80:5, 129:23
**imperiled** [1] - 8:17
**implement** [3] - 87:14, 105:17, 112:24
**implementation** [4] - 9:5, 78:19, 78:20, 108:21
**implemented** [2] - 87:16, 100:2

**implementing** [4] - 9:9, 17:2, 23:6, 96:17
**implicit** [1] - 6:22
**imply** [1] - 104:4
**important** [11] - 5:20, 46:17, 60:2, 73:11, 88:20, 104:7, 114:7, 119:2, 120:16, 122:10, 124:8
**imposed** [4] - 18:18, 97:12, 97:14, 97:16
**impossible** [3] - 106:17, 106:19, 123:2
**impractical** [1] - 106:11
**improvement** [1] - 37:16
**improvements** [1] - 76:1
**IN** [1] - 1:1
**inability** [1] - 134:24
**inaccurate** [1] - 57:6
**inadequacy** [1] - 35:16
**inadequate** [2] - 48:10, 54:10
**incidental** [23] - 15:5, 15:6, 15:13, 17:3, 23:1, 87:15, 93:3, 93:9, 94:9, 94:25, 95:3, 98:12, 98:18, 99:13, 99:14, 101:18, 102:4, 104:1, 105:12, 106:14, 110:13, 110:17, 113:4
**Incidental** [9] - 6:12, 7:2, 14:23, 106:4, 106:6, 107:7, 112:11, 112:16, 118:14
**include** [11] - 10:20, 37:20, 53:13, 72:13, 74:11, 78:10, 85:9, 85:17, 115:19, 118:22, 123:3
**included** [18] - 9:4, 18:8, 20:12, 38:20, 43:13, 44:5, 51:13, 51:15, 72:21, 72:24, 84:3, 85:14, 115:19, 117:19, 117:20, 118:19
**includes** [9] - 10:18, 18:19, 41:17, 55:6, 79:16, 116:3, 123:3, 123:5
**including** [13] - 5:16,

5:19, 7:7, 8:22, 9:10, 11:6, 17:17, 26:12, 39:7, 44:3, 69:22, 89:3, 115:25
**incomplete** [4] - 51:3, 53:15, 83:22, 83:24
**inconsistent** [1] - 129:15
**incorporate** [1] - 40:22
**incorporated** [4] - 39:19, 52:13, 58:21, 98:6
**incorporates** [2] - 96:15, 119:15
**incredibly** [1] - 13:2
**indeed** [1] - 16:1
**independent** [9] - 32:8, 32:9, 44:22, 46:6, 59:3, 59:7, 129:13, 129:18
**Indian** [1] - 123:24
**indicate** [1] - 109:16
**indicated** [3] - 7:22, 35:1, 99:13
**indicates** [1] - 98:4
**indicating** [2] - 37:8, 86:16
**Indies** [1] - 8:22
**indigo** [3] - 13:25, 15:9, 15:10
**indisputable** [1] - 47:21
**individuals** [1] - 19:10
**indulge** [1] - 114:5
**industry** [1] - 81:18
**infer** [1] - 41:10
**inference** [1] - 66:14
**influenced** [5] - 73:5, 76:8, 83:15, 84:19, 85:22
**inform** [2] - 32:4, 86:19
**informal** [1] - 110:1
**information** [25] - 12:7, 12:9, 16:22, 19:7, 32:7, 32:23, 44:6, 45:7, 47:20, 58:23, 59:9, 59:11, 79:25, 89:3, 91:11, 91:18, 97:25, 99:18, 108:16, 127:13, 127:15, 127:16, 129:14, 131:15, 131:17
**informational** [5] - 126:20, 127:1, 128:3, 128:4, 133:15
**initial** [1] - 12:12
**initiated** [1] - 22:11

**initiating** [1] - 80:14
**initiation** [1] - 86:17
**injunction** [1] - 125:21
**injuries** [1] - 32:22
**injury** [5] - 32:11, 125:6, 126:21, 127:1, 134:23
**input** [1] - 97:6
**instance** [5] - 64:20, 98:8, 99:24, 100:2, 126:5
**instances** [1] - 123:7
**instead** [6] - 10:5, 20:21, 23:8, 31:17, 36:2, 38:3
**instituted** [1] - 17:6
**insufficient** [1] - 52:4
**intake** [3] - 87:18, 97:4, 120:25
**intend** [2] - 52:2, 52:21
**intended** [8] - 20:16, 27:23, 37:22, 51:8, 51:10, 93:6, 103:7, 103:10
**intending** [1] - 94:23
**intensity** [1] - 88:7
**intent** [15] - 28:5, 28:7, 28:18, 28:24, 29:4, 30:12, 30:19, 62:19, 67:12, 67:17, 67:18, 68:7, 97:9, 129:8
**intention** [1] - 51:22
**intentional** [1] - 94:24
**intentions** [1] - 100:14
**interagency** [5] - 51:7, 51:11, 52:25, 53:11, 53:16
**interest** [2] - 59:16, 130:7
**interested** [3] - 78:21, 81:6, 97:21
**interests** [2] - 126:18, 133:14
**interface** [1] - 36:24
**interfered** [1] - 34:22
**internal** [2] - 43:23, 91:20
**interpret** [4] - 28:1, 28:2, 130:4, 130:9
**interpretation** [2] - 67:2, 96:17
**interrupt** [2] - 100:9, 100:11
**interrupting** [1] - 8:9
**intersection** [1] - 109:1
**interstate** [8] - 37:17, 72:18, 72:20, 73:6, 74:3, 74:9, 74:19,

75:25
**intervene** [1] - 19:24
**Intervenor** [1] - 2:2
**intervenor's** [1] - 4:18
**intervenors** [2] - 4:8, 4:11
**intervention** [1] - 133:23
**intra** [1] - 110:23
**intra-agency** [1] - 110:23
**introduce** [1] - 3:16
**introduced** [1] - 8:6
**invalidate** [1] - 46:7
**invention** [3] - 115:12, 120:17, 121:14
**involved** [2] - 70:3, 125:14
**involves** [3] - 6:17, 121:2, 126:14
**involving** [1] - 123:21
**issuance** [12] - 10:25, 11:1, 11:12, 11:13, 18:20, 31:8, 31:14, 33:4, 96:20, 108:8, 121:25
**issue** [32] - 12:18, 22:22, 24:2, 25:16, 31:11, 32:6, 40:16, 41:2, 41:5, 42:16, 42:19, 46:3, 46:8, 46:25, 57:9, 61:1, 61:10, 62:9, 63:17, 69:6, 73:15, 92:9, 97:9, 103:10, 103:12, 125:7, 125:11, 125:16, 127:9, 130:15, 130:16, 134:22
**issued** [7] - 11:2, 20:7, 27:20, 93:16, 96:11, 99:14, 119:3
**issues** [14] - 4:24, 31:14, 32:3, 52:21, 68:10, 81:11, 97:10, 98:6, 102:1, 108:10, 110:24, 114:15, 133:25, 134:17
**issuing** [6] - 10:20, 17:14, 18:18, 93:20, 110:22, 121:19
**items** [1] - 88:20
**iteration** [1] - 65:19
**ITS** [15] - 6:6, 7:19, 17:10, 19:11, 20:13, 20:17, 21:5, 21:7, 21:8, 21:12, 21:20, 87:13, 106:6, 117:11, 130:22
**itself** [18] - 14:12,

15:11, 25:15, 35:6, 35:15, 45:18, 61:11, 64:6, 78:18, 98:21, 102:12, 102:14, 107:12, 107:13, 114:22, 114:23, 123:3

**J**

**J3** [2] - 60:11, 60:20
**Jacksonville** [3] - 80:5, 82:10, 82:11
**jaded** [1] - 114:25
**JAXBO** [2] - 12:15, 16:4
**Jeff** [1] - 4:10
**JEFFREY** [1] - 2:2
**jeopardize** [6] - 17:9, 25:16, 26:19, 48:1, 96:12, 96:20
**jeopardized** [1] - 109:9
**jeopardy** [7] - 10:9, 12:7, 12:12, 22:1, 24:2, 104:23, 117:1
**Jersey** [10] - 21:22, 22:9, 22:10, 22:11, 29:16, 29:19, 101:22, 107:4, 107:6, 131:24
**job** [4] - 10:1, 10:4, 21:14, 71:5
**joined** [1] - 4:12
**joint** [1] - 132:7
**joints** [1] - 63:15
**JUDGE** [2] - 1:10, 1:10
**Judge** [6] - 48:22, 51:20, 56:25, 63:8, 64:16, 72:6
**judge** [1] - 125:23
**judgment** [9] - 4:17, 4:18, 4:19, 44:22, 127:9, 128:4, 132:13, 132:16, 132:19
**judgments** [1] - 50:5
**judicial** [3] - 7:25, 38:22, 125:24
**July** [2] - 24:22, 86:16
**jurisdiction** [17] - 8:15, 24:10, 24:20, 37:22, 38:25, 39:4, 39:15, 40:1, 40:5, 42:1, 42:3, 42:20, 42:25, 45:24, 73:24, 76:24, 85:23
**jurisdictional** [1] - 78:25
**justice** [3] - 19:19,

68:14, 70:10
**Justice** [3] - 1:20, 37:4, 48:13
**JUSTIN** [1] - 2:13
**Justin** [1] - 4:12

# K

**keep** [3] - 35:25, 70:17, 114:8
**keeps** [1] - 123:12
**key** [6] - 62:13, 97:3, 114:17, 116:11, 130:13
**Key** [1] - 116:11
**keys** [1] - 13:13
**killing** [6] - 15:6, 93:3, 94:13, 95:2, 95:3, 95:8
**kind** [3] - 16:25, 101:5, 127:16
**kinds** [1] - 123:4
**knowledge** [11] - 7:17, 18:7, 28:23, 62:19, 67:12, 67:18, 67:25, 68:1, 68:7, 68:22, 87:17
**knowledgeable** [1] - 101:7
**known** [1] - 68:17
**Kupchan** [1] - 4:3
**KUPCHAN** [1] - 2:15

# L

**lack** [7] - 53:13, 67:24, 68:1, 91:17, 124:12, 124:13, 124:14
**lacked** [2] - 16:21, 123:25
**laid** [5] - 51:12, 52:11, 57:19, 132:15, 133:8
**lakes** [1] - 123:4
**land** [2] - 93:12, 132:23
**lands** [1] - 123:22
**language** [20] - 10:24, 23:5, 28:6, 28:17, 28:21, 28:23, 38:5, 38:14, 41:23, 55:12, 59:25, 62:4, 63:15, 63:19, 64:10, 65:21, 73:8, 73:18, 74:16, 107:10
**large** [3] - 57:10, 130:25, 131:1
**last** [6] - 8:24, 47:16, 50:15, 124:4, 126:23, 134:12
**late** [2] - 111:10, 135:5

**latter** [2] - 10:10, 11:11
**law** [30] - 7:7, 11:5, 11:6, 23:9, 28:24, 30:25, 33:14, 33:17, 33:18, 33:19, 36:5, 36:18, 38:11, 38:19, 45:13, 49:13, 59:12, 60:13, 64:13, 67:13, 69:24, 74:1, 74:2, 74:6, 94:3, 108:23, 115:21, 125:23, 126:2
**laws** [2] - 5:16, 101:7
**lawyer** [1] - 70:19
**lay** [1] - 52:14
**lays** [3] - 60:13, 115:9, 115:15
**lead** [2] - 21:13, 49:12
**leads** [1] - 95:15
**least** [18] - 5:23, 6:23, 15:17, 17:19, 18:7, 20:15, 36:15, 39:18, 40:19, 41:10, 46:12, 70:11, 75:3, 83:11, 92:9, 107:15, 117:9, 126:19
**leave** [2] - 4:20, 111:9
**leaves** [1] - 63:15
**leaving** [2] - 83:6, 87:13
**led** [3] - 32:21, 127:14, 127:15
**left** [8] - 5:9, 9:1, 39:25, 46:23, 47:8, 101:21, 101:25, 132:23
**legal** [7] - 36:22, 53:10, 84:7, 89:9, 94:2, 104:5, 120:12, 120:15, 129:4, 130:3
**legally** [3] - 74:2, 95:16, 112:25
**legislative** [2] - 41:8, 130:5
**length** [1] - 82:5
**lengthy** [1] - 44:10
**Leopoldo** [1] - 3:4
**less** [11] - 30:25, 31:1, 60:17, 65:18, 71:21, 71:22, 71:25, 81:22, 108:24, 134:3
**letter** [5] - 47:23, 60:3, 60:4, 60:25
**letters** [2] - 82:25, 83:2
**level** [12] - 11:14, 14:13, 17:9, 18:4, 18:18, 21:2, 22:1, 24:5, 34:3, 36:14,

107:8, 131:4
**liability** [18] - 15:25, 17:3, 21:7, 22:2, 23:1, 27:1, 27:19, 50:13, 92:10, 93:8, 93:9, 101:18, 102:3, 103:5, 105:7, 106:23, 108:2, 110:13
**liable** [2] - 19:11, 93:3
**license** [1] - 92:16
**lies** [2] - 78:22, 79:19
**life** [1] - 17:5
**lifting** [1] - 135:10
**light** [2] - 55:6, 64:10
**Light** [2] - 38:13, 78:1
**lightly** [1] - 92:12
**likely** [6] - 69:19, 71:22, 96:20, 98:8, 104:23, 116:25
**LILY** [1] - 2:5
**Lily** [1] - 4:7
**limit** [10] - 14:18, 14:20, 17:6, 17:23, 18:15, 21:2, 21:12, 21:20, 99:15, 104:1
**limitation** [8] - 17:18, 18:17, 18:20, 18:21, 19:2, 20:11, 20:17, 34:4
**limitations** [7] - 18:8, 30:21, 30:22, 30:24, 31:1, 61:13, 62:1
**limited** [3] - 37:20, 121:12, 125:1
**limits** [5] - 12:9, 18:3, 18:11, 19:8, 24:2
**line** [10] - 15:22, 22:17, 56:3, 66:24, 70:18, 78:25, 85:24, 108:7, 123:8, 123:10
**lines** [1] - 46:11
**list** [67] - 39:14, 39:15, 41:17, 42:18, 43:8, 43:11, 43:15, 43:16, 43:17, 43:21, 43:24, 43:25, 44:2, 44:5, 45:6, 45:15, 45:18, 45:22, 45:23, 46:1, 48:10, 72:10, 72:13, 72:25, 74:18, 74:19, 74:22, 75:6, 75:19, 76:9, 77:8, 77:11, 77:17, 78:5, 78:14, 78:18, 79:11, 79:14, 80:2, 80:6, 80:8, 80:10, 80:16, 80:18, 80:25, 82:11, 82:17, 83:4, 83:7, 83:13, 84:14, 84:18, 85:3,

85:14, 85:17, 85:18, 122:22, 122:24, 123:2, 129:20, 129:21, 129:24, 129:25
**listed** [7] - 18:11, 88:13, 89:21, 94:24, 96:21, 112:22, 118:4
**lists** [4] - 81:3, 81:5, 81:23, 81:24
**literally** [3] - 116:13, 127:18, 127:24
**litigation** [1] - 84:24
**live** [1] - 36:11
**LLP** [2] - 2:3, 2:5
**located** [1] - 118:5
**location** [2] - 14:1, 88:7
**locations** [1] - 14:2
**long-standing** [6] - 50:18, 66:18, 67:2, 69:10, 69:16, 81:9
**long-term** [1] - 55:3
**look** [47] - 10:5, 10:7, 10:23, 10:24, 11:5, 11:13, 11:21, 11:22, 12:3, 12:10, 13:4, 29:17, 41:8, 44:9, 44:18, 44:19, 52:15, 53:18, 56:13, 57:23, 58:6, 59:9, 60:3, 60:10, 60:19, 61:15, 64:1, 64:19, 68:20, 71:16, 73:10, 75:2, 76:9, 77:12, 77:19, 79:12, 89:19, 93:25, 94:5, 94:6, 94:7, 95:14, 118:19, 122:4, 122:19, 127:11
**looked** [13] - 9:19, 9:22, 12:19, 13:1, 18:13, 57:12, 60:6, 76:17, 94:14, 105:24, 107:22, 107:25, 131:20
**looking** [5] - 10:13, 54:22, 75:6, 89:13, 89:22
**looks** [3] - 29:18, 88:21, 107:2
**looser** [1] - 108:3
**lose** [1] - 70:23
**loses** [1] - 71:14
**losing** [1] - 134:21
**loss** [4] - 9:11, 15:11, 32:23, 134:20
**low** [2] - 8:25, 77:2

# M

**magnified** [1] - 33:11
**magnitude** [2] - 14:8, 15:12
**main** [2] - 111:5, 126:8
**major** [1] - 76:12
**majority** [2] - 82:3, 82:4
**Malloy** [1] - 3:14
**MALLOY** [3] - 1:15, 3:13, 3:16
**manatee** [1] - 8:22
**mandate** [1] - 113:2
**mandates** [3] - 8:18, 9:8, 24:4
**manner** [1] - 126:18
**map** [2] - 78:24
**mapping** [1] - 78:21
**Marine** [10] - 12:16, 16:5, 16:24, 19:6, 24:10, 24:16, 50:22, 86:19, 102:18, 110:20
**massive** [3] - 5:16, 84:20, 134:8
**match** [1] - 53:19
**material** [6] - 49:13, 55:4, 57:17, 57:23, 58:2, 58:7
**materially** [2] - 56:6, 58:25
**materials** [1] - 75:14
**matter** [10] - 35:8, 35:9, 35:10, 49:22, 57:10, 57:14, 62:18, 71:10, 115:21, 118:14
**matters** [1] - 74:10
**mean** [35] - 6:1, 7:21, 21:1, 28:13, 51:10, 51:24, 52:5, 54:16, 57:11, 58:9, 62:14, 62:15, 62:22, 64:7, 64:11, 64:17, 67:15, 67:17, 68:6, 69:19, 73:23, 74:8, 74:15, 75:11, 79:22, 79:23, 83:3, 83:21, 85:13, 100:11, 104:4, 105:22, 107:4, 110:10
**meaning** [1] - 96:15
**meaningful** [2] - 34:22, 111:8
**means** [5] - 12:2, 37:17, 64:2, 64:7, 76:16
**meant** [2] - 39:21, 85:14

measure [2] - 106:11, 115:18
measures [17] - 12:11, 14:19, 97:7, 98:5, 100:2, 100:10, 103:25, 105:14, 105:17, 105:20, 112:15, 112:16, 112:25, 113:3, 113:4, 113:6, 113:9
mechanics [1] - 97:22
mechanism [3] - 17:10, 69:13, 101:10
meet [9] - 26:11, 31:8, 32:19, 49:17, 61:22, 78:8, 102:15, 126:14, 129:1
meets [2] - 58:24, 123:6
members [4] - 81:16, 81:17, 126:11, 133:15
memo [2] - 120:12, 120:15
memorandum [8] - 20:13, 25:1, 88:23, 93:15, 96:24, 98:2, 112:24
memory [2] - 57:18, 57:20
mens [4] - 61:12, 61:24, 67:1, 68:4
mention [7] - 37:1, 46:24, 59:5, 103:9, 130:12, 132:12, 133:11
mentioned [8] - 46:18, 46:22, 60:5, 66:20, 129:22, 130:1, 131:14, 133:17
met [4] - 25:18, 31:18, 32:18, 129:6
methodology [1] - 107:23
methods [1] - 95:19
Mexico [2] - 85:19, 85:21
Miami [1] - 1:17
Michigan [4] - 21:23, 21:24, 29:16, 29:18
middle [1] - 91:1
might [16] - 15:14, 20:22, 24:22, 35:4, 40:15, 48:4, 49:7, 56:2, 56:11, 56:16, 69:17, 79:17, 80:6, 99:13, 109:5, 112:8
mind [9] - 16:15, 35:25, 36:4, 36:14, 48:6, 94:12, 103:5,

105:5
minimize [6] - 12:24, 105:15, 105:21, 112:5, 112:18, 112:21
minimized [1] - 88:14
minimum [6] - 8:12, 27:17, 49:16, 49:19, 50:3, 61:16
mining [1] - 121:3
minor [1] - 84:10
minutes [10] - 48:12, 48:18, 113:21, 113:22, 114:4, 114:12, 116:13, 116:14, 128:21
Miranda [1] - 3:4
Miranda-Castro [1] - 3:4
misapprehend [1] - 99:21
missing [2] - 34:18, 91:11
mission [1] - 99:3
Mississippi [1] - 76:12
mistake [2] - 57:7, 83:6
mistaken [1] - 7:23
misunderstanding [1] - 75:18
misunderstood [1] - 83:10
mitigation [4] - 14:5, 14:19, 18:10, 122:8
MOA [4] - 39:11, 39:13, 40:4, 42:18
model [7] - 5:18, 7:16, 8:1, 87:11, 92:13, 107:6, 131:24
modification [1] - 104:23
modified [1] - 109:9
modify [1] - 96:12
moment [1] - 115:3
months [1] - 75:13
morning [1] - 113:23
MOSS [1] - 1:10
Moss [6] - 48:22, 51:20, 56:25, 63:8, 64:17, 72:6
most [8] - 7:1, 8:16, 23:16, 29:24, 88:10, 113:1, 130:11, 135:4
mostly [1] - 36:21
MOTION [2] - 1:4, 1:9
motion [5] - 4:17, 4:18, 132:17, 132:18
MOU [2] - 95:22, 115:22
move [8] - 31:4, 31:6,

33:9, 34:7, 37:12, 53:20, 72:7, 121:11
MR [89] - 3:24, 4:2, 4:10, 48:22, 49:5, 49:9, 50:14, 50:23, 51:1, 51:20, 52:11, 52:23, 53:20, 55:15, 55:23, 56:24, 57:5, 58:15, 59:23, 62:5, 62:25, 63:8, 63:14, 64:16, 65:5, 65:13, 65:17, 67:19, 68:3, 68:24, 69:4, 69:9, 70:9, 70:22, 72:5, 72:9, 72:16, 73:9, 73:20, 75:9, 75:20, 76:14, 76:20, 77:16, 77:24, 78:17, 79:6, 79:14, 80:12, 82:16, 82:21, 82:25, 83:15, 83:18, 84:5, 84:10, 84:14, 85:7, 85:11, 85:15, 86:1, 86:5, 86:7, 114:4, 114:10, 114:13, 116:8, 116:11, 116:17, 116:20, 117:18, 117:23, 118:2, 118:11, 118:21, 118:24, 120:4, 120:9, 120:14, 121:11, 121:24, 122:21, 124:23, 126:4, 126:13, 127:6, 128:8, 128:13, 128:19
MS [158] - 3:7, 3:10, 3:13, 3:16, 3:21, 4:7, 4:23, 5:5, 5:11, 5:15, 5:25, 6:8, 7:5, 7:17, 8:5, 8:10, 10:10, 11:3, 12:4, 13:11, 13:24, 14:11, 15:1, 15:9, 16:3, 16:10, 16:17, 16:19, 17:19, 18:9, 19:3, 19:21, 19:23, 20:23, 21:5, 21:24, 22:8, 22:10, 22:21, 23:4, 23:12, 24:15, 24:23, 25:10, 25:14, 26:1, 26:6, 26:8, 27:6, 27:15, 28:7, 28:20, 28:25, 29:3, 29:6, 29:17, 29:21, 30:1, 30:4, 30:10, 30:21, 31:7, 32:13, 32:16, 33:2, 33:9, 34:11, 35:10, 36:10, 36:17, 36:21, 37:9, 37:12, 38:9, 38:18, 39:23, 41:13,

42:5, 42:14, 43:1, 43:20, 44:18, 44:21, 45:4, 45:21, 46:12, 46:22, 47:14, 47:16, 86:10, 86:15, 87:1, 87:4, 87:9, 87:17, 87:22, 89:11, 89:16, 89:19, 90:9, 90:12, 90:18, 90:20, 90:23, 91:1, 91:7, 91:14, 92:3, 92:7, 94:19, 94:23, 95:1, 95:4, 95:10, 95:20, 96:1, 96:8, 97:20, 97:24, 98:13, 98:25, 99:9, 99:21, 100:8, 100:10, 100:21, 102:8, 102:12, 102:17, 102:25, 103:19, 104:17, 105:3, 105:5, 106:2, 106:10, 106:16, 107:4, 108:4, 109:5, 109:8, 109:12, 110:16, 110:19, 111:2, 111:5, 112:1, 112:10, 113:16, 113:18, 128:22, 130:25, 132:6, 132:11, 134:5, 134:7, 134:24, 135:3
muckier [1] - 71:20
must [16] - 7:9, 8:12, 8:19, 27:21, 29:13, 32:2, 32:19, 54:24, 54:25, 55:8, 57:2, 64:11, 85:8, 91:11, 100:18, 105:16
muster [1] - 128:3

N

N.W [1] - 136:11
nail [3] - 102:23, 104:14
name [1] - 107:17
named [2] - 79:15, 83:12
names [1] - 3:5
nation's [1] - 5:20
National [9] - 12:16, 16:5, 16:24, 19:6, 24:10, 24:16, 86:19, 102:18, 110:20
nationwide [3] - 11:5, 11:7, 11:9
natural [2] - 37:16, 38:14
nature [1] - 6:7
navigability [7] - 46:1,

76:2, 76:5, 76:25, 77:18, 77:21, 80:7
navigable [26] - 8:15, 37:20, 38:21, 38:23, 39:2, 43:3, 47:3, 72:17, 72:24, 73:25, 74:2, 74:6, 74:13, 74:14, 74:25, 75:1, 75:21, 75:22, 75:24, 76:6, 78:3, 78:6, 78:7, 78:8, 78:10
navigation [3] - 38:8, 77:4, 77:10
Navy [1] - 120:23
Navy's [1] - 120:24
NE [1] - 1:21
nearly [2] - 113:8, 114:24
necessarily [4] - 15:17, 38:20, 97:25, 108:9
necessary [9] - 41:21, 105:14, 105:20, 110:3, 113:5, 113:6, 117:12, 134:1, 134:3
need [16] - 13:15, 13:19, 15:21, 23:24, 23:25, 33:25, 40:24, 56:13, 56:21, 56:22, 68:10, 92:15, 110:2, 113:20, 128:15, 130:22
needed [6] - 91:19, 100:8, 100:11, 103:25, 104:1
needs [4] - 12:11, 33:12, 103:6, 131:9
negate [1] - 62:8
negligence [61] - 27:2, 27:7, 27:22, 28:5, 28:11, 29:4, 29:16, 30:8, 50:20, 61:12, 61:24, 62:11, 62:13, 62:14, 62:16, 63:10, 63:18, 63:21, 64:1, 64:2, 64:6, 64:7, 64:8, 64:11, 64:12, 64:14, 64:15, 64:21, 64:23, 66:3, 66:7, 66:8, 66:11, 66:16, 66:25, 67:15, 67:16, 67:21, 68:4, 68:5, 68:6, 68:13, 68:16, 68:20, 69:18, 69:23, 70:3, 70:14, 70:17, 70:18, 70:20, 70:21, 70:25, 72:1, 129:9, 129:10, 129:11
NEPA [2] - 9:11, 46:15
nest [1] - 15:13

**nesting** [1] - 24:9
**nests** [1] - 68:18
**never** [6] - 24:4, 27:4, 43:15, 69:22, 84:3, 84:25
**new** [4] - 11:6, 12:9, 19:7, 115:12
**New** [11] - 21:22, 22:9, 22:10, 22:11, 29:16, 29:19, 30:5, 101:22, 107:4, 107:6, 131:24
**next** [6] - 11:23, 34:7, 37:12, 43:17, 87:19, 135:9
**nexus** [1] - 32:10
**night** [1] - 135:16
**Ninth** [4] - 30:17, 66:21, 129:17
**NMFS** [4] - 24:13, 24:19, 24:20, 25:12
**no-effect** [2] - 25:19, 25:21
**nobody** [1] - 41:5
**non** [6] - 24:14, 26:15, 34:8, 37:6, 37:13, 124:14
**non-APA** [1] - 124:14
**non-assumable** [3] - 26:15, 34:8, 37:13
**non-assumed** [1] - 24:14
**non-rulemaking** [1] - 37:6
**noncompliance** [1] - 32:5
**nondiscretionary** [1] - 22:7
**none** [2] - 51:25, 93:22
**normally** [1] - 110:10
**North** [1] - 7:7
**Note** [1] - 44:11
**note** [3] - 61:20, 66:4
**notebook** [2] - 87:5, 87:6
**noted** [1] - 18:9
**notes** [1] - 136:5
**nothing** [10] - 31:15, 44:5, 60:22, 61:24, 61:25, 72:6, 94:16, 109:16, 126:15, 130:17
**notice** [22] - 19:23, 25:5, 25:8, 34:23, 35:7, 35:11, 35:18, 37:4, 82:15, 82:17, 83:25, 86:15, 91:23, 97:9, 104:3, 117:10, 117:17, 119:21, 120:7, 120:11,

134:17
**notwithstanding** [1] - 34:17
**now-governing** [1] - 47:6
**NPDES** [1] - 66:20
**nuanced** [1] - 76:22
**null** [1] - 80:10
**Number** [6] - 122:25, 125:10, 125:16, 125:19, 126:1, 126:10
**number** [10] - 4:24, 6:3, 59:16, 88:7, 106:5, 112:13, 116:6, 125:6, 125:25, 126:13
**numbered** [1] - 89:16
**numerical** [4] - 106:7, 106:11, 112:13
**NW** [2] - 2:3, 2:22

---

## O

**objected** [1] - 125:14
**objections** [2] - 25:6, 25:7
**objective** [1] - 68:7
**objectives** [1] - 112:4
**objects** [1] - 125:12
**obligated** [5] - 99:2, 99:5, 99:8, 111:16
**obligation** [4] - 89:9, 94:2, 102:15, 119:17
**obstruction** [2] - 77:4, 77:5
**obvious** [3] - 85:10, 85:20, 130:3
**obviously** [9] - 4:20, 6:1, 18:5, 18:21, 37:7, 40:13, 61:10, 63:24, 135:7
**occur** [6] - 12:13, 13:3, 14:12, 17:11, 46:15, 106:19
**occurred** [5] - 13:5, 18:15, 19:13, 23:19, 82:15
**occurring** [1] - 93:12
**occurs** [1] - 21:7
**October** [2] - 1:6, 136:7
**odd** [1] - 52:9
**OF** [3] - 1:1, 1:9, 136:1
**off-ramp** [1] - 22:24
**office** [3] - 4:5, 110:24
**Office** [2] - 2:15, 4:3
**OFFICIAL** [1] - 136:1
**Official** [2] - 2:21, 136:10

**often** [2] - 70:6, 81:19
**oftentimes** [1] - 70:16
**Oklahoma's** [1] - 124:9
**old** [1] - 47:10
**omnibus** [1] - 53:21
**once** [4] - 48:25, 71:13, 71:20, 74:25
**one** [62] - 9:16, 13:22, 13:24, 15:13, 17:20, 24:16, 24:21, 25:14, 27:15, 29:6, 30:4, 30:23, 32:19, 34:9, 34:15, 37:4, 39:23, 40:10, 41:7, 41:10, 43:6, 43:18, 44:23, 45:21, 47:18, 47:20, 50:11, 53:23, 64:18, 67:6, 68:13, 77:14, 82:4, 82:19, 84:5, 87:7, 89:8, 89:21, 89:22, 89:23, 90:21, 94:20, 94:23, 99:17, 102:3, 103:7, 105:24, 108:20, 110:20, 121:5, 123:8, 123:16, 124:6, 125:6, 126:13, 126:14, 129:8, 130:13, 133:24, 134:20, 135:9
**one-time** [1] - 108:20
**ones** [7] - 13:23, 71:16, 74:23, 93:20, 97:14, 134:1, 134:2
**ongoing** [1] - 124:1
**online** [1] - 127:18
**Op** [15] - 12:15, 16:4, 51:6, 51:7, 51:11, 51:15, 53:6, 53:9, 53:11, 53:13, 53:14, 53:19, 113:3, 115:20
**open** [2] - 35:25, 120:14
**opening** [3] - 60:24, 61:1, 71:5
**operate** [1] - 13:18
**opinion** [56] - 7:4, 7:10, 7:19, 9:17, 12:12, 12:16, 14:17, 20:7, 20:13, 21:17, 25:18, 25:22, 35:16, 47:20, 47:22, 48:2, 53:5, 87:12, 87:24, 88:6, 88:11, 88:22, 89:6, 89:12, 89:14, 93:11, 93:17, 94:2, 95:12, 95:21, 96:7, 96:23, 98:5, 98:14,

101:1, 103:9, 106:1, 107:7, 107:20, 108:8, 110:14, 110:25, 112:3, 115:5, 115:7, 115:9, 116:7, 116:8, 117:11, 118:14, 127:3, 127:5, 131:4, 131:22, 132:15
**opinions** [8] - 6:6, 13:12, 34:20, 53:1, 53:2, 130:22, 131:2, 131:19
**opportunity** [10] - 17:16, 21:11, 21:19, 35:7, 51:16, 52:3, 53:15, 83:8, 84:4, 114:2
**opposite** [1] - 49:3
**optional** [1] - 97:10
**options** [1] - 22:22
**order** [6] - 8:13, 40:16, 46:8, 49:3, 61:23, 103:17
**ordinarily** [3] - 68:13, 93:24, 96:5
**ordinary** [1] - 95:18
**organizational** [1] - 32:23
**organizations** [3] - 81:18, 133:13
**organize** [1] - 4:21
**original** [1] - 115:11
**originally** [3] - 65:12, 65:13, 65:18
**originated** [1] - 38:12
**otherwise** [2] - 11:8, 128:17
**ought** [1] - 80:25
**outdated** [2] - 45:6, 45:16
**outlier** [1] - 23:8
**outline** [1] - 78:24
**outlines** [1] - 51:7
**outset** [1] - 67:4
**outside** [1] - 36:6
**oversight** [7] - 21:15, 71:19, 98:9, 104:12, 112:19, 113:9, 124:1
**own** [5] - 13:19, 21:24, 22:3, 43:23, 95:20

---

## P

**P.M** [1] - 1:7
**p.m** [1] - 135:17
**P.O** [1] - 1:20
**page** [13] - 44:11, 44:15, 89:19, 89:20, 90:7, 90:17, 95:6,

115:8, 116:6, 116:8, 116:10, 121:23, 121:24
**pages** [9] - 44:13, 55:18, 61:1, 61:2, 117:19, 121:21, 122:1, 122:7, 127:24
**paint** [1] - 122:16
**panther** [10] - 8:23, 8:25, 14:25, 15:1, 15:2, 15:3, 15:4, 15:7, 106:15, 134:8
**panthers** [1] - 106:25
**paper** [1] - 128:17
**paradigm** [1] - 93:5
**paragraph** [7] - 90:2, 90:8, 90:10, 90:20, 91:2, 91:9, 116:9
**paragraphs** [1] - 60:6
**parallels** [1] - 31:22
**paramount** [1] - 134:17
**paraphrasing** [2] - 52:17, 74:8
**parcel** [1] - 20:5
**parenthetical** [2] - 73:12, 78:13
**part** [8] - 20:5, 24:7, 39:20, 88:2, 113:1, 117:16, 118:20, 130:11
**partial** [1] - 101:14
**participate** [4] - 115:14, 115:20, 116:20, 116:21
**particular** [21] - 6:17, 8:20, 8:24, 9:2, 12:14, 12:23, 13:12, 15:20, 18:14, 25:12, 25:20, 57:9, 62:24, 63:6, 91:11, 103:10, 105:24, 105:25, 106:9, 113:2
**parties** [1] - 84:1
**partly** [1] - 134:8
**parts** [3] - 20:25, 21:17, 80:22
**party** [5] - 20:22, 110:8, 110:11, 124:5, 125:22
**pass** [3] - 52:16, 110:8, 128:3
**passage** [1] - 66:9
**passing** [1] - 37:5
**past** [8] - 6:5, 9:13, 10:12, 38:7, 38:15, 68:20, 72:18, 74:3
**path** [1] - 131:24
**paucity** [2] - 108:15, 131:15

**penalties** [5] - 26:24, 64:24, 65:2, 65:3, 66:6
**people** [5] - 70:16, 70:17, 101:7, 113:25, 135:15
**percent** [1] - 70:2
**perfect** [5] - 12:5, 43:15, 43:16, 84:16, 123:2
**perfection** [2] - 43:18, 44:25
**perform** [1] - 58:13
**perhaps** [7] - 34:12, 34:23, 40:12, 40:25, 83:10, 83:14, 107:11
**period** [10] - 20:8, 34:21, 48:8, 50:15, 56:17, 75:12, 88:5, 91:11, 91:23, 131:20
**perish** [1] - 93:1
**permissible** [1] - 106:12
**permit** [74] - 9:10, 10:25, 11:5, 11:9, 11:11, 13:10, 17:21, 17:24, 18:3, 18:20, 20:12, 21:2, 21:12, 21:18, 22:1, 22:12, 23:22, 23:25, 24:5, 25:15, 27:20, 31:14, 31:18, 33:25, 34:1, 34:5, 51:7, 51:11, 52:15, 52:25, 53:11, 53:16, 59:11, 62:12, 79:20, 85:21, 88:15, 88:17, 94:9, 96:2, 96:3, 96:20, 97:9, 98:2, 98:6, 98:17, 98:20, 98:24, 99:12, 99:14, 99:16, 101:10, 102:2, 103:6, 103:14, 104:3, 104:6, 104:10, 110:17, 110:22, 111:21, 115:2, 117:2, 121:19, 122:1, 122:12, 125:8, 125:12, 125:16, 127:18, 130:15, 131:4
**permit-by-permit** [1] - 79:20
**permits** [44] - 9:10, 9:22, 10:7, 10:8, 10:9, 10:20, 10:22, 10:25, 11:1, 11:7, 11:12, 11:13, 12:17, 14:15, 17:13, 17:14,

133:13
**plaintiffs** [40] - 3:8, 3:11, 3:14, 4:22, 12:15, 32:20, 44:4, 51:2, 51:14, 52:3, 52:24, 53:10, 53:15, 54:2, 55:13, 56:9, 56:14, 57:15, 59:2, 62:5, 64:5, 66:20, 77:25, 83:7, 83:8, 86:12, 93:23, 103:1, 109:15, 113:22, 114:12, 114:25, 122:16, 125:8, 125:19, 126:5, 126:15, 128:20, 133:4
**Plaintiffs** [1] - 1:4, 1:14
**plaintiffs'** [9] - 3:6, 4:17, 32:22, 48:24, 50:7, 60:3, 60:25, 61:10, 72:9
**planning** [1] - 107:1
**play** [3] - 63:15, 68:13, 68:23
**plenty** [1] - 114:5
**plus** [1] - 39:16
**podium** [3] - 3:6, 26:2, 44:9
**point** [56] - 10:14, 22:5, 29:6, 29:21, 29:24, 31:22, 42:25, 47:16, 47:18, 49:11, 49:15, 50:8, 50:9, 51:1, 51:24, 56:5, 57:15, 64:17, 65:25, 67:6, 68:3, 68:8, 69:15, 69:20, 70:22, 71:5, 71:15, 72:4, 72:5, 72:6, 75:15, 77:1, 80:1, 81:10, 81:14, 84:6, 84:10, 84:17, 89:9, 89:11, 90:9, 100:16, 103:15, 104:7, 111:6, 121:9, 121:24, 126:23, 127:6, 130:2, 130:20, 131:14, 132:22, 133:18
**pointed** [4] - 12:15, 33:15, 131:6, 131:16
**pointing** [1] - 99:24
**points** [12] - 27:15, 49:7, 49:9, 59:17, 64:16, 75:11, 81:7, 84:5, 114:3, 114:7, 129:7, 132:2
**policies** [1] - 121:7

17:17, 18:8, 18:9, 18:14, 18:18, 22:23, 26:19, 31:8, 31:10, 31:11, 32:22, 33:3, 33:7, 41:5, 47:25, 53:24, 54:8, 95:12, 96:11, 96:22, 103:23, 106:17, 110:24, 121:15, 125:13, 134:25
**permitted** [5] - 6:5, 11:8, 19:9, 98:19, 134:9
**permittee** [2] - 104:5, 104:9
**permittees** [2] - 17:5, 21:9
**permitting** [34] - 5:24, 6:13, 6:25, 7:14, 7:16, 10:6, 12:19, 12:20, 12:23, 12:25, 13:3, 13:5, 13:7, 14:12, 17:15, 22:24, 31:13, 40:13, 50:20, 54:6, 54:24, 55:2, 58:18, 59:14, 61:23, 70:25, 71:3, 71:13, 72:3, 88:1, 101:11, 131:6, 131:16
**person** [3] - 83:4, 83:5, 102:2
**persuasive** [1] - 43:20
**petition** [1] - 18:24
**phase** [1] - 91:25
**phrase** [5] - 28:15, 38:6, 40:3, 64:6, 74:14
**physical** [1] - 55:4
**picked** [1] - 130:5
**piece** [3] - 50:2, 127:13, 127:14
**pieces** [2] - 57:16, 58:10
**pin** [1] - 55:20
**pinpoint** [1] - 95:13
**pipeline** [1] - 134:14
**pivotal** [1] - 121:8
**place** [11] - 13:12, 47:20, 91:20, 97:7, 100:10, 102:5, 109:4, 112:1, 115:11, 122:19
**placed** [2] - 12:12, 37:6
**places** [4] - 33:15, 37:10, 39:19, 89:21
**plain** [3] - 23:5, 28:21, 81:21
**plainly** [1] - 29:12
**plaintiff** [2] - 17:21,

**policy** [8] - 49:22, 49:23, 71:6, 81:11, 81:19, 81:20, 82:10
**political** [2] - 71:11, 71:12
**pollutant** [2] - 29:10, 56:2
**pollutants** [2] - 54:18, 54:19
**population** [1] - 8:25
**portion** [2] - 6:9, 44:14
**pose** [3] - 11:13, 86:11, 90:5
**position** [22] - 20:2, 20:6, 25:9, 25:25, 27:3, 27:6, 27:13, 30:16, 43:3, 50:19, 69:10, 81:9, 82:8, 82:9, 82:12, 84:1, 112:12, 120:10, 129:9, 130:10, 133:6, 134:10
**possibility** [4] - 41:10, 58:2, 58:8, 75:4
**possible** [4] - 72:3, 106:5, 114:6, 114:9
**possibly** [1] - 20:6
**post** [6] - 59:17, 59:23, 60:22, 61:7, 97:24, 108:7
**post-decisional** [2] - 97:24, 108:7
**posting** [1] - 107:19
**potential** [6] - 55:3, 57:22, 57:25, 58:3, 78:22, 88:12
**potentially** [2] - 24:14, 134:21
**Power** [2] - 38:13, 78:1
**power** [2] - 97:18, 97:19
**practical** [1] - 79:21
**practice** [1] - 17:13
**preamble** [3] - 42:6, 66:12, 67:3
**precedent** [2] - 73:18, 73:19
**precedents** [1] - 38:23
**precise** [1] - 73:10
**precision** [1] - 73:11
**predate** [1] - 66:21
**predict** [1] - 106:20
**preexisting** [1] - 22:3
**preference** [2] - 106:3, 106:4
**prejudice** [1] - 47:19
**prejudicial** [2] - 36:4, 36:6
**preliminarily** [1] -

90:14
**preliminary** [2] - 78:24, 87:8
**prepare** [1] - 43:25
**preponderance** [1] - 28:13
**prescriptive** [2] - 61:21, 63:10
**presence** [1] - 58:8
**Present** [1] - 2:9
**present** [6] - 10:12, 20:9, 34:3, 56:2, 58:6, 114:25
**presentation** [2] - 48:25, 54:12
**presented** [1] - 108:19
**presently** [2] - 37:15, 73:13
**pressing** [1] - 44:17
**presumably** [4] - 42:20, 70:10, 84:23, 134:16
**presumption** [1] - 109:15
**pretty** [8] - 73:2, 83:22, 85:4, 85:10, 85:20, 117:22, 124:10, 133:9
**prevailed** [1] - 133:5
**prevent** [1] - 19:15
**previously** [1] - 35:1
**primarily** [3] - 27:25, 28:20, 126:8
**primary** [3] - 54:15, 68:25, 132:25
**principles** [2] - 126:7, 129:5
**private** [3] - 10:12, 110:8, 110:11
**problem** [14] - 25:5, 25:9, 25:14, 39:20, 40:15, 40:25, 46:22, 55:15, 56:10, 68:1, 74:18, 84:1, 92:20, 125:15
**problematic** [1] - 117:16
**problems** [1] - 25:10
**procedural** [11] - 34:15, 40:12, 40:19, 82:15, 82:22, 93:22, 102:5, 124:6, 124:15, 134:22
**procedurally** [1] - 34:19
**procedures** [3] - 101:13, 109:3, 123:13
**proceed** [1] - 15:15
**proceedings** [2] -

37:7, 136:6

**proceeds** [1] - 125:16

**process** [69] - 14:14, 21:16, 22:11, 22:20, 23:18, 25:22, 27:12, 35:17, 39:12, 43:2, 43:8, 45:6, 45:8, 46:3, 51:8, 51:10, 51:11, 51:23, 52:3, 52:25, 53:12, 53:16, 54:10, 79:9, 79:20, 80:11, 80:13, 80:14, 80:15, 80:17, 80:19, 81:13, 82:17, 88:9, 88:16, 88:21, 88:22, 96:11, 99:22, 100:22, 100:23, 101:12, 107:11, 107:12, 107:13, 108:12, 108:14, 108:17, 109:13, 109:14, 110:14, 111:6, 112:4, 114:24, 115:1, 115:10, 115:15, 116:21, 116:24, 117:11, 117:17, 118:25, 119:22, 119:24, 120:11, 121:21, 125:18, 127:23, 130:16

**process-based** [1] - 88:9

**processes** [2] - 88:14, 91:20

**processing** [1] - 122:5

**produced** [2] - 116:1, 116:2

**profess** [1] - 99:9

**program** [92] - 6:10, 6:14, 6:20, 6:22, 8:13, 9:20, 11:18, 17:5, 20:5, 21:6, 21:25, 22:4, 22:12, 22:15, 24:1, 24:3, 24:9, 25:15, 25:17, 26:9, 26:11, 26:17, 27:16, 30:5, 30:12, 30:14, 30:25, 31:8, 31:15, 31:19, 31:22, 32:17, 32:21, 32:24, 33:23, 41:14, 42:1, 42:3, 49:19, 49:24, 49:25, 50:3, 51:13, 51:21, 51:22, 51:25, 52:2, 54:3, 60:9, 60:12, 60:15, 60:16, 60:18, 61:18, 69:11, 69:12, 71:3, 71:17, 72:3, 87:14, 96:19,

97:2, 103:20, 112:19, 112:21, 115:2, 115:3, 115:14, 116:21, 118:6, 119:6, 119:8, 119:9, 119:12, 119:13, 120:6, 120:21, 120:24, 122:12, 122:13, 122:17, 124:10, 126:14, 127:14, 127:15, 127:16, 127:17, 127:22

**Programmatic** [1] - 120:18

**programmatic** [31] - 6:5, 6:6, 6:12, 7:2, 7:3, 7:10, 7:19, 11:14, 13:12, 13:14, 13:23, 14:17, 23:7, 23:15, 23:19, 24:4, 87:12, 87:24, 88:9, 93:10, 106:1, 120:1, 120:17, 120:22, 120:24, 121:1, 121:6, 130:22, 131:1, 131:3

**programs** [19] - 6:16, 6:19, 7:13, 7:14, 8:1, 8:12, 26:22, 28:8, 30:6, 31:10, 41:12, 49:17, 50:20, 66:21, 66:25, 70:25, 119:14, 121:2, 130:21

**prohibit** [1] - 96:19

**prohibition** [1] - 19:12

**prohibitions** [2] - 33:17

**project** [19] - 12:20, 14:1, 14:2, 15:12, 17:21, 33:13, 33:21, 55:9, 78:22, 79:9, 89:3, 90:15, 102:4, 106:25, 107:21, 110:12, 115:25, 123:11, 126:17

**project-specific** [1] - 89:3

**projection** [1] - 12:20

**projections** [1] - 131:23

**projects** [6] - 46:14, 116:23, 123:7, 133:13, 134:8, 134:12

**promised** [1] - 24:13

**promote** [1] - 107:9

**prompt** [1] - 46:8

**promulgated** [1] -

41:14

**proof** [11] - 28:8, 28:9, 28:10, 28:12, 28:15, 28:18, 28:23, 29:3, 30:18, 50:12, 62:19

**properly** [1] - 87:16

**propose** [1] - 100:1

**proposed** [11] - 22:23, 50:14, 50:17, 50:18, 51:25, 53:2, 53:5, 53:7, 55:3, 58:24, 67:3

**proposes** [2] - 27:11, 125:7

**proposing** [2] - 51:24, 52:7

**prosecution** [2] - 63:21, 71:2

**prosecutions** [4] - 62:10, 69:23, 70:1, 70:3

**prosecutors** [1] - 31:2

**protect** [2] - 109:4, 118:16

**protected** [1] - 22:14

**Protection** [2] - 2:13, 54:6

**protection** [23] - 15:25, 47:4, 92:10, 93:8, 93:14, 94:10, 100:2, 101:18, 101:19, 101:23, 102:3, 102:7, 103:5, 103:18, 103:25, 104:6, 104:11, 104:13, 105:7, 106:15, 106:23, 108:2, 111:8

**protections** [5] - 8:16, 13:15, 93:22, 102:5, 107:3

**protective** [2] - 12:11, 13:4

**protects** [1] - 122:12

**provide** [16] - 16:10, 18:1, 30:24, 33:12, 41:16, 55:9, 59:10, 59:11, 81:12, 88:17, 101:17, 103:5, 103:11, 105:8, 107:12, 111:7, 119:1, 122:18, 126:25

**provided** [7] - 58:23, 61:16, 79:11, 89:4, 118:5, 118:6, 131:13

**provides** [5] - 79:14, 98:2, 101:10, 118:24, 127:7

**providing** [2] - 94:12,

104:10

**provision** [14] - 6:18, 25:20, 26:21, 28:1, 28:21, 36:7, 38:1, 38:10, 56:4, 62:3, 65:7, 65:9, 66:13, 123:5

**provisions** [3] - 52:12, 54:21, 104:2

**prudent** [7] - 105:13, 105:19, 112:15, 112:16, 112:25, 113:3, 113:9

**public** [10] - 36:23, 40:23, 41:22, 44:3, 45:8, 78:21, 91:23, 125:17, 134:15, 134:17

**published** [1] - 82:1

**pure** [1] - 70:3

**purpose** [5] - 74:21, 75:5, 76:19, 96:10

**purposes** [5] - 5:23, 9:23, 20:9, 38:8, 64:14, 74:6, 107:9

**pursuant** [2] - 20:12, 112:18

**pursue** [1] - 63:20

**pursuing** [1] - 62:20

**purview** [1] - 50:24

**push** [1] - 44:1

**pushed** [1] - 44:1

**put** [19] - 7:5, 15:11, 28:18, 65:19, 67:10, 93:23, 96:7, 97:7, 97:13, 100:10, 102:12, 103:1, 107:17, 115:11, 118:3, 118:13, 130:10, 133:6, 135:9

**puts** [3] - 94:8, 98:3, 126:18

**putting** [4] - 45:20, 70:6, 80:25, 102:22

**Q**

**qualify** [1] - 34:1

**quality** [19] - 33:9, 33:11, 33:13, 33:14, 34:3, 54:4, 54:19, 55:7, 55:10, 55:11, 55:25, 56:3, 56:11, 56:17, 57:25, 58:2, 58:3, 58:9, 121:20

**quantifying** [1] - 106:3

**questions** [25] - 9:15, 13:25, 14:5, 26:3, 31:5, 36:12, 36:13, 50:9, 50:11, 69:5,

79:12, 79:17, 86:2, 91:10, 91:17, 91:23, 113:13, 113:14, 114:6, 114:8, 114:10, 120:19, 122:22, 128:8, 128:11

**quick** [1] - 5:12

**quicker** [1] - 31:2

**quickest** [1] - 122:19

**quickly** [3] - 43:7, 114:15, 127:17

**quite** [1] - 99:17

**quote** [1] - 112:8

**R**

**raise** [4] - 36:3, 36:13, 59:16, 134:22

**raised** [3] - 69:1, 114:16, 120:20

**raises** [1] - 101:5

**raising** [1] - 40:18

**ramp** [1] - 22:24

**RANDOLPH** [1] - 1:10

**range** [1] - 63:24

**rather** [3] - 19:14, 33:21, 49:2

**rational** [1] - 59:10

**rationalizations** [1] - 59:17

**rea** [4] - 61:12, 61:24, 67:1, 68:4

**reached** [1] - 130:23

**reaches** [1] - 76:23

**read** [10] - 7:21, 39:13, 39:14, 62:7, 64:1, 64:10, 67:11, 88:19, 127:4

**readily** [1] - 45:7

**reading** [8] - 16:7, 41:9, 55:16, 56:25, 64:18, 65:25, 67:8, 126:12

**reads** [1] - 82:2

**real** [5] - 14:17, 69:17, 92:20, 127:18, 134:13

**real-time** [1] - 127:18

**real-world** [1] - 69:17

**reality** [3] - 23:21, 71:11, 79:22

**realize** [2] - 59:2, 108:6

**really** [22] - 38:9, 40:20, 52:6, 54:13, 56:7, 59:4, 59:14, 60:2, 64:3, 64:24, 71:10, 78:11, 86:24, 93:11, 94:12,

100:12, 105:23, 106:8, 107:8, 109:15, 121:8, 135:10

**reason** [6] - 40:20, 44:7, 52:4, 71:1, 85:1, 120:16

**reasonable** [26] - 28:14, 31:18, 31:24, 33:5, 33:10, 33:12, 33:20, 34:6, 37:16, 45:6, 45:8, 48:3, 55:9, 59:25, 60:5, 75:25, 85:4, 105:13, 105:19, 108:22, 112:12, 112:15, 112:16, 112:25, 113:2, 113:9

**reasonably** [2] - 10:18, 50:2

**reasoning** [2] - 37:3, 51:6

**reasons** [5] - 41:7, 41:10, 61:6, 64:18, 99:17

**reassess** [1] - 12:10

**rebuttal** [3] - 5:6, 113:22, 114:12

**receipt** [1] - 91:5

**receive** [3] - 23:22, 98:23, 111:21

**received** [2] - 91:21, 118:12

**receives** [2] - 98:2, 125:10

**receiving** [4] - 55:10, 90:12, 90:21, 115:23

**recent** [1] - 23:16

**recess** [1] - 48:19

**recognize** [1] - 6:21

**recognized** [2] - 88:3, 106:5

**recognizing** [1] - 108:20

**recommendations** [4] - 80:23, 81:13, 81:15, 81:19

**record** [26] - 3:5, 17:20, 17:23, 30:11, 44:12, 44:15, 54:16, 69:25, 72:6, 75:9, 75:12, 75:18, 77:11, 77:18, 80:3, 80:13, 83:1, 83:2, 97:25, 108:11, 111:15, 117:19, 117:21, 118:20, 118:21, 132:6

**records** [2] - 75:14, 83:3

**recreational** [1] - 133:14

**red** [2] - 15:22, 81:17

**reevaluate** [1] - 127:10

**refer** [3] - 38:4, 55:18, 121:17

**reference** [7] - 38:1, 38:2, 44:12, 52:13, 54:13, 58:21, 63:22

**referenced** [3] - 29:10, 61:21, 109:10

**referred** [4] - 37:1, 37:5, 37:9, 89:1

**referring** [1] - 80:4

**refine** [1] - 102:24

**reflects** [3] - 75:10, 75:12, 117:23

**refused** [1] - 9:9

**reg** [13] - 28:6, 28:19, 54:23, 62:2, 62:3, 62:4, 65:12, 65:13, 65:19, 65:25, 66:2, 66:4

**regard** [5] - 5:7, 30:11, 114:17, 118:16, 126:16

**regarding** [3] - 32:3, 91:10, 113:9

**regardless** [1] - 31:21

**regime** [4] - 36:24, 57:14, 59:14, 70:16

**region** [1] - 106:25

**regs** [8] - 53:18, 54:22, 54:24, 58:5, 66:10, 67:8, 71:8, 84:7

**regular** [1] - 27:12

**regularity** [1] - 109:15

**regularly** [1] - 79:7

**regulated** [3] - 41:22, 46:23, 88:7

**regulating** [2] - 49:12, 88:4

**regulation** [15] - 28:8, 28:17, 42:6, 50:13, 52:9, 63:4, 63:5, 66:12, 66:19, 67:11, 74:5, 79:2, 84:8, 120:2

**regulations** [35] - 9:9, 11:4, 17:2, 23:6, 23:17, 30:24, 40:21, 41:14, 51:13, 51:15, 51:17, 52:1, 52:6, 52:14, 54:17, 55:17, 55:24, 56:25, 57:11, 57:21, 58:19, 63:25, 64:18, 66:15, 84:11, 96:17, 96:18, 98:9,

109:18, 114:21, 114:22, 117:14, 121:18, 122:18, 135:9

**Regulations** [1] - 65:22

**regulatory** [7] - 6:18, 41:8, 53:12, 54:20, 62:5, 66:1, 68:11

**Reichert** [3] - 3:11, 87:10, 132:3

**REICHERT** [43] - 1:15, 3:10, 4:23, 5:5, 5:11, 5:15, 5:25, 6:8, 7:5, 7:17, 8:5, 8:10, 10:10, 11:3, 12:4, 13:11, 13:24, 14:11, 15:1, 15:9, 16:3, 16:10, 16:17, 16:19, 17:19, 18:9, 19:3, 19:21, 19:23, 20:23, 21:5, 21:24, 22:8, 22:10, 22:21, 23:4, 23:12, 24:15, 24:23, 25:10, 25:14, 26:1, 26:6

**Reichert's** [1] - 99:11

**reinforced** [1] - 96:17

**reinitiate** [1] - 19:6

**reinitiation** [3] - 12:8, 17:8, 98:20

**rejected** [1] - 109:20

**relate** [1] - 69:1

**related** [1] - 31:14

**relates** [1] - 29:9

**relationship** [1] - 36:22

**relevant** [1] - 60:21

**reliance** [2] - 6:6, 25:11

**relied** [6] - 23:8, 24:7, 24:25, 25:18, 34:20, 38:22

**relief** [1] - 134:11

**relies** [1] - 31:17

**rely** [3] - 32:6, 45:15, 133:20

**relying** [6] - 28:19, 28:21, 31:23, 33:4, 45:6, 55:13

**remained** [1] - 39:10

**remaining** [3] - 8:24, 35:9, 134:12

**remedies** [3] - 63:6, 134:25, 135:1

**remedy** [2] - 40:15, 46:19

**remember** [3] - 16:7, 126:12, 133:3

**reminded** [1] - 44:7

**remotely** [1] - 80:6

**remove** [1] - 46:12

**removed** [2] - 75:13, 94:11

**render** [1] - 53:14

**rendering** [1] - 53:2

**renders** [1] - 53:5

**reopened** [1] - 98:21

**repeating** [1] - 57:6

**reply** [4] - 44:10, 47:22, 55:19, 125:4

**report** [4] - 18:10, 82:1, 82:3, 82:5

**Reporter** [3] - 2:20, 2:21, 136:10

**REPORTER** [1] - 136:1

**reporter** [3] - 48:17, 88:13, 124:20

**reporting** [1] - 18:1

**reports** [2] - 116:1, 116:3

**represent** [1] - 5:15

**representative** [1] - 81:1

**represented** [1] - 7:24

**request** [1] - 88:3

**requested** [1] - 86:17

**require** [20] - 12:5, 13:4, 14:8, 17:10, 31:12, 33:23, 40:21, 43:18, 57:4, 58:12, 62:24, 68:6, 84:11, 95:17, 109:8, 112:17, 117:14, 123:2, 129:15

**required** [40] - 9:10, 9:17, 10:17, 13:17, 13:21, 14:6, 14:15, 14:23, 17:1, 18:12, 19:7, 23:2, 23:22, 23:23, 24:1, 25:15, 28:9, 28:10, 28:24, 29:1, 30:13, 31:3, 31:25, 44:25, 60:7, 60:15, 60:16, 60:18, 67:12, 83:23, 94:1, 107:17, 109:22, 111:18, 111:20, 111:24, 129:18, 131:9, 131:10, 131:12

**requirement** [19] - 21:21, 41:11, 50:20, 52:24, 53:12, 58:1, 59:6, 61:13, 61:25, 67:1, 67:12, 67:17, 68:4, 70:25, 85:1, 109:2, 122:14, 133:21, 133:22

**requirements** [20] - 6:24, 12:8, 14:18, 18:10, 21:8, 21:9, 31:18, 33:22, 36:22, 41:15, 49:20, 50:4, 53:24, 60:13, 63:5, 82:19, 96:5, 121:16, 123:6, 126:11

**requires** [15] - 12:6, 13:7, 17:6, 19:12, 26:22, 30:25, 31:2, 31:9, 31:15, 35:7, 47:23, 61:12, 63:2, 119:7, 130:18

**requiring** [1] - 33:5

**reserve** [1] - 5:5

**reside** [1] - 14:3

**resolve** [1] - 125:11

**resolved** [1] - 42:16

**resource** [2] - 115:2, 122:11

**respect** [20] - 11:22, 14:24, 15:4, 15:8, 15:25, 24:13, 40:14, 41:5, 42:25, 50:21, 55:14, 63:5, 63:24, 71:12, 79:4, 95:18, 99:4, 117:10, 130:19, 134:20

**respond** [1] - 91:25

**responding** [2] - 60:24, 60:25

**response** [9] - 43:10, 56:5, 60:1, 60:10, 61:5, 70:23, 91:16, 91:17, 130:20

**responsibility** [2] - 71:13, 102:19

**responsible** [2] - 27:25, 98:7

**rest** [2] - 57:19, 68:24

**restrictions** [2] - 15:15, 16:2

**result** [5] - 10:9, 15:12, 39:9, 88:4, 133:5

**resulted** [2] - 43:7, 120:9

**retain** [3] - 8:14, 37:22, 40:5

**retained** [61] - 34:7, 37:14, 38:1, 38:19, 39:14, 39:15, 40:9, 40:14, 40:17, 41:17, 42:10, 42:18, 42:22, 43:4, 43:8, 44:1, 44:5, 45:13, 47:12, 72:10, 72:13, 72:25, 73:3, 73:4, 74:12, 77:8, 78:2, 78:5,

78:14, 78:18, 78:23, 79:4, 79:16, 80:16, 80:17, 80:24, 80:25, 81:3, 81:5, 81:21, 81:23, 82:14, 82:17, 82:22, 83:4, 83:13, 83:16, 83:19, 84:11, 85:5, 85:13, 85:15, 85:19, 114:15, 122:22, 122:23, 123:2, 129:20, 129:21

**retains** [4] - 39:3, 39:14, 40:1, 42:3

**revert** [1] - 67:7

**review** [31] - 17:15, 17:16, 23:22, 24:12, 46:15, 50:22, 51:8, 51:11, 52:25, 53:11, 53:16, 69:25, 89:5, 89:7, 90:13, 93:18, 95:11, 96:2, 96:3, 98:24, 99:23, 100:3, 100:20, 103:24, 104:21, 111:21, 118:4, 121:25, 122:6, 122:8, 125:24

**reviewed** [2] - 60:11, 91:21

**reviews** [5] - 98:2, 100:4, 104:19, 122:8, 128:1

**revision** [2] - 27:9, 27:10

**RHA** [2] - 74:6, 79:24

**rings** [1] - 61:8

**rise** [2] - 34:3, 94:2

**risk** [4] - 15:11, 15:21, 72:4, 99:6

**risking** [1] - 15:23

**risks** [1] - 9:20

**River** [1] - 76:12

**rivers** [1] - 123:4

**Rivers** [12] - 5:1, 5:17, 37:21, 37:23, 38:2, 38:24, 39:7, 45:23, 46:5, 73:23, 74:13, 85:4

**RMR** [2] - 2:20, 136:9

**roadmap** [1] - 5:12

**robust** [3] - 69:12, 117:19

**Room** [2] - 2:21, 136:10

**room** [1] - 101:7

**round** [1] - 126:24

**rule** [25] - 7:8, 7:12, 36:4, 36:5, 47:4, 47:10, 48:6, 50:14, 50:17, 50:18, 56:10,

56:15, 57:2, 57:3, 57:4, 57:13, 67:3, 67:9, 67:10, 85:1, 96:19, 97:2, 109:19, 112:21, 121:1

**ruled** [1] - 119:20

**rulemaking** [10] - 35:1, 36:13, 36:18, 36:25, 37:2, 37:6, 37:9, 120:8, 120:9

**rules** [6] - 20:4, 36:24, 57:7, 95:19, 102:5, 110:4

**run** [7] - 33:22, 73:16, 73:22, 92:23, 93:1, 93:4

**running** [1] - 111:10

**runoff** [1] - 16:1

**rushed** [1] - 114:2

**rushing** [1] - 69:14

## S

**Sackett** [1] - 47:13

**safe** [1] - 91:22

**safeguard** [2] - 51:8, 54:11

**San** [1] - 2:7

**sandwiched** [1] - 60:6

**satisfied** [3] - 6:25, 50:3, 113:10

**satisfies** [3] - 49:19, 102:20, 104:25

**satisfy** [1] - 53:24

**scenario** [4] - 108:16, 110:23, 111:3, 124:2

**scheme** [1] - 94:11

**science** [2] - 23:23, 131:10

**scientific** [4] - 95:19, 96:4, 107:23, 111:24

**scope** [6] - 47:4, 62:3, 74:12, 79:16, 80:24, 81:21

**score** [1] - 32:22

**scores** [1] - 44:3

**scratch** [2] - 80:17, 81:5

**sea** [4] - 8:22, 23:6, 24:9, 119:4

**seat** [1] - 89:22

**Second** [4] - 6:23, 109:20, 120:25

**second** [17] - 17:1, 26:14, 34:2, 49:15, 54:5, 62:23, 84:2, 90:2, 90:9, 90:11, 99:18, 103:16, 113:19, 116:10, 118:9, 124:3, 131:7

**secondary** [1] - 122:9

**secretary** [12] - 42:3, 82:2, 82:9, 105:8, 105:14, 105:20, 109:24, 110:2, 110:15, 113:5, 113:6

**section** [3] - 61:16, 73:12, 122:5

**Section** [61] - 5:23, 6:4, 7:13, 19:11, 19:21, 21:13, 22:23, 23:2, 26:21, 27:1, 27:19, 29:7, 29:8, 29:9, 29:10, 29:11, 29:14, 31:9, 32:1, 37:14, 45:23, 49:17, 49:18, 50:19, 52:13, 54:23, 61:15, 61:20, 61:23, 71:2, 72:14, 72:16, 72:21, 73:3, 74:11, 78:6, 80:2, 80:6, 80:7, 80:9, 80:10, 81:22, 81:24, 82:11, 85:21, 88:1, 88:15, 88:18, 102:21, 104:25, 110:17, 112:5, 116:24, 120:5, 122:6, 129:10

**sections** [4] - 58:20, 60:19, 60:20, 61:22

**sedimentation** [1] - 74:24

**see** [20] - 6:8, 16:15, 22:16, 28:22, 38:17, 41:9, 48:18, 53:19, 65:7, 68:21, 81:19, 82:21, 85:23, 89:5, 90:4, 101:3, 111:20, 116:18, 127:18, 130:25

**seeing** [1] - 90:16

**seek** [4] - 65:8, 65:9, 85:21, 134:11

**seem** [3] - 6:3, 44:13, 128:2

**sees** [2] - 99:6, 100:17

**Sefranek** [2] - 2:20, 136:9, 136:9

**SEFRANEK** [1] - 136:3

**selective** [1] - 55:16

**send** [2] - 46:20, 93:17

**sending** [1] - 110:7

**sends** [1] - 93:24

**sense** [3] - 12:1, 28:1, 49:24

**sensitive** [1] - 134:18

**sent** [1] - 18:1

**sentence** [3] - 60:25,

64:25, 91:9

**sentences** [3] - 60:4, 60:5, 61:2

**separate** [4] - 35:11, 45:25, 126:20, 133:19

**separately** [2] - 41:19, 42:7

**sequence** [2] - 121:25, 122:7

**series** [2] - 31:14, 133:13

**serious** [1] - 94:12

**serve** [1] - 133:1

**served** [1] - 80:22

**Service** [107] - 9:3, 9:7, 10:17, 12:17, 13:16, 14:7, 14:15, 16:5, 16:20, 16:25, 17:3, 18:2, 19:5, 19:6, 23:5, 23:17, 23:21, 24:3, 24:11, 24:17, 44:14, 50:22, 52:8, 52:18, 52:20, 53:5, 86:19, 87:23, 87:25, 88:3, 88:8, 88:16, 88:24, 89:4, 89:5, 89:6, 89:24, 91:4, 91:10, 91:16, 91:19, 91:20, 91:22, 91:24, 92:1, 92:17, 92:18, 93:16, 94:14, 94:17, 95:11, 95:17, 96:1, 96:7, 96:14, 97:8, 97:15, 97:19, 98:2, 98:11, 99:2, 99:8, 100:3, 100:4, 100:15, 100:17, 100:24, 100:25, 101:19, 101:22, 101:24, 102:1, 102:6, 102:17, 102:18, 103:4, 103:8, 103:16, 103:24, 104:9, 104:18, 104:21, 104:22, 106:14, 107:2, 107:16, 107:21, 110:6, 110:19, 110:20, 110:22, 111:16, 112:22, 115:6, 115:19, 116:1, 116:21, 116:23, 117:5, 117:20, 118:12, 118:15, 130:15, 130:17, 130:18, 131:17

**Service's** [2] - 24:8, 98:5

**Services** [1] - 97:5

**set** [16] - 8:12, 11:7, 78:7, 79:3, 80:10, 81:19, 87:18, 94:14, 97:2, 101:16, 104:1, 107:13, 113:12, 118:23, 123:13

**setbacks** [1] - 116:4

**sets** [2] - 105:15, 110:3

**setting** [1] - 107:11

**settings** [1] - 69:21

**settled** [1] - 83:20

**seven** [1] - 116:13

**several** [1] - 121:21

**shall** [8] - 28:8, 28:25, 54:25, 55:2, 65:8, 67:13, 82:12, 105:8

**share** [1] - 103:23

**shifted** [1] - 22:12

**shifts** [1] - 74:24

**short** [2] - 55:3, 88:13

**short-term** [1] - 55:3

**shortcuts** [1] - 43:6

**shorter** [2] - 30:22, 31:1

**shove** [1] - 44:1

**show** [5] - 17:25, 25:15, 31:10, 47:25, 77:11

**showing** [3] - 62:10, 63:21, 68:7

**shown** [1] - 47:19

**shows** [3] - 16:4, 43:23, 45:17

**sic** [1] - 64:2

**sic]** [1] - 106:23

**side** [12] - 44:2, 57:1, 64:4, 79:1, 85:24, 92:24, 93:1, 123:8, 127:8, 128:3

**side-by-side** [1] - 127:8

**sides** [1] - 123:12

**signed** [1] - 127:12

**significant** [5] - 75:4, 92:21, 116:1, 116:2, 121:13

**similar** [12] - 5:23, 7:15, 7:16, 8:2, 36:7, 55:13, 108:14, 108:19, 109:21, 112:4, 124:11, 131:15

**similarly** [1] - 18:2

**Simma** [1] - 4:3

**SIMMA** [1] - 2:15

**simple** [18] - 27:2, 27:7, 27:22, 28:10, 29:4, 29:16, 30:7,

**61**:12, 61:24, 64:15, 66:16, 66:25, 68:5, 69:18, 69:23, 70:3, 114:24, 129:11

**simply** [5] - 10:2, 40:16, 40:22, 46:20, 64:7

**single** [4] - 23:8, 60:4, 84:18, 106:14

**single-spaced** [1] - 60:4

**sit** [1] - 109:6

**site** [2] - 23:7, 23:15

**site-specific** [2] - 23:7, 23:15

**situation** [11] - 41:3, 46:13, 47:8, 48:5, 108:14, 116:14, 120:18, 121:5, 123:15, 131:6, 133:10

**size** [2] - 14:1, 122:25

**skip** [2] - 90:20, 91:1

**skipped** [1] - 104:8

**slightly** [1] - 38:6

**Slope** [1] - 7:7

**small** [2] - 69:19, 71:11

**snail** [6] - 92:19, 92:20, 92:21, 92:24, 92:25, 93:4

**snake** [4] - 13:25, 15:9, 15:10, 15:13

**snakes** [3] - 14:3, 15:12, 15:13

**solely** [1] - 76:6

**solid** [1] - 119:12

**someone** [9] - 44:16, 67:21, 76:16, 93:25, 94:10, 95:24, 96:6, 97:17, 102:6

**somewhere** [1] - 101:3

**sorry** [15] - 15:2, 31:10, 54:23, 55:1, 63:22, 85:11, 90:16, 90:19, 100:9, 100:11, 112:7, 116:12, 118:1, 118:18, 120:2

**sort** [18] - 15:16, 25:2, 37:25, 53:5, 53:21, 61:7, 61:24, 70:3, 72:23, 75:7, 77:9, 80:16, 92:9, 93:5, 93:20, 101:5, 120:18, 128:5

**sorts** [1] - 127:25

**soundly** [1] - 36:18

**source** [1] - 6:2

**South** [2] - 123:22, 132:23

**southwest** [1] - 8:23

**Southwest** [2] - 2:9, 3:18

**spaced** [1] - 60:4

**spare** [1] - 128:11

**speaking** [1] - 124:20

**speaks** [1] - 67:11

**Species** [35] - 4:25, 5:13, 5:17, 6:9, 6:11, 6:24, 9:8, 10:11, 12:5, 15:24, 18:12, 20:24, 21:25, 22:2, 22:20, 23:5, 24:6, 26:3, 49:2, 92:11, 93:10, 96:16, 107:9, 107:14, 108:18, 109:1, 111:19, 111:25, 113:1, 113:10, 129:2, 130:12, 130:19, 131:13, 132:1

**species** [79] - 8:17, 8:21, 8:25, 9:2, 9:13, 10:3, 10:9, 10:14, 10:21, 11:23, 11:25, 12:1, 12:23, 12:25, 13:2, 13:13, 14:13, 15:5, 15:11, 15:16, 15:17, 15:18, 16:6, 16:21, 17:9, 19:17, 22:4, 22:12, 22:14, 23:24, 23:25, 24:10, 24:20, 25:16, 26:19, 48:1, 51:9, 52:21, 53:3, 54:11, 88:13, 90:14, 92:21, 93:12, 94:13, 94:24, 95:2, 96:12, 96:21, 99:7, 103:9, 105:12, 105:13, 105:15, 105:24, 105:25, 106:9, 109:4, 109:9, 109:25, 111:8, 112:18, 112:22, 115:14, 117:15, 118:4, 118:16, 119:8, 119:11, 119:15, 119:16, 119:25, 120:5, 131:11, 131:12, 134:21

**species-specific** [1] - 14:13

**specific** [15] - 14:13, 23:7, 23:15, 33:3, 40:8, 44:4, 60:7, 65:9, 67:9, 78:15, 79:18, 89:3, 99:16,

107:10, 116:3

**specifically** [5] - 40:4, 65:6, 100:23, 108:23, 112:14

**specifics** [1] - 50:7

**specified** [2] - 78:9, 105:18

**specifies** [3] - 105:12, 105:13, 105:19

**specify** [1] - 113:4

**speculative** [1] - 125:3

**spell** [2] - 39:21, 40:21

**spelled** [5] - 41:9, 41:11, 80:13, 101:20, 121:20

**spent** [1] - 72:10

**spoken** [1] - 109:12

**sponte** [2] - 124:8, 124:13

**spot** [2] - 98:16, 122:4

**Square** [1] - 1:21

**staff** [1] - 135:5

**stage** [2] - 127:9, 128:4

**stand** [2] - 23:18, 86:13

**stand-in** [1] - 23:18

**standalone** [2] - 7:12, 36:7

**standard** [34] - 29:15, 30:7, 30:13, 30:19, 31:3, 31:20, 34:3, 50:12, 57:25, 58:2, 58:4, 58:9, 62:21, 63:10, 64:9, 66:8, 68:8, 69:18, 69:19, 70:13, 70:17, 70:18, 71:9, 94:17, 96:14, 100:17, 107:23, 109:10, 116:23, 117:1, 132:14, 132:16, 132:17

**standards** [21] - 6:18, 8:12, 49:16, 54:4, 54:20, 55:11, 55:25, 56:3, 56:12, 58:25, 59:1, 61:16, 62:24, 93:19, 96:4, 96:10, 101:13, 102:21, 108:13, 112:5, 129:5

**standing** [32] - 32:14, 50:18, 66:18, 67:2, 69:10, 69:16, 81:9, 114:16, 123:20, 123:25, 124:5, 124:13, 124:14, 124:19, 126:2, 126:4, 126:5, 126:7, 126:15, 126:20, 126:21, 127:10,

128:4, 132:12, 132:16, 133:12, 133:18, 133:19, 133:20, 134:19, 134:22

**stands** [1] - 7:18

**start** [12] - 4:22, 5:12, 25:12, 26:20, 43:17, 50:10, 80:17, 86:12, 87:5, 94:21, 134:6, 134:7

**start-from-scratch** [1] - 80:17

**started** [3] - 43:2, 46:1, 87:4

**starting** [3] - 3:6, 51:2, 57:1

**starts** [2] - 89:20, 90:21

**state** [131] - 3:5, 6:6, 6:13, 7:15, 8:12, 9:5, 9:21, 9:25, 10:4, 10:6, 10:7, 10:13, 10:20, 10:21, 11:2, 11:23, 14:16, 14:18, 17:4, 20:21, 21:6, 21:24, 22:4, 26:11, 26:14, 26:22, 27:20, 27:21, 28:8, 28:24, 30:24, 31:9, 31:10, 31:17, 31:22, 31:23, 32:18, 32:19, 37:13, 39:4, 39:6, 39:10, 39:17, 40:2, 40:6, 40:23, 41:4, 41:16, 41:25, 42:2, 42:12, 42:24, 45:1, 45:5, 45:10, 45:13, 46:13, 46:24, 47:9, 47:12, 48:13, 49:13, 49:16, 49:19, 49:21, 50:19, 54:7, 54:17, 55:11, 58:5, 58:12, 58:13, 58:24, 60:13, 61:12, 61:16, 61:18, 62:9, 62:15, 62:19, 63:2, 63:11, 63:20, 66:7, 66:25, 67:13, 68:1, 69:11, 69:12, 71:2, 71:16, 72:2, 79:1, 79:22, 81:6, 84:19, 84:25, 88:14, 88:17, 90:24, 91:14, 93:24, 96:11, 96:18, 97:16, 97:18, 101:10, 101:15, 102:1, 112:20, 114:18, 116:2, 116:21, 118:3, 119:6, 120:10, 121:2,

128:4, 132:12, 132:16, 133:12, 133:18, 133:19, 133:20, 134:19, 134:22

**State** [13] - 4:11, 6:10, 6:13, 6:18, 21:9, 24:8, 88:17, 89:2, 91:24, 96:19, 96:20, 109:19, 115:14

**state's** [2] - 46:25, 60:12

**state-assumed** [1] - 46:13

**state-issued** [1] - 96:11

**Statement** [9] - 6:12, 7:3, 14:23, 106:4, 106:6, 107:8, 112:11, 112:17, 118:14

**statement** [3] - 98:20, 103:8, 105:11

**statements** [1] - 37:8

**STATES** [2] - 1:1, 1:10

**States** [16] - 2:21, 18:6, 18:21, 37:15, 41:25, 42:2, 47:2, 47:7, 48:23, 72:17, 73:25, 74:15, 75:21, 75:23, 75:24, 95:24

**states** [18] - 7:1, 22:22, 27:16, 27:23, 29:13, 29:23, 30:4, 32:2, 49:11, 61:17, 61:22, 70:24, 78:7, 81:17, 87:13, 112:4

**statewide** [1] - 22:23

**static** [1] - 78:16

**status** [7] - 9:12, 10:14, 23:24, 24:12, 36:12, 36:16, 42:11

**statute** [26] - 10:24, 30:21, 30:22, 30:24, 31:1, 39:21, 39:24, 40:20, 49:14, 61:13, 62:23, 63:2, 63:9, 71:7, 71:8, 83:23, 84:8, 92:13, 92:14, 94:4, 101:10, 102:12, 102:14, 103:17, 105:2, 109:23

**statutes** [3] - 62:1, 121:3, 130:10

**statutory** [8] - 32:18, 39:19, 40:22, 53:12, 61:19, 73:2, 123:6, 128:25

**stayed** [1] - 135:5

**stems** [1] - 32:24

**stenographic** [1] - 136:5

**step** [7] - 49:6, 71:9, 71:22, 94:12, 103:15, 103:16, 124:16

**steps** [1] - 89:25

**still** [15] - 13:17, 31:23, 35:6, 35:18, 46:17, 73:17, 74:18, 75:1, 83:12, 83:13, 86:20, 95:15, 128:10, 131:5

**stood** [1] - 81:15

**stop** [2] - 80:11, 80:12

**stream** [1] - 121:1

**Street** [3] - 1:21, 2:3, 2:6

**strikes** [4] - 40:11, 68:12, 70:7, 93:6

**stringent** [3] - 30:25, 31:1, 60:17

**strong** [1] - 8:16

**strongly** [1] - 80:2

**structure** [4] - 87:17, 102:15, 103:21, 120:25

**structures** [1] - 97:4

**studies** [6] - 25:2, 76:5, 77:18, 77:21, 127:25

**study** [1] - 80:7

**sua** [2] - 124:8, 124:13

**sub** [3] - 53:22, 54:1, 57:9

**sub-arguments** [2] - 53:22, 54:1

**sub-issue** [1] - 57:9

**subcommittee** [8] - 80:20, 80:21, 80:23, 81:2, 81:10, 81:12, 81:16, 130:2

**subject** [6] - 43:11, 79:25, 83:18, 93:9, 108:1, 119:21

**subjective** [1] - 31:20

**submission** [7] - 26:17, 29:18, 51:21, 54:15, 63:14, 68:25

**submit** [11] - 14:23, 42:8, 43:5, 50:4, 51:6, 56:22, 58:13, 91:10, 91:23, 125:8, 128:19

**submittal** [2] - 53:14, 90:13

**submitted** [10] - 24:19, 35:14, 50:3, 51:4, 83:1, 83:21, 117:18, 125:17,

127:12, 129:14

**submitting** [1] - 17:15

**subparagraph** [3] - 62:7, 62:8, 62:17

**subpart** [2] - 32:1, 55:6

**subsequent** [3] - 42:3, 65:21, 108:21

**subset** [2] - 78:6, 78:8

**substance** [1] - 25:8

**substantial** [5] - 59:21, 70:8, 88:6, 107:15, 126:8

**substantive** [13] - 31:21, 34:15, 35:15, 40:12, 51:14, 52:24, 58:24, 58:25, 66:12, 124:7, 124:15, 126:20, 126:21

**substitute** [1] - 107:13

**sue** [4] - 94:6, 95:24, 96:6, 117:8

**sued** [1] - 19:4

**suffice** [1] - 129:9

**suffices** [1] - 63:18

**sufficiency** [3] - 32:17, 32:20

**sufficient** [8] - 16:22, 42:8, 58:23, 92:3, 92:6, 93:2, 100:5, 113:1

**suit** [1] - 18:25

**suit-type** [1] - 18:25

**Suite** [2] - 1:17, 2:6

**summarize** [1] - 73:23

**summarizes** [2] - 53:8, 127:7

**summary** [14] - 4:17, 4:18, 4:19, 50:5, 53:11, 127:8, 128:4, 132:13, 132:16, 132:19

**summation** [2] - 114:21, 121:18

**summer** [1] - 124:4

**super** [2] - 119:2, 135:6

**super-important** [1] - 119:2

**supplement** [2] - 43:25, 83:6

**supplemental** [1] - 126:25

**support** [3] - 8:21, 54:8, 58:17

**supported** [1] - 36:18

**suppose** [2] - 36:2, 43:9

**supposed** [9] - 9:24, 46:9, 81:9, 89:3,

99:23, 100:1, 103:17, 107:24, 119:5

**supremacy** [1] - 51:18

**Supreme** [11] - 36:15, 38:10, 69:22, 73:18, 73:19, 74:15, 119:3, 119:9, 119:20, 121:7, 126:7

**surprising** [1] - 52:23

**surreply** [3] - 59:18, 69:10, 77:25

**surveillance** [1] - 124:23

**susceptible** [8] - 37:15, 38:14, 73:7, 73:9, 73:13, 74:8, 75:5, 77:6

**system** [6] - 64:12, 67:25, 68:1, 130:14, 131:7, 133:5

**systematic** [1] - 103:8

**systems** [1] - 13:17

**T**

**TA** [2] - 23:18, 25:22

**table** [2] - 4:3, 122:4

**tainted** [1] - 25:20

**takings** [1] - 87:15

**talks** [1] - 64:19

**TAMARA** [1] - 136:3

**Tamara** [2] - 2:20, 136:9, 136:9

**TANIA** [1] - 1:14

**tania** [1] - 3:7

**team** [1] - 115:15

**Technical** [1] - 45:3

**technical** [20] - 14:14, 21:16, 35:17, 48:16, 51:12, 54:10, 87:14, 88:15, 88:21, 88:22, 96:10, 108:12, 108:17, 109:13, 111:6, 112:3, 115:9, 115:10, 115:15, 121:5

**technology** [1] - 6:18

**ten** [2] - 48:12, 48:18

**tens** [1] - 84:20

**term** [8] - 55:3, 62:13, 62:14, 74:1, 88:13, 104:5, 115:18

**terminated** [1] - 46:2

**terms** [24] - 10:17, 12:14, 14:11, 16:5, 20:23, 21:8, 21:13, 24:16, 38:11, 38:18, 47:22, 47:23, 48:1, 48:16, 96:9, 96:16,

104:6, 104:13, 105:16, 112:15, 113:11, 116:4, 122:25

**terribly** [1] - 85:9

**test** [4] - 40:22, 73:19, 133:19

**testimony** [1] - 128:5

**testing** [1] - 58:12

**tests** [1] - 126:8

**text** [5] - 61:19, 73:2, 73:10, 81:21

**textual** [1] - 64:17

**THE** [251] - 1:1, 1:1, 1:10, 3:2, 3:9, 3:12, 3:15, 3:20, 3:23, 4:1, 4:6, 4:9, 4:14, 5:4, 5:7, 5:14, 5:22, 6:1, 6:21, 7:11, 7:21, 8:8, 9:15, 10:23, 11:10, 13:8, 13:22, 14:9, 14:20, 15:2, 15:10, 16:7, 16:13, 16:18, 17:13, 18:5, 18:17, 19:18, 19:22, 20:1, 21:4, 21:22, 22:5, 22:9, 22:16, 23:3, 23:11, 24:12, 24:21, 24:24, 25:13, 25:23, 26:4, 26:7, 27:3, 27:14, 28:4, 28:12, 28:22, 29:2, 29:5, 29:15, 29:20, 29:24, 30:3, 30:9, 30:20, 31:6, 32:10, 32:14, 33:1, 33:8, 34:9, 34:12, 35:23, 36:11, 36:20, 37:3, 37:11, 38:4, 38:17, 39:18, 40:10, 41:23, 42:11, 42:23, 43:9, 44:7, 44:20, 45:14, 46:5, 46:19, 47:13, 47:15, 48:11, 48:20, 49:4, 49:8, 50:10, 50:21, 50:25, 51:17, 52:5, 52:22, 53:17, 54:22, 55:22, 56:8, 57:1, 58:14, 59:20, 62:2, 62:22, 63:1, 63:13, 63:23, 65:3, 65:12, 65:15, 67:18, 67:20, 68:9, 69:3, 69:8, 70:5, 70:10, 71:4, 72:8, 72:15, 73:7, 73:15, 74:17, 75:17, 76:9, 76:15, 77:11, 77:23, 78:14, 79:2, 79:11, 80:11, 82:13, 82:19, 82:24, 83:10,

83:17, 83:20, 84:9, 84:13, 85:6, 85:8, 85:13, 85:25, 86:3, 86:6, 86:9, 86:14, 86:23, 87:3, 87:7, 87:10, 87:21, 89:7, 89:14, 89:18, 90:7, 90:11, 90:16, 90:19, 90:22, 90:25, 91:6, 91:13, 92:2, 92:5, 92:8, 94:22, 94:25, 95:3, 95:7, 95:14, 95:23, 96:3, 96:7, 97:11, 97:23, 98:11, 98:22, 99:1, 99:19, 100:7, 100:9, 100:12, 101:2, 102:11, 102:16, 102:22, 103:1, 104:16, 105:1, 105:4, 105:6, 106:8, 106:13, 106:21, 107:5, 108:25, 109:7, 109:11, 109:22, 110:18, 111:1, 111:4, 111:9, 112:9, 113:14, 113:17, 114:1, 114:8, 114:11, 116:6, 116:10, 116:15, 116:18, 117:9, 117:22, 117:25, 118:10, 118:18, 118:22, 120:2, 120:7, 120:13, 121:10, 121:23, 122:20, 124:22, 126:2, 126:12, 127:4, 128:7, 128:10, 128:15, 128:20, 130:19, 132:4, 132:9, 133:24, 134:6, 134:19, 135:2, 135:4

**themselves** [3] - 10:14, 19:10, 108:14

**theoretically** [1] - 11:8

**theory** [3] - 45:14, 72:1, 134:19

**there'd** [1] - 84:24

**thereafter** [1] - 91:8

**therefore** [8] - 20:14, 22:13, 27:21, 50:5, 64:2, 119:11, 119:25, 120:1

**they've** [7] - 38:23, 73:21, 89:7, 115:20, 115:21, 125:14

**thin** [1] - 117:22

**thinks** [2] - 100:22,

103:7
**third** [8] - 23:4, 26:16, 34:5, 54:9, 54:11, 90:8, 118:13, 125:22
**third-party** [1] - 125:22
**thoughts** [1] - 35:3
**thousands** [5] - 11:16, 11:17, 84:20, 117:19, 127:24
**threat** [1] - 11:13
**threaten** [2] - 54:4, 54:19
**threatened** [3] - 8:21, 9:1, 133:13
**threatening** [1] - 32:22
**three** [21] - 9:6, 26:10, 30:23, 33:22, 61:1, 61:2, 66:23, 70:2, 70:11, 76:11, 76:13, 77:13, 91:4, 118:2, 123:21, 124:6, 125:16, 126:4, 126:6, 126:13
**threshold** [1] - 89:2
**throughout** [3] - 88:5, 89:21, 95:12
**tidal** [12] - 37:18, 39:16, 42:17, 42:19, 42:21, 79:9, 79:16, 79:17, 84:2, 85:6, 85:15, 85:17
**tidally** [5] - 73:5, 76:8, 83:15, 84:19, 85:21
**tide** [3] - 79:18, 83:19, 84:22
**tie** [1] - 123:10
**tied** [1] - 20:19
**tiering** [1] - 131:3
**time-sensitive** [1] - 134:18
**timeline** [3] - 86:19, 86:24, 87:1
**timing** [1] - 88:7
**tiny** [1] - 96:25
**Title** [1] - 35:5
**TNWs** [4] - 72:23, 80:6, 80:15, 81:3
**today** [4] - 4:12, 26:5, 75:4, 120:20
**together** [7] - 79:13, 80:25, 86:20, 115:1, 118:3, 118:13, 123:9
**tomorrow** [3] - 113:23, 128:14, 128:15
**tonight** [1] - 113:21
**tons** [1] - 57:11
**took** [3] - 38:14,

40:18, 75:18
**tool** [1] - 78:21
**top** [2] - 55:20, 90:19
**topic** [2] - 9:16, 111:9
**touched** [1] - 112:14
**towards** [1] - 19:9
**town** [1] - 113:25
**toxic** [1] - 34:4
**track** [2] - 6:3, 112:6
**traditional** [1] - 38:23
**traditionally** [6] - 8:15, 37:19, 38:21, 39:2, 43:3, 72:24
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 136:4, 136:6
**transfer** [11] - 9:4, 32:24, 34:8, 37:13, 45:1, 45:5, 45:9, 45:12, 123:21, 123:25, 132:23
**transferred** [3] - 26:14, 39:9, 44:24
**transferring** [1] - 9:20
**transparency** [1] - 41:21
**transport** [6] - 37:17, 72:18, 72:20, 73:5, 74:3, 75:25
**travel** [1] - 135:15
**treated** [3] - 34:16, 121:9, 123:16
**trends** [1] - 127:12
**tribe** [1] - 123:25
**trigger** [1] - 105:6
**triggers** [1] - 17:7
**trouble** [1] - 70:12
**troubling** [1] - 93:7
**true** [9] - 51:9, 61:14, 65:5, 66:22, 68:4, 81:1, 122:21, 136:4, 136:5
**truly** [1] - 123:1
**truncated** [1] - 43:7
**try** [4] - 94:19, 97:21, 114:8, 114:14
**trying** [7] - 7:22, 12:1, 25:24, 28:18, 45:19, 68:8, 78:2
**turn** [8] - 5:13, 26:2, 31:12, 50:7, 56:15, 88:11, 88:23, 132:3
**turning** [2] - 8:10, 8:20
**turns** [2] - 17:8, 32:18
**turtles** [6] - 8:22, 24:9, 67:23, 68:17, 68:19, 68:21
**two** [22] - 18:9, 18:13, 18:16, 22:18, 49:7, 50:10, 54:14, 58:10,

60:4, 60:5, 60:25, 61:2, 64:16, 66:23, 72:12, 75:11, 77:14, 89:25, 99:16, 124:7, 125:10, 126:10
**two-sentence** [1] - 60:25
**type** [13] - 9:23, 11:14, 14:22, 14:23, 18:23, 18:25, 41:11, 101:20, 102:7, 103:4, 111:18, 111:23, 131:7
**types** [2] - 63:6, 93:22
**typical** [1] - 48:5
**typically** [5] - 67:21, 107:17, 111:18, 111:24, 133:20
**typo** [1] - 44:16

## U

**U.S** [13] - 1:20, 9:3, 9:7, 17:2, 18:2, 19:5, 23:21, 24:3, 91:16, 91:19, 122:13, 130:14
**ultimate** [4] - 34:5, 44:23, 52:21, 59:11
**ultimately** [1] - 52:20
**ultra** [2] - 63:4
**unambiguously** [1] - 61:11
**unanimously** [1] - 81:20
**unbroken** [1] - 66:24
**uncertainty** [2] - 41:12, 88:6
**unclear** [2] - 18:13, 21:11
**unconcerned** [1] - 54:3
**unconstitutional** [1] - 27:7
**under** [103] - 6:4, 6:5, 6:11, 6:13, 7:10, 7:13, 7:14, 10:10, 13:17, 13:18, 14:17, 15:14, 17:2, 18:12, 22:2, 24:10, 24:20, 26:23, 27:1, 27:19, 28:9, 28:10, 28:24, 29:1, 29:4, 31:3, 33:19, 34:1, 35:5, 35:6, 35:11, 35:18, 35:20, 36:2, 36:3, 36:8, 39:2, 42:1, 45:14, 45:16, 45:22, 46:5, 47:5, 48:25, 49:13, 50:8, 54:9,

56:4, 57:14, 58:16, 59:1, 59:8, 59:14, 60:7, 60:9, 60:15, 60:16, 60:18, 62:20, 64:12, 64:13, 66:4, 67:13, 68:1, 69:17, 69:18, 69:23, 70:1, 71:2, 71:21, 74:13, 89:9, 90:3, 92:11, 93:9, 98:9, 100:18, 103:17, 105:4, 109:23, 110:17, 111:18, 111:25, 112:17, 112:20, 116:11, 116:23, 119:19, 121:3, 126:2, 127:13, 127:15, 127:16, 129:11, 130:14, 130:16, 132:1, 132:16, 132:17, 133:22
**undergoes** [1] - 6:13
**undermined** [1] - 16:24
**undermining** [1] - 5:16
**underneath** [1] - 90:8
**undersea** [1] - 120:24
**understood** [5] - 37:3, 66:15, 74:13, 85:12, 119:5
**undertake** [1] - 129:19
**undertaken** [1] - 131:18
**undertaking** [2] - 84:20, 110:12
**undiluted** [1] - 132:24
**unfortunately** [1] - 43:7
**uniformly** [1] - 129:12
**unique** [2] - 6:14, 122:11
**UNITED** [2] - 1:1, 1:10
**United** [16] - 2:21, 18:6, 18:21, 37:15, 41:25, 42:2, 47:2, 47:7, 48:23, 72:17, 73:25, 74:15, 75:21, 75:23, 75:24, 95:24
**universe** [2] - 72:22, 80:9
**unknowns** [1] - 45:9
**unlawful** [5] - 8:18, 25:21, 25:22, 45:12, 98:12
**unlawfully** [1] - 24:7
**unless** [3] - 54:3, 75:2, 130:15
**unlimited** [1] - 17:3

**unnamed** [1] - 39:16
**unpack** [2] - 54:1, 94:19
**unpermitted** [1] - 62:12
**unreasonable** [1] - 45:15
**unworkable** [2] - 43:8, 123:1
**up** [24] - 4:20, 19:19, 27:17, 42:16, 44:9, 45:18, 46:25, 53:19, 56:3, 62:22, 77:10, 78:7, 87:13, 95:4, 107:11, 107:14, 119:19, 123:8, 126:24, 128:23, 129:8, 129:24, 129:25, 132:21
**upcoming** [1] - 48:2
**update** [4] - 43:25, 45:23, 45:25, 50:10
**uses** [3] - 21:25, 38:6, 38:11
**USFWS** [2] - 91:4, 115:13

## V

**vacated** [2] - 8:19, 47:3
**vacater** [1] - 133:5
**vague** [1] - 31:20
**valid** [1] - 61:7
**valuable** [2] - 13:2, 101:17
**value** [2] - 70:24, 134:21
**vanishingly** [1] - 69:19
**various** [3] - 6:6, 25:2, 84:1
**verification** [1] - 129:18
**verify** [1] - 129:14
**version** [2] - 89:17, 130:4
**versus** [8] - 9:22, 10:25, 11:1, 33:5, 33:17, 70:20, 111:16
**veto** [1] - 117:7
**view** [13] - 9:16, 9:19, 9:25, 20:10, 22:6, 22:19, 24:24, 28:4, 34:15, 35:1, 66:18, 67:4, 69:16
**views** [1] - 99:6
**violate** [7] - 55:25, 56:2, 56:11, 56:16, 56:18, 56:19, 56:21

**violated** [7] - 9:6, 18:21, 21:21, 26:9, 26:21, 55:11, 100:18
**violates** [2] - 21:12, 97:17
**violating** [1] - 15:23
**violation** [10] - 15:7, 19:1, 19:11, 21:13, 24:5, 35:18, 57:25, 62:20, 82:15, 82:22
**violations** [14] - 26:23, 26:25, 27:22, 28:1, 29:7, 29:13, 34:4, 35:15, 57:22, 61:18, 62:13, 63:12, 63:17, 64:20
**vires** [2] - 63:4
**void** [1] - 69:14
**voluminous** [2] - 114:22, 114:23
**voluntary** [1] - 111:7
**vs** [1] - 1:5

## W

**wait** [1] - 84:2
**walk** [1] - 55:23
**wants** [3] - 106:23, 113:23, 115:19
**Washington** [5] - 1:6, 1:22, 2:4, 2:22, 136:11
**waste** [1] - 119:12
**watch** [2] - 71:17, 71:18
**Water** [28] - 5:1, 5:17, 8:11, 21:15, 26:9, 35:6, 35:12, 35:19, 36:2, 36:8, 39:3, 45:16, 47:5, 48:25, 49:10, 50:2, 61:11, 61:22, 64:15, 70:1, 70:24, 109:1, 112:18, 117:13, 120:4, 121:12, 121:15, 130:4
**water** [62] - 6:16, 7:6, 7:11, 7:18, 8:1, 23:12, 33:9, 33:11, 33:13, 33:14, 34:3, 42:17, 42:21, 46:23, 54:4, 54:19, 55:6, 55:25, 56:2, 56:11, 56:17, 57:25, 58:2, 58:3, 58:9, 74:2, 74:6, 74:7, 75:21, 75:23, 75:24, 77:5, 78:2, 78:3, 78:5, 79:9, 79:18, 79:23, 83:7, 83:18, 83:19,

84:18, 85:19, 87:18, 96:25, 97:1, 97:4, 102:13, 108:15, 109:21, 113:8, 114:15, 120:25, 121:20, 122:12, 122:13, 122:25, 123:3, 123:15, 131:7, 131:15
**water-type** [1] - 131:7
**Waterkeeper** [3] - 124:4, 124:18, 133:3
**waters** [166] - 8:15, 24:14, 26:15, 26:18, 34:7, 37:13, 37:14, 37:18, 37:19, 37:20, 37:21, 37:23, 38:1, 38:3, 38:7, 38:15, 38:19, 38:20, 38:21, 38:23, 39:1, 39:2, 39:3, 39:6, 39:7, 39:8, 39:14, 39:15, 39:16, 40:1, 40:5, 40:13, 40:14, 40:15, 40:17, 40:21, 40:24, 41:2, 41:6, 41:17, 41:18, 41:19, 41:24, 42:2, 42:7, 42:9, 42:10, 42:18, 42:19, 42:25, 43:3, 43:4, 43:8, 43:12, 43:14, 44:1, 44:4, 44:5, 44:22, 44:24, 45:1, 45:5, 45:10, 45:12, 46:14, 46:15, 46:20, 47:1, 47:3, 47:7, 47:9, 47:12, 48:10, 55:10, 72:10, 72:13, 72:14, 72:16, 72:17, 72:21, 72:24, 72:25, 73:3, 73:4, 73:5, 73:6, 73:13, 73:25, 74:12, 74:14, 74:19, 74:20, 75:13, 75:19, 76:6, 76:23, 77:8, 77:9, 77:22, 78:5, 78:6, 78:7, 78:8, 78:10, 78:11, 78:12, 78:14, 78:18, 78:23, 79:4, 79:15, 79:16, 80:6, 80:7, 80:8, 80:9, 80:16, 80:17, 80:21, 80:24, 80:25, 81:3, 81:5, 81:10, 81:16, 81:22, 81:23, 82:14, 82:17, 82:23, 83:4, 83:12, 83:13, 83:16, 83:24, 84:3, 84:11, 84:12, 84:20, 85:5, 85:6, 85:15, 85:17, 85:18, 87:11,

88:1, 114:16, 122:22, 122:24, 123:2, 129:20, 129:21, 129:23, 130:1
**waterway** [4] - 11:24, 74:25, 77:1
**waterways** [6] - 11:17, 39:10, 40:8, 46:4, 46:13, 47:4
**ways** [4] - 9:6, 26:10, 45:11, 101:16
**website** [5] - 16:12, 78:23, 85:23, 98:4, 107:20
**week** [1] - 50:15
**weigh** [4] - 99:5, 100:18, 103:25, 111:16
**weighing** [1] - 111:24
**welcome** [2] - 4:14, 59:20
**West** [1] - 8:22
**wetlands** [4] - 5:20, 8:20, 37:18, 39:16
**whatsoever** [1] - 61:25
**WHEELER** [1] - 1:6
**whereas** [1] - 31:24
**whereby** [1] - 80:15
**whichever** [1] - 110:20
**whole** [7] - 31:13, 35:24, 81:10, 92:9, 95:4, 101:11, 122:5
**wild** [1] - 9:1
**wildlife** [2] - 19:5, 116:2
**Wildlife** [130] - 2:12, 3:19, 9:3, 9:7, 9:19, 10:17, 11:20, 13:10, 13:16, 13:18, 14:7, 14:14, 16:20, 17:3, 17:16, 18:2, 18:9, 18:24, 19:5, 20:22, 21:18, 22:18, 23:4, 23:17, 23:21, 24:3, 24:8, 44:14, 51:18, 51:23, 52:7, 52:8, 52:16, 52:18, 52:20, 53:4, 54:24, 87:23, 87:25, 88:2, 88:8, 88:16, 88:24, 88:25, 89:4, 89:5, 89:6, 89:24, 90:1, 91:3, 91:4, 91:10, 91:15, 91:16, 91:19, 91:20, 91:22, 91:24, 92:1, 92:17, 92:18, 93:16, 93:25, 94:14, 94:17, 95:11, 95:17, 96:1,

96:6, 96:14, 97:5, 97:8, 97:15, 97:19, 98:1, 98:4, 98:11, 98:23, 99:2, 99:8, 99:23, 100:3, 100:4, 100:15, 100:17, 100:24, 100:25, 101:19, 101:22, 101:24, 101:25, 102:6, 102:17, 103:3, 103:8, 103:16, 103:24, 104:9, 104:18, 104:21, 104:22, 106:13, 106:24, 107:2, 107:16, 107:20, 110:6, 110:19, 110:21, 111:15, 111:22, 112:23, 115:6, 115:13, 115:19, 116:1, 116:20, 116:22, 117:5, 117:11, 117:20, 118:12, 118:15, 127:25, 130:14, 130:17, 130:18, 131:9, 131:17
**willing** [2] - 74:23, 95:23
**winning** [1] - 70:12
**withheld** [1] - 46:10
**WOLFE** [1] - 2:13
**wolfe** [2] - 127:7, 127:12
**Wolfe** [2] - 4:12, 42:15
**wonder** [1] - 63:23
**wondering** [7] - 40:10, 44:15, 97:16, 101:2, 101:21, 101:25, 106:22
**wood** [1] - 132:21
**Wood** [1] - 4:10
**WOOD** [28] - 2:2, 4:10, 114:4, 114:10, 114:13, 116:8, 116:11, 116:17, 116:20, 117:18, 117:23, 118:2, 118:11, 118:21, 118:24, 120:4, 121:11, 121:24, 122:21, 124:23, 126:4, 126:13, 127:6, 128:8, 128:13, 128:19
**wood's** [1] - 130:20
**word** [5] - 28:15, 64:22, 66:2, 66:10,

104:3
**words** [5] - 9:24, 32:14, 53:6, 134:6, 135:6
**workable** [1] - 123:13
**Works** [2] - 82:2, 82:10
**works** [5] - 19:15, 71:6, 93:6, 98:1, 115:16
**world** [3] - 56:18, 69:17, 120:1
**worried** [1] - 71:25
**worry** [3] - 71:23, 111:12, 126:16
**worse** [1] - 133:6
**wrap** [1] - 128:23
**wrestle** [2] - 134:2, 134:4
**wrestling** [1] - 78:1
**writ** [1] - 57:10
**write** [1] - 135:5
**writer's** [1] - 127:19
**writing** [3] - 54:25, 55:2, 60:24
**written** [1] - 105:11
**wrongfully** [1] - 46:10
**wrongly** [2] - 7:6, 23:9

## Y

**year** [1] - 30:23
**years** [9] - 5:23, 11:23, 22:22, 27:10, 30:23, 61:13, 66:17, 108:24, 116:13
**you-all** [1] - 5:8
**young** [1] - 127:22
**yourself** [1] - 45:15

## Z

**zero** [1] - 15:5
**Zilioli** [1] - 4:4
**ZILIOLI** [1] - 2:14
**zones** [2] - 13:3, 13:4
**Zoom** [1] - 135:15

# EXHIBIT P

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CENTER FOR BIOLOGICAL
DIVISION, ET AL, et al.

        Appellees,

   v.

MICHAEL S. REGAN, in his official
capacity as Administrator for the U.S.
Environmental Protection Agency, et al.,

        Defendants,

STATE OF FLORIDA and FLORIDA
DEPARTMENT OF ENVIRONMENTAL
PROTECTION,

        Appellants

**CASE NO. 24-5101**

**DECLARATION OF JUSTIN WOLFE, GENERAL COUNSEL FOR THE**
**FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

     1.     My name is Justin Wolfe.  I declare under penalty of perjury under the

laws of the United States of America and the State of Florida that the following

statements are true and correct to the best of my knowledge and belief.

     2.     I serve as General Counsel to the Florida Department of Environmental

Protection ("FDEP").  FDEP is the state agency in Florida authorized by law to

"control and prohibit pollution of air and water…." Fla. Stat. § 403.061. Pursuant to

Section 20.255(c), Florida Statutes, as General Counsel, I am responsible for all legal

matters of FDEP. I have held this position for approximately five years. Before

serving as the General Counsel for FDEP, I served as the Deputy General Counsel for the Water, Air, and State Lands Section of FDEP's Office of General Counsel.

3.    I am authorized by the Office of the Governor of the State of Florida, the Office of Attorney General of the State of Florida, and the Secretary of the FDEP to provide this declaration to this Court.

4.    I am providing this declaration to provide sworn facts to this Court in support of the State of Florida's Petition for Stay Pending Appeal (Petition). I have read the Petition and I affirm the facts as stated therein. I signed and submitted six sworn declarations in the District Court proceedings in this case (Dkt. 4-2, Dkt. 102-1, Dkt. 107-1, Dkt. 149-1, Dkt. 160-1, Dkt. 166-1), all of which I hereby re-affirm and incorporate by reference, subject to any additional information of clarifications provided herein.

5.    As set forth herein, vacatur of federal approval of Florida's Clean Water Act (CWA) Section 404 program, along with vacatur of the Programmatic Biological Opinion with Incidental Take Statement (BiOp/ITS) accompanying approval of the program, has severely injured the sovereignty interests of the State of Florida, imposed enormously disruptive consequences on environmental permitting across Florida, deprived the State of the benefit of years of preparation and implementation efforts for this permit program, put over 300 state employees in a "pencils down" posture for purposes of Section 404 permitting, and raised a

number of complex problems for the State of Florida and thousands of Floridians to try to address.

6. The district court vacated the BiOp/ITS on Endangered Species Act (ESA) grounds and took the additional step of vacating EPA's approval of the entire program in Florida, even though every Florida 404 permit is made available for review by the U.S. Environmental Protection Agency (EPA), U.S. Fish and Wildlife Service (FWS or USFWS), and National  Marine Fisheries Service (NMFS), and Florida integrates any species-protection measures proposed by federal agencies into state 404 permits.

**Injury to Florida's Sovereign Interests Over Water Resources, Land Use, and Wildlife**

7. Management of land use, water resources, and wildlife are areas of traditional state responsibility.

8. The Florida Constitution establishes the "policy of the state to conserve and protect its natural resources and scenic beauty," with "[a]dequate provision" for the "conservation and protection of natural resources." Fla. Const. Art. II, Sec. 7(a). The "public policy of [Florida] [is] to conserve the waters of the state," Fla. Stat. § 403.021(2), and "to provide for the management of water and related land resources," *id*. § 373.016(3)(a).

9. On this basis, Florida takes a comprehensive approach to protecting wetlands and other water resources. Those efforts have accelerated in recent years,

with Florida dedicating an unprecedented amount of state funding to the restoration and protection of the Florida Everglades (over $3.3 billion since 2019), increasing investment in state environmental permitting programs, and completing efforts to obtain federal approval to administer the Section 404 permit program, among other things.

10.    For water resource management purposes, Florida has divided the State into five "Water Management Districts," or "WMDs," each with technical staff trained to supplement the work of FDEP in conserving water resources.

11.    Even before obtaining authority to administer the Section 404 program in assumable waters in Florida, the State of Florida and FDEP had already spent many years (in some cases decades) administering most other major federal environmental programs capable of state delegation/assumption, including the CWA Section 402 NPDES Permit Program (pollutant water discharge permits); Clean Air Act permit programs (air emissions permits); RCRA Subtitle C Program (hazardous waste disposal permits); Coastal Zone Management Act Program (coastal development permits); Safe Drinking Water Act Program (regulation of public water systems in Florida); and the Underground Injection Control Program (regulation of injections to underground areas).

12.    On top of these federally-approved programs, FDEP has administered various other non-federal, state-only environmental programs. For decades, FDEP

4

has administered the State Environmental Resource Permit (ERP) Program, which is broader in scope than the federal Section 404 program because, among other things, ERP regulates dredging or filling of **all waters in the State**, not merely the narrower category of "waters of the United States" regulated under CWA Section 404. The ERP program has successfully provided protection to water resources (including wetlands) in Florida that goes far beyond the jurisdictional limits of the CWA program.

13.    The Florida Fish and Wildlife Conservation Commission (FWC) also protects Florida's wildlife, including state-listed endangered and threatened species that are not listed under the ESA. FWC has developed the Imperiled Species Management Plan to address the needs of state listed species. Following the approval of Florida's state 404 program, FWC has been able to ensure that state-listed species receive adequate protections during 404 permitting through close coordination with the U.S. Fish and Wildlife Service (USFWS). *See* Attachment A (Florida FWC letter).

14.    Florida law currently authorizes FDEP to obtain approval of the 404 program and to administer the 404 program. In March 2018, the Governor of Florida signed into law a new statute authorizing FDEP to establish a Section 404 Program. *See* Chapter 2018-88, Laws of Florida (codified at Fla. Stat. § 373.4146). This state law, which expanded upon previous state laws allowing for the pursuit of

5

assumption, sought to "enable the [FDEP] to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program.…" Fla. Stat. § 373.4146(2). Congress invited all states to undertake implementation of the Section 404 program, and Florida has accepted that invitation in compliance with applicable law.

15.    FDEP completely stood up its comprehensive regulatory 404 program over the course of three years. FDEP had trained **over 300 certified wetlands evaluators and other staff**, and received **over 9,300 permit applications** for individual permits, coverage under general or regional permits, and "no permit required" determinations. This includes over 400 individual permit applications for projects in assumable waters that were transferred by the Corps to FDEP in the early weeks of the program. Of the applications received by FDEP, over 3,600 were eventually withdrawn by permit applicants, often based on requests by FDEP for more information or other concerns. To date, FDEP has issued **over 700 individual 404 permits** (including modifications) and **denied over 300 applications** (including individual, regional/general, and NPR requests).

16.    The vacatur order severely impedes the State of Florida's ability to perform its role under the cooperative federalism structure of the CWA and to protect its sovereign interests in the management and conservation of water resources, land use, and wildlife. Instead of having a primary role in leading the processing of permit

6

decisions, with federal oversight, Florida is now relegated to a much lesser role of merely commenting on the issuance of Corps' 404 permits with only the opportunity to exercise rights under Section 401 of the Clean Water Act concerning certification that permits are consistent with state water quality standards.

17.    FDEP officials are under a legal duty to process permits in accordance with law, and a vacatur order from a federal court prohibiting FDEP from processing state 404 permits makes it impossible for FDEP to perform those legal duties.

**Impacts to Florida's Ability to Ensure Compliance and Enforce Violations**

18.    The District Court's vacatur order severely impedes the State of Florida's ability to continue to promote compliance with environmental standards and to enforce against violations of the state 404 program. At the time of the vacatur order, the State of Florida was investigating over 100 potential violations of the 404 program. The vacatur order calls into question whether Florida has legal authority to take actions to ensure compliance and/or pursue enforcement actions for 404 violations in Florida. Given the limited resources and staff of the federal agencies in Florida, it is likely that many, if not most, of those potential violations would go unenforced as a result of the vacatur order. Based on information and belief, it is my understanding that, in comparison to FDEP's program staffing, the Corps has significantly fewer full-time equivalent employees currently working on Section 404 compliance and enforcement investigations for projects in Florida.

7

**Permitting Delays and Waste of State Resources**

19.     Over the course of the more than two months since the District Court's vacatur order, the State of Florida has repeatedly urged the District Court to stay that order, whether in whole or in part, with no relief granted so far.

20.     In the two-year period immediately preceding the February 15 vacatur order (i.e., permits issued from February 1, 2022 through January 31, 2024), FDEP issued 634 individual final permits or individual permit modifications under the 404 program. This averages to approximately 26 individual permits or permit modifications issued each month by FDEP and does not include the numerous general permits or other 404 permitting actions taken by FDEP. While FDEP cannot pre-judge whether any particular permit would have been issued prior to completion of the permit process, it is reasonable to assume that, but for vacatur of the program, FDEP would have issued more than 50 individual permits and permit modifications during the time period since vacatur. These likely would have included permits for many high-priority projects in Florida, with total economic value easily exceeding hundreds of millions (and likely billions) of dollars.

21.     At the time of the issuance of the vacatur order, **over 1,000 permit applications were pending in the FDEP 404 process** (as shown on Attachment B). The total economic value of the list of pending projects **easily exceeds $1 billion**, and likely much more. Hundreds of those projects had undergone extensive state 404

8

review procedures. FDEP's 404 permit records, which are available online in their entirety in real-time, show that for most individual permit applications, thousands of pages of analysis would have already been developed for these permits, along with public notices, public meetings, and negotiations of terms and conditions to mitigate potential environmental impacts, among other things. This level of effort has been undertaken for hundreds, if not thousands, of projects across Florida.

22.    Following the vacatur order, FDEP staff are now "pencils down" on all such pending Florida 404 permit applications and those 404 permit applicants must, absent a stay of the vacatur order or other relief from the courts, *restart* the 404 permit process. Essentially, those applicants are back to "square one" in the Corps' permit process: a new application must be filed with the Corps; Corps permit officials must make an independent assessment that the permit application is "complete;" a new public notice must be issued; and all of the other steps of the Corps 404 permit process must be followed. As a result, the State of Florida has lost the benefit of the time and resources expended on the processing of more than a thousand 404 permits.

23.    I am aware that representatives of the Corps of Engineers have given some general and vague assurances (without any sworn declarations) that the Corps' Jacksonville District is seeking to reduce burdens on Florida 404 permit applicants following the vacatur order. Almost a decade ago, the United States Supreme Court

observed the very high cost and burdens associated with the federal CWA Section 404 process, explaining that the federal 404 "permitting process can be arduous, expensive, and long" and citing "one study [that] found that the average applicant" for individual 404 permits "spends 788 days and $271,596 in completing the process,' without 'counting costs of mitigation or design changes.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1811-12 (2016) (internal citations omitted).

24.     Based on information and belief, the Corps has stated publicly that the Corps is moving over a "couple dozen" employees to assist with a potential increase in Florida 404 permit applications following the vacatur order. A Corps representative also stated vaguely that the Corps has "identified other people" in the Corps to help with a "surge" of applications.

25.     However, those statements by the Corps do not address (A) the already existing backlog of Corps 404 permit applications nationwide and in Florida; (B) the fact that the Corps would still have far fewer employees focused on Florida 404 permits for assumable waters in Florida than FDEP already has trained and in place for this work; or (C) the impact of those efforts by the Corps on other Corps missions in Florida, including processing of Corps 404 permits in non-assumable (retained) waters. It is not so simple as the Corps "picking up where Florida left off." Vague assurances in that regard do not account for the time and effort required to gather,

transfer, and review the extensive documentation already developed for each of the more than 1,000 pending Florida 404 permit files.

26.    I was surprised to hear that a Corps representative informed the district court that "Florida has not transferred permits to the Corps yet." All Florida 404 permit files are immediately accessible and available to the public, including the Corps of Engineers. Those files can be downloaded directly from the FDEP permit information portal. Yet, on April 24, 2024, the Chief of the Corps' Jacksonville District asked FDEP to "assemble the [Florida 404 permit] files into an electronic folder structure and transmit the files by external hard drive (or if less than 8GB, by the web-based file transfer program DoD SAFE (https://safe.apps.mil/)." FDEP estimates that the pending permit files in the Florida 404 database is likely in the range of 100 GB of data.

27.    Meanwhile, the Corps' Jacksonville District website for 404 permitting in Florida continues to "recognize[] that either the District Court or an Appellate Court may issue a full or partial stay of the February 15th order at some point. In the interim, **applicants may submit applications to the USACE** for activities involving the discharge of dredged or fill material into formerly state-assumed waters. The **USACE will begin processing any applications it receives**, however

applicants and stakeholders should **recognize the uncertainty surrounding the current litigation**."[1]

28.     Many of these permit applications involve projects undertaken by the State of Florida, such as various highway projects undertaken by the Florida Department of Transportation, while many others are projects undertaken by citizens in Florida that would have significant benefits to the people of Florida, such as construction of senior living communities, hospital facilities, school facilities, and affordable housing projects, to name a few.

29.     With more than 1,000 permit applications required to start anew with the 404 permit process by filing applications with the Corps, the vacatur order means that the State of Florida and its citizens would be losing, collectively, the benefit of *hundreds of thousands* (if not, millions) of hours of FDEP staff permit processing work, including significant time spent on federal review procedures for species protection purposes. Indeed, FWC has logged and reviewed ***approximately 2,900*** State 404 permitting projects in coordination with USFWS staff for potential impacts to state or federally listed species.

**Fiscal Impacts to the State of Florida**

30.     The vacatur order also imposes severe fiscal impacts on the State of Florida. To even be in a position to apply for Section 404 assumption, the State of

---

[1] https://www.saj.usace.army.mil/Missions/Regulatory/

Florida invested millions of dollars into the process of obtaining state legislative approval, drafting and adopting new state regulations, and assembling a voluminous 404 program application that was submitted to EPA in August 2020. In particular, on August 20, 2020, Florida filed a complete application with EPA to administer a Section 404 Program. Florida's application contained all of the required elements of a State 404 program as set forth in 40 C.F.R. § 233.10. This included (among other things): (a) a letter from Florida's Governor requesting program approval; (b) a complete program description as set forth in 40 C.F.R. § 233.11; (c) a State legal opinion as set forth in 40 C.F.R. § 233.12; (d) a MOA with the EPA Regional Administrator as set forth in 40 C.F.R. § 233.13; (e) a MOA with the Corps of Engineers as set forth in 40 C.F.R. § 233.14; and (f) copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures. Florida's application was available for public review via FDEP's website, EPA's website, and the Federal government's regulatory docket website. The application documents comprehensively described and delineated Florida's 404 program. To help the public "understand the rules, procedures, standards, and criteria that apply to the State 404 Program," FDEP developed the "State 404 Program Applicant's Handbook," which was adopted as a regulation in Florida.

31.     After approval of Florida's program in December 2020, the State of Florida expended millions of dollars more on standing-up the Section 404 program.

This included **_training over 300 employees_**, including certified wetlands evaluators (CWEs), compliance and enforcement personnel, and other staff necessary for the implementation of a comprehensive 404 program. FDEP also entered an agreement with the state Water Management Districts to provide additional staffing support for the 404 program. The vacatur order deprives the State of Florida of the benefits of those significant investments.

32.     Absent a stay, FDEP would also likely incur significant additional costs associated with facilitating return of the program to the Corps of Engineers. The time and expense associated with that process would be substantial – for both FDEP and the Corps of Engineers. Permit delays associated with that process would likely extend six months or more, especially in light of the delays associated with the initial ramp-up of the FDEP program when the Corps transferred hundreds of applications to Florida. It is a matter of public record that the Corps of Engineers' permitting staff already has a backlog of permit applications, and while the Corps may be able to begin processing some small number of Florida 404 permits, it is unrealistic to believe that the Corps would be able to make it through its current backlog of permit applications while also expeditiously issuing permits for those applications that were already pending for months or longer at FDEP.

**Loss of Permitting Efficiencies**

33.    A key advantage for Florida in assuming the Section 404 program was the regulatory efficiencies to be gained from coordinating the issuance of ERP and 404 permits. In fact, Florida and its citizens experienced significant permit delays and other challenges with the Corps of Engineers' administration of the CWA Section 404 program within the State, which was one of the reasons supporting Florida's efforts to obtain program approval. Florida believed that, consistent with the cooperative federalism framework of the CWA, FDEP and its staff would be better suited to administer the Section 404 program, particularly in light of FDEP's longstanding implementation of the ERP program, localized knowledge and experience, a larger number of FDEP offices and staff spread throughout the State, and the availability of Florida's five Water Management Districts. As noted above, it is my understanding that Florida currently has significantly more staff dedicated to administering its Section 404 program than the Corps has historically employed to administer its 404 program in Florida.  Florida also hoped to benefit from the improved economic climate that comes from more efficient permit programs for development that also protects the environment. The vacatur order eliminates those significant efficiencies that had been realized via coordination of state 404 with state ERP.

**Impacts to High-Value Projects**

34.     Among the more than 1,000 permit applications that were pending in Florida at the time of the vacatur order, many involved projects with significant public benefits. For illustrative purposes, I would highlight various permit applications that were pending as of February 15, 2024 and are currently in regulatory limbo.

35.     Several projects with pending 404 applications involve Everglades restoration work, which is a high priority for the State of Florida. For example, the C-139 Flow Equalization Basin is a priority Everglades project to control the flow of water and improve water quality before it flows south to Everglades National Park. Similarly, the EAA A-2 Reservoir Project is a critical component of Greater Everglades Restoration due to its role in reducing harmful discharges and sending more fresh, clean water south.

36.     Over 140 transportation projects, which were the subject of pending 404 applications, are also directly impacted by the vacatur order. This includes over a dozen projects proposed by the Florida Department of Transportation (FDOT). For example, FDEP was in the process of finalizing permits for several highway expansion projects, bridge repair and replacement projects, culvert construction projects to address stormwater near roadways, and various other projects. FDEP was

16

also reviewing 404 permit applications for projects to expand airport runways as well as to replace a railroad bridge.

37.     As of February 15, 2024, FDOT had at least 26 applications for Section 404 permits pending at FDEP. The total cost of those FDOT projects easily exceeds $1 billion (and likely billions more). FDOT depends upon the timely issuance of 404 permits to maintain project funding and deliver projects on schedule, all while meeting applicable environmental requirements. If FDOT is required to re-file the remainder of these applications with the Corps, FDOT will incur significant new expenses that have not been budgeted and projects will undoubtedly experience delays. Projects with applications on the path of issuance will have to be restarted, requiring duplication of staff and consultant hours.  New applications and forms will need to be prepared and submitted to the Corps for each project, triggering new review and re-noticing of FDOT projects, essentially putting these projects back to the start of the Section 404 process and potentially delaying the delivery of these important transportation infrastructure projects.

38.     Among the pending Florida 404 permits, there are nearly 200 public projects proposed by state and local governments and agencies, the majority of which are intended to build or improve sidewalks, bridges, utilities, roads, and highways across the state (e.g., over 20 pending applications involving projects

proposed by the state transportation department including a project to construct a wildlife crossing over U.S. Highway 27.

39.     Several pending applications involve expansion of sanitary sewer systems including placement of underground sewer utilities. Other applications involve construction of seawalls to protect property and construction of stormwater retention ponds.  A noteworthy example involves stormwater infrastructure repairs and improvements at U.S. Naval Air Station-Pensacola due to damage from Hurricane Sally.

40.     Three proposed projects to build new medical facilities in different parts of the state, including a new emergency department in South Florida, a new 144 bed behavioral health hospital in Orange County, and an additional campus for the Mayo Clinic in Jacksonville are now in regulatory limbo.

41.     Six projects to construct new schools or improve existing school facilities, including construction of a new charter school and construction of a secondary access road to address traffic, bus schedules and safety for an existing school are also in limbo.

42.     Also impacted by the vacatur order are hundreds of housing projects, including many dozen multi-family or large single family developments (e.g., 128 unit senior living facility), to provide residences for thousands of people in Florida's

fastest growing areas. Across Florida, Section 404 permit applications filed with FDEP by individual homeowners seeking to develop their property are now on hold.

**Impacts to Energy Grid Reliability**

43.     The vacatur order is also delaying progress on critical energy infrastructure projects necessary for grid reliability and meeting the growing need for electricity in Florida. FDEP was in the middle of processing (and likely soon to be issuing) permits for projects in this category.

44.     The Environmental Committee of the Florida Electric Power Coordinating Group ("FCG-EC"), which represents investor-owned electric utilities, rural electric cooperatives, and municipal electric utilities on environmental issues affecting the electric utility industry in Florida, recently informed FDEP that the vacatur order has "created a degree of regulatory uncertainty that is making the impact to [their] members acute," and is "risking the state's electrical infrastructure." *See* Attachment C (FCG-EC Letter). At the time of the vacatur order, members of FCG-EC had twelve permit applications pending with the State 404 Program. Five of those applications were "more than halfway complete with permit processing." The pending applications include "projects to install new electrical lines (including connections to new solar power sites), rebuild and expand existing transmission lines, replace electric substations, and improve a transmission line right-of-way to

allow for stating during disaster response." The group anticipated submitting many additional permit applications as well.

45.     According to FCG-EC, these "permit applications are required for [their] members' construction of power distribution systems to new users or the maintenance of existing systems," as is essential for meeting growing energy needs in Florida. Rapid population growth in Florida "requires nearly continuous expansion of electrical infrastructure to meet the needs of new residents." Ongoing permit delays caused by the vacatur order are also impacting their ability to develop renewable energy projects.

**Impacts on State Contracts**

46.     The State of Florida has also entered various agreements with federal and state agencies as part of the 404 program, such as the Memorandum of Agreement between FDEP, USFWS, and FWC regarding coordination to protect threatened and endangered species (among several other such agreements). The vacatur order effectively nullifies those agreements.

**Loss of Key Environmental Benefits, including Benefits to Listed Species**

47.     The vacatur order leads to worse environmental outcomes, including delaying or depriving the state and the public of the environmental protection benefits obtained through the State 404 program that exceed those of the federal program; diverting and wasting of limited federal and state resources for

environmental protection that have been utilized in a more efficient manner through the Florida 404 program; and undermining regulatory clarity and consistency, potentially leading to fewer activities that seek permits for projects.

48.     FDEP provides early Endangered Species Act (ESA) coordination engagement for all State 404 Program general and individual permit applications. The FDEP process is specifically designed to ensure that the state and federal agencies review the same species-related information using the same legal standards as in the Corps-led 404 program, and FDEP is committed to adopting any species-related measures provided by FWS.

49.     The USFWS has a long working history with the FWC (and its predecessor agencies) regarding the recovery and conservation of federal species. The USFWS first entered into an ESA section 6 cooperative agreement with the State in 1976. The FWC's willingness to facilitate and assist the USFWS with the review of federally listed species is fundamental to the State 404 Program's success.

50.     The Memorandum of Understanding between FDEP, Florida Fish & Wildlife Conservation Commission (FWC), and the U.S. Fish & Wildlife Service (USFWS) describes the roles, responsibilities, and commitments of each agency in implementing the State 404 Program.

51.     FDEP is committed to ensuring protection of species as part of its Section 404 program. Florida's Section 404 Program regulations expressly provide:

21

"No permit shall be issued … [w]hen the project is inconsistent with the requirements of this chapter and the [Florida] 404 Handbook, including when the project … [j]eopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat for endangered or threatened species. Compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service (NMFS) for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency as described in Fla. Admin. Code 62-331.052(2) **shall be determinative** for purposes of evaluating violations of this subparagraph..." Fla. Admin. Code R. 62-331.053(3)(a)(4).

52.    Florida's 404 program ensures that endangered and threatened federally listed species and their critical habitats are protected as an integral part of the program. Both USFWS and FWC review a proposed project's effect on listed species and provide recommended requirements, if needed, before a permit is issued. Importantly, **FDEP provides a copy of all individual 404 permit applications to the USFWS and FWC for review**. (Actually, all FDEP 404 permit applications and related agency records and files are also instantly available to these agencies and the

entire general public via FDEP's online records system.) The outcomes of the effect determinations and any wildlife agency recommended requirements are incorporated into the State 404 Program permit file and included in the public notice.

53.    The species review process under the Florida-led program was comprehensively described in the program application including (among other places) in the MOU entered between USFWS, FWC, and FDEP; and in the Florida 404 Applicant's Handbook. Ultimately, this process was integrated with the Technical Assistance Process established in the Programmatic BiOp and its ITS. USFWS, FWC, and FDEP *must and do* participate in the species review process as part of the Florida 404 program. Importantly, for Florida 404 permits, conclusions by USFWS and NMFS regarding potential impacts to federally-listed species (and necessary measures to address those impacts) are "determinative." BiOp at 31, 40; MOU at 10. And incidental take, if any, is not authorized if a permittee fails to comply with *all* of those measures. BiOp at 70.

54.    These procedures ensure that endangered and threatened federally listed species and their critical habitats are protected as an integral part of the State 404 Program that go above and beyond the procedures required by the only other two states with approved state 404 permit programs (Michigan and New Jersey). To be clear, compliance is "required" for "any requirements" set by FWC, USFWS, and NMFS during the technical assistance process "for permits reviewed under the State

404 Program." Florida 404 Handbook at 1.3.3 ("**Compliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, [FWC, FWS, and NMFS] for permits reviewed under the State 404 Program**.").

55.     Similar to the lawful consultation process employed under the federal ESA Consultation Handbook, the species coordination efforts under the Florida-led 404 program result in the following categories of projects in regard to species impacts: (1) projects with "no effect" on listed species; (2) projects that "may affect" but are "not likely to adversely affect" listed species; and (3) projects that "may affect" and are "likely to adversely affect" listed species. This third category indicates anticipated incidental take and requires additional review by USFWS.

56.     In accordance with the requirements for the Technical Assistance Process as set forth in the Programmatic Biological Opinion, FWS must use the **best available data** when making species-related determinations. The Programmatic Biological Opinion defines "best available data" as "data to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under

Section 7(a)(2) of the ESA, the USFWS is required to use the best available science."
BiOp at iv.

57.     In accordance with these processes, both USFWS and FWC review a proposed project's anticipated effects on listed species before a permit is issued. The USFWS and FWC effect determinations and recommended requirements are incorporated into the State 404 Program permit file and included in the public notice, and modifications or conditions are incorporated into the permit. If a project's effect is "likely to adversely affect" a particular species, then incidental take is anticipated, and further analysis is required to determine if the amount of take will result in jeopardizing the continuation of the species (jeopardy or no jeopardy). If adequate protection measures are available, USFWS's final conclusion would be "may affect, not likely to adversely affect," or "not expected to jeopardize the continued existence of the species." If USFWS's final conclusion is that the activities allowed by a potential permit will "jeopardize the continued existence of a species," and no protection measures are available to address the adverse impacts, the permit would not be issued pursuant to the ESA and Fla. Admin. Code R. 62-33.053(3)(a) 4, 62-331.201(3)(k), and 62-331.248(3)(j).

58.     During the pendency of the Florida-led 404 program, FWC has been able to ensure that state-listed species receive adequate protections through close coordination with USFWS. During FWC's review of **over 2,900 state 404**

**permitting projects** with potential species impacts, FWC has had a meaningful seat at the table to propose permit conditions that offer greater protections to state and federally listed species. Unless FDEP is able to resume implementation of the Florida 404 program, FWC staff will not be able to readily offer technical input and expertise, propose conditions to be incorporated into 404 permits, or ensure that state-listed species receive adequate protections (reducing the potential for such species becoming federally listed). *See* Attachment A (FWC letter).

59.     Importantly, separate and apart from vacatur of the program approval, Florida is incurring significant and irreparable harm by virtue of vacatur of the BiOp/ITS, in at least three respects.

60.     First, the BiOp/ITS provided an effective process for coordinating species reviews among federal and state agencies and enhancing species protections in a manner that goes far above and beyond the basic procedures and protections employed under CWA Section 404 and its implementing regulations found at 40 C.F.R. Part 233. That process is now vacated.

61.     As is the case in New Jersey and Michigan, the Florida 404 program provides for federal agency review of Florida 404 permits that may affect listed species as part of the Section 404 regulatory framework under EPA regulations found at 40 C.F.R. Part 233. Under those procedures, EPA may "federalize" (i.e., remove a state 404 permit from state authority and transfer it to the Corps of

Engineers for processing), *but only if* a state has otherwise failed to address a federal agency objection that is necessary to avoid "jeopardy" of a listed species. Importantly, the baseline requirements under Section 404 and Part 233 do not prevent a state from issuing a state 404 permit that may affect, or is even likely to adversely affect, any listed species; the state only must avoid "jeopardy" of a listed species as a matter of compliance with Section 404. The Florida BiOp/ITS provides an additional layer of meaningful species review and species protection that goes above and beyond those efforts required for Section 404 compliance purposes, and the vacatur order eliminates all of those procedures and resulting benefits.

62.     The Florida BiOp/ITS ensures a more robust process for species protection than otherwise required under typical state 404 procedures or even under typical federal 404 procedures administered by the Corps of Engineers. Specifically, under the Florida 404 BiOp/ITS, *all Section 404 individual permits* are reviewed and are subject to conditions imposed by USFWS and FWC (and subject to state administrative and judicial review). The State 404 Program provides an opportunity for enhanced conservation of federally listed species and State-listed species by requiring a coordinated, comprehensive review between FWC and USFWS for species under different jurisdictions but that use the same habitats.  As noted above, FDEP is required to adopt any species-protection measures proposed by USFWS and FWC for Florida 404 permits.

63.      Second, vacatur of the BiOp/ITS eliminated the exemption of incidental take prohibition under section 9 of the ESA for the State of Florida, FDEP, and its employees and personnel involved in the permitting of Section 404 projects.

64.      Third, vacatur of the BiOp/ITS eliminated the exemption of incidental take prohibition under section 9 of the ESA for FDEP's permittees who would otherwise benefit from that protection. Again, Florida 404 permittees would only be exempted from the prohibition of  incidental take under the ITS *if and only if* they fully comply with all terms and conditions imposed by FWC/USFWS and incorporated into the State 404 permit. The vacatur order eliminates that protection for Florida 404 permittees.

65.      If the BiOp/ITS remains vacated while the state 404 program is allowed to remain in effect, it is true that *some* state 404 permittees may decide to apply for an Incidental Take Permit coverage under ESA Section 10, but as a voluntary process, it is unknown which permittees would actually undertake that process. Those engaged in private activities that do not otherwise trigger federal permitting obligations may seek to voluntarily avoid - outside of any permit context - impacts to species. Regrettably, some may, by ignorance of the law or intentionally, forego obtaining Section 10 permits and/or simply assume the risk of potential enforcement. Thus, while all Florida 404 permit applicants are (by virtue of the Florida 404 program with the BiOp/ITS) required to undergo detailed species review procedures

with all USFWS-imposed requirements applying to their activities, it is uncertain what percentage of those applicants would actually seek an ESA Section 10 permit. The voluntary process in Section 10 is not a substitute for the comprehensive approach to species review that is established under the Florida 404 BiOp/ITS.

**Comparability of Federal and State Species Review Procedures**

66.    The Florida-led process ensures *even more protection for species* and *even more public involvement* than the Corps-led process for at least three reasons: (A) FDEP *must* (and, in fact, does) incorporate all FWS measures, terms, and conditions into Florida Section 404 permits (whereas the Corps *may* do so for their permits); (B) FDEP *must* deny a permit if FWS, NMFS, or FWC finds no protection measures are available to reduce the risk of jeopardy to an acceptable level (whereas the Corps *may* decide to issue a permit in such circumstances); and (C) the public has full access to review and comment on *all species-related information* before FDEP makes a final determination on the permit, which allows for FDEP, EPA, and the permit applicant to consider and respond to those concerns including with project and/or permit changes as warranted (whereas there is *no right of public review and comment* on the Biological Opinion/ITS under the Corps-led process).

**Species under Jurisdiction of National Marine Fisheries Service (NMFS)**

67.    Florida has a long history of coordinating with the National Marine Fisheries Service (NMFS) on state permits, and Florida remains committed to

29

ensuring that NMFS has every opportunity for reviewing Florida Section 404 permits. In fact, the Florida 404 Handbook provides for NMFS review of Florida 404 permits in the same manner as FWS. There is also an ESA Section 6 "Cooperative Agreement" between FWC and NMFS for recovery and conservation efforts in species under NMFS jurisdiction.

68.     However, because Florida's 404 program does not apply to virtually all coastal waters (as such waters are retained by the Corps of Engineers for Section 404 permitting purposes), the presence of listed and protected species under NMFS jurisdiction were not expected to be frequent. As such, NMFS generally has not engaged with FDEP for Florida 404 permits regarding protected species (although NMFS has engaged on at least one project regarding Essential Fish Habitat). Based on information and belief, EPA and NMFS discussed re-evaluating the potential need for NMFS protected species review and initiated Section 7 consultation regarding Florida's 404 program, but Florida's current understanding is that this EPA-NMFS consultation recently ceased in light of this Court's vacatur order. It is Florida's expectation that, should the vacatur order be stayed, EPA and NMFS would be able to re-engage with consultation efforts here.

**Environmental Information**

69.     In my experience, the volume of species-related information available to the public for review and comment as part of the Florida 404 permitting process

is *substantially greater* than under the Corps-led program. While virtually no Corps 404 permit records are available in real-time during the permitting process, virtually all FDEP 404 permit records for every project are instantly available to the public in <u>real-time</u> via the FDEP Information Portal website. For example, the public file for any particular 404 individual permit application in Florida often includes many thousands of pages of documentation and analysis, all of which is readily available to any member of the public at any time. This includes the USFWS Technical Assistance Process response documentation, which would contain an opinion of the FWS concerning the biological status of species impacted by the project along with an analysis of the effects of the project on those species, with a set of "Special Conditions" and "Additional Commitments." Other relevant documents in the FDEP Information Portal file also address species impacts issues, such as (among other materials): comments, recommendations, and permit conditions provided by the Florida Fish & Wildlife Conservation Commission; proposed wildlife crossing plans; species management plans; Applicant-prepared Biological Assessments and Species Survey Reports; and Requests for Additional Information and any responses. Florida has made all of its 404 permit records instantly available to the public. Typically, to obtain similar information from the Corps, a member of the public must file a Freedom of Information Act request.

**Opportunities for Environmental Groups to Challenge Florida 404 Permits in State Tribunals**

70.    Where FDEP ultimately decides to move forward with issuance of a Section 404 permit for a particular project, FDEP first issues a "Proposed Permit" that does not become "effective" *unless and until* (A) the permit is received and signed by both the FDEP and the permit applicant (a permit applicant has 60 days to review and sign a proposed permit); *and* (B) a petition for administrative proceeding under Sections 120.569 and 120.57, Fla. Stat., is *not* filed within 21 days of publication of the notice of FDEP's action. Permit recipients "cannot justifiably rely on the finality" of a permit decision unless notice of the decision and the right of substantially affected persons to challenge the decision has been "duly published or otherwise provided to all persons substantially affected by the decision." Fla. Admin. Code Ann. R. 62-110.106(1); *see also* Florida 404 Handbook at 8.3.4. Under Florida law, the administrative hearing process is designed to formulate final agency action, and as a result, FDEP may modify or take a different position than the proposed action.

71.    When a petition for administrative hearing is filed, FDEP has a standard practice of sending a form letter to the permit applicant advising that FDEP has "received a petition for administrative hearing under Sections 120.569 and 120.57, Florida Statutes, challenging the Department's permitting decision." The letter explains that "action on this matter is proposed agency action only, and no permit

has been issued" and, accordingly, "no action may be taken based on the above permit application, until the Department enters a Final Order either issuing or denying the above permit..." FDEP also reminds the applicant that they "must demonstrate prima facie entitlement to the permit issuance in any administrative hearing held under the filing of the petition."

72.    Florida administrative law and judicial review processes do not place environmental groups at any disadvantage relative to the federal system for reviewing permit decisions. Among other things, Florida law provides for a *de novo* administrative hearing process where a permit challenger has the opportunity to continue to develop the record to pursue a challenge and FDEP receives no deference. Florida law also provides ample opportunities for judicial review in state courts.

Executed on the 25th day of April, 2024.

_____

Justin Wolfe
General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd M.S. 35
Tallahassee, FL 32399

# Attachment A



**Florida Fish and Wildlife Conservation Commission**

**Commissioners**
**Rodney Barreto**
Chairman
*Coral Gables*

**Steven Hudson**
Vice Chairman
*Fort Lauderdale*

**Preston Farrior**
*Tampa*

**Gary Lester**
*Oxford*

**Albert Maury**
*Coral Gables*

**Gary Nicklaus**
*Jupiter*

**Sonya Rood**
*St. Augustine*

**Office of the Executive Director**
**Roger A. Young**
Executive Director

**Charles "Rett" Boyd**
Assistant Executive Director

**George Warthen**
Chief Conservation Officer

**Jessica Crawford**
Chief of Staff

850-487-3796
850-921-5786 FAX

*Managing fish and wildlife resources for their long-term well-being and the benefit of people.*

620 South Meridian Street
Tallahassee, Florida
32399-1600
Voice: 850-488-4676

Hearing/speech-impaired:
800-955-8771 (T)
800-955-8770 (V)

MyFWC.com

April 3, 2024

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington D.C. 20460

The Honorable Michael Connor
Assistant Secretary of the Army – Civil Works
U.S. Department of the Army
108 Army Pentagon
Washington, D.C. 20310-0108

The Honorable Shannon Estenoz
Assistant Secretary for Fish and Wildlife and Parks
U.S. Department of the Interior
1849 C Street, NW
Washington D.C. 20240

Re: Florida's Assumption of Section 404 of the Clean Water Act

Dear Mr. Regan, Mr. Connor and Ms. Estenoz:

I am writing to express strong support for Florida's Section 404 permitting program. The Florida Fish and Wildlife Conservation Commission (FWC) is Florida's state wildlife agency established in the State Constitution to exercise the regulatory and executive powers of the state with respect to wild animal life and freshwater aquatic life. FWC administers the Florida Endangered and Threatened Species Act, which establishes Florida's policy to "conserve and wisely manage these resources, with particular attention to those species defined by [FWC], the Department of Environmental Protection, or the United States Department of Interior, or successor agencies, as being endangered or threatened." § 379.2291, Fla. Stat.

FWC partnered with the Florida Department of Environmental Protection (FDEP) and the U.S. Fish and Wildlife Service (USFWS) in August of 2020 by signing a memorandum of understanding (MOU) that was integral to Florida's assumption of the Section 404 permitting program. This MOU institutes a process that enhances coordination between FDEP, FWC and USFWS staff when reviewing State 404 permitting projects for potential adverse impacts to federally and state listed species. For example, the MOU establishes an "Endangered and Threatened Species Technical Team" comprised of FWC, USFWS, and FDEP experts who convene regularly to discuss specific projects and improvements and coordination procedures.

Since the MOU was signed, FWC staff has logged and reviewed approximately 2,900 State 404 permitting projects in coordination with USFWS staff for potential impacts to state or federally listed species. In each of these reviews, FWC has had a meaningful seat at the table to propose permit conditions that offer greater protections to state and federally listed species. If the U.S. Army Corps of Engineers (USACE) resumes responsibility of all 404 permitting, FWC staff could not as readily offer technical input and expertise, propose conditions to be incorporated in the 404 permits, or ensure that state-listed species receive adequate protections (which reduces the potential such species becoming federally listed).

For these reasons, and in the interest of the endangered and threatened species in Florida, I implore you to continue to vigorously defend EPA's approval of Florida's program in the pending litigation and to take any necessary actions to protect and preserve it.

Sincerely,

Roger A. Young
Executive Director

Attachment B

# EXHIBIT B

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0431019-001-SFG | ALACHUA | NW 53RD SIDEWALK | SFG 20 | 1/31/2023 |
| 0432709-001-SFG | ALACHUA | SW 62ND BLVD MANHOLE IMPR | SFG 15 | 3/13/2023 |
| 0440450-001-SFG | ALACHUA | BIVENS ARM NATURE PARK | SFG 25 | 9/19/2023 |
| 0443925-001-SFG | ALACHUA | HATCHET CREEK BRIDGE NO 260033 | SFG 48 | 1/8/2024 |
| 0416166-001-SFI | BAKER | 404 - BARBER POINTE SUBDIV | SFI 32 | 2/7/2022 |
| 0401093-002-SFI | BAKER | WOODSTOCK PROJECT CENTER | SFI 33 | 12/14/2022 |
| 0435886-001-SFG | BAKER | SANDCASTLE MANOR | SFG 36 | 5/31/2023 |
| 0436856-001-SFG | BAKER | ICE CUBE XPRESS | SFG 36 | 6/20/2023 |
| 0441053-001-SFG | BAKER | HIDDEN LAKE SANDERSON | SFG 36 | 9/27/2023 |
| 0429434-001-SFI | BAY | STATE AVENUE TOWNHOMES | SFI 30 | 12/14/2022 |
| 0431236-001-SFI | BAY | TKB ASSETS - DUAL HOTEL | SFI 31 | 2/6/2023 |
| 0068305-001-SFG | BAY | TYNDALL PARKWAY APARTMENTS | SFG 27 | 3/10/2023 |
| 0404276-002-SFI | BAY | ROYAL PALMS APARTMENTS | SFI 32 | 4/7/2023 |
| 0436707-001-SFI | BAY | OSPREY POINT VILLAGE PHASE A | SFI 32 | 6/20/2023 |
| 0398831-003-SFI | BAY | HOMBRE APARTMENTS - RESUBMITTA | SFI 29 | 6/30/2023 |
| 0437745-001-SFG | BAY | OCEAN PARK PAVILION PHASE 2 | SFG 36 | 7/13/2023 |
| 0272837-003-SFI | BAY | SUBDIVISION AT MINNESOTA AVE | SFI 29 | 7/18/2023 |
| 0438502-001-SFG | BAY | LITTLE BURNT MILL CREEK PH 1 | SFG 27 | 8/3/2023 |
| 0438784-001-SFG | BAY | ALEXANDRA'S PARK | SFG 27 | 8/11/2023 |
| 0439538-002-SFG | BAY | RAMROOP SF RESIDENCE ST404 | SFG 27 | 9/1/2023 |
| 0440627-001-SFG | BAY | REDWOOD AVENUE DRAINAGE | SFG 10 | 9/28/2023 |
| 0412425-004-SFRP | BAY | WATERSOUND PARKWAY 79- ST 404 | SFRP 86 | 10/23/2023 |
| 0441723-001-SFI | BAY | MLK BLVD COMMERCIAL | SFI 30 | 10/30/2023 |
| 0442049-002-SFG | BAY | MEXICO BCH 16TH ST - SR 390 | SFG 17 | 11/8/2023 |
| 0161242-001-SFG | BAY | MINNESOTA AVE MITIGATION ST404 | SFG 20 | 11/8/2023 |
| 0403572-025-SFRP | BAY | LMWS PH 5 A 3 ST 404 | SFRP 05 | 12/12/2023 |
| 0443343-002-SFG | BAY | DUNDEE LANE HMGP ST 404 | SFG 17 | 12/19/2023 |
| 0240230-006-SFI | BAY | HATHAWAY APARTMENTS RESUBMITAL | SFI 32 | 12/19/2023 |
| 0444431-002-SFI | BAY | GAGER SF RESIDENCE - ST404 | SFI 29 | 1/24/2024 |
| 0444698-001-SFG | BAY | EMBRIE TOWNHOMES | SFG 27 | 1/29/2024 |
| 0443878-001-SFI | BAY | EMERALD COVE | SFI 32 | 2/9/2024 |
| 0445375-003-SFG | BAY | LINGER LONGER RD ST  404 | SFG 17 | 2/16/2024 |
| 0416170-001-SFG | BRADFORD | 404 - SE 49TH AVE IMPROVEMENTS | SFG 17 | 2/7/2022 |
| 0283607-002-SFI | BRADFORD | CYPRESS RUN BOAT RAMP | SFI 29 | 9/26/2023 |
| 0397041-001-SFI | BREVARD | C-10 WATER MANAGEMENT AREA | SFI 33 | 1/8/2021 |
| 0413077-001-SFI | BREVARD | HUNTINGTON PARK | SFI 29 | 11/29/2021 |
| 0416990-003-SFI | BREVARD | AREA 2 | SFI 32 | 4/13/2022 |
| 0401326-003-SFI | BREVARD | TIER TWO SOUTH CAMPUS | SFI 32 | 4/13/2022 |
| 0423247-001-SFI | BREVARD | RANGE ROAD SUBDIVISION | SFI 29 | 6/29/2022 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0424336-001-SFI | BREVARD | LAKEWOOD RESERVE | SFI 31 | 7/27/2022 |
| 0424699-001-SFG | BREVARD | BSS BUILDING | SFG 36 | 8/4/2022 |
| 0425332-001-SFI | BREVARD | LENNAR PLUCKEBAUM RESIDENTIAL | SFI 33 | 8/18/2022 |
| 0398515-002-SFI | BREVARD | MATTAMY HOMES AT FISKE BLVD | SFI 32 | 8/31/2022 |
| 0430195-001-SFI | BREVARD | STILLWELL | SFI 32 | 1/6/2023 |
| 0422662-002-SFI | BREVARD | KRODEL PROPERTIES SFH (404) | SFI 29 | 2/27/2023 |
| 0434155-001-SFI | BREVARD | TITUSVILLE SOUTH STREET (404) | SFI 30 | 4/20/2023 |
| 0434549-002-SFG | BREVARD | HADDEN HOME BUILD (404) | SFG 27 | 5/2/2023 |
| 0434817-002-SFG | BREVARD | HEMPEL SATELLITE BLVD. (404) | SFG 27 | 5/8/2023 |
| 0436160-001-SFI | BREVARD | KRODEL - 425 SBRD (404) | SFI 29 | 6/8/2023 |
| 0436161-002-SFI | BREVARD | KRODEL - 435 SBRD (404) | SFI 29 | 6/8/2023 |
| 0436557-001-SFI | BREVARD | MUD LAKE WEST COCOA DRAINAGE | SFI 29 | 6/15/2023 |
| 0423041-002-SFI | BREVARD | 1901 SATELLITE BOULEVARD | SFI 29 | 7/10/2023 |
| 0440567-001-SFI | BREVARD | ROBERTS NORTH MASS GRADING | SFI 33 | 9/29/2023 |
| 0441315-001-SFI | BREVARD | ADELON WATER DRIVE MF | SFI 30 | 10/18/2023 |
| 0441855-001-SFG | BREVARD | GRISSOM PARKWAY INDUSTRIAL | SFG 36 | 11/2/2023 |
| 0442208-001-SFG | BREVARD | SPACE LAUNCH COMPLEX 14, CCSFS | SFG 36 | 11/14/2023 |
| 0442547-001-SFG | BREVARD | PINEDA CAUSEWAY IMPROVEMENTS | SFG 17 | 11/27/2023 |
| 0439125-002-SFG | BREVARD | BREVARD REST AREA | SFG 36 | 1/23/2024 |
| 0444969-001-SFG | BREVARD | ROVINI STORAGE | SFG 36 | 2/6/2024 |
| 0399733-001-SFI | BROWARD | ST. KATHARINE DREXEL CHURCH | SFI 31 | 3/1/2021 |
| 0401026-001-SFI | BROWARD | PEMBROKE PINES TOWNHOUSES | SFI 31 | 3/22/2021 |
| 0423208-001-SFG | BROWARD | SR 93 I75 INTERCHANGE IMPROVE | SFG 48 | 6/29/2022 |
| 0426421-001-SFI | BROWARD | TERRA PINES FSER | SFI 29 | 9/19/2022 |
| 0428254-002-SFG | BROWARD | GRAVERAN SFR DREDGE AND FILL | SFG 27 | 11/9/2022 |
| 0430105-002-SFI | BROWARD | VECENERGY SITE | SFI 31 | 1/3/2023 |
| 0433112-001-SFI | BROWARD | PEMBROKE ROAD EXTENSION | SFI 32 | 3/22/2023 |
| 0433047-002-SFI | BROWARD | 14010 MUSTANG TRAIL SW RANCHES | SFI 29 | 3/23/2023 |
| 0435645-001-SFI | BROWARD | STIRLING ROAD DRIVEWAY | SFI 29 | 6/1/2023 |
| 0436512-001-SFI | BROWARD | MENORAH GARDENS | SFI 31 | 6/20/2023 |
| 0436812-001-SFI | BROWARD | 13310 MUSTANG TRL | SFI 29 | 6/22/2023 |
| 0377669-004-SFG | BROWARD | MUSTANG TRAIL | SFG 27 | 8/9/2023 |
| 0396518-002-SFI | BROWARD | NSU PORT PARCEL | SFI 31 | 8/15/2023 |
| 0440828-002-SFI | BROWARD | ORTIZ RESIDENCE | SFI 29 | 10/6/2023 |
| 0441619-002-SFI | BROWARD | SFR & TENNIS COURT WETLANDS | SFI 29 | 10/27/2023 |
| 0442197-001-SFI | BROWARD | KEISER | SFI 29 | 11/13/2023 |
| 0431581-003-SFI | BROWARD | KBNP LLC RES DEV (404) | SFI 33 | 11/17/2023 |
| 0442660-001-SFI | BROWARD | 901 SW 121ST AVE | SFI 29 | 11/30/2023 |
| 0444113-001-SFI | BROWARD | UNIVERSITY HOTEL | SFI 29 | 1/18/2024 |
| 0437895-003-SFG | CALHOUN | CALHOUN BOCC LOTS MILL CREEK | SFG 17 | 7/20/2023 |
| 0439260-003-SFG | CALHOUN | FPL SOLAR ENERGY CENTER ST404 | SFG 15 | 10/12/2023 |
| 0441634-001-SFG | CALHOUN | SR 71 FROM S OF CR 275 | SFG 17 | 10/27/2023 |
| 0413222-004-SFI | CHARLOTTE | SF DRIVEWAY (404) | SFI 29 | 1/5/2022 |
| 0419860-001-SFI | CHARLOTTE | MCNEW RANCH MIXED-USE DEVELOPM | SFI 33 | 4/21/2022 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0422030-002-SFI | CHARLOTTE | UTILITY TRAIL MAINT (404) | SFI 30 | 5/27/2022 |
| 0416693-002-SFI | CHARLOTTE | S2A MODULAR | SFI 29 | 10/28/2022 |
| 0429052-001-SFI | CHARLOTTE | SHELL OAKS | SFI 32 | 12/5/2022 |
| 0273798-009-SFI | CHARLOTTE | SR 31 AT CR 74 ROUNDABOUT | SFI 29 | 2/15/2023 |
| 0424972-003-SFI | CHARLOTTE | 404 SFR | SFI 29 | 3/14/2023 |
| 0421003-002-SFI | CHARLOTTE | BARSTOOL SFI | SFI 29 | 5/30/2023 |
| 0436057-002-SFG | CHARLOTTE | SFR SFG | SFG 16 | 6/6/2023 |
| 0434642-003-SFG | CHARLOTTE | HDD UTILITY 404 | SFG 15 | 7/26/2023 |
| 0429979-003-SFI | CHARLOTTE | BURNT STORE ROAD 265 | SFI 30 | 10/16/2023 |
| 0441436-001-SFI | CHARLOTTE | LITTLE HOMESTEAD OF SWFL 404 | SFI 29 | 10/23/2023 |
| 0442988-002-SFI | CHARLOTTE | SFR DRIVEWAY WETLANDS 404 | SFI 29 | 12/11/2023 |
| 0443030-002-SFG | CHARLOTTE | SF SEAWALL 404 | SFG 16 | 12/12/2023 |
| 0437447-002-SFG | CHARLOTTE | WEST PORT EAST 404 | SFG 27 | 2/2/2024 |
| 0441705-002-SFI | CHARLOTTE | SFI 404 | SFI 29 | 2/5/2024 |
| 0441233-001-SFG | CITRUS | HOMOSASSA SELF STORAGE | SFG 10 | 10/17/2023 |
| 0442514-002-SFG | CITRUS | O'REILLY AUTO PARTS STORE | SFG 36 | 11/28/2023 |
| 0442863-002-SFG | CITRUS | JOHN DAVEY RESIDENCY | SFG 27 | 11/29/2023 |
| 0397632-001-SFI | CLAY | 404-VILLAGE PARK | SFI 33 | 1/13/2021 |
| 0409088-001-SFI | CLAY | 404-OLD JENNINGS & TYNES | SFI 30 | 8/30/2021 |
| 0414410-001-SFI | CLAY | 404-BRANAN FIELD MULTI FAMILY | SFI 29 | 12/7/2021 |
| 0419794-001-SFI | CLAY | 404 - ASBURY HAMMOCK | SFI 31 | 3/22/2022 |
| 0424421-001-SFI | CLAY | LAKE ASBURY BUILD TO RENT | SFI 30 | 5/24/2022 |
| 0396377-003-SFI | CLAY | 404-ATLANTIS DRIVE ROADWAY IMP | SFI 30 | 6/16/2022 |
| 0422142-002-SFG | CLAY | CHALLENGER TOWNHOMES | SFG 27 | 6/22/2022 |
| 0426427-003-SFG | CLAY | 404 - BURKHARDT DRAIN PIPE | SFG 20 | 10/7/2022 |
| 0427634-001-SFI | CLAY | CMAR GROUP 2 PROJECT 5 - CR220 | SFI 31 | 10/18/2022 |
| 0427618-001-SFI | CLAY | MIDDLEBURG DUNKIN DONUTS | SFI 29 | 10/18/2022 |
| 0429768-001-SFI | CLAY | BATTON LAKES RV PARK | SFI 29 | 12/22/2022 |
| 0150459-002-SFG | CLAY | 404-FPL DAN MOODY ROAD | SFG 15 | 1/24/2023 |
| 0437630-001-SFI | CLAY | MIDDLEBERG STORAGE | SFI 30 | 7/5/2023 |
| 0350535-007-SFI | CLAY | 404_PETERS CREEK PIPELINE | SFI 29 | 7/11/2023 |
| 0437648-001-SFI | CLAY | CR315 LANE WIDENING | SFI 31 | 7/11/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0438295-001-SFG | CLAY | 404-HURTZ BLANDING COMMERCIAL | SFG 27 | 7/31/2023 |
| 0439216-001-SFG | CLAY | 404-OAKLEAF BOAT AND RV STORAG | SFG 36 | 8/23/2023 |
| 0420584-004-SFM | CLAY | 404-FPL TERRILL CREEK SOLAR | SFM 31 | 9/15/2023 |
| 0409518-003-SFM | CLAY | CR 209 FROM US 17 TO CR 315B | SFM 06 | 10/12/2023 |
| 0442894-001-SFI | CLAY | MURRAY FARMS | SFI 30 | 12/5/2023 |
| 0444554-001-SFI | CLAY | CR 315 FROM CSX RAILROAD | SFI 29 | 1/25/2024 |
| 0423014-001-SFI | CLAY | 404-VENTURE LANE TOWNHOMES | SFI 31 | 2/9/2024 |
| 0445664-001-SFI | CLAY | HMGP RIVER RD SITES 1-6 | SFI 29 | 2/16/2024 |
| 0426429-002-SFI | CLAY | HMGP WINFRED CULVERT | SFI 29 | 2/16/2024 |
| 0396364-001-SFI | COLLIER | BELLMAR COMMUNITY (404) | SFI LT | 12/28/2020 |
| 0396348-001-SFI | COLLIER | IMMOKALEE ROAD RURAL VILLAGE | SFI 33 | 12/28/2020 |
| 0396561-001-SFI | COLLIER | PICAYUNE CWIP | SFI 33 | 12/28/2020 |
| 0377871-002-SFI | COLLIER | SF RESIDENCE WETLANDS (404) | SFI 29 | 12/28/2020 |
| 0396522-001-SFI | COLLIER | SR 82 WIDENING | SFI 32 | 12/28/2020 |
| 0396966-001-SFI | COLLIER | RURAL LANDS WEST (404) | SFI LT | 1/8/2021 |
| 0281251-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 7/7/2021 |
| 0249373-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/2/2021 |
| 0396121-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/4/2021 |
| 0408682-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/23/2021 |
| 0409958-002-SFG | COLLIER | SF RESIDENCE (404) | SFG 27 | 9/20/2021 |
| 0409961-002-SFG | COLLIER | SF RESIDENCE (404) | SFG 27 | 9/20/2021 |
| 0410536-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 9/29/2021 |
| 0232838-003-SFG | COLLIER | SF RESIDENCE (404) | SFG 27 | 10/8/2021 |
| 0276569-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 10/11/2021 |
| 0411474-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 10/19/2021 |
| 0411589-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 10/25/2021 |
| 0411667-002-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 10/26/2021 |
| 0405479-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/3/2021 |
| 0412065-001-SFI | COLLIER | SHAGGY CYPRESS | SFI 33 | 11/4/2021 |
| 0406897-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/9/2021 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0405635-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/12/2021 |
| 0376365-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/12/2021 |
| 0243229-006-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/12/2021 |
| 0259920-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/12/2021 |
| 0393322-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/17/2021 |
| 0412725-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/23/2021 |
| 0214415-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/30/2021 |
| 0413227-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 12/2/2021 |
| 0413441-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 12/8/2021 |
| 0413556-002-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 12/9/2021 |
| 0259821-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 12/26/2021 |
| 0255422-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 1/10/2022 |
| 0241214-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 1/11/2022 |
| 0288100-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 1/12/2022 |
| 0414967-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 1/18/2022 |
| 0415186-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 1/19/2022 |
| 0415851-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/2/2022 |
| 0394767-004-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 2/3/2022 |
| 0395112-004-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 2/3/2022 |
| 0398572-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/3/2022 |
| 0414684-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/7/2022 |
| 0395417-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/8/2022 |
| 0207010-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/11/2022 |
| 0405882-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/11/2022 |
| 0416754-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/18/2022 |
| 0416757-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 2/18/2022 |
| 0214403-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 3/3/2022 |
| 0410358-004-SFI | COLLIER | SF FENCE (404) | SFI 29 | 3/11/2022 |
| 0222910-005-SFM | COLLIER | MOD 004 MIT BANK | SFM 06 | 3/14/2022 |
| 0369917-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 3/14/2022 |
| 0369919-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 3/14/2022 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0405559-002-SFI | COLLIER | BRIGHTSHORE VILLAGE | SFI 33 | 3/15/2022 |
| 0387945-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/7/2022 |
| 0387946-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/7/2022 |
| 0236519-006-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/15/2022 |
| 0266720-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/18/2022 |
| 0259142-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/21/2022 |
| 0403864-005-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 4/22/2022 |
| 0227917-008-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 4/22/2022 |
| 0420092-002-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 4/27/2022 |
| 0420112-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/27/2022 |
| 0420105-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 4/27/2022 |
| 0275383-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 5/9/2022 |
| 0257461-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 5/20/2022 |
| 0240570-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 5/20/2022 |
| 0225316-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 5/20/2022 |
| 0422231-002-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 6/9/2022 |
| 0408890-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 6/9/2022 |
| 0422356-002-SFI | COLLIER | SF DRIVEWAY (404) | SFI 29 | 6/13/2022 |
| 0244622-005-SFI | COLLIER | SF RESIDENCE WETLANDS | SFI 29 | 7/1/2022 |
| 0423445-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 7/7/2022 |
| 0412138-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 7/8/2022 |
| 0232010-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 7/12/2022 |
| 0256699-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 7/12/2022 |
| 0242670-003-SFI | COLLIER | SINGLE FAMILY RESIDENCE(404) | SFI 29 | 7/15/2022 |
| 0423979-002-SFI | COLLIER | SFR IN WETLANDS (404) | SFI 29 | 7/19/2022 |
| 0424107-002-SFI | COLLIER | SF WETLANDS (404) | SFI 29 | 7/21/2022 |
| 0259172-004-SFG | COLLIER | SF FENCE (404) | SFG 27 | 7/28/2022 |
| 0230159-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/10/2022 |
| 0271988-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/15/2022 |
| 0425463-001-SFI | COLLIER | GREENWAY FRITCHEY RESIDENTIAL | SFI 33 | 8/16/2022 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0243586-007-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/25/2022 |
| 0425632-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 8/29/2022 |
| 0426249-001-SFI | COLLIER | FIORI APARTMENTS | SFI 31 | 9/12/2022 |
| 0426361-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 9/15/2022 |
| 0426526-002-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 9/19/2022 |
| 0426814-002-SFI | COLLIER | SF RESIDENCE 404 | SFI 29 | 9/26/2022 |
| 0263510-005-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/4/2022 |
| 0428480-001-SFI | COLLIER | KINSALE GOLF CLUB | SFI 29 | 11/16/2022 |
| 0422450-003-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 11/17/2022 |
| 0245799-004-SFI | COLLIER | SF RESIDENCE (404) | SFI 29 | 12/21/2022 |
| 0430176-003-SFI | COLLIER | 404 SFR | SFI 29 | 1/19/2023 |
| 0189064-003-SFI | COLLIER | 404 SFR WETLANDS | SFI 29 | 1/31/2023 |
| 0259202-003-SFI | COLLIER | 404 SFR WETLANDS | SFI 29 | 2/2/2023 |
| 0399564-003-SFI | COLLIER | 404 SFR | SFI 29 | 2/22/2023 |
| 0431880-002-SFI | COLLIER | 404 SFR | SFI 29 | 2/22/2023 |
| 0414894-003-SFI | COLLIER | 404 SFR SFI | SFI 29 | 2/22/2023 |
| 0432560-002-SFI | COLLIER | 404 SFR | SFI 29 | 3/10/2023 |
| 0432549-002-SFI | COLLIER | 404 SFR | SFI 29 | 3/10/2023 |
| 0430260-003-SFI | COLLIER | 404 SFR | SFI 29 | 3/16/2023 |
| 0432857-002-SFI | COLLIER | 404 SFR | SFI 29 | 3/17/2023 |
| 0432914-002-SFI | COLLIER | SFR 404 | SFI 29 | 3/20/2023 |
| 0432977-002-SFI | COLLIER | 404 SFR | SFI 29 | 3/21/2023 |
| 0433050-002-SFI | COLLIER | SFR 404 | SFI 29 | 3/23/2023 |
| 0433441-002-SFI | COLLIER | 404 | SFI 30 | 3/30/2023 |
| 0431981-003-SFI | COLLIER | SFR 404 | SFI 29 | 4/3/2023 |
| 0433747-002-SFI | COLLIER | SFR 404 | SFI 29 | 4/10/2023 |
| 0433924-002-SFI | COLLIER | SFR 404 | SFI 29 | 4/13/2023 |
| 0434280-002-SFI | COLLIER | SFR 404 | SFI 29 | 4/24/2023 |
| 0434715-002-SFI | COLLIER | SFR 404 | SFI 29 | 5/3/2023 |
| 0419998-003-SFI | COLLIER | SFR 404 | SFI 29 | 5/9/2023 |
| 0260181-003-SFI | COLLIER | SFR 404 | SFI 29 | 5/12/2023 |
| 0435182-001-SFI | COLLIER | GG BRIDGE SFI | SFI 29 | 5/15/2023 |
| 0435178-002-SFI | COLLIER | SFR 404 | SFI 29 | 5/15/2023 |
| 0413960-004-SFI | COLLIER | SFR 404 | SFI 29 | 5/22/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0199168-003-SFI | COLLIER | SFR SFI | SFI 29 | 5/25/2023 |
| 0405963-004-SFI | COLLIER | SFR SFI | SFI 29 | 5/31/2023 |
| 0415716-005-SFI | COLLIER | SFR SFI | SFI 29 | 6/13/2023 |
| 0420996-003-SFI | COLLIER | SFR AND DRIVEWAY | SFI 29 | 6/15/2023 |
| 0436573-002-SFI | COLLIER | SFR SFI | SFI 29 | 6/16/2023 |
| 0268920-004-SFI | COLLIER | SF RESIDENCE SFI | SFI 29 | 6/19/2023 |
| 0405904-003-SFI | COLLIER | SFR 404 | SFI 29 | 6/19/2023 |
| 0437191-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 7/3/2023 |
| 0406896-005-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 7/5/2023 |
| 0437385-001-SFI | COLLIER | HORSE TRIALS | SFI 31 | 7/10/2023 |
| 0405964-005-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 7/21/2023 |
| 0419503-002-SFI | COLLIER | COLLIER ROD AND GUN CLUB | SFI 33 | 7/24/2023 |
| 0438909-001-SFI | COLLIER | CREATIVE COMMONS 404 | SFI 30 | 8/15/2023 |
| 0432907-003-SFI | COLLIER | SF DRIVEWAY WETLANDS 404 | SFI 29 | 8/15/2023 |
| 0262933-012-SFI | COLLIER | SFR BARN WETLANDS 404 | SFI 29 | 8/16/2023 |
| 0335221-004-SFI | COLLIER | SFR DRIVEWAY WETLANDS 404 | SFI 29 | 8/17/2023 |
| 0257447-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 8/18/2023 |
| 0436344-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 8/22/2023 |
| 0439362-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 8/28/2023 |
| 0439435-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 8/31/2023 |
| 0268685-005-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 8/31/2023 |
| 0383520-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 9/1/2023 |
| 0439542-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 9/4/2023 |
| 0436616-004-SFI | COLLIER | SFR WETLANDS | SFI 29 | 9/5/2023 |
| 0214403-005-SFI | COLLIER | SFR WETLANDS | SFI 29 | 9/5/2023 |
| 0432786-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 9/5/2023 |
| 0440079-001-SFI | COLLIER | ASGM 404 | SFI 32 | 9/18/2023 |
| 0440193-001-SFI | COLLIER | ST. MARISSA CONDO 404 | SFI 29 | 9/20/2023 |
| 0440505-001-SFG | COLLIER | COLLIER BLVD ROADWAY 404 | SFG 17 | 9/28/2023 |
| 0428976-004-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 9/29/2023 |
| 0188424-005-SFI | COLLIER | 404 SFI | SFI 29 | 10/5/2023 |
| 0440835-002-SFI | COLLIER | SFI 404 | SFI 29 | 10/6/2023 |
| 0440865-002-SFI | COLLIER | SFI 404 | SFI 29 | 10/9/2023 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0440891-002-SFI | COLLIER | SFI 404 | SFI 29 | 10/9/2023 |
| 0439561-004-SFI | COLLIER | SFR 404 | SFI 29 | 10/11/2023 |
| 0441124-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 10/13/2023 |
| 0393615-003-SFI | COLLIER | SFR FENCE WETLANDS 404 | SFI 29 | 10/25/2023 |
| 0441768-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 11/1/2023 |
| 0442183-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 11/14/2023 |
| 0433749-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 11/17/2023 |
| 0389225-005-SFI | COLLIER | SFR DRIVEWAY WETLANDS 404 | SFI 29 | 11/20/2023 |
| 0442737-002-SFI | COLLIER | SFR 404 | SFI 29 | 12/4/2023 |
| 0255424-003-SFI | COLLIER | SFI 404 | SFI 29 | 12/5/2023 |
| 0431964-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 12/6/2023 |
| 0442999-002-SFG | COLLIER | FPL GOLDENROD SOLAR CENTER 404 | SFG 45 | 12/11/2023 |
| 0443163-002-SFI | COLLIER | SFR UPLANDS/WETLANDS 404 | SFI 29 | 12/15/2023 |
| 0434159-004-SFI | COLLIER | SF DRIVEWAY WETLANDS 404 | SFI 29 | 12/28/2023 |
| 0439316-003-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 1/5/2024 |
| 0442274-004-SFI | COLLIER | SFR DRIVEWAY WETLANDS | SFI 29 | 1/17/2024 |
| 0320260-005-SFI | COLLIER | MAINTAIN SFR WETLANDS 404 | SFI 29 | 1/26/2024 |
| 0403473-005-SFM | COLLIER | SFR MOD | SFM 06 | 1/31/2024 |
| 0403966-006-SFI | COLLIER | SFR SFI | SFI 29 | 1/31/2024 |
| 0315742-006-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 2/2/2024 |
| 0444909-002-SFI | COLLIER | SFR SFI | SFI 29 | 2/5/2024 |
| 0445085-002-SFG | COLLIER | 33 ELEC POLES WETLANDS 404 | SFG 15 | 2/8/2024 |
| 0412537-006-SFM | COLLIER | SFR MOD | SFM 29 | 2/8/2024 |
| 0445138-001-SFI | COLLIER | NAPLES GREENWAY MF DEV 404 | SFI 31 | 2/9/2024 |
| 0445089-002-SFI | COLLIER | SFR WETLANDS 404 | SFI 29 | 2/9/2024 |
| 0445306-001-SFI | COLLIER | TAMIAMI 58 404 | SFI 32 | 2/15/2024 |
| 0431148-001-SFI | COLUMBIA | COLUMBIA'S SHERIFF'S EVI BLDG | SFI 29 | 2/2/2024 |
| 0348342-002-SFI | COLUMBIA | RIVER RISE BOAT RAMP IMPROVEME | SFI 29 | 1/29/2024 |
| 0407220-001-SFI | DESOTO | CAYMAN LAKES | SFI 31 | 7/19/2021 |
| 0429260-001-SFI | DESOTO | HARBOUR LAKE | SFI 31 | 12/9/2022 |
| 0432952-002-SFI | DESOTO | LLANO RANCHES SFI | SFI 29 | 5/22/2023 |
| 0443877-002-SFG | DESOTO | SADDLE SOLAR CENTER 404 | SFG 45 | 12/18/2023 |
| 0443327-002-SFG | DESOTO | JOSHUA CREEK SOLAR SFG | SFG 45 | 12/19/2023 |
| 0424119-001-SFG | DIXIE | CROSS CITY AIRPORT RUNWAY IMPR | SFG 17 | 7/20/2022 |
| 0402457-001-SFI | DUVAL | 404-JIA WOODWINGS EAST | SFI 32 | 4/16/2021 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0403621-001-SFI | DUVAL | 404-SOUTEL & OLD KINGS SITE | SFI 30 | 5/5/2021 |
| 0409409-001-SFI | DUVAL | 404 - ELLIS COVE MODIFICATION | SFI 33 | 8/24/2021 |
| 0409599-001-SFI | DUVAL | 404 - ARNOLD RD CANAL CLEARING | SFI 30 | 9/10/2021 |
| 0410322-001-SFI | DUVAL | 404 - SERENOA GARDENS SOUTH | SFI 31 | 9/23/2021 |
| 0418733-002-SFG | DUVAL | PRITCHARD ROAD UTILITY LINE | SFG 15 | 3/30/2022 |
| 0420170-001-SFI | DUVAL | 404 - BACARDI | SFI 32 | 4/18/2022 |
| 0423180-001-SFI | DUVAL | 4390 IMESON ROAD | SFI 30 | 5/6/2022 |
| 0421665-001-SFI | DUVAL | BOWDEN ROAD SITE | SFI 30 | 5/24/2022 |
| 0424791-001-SFG | DUVAL | CECIL CHARTER SCHOOL ROADWAY | SFG 17 | 8/8/2022 |
| 0406188-002-SFI | DUVAL | 404-LEM TURNER PROPERTY | SFI 33 | 8/23/2022 |
| 0401097-002-SFI | DUVAL | 404 - JONES BRANCH TRUCK YARD | SFI 30 | 8/30/2022 |
| 0426935-001-SFI | DUVAL | IDEA LANE LENOX | SFI 30 | 9/22/2022 |
| 0427091-001-SFG | DUVAL | CHARTER SCHOOL AT OLD ST AUG | SFG 36 | 10/4/2022 |
| 0427122-001-SFI | DUVAL | NEW KINGS ROAD SELF STORAGE | SFI 29 | 10/5/2022 |
| 0429132-001-SFI | DUVAL | ZOO PARKWAY SITE | SFI 30 | 12/7/2022 |
| 0397308-004-SFI | DUVAL | 404 - HUNTLEY - SEATON CREEK | SFI 32 | 12/20/2022 |
| 0431434-001-SFG | DUVAL | 404-MUNTAZ, HUSSEIN | SFG 27 | 1/9/2023 |
| 0430397-001-SFG | DUVAL | PECAN PARK SELF STORAGE | SFG 36 | 1/10/2023 |
| 0430296-001-SFI | DUVAL | RAHIMI ST JOHNS BLUFF RD | SFI 29 | 1/12/2023 |
| 0431643-001-SFI | DUVAL | JUSTAMERE PROPERTY GRADING | SFI 30 | 2/14/2023 |
| 0425361-002-SFG | DUVAL | 404-CEDAR POINT BRIDGES | SFG 17 | 3/15/2023 |
| 0433829-001-SFI | DUVAL | 404-ACREE CDD OFFSITE ROADWAY | SFI 31 | 4/11/2023 |
| 0435966-001-SFI | DUVAL | MINING DRIVE | SFI 31 | 5/31/2023 |
| 0436489-001-SFI | DUVAL | DUVAL AND PECAN PARK | SFI 30 | 6/8/2023 |
| 0436211-001-SFG | DUVAL | SR 200 MEDIAN U-TURN | SFG 48 | 6/8/2023 |
| 0384095-002-SFG | DUVAL | MARIGOLD RIDGE TOWNHOMES | SFG 27 | 6/9/2023 |
| 0436327-001-SFI | DUVAL | 404-BRADDOCK SOUTH | SFI 33 | 6/12/2023 |
| 0436836-002-SFI | DUVAL | 404-JACKSONVILLE FAIRGROUNDS | SFI 31 | 6/22/2023 |
| 0437094-001-SFI | DUVAL | SEATON HOLLOW SUBDIVISION | SFI 31 | 6/27/2023 |
| 0437282-001-SFI | DUVAL | 404_OWENS ROAD LAYDOWN | SFI 30 | 6/29/2023 |
| 0396534-002-SFI | DUVAL | CECIL CONNECTOR RD - PH 2 | SFI 29 | 7/5/2023 |
| 0435400-003-SFG | DUVAL | 404-HOWELL PARK DITCH MAINT | SFG 38 | 7/21/2023 |
| 0413044-002-SFI | DUVAL | FCRU PLANT SITE 404 | SFI 31 | 7/27/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0438538-001-SFG | DUVAL | SHORES LANDING APARTMENTS | SFG 27 | 7/27/2023 |
| 0438539-001-SFI | DUVAL | ANNISTON | SFI 29 | 7/28/2023 |
| 0438540-001-SFG | DUVAL | TOM BUSH PARTS WAREHOUSE | SFG 36 | 7/31/2023 |
| 0438780-001-SFI | DUVAL | AZALEA CREEK | SFI 30 | 8/3/2023 |
| 0423874-004-SFM | DUVAL | 404-FPL BALDWIN SUBSTATION | SFM 06 | 8/4/2023 |
| 0439108-001-SFI | DUVAL | KINGS PRESERVE | SFI 31 | 8/10/2023 |
| 0440259-001-SFI | DUVAL | MURIEL STREET PARKING | SFI 30 | 9/12/2023 |
| 0440259-002-SFI | DUVAL | MURIEL STREET PARKING | SFI 30 | 9/26/2023 |
| 0441057-001-SFG | DUVAL | ALADDIN ROAD SUBDIVISION | SFG 27 | 10/11/2023 |
| 0396589-001-SFI | DUVAL | 404-EAGLES GLEN SUBDIVISION | SFI 33 | 10/12/2023 |
| 0082095-001-SFG | DUVAL | 404-PENSKE PARKING LOT EXP | SFG 36 | 10/12/2023 |
| 0441213-001-SFG | DUVAL | BLANDING TOWNHOMES | SFG 27 | 10/12/2023 |
| 0441377-001-SFI | DUVAL | MAYO CLINIC NORTH CAMPUS | SFI 30 | 10/19/2023 |
| 0433829-002-SFI | DUVAL | ACREE POD G SUBDIVISION | SFI 31 | 10/30/2023 |
| 0435656-002-SFG | DUVAL | WESTLAKE PARCEL 3 - BUILDINGS | SFG 36 | 11/1/2023 |
| 0441948-001-SFG | DUVAL | VILLAGE AT TOWN CENTER | SFG 36 | 11/2/2023 |
| 0409408-001-SFG | DUVAL | 404-FENNELL ROAD PROJECT | SFG 27 | 11/3/2023 |
| 0442256-001-SFI | DUVAL | 404-THOMAS CREEK PUD | SFI 32 | 11/10/2023 |
| 0442536-001-SFI | DUVAL | NORTHVIEW SUBDIVISION | SFI 31 | 11/27/2023 |
| 0443245-001-SFI | DUVAL | 404-BROWARD SELF STORAGE | SFI 29 | 12/15/2023 |
| 0443358-001-SFG | DUVAL | 404-ARGYLE FOREST DUTCH BROS. | SFG 36 | 12/19/2023 |
| 0443587-001-SFG | DUVAL | NORTH JAX MINISTRIES | SFG 36 | 12/22/2023 |
| 0420719-001-SFI | DUVAL | 404-GARDEN STREET SUBSTATION | SFI 30 | 1/9/2024 |
| 0444357-001-SFI | DUVAL | RING POWERED MANUFACTURING | SFI 31 | 1/16/2024 |
| 0444449-001-SFG | DUVAL | CECIL POINT | SFG 27 | 1/22/2024 |
| 0444526-001-SFI | DUVAL | ROYAL FOREST | SFI 32 | 1/22/2024 |
| 0444543-001-SFG | DUVAL | NEW BERLIN GATE EXPRESS CAR | SFG 36 | 1/24/2024 |
| 0413074-001-SFI | DUVAL | 404-SUBEMA WAREHOUSE DEV | SFI 32 | 2/5/2024 |
| 0437286-002-SFM | DUVAL | 404-DURBAN CREEK | SFM TO | 2/21/2024 |
| 0406873-002-SFG | DUVAL | 404-BLIUC RESIDENCE | SFG 27 | 2/22/2024 |
| 0405573-001-SFI | ESCAMBIA | WEST KINGSFIELD ROAD EXTENSION | SFI 32 | 6/15/2021 |
| 0283221-002-SFG | ESCAMBIA | WOODLAND HILLS S/D FILL | SFG 27 | 7/13/2022 |
| 0436680-001-SFG | ESCAMBIA | SEMINOLE BEND SUBDIVISION | SFG 17 | 6/19/2023 |
| 0437596-002-SFG | ESCAMBIA | ESCAMBIA CO PINE FOREST ST 404 | SFG 16 | 7/12/2023 |
| 0438754-001-SFI | ESCAMBIA | SKYHAWK LANDING SUBDIVISIONS | SFI 30 | 8/9/2023 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0441040-001-SFG | ESCAMBIA | GOLDENVALE | SFG 27 | 10/10/2023 |
| 0441130-001-SFI | ESCAMBIA | BSIDE MULTI-USE DEVELOPMENT | SFI 29 | 10/13/2023 |
| 0442052-003-SFG | ESCAMBIA | NAS 7.10 CULVERT REPAIR | SFG 17 | 12/6/2023 |
| 0442107-003-SFG | ESCAMBIA | NAS OLD RADFORD SW RR ST 404 | SFG 14 | 12/6/2023 |
| 0441636-002-SFG | ESCAMBIA | 1000 BLOCK MASSACHUSETTS | SFG 40 | 12/7/2023 |
| 0443846-002-SFI | ESCAMBIA | MOLALE SF HOME ST 404 | SFI 29 | 1/9/2024 |
| 0409534-001-SFG | FLAGLER | 404 - KOLTER - EAGLE LAKE | SFG 27 | 9/8/2021 |
| 0417664-001-SFI | FLAGLER | 404 - E-SECTION WEST | SFI 29 | 3/3/2022 |
| 0419219-001-SFG | FLAGLER | 404 - K-SECTION DRAIN CONVEY | SFG 40 | 4/1/2022 |
| 0428743-001-SFG | FLAGLER | MATANZAS SUB & BELLE TERRE STW | SFG 33 | 11/17/2022 |
| 0433508-001-SFG | FLAGLER | THE SOUTHERLY AT PALM COAST | SFG 27 | 4/3/2023 |
| 0419238-002-SFI | FLAGLER | 404-DOUGLAS - CASCADES | SFI 31 | 5/3/2023 |
| 0435335-001-SFI | FLAGLER | 1784 CAPITAL HOLDINGS FACILITY | SFI 29 | 5/16/2023 |
| 0436647-001-SFG | FLAGLER | BELLE TERRE MASS GRADING | SFG 36 | 6/19/2023 |
| 0407089-002-SFI | FLAGLER | COLBERT & BLAIR CONVEYANCE | SFI 29 | 8/23/2023 |
| 0439716-001-SFI | FLAGLER | WOODSIDE AT ORMOND STATION | SFI 30 | 8/25/2023 |
| 0441466-001-SFI | FLAGLER | OAKSIDE AT ORMOND STATION | SFI 31 | 9/6/2023 |
| 0440466-001-SFI | FLAGLER | RIDGESIDE AT ORMOND STATION | SFI 31 | 9/6/2023 |
| 0440769-001-SFI | FLAGLER | 404-COQUINA SHORES | SFI 30 | 10/5/2023 |
| 0401753-003-SFI | FLAGLER | MATANZAS WOODS RETAIL | SFI 31 | 11/29/2023 |
| 0442704-002-SFI | FLAGLER | 404-OARE MAGNOLIA TRACE | SFI 31 | 12/1/2023 |
| 0432007-001-SFG | FLAGLER | 404-PALM COAST P1 CONTROL | SFG 40 | 1/4/2024 |
| 0434868-001-SFG | FLAGLER | 404-BELLE TERRE PARKWAY IMPROV | SFG 17 | 1/8/2024 |
| 0444177-001-SFI | FLAGLER | BELLE TERRE HOLDINGS | SFI 30 | 1/10/2024 |
| 0430653-008-SFI | FRANKLIN | CR 67 PHASE IV SCRAP ST404 | SFI 31 | 8/31/2023 |
| 0442407-003-SFG | FRANKLIN | ARWEA LOW WATER CROSSING ST404 | SFG 17 | 11/20/2023 |
| 0442407-002-SFG | FRANKLIN | ARWEA LOW WATER CROSSING ST404 | SFG 17 | 11/20/2023 |
| 0444666-002-SFG | FRANKLIN | POTEET DRAINAGE IMPRV ST404 | SFG 40 | 1/30/2024 |
| 0319515-004-SFI | GADSDEN | COMPLEX A - 404 RENEWAL | SFI 32 | 6/23/2021 |
| 0210571-009-SFI | GADSDEN | N LITTLE RIVER MINE | SFI 31 | 11/12/2021 |
| 0419648-001-SFI | GADSDEN | ALTA EQUIPMENT COMPANY ST 404 | SFI 30 | 4/14/2022 |
| 0444925-001-SFG | GADSDEN | CROSS CREEK GARDENS | SFG 27 | 2/5/2024 |
| 0442719-001-SFG | GILCHRIST | RECTOR- SEAWALL REPAIR & DOCK | SFG 16 | 12/1/2023 |
| 0443068-001-SFG | GILCHRIST | HART SPRINGS BOAT RAMP IMPROVE | SFG 33 | 12/11/2023 |
| 0422168-003-SFG | GLADES | REPLACE SEAWALL (404) | SFG 16 | 6/9/2022 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0436829-002-SFG | GLADES | SFR SFG | SFG 27 | 6/23/2023 |
| 0439198-001-GLSI | GLADES | TURKEY BRANCH | GLSI LT | 8/23/2023 |
| 0423235-001-SFI | GULF | RISH FAMILY PLAZA | SFI 29 | 6/28/2022 |
| 0426921-002-SFG | GULF | CRAIG HEWIIT DWELLING | SFG 27 | 4/26/2023 |
| 0441417-002-SFG | HAMILTON | 404-DUKE ENERGY FLORIDA | SFG 15 | 10/23/2023 |
| 0442445-001-SFG | HAMILTON | FIVE HOLE SPRINGS BOAT RAMP | SFG 33 | 11/20/2023 |
| 0433135-001-SFI | HARDEE | PLATT ROAD RESIDENTIAL | SFI 30 | 3/24/2023 |
| 0417378-002-SFM | HARDEE | PEACH RANCH | SFM 06 | 2/9/2024 |
| 0423286-002-SFG | HENDRY | 404 FENCE | SFG 27 | 7/1/2022 |
| 0431793-002-SFG | HERNANDO | LEAD FOOT CITY - PHASE 1 | SFG 39 | 1/16/2024 |
| 0444833-001-SFI | HERNANDO | CANOPY PHASE 1 (VILLAGE A) | SFI 31 | 2/2/2024 |
| 0315171-003-SFG | HIGHLANDS | INSTALL SEAWALL (404) | SFG 16 | 10/13/2021 |
| 0411274-002-SFG | HIGHLANDS | INSTALL SEAWALL (404) | SFG 16 | 10/13/2021 |
| 0411276-002-SFG | HIGHLANDS | INSTALL SEAWALL (404) | SFG 16 | 10/14/2021 |
| 0319242-005-SFG | HIGHLANDS | SF RETAINING WALL (404) | SFG 16 | 3/15/2022 |
| 0402537-002-SFI | HIGHLANDS | FLORIDA LAKES RV PARK | SFI 30 | 9/20/2022 |
| 0429167-002-SFG | HIGHLANDS | INSTALL SEAWALL (404) | SFG 16 | 12/8/2022 |
| 0433499-006-SFG | HIGHLANDS | 404-SEAWALL 2 PARCELS | SFG 16 | 1/31/2024 |
| 0445151-001-SFG | HIGHLANDS | US 27 VENUS WILDLIFE CROSSING | SFG 17 | 2/12/2024 |
| 0397193-004-SFI | HILLSBOROUGH | WATERSET-WOLF CREEK | SFI 31 | 2/5/2022 |
| 0393210-003-SFG | HILLSBOROUGH | SAMMY HERRERA | SFG 43 | 2/24/2022 |
| 0404384-002-SFI | HILLSBOROUGH | ROBERTS RANCH ROAD INDUSTRIAL | SFI 32 | 4/4/2022 |
| 0422338-001-SFG | HILLSBOROUGH | HCPS VILLEMAIRE TRANSPORTATION | SFG 36 | 6/13/2022 |
| 0424121-001-SFG | HILLSBOROUGH | 2005 B C TRL CULVERT REPLACEMT | SFG 16 | 7/20/2022 |
| 0424697-001-SFG | HILLSBOROUGH | I-75 SOUTHBOUND & NORTHBOUND | SFG 48 | 8/4/2022 |
| 0403001-007-SFI | HILLSBOROUGH | LAKESIDE STATION PHASE V | SFI 31 | 8/10/2022 |
| 0426256-001-SFI | HILLSBOROUGH | CROSSROADS INDUSTRIAL CENTER W | SFI 30 | 9/12/2022 |
| 0318596-002-SFG | HILLSBOROUGH | WATERFORD PROPERTY OWNERS | SFG 16 | 9/12/2022 |
| 0427663-001-SFG | HILLSBOROUGH | PILOT TRAVEL CENTER | SFG 36 | 10/19/2022 |
| 0427546-001-SFI | HILLSBOROUGH | OPAL APARTMENTS | SFI 30 | 10/20/2022 |
| 0403001-009-SFI | HILLSBOROUGH | LAKESIDE STATION VILLAGE 3 S | SFI 29 | 11/17/2022 |
| 0429706-001-SFI | HILLSBOROUGH | ARMENIA AVE DRAINAGE IMPROVE | SFI 29 | 12/21/2022 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0430928-001-SFG | HILLSBOROUGH | ADAMO CSX RETAIL | SFG 36 | 1/25/2023 |
| 0431609-001-SFI | HILLSBOROUGH | MADDUX FERN HILL | SFI 30 | 2/15/2023 |
| 0434371-001-SFG | HILLSBOROUGH | VARREA PH2 OFFSITE RDWY IMRPOV | SFG 17 | 4/24/2023 |
| 0434546-001-SFG | HILLSBOROUGH | WILLIAM CARTER II | SFG 33 | 4/26/2023 |
| 0435350-001-SFI | HILLSBOROUGH | BIG BEND ROAD | SFI 30 | 5/16/2023 |
| 0436459-001-SFG | HILLSBOROUGH | SPENCER CREEK PHASE 3 | SFG 27 | 6/14/2023 |
| 0436654-001-SFI | HILLSBOROUGH | LARSON NINE EAGLES | SFI 29 | 6/19/2023 |
| 0437123-001-SFG | HILLSBOROUGH | SOUTHWIND | SFG 27 | 6/28/2023 |
| 0437162-001-SFI | HILLSBOROUGH | MCINTOSH PARK WM PLAN | SFI 33 | 6/30/2023 |
| 0434371-002-SFI | HILLSBOROUGH | VARREA NORTH MASS GRADING | SFI 31 | 7/28/2023 |
| 0438894-001-SFI | HILLSBOROUGH | SYMMES RD @ E BAY RD | SFI 29 | 8/14/2023 |
| 0439759-001-SFG | HILLSBOROUGH | NORTHWOOD CHARTER SCHOOL | SFG 17 | 9/11/2023 |
| 0440149-002-SFG | HILLSBOROUGH | CENTRAL FLORIDA PIPELINE LLC | SFG 15 | 9/19/2023 |
| 0439261-002-SFG | HILLSBOROUGH | CRANBERRY LN DRAINAGE IMPROV. | SFG 14 | 9/19/2023 |
| 0437650-002-SFG | HILLSBOROUGH | N ARRAWANA AVE BR REPLACEMENT | SFG 17 | 9/26/2023 |
| 0440542-001-SFI | HILLSBOROUGH | PERSIMMON FARM | SFI 29 | 9/26/2023 |
| 0425877-002-SFG | HILLSBOROUGH | CROSSROADS EAST FDOT IMPROVE | SFG 17 | 9/29/2023 |
| 0441221-001-SFG | HILLSBOROUGH | WAWA RIVERVIEW, FL | SFG 10 | 10/17/2023 |
| 0441309-001-SFI | HILLSBOROUGH | 5412 W LINEBAUGH | SFI 30 | 10/18/2023 |
| 0441453-002-SFG | HILLSBOROUGH | MAGGIEVILLE WETLAND TRAIL | SFG 17 | 10/25/2023 |
| 0442039-001-SFG | HILLSBOROUGH | TAKE 5 OIL CHANGE VALRICO | SFG 10 | 11/6/2023 |
| 0288580-004-SFG | HILLSBOROUGH | DOVER ST TRANSFER STATION | SFG 36 | 11/8/2023 |
| 0133996-109-SFG | HILLSBOROUGH | SPA(13)II--NORTH CONNECTION | SFG 25 | 11/8/2023 |
| 0133996-108-SFG | HILLSBOROUGH | SPA(13)I--SOUTH CONNECTION | SFG 25 | 11/8/2023 |
| 0442591-001-SFG | HILLSBOROUGH | ODESSA PRESERVE | SFG 27 | 11/28/2023 |
| 0442840-001-SFG | HILLSBOROUGH | ANGELIA PAYNE | SFG 10 | 12/6/2023 |
| 0351685-003-SFG | HILLSBOROUGH | ROBERT CREEK | SFG 16 | 12/6/2023 |
| 0442991-001-SFG | HILLSBOROUGH | SLAM RUSKIN CHARTER SCHOOL | SFG 36 | 12/8/2023 |
| 0442937-001-SFG | HILLSBOROUGH | WILLIAM STOVER | SFG 20 | 12/8/2023 |
| 0443063-002-SFG | HILLSBOROUGH | TECO ACCESS RD 230020 | SFG 15 | 12/11/2023 |
| 0443134-001-SFI | HILLSBOROUGH | JJ TAYLOR EXPANSION | SFI 31 | 12/13/2023 |
| 0443179-002-SFG | HILLSBOROUGH | BULLFROG CREEK TRANSMISSION | SFG 15 | 12/14/2023 |
| 0443234-002-SFG | HILLSBOROUGH | PROGRESS VILLAGE RDI | SFG 40 | 12/18/2023 |
| 0443499-001-SFG | HILLSBOROUGH | 18830 GUNN HWY CULVERT REPLACE | SFG 40 | 12/22/2023 |
| 0443583-002-SFG | HILLSBOROUGH | TECO SOUTH TAMPA RESILIENCY | SFG 15 | 12/27/2023 |
| 0443704-001-SFG | HILLSBOROUGH | MADISON AVE BOX CULVERT EXT | SFG 10 | 1/4/2024 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0444035-002-SFG | HILLSBOROUGH | HC N WILDER RD CULVERT REPLACE | SFG 15 | 1/15/2024 |
| 0444085-001-SFG | HILLSBOROUGH | GUNN HWY & FOUR OAKS DEV | SFG 36 | 1/16/2024 |
| 0444998-001-SFG | HILLSBOROUGH | O'BRIEN SEAWALL | SFG 10 | 2/6/2024 |
| 0445168-001-SFG | HILLSBOROUGH | ANTHONY BOSCO | SFG 16 | 2/12/2024 |
| 0445201-001-SFG | HILLSBOROUGH | LAKE COOPER DRNG IMPROV | SFG 10 | 2/13/2024 |
| 0445336-001-SFG | HILLSBOROUGH | FL STATE FAIR RV CAMPGROUND | SFG 27 | 2/14/2024 |
| 0418466-002-SFG | HILLSBOROUGH | RODGERS MIDDLE SCHOOL | SFG 36 | 2/16/2024 |
| 0445670-001-SFG | HILLSBOROUGH | JACKSON SPRINGS RD IMPROVEMENT | SFG 17 | 2/19/2024 |
| 0439685-002-SFG | HOLMES | LAVIGNE DRIVEWAY ST404 | SFG 27 | 10/4/2023 |
| 0423501-001-SFI | INDIAN RIVER | RAVENS LANDING | SFI 32 | 7/8/2022 |
| 0435358-002-SFI | INDIAN RIVER | 899 GLADIOLA RESIDENCE | SFI 29 | 5/18/2023 |
| 0434224-001-SFG | INDIAN RIVER | CR 510 FROM CR 512 TO 84TH AVE | SFG 17 | 6/27/2023 |
| 0439746-001-SFG | INDIAN RIVER | FELLSMERE SW LAKE & STATES ST | SFG 40 | 9/11/2023 |
| 0442269-002-SFG | INDIAN RIVER | RED TRAIL BRIDGE REPLACEMENT | SFG 17 | 11/15/2023 |
| 0442938-002-SFG | INDIAN RIVER | 322 BISCAYNE LANE | SFG 14 | 12/9/2023 |
| 0444057-002-SFG | INDIAN RIVER | SPANISH MOSS SOLAR ENERGY | SFG 45 | 1/11/2024 |
| 0444914-001-SFI | INDIAN RIVER | ROCK CITY GARDENS PARKING | SFI 29 | 2/13/2024 |
| 0438087-001-SFG | JACKSON | CR 278 RESURFACING | SFG 17 | 7/24/2023 |
| 0436265-004-SFG | JACKSON | FILLMORE DR BOX CULVERT ST 404 | SFG 17 | 1/4/2024 |
| 0434033-001-SFI | JEFFERSON | POND EXPANSION | SFI 31 | 4/17/2023 |
| 0429693-001-SFG | LAFAYETTE | FRIER SEAWALL | SFG 16 | 12/16/2022 |
| 0439367-001-SFG | LAFAYETTE | STEPHEN DOUGLAS SEAWALL | SFG 16 | 8/25/2023 |
| 0407075-001-SFI | LAKE | RACETRAC GROVELAND (404) | SFI 30 | 7/14/2021 |
| 0414592-001-SFG | LAKE | LAKE WINONA BASIN 12A | SFG 20 | 1/4/2022 |
| 0414611-001-SFG | LAKE | SHORELINE RANCH SUBDIVISION | SFG 40 | 1/4/2022 |
| 0424900-001-SFI | LAKE | BANNING RANCH | SFI 29 | 8/5/2022 |
| 0428444-001-SFG | LAKE | CRESSWIND MASS GRADING (404) | SFG 27 | 11/16/2022 |
| 0430036-001-SFI | LAKE | CRS TIMBER PROJECT | SFI 31 | 1/4/2023 |
| 0430547-001-SFG | LAKE | YWAM ORLANDO PH 1 CONSTRUCTION | SFG 36 | 1/18/2023 |
| 0432456-001-SFI | LAKE | SR 516-237/COOK RD TO LAKEORAN | SFI 32 | 3/7/2023 |
| 0433334-001-SFI | LAKE | SR 516 FROM US 27 TO COOK RD | SFI 32 | 3/29/2023 |
| 0434100-001-SFI | LAKE | C.R. 455 PHASE 2 | SFI 30 | 4/18/2023 |
| 0436552-001-SFG | LAKE | LAKE DENHAM TOWNHOMES | SFG 27 | 6/14/2023 |
| 0396232-002-SFI | LAKE | PACIFIC ACE PHASE 2 (404) | SFI 30 | 6/21/2023 |
| 0190521-029-SFI | LAKE | CEMEX BARAHONAS EXTENSION | SFI 32 | 9/6/2023 |
| 0352064-003-SFG | LAKE | FISHER_PERMIT2023 PHASE 1 | SFG 16 | 9/8/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0435794-002-SFG | LAKE | LOUCKS ISLAND | SFG 27 | 9/8/2023 |
| 0441101-001-SFG | LAKE | CR 565 | SFG 17 | 10/13/2023 |
| 0441296-001-SFI | LAKE | DAMAR STORAGE | SFI 30 | 10/18/2023 |
| 0441486-001-SFG | LAKE | SCHOFIELD ROAD PROPERTY (404) | SFG 27 | 10/24/2023 |
| 0442139-001-SFI | LAKE | PEACHTREE HILLS (404) | SFI 30 | 11/9/2023 |
| 0291030-004-SFI | LEE | FFD CORKSCREW ROAD PROPERTY | SFI 32 | 10/13/2021 |
| 0251053-004-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 2/2/2022 |
| 0253437-005-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 3/1/2022 |
| 0415509-003-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 3/28/2022 |
| 0415412-003-SFI | LEE | SF WETLANDS (404) | SFI 29 | 3/28/2022 |
| 0292013-008-SFI | LEE | TROYER 404 PERMIT MOD | SFI 33 | 4/1/2022 |
| 0411125-005-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 4/13/2022 |
| 0415464-003-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 4/15/2022 |
| 0415507-003-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 4/15/2022 |
| 0155409-003-SFI | LEE | PARALLEL RUNWAY | SFI 33 | 4/22/2022 |
| 0154504-012-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 4/25/2022 |
| 0413811-004-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 4/25/2022 |
| 0422803-001-SFI | LEE | DANIELS SOUTH | SFI 33 | 6/20/2022 |
| 0423130-001-SFI | LEE | KINGSTON | SFI 31 | 6/28/2022 |
| 0420045-004-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 7/1/2022 |
| 0285023-003-SFG | LEE | SF RESIDENCE (404) | SFG 27 | 7/1/2022 |
| 0348414-003-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 8/11/2022 |
| 0425376-001-SFG | LEE | WILLIAMS RD IMPROVEMENTS | SFG 17 | 8/22/2022 |
| 0425863-001-SFI | LEE | ALICO RD WIDENING | SFI 31 | 9/1/2022 |
| 0425753-003-SFG | LEE | INSTALL SEAWALL (404) | SFG 16 | 9/7/2022 |
| 0326400-004-SFG | LEE | SFR WETLANDS | SFG 27 | 9/16/2022 |
| 0426679-001-SFI | LEE | 31 OAKS | SFI 32 | 9/21/2022 |
| 0423938-002-SFI | LEE | REVANA LAKES | SFI 33 | 10/14/2022 |
| 0427416-002-SFG | LEE | INSTALL SEAWALL (404) | SFG 16 | 10/17/2022 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0272653-006-SFG | LEE | SF RESIDENCE (404) | SFG 27 | 11/7/2022 |
| 0406484-002-SFI | LEE | SUNSET FALLS | SFI 32 | 11/10/2022 |
| 0428364-002-SFG | LEE | SF DRIVEWAY BARN (404) | SFG 27 | 11/14/2022 |
| 0428526-002-SFG | LEE | INSTALL SEAWALL (404) | SFG 16 | 11/15/2022 |
| 0428400-002-SFI | LEE | SF RESIDENCE (404) | SFI 29 | 11/15/2022 |
| 0404095-002-SFG | LEE | BONITA GRANDE DR | SFG 17 | 12/1/2022 |
| 0429523-002-SFG | LEE | SF RESIDENCE (404) | SFG 27 | 12/16/2022 |
| 0429658-001-SFI | LEE | UNIVERSITY VILLAGE IMPROVEMENT | SFI 33 | 12/20/2022 |
| 0405511-003-SFG | LEE | 404 SFG | SFG 27 | 2/1/2023 |
| 0272230-003-SFG | LEE | SFR 404 SFG | SFG 27 | 3/29/2023 |
| 0325080-004-SFG | LEE | PERMIT EXTENSION (404) | SFG 27 | 4/19/2023 |
| 0430626-002-SFI | LEE | SPORTING CLUB SFI | SFI 29 | 5/1/2023 |
| 0435435-001-SFG | LEE | BOB JANES PRESERVE SFI | SFG 25 | 5/19/2023 |
| 0435584-002-SFI | LEE | SFR 404 | SFI 29 | 5/23/2023 |
| 0430788-003-SFI | LEE | SFI WETLAND FILL | SFI 29 | 7/14/2023 |
| 0438186-002-SFI | LEE | SFR WETLANDS 404 | SFI 29 | 7/28/2023 |
| 0402225-002-SFI | LEE | OWL CREEK DEVELOPMENT 404 | SFI 33 | 8/11/2023 |
| 0439111-001-SFI | LEE | DIA CROSSING MIXED UE 404 | SFI 31 | 8/21/2023 |
| 0439522-001-SFG | LEE | WILD TURKEY TRAIL IMPROVE 404 | SFG 39 | 8/31/2023 |
| 0324576-004-SFG | LEE | SFR WETLANDS 404 | SFG 27 | 10/9/2023 |
| 0430211-003-SFG | LEE | PINE LAKES COUNTRY CLUB 2 | SFG 31 | 10/10/2023 |
| 0341072-008-SFG | LEE | SFR WETLANDS 404 | SFG 27 | 11/20/2023 |
| 0433074-002-SFI | LEE | PENZANCE SQUARE 404 | SFI 31 | 12/13/2023 |
| 0443235-002-SFI | LEE | SFR WETLANDS 404 | SFI 29 | 12/18/2023 |
| 0443931-002-SFG | LEE | 404SEAWALLW/RIPRAP W/W OF OHWL | SFG 16 | 1/11/2024 |
| 0420343-011-SFM | LEE | 009 MOD 404 | SFM 29 | 1/13/2024 |
| 0444282-002-SFG | LEE | 404-SEAWALL | SFG 16 | 1/22/2024 |
| 0371543-004-SFI | LEE | SFR WETLANDS 404 | SFI 29 | 1/26/2024 |
| 0166176-038-SFM | LEE | 404 MODIFICATION | SFM 33 | 1/30/2024 |
| 0421077-003-SFM | LEE | 404 PERMIT TRANSFER | SFM TO | 2/1/2024 |
| 0444986-002-SFG | LEE | 404-SEAWALL IN FRESHWATER CANA | SFG 16 | 2/7/2024 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0445120-001-SFI | LEE | CORKSCREW COMMONS 404 | SFI 31 | 2/9/2024 |
| 0436311-003-SFG | LEE | DANIELS ROAD WIDENING 404 | SFG 17 | 2/16/2024 |
| 0430352-002-SFG | LEON | WYNN SF RESIDENCE | SFG 27 | 1/17/2023 |
| 0439429-002-SFG | LEON | DUKE BAKER TAP KLLRN TAP ST404 | SFG 15 | 8/30/2023 |
| 0439465-002-SFG | LEON | DUKE BAKER TAP MICCOSUK ST404 | SFG 15 | 8/31/2023 |
| 0441757-002-SFG | LEON | PS12 182 REDUNDANT POWER ST404 | SFG 15 | 11/1/2023 |
| 0437287-001-SFG | LEVY | CEDAR KEY TELECOM TOWER | SFG 15 | 7/5/2023 |
| 0439089-001-SFG | LEVY | BLACK PRONG EQUESTRIAN VILLAGE | SFG 24 | 8/18/2023 |
| 0361944-004-SFG | LIBERTY | ANF SALAMANDER POND | SFG 25 | 11/15/2022 |
| 0423153-002-SFG | MADISON | 404- DUKE ENERGY SUNDANCE | SFG 45 | 12/28/2023 |
| 0421411-001-SFI | MANATEE | 44TH AVE EAST PH 6 | SFI 31 | 5/23/2022 |
| 0421411-002-SFI | MANATEE | TAYLOR RANCH | SFI 29 | 6/10/2022 |
| 0431031-001-SFG | MANATEE | ERIE RD WIDENING E SEGMENT | SFG 17 | 2/1/2023 |
| 0431616-001-SFI | MANATEE | FIRETHORN RESIDENTIAL SUBDIV | SFI 30 | 2/15/2023 |
| 0432326-001-SFI | MANATEE | 63RD AVE E RDWY IMPROVMENTS | SFI 31 | 3/2/2023 |
| 0400385-002-SFI | MANATEE | MOCCASIN WALLOW RD. SEGMENT 2 | SFI 31 | 3/24/2023 |
| 0434271-001-SFG | MANATEE | LENA ROAD WIDENING | SFG 17 | 4/21/2023 |
| 0434219-001-SFI | MANATEE | UPPER MANATEE RIVER RD | SFI 31 | 4/21/2023 |
| 0434261-001-SFI | MANATEE | WATERBURY PARK | SFI 29 | 4/21/2023 |
| 0396251-004-SFG | MANATEE | IA MANATEE | SFG 27 | 5/1/2023 |
| 0435964-002-SFI | MANATEE | FLATFORD SOLAR ENERGY CENTER | SFI 31 | 6/1/2023 |
| 0436817-001-SFG | MANATEE | 51ST AVE - 17TH ST TO US 301 | SFG 17 | 6/22/2023 |
| 0437310-001-SFI | MANATEE | LINGER LODGE TOWNHOMES | SFI 29 | 7/6/2023 |
| 0400385-003-SFI | MANATEE | MOCCASIN WALLOW RD SEGMENT 3 | SFI 31 | 7/11/2023 |
| 0437727-002-SFG | MANATEE | FROG CREEK WETLAND RESTORATION | SFG 25 | 7/17/2023 |
| 0437851-002-SFG | MANATEE | CROSSWIND RANCH PH III-IV MASS | SFG 27 | 8/7/2023 |
| 0439065-001-SFG | MANATEE | BUS BARN PROJECT | SFG 27 | 8/14/2023 |
| 0439129-001-SFG | MANATEE | SR 70 FROM BOURNESIDE BLVD | SFG 48 | 8/22/2023 |
| 0406292-003-SFG | MANATEE | SYMPHONY LAKES PHASE II | SFG 27 | 8/23/2023 |
| 0412254-002-SFG | MANATEE | AAA STORAGE US-41 | SFG 36 | 8/31/2023 |
| 0440565-001-SFI | MANATEE | LORRAINE ROAD | SFI 30 | 9/25/2023 |
| 0402112-002-SFG | MANATEE | ROBINSON GATEWAY | SFG 27 | 10/27/2023 |
| 0441678-001-SFI | MANATEE | THE MITCHELL AT TERRA CEIA | SFI 29 | 10/27/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0417284-002-SFM | MANATEE | 44TH AVE E EXTENSION | SFM 31 | 10/30/2023 |
| 0442031-001-SFG | MANATEE | TERRA CEIA | SFG 27 | 11/8/2023 |
| 0299496-005-SFI | MANATEE | LONG BAR POINTE MULTIFAMILY | SFI 30 | 12/20/2023 |
| 0440359-002-SFG | MANATEE | LAKE MINNIE POND IMPROVEMENTS | SFG 20 | 1/16/2024 |
| 0436436-002-SFI | MANATEE | RIVERSONG PHASE IA | SFI 32 | 1/24/2024 |
| 0444635-001-SFI | MANATEE | 7110 21ST ST E | SFI 29 | 1/26/2024 |
| 0444651-001-SFI | MANATEE | REAGAN RANCH PHASE I, II & III | SFI 31 | 1/29/2024 |
| 0444937-001-SFI | MANATEE | DEER PARK MASS GRADING | SFI 30 | 2/6/2024 |
| 0431696-002-SFG | MANATEE | COOPER CREEK PARKING EXPANSION | SFG 36 | 2/7/2024 |
| 0445029-001-SFG | MANATEE | KAY RD BRIDGE REPLACEMENT & | SFG 17 | 2/7/2024 |
| 0445048-001-SFG | MANATEE | UNI CHICK-FIL-A MITIGATION MOD | SFG 25 | 2/7/2024 |
| 0445042-001-SFI | MANATEE | UTC OUTPARCEL EXPANSION | SFI 30 | 2/7/2024 |
| 0445595-001-SFG | MANATEE | MEDALLION SR-62 RV | SFG 27 | 2/19/2024 |
| 0445462-001-SFG | MANATEE | O'REILLY AUTO PARTS PARRISH | SFG 36 | 2/19/2024 |
| 0445588-001-SFI | MANATEE | RYE RANCH PH 3 & 4 | SFI 30 | 2/19/2024 |
| 0423434-001-SFI | MARION | RIVER CREEK RV RESORT | SFI 30 | 7/5/2022 |
| 0442235-001-SFG | MARION | THE KEYS AT OCALA | SFG 20 | 11/14/2023 |
| 0444397-001-SFI | MARION | CLASSIC MILE FARMS | SFI 30 | 1/22/2024 |
| 0412601-001-SFI | MARTIN | RIVER OAK | SFI 30 | 11/17/2021 |
| 0422344-002-SFI | MARTIN | AVONLEA LOT 10 | SFI 29 | 9/6/2022 |
| 0422344-003-SFI | MARTIN | AVONLEA LOT 13 | SFI 32 | 9/6/2022 |
| 0313295-005-SFG | MARTIN | DUPUIS WIDLIFE MANAGEMENT | SFG 25 | 8/28/2023 |
| 0444663-001-SFI | MARTIN | THE PRESERVE AT LOBLOLLY NORTH | SFI 29 | 2/1/2024 |
| 0396558-001-SFI | MIAMI-DADE | MICCOSUKEE TRIBE OF INDIANS | SFI 32 | 12/28/2020 |
| 0397047-001-SFI | MIAMI-DADE | FIFTH AVENUE ESTATES | SFI 32 | 1/8/2021 |
| 0397029-001-SFG | MIAMI-DADE | MICCOSUKEE TRIBE OF INDIANS FL | SFG 10 | 1/8/2021 |
| 0407803-002-SFI | MIAMI-DADE | BJ'S WHOLESALE CLUB AT WEST DA | SFI 32 | 7/6/2022 |
| 0419003-003-SFI | MIAMI-DADE | I-75 AT PINES BLVD INTERCHANGE | SFI 32 | 11/22/2022 |
| 0428920-001-SFI | MIAMI-DADE | WHSE/RETAIL BLD FLTWAY 10 LLC | SFI 29 | 12/2/2022 |
| 0396493-002-SFI | MIAMI-DADE | TARGET WEST DADE | SFI 32 | 1/13/2023 |
| 0430625-001-GLSG | MIAMI-DADE | S-332B PUMPSTATION REPLACEMENT | GLSG 25 | 1/23/2023 |
| 0397050-002-SFI | MIAMI-DADE | BEACON LAKES 46 ASSEMBLAGE | SFI 32 | 1/26/2023 |
| 0431464-001-SFI | MIAMI-DADE | ALGER COMMONS | SFI 33 | 2/21/2023 |
| 0175235-023-SFI | MIAMI-DADE | MIAMI QUARRY 404 PERMIT | SFI 33 | 3/16/2023 |
| 0427077-002-SFI | MIAMI-DADE | CEMEX CANAL EXTENSION | SFI 31 | 3/20/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0432702-001-SFI | MIAMI-DADE | SW 157TH AVE IMPROVEMENTS | SFI 31 | 3/21/2023 |
| 0396424-002-SFG | MIAMI-DADE | 115 PRESERVATION LAND TRUST | SFG 25 | 3/23/2023 |
| 0434048-001-SFI | MIAMI-DADE | LVPA COMMERCIAL TRUCK PARK | SFI 31 | 4/20/2023 |
| 0435392-001-SFI | MIAMI-DADE | BRIDGE POINT DORAL PHASE 1 | SFI 31 | 5/23/2023 |
| 0175263-018-SFI | MIAMI-DADE | TITAN FLORIDA QUARRY 404 | SFI 30 | 9/26/2023 |
| 0443151-001-SFG | MIAMI-DADE | HEFT WIDENING FT N CAMPBELL | SFG 17 | 12/14/2023 |
| 0443581-001-SFG | MIAMI-DADE | SR 821 MAINLINE AND SURFACE | SFG 17 | 12/22/2023 |
| 0444917-001-GLSG | MIAMI-DADE | S-333 SHOAL REMOVAL | GLSG 10 | 1/9/2024 |
| 0444281-002-SFG | MIAMI-DADE | G-72 CONTROL STRUCTURE | SFG 24 | 1/12/2024 |
| 0444333-001-GLSG | MIAMI-DADE | S-332C PS EMERGENCY REPAIRS | GLSG 10 | 1/18/2024 |
| 0444877-001-SFI | MIAMI-DADE | COCONUT PALM GROWERS | SFI 29 | 2/6/2024 |
| 0439914-001-GLSG | MONROE | C-111 SD S-332C PS | GLSG 25 | 9/12/2023 |
| 0417863-001-SFI | NASSAU | 404 - GREENBRIE SUBDIVISION | SFI 32 | 3/11/2022 |
| 0419383-001-SFI | NASSAU | 404 - WILLIAM BURGESS BLVD EXT | SFI 31 | 4/11/2022 |
| 0421600-001-SFI | NASSAU | CALLAHAN ACRES | SFI 31 | 5/19/2022 |
| 0404052-002-SFI | NASSAU | YULEE MF | SFI 29 | 6/3/2022 |
| 0423775-001-SFI | NASSAU | CREEKSIDE LAKES | SFI 32 | 7/8/2022 |
| 0424427-001-SFI | NASSAU | EAGLES NEST SUBDIVISION | SFI 32 | 7/25/2022 |
| 0425009-001-SFG | NASSAU | BUCKHEAD SUBDIVISION | SFG 27 | 8/9/2022 |
| 0434167-001-SFI | NASSAU | NASSAU COUNTY W-SIDE REG PARK | SFI 30 | 8/22/2022 |
| 0428109-001-SFG | NASSAU | HILLIARD RV PARK | SFG 27 | 11/2/2022 |
| 0433197-001-SFI | NASSAU | SANDY BLUFF SUBDIVISION | SFI 30 | 3/23/2023 |
| 0438402-005-SFG | NASSAU | 404-UTILI-LINK WINDSTREAM | SFG 15 | 11/14/2023 |
| 0406196-002-SFM | NASSAU | 404-LIBERTY COVE | SFM 30 | 11/21/2023 |
| 0442896-001-SFG | NASSAU | BRIDGE REPLACEMENT MP SM 18.8 | SFG 17 | 12/5/2023 |
| 0433883-002-SFI | OKALOOSA | LEGACY PLACE | SFI 33 | 4/24/2023 |
| 0402157-002-SFG | OKALOOSA | INDIAN BAYOU WEST | SFG 27 | 5/5/2023 |
| 0438704-002-SFG | OKALOOSA | EDEN LAKE RESIDENTIAL DEV | SFG 27 | 10/2/2023 |
| 0440827-003-SFG | OKALOOSA | RODRIGUEZ CULVERT REPLAC ST404 | SFG 27 | 11/14/2023 |
| 0443728-002-SFG | OKALOOSA | CEFCO HWY 60 & OLD BETHEL | SFG 36 | 1/23/2024 |
| 0445054-003-SFG | OKALOOSA | SAMBOGNA SEAWALL | SFG 16 | 2/15/2024 |
| 0445659-001-SFG | OKALOOSA | CHELSEA VILLAGE ST 404 | SFG 27 | 2/16/2024 |
| 0371646-005-SFI | OKEECHOBEE | FPL NUBBIN SUBSTATION EXPAN | SFI 29 | 3/13/2023 |
| 0429427-003-SFI | OKEECHOBEE | SINGLE FAMILY HOME BUILD 2 | SFI 29 | 6/22/2023 |
| 0440726-001-SFI | OKEECHOBEE | PINE CREEK SPORTING CLUB | SFI 29 | 10/9/2023 |
| 0138524-006-SFG | OKEECHOBEE | FPL SEVILLE-SWEATT | SFG 15 | 11/22/2023 |
| 0443452-001-SFI | OKEECHOBEE | PARK STREET COMMERCE CENTER | SFI 29 | 12/27/2023 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0443748-002-SFG | OKEECHOBEE | FPL TANGELO SOLAR ENERGY | SFG 37 | 1/2/2024 |
| 0444541-001-SFI | OKEECHOBEE | QUAIL CREEK CLUBHOUSE | SFI 29 | 1/30/2024 |
| 0396971-001-SFI | ORANGE | THE GROW | SFI 32 | 1/8/2021 |
| 0403474-001-SFG | ORANGE | EAGLE CREEK OF OCOEE (404) | SFG 27 | 5/5/2021 |
| 0409467-001-SFI | ORANGE | HEROLCA TRUCK PARKING FACILITY | SFI 30 | 8/31/2021 |
| 0419799-001-SFI | ORANGE | FICQUETTE ROAD WIDENING | SFI 32 | 4/19/2022 |
| 0420998-002-SFG | ORANGE | BUDRON DALLAS BLVD RESID (404) | SFG 27 | 5/17/2022 |
| 0421819-001-SFI | ORANGE | TUSCANA PD (404) | SFI 33 | 5/31/2022 |
| 0422922-001-SFI | ORANGE | REAMS RD - S TO TABORFIELD AVE | SFI 31 | 6/22/2022 |
| 0424234-002-SFG | ORANGE | LAKE NONA MEDICAL CITY WEST | SFG 20 | 7/26/2022 |
| 0406078-002-SFI | ORANGE | POITRAS WEST | SFI 33 | 7/27/2022 |
| 0425740-001-SFI | ORANGE | BRILEY FARM PHASE 1B & 2 | SFI 29 | 8/29/2022 |
| 0426379-002-SFG | ORANGE | PALMVIEW LOT 3 | SFG 27 | 9/15/2022 |
| 0427314-001-SFI | ORANGE | RICHARD CROTTY PKWY - SEG 1A&B | SFI 31 | 10/11/2022 |
| 0427566-001-SFI | ORANGE | MIDNIGHT APARTMENTS | SFI 30 | 10/18/2022 |
| 0428418-002-SFG | ORANGE | LAUG ORTEGA ST00424 ORLAND 404 | SFG 27 | 11/16/2022 |
| 0429450-002-SFG | ORANGE | CIRRINCIONE_TAMANACOTRLORLANDO | SFG 27 | 12/16/2022 |
| 0429692-002-SFG | ORANGE | WEMBLEY AVE LOT 7 SFH | SFG 27 | 12/21/2022 |
| 0272831-003-SFG | ORANGE | PRITCHETT_ROBERTSONST05200 | SFG 27 | 1/12/2023 |
| 0430473-001-SFG | ORANGE | SR 417 WIDENING | SFG 48 | 1/13/2023 |
| 0431714-002-SFG | ORANGE | 9A CAESAR AVE. (404) | SFG 20 | 2/17/2023 |
| 0432282-001-SFI | ORANGE | THE GROVE SUBDIVISION | SFI 29 | 3/2/2023 |
| 0433001-001-SFG | ORANGE | ACADIAORLANDO HEALTH - APOPKA | SFG 36 | 3/21/2023 |
| 0433793-001-SFI | ORANGE | SI RESORT, COUNTYLINE PROPERTY | SFI 31 | 4/11/2023 |
| 0434221-002-SFG | ORANGE | 12607 W LAKE BUTLER ROAD | SFG 16 | 4/24/2023 |
| 0434246-002-SFG | ORANGE | LEDESMA_REYNOLDS PKWY03-020 | SFG 27 | 4/24/2023 |
| 0434245-002-SFG | ORANGE | VASQUEZ-VELEZ-OVERTON-ST11-180 | SFG 27 | 4/24/2023 |
| 0423372-002-SFI | ORANGE | FLEMINGS RD WIDENING SEG 5 & 6 | SFI 30 | 5/3/2023 |
| 0436093-001-SFI | ORANGE | ETS FACILITY IMPROVEMENTS | SFI 32 | 6/2/2023 |
| 0436465-002-SFG | ORANGE | NAQVI_NORTHCLIFFEST10-080- 404 | SFG 27 | 6/15/2023 |
| 0437061-001-SFI | ORANGE | SR 528-168 FROM WEST OF GOLDEN | SFI 30 | 6/29/2023 |
| 0437154-001-SFG | ORANGE | WOODLAWN FUNERAL HOME | SFG 40 | 6/29/2023 |
| 0437553-001-SFI | ORANGE | CENTRAL FLORIDA RESEARCH PARK | SFI 32 | 7/11/2023 |
| 0422958-002-SFI | ORANGE | EMMERSON PROPERTY (404) | SFI 29 | 7/21/2023 |
| 0438557-002-SFG | ORANGE | VASQUEZ MATA PROPERTY - LOT 10 | SFG 20 | 8/9/2023 |
| 0438555-002-SFG | ORANGE | VASQUEZ PROPERTY - LOT 09 | SFG 20 | 8/9/2023 |
| 0440389-002-SFG | ORANGE | RAMOS NAVARRO PALMVIEW | SFG 27 | 9/27/2023 |
| 0423372-003-SFG | ORANGE | FLEMINGS RD WIDENING | SFG 17 | 10/6/2023 |
| 0441027-001-SFI | ORANGE | POLO GLEN LAKE BETTY | SFI 29 | 10/11/2023 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0442096-002-SFG | ORANGE | VALLEJO SFH REYNOLDS PKY (404) | SFG 27 | 11/13/2023 |
| 0442463-002-SFG | ORANGE | GODERIS SHELDON STREET (404) | SFG 27 | 11/27/2023 |
| 0289412-002-SFI | ORANGE | PHAM RESIDENCE (404) | SFI 29 | 11/27/2023 |
| 0443398-001-SFI | ORANGE | HAMLIN BOARDWALK MOD | SFI 31 | 12/20/2023 |
| 0205102-011-SFM | ORANGE | CFX SR516 LAKE ORANGE (404) | SFM 32 | 1/9/2024 |
| 0443870-002-SFG | ORANGE | LATTIMORE_ODHAMST 23-080 (404) | SFG 27 | 1/10/2024 |
| 0302579-003-SFG | ORANGE | TARANTINO_QUARTERLY PKWY (404) | SFG 27 | 1/16/2024 |
| 0444244-001-SFG | ORANGE | ANTI-GRAVITY | SFG 36 | 1/17/2024 |
| 0411665-001-SFI | OSCEOLA | EVEREST PLACE | SFI 32 | 10/25/2021 |
| 0416705-001-SFI | OSCEOLA | MAGIC PLACE PHASE 2 | SFI 32 | 2/16/2022 |
| 0418277-001-SFI | OSCEOLA | CANOE CREEK RESERVE (404) | SFI 32 | 3/16/2022 |
| 0419929-001-SFI | OSCEOLA | HAM BROWN RESERVE | SFI 31 | 4/20/2022 |
| 0420126-001-SFI | OSCEOLA | GATEWAY COMMONS CONSTELLATION | SFI 31 | 4/27/2022 |
| 0422385-001-SFI | OSCEOLA | REAVES ROAD PROPERTY (404) | SFI 31 | 6/9/2022 |
| 0423362-001-SFG | OSCEOLA | 4441 ANDERSON RD SINGLE FAMILY | SFG 27 | 6/30/2022 |
| 0424083-001-SFI | OSCEOLA | SR 538 EX. TO US 17/92 | SFI 32 | 7/18/2022 |
| 0424426-001-SFG | OSCEOLA | SR 60 PASSING LANES | SFG 23 | 7/29/2022 |
| 0424083-002-SFI | OSCEOLA | CFX 538-234 TO RONALD R. PKWY | SFI 32 | 8/12/2022 |
| 0425041-002-SFG | OSCEOLA | VELERO PROPERTIES SFR | SFG 27 | 8/15/2022 |
| 0414697-002-SFI | OSCEOLA | GREEN ISLAND RANCH CCN3-B(404) | SFI 30 | 10/14/2022 |
| 0427822-001-SFI | OSCEOLA | POINCIANA INDUSTRIAL E & W | SFI 30 | 10/25/2022 |
| 0413205-002-SFI | OSCEOLA | TUN EXPRESS, LLC | SFI 29 | 11/1/2022 |
| 0429113-001-SFI | OSCEOLA | TYSON RESERVE | SFI 31 | 12/7/2022 |
| 0429423-001-SFI | OSCEOLA | BUENAVENTURA LAKES ALT OUTFALL | SFI 29 | 12/14/2022 |
| 0430466-001-SFI | OSCEOLA | TURNPIKE WIDENING | SFI 33 | 1/13/2023 |
| 0431040-001-SFI | OSCEOLA | FISH LAKE PARCELS 2A AND 2B | SFI 31 | 2/1/2023 |
| 0431688-001-SFI | OSCEOLA | CROSS PRAIRIE PARKWAY NORTH | SFI 31 | 2/17/2023 |
| 0431702-001-SFI | OSCEOLA | HAMMOCK PRESERVE | SFI 31 | 2/17/2023 |
| 0432260-002-SFG | OSCEOLA | FLORIDA SOUTHEAST CONNECTION | SFG 15 | 3/2/2023 |
| 0432166-002-SFG | OSCEOLA | STOREY BEND T-LINE (404) | SFG 15 | 3/2/2023 |
| 0432684-001-SFI | OSCEOLA | LAKEVIEW PRESERVE | SFI 31 | 3/13/2023 |
| 0432652-001-SFI | OSCEOLA | ROAN BRIDGE CONCEPTUAL | SFI 32 | 3/13/2023 |
| 0433290-001-SFI | OSCEOLA | FISH LAKE | SFI 30 | 3/28/2023 |
| 0398098-002-SFG | OSCEOLA | WESTSIDE BLVD EXT-STN 66+00-96 | SFG 17 | 5/15/2023 |
| 0435957-001-SFI | OSCEOLA | PRINCESS RESORT TOWNHOMES | SFI 30 | 5/30/2023 |
| 0436012-002-SFG | OSCEOLA | 3834 LA SALLE AVE DRIVEWAY 404 | SFG 27 | 6/6/2023 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0436965-001-SFG | OSCEOLA | SULLIVAN ROAD TOWNHOMES | SFG 27 | 6/26/2023 |
| 0438823-001-SFI | OSCEOLA | POINCIANA APARTMENTS | SFI 31 | 8/14/2023 |
| 0438993-001-SFI | OSCEOLA | BARNES BOULEVARD TOWNHOMES | SFI 30 | 8/17/2023 |
| 0439060-001-SFG | OSCEOLA | OCTAVIA STORAGE | SFG 36 | 8/21/2023 |
| 0439504-001-SFI | OSCEOLA | SUNRAY JUNCTION WEST | SFI 31 | 8/31/2023 |
| 0439855-001-SFI | OSCEOLA | CANOE CREEK ROAD | SFI 30 | 9/13/2023 |
| 0439849-002-SFG | OSCEOLA | SOUTH BREEZE DRIVE LOT13 (404) | SFG 27 | 9/15/2023 |
| 0439832-002-SFG | OSCEOLA | SOUTH BREEZE ROAD LOT 12 (404) | SFG 27 | 9/15/2023 |
| 0422877-002-SFI | OSCEOLA | THE SHORES (404) | SFI 30 | 9/15/2023 |
| 0440156-001-SFI | OSCEOLA | SPRINGHEAD LAKE | SFI 32 | 9/19/2023 |
| 0441176-001-SFI | OSCEOLA | SOUTH LAKE TOHO CONCEPTUAL | SFI 32 | 10/16/2023 |
| 0442419-001-SFG | OSCEOLA | OSCEOLA PARKWAY BRIDGE REPAIRS | SFG 10 | 11/16/2023 |
| 0442511-001-SFI | OSCEOLA | SDOC TRANSPORTATION WEST | SFI 31 | 11/17/2023 |
| 0443074-001-SFI | OSCEOLA | BASS ROAD APARTMENTS | SFI 29 | 12/12/2023 |
| 0443548-001-SFI | OSCEOLA | HILLIARD ISLE | SFI 32 | 12/21/2023 |
| 0419228-006-SFG | OSCEOLA | HARMONY II SOLAR MODIFIC (404) | SFG 20 | 12/27/2023 |
| 0419610-004-SFM | OSCEOLA | STOREY BEND SOLAR MODIFI (404) | SFM 30 | 12/27/2023 |
| 0443701-002-SFG | OSCEOLA | LAKE WILSON SUB LINE RR (404) | SFG 15 | 1/9/2024 |
| 0444835-001-SFG | OSCEOLA | POINCIANA PARC | SFG 27 | 2/2/2024 |
| 0445425-002-SFG | OSCEOLA | CYPRESS LAKE RESTORATION (404) | SFG 25 | 2/15/2024 |
| 0445669-002-SFG | OSCEOLA | TOHO S DOVERPLUM AVE. WM (404) | SFG 15 | 2/22/2024 |
| 0401723-001-SFI | PALM BEACH | NORTHLAKE BLVD E HALL | SFI 32 | 4/2/2021 |
| 0415483-001-SFI | PALM BEACH | MIDA FARMS SERVICE DRIVE | SFI 29 | 1/25/2022 |
| 0397581-002-SFI | PALM BEACH | BAYHILL ESTATES_PHASE 2 | SFI 29 | 6/14/2022 |
| 0423155-001-SFI | PALM BEACH | DEBRIS DOGS PHASE II | SFI 30 | 6/28/2022 |
| 0146481-001-SFI | PALM BEACH | SAMJACK SOUTH BAY | SFI 32 | 7/29/2022 |
| 0426886-001-SFI | PALM BEACH | PBC ROADWAY IMPROVEMENT | SFI 30 | 9/23/2022 |
| 0427428-001-SFI | PALM BEACH | MINTO PBLH WESTLAKE | SFI 33 | 10/12/2022 |
| 0433622-001-SFI | PALM BEACH | CALUSA POINTE II | SFI 31 | 4/11/2023 |
| 0435817-001-SFI | PALM BEACH | STATE ROAD 7 BUSINESS PLAZA | SFI 32 | 6/2/2023 |
| 0322710-002-SFI | PALM BEACH | THE CLUB AT IBIS NORTH CAMPUS | SFI 30 | 6/2/2023 |
| 0428280-003-SFI | PALM BEACH | JW CORBETT CAMPGROUND G EXPAND | SFI 29 | 6/9/2023 |
| 0436143-001-SFI | PALM BEACH | OLD DIXIE HIGHWAY | SFI 31 | 6/9/2023 |
| 0436554-001-GLSI | PALM BEACH | EAA A-2 CONSTRUCTION VILLAGE | GLSI 33 | 6/13/2023 |
| 0439113-001-SFG | PALM BEACH | AUSTRALIAN AVE. | SFG 17 | 8/17/2023 |
| 0439113-002-SFG | PALM BEACH | AUSTRALIAN AVE. | SFG 40 | 8/17/2023 |
| 0440694-002-SFG | PALM BEACH | EAKINS RESIDENCE | SFG 27 | 10/3/2023 |
| 0441080-001-SFI | PALM BEACH | ROYAL PALM BCH BLVD | SFI 31 | 10/19/2023 |
| 0442218-001-SFI | PALM BEACH | TOWNS AT TIDEWATER | SFI 31 | 11/14/2023 |
| 0442984-001-SFG | PALM BEACH | COMPLETE TURBINE FACILITY | SFG 36 | 12/18/2023 |
| 0421116-001-SFI | PASCO | MAGNOLIA VALLEY STORAGE | SFI 32 | 5/16/2022 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0398030-010-SFG | PASCO | ANGELINE PHASE 2C | SFG 27 | 6/29/2022 |
| 0396249-005-SFI | PASCO | CONNERTON VILLAGE 3 & 4 | SFI 30 | 11/10/2022 |
| 0388624-004-SFG | PASCO | KARZON SINGLE FAMILY RESIDENCE | SFG 27 | 3/31/2023 |
| 0434449-001-SFI | PASCO | FOUNDATION WAY | SFI 30 | 4/27/2023 |
| 0434819-001-SFG | PASCO | POPPLETON | SFG 16 | 5/4/2023 |
| 0404183-003-SFG | PASCO | BOGER RANCH SUBDIVISION | SFG 27 | 5/19/2023 |
| 0432942-004-SFI | PASCO | PROJECT EXCALIBUR PH 1B RDWY | SFI 30 | 8/4/2023 |
| 0438510-001-SFI | PASCO | CATTLE GAP COMMERCIAL | SFI 29 | 8/7/2023 |
| 0403569-002-SFI | PASCO | CROCKETT - SEAWALL | SFI 29 | 8/8/2023 |
| 0256660-004-SFI | PASCO | DOERFLING - SEAWALL | SFI 29 | 8/8/2023 |
| 0434449-002-SFI | PASCO | PASCO COUNTY F&M WAREHOUSE | SFI 29 | 8/24/2023 |
| 0439648-001-SFG | PASCO | CAROLINE DRIVE | SFG 27 | 9/6/2023 |
| 0440488-001-SFG | PASCO | FLYING J TRAVEL CENTER 624 | SFG 36 | 9/25/2023 |
| 0440687-001-SFG | PASCO | CHANCEY ROAD | SFG 36 | 10/3/2023 |
| 0440805-001-SFG | PASCO | STARKEY RANCH MULTIFAMILY | SFG 10 | 10/6/2023 |
| 0439637-004-SFG | PASCO | ROBINSON_5712 CONGRESS ST_EXEM | SFG 16 | 10/10/2023 |
| 0441133-001-SFG | PASCO | HANDCART TOWNHOMES | SFG 27 | 10/13/2023 |
| 0442352-002-SFG | PASCO | WRP OBSERVATION DOCK | SFG 39 | 11/17/2023 |
| 0428567-002-SFI | PASCO | STONEHILL | SFI 30 | 12/1/2023 |
| 0411650-002-SFI | PASCO | HARVEST HILLS NORTH PHASE 1A | SFI 32 | 12/7/2023 |
| 0432612-003-SFI | PASCO | RD RANCH MASS GRADING WEST | SFI 32 | 12/15/2023 |
| 0429741-002-SFG | PASCO | SETBACK PVC FENCE | SFG 20 | 12/18/2023 |
| 0401699-002-SFG | PASCO | SR 52 GROVES | SFG 27 | 12/18/2023 |
| 0402383-003-SFI | PASCO | STONEBRIDGE NORTH | SFI 31 | 12/18/2023 |
| 0443352-001-SFI | PASCO | BEXLEY RD/WISTERIA LOOP VISION | SFI 30 | 12/19/2023 |
| 0443410-001-SFI | PASCO | SADDLEBROOK GOLF COURSE RENO | SFI 30 | 12/20/2023 |
| 0444250-001-SFG | PASCO | LAFITTE DR STORMWATER IMPROV | SFG 17 | 1/19/2024 |
| 0444385-001-SFG | PASCO | DOBINSON WAREHOUSE | SFG 36 | 1/22/2024 |
| 0444641-001-SFG | PASCO | CYPRESS CREEK SURFACE WATER | SFG 25 | 1/26/2024 |
| 0411299-003-SFG | PASCO | IMAGINE SCHOOLS PASCO COUNTY | SFG 36 | 2/5/2024 |
| 0424574-002-SFG | PASCO | PASCO COUNTY MOSQUITO CONTROL | SFG 36 | 2/5/2024 |
| 0411391-005-SFG | PASCO | JALLO EXPRESS CARWASH | SFG 36 | 2/20/2024 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0418633-001-SFG | PINELLAS | FAIRVIEW PARK BANK REINFORCEME | SFG 16 | 3/28/2022 |
| 0430238-001-SFG | PINELLAS | ON TOP OF THE WORLD | SFG 43 | 1/9/2023 |
| 0433136-001-SFG | PINELLAS | CMNY TRANSITIONS | SFG 36 | 3/21/2023 |
| 0435148-001-SFI | PINELLAS | 8900 US 19 N | SFI 31 | 5/12/2023 |
| 0441450-001-SFG | PINELLAS | BELLEAIR POND RELOCATION | SFG 40 | 10/23/2023 |
| 0442534-002-SFG | PINELLAS | ULMERTON CDO STORM STAGING SIT | SFG 36 | 11/27/2023 |
| 0444315-002-SFG | PINELLAS | IAN FLYNN VOGEL-THOMPSON | SFG 16 | 1/19/2024 |
| 0445345-001-SFG | PINELLAS | BRIDGE REPLACEMENT 17TH ST N | SFG 10 | 2/14/2024 |
| 0400133-001-SFI | POLK | GREYSTONE NORTH, SOUTH, & WEST | SFI LT | 3/10/2021 |
| 0411485-001-SFI | POLK | APPLEWOOD RESERVE | SFI 29 | 10/22/2021 |
| 0416259-001-SFG | POLK | N LAKE REEDY RD EAST BRIDGE | SFG 10 | 2/9/2022 |
| 0420908-001-SFG | POLK | OLSEN RD SUBDIVISION | SFG 27 | 5/11/2022 |
| 0427604-001-SFI | POLK | RIDGEWOOD LAKES | SFI 32 | 10/17/2022 |
| 0429061-001-SFI | POLK | AUBURN LAKES PRESERVE | SFI 31 | 12/5/2022 |
| 0396376-002-SFI | POLK | FOX BRANCH WEST | SFI 31 | 12/14/2022 |
| 0431066-001-SFI | POLK | I-4 AT SR 33 INTERCHANGE | SFI 32 | 2/2/2023 |
| 0432064-001-SFI | POLK | CENTRAL POLK PARKWAY | SFI 32 | 2/23/2023 |
| 0435083-001-SFI | POLK | THOMPSON NURSERY ROAD, SEG 1 | SFI 31 | 5/11/2023 |
| 0435202-002-SFG | POLK | MOORE | SFG 16 | 5/15/2023 |
| 0435889-001-SFI | POLK | KING BLVD DRAINAGE & DITCH IMP | SFI 30 | 6/1/2023 |
| 0436625-001-SFG | POLK | LEGACY @ DAVENPORT MF | SFG 27 | 6/16/2023 |
| 0436943-001-SFG | POLK | PIPKIN CREEK OFFICE | SFG 36 | 6/26/2023 |
| 0437258-001-SFI | POLK | MARIGOLD AVENUE WIDENING | SFI 32 | 6/30/2023 |
| 0437577-001-SFG | POLK | MOORE ROAD 20 - AG CROSSINGS | SFG 43 | 7/12/2023 |
| 0404339-002-SFI | POLK | NORTH RIDGE TRAIL | SFI 31 | 7/17/2023 |
| 0438667-001-SFI | POLK | HORSESHOE CREEK BRDG REPLACE | SFI 31 | 8/9/2023 |
| 0439784-001-SFI | POLK | CR 557 & BUENA VISTA RD | SFI 33 | 9/8/2023 |
| 0439722-001-SFG | POLK | FAIRWAY AVE DRNG IMPROVEMENTS | SFG 43 | 9/8/2023 |
| 0440114-001-SFG | POLK | KINDER MORGAN CFPL PIPELINE | SFG 15 | 9/19/2023 |
| 0440361-001-SFI | POLK | CRETE - POLK COUNTY | SFI 31 | 9/22/2023 |
| 0440487-001-SFG | POLK | ELLIS BRANCH STORMWATER CLEANO | SFG 10 | 9/25/2023 |
| 0441346-001-SFG | POLK | LAKE ARIAN PARK - PHASE 1 | SFG 39 | 10/19/2023 |
| 0396395-004-SFM | POLK | PEACHLEAF / MEDULLA CONNECTOR | SFM 29 | 11/8/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0442161-002-SFG | POLK | PEGGY BANNER | SFG 31 | 11/13/2023 |
| 0401709-003-SFI | POLK | CITY OF LAKE WALES - POD A | SFI 30 | 11/17/2023 |
| 0442688-001-SFI | POLK | GFI LAKELAND PHASE II | SFI 31 | 12/1/2023 |
| 0442698-002-SFG | POLK | STORMWATER OUTLET LAKE MCLEOD | SFG 40 | 12/1/2023 |
| 0442712-002-SFG | POLK | LAKE AGNES SLALOM COURSE | SFG 20 | 12/3/2023 |
| 0442749-001-SFG | POLK | 1ST STREET NW SIDEWALK | SFG 17 | 12/4/2023 |
| 0443205-001-SFG | POLK | STORMH2O OUTLET TO LAKE MCLEOD | SFG 40 | 12/15/2023 |
| 0074283-002-SFG | POLK | EXCLOSURES ON LAKE HANCOCK | SFG 25 | 12/19/2023 |
| 0443571-001-SFG | POLK | ROCKRIDGE RD BRG REPLACEMENT | SFG 10 | 12/27/2023 |
| 0443684-001-SFI | POLK | REYNOLDS TRAILER STORAGE | SFI 31 | 1/3/2024 |
| 0444294-002-SFG | POLK | TECO LOGISTICS PKWY PHASE I | SFG 15 | 1/19/2024 |
| 0444655-001-SFG | POLK | DERBY DITCH DRAINAGE | SFG 43 | 1/29/2024 |
| 0444653-001-SFI | POLK | FORESTLAKE OFFSITE IMPROVEMENT | SFI 29 | 1/29/2024 |
| 0444658-001-SFI | POLK | RIDGEWOOD LAKES MULTIFAMILY | SFI 31 | 1/29/2024 |
| 0445095-001-SFI | POLK | PUBLIX ALLEN BREED WAREHOUSE | SFI 32 | 2/8/2024 |
| 0401882-002-SFI | POLK | CROSSWINDS WEST | SFI 31 | 2/15/2024 |
| 0427693-001-SFG | PUTNAM | SILVER BAY RESIDENTIAL COM | SFG 27 | 10/20/2022 |
| 0436859-001-SFG | PUTNAM | NXFL0332 INTERLACHEN CELLTOWER | SFG 27 | 6/20/2023 |
| 0442268-002-SFG | PUTNAM | 404-LAKE GEORGE CONSERVATION | SFG 17 | 11/15/2023 |
| 0174021-007-SFI | SANTA ROSA | YELLOW RIVER RANCH PH II | SFI 29 | 3/12/2021 |
| 0422193-001-SFI | SANTA ROSA | RIVER WOODS RANCH PH 1 | SFI 29 | 5/26/2022 |
| 0174021-011-SFG | SANTA ROSA | YRR DITCHES ST 404 | SFG 43 | 6/22/2022 |
| 0255307-014-SFI | SANTA ROSA | WHISPER CREEK - PHASE 4A | SFI 29 | 12/8/2022 |
| 0396488-002-SFM | SANTA ROSA | WILSON - FLYNN TRANSFER ST 404 | SFM TO | 2/6/2023 |
| 0432114-001-SFG | SANTA ROSA | NANTAHALA APARTMENTS | SFG 27 | 2/28/2023 |
| 0431990-002-SFI | SANTA ROSA | BOTTLE CREEK (002) SUBDIVISION | SFI 30 | 3/1/2023 |
| 0174021-012-SFI | SANTA ROSA | YELLOW RIVER RANCH PHASE 3 | SFI 29 | 3/7/2023 |
| 0396546-002-SFI | SANTA ROSA | FALL SF RESIDENCE ST 404 | SFI 29 | 7/24/2023 |
| 0408488-002-SFG | SANTA ROSA | FOREST BAY VILLIAS | SFG 27 | 8/7/2023 |
| 0438982-002-SFI | SANTA ROSA | WHEELER SF RESIDENCE ST404 | SFI 29 | 8/17/2023 |
| 0431250-002-SFI | SANTA ROSA | SMITH SF RESIDENCE ST404 | SFI 29 | 10/3/2023 |
| 0441765-001-SFG | SANTA ROSA | WOODBINE RD AND US 90 | SFG 17 | 10/31/2023 |
| 0441767-002-SFI | SANTA ROSA | DOUGHERTY SF LOT 3 BLK 186 | SFI 29 | 11/1/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0442658-002-SFI | SANTA ROSA | CHARTRAND SF HOME | SFI 29 | 11/30/2023 |
| 0442729-002-SFI | SANTA ROSA | JONES SF RESIDENCE ST404 | SFI 29 | 12/4/2023 |
| 0256605-011-SFM | SANTA ROSA | PHILLIPS SF RESIDENCE ST 404 | SFM 06 | 12/19/2023 |
| 0443682-001-SFG | SANTA ROSA | PINE BLOSSOM ROAD DRAINAGE | SFG 14 | 12/28/2023 |
| 0438908-004-SFG | SANTA ROSA | E BAY BLVD CULVERT REPLST404 | SFG 16 | 1/9/2024 |
| 0443904-002-SFI | SANTA ROSA | HOMES BY VISION LTS 9-10 ST404 | SFI 29 | 1/10/2024 |
| 0443938-002-SFI | SANTA ROSA | LOT 12 13TH AVE ST404 | SFI 29 | 1/11/2024 |
| 0444252-002-SFI | SANTA ROSA | TAYEBI- SF RESIDENCE ST 404 | SFI 29 | 1/19/2024 |
| 0445172-002-SFG | SANTA ROSA | HOLLIMAN DRIVEWAY ST404 | SFG 27 | 2/12/2024 |
| 0418283-001-SFI | SARASOTA | TOLEDO VILLAGE | SFI 31 | 3/17/2022 |
| 0407250-002-SFI | SARASOTA | HAWKSTONE | SFI 30 | 5/16/2022 |
| 0414379-004-SFG | SARASOTA | INSTALL UTILITY (404) | SFG 15 | 7/26/2022 |
| 0135934-026-SFI | SARASOTA | BEE RIDGE GMP 2 (404) | SFI 29 | 11/23/2022 |
| 0430014-001-SFI | SARASOTA | LAUREL ROAD WIDENING | SFI 29 | 1/3/2023 |
| 0071131-001-SFI | SARASOTA | SKYE RANCH PHASE 2 | SFI 29 | 2/9/2023 |
| 0435526-001-SFG | SARASOTA | REGIONAL PARK SFI | SFG 39 | 5/19/2023 |
| 0434342-002-SFG | SARASOTA | JARVIS ROAD BRIDGE SFG | SFG 24 | 6/29/2023 |
| 0432333-002-SFG | SARASOTA | BOURNESIDE BOULEVARD SFG | SFG 17 | 7/20/2023 |
| 0441781-002-SFI | SARASOTA | VIREO SWEET WATER LAKES 404 | SFI 29 | 11/1/2023 |
| 0442032-001-SFG | SARASOTA | TOLL BROTHERS RD 404 | SFG 17 | 11/8/2023 |
| 0404503-005-SFI | SARASOTA | BENDERSON PARK BOAT RAMP 404 | SFI 29 | 11/16/2023 |
| 0442440-001-SFG | SARASOTA | GATOR CREEK GOLF CLUB 404 | SFG 39 | 11/20/2023 |
| 0442443-001-SFI | SARASOTA | TOLEDO PRESERVE 404 | SFI 32 | 11/20/2023 |
| 0441781-003-SFI | SARASOTA | NEWGROWTH SFI | SFI 29 | 11/29/2023 |
| 0444402-002-SFG | SARASOTA | 404SEAWALL IN FRESHWATER CANAL | SFG 16 | 1/23/2024 |
| 0444581-002-SFG | SARASOTA | PLAYMORE REC TRAIL 404 | SFG 17 | 2/16/2024 |
| 0416860-001-SFI | SEMINOLE | YARBOROUGH PROPERTY TRACT 3 | SFI 30 | 2/21/2022 |
| 0427569-001-SFI | SEMINOLE | OVIEDO COMMONS - PHASE 1 | SFI 29 | 10/19/2022 |
| 0428468-001-SFG | SEMINOLE | OVIEDO CONNECTOR ROAD | SFG 17 | 11/15/2022 |
| 0431599-002-SFG | SEMINOLE | GABRIELLA LANE (404) | SFG 20 | 2/16/2023 |
| 0364097-004-SFI | SEMINOLE | 2460 FAWN RUN (404) | SFI 29 | 2/27/2023 |
| 0433666-001-SFI | SEMINOLE | REGISTRY ON LAKE MARY BLVD | SFI 30 | 4/6/2023 |
| 0435317-001-SFI | SEMINOLE | SLAVIA RD CAP IMPR RED BUG LK | SFI 30 | 5/16/2023 |
| 0435115-002-SFG | SEMINOLE | SUNSET PARK BOAT LAUNCH | SFG 33 | 6/13/2023 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

**(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)**

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0436788-001-SFG | SEMINOLE | JESUS IMAGE | SFG 36 | 6/19/2023 |
| 0437068-001-SFG | SEMINOLE | MIDWAY DRAINAGE IMPROVEMENTS | SFG 40 | 6/29/2023 |
| 0437450-001-SFI | SEMINOLE | 1072 SR 434 RETAIL | SFI 29 | 7/10/2023 |
| 0437068-002-SFI | SEMINOLE | MIDWAY IMPROVEMENT BP2 (404) | SFI 29 | 8/1/2023 |
| 0441030-001-SFG | SEMINOLE | LAKE CHARM DITCH | SFG 20 | 10/11/2023 |
| 0441843-002-SFG | SEMINOLE | THOMAS GARAGE (404) | SFG 27 | 11/2/2023 |
| 0442544-001-SFG | SEMINOLE | OVIEDO MULTIFAMILY | SFG 27 | 11/20/2023 |
| 0443496-001-SFG | SEMINOLE | LOCKWOOD BLVD SIDEWALK | SFG 20 | 12/21/2023 |
| 0443591-001-SFI | SEMINOLE | CONNECTION POINT | SFI 30 | 12/27/2023 |
| 0444967-001-SFG | SEMINOLE | ALAFAYA PUD MASTER PLAN | SFG 40 | 2/6/2024 |
| 0445117-001-SFG | SEMINOLE | CASSELBERRY CHEDDARS | SFG 36 | 2/9/2024 |
| 0400128-002-SFI | ST. JOHNS | 404-SUNNYSIDE BORROW PIT | SFI 29 | 6/12/2022 |
| 0396565-002-SFI | ST. JOHNS | 404-MIDDLEBOURNE PHASE 3 | SFI 31 | 7/11/2022 |
| 0424211-001-SFI | ST. JOHNS | COUNTY ROAD 210 COMMERCIAL | SFI 30 | 7/21/2022 |
| 0424488-001-SFI | ST. JOHNS | 404-FLETCHER IGP | SFI 33 | 8/1/2022 |
| 0426062-001-SFI | ST. JOHNS | SCOTT ROAD SUBDIVISION | SFI 31 | 8/26/2022 |
| 0401663-002-SFM | ST. JOHNS | STOKES LANDING | SFM 29 | 9/22/2022 |
| 0427291-001-SFG | ST. JOHNS | LEE RD DRAINAGE IMPROVEMENTS | SFG 17 | 10/11/2022 |
| 0428553-001-SFG | ST. JOHNS | MAI OFFICE | SFG 36 | 11/16/2022 |
| 0428758-001-SFG | ST. JOHNS | 311 WEFF ROAD DRIVEWAY | SFG 27 | 11/17/2022 |
| 0404833-003-SFI | ST. JOHNS | DURBIN PARK, PHASE 3 | SFI 32 | 11/30/2022 |
| 0380893-002-SFG | ST. JOHNS | SR 206 TRUCK SALES PARKING LOT | SFG 36 | 12/8/2022 |
| 0429474-002-SFG | ST. JOHNS | TONA RESIDENCE, LEMONWOOD RD | SFG 27 | 12/21/2022 |
| 0430789-001-SFG | ST. JOHNS | PLANET SWIM IMPROVEMENTS | SFG 36 | 1/24/2023 |
| 0432228-002-SFG | ST. JOHNS | 404-FPL BROOK SUBSTATION | SFG 15 | 3/2/2023 |
| 0434076-001-SFG | ST. JOHNS | REIT US 1 NORTH | SFG 36 | 4/17/2023 |
| 0434071-002-SFG | ST. JOHNS | 404-GROSHELL PROPERTY | SFG 27 | 4/18/2023 |
| 0434339-002-SFG | ST. JOHNS | HEATH SINGLE FAMILY FILL 404 | SFG 27 | 4/25/2023 |
| 0434478-002-SFI | ST. JOHNS | 404-SJCUD CR 214 TO SR 207 FM | SFI 32 | 4/27/2023 |
| 0435025-002-SFG | ST. JOHNS | 404-HE HYBISCUS AVE SINGLE FAM | SFG 27 | 5/10/2023 |
| 0435660-001-SFG | ST. JOHNS | CR16A COM OFFICE BUILDING | SFG 36 | 5/22/2023 |
| 0435662-001-SFI | ST. JOHNS | ENCLAVE AT WORLD GOLF VILLAGE | SFI 30 | 5/23/2023 |
| 0436075-001-SFG | ST. JOHNS | STERLING PHASE II | SFG 36 | 6/3/2023 |
| 0436652-001-SFG | ST. JOHNS | PALM VALLEY RD SIDEWALKS PH2 | SFG 17 | 6/19/2023 |
| 0437285-001-SFG | ST. JOHNS | SEAGATE CULVERTS | SFG 20 | 6/30/2023 |
| 0437289-001-SFI | ST. JOHNS | DAILYS AT GRAND CREEK | SFI 30 | 7/5/2023 |
| 0437336-001-SFG | ST. JOHNS | PALM VALLEY SINGLE FAMILY | SFG 27 | 7/6/2023 |
| 0437514-001-SFI | ST. JOHNS | DAILYS AT MIDDLEBOURNE | SFI 31 | 7/10/2023 |

**Exhibit B**
**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**
(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0437584-002-SFG | ST. JOHNS | 404-FPL D8471788 ST. JOHNS | SFG 15 | 7/13/2023 |
| 0438052-001-SFI | ST. JOHNS | LONGLEAF MIXED-USE BUILDOUT | SFI 31 | 7/17/2023 |
| 0437750-001-SFG | ST. JOHNS | MOSCARELLO CULVERT CROSSING | SFG 14 | 7/17/2023 |
| 0438783-001-SFG | ST. JOHNS | SHERWOOD SENIOR LIVING CENTER | SFG 36 | 8/3/2023 |
| 0439101-001-SFI | ST. JOHNS | 2520 SR 207 | SFI 30 | 8/14/2023 |
| 0438933-001-SFG | ST. JOHNS | 708 AND 716 W FILL 404 | SFG 27 | 8/16/2023 |
| 0440290-001-SFI | ST. JOHNS | GREENBRIAR ROAD BTI | SFI 30 | 9/14/2023 |
| 0421031-002-SFI | ST. JOHNS | 404-THE LANDINGS AT GREENBRIAR | SFI 31 | 9/20/2023 |
| 0440829-001-SFI | ST. JOHNS | GREENBRIAR ROAD IMPROVMENTS | SFI 30 | 10/5/2023 |
| 0436192-001-SFI | ST. JOHNS | 404-WOLFE MARSHALL RESIDENTIAL | SFI 31 | 10/20/2023 |
| 0441583-001-SFI | ST. JOHNS | TRINITY EPISCOPAL NORTH CAMPUS | SFI 30 | 10/23/2023 |
| 0432258-001-SFI | ST. JOHNS | 404-US 1 MIXED USE DEVELOPMENT | SFI 32 | 11/1/2023 |
| 0441813-001-SFM | ST. JOHNS | SHEARWATER PH 3H POD 28 | SFM 29 | 11/1/2023 |
| 0441917-001-SFG | ST. JOHNS | REGALO ROAD IMPROVEMENTS | SFG 17 | 11/2/2023 |
| 0426459-002-SFG | ST. JOHNS | 404-142 SOUTH ROSCOE BLVD | SFG 27 | 11/6/2023 |
| 0442432-001-SFI | ST. JOHNS | VERMEER SOUTHEAST | SFI 29 | 11/16/2023 |
| 0443898-001-SFI | ST. JOHNS | CYPRESS POINT | SFI 31 | 1/5/2024 |
| 0444201-001-SFI | ST. JOHNS | 1900 SR 16 COMMERCIAL MASS | SFI 31 | 1/16/2024 |
| 0444072-001-SFG | ST. JOHNS | 404-SECESSION SUBDIVISION | SFG 27 | 1/16/2024 |
| 0444206-001-SFI | ST. JOHNS | CORONADO AT WILDWOOD HOA | SFI 29 | 1/17/2024 |
| 0444577-001-SFI | ST. JOHNS | RIVERDALE RANCHES ROADWAY PH 1 | SFI 29 | 1/18/2024 |
| 0399294-001-SFI | ST. LUCIE | VERANDA ST. LUCIE LAND HOLDING | SFI 33 | 2/18/2021 |
| 0411546-001-SFI | ST. LUCIE | SILVER OAKS | SFI 29 | 10/25/2021 |
| 0418051-001-SFI | ST. LUCIE | ST.ANDREWS PARK | SFI 30 | 3/14/2022 |
| 0430018-001-SFI | ST. LUCIE | OAK RIDGE RANCHES | SFI 33 | 1/5/2023 |
| 0440194-001-SFG | ST. LUCIE | SLC CYPRESS CREEK REHYDRATION | SFG 25 | 9/21/2023 |
| 0441234-001-SFI | ST. LUCIE | NEILL FARMS ESTATES | SFI 31 | 10/18/2023 |
| 0441243-001-SFG | ST. LUCIE | NAPA - OLEANDER AVE. | SFG 36 | 10/20/2023 |
| 0442828-001-SFG | ST. LUCIE | LAKEWOOD PARK CANAL 4 | SFG 14 | 12/8/2023 |
| 0442903-001-SFG | ST. LUCIE | MEADOWOOD WEST | SFG 14 | 12/14/2023 |
| 0443885-002-SFG | ST. LUCIE | SR-70 ST. LUCIE | SFG 15 | 1/3/2024 |
| 0444459-002-SFG | ST. LUCIE | FPL PINE LILY SOLAR ENERGY | SFG 15 | 1/19/2024 |
| 0444437-001-SFG | ST. LUCIE | INDRIO SAVANNAHS WET POND | SFG 16 | 1/30/2024 |
| 0444897-001-SFI | ST. LUCIE | CARTER AVENUE IMPROVEMENTS | SFI 29 | 2/6/2024 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0409372-003-SFI | SUMTER | MARLENE O'TOOL INDUSTR. PARK 2 | SFI 30 | 8/5/2022 |
| 0399615-002-SFG | SUMTER | CR525E ULT 4-LN IMPROVEMENTS | SFG 17 | 12/7/2022 |
| 0430543-001-SFI | SUMTER | EDEN AT OXFORD VILLAGE | SFI 31 | 1/13/2023 |
| 0432915-001-SFG | SUMTER | GINGERICH CONSTN WRHSE EXPANSI | SFG 36 | 3/20/2023 |
| 0415754-001-SFI | SUWANNEE | 404 - PARKER SEAWALL | SFI 31 | 1/21/2022 |
| 0428471-001-SFI | SUWANNEE | LIVE OAK PINES EXPANSION | SFI 29 | 11/14/2022 |
| 0441336-001-SFG | TAYLOR | USACE REPORT CULVERT INSTALL | SFG 17 | 10/17/2023 |
| 0442725-001-SFG | TAYLOR | ASH STREET- WIDENING/RESURFACI | SFG 17 | 12/1/2023 |
| 0444109-001-SFG | TAYLOR | US 221 BRIDGE REPLACEMENT | SFG 17 | 1/12/2024 |
| 0437097-001-SFG | UNION | CR18 RESURFACE UNION COUNTY | SFG 17 | 6/22/2023 |
| 0394847-003-SFG | VOLUSIA | SCHNEIDER DRIVEWAY 404 | SFG 27 | 1/22/2021 |
| 0403964-001-SFI | VOLUSIA | DAYTONA LAKES RV RESORT(404) | SFI 31 | 5/13/2021 |
| 0414997-001-SFI | VOLUSIA | WAYPOINTE SUBDIVISION | SFI 31 | 1/13/2022 |
| 0406137-004-SFG | VOLUSIA | MADELINE AVE EXTENSION | SFG 27 | 2/7/2022 |
| 0406137-002-SFI | VOLUSIA | WALKERS GREEN PHASE 1A | SFI 30 | 2/7/2022 |
| 0406137-003-SFI | VOLUSIA | WALKERS GREEN PHASE 1B | SFI 31 | 2/7/2022 |
| 0416438-001-SFI | VOLUSIA | CIRCLE C BOAT & RV STORAGE | SFI 30 | 2/8/2022 |
| 0408272-002-SFI | VOLUSIA | AVALON DAYTONA PHASE 2 (404) | SFI 32 | 3/7/2022 |
| 0405365-003-SFG | VOLUSIA | GRIER RESIDENCE (404) | SFG 27 | 4/22/2022 |
| 0420011-002-SFI | VOLUSIA | FAIRLAWN DEVELOPMENT (404) | SFI 33 | 4/29/2022 |
| 0424125-001-SFI | VOLUSIA | LEILA'S HAMMOCK HOMES | SFI 31 | 7/21/2022 |
| 0417809-002-SFI | VOLUSIA | TOMOKA FARMS INDUSTRIAL | SFI 31 | 9/8/2022 |
| 0428967-001-SFI | VOLUSIA | WASHINGTON PARK NORTH | SFI 30 | 12/2/2022 |
| 0431036-001-SFI | VOLUSIA | OAKBRIDGE COLONY | SFI 31 | 2/1/2023 |
| 0432982-001-SFI | VOLUSIA | RIDGE HAVEN | SFI 30 | 3/21/2023 |
| 0407073-003-SFI | VOLUSIA | SOUTH VILLAGE PHASE 1 (404) | SFI 33 | 4/7/2023 |
| 0435154-002-SFG | VOLUSIA | HOME BUILD (404) | SFG 27 | 5/16/2023 |
| 0437549-001-SFI | VOLUSIA | OAK HILL TOWN CENTER | SFI 30 | 7/11/2023 |
| 0257422-003-SFG | VOLUSIA | DOSTER RD (404) | SFG 27 | 7/25/2023 |
| 0438338-001-SFI | VOLUSIA | B-19 CANAL CULVERT | SFI 29 | 8/1/2023 |
| 0434120-003-SFI | VOLUSIA | RIDDLE SFH ADDITION | SFI 29 | 9/27/2023 |
| 0440815-001-SFI | VOLUSIA | OAK LEAF PRESERVE | SFI 29 | 10/6/2023 |
| 0442267-002-SFG | VOLUSIA | HICA TRUCK TRAIL 12 BRDG REPLM | SFG 17 | 11/15/2023 |
| 0407817-003-SFG | VOLUSIA | FEC 107.04 RAIL BRIDGE REPLACE | SFG 20 | 11/27/2023 |
| 0442545-001-SFG | VOLUSIA | OAK BREEZE PLAZA | SFG 36 | 11/27/2023 |
| 0444245-001-SFG | VOLUSIA | DUNLAWTON AVE DRAINAGE | SFG 17 | 1/19/2024 |
| 0444178-002-SFG | VOLUSIA | 1667 6TH AVE SINGLE-FAMILY | SFG 27 | 1/22/2024 |
| 0296797-007-SFI | VOLUSIA | FPL PIROLO TRANSMSN LINE PULL | SFI 29 | 1/22/2024 |

**Exhibit B**

**Section 404 Permit Applications Pending Before FDEP as of February 24, 2024 Sorted by County**

(*See* https://prodapps.dep.state.fl.us/pa/summarypending/PaData)

| Application # | County | Project Name | Permit Type / Subtype | Date Received |
|---|---|---|---|---|
| 0444556-002-SFI | VOLUSIA | ORMOND BEACH FUEL TERMINAL | SFI 31 | 1/26/2024 |
| 0444853-002-SFG | VOLUSIA | BEY RESIDENC 529 PALM DR (404) | SFG 27 | 2/5/2024 |
| 0402347-001-SFI | WALTON | MACK BAYOU SUBDIVISION | SFI 30 | 4/14/2021 |
| 0426893-001-SFG | WALTON | THE CANOPIES | SFG 27 | 9/23/2022 |
| 0424352-002-SFG | WALTON | SEASCAPE P2 / THE GROVE P1 | SFG 27 | 11/29/2022 |
| 0429136-002-SFG | WALTON | HESS SF RESIDENCE ST 404 | SFG 27 | 12/7/2022 |
| 0431683-002-SFI | WALTON | HOWERTON SF RESIDENCE ST404 | SFI 29 | 2/17/2023 |
| 0423772-001-SFI | WALTON | BAY VITA DEVLOPMENT ST404 | SFI 30 | 2/28/2023 |
| 0127599-002-SFG | WALTON | HOTEL IN MIRAMAR BEACH | SFG 36 | 4/3/2023 |
| 0276418-007-SFG | WALTON | BROWN RESIDENCE LOT 31 ST404 | SFG 27 | 5/10/2023 |
| 0192177-007-SFG | WALTON | FPL SR WEST SS EXP ST404 | SFG 15 | 6/27/2023 |
| 0437565-001-SFI | WALTON | DOCK OF THE BAY | SFI 29 | 7/10/2023 |
| 0437510-002-SFI | WALTON | KRESBACH HOME LOT 11 ST 404 | SFI 29 | 7/12/2023 |
| 0439086-002-SFI | WALTON | LOT 6 KOURY SF RESIDENCE | SFI 29 | 8/21/2023 |
| 0440113-002-SFI | WALTON | COASTLYE HOMES LOT 32 ST 404 | SFI 29 | 9/19/2023 |
| 0231997-004-SFG | WALTON | GOTTIER SF RESIDENCE ST 404 | SFG 27 | 9/22/2023 |
| 0441018-002-SFI | WALTON | SASHA SF RESIDENCE ST 404 | SFI 29 | 10/11/2023 |
| 0265380-002-SFG | WALTON | ROBERTS MANAGEMENT CORP | SFG 36 | 10/20/2023 |
| 0441763-001-SFG | WALTON | BLACK CREEK ESTATES PUD | SFG 27 | 10/30/2023 |
| 0442423-001-SFI | WALTON | MOLL TOWNHOMES | SFI 29 | 11/15/2023 |
| 0442332-002-SFI | WALTON | STEWART SF RESIDENCE ST 404 | SFI 29 | 11/17/2023 |
| 0443250-002-SFG | WALTON | CHAT HOLLEY FORCE ST 404 | SFG 15 | 12/18/2023 |
| 0426952-004-SFI | WALTON | FREEPORT HOTEL ROHAN M PATEL | SFI 30 | 12/19/2023 |
| 0443873-002-SFG | WALTON | HANDFELT SF RESIDENCE | SFG 27 | 1/9/2024 |
| 0442796-004-SFG | WALTON | DOLLAR GENERAL 30103 ST404 | SFG 36 | 1/17/2024 |
| 0396442-004-SFRP | WALTON | SWCP PHASE 3 - ST404 | SFRP 86 | 1/18/2024 |
| 0444830-001-SFI | WALTON | THE SANDBAR | SFI 29 | 2/2/2024 |
| 0445221-002-SFI | WALTON | HAWKEYE DESIGN SF 404 | SFI 29 | 2/13/2024 |
| 0435166-001-SFI | WASHINGTON | CHIPLEY RIDGE RV PARK | SFI 32 | 5/12/2023 |
| 0412129-003-SFG | WASHINGTON | JOHNS WAY BREIDGE REPL ST 404 | SFG 17 | 12/11/2023 |

**Permit Type Key:**
- GLSG = Everglades State 404 General Permit
- GLSI = Everglades State 404 Individual Permit
- SFG = State 404 General Permit
- SFI = State 404 Individual Permit
- SFM = State 404 Permit Modification
- SFRP = State 404 Regional Permit

# Attachment C

**FLORIDA ELECTRIC POWER COORDINATING GROUP, INC.  (FCG)**
3001 N. Rocky Point Drive E, Suite 410
Tampa, Florida 33607
(813) 418-0054



April 22, 2024

Justin Wolfe
General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd
MS 35
Tallahassee, Florida 32399

Re:     Current Status of Florida 404 Program

Dear Mr. Wolfe,

The Florida Electric Power Coordinating Group, Inc., Environmental Committee ("FCG EC") writes to express our deep concern at the continued hiatus in the issuance of permits under Florida's assumption of the federal 404 permitting program from the U.S. Army Corps of Engineers ("State 404 Program").  As a result of the court's decision in *Center for Biological Diversity, et al. v. Michael S. Regan, et al.* on February 15, 2024, the Florida Department of Environmental Protection ("the Department") has been required to cease "all activity"[1] pertaining to the State 404 Program.  This "pause" has now lasted over 2 months and created a degree of regulatory uncertainty that is making the impact to our members acute.

The FCG EC represents investor-owned electric utilities, rural electric cooperatives, and municipal electric utilities on environmental issues affecting the electric utility industry.  The FCG has a long history of working cooperatively with state and federal regulatory agencies to address regulatory initiatives that affect the electric utility industry in Florida.  The FCG EC supported Florida's assumption of the federal 404 program.

FCG EC members currently have twelve State 404 Program permit applications awaiting action at the Department and a multitude of permit applications that will be submitted in the coming weeks and months.  Five of the pending applications awaiting action from the Department are more than halfway complete with permit processing.

These permit applications are required for our members' construction of power distribution systems to new users or the maintenance of existing systems.  Florida received 249,604 new net residents in 2022, or almost 700 people per day (excluding a substantial number of new residents from other countries).[2]  As of 2022, the *growth* in Florida's population exceeded the total population of 18 other states.[3]  This population growth requires nearly continuous expansion of electrical infrastructure to meet the needs of new residents.  To provide safe and reliable power, FCG members are also continually re-investing in existing electrical power infrastructure.

---

[1] See State 404 Program | Florida Department of Environmental Protection (last visited April 4, 2024).
[2] See These States Are Bringing In More Residents Than They're Losing | Best States | U.S. News (usnews.com) (last visited April 4, 2024).
[3] See Florida's booming population. 7 charts tell the hidden story (tampabay.com) (last visited April 4, 2024).

Mr. Justin Wolfe
April 22, 2024
Page 2

The applications pending at the Department include projects to install new electrical lines (including connections to new solar power sites), rebuild and expand existing transmission lines, replace electric substations, and improve a transmission line right-of-way to allow for staging during disaster responses.

In addition to the impact on these power distribution system and maintenance projects, the ongoing delay associated with suspension of the State 404 Program is impacting our members' ability to develop renewable energy projects. The Sundance Solar Facility, for example, is waiting for completion of its pending application. Because of the hiatus, the project construction has already had to change, at considerable expense. Our members are under increasing pressure from the public and government to eliminate carbon emissions by 2035. To that end, the utilities have made significant investments in capital, workforce, and infrastructure to develop renewable energy in Florida. The current stand-still in processing of pending applications represents a severe setback in meeting clean energy targets and poses a tremendous risk on investments already made in the renewable sector.

Sound planning for this work requires regulatory certainty, and the lack of regulatory certainty is delaying projects and plans for necessary transmission lines, substations, and related infrastructure. FCG EC members are concerned that any transition of the State 404 Program back to the U.S. Army Corps of Engineers will create substantial delay and uncertainty regarding the timing of existing applications and those to be submitted. When the program was transferred to Florida – following a lengthy period in which the relevant agencies were *preparing* for a transfer – no permits were issued for five months and it took another year to get 11 permits issued across the entire state of Florida. Under the current circumstances, in which the agencies have made no preparations for a transition, it seems inconceivable that even lengthier delays won't again bog down planning, building, and maintaining the state's power distribution system.

The continued hiatus of the State's 404 Program is jeopardizing our members' ability to plan and continue these necessary projects due to the regulatory uncertainty. In so doing, this uncertainty is risking the state's electrical infrastructure. We urge the Department to take all necessary steps to immediately resume activities under the State 404 Program.

The FCG EC appreciates the Department's consideration of these comments. Please contact me if you have any questions.

> Sincerely,
> /s/ *Gregory M. Munson*
> Gregory M. Munson
> Gunster, Yoakley & Stewart
>
> On behalf of the Florida Electric Power
> Coordinating Group, Inc.
> Environmental Committee

cc: Tanya Portillo, Executive Director, FCG Environmental Committee

# EXHIBIT Q

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL, et al. | |
| Appellees, | |
| v. | **CASE NO. 24-5101** |
| MICHAEL S. REGAN, in his official capacity as Administrator for the U.S. Environmental Protection Agency, et al., | |
| Defendants, | |
| STATE OF FLORIDA and FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| Appellants | |

**DECLARATION OF JENNIFER MARSHALL, DIRECTOR OF THE OFFICE OF ENVIRONMENTAL MANAGEMENT FOR THE FLORIDA DEPARTMENT OF TRANSPORTATION**

1.     My name is Jennifer Marshall.  I declare under penalty of perjury under the laws of the United States of America and the State of Florida that the following statements are true and correct to the best of my knowledge and belief.

2.     I serve as the Director of the Office of Environmental Management for the Florida Department of Transportation ("FDOT"), an executive agency of the State of Florida.

1

3.    FDOT's mission is to provide a safe transportation system that ensures the mobility of people and goods, enhances economic prosperity, and preserves the quality of our environment and communities.

4.    The unique nature of the Sunshine State and its year-round warm climate provides numerous opportunities to move people and goods through multiple modes including highways/streets, air, rail, sea, spaceports, transit, and ever-expanding deployment of bicycle & pedestrian facilities.

5.    FDOT is committed to building a transportation system that not only fits the current needs of Florida's residents and visitors but also enhances mobility throughout the state to accommodate its consistent and rapid growth.

6.    Many, if not most, FDOT projects require various forms of federal and/or state permits, including Section 404 permits under the Clean Water Act (CWA). FDOT routinely applies for CWA 404 permits as part of the development and delivery of Florida's transportation infrastructure improvements.

7.    Since December 14, 2016, FDOT has, pursuant to 23 United States Code (U.S.C.) 327, assumed Federal Highway Administration's (FHWA's) responsibilities under the National Environmental Policy Act (NEPA) for highway projects and roadway projects in Florida whose source of federal funding comes from FHWA or which constitute a federal action through FHWA. This assumption, known as NEPA Assignment, includes responsibilities for environmental review,

interagency consultation and other regulatory compliance-related actions pertaining to the review or approval of NEPA projects.

8.      As part of NEPA Assignment, FDOT has assumed FHWA's role as the Lead Federal Agency, with approval authority for federally-funded projects resting in FDOT's Office of Environmental Management. In this capacity, FDOT is empowered to directly undertake Section 7 consultation with the United States Fish and Wildlife Service and National Marine Fisheries Service in support of its CWA 404 permits.

9.      As of February 15, 2024, FDOT had at least 26 applications for Section 404 permits pending at the Florida Department of Environmental Protection ("FDEP"). At the time of vacatur, three of these applications were within a week of permit issuance with another three pending public notice within approximately 1 - 2 weeks of the order.

10.      In response to the vacatur order, FDOT submitted applications for ten of the twenty-six projects, four of which are individual permits, to the United States Army Corps of Engineers ("USACE") for processing due to their priority status and/or quickly approaching contract letting dates. These ten projects have construction costs alone of **$1,022,300,763**.

11.      Currently, sixteen projects have applications that remain pending with FDEP. These projects are also critical to Florida's transportation infrastructure,

including pending applications for highway capacity projects, critical bridge repair and replacement projects, culvert construction projects to address stormwater near roadways, as well as a project to construct a wildlife crossing under US 27.

12.    FDOT depends upon the timely issuance of these permits to maintain project funding and deliver projects on schedule, all while meeting applicable environmental requirements.

13.    If FDOT is required to re-file the remainder of these applications with the USACE, FDOT will incur significant new expenses that have not been budgeted and projects will undoubtedly experience delays. Projects with applications on the path of issuance will have to be restarted, requiring duplication of staff and consultant hours.   New applications and forms will need to be prepared and submitted to the USACE for each project, triggering new review and re-noticing of FDOT projects, essentially putting these projects back to the start of the Section 404 process and potentially delaying the delivery of these important transportation infrastructure projects.

Executed on the 24th day of April, 2024.

_____
Jennifer Marshall, P.E.
Director, Office of Environmental Management
Florida Department of Transportation
605 Suwannee Boulevard
Tallahassee, FL 32399