NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5101

# In the United States Court of Appeals for the District of Columbia Circuit

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,

*Appellees*,

v.

MICHAEL S. REGAN,
IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR FOR THE U.S.
ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Defendants*,

STATE OF FLORIDA AND
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,

*Appellants*.

## AMICI CURIAE BRIEF OF
## THE FLORIDA CHAMBER OF COMMERCE, ET AL.
## IN SUPPORT OF FLORIDA'S MOTION FOR A STAY

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA,
NO. 1:21-CV-119-RDM

MOHAMMAD O. JAZIL
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 270-5938 (phone)
(850) 741-1023 (facsimile)

EDWARD M. WENGER
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici provide as follows:

***Amici G.L. Homes of Florida Corporation***: The parent corporation of G.L. Homes of Florida Corporation is G.L. Homes of Florida Holding Corporation. No publicly held corporation owns 10% or more of the stock of such parent corporation.

***Amici Pulte Group***: The parent corporation of Pulte Group is PulteGroup, Inc. a Michigan corporation. Pulte Group, Inc., the ultimate parent of the amicus, is a public company listed on NYSE–PHM. Pulte Group, Inc. has two institutions that own more than 10% of its stock (BlackRock and Vanguard).

***Amici Taylor Morrison Home Corporation***: is publicly held (TMHC). No publicly held corporation owns 10% or more of its stock.

All other amici curiae state that they are not publicly held corporations or other publicly held entities, and that they have no parent corporations. No publicly held corporation or other publicly held entity owns ten percent (10%) or more of any of these other amicus organizations.

/s/ Edward M. Wenger
EDWARD M. WENGER

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

### A.     Parties and Amici

*Intervenor-Defendant-Appellants*: State of Florida and Florida Department of Environmental Protection.

*Federal Defendants*: Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency; Radhika Fox, in her official capacity as Assistant Administrator for the Office of Water of the U.S. Environmental Protection Agency; Jeffrey Prieto, in his official capacity as General Counsel for the U.S. Environmental Protection Agency; Lawrence Starfield, in his official capacity as Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance for the U.S. Environmental Protection Agency; John Blevins, in his official capacity as Acting Administrator for Region 4 of the U.S. Environmental Protection Agency; Leopoldo Miranda-Castro, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service; Martha Williams, in her official capacity as Principal Deputy Director for the U.S. Fish and Wildlife Service; Scott Spellmon, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; James Booth, in his official capacity as District Commander of the Jacksonville District for the U.S. Army Corps of Engineers; U.S. Environmental Protection Agency; U.S. Army Corps of Engineers; and U.S. Fish and Wildlife Service.

*Plaintiff-Appellees*: Center for Biological Diversity; Defenders of Wildlife; the Sierra Club; the Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

*Additional Parties Before the District Court*: Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd.

*Amici Before the District Court*: Association of Florida Community Developers, Incorporated; Florida Chamber of Commerce; Cameratta Companies LLC; CAM7-SUB, LLC; Lennar Corporation; G.L. Homes; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison; Florida Transportation Builders Association; Florida State Hispanic Chamber of Commerce; and Associated Industries of Florida.

*Amici Before this Court*: The Florida Chamber of Commerce; the Association of Florida Community Developers, Inc.; the Mosaic Company; the Florida Home Builders Association; The Florida Transportation Builders' Association; the Leading Builders of America; the Associated Industries of Florida; the Lennar Corporation; G.L. Homes of Florida Corp.; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison Home Corp; Florida State Hispanic Chamber of Commerce.

## B.    Rulings Under Review

The State of Florida and the Florida Department of Environmental Protection have appealed the district court's February 15, 2024 order, as amended on April 12,

2024. That order was made final and appealable on April 12, 2024, when the district court entered a final judgment under Federal Rule of Civil Procedure 54(b).

**C.     Related Cases**

None.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................I

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES ..................II

    A.   Parties and Amici .......................................................................... ii
    B.   Rulings Under Review ......................................................... iii
    C.   Related Cases .........................................................................iv

TABLE OF CONTENTS ........................................................................ I

TABLE OF AUTHORITIES.....................................................................II

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE .............1

INTRODUCTION & SUMMARY OF THE ARGUMENT ...................................3

ARGUMENT ...........................................................................................3

I.    A DECISION NOT TO STAY THE DISTRICT COURT'S ORDER WOULD INFLICT CATASTROPHE ON INDUSTRIES THROUGHOUT FLORIDA. ....................................3

II.   RETURNING 404 PERMITTING TO THE U.S. ARMY CORPS OF ENGINEERS WILL NOT JEOPARDIZE ANY WILDLIFE (ENDANGERED OR OTHERWISE)......................6

III.  DESPITE ITS ASSERTIONS TO THE CONTRARY, THE U.S. ARMY CORPS OF ENGINEERS IS NOT PREPARED TO HANDLE THE DELUGE OF FLORIDIAN 404 PERMIT APPLICATIONS. ......................................................9

CONCLUSION .....................................................................................13

CERTIFICATE OF COMPLIANCE ...................................................15

CERTIFICATE OF SERVICE..........................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ................................................................... 4

**Rules**

Fed. R. App. P. 26.1 .................................................................... i

Fed. R. App. P. 27(d) ................................................................. 15

Fed. R. App. P. 29(a)(2) .............................................................. 1

Fed. R. App. P. 32(f) .................................................................. 15

Fed. R. Civ. P. 54(b) ................................................................. iv

**Other**

Section 7 ................................................................................ 7

Section 404 ................................................................ 3, 4,5, 8, 9, 11

## STATEMENT OF IDENTITY
## AND INTEREST OF AMICUS CURIAE[1]

Amici are well poised to speak on the tremendous disruption that would arise in the absence of a stay. They include production homebuilders currently operating across the entire State. Indeed, they provide the lion share of new housing. They are:

**The Florida Chamber of Commerce.**

**The Association of Florida Community Developers, Inc.**

**The Mosaic Company.**

**The Florida Home Builders Association.**

**The Florida Transportation Builders' Association.**

**The Leading Builders of America.**

**The Associated Industries of Florida.**

**The Lennar Corporation.**

**G.L. Homes of Florida Corp.**

**Greenpoint Holdings.**

**KB Home.**

**Pulte Group.**

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(2), counsel for all parties have provided consent for Amici Curiae to submit this brief for the Court's consideration. No party's counsel authored this brief in whole or in part, and no one besides Amici Curiae contributed money to fund the brief's preparation or submission.

**Taylor Morrison Home Corp.**

**Florida State Hispanic Chamber of Commerce.**

## INTRODUCTION &
## SUMMARY OF THE ARGUMENT

As they did before the district court, Amici offer the following to underscore the extent to which the public interest would benefit immensely from a stay of the district court's vacatur. As representatives from the industries most directly reliant on the 404-permitting process, they can speak from the clearest vantage point regarding the havoc that the district court's order has wrought on the State of Florida. Given that the district's court order will result in looming economic upheaval, provides no discernable benefit to any Florida wildlife (endangered, threatened, or otherwise), and quite mistakenly assumes that the U.S. Army Corps of Engineers is poised to seamlessly pick up the reigns that the district court yanked out of the State's hands, the Court should enter the stay requested by the State.

## ARGUMENT

### I.     A DECISION NOT TO STAY THE DISTRICT COURT'S ORDER WOULD INFLICT CATASTROPHE ON INDUSTRIES THROUGHOUT FLORIDA.

For the past three years, the Florida Department of Environmental Protection has administered the Section 404 permitting process. During that time, thousands of Section 404 permits have issued, facilitating a tremendous number of construction projects throughout one of the Nation's fastest growing states. Without question, Florida's assumption of the Section 404 permitting program has allowed the State's construction industry to flourish while being highly protective of the environment.

The district court's order, flawed as it was, is poised to swing the pendulum far in the opposite direction. Just as Florida's cooperative-federalism initiative benefited its populace, the district court's interference with it will work a tremendous detriment, if this Court allows the vacatur order to take effect. Although the court below gave short shrift to the disruptive consequences that it was duty-bound to consider, *see e.g.*, *Weinberger v. RomeroBarcelo*, 456 U.S. 305, 312 (1982), this Court need not repeat that mistake. Indeed, the public interest weighs heavily in favor of State's request for a stay.

Should the Court decline Florida's request, one effect will arise immediately—screeching delays throughout Florida's construction industry. And as night follows day, these delays will devastate Florida's construction industry (directly) while slashing the State's economy (as a downstream effect), exacerbating an already-worsening affordable housing crisis along the way. Amici represent many Section 404 permit applicants, and many of the permits submitted by those applications are set out in the exhibit attached to the State's motion for a stay. See Dkt. No. 166-2 (Ex. B). They can attest that 404 permits are essential to just about every land disturbing activity—vacatur will be cataclysmic. Even a six-month delay would cost tens of millions collectively, and this appeal will likely not be resolved within a years' time. Over that span, not only would housing starts decline

precipitously, but land prices, building materials, and labor would rise even further than they have in recent years, making affordability a daunting challenge.

Florida's land developers are not the only ones with a dog in this fight. Halting a construction project cascades to third parties, like contractors, suppliers, consultants, local government, and the public. All trades, manual labor, and other work forces will suffer, including many small and minority-owned businesses. And Amici would be remiss if they failed to note that environmentally friendly projects would also grind to a halt. As shown by the preliminary-injunction intervenors below, see Dkt. No. 146, many pending projects include things like Florida-panther crossing and other environmentally protective enhancements are only possible through required mitigation. These private, yet eco-friendly, ventures would also be delayed (perhaps indefinitely) in the absence of a stay.

Amici Lennar Homes, for instance, has a project that clearly elucidates the chaos that the district court's vacatur is about inflict. One of Lennar Homes' projects involves a multi-use development project in Pasco County. Lennar Homes' 404 permit application was pending before the Corps in 2019. When Florida assumed the Section 404-permitting regime, Lennar Homes was forced to begin its application from scratch. It did, and just as it reached the brink of approval, the district court suspended Florida's authority. Now, Lennar Homes will be forced to begin from square one *again*, which means that the residential structures,

commercial spaces, public-trail system, charter school, and significant roadway network that it has been trying to build are stalled indefinitely. The current vacatur renders the future of this project and investment in public infrastructure uncertain, even though it is uncontested that the federal and state agencies have determined that this project will not adversely impact any endangered species.

The destructive impact that vacatur will inflict manifestly outweighs the far-more-speculative harm that the Plaintiffs suggest (especially given Florida's demonstrated commitment to endangered- and threatened-species protection). A stay is thus warranted.

## II.     RETURNING 404 PERMITTING TO THE U.S. ARMY CORPS OF ENGINEERS WILL NOT JEOPARDIZE ANY WILDLIFE (ENDANGERED OR OTHERWISE).

Distilled to its core, the district court's issue with Florida's 404 permitting regime is its belief that Florida's system provides inadequate protection to endangered species compared to the protection from the inter-agency process led by the Corps of Engineers. This ignores the fact that the state led process leads to the same level of species protection. Indeed, a perusal of the permits the State has issued shows that federally listed species enjoy as much—if not more—protection than when the Corps issued 404 permits in the State. It is literally the same personnel in the U.S. Fish and Wildlife Service that review the state-issued 404 permits.

Throughout the three years that Florida has been allowed to issue 404 permits, all applications were reviewed by the U.S. Fish and Wildlife Service as well as the

State Fish and Wildlife Commission. Many were designated by the U.S. Fish and Wildlife Service as either a "No Effect" projects, or "May Affect, Not Likely to Adversely Affect" ("MANLAA") projects. These designations resulted from Section 7 "informal consultation." By the terms of Florida's 404 regime, this informal consultation arises when Florida and a 404-permit applicant seek technical assistance from the U.S. Fish and Wildlife Service for species review. If after reviewing the application, the U.S. Fish and Wildlife Service determines a project will result in a No Effect or a MANLAA, there arises no need for Section 7 formal consultation because the federal government has already concluded that take is unlikely. Informal consultation through technical assistance (and No Effect/MANLAA designations) arises whether the Florida or the Corps make the determination.

Critically, both the Corps and the State require that all 404 permits include binding conditions that protect any listed species. Indeed, Florida adds an extra layer of protection—State Fish and Wildlife Commission review, which is separate and apart from the U.S. Fish and Wildlife Service's review. And in the event that a project appears like it might result in take, *both* the federal and state agencies conduct a case-by-case review, and *both* will add conditions to address or mitigation any potential, incidental take.

Accordingly, the district court's vacatur has the perverse effect of *reducing* protection to listed species. Not only does it inject tremendous regulatory uncertainty; it also removes an added layer of protection that the State imposes when projects represent a risk to endangered species. Insofar as the district court had a concern with endangered-species protection, the conclusions in its order are precisely backwards.

Permitting conditions to do not end at permit issuance. The required deliverables between the State and the permittee assure that the State's program protects listed species. State-imposed permit conditions include monitoring and reporting species information to the State, as well as recording conservation easements (with the State as the beneficiary) to protect species habitat. The regulatory void created by the district court's vacatur means that *no* agency (federal or state) is either monitoring or enforcing these conditions. The State cannot, by virtue of the vacatur. And the Corps, for its part, has provided no guidance to permittees regarding permit conditions. Either way, the order has detracted from, rather than augmented, the protection that Florida's wildlife enjoyed while the State was administering the Section 404 permitting system.

III.   **DESPITE ITS ASSERTIONS TO THE CONTRARY, THE U.S. ARMY CORPS OF ENGINEERS IS NOT PREPARED TO HANDLE THE DELUGE OF FLORIDIAN 404 PERMIT APPLICATIONS.**

To be sure, Amici have no desire to impugn the U.S. Army Corps of Engineers, particularly given the role they play in the permitting process writ large. That said, facts are facts, and facts do not lie. And the facts, as experienced by Amici, demonstrate that the Corps is not at all prepared to pick up where the State left off without terrific disruption to the Section 404 permitting process.

The district court was made aware of the problems that would ensue if it disturbed Florida's assumption of the 404-permitting regime. At hearing conducted on April 4, 2024, counsel for the State implored the court to allow the State to continue processing permits. Counsel explained that over 1,000 applications remained in regulatory paralysis since the court had determined that certain parts of Florida's assumption violated the Endangered Species Act. Dkt 181, at 4 (Apr. 4, 2024 Hrg. Tr.).

The district court was unpersuaded, Dkt 181 at 26, and expressed confidence that the Corps stood at the "ready to accept permit applications right now." *Id*. at 27. It did so in reliance on the federal defendants' assurance that the Corps "ha[d] identified and allocated resources to process those permits" and was prepared to being processing them. *Id*.at 28-29. In fact, Counsel for the Corps "emphasize[d] that a project will not go to the back of the line just because the applicant had

previously applied to Florida." Dkt 181 at 30. The district bought those assurances, dismissing the State's concerns due to its belief that "the Corps stands ready and able to process the outstanding permit applications." Dkt. 183 at 10. And for good measure, the Corps doubled down on its confidence, asserting that "the Corps is administering 404 permitting in a way that serves the public," "is diligently processing permit applications," and "will continue to do so to mitigate any disruption and delay to applicants." Dkt. 188 at 1. The Federal Defendants have told this Court that applicants will "not go to the back of the line." Doc. #2052135 at 10.

Amici, respectfully, can represent without equivocation that the Corps' confidence is not borne out on the ground. Amici represent a wide cross section of businesses that have sought 404 permits both before and after the State assumption. Since the district court vacated Florida's program, they have had repeated interactions with the state and federal agencies. Unfortunately, they can report that the Corps is *not* "open for business" in the manner necessary to respond to this new task. Dkt 181 at 31.

To be certain, the Corps is not inept. The fact remains, however, that the State and the Corps have their own distinct 404-permit processes. Assuming that the Corps will be provided the full permit application files from the State and pick up where Florida left oft vastly underestimates the complexity of the transfer ordered by the district court. *Every* Florida permit applicant must start from the beginning and

submit a new Corps-specific permit application, which means the process must begin from scratch. The system simply cannot operate otherwise.

Adding to the chaos is that the Corps field offices have made clear that they are not prioritizing applications that were previously reviewed by the State. These applications are treated like any other new permit request; i.e., they are reviewed in the order they are received (including those that were pending before the Corps before Florida assumed the Section 404 permitting process). As it stands now, the Corps is working through the applications that it currently has in the system, which have swelled to create a 2022-application backlog.

While Amici do not question the sincerity of the Corps' commitment to process diligently the 1,000 applications that the State had on its desk, the State hired 300 employees upon assuming the 404-permitting regime for a very good reason. Processing 404 permits is a time- and labor-intensive process. Doing so involves at a minimum completeness review, confirmation of jurisdiction (and probable site visits), public notice, consideration of comments, consultation with the U.S. Fish and Wildlife Service, drafting permit terms and conditions, and review under the National Environmental Policy Act. In Amici's well-informed and hard-earned view, it will take years for the Corps to review individual 404 permits, even for those permits that were on the verge of issuance by when they were pending before the State (some of which started with the Corps and were sent to the state in 2020).

11

And those are just the permits that remain pending at the application stage. Of equal consequence are the thousands of permits already issued by the State, which, as noted above, now have (apparently) *no* agency (federal or State) monitoring them for compliance or enforcing them where they are violated. In the absence of a stay, the Corps will be responsible this role. But when (if?) they begin this process, they will do so without *any* institutional knowledge (and, currently, without *any* files). no files in front of them), the agency will have minimal ability to step into the shoes of FDEP.

Simply put, "open for business"[2] means exactly what it says—and no more. Even assuming that the Corps is be prepared to accept 404 permit applications, Amici can attest that the Corps is not ready to process and issue permits without tremendous growing pains. When Florida assumed the program (following a lengthy preparation period), it issued no permits for five months and only eleven after the State began approving them.[3] Under the current circumstances, in which both the federal and state agencies were blindsided by the district court's order, it defies belief that re-transiting the 404 program to the Corps will result in anything short of a total fiasco.

---

[2] 4/4/24 Hr'g Tr. at 31.

[3] Dkt. 166 at 6 n.7

In its recent filing/declaration, the Corps maintains its vague "we got this" position without anything concrete to allay the Amici's concerns. "Mak[ing] short- and long-term plans" is cold comfort. Zinser Dec. ¶ 10. So too is its ability to process roughly *6 percent* (10 permits authorized divided by 156 applications received). *Id.* ¶ 12. And dismissiveness regarding the "Florida-specific process[]" training that the Corps will need to commence underestimates tremendously the complexity that such training will involve, given Florida's inimitable ecosystem. *Id.* ¶ 10. If anything, the Corps "no position" filing provides additional support for why a stay must issue, lest calamity ensure throughout the State.

## CONCLUSION

For the foregoing reasons, Amici urge the Court to great the State's motion for a stay.

13

Dated: May 2, 2024

Respectfully submitted,

Mohammad O. Jazil
(FBN 72556) (DC BN 90010692)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street
Suite 500
Tallahassee, Florida 32301
(850) 270-5938 (phone)
(850) 741-1023 (facsimile)
mjazil@holtzmanvogel.com

*/s/ Edward M. Wenger*
Edward M. Wenger
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
emwenger@holtzmanvogel.com

*Counsel for Amici Curiae*

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 27(d) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 2,598 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 2nd day of May, 2024, a true copy of the Brief of Amicus Curiae was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER