NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5101

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
*Plaintiff-Appellees*,

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Defendants*,

STATE OF FLORIDA, ET AL.,
*Intervenor-Appellants*.

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:21-CV-0119 (RDM)

**PLAINTIFF-APPELLEES' RESPONSE IN OPPOSITION TO
INTERVENOR-APPELLANTS' MOTION FOR STAY PENDING APPEAL**

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd, Ste. 201
Miami, FL 33137
Tel.: (305) 440-5432
tgalloni@earthjustice.org
creichert@earthjustice.org

Bonnie Malloy
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL 32301
Tel.: (850) 681-0031
bmalloy@earthjustice.org

*Attorneys for Plaintiff-Appellees*

Dated: May 6, 2024

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties and Amici**

Parties: Plaintiffs-Appellees, Federal Defendants, and Intervenor-Defendant-Appellants are as stated in the Federal Defendants' Response in Opposition to the Motion.  Doc. #2052135 at 2.

Limited Intervenors Before the District Court: Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd., and Cameratta Companies, LLC, and Cam7-Sub, LLC, were granted leave to intervene solely for the purpose of opposing the motion for preliminary injunction below.

Amici Before this Court: Florida Chamber of Commerce; Association of Florida Community Developers, Inc.; Mosaic Company; Florida Home Builders Association; Florida Transportation Builders' Association; Florida State Hispanic Chamber of Commerce; Leading Builders of America; Associated Industries of Florida; G.L. Homes of Florida Corp.; KB Home; Lennar Corp.; Pulte Group, Inc.; Greenpoint Holdings; and Taylor Morrison Home Corp., submitted an amicus brief in support of Intervenor-Appellants' motion for a stay.  Doc. #2052661.

**B.    Rulings Under Review**

The State of Florida and the Florida Department of Environmental Protection appeal the district court's February 15, 2024, order, as amended on April 12, 2024. That order was made final and appealable on April 12, 2024, when the district court

directed entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b).

## C.    Related Cases

There are no related cases pending before this Court or the U.S. District Court for the District of Columbia.  However, a related case was filed in the U.S. District Court for the Southern District of Florida which was stayed and administratively closed in light of the order that is on appeal here.  Order at 2–3, Miccosukee Tribe of Indians of Fla. v. EPA, No. 1:22-CV-22459 (S.D. Fla. July 28, 2023), ECF No. 50.

*/s/ Tania Galloni*
TANIA GALLONI

Attorney for Plaintiff-Appellees

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Plaintiff-Appellees Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper ("Conservation Groups") are not-for-profit membership organizations dedicated to environmental conservation, including the protection of threatened and endangered species and their habitats.  Cir. R. 8(a)(4), 26.1(b). Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1(a), Plaintiff-Appellees affirm that they are nongovernmental organizations with no parent or publicly held corporation that has an ownership interest in them.

<u>/s/ Tania Galloni</u>
TANIA GALLONI

Attorney for Plaintiff-Appellees

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT ............................................................. iii

TABLE OF CONTENTS ................................................................................... iv

TABLE OF AUTHORITIES ...............................................................................v

GLOSSARY .................................................................................................... viii

LIST OF EXHIBITS .........................................................................................x

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE ..........................................................................2

    I.    Statutory Background ..........................................................................2

    II.    Procedural History ...............................................................................4

LEGAL STANDARD .......................................................................................9

ARGUMENT ...................................................................................................10

    I.    Florida Has Not Shown Likelihood of Success on Appeal ......................10

        A.    Conservation Groups Demonstrated Standing. ......................................10

        B.    The BiOp Violated the ESA. ..................................................................12

        C.    The ITS Violated the ESA. ....................................................................13

        D.    The "TA Process" Was Unlawful ...........................................................14

        E.    Florida is Not Likely to Succeed Based on *Cooling Water* ..................16

    II.    Florida Has Failed to Show Irreparable Harm. .......................................18

    III.   The Balance of Equities and Public Interest Weigh Against a Stay ..........21

CONCLUSION .................................................................................................23

CERTIFICATE OF COMPLIANCE ................................................................24

CERTIFICATE OF SERVICE .........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Akiachak Native Cmty. v. Jewell*,
   995 F. Supp. 2d 7 (D.D.C. 2014)........................................................................19

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)...........................................................................................21

*Citizens for Resp. & Ethics in Wash. v. FEC*,
   904 F.3d 1014 (D.C. Cir. 2018)...........................................................................9

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ................................................................................16

*Crow Creek Sioux Tribe v. Brownlee*,
   331 F.3d 912 (D.C. Cir. 2003).............................................................................11

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
   733 F.3d 1106 (11th Cir. 2013) .........................................................................12

*Fed. Nat'l Mortg. Ass'n v. LeCrone*,
   868 F.2d 190 (6th Cir. 1989) .............................................................................21

*Fund for Animals v. Espy*,
   814 F. Supp. 142 (D.D.C. 1993)........................................................................22

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981)............................................................................................15

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ..............................................................................19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................10

*N. Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980)...........................................................................18

*Nat'l Wildlife Fed'n v. Andrus*,
   440 F. Supp. 1245 (D.D.C. 1977)......................................................................22

*Nat'l Wildlife Fed'n v. Brownlee*,
  402 F. Supp. 2d 1 (D.D.C. 2005).......................................................18

*Nken v. Holder*,
  556 U.S. 418 (2009)...........................................................................9

*Oceana v. Pritzker*,
  125 F. Supp. 3d 232 (D.D.C. 2015)..................................................10

*Safari Club Int'l v. Salazar*,
  852 F. Supp. 2d 102 (D.D.C. 2012)..................................................20

*Solid Waste Agency of N. Cook Cnty. v. Corps*,
  531 U.S. 159 (2001).........................................................................19

*Waterkeeper Alliance, Inc. v. Regan*,
  41 F.4th 654 (D.C. Cir. 2022)..........................................................11

**Federal Statutes**

16 U.S.C. § 1531(a)(1)............................................................................3

16 U.S.C. § 1532(19)..............................................................................3

16 U.S.C. § 1536....................................................................................3

16 U.S.C. § 1536(a)(2)...........................................................................3

16 U.S.C. § 1536(b)(3)(A).....................................................................3

16 U.S.C. § 1536(o).............................................................................14

16 U.S.C. § 1538(a)(1)(B)......................................................................3

16 U.S.C. § 1539....................................................................................3

16 U.S.C. § 1539(a)................................................................................3

33 U.S.C. § 1344(a)................................................................................2

33 U.S.C. § 1344(g)................................................................................2

33 U.S.C. § 1344(h)(1)(A)(i)..................................................................2

**Federal Regulations**

40 C.F.R. § 230.10(b)(3) ................................................................2

40 C.F.R. § 233.20(a) .....................................................................2

50 C.F.R. § 17.22(b)(1) ..................................................................3

50 C.F.R. § 17.31(a) .......................................................................3

50 C.F.R. § 402.14 (2019) ..............................................................3

50 C.F.R. § 402.14(g) .....................................................................3

50 C.F.R. § 402.14(h) .....................................................................3

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Assumable Waters | Waters of the United States under the CWA over which states may assume Section 404 permitting authority pursuant to 33 U.S.C. § 1344(g)(1) |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BiOp | Biological Opinion |
| Conservation Groups | Plaintiff-Appellees Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| Corps | U.S. Army Corps of Engineers |
| Corps Dec. | Declaration of Shawn H. Zinszer, Corps, Apr. 30, 2024, Doc. #2052135 at 7–10 |
| CWA | Clean Water Act |
| EPA | U.S. Environmental Protection Agency |
| ERP program | Florida Environmental Resource Permit program |
| ESA | Endangered Species Act |
| FDEP | Florida Department of Environmental Protection |
| FDEP Dec. | Declaration of Justin Wolfe, FDEP, Apr. 25, 2024, Doc. #2051487 at 1467–1538 |
| FDOT Dec. | Declaration of Jennifer Marshall, FDOT, Apr. 25, 2024, Doc. #2051487 at 1539–43 |

viii

| | |
|---|---|
| FDOT | Florida Department of Transportation |
| Defendants | EPA, USFWS, the Corps, and federal officials |
| Florida | Intervenor-Appellants State of Florida and FDEP |
| ITP | Incidental Take Permit (Section 10 of the ESA) |
| ITS | Incidental Take Statement (Section 7 of the ESA) |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| Partial Stay Denial | Memorandum Opinion, Apr. 25, 2024, Doc. #2051487 at 1149–75 |
| Opinion | Amended Memorandum Opinion, Apr. 25, 2024, Doc. #2051487 at 1177–274 |
| Retained Waters | Waters of the United States under the CWA over which the Corps retains Section 404 permitting authority after state assumption pursuant to 33 U.S.C. § 1344(g) |
| RHA | Rivers and Harbors Act |
| Stay Denial | Memorandum Opinion and Order, Apr. 25, 2024, Doc. #2051487 at 1294–307 |
| TA Process | Technical Assistance Process |
| Transcript | Transcript for Oct. 19, 2023, Hearing on Cross-Motions for Summary Judgment, Doc. #2051487 at 1309–466 |
| USFWS | U.S. Fish and Wildlife Service |
| Wildlife Agencies | NMFS and USFWS |

# LIST OF EXHIBITS[1]

| Tab | Exhibit |
|-----|---------|
| 1 | Plaintiff-Appellees Center for Biological Diversity and Sierra Club Motion for Temporary Restraining Order and Preliminary Injunction, Dec. 4, 2023 (D.D.C. Dkt. 135) |
| 2 | Plaintiff-Appellees Center for Biological Diversity and Sierra Club Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Jan. 26, 2024 (D.D.C. Dkt. 153) |
| 3 | Plaintiff-Appellees' Brief on Remedy for Claims Relating to Protection of ESA-Listed Species, Feb. 9, 2024 (D.D.C. Dkt. 161) |
| 4 | Declaration of Amber Crooks, Plaintiff-Appellee Conservancy of Southwest Florida and Attachments, May 3, 2024[2] |
| 5 | Composite Exhibit of Declarations Submitted on Behalf of Conservation Groups in Support of Motion for Summary Judgment, Feb. 28, 2023 (D.D.C. Dkts. 98-2 to 98-10) |
| 6 | Plaintiff-Appellees' Reply in Support of Motion for Summary Judgment, June 9, 2023 (D.D.C. Dkt. 104) |
| 7 | TA Process Compared to ESA Section 7 Consultation, Jan. 26, 2024 (D.D.C. Dkt. 153-1) |

---

[1] For their exhibits, Conservation Groups pin cite (1) the district court's ECF page numbers for filings in the district court; (2) PDF page numbers for composite exhibits; and (3) PDF page numbers for transcripts. For exhibits filed by Florida and the Defendants, Conservation Groups cite the document number (Doc. #2051487 or Doc. #2052135) and they pin cite the ECF page number in this Court.

[2] For declarations that were filed in the district court (Exs. 4, 5, and 12), Conservation Groups submit the declarations without attachments or exhibits.

8          Transcript for Apr. 4, 2024, Hearing on Florida's Motion for Judgment and Motion for a Partial Stay (D.D.C. Dkt. 181)

9          Excerpt of FDEP Section 404 Annual Report, July 1, 2022 – June 30, 2023 (D.D.C. Dkt. 160-1)

10         Oversight Letter from Deputy Regional Administrator Jeaneanne Gettle, EPA, to Secretary Emile D. Hamilton, FDEP, Apr. 6, 2023 (D.D.C. Dkt. 104-1)

11         Plaintiff-Appellees' Response to Florida Intervenors' Motion for Stay Pending Appeal, Apr. 22, 2024 (D.D.C. Dkt. 189)

12         Composite Exhibit of Declarations Submitted on Behalf of Plaintiff-Appellees Center for Biological Diversity and Sierra Club in Support of Motion for Preliminary Injunction and Temporary Restraining Order, Dec. 4, 2023 (D.D.C. Dkts. 135-4, 135-5)

13         Defendants' Response to Florida's Motion for Entry of Final Judgment, Mar. 18, 2024 (D.D.C. Dkt. 175)

14         Memorandum Opinion and Order on Partial Summary Judgment, Mar. 30, 2022 (Moss, J.) (D.D.C. Dkt. 73)

## **INTRODUCTION**

For more than forty years, the Corps administered the entirety of Section 404 of the CWA in nearly every state, including Florida.  In late 2020, EPA approved Florida's request to administer the program in assumable waters of the United States.  But, as the district court's thoroughly reasoned opinion explains, EPA's approval rested on serious violations of the ESA that could not be remedied on remand.  The court therefore restored authority over assumable waters in Florida to the Corps, which had continued to administer 404 in Florida's retained waters throughout.

To promote efficiency, the Corps has increased staffing to levels higher than before state assumption, met with numerous project proponents, and prioritized projects requiring expedited review.  Already, more than 150 permit applicants have returned to the Corps.  Florida, in contrast, has hampered these efforts by refusing to transfer state applications to the Corps.

Florida now asks for the extraordinary relief of a stay pending appeal, which would have the effect of transferring 404 authority for the third time in as many years.  The district court thoroughly evaluated the stay factors and found that Florida met none of them.  Nothing has changed since then.

Florida is not likely to succeed on appeal because its entire legal theory hinges on a single out-of-circuit decision that involved different facts and is contrary to the ESA, its regulations, and the overwhelming weight of authority.  Florida's asserted

1

harms are either nonexistent (sovereignty harms), speculative (permitting delays), self-inflicted (regulatory "chaos"), or some combination of the three. The public interest would not be served by a third transfer, which would be worse for regulatory certainty and for threatened and endangered species in one of the country's most biodiverse states.

This Court should deny the motion.

## STATEMENT OF THE CASE

### I.    Statutory Background

*Clean Water Act*. Section 404 of the CWA authorizes the Corps to permit discharges of dredged or fill materials into waters of the United States. *See* 33 U.S.C. § 1344(a). With EPA approval, a state may administer Section 404 in lieu of the Corps within assumable waters. *Id.* § 1344(g). For a state to assume this authority, EPA must first determine that state-issued permits will, among other things, "apply, and assure compliance with" all Section 404 requirements, including the 404(b)(1) Guidelines. *Id.* § 1344(h)(1)(A)(i). The Guidelines prohibit the issuance of permits that would jeopardize the continued existence of protected species or adversely modify or destroy critical habitat. 40 C.F.R. §§ 230.10(b)(3), 233.20(a). Just two states currently administer 404 in assumable waters: Michigan (since 1984) and New Jersey (since 1994).

*Endangered Species Act*.  Congress enacted the ESA to address increasing threats of extinction due to "economic growth and development untempered by adequate concern and conservation."  16 U.S.C. § 1531(a)(1).  To accomplish this goal, Section 7 requires federal agencies to consult with wildlife agencies whenever a federal action may affect threatened or endangered species.  *Id.* § 1536; 50 C.F.R. § 402.14 (2019).[3]  If the proposed action is likely to adversely affect protected species, the wildlife agencies must use the best available information to produce a detailed BiOp that analyzes the action's impacts on species to ensure that the action is not likely to cause jeopardy.  16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

The ESA also prohibits taking (e.g., injuring or killing) protected species.  16 U.S.C. §§ 1532(19), 1538(a)(1)(B); 50 C.F.R. § 17.31(a).  Congress created two paths to ensure that "incidental" take resulting from otherwise lawful activities would not jeopardize protected species:  (1) Section 7 for federal actions, 16 U.S.C. § 1536; and (2) Section 10 for non-federal actions, *id.* § 1539.  Both mandate robust analyses and standards for wildlife agencies to limit authorized incidental take and exempt that take from the ESA's prohibition (and corresponding liability).  *Id.* § 1539(a); 50 C.F.R. § 17.22(b)(1).  *See* Doc. #2051487 at 1185–96 (Opinion).

---

[3] This memorandum cites the regulations in effect at the time of EPA's action.

3

## II.    Procedural History

In 2020, Florida applied to administer Section 404.  Home to more than 130 threatened and endangered species, Florida wanted to ensure that state permittees would not face ESA liability for incidental take, a shield available to them through Section 7 when the Corps (a federal actor) administers the program.  *Id.* at 1181, 1217.  But Florida (a non-federal actor) felt the Section 10 process was too "burdensome," "time consuming[,] and resource-intensive."  *Id.* at 1181 (internal quotations omitted).

Florida therefore proposed a non-statutory solution.  First, EPA would engage in a one-time Section 7 consultation at the programmatic level, with USFWS producing a BiOp that would punt all species-related analyses to a "TA process" at the permit level, where Section 7 would not apply.  Second, USFWS would issue an ITS at the programmatic level to extend unlimited take liability coverage to all future state permittees at the permit level.  *Id.* at 1181, 1183, 1254–55.  At the time, however, EPA's position was that its approval of state 404 programs did not require Section 7 consultation.  *Id.* at 1201.

EPA moved at breakneck speed to approve Florida's application.  This speed was possible, in part, because EPA, USFWS, and Florida coordinated for months before Florida submitted its application, acting as though Florida's ESA proposal

4

was a *fait accompli*. *Id.* at 1201–06.[4]  Within days of Florida's application, EPA

adopted Florida's request to reverse its position on Section 7 consultation and find

that "one-time" Section 7 consultation would suffice. *Id.* at 1201–02, 1206.  EPA

then immediately requested formal consultation with USFWS, transmitting a BE that

was "cut and paste[d]" from Florida's BA. *See id.* at 1203, 1205–07.  EPA did not

engage in formal consultation with NMFS, erroneously concluding consultation was

not required. *Id.* at 1207.  USFWS issued its BiOp after public comment on Florida's

application closed, even though the application relied on it to claim program

sufficiency. *Id.* at 1207–08, 1260–61.

The BiOp contained several serious errors.  USFWS concluded that EPA's

action would likely "adversely affect" protected species, but:

(1)  failed to conduct any of the analyses required by Section 7;

(2)  deferred all species analysis to an inadequate, non-statutory "TA process" at the permit level;

(3)  but asserted that EPA's approval of Florida's program would not jeopardize species;

(4)  opined that EPA's approval was reasonably certain to result in the incidental take of listed species;

(5)  but failed to set any limit on that take; and

(6)  then extended unlimited incidental take liability coverage without

---

[4] EPA deemed Florida's application "complete" as of its submission, which triggered a 120-day decision deadline (that could be extended), even though the application relied on the "anticipated" BiOp. *Id.* at 1198 (Opinion); *id.* at 847 (Pls.' MSJ).

imposing meaningful terms and conditions, including none applicable to state permittees. *Id.* at 1220, 1237–38, 1257.

EPA relied on the BiOp to approve Florida's application, effective December 22, 2020. *See id.* at 1260–61.

On January 14, 2021, Conservation Groups representing thousands of members challenged EPA's action, seeking vacatur of EPA's approval as unlawful under, as relevant here, the APA and ESA. *Id.* at 1209. The Amended Complaint alleged that EPA and USFWS did not comply with the ESA either procedurally or substantively (Counts 3–6, 10–13). It also alleged EPA's approval violated the CWA and APA because Florida's proposal was not complete when submitted (Count 1) and not as stringent as federal law requires (Count 2). And it alleged the Corps' retained waters list violated the RHA (Count 7). The district court granted early summary judgment to the Defendants on preliminary procedural claims (Claims 8 and 9), while the parties resolved administrative record issues and briefed summary judgment on all other claims. *See id.* at 1209.

Center for Biological Diversity and Sierra Club subsequently moved for a preliminary injunction to prevent Florida's imminent issuance of 404 permits for projects that would cause irreparable harm to the critically endangered Florida panther (estimated remaining adult population between 120 to 230) and the threatened Florida crested caracara (a bird of prey with very limited available habitat). Ex. 1; Ex. 2.

6

After reviewing more than twenty briefs on the merits, studying a voluminous administrative record consisting of thousands of pages, hearing oral argument on the ESA claims (twice), and considering additional briefing and evidence on remedy, the district court granted summary judgment to Conservation Groups on their ESA claims, vacated the BiOp, ITS, and program approval (prospectively), and denied the motion for preliminary injunction as moot. *See* Doc. #2051487 at 1183, 1211 n.8 (Opinion).

The court found USFWS' BiOp unlawful because it failed to conduct any of the species-specific analysis that Section 7 requires. *Id.* at 1234. USFWS was not "free to disregard" this mandate by deferring analysis to a later process that itself would not be subject to Section 7. *Id.* at 1247. USFWS' ITS was unlawful because it contained no take limit and expressly disavowed any duty to reinitiate consultation should EPA's approval of Florida's 404 program result in excess take or otherwise jeopardize the continued existence of protected species. *Id.* at 1257. While the ESA creates two paths for take liability coverage (Sections 7 and 10), neither authorized the scheme that the Defendants adopted at Florida's request. *Id.*

EPA impermissibly relied on USFWS' BiOp and ITS to approve Florida's program, given that those documents "entirely fail[ed] to address essential

7

questions." *Id.* at 1260–61.[5]  EPA's approval also unlawfully relied on a "no effect" determination as to NMFS species that improperly disregarded indirect effects.  *Id.* at 1263–64.

For remedy, the court considered briefing from the parties, intervenors (including Florida's nearly 500-page declaration), and amici and carefully analyzed the *Allied-Signal* factors.  *Id.* at 1265.  *See* Ex. 3 at 7–14.  The court concluded that the agencies' ESA violations were serious and that vacatur was warranted.  Doc. #2051487 at 1265–72 (Opinion).  The court also found that the disruption Florida alleged was "inherent" in Congress' design because Section 404 requires EPA to withdraw approval when a state program is unlawful.  *Id.* at 1269–70.

The court accepted still more briefing and evidence on Florida's motion for a limited stay, which the Defendants opposed as "neither workable nor lawful."  *Id.* at 1152 (Partial Stay Denial).  The court agreed with the Defendants and denied the stay.  *Id.*  The court found that "the Corps stands ready and able" to process pending permit applications and that "any delay in processing those applications is a result of Florida's effort to keep some semblance of the Section 404 assumption in place—even if only temporarily."  *Id.*  *See id.* at 1159–60.  In light of the vacatur, the court dismissed Plaintiffs' CWA claims without prejudice as prudentially moot and, at

---

[5] Indeed, the Defendants estimate that as many as 85% of Florida 404 permit applications may affect ESA-listed species.  *See id.* at 1156 (Partial Stay Denial).

Florida's request, directed entry of partial final judgment to allow this appeal. *Id.* at 1149, 1175.

The court considered yet another round of briefing on Florida's motion for a stay pending appeal, which relied on hundreds of pages of previously submitted declarations. *See id.* at 1295–96 (Stay Denial). The court denied the stay finding that Florida failed to show a likelihood of success on appeal (or even the lower, albeit inapplicable, "serious legal question" standard), irreparable injury, or that the balance of harms and public interest weighed in favor of a stay. *Id.* at 1294, 1298–1307 (Stay Denial).[6]

## **LEGAL STANDARD**

A party seeking the extraordinary relief of a stay pending appeal must make a "substantial" showing that certain "stringent requirements" are met: a likelihood of success on appeal, irreparable harm absent a stay, and that the balance of harms and the public interest support a stay. *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016–17 (D.C. Cir. 2018). "The first two factors are the most critical" and require more than a mere "possibility" of relief and irreparable harm. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

---

[6] The district court also issued an Amended Opinion on the merits that contained minor revisions. Doc. #2051487 at 1157 n.2 (Stay Denial).

## ARGUMENT

### I.    Florida Has Not Shown Likelihood of Success on Appeal.

Florida argues that this Court will likely reverse the district court decision because (1) Conservation Groups lacked standing; and (2) the Defendants' actions complied with the ESA.  As the district court correctly explained, Florida is wrong on both counts.  Doc. #2051487 at 1298–1302 (Stay Denial).

### A.    Conservation Groups Demonstrated Standing.

The district court properly concluded that Conservation Groups had standing. Detailed declarations set forth their members' recreational and aesthetic interests, including regularly hiking, camping, and viewing listed species, like the endangered Florida panther, in the wild.  *Id.* at 1214–27 (Opinion); Ex. 4 at 4, 12–20 ¶¶ 9, 30– 44 (Crooks).[7]  These interests established an Article III injury.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992); *Oceana v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015).

Florida denies a connection between the challenged actions and these injuries. Doc. #2051487 at 32–33.  But as the district court explained, USFWS failed to conduct species-specific analyses, set incidental take limits, or ensure that EPA's

---

[7] *See also* Ex. 5 at 9–10 ¶¶ 30–33 (Carter), 18–24 ¶¶ 20–36 (Fleming), 34–37 ¶¶ 32– 40 (Hartl), 41–56 ¶¶ 9–54 (Schwartz), 59, 65–66 ¶¶ 9, 28–32 (Rinaman), 76–81 ¶¶ 21–36 (Silverstein), 89–91 ¶¶ 23–27 (Robertson), 95 ¶ 8 (Glendhill), 100–09 ¶¶ 15–40 (Umpierre).

transfer of authority would not jeopardize listed species like the panther. *Id.* at 1217–21, 1233–58 (Opinion). Florida's TA process "provid[ed] far less robust ESA protection of listed species than the ESA procedures it supplant[ed]," thereby posing direct threats to species and members' interests in them. *Id.* at 1255.

Neither of the cases Florida cites, *id.* at 33, undermines Conservation Groups' standing. In *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654 (D.C. Cir. 2022), the plaintiffs challenged an EPA regulation that would not affect the state program causing their harm (and thus failed to show redressability). Here, EPA's action—the program approval—authorized the transfer of 404 authority to Florida. Florida's program harmed Conservation Groups and vacating EPA's action remedied those harms. Doc. #2051487 at 1222–24 (Opinion). In *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 917 (D.C. Cir. 2003), the challenged transfer "effect[ed] no legal change that would lessen the protection of the Tribe's cultural heritage under federal law." Here, EPA's transfer decision resulted in the loss of Section 7 consultation, replaced by a non-statutory and inadequate TA process. Doc. #2051487 at 1220, 1238, 1255, 1257 (Opinion). EPA's oversight role, on which Florida also relies, "is intended to ensure that a state program is operating as approved, not to remedy a violation of the ESA." *Id.* at 1257.

11

**B.    The BiOp Violated the ESA.**

The ESA unambiguously requires USFWS to use the best available information to issue a BiOp that "detail[s] how the agency action affects the species." *Id.* at 1188–91, 1233–36.  The BiOp here, however, "failed to undertake *any* species-specific analysis." *Id.* at 1234 (Opinion) (emphasis in original).[8]  *See id.* at 1150–51 (Partial Stay Denial); *id.* at 1298–1302 (Stay Denial).  Nor did USFWS use the "reams of data from previous Section 7 consultations" at its disposal. *Id.* at 1239–40.  With this information, USFWS "'could have determined whether post-[assumption] activities in particular areas were fundamentally incompatible with the continued existence of the species.'" *Id.* at 1240 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

Florida disputes the court's reading of the ESA, *id.* at 25–26, by taking Section 7(a)(2)—which requires wildlife agencies to make an ultimate conclusion as to whether jeopardy to listed species is likely—out of context.  Florida ignores the rest of Section 7, where Congress expressly directed *how* USFWS must reach that determination: by using the best available information to detail effects on listed species. *Id.* at 1233 (Opinion).  Florida relies on *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013), to bolster its plain

---

[8] Since the statute requires analyses of effects to species, whether the term "species-specific" appears in the statute, Doc. #2051487 at 15, is irrelevant.

language argument. But the action there *complied* with the ESA. Doc. #2051487 at 1112–13, 1121–22. That BiOp contained species-specific analyses, committed to future Section 7 consultations, and authorized no incidental take. *Id.* at 1244, 1253 (Opinion); *id.* at 1299–1300 (Stay Denial).

### C.     The ITS Violated the ESA.

The district court's determination that the ITS was unlawful was "not taxing." *Id.* at 1249 (Opinion). The ITS "sets no numerical take limit, offers no surrogate, and provides no 'clear standard for determining when the level of anticipated take has been exceeded.'" *Id.* at 1250 (quoting 50 C.F.R. § 402.14(i)(1)(i)). Moreover, "none of the listed 'terms and condition[s]' govern the conduct of state permittees," binding only EPA and Florida. *Id.* at 1208.

Florida avers that USFWS was required to issue an ITS because EPA "approved Florida's program." *Id.* at 27. But the statutory trigger for an ITS was USFWS' determination that EPA's action would cause incidental take of all 139 listed species in Florida. *Id.* at 1191–92, 1217 (Opinion). That finding required USFWS not only to issue an ITS, but also to identify incidental take limits and set meaningful terms and conditions. *Id.* at 1208, 1249–50. USFWS had sufficient information "to quantify numerical take" "given the wealth of previous permit and ESA consultation data at their disposal," but failed to do so. *Id.* at 1251. Ex. 6 at 26–28. No deference was due to USFWS' conclusory suppositions otherwise. *Id.*

Florida also cites Section 7(o)(2), Doc. #2051487 at 27, but that provision merely exempts "any taking in compliance with [an ITS'] terms and conditions." 16 U.S.C. § 1536(o). Because an ITS authorizes take of listed species, the ESA requires that USFWS analyze the effects on species, establish incidental take limits, and set meaningful terms and conditions. But the ITS here unlawfully authorized incidental take of all listed species in Florida for the life of Florida's 404 program without setting any limit. Doc. #2051487 1217, 1220–21, 1250 (Opinion).

**D.    The "TA Process" Was Unlawful.**

USFWS' approach to consultation was also unlawful because it evaded compliance with Section 7 altogether, at both the programmatic and permit levels. *Id.* at 1300 (Stay Denial). That is not the statute "that Congress enacted." *Id. See id.* at 1193, 1245–47 (Opinion); Ex. 6 at 37–41; Ex. 7.

As it did below, Florida defends the consultation by arguing that the "action" under review was EPA's approval decision. Doc. #2051487 at 26. But USFWS was still required to detail how this action affects species, *id.* at 1233–36 (Opinion), including "the consequences of other activities that are caused by the proposed action," *id.* at 1190, which here meant Florida's program implementation.

Florida's disagreement with the court's analysis of "framework" consultation, *id.* at 26–27, mischaracterizes the court's decision. After examining all relevant regulatory provisions, the court found that they "leave[] little doubt that USFWS

14

will engage in the required species-specific analysis" under Section 7 later.  *Id.* at 1300 (Stay Denial).  *Accord id.* at 1245 (Opinion).  The BiOp here was not a "framework" consultation precisely because there would be no future Section 7 consultation.  *Id.* at 1300 (Stay Denial); *id.* at 1245–47 (Opinion).  No provision authorized Florida's approach.

Florida attempts to recast the district court's opinion as requiring that USFWS "make an upfront, species-specific Section 7 analysis of every permit that Florida would issue after approval."  *Id.* at 27 (emphasis omitted).  Not so.  The court recognized that there were other options for Florida's assumption that would have complied with the ESA.  *Id.* at 1203, 1272 (Opinion).  But Florida pushed for this particular scheme to secure broad take liability exemption for state permittees without USFWS undertaking Section 7 analyses or requiring state permittees to obtain Section 10 ITPs.  *See, e.g.*, *id.* at 1202–03, 1206–07, 1243; *id.* at 1300 (Stay Denial).

Florida's claim that the district court's decision undermines federalism principles in the CWA and ESA, *id.* at 31–32, is baseless.  A state is only empowered to administer federal programs in compliance with federal law.  *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–92 (1981).  *Accord* Doc. #2051487 at 1303–04 (Stay Denial).

### E.     Florida is Not Likely to Succeed Based on *Cooling Water*.

Florida relies extensively on the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), which involved programmatic consultation on an EPA rulemaking.   But as the district court concluded, *Cooling Water* addressed fundamentally different facts and was wrongly decided.   Doc. #2051487 at 1241–43 (Opinion); *id.* at 1299–300 (Stay Denial). Although Florida claims that the district court was the "first to reject *Cooling Water*," *id.* at 30–31, Florida fails to acknowledge that the instant case was *the* "first next time" that an agency adopted a similar approach.  *Id.* at 1243 (Opinion).

*Cooling Water* arose in a very specific, and different, context.  It addressed nationwide EPA standards for cooling water structures that would be implemented through Section 402 state and federal permits for power plants and manufacturing facilities.  *Id.* at 1241 (Opinion).  Here, EPA was transferring authority over Section 404 assumable waters from the Corps to Florida (including permitting, compliance, and enforcement).  *Id.*  There, EPA promulgated a TA process that created legally binding responsibilities for all parties.  *Id.*  Here, the TA process contained no enforceable regulatory framework binding the parties' actions.  *Id.* at 1242; *id.* at 1397–1400 (Transcript); Ex. 7.  There, consultation data from past state and federal permits for cooling water intake structures was non-existent.  *See* Ex. 6 at 47–48. Here, USFWS had decades of data from its own consultations on 404 permits in

16

Florida that it could and should have used to perform ESA-mandated analyses. Doc. #2051487 at 1239–40 (Opinion).

Florida contends that the district court erred by focusing on the codification of the TA process in *Cooling Water*. *Id.* at 29–30. But Florida fails to grapple with *Cooling Water*'s reliance on the fact that the rule there obligated USFWS to provide technical assistance at the permit level. *Id.* at 1241–42 (Opinion) (*quoting Cooling Water*, 905 F.3d at 72). Here, by contrast, "no regulatory framework bind[s] the parties[]." *Id.* at 1242.[9]

Additionally, *Cooling Water*'s approval of deferring species analysis to the permit stage was "at odds with the statute, regulations, and caselaw." Doc. #2051487 at 1243–47 (Opinion); *id.* at 1299–300 (Stay Denial). Although the ESA authorizes programmatic consultation, it requires complete Section 7 consultation to occur at either the programmatic or permit level, or both. *See id.* at 1243–47. Indeed, as the district court explained, the very authority on which *Cooling Water* relied to say otherwise affirms this reading of the ESA. *See id.* at 1244.

*Cooling Water* also clearly erred in holding that setting no take limit was lawful because, again, the decision itself relied on cases that themselves required a

---

[9] Contrary to Florida's characterization, there is no impending circuit split, because *Cooling Water* is an outlier that was decided under specific, and fundamentally different, circumstances. *Id.* at 1241–43.

take limit.  *See id.* at 1252.  As the district court here remarked, "in a case that has been briefed beyond the point of exhaustion," the Defendants were able to identify only *Cooling Water* as upholding an ITS that set no take limit.  *Id.*

As it did below, Florida, *id.* at 28–30, "focuses on the differences" between *Cooling Water* and the district court's opinion here, but "never explains why [the opinion here] is wrong—or even subject to serious dispute."  *See id.* at 1299 (Stay Denial).  Florida does not argue, much less show, that the decision here was inconsistent with the ESA, its implementing regulations, or this Circuit's precedents. *Id.* at 1245–47 (Opinion) (discussing *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), and *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005)).

## II.    Florida Has Failed to Show Irreparable Harm.

Florida asserts three bases to claim it will suffer irreparable harm without a stay.  But these harms are speculative, nonexistent, or self-inflicted.  None are irreparable and none supports a stay.  Florida's latest declaration largely repeats unsupported claims and legal arguments the district court considered and rejected. *See* Doc. #2051487 at 1302–05 (Stay Denial).

Florida's allegation of harm to its sovereign interests, *id.* at 33–34, fails because any state interest in administering a federal program requires compliance with federal law.  Moreover, Florida enjoys the same authority over waters subject

to the CWA as it had prior to EPA's approval.  *Id.* at 1303–04 (Stay Denial).  And regardless of whether Florida is authorized to implement federal law with respect to assumable waters, "it remains free to enforce *state* law," such as its ERP program, "and to exercise its traditional sovereign authority to prevent pollution and other environmental harms."  *Id.* at 1303–04 (emphasis in original).  *See id.* at 1471–72 ¶ 12 (FDEP Dec.).  Florida's cited cases are therefore unavailing.  *Cf. Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 16–17 (D.D.C. 2014) (regulation impinged state sovereignty by allowing federal government to take tribal lands into trust, beyond state's control); *Kentucky v. Biden*, 23 F.4th 585, 600, 611–12 (6th Cir. 2022) (federal vaccine requirement impinged state authority over public health).[10]

The record also refutes Florida's claim of regulatory "chaos."  Doc. #2051487 at 34–35.  "[T]he Corps is ready, willing, and able to administer" Section 404 in Florida's assumable waters during appeal—as the Corps did for decades before EPA's approval "and as it does in 47 other States."  *Id.* at 1302–03 (Stay Denial) (quoting Ex. 8 at 28–31)).  *See id.* at 1304–05; Doc. #2052135 at 8–10 ¶¶ 7–12 (Corps Dec.) (since court's ruling Corps has been processing and issuing permits). Even Florida's Department of Transportation has submitted its "priority" projects to

---

[10] *Solid Waste Agency of N. Cook Cnty. v. Corps*, 531 U.S. 159 (2001), Doc. #2051487 at 11, is also inapposite because that case involved the scope of waters subject to the CWA, which is not at issue here.

the Corps.  Doc. #2051487 at 1542 ¶ 10 (FDOT Dec.).  *See id.* at 1270 (Opinion) (no complaints of disruption when EPA transferred program to Florida).

Only Florida stands in the way, by refusing to transfer state applications to the Corps.  *See id.* at 1478 ¶ 26 (FDEP Dec.); Ex. 4 at 20 ¶ 45.  Those developers choosing not to avail themselves of the Corps' permitting process suffer no irreparable harm.  *See Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 122–24 (D.D.C. 2012) (harms self-inflicted where ranchers could have sought permits during case; allegedly "burdensome permitting system" "not sufficient justification").

Florida's claim that state agencies are blocked from performing legal duties, Doc. #2051487 at 34, ignores that Florida has no duty or authority to administer Section 404 in violation of federal law.  *Id.* at 1303–04 (Stay Denial).  Florida's claim that "300 staff" were hired just to administer Section 404, *id.* at 34, is refuted by the record, *see* Ex. 9 (FDEP reporting 90 permitting, 44 enforcement staff spend most of their time on 404); Ex. 10 at 31, 38 (EPA concerns about adequacy of Florida's 404 staffing); Doc. #2051487 at 1303–04 (Stay Denial) (Florida claimed 85% overlap of 404 and state ERP programs).

The purported loss of "permitting efficiencies," Doc. #2051487 at 34, does not constitute irreparable harm, *id.* at 1305 (Stay Denial).  As with Amici, Florida's claims of economic loss are hyperbolic, unsupported, and unfounded.  *Id.* at 1475–

20

76, 1479–82 ¶¶ 20–21, 30–32 (FDEP Dec.).

## III.   The Balance of Equities and Public Interest Weigh Against a Stay.

The Corps' administration of Section 404 is long-established, familiar to the regulated community, and requires ESA consultation.   A stay would revert 404 authority once again to a state program that does not comply with the ESA, putting listed species at risk of irreparable harm.

As the district court found after rigorous review, the TA process "is no substitute" for Section 7 consultation.  *Id.* at 1218–20, 1238, 1255, 1257 (Opinion). The "TA process" could also insulate USFWS from any ESA accountability because state courts, which review state permit challenges, cannot review federal agency action, *Fed. Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 193 (6th Cir. 1989), and, according to the Defendants, USFWS' technical assistance does not constitute agency action reviewable in federal court, Ex. 11 at 13.

The balance of harms and public interest favor denying a stay because environmental injury, by its nature, is irreparable.  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).   Throughout this litigation, Conservation Groups identified state 404 permit applications that threatened substantial harm to the environment and protected species.  *See, e.g.*, Ex. 12 at 30–33; Ex. 4 at 4, 13–20 ¶¶ 9, 30–44.  Indeed, just before the district court ruled, Florida was poised to issue permits that would (1) destroy thousands of acres of essential panther habitat;

(2) result in the injury or death of 3 panthers from habitat loss and 6 to 25 panthers at buildout and *each and every year* thereafter as roadkill; and (3) destroy thousands of acres of essential caracara habitat. Ex. 1 at 32–38; Ex. 2 at 27–36; Ex. 11 at 32–33; Ex. 12 at 4–6 ¶¶ 10–19 (McGrath), 11–20 ¶¶ 10–39 (Roff); Doc. #2051487 at 1273 (Opinion) (denying preliminary injunction as moot after vacating EPA's approval). Allowing Florida to permit these and other harmful projects without Section 7 consultation ever occurring would cause irreparable harm.[11] A stay would also harm Conservation Groups by depriving them of information available through the federal permitting process that is necessary for their advocacy. *See* Ex. 14 at 21, 41–44, 50.

The public interest also weighs heavily against a stay. "The public unquestionably has a substantial stake in the enforcement of [federal environmental laws] and in preservation of the natural environment." *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977); *see also Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) ("strong public interest in meticulous compliance with the law by public officials."). *Accord* Ex. 11 at 34.

---

[11] A stay would also harm Conservation Groups by transferring authority back to Florida without a determination on their CWA claims. Doc. #2051487 at 870–94; Ex. 13 at 1 (Defendants arguing remaining claims moot only if stay denied).

22

Reviving Florida's program would also imperil the interests of federally recognized Tribes. This includes the Miccosukee Tribe of Indians of Florida, which has separately challenged EPA's approval as unlawfully ceding federal permitting authority over tribal lands to Florida. Ex. 11 at 34–35. Additionally, all Tribes would lose consultation rights guaranteed under the NHPA. *Id.* at 35–36.

## CONCLUSION

Because Florida has failed to carry its burden, the motion should be denied.

Dated: May 6, 2024                Respectfully submitted,

*/s/ Tania Galloni*
TANIA GALLONI
CHRISTINA I. REICHERT
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
Email: tgalloni@earthjustice.org
Email: creichert@earthjustice.org
Telephone: (305) 440-5432

BONNIE MALLOY
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
Email: bmalloy@earthjustice.org
Telephone: (850) 681-0031

Attorneys for Plaintiff-Appellees

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,187 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: May 6, 2024

*/s/ Tania Galloni*
TANIA GALLONI

Attorney for Plaintiff-Appellees

24

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of May 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Tania Galloni*
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

25