# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
et al.,

  Plaintiffs,

  v.           **CASE NO.** 1:21-cv-00119 (RDM)

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

  Defendants.

**MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION BY PLAINTIFFS CENTER FOR BIOLOGICAL
DIVERSITY AND SIERRA CLUB**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................ 1

LEGAL FRAMEWORK ............................................................................................. 3

FACTUAL BACKGROUND....................................................................................... 4

   I.   The Permits at Issue Will Harm the Florida Panther. ......................................... 6

      A.  The Florida Panther is Critically Endangered. ........................................... 6

      B.  The Permits at Issue Will Destroy Panther Habitat and Take Panthers. ................... 9

   II.  The Permits at Issue Will Harm Florida's Crested Caracara ........................... 12

      A.  Habitat Loss Threatens Florida's Threatened Crested Caracara. ............... 12

      B.  The Permits at Issue Will Destroy Caracara Habitat and Result in Loss of Reproductive Success. ................................................................. 14

STANDARD OF REVIEW ....................................................................................... 15

ARGUMENT .............................................................................................................. 16

   I.   Plaintiffs are Likely to Succeed on the Merits.................................................. 17

   II.  Absent Immediate and Preliminary Relief, Plaintiffs will Suffer Irreparable Harm. ........ 19

      A.  USFWS' Technical Assistance Fails to Adequately Protect ESA Species and Does Not Produce Biological Opinions Clearly Reviewable in Federal Court. ........................ 19

      B.  The Projects Will Irreparably Harm Panthers and Plaintiffs' Members. ................... 26

      C.  The Projects Will Irreparably Harm Caracara and Plaintiffs' Members. ................... 31

   III. The Balance of Equities and the Public Interest Favor Preliminary Relief....................... 32

   IV. Preliminary Relief Should Issue Without Bond. .............................................. 35

CONCLUSION........................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                **Page(s)**

*Aamer v. Obama*,
    742 F. 3d 1023 (D.C. Cir. 2014) ........................................................................... 35

\*    *Am. Rivers v. U.S. Army Corps of Eng'rs*,
    271 F. Supp. 2d 230 (D.D.C. 2003) ............................................................... *passim*

\*    *Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ................................................................................... 27, 32

*Angelo v. D.C.*,
    648 F. Supp. 3d 116 (D.D.C. 2022) ....................................................................... 15

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................................... 4, 18, 25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1, 26 (D.D.C. 2009). .................................................................... 34

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*,
    No. 95-CV-1702, 1995 WL 748246 (D.D.C. 1995) ............................................. 34

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................................ 15

*Defs. of Wildlife v. Bernal*,
    204 F.3d 920 (9th Cir. 1999) ................................................................................. 26

*Earth First v. Block*,
    569 F. Supp. 415 (D. Or. 1983) ............................................................................. 28

*Fed. Maritime Comm'n v. City of L.A.*,
    607 F. Supp. 2d 192 (D.D.C. 2009) ....................................................................... 32

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980) .............................................................................. 35

\*    *Fund for Animals v. Clark*,
    27 F. Supp. 2d 8 (D.D.C. 1998) ..................................................................... 29, 32

\*    *Fund for Animals v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993) .................................................................... 30, 34

*Humane Soc'y of the U.S. v. Kempthorne*,
    481 F. Supp. 2d 53 (D.D.C. 2006) ................................................................. 27, 34

*Isbrandtsen Co. v. United States*,
  211 F.2d 51 (D.C. Cir. 1954)..................................................................15

\* *League of Women Voters of the U.S. v. Newby*,
  838 F. 3d 1 (D.C. Cir. 2016)..........................................................15, 35

*Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*,
  702 So.2d 1352 (Fla. 1st Dist. Ct. App. 1997)......................................25

*Mcclash v. Manasota-88, Inc.*,
  No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hearings June 25, 2015) ....................25

*Morgan Stanley DW, Inc. v. Rothe*,
  150 F. Supp. 2d 67 (D.D.C. 2001)........................................................15

\* *Nat. Res. Def. Council, Inc. v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971)...........................................................36

\* *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
  628 F.2d 604 (D.C. Cir. 1980).............................................................33

\* *Nat'l Audubon Soc. v. Butler*,
  160 F. Supp. 2d 1180 (W.D. Wash. 2001)..............................................28

*Nat'l Wildlife Fed'n v. Andrus*,
  440 F. Supp. 1245 (D.D.C. 1977).........................................................34

\* *Nat'l Wildlife Fed'n v. Burford*,
  835 F.2d 305 (D.C. Cir. 1987).............................................................28

\* *Nat'l Wildlife Fed'n v. NMFS*,
  886 F.3d 803 (9th Cir. 2018) ........................................................16, 30

*S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*,
  588 F.3d 718 (9th Cir. 2009)...............................................................33

*Safari Club Int'l v. Jewell*,
  960 F. Supp. 2d 17 (D.D.C. 2013)..........................................................3

*Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*,
  628 F. Supp. 1438 (D.D.C. 1986).........................................................15

*Sutton Invs. LLC v. Perlmutter*,
  No. 1:21-CV-3226, 2021 WL 6062635 (D.D.C. Dec. 22, 2021)....................35

\* *Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978)...........................................................3, 33, 34, 35

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell,*
   103 F. Supp. 3d 133 (D.D.C. 2015) ...............................................................15

*Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency,*
   766 F.2d 1319 (9th Cir. 1985) ........................................................................35

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) .......................................................................................34

*Winter v. Nat. Res. Def. Council, Inc.,*
   129 S. Ct. 365 (2008) .....................................................................................15

**Federal Statutes**

16 U.S.C. § 1536(a)(2).............................................................................3, 4, 20

16 U.S.C. § 1536(b)(3)(A)...........................................................................3, 20

16 U.S.C. § 1536(b)(4) .....................................................................................3

16 U.S.C. § 1536(o)........................................................................................24

33 U.S.C. § 1344(h)(1)(a)(i) ..............................................................................4

16 U.S.C. § 1536 ..............................................................................................3

**Code of Federal Regulations**

50 C.F.R. § 402.02...........................................................................20, 22, 24

50 C.F.R. § 402.13...........................................................................................3

50 C.F.R. § 402.14...........................................................................................3

50 C.F.R. § 402.14(i)...................................................................................3, 20

50 C.F.R. § 402.14(i)(3).....................................................................................4

50 C.F.R. § 402.14(4).......................................................................................4

50 C.F.R. § 402.14(g)..................................................................................3, 20

50 C.F.R. § 402.14(g)(3)..................................................................................22

50 C.F.R. § 402.14(g)(7)....................................................................................3

50 C.F.R. § 402.14(g)(8)..................................................................................22

50 C.F.R. § 402.14(h)..................................................................................3, 20

iv

50 C.F.R. § 402.14(h)(1)(iii)...........................................................................................22

50 C.F.R. § 402.16(a)..........................................................................................................4

**State Statutes**

Fla. Stat. §120.57(k).........................................................................................................25

Fla. Stat. § 403.412(6)......................................................................................................25

Fla. Stat. § 403.412(7)......................................................................................................25

## INTRODUCTION

Plaintiffs Center for Biological Diversity and Sierra Club ("Plaintiffs") respectfully request a temporary restraining order ("TRO") by December 7, 2023, and preliminary injunction thereafter, to prevent the imminent issuance of two state 404 permits for projects that will cause them irreparable harm: the Bellmar and Kingston development projects.[1]  U.S. Fish and Wildlife Service ("USFWS") anticipates that, together, these projects will destroy thousands of acres of critically important Primary Zone habitat for the endangered Florida panther, and that this habitat loss will result in the take of 2 panthers from injury or death.[2]  The projects will injure or kill 6 to 25 panthers from vehicle strikes at the year of buildout and each and every year thereafter. USFWS also anticipates that the projects will collectively destroy more than 4,500 acres of nesting and foraging habitat for Florida's threatened crested caracara and result in the loss of breeding for 2 caracara pairs in the first year of the projects.

Plaintiffs' experts have shown that these projects are even more harmful than USFWS has anticipated.  The agency made its assessments through an unlawful and inadequate technical assistance process that failed to use the best available science and failed to provide the analysis, standards, guardrails, or accountability required at the federal level and under the ESA.  And because of USFWS' inadequate analyses and unlawful actions at both the programmatic and site-specific level, these two projects will be authorized to take panther and caracara without any express limitation on the amount of authorized take.  USFWS' actions under the technical

---

[1] Plaintiffs Center for Biological Diversity and Sierra Club are national non-profit organizations that have retained experts whose opinions, along with member declarations, are submitted here to show the inadequacies of USFWS' actions and the threat of irreparable harm if injunctive relief is not granted.

[2] According to USFWS, take is "anticipated" when the agency deems it "reasonably certain" to occur, which means there is clear and substantial information to support that conclusion.  FWS-006028, at FWS-006058, FWS-006095 (BiOp).

assistance process do not result in a biological opinion ("BiOp") that is clearly susceptible to challenge in federal court. And under Florida law, Plaintiffs also face barriers to challenging state permits in state administrative proceedings because of restrictive standing requirements under Florida law and the costs of bringing such actions there as compared to federal court.

During the October 19, 2023, oral argument on the parties' cross-motions for summary judgment, Plaintiffs' counsel asked the Court to prioritize Plaintiffs' claims regarding species protected under the Endangered Species Act ("ESA") because certain major projects in panther habitat were on the cusp of being permitted, and Plaintiffs hoped to avoid having to seek emergency relief. Hr'g Tr. at 133–34. Then, on November 6, 2023, the Florida Department of Environmental Protection ("FDEP") issued a final 30-day public notice for the Bellmar State 404 Permit Application, and on November 20, 2023, FDEP issued a 30-day final public notice for the Kingston State 404 Permit Application. These projects are in the heart of key habitat for the only remaining population of Florida panthers.

The Defendants and Intervenors have rejected Plaintiffs' requests to postpone action on these permits until the Court renders judgment on their claims related to ESA-listed species. The Court's intervention is thus necessary to prevent irreparable harm and maintain the status quo pending resolution of these claims, including any relief.

Plaintiffs therefore respectfully request that the Court (1) immediately issue a TRO enjoining Defendants and Intervenor FDEP from taking any action furthering the issuance of these permits, up to and including issuing the permits; and (2) preliminarily enjoin any further action on these permits until the Court grants final judgment, including any remedy, on Plaintiffs' claims related to ESA-listed species.

## LEGAL FRAMEWORK

By enacting the ESA, Congress made a "conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). Indeed, an "examination of the language, history, and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174. "A major goal of the ESA is the recovery of species to the point at which the protection of the ESA is no longer necessary." *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 27 (D.D.C. 2013).

Congress required federal agencies to consult with wildlife agencies—USFWS and the National Marine Fisheries Service—for any action that may affect an ESA-listed species. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.13, 402.14. The ESA requires the wildlife agencies to issue a BiOp that uses the "best scientific and commercial data available" to (1) evaluate the baseline status of the species affected; (2) analyze the direct and cumulative effects of the action on those species; (3) assess whether the action would jeopardize the survival and recovery of protected species; and (4) propose reasonable and prudent alternatives if the agency concludes jeopardy is likely. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g), (h).

When the wildlife agencies anticipate that a federal action is reasonably certain to result in incidental take, USFWS must also issue an incidental take statement ("ITS") that specifies (1) the amount or extent of incidental take; (2) reasonable and prudent measures required to minimize take impacts; and (3) implementing terms and conditions with which the action agency must comply. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), (i). An ITS serves as a check on a BiOp, acting as a "trigger" by denoting when an unacceptable level of take has occurred, which then invalidates the safe harbor provision and requires the action agency to (1) reinitiate consultation to reevaluate the action; (2) determine if the action may now jeopardize protected

species or critical habitat; and (3) determine what additional protective measures may be required to reduce impacts from the action.  50 C.F.R. §§ 402.14(i)(3), (4), 402.16(a).

A BiOp and ITS constitute final agency actions that are clearly reviewable in federal court to enforce these requirements.  *See Bennett v. Spear*, 520 U.S. 154, 177–79 (1997).

## FACTUAL BACKGROUND

In approving Florida's program to administer permits under Section 404 of the Clean Water Act, EPA relied on USFWS' Programmatic BiOp (and the "technical assistance process" outlined therein) to conclude that:  (1) EPA's approval of Florida's program would not result in jeopardy to ESA species or adversely modify their critical habitat; and (2) Florida's program complied with the 404(b)(1) requirement for state assumption to demonstrate that state-issued permits would not jeopardize species or adversely modify their critical habitat.  *See* 16 U.S.C. § 1536(a)(2); 33 U.S.C. § 1344(h)(1)(a)(i).  As demonstrated in summary judgment briefing (and at oral argument), nothing requires USFWS to engage in the "technical assistance" process.  And even when USFWS does engage in the process, the "technical assistance" scheme does not impose the standards, requirements, or duties on USFWS that exist when the agency creates a biological opinion under the ESA.

USFWS' Programmatic ITS for Florida's 404 program exempted state permittees from liability for the incidental take of ESA-listed species so long as FDEP assures there will be compliance with the terms of state-issued permits.  But nothing in the technical assistance process requires permit conditions that limit authorized incidental take.  Thus, under the EPA-approved program, state permittees are granted immunity from liability for the incidental take of ESA-protected species without having to undergo any of the rigorous, and clearly enforceable, processes Congress enacted to protect threatened and endangered species, including Section 7 (consultation) and Section 10 (incidental take permits), and without any express limit on take.

4

USFWS engaged in the technical assistance process for the Bellmar and Kingston projects, producing a technical assistance "form" for each.  In those forms, USFWS concluded that neither project would cause jeopardy to the Florida panther and crested caracara (or any other ESA-listed species) and recommended inadequate permit conditions.  USFWS also determined that each project would cause a great deal of incidental take of the Florida panther and crested caracara.  Yet, USFWS' permit conditions expressed no limit on that take.  Pursuant to USFWS' Programmatic ITS, the state permittees will enjoy immunity from liability for incidental take so long as FDEP assures compliance with permit conditions, none of which expressly limit take.

On November 6, 2023, FDEP issued a 30-day public notice for the Bellmar development permit and scheduled a public meeting for December 7, 2023.  Ex. 4 at 6 (McGrath Dec. ¶ 22).  On November 9, 2023, Plaintiffs asked FDEP to postpone the Bellmar meeting for 60 days or until the Court ruled on Plaintiffs' ESA-related claims, but on November 17, 2023, FDEP declined.  Ex. 4 at 6–7 (McGrath Dec. ¶¶ 24–26).  On November 21, 2023, USFWS advised Plaintiffs that the agency did not intend to provide further comment on the Bellmar permit, aside from the October 31, 2023, Technical Assistance Form ("TA Form") it had completed for the project.  Ex. 4 at 6–7 (McGrath Dec. ¶ 26).  On November 28, 2023, EPA explained it was reserving its right to comment on the Bellmar permit, but would not say whether EPA would, or intended to, comment on the permit.  *Id.*  EPA could waive its right to comment on the permit at any time, allowing FDEP to issue the permit at any time following the December 7, 2023, hearing.[3]  EPA-HQ-OW-2018-0640-0018, at 8 (MOA between EPA and FDEP).

---

[3] By reserving its right, EPA may provide comments on the Bellmar permit by February 4, 2024, at the latest.  However, nothing prevents the agency from commenting sooner or stating sooner that it has no further comments.

On November 20, 2023, FDEP issued a 30-day public notice for the Kingston development. Ex. 4 at 7 (McGrath Dec. ¶ 28). On November 21, 2023, Plaintiffs asked FDEP to postpone action on that permit as well. Ex. 4 at 7 (McGrath Dec. ¶ 28). On December 1, 2023, FDEP declined.[4] On November 21, 2023, Plaintiffs also asked whether the federal agencies intended to comment further on the Kingston project. Plaintiffs have received no response as to USFWS. On December 4, 2023, DOJ informed Plaintiffs' counsel that EPA will be reserving its right to provide comments on the Kingston Project. However, as with Bellmar, EPA could waive that right at any time, allowing FDEP to issue the permit following the close of the public comment period. EPA-HQ-OW-2018-0640-0018, at 8 (MOA between EPA and FDEP).

As demonstrated below, the Bellmar and Kingston permits are likely to cause irreparable harm to the critically endangered Florida panther, the threatened Florida population of the crested caracara, and Plaintiffs' interests in both.

## I.     The Permits at Issue Will Harm the Florida Panther.

### A.  The Florida Panther is Critically Endangered.

The Florida panther is critically endangered, with a single population consisting of only 120 to 230 adults and subadults in the wild. EPA-HQ-OW-2018-0640-0388-A8, at 1 (Florida FWC Panther Population Estimate); Ex. 1 at 6–7 (Frakes Dec. ¶ 18).[5] USFWS estimates that only 9 panthers are added to the population each year, Bellmar TA Form at 17, and even this estimate is likely inaccurate because it relies on questionable methods and assumptions. Ex. 1 at

---

[4] Counsel for FDEP notified Plaintiffs' counsel that it would not agree to postpone action on the Kingston permit after Mr. McGrath's declaration was finalized.

[5] Dr. Robert Frakes is a panther habitat modeling expert who was retained by Center for Biological Diversity to provide his professional opinion regarding matters in this case. Ex. 1 (Frakes Dec.).

21 (Frakes Dec. ¶ 59).[6]  Indeed, recent evidence suggests that panther population growth has

leveled off and may be declining.  *Id.*  USFWS has determined that the panther will be recovered

only when 3 populations of at least 240 individual panthers exist.  EPA-HQ-OW-2018-0640-

0388-A9, at 115–16 (Panther Recovery Plan); Ex. 1 at 8 (Frakes Dec. ¶ 22).

Although Florida panthers historically ranged across the southeastern United States, they

are now restricted to less than 5% of that range, with their last remaining occupied range found

in southwest Florida.  EPA-HQ-OW-2018-0640-0388-A9, at 22 (Panther Recovery Plan); Ex. 1

at 9 (Frakes Dec. ¶ 25).  Southwest Florida, however, is subject to tremendous development

pressure, which is further imperiling the species.  EPA-HQ-OW-2018-0388-A10, at 15 (Panther

Status Report); EPA-HQ-OW-2018-0640-0388-A9, at 54 (Panther Recovery Plan).  Currently,

"the land in southwest Florida is all there is for the species."  Ex. 1 at 10 (Frakes Dec. ¶ 27).

USFWS has categorized land in the panthers' remaining occupied range into "zones" to

indicate the relative importance and need for conservation of particular areas.  EPA-HQ-OW-

2018-0640-0388-A9, at 45 (Panther Recovery Plan).  The most important habitat is "Primary

Zone" habitat, which consists of "lands essential to the long-term viability and persistence of the

panther in the wild."  *Id.*; Ex. 1 at 10 (Frakes Dec. ¶ 28).  USFWS has stated that conservation

efforts should "focus on maintaining the total available area, quality, and spatial extent of habitat

within the Primary Zone" to "prevent further loss of population viability."  EPA-HQ-OW-2018-

0640-0388-A9, at 45, 107 (Panther Recovery Plan); Ex. 1 at 10 (Frakes Dec. ¶ 28).  Secondary

Zone habitat is located near Primary Zone habitat, is used by panthers, and could be used for

---

[6] USFWS has estimated a population growth rate of 8 panthers per year in the Kingston technical
assistance form, Ex. 10 at 23 (Kingston TA Form), and 9 panthers per year in the Bellmar form,
Ex. 8 at 17 (Bellmar TA Form).  The agency provides no explanation for these different
population growth rates in its contemporaneous assessments.

population expansion and connectivity.  EPA-HQ-OW-2018-0640-0388-A9, at 107 (Panther

Recovery Plan); Ex. 1 at 10 (Frakes Dec. ¶ 28).  Adult breeding habitat refers to areas that

modeling predicts would be used for establishing home ranges and reproducing, which overlaps

but is not coextensive with Primary Zone habitat yet is equally important.  Ex. 1 at 10 (Frakes

Dec. ¶¶ 29–30).

The leading threat to the Florida panther's survival and recovery is the loss, degradation,

and fragmentation of its remaining occupied range because panthers require large areas to hunt,

forage, and breed.  EPA-HQ-OW-2018-0640-0388-A9, at 11 (Panther Recovery Plan).  USFWS

has found that "[r]apid development in southwest Florida has compromised the ability of

landscapes to support a self-sustaining panther population." *Id.* at 56.  As USFWS has

acknowledged, the long-term survival of panthers could require as much as 156,000 to 234,000

square miles of habitat (roughly 60–70% of their historical range), in contrast to the 3,548 square

miles of breeding range in southwest Florida now occupied by the panther.  EPA-HQ-OW-2018-

0640-0388-A9, at 22, 24 (Panther Recovery Plan).  Conservation of this remaining range is vital

for the panther's survival and recovery.  EPA-HQ-OW-2018-0640-0388-A10, at 13 (Panther

Status Report); Ex. 1 at 9–10 (Frakes Dec. ¶¶ 26–27).  Further, because of the limited habitat and

increasing development in southwest Florida, USFWS has concluded that the Florida panther

must have access to corridors that connect southwest Florida to the suitable unoccupied habitat

areas in north Florida and other parts of the panther's historic range.  EPA-HQ-OW-2018-0640-

0388-A9, at 107, 110 (Panther Recovery Plan); Ex. 1 at 9 (Frakes Dec. ¶ 25).

Accompanying this rapid development are road expansions and traffic increases, which

amplify the risk of a leading cause of panther deaths: vehicle strikes.  EPA-HQ-OW-2018-0640-

0388-A9, at 11, 35, 67–69 (Panther Recovery Plan); EPA-HQ-OW-2018-0640-0388-A10, at 7,

19 (Panther Status Report).  "Panther-vehicle collisions are a significant source of mortality and pose an on-going threat."  EPA-HQ-OW-2018-0640-0388-A9, at 69 (Panther Recovery Plan). These vehicle strikes also limit panthers' ability to expand their range northward.  *Id.* at 11. USFWS estimates that approximately 26 panthers are struck and killed by vehicles each year. Ex. 10 at 18 (Kingston TA Form).

**B.  The Permits at Issue Will Destroy Panther Habitat and Take Panthers.**

The projects here will irreparably harm the panther.  The Bellmar permit application is for a mixed-use community (residential village and commercial town center) covering a 5,105-acre area.  Ex. 6 at 1 (Bellmar Public Notice).  The project is entirely within Primary Zone panther habitat, and a panther den, where panther kittens are born and reared, is located just over 2 miles away.  Ex. 8 at 10 (Bellmar TA Form).  Bellmar is also roughly a mile from the Florida Panther National Wildlife Refuge, which was established in 1989 to protect core habitat for the panther and important wildlife corridors.  Ex. 1 at 21 (Frakes Dec. ¶ 60); *Florida Panther National Wildlife Refuge*, USFWS.[7]  Currently, 17 panthers on average are struck and killed per year by vehicles in the Bellmar project's action area (as compared to a range-wide annual average of 26).  Ex. 8 at 13 (Bellmar TA Form).  USFWS estimates that Bellmar alone would increase traffic in the area by 13%.  *Id.*

According to USFWS, the land clearing and construction activities from this project will destroy approximately 1,793 acres of panther habitat.  *Id.* at 11.  But in fact, the actual loss of functional panther habitat will be much greater, destroying nearly 2,500 acres. Ex. 1 at 11–14, 23–24 (Frakes Dec. ¶¶ 34–42, 66).  Although the applicant proposes to primarily develop agricultural land onsite, USFWS does not acknowledge that these agricultural lands are near

---

[7] *Available at* https://www.fws.gov/refuge/florida-panther/about-us (last visited Dec. 2, 2023).

9

forests, which are valuable to panthers who use the periphery of forests to hunt.  *Id.* at 13–14 (Frakes Dec. ¶ 41).  The project will also constrain the west side of the Camp Keais Strand corridor that panthers use to move between larger areas of habitat.  *Id.* at 14 (Frakes Dec. ¶ 42).  In the Panther Recovery Plan, USFWS created a specific goal to conserve and protect the Camp Keais Strand.  EPA-HQ-OW-2018-0640-0388-A9, at 122, 150 (Panther Recovery Plan).

USFWS anticipates that the acreage destroyed will result in the take of 1 panther by assuming this habitat loss represents a portion of the average home range for 1 Florida panther.  Ex. 8 at 12 (Bellmar TA Form).  USFWS explains that this habitat loss is permanent and would not only harm panthers but also the prey they rely on to survive.  *Id.* at 11.  In other words, even according to USFWS' assessment, the panther population will be permanently reduced because the permanent habitat loss will prevent the successful replacement of the lost individual.  USFWS further anticipates that this net loss of habitat may cause male panthers to attack and kill other panthers (to defend their territory) as they adjust their home ranges (known as "intraspecies aggression").  *Id.* at 11–12, 16.

But in fact, the impact of the Bellmar project will likely be even worse because the panther habitat it will destroy is likely part of several panthers' home ranges, rather than only 1.  Ex. 1 at 14, 16–17 (Frakes Dec. ¶¶ 44, 49).  Dr. Frakes' analysis of historical data from radio-collared panthers showed that Bellmar is likely to impact at least 7 panther home ranges.  *Id.* at 17 (Frakes Dec. ¶ 49).

In addition to harm from habitat loss, USFWS anticipates that the project will result in vehicle strikes that injure or kill an additional 3 panthers at year of buildout.  Ex. 8 at 16

(Bellmar TA Form).[8]  USFWS then anticipates that 3 more panthers will be injured or killed *each year* thereafter due to vehicle strikes.  *Id.*

Kingston is a large-scale mixed-use development project that will span 6,673 acres.  Ex. 10 at 7 (Kingston TA Form).  The project is proposed within Primary and Secondary Zone habitat, and a panther den is located less than half a mile from the site.  *Id.* at 15.  USFWS anticipates that the project will increase traffic to varying extents depending on the road segment, with increases in traffic ranging between 7.3% and 84.3%.  *Id.* at 18.

According to USFWS, the land clearing and construction activities from this project will destroy approximately 3,400 acres of Florida panther habitat.  *Id.* at 16.  But in fact, the actual loss of functional panther habitat will be much greater, destroying nearly 5,200 acres.  Ex. 1 at 25 (Frakes Dec. ¶ 72).  USFWS anticipates this habitat loss will take 1 panther by comparing the acreage loss to an average panther's home range, Ex. 10 at 21 (Kingston TA Form), although the agency states elsewhere that this habitat loss could impact 2 panthers, *id.* at 23.  USFWS anticipates that this net loss of habitat may cause panthers to attack and kill other panthers as they adjust their home ranges, which would cause further harm.  *Id.* at 16–17, 21.

So as with Bellmar, even according to USFWS' Form, the Kingston project will permanently reduce the panther population because the permanent habitat loss will prevent the

---

[8] USFWS reached this conclusion based on a traffic study that only estimated traffic increases once the project is completed years from now, Ex. 8 at 12 (Bellmar TA Form), but the agency failed to address or account for traffic increases that will necessarily result from clearing and construction activities and as homes are built and sold over time.  *See also* Passarella & Associates, Bellmar Traffic Analysis, Feb. 13, 2023, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396364/facility!search.  The developer's own website anticipates that once permits are obtained in 2023, construction will also begin in 2023, and that homes will begin to be constructed in 2024.  *See* Ex. 4 at 20 (McGrath Dec. Ex. 2).  It was therefore arbitrary for USFWS to address increases in traffic, and the resulting increases in panther injuries and deaths from vehicle strikes, only after the entire project is completed.

successful replacement of 1 to 2 individuals.  And again as with Bellmar, USFWS' assessment is likely an underestimate because panther home ranges overlap with one another, meaning that several panthers likely rely on the resources provided by the habitat that will be destroyed by the Kingston project. Ex. 1 at 27–28 (Frakes Dec. ¶ 77).  Dr. Frakes' analysis of historical home range data (2004–2013) showed that 6 collared panthers included the Kingston footprint in their home range. *Id.*  In addition, the Kingston project will impinge upon or block panther corridors which are essential to habitat connectivity. *Id.* at 28 (Frakes Dec. ¶ 80).

USFWS also estimates that additional traffic from the Kingston project will result in the lethal take of 16 panthers per year at project buildout, which it later re-states as a range of between 4 and 23 panthers that will be taken by vehicle strikes at project buildout.[9] Ex. 10 at 6, 23 (Kingston TA Form).  USFWS expects that a comparable number of panthers will be taken *per year* afterward. *Id.* at 23.[10]

## II.     The Permits at Issue Will Harm Florida's Crested Caracara

### A.     Habitat Loss Threatens Florida's Threatened Crested Caracara.

The crested caracara is a large, boldly patterned raptor with a unique appearance, including a long neck, unusually long yellow legs, and large gray-blue bill, as well as a white head and throat, white wing tips, and white tail that contrast with its dark body and signature

---

[9] As with Bellmar, USFWS here relied on an applicant's traffic study that only analyzed traffic increases at project buildout, Kingston TA Form at 18, but the agency failed to account for the traffic increases that will result from construction activities and as homes are built and sold over time.  It is therefore arbitrary to assume that increases in traffic, and therefore increases in panther injuries and deaths from vehicle strikes, will only begin the moment the project is completed.

[10] Although later in the form USFWS suggests that the agency does not expect the actual number of panthers killed by vehicles to reach the upper bounds of this estimate, Kingston TA at 23–24, that range represents the best estimate that USFWS itself has provided and is the number USFWS relies on for its technical assistance assessment.  Moreover, even the lower bounds of this estimate (together with anticipated take from Bellmar) would exceed the 9 panthers that USFWS purports are added to the already precarious panther population each year.

black crest. *South Florida Multispecies Recovery Plan: Species*, USFWS, at 221 (1999) [hereinafter "Caracara Recovery Plan"].[11]  The Bellmar and Kingston projects will also harm the Florida population of this threatened bird of prey.

Recent estimates show the Florida population of the caracara consists of approximately 564.4 individuals, or 280 breeding pairs.  Ex. 2 at 7 (Morrison Dec. ¶ 22).[12]  Caracara mating pairs occupy home territories of approximately 3,200 acres of foraging habitat centered around a nest tree.  Ex. 2 at 4 (Morrison Dec. ¶ 13); Caracara Recovery Plan at 226.  Caracara breeding pairs return to the same nesting site for years and rely on their home range to provide essential foraging habitat to feed and raise their young.  Ex. 2 at 4–5 (Morrison Dec. ¶¶ 14, 16).

The caracara's decline is primarily due to habitat loss from agriculture and residential development.  Caracara Recovery Plan at 227–28.  The Florida population of the caracara is isolated with a restricted range that is rapidly urbanizing, and habitat loss is the primary threat to the caracara's survival and recovery.  Caracara Recovery Plan at 227–28, 235; *Florida Population of Audubon's Crested Caracara = Northern Crested Caracara 5-Year Review: Summary and Evaluation*, USFWS, at 9–10 (2008) [hereinafter "Caracara Review"].[13]  USFWS recognizes that the caracara population in Florida is "sensitive to even modest habitat loss." Caracara Review at 8.

---

[11] Available at https://ecos.fws.gov/docs/recovery_plan/140903.pdf.
[12] Dr. Joan Morrison is a conservation biologist who has been studying the Florida population of the crested caracara for thirty years.  She was retained by Sierra Club to provide her professional opinion regarding matters in this case.  Ex. 2 (Morrison Dec.).
[13] *Available at* https://ecosphere-documents-production-public.s3.amazonaws.com/sams/public_docs/species_nonpublish/1417.pdf.

### B.  The Permits at Issue Will Destroy Caracara Habitat and Result in Loss of Reproductive Success.

USFWS has recognized that the remaining available habitat for the caracara is "saturated," meaning the habitat is already claimed by breeding pairs of caracara.  Ex. 8 at 9 (Bellmar TA Form); Ex. 2 at 5–6 (Morrison ¶¶ 19–20).  "[C]urrently available evidence provides substantial reasons to believe that habitat loss that reduces the number of breeding pairs likely appreciably diminishes survival and recovery."  Ex. 2 at 8 (Morrison Dec. ¶ 24).

Bellmar contains approximately 2,285 acres of suitable habitat for the caracara.  Ex. 8 at 7 (Bellmar TA Form).  Through construction activities, the Bellmar project will destroy 1,440.33 acres of the home range for the resident nesting pair of caracara, which constitutes nearly 50% of an average caracara's home range.  *Id.*  USFWS anticipates that noise and activity from construction will also disturb foraging and nesting caracara.  *Id.* at 7–8.  USFWS anticipates that the project will eliminate the reproductive capacity for the known breeding pair in the initial year of the project.  *Id.* at 8.

In actuality, the harm to the breeding pair will likely be permanent, and will likely cascade into further harm for other pairs in the population as the displaced breeding pair attempt to move into the already occupied territories of other breeding pairs, resulting in fierce competition for insufficient resources.  Ex. 2 at 5 (Morrison Dec. ¶ 20).  Loss of reproductive success means that the nesting pair will not be able to reproduce or will reproduce but their offspring will not survive.  Ex. 2 at 2, 5, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–38, 45).

Kingston contains approximately 5,383.44 acres of suitable habitat for the caracara.  Ex. 10 at 7 (Kingston TA Form).  This habitat is sufficient to support portions of 6 caracara territories.  *Id.*  The Kingston project, however, will destroy 3,233.36 acres of caracara habitat, representing the "complete loss" of this nesting pair's habitat.  *Id.*  USFWS anticipates the

project will result in the loss of reproductive success for the resident breeding pair during construction. *Id.* at 8.

## STANDARD OF REVIEW

To obtain a TRO or preliminary injunction, Plaintiffs must make a clear showing that four factors, taken together, warrant relief: (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) the balance of the equities weigh in their favor; and (4) an injunction is in accord with the public interest. *League of Women Voters of the U.S. v. Newby*, 838 F. 3d 1, 6–7 (D.C. Cir. 2016); *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).[14]  The final two factors in the Court's analysis of a request for preliminary relief—the balance of equities and the public interest—"merge" in cases where, as here, the relief sought is against the government. *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 163–64 (D.D.C. 2015) (Moss, J.), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).[15]  Although the D.C. Circuit has not addressed whether there should be a presumption in favor of injunctions to avoid irreparable harm under the ESA, Plaintiffs submit, and the Ninth Circuit has recognized, that there should be, and thus presumes "that remedies at law are

---

[14] Courts in the D.C. Circuit apply a "sliding scale" to these four factors. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).  If a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.  Although the D.C. Circuit has "hinted on several occasions" that *Winter v. NRDC*, 129 S. Ct. 365, 375 (2008), "should be read to suggest that 'a likelihood of success is an independent, free-standing requirement for a preliminary injunction,'" it "'has not yet needed to decide th[e] issue.'" *Angelo v. D.C.*, 648 F. Supp. 3d 116, 121–22 (D.D.C. 2022) (Moss, J.).  Regardless, Plaintiffs here have demonstrated likelihood of success on the merits.

[15] The Court has authority to enjoin Intervenor FDEP because it is considered "a full participant in the lawsuit and is [to be] treated just as if it were an original party." *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1440 (D.D.C. 1986).  *Accord Isbrandtsen Co. v. United States*, 211 F.2d 51, 57 (D.C. Cir. 1954) (enjoining intervenors).

inadequate, that the balance of interests weighs in favor of protecting endangered species, and

that the public interest would not be disserved by an injunction." *See, e.g.*, *Nat'l Wildlife Fed'n*

*v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018).

## ARGUMENT

Through briefing and at oral argument on summary judgment, Plaintiffs have shown that

they are likely to succeed on their claims that EPA's approval of Florida's 404 program violated

federal requirements to ensure that the state 404 program (and permits issued thereunder) avoid

jeopardy to species and adverse modification or destruction of critical habitat.[16]  But Plaintiffs

now face the risk of irreparable harm because FDEP is poised to authorize major projects that

will cause incidental take of threatened and endangered species, damaging Plaintiffs' members'

ability to enjoy these species in the wild, and will do so through an unlawful and inadequate

"technical assistance" process that does not produce a BiOp subject to challenge in federal court.

Together, the Bellmar and Kingston projects would destroy thousands of acres of panther

habitat and result in the take of 8 to 27 panthers at year of buildout.  The projects will then result

in the take of at least 6 to 25 panthers per year thereafter.  The likely loss of even relatively few

individuals from a protected species is "a significant, and undoubtedly irreparable, harm." *Am.*

*Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003).  In addition,

the projects will collectively destroy 4,673.69 acres of caracara habitat, eliminate the

reproductive success of 2 breeding pairs at year of buildout, and likely result in the permanent

displacement and permanent loss of reproductive capacity for at least 1 breeding pair.  These

activities will be authorized following the "technical assistance" process that is challenged here

and which does not result in a BiOp that can clearly be challenged in federal court.  Absent a

---

[16] Plaintiffs are focusing on their claims related to ESA-protected species for purposes of this
motion but are also likely to succeed on all other claims.

TRO and preliminary injunction, Plaintiffs will suffer imminent and irreparable harm.  The balance of the equities and the public interest in protecting threatened and endangered species weigh in favor of maintaining the status quo until the Court has entered judgment on Plaintiffs' claims related to ESA-species, including any relief.

I.      **Plaintiffs are Likely to Succeed on the Merits.**

As demonstrated in summary judgment briefing and oral argument, Plaintiffs have shown that they are likely to succeed on the merits of their claims.  Dkts. 98, 104, 123, 128, Oct. 19, 2023, Hr'g Tr.[17]  Specifically, for purposes of this motion, Plaintiffs submit that they have shown they are likely to succeed on their claims related to the protection of ESA-listed species under USFWS' jurisdiction, namely Claims 3, 4, 6, and 13.  USFWS' Programmatic BiOp and ITS failed to comply with the ESA at the programmatic level, punting all analysis to the permit level.  Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.

But the "technical assistance" scheme at the permit level imposes no meaningful requirements on USFWS and does not require the agency to comply with ESA guardrails at that step either.  Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.  At most, USFWS has committed only to receive and review permit applications.  Dkt. 98 at 46–49; Dkt. 104 at 42–46; Dkt. 123 at 9–12; Dkt. 129 at 2 & n.2.  The "technical assistance" process does not bind the agency to comply with the procedures and standards of the ESA, including the requirement to use the best available science, analyze the baseline status of the species, evaluate impacts, assess jeopardy, and impose limits on incidental take.  Dkt. 98 at 46–49; Dkt. 104 at 42–46; Dkt. 123 at 9–12; Dkt. 129 at 2 & n.2.

---

[17] Plaintiffs hereby adopt and incorporate their briefing on summary judgment, Dkts. 98, 104, 123, 128, in support of this motion.

When the Court asked the Defendants' counsel whether USFWS was under a legal obligation even to review permit applications, Hr'g Tr. 89:7–10, counsel could only point to statements in the BiOp that "[USFWS] has internal processes in place to ensure that all applications are received and reviewed," that USFWS "may" submit comments or questions and that the failure to do so by the deadline would mean that no further information was required from USFWS, and that—as a "fail-safe"— USFWS "may" submit comments during the public comment period. *Id.* at 91:14–92:1. The "technical assistance" process also does not result in a BiOp that is clearly enforceable in federal court. *Cf. Bennett*, 520 U.S. at 177–79.

In the Programmatic ITS, USFWS unlawfully extended unlimited incidental take liability exemption to EPA, the State, and all future state permittees for the life of the program, and provided no trigger for reinitiating consultation. Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2. It shielded all future state 404 permittees so long as FDEP assures compliance with permit conditions, without requiring permittees to obtain that protection through Section 7 or 10 of the ESA as Congress intended. Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2. *See also* Hrg. Tr. 92:8–94:18. However, the technical assistance process does not require that USFWS propose permit conditions to limit incidental take. Even when USFWS anticipates take, nothing in the program gives that expectation of take the force of a permit condition that expressly limits authorized take.

Plaintiffs have also shown that they are likely to succeed on Claims 2[18] and 10 because of EPA's arbitrary and capricious reliance on the BiOp and ITS to approve Florida's program. By relying on the BiOp (and the technical assistance process outlined therein) to approve Florida's

---

[18] For purposes of this motion, Plaintiffs focus on the ESA-related deficiency in EPA's approval of Florida's program (Claim 2). The summary judgment briefing on Claim 2, however, addresses several other deficiencies that also rendered EPA's approval unlawful.

program, EPA failed to ensure that the State program would satisfy the 404(b)(1) Guideline that prohibits the issuance of permits that may jeopardize species or adversely modify or destroy critical habitat.  *See* Dkt. 98 at 66; Dkt. 104 at 73 (Claim 2).  As a result of that reliance, EPA also failed to satisfy its independent duties under the ESA.  Dkt. 98 at 51–52; Dkt. 104 at 49–51; Dkt. 123 at 12–13 (Claim 10).

## II.    Absent Immediate and Preliminary Relief, Plaintiffs will Suffer Irreparable Harm.

The Bellmar and Kingston permits will cause imminent and irreparable harm to the Florida panther and crested caracara, to their habitat, and to the Plaintiffs, whose members recreate to observe these threatened and endangered species in the wild.  The permits will authorize take of the Florida panther and caracara without USFWS having complied with its ESA duties at the programmatic or the permit level.  This take will be authorized through the unlawful and inadequate "technical assistance" process created in the programmatic BiOp that does not impose any meaningful requirements on USFWS to comply with the ESA and does not result in a permit-level BiOp that clearly can be challenged in federal court to enforce the ESA. To make matters worse, the permits will not include any express limitation on the amount of incidental take authorized, while FDEP and the permittee are immunized from liability for that take under the terms of the Programmatic ITS.

## A.    USFWS' Technical Assistance Fails to Adequately Protect ESA Species and Does Not Produce Biological Opinions Clearly Reviewable in Federal Court.

Having avoided compliance with the ESA at the programmatic level, USFWS also failed to comply with its requirements at the permit level.  USFWS' "technical assistance" forms for Bellmar and Kingston failed to satisfy the standards and procedures that would be required for Section 7 consultations and would allow the issuance of permits that will irreparably harm the Florida panther, crested caracara, and Plaintiffs' interests in both.

19

The "technical assistance" process does not require USFWS to comply with ESA requirements for a BiOp, meet ESA standards, or apply its guardrails. At oral argument, Florida heralded Bellmar as reflecting the gold standard of what Florida's program *can* do. Hr'g Tr. 115:25–116:5.[19] And yet USFWS' technical assistance forms fall far short of what the ESA would require of a BiOp. The "technical assistance" forms make various assessments without using the best available science, performing the required analyses, or articulating a limit on incidental take, all while USFWS extends incidental take liability protection to developers through its unlawful Programmatic BiOp and ITS. And this is precisely the point. Because of how Florida's 404 program is structured, the technical assistance process does not require USFWS to do any of those things. When asked by the Court, the Defendants, notably, refused to provide assurance that USFWS can be held accountable for the inadequacy of its actions in the technical assistance process the same way that it could for an inadequate BiOp. *Id.* at 95:20–22, 95:23–96:7, 96:8–21.

Whereas Section 7 consultation requires USFWS to use the best available science to determine whether a project will cause jeopardy to a protected species, the effects of the action on the species, and the likely anticipated take, the technical assistance process does not contain these requirements, and USFWS failed to use the best available science for its assessments. *See* 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(g)–(i); Ex. 1 at 23 (Frakes Dec. ¶ 65). In fact, USFWS' entire house is built on a broken foundation, because USFWS did not use the best available science to estimate the populations of ESA-protected species. For example, USFWS based its review of panther impacts on an unreasonably broad and arbitrarily

---

[19] It is worth noting that these are projects that have been under considerable scrutiny as a result of their being highlighted in this litigation.

high population estimate, ranging from 222 to 773 panthers. Ex. 8 at 10–11 (Bellmar TA Form);

Ex. 10 at 15 (Kingston TA Form). But as Dr. Frakes explains, the panther's existing occupied

habitat could not possibly support the upper end of that estimate, which would be 3 times the

density of puma in any other place in North America. Ex. 1 at 20 (Frakes Dec. ¶ 58).[20] The

authors of the study who arrived at this estimate recommended *against* using it because it far

exceeds the carrying capacity of existing habitat. *Id.* Critically, USFWS *itself* has stated in the

most recent publicly available draft species status assessment that this estimate's margin of error

is far too wide to inform conservation decisions for the panther. *Id.* USFWS' reliance on an

unreasonable population assessment tainted its assessment of the projects' impacts on the Florida

panther.

Similarly, USFWS' discussion of the caracara failed to use the best available population

estimates for the caracara and, in fact, failed to discuss the caracara's population at all. Ex. 8 at 7

(Bellmar TA Form); Ex. 10 at 7 (Kingston TA Form). The best and most reliable estimate of

Florida's caracara population found that there are approximately 565 individual caracara,

representing approximately 280 breeding pairs. Ex. 2 at 7 (Morrison Dec. ¶ 22). The absence of

population information for the caracara in USFWS' Technical Assistance Forms renders wholly

unreliable the agency's assessments of the projects' impacts on that species.

USFWS' baseline discussions also failed to use the best available science to analyze the

species' current condition, the anticipated impacts of all proposed federal projects in the action

---

[20] The Florida panther is the most endangered big cat in North America. *See Florida's Big Cat*,
National Park Service,
https://www.nps.gov/features/bicy/climatechange/BICY708/#:~:text=Big%20Cats%E2%80%94
Little%20Population&text=The%20Florida%20panther%20is%20the,Preserve%20as%20their%
20main%20habitat (last visited Dec. 2, 2023).

area, and the consequences to the species from ongoing activities.  50 C.F.R. §§ 402.02,

402.14(g)(3), (g)(8), (h)(1)(iii).  The Technical Assistance Forms failed to adequately assess

these elements as compared to what is required in a BiOp.  Ex. 1 at 20–24 (Frakes Dec. ¶¶ 56,

61, 65–66).  As to the panther, USFWS merely pointed to tracking data in the action area and the

unreasonable population estimates the agency itself has said it should not use.  Ex. 8 at 10–11

(Bellmar TA Form); Ex. 10 at 15 (Kingston TA Form).  As to the caracara, USFWS provided

even less information on the baseline of the species.  Ex. 8 at 7 (Bellmar TA Form); Ex. 10 at 7

(Kingston TA Form).  Specifically, USFWS failed to consider federal actions approved since

2019 that will collectively destroy 29,000 acres of caracara habitat, resulting in the take of

around 15 breeding pairs.  Ex. 2 at 20 (Morrison Dec. ¶ 47).

 USFWS' baseline sections also fail to include a review of important literature and

research regarding issues such as the species' habitat needs, population changes, birth and death

rates, and disease prevalence, as would appear in a BiOp.  Ex. 1 at 23 (Frakes Dec. ¶ 65).

USFWS mentions only *one* peer-reviewed publication for the panther even though several new

studies have been published in recent years.  *Id.*  The agency's failure to include this literature

review further demonstrates its failure to use the best available science to assess the baseline

status of the species.  And like USFWS' unreasonable (or missing) population estimates, this

failure taints USFWS' subsequent discussion of impacts and jeopardy.

 USFWS also failed to use the best available science to consider the effects on species.  50

C.F.R. §§ 402.02, 402.14(g)(3), (g)(8), (h)(1)(iii).  USFWS assumed that the habitat lost for each

project will impact only 1 panther by comparing the acreage destroyed by each project to the

average home range for a panther.  Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21

(Kingston TA Form).  However, panther home ranges overlap.  Therefore, the projects are likely

to affect multiple individuals and multiple panther home ranges.  Ex. 1 at 16–17, 19, 27–28

(Frakes Dec. ¶¶ 49, 53, 77).  As explained by Dr. Frakes, tracking data for radio-collared

panthers (between 2004 and 2013) indicate that the Bellmar footprint could impact the home

ranges of as many as 7 adult panthers, and Kingston could impact the home ranges of as many as

6 adult panthers.  *Id.*  Therefore, each project will likely impact multiple panther home ranges,

and could impact even more than 6 or 7 panthers' home ranges today.  *Id.*

Next, USFWS failed to consider cumulative impacts on panthers as to each project as

would be required during Section 7 consultation.  USFWS expressly assumed that these

developments would occur even without the 404 permitting, and with less mitigation.  TA

Forms.  There is no basis for this assumption.  USFWS then described projects that do not

impact wetlands, and therefore, would not require any regulatory review under Section 404.  Ex.

1 at 22–23 (Frakes Dec. ¶ 61).  USFWS ultimately acknowledged that there are "other" 404

permit projects that are reasonably foreseeable, but only listed the acreage lost from three:

Kingston, FFD, and Rural Lands West.  Ex. 8 at 14–15 (Bellmar TA Form); Ex. 10 at 20–21

(Kingston TA Form).  In other words, USFWS omitted most future wetlands development

permits from its assessment.  And, for those it did mention, USFWS only looked at gross acreage

numbers.  USFWS failed to consider impacts or potential incidental take from those projects (in

addition to impacts from Bellmar and Kingston) as a result of changes to habitat ranges,

corridors, and traffic, which are the key factors leading to harms to panthers and incidental take.

For the caracara, USFWS unreasonably limited the area considered to the project

footprint and therefore did not perform a cumulative impacts analysis at all.  The ESA, however,

requires the agency to consider the cumulative impacts from future State or private activities that

are reasonably foreseeable to occur within the action area, which would include all areas with

direct and indirect impacts beyond the immediate area involved in the action.  50 C.F.R.

§ 402.02 (defining action area); Ex. 2 at 20–21 (Morrison Dec. ¶¶ 48–52).  The Bellmar TA

Form's limitation of the action area to the project footprint itself is particularly egregious

considering that USFWS elsewhere recognizes the reasonably foreseeable development of Rural

Lands West, immediately north of Bellmar, and the Kingston project, approximately 15 miles

northwest of Bellmar.  Ex. 2 at 20–21 (Morrison Dec. ¶ 49).  These projects, together, will likely

have a domino effect on the caracara population as breeding pairs are displaced into the

territories of other breeding pairs.  *Id.* at 5–6, 21 (Morrison Dec. ¶¶ 20, 50–51).

    As a final example, USFWS' forms did not articulate any incidental take limit or

recommend any permit condition that expressed a limit on incidental take for either project.  Ex.

8 at 5, 17 (Bellmar TA Form); Ex. 10 at 5, 22–23 (Kingston TA Form).  And yet, by its terms,

USFWS' Programmatic BiOp and ITS exempts permittees from liability for incidental take so

long as FDEP and EPA comply with the terms and conditions of the ITS.  FWS-006028, FWS-

006109–10 (BiOp); 16 U.S.C. § 1536(o).[21]  USFWS anticipates that together, Bellmar and

Kingston will result in the likely injury or death of 2 panthers from habitat loss and the death or

injury of another 6 to 25 panthers at project buildout and *each year* thereafter.  Take at the upper

range (combined with the damage to existing corridors) would jeopardize the survival and

recovery of the panther.  Ex. 1 at 30 (Frakes Dec. ¶ 84).  USFWS further anticipates the loss of

reproductive success for 2 breeding pairs of caracara at year of buildout (e.g., construction).  For

the caracara, "currently available evidence provides substantial reasons to believe that habitat

---

[21] As Plaintiffs explained in briefing on summary judgment, the ITS creates no terms and
conditions for state permittees and only requires that EPA abide by its existing duties under the
Clean Water Act and that FDEP comply with its obligations under the technical assistance
process.  Dkt. 98 at 44; Dkt. 104 at 33–36; Hr'g Tr. 21:8–21.

loss that reduces the number of breeding pairs likely appreciably diminishes survival and recovery."  Ex. 2 at 8 (Morrison Dec. ¶ 24).

Moreover, unlike when the Corps issues a 404 permit, here there is no site-specific BiOp that is clearly reviewable in federal court to enforce the guarantees of the ESA.  *See Bennett*, 520 U.S. at 177–79.  When directly asked by the Court, the Defendants would not concede that USFWS could be held liable for its actions under the technical assistance process.[22]

And as Plaintiffs have shown throughout, they face barriers to challenging state 404 permits because Florida law restricts access to administrative courts to citizens of the State.  Dkt. 104 at 97–98.  At least one Florida appellate court has found that a foreign corporation would not quality as a citizen of the State, even when they hold a valid certificate of authority to operate in the State.  *Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*, 702 So.2d 1352, 1353 (Fla. 1st Dist. Ct. App. 1997); *Mcclash v. Manasota-88, Inc.*, No. 14-4735, 2015 WL 3966050, at *8 (Fla. Div. Admin. Hearings June 25, 2015) ("Sierra Club is not a citizen of the state; it is a foreign nonprofit corporation."). This is true under both the administrative code and Florida statutes.  *See* Fla. Stat. §§ 403.412(6) (standing for environmental non-profit that is a "Florida corporation"); *id.* § 403.412(7) (Art. III standing for challenges by citizens of the state related to federally delegated programs).  Even if Plaintiffs had standing, they would face the potentially prohibitive expense of having to litigate a de novo proceeding, including costs related to retaining experts not only to render opinions, but to participate in depositions and trial.  Dkt. 104 at 96–97; Dkt. 123 at 23; Fla. Stat. § 120.57(k) (de novo proceedings).

---

[22] The Defendants' arrangement with the State punts all species review to the permit level while not requiring anything meaningful of USFWS at the permit level, and not producing a site-specific BiOp that is clearly reviewable in federal court.  *See* Hr'g Tr. 92:8–94:18, 95:14–19.  At argument, DOJ notably declined to concede that USFWS could be sued for its permit-level actions or inaction.  *Id.* at 95:20–22, 95:23–96:7.

Lastly, the Bellmar and Kingston projects would be authorized without having undergone review under the National Environmental Policy Act, which would be required if the projects' 404 permit applications were under consideration by the Corps.  As a result, Plaintiffs are deprived of the NEPA documents generated during NEPA review, and the project has not undergone the same level of environmental scrutiny as it would under NEPA, something Plaintiffs could also enforce in federal court if the review proved inadequate.

**B.      The Projects Will Irreparably Harm Panthers and Plaintiffs' Members.**

USFWS anticipates that the Bellmar and Kingston projects will destroy thousands of acres of Primary Zone panther habitat and collectively result in the injury or death of 2 panthers from habitat loss during construction activities, as well as the injury or death of 6 to 25 panthers at buildout.[23]  Ex. 8 at 16 (Bellmar TA Form); Ex. 10 at 21–22 (Kingston TA Form).  As Dr. Frakes explains, these are likely underestimates as his modeling shows the projects will likely destroy more functional habitat and that the estimated habitat loss will therefore likely impact more panthers than USFWS anticipates.  Ex. 1 at 11–13, 23–25 (Frakes Dec. ¶¶ 34–40, 66, 72).

The likely loss of even relatively few individuals from a protected species is "a significant, and undoubtedly irreparable, harm."  *Am. Rivers*, 271 F. Supp. 2d at 258–59 (citing *Fund for Animals v. Turner*, No. 91-cv-2201, 1991 WL 206232, at *8 (D.D.C. Sept. 27, 1991)); *Defenders of Wildlife v. Bernal,* 204 F.3d 920, 925 (9th Cir. 1999) (reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction).  Environmental injury, such as what will occur here, "can seldom be adequately remedied by money damages

---

[23] As noted previously, the injuries and deaths of panthers from vehicle strikes are also likely to begin as traffic increases during clearing and construction activities and as homes are built and occupied.

26

and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

In *American Rivers*, for example, the court found irreparable harm where a project would result in the loss of 15 to 121 individual least terns and piping plovers out of populations of 7,000 and 2,000 birds, respectively. 271 F. Supp. 2d at 258–59. And as to the pallid sturgeon (for which USFWS had been unable to create a numerical estimate of take), the Court found that this species (with a population of 2,000) was in such a "weakened state" that "*any* potential harm" would be "irreparable and must be avoided." *Id.* (emphasis in original).

Here, the panther population is estimated to be 120 to 230 adults and subadults (and is likely not genetically viable in the long term). Ex. 1 at 8–9 (Frakes Dec. ¶ 23). USFWS anticipates the injury or death of 2 panthers from construction activities and habitat loss, Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form), and even more panthers will likely be harmed. Ex. 1 at 11–14, 16–17, 20, 25, 27–28 (Frakes Dec. ¶¶ 34–44, 49, 57, 72, 77). USFWS also anticipates that 6 to 25 panthers will be injured or killed from vehicle strikes at project buildout, Ex. 8 at 12–14, 16 (Bellmar TA Form); Ex. 10 at 17–20, 22 (Kingston TA Form), and yet failed to assess the take that will occur as traffic increases with construction activities between now and then. That take is significant on its face, but in the context of USFWS' own (and likely over-) estimate that only 8 or 9 panthers are added to the population each year, take of this magnitude, from just two of many projects in southwest Florida, would be devastating to the panther's prospects of survival and recovery.[24] This level of take is

---

[24] To show imminent, irreparable harm, Plaintiffs need not show that the action to be enjoined will jeopardize the survival and recovery of a protected species. *Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 69 (D.D.C. 2006), *judgment vacated on other grounds by* 527 F.3d 181 (D.C. Cir. 2008) ("The Court agrees" that "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head.

particularly concerning given that it almost matches USFWS' annual anticipated growth rate for the panther population and, at its upper range, is three times higher than the growth rate. Ex. 1 at 29 (Frakes Dec. ¶ 83) (discussing USFWS anticipated take range as to Kingston).  In Dr. Frakes' opinion, the upper end of this range, in combination with the damage done to panther movement pathways, would jeopardize the survival and recovery of the Florida panther.  *Id.* at 30 (Frakes Dec. ¶ 84).  When considering the baseline number of vehicle deaths already occurring, the harm is only magnified.  USFWS' own estimates show that these projects could nearly double the amount of take from vehicle strikes, adding up to 27 takes from vehicle strikes to the current annual average of 26 takes from vehicle strikes throughout their entire occupied range.  Ex. 8 at 12–14, 16 (Bellmar TA Form); Ex. 10 at 17–20, 22 (Kingston TA Form).

In addition to take of individual panthers, these projects will permanently destroy 6,707.6 acres of the panther's remaining habitat without replacing any of those acres, resulting in a net loss of already insufficient available habitat in the core breeding range for the sole remaining population of Florida panthers.  Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form).  *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324–25 (D.C. Cir. 1987) (in action challenging lifting of protective land restrictions, finding irreparable harm from damage to land that will harm the recreational and aesthetic interests of plaintiffs' members); *Nat'l Audubon Soc. v. Butler*, 160 F. Supp. 2d 1180, 1191 (W.D. Wash. 2001) (in action challenging agency plan to relocate bird population without NEPA EIS, destroying habitat without a long-term alternative would result in irreparable harm); *Earth First v. Block*, 569 F. Supp. 415, 417, 422 (D. Or. 1983) (in case challenging redesignation of wilderness area, building

Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction.").

of road would cause irreparable harm by destroying wilderness habitat which cannot be

restored). As soon as bulldozers arrive and construction crews begin work, panthers will be

pushed away from their habitat because panthers avoid areas where there is a lot of noise and

activity. Ex. 8 at 11 (Bellmar TA Form); Ex. 10 at 16 (Kingston TA Form); Ex. 1 at 3–4, 13–14

(Frakes Dec. ¶¶ 11, 41). Importantly, these projects will not replace the lost habitat with

compensatory restoration of functional habitat somewhere else. Ex. 8 at 11–12, 16 (Bellmar TA

Form); Ex. 10 at 16–17, 21 (Kingston TA Form); Ex. 1 at 8–10, 13–14, 18 (Frakes Dec. ¶¶ 23–

27, 39–41, 51). Instead, they purport to "preserve" other habitat areas that are not being

destroyed. Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form). As

Dr. Frakes explains, several peer-reviewed papers state that further habitat loss in the panther's

core breeding range is not acceptable. Ex. 1 at 8–10, 18 (Frakes Dec. ¶¶ 23–27, 51). He is not

aware of *any* scientific publication that states panthers can afford to lose more habitat, *id.*, and

USFWS points to none in their Technical Assistance Forms.

The Bellmar and Kingston projects would also constrain existing corridors (e.g., the

Camp Keais Strand) that are vital for panthers to move between high-quality habitat areas. *Id.* at

14, 23 (Frakes Dec. ¶¶ 42, 66). These corridors connect the fragmented panther habitat in

southwest Florida and serve as the only means to expand the panther range into north Florida,

which USFWS says is needed for panther recovery. *Id.* at 9 (Frakes Dec. ¶ 25).

This irreparable harm to the panther will also irreparably harm Plaintiffs' members who

seek to observe panthers in the wild. The loss of opportunities to view wildlife constitutes

irreparable harm. *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding

irreparable harm from planned bison hunt where plaintiffs' evidence established that "seeing or

even contemplating the type of treatment of the bison inherent in an organized hunt would cause

them to suffer an aesthetic injury that is not compensable in money damages"); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (same); *Nat'l Wildlife Fed'n v. NMFS,* 886 F.3d at 822 (holding that plaintiffs established "irreparable harm to their own interests stemming from the irreparable harm to the listed species").

Here, Center for Biological Diversity member Matthew Schwartz frequently seeks out panthers and signs of their presence in the Florida Panther National Wildlife Refuge—which is roughly a mile from the Bellmar project and contains core panther habitat—as well as Corkscrew Regional Ecosystem Watershed ("CREW") lands that are connected by the habitat in the Bellmar and Kingston projects' footprint. Dkt. 98-5 at 3–4, 7, 15–16 (Schwartz Dec. ¶¶ 8–12, 17–23, 45–47); Ex. 3 at 2–8 (Schwartz Second Dec. ¶¶ 10–34). Permitting Kingston and Bellmar would harm Mr. Schwartz's ability to observe panthers in these and other areas. Dkt. 98-5 at 3–4, 7, 15–16 (Schwartz Dec. ¶¶ 8–12, 17–23, 45–47); Ex. 3 at 2–8 (Schwartz Second Dec. ¶¶ 10–34).

Sierra Club members Rhonda Roff and Michael McGrath will also be harmed by these developments. Ms. Roff regularly visits preserves near both the proposed Bellmar and Kingston developments and frequently observes wildlife along the road that is north of the Bellmar site. Ex. 5 at 3–5, 7–9 (Roff Dec. ¶¶ 10, 16, 20, 25–26, 28–30). Mr. McGrath frequents public lands and trails that are near both projects and enjoys looking for panthers and engaging in wildlife photography. Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 16, 19). Ms. Roff has even been lucky to observe panthers in the wild several times. Ex. 5 at 7–8 (Roff Dec. ¶ 26). These projects will harm Ms. Roff's and Mr. McGrath's ability to observe panthers in these and other areas where they regularly recreate. *Id.* at 3–5, 7–9 (Roff Dec. ¶¶ 10, 16, 20, 25–26, 28–30); Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 16, 19).

### C.     The Projects Will Irreparably Harm Caracara and Plaintiffs' Members.

In addition to harming the panther, these projects will permanently destroy thousands of acres of foraging and nesting habitat for at least 2 breeding pairs of caracara and will destroy the reproductive success of those 2 pairs at least during the construction year.  Ex. 8 at 7–8 (Bellmar TA Form); Ex. 10 at 7–8 (Kingston TA Form).  For a species estimated to consist of only 280 nesting pairs, Ex. 2 at 7 (Morrison Dec. ¶ 22), the loss of reproduction from 2 nesting pairs is significant and irreparable.  *Am. Rivers*, 271 F. Supp. 2d at 258–59.

Dr. Morrison assessed the impacts that the Bellmar project would have on the caracara. In her professional opinion, the Bellmar project alone would cause the *permanent* loss of reproductive success for the resident breeding pair.  Ex. 2 at 2, 5, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–38, 45).  As USFWS itself acknowledges, caracara habitat in Florida is saturated (meaning there is no vacant habitat in which this pair can establish a new home range and reproduce).  Ex. 8 at 9 (Bellmar TA Form); Ex. 2 at 5–6 (Morrison Dec. ¶¶ 19–20).  Dr. Morrison explains the problem as an ever-shrinking fishbowl, where fewer and fewer resources support fewer and fewer caracara.  Ex. 2 at 5–8 (Morrison Dec. ¶¶ 20–23).  The habitat loss from Bellmar will thus displace the nesting pair and force them to move into another territory where they will have to compete for resources with other caracara breeding pairs, with habitat sufficient for only 1 to survive.  *Id.* at 2, 5, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–38, 45).  This represents a potential domino effect where displacement ripples out as resident caracara breeding pairs are pushed from their territories by incoming displaced pairs.  *Id.*  For the caracara, "currently available evidence provides substantial reasons to believe that habitat loss that reduces the number of breeding pairs likely appreciably diminishes survival and recovery."  *Id.* at 8 (Morrison Dec. ¶ 24).

This harm to the caracara will irreparably harm Plaintiffs' members.  *Fund for Animals v. Clark*, 27 F. Supp. 2d at 14.  Ms. Roff is an avid birdwatcher who specifically enjoys seeing crested caracaras when she recreates and travels in Collier County.  Ex. 5 at 3–5, 7 (Roff Dec. ¶¶ 12, 16, 20, 25, 27–29).  Ms. Roff regularly travels along portions of the roads adjacent to the Bellmar site to view birds, including the caracara.  *Id.*  Similarly, Mr. McGrath regularly travels to natural areas near these two proposed projects to view wildlife, including the caracara.  Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 14, 16, 19).  As a result of these projects, Plaintiffs' members ability to birdwatch for caracara will be irreparably harmed.  Ex. 5 at 3–5, 7, 11 (Roff Dec. ¶¶ 12, 16, 20, 25, 27–29, 38); Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 14, 16, 19).

## III.    The Balance of Equities and the Public Interest Favor Preliminary Relief.

The irreparable harms to endangered species and Plaintiffs' interests posed by the impending permits outweigh any purported harm to the opposing parties.  An injunction also furthers the public interest by protecting threatened and endangered species from irreparable harm and ensuring compliance with the ESA.  An injunction also preserves federal rights and remedies to ensure the enforceability of Congress' mandates.

When weighing the balance of equities, the Court must consider "the competing claims of injury and the effect an injunction would have on each party."  *Fed. Maritime Comm'n v. City of Los Angeles*, 607 F. Supp. 2d 192, 203 (D.D.C. 2009).  When, as here, there is environmental injury, the balance of harm favors preliminary relief because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."  *Amoco*, 480 U.S. at 545.  As discussed above, the harms Plaintiffs face are irreparable and imminent.  By contrast, there is no substantial harm to the Defendants, Intervenors, or developers.

As to the Defendants and Intervenors, the preliminary relief Plaintiffs seek would at most postpone a permitting decision by FDEP on only two permit applications until the Court has entered final judgment, including any remedy, on the merits of Plaintiffs' ESA claims.  Since the parties' cross-motions for summary judgment have been fully briefed, and the Court has already held oral argument, the matter is ripe for adjudication.  FDEP would be able to continue administering the state 404 permit during that time, and the Defendants would be able to continue their activities related to the state program.[25]

The developers could face some delay in the permitting decision but could also benefit from the Court's ruling on the legality of the technical assistance process and incidental take coverage in the program that issues that permit.  Additionally, there is no reason to believe that the potential burden of some additional delay would be substantial or sufficiently substantial to overtake the irreparable harm to Plaintiffs and the public interest in protecting threatened and endangered species.  *See Tenn. Valley Auth.*, 437 U.S. at 178 (observing that the value of our "genetic heritage" in the form of endangered species is "quite literally, incalculable" (quoting H.R. Rep No. 93-412, at 4–5 (1973))); *Am. Rivers*, 271 F. Supp. 2d at 261 (granting preliminary injunction); *see also Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 614 (D.C. Cir. 1980) (balance of equities favored farmworker organizations seeking to enjoin use of pesticide based on health effects to 10- and 11-year-olds even where growers might experience diminished labor pool, delays, and increased costs to attract other workers or seek waivers of the prohibition); *S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (temporary economic harms did not outweigh environmental harms).

---

[25] It is also possible that the parties could transfer the permits to the Corps for processing, which would restore federal protections under the ESA and NEPA and ensure accountability in federal court.

The requested relief is also in the public interest because it would ensure protection of threatened and endangered species that rely on habitat areas that would be destroyed by the Bellmar and Kingston projects.  "Congress' enactment of the ESA clearly indicates that the balance of interests 'weighs *heavily* in favor of protected species.'"  *Am. Rivers*, 271 F. Supp. 2d at 261 (emphasis in original).  *Accord Humane Soc'y*, 481 F. Supp. 2d at 71 ("Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the 'public interest' lies in the protection of the endangered [species]…").  When it comes to the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth.*, 437 U.S. at 194.  *Accord Am. Rivers*, 271 F. Supp. 2d at 261.  The public "unquestionably" has a "substantial stake" in "preservation of the natural environment." *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977).  And here, "only an injunction [can] vindicate the objectives of the [ESA]." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982).

There is also a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. at 152.  *See also Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. at 1256 (same); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702, 1995 WL 748246, at *12 (D.D.C. 1995) ("Issuance of a preliminary injunction here would thus directly serve the public interest by ensuring that federal agencies thoroughly consider the environmental consequences of their actions…").  There can be "no question" that the public has an interest in having Congress' environmental mandates "carried out accurately and completely." *Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 26 (D.D.C. 2009).  Here, Plaintiff's "extremely high likelihood of success on the

merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

Moreover, the "primary 'purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo.'" *Aamer v. Obama*, 742 F. 3d 1023, 1043 (D.C. Cir. 2014). In this case, the targeted relief Plaintiff seeks would prevent the issuance of specific state 404 permits until final resolution of the merits. This would preserve the status quo as to those applications because the permits have not issued.

## IV.   Preliminary Relief Should Issue Without Bond.

Lastly, the Court should exercise its discretion to issue a TRO and preliminary injunction without requiring a bond or, in the alternative, requiring a nominal bond of $100. While harm to Plaintiffs would be incalculable, *Tenn. Vall. Auth.*, 437 U.S. at 178, the relief requested would preserve the status quo of the permits and the parties' interests. It is well within the Court's broad discretion not to require a bond. *Sutton Invs. LLC v. Perlmutter*, No. 1:21-CV-3226, 2021 WL 6062635, at *6 n.4 (D.D.C. Dec. 22, 2021). This discretion has been applied to require no bond where it would in effect deny nonprofit environmental organizations from obtaining judicial review of the Government's violation of environmental laws. *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (setting no bond for an environmental non-profit "to ensure access to the courts . . . where Congress has provided for private enforcement of a statute"). Courts have also declined to require a bond for a TRO and preliminary injunction where, as here, the restraint will do the defendant "no material damage." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (outlining discretion for bonds on injunctions and stays).

If the Court does require a bond, a nominal bond of $100 is appropriate because a TRO

and preliminary injunction is in the public interest and a substantial bond requirement would in

effect prevent environmental nonprofits from enforcing environmental laws against the

Government.  *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168–69 (D.D.C. 1971)

(requiring only a nominal bond in a NEPA case).

## CONCLUSION

For the reasons expressed above, Plaintiffs therefore respectfully request that the Court

(1) immediately issue a TRO enjoining the parties from taking any action furthering the issuance

of the Bellmar and Kingston permits, up to and including issuing the permits; and

(2) preliminarily enjoin any further action on these permits until the Court grants final judgment,

including any remedy, on Plaintiffs' claims related to ESA-listed species.

In the alternative, Plaintiffs request an expedited ruling on Plaintiffs' Motion for

Summary Judgment as to Claims 2–4, 6, 10, and 13, with an order restoring authority to the

Corps over permits that may affect ESA species, by the date that any TRO expires, while the

parties further brief remedy regarding vacatur of the programmatic BiOp, programmatic ITS, and

EPA's approval of the State 404 program.

In accordance with LCvR 7(m), Plaintiffs' counsel conferred with opposing counsel in a

good faith effort to determine whether there is opposition to the motion and were not able to

come to an agreement regarding the motion.  Defendants have reserved their position on the

motion and intend to file a response.  Intervenors oppose the motion.

Dated:  December 4, 2023

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221

36

CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org


/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org


/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing under LCvR 83.2(c)(1))

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December 2023, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org