**EXHIBIT 2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | **CASE NO.** 1:21-cv-00119 (RDM) |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY AND SIERRA CLUB'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

   I.   Plaintiffs are Likely to Succeed on the Merits. ............................................ 2

      A.   The Programmatic BiOp and ITS Violate the ESA, and EPA's Reliance
          Was Unlawful. ...................................................................................... 3

      B.   Plaintiffs Have Established Standing. ................................................... 9

   II.   Absent Immediate Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm. ............ 11

      A.   USFWS' Technical Assistance Fails to Adequately Protect ESA Species and
          Is Not Clearly Reviewable in Federal Court to Ensure ESA Compliance .................... 13

      B.   The Projects Will Irreparably Harm Panthers and Plaintiffs' Members. ...................... 20

      C.   The Projects Will Irreparably Harm Caracara and Plaintiffs' Members. .................... 26

      D.   Issuance of the Permits is Imminent. .................................................. 29

      E.   Plaintiffs' Request for Preliminary Relief is Timely. ......................... 31

   III.   The Balance of Equities and Public Interest Favor Preliminary Relief. ........................ 36

      A.   Preliminary Injunctions Are Temporary. ........................................... 36

      B.   Plaintiffs' Requested Relief Would Preserve the Status Quo. .............. 37

      C.   The Public Interest is in Protecting ESA-Listed Species. .................... 37

      D.   Plaintiffs' Motion Serves the Public Interest in Cooperative Federalism. .................. 38

      E.   Plaintiffs' Harms Outweigh FDEP's Asserted Harms. ......................... 39

      F.   Plaintiffs' Harms Outweigh the Developers' Asserted Harms. ............. 42

      G.   The Public Interest Favors Preliminary Relief .................................... 44

   IV.   The Court Has Authority to Enter the Requested Relief. ................................. 45

   V.   The Requested Relief is Narrowly Tailored and Appropriate. ......................... 51

CONCLUSION ............................................................................................................... 55

CERTIFICATE OF SERVICE ....................................................................................... 56

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
  406 So. 2d 478 (Fla. 2d Dist. Ct. App. 1981) ............................................................9

*Am. Forest Res. Council v. Williams*,
  No. CV 21-601 (RJL), 2021 WL 4819846 (D.D.C. Oct. 13, 2021) .......................................33

\*  *Am. Rivers v. Corps*,
  271 F. Supp. 2d 230 (D.D.C. 2003) .........................................................12, 21, 26

\*  *Appalachian Voices v. U.S. Dep't of Interior*,
  25 F.4th 259 (4th Cir. 2022) ...................................................................15, 16

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992) .............................................................................39

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) .............................................................................13

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................9

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ....................................................................51

\*  *Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ...................................................................37

*Conservancy of Sw. Fla. v. Williams*,
  No. 13-14477, 2018 WL 11422990 (S.D. Fla. Dec. 21, 2018)..................................................14

*D.C. v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) .................................................................37

*Defs. of Conewango Creek v. Echo Devs., LLC.*,
  No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007)....................................32

*Defs. of Wildlife v. EPA*,
  420 F.3d 946 (9th Cir. 2005) ...................................................................53

*Defs. of Wildlife v. Salazar*,
  812 F. Supp. 2d 1205 (D. Mont. 2009)..............................................................11

*Defs. of Wildlife v. U.S. Dep't of Interior*,
  931 F.3d 339 (4th Cir. 2019) ...................................................................24

*District of Columbia v. Schramm*,
   631 F.2d 854 (D.C. Cir. 1980) ........................................................................46

\*   *Eco Tour Adventures, Inc. v. Zinke*,
   249 F. Supp. 3d 360 (D.D.C. 2017) ..............................................................32

\*   *Fed. Nat'l Mortg. Ass'n v. LeCrone*,
   868 F.2d 190 (6th Cir. 1989) ........................................................................51

\*   *Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge*,
   679 F. Supp. 37 (D.D.C. 1987) ...............................................................41, 42

\*   *Fla. Wildlife Fed'n v. Fla. Dep't of Env't Prot.*,
   No. 14-1420RU, 2014 WL 4627151 (Fla. Div. Admin. Hr'gs Sept. 11, 2014) ...................10

\*   *Friends of Crystal River v. EPA*,
   794 F. Supp. 674 (W.D. Mich. 1992) .......................................................38, 47

\*   *Fund for Animals, Inc. v. Turner*,
   No. CIV. A. 91-2201, 1991 WL 206232 (D.D.C. Sept. 27, 1991) ..........................12

\*   *Fund for Animals v. Clark*,
   27 F. Supp. 2d 8 (D.D.C. 1998) ..................................................................13

\*   *Fund for Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) ...........................................................13

*Fund for Animals v. Rice*,
   85 F.3d 535 (11th Cir. 1996) ......................................................................14

*General Motors Corp. v. EPA*,
   168 F.3d 1377 (D.C. Cir. 1999) ..................................................................46

\*   *Gordon v. Holder*,
   632 F.3d 722 (D.C. Cir. 2011) ................................................................30, 32

*State ex rel. Guste v. Lee*,
   635 F. Supp. 1107 (E.D. La. 1986) .............................................................44

\*   *Humane Soc'y of U.S. v. Kempthorne*,
   481 F. Supp. 2d 53 (D.D.C. 2006) ..............................................................12

\*   *League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...................................................................38, 42

*Loper Bright Enters., Inc. v. Raimondo*,
   45 F.4th 359 (D.C. Cir. 2022) .....................................................................14

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)................................................................................50

*McClash v. Manasota-88, Inc.*,
    No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hr'gs June 25, 2015)............................10

\*   *Melendres v. Maricopa Cnty.*,
    897 F.3d 1217 (9th Cir. 2018) ......................................................................39

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)................................................................................53

\*   *Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) ............................................................40, 43

*Nat'l Treasury Emps. Union v. Yeutter*,
    918 F.2d 968 (D.C. Cir. 1990) ....................................................................53

\*   *Nat'l Wildlife Fed'n v. Brownlee*,
    402 F. Supp. 2d 1 (D.D.C. 2005) ..........................................................17, 50

*Nat'l Wildlife Fed'n v. Caldera*,
    No. 00-cv-1031, 2002 WL 628649 (D.D.C. Mar. 26, 2002) ...................................50

\*   *Nat'l Wildlife Fed'n v. NMFS*,
    886 F.3d 803 (9th Cir. 2018) ......................................................................13

*Nat'l Wildlife Fed'n v. Norton*,
    332 F. Supp. 2d 170 (D.D.C. 2004) ....................................................17, 25, 27

*Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ....................................................................52

*New York v. United States*,
    505 U.S. 144 (1992)................................................................................39

*Nw. Env't Def. Ctr. v. Corps*,
    817 F. Supp. 2d 1290 (D. Or. 2011) ............................................................11

\*   *Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ..................................................................52

\*   *Quechan Tribe of the Ft. Yuma Rsrv. v. U.S. Dep't of the Interior*,
    755 F. Supp. 2d 1104 (S.D. Cal. 2010)........................................................41

*Safari Club Int'l v. Salazar*,
    No. 11-CV-01564, 2012 WL 13069816 (D.D.C. Mar. 21, 2012) ...........................36

*Sierra Club v. Ga. Power Co.*,
    180 F.3d 1309 (11th Cir. 1999) ......................................................44

*Sierra Club v. USFWS*,
    No. 2:20-CV-13, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023) .........................17, 20

*Siesta Key Ass'n of Sarasota, Inc. v. City of Sarasota*,
    320 So.2d 833 (Fla. 2d Dist. Ct. App. 2021) ......................................51

*Standing Rock Sioux Tribe v. Corps*,
    239 F. Supp. 3d 77 (D.D.C. 2017) ..................................34, 35, 36

\*   *Tate v. Pompeo*,
    513 F. Supp. 3d 132 (D.D.C. 2021) ..................................................37

\*   *Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ............................................................38

\*   *Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ............................................................47

\*   *United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2010) ..................................................14

\*   *W. Watersheds Project v. Bernhardt*,
    468 F. Supp. 3d 29 (D.D.C. 2020) ..............................................12, 32

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................26

**Federal Statutes**

16 U.S.C. § 1536(a)(2) .................................................................8

16 U.S.C. § 1536(b)(4)(C)(i) ...........................................................5

16 U.S.C. § 1536(o) .....................................................................6

**Federal Regulations**

33 C.F.R. § 325.2(b)(5) .................................................................9

33 C.F.R. § 325.4(a)(1) .................................................................9

40 C.F.R. § 230.10(b)(3) ...............................................................9

40 C.F.R. § 230.30(c) ...................................................................9

50 C.F.R. § 402.02 ........................................................15, 17, 18, 27

50 C.F.R. § 402.14(i)(1)(i)............................................................................5

50 C.F.R. § 402.14(g)(2)............................................................................15

50 C.F.R. § 402.14(g)(3)............................................................................17

50 C.F.R. § 402.14(h)(1)(ii).......................................................................15

50 C.F.R. § 402.16(a)(1)..............................................................................5

**State Statutes**

Fla. Stat. § 403.412...................................................................................10

Fla. Stat. § 403.412(2)..............................................................................11

Fla. Stat. § 403.412(7)..............................................................................10

**State Legislative Material**

S.B. 738, 126th Reg. Sess. (Fla. 2024) ....................................................11

**Other Authorities**

USFWS & NMFS, Endangered Species Consultation Handbook (1998), *available at* https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf...................................................................15

## INTRODUCTION

In this action, Plaintiffs challenge the Florida Department of Environmental Protection's ("FDEP") authority to issue any 404 wetlands permit under the Clean Water Act because the State's program was unlawfully approved by the Environmental Protection Agency ("EPA") and relies on unlawful actions by U.S. Fish and Wildlife Service ("USFWS") and the U.S. Army Corps of Engineers ("Corps").  FDEP is now poised to exercise that authority to issue permits for the Bellmar and Kingston projects, which USFWS anticipates will result in significant take of the critically endangered Florida panther and the loss of reproductive success for threatened crested caracara, causing irreparable harm to Plaintiffs Center for Biological Diversity and Sierra Club ("Plaintiffs").  To avoid a preliminary injunction, the opposing parties raise a number of arguments (sometimes at cross-purposes), none of which have merit.

The argument that Plaintiffs have not established a likelihood of success on the merits is not supported by the administrative record or the law, as Plaintiffs have shown on summary judgment.  The argument that Plaintiffs will not be irreparably harmed relies on the opposing parties' attempt to walk back USFWS' own determinations.  It also relies on the demonstrably false premise that there is an adequate remedy at law, when in fact state courts lack authority to review federal agency actions even if Plaintiffs had adequate access to them (which they do not). The claim that delay in the issuance of two permits outweighs Plaintiffs' and the public's interest in preventing irreparable harm to ESA-listed species conflicts with Congress' intent to afford protection of these species the highest of priorities.  The invocation of "cooperative federalism" ignores that state and federal cooperation that is unlawful is not in the public interest.

Collectively, the opposing parties argue that Plaintiffs have moved too late (they should have sought a preliminary injunction at the start of the litigation) but also too soon (the permits' issuance is not imminent).  They argue that it is improper to mount a permit attack here, but also

1

that there are no permits yet to attack.  And they argue that Plaintiffs should not "target" two specific projects, but also that the requested relief is not narrowly tailored.  The Developers[1] add that delay would purportedly be costly, but cost alone does not outweigh these irreparable harms.

As further shown below, these arguments have no merit.  Plaintiffs seek relief from this Court to avoid irreparable harm to the Florida panther and crested caracara that will also harm Plaintiffs' interests in these species.  The risk of irreparable harm to ESA-listed species has existed since EPA transferred authority over 404 permitting to Florida.  But with the completion of USFWS' Technical Assistance Forms ("TA Forms") for the Bellmar and Kingston projects, that threat has now become concrete and imminent.  The gravity of the threat from these projects also demonstrates that the balance of equities weighs in the Plaintiffs' favor and that injunctive relief is in the public's interest.  In light of the standard for preliminary injunctive relief, it is therefore not only necessary but also proper that Plaintiffs seek this relief now.  Plaintiffs therefore respectfully request that the motion be granted.

## ARGUMENT

### I.      Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs have demonstrated that they are likely to succeed on their claims against USFWS and EPA that are related to the protection of ESA-listed species under USFWS' jurisdiction (Claims 2–4, 6, 10, and 13).[2]  On November 7, 2023, the Court ordered that "[n]o further briefs will be accepted with respect to the fully briefed and submitted cross-motions for

---

[1] In this filing, Plaintiffs refer to Collier Enterprises (the developer for the Bellmar project) as "Collier," and refer to Cameratta Companies, LLC, and CAM7-SUB, LLC (the developer for the Kingston project), collectively, as "Cameratta."

[2] Florida argues that Plaintiffs in Claim 2 alleged that EPA violated the Clean Water Act by approving a program that provides inadequate access to the courts.  Dkt. 149 at 12, 35.  But the Claim 2 allegation relevant to this motion is that EPA failed to ensure that the State program would satisfy the 404(b)(1) Guideline that prohibits the issuance of permits that may jeopardize species or adversely modify or destroy critical habitat.  Dkt. 135 at 24–25 & n.18.

summary judgment." Minute Order, Nov. 7, 2023. Plaintiffs have therefore relied on their prior

briefing to demonstrate their likelihood of success on these claims. Dkt. 135 at 23–25. In

response, the Defendants have tried to rehabilitate arguments they raised on summary judgment,

but to no avail. Florida, for its part, has improperly raised new arguments (and submitted a new

"comparison" chart) in apparent contravention of the Court's directive. Should the Court

consider those arguments, Plaintiffs address them below.

### A.    The Programmatic BiOp and ITS Violate the ESA, and EPA's Reliance Was Unlawful.

As Plaintiffs have shown, USFWS had a duty to comply with the ESA, and it failed

twice.[3] Dkt. 135 at 23–24. First, USFWS' Programmatic BiOp and ITS failed to comply with

the ESA at the programmatic level, punting all ESA-required analysis to the permit level. *Id.*

Second, the permit-level technical assistance process does not require anything of USFWS other

than to receive and review state permit applications.[4] *Id.* That USFWS provided technical

assistance as to the Bellmar and Kingston projects does not alter the fact that the agency is not

*required* to as part of the EPA-approved Florida program, and that therefore the agency's failure

to do so (or doing so inadequately) is not clearly enforceable.

The Defendants suggest that the technical assistance process requires USFWS to comply

with the ESA's guardrails and contend that USFWS' technical assistance "clearly incorporates

the meaning of the terms from the ESA and its implementing regulations." Dkt. 148 at 18–19,

n.2 & n.3. But as an initial matter, USFWS *still* cannot point to *any* language in the BiOp that

---

[3] Cameratta mis-states Plaintiffs' burden as having to show that *their project* violates the ESA, Dkt. 146-2 at 9, but Plaintiffs' burden is as to the merits of the claims in their Complaint. Collier does not address the prong at all.

[4] The Defendants had options to ensure that the State 404 program complied with both the ESA and the Clean Water Act's 404(b)(1) Guidelines regarding species protection. Dkt. 98 at 28–29 & n.13. Not all would have required programmatic consultation. *Contra* Dkt. 149 at 15–16.

requires USFWS to comply with the guardrails of the ESA, including using the best available science to (1) analyze the baseline status of species; (2) evaluate the impacts of a proposed permit; (3) assess jeopardy; (4) propose reasonable and prudent alternatives; and (5) impose limits on authorized incidental take.  *See id.*[5]  Moreover, as Plaintiffs have demonstrated, the technical assistance for the Bellmar and Kingston permit applications falls far short of complying with the ESA's guardrails.  Dkt. 135 at 25–32.

And even if USFWS had provided thorough review of these high-profile projects (which have been subject to exceptional scrutiny) consistent with its ESA Section 7 obligations (which it has not), that would not change the fact that Florida's 404 program, as approved by EPA, does not require USFWS to do so.  Similarly, even if USFWS had expressly set a limit on incidental take for these projects, the Programmatic BiOp does not require them to do so, does not provide any mechanism to clearly enforce a project's take limit, and does not identify any mechanism to hold USFWS accountable for unlawful actions by the agency regarding take limits.

The Defendants also adhere to their position that USFWS' technical assistance is not a final agency action subject to judicial review but suggest that this has no bearing on the merits of Plaintiffs' claims.[6]  Dkt. 148 at 23.  However, the fact that the technical assistance process does not produce a BiOp that is clearly enforceable in federal court only amplifies the inadequacy of USFWS' standardless and voluntary engagement in the technical assistance process.  *See* Dkt. 135 at 23–24.  It would allow USFWS to avoid undertaking the analysis required to ensure against jeopardy at the programmatic level (by punting all ESA-required analysis to the permit level) and again at the permit level (by employing this non-statutory technical assistance process

---

[5] The same is true for Florida.
[6] USFWS' position that these actions are unreviewable in any court only underscores the need for urgent relief from this Court before these state permits issue.

for which USFWS disavows any reviewability of *its own* actions).  The programmatic BiOp thus would simply become a vehicle for USFWS to extend unlimited incidental take liability protection not only to EPA, but also to the State and State permittees for the life of the program. The absence of accountability asserted by the Defendants only underscores that the technical assistance process does not comply with the ESA as it would allow federal wildlife agencies to evade enforcement of that statute, contrary to Congress' intent.  *Id.  Accord* Oct. 19, 2023, Hr'g Tr. 92:8–94:18, 95:14–96:9.  The technical assistance process thus does not and cannot stand in for adequate ESA consultation at the programmatic level.

In response to Plaintiffs' showing that the technical assistance process does not expressly require USFWS to identify permit conditions to cap the amount of incidental take authorized by the programmatic ITS, Dkt. 135 at 23–24, the Defendants claim that "the BiOp provides otherwise," Dkt. 148 at 19, but fail to point to any language to support that proposition.  Indeed, the BiOp states only that the amount or extent of incidental take will be *quantified* by USFWS and that this will be done "in coordination with FDEP/[the Florida Fish and Wildlife Conservation Commission ("FWC")]."  FWS-0006028, at FWS-0006108 (BiOp).  It does not require USFWS to articulate a permit condition to limit take or otherwise expressly cap the amount of take that will be authorized per the programmatic ITS, as is required in an ITS associated with a project specific BiOp.  *See* 16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. §§ 402.14(i)(1)(i), (4), 402.16(a)(1) (requiring a clear, enforceable standard for determining when the level of anticipated take has been exceeded such that consultation must be reinitiated).

Not having set take limits at the programmatic level, USFWS cannot evade its duty again by not setting take limits at the permit level.  The lack of any express take limits in the conditions for the projects' TA Forms is the foreseeable consequence of a technical assistance process that

does not require USFWS to establish them, even though this generates uncertainty about how much take is shielded from ESA liability pursuant to the programmatic ITS. Dkt. 135 at 30–31. The Defendants and Florida contend otherwise, Dkt. 148 at 19 n.3, 42; Dkt. 149 at 18, but their arguments are contradicted by the TA Forms and Public Notices.

As Plaintiffs have explained, the ESA creates a liability shield for incidental take "that is in compliance with the terms and conditions specified in [an ITS]," 16 U.S.C. § 1536(o), but the Programmatic ITS specifies no terms and conditions that apply to permittees. Dkt. 135 at 24, 30, & 30 n.21. At most, the ITS' terms and conditions require only that the State will assure compliance with state permit conditions. *Id.* at 30 (citing FWS-006028, FWS-006109–10 (BiOp)).[7] Therefore, to ensure compliance with the ESA, USFWS would have had to specify a take limit at the permit level, since it did not do so at the programmatic level. But the TA Forms do not expressly establish take limits, nor do they include permit conditions expressly limiting the amount of take. Dkt. 135-8 at 8–9, 16–17, 29–37; Dkt. 135-10 at 8–9, 22–23, 33–42. The Defendants and Florida make unsupported arguments that USFWS' anticipated take estimates will be incorporated by FDEP as conditions, but USFWS itself did not identify them as permit conditions. Dkt. 135-8 at 8–9, 16–17, 29–37; Dkt. 135-10 at 8–9, 22–23, 33–42. *See* Dkt. 148-1 at 19, 26, 28, 33 (Carey Dec. ¶¶ 31, 41, 46, 54).[8] Although the ITS states that FDEP will

---

[7] Florida relies on a statement from the ITS that "any take" incidental to a state 404 permit is exempt "if the permittee implements all permit conditions ... as agreed upon by the State and the USFWS," Dkt. 148 at 18; Dkt. 149-3 at 2, 5 n.r (citing FWS-006028, at FWS-006108 (BiOp)); but this is not included as a term and condition of the programmatic ITS. FWS-006028, at FWS-006109–10. Nor does this language state that a permittee must comply with a take limit established by USFWS at the permit-level to receive take liability protection or even that USFWS must establish a permit-level take limit at all. *Id.* at FWS-006108.

[8] Florida's argument that a permittee must comply with permit requirements, Dkt. 149 at 19, falls flat because USFWS has not proposed permit conditions that would expressly limit incidental take, Dkt. 135-8 at 8–9, 16–17, 29–37; Dkt. 135-10 at 8–9, 22–23, 33–42.

"reopen the permit" if take exceeds that anticipated by USFWS (if and when USFWS identifies an amount of anticipated take), FWS-006028, at FWS-006110 (BiOp), the ITS does not say that take exceeding the anticipated amount would be unauthorized and therefore subject to an ESA enforcement action by the public or USFWS.  *Contra* Dkt. 148 at 42.

For its part, Florida belatedly seeks to introduce extensive argument on the merits of Plaintiffs' claims, including a new comparison chart that purports to show that the same process and standards apply to Corps-led and State-led 404 permit review.[9]  Dkt. 149 at 20; Dkt. 149-3. But that is not the case.  Plaintiffs attach their own comparison chart citing the applicable legal authority that shows otherwise and address Florida's meritless arguments here.

First, Florida argues that USFWS uses the same "review standard" for State 404 permits, but the BiOp language cited as support describes "FDEP's processes and procedures," the overarching "jeopardy" standard, and preliminary effect determinations made "by FDEP and FWC, and coordinated with USFWS."[10]

Second, Florida places great weight on the BiOp's definition of "best available data" to suggest that this definition creates a legal requirement for USFWS to use the best available science when engaging in the technical assistance process.  Dkt. 149 at 19.  However, that definition is not an express requirement to use the best available science during the technical assistance process, and Florida points to no authority that suggests it is.  The ESA *requires* USFWS to use the best available science in developing its programmatic BiOp (yet it did not).

---

[9] The Defendants, by contrast, explicitly stated at summary judgment that they do not argue that the technical assistance process is equivalent to Section 7 consultation.  Dkt. 99 at 74.
[10] Florida also touts the State's "track record" of species protection, Dkt. 149 at 21–22, but only says that USFWS "reviewed" applications they received, *id.*, which is all the program requires, and that "conditions were included" to protect species.  Plaintiffs, however, have identified other specific examples of USFWS' inadequate involvement.  *See, e.g.*, Dkt. 98-1 at 9–12, 18, 38 (Crooks Dec. ¶¶ 28–32, 51–52, att. A); Dkt. 104-1 at 4 (Crooks Dec. ¶ 70).

But nothing in the technical assistance process binds USFWS to comply with the ESA's best available science requirement at the permit level.[11]  Indeed, that term is not used at all in the BiOp's description of USFWS' voluntary engagement in the technical assistance process.  FWS-006028, at FWS-006049–75 (BiOp).[12]

Florida also asserts that USFWS is participating in the technical assistance process "by virtue of its obligations arising under Section 7(a)(2)" and therefore must use the best available science.  Dkt. 149-3 at 3, 5 n.dd.  However, Section 7 on its face only applies to USFWS' actions fulfilling its obligations to consult with a federal agency on a federal agency action, 16 U.S.C. § 1536(a)(2), whereas here, USFWS is only providing "assistance" to a state agency on a state agency action.  Indeed, the Defendants have clearly said that they "do not claim that the technical assistance process equals Section 7 consultation" and that "absent any further federal permitting, no further Section 7 consultation is required."  Dkt. 99 at 74.

Third, Florida misstates federal law when it suggests that, unlike FDEP, the Corps may accept or disregard USFWS conditions when granting a permit.  Dkt. 149 at 20–21, 45; Dkt. 149-3 at 5 n.s, n.t.  The Supreme Court has explained that this is "technically" possible, but a federal agency would "do[] so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal

---

[11] In the programmatic BiOp and MOU, USFWS could have made plain that it must use the best available science in technical assistance decisions—it did not do so.  The Defendants attempt to cure this defect by asserting broadly in their brief that the ESA requirements for consultations apply to technical assistance.  But the same brief also makes clear their position that USFWS's compliance with those requirements would not be subject to judicial review.

[12] Plaintiffs searched "best available data" and "best available science," and aside from the definition, found only one reference in the entire BiOp, which says that the best available data would be used by FDEP and FWC, and coordinated with USFWS, to make the preliminary effects determinations that decide whether technical assistance is required.  FWS-006028, at FWS-006062 (BiOp).

penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (noting that agency action causing take in a manner inconsistent with terms and conditions of an ITS would violate ESA).  Therefore, as the Court "put it mildly," USFWS is "keenly aware of the virtually determinative effect of its [BiOps]." *Id.*[13]  Florida's improperly raised merits arguments fail.

### B.    Plaintiffs Have Established Standing.

Florida also attempts to re-hash its baseless arguments that Plaintiffs lack standing to prosecute this case at all.  But Plaintiffs have established their standing as to every claim, including the claims on which this motion focuses, based on several harms.[14]  Dkt. 98 at 75–81; Dkt. 104 at 90–101, 107–112.

To the extent Plaintiffs' standing in this case relies on the harm of inadequate access to state courts, Florida continues to argue that *Agrico*'s "substantial interest" test would allow Plaintiffs to bring state permit challenges, Dkt. 149 at 35–38, but that is simply not the case. *Agrico* addressed whether economic injury was sufficient to confer standing on a businesses seeking to intervene in a permit proceeding involving a competitor.  *Agrico Chem. Co. v. Dep't of Env't Regul.*, 406 So. 2d 478, 482 (Fla. 2d Dist. Ct. App. 1981).  The case was about the type of *interest*, not the type of *party*; it did not address associational standing.

As Plaintiffs have shown, under Florida law, associational standing requires showing that a "substantial number" of an organization's members are "substantially affected" by an agency

---

[13] Indeed, the Corps must ensure that no 404 permit will jeopardize an ESA-listed species, 40 C.F.R. § 230.10(b)(3), which the agency satisfies through Section 7 consultation, *see* 33 C.F.R. §§ 325.2(b)(5), 325.4(a)(1).  *Accord* 40 C.F.R. § 230.30(c).

[14] Citing nothing, Florida wrongly speculates that five Plaintiffs were "jettison[ed]" from the motion for preliminary injunction to "manufacture" standing (based on barriers to access to state courts) for Plaintiffs that do not qualify as "citizens of the state."  Dkt. 149 at 9 n.2 & 35.  *See also* Dkt. 146-2 at 8 n.2.  But Florida ignores that Plaintiff Defenders of Wildlife is also a national organization.  And the moving Plaintiffs have an independent right to protect their interests and would assert the same harms even if the motion had been filed by all Plaintiffs.

action.  Dkt. 98 at 75–76 & n.39; Dkt. 31 at 47–48.  Using this test, standing has even been found

lacking for a Florida organization.  Dkt. 31 at 47.  The application of the test places particularly

unreasonable restrictions on national organizations with hundreds of thousands of members who

seek to defend the conservation interests of their Florida members.  *Id.*; Dkt. 98 at 75–76 & n.39.

Florida has previously argued that Florida Statute Section 403.412 removes this obstacle,

Dkt. 102 at 46–47, but that too is not the case.  Under Section 403.412, only "citizens of the

state" qualify for Article III standing in administrative proceedings pertaining to federally

delegated programs.  Fla. Stat. § 403.412(7).  *See* Dkt. 104 at 97.  Therefore, to challenge a

permit in a state administrative proceeding, Plaintiffs must either show that (1) a substantial

number of members are substantially affected to establish associational standing pursuant to

Chapter 120; or (2) they are a citizen of the state under Section 403.412.  Although the

administrative court in *McClash* found that Sierra Club had associational standing under Chapter

120 (but not under Section 403.412), that finding was based entirely on the parties' stipulation

that Sierra Club had a substantial number of members that were substantially affected.  *McClash

v. Manasota-88, Inc.*, No. 14-4735, 2015 WL 3966050, at *8 (Fla. Div. Admin. Hr'gs June 25,

2015).  Where there has been no such stipulation, the administrative court has found otherwise,

even as to a Florida organization.  *Fla. Wildlife Fed'n v. FDEP*, No. 14-1420RU, 2014 WL

4627151, at *5, *14 (Fla. Div. Admin. Hr'gs Sept. 11, 2014).

Contrary to Florida's accusation, Dkt. 149 at 35, Plaintiffs did not "ignore" Chapter 120.

*See* Dkt. 31 at 47–48; Dkt. 98 at 78–79; Dkt. 104 at 95–98; Dkt. 135 at 31.  Plaintiffs have

identified several obstacles to bringing permit challenges, including restrictive standing and the

prohibitive expense of having to litigate cases de novo that likely require significant

expenditures.[15]  *Contra* Dkt. 149 at 38 n.19.  As Plaintiffs have noted, retaining an expert to prepare a declaration based on their review of records hardly compares to putting on an affirmative case in a de novo proceeding, including depositions and expert testimony.

To make matters worse, national organizations who are not citizens of the state completely lose the ability to bring enforcement actions in state court.  Fla. Stat. § 403.412(2) (only "a citizen of the state" may "maintain an action for injunctive relief" in state court).  In other words, non-citizens of the state are barred from suing to enjoin 404 permit violations or to compel FDEP to take enforcement action for 404 violations.  *Id.*  So, for instance, if the Developers receive the state 404 permits at issue here, Plaintiffs would face barriers to filing a state enforcement action to enforce compliance with mitigation requirements and other conditions that the opposing parties tout in their filings as ensuring species protection.

## II.    Absent Immediate Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm.

Plaintiffs have shown that these projects threaten irreparable harm to the critically endangered Florida panther and the threatened crested caracara, as well as Plaintiffs' interest in those species.  Dkt. 135 at 25–38.  The opposing parties' arguments to the contrary fail.  As an initial matter, the Defendants ask this Court to apply a standard for irreparable harm to species (population-level harm) that has been rejected by all courts in the D.C. Circuit that have considered it.  Dkt. 148 at 29.[16]  Florida argues for an even more unreasonable standard, also rejected by the district courts, that would require a showing of jeopardy.  Dkt. 149 at 8.

---

[15] Notably, the Florida Legislature has been considering a bill that would require the mandatory award of attorney fees against the losing party in a permit challenge, a barrier to access the courts that already exists for permit enforcement actions.  S.B. 738, 126th Reg. Sess. (Fla. 2024).

[16] The Defendants' cases are easily distinguishable.  *Nw. Env't Def. Ctr. v. Corps*, 817 F. Supp. 2d 1290, 1315–16 (D. Or. 2011) (no irreparable harm where the proposed mining project would not directly harm any protected salmon); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) (no irreparable harm where scientists have found that the species "can easily withstand" the proposed wolf hunt).

*Western Watersheds Project v. Bernhardt* specifically addressed this question and found that applying a test that required even a showing of population-level harm would be a "dubious proposition," and that the requirement to show jeopardy would "stand the ESA on its head." 468 F. Supp. 3d 29, 46–48 (D.D.C. 2020) (quoting *Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 69 (D.D.C. 2006), *vacated sub nom. on other grounds Humane Soc. of U.S. v. Kempthorne*, 527 F.3d 181 (D.C. Cir. 2008)). The court ultimately denied the request for preliminary relief because the killing of a *single* threatened grizzly bear may not be irreparable, especially where the population "has been growing for years" and USFWS' rules allow grizzlies to be killed for self-defense, defense of property, or if they are a nuisance. *Id.* at 46–48. The court "expressed no view on whether the taking of a *single endangered* species would constitute irreparable harm." *Id.* at 48 n.10. Here, the panther and caracara have small populations, these projects will likely injure and kill many panthers and permanently destroy reproductive success for caracara, and neither species may be killed or harmed without USFWS approval.

Indeed, courts in the D.C. Circuit have held that the likely loss of even relatively few individuals from a species protected by the ESA is "a significant, and undoubtedly irreparable, harm." *Am. Rivers v. Corps*, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003). *Accord Fund for Animals, Inc. v. Turner*, No. CIV. A. 91-2201, 1991 WL 206232, at *8 (D.D.C. Sept. 27, 1991) ("[T]he loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable, harm."); *Kempthorne*, 481 F. Supp. 2d at 69 ("The Court agrees with Plaintiffs' contention that '[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head. Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered

species before a species was on the brink of extinction.").  *See also Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 819 (9th Cir. 2018) ("[T]he fact that [the ESA] permits some incidental take of listed species does not establish that harm to individual members of a species cannot be irreparable.").  "[T]he question of irreparable injury does not focus on the significance of the injury, but rather, whether the injury, irrespective of its gravity, is irreparable—that is whether there is any adequate remedy at law."  *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) (internal citation and quotations omitted).

### A. USFWS' Technical Assistance Fails to Adequately Protect ESA Species and Is Not Clearly Reviewable in Federal Court to Ensure ESA Compliance.

Plaintiffs have shown that USFWS failed to comply with the ESA at the programmatic level and failed to satisfy the standards and procedures of Section 7 consultations during technical assistance for the Bellmar and Kingston permit applications.  *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (procedural injury tied to concrete harm also constitutes irreparable harm).  The Defendants' arguments to the contrary are unconvincing.  To set the stage, the Defendants argue that the Court must provide USFWS "special deference" for its technical assistance and, presumably, find no irreparable harm.  Dkt. 148 at 30–31.  There are at least three problems with this request.

First, USFWS itself anticipates take that will irreparably harm the panther and caracara.  As shown further below, USFWS' efforts to walk back, undermine, and question the import of its own assessments to avoid the relief Plaintiffs seek here fail.

Second, no deference is due to the agency's unsupported claim that the amount of take USFWS anticipates will not be reached.  To support this claim, the Defendants tailor-make a quote from *Baltimore Gas* that omits a key part of the test the Court established: that the agency is making predictions, "within its area of special expertise *at the frontiers of science*."  *Balt. Gas*

*& Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).[17]  But here, the Defendants did

not even use the best available science in their TA Forms, much less anything at its frontiers.

   Third, the Defendants cite no authority for the proposition that they are entitled to

deference when they engage in a non-statutory technical assistance process that is not authorized

by federal law and that fails to bind USFWS to the requisite standards and procedures set forth in

the ESA.  Dkt. 135 at 23–25.  *See Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 370

(D.C. Cir. 2022), *cert. granted in part sub nom. Loper Bright Enters. v. Raimondo*, 143 S. Ct.

2429 (2023) (no deference owed if agency has no delegated authority from Congress to act).

Additionally, "[courts] do not defer to [an] agency's conclusory or unsupported suppositions,"

such as those made by USFWS here.  *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557,

562 (D.C. Cir. 2010).  USFWS therefore deserves no "special deference," and none of the

Defendants' cited cases provide otherwise.[18]

   As for USFWS' technical assistance here, Plaintiffs have explained that USFWS' entire

house is built on a broken foundation because USFWS did not use the best available science to

estimate the populations of the ESA-protected species affected by these two permits.  Dkt. 135 at

26–27.  Any conclusions the agency has drawn without the proper foundation are unreliable.

   For the caracara, USFWS takes the position that it was not required to include a

discussion of the species' current population.  Dkt. 148 at 32; Dkt. 148-1 at 26 (Carey Dec. ¶ 42).

---

[17] *Baltimore Gas* is also a NEPA case, and so the review standard provided by the Defendants, Dkt. 148 at 30–31, is inapplicable in an ESA case.

[18] *Conservancy of Sw. Fla. v. Williams*, No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990, at *17 (S.D. Fla. Dec. 21, 2018) (relying on "exceedingly deferential" standard to find that "no jeopardy" decision was not arbitrary because (1) there would be no injury or death of panthers; and (2) USFWS explained how mitigation would compensate for the quality, function, and value of lost habitat); *Fund for Animals v. Rice*, 85 F.3d 535, 547–48 (11th Cir. 1996) (upholding "no jeopardy" opinion where panthers had not been sighted on or near project footprint for ten years, and the panther had no occupied territory in entire county).

And that is precisely Plaintiffs' point:  Section 7 consultation requires that USFWS evaluate the current status and environmental baseline for listed species, which includes an assessment of the current population.  50 C.F.R. §§ 402.14(g)(2), (h)(1)(ii); USFWS & NMFS, Endangered Species Consultation Handbook at 4-20 to 4-21 (1998).[19]  A Section 7 BiOp's analysis builds on that foundation and relies on it to draw conclusions about a project's impact on the species.  *See Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (rejecting baseline analysis; explaining that if USFWS conducted "jeopardy analysis in a vacuum … then a listed species could be gradually destroyed, so long as each step on the path of destruction [wa]s sufficiently modest" (internal citation and quotation marks omitted)).  And although Plaintiffs' burden to show irreparable harm does not require a showing of jeopardy, for USFWS to evaluate jeopardy under *the ESA*, the agency must determine whether the action is likely to appreciably reduce the likelihood of the species' survival and recovery "by reducing the reproduction, *numbers*, or *distribution* of that species."  50 C.F.R. § 402.02 (emphasis added).  By failing to assess the current status and environmental baseline of the species, USFWS did not and could not have met its obligations under the ESA, and its determination that the actions would not appreciably reduce the numbers and distribution of that species did not comply with the ESA.

As for the panther, the Defendants' declarant now avers that USFWS "does not believe the actual number of panthers in the population is at or near the upper bound (>700)" of the estimate that the agency relied upon in the TA Forms.  Dkt. 148-1 at 7 (Carey Dec. ¶ 11).  Instead, he claims that the agency used the lower range.  *Id.*  But that position is not articulated in the TA Forms, which specifically stated, without qualification, that "[b]ased on the data," the

---

[19] *Available at* https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

panther population has increased "to between approximately 222 and 773 individuals in 2018," Dkt. 135-8 at 11; Dkt. 135-10 at 15, and then proceeded to its discussion of effects.[20] Additionally, Plaintiffs have shown that the margin of error was too high for this population estimate range to be relied upon in conservation decision-making, as explained by both USFWS and the authors of the study.  Dkt. 135 at 26–27; Dkt. 135-1 at 20 (Frakes Dec. ¶ 58); Dkt. 149-2 at 100 (Duncan Dec. att. A) (USFWS' Species Status Assessment for the Panther, "SSA").

Regarding the TA Forms' "baseline" sections for the panther, the Defendants do not contest that USFWS failed to include a review of important literature and research, as would appear in a BiOp.  Dkt. 135 at 28.  Nor do they contest that USFWS cited only one peer-reviewed publication despite several studies being published in recent years.  *Id.*  But, "[w]hen it comes to protecting listed species, environmental context is critical."  *Appalachian Voices*, 25 F.4th at 269.  The failure to include this context severely undermines the sufficiency of USFWS' technical assistance and demonstrates that USFWS did not abide by the ESA.

As for the effects of the proposed projects on the panther population, Dkt. 135 at 28–29, the Defendants contend that USFWS "disagrees with the concept" that multiple panthers include the project footprints in their home ranges, as Dr. Frakes' studies have shown.[21]  *See* Dkt. 148 at 35 n.11; Dkt. 148-1 at 8 (Carey Dec. ¶ 13).  Instead, USFWS states it does not have the information to estimate the number of panthers using a proposed project site, Dkt. 148-1 at 8 (Carey Dec. ¶ 13), and thus uses oblique acreage amounts to determine if a project will destroy a

---

[20] The Defendants also fail to address recent trends that indicate the panther population may be "stabilizing or declining," as evidence submitted by Florida shows.  Dkt. 149-2 at 328–29 (Duncan Dec. Att. B) (FWC Annual Panther Report 2023).

[21] Contrary to Mr. Carey's critique, Dkt. 148-1 at 8 (Carey Dec. ¶ 13), Dr. Frakes identified *overlapping* home ranges, where multiple panthers use the same habitat, Dkt. 135-1 at 16–17, 27–28 (Frakes Dec. ¶¶ 49, 77), and mentioned "shifting ranges" to say panthers will have to adjust to lost habitat, *id.* at 14, 19 (Frakes Dec. ¶¶ 44, 53).

portion of an average panther's home range.[22]  But that information is readily available.

Dr. Frakes used radio telemetry data to assess the number of panthers that include the project

footprints in their home ranges.  Dkt. 135-1 at 16–17, 27–28 (Frakes Dec. ¶¶ 49, 77).  This

telemetry data comes from radio-collared panthers, is publicly available from FWC, and was last

updated November 22, 2023.[23]  Moreover, it is the same telemetry data that USFWS itself used

in the TA Forms to show that panthers use the habitat areas in the project footprints.  Dkt. 135-8

at 10; Dkt. 135-10 at 15.[24]  USFWS articulates no reasonable basis not to have considered that

data to determine how many panthers currently rely on the habitat in the project footprints.

    Regarding the "cumulative effects" sections, the ESA requires USFWS to assess the

effect from future State or private activities that are reasonably certain to occur, which means

USFWS must consider all "but for" consequences to listed species resulting from the project

under review.  50 C.F.R. §§ 402.14(g)(3), 402.02.  *See Nat'l Wildlife Fed'n v. Norton*, 332 F.

Supp. 2d 170, 178 (D.D.C. 2004) (in isolation, individual projects may impact only small

portions of panther habitat, but cumulative impacts might be significant); *Nat'l Wildlife Fed'n v.

Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005) (same).  But USFWS did not do that here.

Plaintiffs have shown that USFWS looked only at the raw acreage lost for each of the 404

permits, rather than assessing the *effects* from that loss of habitat, including the incidental take

anticipated from intraspecies aggression caused by habitat loss and from vehicle strikes caused

---

[22] USFWS claims that even if it had data, it would consider this a "one-time impact" for those individual panthers, Dkt. 148-1 at 8 (Carey Dec. ¶ 13), but this "one-time impact" would likely be injury or death from intraspecies aggression.  Dkt. 135-8 at 11–12; Dkt. 135-10 at 16–17.
[23] *Florida Panther Telemetry*, FWC, https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/about (last visited Jan. 25, 2024).
[24] Plaintiffs also note that USFWS has previously been able to use this telemetry data to determine the number of panthers using an action area.  *See Sierra Club v. USFWS*, No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933, at *4 (M.D. Fla. Nov. 1, 2023).

by increased traffic from these other planned developments. Dkt. 135 at 29. The Defendants do not contest that USFWS looked solely at raw acreage to draw conclusions about take and instead contend that Plaintiffs "have not identified any specific deficiency." Dkt. 148 at 41.[25] But the specific deficiency is plain. USFWS did not employ or meet ESA standards in this review because it failed to consider the but-for consequences to listed species from the loss of acreage associated with reasonably certain to occur activities. Dkt. 135 at 29.

As for the caracara, USFWS provided no cumulative effects assessment at all because it unreasonably limited the "action area" to the project footprint, even though the development will likely have direct and indirect effects beyond the project footprint, *id.* at 29–30, a fact the Defendants did not dispute. Nor do the Defendants dispute that these impacts would likely cross into the Rural Lands West project footprint, located immediately north of Bellmar.[26] *See id.* Instead, they focus on the *existing federal projects* attached to Dr. Morrison's declaration and state that those existing projects are too far away and not interrelated with Bellmar. Dkt. 148 at 33.[27] This argument completely overlooks the *future state and private* projects that are reasonably foreseeable, including Rural Lands West. Dkt. 135 at 30. The additional destruction of the Rural Lands West habitat would certainly compound the impacts of the Bellmar project. *Id.*; Dkt. 135-2 at 16, 20–21 (Morrison Dec. ¶¶ 41, 48–49).

---

[25] Plaintiffs have also shown that USFWS expressed the unfounded assumption that these developments would occur regardless of 404 permitting, Dkt. 135 at 29, and the Defendants do not dispute this or provide a basis for the assumption.

[26] Rural Lands West is a development project that is proposed for the area immediately North of Bellmar. *See* Dkt. 135-8 at 36; Dkt. 139-1 at 6–7 (Passarella Dec. ¶¶ 18, 20) (explaining that Rural Lands West and Bellmar were conceived as *one* project that Collier later broke into two).

[27] These existing federal projects should have been considered as part of the baseline status of the caracara, but were not. 50 C.F.R. § 402.02 (baseline includes consideration of past and present federal projects); Dkt. 135-2 at 9, 76–78 (Morrison Dec. ¶ 27, att. D).

Regarding incidental take, the TA Forms do not articulate express incidental take limits nor recommend any permit conditions that set or identify a limit on incidental take.  Dkt. 135 at 30–31.  As discussed at length above, the Defendants' arguments to the contrary are unavailing.  Anticipating the amount of take, and limiting the amount of take authorized, are very different things.  And yet, if these permits are allowed to issue before the Court has determined whether this TA scheme is lawful, the permittees will be shielded from liability for incidental take by virtue of the Programmatic ITS, without any clear permit condition limiting the amount of take.

Additionally, as Plaintiffs have shown, when the Corps issues a 404 permit, there is a site-specific BiOp and ITS that is clearly reviewable in federal court to enforce the guardrails and procedures of the ESA.  *Id.* at 31.[28]  Here, such a clear avenue for relief does not exist; and indeed, the Defendants and Florida take it a step further to describe a non-statutory process that would avoid such accountability entirely.  In their response, the Defendants adhere to their position that USFWS "is not engaged in a reviewable 'agency action' when it provides technical assistance."  Dkt. 148 at 23.  If this position is taken as true, their assertion that Plaintiffs (even if they faced no barrier to standing or exorbitant cost) would have an adequate remedy to challenge permits that rely on USFWS' BiOp, ITS, and technical assistance in state court fails, because a state court has no authority over a federal agency and cannot opine on the legality of Florida's program.  And, as Florida admits, FDEP is required to accept permit conditions USFWS proposes.  But a state court would not have authority to review USFWS' permit conditions.

---

[28] Florida suggests Plaintiffs are concerned with form over substance, Dkt. 149 at 49, but that is belied by the extensive substantive flaws with the TA Forms as outlined by Plaintiffs.

Florida's lengthy discussion of an irrelevant Middle District of Florida case involving a 3-mile road expansion has no bearing on this case.[29]  Dkt. 149 at 46–47; *Sierra Club v. USFWS*, No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023).  Although the plaintiffs there asked the Court to review USFWS' original action, the Court concluded that it should review only the amended BiOp and found it lawful.  *Id*. at *2–6.  But there is nothing in that case that has any bearing on the issues raised in this litigation.  *Contra* Dkt. 149 at 47–48.  Although the plaintiffs challenged USFWS' analysis, the central issue in that case was USFWS' failure to create a numerical take limit, as opposed to relying on a habitat loss surrogate.  *Sierra Club v. USFWS*, 2023 WL 7188933, at *6–7.  Here, USFWS anticipated a numerical amount of take, and has not proposed to use any sort of surrogate in lieu of a numerical estimate.  If anything, *Sierra Club v. USFWS* demonstrates that when the Corps administers the 404 program and consults with USFWS pursuant to Section 7 of the ESA, (1) USFWS is required to produce more thorough, detailed analyses, and that it will revisit and reassess those analyses when challenged in federal court; and (2) affected organizations have a clear avenue for receiving their day in court for a determination as to whether USFWS has met its duty.[30]

### B.     The Projects Will Irreparably Harm Panthers and Plaintiffs' Members.

As Plaintiffs have shown, the Bellmar and Kingston projects will destroy thousands of acres of Primary Zone panther habitat located near panther dens, where panthers birth and rear their kittens, and near crucial conservation areas, including the Florida Panther National Wildlife

---

[29] In that case, USFWS responded by re-initiating consultation, which resulted in a 59-page BiOp addressing the impacts on *just* the panther.  *Cf.* Dkt. 149 at 46 (asserting BiOp was 21 pages).
[30] Contrary to Florida's contention, Dkt. 149 at 48 n.27, Plaintiffs have shown the deficiencies in the State program as well as the barriers to challenging state permits in state court, Dkt. 135 at 25–32.  Moreover, Plaintiffs ultimately seek vacatur of EPA's approval of Florida's program and not, as the case Florida cites suggests, Dkt. 149 at 48 n.27 (citing *Marino v. NOAA*, 33 F.4th 593, 596–98 (D.C. Cir. 2022)), a remand for the favorable exercise of agency discretion.

Refuge, that support the critically endangered panther population.  Dkt. 135 at 32–36.  USFWS

has said that it anticipates the construction of these projects, alone, will likely injure or kill 3

panthers[31] from attacks by other male panthers (i.e., intraspecies aggression) as panthers are

thrust from their home ranges (now destroyed) and forced into neighboring territories.  *Id.* at 32.

And USFWS has said it anticipates that these projects will also likely result in the injury or death

of 6 to 25 panthers as roadkill resulting from traffic increases caused by these projects *each year*.

*Id.* at 7, 32–33.  Rather than addressing these startling numbers, the Defendants attempt to shift

focus to mitigation measures (e.g., money donations and one wildlife crossing located in the

project footprint of another planned development).[32]

     Although the Defendants suggest that USFWS does not expect the upper end of the take

estimates to occur, it is nevertheless the range that USFWS has expressed as its best estimate.

Moreover, it is not necessary that the take reach the highest anticipated level for Plaintiffs to

establish that the projects will cause irreparable harm.  As an initial matter, the take of even a

small number of endangered species constitutes irreparable harm.  *Am. Rivers*, 271 F. Supp. 2d at

258–59.  Here, the upper range of anticipated take (up to 28 panthers at buildout and 25 annually

thereafter) is more than three times the (likely overestimated) annual growth rate of the panther

population (8 or 9 panthers).  Dkt. 135-8 at 12–17, 16; Dkt. 135-10 at 21–23.  As Dr. Frakes

concluded, take at the upper range in combination with the damage done to panther movement

---

[31] In the TA Form, USFWS stated both that habitat loss from Kingston would impact 2 panthers,
while anticipating take of only 1 panther from habitat loss.  The Defendants now appear to
concede that habitat loss alone will likely take 2 panthers.  Dkt. 148-1 at 24 (Carey Dec. ¶ 40).
[32] Cameratta contends that take is not only the killing but also other forms of harm, Dkt. 146-2 at
10–11, but this argument disregards that lethal take is not required to show irreparable harm, and
that USFWS' take estimate largely contemplates death from vehicle strikes.  Cameratta's claim
that there is no correlation between increased traffic and panther deaths, *id.* at 11, is contradicted
by USFWS' own assessment, Dkt. 135-10 at 23.

pathways would harm the panther far beyond the bar necessary to establish irreparable harm—to the point of jeopardy. Dkt. 135-1 at 30 (Frakes Dec. ¶ 84). At the midrange, this amount of take would still exceed the growth rate by one and a half times (8 or 9 panthers compared with 14 panthers). Even the lowest estimate would remove two thirds of the projected growth rate, placing the panther in a very precarious position, particularly with the number of other development projects on the horizon that will destroy more habitat and take more panthers. *See, e.g.*, Dkt. 31-1 at 13–16, 23 (Crooks Dec. ¶¶ 37–47, 72(b)); Dkt. 98-1 at 16–19, 25–28 (Crooks Dec. ¶¶ 45–54, 76–81, 84(a)–(b)); Dkt. 105-1 at 6–7 (Crooks Dec. ¶ 2).[33] The Defendants themselves characterize USFWS' TA Forms as "generating an estimate of take that [USFWS] believes *is reasonably certain to occur*." Dkt. 148 at 35–36 (emphasis added). The Defendants' attempt to now walk their own assessment back should not be countenanced.

Cameratta attempts to dismiss the anticipated vehicular strike take as uncertain, Dkt. 146-4 at 8–10 (Johnson Dec. ¶ 21), but that uncertainty is built into the range of USFWS' estimate, which is that vehicular strike take is likely to be between 4 to 23 panthers, each year, Dkt. 135-10 at 21–22.[34] Further, USFWS determines anticipated incidental take *after* taking into account the project's minimization measures. *See* FWS-006028, at FWS-006108 (BiOp). And while Cameratta attempts to raise questions of causation (by pointing out that it can be difficult to distinguish between project and non-project related vehicle collisions), it nevertheless admits that USFWS has determined the anticipated vehicular take will be "due primarily to Project-related traffic increases." Dkt. 146-4 at 8 (Johnson Dec. ¶ 21). Cameratta further admits that USFWS

---

[33] *See State 404 Permits*, FDEP, https://www.arcgis.com/apps/mapviewer/index.html?
layers=ce4369c29c0c428f8316af480c19fe65 (last visited Jan. 20, 2024).

[34] Cameratta's reliance on cases where there was no harm or where measures were designed to restore damaged land after mining activities ended is therefore misplaced. Dkt. 146-2 at 11.

intends to implement measures to reduce vehicle take *only* if that takes exceeds "the annual

average of 16 panthers per year" within the action area.  Dkt. 146-4 at 11 (Johnson Dec. ¶ 24).[35]

The Defendants also point to the proposed permit conditions to suggest that these take

amounts are unlikely to occur, Dkt. 148 at 38–39, but those conditions are not likely to reduce

take appreciably.  For example, Bellmar includes a permit condition to fund a wildlife crossing,

*id.* at 39 n.12, but that crossing is located north of the project footprint within another

development project (Rural Lands West) that will destroy more habitat, introduce more traffic,

and result in more incidental take of panthers, Dkt. 135-8 at 36.  *See also* Dkt. 31-1 at 16–19

(Crooks Dec. ¶¶ 48–56); Dkt. 98-1 at 19–22 (Crooks Dec. ¶¶ 55–64).[36]  The Defendants also

point to money payments to the various funds, Dkt. 148 at 39 n.12, but those funds are not solely

dedicated to measures that would limit the anticipated take from these projects, and nothing

requires that the money provided by the Developers be used to fund such measures.[37]

The Defendants' claim that mitigation measures developed through the panther habitat

assessment methodology (which identifies the amount of mitigation credits, called PHUs, that

must be obtained) defeats Plaintiffs' claim of irreparable harm fails, because PHUs are not an

---

[35] And Cameratta's claim that even more harmful mining or other projects "could" occur in lieu
of Kingston, Dkt. 146-2 at 9; Dkt. 146-4 at 7 (Johnson Dec. ¶ 18), are speculative and irrelevant
as to whether Kingston is likely to irreparably harm Plaintiffs.

[36] Cameratta claims that the estimated vehicular take here will also be reduced by "proposed"
mitigation measures such as wildlife crossings that may one day come to pass, but as noted
above, the additional impacts of the projects where those crossings may be placed have yet to be
considered.  Dkt. 146-4 at 11 (Johnson Dec. ¶ 24).  Cameratta cites no authority to suggest that
the promise of theoretical—and unenforceable—mitigation can cure the risk of irreparable harm.

[37] Cameratta argues that Plaintiffs have not established the threat of irreparable harm because
permit conditions for that project "have yet to be finalized."  Dkt. 146-2 at 11.  But USFWS has
indicated it has no further comment on the project (and so no further recommendations as to
permit conditions), *see* Dkt. 135-6 at 4; Dkt. 135-9 at 4, and Cameratta has admitted that it has
"already agreed to" the permit conditions, Dkt. 146-2 at 11–12; Dkt. 146-4 at 11–12 (Johnson
Dec. ¶¶ 25–26).  And as Plaintiffs have shown, once the permits issue it will be too late to
prevent irreparable harm.

adequate substitute and because that methodology relies on outdated information.  Dkt. 135-1 at 3 (Frakes Dec. ¶¶ 9–10).  The Defendants argue extensively about Dr. Frakes' critique of the panther habitat assessment methodology, Dkt. 148 at 36–37, but fail to recognize that this is a methodology Dr. Frakes helped create, Dkt. 135-1 at 3 (Frakes Dec. ¶ 9).  Dr. Frakes' criticism is not with the methodology, but that USFWS is not using the best available science (or data) in its calculations, relying instead on outdated data.  *Id.* (Frakes Dec. ¶¶ 9–10).  Thus, contrary to the Defendants' claim that Dr. Frakes' critique would require them to "create new science," Dkt. 148 at 37, Dr. Frakes has clearly said that they need to use existing, updated data.  *See Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 346, 349, 351 (4th Cir. 2019).

In addition to causing the injury and death of many panthers, Dr. Frakes model showed that these projects will result in the functional loss of over 7,500 acres of Primary Zone Habitat. Dkt. 135-1 at 11–14, 23–25 (Frakes Dec. ¶¶ 34–42, 66, 72).  The Defendants contend that USFWS does not consider Dr. Frakes' model to be the best available science.  Dkt. 148 at 36–37. But USFWS itself has extensively relied on that model in the SSA.  *See, e.g.*, Dkt. 149-2 at 121– 38, 146, 150, 156–58, 164, 187–188, 225, 263–64 (Duncan Dec. Att. A).

As for the thousands of acres of Primary Zone Habitat USFWS itself anticipates will be destroyed, Dkt. 135 at 34–35, the Defendants contend this destruction is not irreparable because it is "small" compared to the overall (remaining) range of the panther.  Dkt. 148 at 11, 16, 37.[38] But their myopic view misses the point.  To begin, the panther's remaining range is exceedingly small compared to its original range.  Dkt. 135 at 12–14.  Any *further* reduction of that range threatens the panther.  *Id.*  Primary Zone habitat in particular is necessary to a species that

---

[38] The Defendants also point out that Bellmar will focus its destruction on row crops, Dkt. 148 at 38, which Plaintiffs have already explained provide vital edge habitat where panthers hunt, Dkt. 135 at 15–16, a fact the Defendants do not dispute.

requires more, not less, habitat. *Id.* USFWS itself acknowledges that this loss of habitat, alone, will likely result in the injury or death of at least 3 panthers, and Plaintiffs have shown it will likely injure or kill even more. *Id.* at 15–18. *See Norton*, 332 F. Supp. 2d at 177 (USFWS cannot look only at habitat loss percentages while "mak[ing] no effort to discuss what these percentages mean for the panther").

The Defendants mischaracterize Plaintiffs' arguments as being that *any* destruction of Primary Zone habitat cannot be approved and argue that the recovery plan in which this habitat was identified does not create legal requirements. Dkt. 148 at 37–39. However, Plaintiffs' argument is that (1) in the recovery plan, USFWS itself has identified Primary Zone habitat and stated that it must be preserved for the survival and recovery of the panther; and (2) the scientific community has said that Primary Zone habitat must be preserved for the survival and recovery of the panther. Dkt. 135 at 34–35. Therefore, a *net loss* of Primary Zone habitat would likely harm the panther's survival and recovery, and the mere preservation of other existing Primary Zone habitat will not remediate that harm. *Id.*[39]

Plaintiffs have also shown that these projects will damage important corridors that USFWS has said must be preserved. Dkt. 135 at 35. In response, the Defendants argue that

---

[39] Notwithstanding USFWS' assessment, Cameratta claims that the project will provide a net benefit to panthers by improving habitat (presumably excluding the habitat the project destroys), saving the site from an otherwise mining destiny, funding various entities, and building crossings. Dkt. 146-2 at 9–10; Dkt. 146-4 at 3–8 (Johnson Dec. ¶¶ 8, 11–20). However, these mitigation measures are built into USFWS' assessment and conflict with USFWS' own assessment that the project will result in considerable take, both from habitat loss and annual vehicular strikes. *See* FWS-006028, at FWS-006108 (BiOp). Moreover, the project purports to restore only 156 acres to Primary Zone conditions and 249 acres to Secondary Zone conditions, resulting in a net loss of approximately 357 acres of Primary Zone Habitat and 2,641 acres of Secondary Zone Habitat. Comments from Karimah Schoenhut, Sierra Club, and Elise Pautler Bennett, Center for Biological Diversity, to Jonathan Guinn et al., FDEP et al., Jan. 16, 2024, at 13–14, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ ST404_423130/facility!search [hereinafter "Plaintiffs' Kingston Comments"].

these projects were designed with the improvement of corridors in mind.  Dkt. 148 at 38.  But whatever was "in mind" cannot trump scientific evidence presented by Dr. Frakes that these projects will, in fact, harm panther corridors.  Dkt. 135-1 at 14, 23–24 (Frakes Dec. ¶¶ 42, 66).  The Defendants have presented no analysis or evidence to support its contentions otherwise.[40]

These impacts to the panther population and its habitat will irreparably harm Plaintiffs' members who seek to observe panthers in the wild.[41]  Dkt. 135 at 35.  No party has disputed the declarations provided by Plaintiffs' members.

## C.   The Projects Will Irreparably Harm Caracara and Plaintiffs' Members.

Plaintiffs have also demonstrated that these two projects will permanently destroy thousands of acres of foraging and nesting habitat for at least 2 breeding pairs of caracara and will destroy the reproductive success of those 2 pairs at least during construction.[42]  *Id.* at 37–38; *Am. Rivers*, 271 F. Supp. 2d at 258–59.

In response to Plaintiffs' motion, the Defendants claim that USFWS does not anticipate any "lethal take" of caracara, Dkt. 148 at 31, but that is not entirely true.  As Plaintiffs explained, the loss of reproductive success can include the death of caracara young that may be hatched during this period.  Dkt. 135 at 20; Dkt. 135-2 at 2, 5–6, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–

---

[40] Cameratta disagrees with these irreparable harms to the panther and implausibly claims that its project will increase habitat connectivity, Dkt. 146-2 at 10, but relies on its consultant who did not demonstrate an expertise in panthers, *see also Senior Staff*, Passarella & Associates, https://passarella.net/about-us/senior-staff (last visited Jan. 24, 2024) (describing Mr. Johnson's species experience as relating to birds, reptiles, rodents, tortoises, and amphibians).  This is not competent evidence to rebut the evidence on which Plaintiffs rely.

[41] Relying on *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21–22 (2008), Cameratta argues that Plaintiffs' alleged irreparable harm "is in the abstract."  Dkt. 146-2 at 11.  But in *Winter*, the plaintiffs were concerned about the risk of sonar injury to marine mammals from a Navy practice that in 40 years had never resulted in a documented case of sonar-related injury to marine mammals in the area.  555 U.S. at 21–22.  Here, by contrast, vehicle strikes in Southwest Florida are a leading cause of death for the Florida panther.  Dkt. 135 at 14–15.

[42] Neither Developer contests the harm Plaintiffs have shown as to the caracara.

38, 45).  Moreover, jeopardy can occur when an action "reduce[s] the reproduction" of the listed species, even if it does not lead to lethal take of adults.  50 C.F.R. § 402.02.

Although the Defendants acknowledge that the habitat destruction at Bellmar accounts for nearly half of a caracara pair's average home range and at Kingston accounts for more than one caracara's average home range, they also claim that this destruction is "minimal" compared to the overall habitat range of the caracara.  Dkt. 148 at 31–32; Dkt. 148-1 at 26–27 (Carey Dec. ¶ 43).  This approach fails to account for the fact that the caracara habitat in Florida is saturated, which the Defendants concede.  Dkt. 135-8 at 9.  This means that all suitable remaining caracara habitat is already inhabited by nesting pairs (which are territorial), and therefore no habitat is *available* for the resident nesting pairs.  Dkt. 135 at 20, 37.  *See Norton*, 332 F. Supp. 2d at 177 (finding it arbitrary for USFWS to identify habitat loss percentages without assessing how that loss affects an ESA-listed species).  The Defendants' claim that the caracara nesting pairs will simply move into adjacent territory is therefore unfounded.[43]  Rather, the resident nesting pairs will likely *attempt* to move into neighboring territories and face fierce competition until only one caracara pair remains, or the other caracara pair moves into another territory, starting the cycle over again.  Dkt. 135 at 37.  In short, the amount of habitat affected may appear minimal considering only crude acreage amounts, but the potential impact on the caracara based on the context of their population and distribution is likely substantial.  Dkt. 135-2 at 8 (Morrison Dec. ¶ 24).  This context is also the reason USFWS' failure to require habitat replacement is inadequate to ensure that the caracara will survive.  *Contra* Dkt. 148 at 31–32.

---

[43] The Defendants also suggest that caracara regularly alter their territory, Dkt. 148 at 32; Dkt. 148-1 at 26 (Carey Dec. ¶¶ 43), but this is inaccurate.  As Dr. Morrison explained, caracara are "strongly site faithful" and though they sometimes use alternate nest trees when a prior tree is damaged, they remain within 0.5 km of the original tree and stay within their 3,200-acre territory.  Dkt. 135-2 at 5 (Morrison Dec. ¶ 16).

The Defendants contend that the proposed permit conditions and mitigation measures will further reduce impacts to the caracara nesting pairs, but those measures are unlikely to reduce the harm.  The Defendants cite the permit condition that prohibits the removal of an "active tree,"[44] *id.* at 33, but fail to mention that clearing can proceed once the nest is empty (either because it has been abandoned or the caracara young have fledged and left the site), Dkt. 135-8 at 3.  It also fails to account for the fact that, as Dr. Morrison explained, caracara require foraging habitat to support their young, and the destruction of their foraging habitat (even if the nest tree temporarily remains) would impact the caracara's ability to rear any young in an "active tree."  Dkt. 135-2 at 13 (Morrison Dec. ¶ 35).  This destruction of foraging habitat also explains why the presence of "alternate trees," Dkt. 148 at 32–33; Dkt. 148-1 at 28–29 (Carey Dec. ¶ 47), does not minimize the harm to the caracara pair, because any alternative nest relies on the same foraging habitat, Dkt. 135-2 at 11–12 (Morrison Dec. ¶¶ 33–34).

The Defendants also point to measures that require restoration of a comparable area if the primary zone around an active nest tree is impacted.  Dkt. 148 at 34.  However, as Dr. Morrison explained, that does not remedy the harm because the pair is still likely to abandon their home range.  Dkt. 135-2 at 15 (Morrison Dec. ¶ 40).  Bellmar will destroy 1,440 acres of caracara foraging habitat; replacing the "primary zone" (70 acres) would not provide enough habitat to support a nesting pair.  *Id.*  For example, Dr. Morrison is aware of a situation where clearing land 500 meters from an active nest caused nest failure and subsequent territory abandonment.  *Id.*

---

[44] The Defendants claim that there is no "active" nest tree on the Bellmar footprint, Dkt. 148 at 12, but this is patently incorrect.  A nest tree is only considered "inactive" after a 3-year period of documented inactivity, Dkt. 135-2 at 17 (Morrison Dec. ¶ 43), and the Bellmar nest trees were active in 2020 and 2022, Dkt. 135-8 at 7.

None of these permit conditions will prevent the permanent loss of reproductive success for the resident nesting pair, nor the likely ripple effect of displacement.

These impacts to the caracara and its habitat will irreparably harm Plaintiffs' members who seek to observe caracara in the wild.  Dkt. 135 at 38.  No party has disputed the declarations provided by Plaintiffs' members.

**D.    Issuance of the Permits is Imminent.**

Plaintiffs have provided ample evidence to show that FDEP is poised to issue these permits—which the opposing parties fail to persuasively rebut—and that irreparable harm is therefore imminent.[45]  Indeed, Florida admits that FDEP could issue these permits for Bellmar as early as February 5th and for Kingston as early as February 19th.  Dkt. 149 at 26–27.[46]  USFWS has issued final comments on both permit applications.  Dkt. 135-5 at 4–5 (Roff Dec. ¶¶ 17, 21); Dkt. 135-6 (stating USFWS had provided its "final" comments and conditions for Bellmar); Dkt. 135-9 (same for Kingston).[47]  For both projects, FDEP issued public notices, has now held public meetings (Bellmar on December 7, 2023, and Kingston on January 16, 2024), Dkt. 148 at 23, and

---

[45] Plaintiffs do not seek to cut any agency review short as Florida claims, Dkt. 149 at 8, 10, but rather to ensure that the agency review is lawful.

[46] The Developers also appear to expect the imminent issuance of the permits.  Collier describes Plaintiffs' motion as coming "at the eleventh hour" and "at the end of the [permitting] process." Dkt. 145 at 2.  *See also* Dkt. 139 at 13 (the permit review process for Bellmar "is in its final stages").  Cameratta asserts that "any delays will cost [them] thousands of dollars per day," Dkt. 146 at 2; Dkt. 146-2 at 12, an assertion that presumes issuance of the permit is imminent.

[47] And although the Defendants now claim that USFWS has not yet decided the "suite of conditions" that could be included in the permits, Dkt. 148 at 22, USFWS' own "final" comments belie that assertion, Dkt. 135-6 at 4; Dkt. 135-9 at 4. While Cameratta echoes the argument that permit conditions "have yet to be finalized," Dkt. 146-2 at 11, its declarants admit that Cameratta has "already agreed to" the permit conditions that will be required by USFWS and FWC.  Dkt. 146-2 at 11–12; Dkt. 146-4 at 11–12 (Johnson Dec. ¶¶ 25, 26) (acknowledging that TA document identified the avoidance and minimization measures USFWS has deemed necessary for permit issuance, that Cameratta has agreed to these conditions, and that these will be incorporated into the permit as permit conditions).  Cameratta's claim that delay will cost thousands of dollars *per* day demonstrates not only that the developer believes the state permit is imminent, but also that the agreed-to conditions are not going to change.

has closed public comment periods.  And, although EPA has retained the right to comment, the

agency has not indicated that it intends to comment and is free to waive that right at any time.

Dkt. 135 at 11–12.  The opposing parties' (often contradictory) contentions are unavailing.

Florida and the Defendants argue that any irreparable harm asserted by Plaintiffs is not

imminent because the Bellmar and Kingston permits have not been issued.  Dkt. 148 at 22–26;

Dkt. 149 at 41–42.  However, preliminary injunctive relief is intended to prevent irreparable

harm.  *Gordon v. Holder*, 632 F.3d 722, 724–25 (D.C. Cir. 2011) (a motion for preliminary

injunctive relief may fail to establish irreparable harm "if the harm has occurred and the parties

cannot be returned to the status quo").

And as Plaintiffs have explained above, to avoid irreparable harm, Plaintiffs cannot wait

until the permits have been issued because the State restricts their access to state courts and state

courts would lack jurisdiction over federal agency actions.  The state court's jurisdiction would

only determine whether a permit complies with the State 404 program, which Plaintiffs contend

is unlawful as a result of the federal actions that resulted in its approval.  The state court process

would not provide an avenue to challenge whether USFWS' take estimates and no jeopardy

conclusions complied with ESA requirements.  Indeed, the state court would lack jurisdiction to

review any of USFWS' actions as to particular projects.  As for federal challenges, there is no

BiOp or permit specific ITS to challenge, and the Defendants assert that USFWS' technical

assistance is not reviewable, Dkt. 148 at 23.  Instead, they point to ESA Section 9 suits against

those directly causing take, ignoring that USFWS' purportedly unreviewable technical

assistance, coupled with the programmatic ITS, would shield that take from Section 9 suits.

Although Florida and the Defendants claim that there are various, possible future steps in

the permitting process that make Plaintiffs' harms speculative, *id.* at 22–25; Dkt. 149 at 8–10,

28–29, 41–42, the reverse is true.  Every reliable indication is that this train has left the station

and will reach its destination shortly.  What is speculative is the parade of potential actions the

opposing parties identify in an effort to defeat the relief Plaintiffs seek.  The likelihood of any of

these theoretical additional steps occurring is particularly low given all the steps Florida lays out

at length as having taken for these two permits, including requests for information, public

meetings, "final" comments from USFWS, and the Developers' expectations.  Dkt. 149 at 41–

42; Dkt. 149-1 at 7, 9–11 (Wolfe Dec. ¶¶ 25–26, 33–34); *see also* Dkt. 135-6; Dkt. 135-9; Dkt.

145 at 2–3; Dkt. 139 at 13; Dkt. 146 at 2; Dkt. 146-2 at 12–13.  Therefore, while some of the

actions the opposing parties point to (e.g., further permit conditions or modifications) *could*

occur, none of the parties have given any reason to believe that they are *likely* to occur.[48]  The

only actions FDEP states will or are likely to happen are the review of submitted comments and,

once the agency grants the permit, execution of an approved "proposed" permit by FDEP and

Developers.  Dkt. 149 at 28–29; Dkt. 149-1 at 11 (Wolfe Dec. ¶ 35).  These actions indicate the

imminence of a final decision.[49]

       **E.**    **Plaintiffs' Request for Preliminary Relief is Timely.**

     Plaintiffs have not delayed in requesting preliminary, emergency relief.  They promptly

sought this relief once irreparable harm from the issuance of major permits pursuant to FDEP's

unlawful program became concrete and demonstrably imminent, a prerequisite to obtaining

preliminary injunctive relief.  Notably, no party has argued that Plaintiffs delayed once USFWS

---

[48] Florida's assertion that a Plaintiff could simply file an administrative appeal to render an
issued permit non-final (for the pendency of that proceeding) ignores the hurdles that Plaintiffs
have identified and the inadequacy of that forum to redress Plaintiffs' harms.
[49] Plaintiffs need not show that FDEP will purposefully bypass a particular process that must
occur.  *Contra* Dkt. 149 at 42.  Plaintiffs need only show that the permits are close to issuance
and will cause them irreparable harm.

provided final comments and issuance of the permits became imminent.[50]  And no party has

shown that FDEP would have authority to issue the permits if Plaintiffs prevail on their claims.

The circumstances presented here are far removed from the (mostly out of Circuit) cases

cited by Florida, where plaintiffs' motion alleged immediate, irreparable harm arising before or

at the time of filing suit, but delayed in promptly seeking preliminary injunctive relief.  *See, e.g.*,

*W. Watersheds Project*, 468 F. Supp. 3d at 49–50 (denying preliminary injunction where there

was no irreparable harm and there were unexplained delays in plaintiffs' filing suit and bringing

motion); *Defs. of Conewango Creek v. Echo Devs., LLC.*, No. CIV.A. 06-242 E, 2007 WL

3023927, at *5 (W.D. Pa. Oct. 12, 2007) (finding unreasonable delay where plaintiffs sought

injunctive relief more than a year *after the issuance of the permit* that threatened irreparable

harm to protected species).

The standard in this Circuit was articulated in *Gordon v. Holder*, 632 F.3d at 724–25,

which holds that delay is not a proper basis to deny preliminary injunctive relief but may be

considered when determining whether the irreparable harm prong for relief has been met.  *Id.*

("The factor of delay is only significant if the harm has occurred and the parties cannot be

returned to the status quo...." (quoting *McDermott ex rel. NLRB v. Ampersand Pub., LLC*, 593

F.3d 950, 965 (9th Cir. 2010) (internal quotation marks omitted))).  The relevant question is not

the length of any purported delay, but the context of the motion's timing.  *See Eco Tour*

*Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 387–89 (D.D.C. 2017).

---

[50] Collier argues that Plaintiffs should have moved sooner because "the potential effects" of
Bellmar should have been known to Plaintiffs when Collier first filed for a 404 permit.  Dkt. 145
at 9–10 & n.9.  But Plaintiffs could not have known what USFWS' TA Forms would conclude
until those documents were completed.  And as shown above, it would have been premature to
act before Plaintiffs' demonstrable irreparable harms became concrete and imminent.

Plaintiffs here have presented a more than reasonable explanation for the timing of their motion, properly filing it when serious, irreparable harm became concrete and imminent (including from USFWS' issuance of TA Forms at the conclusion of the permitting process anticipating high levels of take, even with mitigation measures) and before the irreparable harm to be enjoined has occurred.[51] *Cf. Am. Forest Res. Council v. Williams*, No. CV 21-601 (RJL), 2021 WL 4819846, at *4 (D.D.C. Oct. 13, 2021) (denying preliminary injunction where plaintiffs failed to demonstrate concrete, imminent harm and nowhere contended that the threatened injuries had only become apparent recently to justify delay).  It would have been premature for Plaintiffs to file this motion before the irreparable harm became concrete and imminent and it would be too late to seek relief once the permits issue.

Plaintiffs have acted judiciously in reserving that extraordinary action for this extraordinary moment—when two permits that pose an unacceptable, demonstrable, and irreparable harm to ESA-listed species and Plaintiffs' interests—are on the cusp of being permitted pursuant to a State program unlawfully authorized and approved by the Defendants in this case.[52]  Plaintiffs filed the motion promptly after USFWS' issuance of the TA documents for these projects, and within days of confirming that USFWS intended no further comment and that the Defendants and Florida would not agree to postpone action pending a ruling on Plaintiffs' ESA claims.  Dkt. 135 at 11–12.

---

[51] Indeed, Florida struggles with the appropriate timing by arguing that Plaintiffs' request for relief is premature, Dkt. 149 at 35, and yet also too late.  Dkt. 149 at 43 (arguing that Plaintiffs' demonstration of irreparable harm is "undercut" by the timing of this motion).

[52] It is true that Plaintiffs previously asserted they would face imminent, irreparable harm from EPA's transfer of authority to Florida.  Dkt. 149 at 44 n.25.  And there was a reasonable basis for the assertion at the time, including Florida's aspirational claims that FDEP would have the staff and resources to handle the program at the get-go and that its 404 permitting program would be easier and faster than the Corps' program.  Florida's assertions, particularly as to major permits of concern to the Plaintiffs, proved unfounded.

Relying on *Standing Rock Sioux Tribe v. Corps*, 239 F. Supp. 3d 77 (D.D.C. 2017), Collier asserts that Plaintiffs' motion is barred by the doctrine of laches. Dkt. 145 at 9–11. But the circumstances in the two cases could not be any more different, and a comparison confirms that Plaintiffs' motion is not so barred. To avoid this reality, Collier begins by mischaracterizing the case as turning on a lack of diligence in *pursuing injunctive relief*. Dkt. 145 at 9. But as *Standing Rock* explains, the question of laches turns instead on whether the plaintiff has been diligent in *raising the concerns* on which the motion is based, including in the administrative process and earlier stages of the litigation, such that the other party would have had an opportunity to address them. 239 F. Supp. 3d at 84.

In *Standing Rock*, the plaintiff Tribe had long been aware of the plan to send oil through a pipeline under the bed of Lake Oahe. *Id*. at 84–87. And while the Tribe had raised a number of concerns about the risk of harm from a leak or rupture of the pipeline, they had never raised the concern that the mere presence of a crude oil under the Lake would interfere with the Lakota people's religious exercise—not until they moved for a temporary restraining order and preliminary injunction on that claim. *Id*. at 82. The Court observed that Tribes were put on notice of the pipeline's route in 2014, that in 2015 they made several general claims about how the pipeline might adversely affect sacred sites, including water, in their consultations with the Corps, and that in 2016 they filed suit alleging only generally that the affected waters were religiously significant, and that spills or ruptures posed risks to those waters. *Id.* at 85–86. But it was not until 2017—when construction of the pipeline was nearly completed—that the Tribe for the first time raised the concern about the impact on religious practice of the pipeline's mere presence, regardless of spill or rupture, beneath Lake Oahe, and relied on that claim (which required amending the complaint) as the basis for its request for preliminary injunctive relief. *Id.*

at 85.  It was under *these* circumstances that the Court found the plaintiff had not acted diligently and that its multi-year delay in raising religious exercise objections was inexcusable, therefore precluding its motion on the basis of laches.  *Id.* at 87.

The Court further noted that the Tribe's failure to raise its specific religious objection had unduly prejudiced the Defendants, because they could have considered whether and how to accommodate the concern had it been raised sooner.  *Id.* at 87.  With permits issued, the necessary easement granted, and construction just days from completion, the Court found that granting an injunction now was an extraordinary and drastic remedy barred by laches.

Nothing of the sort can be said here.  Plaintiffs have raised concerns about the impact of Florida's program on the Florida panther and caracara repeatedly, including with reference to specific projects.  *See, e.g.*, Dkt. 98 at 14, 21, 40, 50; Dkt. 98-1 at 22–25, 26–27 (Crooks Dec. ¶¶ 65–75, 82–83); Dkt. 98-4 at 9–11 (Hartl Dec. ¶¶ 32–38); Dkt. 98-5 at 3–4, 7–9, 15–16 (Schwartz Dec. ¶¶ 8–12, 17–23, 45–47); Dkt. 98-10 at 5–6 (Umpierre Dec. ¶ 16).  Plaintiffs have repeatedly, consistently, and from the beginning, raised these concerns to state and federal agencies under the ESA and the Clean Water Act.  Plaintiffs need not dwell much on this fact, because Collier acknowledges it too.  Dkt. 145 at 5–6 & n.6 (describing how Plaintiffs have "submitted several letters" both in response to public comment periods and on their own initiative throughout the permit application review process); *id.* at 11 ("Plaintiffs have been regular commenters in [the State's] permitting process"); Dkt. 139 at 6 (same).

Plaintiffs' ESA claims—the same claims on which the motion for a preliminary injunction is based—appeared in the original and amended complaints.  Dkt. 1 at 20–23, 25–26, 34–42, 44–45 (Compl. ¶¶ 108–09, 154, 162–201, 213–21); Dkt. 77 at 49–52, 56 (Am. Compl. ¶¶ 249–73, 295–300).  As Collier again acknowledges, Plaintiffs have consistently raised these

concerns also in this litigation.  Dkt. 145 at 6.  Unlike in *Standing Rock*, Collier here does not,

and could not, aver that the concerns Plaintiffs have continued to raise during the state permitting

process are different from the ESA concerns they have raised in this litigation.

**III.      The Balance of Equities and Public Interest Favor Preliminary Relief.**

Plaintiffs have demonstrated that the irreparable harm to Plaintiffs outweighs any

purported harms to the opposing parties.  Dkt. 135 at 38–41.  An injunction also furthers the

public interest by protecting ESA-listed species and ensuring that government actors comply

with the law.  *Id.* at 40–41.  Although the opposing parties point to past investments, economic

losses from the *temporary* delay in obtaining a permit do not outweigh the irreparable and

significant harms Plaintiffs will experience if the permits issue unlawfully.  And although the

Defendants and Florida point to concerns regarding cooperative federalism, *unlawful* cooperation

between the federal government and the State is not in the public interest.

**A.      Preliminary Injunctions Are Temporary.**

The Defendants begin with a baseless claim that the balance of equities tip in their favor

because there is no "guarantee" the delay from a preliminary injunction would be temporary and

that suspending action on the permits in question until the Court enters final judgment would

result in "indefinite" delay.[53]  Dkt. 148 at 43–44.  But preliminary injunctions are, by definition,

temporary.  *Safari Club Int'l v. Salazar*, No. 11-CV-01564 (BAH), 2012 WL 13069816, at *2

(D.D.C. Mar. 21, 2012) ("As the federal defendants argue ... a preliminary injunction is a

temporary means for a court to maintain the status quo until adjudication of the merits....").

In reality, the Defendants appear to take issue with the possibility that an injunction could

last longer than they prefer.  Dkt. 148 at 43 ("potentially lengthy period").  Yet, the Defendants

---

[53] Collier Enterprises likewise claim that a preliminary injunction would lead to an "indefinite[]" halt."  Dkt. 145 at 2. They too provide no explanation or legal authority for this proposition.

assert no harm that would result from this delay.  And they fail to acknowledge that Plaintiffs'

alternative request for relief would reduce delay by expediting a decision on the merits.

**B.    Plaintiffs' Requested Relief Would Preserve the Status Quo.**

The Defendants' next argument, that the relief Plaintiffs seek would alter rather than

preserve the status quo, *id.* at 9, 44, similarly lacks merit.  The purpose of a preliminary

injunction is "to preserve the relative positions of the parties" until the merits are resolved.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal

citation omitted).  The Court has authority to enjoin actions that are likely to be unlawful in order

to protect Plaintiffs from irreparable harm.  *Tate v. Pompeo*, 513 F. Supp. 3d 132, 154 (D.D.C.

2021), *dismissed sub nom. Tate. v. Blinken*, No. 21-5068, 2021 WL 3713559 (D.C. Cir. July 22,

2021) (enjoining defendants from relying on challenged Presidential Proclamations to suspend or

refuse visa adjudications to the plaintiffs).

Plaintiffs' motion requests an injunction against taking further action to issue certain

permits, which is to refrain from acting.  Dkt. 135 at 42.  The requested relief would preserve the

status quo, which is that no state 404 permit for Bellmar or Kingston has yet been issued, by

temporarily preserving the relative positions of the parties until Plaintiffs' claims are resolved.

*D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).[54]

**C.    The Public Interest is in Protecting ESA-Listed Species.**

As for the public interest, the Defendants suggest that the public's interest "in the

protection of threatened and endangered species" should be considered against the public's

interest in a state 404 program's ability to issue permits uninterrupted.  Dkt. 148 at 44–45.

---

[54] For these same reasons, the Defendants' argument that this request is inconsistent with "the
current legal regime," Dkt. 148 at 44, also fails.  Plaintiffs' preliminary relief does not alter the
current legal regime in any way.  Plaintiffs' alternate request for relief would be based on the
Court's ruling that the current legal regime is not legal.

However, one of these things is not like the other.  It is "beyond doubt" that in passing the ESA, "Congress intended endangered species to be afforded the highest of priorities."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  The public interest in guarding against irreparable harm to ESA-protected species outweighs a temporary interruption in the issuance of two permits. Even Plaintiffs' alternate request for relief would simply transfer permits that may affect ESA-listed species to the Corps, restoring the default permitting mechanism authorized by Congress.

### D.    Plaintiffs' Motion Serves the Public Interest in Cooperative Federalism.

That federal courts should generally consider principles of federalism and comity "before enjoining state action," Dkt. 148 at 23 n.4, presents no bar to the relief requested in this motion or this case.  *See Friends of Crystal River v. EPA*, 794 F. Supp. 674, 685 (W.D. Mich. 1992), *aff'd*, 35 F.3d 1073 (6th Cir. 1994) (permanently enjoining state from issuing 404 permit after finding that authority over the permit was vested with the Corps once EPA federalized the permit; EPA lacked authority to "return" the permit to the state's jurisdiction).

The assertion that an injunction would disserve the public's interest in "cooperative federalism," Dkt. 148 at 45–46; Dkt. 149 at 50–51, ignores that Congress intended state assumption to comply with federal law.  *See* Dkt. 104 at 17–18; *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action....  To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (citation omitted)).

In the Clean Water Act, Congress spelled out the requirements for state assumption, and in the ESA, Congress prescribed the requirements to ensure the protection of listed species. Congress' interest in cooperative federalism is not served by state assumption in violation of these statutes.  And state and federal cooperation that is unlawful does not serve the public

interest.  *See Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1219–20, 1224 (9th Cir. 2018)

(affirming injunction against county sheriff's office for constitutional violations based on racial

profiling under guise of enforcing state and federal immigration laws) (cited by the Defendants,

Dkt. 148 at 23 n.4).  States have no authority to limit federal authority under the Clean Water

Act.  *Arkansas v. Oklahoma*, 503 U.S. 91, 105–07 (1992) (rejecting Arkansas' challenge to

EPA's authority to require federal NPDES permit for Arkansas facility discharging into interstate

waters to comply with downstream state's water quality standards) (cited by the Defendants,

Dkt. 148 at 46).  And although states may choose whether to take on federal programs, when

they do, they must meet federal standards.  *New York v. United States*, 505 U.S. 144, 167–68

(1992) (cited by the Defendants, Dkt. 148 at 46).

     Since Plaintiffs' motion is premised on the likelihood that the Defendants violated the

Clean Water Act and the ESA in approving Florida's program, the relief Plaintiffs seek is

entirely consistent with Congress' design.  Nothing in the congressional design weighs against

the relief Plaintiffs seek, *contra* Dkt. 148 at 46, because the Defendants violated federal law, and

so issuance of these permits pursuant to an unlawfully approved program would be unlawful.[55]

### E.   Plaintiffs' Harms Outweigh FDEP's Asserted Harms.

     Florida argues that the balance of equities tips in their favor based on a

mischaracterization of the relief Plaintiffs' motion seeks.  In any case, although Florida laments

the loss of past expenditures, the loss of program efficiencies, and other alleged harms tied to

program implementation, Dkt. 149 at 11, 15, 51; Dkt. 149-1 at 15–16 (Wolfe Dec. ¶¶ 48–52),

---

[55] The Defendants' argument that Plaintiffs' "complaint lies with the design of the [Clean Water Act]," Dkt. 148 at 46, completely disregards the precondition of legality.  If the relief Plaintiffs seek is not granted, Plaintiffs will be irreparably harmed by an unlawful program that relies on USFWS' unlawful actions.  And even if Plaintiffs faced no barrier to state court (which they do), USFWS' actions would not be amenable to suit there either.

none of these are affected by the relief Plaintiffs seek, *contra* Dkt. 149-1 at 16 (Wolfe Dec. ¶ 52). Past efforts and money expended to assume and implement the state program are utterly unaffected, as those funds and efforts have been used to administer the program.  *See id.*  Nor is the public or FDEP deprived of any alleged benefits generated by past expenditure because Florida has used those funds to operate the 404 program during the pendency of this case.  *See id.*  Future allocations of resources are also not impacted by the preliminary injunction Plaintiffs seek because FDEP would still administer the state program pending the final resolution of this case.[56]  And should Plaintiffs prevail, the State would presumably modify its future expenditures and allocation of staff accordingly.  Nor are Florida's arguments about losing the "combined efficiencies" in processing ERP and 404 applications, *id.* at 15 (Wolfe Dec. ¶ 49), availing because preliminary relief would only affect the two permits at issue.

Even if Florida's past expenditures and future resources could somehow be "lost" by a preliminary injunction against two applications (which they plainly could not), Florida failed to provide the proper showing of proof.  Florida's argument contains only conclusory statements as to past expenditures and no proof of future losses.  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (bare assertions of only past losses without detailed accounting of how business would go out of business within 18 months was insufficient to show irreparable harm). Indeed, there were (and remain) plenty of other environmental issues for FDEP to tackle for the public's benefit, e.g., preventing toxic algal blooms, improving poor water quality, and addressing the emerging disease that is further imperiling the panther.  EPA-HQ-OW-2018-0640-0386-A1, at 5, 45–47 (Plaintiff Comments); Dkt. 149-2 at 177 (Duncan Dec. att. A).

---

[56] According to Florida's estimate that there is an 85% overlap between the ERP and 404 programs, EPA-HQ-OW-2018-0640-0011 at 9 (State Assumption Application), it is especially difficult to see how FDEP's resources could be appreciably affected.

And Florida has been well aware of these claims of illegality since undertaking

assumption and deciding allocation of these resources.  *See, e.g.*, *Quechan Tribe of the Ft. Yuma*

*Rsrv. v. U.S. Dep't of the Interior*, 755 F. Supp. 2d 1104, 1121 (S.D. Cal. 2010) ("While the

court is sympathetic to the problems Defendants face, the fact that they are now pressed for time

and somewhat desperate after having invested a great deal of effort and money is a problem of

their own making and does not weigh in their favor."); *Fed'n of Japan Salmon Fisheries Co-op.*

*Ass'n v. Baldrige*, 679 F. Supp. 37, 48–49 (D.D.C. 1987), *aff'd and remanded sub nom.*

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*, 839 F.2d 795 (D.C. Cir. 1988) (harm to species

outweighs economic harms).[57]

Additionally, no competent evidence supports the claim that Plaintiffs' narrowly tailored

request for relief would "severely undermine" Florida's implementation of the program, affect

public confidence, much less have a "severe chilling effect" on the 404 permitting division and

create "chaos."  *See* Dkt. 149 at 51; Dkt. 149-1 at 15–16 (Wolfe Dec. ¶¶ 48, 50).[58]  If anything

has undermined public confidence, it is the manner in which Florida and the Defendants crafted

workarounds for (or otherwise disregarded) federal law to approve Florida's program

notwithstanding its many legal defects.  If anything has created a chilling effect, it is the

increasing barriers Florida has adopted to preclude access to the courts.  And if anything has

generated regulatory chaos, it is Florida's ill-preparedness to have taken on this federal program

from the outset, and its unwillingness to abide by federal law, including in its application of

definition of waters of the United States.  *See* Dkt. 31 at 11; Dkt. 42 at 67 n.38; Dkt. 98 at 68.

---

[57] The Developers have also long been on notice of the challenge to the State's program.

[58] Florida's claim that it might see "fewer activities that seek permits for projects," Dkt. 149-1 at
16 (Wolfe Dec. ¶ 51), is belied by its contention that it has received more than 9,000 applications
notwithstanding the chaos of its program administration and this ongoing lawsuit.

As the D.C. Circuit has opined, there is generally "no public interest" in perpetuating unlawful agency action, but there is "substantial public interest" in agencies abiding by federal law. *League of Women Voters,* 838 F.3d at 12. Certainly, Florida does not suggest that principles of federalism, past expenditure of funds while on notice of legal defects, and potential short-term (if any) uncertainty in program implementation overrides public interest in the government abiding by the law. After all, the injunction Plaintiffs seek only helps ensure that FDEP's "legal duty to process permits" is, in fact, "in accordance with the law." *See* Dkt. 149-1 at 15 (Wolfe Dec. ¶ 47).

### F.    Plaintiffs' Harms Outweigh the Developers' Asserted Harms.

For their part, the Developers assert that the harm to them outweigh the harms to the Plaintiffs. But their alleged harms are financial, have not been established by competent evidence, and are not irreparable. The Developers both point to money they have already invested in the two projects. *See* Dkt. 146-2 at 8–10, 12–13; Dkt. 139 at 6 (citing Dkt. 139-1 at 8 (Passarella Dec. ¶ 36)). But granting Plaintiffs relief pending resolution of this case has zero effect on that past investment. The only impact Developers assert is from economic losses caused by delay, which is insufficient to outweigh the harms to Plaintiffs. *Japan Salmon Fisheries*, 679 F. Supp. at 48–49 (harm to species outweighs economic harms).

Notably, Collier does not say how or during what period this money has been expended (averring elsewhere it has worked for 20 years on the Bellmar development, *see* Dkt. 139-1 at 4 (Passarella Dec. ¶ 8)) and submits no competent evidence to support the claim. Dkt. 139 at 6 (citing Dkt. 139-1 at 8 (Passarella Dec. ¶ 36)) (relying on conclusory statement by consultant).[59]

---

[59] Also, based on Collier's assertion that it has worked on the Bellmar project for twenty years, it is difficult to see how a temporary delay to ensure the lawfulness of Florida's program, would be particularly harmful.

Cameratta vaguely claims that it will "incur thousands of dollars in damages per day if the Project is delayed" (as well as other, unspecified harm from delays), Dkt. 146-2 at 12, but cites no evidence for this assertion, and does not assert that its business would be jeopardized. *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (requiring detailed accounting of how business would go out of business within 18 months and proof of future losses). Collier also points to additional monies spent on another permit not at issue in the motion and on the draft Habitat Conservation Plan ("HCP") it voluntarily considered and then abandoned. *See, e.g.*, Dkt. 139-1 at 9 (Passarella Dec. ¶ 36).[60] Having failed to establish financial harm, much less harm that would outweigh the irreparable harm to the Plaintiffs, the balance of the equities plainly is in Plaintiffs' favor.

---

[60] As to the Bellmar project, Collier attempts to undermine Plaintiffs' request for relief by referring to its participation, along with Plaintiffs Defenders of Wildlife and Florida Wildlife Federation ("FWF"), in efforts to develop a voluntary HCP for Eastern Collier County. Dkt. 145 at 3. This reference misleadingly suggests that those conservation groups support, or at least do not oppose, Bellmar when in fact they have opposed it and requested greater protections than developers were willing to provide. As those organizations have explained, their objective in seeking to negotiate an HCP was to promote an approach they hoped would enable conservation on a landscape-level scale that considered multiple projects in concert with mitigation measures and conservation initiatives to provide for habitat connectivity and travel corridors, with aiming to provide a net benefit to panthers unavailable outside the HCP. Had an agreement concerning a potential HCP been reached, it would have gone through a rigorous ESA process that also requires NEPA review and Section 7 consultation. Dkt. 31-6 at 11–12 (Carter Dec. ¶¶ 35–38); Dkt. 31-7 at 10–12 (Robertson Dec. ¶¶ 32–35). Although irrelevant to the issues before the Court, the reference to this abandoned process, if anything, illustrates the harm from Florida's deficient program. Defenders and FWF expressed concern that landowners would walk away from the HCP effort since EPA's approval of Florida's program provided an easier and less expensive route to incidental take protection; that is exactly what the landowners did. Dkt. 98-2 at 9–10 (Carter Dec. ¶¶ 30–33); Dkt. 98-3 at 10–11 (Fleming Dec. ¶¶ 30–33); Dkt. 98-8 at 7–9 (Robertson Dec. ¶¶ 23–27). Collier's invocation of Audubon's participation in that process fares no better, as that organization is also opposing the proposed Bellmar project. *See* Comments from Bradley Cornell, Audubon West Everglades, to Toby Schwetje, FDEP, Dec. 7, 2023, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396364/facility!search.

G.      **The Public Interest Favors Preliminary Relief.**

Cameratta also claims that the public interest would be *better* served by issuance of this permit than its being temporarily enjoined.  Dkt. 146-2 at 13–14.  First, Cameratta presents a false choice, suggesting that granting Plaintiffs preliminary relief pending resolution of this case equates to precluding the Kingston project in its entirety.  *Id*.  But as shown above, the requested relief is temporary.  Once Plaintiffs' claims are resolved, Cameratta will either be able to continue the permitting process with FDEP or with the Corps.  Cameratta's assertion of theoretical losses involving infrastructure improvements, tax revenue, economic development, and ecological benefits is therefore unavailing.  *Id.* at 13.  Even if Cameratta had established that Kingston would bring these benefits (which it has not), or that these benefits outweigh the public interest in avoiding irreparable harm to ESA-listed species and compliance with the law (which it has not), preliminary relief serves the public interest because Plaintiffs' requested relief would only preserve the status quo, Dkt. 135 at 41, pending a final decision as to whether Florida's 404 program complies with federal law.

Similarly, because the relief Plaintiffs seek is preliminary, Cameratta's parade of potential horribles—that an injunction would delay economic benefits or "leave the possibility" that the land would be mined or developed piecemeal—is misplaced.  Dkt. 146-2 at 13.  The circumstances here are a far cry from the facts presented in the cases on which Cameratta relies.  *Id.  See, e.g.*, *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1310 (11th Cir. 1999) (preliminary injunction would cause Georgia Power to reduce electrical power generation and have temporary and insignificant effects on fish); *State ex rel. Guste v. Lee*, 635 F. Supp. 1107, 1128–29 (E.D. La. 1986) (permanent injunctive relief in NEPA would cause "the immediate cessation of shell dredging operations," resulting in the demise of a 50 year-old industry, the loss of jobs, and the loss of capital investments, and plaintiffs' harms were speculative).  Because of the irreparable

harm that the Kingston project will cause to the Plaintiffs, the status quo *should* be preserved

pending resolution of Plaintiffs' ESA claims.

Cameratta's final argument, that it is up to USFWS (rather than the Court) to determine

whether a project is in the public interest, Dkt. 146-2 at 14, fails.  First, Cameratta cites no

authority for the proposition that USFWS may decide whether a project is in the public interest.

Second, Cameratta's claim that Plaintiffs' request is "improper" and asks the Court to "usurp"

the role of a federal agency has no basis in law and ignores that federal agencies must comply

with federal law.  Third, whatever purported benefits may accrue to the public from Kingston

would only be delayed until the Court determines whether FDEP may lawfully issue the permit.

And because denying preliminary relief would cause irreparable harm to the Plaintiffs, who are

likely to succeed on the merits of their claims that FDEP's program is unlawful, the public

interest will be served by issuing the requested relief.

## IV.     The Court Has Authority to Enter the Requested Relief.

Florida argues that the Court lacks jurisdiction over this case, over the Florida

Intervenors, and over State permits.  Dkt. 149 at 29–34.  Florida's first two claims fail as a matter

of law,[61] and the third fails as a matter of fact.

Florida's argument that the Court lacks jurisdiction "to adjudicate state permit

applications," *id.* at 29, is a red herring because Plaintiffs have not asked the Court to adjudicate

state permit applications.  Therefore, Florida's lengthy discussion of state authority to adjudicate

the merits of state permit applications, *id.* at 29–34, is neither here nor there.

---

[61] Plaintiffs demonstrated the Court's jurisdiction over their claims in the briefing on summary
judgment and the Court's jurisdiction over the Florida Intervenors in the instant motion.  Dkt. 98
at 75–80; Dkt. 104 at 90–115; Dkt. 123 at 21–25.

Similarly, Florida's complaint that state permits must be challenged in state court fails, as permits here have not been issued and Plaintiffs are therefore not challenging state-issued permits.  *See, e.g.*, *id.* at 32–33 (quoting *Conewango Creek*, 2007 WL 3023927, at *5 (stating that challenges to state permits should be brought in state court "assuming Plaintiff is challenging final Pennsylvania-issued permits…")).

Florida's assertion that the relief Plaintiffs seek is "contrary to D.C. Circuit precedent," *id.* at 9, 30–34, is unavailing.  In *District of Columbia v. Schramm*, 631 F.2d 854, 856, 860 (D.C. Cir. 1980), the District asked a federal court to *revoke* a state permit because EPA had declined to veto it.  The Court held that EPA's decision not to veto a permit was not reviewable because the decision was committed to agency discretion as a matter of law.  *Id.*  But here, the permits in question have not issued, there is nothing to revoke, and no "inaction" involved.  Also, unlike in *Schramm*, Plaintiffs in this case have challenged EPA's approval of Florida's program (and related agency actions), which is the source of FDEP's authority to issue 404 permits.  It therefore cannot be said that "federal involvement is merely secondary."  *Id.* at 861.  To the contrary, the Defendants' actions underlie the very authority on which the State relies to issue 404 permits at all.  Any discussion of congressional intent regarding the delegation of Clean Water Act programs to the states presumes that the federal approval of those programs (and so the delegation) has been lawful.

Florida's reliance on *General Motors Corporation v. EPA*, *see* Dkt. 149 at 31–34, fares no better as that case involved a collateral attack on the merits of an already-issued state permit. 168 F.3d 1377, 1382 (D.C. Cir. 1999) (rejecting General Motors' effort to attack terms of its own state permit in the course of an EPA enforcement action; observing that Clean Water Act did not authorize federal courts to review merits of permits issued by state).

46

Florida has *no* response to the actual basis for Plaintiffs' motion, which is a request to temporarily enjoin the issuance of two state permits that pose the risk of irreparable harm until the Court has determined whether FDEP has lawfully been granted the authority to issue 404 permits in the first place.  And Florida cites *no* authority to support its wishful assertion that the Court lacks authority to grant the narrow relief Plaintiffs have requested.  Dkt. 149 at 29–34.

To the contrary, the Court enjoys broad authority to craft the terms of a preliminary injunction.  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.").  This is because "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward."  *Id.* at 580 (internal citation omitted).

The most analogous case is *Friends of Crystal River v. EPA*, 794 F. Supp. 674 (W.D. Mich. 1992), *aff'd*, 35 F.3d 1073 (6th Cir. 1994), which Florida cites, Dkt. 149 at 33 n.17.  In that case, the court permanently enjoined the state agency from issuing a state 404 permit on the basis that it was the federal government, and not the state, that had lawful authority to issue the permit.  749 F. Supp. at 685, 694.  There, EPA had objected to the permit, transferred authority from Michigan to the Corps, and then sought to "return" the permit to the state's jurisdiction even though the state had not taken the requisite action to address EPA's objection.  *Id.* at 692–93.  The Court found that given the state's inaction, EPA lacked the statutory authority to return the permit to the state's jurisdiction.  *Id.*  Although the facts differ, whether FDEP or the Corps has the lawful authority to issue these permits is also the question presented by this case.  If

Plaintiffs prevail on the merits that EPA's approval of Florida's program was unlawful and therefore must be vacated, then permitting authority rests with the Corps.[62]

Without citing any authority, the Developers similarly argue that the Court may not enjoin FDEP's issuance of permits, Dkt. 145 at 7, even though, as Plaintiffs have shown, FDEP's authority to issue the 404 permits arises from the unlawful actions by federal agencies challenged in this case.[63]  Cameratta argues that Plaintiffs' motion for preliminary relief constitutes a challenge to a "new agency action" and that even a ruling in Plaintiffs' favor on the merits "would not automatically vacate approved projects."  Dkt. 146-2 at 6.  But again, these projects have not been approved.

Aside from demonstrating that Cameratta considers this permit approval a done deal, the argument has no bearing on this motion.  Plaintiffs are *not* challenging a new agency action or seeking vacatur of any state-approved project.  To the contrary, this case challenges the state's *authority* to issue state 404 permits on the basis that EPA's approval of the state program and the related agency actions by USFWS and the Corps were unlawful.  Plaintiffs have specifically sought *preliminary* relief to prevent the issuance of unlawful state 404 permits authorizing the Bellmar and Kingston projects because of the irreparable harm this would cause.  Plaintiffs have also specifically requested this relief pending the Court's final judgment, including as to remedy, on Plaintiffs' claims related to the protection of ESA-species under USFWS jurisdiction.  The

---

[62] Florida cites no authority for its confounding assertion that enjoining FDEP would be improper "because, in Movants' words" the agency has "'intervened' to defend the EPA decision to approve Florida's 404 program," Dkt. 149 at 30, when that is, as Florida concedes, precisely what the agency has done, *see id.*

[63] Collier's argument that Plaintiffs' motion is not directed at the actions challenged in this litigation, Dkt. 145 at 7, flatly ignores that the entirety of Plaintiffs' case challenges the State's authority to issue any state 404 permit because they submit that EPA's approval (and related federal agency actions) were unlawful in part for their failure to comply with the ESA, including the unlawful Programmatic BiOp and ITS and the unlawful technical assistance process.

relief Plaintiffs seek here is therefore by definition not, as Cameratta suggests, the final word on remedy. *See* Dkt. 146-2 at 12–14.

The Developers seek to defeat Plaintiffs' motion by attempting to re-cast it as a permit challenge. Under their re-imagining of Plaintiffs' filing, the Developers posit that this (nonexistent) permit challenge must fail for various reasons, including that the yet-to-be issued permits are not final agency actions ripe for review, the State administrative records as to each permit are not before the Court, and any challenge to State-issued permits must be brought in State court. Dkt. 145 at 7–8; Dkt. 146-2 at 6–8.[64] Whatever abstract merit these general principles may have, they have zero relevance here, because Plaintiffs' request for preliminary relief is not a permit challenge.

From the start, Plaintiffs have alleged that EPA's approval of Florida's 404 program and related agency actions are unlawful, rendering the state's authority to issue 404 permits null and void. Plaintiffs' motion for preliminary injunctive relief seeks to prevent irreparable harm resulting from that unlawful state program—serious, irreparable harm that has become imminent now that the permits for Bellmar and Kingston—two major projects posing serious harm—are about to be granted. Granting the relief Plaintiffs request here does not render judgment on these permits—it only ensures that the permits will not be issued unless and until the Court has determined that the federal actions challenged in this case were lawful. And should Plaintiffs

---

[64] In addition to concerns raised as to both projects during this litigation, Plaintiffs have submitted comments to FDEP on both the Bellmar and Kingston permits, *contra* Dkt. 146-2 at 7, and also participated in FDEP's public meetings as to Bellmar on December 7, 2023, and as to Kingston on January 16, 2024. *See* Comments from Karimah Schoenhut, Sierra Club, & Elise Pautler Bennett, Center for Biological Diversity, to Shawn Hamilton et al., FDEP et al., Dec. 7, 2023, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ ST404_396364/facility!search; Plaintiffs' Kingston Comments.

prevail on the merits, that too does not render judgment on the permits, it only requires that the

permit applications be processed by the Corps rather than the state.

Collier's argument that this motion is somehow an "end-run" around the Administrative

Procedures Act ("APA"), Dkt. 145 at 8, is not supported by fact or law.[65]  Plaintiffs have (and

continue to) seek relief on the merits of their claims under the APA (and other federal statutes).

While that action is pending, they are entitled to seek preliminary relief to preserve forestall

irreparable harm when the risk of that harm has become imminent, as it has here.  The cases on

which Collier relies are inapposite.  *Id.*  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891–94

(1990) (plaintiffs could not challenge various continually changing agency operations where

operations did not constitute a final agency action or have actual or immediate threatened effect;

plaintiffs would instead have to challenge final actions case by case); *Nat'l Wildlife Fed'n v.*

*Caldera*, No. 00-cv-1031, 2002 WL 628649, at *1–5 (D.D.C. Mar. 26, 2002) (plaintiffs could

not seek programmatic relief requiring agency to develop comprehensive plan to protect Florida

panther by pointing to 23 already-issued permits they had not sought to enjoin).  *See also*

*Brownlee*, 402 F. Supp. 2d at 6, 10–11 (holding that *Caldera* did not bar procedural challenge to

nationwide permits affecting panther habitat and that Corps violated the ESA for failing to

consult with USFWS at a programmatic level (even if it would consult at the site-specific level)

because those authorizations "may affect" the Florida panther).  Indeed, *Caldera* is particularly

instructive here, where Plaintiffs have properly mounted a programmatic challenge to

programmatic actions and now seek to enjoin permits that threaten irreparable harm during the

pendency of that challenge.  Rather than seek any "end-run" around anything, Plaintiffs' motion

---

[65] The absurdity of the argument is underscored by efforts to characterize Plaintiffs' motion as
both unripe and tardy.

is exceedingly conservative, asking the Court only to enjoin the issuance of specific permits that threaten them with specific irreparable harm until the Court has determined whether FDEP has the lawful authority to issue those permits.

Cameratta's argument that "Plaintiffs Are in the Wrong Court," Dkt. 146-2 at 8, misses the mark by far.  Plaintiffs' illustration of the barriers they face in state court to challenge state 404 permits is not a "lament," *id.*; it is demonstration of additional irreparable harm to which Plaintiffs will, absent preliminary injunctive relief, be subjected as a result of EPA's unlawful approval of Florida's 404 program.  Even if Plaintiffs faced *no* barriers to state court to challenge a state 404 permit, the state court would lack authority to rule on the lawfulness of the Defendants' actions underlying that approval (and thus FDEP's authority to issue the permits in the first place), which is the crux of this litigation.[66]  That authority resides solely with this Court.  And if the permits were to issue pursuant to a State 404 program ultimately deemed unlawful, Plaintiffs will have been irreparably harmed by EPA's unlawful approval and USFWS' failure to produce a BiOp that met Section 7 standards and is enforceable in federal court.[67]

## V.      The Requested Relief is Narrowly Tailored and Appropriate.

Lastly, the Defendants implausibly argue that the very specific relief Plaintiffs seek is not "narrow or appropriately tailored."  Dkt. 148 at 9, 46–48.  As a preliminary matter, Rule 65

---

[66] For this reason, Florida's argument that the State provides an adequate remedy at law, Dkt. 149-1 at 12 (Wolfe Dec. ¶¶ 37–38), has no bearing.  As Florida has repeatedly argued, a state permit challenge would only address whether FDEP's permit complied with *state law*.  Dkt. 149 at 30.  State courts, however, lack authority to review actions by federal agencies absent a waiver of sovereign immunity.  *Siesta Key Ass'n of Sarasota, Inc. v. City of Sarasota*, 320 So.2d 833, 835 n.1 (Fla. 2d Dist. Ct. App. 2021).  In the APA, Congress waived sovereign immunity for suits against federal agencies, other than for money damages, brought in federal court.  *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).  The waiver does not apply to state court.  *See Fed. Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 193 (6th Cir. 1989).

[67] Indeed, it is the Defendants' position that USFWS' TA Form is not a reviewable agency action at all, Dkt. 148 at 23–24.

imposes requirements on court orders granting injunctions.  Fed. R. Civ. P. 65(d)(1)(C).

Nevertheless, the relief Plaintiffs seek "describe[s] in reasonable detail—and not be referring to

the complaint or other document—the act or acts restrained or required."  *Id.*  Indeed, the

Defendants have not articulated any plausible confusion over the scope of the requested relief,

which is plainly intended to prevent the issuance of two specific permits.  *See Prairie Band of

Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1244 (10th Cir. 2001) (court was "at a loss" as to

how preliminary injunction that barred state from "any further application and enforcement" of

its motor vehicle registration or titling laws against the Tribe, or persons with vehicles registered

and titled under the tribal motor vehicle code, was inadequate).

The Defendants cite *Nebraska Department of Health & Human Services v. U.S.

Department of Health & Human Services*, Dkt. 148 at 46, for the general proposition that

injunctions must be narrowly tailored to remedy specific harm.  435 F.3d 326, 330 (D.C. Cir.

2006) (observing that vacatur "is the normal remedy for an unlawful agency rule" and reviewed

in the same way as are injunctions).  In this case, Plaintiffs seek (among other things) vacatur of

EPA's approval of Florida's 404 program, vacatur of USFWS' Programmatic BiOp and ITS, and

an injunction of EPA's transfer of 404 authority to the state.  Dkt. 77 at 58 (Am. Compl. ¶¶ (l)–

(m), (p)).  But for purposes of *this* motion, Plaintiffs have carefully narrowed their request for

relief to enjoin the issuance of only two state permits that pose the risk of irreparable harm.[68]

Plaintiffs' alternative request for relief is also narrowly tailored by requesting relief specific to

Plaintiffs' ESA-related claims, and to permits that would affect ESA-listed species, should the

Court rule in Plaintiffs' favor on the merits of those claims.  Plaintiffs' requests therefore easily

---

[68] Florida's objection to a remedy that "targets specific Florida 404 permit applications," Dkt.
149 at 40, is at odds with its claim that Plaintiffs' request is not narrowly tailored, *id.* at 40 n.21.

meet the test of being carefully tailored to remedy specific harm.  *See Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).

Florida misapprehends Plaintiffs' alternative request as applying "pending a decision by the Court on the merits."  Dkt. 149 at 40 n.21.  To the contrary, the request is for an expedited ruling on Plaintiffs' ESA-related claims with, presuming the Court has ruled in Plaintiffs' favor, an order restoring authority to the Corps over permits that may affect ESA-listed species.  Dkt. 135 at 42.  Plaintiffs' reference to further briefing on remedy was intended to refer to additional remedies that may be warranted in light of the Court's ruling on those claims.  Although Florida complains that this would constitute improper partial vacatur,[69] Dkt. 149 at 40 n.21, it would actually be narrowly tailored relief, applying only to a subset of permits, to remedy violations affecting ESA-listed species.[70]  Florida cites no authority for its claim that simply because this may involve hundreds of applications (of the more than 9,000 Florida says it has received, *id.* at 15), the relief is not narrow or tailored.

---

[69] Florida's claim that a federal court has never vacated a federally delegated program, Dkt. 149 at 39, is incorrect.  A federal court vacated EPA's approval of Arizona's NPDES program.  *See Defs. of Wildlife v. EPA*, 420 F.3d 946, 979 (9th Cir. 2005).  The Supreme Court reversed that decision not because of the remedy, but because it reached the contrary legal conclusion on the merits.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 649 (2007).  And contrary to Florida's related claim, Dkt. 149 at 39, the Ninth Circuit did not "decid[e]" not to vacate EPA's approval of Idaho's NPDES program after finding the agency had abused its discretion.  It granted the relief petitioners requested: remand without vacatur.  *See* Petr's Br. at 51, June 26, 2019, ICL v. EPA, Case No. 18-72684 (9th Cir.), ECF No. 30-1.

[70] Florida's argument that the only remedy for these violations would be the loss of incidental take protection, Dkt. 149 at 40 n.22, lacks any merit.  If Plaintiffs prevail on their claims that USFWS' Programmatic BiOp (which concludes with a determination that EPA's approval would not jeopardize protected species) was unlawful and that EPA unlawfully approved Florida's program as demonstrating compliance with the 404(b)(1) Guidelines, EPA's approval would be null and void, and the state would lack authority to issue 404 permits.  The relief Plaintiffs request in the present notion is therefore far narrower than ("rather than "far beyond," *id.* at 11) the relief available should they prevail on the merits of even a subset of their claims.

The Defendants' argument that it would not make sense to enjoin EPA "unless the Court also enjoins FDEP," Dkt. 148 at 47, is consistent with Plaintiffs' request, which is to enjoin them both, *see id.* at 46 (quoting Plaintiffs' request).  The Defendants object that Plaintiffs did not identify USFWS or the Corps in their proposed order or what specific actions by those agencies would be enjoined.  *Id.* at 47 n.13.  But at the time of filing, USFWS had communicated to Plaintiffs that the agency had no further comment on the proposed projects, and so Plaintiffs understood that there was no further action for USFWS to take.  In opposition to the present motion, however, USFWS appears to suggest it could yet take more actions.  To the extent that these speculative actions by USFWS would *prevent* issuance by providing FDEP with a jeopardy conclusion, for example, Plaintiffs do not seek to enjoin them.  Plaintiffs' motion seeks only to enjoin USFWS actions that would further issuance of the proposed permits.  *See* Dkt. 135 at 8 (seeking injunction of any action furthering issuance of these permits, which necessarily would be limited only to those agencies with authority to take further action regarding the permits).[71]

Mischaracterizing the requested relief, the Defendants complain that Plaintiffs are asking the Court to "direct" EPA to take action and that this would constitute a mandatory injunction.  Dkt. 148 at 47–48.  But nothing in Plaintiffs' request, including the language the Defendants cite, is in the form of a mandatory injunction; it does not direct EPA to do anything in the affirmative and would not, contrary to the Defendants' claim, require EPA to object to a permit.  It simply enjoins EPA from acting.  Dkt. 135 at 42.[72]  Therefore, even if a higher burden applied to mandatory injunctions, Dkt. 148 at 48 n.15, it would not apply here.

---

[71] Plaintiffs do not, however, seek to enjoin the Corps, an agency that apparently has no role in the issuance of these permits at present and thus would not be covered by the requested relief.

[72] Plaintiffs are not, as the Defendants suggest, seeking to enjoin EPA from objecting to the permits, as an objection would not be in furtherance of the state issuing the permits.

## CONCLUSION

For the reasons expressed above, Plaintiffs therefore respectfully request that their motion

be granted by February 5, 2024.

Dated:  January 26, 2024

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

Counsel for Plaintiffs

* Appearing pro hac vice

55

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of January 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

56