# EXHIBIT 4

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Appellees, | |
| v. | CASE NO. 24-5101 |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants, | |
| STATE OF FLORIDA and FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| Appellants. | |

## DECLARATION OF AMBER CROOKS

I, Amber Crooks, make the following declaration:

    1.    I am a resident of Naples, Florida.

    2.    I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

    3.    I am a member of the Conservancy of Southwest Florida ("Conservancy"). I am also employed by Conservancy as the Environmental Policy Manager. I have been employed by Conservancy for 16 years.

1

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

4. Conservancy is a 501(c)(3) nonprofit that focuses on environmental conservation in Southwest Florida. Our water policy work addresses issues at local, statewide, and federal levels. Conservancy was founded in 1964 and has grown in membership to approximately over 2,727 dues-paying members, and approximately over 1,800 additional donors and supporters. The mission of Conservancy is to protect the natural environment, species, and habitats of Southwest Florida, summed up in our motto: "Our Water, Land, Wildlife, Future." We do this through four main program areas: 1) Science and Research, 2) Policy and Advocacy, 3) Wildlife Rehabilitation, and 4) Environmental Education.

5. Conservancy's Policy and Advocacy program focuses on protecting water, wildlife, and land. In protecting wetlands and waterways, we work to promote better water management and resource protection by working with stakeholders and decision-makers to ensure that stringent water management tools, regulations, and best practices are in place and utilized. In protecting wildlife and endangered species, we work to prevent harm by preserving species' habitats from environmental changes, conserving landscape corridors and critical habitat, and ensuring that protections are strong to recover imperiled species populations. We perform this work at the local, state, and federal levels.

6. Conservancy's Wildlife Rehabilitation program operates the von Arx Wildlife Hospital, which treats approximately 3,500 injured, sick, or orphaned

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

native animals on an annual basis. These native species include small mammals, birds (including migratory and protected birds), turtles, gopher tortoises, and many others.

7.    Protection of water resources such as wetlands and conservation of native species are core programmatic areas for Conservancy's policy work.

8.    I have a deep personal commitment to the protection and recovery of Florida's endangered and threatened species, and I engage in both professional and personal activities to further this commitment.

9.    I have an aesthetic and scientific appreciation of the critically endangered Florida panther in the wild and travel to panther habitats in hopes of viewing and photographing the elusive panther. I enjoy recreating in panther habitat areas, including hiking, camping, viewing wildlife, and engaging in nature photography.

10.    I graduated with a B.A. in political science from Stetson University in 2003, and I received a Masters of Public Administration in Environmental Policy and Planning from Florida Gulf Coast University in 2011.

11.    Through my work at Conservancy and through my formal education, I have studied endangered species policy issues, including critical habitat designation, Habitat Conservation Plans, and the Florida panther, among other topics. As the environmental policy manager at Conservancy, I specialize in

wildlife policy and am the organization's endangered and threatened species policy expert. Endangered species that my work focuses on include, but are not limited to, Florida panthers, bonneted bats, and smalltooth sawfish. My job duties also include overseeing policy staff members' technical analysis of issues related to state and federal permitting processes.

12. Southwest Florida, as a region, has many endangered and threatened species that receive regulatory review by federal agencies as required under the Endangered Species Act ("ESA"). One such species is the Florida panther, one of the most endangered species on the planet, with only 120 to 230 adults and subadults remaining in their last remaining occupied habitat in Southwest Florida. According to the U.S. Environmental Protection Agency's ("EPA") Biological Evaluation in this case, this region had the highest concentration of ESA consultations in all of Florida from 2014-2018. *See* Dkt. 31-1, at 4.

13. One of the main tools Conservancy uses to protect species, their habitats, and waters is the public commenting process. When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; utilize geographic information system ("GIS") analysis, a data mapping tool that allows us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts;

4

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

review applicable rules and laws; and submit comment letters. As with this case, we also engage in litigation when needed to carry out our organization's goals.

14.     I submitted a declaration in support of Plaintiffs' Motion for Partial Summary Judgment on March 5, 2021, Dkt. 31-1, and a second declaration in support thereof on May 24, 2021, Dkt. 43-1. *See* Exhibits A and B. I submitted a declaration in support of Plaintiffs' Motion for Summary Judgment on February 28, 2023, Dkt. 98-1, and a second declaration in support thereof on June 9, 2023, Dkt. 104-1. *See* Exhibits C and D. These declarations are attached and hereby incorporated into this declaration.

15.     I am providing this declaration to provide updates on events that have transpired since my last declaration and to respond to factual assertions raised by Florida in its April 25, 2024, Motion for a Stay Pending Appeal, including in the Declarations by Justin Wolfe, Dkt. 4 (Exhibit P) and Jennifer Marshall, Dkt. 4 (Exhibit Q).

## Organizational Harms from the State Program

16.     Conservancy has dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program, in light of the State's poor permitting track record in environmental protection and the State's failure to demonstrate that it would provide the same level of protection, rights and remedies available under federal law, and that its program meets the requirements

of federal law. *See* EPA-HQ-OW-2018-0640-0386-A1, at 5 (Plaintiffs' Comments); HQ-OW-2018-0640-0385-A1 (*The Rick Scott Record: An Environmental Disaster*); EPA-HQ-OW-2018-0640-0385-A2 (*Scott's Undeclared Polluters' Holiday Stains Florida*); EPA-HQ-OW-2018-0640-0385-A3 (*Report on Enforcement Efforts by the Florida Department of Environmental Protection Calendar Year 2015*); EPA-HQ-OW-2018-0640-0385-A4 (*State Failing to Protect Our Waterways) (collecting articles describing the State's environmental record*).

17.     EPA's approval of the State's 404 program caused Conservancy to divert resources, threatened wetlands and wildlife, and undermined Conservancy's ability to fully realize its mission by depriving the organization of information, rights, and remedies available when Section 404 is administered by the Corps as it had been for decades. *See* Exhibit A; Exhibit C; Exhibit D. Restoring the State's ability to implement their unlawful program will unleash these same harms on Conservancy yet again. Below I note a few of these harms to correct assertions made by the State in Mr. Wolfe's declaration. *See* Dkt. 4 at 30-34 ¶ 66-72.

18.     **Available Information**: As I explain in more detail in my incorporated declarations, while Florida was implementing the State 404 program public notices were often issued without much, if any, detail on a project's actual impacts to listed species and the necessary conditions to avoid, minimize, and mitigate probably impacts, a primary concern of Conservancy's. *See also* Exhibit

C at 9-10 ¶ 28-29; Exhibit D at 2-4 ¶ 4-7. It was difficult to obtain meaningful project information under the State's 404 program. The available information contained primarily submittals by the applicant. I rarely saw agency analyses or assessments of the applicant's information, including a lack of alternative analysis, or agency proposed permit conditions.

19. This was of specific concern for our work, because obtaining the types of information we need to understand the impacts of projects on listed species and their habitat is central to our mission. That information would include agency analysis of impacts to species, determinations of necessary conditions and conservation measures based on the analyses, assessments of take and jeopardy, and discussion of take triggers. In other words, I did not typically find much in the files that told me what the Florida Department of Environmental Protection ("DEP") and the wildlife agencies were doing with information submitted by the applicant to make *their* decisions or any analysis of the applicant-submitted information. Contrary to Justin Wolfe's statement that permit files would contain a "USFWS Technical Assistance Process response documentation," Dkt. 4 at 32 (Exhibit P ¶ 69), besides a handful of projects, I did not find this form yet in most of the projects I have been tracking.

20. In contrast, when the Corps implements the 404 program for all waters of the United States, Conservancy has and is again able to rely on extensive

agency information provided pursuant to the ESA (i.e., biological opinions) and NEPA (i.e., environmental assessments and environmental impact statements).

21.     **State Species Review Failures**:  In addition to the loss of the more robust analysis and information when the Corps implements the program, the Conservancy encountered other substantial hardships resulting from with the state technical assistance review process.  *See* Exhibit C at 10-12 ¶ 30-33; Exhibit D at 4-5 ¶ 8.  Importantly, while the state administered the program, Conservancy had been unable to perform one of its key functions—tracking and advocating for limiting the amount of take anticipated or authorized pursuant to state 404 permits. Even when agencies determined that incidental take was likely to occur as a result of a project, the permit often lacked any limit on that take.  By contrast, biological opinions produced when the Corps administers the 404 program typically articulate a limit on the take authorized.  Conservancy relies on that information to track the take of different species that is authorized throughout Southwest Florida.

22.     Despite the State's claim that it would impose any permit condition recommended by USFWS, Conservancy encountered the State's failure to do just that, by failing to include a permit condition recommended by USFWS as necessary to protect species on a project of concern to the Conservancy—a large residential development called Fleischmann Parcel (AKA Isles of Collier Preserve), Dkt. 98-1 at 11 ¶ 31.

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

23.     When the state did impose permit conditions relative to listed species,

Conservancy found that in several instances these conditions were vague and

subject to interpretation or ignored relevant information, undermining confidence

that the conditions would be sufficiently protective of listed species, Dkt. 98-1 at

11-12 ¶ 32.

24.     The programmatic biological opinion's failure to articulate the amount

or extent of incidental take authorized for any ESA-listed species in Florida meant

that Conservancy could not determine if or when the authorized amount of take

had been exceeded so as to ensure that agencies reinitiate programmatic

consultation as the ESA requires under those circumstances.

25.     All of these inadequacies meant Conservancy's mission to advocate

on behalf of and seek protections for these species was gravely impaired.

26.     **Access to Courts**: Conservancy has challenged 404 permits in federal

court as one of our advocacy tools to further our mission, and we were harmed by

the inability to challenge 404 permits and biological opinions in federal court when

permits were issued by the State.  While the state administered the program,

USFWS' involvement (or lack thereof) in the technical assistance process could

not be challenged in state court because, as I understand it, federal agency actions

cannot be sued in state court.  Access to federal court, by contrast, allows us to

protect the interests of our organizational mission and our members.  We do not

have the same access when we are limited to state court challenges because of the significantly higher costs of state administrative court litigation (which requires the affirmative presentation of evidence by employing a de novo review standard rather than relying on an administrative record for permit challenges) and the State's mandatory fee shifting provision for suits seeking to enjoin environmental violations (which makes local non-profits like the Conservancy have to risk a potentially large fee recovery if the suit is not ultimately successful despite it being brought in the public interest to protect the environment and species). Exhibit A at 27-28 ¶ 78-81; Exhibit C at 13-15 ¶ 37-41; Exhibit D at 5 ¶ 9.

27.     The lack of procedural safeguards, and in turn, a weaker system for evaluating the environmental impacts of permitting, significantly increased the risk of harms to Florida's water resources, species, and their habitats, environmental harms that are felt personally by me as a member of Conservancy and a long-time resident of Naples. I regularly partake in outdoor activities such as hiking, camping, observing wildlife, and nature photography. Some of the areas that I like to visit include, but are not limited to, Big Cypress National Preserve, Fakahatchee Strand Preserve State Park, Picayune Strand State Forest, Collier Seminole State Park, Florida Panther National Wildlife Refuge, Corkscrew Regional Ecosystem Watershed's Corkscrew Marsh, Bird Rookery Swamp and Flint Pen Strand, Corkscrew Swamp Sanctuary, Stormwater Treatment Area 5, Babcock Ranch

Preserve, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild Wildlife Management Area, and county owned conservation properties such as those in Collier and Lee counties.

28.     If Florida is allowed to operate this unlawful 404 program again, Conservancy would be irreparably harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

**Organizational and Membership Harms From Pending Project Applications**

29.     The Conservancy is particularly concerned about the harms to its organizational and membership interests that would result if a stay were granted that allowed the State (rather than the Corps) to process permit applications for major projects that would adversely affect ESA-listed species and their habitats.

30.     **Troyer Mine.**  According to DEP's online search portal, prior to the district court's ruling, FDEP had pending a 404 permit application by Troyer Brothers Florida, LLC, for construction and operation of a lime rock and fill dirt mine.  *See also* Exhibit A at 13-16 ¶ 37-47; Exhibit C at 16-19 ¶ 45-54.  The proposed project includes the extraction of approximately 256,000 cubic yards of crushed lime rock from the project site.  Troyer Mine would cover 1,803.51 acres and would affect waters that are part of the Big Cypress Swamp Watershed.  The project site is within the consultation areas for several endangered and threatened species, including the Florida panther, bonneted bat, red cockaded woodpecker,

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail kite, and the Florida scrub jay.

31.     Ninety percent of the project site is in Florida panther Primary Zone habitat, meaning it is habitat essential for the continued survival and recovery of the species.  Due to the proposed placement of the mine between two public lands and important panther habitat, linkages will be fragmented.  Cumulatively with other proposed projects currently being reviewed by the state of Florida, about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat for the Florida panther will be lost.

32.     Vehicular collisions are the leading cause of known deaths for the Florida panther.  Troyer Brother's proposed project would result in at least 1,160 daily truck trips to or from the site, adding heavy traffic to already deadly roadways for panthers.

33.     Troyer Mine went to public notice twice (on November 5, 2021, after the application was first before the State, and on July 8, 2022, after the application was resubmitted).  At neither junction were proposed permit conditions by the wildlife agencies to address federally-listed species made available either in Oculus or in the Public Notice.

34.     Recently, on April 23, 2024, I contacted the Corps to inquire about the status of the Troyer Mine application, and was informed that although the State

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

had not yet transferred the application to the Corps, Troyer Mine's agent had indicated that the project would be returning to the federal process. The federal process will ensure that the application is subject to Section 7 consultation on impacts to species, which, if authorized, will likely result in a detailed biological opinion with an incidental take statement as required by the ESA. The federal process will also require compliance with NEPA, which for a project of this magnitude typically generates additional information (and provides additional procedural rights) necessary for Conservancy to serve its mission. Indeed, when this project was before the Corps prior to the State's assumption, it was determined that an environmental impact statement under NEPA was needed, which could now be reinitiated.

35. If, on the other hand, Florida were allowed to process the Troyer Mine permit instead, the Conservancy would be harmed by the State's inadequate and unlawful technical assistance process and not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA. If a state 404 permit were granted, the Conservancy's ability to challenge the permit and harms that result from the project would also be severely (if not prohibitively) constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially

13

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.

36.     In addition to harming Conservancy's organizational interests, the Troyer Mine project would also harm my interests as a member.  The Troyer Mine would be located approximately three and a half miles away from the public lands I enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp, and observe the wildlife listed above.  Panthers require huge swaths of territory for roaming, foraging, and breeding, can have ranges over 200 square miles, and can travel 12 or more miles a day.  I have found memories of visiting Corkscrew as a traditional camping trip with friends, and I plan to return here as often as possible.  Environmental harms from Troyer Mine, including harms to essential species habitat, would negatively impact my ability to enjoy these lands and observe wildlife.

37.     **Immokalee Road Rural Village (IRRV)**.  According to DEP's online search portal, at the time of the district court's ruling, pending before FDEP was a 404 permit application for 27th/Pico Boulevard Limited Partnership who seeks to construct a mixed-use residential and commercial development over 2,780 acres in Collier County (application #396348-001).  *See also* Exhibit A at 23 ¶ 72(b); Exhibit C at 25-26 ¶ 76-81.  This project would result in the discharge of approximately 159,091 cubic yards of fill material into 32.87 acres of wetlands and

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

1,942,195 cubic yards of fill material into 200.64 acres of other surface waters. The project would also involve the excavation of approximately 179,241 cubic yards of material from over 11 acres of wetlands. The site is within the USFWS designated Florida panther Focus Area (an area developed by the federal wildlife agency that includes the Primary Zone panther habitat area, as well as other panther habitat areas critical for the survival and recovery of the species), and is within the USFWS designated consultation area for the crested caracara. The project is located within the panther's primary zone habitat (675 acres within primary zone and 344 acres within adult breeding habitat) and wood stork's Core Foraging Areas. There is also a severe panther roadkill hotspot adjacent to this project.

38.     The IRRV project is situated near the conservation lands of Bird Rookery Swamp. The project is located within the consultation area for the Everglade snail kite, Florida scrub-jay, Florida bonneted bat, red cockaded woodpecker, eastern indigo snake, wood stork, Audubon's crested caracara, and the Florida panther; there are a number of state-listed species also in the area. The applicant's field survey documented at least 110 gopher tortoise burrows on site, and bonneted bat calls on the site.

39.     If Florida is allowed to process the IRRV permit, the Conservancy will be harmed from the State's inadequate and unlawful technical assistance

process and not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA. If the permit is granted, the Conservancy's ability to challenge the permit and harms that result from the project will also be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.

40.     I would also be personally harmed by the Immokalee Road development. I like to hike at Corkscrew Swamp Sanctuary and Corkscrew Regional Ecosystem Watershed Bird Rookery Swamp. The Sanctuary is about two miles from the project site, and Bird Rookery even closer, essentially across the street from IRRV. I plan to return as often as possible. Environmental harms from this development project threaten my ability to enjoy these natural areas, hike, and observe wildlife. Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

41.     **Hogan West (AKA Brightshore).** Barron Collier is seeking a permit for a project that would convert habitat to approximately 2,300 homes and commercial development. *See also* Exhibit C at 27-28 ¶ 84(a). Of the 640-acre site, about 210 of those acres are Primary Zone panther habitat and the remainder

is Secondary Zone panther habitat. A draft Biological Opinion analyzing Hogan West and the other nearby planned developments showed a statistically significant reduction in panther population viability if these projects were approved. The project sits within the Corkscrew Swamp wetland ecosystem and adjacent to the Poggie Strand.

42. **FFD (AKA Orchid)**. FFD Land Co., Inc. is seeking a 404 permit for a large-scale development in Lee County. *See also* Exhibit C at 28 ¶ 84(b). The application would result in over 550 acres of impact to Primary Zone panther habitat and 1,370 acres of Adult Breeding Habitat directly. Expert review by Dr. Robert Frakes in August 2022 identified that with FFD, cumulatively with other proposed projects currently that were being reviewed by the state of Florida, about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat would be lost. Notably, FFD received their conceptual environmental resource permit associated with this project on May 25, 2023. If Florida is allowed to continue processing the 404-permit application, based on their assertion of the considerable overlap between the environmental resource permitting program and 404 program, the Conservancy is concerned the 404 permit could issue quickly thereby harming the Conservancy's interests in protecting species.

43. **Horse Trial**. Tarpon Blue CE Management, LLC has a file with the state 404 program that was listed as verification that no permit is required (in other

17

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

words, they do not think they even need to obtain a 404 permit claiming there are no waters of the United States on the property) for a mixed residential and commercial development covering 1,778 acres in Collier County. Seventeen percent of the site is state ERP jurisdictional wetlands, for which the applicant proposes 47.53 acres of impacts. Several listed species utilize the project location including the Eastern indigo snake, crested caracara, Everglade snail kite, wood stork, Florida bonneted bat, and the Florida panther. The project is 100% within Primary Zone panther habitat as identified in the Florida Panther Recovery Plan. The project also appears to be 100% within the Florida Wildlife Corridor. Additionally, this area is adjacent to one of the worst vehicle collision hot spots for the endangered Florida panther along State Road 29 and a heavily utilized habitat area for the Florida panther. On July 31, 2023, Conservancy sent a letter objecting to the request for a no permit required determination, as this project will have unacceptable direct, indirect, and cumulative impacts on waters of the United States, endangered and threatened species, and other natural resources. *See* Exhibit E. After Conservancy's letter, FDEP told me that the applicant would in fact submit an application for a 404 permit.

44. **US 27 Wildlife Crossing.** DEP and FDOT both mention a project to construct a proposed wildlife crossing in Highlands County, Florida. This project will reconstruct a 0.38-mile stretch of the existing roadway by replacing a 48-year-

18

old twin cross drain pipe culverts and constructing a new adjacent box culvert underneath. One mile of wildlife fencing will be installed on both sides of US 27 to guide animals to the crossing and help prevent vehicle collisions. The lands on both sides of the crossing are also targeted for future conservation easement acquisition. As far as I understand, the project is currently in its design phase and construction is planned for July 2025. This project is located in a rural area with an abundance of wildlife including endangered species like the Florida panther. Vehicle collisions are the leading known cause of death for Florida panthers and 2 panther collisions have occurred in this area. Conservancy supports this crossing project as necessary to help reduce wildlife vehicle collisions, improve habitat connectivity, and improve safety along this regional transportation and freight corridor. The application was submitted just 3 days before the State's program was vacated.

45. **Transfer Process**: I was taken aback by Mr. Wolfe's complaint regarding the Corps' request that the State transfer pending permit applications to them by external hard drive given that this appears to be precisely what the Corps did for the State immediately following program approval. *See* Exhibit E.

DocuSign Envelope ID: 1B947107-E6AB-4400-8C03-F882BA3C6282

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ³___ day of May 2024.

DocuSigned by:

*Amber Crooks*

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

# Exhibit A

DocuSign Envelope ID: D470E83B-B49C-43D6-9F56-A2385436ED6F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF AMBER CROOKS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Amber Crooks, make the following declaration:

1.       I am a resident of Naples, Florida.

2.       I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.       I am a member of the Conservancy of Southwest Florida ("Conservancy"), and I am also employed by Conservancy as the Environmental Policy Manager.

4.       Conservancy is a 501(c)(3) nonprofit that focuses on environmental conservation in Southwest Florida.  Our water policy work addresses issues at local, statewide, and federal levels.  Conservancy was founded in 1964 and has grown in membership to over 3,600 dues-paying members, and over 2,000 additional donors and supporters.  The mission of Conservancy is to protect the natural environment, species, and habitats of Southwest Florida, summed up in our motto: "Our Water, Land, Wildlife, Future."  We do this through four main program areas:

1

DocuSign Envelope ID: D470E83B-B49C-43D6-9F5E-A2385436ED6F

1) Science and Research, 2) Policy and Advocacy, 3) Wildlife Rehabilitation, and 4) Environmental Education.

5.     Conservancy's Policy and Advocacy program focuses on protecting water, wildlife, and land.  In protecting wetlands and waterways, we work to promote better water management and resource protection by working with stakeholders and decision-makers to ensure that stringent water management tools, regulations, and best practices are in place and utilized.  In protecting wildlife and endangered species, we work to prevent harm by preserving species' habitats from environmental changes, conserving landscape corridors and critical habitat, and ensuring that protections are strong to recover imperiled species populations.  We perform this work at the local, state, and federal levels.

6.     Conservancy's Wildlife Rehabilitation program operates the von Arx Wildlife Hospital, which treats approximately 3,800 injured, sick, or orphaned native animals on an annual basis.  These native species include small mammals, birds (including migratory and protected birds), turtles, gopher tortoises, and many others.

7.     Protection of water resources such as wetlands and conservation of native species are core programmatic areas for Conservancy's policy work.

8.     I have a deep personal commitment to the protection and recovery of Florida's protected species, and I engage in both professional and personal activities to further this commitment.

9.     I have an aesthetic and scientific appreciation of the Florida panther in the wild, and travel to panther habitats in hopes of viewing and photographing the elusive panther.  I enjoy recreating in panther habitat areas, including hiking, camping, wildlife viewing, and nature photography.

10.     I graduated with a B.A. in political science from Stetson University in 2003, and I received a Masters of Public Administration in Environmental Policy and Planning from Florida Gulf Coast University in 2011.

11.     Through my work at Conservancy and through my formal education, I have studied endangered species policy issues, including critical habitat designation, Habitat Conservation Plans, and the Florida panther, among other topics.  As the environmental policy manager at Conservancy, I specialize in wildlife policy and am the organization's listed (endangered and threatened) species expert.  Endangered species that my work focuses on include, but are not limited to, Florida panthers, bonneted bats, and smalltooth sawfish.  My job duties also include overseeing policy staff members' technical analysis of issues related to state and federal permitting processes.

12.     Southwest Florida, as a region, has many endangered and threatened species that receive regulatory review by federal agencies as required under the Endangered Species Act ("ESA").  One such species is the Florida panther, one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  According to the U.S. Environmental Protection Agency's ("EPA") Biological Evaluation in this case, this region had the highest concentration of ESA consultations in all of Florida from 2014-2018.  See Exhibit A, Excerpt from ESA Evaluation for Clean Water Act Section 404 Assumption by the State of Florida.

13.     One of the main tools Conservancy uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; utilize geographic information system (GIS) analysis, a data mapping tool that allows us to visually understand the affected geographic environment; review wetland

impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters. As with this case, we also engage in litigation when needed to carry out our organization's goals.

**Conservancy's Engagement on Florida Assumption of Section 404**

14. Conservancy has dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program, in light of the state's poor permitting track record in environmental protection and the state's failure to demonstrate that it would provide the same level of protection, rights and remedies available under federal law, and that its program meets the requirements of federal law.

15. Between 2017 and 2020, I advocated on behalf of Conservancy, against state efforts to pursue assumption on Section 404 in Florida. Among other things, I testified before the state legislature, participated in the state rulemaking process (via comments and hearings), regularly raised concerns directly with the Secretary of Department of Environmental Protection and his staff, and helped engage our membership in advocacy against the proposed program at the state and federal levels.

16. In 2018, we launched a campaign to urge Governor Rick Scott to veto a quickly passed bill that authorized the Department of Environmental Protection to pursue seeking approval from EPA to administer Section 404. This included our supporters sending more than 700 emails in opposition, online advertisements that reached more than 70,000 viewers, and advertisements and opinion pieces published in local newspapers. We submitted comments to the U.S. Army Corps of Engineers ("Corps") as it was considering modification to the list of waters that could be assumed by the state under Section 404. In 2019, we sent an action alert to our members and supporters asking them to contact the new Governor, Ron DeSantis, to urge

DocuSign Envelope ID: D470E83B-B49C-43D6-9F5E-A2385436ED6F

him to reverse course on 404 assumption, as he had made promises about protecting our water quality.

17.     From 2018 to 2020, we participated in the state's rulemaking process, the final steps of which were conducted at the height of uncertainty around the coronavirus pandemic (February to April 2020), urging the state not to rush the process when the community was facing a public health emergency involving stay at home orders, closed schools and scarce household supplies, and requiring families to focus on protecting their health, livelihood, and well-being.

18.     After the state submitted its 404 application to EPA in August 2020, and EPA initiated a public comment period in September 2020, Conservancy, along with other Plaintiffs in this action, objected to the incompleteness of the application in October 2020, and in November 2020 submitted comprehensive comments objecting to Florida's proposed program as grossly inadequate and unlawful under federal law.  Those comments are attached here as Exhibits B and C.

19.     After EPA published its notice approving Florida's program and gave it immediate legal effect on December 22, 2020, Conservancy's counsel notified EPA and the other federal defendants, as well as the state, that EPA's transfer of authority was unlawful. Exhibit D.  On December 28, 2020, EPA responded by claiming for the first time that the agency's December 22, 2020, action did not have to meet the 30-day requirement or codify the state program because it was an informal adjudicatory order, rather than a rule.  Exhibit E.

20.     On January 14, 2021, Conservancy joined with the other Plaintiffs in this action to filed the present suit.

21.     Conservancy was harmed, and continues to be harmed, by EPA's decision to make the state-assumed 404 program effective immediately on December 22, 2020, rather than at least 30 days after publication (January 21, 2021), as required for rulemakings, and without lawfully effectuating that transfer through codification.  The unlawful transfer of authority from the Corps to the state harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests as a result of the state's unlawful administration of the 404 program.

**Conservancy Lost Procedural Rights As a Result of EPA's Unlawful Action**

22.     As a result of EPA's immediate effective date, Conservancy lost the procedural rights to seek agency reconsideration prior to the transfer going into effect, to seek an agency stay pending judicial review, and to benefit from the incoming Administration's directive to review, and consider staying, rules that had not yet gone into effect as of inauguration day.  Conservancy would have exercised these rights had they been available.

23.     As to reconsideration, Conservancy was deprived of the right to ask EPA to reconsider its determination that Florida's application was complete, and to allow public comment on the complete application, before the rule took effect.  During the public comment period, Conservancy objected to EPA's completeness determination on at least three bases: (1) the failure to adequately identify the scope of waters that would be assumed by the state; (2) the failure to demonstrate that the state would have the resources to administer a complex federal program without, as it claimed, a cent in additional resources, particularly at a time when the state's coffers are under strain from the economic impacts of the coronavirus pandemic; and (3) the failure to define the "technical assistance" process the state claimed would ensure protection of imperiled species, but that was not laid out until more than two weeks after the public

comment period closed.  Conservancy also was deprived of the right to ask EPA to reconsider its

approval of the state program as unlawful, for the reasons stated in Plaintiffs' Complaint.

24.     As a result of EPA's immediate effective date, Conservancy was also denied the

right to ask the agency to postpone the effective date of the rule pending judicial review.  On

January 20, 2021, Conservancy and the other Plaintiffs in this action asked EPA to cure the

immediate effective date and failure to codify violations regarding the state program.  See

Exhibit F, Earthjustice's Letter dated January 20, 2021, "Request for Expedited Action; Ctr. for

Biological Diversity, et al., v. Wheeler, No. 1:21-cv-119-RDM (D.D.C. Jan. 14, 2021)."

Conservancy and the other Plaintiffs further requested that if EPA were to properly promulgate

and codify its approval of Florida's program, that the agency also postpone the effective date of

that action pending judicial review.  EPA, however, has adhered to its position that the

immediate effective date was lawful, prohibiting the agency from considering Plaintiffs' stay

request.  If the court were to remedy these violations, Conservancy would again ask the agency

to postpone the effective date of the rule pending judicial review.

25.     EPA's immediate effective date of December 22, 2020, also foreclosed

Conservancy's ability to benefit from the Biden Administration's review of the rule.  It is my

understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff

Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing

agency heads to review and consider postponing by at least 60 days any rule that had been

published in the Federal Register but had not taken effect. [1]  Had EPA provided the required 30-

day effective date from its publication in the Federal Register, it is my understanding that EPA's

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/

approval and transfer of authority to the state would have been covered by the Klain Memo. A review of the unlawful aspects of Florida's 404 program could have resulted in actions to stay the program's effective date and take other remedial measures.

26.     The loss of procedural rights Conservancy has sustained as a result of EPA's immediate transfer of authority to the state, as well as its failure to lawfully effectuate the transfer through codification, has resulted in immediate and on-going organizational and membership harms while the state's unlawful program operates. The state's 404 program causes Conservancy to divert resources, threatens wetlands and wildlife, and undermines Conservancy's ability to fully realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

**Organizational Harms From Immediate Effective Date**

27.     I understand that the APA 30-day delay between a rule and its effective date is intended to allow all those affected to prepare for the effect of the rule. As discussed above, the delay allows those adversely affected to request reconsideration of the action, and take other action, such as requesting an agency stay, before the rule's effective date. The delay also allows those affected to prepare for the impact of the rule when it becomes effective.

28.     Here, without the 30-day window between the rule and effective date, Conservancy was unable to adequately prepare for the mass of permits immediately transferred from the Corps to the state, which required a substantial diversion of attention from its planned activities to determining the status and impact of these transfers and what actions the state would take. Conservancy was forced to divert resources from core programmatic work to immediately turn its attention to these questions. This included forcing Conservancy to try to understand the impact and scope of the program's components, which have not been codified, to try to prepare

to continue its advocacy against pending permit applications threatening its interests and those of its members.  We had to quickly transition our resources from other core programs and towards trying to learn and stay on top of the state-assumed program.

29.     In this 30-day period, Conservancy had emergency internal meetings to create strategy plans and re-staff projects so that Conservancy would be able to 1) stay on top of how Florida was processing new applications and which existing 404 applications would be transferred from the Corps; 2) ensure we would not miss decision points on applications that would authorize projects affecting Conservancy's and our members' interests; 3) ensure we would not miss information or deadlines for applications that could be of concern to Conservancy;  4) assess overall how Florida was administering the program; 5) better understand how the agency MOA/MOUs, Biological Opinion, and state rules would perform in implementation on varied applications; and 6) what the best forms of advocacy would be under the state assumed program.

30.     In this 30-day window, Conservancy dedicated a significant amount of resources to tracking the state's "Oculus" search engine to figure out where and how to access 404 application documents and whether and how the state was proceeding with new and transferred permitting requests.  Conservancy was simultaneously contacting the state via phone and email to learn the same.  Conservancy also spent time trying to figure out how to sign up to receive public notices of developments on projects with little to no avail.

31.     Halfway through this 30-day period, we received individual instructions from the state on how to search Florida's database of transferred and new applications and general information about where future public notices would be posted.  Once we had this information, we had to go through hundreds of data entries in the Oculus database to determine if any projects

Conservancy had already been tracking and on which we had submitted comments were transferred to the state (and under what project name and the state 404 application identification number was), as well as attempting to discern whether any new project applications that would be of concern to Conservancy were submitted. Because the state posted records to its Oculus site in a piecemeal fashion, we had to repeatedly call the Corps to ascertain whether the agency transferred individual project applications that Conservancy had been tracking and on which we had submitted comments.

32.     Conservancy therefore had to re-allocate our staff time toward this effort, which required us to reduce or eliminate time that would have been spent on other work. This increase in work redirected Conservancy's resources and staff capacity that were dedicated to other aspects of the organization's core planned conservation programs.

33.     Although I had planned to monitor the transfer of 404 permitting authority from the federal agency to the state following the program's approval, if EPA had not instituted an immediate effective date, I would not have had to work almost exclusively on this during the weeks that followed the program going into effect immediately on December 22, 2020. A core component of my work is protecting panthers. In the 30 days following the program approval, I was unable to devote the time I otherwise would have to this work, including my otherwise planned tasks regarding transportation issues that affect panthers.

34.     We also had to divert resources away from our informational work dedicated to translating policy so that it is more user-friendly for our members and the general public. At Conservancy, we aspire to take the complex matters we work on and break them down to a level that the general public can understand. This includes creating story maps, visuals, PowerPoints, and the like for the public. We then put this information on our website and social media to

educate our members and supporters, inspire them to take action, and further attracts supporters and donors to Conservancy. Because of the hastened need for many of our Policy staff members to address the Florida 404 program and several of the pending applications, we had to shift away from this work or put it on hold until resources became available.

35. These harms to Conservancy have continued beyond the 30 days following the immediate effective date of the program. Now that 404 applications are being processed and the state is sending Requests for Additional Information ("RAIs") to permit applicants, we are forced to engage in our advocacy work all at once on all the 404 permits we had been tracking. In addition to ensuring our comments on projects that were pending before the Corps were forwarded to the state, we will also have to submit brand new comments to the state for each 404 project impacting our mission, tailored to the specifics of the new program, and request public hearings for each project. Furthermore, because the applications were submitted or transferred at around the same time giving them all similar timeclock start dates, we are having to monitor developments on the permit applications all at once, rather than if the permits had remained on their own natural timeline under the Corps' jurisdiction. As a result, we are continuing to divert staff time from other important local and state matters affecting species and water quality.

**Organizational and Membership Harms From Particular Projects**

36. EPA's unlawful transfer of authority to the state via an immediate effective date and without codifying the state program, mean that the state is presently administering the 404 program, while Conservancy has been denied the right to request reconsideration or an agency stay pending judicial review, and the ability benefiting from the Klain memo. As a result, the state is poised to issue 404 permits on major projects that will Conservancy's organizational interests and my interests as a member. We are particularly concerned about certain permit

applications that have been transferred by the Corps to the state[2] for major projects, especially given the state's public statements that its objective in assuming jurisdiction over 404 permits is to issue permits quickly.

37.     **Troyer Mine.**  According to DEP's online search portal, as of January 8, 2021, the Corps transferred a 404 permit application by Troyer Brothers Florida, LLC, for construction and operation of a lime rock and fill dirt mine, to the state, in state application number 0292013007.  The proposed project includes the extraction of approximately 256,000 cubic yards of crushed lime rock from the project site.[3]

38.     Troyer Mine would cover 1,803.51 acres and would affect waters that are part of the Big Cypress Swamp Watershed.  The project site is within the consultation areas for several endangered and threatened species, including the Florida panther, bonneted bat, red cockaded woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail kite, and the Florida scrub jay.  Additionally, the site has suitable habitat for the threatened eastern indigo snake and wood stork.  Other listed species observed on the site include the bald eagle, Florida sandhill crane, roseate spoonbill, limpkin, little blue heron, snowy egret, tricolored heron, white ibis, American alligator, and Big Cypress fox squirrel.  The project is also within three wood stork colony Core Foraging Areas.  See Exhibit G, Public Notice, Permit Application No. SAJ-2008-03793.

39.     While the application for Troyer Mine was pending before the Corps, Conservancy submitted public comments opposing the project (see Exhibit H).  Ninety percent

---

[2] https://depedms.dep.state.fl.us/Oculus/servlet/login and
https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal.
[3] State 404 File for Troyer Mine: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_292013/gis-facility!search.

of the project site is in Florida panther Primary Zone habitat, meaning it is habitat essential for the continued survival and recovery of the species. This project site is about 90% Primary Zone and Adult Breeding Habitat for the Florida panther.

40.    Vehicular collisions are the leading cause of known deaths for the Florida panther. Troyer Brother's proposed project would result in an estimated 2,089 daily truck trips to or from the site, adding heavy traffic to already deadly roadways for panthers.

41.    Troyer Mine would also likely destroy 214 acres of wetland that are part of regional flowways, or connected strands of water that comprise a wetland ecosystem within the Density Reduction Groundwater Resource Area of Lee County, a large area of protected wetlands, agricultural lands, and conservation lands. This area includes preserved lands of Imperial Marsh Preserve, Corkscrew Regional Mitigation Bank, and Southwest Florida International Airport mitigation lands. Wetlands in this area are critical to preserving aquifers and water supply for Lee County and surrounding areas; for example, water from rain runoff naturally flow to and re-charge the aquifers. These wetlands also provide panther habitat. As explained in our attached Comments (Exhibit H), the mining project would likely impact evaporation rates of water supply due to seepage from wetlands into the mines, resulting in a lower water table, with the potential for adjacent wetlands to be drained as a result.

42.    The Troyer Mine project requires both a state-level environmental resource permit ("ERP") and a 404 permit. In 2011, the state granted Troyer Brother's ERP applications. In 2019, the state granted modifications to those permits. On June 29, 2019, while the 404 permit application was before the Corps, the Corps closed the public comment period.

43.    In assuming jurisdiction over the federal 404 program, the state has repeatedly stated that its objective is to grant 404 permit applications quickly. The state has also claimed in

its 404 application to EPA that the ERP process has an 85% overlap with the 404 application process, suggesting that once the ERP process has been completed, there is not much more for the state agency to do to complete its 404 review.[4]

44.     Absent a request for additional information, it typically takes 90 days for FDEP to process a state-level ERP permit from start to finish: 30 days to make a completeness determination and 60 days to issue or deny the permit.[5]  For the state 404 program, within 10 days of a completeness determination, DEP must provide public notice of the proposed application, which opens a 30-day comment period for most permits that is extended to the close of any public meeting, if one is held.  If EPA does not comment or signal it may comment or object, FDEP generally has 60 days from the close of the comment period (or its determination that the application is technically complete) to make a final permit decision.  If a request for additional information is issued, applicants have 90 days to respond, though, as shown below, they may respond sooner.

45.     As for Troyer Mine, that the state ERP process has been completed, the federal 404 public comment period has concluded, the Corps has transferred the application to the state, and the state has not issued an RAI, it appears that there is little left to do to process this 404 application.

46.     If the Troyer Mine permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation

---

[4] See https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/state-404-program.
[5] See https://floridadep.gov/comm/press-office/content/dep-101-environmental-resource-permitting

DocuSign Envelope ID: D470E83B-B40C-43DC-9F55-A2385426ED6F

requirements because of the need to retain expert witnesses, and the potentially devastating risk

of mandatory fee-shifting laws), that are not comparable to the processes or remedies available

under federal law.  Conservancy will also lose access to information about the project that would

have been provided under NEPA and Section 7 of the ESA.

47.     In addition to harming Conservancy's organizational interests, the Troyer Mine

project would be located approximately three and a half miles away from the public lands I

enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike,

camp, and observe the wildlife listed above.  Panthers require huge swaths of territory for

roaming, foraging, and breeding, can have ranges over 200 square miles, and can travel 12 or

more miles a day.  I visit Corkscrew for an annual camping trip with friends, and I plan to return

here as often as possible.  Environmental harms from Troyer Mine, including harms to essential

species habitat, would negatively impact my ability to enjoy these lands and observe wildlife.

48.     **Rural Lands West.**  According to FDEP's online search portal, as of January 11,

2021, the 404 permit application for Rural Lands West was transferred to the state, in state

application number 0396966001.[6]  Interestingly, Corps personnel advised Conservancy that this

404 application was transferred to the state as of December 21, 2020, a day before EPA

published notice of its approval of the state program.

49.     Collier Enterprises Management, Inc., seeks this permit to develop in the Big

Cypress Drainage Basin.  This drainage basin includes critical wetland ecosystems such as

Shaggy Cypress, Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand, which

are proximate or downstream to this proposed project.  Rural Lands West is a project to clear,

---

[6] State 404 File for Rural Lands West:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396966/gis-facility!search.

grade, excavate, dredge, and fill to construct and maintain a mixed-used development consisting
of two golf courses; a commercial town center; an elementary, middle, and high school; and
residential neighborhoods with roads, driveways, parking areas, lakes, drainage management
systems and other associated infrastructure.  The project would discharge 196,217 cubic yards of
fill into 98.25 acres of jurisdictional wetlands and 1,360 cubic yards of materials into 0.68 acre
of isolated wetlands in the watershed for the Big Cypress Drainage Basin.  Approximately
27,820 cubic yards of materials would be discharged into 13.90 acres of remnant farm-field
ditches.  The project also would dredge/excavate approximately 2,951,250 cubic yards of native
materials from 197.45 acres of jurisdictional wetlands and 16,500 cubic yards of material from
1.1 acre of isolated wetlands.  See Exhibit I, Public Notice, Permit Application No. SAJ-2008-
00210.

50.     While the Rural Lands West application was pending before the Corps,
Conservancy submitted comments in opposition to the project (see Exhibits J and K).
Conservancy owns 1.4 acres of land for conservation purposes that are approximately 1.5 miles
away from Rural Lands West, and another 26 acres of land within 3 miles of the project.

51.     The project would result in approximately 10,000 new residents arriving to the
area and would impact over 300 acres of wetlands.  The project falls within important regional
flowways and ecosystems.

52.     Regarding water resources, we additionally raised concerns that Rural Lands
West would be in an impaired water body that does not meet water quality standards, particularly
for nutrients or where nutrients are the pollutant.  Conservancy asked federal agencies for better
hydrological analysis of the impacts of this project on downstream and adjacent wetlands.

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5F-A2385426EB6F

53.     As stated in the comments Conservancy submitted to the Corps in opposition to this project, there would be 4,100 acres of impacts to panther habitat, with 75% of the project in the Primary Zone habitat.  A substantial amount of the project is also in panther Adult Breeding Habitat.  The Rural Lands West project is part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan which the Conservancy opposes, in part, due to loss of panther habitat from projects like Rural Lands West.

54.     The Rural Lands West project requires both a state-level ERP and a 404 permit.  In 2018, the state granted Collier Enterprises Management, Inc.'s ERP applications.  The Corps closed the public comment period on the application in 2017.  In assuming jurisdiction over the federal 404 program, the state has repeatedly stated that its objective is to grant 404 permit applications quickly.  After the 404 application was transferred to the state, an RAI was issued on February 5, 2021, meaning it is now over a month into the maximum 90-day window for Collier Enterprises to respond, moving the proposed project further along in the application process.

55.     If the Rural Lands West permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

56.     I would also be personally harmed by the Rural Lands West development.  I regularly hike the public trails at the Florida Panther National Wildlife Refuge. The Refuge

boundary is about four miles from the project site, and I plan to return as often as possible. Environmental harms from the Rural Lands West development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.

57.     **Babcock Development.**  According to FDEP's online search portal, as of December 28, 2020, Babcock Property Holdings, LLC's 404 permit application to expand its nearly 18,000-acre property development was transferred to the state, in state application number 0396574001.[7]  As with Rural Lands West, Corps personnel advised Conservancy that this 404 application was transferred to the state as of December 21, 2020, a day before EPA published notice of its approval of the state program.

58.     The proposed modification, which would cover an 8,711-acre project area would be located in the Tidal Caloosahatchee River Watershed, and it would add 113.42 acres of wetland impacts, totaling 553.63 acres of wetland impacts for this project.  See Exhibit L, Public Notice, Permit Application No. SAJ-2006-06656.

59.     In comments by the Conservancy to the Corps (see Exhibit M), we highlighted potential harms to the caracara Primary Zone buffer, as the caracara is non-migratory and uses this territory year-round.  We also highlighted concerns about the Florida bonneted bat, as much of the development site would be within proposed bonneted bat critical habitat.

60.     On November 12, 2020, the Corps closed the public comment period. Additionally, the state ERP has been pending since May 27, 2020, but could be granted at any time.  Under state law, once an ERP application is received, FDEP has 30 days to determine if it is complete or to seek additional information; once the application is deemed complete, FDEP

---

[7] State 404 File for Babcock Development:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396574/gis-facility!search.

has 60 days to make a decision on the permit. For the state 404 permit application, FDEP issued a RAI, which Babcock Property Holdings responded to quickly on March 1, 2021, thus moving the application further along the processing timeline toward a final decision.

61.    Conservancy's ability to challenge the permit and harms that result from Babcock Development will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.   Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

62.    **Bellmar Development.**   According to FDEP's online search portal, as of December 28, 2020, the 404 application for Bellmar Development was transferred to the state, in state application number 396364001.[8]  Collier Enterprises Management, Inc., applied to develop a mixed-use community that would cover about 1,500 acres within the Big Cypress Drainage Basin.  This drainage basin includes critical wetland ecosystems such as the Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand which are proximate or downstream to this proposed project.  The development site would also be within proposed critical habitat for the bonneted bat.

63.    The Bellmar project is proposed completely within 100% Primary Zone habitat for the Florida panther, and about 80% of the site is Adult Breeding Habitat for the panther as well. The Bellmar project is part of the proposed Eastern Collier Multiple Species Habitat

---

[8] State 404 File for Bellmar Development:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396364/gis-facility!search.

Conservation Plan which the Conservancy opposes, in part, due to loss of panther habitat from projects like Bellmar.

64.     The project would likely impact lands that are part of the Florida Panther National Wildlife Refuge, where I love to regularly visit and recreate.  Conservancy also owns property about 3 miles from the proposed project site.

65.     After the 404 application was transferred to the state, an RAI was issued on January 27, 2021, meaning it is now over a month into the maximum 90-day window for Collier Enterprises to respond, moving the proposed project further along in the application process.

66.     Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

67.     **Fleischmann Development.**  According to FDEP's online search portal, as of February 16, 2020, Minto Sabal Bay, LLC's application to construct a residential development with associated infrastructure, amenities, and stormwater management system had been transferred to the state, in state application number 398942001.[9]

68.     Fleischmann Development would encompass 53.7 acres of wetlands.  It would result in the discharge of 169,077 cubic yards of fill material into 26.2 acres of wetlands and 839

---

[9] State 404 file for Fleischmann Development:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_398942/gis-facility!search.

cubic yards of fill material into 0.13 acre of other surface waters.  It would also result in the

excavation of 72,213 cubic yards of material from 7.46 acres of wetlands.  The project would

impact eastern indigo snake habitat and could also impact the wood stork, red-cockaded

woodpecker, Florida scrub jay, Florida panther, Florida bonneted bat, and the American

crocodile.  See Exhibit N, Public Notice, Permit Application No. SAJ-2019-03152.

69.     While the application had been pending before the Corps, Conservancy submitted

comments to the Corps (see Exhibit O), in which we outlined concerns about the gopher tortoise

and indigo snake and advocated for better protections for the upland species impacted or

potentially impacted by the project.

70.     On July 5, 2020, the Corps closed the public comment period.  Additionally, the

state ERP has been pending since July 24, 2020, but could be granted at any time.  Under Florida

law, once an ERP application is received, FDEP has 30 days to determine if it is complete or to

seek additional information; once the application is deemed complete, FDEP has 60 days to

make a decision on the permit, and according to FDEP, there is an 85% overlap between the ERP

and 404 permit process.

71.     Conservancy's ability to challenge the permit and harms that result from the

project will be severely constrained by inadequate and costly state procedures (including

restrictive standing requirements, costly litigation requirements because of the need to retain

expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not

comparable to the processes or remedies available under federal law.  Conservancy will also lose

access to information about the project that would have been provided under NEPA and Section

7 of the ESA.

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5E-A2385426EB6F

72.     Further demonstrating the harms discussed above and below, I have verified additional 404 applications in FDEP's State 404 Program database that have already been transferred to the state, that Conservancy has been monitoring and has already engaged in, and for which the Corps' comment periods have closed:

a.  **Vanderbilt Beach Extension**.  Collier County seeks to widen and extend a roadway that would impact 3.38 acres of wetlands and panther habitat.  Conservancy submitted a comment letter seeking consideration of panther movement in that area.

b.  **Immokalee Road Rural Village.**  27th/Pico Boulevard Limited Partnership seeks to construct a mixed-use residential and commercial development in Collier County, which would result in the discharge of 159,091 cubic yards of fill material into 32.87 acres of wetlands and 1,942,195 cubic yards of fill material into 200.64 acres of other surface waters. The project would also involve the excavation of 179,241 cubic yards of material from 11.11 acres of wetlands.  The site is within the USFWS designated Focus Area for the Florida panther and is within the USFWS designated consultation area for the crested caracara. Conservancy sent a letter seeking consideration and action on the severe panther roadkill hotspot adjacent to this project.

73.     These harms would be pervasive and ongoing.  Conservancy has identified and has been monitoring project developments that will likely need a 404 permit in the future:

a.  **Old Corkscrew Plantation Mine.**  This is a potential mining project that could cover 4,000 acres.  It had an active 404 permit application in 2011, but no permit was issued to my knowledge.  The project already received its ERP from FDEP in 2011.  About 87% of the property is considered Florida panther Adult Breeding Habitat, and the project also contains Florida panther Primary Zone habitat. The following species have been previously

documented on site, including crested caracara, Everglades snail kite, wood stork, Florida

panther, Florida sandhill crane, little blue heron, roseate spoonbill, Big Cypress Fox squirrel,

and Florida black bear. The project also contains Core Foraging Area for four wood stork

colonies.  Based on earlier permit applications, this project would add about 2,300 daily truck

trips onto a roadway that already is deadly for Florida panther-vehicle collisions.  This

project would also be approximately one and a half miles away from the public lands I enjoy,

namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp,

and observe wildlife.

b. **State Road 29.**   This is a project to widen State Road 29 in Collier County, and it

is already beyond the beginning stages of the planning process with the Florida Department

of Transportation.  The State Road 29 project encompasses Florida roadkill hotspots that

threaten panthers, and it is adjacent to the public lands of Big Cypress National Preserve and

the Florida Panther National Wildlife Refuge.  This project would be located directly

adjacent to these key public lands, where I enjoy hiking and other outdoor activities.

c. **Wilson-Benfield Road.**  This is a project to extend a major roadway in Collier

County, and it would be within or adjacent to the Picayune Strand State Forest. The Picayune

Strand provides habitat for numerous species, including the wood stork, red cockaded

woodpecker, Florida black bear, Florida panther, and others.  This roadway may impact

important downstream resources, fragment wildlife habitat, and alter hydrological

connections.  This project is likely to go forward, as it has already been listed on the Collier

County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan,

which is the federally mandated planning mechanism for local governments to receive

federal funding for transportation projects.  I live about 1.5 miles way from this project area,

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5E-A2385426EB6F

and enjoy recreation, such as hiking and wildlife observation, in the Picayune Strand State Forest and plan to continue doing so as often as I can.

      d. **I-75 Interchange near Everglades Blvd**.  This is a project to construct a new interchange on I-75 in Alligator Alley.  An interchange in this area would increase development in Golden Gate Estates and the Rural Lands Stewardship Areas. These areas provide habitat for wildlife such as Florida black bears and Florida panthers, among other species.  This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects.

      e. **Eden Oak Development**.  This is a project to develop a 55-home community on 306 acres along the Caloosahatchee River.  The project was previously pending with the Corps starting in 2012, it would have impacted at least 35 acres of mangrove and salt marsh, and it was within smalltooth sawfish critical habitat and Florida manatee critical habitat.  The wetlands within this site were recognized by agencies as Aquatic Resources of National Importance.  The developer has an active application for development at the local level.

      f. **FPL "Sawgrass" Solar Facility**.  This is a project by Florida Power & Light to construct a solar facility that would span over 3,000 acres.  It would cut through Florida Panther Primary Zone habitat. The project is also adjacent to a roadkill hotspot for Florida panthers.

**Organizational Harms from the State Program**

      74.    As stated above, because Conservancy was unable to seek agency reconsideration or an agency stay, was foreclosed from benefitting from the Klain memo, and because EPA

unlawfully transferred authority to the state, the state is currently administering its unlawful

Section 404 program. The state 404 program is and will harm Conservancy as an organization.

75. Now that Florida has unlawfully assumed the federal 404 program, Conservancy

is harmed by the loss of environmental review of projects under NEPA. This statute not only

provides more scrutiny for water resources, species and their habitat, but also provides the

Conservancy with vital information to vet the impacts of a proposed project and additional

opportunities for public comment. In order to carry out our mission of protecting species and

wetlands, we now will be required to hire our own experts to engage in alternatives analyses,

again draining our financial resources that would go elsewhere.

76. The NEPA review process provides Conservancy with an opportunity to engage

in the Corps decision-making, which can lead to better environmental decisions, opportunities

that are lost now while Florida is allowed to continue administering this 404 program. For

example, several proposed large-scale mining projects in Lee and Collier counties were subject

to NEPA, under which an environmental impact statement ("EIS") was determined to be

required. As a result of this decision, two of the applications – which would have impacted over

9,000 acres – were either suspended or withdrawn. See Exhibit P (correspondence between

permit applicants and the Corps documenting the EIS as the reason for withdrawal/suspension).

77. The loss of critical information and procedural safeguards afforded by NEPA will

significantly set back our established methods of advocating for and protecting water resources,

species and their habitats, and as the pending 404 project applications discussed above

demonstrate, these losses will occur if Florida assumes the 404 program. Furthermore, for any of

the projects in which Conservancy determines the need for litigation, a tool employed by our

DocuSign Envelope ID: D470E83B-B40C-43DC-9F55-A2385426EB6F

organization, it is guaranteed that Conservancy would have to divert its resources to engage in state court litigation, or forego litigation completely, damaging our organizational mission.

78.     Furthermore, Conservancy challenges 404 permits in federal court as one of our advocacy tools to further our mission, and we are harmed by the loss of federal court as a venue as a result of Florida assuming the 404 program.  Litigating in federal court provides us with the necessary access to protect the interests of our organizational mission and our members.  We would not have the same access to state courts because of the significantly higher costs of state court litigation and the potential drain on our resources to litigate at the state level.

79.     With assumption, there is now an entirely different legal scheme to challenge wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Conservancy would have to incur considerable expense to hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Conservancy would have to divert from other programmatic goals if we did not have to litigate in state court.  This also means that Conservancy may be restricted from challenging 404 permits, and will certainly not be able to utilize the same tools as it has under the federal regime.  In state court, we also would not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes affords.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case before Florida's Division of Administrative Hearings ("DOAH") can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.  With our limited budget, one permit challenge in state court could eat up a

DocuSign Envelope ID: D470E83B-B40C-43DC-9F55-A2385426EB65

significant portion of the policy department's budget.  In order to engage in such costly litigation

we would to have to 1) raise additional money to fund these challenges, 2) pull funds from other

areas within our existing operating budget, or 3) forego certain litigation, as funding is not

included in our budget.  All three options would damage our ability to carry out our mission.

80.     It is my understanding that Conservancy would also risk exposure to a mandatory

"fee-shifting" provision in which we risk being liable for the costs and fees to engage in

litigation, costs and fees that we would not automatically be subject to if we retained the ability

to litigate in federal court.  Such a fee-shifting provision would further diminish our ability to

engage in litigation, because we would be required to weigh this financial risk in addition to the

above costs, regardless of how strong our claim might be.

81.     It is also my understanding that it would be significantly harder for Conservancy

to even bring a lawsuit for environmental harms on behalf of our members, because we would be

required to show harm to a significant number of our members under Florida law, rather than to

just one member under federal law.

82.     The lack of procedural safeguards, and in turn, a weaker system for evaluating

and testing the environmental impacts of permitting, also significantly increase the risk of harms

to Florida's water resources, species, and their habitats, environmental harms that would be felt

personally by me as a member of Conservancy and a long-time resident of Naples.  I regularly

partake in outdoor activities such as hiking, camping, observing wildlife, and nature

photography.  Some of the areas that I like to visit include, but are not limited to, Big Cypress

National Preserve, Fakahatchee Strand Preserve State Park, Picayune Strand State Forest, Collier

Seminole State Park, Florida Panther National Wildlife Refuge, Corkscrew Regional Ecosystem

Watershed's Corkscrew Marsh, Bird Rookery Swamp and Flint Pen Strand, Corkscrew Swamp

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5E-A2385426EB6E

Sanctuary, Stormwater Treatment Area 5, Babcock Ranch Preserve, Fisheating Creek,

Okaloacoochee Slough State Forest and Spirit of the Wild Wildlife Management Area, and

county owned conservation properties such as those in Collier and Lee counties.

83.     If Florida is allowed to continue operating this unlawful 404 program,

Conservancy would be irreparably harmed in its ability to carry out its mission of protecting

native and endangered species, their habitats, and waters.

84.     A ruling in Plaintiffs' favor would set aside EPA's immediate transfer of authority

to the state, thereby allowing Conservancy to pursue all avenues, as discussed above, including

seeking an agency stay of Florida's administration of the Section 404 pending judicial review.  In

addition, as indicated by the Klain memo, the Biden Administration is focused on reviewing final

actions of the outgoing Administration, and as new leadership of the agency Defendants comes

in, it is possible that the agencies would grant Plaintiffs relief, particularly pending judicial

review.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

___ 5 ___day of March, 2021.

DocuSigned by:

*Amber Crooks*

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

### <u>SECOND DECLARATION OF AMBER CROOKS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

I, Amber Crooks, make the following declaration:

1.    I am a resident of Naples, Florida.

2.    I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.    I signed my first declaration in support of Plaintiffs' Partial Motion for Summary Judgment on March 5, 2021.  Dkt. 31-1.  I am providing a second declaration in support of Plaintiffs' Partial Motion for Summary Judgment to provide updates on events that have transpired since my prior declaration regarding the Fleischmann Development, Dkt. 31-1 at 21–22 (Crooks Dec. ¶¶ 67–70), as well as to provide supplemental information regarding my understanding and anticipation of when EPA would transfer the Section 404 program to the state.

4.    **Fleischmann Development (ST404_398942).**  This development was detailed in Dkt. 31-1 at 21–22 (Crooks Dec. ¶¶ 67–70).  As explained there, the Corps transferred the

application for this project to the Florida Department of Environmental Protection ("FDEP") on February 16, 2021.  Id. at 21 (Crooks Dec. ¶ 67).  Since my prior declaration, the following events have transpired:

5.      On March 17, 2021, FDEP submitted a Request for Additional Information to the applicant.  Exhibit A.  As detailed within the Request for Additional Information, FDEP's "desire [is] to provide prompt turnaround times on permit applications, and a quicker response to this RAI shortens the timeframe for which a final decision on the application can be made." Id.

6.      After 21 days, on April 7, 2021, the applicant responded to the Request for Additional Information.  Exhibit B.

7.      On May 17, 2021, FDEP posted a public notice inviting comments on this proposed development.  Exhibit C.  The public notice details that the proposed project would destroy over 25 acres of wetlands and "may affect the eastern indigo snake and the Florida panther." Id. at 5.

8.      The public comment period on this development closes on June 16, 2021.  Id. at 6.  FDEP generally has 60 days from the close of the comment period (or its determination that the application is technically complete) to make a final permit decision.  This means FDEP could decide to issue the permit for this project by August 15, 2021.

9.      **Effective Date:**  Until the day before the publication of EPA's approval, Conservancy and I had not been anticipating that EPA would publish its approval on December 22, 2020.  I also had not been anticipating that the transfer of the Section 404 to the State would be effective immediately.  My understanding that the transfer would not occur until several weeks later was informed by emails with FDEP staff.

10.     On December 17, 2020, I emailed with Deputy Secretary John Truitt to discuss

the anticipated date of the Federal Register notice expected to announce EPA's decision on

Florida's submission package.  Exhibit D.  During that email conversation, I asked about the

status of EPA's review of the state's program and was told that, although FDEP had not been

informed of a particular date, that staff anticipated publication of the Federal Register notice in

mid-January 2021.  Id.

11.     In a follow up email on December 21, 2020, Deputy Secretary John Truitt

informed me that the Federal Register notice was scheduled for the following day.  Exhibit E.

12.     An email from one of the FDEP staff members leading the state's assumption

process, Heather Mason, that was received in response to a public records request submitted by

Earthjustice, indicates that the state also believed the effective date of the program would be later

than December 22, 2020.  Exhibit F at 4.  The email was sent December 18, 2020, the Friday

before EPA released its prepublication notice of its approval of the state program.  Id.  The email

says,

> We just got our implementation date.  The effective date will be December 22,
> 2020.  I know this is a lot earlier than we discussed, and we will have some things
> to work out and discuss at today's meeting for sure.  I apologize that we were so
> wrong with our estimates.  I will explain later at our meeting.

Id.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

21st day of May, 2021.

DocuSigned by:

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>    Defendants. | **CASE NO.** 1:21-cv-00119 (RDM) |

## <u>DECLARATION OF AMBER CROOKS</u>

I, Amber Crooks, make the following declaration:

1.      I am a resident of Naples, Florida.

2.      I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3.      I am a member of the Conservancy of Southwest Florida ("Conservancy"), and I am also employed by Conservancy as the Environmental Policy Manager.

4.      Conservancy is a 501(c)(3) nonprofit that focuses on environmental conservation in Southwest Florida. Our water policy work addresses issues at local, statewide, and federal levels. Conservancy was founded in 1964 and has grown in membership to approximately over 3,600 dues-paying members, and approximately over 2,000 additional donors and supporters. The mission of Conservancy is to protect the natural environment, species, and habitats of Southwest Florida, summed up in our motto: "Our Water, Land, Wildlife, Future." We do this

through four main program areas: 1) Science and Research, 2) Policy and Advocacy, 3) Wildlife Rehabilitation, and 4) Environmental Education.

5.      Conservancy's Policy and Advocacy program focuses on protecting water, wildlife, and land.  In protecting wetlands and waterways, we work to promote better water management and resource protection by working with stakeholders and decision-makers to ensure that stringent water management tools, regulations, and best practices are in place and utilized.  In protecting wildlife and endangered species, we work to prevent harm by preserving species' habitats from environmental changes, conserving landscape corridors and critical habitat, and ensuring that protections are strong to recover imperiled species populations.  We perform this work at the local, state, and federal levels.

6.      Conservancy's Wildlife Rehabilitation program operates the von Arx Wildlife Hospital, which treats approximately 4,200 injured, sick, or orphaned native animals on an annual basis.  These native species include small mammals, birds (including migratory and protected birds), turtles, gopher tortoises, and many others.

7.      Protection of water resources such as wetlands and conservation of native species are core programmatic areas for Conservancy's policy work.

8.      I have a deep personal commitment to the protection and recovery of Florida's protected species, and I engage in both professional and personal activities to further this commitment.

9.      I have an aesthetic and scientific appreciation of the Florida panther in the wild, and travel to panther habitats in hopes of viewing and photographing the elusive panther.  I enjoy recreating in panther habitat areas, including hiking, camping, wildlife viewing, and nature photography.

10.     I graduated with a B.A. in political science from Stetson University in 2003, and I received a Masters of Public Administration in Environmental Policy and Planning from Florida Gulf Coast University in 2011.

11.     Through my work at Conservancy and through my formal education, I have studied endangered species policy issues, including critical habitat designation, Habitat Conservation Plans, and the Florida panther, among other topics.  As the environmental policy manager at Conservancy, I specialize in wildlife policy and am the organization's listed (endangered and threatened) species expert.  Endangered species that my work focuses on include, but are not limited to, Florida panthers, bonneted bats, and smalltooth sawfish.  My job duties also include overseeing policy staff members' technical analysis of issues related to state and federal permitting processes.

12.     Southwest Florida, as a region, has many endangered and threatened species that receive regulatory review by federal agencies as required under the Endangered Species Act ("ESA").  One such species is the Florida panther, one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  According to the U.S. Environmental Protection Agency's ("EPA") Biological Evaluation in this case, this region had the highest concentration of ESA consultations in all of Florida from 2014-2018.  *See* Dkt. No. 031-1, at 30-32 (Exhibit A, Excerpt from ESA Evaluation for Clean Water Act Section 404 Assumption by the State of Florida).

13.     One of the main tools Conservancy uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; utilize geographic information system (GIS) analysis, a data mapping

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-SGB24385A15E

tool that allows us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters. As with this case, we also engage in litigation when needed to carry out our organization's goals.

**Conservancy's Engagement on Florida Assumption of Section 404**

14.     Conservancy has dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program, in light of the State's poor permitting track record in environmental protection and the State's failure to demonstrate that it would provide the same level of protection, rights and remedies available under federal law, and that its program meets the requirements of federal law.

15.     Between 2017 and 2020, I advocated on behalf of Conservancy, against efforts to pursue assumption on Section 404 in Florida. Among other things, I testified before the State legislature, participated in the State's rulemaking process (via comments and hearings), regularly raised concerns directly with the Secretary of Department of Environmental Protection and his staff, and helped engage our membership in advocacy against the proposed program at the state and federal levels.

16.     In 2018, we launched a campaign to urge Governor Rick Scott to veto a quickly passed bill that authorized the Department of Environmental Protection to pursue seeking approval from EPA to administer Section 404. This included our supporters sending more than 700 emails in opposition, online advertisements that reached more than 70,000 viewers, and advertisements and opinion pieces published in local newspapers. We submitted comments to the U.S. Army Corps of Engineers ("Corps") as it was considering modification to the list of waters that could be assumed by the State under Section 404. In our comments, we submitted a

comparison of the 2014 and 2017 navigable waters lists, urged the Corps to use its 2017 list as

the starting point for a retained waters list, and identified dozens of waterways in Florida

counties that should be considered for navigability in addition to the those listed by the Corps.  In

2019, we sent an action alert to our members and supporters asking them to contact the new

Governor, Ron DeSantis, to urge him to reverse course on 404 assumption, as he had made

promises about protecting our water quality.

17.     From 2018 to 2020, we participated in the State's rulemaking process, the final

steps of which were conducted at the height of uncertainty around the coronavirus pandemic

(February to April 2020), urging the State not to rush the process when the community was

facing a public health emergency involving stay at home orders, closed schools and scarce

household supplies, and requiring families to focus on protecting their health, livelihood, and

well-being.

18.     After the State submitted its 404 application to EPA in August 2020, and EPA

initiated a public comment period in September 2020, Conservancy, along with other Plaintiffs

in this action, objected to the incompleteness of the application in October 2020, and in

November 2020 submitted comprehensive comments objecting to Florida's proposed program as

grossly inadequate and unlawful under federal law.  *See* Dkt. No. 031-1, at 33, 43 (Exhibits B

and C).

19.     After EPA published its notice approving Florida's program and gave it

immediate legal effect on December 22, 2020, Conservancy's counsel notified EPA and the

other federal defendants, as well as the State, that EPA's transfer of authority was unlawful.  *See*

Dkt. No. 031-1, at 99-101 (Exhibit D).  On December 28, 2020, EPA responded by claiming for

the first time that the agency's December 22, 2020, action did not have to meet the 30-day

requirement or codify the State program because it was an informal adjudicatory order, rather than a rule. *See* Dkt. No. 031-1, at 102-104 (Exhibit E).

20.     On January 14, 2021, Conservancy joined with the other Plaintiffs in this action to filed the present suit.

21.     Conservancy was harmed, and continues to be harmed, by EPA's decision to approve the State-assumed 404 program, and the other agency actions related to that decision which are also challenged in this case.  Florida's implementation of the unlawful 404 program harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests.

## Organizational Harms from the State Program

22.     EPA's approval of the State's 404 program causes Conservancy to divert resources, threatens wetlands and wildlife, and undermines Conservancy's ability to fully realize its mission by depriving the organization of information, rights, and remedies available when Section 404 is administered by the Corps as it has been for decades.

23.     To begin, Conservancy was harmed by Florida's incomplete assumption application.  The application relied on a "technical assistance" process in a "forthcoming" biological opinion that was not produced until weeks after the public comment period ended.  This prevented Conservancy from fully commenting on this vital component of Florida's program.  This harmed Conservancy's ability to achieve one of its core missions—to protect listed species and their habitat—by providing EPA with its comment on the inadequacy of such an approach and the more protective options available and required.  Moreover, since the "technical assistance" process in the biological opinion was not produced until November 2020,

the 120-day review clock would have run through March 2021, well into the next Presidential

administration where many bad environmental decisions were stalled, reversed, or revised.

24.     Once Florida was allowed to assume the 404 program, it restarted the review

process for all applications received from the Corps.  This meant Conservancy was forced to re-

engage in our advocacy on pending 404 permits of concern to us, but now all at once.  In

addition to ensuring that our existing comments were forwarded to the State, we also had to

submit new comments to the State for each 404 project impacting our mission, tailored to the

specifics of the new program.  Since then, because applications for many projects Conservancy

has been engaged on for years were submitted or transferred at around the same time, those

projects landed on a similar review schedule for the expedited state process, requiring us to

monitor developments on the permit applications all at once, rather than if the permits had

remained on their own natural timeline under the Corps' jurisdiction.  As a result, we are

continuing to divert staff time from other important local and state matters affecting species and

water quality to keep up with the state 404 process.  This includes reassigning a substantial

amount of several employees' job duties.

25.     In addition to troubling projects progressing along the same state timeframe,

applications are being processed more quickly than under the Corps' 404 program.  The State's

expressed goal in assuming 404 authority was to streamline and expedite permitting.  The

quicker processing times means the Conservancy has less time to try to obtain project

information, review and analyze the information, and voice concerns.  For instance, over the

course of several years, Conservancy opposed several projects in eastern Lee County and eastern

Collier County, including those that at the time were part of the proposed Eastern Collier

Multiple Species Habitat Conservation Plan (HCP) that was being considered by the U.S. Fish

7

and Wildlife.  Projects that comprised the HCP were transferred or submitted to the State upon

404 assumption, as well as major projects across the county border in eastern Lee County.

Under the State's program, these projects are being processed at a much quicker pace that makes

the Conservancy question whether the impacts are adequately being considered as compared to

our experiences under the federal program.

26.     In this shorter period of time, Conservancy also has to divert considerable staff

time in order to monitor and obtain information about projects as compared to under the Corps'

404 program.  First, as explained more fully below, Conservancy no longer has the analyses

available under NEPA and ESA while the State implements the program.  In addition, it is

incredibly difficult to obtain project information under the State's program.  The State's main

database for collecting project information, Oculus, is incredibly difficult to navigate and often

has little information available, especially as to a project's impacts to species.  Therefore,

Conservancy has dedicated a significant amount of resources to tracking the State's "Oculus"

search engine to figure out where and how to access 404 application documents.  Even when

records are available, frequently it is unclear what each document is for, who the author is, or

even whether a particular document is a final or a draft.  This requires the Conservancy also to

have to contact the State via phone and email to ascertain what various documents found in

Oculus mean.

27.     Under the State's program, Conservancy's ability to comment on a permit

application is also significantly hindered.  Despite the State's recent draft annual report

applauding its online public commenting system as encouraging comments, in reality the

system's design has had the opposite effect.  As a core part of Conservancy's work, Conservancy

has expertise and designed strategies for submitting public comments on its behalf and on behalf

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-5CB24385A15E

of its members.  DEP's system is burdensome because it requires members of the public to register for an account through a multi-step registration process, as opposed to simply accepting public comment sent via email or a one-click online docket.  In our experience, the longer and more cumbersome a process is, the less likely members of the public are to complete the process and post a comment.  And because of Florida's system, Conservancy has had to expend still more time and divert more resources to develop new strategies to comment in an accessible way and to encourage its members and try to facilitate their ability to comment in a meaningful way.

28.     To make matters worse, under the State program public notices are often issued without much, if any, detail on the impacts to listed species, a primary concern of Conservancy's.  In its MOA with FWS and EPA, the State said that it would complete its species review, the "technical assistance" process, prior to issuing public notices to ensure the public would have this information to comment on.  But this has not been the case.  In the public notices on projects of concern to Conservancy, not one has contained the proposed required permit conditions needed to protect federally-listed species.  Nor has Conservancy been able to obtain this information typically through Oculus.  Where Conservancy has been able to obtain information on the impacts to federally-listed species, this has typically been only after the close of the public comment period.  Again, with the lack of information provided, Conservancy must not only re-allocate staff time toward trying to obtain it or expend resources on experts to develop it, but must do so in time to attempt to comment on project applications.  Sadly, since the proposed permit conditions revealed through the technical assistance process has not been available before public notices are issued, Conservancy is greatly hindered in its mission to advocate for proper species protections.  This increase in work and required resources has

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

redirected Conservancy's resources and staff capacity that were dedicated to other aspects of the organization's core planned conservation programs.

29.     In addition to not having species related project information before public notice issuance, the State's "technical assistance" process overall has been a black box.  Whether checking Oculus or asking the State and federal agencies directly for information, there is rarely much analysis documented or publicly shared on projects pending with the State.  Without the benefit of the ESA's analyses, Conservancy is again left having to redirect staff and resources from other core work to try to assess the impact of projects on species.

30.     While attempting to obtain this information from the agencies, Conservancy has also been met with confusion by State and Federal staff who seem unclear as to their agency's duties under the "technical assistance" process.  On several occasions on different projects, Conservancy was told by Florida Fish and Wildlife Conservation Commission (FWC) that any analysis for federally-listed species would be conducted by USFWS.  USFWS, which has historically been the expert on federally-listed species, has claimed the opposite, indicating that at best they could only provide non-regulatory recommendations to the State on these species.  This has left an obvious void on who, if anyone, is actually looking at impacts to federally-listed species.  Conservancy has expended and diverted staff time in order to pressure and stay on top of both agencies to ensure one of them will consider federally-listed species.  For instance, for the Troyer mine project discussed below, Conservancy urged USFWS to review impacts to federally-listed species especially given the large scale of the mining operation and its location in the panther's last remaining habitat.  USFWS at first seemed unsure of the project's status, but later confirmed it would plan to comment, and that it would need to request additional time in order to do so.

31.     Conservancy also has concerns with the State's compliance with the requirements laid out in the "technical assistance" process. On at least one occasion, the State failed to include a permit condition required by USFWS to protect species on a project of concern to the Conservancy. Namely, in its permit for a large residential development called Fleischmann Parcel (AKA Isles of Collier Preserve), the State failed to include a USFWS required condition for the eastern indigo snake. In other instances, the State's permit conditions are vague and subject to interpretations that could lead to insufficient protection of listed species.

32.     One example of the State's concerning technical assistance process involved Babcock Property Holdings, LLC's, 404 permit application to expand its nearly 18,000-acre property development with an 8,711-acre project area located in the Tidal Caloosahatchee River Watershed. *See* Dkt. No. 031-1, at 19-20 (describing project and concerns). During the application process, the Conservancy voiced concerns over the potential harms to the caracara and the Florida bonneted bat. This project was permitted on November 19, 2021. Prior to and again after permit issuance, Conservancy voiced its concerns regarding the technical assistance process. First, FWC's final proposed permit conditions for listed species were only available a few days prior to permit issuance and well after the close of the public notice window. Further, Conservancy could not locate any information—not in the permit, not in FWC comments, and not in the public record—that assured us USFWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat for this project, or a proper analysis of whether or not take would occur, or if they adequately assessed take associated with this project. This is particularly of concern, as there are significant nesting resources for the threatened crested caracara that can be affected in the project area. The permit condition requiring the applicant to follow conservation measures to protect the caracara is only triggered "if nesting is observed"

11

even though there were documented nests within the impact area, the caracara is a non-migratory bird, and it uses its territory year-round.  The permit acknowledges an estimated take of up to five different pairs of caracara, but stops short of setting a take limit from this project.

33.     Similarly, there is also Florida bonneted bat presence that will likely be impacted by the activities for this project.  The USFWS had acknowledged that there is likely to be take of the bonneted bat as well.  *See* Attachment A (Jan. 2022 Conservancy Comments).  However, again, the permit does not assess take to Florida bonneted bat or provide a take limit associated with this project.  The State's wholly inadequate technical assistance process harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests.

34.     Conservancy is also harmed by the loss of environmental review of projects under NEPA.  This statute not only provides more scrutiny for water resources, species, and their habitat, but also provides the Conservancy with vital information to vet the impacts of a proposed project and additional opportunities for public comment.  In order to carry out our mission of protecting species and wetlands, we are now obligated to hire our own experts or divert significant staff time to engage in alternatives analyses, again draining our resources that would go elsewhere.

35.     The NEPA review process provides Conservancy with an opportunity to engage in the Corps decision-making, which can lead to better environmental decisions, opportunities that are lost now while Florida is allowed to continue administering this 404 program.  For example, four proposed large-scale projects in Lee and Collier counties were previously subject to NEPA, under which an environmental impact statement ("EIS") was determined to be required.  As a result of this decision, two of the applications – which would have impacted over

9,000 acres – were either suspended or withdrawn.  These projects are now under consideration

by FDEP for State 404 permit without the benefit of a NEPA EIS review; Old Corkscrew

Plantation (Kingston), Troyer Mine, and FFD were three of the four project areas considered in

the former Army Corps determination.  *See* Dkt. No. 031-1, at 235 (Exhibit P, correspondence

between permit applicants and the Corps documenting the EIS as the reason for

withdrawal/suspension).

36.     The loss of critical information and procedural safeguards afforded by NEPA has

significantly set back our established methods of advocating for and protecting water resources,

species and their habitats, and as the pending 404 project applications discussed above

demonstrate, these losses will continue to occur while Florida administers the 404 program.

37.     Furthermore, Conservancy has challenged 404 permits in federal court as one of

our advocacy tools to further our mission, and we are harmed by the loss of federal court as a

venue when permits are issued by the State.  Litigating in federal court provides us with the

necessary access to protect the interests of our organizational mission and our members.  We do

not have the same access to state courts because of the significantly higher costs of state court

litigation and the anticipated drain on our resources to litigate at the state level.

38.     With assumption, there is now an entirely different legal scheme to challenge

wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").

Because legal proceedings in front of DOAH are conducted from scratch and are not treated as

administrative record review cases, Conservancy would have to incur considerable expense to

hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of

dollars to retain on a case, which is thousands of dollars Conservancy would have to divert from

other programmatic goals in order to litigate in state court. This also means that Conservancy may be restricted from challenging 404 permits.

39. Conservancy also certainly will not be able to utilize the same tools as it had under the federal regime. In state administrative proceedings, we do not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes affords. Rather, in state court, we have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses. A case before Florida's Division of Administrative Hearings ("DOAH") can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time. With our limited budget, one permit challenge in state court could eat up a significant portion of the policy department's budget. In order to engage in such costly litigation we would have to 1) raise additional money to fund these challenges, 2) pull funds from other areas within our existing operating budget, or 3) forego certain litigation, as funding is not included in our budget. All three options would damage our ability to carry out our mission.

40. It is my understanding that Conservancy would also risk exposure to a mandatory "fee-shifting" provision in which we risk being liable for the costs and fees to engage in litigation, costs, and fees that we would not automatically be subject to if we retained the ability to litigate in federal court. Such a fee-shifting provision further diminishes our ability to engage in litigation, because we are required to weigh this financial risk in addition to the above costs, regardless of how strong our claim might be.

41. It is also my understanding that it would be significantly harder for Conservancy to even bring a permit-specific lawsuit for environmental harms on behalf of our members,

because we would be required to show harm to a significant number of our members under Florida law, rather than to just one member under federal law.

42.     The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that are felt personally by me as a member of Conservancy and a long-time resident of Naples. I regularly partake in outdoor activities such as hiking, camping, observing wildlife, and nature photography. Some of the areas that I like to visit include, but are not limited to, Big Cypress National Preserve, Fakahatchee Strand Preserve State Park, Picayune Strand State Forest, Collier Seminole State Park, Florida Panther National Wildlife Refuge, Corkscrew Regional Ecosystem Watershed's Corkscrew Marsh, Bird Rookery Swamp and Flint Pen Strand, Corkscrew Swamp Sanctuary, Stormwater Treatment Area 5, Babcock Ranch Preserve, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild Wildlife Management Area, and county owned conservation properties such as those in Collier and Lee counties.

43.     If Florida is allowed to continue operating this unlawful 404 program, Conservancy would be irreparably harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

**<u>Organizational and Membership Harms From Pending Project Application</u>**

44.     The Conservancy is particularly concerned about certain permit applications before the State[1] for major projects.

---

[1] https://depedms.dep.state.fl.us/Oculus/servlet/login and
https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal.

45.     **Troyer Mine.**  According to DEP's online search portal, the Corps transferred a 404 permit application by Troyer Brothers Florida, LLC, for construction and operation of a lime rock and fill dirt mine, to the State, in state application number 0292013007.  The proposed project includes the extraction of approximately 256,000 cubic yards of crushed lime rock from the project site.[2]  The project was withdrawn March 1, 2022 and later resubmitted March 31, 2022 with the state application number of 0292013008.

46.     Troyer Mine would cover 1,803.51 acres and would affect waters that are part of the Big Cypress Swamp Watershed.  The project site is within the consultation areas for several endangered and threatened species, including the Florida panther, bonneted bat, red cockaded woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail kite, and the Florida scrub jay.  Additionally, the site has suitable habitat for the threatened eastern indigo snake and wood stork.  Other listed species observed on the site include the bald eagle, Florida sandhill crane, roseate spoonbill, limpkin, little blue heron, snowy egret, tricolored heron, white ibis, American alligator, and Big Cypress fox squirrel.  The project is also within three wood stork colony Core Foraging Areas.  *See* Dkt. No. 031-1, at 130-153 (Exhibit G, Public Notice, Permit Application No. SAJ-2008-03793).

47.     While the application for Troyer Mine was pending before the Corps, Conservancy submitted public comments opposing the project.  *See* Dkt. No. 031-1, at 154-66 (Exhibit H).  Ninety percent of the project site is in Florida panther Primary Zone habitat, meaning it is habitat essential for the continued survival and recovery of the species.  This project site is about 90% Primary Zone and Adult Breeding Habitat for the Florida panther.  Due

---

[2] State 404 File for Troyer Mine: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_292013/gis-facility!search.

to the proposed placement of the mine between two public lands and important panther habitat, linkages will be fragmented.  Expert review prepared for the FDEP Public Notice by Dr. Robert Frakes in August 2022 identified that Troyer Mine is the major current link for panthers to access habitat east of the mine, which includes large segments of panther habitat.  Cumulatively with other proposed projects currently being reviewed by the state of Florida, about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost.

48.     Vehicular collisions are the leading cause of known deaths for the Florida panther.  Troyer Brother's proposed project would result in at least 1,160 daily truck trips to or from the site, adding heavy traffic to already deadly roadways for panthers.

49.     Troyer Mine would also likely destroy 172 acres of wetland that are part of regional flowways, or connected strands of water that comprise a wetland ecosystem within the Density Reduction Groundwater Resource Area of Lee County, a large area of protected wetlands, agricultural lands, and conservation lands.  This area includes preserved lands of Imperial Marsh Preserve, Corkscrew Regional Mitigation Bank, and Southwest Florida International Airport mitigation lands.  Wetlands in this area are critical to preserving aquifers and water supply for Lee County and surrounding areas; for example, water from rain runoff naturally flow to and re-charge the aquifers.  These wetlands also provide panther habitat.  As explained in our attached Comments (*See* Dkt. No. 031-1, at 154-66 (Exhibit H)), the mining project would likely impact evaporation rates of water supply due to seepage from wetlands into the mines, resulting in a lower water table, with the potential for adjacent wetlands to be drained as a result.

50.     For the state 404 program, within 10 days of a completeness determination, DEP must provide public notice of the proposed application, which opens a 30-day comment period

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8B59-CED34385A1FF

for most permits that is extended to the close of any public meeting, if one is held.  If EPA does not comment or signal it may comment or object, FDEP generally has 60 days from the close of the comment period (or its determination that the application is technically complete) to make a final permit decision.  If a request for additional information is issued, applicants have 90 days to respond, though, they may respond sooner.

51.     Troyer Mine went to public notice twice (on November 5, 2021, after the application was first before the State, and on July 8, 2022, after the application was resubmitted).  At neither junction were proposed permit conditions to address federally-listed species made available either in Oculus or in the Public Notice.

52.     Despite the potential impacts to listed species, including the Florida panther, the July 2022 Public Notice stated that "The Department has requested review from the Florida Fish and Wildlife Conservation Commission (FWC) and the US Fish and Wildlife Service (USFWS). FWC and USFWS contacted the Department to notify us that they did not have any comments regarding the ST404_292013-008 application."  In July, Conservancy reached out to FDEP, EPA, and USFWS with concerns about the apparent lack of technical assistance.  At first, USFWS was uncertain as to their review status and the status of the project.  Later, USFWS staff stated that (contrary to the public notice) their technical assistance was not yet complete, and that the agency would request more time to review this large project.  The USFWS stated that they had started to work on terms and conditions, but that these were never sent to the State.  We are concerned that this important project may well have slipped through the cracks if not for our advocacy.

53.     If the Troyer Mine permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8B59-CED34385A1FE

costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law. Conservancy will also be harmed from not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA.

54.     In addition to harming Conservancy's organizational interests, the Troyer Mine project would be located approximately three and a half miles away from the public lands I enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp, and observe the wildlife listed above. Panthers require huge swaths of territory for roaming, foraging, and breeding, can have ranges over 200 square miles, and can travel 12 or more miles a day. I visit Corkscrew for a near-annual camping trip with friends, and I plan to return here as often as possible. Environmental harms from Troyer Mine, including harms to essential species habitat, would negatively impact my ability to enjoy these lands and observe wildlife.

55.     **Rural Lands West.**  According to FDEP's online search portal, the 404 permit application for Rural Lands West was transferred to the State, in state application number 0396966001.[3]  Interestingly, Corps personnel advised Conservancy that this 404 application was transferred to the State as of December 21, 2020, a day before EPA published notice of its approval of the state program.

---

[3] State 404 File for Rural Lands West:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396966/gis-facility!search.

56.     Collier Enterprises Management, Inc., seeks this permit to develop approximately 4,000 acres in the Big Cypress Drainage Basin. This drainage basin includes critical wetland ecosystems such as Shaggy Cypress, Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand, which are proximate or downstream to this proposed project. Rural Lands West is a project to clear, grade, excavate, dredge, and fill to construct and maintain a mixed-used development consisting two golf courses; a commercial town center; an elementary, middle, and high school; and residential neighborhoods with roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure. The project would discharge 196,217 cubic yards of fill into 98.25 acres of jurisdictional wetlands and 1,360 cubic yards of materials into 0.68 acre of isolated wetlands in the watershed for the Big Cypress Drainage Basin. Approximately 27,820 cubic yards of materials would be discharged into 13.90 acres of remnant farm-field ditches. The project also would dredge/excavate approximately 2,951,250 cubic yards of native materials from 197.45 acres of jurisdictional wetlands and 16,500 cubic yards of material from 1.1 acre of isolated wetlands. *See* Dkt. No. 031-1, at 167-173 (Exhibit I, Public Notice).

57.     While the Rural Lands West application was pending before the Corps, Conservancy submitted comments in opposition to the project. *See* Dkt. No. 031-1, at 174-204 (Exhibits J and K). Conservancy owns 1.4 acres of land for conservation purposes that are approximately 1.5 miles away from Rural Lands West, and another 26 acres of land within 3 miles of the project.

58.     The project would result in approximately 10,000 new residents arriving to the area and would impact over 300 acres of wetlands. The project falls within important regional flowways and ecosystems.

59.     Regarding water resources, we additionally raised concerns that Rural Lands West would be in an impaired water body that does not meet water quality standards, particularly for nutrients or where nutrients are the pollutant.  Conservancy asked federal agencies for better hydrological analysis of the impacts of this project on downstream and adjacent wetlands.

60.     As stated in the comments Conservancy submitted to the Corps in opposition to this project, there would be 4,000 acres of impacts to panther habitat, with 75% of the project in the Primary Zone habitat.  A substantial amount of the project is also in panther Adult Breeding Habitat.  The Rural Lands West project was part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan that was being considered by the USFWS from 2010-2022 for which the Conservancy opposed, in part, due to loss of panther habitat from projects like Rural Lands West.  A draft Biological Opinion showed a statistically significant reduction in panther population viability if Rural Lands West and the other development envisioned in the HCP, such as Bellmar and Hogan West (AKA Brightshore), were approved.

61.     The Conservancy obtained expert review by Dr. Robert Frakes, who conducted an analysis of Rural Lands West in September 2022.  He found that Rural Lands West, in combination with Bellmar, would result in direct and indirect destruction of 5,680 acres (23 square kilometers) of Adult Breeding Habitat.

62.     In April 2022, Conservancy submitted comments asking the State to elevate this application as a project with a significant degree of public interest to hopefully ensure a public hearing would be provided, given the size, potential effect ton environment or public, controversial nature, and the location within the panther's primary zone habitat, bonneted bat's critical habitat, and wood stork's Core Foraging Areas.  *See* Attachment B.

63.     If the Rural Lands West permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  Conservancy will also be harmed from not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA.

64.     I would also be personally harmed by the Rural Lands West development.  I regularly hike the public trails at the Florida Panther National Wildlife Refuge.  The Refuge boundary is about four miles from the project site, and I plan to return as often as possible. Environmental harms from the Rural Lands West development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.

65.     **Bellmar Development.**  Collier Enterprises Management, Inc., applied to develop a mixed-use community that would cover about 1,700 acres within the Big Cypress Drainage Basin.[4]  This drainage basin includes critical wetland ecosystems such as the Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand which are proximate or downstream to this proposed project.  The project would impact about 130 acres of wetlands.

66.     In October 2021 and September 2022, Conservancy submitted comments discussing the shortcomings of the alternative and cumulative impact analyses for Bellmar.  *See* Attachment C (September 2022 Comments).  Conservancy explained that the project would have

---

[4] 404 File for Bellmar Development: https://prodenv.depStatel.us/DepNexus/public/electronic-documents/ST404_396364/gis-facility!search.

unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources. As it is located within a flowway and key wildlife corridor, it would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR). It is also apparent that this project will cause jeopardy to listed species due to habitat loss, infringement of wildlife corridors, indirect impacts on adjacent preserves, and impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

67.     The Bellmar project is proposed completely within 100% Primary Zone habitat for the Florida panther, and about 80% of the site is Adult Breeding Habitat for the panther as well. The Bellmar project was part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan (HCP) that was being considered by the US Fish and Wildlife Service from 2010-2022 for which the Conservancy opposed, in part, due to loss of panther habitat from projects like Bellmar. A draft Biological Opinion showed a statistically significant reduction in panther population viability if Bellmar and the other development envisioned in the HCP, such as Rural Lands West and Hogan West (AKA Brightshore), were approved. *See* Attachment C (Conservancy Comments).

68.     The Conservancy hired an expert, Dr. Robert Frakes, to conduct an analysis of Bellmar and, in combination with Rural Lands West in response to the FDEP Public Notice. He found that these two projects would result in direct and indirect destruction of 5,680 acres (23 square kilometers) of Adult Breeding Habitat.

69.     The project would likely impact lands that are part of the Florida Panther National Wildlife Refuge, where I love to regularly visit and recreate and plan to continue regularly visiting.  Conservancy also owns property about 3 miles from the proposed project site.

70.     Bellmar went to public notice on August 16, 2022.  As common in the State's public notices, there were no proposed permit conditions for listed species despite the findings that the project "may affect" and was "likely to adversely affect" the panther, bonneted bat, and eastern indigo snake.  In fact, the notice merely says that the agencies would "work with" the applicant to determine "any necessary permit conditions."  *See* Attachment D (Public Notice).

71.     On November 9, 2022, EPA stated they had no comments on the project.

72.     In 2021 and throughout 2022 and in its comments, Conservancy raised its concerns the need for traffic analyses for this project which were necessary for proper review. The State issued the Public Notice for Bellmar despite the USFWS asking in a RAI for the traffic information to be submitted, but the applicant did not provide the requested specific information. The State eventually informed Conservancy that they would request this information and that it would also hold a public hearing after receipt of the information as a last step before granting or denying the permit.

73.     In January 2023, the applicant's proposed permit conditions were submitted for review.

74.     The State has informed Conservancy that a public hearing will be set within the next couple of months.  There appears to be no further outstanding issues regarding this application before the State and a permit could issue shortly after such public hearing.

75.     Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly State procedures (including

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

restrictive standing requirements, costly litigation requirements because of the need to retain

expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not

comparable to the processes or remedies available under federal law.  Conservancy will also lose

access to information about the project that would have been provided under NEPA and Section

7 of the ESA.

76.     **Immokalee Road Rural Village (IRRV)**.  27th/Pico Boulevard Limited

Partnership seeks to construct a mixed-use residential and commercial development over 2,780

acres in Collier County (application #396348-001), which would approximately result in the

discharge of 159,091 cubic yards of fill material into 32.87 acres of wetlands and 1,942,195

cubic yards of fill material into 200.64 acres of other surface waters.  The project would also

involve the excavation of approximately 179,241 cubic yards of material from over 11 acres of

wetlands.  The site is within the USFWS designated Focus Area for the Florida panther and is

within the USFWS designated consultation area for the crested caracara.  Conservancy sent a

letter seeking consideration and action on the severe panther roadkill hotspot adjacent to this

project.

77.     The IRRV project is situated near the conservation lands of Bird Rookery Swamp.

The project is located within the consultation area for the Everglade snail kite, Florida scrub-jay,

Florida bonneted bat, red cockaded woodpecker, eastern indigo snake, wood stork, Audubon's

crested caracara, and the Florida panther; there are a number of state-listed species also in the

area.  The applicant's field survey documented at least 110 gopher tortoise burrows on site, and

bonneted bat calls on the site.

78.     In April 2022, Conservancy submitted comments flagging this project to the State

given the size, potential effects on environment or public, controversial nature, and the location

within the panther's primary zone habitat (675 acres within primary zone and 344 acres within adult breeding habitat) and wood stork's Core Foraging Areas. *See* Attachment B.

79.     In October 2022, Conservancy again submitted comments voicing concerns over the project in response to materials submitted by the applicant. *See* Attachment E.

80.     If the Immokalee Road development permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.

81.     I would also be personally harmed by the Immokalee Road development. I like to hike at Corkscrew Swamp Sanctuary and Corkscrew Regional Ecosystem Watershed Bird Rookery Swamp. The Sanctuary is about two miles from the project site, and Bird Rookery even closer, essentially across the street from IRRV. I plan to return as often as possible. Environmental harms from this development project threaten my ability to enjoy these natural areas, hike, and observe wildlife. Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

82.     **Old Corkscrew Plantation Mine (AKA Kingston)**. Cameratta Companies is pursuing this large-scale development project that would span over 6,671 acres. It had an active 404 permit application in 2011, which was withdrawn after the Army Corps determined an EIS under NEPA was necessary, and now is being considered under application #0423130-001. The project already received its ERP for mining from FDEP in 2011, and now is being considered by the State for a new ERP consistent with this application. Much of the project is panther habitat,

including Adult Breeding Habitat, and the project also contains Florida panther Primary Zone

habitat.  The applicant would add 95,000 additional trips per day.  Expert review by Dr. Robert

Frakes in August 2022 identified that Old Corkscrew (AKA Kingston) would have a substantial

impact cumulatively with other proposed projects Troyer Mine and FFD; about 7,400 acres (~30

square kilometers) of Adult Breeding Habitat will be lost directly and indirectly with these three

projects.

83.     The following species have been previously documented on site, including crested

caracara, Everglades snail kite, wood stork, Florida panther, Florida sandhill crane, little blue

heron, roseate spoonbill, Big Cypress Fox squirrel, and Florida black bear.  The project also

contains Core Foraging Area for four wood stork colonies.  This project would also be

approximately one and a half miles away from the public lands I enjoy, namely, the Corkscrew

Regional Ecosystem Watershed lands where I regularly hike, camp, and observe wildlife.

84.     Further demonstrating the harms discussed above and below, here are additional

applications before the State that Conservancy has been monitoring and has already engaged in:

a.  **Hogan West (AKA Brightshore)**.  Barron Collier is seeking a permit

(application #0405559-001-NPR, 0405559-002-SFI) for this project that would convert

habitat to approximately 2,300 homes and commercial development.  Of the 640-acre site,

about 210 of those acres are Primary Zone panther habitat and the remainder is Secondary

Zone panther habitat.  A draft Biological Opinion showed a statistically significant reduction

in panther population viability if Hogan West and the other development envisioned in the

HCP, such as Rural Lands West and Bellmar, were approved.  The project sits within the

Corkscrew Swamp wetland ecosystem and adjacent to the Poggie Strand.  In October 2021,

we notified the State and the federal agencies that the applicant was attempting to receive a

verification of a no permit required (NPR) determination.  We did not receive a response.

However, sometime thereafter, the project was resubmitted as an Individual Permit.  I am

concerned that the NPR may have been granted if not for our advocacy.  Conservancy will

continue to monitor this project due to its potential impacts to the panther.

b.  **FFD (AKA Orchid)**.  FFD Land Co., Inc. is seeking a State 404 permit for a

large scale development in Lee County (application #0291030-004-SFI).  The application

would result in over 550 acres of impact to Primary Zone panther habitat and 1,370 acres of

Adult Breeding Habitat directly.  Expert review by Dr. Robert Frakes in August 2022

identified that with FFD, cumulatively with other proposed projects currently being reviewed

by the state of Florida for Troyer Mine and Old Corkscrew Plantation (Kingston), about

7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost.  *See* Attachment

F (June 2022 Conservancy Comments).

85.  Conservancy has also identified and has been monitoring project developments

that will likely need a 404 permit in the future:

a.  **State Road 29.**  This is a project to widen State Road 29 in Collier County, and it

is already beyond the beginning stages of the planning process with the Florida Department

of Transportation.  The State Road 29 project encompasses Florida roadkill hotspots that

threaten panthers, and it is adjacent to the public lands of Big Cypress National Preserve and

the Florida Panther National Wildlife Refuge.  This project would be located directly

adjacent to these key public lands, where I enjoy hiking and other outdoor activities.

b.  **Wilson-Benfield Road.**  This is a project to extend a major roadway in Collier

County, and it would be within or adjacent to the Picayune Strand State Forest.  The

Picayune Strand provides habitat for numerous species, including the wood stork, red

cockaded woodpecker, Florida black bear, Florida panther, and others.  This roadway may impact important downstream resources, fragment wildlife habitat, and alter hydrological connections.  This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects.  Collier County is currently engaged in the alignment selection process.  I live about 1.5 miles way from this project area, and enjoy recreation, such as hiking and wildlife observation, in the Picayune Strand State Forest and plan to continue doing so as often as I can.

     c.  **I-75 Interchange near Everglades Blvd**.  This is a project to construct a new interchange on I-75 in Alligator Alley.  An interchange in this area would increase development in Golden Gate Estates and the Rural Lands Stewardship Areas.  These areas provide habitat for wildlife such as Florida black bears and Florida panthers, among other species.  This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects.

     d.  **Eden Oak Development**.  This is a project to develop a 55-home community on 306 acres along the Caloosahatchee River.  The project was previously pending with the Corps starting in 2012, it would have impacted at least 35 acres of mangrove and salt marsh, and it was within smalltooth sawfish critical habitat and Florida manatee critical habitat.  The wetlands within this site were recognized by agencies as Aquatic Resources of National Importance.  The developer has an active application for development at the local level.  We

do not know definitely yet, as no 404 application has been submitted, if this project would be in solely assumed waters that would be processed by FDEP or if the project would be retained by the Army Corps.

86.      A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Conservancy's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress Conservancy's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of February, 2023.



Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF AMBER CROOKS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Amber Crooks, make the following declaration:

1.      I am a resident of Naples, Florida.

2.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.      I submitted a declaration in support of Plaintiffs' Motion for Partial Summary Judgment on March 5, 2021, Dkt. 031-1, and a second declaration in support thereof on May 24, 2021, Dkt. 043-1.  I submitted another declaration in support of Plaintiffs' Motion for Summary Judgment on February 28, 2023.  Dkt. 98-1.  I am providing this supplemental declaration to provide updates on events that have transpired since my last declaration regarding particular projects and in response to factual matters raised by Florida, including in the Declaration by Justin Wolfe, Dkt. 102 and 102-1.

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D89F31A25C

4.    **Available Information**:  I have been an environmental advocate in Florida for over 15 years.  As I previously stated, it is incredibly difficult to obtain meaningful project information under the State's 404 program.  While there are several *access methods* available online to try to obtain public documents regarding pending 404 applications (Oculus, Information Portal, Permitting Information Database and ARCGIS Mapping Tool), all of these lead to the same pot of information.  And that pot of information is lacking.  The available information contains primarily submittals by the applicant.  I rarely, if ever, see agency factual determinations on whether the permit complies with the regulations' requirements, permit conditions negotiated with the applicant, or agency assessments of the applicant's alternatives analysis (and whether it is reliable).

5.    This is of specific concern for our work, because obtaining the types of information we need to understand the impacts of projects on listed species and their habitat is central to our mission.  That information would include state or federal agency analysis of impacts to species, determinations of necessary conditions and conservation measures based on the analyses, assessments of take and jeopardy, and discussion of take triggers.  Dkt. 98-1, at 9-10 (discussing that this information is missing from the publicly available files, that technical assistance is not completed in a transparent way, and that when this information may be obtained it is typically after the close of the public comment period harming our ability to advocate for necessary protections).  In other words, I do not usually find anything in the files that tells me what the Florida Department of Environmental Protection ("DEP") and the wildlife agencies are doing with that information to make *their* decisions or any analysis of the applicant-submitted information.  For instance, the applicant submits a biological assessment, but I cannot find information on how the agencies use it to form their own decisions.  Or, the applicant submits

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D89F31A25C

information on an alternatives analysis and cumulative impacts, and there are no documents to indicate what DEP does with those documents (analysis, reliance, etc.).  In addition, for the projects I monitor, I have yet to find agency documents containing environmental information comparable to what an environmental impact statement or environmental assessment would contain under NEPA.

6.     Though biological opinions are not produced for every 404 permit, most of the projects the Conservancy monitors and has concerns over typically trigger Section 7 consultation under the Endangered Species Act, when those types of projects are processed under the Corps' program because of their impacts to imperiled species.  For instance, the following projects discussed in my prior declaration were subject to or would be subject to receiving a biological opinion: Troyer Mine, Rural Lands West development, Bellmar development, Immokalee Road Rural Village development, Old Corkscrew Plantation (AKA Kingston) development, Hogan West development, and FFD development, *see* Dkt. 98-1, at 16-28.  This is unsurprising considering it is typically the larger scale developments that pose the most threats to listed species and their habitats and are therefore of most concern to Conservancy and to me.

7.     I recently reviewed the same database (Environmental Conservation Online System) to review issued biological opinions that Justin Wolfe discusses in his declaration.  Dkt. 102-1, at 9-10.  In addition to missing opinions from 2022 and 2023 as he mentions, depending on which dropdown choices you select (like selecting the Florida Field Office), the query function may not always include the Florida panther.  Therefore, many biological opinions for the Florida panther (e.g. WildBlue development, Argo Manatee development, Corkscrew Farms/the Place development, with which I am familiar because the Conservancy tracked these major developments) appear to be missing from Enclosure C provided by Mr. Wolfe.  That may

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D89F31A25C

mean that he underestimated the amount of Biological Opinions occurring in assumed waters. The EPA's Biological Evaluation acknowledged that a small number of species make up a majority of the consultations.  Notably, the Florida panther and Florida bonneted bat (another species that occurs in assumed waters here in southwest Florida) make up a large number of these reviews.  The Biological Evaluation depicts Southwest Florida as a hotspot for ESA consultations.  Finally, the database that Mr. Wolfe relies on in his declaration would also not reflect several biological opinions that had been under consideration by the Corps (such as for transferred projects) but were never completed.  Those opinions collectively covered thousands of non-coastal acres that would have received biological opinion-level analysis.

8.     **Take of Listed Species**.  Since Florida's implementation of the 404 program, the Conservancy has been unable to track take that is occurring in Southwest Florida from Florida's program cumulatively as a whole because no biological opinions are being produced for projects in assumed waters.  For the projects of interest to the Conservancy, we have not seen details of take analysis or take authorization, even when take seems likely.  The Conservancy is especially concerned with tracking take for the listed crested caracara, Florida panther, smalltooth sawfish, and Florida bonneted bat.  More importantly, because the programmatic biological opinion's incidental take statement does not identify the amount or extent of incidental take that is authorized for these species for Florida's implementation of the program, the Conservancy can also not determine if or when the authorized amount of take has been exceeded for these species or ensure the agencies reinitiate programmatic consultation when it is exceeded.  This means the Conservancy's mission to advocate on behalf of and seek protections for these species is gravely impaired.  Given the lack of information about the technical assistance process and vagueness of the reasonable and prudent measures and implementing terms and conditions in the ITS, the

Conservancy cannot monitor compliance with these processes and conditions.  This likewise harms the Conservancy's mission and members who seek to protect listed species in Southwest Florida.

9.      **Access to Courts**.  I previously referred to the fee shifting provision whereby attorney's fees are required to be assessed against the non-prevailing party in state court.  The potential risk of being responsible for paying an opposing party's fees, including not only the agency being sued, but also any third parties that have intervened, is a serious consideration for organizations contemplating a legal challenge, including the Conservancy.  As an example of some of the monetary considerations associated with suits where fee shifting applies, the Conservancy need look no further than our litigation against Collier County and Collier Enterprises Management over the Rivergrass Development Order (Conservancy of Southwest Florida, Inc., Plaintiff, v. Collier County, Florida and Collier Enterprises Management, Inc., Defendants.  Case No:  11-2020-CA-000780-0001-XX).  While no party has yet prevailed in this litigation, the trial court has determined amounts of fees previously incurred that, if the Conservancy were to lose, the Conservancy would have to pay Defendants.  The Conservancy disputes the constitutionality of the fee shifting provision to which that specific case is subject.  And the Conservancy has not lost the case, which has been remanded to Collier County Circuit Court for additional proceedings.  Therefore, these numbers are provided only to demonstrate the *potential* significant financial risks associated with challenges that require losing parties to pay prevailing party fees.  Specifically, the trial court found that Defendant Collier County would be entitled to fees of $118,142.45 and that Defendant Collier Enterprises Management would be entitled to fees of $2,381,436.88.  This is illustrative of the financial risk that *could* be associated with losing under a fee shifting provision.

10. **Current Status of DEP's 404 Program**.  Upon reviewing the Declaration by Justin Wolfe, Dkt. 102-1, at 2-3, I noticed that in his description of Florida's program activities since implementation there were several important updates not provided.  This includes three separate letters from EPA raising concerns about Florida's implementation, which I have reviewed and attached here.  Exhibit A Combined RAI Letters; Exhibit B Annual Report Letter. In addition, as to the denied applications he mentions, Dkt. 102-1, at 3, based on my review of data from Oculus, all permit denials were because of non-responsiveness to a request for further information and the applicant was instructed that they could resubmit their application without prejudice.  As to no permit required requests, almost exclusively, DEP denied the requests for non-responsiveness to DEP's request for additional information or due to a lack of information sufficient to determine no permit is required.

11. **Bellmar Development.**  On or around May 9, 2023, Conservancy saw correspondence from U.S. Fish and Wildlife Service that their final comments would be provided to DEP by the end of May for this mixed-use community that would cover about 1,700 acres within the Big Cypress Drainage Basin.  DEP also stated they plan to hold a public hearing once this information is obtained.  After that, we fear the permit will be issued, as there appears to be no other outstanding issues before the State.  As explained in my prior declaration, this project is of particular concern and would have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources.  This includes jeopardizing the Florida panther and resulting in take of this species and others.

12. **Troyer Mine.**  Based on documents that are available through DEP's publicly assessable databases, there has been no request for additional information (RAI) from DEP since April 29, 2022.  On June 3, 2022, Troyer provided a response document.  Under DEP's rules,

applicants have 90 days to respond to an RAI.  There has been no request for extension by the applicant nor a subsequent RAI from DEP that I have been able to locate on Oculus.  The Declaration of Justin Wolfe however indicates that DEP is still waiting on a response to an RAI. Dkt. 102-1, at 9-10.

13.     **Eden Oak Development**.  Conservancy has been monitoring this project because it will likely need a 404 permit in the future.  Given a recent zoning denial at the local Lee County level, the applicant cannot submit the same or similar project for at least one year.  We will continue monitoring any future development proposals on this parcel.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of May, 2023.

DocuSigned by:

*Amber Crooks*

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102