**EXHIBIT 5**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

<u>**DECLARATION OF ANDREW CARTER**</u>

I, Andrew Carter, make the following declaration:

1.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

2.      I have a Ph.D. in Environmental Science and Policy from the Abess Center for Ecosystem Science and Policy at the University of Miami, a J.D. from the University of Miami School of Law, an M.A. in Marine Conservation and Policy from Stony Brook University, and a B.A. in Anthropology and Geography from Hunter College.

3.      I am Director, Conservation Policy at the Center for Conservation Innovation at Defenders of Wildlife ("Defenders") and work in Defenders' national headquarters in Washington, D.C.

4.      At Defenders' Center for Conservation Innovation I research and analyze conservation governance strategies and emerging policy issues to preserve biodiversity and promote habitat and species protection, and lead analysts carrying out that work.  The scope of

my work is nationwide, rather than being trained on one particular region.  I have been at Defenders since 2019.

5.      Founded in 1947, Defenders is a 501(c)(3) nonprofit membership organization with six regional offices throughout the country.

6.      Defenders' mission is to protect species and the habitats upon which they depend. In doing so, we focus on preserving the health of our nation's rich biological heritage (biodiversity).

7.      Defenders works to achieve its mission by various means such as policy development, litigation, research, education, and engagement with federal, state, and local governments.

8.      Habitat and biodiversity loss are disrupting ecosystems and breaking down the natural barriers that help reduce disease transfer and provide critical ecosystem services such as pollination, water filtration and carbon sequestration.  With these services at risk, protecting our wildlife and their habitats is now more important than ever.

9.      More than one-third of our country's threatened and endangered species live exclusively in wetlands, and almost half of these imperiled species use wetlands at some point during their lives.  Unfortunately, the United States has lost over half of the wetlands in the lower 48 states.

10.     Preventing or minimizing water pollution is critically important to protecting marine and aquatic species, as well as species like many birds that rely on healthy wetlands for food and shelter.

11.     To that end, Defenders engages in advocacy, including litigation, to protect imperiled marine/aquatic and other species, and their habitats, including wetlands.

DocuSign Envelope ID: 6975EZE3-7183-43E4-8232-5CA23AE6EFFA

12.     On a national scale, every species Defenders works to protect is an important species in the web of life.  Wildlife has the greatest chance of being secure and thriving if it is supported by a transnational network of conserved public and private lands, rivers and coastal waters, core natural areas, and working landscapes.

13.     We approach our work at Defenders with the understanding that local actions have national consequences.  For instance, in 2020 I coauthored a paper with two coworkers addressing the need for a monitoring policy framework for the United States Endangered Species Act ("ESA").  Megan Evansen et al., *A Monitoring Policy Framework for the United States Endangered Species Act* (2020).  The U.S. Fish and Wildlife Service ("USFWS") is in dire need of a comprehensive national monitoring policy in large part because many listed species have ranges spanning multiple states.  Individual state decisions affecting these species in their respective states will affect the likelihood of a species' future existence as a whole.  A standardized national monitoring policy is necessary to prevent siloed policymaking and enhance the species' likelihood of survival overall.

14.     Defenders has joined other conservationists to achieve our goal "30 by 30," which aims protect at least 30% of the planet by 2030.  Integral to that goal is ensuring species and habitat conservation in Florida. In 2021, President Biden signed an executive order setting that goal for the federal government.

15.     To address the larger issue of biodiversity loss, we at Defenders also engage with communities across the country to protect public lands, restore habitat, limit negative interactions between humans and wildlife, and advocate for protections for imperiled species.  Engaging in Florida-based issues is a part of our national strategy because it is a critical piece in the nationwide puzzle of biodiversity preservation.

16.     Florida has a large number of species designated as threatened or endangered under the ESA.  According to Service data, approximately 132 threatened or endangered species are found in Florida, with about 70% of those species found only in Florida, such as the endangered Florida panther, Florida bonneted bat, and Florida key deer.

  

Florida Panther. Photo courtesy of NPS / Rodney Cammauf    Florida Bonneted bat. Photo courtesy of Gary Morse    Florida Key Deer. Photo courtesy of NWF

17.     Florida habitat is also home to populations of imperiled species whose ranges span beyond Florida.  For instance, many threatened red knots use Florida as their midpoint to land and refuel during their migration to their Arctic breeding grounds from as far south as Argentina.



Red knot. Photo courtesy of FWS/Anne Marie Morrison

18.     Some threatened West Indian manatees are known to migrate north to Georgia, South Carolina, and North Carolina or west into Alabama and Louisiana.



West Indian Manatee. Photo courtesy of NOAA

19.     Several species of ESA-listed sea turtles, too, can be found in Florida in addition to coastal areas of other states.  For example, the threatened Northwest Atlantic Ocean Distinct Population Segment of the loggerhead sea turtle nests primarily along the Atlantic coast of Florida, South Carolina, Georgia, and North Carolina, and along the Florida and Alabama coasts in the Gulf of Mexico.  Endangered hawksbill sea turtles occur in states along the Gulf of Mexico, especially in Texas, and in the United States, their nesting is limited to the southeast coast of Florida and the Florida Keys.



Loggerhead sea turtle. Photo courtesy of Wexor Tmg          Hawksbill sea turtle. Photo courtesy of Kris Mikael Krister

20.     Given Florida's importance to achieving Defenders' national mission, projects of mine that are national in scale can require me to work on issues that occur in Florida, such as by reviewing ESA section 7 consultation documents and ESA section 10 habitat conservation plans.

21.     EPA's approval of Florida's application to assume control of section 404 permitting undermines Defenders' mission.  Among other failings, EPA approved the program with Florida not committing any new financial resources to administer it; it has no lawful plans to ensure that listed species are adequately protected, and analyses of section 404 permit applications issued by Florida will no longer include review under the National Environmental Policy Act ("NEPA") or consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers instead.

22.     Many listed species are likely to be adversely affected by projects permitted through Florida's section 404 program.  For example, these projects can cause habitat destruction and fragmentation for endangered Florida bonneted bats, red-cockaded woodpeckers, Florida panthers, and Florida salt marsh voles, as well as threatened American crocodiles and Eastern indigo snakes.  Florida's program does not adequately protect against these harms, in part because it does not require consultation under Section 7 or a habitat conservation plan under Section 10 of the ESA.



Red-cockaded woodpecker. Photo courtesy of Martjan Lammertink

Florida salt marsh vole. Photo courtesy of USFWS/Michael Mitchell

American Crocodile. Photo courtesy of NPS – Crocodile

Eastern indigo snake. Photo courtesy of Todd Pierson

23.     Because section 404 permit applications processed by Florida will not undergo a NEPA analysis or site-specific ESA section 7 consultation, nor will they be subject to Section 10 habitat conservation plans, these projects will likely be subject to a far less rigorous environmental review, which increases risk of harm to listed species and their habitat.

24. The state's administration of this unlawful section 404 program will also prevent Defenders from being able to monitor and engage in proposed permits to the same degree that the federal program afforded us. Without a NEPA analysis or biological opinions by federal wildlife agencies, we will not have access to the same level of information regarding a project's environmental impacts as we would for projects reviewed by the Corps.

25. The state's unlawful assumption will interfere with our ability to litigate over illegal section 404 permitting actions, when necessary. It is my understanding that there is a higher bar to establish organizational standing in Florida state court because we would be required to show that a *substantial* number of our members will be affected by the challenged action, while in federal court we are only required to show that a single member is adversely affected. As an organization with nationwide membership, it would be impracticable to make such a showing in most cases. It is also my understanding that Defenders would risk exposure to mandatory fee-shifting for certain types of permit litigation, which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. We are not exposed to this same risk in federal court, where the Corps is the section 404 permitting agency. The risk of incurring these substantial costs and fees could result in our inability to bring certain types of litigation in Florida that would cause serious harm to threatened and endangered species, even if our claims are strong.

26. Defenders was harmed by Florida's incomplete application, which failed to include a biological opinion assessing the risk to species from the program, and incidental take statement authorizing incidental harm of listed species resulting from the state program and state-issued permits. These documents were not provided during the public comment period and were completed only after the public comment period closed. Florida's application referred to a

"technical assistance" process that it said would be described in "an anticipated biological opinion"; however, the biological opinion containing that information was not part of the application, frustrating Defenders' ability to analyze and comment on the process.  Florida relied on this missing information when asserting that it complied with the Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy.  Without being able to review these documents, it was impossible for me to determine whether the state program met that criteria.  This also deprived Defenders of the opportunity to comment on, and object to, the adequacy of the "technical assistance" process articulated in the biological opinion.

27.     EPA's ultimate approval of Florida's 404 program, which does not require rigorous section 7 consultation with wildlife agencies for permits that may adversely affect protected species, and instead provides a broad exemption from incidental take liability for harm to species, imperils protected species.  USFWS' "technical assistance" process, which puts the state in the driver's seat and does not require USFWS to follow the requirements of Section 7, is not as protective as the ESA.

28.     Had EPA not deemed Florida's application complete before the "technical assistance" process was articulated in the biological opinion dated November 17, 2020, the clock to render a decision on Florida's application would have continued until at least March 17, 2021, well into the Biden administration, which very well make have taken a different view on the application as a matter of law and/or policy.

29.     The loss of procedural rights Defenders has sustained as a result of EPA's and USFWS' actions has resulted in immediate and ongoing harm while the state's unlawful program operates.  The state's inadequate 404 program causes Defenders to divert resources, threatens wetlands and wildlife, and undermines Defenders' ability to realize its mission by depriving the

DocuSign Envelope ID: 6975EZE3-7183-43E4-8232-5CA33A5E6FFA

organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

30.     Additionally, as a result of EPA's transfer of 404 authority to the state, Defenders has been harmed because its work on the proposed Eastern Collier County Habitat Conservation Plan ("Eastern Collier HCP") has not gone forward due to permit applicants withdrawing the proposed HCP. The ESA Section 10 HCP process can require rigorous planning that must account for minimizing and mitigating impacts to protected species, among other requirements, and depending on the complexity of the plan, can include requirements such as long-term monitoring to ensure the plan's effectiveness.

31.     The proposed Eastern Collier HCP was to cover approximately 152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connect the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region.  Defenders was deeply involved in working on the Eastern Collier HCP, which represents a significant focus of its Florida conservation work, with the goal of protecting species in one of the most biodiverse regions of the country.  The species at issue for this HCP included 11 federally listed or candidate species, such as the Florida panther, Florida scrub jay, and Florida bonneted bat.

32.     Defenders believes that Florida's unlawful 404 permitting program, which offers incidental take coverage through a "technical assistance" process, created less of an incentive for private developers to engage in the HCP process.  Indeed, it came to Defenders staff members' attention that landowners who were parties to the Eastern Collier HCP had been considering withdrawing from the HCP in the wake of a state 404 assumption program with much lower bars

to meet to obtain incidental take authorization and which does not meaningfully account for landscape-scale conservation.  In August 2022, the landowners did withdraw from the HCP.

33.     This represents the loss of an entire body of Defenders' work in Florida to protect endangered and threatened species in this region.  It means that Defenders has to redouble our efforts advocating for the gains that have been lost since the landowners involved in the HCP walked away.  State 404 permits will not offer the same protection to listed species as the HCP would have.

34.     The lack of NEPA and ESA site-specific consultation with Florida's 404 program and the hurdles and roadblocks to litigating in state court, as described above, would be detrimental to our ability to carry out our organizational mission of protecting wildlife.

35.     Due to my work regarding environmental governance at the national level, I am particularly concerned about state-specific actions that could have broader impacts across the country.  Allowing an unlawful 404 assumption program could spur other states to apply for and receive authority under section 404 of the Clean Water Act to administer programs that do not comply with federal law. For example, to my knowledge Alaska has begun the process of pursuing 404 assumption. Alaska has more wetland area than the rest of the United States combined, placing a significant portion of the country's biodiversity at risk.

36.     Many states, like Florida, do not appear to devote sufficient resources to assume permitting authority over dredge-and-fill operations, and should they receive that authority, wetlands degradation and its corresponding impact on threatened and endangered species could accelerate across the country.

37.     It is my understanding that several other states have taken steps to submit their own section 404 assumption applications.  Defenders will monitor these developments as they

occur and engage in advocacy efforts, as necessary, to oppose unlawful state programs that pose a threat to our mission.

38.     If Florida is allowed to continue unlawfully operating the dredge-and-fill permitting program, Defenders and its members would be irreparably harmed in their ability to protect wetlands, imperiled species, and their habitat.

39.     A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Defenders' harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress Defenders' harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonable and prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25___ day of February 2023, in Washington, D.C.

Andrew Carter
Director, Conservation Policy
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**DECLARATION OF ELIZABETH H. FLEMING**

I, Elizabeth H. Fleming, hereby declare as follows:

1.      I am a resident of St. Petersburg, Florida, and a member of Defenders of Wildlife ("Defenders"). As a member of Defenders, I rely on the organization to represent my interests in protecting all native wild animals and plants in their natural communities, including from two of the most serious environmental threats to the planet: the accelerating rate of extinction of species and associated loss of biological diversity, and habitat alteration and destruction. Florida panthers and sea turtles are particular passions of mine and I am grateful for the work that Defenders does to protect them in my native state.

2.      I attended Tufts University in Massachusetts from 1983 to 1987 and graduated *magna cum laude* with a degree in political science and a minor in biology. I had designed a curriculum that allowed me to take graduate courses and undertake independent studies on the environment.  In 2002, I returned to St. Petersburg, Florida.

**Membership and Work with Defenders of Wildlife**

3.      I began working for Defenders as the Florida Representative in 2004 and became the Senior Florida Representative in 2012. As a member of Defenders and a Florida, protecting the Florida panther and sea turtles is an ongoing and important part of my professional life and my personal interests.

4.      Founded in 1947, Defenders is a national non-profit conservation organization focused solely on wildlife and habitat conservation and the safeguarding of biodiversity with a mission to protect all native animals and plants in their natural communities. The organization protects and restores imperiled species throughout North America by transforming policies and institutions and by promoting innovative solutions informed by scientific, legal, and policy expertise, hands-on wildlife management experience, and effective advocacy.

5.      Defenders reaches thousands of people through print and online media and communications. Defenders' Florida/Georgia/Alabama Facebook page reaches a network of over 1,000 people. Our Defenders magazine is circulated to around 300,000 members and is available on our website.

6.      As Defenders' Senior Florida Representative, I work to protect and restore Florida's imperiled wildlife, wildlife habitat, and a state ecological network. I coordinate with partners to conserve core and connective habitat for threatened and endangered wildlife, especially wide-ranging species that use a mosaic of habitats such as the Florida panther and Florida manatee.

7.      I also coordinate with partners to conserve core and connective habitat for sea turtles; some of these habitats include nesting beaches, seagrass beds, coral reefs, mangroves, sargassum mats, estuaries, and open water.

8.      As part of my work, I engage with members and supporters to help protect the wildlife and wildlife habitat throughout Florida. I have personally written letters to federal agencies regarding a number of rulemakings, including reclassification of species and refuge planning.  I also oversee programs that foster responsible coexistence with wildlife, including the Florida panther, manatees and sea turtles.

9.      In my capacity at Defenders and as a board member of the Friends of the Florida Panther National Wildlife Refuge, which supports Ten Thousand Islands National Wildlife Refuge, I have helped advance efforts to darken beaches, such as by endorsing allocation of monies from the BP Deepwater Horizon restoration funds to retrofit buildings on entire stretches of beach. I am currently endorsing efforts to secure Dark Sky designation for Ten Thousand Islands National Wildlife Refuge in the western Everglades.  The outer barrier islands of the Refuge are important nesting areas for several endangered and threatened sea turtle species that need dark beaches for their survival.

10.      I lead Defenders' work on the Florida panther.  Because of our comprehensive approach to panther conservation and recovery, I serve as conservation representative for the Florida Panther Recovery Implementation Team ("PRIT"), a state and federal public-private initiative formed in 2013 to help USFWS implement the 2008 Florida Panther Recovery Plan and advance recovery objectives.  I helped write parts of the current panther recovery plan.  And I serve as the liaison between the PRIT's core team and the transportation sub-team, which aims to reduce road fatalities (vehicle strikes), the largest human source of panther deaths.

11.      I have also worked on securing wildlife crossings for the Florida panther, which are necessary as roads are constructed in areas where wide-ranging panthers roam.   Wildlife crossings help protect panthers against vehicle strikes, a leading cause of death.  Wildlife

crossings can allow panthers to move safely throughout their large home ranges as to improve

foraging and breeding opportunities. Panthers need to expand their range northward for the

population to increase, and fragmentation and destruction of habitat, along with roads

necessitated by new development, are a major threat to their conservation and recovery.

12.     As part of my work, I also advocate for co-existence when people and wildlife

come into contact.  For example, we have a predator resistant enclosure program where we help

fund and construct sturdy enclosures that help keep goats and other small livestock and pets safe

from panthers and other predators.  I have worked to try to improve state and federal funding

programs to help compensate ranchers who've lost livestock, and also to receive payment for

ecological services to provide a financial incentive to maintain land in ways that benefit wildlife.

13.     The Florida panther is important not only because it is critically endangered, but it

also serves as an umbrella species.  That means that when we conserve the panther—a large,

wide-ranging animal that requires vast areas of connected habitat to survive—we are also

benefting other plants and wildlife, including landscapes and watersheds that fall within panther

range, and so the overall biological diversity in the state.

14.     I also co-lead Defenders' work on sea turtles and on the Everglades. Defenders'

work on sea turtles focuses on reducing threats to these species and their habitats from fisheries

interactions, entanglement in and ingestion of plastics and other marine debris, coastal and

upstream development, offshore oil and gas development, climate change, and other stressors.

Defenders has been an active participant in multiple notice-and-comment rulemaking processes

related to sea turtle conservation. We also have worked statewide on policies and regulations to

improve coastal construction practices, inappropriate lighting and inadequate habitat protection,

as well as on-site specific projects in different areas in Florida. Our members regularly use,

enjoy, and benefit from healthy coastal and marine ecosystems and the presence of diverse coastal and marine life, including sea turtles.

15.     In my work on behalf of sea turtle conservation, I work specifically along the Atlantic and Gulf of Mexico coasts of Florida to preserve sea turtle nesting beaches and foraging areas; improve coastal-construction policies so that jetties and sea walls do not prevent turtles from nesting; promote responsible lighting along nesting beaches; encourage local residents, visitors, and businesses to remove trash that attracts raccoons and other predators that devour eggs and hatchlings; and organize workshops and beach clean-ups. For instance, in 2010, I worked with Defenders staff to document beach lighting violations in Bay County, in the Florida Panhandle on the Gulf of Mexico, and supported local efforts to adopt protective lighting ordinances in Bay County and in Panama City.

16.     Over the years, I have organized opportunities for Defenders staff and other conservation professionals to accompany sea turtle researchers with the University of Central Florida to monitor sea turtle nesting at Archie Carr National Wildlife Refuge. The Refuge was established in 1991 to protect nesting habitat for sea turtles. In May 2015, we were fortunate to be able to observe an endangered leatherback turtle laying her eggs.

17.     As part of my work at Defenders, I have also organized a number of events to help educate the general public about threats to sea turtles and connect them with opportunities to help conserve sea turtles. In 2006, I organized a site visit to Archie Carr National Wildlife Refuge with reporters and other conservation professionals to witness nesting green and loggerhead sea turtles from a responsible distance. Several of the reporters wrote uplifting stories about the importance of conserving sea turtles and actions people can take to help. On May 31, 2008, I organized and hosted a workshop at Gumbo Limbo Nature Reserve in Boca Raton for

around 100 coastal residents in Broward and Palm Beach counties, educating them about responsible practices fostering sea turtle conservation in their communities, with a focus on reducing artificial lighting that disorients nesting and hatchling sea turtles, and including disposal of trash, reducing pollution, and planting native vegetation. The workshop included a nighttime beach walk to observe artificial and natural beach lighting conditions and allowed participants to observe sea turtles nesting from a responsible distance.

18.     On July 9, 2021, I participated in filming in Boca Raton for a program about sea turtles hosted by conservationist and television personality Jeff Corwin. The program is part of a new television series called "Wildlife Nation," sponsored by Defenders, which focuses on efforts to save endangered species across North America. The sea turtle episode premiered on ABC on October 9, 2021 and will air again on November 13, 2021. During the filming I emphasized the global importance of Florida's beaches and waters to sea turtles, and I helped release a loggerhead sea turtle that had been rescued following a boat strike and rehabilitated in captivity. It was a phenomenal and moving experience to observe this 105-pound loggerhead sea turtle reenter the wild to be able to reproduce and help her species.

19.     Defenders actively supported the establishment of the Nature Coast Aquatic Preserve in 2020 to protect 400,000 acres of shallow seagrass meadows, which are abundant foraging habitat for green sea turtles, manatees, and other species. I have also supported recent efforts to launch a Sea Turtle Protection Zone in Palm Beach County. Launched earlier this year, the initiative, which is voluntary, is intended to protect sea turtles from unintended boat strikes during nesting season between March 1 and October 31.

**Recreational and Aesthetic Interests**

20.     I grew up in Florida from age 7 and have been interested in wildlife my whole life.  I remember driving across Alligator Alley when it was a two-lane highway and reading the signs letting the public know how many Florida panthers were still left.  The signs would be crossed out with grim new numbers as more panthers died.  I've always been aware of how precarious their continued existence is.

21.     Growing up on the east coast of Florida in Lighthouse Point, my family was very engaged in outdoor marine activities. I saw my first sea turtle and manatee from our family's boat sometime around the mid-1970s. Following that initial experience, my family and I frequently observed sea turtles while boating and snorkeling, at home and during trips and vacations around the state. I have vivid memories of my sea turtles encounters and experienced several life-changing events observing and engaging with them. For instance, when I was in high school, I recall sitting at Deerfield Beach with a group of my friends and witnessing a loggerhead sea turtle crawl up the beach to within 30 feet of where we were and proceed to dig her nest chamber and lay her eggs. I also used to sail a lot in middle and high school and often saw sea turtles, including mating sea turtles on several occasions. I even have scooped up sea turtle hatchlings crossing a road fronting Fort Lauderdale beach. They were heading the wrong way because of artificial lighting from hotels and were being run over on the roadway separating the beach and the hotels. These formative experiences shaped my love of sea turtles and my commitment to their conservation.

22.     Personally, I enjoy seeing sea turtles and other marine wildlife at every opportunity near my home in St. Petersburg, Florida. I live in Shore Acres, a manmade island in St. Petersburg accessible by bridges. Most mornings, I walk four to six miles from my home

across a bridge to Snell Isle. While walking along the shoreline and across bridges in my

neighborhood situated within Tampa Bay, I often look for and will sometimes have the occasion

to see  juvenile loggerhead and green sea turtles foraging in seagrasses and swimming in the

water.

23.     Every year from May through October during sea turtle nesting season, I also see

sea turtle nests, marked and protected, while strolling along St. Pete Beach, a Gulf Coast beach

near where I live. I drive over to that beach just to walk, to observe evidence of sea turtles

nesting and to visit friends.

24.     While I was growing up, my family regularly visited and vacationed in many

areas of Florida along the Gulf and Atlantic coasts, such as the Keys, Marco Island, Sanibel

Island, Melbourne (Archie Carr National Wildlife Refuge), and other places to see sea turtles

swimming, nesting, and/or hatching. To this day we still visit many of these places as a family in

hopes of viewing sea turtles in the wild. Most recently, from October 16 to October 23, 2021, my

mother and I vacationed in Sanibel Island in hopes of seeing sea turtles. We were able to see two

green sea turtle nests. As it was later in the nesting season, there were significantly fewer nests

than the last time we had visited in September 2020 when there were more than a dozen

loggerhead nests on that same stretch of beach. Last year, my mother and I had made the same

trek to Sanibel Island and were thrilled to see many marked nests on the beach that had been laid

the night before and tiny tracks in the sand where hatchings had emerged. We also had the

pleasure of chatting with sea turtle researchers every morning who were on the beach monitoring

and studying the sea turtle nests. We plan to continue these family trips to Sanibel Island and

other areas of Florida next year and every year into the future. Seeing sea turtles in their natural

habitat is a wonderful and integral part of these trips.

25.     I also go boating on occasion to enjoy the ocean and to view wildlife such as sea turtles. My sister lives in Boca Raton, Florida, on the Atlantic Coast, and for years, at least twice a year, I have gone boating with her family whenever I visit. Boca Raton is one of the most important beaches for sea turtle nesting and my sister lives within ten miles of where I grew up. When I visit her, we go out boating and look for sea turtles. We mostly see loggerhead sea turtles, although on occasion also see green and leatherback sea turtles out in the water. It is a great bonding experience and I look forward to these trips with her. I plan to visit her and her family for Christmas this year.

26.     Conservation of sea turtles is important to me because it is a passion that I share with my family members who also live in Florida and are active Defenders members. I enjoy seeing sea turtles and other wildlife with my family and knowing that it is a love that has been passed down through the generations. My mother enjoys photographing wildlife, especially seabirds and shorebirds. My father always enjoyed walking the beach and collecting seashells, beach glass, fossilized sharks' teeth and driftwood that washed in with the tide. I have always been particularly fascinated with sea turtles, knowing they have been around in their current form for 110 million years, roaming the Earth's oceans since the time of the dinosaurs, and that they navigate the world's oceans throughout different stages of their lives. Spending time as a family at the beach and on the water has been a wonderfully relaxing way to connect and experience nature together.

27.     One of the reasons I am so committed to conserving sea turtles is that Florida is globally important for multiple sea turtle species. Florida's beaches provide nesting habitat for five of the world's seven species of sea turtles: loggerhead, green, leatherback, Kemp's ridley, and hawksbill, all of which are listed as either threatened or endangered under the U.S.

Endangered Species Act (ESA). More than 90% of all sea turtle nesting in the continental U.S. occurs in Florida. Florida beaches host the world's largest nesting aggregation of loggerhead turtles and almost all the nesting in North America for green turtles and leatherback turtles. The turtles that use Florida's nesting beaches forage in and migrate through the nearshore and coastal waters of the U.S. Gulf of Mexico and South Atlantic waters.

28.     Seeing sea turtles in the wild, both onshore and in my local and surrounding waters, brings me immense joy in my day-to-day life. I have often tried to photograph them even though it is difficult to capture the right shot. I want to be able to see sea turtles nesting on our Atlantic and Gulf beaches and swimming in the waters of the Atlantic and Gulf of Mexico this year and in the coming years.

**Harms and Redressability**

29.     My professional and personal interests in the Florida panther, manatees and sea turtles are harmed by EPA's approval of Florida's 404 permitting program because it is not as stringent as federal law and allows for 404 permitting without the protections of ESA Section 7 consultations or, where appropriate, NEPA review.  Florida's program is also less protective because it extends incidental take coverage to permittees without requiring them to go through the Section 7 or Section 10 processes under the ESA.

30.     I devoted years of my professional life to cultivating the collaborative relationships with private landowners and others that led to development of a proposed Habitat Conservation Plan ("HCP") for the Florida panther that was going to take place over 50 years. Under Section 10, the HCP would take a "big picture" science-based approach to panther conservation, taking into account growth, development, transportation, agriculture, and habitat connectivity, providing coverage against incidental take liability in exchange.

31.     The HCP would have covered approximately 152,000 acres of rural, agricultural, and wild lands in eastern Collier County in southwest Florida that connects the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region.  The HCP covered  11 federally listed or candidate species, including the Florida panther, Florida scrub jay, and Florida bonneted bat.

32.     However, once the state assumed the 404 process, which relies on a "technical assistance" process for ESA review rather than Section 7 or Section 10 of the ESA, landowners who were party to the HCP began considering abandoning that process.  And ultimately, in August 2022, they withdrew from the HCP.

33.     As a result, much of Defenders' investment in the HCP has been thwarted, and we will have to divert resources to try to secure comparable gains in terms of mitigation and conservation as individual projects move forward.  We know that in addition to pending 404 permits, there are other projects that will be coming into the pipeline and that will also pose a threat to the Florida panther, especially in terms of habitat loss and fragmentation.  A few of many projects include Rivergrass, Rural Lands West, and several other projects popping up in Collier County and on Corkscrew Road in Lee County that are north of the the lands that would have been covered by the HCP.

34.     My personal and professional interests are harmed by the threats to the Florida panther from the state program.  I have recreated in and around panther habitat for many years and do so whenever I get the chance. My parents live in Estero in southwest Florida and I often visit and work from there when I have meetings, events and other engagements involving panthers. Since 2008 I have served as a board member and advocacy chair of the Friends of the Florida Panther National Wildfe Refuge, and I have been to the panther refuge dozens of times

of the years for the annual Save the Florida Panther Day open house and for additional meetings

and field outings. Some other areas in panther habitat that I have frequented over the years

include Big Cypress National Preserve many times, notably in June 2006 when I was down there

working on a proposal for a wildlife underpass to reduce panther mortality along the Turner

River section of US41 Big Cypress, the biologist got the call that a Florida panther mother that

they had been monitoring had left the den to hunt. I got to accompany the biologist and the

superintendent of the park in a helicopter to travel to the  den while the biologist "worked up" the

three kittens (e.g., examine, deworm, microship, hair sample). Over the course of several hours, I

was able to hold a panther kitten as they worked on the others, an experience I will never forget

as they are so vulnerable and adorable. I've driven on trails and hiked in Fakahatchee Strand

State Preserve Park, Picayune Strand State Forest, Collier Seminole State Park, Audubon's

Corkscrew Swamp Sanctuary, Okaloacoochee Strand State Forest, Spririt of the Wild Wildlife

Management Area, Babcock Ranch Preservation Area and other conservation lands occupied by

panthers, and I have spent time on the properties of more than two dozen private ranches in

panther country and in panther expansion areas.

     35.    Even though panther sightings are rare, I have seen panther tracks, scat, scrapes

and other panther sign on many occasions, and I know that some of the panthers that left this

sign saw me even though I didn't see them. It gives me tremendous joy to know that Florida

landscapes are still healthy enough to support Florida panthers, which represent the only

remaining population of pumas east of the Mississippi, and as such they play a vital role in

maintaining wild and natural landscapes in Florida. In recognition of the importance to the rest of

the ecosystem in which it occurs, the Florida panther is aptly designated as our official state

animal. I am travelling down to panther country tomorrow to staff the annual Swamp Cabbage

Festival in LaBelle near Okaloacoochee Slough State Forest in Hendry County to display our predator resistant enclosure and interact with members of the public about living responsibly with Florida panthers. This festival is held in an area close to where I saw a panther crossing a forest road in December 2011 as I described in this blog, *Florida Panther Sighting Heralds Slow Zone Designation*, available at https://defenders.org/blog/2011/12/florida-panther-sighting-heralds-slow-zone-designation.  I will also be going to the panther refuge on Save the Florida Panther Day on March 18, 2023. Harms to those habitats will affect my use and enjoyment of that environment.

36.     My personal and professional interests are also harmed by EPA's failure to consult at all on the potential impact of Florida's 404 program on nesting sea turtles. Development and construction projects near beaches can adversely affect nesting sea turtles especially when it comes to artificial lighting that disorients nesting and hatchling sea turtles. Reduced protections for sea turtles will make it less likely that I will able to observe and enjoy these species in their natural habitat.

37.     My work will also be harmed by the loss of information now that many 404 projects, including those affecting the Florida panther, will be handled by the State where they will not be studied in USFWS Biological Opinions and will not undergo any NEPA review.  We rely on important information produced in biological opinions and NEPA documents to educate our members, identify projects of particular concern, and engage in advocacy.  Without access to that information, we will have to divert organizational resources to try to assess the impact projects on a variety of listed species.

38.     I understand that Defenders, alongside other organizations, is suing EPA, USFWS, and the Corps over their failure to comply with the requirements of the Administrative

Procedure Act, the Clean Water Act, the Endangered Species Act, and the Rivers and Harbors Act.  I depend on the federal government to comply with these laws to protect and conserve sea turtle populations and the Florida panther.

39.    My injuries would be redressed if the Court sets aside the agency actions in this case and remands the matter to comply with federal law.  Vacating EPA's approval of Florida's 404 program would restore the Corps' authority over all 404 permitting in Florida, making those actions once again subject to the protections of NEPA and ESA Section 7 consultations.  This would also ensure that protection against liability for incidental take of listed species would be extended only pursuant to a biological opinion issued after Section 7 consultation or pursuant to a Section 10 Habitat Conservation Plan.

40.    A ruling in Defenders' favor on our ESA claims would also redress my harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonable and prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

41.    I declare under penalty of perjury that the foregoing is true and correct. Executed this 23th day of February 2023, at St. Petersburg, Florida.

Elizabeth H. Fleming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## DECLARATION OF BRETT HARTL

I, Brett Hartl, make the following declaration:

1.     I am a resident of Prescott, AZ.

2.     I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.     I am the Government Affairs Director at the Center for Biological Diversity ("Center"), and I work out of both the Center's Washington, D.C., and Arizona offices.  I have been with the Center since 2013.

4.     I am also a member of the Center and have been a member of the Center since 2013.  As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

5.     I hold a bachelor's degree from Prescott College in conservation biology, and a law degree from Lewis and Clark Law School.  Prior to law school, I spent five years as a field

biologist working with endangered species in the northwest Hawaiian Islands, Kauai, and Southern California.  I also worked in the House of Representatives Natural Resources Committee for Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

6.     The Center is a member organization incorporated under the laws of the State of California.  It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.  The Center has 84,324 active members across the country, including more than 4,092 members in Florida.  The Center is based in Tucson, AZ, and works throughout the entire United States.  Our other major offices are in Washington, D.C.; San Francisco, CA; and Portland, OR.

7.     The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law.  Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction.  We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

8.     In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact endangered species, wildlife, clean water, and environmental protection broadly.  This includes agency rulemaking and their policy consequences throughout the country.  I coordinate the Center's response and engagement, meet with agency officials, and work with outside stakeholders.  I oversee or am involved with

Freedom of Information Act ("FOIA") requests, formal commenting, advocacy, lobbying, and litigation.

9. Protection of endangered and threatened species is a core organizational focus of the Center. Whether large or small, we believe all species have an intrinsic right to live. The United States and the world at large are currently in the midst of a biodiversity crisis: the diversity of life that sustains ecological systems and human cultures around the world are collapsing. As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats for species, and holding federal agencies accountable to their duties to protect species as directed by Congress.

10. Many of the species we work to protect throughout the country rely on healthy, intact wetlands to survive—whether directly or indirectly. Wetlands are therefore vital to our endangered species work. To that end, the Center has longstanding programs to protect freshwater and protected species in the Southeast, which is a hotspot of extinction nationally.

11. One such program is the Southeast Freshwater Extinction Campaign, which seeks to protect the unique and vast aquatic biodiversity of the Southeastern United States. The Southeastern United States has some of the richest aquatic fauna of any temperate area in the world, including globally significant diversity of freshwater mussels, freshwater fish and other species. The Southeast contains two-thirds of North America's species and subspecies of crayfishes and contains more amphibians and aquatic reptiles than any other region. It is also home to the largest number of listed species and extinct species in the lower 48 states. For example, nearly 70% of all freshwater mussel species in North America are either protected under the Act or already extinct, and most of the remaining species are declining and will need

protection under the Endangered Species Act in the future.  Loss of these aquatic species in this region represents not only a loss to the nation as a whole but to the entire global biodiversity of freshwater systems.

12.     Within the Southeastern United States, Florida has irreplaceable ecosystems not found anywhere else in the country, made up of semi-tropical environments, marine estuary systems, and springs.  These include iconic ecosystems such as the Everglades and the Pine Rockland ecosystems.  Florida is also home to unique protected species, including but not limited to the Florida panther, West Indian manatee, frosted flatwoods salamander, wood stork, eastern indigo snake, various species of turtles, smalltooth sawfish, and freshwater mussels. Florida is also home to some of the largest populations of protected sea turtles nationally.  Any loss of biodiversity in Florida represents a loss to the nation at large.  The uniqueness of these species and ecosystems means these losses cannot be replaced.

13.     Florida's wetlands provide key migratory stopover habitats for numerous species of birds that migrate between the United States and Central America, the Caribbean, and South America.  Examples of listed species that are migratory and rely on Florida's wetlands include the Red Knot, which migrate from South America to Canada and back each year and the Black Rail, which winters in Florida and migrates to the east coast to breed.  Other listed species of birds like the Everglades Snail Kite and Audubon's Caracara rely on Florida's wetland ecosystems year-round.

14.     The federal section 404 wetlands permitting program provides a vital check on actions that would otherwise destroy wetlands, and it ensures vital information is gathered to understand how an action impacts wetlands and the species who rely on them.  It provides

federally mandated minimum levels of protections that have been instrumental in conservation of protected species.

15.     Assumption by the states that is not in strict compliance with federal law is extremely problematic, because it will not provide the same level of transparency and substantive protections that the federal program provides.

16.     Unlawful state assumption of 404 programs would harm the Center's ability to protect wildlife, in Florida and around the country.

17.     Just as the Center is engaged in litigation in this case to challenge EPA's approval of Florida's program and related federal agency actions, the Center has also been monitoring other states that have expressed an interest in assuming the CWA 404 program.  For example, one state we are monitoring closely is Arizona, which since 2018 has been considering changes to its wetlands regulation program that may ultimately include the State applying to assume the 404 program.  Wetland and riparian areas in desert environments are particularly critical to wildlife.  Nearly 80 percent of all wildlife species, including numerous listed species like the Yellow-billed Cuckoo, SW Willow Flycatcher and narrow-headed gartersnake, are found close to riparian and wetland ecosystems.

18.     Since 2020, Alaska has also apparently indicated to the EPA that it might be interested in assumption of the state's 404 program. The Center has submitted several Freedom of Information Act requests to learn more about the status of these efforts.  If states such as Alaska or Arizona or others were to assume 404 permitting without sufficient safeguards, many of endangered species could be harmed across the country.

19.     It is my understanding that former U.S. Environmental Protection Agency Administrator Andrew Wheeler, at the press conference announcing EPA's approval of Florida's

404 program, encouraged other states to follow Florida's example as a model.  If EPA's approval of Florida's 404 program is upheld, it would set a dangerous precedent of state 404 programs that are inadequate to protect listed species and wetlands.

20.     The Center is particularly concerned with how EPA's approval of Florida's 404 program will likely result in increased negative impacts to wildlife and water quality, as follows:

21.     I understand that DEP has stated that its intention is to approve permits faster.

22.     I also understand that DEP has and continues to apply the 2020 Navigable Water Protection Rule, which has been invalidated and vacated by two federal courts.  DEP's application of this unlawful rule significantly reduces and the number of waterways, and wetlands in particular, that are protected under the Clean Water Act.

23.     I believe that with the Florida dredge-and-fill permitting program, the wetlands that are impacted by development projects do not receive the same level of environmental review that they would otherwise under the dredge-and-fill permitting program administered by the U.S. Army Corps of Engineers and consulting federal agencies like the USFWS and National Marine Fisheries Service.  While Florida is permitted to continue administering the 404 program, the Center is prevented from fully assessing and publicly engaging on specific project applications and is forced to expend significant resources in the process to discover or develop information that would otherwise be afforded by NEPA and the ESA.

24.     In fact, the Center has already had significant difficulty fully assessing and publicly engaging on projects going through the state-administered 404 program.  For example, I understand that Center staff are tracking the application and impacts of the Bellmar development (permit application no. 396364-001) because of its potential to adversely affect the Florida panther, Florida bonneted bat, and eastern indigo snake, among other species.

25.     I understand the system for submitting public comments is also more burdensome
and inconvenient than the federal public commenting process.  I understand that DEP accepts
electronically submitted comments through its business portal, which requires registration and is
difficult to navigate. Records relating to applications are posted on another DEP portal, which is
also very difficult and time-consuming to navigate.  Furthermore, I understand that DEP is
failing to make records relating to 404 permits that it has in its possession available to the public
in a timely manner.  I also understand that the documents generated by DEP's 404 process are far
less informative and useful than the documentation produced during the federal 404 process.  All
of these impediments make it more difficult and time-consuming for the Center to advocate for
species and their habitat, and they likely deter participation from the general public, who do not
have the time and resources to figure out the portals.

26.     Additionally, EPA's approval of Florida's assumption program harms the
Center's ability to litigate on behalf of wetland habitats and the species that rely on them.
Because legal challenges to state permits have to be filed in state administrative court, rather than
proceed as administrative record cases litigated in federal court, it is my understanding that the
Center would be required to spend significant monetary resources to hire expert witnesses to
successfully bring legal challenges—monetary resources that would otherwise be put toward
other important organizational initiatives and goals.  The significant expense involved in
bringing expert-driven challenges in state court means that the Center may have to forego
challenging permits it would and could otherwise have challenged in federal court.

27.     It is also my understanding that it is significantly more difficult to establish
standing in state court when compared to federal court.  For example, in Florida state court, an
organization like the Center is required to show that a *substantial number* of its members will be

affected by the challenged action, while in federal court organizations can establish standing based on harms suffered by an individual member.  With a national membership, it would be exceedingly difficult, if not impossible, for the Center to establish standing to challenge individual permits under such a state standard.

28.     It is also my understanding that, in state court, the Center would be exposed to liability for legal fees and costs under mandatory fee-shifting state law provisions for certain types of permit challenges that it would not be exposed to in federal court.  This can hamper the Center's ability to participate in vigorous advocacy for species and habitat because the Center would be required to weigh that significant financial risk—even if the Center had strong legal claims.

29.     With Florida's assumption of the 404 program, the lack of project-by-project consultation with USFWS under Section 7 or Section 10 of the ESA, and the blanket exemption from incidental take liability extended to the state and state permittees, imperils protected species that the Center's mission is to protect.

30.     Moreover, without the information that is made available under the ESA consultation process and NEPA review process—including a robust alternatives analysis—the Center is denied important information about environmental and species impacts, forcing the Center to hire scientific experts to carry out the analysis.  This will cost the Center significant financial resources that could have been put toward other organizational priorities and can reduce the number of potentially harmful and concerning projects on which the Center could engage. As a result, the Center and its members do not have access to important information about the effects of wetland destruction on species, nor do we have a clear process to advocate on behalf of endangered and threatened species at the administrative level.  This, in turn, harms the Center's

DocuSign Envelope ID: 9182F847-213F-417C-AC5A-74A6DF58DF609

interest in meaningfully evaluating how wetland destruction harms endangered and threatened species, and advocating on their behalf.  It also requires the Center to hire its own scientific experts to analyze the species effects, which requires the Center to use financial resources it could have put toward other organizational missions.

31.     The loss of procedural rights the Center has sustained as a result of EPA's transfer of authority to the state, has resulted in immediate and ongoing organizational and membership harms while the state's unlawful program operates.  The state's 404 program causes the Center to divert resources, threatens wetlands and wildlife, and undermines the Center's ability to realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

32.     The state is poised to issue 404 permits on major projects that will harm the Center's organizational interests the interests of its members.

33.     Of particular concern to the Center are several proposed developments in southwest Florida that would adversely affect many endangered and threatened species.

34.     For example, DEP is considering a permit application for the Bellmar development (permit application no. 396364-001), which is likely to adversely affect the Florida panther, Florida bonneted bat, and eastern indigo snake, among other species.  The Center is particularly concerned about adverse effects on the Florida panther because the proposed development is located within the core breeding range for the only remaining population of Florida panthers.  The proposed development is also about a mile away from Florida Panther National Wildlife Refuge and would stand between the panther and its ability to expand north through its historic range—a necessary prerequisite for the species' recovery.  Bellmar would

also induce the construction of more roads and more vehicle trips, which will, in turn, increase

the number of panther deaths from vehicle strikes, the leading cause of death for the species.

35.    The Center is concerned about the direct, indirect, and cumulative effects of

Bellmar, particularly on the endangered Florida panther.  I understand that the Center has

received public records from U.S. Fish and Wildlife Service relating to a now-withdrawn

Endangered Species Act Section 10 permitting application for massive planned development in

eastern Collier County that indicate Bellmar and other reasonably foreseeable developments in

the county are likely to jeopardize the survival and recovery of the panther through habitat

destruction, infringement of wildlife corridors, indirect impacts on adjacent preserves, and

increased vehicle-caused panther mortality driven by increased traffic and transportation needs.

36.    The state-assumed 404 permitting process and USFWS's technical assistance fall

short of the Endangered Species Act's requirements for analyses, study, and evaluation to ensure

against jeopardy for the panther.  For example, as described above, DEP provided public notice

for an incomplete file that omitted key traffic information.  This falls far short of the Endangered

Species Act's mandate that jeopardy determinations be based on the best scientific and

commercial data available.  Furthermore, if USFWS misses a time-limited opportunity to

comment, it appears that there is no mechanism for USFWS to stop the issuance of a permit—

even if it determines that issuing the permit may jeopardize an endangered or threatened species

or adversely modify critical habitat.  Not only would this violate the Service's ESA-mandated

duty to ensure against jeopardy but it would have real and dire consequences for species like the

Florida panther, particularly in view of USFWS analyses that indicate the cumulative impact of

Bellmar and reasonably foreseeable projects nearby, which will likely also be permitted under

the state 404-permit process, are likely to jeopardize the panther.  Under Section 7 consultation,

DocuSign Envelope ID: 9102E847-213F-417C-AC5A-71A9DF8DF600

by contrast, no permit could issue unless and until USFWS makes a "no jeopardy" determination.

37.     If DEP were to approve Bellmar and other projects in southwest Florida, it would harm the Center's interest in preventing the decline and extinction of endangered and threatened species in Florida.  In particular, it would harm the Center's interest in securing the survival and recovery of the Florida panther and the Florida bonneted bat, species whose protection we have advocated for years. The approval of Bellmar and nearby developments would harm those interests, setting the species' recovery back and putting them at greater risk of extinction.

38.     It's also my understanding that DEP has failed to provide the public with the information it needs to meaningfully weigh in on the permit application for Bellmar. For example, at the time DEP issued its public notice on Bellmar's state 404-permit application, USFWS indicated that it needed more information that was missing from the applicant's biological assessment; namely, an estimate of panther mortality due to traffic volume increases upon completion of the development.  Without this key information, the public and the Center were unable to fully and meaningfully participate during the open comment period.  While in this instance, DEP has stated they will hold another public hearing after submittal of traffic analyses by the applicant, it is still not clear if the public will have USFWS' comments or proposed permit conditions for consideration.

39.     Additionally, the Center is concerned about the proposed Burnett Oil drilling projects, whose 404 applications are expected to be re-submitted to the state, that would pave the way for oil drilling in Big Cypress National Preserve for the next 30 years.  Dkt. 031-4 (Declaration of Ann Wiley in Support of Plaintiffs' Partial Motion for Summary Judgment, dated March 3, 2021).  Not only will the Center experience the aforementioned harms to its mission of

protecting species and the natural environment as these permits are being processed and if approved, the Center's members will be harmed by these projects to develop in our nation's first national preserve.  The freshwaters of Big Cypress are vital to the health of the neighboring Everglades and to the wildlife that inhabit it—waters and wildlife that the Center strives to protect and that our members enjoy.

40.     If Florida is allowed to continue administering an unlawful dredge-and-fill permitting program, the Center and its members will be harmed in their ability to protect wetlands, imperiled species, and their habitat.

41.     The Center's harms would be redressed by a ruling that invalidates EPA's approval of Florida's program.  This ruling would restore 404 authority over assumable waters to the Corps, restore Section 7 and NEPA review for projects, and ensure that all requirements of federal law are met and can be enforced in federal court.  In addition, a ruling in Plaintiffs' favor on the agencies' ESA violations would redress the Center's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require a legally sufficient biological opinion that properly analyzes the impact to listed species and critical habitat, sets limits on incidental take, and imposes reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23___ day of February 2023, in Prescott, AZ.

DocuSigned by:

*Brett Hartl*

17B8BD37BB374A7...

Brett Hartl
Government Affairs Director

Center for Biological Diversity
1411 K Street, NW, Ste. 1300
Washington, D.C. 20005

DocuSign Envelope ID: EEF87686-107G-42BC-B9DA-86742DDD5A63

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## <u>DECLARATION OF MATTHEW SCHWARTZ</u>

I, Matthew Schwartz, state and declare as follows:

1. I am a resident of Tampa, Florida. The following facts are personally known to me and if called as a witness I could and would truthfully testify to these facts.

2. I have been a resident of South Florida since 1995.

3. I have a bachelor's degree from the State University of New York-Albany, a master's degree in psychology (counseling) from New York University, and a master's degree in sociology from City College of the City University of New York. I did my master's thesis in sociology on recreational activities of residents in Bronx, NY.

4. I am a member of the Center for Biological Diversity since 2019. I frequently read press releases and documents the Center provides links to on its website. I have also read the Center's action alerts and news stories where the organization is cited. On occasion, I interact with Center staff. I trust the Center represents my interests and I rely on the Center to represent my interests in addition to my own advocacy.

5. I am the Executive Director of South Florida Wildlands Association, a nonprofit organization founded in 2010 that is dedicated to the protection of wildlife and habitat in the Greater Everglades. My work focuses on places where human development impacts wildlife.

6. Along with my work at South Florida Wildlands Association, I also work as a tour guide in the Everglades where I lead group hiking, biking, and kayaking tours. I give talks on the human, natural, and geologic history of the Everglades and take the public on airboat tours with the Miccosukee Tribe of Indians. On airboat tours, I have traveled deep into the Everglades as far west as the border of the Big Cypress and into Mullet Slough where pristine waters of the Big Cypress join the Everglades. I also led swamp walks with the Sierra Club in the Big Cypress for about five years. I continue to provide these tours, talks, and activities to visitors to the Everglades.

7. As an environmentalist, I routinely interact with federal, state, and county agencies. I communicate with the Department of Interior (DOI), the U.S. Fish & Wildlife Service (FWS), the U.S. National Park Service (NPS), the Florida Fish and Wildlife Conservation Commission (FWC), the Florida Department of Transportation (FDOT), and the Florida Department of Environmental Protection (DEP) regarding development, energy, and transportation projects and their impacts to wildlife. I regularly send requests under the Freedom of Information Act and Florida's Public Records Act to obtain project specific information. I speak to agency staff by email, telephone, and in person regarding these projects. I also frequently speak with staff of South Florida county governments about upcoming projects and speak at county commission meetings on topics of interest including the rezoning of agricultural lands to make way for new development.

8. I serve on several Management Advisory Groups for State Wildlife Management Areas (WMAs), including the Okaloacoochee Slough WMA, Dinner Island Ranch WMA, and Spirit of the Wild WMA in southwest Florida. Former agricultural lands like those found in these WMAs provide important habitat to species like the endangered Florida panther. Unfortunately, many agricultural lands outside the WMAs and other public lands are being converted to development.

9. I enjoy hiking, kayaking, and exploring public lands throughout the state and especially in South Florida where I lived for many years before relocating to Tampa. I have visited virtually all the public lands in South Florida and plan to continue visiting them in the future.

10. In the southeast part of the state, I have visited and recreated in Jonathan Dickinson State Park, Allapattah Flats WMA, Loxahatchee Slough, Grassy Waters Preserve, J.W. Corbett WMA, Dupuis Wildlife and Environmental Area, Hungryland Wildlife and Environmental Area, Rotenberger WMA, Holeyland WMA, Everglades and Francis S. Taylor WMA, Stormwater Treatment Area (STA) 1 West, STA 1 East, the Loxahatchee NWR, the Harold Campbell Public Use Area of STA 3 and 4, STA 5 and 6, the A-1 Flow Equalization Basin, and Everglades National Park. I regularly kayak in Biscayne Bay and in the Intracoastal Waterway in Broward and Palm Beach Counties.

11. I enjoy hiking, birding, photography, and animal watching in all the above public lands and in the WMAs in the Southwestern corner of Palm Beach County. I am on the management advisory group of the Everglades Complex of WMAs, which includes the Everglades and Francis Taylor WMA, the Rotenberger WMA, and the Holeyland WMA.

One of my favorite activities in all these lands is looking for tracks, scat, and other signs of wildlife. I have seen bear and panther tracks in many of these public lands.

12. In southwest Florida, I have visited the Florida Panther National Wildlife Refuge (NWR), Big Cypress National Preserve, Fakahatchee Strand State Preserve, Picayune Strand State Forest, Ten Thousand Islands NWR, and Collier Seminole State Park. I have enjoyed kayaking and looking for wildlife in the mangroves of the Turner River south of U.S. Highway 41 towards the Gulf of Mexico and kayaking from Chockoloskee to Ten Thousand Islands NWR. I have enjoyed seeing sharks, manatees, rays, dolphins, birds, mollusks, and crustaceans while I kayak these waters. I have also kayaked, walked, and camped along Fisheating Creek, bicycled, and walked the levee of Lake Okeechobee and kayaked its waters. I have walked and kayaked Myakka River State Park, and walked the trails of Little Manatee River State Park, Alafia River State Park, Highlands Hammock State Park, and the Lake Wales Ridge State Forest. I have also kayaked in the Estero River, Terra Ceia Preserve State Park, Upper Hillsborough River, Chassahowitzka WMA, and Cedar Key.

13. In central Florida, I have kayaked the Kissimmee River, Lake Istokpoga, Blue Cypress Lake, Shingle Creek, Lake Panasoffkee, the Indian River Lagoon, Banana River, and the Mosquito Lagoon. As part of a kayak trip on the Indian River Lagoon in 2021, I kayaked to the site of a "manatee graveyard" north of Manatee Cove County Park in Brevard County. I took photos and video of the site. I am aware that scientists have determined the leading cause of death for manatees in this part of Florida to be the lack of seagrass (the manatees' main food supply) as a result of poor water quality in the lagoon. I also witnessed the near-complete lack of seagrass in this part of the lagoon. It saddened me to

DocuSign Envelope ID: EEF87686-107G-42BC-B8DA-86742DDD5A63

think that so many of Florida's manatees are now dying due to years of nutrient-rich runoff that has been allowed to pour into this once-biodiverse estuary. Indian River Lagoon has been deteriorating for decades primarily due to the improperly regulated run-off from surrounding fertilized lawns, agriculture, and septic systems. I have enjoyed hiking and star watching in Kissimmee Prairie Preserve State Park, and hiking in the Fort Drum WMA, Blue Cypress Conservation Area, Little Big Econ State Forest, Ocala National Forest, the Green Swamp WMA, Withlacoochee State Forest, Richloam WMA, Half Moon WMA, Flying Eagle WMA, and Citrus WMA.

14. In North Florida, I have enjoyed kayaking in Anastasia State Park, Guana River WMA, and the Saint John's River near Palatka. I have also explored the Goethe State Forest, Saint Marks NWR, Apalachicola National Forest, Tate's Hell State Forest, St. Joseph Peninsula State Park, the Dead Lakes north of Wewahitchka, Osceola National Forest, and the Okefenokee NWR. I enjoyed hiking in the Black Water River State Forest while being trained as a wilderness first responder in Century, Florida.

15. As an environmentalist, I have spent many years on several campaigns to create management plans and policies on public lands that put wildlife protection first. In the Big Cypress National Preserve, I have worked to rein in the use of recreational motor vehicles in some of the preserve's more sensitive areas. I have also worked to limit damage to seagrass beds, coral reefs, and bird rookeries from power boats in Everglades and Biscayne National Parks. In Biscayne National Park I also advocated for the 10,000-acre marine reserve which is now a part of the park's management plan. While serving on the Management Advisory Groups for various state-run WMAs, I advocate for management plans that emphasize wildlife protection as well as public education that

DocuSign Envelope ID: EEF87686-107G-42BC-B9DA-86742DDD5A63

teaches the public why these protected lands are so important and why they should be
supported. I also routinely oppose new developments and transportation projects on
private lands that buffer all these protected public lands.

16. In the course of my environmental work, I have also opposed five proposals to explore
and drill for oil in the Greater Everglades. In chronological order, they include: 1) an
exploratory oil well by the Dan A. Hughes Company on land that sits between the Florida
Panther National Wildlife Refuge and the Golden Gate Estates; 2) seismic testing for oil
using shot holes and explosives by Tocala LLC across more than 100,000 acres of land
north of the Big Cypress National Preserve; 3) seismic testing (using vibroseis vehicles)
and exploratory oil wells by Burnett Oil on 235,000 acres of mineral rights leased inside
the Big Cypress National Preserve; 4) an exploratory oil well in the Everglades of
Broward County by Kanter Real Estate; and 5) an exploratory oil well proposed by Trend
Exploration inside the community of Immokalee.  In all cases, I opposed the projects due
to potential negative impacts to underlying aquifers and drinking water supplies, surface
wetlands, native vegetation, and state and federally listed wildlife. Public lands and their
enjoyment by residents and visitors was also a concern. I engaged in litigation involving
the Dan A. Hughes Company, Tocala, Burnett (with CBD and other environmental
allies), and Kanter Realty – with legal issues including federally jurisdictional wetlands,
NEPA, state ERPs, state laws on oil drilling, NPS rules on oil drilling, and federal and
state laws regarding listed wildlife species.  In the case of the Dan A. Hughes Company,
the company was also applying for a Class II Injection Well from the EPA for the
disposal of liquids connected with their oil operations. I actively opposed that application
as well. I also helped write extensive comments for the Apalachicola Riverkeeper in their

opposition to an exploratory oil well by Spooner Petroleum in the floodplain of the Apalachicola River. Three of the five operations I worked on in South Florida – Dan A. Hughes, Tocala LLC, and Kanter Realty – are no longer pursuing their applications (Kanter Realty received a buyout of their land inside Water Conservation Area 3 from the state).

17. I routinely visit natural areas in Southwest Florida with friends and on my own and I intend to do so in the future.

18. On January 31 and February 1, 2023, I visited Dinner Island Ranch WMA, Sprit-of-the-Wild WMA, and Okaloacoochee Slough WMA, and the Okaloacoochee Slough State Forest while staying in the area to attend the February 1st Management Advisory Group meeting for the Okaloacoochee Slough WMA. During my visit I hiked several trails, observed habitats, and practiced wildlife photography. I also engaged in night photography in Dinner Island Ranch where some of the darkest night skies in Southwest Florida are found. Stargazing has been an important hobby for me ever since I arrived in South Florida in 1995. Seeing dark skies that are less impacted by urban and suburban light pollution is another reason for me to spend time on Florida's public lands.

19. I frequently explore the state's waters and wetlands and intend to visit them in the future. I have explored marshes in Eastern Bear Island (Little Marsh), the California Slough in the Big Cypress "Addition Lands," Mullet Slough on the Florida Trail in the Big Cypress, and in the Hungryland Wildlife and Environmental Area in Martin and Palm Beach Counties. I frequently hike into the wet interior of cypress domes and cypress strands in these areas for the variety of vegetation and animal life they host. I have also swamp-walked through parts of the Okaloacoochee Slough, which feeds public lands and waters

south to the 10,000 islands. These wetlands are important to the hydrology of the larger Everglades ecosystem. I am concerned about the drainage of nearby wetlands and how this impacts the groundwater and the public lands I visit. We have already seen the effects of drainage. In the places like the Florida Panther NWR and the Picayune Strand State Forest, sabal palms that normally cannot handle standing water for long periods of time, have taken over vast swaths of the former wetland landscape. The area around the Florida Panther National Wildlife Refuge has also become a significant area for new residential development. The increased development I am seeing in this region bothers me a great deal. Southwest Florida's aquifers are nearly tapped out. The state is urging people to use less water and it is trying to switch to desalinating parts of the Florida Aquifer as an alternative water supply. But in addition to the direct loss of habitat from development, important wetlands are continuously being degraded and lost to development.

20. The amount of development occurring in Southwest Florida saddens me. In the past two months, I hiked Bird Rookery Swamp in the CREW lands in Corkscrew, Florida as well as other CREW lands south of Florida State Road 82. These lands include the Caracara Prairie Preserve, Flint Pen, and the Cypress Dome trails off Corkscrew Road. I also visited Audubon's Corkscrew Swamp. Each time I return to this area, it seems that the level of development as well as traffic on area roads is increasing. This increased traffic and resulting wildlife road fatalities diminish my opportunities to see wildlife when I'm in these areas. The noise from traffic and light pollution from these developments also affect my ability to enjoy these areas because the feeling is one of being in suburbia as opposed to being immersed in nature.

21. I almost always visit Big Cypress National Preserve when I visit Collier County. In the past month, I also explored the Picayune State Forest for a day. I entered the forest from Everglades Blvd on the north side and hiked various trails and photographed the landscape. I also visited the massive new pump stations that were built south of I-75 to help bring back the natural hydrology of the area. I document what I see through photography that I often share with my organization's followers on social media and in PowerPoint presentations.

22. Now living in the Tampa Bay area, I continually frequent public lands on drives to Collier County. I have increasing interest in the Babcock/Webb WMA and Babcock Ranch Preserve, which I enjoy exploring. I am aware that the FWS has considered those lands for their excellent potential in expanding Florida panther habitat north of the Caloosahatchee River. I have also explored public lands on Pine Island and other nearby locations on other occasions.

23. I enjoy viewing native plants and I am always looking for wildlife tracks including scrapes and scat. I have seen Florida panthers on more than one occasion.  On my first visit to the Big Cypress National Preserve soon after arriving in South Florida, I camped in the Bear Island section of the Big Cypress National Preserve. On my way home after the weekend, I was driving at dusk on Turner River Road and saw wild piglets on the side of the road. I then saw what appeared to me at the time to be a very large breed of dog walking north as I drove south. As I got closer, it turned sideways and showed itself as a large panther before it disappeared into the brush on the side of the road. I also saw a panther at night in the Okaloacoochee Slough WMA and one just outside the protective fence on the west side of the Florida Panther National Wildlife Refuge along SR 29. The

fourth panther I encountered in the wild was when I was driving north late at night on State Road 29. I stopped to help a motorist who said he had accidentally hit an alligator that damaged the plastic under his vehicle. We walked back to where he thought he had hit the gator, but the gator had walked off. As we returned to the vehicles, we hugged the fence on the side of the road to be away from the traffic on a dark road. A panther hissed and spit loudly and slapped the fence we were walking alongside of. We were only separated from the panther by about a foot – but had the fence between us.

24. I am interested in visiting the Carlton Reserve soon. I also recently visited the Little Manatee River State Park several times near my home. Because of its proximity to the Myakka River State Park, the Carlton Reserve and the stretch of lands north of the Caloosahatchee River could be a place for panthers, but recent development and transportation projects make that a challenge. I plan to spend more time in the public lands of Central Florida and exploring wildlife connections between the I-4 Corridor and the Caloosahatchee River. I am interested in and will be visiting public lands in this region because I now live closer to these lands, and they are within the Florida Wildlife Corridor and the expansion area for the Florida panther. When the M-CORES highway project was still working its way through the state approval process, I advocated strongly to stop the project due to severe disruption to the habitat and the movement of wildlife in this area.

25. I often look at development and road widening projects during my travels through these areas. My photography captures the interaction between human development and habitat. Growing up in New York, the large amount of remaining wilderness and the degree of biodiversity in South Florida fascinated me. It was also interesting for me to see the

DocuSign Envelope ID: E5E87686-197C-42BC-BBDA-86743DDD5A63

proximity of this wilderness and wildlife habitat to the intense level of human development that is also a part of this region.

26. The juxtaposition interests me, but I don't like to see it. I feel the state is trading off its most important natural habitats, including those that are vital for its state animal, the Florida panther, for subdivisions and strip malls. I consider this to be this to be a very bad tradeoff. It makes me sad that it is happening, and that state and local governments are greenlighting it. I also believe the state-assumed 404 permits are coming in with great frequency right now and many are receiving quick approvals.

27. I am concerned about the boom-and-bust history of development in Florida and the burden this new development and growing population places on local governments to provide services, to residents like me.

28. There is something about Florida that I believe is special and that I love. I have hiked around the world, including in the Rocky Mountains, the Andes, and Alaska. In Florida, you can hike year-round, and the biodiversity is overwhelming. Aside from the wildlife, I love natural places for my own well-being. I feel bad when I do not get outside for any length of time. I have also learned to navigate on foot by compass and GPS and feel very comfortable in Florida's most wild landscapes.

29. I grew up with a passion for fishing in New York City.  I fished regularly in Jamaica Bay near my home in Brooklyn and then along many parts of the Hudson and East Rivers. I believe these experiences were what first introduced me to caring about the environment. I fell in love with the nature and wildlife I experienced when I moved to Florida, but I also saw it disappearing right before my eyes. This made me an environmentalist. The

DocuSign Envelope ID: E5E87686-197C-42BC-B8DA-86749DDD5A63

Everglades is a special place, and it is sad that it is being destroyed. It is an incredible world resource that should be treated better than it is.

30. I enjoy talking to the locals I meet when I am exploring these places. I like having conversations with them about Florida's history and what the landscape once looked like pre-development. I have gotten to know some of the locals that live in the towns around Lake Okeechobee who have described to me what the northern Everglades looked like before sugar fields covered the landscape.

31. My experiences as an environmentalist have changed through the years. Initially, I was more of a naturalist – and tried hard to learn the names of many native plants, birds, and wildlife. But as I learned more about the history, law, and policy affecting these places I became more knowledgeable. I now understand the politics more and how Florida's environment is being managed. I often think about the changes being made to the natural environment. When I view a landscape now, I see the land as it is. But I also know what the land was like before, how and why it changed, and often I have the knowledge of what is coming.

32. I am familiar with the state's assumption of the 404-permitting program. I voiced opposition to the state's assumption of the program in public comment. I provided verbal comments at the EPA hearing on the state's assumption of the program.

33. One of my main concerns is that the transfer of the program to the state eliminates the biological opinion process under the federal Endangered Species Act. It also eliminates full NEPA review and the consideration of other laws such as the National Historic Preservation Act.

34. I know how in-demand housing development is, and biological opinions are one of the only tools to fall back on for the survival and recovery of species like the Florida panther. Section 7 of the Endangered Species Act allows a line to be drawn to stop development that would jeopardize these species. It is the last and best tool we have, and it directly implements the intention of the ESA to conserve rare species.

35. This won't take place through the State's technical assistance process. The new process speeds up the pace of development with many more applications coming in and being approved.

36. As a non-lawyer, it was not easy for me to learn and become familiar with the federal process for protecting endangered species. Yet, in one swoop of the pen it was replaced with a process I still don't fully understand. FWC has very little experience with the ESA, and it is now the lead agency in approving projects in the habitat of federally listed wildlife. FWC's previous reviews were at best anemic for development projects applying for state permits. Often, their comment on a project they were asked to review was "no comment." They never issued biological opinions and have no experience with them. In my opinion, though FWC staff were extremely knowledgeable about Florida's wildlife and their needs, they were not an agency that did a rigorous review of the impacts of development projects. My experience with the FWS is that their review yielded a full biological opinion for individual projects. At the very least, it was a written document produced according to the guidelines laid out in the Endangered Species Act. I knew there was a formal federal process for submitting public comment and that people could challenge a biological opinion in federal court if it was thought to be inadequate.

37. This technical assistance process is novel and does not have all the requirements of a biological opinion. Components like the environmental baseline, action area, and effects analysis are described in the ESA and the ESA regulations. The components of a biological opinion make the process intelligible and subject to review and one can challenge them in federal court if they are deficient. These components are lost through the state's assumption of the program.

38. It also makes it more difficult to challenge the state's decision in state court as there are fewer resources to do so. I have previously brought suits in federal court to protect the panther and the ESA was front and center. Previously, I relied on federal legal practitioners who were ESA experts to represent me in federal court. I will lose the expertise of many federal lawyers to interpret the adequacy of biological opinions for me and challenge a permit that harms endangered species.

39. The blanket incidental take statement in the Programmatic Biological Opinion was one of the biggest daggers. There was no specificity for any project, current or future, and the impacts to each species of concern are unknown. New development projects in Southwest Florida will bring new roads, which will inevitably lead to more vehicle trips, resulting in more roadkill. Vehicle mortality is one of the major impacts to panthers and this will greatly affect my ability to see and look for them in the wild. I am also concerned about how these projects will affect the species as a whole as well as the many other wildlife species which share the panther's habitat.

40. I don't believe state protections are adequate. There is no superfluous habitat for panthers. I am now left with the problem of not knowing what I can do to advocate for the panther and how I can best make a difference.

41. The state's assumption of the permitting program creates a lot more anxiety knowing the places I explore and the wildlife I like to see will be impacted by the new roads and development. The light pollution from these developments will destroy my ability to see the night sky in the places I enjoy visiting, particularly in Southwest Florida. Newly approved development will cause degradation in all kinds of ways and is already impacting the public lands I visit. I am concerned about not seeing wildlife in places like Big Cypress. I also enjoy seeing the signs of them - their scat, tracks, and markings. Not seeing them will make me sad.

42. I have been extensively involved in transportation, development, and energy projects that impact panthers, especially in Collier County.

43. I regularly attend County Commission and Planning Commission meetings.

44. I speak out against new development at public meetings.

45. I created an online petition that garnered more than 165,000 signatures to ask FWS to reject approval of the Eastern Collier Multi-Species Habitat Conservation Plan.

46. I have met with FWS and other federal agencies about projects that threatened species like the panther in Southwest Florida. I have given numerous interviews with the press and track a lot of projects including the Town of Big Cypress and its three component villages. I spoke in opposition to these projects at the public meetings I attended and my comments were often picked up in the local press. These component villages include Belmar, Longwater, and Rivergrass. Each of these separate villages are approximately 1,000 acres each and were each the subject of separate planning and county commission hearings. I attended most of those hearings. These projects run from just north of Oil Well Road to just north of the Florida Panther National Wildlife Refuge. The villages and

the town itself are deep in the primary zone of the panther and will have multiple impacts

on the panther and many other species. I also warned the commissioners that in

approving these projects, they were inviting human-wildlife conflicts. The Florida

Panther Wildlife Refuge is a haven for Florida black bears as well as panthers. And food

odors from the new residences will surely attract bears into the new neighborhoods.

47. My top concern with these projects is their proximity to the Florida Panther NWR that I

frequently visit and plan to continue visiting. I visit the Refuge because it has the greatest

density of panthers based on telemetry points. I know from the FWC's annual reports

which track the movement of collared panthers, that these panthers are constantly moving

in and out of the Refuge boundaries. The surrounding lands are very important to wildlife

of the Refuge, but also because they form habitat connections between the Refuge and

the CREW Lands and many other public lands in the vicinity that I also enjoy visiting.

Allowing these developments to fragment this rural, undeveloped, and currently

unpopulated area harms the panther and other species living there. This harm will impact

my ability to enjoy these largely untouched areas and the wildlife that lives there.

48. I am also monitoring the Immokalee Road Rural Village, which is a 2,500-acre project

south and east of Immokalee Road. It is in close proximity to Audubon's Corkscrew

Swamp Sanctuary (to the north) and the CREW lands to the west - specifically Flint Pen

Strand and Bird Rookery Swamp (areas I regularly hike in). I have also attended planning

and county commission hearings on this project. The west side of the project is in the

primary zone of the panther and the east side is in the secondary zone. I am aware of

numerous panthers that have already died as a result of roadkill on the part of Immokalee

Road which separates the west side of Immokalee Road Rural Village from the CREW

Lands further west. This project is also near public lands I regularly use and will continue to use. Like the projects discussed above, this large-scale project also threatens to further fragment panther habitat and, as such, harms my ability to enjoy these lands and view wildlife.

49. Another project I was very engaged in was Brightshore Village, which is on the north side of Immokalee Road in the same general vicinity as Immokalee Road Rural Village. I opposed this project as well at the planning and county commission level.

50. The area is deteriorating and there are other projects everywhere in rural parts of Southwest Florida. I try to track as many as I can to help these panthers through my advocacy. Once we had the potential for a Habitat Conservation Plan (HCP) for a significant section of Eastern Collier County, but now we won't even have individual biological opinions for each of these new projects. My concern is nobody at the state is watching these projects, that they are not being looked at as a whole and that their impacts are not being considered cumulatively. I also don't believe the new process will provide the "hard look" that NEPA previously provided and required.

51. Previously, biological opinions would be posted on FWS's Vero Beach office website for public review. I could also provide comments to FWS and U.S. Army Corps of Engineers on permit applications that were under review and a biological opinion was being prepared. It was a slower process, but it provided protections and adequate time to review complex decisions. Who actually benefits now from this new "streamlined process?" I believe this transfer of authority was a gift to developers without any benefit for wildlife or the current residents of this rapidly developing part of Southwest Florida.

DocuSign Envelope ID: EEE87686-197C-42BC-BBDA-86743DDD5A63

52. I also don't believe the public understands the new process. In my experience, when previously appearing before local government officials, I would be told that it is for the federal scientists to determine if the project would harm endangered wildlife (or cause their extinction) under the Endangered Species Act. Now that process is no longer in place. I have been involved in the federal process for a long time and I am still trying to wrap my head around this new state approval process.

53. From what I've seen so far, the approval process now feels like an applicant for a building permit receiving specific terms and conditions on how he/she should construct a given project. In a Biological Opinion, all the components of the review including the specifics of how listed wildlife will be impacted by the project are spelled out in the ESA. It is a formal process that others, including federal courts, could review and determine the sufficiency under the ESA. It was easily subject to outside review and challenge.

54. While Florida is allowed to implement this 404 program, I will be personally harmed by permitted developments that do not undergo the same rigorous review as under the Federal program. The fragmentation of largely untouched rural areas and impacts to wildlife from these developments threaten my ability to enjoy the public lands and advocate for the protection of the panther and other species for the reasons discussed above.

55. If I had the ability, I would immediately bring the process back to the U.S. Army Corps of Engineers and FWS whenever federally listed species would be affected. The previous system was imperfect, but it was codified and subject to challenge in federal court when there were inconsistencies with the requirements of the Biological Opinion and the ESA. It carried with it the bigger lens of federal law including NEPA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February ___23___, 2023.

DocuSigned by:

*Matt Schwartz*

16A5ED2A5C724D5...

Matthew Schwartz

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## <u>DECLARATION OF LISA RINAMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

I, Lisa Rinaman, make the following declaration:

1.      I am a resident of Jacksonville, Florida.

2.      I am competent to make this declaration.  I provide this declaration based upon my personal and professional knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.      I am a member of St. Johns Riverkeeper, and I am also employed by St. Johns Riverkeeper as the Riverkeeper.

4.      At 310 miles long, the St. Johns River is the longest river in the state of Florida and is a significant waterway for commercial and recreational use.  It flows south to north and spans the northern half of the state on the eastern side.

5.      Through my work at St. Johns Riverkeeper, I have extensive experience advocating for the St. Johns River's water quality and health.  My work includes holding regulatory agencies and polluters accountable, including investigating and reporting threats and

monitoring for permit violations; identifying and advocating for solutions to protect and restore the river; building coalitions across government entities, businesses, and the community to solve problems affecting the river; working with the media to highlight river-related issues; and educating the public about river related issues.

6.      Before being named Riverkeeper, I previously served in the St. Johns Riverkeeper Water Policy Group, where I advocated for water conservation and reuse policies that are more protective of our water resources.

7.      I also previously worked as a senior staff member for Jacksonville Mayor John Peyton, where I was instrumental in leading the effort to develop and implement irrigation, fertilizer, and Florida-friendly landscape ordinances to better protect the St. Johns River and local waterways.  I also played a key role in securing state funding for water quality improvements, organized Jacksonville's Manatee Protection Plan, and advocated for robust programs to fulfill the River Accord restoration plan for the Lower St. Johns River.

8.      I graduated with a Bachelor of Arts in Communications from the University of Arkansas in 1991.

9.      I have a deep and personal commitment to the protection and conservation of the St. Johns River.  I regularly enjoy recreating in the river, where I kayak, boat, swim, fish, bird-watch, and take photos with my husband and teenage boys.  I also regularly enjoy hiking and camping in the areas surrounding the river.  These are activities that members of St. Johns Riverkeeper also regularly partake in and enjoy.  These activities depend on there being a clean, pollution-free river whose waters are fresh and not depleted.

10. St. Johns Riverkeeper is a 501(c)(3) nonprofit with approximately 1,400 dues-paying members made up of businesses, families, single members. We also receive support and funding from foundations.

11. The core purpose of St. Johns Riverkeeper, for which my work is vitally intertwined, is to protect the river, tributaries, and watershed. In doing so, we are also protecting the habitat of all the species who depend on the river.

12. EPA's approval of Florida's application to assume control of section 404 permitting undermines St. John Riverkeeper's mission. Among other failings, when Florida submitted its application to EPA, it claimed it would not need to commit any new financial resources to the program. Additionally, the state program has no lawful plans to ensure that listed species are adequately protected, and analyses of section 404 permit applications issued by Florida would no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the Endangered Species Act ("ESA"), as they would if 404 authority remained with the U.S. Army Corps of Engineers instead.

13. Because section 404 permit applications processed by Florida do not undergo a NEPA analysis or site-specific ESA section 7 consultation, state 404 projects are subject to a far less rigorous environmental review, which is increasing risk of harm to the St. Johns River water quality and ecosystem.

14. Overdevelopment, overpopulation, reduced water quality, and loss of critical wildlife habitat would harm my and St. Johns Riverkeeper members' ability to enjoy this natural area.

15. The state's administration of this unlawful section 404 program is preventing St. Johns Riverkeeper from being able to monitor and engage in proposed permits to the same

degree that the federal program afforded us.  As an organization, we heavily rely on federal

review and analysis of projects that affect the river and its entire ecosystem.

16.     Because FDEP state assumption of the 404 program is in place, we are losing the

protections that the federal law allows under the Clean Water Act, NEPA, and ESA.  This means

that there is no federal analysis or comment process on projects and permits under those laws.

As an organization, we do not have the ability to take on every advocacy effort, so we rely on

that federal review to evaluate those projects to protect the river.  We can then review the

information provided by those federal reviews to assess the impact of those projects, share that

information with our members, and advocate for necessary protections.  Our organization now

suffers from losing that information.

17.     Our organization will be significantly harmed without these federal analyses

because to advocate effectively, we will be required to hire our own experts in an attempt to

otherwise assess and understand impacts of agency actions.

18.     One of the main tools St. Johns Riverkeeper uses to protect the river is the

commenting process afforded by the NEPA.  When there is a proposed agency action (such as a

Corps 404 permit), we review the applications and documents; review applicable laws and

regulations; determine the scope and effects it would have on the St. Johns, its tributaries, and

watershed; and submit comment letters as needed.  As with this case, we also engage in litigation

when needed to carry out our organization's goals.

19.     Additionally, the environmental assessments and analyses required under NEPA

are crucial to St. Johns Riverkeeper's ability to carry out its mission.  We rely on this

information that we otherwise would not have access to in order to fully and accurately

understand the scope and impacts of a proposed agency action.  In turn, we use this information

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD4

to educate our members about a proposal and how it impacts the river and their ability to utilize the river. This information is also vital for our advocacy, monitoring, and litigation efforts.

20.     Because Florida has assumed 404 wetlands permitting, we have lost NEPA review and the high-level of protections it affords for the environment and our water resources. The loss of crucial information is extremely detrimental to St. Johns Riverkeeper's ability to carry out its mission of protecting the river. And because of this loss, we would be required to hire our own experts to ascertain information previously provided under federal law. Experts costs thousands of dollars to retain, which is thousands of dollars that would otherwise go toward our programmatic goals. The loss of information from NEPA analyses will result in additional staff time to triage permits to identify harms to the river and additional costs in hiring experts.

21.     NEPA also provides our organization with an avenue for challenging 404 permits and ensuring better environmental analyses. St. Johns Riverkeeper is being harmed by the loss of federal court as a venue to challenge agency actions taken on section 404 permits. As with this case, our organization engages in federal court litigation as a tool to advocate for the river and oppose actions that would harm it. Without federal court access to challenge certain permits, we are now required to bring permit challenges in state court before the Division of Administrating Hearings ("DOAH"). Because legal proceedings in front of DOAH do not involve records review from an administrative record, St. Johns Riverkeeper would be required to spend money to hire expert witnesses if it were to bring a legal challenge. Factoring in the time and costs to build a case from the ground up in state court, one single challenge could cost upwards of several hundreds of thousands of dollars, which represents 35% of our annual operating budget. We either have to fundraise in order to cover additional costs to litigate, which would be a significant drain on our time and resources with no guarantee of success; divert

resources to cover these costs that would otherwise cover other items in our budget; or be foreclosed completely from this avenue to protect the river.

22.     Engaging in state court litigation would also risk St. Johns Riverkeeper's exposure to a mandatory "fee-shifting" provision, in which we would risk being liable for the costs and fees to engage in litigation, costs and fees that we would not be subject to if Florida was not allowed to assume the 404 program.  Such a fee-shifting provision would further diminish our ability to engage in litigation, because we would be required to weigh this financial risk in addition to the above costs, regardless of how strong our claim might be.

23.     Assuming we would be able to overcome the steep barriers to litigating a case in state court, St. Johns Riverkeeper might still be precluded from challenging a proposal or action in state court as a result of different legal requirements under state versus federal law.  It is my understanding that under Florida law, we would be required to show harm to a significant number of our members to be able to bring a claim, rather than to just one member under federal law.

24.     St. Johns Riverkeeper was also harmed by Florida's incomplete application, which did not include the technical assistance process the state proposed to use to ensure state permits will not jeopardize ESA-protected species.  In doing so, the application did not address how ESA-protected species review would occur, how a no-jeopardy determination would be made, or relevant and important information about the take of listed species.  While Florida's application referred to a "technical assistance" process that it said would be described in "an anticipated biological opinion," the biological opinion containing that information was not part of the application, frustrating St. Johns Riverkeeper's ability to analyze and comment on the process.  Florida relied on this missing information when asserting that it complied with the

Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for St. Johns Riverkeeper to comment on whether the state's plan would in fact protect listed species.

25. We were also harmed by the Corps creation and the state's use of an incomplete list of assumed versus retained waters. This harmed St. Johns Riverkeeper's ability to carry out its organizational mission. The incomplete list did not include the headwaters of the St. Johns River, which is a series of lakes and wetlands that are hydrologically connected to the river. Without the full list of retained waters, we were unable to educate our members about the impacts and decision-making process of such a momentous shift in Florida wetlands. And the headwaters that were not retained are now subject to the state's flawed 404 program.

26. The state's enforcement of its section 404 program also harms St. Johns Riverkeeper. St. Johns Riverkeeper engages in enforcement activities to protect the river. This includes investigating and reporting pollution, monitoring for permit violations (including dredge and fill permits), and ensuring that environmental laws and regulations are implemented and enforced. To that end, we patrol the river regularly in our organization's boat, the Kingfisher, which is captained by our patrol unit. When appropriate, we refer issues to the authorities for investigation and criminal prosecution, for which we provide any necessary assistance. The state program, however, does not include the same enforcement standards and requirements as federal law.

27. For example, in 2021, St. Johns Riverkeeper was contacted about a construction site on Pottsburg Creek that was pumping muddy water into the adjacent wetlands and that was failing to construct permit-required siltation fences to control sedimentation released into the waterways. See Pictures (Att. A). We investigated these conditions along with the neighbors,

who had reported the violation to FDEP.  Overall, it took months for FDEP to issue a consent order requiring the construction site to stabilize the site to ensure no further sedimentation reached the adjacent wetlands.  Because FDEP did not move with necessary speed to protect these wetlands, more polluted water being released into wetlands than should have been (over 1,000 times the amount allowed by law).

28.     My personal recreational and aesthetic interests as a member of St. Johns Riverkeeper are also being harmed by the state 404 program because the state is considering permits that would impact the headwaters of the St. Johns River.  One such project is Mattamy Homes at Fiske Blvd, which would permit Phase 1 of a project to construct and develop an approximately 246-acre site.  The permit applicant states that the project will impact 22.64 acres of jurisdictional wetlands, but the applicant used the vacated Trump definition of waters of the United States to make that assessment.  The project will also likely impact wading birds because the current site contains habitat for nesting and migratory birds.  Permit Application, ST404_398515 (Att. B); Email from FDEP to Commenting Agencies (Sept. 2, 2022) (Att. C); RAI Response, ST404_398515 (Att. D).

29.     Destruction of these wetlands so close to St. Johns River headwaters and construction of a housing development will impact the St. Johns River and my ability to enjoy recreating on the River.  The project is also concerning because its impact on wading and migratory birds, which will likely harm my interest in birdwatching on the St. Johns River.

30.     As a plaintiff to this case and for the reasons stated in this declaration, it is St. Johns Riverkeeper's position that Florida's 404 program is unlawful and will result in harms to the river that our organization strives to protect.  This was reflected in St. Johns Riverkeeper's advocacy during the state's 404 application process, during which I was engaged in our review

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD4

of Florida's proposal during EPA's public comment period and participated in the development of our comments in opposition to the program.

31.     Because the EPA granted the state's application to take over the 404 program, the state has been applying and will continue to apply its unlawful program for permits that will destroy wetlands and risk significant harm to listed species. And our organization will now have substantial difficulty furthering our mission because of the significant barriers for advocacy, as discussed above.

32.     My recreational and aesthetic interests are also being harmed by the state's operation of the 404 program because the state is now considering permits that would affect the water quality and habitat in St. Johns River headwaters. My ability to enjoy boating, kayaking, swimming, fishing, bird-watching, and photography on the St. Johns River depends on a healthy river with necessary water supply. These permits threaten the St. Johns River water quality and supply.

33.     Absent EPA's unlawful approval of the state 404 program, St. Johns Riverkeeper would continue to enjoy rights and protections guaranteed by federal law, including participation in the lawful 404 program administered by the U.S. Army Corps of Engineers for more than 40 years in Florida, the public participation process afforded by NEPA, the protections afforded to species through the ESA whenever a project may affect a listed species, and the ability to enforce all these rights in federal court, where St. Johns Riverkeeper can meet more permissive standing requirements and afford to litigate based on an administrative record, unlike the undue barriers that litigation in state court present.

34.     Florida's assumption of the Section 404 program has and will lead to greater environmental harms that irreparably harms St. Johns Riverkeeper's programmatic operations

and will also harm my and our members' enjoyment and use of the river and the beautiful and unspoiled natural areas that surround it.

35.     A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress St. Johns Riverkeeper's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress St. Johns Riverkeeper's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 24 day of February 2023.


DocuSigned by:

*Lisa Rinaman*

42AEE8821F824DB...

Lisa Rinaman
Riverkeeper at St. Johns Riverkeeper
2800 University Blvd N
Jacksonville, FL 32211


10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**DECLARATION OF RACHEL SILVERSTEIN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Rachel Silverstein, Ph.D., make the following declaration:

1.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

2.      I am a resident of Coral Gables, Florida.

3.      I am the Executive Director and Waterkeeper of Miami Waterkeeper, one of the Plaintiffs in this case.  I am also a member of Miami Waterkeeper.  I have been a member of Miami Waterkeeper since 2014.

4.      As Executive Director and Waterkeeper, I lead and oversee all of Miami Waterkeeper's programs and initiatives, utilizing my expertise in marine biology and deep working knowledge of South Florida's waterways, wetlands, and ecosystems.  I hold a Ph.D. in Marine Biology and Fisheries from the University of Miami and a B.S. degree in Ecology, Evolution, and Environmental Biology from Columbia University.

1

5.      Miami Waterkeeper is a 501(c)(3) nonprofit whose mission in South Florida is to ensure swimmable, drinkable, fishable water for all; protect marine ecosystems and habitats; and to ensure resiliency and preparedness for sea-level rise.  We accomplish these goals through legal advocacy, community outreach, and education and scientific research.  Collectively, our organization's work focuses primarily on water quality and aquatic habitat protection, such as marine and wetland ecosystems.  Founded in 2010, Miami Waterkeeper has paying members as well social media followers.

6.      Miami Waterkeeper's clean water initiatives are specifically grounded on the bedrock protections of the federal Clean Water Act ("CWA").[1]  We work to keep South Florida's waters clean by (1) training the public to document and report pollution through our 1000 Eyes on the Water program; (2) litigating against polluters who violate environmental laws; (3) referring matters to the authorities for investigation and prosecution; (4) reporting stormwater runoff violations to regulatory agencies for possible enforcement action; (5) preventing algae blooms by working to reduce fertilizer use, stormwater runoff, septic tanks, and sewage spills; (6) protecting against contamination from Miami's aging nuclear power plant; (7) fighting against proposed rules that would allow more toxic and cancer-causing chemicals in Florida's water; (8) training the next generation of environmental leaders and clean water advocates through our Junior Ambassador program; (9) testing popular recreation beaches and waterways for bacteria on a weekly basis; (10) reporting the latest water quality data to the public on theswimguide.org; and (11) working to stop unnecessary application of herbicides like glyphosate into our waterways.

---

[1] Miami Waterkeeper, About Us, Our Focus Areas, Clean Water: https://www.miamiwaterkeeper.org/clean_water ("Swimmable, drinkable, and fishable water is a right granted to all of us under the Clean Water Act").

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F8889DFB3BAD

7.    Miami Waterkeeper's ecosystem and habitat protection initiatives focus on protecting freshwater wetlands, coral reefs, saltwater and mangrove wetlands, and seagrasses. The coral reefs that we work to protect are protected under the Magnuson-Stevens Fisheries Management Act; and specific corals and their critical habitats in our local reefs are protected under the Endangered Species Act.  Along with the aforementioned initiatives, additional ways we accomplish this mission include (1) protecting coral reefs from dredging and supporting coral restoration and research; (2) litigating to stop illegal destruction of our natural areas; (3) litigating to enforce the Endangered Species Act ("ESA") and the National Environmental Protection Act ("NEPA"); (4) advocating to improve water quality in Biscayne Bay and surrounding waters; (5) producing economic studies that value ecosystem services; (6) supporting efforts to get more fresh water to Biscayne Bay, like the Biscayne Bay Coastal Wetlands project; and (7) conducting key scientific research to inform policy decisions.

8.    Miami Waterkeeper reviews proposed agency actions, and when we determine it is necessary to engage to protect South Florida's waters and marine habitats, the main tools we employ include (1) thorough review of said agency action under NEPA and the ESA; (2) engaging in the comment process; (3) organizing public participation in the comment process[2]; (4) litigation; and (5) public education, i.e. a blog, social media, and/or newsletter posts to our members and followers relying on environmental assessments, environmental impact statements, and biological opinions.

---

[2] As an example, see our Port Everglades Action Alert page: https://www.miamiwaterkeeper.org/port_everglades_action_alert, which documents how we organized over 10,000 comments and circulated a petition that was sent to the U.S. Army Corps of Engineers for stronger protections of coral reefs in response to the Corps' dredging project at Port Everglades in Fort Lauderdale, FL.

9.      Our legal challenge to the Port Everglades dredging project, beginning in 2016 and ongoing, is an example of how Miami Waterkeeper harnesses the protections of NEPA and ESA to protect ESA-listed coral.  To protect the reefs near Port Everglades from the devastation to coral that occurred in a similar dredging project in Miami (in which we also took legal action), we filed a NEPA and ESA lawsuit against the Army Corps and the National Oceanic Atmospheric Administration ("NOAA").  We argued that by ignoring the unexpected harm that occurred to the reef at Port Miami, the Corps failed to use "best available science" in their Port Everglades environmental analyses.  In response, the Corps agreed to conduct new environmental studies before starting its planned dredging project to expand Port Everglades.

10.      As discussed in this declaration and for the reasons stated in Plaintiffs' complaint, Miami Waterkeeper is opposed to Florida's assumption of the 404 permitting program because state 404 permits are not subject to NEPA review and analysis, ESA consultation, nor federal CWA processes and guidelines, on which we rely when reviewing, commenting, and challenging permits; and it will make it more challenging, if not impossible, to bring permit challenges in court.  The proposed state 404 projects that would be within Miami Waterkeeper's purview to challenge, as discussed at paragraphs 27–44 below, demonstrate the harms that are and will occur as Florida continues to operate the program, harms that impact Miami Waterkeeper's organizational mission and my and our members' recreational and aesthetic interests.

**Miami Waterkeeper and Its Members are Harmed by Florida's Assumption of the 404 Permitting Program**

11.      Miami Waterkeeper and its members are harmed, and will continue to be harmed, by Florida's assumption of the state 404 permitting program.

12.      Miami Waterkeeper almost exclusively litigates in federal court.  We typically do not litigate state court claims because of the significantly high costs and drain on our resources to

do so.  Permit challenges in state court are not administrative review cases, as they are in federal court.  Therefore, we do not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA litigation affords.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case like this before Florida's Division of Administrative Hearings can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.

13.     A state permit challenge would significantly cut into our operating budget, requiring us to divert resources that would otherwise be dedicated to our programmatic work.  We would have to (1) raise additional money to fund these challenges; (2) use funds from our existing operating budget; or (3) no longer engage in litigation as an advocacy tool.  Under the first option—raise additional money to fund these challenges—the time spent fundraising would prevent us from carrying out our other programmatic work, and it is unknown whether we would even be successful in raising funds to cover legal costs.  Under the second option—use funds from our existing budget—factoring in our other operating and overhead costs, we would not be able to carry out as much of our other robust programmatic work.  Under the third option—abandoning litigation as an advocacy tool—we would no longer have this powerful tool of seeking legal remedies to carry out our organization's mission of protecting South Florida's waters, wetlands, and species' habitats.  All three options would damage our operations, with the first two resulting in a depletion of our time, resources, and money away from our existing program work to the detriment of our ability to actually carry out other work.  The third option would drastically impede our ability to carry out our organization's mission by eliminating one of the main advocacy tools we use to accomplish our mission, namely, litigation.

14.     On top of the aforementioned irreparable harms, Miami Waterkeeper would be further harmed by the mandatory fee-shifting provision for permit enforcement and 404 unpermitted discharge litigation, which we would not be subject to in federal court.  This further financial risk on top of the above-listed costs of litigating in state court means we would effectively have to choose between bringing these challenges in state court or carrying out our other existing programs and initiatives.

15.     Furthermore, even if we somehow were able to raise enough funds to cover state court litigation, we would still face potentially insurmountable hurdles to getting into court, since Florida law requires harm to a significant portion of our members to pursue litigation on their behalf, whereas federal law would only require us to show harm to at least one member.

16.     Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations.  For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

17.     There have already been gaps in Florida Department of Environmental Protection's ("FDEP") enforcement of environmental laws.  For example, Miami Waterkeeper took an inventory of NPDES permits along the Miami River and discovered that many of the permits were outdated or that discharges were occurring without a permit.  Miami Waterkeeper went through the painstaking process of researching each permit in FDEP's Oculus search engine. We also had to work with graduate students and law students to assist with the inventory, which further resulted in a diversion of resources to manage the students.  Among the violations we discovered, four were particularly egregious.  This process culminated in a letter to FDEP

urging them to enforce the NPDES permit program.  Miami Waterkeeper letter to FDEP (Borja Crane Amores), 30 March 2018.

18.     Another example of FDEP's enforcement limitations concerns the Municipal Separate Storm Sewer (MS4) permittees.  FDEP, as the MS4 program administrator, has the oversight responsibility to provide support, assist with compliance, and ultimately enforce the permit terms and conditions.  Miami Waterkeeper reviewed the compliance and practices of 35 Phase I MS4 operators in Miami-Dade County to ascertain the Permittee's compliance with their MS4 permits.  We found that none of the 35 MS4 permit holders were 100% compliant with their permit requirements, and the average compliance score was below a C-, based on our rubric.  We consulted Oculus for compliance records and examined the five lowest-performing municipalities. We found that enforcement actions, where they were started or attempted, were ineffectual at gaining full compliance. For a full review of our findings, please see: *An Audit of Miami-Dade County Stormwater Permit Compliance: 2022 Report Card and Recommendations*, Miami Waterkeeper & Everglades Law Center, July 8, 2022, https://www.miamiwaterkeeper.org/stormwater.

19.     Aside from litigation and enforcement, the loss of NEPA, ESA, and CWA review, analyses, and public notice and comment requirements that have resulted from Florida's assumption of the 404 program will also harm our organizational mission.  Without these required evaluations and analyses, we will lose access to information that allows us to assess projects and understand the impacts of those projects on waters, wetlands, and species.  This information is necessary to determine how to advocate effectively and to inform our members and followers of the crucial developments that could impact them.  As a result, we will either be unable to carry out a major aspect of our organizational mission, or we will be required to

expend significant resources hiring experts to provide us with this information we otherwise would have access to.  Either option will cause great harm to Miami Waterkeeper's ability to protect local waters, species, and their habitats.

20.     Overdevelopment, and the resulting environmental harms to South Florida's freshwater and marine ecosystems, are also more likely to occur with this assumption because of the state's lack of federal guidelines and reviews as well as public notice and comment required by the Clean Water Act, NEPA, and the ESA.  Dense urban development increases contaminated stormwater runoff.  It also leads to increased pressure on the aging sewage infrastructure or an increased number of septic tanks.  Both sewage leaks and septic tanks increase nutrient runoff and bacteria levels, leading to algae blooms and/or public health and recreation implications.  Additionally, without the natural filtration system wetlands provide for stormwater runoff, nutrient runoff to lakes, ponds, ocean, and surrounding bays would increase, leading to increased turbidity and algae blooms that are harmful to marine species and renders waters unsafe for humans.  Nutrient-loading and harmful algal blooms are well-documented problems in Florida, as was seen earlier this year with algal bloom and nutrient loading that caused a massive fish die-off and made parts of Biscayne Bay a temporary dead zone.[3] Last, development authorizations that fail to incorporate credible endangered species review imperil the biodiversity of our area of responsibility, Miami-Dade and Broward counties.

---

[3] For further information on this event, see Miami Waterkeeper's coverage: https://www.miamiwaterkeeper.org/fish_kill.

**Organizational and Membership Harms from Particular Projects**

21.     Because the state is presently administering the 404 program, the state is poised to issue 404 permits on major projects that will impact Miami Waterkeeper's organizational interests and my interests as a member.

22.     **Port 1850**.  A project that would have been in our purview to challenge is Port 1850 LLC's application to place 44,107 cubic yards of fill within 4.21 acres of mangrove wetlands for the construction of a new commercial warehouse in Fort Lauderdale.  <u>See</u> Army Corps of Engineers public notice for this project, Dkt. 31-1, at 29–39.  This project was transferred to the state of Florida on December 28, 2020.[4]

23.     Mangroves and other estuarine environments provide critical habitat for protected species in southeast Florida including the eastern brown pelican, wood stork, manatee, and common snook.  Mangrove forests provide habitat for adult fish and also act as nurseries for juvenile species.  They stabilize shorelines, protecting coastal areas from storm surge and providing erosion control.  South Florida is particularly vulnerable to sea level rise, so this protective buffer area is of critical importance.  Mangroves trap sediments and maintain water quality by absorbing nutrients and other pollutants from the water.  <u>See</u> U.S. Fish and Wildlife Service's informational report on mangroves:

https://www.fws.gov/verobeach/msrppdfs/mangroves.pdf.   Mangroves also absorb carbon dioxide and other greenhouse gasses from the atmosphere and store those gasses—an important ecosystem service to combat climate change.  Mangrove forests have declined across the state due to overdevelopment.  *See* FDEP's informational page on mangroves:

---

[4] State 404 File for Port 1850 Project: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396518/gis-facility!search.

https://floridadep.gov/rcp/rcp/content/floridas-mangroves. For these reasons, mangrove species

have been protected by law in the state of Florida.  *See* Florida's Mangrove Trimming and

Preservation Act: https://floridadep.gov/sites/default/files/mtpa96_0.pdf.

24.     The smalltooth sawfish is one such species, <u>see</u> Dkt. 31-3, at 40–55, listed as

endangered under the Endangered Species Act by the National Marine Fisheries Service.

Destruction of mangroves will have a direct, negative impact on this species which uses

mangroves for nursery habitat.  This area of South Florida where the project is located is part of

the historic range for smalltooth sawfish.

25.      Destruction of mangroves releases large amounts of sediment, carbon, and

nutrients, which can be fatal to seagrasses by causing shading, suffocation or eutrophication,

which can lead to algae blooms.  Other federally listed species depend on seagrass in South

Florida; these include the West Indian manatee, American crocodile, loggerhead sea turtle,

hawksbill sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, roseate tern, wood stork, and

bald eagle.  *See id.* at 122 (describing species that depend on seagrass); *id.* at 124

(describing the ecological function of seagrass).  Furthermore, the coastal area of South Florida

is home to one of the world's largest loggerhead rookeries and increasing green turtle and

leatherback breeding populations.  *See id.* at 144–158, Bovery, Wyneken, *Seasonal Variation in

Sea Turtle Density and Abundance in Southeast Florida Current and Surrounding Waters*, at 9.

This area of Fort Lauderdale is also home to the West Indian manatee.

26.     Preservation of these endangered and threatened species are critical to Miami

Waterkeeper's mission, and to the recreational and aesthetic interests of Miami Waterkeeper's

members.  Miami Waterkeeper has members in Broward County who regularly recreate on the

water canals and intercoastal waterway area downstream of the project area, which will be

DocuSign Envelope ID: 9A44C8F8-1699-4906-9265-E2890DFB3BAD

negatively impacted by the destruction of the mangroves. This project site is also approximately two miles west of Eula Johnson State Park, where Miami Waterkeeper has led beach clean-ups with members and the general public and has given lectures and presentations on South Florida marine ecology, habitats, and species. We have also held a diving "Bioblitz" event and coral identification trainings just offshore of Port Everglades. Harms to habitat and species are very likely to occur here if this project is allowed to go forward, negatively impacting Miami Waterkeeper's members and Miami Waterkeeper itself in its mission to protect and study marine species and access natural areas to carry out program activities.

27.     Miami Waterkeeper's ability to challenge this project's permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law. The state program also lacks enforcement capacity and measures required under federal law, reducing the incentive to comply with permit requirements, further increasing the risk to wetlands and species.

28.     Harms to the waters and species would also affect me personally as a member of Miami Waterkeeper. I go boating and diving at the mouth of Port Everglades, which is approximately two miles north of the above-cited warehouse project. When I go boating and diving, I enjoy observing listed coral and other marine wildlife, and I look out for and try to observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and dolphins. My ability to enjoy these waters and wildlife are dependent on there being clean, safe waters. The approval of this project and likely resulting harms would negatively impact my ability to recreate in this area, due to harms to the waters and wildlife.

29.     In 2021, Miami Waterkeeper began a water quality sampling contract with the City of Fort Lauderdale, which will include routine monitoring of multiple sites within a few miles of project SAJ-2020-01739.  *See* Dkt. 31-3 at 159–60, Miami Waterkeeper's Water Monitoring Map.  Members of the community and followers of Miami Waterkeeper depend on our weekly water quality updates on our mobile platform to gather information about water quality at these sites where they recreate.  These activities include paddle-boarding, kayaking, jet-skiing, and swimming, among others.  Increased development under an unlawful state-assumed program and the aforementioned environmental harms from project SAJ-2020-01739 would impede community members and Waterkeeper followers from engaging in these recreational activities and may negatively impact water quality.

30.     **CPN West, LLC.**  Based on the permit file,[5] this project would impact wetlands and should have required a state 404 permit, but FDEP applied the vacated Navigable Waters Protection Rule ("NWPR") to issue a "No Permit Required" decision on October 6, 2021, over a month after the rule was vacated on August 31, 2021.  *Pasqua Yaqui Tribe, et al. v. U.S. Env't Prot. Agency, et al.*, No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021).  Miami Waterkeeper's attorneys notified the state and EPA about Florida's need to stop using

---

[5] State 404 File for CPN West LLC, https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_402032/facility!search.

NWPR on multiple occasions.[6]  EPA notified the state that it must apply the pre-2015 regulatory regime rather than NWPR.[7]  But Florida has continued to apply NWPR regardless.[8]

31.     A tree survey included with application documents suggests that this is a palustrine, forested wetland with cypress, maples, and palms.  Pictures included in the file show trees exhibiting morphological adaptations: cypress knees and buttressed bases—these indicate the site floods.  A soil survey derived from the National Resources Conservation Service classifies the soil in this location as "Sanibel muck," a hydric soil.  This property's mature wetland canopy and its position in the landscape make it a unique, relict natural area in the urban landscape surrounding it.

32.     This project, involving the placement of fill for several buildings and access roads, impacts recreational and aesthetic interests by removing mature, scenic wetlands, and by adding fill to an area that drains into the Cypress Creek canal, which is tributary to Lake Santa Barbara and the intracoastal waterway, which is in the geographic area that my organization protects and defends.

---

[6] Letter from Tania Galloni, Earthjustice, to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment A); Letter from Tania Galloni, Earthjustice, to Mark Wilson & Lance Pierce, Developers, Feb. 16, 2022 (Attachment B) (copying EPA and FL); Letter from Christina I. Reichert, Earthjustice, to Radhika Fox, EPA, Jan. 30, 2022 (Attachment C).

[7] Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment D); Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment E).

[8] *See* Final NPR (granted Feb. 16, 2023), *in State 404 File for Int of Moccasin Wallow Rd & Carter Rd, ST404_417551,* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_417551/facility!search; Final NPR (granted Feb. 14, 2023), *in State 404 File for East Daytona North — Phase 2 Paving, ST404_428112,* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_428112/facility!search.

DocuSign Envelope ID: 9A44C8F8-1699-4906-8265-E2890DF33BAD

33.     A portion of the site is also within the 300-foot buffer retained by the Corps. Because a portion is within this 300-foot buffer, the 404 application files should have contained a determination as to which agency would review under 404 purview.

34.     Moreover, the NPR letter states that the site "current[ly] connect[s] through a drainage ditch that runs to the Cypress Creek Canal." Therefore, the project contains a direct surface-water connection to seagrasses, mangroves, and corals that I and other Miami Waterkeeper members enjoy and seek to protect.

35.     If the state were not operating the 404 program in assumed waters, this permit would have required a Section 404 permit from the Corps, including application of the Corps' compensatory mitigation rule at 33 CFR Part 332, and Executive Order 11990, "no Net Loss of Wetlands."  Moreover, the Corps permit would have been subject to NEPA review, ESA Section 7 consultation, and the rigors of the federal Clean Water Act program more generally.

36.     If Florida is allowed to continue operating this unlawful 404 program, Miami Waterkeeper will be harmed in its ability to carry out its mission of protecting South Florida's waters, wetlands, species, and their habitats.  Additionally, the recreational and aesthetic interests of Miami Waterkeeper's members, including myself, will continue to be harmed by the state processing section 404 permits.

37.     A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Miami Waterkeeper's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 consultation and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress Miami Waterkeeper's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of

Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of February, 2023.

Rachel Silverstein, Ph.D.
Executive Director and Waterkeeper
Miami Waterkeeper
P.O. Box 141596
Coral Gables, FL 33114-1596
(305) 905 0856

DocuSign Envelope ID: EA3B8104-BD13-4BDA-A927-87EAF30F3E84

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF PRESTON T. ROBERTSON

I, Preston T. Robertson, make the following declaration:

1.  I am a resident of Tallahassee, Florida.

2.  I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.  I am the former President and Chief Executive Officer of Florida Wildlife Federation, Inc. ("FWF"), one of the Plaintiffs in this case, and a lifetime member.  I worked for FWF for over 17 years and was President and Chief Executive Officer from February 2019 until December 2022.

4.  FWF is a 501(c)(3) nonprofit that solely focuses on conserving Florida's wildlife, habitat, and natural resources.  FWF was founded in 1936 and has grown in membership to over 9,000 members and approximately 60,000 supporters throughout Florida.  The mission of FWF is to ensure that wildlife and Florida's fragile environment have a voice, which is echoed in our

motto: "Wildlife is our Middle Name."  FWF does this through three main outreach areas:
1) Environmental Education, 2) Policy and Advocacy, 3) and Science-based Stewardship.

5.    FWF's Environmental Education program focuses on educating the public on the
importance of protecting Florida's environment.  FWF accomplishes this through a distribution
of various media focusing on wildlife issues.  FWF's media includes books, videos, and a
newsletter aiming to educate the public on the importance of protecting the environment.
Additionally, FWF supports wildlife research and environmental preservation.

6.    FWF program areas focus on wildlife, land conservation, water, and climate
change through our educational materials, policy and advocacy.  FWF advocates for the
protection of species like the Florida panther and other listed species through connection of
existing conservation lands along with road crossings in Southwest Florida.  FWF has been a
leader in statewide land conservation and advocates for more funding for the Florida Forever
program and other similar programs.  FWF promotes Everglades restoration, strengthening the
environmental resiliency of our rivers and bays, and coastal protection for sea turtles and birds.
Lastly, FWF pushes for action on the state and federal level to counter climate change with
activities such as successfully promoting a ban of oil and gas drilling in Florida's coastal waters.

7.    A majority of FWF's core advocacy work is dedicated to wildlife protection and
land conservation.

8.    As former President and Chief Executive Officer at FWF, I specialized in
advocating for the protection of Florida's wildlife and lands.  I have over 31 years of experience
as an environmental attorney in Florida advocating for the protection of Florida' environment.

9.    EPA's approval of Florida's application to assume control of section 404
permitting undermines FWF's mission.  Among other failings, Florida has not committed

DocuSign Envelope ID: EA3B8J04-BD13-4BDA-A021-87EAF30F3E84

sufficient financial resources to the program, it relies upon an unlawful technical assistance

process regarding its duty to ensure that listed species are adequately protected, and analyses of

section 404 permit applications issued by Florida no longer include review under the National

Environmental Policy Act ("NEPA") and consultation under section 7 of the Endangered Species

Act ("ESA"), as they would if 404 authority remained with the U.S. Army Corps of Engineers

("Corps").

10.     Because section 404 permit applications processed by Florida do not undergo a

NEPA analysis or site-specific ESA section 7 consultation, these projects are subject to a far less

rigorous environmental review, which increases risk of harm to listed species and their habitats.

11.     The state's administration of the section 404 program prevents FWF from being

able to monitor and engage in proposed permits to the same degree that the federal program

afforded us.  As an organization, FWF is heavily reliant upon federal review and analysis of

projects that affect wildlife, land conservation, climate and water.  We review applications that

go to the Corps, and we act on them as needed depending on the impacts of the proposed project.

We have relied on information generated through NEPA and the ESA to assess the harms posed

by proposed projects.  These critical federal analyses provide a baseline for the natural

environment and protected species and analysis of impacts and alternatives from which we can

assess proposed agency actions and resultant environmental impacts.

12.     While Florida maintains 404 jurisdiction over assumable waters, we are losing the

information, analysis, and protections that these federal laws provide.  We are also losing the

opportunity to participate in the NEPA process for major projects.  This reduces our ability to

advocate for wildlife by greatly reducing the information we have available to evaluate the

impact of proposed projects, and our ability to identify those projects where it is most imperative

that we focus our limited resources. FWF does not have the ability to take on every advocacy

with regard to every 404 project that will adversely affect wildlife, so we have for years relied on

information generated by the Corps, the U.S. Fish and Wildlife Service, and the National Marine

Fisheries Service to evaluate projects for our members and Florida's environment, and decide

where to best focus our efforts.

13.     FWF is significantly harmed without these federal analyses because the

organization would have to hire cost-prohibitive experts to obtain comparable information to

assess and understand the impacts of the proposed projects. Experts such as these can cost

thousands of dollars per case, well beyond our budget. And as a small organization with limited

staff, without this information we are unable to review and act on proposals or projects at the rate

we normally did. Therefore, the loss of information from these analyses results in additional

staff time to triage permits to identify harms to the listed species and their habitats and requires

additional costs in hiring experts. Therefore, our core program work focused on conservation is

significantly hindered.

14.     A primary tool FWF uses to protect species and their habitats is the public

commenting process. When there is a proposed agency action, FWF reviews the applications

and any available federal analyses, determines the scope and effect it would have on wildlife and

their habitats that we seek to protect, review applicable rules and laws, and submits comment

letters. Without the information generated when the Corps has jurisdiction, FWF is greatly

hindered from obtaining information necessary to weigh in on the impact of proposed projects.

15.     For example, under the state 404 program, there is no ESA Section 7 consultation

for individual projects, and no requirement that applicants pursue an ESA Section 10 habitat

conservation plan process to obtain incidental take protection. Section 7 and Section 10 reviews

4

are robust and comprehensive as required under the ESA. We often rely on these processes to understand, comment, and engage on these projects.

16.     The resulting federal analyses from these processes help us evaluate the impacts on Florida's wildlife and land conservation. Many endangered and threatened species are in Florida and are subject to regulatory review by the agencies, including but not limited to Florida panthers, bonneted bats, nesting turtles, sturgeon, and smalltooth sawfish. These species are important to FWF, and to me as a member of FWF, for their ecological value. In addition, land conservation protects our watersheds and our native species.

17.     Many listed species are likely to be adversely affected by projects permitted through Florida's section 404 program. For example, these projects can cause habitat destruction and fragmentation. Florida's program does not adequately protect against these harms, in part because it does not require consultation under Section 7 or a habitat conservation plan under Section 10 of the ESA, and because projects are not subject to scrutiny under NEPA.

18.     In addition to interfering with our ability to understand and therefore comment on projects, the state's unlawful assumption hinders our ability to enforce the law by challenging illegal section 404 permitting actions, when necessary. It is my understanding that, as compared to federal court, there is a higher bar to establish standing in Florida state court because FWF would be required to show that a substantial number of its members will be affected by the challenged action, while in federal court FWF is only required to show that a single member is adversely affected. It is also my understanding that FWF would risk exposure to mandatory "fee-shifting" in certain types of actions which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. FWF is not exposed to this same risk in federal court, the forum for challenges to actions by federal agencies. The risk of incurring these

substantial costs and fees could hinder FWF's ability to challenge illegal permit authorizations in Florida that would cause serious harm to threatened and endangered species even if the claims are strong.

19.     FWF was also harmed by Florida's incomplete application, which failed to include a biological opinion assessing the risk to species from the program, and an incidental take statement authorizing incidental harm of listed species resulting from the state program and state-issued permits.  These documents were not provided during the public comment period and were completed only after the public comment period closed.  In doing so, the application did not address how endangered species review would occur, how a no-jeopardy determination would be made, or relevant and important information about the take of listed species.  While Florida's application referred to a "technical assistance" process that it said would be described in "an anticipated biological opinion," the biological opinion containing that information was not part of the application, frustrating FWF's ability to analyze and comment on the process.  Florida relied on this missing information when asserting that it complied with the Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for FWF to comment on whether the state's plan would in fact protect listed species.

20.     EPA's ultimate approval of Florida's 404 program, which does not require rigorous section 7 consultation with U.S. Fish and Wildlife Service for permits that may adversely affect protected species, and instead provides a broad exemption from incidental take liability for harm to species, imperils protected species.

21.     As a plaintiff to this case and for the reasons stated in this declaration, it is FWF's position that Florida's 404 program is unlawful and will result in harm to the environment and

DocuSign Envelope ID: EA3B81D4-BD13-4BDA-A981-87EAF30F3E84

wildlife that our organization strives to protect. This was reflected in FWF advocacy during the state's 404 application process, during which I was engaged in FWF's review of Florida's proposal during EPA's public comment period and participated in the development of our comments in opposition to the program.

22.     Absent Florida's unlawful assumption, FWF would continue to enjoy rights and protections guaranteed by federal law, including participation in the lawful 404 program administered by the U.S. Army Corps of Engineers for more than 40 years. FWF would also benefit from the public participation process afforded by NEPA, the protections afforded to species through Section 7 or Section 10 of the ESA whenever a project may affect a listed species, and the ability to enforce all these rights in federal court, where FWF can meet standing requirements and afford to litigate based on an administrative record, unlike the barriers that litigation in state court present.

23.     EPA's approval of Florida's unlawful 404 permitting program, which has faster processing times and less stringent permitting requirements, also increases the likelihood that ESA section 10 Habitat Conservation Plan ("HCP") processes will no longer be utilized. As an alternative to section 7 project-by-project consultation, the ESA section 10 incidental take permit ("ITP") application process for private developers requires an HCP that minimizes and mitigates impacts to protected species. Unlike Florida's 404 application process, which is designed to be completed in a matter of months, development of an HCP is a complex process that can take years to complete in order to ensure that species receive the level of protection Congress intended. It requires landowners and developers to come together to initiate the process. The beauty of an HCP is that it allows various stakeholders—including environmental conservationists—to work together and create a framework to ensure that environmental interests

are considered in the development of the plan; and it can set aside land in perpetuity for wildlife and water resources. All too often, individual development and transportation projects move forward in a piecemeal fashion, which results in a "checkerboard" of habitat destruction and fragmentation across the landscape, to the severe detriment of species dependent on continuous and connected habitat. The HCP process is intended to prevent this.

24. The HCP process is more stringent than Florida's 404 permitting program in that it requires NEPA analysis and a biological opinion under section 7 of the ESA, among other statutory requirements. The section 10 HCP process also requires long-term monitoring for compliance, including periodic accountings of take, surveys to determine species status in project areas or mitigation habitats, and progress reports on fulfillment of mitigation requirements. The HCP process would naturally result in greater species and environmental protections than Florida's 404 permitting process because it requires more stringent and detailed standards of review, both before and after the ITP is approved. From the perspective of developers, however, the HCP process is arguably more costly and time-consuming because it contemplates various development projects, has more stringent standards that must be met for approval, and as a result, is a much lengthier process than the 404 permit program. The HCP process is also much more expensive. The state 404 program creates a disincentive for developers to go the HCP route because it gives them an easy shot at incidental take protection through a simpler, cheaper "technical assistance" process not contemplated or authorized by Congress. This creates additional risk of loss of environmental and species protection from overdevelopment in the unique and biodiverse state of Florida.

25. To further FWF's organization goals, FWF has actively engaged on habitat conservation plans in order to obtain protections for listed species and conserve habitat for their

survival and recovery.  For instance, for years FWF worked on the Eastern Collier County HCP

("Eastern Collier HCP") in Southwest Florida, which represented a significant focus of its

Florida conservation work because of its importance to protecting species in one of the most

biodiverse regions of the country.  The proposed Eastern Collier HCP covered approximately

152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connect

the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other

protected areas in the region.  This HCP would have kept 70% of the area as either conservation

or agricultural lands, with the other 30% set aside for residential and commercial development.

26.     In August 2022, however, the landowners who are party to the Eastern Collier

HCP withdrew their HCP application.  Now the development projects proposed to be covered by

the HCP will only undergo the State's species review process associated with their state

processed 404 permit, which is not as stringent as ESA's Section 7 or Section 10 review.

27.     As with the loss of use of habitat conservation plans in general, it is detrimental to

FWF's mission that the landowners abandoned the HCP in favor of the state 404 assumption

program which has a much lower bar to meet to obtain a permit and which does not have the

same long-term monitoring requirements.  The loss of the Eastern Collier HCP and/or the

decrease in protections it contemplated represents the loss of an entire body of FWF's work in

Florida to protect endangered and threatened species in this region for the past decade.  It also

means that FWF has had to start from scratch in working to protect endangered species in this

area, particularly the highly endangered Florida panther.  Instead of ensuring species protection

through one HCP for numerous development projects, FWF now has to review and challenge

problematic developments on a project-by-project basis in state court.

28.     The lack of NEPA and ESA site-specific consultation with Florida's 404 program and the hurdles and roadblocks to litigating in state court, as described above, harms FWF's ability to carry out the organizational mission of protecting wildlife.

29.     While Florida is allowed to implement the state 404 program, FWF will continue to be harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

30.     A favorable ruling from this Court would return Section 404 authority to the Corps and restore the federal protections afforded under NEPA and the ESA.  In addition, a favorable ruling would allow FWF to pursue remedies in federal court in order to vindicate rights under the CWA, NEPA, and ESA.  A decision favorable to the Plaintiffs will prevent the issuance of permits authorized by the state program and the associated harms to FWF as outlined above.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of February, 2023.

DocuSigned by:

*Preston Robertson*

9C75928929AF45D...

Preston T. Robertson

14241 Buckhorn Road

Tallahassee, FL 32312

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF SARAH GLEDHILL

I, Sarah Gledhill, make the following declaration:

1.      I am a resident of St. Augustine, Florida.

2.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.      I am President and Chief Executive Officer of Florida Wildlife Federation, Inc. ("FWF"), one of the Plaintiffs in this case.  I began my career with FWF 19 years ago, advocating for the development of policies that protected Northeast Florida's natural resources. In 2016, I became FWF's Planning Director focusing on statewide water resources, land acquisition, and growth management initiatives.  After spending a few years with the Center for Biological Diversity, I returned to FWF as its Regional Policy Director in 2021 and later became Vice-President.  On January 21, 2023, I became the fourth President to lead the organization.

4.      FWF is a 501(c)(3) nonprofit that solely focuses on conserving Florida's wildlife, habitat, and natural resources.  FWF was founded in 1936 and has grown in membership to over 9,000 members and approximately 60,000 supporters throughout Florida.  The mission of FWF is to ensure that wildlife and Florida's fragile environment have a voice, which is echoed in our motto: "Wildlife is our Middle Name."  FWF does this through three main outreach areas: 1) Environmental Education, 2) Policy and Advocacy, 3) and Science-based Stewardship.

5.      FWF's Environmental Education program focuses on educating the public on the importance of protecting Florida's environment.  FWF accomplishes this through a distribution of various media focusing on wildlife issues.  FWF's media includes books, videos, and a newsletter aiming to educate the public on the importance of protecting the environment. Additionally, FWF supports wildlife research and environmental preservation.

6.      FWF program areas focus on wildlife, land conservation, water, and climate change through our educational materials, policy and advocacy.  FWF advocates for the protection of species like the Florida panther and other listed species through connection of existing conservation lands along with road crossings in Southwest Florida.  FWF has been a leader in statewide land conservation and advocates for more funding for the Florida Forever program and other similar programs.  FWF promotes Everglades restoration, strengthening the environmental resiliency of our rivers and bays, and coastal protection for sea turtles and birds. Lastly, FWF pushes for action on the state and federal level to counter climate change with activities such as successfully promoting a ban of oil and gas drilling in Florida's coastal waters.

7.      A majority of FWF's core advocacy work is dedicated to wildlife protection and land conservation.

8.      On behalf of FWF, I concur with Preston Robertson's, FWF's former President, declaration regarding the harms FWF has sustained and will continue to sustain because of Florida's assumption of the 404 permitting program.  Preston Robertson accurately describes those harms to our organization and I adopt those in my official capacity on behalf of FWF.

9.      While Florida is allowed to implement the state 404 program, FWF will continue to be harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

10.     A favorable ruling from this Court would return Section 404 authority to the Corps and restore the federal protections afforded under NEPA and the ESA.  In addition, a favorable ruling would allow FWF to pursue remedies in federal court in order to vindicate rights under the CWA, NEPA, and ESA.  A decision favorable to the Plaintiffs will prevent the issuance of permits authorized by the state program and the associated harms to FWF as outlined above.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 09 day of February, 2023.

DocuSigned by:

*Sarah Gledhill*

87734EF4DD8142D...

Sarah Gledhill

53 Salt Point

St Augustine, FL 32086

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF DIANA UMPIERRE

I, Diana Umpierre, make the following declaration:

1.      I submit this declaration in support of the Sierra Club in the above-captioned action.

2.      I live in Pembroke Pines, Broward County, Florida, near the Everglades and the associated Water Conservation Areas, and have lived here since 2000.  I spend a considerable amount of time enjoying and trying to help protect the natural environment and wildlife in South Florida.  I believe our unique ecosystem and wildlife are very important to the communities here and for biodiversity in general.

3.      Accordingly, I became an active member of the Sierra Club in 2014 to help protect and conserve endangered species and natural ecosystems in South Florida.

4.      I became an employee of the Sierra Club in June 2016 and since then have been serving as an Organizing Representative for the Sierra Club's Everglades Restoration Campaign.

5.      Prior to joining Sierra Club, my experience included working as a geoscientist for environmental consulting firms in New Jersey and Florida where I provided geographic data analysis of impacts to ecologically sensitive habitats and water quality from planned transportation and water/wastewater projects as part of NEPA environmental assessments. My experience also includes working as a geographer for the South Florida Water Management District where I supported regional water supply long-range planning for 16 counties in South Florida, including analysis of geographic data on water resources and of land cover over time to determine wetland impacts.  I assisted the Southeast Florida Regional Climate Change Compact by coordinating with government and academic partners in analyzing, mapping, and communicating sea level rise vulnerability for four counties in Southeast Florida, including Miami-Dade.  I earned my Bachelor of Science degree in Geological Sciences from Cornell University in 1990.

6.      The Sierra Club is a national non-profit grassroots environmental organization with over 700,000 members across the United States dedicated to practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.  Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, wilderness preservation, public lands and waters protection, and the protection of clean air and water resources.  These activities support Sierra Club's mission to explore, enjoy, and protect the wild places of the earth.

7.      The Sierra Club headquarters is in Oakland, California.  Sierra Club has chapters across the nation, including Florida, with members interested in wildlife and wildlife habitats.  Most of the Sierra Club chapters include all-volunteer groups, whose members work to preserve and protect their area's natural resources.  Sierra Club's Florida Chapter has nearly 5,000 members and focuses on protecting Florida's unique natural wonders, including its springs, wetlands, and endangered wildlife like the Florida panther and the Florida bonneted bat.

8.      One of the Sierra Club's main national initiatives, the Our Wild America campaign, which includes Everglades restoration efforts, tackles pressing environmental problems including global warming and threats to wildlife.  Sierra Club has long advocated for protections for species under the ESA, and has brought litigation to ensure that Federal agencies meet their ESA obligations.

9.      My work involves supporting and expanding volunteer-based grassroots efforts to promote the restoration of the Greater Everglades ecosystem and the protection of its remaining natural wildlife habitats from threats such as water mismanagement, development, and sea level rise.

10.      As an active member, I have advocated for Everglades restoration, the protection of native habitat, and the restoration of natural and clean water flows, which are important for healthy wildlife.  I also spend time educating people about the importance of protecting Florida panther and Florida bonneted bat habitat.  I plan to continue participating in these activities in the future.

11.     I am also an active member of the International Dark Sky Association and have advocated for the protection of the natural nocturnal environment, which is important for wildlife, including nocturnal species like fireflies, the Florida panther, and the Florida bonneted bat.  In 2016, I helped Big Cypress National Preserve become the first National Park Service unit east of Colorado to achieve an International Dark Sky Place designation, in part because this protection is important for the Florida panther and other nocturnal species.  I have also been actively engaged in advocating for similar Dark Sky Place designations and stronger nocturnal environment protections for other parts of the Greater Everglades, including Miami-Dade County, Florida Panther National Wildlife Refuge, and Everglades National Park.  Therefore, protecting the natural night sky and the nocturnal environment of these conservation areas is very important to me.

12.     EPA's approval of Florida's application to assume control of section 404 permitting undermines Sierra Club's mission.  Among other failings, Florida has no lawful plans to ensure that listed species are adequately protected and analyses of section 404 permit applications issued by Florida will no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers ("Corps") instead.

13.     Because section 404 permit applications processed by Florida do not undergo a NEPA analysis or site-specific ESA section 7 consultation, these projects are subject to a far less rigorous environmental review, which increases the risk of harm to listed species and their habitat and harms Sierra Club's mission.

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525159EFCE

14.     Florida claimed this permitting program would be easily streamlined with their current state environmental resource permitting ("ERP") program which has significant differences and is required for projects that impact surface waters.  Florida also stated throughout the assumption process that it will process permits faster than the Corps has in the past.  The harms from this transfer of authority are detailed in an article written by Craig Pittman wherein he describes how lobbyists for the developers called this handover "the Holy Grail."  *See* Attachment A.  The bottom line is that "super-fast permit approvals" prioritize development over our precious wetlands in Florida.

**Organizational and Membership Harms From Particular Projects**

15.     The state's 404 program undermines Sierra Club's ability to realize its mission by depriving the organization of information, rights, and remedies available when Section 404 is administered by the Corps, as it has been for decades.  As a result of EPA's unlawful transfer of 404 authority to the state, the state will continue to issue 404 permits on major projects that will harm Sierra Club's organizational interests and my interests as a member.

16.     A project we are particularly concerned about is the Bellmar development project (state 404 application number 0396364-001) in Southwest Florida.  Collier Enterprises Management, Inc., applied on December 16, 2020, to build the Bellmar project in eastern Collier County, Florida, which would encompass over 5,000 acres and affect approximately 132 acres of wetlands. The project is located approximately one mile from the Florida Panther National Wildlife Refuge, which protects the core habitat of the endangered Florida panther. Telemetry data also shows the presence of the Florida

panthers on the project site. The proposed development would also impact habitat of the endangered Florida bonneted bat and crested caracara. On September 15, 2022, Sierra Club submitted public comments to Director Martha Williams of the U.S. Fish and Wildlife Service on the threats the development would pose to the Florida Panther. *See* Attachment B.

17.     Two additional project proposals that we are particularly concerned about are oil drilling projects in Big Cypress National Preserve that, if approved, would pave the way for oil drilling and production in the preserve for the next 30 years.

18.     Spanning over 700,000 acres, Big Cypress National Preserve is the nation's first national preserve.  It is a continuous freshwater ecosystem comprised of five habitats that are connected by the water that flows through them, and it is replenished entirely by rainwater.  The water flows from the hardwood hammocks to the pinelands, across the prairies, into the cypress swamps, and then into the estuaries that flow to the Gulf of Mexico.  The freshwaters of Big Cypress are crucial to the health of the neighboring Everglades and critical to the wildlife that inhabits it.  Big Cypress provides habitat for various listed species and has the largest contiguous acreage of habitat for the endangered Florida panther in south Florida.

19.     For the first proposed Big Cypress project I am concerned about, the Nobles Grade Prospect (previous state 404 application number 323836-004), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad for three vertical wells and an access road in Big Cypress National Preserve for the purposes of oil

drilling.[1]  On February 22, 2022, the applicant withdrew this proposal for this project but stated it would resubmit its application pending further project development.  The project as originally proposed would cover 21.21 acres and would result in the filling of 85,000 cubic yards of wetlands in Big Cypress.  The proposed area is located approximately three miles southwest of the rest stop at Interstate 75 mile marker 63.  This rest stop serves as an access point to hiking trails that go directly into the backcountry of Big Cypress.[2]

20.    Big Cypress National Preserve provides habitat for threatened and endangered species.  Endangered Species Act-listed species observed or potentially occurring within or near the Nobles Grade proposed project area include the following: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, crested caracara, and the Florida panther.

21.    For the second proposed Big Cypress project I am concerned about, the Tamiami Prospect (previous state 404 application number 397879-002), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad and an access road in Big Cypress National Preserve at the eastern boundary of the Preserve for the purposes of oil drilling.  On February 22, 2022, the applicant withdrew this proposal as well, and again stated it would resubmit its application pending further project development.  The

---

[1] Burnett Oil's ERP / State 404 Application for Nobles Grade Prospect, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_323836/gis-facility!search .
[2] National Park Service, Big Cypress, I-75 Mile Marker 63, *see* https://www.nps.gov/bicy/planyourvisit/i-75-mm-63.htm .

area would cover 10.99 acres and would result in the filling of 46,000 cubic yards of wetlands in Big Cypress.

22.     Endangered Species Act-listed species observed or potentially occurring within or near the Tamiami proposed project area include: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, crested caracara, Florida bonneted bat, and the Florida panther.

23.     On February 3, 2021, several conservation groups sent a letter to the Florida Department of Environmental Protection ("FDEP") raising concerns about the impacts of the proposed projects.  I have reviewed this letter and incorporate it in this declaration, *see* Attachment C, because I share the same concerns regarding these oil projects.

24.     For example, not included and fully analyzed in Burnett Oil's applications are the scope of activities attendant to oil development and drilling and their impacts such as development activities associated with access roads, staging areas and seismic operations, and construction of gathering, transmission, and distribution pipelines.

25.     Because Big Cypress National Preserve is a continuous ecosystem connected by the flow of freshwater, any disruption to this flow from the oil projects would lead to still or stagnant water directly north and south of the site, altering and disturbing the natural environment on which plant and animal species depend.  Similarly, pollution at one location in Big Cypress will affect the remaining habitats to which that water flows, thereby threatening water quality downstream and in turn, threatening the species that rely on this habitat.

26.     Aside from disruptions to the flow of water and the threat of pollution/water quality degradation, the construction and operation of oil drilling infrastructure will negatively impact the species within the vicinity of the projects. Birds and other wildlife will be forced to flee as a result of the noise, artificial light at night, ground vibration, the presence of machinery, vehicles, and humans, and other attendant circumstances.  Animals that cannot get away risk injury from construction and operation activities.

27.     Burnett Oil's proposed projects are particularly concerning in light of the harmful impacts from previous seismic exploration activities in Big Cypress National Preserve in 2017 and 2018, when Burnett Oil utilized Vibroseis (seismic vibration technology) to send signals into the earth to locate subsurface oil and natural gas deposits within Big Cypress.  This seismic exploration took place over approximately 110 square miles of the Preserve and resulted in significant environmental damage that is still present today.  The damage included severely altered and rutted wetland soils; removal of dwarf cypress trees, which provide roosting sites for birds and other wildlife above high water levels; significantly diminished vegetation groundcover; the presence of dwarf pond cypress tree stumps that are not re-sprouting and the absence of seedlings for these trees; and uneven ground elevations as a result of the company's reclamation attempts, among other harms.

28.     Big Cypress is not suitable for any oil exploration or drilling because of ecological importance and sensitivity, as well as the damage already caused by those activities to this preserve and the protected species that rely on it.  So even if the projects

are modified, similar activities will harm our organizational and my membership

interests.

29.     Another concerning project is the State Road 836 (Dolphin Expressway)

Extension (state 404 application number 13-396515-001-SFI).  On March 26, 2019, the

Miami-Dade Expressway Authority submitted its initial 404 permit application to the

Corps (SAJ-2018-01778 (SP-MLC)).  That 404 permit application was transferred from

the Corps to the state (FDEP) on or about December 28, 2020, a few days after state

assumption became effective. On August 20, 2021, the applicant withdrew this proposal

for this project stating as reason that  "the State 404 authorization cannot be issued until

the [Environmental Resource Permit] has been issued," suggesting that the 404

application would be resubmitted once the applicant completed a "pre-permit application

process with the FDEP."    *See* Attachment D.

30.     While the application was under Corps jurisdiction, on May 22, 2019, the

Corps issued a Public Notice "soliciting comments from the public; Federal, State, and

local agencies and officials; Indian Tribes; and other Interested parties in order to

consider and evaluate the impacts of this proposed activity."[3]

31.     On July 26, 2019, the Everglades Coalition, comprised of over 60

organizations committed to the health and protection of America's Everglades, including

Sierra Club, submitted comments to the Corps opposing the proposed 404 permit, *see*

Attachment E.

---

[3] U.S. Army Corps of Engineers public notice SAJ-2018-01778(SP-MLC), available at
https://www.saj.usace.army.mil/Missions/Regulatory/Public-
Notices/Article/1855244/saj-2018-01778sp-mlc/ .

32.     Furthermore, in a letter sent to Governor DeSantis on June 24, 2020, the

Everglades Coalition asked him to uphold a recent ruling by Florida Administrative Law

Judge Suzanne Van Wyk, which held that the Miami-Dade County Comprehensive Plan

Amendment adopted by Miami-Dade County via Ordinance 2018-109 on September 27,

2018, that would allow for the proposed highway extension, demonstrated inconsistency

with Everglades restoration efforts, with Miami-Dade County's Comprehensive

Development Master Plan, and with state law.  *See* Attachment F.

33.     This project's purpose is to construct a 14-mile toll road extending the

current Dolphin Expressway.[4]  The project will consist of a six-lane toll road extending

State Road (SR) 836 through jurisdictional wetlands within the Comprehensive

Everglades Restoration Plan's (CERP) footprint.  The project would result in the filling

of 360 acres of wetlands and secondary impacts to almost 100 acres of wetlands located

in the Bird Drive and North Trail Wetland Basins which are adjacent to the Everglades

National Park.  These basins have been set aside as a water quality, water seepage, and

habitat buffer for the Park.  Freshwater wetlands are essential to the region for water

quality and wildlife benefits.

34.     Everglades National Park spans 1.5 million acres that stretch over the

southern part of Florida and is home to a vast diversity of plants and wildlife across

different ecosystems: freshwater sloughs, marl prairies, tropical hammocks, pinelands,

cypress, mangrove, coastal lowlands, marine, and estuarine.  The State Road 836

---

[4] Miami-Dade Expressway Authority State 404 related documents are available at
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-
documents/ST404_396515/gis-facility!search .

Extension project would impact the progress made and on-going efforts to restore water flows and quality, fragile ecosystems, and natural resources within the Everglades National Park.

35.     In an August 23, 2019 letter to the Corps, the EPA voiced concerns and stated that the road extension project "may have substantial and unacceptable adverse secondary impacts to the Greater Everglades wetland ecosystem and direct impacts to 350 acres of freshwater wetlands located in the Bird Drive Basin and within Congressionally authorized CERP project boundaries that are an ARNI [aquatic resource of national importance]."[5]  In a subsequent letter on September 16, 2019, the EPA once again expressed its concerns and that it had "received no additional information from the Corps to address these concerns" and that "the EPA finds that the proposed project will have a substantial and unacceptable impact on aquatic resources of national importance."

36.     According to the Corps' May 2019 public notice, there are several listed species that may use the wetlands that would be affected if the SR 836 extension 404 permit is granted, including the wood stork, the Eastern indigo snake, and the Florida bonneted bat.

37.     I am personally and professionally very worried about the federally endangered Florida bonneted bat, the largest bat in Florida.  On June 10, 2020, the U.S. Fish and Wildlife Service proposed critical habitat that includes part of the footprint of

---

[5] U.S. Environmental Protection Agency letter to Army Corps of Engineers, August 23, 2019, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396515/gis-facility!search .

DocuSign Envelope ID: D73B0293-BD78-402E-B269-84F251B9F5CF

the proposed highway project.[6]  I am very concerned that SR 836 extension will induce more traffic that would affect the wetlands and water quality, and invite more development.  All of which will cause harm to the listed species in this area impeding Sierra Club's mission and my personal use and enjoyment of this area.  Several likely consequences include increased bird and snake road fatalities as this area is very close to a water conservation area and wildlife management area within the Everglades Protection Area.  I am also very concerned about a substantial increase of light pollution in nearby conservation areas that may come from new artificial lighting on the highway and associated infrastructure, including exit interchanges and parking areas.  Increased noise will likely also affect listed species that may be present in this area.

38.     All of these projects are particularly concerning to me, because I love and enjoy visiting the Everglades Protection Area, Everglades National Park, and Big Cypress National Preserve.  Over the years I have visited many preserves, but Big Cypress National Preserve is still my most beloved and I visit about four times a year.  I also thoroughly enjoy visiting Everglades National Park, which I visit about two to four times a year.  During my visits, I typically hike, observe the flora and fauna, stargaze, and take photographs.  I enjoy recreating in nature to keep myself healthy, and to observe wildlife.  I enjoy getting outdoors to experience the unique environment and native wildlife, including opportunities to see or hear the Florida panther and Florida bonneted

---

[6] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Florida Bonneted Bat, 50 C.F.R. § 17 (2020), available at https://www.govinfo.gov/content/pkg/FR-2020-06-10/pdf/2020-10840.pdf#page=1 .

bat, of South Florida.  I have plans to continue regularly visiting Big Cypress National

Preserve and Everglades National Park as well.

39.     I also attend night education events hosted by park rangers at Big Cypress

National Preserve.  I always look for panthers and fireflies when I am out at night.  I plan

to continue these activities in the future.

40.     It is important to me to see the natural environment of South Florida

preserved in a way that will maintain the integrity of the ecosystem.  My personal

enjoyment of the ecosystem and natural areas in which I recreate will diminish

significantly if the ecosystem and species like the panther are harmed.  For example,

panthers are critical to supporting and maintaining the health of the South Florida

ecosystem.  Without the panther, or with fewer panthers in the wild, there will be a

domino effect on the ecosystem and its biodiversity.  This substantial alteration of the

native ecosystem will fundamentally change the character and way of life in and around

South Florida, adversely affecting my use and enjoyment.

**Organizational Harms from Waters Excluded from the Retained Waters List**

41.     Members of the Sierra Club reside in nearly every corner of the state and

our members enjoy, explore, and do everything they can to protect the water bodies in

their local regions.

42.     On April 16, 2018, Sierra Club sent a letter to then-District Commander

Jason A. Kirk of the Jacksonville District Corps of Engineers, demanding that "the Corps

completely rectify its inventory of Florida's navigable waters before any actions take

place concerning the assumption of delegation of Section 404 dredge and fill permitting

DocuSign Envelope ID: D73B0293-BD78-402F-B269-84F251B9E5CE

authority by Florida's Department of Environmental Protection." Our well-founded concern was then, and is now, that many of the water bodies left off the current Retained Waters List will be further imperiled by FDEP's failure to provide them protection under an adequate 404 permitting system.

43.     The following water bodies are a sample of water bodies that are ecologically and/or recreationally significant to our members, and which were excluded from the Corps' 2020 Retained Waters List but had been present in the 2017 version of the same list:

44.     The Alapaha River (Hamilton County), is a tributary of the Suwannee River that is impacted by the Hamilton phosphate mining district. Near Jennings, Florida, the Alapaha drains into a sinkhole into the Floridan Aquifer. That aquifer supplies drinking water to more than 90 percent of people in northeast and east-central Florida. This aquifer system underlies an area of about 100,000 square miles in southern Alabama, eastern and southern Georgia, southeastern Mississippi, southern South Carolina, and all of Florida. The Alapaha River and its water trail,[7] like the Suwannee River, is a treasured, popular spot for recreation (fishing, paddling, outings, and camping) for our members.

45.     Several other waterways are imperiled by industry activity and are at further risk with 404 permitting in the hands of the state. Deep Creek (Duval and Baker counties), near U.S. Route 301, runs behind and receives runoff from the Chemours mine

---

[7] Georgia River Network, *Alapaha River Water Trail*, https://garivers.org/alapaha-river-water-trail/.

dump. Water Oak Creek (Bradford County) is also a repository for wastewater from the Chemours mine.  Our members have experienced and witnessed skin burns from contact with the water in Water Oak Creek that feeds into Lake Rowell and Lake Sampson via Alligator Creek (see below).

46.     Deep Creek (Suwannee County) receives phosphate waste from the Nutrien White Springs Phosphate plant and flows into the Suwannee River.

47.     Swift Creek (Hamilton and Suwannee counties) receives phosphate waste from the Nutrien Swift Creek processing plant.

48.     Turkey Creek (Baker County) receives mining discharge from the Chemours mine and the City of McClenny sewage treatment system.

49.     Horse Creek (Hardee and DeSoto counties) is surrounded in Hardee County by existing phosphate mines and is threatened by a new phosphate mine proposal from Mosaic in DeSoto County.[8]  Horse Creek in Hardee County flows within and south of phosphate mines.  Horse Creek is the largest tributary of the Peace River and begins at the "Four Corners," where the counties of Hillsborough, Manatee, Polk and Hardee meet in the heart of phosphate mining territory.

50.     Peace River (Polk, Hardee, DeSoto, and Charlotte counties) is vital to maintain the delicate salinity of Charlotte Harbor, which hosts several endangered species including the smalltooth sawfish.  Phosphate strip mining and fertilizer processing

---

[8] The Mosaic Company, *DeSoto County Project*, https://mosaicfloridaphosphate.com/communities/desoto-county/desoto-project/.

continue to threaten this river.  DeSoto County is under the threat of phosphate mining by Mosaic, the nation's largest producer of fertilizer.

51.     Peacock Slough (Suwannee County) is in Wes Skiles Peacock Springs State Park, which has two major springs, a spring run, and six sinkholes.  Many of our members recreate at this site (hiking, swimming, cave diving, and picnicking).

52.     Ichetucknee River (Columbia County) flows through the Ichetucknee Springs State Park – an area of high ecological and recreational value to our members (paddling, tubing, etc.). The Ichetucknee is imperiled by nutrient pollution that fuels the harmful algae that now chokes its once-pristine waters, in addition to the over-pumping of groundwater.

53.     Santa Fe River (Columbia, Suwannee, Bradford, Baker, Union, Gilchrist, and Alachua counties) flows underground in O'Leno State Park through an intricate cave system, emerges in River Rise Preserve State Park, and empties into the Suwannee River; this river sink/river rise system in O'Leno is the largest swallet-to-resurgence system in Florida.  Gilchrist Blue, Ginnie, Hornsby, Lily, Poe, and Rum Island springs are some of the 36 named springs and numerous smaller springs along the banks of or submerged by the river.  The headwaters of the river are Lake Santa Fe, near Keystone Heights.

54.     The Santa Fe River, its springs, and its tributaries, play a major role in the recreational (spring hopping, paddling, camping, and fishing) lives of our members.  The Santa Fe is also threatened by development in its sizable watershed.  The following Santa Fe River tributaries are also missing from the retained waters list: New River (Union and Bradford counties), the largest of the Santa Fe River tributaries, is near significant

phosphate deposits and was threatened by the HPS II phosphate mining project proposal, which would have mined over 7,400 acres across Union and Bradford counties.  We expect that additional mining proposals will arise because Julian Hazen, who worked for the Florida Industrial and Phosphate Research Institute, is quoted in media as stating that because the United States is low on phosphate rock "[s]omeday, this deposit will be mined. . . [w]hether it's 5 years from now or 20 years from now."[9]

55.     Alligator Creek (Bradford County) receives discharges from the Chemours mine, and it feeds several local waterways. It was once a beautiful paddling spot that has become a polluted drainage ditch. Braggs Branch (Bradford County), just south of Brooker, is also impacted by mining.  New River is part of the Santa Fe River Basin that spans nine counties including parts of Alachua, Gilchrist, Suwannee, Columbia, Union, Bradford, Baker, Clay, and Putnam. This watershed is an important recharge area for the Floridan Aquifer; Olustee Creek (Washington County) and Sampson River (Bradford County) are also tributaries of the Santa Fe River.

56.     Silver River (Marion County) is a seven-mile run from the outflow from Silver Springs State Park to a confluence with the Ocklawaha River.  While it still provides a breathtaking scenic experience for those in canoes or kayaks, and is a popular and beloved destination for our members, it is now choked with algae.  The iconic glass-bottomed boats on the river show a vastly different river bottom from that of 50 years ago.  The Silver River is further threatened by the River Creek RV Resort project (State

---

[9] Molly Minta, WUFT News, *What's Mine Is Yours*, available at https://projects.wuft.org/peakflorida/whats-mine-is-yours/

404 Program Permits: 671124).  The River Creek RV Resort is a proposed 385 Site

Recreation Vehicle Resort on 160.76 Acres located near the confluence of the Silver and

Ocklawaha rivers.

57.     Hendry Creek (Lee County) is located within Caloosahatchee River Basin

and was designated as impaired in FDEP's implementation of its Impaired Waters

Rule.  It runs through the Hendry Creek neighborhood in South Ft. Myers.

58.     Hickey Creek (Lee County) runs through the Hickey Creek Mitigation

Park,  a popular hiking, paddling, and birding location for our members. The creek's

ecosystem supports the threatened Florida Scrub-Jay and gopher tortoises.

59.     Powell Creek (Lee County), a tributary of the Caloosahatchee River, runs

through Powell Creek Preserve and is a popular recreation spot for our members and their

families for walking, biking, and viewing wildlife, including pileated woodpeckers and

gopher tortoises.  The endangered gopher tortoise is a keystone species; it shares its

burrows with more than 350 other species.

**Organizational Harms from the State Program**

60.     The state's administration of this unlawful section 404 program prevents

Sierra Club from being able to monitor and engage in proposed permits to the same

degree that the federal program afforded us.

61.     To start, we do not have the same access to basic information about 404

applications open for public comment under the state program that we were readily able

to obtain from the Corps.  As a staff member, I would regularly review 404 public notices

from the Corps and forward those to Sierra Club groups located throughout the state.

DocuSign Envelope ID: D73B0293-BD78-402F-B260-84F251B9E5CE

Those groups would then use the information to identify projects of concern, help set their advocacy priorities, and prepare members to engage in advocacy, particularly during the comment period.  Sierra Club used this information also to monitor development pressures and trends so that we could tailor our advocacy around those.

62.     The state program, however, does not provide this information in an accessible manner.  The state has an email subscription service, called Permit Application Subscription Service (PASS), that provides a periodic email that lists different permit applications they received for processing. However, that service does not email public notices of 404 permits applications open for public comment.  This unduly burdens Sierra Club's ability to get prompt information about 404 permits open for public comment, which I do get by email from USACE for any 404 individual permit application open for public comment to the Corps from anywhere in Florida. Prompt access is important because 404 permits typically only have a 30-day public comment period and a limited timeframe for Sierra Club and any member of the public to request a public hearing. We cannot do this promptly or effectively to advocate against harmful 404 projects.  We are required to divert resources to try to find the pertinent information, and to do so in time to notify local Sierra Club groups that may be most concerned, and to ensure they have the opportunity to review the application and engage in advocacy before it is too late.  Each of the six FDEP local district posts its 404 public notices on their own separate district web pages. There is no easy means to subscribe to a single email distribution list that automatically informs me when a 404 permit application is open for public comment. It is onerously burdensome, and often not possible, to check six different FDEP district web

pages, every single day, to see if there any 404 permit applications that might be of concern to our Sierra local groups. That is just one example of how the State's assumption of 404 permit is hurting our ability to protect our waters.

63. Without being able to receive public notices in a timely, orderly manner as we had before, we are unable to forward that information in a timely way to Sierra Club groups, and they and we as a result are hindered in our ability to track trends in development that may collectively require coordinated advocacy. This harms our ability to execute our mission.

64. As an organization, we also heavily rely on federal review and analyses of projects that affect wildlife, land conservation, climate, and water. We act on them as needed depending on the impacts of the proposed project. We utilize information required under NEPA, the ESA, and the Clean Water Act to review permit applications. These federal analyses also provide a common baseline for issues, from which we can assess proposed agency actions and their environmental impacts.

65. Because the state program is in place, we are losing all of the protections that the federal law allows. This means that there will be no federal analysis or comment process on state 404 projects and permits. As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

66. Our organization is significantly harmed without these federal analyses because we must hire our own experts in an attempt to assess and understand the impacts of agency actions. Experts cost thousands of dollars per case, we are longer able to

review and act on proposals or projects at the rate we normally do.  The loss of information from these analyses results in additional staff time to triage permits to identify harms to the listed species and their habitats and additional costs in hiring experts.  As a result, our conservation advocacy work is significantly hindered.

67.     One of the main tools Sierra Club uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; review the geographic information and maps that allow us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters.

68.     Under the Florida's 404 program, however, this public commenting process has become significantly more difficult, harming the advocacy of our members and volunteers. First, the state provides far less information about projects than the federal process does.  Second, FDEP has moved the online public commenting process to the FDEP Nexus Business Portal, which requires commenters to provide their personal information including address and phone number to register for an account before allowing them to submit public comments. This onerous system discourages public comments in Sierra Club's grassroots campaigns, to the detriment of our organizational mission and to members concerned with harmful projects.

69.     The loss of critical information and procedural safeguards afforded by NEPA and the ESA significantly sets back our ability to advocate for and protecting

DocuSign Envelope ID: D73B0293-BD78-402F-B269-84F251B9E5CF

water resources, species and their habitats. As the pending 404 project applications discussed above demonstrate, these losses are caused by Florida's assumption of the 404 program. Furthermore, for any of the projects which Sierra Club would challenge through litigation, a tool employed by our organization, it is guaranteed that Sierra Club will either have to divert significant resources to engage in state court litigation, or forego litigation completely, damaging our organizational mission.

70.     The state's unlawful assumption also hinders in other ways our ability to litigate over illegal section 404 permitting actions, when necessary. Sierra Club challenges 404 permits in federal court as one of our advocacy tools to further our mission, and we are harmed by the loss of federal court as a venue as a result of Florida assuming the 404 program because it is much more difficult and expensive to bring these challenges in Florida's state courts.

71.     It is my understanding that there is a higher bar to establish standing in Florida state court because we are required to show that a substantial number of our members will be affected by the challenged action, while in federal court we are only required to show that a single member is adversely affected. It is also my understanding that Sierra Club risks exposure to mandatory "fee-shifting" which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. We are not exposed to this same risk in federal court, where the Corps is the section 404 permitting agency. The risk of incurring these substantial costs and fees results in our inability to challenge illegal permit authorizations in Florida that would cause serious harm to threatened and endangered species, even if our claims are strong.

72.     With assumption, there is now an entirely different legal scheme to challenge wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Sierra Club will have to incur considerable expense to hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Sierra Club would have to divert from other programmatic goals if we did not have to litigate in state court.  In state court, we also would not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes afford.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case before DOAH can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.  As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

73.     The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that are felt personally by me as a member of Sierra Club.  I regularly partake in outdoor activities such as hiking, camping, observing wildlife, stargazing, and nature photography.  Some of the areas that I like to visit include, but are not limited to, Everglades National Park, Big Cypress National Preserve, Fakahatchee

Strand Preserve State Park, Florida Panther National Wildlife Refuge, Corkscrew Swamp

Sanctuary, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild

Wildlife Management Area, and several state, county and municipal-owned natural areas

in South Florida.

74.     Sierra Club is and will continue to be irreparably harmed in its ability to

carry out its mission of protecting native and endangered species, their habitats, and

waters if Florida is allowed to continue operating this unlawful 404 program.

**Redressability**

75.     A ruling in Plaintiffs' favor in this litigation would redress Sierra Club's

and my harms.  A ruling on our Clean Water Act claims invalidating EPA's approval of

Florida's program would restore 404 authority over assumable waters to the Corps,

restoring ESA Section 7 and NEPA review to projects (and the essential information and

analyses that those processes generate), and ensuring that all requirements of federal law

are met and can be enforced in federal court.

76.     A ruling in Plaintiffs' favor on our ESA claims would redress Sierra

Club's and my harms by invaliding EPA's approval of the state program; requiring EPA

to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the

effects of Florida's application on listed species and critical habitat; require the wildlife

agencies to produce legally sufficient biological opinions that properly analyze the

impact to listed species and critical habitat, set limits on incidental take, and impose

reasonable and prudent measures and triggers for reinitiation that are protective under the

DocuSign Envelope ID: D73B0293-BD78-402F-B260-84F2E1B9E5CE

ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

77.     A ruling in Plaintiffs' favor on the Retained Waters List would invalidate EPA's approval of the state program, set aside the Corps' inadequate retained waters list, prevent state 404 permitting on waters required to remain under the Corps' jurisdiction, require EPA to ensure that no non-assumable waters are placed under state 404 authority, and require re-evaluation of the Corps' list to comply with federal law..

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___27___ day of February 2023, at Pembroke Pines, Florida.
.

DocuSigned by:

*Diana Umpierre*

A1CFBA93B2C3410...

Diana Umpierre