**EXHIBIT 11**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

---

## PLAINTIFFS' RESPONSE TO FLORIDA INTERVENORS' MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .......................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................... 2

LEGAL STANDARD .................................................................................................... 3

ARGUMENT ................................................................................................................. 4

    I.   Florida Is Not Likely to Succeed on the Merits of Its Appeal. ............................. 5

       A.   Florida Has Forfeited Any Showing of a Likelihood of Success on Appeal. ................. 5

       B.   The Court's Decision Rests Firmly on the Plain Language of the ESA, ESA Regulations, and ESA Case Law. ....................................................................... 5

       C.   The Court Properly Determined That Plaintiffs Have Standing. ................................. 12

       D.   The Court Properly Weighed the *Allied-Signal* Factors to Determine That Vacatur was Warranted. ........................................................................................... 14

    II.   Florida Has Failed to Demonstrate That It Will Suffer Irreparable Harm. ....................... 16

       A.   Florida's Sovereign Interests Will Not Be Irreparably Harmed. ................................. 17

       B.   No Enforcement Void Will Result Absent a Stay. ..................................................... 19

       C.   Florida's Claims of Cost and Delay Do Not Constitute Irreparable Harm. ................. 21

    III.  The Balance of Equities and Public Interest Weigh Against a Stay. ............................. 25

       A.   A Stay Would Cause Plaintiffs Substantial Harm. ................................................... 26

       B.   The Public Interest Weighs in Favor of Denying Florida's Stay Request. ................. 28

CONCLUSION ............................................................................................................ 32

CERTIFICATE OF SERVICE ................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Akiachak Native Cmty. v. Jewell*,
  995 F. Supp. 2d 7 (D.D.C. 2014) ..................................................................4, 18

\* *Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) .........................................................................16

\* *Alvarez v. Smith*,
  558 U.S. 87 (2009) ..............................................................................................13

\* *Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F. Supp. 2d 230 (D.D.C. 2003) ...................................................1, 27, 29, 31

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
  480 U.S. 531 (1987) .............................................................................................25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................29

*Cigar Ass'n of America v. FDA*,
  317 F. Supp. 3d 555 (D.D.C. 2018) .....................................................................11

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*,
  No. 95-CV-1702, 1995 WL 748246 (D.D.C. 1995) ............................................29

\* *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
  904 F.3d 1014 (D.C. Cir. 2018) .............................................................................5

*Co. River Indian Tribes v. Marsh*,
  605 F. Supp. 1425 (C.D. Cal. 1985) ....................................................................31

*Comanche Nation v. United States*,
  No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ..................30

*Cooling Water Intake Structure Coal. v. EPA*,
  905 F.3d 49 (2d Cir. 2018)............................................................................7, 8, 9

\* *Cuomo v. U.S. Nuclear Regulatory Comm'n*,
  772 F.2d 972, 978 (D.C. Cir. 1985) ......................................................................3

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
  733 F.3d 1106 (11th Cir. 2013) .............................................................................9

\* *Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  319 F. Supp. 3d 70 (D.D.C. 2018) .........................................................................4

\*     *Fund for Animals v. Espy*,
     814 F. Supp. 142 (D.D.C. 1993) ..................................................................29

*Georgia v. Pruitt*,
     326 F. Supp. 3d 1356 (S.D. Ga. 2018) ........................................................18

*Hilton v. Braunskill*,
     481 U.S. 770 (1987) ......................................................................................4

*Humane Soc'y of U.S. v. Kempthorne*,
     481 F. Supp. 2d 53 (D.D.C. 2006) ..............................................................29

*Kentucky v. Biden*,
     23 F.4th 585 (6th Cir. 2022) ........................................................................18

\*     *League of Women Voters of U.S. v. Newby*,
     838 F.3d 1 (D.C. Cir. 2016) ..........................................................................4

\*     *Lujan v. Defs. of Wildlife*,
     504 U.S. 555 (1992) ....................................................................................13

*Menominee Indian Tribe of Wisconsin v. EPA*,
     947 F.3d 1065 (7th Cir. 2020) ....................................................................30

*Mexichem Specialty Resins, Inc. v. EPA*,
     787 F.3d 544 (D.C. Cir. 2015) ....................................................................17

*Miccosukee Tribe of Indians of Fla. v. EPA*,
     No. 1:22-CV-22459 (S.D. Fla. Mar. 18, 2024) ..........................................30

\*     *N. Slope Borough v. Andrus*,
     642 F.2d 589 (D.C. Cir. 1980) ....................................................................10

*Nat. Res. Def. Council v. EPA*,
     489 F.3d 1250 (D.C. Cir. 2007) ..................................................................16

\*     *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
     628 F.2d 604 (D.C. Cir. 1980) ....................................................................31

*Nat'l Wildlife Fed'n v. Andrus*,
     440 F. Supp. 1245 (D.D.C. 1977) ..............................................................29

\*     *Nat'l Wildlife Fed'n v. Brownlee*,
     402 F. Supp. 2d 1 (D.D.C. 2005) ................................................................10

\*     *Nken v. Holder*,
     556 U.S. 418 (2009) ............................................................................ *passim*

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*,
    755 F. Supp. 2d 1104 (S.D. Cal. 2010)........................................................30

\*   *S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*,
    588 F.3d 718 (9th Cir. 2009) .....................................................................31

\*   *Scripps-Howard Radio v. FCC*,
    316 U.S. 4 (1942)......................................................................................17

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ....................................................................4

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)..................................................................................18

\*   *In re Special Proceedings*,
    840 F. Supp. 2d 370 (D.D.C. 2012) .............................................................5

\*   *Tenn. Valley Auth. v Hill*,
    437 U.S. 153 (1978)..........................................................................1, 29, 31

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) .................................................................4, 5

*West Virginia v. EPA*,
    669 F. Supp. 3d 781 (D.N.D. 2023)............................................................18

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)........................................................................................4

\*   *Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..............................................................16, 21

**Federal Statutes**

33 U.S.C. § 1344(i)............................................................................................19, 22

**State Statutes**

Fla. Stat. § 403.121..............................................................................................20

Fla. Stat. § 403.131..............................................................................................21

Fla Stat. § 403.161(1)...........................................................................................20

**INTRODUCTION**

The U.S. Army Corps of Engineers ("Corps") administered the entirety of Section 404 of the Clean Water Act in nearly every other state, including Florida, for more than 40 years until late 2020, when EPA approved Florida's request to administer the program as to assumable waters. In February of this year, this Court vacated that approval because it violated procedural and substantive requirements of the Endangered Species Act ("ESA"). Dkt. 183. The Corps immediately resumed its administration of the program, putting its decades of experience doing so to work. It has identified and allocated resources to process pending 404 permits, including by increasing staff to levels higher than before state assumption. It has met with project proponents and prioritized several projects by giving them expedited review, and it has confirmed that others will proceed apace.

Florida asks the Court to disturb this status quo by granting a stay pending appeal, which would flipflop regulatory authority for the third time in as many years. A stay would create regulatory uncertainty by allowing Florida to issue permits pursuant to a program already found to be unlawful, creating questions about the legality of those permits, any incidental take they may purportedly authorize, and any exemption from liability for incidental take that the program might purport to ensure. A stay would also harm threatened and endangered species by allowing the State to authorize projects that will adversely affect those species and their habitat without ESA compliance, contrary to Congress' intent that protection of these species be accorded the highest of priorities. *Tenn. Valley Auth. v Hill*, 437 U.S. 153, 174 (1978). *Accord Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003).

Florida has not met its burden for such extraordinary relief. Florida has failed to show it is likely to prevail on appeal and has failed to demonstrate irreparable harm. The balance of the

equities and public interest weigh sharply against a stay because the Corps' administration of the program is longstanding, familiar to the regulated community, and compliant with the ESA.

## PROCEDURAL HISTORY

In late December 2020, the Environmental Protection Agency ("EPA") approved Florida's request to assume Clean Water Act 404 authority over assumable waters, making it only the third state authorized to administer the program in more than forty years. In January 2021, Plaintiffs promptly challenged EPA's action as unlawful, seeking vacatur of the approval and related agency actions by U.S. Fish and Wildlife Service ("USFWS") and the Corps. Dkt. 1.

With leave of Court, in March 2021, Plaintiffs sought early summary judgment on their procedural claims (Claims 8 and 9), arguing that EPA's transfer of 404 authority to Florida was unlawful and that as a matter of law, Section 404 authority over assumable waters either remained with—or should be restored to—the Corps. Dkt. 31. In March 2022, the Court denied one of Plaintiffs' procedural claims on the merits. Dkt. 73 (Claim 9). And in August 2023, the Court dismissed Plaintiffs' other procedural claim as no longer redressable. Dkt. 119 (Claim 8).

In February 2024—after reviewing hundreds of pages of briefing on the merits, studying a voluminous administrative record, hearing oral argument on the merits of Plaintiffs' ESA claims (twice), and considering additional briefing on the appropriate remedy—the Court issued a 97-page memorandum opinion granting summary judgment to the Plaintiffs on their ESA-related claims and vacating the challenged agency actions. *See* Dkt. 163 at 7. Florida moved for a limited stay of the ruling, Dkt. 166, while the Federal Defendants averred that such a stay was neither "workable [n]or desirable." Dkt. 165.

In March 2024, the Court scheduled a status conference for early April 2024 in light of what the Court later called the "unique posture" of the matter, with Florida seeking a stay while the Federal Defendants opposed it. *See* Minute Order Mar. 14, 2024. While the motion was

pending, Florida moved for final judgment (on the theory that Plaintiffs' remaining claims were moot) or, in the alternative, for partial final judgment, in order to be able to immediately appeal the Court's rulings.  Dkt. 171.  The Federal Defendants agreed that Plaintiffs' remaining claims were moot only if a stay were to be denied and took no position on the motion for partial final judgment.  Dkt. 175.  Plaintiffs opposed entry of final or partial judgment.  Dkt. 178.

On April 4, 2024, the Court heard argument on both motions and, at Florida's request for an expedited ruling, ruled on both motions on April 12, 2024.  Dkt. 183.  The Court issued an Amended Memorandum and Opinion on the ESA claims.  Dkt. 182.  The Court also denied Florida's stay request, dismissed without prejudice Plaintiffs' Clean Water Act claims as prudentially moot, and entered partial final judgment on all claims except for Plaintiffs' claim under the Rivers and Harbors Act.  Dkt. 183.  Florida then filed a notice of appeal.  Dkt. 185.  On April 16, 2024, Florida filed the instant motion for a stay pending appeal, Dkt. 187.[1]

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy."  *See Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).  The party seeking a stay bears the burden of establishing that relief is warranted.  *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009).  A decision to grant or deny a stay is "an exercise of judicial discretion."  *Id*. at 433 (internal quotations and citation omitted).  When assessing a stay request, a court must consider four factors: (1) whether the movant has made a "strong showing" that they are likely to succeed on the merits; (2) whether the movant "will be irreparably injured absent a stay;" (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and

---

[1] Florida's insinuation that the Court has unduly delayed action following its February 15, 2024, ruling, Dkt. 187 at 1–2, is belied by the record.  To the contrary, for each of Florida's three post-decision motions, the Court has shortened the response time at Florida's request.  Minute Orders Feb. 26, 2024, Mar. 12, 2024, & Apr. 17, 2024.

(4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

Courts in the D.C. Circuit apply a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another."[2] *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The first two factors though are "the most critical." *Nken*, 556 U.S. at 434. Whether a case presents a "serious legal question" can help tip the scales in favor of a stay "where likelihood of success on appeal is low," but "only where the movants would otherwise prevail on the harm prong." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 106 (D.D.C. 2018) (Moss, J.). *Accord Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12–13 (D.D.C. 2014) ("[T]he motion to stay may be granted when a 'serious legal question is presented, when little if any harm will befall other interested persons or the public, and when denial of the order would inflict irreparable injury on the movant.'" (internal quotation omitted)).

## ARGUMENT

Florida's motion is due to be denied because it has failed to satisfy the criteria for a stay pending appeal. To the contrary, the Court's ruling and remedy on Plaintiffs' ESA claims are soundly rooted in this Circuit's precedents. Florida's interest in resuming the 404 program does not implicate any harm that is irreparable. Moreover, the balance of the equities and the public interest weigh heavily against a stay. Only the Corps' continued administration of the 404 program pending appeal will ensure the lawful application of the ESA as Congress intended.

---

[2] Whether the sliding-scale approach survives the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), has not yet been resolved by the D.C. Circuit. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

I.      **Florida Is Not Likely to Succeed on the Merits of Its Appeal.**

Florida has failed to demonstrate that it is likely to succeed on the merits of its appeal.

To receive a stay, Florida must make a "strong showing that [it] is likely to succeed on the

merits." *Nken*, 556 U.S. at 426.  "[M]ore than a mere 'possibility' of relief is required."  *Id.* at

434.  Indeed, likelihood of success is "one of the two most 'critical prongs' of the test for a stay."

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir.

2018) (quoting *Nken*, 556 U.S. at 434).  Florida must demonstrate a "substantial" likelihood of

success.  *Id.* at 1018.  *Accord Wash. Metro.*, 559 F.2d at 843.

A.      **Florida Has Forfeited Any Showing of a Likelihood of Success on Appeal.**

Florida's motion forfeits the requisite "likelihood of success" prong by relying instead on

a "serious legal question" theory that would only be available if the State had shown all other

factors weighed in favor of a stay (which it has not).  *See In re Special Proceedings*, 840 F.

Supp. 2d 370, 372 (D.D.C. 2012) (*citing, e.g.*, *Wash. Metro.*, 559 F.2d at 844) (finding that

"serious legal question" standard replaces likelihood of success on the merits "only when the

other three factors tip sharply in the movant's favor").  But as shown below, Florida has also

failed to satisfy the remaining prongs, much less show that they tip sharply in favor of a stay.

Florida's motion for a stay should therefore be denied on this basis alone.

B.      **The Court's Decision Rests Firmly on the Plain Language of the ESA, ESA Regulations, and ESA Case Law.**

Florida's "serious legal question" argument fails to establish a likelihood of success on

appeal.  Florida presents no facts or legal arguments that in any way undermine this Court's

well-reasoned decision.  In fact, Florida's argument does not address any of this Circuit's ESA

case law, relying instead on an outlier out-of-Circuit decision.  Florida's argument therefore

establishes no basis to find that the State is likely to succeed on appeal.

This Court relied on the plain language of the ESA and its implementing regulations to rule in Plaintiffs' favor. Dkt. 182 at 57–71. The Court's ruling was also firmly rooted in this Circuit's ESA precedents. USFWS' Programmatic Biological Opinion ("BiOp") failed to comply with the ESA at the programmatic level, punting all analysis to a non-statutory and inadequate technical assistance process at the permit level. *Id.* at 7, 57–71. *Accord* Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.[3] USFWS' Programmatic Incidental Take Statement ("ITS") unlawfully extended unlimited incidental take liability exemption to EPA, the State, and all future state permittees for the life of the program, while providing no trigger for reinitiating consultation and again relying on the inadequate and non-statutory assistance process to fill in the gaps. Dkt. 182 at 7, 71–81. *Accord* Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2. And EPA arbitrarily and capriciously relied on the facially invalid Programmatic BiOp and ITS to approve Florida's program, thereby failing to satisfy its independent duty under the ESA to ensure that its action would not jeopardize protected species or adversely modify or destroy critical habitat. Dkt. 182 at 82–85. *Accord* Dkt. 98 at 51–52; Dkt. 104 at 49–51; Dkt. 123 at 12–13. Additionally, EPA entirely failed to engage in Section 7 consultation on impacts to (1) species under the jurisdiction of the National Marine Fisheries Service ("NMFS"), instead relying on an erroneous "no effect" determination that excluded indirect effects, Dkt. 182 at 86–88; and (2) nesting sea turtles under USFWS' jurisdiction, despite the likelihood that state 404 permits would at least indirectly affect those species, *id.* at 85 n.20. *Accord* Dkt. 98 at 52–55; Dkt. 104 at 51–53; Dkt. 98 at 41; Dkt. 104 at 29–30.

---

[3] Plaintiffs hereby incorporate their prior briefing on their ESA claims and justiciability. Dkts. 31, 43, 98, 104, 123, 135, 153, 161, 169.

Florida's reliance on *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), Dkt. 187 at 4–8, does not establish a likelihood of success. The Court thoroughly considered, and rejected, the same arguments that Florida now raise relying on an outlier out-of-Circuit opinion that is contrary to the overwhelming weight of authority and is in any event, as the Court explained, distinguishable on the facts. *See id.*[4] Florida's failure to grapple with this Circuit's case law is fatal to establishing a likelihood of success on appeal.

Florida fails to show that the Court incorrectly distinguished *Cooling Water* on the facts. Florida mischaracterizes the circumstances of *Cooling Water* as "analogous" to EPA's approval of a state permitting program, claiming that both involve EPA adopting a "program that allowed states to issue permits" that would impact species and rely on "'technical assistance' from federal agencies." *Id.* at 4. However, as this Court correctly observed, the federal agency action in *Cooling Water* (EPA's promulgation of a national rule creating standards for the impingement and entrainment of aquatic life that would be implemented in both state and federal Section 402 programs) was fundamentally different from the agency action in this case (EPA's approval of a state Section 404 program that transferred authority from the Corps to the State). Dkt. 182 at 65. *Accord* Dkt. 98 at 49–50; Dkt. 104 at 48.

Florida claims the Court erred in distinguishing *Cooling Water* on the basis that in that case, EPA had formally promulgated the "technical assistance" process into federal regulations, Dkt. 187 at 7–8, whereas here EPA and USFWS relied solely on non-binding assertions contained in a BiOp that itself was unlawful, *see* Dkt. 182 at 65–66. As it did on summary judgment, Florida leans on the Memorandum of Understanding ("MOU") with USFWS and the

---

[4] The Court's opinion shows that the Court studied the *Cooling Water* decision thoroughly, even reviewing the oral arguments in that case. Jan. 30, 2024, Hr'g Tr. 59:18–25.

state program's Handbook to suggest that the technical assistance process here is equally binding and enforceable, but Florida itself concedes that the "anticipated" technical assistance procedures were "established in the BiOp/ITS." Dkt. 187 at 8.  Florida also fails to acknowledge that (1) the MOU states that the technical assistance process will be contained in the final BiOp, Dkt. 55-1 at 124; (2) the Handbook fails to articulate the technical assistance process that is contained in the BiOp, Dkt. 52 at 104–05; and (3) the BiOp does not require anything of USFWS other than to receive and review applications, *see* Dkt. 182 at 43, 66.  Even the Federal Defendants took the position that none of the technical assistance process's so-called requirements were legally binding so as to be enforceable, Dkt. 148 at 23 (arguing that USFWS' technical assistance did not constitute a reviewable "agency action" subject to judicial review), and were unable to point to any binding duty on USFWS other than to "receive and review" permit applications.  Oct. 19, 2023, Hr'g Tr. 89:7–10, 91:14–92:1.

Florida avers that these distinguishing facts are not relevant but fails to explain why that would be the case.  Dkt. 187 at 7–8.  Florida's argument rests on a comparison of the *Cooling Water* BiOp to the BiOp at issue here.  Dkt. 187 at 6–7.  However, the Court acknowledged that this similarity was by design and found that those similarities did not affect its analysis as to whether the BiOp complied with the plain language of the ESA, its implementing regulations, and the overwhelming weight of authority.  Dkt. 182 at 66–67.  Florida's continued reliance on *Cooling Water* therefore fails to establish the likelihood of success or "serious legal question" required for a stay.

Ignoring the weight of authority supporting the Court's ruling, Florida suggests that this Court erred by taking a "fundamentally different legal approach" from the Second Circuit in *Cooling Water*, Dkt. 187 at 4.  But Florida cannot establish a likelihood of success on appeal by

claiming the Court should have relied on an outlier out-of-Circuit decision rather than on this Circuit's longstanding precedent (and the overwhelming weight of authority).  Florida's argument also fails to overcome the Court's well-reasoned disagreement with that case.  Indeed, according to Plaintiffs' review of caselaw, the "legal approach" approved in *Cooling Water* has not been adopted by any other court, and Florida points to no case where it has.  Instead, this case represents the "first next time" that an agency has used this approach.  Dkt. 182 at 67.

Moreover, the Court was not persuaded by *Cooling Water* to reach a different conclusion because the Court relied on the plain language of the ESA's regulations to explain that "the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required, 'detailed discussion of the effects of the action on listed species, to a later phase, only to conclude" "that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7."  *Id.* at 67–68 (internal citations omitted).

Florida fails to address the Court's analysis of *Cooling Water*, which showed, among other things, that *Cooling Water* relied on caselaw that conflicted with its own ruling.  For example, the Court explained that *Cooling Water*'s reliance on *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), was misplaced because that case involved a programmatic BiOp that *did* evaluate the species effects of both the installation *and* operation stage of a Naval underwater submarine warfare training range.  Dkt. 182 at 68.  The Court also pointed out that *Cooling Water* relied on cases that held a take limit *must exist*, either as a numerical limit or a properly supported surrogate, to find the contrary: that the lack of an incidental take limit in that case was lawful.  *Id.* at 76.[5]

---

[5] The Court found additional support on this point from *Defenders of Wildlife* because there, the programmatic BiOp did not include an ITS, which meant that *any* take would require reinitiating consultation.  Dkt. 182 at 77 (citing *Defs. of Wildlife*, 733 F.3d at 1124).

Florida also fails to address the fact that the Court relied on D.C. Circuit precedent that "although not directly on point, further supports the [Court's] sensible conclusion that an agency may not avoid its obligation to engage in meaningful Section 7 consultation by deferring detailed, species-specific analysis for another day." *Id.* at 69.  The Court relied on *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), which "requires courts to consider whether 'stage-by-stage' consultation under Section 7 is consistent with the ESA's mandate to consider the 'agency action' as a whole," which the Federal Defendants' approach failed to do "by a wide margin."  Dkt. 182 at 70 (citing *Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988) (so reading *North Slope*)).  And the Court relied on *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), which held the Corps violated the ESA by deferring consultation regarding the effects of individual actions authorized under four general permits, which the Corps was aware "m[ight] affect" the Florida panther.  Dkt. 182 at 70–71 (citing *Nat'l Wildlife Fed'n*, 402 F. Supp. at 10 & n.15).

Florida wrongly asserts that the Court adopted Plaintiffs' purported position that the only avenue for incidental take liability coverage for state 404 permittees is an incidental take permit under Section 10.  The record clearly establishes that Florida urged EPA to adopt this programmatic consultation/technical assistance scheme for the purpose of securing broad incidental take liability to state permittees without requiring them to obtain Section 10 permits. *See, e.g.*, Dkt. 182 at 26–27, 30–31 (quoting Dkt. 112-2 at 3; Dkt. 112-3 at 269, 368–69; Dkt. 56-1 at 781).  As the Court explained, EPA had acknowledged that there were options for the State to assume the 404 program while complying with the ESA. *Id.* at 27.  In addition, the Court found that the scheme urged by Florida (and adopted by the Federal Defendants) was unlawful

because "Congress did not codify a third option" outside of Section 7 or Section 10 for exempting incidental take from liability. *Id.* at 62.

The Court articulated that on remand, the Federal Defendants and Florida could either (1) require state permittees to obtain Section 10 permits; (2) rely on a Clean Water Act process for sending permits back to the Corps where appropriate; or (3) prepare a "dramatically different BiOp and ITS" under Section 7. *Id.* at 96. Florida's argument that USFWS was required to issue an ITS pursuant to Section 7, Dkt. 187 at 8, completely ignores that USFWS was first required to prepare a lawfully sufficient BiOp, something the Court rightly concluded the agency had not done. Dkt. 182 at 71.

Contrary to Florida's characterization, Plaintiffs argued that the Federal Defendants had other options to address ESA compliance (a fact EPA conceded, as the Court recognized), but having chosen to engage in Section 7 programmatic consultation, USFWS was required to comply with the requirements of the ESA and its implementing regulations. Dkt. 98 at 28–29; Dkt. 104 at 42–43. The Court agreed, holding that Section 7 review must occur somewhere and that the Federal Defendants approach "cannot stand" because it failed to address species effects at the programmatic level and provided no further Section 7 consultation at the permit-level. Dkt. 182 at 67, 71.

Florida's reliance on *Cigar Association of America v. FDA*, 317 F. Supp. 3d 555 (D.D.C. 2018), Dkt. 187 at 4, is also misplaced. In *Cigar Association*, the court found a "serious legal question" weighed in favor of a stay, where the matter involved difficult constitutional questions that "the D.C. Circuit might well disagree with [that] court's resolution of them," 317 F. Supp. 3d at 561, and a recent Supreme Court decision "only add[ed] to the substantiality of the issues Plaintiffs intend[ed] to raise on appeal." *Id.* Neither circumstance is present here.

11

Here, the Court resolved the relevant legal questions through a straight-forward application of the plain language of the ESA and its implementing regulations to conclude that USFWS had failed to prepare a lawful programmatic BiOp. As to the Programmatic BiOp, the Court recognized that the plain language of the ESA and its implementing regulations required a detailed analysis of species-specific effects and concluded that "it [was] clear that, at the very least, [USFWS] failed to undertake *any* species-specific analysis." Dkt. 182 at 57–58. As the Court found when analyzing the Programmatic ITS, its analysis was "not taxing" because, contrary to the plain language of the ESA and its implementing regulations, the ITS "set[] no numerical take limit, offer[ed] no surrogate, and provide[d] 'no clear standard for determining when the level of anticipated take has been exceeded.'" *Id.* at 73–74. EPA had a duty to comply with these requirements once it determined that its approval of Florida's program was likely to adversely affect ESA-listed species and result in incidental take. Florida has identified no Supreme Court or D.C. Circuit decision that would raise questions about this Court's decision.

### C.   The Court Properly Determined That Plaintiffs Have Standing.

Florida also has not shown that it would be likely to prevail on its twice-rejected claims that Plaintiffs lacked standing to prosecute this case. In considering the parties' early cross-motions for summary judgment on Claim 9, the Court found that Plaintiffs had established informational standing emanating from EPA's approval of Florida's program. Dkt. 73 at 21, 24, 49–52. And on final summary judgment, the Court concluded Plaintiffs had standing to prosecute all remaining claims, including the ESA claims, based on their associational interests in protecting Florida's valuable waterways and the endangered and threatened species that rely

on them.[6]  Dkt. 182 at 38–51.  *Accord* Dkt. 98 at 78; Dkt. 104 at 90–101.  Plaintiffs' members have an interest in the enjoyment of listed species, including NMFS species and sea turtles, and this interest is germane to Plaintiffs' organizational interests.  Dkt. 182 at 41–42, 49–50.  *Accord* Dkt. 98 at 79–81; Dkt. 104 at 99–101.  USFWS' unlawful BiOp and ITS threatened Plaintiffs' interests by failing to (1) analyze the impact of Florida's program on listed species and critical habitat; (2) render a lawful jeopardy determination; and (3) set limits on incidental take.  Dkt. 182 at 41–44.  *Accord* Dkt. 98 at 79.  EPA's reliance on the BiOp and ITS harmed Plaintiffs' interests by failing to ensure that Florida's program would not jeopardize listed species or adversely modify critical habitat.  Dkt. 182 at 41–44.  *Accord* Dkt. 98 at 80.  And EPA's failure to consult on NMFS species and to consult with USFWS on impacts to nesting sea turtles threatened Plaintiffs' interests as to those species.  Dkt. 182 at 49–50.  *Accord* Dkt. 98 at 80–81.

Florida contends that the Court erred in relying on facts that arose after the Complaint was filed.  Dkt. 187 at 10.  But Florida cites no authority for this argument nor points to any language in the decision where the Court relied on such facts.  *Id.*  Plaintiffs demonstrated standing throughout this litigation, as the case and controversy requirement requires.  *Alvarez v. Smith*, 558 U.S. 87, 92 (2009).  And it was appropriate for this Court to consider evidence in Plaintiffs' declarations submitted during summary judgment briefing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Florida therefore cannot establish a likelihood of success on this theory either.

---

[6] Having found standing on this basis, the Court declined Florida's invitation to re-visit its earlier conclusion on informational standing on the basis of new evidence.  Dkt. 182 at 40 n.9.  But as Plaintiffs have shown, Florida's supposedly new evidence was simply a regurgitation of the same evidence the Court previously considered and rejected.  Dkt. 104 at 90–94.

To the contrary, the Court found that Plaintiffs' member declarations demonstrated concrete interests in minimizing the loss of protected species in the State.  Dkt. 182 at 41. *Accord* Dkt. 98 at 79–81; Dkt. 104 at 90–101.  The Court explained that USFWS concluded that approval of Florida's program was "'reasonably certain' to result in some level of take of all 139 listed species present in the State."  Dkt. 182 at 41.  And the Court found that USFWS' unlawful BiOp (and ITS) "poses a material risk to the declarants' work and recreational interest in areas of Florida that will be directly affected."  *Id.* at 41–42.

To the extent the Court referred to the inadequacy of the technical assistance process as applied after approval, it did so in response to Florida's and the Federal Defendants' argument that whatever ESA requirements may have been omitted from the Programmatic BiOp and ITS would be addressed through the "technical assistance process."  *Id.* at 42–43.  Importantly, the Court went on to hold that "more fundamentally, the technical assistance process is no substitute for what Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that [USFWS] must conduct *before* it can make a no-jeopardy finding and accord incidental take protection on the EPA, the State, and future state-permittees."  *Id.* at 43.  These gaps in analysis existed from the time EPA approved Florida's program and, therefore, existed at the time Plaintiffs' Complaint was filed.

### D.   The Court Properly Weighed the *Allied-Signal* Factors to Determine That Vacatur was Warranted.

After ruling in Plaintiffs' favor on the ESA Claims, the Court vacated the BiOp, the ITS, and EPA's approval of Florida's program after thoughtfully weighing the *Allied-Signal* factors. *Id.* at 92–94 (ESA violations were serious and could not easily be cured on remand); *id.* at 93–96 (disruption inherent in Congress' design in the Section 404 program; Florida had not demonstrated that normal remedy of vacatur was not appropriate in this case).  *Accord* Dkt. 161

at 7–10, 12–13.  Florida disagrees with the decision but does not identify any legal error or any matter that the Court failed to consider or address in weighing the factors and exercising its discretion to fashion a remedy.

Florida offers nothing to support its claim that it would likely prevail on appeal as to the Court's remedy either as a matter of fact or law.  *See* Dkt. 187 at 10–11.  Florida continues to point to potential delay in the issuance of 404 permits, but Plaintiffs showed how any such disruption would not be sufficient to avoid vacatur, Dkt. 161 at 11–14, and the Corps has moved swiftly to increase staff and develop a plan to avoid undue delays even while Florida has failed to transfer any state 404 permit to the Corps, Dkt. 183 at 10–12.

First, in an effort to call the Court's remedy into question, Florida quotes the Court as saying it was "difficult to make a definitive determination" as to the *Allied-Signal* factors, Dkt. 187 at 10, but omits the context of that statement and mischaracterizes the Court's reasoning. The Court stated that it was "convinced that the violation was a serious one, which will not easily be remedied on remand," and that "[i]n the ordinary course, the Court would have little difficulty in concluding that error of this magnitude requires vacatur."  Dkt. 182 at 94–95.  But the Court added that it was "far from clear" the extent to which the ESA violations infected the overall Florida assumption program because Florida had offered different representations of the number of state permits that were likely to adversely affect protected species.  *Id.* at 95.  The Court went on to say, "For similar reasons, it is also difficult to make a definitive determination regarding the second *Allied-Signal* factor on the present record."  *Id.*

While these statements provide a window into the Court's reasoning, the Court ultimately did make the determination that vacatur was the appropriate remedy, and that determination is firmly supported by this Circuit's precedents.  After considering all the arguments, the Court

concluded that the real question was whether vacatur would lead to further administrative

flipflopping and confusion. *Id.* at 96. Finding that the ESA violations were serious and could

not easily be cured on remand, the Court determined that vacatur was warranted. *Id.* at 94–96.

Second, Florida erroneously characterizes the Court's remedy as "extreme." To the

contrary, vacatur is the normal remedy for APA violations. *Allina Health Servs. v. Sebelius*, 746

F.3d 1102, 1110 (D.C. Cir. 2014) (vacatur "normal remedy" for unsustainable agency action).

*See also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007) (vacating rule

because of "wholesale revision" required on remand as well as harm to petitioners). Moreover,

restoring authority to the Corps is part of Congress' design of the Section 404 program. Under

the statute's plain language, where a state 404 program is deemed unlawful, EPA must withdraw

its approval and during any period of withdrawal, the Corps "shall resume" administration and

enforcement of the Section 404 program. Dkt. 182 at 21 (citing 33 U.S.C. § 1344(i)). There is

no basis to conclude that Florida is likely to prevail on appeal.

## II.     Florida Has Failed to Demonstrate That It Will Suffer Irreparable Harm.

Irreparable harm is one of "the most critical" factors when determining whether to issue a

stay pending appeal. *Nken*, 556 U.S. at 434. To satisfy this factor, Florida must show more than

just some "possibility of irreparable injury."[7] *See id.* at 433–34. Indeed, "[b]are allegations of

what is likely to occur are of no value since the court must decide whether the harm will *in fact*

occur." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis in

original). The "injury must be both certain and great, actual and not theoretical, beyond

---

[7] As the Court found, the programmatic BiOp, ITS, and technical assistance process woefully
failed to comply with the ESA. *See* Dkt. 183. *Accord* Dkt. 163. As explained above, Florida's
motion for a stay fails to raise any justification to call this Court's decision into question. As
such, they have not demonstrated "probable success on the merits," Dkt. 187 at 11, and any
relaxation of the irreparable harm factor does not apply.

remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (internal quotations and citations omitted).  Even if irreparable injury to Florida were found, granting of a stay is not a matter of right; "[i]t is an exercise of 'judicial discretion,'" and "[t]he propriety of its issue is dependent upon the circumstances of the particular case."  *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 10–11 (1942).

Florida fails to show any irreparable injury will result in the absence of a stay.  As explained below, the only harms Florida claims are either not at play (e.g., sovereign interests are not implicated), not irreparable (e.g., potential permitting delays), or both.  There is no dispute that Florida could once again seek EPA approval for an assumption program that complies with federal law.  Moreover, any of the harms Florida has asserted are outweighed by the harms Plaintiffs and the public would face if a stay were granted.

### A.     Florida's Sovereign Interests Will Not Be Irreparably Harmed.

Florida's claim that vacatur of the state 404 program irreparably harms their sovereign interests in "areas of traditional state responsibility," Dkt 187 at 11, fails.  There is no dispute that EPA's lawful transfer of Section 404 authority from the Corps to a state first requires compliance with federal law, including the ESA and the Clean Water Act.  Absent that lawful action, states have no 404 authority over waters of the United States.  And indeed, in 48 states, it is the Corps that administers the entirety of the Section 404 program.

Also, vacatur of Florida's assumed 404 program has no impact on Florida's traditional power and responsibility over its waters and land.  Florida continues to enjoy the same authority and sovereignty over state waters as it had before assuming the federal 404 program.  Waters of the United States, however, are also subject to federal law.  Florida maintains its traditional power and control to enforce state laws, provide public services, tax, ensure public safety, and

17

protect state waters.  And specifically, Florida still retains control and permitting authority over wetlands through its ERP program, which applies to all state waters, including those that also require a 404 permit under federal law.

Because this case does not implicate state sovereignty, the cases on which Florida relies to claim that infringement of state sovereignty can constitute irreparable harm are irrelevant.  *See Akiachak*, 995 F. Supp. 2d at 16–17 (enjoining proposed regulation that would allow federal government to take Alaska tribal lands into trust and thus beyond Alaska's control thereby impinging state sovereignty); *Kentucky v. Biden*, 23 F.4th 585, 611–12 n.19 (6th Cir. 2022) (declining to stay preliminary injunction of COVID-19 vaccine mandate for federal contractors residing in three states that opposed a vaccine requirement); *West Virginia v. EPA*, 669 F. Supp. 3d 781, 807–09 (D.N.D. 2023) (state challenge to newly expanded scope of waters of the United States); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (same).[8]

This case does not involve the scope of the Clean Water Act, and therefore Florida's reliance on cases that do is misplaced.[9]  While determining that the reach of Clean Water Act authority may implicate state sovereignty interests by demarcating lines between state and federal authority, this case is about the allocation of authority over waters that are indisputably waters of the United States covered by the federal Clean Water Act.  Unlike the situations in

---

[8] Florida's citation to *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001), Dkt. 187 at 11, is also to no avail.  That case too involved the scope of waters of the United States under the Clean Water Act's jurisdiction.  531 U.S. at 162.  There the Court recognized a heightened concern over a more expansive interpretation of Section 404's jurisdictional extent that Congress had not clearly spoken on because such interpretation would allow federal encroachment on traditional state power over land and water use.  *Id.* at 173.  More importantly, the Court also made clear that when Congress' intent is clear, such federal encroachment is permissible.  *Id.* at 172–73.  Here, Congress spoke clearly on what Section 7 consultation requires; EPA and USFWS both failed to comply.

[9] Additionally, unlike here, in both the West Virginia and Georgia cases, the states had not yet been heard on the merits.  *See, e.g.*, *West Virginia v. EPA*, 669 F. Supp. 3d at 807.

Georgia and West Virginia, the Court's ruling here does not broaden the scope of waters subject to Clean Water Act jurisdiction, and therefore does not subject more waters in the State to regulation under the Clean Water Act or impose any new burdens on the State to comply with the Clean Water Act on additional waters.

Florida's traditional authority over waters is fully intact.  And Florida retains the ability to pursue state assumption for assumable waters under the Clean Water Act by proposing a program that complies with federal law.  Thus, while Florida may have an *interest* in implementing a state-run 404 program, such interest cannot preempt clear congressional mandates like those in Section 7 of the ESA.  Nor does Florida cite any support for such an assertion.  Congress' view of cooperative federalism still requires compliance with federal law. *See* Dkt. 182 at 20–21.

### B.      No Enforcement Void Will Result if the Court Denies a Stay.

Florida's claim that it has been irreparably harmed by its inability to take enforcement action against 404 violations lacks any basis in fact or law.  To begin, there is no enforcement void because restoring the program to the Corps simply means that the Corps will enforce Section 404 in Florida, as it did for decades before state assumption.  *See* 33 U.S.C. § 1344(i). There is no confusion, contrary to Florida's claim, because all 404 authority has reverted to the Corps.  Moreover, as Plaintiffs have demonstrated in this litigation, administration of the program by the Corps provides for more robust enforcement (and deterrent effect) because Florida's program exempted simple negligence violations from criminal liability (contrary to federal law).  Dkt. 98 at 22, 56–61; Dkt. 104 at 54–65; Dkt. 123 at 14–15.

In an effort to manufacture a claim for irreparable harm, Florida avers that its 404 program consisted of "more than 300" staff members, suggesting that this size staff would be better equipped to handle 404 permitting and enforcement in Florida than the "handful of new

employees" the Jacksonville District may have added to its roster following the Court's ruling.[10]
Dkt. 187 at 12–13.  But even if this comparison somehow amounted to an irreparable harm
(which it does not), Florida's factual assertions do not withstand scrutiny.

Florida fails to mention that the same FDEP staff also administer the State's
Environmental Resource Permitting program ("ERP"), a wetlands permitting program the State
was already administering under state law prior to assumption, Dkt. 55 at 501, and that staff
continue to administer the ERP program since the Court's ruling.[11]  Florida also fails to mention
that EPA's oversight of Florida's program identified problems with staff retention (which FDEP
had publicly acknowledged) and expressed concern that inadequate staffing could be
contributing to a number of program failures (including as to wetlands delineations, the failure to
document "no permit required" determinations, and inadequate coordination with the Corps).
Dkt. 104-1 at 30–31, 38 (EPA Oversight Letters).

Moreover, the State retains authority under state law to take action to remedy or prevent
environmental harm, including irreparable harm.  Florida Statutes Section 403.161(1) makes it a
violation under state law for anyone to cause pollution, except as authorized by Florida law, "so
as to harm or injure human health or welfare, animal, plant, or aquatic life or property."  Fla.
Stat. § 403.161(1).  *See also id.* § 403.121 (FDEP may institute a civil action "to establish

---

[10] Florida's characterization of the Corps' staffing is contradicted by statements by the Corps'
counsel.  Apr. 4, 2024, Hr'g Tr. 29:8–9 (Corps' counsel stating "it is not just a couple more, it is
a couple dozen more").  Indeed, the Corps' counsel stated that "there are more people in the
Jacksonville district today to process section 404 permits than there were before state
assumption."  *Id.* 29:5–7.

[11] When Florida assumed the 404 program, the State assured EPA that it could do so within
existing resources because it would incorporate the 404 program into the State's ERP program,
with staff administering both.  Dkt. 55 at 501–02.  As of June 2023, Florida reported that there
were 355 positions that supported the program "in some capacity," but only 177 of those were
described as relating to permitting, compliance, *and* enforcement, and only 44 were primarily
responsible for compliance and enforcement.  Dkt. 160-1 at 302.

liability and recover damages for any injury to the air, waters, or property, including animal,

plant, and aquatic life, of the state caused by any violation"); *id.* § 403.131 (FDEP may institute

a civil action "to seek injunctive relief to enforce compliance with this chapter or any rule,

regulation, permit certification, or order; to enjoin any violation specified in s. 403.161(1); and to

seek injunctive relief to prevent irreparable injury to the air, waters, and property, including

animal, plant, and aquatic life, of the state and to protect human health, safety, and welfare

caused or threatened by any violation").

### C.    Florida's Claims of Cost and Delay Do Not Constitute Irreparable Harm.

Florida briefly reasserts that the loss of resources it has spent taking on the 404 program

constitutes an irreparable harm.  Dkt. 187 at 14.  But economic loss alone typically does not

constitute irreparable harm.  *See Wis. Gas*, 758 F.2d at 674 ("Mere injuries, however substantial,

in terms of money, time and energy necessarily expended in the absence of a stay are not

enough." (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958))).

Moreover, the expended resources are not, as Florida suggests, simply "lost."  *Contra*

Dkt. 187 at 13.  Florida's expenditures to develop the program may still be applied to any future

state proposal, so long as that proposal complies with federal law.  Its expenditures on permitting

and compliance were put to use during the time the State administered the program.  And the

overlap between the State's ERP and 404 permitting programs (which the State put at 85%)

suggests that the vast majority of on-going expenditures will continue to serve the State's ERP

program.  *See* Dkt. 55 at 501; Dkt. 31-1 at 14–15 (Crooks Dec. ¶ 43).

Florida's claim about the loss of regulatory efficiencies while it administered the state

404 program, Dkt. 187 at 14, fails to substantiate the assertion with evidence, ignores that at least

the ESA-related "efficiencies" have been declared unlawful, and fails to show that any supposed

loss of efficiency would constitute an irreparable harm.

Florida claims irreparable harm on the basis of cost and delay associated with "thousand(s)" of 404 permit applications that were pending with the State when the Court vacated EPA's approval of the state 404 program.[12]  *Id.* at 10–15.  Elsewhere, Florida avers that it issued about 26 individual permits *or permit modifications* each month, *id.* at 13 n.3, which if true would mean that the State would have issued no more than 312 permits (and likely less once permit modifications are considered) in the next year or two while this appeal is pending.

Florida asserts that these projects now face "regulatory limbo," *id.* at 13, but as the Federal Defendants confirmed at oral argument, there is no regulatory limbo because 404 authority has been restored to the Corps.  Apr. 4, 2024, Hr'g Tr. 31:17–23.  There is a clear path forward, which is for the Corps to review those permit applications.  Dkt. 183 at 10–12.  *See also* 33 U.S.C. § 1344(i).  The Corps has also taken affirmative steps to reduce delay, including by adding far more staff assigned to 404 permits than before state assumption, and has taken affirmative steps to prioritize projects and ensure that applicants are not, contrary to Florida's assertion, Dkt. 187 at 13, starting from "square one."  *See* Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr. 30:23–25).

Moreover, although Florida has claimed that only about 15% of permit applications "may affect" ESA-listed species, Dkt. 166-1 at 4 (Wolfe Dec. ¶ 13), counsel for the Corps advised the Court that "Florida and the Corps have very different views about the ratio of no effect and may affect projects."  Apr. 4, 2024, Hr'g Tr. 35:11–12.  In stark contrast, the Corps believes that "the

---

[12] In opposing vacatur, Florida claimed that there would be significant cost and delay associated with the transfer to the Corps of the "thousands of permit applications" pending with Florida. Dkt. 160-1 at 11 (Wolfe Dec. ¶ 29).  In moving for a limited stay, Florida asserted that "[w]ell over 1,000" permit applications are in "regulatory limbo."  Dkt. 166-1 at 3 (Wolfe Dec. ¶ 8). And in this motion, Florida repeats and tempers both claims.  Dkt. 187 at 10 (header asserts "thousands pending"); *id.* at 13 ("more than a thousand" pending); *id.* at 15 ("as many as a thousand" pending).

vast majority of the projects that it sees in the State of Florida are what it would classify as may affect permits," and puts that number closer to 85%. *Id.* 35:13–17, 86:6. The State's narrow view of how many permits "may affect" ESA-listed species. as opposed to the Corps' view, further weighs against a stay.

Even as to the fifty or so permits the State claims it would have issued since the Court vacated EPA's approval of its program, Dkt. 187 at 13, Florida has not identified any irreparable harm. The State's general claim that it has "lost the benefit" of various public projects in the pipeline, *id.*, is not sufficient to establish harm, much less irreparable harm. Because the same projects can be considered and permitted by the Corps, Florida has no basis to claim it has lost any benefit from these projects, much less that it has lost any benefit for all time. The time and resources expended on reviewing pending permit applications is also not "lost," since the State uses much of the same information and processes to issue state ERP permits. To the extent any of that information is relevant only to 404 permits, it too is not "lost" since the Corps has committed to reviewing and using as much of that information as possible. Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr. 30:23–25, 31:1–3).

Florida's prior submissions asserting similar harms fare no better. FDEP's vague claim that "many" pending permit applications were "near the conclusion of the Section 404 permit process" at the time of vacatur, Dkt. 166-1 at 4 (Wolfe Dec. ¶ 10) (describing how long permits have been pending), does not identify how many permits fit this category, how many of these permits were due to be granted versus denied, or that any near-completion permit involved a project so essential as to require immediate permitting to avoid irreparable harm. Florida's assertion that the public would lose the benefit of "mitigation measures" that might be included in state permits, *id.* (Wolfe Dec. ¶ 10), ignores that mitigation is intended to *offset harm* that

results from the permitted activity.  Florida anticipated that restoring authority to the Corps

would likely delay permits by "six months or more" but rested this assertion on the delays

*Florida's* assumption caused permit applicants when its program was approved.  Dkt. 160-1 at

11 (Wolfe Dec. ¶ 29).  As the Court has observed, the Corps has had decades of expertise in

administering this program, something Florida lacked when it assumed the program in 2020.

Dkt. 183 at 11–12.

      Florida's arguments about substantial delays also conflict with "the Corps' perspective

about the state of play of Section 404 permitting in Florida today."  Apr. 4, 2024, Hr'g Tr. at

28:16–17.  Specifically, counsel for the Corps disputed Florida's claim that "the state of play in

Florida right now is regulatory limbo."  *Id.* at 31:17–29.  Indeed, as to Florida's motion for a

partial stay, counsel for the Corps explained that "the efforts the Corps has made really cut

against granting the limited stay of the vacatur."  Dkt. 183 at 11 (quoting Apr. 4, 2024,  Hr'g Tr.

31:22–23).  The Corps has been processing 404 permits "for decades," and "[i]t is familiar to the

regulated community."  *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 31:21–22).  Any delay in processing

those permits at this point is due to Florida's refusal to transfer those permits to the Corps.  Apr.

4, 2024, Hr'g Tr. 29:16–20.

      "The Corps has identified and allocated resources to process those permits" that were

pending before Florida at the time of vacatur.  Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr.

29:1–2).  "[T]here are more people in the Jacksonville district today to process section 404

permits than there were before state assumption," and not just "a couple more" but "a couple

dozen more."  *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 29:5–8).  There are also four other districts

within the South Atlantic division and Corps headquarters where the Corps has identified staff

outside the Jacksonville District "who can help with the anticipated surge of permits given the

number of permits that were pending before Florida." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 29:11–14). *Contra* Dkt. 187 at 12–13.

The Corps has also been meeting with "quite a few project proponents." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 29:23–24). A number of those entities have congressionally approved agreements to seek expedited Corps review. *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 30:1–4). In particular, the South Florida Water Management District has identified pending Everglades Restoration Projects, and the Corps has agreed to give expedited review to those projects. Apr. 4, 2024, Hr'g Tr. 30:5–10. As for the remainder of the pending permit applications, no project will "go to the back of the line just because the applicant had previously applied to Florida." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 30:23–25). Instead, the Corps will be "pick[ing] up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 31:1–3).

## III.    The Balance of Equities and Public Interest Weigh Against a Stay.

The Court should also deny Florida's stay request because the balance of the equities and the public interest weigh in favor of maintaining the Corps' administration of the 404 program, which ensures the application of the ESA's protections for ESA-listed species and their critical habitat. When considering a stay request, the Court must consider "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted). When, as here, a stay would cause environmental injury, the balance of harm favors denying the stay request because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

A.      **A Stay Would Cause Plaintiffs Substantial Harm.**

Throughout this litigation, Plaintiffs have identified 404 permit applications pending with the State that threaten substantial harm to the environment and protected species.  Those still pending at the time of the Court's ruling in Plaintiffs' favor include the following:

- The Troyer Mine project would consist of a 1,803-acre open mine that would harm the Florida panther, Florida bonneted bat, and eastern indigo snake.  Dkt. 31-1 at 13–16 (Crooks Dec. ¶¶ 37–47); Dkt. 98-1 at 10, 16–19 (Crooks Dec. ¶¶ 30, 45–54); Dkt. 105-1 at 6–7 (Crooks Dec. ¶ 12).

- The Immokalee Road Rural Village project would destroy hundreds of acres of surface water and wetlands, including areas vital to the Florida panther and Florida crested caracara.  Dkt. 31-1 at 23 (Crooks Dec. ¶ 72(b)); Dkt. 98-1 at 25–26 (Crooks Dec. ¶¶ 76–81); Dkt. 98-5 at 16–17 (Schwartz Dec. ¶ 48).

- The Hogan West project would consist of a 640-acre development on Primary and Secondary Zone Florida panther habitat.  Dkt. 98-1 at 27–28 (Crooks Dec. ¶¶ 84(a)).

- The FFD project would destroy 550 acres of Primary Zone Florida panther habitat.  Dkt. 98-1 at 28 (Crooks Dec. ¶ 84(b)).

- The Mattamy Homes project would build a 246-acre development that would harm water quality, wading birds, and migratory bird nesting.  Dkt. 98-6 at 8 (Rinaman Dec. ¶¶ 28–29).

Together, these projects would result in the destruction of thousands of acres of wetlands that are habitat for species protected under the ESA and important for water quality in the State.  Allowing these projects to be permitted by the State without the analyses, guardrails, protections,

incidental take limits, and enforcement the ESA ensures would cause Plaintiffs and the public irreparable harm.

Indeed, just before the Court ruled, the State was poised to issue two other permits that would also have caused irreparable harm to the critically endangered Florida panther and the threatened Florida crested caracara. Plaintiffs Center for Biological Diversity and Sierra Club moved for a preliminary injunction to prevent this irreparable harm, which was amply supported by evidence submitted with the motion. Dkt. 135; Dkt. 153; *Am. Rivers*, 271 F. Supp. 2d at 258–59. After ruling in Plaintiffs' favor on the ESA claims and vacating EPA's approval of Florida's program, the Court denied the motion for preliminary injunction as moot. Dkt. 182 at 97. A stay of the vacatur ruling would allow the State to issue those permits, causing Plaintiffs Center for Biological Diversity and Sierra Club irreparable harm.

The motion showed that the Bellmar and Kingston projects would destroy thousands of acres of Primary Zone Florida panther habitat located near panther dens, where panthers birth and rear their kittens, and near crucial conservation areas, including the Florida Panther National Wildlife Refuge, that support the sole, critically endangered panther population remaining in the wild. Dkt. 135 at 32–36; Dkt. 153 at 27–33. USFWS has said that it anticipates the construction of these projects, alone, will likely injure or kill 3 panthers from attacks by other male panthers (i.e., intraspecies aggression) as panthers are thrust from their home ranges (now destroyed) and forced into neighboring territories. Dkt. 153 at 28. And USFWS has said it anticipates that these projects will also likely result in the injury or death of 6 to 25 panthers every year as roadkill resulting from traffic increases caused by these projects. Dkt. 135 at 32; Dkt 153 at 28. As for the caracara, the Bellmar and Kingston projects would permanently destroy thousands of acres of

foraging and nesting habitat for at least 2 pairs of caracara and would inhibit the reproductive

success of those 2 pairs at least during construction.  Dkt. 135 at 37–38; Dkt. 153 at 33–36.

Additionally, a stay would harm Plaintiffs and the public by depriving them of access to

information they would have obtained through National Environmental Policy Act ("NEPA")

and ESA during federal 404 permitting.  Dkt. 98 at 75–76; Dkt. 104 at 90–95.  *See also* Dkt. 73

at 21, 41–44, 50 (holding that Plaintiffs had standing on Claim 9 because of informational harm

from the loss of environmental information developed under NEPA and the ESA).

Plaintiffs would also be harmed by the State's restrictive access to its court system that

would either force Plaintiffs to divert significant resources from their programs or forego

challenging legal violations and inadequate permit decisions.  Dkt. 98 at 75–76; Dkt. 104 at 95–

99.  This harm is amplified by the Federal Defendants' position that their technical assistance is

not an agency action subject to review in federal court.  Dkt. 148 at 23.  And as this Court

recognized, because the ITS lacks both take limits and terms and conditions that bind individual

state permittees, Plaintiffs would not have a clear mechanism to bring an ESA enforcement

action against permittees who harm, injure, or kill protected species.  Dkt. 182 at 44–45.

Moreover, because of the vacatur decision, this Court deemed prudentially moot

Plaintiffs' remaining claims that demonstrate the state program failed to comply with the

requirements of the Clean Water Act.  Should the Court grant Florida's stay request, Plaintiffs

would face additional harm due to the program's other inadequacies.  Dkt. 98 at 55–79; Dkt. 104

at 53–99.  Plaintiffs would also be deprived of an adjudication on those claims while they are

simultaneously harmed by the unlawful state program.

### B.       The Public Interest Weighs in Favor of Denying Florida's Stay Request.

Maintaining the Court's vacatur decision would ensure protection of threatened and

endangered species that rely on habitat areas that would be destroyed by projects permitted

through the state 404 program.  "Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species." *Am. Rivers*, 271 F. Supp. 2d at 261 (emphasis in original) (citation and internal quotation marks omitted).  *Accord Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 71 (D.D.C. 2006), *vacated on other grounds sub nom. Humane Soc. of U.S. v. Kempthorne*, 527 F.3d 181 (D.C. Cir. 2008) ("Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the 'public interest' lies in the protection of the endangered [species]….").  When it comes to the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth.*, 437 U.S. at 194.  *Accord Am. Rivers*, 271 F. Supp. 2d at 261.  "The public unquestionably has a substantial stake in the enforcement of [federal environmental laws] and in preservation of the natural environment." *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977).

There is also a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993).  *See also Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. at 1256 (same); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702, 1995 WL 748246, at *12 (D.D.C. 1995) (public interest served "by ensuring that federal agencies thoroughly consider the environmental consequences of their actions").  There can be "no question" that the public has an interest in having Congress' environmental mandates "carried out accurately and completely." *Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 26 (D.D.C. 2009).

Stay of the Court's vacatur decision would also harm the federally recognized Miccosukee Tribe of Indians of Florida.  The Tribe separately challenged EPA's approval of

Florida's 404 program in the Southern District of Florida alleging, among other things, that the

State's administration of Section 404 unlawfully ceded permitting authority over tribal lands to

the State rather than maintaining that authority with the federal government.[13]  Transferring this

authority back to the State would once again relegate the Tribe to having to seek 404 permits

from the State for activities on the Tribe's lands, including leased lands, other lands on which the

Tribe's rights have been codified by Congress, the Tribe's sacred sites, and Indian lands within

Everglades National Park.  P. Mot. Summ. J. at 16–20, Miccosukee Tribe of Indians of Fla. v.

EPA, No. 1:22-CV-22459 (S.D. Fla. July 28, 2023), ECF No. 32.

      All federally recognized tribes in Florida would also be harmed by a stay because it

would result in their loss of federal government-to-government consultation on 404 permitting

decisions guaranteed under the National Historic Preservation Act.  *See Menominee Indian Tribe*

*of Wisconsin v. EPA*, 947 F.3d 1065, 1074 (7th Cir. 2020), *reh'g denied* (May 8, 2020).  Damage

to sacred or culturally significant sites from the State's administration of the 404 program would

likely be irreparable.  *See Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of*

*Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) (damage to or destruction of any sacred

lands or culturally significant sites would almost by definition constitute irreparable harm);

*Comanche Nation v. United States*, No. CIV-08-849-D, 2008 WL 4426621, at *19 (W.D. Okla.

Sept. 23, 2008) (economic harm would "pale in comparison to the prospect of irreparable harm

---

[13] The Tribe has alleged that EPA's approval of Florida's program failed to comply with the
Clean Water Act and the United States Constitution.  P. Mot. Summ. J. at 1–2, Miccosukee Tribe
of Indians of Fla. v. EPA.  The case was stayed and administratively closed following this
Court's vacatur decision.  Order at 2–3, Miccosukee Tribe of Indians of Fla. v. EPA, No. 1:22-
CV-22459 (S.D. Fla. Mar. 18, 2024), ECF No. 50.  The Federal Defendants recently requested
that the court in that case extend the stay until the conclusion of appellate review in the D.C.
Circuit in this case.  Fed. D. Status Rep. at 5, *Miccosukee Tribe of Indians of Fla. v. EPA*, No.
1:22-CV-22459 (S.D. Fla. Apr. 17, 2024), ECF No. 51.

to sacred lands and centuries-old religious traditions which would occur absent injunctive relief").  Harm to culturally significant lands also harms the public interest. *Co. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("The importance of these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public.").

Florida's arguments that a stay would benefit the public fail for the same reasons discussed above.

First, Florida again points to potential delays in permitting, Dkt. 187 at 14–15, but fails to acknowledge that the Corps is open for business and does not intend to require permit applicants to "start from square one."  Dkt. 183 at 10–12.  There is no reason to believe that the potential burden of administrative delays would be substantial or sufficiently substantial to outweigh the harm to Plaintiffs and the public interest in protecting threatened and endangered species as Congress intended.  *See Tenn. Valley Auth.*, 437 U.S. at 178 (observing that the value of our "genetic heritage" in the form of endangered species is "quite literally, incalculable" (quoting H.R. Rep No. 93-412, at 4–5 (1973))); *Am. Rivers*, 271 F. Supp. 2d at 261 (granting preliminary injunction to prevent harm to ESA-listed species); *see also Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 614–16 (D.C. Cir. 1980) (balance of equities favored farmworker organizations seeking to enjoin use of pesticide based on health effects to 10- and 11-year-olds even where growers might experience diminished labor pool, delays, and increased costs to attract other workers or seek waivers of the prohibition); *S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (temporary economic harms did not outweigh environmental harms).

Second, Florida's suggestion that there will be no enforcement of the Clean Water Act post vacatur, Dkt. 187 at 15, is belied by the fact that the Corps has now resumed that enforcement authority, which, as shown above, is more robust than the State's enforcement authority was when it administered the program.

Third, Florida points to the alleged harm to its sovereign interests. *Id.* at 15–16. However, as explained above, Florida's sovereign interests over its waters and land have not been infringed or limited in any way. Florida continues to enjoy the same authority and sovereignty over state waters as it had before assuming the federal 404 program and can always try to assume the program again.

## CONCLUSION

For the reasons stated above, Florida has failed to carry its burden to demonstrate a stay is required. The Court should therefore deny Florida's stay request.

Dated:  April 22, 2024

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice

111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

Counsel for Plaintiffs

* Appearing pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org