**EXHIBIT 14**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

      *Plaintiffs*,

   v.

MICHAEL S. REGAN, *et al*,[1]

      *Defendants*.

Civil Action No. 21-119 (RDM)

**MEMORANDUM OPINION AND ORDER**

    During the final days of a president's term in office, there is often a rush to complete the

regulatory work of that administration before a new administration takes office. Incoming

administrations, in turn, will often put in place a regulatory freeze, which, among other things,

directs agencies to postpone the effective dates of rules that have not yet taken effect to provide

the new administration with the opportunity to consider any issues that those prospective rules

might present. *See*, *e.g*., 86 Fed. Reg. 7,424 (Jan. 20, 2021) (Memo from Ronald A. Klain,

Assistant to the President and Chief of Staff); 82 Fed. Reg. 8,346 (Jan. 20, 2017) (Memo from

Reince Priebus, Assistant to the President and Chief of Staff). This, then, adds to the outgoing

administration's rush to complete its work, so that any new rules are not only promulgated, but

effective, before the presidential transition occurs. The questions presented by the pending

---

[1] The Court automatically substitutes the current Administrator of the EPA, Michael Regan, in the case caption. *See* Fed. R. Civ. P. 25(d) (providing that "when a public officer . . . ceases to hold office while the action is pending . . [t]he officer's successor is automatically substituted as a party").

1

motions in this case are whether the Environmental Protection Agency ("EPA") cut corners to finalize its decision to transfer certain Clean Water Act, 33 U.S.C. § 1251 *et seq*., permitting authority from the Army Corps of Engineers ("Corps") to the State of Florida in late 2020, and, if so, whether the Plaintiffs—seven environmental organizations—suffered any cognizable and redressable injuries as a result.

Plaintiffs' complaint spans the (metaphorical, if not veritable) waterfront, from the Clean Water Act to the Endangered Species Act to the Rivers and Harbors Act, and asserts nine claims, which challenge both the substance of the EPA's decision and the administrative process through which the EPA reached that decision. *See* Dkt. 1 at 27–35 (Compl. ¶¶ 118–61). For present purposes, however, the parties have limited their arguments to Plaintiffs' standing to bring this action and, if they have standing, to the merits of Counts Eight and Nine of their complaint. Those counts challenge the process, rather than the substance, of the EPA's decision. In Count Eight, Plaintiffs allege that the EPA's decision to give immediate effect to its approval of Florida's Section 404 program violated the APA in two respects: first, it violated 5 U.S.C. § 553(d), which requires agencies to publish final, substantive rules "not less than 30 days before [their] effective date," and, second, the agency violated 5 U.S.C. § 706(2) because its efforts to characterize its decision as an adjudication (and not a rulemaking) and its failure to codify its decision were arbitrary and capricious and not in accordance with law. Dkt. 1 at 46–47 (Compl. ¶¶ 228–39). And, in Count Nine, Plaintiffs allege that the EPA's failure to codify Florida's Section 404 program was arbitrary and capricious and not in accordance with law in violation of 5 U.S.C. § 706(2) and that the agency's omission has "rendered the transfer of authority" to the State of Florida "a nullity." *Id.* at 47–48 (Compl. ¶¶ 240–48).

For the reasons that follow, the Court concludes that Plaintiffs have standing to assert

their claims in Count Nine; that the Court requires further briefing to determine whether

Plaintiffs' claims in Count Eight are redressable; that Plaintiffs have alleged enough to overcome

Florida's motion to dismiss the remaining counts for lack of standing, although the Court will

need to revisit standing at the summary judgment stage on Plaintiffs' remaining claims; and that

Count Nine fails on the merits.  The Court, accordingly, will **DENY** Plaintiffs' motion for partial

summary judgment, Dkt. 31, will **GRANT** in part and **DENY** in part the EPA's cross-motion for

partial summary judgment, Dkt. 34, and will **GRANT** in part and **DENY** in part the State of

Florida's motion to dismiss, Dkt. 36.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

At the core of this case is Section 404 of the Clean Water Act, which governs the

issuance of permits for "the discharge of dredged or fill material into the navigable waters at

specified disposal sites."  33 U.S.C. § 1344(a).  Although Corps is responsible for the issuance of

such permits, a state may submit an application to the EPA, 40 C.F.R. § 233.1(a), seeking

authority to "administer its own individual and general permit program for the discharge of

dredged or fill material into the navigable waters . . . within its jurisdiction," 33 U.S.C. §

1344(g)(1); *see also* Dkt. 1 at 16 (Compl. ¶ 68) ("The Corps is charged with administering

permits under [S]ection 404 of the Clean Water Act.").

A state's application to assume permitting authority under Section 404 must include,

among other things, a "complete program description" and a "statement" from the state's

attorney general.  40 C.F.R. § 233.10.  The "complete program description" "shall include" the

following:

> (a)   A description of the scope and structure of the State's program. The
>       description should include extent of State's jurisdiction, scope of

activities regulated, anticipated coordination, scope of permit exemptions if any, and permit review criteria;

(b)    A description of the State's permitting, administrative, judicial review, and other applicable procedures;

(c)    A description of the basic organization and structure of the State agency (agencies) which will have responsibility for administering the program. If more than one State agency is responsible for the administration of the program, the description shall address the responsibilities of each agency and how the agencies intend to coordinate administration and evaluation of the program;

(d)    A description of the funding and manpower which will be available for program administration;

(e)    An estimate of the anticipated workload, e.g., number of discharges[;]

(f)    Copies of permit application forms, permit forms, and reporting forms;

(g)    A description of the State's compliance evaluation and enforcement programs, including a description of how the State will coordinate its enforcement strategy with that of the Corps and EPA;

(h)    A description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands.

Note: States should obtain from the Secretary an identification of those waters of the U.S. within the State over which the Corps retains authority under section 404(g) of the Act.

(i)    A description of the specific best management practices proposed to be used to satisfy the exemption provisions of section 404(f)(1)(E) of the Act for construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment.

*Id.* § 233.11. The attorney general's statement, in turn, must confirm "that the laws and regulations of the State, or an interstate compact, provide adequate authority to carry out the program and meet the applicable requirements." *Id.* § 233.12(a).

By statute, the EPA has 120 days to evaluate such a state application, "taking into account any comments" submitted by the Corps and the U.S. Fish and Wildlife Service ("FWS").

4

33 U.S.C. § 1344(h)(1).  The governing regulations provide, however, that this statutory period

does not begin to run until the EPA receives a "complete State program submission," and they

require the EPA to "determine whether [a] submission is complete within 30 days of receipt of

the submission."  40 C.F.R. § 233.15(a); *see also id.* § 233.10.  Once the EPA determines that an

application is complete, the EPA must publish the application in the Federal Register and must

solicit input from the Corps, the FWS, and the National Marine Fisheries Service ("NMFS").  *Id.*

§ 233.15(d)–(f).  The EPA must also provide for a public comment period of "not less than 45

days" and must hold a public hearing within the state.  *Id.* § 233.15(e)(1)–(2).

     The EPA has 120 days, in the absence of a request for an extension by the state or an

agreement between the state and the EPA to extend that window, to "approve or disapprove the

program based on whether the State's program fulfills the requirements of this part and the

[Clean Water] Act, taking into consideration all comments received."  *Id.* § 233.15(c), (g).  The

specific official tasked with making that decision is the relevant "Regional Administrator."  *Id.*

§ 233.15(g); *see also id.* § 1.5(a) (explaining that the EPA "consists of Headquarters and 10

Regional Offices," each headed by a "Regional Administrator[]").  In deciding whether to

approve the state's application, the Regional Administrator must consider "whether the State's

program fulfills the requirements of" the Clean Water Act and must take "into consideration all

comments received."  *Id.* § 233.15(g).  The Regional Administrator must then "prepare a

responsiveness summary of significant comments received and his response to these comments"

and must "respond individually to comments received from the Corps, FWS, and NMFS."  *Id.*  If

the Regional Administrator approves the state's application, he must "notify the State and the

[Corps] of the decision" and must "publish notice in the Federal Register."  *Id.* § 233.15(h).  The

"[t]ransfer of the program to the State shall not be considered effective until such notice appears

in the Federal Register." *Id.*  Finally, the Corps is required to "suspend the issuance . . . of [S]ection 404 permits in State regulated waters on [the] effective date." *Id.*

If the EPA "fails to make a determination with respect to any program submitted by a State" within 120 days, the "program shall be deemed approved."  33 U.S.C. § 1344(h)(3).  But even after the EPA approves a transfer of Section 404 permitting authority to a state, or the program is "deemed approved" by virtue of agency inaction, the EPA retains some authority to ensure that the state is administering the program in compliance with federal law.  *See id.* § 1344(i).  In particular, if the Administrator of the EPA (the "Administrator") "determines after a public hearing that a State is not administering a [Section 404] program . . . in accordance with" the Clean Water Act, "the Administrator shall so notify the State, and, if appropriate corrective action is not taken within a reasonable time, . . . the Administrator shall (1) withdraw approval of such program until the Administrator determines that such corrective action is taken, and (2) notify the [Corps] that [it] shall resume the program for the issuance of permits" until the required corrective action is taken by the State.  *Id.*

## B.     Factual and Procedural Background

### 1.     *Administrative Background*

On August 18, 2020, the State of Florida submitted an application to administer the Section 404 permitting program within its borders.  Dkt. 55 at 433 (AR 0004 at 1).  The EPA deemed the application complete on August 20, 2020, Dkt. 56-1 at 684 (AR 0641 at 1–2), triggering the statutory 120-day period for the agency to review the application, *see* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).  On September 16, 2020, the EPA issued a public "[n]otice and request for comments" on Florida's Section 404 program application and announced that the EPA would hold two "virtual hearings" in October 2020.  Dkt. 51 at 1 (AR 0001 at 1).  For those

hearings, the EPA "recommend[ed] that commenters also submit the text of their oral comments

. . . as written comments to the rulemaking docket." *Id.* at 2 (AR 001 at 2).  Following those

hearings, the EPA explained, "verbatim transcripts w[ould] be included in the rulemaking

docket." *Id.*  "If," at the end of this process, the EPA "approve[d] this program, [the] EPA

w[ould] also codify the approved program in 40 C.F.R. 233 subpart H," *id.* at 3 (AR 0001 at 3),

where the EPA had codified the only two state Section 404 programs that the agency had

approved, *see* 49 Fed. Reg. 38,947 (Oct. 2, 1984) (Michigan) (codified at 40 C.F.R. § 233.70);

59 Fed. Reg. 9,933 (Mar. 2, 1994) (New Jersey) (codified at 40 C.F.R. § 233.71).

The EPA received over 3,000 comments, Dkt. 56-1 at 433, including from the Plaintiffs

in this case.  Earthjustice, counsel to Plaintiffs in this case, wrote to the EPA on October 23,

2020, arguing that Florida's application was incomplete and that the EPA had erred when it

concluded otherwise.  Dkt. 55-3 at 69 (AR 0051 at 1); *see also* 40 C.F.R. § 233.11.  Florida's

application, according to that letter, was unsatisfactory in at least three ways.  First, Florida had

"not demonstrated how it w[ould] ensure no jeopardy to listed species" under the Endangered

Species Act and, instead, had "indicated it w[ould] rely on an anticipated programmatic

biological opinion and an anticipated, associated incidental take statement."  Dkt. 55-3 at 70 (AR

0051 at 2).  Second, the state had "failed to identify the waters that would be assumed under its

proposed program," in contravention of applicable EPA regulations.  *Id.* at 72 (AR 0051 at 4)

(citing 40 C.F.R. § 233.11(h)).  Third, Florida had not "provide[d] [the] EPA and the public with

complete information regarding how it would implement, operate and enforce a Section 404

program, particularly given the substantial impact the COVID-19 pandemic has had on State

coffers."  *Id.* at 74 (AR 0051 at 6).  Earthjustice submitted that because, in its view, Florida had

"failed to provide [the] EPA with a complete program submission in [these] three, critical

respects," the proper course was to "suspend the public comment period and review of Florida's application until the State cure[d] these deficiencies and submit[ted] a complete program proposal to the agency." *Id.* at 76 (AR 0051 at 8) (citing 40 C.F.R. § 233.15(a)).

On November 2, 2020, Earthjustice submitted further, detailed comments on behalf of several of the Plaintiffs in this case. *See* Dkt. 56 at 16–64 (AR 0386 at 1–55). The crux of their letter was that the EPA should deny Florida's application "for at least three reasons: (1) the submission [wa]s not complete, (2) the proposed program [wa]s not as stringent as federal law, and (3) Florida [wa]s not equipped to administer and enforce Section 404," *id.* at 17 (AR 0386 at 2). In support of their arguments, Plaintiffs submitted hundreds of pages of exhibits. *See id.* at 71–312 (AR 0386 at 56–307); Dkt. 56-1 at 1–64 (AR 0386 at 308–71).

On December 17, 2020, the EPA Administrator, Andrew Wheeler, announced approval of Florida's program, and the agency published a notice of approval in the Federal Register on December 22, 2020. Dkt. 56-1 at 433–34 (AR 0564 at 1–2); *see also* 85 Fed. Reg. 83,553 (Dec. 22, 2020). That notice, which was signed by the Regional Administrator, asserted that the EPA had "determined that the State of Florida ha[d] the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g-1) and EPA's implementing regulations." Dkt. 56-1 at 433 (AR 0564 at 1). The notice further asserted that the "EPA has taken final action to approve Florida's assumption of the program" and that "Florida's program assumption [was] applicable December 22, 2020," *id.*, which was the day the notice was published in the Federal Register, *see* 85 Fed. Reg. 83,553 (Dec. 22, 2020).

That same day, Earthjustice sent a letter to the EPA asserting that the "EPA's transfer of authority was unlawful." Dkt. 31-1 at 6 (Crooks Decl. ¶ 19); *see also id.* at 100–01 (Crooks Decl., Ex. D) (letter). Among other things, the letter argued that, under the APA, "[t]he required

publication or service of a substantive rule shall be made not less than 30 days before its

effective date." *Id.* at 100 (Crooks Decl., Ex. D) (quoting 5 U.S.C. § 553(d)).  Because,

according to the letter, the EPA's approval of Florida's Section 404 program constituted a

"substantive rule" for purposes of 5 U.S.C. § 553(d), the EPA lacked authority to make its

approval immediately effective.  *Id.*  The EPA had failed, moreover, to "codify [Florida's]

program in the Code of Federal Regulations," as was required by the Federal Register Act and

governing regulations.  *Id.* at 101 (Crooks Decl., Ex. D).  The letter further asserted that Florida's

program thus "d[id] not have the force of law," and "the authority to administer Section 404 of

the Clean Water Act in Florida remain[ed] with the U.S. Army Corps of Engineers."  *Id.*

      The EPA did not respond to Earthjustice but, instead, sent a letter to the Florida

Department of Environmental Protection ("FDEP") on December 28, 2020, positing—"for the

first time," according to Plaintiffs—that the EPA's approval of Florida's application "did not

have to meet the 30-day requirement [and EPA did not have to] codify the state program because

[agency approval] was an informal order, rather than a rule."  *Id.* at 6 (Crooks Decl. ¶ 19); *see

also id.* at 103–04 (Crooks Decl., Ex. E).  In that letter, the EPA's acting general counsel, David

Fotouhi, acknowledged the "letter from Earthjustice questioning the effective date of Florida's

404 assumption."  *Id.* at 103 (Crooks Decl., Ex. E).  Contrary to Earthjustice's understanding,

however, Fotouhi argued that the EPA's immediate effective transfer of Section 404 authority to

the State of Florida complied with both the Clean Water Act and its implementing regulations as

well as the APA's relevant provisions.  *Id.* at 103–04 (Crooks Decl., Ex. E).  As for

Earthjustice's invocation of Section 553(d) of the APA, Fotouhi noted that "[a]gencies may use

adjudications to apply general rules to address specialized or fact-specific questions," and he

argued that the "EPA's approval of Florida's Section 404 program was an adjudication, not a

rulemaking," meaning that "the APA's requirement that the effective date of a rule generally be delayed for 30 days d[id] not apply." *Id.* at 104 (Crooks Decl., Ex. E) (citation omitted).

As for the EPA's failure to codify the transfer, Fotouhi acknowledged that the "EPA ha[d] stated that it intend[ed] to codify the approved program," but he argued that the "EPA's approval ha[d] taken effect . . . and [wa]s not contingent upon the forthcoming codification." *Id.* Instead, according to Fotouhi, "EPA's plan to codify the program [wa]s for the sole purpose of ensuring transparency and clarity about Florida's program for the public, as well as for consistency with the [EPA's] past practice in approving states' applications for Section 404 program assumption, not because its approval is a rule that requires C.F.R. publication." *Id.* As a result, Fotouhi argued, "the fact that [the agency's approval was] not yet codified [wa]s irrelevant for purposes of the effective date of Florida's Section 404 program." *Id.*

On January 14, 2021, the EPA published a "Pre-Publication Notice" indicating that the agency intended to "update[e] the Code of Federal Regulations" to "reflect its approval" of Florida's Section 404 program.  Pre-Publication Notice, EPA, *Codifying EPA's Adjudicatory Decision on Florida's Clean Water Act Section 404 Program Request*, at 1 (Jan. 14, 2021), https://www.epa.gov/sites/default/files/2021-01/documents/pre-publication_frn-_fl_404_codification_final_rule_.pdf. ("Pre-Publication Notice").  That notice identified the relevant "Action" being announced as a "Final Rule" that the EPA Administrator had signed on January 14, 2021, and it explained that "[i]n order to facilitate transparency and consistency with past practice, [the] EPA is voluntarily amending the CFR to reflect its approval of Florida's assumption of the CWA Section 404 program." *Id.*  The Pre-Publication Notice reaffirmed the EPA's view that its approval of Florida's assumption of the permitting authority "was effective on December 22, 2020," but the notice also explained (1) that the "EPA has determined that

10

there is good cause for making this rule final without prior proposal and opportunity for comment because such notice and opportunity for comment is unnecessary, as it simply codifies the approved Florida CWA Section 404 program" and (2) that there was "good cause to make this rule effective immediately." *Id.*

2.   *Procedural Background*

Plaintiffs, seven environmental organizations,[2] filed this suit on January 14, 2021, alleging that "[t]he EPA's actions failed to effectuate a lawful transfer of authority." Dkt. 1 at 3, 10–14 (Compl. ¶¶ 1, 40–53). Plaintiffs name as Defendants the EPA, the FWS, the Corps, and various officials within those agencies. *Id.* at 15–17 (Compl. ¶¶ 57–71). Plaintiffs' nine-count complaint includes allegations that the EPA's determination that Florida's application was complete on August 20, 2020, violated the Clean Water Act and the APA, *id.* at 27 (Compl. ¶ 115) (Count One); the EPA's decision to approve Florida's Section 404 application violated the Clean Water Act and the APA, *id.* at 35 (Compl. ¶ 160) (Count Two); a biological opinion that the FWS issued in support of Florida's application violated the Endangered Species Act and the APA, *id.* at 38 (Compl. ¶ 179) (Count Three); an incidental take statement that the FWS included in that biological opinion violated the Endangered Species Act and the APA, *id.* at 42 (Compl. ¶¶ 199–200) (Count Four); the EPA's determination that its consideration of Florida's Section 404 application was "discretionary," and thus triggered Section 7 consultation under the ESA, violated the Clean Water Act and the APA, *id.* at 43 (Compl. ¶ 211) (Count Five); the FWS's treatment of Florida's application circumvented Section 10 of the Endangered Species Act, in violation of the APA, *id.* at 44–45 (Compl. ¶¶ 218–20) (Count Six); the Corps' treatment

---

[2]  The seven organizations are the Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper. Dkt. 1 at 10–14 (Compl. ¶¶ 40–53).

of Florida's application violated the Rivers and Harbors Act and the APA, *id.* at 45 (Compl.

¶¶ 223–26) (Count Seven); the EPA violated the APA by making its approval of Florida's

Section 404 program immediately effective, *id.* at 47 (Compl. ¶¶ 237–38) (Count Eight); and the

EPA's failure to codify Florida's Section 404 program violated the APA, *id.* at 48 (Compl.

¶ 248) (Count Nine).

Six days later, on January 20, 2021—the day the new administration took office—

Plaintiffs returned to the EPA and again "asked [the agency] to cure the immediate effective date

and failure to codify violations regarding [Florida's] program." Dkt. 31-1 at 8 (Crooks Decl.

¶ 24); *see also id.* at 106–29 (Crooks Decl., Ex. F) (letter). According to Plaintiffs, however, the

EPA "has adhered to its position that the immediate effective date was lawful, prohibiting the

agency from considering" Plaintiffs' request. *Id.* at 8 (Crooks Decl. ¶ 24).

The State of Florida and FDEP (collectively, "Florida" or "the State") moved to

intervene, Dkt. 4, to defend the EPA's decision approving the State's Section 404 program. The

Court granted Florida's motion on February 1, 2021. *See* Minute Order (Feb. 1, 2021).[3] The

Court then held a pre-motion conference, Dkt. 21, at which the parties identified a set of

threshold issues, and the Court set a briefing schedule on those issues, *see* Minute Order (Feb.

17, 2021). Pursuant to that schedule, Plaintiffs filed a partial motion for summary judgment on

March 5, 2021, addressing only Counts Eight and Nine—that is, the EPA's purported violation

of the APA by making its approval of Florida's application immediately effective and by failing

---

[3] The Florida Chamber of Commerce and Association of Florida Community Developers
("Florida Amici") separately moved to intervene in this action. Dkt. 29. This Court denied that
motion without prejudice, Dkt. 30, and invited both entities either to renew their motion or to
seek leave to participate in this matter as amici. The Florida Amici filed a renewed motion to
intervene, Dkt. 32, and the Court again denied intervention but granted the Florida Amici leave
to file a response to Plaintiffs' motion for partial summary judgment, Dkt. 38; Dkt. 39, which
this Court has considered in resolving the present motions.

to codify the transfer of permitting authority from the Corps to the State.  Dkt. 31.  The EPA

cross-moved for summary judgment on Counts Eight and Nine on April 26, 2021, Dkt. 34, and

the State cross-moved to dismiss Plaintiffs' complaint in its entirety for lack of standing and

moved to dismiss Counts Eight and Nine for failure to state a claim, Dkt. 36.

      The Court heard oral argument on March 15, 2022, and permitted the parties to file

supplemental memoranda addressing certain questions that the Court posed at oral argument.

The parties filed those memoranda on March 18, 2022.  *See* Dkt. 70; Dkt. 71; Dkt. 72.  Those

motions are now fully briefed and ripe for decision.[4]

## II.  LEGAL STANDARD

### A.  Motion to Dismiss

      A Rule 12(b)(1) motion challenges the Court's subject-matter jurisdiction to consider a

case, and, accordingly, provides an appropriate vehicle for challenging the plaintiff's Article III

standing.  When the defendant contests the legal sufficiency of the jurisdictional allegations

contained in the complaint, the Court must accept the allegations of the complaint as true and

must construe "the complaint in the light most favorable to the non-moving party."  *Erby v.*

*United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006); *see also I.T. Consultants, Inc. v.*

*Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  When framed in this manner, the

---

[4] Plaintiffs have also moved for leave to file a surreply.  Dkt. 47; *see also* Dkt. 69 (proposed
surreply).  "The decision to grant or deny leave to file a surreply is committed to the sound
discretion of the Court, and in making its decision, the Court considers whether the surreply is
helpful to the adjudication" of the pending motions and "whether the defendant[s] will be unduly
prejudiced if the Court grants leave to allow the surreply."  *Plunkett v. Dep't of Just.*, 249 F.
Supp. 3d 73, 74 n.2 (D.D.C. 2017) (quotation marks and alterations omitted).  Because the Court
concludes that Plaintiffs' proposed surreply will be helpful to the resolution of the pending
motions, and that neither the EPA nor Florida will be unduly prejudiced by the grant of leave to
file, the Court will **GRANT** Plaintiffs leave to file their surreply, Dkt. 69.

Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).

*See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

A motion to dismiss for failure to state a claim upon which relief can be granted under

Federal Rule of Civil Procedure 12(b)(6), meanwhile, "tests the legal sufficiency of a

complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule

12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state

[the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with

adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District

of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 675, 678 (2009)) (citation omitted).  The complaint, however, need not include

"detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  Instead, a complaint may survive a Rule 12(b)(6) motion even if

"recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough

to raise a right to relief above the speculative level."  *Id.* at 555–56 (quotation marks omitted).  In

assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four

corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28

(D.D.C. 2006), along with "any documents attached to or incorporated into the complaint,

matters of which the court may take judicial notice, and matters of public record," *United States

ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

## B.    Summary Judgment

Summary judgment is appropriate under Rule 56 when the pleadings and the evidence

demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In a case involving review of a final

agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012) (citation omitted).  In the unique context of a case brought under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1341 (D.C. Cir. 1995).  The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as agency actions taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).

When it comes to standing, however, district courts are not limited to the administrative record.  In moving for summary judgment on its standing, a plaintiff may not rest on mere allegations, but, instead, must cite to evidence contained in the administrative record or submitted along with its motion, Fed. R. Civ. P. 56(c), that demonstrates that there is no genuine dispute of material fact as to the existence of "a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125

(2014) (citation omitted).  Similarly, a defendant may move for summary judgment on standing,

seeking to demonstrate "that there is no genuine dispute as to any material fact," Fed. R. Civ. P.

56(c), and that plaintiffs cannot establish the required elements of Article III standing based on

the record evidence, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "The evidence of

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

## III.  ANALYSIS

### A.  Standing

The Court begins, as it must, with the question of Plaintiffs' standing to bring the claims

alleged in this suit.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The

"'irreducible constitutional minimum' of standing" requires that Plaintiffs demonstrate that they

have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.

Robins*, 578 U.S. 330, 338 (2015) (citing *Lujan*, 504 U.S. at 560).  Plaintiffs must satisfy these

elements of standing "in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of

the litigation." *Lujan*, 504 U.S. at 561.

This means that two different standards apply here.  First, in response to Florida's cross-

motion to dismiss this entire suit for lack of standing, Dkt. 37, Plaintiffs may rely on "general

factual allegations of injury," and the Court will "presume that general allegations embrace those

specific facts that are necessary to support the claim," *Abigail All. for Better Access to Dev.

Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (alterations and quotation marks

omitted).  Second, in support of their own motions for partial summary judgment and in response

to the EPA's cross-motion for partial summary judgment on Counts Eight and Nine, Dkt. 31;

Dkt. 34, Plaintiffs may "no longer rest on such 'mere allegations,'" *Lujan*, 504 U.S. at 561

(quoting Fed. R. Civ. P. 56(e)), but instead must provide affidavits or other evidence to

demonstrate the specific facts necessary to support standing, *Swanson Grp. Mfg. LLC v. Jewell*,

790 F.3d 235, 240 (D.C. Cir. 2015).

Plaintiffs, as environmental organizations, *see* Dkt. 1 at 10–14 (Compl. ¶¶ 40–53), "can

assert standing on [their] own"—that is, on behalf of themselves as entities—or "on behalf of

[their] members or both," *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,

797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d

1136, 1138 (D.C. Cir. 2011)).  Here, Plaintiffs attempt to do both—that is, they assert injuries to

their own concrete interests (invoking organizational standing principles) and to those of their

members (a question of associational standing).  Dkt. 31 at 35.  Although these are distinct

inquiries, *compare Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), *with Hunt v.*

*Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), under either theory, Plaintiffs

must identify an injury-in-fact to their concrete interests.  As such, the Court will address their

ability to make this showing, focusing (as Plaintiffs do in their brief, *see* Dkt. 31 at 40–48) on

their efforts to show an injury to a concrete organizational interest.

The Court will first address Florida's motion to dismiss under the Rule 12(b)(1) standard

and will then turn to Plaintiffs' and the EPA's cross-motions under the Rule 56 standard.

1.    *Florida's Cross-Motion to Dismiss*

Much of Florida's motion to dismiss overlaps with the EPA's motion for summary

judgment on Counts Eight and Nine, and because Plaintiffs' burden of demonstrating standing at

the summary judgment stage is more demanding than their burden of opposing a motion to

dismiss, the Court will address those overlapping arguments in the context of Plaintiffs' and the EPA's cross-motions for summary judgment. Florida, however, goes beyond the arguments pressed by the EPA with respect to Counts Eight and Nine and argues that the Court should dismiss Plaintiffs' complaint in its entirety for lack of standing. *See* Dkt. 37 at 44–67. Although it is well-established that "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), in pressing these arguments, Florida does not differentiate among the counts of the complaint. The Court will, accordingly, address Florida's categorical arguments with respect to Plaintiffs' suit as a whole.

But before addressing those arguments, the Court must first pause to clarify the nature of Florida's challenge to Plaintiffs' standing. "At the motion to dismiss stage, a challenge to the plaintiff's standing may take one of two forms." *Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, No. 20-cv-2552, 2021 WL 4462723, at *4 (D.D.C. Sept. 29, 2021) (quoting *Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015)). A Rule 12(b)(1) motion may, on the one hand, "raise a 'facial' challenge to the legal sufficiency of the plaintiff's jurisdictional allegations," in which case "the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party." *Erby*, 424 F. Supp. 2d at 182. On the other hand, a Rule 12(b)(1) motion "may pose a 'factual,' challenge to the Court's jurisdiction," in which case "the Court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant, but must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Hale*, 2015 WL 7760161, at *3 (quotation marks omitted).

Florida does not specify which of these two paths it has chosen here. But its arguments,

time and again, challenge the sufficiency of Plaintiffs' allegations as they relate to standing. The

State challenges, for example, the adequacy of Plaintiffs' "*alleged* procedural violation" under

Section 553(d), along with their theory of "*alleged* secondary procedural rights" under Sections

553(e) and 705. Dkt. 37 at 30–31 (emphases added). Florida also titles one section of its cross-

motion to dismiss, "Plaintiffs' *alleged* organizational injuries do not support their standing." *Id.*

at 53 (emphasis added). Even more importantly, Florida offers no *evidence* or *factual* material

beyond the four corners of the complaint in support of its motion. Florida does not, for example,

offer any affidavits or declarations disputing Plaintiffs' alleged injuries, and it has not sought any

jurisdictional discovery. The Court, accordingly, concludes that Florida has "raise[d] a 'facial'

challenge" to the Court's jurisdiction to hear Plaintiffs' suit, and as such will "accept as true the

allegations in the complaint," *Erby*, 424 F. Supp. 2d at 182.

Florida's principal categorical argument begins with the premise that Plaintiffs' theory of

standing relies on their "unspoken contention that Florida's administration of its Section 404

permitting program will cause greater harm to Florida's natural resources than if the Corps were

administering the permitting program." Dkt. 37 at 45. Because Florida's Section 404 program is

"at least as protective as the [f]ederal program," Florida continues, Plaintiffs' "unspoken

contention" is unfounded and the EPA's transfer decision "cannot constitute a concrete injury."

*Id.* at 45–46. But in considering the question of Plaintiffs' standing to bring this suit, the Court

must take care "not to decide the questions on the merits for or against the plaintiff, and must

therefore assume that on the merits the plaintiffs would be successful in their claims." *City of

Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). And here, Plaintiffs allege that the EPA

violated the Clean Water Act and the APA in approving Florida's Section 404 application

because the State had not demonstrated that "it ha[d] authority to . . . issue permits that . . . assure

compliance with[] the requirements of Section 404, including the 404(b)(1) Guidelines; assure

that the public will have notice and an opportunity for hearing on every application; and abate

violations of any permit and the permit program via civil and criminal enforcement."  Dkt. 1 at

27–28 (Compl. ¶ 119); *see also* 33 U.S.C. § 1344(h)(1).  Among a long list of alleged

deficiencies, Plaintiffs allege, for example, that the State program "violates federal law by

purporting to issue scores of general permits without the state permitting authority have made the

requisite determinations regarding environmental impact," Dkt. 1 at 28 (Compl. ¶ 122); "by

authorizing these general permits for a duration of five years from the date of EPA approval of

the program, unlawfully extending the general permits issued initially by the Corps beyond their

statutory limited five-year duration," *id.* (Compl. ¶ 123); by expanding "the circumstances under

which emergency permits—those that do not follow the ordinary requirements of Section 404—

may issue," *id*. (Compl. ¶ 124); and by omitting "important requirements, including the

requirement to 'minimize' discharges in violation of a permit, . . . certain monitoring and

reporting requirements, . . . the requirement that discharges minimize adverse impacts through

restoration, in addition to mitigation, . . . and the requirement of specifically identifying and

completely describing the authorized activity," *id.* at 29 (Compl. ¶ 125); *see also id.* at 28–33

(Compl. ¶¶ 120–47) (identifying other alleged deficiencies).  In short, the crux of Plaintiffs'

substantive challenge to the EPA's decision is that Florida's program is not, in fact, as protective

of wildlife and wildlife habitat as the federal program as administered by the Corps.

        In light of these allegations—which the Court must at present "accept as true," *Erby*, 424

F. Supp. 2d at 182—the Court concludes that Florida's argument that Plaintiffs lack standing

because the EPA's approval did no more than permit the State to "administer its substantively

equivalent [Section 404] program," Dkt. 43 at 74, is "inextricably intertwined with the merits of

the case," *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992).  And it is well-established that, "[i]n those circumstances, . . . the issue of standing need not be conclusively resolved, but instead the [C]ourt should defer its jurisdictional decision until the merits are heard."  *Kadi*, 42 F. Supp. 3d at 28 (quotation marks omitted).  The Court concludes that this path is the prudent one here, and will, accordingly, defer ruling on this particular flavor of Florida's standing-related arguments until Plaintiffs press the merits of their claims as to the substance of the EPA's decision.

Florida's challenge to Plaintiffs' asserted informational injury is even less availing.  According to the State, Plaintiffs will suffer no informational injury due to the EPA's approval of its Section 404 application because neither of the two statutes that Plaintiffs invoke would otherwise entitle the Plaintiff organizations or their members to additional information about projects potentially impacting the environment.  Dkt. 37 at 56.  In particular, the State argues that the Endangered Species Act ("ESA") does not require the disclosure of information to the public, and the National Environmental Policy Act ("NEPA") does not apply to EPA actions under Section 404.  *Id.*  The State has no answer, however, to Plaintiffs' showing that, even if not required to do so, "the ESA implementing agencies[]," in practice, "regularly release federal consultations to the public, including via websites with biological opinions dating back decades."  Dkt. 43 at 68–69.  And, more importantly, although the EPA's actions under Section 404 are not subject to NEPA review, the State ignores the fact that it is not the EPA—but the Corps—that typically issues Section 404 permits, and the Corps' actions are subject to NEPA, 42 U.S.C. § 4332(C); *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1366–67 (S.D. Fla. 2005) (vacating Section 404 permit issued by Corps based on failure to comply with NEPA).

Florida's alternative argument as to standing turns on the Clean Water Act's requirement that the EPA make a determination on a state's Section 404 application within 120 days.  33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).  As noted above, if the agency fails to act on application within the required time, the state's "program shall be deemed approved."  33 U.S.C. § 1344(h)(3).  According to Florida, this provision means that, "*even assuming arguendo* that the Court grants Plaintiffs' requested relief and vacates [the] EPA's approval notice, no relief for Plaintiffs would ensue because Florida's program would then be 'deemed approved' by operation of law."  Dkt. 37 at 60.  The Florida Amici echo this point, maintaining that "even if the Plaintiffs are right about the substance of [their claims], and [the] EPA's approval is vacated as a result, Congress's choice still controls and deems approved the State of Florida's [Section] 404 application because more than 120 days have passed since EPA received the State's [Section] 404 application."  Dkt. 38 at 11.

That argument is unpersuasive on several levels.  Most significantly, Section 404(b)(3)'s "deemed approved" language is triggered only if the EPA "*fails to make a determination* with respect to any program submitted by a State under subsection (g)(1)."  33 U.S.C. § 1344(h)(3) (emphasis added).  But, here, the EPA *did* make a determination—the agency approved Florida's Section 404 application.  *See* Dkt. 56-1 at 433–34 (AR 0564 at 1–2).  That is a problem for Florida and the Florida Amici because the authorities on which Florida rests its argument each involved an agency's failure to make a decision.  The first such case involved an agency "failing to adopt any order before [a] statutory deadline," prompting the D.C. Circuit to conclude that this inaction did not produce a judicially reviewable agency action.  *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131, (D.C. Cir. 2007).  This was so, the court reasoned, because "[t]he deadlocked vote cannot be considered an order of the [agency] nor can it constitute agency action."  *Id.*

Florida's second precedent held that when Federal Energy Regulatory Commission ("FERC")

"deadlocked" during a ratemaking, "the effects of that deadlock are not reviewable orders." *Pub.*

*Citizen, Inc. v. FERC*, 839 F.3d 1165, 1170 (D.C. Cir. 2016); *see also id.* at 1171 ("FERC did not

engage in agency action at all, let alone final agency action.").  And the third concluded that an

agency's "public notice" that certain statutory requirements would "sunset . . . *by operation of*

*law*" for a specific entity did not constitute a final, reviewable agency action.  *AT&T Corp. v.*

*FCC*, 369 F.3d 554, 561–62 (D.C. Cir. 2004).

        To the extent that these decisions have any bearing on the question at hand, they do not

stand for the remarkable proposition that Section 404's "deemed approved" language strips this

Court of the ability to redress any substantive harms caused by the EPA's approval of Florida's

application more than 120 days after its submission.  Given that judicial review of such an

approval will always (or almost always) postdate the 120-day window provided for in the statute,

one would expect Congress more clearly to provide for such a drastic result.  Put differently,

without a more explicit statutory directive, the Court is disinclined to assume that Congress

intended that "an unlawful program unlawfully approved would be 'deemed approved' once a

Court finds it unlawful."  Dkt. 43 at 16.  To be sure, if the program was "deemed approved," that

approval might constitute a congressional action, rather than administrative action, and it might

thus avoid APA review.  But that is not what happened here.

        Whether that 120-day window was even triggered, moreover, is a hotly contested

question.  Plaintiffs allege that "[t]he EPA's determination that Florida's application was

complete as of its submission on August 20, 2020, was arbitrary, capricious, an abuse of

discretion, not in accordance with the law, unsupported by substantial evidence and otherwise in

violation of the Clean Water Act and APA."  Dkt. 1 at 26–27 (Compl. ¶ 114).  This is, in fact,

one of the grounds on which Plaintiffs intend to seek reconsideration if they secure judgment on their claims in Count Eight. *See, e.g.*, Dkt. 31-1 at 7 (Crooks Decl. ¶ 22). The Court, accordingly, cannot grant the premise underlying Florida's argument—that is, that the 120-day statutory window properly began on August 22, 2020—consistent with its obligation to "assume that on the merits the [P]laintiffs would be successful in their claims," *City of Waukesha*, 320 F.3d at 235. Although Florida might prove correct that Florida's Section 404 application was complete at that time, that issue is, like many of Florida's other standing arguments, "inextricably intertwined with the merits of the case," *Herbert*, 974 F.2d at 198, and so the Court will "defer [that] jurisdictional decision until the merits are heard," *Kadi*, 42 F. Supp. 3d at 28.

The Court will, accordingly, deny Florida's motion to dismiss Plaintiffs' complaint in its entirety for lack of standing.

2.     *Cross-Motions for Summary Judgment*

The Court turns to whether Plaintiffs have satisfied the more demanding burden that they face in moving for partial summary judgment on Counts Eight and Nine and in resisting the EPA's cross-motion. For both counts, Plaintiffs' alleged injuries sound in an asserted procedural harm. As a result, to demonstrate standing Plaintiffs must establish that "(1) the government violated their procedural rights designed to protect a threatened, concrete interest, and (2) the violation resulted in injury to that concrete, particularized interest." *California v. Trump*, No. 19-cv-960, 2020 WL 1643858, at *6 (D.D.C. Apr. 2, 2020) (quoting *New Hampshire v. Holder*, 293 F.R.D. 1152, 1157 (D.D.C. 2013)). In conducting this analysis, the Court may "relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). But even though the "standards applicable in procedural injury cases" are "less

demanding," *California*, 2020 WL 1643858, at *6, the doctrine of procedural standing "does

not—and cannot—eliminate any of the 'irreducible' elements of standing," *Fla. Audubon Soc'y

v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc).

In practice, this means that "[w]hen a litigant is vested with a procedural right, that

litigant has standing if there is *some possibility* that the requested relief will prompt the injury-

causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v.

EPA*, 549 U.S. 497, 518 (2007) (emphasis added); *see Sugar Cane Growers Co-op. of Fla. v.

Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("All that is necessary is to show that the

procedural step was connected to the substantive result.").  Establishing causation under this test

requires two showings.  First, the plaintiff must establish a link between the omitted procedural

step and "some substantive government decision that may have been wrongly decided because of

the lack of" that procedural step.  *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C.

Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668).  Second, the plaintiff must establish a

connection between that substantive decision and its "particularized injury."  *Id.*

Because Plaintiffs "must demonstrate standing for each claim [they] seek[] to press,"

*Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChryslerCorp. v.

Cuno*, 547 U.S. 332, 352 (2006)), and because both the EPA and Florida direct different

arguments at the two counts on which Plaintiffs seek partial summary judgment, *see* Dkt. 34 at

17–21 (Count Eight); *id.* at 21–23 (Count Nine); Dkt. 37 at 29–41 (Count Eight); *id.* at 42–44

(Count Nine), the Court will address Counts Eight and Nine separately.

        a.     <u>Count Eight</u>

In Count Eight, Plaintiffs allege that the "EPA violated the APA by making approval" of

Florida's Section 404 program "immediately effective upon publication in the Federal Register,

rather than no less than 30 days thereafter," as required by the APA.  Dkt. 1 at 47 (Compl. ¶ 237).  The EPA's failure to delay the effective date of this approval gives rise to four potential procedural injuries.  The EPA, at least in theory, acknowledges the first—that the transfer's immediate effective date resulted in a cognizable deprivation of Plaintiffs of "their procedural right, under 5 U.S.C. § 553(d), to a 30-day period between the date on which [the] EPA published notice that it had approved Florida's [S]ection 404 program, and the date on which that approval became effective."  Dkt. 35 at 17.  Plaintiffs' second and third asserted procedural injuries are the loss of their ability to seek reconsideration or a stay of the EPA's decision under Section 553(e) and Section 705, respectively.  *See* 5 U.S.C. §§ 553(e), 705.  But for the EPA's allegedly unlawful decision to make its approval of Florida's Section 404 program immediately effective, Plaintiffs argue, they "would have been able to exercise their procedural right to seek reconsideration or an agency stay pending judicial review to protect their concrete interests." Dkt. 31 at 34.  Plaintiffs' fourth asserted procedural injury posits that the "EPA's decision would [also] have been subject to the [Biden] Administration's directive to agencies to review and consider staying rules that had not yet gone into effect as of January 20, 2021."  *Id.*[5]

Of these, the Court will begin with Plaintiffs' claims of procedural injury relating to the alleged loss of their right to a 30-day delay in the Section 404 transfer's effective date under

---

[5] Here, Plaintiffs reference a memorandum sent by President Biden's Chief of Staff, Ronald Klain, on January 20, 2021, the day the new administration took office. Dkt. 31 at 15; *see also* Dkt. 31-1 at 9–10 (Crooks Decl. ¶ 25).  That memorandum, which the parties refer to as the "Klain memo," directed federal agencies, "[w]ith respect to rules that have been published in the Federal Register, or rules that have been issued in any manner, but have not taken effect, [to] consider postponing the rules' effective dates for 60 days from the date of this memorandum," in part "to ensure that the President's appointees or designees have the opportunity to review any new or pending rules." 86 Fed. Reg. 7,424, 7,424 (Jan. 20, 2021) (Memo from Ronald A. Klain, Assistant to the President and Chief of Staff).

Section 553(d).  The Court will then turn to Plaintiffs' claims that this injury led to two further

procedural injuries—namely, their loss of the right to seek a stay of the transfer pending judicial

review, under Section 705, and the right to seek reconsideration of that transfer under Sections

553(e).[6]

i.      Section 553(d)

Section 553(d) provides that "[t]he required publication or service of a substantive rule

shall be made not less than 30 days before its effective date," unless (1) the rule is "a substantive

rule which grants or recognizes an exemption or relieves a restriction," (2) the rule is an

"interpretative rule[]" or "statement[] of policy," or (3) the agency "publish[es] with the rule . . .

good cause" for the immediate effective date.  5 U.S.C. § 553(d).  The EPA concedes that

Plaintiffs have a procedural right under Section 553(d)—or at least that they would if, as

Plaintiffs maintain, the EPA's approval of Florida's program constituted a rule—and that the

immediate effective date deprived them of that right.  Dkt. 35 at 17–19 & n.4.

The primary question, then, is whether Plaintiffs have identified any concrete injuries that

this right is "designed to protect," *Ctr. for Law & Educ.*, 396 F.3d at 1157, and that bear the

requisite causal connection to the EPA's approval decision, *Ctr. for Biological Diversity*, 861

F.3d at 184.  To make this showing, Plaintiffs rely principally on the doctrine of organizational

standing and argue that the EPA's deprivation of their rights under Section 553(d) injured their

concrete interests as advocacy organizations.  *See* Dkt. 31 at 40–48.  Under that doctrine, "[i]t is

not enough for the organization to show that its 'mission has been compromised,' or that it has

---

[6] Although the Court shares Florida's skepticism that the Klain memo confers on Plaintiffs any independent "procedural right . . . designed to protect their threatened concrete interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157; *see* Dkt. 37 at 32–33, at the motions hearing Plaintiffs clarified that they are not advancing any such claim, *see* Rough Tr. at 19 (Mar. 15, 2022).

experienced a 'setback to its abstract social interests.'" *Pub. Citizen v. Trump*, 297 F. Supp. 3d 6, 36 (D.D.C. 2018) (first quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015), then quoting *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).  Rather, "[t]o establish organizational standing a party must show that it suffers" or will imminently suffer "a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests . . . [and] the presence of a direct conflict between the defendant's conduct and the organization's mission." *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (alterations and quotation marks omitted).

Here, citing to the declarations they submitted alongside their motion for partial summary judgment, Plaintiffs identify the following organizational missions:

> (1) securing a future for all species, great or small, hovering on the brink of extinction, Exhibit 5 at 2 (Hartl at ¶ 7); (2) protection of all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments, Exhibit 6 at 2–6 (Carter Dec. at ¶¶ 5–23); (3) protecting wild places, promoting responsible use of the earth's ecosystems and resources, and enlisting humanity to protect and restore the quality of the natural and human environment, Exhibit 2 at 2– 3 (Umpierre Dec. at ¶¶ 6–8); (4) protecting Southwest Florida's land, water, wildlife, and future through advocacy, science, education, and wildlife rehabilitation, Exhibit 1 at 1–2 (Crooks Dec. at ¶¶ 4–7); (5) supporting environmental sustainability and conservation in Florida, Exhibit 7 at 1–2 (Robertson Dec. at ¶¶ 4–7); (6) defending, protecting, and preserving South Florida's watershed, Exhibit 3 at 2 (Silverstein Dec. at ¶¶ 5–6); and (7) providing an independent voice to defend, advocate, and activate others to protect and restore the St. Johns River, Exhibit 8 at 3 (Rinaman Dec. at ¶¶ 10–11).

Dkt. 31 at 40–41.  Neither the EPA nor Florida dispute Plaintiffs' characterization of their organizational missions.  Plaintiffs further explain, again without opposition, that they "accomplish these missions through citizen engagement, education, and outreach, scientific research, advocacy, and legal challenges." *Id.* at 41.

With this background established, Plaintiffs then argue that the EPA's "immediate and

continued unlawful transfer of [Section 404] authority" to the State disrupted the execution of these missions in "three key respects." *Id.* at 41. Plaintiffs first maintain that due to the immediate effective date, they "were forced to immediately expend resources and staff time to gather information on new and transferred [Section] 404 permit applications[] and [to] wade through the contents of the state's obtuse permitting database, all while trying to continue their advocacy against pending permit applications threatening their interests and those of their members." *Id.*; *see also* Dkt. 31-1 at 8–9 (Crooks Decl. ¶ 28). The second and third ways in which their missions have been frustrated, in contrast, go to the injuries that Plaintiffs maintain they have incurred as a result of the transfer itself. They argue that, now that the State is administering the Section 404 program, they have "lost the benefit of federal requirements, rights and remedies available under NEPA and Section 7 of the ESA," and have "been substantially limited in their ability to protect wetlands and species through litigation because of restrictive access to the courts." Dkt. 31 at 41; *see also* Dkt. 31-2 at 15–16 (Umpierre Decl. ¶¶ 46–50) (describing the importance of information gathered from the NEPA and ESA Section 7 review processes in the Sierra Club's advocacy efforts); Dkt. 31-1 at 15–16 (Crooks Decl. ¶ 46) (attesting that the Conservancy of Southwest Florida "will be severely constrained by inadequate and costly state [court] procedures," such as "restrictive standing requirements, costly litigation requirements[,] . . . and the potentially devastating risk of mandatory fee-shifting laws").

In response, the EPA (along with the State) argues that "the remedies available for a violation of [Section] 553(d) are extremely limited" under the D.C. Circuit's per curiam decision in *Prows v. Department of Justice*, 938 F.2d 274 (D.C. Cir. 1991). Dkt. 34 at 18. Under *Prows*, the EPA argues, Plaintiffs may invoke this Court's jurisdiction only to seek redress for "concrete injuries between December 22, 2020, and January 21, 2021"—that is, the 30-day window in

which, under Plaintiffs' theory, the transfer should not have been effective.  *Id.* at 19.  All other injuries, according to the EPA, are rendered non-redressable by *Prows*.  *Id.*  Florida Amici similarly argue that, under *Prows*, Plaintiffs' claims under Count Eight are now moot because "the 30-day delay requirement has long since expired."  Dkt. 38 at 7.

The Court does not read *Prows* quite so expansively.  To be sure, in *Prows* the D.C. Circuit held that "violations" of Section 553(d)'s effective-date requirements "are remedied by denying such a rule effectiveness for the mandated 30 days [and] allowing it to take effect in full thereafter."  938 F.2d at 275.  That holding, however, must be understood in light of the unique facts of the case.  In *Prows*, an inmate sued the Bureau of Prisons after he was fired from his work assignment for failure to comply with a new agency rule (the Inmate Financial Responsibility Program or "IFRP") requiring inmates to "devote a portion of their earnings toward specific 'legitimate financial obligations.'"  *Id.*  The plaintiff argued that the promulgation of a related rule (the "Program Statement") violated the notice-and-comment requirements of Sections 553(b) and 553(c) of the APA, and the district court agreed, declaring the rule "null and void" and ordering the inmate reinstated, with back pay, to his former position. *Id.*  After the inmate was again fired after his court-ordered reinstatement "on a basis wholly independent" of the then-invalidated Program Statement rule, the inmate argued he should be reinstated once more because the IFRP rule had been made effective immediately upon publication, in violation of Section 553(d).  *Id.* at 275–76.  The district court disagreed, and the D.C. Circuit affirmed, reasoning that Section 553(d) "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product of the violation."  *Id.* at 276.  The plaintiff "had been made whole as an incidental result of the district court's having ordered reinstatement with back pay," the D.C. Circuit explained,

and so "any violation" of Section 553(d) "was fully remedied," because even if his original firing could be traced to the enforcement of the IFRP during the 30 days during which that rule should not have been in effect, he was later fired a second time for reasons wholly unrelated to that window. *Id.*

The Court agrees with the EPA that *Prows* limits the relief that Plaintiffs may seek for violations of Section 553(d) in several respects. The decision makes clear that Plaintiffs may not seek redress for injuries that are "not the product of the [Section 553(d)] violation" and that such violations do not typically provide a basis for vacating a rule in its entirety. *Id.* at 275–76. These limitations imply, as the EPA argues, Dkt. 34 at 19, that Plaintiffs may seek relief only for injuries they were incurred during the 30-day window in which the rule should not (at least according to Plaintiffs) have been in effect. This is because it is unlikely that injuries that postdate that window were "the product of the violation" of Section 553(d) standing alone, although in *Prows* the D.C. Circuit was careful to note that to the extent any injuries that occurred more than 30 days after publication were attributable to the Section 553(d) violation, those injuries were "fully remedied" by the district court's prior order that he be reinstated. 938 F.3d at 276. At base, then, *Prows* really stands for the unremarkable proposition that a violation of Section 553(d) requires a remedy that makes "whole" "those who are affected by agency action taken [or refused] during the 30-day waiting period." *Id*.

Applying *Prows* and general principles of standing, the Court is unpersuaded that Plaintiffs have standing based on the theory that the EPA's failure to delay the effective date "forced [them] to divert resources away from core programmatic actions and focus instead on the immediately effective state 404 program." Dkt. 31 at 42. It may be true, for example, that the immediate effective date left Plaintiffs "unable to adequately prepare for the mass of permits

immediately transferred from the Corps to [Florida]" and "required a substantial diversion of

[their] attention from [their] planned activities to determining the status and impact of these

transfers and what actions [Florida] would take."  Dkt. 31-1 at 9 (Crooks Decl. ¶ 28) (describing

impact on one Plaintiff, the Conservancy of Southwest Florida); *see also, e.g.*, Dkt. 31-3 at 7

(Silverstein Decl. ¶ 16) (similar for Plaintiff Miami Waterkeeper); Dkt. 31-5 at 11 (Hartl Decl.

¶ 32) (similar for Plaintiff Center for Biological Diversity).  But there is no relief that the Court

could issue to redress those injuries.  Plaintiffs seek only declaratory and injunctive relief, and

they expressly disclaim any request (at least based on Count Eight) to vacate the transfer in its

entirety, Dkt. 31 at 49–50, a remedy that, in any event, *Prows* appears to foreclose, 938 F.3d at

275–76.  As a result, even if Plaintiffs suffered concrete injuries when the immediate effective

date "forced [them] to immediately expend resources and staff time to gather information on new

and transferred permit applications," Dkt. 31 at 41, such injuries are no longer redressable.

But those are not the only injuries that Plaintiffs claim that they have suffered due to the

EPA's alleged Section 553(d) violation.  Plaintiffs argue, in addition, that they have "lost

procedural rights and the benefits of additional procedures that, absent a court order, cannot be

regained," including the right "to seek reconsideration under Section 553" and "to seek a stay

under Section 705"  Dkt. 43 at 45.  Amber Crooks, who submitted a declaration on behalf of

Plaintiff Conservancy of Southwest Florida, for example, attests that "[a]s a result of [the]

immediate effective date, [the] Conservancy lost the procedural rights to seek agency

reconsideration prior to the transfer going into effect [and] to seek an agency stay pending

judicial review."  Dkt. 31-1 at 7 (Crooks Decl. ¶ 22).  Each of the remaining six Plaintiffs have

submitted declarations echoing versions of this theory of procedural harm.  *See* Dkt. 31-2 at 6

(Umpierre Decl. ¶ 15) (Sierra Club); Dkt. 31-3 at 9 (Silverstein Decl. ¶ 28) (Miami

Waterkeeper); Dkt. 31-5 at 9–10 (Hartl Decl. ¶¶ 28–29) (Center for Biological Diversity); Dkt. 31-6 at 10 (Carter Decl. ¶¶ 30–31) (Defenders of Wildlife); Dkt. 31-7 at 7 (Robertson Decl. ¶ 22) (Florida Wildlife Foundation); Dkt. 31-8 at 8–9 (Rinaman Decl. ¶¶ 28–30) (St. Johns Riverkeeper).  To the extent these injuries occurred during the 30-day window that the EPA was assertedly required to provide under Section 553(d) and were "the product of th[at] violation," *Prows* does not foreclose relief.  938 F.2d at 276.

Florida objects that such a theory of injury turns on "derivative procedural rights," Dkt. 37 at 32, but, as Plaintiffs note, Dkt. 43 at 39 n.19, the State provides no authority for the proposition that "derivative procedural injuries" are inherently unredressable or overly remote. If Plaintiffs can show that a violation of Section 553(d) deprived them of a procedural right they would have otherwise enjoyed under Section 553(e) or Section 705, and that the "derivative" Section 553(e) or Section 705 injury "threatened [their] concrete interests," *Ctr. for Law & Educ.*, 396 F.3d at 1157, the Court sees no reason why Article III precludes relief.  The Court will, accordingly, consider whether Plaintiffs have demonstrated a sufficient relationship between their asserted Section 553(d) injuries and any procedural injury arising under Section 553(e) and Section 705, and, if so, whether any such injuries under Section 553(e) or Section 705 affected their concrete interests.

                    ii.       Section 553(e)

Section 553(e) provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  5 U.S.C. § 553(e).  There appears to be little dispute that this provision vests a right in Plaintiffs to seek reconsideration of the EPA's approval of Florida's Section 404 program.  Indeed, the EPA argues only that Plaintiffs were not deprived of this right because they remained free to seek reconsideration even after a rule took

effect.  Dkt. 35 at 19 n.5.  Plaintiffs respond that the right to seek reconsideration applies only to "a rule," 5 U.S.C. § 553(e), not to an adjudication, and so the EPA's position that its approval of Florida's Section 404 program was an adjudication rather than a rule, *see* Dkt. 31-1 at 103–04 (Crooks Decl., Ex. E), in fact, deprived them of their right to seek reconsideration of that decision.  Dkt. 43 at 39.

But even assuming the existence of a procedural right under Section 553(e), and even assuming that the EPA deprived them of that right, Plaintiffs must be able to trace that deprivation to the Section 553(d) violation alleged in Count Eight.  *See* Dkt. 1 at 47 (Compl. ¶ 237) ("The EPA violated the APA by making its approval effective immediately upon publication in the Federal Register, rather than no less than 30 days thereafter.").  And, at least on the present record, they have not done so.  The loss of Plaintiffs' right to seek reconsideration under Section 553(e)—which applies only to a "rule," 5 U.S.C. § 553(e)—flows not from the immediate effective date, but from the EPA's announcement that its approval of Florida's Section 404 application was an informal adjudication, and not a rulemaking, *see* Dkt. 31-1 at 103–04 (Crooks Decl., Ex. E).

Indeed, according to Plaintiffs, the EPA violated Section 553(d) on December 22, 2020, when the agency announced its decision and declared that "Florida's assumption [was] applicable" the very same day.  Dkt. 56-1 at 433.  But Plaintiffs did not lose their right to seek reconsideration under Section 553(e) until the EPA's acting General Counsel declared almost a week later, on December 28, 2020, that Florida's application "did not have to meet the 30-day requirement [and the agency did not need to] codify the state program because [the EPA's decision] was an informal adjudicatory order, rather than a rule."  Dkt. 31-1 at 6 (Crooks Decl. ¶ 19).  To illustrate the point, suppose that the EPA had, instead, issued the transfer decision as a

rule but had erroneously relied on the "good cause" exception to give the rule immediate effect. *See* 5 U.S.C. § 553(d)(2).  Under that hypothetical, Plaintiffs would have been able to assert a violation of their Section 553(d) rights but not their Section 553(e) rights, underscoring the reality that the two procedural rights are distinct.

Put differently, the right to seek reconsideration under Section 553(e) is not the kind of interest that Section 553(d) is "designed to protect."  *California*, 2020 WL 1643858, at *6. Instead, "the purpose of the thirty-day waiting period" prescribed by Section 553(d) "is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996).  Injuries that accrue due to Section 553(d) violations must, accordingly, flow from the agency's failure to afford parties the effective-date delay required by that provision.  It is for this reason that *Prows* observes that Section 553(d) "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product of the violation." 938 F.2d at 276.

To be sure, Plaintiffs have identified at least some (albeit nonbinding) authority for the proposition that "the primary purpose of [Section 553] was . . . to permit *petitions for reconsideration* and 'to afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take other action which the issuance may prompt.'"  *Nance v. EPA*, 645 F.2d 701, 708–09 (9th Cir. 1981) (emphasis added) (quoting *United States v. Gavrilovic*, 551 F.2d 1099, 1104 (8th Cir. 1977)); *see also Rowell v. Andrus*, 631 F.2d 699, 703 (10th Cir. 1980). The legislative history on which that authority relies, however, does not mention petitions for reconsideration and, instead, posits only that Section 553's predecessor was meant to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take

any other action which the issuance of rules may prompt." S. Rep. No. 79-752, at 201 (1946).

That understanding of the rule makes sense, given that Section 553(d) "protects those who are

affected by agency action taken during the 30-day waiting period," *Prows*, 938 F.2d at 276,

while interested parties may seek reconsideration under Section 553(e) before, during, or after

that 30-day waiting period.

Plaintiffs might be able to assert a standalone claim based on a deprivation of their

Section 553(e) rights. But Count Eight is predicated on a Section 553(d) violation, and whether

Plaintiffs would be able to assert standing based on an independent violation of Section 553(e)—

or, indeed, whether Plaintiffs have any interest in pursuing such a claim—is a question for

another day. For now, the Court merely holds that Plaintiffs cannot establish standing to

challenge the EPA's asserted violation of Section 553(d) based on their inability to seek

reconsideration of the agency's Section 404 transfer decision.

   iii.  Section 705

Under Section 705, "[w]hen an agency finds that justice so requires, it may postpone the

effective date of action taken by it, pending judicial review." 5 U.S.C. § 705. That provision,

according to Plaintiffs, affords them a procedural right "to petition [the] EPA to postpone a rule's

effective date during the pendency of litigation." Dkt. 31 at 33. On January 20, 2021, Plaintiffs

attempted to avail themselves of this right by "ask[ing] [the] EPA to cure the immediate effective

date and failure to codify violations regarding [Florida's Section 404] program" and further

asking that the EPA "postpone the effective date . . . pending judicial review." Dkt. 31-1 at 8

(Crooks Decl. ¶ 24). But, Plaintiffs maintain, "the prior Administration's immediate effective

date has blocked the new Administration's authority to consider staying [the] EPA's actions

pending judicial review and has denied Plaintiffs the right to seek that relief to protect their

interests." Dkt. 31 at 15. Although the EPA has declined to explain why it has failed to act on

Plaintiffs' January 20, 2021 stay request, the agency has, in the past, declined to rule on Section

705 stay requests after the agency action at issue went into effect. *See, e.g.*, 76 Fed. Reg. 28,318,

28,326 (May 17, 2011) (concluding that, because "the effective date of the [agency action] has

already passed[,] . . . a stay under APA [S]ection 705 is not appropriate").[7] Notably, the EPA

does not dispute Plaintiffs' assertions that the immediate effective date precludes the agency

from reviewing their pending stay request, Dkt. 31-1 at 7 (Crooks Decl. ¶ 22) ("As a result of

EPA's immediate effective date, [the] Conservancy lost the procedural right[] . . . to seek an

agency stay pending judicial review."), and it has not argued that the request for a stay remains

pending and thus renders Plaintiffs' claim defective for lack of a final agency action, *see* 5

U.S.C. § 704. At the motions hearing, moreover, the Court asked counsel for the EPA whether

the agency could consider Plaintiffs' January 20, 2021 stay request if the Court concluded "the

rule should not have been effective" during the 30-day window following the December 22,

2020 approval announcement in the Federal Register, given that Plaintiffs "filed [their] request

during that period of time." Rough Tr. at 77–78 (Mar. 15, 2022). Counsel agreed that the

agency could, if the Court granted such relief, consider Plaintiffs' stay request. *Id.* at 78–79.

     Plaintiffs' claim of a Section 705 injury, accordingly, bears a different relation to their

alleged Section 553(d) violation than their claim of a Section 553(e) injury. Because the EPA

has previously taken the position that Section 705 stays are unavailable once an agency action

has taken effect (and it does not disavow that position now), the very act that Plaintiffs allege

---

[7] One such decision notes that "it is not clear whether EPA would have authority under APA
[S]ection 705 to stay an agency action that has already gone into effect." 76 Fed. Reg. 4,780,
4800 (Jan. 26, 2011). That suggestion raises concerns, which are addressed below, about the
redressability of any theory of injury tied to a Section 705 procedural violation, at least insofar as
that injury is itself tied to a Section 553(d) procedural violation (and is thus subject to *Prows*).

violated Section 553(d) arguably deprived them of their right to seek a stay under Section 705. Had Plaintiffs received the benefit of the 30-day delayed effective date that Section 553(d) affords interested parties, *see Prows*, 938 F.2d at 276, Plaintiffs' January 20, 2021 stay request could have been considered before the transfer decision took effect and, accordingly, the EPA would not have been precluded from considering that request.

The EPA does not engage on this point, arguing instead that Plaintiffs cannot show that "Congress intended [Section] 705 to confer a procedural right, the deprivation of which might support a claim for standing." Dkt. 34 at 19–20.  The agency notes that Section 705 provides that "'[w]hen an *agency* finds that justice so requires, *it may* postpone the effective date of the action taken by it,'" arguing that this "is a permissive grant of agency authority [that] affords agencies ample discretion in choosing whether to use the power conferred." *Id.* at 20 (quoting 5 U.S.C. § 705).  Plaintiffs, of course, cannot base their standing on a "procedural right . . . designed to protect their threatened concrete interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157, if no such procedural right exists.  And, as the EPA observes, Dkt. 34 at 20, Section 705's reference to an agency's authority "to postpone the effective date" of an action is a far cry from, say, Section 553(e)'s mandatory requirement that "[e]ach agency *shall give*" a specific class of individuals—"interested person[s]"—a designated right—"the right to petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e) (emphasis added).

The Court is persuaded, however, that, notwithstanding this discretionary language, Section 705 confers upon interested parties a procedural right at least to be heard.  In the only precedent that any of the parties identify, the district court concluded that Section 705 grants interested parties "a procedural right to petition to postpone [an agency action's] effective date." *Env't Def. Fund v. EPA*, 515 F. Supp. 3d 1135, 1145 (D. Mont. 2021).  Nor is this the Court's

38

first word on Section 705; this Court has previously concluded that an agency's decision to issue

a Section 705 stay is a reviewable agency action, and in doing so, the Court rejected the

argument that such decisions are "committed to agency discretion by law." *Bauer v. DeVos*, 325

F. Supp. 3d 74, 101 (D.D.C. 2018) (quoting *Heckler v. Chaney*, 470 U.S. 821, 828 (1985)).  In

identifying a standard of review for such decisions, the Court concluded that Section 705

imposes on agencies an obligation to "weigh the same kinds of equitable considerations that

courts have long applied and [to] explain why, in light of the pending litigation, a stay is

'require[d]' to ensure the parties will ultimately obtain an adequate and just judicial remedy." *Id.*

at 107 (alterations in original) (quoting 5 U.S.C. § 705).

That conclusion turned on a textual analysis of the relationship between Section 705's

first sentence (which authorizes administrative stays) and the provision's second sentence, which

authorizes judicial stays of agency action:

> [1] When an agency finds that justice so requires, it may postpone the effective
> date of action taken by it, pending judicial review.  [2] On such conditions as
> may be required and to the extent necessary to prevent irreparable injury, the
> reviewing court, including the court to which a case may be taken on appeal
> from or on application for certiorari or other writ to a reviewing court, may issue
> all necessary and appropriate process to postpone the effective date of an agency
> action or to preserve status or rights pending conclusion of the review
> proceedings.

5 U.S.C. § 705.  Reading these sentences together, it is apparent that the purpose of a Section

705 stay—whether issued by the agency or by a court—is to "preserve status or rights pending

conclusion of the [judicial] review proceedings." *Id.*; *see also Env't Def. Fund*, 515 F. Supp. 3d

at 1145 ("This process provides a petitioner with immediate relief from a regulation while the

courts consider the merits of a legal challenge.").  That interpretation is consistent with the

standard applied by courts and agencies alike when considering a request for a Section 705

stay—"the four-factor test used to evaluate requests for preliminary injunctive relief." *Bauer*,

325 F. Supp. 3d at 105; *see also Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).

"The purpose of a preliminary injunction," after all, "is merely to preserve the relative positions

of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390,

395 (1981)). Both sentences, moreover, use the word "may" to describe the authority to issue a

stay, and there is no question that a court must consider a stay application and must engage in

reasoned decision making. Nothing in the first sentence suggests that the word "may" carries a

different meaning and leaves administrative agencies with unreviewable discretion to decline to

act—or to decline even to consider a stay application.

The APA's legislative history provides at least some support for this understanding of

Section 705's purpose. It is true that, as the EPA notes, prior to the passage of the APA the

Senate Judiciary Committee noted that the "first sentence" of what is now Section 705 "merely

confirms administrative authority to grant a stay," without shedding further light on the purpose

of that authority. Dkt. 34 at 20. The House Committee report, however, explained that "[t]he

authority granted is equitable and should be used by both the agencies and courts to prevent

irreparable injury or afford parties an adequate judicial remedy." H.R. Rep. No. 79-1980, at 277

(1946). It was for this reason, according to that report, that Section 705's precursor "permit[ted]

either agencies or courts, if the proper showing be made, to maintain the status quo"—or, put

differently, to "provide intermediate relief . . . in order to make judicial review effective." *Id.* In

this way, Congress (or at least the House Committee) appears to have contemplated that parties

might seek the equivalent of a preliminary injunction before an agency while challenging that

agency's conduct in court. And notably, the version of the provision under consideration by the

House—like Section 705's current iteration—referred only to the agency itself: "Pending

40

judicial review any agency may postpone the effective date of its action." *Id.*  If nothing else, this legislative history undermines the EPA's position, *see* Dkt. 34 at 20, that Congress *explicitly* assigns to "interested person[s]," 5 U.S.C. § 553(e), a given procedural right in every instance in which the legislature contemplates the creation of such a right.

Taken together, Section 705's text, purpose, and legislative history indicate that the provision grants Plaintiffs a right to seek a stay from the EPA to "preserve [their] rights pending conclusion of the review proceedings," 5 U.S.C. § 705.  Although the EPA is correct that nothing in Section 705 obligates the agency to *grant* such stays, *see Bauer*, 325 F. Supp. 3d at 105; *Sierra Club*, 833 F. Supp. 2d at 30, the agency must at least *consider* such petitions.  Here, Plaintiffs maintain that by declaring the approval of Florida's Section 404 program immediately effective, the EPA deprived them of this right.  *See, e.g.*, Dkt. 31-1 at 7–8 (Crooks Decl. ¶¶ 22, 24); *see also* 5 U.S.C. § 553(e) (permitting agencies to "postpone," rather than to vacate or repeal, an agency action pending judicial review).  The agency, in effect, precluded Plaintiffs from even "ask[ing] the agency to postpone the effective date of its" transfer of Section 404 authority to the State of Florida "pending judicial review" before this Court, Dkt. 31-1 at 8 (Crooks Decl. ¶ 24), an injury that affected each of the Plaintiffs, *see* Dkt. 31-2 at 7 (Umpierre Decl. ¶¶ 17–18) (similar for Sierra Club); Dkt. 31-3 at 6 (Silverstein Decl. ¶¶ 12, 14) (Miami Waterkeeper); Dkt. 31-5 at 10–11 (Hartl Decl. ¶¶ 30–31) (Center for Biological Diversity); Dkt. 31-6 at 10 (Carter Decl. ¶¶ 30, 32) (Defenders of Wildlife); Dkt. 31-7 at 8 (Robertson Decl. ¶¶ 24–25) (Florida Wildlife Foundation); Dkt. 31-8 at 9 (Rinaman Decl. ¶¶ 30–32) (St. Johns Riverkeeper).

But a violation of a procedural right does not on its own confer standing, and so the Court must return to the question of whether Plaintiffs have identified concrete interests that Section

705 is "designed to protect," *Ctr. for Law & Educ.*, 396 F.3d at 1157.  In an effort to make this

showing, Plaintiffs point to the impact of the EPA's substantive decision to approve Florida's

Section 404 program, and Plaintiffs' corresponding loss of remedies and access to information

under NEPA and Section 7 of the ESA.  *See* Dkt. 31-2 at 16–18 (Umpierre Decl. ¶¶ 46–50).  The

crux of Plaintiffs' concerns is that, when the Corps administers the Section 404 program at the

federal level, Plaintiffs may rely on information gleaned from the environmental review

processes required by NEPA, *see* 42 U.S.C. § 4332(2)(C), and the interagency consultation

process required by Section 7 of the ESA, *see* 16 U.S.C. § 1536.  Each of the Plaintiffs have

submitted declarations attesting that they use this information—and specifically the relevant

NEPA analysis—to, consistent with their organizational missions, "educate the public and . . .

advocate for protections for wetlands and species."  Dkt. 31 at 45; *see* Dkt. 31-1 at 25–27

(Crooks Decl. ¶¶ 74–77) (Conservancy of Southwest Florida); Dkt. 31-2 at 17–19 (Umpierre

Decl. ¶¶ 46–50) (Sierra Club); Dkt. 31-3 at 8, 10 (Silverstein Decl. ¶¶ 18, 25) (Miami

Waterkeeper); Dkt. 35-5 at 5, 7–9 (Hartl Decl. ¶¶ 14, 21, 26) (Center for Biological Diversity);

Dkt. 31-6 at 9, 13 (Carter Decl. ¶¶ 23–25, 39) (Defenders of Wildlife); Dkt. 31-7 at 4–5

(Robertson Decl. ¶¶ 11–14) ((Florida Wildlife Foundation); Dkt. 31-8 at 4–6 (Rinaman Decl.

¶¶ 15–20) (St. Johns Riverkeeper).

According to Plaintiffs, because these review procedures do not apply to Florida's

Section 404 program, they will "be required to hire [their] own experts in an attempt to otherwise

assess and understand impacts of" proposed projects at a cost of "cost thousands of dollars per

case."  Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48).  Plaintiffs further attest that "[t]he loss of

information from these analyses will result in additional staff time to triage permits to identify

harms to the listed species and their habitats and additional costs in hiring experts," and that their

"conservation advocacy work would be significantly hindered." *Id.*; *see also* Dkt. 31-1 at 26 (Crooks Decl. ¶ 75) ("Now that Florida has unlawfully assumed the federal 404 program, [the] Conservancy is harmed by the loss of environmental review of projects under NEPA. This statute not only provides more scrutiny for water resources, species and their habitat, but also provides the Conservancy with vital information to vet the impacts of a proposed project and additional opportunities for public comment.").

As noted above, Plaintiffs' organizational missions include "securing a future for all species, great or small, hovering on the brink of extinction," Dkt. 31 at 40 (citing Dkt. 31-5 at 3 (Hartl Decl. ¶ 7)); "protect[ing] . . . all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments," *id.* (citing Dkt. 31-6 at 3–7 (Carter Decl. ¶¶ 5–23)); and "protecting wild places, promoting responsible use of the earth's ecosystems and resources, and enlisting humanity to protect and restore the quality of the natural and human environment," *id.* (citing Dkt. 31-2 at 3–4 (Umpierre Decl. ¶¶ 6–8)). To accomplish these missions, Plaintiffs use the information provided pursuant to NEPA and Section 7 of the ESA under the federal Section 404 program. *See, e.g.*, Dkt. 31-1 at 26 (Crooks Decl. ¶ 75); Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48). Florida objects that NEPA does not apply to the EPA's approval of Section 404 applications from states, *see* Dkt. 37 at 56, but that is beside the point because it is the Corps that would administer the Section 404 permit program if the EPA were to stay its transfer decision, and the Corps is subject to NEPA. Dkt. 43 at 69–70; *see also* Dkt. 31-1 at 26 (Crooks Decl. ¶ 75); Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48). In contrast, it is undisputed that, as a state entity, FDEP is not subject to NEPA, *see City of Bos. Delegation v. FERC*, 897 F.3d 241, 246 (D.C. Cir. 2018) (describing obligations that NEPA places on "federal agencies"), and even if some

Section 404 permit applications might still trigger NEPA review—because, for example, they require *federal* involvement of some kind, *see* Dkt. 37 at 56—no party contends that this will be true for all (or even most) projects with which Plaintiffs are concerned, *see* Dkt. 31-2 at 8–17 (Umpierre Decl. ¶¶ 20–44).  For those projects, then, Plaintiffs will be deprived of the kinds of environmental assessments required by NEPA of federal agencies, *see* 42 U.S.C. § 4332(c), and Plaintiffs will need to pay for their own experts to provide the same information.  That prospect qualifies as a "concrete and demonstrable injury to [Plaintiffs'] activities," *Elec. Priv. Info.*, 892 F.3d at 1255; *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding injury cognizable where agency inaction "deprived [plaintiff organization] of key information that it relie[d] on to educate the public," forcing organization to "expend[] resources to counteract those injuries").[8]

Plaintiffs are on less sure footing, however, with respect to causation and redressability.  As noted above, the causation element of standing for procedural injuries requires two showings.  Plaintiffs must establish both (1) a link between the omitted procedural step and "some substantive government decision that may have been wrongly decided because of the lack of" that procedural step; and (2) a connection between that substantive decision and their "particularized injury."  *Ctr. for Biological Diversity*, 861 F.3d at 184.  But "where, as here, the purported cause of injury (*i.e.*, promulgation of final rules [or the implementation of a final rule pending judicial review]) and the injury itself is separated by intervening actors and events, the causation and redressability inquiries may appear to merge."  *Ctr. for Law & Educ.*, 396 F.3d at

---

[8] Because the Court concludes that Plaintiffs have identified sufficiently concrete interests that Section 705 is "designed to protect," *Ctr. for Law & Educ.*, 396 F.3d at 1157, the Court need not address Plaintiffs' separate argument that the EPA's transfer harms their interests by forcing them to litigate in Florida state court, where (according to Plaintiffs) they will face burdens such as "highly restrictive standing requirements and mandatory fee shifting," Dkt. 31 at 9.

1160 n.2.  "In such cases, both prongs of standing analysis can be said to focus on principles of

causation: fair traceability turns on the causal nexus between the agency action and the asserted

injury, while redressability centers on the causal connection between the asserted injury and

judicial relief."  *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994).  At

bottom, however, the question is whether "there is *some possibility* that the requested relief will

prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."

*Massachusetts*, 549 U.S. at 518 (emphasis added).

Here, should the Court conclude that the EPA impermissibly gave its transfer decision

immediate effect, that determination might provide Plaintiffs with the opportunity to seek an

administrative stay pursuant to Section 705.  Dkt. 31 at 49–50; *see also* Dkt. 43 at 51.  Plaintiffs

submit, moreover, that there is "at least 'some possibility' that the new Administration would

grant Plaintiffs' petition to postpone the [transfer's] effective date and thereby protect Plaintiffs'

concrete interests pending judicial review."  Dkt. 31 at 50.  That argument has some force,

particularly in light of the Klain memo's directive that federal agencies "consider postponing the

rules' effective dates for 60 days" for any agency rules "that . . . have not taken effect."  86 Fed.

Reg. at 7424.

The problem, however, is that even if the EPA were inclined to issue a Section 705 stay,

it is not at all clear that the agency has the authority to do so now that the transfer has gone into

effect.  If Plaintiffs are correct, and the EPA's transfer decision was a rulemaking that has (even

if prematurely) taken effect, a stay would arguably affect the existing rights of regulated parties

in a manner that might itself require an opportunity for notice and comment.  *Cf. Clean Air

Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (concluding that "an order delaying [a] rule's

effective date . . . [was] tantamount to amending or revoking a rule").  In this respect, it is one

thing to permit an agency to stay an administrative decision pending judicial review in order to maintain the status quo, but something altogether different to alter the status quo without providing an opportunity for notice and comment. *Cf. Sierra Club*, 833 F. Supp. 2d at 25–29 (stressing that stay did not alter the status quo). The D.C. Circuit has declared—albeit in a non-precedential order—that Section 705 "permits an agency to postpone the effective date of a not yet effective rule, pending judicial review," but "it does not permit the agency to suspend without notice and comment a promulgated rule." *Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, at *2–*3 (D.C. Cir. Jan. 19, 1996). Other courts, moreover, have found that logic persuasive when analyzing the authority that Section 705 confers upon agencies. *See, e.g.*, *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1117–18 (N.D. Cal. 2017); *Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953, 963–64 (N.D. Cal. 2017); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019). Those decisions reflect the principle that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

The plain language of Section 705 further supports this conclusion. The provision authorizes an agency to "postpone the effective date" of a rule pending judicial review. 5 U.S.C. § 705. The word "postpone" means "to put off to a later time," or to "defer." *Postpone*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/postpone (last visited Mar. 28, 2022). But, once a rule has taken effect, the agency can no longer "put off" the effective date; it can only rescind or modify it. Perhaps for this reason, Section 705 confers a broader authority on reviewing courts, permitting the court "to postpone the effective date . . . *or to preserve* status or *rights* pending conclusion of the review proceedings." 5 U.S.C. § 705

(emphasis added).  When Congress uses different language in the very same section of a statute, courts should assume that it intended that difference to have some meaning.  *See Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 12 (D.C. Cir. 2011).

One answer to all of this might be that the relief that Plaintiffs contemplate in their motion is altering the effective date itself, such that Florida's Section 404 program will not take effect until 30 days from the date of this Court's order.  But that theory arguably conflicts with *Prows*, and, more significantly, would require the Court (or the agency) to alter the terms of a final rule that took effect over a year ago and to do so without the benefit of notice and comment. Changing the effective date, in this respect, arguably differs from affording Plaintiffs relief for any injury that they sustained during the 30 days following the final promulgation of the rule. The latter remedies a violation of the APA's 30-day notice requirement, while the former arguably invalidates or changes a portion of the rule—that is, the effective date.  As the D.C. Circuit observed in *Clean Air Council*, delaying the effective day of a rule "affects regulated parties' 'rights or obligations'" by at least temporarily "eras[ing] [their] obligation" to comply with it.  862 F.3d at 7 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Another answer might be that the Court could direct the agency to consider the request for a Section 705 stay that Plaintiffs submitted on January 20, 2021, because that request fell within the 30 days in which the transfer could not permissibly have taken effect but for the Section 533(d) violation.  That relief is arguably consistent with the mandate in *Prows* that Section 553(d) violations "are remedied by denying such a rule effectiveness for the mandated 30 days, allowing it to take effect in full thereafter," 938 F.2d at 275, and, indeed, counsel for the EPA acknowledged at the motions hearing that the agency would be permitted to consider Plaintiffs' stay request in those circumstances, Rough Tr. at 78 (Mar. 15, 2022).  But even if the

Court granted that relief—by declaring that the EPA's approval should not have gone into effect until January 21, 2021—there is no avoiding the fact that Florida's Section 404 program has been in operation for over a year.  And there is no way, as far as the Court can tell, to un-ring that bell without vacating the EPA's decision at least in part, in possible contravention of *Prows*.

It is conceivable, however, that the agency retains some equitable authority to fashion a remedy in response to a timely filed Section 705 stay request that (assuming Plaintiffs are right on the merits) the agency declined to consider based on a mistake of law.  The purpose of Section 705, after all, is to enable agencies and courts to "preserve [litigants'] rights pending conclusion of the review proceedings," 5 U.S.C. § 705, and all that Plaintiffs request in Count Eight is a remedy that (roughly) accords with the right that they would have been able to seek but for the EPA's failure to comply with Section 553(d).  In attempting to fashion an equitable remedy, the Court would need to consider the interests of third parties; it would need to consider any legal restraints on its authority to act; and it would need to consider whether it is possible at this date to restore Plaintiffs to the position they would have occupied were it not for the EPA's (alleged) failure to comply with the dictates of Section 553(d).  Whether it is possible to strike such a balance is far from clear.

These questions force the Court into largely uncharted waters, without the benefit of any relevant briefing from the parties.  At the motions hearing, moreover, the EPA requested the opportunity to brief the question of remedy should the Court conclude that the Plaintiffs are right on the merits.  Rough Tr. at 53 (Mar. 15, 2022).  Although the Court cannot reach the merits without first determining whether there is "*some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant," *Massachusetts*, 549 U.S. at 518 (emphasis added), the EPA's suggestion is sensible.  The Court

will, accordingly, direct that the parties submit further briefing as to what relief (if any) the EPA

might be able to provide to Plaintiffs should the Court find in their favor on the merits of Count

Eight.  The Court recognizes that Plaintiffs appear to have a tough row to hoe on this question,

but, before the Court renders a definitive decision, all of the parties should have the opportunity

to brief what is an important and novel question.

    With that question unanswered, the Court concludes that, for now, Plaintiffs' standing to

pursue Count Eight remains an open question, and the Court will, accordingly, deny without

prejudice both the EPA's and Plaintiffs' motion for partial summary judgment on that claim,

along with Florida's motion to dismiss as to Count Eight.

    b.    Count 9

    The Court must also consider Plaintiffs' standing for purposes of Count Nine.  In that

count, Plaintiffs allege that the EPA's transfer of Section 404 authority to the State of Florida

"was intended to be a rule of general applicability," and, as such, it should have been codified in

the Code of Federal Regulations.  Dkt. 1 at 48 (Compl. ¶ 246).  Plaintiffs note that, in the only

two prior instances in which the EPA approved such a transfer, the agency codified its decisions,

*see* 49 Fed. Reg. 38,947 (Oct. 2, 1984) (Michigan) (codified at 40 C.F.R. § 233.70), 59 Fed. Reg.

9,933 (Mar. 2, 1994) (New Jersey) (codified at 40 C.F.R. § 233.71), and they allege that "[t]he

EPA's failure to codify [Florida's] program rendered the transfer of authority a nullity," Dkt. 1 at

48 (Compl. ¶ 248).  In seeking summary judgment on this count, Plaintiffs argue that because the

EPA "failed to codify the components of [Florida's] program, that program lacks lawful

authority."  Dkt. 31 at 48.  And because Florida's program is causing Plaintiffs various concrete

and redressable injuries—such as "a threat of harm to their recreational, aesthetic, and other

interests from the anticipated issuance of permit applications that would destroy thousands of

acres of wetlands that are vital for the survival and recovery of protected species"—Plaintiffs

argue that they have standing to assert their claims in Count Nine.  *Id.* at 49.  Both the EPA and

Florida respond that these injuries are not causally related to the codification (or lack thereof) of

the EPA's decision.  *See* Dkt. 34 at 21–23; Dkt. 37 at 43.

The EPA and Florida, however, disregard the principle that, in assessing a plaintiff's

standing, courts may not "decide the questions on the merits for or against the plaintiff, and must

therefore assume that on the merits the plaintiffs would be successful in their claims."  *City of*

*Waukesha*, 320 F.3d at 235.  That principle is dispositive here.  If Plaintiffs are correct that "[t]he

EPA's failure to codify the state program rendered the transfer of authority a nullity," Dkt. 1 at

48 (Compl. ¶ 248), the agency has, since December 22, 2020, permitted Florida to administer a

Section 404 program that has no basis in law.  And, if that is true, Plaintiffs have standing based

on the concrete injuries that they contend follow from the State's operation of that program.  *See*

Dkt. 31 at 35–40.  The Court need not assess (or re-assess) those asserted injuries in detail,

however, because it has already concluded that at least one injury that flows from Florida's

Section 404 program—the unavailability of universal environmental review under NEPA and the

ESA—is sufficient for Article III purposes.  *See* Dkt. 31-1 at 25–27 (Crooks Decl. ¶¶ 74–77)

(attesting to this injury for Conservancy of Southwest Florida); Dkt. 31-2 at 17–19 (Umpierre

Decl. ¶¶ 46–50) (Sierra Club); Dkt. 31-3 at 8 (Silverstein Decl. ¶ 18) (Miami Waterkeeper); Dkt.

35-5 at 5, 7–9 (Hartl Decl. ¶¶ 14, 21, 26) (Center for Biological Diversity); Dkt. 31-6 at 7–8, 13

(Carter Decl. ¶¶ 23–25, 39) (Defenders of Wildlife); Dkt. 31-7 at 4–5 (Robertson Decl. ¶¶ 11–

14) ((Florida Wildlife Foundation); Dkt. 31-8 at 4–6 (Rinaman Decl. ¶¶ 15–20) (St. Johns

Riverkeeper).

Plaintiffs have also established causation and redressability.  In particular, they have

offered evidence that Florida's allegedly unlawful assumption of Section 404 authority has required that they "hire [their] own experts in an attempt to otherwise assess and understand impacts of" proposed projects at a cost of "thousands of dollars per case." Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48); *see also* Dkt. 31-1 at 26 (Crooks Decl. ¶ 75). Were the Court to rule in favor of the Plaintiffs on Count Nine and "set aside" the EPA's "transfer of authority" to Florida, Dkt. 1 at 48 (Compl. ¶ 248), moreover, the Corps would resume its prior authority to administer the Section 404 program within the affected waters, and Plaintiffs would, once again, be able to avail themselves of the information provided under NEPA and the ESA.

The EPA and Florida's focus on causation belies a misunderstanding of Plaintiffs' claims in Count Nine. Although it is true that Plaintiffs cannot trace any of their Article III injuries to the codification (or lack thereof) of the transfer, *see, e.g.*, Dkt. 34 at 21, their claim is not merely that the EPA failed to engage in the ministerial act of codifying its approval of Florida's application. Instead, Plaintiffs maintain that this failure to codify the rule "rendered the transfer of authority a nullity." Dkt. 1 at 48 (Compl. ¶ 248). For that reason, Plaintiffs' theory of standing under Count Nine is not—at least principally—one of procedural injury; rather, Plaintiffs maintain that they suffered a direct substantive injury "as a result of [the] EPA's failure to codify its action." Dkt. 31 at 48 (emphasis added) (capitalization omitted). As a result, whether the APA's requirement that rules be codified represents a "procedural right . . . designed to protect their threatened concrete interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157, is beside the point. The appropriate question for present purposes is whether, assuming that Plaintiffs are correct that the failure to codify renders the EPA's actions void of legal effect, the unlawful operation of Florida's Section 404 program inflicts on Plaintiffs' constitutionally cognizable harms that are redressable by this Court.

Because the answer to that question is yes, the Court proceeds to the merits of Plaintiffs' claims under Count Nine.

**B.     Merits**

Having concluded that Plaintiffs have standing to assert their claims in Count Nine, the Court now turns to the merits of that claim.  As discussed above, Plaintiffs allege that the EPA was required to codify its approval of Florida's Section 404 application because that decision "was intended to be a rule of general applicability that would have the legal effect of transferring authority from the Corps to [Florida] and authorizing [Florida's Section] 404 program."  Dkt. 1 at 47 (Compl. ¶¶ 241–42).  The EPA's failure to codify its decision, Plaintiffs contend, violates Section 1510(a) of the Federal Register Act, which provides that "[t]he Administrative Committee of the Federal Register . . . may require, from time to time as it considers necessary, the preparation and publication in special or supplemental editions of the Federal Register of complete codifications of the documents of each agency of the Government having general applicability and legal effect."  44 U.S.C. § 1510(a).  That provision applies here, according to Plaintiffs, because the EPA's approval of Florida's Section 4040 program "ha[s] general applicability and legal effect."  Dkt. 1 at 47 (Compl. ¶ 241).

Relatedly, Plaintiffs also allege that the EPA's failure to codify its decision was "not in accordance with law" within the meaning of the APA, *id.* at 48 (Compl. ¶ 247), because the Corps retains authority to administer the Section 404 program unless and until the lawful transfer of authority to Florida is effectuated through the codification process, *see* Dkt. 43 at 30–31.  The Code of Federal Regulations sets forth the default "policies, practices, and procedures to be followed by the Corps of Engineers in connection with the review of applications for . . . permits to authorize the discharge of dredged or fill material into waters of the United States pursuant to

[S]ection 404 of the Clean Water Act." 33 C.F.R. § 323.1.  Under Plaintiffs' theory, those

procedures constitute a rule, and "[r]ules published in the Code of Federal Regulations remain

effective until they expire of their own accord or *are amended by later rules*."  Dkt. 43 at 31

(emphasis added). The EPA's direction to the contrary, in Plaintiffs' view, is "not in accordance

with law" and thus should be set aside under the APA.  5 U.S.C. § 706(2)(C).

   Both the EPA and Florida challenge this claim on the merits, although they employ

different procedural vehicles in doing so.  The EPA moves for partial summary judgment, Dkt.

34 at 33, while Florida moves to dismiss Count Nine for failure to state a claim, Dkt. 37 at 74.

Although the standards that govern consideration of a motion for summary judgment and a

motion to dismiss are different, the Court can perceive no daylight between the two motions

here, both of which turn on pure questions of law.  The Court will, accordingly, consider the

EPA's motion for summary judgment and Florida's motion to dismiss together.

   The Court begins with Plaintiffs' claim that the Federal Register Act requires codification

of the EPA's decision to approve Florida's Section 404 application.  Dkt. 1 at 47 (Compl.

¶¶ 241–42).  The relevant provision of the Federal Register Act provides as follows:

> The Administrative Committee of the Federal Register, with the approval of the
> President, may require, from time to time as it considers necessary, the
> preparation and publication in special or supplemental editions of the Federal
> Register of complete codifications of the documents of each agency of the
> Government having general applicability and legal effect, issued or promulgated
> by the agency by publication in the Federal Register or by filing with the
> Administrative Committee, and are relied upon by the agency as authority for,
> or are invoked or used by it in the discharge of, its activities or functions, and
> are in effect as to facts arising on or after dates specified by the Administrative
> Committee.

44 U.S.C. § 1510(a).  In Plaintiffs' view, this provision "require[s]" publication in the Code of

Federal Regulations those documents that have "general applicability and legal effect" that are

"relied upon by the agency as authority for, or are invoked or used by it in the discharge of" its

responsibilities.  *See* Dkt. 1 at 47 (Compl. ¶¶ 241–42).  Without this final step in the regulatory

process, Plaintiffs contend, an agency cannot alter or amend existing law, and any inchoate effort

to do so remains a nullity.

There are several problems with Plaintiffs' reliance on the Federal Register Act.  First,

although the statute permits the Administrative Committee of the Federal Register to "require"

publication of certain agency decisions, its plain text does not impose an obligation on the

Administrative Committee to do so.  Second, even if such a requirement existed, it applies to

agency "documents . . . having general applicability and legal effect."  44 U.S.C. § 1510(a).

Plaintiffs read this language to mean that "[a]n agency must codify final rules in the Code of

Federal Regulations," Dkt. 31 at 29 (citing 44 U.S.C. § 1510(a)), and they argue that the Federal

Register Act thus requires codification because the "EPA's action was a rule," Dkt. 43 at 33

n.10.  But even assuming Plaintiffs are correct that the EPA engaged in a rulemaking in

approving Florida's Section 404 program, the Federal Register Act does not incorporate the

APA's definition of a rule.  Instead, the Federal Register Act speaks of agency statements

"having general applicability and legal effect," 44 U.S.C. § 1510(a); *see also* 1 C.F.R. § 8.1(a),

while the APA defines a "rule" as an agency statement of "general *or particular applicability*

and *future* effect," 5 U.S.C. § 551(4) (emphasis added).  The inclusion of agency statements of

"particular applicability" in the definition of "rule" in the APA, as a result, implicates a broader

category of agency actions than those addressed by the Federal Register Act.  In contrast, the

Federal Register Act's reference to agency statements having "legal," rather than just "future,"

effect, suggests the APA's definition of "rule" may, in other respects, be narrower.

But even granting Plaintiffs these two assumptions—that the EPA's action was a rule

subject to mandatory codification under the Federal Register Act—Plaintiffs identify no

authority for the proposition that "[t]he EPA's failure to codify [Florida's] program rendered the transfer of authority a nullity." Dkt. 1 at 48 (Compl. ¶ 248). Plaintiffs first attempt to support their contention that a failure to comply with the Federal Register Act nullifies an otherwise proper rulemaking by citing to a footnote in *Simmons v. ICC*, 757 F.2d 296 (D.C. Cir. 1985). *See* Dkt. 31 at 29–30. That reading of *Simmons* cannot be reconciled with what the D.C. Circuit actually said. *Simmons* dealt with a regulation promulgated by the Interstate Commerce Commission ("Commission"), which the Commission defended based on a policy of requiring that railroads provide the agency with "only such information as is 'needed by the Commission on a regular and frequent basis.'" *Id.* at 299 (quoting 44 Fed. Reg. 27,537 (May 10, 1979)). The D.C. Circuit, however, concluded that the Commission could not rely on that policy to defend the rule, because the policy was "neither a principle adopted in the course of a binding adjudication . . . nor a rule promulgated in accordance with . . . notice-and-comment rulemaking procedures." *Id.* As a result, the policy did not constitute "binding agency precedent and could not be treated as such." *Id.*

Only at that point did the D.C. Circuit drop a footnote, further observing that "[t]he Commission also failed to codify the [p]olicy [s]tatement in the Code of Federal Regulations, as is required for all documents of an agency 'having general applicability and legal effect . . . and . . . relied upon by the agency as authority.'" *Id.* at 300 n.2 (quoting 44 U.S.C. § 1510). That aside was not necessary to the court's decision and, more importantly, had the D.C. Circuit concluded that the failure to codify the policy independently deprived it of legal effect, it is safe to assume that the court would have added the Federal Register Act to the list of deficiencies discussed in the text of the opinion. Read in this light, the footnote is better understood as *evidence* that the Commission itself understood that the policy lacked "legal

effect" because it was not the product of an adjudication or rulemaking.  In other words, the

Court did not hold that the policy lacked legal effect because it was not codified but, rather, that

the policy was not codified because the Commission knew that it lacked legal effect.

Plaintiffs also cite to *Brock v. Cathedral Bluffs Shale Oil Co*., 796 F.2d 533 (D.C. Cir.

1986), presumably in support of the argument that the APA itself requires codification of rules.

*See* Dkt. 31 at 30.  In *Brock*, the D.C. Circuit explained that an agency's "[f]ailure to publish in

the Federal Register is indication that the statement in question was *not* meant to be a regulation,

since the [APA] requires regulations to be so published."  796 F.2d at 539 (citing 5 U.S.C.

§ 552(a)(1)(D)).  But that does not help Plaintiffs' cause because there is no dispute that the EPA

published its approval of Florida's Section 404 application in the Federal Register.  *See* Dkt. 56-

1 at 433–34 (AR 0564 at 1–2) (published at 85 Fed. Reg. 83,553 (Dec. 22, 2020)).  That fact

likewise renders inapt the other cases on which Plaintiffs rely, *see* Dkt. 43 at 31, that stand for

the same proposition—that "[a]gencies must publish substantive rules in the Federal Register to

give them effect," *Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009); *see also*

*Morton v. Ruiz*, 415 U.S. 199, 233 & n.27 (1974) (discussing the circumstances in which agency

actions are "required to be published in the Federal Register" by the APA); *Andrews v.*

*Knowlton*, 509 F.2d 898, 905 (2d Cir. 1975) (declaring that an agency action that was not

"published in the Federal Register . . . d[id] not create legally binding rights or obligations").

Even assuming the agency action at issue constituted a "substantive rule," *Nat. Res. Def.*

*Council*, 559 F.3d at 565, the EPA did publish its decision in the Federal Register.

To be sure, in *Brock* the D.C. Circuit also observed that "the real dividing point between

regulations and general statements of policy is publication in the Code of Federal Regulations,

which the statute authorizes to contain only documents 'having general applicability and legal

effect.'" 796 F.2d at 539 (quoting 44 U.S.C. § 1510).  That assertion, however, must be

understood in light of the question that was before the court—that is, whether a "published

enforcement policy was legally binding" or merely advisory.  *Id.* at 534.  The answer to that

question, in turn, hinged on whether the policy was "a substantive rule" or "a general statement

of policy."  *Id.* at 537.  It was in this context that the court of appeals explained that both

substantive rules and policy statements are published in the Federal Register, while only

regulations—that is, documents having binding "legal effect"—are published in the Code of

Federal Regulations.  *Id.* at 539.  As in *Simmons*, the agency's failure to publish the document in

the Code of Federal Regulations was *evidence* that the agency never intended for the

enforcement policy to have binding legal effect.  That conclusion, however, is a far cry from a

holding that the Federal Register Act *nullifies* what would otherwise constitute a binding legal

rule merely because the agency fails to submit the rule to the Federal Register for codification—

or fails promptly to do so.

Plaintiffs' alternative theory under Count Nine is also unavailing.  Under that theory, the

EPA was required to codify the approval of Florida's Section 404 program "because the only

legally binding and effective regulations governing dredge and fill activities in [the] waters of the

United States in Florida are those promulgated by [the] EPA and the Corps."  Dkt. 43 at 31; *see*

*also* 33 C.F.R. § 323.1 *et seq.*  This argument turns not on a freestanding obligation to codify

under the Federal Register Act or the APA but, instead, on the codification of the extant,

generally applicable permitting rule, which Florida's Section 404 application sought to amend

(by creating an exception to it).  As the EPA concedes, "codification requires a rulemaking,"

Dkt. 45 at 15, and, according to Plaintiffs, "[r]ules published in the Code of Federal Regulations

remain effective until they expire of their own accord or are amended by later rules."  Dkt. 43 at

31.  It follows, in Plaintiffs' view, that the extant regulations regarding the federal Section 404

permitting program remain in force unless and until the regulations are amended.

     This argument has some initial appeal, as there is little doubt that the extant Section 404

regulations, *see* 33 C.F.R. 323.1 *et seq.*, constitute binding rules for purposes of the APA, and

"an administrative agency may not slip by the notice and comment rule-making requirements

needed to amend a rule by merely adopting a *de facto* amendment to its regulation through

adjudication," *Marseilles Land & Water Co. v. FERC*, 345 F.3d 916, 920 (D.C. Cir. 2003).

Ultimately, however, the Court is unpersuaded for three reasons.

     First, Plaintiffs themselves argue—with considerable force—that the EPA's decision to

transfer Section 404 permitting authority to Florida was, in fact, a rulemaking, and not an

adjudication.  Among other things, the fact that the EPA codified its decisions to grant the only

two applications that it had approved prior to Florida's, *see* 49 Fed. Reg. 38,947-01 (codified at

40 C.F.R. § 233.70) (Michigan); 59 Fed. Reg. 9,933-01 (codified at 40 C.F.R. § 233.71) (New

Jersey), and that it announced its intention to do the same here, 85 Fed Reg. 57,853; *see also*

Dkt. 51 at 3 (AR 001 at 3), carries significant weight, since "the act of codification require[s] a

rulemaking," Dkt. 45 at 15; *see also Brock*, F.2d at 539; *Wilderness Soc'y v. Norton*, 434 F.3d

584, 595–96 (D.C. Cir. 2006).  Other indicia support this same conclusion, including the facts

that the notice that initiated the agency action at issue was titled "Notice and request for

comments," Dkt. 51 at 1 (AR 001 at 1), and the agency opened a "rulemaking docket" to receive

written comments, *id.* at 2 (AR 001 at 2).  Even more to the point, as late as January 14, 2021,

the EPA reaffirmed its intention to codify its decision in a "final rule."  *See* Pre-Publication

Notice at 1.[9]  That concession, in turn, forces the agency to argue that its decision approving the transfer of Section 404 permitting authority was an *adjudication*, while the EPA Administrator's approval of the codification of that decision was a *rule*.  Dkt. 45 at 15–16.  The fact that the agency is forced to turn such summersaults to maintain its claim that its approval was an adjudication, and not a rule, speaks volumes.

But the Court need not rely on this history alone to conclude that the EPA's approval of Florida's Section 404 program constituted a rule, rather than an adjudication.  The agency's decision is "generally applicable to an open class" of individuals—namely, all those who plan to seek a Section 404 permit within the transferred waters—in contrast to "a particularized order

---

[9] Other evidence further demonstrates that the EPA has long considered its approval of Section 404 programs to constitute rulemakings.  In litigation regarding Michigan's Section 404 program, for example, the government did not question the premise that the program was subject to Section 553, which, of course, applies only to rulemakings.  *See* Federal Appellees' Opp. Br. at 5, *Menominee Indian Tribe of Wisconsin v. EPA*, No. 19-1130 (7th Cir. filed Apr. 30, 2020) (Dkt. 49) (discussing plaintiffs' "ability to petition for a rulemaking" regarding Michigan's Section 404 program pursuant to Section 553(e)).  Sounding a similar theme, the concurring opinion in that case observed:

> [T]he Tribe may petition the EPA to reassume federal permitting authority over this stretch of the Menominee River as an amendment to a rule.  *See* 5 U.S.C. § 553(e).  *The EPA's 1984 approval of Michigan's Section 404 permit program bore the hallmarks of a legislative rule*. See 49 Fed. Reg. 38,947 (Oct. 2, 1984), codified at 40 C.F.R. § 233.70.  The approval was written as a "regulation" that was promulgated after public notice and comment.  *See id.* at 38,947; *see also* 40 C.F.R. § 233.15(e) (providing for public participation in state program approvals).  The EPA would have a duty to respond to any petition for revisions to the scope of the Michigan delegation*. See Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 794 F. Supp. 2d 39, 44 (D.D.C. 2011) ("an agency 'is required to at least definitively respond to ... [a] petition—that is, to either deny or grant the petition" (alteration in original)).

*Menominee Indian Tribe of Wisc. v. EPA*, 947 F.3d 1065, 1074–75 (7th Cir. 2020) (Hamilton, J., concurring) (emphasis added).

affecting particular [individuals] . . . upon individual grounds." *Safari Club Int'l v. Zinke*, 878

F.3d 316, 332 (D.C. Cir. 2017) (quotation marks omitted).  This is, after all, the "basic

distinction between rulemaking and adjudication."  *United States v. Fla. E. Coast Ry. Co.*, 410

U.S. 224, 244 (1973); *see also Sugar Cane Growers*, 289 F.3d at 96 (concluding, with "little

difficulty," that an agency action that, among other things, "set forth the bid submission

procedures which all applicants must follow," constituted a rule for Section 553 purposes, and

adding that "[i]t is simply absurd to call [such an action] anything but a rule 'by another name'").

The EPA's decision, moreover, "ha[s] only future effect," as compared to agency adjudications,

which more typically "bind parties by retroactively applying law to their past actions."  *Safari*

*Club*, 878 F.3d at 332 (quotation marks omitted) (collecting cases); *see also Bowen v.*

*Georgetown Univ. Hosp.*, 488 U.S. 204, 217 (1988) (Scalia, J., concurring) ("[A] rule is a

statement that has legal consequences only for the future.").  The Court, accordingly, is

persuaded that the action that Plaintiffs challenge was, in fact, a rulemaking and, as such, it

constituted a permissible mechanism for amending the extant permitting rules.

Second, to the extent that Plaintiffs maintain that the EPA lacked authority to amend the

extant Section 404 regulations without taking the further step of codifying its amendment, they

disregard an existing provision in the governing regulations, which recognizes (1) that Section

404(h) permits the EPA "to transfer administration of the [S]ection 404 permit program . . . to

qualified States" and (2) that "[o]nce a State's 404 program is approved and in effect, the Corps

. . . will suspend processing of [S]ection 404 applications in the applicable waters."  33 C.F.R.

§ 323.5.  The Court, as a result, cannot accept Plaintiffs' premise that the extant regulations are

irreconcilable with Florida's assumption of permitting authority.

Finally, understanding that the EPA approved the transfer of Section 404 permitting

authority to Florida through a rulemaking, the Court must return to the question (discussed briefly above) whether a rulemaking is invalid absent codification of the final rule.  But the Court need not linger long, for the APA answers that question: it does not require that agencies codify their actions in the *Code of Federal Regulations*; rather, "[a]gencies must publish substantive rules in the *Federal Register* to give them effect."  *Nat. Res. Def. Council*, 559 F.3d at 565 (emphasis added); *see also Brock*, 796 F.2d at 539.  Because the EPA complied with that requirement, *see* Dkt. 56-1 at 433–34 (AR 0564 at 1–2), the EPA did what it had to "give . . . effect" to its decision for purposes of the APA.

For these reasons, the Court concludes that Count Nine of Plaintiffs' complaint fails on the merits.  The Court will, accordingly, grant the EPA's motion for partial summary judgment and Florida's motion to dismiss Count Nine and will deny Plaintiffs' motion for partial summary judgment as to Count Nine.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' motion for partial summary judgment, Dkt. 31, is **DENIED** with respect to Count Nine and **DENIED** without prejudice as to Count Eight; the EPA's cross-motion for partial summary judgment, Dkt. 34, is **GRANTED** with respect to Count Nine and **DENIED** without prejudice with respect to Count Eight; and Florida's cross-motion to dismiss, Dkt. 36, is **GRANTED** with respect to Count Nine, **DENIED** without prejudice as to Count Eight, and **DENIED** in all other respects.

It is further **ORDERED** that the parties shall meet and confer regarding next steps in this litigation and shall appear by video for a status conference on April 18, 2022, at 3:00 p.m.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


March 30, 2022