No. 24-5101

Iɴ Tʜᴇ

# United States Court of Appeals
# for the District of Columbia Circuit

Center for Biological Diversity, et al.,

*Appellees,*

v.

Michael S. Regan, in his official capacity as
Administrator for the U.S. Environmental
Protection Agency, et al.,

*Defendants,*

State of Florida and Florida Department of
Environmental Protection,

*Appellants.*

On Appeal from the United States District Court for the District of Columbia
Case No. 21-119 (RDM)

**REPLY IN SUPPORT OF MOTION TO STAY PENDING APPEAL**

**(RULING REQUESTED BY MAY 21, 2024)**

Jeffrey H. Wood
Bᴀᴋᴇʀ Bᴏᴛᴛs LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7700
jeff.wood@bakerbotts.com

Aaron M. Streett
Anthony J. Lucisano
Bᴀᴋᴇʀ Bᴏᴛᴛs LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
anthony.lucisano@bakerbotts.com

*Counsel for the State of Florida and the*
*Florida Department of Environmental Protection*

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................... ii

Glossary .................................................................................................. iii

List of Exhibits ...................................................................................... iv

Introduction ............................................................................................. 1

Argument ................................................................................................. 2

    I.    Plaintiffs cannot rebut Florida's likelihood of success on the merits. ........................................................................................... 2

        A.    The programmatic consultation here complied with ESA Section 7 ............................................................................ 2

        B.    Plaintiffs have no standing. ..................................................... 8

    II.    Neither Plaintiffs' Response nor the Corps' hollow assurance negates Florida's irreparable harm. ....................................... 9

    III.    Plaintiffs cannot tip the harm/public-interest balance in their favor ....................................................................................... 10

Conclusion ............................................................................................. 12

Certificate of Compliance ..................................................................... 14

Certificate of Service ............................................................................ 15

## TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*Cooling Water Intake Structure Coalition v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ...............................................................1, 2, 5, 6, 7

*Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*,
   698 F.3d 1101 (9th Cir. 2012) ........................................................................5

*Defs. of Wildlife v. U.S. Dep't of Navy*,
   733 F.3d 1106 (11th Cir. 2013) ......................................................................4

*NRDC v. EPA*,
   859 F.2d 156 (D.C. Cir. 1988) .......................................................................9

**STATUTES**

16 U.S.C. § 1531(c)(2) .............................................................................................8

16 U.S.C. § 1536(b)(3)(A) .......................................................................................3

16 U.S.C. § 1536(b)(4)(C)(i) ...................................................................................5

**REGULATIONS**

50 C.F.R. § 402.02 ...................................................................................................4

50 C.F.R. § 402.14(h)(1) ..........................................................................................3

50 C.F.R. § 402.14(m)(1) .........................................................................................7

50 CFR § 402.16 ......................................................................................................6

**OTHER AUTHORITIES**

80 Fed. Reg. 26832, 26835-38 .................................................................................4

H.R. Rep. No. 95-830 ...............................................................................................9

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| Corps | U.S. Army Corps of Engineers |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| Federal Defendants | EPA, Fish and Wildlife, the Corps, and other named federal officials |
| Florida | State of Florida and the Florida Department of Environmental Protection |
| Fish and Wildlife | United States Fish and Wildlife Service |
| Fisheries Service | National Marine Fisheries Service |
| Motion | Florida's Motion to Stay Pending Appeal, filed in this Court on April 25, 2024 |
| Plaintiffs | Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| Response | Plaintiffs' Response in Opposition to Intervenor-Appellants' Motion for Stay Pending Appeal, filed in this Court on May 6, 2024 |
| Services | Fish and Wildlife and Fisheries Service |

LIST OF EXHIBITS

**Tab**        **Exhibit**[1]

R            Florida's Opposition to Motion for a Temporary Restraining Order and
             Preliminary Injunction, Jan. 12, 2024

S            Florida's    Supplemental    Filing    Concerning    Availability    of
             Environmental Information, Mar. 18, 2022

T            Exhibit A to Florida's Supplemental Filing Concerning Availability of
             Environmental Information, Mar. 18, 2022

U            Florida's Reply in Support of Cross-Motion for Summary Judgment,
             July 7, 2023

V            Florida's Supplemental Declaration, July 7, 2023

---

[1] Citations in this brief to Exhibits A-Q are to those attached to Florida's Motion.  Citations to Exhibits 1-14 are to those attached to Plaintiffs' Response.

## INTRODUCTION

Florida's Motion showed that the Court should stay the district court's order invalidating Florida's Section 404 permitting program as soon as practicable. The district court upended the regulatory status quo that had prevailed in Florida for three years and caused grave harm to Florida and its citizens and businesses, which rely on 404 permits to conduct development in Florida's wetland-heavy territory. Plaintiffs' Response to Florida's Motion cannot obscure the extraordinary need to pause the district court's vacatur of Florida's Section 404 program pending appeal.

Plaintiffs' Response only highlights the substantive problems with the district court's opinion—that it engrafts extratextual limits on ESA Section 7's consultation process, conflicts with *Cooling Water Intake Structure Coalition v. EPA,* 905 F.3d 49 (2d Cir. 2018), and poses grave federalism concerns. Standing also independently compels reversal, since Plaintiffs offer no non-conjectural showing that Florida's program presents an increased risk of harm over the Corps' federally-implemented program.

The remaining stay factors present a straightforward choice. On the one hand is allowing Florida to retain sovereign control over a lawfully assumed permitting program that had provided rigorous environmental scrutiny for thousands of projects and was poised to do the same for hundreds more such projects midway through the permitting process. On the other hand is the regulatory chaos caused by the district

court's order, which thrusts Section 404 permitting back onto the Corps and creates confusion, enforcement gaps, duplication of efforts, delays, and other confounding effects.

Plaintiffs urge the Court to avoid that clear choice by arguing that resuming Florida's authority would be a deeply damaging flip-flop. Resp. 1. Quite the opposite—granting a stay would quickly restore the regulatory status quo, enabling stalled permitting processes for development projects to resume immediately, and maintain that continuity on appeal. Florida's declarations show why a stay is imperative. Exs. P-Q. The Court should grant Florida's Motion.

ARGUMENT

## I.    Plaintiffs cannot rebut Florida's likelihood of success on the merits.

### A.    The programmatic consultation here complied with ESA Section 7.

Plaintiffs do exactly what the losing plaintiffs in *Cooling Water* did, advancing "challenges to [Fish and Wildlife's] 'programmatic' approach to the biological opinion" and incidental-take statement. 905 F.3d at 71. That theory clashes with the ESA's text and implementing regulations, creates a rift with the Second Circuit, and would effectively preclude state assumption of Section 404 programs.

1.    Given Plaintiffs' rote reliance on what the district court *said* the ESA requires, a text-based refocusing is needed. In fulfilling ESA Section 7's mandate

2

to ensure a no-jeopardy finding, a BiOp must "detail[] how the agency action affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A), including "the environmental baseline," "the effects of the action on listed species or critical habitat," and "[t]he Service's opinion on whether the action is . . . [n]ot likely to jeopardize" protected species and habitat, 50 C.F.R. § 402.14(h)(1).

The programmatic BiOp here satisfied those requirements, contrary to Plaintiffs' sweeping accusation that it lacked "any of the analyses required by Section 7." Resp. 5. Among other things, the BiOp contained:

- A detailed discussion of the environmental baseline, adopting the Biological Evaluation's assessment of *235 specific species* and "the baseline for 404 permitting in Florida and its past and ongoing effects on ESA-listed and considered species." Ex. F at 45-54; *see also* Ex. E at 36-55; Ex. E at App'x B ("Species Accounts").

- A detailed discussion of the "effects of the action," including its "cumulative effects," adopting the Biological Evaluation's assessment of "major stressors associated with the proposed action" and "effects of the action" for specific ESA-listed species. Ex. F at 54-65; Ex. E at 55-70; Ex. E at App'x C ("Effects of the Action on ESA-listed Species").

- An explanation—accounting for the baseline-versus-effects analysis and the "sufficiently structured process" contained in the mandatory technical-assistance process—that "EPA's action, as proposed, is not likely to jeopardize" listed species or habitats. Ex. F at 68.

Plaintiffs are simply wrong that Fish and Wildlife "deferred all species analysis." Resp. 5.

What Fish and Wildlife *did* defer to the technical-assistance process—and what any programmatic consultation *must* defer for a state-permitting-program

3

assumption of this scale—is a *permit*- and *site*-specific analysis of effects on species, since "the exact locations, amounts, and types of impacts are not yet known."  Ex. F at 57.    No ESA provision prohibits Fish and Wildlife from structuring a programmatic BiOp in that manner to satisfy Section 7's mandate, so Plaintiffs pivot to the purported absence of a provision explicitly "authoriz[ing] Florida's approach." Resp. 15.  That gets things exactly backwards in the context of the ESA and its purposefully flexible command.  *See Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013) ("It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate.").

Moreover, as EPA explained below, ESA regulations do not support Plaintiffs' position that a programmatic consultation cannot satisfy Section 7 when each downstream *State* permitting decision will occur outside Section 7.  The definition of "framework programmatic action" does not support that result.  50 C.F.R. § 402.02.  Indeed, the same rulemaking creating that definition recognizes that there are "*other types of programmatic actions* not falling within the definitions provided in the rule" and that "for decisions adopting framework programmatic actions that also authorize actions to proceed *without any further Federal authorization or section 7 consultation anticipated*, an incidental take statement is required under this rule where *the action is determined to be compliant with section 7(a)(2)* and take is reasonably certain to occur."  80 Fed. Reg. 26832, 26835-38

4

(emphases added). "An example of such actions" is the scenario presented here—a "Federal program[] in which subsequent approval for actions proceeding under the program are delegated to [a] State[]." *Id.* at 26838. The rulemaking thus confirms the flexibility of Section 7's command to analyze how the "agency action" "affects species" by expressly contemplating that a program-level Section 7 analysis is appropriate even when subsequent state permits are not subject to Section 7.

Plaintiffs' attack on the programmatic incidental-take statement fares no better. Such a statement must "specif[y] the impact of such incidental taking on the species," 16 U.S.C. § 1536(b)(4)(C)(i), which Fish and Wildlife did here in outlining the take-minimizing effects of the technical-assistance process, Ex. F at 70. But the ESA does not impose a *numerical*-quantification requirement in the scenario where, as here, the Service "explain[s] why it was impracticable to express a numerical measure of take." *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126-27 (9th Cir. 2012); *Cooling Water*, 905 F.3d at 77.

Plaintiffs also improperly downplay the incidental-take statement's ESA-compliant "terms and conditions" as somehow irrelevant to state-permittee conduct, Resp. 13, while ignoring that those terms and conditions bind the Florida *permitting scheme itself*, which in turn binds permitted entities. Ex. F at 71-72; *see* Ex. I at 13-14 (explaining how Fish and Wildlife's conclusions and proposed measures are "determinative"). And Plaintiffs wrongly proclaim that Fish and Wildlife "expressly

disavowed any duty to reinitiate consultation," Resp. 7, when the BiOp clearly recognized that an event could "trigger re-initiation of ESA section 7 consultation if it results in effects that were not considered herein pursuant to 50 CFR 402.16." Ex. F at 55.

2.    Plaintiffs cannot distinguish this case from *Cooling Water*, which approved the very programmatic approach they malign. Florida already debunked the suggestion that the *Cooling Water* technical-assistance process was more "binding" than the one here. *Compare* Resp. 16, *with* Mot. 17. And *Cooling Water* likewise rejected a similar argument that the Services did not adequately "rely[] on available data" and impermissibly "defer[red] analysis to the permitting process." 905 F.3d at 73; *contra* Resp. 16.

Thus, like the district court, Plaintiffs have no choice but to argue that *Cooling Water* was wrongly decided. Resp. 17 & n.9. It is hard to fathom how the only decision[2] to address the type of programmatic BiOp and incidental-take statement at issue here could be appropriately labeled an "outlier." *Id.* Regardless, Florida *did* explain how the ESA's text and regulations demonstrate why *Cooling Water* was right and the district court here was wrong. Mot. 12-15; *supra* pp. 2-5; *contra* Resp. 18 (arguing that Florida "never explains why [the opinion here] is wrong").

---

[2] Florida's Motion (at 17 n.3) specifically cited and explained why *Andrus* and *Brownlee* do not bear meaningfully on the issues presented here and in *Cooling Water*. *Contra* Resp. 18.

3.    Plaintiffs protest that their argument does not compel Fish and Wildlife to "make an upfront, species-specific Section 7 analysis of every permit that Florida would issue after approval." Resp. 15. But *all agree* that Section 7 applied to EPA's approval of Florida's 404 program, and *all agree* that once Fish and Wildlife determined that EPA's approval was reasonably certain to result in take, Section 7's "statutory trigger" required that an incidental-take statement be included in the consultation-terminating BiOp. Resp. 11, 13; 50 C.F.R. § 402.14(m)(1) ("Formal Consultation is terminated with the issuance of the biological opinion"). Thus, Plaintiffs' position contemplates no avenue and no sequencing besides the Section 7 consultation they challenge.

Plaintiffs' contention (Resp. 12-13, 16-17) that Fish and Wildlife could have relied on prior permit information to somehow evaluate *all* future permit-specific effects and numerically quantify *all* future takes is doubly wrong. It second-guesses Fish and Wildlife's own conclusions that insufficient data existed to make those assessments, which are themselves "scientific determination[s] deserving deference." *Cooling Water*, 905 F.3d at 74. And it contradicts Section 7's purpose of ensuring that federal actions not jeopardize listed species and habitats by forcing the Services to base findings on inherently less-relevant *prior* permitting data, rather than a technical-assistance process designed to evaluate and respond to actual, permit-specific impacts.

7

What remains, then, is a world in which Plaintiffs are happy to channel EPA's Section 404 approval through the Section 7 process but remain bent on distorting that process into one that *cannot* accommodate a programmatic consultation for a state (like Florida) with significant wetlands, species, and habitats. That would gut Congress's policy for federal-state cooperation to resolve wetlands and species-conservation issues. Mot. 18-19; 16 U.S.C. § 1531(c)(2).

### B.    Plaintiffs have no standing.

Plaintiffs do not quibble with this Court's holdings that a state program that preserves safeguards equivalent to those under federal law creates no non-conjectural injury or standing. Mot. 19-20 (collecting cases). Instead, Plaintiffs recycle the district court's conclusion that Florida's technical-assistance process "provid[ed] far less robust ESA protection of listed species," Resp. 11, without explaining how that is so.

Plaintiffs' failure to elaborate is unsurprising, since Florida's program provides the same or greater protections than the default federal-only program. For instance, Florida's declaration explains that Florida "*must* (and, in fact does) incorporate all [Fish and Wildlife] measures, terms, and conditions into Florida Section 404 permits" and "*must* deny a permit if [the Services] or [Florida Fish and Wildlife] finds no protection measures are available to reduce the risk of jeopardy to an acceptable level." Ex. P ¶¶ 62, 66. Plaintiffs offer no rejoinder, meaning they

cannot establish the non-speculative risk of additional harm to species necessary to satisfy Article III.

## II. Neither Plaintiffs' Response nor the Corps' hollow assurance negates Florida's irreparable harm.

Florida's loss of sovereignty over its state-law program establishes irreparable harm. Florida's assumption cannot be characterized as merely "implement[ing] federal law." Resp. 19. Rather, it involves a "*State* program . . . established under *State* law" that "functions *in lieu of* the Federal program," H.R. Rep. No. 95-830 at 104 (emphases added), in an area where Congress has placed "independent emphasis on state autonomy," *NRDC v. EPA,* 859 F.2d 156, 174 (D.C. Cir. 1988). Plaintiffs' only response is to declare that Florida's program violates federal law. Resp. 18-19. But that conflates the merits with irreparable harm. Because Florida *is* likely to prove that EPA's approval of its 404 program complies with federal law, *supra* § I.A, the district court's order *does* irreparably impinge on Florida's sovereignty.

Moreover, while Florida appreciates that the Corps is *attempting* to restart the Section 404 machinery that Florida had effectively administered for three years, the Corps' declaration demonstrates the irretrievably lost time, effort, and efficiencies this attempt will entail. That declaration:

- Notes that the Jacksonville District has 126 staff members, Dec. ¶ 8, which pales in comparison to the "over 300 certified wetlands evaluators and other staff" available to administer Florida's program. Ex. P ¶ 15.

9

- Repeats from the Corps' own website that "applicants and stakeholders should recognize the *uncertainty surrounding the current litigation*." Dec. ¶ 9 (emphasis added).

- Reassures that transferred permit applications "will not go to the 'back of the line,'" but then describes precisely that outcome, in which transferred applications are "screened and assigned in the *same manner as any other application*," meaning information gathered through the Florida permitting process "will have to [be] *independently evaluate[d]*." Dec. ¶ 11 (emphases added).

- Fails to address how diversion of resources to Florida 404 permits will affect other areas of the Corps' mission in Florida or elsewhere.

The prevalence of these problems in the *Corps'* own declaration is revealing indeed.

And that is only one side of the permitting coin. The other side is the Florida regulated community—*i.e.*, the businesses, governments, and individuals who are presently suffering the consequences of vacatur. Florida's declarations and the accounts of 13 Florida industry *amici* vividly illustrate the on-the-ground harms. Plaintiffs' denigrating those harms as "hyperbolic, unsupported, and unfounded" cannot diminish their weight. Resp. 20.

**III.    Plaintiffs cannot tip the harm/public-interest balance in their favor.**

For a species-protecting program that is purportedly so "inadequate," Resp. 11, it is telling that Plaintiffs can identify just a single, two-year-old permit—from the thousands Florida administered over three years—that allegedly failed to include a Fish and Wildlife recommendation. Ex. 4 ¶ 22. The seven other projects Plaintiffs cite as demonstrating impending harm are ones for which Florida has not yet issued

*any permits*, meaning that any future permitting proposal will necessarily percolate through the extensive technical-assistance process and federal oversight that surpasses the species protections under the default Corps program and thus *protects* the interests Plaintiffs tout.  Resp. 21-22; Ex. 4 ¶¶ 30-43; Ex. R at 17-22 (discussing Bellmar and Kingston projects at length).

Plaintiffs' feigned inability to access information regarding Florida's program is unavailing.  Resp. 22.  Florida's program provides the public with immediate access to the same or similar environmental data as the Corps-led program.  Ex. S; Ex. T (side-by-side comparison of available environmental information).[3]

Plaintiffs' remaining arguments do not move the needle.  Resp. 23; Ex. 4 ¶ 26. Florida law provides ample opportunity for Plaintiffs and others to influence the permit process and pursue administrative and de-novo judicial challenges, Ex. I  at 19-23, 35-37; Ex. U at 12-15; Ex. V ¶¶ 21-26, with federal enforcement and/or citizen suits available to address unauthorized takes under the ESA, 16 U.S.C. § 1540(e)-(g).  And no Indian tribes have pursued ESA challenges to Florida's program; just one tribe filed an unrelated, non-ESA lawsuit in Florida.  None of that

---

[3] Because Florida's permit files are available for public download—including by the Corps—Plaintiffs' suggestion that Florida's harm is somehow "self-inflicted" because it is discussing whether to also transfer files via an external hard drive makes no sense.  Resp. 20; Ex. 4 ¶ 45; Ex. P ¶¶ 26, 69.

outweighs the substantial—and unrebutted—public interest in advancing projects of tremendous community importance.  Mot. 22; Exs. P-Q.

## CONCLUSION

The Court should stay the district court's judgment pending appeal.

May 13, 2024

Respectfully submitted,

*/s/ Aaron M. Streett*

Aaron M. Streett
Anthony J. Lucisano
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com
anthony.lucisano@bakerbotts.com

Jeffrey H. Wood
700 K Street NW
BAKER BOTTS LLP
Washington, D.C. 20001
(202) 639-7700
jeff.wood@bakerbotts.com

*Counsel for the State of Florida and the Florida Department of Environmental Protection*

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(C) because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f), this document contains 2,582 words.

2.     This document complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

*/s/ Aaron M. Streett*
Aaron M. Streett

*Counsel for the State of Florida and the Florida Department of Environmental Protection*

**CERTIFICATE OF SERVICE**

I certify that on May 13, 2024, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Aaron M. Streett
Aaron M. Streett

*Counsel for the State of Florida and the Florida Department of Environmental Protection*

# EXHIBIT R

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.

        Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.

        Defendants,

STATE OF FLORIDA, ET AL.

        Intervenors.

**CASE NO.** 1:21-cv-00119 (RDM)

———————————————

## STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION'S OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

———————————————

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................... 1

LEGAL & FACTUAL BACKGROUND ..................................................................................... 5

I.     Litigation History ........................................................................................... 5

II.    Implementation Of Florida's 404 Program And Species Review Process ............ 8

A.     Origins Of The Consultation Approach Used In Florida ............................ 8

B.     Technical Assistance Process In The Florida-Led Process ...................... 11

C.     Comparability Of Species Protections Under The Corps-Led And
       Florida-Led Programs ......................................................................... 13

D.     Florida's Track Record Of Successful Species Protection Efforts ............ 14

III.   Florida's Efforts To Conserve The Florida Panther And Crested Caracara ......... 15

A.     Florida Panther ................................................................................... 15

B.     Audubon's Crested Caracara .............................................................. 16

IV.    Status Of Bellmar Villages And Kingston Permit Applications .......................... 17

A.     Bellmar Villages Project ..................................................................... 17

B.     Kingston Project ................................................................................. 20

C.     Timing and Nature of FDEP Action on Bellmar and Kingston
       Applications ....................................................................................... 21

ARGUMENT ........................................................................................................................ 22

I.     Movants Seek Emergency Relief Unavailable In This Court. ............................. 22

II.    Even If Movants Could Overcome This Identified Jurisdictional Defect,
       They Cannot Meet The High Burden Required For Extraordinary Relief
       To Enjoin A State Agency Administrative Process. ......................................... 27

A.     Movants' Are Not Likely To Succeed On The Merits Of The APA
       Record Review Challenge To EPA's Approval Of Florida's 404
       Program .............................................................................................. 27

       1.     Movants' Attempt To Manufacture Standing In Order To
              Seek Emergency Relief In Federal Court For A State
              Permit Application Should Be Rejected. ...................................... 27

       2.     Previous Briefing And Oral Argument Show That Movants
              Are Unlikely To Succeed As To The Merits And
              Justiciability Of Claims 2, 3, 4, 6, 10 And 13 ............................... 31

3.      Movants Are Unlikely To Succeed On The Merits As To
        Any *Remedy That Directly Enjoins Specific State 404
        Permit Applications*. ..................................................31

B.      Movants Will Not Suffer Irreparable Harm From Denial Of The
        TRO And PI ........................................................................33

        1.      Since The State Permitting Process Is Not Yet Complete,
                There Is No Imminent Threat Of Irreparable Harm.....................34

        2.      Movants' Three Year Delay In Filing Its Request For
                Preliminary Injunctive Relief Undercuts Their Claims Of
                Irreparable Injury ..........................................................36

        3.      Since The State 404 Permitting Process Has The Same Or
                More Rigorous Species Requirements Than The Federal
                Permitting Process, There Is No Threat Of Irreparable
                Harm. .........................................................................38

C.      Balance Of Equities And The Public Interest Do Not Favor
        Emergency Relief..................................................................43

CONCLUSION.................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ................................................................27

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
    406 So. 2d 478 (Fla. 2d DCA 1981) ....................................................29, 30

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................32

*Am. Forest Res. Council v. Williams*,
    No. 21-601, 2021 WL 4819846 (D.D.C. Oct. 13, 2021) .......................37

*Am. Paper Inst., Inc. v. EPA*,
    890 F.2d 869 (7th Cir. 1989) ..................................................................25

*Amoco Prod. Co. v. Gambell*,
    480 U.S. 531 (1987).................................................................................43

*Chaplaincy of Full Gospel Churches v. Eng.*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................34

*Chesapeake Bay Found., Inc. v. Va. State Water Control Bd.*,
    495 F. Supp. 1229 (E.D. Va. 1980) .........................................................26

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) ................................................................27

*Conserve SW. Utah v. U.S.Dep't of Interior*,
    No. 1:21-cv-01506-ABJ, 2023 WL 792285, Mem. Op. (D.D.C. Nov. 16,
    2023) ........................................................................................................32

*Consol. Edison Co. v. N.Y. State Dep't of Env't. Conservation*,
    726 F. Supp. 1404 (S.D.N.Y 1989).........................................................26

*Cooling Water Intake Structure Coal. v. EPA*,
    898 F.3d 173 (2d Cir. 2018), amended, 905 F.3d 49 (2d Cir. 2018) ..................9, 10

*Defs. of Conewango Creek v. Echo Devs., LLC.*,
    No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007)................25, 36

*District of Columbia v. Schramm*,
    631 F.2d 854 (D.C. Cir.1980) ....................................................2, 23, 25

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
　878 F.3d 371 (D.C. Cir. 2017) ....................................................................28

*Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*,
　412 So. 2d 351 (Fla. 1982) ........................................................................29

*Friends of Crystal River v. EPA*,
　794 F. Supp. 674 (W.D. Mich. 1992), *affirmed by* 35 F.3d 1073 (6th Cir.
　1994) ...........................................................................................................26

*Gen. Motors Corp. v. EPA*,
　168 F.3d 1377 (D.C. Cir. 1999) ......................................................24, 25, 27

*Greatness v. FEC*,
　831 F.3d 500 (D.C. Cir. 2016) ..................................................................27

*Idaho Conservation League v. EPA*,
　820 F. App'x 627 (9th Cir. 2020) ..............................................................32

*Kobell v. Suburban Lines*,
　731 F.2d 1076 (3d Cir. 1984)....................................................................37

*Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*,
　702 So.2d 1352 (Fla. 1st Dist. Ct. App. 1997)...................................29, 30

*Marino v. Nat. Oceanic & Atmos. Admin.*,
　33 F.4th 593 (D.C. Cir. 2022) ..................................................................41

*McClash v. Manasota-88, Inc.*,
　No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hr'g June 25, 2015) ........29, 30

*Munaf v. Geren*,
　553 U.S. 674 (2008)...................................................................................27

*Nat. Res. Def. Council, Inc. v. Outboard Marine Corp.*,
　702 F. Supp. 690 (N.D. Ill. 1988) .............................................................26

*Nat'l Assoc. of Home Builders v. Defs. of Wildlife*,
　551 U.S. 644 (2007)............................................................................8, 9, 32

*Nken v. Holder*,
　556 U.S. 418 (2009)...................................................................................43

*Rose Acre Farms, Inc. v. N.C. Dep't of Env't & Nat. Res.*,
　131 F. Supp. 3d 496 (E.D.N.C. 2015).......................................................25

*Shell Oil Co. v. Train*,
　585 F.2d 408 (9th Cir. 1978) ....................................................................25

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   2005 U.S. Dist. LEXIS 36385 (D.N.J. 2005) ........................................................37

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023)......................39, 40

*Sierra Club v. Van Antwerp*,
   526 F.3d 1353 (11th Cir. 2008) ........................................................40

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ........................................................4

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995).........................................................37

*W. Watersheds Project v. Bernhardt*,
   468 F. Supp. 3d 29 (D.D.C. 2020) ........................................................3, 28, 36

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982).........................................................32, 43

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................4, 27, 33, 34, 43

**Statutes**

16 U.S.C. § 1536(a)(2).........................................................10

16 U.S.C. § 1536(b)(4)(C).........................................................10

16 U.S.C. § 1539(a)(1)(b).........................................................10, 11

28 U.S.C. § 1331.........................................................25

33 U.S.C. § 1251(b).........................................................24

33 U.S.C. § 1344(j).........................................................35

Fla. Stat. ch. 120.........................................................30

Fla. Stat. § 120.52(13).........................................................29

Fla. Stat. § 120.57.........................................................29, 30

Fla. Stat. § 403.412(5).........................................................28, 30

Fla. Stat. § 403.412(5).........................................................28, 30

Fla. Stat. § 403.412(7).........................................................29

**Regulations**

40 C.F.R. § 233.20(b), 233.50 ..................................................................35

40 C.F.R.§ 233.20(b), 33.50 .....................................................................35

50 C.F.R. § 402.14(i)(1)(i)........................................................................39

50 C.F.R. § 402.14(i)(5)............................................................................11

**Other Authorities**

118 Cong. Rec. 33761 (1972) ...................................................................24

85 Fed. Reg. 30953 (May 21, 2020) ...........................................................8

85 Fed. Reg. 57853 (Sept. 16, 2020) ..........................................................8

## INTRODUCTION

The State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively, "Florida Intervenors") oppose the motion for a temporary restraining order and preliminary injunction (Motion) filed by Sierra Club and Center for Biological Diversity (collectively, "Movants"). This Court should reject Movants' attempt to cut short ongoing agency review processes for two permit applications: the "Bellmar Villages Project" (which has been under review by FDEP since late 2020) and the "Kingston Project" (which has been under review by FDEP since 2022).

The Motion is an improper attempt to force this Court to adjudicate state-administered Clean Water Act (CWA) permits, which is contrary to D.C. Circuit precedent. State permit actions are not subject to review under the federal Administrative Procedure Act (APA). It is also an improper attempt to force this Court to *preliminarily* block federal approval of Florida's CWA Section 404 Program *several years after* that action was fully implemented, which too is contrary to D.C. Circuit precedent. In early 2021, just a few days after filing the Complaint, Plaintiffs urged the Environmental Protection Agency (EPA) to "stay" its approval of Florida's program. Dkt. 31-1 at 107. They never asked this Court for that relief, until now, when it is clearly too late.[1]

Movants assume that FDEP will issue final permits for these two projects *without terms and conditions necessary to avoid jeopardizing* the continued existence of the Florida panther, the Audubon's crested caracara, or other relevant species or adversely modifying their designated critical habitat. They do not have a crystal ball. Movants (and many others) have submitted comments to FDEP as part of the permit process, and FDEP is still reviewing those comments.

---

[1] Florida Intervenors are filing two declarations with this response: Exhibit A, which is a Declaration of Justin Wolfe as FDEP General Counsel (herein, "Wolfe Decl."); and Exhibit B, which is the Declaration of Mary Duncan, who holds the Threatened and Endangered Species Coordination role for FDEP (herein, "Duncan Decl.").

But even if FDEP proposed permits for these two projects that, in Movants' opinion, lack adequate species protections, those claims should not be interjected into this Court given EPA's oversight role as well as opportunities for administrative appeals and judicial review in Florida.[2]

Moreover, the Motion is devoid of any case law supporting issuance of preliminary injunctions targeting *state permit actions under state law*. D.C. Circuit precedent forbids district courts from entertaining direct challenges to state CWA permits. *District of Columbia v. Schramm*, 631 F.2d 854, 863 (D.C. Cir.1980). That precedent is correct. Congress expressly invited the states to assume administration of the Section 404 Program in recognition of the primary role of states over water resources, and as such, Congress never intended for federal courts to take the kind of extraordinary steps sought by Movants here. That is especially true when, over three years ago, EPA approved Florida's 404 program and that program is now firmly established. Time and time again, Plaintiffs chose not to pursue preliminary relief at the outset of this litigation or any other earlier phase of this case, and it is much too late to provide *preliminary* relief now. Likewise, their refusal to first exhaust administrative remedies and other state-based judicial remedies is a puzzling waste of this Court's time. The mere filing of the administrative appeal in Florida would forestall final agency action on a permit application.

To be clear, Florida Intervenors are not taking a position at this time on the merits of these two pending permit applications. Agencies cannot prejudge the merits of a pending permit application. These applications remain in the permit process and will be subject to additional review by FDEP, EPA, United States Fish & Wildlife Service (FWS), and the Florida Fish & Wildlife Conservation Commission (FWC) before a final decision is made about whether a permit

---

[2] Movants attempt to evade normal state review by jettisoning five of their fellow Plaintiffs, who are "citizens of Florida." They do so only for the limited purpose of this Motion. Plaintiffs should not be allowed to play such games. All seven Plaintiffs brought this lawsuit together in one complaint and non-citizens can demonstrate standing in Florida.

will be issued. Wolfe Decl. ¶ 40 (Ex. A). Instead of defending the merits of these projects, Florida Intervenors oppose the Motion because it interferes with FDEP's legal duty to render permit decisions in the normal course. FDEP is committed to making a timely decision on these permits consistent with applicable laws and regulations.

Nevertheless, as more fully explained herein, this Court cannot grant Movants' requested extraordinary relief unless the Court first finds in favor of Movants on a host of jurisdictional and other issues. Specifically, as to jurisdictional issues, the Court would need to find that it has jurisdiction to: (1) review the claims in the Amended Complaint that underlie the Motion;[3] (2) impose an injunction upon Florida Intervenors when the Amended Complaint does not challenge FDEP actions related to any state permit applications; and (3) adjudicate state permit applications notwithstanding that (a) state CWA permits are not subject to federal judicial review; (b) these two permit applications are still in the state permit process with no underlying administrative record before this Court; and (c) state administrative and judicial review processes are available for these permit actions. Movants cannot prevail on any of these jurisdictional points (let alone all of them).

Likewise, before granting such extraordinary relief, this Court would need to find in favor of Movants across the waterfront of legal and factual issues necessary for obtaining a preliminary injunction. Again, Movants cannot prevail on any of these points (let alone all of them). As to the merits, Plaintiffs are not likely to prevail on the specific legal claims that underlie the Motion (as extensive briefing by Federal Defendants and Florida Intervenors have already demonstrated). Movants' request for relief – targeted at two specific projects – would not be available relief even

---

[3] Florida Intervenors have explained, claim-by-claim, why Plaintiffs lack standing in this case. Dkt. 102 at 37-51; Dkt. 107 at 10-25. All of those arguments are incorporated by reference here. To have standing for this Motion, Movants must demonstrate standing for the underlying claims (i.e., those claims in this case that form the basis of the need for preliminary relief) as well as injury arising from the specific projects they challenge as part of the Motion. *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 41 (D.D.C. 2020). They have done neither.

if Movants were found to be successful on the merits of specific claims in the Amended Complaint underlying the Motion. A plaintiff cannot receive interim relief that goes far beyond what it should achieve after prevailing on the merits. As importantly, the Programmatic Biological Opinion and Incidental Take Statement, which establishes the Technical Assistance Process employed for these permits, resulted from the Supreme Court's instructions concerning Section 7 consultation for EPA programs, and is supported by the Second Circuit's ruling in an analogous context.

As to irreparable harm, no such harm exists where: (a) FDEP has not yet issued permits with specific terms and conditions; (b) the species review process involves the same agencies reviewing the same information using the same legal standards as under the permit process led by the Corps of Engineers (Corps); and (c) FDEP *must* adopt all FWS-imposed terms and conditions for the protection of species.

As to the equities and public interest, those weigh heavily against Movants particularly where Congress has expressly invited states to assume administration of this program in recognition of the primary role of the states over water resources. Likewise, "preliminary" relief is not available where, after tremendous expenditures and efforts by the State of Florida and other stakeholders, the challenged program has been fully implemented for almost three years, with over 9,000 permit applications filed and hundreds of individual permits issued and denied by FDEP.[4]

Thus, because Movants have not met the requirements for a preliminary injunction, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), this Court should deny the Motion and allow the State of Florida to continue the permit processes for the Bellmar Villages Project and the Kingston Project consistent with applicable laws and regulations. The appropriate

_____

[4] *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (declining to vacate agency program where the "egg has been scrambled and there is no apparent way to restore the status quo ante").

course of action for Movants is to withdraw this improper Motion and focus their efforts on the ongoing state agency permit process where they already filed comments. If FDEP proposes a permit that Movants oppose, an administrative hearing can be requested. If, after that hearing, FDEP enters a final order issuing an objectionable permit, judicial review can be sought in Florida state courts.

## LEGAL & FACTUAL BACKGROUND

### I.    Litigation History

Plaintiffs filed their original nine-count complaint in this matter almost three years ago, on January 14, 2021, challenging EPA's approval of Florida's application to assume the CWA Section 404 dredge-and-fill permit program, which became effective on December 22, 2020.   Claims 3 through 6, which are most relevant to this Motion, allege violations of the Endangered Species Act (ESA) or CWA related to the FWS's Biological Opinion and Incidental Take Statement, among other things. Claim 2, which is also relevant here, alleges that EPA's approval of Florida's program violates the CWA because, among other things, standing under state law is more restrictive than federal law. The State of Florida and FDEP intervened to defend EPA's approval of Florida's program application. Dkt. 4; Feb. 1, 2021 Minute Order.

Just days after filing their complaint, Plaintiffs claimed in a January 20, 2021 letter to EPA that "[i]f expedited relief is not granted [in this matter], Plaintiffs … are likely to suffer irreparable harm" and expressly complained about purported harm they would incur if "the state unlawfully administers this program." Dkt. 31-1 at 107. At that time, Plaintiffs argued that they are "likely to succeed on the merits," and for that request, they "focus[ed] on two, critical violations" (Dkt. 31-1 at 111), including the species-based arguments that are at the center of Movants' current TRO request. Dkt. 31-1 at 111 (alleging that Florida's program fails to ensure "no jeopardy" and relies on an unlawful "programmatic biological opinion and incidental take statement"); *see also id* at

121-23 ("Absent preliminary relief, Plaintiffs are likely to suffer irreparable harm before the conclusion of this litigation," including from Florida's "unlawful operation of the state 404 program… [FDEP] is currently considering permits that are reasonably expected to fill precious wetlands that serve as habitat for threatened and endangered species, and their issuance is imminent.").   And they sought to show, based on all four factors, why EPA should stay implementation of Florida's 404 program. *Id.* In a January 29, 2021 notice, Plaintiffs argued that they will be "harmed by EPA's immediate authorization of an unlawful state program that will issue permits to destroy wetlands essential to protected species …" Dkt. 21 at 1, 6.

Despite these statements, Plaintiffs only formally sought such relief *from EPA*, which never granted a stay. Crucially, Plaintiffs made a conscious decision not to request preliminary relief from this Court when they filed their complaint on January 14, 2021. Nor did they do so after the February 17, 2021 hearing regarding its pre-motion conference to bifurcate, or when Federal Defendants confirmed that the Corps transferred all permit files for projects in assumable waters to FDEP. And they did not seek a stay when FDEP confirmed that hundreds of newly trained employees were reviewing and processing applications consistent with state regulations and the federal requirements (Dkt. 40 at 23) or any subsequent time during the litigation until now, some three years after Florida began administering the 404 program.

Instead of seeking a judicial stay, Plaintiffs chose a different, non-traditional path. On January 29, 2021, they asked this Court to bifurcate non-ESA Claims 8 and 9 and proceed to dispositive briefing on those claims first. Federal Defendants and Florida Intervenors objected and asked the Court to resolve all claims through cross-motions on a typical schedule for an APA record review case. Dkt. 22-23. The Court granted Plaintiffs' requested path and issued a briefing schedule for Claims 8 and 9, which resulted in extensive briefing by the parties and a hearing in

March 2022. Dkt. 31, 34-37, 43-48, 51-57, 59-60, 65-72. On March 30, 2022, this Court rejected Count Nine and ordered further briefing on Count Eight. Dkt. 73. The Court eventually dismissed Count Eight for lack of standing as well.

In April 2022, the Court granted Plaintiffs' motion to file an amended complaint that included Claims 10 to 13, which added other species-based claims to this case. Dkt. 77 at 49-56. At the same time, this Court set a schedule for lodging the administrative record and filing cross-motions for summary judgment on all remaining claims, which was amended several times by the parties (including supplemental briefing and declarations) and briefing was eventually completed by October 12, 2023. Dkt. 98-108, 111-12, 114, 119, 121, 123, 125-26.  A hearing on the summary judgment motions occurred on October 19, 2023, with additional post-hearing supplemental briefing occurring in October and November 2023. Dkt. 130, 133-34. At no time up to that point did Plaintiffs seek preliminary relief of any kind.[5]

On December 4, 2023, two of seven Plaintiffs filed the present Motion to enjoin FDEP and EPA from completing the permit process for the Bellmar and Kingston projects. Dkt. 135. Specifically, Movants asked this Court to enter Proposed Orders (Dkt. 135-11 and Dkt. 135-12) that would enjoin FDEP from "further action in furtherance of issuing state 404 permits for the Bellmar and Kingston projects" and "issuing state 404 permits for the Bellmar and Kingston projects." Movants also seek an order enjoining EPA and FWS from "further action in furtherance of issuing state 404 permits for the Bellmar and Kingston projects" and enjoining EPA "from waiving its authority over, or otherwise allowing the issuance of, state 404 permits for these projects."  Dkt. 135-11 and Dkt. 135-12.

---

[5] This Court has also previously noted that Plaintiffs could have sought emergency relief long ago, but did not. *See*, *e.g.*, Dkt. 88 at 52; Dkt. 119 at 19-20.

**II.     Implementation Of Florida's 404 Program And Species Review Process**

Florida Intervenors' prior briefs recount the state's extensive work over of the course of several years to prepare and apply for assumption of the Section 404 permit program along with the key provisions of the program. Dkt. 37 at 20-37; Dkt. 102 at 14-36. FDEP began implementing the program after EPA approval in December 2020. As of the end of December 2023, FDEP has completely stood up its comprehensive regulatory program, trained over 300 certified wetlands evaluators and other staff, and received approximately 9,300 permit applications for individual permits, coverage under general or regional permits, and NPR determinations. Wolfe Decl. ¶¶ 12-13. This includes approximately 400 individual permit applications for projects in assumable waters that were transferred by the Corps to FDEP in the early weeks of program. Wolfe Decl. ¶ 11. Of the applications received so far by FDEP, over 3,600 have been withdrawn, often based on requests by the state for more information or other concerns. To date, FDEP has issued approximately 703 individual 404 permits (including modifications) and denied approximately 302 applications (including individual, regional/general, and NPR requests).  Wolfe Decl. ¶ 13.

**A.     Origins Of The Consultation Approach Used In Florida**

The species review process, which is at the center of the Motion, originates with EPA's correct decision, following a notice and comment process, to initiate Section 7 programmatic consultation when reviewing whether to approve Florida's Section 404 Program. Dkt. 99 at 29-33; Dkt. 102 at 21-27.[6] That path was required under *National Association of Home Builders v. Defenders of Wildlife*, where the Supreme Court explained that EPA must consult with the Services

---

[6] *See* 85 Fed. Reg. 30953 (May 21, 2020); *see also* 85 Fed. Reg. 57853, 57856 (Sept. 16, 2020) (explaining EPA decision to initiate ESA Section 7 consultation in accordance with EPA memorandum dated August 27, 2020, which is available in the Administrative Record at EPA-HQ-OW-2018-0640-0660-A1). Section 404 of the CWA gives EPA discretion to consider impacts to species when evaluating state 404 programs. *Id.*

under Section 7 *if EPA has discretion to consider impacts to listed species when deciding whether to approve a state environmental program.* 551 U.S. 644, 671-73 (2007) (explaining that "[n]othing in the text of Section 402(b) authorizes EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application [for a state NPDES permit program"). As EPA fully explained, Section 404 (unlike Section 402) "provides authority for EPA to consult and consider protection of listed species in the approval decision" for a state program. EPA-HQ-OW-2018-0640-0660-A1 at 6. EPA's decision reflected careful consideration of the statutory text, the legislative history, as well as the Supreme Court's opinion in *NAHB*. *Id.* at 4-6.

That path also aligns with FWS's determination in 1993 when, after deciding to conduct informal consultation for approval of New Jersey's Section 404 Program, FWS stated that "future consultations on state assumptions will be conducted as programmatic formal consultations…"[7] In Florida's situation, where the state is home to *over 130 listed species* and *over 12,000 square miles* of water area, there can be no doubt that EPA properly determined that formal consultation was the correct path. Plaintiffs have not challenged EPA's decision to *initiate* ESA formal consultation when approving Florida's program.

EPA employed the same process when adopting a permit program governing cooling water intake structures implemented at the state level, which was upheld by the Second Circuit against challenges nearly identical to the ones brought here. *See Cooling Water Intake Structure Coal. v. EPA*, 898 F.3d 173 (2d Cir. 2018), amended, 905 F.3d 49, 72-78 (2d Cir. 2018) (rejecting environmental challenge to FWS's use of "programmatic" biological opinion where it extended incidental take coverage via a technical assistance process to permittees under state programs).

_____

[7] *See* Letter from FWS Regional Director to EPA Acting Regional Administrator at 1 (Dec. 22, 1993), available at https://www.fws.gov/sites/default/files/documents/MOAUSFWS.pdf.

The programmatic BiOp with Incidental Take Statement (ITS) at issue in *Cooling Water Intake Structure* was a model for the FWS's programmatic approach here. EPA-HQ-OW-2018-0640-0568 at 101-02 (EPA Response to Comments).

As part of a "programmatic consultation" process, FWS concurred that the action of approving Florida's program was "likely to adversely affect" listed species, which supported FWS's decision to prepare a Programmatic BiOp and, in light of FWS's "no jeopardy" finding, FWS adopted an ITS. This was consistent with longstanding agency practices, the Supreme Court's instructions concerning Section 7 consultation for EPA programs, the Second Circuit's ruling in an analogous context, as well as the plain text of ESA Section 7. Thus, EPA and FWS were on firm ground.

The textual argument is straight-forward. ESA Section 7(a)(2) applies to "any action authorized" by a federal agency, 16 U.S.C. § 1536(a)(2), which encompasses EPA's approval of a state program. Where the action will not jeopardize listed species or adversely modify critical habitat, Section 7(b)(4) provides that FWS "shall provide" a written incidental take statement to not just "the Federal agency," but also to "the applicant concerned, if any," 16 U.S.C. § 1536(b)(4)(C), which includes FDEP as the applicant for EPA approval of a Section 404 program. That written statement must, among other things, "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both…" *Id.* § 1536(b)(4)(C)(iv). Third, Section 7(o)(2) provides incidental take coverage in broad fashion for "any taking" resulting from that action so long as it "is in compliance with the terms and conditions specified in [FWS's] written statement …" *Id.* § 1536(o)(2). Plaintiffs have suggested that only ESA Section 10's Incidental Take Permit process (found at 16 U.S.C. § 1539(a)(1)(b)) applies to such actions, but that view is not supported by the

ESA. Section 1539(a)(1)(b) provides that FWS "may" issue a permit for any incidental taking prohibited under Section 1538(a)(1)(B), but Section 1536(o)(2) clearly exempts incidental take in compliance with Section 7 from the prohibitions of § 1538(a)(1)(B). *See* 50 C.F.R. § 402.14(i)(5); *see also* EPA-HQ-OW-2018-0640-0660-A1 at 6-7 (explaining why incidental take coverage extends to state permittees in this context).

###### B.     Technical Assistance Process In The Florida-Led Process

As previously briefed, the species review process under the Florida-led program was comprehensively described in the program application including (among other places) in the MOU entered between , FWC, and FDEP (EPA-HQ-OW-2018-0640-0016-A2); and in the Florida 404 Handbook (HQ-OW-2018-0640-0002-A20 at 6, 23-24). Ultimately, this process was integrated with the Technical Assistance Process established in the Programmatic BiOp and its ITS. FWS, FWC, and FDEP *must and do* participate in the species review process as part of the Florida 404 program. *See* Dkt. 127-1 at 3-4 (reciting obligations to participate in species review process). Importantly, for Florida 404 permits, FWS's conclusions regarding potential species impacts and necessary measures to address those impacts are "determinative." Dkt. 102 at 23-24. And incidental take, if any, is not authorized if a permittee fails to comply with *all* of those measures. *See* BiOp (EPA-HQ-OW-2018-0640-0642) at 70. Importantly, this process provides early ESA coordination engagement for all State 404 Program general and individual permit applications. Wolfe Decl. ¶ 16. The MOU describes the roles, responsibilities, and commitments of each agency in implementing the State 404 Program. *Id.* ¶ 17. Coordination procedures are further outlined in Fla. Admin. Code R. 62-331, and in the FWS's Programmatic Biological Opinion. *Id.*

These procedures ensure that endangered and threatened federally listed species and their critical habitats are protected as an integral part of the State 404 Program. FDEP's regulations expressly provide that no Section 404 permit will be issued when the project "[j]eopardizes the

continued existence of endangered or threatened species, or results in the likelihood of destruction

or adverse modification of [designated critical] habitat…" Fla. Admin. Code R. 62-331.053(3)(a)4.

Compliance is also "required" for "any requirements" set by FWC, FWS, and NMFS during the

technical assistance process "for permits reviewed under the State 404 Program." Florida 404

Handbook (HQ-OW-2018-0640-0002-A20) at 1.3.3; *see also id.* at 5.2.3. In accordance with the

requirements for the Technical Assistance Process as set forth in the Programmatic Biological

Opinion, FWS must use the best available data when making species-related determinations. EPA-

HQ-OW-2018-0640-0642 at iv; *see also* Dkt. 99 at 69.  The Programmatic Biological Opinion

defines "best available data" as "data to assure the quality of the science used to establish official

positions, decisions, and actions taken by the State of Florida during the review of State 404

program permit applications, the quality of the biological, ecological, technical, and other relevant

information that is used will only be that which is reliable, credible and represents the best data

available. Under Section 7(a)(2) of the ESA, the USFWS is required to use the best available

science."  EPA-HQ-OW-2018-0640-0642 at iv.

     In accordance with these processes, both FWS and FWC review a proposed project's

effects on listed species before a permit is issued. Wolfe Decl. ¶ 19. The outcomes of the effect

determinations are incorporated into the State 404 Program permit file and included in the public

notice. *Id.* The coordination efforts result in a combination of determinations identifying projects

as either "no effect" or "may affect." *Id.* Projects that are determined to be in the "may affect"

category are further identified as either "likely" or "not likely to adversely affect," and a

determination of jeopardy is made (jeopardy or no jeopardy). For example, a determination of

"may affect, likely to adversely affect" for a listed species indicates anticipated incidental take and

requires additional review by FWS. *Id.* If adequate protection measures are available, FWS's final

conclusion would be "no jeopardy" or "may affect, not likely to adversely affect." *Id.* If FWS's final conclusion is that the activities allowed by a potential permit will "jeopardize the continued existence of a species," and no protection measures are available to address the adverse impacts, the permit would not be issued pursuant to the ESA and Fla. Admin. Code R. 62-33.053(3)(a) 4, 62-331.201(3)(k), and 62-331.248(3)(j).

### C.     Comparability Of Species Protections Under The Corps-Led And Florida-Led Programs

Consistent with the terms of the Programmatic BiOp, the process for issuing FDEP 404 permits ensures that FWS (and NMFS, where involved) reviews the same species-related information using the same legal standards as in the Corps-led 404 program. *See* Ex. C (Comparison of Species Review Process in Corps-led and Florida-led Section 404 Programs). In particular, the same legal standards are used in both processes with the action agency (Corps or FDEP conferring with the species agencies) to evaluate whether (1) as an initial matter, a project "may affect" listed species or critical habitat; (2) a permit "may affect" but "is not likely to adversely affect" listed species or critical habitat; or (3) a permit is "likely to adversely affect" listed species or critical habitat, in which case a more formal consultation review ensues to obtain an opinion from the species agencies whether the permit is likely to jeopardize the continued existence of" listed species or "adversely modify" designated "critical habitat." *Id; see also* Wolfe Decl. ¶ 19. The same standards are then used to evaluate jeopardy and adverse modification, as well as to address "incidental take." *Id; see also* Wolfe Decl. ¶ 19.

Significantly, the Florida-led process ensures even more protection for species and even more public involvement than the Corps-led process for at least three reasons: (A) FDEP *must* incorporate all FWS measures, terms, and conditions into the Section 404 permit (whereas the Corps *may* do so for their permits); (B) FDEP *must* deny a permit if FWS, NMFS, or FWC finds

no protection measures are available to reduce the risk of jeopardy to an acceptable level (whereas the Corps *may* decide to issue a permit in such circumstances); and (C) the public has full access to review and comment on all species-related information *before* FDEP makes a final determination on the permit, which allows for FDEP, EPA, and the permit applicant to consider and respond to those concerns including with project and/or permit changes as warranted (whereas there is *no right of public review and comment* on the Biological Opinion/ITS under the Corps-led process). Wolfe Decl. ¶ 43. In most instances, the volume of species-related information available to the public for review and comment as part of the Florida 404 permitting process is substantially greater than under the Corps-led program. Wolfe Decl. ¶ 44.

Likewise, as part of the FDEP 404 process, FDEP prepares a "Technical Staff Report" to "document how the project addresses the requirements" set forth in Florida's Section 404 regulations (including the "no jeopardy" requirements found in Rule 62-331.053). *See* Florida 404 Handbook (HQ-OW-2018-0640-0002-A20) at 8.2(j) (describing the "Technical Staff Report"). FDEP must also "[m]ake and document a finding of either compliance or noncompliance with the requirements" of Florida's Section 404 regulations (again, including the "no jeopardy" requirements found in Rule 62-331.053). *Id.* at 8.2(k) (explaining that this is a "determination of whether the project, including any mitigation, is permittable under the State 404 Program"). Finally, FDEP must "[p]repare a written determination on each application outlining the permitting decision and the rationale for the decision," which must be "included in the official record prior to final action on the application" along with a copy of the Technical Staff Report. *Id.* at 8.2(l).

### D.   Florida's Track Record Of Successful Species Protection Efforts

After almost three years of full program implementation, Florida has a record of successful implementation of the species-protection requirements applicable to Florida's Section 404 Program. For example, during the July 2022 to June 2023 time period, 115 permit applications for

Section 404 permits showed reasonable potential for affecting federally listed species. Wolfe Decl. ¶ 22. Those applications were reviewed by FWC and FWS, and appropriate conditions were included in the permits to ensure protection of species. *Id.* Likewise, during the July 2022-June 2023 time period, the species review process involved approximately 500 species-specific "effect" determinations involving over 30 listed species. *Id.* Again, those applications were reviewed by FWC and FWS, and appropriate conditions were included in the permits to ensure protection of species. *Id.*

### III. Florida's Efforts To Conserve The Florida Panther And Crested Caracara

Movants seek emergency relief based on concerns of potential impacts to two species: the Florida panther and the crested caracara. Both species are highly protected under the Florida ESA and the Federal ESA. *See* Fla. Admin. Code R. 68A-27.003(1)(b) (listing both of these species and providing that they "shall be afforded the protection afforded under [FWC] rules and Florida Statutes and under the Federal [ESA]…").[8]

#### A. Florida Panther

The State of Florida is protecting, conserving, and recovering Florida panther populations and has been for over a half century. Duncan Decl. ¶ 12 (Ex. B). Almost 15 years *before* enactment of the federal ESA, FWC (then known as the Florida Game and Fresh Water Fish Commission) declared the Florida panther to be an endangered species protected under Florida law in 1958. Federal law has protected the Florida panther since 1967. The State of Florida has focused enormous efforts on conservation benefitting the Florida panther, including establishing a Florida Panther Protection Program, mapping suitable habitats, conducting population survey work,

---

[8] No critical habitat has been designated for the Florida panther or the Audubon's crested caracara. Thus, "adverse modification" of critical habitat under Section 7(a)(2) of the ESA is not a relevant basis for an injunction.

working to develop greater habitat connectivity through construction of new wildlife crossings, development of additional scientific information to better understand the threats and opportunities for panther populations, and educating the public. *Id.* ¶ 17. A variety of additional measures are described in the most recent FWC "Annual Report on the Research and Management of Florida Panthers: 2022-2023" and the "Species Status Assessment for the Florida Panther," which are attached to the Duncan Declaration. *Id.* ¶¶ 15-16.

In the early 1990s, the number of individual Florida panthers remaining in the wild was estimated at 20 to 30 individuals. *Id.* Attach. A at v, 76. According to most recent estimates, the current panther population size is estimated to be within the range of 120 to 230 individuals. *Id.* ¶ 13. The population is now "at least 5-fold larger in size when compared to the population three decades ago, has greater resiliency today than it has exhibited for likely well over 100 years." *Id.* ¶ 19 (citing the most recent species assessment). Thus, while continued conservation efforts are vital, the State of Florida is continuing to make progress on recovering panther populations. One of the primary means of advancing recovery efforts is FWC's continued practice of obtaining commitments from Florida permit applicants for mitigation benefitting Florida panther populations (as shown by the efforts thus far by the agencies in the context of the Bellmar and Kingston projects).

## B.   Audubon's Crested Caracara

Though less known, the Audubon's crested caracara is also a highly protected species in Florida.[9] This osprey-sized raptor is a boldly-patterned, dark-colored bird that can reach a body length of approximately two feet. *Id.* ¶ 30.

As shown by the FWC and FWS reports prepared in conjunction with the review of the

---

[9] FWC, *Crested Caracara*, available at https://myfwc.com/wildlifehabitats/profiles/birds/raptors-and-vultures/crested-caracara/.

Bellmar Villages Project, FWC typically seeks to require species avoidance measures and other actions to minimize the impact of projects on this bird species. For example, in the context of the Bellmar project, FWC and FWS jointly require that, prior to conducting any clearing activities within approximately 5,000 feet of any previously documented or newly discovered crested caracara nest site, the applicant must conduct a survey during nesting season (January 1 through April 30) to determine if any documented or discovered nest is active. *Id.* Attach. F at 3-4. This survey must include potential nesting and foraging habitat within the buffer zone. Likewise, to minimize the potential for disturbance to nesting caracaras, the permittee must conduct land clearing activities outside nesting season for areas that occur within the primary zone of any documented caracara nest site. Restoration activities are also required to ensure that nesting and foraging areas are put back in place. All such restoration activities must be performed in consultation with FWS and FWC field staff. And restored areas must be maintained in perpetuity and managed in a condition that supports use by crested caracara. These and other measures, as required by FWC and FWS, are designed to protect this species from jeopardy and to enhance recovery of the species over the long-term. *Id.* ¶ 31.

## IV.    Status Of Bellmar Villages And Kingston Permit Applications

Movants have targeted two state 404 permit applications for emergency relief out of the over 9,000 received by FDEP since taking over the 404 program: the Bellmar Villages Project (DEP Application No. 396364-001) and the Kingston Project (DEP Application No. 423130-001). As described in detail below, agency review of both applications is still in progress. FDEP has not yet issued a decision on either permit application.

### A.    Bellmar Villages Project

As explained in FDEP's public notice, the Bellmar Villages Project involves construction of a master-planned mixed-use community in Collier County, Florida. The project encompasses

an area of approximately 5,000 acres, with impacts to approximately 144 acres of "waters of the United States." Approximately 94% of jurisdictional wetlands on the project site will be preserved, with a "Conservation Area" exceeding 2,570 acres in size. This Conservation Area would be managed as habitat for listed species in according with a Listed Species Management and Human-Wildlife Coexistence Plan. Since the majority of the project is currently in active agricultural operation, the proposed on-site preservation, enhancement, and restoration activities (described in more detail below) are anticipated to result in a net benefit to the conservation of fish, wildlife, listed species, and their habitats

The Bellmar Villages Project has been under review by FDEP since December 28, 2020, when FDEP received the permit application, which was transferred from the Corps of Engineers to FDEP. Wolfe Decl. ¶ 33. Soon thereafter, in January 2021, FDEP and FWC both sent the applicant Requests for Additional Information (RAI). In April 2021, FDEP received applicant's RAI Response. Additional RAIs and Responses to RAIs were exchanged throughout 2021 and 2022. The applicant submitted voluminous information concerning the effects of the project on listed species, including a comprehensive applicant-prepared "Biological Assessment," with species habitat maps, impacts analysis, and other species-related documentation. In May 2022, FDEP received FWC response assessing the project. In August 2022, FDEP issued public notice for the permit application. Around the same time, FDEP received comments from FWS, and EPA requested its 90-day period for review of the permit application.

In September 2022, FDEP received an updated Biological Assessment from the applicant, along with multiple requests for a public meeting on the project from concerned citizens. Additional analysis, information, and comments were received from the project applicant, FWS, FWC, and other stakeholders from November 2022 through November 2023. On November 6,

2023, FDEP provided another public notice for the project and held a public meeting for this project on December 7, 2023. FDEP accepted additional comment until December 12, 2023.[10] FDEP has been informed that EPA will not complete its review of the Bellmar project before January 26, 2024. As a result, even if EPA elects to not "comment upon, object to, or make recommendations" on the Bellmar Project on January 26, 2024, FDEP will not be in a position to make a final determination on that application before February 5, 2024, at the earliest.

FDEP understands that the project applicant for Bellmar intends to also submit responses to comments to help inform FDEP's decision in this matter. FDEP has not yet received those responses but would review them before making determinations concerning next steps in the permit process. FDEP's potential next steps following the public meeting for the Bellmar project are outlined in the November 17, 2023 letter to Plaintiffs which has been filed with this Court. The application otherwise remains under review. FDEP has not determined whether to issue or deny the permit applications or to take other steps with regard to the processing of the permit applications at this time.

As reflected in the permit file,[11] the permit applicant for Bellmar would be required to, among other things, fully fund the construction of five wildlife crossings within the geographic region in locations designed to provide valuable wildlife movement corridors that will benefit Florida panthers. Duncan Decl. ¶ 27. They will also be required to make substantial monetary

---

[10] On December 12, 2023, Plaintiffs also submitted Movants' declarations (as filed with this Motion) to FDEP for purposes of the permit review process. FDEP will consider the information in determining whether to issue, modify, condition or deny a permit for the proposed project. Wolfe Decl. ¶ 25.

[11] Movants claim counsel for Florida Intervenors described the Bellmar permit process as a "gold standard of what Florida's program can do." Dkt. 135 at 20. That is a mischaracterization. Counsel simply noted that the "Bellmar project is a good example where [FWS and FWC have] produced significant reports" concerning "specific take amounts" and "terms and conditions." Tr. at 115-16 (Oct. 19, 2023).

contributions to a wildlife conservation fund (Marinelli Panther Protection Fund), which exists to support panther conservation efforts in South Florida.[12] *Id.* ¶ 28. Physical buffers (such as lakes and/or fencing) are also required in key project locations, as a means to prevent human encounters with panthers. *Id.* ¶ 29. Various other conditions are set forth in the FWC Declaration.

**B.      Kingston Project**

With regard to the Kingston Project,[13] FDEP received a Section 404 application for this project in June 2022, and over the course of July 2022 to October 2023, FDEP sent RAIs to the applicant and received responses, along with species review reports from FWS on October 26, 2023 and FWC on November 1, 2023. FDEP issued public notice for this project on November 20, 2023, and on December 4, 2023, EPA provided notice of 90-day review period. On December 15, 2023, FDEP scheduled a public meeting for this permit application for January 16, 2024. This permit application remains under review. FDEP has made no determinations whether to issue or deny the permit application or to take other steps with regard to the processing of the permit application at this time. EPA has informed this Court that it would not complete its review of the Kingston Project before February 9, 2024. Even if EPA elects to not "comment upon, object to, or make recommendations" on the Kingston Project on February 9, 2024, FDEP will not be in a position to make a final determination on that application before February 19, 2024, at the earliest. Florida Intervenors understanding that the project applicant for Kingston intends to also submit

---

[12] The Marinelli Panther Protection Fund supports activities such as construction of additional wildlife crossings and fencing, habitat acquisition and restoration, corridor enhancement, public education and outreach focused on wildlife conservation, and scientific research relevant to species conservation. Duncan Decl. ¶ 28.

[13] According to the FDEP public notice, the Kingston Project encompasses 6,676 acres, with impacts to less than 13 acres of "waters of the United States." To support issuance of a permit, the project applicant will purchase wetland mitigation credits and create a conservation area exceeding 3,250 acres, while also performing wetland preservation and enhancement activities, as outlined in the permit records.

responses to comments to help inform FDEP's decision in this matter. FDEP has not yet received those responses but would review them before making determinations concerning next steps in the permit process. Of course, if EPA does have comments on either or both projects, that will trigger an additional process for resolving those comments.

### C.    Timing and Nature of FDEP Action on Bellmar and Kingston Applications

With or without EPA comment, for both projects, there are a variety of paths that could occur in the weeks and months ahead.  For example, Florida could request more information from the permit applicant; Florida could engage with EPA and the other federal agencies to address new information received during the comment period; and/or modifications to the project or the permit could be proposed and considered. Ultimately, FDEP could make a proposed decision to either deny or grant the permits. Wolfe Decl. ¶ 35.[14]  Notably, under FDEP's 404 regulations, FDEP must determine, among other things, that the proposed project "meets the conditions for issuance in Rules 62-330.301 [and] 62-330.302 [which are the criteria for the state ERP permits] and 62-331.053 [which are the specific additional criteria for Florida 404 permits]." Fla. Admin. Code R. 62-331.052.[15]

If FDEP eventually approves a permit for either project, FDEP would issue a "Proposed Permit" first. *Id.* ¶ 35. The applicant is provided with an opportunity to review the proposed permit before accepting the permit with all of its terms and conditions. Florida 404 Handbook at 8.3.4.

---

[14] "FDEP will fully consider and address EPA's views, permit conditions, and objections when determining whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit." MOU between FDEP and EPA found at EPA-HQ-OW-2018-0640-0018 at 5 ¶ II.A.2.

[15] These criteria are broader than those applicable under the federal 404 program only. FDEP is prohibited from issuing a 404 permit if the agency does not have "sufficient information to make a reasonable judgement as to whether the proposed activity will comply with the requirements of [FDEP's Section 404 regulations]." Fla. Admin. Code R. 62-331.053(c).

The Proposed Permit becomes "final" and "effective" when it is signed by <u>both</u> FDEP and the permit applicant; however, the permit is neither final agency action nor in effect if an administrative appeal is filed within 21 days of signature. Wolfe Decl. ¶ 35. In other words, FDEP's issuance of a permit is not "final agency action" if the Florida administrative appeal process is triggered. Under that scenario, the administrative hearing process allows for continued development of the agency record, culminating in a recommended order and eventually a final decision by FDEP that is then subject to state judicial review. *Id.* ¶ 36. Presumptively, if Movants have taken the time to file this Motion in federal court, they (or other similarly interested parties such as Plaintiffs Florida Wildlife Federation, Conservancy of Southwest Florida and/or Miami Waterkeeper) will file a request for administrative review to forestall the permit from becoming final.

## ARGUMENT

### I.   Movants Seek Emergency Relief Unavailable In This Court.

As an initial matter, Movants have asked this Court to venture down several paths outside this Court's limited jurisdiction. Specifically, this Court lacks jurisdiction over these state permits for several related reasons, including a lack of jurisdiction to review the claims in the amended complaint that underlie the Motion; a lack of jurisdiction to impose an injunction upon Florida Intervenors; a lack of jurisdiction to adjudicate state permit applications, especially state permit applications that are still in the state permitting process or those that are otherwise subject to state administrative appeals and state judicial review.

Movants are not actually seeking preliminary relief for this case. None of the claims cited in their proposed order as the basis for the requested relief (Claims, 2, 3, 4, 10 or 13) entitle Movants to enjoin Florida from administering its own 404 permitting program as to specific permit applications. Instead, Movants are trying to expand the amended complaint at this late stage in the

litigation (without seeking leave from this Court) to encompass specific state actions not before this Court. The Motion improperly seeks to enjoin FDEP, a state agency administering a state program under state law, on the sole basis that agency has, in Movants' words, "intervened" to defend the EPA decision to approve Florida's 404 program. But, this Court does not have jurisdiction over the state permit applications, and it should not be making determinations on the merits of particular applications that are still pending before FDEP and not properly before this Court when the state administrative process and state courts are the proper forum for such challenges.

Florida's intervention in this case, which was for purposes of defending federal approval of Florida's program based on the claims in the complaint, does not subject state issued 404 permits to review in this Court, particularly where the complaint has never been amended to bring any such claims into this case. Movants have not cited any precedent where a federal court has enjoined a state agency from even finishing its administrative review process or otherwise reaching a final decision to issue or deny a state permit under a federally-approved program in this manner. Movants seek relief that is unprecedented and contrary to D.C. Circuit precedent and precedents of many other circuits, which have held that there is no private right of action under the Clean Water Act to challenge permits issued by states in delegated permitting programs in the first instance.

In *District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir.1980), the District of Columbia sought injunctive and declaratory relief against EPA and the state of Maryland related to a NPDES permit issued by Maryland and reviewed by EPA under a state delegated 402 program allowing effluent discharges into Rock Creek from a wastewater treatment plant. *Id.* at 859. The District did not believe Maryland's permit terms were sufficiently protective of Rock Creek and sought an

injunction prohibiting the permitted discharges under the CWA, National Environmental Policy Act (NEPA) and nuisance. *Id.* The trial district court denied the injunction, finding that the District did not show irreparable injury or sufficient public interest. The District appealed and the D.C. Circuit and largely affirmed the decision with the exception of the trial court's considerations of the challenges to the state issued permit, which it instructed to be dismissed for lack of subject matter jurisdiction. In coming to this decision, the D.C. Circuit focused on Congress' intent in creating a statutory framework built on the principle that states have primary responsibility over water resources: "In authorizing the creation of state NPDES permit programs, Congress made clear that state permits would be issued 'under State law (and) would be State, not Federal, actions ….' 118 Cong. Rec. 33761 (1972), reprinted in 1 Legislative History at 262 (remarks of Rep. Wright)."[16] *Id.* at 863.  "By requiring states to maintain or create sufficient legal and equitable rights and remedies to deal with violations of state permits in order to exercise permit-granting powers under the Act, Congress must have intended that states apply their own law in deciding controversies involving state permits." *Id.* Thus, the D.C. Circuit declined to "infer a federal right of action" and instead held that "state courts are the proper forums for resolving questions about state NPDES permits, which are, after all, questions of state law." *Id.*

Almost 20 years later, the D.C. Circuit again found that state issued CWA permits should be challenged in state court. In *General Motors Corporation v. Environmental Protection Agency*, 168 F.3d 1377 (D.C. Cir. 1999), General Motors filed a petition for review against EPA

---

[16] The same purpose applies to Section 404 permit programs. "It is the policy of Congress that the States . . . implement the permit programs under sections [402] and [404]." 33 U.S.C. § 1251(b). That this creates permit programs under "state law" is even more clear in the 404 "assumption" context than the 402 "delegation" context. *See* H.R. Rep. No. 95–830 at 104 (1977) ('The Conference substitute provides for the administration by a State of its own permit program for the regulation of the discharge of dredged or fill material. . . . The conferees wish to emphasize that such a State program is one which is established under State law and which functions in lieu of the Federal program. It is not a delegation of Federal authority.'').

challenging the award of administrative penalties for violations of a NPDES permit issued by the state of Michigan. *Id.* at 1379-80. In denying the petition and holding that a state-issued permit could not be challenged in the context of a federal enforcement proceeding, the D.C. Circuit explained:

> EPA persuasively argues that it reasonably interpreted the Act to prevent GM from doing in a federal enforcement proceeding what the Company had declined to do before the MDNR and the Michigan state courts.. . . . Not only would the EPA have to expend considerable resources to obtain the information from the state agency; it would also be second-guessing that agency, which is inconsistent with the primary role of the States under the Act.

*Id.* at 1382. The D.C. Circuit also cited to *Schramm*, noting that "the congressional silence on federal court review of state permits is consistent with the view that challengers to those permits should be relegated to state law remedies in state courts." (internal citations omitted). *Id.* at 1383.

Other courts have generally agreed with the D.C. Circuit and dismissed federal court challenges to state issued permits given congressional intent to respect the primary role of states under the Clean Water Act's regulatory framework. *See e.g., Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869 (7th Cir. 1989) (declining to find federal jurisdiction to challenge a state issued CWA permit and thus dismissing industry petitioners challenge to EPA's objections to Wisconsin's state NPDES permit as an unreviewable discretionary act); *Shell Oil Co. v. Train*, 585 F.2d 408, 414 (9th Cir. 1978) (explaining that "existence of a state judicial forum for the review of the regional board's action forecloses the availability of the federal forum under the [APA]" in affirming dismissal of permittee's federal court challenge to state NPDES permit); *Rose Acre Farms, Inc. v. N.C. Dep't of Env't & Nat. Res.*, 131 F. Supp. 3d 496, 507 (E.D.N.C. 2015) ("Here, the court declines to exercise subject-matter jurisdiction under 28 U.S.C. § 1331 over Rose Acre's claim because doing so would upset the congressionally-approved balance of responsibilities between federal and state courts with respect to the CWA's NPDES permitting scheme"); *Defs. of*

*Conewango Creek v. Echo Devs., LLC.,* No. CIV.A. 06-242 E, 2007 WL 3023927, at *8 (W.D. Pa. Oct. 12, 2007) ("Whatever the veneer on the counts, assuming Plaintiff is challenging final Pennsylvania-issued permits, that challenge is properly brought in a Pennsylvania court, with the state able to defend the permit decision and terms, and not here in federal court."); *Consol. Edison Co. v. N.Y. State Dep't of Env't. Conservation*, 726 F. Supp. 1404, 1409 (S.D.N.Y 1989) (dismissing permittee's federal court challenge to a state issued permit); *Nat. Res. Def. Council, Inc. v. Outboard Marine Corp.*, 702 F. Supp. 690, 694 (N.D. Ill. 1988) (direct review of state-issued permits is confined to state courts); *Chesapeake Bay Found., Inc. v. Va. State Water Control Bd.*, 495 F. Supp. 1229, 1237 (E.D. Va. 1980) (granting state agency's motion to dismiss because claims that the board violated the Federal Water Pollution Control Act were traditionally relegated to state law and should be addressed at the state level).[17]

Thus, the Court can and should deny Movants' Motion on this basis alone and does not need to reach the merits of whether Movants have met the incredibly high burden for preliminary injunctive relief. Movants may attempt to argue that these cases do not involve permit challenges in the context of a TRO where the underlying federal approval of the state program is being challenged. But that distinction does not give this Court jurisdiction over state permits, nor have Movants cited any cases where a federal court issued the kind of extraordinary action Movants seek here. Plaintiffs cannot conjure up federal-court review for an otherwise-unreviewable state

---

[17] Counsel found only one court decision recognizing a narrow exception to the rule that federal courts cannot enjoin issuance of state CWA permits: *Friends of Crystal River v. EPA*, 794 F. Supp. 674, 678-86 (W.D. Mich. 1992), *affirmed by* 35 F.3d 1073, 1076-77 (6th Cir. 1994). But that case is clearly distinguishable on the facts. There, plaintiffs first challenged a proposed 404 permit via the state administrative process. While that challenge was occurring, EPA objected to, and then federalized, the permit. EPA then withdrew its objection and attempted to return the permit to the state for final action. Plaintiffs sued in federal court and the court found that EPA lacked statutory authority to *return* a federalized 404 permit to a state. The court enjoined the state from issuing a 404 permit for the project because it was still federalized. That is obviously not the situation here.

permit merely by labelling it a request for preliminary relief in an underlying APA challenge. This Court's jurisdiction—and D.C. Circuit review—cannot be so easily manipulated, particularly when all of the same reasons federal courts refuse to review state permits apply with full—if not greater—force in the TRO/PI context. As the D.C. Circuit explained in *GMC*, precluding collateral attacks of state-issued permits in federal court "ensures that the States [have] the opportunity as a threshold matter to address objections to the permits they issue." *Gen. Motors Corp.*, 168 F.3d at 1382 (recognizing also that the state agency "alone will have the information pertinent to an attack upon the decisionmaking process") (internal quotations omitted).

## II.    Even If Movants Could Overcome This Identified Jurisdictional Defect, They Cannot Meet The High Burden Required For Extraordinary Relief To Enjoin A State Agency Administrative Process.

The primary "purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). Injunctive relief is an "extraordinary and drastic remedy" that "should never be awarded as of right" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To receive such an "extraordinary remedy," a moving party must carry the burden of persuasion by making a "clear showing" that the following four factors, taken together, warrant relief:  (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004); *see also Winter*, 555 U.S. at 20-22.

### A.    Movants' Are Not Likely To Succeed On The Merits Of The APA Record Review Challenge To EPA's Approval Of Florida's 404 Program

#### 1.    Movants' Attempt To Manufacture Standing In Order To Seek Emergency Relief In Federal Court For A State Permit Application Should Be Rejected.

"[T]he merits on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction, including a party's standing." *W. Watersheds Project*, 468 F. Supp. 3d at 41 (internal quotations and citations omitted). "In the context of a preliminary injunction motion, [the court] require[s] the plaintiff to show a substantial likelihood' of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal quotations and citations omitted).

Movants seek to bypass the state administrative review process on the pending state permit applications and instead prematurely seek emergency relief in federal court. To do so, Movants have purposely filed this motion on behalf of only two of the seven Plaintiffs who filed the amended complaint in an attempt to manufacture a standing injury where there simply is none by rearguing issues already fully briefed before this Court.

Like they did in their motion for summary judgment on Claim 2, *see* Dkt. 98 at 79, the two moving parties, Center of Biological Diversity and Sierra Club, again assert here that "they face barriers to challenging state 404 permits because Florida law restricts access to administrative courts to citizens of the State." Dkt. 135 at 31. Florida has fully refuted Plaintiffs' baseless concerns about the Florida administrative and judicial review processes. Dkt. 102 at 30, 45-47; Dkt. 107 at 17-20. Here, yet again, Movants ignore that there are *three* avenues for demonstrating standing. Their motion only refers to two avenues: environmental groups in Florida with "at least 25 current members residing within the county where the activity is proposed" have automatic standing to challenge a permitting action (Fla. Stat. § 403.412(6)); and "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an administrative proceeding under this subsection if the citizen meets the

28

standing requirements for judicial review of a case or controversy pursuant to Article III of the

United States Constitution" (Fla. Stat. § 403.412(7)).

While those two "liberalized" paths for standing do require – and appropriately so – state

citizenship for standing, the third avenue for standing under the seminal case in Florida known as

*Agrico Chem. Co. v. Dep't of Env't Regul.*, 406 So. 2d 478 (Fla. 2d DCA 1981) does not. Under

*Agrico*, plaintiffs have standing to challenge permitting actions if they can demonstrate that their

"substantial interests" are determined or affected by the action and their interests fall within the

zone of interests of the relevant program. Under the *Agrico* framework, associations have standing

if a "substantial number of its members, although not necessarily a majority, are substantially

affected'...." *Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*, 412 So. 2d 351, 353-54

(Fla. 1982). Importantly, *Agrico* creates a two-part test for standing to participate as a "party" in a

chapter 403 permitting process (i.e., a challenge to an FDEP permit). Under Florida law, a "party"

is "[a]ny other person … whose substantial interests will be affected by proposed agency action,

and who makes an appearance as a party." Fla. Stat. § 120.52(13). Citizenship is not a requirement

to be a party. In turn, nothing under Florida Statute § 120.57 requires citizenship for standing to

be a party if that party otherwise is a "person…whose substantial interests will be affected…"

Florida has made this clear in earlier briefing. FDEP Reply Br. (Dkt. 107 at 20 – "The first and

most traditional path for standing, under the *Agrico* test, remains available irrespective of state

citizenship. Wolfe Supp. Decl. ¶ 26.").

Movants cite two cases for the proposition that a "foreign corporation would not qualify as

a citizen of the State," and thus, would lack standing to file an administrative appeal of these

permits. Dkt. 135 at 31 (citing *Legal Env't Assistance Found. (LEAF) v. Fla. Dep't of Env't Prot.,*

702 So.2d 1352, 1353 (Fla. 1st Dist. Ct. App. 1997); *McClash v. Manasota-88, Inc.,* No. 14-4735,

USCA Case #24-5101      Document #2054085      Filed: 05/13/2024      Page 58 of 147

2015 WL 3966050, at *8 (Fla. Div. Admin. Hr'g June 25, 2015)). Movants' reliance on these cases is wrong. Those cases do not stand for the proposition that environmental groups need to be citizens of Florida to qualify for standing under the *Agrico* test.

In *LEAF*, an Alabama-based environmental group sought standing to intervene under the "substantial interest test" of Florida Statute Section 120.57 or the "liberalized provisions of section 403.412(5)."[18] But in that case, the court expressly stated that "LEAF does not argue that it can meet the substantial interest test." 702 So. 2d at 1353. Thus, the court only addressed whether *LEAF* could benefit from the "liberalized provisions of section 403.412(5)," but since that avenue for standing only extends to "citizens," *LEAF* could not rely on it. Nothing in the case suggests that *LEAF* lacked standing under the "substantial interest" test because it was not a citizen of Florida; rather, it was because *LEAF* did not attempt to show "substantial interests" in the proceeding.

Likewise, in *McClash*, the Administrative Law Judge actually found that Sierra Club had standing based on "substantial interests" under Fla. Stat. ch. 120: "Sierra Club claims associational standing to intervene under chapter 120. Respondents stipulated that a substantial number of Sierra Club members have substantial interests in the use of the waters near the project site, but assert that Sierra Club failed to demonstrate injury to these interests. Sierra Club offered evidence to prove the interests of its members could be adversely affected by the proposed project. **Sierra Club has standing under chapter 120**." *McClash,* 2015 WL 3966050, at *8 (emphasis added). Thus, Sierra Club had standing for purposes of the *Agrico* avenue for standing. But what they did not have, according to the ALJ, was "standing to intervene pursuant to section 403.412(5)" because

---

[18] Note, Florida Statutes Section 403.412(5), as referenced in *LEAF*, subsequently became Section 403.412(6) after amendments were adopted to this portion of the Florida Statutes.

"Sierra Club is not a citizen of the state."[19]

> **2.      Previous Briefing And Oral Argument Show That Movants Are Unlikely To Succeed As To The Merits And Justiciability Of Claims 2, 3, 4, 6, 10 And 13.**

Previous briefing on cross-motions for summary judgment both by the Florida Intervenors and Federal Defendants (which was adopted by the Florida Intervenors), oral argument and Florida's post-hearing memorandum demonstrate why Movants are not likely to succeed on the merits of Claims 2, 3, 4, 6, 10 and 13 related to alleged violations of the ESA.  Dkt. 99, 102, 106, 107, 127.  Specifically, Florida Intervenors demonstrated that Movants do not have standing for any of their claims and/or certain species related claims are not ripe. Dkt. 102 at 37-60; Dkt. 10-30, Dkt. 127-2 (Oral Arg. Demonstrative Summarizing Standing Args.).  Notwithstanding Movants' justiciability defects, Florida Intervenors and Federal Defendants have fully demonstrated in their briefs in this case that Movants should also lose on the merits of their ESA claims (as well as all other claims). Dkt. 99 at 49-50, 62-85; Dkt. 106 at 27-48.

> **3.      Movants Are Unlikely To Succeed On The Merits As To Any *Remedy That Directly Enjoins Specific State 404 Permit Applications*.**

The Movants' requested relief presumes that the remedy (if they were to actually succeed on the merits for at least one of their claims) would necessarily include vacatur of EPA's approval

---

[19] Florida Intervenors also incorporate by reference their previous responses to Plaintiffs' reiteration of their specious assertions that Florida's *de novo* standard of review in state proceedings would be more costly than an APA record review case in federal court because they would have retain experts they otherwise would not need. Dkt. 102 at 46 n.26; Dkt. 107 at 18-19. Plaintiffs retained several experts in this record review case as evidenced by the declarations they attached to their motion for preliminary relief.

Similarly, Florida Intervenors also incorporate by reference their previous responses to Plaintiffs' reiteration of the claim that loss of NEPA documentation from EPA's approval of Florida 404 program is a cognizable injury. Dkt. 102 at 38-42; Dkt. 107 at 11-16. Simply stated, Congress, not EPA, decided that state programs are not subject to the NEPA provisions that may trigger environmental documentation. *Id.* And more to the assertion of "harm," Florida Intervenors have fully demonstrated that Plaintiffs receive the same comparable environmental information under the Florida-led process than the Corps-led process. Dkt. 102 at 25-27; 37-42; Dkt. 107 at 11-16.

and therefore cessation of 404 permits issued by FDEP. But this is not the case. No court has ever vacated federal approval of a state environmental program (choosing instead to remand without vacatur). *See e.g., Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th Cir. 2020) (finding that EPA's approval of Idaho's NPDES permit program failed to comply with the Clean Water Act's criminal negligence requirements but deciding against vacatur).[20] "An inadequately supported rule, however, need not necessarily be vacated. . . . The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted).

Under the second *Allied-Signal* prong, courts also consider "public consequences" of possible equitable remedies. This includes equities involving the parties as well as the "interests of third parties," as this Court noted. Dkt. 73 at 48; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (reviewing district court's exercise of equitable discretion in CWA case and instructing courts to "pay particular regard for the public consequences" of a grant of equitable relief); *Conserve SW. Utah v. U.S.Dep't of Interior*, No. 1:21-cv-01506-ABJ, 2023 WL 792285, Mem. Op. (D.D.C. Nov. 16, 2023) (denying Federal Defendants' motion to vacate DOI's grant of a right-of-way under the *Allied Signal* test while granting their motion to remand the decision and related incidental take permit and biological opinions back to the relevant agencies for

---

[20] Federal Defendants and Florida Intervenors have explained why this Ninth Circuit decision is incorrect as to the merits (*see, e.g.*, Dkt. 99 at 56-57), but this case illustrates that even where an error is found by a reviewing court, vacatur is not the automatic or even likely remedy. Notably, a federal district court did vacate EPA's approval of Arizona's NPDES permit program (the only such example counsel has located for this proposition), but that decision was reversed by the U.S. Supreme Court in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), where the Supreme Court clarified when Section 7 consultation should be triggered for purposes of EPA's approval of state environmental programs.

reconsideration). Depending on how this Court rules on the pending summary judgment motions, the parties will need to address complex issues around appropriate remedies. In fact, Plaintiffs themselves asked this Court to forego ruling on remedy until after summary judgment rulings were issued. Dkt. 98 at 15 n.2 ("Plaintiffs respectfully request the opportunity to brief the appropriate remedy _following_ the Court's ruling on summary judgment.") (emphasis added). It would be highly premature to block the issuance of state permits without first determining whether that form of drastic relief is likely to be appropriate and available as the remedy at the culmination of this case.[21] Movants have not shown (nor could they show) that are likely to succeed on the merits as to the substance and the selection of a remedy that _directly targets specific Florida 404 permit applications_.[22]

### B.  Movants Will Not Suffer Irreparable Harm From Denial Of The TRO And PI

The "basis of injunctive relief in the federal courts has always been irreparable harm."  A plaintiff seeking injunctive relief must "demonstrate that irreparable injury is likely in the absence of an injunction." _Winter_, 555 U.S. at 22. "Issuing a preliminary injunction based only on a

---

[21] Movants also present an "alternative" injunction where the Court issues an "order restoring authority to the Corps over permits that may affect ESA species" pending a decision by the Court on the merits "while the parties further brief remedy regarding vacatur of the programmatic BiOp, programmatic ITS, and EPA's approval of the State 404 program." Dkt. 135 at 42. This "alternative" is tantamount to partial _vacatur_ and therefore is improper for all reasons just discussed. Moreover, it is significantly broader than their preferred injunction, as it would apply to any Florida 404 permit that "may affect ESA species." That would likely cover hundreds of applications, including many where the "may affect" finding does not include "likely to adversely affect" situations or otherwise implicate any potential for jeopardy or adverse modification of critical habitat. As such, it is not narrowly tailored and inappropriate relief, even preliminarily.

[22] Even if this Court found a legal deficiency with the BiOp and/or ITS accompanying EPA's approval of Florida's 404 program, the remedy for any such outcome would not be directed at the issuance of particular permits; instead, those issued permits may not be able to rely on the protection afforded by the BiOp/ITS for purposes of defense against possible future claims based on incidental take. To the extent permittees engage in conduct that results in take of species that is not authorized by the ESA, federal enforcement and/or citizen suits could be brought.

*possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (emphasis added). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. Eng.*, 454 F.3d 290, 297 (D.C. Cir. 2006) "First, the injury 'must be both certain and great; it must be actual and not theoretical. . . The moving party must show [t]he injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, Second, the injury must be beyond remediation." *Id.* (internal quotations omitted). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Id.* (internal citation omitted).

### 1.    Since The State Permitting Process Is Not Yet Complete, There Is No Imminent Threat Of Irreparable Harm.

Throughout their motion, Movants assert that the Bellmar Villages and Kingston permits will irreparably harm the Florida panther and/or crested caracara. Dkt. 135 at 12-21, 25-38. Movants claims of "imminent issuance" of permits for both projects and its declarations are focused on alleged impacts to species if the projects are implemented as currently proposed. However, what Movants omit from their factual and legal arguments is that the state 404 permit application process for these two projects has not yet been completed. The applications are still open for public comment and EPA had indicated that it is also reviewing both applications under its oversight authority pursuant the CWA and MOU. Wolfe Decl. ¶ 32.

As Mr. Wolfe's fourth declaration makes clear, FDEP must still review the public comments received as well as address any comments from EPA and determine if additional information is needed before deciding whether to issue, modify, or deny the proposed permit. *Id.* ¶ 25.  EPA also has the option to take over the permitting process if it lodges objections that FDEP

has not satisfactorily resolved. 33 U.S.C. § 1344(j); 40 C.F.R. §§ 233.20(b), 233.50. Movants have

not (and cannot) provide evidence that FDEP intends to bypass its own regulatory process and

issue the proposed permits in their current form, let alone issue them in violation of the obligation

to not "jeopardize" the continued existence of these species or adversely modify designated critical

habitat. Thus, Movants' claimed harms are only theoretical at this point and may never occur

depending on how FDEP proceeds with the permit applications.

     Again, FDEP's regulations expressly provide that no Section 404 permit will be issued

when the project "[j]eopardizes the continued existence of endangered or threatened species, or

results in the likelihood of destruction or adverse modification of [designated critical] habitat…"

Fla. Admin. Code R. 62-331.053(3)(a)4. Compliance is also "required" for "any requirements

resulting from consultation with, or technical assistance by," FWC, FWS, and NMFS "for permits

reviewed under the State 404 Program," which, as already explained, utilizes the same federal

agency offices reviewing the same information using the same standards for the same purposes as

under the Corps-led program. This includes the obligation, as set forth in the Programmatic

Biological Opinion, to use the best available data when making species-related determinations. If

FWS and FDEP reach the same final conclusion that the activities allowed by a potential permit

will "jeopardize the continued existence of a species," and no protection measures are available to

address the adverse impacts, the permit would not be issued pursuant to the ESA and Fla. Admin.

Code R. 62-33.053(3)(a) 4, 62-331.201(3)(k), and 62-331.248(3)(j). If they find that protection

measures are available to address those impacts such that a permit may be issued, project

opponents are able to obtain review of that determination in the state administrative and judicial

forums. Thus, Movants' attempts to tie their claims of irreparable harm to the Technical Assistance

Process does not help their Motion, as the claimed "harm" is directly linked to the yet-to-be issued

permits.[23] Unless and until final permits are issued for the Bellmar Villages and/or Kingston projects with terms that jeopardize the continued existence of listed species or adversely modify designated critical habitat, there is no threat of imminent harm sufficient for a preliminary injunction. If such a situation occurs in the future, then either state permit can be challenged administratively (which results in an automatic stay of final agency action on the permit)[24] and judicially in Florida as described in detail in Florida Intervenors' previous briefing.  Dkt. 102 at 29-36.

### 2. Movants' Three Year Delay In Filing Its Request For Preliminary Injunctive Relief Undercuts Their Claims Of Irreparable Injury

Plaintiffs' actions in this case also belies Movant's claim of immediate irreparable harm, which they have asserted from the beginning of this case but then only two Plaintiffs waited three years to request preliminary relief to address.  *See*, *e.g.*, *W. Watersheds Project*, 468 F. Supp. 3d at 50 (finding plaintiffs "unexplained delays" in seeking emergency relief to enjoin the April 2019 Biological Opinion almost 11 months after issuance in May 2020 "undermine [plaintiffs'] contention that they will be irreparably harmed absent an injunction"); *Defs. of Conewango Creek,*

---

[23] Florida Intervenors have already cross-moved for summary judgment on species related Claims 3, 4, 5, 11 and 12 on several bases, including that those claims are not yet ripe. Dkt. 102 at 51-55; Dkt. 107 at 25-30. Movants' lack of irreparable harm with respect to the Bellmar and Kingston permit applications also show precisely why Movants' claims are not ripe. Movants' irreparable harm is tied directly to issuance of specific state issued permits, not FWS's Biological Opinion or the Technical Assistance Process which are at the heart of the species-related claims in Plaintiffs' Amended Complaint.

[24] When a petition for administrative hearing is filed, FDEP has a standard practice of sending a form letter to the permit applicant advising that FDEP has "received a petition for administrative hearing under Sections 120.569 and 120.57, Florida Statutes, challenging the Department's permitting decision." Wolfe Decl. ¶ 36. The letter explains that "action on this matter is proposed agency action only, and no permit has been issued" and, accordingly, "no action may be taken based on the above permit application, until the Department enters a Final Order either issuing or denying the above permit..." FDEP also reminds the applicant that they "must demonstrate prima facie entitlement to the permit issuance in any administrative hearing held under the filing of the petition." *Id.*

2007 WL 3023927 (finding delays in seeking preliminary relief to enjoin discharges under a state issued NPDES permit that allegedly impacted a listed species undercut assertions of irreparable harm); *Sierra Club v. U.S. Army Corps of Eng'rs*, 2005 U.S. Dist. LEXIS 36385, *60-61 (D.N.J. 2005) ("Plaintiffs' delay in moving for preliminary injunctive relief undermines their claim of irreparable injury."); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[F]ailure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggest that there is, is fact, no irreparable injury.") (internal citations and quotations omitted); *Kobell v. Suburban Lines,* 731 F.2d 1076, 1091 n.27 (3d Cir. 1984) ("the district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay.").[25]

What is obvious from their motion is that Movants believe that the potential source of irreparable harm is from specific state issued 404 permits (which their Amended Complaint does not address), not the FWS's Programmatic Biological Opinion or the Technical Assistance Process. Because the standard applied by FWS to review a proposed state permit issued under the 404 permitting program for Florida approved by EPA is the same or more rigorous than a proposed Corp permit, there is no basis to assert irreparable harm from either the Biological Opinion or Technical Assistance Process as set forth in detail in the next section.

---

[25] Others have tried Movants' tactic and failed. *See, e.g., Am. Forest Res. Council v. Williams*, No. 21-601, 2021 WL 4819846, at *4 (D.D.C. Oct. 13, 2021) ("[P]laintiffs' delay in seeking interim relief from this Court is highly indicative of the fact that plaintiffs do not in fact face the kind of harm warranting a preliminary injunction. . . Faced with plaintiffs' delay and their ultimate inability to point to a concrete, imminent harm from the challenged rules, it is difficult to not view this request for extraordinary relief as anything more than a procedural ploy to have the Court adjudicate their pending summary judgment claims more expeditiously.").

**3.     Since The State 404 Permitting Process Has The Same Or More Rigorous Species Requirements Than The Federal Permitting Process, There Is No Threat Of Irreparable Harm.**

Movants' requested relief is premised on the notion that FDEP will issue Section 404 permits for these two projects that are less protective of species than permits resulting from the Corps-led 404 process such that the Florida panther and other species will be better protected from "irreparable harm" that Movants believe will occur absent extraordinary intervention by this Court. Yet, as already explained, the Florida-led 404 process ensures that the *same FWS offices* review the *same species-related information* using the *same legal standards* and provide the *same incidental take measures* as would apply in the Corps-led program. *See* Ex. C.

A comparison of the two programs clearly shows that the Florida-led process ensures *even more protection for species* and *even more public involvement* than the Corps-led process for at least three reasons:

a) FDEP *must* incorporate all FWS measures, terms, and conditions into the Section 404 permit (whereas the Corps *may* do so for their permits);

b) FDEP *must* deny a permit if FWS, NMFS, or FWC finds no protection measures are available to reduce the risk of jeopardy to an acceptable level (whereas the Corps *may* decide to issue a permit in such circumstances); and

c) the public has full access to review and comment on *all species-related information* before FDEP makes a final determination on the permit, which allows for FDEP, EPA, and the permit applicant to consider and respond to those concerns including with project and/or permit changes as warranted (whereas there is *no right of public review and comment* on the Biological Opinion/ITS under the Corps-led process).

Stated simply, while Movants seek to restore the Corps-led 404 program for these two permits, Movants cannot show that they will succeed on the merits in obtaining relief that avoids or changes the "irreparable harm" they assert will occur. This is fatal to their motion. Clearly, if the Corps had continued to process these two permits instead of Florida or was to begin processing them now,

the same permits would have been, or would be now, issued with the terms and conditions that are just as protective of species. Movants have not and cannot show otherwise.

In particular, Movants complain that the species reviews for these two projects have been inadequate because, among other things, FWS failed to ensure that the projects would not jeopardize the continued existence of the Florida panther and other species. *See e.g.,* Dkt. 135 at 30-34. For example, Movants argue that FWS failed to consider the cumulative effects of the project on the Florida panther, Dkt. 135 at 29-30, and that FWS was imposing inadequate incidental take measures, *id.* at 31. But on all of those points, the outcome of the Corps-led process would be no less protective of species than the Florida-led process.[26] A decision in recent weeks out of the U.S. District Court for the Middle District of Florida, in a lawsuit filed by Sierra Club (one of the Movants here using the same legal counsel representing Plaintiffs in this case), illustrates this point.

On November 1, 2023, the Middle District of Florida issued an order granting summary judgment for the Corps and FWS in a lawsuit by environmental groups challenging the Corps' Section 404 permit authorizing a three-mile expansion of a state road in Florida. *See Sierra Club v. U.S. Fish & Wildlife Serv.,* No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933, (M.D. Fla. Nov. 1, 2023). Because the project would cross through habitat for the Florida panther, the Corps consulted with FWS before issuing the Section 404 permit.  FWS issued a *21-page* biological opinion dated June 2020 finding that the road project is unlikely to jeopardize the continued existence of the

---

[26] Movants erroneously claim that FWS's "permit conditions express no limit on that take" of Florida panther and crested caracara. Dkt. 135 at 11. The ESA regulations require FWS to "specif[y] the impacts, i.e., the amount or extent, of such incidental taking on the species," noting that a "surrogate" such as "similarly affected species or habitat or ecological conditions" "may be used." 50 C.F.R. § 402.14(i)(1)(i). FWS and FWC have specified the amount or extent of take. *See* Duncan Decl. ¶ 26 Attach. F, FWS Report for Bellmar at 8, 16; ¶ 34 Attach. I, FWS Report for Kingston at 8, 21-22.

panther.

Counsel for Movants filed a lawsuit in the Middle District of Florida challenging the Section 404 permit, raising a long list of reasons why the species reviews conducted by the Corps and FWS for the road project were inadequate. The federal district court rejected *all of the Plaintiffs' arguments*, granting summary judgment in favor of the agencies and dismissing the case. Among other things, the court found that FWS adequately evaluated the environmental baseline for the project area, the effects of the project, and the cumulative effects on the panther. The court also rejected the groups' argument that using "habitat loss" as a surrogate to monitor incidental take rather than set a numerical take limit violated the ESA. The court found that FWS adequately explained why setting a numerical take is not practical and described the causal link between the surrogate metric and take. The court further found that the habitat loss surrogate provides a clear means for determining when anticipated take has been exceeded. In reaching these conclusions, the Middle District of Florida acknowledged that "[s]everal courts" in Florida had been called upon to address cases involving similar concerns about the Florida panther, noting that "the Court must exercise 'substantial deference' to the [FWS's] decision on 'how much data is necessary to fully address each [species-related] issue." *Id.* at *7 (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008)).

Of course, these are precisely the same kinds of arguments that Movants are pressing in this case about alleged inadequacies of species protections arising out of the Florida-led process. At root, Movants object to FWS's approach to reviewing impacts to the Florida panther, but that only reinforces the fact that Movants experience no "irreparable harm" *from the continued*

*administration of the Florida-led process relative to the Corps-led 404 process.*[27]  Indeed, Movants
are equally unhappy with either the Corps or Florida issuing any Section 404 permits effecting
panther habitat at all.

Notably, a comparison of the biological opinion for the project reviewed by the Middle
District of Florida aligns with the species review documentation prepared for the two projects at
issue in this Motion.  For the Bellmar project, the publicly accessible FDEP permit file contains
the FWS Technical Assistance Process Response report. *See* Duncan Decl., Attach. F.  As shown
in that response, FWS is participating in the species review process (which remains ongoing) and
has been conducting an in-depth review whether the project has "adequate protection measures to
avoid and minimize any incidental take that is reasonably certain to occur." *Id.* at 2. As such, FWS
provided a list of "necessary avoidance and minimization measures" that FDEP must adopt in
order to "ensure that the permitted activity is not likely to jeopardize any species, adversely modify
or destroy critical habitat or to ensure that any incidental take is avoided or minimized." Id.

This included measures for species and critical habitat that are likely to be adversely
affected by the project, including the Florida panther, the Florida bonneted bat, Audubon's crested
caracara, and the tricolored bat. *Id.* Attach. F. Among other measures, FWS requires construction
of wildlife crossings within the geographic region for the benefit of the Florida panther to provide
and preserve a wildlife movement corridor.  Pages 6 to 24 of the FWS response provides analysis
of the action area, status of species, effects of the action, cumulative effects, amount of take
(including numeric estimates), and jeopardy assessment.  FWS determined that, "[u]pon FDEP's

---

[27] Movants have not pled that the outcome of the species review process under the Corps-led permit
program would be any different in terms of protection of species. That is fatal to the requested
relief in the Motion.  *See Marino v. Nat. Oceanic & Atmos. Admin.*, 33 F.4th 593, 596-98 (D.C.
Cir. 2022) (explaining that "redressability is established" only "where a remand would likely result
in a favorable exercise of agency discretion," which requires that the plaintiff "plausibly plead that
relief is indeed likely")).

incorporation of the necessary avoidance and minimization measures as permit conditions," the "issuance of the State 404 permit is not likely to jeopardize any federally listed species or adversely modify or destroy any critical habitat…" *Id.* Attach. F at 25. FWS based this opinion "on the information in the permit application, as well as the status of the affected species, and any cumulative effects within the permit applications' action area." The final 10 pages of the FWS response contains a set of "Special Conditions" and "Additional Commitments." A voluminous set of other documents in the FDEP Information Portal file also address species impacts issues. Wolfe Decl. ¶ 44; Duncan Decl. Attach. F. The volume of species-related information available to the public for review and comment as part of the ongoing Florida 404 permitting process for the Bellmar Project exceeds the volume of information available for review for the biological opinion reviewed by the Middle District of Florida. The same is true for the Kingston project. Wolfe Decl. ¶ 44; Duncan Decl. ¶ 36.

Ironically, because they cannot truly show a lack of comparability of species protections between the Corps-led and Florida-led 404 processes, the ultimate grounds for Movants' asserted harm is the lack of a "site-specific BiOp that is ***clearly reviewable*** in federal court to enforce the guarantees of the ESA." Dkt. 135 at 31 (emphasis added). But the record here provides voluminous species-related documentation along with the *opinion* of FWS as to the effects of these two projects. As such, there is no actual lack of a "site specific" biological opinion; in reality, FWS has provided its biological "opinion" to FDEP in comparable form and content to the "site-specific BiOp" Movants demand. Movants' point here is the ultimate "form over substance."

Concerning whether the substance of the FWS's species decision is "reviewable in federal court," Movants are careful to hedge their bets. Dkt. 135 at 8 (criticizing the lack of a biological opinion that is "***clearly susceptible*** to challenge in federal court" (emphasis added)). Whether

FWS's report and participation in the Technical Assistance Process are subject to challenge in federal court appears to be a question of first impression. But setting that aside, the terms and conditions in a final permit issued by FDEP would certainly be reviewable in state administrative and judicial forums, which is an adequate remedy at law. The state administrative and judicial review processes provide an avenue to vindicate Movants' concerns with the permit, including objections to terms and conditions related to species protection and claims that the permit fails to meet the criteria and requirements established as part of the Florida Section 404 Program.

### C.      Balance Of Equities And The Public Interest Do Not Favor Emergency Relief

In determining whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger*, 456 U.S. at 312). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The public consequences of granting the requested relief far outweigh the Movants' narrow interest in obtaining it. Here, there are two federal statutes at issue, the CWA and the ESA, with clear congressional intent that may appear inapposite, but in the context of the facts of this case actually are not.  As detailed in Florida Intervenors' first argument, *supra* at I., Congress made clear that cooperative federalism is at the heart of the CWA, which is why Congress designed its key permit programs to be implemented and enforced by states in state courts. States like Florida, as well as the regulated public, have a strong interest in regulatory certainty, including that federally-approved state CWA permit programs will be administered in the normal course by those states. Granting the requested relief would: severely undermine Florida's ongoing implementation

of its CWA 404 program by reducing the administrative efficiency Congress created through cooperative federalism, delay or deprive the public of the environmental protections benefits of Florida's 404 program, as well as create public confusion and uncertainty regarding the permitting process. Wolfe Decl. ¶ 51. An injunction here, even if limited to just two projects, would likely have a severe chilling effect on the entire FDEP Section 404 permit program, potentially causing regulatory chaos with permit applicants lacking certainty as to whether FDEP could continue processing their applications or whether their applications, if granted, could be lawfully relied upon. Wolfe Decl. ¶ 50.

FDEP has hired and trained hundreds of employees to serve as Section 404 permitting staff, who have collectively spent hundreds of hours over the course of three years working on the review of these two permit applications. FDEP staff have held public meetings and reviewed extensive comments from a wide range of stakeholders, including other agencies (federal, state and local) and the public. FDEP has conducted public meetings and developed extensive analysis of the various issues relevant to a determination on these permit applications. The applicants themselves had expended significant resources and time in submitting permit applications and responding to additional FDEP requests for information.

In contrast, as detailed above, there is no threat of irreparable harm to listed species as FDEP has not yet made a decision on either the Bellmar or Kingston permit application or the terms of final permits, if issued. Moreover, even if permits were to be issued that may impact listed species, those permits can be challenged through both state administrative and judicial proceedings, which as explained above are more favorable than federal court to a challenger's concerns as an administrative appeal automatically prevents a permit from being finalized and there is no deference to the agency's decision under state law. Finally, there is no evidence that

the Technical Assistance Process itself leads to less protection for listed species. In fact, the opposite is true as detailed *supra* at II.C.  The Florida Section 404 process ensures that the same agencies review the same species-related information using the same legal standards as in the Corps-led 404 program, and FDEP is required to adopt any species-related measures provided by FWS.

## CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully request denial of Movants' motion for a temporary restraining order and preliminary injunction.[28]

Dated: January 12, 2024

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (DC Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

---

[28] Florida Intervenors take no position on whether this Court should set a bond.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of January 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, ET
AL.

Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, ET AL.

Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

FLORIDA INTERVENORS' SUPPLEMENTAL FILING
CONCERNING AVAILABILITY OF ENVIRONMENTAL INFORMATION

Florida Intervenors respectfully submit this supplemental filing in response to the Court's request at the March 15, 2022 motions hearing.

I.     **Background**

In prior briefing, Florida Intervenors demonstrated that Plaintiffs lack standing based on *substantive* injuries as to all claims. *See* Dkt. 37 at 44-66; Dkt. 46 at 21-29. No concrete injury arises from the transfer of primary permitting authority from the U.S. Army Corps of Engineers ("Corps") to the State of Florida where EPA maintains oversight on a permit-by-permit basis. Dkt. 37 at 44-50; Dkt. 46 at 21-22. As a fallback position, Plaintiffs assert procedural injuries based on a *deprivation* of information otherwise made available to them under the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"), *see* Dkt. 43 at 67, and Florida Intervenors previously explained that this purported harm is an inadequate basis for standing. *See*

Dkt. 37 at 56-57; Dkt. 46 at 23-25.[1]  NEPA does not apply to EPA approvals of state 404 programs,

33 U.S.C. § 1371(c)(1), and state agencies are not subject to NEPA. 42 U.S.C. § 4332 ("[A]ll

agencies of the Federal Government shall..."). Nor does ESA Section 7 consultation requirements

apply to state agency actions. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall...").

       At the March 15, 2022 motions hearing, the Court requested, for purposes of evaluating

Plaintiffs' assertion of informational injury, a "side-by-side" comparison of environmental

information available to the public based on whether the Corps or Florida administers the Section

404 program in Florida. In other words, what specific environmental information was available to

Plaintiffs by virtue of NEPA review and ESA consultation when the Corps led the Section 404

program that is not available to them now under the Florida-led program?

       The requested side-by-side comparison is provided in Exhibit A ("Side-by-Side

Comparison of Environmental Information Available to Public under Corps-led 404 Program and

Florida-led 404 Program").  Although Plaintiffs claimed at the motions hearing that the information

produced by the two programs is "simply not comparable," all major categories of environmental

information available to Plaintiffs under the Corps-led program are also available to them in a

comparable manner after Florida's assumption of the Section 404 program. This includes the

essential contents of a NEPA Environmental Impact Statement ("EIS") and/or Environmental

Assessment ("EA"): purpose and need for a project, alternatives to the project, information about

the affected environment, environmental impacts (including cumulative effects, secondary effects,

etc.), mitigation measures, socioeconomic information, historic/cultural/tribal information, species

_____

[1] Plaintiffs' purported informational injury related to NEPA/ESA-type information is not a basis
for standing to assert Claims 8 and 9. The alleged lack of codification bears no nexus to this
purported informational injury, and no Florida 404 permits were processed during the
purportedly applicable 30-day waiting period.

and habitat information, coastal zone impacts, and a wide range of public interest information.[2]

Plaintiffs still have access to the environmental information that they had before. This is reinforced

by the fact that the Corps rarely prepares an EIS for Section 404 permitting actions, as shown

below, and EAs are, by law, only "brief" and "concise" documents that are not required to address

the multitude of issues covered by an EIS. Moreover, Plaintiffs have *greater access* to

environmental permitting information under Florida's program than under the Corps-led program.

To the extent there is any difference in environmental information made available to the public,

that difference here to Plaintiffs is hypothetical, hardly concrete and particularized, and certainly

not to the extent necessary to support Article III standing.

## II.      Standing for Informational Injuries

In *Spokeo, Inc. v. Robins*, the Supreme Court recently emphasized that all three elements

for standing – injury, causation, and redressability – must be met in an informational injury

context, including the existence of a "particularized" injury that "must affect the plaintiff in a

personal and individual way." 136 S. Ct. 1540, 1549 (2016). The informational injury "must

actually exist" and be "concrete." *Id.*  A "plaintiff must show that the government act performed

without the procedure in question will cause a distinct risk to a particularized interest of the

plaintiff." *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). The D.C. Circuit

has explained, in a NEPA context, that courts must be careful to not open the floodgates to

speculative claims of informational injury. *Foundation on Economic Trends v. Lyng*, 943 F.2d 79,

84-85 (D.C. Cir. 1991).

Plaintiffs must show that (1) they have been "deprived of information that, on its

interpretation, a statute requires the government or a third party to disclose to it, and (2) [they]

---

[2] At the motions hearing, counsel for Plaintiffs incorrectly argued that Florida's program does not provide information on cumulative impacts or alternatives.

suffer[], by being denied access to that information, the type of harm Congress sought to prevent

by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).[3] Courts

consider "whether the particular procedural violations alleged in this case entail a degree of risk

sufficient to meet the concreteness requirement." *Spokeo*, 136 S. Ct. at 1550. Plaintiffs must also

show that any purportedly missing information renders "essential" organizational activities to be

"infeasible." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C.Cir.1994)

("[I]nformational injury is justiciable where the information sought is 'essential to the injured

organization's activities ... [and] lack of the information will render those activities infeasible"); *see

also Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*, 78 F. Supp. 3d

208, 237 (D.D.C. 2015) (finding that plaintiffs failed to allege specific facts that would support

informational injury where lack of information did not "render its activities infeasible").

## III.     Corps NEPA & ESA Procedures

NEPA requires federal agencies to include in "every recommendation or report on

proposals for legislation and other major Federal actions significantly affecting the quality of the

human environment, a detailed statement by the responsible official on the environmental impact

of the proposed action." 42 U.S.C. § 4332(2)(C).   NEPA's "twin aims" are to obligate federal

agencies to "consider every significant aspect of the environmental impact of a proposed action,"

and to "ensure[] that the agency will inform the public that it," *i.e.*, the federal agency, "has indeed

considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co.

v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983). The White House Council on

Environmental Quality ("CEQ") promulgated regulations implementing NEPA, which are

---

[3] Here, Plaintiffs cannot show that they suffer "the type of harm Congress sought to prevent"
when Congress expressly wrote into law that the kinds of NEPA and ESA procedures they seek
are not required for state 404 permitting actions.

currently codified at 40 CFR Parts 1500 through 1508. *See* 85 Fed. Reg. 43,363 (July 16, 2020)

(final rule adopting the most recent changes to the CEQ NEPA regulations).[4] Additionally, the

Corps has adopted NEPA implementing regulations found at 33 C.F.R. Part 230.

      Though Plaintiffs seem to base their informational injury on the availability of voluminous

EISs, the Corps' NEPA regulations provide that "[m]ost permits will normally require only an EA,"

that is, an "Environmental Assessment" and not an EIS. 33 C.F.R. § 230.7(a). The Corps' NEPA

regulations further provide that an "EA is a *brief document* which provides sufficient information

to the district commander on potential environmental effects of the proposed action and, if

appropriate, its alternatives, for determining whether to prepare an EIS or a FONSI." *Id.* at §

230.10(a) (emphasis added). "[N]o special format is required." *Id*. at § 230.10(b). The EA "should

include a brief discussion of [1] the need for the proposed action, [2] or appropriate alternatives if

there are unresolved conflicts concerning alternative uses of available resources, [3] of the

environmental impacts of the proposed action and [4] alternatives and [5] a list of the agencies,

interested groups and the public consulted. The document is to be concise for meaningful review

and decision." *Id*. The Corps' requirements for an EIS, where required, refer back to the CEQ

NEPA regulations.  *Id*. at § 230.13.

      In reality, few EISs are issued in Florida by the Corps for Section 404 individual

permitting purposes alone. According to a report by the Government Accountability Office (GAO),

"CEQ estimates that about 95 percent of NEPA analyses are [categorical exclusions, which do not

provide the information Plaintiffs seek], less than 5 percent are EAs, and less than 1 percent are

EISs." GAO, NEPA: Little Information Exists on NEPA Analyses, GAO-14-369, at 7 (April 2014),

available at https://www.gao.gov/assets/gao-14-369.pdf.  GAO reported that the U.S. Forest

---

[4] Though CEQ recently proposed new changes to its NEPA regulations, *see* 86 Fed. Reg. 55,757
(Oct. 7, 2021), those changes are not yet final or in effect.

Service, the U.S. Bureau of Land Management, the Federal Highway Authority, and the Corps of

Engineers "are generally the most frequent producers" of EISs, though the GAO data showed that

the Corps only issued between 33 and 43 EISs *annually for the entire Corps mission across the*

*entire nation* from 2008 to 2012. *Id*. at 9-10 (Table 2). Section 404 permits are a fraction of the

nationwide work conducted by the Corps that might trigger NEPA obligations. Situations requiring

a Corps EIS often include actions involving coastal ports and waterways (a central part of the

Corps' mission) that would still require Corps' review and approval (as well as separate Corps

permits under various other statutes, such as Section 10 of the Rivers and Harbors Act, which has

not been delegated to Florida). Section 404 permits for coastal projects have been retained by the

Corps (as non-assumable waters).

  While the Corps has stated that most Section 404 permits do not require an EIS and only

require an EA, many projects that do, in fact, trigger the need for an EIS tend to be large-scale

projects, such as major energy development projects, large highway construction projects, and

other similar activities. In those contexts, project proponents usually need a variety of federal

approvals, not just a Section 404 permit. A project that now requires a Florida-issued Section 404

permit *that also triggers another federal approval requirement* would still result in a federal NEPA

review, notwithstanding Florida's 404 program approval. Plaintiffs ignore this reality. For example,

federal funding for a large project independently triggers NEPA obligations irrespective of Section

404 procedures. Likewise, projects that involve federal lands may require federal easements,

rights-of-way, or other federal approvals, thereby triggering NEPA reviews independent of Section

404 permitting. A review of the projects referenced by Plaintiffs in their complaint and supporting

declarations illustrate why this point is important for analyzing standing here. For instance, the two

Burnett Oil projects referenced by Plaintiffs (Nobles Grade and Tamiami Prospect) are subject to

NEPA review for reasons independent of Section 404 permitting (namely, proposed energy production on federal lands).[5] Likewise, the Northern District Wastewater Treatment Plant in Miami-Dade County, which Plaintiffs raised as a basis for their standing in this case, *see* Dkt. 31 at 31-32, was awarded over $400 million in federal loan guarantees under the "WIFIA" program, which separately triggers NEPA obligations independent of Section 404 permitting.[6] NEPA review occurs for these projects (and other projects that require a Section 404 permit and some other kind of federal approval) regardless of Florida's Section 404 program.

Plaintiffs assume whether an EIS is published for Section 404 projects is directly related to whether Florida or the Corps administers the Section 404 program. That is incorrect. CEQ provides access to an EPA-managed database of all EIS documents issued by federal agencies since 1987. https://ceq.doe.gov/get-involved/eis_filings.html. To provide an indication of the kinds of projects that triggered an EIS requirement pre- and post-assumption, counsel for Florida Intervenors ran a search of this database for EIS notices issued for the Corps of Engineers between January 1, 2019 to March 18, 2022 (the final two years of the Corps-led 404 program in Florida and the 15 months since Florida's assumption). The results of that search are provided in Exhibit B, which shows 11 distinct projects with Corps' EISs in that timeframe – *none* of which would be exempt from NEPA

---

[5] Adding to the speculative nature of Plaintiffs' assertion here, both of these permit applications were withdrawn by the permit applicants. Of the 7 projects raised by Plaintiffs as supporting their standing in this case, 4 projects were withdrawn by the project applicants after Florida requested additional information and other concerns were raised. Another small project, referred to by Plaintiffs as the Port 1850 project, involves approximately 5 acres of wetlands impacts, remains a pending application with Florida DEP, and under either a Corps-led or Florida-led 404 program, would not be expected to trigger obligations under NEPA, again reinforcing the speculative nature of Plaintiffs' informational injury claims.

[6] https://www.miamidade.gov/releases/2021-11-04-wasd-wifia-loan-announcement.asp. EPA's WIFIA Federal Compliance Requirements provide that a "proposed WIFIA project must be assessed for its impact on the environment under the guidelines set forth by NEPA." *See* EPA, *WIFIA Federal Compliance Requirements*, available at https://www.epa.gov/wifia/wifia-federal-compliance-requirements.

review now that Florida administers the 404 program: the Lake Okeechobee Water Restoration

Project; the Port Everglades Harbor Project; the Florida Keys Coastal Storm Risk Study; Coastal

Storm Risk Management Feasibility Studies (for Collier County and Miami-Dade County); the

Combined Operational Plan (for Everglades National Park); Loxahatchee River Watershed

Restoration Project; Central and Southern Florida Everglades Agricultural Area Project; Gulf Coast

Parkway Project (new 30-mile highway crossing the Gulf Intracoastal Waterway); East Lake

Tohopekaliga Drawdown Project (water control manual for reservoir classified as retained waters

that remains subject to Corps 404 regulatory purview); and Eagle LNG Partners Jacksonville

Project (FERC process). Setting aside that Plaintiffs have not even relied on these particular

projects for standing, each triggers NEPA review independent of Florida 404 assumption. In other

words, NEPA review for these projects would be unaffected by Florida's assumption of the Section

404 Program. The same is true for a host of other projects.

Likewise, under Section 7 of the ESA, the Corps consults with the USFWS and NMFS

concerning impacts to listed species and their designated critical habitat. 16 U.S.C. § 1536(a)(2).

Section 7 consultation, which only applies to federal actions, requires the Corps to "insure that any

action authorized, funded, or carried out by [the Corps] is not likely to jeopardize the continued

existence of any endangered species or threatened species or result in the destruction or adverse

modification of [designated critical] habitat…" *Id.* As part of this process, *if a particular project is*

*likely to adversely affect listed species or designated critical habitat* and the project is otherwise

moving forward through the process (*i.e.*, the project is not rejected for other reasons or otherwise

withdrawn or modified), the Corps engages in consultation under ESA Section 7, including

preparation of a biological assessment, and in turn, the U.S. Fish and Wildlife Service and/or the

National Marine Fisheries Service[7] prepare a biological opinion. These ESA-based procedures, depending upon the nature of a particular project, provide the public with information about a project's potential impacts to listed species and habitat, including the possibility of incidental take of such species/habitat and any reasonable and prudent measures that may be necessary or appropriate to minimize such impacts. *See* 16 U.S.C. § 1536(a)-(c).

## IV.   Environmental Information Available to Plaintiffs under the Florida-led 404 Program

Plaintiffs (and others in the public) receive the same or similar kinds of environmental information with approval of the Florida Section 404 Program, and they can benefit from even *greater access* to permitting records and environmental information under the Florida-led program. The side-by-side comparison in Exhibit A illustrates these points in detail. Significant environmental information is made available to the public under the combined Florida Environmental Resource Permitting (ERP) Program and the Florida Section 404 Program, along with other state laws and regulations triggered by Florida's review of wetlands permits.[8] This is shown by a review of the relevant Florida Statutes, Florida Administrative Code provisions, the Florida ERP Handbook, the Florida 404 Handbook, the Memoranda of Agreement involving the State of Florida, EPA, the Corps, and other federal and state agencies, and various other

---

[7] Because the Corps retained jurisdiction over coastal waters in Florida, projects with impacts to marine species are retained by the Corps for review and processing. It is conjecture on the part of Plaintiffs to assume that particular projects that impact them would involve marine species for which the Corps would not be involved to process the permit. In any event, the species' reviews conducted under the Florida-led Section 404 program fairly match (or even exceed) the scope of reviews provided under the Corps-led program.

[8] Florida's 404 program now employs over 130 certified wetlands evaluators to process Section 404 permits.

programmatic materials published by the State of Florida.[9] Likewise, under the Florida Endangered

Species Act, the terms of the Memorandum of Agreement between Florida and the U.S. Fish &

Wildlife Service and Florida Fish & Wildlife Conservation Commission, as well as the

Programmatic Biological Opinion issued in conjunction with EPA's approval of Florida's 404

program (including the Technical Assistance Process utilized by Florida DEP, USFWS, FWC, and

NMFS), the same information related to species reviews and impacts are prepared and made

available to the public.

Plaintiffs repeatedly oversimplify and mischaracterize the role of the Programmatic

Biological Opinion[10] and related documents prepared in conjunction with EPA's approval of

Florida's program. The Biological Opinion, along with the agreements between the federal and state

agencies that are incorporated into the Biological Opinion, establishes a framework for coordinating

species and habitat reviews under the Florida 404 program in a manner that aligns with existing

Section 7 consultation processes. The USFWS-FDEP-Florida FWC Memorandum of Understanding

(MOU)[11] is incorporated into the Biological Opinion and describes how this federal-state

cooperative process will ensure comprehensive reviews of potential impacts to species and habitat.

Notably, with regard to public information, the MOU expressly states that this "technical assistance

with the USFWS will be accomplished *prior to the Public Notice*, when possible. The Public Notice

---

[9] The Administrative Record for this case includes copies of these documents. The Court also
may be aided by reviewing the 155-page spreadsheet in the Administrative Record showing how
the Florida ERP and Florida 404 Programs compare with federal requirements. *See*
EPA-HQ-OW-2018-0640-0016-A3, available online at https://downloads.regulations.gov/EPA-
HQ-OW-2018-0640-0016/attachment_3.pdf.

[10] The Biological Opinion is available in the Administrative Record (EPA-HQ-OW-2018-0640-
00642), and is available on-line at https://www.regulations.gov/document?D=EPA-HQ-OW-
2018-0640-0642.

[11] The Memorandum of Understanding is available in the Administrative Record at EPA-HQ-
OW-2018-0640-0623 (also available on-line at https://www.regulations.gov/document?D=EPA-
HQ-OW-2018-0640-0623).

will include the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts."  *See* MOU at pages 5-6.  The MOU further explains that, after public notice, additional information and public concerns will be reviewed and addressed and made part of the file and "recommended conditions" will be "incorporated into the [state 404] permit." *Id.*

Taken together, even where the State of Florida administers the Section 404 Program, Plaintiffs are not deprived of relevant NEPA/ESA-type information concerning the following (at a minimum):

- purpose and need for a project,
- alternatives to the project,
- affected environment,
- environmental impacts (including cumulative effects),
- mitigation measures,
- socioeconomic information,
- historic/cultural/tribal information,
- comprehensive review of species and habitat information and impacts,
- coastal zone impacts, and
- public interest factors.

Plaintiffs still have access to the same environmental information that they had before, and in some instances, even more information.

## V.     Florida's "Sunshine" Laws & Publicly-Accessible Permitting Databases

When evaluating Plaintiffs' claims of injury based on a *deprivation* of information, this Court should also consider Plaintiffs' *right of access* to environmental information as well. Importantly, Florida's Sunshine Laws (found at Chapter 119, Florida Statutes) provide broader access to governmental records and information than the federal corollary statute, the Freedom of Information Act, 5 U.S.C. § 552.  *See* Fla. Const. Article I, § 24 (establishing constitutional right of access to public records in Florida); Fla. Stat. 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied by any person desiring to do so, at

any reasonable time, under reasonable conditions, and under supervision by the custodian of the public records."); Fla. Stat. § 119.011(12) (broadly defining a "public record"). This is not a hypothetical distinction in the ESA context, as the U.S. Supreme Court ruled just last year in a case brought by environmental organizations seeking federal endangered species information that federal FOIA blocks disclosure of deliberative process materials, including draft biological opinions. *See U.S. Fish & Wildlife Service v. Sierra Club*, 141 S. Ct. 777, 782 (2021) (holding that "[t]he deliberative process privilege protects from disclosure under [federal] FOIA in-house draft biological opinions that are both predecisional and deliberative, even if the drafts reflect the agencies' last views about a proposal"). Florida's Sunshine laws do not impose the same limitations on public access to information.

Likewise, Florida provides *real-time access* to state permit records related to Section 404 permit applications via publicly accessible DEP websites. Written communications to or from state officials (including permitting staff) regarding state business are available to the public. Records and information is readily available at no cost via one of DEP's online resources, including:

- Florida's "Oculus" System, which is a web-based electronic document management system providing access to public records associated with DEP permitted facilities and activities. Documents in Oculus are filed under a specific DEP program and facility. The public can access this system and search for all records under the Florida 404 Program, ERP Program, and various other Florida environmental programs. https://depedms.dep.state.fl.us/Oculus/servlet/login

- DEP Information Portal, which provides extensive information about projects, including permit application materials, public comments, agency correspondence, and all other associated records.

https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal

In most respects, these databases provide more information on a real-time basis than is available from the Corps.[12]

Additionally, just as environmental groups gain access to broader information under Florida's Sunshine laws, Florida administrative law gives them greater opportunities to use that information to advance their interests in permit challenges.  Florida law provides for a de novo permit hearing *before* a Florida 404 permit becomes effective, which provides affected parties with an opportunity to gain additional information (including via depositions and interrogatories) and to ensure consideration of that information in the hearing record. *See* Fla. Stat. § 120.57(1)(b). In that regard, environmental groups can build the administrative record in a de novo hearing, with testimony, presentation of experts, and questions directed toward state environmental officials and permit writers, something that is not available to them under federal procedures.

## VI.   Plaintiffs Lack Standing Based on Deprivation of Environmental Information

In light of this informational comparison, Plaintiffs clearly lack standing. The D.C. Circuit recently reiterated the proper framework for evaluating standing based on informational injury. *See Center for Biological Diversity v. Haaland*, 849 Fed. Appx. 2, *3 (D.C. Cir. 2021) (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)). A "procedural injury ... must be tethered to some concrete interest adversely affected by the procedural deprivation." *Id.* (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).  The D.C. Circuit also cautioned against allowing litigants to "simply reframe" injuries in terms of "informational loss," as that tactic "could make 'an end run around the Supreme Court's procedural injury doctrine…'" *Id.* (quoting *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th

---

[12] The Corps has an on-line permit database searching system available at https://permits.ops.usace.army.mil/orm-public#.

Cir. 2010)). A plaintiff has the obligation to give an "explanation *pinpointing* what information it has lost…" *Id.* at *4 (finding that plaintiff failed to show that it suffered informational injury) (emphasis added). Plaintiffs have not done so here. Generalized claims of "missing" information are not enough.

Plaintiffs have not even asserted a NEPA violation in their complaint and have brought no direct NEPA-based challenge here. This further distinguishes the current case from others where the deprivation of information justified standing. For example, in *Spokeo*, 136 S. Ct. at 1549-50, the Supreme Court cited two other informational injury cases where the Court found standing: *Federal Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998), concerning access by voters to FEC data, and *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989), concerning access to information under the Federal Advisory Committee Act. Unlike those cases, which involved direct deprivations of information based on the statutory requirement directly at issue in the case, none of Plaintiffs' claims here assert a violation of NEPA as such; to the contrary, Plaintiffs assert a kind of indirect deprivation of information – not from the statutory program at issue in the direct challenge (Section 404 of the Clean Water Act), but from other statutory programs (particularly, NEPA), which Congress has already expressly deemed inapplicable to state-administered 404 programs.

Finally, Plaintiffs' purported informational injury is not redressable. Even if the Court *could* grant a vacatur of the program (which Florida Intervenors respectfully suggest it cannot, *see* Dkt. 46 at 25-29), the purported informational injury from a lack of NEPA review and ESA consultation is not redressable where federal statutes do not impose those obligations.

<u>CONCLUSION</u>

Plaintiffs are not deprived of specific meaningful environmental information in a way that satisfies the Supreme Court's test for informational standing. Plaintiffs' lawsuit should be dismissed for lack of standing.

Dated:  March 18, 2022                              Respectfully submitted,
                                                    BAKER BOTTS L.L.P.


                                                    <u>/s/ Jeffrey H. Wood</u>
                                                    Jeffrey H. Wood (D.C. Bar No. 1024647)
                                                    700 K Street, NW
                                                    Washington, D.C. 20001
                                                    Phone: (202) 639-7700
                                                    jeff.wood@bakerbotts.com

                                                    Lily N. Chinn (DC Bar No. 979919)
                                                    101 California Street
                                                    San Francisco, CA 94111
                                                    Phone: (415) 291-6200
                                                    lily.chinn@bakerbotts.com

                                                    Aaron M. Streett (TX Bar No. 24037561)
                                                    Harrison Reback (TX Bar No. 24012897)
                                                    (*pro hac vice*)
                                                    910 Louisiana Street
                                                    Houston, TX 77002-4995
                                                    Phone: (713) 229-1234
                                                    aaron.streett@bakerbotts.com
                                                    harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of March 2022, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

/s/ Jeffrey H. Wood
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

# EXHIBIT T

Exhibit A

**Exhibit A**

**Side-by-Side Comparison of Environmental Information
Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| Environmental Information Available under Corps-led 404 Program[i] | Environmental Information Available under Florida 404 Program<br>(*All information described below is publicly available*) |
|---|---|
| Purpose & Need for the Project (NEPA) | The purpose and need for a project are described in the permit documents and considered as part of the "public interest" review and environmental conditions for issuance of permits.  *See* Fla. Stat. § 373.414(1)(a); Fla. Admin. Code § 62-330.301; Florida ERP Handbook[ii] §§ 10.1.1, 10.2.1, 10.2.3. Florida ERP Handbook § 10.2.1 explains that DEP evaluates the purpose of the project in light of whether impacts can be reduced or eliminated. DEP application forms for ERP/404 permits (General Permit Form 62-330.402(1), section K; individual permit application form 62-330.060, section I) also reference project purpose information. *See also* Fla. Admin. Code ch. 62-331 and the Florida 404 Handbook[iii] for additional discussion related to project purpose and need. This information is publicly available. |
| Project Alternatives (NEPA) | Project alternatives are considered and evaluated as part of the Florida 404/ERP procedures. *See* Fla. Admin. Code § 62-331.053; Florida 404 Handbook § 5.2, § 8.3.1. This includes consideration of "no action alternatives."  *See* Florida 404 Handbook at § 8.3.1.  A detailed discussion of Florida's consideration of alternatives is provided in Appendix C of the Florida 404 Handbook Appendix C ("Guidance for Conducting Alternatives Analysis"), which explains that a 404 "permit cannot be issued if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, as long as the alternative does not have other significant adverse environmental consequences. The level of detail in an alternatives analysis shall be commensurate with the scale of the adverse environmental effects of the project. Analysis of projects proposing greater adverse environmental effects shall be more detailed and explore a wider range of alternatives than projects proposing lesser effects."  In this analysis, Florida considers the "purpose and need" for the project proposal; identifies and evaluates "alternatives" that could meet the overall project purpose; analyze practicability and availability considerations; and identify the "least environmentally damaging practicable alternative," which "must be selected." *Id.* Florida also identifies the "environmental impacts for each remaining practicable alternate site." *Id.* This information is publicly available. |

| Affected Environment (NEPA)<br><br>*This is included in the requirements for an EIS but is not a requirement for an EA prepared by the Corps* (33 CFR 230.10). | The Florida ERP and 404 permit application and review process obtains information about the project location and surrounding environment including affected waterbodies. *See, e.g.*, *Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands* (EPA-HQ-OW-2018-0640-0012). Section C of the Application (EPA-HQ-OW-2018-0640-0012-A4), for example, requires descriptions of the wetlands or other surface waters impacted by the project, along with aerials, maps, and other documents and materials to describe the affected environment. Section I of the Application requires, among other things, a description of "any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity," including "the name(s) of those listed species or critical habitat areas," description of "any actions proposed to be taken to avoid or minimize adverse effects to listed species" and "any other available data and information necessary for purposes of reviewing impacts to state and federal listed species."  Section I also requires the application to show the "location and extent of all wetlands and other surface waters, delineated in accordance with Chapter 62-340, F.A.C. The applicant must label all special aquatic sites (e.g., wetlands, sanctuaries and refuges, mudflats, vegetated shallows, and riffle and pool complexes). Each type of boundary (for example, ordinary high water line, mean high water line, wetlands, or other special aquatic sites) must be clearly annotated and/or symbolized to ensure they are differentiable on the map. Unless indicated below, all wetlands and other surface waters on the site, as delineated in accordance with Chapter 62-340, F.A.C., that will be impacted by the proposed activities will be evaluated for permitting purposes under Section 404 of the Clean Water Act."  Moreover, Florida evaluates project impacts on a "watershed" basis. *See* Florida 404 Handbook 2.0(52) (defining "watershed plan" as a plan that "addresses aquatic resource conditions in the watershed, multiple stakeholder interests, and land uses"). Additional information about the environment affected by the project is described in the Florida ERP and 404 Handbooks. This information is publicly available. |
| Environmental impacts of proposed action (NEPA) | Florida Statutes Section 373.414(1) requires consideration of environmental impacts. *See also* Fla. Admin. Code § FAC 62-330.301; Florida Environmental Resource Permit Applicant's Handbook Sections 10.1.1 & 10.2.3; Florida 404 Handbook Sections 8.1(a) & 8.2(i). DEP must weigh the environmental impacts as part of the review of Florida 404 permits. Florida considers direct impacts, cumulative effects, secondary effects, and other similar issues. *See* Florida 404 Handbook § 8.3.5 and § 8.3.6. Florida ERP Handbook Section 10 describes all resources that should be evaluated and how the factors should be weighed.  *See also* Fla. Admin. Code 331.060(1)(f), the Florida ERP Handbook, and the Florida 404 Handbook for additional information. This information is publicly available. |

| Mitigation Measures (NEPA) | Florida considers and prepares information concerning mitigation measures as part of the Florida 404 Program. *See* Fla. Stat. 373.414 (discussing mitigation measures for wetlands permitting); *see generally* Fla. Admin. Code ch. 62-330.  The Florida ERP Handbook (including Section 10.3) and the Florida 404 Handbook (Section 8.5 – 8.5.6.3) provide additional details on mitigation measures under the ERP/404 program. *See also* Fla. Admin. Code 62-331.130 & .140.  Importantly, as explained in the Florida 404 Handbook Section 8.3.3: "[m]itigation for State 404 Program permits is generally evaluated in accordance with Volume I, section 10.3, like ERP. However, in addition to those requirements, the federal mitigation hierarchy described in section 8.5.1 of this Handbook, shall apply to any mitigation for State 404 Program permits." Mitigation is also discussed extensively in the project application documents (including, for example, in Section C of the ERP/404 Application (EPA-HQ-OW-2018-0640-0012-A4)). This information is publicly available. |
| --- | --- |
| Socioeconomic Information (NEPA) | Florida considers public health, safety, or welfare or the property of others as part of the "public interest" review.  *See* Fla. Stat. 373.414(1)(a)1. Moreover, socioeconomic and demographic information related to projects remains publicly available through a variety of sources, including the Florida Office of Economic & Demographic Research[iv] (which produces demographic-related data and products, including by county/municipality/age/race/sex/national origin) and the U.S. Census Bureau[v] (which publishes a wide range of demographic and socioeconomic information about all project locations, including population data, income and poverty statistics, education and employment metrics, housing, health, family, race and ethnicity, and other similar data used for purposes of considering effects on populations in and around project locations). Separately, Plaintiffs continue to have access to a variety of publicly available databases specific to Environmental Justice, including EPA's Environmental Justice mapping and screening system known as "EJScreen,"[vi] as well as the CEQ's Climate and Economic Justice Screening Tool.[vii] This information is publicly available. |

| | |
|---|---|
| Historic/cultural/tribal (NEPA/NHPA) | Florida engages in consultation regarding historic, archeological, cultural, and tribal resources as part of the Florida ERP and 404 programs. As detailed in the Florida ERP Handbook at Section 10.2.3.6, Florida considers whether the regulated activity will adversely affect or will enhance significant historical and archaeological resources. The applicant must map the location of and characterize the significance of any known historical or archaeological resources that may be affected by the regulated activity located in, on or over wetlands or other surface waters." DEP also coordinates with the State Historic Preservation Office and other relevant federal and state agencies.  The applicant will be required to perform an archaeological survey and to develop and implement a plan as necessary to demarcate and protect the significant historical or archaeological resources, if such resources are reasonably expected to be impacted by the regulated activity.  DEP and the State Historic Preservation Office have entered into an Operating Agreement (available in the Administrative Record at EPA-HQ-OW-2018-0640-0016-A1), whereby DEP consults with the SHPO and the Indian Tribes. This Operating Agreement was approved by the Federal Historic Preservation Office as part of the federal consultation process, and was approved by EPA, integrating it as part of the 404 program.  For individual permits, DEP shall send a copy of the public notice required by Rule 62-331.060, F.A.C., to EPA for review and comment. Additional information about DEP consideration of historic, cultural, and tribal issues under the Florida ERP and 404 Programs is available at: Florida 404 Handbook Section 5.2.2 and 5.2.6; Fla. Admin. Code 62-331.052(3)(b), .060(2), .110(7), .200(3)(g) – (i), .201(t) – (v); and the Programmatic Agreement with EPA (EPA-HQ-OW-2018-0640-0639) providing for elevation of issues of concern under Section 106 of the NHPA. This information is publicly available. |

| | |
|---|---|
| Protected Species (NEPA, ESA) | The Florida ERP and 404 Programs require consideration of impacts to listed species and habitat. *See* Fla. Stat. 373.414(1)(a)2; ERP Handbook Section 10.2.2; Fla. Admin. Code 62-331.053(1)(4) and .200(3)(c); Florida 404 Handbook s. 5.2.3.  For purposes of the Florida 404 Program, review and consideration of impacts to listed species and habitat is fully described in the State 404 Program Programmatic Biological Opinion issued by the U.S. Fish & Wildlife Service in conjunction with EPA's approval of Florida's program, as well as in the Memorandum of Agreement between DEP, the Florida Fish & Wildlife Commission, and USFWS.  The Florida 404 Handbook 1.3.3 also explains: "Compliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Services (NMFS) for permits reviewed under the State 404 Program." Section 5.2.3 of the Florida 404 Handbook also explains: "The Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species. Consultation with, or technical assistance by, FWC, FWS, or NMFS shall be required when DEP determines that the project may have the potential to affect listed species. To determine whether a project may have the potential to affect listed species, DEP may use available resources such as scientific literature, species keys, and habitat maps, or it may observe signs that the site is used by listed species during the site visit. If DEP determines that a listed species may be affected, DEP shall seek consultation with or technical assistance by FWC, FWS, and NMFS, as applicable, regarding the proposed project. DEP shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat.   For individual permits, DEP shall send a copy of the public notice required by Rule 62-331.060, F.A.C., to EPA for review and comment. If the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, DEP shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C." Additional details are provided in the documents referenced above. This information is publicly available. |
| Coastal Zone (NEPA/CZM) | Within Florida's 404 program, compliance with the Coastal Zone Management Program is required for issuance of a permit. *See* Rule 62-331.070(2), F.A.C.  Florida's coastal zone includes the area encompassed by the state's 67 counties and its territorial seas.  The Florida Coastal Zone Management Program consists of a network of 24 Florida statute chapters administered by nine state agencies and five water management districts.  Coastal zone impacts are considered consistent with Florida ERP Handbook 1.3.1.1. *See also* Fla. Admin. Code 62-331.070. This information is publicly available. |

| CWA 404(b)(1) Guidelines<br><br>*Not a requirement under NEPA but included here because Plaintiffs referenced these guidelines at the March 15, 2022 hearing* | Florida reviews and considers comparable information to the information considered by the Corps pursuant to the Corps' Section 404(b)(1) Guidelines, which provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." For a comprehensive (155-page) comparison of the Corps 404 Program requirements and the Florida ERP and 404 Programs, please refer to the comparison table found in the Administrative Record at EPA-HQ-OW-2018-0640-0016-A3, available at https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0016. In particular, pages 37 to 39 of the comparison spreadsheet identify Florida regulations that align with the requirements of the federal 404(b)(1) guidelines. Florida Admin. Code 62-331.052 and 62-331.053 also provide requirements comparable to the federal 404(b)(1) guidelines. This information is publicly available. |
|---|---|
| Public Interest Factors (33 CFR 320.4(a)) | Florida evaluates "public interest" factors in evaluating 404 permits. *See* Fla. Stat. § 373.414. This includes, among other things, effects to the public health, safety, or welfare or the property of others; effects to the conservation of fish and wildlife, including endangered or threatened species, or their habitats; effects to navigation or the flow of water or cause harmful erosion or shoaling; effects to the fishing or recreational values or marine productivity in the vicinity of the activity; temporary or permanent nature of a project; effects on significant historical and archaeological resources; and the current condition and relative value of functions being performed by areas affected by the proposed activity. *Id.* § 373.414(a). Public interest information is also obtained as part of the ERP/404 Applications (see, e.g., Section C of the Application). The public interest review is also discussed extensively in the Florida ERP Handbook at Section 10.2.3. This information is publicly available. |
| Agencies and Persons Consulted (NEPA) | Florida provides information about all federal, state, and local agencies and other persons consulted or who otherwise comment on Section 404 permit applications. DEP is required to send public notice to the applicant, any other agency with jurisdiction over the activity or project site, adjoining property owners, any State or tribe who's waters may be affected, and all persons who have requested copies of public notices. Fla. Admin. Code Ann. r. 62-331.060. This information is publicly available. |

---

[i] The Corps' NEPA regulations provide that "[m]ost permits will normally require only an EA," not an EIS, 33 § C.F.R. 230.7(a), and that an "EA is a brief document which provides sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a [Finding of No Significant Impact, or FONSI]." 33 C.F.R. § 230.10(a). An EA must "include a *brief discussion* of the need for the proposed action, or appropriate alternatives if there are unresolved conflicts

concerning alternative uses of available resources, of the environmental impacts of the proposed action and alternatives and a list of the agencies, interested groups and the public consulted." *Id.* at § 230.10(b) (emphasis added).

ii The Florida DEP's Environmental Resource Permit Applicant's Handbook is available in the Administrative Record at EPA-HQ-OW-2018-0640-0002-A1 through EPA-HQ-OW-2018-0640-0002-A4. Copies are also available for public review on-line at https://floridadep.gov/water/water/content/water-resource-management-rules.

iii DEP's State 404 Program Applicant's Handbook is available in the Administrative Record at EPA-HQ-OW-2018-0640-0002-A20. Copies are also available for public review on-line at https://floridadep.gov/water/water/content/water-resource-management-rules.

iv http://edr.state.fl.us/content/population-demographics/data/index-floridaproducts.cfm.

v https://www.census.gov/data.html

vi https://www.epa.gov/ejscreen

vii https://screeningtool.geoplatform.gov/en/

# EXHIBIT U

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.

          Plaintiffs,

      v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.

          Defendants,

STATE OF FLORIDA, ET AL.

          Intervenors.

**CASE NO.** 1:21-cv-00119 (RDM)

_____

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY
JUDGMENT**

_____

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................5

    I.    Plaintiffs' Claims Are Not Justiciable. .................................................. 5

        A.    Informational Injury Does Not Provide Standing Here. .............................6

        B.    Plaintiffs Lack Standing to Challenge EPA's Early Finding that Florida's Application Was "Complete." ...................................................12

        C.    Plaintiffs' Attempt to Show Standing Based on "Restrictive Access" to Florida Courts Fails. .................................................12

        D.    Standing Based on "Aesthetic and Recreational Interests" Also Fails. ............................................................................................16

        E.    Plaintiffs Lack Standing to Challenge Florida's Program on the Basis of Criminal Enforcement or Statute of Limitations. ........................17

    II.    Several of Plaintiffs' Claims Are Not Ripe. ........................................ 20

        A.    Take Liability Claims Are Not Ripe For Review (Claims 3 and 4). .........20

        B.    Plaintiffs Challenge to the "Retained Waters" List Is Not Ripe (Claim 7). ........................................................................................23

        C.    Plaintiffs' NMFS-Based Claims Are Not Ripe (Claims 5, 11, and 12). ..............................................................................................25

CONCLUSION....................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967) ................................................................................................20

*Am. Legion v. Am. Humanist Ass'n*,
   139 S. Ct. 2067 (2019) .............................................................................................5

*Association of American Physicians & Surgeons, Inc. v. Sebelius*,
   901 F. Supp. 2d 19 (D.D.C. 2012) .........................................................................10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971), *abrogated on other grounds,Califano v. Sanders*,
   430 U.S. 99 (1977) ...............................................................................................2, 17

*Cooling Waters v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ......................................................................................21

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ................................................................................................16

*Clean Wisconsin v. EPA*,
   964 F.3d 1145 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) ......4

*Coal. to Save Menominee River Inc. v. EPA*,
   423 F. Supp. 3d 560 (E.D. Wis. 2019) ...................................................................24

*Crow Creek Sioux Tribe v. Brownlee*,
   331 F.3d 912 (D.C. Cir. 2003) ................................................................................17

*Ctr. for Biological Diversity v. Zinke*,
   369 F. Supp. 3d 164 (D.D.C. 2019) ....................................................................6, 10

*Dallas Safari Club v. Bernhardt*,
   518 F. Supp. 3d 535 (D.D.C. 2021) ........................................................................14

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ..................................................................................................5

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
   785 F.3d 1 (D.C. Cir. 2015) ......................................................................................4

*Gen. Elec. Co. v. EPA*,
   360 F.3d 188 (D.C. Cir. 2004) ................................................................................14

ii

*Lake Brooklyn Civic Ass'n, Inc. v. St. John's River Water Mgmt. Dist.*,
  1993 WL 943540 (Fla. Div. Admin. Hrgs. 1993) ................................................................14

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .........................................................................................................5

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................................20

*Menominee Indian Tribe of Wis. v. EPA*,
  947 F.2d 1065 (7th Cir. 2020) .......................................................................................24

*Mississippi v. EPA*,
  744 F.3d 1334 (D.C. Cir. 2013) .....................................................................................13

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ..........................................................................................19

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
  489 F.3d 1221 (D.C. Cir. 2007) .....................................................................................14

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
  734 F.3d 1115 (D.C. Cir. 2013) .....................................................................................13

*New Hanover Twp. v U.S. Army Corps of Eng'rs*,
  992 F.2d 470 (3d Cir. 1993) ..........................................................................................22

*Oceana, Inc. v. Evans*,
  384 F. Supp. 2d 203 (D.D.C. 2005) ...............................................................................24

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) ..................................................................................................20, 24

*Paul Still v. New River Solid Waste Ass'n & FDEP*,
  2001 WL 1917255 (Fla. Div. Admin. Hrgs. 2001) .........................................................14

*Rapanos v. United States*,
  547 U.S. 715 (2006) .........................................................................................................1

*Sackett v. EPA*,
  598 U.S. 590 (2023) ....................................................................................................1, 11

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ......................................................................................3, 5

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .........................................................................................................5

*Sugar Cane Growers Cooperative of Fla. v. Veneman*,
 289 F.3d 89 (D.C. Cir. 2002) ............................................................12

*Texas v. United States*,
 523 U.S. 295 (1998) ..........................................................................20

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021) ........................................................5, 7, 8, 10

*Waterkeeper Alliance, Inc. v. Regan*,
 41 F.4th 654 (D.C. Cir. 2022) ...............................................6, 7, 8

*WildEarth Guardians v. Jewell*,
 783 F.3d 298 (D.C. Cir. 2013) ..........................................................19

*Wyoming Outdoor Council v. Dombeck*,
 148 F. Supp. 2d 1 (D.D.C. 2001) ................................................21, 22

## STATUTES & CODES

16 U.S.C. § 1540(g) ...............................................................................23

33 U.S.C. § 1319 ....................................................................................18

33 U.S.C. § 1344(k) ...............................................................................18

33 U.S.C. § 1344(n) ...............................................................................18

Public Law No. 118-5, 137 Stat. 10, 41 (2023) .....................................11

Fla. Stat. § 379.2291 ...............................................................................2

Fla. Stat. § 403.412(2)(f) .......................................................................14

Fla.Stat. § 403.412(7) ............................................................................15

## OTHER AUTHORITIES

A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17
 Suffolk U. L. Rev. 881, 882 (1983) ...................................................5

Dep't of Justice, *Justice Manual*, available at https://www.justice.gov/jm/jm-5-12000-
 environmental-enforcement-section#5-12.523 (last visited July 7, 2023)................................19

Fla. Const. Art. V, § 21 ..........................................................................13

## INTRODUCTION

The State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively, "Florida Intervenors") concur with Federal Defendants that Plaintiffs' challenge lacks merit. Consistent with Section 404 of the Clean Water Act (CWA) and its cooperative federalism design, the U.S. Environmental Protection Agency (EPA) properly approved Florida's Section 404 Program almost three years ago. Today, FDEP has primary responsibility for administering the Section 404 Program in assumable waters within Florida, with EPA consistently reviewing FDEP's program as well as reviewing individual permits. In the implementation of the program, FDEP, the State's five water management districts, and the Florida Fish and Wildlife Conservation Commission (FWC) cooperate and coordinate with EPA, the U.S. Army Corps of Engineers (Corps), and the U.S. Fish and Wildlife Service (FWS) to ensure that state-assumed waters in Florida and all listed species are protected in the manner required by Section 404 of the CWA and the Endangered Species Act (ESA), respectively.

With regard to water resources protection, Florida's Section 404 program regulates dredge and fill activities impacting the "waters of the United States" (WOTUS) for which the State has assumed primary authority, while Florida also administers a separate state wetlands program – the "Environmental Resource Permit (ERP) Program" – that provides regulatory protection for *all waters* in the State irrespective of whether they fall within the narrower (and often disputed[1]) WOTUS category. Likewise, with regard to species protection, Florida adopted its own state

---

[1] *See Sackett v. EPA*, 598 U.S. 590, 603 (2023) (recounting long track record of confusion over the proper understanding of "waters of the United States," rejecting definitions built on the notion of "significant nexus," and adopting Justice Scalia's definition from *Rapanos v. United States*, 547 U.S. 715 (2006) (plurality)).

endangered species protection law decades ago to avoid and minimize impacts to listed species.[2]

In furtherance of its own federal ESA Section 7 obligations, FWS issued a Biological Opinion (BiOp) with an Incidental Take Statement (ITS) in conjunction with EPA's review and approval of Florida's Section 404 Program. This BiOp/ITS provides reasonable assurance that no permitted action under Florida's Section 404 program would jeopardize listed species or adversely modify critical habitat, so long as the protective measures adopted in the BiOp/ITS are followed by the agencies.[3] This includes a "technical assistance process" that ensures an effective and lawful coordination mechanism for federal and state agencies to cooperate in the protection and conservation of listed species. Dkt. 99 at 70-76; Dkt. 106 at 42-46. The administrative record in this case strongly supports EPA's decision to approve Florida's Section 404 Program and also strongly supports the BiOp/ITS issued in conjunction with that approval. Accordingly, for the reasons set forth in Federal Defendants' briefs (Dkt. 99; Dkt. 106), this Court should enter judgment in favor of Federal Defendants and Florida Intervenors as to all claims in this case.

Yet, as Florida Intervenors have also demonstrated, this Court need not (and should not) reach the merits of most, if not all, of Plaintiffs' claims. Plaintiffs do not suffer cognizable harm sufficient for standing by the mere transfer of primary permitting responsibility from the Corps to FDEP, especially where EPA maintains continuous oversight at both a program level and on a permit-by-permit basis. Across the waterfront of Plaintiffs' broad-based challenge to virtually all aspects of Florida's program, they have identified no claims for which they suffer cognizable harm.

---

[2] The Florida Endangered and Threatened Species Act is codified at Fla. Stat. § 379.2291 and adopts the "policy of [Florida] to conserve and wisely manage these resources, with particular attention to those species defined by the Fish and Wildlife Conservation Commission, the Department of Environmental Protection, or the United States Department of Interior, or successor agencies, as being endangered or threatened."

[3] Agencies are entitled to a presumption of regularity. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

The baseline against which to measure harm is the Corps' administration of the program, and here, Plaintiffs have not shown a single situation where the Corps would decide a permit differently than Florida in a way that presents a unique cognizable injury. Subtle purported differences in criminal enforcement cannot be the basis of that harm, nor can contrived gaps in "environmental information" since Florida's program provides the same or similar environmental information to the public (and actually more information is available on a real-time basis than in the federal permitting system). Many other claims are simply not ripe for review. Therefore, Plaintiffs have not met their burden of demonstrating that each separate claim is justiciable now.

Florida Intervenors' opening brief (Dkt. 102) enclosed a Declaration of Justin Wolfe, FDEP General Counsel, addressing Plaintiffs' factual assertions related to standing. *See* Dkt. 102-1 ("Wolfe Dec."). In their reply, Plaintiffs try to rehabilitate their standing arguments through various legally and factually flawed arguments but the bulk of their standing arguments in the reply brief are based upon a new set of declarations asserting new facts and contesting aspects of Mr. Wolfe's declaration. Dkt. 105 at 90-106. Many assertions in Plaintiffs' new declarations are incorrect.[4]

But more importantly, Plaintiffs' new declarations submitted at the reply brief stage should not be considered by this Court. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). As previously noted, Plaintiffs were obliged to include *in their opening briefs* sufficient evidence to demonstrate standing (where it is not self-evident) in order to meet their burden of proof. Dkt. 102 at 36-37. "Absent good cause shown," Plaintiffs should not expect this Court to allow them to submit new evidence of standing in a reply brief. *Sierra Club,* 292 F.3d at 900-01. Here, Plaintiffs have not provided good cause to be allowed to supplement their standing declarations on reply, so

---

[4] Florida Intervenors concur with Federal Defendants that Plaintiffs' arguments "misstate the record, misstate the law, or misstate both." Dkt. 106 at 9.

those new declarations should be ignored. While "*Sierra Club* is not a gotcha trap,"[5] Plaintiffs knew standing was a key hurdle in this case ever since Florida filed its cross-motion to dismiss over two years ago.  See Dkt. 36-37.  Thus, Plaintiffs should not be permitted to rehabilitate their standing declarations at this late stage.

To the extent this Court considers Plaintiffs' new declarations, Florida Intervenors respectfully request consideration of the Supplemental Declaration of Justin Wolfe ("Wolfe Supp. Dec.") which, among other things, addresses Plaintiffs' new assertions concerning Florida's record of environmental protection generally; Florida's implementation of the Section 404 Program; availability of environmental information; coordination between the Corps and FDEP related to Section 404 program issues; Florida administrative law and avenues for judicial review in state courts; and other topics.[6]

While the merits strongly support Federal Defendants' actions here, this case should be resolved on justiciability grounds. Under that scenario, Plaintiffs would remain free to pursue legal challenges as to any particular projects where they have an adequate interest and can demonstrate that the coordinated efforts of the federal and state agencies failed to follow the law.

---

[5] See *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1159 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) (explaining that a court retains "discretion to look beyond the opening brief and consider material submitted later if the petitioner reasonably believed its standing was self-evident" (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015)).

[6] Florida Intervenors have submitted a supplemental declaration for purposes of contesting Plaintiffs' standing, not on the merits. As Federal Defendants have correctly explained, the merits of this case are governed strictly by the administrative record. Dkt. 99 at 33-34. Further, "[i]nformation concerning Florida's implementation of its Section 404 program is not part of the administrative record. And Plaintiffs do not even attempt to justify the inclusion of post-decision extra-record evidence under one of the 'narrow and rarely invoked' exceptions to record review. Florida's implementation track record is simply not at issue here." *Id.* at 58 (citation omitted).

## ARGUMENT

### I.  Plaintiffs' Claims Are Not Justiciable.

Plaintiffs lack standing across the board. They raise nothing more than speculative, non-concrete injuries based on a fundamental misunderstanding of the relevant legal framework. "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. . . ." *Id.* at 2208. Standing is evaluated based on whether cognizable injury existed at the time of filing of the complaint, not at some distant point in the future. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

"Under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.' … The plaintiff's injury in fact [must] be 'concrete'—that is, 'real, and not abstract." *TransUnion*, 141 S. Ct. at 2203-04 (citing, among other cases, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) and *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2103 (2019)). Here, Plaintiffs "must be able to sufficiently answer the question: What's it to you," if Florida – instead of the Corps – has the primary role in administering the Section 404 Program for assumable waters in Florida where EPA retains oversight responsibility? *Id.* at 2203 (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). And while Plaintiffs need not prove the merits of their case to demonstrate standing, they must show a "substantial probability" that their cognizable interests will be "adversely affected" by the agency action. *See Sierra Club,* 292 F.3d at 898 ("The organization need not prove the merits of its case — '*i.e.*, that localized harm has in fact resulted from a federal rulemaking' — in order to establish its standing, but it 'must demonstrate that there is a `substantial probability' that

local conditions will be adversely affected' and thereby injure a member of the organization."
(citation omitted)).

With regard to standing for environmental plaintiffs to challenge EPA's approval of a state
environmental program, the most relevant recent D.C. Circuit opinion is *Waterkeeper Alliance,
Inc. v. Regan*, where environmental plaintiffs claimed that EPA's approval of a state coal ash
program was unlawful because EPA had not yet adopted "public-participation guidelines for state
programs" and the state program gave "inadequate public-participation opportunities." 41 F.4th
654, 659, 662 (D.C. Cir. 2022). Though no party raised justiciability concerns, the D.C. Circuit
found *sua sponte* that these claims were not sufficient to support standing. *Id.* at 662. (finding that
"they fail to show that their requested relief would redress their injuries"). With regard to plaintiffs'
claim that the state program allowed for "lifetime permits," which plaintiffs said were not
adequately protective, the D.C. Circuit found that they "fail[ed] to demonstrate imminent injury in
connection with [that claim]." *Id.* at 663.

When evaluating standing based on a "procedural right afforded to them by statute," federal
courts "relax—while not wholly eliminating—the issues of imminence and redressability, but not
the issues of injury in fact or causation." *Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d
164, 176-77 (D.D.C. 2019) (citation omitted). Plaintiffs have not shown standing as to their
substantive claims, nor have they carried their burden of proving standing for procedural claims
built on theories of informational injury.

### A.     Informational Injury Does Not Provide Standing Here.

In their reply brief, Plaintiffs contend that they have standing for "Claims Two, Seven, and
Ten" because "EPA's action threatens harm to … Plaintiff organizations' access to information
provided through NEPA review and ESA consultation…" Dkt. 105 at 90, 94. They simply claim,
without further explanation, that they "clearly tied their informational harms to Claims Two,

Seven, and Ten."[7] Yet their opening brief only attempted to tie this flavor of environmental informational standing to Claim Two, not Claims Seven or Ten. Dkt. 98 at 78-79. For this kind of informational standing, Plaintiffs' opening brief vaguely refers to Claims One, Two, and Seven in reference to "the harms sustained as a result of EPA's unlawful approval of the state program, as shown above…" Dkt. 98 at 81. This is not enough. Florida Intervenors previously explained why this "environmental information" standing argument fails. Dkt. 102 at 37-42. In their reply, Plaintiffs make several flawed arguments to try to rehabilitate their standing argument.

First, Plaintiffs argue incorrectly that this Court must find informational injury standing for Claim Two simply because this Court found informational standing for Claim Nine. Dkt. 105 at 90-91 and n. 57. In its March 30, 2022 order (Dkt. 73), this Court evaluated standing for purposes of Claim Nine at an early stage addressing a narrow procedural claim. Now, at this stage, Florida Intervenors have sought summary judgment as to all remaining claims and have challenged Plaintiffs' specious claims of informational injury by submitting a factual declaration showing that Plaintiffs do not suffer actual informational harms by virtue of Florida's administration of the Section 404 program. While this Court did find standing for Claim Nine based on the assumption that Plaintiffs' allegations of injury were true, *see* Dkt. 73 at 13, the Court is not bound to apply the same analysis and to reach the same conclusions at this stage particularly given the evidence before the Court regarding the inaccuracies in Plaintiffs' standing declarations.[8] *Waterkeeper*

---

[7] Plaintiffs still make no viable effort – whether in the complaint, the briefs, or the declarations – to tether their alleged informational injuries to specifically numbered claims in their complaint. It is simply inadequate to generally reference a loss of some kinds of information as a basis for any and all claims. *TransUnion*, 141 S. Ct. at 2208 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . .").

[8] In any event, this Court is always free to reconsider its previous standing analysis in the context of separate claims at separate stages and with the benefit of additional briefing and declarations. In this respect, Florida Intervenors note that this Court's March 31, 2022 opinion did not address

*Alliance*, 41 F.4th at 659-61 (stating that "[courts] have an independent obligation to assure ourselves of our jurisdiction" and finding, where "neither EPA nor Intervenors contest[ed] plaintiffs' standing," that plaintiffs lacked standing to challenge EPA's approval of Oklahoma's coal ash program).

Second, Plaintiffs fail to show at this stage that they have suffered an actual loss of environmental information to the degree required to support Article III standing. While "disclosure of *private* information" may constitute the kind of "intangible harms" that can be sufficiently "concrete" to show standing, *Transunion*, 141 S. Ct at 2204 (emphasis added), this case involves a different kind of *general* environmental information that is part of the public record and not specific to Plaintiffs. In that context, Plaintiffs must do more than assert a vague kind of informational harm; they must show deprivation of specific information as well as show how that deprivation causes them injury. Dkt. 72 at 3-4. Here, however, they do not identify any concrete, non-speculative injury arising from a loss of environmental information to which they are entitled. Florida Intervenors' declarations show that, under Florida's Section 404 program, Plaintiffs may access the same kinds of environmental information (and in fact even get more environmental information more quickly than under the federal program). Dkt. 102-1, at 3-11 ¶¶ 16-30 (Wolfe Dec.); Wolfe Supp. Dec. ¶¶ 9-15.

Third, Plaintiffs' reference to certain pending projects in Florida does not help their standing argument. To support their speculative NEPA-based standing argument, Plaintiffs rely heavily on a comparison between the Corps' 404 permit process for the Troyer Mine project (a proposed limestone mine) and the current FDEP 404 permit process, arguing that, "when the Troyer Mine project was before the Corps, it was determined that an EIS would be required." Dkt.

---

or discuss the supplemental briefs on informational standing filed by the parties in response to the Court's request days before the opinion was issued. Dkt. 70, 71 and 72.

105 at 93. Plaintiffs' sole support for this comparison is found in one of their declarations (Dkt. 98-1 at 12-13 ¶ 35), which in turn relies on a decade-old letter from the Corps dated July 18, 2011 (Dkt. 31-1, at 240-42).

Contrary to Plaintiffs' claim, however, the Corps' July 18, 2011 letter does not actually say that an "EIS would be required." Instead, the Corps recognizes that, due to changes in the project, the Corps was willing to proceed with an Environmental Assessment (EA). Dkt. 31-1, at 240. Specifically, the Corps recognized that a pre-2011 iteration of the Troyer Mine proposed project triggered an EIS because, in combination with "three projects proposed near regional wetland preserves," the project "cumulatively propos[ed] 418 acres of direct wetland impacts." *Id*. The Corps explained that, since the other three projects were no longer "active" proposals, it was re-evaluating whether an EIS was required. *Id.* ("Based on the reduced cumulative impact, the Corps is willing to conduct a review of your project by means of an [Environmental Assessment].") Even now, more than a decade later, an EIS is unlikely to be triggered for the currently proposed version of the Troyer Mine project. Wolfe Supp. Dec. ¶ 14. The updated project, as reflected in the FDEP November 5, 2021 public notice, shows that this project proposes approximately 104 acres of wetlands impacts (approximately 25% of the impacts in the original pre-2011 proposal). *Id.*[9] Given the substantial reduction in impacted wetlands acres and the changes in cumulative impact concerns, it seems unlikely that an EIS would be required by the Corps for the project in its present form, if the Corps was still administering the program for assumable waters in Florida. Wolfe Supp. Dec. ¶ 14. Nevertheless, as with the other projects flagged by Plaintiffs as part of their informational injury argument, even a cursory review of the FDEP database shows many hundreds,

---

[9] Another Corps' public notice for the Troyer Mine project dated May 30, 2019 (and available via the database shown in the Wolfe Declaration) explains that the revised project proposes approximately 203 acres of permanent wetland impacts and 11 acres of temporary wetland impacts but does not state whether an EIS or EA would be required.

if not thousands, of pages of environmental information related to the project. These facts further undercut Plaintiffs' speculative assumption that they would be deprived of specific information in legally cognizable respects.

Ultimately, it was Congress – not EPA – which decided that state agencies are not required to prepare an EIS or a Biological Opinion. Dkt. 102 at 38-39. *Association of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 42-44 (D.D.C. 2012), is not "inapposite," as Plaintiffs suggest. In that case, a group of physicians challenged an agency action requiring non-Medicare providers to comply with certain "opt-out" procedures before obtaining Medicare reimbursement. 901 F. Supp. 2d at 42-43.[10] But since the Medicare statute already required compliance with opt-out procedures, the court found plaintiffs had no standing, explaining that injuries caused by pre-existing statutes and regulations present a "causation problem" for standing. *Id.* at 42. Plaintiffs are also wrong to evade *Center for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 181 (D.D.C. 2019), on the sole basis that it did not involve "informational harm." Dkt. 105 at 92. While the court noted that it did not involve claims of informational injury, the court did, however, highlight a key requirement for such cases; namely, that the plaintiff "identify [a] statute entitling them to any information deprived under the [agency action]." 369 F. Supp. 3d at 181 n.5. NEPA and the ESA expressly provide that they only apply to federal agencies, not state agencies. When deciding whether harm is concrete enough, "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant…" *Transunion*, 141 S. Ct at 2204.

---

[10] In that case, the court looked first to the complaint to see if the alleged injury was referenced there. *Id.* at 42. Of course, here, Plaintiffs' complaint says nothing about NEPA-based injuries arising from EPA's approval of Florida's program. Dkt. 102 at 27-32.

Indeed, recent statutory amendments further undercut Plaintiffs' claims of informational harm. On June 3, 2023, the President signed into law the "Fiscal Responsibility Act of 2023," which raised the federal government's debt ceiling and, relevant here, amended NEPA by capping page limits for EISs at 150 pages and EAs at 75 pages (both limits exclusive of appendices). *See* Public Law No. 118-5, 137 Stat. 10, 41 (2023). Only for proposed actions of "extraordinary complexity" is a larger page limit allowed. *Id*. at 42. In addition, these newly-enacted NEPA reforms expressly prescribe procedures for permittees to prepare an EIS or EA and for the lead agency to then "independently evaluate" and "take responsibility for" the document. 137 Stat. at 42. This further undercuts Plaintiffs' assertion of a cognizable, legally-enforceable injury from the loss of an agency's *independently-prepared* NEPA document. *Cf.* Dkt. 105 at 93-94. Plaintiffs' claim of informational harm cannot be based on the lack of *any environmental information*; to the contrary, Plaintiffs can only try to say that they lack access to *certain kinds of environmental information*. But these new statutory changes further call into question the validity of Plaintiffs' assertion of a "loss" of legally-required environmental information.

Just as recent legislation curbs Plaintiffs' claims, recent Supreme Court action does as well. In *Sackett v. EPA*, issued in May 2023, the Supreme Court clarified the proper scope of "waters of the United States." 598 U.S. at 603. Under the *Sackett* test, the scope of CWA jurisdiction over the "waters of the United States" is narrower than has been employed in the past by EPA, the Corps, or FDEP. Wolfe Supp. Dec. ¶¶ 28-29.  A narrower scope of Section 404 jurisdiction means fewer permits require Section 404 permit coverage, and similarly, fewer projects that require NEPA and/or ESA procedures. Wolfe Supp. Dec. ¶¶ 28-29.

**B.      Plaintiffs Lack Standing to Challenge EPA's Early Finding that Florida's Application Was "Complete."**

Florida Intervenors agree with Federal Defendants that EPA did not err when finding Florida's application to be complete. Dkt. 106 at 9-10. But, again, this Court need not reach that issue as an agency's finding that an application is "complete" is not final agency action subject to judicial review. Federal courts review final agency actions, not every step in the long process that leads to a final decision. Nor do Plaintiffs experience cognizable injuries sufficient to support standing to assert such a novel claim.

Plaintiffs provide no valid arguments to support standing for this purpose and still cite no cases where a court found that a completeness determination was reviewable. Plaintiffs assume that, "[h]ad EPA determined the application was not complete until the BiOp was produced, there is a possibility that the agency would have reached a different decision and/or granted an agency stay pending review." Dkt. 105 at 106. Yet this argument fails as a matter of law since there is no such legal obligation to complete the BiOp before deciding whether a CWA Section 404 assumption application is complete. *See* Dkt. 106 at 10. Whether there is such a "possibility" is beyond even mere speculation. There is simply no showing that this "procedural step was connected to the substantive result." *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

**C.      Plaintiffs' Attempt to Show Standing Based on "Restrictive Access" to Florida Courts Fails.**

Plaintiffs conjure highly speculative and legally dubious reasons to argue that the Florida Section 404 program "subjects Plaintiffs to a restrictive state court system …" Dkt. 105 at 95. They are incorrect. Florida's judicial system provides a fair and appropriate process that allows Plaintiffs to seek to vindicate their concerns if FDEP issues a permit that they believe is improper in any way. This Court should not accept Plaintiffs' invitation to demean the judicial system of the

State of Florida. The Constitution and the Laws of the State of Florida provide a fair, just, and reasonable system for reviewing agency actions. In many ways, Plaintiffs are better off challenging agency actions in Florida courts than in federal courts. Wolfe Supp. Dec. ¶¶ 19-26.

First, Plaintiffs are not harmed by Florida's *de novo* approach to permit appeals, as explained in the Supplemental Wolfe Declaration. Wolfe Supp. Dec. ¶ 22. Indeed, they benefit. Under Florida law, there is no presumption of "correctness" in an administrative hearing challenging an FDEP permit; administrative law judges (ALJs) hear permit challenges *de novo* at the Florida Division of Administrative Hearings (DOAH); and no deference is given to FDEP's permit decision. Wolfe Supp. Dec. ¶ 22.[11] Nor are Plaintiffs *required* to incur "substantial cost" to "present an affirmative case by hiring experts and conducting independent investigations." Wolfe Supp. Dec. ¶ 22. They may rely on their written comments, but they also have the opportunity, in a *de novo* setting, to have their arguments – factual, legal, scientific, and policy – heard by an impartial administrative law judge *before* FDEP renders a "final" decision on the permit. Wolfe Supp. Dec. ¶ 22.

For those challenging permits, this system is preferable to the federal approach where the permitting agency receives deference, both as to legal interpretations and on technical issues. *Mississippi v. EPA,* 744 F.3d 1334, 1349 (D.C. Cir. 2013); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1155 (D.C. Cir. 2013) ("Because we owe significant deference to EPA in areas of its technical expertise, we reject Sierra Club's challenge to EPA's method of addressing non-detect data."). And permit challengers are not entitled to develop the record in an adversarial setting; to the contrary, they must rely on the submittal of comment letters with supporting exhibits

---

[11] *See also* Fla. Const. Art. V, § 21 ("In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo.").

and materials (and in some cases, oral comments at a public meeting). *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 189 (D.C. Cir. 2004). There is a strong presumption that the agency acted properly. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). To overcome this highly deferential standard of review under the APA, Plaintiffs must typically expend resources to submit comprehensive and compelling comments supported by expert testimony, without the benefit of obtaining any testimony from agency officials or others involved in the process. *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 537 (D.D.C. 2021).

Plaintiffs' attempt to conjure standing based on these differences is wholly inadequate. Plaintiffs obviously already hire experts to generate comments and to provide supporting information. Those are funds that they are spending already when projects of concern are under consideration. Their declarations do not address how much more they are spending *over current expenditures* – and any such effort would be inherently speculative and case specific.

Second, Plaintiffs are not likely to be injured by fee-shifting provisions in the context of Florida's Section 404 program. As Florida has already explained, the fee shifting provision at Section 403.412(2)(f) "applies only to circuit court actions for injunctive relief," not administrative actions. Dkt. 102 at 46.[12] Here, Plaintiffs are making a meritless argument; i.e., that somehow they will face a situation one day where FDEP will change its view of the relevant statute and seek to obtain fees for an appeal brought by Plaintiffs that is rejected on the merits. The only situation

---

[12] *See, e.g., Lake Brooklyn Civic Ass'n, Inc. v. St. John's River Water Mgmt. Dist.*, 1993 WL 943540, at *19 (Fla. Div. Admin. Hrgs. 1993) (["Section 403.412(2)(f)" only applies to suits to maintain an action for injunctive relief in circuit court, and not to an administrative action such as this."); *Paul Still v. New River Solid Waste Ass'n & FDEP*, 2001 WL 1917255, at *2 (Fla. Div. Admin. Hrgs. 2001) (adopting ALJ's recommendation that association was not entitled to attorney's fees and costs from petitioner under Fla. Stat. § 403.412(2)(f) because these statutory provisions do not apply to administrative actions brought under subsection 403.412(5)).

cited by Plaintiffs in their brief (Dkt. 105 at 97) involves a *potential* scenario in a case that does not even involve FDEP. Plaintiffs' fears are unfounded. Wolfe Supp. Dec. ¶ 23.

Third, Plaintiffs are wrong to suggest that Florida law concerning standing to challenge permits will harm them. Florida Intervenors have previously explained that environmental groups have at least three avenues to establish standing to challenge permits under Florida law. Dkt. 102 at 30-31. Their new spin on this point has been refuted. Wolfe Supp. Dec. ¶¶ 24-26.  Plaintiffs argue that one of the three paths for standing, under Florida Statutes Section 403.412(7), "is unclear as to which proceedings it applies." Dkt. 105 at 98. They argue that the "clearest reading" is that Section 403.412(7) "appl[ies] Article III standing for injunctive suits regarding delegated programs," and nothing else. Dkt. 105 at 98. But Plaintiffs cite no case or other authority for this exceedingly narrow and (temporarily) self-serving construction. And they ignore the plain language of Section 403.412(7), which says it applies to "administrative proceedings" (not injunctive cases in civil court) in a "matter pertaining to a federally delegated or approved program." As such, this statutory avenue applies to environmental permit challenges. Additionally, Plaintiffs argue that Florida's approach to standing harms Plaintiffs because the statutory avenues are limited to "citizens of the state." This argument is misleading. The first and most traditional path for standing, under the *Agrico* test, remains available irrespective of state citizenship. Wolfe Supp. Dec. ¶ 26.  But even if an environmental petitioner looked to the other avenues for standing, Plaintiffs cite no authority for their premise that state citizenship in this context is a basis for legally cognizable injury.[13]

---

[13] Last, Plaintiffs lack standing on these grounds for reasons similar to those encountered by the Florida businesses that sought intervention. Dkt. 102 at 37.

### D.      Standing Based on "Aesthetic and Recreational Interests" Also Fails.

Plaintiffs also continue to assert standing on the basis of general aesthetic and recreational interests. But they make no showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim arise from FDEP permits, nor have they made any showing that Florida permitting will be any less rigorous than Corps-led permitting, especially given EPA's oversight function. In other words, the mere issuance of Section 404 permits cannot form the basis of standing; there must be some non-speculative showing that Florida 404 permits will harm Plaintiffs' aesthetic and recreational interests in a way that Corps 404 permits would not.

Florida Intervenors relied on *Clapper v. Amnesty International USA*, where the Supreme Court reiterated that a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient." 568 U.S. 398, 409 (2013) (internal quotations omitted). Plaintiffs seek to avoid *Clapper* by suggesting that their claims of harm do not depend upon a "series of events." Dkt. 105 at 100. But as they acknowledge, no harm would arise to their purported aesthetic and recreational interests unless a long series of events transpires. Dkt. 105 at 101.

In truth, the series of events is even longer than they suggest. No harm to Plaintiffs' aesthetic and recreational interests would arise, if at all, *unless and until* (1) FDEP proposes to issue a permit that harms them in some manner; (2) EPA fails to convince FDEP to address the issue and EPA neither objects to nor federalizes the permit; (3) FDEP proceeds to issue the permit without correcting the concerns submitted in the public comment process; (4) Plaintiffs file an administrative challenge and the Florida administrative and judicial review processes result in no changes to the project[14]; and (5) the permitted project proceeds in a manner that actually harms

---

[14] If an administrative challenge is filed, FDEP's permit decision is not final agency action until the completion of the hearing process and the issuance of a final order. Dkt. 102 at 31.

Plaintiffs' aesthetic and recreational interests. This is the kind of chain of events that cannot support standing. Plaintiffs admit that at least three independent actions need to occur to make harm likely, Dkt. 105 at 101, and they give no evidence whatsoever that these three actions are imminent with respect to any project that will actually cause harm to their protected interests.

Here, the pivotal break in the chain of events is EPA's continued oversight of the state program on both a program level and permit-by-permit. Plaintiffs erroneously contend that "EPA's oversight does not supplant an adequate state program nor remove this risk of harm." While Florida's program clearly meets the requirements of the CWA, EPA's role is to ensure that no unlawful permits are issued by the states. Agencies are entitled to a presumption of regularity, not illegality. *Citizens to Pres. Overton Park*, 401 U.S. at 415.

**E.     Plaintiffs Lack Standing to Challenge Florida's Program on the Basis of Criminal Enforcement or Statute of Limitations.**

In its opening brief, Florida cited to binding D.C. Circuit precedent, *Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912 (D.C. Cir. 2003), to show that, "[w]here a statute provides that the federal government 'will have an ongoing and undiluted enforcement role,' concerns about reduced enforcement were simply 'unsupported conjecture' that do not constitute an injury for Article III standing purposes." Dkt. 102 at 48 (citing to *Crow Creek*). Therefore, Plaintiffs lack standing for Claim Two to the extent their alleged injury is based on a heightened mens rea for criminal negligence or shorter statute of limitations under state law or even allegations of insufficient future state enforcement.

Despite their attempts, Plaintiffs' reply brief has failed to meaningfully distinguish *Crow Creek* from the facts of this case. While Plaintiffs argue that the role of EPA and the Corps will be

different under state assumption regarding certain aspects of the 404 program,[15] they do not dispute that Section 404(n) of the Clean Water Act states "[n]othing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title." 33 U.S.C. § 1344(n). Nor do Plaintiffs dispute that Section 309 sets forth the scope of the EPA's enforcement authority, including for violations of permits issued under a state assumed 404 programs. *See* 33 U.S.C. § 1319. Moreover, the federal government's ongoing and undiluted CWA enforcement authority is further reinforced by Section III.G of the EPA-FDEP Memorandum of Agreement which plainly states that "EPA may initiate independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA." EPA-HQ-OW-2018-0640-0018 at 10.

It is also reinforced by Section 5-12.523 ("Coordination with State Programs") of the Justice Manual (formerly known as the U.S. Attorney's Manual), which provides more detail on how the federal government exercises its enforcement discretion in this context. It explains: "Frequently, an unauthorized activity constitutes a violation of both federal and state law. United States Attorneys should remain advised of pending state environmental enforcement actions. If it appears that all federal interests in the case will be vindicated in the state court proceeding, action in federal court may be an unnecessary duplication of effort. **On the other hand, if federal**

---

[15] For example, Plaintiffs' argument that the Corps will not have primary enforcement authority in assumed waters, Dkt. 105 at 103, is a red herring given that EPA retains independent enforcement authority. Similarly, Plaintiffs' argument that EPA has waived review of certain 404 permit categories is unavailing. *Id.* While EPA has agreed to waive initial review of certain categories of state issued 404 permits under the Memorandum of Agreement (MOA) with FDEP (as Congress intended pursuant to Section 404(k), 33 U.S.C. § 1344(k)), it has not relinquished its oversight over waived categories as Section II.B.(3) and II.D.(4).a of the MOA requires FDEP to provide EPA with permit applications, related public notices and supplemental materials for waived permit categories upon request and Section II.B.(2) provides EPA with unilateral authority to terminate waiver of any of the categories identified in the MOA pursuant to EPA regulations. EPA-HQ-OW-2018-0640-0018 at 6-8. Further under the MOA, EPA retains the right to review any of FDEP's compliance and enforcement records upon request. *Id.* at 9.

**interests will not be protected completely in state court, federal proceedings may be warranted.** Where legal action in federal court appears warranted, the United States Attorney should continue to consult and, as appropriate, coordinate with relevant state authorities..." Dep't of Justice, *Justice Manual*, at 5-12.523 available at https://www.justice.gov/jm/jm-5-12000-environmental-enforcement-section#5-12.523 (last visited July 7, 2023) (emphasis added).

Simply put, EPA's approval of Florida's Section 404 program does not block the federal government from bringing civil or criminal enforcement actions under federal law, subject to federal statute of limitations, in federal court for violations of CWA Section 404 in state assumed waters, regardless of whether Florida, in its enforcement discretion, determines to pursue or decline enforcement in a particular context. Wolfe Supp. Dec. ¶¶ 30-32. Consequently, Plaintiffs have not been suffered a cognizable injury sufficient for Article III standing.

Plaintiffs' reliance on *WildEarth Guardians v. Jewell*, 783 F.3d 298 (D.C. Cir. 2013) and *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) in its reply are of no relevance either. Dkt. at 101-02. In relevant part, *WildEarth Guardians* involved standing related to a procedural injury under NEPA. 783 F.3d at 305-08. Here, Plaintiffs' allegations related to the state criminal intent standard or statute of limitations are not procedural injuries, so this case is simply not relevant to standing based on these alleged claims. Similarly, *Mozilla* is also inapposite. In that case, the petitioners challenged a portion of an FCC order that required "[a]ny person providing broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices." 940 F.3d at 46-47. The FCC asserted that petitioners did not have standing to challenge this portion of the rule based on lack of injury, but the court disagreed. *Id.* However, the petitioners in *Mozilla*, unlike the Plaintiffs

here, would have been required to affirmatively provide public disclosures if the rule being challenged was upheld, which the court recognized as a concrete injury directly tied to the rule itself. In contrast, EPA's approval of the Florida's 404 application, with its heightened mens rea and shorter statute of limitations, does not in itself require Plaintiffs to do anything. Nor does EPA's action result in any concrete injury to the Plaintiffs as EPA retains independent enforcement authority under federal law even under state assumption.

## II.   Several of Plaintiffs' Claims Are Not Ripe.

Plaintiffs either misstate or misunderstand this Court's ripeness doctrine as applied to EPA's approval of Florida's 404 program. Claims related to the FWS Incidental Take Statement (Claims Three and Four), the Corps' list of "retained waters" (Claim Seven), and National Marine Fisheries Service (NMFS) consultation (Claims Five, Eleven and Twelve) all rely on contingent future events that are too speculative to adjudicate at this time and are, therefore, unripe under the test set forth in *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967). Generally, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *McCray*, 574 F. Supp. 3d at 12 (quoting *Texas v. United States*, 523 U.S. 295, 300 (1998)) (internal quotations omitted).[16]

### A.   Take Liability Claims Are Not Ripe For Review (Claims 3 and 4).

With regard to the ITS, Plaintiffs' reply brief only points to "creat[ing] an 'unlawful risk of take.'" Dkt. 105 at 108-09. However, Plaintiffs fail to address why challenging particular projects in an as-applied context would be insufficient to prevent any "unlawful risk of take." The

---

[16] *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (explaining ripeness test for challenging agency action as including "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development.").

Florida Section 404 Program, in combination with the BiOp/ITS, provides comprehensive regulatory guarantees concerning species impacts. Further, Plaintiffs do not demonstrate any scenarios under the Florida Section 404 program that actually create an "unlawful risk of take."

Plaintiffs' attempt to have it both ways with regards to the import of the Second Circuit's *Cooling Water* case. 905 F.3d 49 (2d Cir. 2018). While they cite it in support of ripeness, they separately criticize it as "poorly reasoned" and "wrongly decided" when attacking the Federal Defendants' reliance on it for the merits. Dkt. 105 at 46. Moreover, Plaintiffs inaccurately claim that "Florida misleadingly cites the case for having found a different claim to be unripe." Dkt. 105 at 109. But in its opening brief, Florida Intervenors directly quoted *Cooling Water*'s finding that a claim was "unripe" in a scenario where "EPA may still veto the permit" and, "[i]f EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge." *See* Dkt. 102 at 53. Such a situation exists here.

Plaintiffs' reply also suggests that *Cooling Water* "implicitly" ruled on the ripeness of the biological opinion. No such implied ruling is present. In *Cooling Water*, ripeness is only discussed in the footnote previously cited by Florida Intervenors. Dkt. 102 at 53 (citing *Cooling Water*, 905 F.3d at 79 n. 19). The Court did not address ripeness in the context of the direct BiOp challenge and no inference should be drawn from an issue that was not contested or addressed in the case.

Without identifying authority that directly supports their position, Plaintiffs also attempt to distinguish other cases cited by Florida Intervenors but miss the target. For example, Plaintiffs ignore the similarities between the present case and *Wyoming Outdoor Council v. Dombeck*, where plaintiffs challenged EPA's ESA Section 7 procedure during its approval of an application for oil and gas leases. 148 F. Supp. 2d 1, 9 (D.D.C. 2001). The court in *Wyoming Outdoor* found the challenges to EPA's approval to be unripe where subsequent action would need to occur before

final approval occurred. *Id.*

Likewise, Plaintiffs attempt to distinguish the facts of this case from those in *Suburban Trails, Inc. v. New Jersey Transit Corp.,* by arguing that there was no final federal action in that case and no hardships to the plaintiff, just uncertainty. Dkt. 105 at 112. However, Plaintiffs do not address Florida's point that the challenge "was not ripe because a federal agency possessed veto power over the state agency's decision," Dkt. 102 at 54, which is the situation here.

Finally, Plaintiffs incorrectly argue in a footnote that "Florida cherry-picks ripeness language" from a series of cases. Dkt. 105 at 108. Plaintiffs mistake legal synthesis for cherry-picking. Florida provided a series of cases that support each factor of its ripeness argument. Each supports the premise they are cited for. Dkt. 102 at 51-52. Plaintiffs are wrong to argue that there are no "later agency actions that could supersede or undo the violation or remedy the harms wholesale." Dkt. 105 at 110. The ITS, including the required Technical Assistance Process, provide a litany of steps involving multiple federal and state agencies that work in tandem to avoid any of the speculative take concerns that Plaintiffs seem to fear. EPA's veto authority is also a "later agency action" that would be in place to prevent any future harm to the Plaintiffs under the ESA take provisions.

Plaintiffs' rebuttal concerning *New Hanover* is also ineffectual. In *New Hanover*, the challenge to the Corps' use of a nationwide permit to authorize a city landfill project was unripe where the necessary state water permits had not yet been granted because the "results of the [state water permitting] process cannot be predicted." 992 F.2d 470, 473-74 (3d Cir. 1993). Here, the outcome of the agencies' technical assistance process as well as EPA's Section 404 oversight role cannot be predicted and no harm will be caused to Plaintiffs' interest unless and until they show inadequate take protection will occur.

Ultimately, Plaintiffs have not been harmed by the issuance of the ITS and cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions.[17] A comprehensive, coordinated process involving FDEP, EPA, FWS and FWC exists to ensure that no such scenario arises, but if it does, it will invariably entail an exceedingly fact-specific scenario with a developed administrative record for review. Thus, a challenge to the scope of incidental take coverage should await an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate.[18]

**B.      Plaintiffs Challenge to the "Retained Waters" List Is Not Ripe (Claim 7).**

Despite assertions to the contrary, Plaintiffs have not shown that the Retained Waters List has a "sufficiently direct and immediate" impact *on the Plaintiffs* such that *Abbott Lab'* ripeness test is met. A challenge to the Retained Waters List should await a specific as-applied challenge where FDEP permits dredge and fill activity at a particular waterbody excluded from the Retained Waters List but which Plaintiffs believe should be on the List. Of course, such a challenge would only be viable, if at all, where (1) FDEP and the Corps fail to properly follow their agreed-upon process under the Memorandum of Agreement (EPA-HQ-OW-2018-0640-0018 at 8) for evaluating, in the context of specific projects, whether particular waterbodies belong on or off the List; (2) Plaintiffs comment to FDEP that the project should be handled by the Corps based on impacts to waters that should be treated as Retained Waters; and (3) FDEP

---

[17] Plaintiffs have expressed concern about the "Eden Oak Development." An application for a Section 404 permit has not yet been submitted to FDEP for this potential project. Dkt. 102-1 at 22. Even Plaintiffs' declaration notes that the project did not receive local zoning approval, *see* Crooks Dec., Dkt. 105-1 at 7.

[18] If a situation arose with the potential for unlawful take, Plaintiffs would have at least two viable, as-applied legal options at their disposal: first, they could challenge the FDEP 404 permit under Florida administrative and judicial review processes; or second, Plaintiffs could sue in federal court under the ESA's citizen suit provisions (16 U.S.C. § 1540(g)).

and the Corps ignore or reject those comments and/or EPA takes no action in its oversight role. An agency action, such as EPA's approval of Florida's program, that "does not require [plaintiffs] to engage in, or to refrain from, any conduct" does not constitute sufficient hardship for the purposes of ripeness. *Oceana*, 384 F. Supp. 2d at 254-55.[19]

Plaintiffs' main point here seems to be that the ripeness doctrine does not apply to a challenge of a "program as a whole." Dkt. 105 at 112. Yet they cite no case law for such a broad carve-out from the ripeness doctrine. *Cf. Ohio Forestry*, 523 U.S. at 733-34 (finding environmental group's challenge to forest management plan not ripe for review where subsequent challenges could await actual logging projects). Instead, they point to litigation involving the Michigan Section 404 Program, Dkt. 105 at 112-13 (discussing *Menominee*, 947 F.2d 1065, 1069-70 (7th Cir. 2020), but do not address possible differences between the Florida-Corps MOA and any such process in the Michigan context, *see, e.g.*, Dkt. 102 at 57 n. 35). Whether a particular waterbody is on or off the Retained Waters List is of no real consequence to Plaintiffs, at least not yet.

Nor have Plaintiffs demonstrated that the Retained Waters List constitutes "final agency action." Plaintiffs predictably rely on *Coal. to Save Menominee River Inc. v. EPA,* 423 F. Supp. 3d 560, 568 (E.D. Wis. 2019), which Florida Intervenors previously cited to this Court (Dkt. 102 at 57 n. 35), to argue that the Corps' retained water list is final agency action. Plaintiffs ignore the fact-specific distinctions between Florida's Retained Waters List (which, based on the record here, lacks hallmarks of final agency action) and Michigan's Retained Waters List (which is not before this Court and for which the Parties do not have the benefit of comparing the 1984 list and

---

[19] Contrary to Plaintiff's assertion, Dkt. 105 at 113, allegations of insufficient future state enforcement do not constitute harm for standing purposes, particularly where EPA retains independent enforcement authority under the CWA as addressed in previous section.

its accompanying MOA). On the record before this Court, the Florida 404 Program contains a process of routine refinement of the Retained Waters List as particular projects are reviewed. The Corps and FDEP have established "Joint Coordination Procedures" to ensure that the List is appropriately updated, as appropriate. Dkt. 102 at 57. This process is working well and is ensuring that, as stated in the MOA, the list includes "all other waters" that are not expressly listed if they meet the definition of non-assumable waters under 404(g). Dkt. 102-1 at 16-17. To challenge the list as a whole now would be to jump ahead of the process selected by the agencies for ensuring that particular projects are correctly permitted based on whether they are inside or outside the bounds of "retained waters."

### C.      Plaintiffs' NMFS-Based Claims Are Not Ripe (Claims 5, 11, and 12).

Plaintiffs contest EPA's decision to not engage in formal consultation with the National Marine Fisheries Service (NMFS). Florida has explained why these claims are not ripe for review; namely, marine species under NMFS' jurisdiction are unlikely to be found in any assumable waters because the Corps retains jurisdiction over "all waters subject to the ebb and flow of the tide...including wetlands adjacent thereto." Dkt. 102 at 59. Accordingly, it is highly unlikely that FDEP Section 404 permits in assumable waters (non-marine waters) will affect NMFS-listed species and, to the extent any such concerns arise, those would be addressed in the normal permitting procedures. A final permit action involving impacts to species under NMFS jurisdiction could be challenged at that time. No actual harm – and certainly none that is ripe for review at this stage – accrues to Plaintiffs from EPA's decision to defer NMFS consultation. Wolfe Supp. Dec. ¶ 33. In any event, ongoing coordination between EPA and NMFS should decisively cut-off these claims. Dkt. 106 at 48.

**CONCLUSION**

For the foregoing reasons, Florida Intervenors respectfully request entry of summary judgment in favor of Defendants and Intervenors as to all claims.

Dated: July 7, 2023

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July 2023, I electronically filed the foregoing document

using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

_/s/ Jeffrey H. Wood_
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

# EXHIBIT V

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL. |
| Plaintiffs, |
| v. |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL. |
| Defendants. |

**CASE NO.** 1:21-cv-00119 (RDM)

**SUPPLEMENTAL DECLARATION OF JUSTIN WOLFE**

1.      My name is Justin Wolfe. I declare under penalty of perjury under the laws of the United States of America and the State of Florida that the following statements are true and correct to the best of my knowledge and belief.

2.      I serve as General Counsel to the Florida Department of Environmental Protection ("FDEP"). FDEP is the state agency in Florida authorized by law to "control and prohibit pollution of air and water…." Fla. Stat. § 403.061.[1]

3.      Pursuant to Section 20.255(c), Florida Statutes, as General Counsel, I am responsible for all legal matters of FDEP. I have held this position for approximately four years. Before serving as the General Counsel for FDEP, I served as the Deputy General Counsel for the Water, Air, and State Lands Section of FDEP's Office of General Counsel.

---

[1] At this time, I am also temporarily serving in the role of Acting Deputy Secretary of FDEP.

1

4.     I am authorized by the Office of the Governor of the State of Florida, the Office of Attorney General of the State of Florida, and the Secretary of the FDEP to provide this declaration to this Court.

5.     I am aware that a coalition of environmental organizations ("Plaintiffs") filed a Complaint in the U.S. District Court for the District of Columbia seeking, among other things, to invalidate and enjoin EPA's approval of Florida's Section 404 Program.

6.     I am aware that Plaintiffs submitted several sworn declarations in support of standing to bring their lawsuit, including new declarations filed with this Court on June 9, 2023. Previously, I signed a declaration in support of FDEP's standing to intervene, which was filed in this proceeding on January 19, 2021 (Dkt. 4-2), along with another declaration (Dkt. 102-1) in support of Florida's Cross-Motion for Summary Judgment, which was filed with this Court on May 10, 2023, and both of which I hereby re-affirm and incorporate by reference, subject to any additional information or clarifications provided herein.

7.     I am providing this supplemental declaration to provide sworn facts to this Court in response to certain statements in Plaintiffs' new declarations on particular points that I believe are relevant to evaluating whether Plaintiffs have standing, i.e., whether they are injured by EPA's approval of Florida's Section 404 Program or otherwise have standing for the claims brought in this case.

***Florida's Environmental Record***

8.     Plaintiffs wrongly assert that Florida has an "abysmal environmental record" and that Florida's operation of "most federal environmental programs…has been a failure..." *See* Dkt. 105 at 18. This accusation, for which Plaintiffs provide no meaningful support, is baseless. FDEP administers various federally-delegated programs as explained in my prior declaration, and FDEP

continues to administer those programs consistent with law and subject to EPA oversight and review. As stated in FDEP's Mission and Values, FDEP seeks to "advance Florida's position as a world leader in protecting natural resources while growing the state's economy." And Florida continues to make substantial investments in conservation of our environment. In June of 2023, the Legislature approved and the Governor signed a budget for FDEP that provides more than $3.8 billion in state funding to support Florida's environment by enhancing key protections, ensuring the health of Florida's environment, and supporting Florida's economy. This includes over $1.6 billion for Everglades restoration and water quality projects, as well as more than $976 million for conservation and recreational land acquisitions that focus on protecting our water resources and advancing the Florida Wildlife Corridor. In fact, since 2019, the State has secured over $1.25 billion in state funding for land acquisition through the Florida Forever Program, including $850 million specifically for the Florida Wildlife Corridor, and acquired nearly 192,000 acres, which is almost four times more than that of the previous four years. Approximately 90% of these acres are within the Wildlife Corridor.

### *Environmental Information*

9.     Plaintiffs also argue that there is "incomplete or missing information and documentation from FDEP's database." *See* Dkt. 105 at 19. In particular, Plaintiffs claim that they "rarely, if ever, see agency factual determination on whether the permit complies with the regulations' requirements, permit conditions negotiated with the applicant, or agency assessments of the applicant's alternatives analysis (and whether it is reliable)." Crooks Dec., Dkt. 105-1 at 2. Plaintiffs also complain that FDEP's online "permit files include no documents containing the State's analysis of applicant submitted information, the State's findings as to impacts, incidental take, required permit conditions, and alternatives, nor the State's rationale for those decisions…"

Dkt. 105 at 93.  And they complain that "the files contain no analytical information from USFWS as to impacts on species." *Id*.

10.     FDEP's databases, including Oculus, provide real-time access to permit records. FDEP staff evaluate whether project applicants have provided adequate information before proceeding with the permit process. Where additional information is necessary, as is often the case, FDEP staff send a "Request for Additional Information" (RAI) to the applicant. In many instances, multiple rounds of RAIs are sent to the applicant, all of which are available on the FDEP databases (along with any responses received from the applicants). The final permit decision is made publicly available immediately upon issuance along with any permit terms and conditions.

11.     Plaintiffs say that "Mr. Wolfe also mistakenly claims that BiOps [biological opinions] are not publicly provided," and they then refer this Court to the federal agencies' Environmental Conservation Online System available through the USFWS. *See* Dkt. 105-2 at 93 n. 59.  This is precisely the same information that I referenced in my declaration (at paragraph 27, Dkt. 102-1 at 9). And Plaintiffs do not acknowledge that this database only provides copies of BiOps long after a permit proceeding is completed (e.g.,, at the time of my May 2023 declaration, this federal database did not contain *any* BiOps for Corps projects from 2022 and 2023).

12.     Plaintiffs also reference the NOAA Institutional Repository, which contains a database with, among other things, copies of BiOps prepared by NMFS.  This database can be searched based on NOAA regions and states. A search of this database identified 79 BiOps issued by NMFS for *any program or project* (not just Section 404 permits) in Florida since 2016 for *all agencies* (not just the Corps). I have reviewed this list of 79 BiOps, and to the extent some of them involved Section 404 projects, many, if not most, of those BiOps appear to involve projects that would not require Section 404 permits *from FDEP* because they occur in retained waters as would

be expected (e.g., shoreline stabilization projects; marina construction projects; certain pier replacement projects; etc.).

13.     Plaintiffs argue that the following projects "would be subject to receiving a biological opinion" if Florida did not administer the Section 404 program: "Troyer Mine, Rural Lands West Development, Bellmar Development, Immokalee Road Rural Village Development, Old Corkscrew Plantation (AKA Kingston) development, Hogan West development, and FFD Development." Crooks Dec., Dkt. 105-1 at 3. Significant information about each of these projects is readily available to Plaintiffs in the Oculus database. All of these projects remain under review.

14.     Plaintiffs say that, "when the Troyer Mine project was before the Corps, it was determined that an EIS would be required." Dkt. 105 at 93. That is not supported. Dkt. 31-1, at 240 – "Based on the reduced cumulative impact, the Corps is willing to conduct a review of your project by means of an [Environmental Assessment]."). It is unlikely that an EIS would be triggered for the currently proposed version of the Troyer Mine project. My previous declaration (Dkt. 102-1, at 7-8 ¶ 22) provides links to the entire permit file for the Troyer Mine project. The updated project, as reflected in the FDEP's November 5, 2021 public notice, shows that the Troyer Mine proposes approximately 104 acres of wetlands impacts (approximately 25% of the impacts in the original pre-2011 proposal referenced by the Corps in the 2011 letter cited by Plaintiffs). Given the substantial reduction in impacted wetlands acres and the changes in cumulative impact concerns, it seems unlikely that an EIS would be required by the Corps for the project in its present form, if the Corps was still administering the program for assumable waters in Florida.

15.     Plaintiffs complain that information about "take" of protected species is no longer available because FDEP is administering the 404 program. Crooks Dec., Dkt. 105-1 at 4. This is incorrect. The FDEP permit files provide significant species-related information, including

incidental take information where available. The Technical Assistance Process is designed to avoid and minimize take of species.

***Coordination with the Corps of Engineers***

16.     Plaintiffs further contend that there are "issues with FDEP's coordination with the Corps." *See* Dkt. 105-2 at 19. FDEP continues to work cooperatively with the Corps of Engineers on all aspects of the Section 404 Program. FDEP holds monthly meetings with the Corps. We have established working groups to address issues that arise, and FDEP and Corps staff routinely review and determine questions related to assumed versus retained waters.

***FDEP Staffing Levels***

17.     Plaintiffs argue that there are "problems with retaining staff in [Florida's] 404 program, which leads to a drain of expertise." *See* Dkt. 105-2 at 19.  This is not correct. As of the end of June 2023, there were 138 certified wetlands evaluators (CWEs) employed by FDEP alone. When taking into account those employed by Florida's five Water Management Districts, the total number is 186 CWEs. FDEP has adequate staffing to administer the Section 404 program.

***FDEP Permitting Process***

18.     Plaintiffs complain that my declaration does not "acknowledge that the purported 'denials' of individual permit applications make clear that the applicant can resubmit another application without prejudice and were based solely on the applicant's non-responsiveness." *See* Dkt. 105-2 at 19 n. 1.  Plaintiffs also claim, incorrectly, that FDEP "has not denied a single individual 404 permit for purposes of protecting the environment…" *See* Dkt. 105 at 100. FDEP has denied 230 permit applications (including 39 individual permits). A large number of permits remain under review currently (many have pending requests for additional information).  Usually, a permit application is denied when the applicant does not provide adequate information to ensure

that the project meets the criteria for issuance of a Section 404 permit. FDEP only issues permits if the applicant meets the criteria for receiving a Section 404 permit, which is the way that FDEP ensures environmental protection.  Consistent with standard agency practices generally, permit applicants are allowed to resubmit permit applications with new or additional information. Commonly, permit applicants make changes to their projects before resubmitting them for review by FDEP.

***Florida Water Quality Standards***

19.     Plaintiffs make certain unfounded claims about FDEP's protection of water quality standards and lack of compliance with the 404(b)(1) Guidelines. Dkt. 105 at 67-69; Silverstein Dec., Dkt. 105-2 at 4.  EPA correctly found that FDEP's Section 404 Program complies with the 404(b)(1) Guidelines. *See* Dkt. 99 at 45-49. FDEP staff review permit applications to determine whether discharges will impair water quality. Projects are reviewed for consistency with state water quality standards. Additionally, FDEP's ERP review, which applies to every project that requires a Section 404 permit in Florida, ensures that the project satisfies the requirements for a state water quality certification.

20.     Plaintiffs raise concerns about water quality in Biscayne Bay. Silverstein Dec., Dkt. 105-2 at 5. This is not directly relevant to Florida's Section 404 Program as Biscayne Bay is classified as Retained Waters under the regulatory purview for Section 404 purposes of the Corps of Engineers. More generally, FDEP is keenly aware of the water quality issues impacting Biscayne Bay and other parts of South Florida, and has been taking proactive steps to improve conditions. FDEP administers various environmental programs aimed at improving water quality in Biscayne Bay. On June 3, 2021, Governor DeSantis signed legislation creating the Biscayne Bay Commission, which through a deliberative and transparent process, provides input to support

key funding and restoration initiatives and guide regulatory changes that are needed to improve water quality.  Since 2019, Florida has dedicated $72 million into Biscayne Bay water quality and protection projects. Under the leadership of Governor DeSantis, the State of Florida has invested a record $5 billion to protect natural water resources and Everglades restoration (more than doubling the amount of funding from the previous four year period), with significant additional funding called for in Executive Order 23-06.

***Florida Administrative Procedures & State Judicial Review***

21.     Plaintiffs claim that the Florida administrative law and judicial review processes place them at a disadvantage relative to the federal system. *See* Dkt. 105 at 96-98. This is not correct.

22.     First, Plaintiffs present an incorrect picture of Florida's *de novo* approach to permit appeals. Under Florida law, there is no presumption of "correctness" in an administrative hearing challenging an FDEP permit. Administrative law judges (ALJs) hear permit challenges *de novo* at the Florida Division of Administrative Hearings (DOAH). No deference of any kind is given to FDEP's permit decision. After the hearing, the ALJ issues a Recommended Order and FDEP makes a final decision (final order), but FDEP is not empowered to overturn any of the ALJ's finding of facts *unless they are not supported by any competent substantial evidence*. If the final order gets appealed, the Florida District Courts of Appeal give no deference to FDEP's final order. In other words, FDEP's preliminary decision to issue a Section 404 permit is not entitled to any presumption of correctness nor is FDEP entitled to any deference. The standard of proof in permit challenges is a simple preponderance of the evidence. If a judicial appeal is filed, a Florida reviewing court looks not just at FDEP's findings of fact but also the ALJ findings. The administrative record on review includes the FDEP decision with the ALJ determinations and the

ultimate agency outcome. In that setting, the Florida appellate court considers the entire record established during the DOAH process (including any pleadings, motions, transcripts, etc.), not just the FDEP permit record. Contrary to their claims, Plaintiffs are not *required* to incur "substantial cost" to "present an affirmative case by hiring experts and conducting independent investigations." They are certainly free to rely on their written comments, but they also have the opportunity, in a de novo setting, to have their arguments – factual, legal, scientific, and policy – heard by an ALJ *before* FDEP renders a final decision on the permit. In that setting, Plaintiffs are free to introduce a wide array of information and arguments in any form that they choose.

23.     Second, Plaintiffs are incorrect about "fee shifting" under Florida law. Crooks Dec., Dkt. 105-1 at 5. FDEP is not aware of any case where an environmental organization was required to pay attorney's fees to the State of Florida for not prevailing in an environmental permit challenge.  The only situation cited by Plaintiffs in their brief (Dkt. 105 at 97) involves a *potential* scenario in a case that does not even involve FDEP.

24.     Third, Plaintiffs incorrectly describe Florida law concerning standing to challenge FDEP permits. Florida Intervenors have previously explained (Dkt. 102 at 30-31) that environmental groups have at least three avenues to establish standing to challenge permits under Florida law: (1) the test set forth in *Agrico Chem. Co. v. Dep't of Envt'l Regulation*, 406 So. 2d 478 (Fla. 2d DCA 1981); (2) the path under Fla. Stat. § 403.412(6) whereby environmental groups in Florida with "at least 25 current members residing within the county where the activity is proposed" have *automatic standing* to challenge a permitting action; and (3) the path under Fla. Stat. § 403.412(7) where, "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an administrative proceeding

under this subsection if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution."

25.     Plaintiffs raise concerns, in particular, with the third path for standing, contending that Florida Statutes Section 403.412(7) "is unclear as to which proceedings it applies." Dkt. 105 at 98. They argue that the "clearest reading" is that Section 403.412(7) "appl[ies] Article III standing for injunctive suits regarding delegated programs," and nothing else. Dkt. 105 at 98. To the contrary, FDEP reads this provision to apply to "administrative proceedings" in a "matter pertaining to a federally delegated or approved program," and thus, FDEP views this provision as applying to environmental challenges to FDEP 404 permits, which is consistent with how Florida administrative hearings have been handled.

26.     Additionally, Plaintiffs argue that Florida's approach to standing harms Plaintiffs because the statutory avenues are limited to "citizens of the state." To the contrary, the first and most traditional path for standing, under the *Agrico* test, remains available irrespective of state citizenship. The *Agrico* test and Florida Statutes Chapter 120 do not contain a citizenship requirement.

### EPA Oversight

27.     Plaintiffs try to suggest that FDEP is not working cooperatively with EPA. *See* Crooks Dec., Dkt. 105-1 at 6. FDEP is continuing to work with EPA on addressing any issues with program implementation. In that regard, EPA continues to exercise oversight of FDEP's program and, where appropriate, adjustments in the program are made.

28.     A key issue of discussion with EPA has involved implementation of the proper definition of "Waters of the United States" in the midst of ongoing changes in definitions at the federal level (as a matter of both regulatory change and judicial cases). As explained in the State

404 Program Applicant's Handbook, Florida's 404 Permitting Program considers "any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C." to be Waters of the United States and "will treat them as if they are, unless the applicant clearly demonstrates otherwise." *See* Section 1.1 State 404 Program Applicants Handbook.  FDEP has been utilizing the federal definition of "waters of the United States" which was in effect at the time of EPA's approval of Florida's State 404 Permitting Program. While EPA adopted a broader definition in January 2023 based upon the "significant nexus" test for wetlands jurisdiction, that new definition was enjoined by a federal court from going into effect in Florida. On May 25, 2023, the U.S. Supreme Court issued an opinion in *Sackett v. EPA*, which addresses the proper scope of the "Waters of the United States." In *Sackett*, the Court clarified that the "significant nexus" test does not apply and adopted an interpretation of "waters of the United States" that is *narrower* than the definition currently utilized by FDEP.  At this time, FDEP staff are interpreting the phrase "waters of the United States" consistent with the Supreme Court's decision in *Sackett.*

29.     Because *Sackett* narrows the scope of "waters of the United States," it is reasonable to expect that fewer projects will now require permits as part of the Section 404 Program. FDEP is committed to administering the Section 404 Program in full compliance with law.

***Enforcement***

30.     Plaintiffs also contend that Florida has "limited [Plaintiffs'] ability to enforce" Section 404 violations. *See* Dkt. 105 at 105. However, Florida has taken no steps to block Plaintiffs or their members from bringing citizen suits. To the best of my knowledge, Plaintiffs and their members have not brought any citizen suit enforcement actions in Florida (since FDEP assumed the 404 program) involving alleged violations of the Section 404 requirements for projects that are otherwise subject to FDEP 404 permitting.

31.     FDEP and Florida Water Management District staff continue to effectively and diligently enforce the Section 404 program requirements in Florida.

32.     Plaintiffs argue that FDEP's enforcement of the Municipal Separate Storm Sewer (MS4) program has "shortcomings." Silverstein Dec., Dkt. 105-2 at 2. They cite anecdotal information gathered by Miami Riverkeeper regarding compliance by MS4 permit holders in Florida, including a statement that 15 of 35 permit holders lacked a stormwater management program. *Id.* at 2-3.  FDEP strongly disagrees with Plaintiffs' mischaracterizations. First, MS4 compliance is entirely separate and distinct from Section 404 enforcement and involves an entirely different set of circumstances. In the context of MS4 compliance, FDEP must work with local governments to ensure that their stormwater management programs are effectively prohibiting and limiting pollutants from a variety of courses within their respective jurisdictional areas. Where MS4 non-compliance persists, FDEP is taking proper enforcement and other actions to address MS4 non-compliance

***NMFS Review***

33.     FDEP has been informed that EPA continues to prepare a Biological Evaluation (BE) regarding EPA's approval of FDEP's CWA 404 program in coordination with the National Marine Fisheries Service (NMFS). EPA has communicated with FDEP throughout this process. It is our understanding that EPA still plans to complete and issue the BE for NMFS species in the near future. FDEP continues to actively support efforts by EPA and NMFS to complete consultation.

Executed on the 7th day of July, 2023.

Justin Wolfe
General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd M.S. 35
Tallahassee, FL 32399