NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5101

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
*Plaintiff-Appellees*,

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Defendants*,

STATE OF FLORIDA, ET AL.,
*Intervenor-Appellants.*

---

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:21-CV-0119 (RDM)

---

**PLAINTIFF-APPELLEES' RESPONSE IN OPPOSITION TO**
**INTERVENOR-APPELLANTS' MOTION TO EXPEDITE APPEAL**

---

Christina I. Reichert
Tania Galloni
Earthjustice
4500 Biscayne Blvd, Ste. 201
Miami, FL 33137
Tel.: (305) 440-5432
creichert@earthjustice.org
tgalloni@earthjustice.org

Bonnie Malloy
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL 32301
Tel.: (850) 681-0031
bmalloy@earthjustice.org

Dated: June 3, 2024

Attorneys for Plaintiff-Appellees

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Parties: Plaintiff-Appellees are the Center for Biological Diversity; Defenders of Wildlife; Sierra Club; Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

Federal Defendants are Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency ("EPA"); Radhika Fox, in her official capacity as Assistant Administrator for the Office of Water of the EPA; Jeffrey Prieto, in his official capacity as General Counsel for the EPA; Lawrence Starfield, in his official capacity as Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance for the EPA; John Blevins, in his official capacity as Acting Administrator for Region 4 of the EPA; Leopoldo Miranda-Castro, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service ("USFWS"); Martha Williams, in her official capacity as Principal Deputy Director for USFWS; Scott Spellmon, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers ("Corps"); James Booth, in his official capacity as District Commander of the Jacksonville District for the Corps; the EPA; the Corps; and USFWS.

Intervenor-Defendant-Appellants are the State of Florida and Florida Department of Environmental Protection.

Limited Intervenors Before the District Court: Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd., and Cameratta Companies, LLC, and Cam7-Sub, LLC, were granted leave to intervene below solely for the purpose of opposing the motion for preliminary injunction.

Amici: In the district court, the Association of Florida Community Developers, Incorporated; Florida Chamber of Commerce; Cameratta Companies LLC; CAM7-SUB, LLC; Lennar Corporation; G.L. Homes; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison; Florida Transportation Builders Association; Florida State Hispanic Chamber of Commerce; and Associated Industries of Florida filed amicus briefs in support of the Federal Defendants and Intervenor-Defendant-Appellants.

In the Court of Appeals, Florida Chamber of Commerce; Association of Florida Community Developers, Inc.; Mosaic Company; Florida Home Builders Association; Florida Transportation Builders' Association; Florida State Hispanic Chamber of Commerce; Leading Builders of America; Associated Industries of Florida; G.L. Homes of Florida Corp.; KB Home; Lennar Corp.; Pulte Group, Inc.; Greenpoint Holdings; and Taylor Morrison Home Corp., submitted an amicus brief in support of Intervenor-Defendant-Appellants' motion for a stay.

**B.    Rulings Under Review**

Intervenor-Defendant-Appellants appeal the district court's February 15, 2024, order, as amended on April 12, 2024.  That order was made final and appealable on April 12, 2024, when the district court directed entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b).  Plaintiff-Appellants are deciding whether to file a cross-appeal, which may add other rulings for review.  The time to make that decision has not yet run.

**C.    Related Cases**

There are no related cases pending before this Court or the U.S. District Court for the District of Columbia.  However, a related case was filed by the Miccosukee Tribe of Indians of Florida in the U.S. District Court for the Southern District of Florida also challenging EPA's approval of Florida's 404 program.  That case was stayed and administratively closed in light of the order that is on appeal here, which vacated EPA's approval of the program.  Order at 2–3, Miccosukee Tribe of Indians of Fla. v. EPA, No. 1:22-CV-22459 (S.D. Fla. July 28, 2023), ECF No. 50.

*/s/ Christina I. Reichert*
CHRISTINA I. REICHERT

Attorney for Plaintiff-Appellees

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Plaintiff-Appellees Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper ("Conservation Groups") are not-for-profit membership organizations dedicated to environmental conservation, including the protection of threatened and endangered species and their habitats.  D.C. Cir. R. 8(a)(4), 26.1(b).  Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1(a), Plaintiff-Appellees affirm that they are nongovernmental organizations with no parent or publicly held corporation that has an ownership interest in them.

*/s/ Christina I. Reichert*
CHRISTINA I. REICHERT

Attorney for Plaintiff-Appellees

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

RULE 26.1 DISCLOSURE STATEMENT ........................................................ iv

TABLE OF CONTENTS ................................................................................ v

TABLE OF AUTHORITIES ............................................................................ vi

GLOSSARY.................................................................................................. ix

INTRODUCTION .......................................................................................... 1

STATUTORY FRAMEWORK .......................................................................... 2

    I.   The Clean Water Act........................................................................ 2

    II.  The Endangered Species Act .............................................................. 3

PROCEDURAL HISTORY .............................................................................. 4

LEGAL STANDARD...................................................................................... 10

ARGUMENT ................................................................................................ 10

    I.   The District Court's Decision is Not Subject to a Substantial Challenge. 10

      A.   Conservation Groups Demonstrated Standing.................................... 11

      B.   The BiOp and ITS Violated the ESA. .............................................. 13

      C.   The "TA Process" Was Unlawful. .................................................... 15

      D.   Florida is Not Likely to Succeed Based on *Cooling Water*. ................. 16

    II.  Florida Has Failed to Demonstrate Any Irreparable Injuries................. 18

    III. Florida Has Failed to Demonstrate the Public Has an Unusual Interest in Expedited Review. ...................................................................... 21

CONCLUSION ............................................................................................ 22

CERTIFICATE OF COMPLIANCE.................................................................. 23

CERTIFICATE OF SERVICE ........................................................................ 24

# TABLE OF AUTHORITIES

**Cases**                                             **Page(s)**

*Akiachak Native Cmty. v. Jewell*,
  995 F. Supp. 2d 7 (D.D.C. 2014)....................................................................18

*Am. Lung Ass'n v. EPA*,
  No. 96-1251, 1996 WL 734086 (D.C. Cir. Nov. 15, 1996)............................10

*Cooling Water Intake Structure Coal. v. EPA*,
  905 F.3d 49 (2d Cir. 2018) .....................................................................16, 17

*Crow Creek Sioux Tribe v. Brownlee*,
  331 F.3d 912 (D.C. Cir. 2003) ......................................................................13

*Ctr. for Biological Diversity v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ......................................................................11

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
  733 F.3d 1106 (11th Cir. 2013)......................................................................14

*Fed. Nat'l Mortg. Ass'n v. LeCrone*,
  868 F.2d 190 (6th Cir. 1989)..........................................................................12

*Forest Serv. Emps. for Env't Ethics v. USFWS*,
  726 F. Supp. 2d 1195 (D. Mont. 2010)..........................................................16

*Fund for Animals v. Espy*,
  814 F. Supp. 142 (D.D.C. 1993) ....................................................................22

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981)................................................................................15, 18

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ..........................................................................18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................................11

*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) .......................................................................18

*Nat'l Wildlife Fed'n v. Andrus*,
    440 F. Supp. 1245 (D.D.C. 1977)...............................................22

*Nat'l Wildlife Fed'n v. Brownlee*,
    402 F. Supp. 2d 1 (D.D.C. 2005)...............................................18

*Oceana v. Pritzker*,
    125 F. Supp. 3d 232 (D.D.C. 2015)...........................................11

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012)...........................................20

*Solid Waste Agency of N. Cook Cnty. v. Corps*,
    531 U.S. 159 (2001)...............................................................19

*Waterkeeper Alliance, Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022)...................................................12

**Federal Statutes**

16 U.S.C. § 1531(a)(1)...............................................................3

16 U.S.C. § 1532(19)..................................................................3

16 U.S.C. § 1536.......................................................................3

16 U.S.C. § 1536(a)(2)...............................................................3

16 U.S.C. § 1536(b)(3)(A)...........................................................3

16 U.S.C. § 1538(a)(1)(B)...........................................................3

16 U.S.C. § 1539.......................................................................3

16 U.S.C. § 1539(a)...................................................................4

33 U.S.C. § 1344(i)...................................................................21

33 U.S.C. § 1344(a)....................................................................2

33 U.S.C. § 1344(g)....................................................................2

33 U.S.C. § 1344(h)(1)(A)(i).........................................................2

**Federal Regulations**

40 C.F.R. § 230.10(b)(2)...................................................................2

40 C.F.R. § 233.20(a).......................................................................2

50 C.F.R. § 17.22(b)(1).....................................................................4

50 C.F.R. § 17.31(a).........................................................................3

50 C.F.R. § 402.14...........................................................................3

50 C.F.R. § 402.14(g)........................................................................3

50 C.F.R. § 402.14(h)........................................................................3

**Other Authorities**

D.C. Cir. *Handbook of Practice & Internal Procedures* VIII.B ...........................10

# **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| Assumable Waters | Waters of the United States under the Clean Water Act over which states may assume Section 404 permitting authority pursuant to 33 U.S.C. § 1344(g)(1) |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BiOp | Biological Opinion |
| Conservation Groups | Plaintiff-Appellees Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| Corps | U.S. Army Corps of Engineers |
| Corps Dec. | Declaration of Shawn H. Zinszer, Corps, Apr. 30, 2024, Doc. #2052135 at 7–10 |
| EPA | U.S. Environmental Protection Agency |
| ERP program | Florida Environmental Resource Permit program |
| ESA | Endangered Species Act |
| FDEP | Florida Department of Environmental Protection |
| FDEP Dec. | Declaration of Justin Wolfe, FDEP, Apr. 25, 2024, Doc. #2051487 at 1468–538 |
| FDOT Dec. | Declaration of Jennifer Marshall, FDOT, Apr. 25, 2024, Doc. #2051487 at 1540–43 |
| FDOT | Florida Department of Transportation |

ix

| | |
|---|---|
| Defendants | EPA, USFWS, the Corps, and federal officials |
| Florida | Intervenor-Appellants State of Florida and FDEP |
| ITP | Incidental Take Permit (Section 10 of the ESA) |
| ITS | Incidental Take Statement (Section 7 of the ESA) |
| NMFS | National Marine Fisheries Service |
| Partial Stay Denial | Memorandum Opinion, Apr. 25, 2024, Doc. #2051487 at 1149–75 |
| Opinion | Amended Memorandum Opinion, Apr. 25, 2024, Doc. #2051487 at 1177–274 |
| Retained Waters | Waters of the United States under the Clean Water Act over which the Corps retains Section 404 permitting authority after state assumption pursuant to 33 U.S.C. § 1344(g) |
| RHA | Rivers and Harbors Act |
| Stay Denial | Memorandum Opinion and Order, Apr. 25, 2024, Doc. #2051487 at 1294–307 |
| TA Process | Technical Assistance Process |
| Transcript | Transcript for Oct. 19, 2023, Hearing on Cross-Motions for Summary Judgment, Doc. #2051487 at 1309–466 |
| USFWS | U.S. Fish and Wildlife Service |
| Wildlife Agencies | NMFS and USFWS |

## **INTRODUCTION**

Conservation Groups oppose Florida's request to expedite their appeal because Florida has failed to meet the standard for this extraordinary relief. The district court decision here was well-reasoned and rested on the plain language of the ESA and its implementing regulations as well as decades of precedent. The decision is not subject to substantial challenge based on a single out-of-circuit case that was decided under fundamentally different circumstances and is contrary to the plain language of the statute and the overwhelming weight of authority.

Florida also has not shown irreparable injury. Florida has made the same claims of irreparable injury three times before. The district court rejected the claims in denying Florida's motion for a limited stay and then for a full stay pending appeal. This Court also denied Florida's motion for a stay pending appeal, which relied on the same claims of irreparable harm. The panel concluded unanimously that Florida had failed to meet the stringent standard for a stay.

Federal administration of the Clean Water Act's 404 program—which existed for more than forty years before Florida assumed authority over that program—does not impinge on Florida's sovereign interests. Florida retains control over all waters in the State under State law. And Florida has no sovereign interest in the administration of a federal program.

1

Nor has Florida shown that the public has an unusual interest in a expedited disposition of the appeal. There is no evidence that the regulated community is "in disarray" because the Corps has resumed authority over the program and is presently reviewing and issuing permits. And there is no evidence that the public requires expedited resolution of the appeal since the Corps is fully capable of permitting projects where the public is a beneficiary.

Florida's request is also premature because the time for the Defendants to decide whether to appeal has not yet run, nor has the time run for Conservation Groups to decide whether to cross-appeal. It would be inefficient and impractical to set a schedule before knowing the scope of the appeal. *See* Doc. #2057447 at 5–7.

## STATUTORY FRAMEWORK

### I.    The Clean Water Act

Section 404 authorizes the Corps to permit discharges of dredged and fill materials into waters of the United States. 33 U.S.C. § 1344(a). The Clean Water Act allows a state to seek to administer Section 404 within assumable waters. However, EPA must first determine that state programs meet the federal floor, including the Section 404(b)(1) Guidelines. *Id.* § 1344(g), (h)(1)(A)(i). Notably, the Guidelines prohibit the issuance of permits that would jeopardize ESA-listed species or adversely modify or destroy critical habitat. 40 C.F.R. §§ 230.10(b)(2), 233.20(a). Only two states currently administer 404 in assumable waters: Michigan

(since 1984) and New Jersey (since 1994).

## II.    The Endangered Species Act

Congress enacted the ESA to address increasing threats of extinction due to "economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). To accomplish this goal, Section 7 requires federal agencies to consult with wildlife agencies whenever a federal action may affect threatened or endangered species. *Id.* § 1536; 50 C.F.R. § 402.14 (2019).[1] If the action is likely to adversely affect protected species, the wildlife agencies must use the best available data to produce a detailed BiOp that analyzes the action's impacts on species to ensure that the action is not likely to jeopardize protected species. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

The ESA also prohibits taking (e.g., injuring or killing) protected species. 16 U.S.C. §§ 1532(19), 1538(a)(1)(B); 50 C.F.R. § 17.31(a). Congress created two paths to ensure that "incidental" take resulting from otherwise lawful activities would not jeopardize protected species: (1) Section 7 for federal actions, 16 U.S.C. § 1536; and (2) Section 10 for non-federal actions, *id.* § 1539. Both mandate robust analyses and standards for wildlife agencies to limit the amount of authorized incidental take and exempt that take from the ESA's prohibition (and corresponding

---

[1] This memorandum cites the regulations in effect at the time of EPA's action.

3

liability).  *Id.* § 1539(a); 50 C.F.R. § 17.22(b)(1).  *See* Doc. #2051487 at 1185–96 (Opinion) (setting forth a detailed statutory framework for the ESA).

## PROCEDURAL HISTORY

In 2020, Florida applied to administer Section 404 in assumable waters. Home to more than 130 threatened and endangered species, Florida wanted to ensure that state permittees would not face ESA liability for incidental take, a shield available to permittees through Section 7 when the Corps (a federal actor) administers the program. *Id.* at 1181, 1217.  Florida (a non-federal actor) could not avail itself of permit-level Section 7 consultation.  And Florida felt that the Section 10 process was too "burdensome," "time consuming[,] and resource-intensive." *Id.* at 1181 (internal quotations omitted).

Florida therefore proposed a non-statutory solution.  EPA would engage in a one-time Section 7 consultation at the programmatic level.  USFWS would then produce a BiOp that would punt all species-related analyses to a non-statutory and insufficient "TA process" at the permit level.  But despite the absence of these requisite analyses, USFWS would still issue an ITS at the programmatic level that would extend unlimited take liability coverage to all future state permittees at the permit level. *Id.* at 1181, 1183, 1254–55.  At the time, however, EPA's position was that state 404 program approval did not require Section 7 consultation. *Id.* at 1201.

4

EPA moved at breakneck speed to approve Florida's application and adopt Florida's non-statutory approach. This speed was possible, in part, because the Defendants and Florida worked for months before Florida submitted its application acting as though Florida's ESA proposal was a done deal. *Id.* at 1201–06.[2]

Within days of Florida's application, EPA adopted Florida's request to reverse its position on Section 7 consultation for state program approvals and found that "one-time" Section 7 consultation would suffice. *Id.* at 1181, 1201–02, 1206. EPA then immediately requested formal consultation with USFWS, transmitting a BE that was "cut and paste[d]" from Florida's BA. *See id.* at 1203, 1205–07. EPA did not engage in formal consultation with NMFS, erroneously concluding that consultation was not required. *Id.* at 1207. USFWS then issued its BiOp after public comment on Florida's application closed, even though the application relied on it to claim program sufficiency. *Id.* at 1207–08, 1260–61.

The BiOp and ITS contained several serious errors. USFWS concluded that EPA's action would likely "adversely affect" protected species, but:

    (1) failed to conduct any of the analyses required by Section 7; and

    (2) deferred all species analysis to an inadequate, non-statutory "TA process" at the permit level;

---

[2] EPA deemed Florida's application "complete" as of its submission, which triggered a 120-day decision deadline (that could be extended), even though the application relied on the "anticipated" BiOp. *Id.* at 1198 (Opinion); *id.* at 847 (Pls.' MSJ).

(3) but still asserted that EPA's approval of Florida's program would not jeopardize species;

(4) USFWS also opined that EPA's approval was reasonably certain to result in the incidental take of listed species;

(5) but failed to set any limit on that take; and

(6) then extended unlimited incidental take liability coverage without imposing meaningful terms and conditions, including none applicable to state permittees. *Id.* at 1220, 1237–38, 1257.

EPA then erroneously relied on the facially invalid BiOp and ITS to approve Florida's application. *See id.* at 1260–61.

Conservation Groups representing thousands of members subsequently challenged the Defendants' actions, seeking vacatur of EPA's approval and USFWS' BiOp and ITS. *Id.* at 1209. The Amended Complaint alleged that EPA and USFWS did not comply with the ESA either procedurally or substantively (Counts 3–6, 10–13). It also alleged EPA's approval violated the Clean Water Act and APA because Florida's proposal was not complete when submitted (Count 1) and not as stringent as federal law requires (Count 2). And it alleged the Corps' retained waters list violated the RHA (Count 7). The district court granted early summary judgment to the Defendants on preliminary procedural claims (Claims 8 and 9), while the parties resolved administrative record issues and briefed summary judgment on all other claims. *See id.* at 1209.

Center for Biological Diversity and Sierra Club then moved for a preliminary injunction to prevent Florida's imminent issuance of 404 permits for projects that would cause irreparable harm to the critically endangered Florida panther (estimated remaining adult population between 120 to 230) and the threatened Florida crested caracara (a bird of prey with scarce available habitat). Ex. 1;[3] Ex. 2.

After reviewing more than twenty briefs on the merits, studying a voluminous administrative record consisting of thousands of pages, hearing oral argument on the ESA claims (twice), and considering additional briefing and evidence on remedy, the district court granted summary judgment to Conservation Groups on their ESA claims, vacated the BiOp, ITS, and program approval (prospectively), and denied the motion for preliminary injunction as moot. *See* Doc. #2051487 at 1183, 1211 n.8 (Opinion).

The court found USFWS' BiOp unlawful in part because it failed to conduct *any* of the species-specific analysis that Section 7 requires. *Id.* at 1234. USFWS was not "free to disregard" this mandate by deferring analysis to a later process that itself would not be subject to Section 7. *Id.* at 1247.

---

[3] Citations to exhibits reference those attached to Conservation Groups' Response to Florida's Motion to Stay Pending Appeal, Doc. #2053051. For these exhibits, Conservation Groups pin cite the ECF page number in the D.C. Circuit.

The court held that USFWS' ITS was unlawful because it contained no take limit and expressly disavowed any duty to reinitiate consultation should EPA's approval of Florida's 404 program result in excess take or otherwise jeopardize the continued existence of protected species. *Id.* at 1257. While the ESA creates two paths for take liability coverage (Sections 7 and 10), neither authorized the scheme that the Defendants adopted at Florida's request. *Id.*

And the court found that EPA impermissibly relied on USFWS' BiOp and ITS to approve Florida's program, given that those documents "entirely fail[ed] to address essential questions." *Id.* at 1260–61. This reliance was a serious violation because, as the Defendants estimate, as many as 85% of Florida 404 permit applications may affect ESA-listed species. *See id.* at 1156 (Partial Stay Denial). EPA's approval also unlawfully relied on a "no effect" determination as to NMFS species that erroneously disregarded indirect effects. *Id.* at 1262–64 (Opinion).

Turning to remedy, the court considered additional briefing from the parties, intervenors (including Florida's nearly 500-page declaration), and amici and carefully analyzed the *Allied-Signal* factors. *Id.* at 1265. *See* Ex. 3 at 7–14. The court concluded that the agencies' ESA violations were serious and that vacatur was warranted. Doc. #2051487 at 1265–72 (Opinion). The court also found that the disruption Florida alleged was "inherent" in Congress' design because Section 404 requires EPA to withdraw approval of an unlawful state program. *Id.* at 1269–70.

The court accepted still more briefing and evidence on Florida's motion for a limited stay, which the Defendants opposed as "neither workable nor lawful." *Id.* at 1152 (Partial Stay Denial). The court agreed with the Defendants and denied the stay. *Id.* The court found that "the Corps stands ready and able" to process pending permit applications and that "any delay in processing those applications is a result of Florida's effort to keep some semblance of the Section 404 assumption in place—even if only temporarily." *Id. See id.* at 1158–60. In light of the vacatur and at Florida's request, the court dismissed Plaintiffs' Clean Water Act claims without prejudice as prudentially moot and directed entry of partial final judgment to allow this appeal. *Id.* at 1149, 1175.

The court considered yet another round of briefing on Florida's motion for a full stay pending appeal, which relied on hundreds of pages of previously submitted declarations. *See id.* at 1295–96 (Stay Denial). The court denied the stay finding that Florida failed to show a likelihood of success on appeal (or even the lower, albeit inapplicable, "serious legal question" standard), irreparable injury, or that the balance of harms and public interest weighed in favor of a stay. *Id.* at 1294, 1298–1307 (Stay Denial).[4]

---

[4] The district court also issued an Amended Opinion on the merits that contained minor revisions. Doc. #2051487 at 1157 n.2 (Stay Denial).

Florida then moved for a stay pending appeal before this Court, which relied on even more declarations and raised the same arguments it does here to support expediting the appeal. Doc. #2051487. The Defendants and Conservation Groups opposed the stay. Doc #2052135; Doc. #2053051. And the court ultimately denied Florida's motion because it "ha[d] not satisfied the stringent requirements for a stay pending appeal." Doc. #2055213.

## LEGAL STANDARD

"The Court grants expedited consideration very rarely." D.C. Cir. *Handbook of Practice & Internal Procedures* VIII.B. The movant must provide "strongly compelling" reasons for granting this extraordinary relief. *Id.*; *Am. Lung Ass'n v. EPA*, No. 96-1251, 1996 WL 734086, at *1 (D.C. Cir. Nov. 15, 1996). The movant must demonstrate that (1) delay will cause irreparable injury; and (2) the decision under review is subject to substantial challenge. D.C. Cir. *Handbook of Practice & Internal Procedures* VIII.B. The Court may also expedite cases where the public has "an unusual interest in prompt disposition." *Id.* Florida's motion fails to carry this burden.

## ARGUMENT

## I.    The District Court's Decision is Not Subject to a Substantial Challenge.

Florida argues that the district court's decision is subject to substantial challenges because (1) Conservation Groups lacked standing; and (2) the

10

Defendants' actions complied with the ESA.  Florida is wrong on both counts.  *See* Doc. #2051487 at 1298–1302 (Stay Denial).

## A.    Conservation Groups Demonstrated Standing.

The district court properly concluded that Conservation Groups had standing. Detailed declarations set forth their members' recreational and aesthetic interests, including regularly hiking, camping, and seeking to view protected species, like the endangered Florida panther, in the wild.  *Id.* at 1214–27 (Opinion); Ex. 4 at 4, 12–20 ¶¶ 9, 30–44 (Crooks).[5]  The Defendants' actions harmed these interests, which established an Article III injury.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183–85 (D.C. Cir. 2017); *Oceana v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015).

As it did in its stay request, Florida here claims Conservation Groups have failed to show that Florida's program was less protective than the Corps' program. Doc. #2056116 at 7.  But Conservation Groups did just that.

As the district court held, EPA's transfer decision relied on USFWS' unlawful consultation.  USFWS failed to conduct species-specific analyses, set incidental take limits, or ensure that EPA's transfer of authority would not jeopardize listed species,

---

[5] *See also* Ex. 5 at 10–11 ¶¶ 30–33 (Carter), 19–25 ¶¶ 20–36 (Fleming), 35–38 ¶¶ 32–40 (Hartl), 42–57 ¶¶ 9–54 (Schwartz), 60, 66–67 ¶¶ 9, 28–32 (Rinaman), 77–82 ¶¶ 21–36 (Silverstein), 90–92 ¶¶ 23–27 (Robertson), 96 ¶ 8 (Glendhill), 101–10 ¶¶ 15–40 (Umpierre).

like the Florida panther.  Doc. #2051487 at 1217–21, 1233–58 (Opinion).

Florida's TA process also "provid[ed] far less robust ESA protection of listed species than the ESA procedures it supplant[ed]," thereby posing direct threats to species and members' interests in them. *Id.* at 1219–20, 55.  The "TA process" could also insulate USFWS from any ESA accountability because (1) state courts, which review state permit challenges, cannot review federal agency actions, *Fed. Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 193 (6th Cir. 1989); and (2) according to the Defendants, USFWS' technical assistance does not constitute agency action reviewable in federal court, Ex. 11 at 14.

The district court found that these violations would harm Conservation Groups, and that Conservation Groups therefore had standing.  Doc. #2051487 at 1217–24 (Opinion).

Florida relies on the same cases it has raised throughout this litigation and argues there is no harm where a state program preserves equivalent safeguards as federal law.  Doc. #2056116 at 7.  But Florida's program is *not* equivalent, and these cases are inapposite.

In *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654, 660–63 (D.C. Cir. 2022), the plaintiffs challenged an EPA regulation that would not affect the state program causing their harm (and thus failed to show redressability).  Here, the Defendants' actions authorized the transfer of 404 authority to Florida.  Florida's

12

program harmed Conservation Groups, and vacating EPA's action remedied those harms.  Doc. #2051487 at 1222–24 (Opinion).

In *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 917 (D.C. Cir. 2003), the challenged transfer "effect[ed] no legal change that would lessen the protection of the Tribe's cultural heritage under federal law."  Here, EPA's transfer decision resulted in the loss of Section 7 consultation, replaced by a non-statutory and inadequate TA process.  Doc. #2051487 at 1218–20, 1238, 1255, 1257 (Opinion).  Florida also relies on EPA's oversight, Doc. #2056116 at 7–8, but that "[o]versight is intended to ensure that a state program is operating as approved, not to remedy a violation of the ESA."  Doc. #2051487 at 1257 (Opinion).

## B.    The BiOp and ITS Violated the ESA.

Far from taking a "novel" approach, Doc. #2056116 at 6, the district court found the BiOp and ITS unlawful based on the plain language of the ESA and its implementing regulations as well as decades of caselaw.

The ESA unambiguously requires USFWS to use the best available data to issue a BiOp that "detail[s] how the agency action affects the species."  Doc. #2051487 at 1188–91, 1233–36 (Opinion) (quoting 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(g)–(h)).  The BiOp here, however, "failed to undertake *any* species-specific analysis."  *Id.* at 1234 (emphasis in original).  *See id.* at 1150–51 (Partial Stay Denial); *id.* at 1298–1300 (Stay Denial).  Nor did USFWS

use the "reams of data from previous Section 7 consultations" at its disposal. *Id.* at 1239–40 (Opinion). With this data, USFWS "'could have determined whether post-[assumption] activities in particular areas were fundamentally incompatible with the continued existence of the species.'" *Id.* at 1240 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

Florida disputes the court's reading of the ESA, Doc. #2056116 at 5, by again taking Section 7(a)(2)—which requires wildlife agencies to make an ultimate conclusion as to whether jeopardy to listed species is likely—out of context. Florida ignores the rest of Section 7, where Congress expressly directed *how* USFWS must reach that determination: by using the best available data to detail effects on listed species. Doc. #2051487 at 1233 (Opinion).

Florida again relies on *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013), Doc. #2056116 at 5, to bolster its plain language argument. But the action there *complied* with the ESA. Doc. #2051487 at 1244, 1253 (Opinion). That BiOp contained species-specific analyses, committed to future Section 7 consultations, and authorized no incidental take. *Id.*; *id.* at 1299–1300 (Stay Denial).

Notably, Florida fails to identify *any* error, Doc. #2056116 at 5–6, in the district court' determination that the ITS was unlawful. Doc. #2051487 at 1247–57 (Opinion). The ITS "sets no numerical take limit, offers no surrogate, and provides

14

no 'clear standard for determining when the level of anticipated take has been exceeded.'" *Id.* at 1250 (quoting 50 C.F.R. § 402.14(i)(1)(i)). Moreover, "none of the listed 'terms and condition[s]' govern the conduct of state permittees," binding only EPA and Florida. *Id.* at 1208.

### C. The "TA Process" Was Unlawful.

USFWS' approach to consultation was also unlawful because it evaded compliance with Section 7 altogether, at both the programmatic and permit levels. *Id.* at 1193, 1245–47. That "is not the law that Congress enacted." *Id.* *See id.* at 1300 (Stay Denial); Ex. 6 at 38–43; Ex. 7.

Florida claims that the district court's decision undermines federalism principles in the Clean Water Act and ESA by "foreclose[ing]" USFWS' ability to engage in programmatic consultation and rendering state assumption "obsolete." Doc. #2056116 at 6–7. But a state is only empowered to administer federal programs *in compliance with* federal law. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–92 (1981). *Accord* Doc. #2051487 at 1303–04 (Stay Denial).

The district court (and EPA) recognized that there were other options for Florida's assumption that would have complied with the ESA. *Id.* at 1203, 1239, 1272 (Opinion). But Florida pushed for this particular scheme to secure broad take liability exemption for state permittees without USFWS undertaking Section 7 analyses or requiring state permittees to obtain Section 10 ITPs. *See, e.g., id.* at

15

1202–03, 1206–07, 1243; *id.* at 1300 (Stay Denial).  Nothing prevents Florida (or any other state) from following a *lawful* process to assume the 404 program.

### D.    Florida is Not Likely to Succeed Based on *Cooling Water*.

Florida again relies extensively on the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), Doc. #2056116 at 2–3, 5–6, which involved programmatic consultation on an EPA rulemaking.  But as the district court concluded, *Cooling Water* addressed fundamentally different facts and was wrongly decided.  Doc. #2051487 at 1241–47, 1252 (Opinion); *id.* at 1298–300 (Stay Denial).   Although Florida claims that the district court was the "first in the country" to reject *Cooling Water*, Doc. #2056116 at 6, Florida fails to acknowledge that the instant case was the "first next time" that an agency adopted a TA process approach.  Doc. #2051487 at 1243 (Opinion).  *See also id.* at 1240, 1255–56 (discussing *Forest Serv. Emps. for Env't Ethics v. USFWS*, 726 F. Supp. 2d 1195 (D. Mont. 2010) (rejecting a "similar scheme")).

*Cooling Water* arose in a very specific, and different, context.  It addressed nationwide EPA standards for cooling water structures that would be implemented through state and federal Section 402 permits for power plants and manufacturing facilities.  *Id.* at 1241 (Opinion).  Here, EPA was transferring authority over Section 404 assumable waters from the Corps to Florida (including permitting, compliance, and enforcement).  *Id.*  There, EPA promulgated a TA process that created legally

binding responsibilities for all parties. *Id.* at 1241–42. Here, the TA process contained no enforceable regulatory framework binding the parties' actions. *Id.* at 1242; *id.* at 1397–1400 (Transcript); Ex. 7. There, consultation data from past state and federal permits for cooling water intake structures was non-existent. *See* Ex. 6 at 47–48. Here, USFWS had decades of data from its own consultations on 404 permits in Florida that it could and should have used to perform ESA-mandated analyses. Doc. #2051487 at 1239–40 (Opinion).

Additionally, *Cooling Water*'s approval of deferring species analysis to the permit stage was "at odds with the statute, regulations, and caselaw." *Id.* at 1243–47, 1252 (Opinion); *id.* at 1299–300 (Stay Denial). Although the ESA authorizes programmatic consultation, it requires complete Section 7 consultation to occur at either the programmatic or permit level, or both. *See id.* at 1243–47 (Opinion). Indeed, as the district court explained, the very authority on which *Cooling Water* relied to say otherwise affirms this reading of the ESA. *See id.* at 1244. *Cooling Water* also clearly erred in holding that setting no take limit was lawful because, again, the decision itself relied on cases that themselves required a take limit. *See id.* at 1252. As the district court here remarked, "in a case that has been briefed beyond the point of exhaustion," the Defendants were able to identify only *Cooling Water* as upholding an ITS that set no take limit. *Id.*

As it did before, Florida again, Doc. #2056116 at 5–6, "never explains why

[the district court's opinion] is wrong—or even subject to serious dispute." *See* Doc. #2051487 at 1299 (Stay Denial); *see also id.* at 1245–47 (Opinion) (discussing *N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), and *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005)).  As such, its arguments fail.

## II.    Florida Has Failed to Demonstrate Any Irreparable Injuries.

Florida again leans on purported irreparable injuries that are speculative, nonexistent, or self-inflicted.  *See* Doc. #2051487 at 1302–05 (Stay Denial).  None are irreparable and none support expedited consideration.

Florida's repeated allegation of harm to its sovereign interests, Doc. #2056116 at 8, fails because any state interest in administering a federal program requires compliance with federal law.  *Hodel*, 452 U.S. at 289–92.  Moreover, Florida enjoys the same authority over waters subject to the Clean Water Act as it had prior to EPA's approval.  Doc. #2051487 at 1303–04 (Stay Denial).  Florida "remains free to enforce *state* law," such as its ERP program, "and to exercise its traditional sovereign authority to prevent pollution and other environmental harms."  *Id.* (emphasis in original).  *See id.* at 1471–72 ¶ 12 (FDEP Dec.).

Florida's cited cases are therefore unavailing.  *Cf. Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 16–17 (D.D.C. 2014) (regulation impinged state sovereignty by allowing federal government to take tribal lands into trust, beyond state's control); *Kentucky v. Biden*, 23 F.4th 585, 600, 611–12 (6th Cir. 2022)

18

(federal vaccine requirement impinged state authority over public health); *Solid Waste Agency of N. Cook Cnty. v. Corps*, 531 U.S. 159 (2001) (scope of waters subject to the Clean Water Act, which is not at issue here).

Florida also argues that purported delays in the issuance of pending state permits cause irreparable harm.  Doc. #2056116 at 9.  But "the Corps is ready, willing, and able to administer" Section 404 in Florida's assumable waters during appeal—as the Corps did for decades before EPA's approval "and as it does in 47 other States."  Doc. #2051487 at 1302–03 (Stay Denial) (quoting Ex. 8 at 28–31)). *See id.* at 1304–05; Doc. #2057447 at 4–5.  The Corps has explained that it has more staff and resources now than it did before Florida assumed the program.  *Compare* Doc. #2052135 at 8 ¶¶ 7–8 (Corps reporting 126 full-time staff, 23 more than pre-assumption), *with* Ex. 9 (FDEP reporting 90 permitting staff spend *majority* of their time on 404).  And the Corps has unequivocally stated that "[p]ermit applications received from Florida or by applicants for projects in state-assumed waters will not go to the 'back of the line.'"  Doc. #2052135 at 10 ¶ 11.  Indeed, "the Corps expects that the information developed through the state's process will help expedite the Corps' review of those applications."  *Id.*

Rather it is Florida itself that stands in the way of the Corps processing pending permits because Florida refuses to transfer state applications to the Corps. *See* Doc. #2051487 at 1478 ¶ 26 (FDEP Dec.); Ex. 4 at 20 ¶ 45.  When Florida (or

developers) decide not to avail themselves of the Corps' permitting process, any harms from delay are self-inflicted. *See Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 122–24 (D.D.C. 2012) (harms self-inflicted where party could have sought permits during case; allegedly "burdensome permitting system" "not sufficient justification"). Even Florida's Department of Transportation has submitted its "priority" projects to the Corps. Doc. #2051487 at 1542 ¶ 10 (FDOT Dec.).

Although amici's brief in support of Florida's stay request, Doc. #2052661 at 11, hyperbolically alleged "cataclysmic" impacts from the vacatur decision, there is no evidence supporting amici's speculative claims. And notably, no parade of horribles resulted from delays caused by the transfer of the 404 program *to Florida*. *See* Doc. #2051487 at 1270 (Opinion) (no complaints of disruption when EPA transferred program to Florida).

Additionally, Florida claims that its past expenditures on the 404 program are now "wasted," Doc. #2056116 at 9, but past expenditures do not support the issuance of relief here. *See* Doc. #2051487 at 1305 (Stay Denial). Nor were Florida's expended resources wasted. Florida used those expenditures to run the 404 program prior to vacatur. And the overlap between Florida's ERP and 404 permitting programs (which Florida put at 85%) suggests the vast majority of ongoing expenditures will continue to serve the ERP program. *See id.* at 1303–04 (Florida claimed 85% overlap of 404 and state ERP programs). Moreover, Florida's claim

20

that hundreds of staff were hired just to administer Section 404, Doc. #2056116 at 9, is contrary to the record, *see* Doc. #2051487 at 1303–04 (Stay Denial); Ex. 9 (FDEP reporting 90 permitting, 44 enforcement staff spend most of their time on 404); Ex. 10 at 3, 10 (EPA concerns about adequacy of Florida's 404 staffing). Florida's purported loss of "permitting efficiencies," Doc. #2056116 at 9, also does not constitute irreparable harm, Doc. #2051487 at 1305 (Stay Denial).

Although Florida also complains there are "questions" about whether it can enforce 404 permits, Doc. #2056116 at 9, those complaints raise "(at most) an efficiency concern and do[] not constitute" irreparable injury, Doc. #2051487 at 1304 (Stay Denial). The Corps has resumed enforcement of Section 404 in Florida, *see* 33 U.S.C. § 1344(i), and its program is more robust than Florida's program, which exempted an entire class of violations (simple negligence) from enforcement, *see* Doc. #2051487 at 837, 871–76 (Pls. MSJ); Ex. 6 at 55–66.

## III.   Florida Has Failed to Demonstrate the Public Has an Unusual Interest in Expedited Review.

Florida claims that the public has an unusual interest in expedited review, Doc. #2056116 at 10–11, but its arguments all stem from the same purported delay in the issuance of 404 permits. Florida argues that the regulated community is in a "state of disarray" and that Florida's citizens suffer "collateral damage." *Id.* These claims fail for the reasons detailed above. Rather, "[t]he public unquestionably has a substantial stake in the enforcement of [federal environmental laws] and in

preservation of the natural environment." *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977); *see also Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) ("strong public interest in meticulous compliance with the law by public officials"). *See* Ex. 11 at 35; Doc. #2053051 at 33–35.

## **CONCLUSION**

Because Florida has failed to carry its burden, the motion should be denied.

Dated: June 3, 2024

Respectfully submitted,

*/s/ Christina I. Reichert*
CHRISTINA I. REICHERT
TANIA GALLONI
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
Email: creichert@earthjustice.org
Email: tgalloni@earthjustice.org
Telephone: (305) 440-5432

BONNIE MALLOY
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
Email: bmalloy@earthjustice.org
Telephone: (850) 681-0031

*Attorneys for Plaintiff-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,022 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: June 3, 2024

*/s/ Christina I. Reichert*
CHRISTINA I. REICHERT

*Attorney for Plaintiff-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of June 2024, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Christina I. Reichert*
CHRISTINA I. REICHERT
Fla. Bar No. 114257
Earthjustice
4500 Biscayne Blvd., Ste
201 Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
creichert@earthjustice.org