NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5101

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
*Plaintiff-Appellees*, *Cross-Appellants*,

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Defendants*,

STATE OF FLORIDA, ET AL.,
*Intervenor-Appellants*, *Cross-Appellees*.

---

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:21-CV-0119 (RDM)

---

**PLAINTIFF-APPELLEES' / CROSS-APPELLANTS'
NOTICE OF FILING UNDERLYING DECISIONS**

---

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd, Ste. 201
Miami, FL 33137
Tel.: (305) 440-5432
tgalloni@earthjustice.org
creichert@earthjustice.org

Dated: July 10, 2024

Bonnie Malloy
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL 32301
Tel.: (850) 681-0031
bmalloy@earthjustice.org


*Attorneys for Plaintiff-Appellees,
Cross-Appellants*

## NOTICE OF FILING UNDERLYING DECISIONS
## FROM WHICH CROSS-APPEAL ARISES

Plaintiff-Appellees / Cross-Appellants Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper (collectively, "Conservation Groups") submit copies of the underlying District Court decisions from which this cross-appeal arises: The District Court's April 12, 2024, Memorandum of Opinion and the District Court's Order on Claims 1, 2, and 5 entered on April 12, 2024, in favor of the Defendants and Intervenor-Defendants and against Plaintiffs.

Dated: July 10, 2024                        Respectfully submitted,

*/s/ Tania Galloni*
TANIA GALLONI
CHRISTINA I. REICHERT
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
Email: tgalloni@earthjustice.org
Email: creichert@earthjustice.org
Telephone: (305) 440-5432

BONNIE MALLOY
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
Email: bmalloy@earthjustice.org
Telephone: (850) 681-0031

*Attorneys for Plaintiff-Appellee, Cross-Appellants*

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of July 2024, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Tania Galloni*
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　　v.<br><br>MICHAEL S. REGAN, *et al.*,<br><br>　　　　　*Defendants*. | Civil Action No. 21-119 (RDM) |

## MEMORANDUM OPINION

Two motions are currently before the Court: (1) the State of Florida's motion, Dkt. 166, for a limited stay of the Court's February 15, 2024 order, Dkt. 164, which both Plaintiffs and the Federal Defendants oppose, Dkt. 165; Dkt. 169, and (2) Florida's expedited motion for entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d), or, in the alternative, entry of partial, final judgment pursuant to Rule 54(b), Dkt. 171, which Plaintiffs oppose, Dkt. 178, and which the Federal Defendants support in part and "take no position on" in part, Dkt. 175 at 1.

For the reasons that follow, the Court will deny Florida's motion for a limited stay, Dkt. 166. With respect to Florida's second motion, however, the Court will dismiss as prudentially moot Counts 1, 2 and 5 of the Amended Complaint, Dkt. 77; will deny Florida's motion for entry of final judgment pursuant to Rule 58(d); and will grant Florida's motion for entry of partial, final judgment as to Counts 1–6 and 8–13 of the Amended Complaint pursuant to Rule 54(b).

## I.  PROCEDURAL BACKGROUND

The Court's analysis of the substantive issues presented by this case has filled many pages. For present purposes, however, the Court need only briefly summarize some of the

central holdings in those decisions.  Two years ago, the Court granted partial summary judgment

in favor of the Federal Defendants and granted Florida's motion to dismiss with respect to Count

9 of the original complaint, which alleged that the Environmental Protection Agency's ("EPA")

failure to codify Florida's Section 404 program was arbitrary and capricious and not in

accordance with law.  *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 213

(D.D.C. 2022) ("*CBD I*").  Then, about a year later, the Court granted the Federal Defendants'

renewed motion for partial summary judgment and Florida's renewed motion to dismiss with

respect to Count 8 of the original complaint, which alleged that the EPA had unlawfully treated

its approval of Florida's Section 404 assumption application as an adjudication, rather than a

rulemaking, to avoid the 30-day notice requirement found in 5 U.S.C. § 706(2).  *See Ctr. for

Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, at *9–*10 (D.D.C. Aug.

23, 2023) ("*CBD II*").  Although the Court had previously held, in considering the challenge to

Count 9, that the approval of Florida's assumption application was a rulemaking, *see CBD I*, 597

F. Supp. 3d at 212, the Court concluded that Plaintiffs' corresponding injury was non-redressable

and that, as a result, Plaintiffs lacked Article III standing to pursue Count 8.  *See CBD II*, 2023

WL 5437496, at *4–9.  And, most recently, on February 15, 2024, the Court granted summary

judgment in Plaintiffs' favor on Counts 3, 4, 6 and 10–13 of the Amended Complaint.  *See Ctr.

for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 655368, at *4 (D.D.C. Feb. 15,

2024) ("*CBD III*").

While *CBD I* and *II* addressed Plaintiffs' procedural challenges brought under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, *CBD III* focused exclusively on a

subset of Plaintiffs' substantive challenges under the APA to certain actions taken by the Fish

and Wildlife Service ("FWS") pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §

1531 *et seq.*, and the EPA's reliance on those actions in its approval of Florida's Section 404

assumption application.  Without repeating the extensive analysis contained in that opinion, it

suffices for present purposes to note that, at Florida's request, the EPA "exercised [its] discretion

to cast Florida's assumption program in a manner designed to confer ESA liability protection on

future, state-permittees by inviting Section 7 consultation," which, in turn, required a

determination that the proposed program "would likely adversely affect" listed species, *CBD III*,

2024 WL 655368, at *28—but, having triggered the formal Section 7 process, the FWS failed to

prepare a Biological Opinion ("BiOp") containing the required species-specific analysis, *id.* at

*26–32, and failed to issue an Incidental Take Statement ("ITS") that included, among other

things, numerical take limits for listed species or surrogates for such limits, *id.* at *32–36.  The

Court, accordingly, set aside the BiOp and ITS, and, having done so, also set aside the EPA's

approval of Florida's Section 404 assumption application on the ground that the "the EPA

impermissibly relied on a facially flawed BiOp" (and ITS) in taking that action, and thus also

violated the APA.  *Id.* at *38; *see id.* at *37–39, *41–42.  Finally, after considering the factors set

forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir.

1993), the Court concluded that vacatur was required.  *See CBD III*, 2024 WL 655368, at *41–45

(citing 5 U.S.C. § 706).[1]

     The Court, however, left open the possibility of staying its vacatur order in part, in light

of the fact that not all permits issued pursuant to Section 404 of the Clean Water Act ("CWA")

implicate the ESA.  *Id.* at *44.  At the same time, the Court recognized that the parties had not

---

[1] The Court also denied as premature Florida's request for entry of partial final judgment
pursuant to Federal Rule of Civil Procedure 54(b) but invited the State to "renew its request after
the parties have reviewed this decision and have decided whether to seek a limited stay of the
Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has
decided how to proceed."  *Id.* at *45.

briefed the desirability or workability (or, as the parties now stress, the legality) of crafting a

program that would permit Florida to continue to process some, but not all, Section 404 permit

applications.  *Id.*  The Court was also cognizant that crafting such a program, even if possible

and desirable, would require the exercise of administrative discretion and that courts must take

care not to "substitute [their] judgment for that of the agency."  *Id.* (quoting *Vt. Yankee Nuclear

Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)).  Finally, the Court

acknowledged that, if it were inclined to grant a limited stay, it might need to go on to consider

Plaintiffs' remaining claims, which challenge the Section 404 assumption decision in other

respects.  *Id.*

       To provide the parties with an opportunity to consider—and, if necessary, to brief—these

issues, the Court gave Defendants ten days to seek a limited stay but made clear that, unless and

until a stay was granted, Florida lacked authority to issue Section 404 permits and that "all

[relevant] Section 404 permitting authority . . . is vested in the Army Corps of Engineers."  Dkt.

164 at 1.  On February 26, 2024, the Federal Defendants informed the Court that, in their view, a

limited stay was neither workable nor lawful.  Dkt. 165 at 1–2.  Florida disagreed and moved for

a limited stay of at least six months.  Dkt. 166 at 13, 19.  Plaintiffs opposed Florida's motion for

a limited stay, Dkt. 169, and, finally, Florida filed a reply brief in support of its motion, Dkt. 170.

Given the significant concerns about the workability (and legality) of the requested stay raised by

the parties—and, in particular, given the opposition of the federal agencies that would be

responsible for implementing such a program—the Court directed the parties to appear for a

hearing on the motion.  *See* Min. Order (Mar. 8, 2024).

       Before that hearing could take place, Florida filed a second motion—this time seeking

immediate entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d) or, in the

alternative, entry of partial, final judgment pursuant to Rule 54(b). Dkt. 171. And, failing either, Florida "reserved the right" to ask the Court to certify the questions decided in the February 15, 2024 opinion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.* at 4 n.3. Plaintiffs opposed both requests, Dkt. 178, and the Federal Defendants took a middle path, agreeing with Florida that the Court should enter final judgment pursuant to Rule 58(d) while taking "no position on Florida's [other] . . . requests," Dkt. 175 at 1. Briefing closed on March 25, 2024, when Florida filed a reply brief in support of its motion, Dkt. 179, and the Court held a hearing on April 4, 2024, *see* Min. Entry (Apr. 4, 2024).

Both of Florida's motions are now ripe for decision.

## II. ANALYSIS

### A. Florida's Motion for a Limited Stay

All agree that district courts, in general, have authority to stay vacatur orders, whether as an exercise of the court's inherent authority or based on the *Allied-Signal* factors. *See* Dkt. 166 at 3; Dkt. 169 at 6. The parties disagree, however, about whether it would be wise (or lawful) for the Court to do so under the present circumstances. In Florida's view, a limited stay is needed to avoid undue disruption, confusion, and delay in Section 404 permitting within the State. Dkt. 166 at 3–7. Plaintiffs and the Federal Defendants take the opposite view. They contend that a limited stay would be unworkable, would result in increased confusion and would, if anything, increase delays in the Section 404 permitting process. *See* Dkt. 165 at 2; Dkt. 169 at 6–7. The Federal Defendants, moreover, point to a regulation that precludes the EPA from approving "[p]artial State programs . . . under section 404," Dkt. 165 at 3 (alteration in original) (quoting 40 C.F.R. § 233.1(b)), and they argue that a limited stay would, in effect, create the type of "partial State program" that the regulation precludes.

5

The Court is persuaded that a limited stay is neither workable nor desirable.  The Court begins, once again, with the core tenet of administrative law that a court should not "substitute its judgment for that of the agency." *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 555 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  That principle applies here because a limited stay would require more than simply holding the Court's order in partial abeyance; it would require that various federal agencies, including the EPA, the FWS, and the U.S. Army Corps of Engineers ("Corps"), work with the State of Florida to design mechanisms and procedures that would permit the State to continue processing Section 404 applications that do not implicate the ESA, while requiring the Corps to process those that do implicate the ESA.  It is not the Court's role to develop such a program over the objection of the federal agencies, nor would such a judicially mandated approach come dressed for success.

Significantly, the Federal Defendants stress just how real these concerns are.  They observe:

> As a practical matter, it is unclear how, or even if, Florida and the Corps could divide permitting responsibilities for projects in state-assumed waters depending on whether those projects "may affect" listed species.  Under such an arrangement, would applicants apply to Florida or the Corps in the first instance?  Who would then determine impacts on ESA-listed species?  And what would happen if Florida and the Corps disagreed on that determination?  The time needed to answer these, and many other difficult questions could exceed the uncertain duration of a limited stay and would consume considerable agency resources that might otherwise go toward processing permits in the meantime.

Dkt. 165 at 2.  Nor do they stop there.  The Federal Defendants further observe that a limited stay would result in needless "redundancy"—for instance, if review of a proposed permit commences at the state level, only to then be transferred to the Corps later if it is determined that the proposed project "may affect" listed species.  *Id.*  Florida, for its part, agrees that a limited stay would raise a host of questions, including: how to define "a 'may affect' situation for these

purposes;" what "mechanism should be used to identify a 'may affect' situation;" "[w]hat options [would be] available to 'may affect' permit applicants;" and "[h]ow should a limited stay address permit applications that otherwise already trigger Section 7 procedures and/or will obtain Section 10 permit coverage."  Dkt. 166 at 8.  Although Florida proposes answers to some of these questions (and asks the Court to answer others), the Court will not step into the shoes of the federal agencies and design a new or modified Section 404 assumption program, which those agencies submit is neither workable nor lawful.

Recognizing these hurdles, Florida suggests a "second proposed option," which it submits is similar to the Section 404 programs currently in place in Michigan and New Jersey. Dkt. 170 at 9.  Under that approach, Florida "would continue to implement both the existing technical assistance process . . . as supplemented by the same basic 'Procedures' set forth in Section III of the New Jersey-EPA-FWS MOA."  Dkt. 166 at 14.  There are several problems, however, with this alternative.  First, and foremost, it is not the program that the EPA approved in response to Florida's Section 404 assumption application.  Notably, unlike the program that the EPA approved, this approach would provide no incidental take liability protection to Florida permittees.  *Id.* at 15.  That is a critical difference because incidental take protection is vastly more important in Florida than it is in Michigan and New Jersey; as Florida itself stressed at an earlier stage of the proceedings, New Jersey "has only 17 listed species and less than 1,400 square miles of water area," while "Florida has *over 130 listed species* and *over 12,000 square miles* of water area."  Dkt. 127-1 at 5 (emphasis in original).  Indeed, during the administrative process preceding the EPA's decision on Florida's Section 404 assumption application, the State represented that operating a state program without Section 7 incidental take protection at the program level would be "*more burdensome* than the existing federal program," due to the

7

prevalence of listed species in Florida.  *See* Dkt. 112-2 at 4 (emphasis added).  The EPA

similarly explained that in States, like Florida, with "an abundance of ESA listed species," the

absence of program-level incidental take protection would "present a significant obstacle to

assuming the 404 program."  Dkt. 112-3 at 368.  It follows that a stay that would allow Florida to

process Section 404 permit applications without incidental take protection would likely hinder—

rather than grease—the wheels of progress, since few developers would "risk civil and criminal

penalties."  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023).

 In response, Florida insists that the "vast majority of the projects in Florida don't

implicate incidental take."  Dkt. 181 at 11 (Apr. 4, 2024 Hrg. Tr.).  It estimates that on average

only about 15% of Florida Section 404 permit applications would likely trigger a "may affect"

finding.  Dkt. 166 at 11; Dkt. 166-1 at 4 (Wolfe Decl. ¶ 13).  The United States disagrees with

this estimate and would, instead, place the figure as high as 85%.  Dkt. 181 at 35–36 (Apr. 4,

2024 Hrg. Tr.).  That disagreement itself raises red flags about the workability of the proposed

stay, which would require considerable federal-state cooperation and agreement on key aspects

of the modified program.  But, even setting aside that concern, neither of Florida's proposed

approaches makes sense.

 To take just one significant example, under its first proposed approach, Florida argues

that the need for incidental take protection—which it deemed an essential component of its

assumption application—can be addressed by providing "may affect" permit applicants with

several options, including the option to hold an application in abeyance with the State, to amend

an application to ensure that the proposed project would have "no effect" on listed species, to

withdraw an application, or to request that the State "transfer the permit application file to the

Corps of Engineers for processing."  Dkt. 166 at 11–12.  It goes without saying, however, that

the first three options are unlikely to result in greater ease of administration, efficiency, or

expedition than simply allowing the Corps to process all Florida Section 404 permits—with the

concomitant benefit, where appropriate, of incidental take protection.  The fourth option,

moreover, runs head-on into Florida's contention that Plaintiffs have somehow misled the Court

about how the New Jersey program works.  Dkt. 170 at 1–3.

   For present purposes, the Court need not address Florida's accusation in any detail, other

than to note that the Court was not, in fact, misled.[2]  What does matter for present purposes is

that Florida maintains (and the Federal Defendants agree) that under Section 404 of the CWA

and the relevant implementing regulations, the EPA may transfer a permit application from a

State to the Corps only if "the proposed permit is (1) the subject of an interstate dispute under

§ 233.31(a) and/or (2) outside requirements of the Act, these regulations, or the 404(b)(1)

Guidelines[,]" 40 C.F.R. § 233.50(e), and the State is provided an opportunity to amend the

---

[2] Without going too far down this tangent, the Court notes that it had before it the New Jersey
Memorandum of Agreement, which it reviewed and relied upon in its opinion.  The Court also
notes that Florida did not take issue with Plaintiffs' (admittedly abbreviated) description of the
New Jersey program until after the Court issued its February 15, 2024 decision.  And, although
Florida spends pages chastising Plaintiffs for mischaracterizing the New Jersey program as
allowing for the "federalization" of Section 404 permit applications, *see* Dkt. 170 at 1–6; Dkt.
171 at 2 n.2; Dkt. 179 at 10–11, the Court notes that it was the EPA—and not Plaintiffs—that
first referred to "federalizing" Section 404 permit applications and that first treated the
"federalizing" of permit applications as one of "[t]he limited options" that was available "for
states seeking to assume the 404 program."  *See* Dkt. 112-3 at 368.  To the extent any blame can
be assigned regarding this issue—and, to be clear, in the Court's view, no blame is due—it lies in
the failure of all of the parties to add to the many hundreds of pages of briefing (and thousands of
pages of administrative documents) before the Court by providing additional detail about a
decades-old program not directly at issue in this litigation and in the failure of the Court to
describe that program more precisely in its opinion.

To put this issue firmly to rest, however, and to avoid any continuing confusion regarding the
New Jersey program, the Court has amended its February 15, 2024 opinion, in minor respects, to
add the further detail omitted in the parties' filings and the Court's original opinion.  *See* Dkt.
182.  None of these changes have any bearing on the Court's conclusions.

permit to address those objections, 33 U.S.C. § 1344(j).  *See* Dkt. 165 at 2–3 (Federal Defendants); Dkt. 170 at 3, 6 (Florida).  Whether that view is correct, how those principles apply in practice, and whether adoption of such a program would result in an impermissible "[p]artial State program[]," 40 C.F.R. § 233.1(b), are questions beyond the scope of this opinion.[3]  For present purposes it suffices to note that Florida's proposal that permittees simply "[r]equest that [the State] transfer the permit application file to the Corps of Engineers for processing," Dkt. 166 at 12, is of dubious legality and, in any event, is unworkable given the opposition of the Federal Defendants.  To the extent that Florida asks the Court to utilize its broad, equitable authority to craft a limited stay that differs from the type of Section 404 program that the EPA would have the authority to approve, the Court is unpersuaded that such a novel approach is warranted on the facts of this case, particularly given the serious concerns raised by the federal agencies that would need to implement that approach.

For all of these reasons, the Court concludes that a limited stay—in any form—would not alleviate disruption, ameliorate confusion (to the extent any exists), or avoid delays in the processing of Section 404 permit applications.  If anything, a limited stay would have just the opposite effect.  Moreover, and of equal importance, the Court notes that the Corps stands ready and able to process the outstanding permit applications and that, to date, any delay in processing those applications is a result of Florida's effort to keep some semblance of the Section 404 assumption in place—even if only temporarily.  In these respects, the representations made by counsel for the Federal Defendants at the most recent hearing bear repeating at length:

---

[3] *Cf.* Dkt. 112-5 at 154–56 (New Jersey MOA stating that the EPA "*will* object" to any individual permit that the FWS determines is "likely to adversely affect federally-listed species" and if New Jersey "neither satisfies the EPA's objections or requirements for a permit condition . . . nor denies the permit, the permit application *will* be transferred to the Corps for processing" (emphases added)).

[A]s of February 15, there were about 1,000 permit applications pending before the State of Florida.  The Corps has identified and allocated resources to process those permits.  And it starts with the Jacksonville District of the Corps, which is the office that has hand[l]ed Section 404 permitting in Florida since forever, pre-assumption . . . .  [T]here are more people in the Jacksonville district today to process [S]ection 404 permits than there were before state assumption.  And it is not just a couple more, it is a couple dozen more.  In addition to the Jacksonville district, there are four other districts within the South Atlantic division.  And the Corps has identified people in the other districts and the South Atlantic division as well as [at] Corps headquarters who can help with the anticipated surge of permits given the number of permits that were pending before Florida.

And I say the anticipated surge, Your Honor, because Florida has not transferred permits to the Corps yet.  The Corps is prepared to process those permits.  But if those permits exist in a state of regulatory limbo today, I want the Court to understand it is not because the Corps has not taken steps to comply with the Court's Order of February 15th.  The Corps is ready to process permits.

Now, notwithstanding the fact that we haven't gotten permits from Florida yet.  We have had meetings at the Corps with quite a few project proponents, including project proponents who have permits that were pending before Florida as of February 15th.  And a number of those entities have congressionally approved agreements with the Corps to seek expedited Corps review of Section 404 permit applications for priority projects.

. . . .  For those folks who don't have one of the congressionally approved expedited review agreements, I want to emphasize that a project will not go to the back of the line just because the applicant had previously applied to Florida.  The idea here is that the Corps will, as much as possible, pick up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements.  And I think the Corps' hope here is that a project that got pretty close to the end of the line in Florida, because of the work that went into preparing the documents for Florida, will get through the Corps' process faster.  That is the hope.  But I just want to emphasize again . . . the Corps' intention here is not to make people start from square one, it is to do this as efficiently as possible.

. . . .  [T]he state of play is [that] the Corps [is] processing permits.  It has done that for decades.  It is familiar to the regulated community.  I think the efforts the Corps has made really cut against granting the limited stay of the vacatur.

Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.); *contra id.* at 5 (Florida asserting that "permit

applicants are faced with the dilemma currently of being required to go back to square one [and]

have their permits restarted" by the Corps).  In short, the Corps is "open for business today," *id.* at 31; it has unquestionable legal authority to act; it has substantial experience processing Section 404 permit applications; it can, if appropriate, trigger the Section 7 consultative process; and, where appropriate, that process will lead to issuance by the FWS of incidental take statements and any corresponding liability protection.

The Court will, accordingly, deny Florida's motion for a limited stay.

**B.      Florida's Motion for Entry of Final Judgment**

Florida also moves for entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d) or for entry of partial, final judgment pursuant to Rule 54(b).  For the reasons explained below, the Court will dismiss Counts 1, 2, and 5 as moot, but because Count 7 remains, the Court will deny Florida's request for entry of final judgment pursuant to Rule 58(d). The Court will, however, enter partial, final judgment as to Counts 1–6 and 8–13 of the Amended Complaint pursuant to Rule 54(b).

**1.**

Florida first argues (with the concurrence of the Federal Defendants) that the Court should enter final judgment pursuant to Rule 58(d) because, in its view, Plaintiffs have received all the relief that they sought and, as a result, their remaining claims are moot. Dkt. 171 at 8–11 (Florida); Dkt. 175 at 1 (Federal Defendants).[4]  Rule 58(d) provides that a "party may request that judgment be set out in a separate document as required by Rule 58(a)."  As used in the Federal Rules of Civil Procedure, the term "judgment" means "any order from which an appeal lies," Fed. R. Civ. P. 54(a), and, in the usual course, an appeal must await the entry of a "final

---

[4] The Federal Defendants argue that Plaintiffs' remaining claims are moot but take no position on Florida's request for partial final judgment under Rule 54(b).  *See* Dkt. 181 at 36 (Apr. 4, 2024 Hrg. Tr.); Dkt. 175 at 1.

12

decision," 28 U.S.C. § 1291.  A "final decision," under 28 U.S.C. § 1291, "ordinarily must resolve every claim of every party in a case."  *Attias v. CareFirst, Inc.*, 969 F.3d 412, 416 (D.C. Cir. 2020).

Because the Court has yet to resolve every claim involving every party in the case, the Court cannot enter final judgment on the present record.  Recognizing as much, Florida asks the Court to dismiss the remaining claims as moot and, after having done so, to enter final judgment pursuant to Rule 58(d).  Dkt. 171 at 9–10.  According to Florida, the remaining claims are moot because nothing remains for the Court to adjudicate in this case; it argues that because the Court has set aside the BiOp, the ITS, and the Section 404 assumption determination, Plaintiffs have obtained all the relief that they sought and thus, even were they to prevail on the remaining claims, there is no additional relief that the Court could grant.  As a fallback position, Florida argues that "[r]egardless of whether [Plaintiffs'] remaining claims are formally 'moot' or not . . . this Court, at least, has *discretion* to enter final judgment at this point."  Dkt. 179 at 3 (emphasis in original).  Under either formulation of the argument, Florida bears the burden of convincing the Court to dismiss the claims.  *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 569–70 (1984).

As the D.C. Circuit has recognized, the doctrine of mootness has "two distinct branches." *Chamber of Com. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).  The first branch is "grounded in the jurisdictional limitations dictated by the Constitution:  Under Article III, a federal court is without power to act unless it is presented with a live 'case or controversy.'" *City of New York v. Baker*, 878 F.2d 507, 509 (D.C. Cir. 1989) (first citing *Chamber of Com.*, 628 F.2d at 291; and then citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)).  The second branch is often termed "prudential mootness."  *Id.*  It "does not concern [the] [C]ourt's power to

grant relief, but rather its exercise of discretion in the use of that power." *Id.* "Where it is so

unlikely that the court's grant of [remedy] will actually relieve the injury," *Penthouse Int'l,*

*Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991), the court has discretion to "stay its hand,

and to withhold relief it has the power to grant," *Chamber of Com.*, 627 F.2d at 291. "The

cousin of the mootness doctrine, in its strict Article III sense," prudential mootness is "a melange

of doctrines relating to the court's discretion in matters of remedy and judicial administration."

*Id.* (citing 13C A. Miller Wright & E. Cooper, Federal Practice and Procedure § 3533 (1975)).

As a leading treatise explains:

> Despite the clear separation in received theory between mootness principles
> mandated by Article III and principles merely of remedy or judicial
> administration, most decisions do not undertake any explanation of the sources
> drawn upon. At times, to be sure, a court may take pains to explain that it need
> not choose between Article III and prudential concerns in finding a case moot.
> It is more common, however, to focus instead on the ability to provide any
> presently meaningful remedy, in light of the court's ability to surmise continuing
> effects or to forecast possible future effects. Probably this focus reflects a
> disposition to exercise remedial discretion in favor of the litigant who has once
> had a living claim for relief, or to withhold possible remedies that seem too
> drastic in relation to current circumstances.

13B Edward H. Cooper, Federal Practice and Procedure § 3533.1 (3d ed. 2023). For the reasons

explained below, the Court concludes that Counts 1, 2, and 5 of the Amended Complaint are, at

the very least, prudentially moot. The Court is unpersuaded, however, that Count 7 is either

jurisdictionally or prudentially moot.

The Court's analysis of jurisdictional mootness begins with the Seventh Circuit's

decision in *Air Line Pilots Association, Int'l v. UAL Corp.*, 897 F.2d 1394 (7th Cir. 1990). In

that case, the Seventh Circuit held that a provision of a collective bargaining agreement violated

the Railway Labor Act ("RLA") and then remanded the case to the district court to determine

whether that provision and another provision violated state law. *Id.* at 1396. The district court

concluded that both provisions violated state law, and, on a subsequent appeal, the employer

argued that the case had become moot because the time to petition for a writ of certiorari

regarding the Seventh Circuit's earlier RLA holding had expired, and "no purpose could be

served . . . by a declaration that" the same provision of the collective bargaining agreement that

the circuit had already held violated federal law also violated state law. *Id.* For two reasons, the

Seventh Circuit was unpersuaded. First, the court noted that the time to file a petition for

certiorari had not, in fact, expired, because the prior decision was not final. *Id.* at 1397. Second,

and of greater importance here, the court held that a case does not become moot simply because

a court grants complete relief based on one theory of recovery. *Id.* As the Seventh Circuit

explained, "it is cases rather than reasons that become moot," and "[w]hether a court gives one or

ten grounds for its result is not a question to which Article III prescribes an answer." *Id.* "The

practical reason" for this rule "is that the alternative grounds are ripe for decision and deciding

them may help a higher or a subsequent court" decide the case. *Id.*

In *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 587 (D.C. Cir. 2001), the D.C. Circuit

cited *Air Line Pilots Association* with approval and adopted the Seventh Circuit's reasoning.

Echoing the Seventh Circuit, the court wrote: "If a plaintiff presents two or more alternative

grounds as routes to its hoped-for ultimate victory, a court does not lose jurisdiction over the

second claim once it has ruled in the plaintiff's favor on the first claim; victory on the first claim

doesn't moot the second." *Id.* The D.C. Circuit had faced a similar question several months

earlier in *WorldCom, Inc. v. FCC*, 246 F.3d 690 (D.C. Cir. 2001), where the court declared it

"settled law" that resolution of one basis for granting relief does not moot a second ground for

granting that same relief. *Id.* at 695 (citing *Air Line Pilots Ass'n*, 897 F.2d at 1397). Embracing

the Seventh Circuit's "practical reason" for this rule, the D.C. Circuit observed that "[b]y

15

considering both bases, there is obviously potential for economy by the inferior federal courts, as higher-level review might remove the first basis for the outcome." *Id.*

This line of authority provides ample support for the notion that this Court could have—consistent with Article III—resolved all of Plaintiffs' claims and could have, if supported by the law and facts, provided alternative grounds for awarding the same relief. As the Seventh Circuit observed in *Air Line Pilots Association*, "in a vast number of cases the court, having decided that the defendant's conduct is unlawful on ground A, goes on to decide that it is also unlawful on ground B." 897 F.2d at 1397. That is certainly correct. But, as the Seventh Circuit also observed, courts are not "compelled" to reach alternative theories that might, at most, provide a second or third rationale for granting the same relief already justified on the basis of the first theory. *Id.* To continue the Seventh Circuit's observation of common practice, courts will often decide that a defendant's conduct is unlawful on ground A and will decline to go on to consider whether it is also unlawful on grounds B, C, and D. *See id.* (explaining that courts often use the word "moot" "to refer to an issue that need not be decided in light of the resolution in the same opinion of another issue," even though they do not mean moot in an Article III sense (citing *Bazemore v. Friday,* 478 U.S. 385, 387 n.2 (1986))). In other words, courts often have the discretion to treat alternative claims, which offer the plaintiff no prospect of obtaining any further relief, as prudentially moot.

By way of analogy, this is the same thing that the D.C. Circuit does when it affirms a lower court's decision without reaching the merits of a cross-appeal. As the court has explained:

> [W]here . . . the losing party's theories are rejected, courts appear uniformly to dismiss a conditional cross-appeal. . . . While characterizing such a cross-appeal as moot may be in tension with the general recognition that a court's acceptance of one of an appellant's two independent bases for attack does not render the second basis moot, *see Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1397 (7th Cir. 1990), this case presents no reason to break out of conventional

16

practice.   Thus, on affirming the [agency's] decision . . . , we dismiss [this unconditional cross-appeal] without reaching the merits.

*Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 649–50 (D.C. Cir. 1998); *cf. Belton v. WMATA*, 20 F.3d 1197, 1203 (D.C. Cir. 1994) (treating an issue as "moot as a practical matter," even though the appellate court could have reached the issue under *Air Line Pilots Ass'n*).

The fact that courts have discretion to reach alternative legal theories supporting the same relief, accordingly, does not mean that they must always utilize that authority.  Judges "[f]requently . . . decide no more than they have to decide," Cass R. Sunstein, *Foreword: Leaving Things Undecided*, 110 Harv. L. Rev. 4, 6 (1996), and they often have very good reasons for doing so.  This is a common practice in the district courts,[5] and, at least in cases involving pure questions of law, it does not necessarily preclude an appellate court from reaching the claims left undecided by the district court.[6]  The practice ensures that judicial decisions are rendered only after careful consideration, and it permits courts to avoid the pointless—and at times jurisdictionally dubious—task of deciding a broad array of legal and factual issues (including difficult and time-consuming ones) that, in the parlance of mootness, will "make [no] difference to the legal interests of the parties," *Air Line Pilots Ass'n*, 897 F.2d at 1396.

---

[5] *See, e.g.*, *Lewis v. Becerra*, 2023 WL 3884595, at *6 n.6 (D.D.C. June 8, 2023) ("[T]he Court need not reach the plaintiffs' other arguments under alternative provisions of the APA, which request the same relief."); *Dist. Hosp. Partners, L.P. v. Sebelius*, 932 F. Supp. 194, 199 n.5 (D.D.C. 2013) (declining to reach alternative grounds under the APA asserted by plaintiff in vacating an administrative decision); *Burke v. Coggins*, 521 F. Supp. 3d 31, 45 (D.D.C. 2021) (declining to reach plaintiffs' first amendment and appointments clause arguments given complete relief on APA challenge); *Poett v. United States*, 657 F. Supp. 2d 230, 242 (D.D.C. 2009) (denying without prejudice plaintiff's constitutional claims for same reasons).

[6] *See, e.g.*, *Hutchins v. District of Columbia*, 188 F.3d 531, 547–48 (D.C. Cir. 1999) ("Appellees argued before the district court that the curfew also violated their First and Fourth Amendment rights, but because the district court found the curfew unconstitutional on equal protection and due process grounds, it did not reach these additional constitutional claims.  We exercise our discretion to resolve these purely legal claims in the interest of judicial economy.").

Applying these considerations, the Court will exercise its discretion—as a matter of prudential mootness and 5 of the Amended Complaint, but will decline to dismiss Count 7. Counts 1, 2, and 5 are each asserted against the EPA, each challenges the EPA's decision-making process leading up to its decision to approve Florida's Section 404 assumption application, and each seeks vacatur of that approval.  Dkt. 77 at 25–27 (Compl. ¶¶ 104–17) (Count 1) (challenging the EPA's interlocutory completeness determination); *id.* at 27–35 (Compl. ¶¶ 118–61) (Count 2) (challenging the EPA's approval of Florida's program on a variety of theories); *id.* at 42–43 (Compl. ¶¶ 202–12) (Count 5) (challenging the EPA's "no effect" determination with respect to species under the jurisdiction of the National Marine Fisheries Service ("NMFS")); *see id.* at 56–58 (Prayer).  For the reasons given in *CBD III*, the Court has already ruled against the EPA and has already granted Plaintiffs the relief that they seek in Counts 1, 2, and 5—vacatur of the assumption determination.  Dkt. 164.  The Court's vacatur order, moreover, does not merely embody that legal conclusion; it has current, operative effect, and it has fully redressed the injuries alleged in Counts 1, 2, and 5.  That is the ultimate relief to which Plaintiffs are entitled, and, accordingly, reaching the merits of Counts 1, 2, and 5 is unlikely to "make a difference to the legal interests of the parties," *Air Line Pilots Ass'n*, 897 F.2d at 1396.  There is, in short, no assumption program left for Plaintiffs to challenge.

Plaintiffs argue that their claims are not moot "in light of the State's intention to appeal." Dkt. 178 at 7.  But that argument speaks only of jurisdictional mootness and ignores the prudential considerations described above.  Considered in that light, Plaintiffs' argument proves too much; it would require district courts to address all alternative grounds for relief in every case in which an appeal is reasonably anticipated.  The real question is whether reaching the alternative grounds presented will likely assist the court of appeals in its consideration of the

case or avoid an unnecessary remand, and the corresponding delay and expenditure of judicial resources.  Here, however, the Court concludes that the additional judicial time and resources necessary to resolve Plaintiffs' alternative theories (all of which are premised on the APA) is unlikely to be justify by the remote possibility that these alternative rulings would assist the court of appeals or would, in the end, conserve judicial resources.

Plaintiffs also argue that a decision granting them declaratory relief on Counts 1 and 2 would provide additional relief, beyond that which the Court has already granted.  *Id.* at 11.  But the Declaratory Judgment Act provides only that a court "*may* declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a) (emphasis added).  And "[w]here it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers."  *Penthouse*, 939 F.2d at 1020 (affirming district court's denial of request for declaratory judgment on prudential mootness grounds).  Here, where the challenged program no longer exists (and may never again exist), it is "uncertain"—to say the least—that a declaratory judgment would meaningfully benefit Plaintiffs.  *Cf. Baker*, 878 F.2d at 510 (1989) ("[D]eclaratory judgment is [a] discretionary remedy that may be withheld where challenged practice is undergoing significant change so that its ultimate form cannot be predicted." (citing *Mechling Barge Lines, Inc. v United States*, 368 U.S. 324, 331 (1961))).  Thus, even "assuming that there is some trace of a continuing injury sufficient to satisfy Article III," declaratory relief would not be "appropriate as an exercise of the court's discretionary, equitable powers."  *Penthouse*, 939 F.2d at 1019.

The Court recognizes that the remaining claims do not precisely duplicate the claims that the Court has resolved to date; the remaining claims against the EPA are premised on the APA and the CWA, while the claims that the Court has already adjudicated are premised either

exclusively on the APA or on the APA and the ESA.  But they are all APA claims—there is no

available cause of action under the CWA or the ESA.  *See Nat'l Ass'n of Homebuilders v.*

*Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of*

*Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005).  And, in any event, the line between Plaintiffs'

CWA and ESA claims is, as Plaintiffs themselves acknowledge, a blurry one.  *See* Dkt. 178 at 28

("The claims at issue here are inextricably linked . . . .").  In Count 1, for example, Plaintiffs

allege (among other things) that the EPA violated the APA by treating Florida's Section 404

assumption application as complete before the BiOp—which is discussed at length in the Court's

February 15, 2024 opinion—was itself complete.  Dkt. 77 at 25 (Compl. ¶ 108); *see also* Dkt.

178 at 28–31.  Similarly, Count 2 alleges that the EPA erred in approving Florida's assumption

application, which, on Plaintiffs' telling, failed (among other things) to comply with certain

requirements relating to the protection of listed species.  Dkt. 77 at 34 (Compl. ¶ 154); Dkt. 178

at 29–30.  Finally, Count 5 alleges that the EPA's "no effect" determination relating to species

under the jurisdiction of the NMFS violated the APA and the CWA.  Dkt. 77 at 42–43 (Compl.

¶¶ 202–12); Dkt. 178 at 31.  In short, Counts 1, 2, and 5 not only seek the same relief (vacatur of

the EPA's approval of Florida's assumption application) from the same party (the EPA) as the

Court has already awarded, but they tread much of the same ground.

        Under these circumstances, devoting time and resources to resolve the remaining claims

will not accord Plaintiffs any meaningful relief beyond that which they have already achieved,

will provide little (if any) assistance to the D.C. Circuit in its consideration of the case on appeal,

and, based on the Court's assessment of the various claims, will not serve judicial economy by

protecting against the possibility that appellate "review might remove the first basis for the

outcome," *WorldCom, Inc.*, 246 F.3d at 695.[7]  The Court will, accordingly, dismiss Counts 1, 2 and 5 without prejudice.

Count 7, however, presents a different story.  That count is brought against a different defendant—the Army Corps of Engineers—and it challenges a different agency action—the Corps' retained waters determination.  Dkt. 77 at 45 (Compl. ¶¶ 222–27).  Although this count is also brought under the APA, it is supported by an entirely distinct legal theory arising under the Rivers and Harbors Act ("RHA"), *id.*, and it involves distinct portions of the administrative record prepared by the Army Corps, *see* Dkt. 126-1 at 14–16.  Most importantly, this count seeks relief—vacatur of the Corps' retained waters list, Dkt. 77 at 58 (Prayer)—that the Court has not already granted to Plaintiffs.  Unlike with respect to Counts 1, 2 and 5, the Court is persuaded that if Plaintiffs prevail on this claim (and the Court expresses no view on that question at this point), they will be entitled to relief that would "have a more-than-speculative chance of affecting" the legal rights and interests of the parties "in the future."  *Adbelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015).

Under these circumstances, a real controversy continues to exist, and the Court will decline Florida's invitation to dismiss Count 7 as moot, either as a matter of jurisdiction or

---

[7] Even assuming that the exceptions to jurisdictional mootness apply to prudential mootness as well, no exception is available here.  Plaintiffs concede that the voluntary cessation exception is inapplicable but urge that their remaining claims qualify for the "capable of repetition yet evading judicial review" exception.  Dkt. 178 at 18–19.  But, even if the Court's order vacating the BiOp, the ITS, and the EPA's approval of Florida's assumption application were set aside, it is unlikely that Plaintiffs would lose the opportunity to press their alternative claims on remand or in a separate suit.  Plaintiffs maintain that the statute of limitations "*could* result in complete evasion of review" down the line, Dkt. 178 at 19 (emphasis added), but the statute of limitations is not jurisdictional, *see Jackson v. Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020) ("[W]e hold that § 2401(a)'s time bar is nonjurisdictional and subject to equitable tolling."), and, in any event, the six-year period would not run until the end of 2026, and would, of course, restart from any new agency action.  Finally, Plaintiffs can further avoid any risk that their claims would "evade review" by filing a conditional cross-appeal.

prudence.  Because the Court has yet to render a "final decision" resolving "every claim of every

party in [the] case," *Attias*, 969 F.3d at 416, which would permit Florida to file an appeal

pursuant to 28 U.S.C. § 1291, the Court cannot enter final judgment pursuant to Rule 58(d) and

must go on to consider whether to issue partial, final judgment pursuant to Rule 54(b).

**2.**

Normally, an order in a case involving multiple claims or defendants is not "final" (and

therefore not appealable) until the district court has "disposed of all claims against all parties."

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 221 (D.C. Cir. 2011).  Rule

54(b) relaxes this requirement by allowing the district court to "direct entry of a final judgment

as to one or more, but fewer than all, claims or parties" upon an express finding that "there is no

just reason for delay."  Rule 54(b) allows district courts to balance "the demonstrated need for

flexibility in providing for appellate review in complex cases," *Blue v. D.C. Pub. Schs.*, 764 F.3d

11, 15 (D.C. Cir. 2014) (internal quotation marks omitted), against the goal of "avoiding

piecemeal appeals," *Taylor v. FDIC*, 132 F.3d 753, 760 (D.C. Cir. 1997).  "Rule 54(b) is the key

to the problem of appealability when summary judgment is granted on less than the entire suit in

multiple-party or multiple-claim litigation."  *See* 10A Charles Alan Wright, Arthur R. Miller, &

Adam N. Steinman, Federal Practice and Procedure § 2715 (4th ed. 2023).  "It is left to the sound

judicial discretion of the district court to determine the 'appropriate time' when each final

decision in a multiple claims action is ready for appeal."  *Curtiss-Wright Corp. v. Gen. Elec. Co.*,

446 U.S. 1, 8 (1980) (citation omitted).

Rule 54(b) "establishes three requirements for an otherwise interlocutory order to be

certified as a final judgment."  *Attias*, 969 F.3d at 417.  First, "the order must resolve a distinct

'claim for relief;'" second, "the order must be 'final' with respect to that claim;" and, third, "the

district court must permissibly determine that there is 'no just reason for delay' in entering

judgment." *Id.* (citation omitted).  The first two requirements serve a jurisdictional function:  If

there is no final judgment on one or more distinct claims, the court of appeals lacks appellate

jurisdiction. *See id.*  If the jurisdictional requirements are met, the court must then "weigh[] both

'justice to the litigants' and 'the interest of sound judicial administration'" to determine whether

there is "no just reason for delay" in entering the judgment. *Brooks v. Dist. Hosp. Partners, L.P.*,

606 F.3d 800, 806 (D.C. Cir. 2010) (quoting *Curtiss-Wright Corp.*, 446 U.S. at 6, 8).

There is no set formula for deciding whether there is "no just reason" for delay in

entering partial, final judgment, and the relevant factors "will inevitably differ from case to

case." *Id.* (internal quotation marks omitted).  The factors pertaining to "sound judicial

administration" include "whether the claims under review were separable from the others

remaining to be adjudicated and whether the nature of the claims already determined was such

that no appellate court would have to decide the same issues more than once even if there were

subsequent appeals." *Curtiss-Wright Corp.*, 446 U.S. at 8.  How best to balance these factors is

left to the district court's discretion. *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956).

No one factor is dispositive, but where any of the factors pertaining to judicial administration

point against certification, the court should not enter partial, final judgment unless it "find[s] a

sufficiently important reason for nonetheless granting certification." *Curtiss-Wright Corp.*, 446

U.S. at 8 n.2.

Applying this test, the Court is persuaded that the order entered today, as well as the

orders entered on February 15, 2024, Dkt. 164, on August 23, 2023, Dkt. 119, and on March 30,

2022, Dkt. 73, resolve distinct claims (*i.e.*, Counts 1–6 and 8–13 of the Amended Complaint,

Dkt. 77), are final with respect to those claims, and that there is no just reason to delay entry of final judgment with respect to those claims.[8]

For the reasons explained above, the only count of the Amended Complaint that remains pending is Count 7, which alleges that the Army Corps of Engineers violated the APA and the RHA when it made its retained waters determination.  Plaintiffs, for their part, seem to concede that Count 7 asserts a distinct claim for relief for purposes of Rule 54(b), Dkt. 178 at 27 n.15— and for good reason.  That count is asserted against a different defendant than the defendants named in the adjudicated counts, it turns on different facts, and it seeks different relief. Applying the D.C. Circuit's decision in *Attias v. Carefirst, Inc.*, 969 F.3d 412, 417–18 (D.C. Cir. 2020), the claim involves a distinct transaction and nucleus of operative facts and, as such, would not "fall afoul of the rule against splitting claims if brought separately," *Tolson v. United States*, 732 F.2d 998, 1001 (D.C. Cir. 1984) (internal quotation marks and citation omitted); *see also Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004); *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002).

The Court also concludes that there is no just reason to delay entering final judgment with respect to the orders entered today, on February 15, 2024, Dkt. 164, on August 23, 2023,

---

[8] Although Florida's motion concerns only the Court's February 15, 2024 order, *see* Dkt. 171, a district court may *sua sponte* direct entry of final judgment under Rule 54(b), *see, e.g.*, *Bank of Lincolnwood v. Fed. Leasing*, 622 F.2d 944, 947, 952 (7th Cir. 1980) (affirming district court's *sua sponte* entry of final judgment pursuant to Rule 54(b)); *Mitchell v. Lyons Pro. Servs., Inc.*, 727 F. Supp. 2d 116, 119–20 (E.D.N.Y. 2010) ("[T]he Court has broad discretion in determining whether to make the [Rule 54(b)] certification . . . and may do so *sua sponte*."); *Guinan v. A.I. duPont Hosp. for Child.*, 2009 WL 2877595, at *3 (E.D. Pa. Aug. 28, 2009) ("[A] district court may *sua sponte* direct entry of final judgment under Federal Rule of Civil Procedure 54(b).") (collecting cases).  In the present circumstances, the Court concludes that the fair administration of justice, and judicial efficiency, would be served by entering partial, final judgment as to each of the claims adjudicated to date.  As explained below, each claim is distinct and separable from Count 7, and there is "no just reason for delay[ing]" the entry of final judgment as to all of the adjudicated claims.

24

Dkt. 119, and on March 30, 2022, Dkt. 73.  The Court's March 30, 2022 and August 23, 2023

opinions and orders fully resolved Plaintiffs' procedural challenges brought under the APA, and

nothing remains to be resolved with respect to those claims.  Those claims, moreover, do not

overlap in any way with Plaintiffs' retained waters claim.  Similarly, for the reasons explained

above, the Court's February 15, 2024 opinion and order fully resolved all of Plaintiffs' APA

claims against the EPA and FWS, even if that order left some counts presenting alternative

theories for relief unresolved.  Those counts seeking the same ultimate relief on alternative

grounds, moreover, have now been dismissed, and have thus also been fully resolved.

　　　The Court is further persuaded that entry of partial, final judgment on all of Plaintiffs'

claims, with the exception of their retained waters claim, would serve the interests of justice and

judicial administration.  As Florida and the other interveners and amici stress, there is an

important interest in achieving the certainty that will come with prompt appellate review.  In the

words of a Florida developer, who the Court permitted to intervene in this case, "[i]t just needs to

know the rules" that will govern Section 404 permit applications.  Dkt. 177 at 2.  In structuring

the litigation, moreover, the Court has attempted to reach and to resolve the core and most far-

reaching claims first—and it has finally done so.  All that remains is a stand-alone claim that is

unlikely to have any bearing on the issues now subject to appeal, and the issues likely to be

raised on appeal are unlikely to have any bearing on Plaintiffs' retained waters claim.

　　　Finally, the Court is persuaded that entering partial, final judgment will substantially

advance the interests of justice.  The Court has set aside the BiOp, the ITS, and the EPA's

approval of Florida's Section 404 assumption application, and, for the reasons explained above,

even staying that order in limited fashion will result in confusion, delay, and inefficiency.  That

decision is operative now, and, in the Court's view, Florida should be allowed to appeal it

without delay.  Nor do Plaintiffs identify any countervailing concerns premised on

"miscellaneous factors such as delay, economic and solvency considerations, or expense." *SEIU*

*Nat'l Indus. Pension Fund v. Sci &Comp. Sys. Corp.*, 249 F. Supp. 3d 130, 136 (D.D.C. 2017).

They instead argue that Florida will not be prejudiced if partial, final judgment is denied.  The

Court disagrees.  Although the Court's decision is unlikely to result in the dire consequences that

Florida proffers—as noted above, the Corps stands ready, willing, and able to issue Section 404

permits in Florida, as it did for decades before the EPA approved Florida's assumption

application and as it does in 47 other States—Florida nonetheless has a legitimate and substantial

interest in obtaining prompt appellate review of a decision and order that set aside a program to

which it has devoted extensive time and effort.  Florida may or may not prevail on appeal, but

there is no just reason to delay its ability to seek review.

  The Federal Rules of Civil Procedure "should be construed, administered, and employed

by the court and the parties to secure the just, speedy, and inexpensive determination of every

action and proceeding."  Fed. R. Civ. P. 1.  Here, that guidance and the dictates of Rule 54(b)

militate in favor of the entry of partial, final judgment.

**CONCLUSION**

For the foregoing reasons, Florida's motion for a limited stay, Dkt. 166, will be denied.

The Court will also dismiss without prejudice Counts 1, 2, and 5 of Plaintiffs' Amended

Complaint, Dkt. 77.  Finally, Florida's motion for entry of final judgment pursuant to Rule 58(d)

will be denied, its motion for the entry of partial, final judgment pursuant to Rule 54(b) will be

granted, Dkt. 171, and the Court will enter partial, final judgment as to Counts 1-6, 8-13 of the

Amended Complaint.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 12, 2024

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,
                    *Plaintiffs*,

            v.                                          Civil Action No. 21-119 (RDM)

MICHAEL S. REGAN, *et al.*,

                    *Defendants.*

## ORDER

For the reasons explained in the Court's memorandum opinion, Dkt. 183, it is

**ORDERED** that Florida's motion for a limited stay, Dkt. 166, is hereby **DENIED**.

It is further **ORDERED** that Counts 1, 2, and 5 of Plaintiffs' Amended Complaint, Dkt.

77, are hereby **DISMISSED** without prejudice.

It is further **ORDERED** that Florida's motion for entry of final judgment, Dkt. 171, is

hereby **GRANTED** with respect to entry of partial judgment under Federal Rule of Civil

Procedure 54(b) and is hereby **DENIED** with respect to entry of final judgment under Rule

58(d).

The Court hereby directs the entry of final judgment pursuant to Rule 54(b) as to Counts

1–6 and 8–13 of Plaintiffs' Amended Complaint, Dkt. 77.

**SO ORDERED**.

                                        /s/ Randolph D. Moss
                                        RANDOLPH D. MOSS
                                        United States District Judge

Date:  April 12, 2024