**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 24-5101 (c/w Nos. 24-5156 and 24-5159)**

# In the United States Court of Appeals for the District of Columbia Circuit

_____

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

_____

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

_____

## ADDENDUM TO OPENING BRIEF OF APPELLANTS STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION

_____

Henry C. Whitaker
SOLICITOR GENERAL

Christopher J. Baum
SENIOR DEPUTY SOLICITOR GENERAL

Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

# TABLE OF CONTENTS

**Page**

## Federal Statutes *

16 U.S.C. § 1531 .......................................................... 1a

16 U.S.C. § 1532 .......................................................... 6a

16 U.S.C. § 1536 .......................................................... 9a

16 U.S.C. § 1538 .......................................................... 20a

16 U.S.C. § 1539 .......................................................... 25a

33 U.S.C. § 1251 .......................................................... 34a

33 U.S.C. § 1342 .......................................................... 37a

33 U.S.C. § 1344 .......................................................... 51a


## State Constitution and Statutes

Fla. Const. Art. II, § 7 .......................................................... 59a

Fla. Stat. § 373.016 .......................................................... 61a

Fla. Stat. § 403.021 .......................................................... 64a


## Federal Regulations

40 C.F.R. § 230.10 .......................................................... 67a

---

\* Statutory and regulatory provisions contained in this addendum are the versions in place when EPA approved Florida's Section 404 program.

40 C.F.R. § 233.1 ............................................................. 70a

40 C.F.R. § 233.10 ........................................................... 72a

40 C.F.R. § 233.11 ........................................................... 73a

40 C.F.R. § 233.12 ........................................................... 75a

40 C.F.R. § 233.13 ........................................................... 76a

40 C.F.R. § 233.14 ........................................................... 77a

40 C.F.R. § 233.15 ........................................................... 78a

40 C.F.R. Part 233, Subpart F (§§ 233.50-.53) ......................... 80a

50 C.F.R. § 402.01 ........................................................... 94a

50 C.F.R. § 402.02 ........................................................... 96a

50 C.F.R. § 402.03 ........................................................... 100a

50 C.F.R. § 402.14 ........................................................... 101a

50 C.F.R. § 402.15 ........................................................... 109a

**Federal Register Notices**

80 Fed. Reg. 26,832 (May 11, 2015) ................................... 110a

85 Fed. Reg. 57,853 (Sept. 16, 2020) .................................. 124a

85 Fed. Reg. 83,553 (Dec. 22, 2020) .................................. 128a

**CERTIFICATE OF SERVICE**

I certify that on September 16, 2024, the foregoing addendum was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett

*Counsel for the State of Florida
and the Florida Department of
Environmental Protection*

United States Code Annotated
  Title 16. Conservation
    Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1531

§ 1531. Congressional findings and declaration of purposes and policy

Currentness

**(a) Findings**

The Congress finds and declares that--

**(1)** various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

**(2)** other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

**(3)** these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

**(4)** the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to--

**(A)** migratory bird treaties with Canada and Mexico;

**(B)** the Migratory and Endangered Bird Treaty with Japan;

**(C)** the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

**(D)** the International Convention for the Northwest Atlantic Fisheries;

**(E)** the International Convention for the High Seas Fisheries of the North Pacific Ocean;

**(F)** the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

**(G)** other international agreements; and

USCA Case #24-5101       Document #2074992       Filed: 09/16/2024       Page 6 of 133

**(5)** encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

**(b) Purposes**

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

**(c) Policy**

**(1)** It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

**(2)** It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 93-205, § 2, Dec. 28, 1973, 87 Stat. 884; Pub.L. 96-159, § 1, Dec. 28, 1979, 93 Stat. 1225; Pub.L. 97-304, § 9(a), Oct. 13, 1982, 96 Stat. 1426; Pub.L. 100-478, Title I, § 1013(a), Oct. 7, 1988, 102 Stat. 2315.)

<div align="center">

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 13648**

&lt;July 1, 2013, 78 F.R. 40621&gt;

**Combating Wildlife Trafficking**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to address the significant effects of wildlife trafficking on the national interests of the United States, I hereby order as follows:

**Section 1. Policy.** The poaching of protected species and the illegal trade in wildlife and their derivative parts and products (together known as "wildlife trafficking") represent an international crisis that continues to escalate. Poaching operations have expanded beyond small-scale, opportunistic actions to coordinated slaughter commissioned by armed and organized criminal syndicates. The survival of protected wildlife species such as elephants, rhinos, great apes, tigers, sharks, tuna, and turtles has beneficial economic, social, and environmental impacts that are important to all nations. Wildlife trafficking reduces those benefits while generating billions of dollars in illicit revenues each year, contributing to the illegal economy, fueling instability, and undermining security. Also, the prevention of trafficking of live animals helps us control the spread of emerging infectious diseases. For these reasons, it is in the national interest of the United States to combat wildlife trafficking.

In order to enhance domestic efforts to combat wildlife trafficking, to assist foreign nations in building capacity to combat wildlife trafficking, and to assist in combating transnational organized crime, executive departments and agencies (agencies) shall take all appropriate actions within their authority, including the promulgation of rules and regulations and the provision of technical and financial assistance, to combat wildlife trafficking in accordance with the following objectives:

**(a)** in appropriate cases, the United States shall seek to assist those governments in anti-wildlife trafficking activities when requested by foreign nations experiencing trafficking of protected wildlife;

**(b)** the United States shall promote and encourage the development and enforcement by foreign nations of effective laws to prohibit the illegal taking of, and trade in, these species and to prosecute those who engage in wildlife trafficking, including by building capacity;

**(c)** in concert with the international community and partner organizations, the United States shall seek to combat wildlife trafficking; and

**(d)** the United States shall seek to reduce the demand for illegally traded wildlife, both at home and abroad, while allowing legal and legitimate commerce involving wildlife.

**Sec. 2. Establishment.** There is established a Presidential Task Force on Wildlife Trafficking (Task Force), to be co-chaired by the Secretary of State, Secretary of the Interior, and the Attorney General (Co-Chairs), or their designees, who shall report to the President through the National Security Advisor. The Task Force shall develop and implement a National Strategy for Combating Wildlife Trafficking in accordance with the objectives outlined in section 1 of this order, consistent with section 4 of this order.

**Sec. 3. Membership. (a)** In addition to the Co-Chairs, the Task Force shall include designated senior-level representatives from:

**(i)** the Department of the Treasury;

**(ii)** the Department of Defense;

**(iii)** the Department of Agriculture;

**(iv)** the Department of Commerce;

**(v)** the Department of Transportation;

**(vi)** the Department of Homeland Security;

**(vii)** the United States Agency for International Development;

**(viii)** the Office of the Director of National Intelligence;

**(ix)** the National Security Staff;

**(x)** the Domestic Policy Council;

**(xi)** the Council on Environmental Quality;

**3a**

**(xii)** the Office of Science and Technology Policy;

**(xiii)** the Office of Management and Budget;

**(xiv)** the Office of the United States Trade Representative; and

**(xv)** such agencies and offices as the Co-Chairs may, from time to time, designate.

**(b)** The Task Force shall meet not later than 60 days from the date of this order and periodically thereafter.

**Sec. 4. Functions.** Consistent with the authorities and responsibilities of member agencies, the Task Force shall perform the following functions:

**(a)** not later than 180 days after the date of this order, produce a National Strategy for Combating Wildlife Trafficking that shall include consideration of issues relating to combating trafficking and curbing consumer demand, including:

**(i)** effective support for anti-poaching activities;

**(ii)** coordinating regional law enforcement efforts;

**(iii)** developing and supporting effective legal enforcement mechanisms; and

**(iv)** developing strategies to reduce illicit trade and reduce consumer demand for trade in protected species;

**(b)** not later than 90 days from the date of this order, review the Strategy to Combat Transnational Organized Crime of July 19, 2011, and, if appropriate, make recommendations regarding the inclusion of crime related to wildlife trafficking as an implementation element for the Federal Government's transnational organized crime strategy;

**(c)** coordinate efforts among and consult with agencies, as appropriate and consistent with the Department of State's foreign affairs role, regarding work with foreign nations and international bodies that monitor and aid in enforcement against crime related to wildlife trafficking; and

**(d)** carry out other functions necessary to implement this order.

**Sec. 5. Advisory Council on Wildlife Trafficking.** Not later than 180 days from the date of this order, the Secretary of the Interior (Secretary), in consultation with the other Co-Chairs of the Task Force, shall establish an Advisory Council on Wildlife Trafficking (Advisory Council) that shall make recommendations to the Task Force and provide it with ongoing advice and assistance. The Advisory Council shall have eight members, one of whom shall be designated by the Secretary as the Chair. Members shall not be employees of the Federal Government and shall include knowledgeable individuals from the private sector, former governmental officials, representatives of nongovernmental organizations, and others who are in a position to provide expertise and support to the Task Force.

**Sec. 6. General Provisions. (a)** This order shall be implemented consistent with applicable domestic and international law, and subject to the availability of appropriations.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof, or the status of that department or agency within the Federal Government; or

---

USCA Case #24-5101        Document #2074992        Filed: 09/16/2024        Page 9 of 133

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** Insofar as the Federal Advisory Committee Act, as amended (5 U.S.C. App.) (the "Act"), may apply to the Advisory Council, any functions of the President under the Act, except for that of reporting to the Congress, shall be performed by the Secretary in accordance with the guidelines issued by the Administrator of General Services.

**(e)** The Department of the Interior shall provide funding and administrative support for the Task Force and Advisory Council to the extent permitted by law and consistent with existing appropriations.

BARACK OBAMA

[Reference to the National Security Staff deemed to be a reference to the National Security Council Staff, see Ex. Ord. No. 13657, Feb. 10, 2014, 79 F.R. 8823, set out as a note under 50 U.S.C.A. § 3021.]

Extension of Term of the Advisory Council on Wildlife Trafficking

For termination, renewal or continuation of advisory committees by executive order, see Executive Orders set out as notes, and listed as former notes, under 5 U.S.C.A. § 1013. The following Executive Orders contained extensions of the term of the Advisory Council on Wildlife Trafficking:

Ex. Ord. No. 13708, Sept. 30, 2015, 80 F.R. 60271 [extended until September 30, 2017].

Notes of Decisions (65)

16 U.S.C.A. § 1531, 16 USCA § 1531
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

---

                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 16. Conservation
        Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1532

§ 1532. Definitions

Currentness

For the purposes of this chapter--

**(1)** The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

**(2)** The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however*, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

**(3)** The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

**(4)** The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

**(5)(A)** The term "critical habitat" for a threatened or endangered species means--

**(i)** the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

**(ii)** specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

**(B)** Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

**(C)** Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

**(6)** The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

**(7)** The term "Federal agency" means any department, agency, or instrumentality of the United States.

**(8)** The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

**(9)** The term "foreign commerce" includes, among other things, any transaction--

**(A)** between persons within one foreign country;

**(B)** between persons in two or more foreign countries;

**(C)** between a person within the United States and a person in a foreign country; or

**(D)** between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

**(10)** The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

**(11)** Repealed. Pub.L. 97-304, § 4(b), Oct. 13, 1982, 96 Stat. 1420.

**(12)** The term "permit or license applicant" means, when used with respect to an action of a Federal agency for which exemption is sought under section 1536 of this title, any person whose application to such agency for a permit or license has been denied primarily because of the application of section 1536(a) of this title to such agency action.

**(13)** The term "person" means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

**(14)** The term "plant" means any member of the plant kingdom, including seeds, roots and other parts thereof.

**(15)** The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

**(16)** The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

**(17)** The term "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

**(18)** The term "State agency" means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

**(19)** The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

**(20)** The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

**(21)** The term "United States", when used in a geographical context, includes all States.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 93-205, § 3, Dec. 28, 1973, 87 Stat. 885; Pub.L. 94-359, § 5, July 12, 1976, 90 Stat. 913; Pub.L. 95-632, § 2, Nov. 10, 1978, 92 Stat. 3751; Pub.L. 96-159, § 2, Dec. 28, 1979, 93 Stat. 1225; Pub.L. 97-304, § 4(b), Oct. 13, 1982, 96 Stat. 1420; Pub.L. 100-478, Title I, § 1001, Oct. 7, 1988, 102 Stat. 2306.)

Notes of Decisions (115)

16 U.S.C.A. § 1532, 16 USCA § 1532
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 16. Conservation
      Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1536

§ 1536. Interagency cooperation

Currentness

**(a) Federal agency actions and consultations**

**(1)** The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

**(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(3)** Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

**(4)** Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

**(b) Opinion of Secretary**

**(1)(A)** Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

**(B)** In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)--

**(i)** if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth--

**(I)** the reasons why a longer period is required,

**(II)** the information that is required to complete the consultation, and

**(III)** the estimated date on which consultation will be completed; or

**(ii)** if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

**(2)** Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

**(3)(A)** Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

**(B)** Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

**(4)** If after consultation under subsection (a)(2), the Secretary concludes that--

**(A)** the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

**(B)** the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

**(C)** if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that--

**(i)** specifies the impact of such incidental taking on the species,

**(ii)** specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

**(iii)** in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

**(iv)** sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

#### (c) Biological assessment

**(1)** To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

**(2)** Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

#### (d) Limitation on commitment of resources

After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

**(e) Endangered Species Committee**

**(1)** There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

**(2)** The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

**(3)** The Committee shall be composed of seven members as follows:

**(A)** The Secretary of Agriculture.

**(B)** The Secretary of the Army.

**(C)** The Chairman of the Council of Economic Advisors.

**(D)** The Administrator of the Environmental Protection Agency.

**(E)** The Secretary of the Interior.

**(F)** The Administrator of the National Oceanic and Atmospheric Administration.

**(G)** The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

**(4)(A)** Members of the Committee shall receive no additional pay on account of their service on the Committee.

**(B)** While away from their homes or regular places of business in the performance of services for the Committee, members of the Committee shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under section 5703 of Title 5.

**(5)(A)** Five members of the Committee or their representatives shall constitute a quorum for the transaction of any function of the Committee, except that, in no case shall any representative be considered in determining the existence of a quorum for the transaction of any function of the Committee if that function involves a vote by the Committee on any matter before the Committee.

**(B)** The Secretary of the Interior shall be the Chairman of the Committee.

**(C)** The Committee shall meet at the call of the Chairman or five of its members.

**(D)** All meetings and records of the Committee shall be open to the public.

**(6)** Upon request of the Committee, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Committee to assist it in carrying out its duties under this section.

**(7)(A)** The Committee may for the purpose of carrying out its duties under this section hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee deems advisable.

**(B)** When so authorized by the Committee, any member or agent of the Committee may take any action which the Committee is authorized to take by this paragraph.

**(C)** Subject to the Privacy Act, the Committee may secure directly from any Federal agency information necessary to enable it to carry out its duties under this section. Upon request of the Chairman of the Committee, the head of such Federal agency shall furnish such information to the Committee.

**(D)** The Committee may use the United States mails in the same manner and upon the same conditions as a Federal agency.

**(E)** The Administrator of General Services shall provide to the Committee on a reimbursable basis such administrative support services as the Committee may request.

**(8)** In carrying out its duties under this section, the Committee may promulgate and amend such rules, regulations, and procedures, and issue and amend such orders as it deems necessary.

**(9)** For the purpose of obtaining information necessary for the consideration of an application for an exemption under this section the Committee may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents.

**(10)** In no case shall any representative, including a representative of a member designated pursuant to paragraph (3)(G) of this subsection, be eligible to cast a vote on behalf of any member.

**(f) Promulgation of regulations; form and contents of exemption application**

Not later than 90 days after November 10, 1978, the Secretary shall promulgate regulations which set forth the form and manner in which applications for exemption shall be submitted to the Secretary and the information to be contained in such applications.

Such regulations shall require that information submitted in an application by the head of any Federal agency with respect to any agency action include, but not be limited to--

**(1)** a description of the consultation process carried out pursuant to subsection (a)(2) of this section between the head of the Federal agency and the Secretary; and

**(2)** a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2) of this section.

**(g) Application for exemption; report to Committee**

**(1)** A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

**(2)(A)** An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

**(B)** Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

**(3)** The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary--

**(A)** determine that the Federal agency concerned and the exemption applicant have--

**(i)** carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

14a

**(ii)** conducted any biological assessment required by subsection (c); and

**(iii)** to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

**(B)** deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of Title 5.

**(4)** If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of Title 5 and prepare the report to be submitted pursuant to paragraph (5).

**(5)** Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing--

**(A)** the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

**(B)** a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

**(C)** appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

**(D)** whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

**(6)** To the extent practicable within the time required for action under subsection (g) of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of Title 5.

**(7)** Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section.

**(8)** All meetings and records resulting from activities pursuant to this subsection shall be open to the public.

**(h) Grant of exemption**

**(1)** The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person--

**(A)** it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that--

**(i)** there are no reasonable and prudent alternatives to the agency action;

**(ii)** the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

**(iii)** the action is of regional or national significance; and

**(iv)** neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

**(B)** it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of Title 5.

**(2)(A)** Except as provided in subparagraph (B), an exemption for an agency action granted under paragraph (1) shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action--

**(i)** regardless whether the species was identified in the biological assessment; and

**(ii)** only if a biological assessment has been conducted under subsection (c) with respect to such agency action.

**(B)** An exemption shall be permanent under subparagraph (A) unless--

**(i)** the Secretary finds, based on the best scientific and commercial data available, that such exemption would result in the extinction of a species that was not the subject of consultation under subsection (a)(2) or was not identified in any biological assessment conducted under subsection (c), and

**(ii)** the Committee determines within 60 days after the date of the Secretary's finding that the exemption should not be permanent.

If the Secretary makes a finding described in clause (i), the Committee shall meet with respect to the matter within 30 days after the date of the finding.

**(i) Review by Secretary of State; violation of international treaty or other international obligation of United States**

Notwithstanding any other provision of this chapter, the Committee shall be prohibited from considering for exemption any application made to it, if the Secretary of State, after a review of the proposed agency action and its potential implications, and after hearing, certifies, in writing, to the Committee within 60 days of any application made under this section that the granting of any such exemption and the carrying out of such action would be in violation of an international treaty obligation or other international obligation of the United States. The Secretary of State shall, at the time of such certification, publish a copy thereof in the Federal Register.

**(j) Exemption for national security reasons**

Notwithstanding any other provision of this chapter, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.

**(k) Exemption decision not considered major Federal action; environmental impact statement**

An exemption decision by the Committee under this section shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969: *Provided*, That an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats shall have been previously prepared with respect to any agency action exempted by such order.

**(l) Committee order granting exemption; cost of mitigation and enhancement measures; report by applicant to Council on Environmental Quality**

**(1)** If the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid for by the exemption applicant in implementing the agency action. All necessary mitigation and enhancement measures shall be authorized prior to the implementing of the agency action and funded concurrently with all other project features.

**(2)** The applicant receiving such exemption shall include the costs of such mitigation and enhancement measures within the overall costs of continuing the proposed action. Notwithstanding the preceding sentence the costs of such measures shall not be treated as project costs for the purpose of computing benefit-cost or other ratios for the proposed action. Any applicant may request the Secretary to carry out such mitigation and enhancement measures. The costs incurred by the Secretary in carrying out any such measures shall be paid by the applicant receiving the exemption. No later than one year after the granting of an exemption, the exemption applicant shall submit to the Council on Environmental Quality a report describing its compliance with the mitigation and enhancement measures prescribed by this section. Such a report shall be submitted annually until all such mitigation and enhancement measures have been completed. Notice of the public availability of such reports shall be published in the Federal Register by the Council on Environmental Quality.

**(m) Notice requirement for citizen suits not applicable**

The 60-day notice requirement of section 1540(g) of this title shall not apply with respect to review of any final determination of the Committee under subsection (h) of this section granting an exemption from the requirements of subsection (a)(2) of this section.

**(n) Judicial review**

Any person, as defined by section 1532(13) of this title, may obtain judicial review, under chapter 7 of Title 5, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for (1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia, by filing in such court within 90 days after the date of issuance of the decision, a written petition for review. A copy of such petition shall be transmitted by the clerk of the court to the Committee and the Committee shall file in the court the record in the proceeding, as provided in section 2112 of Title 28. Attorneys designated by the Endangered Species Committee may appear for, and represent the Committee in any action for review under this subsection.

**(o) Exemption as providing exception on taking of endangered species**

Notwithstanding sections 1533(d) and 1538(a)(1)(B) and (C) of this title, sections 1371 and 1372 of this title, or any regulation promulgated to implement any such section--

**(1)** any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

**(2)** any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

**(p) Exemptions in Presidentially declared disaster areas**

In any area which has been declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act, the President is authorized to make the determinations required by subsections (g) and (h) of this section for any project for the repair or replacement of a public facility substantially as it existed prior to the disaster under section 405 or 406 of the Disaster Relief and Emergency Assistance Act, and which the President determines (1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of this section to be followed. Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.

## CREDIT(S)

(Pub.L. 93-205, § 7, Dec. 28, 1973, 87 Stat. 892; Pub.L. 95-632, § 3, Nov. 10, 1978, 92 Stat. 3752; Pub.L. 96-159, § 4, Dec. 28, 1979, 93 Stat. 1226; Pub.L. 97-304, §§ 4(a), 8(b), Oct. 13, 1982, 96 Stat. 1417, 1426; Pub.L. 99-659, Title IV, § 411(b), (c), Nov. 14, 1986, 100 Stat. 3742; Pub.L. 100-707, Title I, § 109(g), Nov. 23, 1988, 102 Stat. 4709.)

Notes of Decisions (913)

16 U.S.C.A. § 1536, 16 USCA § 1536
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers,  11th Cir.(Fla.),   Sep. 15, 2010

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 16. Conservation
        Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1538

§ 1538. Prohibited acts

Currentness

**(a) Generally**

**(1)** Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to--

**(A)** import any such species into, or export any such species from the United States;

**(B)** take any such species within the United States or the territorial sea of the United States;

**(C)** take any such species upon the high seas;

**(D)** possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

**(E)** deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

**(F)** sell or offer for sale in interstate or foreign commerce any such species; or

**(G)** violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

**(2)** Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of plants listed pursuant to section 1533 of this title, it is unlawful for any person subject to the jurisdiction of the United States to--

**(A)** import any such species into, or export any such species from, the United States;

**(B)** remove and reduce to possession any such species from areas under Federal jurisdiction; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law;

**(C)** deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

**(D)** sell or offer for sale in interstate or foreign commerce any such species; or

**(E)** violate any regulation pertaining to such species or to any threatened species of plants listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

**(b) Species held in captivity or controlled environment**

**(1)** The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title: *Provided*, That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity. With respect to any act prohibited by subsections (a)(1)(A) and (a)(1)(G) of this section which occurs after a period of 180 days from (i) December 28, 1973, or (ii) the date of publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title, there shall be a rebuttable presumption that the fish or wildlife involved in such act is not entitled to the exemption contained in this subsection.

**(2)(A)** The provisions of subsection (a)(1) shall not apply to--

**(i)** any raptor legally held in captivity or in a controlled environment on November 10, 1978; or

**(ii)** any progeny of any raptor described in clause (i);

until such time as any such raptor or progeny is intentionally returned to a wild state.

**(B)** Any person holding any raptor or progeny described in subparagraph (A) must be able to demonstrate that the raptor or progeny does, in fact, qualify under the provisions of this paragraph, and shall maintain and submit to the Secretary, on request, such inventories, documentation, and records as the Secretary may by regulation require as being reasonably appropriate to carry out the purposes of this paragraph. Such requirements shall not unnecessarily duplicate the requirements of other rules and regulations promulgated by the Secretary.

**(c) Violation of Convention**

**(1)** It is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in article I thereof.

**(2)** Any importation into the United States of fish or wildlife shall, if--

**(A)** such fish or wildlife is not an endangered species listed pursuant to section 1533 of this title but is listed in Appendix II to the Convention,

**(B)** the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,

**(C)** the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and

**(D)** such importation is not made in the course of a commercial activity,

be presumed to be an importation not in violation of any provision of this chapter or any regulation issued pursuant to this chapter.

**(d) Imports and exports**

**(1) In general**

It is unlawful for any person, without first having obtained permission from the Secretary, to engage in business--

**(A)** as an importer or exporter of fish or wildlife (other than shellfish and fishery products which (i) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (ii) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants; or

**(B)** as an importer or exporter of any amount of raw or worked African elephant ivory.

**(2) Requirements**

Any person required to obtain permission under paragraph (1) of this subsection shall--

**(A)** keep such records as will fully and correctly disclose each importation or exportation of fish, wildlife, plants, or African elephant ivory made by him and the subsequent disposition made by him with respect to such fish, wildlife, plants, or ivory;

**(B)** at all reasonable times upon notice by a duly authorized representative of the Secretary, afford such representative access to his place of business, an opportunity to examine his inventory of imported fish, wildlife, plants, or African elephant ivory and the records required to be kept under subparagraph (A) of this paragraph, and to copy such records; and

**(C)** file such reports as the Secretary may require.

**(3) Regulations**

The Secretary shall prescribe such regulations as are necessary and appropriate to carry out the purposes of this subsection.

**(4) Restriction on consideration of value or amount of African elephant ivory imported or exported**

In granting permission under this subsection for importation or exportation of African elephant ivory, the Secretary shall not vary the requirements for obtaining such permission on the basis of the value or amount of ivory imported or exported under such permission.

**(e) Reports**

It is unlawful for any person importing or exporting fish or wildlife (other than shellfish and fishery products which (1) are not listed pursuant to section 1533 of this title as endangered or threatened species, and (2) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants to fail to file any declaration or report as the Secretary deems necessary to facilitate enforcement of this chapter or to meet the obligations of the Convention.

**(f) Designation of ports**

**(1)** It is unlawful for any person subject to the jurisdiction of the United States to import into or export from the United States any fish or wildlife (other than shellfish and fishery products which (A) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (B) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants, except at a port or ports designated by the Secretary of the Interior. For the purpose of facilitating enforcement of this chapter and reducing the costs thereof, the Secretary of the Interior, with approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. The Secretary of the Interior, under such terms and conditions as he may prescribe, may permit the importation or exportation at nondesignated ports in the interest of the health or safety of the fish or wildlife or plants, or for other reasons if, in his discretion, he deems it appropriate and consistent with the purpose of this subsection.

**(2)** Any port designated by the Secretary of the Interior under the authority of section 668cc-4(d) of this title, shall, if such designation is in effect on December 27, 1973, be deemed to be a port designated by the Secretary under paragraph (1) of this subsection until such time as the Secretary otherwise provides.

**(g) Violations**

It is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section.

## CREDIT(S)

(Pub.L. 93-205, § 9, Dec. 28, 1973, 87 Stat. 893; Pub.L. 95-632, § 4, Nov. 10, 1978, 92 Stat. 3760; Pub.L. 97-304, § 9(b), Oct. 13, 1982, 96 Stat. 1426; Pub.L. 100-478, Title I, § 1006, Title II, § 2301, Oct. 7, 1988, 102 Stat. 2308, 2321; Pub.L. 100-653, Title IX, § 905, Nov. 14, 1988, 102 Stat. 3835.)

Notes of Decisions (236)

16 U.S.C.A. § 1538, 16 USCA § 1538
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers,  11th Cir.(Fla.),  Sep. 15, 2010

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> United States Code Annotated
>    Title 16. Conservation
>       Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1539

§ 1539. Exceptions

Currentness

**(a) Permits**

**(1)** The Secretary may permit, under such terms and conditions as he shall prescribe--

**(A)** any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j); or

**(B)** any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

**(2)(A)** No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a conservation plan that specifies--

**(i)** the impact which will likely result from such taking;

**(ii)** what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;

**(iii)** what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

**(iv)** such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

**(B)** If the Secretary finds, after opportunity for public comment, with respect to a permit application and the related conservation plan that--

   **(i)** the taking will be incidental;

   **(ii)** the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;

   **(iii)** the applicant will ensure that adequate funding for the plan will be provided;

   **(iv)** the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and

   **(v)** the measures, if any, required under subparagraph (A)(iv) will be met;

and he has received such other assurances as he may require that the plan will be implemented, the Secretary shall issue the permit. The permit shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph, including, but not limited to, such reporting requirements as the Secretary deems necessary for determining whether such terms and conditions are being complied with.

**(C)** The Secretary shall revoke a permit issued under this paragraph if he finds that the permittee is not complying with the terms and conditions of the permit.

**(b) Hardship exemptions**

**(1)** If any person enters into a contract with respect to a species of fish or wildlife or plant before the date of the publication in the Federal Register of notice of consideration of that species as an endangered species and the subsequent listing of that species as an endangered species pursuant to section 1533 of this title will cause undue economic hardship to such person under the contract, the Secretary, in order to minimize such hardship, may exempt such person from the application of section 1538(a) of this title to the extent the Secretary deems appropriate if such person applies to him for such exemption and includes with such application such information as the Secretary may require to prove such hardship; except that (A) no such exemption shall be for a duration of more than one year from the date of publication in the Federal Register of notice of consideration of the species concerned, or shall apply to a quantity of fish or wildlife or plants in excess of that specified by the Secretary; (B) the one-year period for those species of fish or wildlife listed by the Secretary as endangered prior to December 28, 1973, shall expire in accordance with the terms of section 668cc-3 [1] of this title; and (C) no such exemption may be granted for the importation or exportation of a specimen listed in Appendix I of the Convention which is to be used in a commercial activity.

**(2)** As used in this subsection, the term "undue economic hardship" shall include, but not be limited to:

   **(A)** substantial economic loss resulting from inability caused by this chapter to perform contracts with respect to species of fish and wildlife entered into prior to the date of publication in the Federal Register of a notice of consideration of such species as an endangered species;

**(B)** substantial economic loss to persons who, for the year prior to the notice of consideration of such species as an endangered species, derived a substantial portion of their income from the lawful taking of any listed species, which taking would be made unlawful under this chapter; or

**(C)** curtailment of subsistence taking made unlawful under this chapter by persons (i) not reasonably able to secure other sources of subsistence; and (ii) dependent to a substantial extent upon hunting and fishing for subsistence; and (iii) who must engage in such curtailed taking for subsistence purposes.

**(3)** The Secretary may make further requirements for a showing of undue economic hardship as he deems fit. Exceptions granted under this section may be limited by the Secretary in his discretion as to time, area, or other factor of applicability.

#### (c) Notice and review

The Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application; except that such thirty-day period may be waived by the Secretary in an emergency situation where the health or life of an endangered animal is threatened and no reasonable alternative is available to the applicant, but notice of any such waiver shall be published by the Secretary in the Federal Register within ten days following the issuance of the exemption or permit. Information received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding.

#### (d) Permit and exemption policy

The Secretary may grant exceptions under subsections (a)(1)(A) and (b) of this section only if he finds and publishes his finding in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title.

#### (e) Alaska natives

**(1)** Except as provided in paragraph (4) of this subsection the provisions of this chapter shall not apply with respect to the taking of any endangered species or threatened species, or the importation of any such species taken pursuant to this section, by--

**(A)** any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska; or

**(B)** any non-native permanent resident of an Alaskan native village;

if such taking is primarily for subsistence purposes. Non-edible byproducts of species taken pursuant to this section may be sold in interstate commerce when made into authentic native articles of handicrafts and clothing; except that the provisions of this subsection shall not apply to any non-native resident of an Alaskan native village found by the Secretary to be not primarily dependent upon the taking of fish and wildlife for consumption or for the creation and sale of authentic native articles of handicrafts and clothing.

**(2)** Any taking under this subsection may not be accomplished in a wasteful manner.

**(3)** As used in this subsection--

   **(i)** The term "subsistence" includes selling any edible portion of fish or wildlife in native villages and towns in Alaska for native consumption within native villages or towns; and

   **(ii)** The term "authentic native articles of handicrafts and clothing" means items composed wholly or in some significant respect of natural materials, and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or other mass copying devices. Traditional native handicrafts include, but are not limited to, weaving, carving, stitching, sewing, lacing, beading, drawing, and painting.

**(4)** Notwithstanding the provisions of paragraph (1) of this subsection, whenever the Secretary determines that any species of fish or wildlife which is subject to taking under the provisions of this subsection is an endangered species or threatened species, and that such taking materially and negatively affects the threatened or endangered species, he may prescribe regulations upon the taking of such species by any such Indian, Aleut, Eskimo, or non-Native Alaskan resident of an Alaskan native village. Such regulations may be established with reference to species, geographical description of the area included, the season for taking, or any other factors related to the reason for establishing such regulations and consistent with the policy of this chapter. Such regulations shall be prescribed after a notice and hearings in the affected judicial districts of Alaska and as otherwise required by section 1373 of this title, and shall be removed as soon as the Secretary determines that the need for their impositions has disappeared.

**(f) Pre-Act endangered species parts exemption; application and certification; regulation; validity of sales contract; separability; renewal of exemption; expiration of renewal certification**

**(1)** As used in this subsection--

   **(A)** The term "pre-Act endangered species part" means--

      **(i)** any sperm whale oil, including derivatives thereof, which was lawfully held within the United States on December 28, 1973, in the course of a commercial activity; or

      **(ii)** any finished scrimshaw product, if such product or the raw material for such product was lawfully held within the United States on December 28, 1973, in the course of a commercial activity.

   **(B)** The term "scrimshaw product" means any art form which involves the substantial etching or engraving of designs upon, or the substantial carving of figures, patterns, or designs from, any bone or tooth of any marine mammal of the order Cetacea. For purposes of this subsection, polishing or the adding of minor superficial markings does not constitute substantial etching, engraving, or carving.

**(2)** The Secretary, pursuant to the provisions of this subsection, may exempt, if such exemption is not in violation of the Convention, any pre-Act endangered species part from one or more of the following prohibitions:

**(A)** The prohibition on exportation from the United States set forth in section 1538(a)(1)(A) of this title.

**(B)** Any prohibition set forth in section 1538(a)(1)(E) or (F) of this title.

**(3)** Any person seeking an exemption described in paragraph (2) of this subsection shall make application therefor to the Secretary in such form and manner as he shall prescribe, but no such application may be considered by the Secretary unless the application--

**(A)** is received by the Secretary before the close of the one-year period beginning on the date on which regulations promulgated by the Secretary to carry out this subsection first take effect;

**(B)** contains a complete and detailed inventory of all pre-Act endangered species parts for which the applicant seeks exemption;

**(C)** is accompanied by such documentation as the Secretary may require to prove that any endangered species part or product claimed by the applicant to be a pre-Act endangered species part is in fact such a part; and

**(D)** contains such other information as the Secretary deems necessary and appropriate to carry out the purposes of this subsection.

**(4)** If the Secretary approves any application for exemption made under this subsection, he shall issue to the applicant a certificate of exemption which shall specify--

**(A)** any prohibition in section 1538(a) of this title which is exempted;

**(B)** the pre-Act endangered species parts to which the exemption applies;

**(C)** the period of time during which the exemption is in effect, but no exemption made under this subsection shall have force and effect after the close of the three-year period beginning on the date of issuance of the certificate unless such exemption is renewed under paragraph (8); and

**(D)** any term or condition prescribed pursuant to paragraph (5)(A) or (B), or both, which the Secretary deems necessary or appropriate.

**(5)** The Secretary shall prescribe such regulations as he deems necessary and appropriate to carry out the purposes of this subsection. Such regulations may set forth--

**(A)** terms and conditions which may be imposed on applicants for exemptions under this subsection (including, but not limited to, requirements that applicants register inventories, keep complete sales records, permit duly authorized agents of the Secretary to inspect such inventories and records, and periodically file appropriate reports with the Secretary); and

**(B)** terms and conditions which may be imposed on any subsequent purchaser of any pre-Act endangered species part covered by an exemption granted under this subsection;

to insure that any such part so exempted is adequately accounted for and not disposed of contrary to the provisions of this chapter. No regulation prescribed by the Secretary to carry out the purposes of this subsection shall be subject to section 1533(f) (2)(A)(i) of this title.

**(6)(A)** Any contract for the sale of pre-Act endangered species parts which is entered into by the Administrator of General Services prior to the effective date of this subsection and pursuant to the notice published in the Federal Register on January 9, 1973, shall not be rendered invalid by virtue of the fact that fulfillment of such contract may be prohibited under section 1538(a)(1)(F) of this title.

**(B)** In the event that this paragraph is held invalid, the validity of the remainder of this chapter, including the remainder of this subsection, shall not be affected.

**(7)** Nothing in this subsection shall be construed to--

**(A)** exonerate any person from any act committed in violation of paragraphs (1)(A), (1)(E), or (1)(F) of section 1538(a) of this title prior to July 12, 1976; or

**(B)** immunize any person from prosecution for any such act.

**(8)(A)(i)** [2] Any valid certificate of exemption which was renewed after October 13, 1982, and was in effect on March 31, 1988, shall be deemed to be renewed for a six-month period beginning on October 7, 1988. Any person holding such a certificate may apply to the Secretary for one additional renewal of such certificate for a period not to exceed 5 years beginning on October 7, 1988.

**(B)** If the Secretary approves any application for renewal of an exemption under this paragraph, he shall issue to the applicant a certificate of renewal of such exemption which shall provide that all terms, conditions, prohibitions, and other regulations made applicable by the previous certificate shall remain in effect during the period of the renewal.

**(C)** No exemption or renewal of such exemption made under this subsection shall have force and effect after the expiration date of the certificate of renewal of such exemption issued under this paragraph.

**(D)** No person may, after January 31, 1984, sell or offer for sale in interstate or foreign commerce, any pre-Act finished scrimshaw product unless such person holds a valid certificate of exemption issued by the Secretary under this subsection, and unless such product or the raw material for such product was held by such person on October 13, 1982.

**(g) Burden of proof**

In connection with any action alleging a violation of section 1538 of this title, any person claiming the benefit of any exemption or permit under this chapter shall have the burden of proving that the exemption or permit is applicable, has been granted, and was valid and in force at the time of the alleged violation.

**(h) Certain antique articles; importation; port designation; application for return of articles**

**(1)** Sections 1533(d) and 1538(a) and (c) of this title do not apply to any article which--

    **(A)** is not less than 100 years of age;

    **(B)** is composed in whole or in part of any endangered species or threatened species listed under section 1533 of this title;

    **(C)** has not been repaired or modified with any part of any such species on or after December 28, 1973; and

    **(D)** is entered at a port designated under paragraph (3).

**(2)** Any person who wishes to import an article under the exception provided by this subsection shall submit to the customs officer concerned at the time of entry of the article such documentation as the Secretary of the Treasury, after consultation with the Secretary of the Interior, shall by regulation require as being necessary to establish that the article meets the requirements set forth in paragraph (1)(A), (B), and (C).

**(3)** The Secretary of the Treasury, after consultation with the Secretary of the Interior, shall designate one port within each customs region at which articles described in paragraph (1)(A), (B), and (C) must be entered into the customs territory of the United States.

**(4)** Any person who imported, after December 27, 1973, and on or before November 10, 1978, any article described in paragraph (1) which--

    **(A)** was not repaired or modified after the date of importation with any part of any endangered species or threatened species listed under section 1533 of this title;

    **(B)** was forfeited to the United States before November 10, 1978, or is subject to forfeiture to the United States on such date of enactment, pursuant to the assessment of a civil penalty under section 1540 of this title; and

**(C)** is in the custody of the United States on November 10, 1978;

may, before the close of the one-year period beginning on November 10, 1978, make application to the Secretary for return of the article. Application shall be made in such form and manner, and contain such documentation, as the Secretary prescribes. If on the basis of any such application which is timely filed, the Secretary is satisfied that the requirements of this paragraph are met with respect to the article concerned, the Secretary shall return the article to the applicant and the importation of such article shall, on and after the date of return, be deemed to be a lawful importation under this chapter.

**(i) Noncommercial transshipments**

Any importation into the United States of fish or wildlife shall, if--

**(1)** such fish or wildlife was lawfully taken and exported from the country of origin and country of reexport, if any;

**(2)** such fish or wildlife is in transit or transshipment through any place subject to the jurisdiction of the United States en route to a country where such fish or wildlife may be lawfully imported and received;

**(3)** the exporter or owner of such fish or wildlife gave explicit instructions not to ship such fish or wildlife through any place subject to the jurisdiction of the United States, or did all that could have reasonably been done to prevent transshipment, and the circumstances leading to the transshipment were beyond the exporter's or owner's control;

**(4)** the applicable requirements of the Convention have been satisfied; and

**(5)** such importation is not made in the course of a commercial activity,

be an importation not in violation of any provision of this chapter or any regulation issued pursuant to this chapter while such fish or wildlife remains in the control of the United States Customs Service.

**(j) Experimental populations**

**(1)** For purposes of this subsection, the term "experimental population" means any population (including any offspring arising solely therefrom) authorized by the Secretary for release under paragraph (2), but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species.

**(2)(A)** The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species.

**(B)** Before authorizing the release of any population under subparagraph (A), the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species.

USCA Case #24-5101    Document #2074992    Filed: 09/16/2024    Page 37 of 133

**(C)** For the purposes of this chapter, each member of an experimental population shall be treated as a threatened species; except that--

**(i)** solely for purposes of section 1536 of this title (other than subsection (a)(1) thereof), an experimental population determined under subparagraph (B) to be not essential to the continued existence of a species shall be treated, except when it occurs in an area within the National Wildlife Refuge System or the National Park System, as a species proposed to be listed under section 1533 of this title; and

**(ii)** critical habitat shall not be designated under this chapter for any experimental population determined under subparagraph (B) to be not essential to the continued existence of a species.

**(3)** The Secretary, with respect to populations of endangered species or threatened species that the Secretary authorized, before October 13, 1982, for release in geographical areas separate from the other populations of such species, shall determine by regulation which of such populations are an experimental population for the purposes of this subsection and whether or not each is essential to the continued existence of an endangered species or a threatened species.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 93-205, § 10, Dec. 28, 1973, 87 Stat. 896; Pub.L. 94-359, §§ 2, 3, July 12, 1976, 90 Stat. 911, 912; Pub.L. 95-632, § 5, Nov. 10, 1978, 92 Stat. 3760; Pub.L. 96-159, § 7, Dec. 28, 1979, 93 Stat. 1230; Pub.L. 97-304, § 6(1) to (4)(A), (5), (6), Oct. 13, 1982, 96 Stat. 1422 to 1424; Pub.L. 100-478, Title I, §§ 1011, 1013(b), (c), Oct. 7, 1988, 102 Stat. 2314, 2315.)

Notes of Decisions (90)

<div align="center">

**Footnotes**

</div>

1    Repealed by Pub.L. 93-205, § 14, Dec. 28, 1973, 87 Stat. 903.

2    So in original. No. cl. (ii) has been enacted.

16 U.S.C.A. § 1539, 16 USCA § 1539
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Research and Related Programs (Refs & Annos)

33 U.S.C.A. § 1251

§ 1251. Congressional declaration of goals and policy

Currentness

**(a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective**

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--

**(1)** it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

**(2)** it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

**(3)** it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

**(4)** it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

**(5)** it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

**(6)** it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

**(7)** it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

**(b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States**

34a

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

**(c) Congressional policy toward Presidential activities with foreign countries**

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

**(d) Administrator of Environmental Protection Agency to administer chapter**

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

**(e) Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**(f) Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

**(g) Authority of States over water**

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

**CREDIT(S)**

---

(June 30, 1948, c. 758, Title I, § 101, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 816; amended Pub.L. 95-217, §§ 5(a), 26(b), Dec. 27, 1977, 91 Stat. 1567, 1575; Pub.L. 100-4, Title III, § 316(b), Feb. 4, 1987, 101 Stat. 60.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11548

Ex. Ord. No. 11548, July 20, 1970, 35 F.R. 11677, which related to the delegation of Presidential functions, was superseded by Ex. Ord. No. 11735, Aug. 3, 1973, 38 F.R. 21243, set out as a note under section 1321 of this title.

### EXECUTIVE ORDER NO. 11742

<Oct. 23, 1973, 38 F.R. 29457>

**Delegation of Functions to Secretary of State Respecting Negotiation
of International Agreements Relating to Enhancement of Environment**

Under and by virtue of the authority vested in me by section 301 of title 3 of the United States Code and as President of the United States, I hereby authorize and empower the Secretary of State, in coordination with the Council on Environmental Quality, the Environmental Protection Agency, and other appropriate Federal agencies, to perform, without the approval, ratification, or other action of the President, the functions vested in the President by Section 7 of the Federal Water Pollution Control Act Amendments of 1972 (Public Law 92-500; 86 Stat. 898) with respect to international agreements relating to the enhancement of the environment.

RICHARD NIXON.

Notes of Decisions (159)

33 U.S.C.A. § 1251, 33 USCA § 1251
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1342

§ 1342. National pollutant discharge elimination system

Effective: January 14, 2019
Currentness

**(a) Permits for discharge of pollutants**

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend

beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

**(b) State permit programs**

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

**(1)** To issue permits which--

   **(A)** apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

   **(B)** are for fixed terms not exceeding five years; and

   **(C)** can be terminated or modified for cause including, but not limited to, the following:

      **(i)** violation of any condition of the permit;

      **(ii)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

      **(iii)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

   **(D)** control the disposal of pollutants into wells;

**(2)(A)** To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

**(B)** To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

**(3)** To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

**(4)** To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(5)** To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

**(6)** To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

**(7)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

**(8)** To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

**(9)** To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

**(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator**

**(1)** Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

**(2)** Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

**(3)** Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The

Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

### (4) Limitations on partial permit program returns and withdrawals

A State may return to the Administrator administration, and the Administrator may withdraw under paragraph (3) of this subsection approval, of--

**(A)** a State partial permit program approved under subsection (n)(3) only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

**(B)** a State partial permit program approved under subsection (n)(4) only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

### (d) Notification of Administrator

**(1)** Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

**(2)** No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

**(3)** The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

**(4)** In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

### (e) Waiver of notification requirement

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

USCA Case #24-5101    Document #2074992    Filed: 09/16/2024    Page 45 of 133

**(f) Point source categories**

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

**(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants**

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

**(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works**

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

**(i) Federal enforcement not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(j) Public information**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

**(k) Compliance with permits**

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

**(l) Limitation on permit requirement**

**(1) Agricultural return flows**

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

**(2) Stormwater runoff from oil, gas, and mining operations**

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

**(3) Silvicultural activities**

**(A) NPDES permit requirements for silvicultural activities**

The Administrator shall not require a permit under this section nor directly or indirectly require any State to require a permit under this section for a discharge from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance.

**(B) Other requirements**

Nothing in this paragraph exempts a discharge from silvicultural activity from any permitting requirement under section 1344 of this title, existing permitting requirements under section 1342 of this title, or from any other federal law.

**(C)** The authorization provided in Section [1] 1365(a) of this title does not apply to any non-permitting program established under 1342(p)(6) [2] of this title for the silviculture activities listed in 1342(l)(3)(A) [2] of this title, or to any other limitations that might be deemed to apply to the silviculture activities listed in 1342(l)(3)(A) [2] of this title.

**(m) Additional pretreatment of conventional pollutants not required**

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect

State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

**(n) Partial permit program**

**(1) State submission**

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the discharges into the navigable waters in such State.

**(2) Minimum coverage**

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b).

**(3) Approval of major category partial permit programs**

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if--

**(A)** such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

**(B)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b).

**(4) Approval of major component partial permit programs**

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) if--

**(A)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b); and

**(B)** the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

**(o) Anti-backsliding**

**(1) General prohibition**

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

**(2) Exceptions**

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if--

**(A)** material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

**(B)(i)** information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

**(ii)** the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B);

**(C)** a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

**(D)** the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

**(E)** the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

**(3) Limitations**

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

**(p) Municipal and industrial stormwater discharges**

**(1) General rule**

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

**(2) Exceptions**

Paragraph (1) shall not apply with respect to the following stormwater discharges:

**(A)** A discharge with respect to which a permit has been issued under this section before February 4, 1987.

**(B)** A discharge associated with industrial activity.

**(C)** A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

**(D)** A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

**(E)** A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

**(3) Permit requirements**

**(A) Industrial discharges**

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

**(B) Municipal discharge**

Permits for discharges from municipal storm sewers--

**(i)** may be issued on a system- or jurisdiction-wide basis;

**(ii)** shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

**(iii)** shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

## (4) Permit application requirements

### (A) Industrial and large municipal discharges

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

### (B) Other municipal discharges

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

## (5) Studies

The Administrator, in consultation with the States, shall conduct a study for the purposes of--

**(A)** identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

**(B)** determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

**(C)** establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

**(6) Regulations**

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

**(q) Combined sewer overflows**

**(1) Requirement for permits, orders, and decrees**

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000, for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the "CSO control policy").

**(2) Water quality and designated use review guidance**

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

**(3) Report**

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

**(r) Discharges incidental to the normal operation of recreational vessels**

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck runoff, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

**(s) Integrated plans**

**(1) Definition of integrated plan**

**47a**

USCA Case #24-5101      Document #2074992      Filed: 09/16/2024      Page 52 of 133

In this subsection, the term "integrated plan" means a plan developed in accordance with the Integrated Municipal Stormwater and Wastewater Planning Approach Framework, issued by the Environmental Protection Agency and dated June 5, 2012.

**(2) In general**

The Administrator (or a State, in the case of a permit program approved by the Administrator) shall inform municipalities of the opportunity to develop an integrated plan that may be incorporated into a permit under this section.

**(3) Scope**

**(A) Scope of permit incorporating integrated plan**

A permit issued under this section that incorporates an integrated plan may integrate all requirements under this chapter addressed in the integrated plan, including requirements relating to--

**(i)** a combined sewer overflow;

**(ii)** a capacity, management, operation, and maintenance program for sanitary sewer collection systems;

**(iii)** a municipal stormwater discharge;

**(iv)** a municipal wastewater discharge; and

**(v)** a water quality-based effluent limitation to implement an applicable wasteload allocation in a total maximum daily load.

**(B) Inclusions in integrated plan**

An integrated plan incorporated into a permit issued under this section may include the implementation of--

**(i)** projects, including innovative projects, to reclaim, recycle, or reuse water; and

**(ii)** green infrastructure.

**(4) Compliance schedules**

**(A) In general**

48a

A permit issued under this section that incorporates an integrated plan may include a schedule of compliance, under which actions taken to meet any applicable water quality-based effluent limitation may be implemented over more than 1 permit term if the schedule of compliance--

  **(i)** is authorized by State water quality standards; and

  **(ii)** meets the requirements of section 122.47 of title 40, Code of Federal Regulations (as in effect on January 14, 2019).

**(B) Time for compliance**

For purposes of subparagraph (A)(ii), the requirement of section 122.47 of title 40, Code of Federal Regulations, for compliance by an applicable statutory deadline under this chapter does not prohibit implementation of an applicable water quality-based effluent limitation over more than 1 permit term.

**(C) Review**

A schedule of compliance incorporated into a permit issued under this section may be reviewed at the time the permit is renewed to determine whether the schedule should be modified.

**(5) Existing authorities retained**

**(A) Applicable standards**

Nothing in this subsection modifies any obligation to comply with applicable technology and water quality-based effluent limitations under this chapter.

**(B) Flexibility**

Nothing in this subsection reduces or eliminates any flexibility available under this chapter, including the authority of a State to revise a water quality standard after a use attainability analysis under section 131.10(g) of title 40, Code of Federal Regulations (or a successor regulation), subject to the approval of the Administrator under section 1313(c) of this title.

**(6) Clarification of State authority**

**(A) In general**

Nothing in section 1311(b)(1)(C) of this title precludes a State from authorizing in the water quality standards of the State the issuance of a schedule of compliance to meet water quality-based effluent limitations in permits that incorporate provisions of an integrated plan.

**(B) Transition rule**

In any case in which a discharge is subject to a judicial order or consent decree, as of January 14, 2019, resolving an enforcement action under this chapter, any schedule of compliance issued pursuant to an authorization in a State water quality standard may not revise a schedule of compliance in that order or decree to be less stringent, unless the order or decree is modified by agreement of the parties and the court.

## CREDIT(S)

(June 30, 1948, c. 758, Title IV, § 402, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 880; amended Pub.L. 95-217, §§ 33(c), 50, 54(c)(1), 65, 66, Dec. 27, 1977, 91 Stat. 1577, 1588, 1591, 1599, 1600; Pub.L. 100-4, Title IV, §§ 401 to 404(a), (c), formerly (d), 405, Feb. 4, 1987, 101 Stat. 65 to 67, 69; Pub.L. 102-580, Title III, § 364, Oct. 31, 1992, 106 Stat. 4862; Pub.L. 104-66, Title II, § 2021(e)(2), Dec. 21, 1995, 109 Stat. 727; Pub.L. 106-554, § 1(a)(4) [Div. B, Title I, § 112(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-224; Pub.L. 110-288, § 2, July 29, 2008, 122 Stat. 2650; Pub.L. 113-79, Title XII, § 12313, Feb. 7, 2014, 128 Stat. 992; Pub.L. 115-436, § 3(a), Jan. 14, 2019, 132 Stat. 5558.)

## U.S. SUPREME COURT OCTOBER TERM 2024

<U.S. Supreme Court, Oct. Term 2024, Oral Argument - Question Presented: >

<Whether the Clean Water Act allows EPA (or an authorized state) to impose generic prohibitions in NPDES permits that subject permitholders to enforcement for exceedances of water quality standards without identifying specific limits to which their discharges must conform. >

Notes of Decisions (318)

## Footnotes

1    So in original. Probably should not be capitalized.

2    So in original. Probably should be preceded by "section".

33 U.S.C.A. § 1342, 33 USCA § 1342
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1344

§ 1344. Permits for dredged or fill material

Currentness

**(a) Discharge into navigable waters at specified disposal sites**

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

**(b) Specification for disposal sites**

Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

**(c) Denial or restriction of use of defined areas as disposal sites**

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

**(d) "Secretary" defined**

The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

**(e) General permits on State, regional, or nationwide basis**

**(1)** In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall (A) be based on the guidelines described in subsection (b)(1) of this section, and (B) set forth the requirements and standards which shall apply to any activity authorized by such general permit.

**(2)** No general permit issued under this subsection shall be for a period of more than five years after the date of its issuance and such general permit may be revoked or modified by the Secretary if, after opportunity for public hearing, the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits.

**(f) Non-prohibited discharge of dredged or fill material**

**(1)** Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material--

   **(A)** from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

   **(B)** for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;

   **(C)** for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

   **(D)** for the purpose of construction of temporary sedimentation basins on a construction site which does not include placement of fill material into the navigable waters;

   **(E)** for the purpose of construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained, in accordance with best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized;

   **(F)** resulting from any activity with respect to which a State has an approved program under section 1288(b)(4) of this title which meets the requirements of subparagraphs (B) and (C) of such section,

is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

**(2)** Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

**(g) State administration**

**(1)** The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

**(2)** Not later than the tenth day after the date of the receipt of the program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall provide copies of such program and statement to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service.

**(3)** Not later than the ninetieth day after the date of the receipt by the Administrator of the program and statement submitted by any State, under paragraph (1) of this subsection, the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such program and statement to the Administrator in writing.

**(h) Determination of State's authority to issue permits under State program; approval; notification; transfers to State program**

**(1)** Not later than the one-hundred-twentieth day after the date of the receipt by the Administrator of a program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall determine, taking into account any comments submitted by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, pursuant to subsection (g) of this section, whether such State has the following authority with respect to the issuance of permits pursuant to such program:

**(A)** To issue permits which--

**(i)** apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title;

**(ii)** are for fixed terms not exceeding five years; and

**(iii)** can be terminated or modified for cause including, but not limited to, the following:

**(I)** violation of any condition of the permit;

**(II)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

**(III)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

**(B)** To issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title.

**(C)** To assure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application.

**(D)** To assure that the Administrator receives notice of each application (including a copy thereof) for a permit.

**(E)** To assure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

**(F)** To assure that no permit will be issued if, in the judgment of the Secretary, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby.

**(G)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement.

**(H)** To assure continued coordination with Federal and Federal-State water-related planning and review processes.

**(2)** If, with respect to a State program submitted under subsection (g)(1) of this section, the Administrator determines that such State--

**(A)** has the authority set forth in paragraph (1) of this subsection, the Administrator shall approve the program and so notify (i) such State and (ii) the Secretary, who upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program; or

**(B)** does not have the authority set forth in paragraph (1) of this subsection, the Administrator shall so notify such State, which notification shall also describe the revisions or modifications necessary so that such State may resubmit such program for a determination by the Administrator under this subsection.

**(3)** If the Administrator fails to make a determination with respect to any program submitted by a State under subsection (g) (1) of this section within one-hundred-twenty days after the date of the receipt of such program, such program shall be deemed approved pursuant to paragraph (2)(A) of this subsection and the Administrator shall so notify such State and the Secretary who, upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsection (a) and (e) of this section for activities with respect to which a permit may be issued by such State.

**(4)** After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits pending before the Secretary for activities with respect to which a permit may be issued pursuant to such State program to such State for appropriate action.

**(5)** Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the administration and enforcement of such general permit with respect to such activities.

**(i) Withdrawal of approval**

Whenever the Administrator determines after public hearing that a State is not administering a program approved under subsection (h)(2)(A) of this section, in accordance with this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, the Administrator shall so notify the State, and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days after the date of the receipt of such notification, the Administrator shall (1) withdraw approval of such program until the Administrator determines such corrective action has been taken, and (2) notify the Secretary that the Secretary shall resume the program for the issuance of permits under subsections (a) and (e) of this section for activities with respect to which the State was issuing permits and that such authority of the Secretary shall continue in effect until such time as the Administrator makes the determination described in clause (1) of this subsection and such State again has an approved program.

**(j) Copies of applications for State permits and proposed general permits to be transmitted to Administrator**

Each State which is administering a permit program pursuant to this section shall transmit to the Administrator (1) a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State, and (2) a copy of each proposed general permit which such State intends to issue. Not later than the tenth day after the date of the receipt of such permit application or such proposed general permit, the Administrator shall provide copies of such permit application or such proposed general permit to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service. If the Administrator intends to provide written comments to such State with respect to such permit application or such proposed general permit, he shall so notify such State not later than the thirtieth day after the date of the receipt of such application or such proposed general permit and provide such written comments to such State, after consideration of any comments made in writing with respect to such application or such proposed general permit by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, not later than the ninetieth day after the date of such receipt.

If such State is so notified by the Administrator, it shall not issue the proposed permit until after the receipt of such comments from the Administrator, or after such ninetieth day, whichever first occurs. Such State shall not issue such proposed permit after such ninetieth day if it has received such written comments in which the Administrator objects (A) to the issuance of such proposed permit and such proposed permit is one that has been submitted to the Administrator pursuant to subsection (h)(1)(E), or (B) to the issuance of such proposed permit as being outside the requirements of this section, including, but not limited to, the guidelines developed under subsection (b)(1) of this section unless it modifies such proposed permit in accordance with such comments. Whenever the Administrator objects to the issuance of a permit under the preceding sentence such written objection shall contain a statement of the reasons for such objection and the conditions which such permit would include if it were issued by the Administrator. In any case where the Administrator objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing or, if no hearing is requested within 90 days after the date of such objection, the Secretary may issue the permit pursuant to subsection (a) or (e) of this section, as the case may be, for such source in accordance with the guidelines and requirements of this chapter.

**(k) Waiver**

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (j) of this section at the time of the approval of a program pursuant to subsection (h)(2)(A) of this section for any category (including any class, type, or size within such category) of discharge within the State submitting such program.

**(l) Categories of discharges not subject to requirements**

The Administrator shall promulgate regulations establishing categories of discharges which he determines shall not be subject to the requirements of subsection (j) of this section in any State with a program approved pursuant to subsection (h)(2)(A) of this section. The Administrator may distinguish among classes, types, and sizes within any category of discharges.

**(m) Comments on permit applications or proposed general permits by Secretary of the Interior acting through Director of United States Fish and Wildlife Service**

Not later than the ninetieth day after the date on which the Secretary notifies the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service that (1) an application for a permit under subsection (a) of this section has been received by the Secretary, or (2) the Secretary proposes to issue a general permit under subsection (e) of this section, the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such application or such proposed general permit in writing to the Secretary.

**(n) Enforcement authority not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(o) Public availability of permits and permit applications**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or portion thereof, shall further be available on request for the purpose of reproduction.

**(p) Compliance**

Compliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title.

**(q) Minimization of duplication, needless paperwork, and delays in issuance; agreements**

Not later than the one-hundred-eightieth day after December 27, 1977, the Secretary shall enter into agreements with the Administrator, the Secretaries of the Departments of Agriculture, Commerce, Interior, and Transportation, and the heads of other appropriate Federal agencies to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section. Such agreements shall be developed to assure that, to the maximum extent practicable, a decision with respect to an application for a permit under subsection (a) of this section will be made not later than the ninetieth day after the date the notice for such application is published under subsection (a) of this section.

**(r) Federal projects specifically authorized by Congress**

The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section, or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

**(s) Violation of permits**

**(1)** Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any condition or limitation set forth in a permit issued by the Secretary under this section, the Secretary shall issue an order requiring such person to comply with such condition or limitation, or the Secretary shall bring a civil action in accordance with paragraph (3) of this subsection.

**(2)** A copy of any order issued under this subsection shall be sent immediately by the Secretary to the State in which the violation occurs and other affected States. Any order issued under this subsection shall be by personal service and shall state with reasonable specificity the nature of the violation, specify a time for compliance, not to exceed thirty days, which the Secretary determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection is issued to a corporation, a copy of such order shall be served on any appropriate corporate officers.

**(3)** The Secretary is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this paragraph may be brought in the district court of the United States for the district in which the defendant is located or

resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such acton [1] shall be given immediately to the appropriate State.

**(4)** Any person who violates any condition or limitation in a permit issued by the Secretary under this section, and any person who violates any order issued by the Secretary under paragraph (1) of this subsection, shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

**(t) Navigable waters within State jurisdiction**

Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements. This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

<div align="center">

**CREDIT(S)**

</div>

(June 30, 1948, c. 758, Title IV, § 404, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 884; amended Pub.L. 95-217, § 67(a), (b), Dec. 27, 1977, 91 Stat. 1600; Pub.L. 100-4, Title III, § 313(d), Feb. 4, 1987, 101 Stat. 45.)

Notes of Decisions (574)

---

<div align="center">

**Footnotes**

</div>

1        So in original. Probably should be "action".

33 U.S.C.A. § 1344, 33 USCA § 1344
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

West's Florida Statutes Annotated
  Florida Constitution--1968 Revision (Refs & Annos)
    Article II. General Provisions (Refs & Annos)

West's F.S.A. Const. Art. 2 § 7

§ 7. Natural resources and scenic beauty

Currentness

(a) It shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution and of excessive and unnecessary noise and for the conservation and protection of natural resources.

(b) Those in the Everglades Agricultural Area who cause water pollution within the Everglades Protection Area or the Everglades Agricultural Area shall be primarily responsible for paying the costs of the abatement of that pollution. For the purposes of this subsection, the terms "Everglades Protection Area" and "Everglades Agricultural Area" shall have the meanings as defined in statutes in effect on January 1, 1996.

(c) To protect the people of Florida and their environment, drilling for exploration or extraction of oil or natural gas is prohibited on lands beneath all state waters which have not been alienated and that lie between the mean high water line and the outermost boundaries of the state's territorial seas. This prohibition does not apply to the transportation of oil and gas products produced outside of such waters. This subsection is self-executing.

**Credits**

Amended, general election, Nov. 5, 1996; general election, Nov. 3, 1998; Nov. 6, 2018.

**Editors' Notes**

### COMMENTARY TO 1996 AND 1998 AMENDMENTS

*<By William A. Buzzett and Deborah K. Kearney>*

*<1996 Amendment>*

*<(1996 Initiative Petition)>*

Subsection (b) was added by this citizen initiative to specify that polluters in the Everglades Agricultural Area (EAA) are primarily responsible for the costs of abating the pollution they cause within the Everglades Protection Area or the Everglades Agricultural Area. These two areas are defined by statute. § 373.4592, Fla. Stat.

This measure began as a portion of an initiative headed for the 1994 ballot. The 1994 proposal established a trust for restoration of the Everglades, levied a 1¢ per pound fee on raw sugar to fund the trust, and imposed responsibility on polluters to cover cleanup costs. That 1994 initiative violated single-subject requirements, as well as suffered from a misleading ballot summary, and was stricken from the ballot. *In re Advisory Opinion to the Attorney General-Save Our*

*Everglades*, 636 So. 2d 1336 (Fla. 1994). In 1996, the same committee, known as "Save Our Everglades," separated the various aspects of the Everglades cleanup program by filing three individual initiative petitions. The petition that added subsection (b) was known as "Polluter Pays." Opponents of the Everglades amendments focused their energies on defeating Amendment 5, which imposed the penny sales tax on raw sugar. Amendment 5 was defeated, but the other two segments of the overall program passed. Thus, polluters within the EAA are responsible for the cost of abatement of the pollution they cause, *Advisory Opinion to the Governor--1996 Amendment 5 (Everglades)*, 706 So.2d 278 (Fla.1997), but this responsibility is not met through the payment of a constitutionally-imposed penny per pound levy.

<center>*<1998 Amendment>*</center>

<center>*<(1998 Constitution Revision Commission Revision 5)>*</center>

Subsection (a) was amended to add "conservation and protection of natural resources" to the listing of those things for which the Legislature is required to make adequate provision by law. This addition was largely viewed by the Commission as an aspirational goal and a statement that Floridians find conservation and protection of their natural resources important responsibilities of the state.

The Commission's initial proposals on this subject took the form of an "environmental bill of rights" and were designed to grant a broad right of standing to enforce constitutional environmental goals. Substantial amendment pared the measure into a form mandating that the Legislature adequately address the conservation and protection of Florida's natural resources. Commissioners understood that a direction to the Legislature to make "adequate provision" by law had never been interpreted to mandate any particular law, simply that there be some reasonable level of legislative action. *See also* the similar mandate in Art. IX, § 1. In other words, the Legislature is empowered to determine, within reason, what is adequate.

Notes of Decisions (21)

West's F. S. A. Const. Art. 2 § 7, FL CONST Art. 2 § 7
Current through the November 3, 2020, General Election

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

West's Florida Statutes Annotated
  Title XXVIII. Natural Resources; Conservation, Reclamation, and Use (Chapters 369-380)
    Chapter 373. Water Resources (Refs & Annos)
      Part I. State Water Resource Plan (Refs & Annos)

This section has been updated. Click here for the updated version.

West's F.S.A. § 373.016

373.016. Declaration of policy

Effective: [See Text Amendments] to May 12, 2022

(1) The waters in the state are among its basic resources. Such waters have not heretofore been conserved or fully controlled so as to realize their full beneficial use.

(2) The department and the governing board shall take into account cumulative impacts on water resources and manage those resources in a manner to ensure their sustainability.

(3) It is further declared to be the policy of the Legislature:

(a) To provide for the management of water and related land resources;

(b) To promote the conservation, replenishment, recapture, enhancement, development, and proper utilization of surface and groundwater;

(c) To develop and regulate dams, impoundments, reservoirs, and other works and to provide water storage for beneficial purposes;

(d) To promote the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems;

(e) To prevent damage from floods, soil erosion, and excessive drainage;

(f) To minimize degradation of water resources caused by the discharge of stormwater;

(g) To preserve natural resources, fish, and wildlife;

(h) To promote the public policy set forth in s. 403.021;

USCA Case #24-5101    Document #2074992    Filed: 09/16/2024    Page 66 of 133

(i) To promote recreational development, protect public lands, and assist in maintaining the navigability of rivers and harbors; and

(j) Otherwise to promote the health, safety, and general welfare of the people of this state.

In implementing this chapter, the department and the governing board shall construe and apply the policies in this subsection as a whole, and no specific policy is to be construed or applied in isolation from the other policies in this subsection.

(4)(a) Because water constitutes a public resource benefiting the entire state, it is the policy of the Legislature that the waters in the state be managed on a state and regional basis. Consistent with this directive, the Legislature recognizes the need to allocate water throughout the state so as to meet all reasonable-beneficial uses. However, the Legislature acknowledges that such allocations have in the past adversely affected the water resources of certain areas in this state. To protect such water resources and to meet the current and future needs of those areas with abundant water, the Legislature directs the department and the water management districts to encourage the use of water from sources nearest the area of use or application whenever practicable. Such sources shall include all naturally occurring water sources and all alternative water sources, including, but not limited to, desalination, conservation, reuse of nonpotable reclaimed water and stormwater, and aquifer storage and recovery. Reuse of potable reclaimed water and stormwater shall not be subject to the evaluation described in s. 373.223(3)(a)-(g). However, this directive to encourage the use of water, whenever practicable, from sources nearest the area of use or application shall not apply to the transport and direct and indirect use of water within the area encompassed by the Central and Southern Florida Flood Control Project, nor shall it apply anywhere in the state to the transport and use of water supplied exclusively for bottled water as defined in s. 500.03(1)(d), nor shall it apply to the transport and use of reclaimed water for electrical power production by an electric utility as defined in s. 366.02(2).

(b) In establishing the policy outlined in paragraph (a), the Legislature realizes that under certain circumstances the need to transport water from distant sources may be necessary for environmental, technical, or economic reasons.

(5) The Legislature recognizes that the water resource problems of the state vary from region to region, both in magnitude and complexity. It is therefore the intent of the Legislature to vest in the Department of Environmental Protection or its successor agency the power and responsibility to accomplish the conservation, protection, management, and control of the waters of the state and with sufficient flexibility and discretion to accomplish these ends through delegation of appropriate powers to the various water management districts. The department may exercise any power herein authorized to be exercised by a water management district; however, to the greatest extent practicable, such power should be delegated to the governing board of a water management district.

(6) It is further declared the policy of the Legislature that each water management district, to the extent consistent with effective management practices, shall approximate its fiscal and budget policies and procedures to those of the state.

**Credits**

Laws 1972, c. 72-299, Part I, § 2; Laws 1979, c. 79-65, § 36; Laws 1983, c. 83-310, § 70; Laws 1989, c. 89-279, § 5; Laws 1993, c. 93-213, § 20; Laws 1994, c. 94-356, § 250. Amended by Laws 1997, c. 97-160, § 1, eff. July 1, 1997; Laws 1998, c. 98-88, § 1, eff. Oct. 1, 1998.

West's F. S. A. § 373.016, FL ST § 373.016

Current with laws, joint and concurrent resolutions and memorials through July, 1 2024, in effect from the 2024 first regular session. Some statute sections may be more current, see credits for details. The statutes are subject to change as determined by the Florida Revisor of Statutes. (These changes will be incorporated later this year.)

**End of Document**                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

West's Florida Statutes Annotated
Title XXIX. Public Health (Chapters 381-408)
Chapter 403. Environmental Control (Refs & Annos)
Part I. Pollution Control (Refs & Annos)

West's F.S.A. § 403.021

403.021. Legislative declaration; public policy

Currentness

(1) The pollution of the air and waters of this state constitutes a menace to public health and welfare; creates public nuisances; is harmful to wildlife and fish and other aquatic life; and impairs domestic, agricultural, industrial, recreational, and other beneficial uses of air and water.

(2) It is declared to be the public policy of this state to conserve the waters of the state and to protect, maintain, and improve the quality thereof for public water supplies, for the propagation of wildlife and fish and other aquatic life, and for domestic, agricultural, industrial, recreational, and other beneficial uses and to provide that no wastes be discharged into any waters of the state without first being given the degree of treatment necessary to protect the beneficial uses of such water.

(3) It is declared to be the public policy of this state and the purpose of this act to achieve and maintain such levels of air quality as will protect human health and safety and, to the greatest degree practicable, prevent injury to plant and animal life and property, foster the comfort and convenience of the people, promote the economic and social development of this state, and facilitate the enjoyment of the natural attractions of this state. In accordance with the public policy established herein, the Legislature further declares that the citizens of this state should be afforded reasonable protection from the dangers inherent in the release of toxic or otherwise hazardous vapors, gases, or highly volatile liquids into the environment.

(4) It is declared that local and regional air and water pollution control programs are to be supported to the extent practicable as essential instruments to provide for a coordinated statewide program of air and water pollution prevention, abatement, and control for the securing and maintenance of appropriate levels of air and water quality.

(5) It is hereby declared that the prevention, abatement, and control of the pollution of the air and waters of this state are affected with a public interest, and the provisions of this act are enacted in the exercise of the police powers of this state for the purpose of protecting the health, peace, safety, and general welfare of the people of this state.

(6) The Legislature finds and declares that control, regulation, and abatement of the activities which are causing or may cause pollution of the air or water resources in the state and which are or may be detrimental to human, animal, aquatic, or plant life, or to property, or unreasonably interfere with the comfortable enjoyment of life or property be increased to ensure conservation of natural resources; to ensure a continued safe environment; to ensure purity of air and water; to ensure domestic water supplies; to ensure protection and preservation of the public health, safety, welfare, and economic well-being; to ensure and provide for recreational and wildlife needs as the population increases and the economy expands; and to ensure a continuing growth of the economy and industrial development.

(7) The Legislature further finds and declares that:

(a) Compliance with this law will require capital outlays of hundreds of millions of dollars for the installation of machinery, equipment, and facilities for the treatment of industrial wastes which are not productive assets and increased operating expenses to owners without any financial return and should be separately classified for assessment purposes.

(b) Industry should be encouraged to install new machinery, equipment, and facilities as technology in environmental matters advances, thereby improving the quality of the air and waters of the state and benefiting the citizens of the state without pecuniary benefit to the owners of industries; and the Legislature should prescribe methods whereby just valuation may be secured to such owners and exemptions from certain excise taxes should be offered with respect to such installations.

(c) Facilities as herein defined should be classified separately from other real and personal property of any manufacturing or processing plant or installation, as such facilities contribute only to general welfare and health and are assets producing no profit return to owners.

(d) In existing manufacturing or processing plants it is more difficult to obtain satisfactory results in treating industrial wastes than in new plants being now planned or constructed and that with respect to existing plants in many instances it will be necessary to demolish and remove substantial portions thereof and replace the same with new and more modern equipment in order to more effectively treat, eliminate, or reduce the objectionable characteristics of any industrial wastes and that such replacements should be classified and assessed differently from replacements made in the ordinary course of business.

(8) The Legislature further finds and declares that the public health, welfare, and safety may be affected by disease-carrying vectors and pests. The department shall assist all governmental units charged with the control of such vectors and pests. Furthermore, in reviewing applications for permits, the department shall consider the total well-being of the public and shall not consider solely the ambient pollution standards when exercising its powers, if there may be danger of a public health hazard.

(9)(a) The Legislature finds and declares that it is essential to preserve and maintain authorized water depth in the existing navigation channels, port harbors, turning basins, and harbor berths of this state in order to provide for the continued safe navigation of deepwater shipping commerce. The department shall recognize that maintenance of authorized water depths consistent with port master plans developed pursuant to s. 163.3178(2)(k) is an ongoing, continuous, beneficial, and necessary activity that is in the public interest; and it shall develop a regulatory process that shall enable the ports of this state to conduct such activities in an environmentally sound, safe, expeditious, and cost-efficient manner. It is the further intent of the Legislature that the permitting and enforcement of dredging, dredged-material management, and other related activities for Florida's deepwater ports pursuant to this chapter and chapters 161, 253, and 373 shall be consolidated within the department's Division of Water Resource Management and, with the concurrence of the affected deepwater port or ports, may be administered by a district office of the department or delegated to an approved local environmental program.

(b) The provisions of paragraph (a) apply only to the port waters, dredged-material management sites, port harbors, navigation channels, turning basins, and harbor berths used for deepwater commercial navigation in the ports of Jacksonville, Tampa, Port Everglades, Miami, Port Canaveral, Ft. Pierce, Palm Beach, Port Manatee, Port St. Joe, Panama City, St. Petersburg, Pensacola, Fernandina, and Key West.

(10) It is the policy of the state to ensure that the existing and potential drinking water resources of the state remain free from harmful quantities of contaminants. The department, as the state water quality protection agency, shall compile, correlate, and disseminate available information on any contaminant which endangers or may endanger existing or potential drinking water resources. It shall also coordinate its regulatory program with the regulatory programs of other agencies to assure adequate protection of the drinking water resources of the state.

(11) It is the intent of the Legislature that water quality standards be reasonably established and applied to take into account the variability occurring in nature. The department shall recognize the statistical variability inherent in sampling and testing procedures that are used to express water quality standards. The department shall also recognize that some deviations from water quality standards occur as the result of natural background conditions. The department shall not consider deviations from water quality standards to be violations when the discharger can demonstrate that the deviations would occur in the absence of any human-induced discharges or alterations to the water body.

**Credits**

Added by Laws 1967, c. 67-436, § 3; Laws 1978, c. 78-98, § 1; Laws 1981, c. 81-228, §§ 1, 5; Laws 1984, c. 84-79, § 4; Laws 1984, c. 84-338, § 46; Laws 1985, c. 85-269, § 11; Laws 1985, c. 85-277, § 1; Laws 1986, c. 86-186, § 8; Laws 1986, c. 86-213, § 3; Laws 1996, c. 96-320, § 143; Laws 1997, c. 97-103, § 1004. Amended by Laws 1999, c. 99-353, § 4, eff. June 11, 1999.

Notes of Decisions (7)

West's F. S. A. § 403.021, FL ST § 403.021

Current with laws, joint and concurrent resolutions and memorials through July, 1 2024, in effect from the 2024 first regular session. Some statute sections may be more current, see credits for details. The statutes are subject to change as determined by the Florida Revisor of Statutes. (These changes will be incorporated later this year.)

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart B. Compliance with the Guidelines

40 C.F.R. § 230.10

§ 230.10 Restrictions on discharge.

Currentness

Note: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

68a

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (314)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart A. General

40 C.F.R. § 233.1

§ 233.1 Purpose and scope.

Currentness

(a) This part specifies the procedures EPA will follow, and the criteria EPA will apply, in approving, reviewing, and withdrawing approval of State programs under section 404 of the Act.

(b) Except as provided in § 232.3, a State program must regulate all discharges of dredged or fill material into waters regulated by the State under section 404(g)–(1). Partial State programs are not approvable under section 404. A State's decision not to assume existing Corps' general permits does not constitute a partial program. The discharges previously authorized by general permit will be regulated by State individual permits. However, in many cases, States other than Indian Tribes will lack authority to regulate activities on Indian lands. This lack of authority does not impair that State's ability to obtain full program approval in accordance with this part, i.e., inability of a State which is not an Indian Tribe to regulate activities on Indian lands does not constitute a partial program. The Secretary of the Army acting through the Corps of Engineers will continue to administer the program on Indian lands if a State which is not an Indian Tribe does not seek and have authority to regulate activities on Indian lands.

(c) Nothing in this part precludes a State from adopting or enforcing requirements which are more stringent or from operating a program with greater scope, than required under this part. Where an approved State program has a greater scope than required by Federal law, the additional coverage is not part of the Federally approved program and is not subject to Federal oversight or enforcement.

Note: State assumption of the section 404 program is limited to certain waters, as provided in section 404(g)(1). The Federal program operated by the Corps of Engineers continues to apply to the remaining waters in the State even after program approval. However, this does not restrict States from regulating discharges of dredged or fill material into those waters over which the Secretary retains section 404 jurisdiction.

(d) Any approved State Program shall, at all times, be conducted in accordance with the requirements of the Act and of this part. While States may impose more stringent requirements, they may not impose any less stringent requirements for any purpose.

**Credits**
[58 FR 8183, Feb. 11, 1993]

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

USCA Case #24-5101    Document #2074992    Filed: 09/16/2024    Page 75 of 133

AUTHORITY: 33 U.S.C. 1251 et seq.


Notes of Decisions (8)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 40. Protection of Environment
     Chapter I. Environmental Protection Agency (Refs & Annos)
       Subchapter H. Ocean Dumping
         Part 233. 404 State Program Regulations (Refs & Annos)
           Subpart B. Program Approval

40 C.F.R. § 233.10

§ 233.10 Elements of a program submission.

Currentness

Any State that seeks to administer a 404 program under this part shall submit to the Regional Administrator at least three copies of the following:

(a) A letter from the Governor of the State requesting program approval.

(b) A complete program description, as set forth in § 233.11.

(c) An Attorney General's statement, as set forth in § 233.12.

(d) A Memorandum of Agreement with the Regional Administrator, as set forth in § 233.13.

(e) A Memorandum of Agreement with the Secretary, as set forth in § 233.14.

(f) Copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (4)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart B. Program Approval

40 C.F.R. § 233.11

§ 233.11 Program description.

Currentness

The program description as required under § 233.10 shall include:

(a) A description of the scope and structure of the State's program. The description should include extent of State's jurisdiction, scope of activities regulated, anticipated coordination, scope of permit exemptions if any, and permit review criteria;

(b) A description of the State's permitting, administrative, judicial review, and other applicable procedures;

(c) A description of the basic organization and structure of the State agency (agencies) which will have responsibility for administering the program. If more than one State agency is responsible for the administration of the program, the description shall address the responsibilities of each agency and how the agencies intend to coordinate administration and evaluation of the program;

(d) A description of the funding and manpower which will be available for program administration;

(e) An estimate of the anticipated workload, e.g., number of discharges.

(f) Copies of permit application forms, permit forms, and reporting forms;

(g) A description of the State's compliance evaluation and enforcement programs, including a description of how the State will coordinate its enforcement strategy with that of the Corps and EPA;

(h) A description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands.

Note: States should obtain from the Secretary an identification of those waters of the U.S. within the State over which the Corps retains authority under section 404(g) of the Act.

(i) A description of the specific best management practices proposed to be used to satisfy the exemption provisions of section 404(f)(1)(E) of the Act for construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #24-5101    Document #2074992        Filed: 09/16/2024      Page 79 of 133

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart B. Program Approval

40 C.F.R. § 233.12

§ 233.12 Attorney General's statement.

Currentness

(a) Any State that seeks to administer a program under this part shall submit a statement from the State Attorney General (or the attorney for those State or interstate agencies which have independence legal counsel), that the laws and regulations of the State, or an interstate compact, provide adequate authority to carry out the program and meet the applicable requirements of this part. This statement shall cite specific statutes and administrative regulations which are lawfully adopted at the time the statement is signed and which shall be fully effective by the time the program is approved, and, where appropriate, judicial decisions which demonstrate adequate authority. The attorney signing the statement required by this section must have authority to represent the State agency in court on all matters pertaining to the State program.

(b) If a State seeks approval of a program covering activities on Indian lands, the statement shall contain an analysis of the State's authority over such activities.

(c) The State Attorney General's statement shall contain a legal analysis of the effect of State law regarding the prohibition on taking private property without just compensation on the successful implementation of the State's program.

(d) In those States where more than one agency has responsibility for administering the State program, the statement must include certification that each agency has full authority to administer the program within its category of jurisdiction and that the State, as a whole, has full authority to administer a complete State section 404 program.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart B. Program Approval

40 C.F.R. § 233.13

§ 233.13 Memorandum of Agreement with Regional Administrator.

Currentness

(a) Any State that seeks to administer a program under this part shall submit a Memorandum of Agreement executed by the Director and the Regional Administrator. The Memorandum of Agreement shall become effective upon approval of the State program. When more than one agency within a State has responsibility for administering the State program, Directors of each of the responsible State agencies shall be parties to the Memorandum of Agreement.

(b) The Memorandum of Agreement shall set out the State and Federal responsibilities for program administration and enforcement. These shall include, but not be limited to:

(1) Provisions specifying classes and categories of permit applications for which EPA will waive Federal review (as specified in § 233.51).

(2) Provisions specifying the frequency and content of reports, documents and other information which the State may be required to submit to EPA in addition to the annual report, as well as a provision establishing the submission date for the annual report. The State shall also allow EPA routinely to review State records, reports and files relevant to the administration and enforcement of the approved program.

(3) Provisions addressing EPA and State roles and coordination with respect to compliance monitoring and enforcement activities.

(4) Provisions addressing modification of the Memorandum of Agreement.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart B. Program Approval

40 C.F.R. § 233.14

§ 233.14 Memorandum of Agreement with the Secretary.

Currentness

(a) Before a State program is approved under this part, the Director shall enter into a Memorandum of Agreement with the Secretary. When more than one agency within a State has responsibility for administering the State program, Directors of each of the responsible agencies shall be parties of the Memorandum of Agreement.

(b) The Memorandum of Agreement shall include:

(1) A description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary.

(2) Procedures whereby the Secretary will, upon program approval, transfer to the State pending 404 permit applications for discharges in State regulated waters and other relevant information not already in the possession of the Director.

Note: Where a State permit program includes coverage of those traditionally navigable waters in which only the Secretary may issue section 404 permits, the State is encouraged to establish in this MOA procedures for joint processing of Federal and State permits, including joint public notices and public hearings.

(3) An identification of all general permits issued by the Secretary the terms and conditions of which the State intends to administer and enforce upon receiving approval of its program, and a plan for transferring responsibility for these general permits to the State, including procedures for the prompt transmission from the Secretary to the Director of relevant information not already in the possession of the Director, including support files for permit issuance, compliance reports and records of enforcement actions.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

End of Document                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter H. Ocean Dumping
                Part 233. 404 State Program Regulations (Refs & Annos)
                    Subpart B. Program Approval

40 C.F.R. § 233.15

§ 233.15 Procedures for approving State programs.

Currentness

(a) The 120 day statutory review period shall commence on the date of receipt of a complete State program submission as set out in § 233.10 of this part. EPA shall determine whether the submission is complete within 30 days of receipt of the submission and shall notify the State of its determination. If EPA finds that a State's submission is incomplete, the statutory review period shall not begin until all the necessary information is received by EPA.

(b) If EPA determines the State significantly changes its submission during the review period, the statutory review period shall begin again upon the receipt of a revised submission.

(c) The State and EPA may extend the statutory review period by agreement.

(d) Within 10 days of receipt of a complete State section 404 program submission, the Regional Administrator shall provide copies of the State's submission to the Corps, FWS, and NMFS (both Headquarters and appropriate Regional organizations.)

(e) After determining that a State program submission is complete, the Regional Administrator shall publish notice of the State's application in the Federal Register and in enough of the largest newspapers in the State to attract statewide attention. The Regional Administrator shall also mail notice to persons known to be interested in such matters. Existing State, EPA, Corps, FWS, and NMFS mailing lists shall be used as a basis for this mailing. However, failure to mail all such notices shall not be grounds for invalidating approval (or disapproval) of an otherwise acceptable (or unacceptable) program. This notice shall:

(1) Provide for a comment period of not less than 45 days during which interested members of the public may express their views on the State program.

(2) Provide for a public hearing within the State to be held not less than 30 days after notice of hearing is published in the Federal Register;

(3) Indicate where and when the State's submission may be reviewed by the public;

(4) Indicate whom an interested member of the public with questions should contact; and

USCA Case #24-5101    Document #2074992    Filed: 09/16/2024    Page 83 of 133

(5) Briefly outline the fundamental aspects of the State's proposed program and the process for EPA review and decision.

(f) Within 90 days of EPA's receipt of a complete program submission, the Corps, FWS, and NMFS shall submit to EPA any comments on the State's program.

(g) Within 120 days of receipt of a complete program submission (unless an extension is agreed to by the State), the Regional Administrator shall approve or disapprove the program based on whether the State's program fulfills the requirements of this part and the Act, taking into consideration all comments received. The Regional Administrator shall prepare a responsiveness summary of significant comments received and his response to these comments. The Regional Administrator shall respond individually to comments received from the Corps, FWS, and NMFS.

(h) If the Regional Administrator approves the State's section 404 program, he shall notify the State and the Secretary of the decision and publish notice in the Federal Register. Transfer of the program to the State shall not be considered effective until such notice appears in the Federal Register. The Secretary shall suspend the issuance by the Corps of section 404 permits in State regulated waters on such effective date.

(i) If the Regional Administrator disapproves the State's program based on the State not meeting the requirements of the Act and this part, the Regional Administrator shall notify the State of the reasons for the disapproval and of any revisions or modifications to the State's program which are necessary to obtain approval. If the State resubmits a program submission remedying the identified problem areas, the approval procedure and statutory review period shall begin upon receipt of the revised submission.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #24-5101      Document #2074992      Filed: 09/16/2024      Page 84 of 133

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart F. Federal Oversight

40 C.F.R. § 233.50

§ 233.50 Review of and objection to State permits.

Currentness

(a) The Director shall promptly transmit to the Regional Administrator:

(1) A copy of the public notice for any complete permit applications received by the Director, except those for which permit review has been waived under § 233.51. The State shall supply the Regional Administrator with copies of public notices for permit applications for which permit review has been waived whenever requested by EPA.

(2) A copy of a draft general permit whenever the State intends to issue a general permit.

(3) Notice of every significant action taken by the State agency related to the consideration of any permit application except those for which Federal review has been waived or draft general permit.

(4) A copy of every issued permit.

(5) A copy of the Director's response to another State's comments/recommendations, if the Director does not accept these recommendations (§ 233.32(a)).

(b) Unless review has been waived under § 233.51, the Regional Administrator shall provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the Corps, FWS, and NMFS, within 10 days of receipt. These agencies shall notify the Regional Administrator within 15 days of their receipt if they wish to comment on the public notice or draft general permit. Such agencies should submit their evaluation and comments to the Regional Administrator within 50 days of such receipt. The final decision to comment, object or to require permit conditions shall be made by the Regional Administrator. (These times may be shortened by mutual agreement of the affected Federal agencies and the State.)

(c) If the information provided is inadequate to determine whether the permit application or draft general permit meets the requirements of the Act, these regulations, and the 404(b)(1) Guidelines, the Regional Administrator may, within 30 days of receipt, request the Director to transmit to the Regional Administrator the complete record of the permit proceedings before the State, or any portions of the record, or other information, including a supplemental application, that the Regional Administrator determines necessary for review.

(d) If the Regional Administrator intends to comment upon, object to, or make recommendations with respect to a permit application, draft general permit, or the Director's failure to accept the recommendations of an affected State submitted pursuant to § 233.31(a), he shall notify the Director of his intent within 30 days of receipt. If the Director has been so notified, the permit shall not be issued until after the receipt of such comments or 90 days of the Regional Administrator's receipt of the public notice, draft general permit or Director's response (§ 233.31(a)), whichever comes first. The Regional Administrator may notify the Director within 30 days of receipt that there is no comment but that he reserves the right to object within 90 days of receipt, based on any new information brought out by the public during the comment period or at a hearing.

(e) If the Regional Administrator has given notice to the Director under paragraph (d) of this section, he shall submit to the Director, within 90 days of receipt of the public notice, draft general permit, or Director's response (§ 233.31(a)), a written statement of his comments, objections, or recommendations; the reasons for the comments, objections, or recommendations; and the actions that must be taken by the Director in order to eliminate any objections. Any such objection shall be based on the Regional Administrator's determination that the proposed permit is (1) the subject of an interstate dispute under § 233.31(a) and/or (2) outside requirements of the Act, these regulations, or the 404(b)(1) Guidelines. The Regional Administrator shall make available upon request a copy of any comment, objection, or recommendation on a permit application or draft general permit to the permit applicant or to the public.

(f) When the Director has received an EPA objection or requirement for a permit condition to a permit application or draft general permit under this section, he shall not issue the permit unless he has taken the steps required by the Regional Administrator to eliminate the objection.

(g) Within 90 days of receipt by the Director of an objection or requirement for a permit condition by the Regional Administrator, the State or any interested person may request that the Regional Administrator hold a public hearing on the objection or requirement. The Regional Administrator shall conduct a public hearing whenever requested by the State proposing to issue the permit, or if warranted by significant public interest based on requests received.

(h) If a public hearing is held under paragraph (g) of this section, the Regional Administrator shall, following that hearing, reaffirm, modify or withdraw the objection or requirement for a permit condition, and notify the Director of this decision.

(1) If the Regional Administrator withdraws his objection or requirement for a permit condition, the Director may issue the permit.

(2) If the Regional Administrator does not withdraw the objection or requirement for a permit condition, the Director must issue a permit revised to satisfy the Regional Administrator's objection or requirement for a permit condition or notify EPA of its intent to deny the permit within 30 days of receipt of the Regional Administrator's notification.

(i) If no public hearing is held under paragraph (g) of this section, the Director within 90 days of receipt of the objection or requirement for a permit condition shall either issue the permit revised to satisfy EPA's objections or notify EPA of its intent to deny the permit.

(j) In the event that the Director neither satisfies EPA's objections or requirement for a permit condition nor denies the permit, the Secretary shall process the permit application.

USCA Case #24-5101      Document #2074992      Filed: 09/16/2024      Page 86 of 133

**Credits**

[53 FR 41649, Oct. 24, 1988]

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (30)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter H. Ocean Dumping
                Part 233. 404 State Program Regulations (Refs & Annos)
                    Subpart F. Federal Oversight

40 C.F.R. § 233.51

§ 233.51 Waiver of review.

Currentness

(a) The MOA with the Regional Administrator shall specify the categories of discharge for which EPA will waive Federal review of State permit applications. After program approval, the MOA may be modified to reflect any additions or deletions of categories of discharge for which EPA will waive review. The Regional Administrator shall consult with the Corps, FWS, and NMFS prior to specifying or modifying such categories.

(b) With the following exceptions, any category of discharge is eligible for consideration for waiver:

(1) Draft general permits;

(2) Discharges with reasonable potential for affecting endangered or threatened species as determined by FWS;

(3) Discharges with reasonable potential for adverse impacts on waters of another State;

(4) Discharges known or suspected to contain toxic pollutants in toxic amounts (section 101(a)(3) of the Act) or hazardous substances in reportable quantities (section 311 of the Act);

(5) Discharges located in proximity of a public water supply intake;

(6) Discharges within critical areas established under State or Federal law, including but not limited to National and State parks, fish and wildlife sanctuaries and refuges, National and historical monuments, wilderness areas and preserves, sites identified or proposed under the National Historic Preservation Act, and components of the National Wild and Scenic Rivers System.

(c) The Regional Administrator retains the right to terminate a waiver as to future permit actions at any time by sending the Director written notice of termination.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (1)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                2

84a

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter I. Environmental Protection Agency (Refs & Annos)
>       Subchapter H. Ocean Dumping
>         Part 233. 404 State Program Regulations (Refs & Annos)
>           Subpart F. Federal Oversight

40 C.F.R. § 233.52

§ 233.52 Program reporting.

Currentness

(a) The starting date for the annual period to be covered by reports shall be established in the Memorandum of Agreement with the Regional Administrator (§ 233.13.)

(b) The Director shall submit to the Regional Administrator within 90 days after completion of the annual period, a draft annual report evaluating the State's administration of its program identifying problems the State has encountered in the administration of its program and recommendations for resolving these problems. Items that shall be addressed in the annual report include an assessment of the cumulative impacts of the State's permit program on the integrity of the State regulated waters; identification of areas of particular concern and/or interest within the State; the number and nature of individual and general permits issued, modified, and denied; number of violations identified and number and nature of enforcement actions taken; number of suspected unauthorized activities reported and nature of action taken; an estimate of extent of activities regulated by general permits; and the number of permit applications received but not yet processed.

(c) The State shall make the draft annual report available for public inspection.

(d) Within 60 days of receipt of the draft annual report, the Regional Administrator will complete review of the draft report and transmit comments, questions, and/or requests for additional evaluation and/or information to the Director.

(e) Within 30 days of receipt of the Regional Administrator's comments, the Director will finalize the annual report, incorporating and/or responding to the Regional Administrator's comments, and transmit the final report to the Regional Administrator.

(f) Upon acceptance of the annual report, the Regional Administrator shall publish notice of availability of the final annual report.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 233. 404 State Program Regulations (Refs & Annos)
          Subpart F. Federal Oversight

40 C.F.R. § 233.53

§ 233.53 Withdrawal of program approval.

Currentness

(a) A State with a program approved under this part may voluntarily transfer program responsibilities required by Federal law to the Secretary by taking the following actions, or in such other manner as may be agreed upon with the Administrator.

(1) The State shall give the Administrator and the Secretary 180 days notice of the proposed transfer. The State shall also submit a plan for the orderly transfer of all relevant program information not in the possession of the Secretary (such as permits, permit files, reports, permit applications) which are necessary for the Secretary to administer the program.

(2) Within 60 days of receiving the notice and transfer plan, the Administrator and the Secretary shall evaluate the State's transfer plan and shall identify for the State any additional information needed by the Federal government for program administration.

(3) At least 30 days before the transfer is to occur the Administrator shall publish notice of transfer in the Federal Register and in a sufficient number of the largest newspapers in the State to provide statewide coverage, and shall mail notice to all permit holders, permit applicants, other regulated persons and other interested persons on appropriate EPA, Corps and State mailing lists.

(b) The Administrator may withdraw program approval when a State program no longer complies with the requirements of this part, and the State fails to take corrective action. Such circumstances include the following:

(1) When the State's legal authority no longer meets the requirements of this part, including:

(i) Failure of the State to promulgate or enact new authorities when necessary; or

(ii) Action by a State legislature or court striking down or limiting State authorities.

(2) When the operation of the State program fails to comply with the requirements of this part, including:

(i) Failure to exercise control over activities required to be regulated under this part, including failure to issue permits;

---

(ii) Issuance of permits which do not conform to the requirements of this part; or

(iii) Failure to comply with the public participation requirements of this part.

(3) When the State's enforcement program fails to comply with the requirements of this part, including:

(i) Failure to act on violations of permits or other program requirements;

(ii) Failure to seek adequate enforcement penalties or to collect administrative fines when imposed, or to implement alternative enforcement methods approved by the Administrator; or

(iii) Failure to inspect and monitor activities subject to regulation.

(4) When the State program fails to comply with the terms of the Memorandum of Agreement required under § 233.13.

(c) The following procedures apply when the Administrator orders the commencement of proceedings to determine whether to withdraw approval of a State program:

(1) Order. The Administrator may order the commencement of withdrawal proceedings on the Administrator's initiative or in response to a petition from an interested person alleging failure of the State to comply with the requirements of this part as set forth in subsection (b) of this section. The Administrator shall respond in writing to any petition to commence withdrawal proceedings. He may conduct an informal review of the allegations in the petition to determine whether cause exists to commence proceedings under this paragraph. The Administrator's order commencing proceedings under this paragraph shall fix a time and place for the commencement of the hearing, shall specify the allegations against the State which are to be considered at the hearing, and shall be published in the Federal Register. Within 30 days after publication of the Administrator's order in the Federal Register, the State shall admit or deny these allegations in a written answer. The party seeking withdrawal of the State's program shall have the burden of coming forward with the evidence in a hearing under this paragraph.

(2) Definitions. For purposes of this paragraph the definition of Administrative Law Judge, Hearing Clerk, and Presiding Officer in 40 CFR 22.03 apply in addition to the following:

(i) Party means the petitioner, the State, the Agency, and any other person whose request to participate as a party is granted.

(ii) Person means the Agency, the State and any individual or organization having an interest in the subject matter of the proceedings.

(iii) Petitioner means any person whose petition for commencement of withdrawal proceedings has been granted by the Administrator.

88a

(3) Procedures.

(i) The following provisions of 40 CFR Part 22 [Consolidated Rules of Practice] are applicable to proceedings under this paragraph:

(A) Section 22.02—(use of number/gender);

(B) Section 22.04—(authorities of Presiding Officer);

(C) Section 22.06—(filing/service of rulings and orders);

(D) Section 22.09—(examination of filed documents);

(E) Section 22.19 (a), (b) and (c)—(prehearing conference);

(F) Section 22.22—(evidence);

(G) Section 22.23—(objections/offers of proof);

(H) Section 22.25—(filing the transcript; and

(I) Section 22.26—(findings/conclusions).

(ii) The following provisions are also applicable:

(A) Computation and extension of time.

(1) Computation. In computing any period of time prescribed or allowed in these rules of practice, except as otherwise provided, the day of the event from which the designated period begins to run shall not be included. Saturdays, Sundays, and Federal legal holidays shall be included. When a stated time expires on a Saturday, Sunday or Federal legal holiday, the stated time period shall be extended to include the next business day.

(2) Extensions of time. The Administrator, Regional Administrator, or Presiding Officer, as appropriate, may grant an extension of time for the filing of any pleading, document, or motion (i) upon timely motion of a party to the proceeding, for good cause shown and after consideration of prejudice to other parties, or (ii) upon his own motion. Such a motion by a party may only be made after notice to all other parties, unless the movant can show good cause why serving notice is impracticable. The motion shall be filed in advance of the date on

which the pleading, document or motion is due to be filed, unless the failure of a party to make timely motion for extension of time was the result of excusable neglect.

(3) The time for commencement of the hearing shall not be extended beyond the date set in the Administrator's order without approval of the Administrator.

(B) Ex parte discussion of proceeding. At no time after the issuance of the order commencing proceedings shall the Administrator, the Regional Administrator, the Regional Judicial Officer, the Presiding Officer, or any other person who is likely to advise these officials in the decisions on the case, discuss ex parte the merits of the proceeding with any interested person outside the Agency, with any Agency staff member who performs a prosecutorial or investigative function in such proceeding or a factually related proceeding, or with any representative of such person. Any ex parte memorandum or other communication addressed to the Administrator, the Regional Administrator, the Regional Judicial Officer, or the Presiding Officer during the pendency of the proceeding and relating to the merits thereof, by or on behalf of any party shall be regarded as argument made in the proceeding and shall be served upon all other parties. The other parties shall be given an opportunity to reply to such memorandum or communication.

(C) Intervention—

(1) Motion. A motion for leave to intervene in any proceeding conducted under these rules of practice must set forth the grounds for the proposed intervention, the position and interest of the movant and the likely impact that intervention will have on the expeditious progress of the proceeding. Any person already a party to the proceeding may file an answer to a motion to intervene, making specific reference to the factors set forth in the foregoing sentence and paragraph (b)(3)(ii)(C)(3) of this section, within ten (10) days after service of the motion for leave to intervene.

(2) However, motions to intervene must be filed within 15 days from the date the notice of the Administrator's order is published in the Federal Register.

(3) Disposition. Leave to intervene may be granted only if the movant demonstrates that (i) his presence in the proceeding would not unduly prolong or otherwise prejudice the adjudication of the rights of the original parties; (ii) the movant will be adversely affected by a final order; and (iii) the interests of the movant are not being adequately represented by the original parties. The intervenor shall become a full party to the proceeding upon the granting of leave to intervene.

(4) Amicus curiae. Persons not parties to the proceeding who wish to file briefs may so move. The motion shall identify the interest of the applicant and shall state the reasons why the proposed amicus brief is desirable. If the motion is granted, the Presiding Officer or Administrator shall issue an order setting the time for filing such brief. An amicus curiae is eligible to participate in any briefing after his motion is granted, and shall be served with all briefs, reply briefs, motions, and orders relating to issues to be briefed.

(D) Motions—

90a

(1) General. All motions, except those made orally on the record during a hearing, shall (i) be in writing; (ii) state the grounds therefore with particularity; (iii) set forth the relief or order sought; and (iv) be accompanied by any affidavit, certificate, other evidence, or legal memorandum relied upon. Such motions shall be served as provided by paragraph (b)(4) of this section.

(2) Response to motions. A party's response to any written motion must be filed within ten (10) days after service of such motion, unless additional time is allowed for such response. The response shall be accompanied by any affidavit, certificate, other evidence, or legal memorandum relied upon. If no response is filed within the designated period, the parties may be deemed to have waived any objection to the granting of the motion. The Presiding Officer, Regional Administrator, or Administrator, as appropriate, may set a shorter time for response, or make such other orders concerning the disposition of motions as they deem appropriate.

(3) Decision. The Administrator shall rule on all motions filed or made after service of the recommended decision upon the parties. The Presiding Officer shall rule on all other motions. Oral argument on motions will be permitted where the Presiding Officer, Regional Administrator, or the Administrator considers it necessary or desirable.

(4) Record of proceedings.

(i) The hearing shall be either stenographically reported verbatim or tape recorded, and thereupon transcribed by an official reporter designated by the Presiding Officer;

(ii) All orders issued by the Presiding Officer, transcripts of testimony, written statements of position, stipulations, exhibits, motions, briefs, and other written material of any kind submitted in the hearing shall be a part of the record and shall be available for inspection or copying in the Office of the Hearing Clerk, upon payment of costs. Inquiries may be made at the Office of the Administrative Law Judges, Hearing Clerk, 1200 Pennsylvania Ave., NW., Washington, DC 20460;

(iii) Upon notice to all parties the Presiding Officer may authorize corrections to the transcript which involve matters of substance;

(iv) An original and two (2) copies of all written submissions to the hearing shall be filed with the Hearing Clerk;

(v) A copy of each such submission shall be served by the person making the submission upon the Presiding Officer and each party of record. Service under this paragraph shall take place by mail or personal delivery;

(vi) Every submission shall be accompanied by acknowledgement of service by the person served or proof of service in the form of a statement of the date, time, and manner of service and the names of the persons served, certified by the person who made service; and

(vii) The Hearing Clerk shall maintain and furnish to any person upon request, a list containing the name, service address, and telephone number of all parties and their attorneys or duly authorized representatives.

(5) Participation by a person not a party. A person who is not a party may, in the discretion of the Presiding Officer, be permitted to make a limited appearance by making an oral or written statement of his/her position on the issues within such limits and on such conditions as may be fixed by the Presiding Officer, but he/she may not otherwise participate in the proceeding.

(6) Rights of parties.

(i) All parties to the proceeding may:

(A) Appear by counsel or other representative in all hearing and prehearing proceedings;

(B) Agree to stipulations of facts which shall be made a part of the record.

(7) Recommended decision.

(i) Within 30 days after the filing of proposed findings and conclusions and reply briefs, the Presiding Officer shall evaluate the record before him/her, the proposed findings and conclusions and any briefs filed by the parties, and shall prepare a recommended decision, and shall certify the entire record, including the recommended decision, to the Administrator.

(ii) Copies of the recommended decision shall be served upon all parties.

(iii) Within 20 days after the certification and filing of the record and recommended decision, all parties may file with the Administrator exceptions to the recommended decision and a supporting brief.

(8) Decision by Administrator.

(i) Within 60 days after certification of the record and filing of the Presiding Officer's recommended decision, the Administrator shall review the record before him and issue his own decision.

(ii) If the Administrator concludes that the State has administered the program in conformity with the Act and this part, his decision shall constitute "final agency action" within the meaning of 5 U.S.C. 704.

(iii) If the Administrator concludes that the State has not administered the program in conformity with the Act and regulations, he shall list the deficiencies in the program and provide the State a reasonable time, not to exceed 90 days, to take such appropriate corrective action as the Administrator determines necessary.

(iv) Within the time prescribed by the Administrator the State shall take such appropriate corrective action as required by the Administrator and shall file with the Administrator and all parties a statement certified by the State Director that appropriate corrective action has been taken.

(v) The Administrator may require a further showing in addition to the certified statement that corrective action has been taken.

(vi) If the state fails to take appropriate corrective action and file a certified statement thereof within the time prescribed by the Administrator, the Administrator shall issue a supplementary order withdrawing approval of the State program. If the State takes appropriate corrective action, the Administrator shall issue a supplementary order stating that approval of authority is not withdrawn.

(vii) The Administrator's supplementary order shall constitute final Agency action within the meaning of 5 U.S. 704.

(d) Withdrawal of authorization under this section and the Act does not relieve any person from complying with the requirements of State law, nor does it affect the validity of actions taken by the State prior to withdrawal.

**Credits**

[57 FR 5346, Feb. 13, 1992]

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (6)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 50. Wildlife and Fisheries
    Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
      Subchapter A
        Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
          Subpart A. General

50 C.F.R. § 402.01

§ 402.01 Scope.

Currentness

(a) This part interprets and implements sections 7(a)–(d) [16 U.S.C. 1536(a)–(d)] of the Endangered Species Act of 1973, as amended ("Act"). Section 7(a) grants authority to and imposes requirements upon Federal agencies regarding endangered or threatened species of fish, wildlife, or plants ("listed species") and habitat of such species that has been designated as critical ("critical habitat"). Section 7(a)(1) of the Act directs Federal agencies, in consultation with and with the assistance of the Secretary of the Interior or of Commerce, as appropriate, to utilize their authorities to further the purposes of the Act by carrying out conservation programs for listed species. Such affirmative conservation programs must comply with applicable permit requirements (50 CFR parts 17, 220, 222, and 227) for listed species and should be coordinated with the appropriate Secretary. Section 7(a)(2) of the Act requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat. Section 7(a)(3) of the Act authorizes a prospective permit or license applicant to request the issuing Federal agency to enter into early consultation with the Service on a proposed action to determine whether such action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Section 7(a)(4) of the Act requires Federal agencies to confer with the Secretary on any action that is likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat. Section 7(b) of the Act requires the Secretary, after the conclusion of early or formal consultation, to issue a written statement setting forth the Secretary's opinion detailing how the agency action affects listed species or critical habitat Biological assessments are required under section 7(c) of the Act if listed species or critical habitat may be present in the area affected by any major construction activity as defined in § 404.02. Section 7(d) of the Act prohibits Federal agencies and applicants from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. Section 7(e)–(o)(1) of the Act provide procedures for granting exemptions from the requirements of section 7(a)(2). Regulations governing the submission of exemption applications are found at 50 CFR part 451, and regulations governing the exemption process are found at 50 CFR parts 450, 452, and 453.

(b) The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) share responsibilities for administering the Act. The Lists of Endangered and Threatened Wildlife and Plants are found in 50 CFR 17.11 and 17.12 and the designated critical habitats are found in 50 CFR 17.95 and 17.96 and 50 CFR Part 226. Endangered or threatened species under the jurisdiction of the NMFS are located in 50 CFR 222.23(a) and 227.4. If the subject species is cited in 50 CFR 222.23(a) or 227.4, the Federal agency shall contact the NMFS. For all other listed species the Federal Agency shall contact the FWS.

94a

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

Notes of Decisions (317)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 50. Wildlife and Fisheries
    Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
      Subchapter A
        Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
          Subpart A. General

This section has been updated. Click here for the updated version.

50 C.F.R. § 402.02

§ 402.02 Definitions.

Effective: October 28, 2019 to May 5, 2024

Act means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;

(b) the promulgation of regulations;

(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

(d) actions directly or indirectly causing modifications to the land, water, or air.

Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

Applicant refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

Biological assessment refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

Conference is a process which involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

Conservation recommendations are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

Designated non-Federal representative refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species.

Director refers to the Assistant Administrator for Fisheries for the National Marine Fisheries Service, or his or her authorized representative; or the Director of the U.S. Fish and Wildlife Service, or his or her authorized representative.

Early consultation is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

Formal consultation is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

Framework programmatic action means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11–17.12.

Major construction activity is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Preliminary biological opinion refers to an opinion issued as a result of early consultation.

Programmatic consultation is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

Proposed critical habitat means habitat proposed in the Federal Register to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

Proposed species means any species of fish, wildlife, or plant that is proposed in the Federal Register to be listed under section 4 of the Act.

Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

Reasonable and prudent measures refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.

Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

Service means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

**Credits**

[73 FR 76286, Dec. 16, 2008; 74 FR 20422, May 4, 2009; 80 FR 26844, May 11, 2015; 81 FR 7225, Feb. 11, 2016; 84 FR 45016, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019]

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #24-5101      Document #2074992      Filed: 09/16/2024      Page 104 of 133

Code of Federal Regulations
  Title 50. Wildlife and Fisheries
    Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National
    Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered
    Species Committee Regulations
      Subchapter A
        Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
        Subpart A. General

50 C.F.R. § 402.03

§ 402.03 Applicability.

Effective: May 4, 2009

Currentness

Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.

**Credits**

[73 FR 76287, Dec. 16, 2008; 74 FR 20423, May 4, 2009]

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

Notes of Decisions (40)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 50. Wildlife and Fisheries
      Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National
      Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered
      Species Committee Regulations
         Subchapter A
            Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
               Subpart B. Consultation Procedures

This section has been updated. Click here for the updated version.

50 C.F.R. § 402.14

§ 402.14 Formal consultation.

Effective: October 28, 2019 to May 5, 2024

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

(b) Exceptions.

(1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

(2) A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

(c) Initiation of formal consultation.

(1) A written request to initiate formal consultation shall be submitted to the Director and shall include:

(i) A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:

(A) The purpose of the action;

(B) The duration and timing of the action;

(C) The location of the action;

(D) The specific components of the action and how they will be carried out;

(E) Maps, drawings, blueprints, or similar schematics of the action; and

(F) Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

(ii) A map or description of all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (i.e., the action area as defined at § 402.02).

(iii) Information obtained by or in the possession of the Federal agency and any applicant on the listed species and designated critical habitat in the action area (as required by paragraph (c)(1)(ii) of this section), including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat, including any critical habitat.

(iv) A description of the effects of the action and an analysis of any cumulative effects.

(v) A summary of any relevant information provided by the applicant, if available.

(vi) Any other relevant available information on the effects of the proposed action on listed species or designated critical habitat, including any relevant reports such as environmental impact statements and environmental assessments.

(2) A Federal agency may submit existing documents prepared for the proposed action such as NEPA analyses or other reports in substitution for the initiation package outlined in this paragraph (c). However, any such substitution shall be accompanied by a written summary specifying the location of the information that satisfies the elements above in the submitted document(s).

(3) Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12.

(4) Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan. The provision in this paragraph (c)(4) does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole.

(d) Responsibility to provide best scientific and commercial data available. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

(e) Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:

(1) The reasons why a longer period is required,

(2) The information that is required to complete the consultation, and

(3) The estimated date on which the consultation will be completed.

A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

(f) Additional data. When the Service determines that additional data would provide a better information base from which to formulate a biological opinion, the Director may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. If formal consultation is extended by mutual agreement according to § 402.14(e), the Federal agency shall obtain, to the extent practicable, that data which can be developed within the scope of the extension. The responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. The Service's request for additional data is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act. If no extension of formal consultation is agreed to, the Director will issue a biological opinion using the best scientific and commercial data available.

(g) Service responsibilities. Service responsibilities during formal consultation are as follows:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g) (1)–(3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45–day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45–day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10–day extension on the deadline.

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

(h) Biological opinions.

(1) The biological opinion shall include:

(i) A summary of the information on which the opinion is based;

(ii) A detailed discussion of the environmental baseline of the listed species and critical habitat;

(iii) A detailed discussion of the effects of the action on listed species or critical habitat; and

(iv) The Service's opinion on whether the action is:

(A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or

(B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

(2) A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

(3) The Service may adopt all or part of:

(i) A Federal agency's initiation package; or

(ii) The Service's analysis required to issue a permit under section 10(a) of the Act in its biological opinion.

(4) A Federal agency and the Service may agree to follow an optional collaborative process that would further the ability of the Service to adopt the information and analysis provided by the Federal agency during consultation in the development of the Service's biological opinion to improve efficiency in the consultation process and reduce duplicative efforts. The Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat, and other relevant factors to determine whether an action or a class of actions is appropriate for this process. The Federal agency and the Service may develop coordination procedures that would facilitate adoption of the initiation package with any necessary supplementary analyses and incidental take statement to be added by the Service, if appropriate, as the Service's biological opinion in fulfillment of section 7(b) of the Act.

(i) Incidental take.

(1) In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

(i) Specifies the impact, i.e., the amount or extent, of such incidental taking on the species (A surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded.);

(ii) Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;

(iii) In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

(iv) Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section; and

(v) Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

(2) Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes.

(3) In order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

(4) If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded, the Federal agency must reinitiate consultation immediately.

(5) Any taking which is subject to a statement as specified in paragraph (i)(1) of this section and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.

(6) For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

(j) Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

(k) Incremental steps. When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if:

(1) The biological opinion does not conclude that the incremental step would violate section 7(a)(2);

(2) The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;

(3) The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action;

(4) The incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and

(5) There is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

(l) Expedited consultations. Expedited consultation is an optional formal consultation process that a Federal agency and the Service may enter into upon mutual agreement. To determine whether an action or a class of actions is appropriate for this type of consultation, the Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat and other relevant factors. Conservation actions whose primary purpose is to have beneficial effects on listed species will likely be considered appropriate for expedited consultation.

(1) Expedited timelines. Upon agreement to use this expedited consultation process, the Federal agency and the Service shall establish the expedited timelines for the completion of this consultation process.

(2) Federal agency responsibilities. To request initiation of expedited consultation, the Federal agency shall provide all the information required to initiate consultation under paragraph (c) of this section. To maximize efficiency and ensure that it develops the appropriate level of information, the Federal agency is encouraged to develop its initiation package in coordination with the Service.

(3) Service responsibilities. In addition to the Service's responsibilities under the provisions of this section, the Service will:

(i) Provide relevant species information to the Federal agency and guidance to assist the Federal agency in completing its effects analysis in the initiation package; and

(ii) Conclude the consultation and issue a biological opinion within the agreed-upon timeframes.

(m) Termination of consultation.

(1) Formal consultation is terminated with the issuance of the biological opinion.

(2) If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

(3) If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

**Credits**

[54 FR 40350, Sept. 29, 1989; 73 FR 76287, Dec. 16, 2008; 74 FR 20423, May 4, 2009; 80 FR 26844, May 11, 2015; 84 FR 45016, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019]

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 50. Wildlife and Fisheries
    Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
      Subchapter A
        Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
          Subpart B. Consultation Procedures

50 C.F.R. § 402.15

§ 402.15 Responsibilities of Federal agency following issuance of a biological opinion.

Currentness

(a) Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.

(b) If a jeopardy biological opinion is issued, the Federal agency shall notify the Service of its final decision on the action.

(c) If the Federal agency determines that it cannot comply with the requirements of section 7(a)(2) after consultation with the Service, it may apply for an exemption. Procedures for exemption applications by Federal agencies and others are found in 50 CFR part 451.

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

Notes of Decisions (11)

Current through September 13, 2024, 89 FR 74850. Some sections may be more current. See credits for details.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

Dated: May 5, 2015.

**Sue Swenson,**

*Acting Assistant Secretary for Special Education and Rehabilitative Services.*

[FR Doc. 2015–11307 Filed 5–8–15; 8:45 am]

**BILLING CODE 4000–01–P**

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## 50 CFR Part 402

**[Docket No. FWS–R9–ES–2011–0080; NOAA–120106024–5048–02; FF09E–31000–156–FXES–1122–0900000]**

**RIN 1018–AX85; 0648–BB81**

## Interagency Cooperation—Endangered Species Act of 1973, as Amended; Incidental Take Statements

**AGENCY:** Fish and Wildlife Service, Interior; National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Commerce.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (collectively, the Services), are amending the incidental take statement provisions of the implementing regulations for section 7 of the Endangered Species Act of 1973, as amended (ESA). The two primary purposes of the amendments are to address the use of surrogates to express the amount or extent of anticipated incidental take and to refine the basis for development of incidental take statements for programmatic actions. These changes are intended to improve the clarity and effectiveness of incidental take statements. The Services believe these regulatory changes are a reasonable exercise of their discretion in interpreting particularly challenging

aspects of section 7 of the ESA related to incidental take statements.

**DATES:** This final rule is effective on June 10, 2015.

**ADDRESSES:** This final rule is available on the internet at *http://www.regulations.gov* at Docket No. FWS–R9–ES–2011–0080. Comments and materials we received on the proposed rule, as well as supporting documentation we used in preparing this rule, are available for public inspection at *http://www.regulations.gov*. The comments, materials, and documentation that we considered in this rulemaking are also available by appointment, during normal business hours at: U.S. Fish and Wildlife Service, Headquarters office, 5275 Leesburg Pike, Falls Church, Virginia 22041, (703) 358–2171, (703) 358–1800 (facsimile); National Marine Fisheries Service, Headquarters office, 1315 East-West Highway, Silver Spring, Maryland 20910, (301) 427–8405, (301) 713–0376 (facsimile).

**FOR FURTHER INFORMATION CONTACT:** Craig Aubrey, Chief, Division of Environmental Review, U.S. Fish and Wildlife Service, Department of the Interior, Washington, DC 20240 (telephone: 703–358–2171); or Cathryn E. Tortorici, Chief, Endangered Species Act Interagency Cooperation Division, Office of Protected Resources, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce, Washington, DC (telephone: 301–427–8400). Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Background

Section 9 of the ESA prohibits the take of fish or wildlife species listed as endangered with certain exceptions. Pursuant to section 4(d) of the ESA, the Services may prohibit the take of fish or wildlife species listed as threatened. Under section 3 of the ESA, the term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Section 7 of the ESA provides for the exemption of incidental take of listed fish or wildlife species caused by Federal agency actions that the Services have found to be consistent with the provisions of section 7(a)(2). The Services jointly administer the ESA via regulations set forth in the Code of Federal Regulations (CFR). This rule deals with regulations found in title 50 of the CFR at part 402.

Under 50 CFR 402.14, Federal agencies must review their actions at the earliest possible time to determine whether any action may affect species listed under the ESA or their designated critical habitat. If such a determination is made, formal consultation with the appropriate Service is required, unless one of the exceptions outlined at § 402.14(b) applies. Within 45 days after concluding formal consultation, the Service delivers a biological opinion to the Federal agency and any applicant. The biological opinion states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of their critical habitat. If a proposed action is reasonably certain to cause incidental take of a listed species, the Services, under 50 CFR 402.14(i), issue along with the biological opinion an incidental take statement that specifies, among other requirements: The impact of such incidental taking on the listed species; measures considered necessary or appropriate to minimize the impact of such take; terms and conditions (including reporting requirements) that implement the specified measures; and procedures to be used for handling or disposing of individuals that are taken.

The current regulations at § 402.14(i)(1)(i) require the Services to express the impact of such incidental taking of the species in terms of amount or extent. The preamble to the final rule that set forth the current regulations discusses the use of a precise number of individuals or a description of the land or marine area affected to express the amount or extent of anticipated take, respectively (51 FR 19954, June 3, 1986).

Court decisions rendered over the last decade regarding the adequacy of incidental take statements have prompted the Services to clarify two aspects of the regulations addressing incidental take statements: (1) The use of surrogates to express the amount or extent of anticipated incidental take, including circumstances where project impacts to the surrogate are coextensive with at least one aspect of the project's scope; and (2) the circumstances under which providing an incidental take statement with a biological opinion on a programmatic action is appropriate.

Through this final rule, the Services are establishing prospective standards regarding incidental take statements. Consistent with the regulatory language set forth in the proposed rule, we are clarifying that the Services formulate an incidental take statement if such take is reasonably certain to occur. Nothing in

these final regulations is intended to require reevaluation of any previously completed biological opinions or incidental take statements. Additionally, this final rule revises only those portions of the joint consultation regulations of 50 CFR part 402 set forth in the "Regulation Promulgation" section below. All other provisions remain unchanged. These revisions to the incidental take statement regulations addressing surrogates, programmatic actions, and the applicable standard for anticipating take are independent revisions that are fully severable from each other.

**Proposed Rule**

On September 4, 2013, the Services published a proposed rule addressing the incidental take statement provisions of the implementing regulations for section 7(a)(2) of the ESA (78 FR 54437). The proposed rule addressed the use of surrogate take indicators and issuance of an incidental take statement for programmatic actions. The proposed rule requested that all interested parties submit written comments on the proposal by November 4, 2013. The Services also contacted appropriate Federal and State agencies, scientific experts and organizations, and other interested parties and invited them to comment on the proposal. The Services received comments from 64 individuals and organizations.

For surrogates, the proposed rule endorsed the use of surrogates to express the amount or extent of anticipated incidental take and set forth three requirements for their use in an incidental take statement. This final rule adopts the approach of the proposed rule for surrogates with no significant changes.

For programmatic actions, the proposed rule addressed the subset of Federal actions that are designed to provide a framework for the development of future, site-specific actions that are authorized, funded, or carried out and subject to the requirements of section 7 at a later time. Development of incidental take statements for "framework" programmatic actions is problematic because they generally lack the site-specific details of where, when, and how listed species will be affected by the program. The Services rely on such information to inform the amount or extent of take in the incidental take statement that serves as a trigger for reinitiation of consultation pursuant to the requirements of 50 CFR 402.16(a).

The Services proposed to distinguish programmatic actions and programmatic incidental take statements for framework actions in the regulations to clarify the basis for development of an incidental take statement for this type of Federal program. The proposed rule stated that the key distinguishing characteristics of programmatic actions for purposes of the rule are: (1) They provide the framework for future, site-specific actions that are subject to section 7 consultations and incidental take statements, but they do not authorize, fund, or carry out those future site-specific actions; and (2) they do not include sufficient site-specific information to inform an assessment of where, when, and how listed species are likely to be affected by the program. In lieu of quantifying a traditional amount or extent of take, the Services proposed to develop programmatic incidental take statements that anticipate an unquantifiable amount or extent of take at the programmatic scale in recognition that subsequent site-specific actions authorized, funded, or carried out under the programmatic action will be subject to subsequent section 7 consultation and incidental take statements, as appropriate. The Services proposed to express reinitiation triggers as reasonable and prudent measures that adopt either specific provisions of the proposed programmatic action, such as spatial or timing restrictions, to limit the impacts of the program on listed species or similar restrictions identified by the Services that would function to minimize the impacts of anticipated take on listed species at the program level.

After further consideration of relevant court rulings, the Services' national section 7 policy, and public comments, the Services are revising the approach described in the proposed rule to address incidental take statements for programmatic actions. The revised approach relies more appropriately on the distinction that a framework programmatic action only establishes a framework for the development of specific future action(s) but does not authorize any future action(s). Under those particular circumstances, the programmatic action in and of itself does not result in incidental take of listed species. Under this final rule, the Services are defining the term *framework programmatic action* in the regulations and recognizing the Services' authority not to provide an incidental take statement with a biological opinion addressing the proposed adoption of a program establishing a framework for the development of future actions. As discussed in more detail below, the Services believe this approach is fully consistent with the statutory purposes of an incidental take statement and the language of section 7 of the ESA. It also advances the policy goals of the Services to focus the provision of incidental take statements at the action level at which such take will result.

The approach taken in the proposed rule was predicated on the assumption that a framework programmatic action could cause take. Given the particular nature of framework programmatic actions discussed above, the Services have altered their view and now affirm that a framework programmatic action in and of itself does not result in incidental take of listed species. This altered view as to incidental take for framework programmatic actions, however, does not undermine the duty to consult under section 7(a)(2) of the ESA. Framework programmatic actions will trigger formal consultation if the action may affect listed species or their designated critical habitat. Additionally, the Services also reconsidered the approach taken in the proposed rule because an incidental take statement for a framework programmatic action may not be practical to implement. In particular, the Services are concerned that it may be difficult to identify measures at a program scale that are specific enough to serve as valid take-related reinitiation triggers in an incidental take statement given that such measures are often described in the proposed program in a qualitative rather than a quantitative manner. Additionally, the Services are concerned that program-based measures may not serve as consistently effective reinitiation triggers because reinitiation would occur only when the action agency deviated from the terms of its own program. The additional burden of monitoring and reporting requirements for such measures in many instances would outweigh the limited functionality such measures would provide in terms of minimizing the impacts of anticipated take. The limited functionality of this approach is also raised by the fact that a similar reinitiation trigger for changes to the proposed action is already set forth in the existing regulations at 50 CFR 402.16(c) where discretionary Federal involvement or control over the action has been retained or is authorized by law.

The proposed rule set forth a definition of *programmatic incidental take statement* that, among other things, indicated the Services would issue an incidental take statement where take was "reasonably certain to occur." While the Services are not including this definition in the final rule, we are

clarifying that the "reasonable certainty" of take is the applicable standard for when the Services formulate an incidental take statement.

## Use of Surrogates

The Services acknowledge congressional preference for expressing the impacts of take in incidental take statements in terms of a numerical limitation with respect to individuals of the listed species. However, Congress also recognized that a numerical value would not always be available and intended that such numbers be established only where possible. H.R. Rep. No. 97–567, at 27 (1982). The preamble to the final rule that set forth the current regulations also acknowledges that exact numerical limits on the amount of anticipated incidental take may be difficult to determine and the Services may instead specify the level of anticipated take in terms of the extent of the land or marine area that may be affected (51 FR 19926 [19953–19954]; June 3, 1986). In fact, as the Services explained in the preamble to that rule, the use of descriptions of extent of take can be more appropriate than the use of numerical amounts "because for some species loss of habitat resulting in death or injury to individuals may be more deleterious than the direct loss of a certain number of individuals" (51 FR at 19954).

Over the last 25 years of developing incidental take statements, the Services have found that, in many cases, the biology of the listed species or the nature of the proposed action makes it impractical to detect or monitor take of individuals of the listed species. In those situations, evaluating impacts to a surrogate such as habitat, ecological conditions, or similar affected species may be the most reasonable and meaningful measure of assessing take of listed species.

The courts also have recognized that it is not always practicable to establish the precise number of individuals of the listed species that will be taken and that "surrogate" measures are acceptable to establish the impact of take on the species if there is a link between the surrogate and take. *See Arizona Cattle Growers' Ass'n* v. *U.S. Fish and Wildlife Service,* 273 F.3d 1229 (9th Cir. 2001). It is often more practical and meaningful to monitor project effects upon surrogates, which can also provide a clear standard for determining when the amount or extent of anticipated take has been exceeded and consultation should be reinitiated. Accordingly, the Services adopted the use of surrogates as part of our national policy for preparing incidental take statements:

Take can be expressed also as a change in habitat characteristics affecting the species (*e.g.,* for an aquatic species, changes in water temperature or chemistry, flows, or sediment loads) where data or information exists which links such changes to the take of the listed species. In some situations, the species itself or the effect on the species may be difficult to detect. However, some detectable measure of effect should be provided. . . . [I]f a sufficient causal link is demonstrated (*i.e.,* the number of burrows affected or a quantitative loss of cover, food, water quality, or symbionts), then this can establish a measure of the impact on the species or its habitat and provide the yardstick for reinitiation. (*Endangered Species Consultation Handbook,* U.S. Fish and Wildlife Service and National Marine Fisheries Service, March 1998, at 4–47–48 ([Services' Section 7 Handbook])

For example, under a hypothetical Clean Water Act permit, the U.S. Army Corps of Engineers would authorize the fill of a quarter-acre of wetlands composed of three vernal pools occupied by the threatened vernal pool fairy shrimp *(Branchinecta lynchi)* to construct a road-crossing. The wetland fill is likely to kill all of the shrimp occupying the three vernal pools. A single pool may contain thousands of individual shrimp as well as their eggs or cysts. For that reason, it is not practical to express the amount or extent of anticipated take of this species or monitor take-related impacts in terms of individual shrimp. Quantifying the habitat area encompassing the three vernal pools supporting this species as a surrogate for incidental take would be a practical and meaningful alternative to quantifying and monitoring the anticipated incidental take in terms of individual shrimp caused by the proposed Federal permit action. It is a practical alternative because effects to vernal pool fairy shrimp habitat are causally related to take of the fairy shrimp, these effects can be readily monitored, and the extent of impacts to occupied habitat provides a clear standard for when the anticipated extent of take has been exceeded.

The Ninth Circuit's holding in *Oregon Natural Resources Council* v. *Allen,* 476 F.3d 1031 (9th Cir. 2007) could be read to suggest that such surrogates cannot be coextensive with the project's scope for fear that reinitiation of consultation would not be triggered until the project is complete. However, even under circumstances of a coextensive surrogate (such as in the above example), the action agency or applicant will be required under the incidental take statement to monitor project impacts to the surrogate during the course of the action (*e.g.,* required monitoring to confirm the action does not exceed fill of three vernal pools in

the quarter-acre wetland), which will determine whether these impacts are consistent with the analysis in the biological opinion. This assessment will ensure that reinitiation of formal consultation will be triggered if the extent of the anticipated taking specified in the incidental take statement is exceeded during the course of the action where discretionary Federal involvement or control over the action has been retained or is authorized by law in accordance with 50 CFR 402.16. In the above example, reinitiation of formal consultation would be triggered in the event a fourth vernal pool was discovered during wetland fill or it was determined that the total amount of vernal pool habitat modified by the project exceeded the identified one-quarter of an acre of wetland habitat. Thus, although fully coextensive with the *anticipated* impacts of the project on the vernal pool fairy shrimp, the surrogate nevertheless provides for a meaningful reinitiation trigger consistent with the purposes of an incidental take statement.

In addition to discussing the use of habitat surrogates for expressing the extent of anticipated take, the Services' Section 7 Handbook also discusses (on page 4–47) the use of impacts to non-listed species as a surrogate for expressing the amount of anticipated take of a listed species:

In some situations, the species itself or the effect on the species may be difficult to detect. However, some detectable measure of effect should be provided. For instance, the relative occurrence of the species in the local community may be sufficiently predictable that impacts on the community (usually surrogate species in the community) serve as a measure of take, *e.g.,* impacts to listed mussels may be measured by an index or other censusing technique that is based on surveys of non-listed mussels. In this case, the discussion determining the level at which incidental take will be exceeded (reinitiation level) describes factors for the non-listed mussels indicating impact on the listed species, such as an amount or extent of decrease in numbers or recruitment, or in community dynamics.

We are amending § 402.14(i)(1)(i) of the regulations to clarify that surrogates may be used to express the amount or extent of anticipated take, provided the biological opinion or the incidental take statement: (1) Describes the causal link between the surrogate and take of the listed species; (2) describes why it is not practical to express the amount of anticipated take or to monitor take-related impacts in terms of individuals of the listed species; and (3) sets a clear standard for determining when the amount or extent of the taking has been exceeded. Such flexibility may be

especially useful in cases where the biology of the listed species or the nature of the proposed action makes it impractical to detect or monitor take-related impacts to individual animals. This use of surrogates to express the amount or extent of incidental take is consistent with Federal court decisions addressing the issue of surrogates as reinitiation triggers in incidental take statements.

## Provision of an Incidental Take Statement With a Biological Opinion for Programmatic Actions

The section 7 regulatory definition of Federal "action" includes Federal agency programs. *See* 50 CFR 402.02. Such programs may include a collection of activities of a similar nature, a group of different actions proposed within a specified geographic area, or an action adopting a framework for the development of future actions. Those future actions may be developed at the local, statewide, or national scale, and are authorized, funded, or carried out and subject to section 7 consultation requirements at a later time as appropriate. Examples of Federal programs that provide such a framework include land management plans prepared by the Forest Service and the Bureau of Land Management and the U.S. Army Corps of Engineers' Nationwide Permit Program.

As discussed above, the Services are modifying the section 7 regulations to address incidental take statements for framework programmatic actions in a way that revises the approach described in the proposed rule. The revised approach reflects our further consideration of relevant court rulings, the Services' national section 7 policy, and public comments on the proposed rule. Under this final rule, we are establishing regulatory provisions specific to framework programmatic actions that require section 7 consultation and adopt a framework for the development of future actions but do not authorize those future actions. This rule change will clarify the circumstances under which the Services will not provide an incidental take statement with a biological opinion addressing a framework programmatic action because adoption of a framework will not itself result in the take of listed species. Any take resulting from subsequent actions that proceed under the framework programmatic action will be subject to section 7 consultation and an incidental take statement, as appropriate. However, this regulatory change does not imply that section 7 consultation is required for a framework programmatic action that has no effect

on listed species or critical habitat. The Services believe that this approach is fully consistent with the statutory purposes of an incidental take statement and the language of section 7 of the ESA.

As an initial and elementary matter, section 7 of the ESA directs the provision of an incidental take statement only where take is anticipated to result from the proposed Federal agency action. If take is not anticipated, then logically no incidental take statement would be provided. *See* 16 U.S.C. 1536(b)(4). Because a framework programmatic action does not itself authorize any action to proceed, no take is anticipated to result, and, therefore, the statute does not require the provision of an incidental take statement.

To read the statute otherwise to require the provision of incidental take statements for framework programmatic actions would not meaningfully further the statutory purposes of incidental take statements. The primary purpose of an incidental take statement is, when consistent with protection of the species, to exempt the incidental take of listed species that is anticipated to result from the agency action and impose conditions on that exemption intended to minimize the impacts of such take for the species' benefit. *See* 16 U.S.C. 1536(b)(4); H.R. Rep. 97–567, at 26–27 (1982). As provided in the legislative history and reflected in the Services' regulations, an additional purpose is to identify reinitiation triggers that provide clear signals that the level of anticipated take has been exceeded and would, therefore, require reexamination through a reinitiated consultation (H.R. Rep. 97–567, at 26–27 (1982); 50 CFR 402.14(i)).

Due to the nature of the action, no take results when a framework programmatic action is adopted. Adoption of the program itself, by definition, only establishes a framework for later action. ESA consultations will occur when subsequent actions may affect listed species and are consistent with the terms of the authorized program. If incidental take is reasonably certain to occur and the proposed action is compliant with the requirements of section 7(a)(2), then an action-specific incidental take statement will be provided that ensures any incidental take from the subsequent action under the program is addressed. The primary purpose of an incidental take statement (exemption of take and minimization of take-related impacts for the benefit of the listed species) would also not be advanced, because any incidental take statement provided at the program level

and the resulting exemption would necessarily be incomplete since a second consultation and an action-specific incidental take statement still need to be provided when later actions are authorized under the program. Additionally, the level of detail available at the program (framework) level is often insufficient to identify with particularity where, when, and how the program will affect listed species. Without such detail, it is difficult to write sufficiently specific and meaningful terms and conditions intended to minimize the impact of the taking for the benefit of the listed species. Given this lack of specificity and information, providing the amount (*e.g.,* the number of individuals of the species taken) or extent (*e.g.,* the number of acres of the species' habitat disturbed) of take in many instances would be speculative and unlikely to provide an accurate and reliable trigger for reinitiation of consultation, thus undermining the additional purpose of an incidental take statement.

As discussed above, the modified approach for addressing incidental take statements for framework programmatic actions advances the policy goals of the Services to focus the provision of incidental take statements at the action level where such take will result. Consistent with that focus, if a decision adopting a framework also includes decisions authorizing actions (that is, actions for which no additional authorization will be necessary), then an incidental take statement would be necessary for those actions, provided the action is compliant with section 7(a)(2) and take is reasonably certain to occur. The Services have included recognition of this circumstance in the regulatory definition of the term "mixed programmatic action" in this final rule. For other types of programmatic actions not falling within the definitions provided in the rule, incidental take statements will be formulated by the Services to accompany biological opinions where incidental take is reasonably certain to occur and the proposed Federal action is compliant with the requirements of section 7(a)(2).

If, as discussed above, an incidental take statement is not provided with a biological opinion on a framework programmatic action on the basis that no take will result at the program stage, questions arise about how the associated biological opinion can nevertheless address indirect effects of the program's implementation. Put another way, if indirect effects amount to killing, harming, harassing, etc., how can no take occur? The explanation turns on the differing purposes of a biological

113a

opinion as compared with an incidental take statement.

Unlike the purposes of an incidental take statement, the analysis in a biological opinion is used to determine whether an agency action is likely to jeopardize a listed species or adversely modify designated critical habitat. *See* 16 U.S.C. 1536(b)(3)(A); 50 CFR 402.14(h); H.R. Rep. 97–567, at 10 (1982). Conducting an effects analysis on a framework programmatic action that examines the potential effects of implementing the program is fully consistent with the purposes of a biological opinion. The analysis in a biological opinion allows for a broad-scale examination of a program's potential impacts on a listed species and its designated critical habitat—an examination that is not as readily conducted when the later, action-specific consultation occurs on a subsequent action developed under the program framework. The provisions of an incidental take statement, including the amount and extent of take and the terms and conditions, necessarily must be specific to ensure they can be followed and allow for a determination of when they have been exceeded. *See* 16 U.S.C. 1536(b)(4); 50 CFR 402.14(i). In contrast, a meaningful effects analysis within a biological opinion may appropriately rely upon qualitative analysis to determine whether a program and its set of measures intended to minimize impacts or conserve listed species are adequately protective for purposes of making a jeopardy determination. Programmatic biological opinions examine how the parameters of the program align with the survival and recovery of listed species. This approach reflects the different statutory purposes that the two related but separate documents were intended to address.

Distinctions between "effects" and "take" at the programmatic scale support analyzing potential program implementation as part of the "effects" of the framework programmatic action but not providing an incidental take statement at the program level. The ESA itself uses different terms in specifying the contents of a biological opinion for jeopardy purposes ("detail[] how the agency action affects the species") and an incidental take statement (focused on "take"). *See* 16 U.S.C. 1536(b)(3)(A), (b)(4). The ESA also does not define "affects" in any way.

For purposes of a biological opinion on a framework programmatic action, the Services typically evaluate the potential implementation of the program as "effects of the action." The Services can legitimately draw a distinction between "effects" of the program and the purpose of a biological opinion on that program and "take" and the purpose of an incidental take statement in the subsequent consultation on later actions carried out under the program. Given that no actions that would lead to take are authorized when the framework program itself is adopted, the Services' position is that take is not anticipated from the adoption of the program in and of itself. As a result, the Services find that it is appropriate not to provide an incidental take statement at the program level and to address take during subsequent steps when specific actions are authorized under the program and subsequent consultation occurs. As mentioned above, if, however, a decision adopting a program framework also includes decisions authorizing actions that will not be subject to further Federal authorization or section 7 consultation and take is reasonably certain to occur, then an incidental take statement would be necessary for those portions of the programmatic action that will result in incidental take. The Services have included recognition of this circumstance in the regulatory definition of the term "mixed programmatic action" in this final rule.

Action agencies often seek to engage in consultation on programmatic actions to gain efficiencies in the section 7 consultation process. The Services anticipate this rule will afford action agencies and the Services with substantial flexibility to efficiently and effectively conduct consultation, while ensuring compliance with responsibilities under the ESA. For example, if an action agency designs a programmatic action and provides adequate information to inform the development of a biological opinion with an incidental take statement covering future actions implemented under the program, the Services anticipate they will be able to provide such an opinion and incidental take statement to the action agency under this rule. Action agencies may request assistance from the Services to help determine how a program could best be addressed pursuant to this rule. The Services also encourage action agencies to consider how any section 7 consultation on a programmatic action is consistent with the action agency's other environmental review processes.

## Standard for Issuance of an Incidental Take Statement

In this final rule, the Services are clarifying that the standard for issuance of an incidental take statement is "reasonable certainty" that take will occur. The Services are amending 50 CFR 402.14(g)(7) to implement this clarification. The Services do not consider this change to be substantive, but rather a clarification of the existing standard for issuance of an incidental take statement.

Expressly including the standard of reasonable certainty in this final rule at 50 CFR 402.14(g)(7) is consistent with the ESA, existing section 7 regulations, the Services' current practice, the Services' Section 7 Handbook, and applicable case law. The three requirements that must be met under section 7 of the ESA before an incidental take statement is issued implicitly suggest that a finding of take is required. *See* 16 U.S.C. 1536(b)(4)(B) ("*the taking* of an endangered species or a threatened species incidental to the agency action will not violate such subsection") (emphasis added). The statute does not set forth the standard by which incidental take is to be determined, however, leaving room for the Services to offer their interpretation.

As for the regulations, the section 7 regulations expressly apply the "reasonable certainty" standard to "indirect effects" that are defined as part of the "effects of the action." *See* 50 CFR 402.02. The existing provision governing the contents of an incidental take statement at 50 CFR 402.16(i)(1) reflects the requirement that at least some level of incidental take be anticipated to meaningfully include the required contents of an incidental take statement, *e.g.*, the impact of the take (amount or extent of take), and the reasonable and prudent measures considered "necessary or appropriate to minimize such impact."

The Services' Section 7 Handbook, issued in 1998, identifies a similar standard of "reasonably likely" to determine when to issue an incidental take statement. The Handbook predates the Ninth Circuit's decision in *Arizona Cattle Growers' Ass'n* v. *U.S. Fish and Wildlife Service,* 273 F.3d 1229 (9th Cir. 2001). In that case, the Ninth Circuit provided a lengthy discussion of when the Services must issue an incidental take statement. Examining the statute and the regulations, the court held that there must be a reasonable basis to conclude that incidental take will occur in order to issue an incidental take statement. Although not definitively resolving the issue, the court cited favorably to the lower court's application of the standard of "reasonable certainty" for issuance of an incidental take statement. The court particularly expressed concern about the imposition of conditions on otherwise lawful land use absent

reasonable certainty of incidental take. In 2002, following the *Arizona Cattle Growers'* decision, the Fish and Wildlife Service expressly recognized "reasonable certainty" as the standard that applies to determine if incidental take will occur.

The language currently in 50 CFR 402.14(g)(7) is not inconsistent with the Services' application of the "reasonable certainty" standard. This provision requires the Services to "formulate a statement concerning incidental take, if such taking *may occur*" (50 CFR 402.14(g)(7) (emphasis added)). While some courts have read this language to potentially suggest a lower standard applies for the issuance of an incidental take statement, *see, e.g., Public Employees for Environmental Responsibility* v. *Beaudreu,* —F.Supp.2d —, 2014 WL 985394 (D.D.C. 2014), that is not the Services' interpretation. The language of § 402.14(g)(7) cannot be read in isolation. The Services implement § 402.14(g)(7) together with the more particular requirements of § 402.14(i).

For all the reasons discussed above, the "reasonable certainty" standard governs the threshold issue of whether to formulate an incidental take statement. Once the Services determine that incidental take is reasonably certain to occur, then the specific provisions of 50 CFR 402.14(i) govern (*e.g.,* amount or extent of take, terms and conditions) and are applied consistent with the best scientific and commercial data available. Where formal consultation results in a determination that take is not "reasonably certain," then consistent with § 402.14(g)(7) and the Services' Section 7 Handbook, the Services provide a section entitled "incidental take statement" along with a short paragraph explaining that incidental take is not anticipated. Thus, the statement does not go on to provide an amount or extent of take, reasonable and prudent measures, or the other components of an incidental take statement. To avoid any confusion about the standard for anticipating incidental take of listed species, the Services have modified the text of § 402.14(g)(7) to reflect the "reasonably certain to occur" standard.

As a practical matter, application of the "reasonable certainty" standard is done in the following sequential manner in light of the best available scientific and commercial data to determine if incidental take is anticipated: (1) A determination is made regarding whether a listed species is present within the area affected by the proposed Federal action; (2) if so, then a determination is made regarding whether the listed species would be exposed to stressors caused by the proposed action (*e.g.,* noise, light, ground disturbance); and (3) if so, a determination is made regarding whether the listed species' biological response to that exposure corresponds to the statutory and regulatory definitions of take (*i.e.,* kill, wound, capture, harm, etc.). Applied in this way, the "reasonable certainty" standard does not require a guarantee that a take will result, rather, only that the Services establish a rational basis for a finding of take. While relying on the best available scientific and commercial data, the Services will necessarily apply their professional judgment in reaching these determinations and resolving uncertainties or information gaps. Application of the Services' judgment in this manner is consistent with the "reasonable certainty" standard. The standard is not a high bar and may be readily satisfied as described above. *See, e.g., Arizona Cattle Growers',* 273 F.3d at 1244 (noting that the standard the court applies in reviewing whether the Services may issue an incidental take statement is a "very low bar to meet").

**Summary of Changes From the Proposed Rule**

In response to public comments and internal review, the Services made the following changes compared to the proposed rule:

The term and definition for *programmatic action* and the proposed text of §§ 402.02 and 402.14(i)(6) are modified in this final rule. The term *programmatic action* is changed to *framework programmatic action*. The term *mixed programmatic action* and its definition are also added to the final rule. The proposed term and definition for *programmatic incidental take statement* at § 402.02 are removed; however, the standard set forth in the definition (reasonable certainty) is included in the final rule as explained below. These changes define, for purposes of incidental take statements under section 7 of the ESA, the subset of Federal agency actions to which this rule applies. The new definitions draw distinctions between these types of programmatic actions based on the extent to which those programs do or do not require subsequent Federal approvals and section 7 consultation for the terms of the program to be carried out. The new § 402.14(i)(6) added to the regulations under this final rule establishes when an incidental take statement is and is not required for these two categories of programmatic action.

The approach relied upon in this final rule for programmatic actions is fully consistent with the identified purpose of the proposed rule, which, among other things, was to clarify development of incidental take statements for programmatic actions. While this approach modifies the approach of the proposed rule for programmatic actions, the public was specifically asked for comment on whether the approach relied upon in this final rule would be more appropriate to address the issue of incidental take statements for programmatic actions. *See* 78 FR 54437, 54441 (Sept. 4, 2013).

As discussed above, the Services are modifying the text in § 402.14(g)(7) to clarify that "reasonable certainty" is the standard that applies to determine when the Services issue an incidental take statement. The proposed rule did not propose this specific change, but the proposed rule definition of *programmatic incidental take statement* included the concept of "reasonable certainty" as the applicable standard for incidental take, and commenters specifically requested the Services to clarify the applicable standard, including many commenters that specifically asserted that "reasonable certainty" is the applicable standard. The Services, therefore, are taking this opportunity to clarify the regulatory language in § 402.14(g)(7) from "if such take *may* occur" to "if such take *is reasonably certain* to occur" (emphasis added). As explained above, the Services do not consider this change to be substantive, but rather a clarification of the existing standard for issuance of an incidental take statement.

The proposed rule included adding a sentence to § 402.14(i)(3) intended to clarify that monitoring project impacts to a surrogate meets the requirement for monitoring the impacts of incidental take on the listed species. Upon further consideration, the Services concluded this sentence is unnecessary as the requirement is already reflected in the existing regulatory language. *See* 50 CFR 402.14(i)(1)–(3) (monitoring and reporting "impacts on the species" includes amount or extent of take and therefore surrogates). The Services are making a technical change to § 402.14(i)(3) to update the citations to the NMFS regulations at the end of that provision from "50 CFR 220.45 and 228.5" to "50 CFR 216.105 and 222.301(h)". These provisions were moved within the Code of Federal Regulations but never updated in § 402.14(i)(3).

**Response to Public Comments**

As noted above, the Services received a total of 64 public comments in response to the proposed rule. For the

reasons discussed above, the Services withdrew the proposed regulatory definition of *programmatic incidental take statement* in this final rule. On that basis, we are not responding to public comments on this aspect of the proposed rule except as they relate to the standards for development of an incidental take statement. We also are not responding to public comments beyond the scope of the proposed rule, including those comments that addressed other portions of the section 7 consultation regulations not related to the formulation of incidental take statements. The following responses to public comments are segregated under four categories: (1) General; (2) the standards for anticipating take; (3) incidental take statements for programmatic actions; and (4) the use of surrogates to express the amount or extent of take.

*General*

*Issue 1:* Several commenters requested an extension of the public comment period.

*Response:* The Services believe the 60-day public comment period provided adequate opportunity for the public to review and comment on the proposed regulations.

*Issue 2:* One commenter stated that the proposed changes to the section 7 regulations are not within the Services' regulatory authority.

*Response:* The Services regard the proposed changes as fully consistent with their discretionary authority to address ambiguous aspects and challenging issues that arise under section 7 of the ESA.

Congress included the incidental take statement provisions in the 1982 amendments to the ESA to resolve the situation in which a Federal action agency or an applicant has been advised by the Services that the proposed action is not likely to jeopardize the continued existence of listed species but is anticipated to result in the taking of listed species incidental to that action, which would otherwise violate the take prohibition of section 9. *See* H.R. Rep. 97–567, 26–27 (1982). According to the legislative history of the ESA, by requiring the Services to specify the impact of take on the listed species, Congress also intended reinitiation triggers (amount or extent of take) to be required as part of the incidental take statement. *See id.*

The ESA is sufficiently ambiguous to allow the Services to adopt a statutory interpretation that supports not providing an incidental take statement for a framework programmatic action, as appropriate. *See Chevron USA, Inc.* v.

*Natural Resources Defense Council,* 467 U.S. 837, 865–66 (1984). First, the definition of ''take'' itself contemplates immediate actions that would potentially injure a listed species (''harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect'' (16 U.S.C. 1532(19)). The programmatic (framework) action by itself and by definition under this rule does not authorize any actions that would result in these sorts of immediate injuries to a listed species. No take will occur at the programmatic level, and any take that results will result only from a second (or subsequent) authorization under the programmatic action. As discussed above, framework programmatic actions may include authorization for actions that will not be subject to further Federal authorization or section 7 consultation and are reasonably certain to cause take. Under those circumstances, an incidental take statement would be necessary for that portion of the framework programmatic action. The Services have included recognition of this circumstance in the regulatory definition of *mixed programmatic action* in this final rule.

Given the step-wise nature of such programmatic actions, sections 7(b)(4) and 7(o)(2) of the ESA can be read to support not providing an incidental take statement at the programmatic level under these circumstances. If incidental take is anticipated to result at this stage, section 7(b)(4) appears to require the Services to issue an incidental take statement (''the Secretary *shall* provide the Federal agency and applicant . . . with a written statement'') (16 U.S.C. 1536(b)(4) (emphasis added). Although section 7(b)(4) does not expressly require a finding that incidental take is anticipated to result from the agency action, the three requirements that must be met before an incidental take statement is issued implicitly suggest this. *See* 16 U.S.C. 1536(b)(4)(B) (''*the taking* of an endangered species or a threatened species incidental to the agency action will not violate such subsection'') (emphasis added). These provisions provide room for the Services to adopt the position that take will not result at the programmatic (framework) level in and of itself since no specific action is authorized when the program is adopted. Any take that will result from the program will be addressed, as appropriate, when a subsequent specific action(s) is authorized and the resulting action-specific consultation occurs. Because of the framework nature of the programmatic actions at issue, the Services are not avoiding the duty to

provide an incidental take statement— any take resulting from the subsequent actions under program will be addressed in the later action-specific consultation. Not providing a take-related reinitiation trigger under an incidental take statement for the framework programmatic action is supportable given the Services' position that take is not anticipated at the program (framework) level in the particular circumstance where no specific action is authorized until a subsequent action developed under the framework is taken and subsequent ESA consultation occurs. Also, for decisions adopting framework programmatic actions that also authorize actions to proceed without any further Federal authorization or section 7 consultation anticipated, an incidental take statement is required under this rule where the action is determined to be compliant with section 7(a)(2) and take is reasonably certain to occur. An example of such actions might include Federal programs in which subsequent approval for actions proceeding under the program are delegated to States.

As defined in this rule and discussed above, a mixed programmatic action may include authorization for actions that will not be subject to further Federal authorization or section 7 consultation and are reasonably certain to cause take. Under those circumstances, an incidental take statement would be necessary for that portion of the programmatic action. The Services have included recognition of this circumstance in the regulatory definition of *mixed programmatic action* in this final rule. Examples of mixed programmatic action would include land management plans in which particular actions, such as establishment of campgrounds or off-road vehicle use, are approved to proceed directly, while the plan itself provides a framework for the development of future actions occurring in the action area that are authorized, funded, or carried out at a later time and subject to section 7 consultation requirements, as appropriate.

Section 7(o)(2) of the ESA supports the Services' interpretation because it appears to contemplate only a single incidental take statement to fully exempt take. The language of section 7(o)(2) provides ''any taking that is in compliance with the terms and conditions [of an incidental take statement] . . . shall not be considered to be a prohibited taking.'' (16 U.S.C. 1536(o)(2)). If the Services were to provide an incidental take statement for a framework programmatic action where any take will result only from future

authorizations under the programmatic (framework) action, the Services would still require a second incidental take statement for those subsequent actions because that is the point at which adequate information typically would be available to identify amount or extent of take and to provide action-specific terms and conditions. Requiring an incidental take statement for the framework programmatic action to fully exempt the take associated with implementing the program or framework, however, may be inconsistent with section 7(o)(2), which exempts ''any taking'' that complies with the terms and conditions of the incidental take statement (emphasis added). Thus, not providing an incidental take statement at the program (framework) level avoids a potential inconsistency with the language of section 7(o)(2).

Additionally, as discussed above, the language of the ESA leaves sufficient room to draw a distinction between ''effects'' and ''take'' at the programmatic scale, and thus to allow for an analysis of program implementation as part of the ''effects'' of a framework programmatic action but not to provide an incidental take statement at the program (framework) level. The ESA itself uses different terms in specifying the contents of a biological opinion for jeopardy purposes (''detail how the agency action *affects* the species'') and an incidental take statement (focused on ''*take*''). *See* 16 U.S.C. 1536(b)(3)(A), (b)(4) (emphasis added). The ESA also does not define ''affects'' in any way. Thus, it is up to the Services to fill in these statutory gaps in the ESA in a reasonable way. *See National Cable & Telecommunications Ass'n.* v. *Brand X Internet Services,* 545 U.S. 967 (2005).

Likewise, the use of surrogates in an incidental take statement is an exercise of the Services' reasonable discretion in carrying out their responsibilities under section 7 of the ESA. The statutory language associated with reinitiation triggers is quite general, providing that as part of an incidental take statement the Services shall ''specif[y] the impact of such incidental taking on the species'' (16 U.S.C. 1536(b)(4)(i)). This language leaves substantial room for statutory interpretation on the part of the Services, including the use of surrogates.

The legislative history of the 1982 amendments to the ESA, which added the incidental take statement provisions, reflects congressional support for the use of surrogates as well. Congress recognized that a numerical value would not always be available and

intended that such numbers be established only where possible (H.R. Rep. No. 97–567, at 27).

In practice, over the last 25 years of developing incidental take statements, the Services have found that in many cases the biology of the listed species or the nature of the proposed action makes it impractical to detect or monitor take of individuals. In those situations, evaluating impacts to a surrogate such as habitat, ecological conditions, or similar affected species may be the most reasonable and meaningful measure of assessing take of listed species and is fully consistent with the language and purposes of the ESA.

The courts have also recognized that it is not always practicable to establish the precise number of individuals that will be taken. Thus under a *Chevron* analysis, the ESA permits the Services to rely upon surrogate measures to establish the impact of take on the species if there is a link between the surrogate and take. *See Arizona Cattle Growers' Ass'n* v. *U.S. Fish and Wildlife Service,* 273 F.3d 1229 (9th Cir. 2001); *see also Oregon Natural Resource Council* v. *Allen,* 476 F.3d 1031, 1041 (9th Cir. 2007). It is often more practical and meaningful to monitor project effects upon surrogates, which can also provide a clear standard for determining when the amount or extent of anticipated take has been exceeded and consultation should be reinitiated. Accordingly, the Services have already exercised their discretionary authority to adopt the use of surrogates as part of our joint national policy for preparing incidental take statements in the Section 7 Handbook (Services 1998).

*Issue 3:* Commenters noted that the proposed rule is subject to the requirements of the National Environmental Policy Act (NEPA), including the requirements applicable to environmental impact statements, that must be satisfied before a final decision is made on the proposed regulatory changes.

*Response:* The categorical exclusions at 43 CFR 46.210(i) and NOAA Administrative Order 216–6, section 6.03c.3(i) apply to this joint rule. Among other things, the exclusions apply to regulations that are of an administrative, financial, legal, technical, or procedural nature and whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process either collectively or case by case. 43 CFR 46.210.

The Services have determined that this final rule will not result in any reasonably foreseeable effects to the

environment and, therefore, that further NEPA review is not required. First, the rule codifies existing practices and case law with respect to use of surrogates and this codification of the status quo does not result in foreseeable environmental effects. Second, the timing of issuance of the incidental take statement will not change the substantive protections afforded to species and therefore the Service's regulations do not change the on-the-ground effects of incidental take statements. Finally, the update to the regulations does not result in environmental impacts because it merely clarifies the Services' longstanding position since the Ninth Circuit's decision in *Arizona Cattle Growers' Ass'n.* that an incidental take statement may be issued only when there is ''reasonable certainty'' that take of listed species will occur.

To the extent the rule would result in reasonably foreseeable environmental effects, the Services have determined that the rule is categorically excluded from further NEPA review and that no extraordinary circumstances are present. The rule qualifies for two categorical exclusions listed at 43 CFR 46.210(i) and NOAA Administrative Order (NAO) 216–6, section 6.03c.3(i). Among other things, the exclusions apply to regulations that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case by case. 43 CFR 46.210. *See also* NAO section 216–6 6.03c.3(i) (substantively the same exclusion).

First, the rule is of a legal, technical, or procedural nature. For surrogates, the rule clarifies when the Services may use a surrogate to establish the amount or extent of take. This clarification is consistent with the Services' existing national policy and applicable case law. For programmatic actions, the rule clarifies the procedural timing of when the Services will issue an incidental take statement. It does not alter substantive protections. Finally, the rule codifies the Services' longstanding interpretation of their existing regulations post *Arizona Cattle Growers' Ass'n.* that an incidental take statement can be issued only if there is ''reasonable certainty'' that take will occur.

Second, any potential impacts of this rule are too broad, speculative, and conjectural to lend themselves to meaningful analysis and will be examined as part of any NEPA analysis conducted by the Federal action agency.

As explained above, the changes in the rule generally constitute clarifications that are consistent with existing practices as well as case law. As such, it would be speculative to try to analyze the effects of the codification of these practices. Furthermore, these changes apply to the nationwide implementation of section 7 consultations, which take place in a wide variety of contexts, for various activities, for and with numerous action agencies. This application allows analysis only at the broadest level and would not permit meaningful analysis. Furthermore, before any action is taken, the responsible action agency will be required to conduct any necessary NEPA analyses, including impacts to listed species and critical habitat. For these reasons, the second categorical exclusion applies to this rule.

Additionally, none of the extraordinary circumstances listed at 43 CFR 46.215 and NAO 216–6 section 5.05c are triggered by the final rule. This rule does not involve a geographic area with unique characteristics, is not the subject of public controversy based on potential environmental consequences, will not result in uncertain environmental impacts or unique or unknown risks, does not establish a precedent or decision in principle about future proposals, will not have significant cumulative impacts, and will not have any adverse effects upon endangered or threatened species or their habitats for the reasons identified above.

In making this determination, the Services have considered whether adequate opportunities for public comment on the rule, including its potential environmental effects, have been provided. Our review of the proposed rule and the comments received on that proposal demonstrated that preparation of an Environmental Assessment is not necessary to obtain public input on this rule. Commentators had the opportunity to weigh in on the various aspects of this final rule and the final rule has been shaped, in part, by those comments. We conclude that preparation of an Environmental Assessment would not result in meaningful additional opportunities for comment, nor would it be likely to provide the Services with significant additional information to guide their decisionmaking process.

*Issue 4:* One commenter requested that the Services include the concept of a ''cumulative'' incidental take statement in the incidental take statement rulemaking.

*Response:* The statutory purposes and features of incidental take statements

are discussed above in the preamble. As reflected in that discussion, incidental take statements are proposed-action specific. While biological opinions examine aggregate or cumulative impacts as part of the jeopardy and adverse modification analyses consistent with the best scientific and commercial data available (*see, e.g.,* Services' Section 7 Handbook, at 4–33), incidental take statements do not, nor are they required to, include such analyses. Additionally, an incidental take statement may be issued only if the proposed action avoids jeopardizing the species or adversely modifying its critical habitat. *See* 16 U.S.C. 1536(b)(4).

*The Standards for Anticipating Take*

*Issue 1:* Several commenters requested the Services to clarify the standards for issuing an incidental take statement.

*Response:* As noted above, in accordance with the ESA, the Services must provide an incidental take statement in a biological opinion in cases where we have concluded that a proposed Federal action will not violate section 7(a)(2) and take of listed species caused by the action is reasonably certain to occur. As discussed above, the Services are clarifying 50 CFR 402.14(g)(7) to clarify that reasonable certainty is the standard. Additionally, for framework programmatic actions, the Services are also clarifying that an incidental take statement is not required at the program (framework) level for those actions falling within the definition of *framework programmatic action.*

In general, the standards for incidental take statements in the current regulations at 50 CFR 402.14(i) continue to apply as well as the standards associated with national policy for incidental take statements found on pages 4–43 through 4–58 of the Services' Section 7 Handbook (Services 1998).

In accordance with those standards and consistent with governing case law and our regulations, the Services' general approach to incidental take statements is summarized below:

Take is specifically defined in the regulations. For example, the terms ''harm'' and ''harass'' have specific meanings, and they are not synonymous (*i.e.,* FWS harm and harass at 50 CFR 17.3; NMFS harm at 50 CFR 222.102). The effects analysis in a biological opinion should discuss, as appropriate, the anticipated effects of an action on listed species in biological terms that relate to the regulatory definitions of take. Similarly, the incidental take statement portion of a biological

opinion should reflect the proper use of take terminology.

If a proposed action includes a reasonable certainty of take, the biological opinion needs to make a rational connection between the effects of the action and the take considered in the incidental take statement. The terms and conditions must have a rational connection to the taking of a species and must give clear guidance to the recipient of the incidental take statement of what is expected and how the conditions (including those for monitoring of take-related impacts caused by the action) can be met.

*Issue 2:* One commenter requested the Services to clarify if an incidental take statement for a program-level action can include an amount or extent of take if the analysis of the effects of the action supports such a finding.

*Response:* Yes, if the Services have determined that incidental take is reasonably certain to occur and that such take will not violate section 7(a)(2) of the ESA.

*Issue 3:* One commenter noted that if a jeopardy determination can be made for a programmatic action, then quantification of anticipated take in an incidental take statement should also be possible.

*Response:* As discussed in the preamble above, a meaningful effects analysis within a biological opinion may appropriately rely upon qualitative analysis to determine whether a framework programmatic action, inclusive of any proposed measures to minimize adverse impacts or conserve listed species, is adequately protective for purposes of making a jeopardy determination. Biological opinions on such programs often examine how the parameters of the program align with the survival and recovery of listed species. These assessments are often qualitative and do not provide the sort of specificity required for the purposes of incidental take statements. See the related discussion above in the section entitled ''Provision of an Incidental Take Statement with a Biological Opinion for Programmatic Actions.''

*Issue 4:* Several commenters requested the Services to affirm that reasonable and prudent measures in an incidental take statement must respect the ''minor change'' rule.

*Response:* The Services find that the text in the current regulations under § 402.14(i)(2) is clear and sufficient in this regard, and no changes are warranted. Reasonable and prudent measures and the terms and conditions that implement them cannot alter the basic design, location, scope, duration,

or timing of the action and may involve only minor changes.

*Programmatic Actions*

*Issue 1:* Several commenters requested the Services to more clearly express the regulatory definition of *programmatic action* and to more clearly explain why this term needs to be defined in the regulations.

*Response:* After considering public comments and internal review, the Services are modifying the term and definition of *programmatic action* in this final rule. The term *framework programmatic action* is added to 50 CFR 402.02 and includes, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future actions that are authorized, funded, or carried out and subject to section 7 requirements at a later time. The term *mixed programmatic action* and its definition are also added to 50 CFR 402.02 in this final rule to further distinguish the forms of programmatic actions that may be developed by Federal agencies. See discussion above for further detail regarding *framework* and *mixed programmatic actions* in the section entitled ''Inclusion of an Incidental Take Statement in a Biological Opinion for Programmatic Actions.''

*Issue 2:* Several commenters requested the Services to more clearly define key phrases in the proposed rule, including those for *programmatic action* and *site-specific.*

*Response:* For *programmatic action,* see the response to Issue 1 above. The regulatory language of the rule no longer uses the term ''site-specific.'' In the Services' view, that term unnecessarily narrowed the definition of the types of programmatic actions to which this rule is intended to apply.

*Issue 3:* One commenter requested the Services to clarify if programmatic actions covered under a Habitat Conservation Plan (HCP) permit issued under section 10(a)(1)(B) of the ESA fall within the scope of the proposed regulatory definition of *programmatic action.*

*Response:* The Services anticipate that an HCP covering programmatic actions by non-Federal parties (*e.g.,* States, local governments, private citizens) generally would not fall under the definition of framework programmatic action established by this rule. The Federal action involved in an HCP is the issuance of a section 10(a)(1)(B) permit, and it is this action that is the subject of a biological opinion and incidental take statement. Such a permit generally is not expected to fall under the definition of framework programmatic

action discussed herein since it is the underlying State/local/private action that is programmatic in nature, not the Federal permit itself, which is subject to consultation.

*Issue 4:* Several commenters noted that the proposed rule fails to establish clear standards for programmatic actions and creates an ''enormous loophole in the consultation process that will harm listed species.''

*Response:* Based on the revisions and clarifications of the proposed rule in this final rule, the Services endeavor to articulate more clearly when an incidental take statement is required for programmatic actions. Additionally, as noted above in the response to Issue 1 in the subsection titled ''The Standards for Anticipating Take,'' an incidental take statement can be provided only where the Services have concluded in a biological opinion that a proposed Federal action and the resultant incidental take will not violate section 7(a)(2). This scenario is the same for both programmatic actions and project-specific actions that fall under such programs, which ensures that no loophole is created.

*Issue 5:* One commenter requested the Services to clarify the standards that will be applied to develop incidental take statements for site-specific actions authorized under a programmatic action, especially those related to monitoring of take-related impacts.

*Response:* The Services note that we are no longer using the term ''site-specific actions'' in our definitions for programmatic action. In general, for actions proceeding under a program that are anticipated to be subject to a subsequent section 7 consultation, the standards for incidental take statements in the current regulations at 50 CFR 402.14(i) would continue to apply as well as those associated with national policy for incidental take statements found on pages 4–43 through 4–58 of the Services' Section 7 Handbook. For a more detailed discussion of these standards, see the response to Issue 1 under ''The Standards for Anticipating Take'' above.

*Use of Surrogates*

*Issue 1:* One commenter suggested that the Services not require an incidental take statement to explain the causal link between the effects of an action to a surrogate and take of listed species under the proposed changes to § 402.14(i)(1)(i) but rather use the agency record of decision to explain how those standards are met. At the very least, the commenter requested the Services to delete reference to ''clear'' in relation to setting a standard for

determining when the level of anticipated take in terms of a surrogate has been exceeded because the word ''clear'' ''implies an extra burden on the agency to provide particular detail about the standard'' that may make the Services vulnerable to assertions that a take reinitiation trigger is not clear enough.

*Response:* The requirement for the Services to explain the causal link is consistent with the Services' current national section 7 policy (*see* page 4–47 of the Services' Section 7 Handbook) and current case law. Additionally, in the section 7 context, the Services do not issue a record of decision; we issue a biological opinion and incidental take statement, which is the appropriate place to address the causal link between anticipated take and an identified surrogate. The Services have retained the word ''clear'' in § 402.14(i)(1)(i) of the regulations because that term best conveys the intent to ensure the standard is understandable to the holder of the incidental take statement.

*Issue 2:* Several commenters were concerned about the Services' proposed regulatory criteria for the use of surrogates to characterize the amount or extent of anticipated take and requested the Services to better define clear standards for the use of surrogates and subsequent monitoring. Some commenters suggested that these standards be less specific, and others suggested that they be more specific.

*Response:* The standards for the use of surrogates, as finalized in this rule, are consistent with relevant case law and the Services' national policy on the use of surrogates (*see* page 4–47 of the Services' Section 7 Handbook), which has been in effect since 1998.

*Issue 3:* One commenter objected to the Services' proposed regulatory authorization for the use of surrogates to address habitat surrogates that are fully coextensive with any aspect of the proposed project's impacts on habitat because such a provision is at odds with the Ninth Circuit's decision in *Oregon Natural Res. Council* v. *Allen,* 476 F.3d 1031 (9th Cir. 2007).

*Response:* The Services consider a ''coextensive'' surrogate to be a surrogate that adopts a portion of a proposed action as a trigger for reinitiation. Coextensive surrogates allowed for by this rule adequately fulfill their role as independent reinitiation triggers because the monitoring and reporting requirements of the incidental take statement will be structured to ensure timely reporting of project impacts to a surrogate to ensure timely reinitiation of formal consultation, as appropriate, in the same

way as for non-coextensive surrogates. The preamble provides additional discussion illustrating how a coextensive surrogate may fulfill its intended function as an independent trigger for reinitiation. A surrogate that did not fulfill this role would not meet the requirements of this rule.

*Issue 4:* Several commenters requested the Services to more clearly describe the meaning of "not practical," "clear standard," and "causal link" as these terms are applied in the use of surrogates.

*Response:* The Services considered this comment in finalizing the preamble discussion on the use of surrogates and believe each of these terms is clearly described in a manner that is consistent with existing case law and the Services national policy on the use of surrogates (*see* page 4–47 of the Services' Section 7 Handbook), which has been in effect since 1998.

*Issue 5:* Several commenters requested the Services to clarify that take of a surrogate is not a violation of section 9 of the ESA.

*Response:* The Services affirm that take of a surrogate is not, in and of itself, a violation of sections 9(a)(1)(B), (C), or (G) of the ESA. Any efforts to prosecute a violation of the take prohibitions would be based on applying the appropriate evidentiary standards to support either a civil or criminal action. A surrogate functions to provide a trigger for reinitiation of consultation under § 402.16(a). If the amount or extent of take is represented by a surrogate and the level of anticipated impact to that surrogate is exceeded, reinitiation may be required consistent with the terms of § 402.16. The availability of the take exemption afforded by the incidental take statement is governed by compliance with the reasonable and prudent measures and terms and conditions contained in the statement. Provided the holder of the incidental take statement is in compliance with all terms and conditions, the take exemption remains in place even if the extent of take as described by a surrogate is exceeded (16 U.S.C. 1536(o)(2); 50 CFR 402.14(i)(5)). However, if the extent of take is exceeded, the regulations require the action agency to immediately reinitiate consultation (50 CFR 402.14(i)(4)).

*Issue 6:* Several commenters recommended the Services to replace the "not practical" standard in the proposed change to § 402.14(i)(1)(i) with a "scientifically impractical" standard.

*Response:* The Services decline to make this change. The Services consider the best scientific and commercial data available in determining whether it is not practical to express the amount of take in terms of individuals of the listed species. In making this determination, the Services must take into account relevant considerations, some of which may be considered broader than "scientifically impractical," such as the scope and scale of the proposed action relative to the costs of any monitoring necessary to determine take of individuals of the listed species from the action.

*Issue 7:* One commenter recommended that the Services delete reference to examples of surrogates in the proposed change to § 402.14(i)(1)(i) because it may be interpreted as an unnecessary limit on the types of surrogates that may be used in an incidental take statement. Another commenter suggested that reference to examples of surrogates should be done only in the preamble section of the rule.

*Response:* The use of examples in this rule is not intended to limit use of surrogates, and any surrogate that meets the standards set forth in this rule would be available.

*Issue 8:* One commenter noted that the use of surrogates in incidental take statements should be done sparingly and under very narrow circumstances to avoid misapplication.

*Response:* As discussed in the preamble, the use of surrogates is fact-pattern specific and dependent on meeting the standards set forth in this rule.

*Issue 9:* One commenter requested the Services to further condition the proposed regulatory standards for the use of surrogates to include a requirement under an incidental take statement to gather data during the term of the Federal action to confirm that effects to the surrogate and the listed species that conform to take are highly likely to correspond.

*Response:* Pursuant to this final rule, use of a surrogate in an incidental take statement is predicated on a finding that measuring take impacts to a listed species is not practical and on establishing a link, based on best available scientific information, between effects of the action to a surrogate and take of the listed species. The Services acknowledge that the body of science relied upon to make that link is likely to vary on a listed species-specific basis. To the extent that a link can be reasonably established, but more information would be helpful, the Services can request the Federal agency or an applicant to collect additional information in the "Conservation Recommendations" section of a biological opinion (*see* pages 4–62 and 4–63 in the Services' Section 7

Handbook). Implementation of the suggested requirement for such information as part of an incidental take statement, if appropriate, would need to comply with the regulatory requirement under § 402.14(i)(2) for the scope of reasonable and prudent measures and terms and conditions to involve only minor changes to the proposed Federal action.

It should also be noted that, in many cases, the surrogate used by the Services in an incidental take statement is habitat or a component of the habitat of the listed species. In those situations, the science related to the habitat requirements and behavior of the listed species informs the analytical basis for findings by the Services that a proposed action is reasonably certain to cause take of the listed species and establishes a causal link between effects to habitat and take of the listed species. For these reasons, quantifying and monitoring take impacts via project effects to the habitat of the listed species is a scientifically credible and practical approach for expressing and monitoring the anticipated level of take for situations where use of a surrogate meets the criteria set forth in this rule. In those instances where insufficient information exists to confirm the causal link, the surrogate would not meet the standard for its use in an incidental take statement. As noted above, the Services can request additional information on such a link in the "Conservation Recommendations" section of a biological opinion (*see* pages 4–62 and 4–63 in the Services' Section 7 Handbook).

The Services intend to prepare implementation guidance for the use of surrogates to supplement the discussion in the Services' Section 7 Handbook and will consider the recommendations provided in public comments as well as in a recent commentary by Murphy and Weiland (2014) on our proposed rule.

*Issue 10:* Several commenters requested the Services clarify if effects to habitat, including designated critical habitat, could be used as a surrogate measure for the amount or extent of anticipated take in an incidental take statement.

*Response:* Effects to habitat can be used as a surrogate for expressing the amount or extent of take of a listed species if the criteria set forth in this final rule are met.

## Required Determinations

### Regulatory Planning and Review (Executive Orders 12866 and 13563)

Executive Order 12866 provides that the Office of Information and Regulatory

Affairs (OIRA) in the Office of Management and Budget will review all significant rules. OIRA has reviewed this rule and has determined that this rule is significant.

Executive Order 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act (5 U.S.C. 601 et seq.)*

Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996; 5 U.S.C. 601 *et seq.*), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare, and make available for public comment, a regulatory flexibility analysis that describes the effect of the rule on small entities (small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of an agency, or his or her designee, certifies that the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a rule will not have a significant economic impact on a substantial number of small entities. We are certifying that this rule will not have a significant economic effect on a substantial number of small entities. The following discussion explains our rationale.

Incidental take statements describe the amount or extent of incidental take that is anticipated to occur when a Federal action is implemented. The incidental take statement conveys an exemption from the ESA's take prohibitions provided that the action agency (and any applicant) complies with the terms and conditions of the incidental take statement. Terms and conditions cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes (50 CFR 402.14(i)(2)). The regulatory changes addressed in this rule will neither expand nor contract the reach of terms and conditions of an incidental take statement. As such, we foresee no economic effects from implementation of this final rule.

*Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.)*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 *et seq.*):

(a) This final rule will not "significantly or uniquely" affect small governments. We have determined and certify under the Unfunded Mandates Reform Act, 2 U.S.C. 1502 *et seq.,* that this rulemaking will not impose a cost of $100 million or more in any given year on local or State governments or private entities. A Small Government Agency Plan is not required. As explained above, small governments would not be affected because the revised regulations will not place additional requirements on any city, county, or other local municipalities.

(b) This rule will not produce a Federal mandate of $100 million or greater in any year (*i.e.,* it is not a "significant regulatory action" under the Unfunded Mandates Reform Act). This regulation would not impose any additional management or protection requirements on the States or other entities.

*Takings (E.O. 12630)*

In accordance with E.O. 12630, we have determined that the final rule does not have significant takings implications. A takings implication assessment is not required because this rule (1) will not effectively compel a property owner to suffer a physical invasion of property and (2) will not deny all economically beneficial or productive use of the land or aquatic resources. This rule would substantially advance a legitimate government interest (conservation and recovery of listed species) and would not present a barrier to all reasonable and expected beneficial use of private property.

*Federalism (E.O. 13132)*

In accordance with E.O. 13132, we have considered whether this final rule has significant Federalism effects and have determined that a Federalism assessment is not required. This rule would not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. No intrusion on State policy or administration is expected; roles or responsibilities of Federal or State governments would not change; and fiscal capacity would not be substantially directly affected. Therefore, this rule does not have significant Federalism effects or implications to warrant the preparation of a Federalism Assessment under the provisions of E.O. 13132.

*Civil Justice Reform (E.O. 12988)*

This final rule will not unduly burden the judicial system and meets the applicable standards provided in sections (3)(a) and (3)(b)(2) of E.O. 12988.

*Government-to-Government Relationship with Tribes*

In accordance with the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951), E.O. 13175, and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with affected Federally recognized Tribes on a government-to-government basis. We have determined that there are no tribal lands affected by this rule, and, therefore, no such communications were made.

*Paperwork Reduction Act*

This final rule does not contain collections of information that require approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid OMB control number.

*National Environmental Policy Act*

The Services have determined that this final rule will not result in any reasonably foreseeable effects to the environment and, therefore, that further NEPA review is not required. First, the rule codifies existing practices and case law with respect to use of surrogates and this codification of the status quo does not result in foreseeable environmental effects. Second, the timing of issuance of the incidental take statement will not change the substantive protections afforded to species and therefore the Service's regulations do not change the on-the-ground effects of incidental take statements. Finally, the update to the

regulations does not result in environmental impacts because it merely clarifies the Services' longstanding position since the Ninth Circuit's decision in *Arizona Cattle Growers' Ass'n.* that an incidental take statement may be issued only when there is "reasonable certainty" that take of listed species will occur.

To the extent the rule would result in reasonably foreseeable environmental effects, the Services have determined that the rule is categorically excluded from further NEPA review and that no extraordinary circumstances are present. The rule qualifies for two categorical exclusions at 43 CFR 46.210(i) and NOAA Administrative Order (NAO) 216–6, section 6.03c.3(i). Among other things, the exclusions apply to regulations that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case by case. 43 CFR 46.210. *See also* NAO section 216–6 6.03c.3(i) (substantively the same exclusion).

First, the rule is of a legal, technical, or procedural nature. For surrogates, the rule clarifies when the Services may use a surrogate to establish the amount or extent of take. This clarification is consistent with the Services' existing national policy and applicable case law. For programmatic actions, the rule clarifies the procedural timing of when the Services will issue an incidental take statement. It does not alter substantive protections. Finally, the rule codifies the Services' longstanding interpretation of their existing regulations post *Arizona Cattle Growers' Ass'n.* that an incidental take statement can be issued only if there is "reasonable certainty" that take will occur.

Second, any potential impacts of this rule are too broad, speculative, and conjectural to lend themselves to meaningful analysis and will be examined as part of any NEPA analysis conducted by the Federal action agency. As explained above, the changes in the rule generally constitute clarifications that are consistent with existing practices as well as case law. As such, it would be speculative to try to analyze the effects of the codification of these practices. Furthermore, these changes apply to the nationwide implementation of section 7 consultations, which take place in a wide variety of contexts, for various activities, for and with numerous action agencies. This application allows analysis only at the broadest level and would not permit

meaningful analysis. Furthermore, before any action is taken, the responsible action agency will be required to conduct any necessary NEPA analyses, including impacts to listed species and critical habitat. For these reasons, the second categorical exclusion applies to this rule.

Additionally, none of the extraordinary circumstances listed at 43 CFR 46.215 and NAO 216–6 section 5.05c are triggered by the final rule. This rule does not involve a geographic area with unique characteristics, is not the subject of public controversy based on potential environmental consequences, will not result in uncertain environmental impacts or unique or unknown risks, does not establish a precedent or decision in principle about future proposals, will not have significant cumulative impacts, and will not have any adverse effects upon endangered or threatened species or their habitats for the reasons identified above.

In making this determination, the Services have considered whether adequate opportunities for public comment on the rule, including its potential environmental effects, have been provided. Our review of the proposed rule and the comments received on that proposal demonstrated that preparation of an Environmental Assessment is not necessary to obtain public input on this rule. Commentators had the opportunity to weigh in on the various aspects of this final rule and the final rule has been shaped, in part, by those comments. We conclude that preparation of an Environmental Assessment would not result in meaningful additional opportunities for comment, nor would it be likely to provide the Services with significant additional information to guide their decisionmaking process.

*Energy Supply, Distribution or Use (E.O. 13211)*

E.O. 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. This rule is not expected to significantly affect energy supplies, distribution, and use. Because this action is not a significant energy action, no Statement of Energy Effects is required.

Authority

We are taking this action under the authority of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

List of Subjects in 50 CFR Part 402

Endangered and threatened wildlife, Fish, Intergovernmental relations, Plants (agriculture).

Regulation Promulgation

Accordingly, we amend subpart B of part 402, subchapter A of chapter IV, title 50 of the Code of Federal Regulations, as set forth below:

PART 402—[AMENDED]

■ 1. The authority citation for part 402 continues to read as follows:

**Authority:** 16 U.S.C. 1531 *et seq.*

■ 2. Amend § 402.02 by adding definitions for *Framework programmatic action* and *Mixed programmatic action* in alphabetical order to read as follows:

§ 402.02  Definitions.

\*    \*    \*    \*    \*

*Framework programmatic action* means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

\*    \*    \*    \*    \*

*Mixed programmatic action* means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

\*    \*    \*    \*    \*

■ 3. Amend § 402.14 by:
■ a. Revising paragraphs (g)(7) and (i)(1)(i);
■ b. Revising the second sentence of paragraph (i)(3); and
■ c. Adding paragraph (i)(6).
The revisions and additions read as follows:

§ 402.14  Formal consultation.

\*    \*    \*    \*    \*

(g) \*    \*    \*
(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

\*    \*    \*    \*    \*

(i) \*    \*    \*
(1) \*    \*    \*

122a

(i) Specifies the impact, *i.e.,* the amount or extent, of such incidental taking on the species (A surrogate (*e.g.,* similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded.);

\*    \*    \*    \*    \*

(3) \* \* \* The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

\*    \*    \*    \*    \*

(6) For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

\*    \*    \*    \*    \*

Dated: December 23, 2014.

**Michael J. Bean,**

*Principal Deputy Assistant Secretary for Fish and Wildlife and Parks, U.S. Department of the Interior.*

Dated: April 30, 2015.

**Samuel D. Rouch, III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

[FR Doc. 2015–10612 Filed 5–8–15; 8:45 am]

**BILLING CODE 4310–55–3510–22–P**

**123a**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OW–2018–0640; FRL–10014–54– Region 4]

### Florida's Request To Assume Administration of a Clean Water Act Section 404 Program

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice and request for comments.

**SUMMARY:** The Clean Water Act (CWA) established the Section 404 program, under which the U.S. Army Corps of Engineers (Corps) may issue permits for the discharge of dredged or fill material into "waters of the United States," as identified in the CWA. Section 404(g)(1) of the CWA authorizes states and tribes to administer their own permit program for the discharge of dredged or fill material into navigable waters, other than those waters that the CWA reserves as subject to Corps jurisdiction. On August 20, 2020, the Environmental Protection Agency (EPA) received from the Governor of the State of Florida, a complete program submission for regulating discharges of dredged or fill material into waters within the jurisdiction of the State in accordance with the CWA. Pursuant to CWA Section 404(h) and EPA's implementing regulations, EPA will hold public hearings and is opening a 45-day comment period. EPA is also initiating a programmatic consultation under Section 106 of the National Historic Preservation Act (NHPA) and is soliciting comments pursuant to NHPA implementing regulations during the 45-day comment period.

**DATES:** Comments on EPA's decision to approve or disapprove under CWA Section 404 must be received on or before November 2, 2020. Comments associated with the consultation under section 106 of the NHPA may also be submitted on or before November 2, 2020. EPA intends to approve or disapprove the State of Florida's request to assume administration of a CWA Section 404 program by December 17, 2020.

**ADDRESSES:** You may send comments on both actions (Florida's request to assume a CWA Section 404 program and EPA's consultation under NHPA section 106), identified by Docket ID No. EPA– HQ–OW–2018–0640, by any of the following methods:

• *www.regulations.gov:* Follow the on-line instructions for submitting comments and accessing the docket and materials related to this notice.

• *Email: 404Assumption-FL@epa.gov.*

• *Mail:* Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303.

*Instructions:* All submissions received must include the Docket ID No. EPA– HQ–OW–2018–0640 for these actions. Comments received may be posted without change to *https:// www.regulations.gov/*, including any personal information provided.

Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov/* or email at *404Assumption-FL@epa.gov,* as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The virtual hearings will be held on October 21, 2020 and October 27, 2020. The hearing held on October 21, 2020 will convene at 9:00 a.m. and will conclude no later than 12:00 p.m. EDT. The hearing on October 27, 2020 will convene at 5:00 p.m. EDT and will conclude not later than 8:00 p.m. EDT. For information about registration for these virtual public hearings, please see *https://www.epa.gov/aboutepa/about- epa-region-4-southeast.*

**FOR FURTHER INFORMATION CONTACT:** Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303; (404) 562–9262; email address: *404Assumption-FL@epa.gov.*

**SUPPLEMENTARY INFORMATION:** The State's submission may be read online through the Federal eRulemaking Portal, Docket No. EPA–HQ–OW–2018–0640, the EPA's Docket Center, available at *https://www.regulations.gov.* The State's submission is also on file and may be inspected and copied (for a per page charge) at the EPA Docket Center Reading Room located at WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. Due to COVID–19, access to the EPA Docket Center Reading Room will be allowed by appointment only. Procedures to make an appointment to visit the EPA Docket Center Reading Room can be found at *https://*

*www.epa.gov/dockets/epa-docket- center-reading-room.*

## Table of Contents

I. General Information
    A. Does this action apply to me?
    B. What should I consider as I prepare my comments?
    C. How can I participate in the virtual public hearing?
II. Background
    A. Clean Water Act Section 404(g)
    B. National Historic Preservation Act Section 106 Consultation
    C. Endangered Species Act Consultation

## I. General Information

### A. Does this action apply to me?

States and tribes that have assumed or are considering assuming the administration of a CWA Section 404 dredged or fill material permitting program as well as regulated entities and members of the public in the State of Florida may be interested in providing input on the issues described in this document.

Tribal and State Historic Preservation Offices as well as members of the public with knowledge of or interest in the identification (and location) of historic properties in the State of Florida, the effects of discharges from dredged or fill activities into waters of the United States on these historic properties, or ways to mitigate or avoid adverse effects of such discharges may be interested in commenting on EPA's consultation on this action under section 106 of the NHPA.

### B. What should I consider as I prepare my comments?

Comments may consider whether the state program meets the requirements of Section 404(g) of the CWA and its implementing regulations. Comments may also consider the impacts of EPA's approval or disapproval of Florida's request on historic sites located within the State of Florida in accordance with section 106 of the NHPA.

Submit your comments, identified by Docket ID No. EPA–HQ–OW–2018– 0640, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. EPA may publish any comment received to its public docket. Do not submit to EPA's public docket any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment

is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.*

The EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov/* as there may be a delay in processing mail and faxes. Hand deliveries or couriers will be received by scheduled appointment only. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets.*

EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our federal partners so that we can respond rapidly as conditions change regarding COVID–19.

*C. How can I participate in the virtual public hearing?*

EPA is deviating from its typical approach because the President has declared a national emergency. Because of current CDC recommendations, as well as state and local orders for social distancing to limit the spread of COVID–19, EPA cannot hold in-person public meetings at this time.

The virtual hearings will be held on October 21, 2020 and October 27, 2020. The hearing held on October 21, 2020 will convene at 9:00 a.m. and will conclude no later than 12:00 p.m. EDT. The hearing held on October 27, 2020 will convene at 5:00 p.m. EDT and will conclude not later than 8:00 p.m. EDT.

EPA will begin pre-registering speakers and listen-only attendees for the hearings upon publication of this notice in the **Federal Register**. For a link to the on-line registration page, please visit *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.* Immediately following registration, you will receive an email confirming your registration and providing a unique link to the webinar. Speakers will be signed up to speak in the order that their registration is received. The last day to

pre-register to speak at a hearing will be October 9, 2020. On October 20, 2020, EPA will post a general agenda for the hearing that will list the order of pre-registered speakers and their approximate timeslots at: *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.* Please note that timeslots will be estimated and speakers are encouraged to join the webinar at least 15 minutes prior to the start of their estimated speaking time.

EPA will make every effort to follow the schedule as closely as possible on the day of the hearing; however, please plan for the hearings to run either ahead of schedule or behind schedule.

Oral comments shall be limited to no more than five (5) minutes. EPA recommends that commenters prepare their oral statement in advance to ensure it can be completed within five minutes. EPA also recommends that commenters also submit the text of their oral comments (with any relevant supplementary information) as written comments to the rulemaking docket. EPA encourages commenters to provide EPA with a copy of their oral testimony electronically (via email) by emailing it to Mr. Kelly Laycock at *404Assumption-FL@epa.gov.*

EPA may ask clarifying questions during the oral testimony but will not respond to the comments at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing. The proceedings of the hearings will be recorded. After the public hearing, verbatim transcripts of the sessions will be included in the rulemaking docket.

Please note that any updates made to any aspect of the hearing will be posted online at *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.* While EPA expects the hearing to go forward as set forth above, please monitor our website to determine if there are any updates. EPA does not intend to publish a document in the **Federal Register** announcing updates.

To request services for special accommodations, please pre-register for the hearing with Mr. Kelly Laycock at *404Assumption-FL@epa.gov* and describe your needs by October 7, 2020. EPA will seek to arrange special accommodations as needed to support hearing participation if given advanced notice.

## II. Background

*A. Clean Water Act Section 404(g)*

The CWA established the Section 404 program, under which the Secretary of the Army, acting through the Chief of Engineers of the Corps, may issue permits for the discharge of dredged or fill material into waters of the United States as identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction.

The regulations establishing the requirements for the approval of state or tribal programs under section 404 of the CWA were published in the **Federal Register**, at 53 FR 20764, (June 6, 1988) (40 CFR parts 232 and 233), and can be accessed at *https://www.epa.gov/cwa404g/statutory-and-regulatory-requirements-assumption-under-cwa-section-404.* "State regulated waters" are defined in 40 CFR 232.2 as "those waters of the United States in which the Corps suspends the issuance of Section 404 permits upon approval of a state's section 404 permit program by the Administrator under section 404(h). The program cannot be transferred for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to the high tide line, including wetlands adjacent thereto." The Corps retains CWA Section 404 permitting authority over waters of the United States within "Indian country" as that term is defined at 18 U.S.C. 1151, unless a tribe has assumed the 404 program within Indian country. *See* 40 CFR 233.1(b).

A state application to administer a Section 404 program must include the following: (a) A letter from the Governor of the state requesting program approval; (b) a complete program description as set forth in 40 CFR 233.11; (c) an Attorney General's statement or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 CFR 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 CFR 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 CFR 233.14; and (f) copies of all applicable state statutes and regulations, including those governing applicable

state administrative procedures. 40 CFR 233.10.

EPA has reviewed the State of Florida's program submission and consistent with 40 CFR 233.15 has determined that it is a complete request for State program approval that meets the submittal requirements of 40 CFR 233.10. The Governor's request proposes that FDEP administer a permit program for regulated activities in waters regulated by the State under section 404(g)(1), as identified in the Memorandum of Agreement with the Secretary of the Army, in accordance with section 404 of the CWA. The main statutory and regulatory authorities to administer and enforce the State 404 program can currently be found in the State's submission to assume the program and are available on FDEP's web page at *https://floridadep.gov/water/water/content/water-resource-management-rules.*

The State 404 program would provide for the issuance of general permits and individual permits. The State has adopted 38 general permits which are listed in 62–331 F.S. as part of their package submittal. A complete description of the individual permit process and the standards for granting of an individual permit are found at 62–331 F.S. In addition, there are standard requirements for all regulated activities in State-assumed waters. No permit shall be issued in certain specified circumstances, including when the permit does not comply with the requirements of the CWA or implementing regulations, including the CWA Section 404(b)(1) Guidelines. 40 CFR 233.20. Florida's laws outline a number of requirements applicable to State 404 permits, including that "no dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences," and an individual permit cannot be issued if it "[c]auses or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved . . ." by FDEP at 62–331.053 F.S.

Currently, Florida operates the Environmental Resource Permit program (ERP), which regulates the disposal of dredged or fill material into waters of the State under State law. State-regulated activities under ERP that go beyond the purview of the CWA are not subject to EPA approval or oversight under 40 CFR part 233.

The Memorandum of Agreement between FDEP and the Secretary of the Army, available in the docket for this action, identifies procedures for the transfer of all pending permit applications for discharges into the waters assumed by the State. 40 CFR 233.14. Pursuant to the Memorandum of Agreement, existing Section 404 permits already issued by the Corps as of the effective date of State assumption will remain with the Corps during the already approved lifespan of that permit.

The Regional Administrator is required to approve a state request to assume the Section 404 program unless the state program does not meet the requirements of Section 404(h) of the CWA and its implementing regulations. Among other authorities, the state must have: (1) Adequate authority to issue permits which comply with all pertinent requirements of the CWA, including but not limited to, the Section 404(b)(1) Guidelines, and which may be issued for fixed terms not to exceed 5 years; (2) adequate authority, including civil and criminal penalties, to abate violations of the permit or permit program; and (3) authority to ensure that the Administrator, the public, and any other affected state or tribe are given notice of each permit application and that the public and affected states and tribes are provided an opportunity for public hearing before a ruling on each such application. 33 U.S.C. 1344(h)(1).

The procedures for EPA's review and approval or disapproval of a state Section 404 program are outlined in 40 CFR 233.15. In summary, once a state submits an assumption package that is complete, a 120-day statutory review period commences, which may be extended by mutual agreement of the state and EPA. EPA shall provide copies of a complete assumption package within 10 days of receipt to the Corps, the National Marine Fisheries Service (NMFS), and the United States Fish and Wildlife Service (USFWS) for review and comment. Within 90 days of EPA's receipt of a complete program submission, the Corps, FWS, and NMFS shall submit to EPA any comments on the state program. EPA shall publish notice of the state's application in the **Federal Register**, state newspapers, and via mail to interested parties. EPA shall provide for a public comment period of not less than 45 days as well as a public hearing not less than 30 days after such notice is published in the **Federal Register**. EPA shall also provide notice of an opportunity to consult to federally recognized Indian tribes in the state.

Within 120 days of receipt of a complete program submission (unless

EPA and the state extend the statutory review period), EPA shall approve or disapprove the program based on whether the state's program fulfills the requirements of the Act and 40 CFR part 233, taking into consideration all comments received. EPA will prepare a summary of significant comments received and responses to these comments, as well as respond individually to comments received from the Corps, USFWS, and NMFS.

If EPA approves Florida's program, EPA will notify the State and the Corps and publish notice in the **Federal Register**. Transfer of the program to the State is not effective until this notice is published. EPA may only disapprove the State's program if it is inconsistent with the requirements of the CWA and 40 CFR part 233. If EPA disapproves the State's program it shall notify the State of the reasons for the disapproval and of any revisions or modifications to the State's program which are necessary to obtain approval. If the State resubmits a program submission remedying the identified problem areas, the approval procedure and statutory review period shall begin upon receipt of the revised submission. EPA maintains oversight of State-issued permits pursuant to 40 CFR 233.50.

If EPA approves this program, EPA will also codify the approved program in 40 CFR 233 subpart H.

*B. National Historic Preservation Act Section 106 Consultation*

In accordance with 36 CFR 800.2(d), EPA is providing information and seeking comment on EPA's potential approval of Florida's request to assume a CWA Section 404 program and any potential effects of such approval on historic properties. The National Historic Preservation Act of 1966, as amended, (NHPA) establishes historic preservation as a federal agency policy and provides for the identification and protection of historic properties and resources. Section 106 of the NHPA requires federal agencies to take into account the effects of their undertakings on historic properties that are listed or eligible for listing on the National Register of Historic Places and provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment with regard to such undertakings. The approval of the State of Florida's request to assume the CWA Section 404 program would be an undertaking pursuant to 36 CFR 800.16(y), and therefore, in accordance with Section 106 of the NHPA and the ACHP's implementing regulations at 36 CFR part 800, EPA has initiated consultation regarding this undertaking.

126a

EPA has invited the ACHP, FDEP, the State Historic Preservation Officer (SHPO), and Indian tribes with interests in the State of Florida to participate as consulting parties.

The State's administration of the Section 404 program and its issuance of permits over time has the potential to affect historic properties, including cultural resources or historic properties of religious and cultural significance. FDEP and the SHPO have entered into an Operating Agreement which sets forth a process to identify historic properties that may be impacted by Florida's issuance of Section 404 permits, and to develop recommendations for resolving adverse effects. As discussed in the State's Operating Agreement, such effects could potentially include, but are not limited to, the following:

i. Physical destruction of or damage to all or part of the property, including inundation;

ii. Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access;

iii. Change of the character of the property's use or of physical features within the property's setting, or impacts to the landscape that contribute to its historic significance;

iv. Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features; and

v. Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian Tribe.

Pursuant to the Operating Agreement, if the parties cannot reach agreement on the determination or resolution of effects, they may forward any outstanding issues to EPA for decision-making consistent with EPA's permitting review authorities under 40 CFR 233.50. The Operating Agreement provides comprehensive procedures for assessing the effects of Florida's 404 program on historic properties and therefore will considerably inform EPA's Section 106 consultation.

EPA solicits comments on this undertaking and any potential effects on historic properties at the Federal eRulemaking Portal, Docket No. EPA–HQ–OW–2018–0640. The comment period closes November 2, 2020.

*C. Endangered Species Act Consultation*

The Endangered Species Act (ESA) Section 7 directs each federal agency to ensure, in consultation with the USFWS and NMFS, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). EPA views consultation under ESA Section 7 to be required if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. EPA's position is set forth in a memorandum issued by David P. Ross, Assistant Administrator for the Office of Water, dated August 27, 2020, following the consideration of comments received during a public participation process that is outside of the scope of this notice. Accordingly, EPA is conducting ESA Section 7 consultation during the Agency's review of the State of Florida's request to assume administration of a CWA Section 404 program because EPA has determined that the Agency's potential approval of the program may affect ESA-listed species or designated critical habitat. *See https://www.epa.gov/ cwa404g/consultation-cwa-section-404-program-requests-endangered-species-act-and-national-historic* for more information regarding EPA's position on ESA Section 7 consultation under CWA Section 404(g).

Dated: September 2, 2020.

**Mary Walker,**

*Regional Administrator, EPA Region 4.*

[FR Doc. 2020–19881 Filed 9–15–20; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–OAR–2011–0371; FRL 10014–33–OAR]**

## Proposed Information Collection Request; Comment Request; National Volatile Organic Compounds Emission Standards for Architectural Coatings (Renewal)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** The Environmental Protection Agency (EPA) is planning to submit an information collection request (ICR), titled, National Volatile Organic Compounds Emission Standards for Architectural Coatings to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act (PRA). Before doing so, the EPA is soliciting public comments on specific aspects of the proposed information collection as described below. This is a proposed extension of the ICR, which is currently approved through June 30, 2021. An Agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

**DATES:** Comments must be submitted on or before November 16, 2020.

**ADDRESSES:** Submit your comments, referencing Docket ID No. EPA–OAR–2011–0371, online using *https:// www.regulations.gov/* (our preferred method), by email to *a-and-r-docket@ epa.gov,* or by mail to: EPA Docket Center, Environmental Protection Agency, Mail Code 28221T, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

The EPA's policy is that all comments received will be included in the public docket without change including any personal information provided, unless the comment includes profanity, threats, information claimed to be Confidential Business Information, or other information whose disclosure is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** J. Kaye Whitfield, Sector Policies and Programs Division, Office of Air Quality Planning and Standards, D243–02, Research Triangle Park, North Carolina 27711, telephone number: 919–541–2509; fax number: 919–541–4991; email address: *whitfield.kaye@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Supporting documents which explain in detail the information that the EPA will be collecting are available in the public docket for this ICR. The docket can be viewed online at *https:// www.regulations.gov/.* Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov/* or email, as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on EPA Docket Center services and the current status, please visit us online at *https:// www.epa.gov/dockets.* The telephone number for the Docket Center is 202–566–1744.

Pursuant to section 3506(c)(2)(A) of the PRA, the EPA is soliciting comments and information on National Volatile Organic Compounds Emission Standards for Architectural Coatings

**127a**

the subsequent need to complete all federal authorizations within 90 days of the date of issuance of the Commission staff's EA.

Persons who wish to comment only on the environmental review of this project should submit an original and two copies of their comments to the Secretary of the Commission. Environmental commenter's will be placed on the Commission's environmental mailing list and will be notified of any meetings associated with the Commission's environmental review process. Environmental commenter's will not be required to serve copies of filed documents on all other parties. However, the non-party commenters, will not receive copies of all documents filed by other parties or issued by the Commission and will not have the right to seek court review of the Commission's final order.

The Commission strongly encourages electronic filings of comments, protests and interventions in lieu of paper using the eFile link at *http://www.ferc.gov.* Persons unable to file electronically may mail similar pleadings to the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426. Submissions sent via any other carrier must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, Maryland 20852.

Dated: December 16, 2020.

**Kimberly D. Bose,**

*Secretary.*

[FR Doc. 2020–28248 Filed 12–21–20; 8:45 am]

**BILLING CODE 6717–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OW–2018–0640; FRL–10018–92–Region 4]**

### EPA's Approval of Florida's Clean Water Act Section 404 Assumption Request

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice.

**SUMMARY:** On August 20, 2020, the Environmental Protection Agency (EPA) received from the Governor of the State of Florida a complete program submission to assume regulating discharges of dredged or fill material into waters within the jurisdiction of the State in accordance with Clean Water Act (CWA) section 404(g–l). Receipt of the package initiated a 120-day statutory review period. After careful review of the package submitted, as well as

consideration of comments submitted on the package by the U.S. Fish and Wildlife Service (USFWS), the National Marine Fisheries Service (NMFS), and the U.S. Army Corps of Engineers (Corps), comments received during consultation with tribes, and over 3,000 comments received from the public, EPA has determined that the State of Florida has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g–l) and EPA's implementing regulations. Therefore, EPA has taken final action to approve Florida's assumption of the program.

**DATES:** Florida's program assumption will be applicable December 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303; telephone number: (404) 562–9262; email address: *404Assumption-FL@epa.gov.*

**SUPPLEMENTARY INFORMATION:** The CWA established the Section 404 program, under which the Secretary of the Army, acting through the Chief of Engineers of the Corps, may issue permits for the discharge of dredged or fill material into waters of the United States as identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction.

The regulations establishing the requirements for the approval of state or tribal programs under section 404 of the CWA were published in the **Federal Register** at 53 FR 20764 (June 6, 1988) (40 CFR parts 232 and 233), and can be accessed at *https://www.epa.gov/cwa404g/statutory-and-regulatory-requirements-assumption-under-cwa-section-404.* ''State regulated waters'' are defined in 40 CFR 232.2.

The Corps generally retains CWA Section 404 permitting authority over waters of the United States within ''Indian country'' as that term is defined at 18 U.S.C. 1151, unless a tribe has assumed administration of a CWA Section 404 program within Indian country. *See* 40 CFR 233.1(b).

A state application to administer a Section 404 program must include the following: (a) a letter from the Governor of the state requesting program approval; (b) a complete program description as set forth in 40 CFR 233.11; (c) an Attorney General's statement or a statement from the attorney for that state or interstate agencies which have independent legal counsel, as set forth in 40 CFR 233.12;

(d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 CFR 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 CFR 233.14; and (f) copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures. 40 CFR 233.10.

On September 16, 2020, EPA published a **Federal Register** notice of its receipt of a complete program assumption request package (85 FR 57853), opened a public comment period, and scheduled two virtual public hearings on the Section 404 program submitted by Florida. EPA held virtual public hearings on October 21, 2020, and October 27, 2020, and received comments submitted to Docket ID No. EPA–HQ–OW–2018–0640 during the public comment period which ended November 2, 2020. EPA received and reviewed over 3,000 comments submitted during the comment period and public hearings, comments provided during tribal consultation, as well as comments from USFWS, NMFS, and the Corps. EPA also consulted under section 7 of the Endangered Species Act with the USFWS, and under section 106 of the National Historic Preservation Act (NHPA) with the Advisory Council on Historic Preservation (ACHP), the Florida State Historic Preservation Officer (Florida SHPO), the Florida Department of Environmental Protection (FDEP), and Indian tribes with interests in the State of Florida on its decision whether to approve Florida's program request. On December 16, 2020, EPA entered into a programmatic agreement with the ACHP, the Florida SHPO, and FDEP which evidences EPA's compliance with section 106 of the NHPA and its implementing regulations. The programmatic agreement became effective on December 16, 2020. EPA has concluded that the State of Florida and FDEP have the necessary authority to operate a program in accordance with the requirements found in CWA section 404 and 40 CFR part 233. EPA has met its requirements under ESA section 7(a)(2) by completing ESA consultation and receiving a ''no jeopardy'' Biological Opinion from the USFWS on November 17, 2020. A summary of the comments received, EPA's responses to the comments, and a memorandum documenting the basis for EPA's decision (''State of Florida's Request to Assume a Clean Water Act Section 404 Program'', December 17, 2020) can be found in the docket for this action

128a

(Docket ID No. EPA–HQ–OW–2018–0640).

All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form at the EPA Docket Center and Reading Room. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets*. Publicly available docket materials are available electronically through *http://www.regulations.gov*.

Dated: December 17, 2020.

**Mary Walker,**

*Regional Administrator, EPA Region 4.*

[FR Doc. 2020–28232 Filed 12–18–20; 4:15 pm]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OLEM–2020–0527; FRL–10017–07–OLEM]**

**RIN 2050–ZA18**

## Interim PFAS Destruction and Disposal Guidance; Notice of Availability for Public Comment

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability for public comment.

**SUMMARY:** The National Defense Authorization Act for Fiscal Year 2020 (FY 2020 NDAA) was signed into law on December 19, 2019. Section 7361 of the FY 2020 NDAA directs the U.S. Environmental Protection Agency (EPA) to publish interim guidance on the destruction and disposal of perfluoroalkyl and polyfluoroalkyl substances (PFAS) and materials containing PFAS. The EPA is releasing the interim guidance for public comment. The guidance provides information on technologies that may be feasible and appropriate for the destruction or disposal of PFAS and PFAS-containing materials. It also identifies needed and ongoing research and development activities related to destruction and disposal technologies, which may inform future guidance.

**DATES:** Comments must be received on or before February 22, 2021.

**ADDRESSES:** You may send comments, identified by Docket ID No EPA–HQ–OLEM–2020–0527, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

• *Agency website: www.epa.gov/pfas.* Follow the online instructions for submitting comments.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, OLEM Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand Delivery/Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided.

Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov/,* as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Carlos Pachon, TIFSD, OSRTI, OLEM, 5023P, Environmental Protection Agency, 1200 Pennsylvania Ave. NW; email address, *pachon.carlos@epa.gov* or visit *www.epa.gov/pfas.*

**SUPPLEMENTARY INFORMATION:**

### I. General Information

*A. Does this action apply to Me?*

This interim guidance provides a summary of EPA's current knowledge of technologies for destruction or disposal of PFAS and PFAS-containing materials. This information may be useful to EPA staff, other federal agencies, states, tribes, and local governments, the public, including environmental and public interest groups, as well as commercial and industry groups.

**Peter Wright,**

*Assistant Administrator, Office of Land and Emergency Management.*

[FR Doc. 2020–28376 Filed 12–18–20; 4:15 pm]

**BILLING CODE 6560–50–P**

---

## FEDERAL DEPOSIT INSURANCE CORPORATION

## Notice to All Interested Parties of Intent To Terminate Receiverships

*Notice is hereby given* that the Federal Deposit Insurance Corporation (FDIC or Receiver), as Receiver for the institutions listed below, intends to terminate its receivership for said institutions.

NOTICE OF INTENT TO TERMINATE RECEIVERSHIPS

| Fund | Receivership name | City | State | Date of appointment of receiver |
|------|-------------------|------|-------|-------------------------------|
| 10109 ..... | Bradford Bank | Baltimore | MD | 08/28/2009 |
| 10110 ..... | Affinity Bank | Ventura | CA | 08/28/2009 |
| 10156 ..... | Greater Atlantic Bank | Reston | VA | 12/04/2009 |
| 10184 ..... | George Washington Savings Bank | Orland Park | IL | 02/19/2010 |
| 10192 ..... | Sun American Bank | Boca Raton | FL | 03/05/2010 |
| 10250 ..... | Nevada Security Bank | Reno | NV | 06/18/2010 |
| 10254 ..... | USA Bank | Port Chester | NY | 07/09/2010 |
| 10263 ..... | First National Bank of the South | Spartanburg | SC | 07/16/2010 |
| 10419 ..... | The First State Bank | Stockbridge | GA | 01/20/2012 |