ORAL ARGUMENT NOT YET SCHEDULED

No. 24-5101

# In the United States Court of Appeals for the District of Columbia Circuit

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,

*Appellees*,

v.

MICHAEL S. REGAN,
IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR FOR THE U.S.
ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Defendants*,

STATE OF FLORIDA AND
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,

*Appellants.*

## AMICI CURIAE BRIEF OF
## THE FLORIDA CHAMBER OF COMMERCE, ET AL.
## IN SUPPORT OF THE STATE OF FLORIDA AND REVERSAL

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA,
NO. 1:21-CV-119-RDM

MOHAMMAD O. JAZIL
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 270-5938 (phone)
(850) 741-1023 (facsimile)

EDWARD M. WENGER
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

**Lennar Corporation** is publicly traded (LEN), and two companies (BlackRock and Vanguard) own 10% or more of Lennar Corporation's stock. Lennar Corporation does not have a parent corporation.

The undersigned certifies, under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, that amici curiae are not publicly held corporations or other publicly held entities, and that they have no parent corporations. No publicly held corporation or other publicly held entity owns ten percent (10%) or more of any of these other amicus organizations.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

**Intervenor-Defendant-Appellants:** State of Florida and Florida Department of Environmental Protection.

**Federal Defendants:** Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency; Radhika Fox, in her official capacity as Assistant Administrator for the Office of Water of the U.S. Environmental Protection Agency; Jeffrey Prieto, in his official capacity as General Counsel for the U.S. Environmental Protection Agency; Lawrence Starfield, in his official capacity as Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance for the U.S. Environmental Protection Agency; John Blevins, in his official capacity as Acting Administrator for Region 4 of the U.S. Environmental Protection Agency; Leopoldo Miranda-Castro, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service; Martha Williams, in her official capacity as Principal Deputy Director for the U.S. Fish and Wildlife Service; Scott Spellmon, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; James Booth, in his official capacity as District Commander of the Jacksonville District for the U.S. Army Corps of Engineers; U.S. Environmental Protection Agency; U.S. Army Corps of Engineers; and U.S. Fish and Wildlife Service.

**Plaintiff-Appellees:** Center for Biological Diversity; Defenders of Wildlife; the Sierra Club; the Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

**Additional Parties Before the District Court:** Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd.

**Amici Before the District Court:** Association of Florida Community Developers, Incorporated; Florida Chamber of Commerce; Cameratta Companies LLC; CAM7-SUB, LLC; Lennar Corporation; G.L. Homes; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison; Florida Transportation Builders Association; Florida State Hispanic Chamber of Commerce; and Associated Industries of Florida.

**Amici Before this Court:** Association of Florida Community Developers, Incorporated; Florida Chamber of Commerce; Cameratta Companies LLC; CAM7-SUB, LLC; Lennar Corporation; G.L. Homes; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison; Florida Transportation Builders Association; Florida State Hispanic Chamber of Commerce; and Associated Industries of Florida.

**Rulings Under Review:** The State of Florida and the Florida Department of Environmental Protection have appealed the district court's February 15, 2024 order, as amended on April 12, 2024. That order was made final and appealable on April

12, 2024, when the district court entered a final judgment under Federal Rule of Civil Procedure 54(b).

**Related Cases: None**

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES ................... ii

TABLE OF AUTHORITIES ........................................................................vi

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE .............1

INTRODUCTION & SUMMARY OF THE ARGUMENT ...................................5

    I.    CONGRESS INTENDED THAT STATES WOULD ADMINISTER THE SECTION 404 PERMITTING PROCESS, AND THE DISTRICT COURT'S OPINION RENDERS THAT CONGRESSIONAL DESIRE UNWORKABLE. ........................7

    II.    FLORIDA'S ASSUMPTION OF THE SECTION 404 PERMITTING PROGRAM BENEFITED THE BUSINESS COMMUNITY WHILE PROVIDING MORE ENDANGERED-SPECIES PROTECTION THAN THE FEDERAL GOVERNMENT HAD PREVIOUSLY. ...................................................9

    III.    THE U.S. ARMY CORP OF ENGINEERS STILL IS NOT "OPEN FOR BUSINESS." ...................................................13

CONCLUSION ...................................................................................17

CERTIFICATE OF COMPLIANCE ...................................................19

CERTIFICATE OF SERVICE .............................................................20

# TABLE OF AUTHORITIES

**Cases**

*Tennessee Valley Authority v. Hill*,
   437 U.S. 153 (1978)................................................................8

**Statutes**

Endangered Species Act, 16 U.S.C. § 1531(c),.................................8

Clean Water Act, 33 U.S.C. § 1251 ...........................................5, 7

ESA Amendments of 1982 (Pub. L. 97-304) ...............................9

Pub. L. 93-205 ......................................................................8

Public L. No. 92-500 .............................................................8

**Other Authorities**

122 Cong. Rec. S28, 771-99, S28, 774 (1976).............................8

S. Rep. 95-370, at 78 (1977) ...................................................8

## STATEMENT OF IDENTITY
## AND INTEREST OF AMICUS CURIAE[1]

Amici are well poised to speak on the practical effects of the decision on appeal. They include production homebuilders currently operating across the entire State, businesses, and others affected by the vacatur of state primacy over dredge-and-fill permitting. For example:

**The Florida Chamber of Commerce:** The Chamber was founded in 1916. As an organization, the Chamber's mission has been to encourage a business-friendly climate to spur private-sector job creation and general economic growth, including through regulatory reform and streamlining of state and federal permitting requirements. The Chamber and its members reflect a cross section of Florida. Members include businesses of every size from the large multinational companies to the family businesses. Members provide products and services for, among other things, the tourism industry, construction, agriculture, retail, manufacturing, conservation, and space exploration. The Chamber and its members remain committed to science-based policies for water, land use, energy, and growth that prioritize long-term sustainability over short-term gains. The Chamber and its

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(2), counsel for all parties have provided consent for Amici Curiae to submit this brief for the Court's consideration. No party's counsel authored this brief in whole or in part, and no one besides Amici Curiae contributed money to fund the brief's preparation or submission.

members remain mindful that Florida is a rapidly growing State; over four million new residents are expected to move to Florida by 2030 with nearly two and a half million new drivers on Florida roads who will need nearly two million new jobs. The Chamber therefore advocates for predictable, streamlined, and effective permitting that balances growth with the preservation of unique ecological treasures like the beaches and wetlands so vital to our economy. In helping Florida grow, Chamber members apply for and obtain Section 404 permits for many projects such as community developments (homes, schools, hospitals), environmental restoration projects, and mining operations.

**The Association of Florida Community Developers, Inc.:** Founded in 1984, the AFCD is dedicated to advocating for policies that support high-quality community development across the State of Florida. The AFCD's mission is to provide a leadership role in the creation of quality community developments and the formulation of responsible approaches to the planning and development of Florida's future. Members of the AFCD advocate for an effective and efficient planning and policy framework to encourage and support economic development while retaining Florida's natural beauty (its beaches and wetlands, for example); this balance, the AFCD believes, helps draw tourists and new residents to Florida.

**The Mosaic Company:** A member of the Florida Chamber of Commerce, The Mosaic Company is the world's leading integrated producer of concentrated

phosphate and potash, essential nutrients for fertilizer used throughout the world. Mosaic mines phosphate in Florida's Bone Valley, which contains the largest known deposits of phosphate in the United States. Mosaic's mining activities must comply with various federal, state, and local regulations; permits under Sections 404 and 402 of the Clean Water Act are but two of the necessary authorizations needed for Mosaic to mine in the region and produce agricultural nutrient products. Vacating the Section 404-permitting process in Florida creates needless uncertainty for Mosaic.

**The Florida Homebuilders Association:** A member of the Florida Chamber of Commerce, the Association represents the interests of Florida's homebuilding industry and, more specifically, its 8,145 members throughout the State. Given Florida's unique geography and topography, homebuilders throughout the State often must obtain permits under Section 404 of the Clean Water Act and the State's analogous permitting scheme under Chapter 373 of the Florida Statutes. Vacating the Section 404-permitting process in Florida creates needless uncertainty for the Association and its members as they continue to meet the needs of a growing State.

**The Associated Industries of Florida:** The Associated Industries of Florida (AIF) is the voice of Florida business and represents the interests of a broad group of corporations, professional associations, partnerships, and proprietorships in all business sectors, including agricultural, industrial, manufacturing, power

3

generation, home building, and county and municipal government. It has represented the interests of prosperity and free enterprise before the three branches of state government since 1920. A voluntary association of diversified businesses, AIF was created to foster an economic climate in Florida conducive to the growth, development, and welfare of industry and business and the people of the state.

**Lennar Corporation** is one of America's leading homebuilders. It builds new homes and communities in twenty-six states, and it has built over one million homes since 1954. In Florida, Lennar is the largest homebuilder and builds homes that are designed for first-time homebuyers, move-up, active adult, luxury homebuyers, and cater to all lifestyles and family dynamics.

## INTRODUCTION &
## SUMMARY OF THE ARGUMENT

Florida has three things going for it. It is the fastest growing state in the Nation, with millions projected to move within its borders over the next few decades and billions of dollars of new construction on the horizon. It has a wider-ranging, tremendously diverse ecosystem that is the envy of the rest of the Country. And it being run by State agencies committed to promoting the former while safeguarding the latter.

For that reason, it precisely the sort of state that Congress had in mind when it pronounced that its "policy" would be that the states should "implement the permit programs under section[] . . . 404" of the Clean Water Act. 33 U.S.C. § 1251. This policy is driven by express congressional devotion "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this Act." *Id*. In other words, States know best how to address dredge and fill operations, because they are closer to those actions, and Florida knows better than most.

Applying a crabbed interpretation of the Endangered Species Act, the district court rendered this explicit congressional intention all but impossible to achieve. Rejecting the logic of Second Circuit precedent, the federal government's position

(across multiple administrations), and the State of Florida's position, it held that the federal government (specifically the federal Fish and Wildlife Service) must assess, species-by-species, the level of endangered-species "take" that would likely occur because of Florida's Section 404 permitting-process assumption. Without knowing who might seek permits in which area of Florida at some unknowable time in the future for as-yet-unplanned construction projects, this task cannot be accomplished.

The Endangered Species Act neither requires clairvoyance nor functions as a kill-switch for other congressional priorities and preferences. Logic dictates this conclusion. So, too (as discussed below) does the legislative history of both the Clean Water Act and the Endangered Species Act. Finally, prudence underscores that the district court's order cannot remain in force. In the interest of applying the strictures of the Endangered Species Act, the district court forced the Section 404 permitting process back into the regime with *fewer* protections for Florida's hundreds of endangered and threatened species.

The State has shown why the Plaintiffs do not have standing; indeed, the supposed procedural injury they suffered mirrors the procedural injury advanced by some Amici when they sought to intervene but rejected by the district court on Article III standing grounds.[2]

---

[2] *See* ECF No. 39.

In addition, the Federal Government's halfhearted confession of error regarding consultation with the National Marine Fisheries Service changes nothing; by its own lights, the National Marine Fisheries Service has jurisdiction over roughly three (of several hundred) endangered species in waters *retained* by the Federal Government (not assumed by the State) that might someday be *indirectly* affected by an as-yet-hypothetical Florida-issued Section 404 permit. The Court should not allow this stacked conjecture to sabotage Florida's lawful, economically beneficial, and environmentally protective Section 404 permitting-process assumption.

## ARGUMENT

## I.     CONGRESS INTENDED THAT STATES WOULD ADMINISTER THE SECTION 404 PERMITTING PROCESS, AND THE DISTRICT COURT'S OPINION RENDERS THAT CONGRESSIONAL DESIRE UNWORKABLE.

According to the district court, Florida's assumption of the Section 404 permitting process had to be scuttled because the federal Fish and Wildlife Service "failed to undertake *any* species-specific analysis" when it issued the Endangered Species Act-mandated biological opinion. *See* ECF No. 163, at 57 (emphasis in original). The State has already shown how this renders all but impossible its ability to assume the Section 404 permitting process, which defies the both the text and the spirit of the Clean Water Act. *See* Fla. Br. at 4. So too has the federal government. *See* Fed. Br. at 1-2. Amici write to demonstrate why the legislative history

underlying both the Clean Water Act and the Endangered Species Act render the district court's analysis wholly untenable.

Congress enacted the Clean Water Act in 1972. *See* Public L. No. 92-500. As originally passed, the Clean Water Act housed the Section 404 permitting program solely under the ambit of the U.S. Army Corp of Engineers. Back then, no statutory mechanism allowed a State to assume this process.

One year later, Congress enacted the Endangered Species Act of 1973. *See* Pub. L. 93-205. Stating broadly that "it is the policy of Congress to conserve species," 16 U.S.C. § 1531(c), this Act placed responsibility for implementation on the United States Fish and Wildlife Service. *Id.* § 6(a). In so doing, Congress mandated that the Fish and Wildlife Service "shall cooperate to the maximum extent practicable with the States." *Id.*

In 1977, Congress amended the Clean Water Act. In so doing, it created the Section 404 permitting-assumption process at issue here. While doing so, Congress explained that it intended to streamline and expedite the transfer of the Section 404 permitting process to the states. 122 Cong. Rec. S28, 771-99, S28, 774 (1976); S. Rep. 95-370, at 78 (1977).

In response to the Supreme Court's decision in *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), Congress amended the Endangered Species Act several times in the late 1970s and early 1980s. Critically, these amendments *relaxed* the

Act's strictures to strike a more appropriate balance between protecting species at all costs, and economic growth. Of note, a 1982 amendment declared the policy of Congress to mandate increased cooperation between federal agencies and the States to resolve water-resource issues in connection listed-species conservation, and *in the same enactment*, added Section 7(b) to require the preparation of biological opinions. *See* ESA Amendments of 1982 (Pub. L. 97-304). The district court's use of the biological-opinion requirement to foreclose federal/state cooperation here, then, cannot be squared with manifest congressional intent.

In other words, the Clean Water Act and the Endangered Species Act were enacted, and then amended, in lockstep. As time marched on, Congress moved in a direction of (1) involving the states to a greater degree in preserving the natural resources within their respective borders, and (2) creating additional tractability for economic activity to thrive alongside listed-species protection. Above and beyond the textual and contextual missteps the district court undertook, it also trampled on the flexibly demonstrated by this history. This legislative history, then, provides additional fodder for deciding this case in favor of the State.

## II.  FLORIDA'S ASSUMPTION OF THE SECTION 404 PERMITTING PROGRAM BENEFITED THE BUSINESS COMMUNITY WHILE PROVIDING MORE ENDANGERED-SPECIES PROTECTION THAN THE FEDERAL GOVERNMENT HAD PREVIOUSLY.

Before the district court's erroneous order, the Florida Department of Environmental Protection administered the Section 404 permitting process with

tremendous success. During that time, it issued thousands of Section 404 permits, facilitating a tremendous number of projects throughout one of the Nation's fastest growing states. Without question, Florida's assumption of the Section 404 permitting program allowed the State's growth to flourish while remaining highly protective of the environment.

The reasons why the State could achieve this feat are obvious. Florida knows how to care for its ecological resources. Indeed, long before it assumed the Section 404 permitting process from the U.S. Army Corp of Engineers, the Florida Department of Environmental Protection had been issuing Environmental Resource Permits. According to the information before the district court, 85 percent of the review requirements between the Section 404 permitting process and the Environmental Resource Permit process overlap. This makes sense given that both programs aim to protect and regulate the same basic resources— waterways and wetlands. And the record before the district court established that Florida's Environmental Resource Permit review process is more streamlined, consistent, and predictable than the Corps' Section 404 permitting process. Efficiency matters, and Florida's assumption of the Section 404 permitting process yields efficiency in spades because of Florida's experience in protecting the same basic resources through a similar permitting program that happens to be more streamlined.

This efficiency, moreover, comes at no cost to Florida's listed species. Indeed, a review of the permits the State has issued shows that federally listed species enjoy as much—indeed, more—protection than when the Corps issued Section 404 permits in the State. Florida's regime allows all relevant federal agencies to determine whether a permit application has a "reasonable potential for affecting endangered or threatened species or critical habitat" after public notice, *see* Dkt. No 166 at 10-11, which, notably, extends *more* protection than the run-of-the-mine Section 7 consultation process. At a minimum, though, what was lost on the district court was that, through the technical assistance process, literally the same personnel in the U.S. Fish and Wildlife Service that reviewed the Section 404 permits when the Corps issued them also reviewed the Section 404 permits when the State was doing so. And after the State assumed the Section 404 permitting process, the Florida State Fish and Wildlife Commission added another layer of review.

Before the district court shuttered Florida's operation of the Section 404 permitting process, many permit applications were designated by the U.S. Fish and Wildlife Service as either a "No Effect" projects, or "May Affect, Not Likely to Adversely Affect" ("MANLAA") projects. These designations resulted from Section 7 "informal consultation." By the terms of Florida's Section 404 regime, this informal consultation arose when Florida and a Section 404-permit applicant sought technical assistance from the U.S. Fish and Wildlife Service for species review. If

after reviewing the application, the U.S. Fish and Wildlife Service determined that a project would result in a No Effect or a MANLAA, there arose no need for Section 7 formal consultation because the federal government has already concluded that take was unlikely. Informal consultation through technical assistance (and No Effect/MANLAA designations) arises whether the Florida or the Corps make the determination. And if a project appears like it might result in take, both the federal and state agencies conduct a case-by-case review, and both will add conditions to address or mitigation any potential, incidental take.

Accordingly, the district court's vacatur had the effect of *reducing* protection to listed species. Not only did it inject tremendous regulatory uncertainty; it also removed an added layer of protection that the State imposed when projects represented a risk to endangered species. Insofar as the district court had a concern with endangered-species protection, its order got things backwards.

Permitting conditions do not end at permit issuance, either. The required deliverables between the State and the permittee ensure that the State's program protected listed species. State-imposed permit conditions included monitoring and reporting species information to the State, as well as recording conservation easements (with the State as the beneficiary) to protect species habitat. The regulatory void created by the district court's vacatur means that no agency (federal or state) is either monitoring or enforcing these conditions. The State cannot, because

of the vacatur. And the Corps, for its part, has provided no guidance to permittees regarding permit conditions. Either way, the order has detracted from, rather than augmented, the protection that Florida's wildlife enjoyed while the State was administering the Section 404 permitting system. For that reason, the district court's order was erroneous and should not be allowed to remain in effect.

## III.    THE U.S. ARMY CORP OF ENGINEERS STILL IS NOT "OPEN FOR BUSINESS."

Finally, the federal government's appellate brief warrants a quick response. With precisely no context or detail, the federal government quotes the district court as proclaiming that "'the Corps is open for business today; it has unquestionable legal authority to act; it has substantial experience processing Section 404 permit applications; it can, if appropriate, trigger the Section 7 consultative process; and, where appropriate, that process will lead to issuance by FWS of incidental take statements and any corresponding liability protection.'" Fed. Br. at 64 (quoting ECF No. 183, at 12 (cleaned up)). Respectfully, the view is different from that of those on the ground, like Amici.

As best as Amici can tell, there remains no dispute that Section 404 permits were issued faster when Florida was reviewing them. Many factors such as high workloads, cumbersome permit processes, and staff turnover have historically led to delays in the processing of Section 404 permits by the Corps. These delays lead to

unnecessary expenditures and uncertainty that harm businesses and make it difficult to know where and how to build new projects for the next generation of Floridians.

This matters. Untimely processing of permits causes more than mere delay. Unduly long or unanticipated delays can lead to loss of project funding, increased costs, and even cancellation of a project. In a state growing as fast as Florida, the problems associated with prolonged delays can be ruinous.

Transparency in the process of obtaining a permit is also important. Without transparency, it can be impossible to understand why any one permit condition was imposed, why a condition may have been imposed in one instance but not in another, or why an application was denied. Florida's broad public records laws and the protections afforded by the Florida Administrative Procedure Act provided the transparency necessary to understand permitting conditions, which, in turn, promoted consistency and predictability in the permitting process. Consistency and predictability allowed Section 404 permit seekers to make the sort of informed business decisions necessary for a robust and growing economy to flourish.

Amici, who represent a wide cross section of businesses that have sought Section 404 permits both before and after the State assumed the program, represent without equivocation that things have gotten much worse since the U.S. Army Corps of Engineers have reassumed the Section 404 permitting process. Though the Corps is not inept, it is painfully slow and unusually opaque. The fact remains, however,

that the State and the Corps have their own distinct Section 404-permit processes. The district court assumed that the Corps would simply pick up where Florida left off, but it vastly underestimated the complexity of the transfer it ordered. As a result, *every* Florida permit applicant must start from the beginning and submit a new Corps-specific permit application, which means the process must begin from scratch. The system simply cannot operate otherwise.

Adding to the chaos is that the Corps field offices have made clear that they are not prioritizing applications that were previously reviewed by the State. These applications are treated like any other new permit request; i.e., they are reviewed in the order they are received (including those that were pending before the Corps before Florida assumed the Section 404 permitting process). As it stands now, the Corps is working through the applications that it currently has in the system, which have swelled to create a backlog of more than 2,000 applications.

While Amici do not question the sincerity of the Corps' commitment to process diligently the 1,000 applications that the State had on its desk, the State hired three-hundred employees upon assuming the Section 404-permitting regime for a very good reason. Processing Section 404 permits is a time- and labor-intensive process. Doing so involves at a minimum completeness review, confirmation of jurisdiction (and probable site visits), public notice, consideration of comments, consultation with the U.S. Fish and Wildlife Service, drafting permit terms and

conditions, and review under the National Environmental Policy Act. In Amici's well-informed and hard-earned view, it will take years for the Corps to review individual Section 404 permits, even for permits that were on the verge of issuance by when they were pending before the State (some of which started with the Corps and were sent to the State in 2020).

And those are just the permits that remain pending at the application stage. Of equal consequence are the thousands of permits already issued by the State, which, as noted above, now have (apparently) no agency (federal or state) monitoring them for compliance or enforcing. In the absence of a stay, the Corps will be responsible for these functions. But when (if?) they begin this process, they will do so without any institutional knowledge (and, currently, without any files). In other words, the Corps will have minimal ability to step into the shoes of the State.

Simply put, "open for business" means exactly what it says—and no more. Even if the Corps is prepared to accept Section 404 permit applications, Amici can attest that the Corps has been unable to process and issue permits without tremendous growing pains. When Florida assumed the program (following a lengthy preparation period), it issued no permits for five months and only eleven after the State began approving them. Under the current circumstances, in which both the federal and state agencies were blindsided by the district court's order, it defies belief

that re-transiting the 404 program to the Corps will result in anything short of a total fiasco.

In its recent filing/declaration, the Corps maintains its vague "we got this" position without anything concrete to allay the Amici's concerns. "Mak[ing] short and long-term plans" is cold comfort. Zinser Dec. ¶ 10, and the federal government has offered nothing additional in its recently filed initial brief. So too is its ability to process roughly 6 percent (10 permits authorized divided by 156 applications received). *Id.* ¶ 12. And its dismissiveness regarding the "Florida-specific process[]" training that the Corps will need to commence underestimates tremendously the complexity that such training will involve, given Florida's inimitable ecosystem. *Id.* ¶ 10.

## CONCLUSION

For all these reasons, the Court should reverse the district court and reinstate Florida's assumption of the Section 404 permitting process.

Dated: September 23, 2024                    Respectfully submitted,

*/s/ Mohammad O. Jazil*                      */s/ Edward M. Wenger*
Mohammad O. Jazil                            Edward M. Wenger
DC Bar No. 90010692                          DC Bar No. 1001704
HOLTZMAN VOGEL BARAN                          HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC                    TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe Street, Suite 500              2300 N Street NW, Suite 643A
Tallahassee, Florida 32301                   Washington, DC 20037
(850) 270-5938 (phone)                       (202) 737-8808 (phone)
(850) 741-1023 (facsimile)                   (540) 341-8809 (facsimile)
*mjazil@holtzmanvogel.com*                   *emwenger@holtzmanvogel.com*


*Counsel for Amici Curiae*

18

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 27(d) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,694 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 23rd day of September, 2024, a true copy of the Amici Curiae Brief of the Florida Chamber of Commerce, et al., was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

20