**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

No. 24-5101

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
*Plaintiff-Appellees / Cross-Appellants*,

v.

MICHAEL REGAN, ET AL.,
*Defendant-Appellants / Cross-Appellees*,

and

STATE OF FLORIDA, ET AL.,
*Intervenors-Defendants-Appellants / Cross-Appellees*.

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-0119 (Hon. Randolph D. Moss)

**ADDENDUM FOR ENVIRONMENTAL APPELLEES**

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd, Ste. 201
Miami, FL 33137
Tel.: (305) 440-5432
tgalloni@earthjustice.org
creichert@earthjustice.org

Bonnie Malloy
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL 32301
Tel.: (850) 681-0031
bmalloy@earthjustice.org

*Counsel for Plaintiff-Appellees / Cross-Appellants*

## **ADDENDUM**

16 U.S.C. § 1533 ........................................................................... 1a

S. Rep. No. 93-307 (1973) .......................................................... 11a

S. Rep. No. 97-418 (1982) .......................................................... 53a

H.R. Rep. No. 97-567 (1982) ..................................................... 95a

40 C.F.R. § 233.20 ..................................................................... 176a

50 C.F.R. § 17.11 ....................................................................... 177a

50 C.F.R. § 17.22 ....................................................................... 302a

50 C.F.R. § 17.23 ....................................................................... 313a

84 Fed. Reg. 44,976-01 (Aug. 27, 2019) ................................. 316a

United States Code Annotated
  Title 16. Conservation
    Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1533

§ 1533. Determination of endangered species and threatened species

Effective: December 27, 2022
Currentness

**(a) Generally**

**(1)** The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

**(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;

**(B)** overutilization for commercial, recreational, scientific, or educational purposes;

**(C)** disease or predation;

**(D)** the inadequacy of existing regulatory mechanisms; or

**(E)** other natural or manmade factors affecting its continued existence.

**(2)** With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970--

**(A)** in any case in which the Secretary of Commerce determines that such species should--

**(i)** be listed as an endangered species or a threatened species, or

**(ii)** be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;

**(B)** in any case in which the Secretary of Commerce determines that such species should--

**(i)** be removed from any list published pursuant to subsection (c) of this section, or

**(ii)** be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

**(C)** the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

**(3)(A)** The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable--

**(i)** shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

**(ii)** may, from time-to-time thereafter as appropriate, revise such designation.

**(B)(i)** The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

**(ii)** Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

**(iii)** Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

**(b) Basis for determinations**

**(1)(A)** The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

**(B)** In carrying out this section, the Secretary shall give consideration to species which have been--

**(i)** designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

**(ii)** identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

**(2)** The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

**(3)(A)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

**(B)** Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

**(i)** The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

**(ii)** The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

**(iii)** The petitioned action is warranted, but that--

**(I)** the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

**(II)** expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

**(C)(i)** A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

**(ii)** Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

**(iii)** The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7 [1] to prevent a significant risk to the well being of any such species.

**(D)(i)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

**(ii)** Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

**(4)** Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of Title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

**(5)** With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3), the Secretary shall--

**(A)** not less than 90 days before the effective date of the regulation--

**(i)** publish a general notice and the complete text of the proposed regulation in the Federal Register, and

**(ii)** give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

**(B)** insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

**(C)** give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

**(D)** publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

**(E)** promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

**(6)(A)** Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register--

**(i)** if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either--

**(I)** a final regulation to implement such determination,

**(II)** a final regulation to implement such revision or a finding that such revision should not be made,

**(III)** notice that such one-year period is being extended under subparagraph (B)(i), or

**(IV)** notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

**(ii)** subject to subparagraph (C), if a designation of critical habitat is involved, either--

**(I)** a final regulation to implement such designation, or

**(II)** notice that such one-year period is being extended under such subparagraph.

**(B)(i)** If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

**(ii)** If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

**(iii)** If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

**(C)** A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that--

**(i)** it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

**(ii)** critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

**(7)** Neither paragraph (4), (5), or (6) of this subsection nor section 553 of Title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if--

**(A)** at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

**(B)** in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

**(8)** The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

**(c) Lists**

**(1)** The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b).

**(2)** The Secretary shall--

  **(A)** conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

  **(B)** determine on the basis of such review whether any such species should--

    **(i)** be removed from such list;

    **(ii)** be changed in status from an endangered species to a threatened species; or

    **(iii)** be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b).

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e) Similarity of appearance cases**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that--

  **(A)** such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

  **(B)** the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   **Addendum 7a**   7

**(C)** such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f) Recovery plans**

**(1)** The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable--

**(A)** give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

**(B)** incorporate in each plan--

**(i)** a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

**(ii)** objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

**(iii)** estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

**(2)** The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to chapter 10 of Title 5.

**(3)** The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

**(4)** The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

**(5)** Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g) Monitoring**

**(1)** The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c).

**(2)** The Secretary shall make prompt use of the authority under paragraph 7 [1] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to--

**(1)** procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

**(2)** criteria for making the findings required under such subsection with respect to petitions;

**(3)** a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

**(4)** a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition**

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3), the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

**CREDIT(S)**

(Pub.L. 93-205, § 4, Dec. 28, 1973, 87 Stat. 886; Pub.L. 94-359, § 1, July 12, 1976, 90 Stat. 911; Pub.L. 95-632, §§ 11, 13, Nov. 10, 1978, 92 Stat. 3764, 3766; Pub.L. 96-159, § 3, Dec. 28, 1979, 93 Stat. 1225; Pub.L. 97-304, § 2(a), Oct. 13, 1982, 96 Stat. 1411; Pub.L. 100-478, Title I, §§ 1002 to 1004, Oct. 7, 1988, 102 Stat. 2306; Pub.L. 108-136, Div. A, Title III, § 318, Nov. 24, 2003, 117 Stat. 1433; Pub.L. 117-286, § 4(a)(113), Dec. 27, 2022, 136 Stat. 4318.)

Notes of Decisions (570)

---

## Footnotes

1       So in original. Probably should be "paragraph (7)".

16 U.S.C.A. § 1533, 16 USCA § 1533
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   **Addendum 10a** 10

# Calendar No. 289

| 93D CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 93–307 |
|---|---|---|

## ENDANGERED SPECIES ACT OF 1973

JULY 1, 1973.—Ordered to be printed
Filed under authority of the order of the Senate of June 30, 1973

Mr. MAGNUSON, from the Committee on Commerce,
submitted the following

## REPORT

[To accompany S. 1983]

The Committee on Commerce, to which was referred the bill (S. 1983) to provide for the conservation, protection, restoration, and propagation of species of fish, wildlife, and plants facing extinction, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill do pass.

### PURPOSE

The purpose of this bill is to provide for conservation, protection and propagation of endangered species of fish and wildlife by Federal action and by encouraging the establishment of State endangered species conservation programs. The methods include authorization to the Secretaries of Interior and Commerce to list species which are either (1) endangered or (2) likely to become endangered within the forseeable future, and authority to establish an Advisory Committee for consultation regarding this list; authorization to the Secretary to use certain existing legislation for land acquisition; provision for criminal and civil penalties for violation of its prohibitions; provision for the administrative implementation of the international convention on endangered species; management of endangered and threatened species by the States under State plans that are approved by the Secretary; and provision for financial aid to State wildlife management agencies which enter into cooperative or management agreements with the Secretary.

Programs provided by this bill are to be administered jointly by the Secretary of the Interior and the Secretary of Commerce within their respective jurisdictions as regards fish or wildlife, as provided by Reorganization Plan No. 4 of 1970.

Addendum 11a

## Background

It has become increasingly apparent that some sort of protective measures must be taken to prevent the further extinction of many of the world's animal species. The number of animals on the Secretary of the Interior's list of domestic species that are currently threatened with extinction is now 109 On the foreign list, there are over 300 species. Further, the rate of extinction has increased to where on the average, one species disappears per year.

Consideration of this need to protect endangered species goes beyond the aesthetic. In hearings before the Subcommittee on the Environment it was shown that many of these animals perform vital biological services to maintain a "balance of nature" within their environments. Also revealed was the need for biological diversity for scientific purposes.

The two major causes of extinction are hunting and destruction of natural habitat.

The first comprehensive endangered species legislation was enacted by the 89th Congress and has become known as the Endangered Species Preservation Act of October 15, 1966, (Public Law 89–669 (80 Stat. 926)). This Act achieved a dual objective: First, it authorized and directed the Secretary of the Interior to initiate and carry out a comprehensive program to conserve, restore, and where necessary to bolster wild populations to propagate selected species of *native* fish and wildlife, including game and non-game birds; that he found to be threatened with extinction. Secondly, it consolidated and in some cases expanded the authorities of the Secretary of the Interior relating to the management and administration of the National Wildlife Refuge System.

The 91st Congress enacted Public Law 91–135 (83 Stat. 275), known as the Endangered Species Conservation Act of 1969. This law expanded the endangered species program in at least three significant respects:

First, to help insure that the United States does not contribute to the extirpation of other nations' wildlife, the Secretary of the Interior was authorized to develop a list of species or subspecies of animals that were threatened with worldwide extinction, and to prohibit the importation from a foreign country of any such animal or any part, any product, or egg thereof. Two limited exceptions to this prohibition were provided: the first authorizes the Secretary to issue permits for the importation of listed animals for scientific, educational zoological or propagational purposes; the second allows the Secretary to permit for one year the importation of such animals or products for commercial purposes if the importer was a party to a contract entered into prior to the date the animal was placed on the list if the importer would otherwise suffer "undue economic hardship".

Second, in order to assist the States in protecting domestically endangered species, the legislation amended existing laws to make unlawful throughout the United States their sale or purchase by any person who knows, or in the exercise of due care should know, that such animal was taken in any manner in violation of the laws or regulations of a State or foreign country. These provisions supplement an existing statute which currently prevents the interstate sale or purchase of fish, mammals, or birds in violation of State or foreign law.

Addendum 12a

Third, in order to further assist in the protection of domestically endangered species the law increased the amounts authorized to be appropriated to acquire lands for the purpose of conserving, protecting, restoring, or propagating any endangered species. This new authority for use of funds contained limits of $2.5 million per area and $5 million per year, and $15 million total ceiling.

## NEED FOR THE LEGISLATION

While the Acts of 1966 and 1969 laid the framework for an increasingly effective endangered species conservation program, the Department of the Interior has indicated some difficulties in expanding the practical effect of the program to the spirit of the original legislation. As the President stated in his Environmental Message of February 8, 1972, the existing law "simply does not provide the kind of management tools needed to act early enough to save a vanishing species."

From testimony offered at hearings on the bill, it is apparent that the following four requirements must be satisfied if the bill is to be effective:

(1) The bill must provide the Secretary with sufficient discretion in listing and delisting animals so that he may afford present protection to those species which are either in present danger of extinction or likely within the foreseeable future to become so endangered; (2) the bill must provide protection throughout the nation for animals which are either endangered or threatened; (3) the bill must lift the statutory restrictions that existing law places on authorization of monies for habitat acquisition from the Land and Water Conservation Fund Act, and extend to the Secretary land acquisition powers for such purposes from other existing legislation; and (4) finally, it became apparent in hearings that many established State agencies could in the future, or do now provide efficient management programs for the benefit of endangered species.

While the Federal government should protect such species where States have failed to meet minimum Federal standards, it should not pre-empt efficient programs. Instead, it should encourage these, and aid in the extension or establishment of others, to facilitate management by granting regulatory authority and making available financial assistance to approved schemes. The reported bill is designed to meet these requirements.

The bill provides a broadened concept of "endangered species" by affording the Secretary the additional power to list animals which he determines are likely within the foreseeable future to become threatened with extinction. This gives effect to the Secretary's ability to forecast population trends by permitting him to regulate these animals before the danger becomes imminent while long-range action is begun. By creating two levels of protection, regulatory mechanisms may more easily be tailored to the needs of the endangered animals. Flexibility in regulation is enhanced by a provision which allows for listing if the animal is endangered over a "substantial portion of its range". The Secretary makes his listing in full consideration of the forces which acted to bring about such endangerment. The Secretary is required to appoint an advisory committee for consultative purposes to aid in the review of these lists.

3

The bill makes violations of conduct prohibited under the bill subject either to civil penalties up to $10,000 or, to criminal penalties with fines levied up to $20,000 and/or imprisonment for up to one year. For the first time, the knowing taking of an endangered animal in violation of the law is a criminal offense where the Federal government has retained management power.

The Secretary may make certain exemptions from the prohibitions for scientific purposes or for the propagation of the species in controlled habitats, if he finds that such excepted conduct furthers the intent of the Act. The Committee wishes to clarify that such exemptions may be granted to individuals with legitimate claims who breed such animals domestically, whether or not they are associated with an institution. He may also receive applications for exemption where it is proven to him that failure to grant such an exemption will cause undue economic hardship to the applicant. The Secretary shall carefully scrutinize such applications to assure validity of the claim, and no such hardship exemption shall be longer than one year.

### LAND ACQUISITION

Because the authorization for habitat acquisition under the 1969 Act *expired* this year, the Committee reviewed carefully the wisdom of the restrictive authorization ceilings for the habitat acquisition under existing authority. Accordingly, the reported bill permits the Secretary to use funds available to him under the Land and Water Conservation Fund Act with no ceiling attached. In addition, he may utilize his authorities under the Migratory Bird Conservation Act, the Fish and Wildlife Act of 1956, and the Fish and Wildlife Coordination Act for land acquisition. Often, protection of habitat is the only means of protecting endangered animals which occur on non-public lands. With programs for protection underway, and worthy of continuation into the foreseeable future, an accelerated land acquisition program is essential.

The Committee finds that the most efficient way to enforce the prohibitions of this bill and to develop the most appropriate and extensive programs is through utilization of the agencies already established for such purposes within the States and development of the potential for such State programs where they do not already exist or have less than sufficient authority to meet the need. Testimony given before the Subcommittee on the Environment revealed that approximately 35 States already have established extensive programs. Many of these already provide for the listing of endangered species, their legal protection, habitat protection, and related land acquisition. Nationwide, State agencies employ approximately 6,000 enforcement agents.

In contrast, the Federal Government, in fiscal year 1973, employed 158 enforcement agents, most of whom were located in ports of entry in order to enforce laws prohibiting the transport of endangered species in foreign commerce. It was found that if the Federal government were to embark on an attempt to manage and regulate endangered fish and wildlife nationwide, administration would necessarily be considerably extended. The Committee decided that the most effective way to fulfill the provisions of the Act was through delegation of authority to approved State agencies. Accordingly, the bill permits three courses of action: (1) The State may enter into a management agreement

agreement with the Secretary (section 6(b)); (2) the State may receive financial assistance if it "establishes and maintains an adequate and active program for the management, conservation, protection, and restoration of endangered and threatened species" (section 6(c)); (3) the State may have sole responsibility for the protection of endangered and threatened species of fish and wildlife if it establishes a plan for endangered and threatened species "in accordance with this Act" and such plan is approved by the Secretary (section 16). If a State meets the prerequisites for financial assistance from the Federal government, it may under a cooperative agreement receive as much as 50% of the total budget estimate for such a plan or agreement. For these purposes the bill authorizes the appropriation of $10,000,000. The Federal government shall retain its authority to regulate the interstate and foreign commerce of endangered species, whether or not it has established such agreements with the States.

## OTHER PROVISIONS

### ALASKAN NATIVES

It became apparent to the Committee in hearings that the case of the Alaskan native Indians, Aleuts, and Eskimoes required special attention. Certain native inhabitants depend on traditional hunting practices not only for sustenance but as a means for preserving social unity. Further, it was shown that their "take" was not the principal threat to the animals involved. Accordingly, S. 1983 does not apply with respect to the taking of any endangered or threatened species by such natives, provided that the action is for the purpose of consumption or use in a native community or for creation and sale of native articles of handicrafts and clothing, and is not accomplished in a wasteful manner. Application of the provisions of this section remains subject to the discretion of the Secretary under the terms and conditions set forth in the Act, who may revoke or regulate the exemption on the taking of endangered or threatened fish or wildlife with reference to species, isolated populations, season for taking, or geographical location.

### CONVENTION IMPLEMENTATION

The Federal government has already acknowledged the need for international cooperation in the protection of endangered wildlife by entering into several agreements with other nations, including; migratory bird treaties with Canada and Mexico, a Migratory and Endangered Bird Treaty with Japan, and the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere. Accordingly, one of the purposes of the bill is to take all appropriate steps to implement the Nation's international commitments. To further this intent, the bill provides a means for implementation of the regulations of the Convention on International Trade in Endangered Species of Wild Fauna and Flora if and when that Convention is ratified by the Senate. The Convention met in February 1973 with 80 countries in attendance. "Practically all" of those given plenipotentiary power, including the representatives of the United States, signed the Convention. Under its provisions, a system of regulation designed to prevent the commercial overexploitation of any species of flora or fauna judged to be endangered or threatened by such trade is

**Addendum 15a**

established. Provision is made for management and scientific authorities, and for a Secretariat to coordinate regulations and lists. The Committee found that such a centralized international authority would further the purposes of the Act regarding international cooperation. S. 1983, therefore, provides the means to establish the appropriate management and scientific authorities, one of which would establish communication between Convention and Federal authorities.

### SMITHSONIAN STUDY

Recognizing the need for protection of the habitats of endangered species, as well as the need to protect endangered flora to preserve biological diversity, the Committee studied carefully the possibility of including plants within the protective provisions of the Act. However, it was discovered that there is not enough information available on situations of such endangered plants to bring plants within regulatory legislation. To help remedy this lack of information, the Act authorizes the Smithsonian Institution to conduct a review of species of endangered plants and authorizes $250,000 be appropriated for such study. A report of the conclusions of this study, together with legislative recommendations, shall be sent to the Congress within one year following the passage of the Act.

### SECTION-BY-SECTION ANALYSIS

#### (1) Section 1 (Short Title)

The short title of this Act is the "Endangered Species Act of 1973"; the long and more descriptive title, which constitutes one of two Committee amendments, is "A Bill to provide for the conservation, protection, restoration, and propagation of species of fish, wildlife, and plants facing extinction, and for other purposes."

The other Committee amendment was in the nature of a substitute text, an analysis of which follows.

#### (2) Section 2 (Declaration of Policy)

In subsection (a) (Findings), the Congress finds that various species of fish and wildlife have become extinct and others are endangered by or threatened with extinction; that such species and their preservation is of value and a matter of concern to the United States for educational and scientific reasons and because the nation has made sovereign commitments by treaty with foreign nations to protect such species of fish and wildlife facing extinction. The Congress finds further that encouraging the States to develop and maintain endangered species programs is a key toward safeguarding the endangered and threatened species.

In subsection (b) (Purposes), the Congress declares that the purposes of this Act include providing an effective means to "conserve, protect, and restore the ecosystems" upon which these species depend; providing programs to conserve, protect, restore, and propagate these species; and insuring that all Federal agencies cooperate in protection efforts.

#### (3) Section 3 (Definitions)

"Convention", as defined in section 1(1), means the recently signed international convention with respect to international trade in "Endangered Species of Wild Fauna and Flora" and its appendices.

Section 3(2) defines an "endangered species" as one "which is in danger of extinction throughout all or a significant portion of its range". Section 3(13) defines a "threatened species" as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."

"Fish or wildlife" is defined very broadly in section 3(3) to mean not only animals and fish and birds, but also any part of any such creature, alive or dead. There is a similarly broad definition of "plant" (section 3(7)).

There are definitions of "foreign commerce" (section 3(4)); person (section 3(6)) (includes a corporation or other such entity and any employee of any government); State (section 3(10)); and United States (section 3(14)).

"Import", as used in this Act and defined in section 3(5), has a broader meaning than the same term as used in the customs laws of the United States, including as it does an *attempt* to land on, bring into, or introduce into any place subject to United States jurisdiction, as well as an actual landing, bringing into, or introducing.

"Secretary", as defined in section 3(8), means either the Secretary of the Interior or the Secretary of Commerce depending upon the program responsibilities of each such Secretary under the 1970 Reorganization Plan.

Section 3(9) defines "species" to mean not only a species of fish or wildlife, but also any subspecies or other group of the "same species or lesser taxa in common spatial arrangement that interbreed when mature." Thus, for purposes of this Act, an endangered subspecies of wildlife is an endangered species.

"State agency" is defined in section 3(11) to mean the State agency or other entity within a State which is responsible for that State's program for management and conservation of fish and wildlife resources.

"Take" is defined in section 3(12) in the broadest possible manner to include every conceivable way in which a person can "take" or attempt to "take" any fish or wildlife.

*(4) Section 4 (Determination of Endangered or Threatened Species)*

This section sets forth the mechanism for determining and listing species of fish and wildlife which are endangered or threatened, and sets up machinery for the transition from the single list maintained today under the Endangered Species Act of 1969 to the two lists to be maintained under this Act.

Under subsection (a) (General), the Secretary can list a species as endangered or threatened "as a result of any" of five listed factors: curtailment of its habitat; overutilization; disease or predation; inadequacy of other regulatory mechanisms; and other "natural or manmade factors affecting its continued existence."

Subsection (b) (Basis for Determinations) sets up requirements for listing as either an endangered or a threatened species.

Subsection (c) (Lists) sets out the mechanics for listing or removing from a list, including publication in the Federal Register, a review under section 553 of title 5, United States Code if a petition is filed by an interested person provided the Secretary finds that such person has presented substantial evidence which in his judgment warrants such a review. The species on the endangered species list which is in

existence when this Act becomes effective "shall be republished to conform to the appropriate classifications under this Act."

Subsection (d) (Advisory Committee) establishes a special committee to advise the Secretary on additions to, removals from, or reclassifications within the lists.

Subsection (e) (Protective Regulations) requires the Secretary, once he has listed a species of fish or wildlife as a threatened species, to issue regulations to protect that species. Among other protective measures available, he may make any or all of the acts and conduct defined as "prohibited acts" (in section 10(a)) as to "endangered species" also prohibited acts as to the particular threatened species. (The penalties for prohibited acts are declared in sections 12(a) (civil violation) and 12(b) (criminal violation)).

### (5) Section 5 (Land Acquisition)

This section gives the Secretary broad authority to acquire any real property ("land, waters, or interests therein") which he finds "necessary for the purpose of conserving, protecting, restoring, or propagating any endangered or threatened species." He may use the land acquisition authority under other legislation in addition to the direct authority conferred by this Act, and he may use funds authorized and appropriated under the "Land and Water Conservation Fund Act of 1965" in addition to direct appropriations under this Act.

### (6) Section 6 (Cooperation With the States)

This section establishes mechanisms through which the Federal government and the governments of the States can work fruitfully together toward the mutually accepted goal of protection of endangered and threatened species.

Subsection (a) (General) directs the Secretary to "cooperate to the maximum extent practicable with the States." He is required to consult with a State before acquiring any real property in that State for purposes of protection of endangered or threatened species.

Subsection (b) (Management Agreements) authorizes the Secretary to agree with a State to manage, under a management agreement, any area established for such protective purposes.

Subsection (c) (Financial Assistance) authorizes financial-aid grants to the States for endangered and threatened species programs which meet the criteria set forth in this subsection. The prerequisites to Federal assistance are enumerated.

Subsection (d) (Allocation of Funds) sets out guidelines for the Secretary in dividing appropriated funds between the various eligible States and enumerates provisions regarding each such cooperative agreement for financial aid (e.g. Federal share shall not exceed 50% of the total estimated costs for a single State).

Subsection (e) (Periodic Review) requires annual review by the Secretary, including the consideration of comment from interested persons.

Subsection (f) (State Action Permitted) makes it clear that this Act shall in no way be construed to hold any State to a Federal standard which is lower or less protective of any endangered or threatened species, except for foreign commerce matters.

### (7) Section 7 (Interagency Cooperation)

All agencies, departments, and other instrumentalities of the Federal government are directed to cooperate in the implementation of the

Addendum 18a

goals of this Act. Each agency shall, inter alia, take steps to "insure that actions authorized, funded, or carried out" by it do not jeopardize the continued existence of any such species or result in the destruction of its habitat.

### (8) *Section 8 (International Cooperation)*

Subsection (a) (Financial Assistance) authorizes the President to provide assistance to endangered species programs using foreign currencies accruing to the United States in other nations subject to the provisions of section 1415 of the Supplemental Appropriation Act of 1953. However, no funds other than "counterpart" or "blocked" foreign currencies may be used for such purposes.

Subsection (b) (Encouragement) authorizes the Secretary, with the assistance of the Secretary of State, to encourage foreign countries to establish protective programs and to enter into bilateral or multilateral agreements for the protection, conservation, restoration, or propagation of endangered and threatened species, and to encourage citizens of such countries to practice conservation in taking fish or wildlife for importation into the United States.

Subsection (c) (Personnel) authorizes, after consultation with the Secretary of State, overseas assignment of personnel and expenditure of funds for specified programs.

Subsection (d) (Investigations) authorizes research and law enforcement investigations to be conducted overseas by the Secretary, after consultation with the Secretaries of State and Treasury.

Subsection (e) (Convention Implementation) directs the President to designate appropriate agencies to meet the Nation's implementation and enforcement responsibilities under the Convention.

### (9) *Section 9 (Regulations, Procedure, and Judicial Review)*

Subsection (a) (Regulations) sets forth the requirements for the issuance of regulations by the Secretary under this Act.

Subsection (b) (Procedure) incorporates by reference the provisions of the Administrative Procedure Act, except for emergency action.

Subsection (c) (Judicial Review) authorizes limited judicial review of determinations by the Secretary under this Act.

### (10) *Section 10 (Unlawful Conduct)*

Subsection (a) (Prohibited Acts) lists the conduct which is unlawful under this Act and punishable under section 12 (Penalties and Enforcement). The unlawful conduct includes, e.g., importing, exporting, taking, selling, distributing, or offering for sale in the United States any endangered species. The prohibited act is not limited to an entire animal, but includes any part of the dead body of any fish or wildlife which is listed pursuant to section 4 (see definition of fish and wildlife).

Subsection (b) (Similarity of Appearance Cases) authorizes the Secretary to deal with the problem presented by two species which are so similar in appearance that persons without specialized training cannot distinguish between them. If one is species listed under section 4, but the other is not, the Secretary may treat the unlisted species as an endangered or threatened species if such treatment "will substantially facilitate the enforcement and further the policy of this Act."

9

**Addendum 19a**

*(11) Section 11 (Exceptions)* .

Subsection (a) (General) permits, upon approval, the importation, exportation, taking, or transportation of an endangered or threatened species for scientific purposes or the propagation of such species in captivity or in a controlled habitat.

Subsection (b) (Hardship) authorizes a limited hardship case exception for persons who have entered into contracts prior to the date a species is listed or proposed to be listed as an endangered or threatened species.

Subsection (c) (Procedure) requires an application, publication of notice, and review before the Secretary may grant a permit under subsection (a) or (b).

Subsection (d) (Alaska Natives) provides that the provisions of this Act shall not apply, with respect to an endangered or threatened species, to Indians, Aleuts, or Eskimos who take such fish or wildlife for the purpose of consumption or use in a native community or for the purpose of selling or creating for sale authentic native articles of handicrafts and clothing, provided the taking is not done in a wasteful manner. As used in this subsection, the phrase "consumption or use in a native community" includes selling any edible portion of fish and wildlife in native villages and towns in Alaska for native consumption. By "native villages and towns in Alaska" the Committee intends to include any native village and any settlement or municipality in Alaska. By "native village" in the previous sentence, the committee means any tribe, band, clan, group, village, community, or association in Alaska which the Alaska Native Claims Settlement Act or the Secretary of the Interior finds eligible for land conveyances under subsection 14(a) of that Act. "Native village" also includes 'native groups" as defined in subsection 3(d) of that Act. The term "native village" thus includes entities containing populations of more than 25 and also entities containing populations of less than 25. The Secretary may, however, with respect to endangered and threatened species set and prescribe detailed regulations.

*(12) Section 12 (Penalties and Enforcement)*

Subsection (a) (Civil Penalty) makes a knowing violation punishable by a civil penalty up to $10,000. Other violations may be punished by a penalty up to $1,000. Each prohibited act constitutes a separate violation. No such penalty may be assessed without notice and a hearing pursuant to section 554 of title 5, United States Code.

Subsection (b) (Criminal Violation) makes a knowing and willful violation punishable by a $20,000 fine and up to one year in prison, or both. In case of a criminal conviction, a person may also forfeit Federal hunting permits and other licenses.

Subsection (c) (Rewards) authorizes the Secretary to pay one-half of the amount of the penalty or fine paid to any person who furnishes information which leads to a civil penalty or conviction.

Subsection (d) (Enforcement) establishes mechanisms for enforcement and for forfeitures in case of violation.

Subsection (e) (Registration) requires each person who is an importer of fish or wildlife to register with the Secretary of the Treasury; to keep records; and permit inspection of these records.

Subsection (f) (Enforcement Regulations) authorizes the promulgation of enforcement regulations and the charging of reasonable fees for permits.

**Addendum 20a**

Subsection (g) (Citizen Suits) permits, subject to certain conditions, private actions to enforce the provisions of this Act.

Subsection (h) (Coordination) directs the Secretary and the Secretary of Agriculture to coordinate the administration of this Act with the administration of the animal quarantine laws, as well as for coordination in other possibly overlapping areas.

*(13) Section 13 (Endangered Plants)*

The Smithsonian Institution is directed to review species of plants which are endangered or threatened and methods of providing adequate protection for such species. (Such methods might include adding plants to fish or wildlife within the general coverage of this Act). The Institution is directed to report its results and recommendations for legislation to Congress within one year, and funds, not to exceed $250,000, for such purpose are authorized to be appropriated.

*(14) Section 14 (Conforming Amendments)*

The Act amends several existing statutes to conform with the terminology and provisions of this Act.

*(15) Section 15 (Repealer)*

The Endangered Species Conservation Act of 1969 is repealed.

*(16) Section 16 (Applicability Within States)*

Subsection (a) (State Plan) declares that a State may establish a plan for endangered and threatened species in accordance with this Act. A plan is in accordance if it meets or exceeds the requirements set forth in section 6(c) and "represents an effective response to the Nation's need to conserve, protect, restore, and propagate endangered and threatened species of fish or wildlife."

Subsection (b) (Determination by Secretary) provides for the Secretary to determine whether or not such a State plan is in accordance with this Act.

Subsection (c) (Periodic Review) directs the Secretary to review, not less than once every three years, performance within each State with an approved plan "to determine whether such plan is still in accordance with this Act, and to evaluate the success of such plan in terms of the policy of this Act."

Subsection (d) (No State Plan) provides that the provisions of this Act shall become applicable in their entirety within a State 15 months after the enactment date unless, prior to that date, the Secretary has made a determination that such State has not established a plan in accordance with this Act. If such a State later establishes an acceptable plan, such plan shall become effective and the provisions of this Act as to management and taking shall cease to have effect within that State.

Subsection (e) (Procedure) requires published notice and authorizes limited judicial review of a determination regarding a State plan.

Subsection (f) (Effective Date) provides that except for the State plan provisions of this section, the Act takes effect upon the date of enactment.

*(17) Section 17 (Marine Mammals Act)*

In case of conflict, no provision of this Act shall take precedence over a more restrictive provision in the Marine Mammal Protection Act of 1972.

Addendum 21a

**(18) Section 18 (Authorization for Appropriations)**

Appropriations are authorized for the next three fiscal years.

## TEXT OF S. 1983, AS REPORTED

"A bill to provide for the conservation, protection, restoration, and propagation of threatened and endangered species of fish, wildlife, and plants, and for other purposes." *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Endangered Species Act of 1973".

### DECLARATION OF POLICY

SEC. 2. (a) FINDINGS.—The Congress finds and declares that—

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife and plants are of educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve and protect to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to—

(A) migratory bird treaties with Canada and Mexico;

(B) the Migratory and Endangered Bird Treaty with Japan;

(C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

(D) the International Convention for the Northwest Atlantic Fisheries;

(E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

(F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

(G) other international agreements.

(5) encourage the States, through Federal financial assistance and a system of incentives, to develop and maintain conservation, protection, restoration, and propagation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish and wildlife.

(b) PURPOSES.—The Congress hereby declares that the purposes and policy of this Act are to—

(1) provide an effective means to conserve, protect, and restore the ecosystems upon which endangered and threatened species of fish or wildlife depend;

(2) provide a viable program for the conservation, protection, restoration, and propagation of endangered and threatened species;

**Addendum 22a**

(3) take all appropriate steps to implement the Nation's international commitments with respect to endangered and theatened fish and wildlife; and

(4) insure that all departments, agencies, and instrumentalities of the United States seek, within the scope of their authority and administrative jurisdiction, to protect endangered and threatened species.

## DEFINITIONS

SEC. 3. As used in this Act—

(1) "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

(2) "Endangered species" means any species of fish or wildlife which is in danger of extinction throughout all or a significant portion of its range.

(3) "Fish or wildlife" means any living member of the animal kingdom and the remains of any dead member of the animal kingdom, including, but not limited to, any mammal, fish, bird, amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, or any part, egg, or offspring of any such member, or any product produced from any part or parts of the remains of any such member.

(4) "Foreign commerce" includes any transaction—

(A) between persons within one foreign country;

(B) between persons in two or more foreign countries;

(C) between a person within the United States and a person in a foreign country; or

(D) between persons within the United States, where the fish or wildlife involved are moving in any country or countries outside the United States.

(5) "Import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduced into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

(6) "Person" means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government.

(7) "Plant" means any member of the plant kingdom, including seeds, roots, and other parts of any such member.

(8) "Secretary" means, except as otherwise provided, the Secretary of the Interior or the Secretary of Commerce in the same manner in which program responsibilities are vested under Reorganization Plan Numbered 4 of 1970. With respect to enforcement of the provisions of this Act and of the Convention, which pertain to the importation of terrestrial plants, the term means the Secretary of Agriculture.

(9) "Species" includes any subspecies or other group of fish or wildlife of the same species or lesser taxa in common spatial arrangement that interbreed when mature.

(10) "State" means any State, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(11) "State agency" means the State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish and wildlife resources within a State.

(12) "Take" means to harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(13) "Threatened species" means any species of fish or wildlife which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

(14) "United States", when used in a geographical sense, includes all States.

DETERMINATION OF ENDANGERED OR THREATENED SPECIES

SEC. 4. (a) GENERAL.—The Secretary shall by regulation determine whether any fish or wildlife is an endangered or threatened species as a result of any of the following factors:

(1) the present or threatened destruction, modification, or curtailment of its habitat or range;

(2) overutilization for commercial, sporting, scientific, or educational purposes;

(3) disease or predation;

(4) the inadequacy of existing regulatory mechanisms; or

(5) other natural or manmade factors affecting its continued existence.

(b) BASIS FOR DETERMINATIONS.—(1) The determinations required by this section shall be made on the basis of the best scientific and commercial data available to the Secretary, including any recommendations that have been made by the Advisory Committee established under subsection (d) of this section and after consultation, as appropriate, with all interested persons and organizations, including affected or knowledgeable cderal, State, and foreign government agencies. In any case in which such determinations involve an indigenous species, the Secretary shall consult with and consider the recommendations of each State involved. In any case in which determinations involve a species which is normally found on the high seas, in lakes, or other waters off the coast of a State of which are customarily harvested by citizens of such a State, the Secretary shall consult with and consider the recommendations of each State involved. In any case in which such determinations involve a species which is normally found in a foreign country or countries or which is harvested from the ocean by citizens of such country or countries, the Secretary shall (where practicable) with the assistance of the Secretary of State, consult with and consider the recommendations of such country or countries.

Addendum 24a

(2) In determining whether or not any fish or wildlife is an endangered or a threatened species, the Secretary shall take into consideration those efforts, if any, being made by any nation or any political subdivision of any nation to protect within any area under its jurisdiction such fish or wildlife, whether by predator control, protection of habitat and food supply, or other conservation or management practices.

(3) Fish or wildlife which have been designated as requiring protection from unrestricted commerce by any foreign country, or pursuant to any international agreement, shall receive special and full consideration by the Secretary to determine whether each is an endangered or a threatened species.

(c) Lists.—(1) The Secretary shall publish in the Federal Register a list of all fish or wildlife determined by him by regulation to be endangered species and a list of all fish or wildlife determined by him by regulation to be threatened species. Such lists may be amended, modified, or revised periodically by regulation. Each list shall refer to each species of fish or wildlife named therein by scientific name and common name or names and shall specify the portion of its range over which it is endangered or threatened.

(2) The Secretary shall, upon the petition of an interested person under subsection 553(e) of title 5, United States Code, conduct a review of any listed or unlisted species of fish or wildlife proposed to be removed from or added to either of the lists published pursuant to paragraph (1) of this subsection, but only if he makes and publishes a finding that such person has presented substantial evidence which in his judgment warrants such a review.

(3) Any list of species of fish or wildlife determined to be threatened with extinction, by the Secretary of the Interior pursuant to the Endangered Species Conservation Act of 1969, which is in effect the day before the date of enactment of this Act shall be republished to conform to the appropriate classifications under this Act. Pending reclassification as endangered species or threatened species and republication, any species listed pursuant to the Act of 1969 shall be deemed an endangered species within the meaning of this Act. Such reclassification and republication shall not require a public hearing or comment under section 553 of title 5, United States Code.

(d) Advisory Committee.—(1) The Secretary shall establish an Advisory Committee on Endangered and Threatened Species to consult with, advise, and make recommendations to him and to the States. The Advisory Committee shall consist of not more than eleven members including a Chairman who shall be appointed by the Secretary from lists of qualified individuals submitted by State fish and wildlife agency administrators, universities, nongovernmental organizations concerned with conservation, and scientific societies. Five of the members shall be regularly employed by State governments or political subdivisions thereof. The terms of office shall be so arranged by the Secretary that each year at least three new members shall be appointed to fill vacancies caused by the expiration of terms of office.

(2) The Advisory Committee shall periodically, but not less than once each year, make recommendations to the Secretary with respect to removal from, addition to, or reclassification within the lists maintained pursuant to subsection (a) of this section, and may, with the

approval of the Secretary, perform other functions in furtherance of the purposes of this Act. A member of the Advisory Committee who is not otherwise a Government employee may, in the discretion of the Secretary, receive not more than $150 per diem when engaged in the actual performance of his duties. Each member may receive reimbursement for travel, subsistence, and other necessary expenses incurred in the performance of his duties.

(e) PROTECTIVE REGULATIONS.—Whenever the Secretary lists a species of fish or wildlife as a threatened species, pursuant to subsection (a) of this section, he shall issue such regulations as he deems necessary and advisable to provide for the conservation, protection, restoration, or propagation of such species. With respect to any endangered or threatened species, the Secretary may by regulation prohibit any act prohibited with respect to an endangered species under section 10(a) this Act.

## LAND ACQUISITION

SEC. 5. The Secretary shall establish and implement a program to conserve, protect, restore, and propagate fish or wildlife which are listed as endangered or threatened species pursuant to section 4 of this Act. To carry out such programs, the Secretary—

    (a) shall utilize as appropriate the land acquisition and other authorities conferred upon him under the Migratory Bird Conservation Act, the Fish and Wildlife Act of 1956, and the Fish and Wildlife Coordination Act;

    (b) may acquire by purchase, donation, or otherwise any lands, waters, or interests therein necessary for the purpose of conserving, protecting, restoring, or propagating any endangered or threatened species. Such authority shall be in addition to any other land acquisition authority vested in him; and

    (c) may use funds made available under the Land and Water Conservation Fund Act of 1965 or under this Act to acquire such lands, waters, or interests therein.

## COOPERATION WITH THE STATES

SEC. 6. (a) GENERAL.—In carrying out the program authorized by this Act, the Secretary shall cooperate to the maximum extent practicable with the States. In addition to all other obligations, the Secretary shall consult with the affected State before the acquisition of any lands, waters, or interests therein for the purpose of conserving, protecting, restoring, or propagating any endangered or threatened species.

(b) MANAGEMENT AGREEMENTS.—The Secretary may enter into an agreement or agreements with any State for the administration and management of any area established for the conservation, protection, restoration, or propagation of an endangered or a threatened species. Any revenues derived from the administration of such areas under such agreements shall be subject to section 401 of the Act of June 15, 1935 (16 U.S.C. 715s).

(c) FINANCIAL ASSISTANCE.—The Secretary is authorized to enter into a cooperative agreement in accordance with this subsection to provide financial assistance to any State which establishes and maintains

16

**Addendum 26a**

an adequate and active program for the management, conservation, protection, and restoration of endangered and threatened species. Before the Secretary may enter into or renew such a cooperative agreement to provide financial assistance to a State, he shall make, justify, and publish in the Federal Register a finding that such agreement would further the policy of this Act and that such State has a program under which—

(1) the State agency has authority and administrative jurisdiction to manage and protect any species of fish or wildlife which is determined by such agency or the Secretary to be endangered or threatened;

(2) the State has established a State plan, including a management program under the State agency, for all species of resident fish or wildlife which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary;

(3) the State agency during the first year of the existence of such agreement—

(A) will issue protective regulations;

(B) will employ sufficient trained and qualified personnel; and

(C) will maintain investigation, enforcement, and public education programs,

which are adequate, in the Secretary's judgment, for the conservation, protection, restoration, and propagation of species of fish or wildlife facing extinction;

(4) the State agency is authorized and plans to conduct studies to determine the status and requirements for survival of species of residual fish or wildlife and agrees to transmit a copy of the findings of such studies to the Secretary;

(5) the State agency is authorized and plans to establish programs, including the acquisition of lands, waters, or interests therein, for the conservation, protection, restoration, and propagation of endangered and threatened species; and

(6) provision is made for public participation in designating species of resident fish or wildlife as endangered or threatened.

(d) ALLOCATION OF FUNDS.—(1) Funds appropriated for financial assistance pursuant to subsection (c) of this section shall be available to the Secretary for allocation to the States under cooperative agreements. The purposes for which such funds may be used include, but are not limited to, research, censusing, law enforcement, and habitat acquisition or improvement. The Secretary shall allocate appropriated funds to such States upon the basis of—

(A) the international commitments of the United States to protect endangered or threatened species;

(B) the national significance of a species found to be endangered or threatened within a State; and

(C) the potential for preventing extinction of a species or for restoring a species to nonendangered or nonthreatened status.

Funds allocated to a State but unexpended or unobligated at the close

17

of the fiscal year remain available for expenditure by such State until the close of the succeeding fiscal year.

(2) Each cooperative agreement between a State and the Secretary shall provide for—

(A) the actions to be taken by the Secretary and the State;

(B) the benefits that are expected to be derived in connection with preservation and restoration of endangered or threatened species;

(C) the estimated cost of these actions; and

(D) the share of such costs to be borne by the Federal Government and by the States, except that—

(i) the Federal share of such program costs shall not exceed 50 per centum of the estimated program costs stated in the agreement; and

(ii) the Federal share may be increased to 66⅔ per centum whenever two or more States, having a common interest in a program that the Secretary deems to meet the criteria of paragraph (1) of this subsection, enter jointly into an agreement with the Secretary.

The Secretary may, in his discretion, and under such rules and regulations as he may prescribe, advance funds to the State for financing the United States pro rata share agreed upon in the cooperative agreement.

(3) The Secretary is authorized to issue such regulations as may be appropriate to carry out the provisions of this section with respect to financial assistance to States.

(4) For the purposes of this section, there is authorized to be appropriated $10,000,000.

(e) PERIODIC REVIEW.—The finding made under subsection (c) of this section and any action taken by the Secretary under this section shall be subject to his periodic review, including the consideration of comment from interested persons, at no greater than annual intervals. Upon ninety days' notice in writing to the affected State, the Secretary may terminate in his discretion any cooperative agreement entered into under this section.

(f) STATE ACTION PERMITTED.—Nothing in this Act shall be construed as superseding or limiting the power of any State or political subdivision thereof to enact legislation or regulations more restrictive than or consistent with the provisions of this Act with respect to an endangered or a threatened species: *Provided*, That any State law or regulation of the import or export of or the interstate or foreign commerce in an endangered species listed pursuant to section 4 of this Act is void to the extent that it may effectively permit what is prohibited by this Act or its implementing regulations, or prohibit what is authorized pursuant to an exemption or permit provided for in this Act or its implementing regulations. This Act shall not otherwise be construed to void any State law or regulation which is intended to conserve and manage migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife.

INTERAGENCY COOPERATION

SEC. 7. The Secretary shall review all programs administered by him and utilize such programs in furtherance of the policy of this Act. All

other departments, agencies, and instrumentalities of the Federal Government shall, in consultation with and with the assistance of the Secretary—

(a) carry out such programs as are practicable for the protection of species listed, pursuant to section 4 of this Act, as endangered or threatened;

(b) take such action as is necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of any endangered or threatened species, or result in the destruction or modification of any habitat of such species which is determined by the Secretary, after consultation to the extent appropriate and necessary with affected States, to be a critical habitat of such species.

## INTERNATIONAL COOPERATION

SEC. 8. (a) FINANCIAL ASSISTANCE.—As a demonstration of the commitment of the United States to the worldwide protection of endangered and threatened species, the President may, subject to the provisions of section 1415 of the Supplemental Appropriation Act, 1953 (31 U.S.C. 724), use foreign currencies accruing to the United States Government under the Agricultural Trade Development and Assistance Act of 1954 or any other law to provide to any foreign country (with its consent) assistance in the development and management of programs in that country which the Secretary determines to be necessary or useful for the conservation, protection, restoration, or propagation of any endangered or threatened species listed by the Secretary pursuant to section 4 of this Act: *Provided*, That no funds other than foreign currencies available for expenditure only within such foreign country shall be used pursuant to this section. The President shall provide assistance (which includes, but is not limited to, the acquisition, by lease or otherwise, of lands, waters, or interests therein) to foreign countries under this section upon such terms and conditions as he deems appropriate.

(b) ENCOURAGEMENT.—In order to carry out further the provisions of this Act, the Secretary, with the assistance of the Secretary of State, shall encourage—

(1) foreign countries to provide for the protection, conservation, restoration, or propagation of fish or wildlife, including endangered and threatened species listed pursuant to section 4 of this Act;

(2) the entering into of bilateral or multilateral agreements for foreign countries to provide for such protection, conservation, restoration, or propagation; and

(3) foreign persons, who directly or indirectly take fish or wildlife in foreign countries or on the high sea for importation into the United States for commercial or other purposes, to develop and carry out, with such assistance as he may provide, conservation practices designed to enhance such fish, wildlife and plants and their habitat.

(c) PERSONNEL.—After consultation with the Secretary of State, the Secretary may—

(1) assign or otherwise make available any officer or employee of his department for the purpose of cooperating with foreign

countries and international organizations in developing personnel resources and programs which promote the protection, conservation, restoration, or propagation of fish or wildlife; and

(2) conduct or provide financial assistance for the educational training of foreign personnel, in this country or abroad, in fish, wildlife or plant management, research, and law enforcement, and to render professional assistance abroad in such matters.

(d) INVESTIGATIONS.—After consultation with the Secretary of State and the Secretary of the Treasury, as appropriate, the Secretary may conduct or cause to be conducted such law enforcement investigations and research abroad as he deems necessary to carry out the purposes of this Act.

(e) CONVENTION IMPLEMENTATION —The President is authorized and directed to designate appropriate agencies to act as the Management Authority or Authorities and the Scientific Authority or Authorities pursuant to the Convention. The agencies so designated shall thereafter be authorized to do all things assigned to them under the Convention, including the issuance of permits and certificates. The agency designated by the President to communicate with other parties to the Convention and with the Secretariat shall also be empowered, in consultation with the State Department, to act on behalf of and represent the United States in all regards as required by the Convention.

REGULATIONS, PROCEDURE, AND JUDICIAL REVIEW

SEC. 9. (a) REGULATIONS.—The Secretary shall publish any regulations proposed under this Act in the Federal Register at least sixty days prior to the time when such regulations shall become final, except that in case of an emergency the Secretary may publish such regulations not less than thirty days prior to the time when such regulations shall become final if at the same time he publishes in the Federal Register detailed reasons why emergency action is necessary. The Secretary shall also publish in the Federal Register a notice of all petitions received pursuant to this Act and, if such petition is denied, his reasons therefor. Such notice shall identify the purpose of the petition and include a statement of the availability of any data submitted in support of such petition. If any person adversely affected by a proposed regulation files objections and requests a public hearing within forty-five days of the date of publication of the proposed regulation, the Secretary shall grant such request. If such public hearing is held, final regulations shall not be promulgated by the Secretary until after the conclusion of such hearing. All public hearings authorized by this subsection shall consist of the oral and written presentation of data or arguments in accordance with such conditions or limitations as the Secretary may make applicable thereto. Proposed and final regulations issued under this Act shall set forth findings of fact on which the regulations are based and shall state the relationship of such findings to the regulations issued.

(b) PROCEDURE.—Except as expressly modified by this section, the provisions of the Administrative Procedure Act (5 U.S.C. 551 et seq.) shall apply to proceedings conducted by the Secretary under this Act: Provided, that the provisions of this section shall not apply to the

**Addendum 30a**

extent necessary to permit emerging action by the Secretary. Notice of and reasons for such action shall be published prior to such action in the Federal Register.

(c) JUDICIAL REVIEW.—(1) Any judicial review of final regulations promulgated under this Act and final actions under section 5(c) of this Act shall be in accordance with sections 701–706 of title 5, United States Code, except that—

(A) with respect to regulations promulgated under section 4 or 6 of this Act, the findings of the Secretary as to the facts shall be sustained if based upon substantial evidence on the record considered as a whole; and

(B) with respect to relief pending review, no stay of an action may be granted unless the reviewing court determines that the party seeking such stay—

(i) is likely to prevail on the merits in the review proceeding, and

(ii) will suffer irreparable harm pending such proceeding.

(2) If the party seeking judicial review applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court either that—

(A) the information is material and was not available at the time of the proceeding before the Secretary; or

(B) failure to include such evidence in the proceeding was an arbitrary or capricious act of the Secretary,

the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Secretary, and to be adduced upon the hearing, in such manner and upon such terms and conditions as the court may deem proper. The Secretary may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken, and he shall file with the court such modified or new findings and his recommendation, if any, for the modification or setting aside of his original order.

(d) AUDIT.—(1) Each recipient of Federal assistance under this Act, pursuant to grants, subgrants, contracts, subcontracts, loans or other arrangements, entered into other than by formal advertising, and which are otherwise authorized by this Act, shall keep such records as the Secretary shall prescribe, including records which fully disclose the amount and disposition by such recipient of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, the amount of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.

(2) The Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, shall, until the expiration of three years after completion of the project or undertaking referred to in subsection (a) of this section, have access for the purpose of audit and examination to any books, documents, papers, and records of such recipients which in the opinion of the Secretary or the Comptroller General may be related or pertinent to the grants, subgrants, contracts, subcontracts, loans or other arrangements referred to in subsection (a).

Addendum 31a

UNLAWFUL CONDUCT

SEC. 10. (a) PROHIBITED ACT.—Except as povided in section 11 of this Act, it is unlawful for any person subject to the jurisdiction of the United States to—

(1) import into, or export from, the United States any endangered species which has been listed pursuant to section 4 of this Act;

(2) take any such species within the United States or in the territorial sea of the United States or upon the high seas;

(3) possess, sell, deliver, carry, transport, ship, or receive, by any means whatever, any such species which are taken in violation of paragraph (2) of this subsection;

(4) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and for commercial purposes, any such species;

(5) sell, distribute, or offer for sale in foreign commerce, interstate commerce, or activity affecting interstate commerce specimens or products processed or manufactured in whole or in part from specimens of any such species;

(6) attempt to commit, solicit another to commit, or cause to be committed, any act prohibited by paragraphs (1) through (5) of this subsection;

(7) engage in any trade in any specimens of fish, wildlife, or plants, contrary to the provisions of the Convention, or possess any specimens traded contrary to the provisions of the Convention, including the definitions in article I therein;

(8) violate any regulation which is promulgated by the Secretary pursuant to section 4(e) of this Act; or

(9) import into or export from the United States except at a port or ports designated by the Secretary, any fish or wildlife, except nonendangered and nonthreatened shellfish and fishery products which are imported or exported for human or animal consumption or taken for recreational purposes in waters under United States jurisdiction or on the high seas. To facilitate enforcement of this paragraph and to reduce the costs of enforcement, the Secretary, with the approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. Upon such terms and conditions as he may prescribe, the Secretary may permit such importation at nondesignated ports in the interest of the health or safety of the fish or wildlife or for any other reason he deems appropriate. Any port designated by the Secretary of the Interior under the authority of section 4(d) of the Act of December 5, 1969 (16 U.S.C. 666cc–4(d)), shall, if such designation is in effect on the day before the date of the enactment of this Act, be deemed to be a port designated by the Secretary under this paragraph until such time as the Secretary otherwise provides.

(b) SIMILARITY OF APPEARANCE CASES.—The Secretary may, by regulation, and to the extent he deems advisable, treat any species of fish or wildlife as an endangered or threatened species even though it is not listed pursuant to section 4 of this Act if he finds that—

Addendum 32a

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this Act.

SEC. 11. (a) GENERAL.—Upon a finding that the excepted conduct will not adversely affect the regenerative capacity of the involved species in a significant portion of its range or habitat or otherwise affect the survival of the wild population of such species, and upon such terms and conditions as he may prescribe, the Secretary may issue permits authorizing the importation, exportation, taking, or transportation, by persons found to be qualified, of any fish or wildlife which is listed as an endangered or threatened species pursuant to section 4 of this Act for—

(1) scientific purposes in furtherance of the purposes of this Act; or

(2) the propagation of such species in captivity or in a controlled habitat.

(b) HARDSHIP.—The Secretary may except from the application of section 10(a) of this Act any person who enters into a contract with respect to a species of fish or wildlife before the date of publication in the Federal Register of notice of a proposed listing of that species as an endangered or threatened species if the failure to grant such exception will cause undue economic hardship to such person under the contract. The extent and duration of such exception shall be such as the Secretary deems appropriate. No such exception shall be granted unless such person applies to the Secretary in writing and furnishes with such application such information as the Secretary may require to prove such hardship. No such exception shall be for a duration of more than one year from the date of publication in the Federal Register of notice of a proposed listing of the involved species, nor shall such exception apply to a quantity of fish or wildlife in excess of that specified by the Secretary. The one-year period for those species of fish or wildlife which were listed by the Secretary as endangered prior to the effective date of this Act shall expire in accordance with the terms of section 3 of the Act of December 5, 1969 (83 Stat. 275). No such exemption may be granted for the importation or exportation of a specimen listed in appendix I of the Convention which is to be used for primarily commercial purposes.

(c) PROCEDURE.—(1) The Secretary shall publish a notice in the Federal Register of each application for an exception. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application. Information received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding.

(2) The Secretary may grant exceptions under subsections (a) and (b) of this section only if he finds, and publishes such finding in the Federal Register, that such exceptions were applied for in good faith and if granted and exercised will not operate to the disadvantage of

**Addendum 33a**

such endangered or threatened species and will be consistent with the policy of this Act.

(d) ALASKA NATIVES.—(1) The provisions of this Act shall not apply with respect to the taking of any endangered or threatened species by any Indian, Aleut, or Eskimo who is an Alaskan native who resides in Alaska if such taking is for the purpose of consumption or use in a native community or for the purpose of selling or creating for sale in interstate commerce authentic natives articles of handicrafts and clothing: *Provided*, That in each case such taking is not accomplished in a wasteful manner. As used in this paragraph—

(A) "consumption or use in a native community" includes selling any edible portion of fish or wildlife in native villages and towns in Alaska for native consumption; and

(B) "authentic native articles of handicrafts and clothing" means items composed wholly or in some significant respect of natural materials, and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or other mass copying devices. Traditional native handicrafts include, but are not limited to, weaving, carving, stitching, sewing, lacing, beading, drawing, and painting.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, whenever the Secretary determines that any species of fish or wildlife which is subject to taking by Indians, Aleuts, or Eskimos is an endangered or threatened species and that such taking materially and negatively affects the threatened and endangered species, he may prescribe regulations upon the taking of such species by any such Indian, Aleut, or Eskimo. Such regulations may be established with reference to species, geographical decription of the area included, the season for taking, or any other factors related to the reason for establishing such regulations and consistent with the policy of this Act. Such regulations shall be prescribed after notice and hearings in the affected judicial district of Alaska and as otherwise required by section 103 of the Marine Mammal Protection Act of 1972, and shall be removed as soon as the Secretary determines that the need for their imposition has disappeared: *Provided*, That no such regulation shall be established which is in contravention of any provision of the Marine Mammal Protection Act of 1972.

## PENALTIES AND ENFORCEMENT

SEC. 12. (a) CIVIL PENALTY.—(1) Any person who—

(A) knowingly violates any provision of this Act or any regulation or permit issued under this Act, which prohibits the taking, importing, exporting, shipping, receiving, or otherwise moving in interstate or foreign commerce of any endangered or threatened species of fish or wildlife, or commits any act made unlawful under section 10(a) of this Act, may be assessed a civil penalty by the Secretary of not more than $10,000 for each violation;

(B) commits any act made unlawful under section 10(a) of this Act, or violates any other provision of this Act, or any regulation or permit issued under this Act, may be assessed a civil

89-690 O - 82 - 22

Addendum 34a

penalty by the Secretary of not more than $1,000 for each such violation.

No penalty shall be assessed unless such person is given notice and opportunity for a hearing with respect to such violation. Each prohibited act is a separate violation. Any such civil penalty may be compromised by the Secretary. Upon any failure to pay a penalty assessed under this subsection, the Secretary may by his own attorneys institute a civil action in a district court of the United States for any district in which such person is found, resides, or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. The court shall hear such action solely on the record made before the Secretary and shall sustain his action if it is supported by substantial evidence on the record considered as a whole.

(2) Hearings held during proceedings for the assessment of civil penalties authorized by paragraph (1) of this subsection shall be conducted in accordance with section 554 of title 5, United States Code. The Secretary may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and may administer oaths. Witnesses summoned shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person pursuant to this paragraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Secretary or to appear and produce documents before the Secretary, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) CRIMINAL VIOLATIONS.—(1) Any person who knowingly and willfully violates any provision of this Act, or of any regulation or permit issued thereunder, shall, upon conviction, be fined not more than $20,000 or imprisoned for not more than one year, or both.

(2) The head of any Federal agency which has issued a lease, license, permit, or other agreements authorizing the use of Federal lands, including grazing of domestic livestock, to any person who is convicted under paragraph (1) of this subsection may immediately modify, suspend, or revoke such lease, license, permit, or other agreement. The Secretary may suspend, cancel, or refuse to issue for a period of up to one year Federal hunting or fishing permits or stamps with respect to any person who is convicted under paragraph (1) of this subsection. The United States shall not be liable to pay any compensation, reimbursement, or damages in connection with any such modification, suspension, or revocation of any lease, license, permit, stamp, or other agreement.

(c) REWARDS.—Upon the recommendation of the Secretary, the Secretary of the Treasury is authorized to pay an amount equal to one-half of the civil penalty or fine paid, but not to exceed $2,500, to any person who furnishes information which leads to a finding of civil violation or a conviction of a criminal violation of any provision of

**Addendum 35a**

this Act or any regulation or permit issued thereunder. Any officer or employee of the United States or of any State or local government who furnishes information or renders service in the performance of his official duties shall not be eligible for payment under this section.

(d) ENFORCEMENT.—(1) The provisions of this Act and any regulations or permits issued under this Act shall be enforced by the Secretary, the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating, or all Secretaries. Each such Secretary may utilize, by agreement, with or without reimbursement, the personnel, services, and facilities of any other Federal agency or any State agency for purposes of enforcing this Act.

(2) The judges of the district courts of the United States and the United States magistrates may, within their respective jurisdictions, upon proper oath or affirmation showing probable cause, issue such warrants or other process as may be required for enforcement of this Act and any regulation issued thereunder.

(3) Any person authorized by the Secretary, the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating, in furtherance of the enforcement of this Act may execute and serve any arrest warrant, search warrant, or other warrant of civil or criminal process issued by any officer or court of competent jurisdiction. A person so authorized may search and seize, with or without a warrant, to the extent authorized by law. Any fish, wildlife, property, or item so seized shall be held by any person authorized by the Secretary, the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating pending disposition of civil or criminal proceedings, or the institution of an action in rem for forfeiture of such fish, wildlife, property, or item pursuant to paragraph (4) of this subsection, except that the Secretary may, in lieu of holding such fish, wildlife, property, or item, permit the owner or consignee to post a bond or other surety satisfactory to the Secretary.

(4) All fish or wildlife, or plants taken, possessed, sold, purchased, offered for sale or purchase, transported, delivered, received, carried, shipped, exported or imported contrary to the provisions of this Act, any regulation issued under this Act, or any permit issued thereunder, and all guns, traps, nets, and other equipment, vessels, vehicles, aircraft, and other means of transportation used to aid the taking, possessing, selling, purchasing, offering for sale or purchase, transporting, delivering, receiving, carrying, shipping, exporting, or importing of any fish or wildlife, or plants in violation of this Act, any regulation made pursuant thereto, or any permit issued thereunder shall be subject to forfeiture to the United States.

(5) All provisions of law relating to the seizure, forfeiture, and condemnation of a vessel for violation of the customs laws, the disposition of such vessel or the proceeds from the sale thereof, and the remission or mitigation of such forfeiture, shall apply to the seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this Act, insofar as such provisions of law are applicable and not inconsistent with the provisions of this Act. The powers, rights, and duties conferred or imposed by the customs laws upon any officer or employee of the Treasury Department shall, for purposes of this Act,

be exercised or performed by the Secretary or by such persons as he may designate.

(e) REGISTRATION.—(1) Any person who engages to any extent in business as an importer of fish or wildlife must register with the Secretary of the Treasury his name and the address of each place of business at which, and all trade names under which, he conducts such business.

(2) Any person required to register with the Secretary of the Treasury under paragraph (1) of this subsection shall—

(A) keep such records as will fully and correctly disclose each importation or exportation of fish or wildlife except nonendangered and nonthreatened shell fish or fishery products which are imported or exported for human or animal consumption or recreational purposes, made by him and the subsequent disposition made by him with respect to such fish or wildlife and

(B) at all reasonable times upon notice by a duly authorized representative of the Secretary, afford such representative access to his places of business, an opportunity to examine his inventory of imported fish or wildlife and the records required to be kept under subparagraph (A) of this paragraph and to copy such records.

(3) The Secretary of the Treasury, after consultation with the Secretary, shall prescribe such regulations as are necessary and appropriate to carry out the purposes of this subsection.

(f) ENFORCEMENT REGULATIONS.—(1) The Secretary, the Secretary of the Treasury, and the Secretary of the Department in which the Coast Guard is operating, are authorized to promulgate such regulations as may be appropriate to enforce this Act, and to charge reasonable fees for expenses to the Government connected with permits authorized by this Act, including processing applications and reasonable inspections, and the transfer, board, handling, or storage of fish, wildlife, or plants and evidentiary items seized and forfeited under this Act. All fees collected pursuant to this subsection shall be deposited in the Treasury to the credit of the appropriation which is current and chargeable for the cost of furnishing the services. Appropriated funds may be expended pending reimbursement from parties in interest.

(g) CITIZEN SUITS.—(1) Except as provided in paragraph (2) of this subsection, any person may commence a civil suit on his own behalf to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, as the case may be.

(2) No action may be commenced—

(A) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

(B) if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

Addendum 37a

(C) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

(3) (A) Any suit under this subsection may be brought in the judicial district in which the violation occurs.

(B) In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

(4) The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

(5) The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).

(h) COORDINATION.—The Secretary of Agriculture and the Secretary shall provide for appropriate coordination of the administration of this Act with the administration of the animal quarantine laws (21 U.S.C. 101–105, 111–135b, and 612–614) and section 306 of the Tariff Act of 1930 (19 U.S.C. 1306). Nothing in this Act or any amendment made by this Act, shall be construed as superseding or limiting in any manner the functions of the Secretary of Agriculture under any other law relating to prohibited or restricted importations or possession of animals and other articles. No proceeding or determination under this Act shall preclude any proceeding or be considered determinative of any issue of fact or law in any proceeding under any Act administered by the Secretary of Agriculture. Nothing in this Act shall be construed as superseding or limiting in any manner the functions and responsibilities of the Secretary of the Treasury under the Tariff Act of 1930, including, but not limited to, section 527 of such Act (19 U.S.C. 1527), relating to the importation of wildlife taken, killed, possessed, or exported to the United States in violation of the laws or regulations of a foreign country.

### ENDANGERED PLANTS

SEC. 13. The Secretary of the Smithsonian Institution, in conjunction with other affected agencies, is authorized and directed to review species of plants which are endangered or threatened, and methods of providing adequate protection including legislation for such species. He shall report the results of such review to Congress, not later than one year after the date of enactment of this Act. For purposes of this section, there is authorized to be appropriated not to exceed $250,000.

### CONFORMING AMENDMENTS

SEC. 14. (a) Section 4(c) of the Act of October 15, 1966 (80 Stat. 928, 16 U.S.C. 668dd(c) ), is further amended by revising the second sentence thereof to read as follows: "With the exception of endangered

**Addendum 38a**

and threatened species listed by the Secretary pursuant to section 4 of the Endangered Species Act of 1973 in States wherein a cooperative agreement does not exist pursuant to section 6(c) of such Act nothing in this Act shall be construed to authorize the Secretary to control or regulate hunting or fishing of resident fish and wildlife on lands not within the System."

(b) Section 10(a) of the Migratory Bird Conservation Act (45 Stat. 1224, 16 U.S.C. 715i(a)) and section 401(a) of the Act of June 15, 1935 (49 Stat. 383, 16 U.S.C. 715s(a)) are each amended by striking out "threatened with extinction," and inserting in lieu thereof the following: "listed pursuant to section 4 of the Endangered Species Act of 1973 as endangered or threatened species.".

(c) Section 6(a)(1) of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601–9(a)(1)) is amended by striking out:

"THREATENED SPECIES.—For any national area which may be authorized for the preservation of species of fish or wildlife that are threatened with extinction."

and inserting in lieu thereof the following:

"ENDANGERED AND THREATENED SPECIES.—For lands, waters, or interests therein, the acquisition of which is authorized under section 5 of the Endangered Species Act of 1973, needed for the purpose of conserving, protecting, restoring, or propagating endangered or threatened species of fish, wildlife, or plants."

(d) The first sentence of section 2 of the Act of September 28, 1962 (76 Stat. 653; 16 U.S.C. 460k–1), is amended to read as follows:

"SEC. 2. The Secretary is authorized to acquire areas of land, or interests therein, which are suitable for—

"(1) incidental fish and wildlife-oriented recreational development,

"(2) the protection of natural resources,

"(3) the protection of endangered or threatened species listed by the Secretary pursuant to section 4 of the Endangered Species Act of 1973, or

"(4) carrying out two or more of the purposes set forth in paragraphs (1) through (3) of this section,

and are adjacent to, or within, the said conservation areas, except that the acquisition of any land or interest therein pursuant to this section shall be accomplished only with such funds as may be appropriated therefor by the Congress or donated for such purposes, but such property shall not be acquired with funds obtained from the sale of Federal migratory bird hunting stamps."

(e) The Marine Mammal Protection Act of 1972 (16 U.S.C. 1361–1407 is amended—

"(1) by striking out "Endangered Species Conservation Act of 1969" in section (1)(B) thereof and inserting in lieu thereof the following: "Endangered Species Act of 1973";

"(2) by striking out "pursuant to the Endangered Species Conservation Act of 1969" in section 101(a)(3)(B) thereof and inserting in lieu thereof the following: "or threatened species pursuant to the Endangered Species Act of 1973";

"(3) by striking out "endangered under the Endangered Species Conservation Act of 1969" in section 102(b)(3) thereof and in-

serting in lieu thereof the following: "an endangered or a threat-ened Species pursuant to the Endangered Species Act of 973"; and

(4) by striking out "Endangered Species List," authorized by the Endangered Species Conservation Act of 1969." in section 202(a)(6) thereof and inserting in lieu thereof the following: "endangered species list and threatened species list published pursuant to section 4(c)(1) of the Endangered Species Act of 1973".

### REPEALER

Sec. 15. The Endangered Species Conservation Act of 1969 (sections 1 through 3 of the Act of October 15, 1966, and sections 1 through 6 of the Act of December 5, 1969; 16 U.S.C. 668aa—668cc-6) is repealed.

### APPLICABILITY WITHIN STATES

Sec. 16. (a) State Plan.—By the end of the first year after the date of enactment of this Act, a State may establish a plan for endangered and threatened species in accordance with this Act. A plan is in accordance with this Act if it meets or exceeds the requirements set forth in section 6(c) of this Act and represents an effective response to the Nation's need to conserve, protect, restore, and propagate endangered and threatened species of fish or wildlife. Upon the establishment of such a plan, the Governor or the head of the State agency shall promptly transmit a certified copy to the Secretary.

(b) Determination by Secretary.—Within ninety days after the Secretary receives a certified copy of a State plan established under subsection (a) or subsection (d) of this section, the Secretary shall make a determination whether such State has established a plan for endangered and threatened species in accordance with this Act. Unless the Secretary determines, pursuant to this section, that a State plan is not in accordance with this Act, the plan shall go into effect in such State on the date designated in the plan. In no event shall such State plan go into effect less than three months or more than nine months after the date of its establishment.

(c) Periodic Review.—The Secretary shall periodically, but not less than once every three years, review each State plan for endangered and threatened species which has been approved under subsection (b) of this section and for which there is experience, to determine whether such plan is still in accordance with this Act and to evaluate the success of such plan in terms of the policy of this Act. To facilitate such review, the Governor or the head of the State agency in each such State shall submit to the Secretary periodically all information relevant and requested by the Secretary. The Secretary shall report to the President and Congress simultaneously each year on the results of such reviews, including any recommendations for legislation.

(d) No State Plan.—Except as to species listed in Appendix I of the Convention, the provisions of this Act regarding the management and taking of any State's resident species shall become applicable in their entirety within a State fifteen months after the date of enactment of this Act unless, prior to such date, the Secretary has made

a determination under subsection (b) of this section that such State has established a plan for endangered and threatened species in accordance with this Act: Provided, That the provisions of subsection (a) of section 10 of this Act shall be effective upon the date of enactment of this Act within any State which does not prevent the taking of any species listed by the Secretary as an endangered species. If, at any time thereafter, the Secretary upon petition makes a determination, pursuant to subsection (b) of this section, that a State has established a plan for endangered and threatened species in accordance with this Act, such plan shall go into effect and the provisions of this Act regarding the management and taking of any species shall cease to be applicable or in effect within such State on a date to be designated by the Secretary. If, after a State plan in accordance with this Act is in effect within a State, the Secretary makes a determination, pursuant to subsection (e) of this section, that such plan is no longer in accordance with this Act, the provisions of this Act regarding the management and taking of any species shall go into effect within such State and such plan shall cease to be in effect on a date to be designated by the Secretary.

(e) PROCEDURE.—(1) Before making any determination under this section, the Secretary shall publish a notice in the Federal Register and afford the State and all interested parties a reasonable opportunity to present their views by oral and written submission.

(2) The Secretary shall notify in writing the Governor of the affected State of any determinations made under this section and shall publish these determinations with reasons therefor in the Federal Register.

(3) Any determinations made by the Secretary under this section shall be subject to judicial review in accordance with chapter V of title 5, United States Code, in the United States court of appeals for the circuit in which is located the State whose plan is the subject of such determination or in the United States Court of Appeals for the District of Columbia Circuit. Any such review shall be instituted within sixty days from the date on which the determination made by the Secretary is published in the Federal Register.

(f) EFFECTIVE DATE.—Except as otherwise provided in this section, the provisions of this Act shall become effective in their entirety upon the date of enactment of this Act.

MARINE MAMMALS ACT

SEC. 17. CONFLICTS.—Except as otherwise provided in this Act, no provision of this Act shall take precedence over any more restrictive conflicting provision of the Marine Mammal Protection Act of 1972.

AUTHORIZATION FOR APPROPRIATIONS

SEC. 18. For purposes of this Act, other than section 6 and section 13 of this Act, there are authorized to be appropriated such sums as are necessary, not to exceed $3,960,000 for the fiscal year ending June 30, 1974; not to exceed $6,660,000 for the fiscal year ending June 30, 1975; and not to exceed $8,870,000 for the fiscal year ending June 30, 1976.

**Addendum 41a**

## Cost Estimates

It is not possible to estimate with precision the cost of S. 1983. The Committee on Commerce estimates that the total cost, except for Sections 6 (Cooperation With the States) and 13 (Endangered Plants), of the endangered species programs under this bill would be:

| For fiscal year ending: | Million |
|---|---|
| June 30, 1974 | $3.00 |
| June 30, 1975 | 6.66 |
| June 30, 1976 | 8.87 |

No additional authority is granted to the Departments to obtain funds under the Land and Water Conservation Fund Act. Section 6 (d) (4) of the Act authorizes not to exceed $10.0 million to be appropriated for the purpose of funding the cooperative financial agreements between State governments and the Federal government. Section 13 of the Act authorizes not to exceed $250,000 to be appropriated for the purpose of a study by the Secretary of the Smithsonian Institution. The Committee knows of no other cost estimates at variance with its own.

## Changes in Existing Law

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill as reported are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### SECTION 4(C) OF THE ACT OF OCTOBER 15, 1966 (16 U.S.C. 668dd(c))

"(c) No person shall knowingly disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States, including natural growth, in any area of the System; or take or possess any fish, bird, mammal, or other wild vertebrate or invertebrate animals or part or nest or egg thereof within any such area; or enter, use, or otherwise occupy any such area for any purpose; unless such activities are performed by persons authorized to manage such area, or unless such activities are permitted either under subsection (d) of this section or by express provision of the law, proclamation Executive order, or public land order establishing the area, or amendment thereof: *Provided*, That the United States mining and mineral leasing laws shall continue to apply to any lands within the System to the same extent they apply prior to the effective date of this Act unless subsequently withdrawn under other authority of law. [Nothing in this Act shall be construed to authorize the Secretary to control or regulate hunting or fishing of resident fish and wildlife, including endangered species thereof, on lands not within the System.] *With the exception of endangered and threatened species listed by the Secretary pursuant to section 4 of the Endangered Species Act of 1973 in States wherein a cooperative agreement does not exist pursuant to section 6(c) of such Act nothing in this Act shall be construed to authorize the Secretary to control or regulate hunting or fishing of resident fish and wildlife on lands not within the system.* The regulations permitting hunting and fishing of resident fish and wildlife within the System shall be,

Addendum 42a

to the extent practicable, consistent with State fish and wildlife laws and regulations. The provisions of this Act shall not be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System."

### SECTION 10(a) OF THE MIGRATORY BIRD CONSERVATION ACT (16 U.S.C. 715i(a))

"(a) Areas of lands, waters, or interests therein acquired or reserved pursuant to sections 1–5, 6, 7–12, and 15–19 of this Act shall, unless otherwise provided by law, be administered by the Secretary of the Interior under rules and regulations prescribed by him to conserve and protect migratory birds in accordance with treaty obligations with Mexico and Canada, and other species of wildlife found thereon, including species that are [threatened with extinction] *listed pursuant to section 4 of the Endangered Species Act of 1973 as endangered or threatened species,* and to restore or develop adequate wildlife habitat."

### SECTION 401(a) OF THE ACT OF JUNE 15, 1935 (16 U.S.C. 715s(a))

"(a) Separate fund in the United States Treasury; availability of funds until expended; definition of "National Wildlife Refuge System".
. . . The National Wildlife Refuge System (hereafter referred to as the "System") includes those lands and waters administered by the Secretary as wildlife refuges, lands acquired or reserved for the protection and conservation of fish and wildlife that are [threatened with extinction] *listed pursuant to section 4 of the Endangered Species Act of 1973 as endangered or threatened species,* wildlife ranges, game ranges, wildlife management areas, and waterfowl areas established under any law, proclamation, Executive or public land order."

### SECTION 6(a)(1) OF THE LAND AND WATER CONSERVATION FUND ACT OF 1965 (16 U.S.C. 4601-9(a)(1))

"(a) Moneys appropriated from the fund for Federal purposes shall, unless otherwise allotted in the appropriation Act making them available, be allotted by the President to the following purposes and subpurposes in substantially the same proportion as the number of visitor-days in areas and projects hereinafter described for which admission fees are charged under section 2 of this Act:
"(1) For the acquisition of land, waters, or interests in land or waters as follows: . . .

\*           \*           \*           \*           \*

[**"THREATENED SPECIES.**—For any national area which may be authorized for the preservation of species of fish or wildlife that are threatened with extinction.**]**
"*ENDANGERED AND THREATENED SPECIES.*– *For lands, waters, or interests therein, the acquisition of which is authorized under section 5 of the Endangered Species Act of 1973, needed for the purpose of conserving, protecting, restoring, or propagating endangered or threatened species of fish, wildlife, or plants. . . ."*

33

SECTION 2 OF THE ACT OF SEPTEMBER. 28, 1962 (16 U.S.C. 460k-1)

"[SEC. 2. In order to avoid adverse effects upon fish and wildlife populations and management operations of the said areas that might otherwise result from public recreation or visitation to such areas, the Secretary is authorized to acquire limited areas of land for recreational development adjacent to the said conservation areas in existence or approved by the Migratory Bird Conservation Commission as of the date of enactment of this Act: *Provided,* That the acquisition of any land or interest therein pursuant to this section shall be accomplished only with such funds as may be appropriated therefor by the Congress or donated for such purposes, but such property shall not be acquired with funds obtained from the sale of Federal migratory bird hunting stamps. Lands acquired pursuant to this section shall become a part of the particular conservation area to which they are adjacent.]

*SEC. 2. The Secretary is authorized to acquire areas of land, or interests therein, which are suitable for—*

*(1) incidental fish and wildlife oriented recreational development,*

*(2) the protection of natural resources,*

*(3) the protection of endangered or threatened species listed by the Secretary pursuant to section 4 of the Endangered Species Act of 1973, or*

*(4) carrying out two or more of the purposes set forth in paragraphs (1) through (3) of this section, and are adjacent to, or within, the said conservation areas, except that the acquisition of any land or interest therein pursuant to this section shall be accomplished only with such funds as may be appropriated therefor by the Congress or donated for such purposes, but such property shall not be acquired with funds obtained from the sale of Federal migratory bird hunting stamps."*

SECTION 3(1)(B) OF THE MARINE MAMMAL PROTECTION ACT (16 U.S.C. 1362) DEFINITIONS

"(1) The term 'depletion' or 'depleted' means any case in which the Secretary, after consultation with the Marine Mammal Commission and the Committee of Scientific Advisors on Marine Mammals established under title II of this Act, determines that the number of individuals within a species or population stock—

(A) has declined to a significant degree over a period of years;

(B) has otherwise declined and that if such decline continues, or is likely to resume, such species would be subject to the provisions of the [Endangered Species Conservation Act of 1969] *Endangered Species Act of 1973;* or

(C) is below the optimum carrying capacity for the species or stock within its environment."

SECTION 101(A)(3)(B) OF THE MARINE MAMMAL PROTECTION ACT (16 U.S.C. 1371)

"(B) Except for scientific research purposes as provided for in paragraph (1) of this subsection, during the moratorium no permit may be issued for the taking of any marine mammal which is classified as belonging to an endangered species [pursuant to the Endangered

Species Conservation Act of 1969] *or threatened species pursuant to the Endangered Species Act of 1973* or has been designated by the Secretary as depleted, and no importation may be made of any such mammal."

SECTION 132(b)(3) OF THE MARINE MAMMAL PROTECTION ACT (16 U.S.C. 1372(b)(3))

"(b) Except pursuant to a permit for scientific research issued under section 104(c) of this title, it is unlawful to import into the United States any marine mammal if such mammal was—

(1) pregnant at the time of taking;

(2) nursing at the time of taking, or less than eight months old, whichever occurs later;

(3) taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock or which has been listed as [endangered under the Endangered Species Conservation Act of 1969] *an endangered or a threatened species pursuant to the Endangered Species Act of 1973;* or

(2) taken in a manner deemed inhumane by the Secretary."

SECTION 202(a)(6) OF THE MARINE MAMMAL PROTECTION ACT (16 U.S.C. 1402(a)(6))

SEC. 202. (a) The Commission shall—

". . . (6) recommend to the Secretary of the Interior such revisions of the [Endangered Species List, authorized by the Endangered Species Conservation Act of 1969] *endangered species list and threatened species list published pursuant to section 4(c)(1) of the Endangered Species Act of 1973,* as may be appropriate with regard to marine mammals; . . . ."

SECTIONS 1–3 OF THE ACT OF OCTOBER 15, 1966 (16 U.S.C. 668AA–668CC)

[An Act To provide for the conservation, protection, and propagation of native species of fish and wildlife, including migratory birds, that are threatened with extinction; to consolidate the authorities relating to the administration by the Secretary of the Interior of the National Wildlife Refuge System; and for other purposes.

[*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) the Congress finds and declares that one of the unfortunate consequences of growth and development in the United States has been the extermination of some native species of fish and wildlife; that serious losses in other species of native wild animals with educational, historical, recreational, and scientific value have occurred and are occurring; and that the United States has pledged itself, pursuant to migratory bird treaties with Canada and Mexico and the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, to conserve and protect, where practicable, the various species of native fish and wildlife, including game and nongame migratory birds, that are threatened with extinction. The purposes of this Act are to provide a program for the conservation, protection, restoration, and propagation

of selected species of native fish and wildlife, including migratory birds, that are threatened with extinction, and to consolidate, restate, and modify the present authorities relating to administration by the Secretary of the Interior of the National Wildlife Refuge System.

[(b) It is further declared to be the policy of Congress that the Secretary of the Interior, the Secretary of Agriculture, and the Secretary of Defense, together with the heads of bureaus, agencies, and services within their departments, shall seek to protect species of native fish and wildlife, including migratory birds, that are threatened with extinction, and, insofar as is practicable and consistent with the primary purposes of such bureaus, agencies, and services, shall preserve the habitats of such threatened species on lands under their jurisdiction.

[(c) A species of native fish and wildlife shall be regarded as threatened with extinction whenever the Secretary of the Interior finds, after consultation with the affected States, that its existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of overexploitation, disease, predation, or because of other factors, and that its survival requires assistance. In addition to consulting with the States, the Secretary shall, from time to time, seek the advice and recommendations of interested persons and organizations including, but not limited to, ornithologists, ichthyologists, ecologists, herpetologists, and mammalogists. He shall publish in the Federal Register the names of the species of native fish and wildlife found to be threatened with extinction in accordance with this paragraph.

[Sec. 2. (a) The Secretary of the Interior shall utilize the land acquisition and other authorities of the Migratory Bird Conservation Act, as amended, the Fish and Wildlife Act of 1956, as amended, and the Fish and Wildlife Coordination Act to carry out a program in the United States of conserving, protecting, restoring, and propagating selected species of native fish and wildlife that are threatened with extinction.

[(b) In addition to the land acquisition authorities in such Acts, the Secretary is hereby authorized to acquire by purchase, donation, or otherwise, lands or interests therein needed to carry out the purpose of this Act relating to the conservation, protection, restoration, and propagation of selected species of native fish that are threatened with extinction.

[(c) Funds made available pursuant to the Land and Water Conservation Fund Act of 1965 (78 Stat. 897) may be used for the purpose of acquiring lands, waters, or interests therein pursuant to this section that are needed for the purpose of conserving, protecting, restoring, and propagating selected species of native fish and wildlife, including migratory birds, that are threatened with extinction. Not to exceed $5,000,000 may be appropriated annually pursuant to that Act for such purpose for any fiscal year; and the total sum appropriated for such purpose shall not exceed $15,000,000: *Provided,* That the Secretary shall, to the greatest extent possible, utilize funds from the Land and Water Conservation Fund Act of 1965 for such purpose. Such sums shall remain available until expended. The Secretary shall not use more than $750,000 to acquire lands, waters, or interests therein for any one area for such purpose unless authorized by Act of Congress.

Addendum 46a

⟦(d) The Secretary shall review other programs administered by him and, to the extent practicable, utilize such programs in furtherance of the purpose of this Act. The Secretary shall also encourage other Federal agencies to utilize, where practicable, their authorities in furtherance of the purpose of this Act and shall consult with and assist such agencies in carrying out endangered species program.

Sec. 3. (a) In carrying out the program authorized by this Act, the Secretary shall cooperate to the maximum extent practicable with the several States. Such cooperation shall include consultation before the acquisition of any land for the purpose of conserving, protecting, restoring, or propagating any endangered species of native fish and wildlife.

⟦(b) The Secretary may enter into agreements with the States for the administration and management of any area established for the conservation, protection, restoration, and propagation of endangered species of native fish and wildlife. Any revenues derived from the administration of such areas under these agreements shall be subject to the provisions of section 401 of the Act of June 15, 1935 (49 Stat. 383), as amended (16 U.S.C. 715s).⟧

SECTIONS 1–6 OF THE ACT OF DECEMBER 5, 1969 (16 U.S.C.
66 SEC–1–1—66 SEC–6)

⟦*An Act* To prevent the importation of endangered species of fish or wildlife into the United States; to prevent the interstate shipment of reptiles, amphibians, and other widlife taken contrary to State law; and for other purposes.

⟦*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, for the purposes of sections 2 through 5 of this Act, the term—

⟦(1) "Secretary" means the Secretary of the Interior;

⟦(2) "fish or wildlife" means any wild mammal, fish, wild bird, amphibian, reptile, mollusk, or crustacean, or any part, products, egg, or offspring thereof, or the dead body or parts thereof;

⟦(3) "United States" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, and Guam; and

⟦(4) "person" means any individual, firm, corporation, association, or partnership.

⟦Sec. 2. Except as provided in section 3 of this Act, whoever imports from any foreign country into the United States any species or subspecies of fish or wildlife which the Secretary has determined, in accordance with the provisions of section 3 of this Act, to be threatened with worldwide extinction, shall be punished in accordance with the provisions of section 4 of this Act.

⟦Sec. 3. (a) A species or subspecies of fish or wildlife shall be deemed to be threatened with worldwide extinction whenever the Secretary determines, based on the best scientific and commercial data available to him and after consultation, in cooperation with the Secretary of State, with the foreign country or countries in which such fish or wildlife are normally found and, or to the extent practicable, with interested persons and organizations and other interested Federal agencies, that the continued existence of such species or subspecies of fish or wildlife is, in the judgment of the Secretary, endangered due to any of

**Addendum 47a**

the following factors: (1) the destruction, drastic modification, or severe curtailment, or the threatened destruction, drastic modification, or severe curtailment, of its habitat, or (2) its overutilization for commercial or sporting purposes, or (3) the effect on it of disease or predation, or (4) other natural or man-made factors affecting its continued existence. After making such determination, the Secretary shall promulgate and from time to time he may revise, by regulation, a list in the Federal Register of such fish or wildlife by scientific, common, and commercial name or names, together with his determination. The Secretary shall at least once every five years conduct a thorough review of any such list to determine what, if any, changes have occurred relative to the continued existence of the species or subspecies of fish or wildlife then on the list and to determine whether such fish or wildlife continue to be threatened with worldwide extinction. Upon completion of such review, he shall take appropriate action consistent with the purposes of this Act. The Secretary shall, upon the request of any interested person, also conduct such review of any particular listed species or subspecies at any other time if he finds and publishes his finding that such person has presented substantial evidence to warrant such a review.

[(b) In order to minimize undue economic hardship to any person importing any species or subspecies of fish or wildlife which are determined to be threatened with worldwide extinction under this section, under any contract entered into prior to the date of publication of such determination in the Federal Register of such species or subspecies, the Secretary, upon such person filing an application with him and upon filing such information as the Secretary may require showing, to his satisfaction, such hardship, shall permit such person to import such species or subspecies in such quantities and for such periods, not to exceed one year, as he determines to be appropriate.

[(c) The Secretary may permit, under such terms and conditions as he may prescribe, the importation of any species or subspecies of fish or wildlife listed in the Federal Register under this section for zoological, educational, and scientific purposes, and for the propagation of such fish or wildlife in captivity for preservation purposes, unless such importation is prohibited by any other Federal law or regulation.

[(d) The provisions of section 553 of title 5 of the United States Code shall apply to any regulation issued under this section.

[SEC. 4. (a)(1) Any person who violates any provision of section 2 or 3 of this Act or any regulation or permit issued thereunder, or any regulation issued under subsection (d) of this section, other than a violation the penalty for which is prescribed by subsection (b) of this section, shall be assessed a civil penalty by the Secretary of not more than $5,000 for each such violation. No penalty shall be assessed unless such person is given notice and opportunity for a hearing with respect to such violation. Each violation shall be a separate offense. Any such civil penalty may be compromised by the Secretary. Upon any failure to pay the penalty assessed under this paragraph, the Secretary may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found or resides or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. In

hearing such action, the court shall have authority to review the violation and the assessment of the civil penalty de novo.

[(2) Any employee authorized pursuant to subsection (c) of this section to enforce the provision of sections 2 and 3 of this Act, and any regulations or permits issued pursuant thereto or pursuant to subsection (d) of this section, shall have authority, in addition to any other authority provided by law relating to search and seizure, to execute any warrant to search for and seize any fish or wildlife or property or items taken, used, or possessed in connection with any violation of any such section, regulation, or permit with respect to which a civil penalty may be assessed pursuant to paragraph (1) of this subsection. Such fish, wildlife, property, or item so seized shall be held by any employee authorized by the Secretary or the Secretary of the Treasury pending disposition of proceedings by the Secretary involving the assessment of a civil penalty pursuant to paragraph (1) of this subsection; except that the Secretary may, in lieu of holding such fish, wildlife, property, or item, permit such person to post a bond or other surety satisfactory to the Secretary. Upon the assessment of a civil penalty pursuant to paragraph (1) of this subsection for any nonwillful violation of any such section, regulation, or permit, such fish, wildlife, property, or item so seized may be proceeded against in any court of competent jurisdiction and forfeited to the Secretary for disposition by him in such manner as he deems appropriate. The owner or consignee of any such fish, wildlife, property, or item so seized shall, as soon as practicable following such seizure, be notified of that fact in accordance with regulations established by the Secretary or the Secretary of the Treasury. Whenever any fish or wildlife or property or item is seized pursuant to this subsection, the Secretary shall move to dispose of the civil penalty proceedings pursuant to paragraph (1) of this subsection as expeditiously as possible. If, with respect to any such fish, wildlife, property, or item so seized no action is commenced in any court of competent jurisdiction to obtain the forfeiture of such fish, wildlife, property, or item within thirty days following the disposition of proceedings involving the assessment of a civil penalty, such fish, wildlife, property, or item shall be immediately returned to the owner or the consignee in accordance with regulations promulgated by the Secretary.

[(b) Any person who willfully violates any provision of section 2 or 3 of this Act or any regulation or permit issued thereunder or any regulation issued under subsection (d) of this section shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both.

[(c) The provisions of sections 2 and 3 of this Act and any regulations or permits issued pursuant thereto or pursuant to subsection (d) of this section shall be enforced by either the Secretary or the Secretary of the Treasury, or both such Secretaries. Either Secretary may utilize, by agreement, the personnel, services, and facilities of any other Federal agency or any State agency. Any employee of the Department of the Interior or the Department of the Treasury authorized by the Secretary or the Secretary of the Treasury may, without a warrant, arrest any person who such employee has probable cause to believe is willfully violating, in his presence or view, any such section, or any regulation or permit issued thereunder, the penalty for

which is provided under subsection (b) of this section, and may execute a warrant or other process issued by an officer or court of competent jurisdiction to enforce the provisions of such sections, regulations or permits. An employee who has made an arrest of a person in connection with any such willful violation may search such person at the time of his arrest and seize any fish or wildlife or property or items taken, used, or possessed in connection with any such violation, or any such employee shall have authority, in addition to any other authority provided by law relating to search and seizure, to execute any warrant to search for and seize any such fish, wildlife, property, or item so taken, used, or possessed. Any fish or wildlife or property or item seized shall be held by any employee authorized by the Secretary or the Secretary of the Treasury or by a United States marshal pending disposition of the case by the court, commissioner, or magistrate, except that the Secretary may, in lieu thereof, permit such person to post a bond or other surety satisfactory to him. Upon conviction, any (1) fish or wildlife seized shall be forfeited to the Secretary for disposal by him in such manner as he deems appropriate, and (2) any other property or items seized may, in the discretion of the court, commissioner, or magistrate, be forfeited to the United States or otherwise disposed of. The owner or consignee of any such fish, wildlife, property, or item so seized, shall, as soon as practicable following such seizure, be notified of that fact in accordance with regulations established by the Secretary or the Secretary of the Treasury. If no conviction results from any such alleged violation, such fish, wildlife, property or item so seized in connection therewith shall be immediately returned to the owner or consignee in accordance with regulations promulgated by the Secretary, unless the Secretary, within thirty days following the final disposition of the case involving such violation, commences proceedings under subsection (a) of this section.

[(d) For the purposes of facilitating enforcement of sections 2 and 3 of this Act and reducing the costs thereof, the Secretary, with the approval of the Secretary of the Treasury, shall, after notice and an opportunity for a public hearing, from time to time designate, by regulation, any port or ports in the United States for the importation of fish and wildlife, other than shellfish and fishery products imported for commercial purposes, into the United States. The importation of such fish or wildlife into any port in the United States, except those so designated, shall be prohibited after the effective date of such designations; except that the Secretary, under such terms and conditions as he may prescribe, may permit importation at nondesignated ports for movement to designated ports of entry. Such regulations may provide other exceptions to such prohibition if the Secretary deems it appropriate and consistent with the purposes of this subsection.

[(e) In carrying out the provisions of sections 2 through 5 of this Act, the Secretary may issue such regulations as may be appropriate.

[SEC. 5. (a) In carrying out the provisions of sections 2 and 3 of this Act, the Secretary, through the Secretary of State, shall encourage foreign countries to provide protection to species and subspecies of fish or wildlife threatened with worldwide extinction, to take measures

40

to prevent any fish or wildlife from becoming threatened with extinction, and shall cooperate with such countries in providing technical assistance in developing and carrying out programs to provide such protection, and shall, through the Secretary of State, encourage bilateral and multilateral agreements with such countries for the protection, conservation, and propagation of fish or wildlife. The Secretary shall also encourage persons, taking directly or indirectly fish or wildlife in foreign countries for importation into the United States for commercial or other purposes, to develop and carry out, with such assistance as he may provide under any authority available to him, conservation practices designed to enhance such fish or wildlife and their habitat. The Secretary of State, in consultation with the Secretary, shall take appropriate measures to encourage the development of adequate measures, including, if appropriate, international agreements, to prevent such fish or wildlife from becoming threatened with worldwide extinction.

[(b) To assure the worldwide conservation of endangered species. and to prevent competitive harm to affected United States industries, the Secretary, through the Secretary of State, shall seek the convening of an international ministerial meeting on fish and wildlife prior to June 30, 1971, and included in the business of that meeting shall be the signing of a binding international convention on the conservation of endangered species.

[(c) There are authorized to be appropriated such sums, not to exceed $200,000, as may be necessary to carry out the provisions of subsection (b) of this section, such sums to remain available until expended.

[SEC. 6. (a) The Secretary of Agriculture and the Secretary shall provide for appropriate coordination of the administration of this Act and amendments made by this Act, with the administration of the animal quarantine laws (21 U.S.C. 101 et seq., 21 U.S.C. 111, 21 U.S.C. 134 t seq.) and the Tariff Act of 1930, as amended (19 U.S.C. 1306).

[(b) Nothing in this Act, or any amendment made by this Act, shall be construed as superseding or limiting in any manner the functions of the Secretary of Agriculture under any other law relating to prohibited or restricted importations of animals and other articles and no proceeding or determination under this Act shall preclude any proceeding or be considered determinative of any issue of fact or law in any proceeding under any Act administered by the Secretary of Agriculture.

[(c) Nothing in this Act, or any amendment made by this Act, shall be construed as superseding or limiting in any manner the functions and responsibilities of the Secretary of the Treasury under the Tariff Act of 1930, as amended, including, without limitation, section 527 of said Act (19 U.S.C. 1527) relating to the importation of wildlife taken, killed, possessed or exported to the United States in violation of the laws or regulations of a foreign country.]

AGENCY COMMENTS

No comments on S. 1983 were received from any affected agency. The following comments were received on S. 1592:

Addendum 51a

DEPARTMENT OF STATE,
*Washington, D.C., June 5, 1973.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Commerce,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: The Secretary has asked me to reply to your letter of May 15, 1973, requesting the Department's comments on S. 1592, a bill to provide for the conservation, protection and propagation of species or subspecies of fish and wildlife that are presently threatened with extinction or likely within the foreseeable future to become threatened with extinction; and for other purposes.

The legislation was transmitted to the Congress in conjunction with the President's State of the Union Message on Natural Resources and Environment of February 15, 1973. This Department strongly supports S. 1592.

The Office of Management and Budget advises that there is no objection to the submission of this report and that enactment of S. 1592 would be in accord with the Administration's program.

Sincerely,

MARSHALL WRIGHT,
*Assistant Secretary for Congressional Relations.*

THE GENERAL COUNSEL OF THE TREASURY,
*Washington, D.C., May 25, 1973.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Commerce,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of this Department on S. 1592, "To provide for the conservation, protection, and propagation of species or subspecies of fish and wildlife that are presently threatened with extinction or likely within the foreseeable future to become threatened with extinction; and for other purposes."

The President, in his State of the Union Message of February 15, 1973, on Natural Resources and the Environment, stated that the limited scope of existing laws requires new authority to identify and protect endangered species before they are so depleted that it is too late and that he would ask the 93rd Congress to direct its attention to this problem. The Administration's proposal is contained in S. 1592.

In view of the foregoing, the Department recommends the enactment of S. 1592.

The Department was advised by the Office of Management and Budget that there was no objection to the submission to the Committee on Merchant Marine and Fisheries of a similar report on H.R. 4758, an identical bill, and that enactment of this legislation would be in accord with the program of the President.

Sincerely yours,

SAMUEL R. PIERCE, Jr.
*General Council.*

42

**Addendum 52a**

Calendar No. 600

| 97TH CONGRESS 2d Session | SENATE | REPORT No. 97-418 |
|---|---|---|

# ENDANGERED SPECIES ACT AMENDMENTS OF 1982

## REPORT

### OF THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS UNITED STATES SENATE

### TO ACCOMPANY

## S. 2309



MAY 26 (legislative day, MAY 25), 1982.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1982

94-389 O

**Addendum 53a**

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

ROBERT T. STAFFORD, Vermont, *Chairman*

| | |
|---|---|
| HOWARD H. BAKER, Jr., Tennessee | JENNINGS RANDOLPH, West Virginia |
| PETE V. DOMENICI, New Mexico | LLOYD M. BENTSEN, Texas |
| JOHN H. CHAFEE, Rhode Island | QUENTIN N. BURDICK, North Dakota |
| ALAN K. SIMPSON, Wyoming | GARY HART, Colorado |
| JAMES ABDNOR, South Dakota | DANIEL PATRICK MOYNIHAN, New York |
| STEVE SYMMS, Idaho | GEORGE J. MITCHELL, Maine |
| SLADE GORTON, Washington | MAX BAUCUS, Montana |
| FRANK H. MURKOWSKI, Alaska | |

BAILEY GUARD, *Staff Director*
JOHN W. YAGO, Jr., *Minority Staff Director*

(II)

**Addendum 54a**



# CONTENTS

|  | Page |
|---|---|
| General statement | 1 |
| Section-by-section analysis: | |
|     Section: | |
|         1. Short title | 7 |
|         2. Experimental populations | 7 |
|         3. Cooperation with the States | 10 |
|         4. Listing process | 10 |
|         5. Exemption process | 16 |
|         6. Consultation process | 19 |
|         7. Relationship between sections 7 and 9 of the act | 20 |
|         8. Convention implementation | 22 |
|         9. Enforcement | 24 |
|         10. Miscellaneous | 24 |
|         11. Removal of plants | 26 |
|         12. Authorizations of appropriations | 26 |
| Other points: | |
|     Commercial activity | 27 |
|     Licensing requirement | 28 |
|     Seizure and forfeiture | 28 |
|     "Import" from Alaska or Hawaii | 28 |
| Hearings | 29 |
| Rollcall votes | 29 |
| Regulatory impact | 29 |
| Cost of legislation | 30 |
| Departmental reports: | |
|     Departments of: | |
|         Interior | 36 |
|         Agriculture | 38 |
|         State | 39 |
| Changes in existing law | 40 |

(III)

# Calendar No. 600

| 97TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 97–418 |
|---|---|---|

## ENDANGERED SPECIES ACT AMENDMENTS OF 1982

MAY 26 (legislative day, MAY 25), 1982.—Ordered to be printed

Mr. CHAFEE, from the Committee on Environment and Public Works, submitted the following

# REPORT

### [To accompany S. 2309]

The Committee on Environment and Public Works, to which was referred the bill (S. 2309) to authorize appropriations carry out the provisions of the Endangered Species Act of 1973 for fiscal years 1983, 1984, and 1985, and for other purposes having considered the same, reports favorably thereon with amendments and an amendment to the title and recommends that the bill (as amended) do pass.

### GENERAL STATEMENT

The Endangered Species Act of 1973 (ESA or the Act) as amended, is the first comprehensive legislation enacted to conserve endangered and threatened species and their habitat. However, development of the current ESA programs to conserve endangered and threatened species can be traced back to 1966.

The first legislation enacted specifically to protect endangered species was the Endangered Species Preservation Act of 1966 (P.L. 89–669). The 1966 Act contained four important provisions. First, it directed the Secretary of the Interior to "carry out a program in the United States of conserving, protecting, restoring and propagating selected species of native fish and wildlife." Second, it authorized the acquisition of endangered species habitat for inclusion in the National Wildlife Refuge System using funds up to $15 million from the Land and Water Conservation Fund, provided that no more than $750,000 be spent on any one area. Third, it required the preparation of an official list of endangered species. Fourth, it declared that the Departments of Interior, Agriculture, and Defense shall seek to protect species of native fish and wildlife threatened with extinction and shall preserve their habitat on lands under their jurisdiction if it is practicable and consistent with the primary purposes of the Departments' agencies.

(1)

**Addendum 56a**

Although the 1966 Act was an important step towards conserving endangered species, it had serious drawbacks including its failure to prohibit the taking of endangered species. The habitat protection provisions of the 1966 Act were of little consequence because the agencies were only directed to protect habitat "insofar as practicable and consistent with the primary purposes" of the agencies, and because of the limited acquisition authority given the Secretary of the Interior. Furthermore, the 1966 Act applied only to native wildlife as opposed to foreign wildlife.

The Endangered Species Conservation Act of 1969 (P.L. 91–135) corrected several of the weaknesses of the 1966 Act. The 1969 Act expanded the Secretary's habitat acquisition authority by increasing the maximum amount that could be spent on any one area to $2.5 million from the $750,000 limit of the 1966 Act. It also redefined fish and wildlife to include "any wild mammal, fish, wild bird, amphibian, reptile, mollusk, or crustacean." The 1966 Act had been limited to vertebrate animals. But the international aspects of the 1969 Act were the most noticeable improvement. It authorized the publication of a list of species or subspecies of fish and wildlife threatened with "world-wide" extinction and prohibited their importation into the United States.

Even with the 1966 and 1969 Acts, the endangered species program was far from adequate. There still were no prohibitions on the taking of endangered species, and the habitat protection provisions were limited to only a few agencies and then only if they were practicable and consistent with the primary purposes of those agencies.

In 1973 Congress again turned its attention to endangered species. That year it enacted the comprehensive Endangered Species Act of 1973 to correct the shortcomings of its previous legislative efforts. The 1973 Act embraced "any member of the animal kingdom" within its protective reach, and for the first time authorized the listing and conservation of plants. It also established the threatened species category in addition to endangered species, thereby affording protection to species before they become endangered. The 1973 Act also included several provisions to protect endangered species and their habitat. It provided for the designation of critical habitat for endangered and threatened species to protect that essential habitat, and eliminated all restrictions on the expenditure of money from the Land and Water Conservation Fund. Significantly, the 1973 Act, for the first time, prohibited the taking of endangered species. Section 7 of the 1973 Act imposed strict but necessary requirements on all Federal agencies to protect endangered and threatened species and their habitat. First, each agency must utilize their programs to further the purposes of the Act and to carry out conservation requirements; and second, each agency must ensure that its activities do not jeopardize the continued existence of endangered or threatened species or destroy or modify critical habitat.

Since its enactment in 1973 the Endangered Species Act has remained intact with only one major amendment in 1978. That year Congress amended the Endangered Species Act of 1973 to establish an Endangered Species Interagency Committee to review Federal agency actions that would jeopardize the continued existence of a threatened or endangered species or destroy critical habitat. The Endangered

3

Species Committee then determines whether the Federal action should be exempted from the Act's prohibition of such actions. At the same time, Congress also amended the 1973 Act to require the designation of critical habitat as part of the listing process.

In 1979, Congress amended several sections of the 1973 Act in large part to bring them into conformance with agency practice and judicial decisions. None of the amendments significantly changed the substantive provisions of the 1973 Act.

The long and painstaking development of the Federal endangered and threatened species program demonstrates a commitment to the conservation of these species and their habitat. The authorization for appropriations to implement the Act expires on September 30, 1982. S. 2309 continues the Federal commitment to the conservation of endangered and threatened species and their habitat and extends the budget authority for the endangered species program through fiscal year 1985 at current authorization levels. The fact that in recent years Presidential requests for appropriations for this program and actual appropriations for the program have been significantly less than the amounts authorized is of great concern to the Members of this Committee. Significant funding reductions in fiscal year 1982, for example, have undercut the ability of the Federal Government to satisfactorily carry out its numerous responsibilities under the Act. Similarly, the elimination of funds for section 6 grants to the States has seriously disrupted the many excellent State endangered species programs. Adequate funding at or near the levels authorized by this Committee is essential to ensure the success of this important and well-established program.

The Nation has had nine years of experience with the Endangered Species Act of 1973. While the Committee found in its hearings that the Act has been the subject of much controversy, close scrutiny, and discussion, the experience shows that the Act has worked well. It has evolved to permit greater flexibility and predictability with regard to economic development and major revisions are not needed.

In addition to extending the authorization of appropriations for three years, the bill amends the current law in several respects to correct several problem areas and to make the program work better.

Under current law, the Secretary can authorize the establishment of experimental populations to aid recovery of a species, e.g. reestablishment in the wild of captive bred individuals. Other Federal agencies, State officials and private individuals, however, are reluctant to allow experimental or new populations of endangered species to be established on their land for fear that the section 7 jeopardy standard, critical habitat designation, and the section 9 taking prohibitions will be applied to limit their land management options.

Section 2 of S. 2309 encourages the establishment of "experimental populations" by allowing the establishment of such populations in a manner that would not trigger the full protective measures of the Act. All experimental populations would be treated as if they were "threatened" species. For the purposes of section 7 and critical habitat designation, "non-essential" populations (those that do not occur on Natonal Wldlife Refuges and that the Secretary finds are not necessary for the continued existence of the species) would be treated as if they were species "proposed" to be listed.

**Addendum 58a**

Treatment as "threatened" provides a mechanism to address the concern about mandatory application of the section 9 taking prohibition. Treatment as "proposed" addresses the concerns about application of the section 7 jeopardy standard and critical habitat designation.

The current listing process is poorly drafted with many complex and duplicative provisions. Furthermore, as a result of numerous procedural requirements and the absence of meaningful time limits, the listing process has come to a virtual standstill.

The 1978 amendments to the ESA required the designation of critical habitat as part of the listing process. The enactment of those amendments to section 4 burdened the listing process with nonbiological factors and, as a result, greatly decreased the number of listings. Excluding the listings that already had been proposed before the 1978 amendments to section 4, there have been only 15 new listings since those changes; in only one of the 15 listings was critical habitat designated. Thus, the designation of critical habitat has failed on two grounds. First, it is not being designated. Second, it has improperly delayed listings.

Under current law, the Secretary is given two years from date of proposal to finalize a listing action. However, if he misses the deadline the proposal is simply dropped with no reviewable decision having been made. The lack of meaningful deadlines affects proposals to delist species as well.

This bill would amend the current listing process to correct these numerous problems. First, many portions of the current law would be reordered and consolidated to provide clarity. Second, by imposing upon the Secretary a mandatory, nondiscretionary duty to make and publish decisions on petitions and in-house generated proposals to list or delist, S. 2309 would force judicially reviewable action and would, therefore, impose meaningful time limits. Finally, the bill restates the current requirement that decisions on listing are to be made solely on the basis of biological information. Testimony received from the Director of the U.S. Fish and Wildlife Service at oversight hearings before the Committee explained that under current law, some economic analysis is done for all listing packages but that this analysis is used for informational purposes only; decisions on listing are made solely on the basis of biological information. These amendments would ensure that such economic analysis is used for informational purposes only and that such analysis will not delay or affect decisions on listing.

The bill would also streamline the section 7 exemption process. In 1978 the Act was amended to provide a mechanism to exempt Federal development activities from section 7 if they are found to be in the public interest. However, industry representatives testified that they find the exemption process time consuming and unworkable. Under the 1978 amendment, a 3-member review board (representatives from the Department of the Interior, the affected State, and an administrative law judge) certifies to a 7-member cabinet level Endangered Species Committee that an exemption applicant has met certain specified criteria—engaged in good faith consultation, conducted a biological assessment of the project area, and refrained from irreversible and irretrievable commitments of resources. The Board

**Addendum 59a**

**5**

then prepares a detailed report on the activity for the Committee and the Committee votes on whether or not to exempt the activity from the Act.

Although complaints about this section of the law were undocumented, based on fear rather than fact, the bill would shorten the process so that a decision is rendered within 200 days from the date of application for an exemption instead of the current 360 days. The Secretary of the Interior (or, where Fish and Wildlife Service opinions are at issue, the Secretary of Commerce) is substituted for the Review Board, must hold a formal hearing with an administrative law judge presiding, and, in consultation with Members of the Endangered Species Committee, prepare the detailed report for the Committee.

S. 2309 also contains an amendment to resolve the conflict between sections 7 and 9 of the Act. Section 7 provides for a consultation process between Federal agencies prior to any Federal action that might jeopardize the continued existence of an endangered or threatened species or its critical habitat. If the Secretary of the Interior or the Secretary of Commerce issues a "no jeopardy" opinion regarding a proposed project, the Federal agency may proceed. However, a favorable consultation under section 7 does not free the agency or the permittee, if any, from the strict prohibitions of section 9 of the Act, which prohibits the "taking" of any individual specimen of an endangered species. The amendment would remedy this statutory contradiction by providing that action that is in compliance with measures specified by the Secretary to minimize takings in section 7 consultation will be exempt from the prohibition in section 9 against incidental takings.

The bill would overrule a D.C. Circuit Court of Appeals decision requiring the Secretary to have population estimates prior to allowing the export of species that are not listed on the United States endangered species lists but are listed on Appendix II of the Convention on International Trade in Endangered Species (CITES). Section 8 of S. 2309 requires the Secretary to make determinations on the basis of "the best available biological information derived from professionally accepted wildlife management practices". This in no way diminishes the responsibility of the United States under CITES.

Section 10 of S. 2309 adds to the policy statement in current law a recognition of water resource problems and instructs the Federal Government to work with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

The problem of over-collecting of listed plants was well documented in hearings held by this Committee. As a first step to resolve this problem, section 11 of the bill provides the tools to halt such collection from Federal lands.

The provisions of S. 2309 amend current law in response to real problems that have arisen since Congress last considered the Act. The bill maintains the integrity and strength of the Endangered Species Act of 1973, a landmark piece of legislation.

**Addendum 61a**

### SECTION-BY-SECTION ANALYSIS

#### SECTION 1. SHORT TITLE

The short title of this bill is the "Endangered Species Act Amendments of 1982".

#### SECTION 2. EXPERIMENTAL POPULATIONS

Section 2 of S. 2309 would add to the Act new provisions that are intended to give greater flexibility to the Secretary in the treatment of populations of endangered or threatened species that are purposely introduced into areas outside their current range to further the conservation of the species. Such introductions, if carefully planned and controlled, may be beneficial in securing the recovery of listed species. Thus, to encourage efforts to establish such experimental populations when the conservation needs of a species would be served by doing so, this amendment would relax certain restrictions otherwise applicable to listed species and authorizes the Secretary to relax others.

Subsection 2(a) of S. 2309 would add a new paragraph (7) to section 3 of the Act to define the term "experimental population". To qualify for special treatment afforded experimental populations, a population must have been released outside the current range of the species to further its conservation. The transport and release of such specimens must be pursuant to the Act, that is, permitted by the Secretary pursuant to section 10 by permit, regulation or otherwise. Populations resulting from releases that have not been permitted by the Secretary shall not be considered "experimental populations" entitled to the special provisions of this subsection.

The bill carefully defines how to treat introduced populations that overlap, in whole or in part, natural populations of the same species. To assure adequate protection of natural populations and to avoid potentially complicated problems of law enforcement, the definition is limited to those introduced populations that are wholly separate geographically from nonexperimental populations of the same species. Thus, for example, in the case of the introduction of individuals of a listed fish species into a portion of a stream where the same species already occurs, the introduced specimens would not be treated as an "experimental population" separate from the naturally occurring specimens. On the other hand, specimens of the same species introduced into a portion of a stream separate from any natural population (e.g. when a reservoir or other manmade or natural obstacle acts as a barrier to fish passage) would qualify as an experimental population. If an introduced population overlaps with natural populations of the same species during a portion of the year, but is wholly separate at other times (e.g. during the breeding season or in winter), the introduced population is to be treated as an experimental population at such

(7)

**Addendum 62a**

times as it is wholly separate. Such a population shall be treated as experimental only when the times of geographic separation are reasonably predictable and not when total separation occurs as a result of random and unpredictable events.

Subsection 2(b) (1) and (2) of S. 2309 clarify that permissible acts that are associated with the establishment of experimental populations are to be encompassed within the category of actions "to enhance the propagation or survival" of a listed species, a category for which the Secretary may issue permits under section 10(a)(1) of the Act. In issuing permits for such actions, the Secretary is subject to the requirement of section 10(d) that issuance will not operate to the disadvantage of the listed species.

Subsection 2(b) (3) directs the Secretary to issue such regulations as are necessary to provide for the identification of experimental populations. This requirement is intended to clarify that any population now in existence which may meet the definition of an experimental population shall be treated as an experimental population only when determined by regulation to be such. Thus, until such time as the Secretary makes an affirmative determination that a particular population is an experimental population, it shall remain subject to the same protections as any other population of the same species.

Subsection 2(b) (3) of S. 2309 also sets forth the restrictions applicable to experimental populations of listed species. All experimental populations, once determined to be such, are to be treated as though they have been separately listed as threatened species. This provision obliges the Secretary to issue such regulations as he deems necessary and advisable to provide for the conservation of the experimental population, just as he now does under subsection 4(d) for any other threatened species.

The purpose of requiring the Secretary to proceed by regulation is to provide a vehicle for the development of special regulations for each experimental population that will address the particular needs of that population. The Secretary is granted broad flexibility in promulgating regulations to protect threatened species. These regulations may even allow the taking of threatened animals. There will be instances where the regulations will allow for the incidental taking of experimental populations, such as the inadvertent taking of experimental fish species by those fishing for other species on the same body of water. Where appropriate, the regulations may allow for the direct taking of experimental populations. For example, regulations pertaining to the release of experimental populations of predators, such as red wolves, will probably allow for the taking of these animals if depredations occur or if the release of these populations will continue to be frustrated by public opposition. The Secretary, acting through the Fish and Wildlife Service or National Marine Fisheries Service, as appropriate, may avoid the need for step-by-step review and promulgation of specific regulations concerning Federal actions by entering into written agreements or memoranda of understanding with other Federal land managing agencies to develop long-term programs for the conservation of said experimental populations.

Section 7 of the Act is to be fully applicable to experimental populations unless the Secretary determines that a particular population is

**Addendum 63a**

not essential to the survival of the species as listed. If he determines that it is not, then the population is subject only to subsection 7(a)(1) and those protections of section 7 that apply to species proposed to be listed. Critical habitat may not be designated for such nonessential populations. However, any experimental population that is found on any unit of the National Wildlife Refuge System shall remain subject to the full protection of section 7.

In making the determination whether an experimental population is essential to the survival of the species, the Secretary shall consider whether the loss of the experimental population would be likely to appreciably reduce the likelihood of survival of that species in the wild as listed. If the Secretary determines that it would, the population should be considered essential to the survival of the species. The level of reduction necessary to constitute "essentiality" is expected to vary among listed species and, in most cases, experimental populations would not be essential.

The involvement of State Fish and Wildlife Agencies in the experimental population regulatory process is crucial. In addition, where experimental populations are released on or near private land, the landowners must be fully apprised of the release and the regulations under which the population will be managed.

Subsection 2(b)(3) of S. 2309 would also add a new paragraph (3) to subsection 10(a) of the Act. This new paragraph is intended to clarify the authority of the Secretary to issue permits for actions which result in the incidental taking of listed species, provided that such takings are part of an adequately funded conservation plan to promote the long-term conservation of the species. Thus, a project sponsor whose activities might result in incidental takings could apply to the Fish and Wildlife Service or National Marine Fisheries Service, as appropriate, for a permit to authorize such takings. In conjunction with the permit application, the applicant would be required to develop a conservation plan designed to ensure the long-term survival and enhancement of the species involved. An intra-agency consultation under section 7 would then occur between the Fish and Wildlife or National Marine Fisheries Service office responsible for issuing the permit and the Service office responsible for endangered species conservation. This consultation will ensure that the Service, in issuing the permit, would be in compliance with section 7(a)(2). A major factor involved in determining compliance would be the adequacy of the conservation plan, that is, whether it promotes the long-term conservation of the species and whether there are adequate assurances that the plan will be fully implemented. If these criteria are met, there would be a biological opinion of no jeopardy rendered regarding the issuance of the permit. If the conservation plan were found to be lacking, the biological opinion could specify reasonable and prudent alternatives which could be adopted. In addition, since the standard of promoting the long-term conservation of the species is greater than that of jeopardy, under the authority provided by section 7 of S. 2309 the Secretary could propose alternative measures that could be adopted to allow the project sponsor to meet the section 10(a) standard. Thus, assuming circumstances remain the same and the conservation plan is conducted in a manner that is within the scope of consultation, the issu-

ance of the section 10 permit would assure that the applicant and any subsequently involved Federal agency would also be in compliance with section 7 of the Act, and further consultation under section 7 would not be required.

In some cases, the overall effect of a project can be beneficial to a species, even though some incidental taking may occur. An example is the development of some 3000 dwelling units on the San Bruno Mountains near San Francisco. This site is also habitat for three endangered butterflies. The project developer, in cooperation with the U.S. Fish and Wildlife Service and State authorities is developing a conservation plan for the protection and enhancement of the butterflies' habitat, to be financed through an assessment on home owners. Absent the development of this project these butterfly recovery actions may well have never been developed. The proposed amendment should lead to resolution of potential conflicts between endangered species and the actions of private developers, while at the same time encouraging these developers to become more actively involved in the conservation of these species.

### SECTION 3. COOPERATION WITH THE STATES

This section of the bill would amend section 6 of the Act to increase the maximum Federal share of grants to States from 66⅔ percent to 75 percent for single State projects and from 75 percent to 90 percent for multi-State projects. The purpose of this amendment is to make the endangered species grant program consistent with existing Federal responsibilities under the Federal Aid in Wildlife Restoration Program (Pittman-Robertson) and the Federal Aid in Fish Restoration Program (Dingell-Johnson). It is appropriate that the Federal Government provide the same support and encouragement to states for endangered species programs.

### SECTION 4. LISTING PROCESS

The cornerstone of effective implementation of the Endangered Species Act is the process to determine which species should be listed as endangered or threatened and which listed species should be reclassified or removed from the lists (delisted). Listing is critically important because it sets in motion the Act's other provisions, including the protective regulations, consultation requirements, and recovery efforts.

A considerable number of species have been identified by the U.S. Fish and Wildlife Service as "candidates" for eventual designation as endangered or threatened. The total number exceeds 3,000, of which more than 1,800 are plant species with data indicating they probably should be listed. Because of the length and complexity of the formal listing procedures now in force, many such species are likely not to be accorded recognition and full protection for some years, despite convincing evidence that such protection is warranted. Failure to list species in a timely manner precludes early identification of possible or probable conflicts. Identification of such conflicts at the earliest stage possible in project planning provides an opportunity to make minor modifications that may remove the potential for conflict.

**Addendum 65a**

**11**

The listing process under section 4 of the current law has been seriously hampered since the 1978 amendments to the Act. These amendments require the Secretary "to the maximum extent prudent" to specify at the time a species is proposed, any habitat of the species which is then considered to be critical. The 1978 amendments indirectly introduced economic considerations into the listing process by requiring the Secretary to consider the economic impact of specifying the habitat. This is one of only two instances in the Act where economic impact is to be considered (the other relates to the section 7(h) exemption process).

Section 4 of S. 2309 would make various amendments to section 4 of the Act. The principal purpose of these amendments is to insure that decisions pertaining to the listing or delisting of species are based solely upon biological criteria and to prevent non-biological considerations from affecting such decisions. These amendments are intended to expedite the listing process and to ensure prompt action in determining the status of the many species that have already been identified by the Secretary of the Interior as likely to be eligible for listing.

Section 4(a)(2) of the proposed amendments requires the Secretary, to the maximum extent prudent and determinable, to designate the critical habitat of any endangered or threatened species concurrent with the determination of the status and the lising of the species. During the hearings on these amendments, the Administration's witnesses, among others, expressed much concern that critical habitat designations may delay the listing process if insufficient information exists at the time of listing to determine the critical habitat of a species.

At the present time, the Secretary is required to withdraw a proposal from further consideration if he fails to make a final determination with respect to the status of the species within two years after it has been proposed for listing or delisting. Since 1978, this requirement has caused the Secretary to withdraw numerous listing proposals solely because the Secretary has been unable, within the prescribed two year period, to complete the economic analysis of critical habitat designation. Other proposals have been withdrawn because the scientific information necessary to designate critical habitat has been unavailable. Under the law as it would be amended, the Secretary will be required to list a species for which sufficient information justifying its listing is available within one year after it is proposed for listing. These amendments would require the Secretary to designate critical habitat concurrent with listing unless the Secretary determines that such designation is imprudent or that insufficient information exists to determine the species' critical habitat.

If the Secretary finds that critical habitat is not determinable based on the best scientific and commercial data available at the time of listing, the Secretary shall proceed with the listing and state his finding in the listing rulemaking. The Secretary must continue to gather the information necessary to determine the species' critical habitat and once adequate information is obtained, promulgate regulations designating the habitat.

Similarly, nothing in these proposed amendments would prevent the Secretary from designating critical habitat of species listed before the date of enactment of these amendments.

**Addendum 66a**

When designating critical habitat, the Secretary is expected to comply with the statutory definition and to designate "specific areas." Several witnesses suggested that instead of designating such "specific areas" the Secretary was designating "geographical ranges." Section 3(5)(c) of the Act states as a general rule that "critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species."

Section 4(a)(3) of the proposed amendments to the listing process makes clear that listing determinations must be based solely on the factor set forth in section 4(a)(1) of the Act. This amendment would preclude the Secretary from considering economic or other non-biological factors in determining whether a species should be listed or delisted. Listings or delistings must be based solely on biological considerations. Only in this way will the endangered and threatened species lists accurately reflect those species that are or are likely to be in danger of extinction.

The proposed amendments would continue to require the Secretary to consider fully for listing those species that States or foreign countries have designated or identified as in need of protection. This requirement applies regardless of the distribution of such species.

The proposed amendments would streamline the listing process by reducing the time periods for rulemaking, consolidating public meeting and hearing requirements, and requiring only if practical, publication of proposed regulations in local newspapers. The proposed amendments would require the Secretary to allow the public a minimum 60-day comment period on a proposed regulation and an opportunity to request within 45 days after the date of the general notice of proposed rulemaking, a public hearing on the action. If requested, the Secretary must promptly conduct a public hearing on the action. The public hearing should be conducted in a timely manner to allow for meaningful consideration of all information gleaned during the hearing before publication of the final determination. The Secretary shall determine the procedures necessary for such hearing.

As part of the public comment process, the Secretary would be required to provide to the State agency responsible for the conservation of fish or wildlife or plants in each State in which the species is believed to occur actual notice of any proposed regulation concerning the listing of such species. He would also be required to invite the comment of that agency on the proposed regulation. The involvement and advice of such State agencies in the Federal regulatory process is crucial and must not be ignored.

The proposed amendment to the petition process (section 4(a)(3) of S. 2309) alter the evidentiary standard petitioners must satisfy to warrant a status review of the species proposed for listing or delisting. The Act previously required the Secretary to determine whether a petitioner had presented substantial evidence justifying a status review. Concern was expressed at the hearings that, particularly with respect to the economic considerations required for critical habitat designations, petitioners may be required to present economic information relevant to the proposed action. The amendments make clear that petitioners would be required to present only biological, not economic information.

**13**

The proposed amendments would not change the amount of information needed to warrant a status review of the species. As under the existing provisions, the petitioner need only present information sufficient to indicate that an addition to, or removal from, the lists may be warranted and thus, that a status review of the species should be conducted.

In several ways, these amendments will replace the Secretary's discretion with mandatory, nondiscretionary duties. For example, under current law, if a petition presents substantial evidence warranting a review of the status of a species, the Secretary is to undertake such review. However, the statute imposes no deadlines within which such review is to be completed. In practice, such status reviews have often continued indefinitely, sometimes for many years. These amendments will force action on listing and delisting proposals by requiring that the Secretary:

(1) promptly, after receipt of a petition, determine and publish a finding whether the petition presents substantial scientific information;

(2) within 90 days of receiving such a petition, the Secretary must conduct a review of the status of the species; and

(3) within 12 months of receiving the petition, the Secretary must publish in the Federal Register either:

(a) a proposed regulation to implement the petitioned action; or

(b) a finding that the petitioned action is, not in fact, warranted; or

(c) if he is actively working on other listing actions, actions that concern species facing a greater degree of threat than the species addressed in the petition, he must publish a finding that such other actions preclude his proposing the petitioned action at that point in time.

If the Secretary determines that a petition does not present substantial evidence that the petitioned action may be warranted, or that the petitioned action is not warranted, such negative determinations shall be subject to judicial review. The object of such review is to determine whether the Secretary's action was arbitrary or capricious in light of the scientific information available concerning the petitioned action.

If, within 12 months of receiving a petition that warrants the publication of a proposed regulation, the Secretary determines that he is unable to propose such action at that time or, if able to propose the action, unable to make a final determination within the statutorily specified and judicially enforceable time frame, he will be excused from publishing a proposed regulation provided he satisfies several, limited conditions.

First, he must be actively working on other listing actions, actions that concern species facing a greater degree of threat than the species addressed in the petition. If a petition concerns a population facing a high degree of threat, active work on a full species or subspecies facing an equally high degree of threat shall take precedence. Similarly, petitions concerning a full species or subspecies facing a high degree of threat shall take precedence over populations facing an

**Addendum 68a**

14

equally high degree of threat. Preferential treatment for "higher life forms", species of a higher taxonomic order, has no basis in the Act nor in these amendments. The Act provides for equal legal protection of all life forms, including plants and invertebrates, as endangered or threatened species. Biologically, it makes sense to treat all taxonomic groups equally or even to place some special emphasis on protecting plants and invertebrates since they form the bases of ecosystems and food chains upon which all other life depends. The Act's stated purpose is to conserve ecosystems.

Second, the Secretary must determine and publish a finding that such other work which has resulted in pending and imminent proposals actually precludes his preparing the petitioned action at that point in time. Nothing in these amendments would prevent the Secretary from proposing such petitioned action at a later point in time. Similarly, a determination that a petitioned action shall not be proposed will not prevent an interested party from resubmitting a petition.

Finally, the Secretary must present evidence that he is, in fact, making efficient and speedy progress in the process of listing such other species. With more than 3,000 species already identified as "candidates" for designation as endangered or threatened, the Secretary should make considerably more progress in the listing process than he has during the past 14 months. As are the determinations discussed earlier, these too shall be subject to judicial review. In cases challenging the Secretary's claim of inability to propose an otherwise warranted petitioned action, the court will, in essence, be called on to separate justifications grounded in the purposes of the Act from the footdragging efforts of a deliquent agency.

To ensure that proposals, whether developed in-house or by petition, are acted upon quickly, these amendments would shorten the allowable time for final action from 2 years to one year from date of proposal. The one-year period within which the Secretary must make a final determination may, under limited circumstances, be extended to eighteen months. Such extension is permissible only if the Secretary finds that there is substantial disagreement regarding the sufficiency or accuracy of the information available with respect to the listing or delisting proposal. Extensions to allow additional time to conduct economic or other analyses are not permissible.

At the end of such 12 month period (or 18 month period, if an extension occurs), the Secretary must make a final determination with respect to the listing proposal. He must determine, on the basis of the information then available, either that the species should be listed or delisted, or that the proposal for listing or delisting should not be promulgated as a final regulation. If he determines that a final regulation is not warranted because of insufficient evidence to promulgate the proposed action, that determination shall be subject to judicial review to determine whether the Secretary's determination was arbitrary or capricious in light of the scientific information available concerning the proposed action. If he determines that a final regulation is warranted, he must publish the final regulation prior to the expiration of the prescribed twelve or eighteen month period.

Although amended section 4(f)(5) of the Act would require that the Secretary make a final determination with respect to any proposed

**Addendum 69a**

15

listing action within one year after such proposal is published, this requirement shall not apply to any listing proposal outstanding as of the date of these amendments. At the current time, there are approximately 20 listing proposals outstanding, all of which are already more than a year old. Final determinations with respect to these proposals should be made within the time limits prescribed by current law, without regard to these amendments. Proposals previously made and withdrawn pursuant to existing Section 4(f)(5) may be reproposed if substantial evidence warrants such reproposal whether or not such evidence post-dates the withdrawal of such proposals.

The proposals previously withdrawn pursuant to existing section 4(f)(5) were withdrawn without any final determination of the status of the species and because of the inability to complete the burdensome procedures from which the Committee's bill is designed to give relief. Accordingly, such species that are biologically eligible for reproposal may be reproposed without regard to when the biological evidence was developed.

Section 4(b) of S. 2309 would amend the citizen suit provision of the Act to authorize actions against the Secretary for failure to perform the acts and duties that are imposed by section 4(a) of S. 2309. Unlike the situation under current law, the Secretary cannot simply refuse to act. He must make decisions within specified periods of time and he will be accountable for failure to make timely and defensible decisions.

The amendments to section 4 of the Act would also substitute the word "recreational" for the word "sporting" in amended subsection 4(a)(1)(B). Subsection 4(a)(1) of the Act requires the Secretary to consider whether a species is endangered or threatened because of any of several factors set forth there. The summary of factors identified in section 4(a)(1) is intended to be comprehensive, and to exclude no possible cause of endangerment. This is made clear by amended subsection 4(a)(1)(E), which requires the Secretary to consider, in addition to the specific factors identified in paragraphs (A) through (D), any "other natural or manmade factors affecting" the continued existence of any species. Thus, the change in the wording of subsection 4(a)(1)(B) is not intended to limit the authority of the Secretary to consider whether a particular species may be endangered or threatened for any reason. The change in wording is not intended to have any substantive effect. Testimony received by the Committee suggested that the word "sporting" was perceived as an insult to sport hunters. The Endangered Species Act is not meant to imply that any lawful consumptive use of wildlife is improper. The license-buying sportsman is recognized as an active and dependable conservationist who believes in protection of endangered species and who finances State endangered species protection programs. Improperly regulated hunting or illegal hunting, however, can seriously and adversely affect wildlife populations. Wildlife management practices that are not based on proper biology and lax enforcement of hunting regulations shall not be condoned or tolerated.

The Committee received testimony that one serious problem which has not been resolved administratively involves myriad wildlife lists one is compelled to review to ascertain compliance with the law. The

**Addendum 70a**

Department of Interior has yet to publish a consolidated list indicating by species the various laws and/or regulations that are applicable. The lists for CITES, the Endangered Species Act, migratory bird treaties, etc., as well as various regulations overlap and often lead to confusion. The Department of the Interior should sanction a privately published consolidated list or publish their own consolidated wildlife list and code it to indicate the applicable laws and regulations.

The Committee also received testimony stating that "the Secretary has listed some foreign species as endangered throughout their entire range without considering whether their population status varies from country to country." There may be nations where a combination of a healthy population and effective management programs permit the sport hunting of such species without adversely affecting its status. The failure to recognize this may result in the foreign nations being denied much-needed revenues derived from license fees that are used to fund their wildlife conservation and management programs.

If the Secretary is in receipt of biological information from a foreign nation with respect to a resident game species listed as "endangered", he should evaluate the status of such species within the country in question. The evaluation should consider the effectiveness of management programs such as artificial propagation, and whether these programs permit sport hunting of listed species in nations where it otherwise might be detrimental to the species. The evaluation should also determine whether the specific country in question has a management program for the species, whether the species' population can sustain a sport hunting harvest, and whether the sport hunting enhances the survival of the species. If the Secretary determines that sport hunting in such country will assist in the conservation of a listed species, he should issue appropriate regulations to facilitate the import of sport-hunted trophies of such specimens.

The above-mentioned criteria should be taken into account in future listings of game species as well.

### SECTION 5. EXEMPTION PROCESS

The 1978 amendments to section 7 of the Endangered Species Act created a process by which actions authorized, funded, or carried out by Federal agencies could be exempted from the provisions of the Act. Additional minor changes were made to this process in the 1979 amendments to the Act. Section 5 of S. 2309 contains a number of amendments to streamline the exemption process. The proposed changes are procedural only, they are not intended to alter the substantive requirements or standards that were adopted in 1978.

The exemption process was designed to resolve endangered species conflicts after consultation has been exhausted and after other administrative remedies have resulted in final agency action. The basic premise of the 1978 amendments, the 1979 amendments and S. 2309 is that the integrity of the interagency consultation process designated under section 7 of the Act be preserved. Many, if not most, conflicts between the Endangered Species Act and Federal actions can be resolved by full and good faith consultation between the project agency and the Fish and Wildlife Service or the National Marine Fisheries

**Addendum 71a**

17

Service, as appropriate. Only in those instances where the consultation process has been exhausted and a conflict still exists should the Endangered Species Committee consider granting an exemption for a Federal action.

Under current law, when an exemption application is filed with the Secretary responsible for the biological opinion concerned, a three-member Review Board is formed to make a full examination of the consultation that has been carried out. It is the function of the Review Board to determine by majority vote within 60 days after its appointment: (1) whether an irresolvable conflict exists; and (2) whether the exemption applicant and the Federal agency concerned have:

(a) carried out their consultation responsibilities in good faith and have made "a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action" which would avoid jeopardy to the species or adverse modification to its critical habitat;

(b) conducted a biological assessment, if required; and

(c) refrained from making an irreversible or irretrievable commitment of resources.

If the Board finds that the applicant or Federal agency concerned has failed to meet any of the above mentioned exemption criteria, no exemption can be granted and the finding is considered a final action under the Administrative Procedure Act. If, however, the Board makes a positive finding concerning the applicant's eligibility, it proceeds to prepare a report for the cabinet-level Endangered Species Committee, to be presented within 180 days following the Board's findings.

Section 5 of S. 2309 amends section 7(g) of the Act by deleting all references to a Review Board. The functions of the Review Board would be carried out by the Secretary. The finding concerning the applicant's eligibility is to be made by the Secretary responsible for the biological opinion concerned. In those instances where both the Department of the Interior and the Department of Commerce have issued negative biological opinions for the same agency action, the Secretaries of the Interior and Commerce shall jointly review the application and render a finding concerning the applicant's eligibility for an exemption.

Section 7(g), as amended by S. 2309, would not require a specific finding as to whether an "irresolvable conflict" exists. This requirement was deleted because all conflicts are "resolvable" whether by accommodation, exemption or otherwise. The purpose of the original requirement was to mandate close cooperation between a Federal action agency on the one hand and the Fish and Wildlife Service and National Marine Fisheries Service on the other. Under current law, an action cannot be considered for an exemption unless every effort has been made to resolve the conflict. The same would be true under the law as it is proposed to be amended by S. 2309. Failure to make every effort to resolve the conflict is evidence of failure to carry out consultation responsibilities in good faith. The Endangered Species Committee is designed to function as an administrative court of last resort. Circumstances can change, procedures can be overlooked, and options may remain unexplored. In such situations, the Secretary should reject an

application until all other administrative avenues have been pursued in good faith and resulted in final action.

Under current law, the Review Board must determine as a threshold matter whether there has been an irreversible or irretrievable commitment of resources. If the Board finds that there has been such a commitment of resources, the application is denied at the outset. Such a determination may involve complex questions of fact and data that may not be readily available. These amendments would reduce from 60 days to 20 days the time available to make the initial determination concerning the applicant's eligibility. In some cases, it may not be possible to make the determination concerning commitment of resources within 20 days after receipt of the application. Therefore, section 5 of S. 2309 would require the Secretary to determine whether an irreversible or irretrievable commitment of resources has been made "to the extent determinable within the timeframe provided." If the Secretary finds that such a commitment has been made, no exemption can be granted and the finding is considered a final action. If the Secretary does not make such a finding, for whatever reason, the matter must be addressed in the report to the Endangered Species Committee. If the Committee concludes that an irreversible or irretrievable commitment of resources has been made, it may not grant an exemption.

Under these amendments, the Secretary shall, if he determines that the Federal agency concerned and the exemption applicant have met the threshold requirements, conduct hearings and prepare the report for the Endangered Species Committee in consultation with the members of that Committee. The term "in consultation with" in this instance does not connote the formal interagency consultation process provided for in section 7. Rather, it is intended that in preparing the report, the Secretary or his staff coordinate closely with Members of the Endangered Species Committee to keep them regularly informed of the progress of the report and to provide them with the opportunity to participate in the collection of information, analysis and drafting of the report.

The conduct of hearings and preparation of the report for the Endangered Species Committee would, pursuant to these amendments, be the responsibility of the Secretary of the Interior. However, to avoid the appearance of a conflict of interest, the Secretary of Commerce would be responsible for the conduct of hearings and preparation of the report when the biological opinion concerned was issued by the Department of the Interior's Fish and Wildlife Service. Similarly, when a biological opinion was issued by the Department of Commerce with respect to an action of an Interior Department agency, or visa versa, the Secretaries shall jointly conduct hearings and prepare the report.

These amendments would reduce from 180 days to 150 days the time available to make the report for the Endangered Species Committee. Notwithstanding this reduction in time, it will be practicable in most, if not all, cases to conduct the required hearing in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of title 5, United States Code. A formal adjudicatory hearing to review the question of the exemption will provide a record of facts that has been compiled by a neutral party, the presiding administra-

tive law·judge. The record·of the proceedings is to be transmitted to the Endangered Species Committee along with the Secretary's report.

The Committee is to meet at the call of its Chairman, the Secretary of the Interior. Under current law, the Committee has 90 days after receiving the report of the Review Board to decide whether or not to grant the agency action an exemption. These amendments would reduce the 90 day period and provide that the Committee shall have 30 days after receiving the report of the Secretary to render a decision. The Committee's determination must be based on the record developed by the administrative law judge, the report prepared by the Secretary, and any record developed by the Committee itself. Although the Committee has the authority to receive testimony and evidence, it is not expected to conduct additional formal adjudicatory hearings.

The proposed amendment to section 7(e)(10) of the Act would delete the requirement that a Committee member's representative be a Presidential appointee. The representative, however, should be a Federal officeholder.

In reducing the time allowed for consideration of an application, it is not intended that the quality for the deliberations be diminished or that unrealistic time constraints be placed upon members of the Endangered Species Committee. It is intended that the Secretary, in preparing the report, will keep the members of the Committee fully informed and will provide all relevant documents to them so that they may be thoroughly familiar with the background evidence when the Secretary's report and the hearing record are provided. Full consultation and the provision of background information while the Secretary is .preparing the report will ensure that an informed and reasoned decision can be made, with full knowledge of the facts. within the time frame allotted.

### SECTION 6. CONSULTATION PROCESS

This section would amend section 7(b) of the Act. At the present time, consultation between the Secretary acting through the Fish and Wildlife Service or the National Marine Fisheries Service as appropriate and the Federal agency must be concluded within 90 days after initiation, unless extended for a longer period that is mutually agreeable to the Secretary and the Federal agency. In the case of Federal actions that involve the issuance of permits or licenses to private parties, the applicant for such permit or license has no statutory authority to object to the extension of consultation. The result may be than consultation will be extended for a sufficiently long period that the permit of license applicant will, as a practical matter, be unable to undertake the action for which he seeks a permit or license. To avoid that result and to provide some certainty for the applicant, while at the same time allowing the Secretary and the Federal agency sufficient time to gather the necessary information to render an informed biological opinion, subsection 7(b)(1), as amended, would provide that consultation may be extended beyond the normal period of 90 days by mutual agreement of the Secretary and the Federal agency involved, but if such extension is for more than an additional 60 days, the concurrence of the

affected permit or license applicant, if any, must be obtained for such additional extension.

When an extension is agreed to, the Secretary would be required to specify what additional information is needed to complete consultation and on what date the biological opinion can be rendered.

Permit or license applicants should, in most cases, recognize the advantage to them of concurring in such further extensions when those extensions are necessary to gather the additional biological information necessary to render an informed biological opinion as to whether issuance of the permit or license would comply with the requirements of Section 7(a)(2). When biological opinions are rendered on the basis of inadequate information, the Secretary and the agency have a continuing responsibility to develop adequate information. If a biological opinion concludes on the basis of inadequate information that an agency action will comply with the requirements of section 7(a)(2), the agency may decide to proceed and, for example, issue the permit or license. However, such action is taken with the understanding that new information may be developed, consultation reinitiated and a biological opinion may conclude that the action would violate section 7(a)(2). In such a case, the applicant would have committed resources at his own risk with regard to any future exemption application pursuant to section 7(g).

Nothing in this proposed amendment is intended to affect the definition of "agency action" as interpreted by the courts.

Consultation under section 7 of the Act is intended to provide a process by which potential conflicts between Federal activities and endangered species protection can be identified and resolved. Most, if not all, such conflicts can be remedied through proper cooperation between local, State, and Federal authorities. Further, emphasis should be given throughout the consultation process, including suggestions for alternatives under section 7(b) and biological assessments under section 7(c), to opportunities for participation by permit applicants, if any. Such involvement by permit applicants increases the likelihood that conflicts will be resolved in a timely manner and that their method of resolution will be equally acceptable to all interested parties. The ultimate responsibility for compliance with section 7, however, continues to remain with the Federal agencies.

### SECTION 7. (RELATIONSHIP BETWEEN SECTIONS 7 AND 9 OF THE ACT)

Under the existing provisions of the Act, Federal agencies that receive favorable biological opinions which conclude that the agency action would not violate section 7(a)(2) remain subject to the section 9 prohibition against taking individual specimens of endangered species of fish or wildlife. Should a taking occur, therefore, the offending party may be subjected to citizen suits or civil or criminal penalties for violating section 9 of the Act.

Section 7 of S. 2309 would address this problem by amending section 7(b) of the Act to require the Secretary, in cases where he has concluded that the agency action would not violate section 7(a)(2), to provide a written statement specifying (1) the extent of take incidental to the agency action that would not violate section 7(a)(2); and (2)

21

those reasonable and prudent measures that must be followed to minimize such takings. If a Federal or private action that is in compliance with the measures specified to minimize takings results in the taking of specimens of a species that was the subject of the biological opinion, such action will not be considered a "taking" for the purposes of section 9 of the Act. Actions that are not in compliance with the specified measures, however, remain subject to the prohibition against takings that is contained in section 9.

These provisions would preserve the integrity of the current section 7 consultation process as well as the integrity of the Secretary's biological opinions. The amendment would not lessen in any way an agency's obligation under section 7(a)(2) to insure that its action is not likely to jeopardize the continued existence of a listed species or to result in the destruction or adverse modification of critical habitat.

The amendment would, however, authorize the Secretary to issue, in addition to issuing a biological opinion, a written statement that places mandatory and enforceable controls on the means and level of incidental takings that may be allowed with respect to the agency action. In no instance, however, may the Secretary authorize takings which would result in violation of Section 7(a)(2). The written statement concerning incidental takings should be appended to the biological opinion.

Under the proposed amendment, the Secretary is required to specify the extent of incidental take that would not violate the Section 7(a)(2) standard. The phrase "extent of take" is used to allow the Secretary flexibility in expressing the point at which incidental takings might result in a violation of Section 7(a)(2). In some cases, the Secretary may determine that it is inappropriate for the "extent of take" to be expressed in terms of numbers of individuals, or numbers of parts, products, eggs or offspring of individuals. In such cases, "extent of take" may be expressed as incidental takings which occur when the action is in compliance with the measures specified to minimize takings. It is not intended that a quota necessarily be established, but rather that Federal agencies and permit or license applicants, if any, be provided with notice of the point at which incidental takings would result in possible violation of Section 7(a)(2) of the Act. If the specified extent of the take is exceeded, the Federal agency or permit or license applicant, if any, must immediately reinitiate consultation.

The proposed amendment would also require the Secretary to specify those reasonable and prudent measures that must be followed to minimize takings of individuals or parts, products, eggs or offspring of individuals of the species concerned. Such measures shall be mandatory. The Secretary may use discretion in determining such measures, which may include reporting and monitoring requirements. The proposed amendments are not intended to provide a liberal exemption from the taking prohibitions of the Act for a large class of activities. Rather, only a narrow set of activities that are conducted in compliance with the specified reasonable and prudent measures shall be exempt from the taking prohibitions of the Act. Any agency or applicant taking a listed species that was not the subject of the biological opinion or taking any listed species by actions that are not in compliance with the measures specified by the Secretary shall be

**Addendum 76a**

liable for such takings under the Act. In enacting the Endangered
Species Act in 1973, Congress was well aware that one of the most
effective tools for conserving endangered wildlife was a proscription
on taking. The proposed amendment is not intended to weaken this
tool; rather, it is intended to provide Federal agencies and applic-
cants with some certainty as to whether they may be liable for violat-
ing the taking provisions of the Act if their activity complies with
Section 7(a)(2) and the action agency or applicant has in good faith
taken all reasonable and prudent steps necessary to minimize or avoid
incidental takings.

Nothing in this amendment is intended to void more restrictive
State laws or regulations respecting the particular species, and the
provisions of Section 6(f) are in no way modified by the amendment.

### SECTION 8. CONVENTION IMPLEMENTATION

Section 8 of S. 2309 adds a new paragraph to section 8A of the Act
to overrule the decision of the U.S. Court of Appeals for the District
of Columbia Circuit in *Defenders of Wildlife, Inc.* v. *Endangered
Species Scientific Authority*, 659 F. 2d 168 (D.C. Cir. 1981). The court
held that a valid no-detriment finding concerning export of bobcat
pelts cannot be made under the Convention on International Trade in
Endangered Species of Wild Fauna and Flora (CITES or the conven-
tion) without a reliable estimate of the bobcat population in a State.
The ruling of the court is not based on sound wildlife management.

This amendment makes clear that, with respect to wildlife species,
the Secretary is required to base export determinations and advice
upon the best available biological information derived from profes-
sionally accepted practices used in wildlife management. In the case
of the bobcat, as with most other wild animal populations, the re-
source is monitored by a variety of techniques that yield information
used in evaluating the condition of a population. As these data are
accumulated over time, they reflect trends and call attention to changes
in the population. Habitat information, indices of population size,
age and sex structure, and harvest information are all used to evaluate
population status. If population estimates are available for a par-
ticular species, such information shall be considered with other data
in making export decisions. The Secretary shall not, however, be re-
quired to make, nor may he require any State to make, estimates of
population size as a prerequisite to making the determinations and
rendering the advice required by Article IV of the Convention.
Provided that there is other data derived from professionally ac-
cepted wildlife management practices establishing that export will
not be detrimental to the survival of the species, no exports shall be
disallowed for the reason that population estimates are not available.
If available population estimates contradict other information derived
from professionally accepted wildlife management practices, the Sec-
retary shall consider all information in making his export decision.
Effective on the data of enactment of this Act, the Secretary's export
decisions shall be based upon the criteria set forth in this amendment.
Such decisions may be rendered with respect to future export of
specimens that have been lawfully taken prior to the date of enactment
of this Act.

**Addendum 77a**

23

The Convention extends protection to certain species which are involved in international trade but, with respect to many listed species which are native to the United States, primary authority for management and protection resides in the States. With respect to such species, the Secretary's no-detriment findings are properly based on information generated by State agencies possessing primary management authority. The Secretary is not required to independently generate data, on which to base export decisions, which is being collected by State biologists.

In making Convention findings, the Secretary may require the establishment of target harvest levels and tagging procedures to ensure that export of any species will not be detrimental to the survival of the species.

Prior to 1979, the Endangered Species Scientific Authority (ESSA), an interagency committee, operated as the United States scientific authority with responsibilities under the Convention. The 1979 amendments to the Act, however, abolished ESSA and transferred that authority to the Secretary of the Interior acting through the United States Fish and Wildlife Services (FWS). A new organization, the International Convention Advisory Commission (ICAC) was created to advise the Secretary primarily on scientific matters relating to the Convention.

Since fiscal year 1982, funding for ICAC has been eliminated and ICAC no longer has any staff. The staff of FWS can and should advise the Secretary on scientific matters relating to the Convention. Many of the useful functions that were performed by ICAC are already being performed by the various offices of FWS. For example: Law Enforcement is continuing the monitoring of imports and exports; Office of Scientific Authority is reviewing draft questionnaires for permit applicants; Wildlife Permit Office gets continuing input from all involved Federal agencies through the Management Authority Contact Group (this group meets monthly and covers species and non-species Convention issues); public input on Convention positions is guaranteed by regulation; and public input on permit applications concerning species which are also endangered species is guaranteed through notice in the Federal Register.

The United States is a leader in international conservation efforts. We have a long history in this respect and one of the most important examples of our leadership is the Convention. It was a United States initiative and, through the Endangered Species Act, the United States has responsibly implemented the requirements of the Convention and has encouraged other nations to do likewise. It is important for us to retain leadership in order to be able to guide conservation along practical, balanced, scientific lines which are acceptable to conservationist and commercial interests alike, and which recognizes the divisions between Federal, State and local responsibilities. The amendments contained in section 8 of S. 2309 do not weaken our leadership role and are consistent with our international obligations under the Convention. It is important to note that they would retain the independent authority of the Secretary of the Interior, acting as the United States national scientific authority, to make "no detriment" findings as required by the Convention.

**Addendum 78a**

24

### SECTION 9. ENFORCEMENT

The Attorney General of the United States may not be authorized to seek injunctions under the Act. Although section 11 of the Act accords private citizens the right to seek injunctive relief, no such Federal enforcement authority is explicitly provided to the Attorney General. Section 9 of S. 2309 explicitly provides such authority.

Injunctions provide greater opportunity to attempt resolution of conflicts before harm to a species occurs. Because courts are reluctant to infer a right of action on behalf of the government absent a specific congressional grant of authority, however, the Department of Justice has chosen not to pursue this form of relief under the Act. The ability to enjoin a violation of the Act rather than the ability only to prosecute a completed violation will better serve the interests of the public, the potential violator and the potentially harmed species.

### SECTION 10. MISCELLANEOUS

This section deletes an outdated provision of the law relating to the Tellico and Grayrocks Dam projects, clarifies the scope of exiting statutory exceptions to the prohibitions contained in section 9 of the Act, and adds a policy statement to current law.

The language of subsections 9(b)(1) and 9(b)(2) of the Act, "this section shall not apply to," exempt certain pre-Act wildlife specimens and certain raptors from the entirety of section 9. Such language is overly-broad. Section 9 of the Act includes prohibitions in subsection 9(c) that implement the Convention on International Trade in Endangered Species (CITES) as well as the designated port and reporting requirements of subsection 9(d). The international obligation of the United States to apply CITES to these species should not be overriden. In addition to preventing the United States from meeting its international obligation, such an overly-broad interpretation could cause problems for persons engaging in legitimate transactions. Under current law, the Federal Government may not have the authority to issue CITES permits for specimens covered by subsection 9(b)(1) and 9(b)(2). Without the appropriate permits from the United States, other countries may not allow the importation of such specimens from the United States.

Subsections 10(b) and 10(c) of S. 2309 would correct these problems by: (1) allowing the United States to meet its international obligation under CITES; (2) authorizing CITES permits to be issued for such specimens; and (3) retaining the designated port and reporting requirements, which are a cost-efficient method of data gathering and control for CITES and other laws enforced by the Federal Government.

Subsection 10(b) of S. 2309 would also resolve a conflict between two Federal circuit court opinions regarding the applicability of the prohibitions of section 9 of the Act to pre-Act wildlife held in the course of a commercial activity after December 28, 1973.

In the case of *United States* v. *Kepler*, 531 F.2d 796 (6th Cir. 1976), the U.S. Court of Appeals for the Sixth Circuit ruled that the exemption did not apply to wildlife transported in the course of a commercial

**Addendum 79a**

activity in 1974, even though the wildlife may have been held for non-commercial purposes on December 28, 1973.

In the case of *United States* v. *Molt*, 624 F.2d 1092 (3rd Cir. 1980), however, the United States Court of Appeals for the Third Circuit held that the pre-Act wildlife clause renders the Act's prohibitions unduly vague when applied to wildlife held commercially after December 28, 1973. The majority of the court in *Molt* ignored *Kepler* and refused to consider the exemption's legislative history. Focusing instead on the syntax of the exemption, the majority in *Molt* noted that the language of the exemption stating its inapplicability to wildlife "held in the course of a commercial activity" was separated from the language stating its applicability to wildlife held in captivity on December 28, 1973, by only a semicolon. The majority concluded that the phrase, "held in the course of a commercial activity," could be read as referring only to December 28, 1973, and, therefore, that the Act failed to give sufficient notice that its prohibitions applied to wildlife held commercially after that date.

The Third Circuit's *Molt* decision is wrong on the law and, if followed, will open a large loophole in the Act's regulatory scheme and have significant adverse effects on the endangered species program. Under the *Molt* decision, defendants charged with a violation of the Act will merely have to produce some evidence that on December 28, 1973, their wildlife was in a private collection or otherwise held for noncommercial purposes. Such evidence is virtually impossible to rebut and will become progressively more difficult as the years progress.

To clarify the pre-Act exemption, subsection 10(b) of S. 2309 would amend subsection 9(b)(1) of the Act. The interpretation of the Court of Appeals for the Sixth Circuit in *United States* v. *Kepler* is adopted as the proper scope of subsection 9(b)(1). The amendment would also clarify that with regard to species that are listed pursuant to section 4 of the Act subsequent to December 28, 1973, the date of enactment of the Act, the provisions of subsection 9(b)(1) become applicable on the date of publication of a final regulation adding such species to the list.

Subsection 10(d) of S. 2309 adds a new paragraph to subsection 2(c) of the Act, the statement of congressional policy. This amendment is not intended to and does not change the substantive or procedural requirements of the Act with respect to the conservation of endangered or threatened species, nor is the amendment intended to alter in any way any provision of State law, regulation, or rule of law, or of any, interstate compact covering the appropriation, use, or diversion of water. Rather, the purpose of the amendment is to recognize the individual States' interest and, very often, the regional interest with respect to water allocation. The policy statement contained in this amendment recognizes that most of the potential conflicts between species conservation and water resource development can be avoided through close cooperation between local, State and Federal authorities. The Committee amendment to the Subcommittee version of this amendment was not based upon agreement or disagreement with the issues addressed therein. Rather, the provision

adopted by the Committee more accurately reflects the intent of the original amendment to provide a statement of policy and not an interpretation of law.

### SECTION 11. REMOVAL OF PLANTS

Section 11 of S. 2309 would amend section 9 of the Act by adding a provision to prohibit the removal and reduction to possession of any endangered plant that is on Federal land. Current law prohibits the taking of any endangered species of fish or wildlife. It does not, however, prohibit the taking of endangered plants. This amendment would make it unlawful to remove and reduce to possession any endangered plant from an area where it is found on Federal land. For example, the collection of such plants from National Park or Bureau of Land Management lands would now be prohibited. It is not necessary that the plant be entirely removed from Federal land for a violation to occur. Removal from the particular location on Federal land where it was located is prohibited. It is important to note that section 3(14) of the Act defines "plant" as any member of the plant kingdom, including seeds, roots and other parts thereof. Thus, removal of any parts or cuttings would be prohibited.

Unlike the section 9 provision that prohibits the taking of any endangered fish or wildlife, including harm which may occur as a result of habitat modification, such harm to species of plants would not be within the scope of the prohibition added by this amendment. Similarly, removals from areas other than those within Federal lands would not be prohibited.

### SECTION 12. AUTHORIZATION OF APPROPRIATIONS

Section 12 would authorize appropriations for the Department of the Interior, the Department of Commerce and the Department of Agriculture at existing levels for fiscal year 1983, 1984, and 1985.

The Department of the Interior would receive $27 million for each year, with the Department of Commerce and the Department of Agriculture receiving $3.5 million and $1.85 million, respectively, for each fiscal year.

In addition, section 12(b) of the bill would authorize appropriations of $6 million for State programs for each of the fiscal years 1983, 1984 and 1985. In 1973 Congress made clear that successful development of an endangered species program would depend on a good working relation between Federal and State wildlife agencies. The legislative history of the Act clearly recognizes that the Federal Government has directed new, innovative and expensive programs on the States and should therefore bear a significant portion of their costs. The 1973 conference report stated that "the grant authority must be exercised if the high purposes of this legislation are to be met."

In response to this encouragement and support, thirty-nine States have entered into 49 Cooperative Agreements under section 6 of the Act. States are providing recovery efforts, research, surveys, law enforcement, land acquisition, and public information/education programs for 88 federally-listed and 173 State listed and candidate endangered or threatened species.

**Addendum 81a**

Failure to appropriate funds in fiscal year 1982 and proposals to appropriate no funds in fiscal year 1983 for section 6 programs has generated deep skepticism among State wildlife agencies which have been urged to develop programs only to see the funding source completely withdrawn. Adequate funding of section 6 programs is, in the Committee's view, a matter of extreme importance. The amount authorized in the current legislation and in this bill represents what would be an adequate level of funding for this important aspect of the endangered species program.

The expertise of the States in managing wildlife is well recognized and respected and it is clearly in the best interest of any Federal wildlife conservation program to draw on and benefit from the State's knowledge and experience. Thus, cooperation between State and Federal agencies, not only under section 6 of the Act, but throughout the Act's implementation, is of the utmost importance to the protection and recovery of endangered and threatened species. Emphasis should be given to informational exchanges with State wildlife agencies on Federal proposals for the listing, protection, or recovery of species.

Section 3(15) of the Act provides authority to the Secretary of Agriculture to enforce import and export restrictions for "terrestrial plants." This authority is consistent with the USDA's existing port inspection system for plants, which prevents accidental imports of diseases and pests.

The problem of defining "terrestrial" plant species has created confusion. For example, some have argued that bogdwelling orchids and carnivorous plants are aquatic plants. Although there has been no legal challenge of Agriculture's jurisdiction over these species, this cannot be ruled out. Removal of the qualifier "terrestrial" from Section 3(15) and from the authorization of appropriations in Section 15(3) would end this confusion.

### OTHER POINTS

There are several points concerning the Endangered Species Act which should be addressed. Although these matters do not warrant amendments to the law, some clarification would be useful.

#### COMMERCIAL ACTIVITY

Section 3(2) of the Act defines "commercial activity" to mean all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling. The exhibitions of commodities by museums or similar cultural or historical organizations are specifically excluded by the statutory definition.

As in the Lacey Act Amendments of 1982 (P.L. 97–79), the phrase "commercial activity" does not encompass the lawful dealings of a hunter with his taxidermist. Similarly, the dealings of a hunter with his travel agent or an airlines to arrange a trip for the acquisition of wildlife does not constitute an activity of industry or trade for the purposes of this Act. However, a commercial arrangement whereby a professional guide offers his services to illegally obtain wildlife is,

**Addendum 82a**

in effect, an unlawful offer to sell wildlife. When such an offer is made, it is a commercial activity within the meaning of the Act. The Act's criminal culpability requirement assures that innocent violators of the Act will not be subject to criminal penalties.

### LICENSING REQUIREMENT

Section 9(d) of the Act provides that it is unlawful for any person to engage in business as an importer or exporter of fish or wildlife or plants without first having obtained permission from the Secretary. As part of the Administration's ongoing review of the many Federal regulations and requirements that are based upon numerous laws, the Department of the Interior should review the licensing requirements that have been promulgated pursuant to section 9(d) of this Act. The paperwork and regulatory burden imposed by any such requirements should be the minimum necessary to accomplish the purposes of the law and to ensure proper administration of the law.

### SEIZURE AND FORFEITURE

Section 11 of the Act authorizes the seizure and forfeiture of any fish or wildlife or plant that has been imported in violation of the law. As noted in a Fish and Wildlife Service Law Enforcement Memorandum dated April 30, 1982, however, discretion must be applied to avoid unnecessarily harsh forfeiture actions in certain noncommercial importation violations. Seizure for the purpose of seeking forfeiture will not always be appropriate where the conduct providing the grounds for seizure and forfeiture involves a non-commercial importation violation which is also non-culpable, that is, where there is no indication of fraud, negligence, or intent to violate the law.

Game trophies in transit through the United States were specifically addressed in the above-referenced memorandum. It was properly noted that non-commercial shipments of endangered species in-transit through the United States should not be seized where such shipments were lawfully exported from the country of origin and country of re-export, may be lawfully imported into the country of destination, and the exporter (or owner) gave explicit instructions not to ship through the United States or did all that could have reasonably been done to prevent transshipment and the circumstances leading to the property's transshipment were beyond the exporter's (or owner's) control. This exception, however, does not authorize the importation for the purpose of processing wildlife products or mounting of trophies in the United States and subsequent exportation without proper permits.

### "IMPORT" FROM ALASKA OR HAWAII

As used in this Act, the term "import" does not include the transportation of fish or wildlife or plants directly between the contiguous United States and any other States. Therefore, no importation occurs when a hunter lawfully takes a grizzly bear in Alaska and personally transports the animal by automobile directly through Canada to

**Addendum 83a**

29

another State or ships it directly to another State. If, on the other hand, the animal is left with a taxidermist in Canada the subsequent shipment to a State is an importation. Also, a tourist who purchases a wildlife product in a foreign country and returns to the contiguous United States by way of another State, such as Hawaii, imports the product only upon arrival in Hawaii. The subsequent direct transportation to another State is not an importation.

### HEARINGS

The Subcommittee on Environmental Pollution conducted oversight hearings on December 8 and 10, 1981. The bill, S. 2309, was introduced on March 30, 1982. The Subcommittee conducted hearings on the bill on April 19 and 22, 1982.

### ROLLCALL VOTES

Section 7(c) of rule XXVI of the Standing Rules of the Senate requires publication of any rollcall votes. There were two rollcall votes during the Committee's consideration of the bill.

On May 5, 1982, the Subcommittee approved S. 2309 with amendments by a unanimous rollcall vote. The vote was recorded as follows:

**AYES**

| | | |
|---|---|---|
| Chafee | Mitchell | Symms |
| Gorton | Moynihan | |
| Hart | Simpson | |

The Committee ordered the bill reported by a unanimous rollcall vote on May 11, 1982. The vote was recorded as follows:

**AYES**

| | | |
|---|---|---|
| Abdnor | Domenici | Randolph |
| Baker | Gorton | Simpson |
| Baucus | Hart | Stafford |
| Bentsen | Mitchell | Symms |
| Burdick | Moynihan | |
| Chafee | Murkowski | |

### REGULATORY IMPACT

In compliance with paragraph 11(b) of rule XXVI of the Standing Rules of the Senate, the Committee makes the following evaluation of the regulatory impact of the reported bill.

The reported bill does not add to or reduce the regulatory authority provided by existing law.

The bill has no impact on the personal privacy of individuals.

The bill has no impact on paperwork of Federal agencies.

There is no specific economic impact of the bill.

The bill has no impact on recordkeeping requirements.

**Addendum 84a**

## COST OF LEGISLATION

Paragraph 11(a) of rule XXVI of the Standing Rules of the Senate requires cost estimates and comparisons of costs to be incurred in carrying out the bill to be published in reports. In accordance with section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared a report on the costs to be incurred by the Federal Government resulting from the enactment of this bill. Such cost estimates follow:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 17, 1982.*

Hon. ROBERT T. STAFFORD,
*Chairman, Committee on Environment and Public Works,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for S. 2309, the Endangered Species Act Amendment of 1982.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

STANLEY L. GREIGG
(For Alice M. Rivlin, Director).

CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

MAY 17, 1982.

1. Bill number: S. 2309.
2. Bill title: Endangered Spices Act Amendments of 1982.
3. Bill status: As ordered reported by the Senate Committee on Environment and Public Works, May 11, 1982.
4. Bill purpose: The bill authorizes the appropriation of $38 million for the implementation of the Endangered Species Act of 1973, for each of the fiscal years 1983, 1984, and 1985. In each of these fiscal years, the bill allocates $33.6 million to the Department of the Interior, $3.5 million to the Department of Commerce, and $1.9 million to the Department of Agriculture. This bill also amends several substantive and procedural provisions in the Endangered Species Act.
5. Cost estimate:

| Authorization level: Fiscal year: | *Millions* |
|---|---|
| 1983 | $39.0 |
| 1984 | 39.0 |
| 1985 | 39.0 |
| 1986 | ----- |
| 1987 | ----- |

| Estimated outlays: Fiscal year: | |
|---|---|
| 1983 | 37.7 |
| 1984 | 39.0 |
| 1985 | 39.0 |
| 1986 | 1.3 |
| 1987 | ----- |

The costs of this bill fall within budget function 300.

**Addendum 85a**

31

6. Basis of estimate: This estimate assumes that the bill will be enacted in fiscal year 1982 and that the amounts authorized will be appropriated for each year. Annual outlays were estimated using the historical two-year spendout pattern for the departments' endangered species programs.

7. Estimate comparison: None.

8. Previous CBO estimate: On May 14, 1982, the Congressional Budget Office transmitted a cost estimate for H.R. 6133, a bill ordered reported by the House Committee on Merchant Marine and Fisheries, May 5, 1982. The House bill is similar but not identical to S. 2309. The authorization levels and outlay estimates reflect the differences.

9. Estimate prepared by: Kathy Gramp.

10. Estimate approved by:

C. G. NUCKOLS
(For James B. Blum,
Assistant Director for Budget Analysis).

---

## DEPARTMENTAL REPORTS

Departmental reports were submitted on S. 2309 by the Departments of the Interior, Agriculture, and State. The reports follow:

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., May 13, 1982.*

Hon. ROBERT T. STAFFORD,
*Chairman, Committee on Environment and Public Works,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is to provide you with our views on S. 2309 as ordered reported, a bill to amend the Endangered Species Act of 1973. We sincerely appreciate the attention given by the Committee to recommendations presented by the Department at the April 19 hearing. While we do have several comments on the reported bill, we strongly endorse its overall approach. Our recommendations are set forth below. Where appropriate, we have also provided specific legislative language to implement these recommendations.

### EXPERIMENTAL POPULATIONS

Section 2 of S. 2309 makes a much needed change in the Act that will be important to the conservation of threatened and endangered species. Recovery of a species is key to ensuring its survival. There are some instances, however, where the Service has progressed as far as possible in recovery actions within current habitat boundaries. For example, certain existing populations are at carrying capacity in currently occupied habitat, or they exist only as captive species in a captive propagation program and need habitat for release. The captive bred population of the red wolf in the Tacoma, Washington zoo is a good example. One of the most effective measures that can be taken to ensure recovery of these species is reintroduction into their historical range. However, this is also one of the most difficult recovery tasks to implement. To have a successful reintroduction program, it is essen-

**Addendum 86a**

tial to have the cooperation of the State and, in some cases the private or Federal land manager. States, however, fear that strigent provisions in the present Act will alter or eliminate wildlife and land management options available in the introduction area and are reluctant to give their approval. States have also raised the concern that the Service may be required to declare critical habitat, resulting in the removal of State control and prevent ongoing uses. As an example, the State of Colorado has hesitated in approving the introduction of the endangered squawfish into the Colorado River for fear that fishermen who inadvertently hook one of these fish could be subject to prosecution under the Act for "taking." An even greater concern is that the State fishery management program will be disrupted and the State forced to place priority on protection of the introduced endangered fish.

Federal agencies have voiced similar concerns and are often reluctant to give approval for reintroduction for fear of delay, alterations, or postponements of ongoing or proposed actions through application of section 7. TVA, for instance, has expressed concern about efforts to reintroduce the red wolf into the Land between the Lakes area in Tennessee without assurance that flexibility will be provided for the management of the species.

Section 2 of S. 2309 would help to address this very difficult situation by creating a new category of "experimental population." By authorizing the Secretary to issue special regulations for these species, the bill would provide the flexibility to fashion an administrative remedy to the problems raised.

There are three aspects of this amendment, however, where clarification would be helpful. First, the "not wholly separate" language contained in section 2(a) is somewhat confusing. We assume that it intended to address those situations where an experimental population rejoins the original population due to expansion, migration, or other reasons. If this is the case, we believe that this can be accomplished by adopting the definition of "experimental population" contained in H.R. 6133.

What constitutes a "non-essential" experimental population under section 2(b) is also unclear. It may be assumed that in most cases experimental populations would not be essential, because the continued existence of the species as a whole would not be jeopardized by their loss. Some species, however, are at such critically low levels that any loss would be jeopardizing and so experimental populations of these species should be designated as "essential." The dusky seaside sparrow is an example. We believe that the language of H.R. 6133—"in decline and in imminent danger of extinction"—is preferable.

Another question which should be clarified is whether the section 4 listing process would be applicable to the designation of experimental populations. The Committee should be aware that it is the intention of the Fish and Wildlife Service to promulgate special regulations each time that an experimental population is established. We intend for these regulations to serve essentially as a cooperative agreement between the Service and the appropriate State and Federal agencies and private individuals for the management of the species.

**Addendum 87a**

33

Section 3 increases the Federal matching share for section 6 programs from 66⅔ percent to 75 percent for single State programs, and from 75 percent to 90 percent for multi-State programs. The Administration, as a general policy, opposes this type of grant-in-aid program. The Service is not requesting section 6 funds in fiscal year 1983. Thus, we oppose any amendment increasing the matching share.

## LISTING

Section 4 consolidates and revises the current process for listing species and determining critical habitat. The Department supports the amendments adopted by the Committee, which clarify questions raised by S. 2309 as introduced. We would, however, like to offer some additional clarifications.

Section 4(a) of existing law requires the Secretary to determine critical habitat "to the maximum extent prudent" concurrent with listing. Section 4(5) of S. 2309 expands this criteria to "the maximum extent prudent and determinable." It is unclear as to the intended interpretation of the term "determinable." If critical habitat can not be determined at the time of listing, but one can reasonably anticipate that such a determination could be made in the future, does listing proceed? If listing does proceed, will determination of critical habitat at a later date by prohibited?

In addition, paragraph 4(5) changes from 60 to 90 days before the effective date of a regulation the time in which the Secretary must give notice of the proposal. The assumption is that this includes 60 days for public comment prior to publication of the final regulation and 30 days from the publication of the final rule to the effective date. Clarification in legislative hitsory concerning these two points would be helpful.

We would also like to inform you of our interpretation of two other paragraphs. New paragraphs 4(b)(5)(f) would require that listing determinations be made on the basis of biological criteria set forth in the Act. This is the current practice and we have no objection to this amendment, which we interpret as allowing us to continue to comply with E.O. 12291 and applicable statutes in evaluating alternatives. New section 4(b)(4) would delete the requirement under existing section 4(f)(2)(B)(i)(II) that the Service publish a map of any proposed critical habitat in a newspaper in general circulation in the affected area. Notwithstanding this change, the Service will continue to identify the affected area in as great detail as possible, either through a map or a written description.

## EXEMPTION PROCESS

The bill simplifies the existing section 7 exemption process in two ways: it assigns to the Secretary of the Interior, or Commerce as appropriate, the responsibility for making threshold decisions and preparing the report to the Endangered Species Committee (Committee). It also decreases the amount of time involved in the process. Both of

**Addendum 88a**

these changes are improvements over existing law. There are, however, several issues which should be addressed.

Section 5(b)(7)(A) reduces the time available to conduct the study and issue the report from 180 days to 150 days. This may strain the ability of the Secretary to prepare the report, without expediting the exemption process significantly. Unless considerable information about the proposed project is already available, even 180 days is a rather limited period within which to conduct the study necessary to address the exemption criteria. This could be the first time that the economics of the project and possible alternatives will be analyzed. This analysis is likely to be complex, so sufficient time should be provided for the Secretary to gather and analyze the relevant information.

The current exemption process takes 360 days to complete from the time an application is submitted. The process proposed in the amendment would take only 200 days: 20 days for the threshold decisions, 150 days for the report, and 30 days for the Committee decision. While we recognize that S. 2309 provides some flexibility for extension of these time limits, the Department recommends alternative time limits that would take a total of only 210 days, while imposing a slightly less restrictive deadline on preparation of the report. This would be 20 days for the threshold decisions, 180 days for the report and 10 days for the Committee decision. We believe that ten days should be sufficient time for the Committee to make its decision. From the time the threshold decisions are made, the Committee has 180 days notice that it will have to begin contemplating an exemption. Thus, ample time is provided to schedule a decision meeting. Further, since the staffs of the various Committee members will be briefed regularly on the progress of the report, the members should be well informed on the issues prior to the decision meeting. Thus, despite the limited timeframe, the integrity of the process could be maintained and a considered decision rendered within the statutory deadlines.

Section 5(b)(5), together with sections 5(b)(7) and 5(c)(3), also raises concerns. Section 5(b)(5) calls for the Secretary to determine whether an irreversible or irretrievable commitment of resources was made by the exemption applicant "to the extent determinable within the timeframe provided." Section 5(b)(7) requires the Secretary to discuss this issue in his report to the Committee. Section 5(c)(3) makes the Secretary's determination reviewable by the Committee and prevents the Committee from granting an exemption if it finds that the exemption applicant made an irreversible or irretrievable commitment of resources. Given the importance of the matter, it seems desirable to have the Committee make the determination. However, postponing this decision until the end of the exemption process creates unnecessary uncertainty and risks fasting both public and private resources. The Department recommends that the decision be retained as a threshold decision, made by the Secretary at the beginning of the exemption process, but that the decision be reviewable by the rest of the Committee within 30 days after the Secretary makes the decision. Some or all of these 30 days could overlap with the early stages of preparing the report to the Committee; however, a decision by the Committee to overturn a decision by the Secretary would waste far fewer resources

**Addendum 89a**

35

than if decision was made later. Rulemaking by the Committee would spell out the process in detail.

This section of the bill deletes entirely the irresolvable conflict threshold determination. Although in most instances this determination will be a perfunctory, procedural matter, we believe that it is important to retain it as a threshold determination. The Committee is designed to function as an administrative court of last resort. Circumstances can change, procedures be overlooked, and options remain unexplored. In such situations the Secretary should have the flexibility to reject an application until all other administrative avenues have been exhausted. We therefore recommend that the irresolvable conflict determination be retained.

This section of the bill contains four references to the preparation of the report "in consultation with the members of the Committee." The world "consultation" is a term of art in the Endangered Species Act. We believe that the other members of the Committee should be kept regularly informed of the progress on the report and be given the opportunity to participate in the collection of information, the analysis, and the drafting of the report. However, we believe a more appropriate term would be "in coordination" with the rest of the Committee, with the understanding that much or all of this coordination would take place at the staff level.

Section 5(a) of the bill strikes from section 7(e)(10) of existing law the sentence requiring that a Committee member's representative be a Presidential appointee. For clarification purposes, only the portion requiring the representative to be someone who has been confirmed by the Senate should be deleted. The representative, however, should be a Federal officeholder.

It is our understanding that while section 5(b)(2)(C) amends the responsibility for the report in situations where there might be a conflict of interest, it leaves the responsibility for making the threshold decisions unchanged, and that these decisions are to be made by the Secretary who issues the biological opinion and receives the exemption application. We recommend that this be clarified in the legislative history.

While section 5(b)(2)(C) of S. 2309 refers to the Secretary of Commerce, it is the Administrator of NOAA, not the Secretary, who is a member of the Committee. Therefore, the question has been raised as to whether the bill's sponsors intended the Secretary or the Administrator to prepare the report. A clarification would be helpful.

### CONSULTATION

Section 6 of S. 2309 amends section 7(b) of the Act to require consent of license or permit applicants on extensions of consultation of greater than 60 days. As a matter of policy, we attempt to keep such applicants fully informed about the reasons for all extensions of consultation. The great majority of all our consultations are completed within the 150 days allowed before applicant consent is required under this amendment. However, it is occasionally necessary to extend this period in order to obtain adequate data on which to base a decision.

**Addendum 90a**

## EXCEPTION ON TAKING

Under current law, an action which has been granted an exemption is not considered to be a taking under section 4(d) or 9(a). While there is no explicit exception for actions which have received a favorable biological opinion, our Solicitor's office has concluded that section 7 contains an implied exemption from section 9 for incidental takings within the scope and nature of a project where non-jeopardy opinion has been issued under section 7. Nevertheless, a question still remains as to whether an agency or individual who has received a non-jeopardy opinion may be subject to prosecution or civil injunctive litigation for the taking of a species.

We agree with the amendment adopted by the Committee to address this anomaly in the law. Under the amendment, the biological opinion would contain a determination of the extent of incidental take of a species that would not jeopardize its cotinued existence. In conjunction with this determination, the Secretary would also provide "reasonable and prudent measures" that must be taken to minimize takings of species. Actions in compliance with such measures would not be considered a taking of the species involved under sections 4(d), 9(a)(1)(B), or 9(a)(1)(C) of the Act. We believe it would be helpful to have legislative history indicating that the use of the term "extent of take" in the amendment would not mean that the opinion would always designate a specific number of individuals that could be taken. Such a number would be specified where practicable, but would not be available in the case of every species or action. We also support the new amendment to section 10 that would permit the Secretary to issue a permit for incidental taking pursuant to an approved conservation plan. We believe that this provision could result in opportunities not otherwise available to allow projects with identified effects to continue and to enhance the condition of species.

## AUTHORIZATIONS

In lieu of the authorizations provided by section 11 for the Department of the Interior, the Department recommends a one-year authorization of $16,550,000, the amount contained in the President's fiscal year 1983 budget request.

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

J. CRAIG POTTER,
*Acting Assistant Secretary.*

Enclosure.

DEPARTMENT OF THE INTERIOR'S PROPOSED AMENDMENTS TO S. 2309

1. On page 1, strike out line 5 and all that follows through page 3, line 19, and substitute from H.R. 6133 as reported by the Committee on Merchant Marine and Fisheries the appropriate language pertaining to experimental populations.

2. On page 3, strike out line 20 and all that follows through page 4, line 3.

**Addendum 91a**

37

3. On page 12, line 17, strike out "first sentence thereof" and insert in lieu thereof "words 'the appointment to which' and all that follows in the first sentence and inserting in lieu thereof a period.".

On page 13, lines 9 and 17, and in the proviso added by the Committee beginning on line 18, and on page 15, line 25, strike out "consultation" and insert in lieu thereof "coordination".

On page 14, immediately following line 24, insert the following: "(A) determine whether an irresolvable conflict exists;

On page 15, line 1, strike out "(A)" and insert in lieu thereof "(B)".

On page 15, immediately following line 12, substitute the following for the Committee amendment:

(C) determine whether the Federal agency concerned and the exemption applicant have refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d) ; and

On page 15, line 13, strike out "(B)" and insert in lieu thereof "(D)".

On page 15, line 16, as amended by the Committee, strike out "subclauses (i), (ii) and (iii)" and insert in lieu thereof "subparagraphs (A), (B), and (C)".

On page 15, line 17, insert immediately after "paragraph" the following:

; except that in the determination under subparagraph (C), the Secretary's decision is reviewable by the full Committee within 30 days after the decision.".

On page 15, lines 24 and 25, as amended by the Committee, strike out "subclauses (i), (ii) and (iii)" and insert in lieu thereof "subparagraphs (A), (B), and (C)".

On page 16, strike out lines 13 through 20, and on line 22, strike out "(D)" and insert in lieu thereof "(B)".

On page 17, line 10, insert immediately after "board" the following "; and".

On page 17, line 11, insert a period immediately before the semicolon and strike out "and".

On page 17, immediately following line 11, insert the following: "(E) striking out subparagraph (C) ; and

On page 17, line 12, strike out "(E)" and insert in lieu thereof "(F)".

On page 18, line 24, strike out "; and" and insert in lieu thereof a period.

On page 19, strike out lines 1 through 12, including the language added by the Committee amendment.

4. On page 22, line 7, strike out "sections 6 and 7" and insert in lieu thereof "section 7".

On page 22, lines 9 and 10, strike out "$27,000,000 for each of fiscal years 1983, 1984, and 1985" and insert in lieu thereof "$16,550,000 for fiscal year 1983".

On page 22, strike out lines 23 through 25 and all that follows through line 3 on page 23.

On page 22, line 4, strike out "(c)" and insert in lieu thereof "(b)".

**Addendum 92a**

DEPARTMENT OF AGRICULTURE,
OFFICE OF THE SECRETARY,
*Washington, D.C., May 10, 1982.*

Hon. JOHN H. CHAFEE,
*Chairman, Subcommittee on Environmental Pollution, Committee on
Environment and Public Works, U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in regard to the reauthorization of appropriations for the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*). While the Department supports the reauthorization of appropriations for the Act, we offer the following suggestion for an amendment.

The provisions of the Endangered Species Act and the Convention on International Trade in Endangered Species of Wild Fauna and Flora impose certain restrictions on the international movement of specified plants. Under the Act, the United States Department of Agriculture (USDA) is responsible for enforcement of the provisions of the Act and the Convention which pertain to the importation and exportation of terrestrial plants. This responsibility has, in turn, been delegated to the Department's Animal and Plant Health Inspection Service (APHIS).

Section 9(f)(1) of the Act (16 U.S.C. 1538(f)(1)) requires plants to be imported or exported only at ports designated by the Secretary of the Interior or at nondesignated ports upon approval by the Secretary of the Interior in accordance with specified criteria. Since APHIS is responsible for enforcement of the provisions of the Act which pertain to the importation and exportation of terrestrial plants, determinations concerning ports for the importation and exportation of terrestrial plants should be based on the availability of APHIS personnel and facilities for conducting the necessary enforcement activities. These determinations relate solely to information within USDA. Therefore, we recommend that the Act be amended to authorize the Secretary of Agriculture to designate the ports for the importation and exportation of terrestrial plants and to make determinations concerning the importation or exportation of terrestrial plants at nondesignated ports.

We enclose a suggested amendment to Section 9(f)(1) of the Act.

An identical letter has been sent to Honorable John B. Breaux, Chairman, Subcommittee on Fisheries.

The Office of Management and Budget advises that there is no objection to the submission of this report from the standpoint of the Administration's program.

Sincerely,

JOHN R. BLOCK,
*Secretary.*

Enclosure.

Section 9(f)(1) of the Endangered Species Act of 1973 (16 U.S.C. 1538(f)(1) is amended to read:

(f)(1) It is unlawful for any person subject to the jurisdiction of the United States to import into or export from the United States any fish or wildlife (other than shellfish and fishery products which (A) are not listed pursuant to

**Addendum 93a**

section 4 of this Act as endangered species or threatened species, and (B) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or marine plants, except at a port or ports designated by the Secretary of the Interior, or to import into or export from the United States terrestrial plants, except at a port or ports designated by the Secretary of Agriculture. For the purpose of facilitating enforcement of this Act and reducing the costs thereof, the Secretary of the Interior, with regard to fish and wildlife and marine plants, or the Secretary of Agriculture, with regard to terrestrial plants, with approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. The Secretary of the Interior, with regard to fish, wildlife, and marine plants, and the Secretary of Agriculture, with regard to terrestrial plants, under such terms and conditions as they may prescribe, may permit the importation or exportation at non-designated ports in the interest of the health or safety of the fish or wildlife or plants, or for other reasons if, in their discretion, they deem it appropriate and consistent with the purpose of this subsection.

———

DEPARTMENT OF STATE,
*Washington, D.C., May 10, 1982.*

Hon. ROBERT T. STAFFORD,
*Chairman, Committee on Environment and Public Works,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is to provide you with our views on S. 2309 as ordered reported by the Subcommittee on Environmental Pollution, a bill to amend the Endangered Species Act of 1973.

The Department strongly supports the Endangered Species Act of 1973 and considers that, in general, the amendments proposed in S. 2309 would improve its implementation. Many of the proposals concerning matters under the exclusive jurisdiction of the Departments of Interior and Commerce, and this Department is not in a position to comment on them. We do, however, have comments on three items which relate to relations with foreign nations and United States treaty obligations.

Under Section 4, in the "Listing Process" "Basis for Determinations", the bill would delete the requirement *for cooperation with the Secretary of State* in taking into account efforts made by foreign nations to protect species during the process of determining whether species are endangered or threatened. The Department considers that: (1) as relation with foreign nations fall within the province of the Department of State, and (2) as the Department is in a position through its diplomatic and consular missions abroad to expedite information collection of foreign efforts to protect species, the provision for cooperation with the Department of State should be retained in Section 4(b)(1).

**Addendum 94a**

| 97TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 97–567<br>Part 1 |
|---|---|---|

## · ENDANGERED SPECIES ACT AMENDMENTS

―――――――――

MAY 17, 1982.—Ordered to be printed

―――――――――

Mr. JONES of North Carolina, from the Committee on Merchant Marine and Fisheries, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 6133]

[Including cost estimate of the Congressional Budget Office]

The Committee on Merchant Marine and Fisheries, to whom was referred the bill (H.R. 6133) to authorize appropriations to carry out the Endangered Species Act of 1973, as amended, through fiscal year 1984, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Strike out all after the enacting clause and insert the following:

SECTION 1. DETERMINATION OF ENDANGERED AND THREATENED SPECIES.

(a) Section 4 of the Endangered Species Act of 1973 (16 U.S.C. 1533) is amended as follows:

    (1) Subsection (a)(1) is amended—

        (A) by redesignating subparagraphs (1) through (5) as subparagraphs (A) through (E);

        (B) by striking out "sporting," in subparagraph (B) (as so redesignated) and inserting in lieu thereof "recreational,"; and

        (C) by amending the penultimate sentence by striking out " by regulation", and by striking out "prudent, specify" and inserting in lieu thereof "prudent and determinable, specify therein".

    (2) Subsection (b) is amended—

        (A) by inserting "solely" immediately before "on the basis" in the matter preceding subparagraph (A) of paragraph (1); and

        (B) by amending paragraph (1)(B) to read as follows:

    "(B) allowed each such State 90 days after notification to submit its comments and recommendations (except to the extent that such period may be

**Addendum 95a**

2

shortened by agreement between the Secretary and the Governor or Governors concerned) and, if he disagrees with any of such comments and recommendations, provided the State with a written statement of the reasons for disagreement; and".

(3) Subsection (c)(2) is amended to read as follows:

"(2)(A) To the maximum extent practicable, the Secretary shall, within 180 days after receiving the petition of an interested person under section 553(e) of title 5, United States Code, determine whether the petition contains substantial evidence indicating that the species concerned is likely to qualify for addition to, or removal from, either of the lists published pursuant to paragraph (1).

"(B) If an affirmative determination is made under subparagraph (A) regarding a petition, the Secretary shall immediately commence rule-making procedures pursuant to subsection (f) to list or delist, as the case may be, the species concerned. A negative determination regarding a petition under subparagraph (A) shall be subject to judicial review.".

(4) Subsection (f)(5) is amended to read as follows:

"(5)(A) A final regulation adding a species to (whether or not critical habitat is specified therein), or removing a species from, any list published pursuant to subsection (c) shall be published in the Federal Register no later than one year after the date of publication of general notice under paragraph (2) proposing such listing or delisting; but no publication of such a final regulation may be made before the close of such one-year period unless the critical habitat, to the maximum extent prudent and determinable, is specified therein.

"(B) If the Secretary finds that there is substantial disagreement regarding the sufficiency or accuracy of the available scientific or commerical information regarding whether a species should be listed or delisted, the Secretary may extend the one-year period specified in subparagraph (A) for not more than 6 months for purposes of soliciting additional information from specialists (selected after consultation with appropriate professional organizations) in the matters concerned. If a proposed regulation is not adopted within such one-year period (or longer period if extension under the preceding sentence applies) because the Secretary has determined that there is not sufficient evidence to justify listing or delisting the species concerned, the Secretary shall withdraw the regulation and shall publish notice of the determination to withdraw in the Federal Register not later than 30 days after the end of such period. A determination to withdraw a regulation shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this subparagraph unless he determines that sufficient new information is available to warrant such proposal.

"(C) If a regulation referred to in subparagraph (A) does not specify critical habitat therein, then a final regulation specifying, to the maximum extent prudent, such habitat shall be published in the Federal Register before the close of the one-year period beginning on the closing date of the one-year period (or longer period if extension under subparagraph (B) applies) referred to in subparagraph (A).".

(5) Subsection (g) is amended by striking out "recovery plans," and inserting in lieu thereof "recovery plans (1) shall, to the maximum extent practicable, give priority to preparing plans for endangered species or threatened species that are, or may be, in conflict with construction or other developmental projects; and (2)".

(b) The provisions of paragraph (5) of section 4(f) of such Act of 1973 (as in effect on the day before the date of the enactment of this Act) shall continue to apply to any regulation that proposes to add a species to a list published pursuant to section 4(c) of such Act of 1973 if the general notice proposing such regulation was published before such date of enactment. Any petition filed under such section 4(c) before, and pending with the Secretary on, such date of enactment shall be treated as having been filed with the Secretary under such section on such date of enactment.

SEC. 2. COOPERATION WITH THE STATES.

Section 6 of the Endangered Species Act of 1973 (16 U.S.C. 1535) is amended—

(1) by striking out "66⅔ per centum" in subsection (d)(2)(i) and inserting in lieu thereof "75 per centum";

(2) by striking out "75 per centum" in subsection (d)(2)(ii) and inserting in lieu thereof "90 per centum"; and

(3) by amending subsection (i) to read as follows:

"(i) Appropriations.—For the purposes of this section, there are authorized to be appropriated not to exceed $6,000,000 for each of fiscal years 1983, 1984, and 1985.".

**Addendum 96a**

**SEC. 3. INTERAGENCY COOPERATION AND COMMITTEE EXEMPTIONS.**

Section 7 of the Endangered Species Act of 1973 (16 U.S.C. 1536) is amended as follows:

(1) Subsection (a) is amended—

(A) by amending paragraph (2) by inserting "(A)" immediately after "(2)", and by adding at the end thereof the following new subparagraph:

"(B) A Federal agency, promptly after receiving an application for a permit or license for an activity regarding which the Secretary has issued an opinion required under subsection (b)(3), shall issue to the applicant a written statement indicating whether, in the agency's judgment, the carrying out of the action will violate subparagraph (A); and, if the agency's judgment is in the affirmative, whether the agency would likely issue the permit or license but for such judgment."; and

(B) by redesignating paragraph (3) as paragraph (4), and by inserting immediately after paragraph (2) the following new paragraph;

"(3) Subject to such guidelines as the Secretary may establish, a prospective permit or license applicant may consult with the Secretary at any time the applicant has reason to believe that an endangered species or threatened species may be present and that implementation of the action concerned will likely affect such species.".

(2) Subsection (b) is amended to read as follows:

"(b) Opinion of Secretary.—(1) Consultation under paragraph (2)(A) of subsection (a) with respect to any agency action shall be concluded within 90 days after the date on which initiated or within such other period of time as is mutually agreeable to the Secretary and the Federal agency; but if the agency action involves a permit or license applicant, such 90-day period may not be extended by the Secretary and the Federal agency—

"(A) for less than 45 days unless the Secretary, before the close of the 90-day period, provides the applicant with a written statement of the reasons for the extention, or

"(B) for 45 days or more unless the Secretary, before the close of the 90-day period, obtains the written consent of the applicant to the extension.

"(2) consultation under paragraph (3) of subsection (a) shall be concluded with such period as is mutually agreeable to the Secretary and the applicant concerned.

"(3) Promptly after conclusion of consultation under paragraph (2)(A) or (3) of subsection (a), the Secretary shall provide to the Federal agency or the applicant, as the case may be, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If such jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2)(A) and can be taken by the Federal agency or applicant in implementing the agency action. An opinion issued by the Secretary incident to consultation under subsection (a)(3) regarding an agency action shall be treated as an opinion issued after consultation under subsection (a)(2)(A) regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds that no significant changes have been made with respect to the action and that no significant change has occurred regarding the scientific information used during the initial consultation.

"(4) If after consultation under paragraph (2)(A), the Secretary concludes that—

"(A) the agency action will not violate subsection (a)(2)(A), or offers reasonable and prudent alternatives that will enable the action agency to avoid violating subsection (a)(2)(A); and

"(B) the taking of a listed species incidental to the agency action will not violate subsection (a)(2)(A);

the Secretary shall provide the Federal agency or applicant with a written statement that—

"(i) specifies the impact of such incidental taking on the species,

"(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, and

"(iii) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant in order to implement the measures specified under clause (ii).".

(3) Subsection (c) is amended—

(A) by amending the penultimate sentence in paragraph (1) by inserting ", except that if a permit or license applicant is involved, the 180-day period may not be extended unless the Secretary provides the applicant, before the close of such period, with a written statement setting forth the

**Addendum 97a**

length of the proposed extension and the reasons therefor" immediately after "agency" and before the parenthesis; and

(B) by amending the first sentence of paragraph (2) to read as follows: "Each permit or license applicant undertaking consultation under subsection (a)(3), and any person who may wish to apply for exemption under subsection (g), may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by the agency action concerned.".

(4) Subsection (g) is amended as follows:

(A) The sideheading is amended to read as follows: "Submittal of Application for Exemption; Report by Secretary.—".

(B) The first two sentences of paragraph (1) are amended to read as follows: "A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under paragraph (2) or (3) of subsection (a), the Secretary's opinion under subsection (b)(3) indicates that the agency action would violate subsection (a)(2)(A). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5).".

(C) Paragraph (2) is amended—

(i) by amending the first sentence of subparagraph (A) to read as follows: "An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process under subsection (a)(2)(A) if the agency action does not involve a permit or license applicant; or, if the action involves a permit of license applicant, not later than 90 days after (i) the date on which the applicant receives the written statement required under subsection (a)(2)(B), or (ii) the date on which the Federal agency concerned takes final agency action, for purposes of chapter 7 of title 5, United States Code, regarding such action."; and (ii) by amending subparagraph (B) by striking out "to the review board to be established under paragraph (3) and". (D) Paragraphs (3) and (4) are repealed.

(E) Paragraph (5) is redesignated as paragraph (3) and is amended—

(i) by amending that portion which precedes clause (i) to read as follows: "Within 30 days after receiving an application under paragraph (2)(A), the Secretary, in consultation with the Committee, shall determine whether (A) an irresolvable conflict exists, and (B) whether the Federal agency concerned and the exemption applicant have—"; and (ii) by striking out "review board" in the second sentence and inserting in lieu thereof "the Secretary".

(F) Paragraph (6) is redesignated as paragraph (4) and is amended to read as follows:

"(4) If the Secretary determines that an irresolvable conflict exists and makes positive determinations under subclauses (i), (ii), and (iii) of paragraph (3)(B), the Secretary shall proceed to prepare the report required under paragraph (5).".

(G) Paragraph (7) is redesignated as paragraph (5) and is amended—

(i) by amending that part which precedes subparagraph (A) to read as follows: "Within 120 days after making the determinations under paragraph (4), the Secretary shall submit to the Committee a report discussing—"; (ii) by striking out "a summary of the evidence concerning" in subparagraph (B); and (iii) by adding at the end thereof the following flush sentence: "The Secretary shall hold at least one public hearing on the matters to be discussed in the report and shall include with the report a summary of the evidence on which it is based.".

(H) Paragraph (8) is redesignated as paragraph (6) and is amended by striking out "subsection (g) of".

(I) Paragraphs (9) and (11) are repealed.

(J) Paragraph (10) is redesignated as paragraph (7) and is amended—

(i) by striking out "a review board" and inserting in lieu thereof "the Secretary"; and (ii) by striking out "review board to assist it in carry out its" and inserting in lieu thereof "Secretary to assist him in carrying out his".

**Addendum 98a**

(K) Paragraph (12) is redesignated as paragraph (8) and is amended to read as follows:

"(8) All hearings held by the Secretary in carrying out this subsection, and the evidence submitted at the hearings, shall be open to the public.".

(5) Subsection (h)(1) is amended—

(A) by striking out "90 days of receiving the report of the review board under subsection (g)(7)" in the first sentence and inserting in lieu thereof "30 days of receiving the report of the Secretary pursuant to subsection (g)(5)"; and

(B) by amending subparagraph (A) by striking out "review board" immediately after "the report of the" and inserting in lieu thereof "Secretary".

(6) Subsection (o) is amended to read as follows:

"(o) Notwithstanding sections 4(d) and 9(a) or any regulation promulgated pursuant to either such section—

"(1) any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

"(2) any talking that is in compliance with the terms and conditions specified in a written statement pursuant to subsection (b)(4)(iii) shall not be considered to be a taking of any endangered species or threatened species.".

(7) Subsection (q) is amended to read as follows:

"(q) There are authorized to be appropriated to the Secretary to assist him and the Committee in carrying out their functions under subsections (e), (f), (g), and (h) of this section not to exceed $600,000 for each of fiscal years 1983, 1984, and 1985.".

### SEC. 4. CONVENTION IMPLEMENTATION.

(a) Section 8A of the Endangered Species Act of 1973 (16 U.S.C. 1537a) is amended—

(1) by amending subsection (c) by inserting "(1)" after "(c)", and by adding at the end thereof the following new paragraph:

"(2) Secretary shall base the determinations and advice given by him under Article IV of the Convention with respect to wildlife upon the best available biological information derived from professionally accepted wildlife management practices; but is not requried to make, or require any State to make, estimates of population size in making such determinations or giving such advice.";

(2) by amending subsection (d) to read as follows:

"(d) Reservations by the United States under Convention.—If the United States votes against including any species in Appendix I or II of the Convention and does not enter a reservation pursuant to paragraph (3) of Article XV of the Convention with respect to that species, the Secretary of State, before the 90th day after the last day on which such a reservation could be entered, shall submit to the Committee on Merchant Marine and Fisheries of the House of Representatives, and to the Committee on the Environment and Public Works of the Senate, a written report setting forth the reasons why such a reservation was not entered."; and

(3) by amending subsection (e) to read as follows:

"(e) Wildlife Preservation in Western Hemisphere.—(1) the Secretary of the Interior (hereinafter in this subsection referred to as the 'Secretary'), in cooperation with the Secretary of State, shall act on behalf of, and represent, the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (56 Stat. 1354, T.S. 982, hereinafter in this subsection referred to as the 'Western Convention'). In the discharge of these responsibilities, the Secretary and the Secretary of State shall consult with the Secretary of Agriculture, the Secretary of Commerce, and the heads of other agencies with respect to matters relating to or affecting their areas of responsibility.

"(2) The Secretary and the Secretary of the State shall, in cooperation with the contracting parties to the Western Convention and, to the extent feasible and appropriate, with the participation of State agencies, take such steps as are necessary to implement the Western Convention. Such steps shall include, but not be limited to—

"(A) cooperation with contracting parties and international organizations for the purpose of developing personnel resources and programs that will facilitate implementation of the Western Convention;

"(B) identification of those species of birds that migrate between the United States and other contracting parties, and the habitats upon which those species depend, and the implementation of cooperative measures to ensure that such species will not become endangered or threatened; and

"(C) identification of measures that are necessary and appropriate to implement those provisions of the Western Convention which address the protection of wild plants.

"(3) No later than September 30, 1985, the Secretary and the Secretary of State shall submit a report to Congress describing those steps taken in accordance with the requirements of this subsection and identifying the principal remaining actions yet necessay for comprehensive and effective implementation of the Western Convention.

"(4) There is authorized to be appropriated to the Department of the Interior not to exceed $150,000 for each of fiscal years 1983 and 1984, and not to exceed $300,000 for fiscal year 1985, for purposes of carrying out this subsection, and such sums shall remain available until expended.

"(5) The provisions of this subsection shall not be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate resident fish and wildlife under State law or regulations.".

(The amendment made by paragraph (1) of subsection (a) shall take effect Janaury 1, 1981.

## SEC. 5. EXPERIMENTAL POPULATIONS AND OTHER EXCEPTIONS

Section 10 of the Endangered Species Act of 1973 (16 U.S.C. 1539) is amended as follows:

"(1) Subsection (a) is amended to read as follows:

"(a) Permits.—(1) The Secretary may permit, under such terms and conditions as he shall prescribe—

"(A) any act otherwise prohibited by section 9 for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j); or

"(B) any taking otherwise prohibited by section 9(a)(1)(B) if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

"(2)(A) No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a plan that specifies—

"(i) the number of the species which will likely be taken;

"(ii) what steps the applicant will take to minimize such taking; and

"(iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized.

"(B) If the Secretary finds, after opportunity for public comment, with respect to a permit application that—

"(i) the taking will be incidental;

"(ii) the applicant will, to the maximum extent practicable, minimize the taking; and

"(iii) the level of such taking is not likely. to jeopardize the continued existence of the species;

the Secretary shall issue the permit. The permit shall contain such reporting requirements as the Secretary deems necessary for determining whether the permittee complies with the terms and conditions of the permit.

"(C) The Secretary shall revoke a permit issued under this paragraph if he finds, after opportunity for public comment, that the permittee is not complying with the terms and conditions of the permit.".

(2) Subsection (f) is amended—

(A) by amending paragraph (1)(B) by inserting "substantial" immediately before "etching" and before "carving", and by adding at the end thereof the following new sentence: "For purposes of this subsection, polishing or the adding of minor superficial markings does not constitute substantial etching, engraving, or carving."; and

(B) by adding at the end thereof the following new paragraph:

"(9)(A) The Secretary shall carry out a comprehensive review of the effectiveness of the regulations prescribed pursuant to paragraph (5) of this subsection—

"(i) in insuring that pre-Act finished scrimshaw products, or the raw materials for such products, have been adequately accounted for and not disposed of contrary to the provisions of this Act; and

"(ii) in preventing the commingling of unlawfully imported or acquired marine mammal products with such exempted products either by persons to

**Addendum 100a**

whom certificates of exemption have been issued under paragraph (4) of this subsection or by subsequent purchasers from such persons.

"(B) In conducting the review required under subparagraph (A), the Secretary shall consider, but not be limited to—

"(i) the adequacy of the reporting and records required of exemption holders;

"(ii) the extent to which such reports and records are subject to verification;

"(iii) methods for identifying individual pieces of scrimshaw products and raw materials and for preventing commingling of exempted materials from those not subject to such exemption; and

"(iv) the retention of unworked materials in controlled-access storage.

The Secretary shall submit a report of such review to the Committee on Merchant Marine and Fisheries of the House of Representatives and the Committee on the Environment and Public Works of the Senate and make it available to the general public. Based on such review, the Secreary shall, on or before July 1, 1983, propose and adopt such revisions to such regulations as he deems necessary and appropriate to carry out this paragraph. Upon publication of such revised regulations, the Secretary may renew for a further period of not to exceed three years any certificate of exemption previously renewed under paragraph (8) of this subsection, subject to such new terms and conditions as are necessary and appropriate under the revised regulations; except that any certificate of exemption that would, but for this clause, expire on or after the date of enactment of this paragraph and before the date of the adoption of such regulations may be extended until such time after the date of adoption as may be necessary for purposes of applying such regulations to the certificate. Notwithstanding the foregoing, however, no person may, after January 31, 1984, sell or offer for sale in interstate or foreign commerce any pre-Act finished scrimshaw product unless such person has been issued a valid certificate of exemption by the Secretary under this subsection and unless such product or the raw material for such product was held by such person on the date of the enactment of this paragraph.".

(3)(A) Subsection (h)(1) is amended—

(i) by striking out "(other than scrimshaw)"; and

(ii) by amendment made by subparagraph (A) to read as follows:

"(A) is not less than 100 years of age;".

(B) The amendment made by subparagraph (A) shall take effect January 1, 1981.

(4) At the end thereof insert the following new subsection:

"(j) Experimental populations.—(1) For purposes of this subsection, the term 'experimental population' means any population authorized by the Secretary for release under paragraph (2), but only when, and at such time as, the population is wholly separate geographically from nonexperimental populations of the same species.

"(2) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species.

"(3) For purposes of this Act—

"(A) if an experimental population is of an endangered species or threatened species that the Secretary has determined, on the best available biological evidence, to be in decline and in imminent danger of extinction, such experimental population shall also be treated as a threatened species listed under section 4; or

"(B) if an experimental population is of an endangered species or threatened species not described in subparagraph (A), the experimental population shall (except for section 7) be treated as a threatened species listed under section 4; but for purposes of applying section 7, the population shall, except for such time as it occurs in an area within the National Wildlife Refuge System or the National Park System, be treated as a species proposed to be listed under section 4 (but the provisions relating to critical habitat shall not apply).

"(4) The Secretary, with respect to any population of an endangered species or threatened species that the Secretary authorized, before the date of the enactment of this subsection, for release in a geographical area separate from other populations of such species, shall determine by regulation whether such population is an experimental population for the purposes of this subsection.".

SEC. 6. AUTHORIZATION OF APPROPRIATIONS.

Section 15 of the Endangered Species Act of 1973 (16 U.S.C. 1542) is amended to read as follows:

**Addendum 101a**

8

"Sec. 15. Except as authorized in sections 6, 7, and 8 of this Act, there are authorized to be appropriated the following sums:

"(1) To enable the Department of the Interior to carry out such functions and responsibilities as it may have been given under this Act:

"(A) Not to exceed $27,000,000 for each of fiscal years 1983, 1984, and 1985.

"(2) To enable the Department of Commerce to carry out such functions and responsibilities as it may have been given under this Act:

"(A) Not to exceed $3,500,000 for each of fiscal years 1983, 1984, and 1985.

"(3) To enable the Department of Agriculture to carry out its functions and responsibilities with respect to the enforcement of this Act and the Convention which pertain to the importation or exportation of plants:

"(A) Not to exceed $1,850,000 for each of fiscal years 1983, 1984, and 1985.".

Amend the title so as to read:

A bill to amend the Endangered Species Act of 1973.

## Purpose of the Legislation

The purpose of the legislation is to authorize appropriations to carry out the Endangered Species Act for Fiscal Years 1983, 1984, and 1985, to resolve problems which have arisen since it was last reauthorized, and to make the Act a more effective and efficient tool for the conservation of the species affected.

To accomplish this purpose, the legislation extends the authorization for appropriations for three years at current levels, which are: Section 6, Cooperation with the States, $6 million per year; Section 7, Endangered Species Committee, $600,000 per year; and Section 15, to carry out the purposes of the Act generally, $27 million per year for the Department of the Act generally, $27 million per year for the Department of the Interior, $3.5 million per year for the Department of Commerce, and $1.85 million per year for the Department of Agriculture. In addition, it authorizes $150,000 for Fiscal Years 1983 and 1984 and $300,000 for Fiscal Year 1985 to the Department of the Interior to carry out the requirements of the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere.

The bill further amends the Act to (1) speed up the process by which species are added to or subtracted from the endangered and threatened species lists, (2) facilitate the consultation and exemption processes which are designed to resolve conflicts between species protection and development, (3) exempt certain incidental takings, and (4) clarify the handling of experimental populations of endangered species.

## Legislative Background

H.R. 6133 was introduced on April 21, 1982, by Mr. Breaux and Mr. Forsythe, at the request of the Secretary of Commerce. Previously, the Subcommittee on Fisheries and Wildlife Conservation and the Environment held two days of oversight hearings on February 22, and March 8, 1982, on the operation and administration of the Endangered Species Act. Testimony was received from 34 witnesses representing the Departments of Commerce, State and the Interior: four individual States and the International Association of Fish and Game Agencies; a broad variety of conservation

**Addendum 102a**

and environmental groups; the scientific community; and various industries affected by the Act.

The Department of Commerce witness recommended that the Act be reauthorized for two years without amendment as proposed by H.R. 6133, as introduced. The Department of State witness urged that the Act be reauthorized "as it has in the past in a manner not conflicting with our treaty obligations or our foreign policy interests." The Department of the Interior witness stated that a number of problem areas had been identified in the Act, including the need for streamlining of the Section 7 exemption process and establishment of experimental populations, but the Department was uncertain how to translate the identification of those problems into specific legislation. Accordingly, he recommened reauthorization of the Act for one year without change except for the aforementioned two specific areas and said, in the interim, the Department would attempt to correct other identified problems through existing regulatory and administrative mechanisms.

Environmental groups generally supported the Act but urged that the listing process be speeded up and that experimental populations be encouraged. Representatives of the individual States and the International Association of Fish and Game Agencies requested increased funding for Section 6 grants to the States, abolishment of the International Convention Advisory Committee, easing of the protections for experimental populations, and language to overturn the Court of Appeals decision requiring that population estimates be used in determining whether species such as bobcats, which are listed under the Convention on International Trade in Endangered Species, may be exported. Industry generally felt that economic considerations should be given greater weight under the Act, that the exemption process was too slow and cumbersome and that incidental taking of species should be exempt from the Act. Witnesses from the scientific community stressed the need to preserve plant and invertebrate species, some of which have yielded lifesaving chemicals. They urged that the Act be reauthorized without weakening amendments to conserve biological diversity which represents an untapped mine of potential cures and benefits to mankind as well as a depository of genes that are potentially transferrable as a result of recent breakthroughs in genetic engineering.

The Subcommittee gave careful consideration to the testimony presented at the hearings and, on April 27, 1982, adopted an amendment in the nature of a substitute and ordered the legislation, as amended, reported to the Full Committee. On May 5, 1982, the full committee, by unanimous voice vote, adopted an amendment in the nature of a substitute to the bill as reported by the Subcommittee, and ordered H.R. 6133, as amended, reported to the House.

### BACKGROUND AND NEED

The Endangered Species Act was enacted in 1973 as a response to mounting concern over the extinction of fish, wildlife, and plants in the United States. The Endangered Species Preservation Act of 1966 and the Endangered Species Conservation Act of 1969 preced-

ed the 1973 Act to address the same problem, but it was the last statute which constructed a comprehensive means to balance economic growth and development with adequate conservation measures. This multi-faceted measure is designed to restore species that are so depleted in numbers that they are in danger of, or threatened with, extinction. Subsequent to its passage, the Act was amended in 1976, 1978 and 1979 to increase the flexibility in balancing species protection and conservation with development projects. The Act is administered by the Secretaries of the Interior and Commerce through the U.S. Fish and Wildlife Service and the National Marine Fisheries Service respectively.

The protective measures to counter species extinction take effect when a species is listed. The listing process under Section 4 is the keystone of the Endangered Species Act. Any species or subspecies of fish, wildlife or plants may be listed and separate populations of vertebrate species may be listed. The Secretary is directed, to the maximum extend prudent, to designate habitat critical to the survival of the species at the time of listing. The public may play an active role in this process. Petitions may be submitted to the Secretary for listing proposals, and public consultation with affected States prior to listing is required. The final decision on whether or not to list the species as endangered or threatened rests with the Secretary. He must use the best available scientific and commercial data regarding the status of the species. Designations of the critical habitat of the species listed may be altered by the Secretary to reflect economic considerations unless the failure to designate an area would result in the extinction of the species. Section 4 also directs the Secretary to develop and implement recovery plans which are designed to return endangered and threatened species to healthy population levels.

Listing a species, subspecies, or population implies several responsibilities created by other sections of the Act, the most wide-ranging, effective and controversial of which are encompassed in Section 7. That section mandates all federal agencies, in consultation with the Secretary, to ensure that any action authorized, funded or carried out by such agency is not likely to jeopardize the continued existence of an endangered species or result in the destruction or adverse modification of its critical habitat.

The assessment of the potential threat of the agency action is performed by the Secretary in a biological opinion. This process begins when the agency is advised by the Fish and Wildlife Service or the National Marine Fisheries Service that an endangered species resides in the area of the intended project. When a species is in the project area, the agency responsible for the action or the applicant for a federal permit or license performs a biological assessment to determine if the species is present and submits it to the Secretary. Based on this and other information, the Secretary issues a biological opinion as to whether or not a project would be likely to jeopardize a species or adversely modify its critical habitat. If the project would do so, the Secretary suggests reasonable and prudent alternatives to the project to avoid such jeopardy or adverse modification of habitat.

Should an "irresolvable" conflict exist between an endangered species and the proposed action, the Section 7 exemption provisions

**Addendum 104a**

11

create an avenue for the action agency to proceed with the project. Under these provisions, a three member review board studies the biological and economic data and prepares a report on it for a seven member Endangered Species Committee composed of cabinet level officials. This Committee decides whether to grant an exemption from the Act to the federal agency in question.

Other sections of the Act are intended to further the conservation of endangered and threatened species. Section 5 authorizes the Secretary to acquire habitat to protect endangered species through authority contained in the Land and Water Conservation Fund. Section 6 of the Act authorizes the establishment of cooperative agreements with the states for endangered and threatened species conservation. To date, over 40 states have chosen to enter into cooperative agreements.

The national implementation of U.S. responsibilities under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) flows from Section 8 of the Act. This convention, which currently has 77 member nations, provides for the control of trade in species determined by the parties to be in danger of extinction—or likely to become so—due to the pressures exerted upon the natural populations through international trade.

Prohibited actions are specified in Section 9. Virtually all commerce in endangerd species–including importation, exportation, interstate transportation and possession of species, as well as the taking of such species—is in violation of the Act. For threatened species, the Secretary has the authority to waive, by regulation, any or all of the prohibitions in Section 9. Section 10 permits some exceptions to these prohibitions, particularly for Alaskan natives and for persons holding pre-Act scrimshaw articles and antique articles. Certificates of exemption are issued under Section 10 to implement these permitted exemptions.

Penalties (civil and criminal) are contained in Section 11. Section 15 authorizes the funds to be appropriated to the respective Secretaries to carry out their responsibilities under the Act.

Consideration of H.R. 6133 was preceded by two days of oversight hearings by the Subcommittee on Fisheries and Wildlife Conservation and the Environment. Testimony was received from 34 witnesses and written statements were received from numerous other individuals. The testimony reflected the fact that certain difficulties in implementing the Endangered Species Act have arisen.

One of the prinicpal problems noted was the decline in the pace of listing species which has occurred in recent years. Since 1981, only two species have passed through the entire proposal and listing processes. Those two are the Hay Springs amphipod, a crustacean residing in the National Zoo in Washington, D.C.; and Navasota ladies'-tresses, a rare orchid located in Texas.[1] Specific shortcomings in the listing process were identified during testimony before the Committee and it was clear that a clarified process and structure would improve the working of section 4 of the Act.

In evaluating the testimony, the Committee arrived at the conclusion that critical habitat adds some confusion to the listing

---

[1] On May 10, 1982, two fish species in Nevada were listed on an emergency basis: the Amargosa pupfish and the Ash Meadows speckled dace.

**Addendum 105a**

phase. Although the Secretary is to determine whether a species should be listed based on biological information on the status of that population, the critical habitat designation, which is to accompany the species listing to the maximum extent prudent, also takes into account the economic impacts of listing such habitat as critical. Whether a species has declined sufficiently to justify listing is a biological, not an economic, question. For this reason, the Committee eliminated all economic considerations from the species listing process. Desirous to restrict the Secretary's decision on species listing to biology alone, the Committee nonetheless recognized that the critical habitat designation, with its attendant economic analysis, offers some counter-point to the listing of species without due consideration for the effects on land use and other development interests. For this reason, the Committee elected to leave critical habitat as an integral part of the listing process but to prevent its designation from influencing the decision on the listing of a species. This was accomplished by requiring the Secretary to reach a decision on the listing proposal by the end of one year and this decision must be based on biological information alone. It is the Committee's strong conviction that listing will be substantially improved and expedited under this new process. The balancing between science and economics should occur subsequent to listing through the exemption process.

The environmental community expressed concern that there are no milestones required of the Secretary to progress through the steps of listing a species. Stricter requirements on the Secretary to make timely decisions on proposals were called for. Such requirements should include prompt action upon receipt of a petition to list species if the petition presents substantial scienfitic evidence that the species is endangered or threatened.

Industry groups were troubled over the quality of the biological information received by the Secretary and argued for more scientific peer review of the species' status. The Committee recognized this concern and established a special procedure for a review of the scientific enidence regarding the species if knowledgeable scientists disagree substantially on the relevant information. Peer reviews of the data, the Committee determined, should be conducted by specialists familiar with the species.

The Committee also sought to accommodate the criticism that no explicit provision in Section 4 outlines the regualtory process to remove a species from the endangered or threatened list. In order to clarify that delisting should be based on the same criteria and conducted according to the identical procedures as listing a species, the Committee amended Section 4 to include delisting in all cases where listing is addressed.

Other witnesses discussed the implementation of recovery plans which provide an essential program to improve a species' status. However, with limited resources, the Secretary must judiciously choose where those resources will accomplish the maximum amount of recovery for a depleted species. Resources should first be directed to recover species which are in direct comflict with human activities, such as construction and development projects, and H.R. 6133 provides for this.

**Addendum 106a**

13

Representatives of the states testified, in particular, about Section 6 of the Act. The states argued that the lack of funding for Federal-State cooperative agreements under Section 6 of the Act is inhibiting wider State participation in these programs. The states also expressed a need for greater federal participation in the funding of these arrangements. Currently, the law limits the federal share of estimated program costs to 66⅔ percent when the agreement concerns one state, or a maximum of 75 percent when two or more states have an interest in a given species. The Committee is concerned that such limits will inhibit states from developing more conservation plans, in the absence of initiatives provided by Federal funding. The Committee is also concerned that States are not making funds readily available for endangered species programs. Available moneys are being diverted to other programs where the federal matching share is greater. Consequently, H.R. 6133 adjusts the matching share under the Endangered Species Act to match that of other wildlife conservation program.

Early in the hearing process debate began on whether Section 7(a) of the Act, which provides that a Federal agency must insure that its actions are not likely to jeopardize the existence of any endangered or threatened species, required revision. Critics of Section 7(a) maintain that the consultation and exemption processes are too time-consuming and complicated. Further, the Section 7(a) consultation process was viewed as an obstacle to development. The maximum 360 days for completion of the exemption process under the Act poses inordinate burdens to those involved, industry claimed. Rather than hold up projects, certain industry spokesmen contended that an opportunity to pit the value of protecting a species against the costs of stopping development should occur in the consultation process and the agency carrying out the project or issuing the permit should be able to make the decision as to whether or not the project should proceed.

Evidence to substantiate changes of this magnitude was not persuasive to the Committee, either in the record or otherwise. During Fiscal Years 1979, 1980 and 1981, a total of 10,762 consultations occurred. Of that number only 192 (1.8 percent) resulted in the issuance of jeopardy opinions. Further, only seven of these 192 projects were prevented from going forward as intended. Of those seven, five were stopped for reasons unrelated to the Endangered Species Act. Of the remaining two, the Act was not the only, or even the prime, factor in stopping the project as contingent issues and statutes were also involved.

The consultation process has built a strong record of timeliness as well. The statutory time limit for consultation is 90 days or such time as is mutually agreed to between the Secretary and the Federal agency under whose authority the project would be conducted. During Fiscal Years 1979, 1980 and 1981, a total of 1,945 formal consultations resulted in the issuance of a written statement. Of those, 1,772 resulted in a biological opinion of no jeopardy and 173 resulted in a finding of jeopardy (or 8.9 percent of these formal consultations). The average time for completion of these 1,945 consultations was 56.6 days. This record establishes a strong argument for the adequacy of the consultation process as it is presently structured.

**Addendum 107a**

A number of industry groups also contended that the consultation process is frequently extended, forcing them to suspend their development plans to complete this process. An extension of the consultation period occurred in only 278 instances during Fiscal Years 1979, 1980 and 1981. Of this total, 214 resulted in findings of no jeopardy, and these were extended an average time of 71.9 days. Extended consultations resulting in jeopardy findings totalled 64 over the same three years and were extended an average of 93.3 days. While this is a highly respectable record, permit and license applicants should be assured of the finality of these consultation extensions when they are necessary. For this reason, a change in existing law was deemed necessary in order to provide an alternative to the mutually agreeable standard for extension of consultation under the present Act. Under H.R. 6133, consultations may not be extended for 45 days or more without the written consent of the applicant. This adjustment to the consultation period should meet the concerns expressed over inordinate delays.

The Committee also determined that changes to other parts of Section 7 would improve the consultation process. First of all, greater flexibility in consultation would assist the industry in planning projects. The legislation includes a provision for early consultation during the planning stages of the project and prior to the application for a Federal license or permit, which would signal the prospective applicant when a conflict is likely to arise during later phases of his activities and allow design adjustments to avoid potential conflict. It is intended that through such communication before problems arise, both the species in question and industry would face a more certain future. To increase flexibility in the exemption process, this early consultation is treated as a consultation for a jeopardy opinion if the Secretary reviews the action at the time the applicant applies for a Federal permit or license and deems that no significant changes have been made in the proposed action and that no new scientific information about the species has surfaced since the initial consultation.

Besides providing for early consultation, the Committee also sought to meet the concerns of industry by paring down the timetable for the exemption process. In total, the maximum period of time allowed to complete the exemption process was reduced from 360 days to 180 days. In doing so the Committee eliminated the Review Board, composed of Presidential and Secretarial appointees as well as an administrative law judge, which reports to the cabinet-level Endangered Species Committee on the merits of the exemption application. This function was vested with the Secretary. The professional staff of the Secretary should be the appropriate individuals to carry out this report, not appointees unfamiliar with this process and with the statutory workings of the Act. A truly professional report would better serve the Endangered Species Committee in making the final decision to exempt a project and, therefore, our Committee abolished the Review Board in favor of requiring the Secretary to fulfill this responsibility. This further answer industry criticism that the exemption process is unwieldy and too removed from understanding the real circumstances of endangered species problems. The concerns that this report could be biased were also met by providing for public participation in the

review process and the basing of the report on the administrative record. The Secretary is required to hold at least one public hearing on his report, and the submitted evidence shall be open to the public.

Another concern raised by industry was that of resolving conflicts between Section 7 and Section 9. After complying with the rigorous demands of the Section 7 consultation process, the applicant or Federal agency receives no assurance that any incidental and unintentional takings contemplated under a Section 7 consultation will not be prosecuted under Section 9 which prohibits any taking. There are also situations where the unintentional taking may occur on private lands owned by a developer who has no need of a Federal permit. These individuals have no access to the consultation and exemption provisions of the Act since they do not apply for any Federal permit or license to conduct their activities but, nevertheless, they are subject to the taking prohibitions of Section 9. In order to meet these two different concerns, the Committee tailored two similar provisions. For the applicant who consults with the Secretary under the Section 7 process, the Secretary shall provide him with a written statement on what permissible incidental taking may occur. For private land owners, the Committee designed a solution through the permit provisions of Section 10 by authorizing the Secretary to issue permits to individuals who demonstrate that the taking of an endangered species will be incidental to, but not the purpose of, the lawful activity they will perform. In order to obtain a permit, the private applicant must present the Secretary with a conservation plan demonstrating that he will minimize the incidental taking, and specifying the number he will likely take and any proposed alternatives.

The above provisions—streamlining the exemption process, providing for early consultation, abolishing the Review Board in favor of a Secretarial report, allowing early access to the exemption process, and resolving the conflict between Section 7 biological opinions and Section 9 take provisions—significantly change Section 7 of the Act in response to legitimate problems brought before Congress. The Committee believes that the changes proposed in H.R. 6133 to Section 7 meet the concerns of the respective parties advocating these changes.

The Committee also focused on the international aspects of endangered species conservation. U.S. responsibilities to implement domestic obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) are lodged in Section 8. Seventy-seven nations are parties to CITES, which is designed to control the trade in endangered species. CITES contains various appendices listing animals and plants to be protected. Appendix I covers "species threatened with extinction" and trade in these species for commerical purposes is prohibited. Appendex II includes species that are not presently endangered but may become so if unrestricted commercial trade in those species occurs absent regulation. Section 8 of the Act implements CITES in the U.S. and also establishes the International Convention Advisory Commission (ICAC) which recommends scientific information to the Secretary to assist him in carrying out his scientific authority under CITES. Since its inception in 1979, however, this panel has played a minor

**Addendum 109a**

role in fulfilling U.S. obligations to CITES. The Committee believes such expert advice can be, and is properly, supplied to the U.S. delegation to CITES by the Secretary and his staff themselves and, therefore, advocates disbanding ICAC.

One of the more contentious issues considered by the Committee involved the bobcat which was listed on Appendix II of CITES in 1977 as part of a listing of all cat species except those already listed on Appendix I. Control of trade in cat pelts was the overriding reason for the listing which was not justified by biological evidence that the bobcat was, in fact, threatened with extinction.

A brief history of the repercussions of this listing in the United States clarify the need for amending the Act to remedy the bobcat issue. The listing of the bobcat on Appendix II required the U.S. wildlife management authority, the U.S. Fish and Wildlife Service, to issue export documents for bobcat pelts only after finding that such export would not be detrimental to the survival of the species and the pelts were not obtained in contravention of wildlife conservation laws. Because the bobcat is managed by state fish and wildlife agencies as a resident species, the Fish and Wildlife Service asked the states for data regarding the bobcat and reviewed the states' management programs. Based on the data and the effectiveness of the plans, they allowed the export of bobcat pelts taken pursuant to the state management plans. A tagging system was devised to ensure that only lawfully taken pelts would be exported.

Defenders of Wildlife sued the Department of the Interior seeking an injunction against the export of bobcats on the grounds that the findings were not based on adequate scientific data. The District Court held that the data was sufficient for 26 states and the Navajo Nation and insufficient for all or part of seven states. Both the Defenders of Wildlife and the Department of the Interior appealed the decision. The appellate court found for the Defenders of Wildlife and, in a finding that has caused serious concern in the professional wild life community, held that the Fish and Wildlife Service could not issue export permits without (1) a reliable estimate of the number of bobcats in the state and (2) information concerning the number of animals to be killed in the particular season. The Supreme Court refused the case on appeal, leaving the appellate court decision as final.

Wildlife managers and biologists believe that establishing reliable population estimates for a species such as the bobcat is virtually impossible and is unnecessary. In managing species such as the bobcat, wildlife biologists rely on data gathered from animals taken and on other techniques to establish population trends and the health of populations. The techniques that have been developed establish the density of the species in an area relative to historic levels and establish whether the population is increasing or decreasing. Techniques to estimate populations have not been used, largely because that information is frequently impossible to obtain. State wildlife managers are concerned that such a decision could have serious impacts on their management of other species and will result in further court challenges to state wildlife management programs.

This case presented the Committee with the need to clarify the requirements placed upon state wildlife agencies by the U.S. Feder-

**Addendum 110a**

al Government in carrying out agreements to which it is a party under CITES. Based on testimony received from the states and professional wildlife managers, the Committee believes the mandatory use of population estimates is not appropriate. Wildlife managers have a variety of tools at their disposal to arrive at estimates of population numbers. Tagging procedures, scent posts, bag limits, and other calculations based on population density can serve the purposes of sound management as well as "reliable population estimates". By expressly relieving the states of the requirement to establish reliable population levels, the U.S. Government will still be able to implement decisions under CITES through means which closely monitor trade in listed species. In this way, the full range of wildlife management techniques will continue to be available to the states rather than one narrow interpretation of how to estimate population levels. Thus, obligations under CITES and flexible measures to protect species are both preserved.

Issues involving policy regarding reservations lodged at CITES were also considered. The U.S. policy at CITES, as reinforced by the purposes of the Act, is to advocate the listing of species based on biology and trade data. In the past, species have been listed in cases where the populations have not been shown to be truly depleted, threatened, or likely to be threatened with extinction. As noted earlier, all cat species were listed on Appendix II of CITES in 1976. In 1981, the United States opposed the proposal, later adopted, to list over 300 parrot species on Appendix II. Subsequent to these listings, the United States did not lodge a reservation to such actions in either case.

While the Committee refrained from requiring that a reservation be nondiscretionary if the U.S. votes against a listing proposal which is adopted by CITES parties, the Committee does believe it necessary to receive a justification from the Secretary of State if, during future CITES meetings, the U.S. votes against a proposal which passes, yet refrains from lodging a reservation.

Another shortcoming of the Act is its tendency to discourage voluntary introduction of species in areas of their historical range. State fish and wildlife agencies had probed the feasibility of introducing such experimental populations, but they feared political opposition to reintroducing species unless some assurances were simultaneously extended to prevent the creation of Endangered Species Act problems. In order to mitigate fears expressed by industry that such experimental populations would halt development projects, the Committee defined what an experimental population is and how it shall be treated under the Act. Clarification of legal responsibilities incumbent with these populations will, it is hoped, encourage private parties to host experimental populations on their lands.

Section 10 of the Act contains an exemption from certain of the Act's restrictions for the possession and sale of pre-Act scrimshaw, or whale bone and teeth, whale oil, and antiques. Scrimshanders, people who carve whale bone and teeth and who were allowed to continue doing so under a Section 10 exemption, have not exhausted their supplies of raw, unworked whale bone and teeth at the rate they anticipated when the former three-year exemption was provided in the Act. An amendment to permit craftsmen to use

**Addendum 111a**

their remaining supplies of whale bone and teeth is necessary to continue to honor certificates of exemption. Otherwise, these scrimshanders would have tons of whale bone and teeth on hand without the ability to sell the finished and carved products. Unfortunately, it is suspected that in some cases illegal infusions of raw whale bone and teeth are replenishing U.S. stockpiles via the Japanese whaling industry and the Azores. These supplies elude governmental records.

The Committee desires once and for all to curtail the illegal entry of whale teeth and bone without unduly burdening scrimshanders by foreclosing their opportunity to work and sell legally certificated material. These considerations led the Committee to permit extension of the exemption period while proposing a tighter definition of a scrimshaw product eligible for exemption and tightening the reporting and regulatory requirements under which the exemption is allowed.

The Committee believes the original purposes of the Act hold as crucially now as before: to prevent the extinction of species in the present and for future generations. From the outset, efforts to address the shortcomings of the Act sought to include, and continue to include, participation from all interested parties. At no point did the Committee proceed without the goal and belief of addressing all matters comprehensively in a package of amendments.

### The Amendments

The Committee adopted two amendments to H.R. 6133. The first struck all after the enacting clause and does the following:

Removes all non-biological criteria from the species listing process;

Raises the burden upon a petitioner requesting a species listing or delisting to submit substantial evidence for a listing or a delisting proposal;

Defines time limits for Secretarial decisions in the listing and delisting process, reducing maximum time to one year plus a possible 6 month extension;

Requires that, if critical habitat is not determinable at the time of listing, such habitat must be designated within one year thereafter.

Sets priorities for recovery plans;

Increases the federal funding share for cooperative agreements with states;

Streamlines the exemption process from 360 to 180 days;

Replaces the exemption Review Board with the Secretary;

Allows for incidental taking subject to consultations and through a permit process;

Overturns the Federal Court of Appeals decision on bobcats;

Implements the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

Abolishes the International Convention Advisory Comittee;

Requires a report on certain U.S. actions at CITES;

Permits extension of scrimshaw exemptions for up to three years and requires new regulations for monitoring whale bone and tooth stocks;

**Addendum 112a**

Creates a procedure for propagation of experimental populations;

Redefines exempted antiques under the Act;

Reauthorizes the Endangered Species Act for three fiscal years (1983 through 1985).

The second amendment adopted by the Committee amended the title of the bill.

## Section-by-Section Analysis

There follows a section-by-section analysis accompanied, where appropriate, by discussion.

### SECTION 1—DETERMINATION OF ENDANGERED AND THREATENED SPECIES.

Section 1 of H.R. 6133 amends Section 4 of the Endangered Species Act, which establishes the process by which species are included in, or removed from, the endangered and threatened species lists. The proper operation of this section is critical to the implementation of the Act, as it determines which species receive the protections of the Act. The principal purpose of the amendments to Section 4 is to ensure that decisions pertaining to the listing and delisting of species are based solely upon biological criteria and to prevent non-biological considerations from affecting such decisions. To accomplish this and other purposes, Section 4(a) is amended in several instances.

Section 4(a) is first amended by changing the list of factors considered in determining whether a species should be listed. This list of factors currently includes overutilization for commercial, sporting, scientific and educational purposes. This list is amended by substituting the word "recreational" for the word "sporting." This is not intended to affect, in any way, the operation of the Act. It merely removes the connotation that properly regulated sport hunting can cause the endangerment of species. The Committee notes, however, that improperly regulated hunting or illegal hunting can seriously affect wildlife populations and in no way condones wildlife management practices not based on proper biology or lax enforcement of hunting regulations.

Section 4(a)(1) is further amended by changing the requirement that the Secretary, to the maximum extent prudent, must designate critical habitat at the time a species is listed. Section 4(a)(1) requires that he must do so only to the maximum extent prudent and determinable. By the inclusion of the word "determinable" the Committee recognizes that, because of the combination of biological studies and the economic analysis required under Section 4(b)(4) of the Act and the attendant analysis imposed by Executive Order 12291 and by statutes such as the Regulatory Flexibility Act and the Paperwork Reduction Act, it may be difficult to determine the most appropriate critical habitat within the time frame contained in the legislation for the listing of species. The Committee feels strongly, however, that, where the biology relating to the status of the species is clear, it should not be denied the protection of the Act because of the inability of the Secretary to complete the work necessary to designate critical habitat. Therefore, the legislation establishes clear time frames, described below, for considering the bi-

**Addendum 113a**

ology of the species and directs that determinations regarding the listing of the species be completed within those time frames. The Committee expects the agencies to make the strongest attempt possible to determine critical habitat within the time period designated for listing, but stresses that the listing of species is not to be delayed in any instance past the time period allocated for such listing if the biological data is clear but the habitat designation process is not complete.

The Committee notes that the term "prudent" has been interpreted to refer to situations where the designation of critical habitat would inform those who would take a species illegally of the location of the species. This is particularly true of some species of butterflies and plants. The Committee approves of this interpretation. The Committee also notes, with approval, the existence of a Solicitor's opinion in the Department of the Interior stating that the critical habitat provisions of the Act only apply to areas within the jurisdiction of the United States and that the designation of critical habitat in foreign countries or on the high seas would be inappropriate.

Section 4(b) of the Act is amended in several instances by Section 1(a)(2) of H.R. 6133. First, the legislation requires that the Secretary base his determinations regarding the listing or delisting of species "solely" on the basis of the best scientific and commercial data available to him. The addition of the word "solely" is intended to remove from the process of the listing or delisting of species any factor not related to the biological status of the species. The Committee strongly believes that economic considerations have no relevance to determinations regarding the status of species and intends that the economic analysis requirements of Executive Order 12291, and such statutes as the Regulatory Flexibility Act and the Paperwork Reduction Act not apply. The Committee notes, and specifically rejects, the characterization of this language by the Department of the Interior as maintaining the status quo and continuing to allow the Secretary to apply Executive Order 12291 and other statutes in evaluating alternatives to listing. The only alternatives involved in the listing of species are whether the species should be listed as endangered or threatened or not listed at all. Applying economic criteria to the analysis of these alternatives and to any phase of the species listing process is applying economics to the determinations made under Section 4 of the Act and is specifically rejected by the inclusion of the word "solely" in this legislation.

Section 4(b) of the Act, as amended, provides that listings shall be based solely on the basis of the best "scientific and commercial data" available. The Committee did not change this information standard because of its interpretation of the word "commercial" to allow the use of trade data. Retention of the word "commercial" is not intended, in any way, to authorize the use of economic considerations in the process of listing a species.

The Committee notes, however, that the provisions in the Act relating to the designation of critical habitat remain unchanged by H.R. 6133 and the economic analysis provisions of Section 4(b)(4) and the provisions of Executive Order 12291 and the aforemen-

**Addendum 114a**

tioned statutes relating to the analysis of regulations would continue to apply to the designation of critical habitat.

H.R. 6133 would also amend paragraph (1)(B) of subsection (b) to require the Secretary to respond to the comments of the Governor of any state where a species proposed to be listed is located if the Secretary disagrees with the comments regarding the listing of species.

The changes made to Section 4(c) by Section 1(a)(3) of H.R. 6133 must be read in conjunction with the amendments to Section 4(f)(5) as these amendments incorporate time frames and judicial review into the listing process in a manner which limits the Secretary's discretion to list or delist species. Section 4(c), as amended by the legislation, would require the Secretary, to the maximum extent practicable, to commence rulemakings to list or delist species within 180 days of receiving a petition containing substantial evidence that the species is likely to qualify for addition to, or removal from, the endangered or threatened species list. A determination that the petition does not contain substantial evidence would be reviewable under the standards found in Section 553(e) of Title 5 of the U.S. Code.

The Committee gave consideration to removing the words "to the maximum extent practicable" but resolved not to do so after hearing concerns expressed by the Administration that devoting staff resources to a particular petition to list or delist a species might deprive the Secretary of the resources to list a species that might be in greater need of protection. However, the Committee does not intend that this phrase be interpreted to allow the Secretary to delay commencing the rulemaking process for any reason other than that the existence of pending or imminent proposals to list species subject to a greater degree of threat would make allocation of resources to such a petition unwise. In such event, the Committee intends that the listing agenices shall utilize a scientifically based priority list of species, subspecies and populations based on their degree of threat, and proceed through that list in an efficient and timely manner. Distinctions based on whether the species is a higher or a lower life form are not to be considered.

It should be noted that the Secretary need only act on those petitions that contain substantial evidence that a species is likely to qualify for addition to, or removal from, the lists. Thus, while the burden on the Secretary to proceed with legitimate petitions is greater, the standard for petitions that qualify for consideration is also higher than under the existing Act.

Section 4(f)(5) is amended by section 1(a)(4) to require that determinations as to the final status of species proposed to be listed or delisted under subsection (c) must be completed within one year of the date of proposal. If the critical habitat designation accompanies the listing, or if the Secretary determines that the designation of critical habitat would not be prudent, the listing can be published at any time within the year, provided the regulatory requirements of Section 4(f) are completed. However, if the critical habitat is determinable and designating it would be prudent, the Secretary cannot proceed with the listing of the species without an accompanying designation of critical habitat until the year has elapsed. At the end of the one year period, if the scientific evidence indicates

**Addendum 115a**

that the species should be listed, the Secretary must do so regardless of whether the analysis necessary to designate critical habitat has been completed. If the scientific evidence indicates the species should not be listed, the listing must be withdrawn. The determination by the Secretary as to whether or not a species should be listed or delisted is reviewable by the courts under the arbitrary and capricious standard. This provision is, of course, subject to the emergency listing provisions of Section 4(f)(2)(C), which allows the Secretary to promulgate an emergency regulation listing a species at any time if necessary to protect a critically endangered species.

The one year period within which the Secretary must make a final listing determination, may, under limited circumstances, be extended to eighteen months. Such an extension is permissible under Section 4(f)(5), as amended, only if the Secretary finds there is substantial disagreement among specialists regarding the sufficiency or accuracy of the information concerning the status of the species. The Committee intends that this extension apply only to those instances where the biological status of the species is being questioned by scientists knowledgeable about the species and not to allow additional time for the economic or other analyses related to the designation of critical habitat.

The addition of time frames for delisting contained in Section 4(f)(5) reflects the concern of the Committee that the endangered and threatened species lists harbor a number of improperly listed species. The listing of species for emotional reasons or based on improper biological data is just as improper as not listing species for economic reasons. Thus, the Committee fully intends that the time frames for consideration of petitions apply to delisting proposals and that the Secretary make final determinations on proposals to delist within one year of the date of proposal, subject to the six month extension if the biological data are inconclusive.

Section 4(f)(5)(C) provides that if a critical habitat is not designated when the species is listed at the end of the one year or eighteen month period, than the critical habitat must, to the maximum extent prudent, be listed within one year of the species listing. The criteria of determinable is not included at this point because the Committee expects the Secretary, at the end of the appropriate period, to designate a critical habitat using the best information available. If, for whatever reason, a critical habitat is not designated at the end of the required period, the original listing of the species is not withdrawn.

Section 1(a)(5) of H.R. 6133 also amends Section 4(g) of the Act to require that the Secretary give priority in the preparation of recovery plans to those species that are, or may be, in conflict with construction or other development projects. The purpose of this change is to ensure that such conflicts, or potential conflicts, receive priority attention from the Secretary so as to limit the occasions upon which major problems under Section 7 may arise. The Committee does not intend that this requirement divert attention from critically endangered species that benefit from recovery plans but are not threatened with conflicts with human activity and has included the words "to the maximum extent practicable" to express this intent.

**Addendum 116a**

23

Subsection (b) of Section 1 is a savings clause to ensure that these amendments will not affect those listings which have already been proposed. Such proposals will continue as if H.R. 6133 were not enacted. Petitions to list species will be treated as having been submitted on the data of enactment of H.R. 6133 and the Secretary will have 180 days to determine if these petitions contain substantial evidence that a species is likely to qualify for listing or delisting.

The Committee notes that many species have been withdrawn pursuant to Section 4(f)(5) because the two year time period required for their listing, under existing law, has elapsed. The Committee suspects that some of these species were withdrawn not because of a lack of biological data but because the analyses relating to the designation of critical habitat were not complete. The Committee intends that the Secretary review the resubmission of any of these petitions de novo and not require that new information be submitted with the petitions if they were withdrawn for reasons other than that the biological data did not indicate they should be listed.

Finally, it has come to the attention of the Committee that certain regulations promulgated under the Act are neither necessary nor appropriate for carrying out its provisions or purposes. Regulations should not be issued pursuant to the Act unless a clear demonstration is made that the regulation is necessary to achieve a specific objective stated in the Act. Each agency which has issued regulations under the Act should review them and rescind any for which such a demonstration cannot be made. Through this process, the agencies will avoid dissipating their resources in enforcement of unnecessary regulations and will focus on programs actually necessary in implementing the Act. The result will be not only to lift unnecessary burdens but also to implement the Act more effectively.

SECTION 2—COOPERATION WITH THE STATES.

Section 2 of H.R. 6133 amends Section 6 of the Act to increase the maximum federal share of grants to states from 66⅔ percent to 75 percent for single state projects and from 75 percent to 90 percent for multi-state projects. The purpose of this amendment is to make the endangered species grant program competitive with the programs administered under the Federal Aid in Wildlife Restoration Program (Pittman-Robertson) and Federal Aid in Sport Fish Restoration Program (Dingell-Johnson).

The Committee notes with disapproval efforts to abolish this aspect of the endangered species program. The ligislative history of the Act unmistakably shows that Congress intended that a cooperative, federal-state relationship be initiated and sustained. Efforts by the states to restore endangered species have met with marked success. Elimination of support to the states will result in greater burdens being placed on the Federal Government and will eventually result in the allocation of more federal resources than would occur if the state grant program continued.

An authorization of $6 million is provided for each of the next three fiscal years to carry out the purposes of Section 6 of the Act. This is the amount contained in the current legislation and repre-

**Addendum 117a**

sents what the Committee believes would be an adequate level of funding for this Section.

### SECTION 3—INTERAGENCY COOPERATION AND COMMITTEE EXEMPTIONS.

Section 3 makes several amendments to the consultation and exemption processes of Section 7 of the Act. The first such amendment alters Section 7(a)(2) by adding a subparagraph (B) which provides that a Federal agency, promptly after receiving a permit or license application for an activity for which the Secretary has issued a biological opinion under Section 7(b), shall issue the applicant a written statement indicating whether the agency would likely issue the requested permit or license but for the biological opinion.

The Committee recognizes that such a determination may be difficult prior to the establishment of the administrative record regarding the permit application and believes that, in some instances, the notification will have to be delayed until enough of the record is established to allow a reasoned judgment to be made regarding the issuance of the permit. While it is not the intent of the Committee that agencies postpone the notification until final determinations are made, the Committee does not expect federal agencies to issue such "but for opinions" unless it is reasonably clear that the permit or license would otherwise be issued. The Committee fully expects that the Secretary will have the authority to review such "but for opinions" and if he finds that the Federal agency involved is not acting in good faith in issuing such an opinion, the Secretary should not be compelled to process such exemption applications.

If the permitting agency issues such a statement to the permit or license applicant, the applicant may, within 90 days thereafter, apply for an exemption under Section 7(g) as amended by H.R. 6133. Alternatively, the permit applicant may await final agency action on his permit or license application, and if such final agency action results in a denial of his permit because of the application of Section 7(a)(2), then he may seek an exemption.

In considering other amendments to Section 7(a), the Committee decided not to change the substantive duty of Section 7(a)(2). Under that section each Federal agency, after consultation with the Secretary, must ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify its critical habitat. As noted in the Background and Need Section of this report, the Committee determined that compliance with this requirement has not resulted in inordinate burdens upon Federal agencies or upon private activities dependent upon Federal agencies for licenses or permits. In fact, the consultation provisions have functioned extremely well as a means whereby potential conflicts between the conservation of threatened and endangered species and the carrying out of Federal activities can be avoided.

To further the objective of minimizing potential conflicts, the Committee amended Section 7(a) by redesignating paragraph 3 as paragraph 4 and by inserting a new paragraph 3 authorizing the Secretary to consult with a propective Federal permit or license ap-

plicant regarding the impact of the proposed project on endangered
or threatened species in the proposed project area. The intent of
this new provision is to involve the Secretary, and hopefully state
and local planning and conservation entities, in the planning stage
of projects. If consultation under Section 7 of the Act begins only at
the time a permit or license is applied for, much of the planning
activity and state and local review will already have been complet-
ed. Thus, the opportunity to modify or alter the development plan
will be accordingly reduced and perhaps made more costly. The
Committee is aware that project sponsors and Federal agencies
have been told that the Secretary lacks the authority to engage in
early consultations. The amendment to Section 7(A)(3) is intended
to overcome this and to formulize the process.

This early consultation is, however, subject to such guidelines as
the Secretary may establish. In these guidelines, the Secretary
should define the types of activities eligible for early consultation.
The Committee expects that the Secretary will exclude from such
early consultation those actions which are remote or speculative in
nature and to include only those actions which the applicant can
demonstrate are likely to occur. In many situations, especially for
actions not on Federal lands, early consultation should not be initi-
ated unless the applicant possesses, or can demonstrate that he
will posess, some property interest in the proposed site on which
the activity will occur. The Committee further expects that the
guidelines will require the prospective applicant to provide suffi-
cient information describing the project, its location, and the scope
of activities associated with it to enable the Secretary to carry out
a meaningful consultation.

Section 3 further amends Section 7 of the Act by restructuring
subsection (b) to add an paragrpah (1) which provides that if a con-
sultation involves an agency action for which a permit or license
applicant exists, then the 90-day consultation period may not be ex-
tended for 45 days or more unless the Secretary, before the close of
the 90-day period, obtains written consent of the applicant. In addi-
tion, such a consultation may not be extended for less than 45 days
unless the Secretary provides the permit or license applicant with
a written statement of the reasons for the extension. It is the Com-
mittee's intent that this written statement shall specify the percise
reasons for the extension.

Section 7(b)(2) provides that consultations conducted pursuant to
Section 7(a)(3) shall be concluded within a period of time that is
mutually agreeable to the Secretary and the applicant concerned.

Section 7(b) is also amended to provide, in paragraph (3), that,
promptly after the conclusion of consultation, whether it is a con-
sultation provided for under Section 7(a)(2) with a Federal agency
or an early consultation provided for in Section 7(a)(3), the Secre-
tary shall provide the Federal agency or the applicant, as the case
may be, a written statement detailing whether the proposed action
will jeopardize the continued existence of the endangered or threat-
ened species involved or result in the destruction or adverse modifi-
cation of the species' critical habitat.

Section 7(b)(3) specifically provides that if such jeopardy or ad-
verse modification is found the Secretary shall suggest reasonable
and prudent alternatives which can be taken to avoid such jeop-

**Addendum 119a**

ardy or adverse modification. The Committee specifically intends that the Secretary must determine, using the best available information, if such jeopardy or adverse modification will occur and does not intend to allow the Secretary to avoid or delay making a finding based on an absence of information.

The opinion issued to a prospective permit or license applicant who has consulted under the early procedure established under Section 7(a)(3) does not, in and of itself, have operative significance either upon the prospective applicant or upon the Federal agency to which the applicant will apply for a permit or license. However, when the prospective applicant applies for a permit or license, the Secretary shall, pursuant to Section 7(b)(3), treat that opinion as though it were an opinion issued to a Federal agency under Section 7(a)(2) if the Secretary again reviews the action and determines that no significant changes have been made either with respect to the action or with respect to the information available concerning the likely impacts of that action. After such review, the Secretary's opinion under Section 7(b)(3) shall be considered as an opinion issued pursuant to a consultation conducted under Section 7(a)(2).

Section 3 further amends Section 7(b) of the Act by adding a new paragraph (4) which provides that if, after consultation, the Secretary concludes that the agency action will not violate Section 7(a)(2) and that the taking of a listed species incidental to the agency action will not violate that section, the Secretary shall provide the Federal agency or applicant with a written statement that: (1) Specifies the impacts of such incidental taking on the species, (2) specifies those reasonable and prudent measures which the Secretary considers necessary or appropriate to minimize such impact, and (3) sets forth the terms and conditions (including reporting requirements) that must be complied with by the Federal agency or applicant in order to implement the reasonable and prudent measures specified.

Section 3 of H.R. 6133 amends Section 7(o) of the Act to provide that any taking that is in compliance with the terms and conditions specified in the written statement issued under Section 7(b)(4) shall not be considered to be a taking of any endangered or threatened species.

The purpose of Section 7(b)(4) and the amendment to Section 7(o) is to resolve the situation in which a Federal agency or a permit or license applicant has been advised that the proposed action will not violate Section 7(a)(2) of the Act but the proposed action will result in the taking of some species incidental to that action—a clear violation of Section 9 of the Act which prohibits any taking of a species. The Federal agency or permit or license applicant is then confronted with the dilemma of having a biological opinion which permits the activity to proceed but is, nevertheless, proscribed from incidentally taking any species even though the incidental taking was contemplated in the biological opinion and determined not to be a violation of Section 7(a)(2). The Committee intends that such incidental takings be allowed provided that the terms and conditions specified by the Secretary to minimize the impact of the taking are complied with.

One of the enumerated terms and conditions is appropriate reporting requirements so that the Secretary may monitor the

impact of the taking on a species. It is not, however, the Committee's intent to create additional reporting requirements.

The Committee notes that many Federal permit or license holders are already under a duty to report on various aspects of their activities. It is the Committee's intent that, to the maximum extent practicable, the reporting requirement established in Section 7(b)(4) shall not be a new requirement but rather shall be incorporated into existing reporting requirements and the information made available to the Secretary.

Section 7(b)(4) requires the Secretary to specify the impact on such incidental taking on the species. The Committee does not intend that the Secretary will, in every instance, interpret the word "impact" to be a precise number. Where possible, the impact should be specified in terms of a numerical limitation on the Federal agency or permittee or licensee. The Committee recognizes, however, that it may not be possible for the Secretary to specify a number in every instance. For example, it may not be possible to determine the number of eggs of an endangered or threatened fish which will be sucked into a power plant when water is used as a cooling mechanism. The Committee intends only that such numbers be established where possible.

If the specified impact on the species is exceeded, the Committee expects that the Federal agency or permittee or licensee will immediately reinitiate consultation since the level of taking exceeds the impact specified in the initial Section 7(b)(4) statement. In the interim period between the initiation and completion of the new consultation, the Committee would not expect the Federal agency or permittee or licensee to cease all operations unless it was clear that the impact of the additional taking would cause an irreversible and adverse impact on the species.

Nothing in the amendments to Section 7(b)(4) or Section 7(o) is intended to void more restrictive state laws or regulations respecting the particular species, and the provisions of Section 6(f) of the Act are in no way modified by the amendment.

Section 7(c) of the Act is amended by Section 3 of H.R. 6133 to authorize a permit or license applicant undertaking an early consultation under Section 7(a)(3) to conduct a biological assessment to identify any endangered or threatened species which is likely to be affected by the agency action. Section 7(c) is further amended to provide that the 180-day period allowed for the asssessment may not be extended unless the Secretary provides the permit or license applicant, if any, with a written statement of the reasons for the extension and the length of the extension. The Committee is aware that biological assessments are sometimes extended for unspecified periods of time and the reasons for the extension are not clearly articulated to the permit or license applicant involved. The purpose of this amendment is to eliminate this circumstance.

Section 7(g) of the existing Act specifies the process and procedures under which an application for an exemption from the Act is filed and considered. Section 3 amends subsection (g)(1) to provide that permittees or licensees who have received a "but for opinion" pursuant to Section 7(a)2)(B) may apply to the Secretary for an exemption under the Act. This early access to the exemption process is intended to provide the permit or license applicant with more

**Addendum 121a**

certainty regarding whether the project may proceed notwithstanding the fact that the action violates Section 7(a)(2). The triggering mechanism for early access to the exemption process is the statement by the action agency that but for the Endangered Species Act prohibitions the requested permit or license would likely be issued.

Section 3 also contains a number of amendments to streamline the exemption process. Under existing law, once an exemption application is filed, the application is considered initially by a three-member review board which determines whether an irresolvable conflict exists and whether the Federal agency and/or the exemption applicant have (1) carried out their consultation responsibilities in good faith, (2) conducted any biological assessment required under Section 7(c), and (3) refrained from making any irreversible or irretrievable commitment of resources during the consultation. If the review board makes affirmative findings, it proceeds to prepare a report for the seven-member Cabinet-level Endangered Species Committee. The report discusses the availability of reasonable and prudent alternatives to the agency action, the nature and extent of the benefits of the agency action and alternative courses of action consistent with conserving the species or its critical habitat, whether the agency action is in the public interest and is of national or regional significance, and appropriate reasonable mitigation and enhancement measures which should be considered by the Endangered Species Committee.

Section 3 of H.R. 6133 amends Section 7(g) by deleting all reference to a review board. Section 7(g), as amended, provides that the functions of the review board will be carried out by the Secretary. Section 7(g) also changes the time requirements in which the findings and reports currently required of the review board must be made. The time for the initial determination of whether an irresolvable conflict exists, etc., is reduced from 60 days to 30 days. The time in which the report discussing the availability of reasonable and prudent alternatives, etc., must be completed is reduced from 180 days to 120 days.

In making the initial determination, Section 7(g)(3), as amended, provides that the Secretary shall consult with the Endangered Species Committee. It has been suggested that this is an inappropriate requirement when the species concerned is under the jurisdiction of the Secretary of Commerce because the Secretary of Commerce is not a statutory member of the Endangered Species Committee. The Committee would only note that the Secretary need not be a member of the Endangered Species Committee in order to consult with those individuals who are members.

Under existing law, the endangered Species Committee has 90 days after receiving the report of the review board to determine whether to allow an exemption under the Act for the agency action concerned. Section 3 of the bill amends Section 7(h) to provide that the endangered Species Committee shall have 30 days after receiving the report of the Secretary in order to reach its decision. In reducing the time allowed for consideration of the report, it is not intended that the quality of the deliberations be diminished or that unrealistic time constraints be placed upon members of the Endangered Species Committee. It is intended that the Secretary, in preparing the report, will keep the members of the Endangered Spe-

**Addendum 122a**

cies Committee fully informed and that all relevant documents will be provided to them so that they may be thoroughly familiar with the background evidence when the Secretary's report and conclusions are provided. Full consultation and the provision of background information to the Endangered Species Committee members while the Secretary is preparing the report will ensure that an informed and reasoned decision can be made, with full knowledge of the facts, within the time frame allotted.

Finally, Section 3 amends subsection (q) of Section 7 to authorize apprpriations of $600,000 for each of Fiscal Years 1983, 1984, and 1985 to the Secretary to assist him and the Endangered Species Committee in carrying out their functions under Section 7(g) and (h) of the Act.

SECTION 4—CONVENTION IMPLEMENTATION.

Section 4(a)(1) of the bill adds a new paragraph to Section 8A of the Act to overrule the decision of the U.S. Court of Appeals for the District of Columbia Circuit in *Defenders of Wildlife, Inc. v. Endangered Species Scientific Authority,* No. 79–2512 (D.C. Cir., February 3, 1981). The court held that a valid no detriment finding concerning the export of bobcat pelts cannot be made under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) without a reliable estimate of the bobcat population in a state. The ruling of the court is not based on sound wildlife management.

The amendment makes clear that the Secretary is required to base export determinations and advice upon the best available biological information derived from professionally accepted practices used in wildlife management, but it is not required to make, nor may he require any state to make, estimates of population size in making such determinations or giving such advice. In the case of the bobcat, as with most other wild animal populations, the resource is monitored by a variety of techniques that yield information used in evaluating the condition of a population. As these data are accumulated over time, they reflect trends and call attention to changes in the population. Habitat information, indices of population size, age and sex structure, and harvest information are all used to evaluate population status. If population estimates are available for a particular species, such information should be considered with other data in making export decisions. Provided that there is other data derived from professionally accepted wildlife management practices establishing that export will not be detrimental to the survival of the species, no exports shall be disallowed for the reason that the population estimates are not available. If available population estimates contradict other information derived from professionally accepted wildlife management practices, the Secretary shall consider all information in making his export decision.

The amendment is made effective as of January 1, 1981, so as to diminish as much as possible the adverse impact of the court ruling on collection of scientific data by state wildlife agencies. Bobcat pelts taken after that date may be considered for export under the criteria established by Section 4(a)(1) of H.R. 6133.

**Addendum 123a**

CITES extends protection to certain species which are involved in international trade but, with respect to many listed species which are native to the United States, primary authority for management and protection resides in the states. With respect to such species, the Secretary's no detriment findings are properly based on information generated by state agencies possessing primary management authority. The Secretary is not required to independently generate data, on which to base export decisions, which is being collected by state biologists.

In making his CITES findings, the Secretary may require the establishment of target harvest levels and tagging procedures to ensure that the export of any species on Appendix II of CITES will not be detrimental to the survival of the species.

Section 4(a)(2) amends Section 8(d) of the Act abolishing the International Convention Advisory Committee and by providing that if the United States votes against including any species in Appendix I or Appendix II of CITES, and if the United States elects not to enter a reservation pursuant to Article XV of the Convention with respect to that species, the Secretary of State shall, within 90 days after the last day in which the reservation could be entered, submit to the Congress a written report specifying the reason why a reservation was not entered. The Committee does not intend to diminish the Secretary of State's authority in determining whether or not to enter a reservation. The Committee is, however, alarmed over past practices in which it appeared that the decision on whether or not to enter a reservation was based on political, and not biological, factors. In fact, during hearings on the legislation, witnesses for the Department of State suggested that whether the biological evidence justified listing the species under CITES had relatively little to do with whether the U.S. would enter a reservation or not. The Committee believes that CITES listings should be based upon adequate biological evience and is pleased to note that subsequent correspondence with the Department of State suggests that the Department now concurs in this view. That correspondence is appended to this report and the intent of Section 4(a)(2) is to monitor the bases on which the Secretary makes future decisions regarding possible reservations.

Section 4(a)(3) amends Section 8(e) to implement the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (hereinafter referred to as the Western Convention). Subsection (e) directs the Secretary of the Interior to take such steps as are necessary to implement the Western Convention including (1) cooperation with contracting parties for the purpose of developing resources and programs, (2) identification of those species of birds that migrate between the United States and other contracting parties, (3) the implementation of cooperative measures to ensure tht such species will not become endangered or threatened, and (4) identification of measures that are necessary and appropriate to implement those provisions of the Western Convention which address the protection of wild plants. In discharging these responsibilities the Secretary shall consult with the Secretaries of Commerce and Agriculture and with other agencies as appropriate. No later than September 30, 1985, the Secretary and the Secretary of State shall submit a report to the Congress describing those

**Addendum 124a**

31

steps which have been taken to implement this section. There are authorized to be appropriated to the Department of the Interior not to exceed $150,000 for each of Fiscal Years 1983 and 1984 and not to exceed $300,000 for Fiscal Year 1985 for the purposes of carrying out subsection (e).

**SECTION 5—EXPERIMENTAL POPULATION AND OTHER EXEMPTIONS.**

Section 5 of H.R. 6133 amends Section 10 of the Act in several important ways. It would add new provisions to facilitate the establishment of experimental populations, to give the Secretary more flexibility in regulating the incidental taking of endangered species, to facilitate the disposition of existing stocks of whale bone and teeth, and to provide for the establishment of experimental populations.

First, the legislation establishes a procedure whereby those persons whose actions may affect endangered or threatened species may receive permits for the incidental taking of such species if the action would not jeopardize the continued existence of the species. This provision addresses the concerns of private landowners who are faced with having otherwise lawful actions not requiring federal permits prevented by the Section 9 prohibitions against taking.

Section 10(a), as amended, would allow the Secretary to permit any taking otherwise prohibited by Section 9(a)(1)(B) if the taking is incidental to, and not the purpose of, an otherwise lawful activity. By use of the word "incidental" the Committee intends to cover situations in which it is known that a taking will occur if the other activity is engaged in but such taking is incidental to, and not the purpose of, the activity. An applicant for such a permit would submit to the Secretary a plan that would specify the number of species likely to be taken, what steps the applicant would take to minimize the takings, and what alternative actions that did not involve the takings were analyzed and why those alternatives were not adopted. The secretary would base his determination on whether or not to grant the permit under the same standard as found in Section 7(a)(2) of the Act, that is, whether or not the taking would jeopardize the continued existence of the species. To issue the permit, the Secretary would also have to find that the taking would be incidental to another activity and that the applicant would minimize the taking to the maximum extent practicable.

As with all Section 10 permits, the legislation provides that the Secretary shall prescribe terms and conditions to ensure that appropriate measures are taken by the applicant to minimize the takings and shall revoke the permit if the permittee is not complying with the terms and conditions of the permit.

Section 5 of H.R. 6133 amends Section 10(f) of the Act to continue, subject to certain important qualifications, the exemption from trade restrictions for certain finished scrimshaw products. At the time of the Act's passage in 1973, there were existing stocks of lawfully acquired whale bone and teeth held by persons who intended to sell such products as "scrimshaw," an art form that utilizes such materials. With passage of the Act, interstate and foreign commerce in such products became illegal. In 1976, however, Congress allowed qualified holders of such products an exemption from the Act's trade restrictions so that such holders might lawfully dispose

**Addendum 125a**

of their lawfully acquired stocks. The exemption authorized in 1976 was limited to a period of three years because of Congress' expectation that the stocks would be fully disposed of in that period. In 1979, however, it was clear that such stocks had not been exhausted and a further extension of three years was authorized.

The exemption authorized by Congress in 1976 and renewed in 1979 required the Secretary of Commerce to prescribe regulations to ensure that the relaxation of the trade restrictions would not open a loophole for trade in unlawful whale products. The regulations promulgated by the Secretary were intended to provide a regulatory regime that would expire after three years. Among other things, these regulations permitted interstate trade in finished scrimshaw products not only by persons who lawfully held such products at the time of the Act's enactment, but also by the subsequent purchasers from such persons. The Committee believes that such interstate trade, while appropriate for a trade exemption of only three years duration, has complicated the regulatory and enforcement difficulties for the Secretary as a result of the further extension of the exemption period. Accordingly, new subsection 10(f)(9)(B) provides that after January 31, 1984, a date after the expiration of the last of the certificates of exemption currently outstanding, any person who acquired a scrimshaw product as a subsequent purchaser from a person to whom a certificate of exemption was issued may no longer sell or offer such product for sale in interstate or foreign commerce.

In addition, the legislation directs the Secretary to carry out a comprehensive review of the adequacy of his existing regulations and directs him, based on that review, to propose and adopt necessary revisions to those regulations. Subparagraph (B) specifies four areas of inquiry that the Secretary must explore in his mandated review. The Committee specified these four areas because of its belief that the existing regulations are likely to need improvement in these areas.

After the revised regulations are promulgated, the Secretary may renew, subject to those revised regulations, any certificate of exemption that was previously renewed under paragraph (8) of subsection 10(f). Any such previously renewed certificate which expires on or after the date of these amendments and prior to the adoption of the revised regulations, may be extended by the Secretary until the revised regulations are adopted.

A further change made by Section 5 of H.R. 6133 is a refinement of the definition of "scrimshaw product" found in Section 10(f)(1)(B) of the Act. The exemption offered by Congress in 1976 was intended to apply only to "finished" scrimshaw products and not to raw whale bone or teeth. It has been suggested that such bone and teeth may be traded as exempt products if polishing or minor superficial marking is done to the raw product. The amended definition clarifies that this is not the case and is intended to codify the existing interpretation of the law by the Secretary of Commerce by requiring substantial etching or carving before a particular item may be treated as a finished scrimshaw product.

Section 5 also amends the antique articles exemption contained in Section 10(h) to remove the provision excluding antique scrimshaw from the exemption and changing the definition of antique

**Addendum 126a**

articles from items made prior to 1830 to those made 100 years before the date of importation. The Committee believes that, because the Secretary is allowed to establish the documentation required to import such articles, there is no reason to exclude properly documented scrimshaw. The change from the year 1830 to 100 years prior to importation conforms the Act to customs tariff schedules.

Finally, Section 5 of H.R. 6133 adds a new subsection (j) to Section 10 of the Act. This new provision is intended to give greater flexibility to the Secretary in the treatment of populations of endangered or threatened species that are introduced into areas outside their current range. The Committee believes that such introductions, if carefully planned and controlled, may be beneficial in securing the restoration of listed species. To encourage efforts to establish such experimental populations when the conservation needs of a species would be served by doing so, this amendment relaxes certain restrictions otherwise applicable to listed species and authorizes the Secretary to relax others.

Paragraph (1) of subsection 10(j) defines the term "experimental population." To qualify for the special treatment afforded experimental populations, a population must have been authorized by the Secretary for release outside the current range of the species. Populations resulting from releases not authorized by the Secretary are not considered "experimental populations" entitled to the special provisions of this subsection.

The Committee carefully considered how to treat introduced populations that overlap, in whole or in part, natural populations of the same species. To protect natural populations and to avoid potentially complicated problems of law enforcement, the definition is limited to those introduced populations that are wholly separate geographically from nonexperimental populations of the same species. Thus, for example, in the case of the introduction of individuals of a listed fish species into a portion of a stream where the same species already occurs, the introduced specimens would not be treated as an "experimental population" separate from the non-introduced specimens. On the other hand, specimens of the same species introduced into a portion of a stream separate from any natural population, such as when a reservoir or other manmade or natural obstacle acts as a barrier to fish passage, would qualify as an experimental population. If an introduced population overlaps with natural populations of the same species during a portion of the year, but is wholly separate at other times, the introduced population is to be treated as an experimental population at such times as it is wholly separate. The Committee intends, however, that such a population be treated as experimental only when the times of geographic separation are reasonably predictable and not when separation occurs as a result of random and unpredictable events.

Under paragraph (2) of Section 10(j), the Secretary may authorize the release of experimental populations outside the current range of the species if he determines by regulation that doing so will further the conservation of the species. The purpose of requiring the Secretary to proceed by regulation, apart from ensuring that he will receive the benefit of public comment on such determinations,

**Addendum 127a**

is to provide a vehicle for the development of special regulations for each experimental population that will address the particular needs of that population. Each experimental population is to be treated as a threatened species under the Act which grants the Secretary broad flexibility in promulgating regulations to protect such species. These regulations can even allow the taking of threatened animals. The Committee fully expects that there will be instances where the regulations allow for the incidental take of experimental populations, such as the inadvertent taking of experimental fish species by those fishing for other species in the same body of water. The Committee also expects that, where appropriate, the regulations could allow for the directed taking of experimental populations. For example, the release of experimental populations of predators, such as red wolves, could allow for the taking of these animals if depredations occur or if the release of these populations will continue to be frustrated by public opposition.

The Committee believes that involvement of state fish and wildlife agencies in the regulatory process is crucial. The Committee also believes that where experimental populations are released on, or near, private land, the landowners must be fully apprised of the release and the regulations under which the population will be managed.

Regulations should be viewed as an agreement among the Federal agencies, the state fish and wildlife agencies and any landowners involved. Changes in the regulations should only be made after close consultation with all of the affected parties.

The legislation also restricts the application of Section 7 to experimental populations. Whenever the Secretary determines that a particular population, whether it is already established or proposed to be established, is an experimental population, he is also to determine, as part of the same rulemaking, whether the population is of a species that is in imminent danger of extinction. If he determines that it is, then the experimental population remains subject to the full protection of Section 7. If he determines that it is not, then the population is subject only to those protections of Section 7 that apply to species proposed to be listed as threatened. However, any experimental population found on any unit of the National Wildlife Refuge System or the National Park System remains subject to the full protection of Section 7 other than those protections relating to critical habitat.

In making the determination whether an experimental population is of a species imminently in danger of extinction, the Committee intends that the Secretary consider whether the loss of the experimental population would be likely to diminish appreciably the prospect for the survival of the species. If the Secretary determines that it would, the full protection of Section 7 should apply for that population.

Paragraph (4) of Section 10(j) is intended to clarify that any population now in existence which may meet the definition of an experimental population shall be treated as such only when determined by regulation. Thus, until such time as the Secretary makes an affirmative determination that a particular population is an experimental population, it shall remain subject to the same protections as any other population of the same species.

**Addendum 128a**

35

The Committee notes that, although this provision does not address the subject of enhancing the populations of endangered and threatened species through ranching, farming and artificial propagation, the Convention on International Trade in Endangered Species of Wild Fauna and Flora allows trade in products derived from such populations under terms and conditions agreed to by the parties. The Committee believes that such methods may, in some circumstances, be beneficial to the conservation of endangered or threatened species by decreasing pressure on wild populations, and recommends that the Secretary encourage these methods when the conservation of the species will be enhanced.

**SECTION 6—AUTHORIZATION OF APPROPRIATIONS.**

Section 6 provides an authorizatiohn of $27,000,000 for each of Fiscal Years 1983, 1984, and 1985 for the Secretary of the Interior to carry out his responsibilities under the Act. Authorizations of $3,500,000 and $1,850,000 in each of those fiscal years are provided for the Secretary of Commerce and the Secretary of Agriculture respectively.

## Cost of the Legislation

In the event the legislation is enacted into law, and the authorized funding is fully appropriated, the maximum cost to the Federal Government for Fiscal Years 1983 and 1984 would be $39.1 million. For Fiscal Year 1985, the maximum cost would be $39.25 million. The Committee accepts the cost and outlay estimate of the Congressional Budget Office.

## Inflationary Impact Statement

Pursuant to Clause 2(e) of Rule XI of the Rules of the House of Representatives, the Committee estimates that the enactment of H.R. 6133 would have no inflationary impact on the prices and costs in the national economy.

## Compliance with Clause 2(e) (3) of Rule XI

With respect to the requirements of Clause 2(e) (3) of Rule XI of the Rules of the House of Representatives:

(A) The Subcommittee on Fisheries and Wildlife Conservation and the Environment held 3 days of oversight hearings on the Endangered Species Act during the 97th Congress on March 19, 1981, and February 22, and March 8, 1982.

(B) The requirements of Section 308(a) of the Congressional Budget Act of 1974 are not applicable to this legislation.

(C) The Committee on Government Operations has sent no report to the Committee on Merchant Marine and Fisheries pursuant to Clause 2(b) (2) of Rule X.

(D) A letter was received from the Director of the Congressional Budget Office pursuant to Section 403 of the Congressional Budget Act of 1974 in reference to H.R. 6133 and follows herewith.

**Addendum 129a**

U.S. Congress,
Congressional Budget Office,
*Washington, D.C., May 14, 1982.*

Hon. Walter B. Jones,
*Chairman, Committee on Merchant Marine and Fisheries, U.S. House of Representatives, Longworth House Office Building, Washington, D.C.*

Dear Mr. Chairman: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for H.R. 6133, a bill to amend the Endangered Species Act of 1973.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

Raymond C. Scheppach
For Alice M. Rivlin, Director.

Congressional Budget Office—Cost Estimate

May 14, 1982.

1. Bill No.: H.R. 6133
2. Bill title: A bill to amend the Endangered Species Act of 1973.
3. Bill status: As ordered reported by the House Committee on Merchant Marine and Fisheries, May 5, 1982.
4. Bill purpose: This bill authorizes the appropriation of $39 million for the implementation of the Endangered Species Act of 1973, for each of the fiscal years 1983, 1984, and 1985. In each of these fiscal years, the bill allocates approximately $34 million to the Department of the Interior, $3.5 million to the Department of Commerce, and $1.9 million to the Department of Agriculture. The bill also expands the Secretary's duties pursuant to the Convention or Nature Protection and Wildlife Preservation in the Western Hemisphere, ("Western Convention"), and provides an additional $150,000 for these activities in fiscal years 1983 and 1984, and $300,000 in 1985.

This bill also amends several substantive and procedural provisions in the Endangered Species Act. Any costs associated with these changes would be absorbed within the authorization levels specified above.

5. Cost estimate:

[By fiscal years, in millions of dollars]

|  | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Authorization level | 39.1 | 39.1 | 39.3 | | |
| Estimated outlays | 37.8 | 39.1 | 39.2 | 1.3 | |

The costs of this bill fall within budget function 300.

6. Basis of estimate: This estimate assumes that the bill will be enacted in fiscal year 1982 and that the amounts authorized will be appropriated for each year. Annual outlays were estimated using the historical two-year spendout pattern for the departments' endangered species programs.

**Addendum 130a**

7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Kathleen M. Gramp (226–2860).
10. Estimate approved by: C. G. Nuckols (For James L. Blum, Assistant Director for Budget Analysis).

### DEPARTMENTAL REPORTS

The Committee received a relevant letter from the Secretary of the Interior on February 8, 1982, as well as a Departmental Report from that Department. Two Departmental Reports were received from the Department of State and Executive Communication No. 3469 and a Departmental Report were received from the Secretary of Commerce. A Departmental Report was also received from the Department of Agriculture. All of these communications follow herewith.

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., February 8, 1982.*

Hon. JOHN B. BREAUX,
*Chairman, Subcommittee on Fisheries and Wildlife, Conservation and the Environment, Committee on Merchant Marine and Fisheries, House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: As you know, the Department of the Interior, as part of its regulatory reform effort, has been engaged in a comprehensive review of the Endangered Species Act (ESA), since August of 1981. At this juncture, there is considerable pressure for the Department to make public its feelings about the Endangered Species Act, and in view of our personal discussions and staff contacts within the past 10 days, I thought it appropriate to let you know our thoughts on this important matter.

During the Departmental review, we have been in contact with a broad range of groups concerned with the ESA, and as a result have identified several problem areas that need to be addressed. Frankly, however, we're uncertain how to translate the identification of those problem areas into specific legislation that would be acceptable during the upcoming session of Congress. My initial suggestion would therefore be to suggest that the Assistant Secretary for Fish and Wildlife and Parks be made available to assist you and your staff in drafting suggested improvements to the Act. In that way, perhaps, we can forge recommended improvements acceptable to both this Administration as well as Congress.

There is one area in particular where there seems to be universal agreement that change must be made—the Section 7 exemption process. This process was designed to provide a procedure by which irresolvable conflicts between proposed Federal projects and endangered species could be resolved. There is clearly a need to streamline this process in order that a public interest determination can be made in a timely manner when an irresolvable conflict arises. We would like to work closely with the Congress in helping to establish a reasonable and workable exemption process. In addition, the Department has had considerable contact with various state officials, through the International Association of Fish and Wildlife

**Addendum 131a**

Agencies. Recognizing the state stake in the ESA, we have identified several state member recommendations that deserve thorough attention.

With the exception of these recommendations we do not now take a position recommending further legislative change, other than to request that you extend the authorization for the Endangered Species Act for one year. During that year, we would seek to pursue correction of identified problems through existing regulatory and administrative mechanisms before opening up the Act to further major legislative modifications. We feel this approach would provide the greatest assurance of improving implementation of the ESA in the short term, while also allowing the time necessary to prepare recommendations for major changes necessary to improve the Act.

Although I have not been entirely pleased with all aspects of the ESA, I feel that the Fish and Wildlife Service (FWS) has done a reasonably good job in the past year of implementing the Act as intended by Congress. For example, after months of indecision regarding handling of listing petitions, guidelines were finally proposed in January of last year.

The FWS has done an especially good job of stressing recovery of listed species which, in my opinion, is where the real payoff under the ESA comes. In 1981 recovery plans for 39 species were initiated and funding of $65,000 was retained for this effort. A total of 45 plans are now approved and being implemented, and $2,585,000 has been set aside in FY 1982 for this important work.

There have been several examples of recovery which are notable:

1. A project involving international and interstate cooperation between the Canadian Wildlife Service and the U.S. Fish and Wildlife Service has resulted in air and ground tracking of the whooping crane family 2600 miles from Wood Buffalo Park, Canada, to Aransas National Wildlife Refuge in Texas. Detailed habitat analyses were conducted at 15 stopover sites utilized by the cranes in their migration. This should accelerate our knowledge of crane biology by about 10 years.

2. As a result of continued State/Federal cooperation and improvement in alligator numbers through much of their range, the Service delisted the American alligator in Louisiana, and is not considering similar actions for portions of Florida and Texas. This coming year the Service will conduct a survey of the American alligator throughout its entire range.

3. As a result of recovery efforts and surveys funded by the Service, the Pine Barrens tree frog was found to occur over a much larger range with many populations on public lands. The FWS is, therefore, initiating steps to delist it as recovered.

4. As a result of the development of captive propagation techniques and releases in the Aleutian Islands, the Aleutian Canada goose is now making its recovery. Breeding populations have increased significantly, and first-hand returns have shown that wintering numbers in California have also increased. The Service will continue to control foxes in the Aleutians, and recovery efforts are proceeding. The Service now considers the Aleutian Canada goose a candidate for delisting.

**Addendum 132a**

39

5. Recent data indicate the Arctic peregrine is in no danger of extinction in the foreseeable future. The current data indicate that the population is stable, with some localized declines and some localized increases, based on preliminary analysis of the 1980 peregrine falcon survey. FWS is in the preliminary stages of considering a limited harvest for falconry purposes in conjunction with reclassification to threatened.

6. Recent surveys have identified at least 9 black footed ferrets in one prairie dog town in Wyoming. These findings indicate new hope for North America's rarest mammal. Research biologists from several agencies are involved in studies of the only known population with hope that these will lead to the finding of other populations and the possible recovery of what was thought by many to be an extinct species.

The success of the Act is really measured by the success of recovery efforts, and I am hopeful that this trend will continue. Meanwhile, as to those portions of the Act which leave something to be desired, we look forward to working with you and your staff in this important legislative effort to improve the Endangered Species Act.

Sincerely,

JAMES G. WATT,
*Secretary.*

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., May 4, 1982.*

Hon. WALTER B. JONES,
*Chairman, Committee on Merchant, Marine and Fisheries, House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: This is to provide you with our views on H.R. 6133 as ordered reported from the Subcommittee on Fisheries, Wildlife Conservation, and the Environment, a bill "To amend the Endangered Species Act of 1973."

Overall, we support the intent of your efforts to streamline and improve administration of the Act. We are concerned, however, that certain provisions of H.R. 6133 may actually decrease protection currently provided threatened and endangered species. Our concerns, and recommendations for addressing those concerns, are discussed in more detail below. In several instances, we recommend that H.R. 6133 be amended to conform more closely with legislation currently under consideration in the Senate, S. 2309. We have also enclosed with this report several specific amendments to resolve other concerns.

SECTION 1. DETERMINATION OF ENDANGERED AND THREATENED SPECIES

The Department supports in concept your efforts to streamline the listing process. We are concerned, however, that several provisions of H.R. 6133, as currently drafted, may have the effect of hindering the listing of species.

Currently, within 90 days after receiving a petition to list a species under the Act, the Fish and Wildlife Service must publish a

**Addendum 133a**

status review of the species involved, if the petition has presented substantial evidence warranting such review. Under agency regulations, the Service then publishes an additional finding as to how it will proceed with the listing, including the manner in which it will be factored into the listing priority system. Section 1(3) of H.R. 6133 would amend the current process by requiring the Secretary to determine, to the maximum extent practicable within 180 days of receiving a petition, whether it contains substantial evidence as to whether a species should be listed. Upon making an affirmative determination, the Secretary would be immediately required to commence rulemaking procedures. A negative determination concerning substantial evidence would be subject to judicial review.

The Department opposes this provision because it would effectively eliminate the use of our listing priority system, which has been developed as mandated by Congress under section 4(h)(3) of the Act. Under the bill, priority for listing would have to be given to those species that are the subject of a petition rather than to those that are in the greatest need of protection. This is particularly true in view of the one-year listing dealine for completion of a listing proposal contained in section 1(4) of the bill.

If the Committee determines that an amendment to expedite the petition process is necessary, the Department recommends that you consider language similar to that contained in S. 2309, with appropriate clarifications as recommended in our April 19 testimony before the Senate Environment and Public Works Committee. Section 4(6) of the Senate bill requires the Secretary to determine within 90 days of receiving a petition whether it presents substantial scientific information. If it does, the bill would then require the Secretary to determine within 12 months after receiving the petition whether to proceed with the listing. We understand that the sponsors of the bill intend that the Secretary could decide not to proceed with a listing at that time because it does not fit into the priority system, but could go on with it at some future appropriate time. We think that this approach would expedite the consdieration of petitions, while still ensuring that those species most urgently in need of protection receive first priority for listing.

Section 4(f)(5) of existing law requires the Secretary to publish a final listing regulation within 2 years of proposing it. If he fails to do so, the proposal must be withdrawn and may not be republished without sufficient new information. Section 1(4) of H.R. 6133 would amend existing law in several ways. First, it would require the Secretary to finalize both listing and delisting regulations within one year of proposing them. Second, a listing regulation must be finalized within one year, regardless of whether it contains critical habitat, but a final regulation may not be published before the close of the one-year period unless it contains critical habitat. Third, the Secretary may extend the one-year period for six months if he finds that there is substantial disagreement regarding the sufficiency or accuracy of available information. Finally, if the regulation is not adopted within the appropriate timeframe because the Secretary has determined that there is not sufficient evidence to justify the listing or delisting, the regulation must be withdrawn. A determination resulting in a withdrawal would be subject to judicial review.

**Addendum 134a**

41

The Department objects to this section. The one-year timeframe could limit the number of species listed. Under current law, certain biological and economic analyses are required before species and their critical habitat can be listed. With some species, it could be difficult to complete the necessary work within one year and, since they cannot be proposed without substantial new information, they might never be listed. This problem would be compounded by the revised petition process discussed above.

Furthermore, there is no indication as to the fate of a proposed listing if it is not completed within a year due to reasons other than lack of sufficient information. It is also unclear how critical habitat is to be dealt with vis-a-vis the one-year limit. Section 1(1)(C) of the bill appears to indicate that a species could be listed without critical habitat, if critical habitat is not determinable. Section 1(4), on the other hand, would stipulate that the one-year deadline applies for all listing, with or without critical habitat, but that a final regulation may not be made before one year if critical habitat is not specified.

Again, we suggest as an alternative that the Committee consider the approach taken in S. 2309. Section 4(6) of that bill clarifies and streamlines the existing listing process. With the revisions recommended by the Department in pages 6 through 9 of the Senate testimony, we believe this bill will expedite the listing of species under the Act.

In the last 4 years there have been a myriad of legislative and administrative requirements that effect the way species are listed under the Act. Although there has been some confusion and delay in attempting to comply with what sometimes appear to be conflicting mandates, we feel that the listing process is now well in hand. The Department's Office of the Solicitor has recently provided guidelines concerning listing and we expect imminent action on the candidate species now in the pipeline.

Section 1(5) of the bill amends section 4(g) of the Act to require the Secretary, in developing recovery plans, to give consideration to the maximum extent practicable to the development of plans for species that are or may be in conflict with construction or other development projects. While we support the intent of this provision, the Department of Commerce has some recommendations concerning the provision with which we concur.

Two other observations are pertinent. Section 1(1)(C) of the bill requires listing of critical habitat concurrently with listing to the maximum extent prudent and determinable. We do not object to this provision, but believe it would be helpful if the term "determinable" were clarified. For instance, if critical habitat cannot be determined at the time of listing, but we can reasonably anticipate that such a determination could be made in the future, can listing proceed? If listing does proceed, will determination of critical habitat at a later date be prohibited?

Finally, section 1(2)(A) of the bill requires the Secretary to make determinations concerning the listing of species solely on the basis of criteria set forth in section 4(A)(1). This is the current practice and we have no objection to this amendment, which we interpret as allowing us to continue to comply with E.O. 12291 and applicable statutes in evaluating alternatives.

**Addendum 135a**

42

### SECTION 2. COOPERATION WITH THE STATES

Section 2 increases the Federal matching share for the section 6 grant-in-aid program from 66⅔ percent to 75 percent for single state projects and from 75 percent to 90 percent for multi-state projects. An annual authorization of $6 million for fiscal year 1983–1985 is also provided. The Administration, as a general policy, opposes this type of grant-in-aid program. The Service is not requesting section 6 funds in fiscal year 1983. Thus, we oppose any amendment increasing the matching share.

### SECTION 3. INTERAGENCY COOPERATION AND COMMITTEE EXEMPTIONS

Section 3(1)(A) of H.R. 6133 would amend section 7(a)(2) of the Act by adding a new subparagraph (B), which would require an action agency receiving a biological opinion to promptly notify a license or permit applicant whether the Federal action of granting the license or permit will violate section 7(a)(2)(A) of the Act as amended by H.R. 6133 and, if it will, whether the action agency is likely to issue the permit or license but for such judgment. Additional amendments would allow this "but for" determination to be the basis for applying for an exemption from the Act under section 7(g). We strongly oppose these amendments as being contrary to the Administration's efforts to streamline and consolidate environmental compliance requirements and procedures. They are also contrary to the concept that the exemption process should be a "court of last resort" to be used only after all other administrative remedies have been exhausted.

Under the bill, the environmental review process would become segmented, with endangered species issues elevated above all other considerations. As a consequence, permitting agencies would have the incentive to avoid consulting with the Service until late in their information-gathering and review processes, so as to ensure that when they must make their "but for" determination, they will have sufficient information to make an informed determination. This approach would undermine years of effort by the Department to encourage early consultation under which endangered species issues can be considered with other environmental issues and, if necessary, modifications be made in the proposed action. We believe such early consultation can best minimize potential conflicts between protection of species and economic development. In addition, allowing early access to the exemption process under the bill would mean that after engaging in a months-long process, and involving six Cabinet or Cabinet-level officials, the applicant may still be denied the permit or license involved on completely unrelated grounds. We therefore strongly recommend that the exemption process remain strictly a final step—to be taken only after all other actions related to issuing the permit or license have been completed.

Sections 3(1)(A) and 5(1) of H.R. 6133 would add a new subparagraph (C) to section 7(a)(2) of the Act, and amend section 10(a)(1)(B), to establish procedures to allow the incidental taking of endangered or threatened species. This approach would require that a permit for such taking be issued by the Secretary, resulting in the establishment of a new permitting program and requiring consulta-

tion under section 7(a)(2) of the Act. We believe that the relationship between sections 7 and 9 of the Act needs to be clarified, but we oppose the proposed amendment as unnecessarily complicated and burdensome on the private sector and Federal agencies.

We believe that a simpler approach to this issue would be to amend sections 7(b), 11(a)(3), and 11(b)(3) of the Act. Under our proposed amendment to section 7(b), the biological opinion would contain a determination of the extent of incidental take of a species that would not jeopardize its continued existence. In conjunction with this determination, the opinion would also provide "reasonable and prudent measures" that must be taken to minimize takings of the species. We note that the use of the term "extent of take" in our proposed amendment would not mean that we would always designate a specific number of individuals that could be taken. Such a number would be specified where practicable, but would not be available in the case of every species and action.

If the action agency or permit applicant complies with these measures, our proposed amendments to sections 11(a)(3) and 11(b)(3) would provide a defense to civil or criminal proceedings under the Act. This defense would only be available if the defendant can show by a preponderance of the evidence that the taking which resulted in the enforcement action occurred despite compliance with the reasonable and prudent measures specified by the Secretary pursuant to the authority of subsection 7(b)(2). Our amendments to subsections 11(a)(3) and 11(b)(3) would also change existing language to clarify that the burden is on the defendant to show that the exemption applies.

We believe that our approach has several advantages over that taken in H.R. 6133. Our amendments would explicitly provide authority to specify measures to minimize takings, would eliminate the need for a permit in addition to the biological opinion, and would place provisions for protection from prosecution in a location more consistent with the Act's format. We therefore strongly recommend that our amendments be adopted.

Section 3(1)(B) of H.R. 6133 would amend section 7(a) of the Act by adding a new paragraph (3) to allow early consultation by actual or prospective license or permit applicants. We recognize that there may be situations in which Federal agencies are not prepared to undertake consultation on future actions, but where a potential license or permit applicant would nevertheless like to determine early in the planning stages whether the project has potential endangered species ramifications. An amendment to the Act is not needed to accomplish this objective. Under current law, we are encouraging early resolution of problems by consulting informally with private individuals to help them asses an activity's potential impact on endangered species. Under the section 7 consultation regulations, due to be published in the near future by the Administration, the practice of informal consultation is even more strongly encouraged. In order to address those instances where informal consultation indicates that problems may exist, we recommend that section 10(a) of the Act be amended to allow such potential aplicants to receive permits from the Secretary to develop conservation plans for the species, and language to accomplish this is included in the enclosed amendments.

44

We believe that this approach is preferable to that of H.R. 6133, under which a potential applicant could not only consult with the Secretary, but could then apply for an exemption from a resulting negative opinion. As with the "but for" amendment discussed above, this would segment the environmental review process by putting endangered species considerations far ahead of the evaluation of other environmental effects. It also eliminates the exemption process as a "court of last resort." Our proposal would assure that projects with specifically identified effects and activities could proceed if appropriate protections for the species can be developed.

Section 3(2) of H.R. 6133 amends section 7(b) of the Act to require consent of license or permit applicants on extensions of consultation of greater than 45 days. As a matter of policy, we attempt to keep such applicants fully informed about the reasons for all extensions of consultation. The great majority of all our consultations are completed within the 135 days allowed before applicant consent is required under his amendment. However, it is occasionally necessary to extend this period in order to obtain adequate data on which to base a decision.

Section 3(2) of H.R. 6133 further amends section 7(b) by referencing the consultations with potential applicants under the proposed section 7(a)(3) discussed above. We oppose this portion of the amendment to 7(b), consistent with our opposition to the proposed 7(a)(3). Section 3(2) also adds the words "If such jeopardy is found," to the existing language of section 7(b). This amendment implies that only when the Secretary issues a negative (jeopardy) biological opinion can the opinion contain recommended reasonable and prudent alternatives to the proposed action. However, in many cases in which a proposed action will not result in jeopardy, there may be minor modifications to the project which will minimize the effects on the species and which the action agency could easily and inexpensively adopt. We believe that providing such information to the action agency is important for the continued protection of endangerd species and assists other Federal agencies in fulfilling their obligations under section 7(a)(1) of the Act. Thus, we oppose the inclusion of the new language in section 7(b).

Section 3(3) of H.R. 6133 amends section 7(c)(2) to allow the preparation of biological assessments by applicants undertaking consultation under proposed section 7(a)(3). We oppose this change consistent with our opposition to the proposed section 7(a)(3).

Section 3(4) and 3(5) of H.R. 6133 would amend sections 7(g) and 7(h) of the Act, which establish the exemption process. The amendments would eliminate the Review Board currently established under the Act and substitute the Secretary as the decisionmaker on the threshold criteria contained in section 7(g)(5) and as the entity responsible for preparation of the report to the Committee under section 7(g)(7). Under this approach, the threshold decisions would be made within 20 days, the report prepared within an additional 120 days, and the Committee's decision required within 30 days of receiving the report. We support the amendment to substitute the Secretary for the Review Board as a means of expediting and simplifying the exemption process. However, we are very concerned that the 120 days allotted for the report will not be sufficient to both hold a public hearing and to prepare the very com-

**Addendum 138a**

45

plex analysis required by the Act. Since this is the first time in the process that the relative economics of various alternatives are considered, there is likely to be a need to gather new information. In highly complex projects, as are likely to come before the Committee, preparation of the report in the time allowed will be a difficult task. We therefore strongly recommend an amendment to extend this period for not more than 60 days, upon mutual agreement of the Secretary and the exemption applicant. Specific language to accomplish this is enclosed.

The amendments to the exemption process also specify that the threshold decisions are to be made in "consultation" with the rest of the Committee. This will be difficult to accomplish within the 20 days allowed, and is likely to be a little value. However, we believe that the preparation of the report should be done "in coordination with" the rest of the Committee. Under such an approach, staff of the various Committee members would be regularly briefed on the progress on the report and would be invited to participate in the collection of information and the drafting of the report. We believe that the decision could be made in a much shorter time, such as 10 days, since there will be regular briefings for staff throughout the process. Scheduling a decision meeting should present no difficulty, since there will be at least 120 days advance notice that the meeting will be necessary.

Finally, we note that there are situations that could make the impartiality of both the report and the entire exemption process suspect. These are addressed to some extent in S. 2309, but not in H.R. 6133. Of particular concern is the case when the Secretary has rendered a jeopardy opinion or is the head of the action agency, whether or not that agency is the exemption applicant.

### SECTION 4. CONVENTION IMPLEMENTION.

We believe that the approach taken to the "bobcat" problem under section 4(a) of the bill is sound. We support the standard of "best available biological information derived from professionally accepted wildlife management practices." In addition, it will be helpful to the Service to have specific authority to regulate exports under Appendix II, as provided for in H.R. 6133. We recommend that this provision be specifically restricted to wildlife since determinations regarding export of plants are also made under CITES. The Department of State has some concerns respecting this amendment, with which we concur. We also strongly concur with the State Department's objections to section 4(a)(2), concerning mandatory reservations, and we recommend that this provision be deleted.

The bill would require the Secretary to conduct specific activities with regard to the Western Hemisphere Convention within a rather limited timeframe. We oppose this provision. These activities are not of high enough priority to fund given the need for other, more important programs.

### SECTION 5. EXPERIMENTAL POPULATIONS AND OTHER EXCEPTIONS

The Department strongly supports the provisons of H.R. 6133 pertaining to the establishment of experimental populations. This

**Addendum 139a**

46

section provides the Secretary with the flexibility to fashion an administrative remedy to "incidental taking" and other problems raised by State and Federal resource managers. The Secretary would be authorized to publish special regulations in cooperation with involved State and Federal agencies and private individuals setting forth specific management practices for the populations. These regulations will serve as a type of cooperative agreement for the involved parties. Accordingly, it is not necessary to have additional permit language for experimental populations under section 10. It may be helpful to clarify in legislative history that although these populations will be established outside of their current range, the intent is to remain within historical range. Finally, clarification would be helpful as to whether the listing process set forth in section 4 of the Act would be applicable to the designation of experimental populations.

Section 5(1) of H.R. 6133 amends section 10(a) of the Act to allow a permit to be issued to authorize the incidental take of a species in conjunction with a project which has received a favorable biological opinion or if the project sponsor adopts reasonable and prudent alternatives suggested by the Secretary pursuant to section 7(b). In addition, where there is no Federal agency involvement, H.R. 6133 would allow the sponsors of projects on land in which a fee or leasehold interest is held to secure a section 10 permit by adopting a conservation plan minimizing the action's adverse effect on the species. As discussed in conjunction with section 3(2) of H.R. 6133, the Department supports an attempts to insulate sponsors of these types of projects from enforcement proceedings for takings occurring incidental to the project. We believe, however that the measures of H.R. 6133 are unduly complicated. Accordingly the Department suggests that the previously discussed amendments to section 7(b), section 10(a), section 11(a)(3) and section 11(b)(3) be adopted.

Finally, it is our understanding that the Department of Commerce has some concerns about section 5(2), relating to antique articles. We defer to that Department on this point.

### SECTION 6. AUTHORIZATION OF APPROPRIATIONS

In lieu of the authorizations provided by Section 6 for the Department of the Interior, the Department recommends a one-year authorization of $16,550,000, the amount contained in the President's fiscal year 1983 budget request.

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

G. RAY ARNETT,
*Assistant Secretary for Fish and Wildlife and Parks.*

Enclosure.

**Addendum 140a**

47

DEPARTMENT OF THE INTERIOR'S PROPOSED AMENDMENTS TO H.R.
6133

1. On page 2, strike out lines 9 through 22 and substitute the corresponding provisions of S. 2309, as clarified in accordance with our recommendations.

On page 2, strike out line 24 and all that follows through page 4, line 7, and substitute the corresponding provisions of S. 2309, as clarified in accordance with our recommendations.

2. On page 4, strike out line 18 and all that follows through page 5, line 5. Redesignate the following sections accordingly.

3. On page 5, strike out line 9 and all that follows through page 6, line 11.

On page 6, line 12, strike out "(2)" and insert in lieu thereof "(1)".

On page 6, line 14, strike out "paragraph (2)(A) of" and insert immediately after "(a)" the following: "(2)".

On page 6, strike out lines 22 and all that follows through "(3)" on line 25.

On page 7, line 1, strike out "paragraph (2)(A) or (3) of" and insert immediately after "(a)" the following: "(2)".

On page 7, lines 2 and 3, strike out "or the applicant, as the case may be,".

On page 7, lines 6 and 7, strike out "If such jeopardy is found, the" and insert in lieu thereof "The".

On page 7, line 9, strike out "(A)".

On page 7, line 11, strike out "An" and all that follows through page 8, line 3 and insert in lieu thereof the following:

"(2) If after consultation, the Secretary concludes the agency action will not violate subsection (a)(2), or has offered reasonable and prudent alternatives that would enable the action agency to avoid violating subsection (a)(2), the Secretary also shall provide the federal agency or applicant concerned with a written statement specifying the extent of take of a listed species incidental to the agency action that would not violate subsection (a)(2) and any reasonable and prudent measures that must be followed to minimize such takings of the species.".

On page 8, line 4, strike out "(4)" and insert in lieu thereof "(2)".

On page 8, line 11, strike out "an actual or prospective" and insert in lieu thereof "a".

On page 8, line 14, strike out "paragraph (2) or (3) of".

On page 8, line 15, insert "(2)" immediately after "(a)".

On page 8, line 16, strike out "(3)" and insert in lieu thereof "(1)".

On page 8, line 17, strike out "(A)".

On page 8, line 23, insert "(B)" immediately after "(2)" and strike out the hyphen and all that follows through "subparagraph (B)" on page 9, line 16.

On page 9, line 25, strike out ", in consultation with" and all that follows through "Committee," on page 10, line 1.

On page 9, line 20, insert immediately after "shall" the following:. "in coordination with the Committee,".

On page 10, line 23, strike out "and".

**Addendum 141a**

48

On page 11, line 4, strike out the period the last place it appears and insert in lieu thereof "; and" and the following new clause:

(iv) by adding the following penultimate sentence: "When the Secretary is unable to complete the report within 120 days, he may, with the consent of the exemption applicant, submit his report to the Committee not later than 180 days after making the determinations required under paragraph (4).".

On page 11, line 19, strike out "(12)" and insert in lieu thereof "(8)".

4. On page 12, line 14, strike out the hyphen, and on line 15, strike out "(1) by amending subsection (c)".

On page 12, line 9, insert "concerning wildlife" immediately after "him".

On page 13, strike out line 5 and all that follows through page 15, line 5.

On page 15, strike out the hyphen on line 13 and "(A)" on line 14. On line 16, strike out the comma after "species" and all that follows through line 19 and insert in lieu thereof a period.

On page 15, strike out line 20 and all that follows through page 17, line 11, and insert in lieu thereof the following:

"(2) A permit for the enhancement of the survival of an endangered species which authorizes the incidental taking of individuals of the affected species may be issued where the Secretary finds that—

"(A) a conservation plan has been developed which promotes the long-term conservation of the species; and

"(B) adequate funding is provided by the permittee and the Secretary is otherwise assured the conservation plan will be fully implemented.".

On page 18, line 3, insert after "may" the term "by regulation".

5. On page 19, line 1, the following new section:

#### SEC. 5. CIVIL AND CRIMINAL PENALTIES

Section 11 of the Endangered Species Act of 1973 (16 U.S.C. 1540) is amended—

(1) by amending subsection (a)(3) to read as follows:

"(3) Notwithstanding any other provision of this Act, no civil penalty shall be imposed if the defendant can show by a preponderance of the evidence that the act was committed based on a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual from bodily harm, from any endangered or threatened species, or in compliance with the reasonable and prudent measures the Secretary specified pursuant to section 7(b)(2) of this Act."; and

Redesignate the following section accordingly.

6. On page 19, line 11, strike out "$27,000,000" and insert in lieu thereof "$16,550,000", and on line 17, strike out 1984, and 1985".

**Addendum 142a**

49

DEPARTMENT OF STATE,
*Washington, D.C., April 26, 1982.*

Hon. JOHN B. BREAUX,
*Chairman., Subcommitttee on Fisheries and, Wildlife Conservation
and the Environment, Committee on Merchant Marine and
Fisheries, U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: The Department of State would like to take this opportunity to offer comments on the draft bill which we understand you are considering substituting in place of HR 6133 to amend and reauthorize the Endangered Species Act of 1973.

As you know, many of the proposed amendments do not bear directly on matters within the province of the Department of State. There are, however, certain provisions which, as they relate to the conduct of foreign policy and to our treaty obligations, are of concern to the Department. The most important of these is the proposal to amend Section 8A to provide for taking of mandatory reservations to listings to the Appendices to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES).

As Mr. David A. Colson, Assistant Legal Adviser for Oceans, International Environmental and Scientific Affairs indicated in his testimony before the Subcommittee March 8, a copy of which is enclosed, the Department of State is strongly opposed to any amendment to the Act which would mandate the taking of reservations in specified instances when species are added to the appendices of the Convention. The points Mr. Colson made, in summary are:

(1) We know of no treaty to which the United States is a party upon which there have been imposed legislatively required reservations in specified instances.

(2) Legislatively required reservations could infringe on the President's constitutional authority to conduct foreign affairs as well as on his treaty-making powers. So far as we know this would be an action without precedent in our 200 years as a nation.

(3) Generally, it is United States policy not to take reservations to international agreements or treaties except in those instances where, absent a reservation, the agreement would conflict with U.S. law, be impossible to implement, or do substantial harm to U.S. interests.

(4) The United States has discouraged other Parties from taking reservations to CITES on the grounds that broad scale taking of reservations could destroy the Convention's effectivenes.

(5) Reservations to CITES listings have no real effect on the requirement for trade with CITES parties which have not taken similar reservations and could lead to inadvertant Lacey Act violations by U.S. residents.

(6) A mandatory reguirement to take reservations to listings would be unduly inflexible and inhibit negotiations with other parties to CITES. Decisions on reservations should be made on a case by case basis.

The specific language on mandatory reservations in your proposed amendment to Section 8A of the Act would require the United States to enter a reservation whenever a species is added to Appendix I or II of the Convention and the United States has voted

**Addendum 143a**

in opposition to such an addition. The Department opposes such a requirement, not only for the general reasons stated above, but also because it would very substantially impede the functioning of United States delegations to Conferences of the Parties to CITES, at which most such amendments are adopted.

(1) There is an important substantive difference between voting against a listing on scientific or other grounds of principle and reserving on the listing of a species. The taking of a reservation means that the reserving party becomes a non-party to the Convention with respect to the species concerned. A reservation in such circumstances is without practical effect when the U.S. is not involved in trade in the species, and as indicated earlier, would have little real effect even when we are in trade, except in cases of multiple reservations or trade with non-parties to the Convention. There have been times in the past, and will undobtedly be times in the future. When the United States, based on principle, wants to register opposition to a listing but does not want to take the more extreme step of making a reservation.

(2) Amendments submitted prior to Conferences of the parties can be and often are modified during the Conference as a result of negotiations among the Parties or the revelation of new information. Changing a United States position would be extremely difficult if the decision on how to vote had also to include a decision on whether or not to take a reservation.

(3) The amendment as proposed makes no provision for the withdrawal of reservations. It is not clear what would happen if the United States voted against a listing, but then decided it was in fact justified or at least acceptable. In any event, we could needlessly arouse animosity on the part of other parties by having to threaten reservations on this basis.

In general, a binding legislative requirement would severely constrict U.S. ability to negotiate with other CITES parties if any vote on a species listing required at the same time a decision on a reservation. Decisions have to be made on a case by case basis. In view of the stated purpose of the Convention to protect species of wild fauna and flora against over-exploitation through international trade, fundamental to any decision on reservation is the determination, based on biological evidence, of the best interests of the species concerned. Such decisions, therefore, require full and careful consideration, which is unlikely to be possible under the time pressures of an international meeting. The Convention provides that reservations can be entered up to 90 days after listings are made, which provides ample time for a carefully reasoned decision.

I would like to re-emphasize Mr. Colson's point in his March 8 testimony that the Department does not oppose reservations per se, but believes that they should be used only in cases of clearly defined national interest and with all due care and caution. We generally believe that there are more effective ways of dealing with unjustified listings.

With regard to defining the functions of the U.S. Scientific authority for CITES, the Department considers that the amendment to Section 8A(c) proposed by Senator Chafee in S. 2309, is generally consistent with our international obligations under CITES as it would retain the idependent authority of the Secretary of the Inte-

**Addendum 144a**

rior to make "no detriment" determinations as required by CITES and not mandate that he *use or not use* and specific method in arriving at such determinations. Your substitute bill, as drafted, could be read to exclude population estimates even when they are the best biological data for a determination for a given species.

The Department is in favor of enhanced attention to wildlife preservation in this hemisphere and therefore generally supports the increased attention to the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere that would be envisaged in the proposed amendment to Section 8A(e). If it is enacted, we will work with the Department of the Interior and other agencies in implementing its provisions.

The Office of Management and Budget has advised that, from the standpoint of the Administration's program, there is no objection to the submission of these views.

With cordial regards,
Sincerely,

POWELL A. MOORE,
*Assistant Secretary*
*for Congressional Relations.*

DEPARTMENT OF STATE,
*Washington, D.C., April 29, 1982.*

Hon. JOHN B. BREAUX,
*Chairman, Subcommittee on Fisheries and Wildlife Conservation and the Environment, Committee on Merchant Marine and Fisheries, U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: With reference to my letter of April 26, 1982 and the amendments you have offered to H.R. 6133 which would reauthorize the Endangered Species Act, I would like to clarify and reemphasize some of the points I made concerning species listing on the Appendices to the Convention on International Trade in Endangered Species (CITES).

First it is the Department's firm intention to work for more effective international implementation of the Convention in cooperation with the Departments of the Interior and Commerce. The entire thrust of the Convention, as laid out in the preamble and spelled out in the Articles, is the protection of wild fauna and flora against over-exploitation through international trade. We fully agree that determinations or whether species are in fact endangered by trade and should thus be listed must depend both upon biological evidence as to the status of the species and upon indications as to the impact or potential impact of trade on that status.

As was pointed out in Mr. Colson's testimony before the subcommittee and in my letter of April 26, the Department is not opposed to reservations per se. We do feel, however, that broad scale taking of reservations by the United States or by other countries—a probable outcome of a "mandatory reservation" approach—would severly weaken the effectiveness of any international agreement over time, including CITES. Therefore our position is that reservations should be taken on a *case by case basis* with careful analysis and weighing of all considerations, including biological evidence, related to each individual situation.

**Addendum 145a**

It is important to note that a decision on voting for or against the listing of a species under CITES is significantly different from a decision to reserve since the latter has the effect of withdrawing the U.S. as a party to CITES for that species. It could very well be impossible to make a reasoned decision of that magnitude during the short timeframe of a CITES Party Conference, and the United States delegation could be forced by legislatively mandated reservations requirements into abstaining on votes when we could clearly register opposition otherwise.

We are aware that there have been improper listings in the past, some of which, as in the case of the cat family, were added prior to adoption of the Berne criteria and others, such as the parrot listing, which were adopted subsequently. In the latter case, the Administration gave serious consideration to taking a reservation, but the Departments involved (Interior, Justice and State) unanimously concluded that a U.S. reservation was not desirable because:

(1) The listing had been overwhelmingly supported by all the exporting countries except Chile (which did not take a reservation).

(2) U.S. importers would still be required to obtain camparable documentation to CITES documentation when importing parrots from CITES parties and could commit inadvertent violations of the Lacey Act if the U.S. reserved.

(3) There was strong Congressional as well as public opposition to taking reservations on either whales or parrots, expressed in letters to the Secretary of State.

(4) U.S. concern with unjustified listings can be effectively make known through means other than by reservations when the taking of a reservation is undesirable.

As a refection of our sensitivity to unjustified listings, the Department sent a communication on April 22, 1981 to U.S. diplomatic posts in all CITES member countries instructing them to make our concern known to host government authorities. We also forwarded on August 25, 1981 a U.S. statement to all CITES parties through the CITES Secretariat specifically expressing our concern about the inappropriateness of the parrot listing.

The Office of Management and Budget has advised that, from the standpoint of the Administration's program, there is no objection to the submission of these views.

With cordial regards,
    Sincerely,

POWELL A. MOORE,
*Assistant Secretary
for Congressional Relations.*

THE SECRETARY OF COMMERCE,
*Washington, D.C., March 15, 1982.*

Hon. THOMAS P. O'NEILL, Jr.,
*Speaker of the House of Representatives,
Washington, D.C.*

DEAR MR. SPEAKER: Enclosed are six copies of a draft bill "To authorize appropriations to carry out the Endangered Species Act of 1973, as amended, through fiscal year 1984", together with a statement of purpose and need in support thereof.

**Addendum 146a**

53

We have been advised by the Office of Management and Budget that there is no objection to the submission of this legislation to the Congress and that its enactment would be in accord with the program of the President.

Sincerely,

MALCOLM BALDRIGE,
*Secretary of Commerce.*

Enclosures.

A BILL To authorize appropriations to carry out the Endangered Species Act of 1973, as amended, through fiscal year 1984

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 15(2) of the Endangered Species Act of 1973, as amended (16 U.S.C. 154(2)), is further amended by deleting the "and" after "1981" and inserting the following language after the date "1982": ", and not to exceed $2,179,000 for fiscal year 1983, and such sums as may be necessary for fiscal year 1984.".

### STATEMENT OF PURPOSE AND NEED

Authorizations for appropriations under the Endangered Species Act expire on September 30, 1982. This proposal would extend the authorization for appropriations for the Endangered Species Act for two years.

The Endangered Species Act was enacted in 1973 to provide for the management, conservation, and recovery of endangered and threatened species of fish and wildlife. The Act provides for the listing by the Secretaries of Commerce and the Interior of threatened and endangered species of flora and fauna, prohibits certain activities involving such species, establishes a permitting system, and provides for enforcement measures. The Department of Commerce is responsible for most marine species of mammals, fish, reptiles, and invertebrates; the remaining species are the responsibility of the Department of the Interior.

Section 15 of the Act, due to expire September 30, 1982, authorizes appropriations for the functions and responsibilities of the Secretary of Commerce under the Act. These responsibilities include NOAA's research activities and enforcement program relating to endangered species preservation. The research activities are directed toward developing programs for assessment, protection, and recovery of species currently listed as threatened and endangered, and identifying additional species which need protection. The enforcement program involves preventing violations, and investigating, apprehending and prosecuting violators. A significant portion of the enforcement effort relates to protecting bowhead whales in Alaska, humpback whales in Hawaii, and sea turtles in the Caribbean and Gulf coastal states.

**Addendum 147a**

54

GENERAL COUNSEL OF THE
U.S. DEPARTMENT OF COMMERCE,
*Washington, D.C., May 6, 1982.*

Hon. JOHN B. BREAUX,
*Chairman, Subcommittee on Fisheries and Wildlife Conservation
and the Environment, Committee on Merchant Marine and
Fisheries, U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: This is to provide you with the views of the
Department of Commerce on H.R. 6133, a bill "To amend the En-
dangered Species Act of 1973."

Our comments relate to the version of the bill ordered reported
from the Subcommittee on April 27, 1982.

I commend you and the Subcommittee on your efforts to main-
tain a strong statutory authority for the protection and recovery of
animals and plants that are or are likely to become in danger of
extinction. Although the Administration's bill to reauthorize appro-
priations for the Endangered Species Act of 1973 recommended a
two year extension without amendments, we believe that with cer-
tain amendments H.R. 6133 would represent a positive effort to im-
prove the Act. The following are our comments on H.R. 6133.

*(1) Listing process*

The proposed amendments (line 12, page 1 and lines 1–11, page 3)
would require the Secretary (defined in the Act to be either the
Secretary of Commerce or the Secretary of the Interior, as appro-
priate) to designate critical habitat at the time of listing "to the
maximum extent prudent and determinable" but would prevent
the Secretary from issuing final regulations adding a species to the
list without specifying its critical habitat. These provisions appear
inconsistent. The language "to the maximum extend prudent and
determinable" would allow the Secretary to proceed with listings
without designating critical habitat should the information neces-
sary for such designations be insufficient at the time of listing. It
would also enable the Secretary to designate a critical habitat sub-
sequent to listing once the appropriate information becomes availa-
ble. This language alone would provide a helpful clarification to
the statute. The proposed amendments to the listing process, how-
ever, muddle the effect of this language. If no final regulations
adding a species to the list may be issued without specifying criti-
cal habitat, it appears listings must be delayed until either suffi-
cient information to designate critical habitat is obtained or the
proposed listing is withdrawn pursuant to lines 21–25, page 3 and
lines 1–7, page 4. We believe the Secretary should be allowed to
designate critical habitat when the necessary information is availa-
ble and that such designations should not delay or terminate the
listing process. Clarification of these provisions would be helpful.

The proposed amendments (lines 9–22, page 2) would require the
Secretary "to the maximum extent practicable" to determine
within 180 days after receiving a petition whether the petition con-
tains substantial evidence warranting the petitioned action. If an
affirmative decision is made, the Secretary must immediately com-
mence rulemaking procedures to list or delist the species. We be-
lieve the phrase "to the maximum extent practicable" confuses the

**Addendum 148a**

55

otherwise clear mandatory provisions of the proposed amendment and that decisions concerning the sufficiency of evidence supporting a petitioned action should be made in a timely manner. We recommend that this phrase be deleted.

The proposed amendments (line 24, page 2, to line 11, page 3) require the Secretary to publish final regulations in the *Federal Register* within one year of the notice of proposed rulemeking to list or delist a species (absent a time extension). The proposed amendment, however, prevents the Secretary from issuing final regulations adding a species to the list unless critical habitat is designated. As mentioned above, we believe this provision may be unduly restrictive and needs clarification.

The proposed amendments (line 21, page 3, to line 7, page 4) would require the Secretary to withdraw a proposed listing or delisting if such action was not adopted within the one year period because the Secretary determined insufficient evidence existed to justify the action. The Department of Commerce opposes this requirement. With some species, it may be impossible to complete the necessary work within one year. In addition, it is unclear what would happen if the Secretary failed to adopt a proposed listing or delisting within the one year period for reasons other than the insufficiency of supporting information. The term "information" may be more appropriate than the term "evidence" on line 25 of page 3.

We do not understand the proposed amendment (line 10, page 4) adding the term "like" to Section 4(f)(5). Report language clarifying the intent and operative provisions of all the section 4 amendments would be helpful. We understand that the Department of the Interior has additional concerns and recommendations concerning the listing and we concur with these recommendations.

*(2) Recovery plans*

The proposed amendments (line 11–17, page 4) would require the Secretary "to the maximum extent practicable," to give priority to preparing recovery plans for listing species that are or may be in conflict with construction or other development projects. The Department of Commerce believes this requirement, contrary to the purpose of the Act, may displace resources from the listed species most in need of recovery. It may, for example, require that priority be given to species with stable or increasing populations rather than species with seriously declining populations simply because the more healthy species is or may be in conflict with certain projects. It is unclear whether the phrase "to the maximum extent practicable" would provide sufficient flexibility to insure that plans are developed for those species most in need of recovery. We suggest the following language replace the above phrase: "shall to the maximum extent prudent and consistent with the purposes and policies of the Act, . . ."

*(3) Cooperation with the States*

This amendment would increase the federal share of this grants-in-aid program. The Administration, as a general policy, opposes this type of program. Since the Administration is not requesting Section 6 funds in fiscal year 1983, it is consistent with the Presi-

**Addendum 149a**

dent's budget to oppose any amendment increasing the matching share.

*(4) Consultation process*

The proposed amendments (lines 13–20, page 5) would require action agencies to provide applicants with a written statement indicating whether the agency believes implementing the action will violate Section 7(a)(2) and if so, whether the agency would likely issue the permit or license but for that determination. This provision would elevate endangered species issues above all other factors the action agency considers in making a decision on a permit application. It would result in segmenting environmental review and compliance procedures by preventing agencies from processing all such requirements together. Moreover, it provides incentives for Federal agencies to delay initiating consultation until they have all the information necessary to make the "but for" determination. The consultation process was designed to discourage such delays so that conflicts between species conservation and agency actions would be avoided. The Department of Commerce opposes this amendment and recommends that it be withdrawn.

The proposed amendments (line 21, page 5, to line 2, page 6) would allow Federal agencies or applicants to apply for an incidental taking permit pursuant to Section 10 if during consultation it is apparent the action will not violate Section 7(a)(2) but takings will likely occur. The Administration has studied this issue and believes the best solution for resolving potential conflicts between Sections 7 and 9 would be an amendment to Section 7(b), authorizing the Secretary to specify in "no jeopardy" cases reasonable and prudent measures to avoid or minimize takings incidental to the agency action considered during consultation, provided no takings would violate Section 7(a)(2). In conjunction with this amendment, we would amend Sections 11(a)(3) and 11(b)(3) to provide to persons who comply with the reasonable and prudent measures a defense to prosecution for violations of the Act's taking prohibitions. We propose the following language for these amendments:

1. Number first paragraph in subsection 7(b) as (1) and add a new paragraph as follows:

"(2) If after consultation, the Secretary concludes the agency action would not violate subsection (a)(2) or has offered reasonable and prudent alternatives that would enable the action agency to avoid violating subsection (a)(2), the Secretary also shall provide the Federal agency or applicant concerned with a written statement incidental to the agency action that would not violate subsection (a)(2) and any reasonable and prudent measures that shall be followed to avoid or minimize such takings of species."

2. Amend subsections 11(a)(3) and 11(b)(3) as follows:

"(3) Notwithstanding any other provision of this Act, no civil penalty [criminal penalty in the case of subsection (b)(3)] shall be imposed if the defendant can show by a preponderance of evidence that the act was committed based on a good faith belief that he was acting (1) to protect himself or herself, a member of his or her family, or any other individual from bodily harm from any endangered or threatened species; or (2) in compliance with the reason-

**Addendum 150a**

able and prudent measures the Secretary specified pursuant to subsection 7(b)(2) of this Act."

We believe the Administration's approach has several advantages over that taken in H.R. 6133. Our amendments would preserve the current Section 7 consultation process, would place enforceable controls on the means and level of incidental takings, would eliminate the need for a permit in addition to the Secretary's statement which may be appended to the biological opinion, and would logically place an affirmative defense to prosecution within the enforcement provisions of the Act.

Under the H.R. 6133 amendment to Section 10(a)(1) (line 20, page 15, to line 11, page 17), applications for incidental take permits could not be processed until the Secretary issues a biological opinion under Section 7 and provides the public opportunity for comment on the permit. This would be administratively burdensome and may delay agency actions for which Section 7 consultations have been conducted.

The proposed amendment (lines 8–11, page 17) also calls for permit revocation only after opportunity for public comment. Generally, as under the Administrative Procedure Act, permits may be sanctioned only after notice and opportunity for a hearing. The proposal needs clarification as to whether the public comment provision is intended to be in addition to regular procedural requirements.

Further, the proposed amendment creates an extensive exception to the taking prohibitions of the Act by expanding the incidental taking provisions to individuals whose activities have undergone no Section 7 consultation and review.

The proposed amendment also would require Section 10(a)(1)(B) permit applicants to minimize takings only "to the maximum extent practicable". We see no reason for allowing this flexibility; all incidental takings should be minimized or avoided.

Finally, we note that no incidental takings of endangered or threatened marine mammals could be allowed under either the Administration's proposal or H.R. 6133 because of the provisions of the Marine Mammal Protection Act.

The proposed amendments to Section 7(a)(3) (lines 6–11, page 6) would allow actual or prospective applicants to consult with the Secretary before Federal agencies undertake consultation on future actions. This would enable such applicants to determine early in the planning process whether the project may affect endangered species. The Administration believes a statutory amendment is unnecessary to help them assess an activity's potential impacts on listed species. Under the Administration's Section 7 consultation regulations, to be published in the near future, informal consultations are strongly encouraged. We believe this approach is preferable to that of H.R. 6133. Further, the Department of Commerce believes only Federal agencies should be authorized to consult formally with the Secretary under Section 7 of the Act. Considerable administrative resources may be expended in formally consulting with "actual or prospective" applicants who end up withdrawing their applications or failing to apply for Federal authorizations. It is unclear what "prospective applicant" means. Must one commit resources to a project? If so, what types and quantity of resources

**Addendum 151a**

must be committed? Moreover, it is unclear whether the Secretary must give priority to formal consultations with these applicants. We recommend this and all related amendments to provide for such consultations be deleted.

The proposed amendment to Section 7(b) (lines 13–21, page 6) would include permit or license applicants in determinations of time extensions for consultations beyond 45 days. We believe the Secretary and Federal agencies should consider the concerns of applicants during the consultation process and should extend consultations only when adequate consultations cannot be completed in the 90-day time period, but that the agencies should have the ultimate authority to determine the time periods necessary for consultation.

The proposed amendment to Section 7(b) beginning with "If such jeopardy is found," (lines 6–7, page 7) would allow the Secretary to suggest reasonable and prudent alternatives only in "jeopardy" biological opinions. Currently, the Secretary may suggest such alternatives in all opinions. The Department of Commerce believes it is useful to provide such alternatives even in "no jeopardy" biological opinions because slight modifications to a project may provide even greater protection to listed species. We also note that the introductory prepositional phase "If jeopardy is found," fails to reference an explicit antecedent statement concerning "jeopardy".

We recommend this phrase be deleted.

*(5) Exemption process*

The proposed amendments (lines 11–22, page 8) would allow permit or license applicants access to the exemption process before the Federal agency takes final action on their permit or license applications. The Department of Commerce opposes this amendment because it undermines the fundamental purpose of the exemption process—that the Endangered Species Committee be the "court of last resort." An applicant should be allowed to seek an exemption only after all administrative remedies have been exhausted and a permit is denied primarily because of Section 7 of the Act. Similarly, only after such a denial should six Cabinet level official be assembled to review exemption applications. Allowing "early access" to the exemption process may waste considerable administrative resources and may discourage good faith consultations under Section 7(a)(2) to avoid potential conflicts between species conservation and proposed actions.

Additionally, the proposed amendment may allow an applicant to apply for an exemption based on the Secretary's "jeopardy" opinion even if the Federal agency has determined (pursuant to proposed Section 7(a)(2)(B)) that the proposed action would not be likely to jeopardize listed species. This would make the opinion of the Secretary, rather than the opinion of the action agency, the determining factor as to whether the proposed action would be likely to jeopardize a listed species. This would alter the current consultation process.

We recommend the early access provisions be deleted.

The Department of Commerce would not oppose the proposed amendments (line 17, page 8, to line 11, page 12) to streamline the exemption process and replace the review board with the Secre-

**Addendum 152a**

tary. We oppose, however, the "consultation with the Committee" requirement on the threshold decision and recommend a provision requiring the Secretary to coordinate preparation of the report with the Committee. We also recommend that to avoid conflict of interest situations, provisions similar to those in S. 2309 be adopted. S. 2309 requires the Secretary who has not issued the biological opinion in a given case to make the threshold determinations and to prepare the report on the exemption appliction. It further requires both Secretaries to review exemption applications and prepare the reports when both Secretaries have issued biological opinions on the proposed action. In addition to these provisions, we would recommend that provisions be adopted to account for situations where the Secretary who has not issued the biological opinion is the head of an agency that has authorized the action for which an exemption is sought.

*(6) Convention implementation*

We defer to the views of the Departments of the Interior and State concerning the proposed amendments to Section 8A(c) relating to the "bobcat" problem (line 3, page 12 to line 4, page 13).

We support the views of the Department of State concerning the proposed amendments to Section 8A(d) regarding mandatory reservations under the Convention (lines 5–11, page 13).

The Department of Commerce opposes the proposed amendments concerning the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (line 3, page 13, to line 7, page 15), because these activities are not of sufficiently high priority given the need for more important programs.

*(7) Experimental populations and other exceptions*

We defer to the views of the Department of the Interior concerning the proposed amendments on experimental populations (lines 16–19, page 15, and line 22, page 17 to line 25, page 18), but, we note that permits for takings of experimental populations appear unnecessary if such populations are treated as threatened species.

*(8) Scrimshaw*

The Department of Commere is opposed to the proposed amendments concerning the scrimshaw antiquities exception under section 10(h)(1) (line 13, page 17), both because it would increase the amount of whale ivory on the interstate market which creates enforcement difficulties, and because of the serious difficulty in accurately dating whale ivory products.

We understand the Committee may add a provision which would extend the certificates of exemption for scrimshaw products issued under Section 10(f) of the Act until supplies of whale ivory held by certificate holders are exhausted. The Department opposes extension of the current certificate program. Our experience during the past six years in attempting to enforce against the significant amount of unlawful trade in whale ivory, is that the certificate program has facilitated such trade by providing a ready avenue in interstate channels for illegal ivory, including illegally imported post-Act ivory. The large, indistinguishable inventories held under the certificates, often consisting of thousands of pounds of teeth and

chips, render it extraordinarily difficult to keep track of individual items in interstate commerce, especially when the ivory pieces are recrafted into several smaller items. The difficulties are compounded by the vast number of subsequent purchasers of ivory who also contributed to the interstate, as well as intrastate, traffic. The current Certificate System, coupled with the demand for whale ivory, invites abuse. It creates a sitution in which our enforcement agents must try to track very complex, and often patchy, paper trails in individual cases, expending efforts greatly disproportionate to the results.

While the Department supported the original Certificate program, we did so in the context of its limited duration. With our limited enforcement resources, we have been hard-pressed to maintain effective control over the interstate network of ivory trade under the current Certificate System. Our enforcement program would be even more taxed if the current system were extended.

*(9) Appropriations*

The Department of Commerce supports the authorization of appropriations specified in the Administration's bill which were not to exceed $2,179,000 for fiscal year 1983 and such sums as may be necessary for fiscal year 1984.

Sincerely,

IRVING P. MARGULIES
(for Sherman E. Unger, General Counsel).

DEPARTMENT OF AGRICULTURE,
OFFICE OF THE SECRETARY,
*Washington D.C., May 10, 1982.*

Hon. JOHN B. BREAUX,
*Chairman, Subcommittee on Fisheries, Wildlife Conservation and the Environment, House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in regard to the reauthorization of appropriations for the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*). While the Department supports the reauthorization of appropriations for the Act, we offer the following suggestion for an amendment.

The provisions of the Endangered Species Act and the Convention on International Trade in Endangered Species of Wild Fauna and Flora impose certain restrictions on the international movement of specified plants. Under the Act, the United States Department of Agriculture (USDA) is responsible for enforcement of the provisions of the Act and the Convention which pertain to the importation and exportation of terrestrial plants. This responsibility has, in turn, been delegated to the Department's Animal and Plant Health Inspection Service (APHIS).

Section 9(f)(1) of the Act (16 U.S.C. 1538 (f)(1)) requires plants to be imported or exported only at ports designated by the Secretary of the Interior or at nondesignated ports upon approval by the Secretary of the Interior in accordance with specified criteria. Since APHIS is responsible for enforcement of the provisions of the Act which pertain to the importation and exportation of terrestrial plants, determinations concerning ports for the importation and exportation of terrestrial plants should be based on the availability of

61

APHIS personnel and facilities for conducting the necessary enforcement activities. These determinations relate solely to information within USDA. Therefore, we recommend that the Act be amended to authorize the Secretary of Agriculture to designate the ports for the importation and exportation of terrestrial plants and to make determinations concerning the importation or exportation of terrestrial plants at nondesignated ports.

We enclose a suggested amendment to Section 9(f)(1) of the Act.

An identical letter has been sent to Honorable John H. Chafee, Chairman, Subcommittee on Environmental Pollution.

The Office of Management and Budget advises that there is no objection to the submission of this report from the standpoint of the Administration's program.

Sincerely,

JOHN R. BLOCK. *Secretary.*

Enclosure.

Section 9(f)(1) of the Endangered Species Act of 1973 (16 U.S.C. 1538(f)(1)) is amended to read:

"(f)(1) It is unlawful for any person subject to the jurisdiction of the United States to import into or export from the United States any fish or wildlife (other than shellfish and fishery products which (A) are not listed pursuant to section 4 of this Act as endangered species or threatened species, and (B) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or marine plants, except at a port or ports designated by the Secretary of the Interior, or to import into or export from the United States terrestrial plants, except at a port or ports designated by the Secretaty of Agriculture. For the purpose of facilitating enforcement of this Act and reducing the costs thereof, the Secretary of the Interior, with regard to fish and wildlife and marine plants, or the Secretary of Agriculture, with regard to terrestrial plants, with approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. The Secretary of the Interior, with regard to fish, wildlife, and marine plants, and the Secretary of Agriculture, with regard to terrestrial plants, under such terms and conditions as they may prescribe, may permit the importation or exportation at non-designated ports in the interest of the health or safety of the fish or wildlife or plants, or for other reasons if, in their discretion, they deem it appropriate and consistent with the purpose of this subsection."

### CHANGES IN EXISTING LAW

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, as amended, change in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### THE ENDANGERED SPECIES ACT OF 1973, AS AMENDED

\*       \*       \*       \*       \*       \*       \*

**Addendum 155a**

#### DETERMINATION OF ENDANGERED SPECIES AND THREATENED SPECIES

SEC. 4. (a) GENERAL. (1) The Secretary shall by regulation determine whether any species is an endangered species or a threatened species bacause of any of the following factors:

    [(1)] (A) the present or threatened destruction, modification, or curtailment of its habitat or range;

    [(2)] (B) overutilization for commercial, [sporting,] *recreational,* scientific, or educational purposes;

    [(3)] (C) disease or predation;

    [(4)] (D) the inadequacy of existing regulatory mechanisms; or

    [(5)] (E) other natural or manmade factors affecting its continued existance.

    At the time any such regulation is proposed, the Secretary shall also [by regulation], to the maximum extent [prudent, specify] *prudent and determinable, specify therein* any habitat of such species which is then considered to be critical habitat. The requirement of the preceding sentence shall not apply with respect to any species which was listed prior to enactment of the Endangered Species Act Amendments of 1978.

    \*     \*     \*     \*     \*     \*     \*

(b) BASIS FOR DETERMINATIONS.—The Secretary shall make determinations required by subsection (a) of this section *solely* on the basis of the best scientific and commerical data available to him after conducting a review of the status of the species, and after consultation, as appropriate, with the affected States, interested persons and organization, other interested Federal agencies, and, in cooperation with the Secretary of State, with the country or countries in which the species concerned is normally found or whose citizens harvest such species on the high seas; except that in any case in which such determinations involve resident species of fish or wildlife, the Secretary of the Interior may not add such species to, or remove such species from, any list published pursuant to subsection (c) of this section, unless the Secretary as first—

    (A) published notice in the Federal Register and notified the Governor of each State within which such species is then known to occur that such action is contemplated;

    [(B) allowed each such state 90 days after notification to submit its comments and recommendations, except to the extent that such period may be shortened by agreement between the Secretary and the Governor or Governors concerned; and]

    *(B) allowed each State 90 days after notification to submit its comments and recommendations (except to the extent that such period may be shortened by agreement between the Secretary and the Governor or Governors concerned) and, if he disagrees with any of such comments and recommendations, provided the State with a written statement of the reasons for disagreement; and*

    \*     \*     \*     \*     \*     \*     \*

(c) LISTS.—(1) The Secretary of the Interior shall publish in the Federal Register, and from time to time he may be regulation revise, a list of all species determined by him or the Secretary of

**Addendum 156a**

Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, and shall specify with respect to each such species over what portion of its range it is endangered or threatened and specify any critical habitat within such range.

⟦(2) The Secretary shall, within 90 days of the receipt of the petition of an interested person under subsection 553(e) of title 5, United States Code, conduct and publish in the Federal Register a review of the status of any listed or unlisted species proposed to be removed from or added to either of the lists published pursuant to paragraph (1) of this subsection, but only if he makes and publishes a finding that such person has presented substantial evidence which in his judgment warrants such a review. Such review and finding shall be made and published prior to the initiation of any procedures under subsection (b)(1).⟧

*(2)(A) To the maximum extent practicable, the Secretary shall, within 180 days after receiving the petition of an interested person section 553(e) of title 5, United States Code, determines whether the petition contains substantial evidence indicating that the species concerned is likely to qualify for addition to, or removal from, either of the lists published pursuant to paragraph (1).*

*(B) If an affirmative determination is made under subparagraph (A) regarding a petition, the Secretary shall immediately commence rulemaking procedures pursuant to subsection (f) to so list or delist, as the case may be, the species concerned. A negative determination regarding a petition under subparagraph (A) shall be subject to judicial review.*

\*     \*     \*     \*     \*     \*     \*

(f) REGULATIONS.—(1) Except as provided in paragraphs (2) and (3) of this subsection and subsection (b) of this section, the provisions of section 553 of title 5, United States Code (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this Act.

\*     \*     \*     \*     \*     \*     \*

⟦(5) A final regulation adding a species to any list published pursuant to subsection (c) shall be published in the Federal Register not later than two years after the date of publication of notice of the regulation proposing such listing under paragraph (B)(i)(I). If a final regulation is not adopted within such two-year period, the Secretary shall withdraw the proposed regulation and shall publish notice of such withdrawal in the Federal Register not later than 30 days after the end of such period. The Secretary shall not propose a regulation adding to such a list any species for which a proposed regulation has been withdrawn under this paragraph unless he determines that sufficient new information is available to warrant the proposal of a regulation. No proposed regulation for the listing of any species published before November 10, 1978 shall be withdrawn under this paragraph before the end of the one-year period beginning on November 10, 1978.⟧

*(5)(A) A final regulation adding a species to (whether or not critical habitat is specified therein), or removing a species from, any list published pursuant to subsection (c) shall be published in the Federal Register no later than one year fter the date of publication of general notice under paragraph (2) proposing such listing or delisting; but no publication of such a final regulation may be made before the close of such one-year period unless the critical habitat, to the maximum extent prudent and determinable, is specified therein.*

*(B) If the Secretary finds that there is substantial disagreement regarding the sufficiency or accuracy of the available scientific or commercial information regarding whether a species should be listed or delisted, the Secretary may extend the one-year period specified in subparagraph (A) for not more than 6 months for purposes of soliciting additional information from specialists (selected after consultation with appropriate professional organizations) in the matters concerned. If a proposed regulation is not adopted within such one-year period (or longer period if extension under the preceding sentence applies) because the Secretary has determined that there is not sufficient evidence to justify listing or delisting the species concerned, the Secretary shall withdraw the regulation and shall publish notice of the determination to withdraw in the Federal Register not later than 30 days after the end of such period. A determination to withdraw a regulation shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this subparagraph unless he determines that sufficient new information is available to warrant such proposal.*

*(C) If a regulation referred to in subparagraph (A) does not specify critical habitat therein, then a final regulation specifying, to the maximum extent prudent, such habitat shall be published in the Federal Register before the close of the one-year period beginning on the closing date of the one-year period (or longer period if extension under subparagraph (B) applies) referred to in subparagraph (A).*

(g) RECOVERY PLANS.—The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conserrvation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species The Secretary, in developing and implmenting [recovery plans,] *recovery plans (1) shall, to the maximum extent practicable, give priority to preparing plans for endangered species or threatened species that are, or may be, in conflict with construction or other developmental projects; and (2)* may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

#### COOPERATION WITH THE STATES

SEC. 6. (a) GENERAL.—* * *

\*          \*          \*          \*          \*          \*          \*

(d) ALLOCATION OF FUNDS.—The Secretary is authorized to provide financial assistance to any State, through its respective State agency, which has entered into a cooperative agreement pursuant

**Addendum 158a**

65

to subsection (c) of this section to assist in development of programs for the conservation of endangered and threatened species. The Secretary shall make an allocation of appropriated funds to such States based on consideration of—

(A) the international commitments of the United States to protect endangered species or threatened species;

(B) the readiness of a State to proceed with a conservation program consistent with the objectives and purposes of this Act;

(C) the number of endangered species and threatened species within a State;

(D) the potential for restoring endangered species and threatened species within a State; and

(E) the relative urgency to initiate a program to restore and protect an endangered species or threatened species in terms of survival of the species.

So much of any appropriated funds allocated for obligation to any State for any fiscal year as remains unobligated at the close thereof is authorized to be made available to that State until the close of the succeeding fiscal year. Any amount allocated to any State which is unobligated at the end of the period during which it is available for expenditure is authorized to be made available for expenditure by the Secretary in conducting programs under this section.

(2) Such cooperative agreements shall provide for (A) the actions to be taken by the Secretary and the States; (B) the benefits that are expected to be derived in connection with the conservation of endangered or threatened species; (C) the estimated cost of these actions; and (D) the share of such costs to be borne by the Federal Government and by the States; except that—

(i) the Federal share of such program costs shall not exceed 【66⅔】 *751 per centum of the estimated program cost stated in the agreement; and*

(ii) the Federal share may be increased to 【75】 *90* per centum whenever two or more States having a common interest in one or more endangered or threatened species, the conservation of which may be enhanced by cooperation of such States, enter jointly into an agreement with the Secretary.

The Secretary may, in his discretion, and under such rules and regulations as he may prescribe, advance funds to the State for financing the United States pro rata share agreed upon in the cooperative agreement. For the purposes of this section, the non-Federal share may, in the discretion of the Secretary, be in the form of money or real property, the value of which will be determined by the Secretary, whose decision shall be final.

\*      \*      \*      \*      \*      \*      \*

【(i) APPROPRIATIONS.—For the purposes of this section, there are authorized to be appropriated not to exceed the following sums:

【(1) $10,000,000 through the period ending September 30, 1977.

【(2) $16,000,000 for the period beginning October 1, 1977, and ending September 30, 1981.】

Addendum 159a

*(i) APPROPRIATIONS.—For the purposes of this section, there are authorized to be appropriated not to exceed $6,000,000 for each of fiscal years 1983, 1984, and 1985.*

### INTERAGENCY COOPERATION

SEC. 7 (a) FEDERAL AGENCY ACTIONS AND CONSULTATIONS.—The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act.

(2) *(A)* Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption of such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

*(B) A Federal agency, promptly after receiving an application for a permit or license for an activity regarding which the Secretary has issued an opinion required under subsection (b)(3), shall issue to the applicant a written statement indicating whether, in the agency's judgment, the carrying out of the action will violate subparagraph (A); and, if the agency's judgment is in the affirmative, whether the agency would likely issue the permit or license but for such judgment.*

*(3) Subject to such guidelines as the Secretary may establish, a prospective permit or license applicant may consult with the Secretary at any time the applicant has reason to believe that an endangered species or threatened species may be present and that implementation of the action concerned will likely affect such species.*

*(1) [(3)] Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 4 or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).*

[(b) Secretary's Opinion-Consultation under subsection (a)(2) with respect to any agency action shall be conducted within 90 days after the date on which initiated or within such other period of time as is mutually agreeable to the Federal agency and the Secretary. Promptly after the conclusion of consultation, the Secretary shall provide to the Federal agency concerned a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency af-

**Addendum 160a**

fects the species or its critical habitat. The Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section and can be taken by the Federal agency or the permit or license applicant in implementing the agency action.**]**

"(b) OPINION OF SECRETARY.—(1) *Consultation under paragraph (2)(A) of subsection (a) with respect to any agency shall be concluded within 90 days after the date on which initiated or within such other period of time as is mutually agreeable to the Secretary and the Federal agency; but if the agency action involves a permit or license applicant, such 90-day period may not be extended by the Secretary and the Federal agency—*

*(A) for less than 45 days unless the Secretary, before the close of the 90-day period, provides the applicant with a written statement of the reasons for the extension, or*

*(B) for 45 days or more unless the Secretary, before the close of the 90-day period, obtains the written consent of the applicant to the extension.*

*(2) Consultation under paragraph (3) of subsection (a) shall be concluded within such period as is mutually agreeable to the Secretary and the applicant concerned.*

*(3) Promptly after conclusion of consultation under paragraph (2)(A) or (3) of subsection (a), the Secretary shall provide to the Federal agency or the applicant, as the case may be, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If such jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2)(A) and can be taken by the Federal agency or applicant in implementing the agency action. An opinion issued by the Secretary incident to consultation under subsection (a)(3) regarding an agency action shall be treated as an opinion issued after consultation under subsection (a)(2)(A) regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds that no significant changes have been made with respect to the action and that no significant change has occurred regarding the scientific information used during the initial consultation.*

*(4) If after consultation under paragraph (2)(A), the Secretary concludes that—*

*(A) the agency action will not violate subsection (a)(2)(A), or offers reasonable and prudent alternatives that will enable the action agency to avoid violating subsection (a)(2)(A); and*

*(B) the taking of a listed species incidental to the agency action will not violate subsection (a)(2)(A);*

*the Secretary shall provide the Federal agency or applicant with a written statement that—*

*(i) specifies the impact of such incidental taking on species,*

*"(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, and*

*"(iii) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with*

**Addendum 161a**

*by the Federal agency or applicant in order to implement the measures specified under clause (ii).*

(c) Biological assessment.—To facilitate compliance with the requirements of subsection (a)(2) each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on the date of enactment of the Endangered Species Act Amendments of 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advisers, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, *except that if a permit or license applicant is involved, the 180-day period may not be extended unless the Secretary provides the applicant, before the close of such period, with a written statement setting forth the length of the proposed extension and the reasons therefor*) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

【(2) Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action.】 *Each permit or license applicant undertaking consultation under subsection (a)(3), and any person who may wish to apply for exemption under subsection (g), may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by the agency action concerned.* Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

\*    \*    \*    \*    \*    \*    \*

(g) 【Application for exemption and consideration by review board.—／ *Submittal of Application for Exemption; Report by Secretary.*—(1) 【A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action "would violate subsection (a)(2). An application for an exemption shall be considered initially by a review board in the manner provided in this subsection, and shall be considered by the Endangered Species Committee for a final determination under subsection (h) after a report is made by the review board.】 *A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if,*

**Addendum 162a**

*after consultation under paragraph (2) or (3) of subsection (a), the
Secretary's opinion under subsection (b)(3) indicates that the agency
action would violate subsection (a)(2)(A). An application for an ex-
emption shall be considered initially by the Secretary in the manner
provided for in this subsection, and shall be considered by the Com-
mittee for a final determination under subsection (h) after a report
is made pursuant to paragraph (5).* The applicant for an exemption
shall be referred to as the 'exemption applicant' in this section.

(2)(A) **⟦**An exemption applicant shall submit a written applica-
tion to the Secretary, in a form prescribed under subsection (f) of
this section, not later than 90 days after the completion of the con-
sultation process; or, in the case of any agency action involving a
permit or license applicant, not later than 90 days after the date on
which the Federal agency concerned takes final agency action, for
purposes of chapter 7 of title 5, United States Code, with respect to
the issuance of the permit or license.**⟧** *An exemption applicant
shall submit a written application to the Secretary, in a form pre-
scribed under subsection (f), not later than 90 days after the comple-
tion of the consultation process under subsection (a)(2)(A) if the
agency action does not involve a permit or license applicant; or, if
the action involves a permit or license applicant, not later than 90
days after (i) the date on which the applicant receives the written
statement required under subsection (a)(2)(B), or (ii) the date on
which the Federal agency concerned takes final agency action, for
purposes of chapter 7 of title 5, United States Code, regarding such
action.* Such application shall set forth the reasons why the exemp-
tion applicant considers that the agency action meets the requir-
ments for an exemption under this subsection.

(B) Upon receipt of an application for exemption for an agency
action under paragraph (1), the Secretary shall promptly notify the
Governor of each affected State, if any, as determined by the Secre-
tary, and request the Governors so notified to recommend individ-
uals to be appointed **⟦**to the review board to be established under
paragraph (3) and**⟧** to the Endangered Species Committee for con-
sideration of such application.

**⟦**(3)(A) A review board shall be established for purposes of con-
sidering an application for exemption and submitting a report to
the Endangered Species Committee under this subsection as fol-
lows:

**⟦**(i) one individual shall be appointed to the board by the
Secretary not later than 15 days after an application is submit-
ted pursuant to paragraph(2).

**⟦**(ii) one individual shall be appointed to the board by the
President, not late than 30 days after an application is submit-
ted pursuant to paragraph (2) and after consideration of any
recommendations received pursuant to paragraph (2)(B). An in-
dividual appointed by the President under this subparagraph
shall be a resident of a State, if any, in which the agency
action will be, or is being, carried out.

**⟦**(iii) one administrative law judge shall be selected to serve
on the board by the Civil Service Commission in the same
manner as administrative law judges are selected under sec-
tion 3344 of title 5 of the United States Code to be detailed to
an agency which occasionally or temporarily is insufficiently

**Addendum 163a**

70

staffed with administrative law judges. The use by the review board of such an administrative law judge shall be on a reimbursable basis.

⟦(B) If biological opinions of both the Secretary of the Interior and the Secretary of Commerce indicate that an agency action would violate subsection (a)(2), such secretaries shall jointly convene a review board to consider any application for exemption filed with respect to such agency action.

⟦(C) Members of a review board who are full-time officers of employees of the United States shall receive no additional pay on account of their service on the board. All other members shall be entitled to receive an amount not to exceed the daily equivalent of the annual rate of basic pay in effect for grade GS–18 of the General Schedule for each day during which they are engaged in the actual performance of duties vested in the board. While away from their homes or regular places of business in the performance of services for a review board, member of the board shall be allowed travel expenses, including per diem in lieu of subsistence, in this same manner as persons employed intermittently in the Government service are allowed expenses under section 5703 of title 5 of the United States Code.

⟦(4) The Secretary shall submit the applicant to the review board immediately after its appointment under paragraph (3), and the Secretary shall submit to the review board in writing, his views and recommendations with respect to the application within 60 days after receiving a copy of any application under paragraph(2).⟧

⟦(5) It shall be the duty of a review board appointed under paragraph (3) to make a full review of the consultation carried out under subsection (a) (2) and within 60 days after its appointment or within such longer time as is mutually agreed upon between the exemption applicant and the Secretary, to make a determination, by a majority vote, (A) whether an irresolvable conflict exists and (B) whether the Federal agency concerned and such exemption applicant has—⟧

*(3) Within 30 days after receiving an application under paragraph (2)(A), the Secretary, in consultation with the Committee, shall determine whether (A) an irresolvable conflict exists, and (B) whether the Federal agency concerned and the exemption applicant have—*

(i) carried out its consultation responsibilities as described in subsection (a)(2) in good faith and made a reasonable and responsbile effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which "would not violate subsection (a)(2);

(ii) conducted any biological assessment required of it by subsection (c); and

(iii) refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

Any determination by the ⟦review board⟧ *the Secretary* that an irresolvable conflict does not exist or that the Federal agency concerned or the exemption applicant has not met its respective requirements under subclause (i), (ii), or (iii) shall be considered final agency action for purposes of chapter 7 of title 5 of the United States Code,";

**Addendum 164a**

【(6) If the review board determines that an irresolvable conflict exists and makes positive determinations under subparagraphs (i), (ii), and (iii) of paragraph (5), it shall proceed to prepare the report to be submitted under paragraph (7).】

*(4) If the Secretary determines that an irresolvable conflict exists and makes positive determinations under subclauses (i), (ii), and (iii) of paragraph (3)(B), the Secretary shall proceed to prepare the report required under paragraph (5).*

【(7) Within 180 days after making the determinations under paragraph (6), the review board shall submit to the Committee a report discussing—】

*(5) Within 120 days after making the determinations under paragraph (4), the Secretary shall submit to the Committee a report discussing—*

    (A) the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

    (B) 【a summary of the evidence concerning】 whether or not the agency action is in the public interest and is of national or regional significance;

    (C) appropriate reasonable mitigation and enhancement measures which should be considered by the Committee.

*The Secretary shall hold at least one public hearing on the matters to be discussed in the report and shall include with the report a summary of the evidence on which it is based.*

*(6)* 【(8)】 To the extent practicable within the time required for action under 【subsection (g)】 of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of title 5, United States Code.

【(9) In carrying out its duties under this subsection, a review board may, and any member of a review board if so authorized by the review board, may—

    【(A) sit and act at such times and places, take such testimony, and receive such evidence, as the review board deems advisable;

    【(B) subject to the Privacy Act of 1974, request of any Federal agency or applicant information necessary to enable it to carry out such duties, and upon such request the head of such Federal agency shall furnish such information to the review board; and

    【(C) use the United States mails in the same manner and upon the same conditions as a Federal agency.】

【(10)】 Upon request of 【a review board,】 *the Secretary*, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the 【review board to assist it in carry *[sic]* out its】 *Secretary to assist him in carrying out his* duties under this section.

【(11) The Administrator of the General Services Administration shall provide to a review board, on a reimbursable basis, such administrative support services as the review board may request.】

**Addendum 165a**

〔(12) All meetings and records of review boards shall be open to the public.〕

*(8) All hearings held by the Secretary in carrying out this subsection, and the evidence submitted at the hearings, shall be open to the public.*

(h) EXEMPTION.—(1) The Committee shall make a final determination whether or not to grant an exemption within 〔90 days of receiving the report of the review board under subsection (g)(7)

*30 days of receiving the report of the Secretary pursuant to subsection (g)(5).*

The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

(A) it determines on the record, based on the report of the 〔review board〕 *Secretary and on such other testimony or evidence as it may receive,* that—

(i) there are no reasonable and prudent alternatives to the agency action;

(ii) the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest; and

(iii) the action is of regional or national significance; and

*          *          *          *          *          *          *

〔(o) EXCEPTION ON TAKING.—Notwithstanding sections 4(d) and 9(a) of this Act or any regulations promulgated pursuant to such sections, any action for which an exemption is granted under subsection (h) of this section shall not be considered a taking of any endangered or threatened species with respect to any activity which is necessary to carry out such action.〕

*(o) Notwithstanding sections 4(d) and 9(a) or any regulation promulgated pursuant to either such section—*

*(1) any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and*

*(2) any taking that is in compliance with the terms and conditions specified in a written statement pursuant to subsection (b)(4)(iii) shall not be considered to be a taking of any endangered species or threatened species.*

*          *          *          *          *          *          *

〔(q) AUTHORIZATION.—There is authorized to be appropriated to the Secretary to assist review boards and the Committee in carrying out their functions under subsections (e), (f), (g), and (h) of this section not to exceed $600,000 for each of fiscal years 1979, 1980, 1981, and 1982.〕

*(q) There are authorized to be appropriated to the Secretary to assist him and the Committee in carrying out their functions under subsections (e), (f), (g), and (h) of this section not to exceed $600,000 for each of fiscal years 1983, 1984, and 1985.*

*          *          *          *          *          *          *

**Addendum 166a**

CONVENTION IMPLEMENTATION.—Sec. 8A * * *

    \*    \*    \*    \*    \*    \*    \*

*(1)* (c) SCIENTIFIC AUTHORITY FUNCTIONS—The Secretary shall do all things necessary and appropriate to carry out the functions of the Scientific Authority under the Convention.

*(2) The Secretary shall base the determinations and advice given by him under Article IV of the Convention with respect to wildlife upon the best available biological information derived from professionally accepted wildlife management practices; but is not required to make, or require any State to make, estimates of population size in making such determinations or giving such advice.*

〔(d) INTERNATIONAL CONVENTION ADVISORY COMMISSION.—(1) There is hereby established the International Convention Advisory Commission (hereinafter in this section referred to as the "Commission").

〔(2) The Commission shall be composed of the following members:

〔(A) One member appointed by each of the following Federal offices from his respective agency:

    〔(i) The Secretary.
    〔(ii) The Secretary of Agriculture.
    〔(iii) The Secretary of Commerce.
    〔(iv) The Director of the National Science Foundation.
    〔(v) The Chairman of the Council on Environmental Quality.

〔(B) One member appointed by the Secretary from among officers and employees of the State agencies having Fish and Wildlife Conservation and management responsibilities.

〔(C) The Secretary of the Smithsonian Institution is invited to appoint a member.

〔(3)(A) Individuals who are appointed as members of the Commission under paragraph (2) must be scientifically qualified.

〔(B) The term of office of a member of the Commission appointed under paragraph (2)(B) is two years and an individual may be appointed under such paragrpah for any number of terms; except that an individual may not be appointed under that paragraph for a term that would be a third consecutive term for that individual under that paragraph.

〔(C) While away from his home or regular place of business in the performance of services for the Commission, a member appointed under paragraph (2)(B) or (C) shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as the expenses authorized by section 5703(b) of title 5, United States Code, for persons in the Government service employed intermittently.

〔(D) Members of the Commission who are full-time officers or employees of the United States shall receive no additional compensation on account of their service on the Commission.

〔(4)(A) The Commission shall elect a chairman from among its members. The term of office of the chairman is one year.

〔(B) No recommendation referred to in paragraph (5) shall be deemed to be a recommendation of the Commission unless a major-

ity of the members of the Commission vote for that recommendation.

【(5) The Commission shall make recommendations to the Secretary of his designee on all matters pertaining to the responsibilities of the Scientific Authority under terms of the Convention. The Commission shall include with any such recommendation any written dissenting view made by any member.

【(6) In the discharge of its responsibilities, the Commission shall, to the extent practicable, ascertain the views of, and utilize the expertise of, the governmental and nongovernmental scientific communities, State agencies responsible for the conservation of wild fauna or flora, humane groups, zoological and botanical institutions, recreational and commercial interests, the conservation community and others as appropriate.

【(7) In any case in which the Scientific Authority decides not to accept a recommendation made by the Commission under paragraph (5), the Scientific Authority shall provide to the Commission a written explanation of the reasons for that decision and shall publish the explanation in the Federal Register.

【(8)(A) The Chairman of the Commission, with the concurrence of the Commission, shall appoint an Executive Secretary for the Commission. The Executive Secretary shall carry out such duties and functions as shall be prescribed by the Commission, shall be appointed subject to the provisions of title 5, Unites States Code, governing appointments in the competitive services, and shall be paid in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates.

【(B) The Secretary shall provide the necessary staff and administrative support for the Commission.

【(e)   WILDLIFE   PRESERVATION   IN   WESTERN   HEMI-SPHERE—The President shall designate those agencies of the Federal Government that shall act on behalf of, and represent the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere.】

*(d) Reservations by the United States under Convention.—If the United States votes against including any species in Appendix I or II of the Convention and does not enter a reservation pursuant to paragraph (3) of Article XV of the Convention with respect to that species, the Secretary of State, before the 90th day after the last day on which such a reservation could be entered, shall submit to the Committee on Merchant Marine and Fisheries of the House of Representatives, and to the Committee on the Environment and Public Works of the Senate, a written report setting forth the reasons why such a reservation was not entered.*

*(e) Wildlife Preservation in Western Hemisphere.—(1) The Secretary of the Interior (hereinafter in this subsection referred to as the "Secretary"), in cooperation with the Secretary of State, shall act on behalf of, and represent, the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (56 Stat. 1354, T.S. 982, hereinafter in this subsection referred to as the "Western Convention"). In the discharge of these responsibilities, the Secretary and the Secre-*

**Addendum 168a**

*tary of State shall consult with the Secretary of Agriculture, the Secretary of Commerce, and the heads of other agencies with respect to matters relating to or affecting their areas of responsibility.*

*(2) The Secretary and the Secretary of State shall, in cooperation with the contracting parties to the Western Convention and, to the extent feasible and appropriate, with the participation of State agencies, take such steps as are necessary to implement the Western Convention. Such steps shall include, but not be limited to—*

*(A) cooperation with contracting parties and international organizations for the purpose of developing personnel resources and programs that will facilitate implementation of the Western Convention;*

*(B) identification of those species of birds that migrate between the United States and other contracting parties, and the habitats upon which those species depend, and the implementation of cooperative measures to ensure that such species will not become endangered or threatened; and*

*(C) identification of measures that are necessary and appropriate to implement those provisions of the Western Convention which address the protection of wild plants.*

*(3) No later than September 30, 1985, the Secretary and the Secretary of State shall submit a report to Congress describing those steps taken in accordance with the requirements of this subsection and identifying the principal remaining actions yet necessary for comprehensive and effective implementation of the Western Convention.*

*(4) There is authorized to be appropriated to the Department of the Interior not to exceed $150,000 for each of fiscal years 1983 and 1984, and not to exceed $300,000 for fiscal year 1985, for purposes of carrying out this subsection, and such sums shall remain available until expended.*

*(5) The provisions of this subsection shall not be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate resident fish and wildlife under State law or regulations.*

\*    \*    \*    \*    \*    \*    \*

## EXCEPTIONS

Sec. 10. [(a) Permits.—The Secretary may permit, under such terms and conditions as he may prescribe, any act otherwise prohibited by section 9 of this Act for scientific purposes or to enhance the propagation or survival of the affected species.]

*(a) Permits.—(1) The Secretary may permit, under such terms and conditions as he shall prescribe—*

*(A) any act otherwise prohibited by section 9 for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j); or*

*(B) any taking otherwise prohibited by section 9(a)(1)(B) if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.*

**Addendum 169a**

*(2)(A) No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a plan that specifies—*

*(i) the number of the species which will likely be taken;*

*(ii) what steps the applicant will take to minimize such taking; and*

*(iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized.*

*(B) If the Secretary finds, after opportunity for public comment, with respect to a permit application that—*

*(i) the taking will be incidental;*

*(ii) the applicant will, to the maximum extent practicable, minimize the taking; and*

*(iii) the level of such taking is not likely to jeopardize the continued existence of the species;*

*the Secretary shall issue the permit. The permit shall contain such reporting requirements as the Secretary deems necessary for determining whether the permittee complies with the terms and conditions of the permit.*

*(C) The Secretary shall revoke a permit issued under this paragraph if he finds, after opportunity for public comment, that the permittee is not complying with the terms and conditions of the permit.*

\*    \*    \*    \*    \*    \*    \*

(f)(1) As used in this subsection—

(A) The term "pre-Act endangered species part" means—

(i) any sperm whale oil, including derivatives thereof, which was lawfully held within the United States on December 28, 1973, in the course of a commercial activity; or

"(ii) any finished scrimshaw product, if such product or the raw material for such product was lawfully held within the United States on December 28, 1973, in the course of a commercial activity.

(B) The term "scrimshaw product" means any art form which involves the *substantial* etching or engraving of designs upon, or the *substantial* carving of figures, patterns, or designs from, any bone or tooth of any marine mammal of the order Cetacea. *For purposes of this subsection, polishing or the adding of minor superficial markings does not constitute substantial etching, engraving, or carving.*

\*    \*    \*    \*    .    \*    \*

*(9)(A) The Secretary shall carry out a comprehensive review of the effectiveness of the regulations prescribed pursuant to paragraph (5) of this subsection—*

*(i) in insuring that pre-Act finished scrimshaw products, or the raw materials for such products, have been adequately accounted for and not disposed of contrary to the provisions of this Act; and*

*(ii) in preventing the commingling of unlawfully imported or acquired marine mammal products with such exempted products either by persons to whom certificates of exemption have*

**Addendum 170a**

been issued under paragraph (4) of this subsection or by subsequent purchasers from such persons.

(B) In conducting the review required under subparagraph (A), the Secretary shall consider, but not be limited to—

(i) the adequacy of the reporting and records required of exemption holders;

(ii) the extent to which such reports and records are subject to verification;

(iii) methods for identifying individual pieces of scrimshaw products and raw materials and for preventing commingling of exempted materials from those not subject to such exemption; and

(iv) the retention of unworked materials in controlled-access storage.

The Secretary shall submit a report of such review to the Committee on Merchant Marine and Fisheries of the House of Representatives and the Committee on the Environment and Public Works of the Senate and make it available to the general public. Based on such review, the Secretary shall, on or before July 1, 1983, propose and adopt such revisions to such regulations as he deems necessary and appropriate to carry out this paragraph. Upon publication of such revised regulations, the Secretary may renew for a further period of not to exceed three years any certificate of exemption previously renewed under paragraph (8) of this subsection, subject to such new terms and conditions as are necessary and appropriate under the revised regulations; except that any certificate of exemption that would, but for this clause, expire on or after the date of enactent of this paragraph and before the date of the adoption of such regulations may be extended until such time after the date of adoption as may be necessary for purposes of applying such regulations to the certificate. Notwithstanding the foregoing, however, no person may, after January 31, 1984, sell or offer for sale in interstate or foreign commerce any pre-act finished scrimshaw product unless such person has been issued a valid certificate of exemption by the Secretary under this subsection and unless such product or the raw material for such product was held by such person on the date of the enactment of this paragraph.

\*          \*          \*          \*          \*          \*          \*

(h) CERTAIN ANTIQUE ARTICLES.—(1) Sections 4(d), 9(a), and 9(c) do not apply to any article [(other than scrimshaw)] which—

[(A) was made before 1830;]

(A) is not less than 100 years of age;

\*          \*          \*          \*          \*          \*          \*

(j) EXPERIMENTAL POPULATIONS.—(1) For purposes of this subsection, the term "experimental population" means any population authorized by the Secretary for release under paragraph (2), but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species.

(2) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the

**Addendum 171a**

*current range of such species if the Secretary determines that such release will further the conservation of such species.*

*(3) For purposes of this Act—*

> *(A) if an experimental population is of an endangered species or threatened species that the Secretary has determined, on the best available biological evidence, to be in decline and in imminent danger of extinction, such experimental population shall also be treated as a threatened species listed under section 4; or*

> *(B) if an experimental population is of an endangered species or threatened species not described in subparagraph (A), the experimental population shall (except for section 7) be treated as a threatened species listed under sction 4; but for purposes of applying section 7, the population shall, except for such time as it occurs in an area within the National Wildlife Refuge System or the National Park System, be treated as a species proposed to be listed under section 4 (but the provisions relating to critical habitat shall not apply).*

*(4) The Secretary, with respect to any population of an endangered species or threatened species that the Secretary authorized, before the date of the enactment of this subsection, for release in a geographical area separate from other populations of such species, shall determine by regulation whether such population is an experimental population for the purposes of this subsection.*

### ⟦AUTHORIZATION OF APPROPRIATIONS

⟦SEC. 15. Except as authorized in sections 6 and 7 of this Act, there are authorized to be appropriated—

> ⟦(1) not to exceed $23,000,000 for each of fiscal years 1979 and 1980, not to exceed $25,000,000 for fiscal year 1981, and not to exceed $27,000,000 for fiscal year 1982 to enable the Department of the Interior to carry out such functions and responsibilities as it may have been given under the Act;

> ⟦(2) not to exceed $2,500,000 for each of fiscal years 1979 and 1980, not to exceed $3,000,000 for fiscal year 1981, and not to exceed $3,500,000 for fiscal year 1982 to enable the Department of Commerce to carry out such functions and responsibilities as it may have been given under this Act; and

> ⟦(3) not to exceed $1,500,000 for fiscal year 1980, not to exceed $1,750,000 for fiscal year 1981, and not to exceed $1,850,000 for fiscal year 1982 to enable the Department of Agriculture to carry out its functions and responsibilities with respect to the enforcement of this Act and the Convention which pertain to the importation or exportation of terrestrial plants.⟧

### AUTHORIZATION OF APPROPRIATIONS

*SEC. 15. Except as authorized in sections 6, 7, and 8 of this Act, there are authorized to be appropriated the following sums:*

> *(1) To enable the Department of the Interior to carry out such functions and responsibilities as it may have been given under this Act:*

>> *(A) Not to exceed $27,000,000 for each of fiscal years 1983, 1984, and 1985.*

**Addendum 172a**

79

*(2) To enable the Department of Commerce to carry out such functions and responsibilities as it may have been given under this Act:*

*(A) Not to exceed $3,500,000 for each of fiscal years 1983, 1984, and 1985.*

*(3) To enable the Department of Agriculture to carry out its functions and responsibilities with respect to the enforcement of this Act and the Convention which pertain to the importation or exportation of plants:*

*(A) Not to exceed $1,850,000 for each of fiscal years 1983, 1984, and 1985.*

**Addendum 173a**

## ADDITIONAL VIEWS OF HON. GENE SNYDER ON H.R. 6133

This legislation would extend the Endangered Species Act for Fiscal Years 1983, 1984, and 1985 to carry out the provisions thereof. For each of these years, the Department of the Interior would receive $27 million, the Department of Commerce would receive $3.5 million, and the Department of Agriculture would receive $1.85 million.

The Department of the Interior has recommended that the Act be extended for one year. Under their proposal, the Department of the Interior would be authorized $16.6 million for fiscal year 1983. The Department of Commerce has requested an authorization of $2.2 million for fiscal year 1983 and such sums as may be necessary for fiscal year 1984.

The legislation would require the Secretary of the Interior to undertake certain activities in order to implement the Treaty on Nature Protection and Wildlife Preservation in the Western Hemisphere. In order to accomplish this, the Secretary would be authorized $150,000 for fiscal year 1983 and 1984 and $300,000 for fiscal year 1985. The Administration opposes implementation of the Treaty at this time.

The bill further amends existing law by extending the state grant program for endangered species for the next three fiscal years with $6 million provided for each of those years. The Administration opposes the continuation of this program.

Finally, section 3 authorizes $600,000 per year for Fiscal Years 1983, 1984 and 1985 for the Endangered Species Committee. The Department of Interior has not taken a formal position on this amendment.

GENE SYNDER.

(80)

O

**Addendum 174a**

The Department strongly supports the proposed addition to Section 4 of provision (b)(5)(B) which: (1) provides for notification, in so far as practical, in cooperation with the Department of State of regulations relating to listing of species to foreign nations: (a) in which species are believed to occur or (b) whose citizens harvest the species on the high seas, and (2) would invite comments from foreign nations. If this proposed provision is enacted, the Department will make every effort to cooperate in implementing it.

The Department understands the rationale for the proposal to amend Section 8A(c) on the functions of the United States Scientific Authority in implementing the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). We consider proposed paragraph 8A(c)(2) to be a substantial improvement on earlier proposals which have been offered to amend the Act, particularly in the light of recent court decisions relating to export of bobcat, as the proposed paragraph would retain the authority of the Secretary of the Interior to make "no detriment" determinations and not *require* that he *use or not use* any specific method in arriving at such determinations.

There are three technical points we would make, however, concerning the proposed amendment at Section 8(2) of S. 2309. First, the words "from the sea" should be added after "introduction" in the first and third sentences to be consistent with the wording of the Convention. Second, the proposal makes reference only to Article IV and Appendix II of the Convention. We question whether Article III and Appendix I of CITES should not also be included in this reference. Although trade in Appendix I species is regulated differently than that of Appendix II species (no commercial trade in the former), the Secretary of Interior, acting as our scientific authority, must make a finding of no detriment to survival of the species for exports and introduction from the sea of specimens on either appendix. The Secretary should be able to base such a determination on the appropriate criteria in either case. To include only Appendix II species in this section creates an implication that the standard is different for Appendix I species. Third, the Department suggests that in the last two sentences of this section, the phrase "professionally accepted" be used in place of the word "reliable" relating to "wildlife management practices." This would make clear that the practices which the United States considers as an appropriate basis for no detriment findings are generally accepted by the wildlife management profession.

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

POWELL A. MOORE,
*Assistant Secretary for Congressional Relations.*

CHANGES IN EXISTING LAW

In the opinion of the Committee, it is necessary to dispense with the requirements of subsection (f) of rule XXIX of the Standing Rules of the Senate in order to expedite the business of the Senate.

O

**Addendum 175a**

USCA Case #24-5101    Document #2083247    Filed: 11/01/2024    Page 178 of 360

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter H. Ocean Dumping
            Part 233. 404 State Program Regulations (Refs & Annos)
               Subpart C. Permit Requirements

40 C.F.R. § 233.20

§ 233.20 Prohibitions.

Currency

No permit shall be issued by the Director in the following circumstances:

(a) When permit does not comply with the requirements of the Act or regulations thereunder, including the section 404(b)(1) Guidelines (part 230 of this chapter).

(b) When the Regional Administrator has objected to issuance of the permit under § 233.50 and the objection has not been resolved.

(c) When the proposed discharges would be in an area which has been prohibited, withdrawn, or denied as a disposal site by the Administrator under section 404(c) of the Act, or when the discharge would fail to comply with a restriction imposed thereunder.

(d) If the Secretary determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired.

SOURCE: 53 FR 20776, 20777, 20779, 20780, 20782, 20783, June 6, 1988; 59 FR 9933, March 2, 1994, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through October 24, 2024, 89 FR 85034. Some sections may be more current. See credits for details.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Addendum 176a**

Code of Federal Regulations
   Title 50. Wildlife and Fisheries
      Chapter I. United States Fish and Wildlife Service, Department of the Interior
         Subchapter B. Taking, Possession, Transportation, Sale, Purchase, Barter, Exportation, and Importation of Wildlife
         and Plants
            Part 17. Endangered and Threatened Wildlife and Plants (Refs & Annos)
               Subpart B. Lists (Refs & Annos)

50 C.F.R. § 17.11

§ 17.11 Endangered and threatened wildlife.

Effective: October 7, 2024 to November 24, 2024
Currentness

<Text of section effective until Nov. 25, 2024.>

(a) The list in paragraph (h) of this section contains the wildlife species determined by the Service or the National Marine Fisheries Service (NMFS) of the Department of Commerce's National Oceanic and Atmospheric Administration (hereafter in this section referred to as "the Services") to be endangered species or threatened species. It also contains the wildlife species treated as endangered species or threatened species because they are similar in appearance to and may be confused with endangered or threatened species (see §§ 17.50 through 17.52). The "Common name," "Scientific name," "Where listed," and "Status" columns provide regulatory information; together, they identify listed wildlife species within the meaning of the Act and describe where they are protected. When a taxon has more than one entry, the "Where listed" or "Status" column will identify its status in each relevant geographic area. The listing of a particular taxon includes all lower taxonomic units.

(b) "Common name" column. Although common names are included, they cannot be relied upon for identification of any specimen, since they may vary greatly in local usage. In cases where confusion might arise, one or more synonyms are provided in parentheses within the "Common name" column. If a species has been listed as an Evolutionarily Significant Unit (ESU) or a Distinct Vertebrate Population Segment (DPS), the ESU or DPS names will be provided in brackets "[ ]" following the common name.

(c) "Scientific name" column. The Services use the most recently accepted scientific name. In cases where confusion might arise, one or more synonyms are provided in parentheses within the "Scientific name" column. The Services rely, to the extent practicable, on the Integrated Taxonomic Information System (ITIS) to determine a species' scientific name. ITIS incorporates the naming principles established by the International Code of Zoological Nomenclature (see paragraph (g) of this section). If the scientific name in ITIS differs from the scientific name adopted for use under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), the CITES nomenclature is provided in brackets "[ ]" within the "Scientific name" column following the ITIS nomenclature.

(d) "Where listed" column. The "Where listed" column sets forth the geographic area where the species is listed for purposes of the Act. Except when providing a geographic description of a DPS or ESU, or an experimental population designation, "Wherever found" will be used to indicate the Act's protections apply to all individuals of the species, wherever found.

(e) "Status" column. Within the "Status" column, the following abbreviations are used:

| Abbreviation | Regulatory status the abbreviation represents |
|---|---|
| E....................................................................... | Endangered species. |
| T....................................................................... | Threatened species. |
| E (S/A)............................................................. | Endangered based on similarity of appearance to an existing listed species. |
| T (S/A)............................................................. | Threatened based on similarity of appearance to an existing listed species. |
| XE.................................................................... | Essential experimental population (See subpart H of this part). |
| XN.................................................................... | Nonessential experimental population (See subpart H of this part). |

(f) "Listing Citations and Applicable Rules" column. The "Listing Citations and Applicable Rules" column is nonregulatory in nature and is provided for informational and navigational purposes only.

(1) Within the "Listing Citations and Applicable Rules" column, the following superscripts are used:

| Superscript | Description of citation or rule |
|---|---|
| N....................................................................... | NMFS listing citation (NMFS Lead). |
| J........................................................................ | Both FWS and NMFS listing citation (Joint Jurisdiction). |
| CH..................................................................... | Critical habitat rule. |
| 4d....................................................................... | Species-specific "4(d)" rule (a rule issued under the authority of section 4(d) of the Act). |
| 10j..................................................................... | Species-specific "10(j)" rule (a rule issued under the authority of section 10(j) of the Act). |

(2) Listing citations contain the volume, document starting page number, and publication date of the Federal Register publication(s) in which a species was given status, listed, or reclassified. At least since 1973, these documents have included a statement indicating the basis for the listing, as well as the effective date(s) of the listing or other rules that changed how the species was identified in the List in paragraph (h) of this section.

(3) "Critical habitat" and "Species-specific" rules superscripts provide cross-references to other sections in this part or part 222, 223, or 226 of chapter II of this title where critical habitat and species-specific rules are found. The species-specific

superscripts also identify experimental populations. Experimental populations (superscript "10j") are a separate citation, with one of the following symbols in the "Status" column: "XE" for an essential experimental population and "XN" for a nonessential experimental population.

(4) This column is for reference and navigational purposes only. All other appropriate rules in this part, parts 217 through 226 of chapter II of this title, and part 402 of chapter IV of this title apply, if no species-specific rules are referenced. In addition, other rules in this title could relate to such species (for example, port-of-entry requirements). The references in the "Listing Citations and Applicable Rules" column do not comprise a comprehensive list of all regulations that the Services might apply to the species or to the regulations of other Federal agencies or State or local governments.

(g) The Services will rely to the extent practicable on ITIS (http://www.itis.gov) and standard references adopted for CITES (http://cites.org).

(h) The "List of Endangered and Threatened Wildlife" is provided in the table in this paragraph (h):

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| **Mammals** | | | | |
| Addax.............................. | Addax nasomaculatus....... | Wherever found..................... | E | 70 FR 52319; 9/2/2005. |
| Anoa, lowland.................. | Bubalus depressicornis...... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Anoa, mountain................ | Bubalus quarlesi.............. | Wherever found..................... | E | 41 FR 24061; 6/14/1976. |
| Antelope, giant sable......... | Hippotragus niger variani.. | Wherever found..................... | E | 41 FR 24061; 6/14/1976. |
| Antelope, Tibetan............. | Pantholops hodgsonii........ | Wherever found..................... | E | 71 FR 15620; 3/29/2006. |
| Argali [All populations except Kyrgyzstan, Mongolia, and Tajikistan].. | Ovis ammon.................... | Wherever found except Kyrgyzstan, Mongolia, and Tajikistan................................ | E | 41 FR 24061; 6/14/1976, 57 FR 28014; 6/23/1992. |
| Argali [Kyrgyzstan, Mongolia, and Tajikistan].. | Ovis ammon.................... | Kyrgyzstan, Mongolia, and Tajikistan................................ | T | 41 FR 24061; 6/14/1976, 57 FR 28014; 6/23/1992, 50 CFR 17.40(j) [4d]. |
| Armadillo, giant............... | Priodontes maximus.......... | Wherever found..................... | E | 41 FR 24061; 6/14/1976. |
| Armadillo, pink fairy........ | Chlamyphorus truncatus.... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |

USCA Case #24-5101      Document #2083247      Filed: 11/01/2024      Page 182 of 360

| | | | | |
|---|---|---|---|---|
| Ass, African wild.............. | Equus africanus............... | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 42 FR 15971; 3/24/1977. |
| Ass, Asian wild................ | Equus hemionus............... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Avahi................................ | Avahi laniger (=entire genus)................................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Aye-aye............................ | Daubentonia madagascariensis............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Babirusa........................... | Babyrousa babyrussa........ | Wherever found...................... | E | 41 FR 24061; 6/14/1976. |
| Baboon, gelada................. | Theropithecus gelada........ | Wherever found...................... | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d]. |
| Bandicoot, barred.............. | Perameles bougainville.... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Bandicoot, desert.............. | Perameles eremiana......... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Bandicoot, lesser rabbit..... | Macrotis leucura.............. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Bandicoot, pig-footed........ | Chaeropus ecaudatus......... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Bandicoot, rabbit.............. | Macrotis lagotis............... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Banteng........................... | Bos javanicus................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Bat, Bulmer's fruit (flying fox)................................ | Aproteles bulmerae........... | Wherever found...................... | E | 49 FR 2779; 1/23/1984. |
| Bat, bumblebee................. | Craseonycteris thonglongyai.................... | Wherever found...................... | E | 49 FR 2779; 1/23/1984. |
| Bat, Florida bonneted........ | Eumops floridanus............ | Wherever found...................... | E | 78 FR 61004, 10/2/2013; 50 CFR 17.95(a). [CH] |
| Bat, gray.......................... | Myotis grisescens............. | Wherever found...................... | E | 41 FR 17736; 4/28/1976. |
| Bat, Hawaiian hoary (opeapea)......................... | Aeorestes semotus............ | Wherever found...................... | E | 35 FR 16047, 10/13/1970. |

---

| | | | | |
|---|---|---|---|---|
| Bat, Indiana..................... | Myotis sodalis................. | Wherever found..................... | E | 32 FR 4001; 3/11/1967, 50 CFR 17.95(a)[CH]. |
| Fruit Bat, Mariana (=fanihi, Mariana flying fox)............................. | Pteropus mariannus mariannus......................... | Wherever found..................... | T | 49 FR 33881; 8/27/1984; 70 FR 1190; 1/6/2005, 50 CFR 17.95(a)[CH]. |
| Bat, Mexican long-nosed... | Leptonycteris nivalis......... | Wherever found..................... | E | 53 FR 38456; 9/30/1988. |
| Bat, northern long-eared.... | Myotis septentrionalis....... | Wherever found..................... | E | 80 FR 17974, 4/2/2015; 87 FR 73488, 11/30/22. |
| Bat, Ozark big-eared......... | Corynorhinus (=Plecotus) townsendii ingens............. | Wherever found..................... | E | 44 FR 69206; 11/30/1979. |
| Bat, Pacific sheath-tailed (Mariana subspecies) (Payeyi, Paischeey).......... | Emballonura semicaudata rotensis........................... | Wherever found..................... | E | 80 FR 59423; 10/1/2015. |
| Bat, Pacific sheath-tailed (South Pacific subspecies) (= peapea vai, American Samoa; = tagiti, Samoa; = beka beka, Fiji)................. | Emballonura semicaudata semicaudata..................... | Wherever found..................... | E | 81 FR 65466; 09/22/2016. |
| Bat, Rodrigues fruit (flying fox)................................. | Pteropus rodricensis.......... | Wherever found..................... | E | 49 FR 2779; 1/23/1984. |
| Bat, Singapore roundleaf horseshoe......................... | Hipposideros ridleyi.......... | Wherever found..................... | E | 49 FR 2779; 1/23/1984. |
| Bat, Virginia big-eared...... | Corynorhinus (=Plecotus) townsendii virginianus...... | Wherever found..................... | E | 44 FR 69206; 11/30/1979, 50 CFR 17.95(a)[CH]. |
| Bear, Baluchistan.............. | Ursus thibetanus gedrosianus...................... | Wherever found..................... | E | 51 FR 17977; 5/16/1986. |
| Bear, brown [Italy]............ | Ursus arctos arctos............ | Italy......................................... | E | 41 FR 24062; 6/14/1976, 41 FR 26019; 6/24/1976. |
| Bear, brown.................... | Ursus arctos pruinosus...... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Bear, grizzly.................... | Ursus arctos horribilis....... | U.S.A., conterminous (lower 48) States, except where listed as an experimental population.. | T | 32 FR 4001, 3/11/1967; 35 FR 16047, 10/13/1970; |

| Common name | Scientific name | Historic range | Status | When listed / citation |
|---|---|---|---|---|
| | | | | 40 FR 31734, 7/28/1975; |
| | | | | 72 FR 14866, 3/29/2007; |
| | | | | 75 FR 14496, 3/26/2010; |
| | | | | 82 FR 30502, 6/30/2017; |
| | | | | 84 FR 37144, 7/31/2019; |
| | | | | 50 CFR 17.40(b) 4d. |
| Bear, grizzly [Bitterroot XN].................................. | Ursus arctos horribilis....... | U.S.A. (portions of ID and MT; see § 17.84(l))................ | XN | 65 FR 69624, 11/17/2000; 50 CFR 17.84(l) 10j. |
| Bear, grizzly [North Cascades XN]................... | Ursus arctos horribilis....... | U.S.A. (WA, except the portion of northeastern Washington defined by the Kettle River from the international border with Canada, downstream to the Columbia River to its confluence with the Spokane River, then upstream on the Spokane River to the WA-ID border; see § 17.84(y))............ | XN | 89 FR 36982, 5/3/2024; |
| | | | | 50 CFR 17.84(y) 10j. |
| Bear, Mexican grizzly....... | Ursus arctos..................... | Mexico.................................... | E | 35 FR 8491; 6/2/1970. |
| Bear, polar........................ | Ursus maritimus............... | Wherever found...................... | T | 73 FR 28212, 5/15/2008, 50 CFR 17.40(q) 4d, 50 CFR 17.95(a) CH. |
| Beaver (Mongolia)............ | Castor fiber birulai............ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Bison, wood.................... | Bison bison athabascae..... | Wherever found, except where listed as an experimental population................................ | T | 35 FR 8491; 6/2/1970, 77 FR 26191; 5/3/2012. |
| Bison, wood.................... | Bison bison athabascae...... | U.S.A. (Alaska)....................... | XN | 79 FR 26175; 5/7/2014, 50 CFR 17.84(x) 10j. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   **Addendum 182a**   6

| Cat, Andean | | | | |
|---|---|---|---|---|
| Bobcat, Mexican | Lynx (=Felis) rufus escuinapae | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Bontebok (antelope) | Damaliscus pygarus (=dorcas) dorcas | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Camel, Bactrian | Camelus bactrianus | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Caribou, barren-ground [Dolphin and Union caribou DPS] | Rangifer tarandus groenlandicus | Canada (Victoria Island, Coronation Gulf, Dolphin and Union Strait, Dease Strait, and Canadian Mainland in Nunavut and Northwest Territories) | E | 87 FR 76112, 12/13/2022. |
| Caribou, woodland [Southern Mountain DPS]. | Rangifer tarandus caribou.. | U.S.A. (wherever found), Canada (southeastern British Columbia) | E | 48 FR 1722, 1/14/1983; 48 FR 49245, 10/25/1983; 49 FR 7390, 2/29/1984; 84 FR 52598, Oct. 2, 2019; 50 CFR 17.95(a).$^{CH}$ |
| Cat, Andean | Felis jacobita | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cat, Asian golden (=Temminck's) | Catopuma (=Felis) temminckii | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cat, black-footed | Felis nigripes | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cat, flat-headed | Prionailurus (=Felis) planiceps | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cat, Iriomote | Prionailurus (=Felis) bengalensis iriomotensis | Wherever found | E | 44 FR 37124; 6/25/1979. |
| Cat, leopard | Prionailurus (=Felis) bengalensis bengalensis | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cat, marbled | Pardofelis (=Felis) marmorata | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cat, Pakistan sand | Felis margarita scheffeli | Wherever found | E | 49 FR 2779; 1/23/1984. |
| Cat, tiger | Leopardus (=Felis) tigrinus | Wherever found | E | 37 FR 6476; 3/30/1972. |
| Chamois, Apennine | Rupicapra rupicapra ornata | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Cheetah | Acinonyx jubatus | Wherever found | E | 35 FR 8491; 6/2/1970, 37 FR 6476; 3/30/1972. |

| | | | | |
|---|---|---|---|---|
| Chimpanzee..................... | Pan troglodytes................ | Wherever found...................... | E | 41 FR 45990; 10/19/1976, 55 FR 9129; 3/12/1990, 80 FR 34500; 6/16/2015. |
| Chimpanzee, pygmy......... | Pan paniscus.................... | Wherever found...................... | E | 41 FR 45990; 10/19/1976, 55 FR 9129; 3/12/1990. |
| Chinchilla........................ | Chinchilla brevicaudata boliviana.......................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Civet, Malabar large-spotted............................. | Viverra civettina (=megaspila c.)................ | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Deer, Bactrian.................. | Cervus elaphus bactrianus. | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Deer, Barbary.................. | Cervus elaphus barbarus.... | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Deer, Calamianes (=Philippine)................... | Axis porcinus calamianensis................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Deer, Cedros Island mule.. | Odocoileus hemionus cedrosensis..................... | Wherever found...................... | E | 40 FR 44149; 9/25/1975. |
| Deer, Columbian white-tailed [Columbia River DPS]............................. | Odocoileus virginianus leucurus.......................... | Columbia River (Clark, Cowlitz, Pacific, Skamania, and Wahkiakum Counties, WA, and Clatsop, Columbia, and Multnomah Counties, OR)....... | T | 32 FR 4001; 3/11/1967, 68 FR 43647; 7/24/2003, 81 FR 71408 10/17 2016, 50 CFR 17.40(i) [4d]. |
| Deer, Corsican red........... | Cervus elaphus corsicanus. | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Deer, Eld's brow-antlered.. | Cervus eldi..................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Deer, Formosan sika......... | Cervus nippon taiouanus... | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Deer, Indochina hog.......... | Axis (=Cervus) porcinus annamiticus.................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Deer, key........................ | Odocoileus virginianus clavium......................... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Deer, Kuhl's (=Bawean).... | Axis porcinus kuhli........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |

| | | | | |
|---|---|---|---|---|
| Deer, marsh.................... | Blastocerus dichotomus..... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Deer, McNeill's................ | Cervus elaphus macneilii... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Deer, musk...................... | Moschus spp. (all species). | Afghanistan, Bhutan, Burma, China (Tibet, Yunnan), India, Nepal, Pakistan, Sikkim........... | E | 41 FR 24062; 6/14/1976. |
| Deer, North China sika...... | Cervus nippon mandarinus | Wherever found.................... | E | 44 FR 37124; 6/25/1979. |
| Deer, pampas.................. | Ozotoceros bezoarticus..... | Wherever found.................... | E | 41 FR 24062; 6/14/1976. |
| Deer, Persian fallow.......... | Dama mesopotamica (=dama m.)...................... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Deer, Ryukyu sika............. | Cervus nippon keramae..... | Wherever found.................... | E | 44 FR 37124; 6/25/1979. |
| Deer, Shansi sika.............. | Cervus nippon grassianus.. | Wherever found.................... | E | 44 FR 37124; 6/25/1979. |
| Deer, South China sika...... | Cervus nippon kopschi...... | Wherever found.................... | E | 44 FR 37124; 6/25/1979. |
| Deer, swamp.................... | Cervus duvauceli.............. | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Deer, Visayan.................. | Cervus alfredi................. | Wherever found.................... | E | 53 FR 33990; 9/1/1988. |
| Deer, Yarkand.................. | Cervus elaphus yarkandensis.................... | Wherever found.................... | E | 44 FR 37124; 6/25/1979. |
| Dhole............................. | Cuon alpinus................... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Dibbler........................... | Antechinus apicalis........... | Wherever found.................... | E | 35 FR 18319; 12/2/1970. |
| Dog, African wild............. | Lycaon pictus................... | Wherever found.................... | E | 49 FR 2779; 1/23/1984. |
| Dolphin, Chinese river...... | Lipotes vexillifer.............. | Wherever found.................... | E | 54 FR 22906; 5/30/1989 [N], 54 FR 22905; 5/30/1989. |
| Dolphin, Hector's............. | Cephalorhynchus hectori hectori............................ | Wherever found.................... | T | 82 FR 43701; 9/19/2017; [N] 84 FR 13809; 4/8/2019. |

| Dolphin, Maui | Cephalorhynchus hectori maui | Wherever found | E | 82 FR 43701, 9/19/2017; [N] 84 FR 13809, 4/8/2019. |
| Dolphin, South Asian River (Indus River subspecies) | Platanista gangetica minor. | Wherever found | E | 55 FR 50835; 12/11/1990 [N], 56 FR 1463; 1/14/1991. |
| Dolphin, Taiwanese humpback | Sousa chinensis taiwanensis | Wherever found | E | 83 FR 21182, 5/9/2018; [N] 84 FR 13809, 4/8/2019. |
| Drill | Mandrillus (=Papio) leucophaeus | Wherever found | E | 41 FR 45990; 10/19/1976. |
| Dugong | Dugong dugon | Wherever found | E | 35 FR 18319; 12/2/1970, 68 FR 70185; 12/17/2003. |
| Duiker, Jentink's | Cephalophus jentinki | Wherever found | E | 44 FR 37124; 6/25/1979. |
| Eland, western giant | Taurotragus derbianus derbianus | Wherever found | E | 44 FR 37124; 6/25/1979. |
| Elephant, African | Loxodonta africana | Wherever found | T | 43 FR 20499; 5/12/1978, 50 CFR 17.40(e) [4d]. |
| Elephant, Asian | Elephas maximus | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Ferret, black-footed | Mustela nigripes | Wherever found, except where listed as an experimental population | E | 32 FR 4001, 3/11/1967; 35 FR 16047, 10/13/1970. |
| Ferret, black-footed | Mustela nigripes | U.S.A. (parts of WY (Shirley Basin/Medicine Bow Management Area); see § 17.84(g)(9)(i)) | XN | 56 FR 41473, 8/21/1991; 50 CFR 17.84(g). [10j] |
| Ferret, black-footed | Mustela nigripes | U.S.A. (parts of SD (Conata Basin/Badlands Reintroduction Area); see § 17.84(g)(9)(ii)) | XN | 59 FR 42682, 8/18/1994; |

50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Ferret, black-footed.......... | Mustela nigripes.............. | U.S.A. (parts of MT (Northcentral Montana Reintroduction Area); see § 17.84(g)(9)(iii))...................... | XN....................................... | 59 FR 42696, 8/18/1994; |

50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Ferret, black-footed.......... | Mustela nigripes.............. | U.S.A. (parts of AZ, NM, UT (Southwest Experimental Population Area), see § 17.84(g)(9)(iv))...................... | XN....................................... | 61 FR 11320, 3/20/1996; |

88 FR
69045,
10/5/2023;
50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Ferret, black-footed.......... | Mustela nigripes.............. | U.S.A. (parts of CO, UT (Northwestern Colorado/ Northeastern Utah Experimental Population Area), see § 17.84(g)(9)(v))..... | XN....................................... | 63 FR 52824, 10/1/1998; |

50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Ferret, black-footed.......... | Mustela nigripes.............. | U.S.A. (parts of SD (Cheyenne River Sioux Tribe Reintroduction Area), see § 17.84(g)(9)(vi))...................... | XN....................................... | 65 FR 60879, 10/13/2000; |

50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Ferret, black-footed.......... | Mustela nigripes.............. | U.S.A. (parts of SD (Rosebud Sioux Reservation Experimental Population Area), see § 17.84(g)(9)(vii))... | XN....................................... | 68 FR 26498, 5/16/2003; |

50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Ferret, black-footed.......... | Mustela nigripes.............. | U.S.A. (most of WY (Wyoming Experimental Population Area), see § 17.84(g)(9)(viii))...................... | XN....................................... | 80 FR 66821, 10/30/2015; |

50 CFR
17.84(g). [10j]

| | | | | |
|---|---|---|---|---|
| Fisher (Southern Sierra Nevada DPS).................... | Pekania pennanti................ | U.S.A. (Southern Sierra Nevada, CA)........................... | E | 85 FR 29532, 5/15/2020. |
| Fox, northern swift............ | Vulpes velox hebes........... | Canada...................................... | E | 35 FR 8491; 6/2/1970. |
| Fox, San Joaquin kit......... | Vulpes macrotis mutica..... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Fox, Santa Catalina Island. | Urocyon littoralis catalinae | Wherever found...................... | T | 69 FR 10335; 3/5/2004 |
| | | | | 81 FR 53315; 8/12/2016, 50 CFR 17.95 (a)<sup>CH</sup> |
| Fox, Sierra Nevada red [Sierra Nevada DPS]......... | Vulpes vulpes necator....... | U.S.A. (CA)—Sierra Nevada... | E | 86 FR 41743, 8/3/2021. |
| Fox, Simien..................... | Canis simensis................. | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Gazelle, Arabian............... | Gazella gazella................. | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Gazelle, Clark's................ | Ammodorcas clarkei.......... | Wherever found...................... | E | 35 FR 8491, 6/2/1970. |
| Gazelle, dama.................. | Gazella dama.................... | Wherever found...................... | E | 70 FR 52319; 9/2/2005, 35 FR 8491; 6/2/1970. |
| Gazelle, Moroccan............ | Gazella dorcas massaesyla. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Gazelle, mountain (=Cuvier's)...................... | Gazella cuvieri................. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Gazelle, Pelzeln's............. | Gazella dorcas pelzelni...... | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Gazelle, sand................... | Gazella subgutturosa marica............................. | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Gazelle, Saudi Arabian...... | Gazella dorcas saudiya...... | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Gazelle, slender-horned..... | Gazella leptoceros............ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Gibbons........................... | Hylobates spp. (including Nomascus )....................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/14/1976. |
| Goral............................... | Nemorhaedus goral........... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |

| | | | | |
|---|---|---|---|---|
| Gorilla..................... | Gorilla gorilla................. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Hare, hispid.................... | Caprolagus hispidus.......... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Hartebeest, Swayne's......... | Alcelaphus buselaphus swaynei........................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/14/1976. |
| Hartebeest, Tora............... | Alcelaphus buselaphus tora.................................. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Hog, pygmy..................... | Sus salvanius.................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Horse, Przewalski's........... | Equus przewalskii............. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Huemul, north Andean...... | Hippocamelus antisensis... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Huemul, south Andean...... | Hippocamelus bisulcus...... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Hutia, Cabrera's............... | Capromys angelcabrerai.... | Wherever found..................... | E | 51 FR 17977; 5/16/1986. |
| Hutia, dwarf.................... | Capromys nana................ | Wherever found..................... | E | 51 FR 17977; 5/16/1986. |
| Hutia, large-eared............. | Capromys auritus............. | Wherever found..................... | E | 51 FR 17977; 5/16/1986. |
| Hutia, little earth.............. | Capromys sanfelipensis..... | Wherever found..................... | E | 51 FR 17977; 5/16/1986. |
| Hyena, Barbary................. | Hyaena hyaena barbara..... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Hyena, brown.................. | Parahyaena (=Hyaena) brunnea........................... | Wherever found..................... | E | 35 FR 8491, 6/2/1970. |
| Ibex, Pyrenean.................. | Capra pyrenaica pyrenaica. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Ibex, Walia..................... | Capra walie..................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Impala, black-faced........... | Aepyceros melampus petersi............................. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Indri............................ | Indri indri (=entire genus). | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Jaguar........................... | Panthera onca.................. | Wherever found..................... | E | 37 FR 6476; 3/30/1972, |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 62 FR 39147; 7/22/1997, 50 CFR 17.95(a)[CH]. |
| Jaguarundi, Guatemalan.... | Herpailurus (=Felis) yagouaroundi fossata........ | Wherever found..................... | | E | 41 FR 24062; 6/14/1976. |
| Jaguarundi, Gulf Coast...... | Puma yagouaroundi cacomitli.......................... | Wherever found..................... | | E | 41 FR 24062; 6/14/1976. |
| Jaguarundi, Panamanian.... | Herpailurus (=Felis) yagouaroundi panamensis. | Wherever found..................... | | E | 41 FR 24062; 6/14/1976. |
| Jaguarundi, Sinaloan......... | Puma yagouaroundi tolteca | Wherever found..................... | | E | 41 FR 24062; 6/14/1976. |
| Kangaroo rat, Fresno......... | Dipodomys nitratoides exilis................................ | Wherever found..................... | | E | 50 FR 4222; 1/30/1985, 50 CFR 17.95(a)[CH]. |
| Kangaroo rat, giant............ | Dipodomys ingens............ | Wherever found..................... | | E | 52 FR 283; 1/5/1987. |
| Kangaroo rat, Morro Bay.. | Dipodomys heermanni morroensis...................... | Wherever found..................... | | E | 35 FR 16047; 10/13/1970, 50 CFR 17.95(a)[CH]. |
| Kangaroo rat, San Bernardino Merriam's....... | Dipodomys merriami paryus.............................. | Wherever found..................... | | E | 63 FR 3835, 1/27/1998; 63 FR 51005, 9/24/1998; 50 CFR 17.95(a).[CH] |
| Kangaroo rat, Stephens'..... | Dipodomys stephensi (incl. D. cascus)............... | Wherever found..................... | | T | 53 FR 38465, 9/30/1988; 87 FR 8967; 2/17/2022; 50 CFR 17.40(t).[4d] |
| Kangaroo rat, Tipton......... | Dipodomys nitratoides nitratoides........................ | Wherever found..................... | | E | 53 FR 25608; 7/8/1988. |
| Kangaroo, Tasmanian forester............................ | Macropus giganteus tasmaniensis................. | Wherever found..................... | | E | 38 FR 14678; 6/4/1973. |
| Koala............................ | Phascolarctos cinereus..... | Australia................................ | | T | 65 FR 26762; 5/9/2000. |
| Kouprey.......................... | Bos sauveli..................... | Wherever found..................... | | E | 35 FR 8491; 6/2/1970. |
| Langur, capped................. | Trachypithecus (=Presbytis) pileatus......... | Wherever found..................... | | E | 41 FR 24062; 6/14/1976. |
| Langur, Douc................... | Pygathrix nemaeus........... | Wherever found..................... | | E | 35 FR 8491; 6/2/1970. |

| | | | | |
|---|---|---|---|---|
| Langur, Francois'.............. | Trachypithecus (=Presbytis) francoisi........ | Wherever found...................... | E | 41 FR 45990; 10/19/1976. |
| Langur, golden.................. | Trachypithecus (=Presbytis) geei.............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Langur, gray (=entellus).... | Semnopithecus (=Presbytis) entellus... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Langur, long-tailed............ | Presbytis potenziani.......... | Wherever found...................... | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d]. |
| Langur, Pagi Island........... | Nasalis concolor.............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Langur, purple-faced......... | Presbytis senex............... | Wherever found...................... | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d]. |
| Lechwe, red..................... | Kobus leche.................... | Wherever found...................... | T | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/14/1976, 45 FR 65132; 10/1/1980. |
| Lemurs........................... | Lemuridae (incl. genera Lemur, Phaner, Hapalemur, Lepilemur, Microcebus, Allocebus, Cheirogaleus, Varecia )..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/14/1976, 41 FR 26019; 6/24/1976. |
| Leopard........................... | Panthera pardus.......... | Wherever found, except where it is listed as threatened............ | E | 35 FR 8491; 6/2/1970, 37 FR 6476; 3/30/1972, 47 FR 4204; 1/28/1982. |
| Leopard [Southern Africa populations]...................... | Panthera pardus................ | In Africa, in the wild, south of, and including, the following countries: Gabon, Congo, Zaire, Uganda, Kenya.. | T | 35 FR 8491: 6/2/1970, 37 FR 6476; 3/30/1972, 47 FR 4204; 1/28/1982, 50 CFR 17.40(f) [4d]. |
| Leopard, clouded.............. | Neofelis nebulosa............ | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/14/1976. |
| Leopard, snow.................. | Uncia (=Panthera) uncia.... | Wherever found...................... | E | 37 FR 6476; 3/30/1972. |
| Linsang, spotted................ | Prionodon pardicolor......... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |

| | | | |
|---|---|---|---|
| Lion............................... Panthera leo leo............... Wherever found...................... | | E | 80 FR 79999; 12/23/2015. |
| Lion............................... Panthera leo melanochaita. Wherever found...................... | | T | 80 FR 79999; 12/23/2015, 50 CFR 17.40(r) [4d] . |
| Loris, lesser slow.............. Nycticebus pygmaeus....... Wherever found...................... | | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d] . |
| Lynx, Canada [Contiguous Lynx canadensis.............. Where found within U.S. DPS]........................ contiguous U.S.A................... | | T | 65 FR 16053; 3/24/2000, 50 CFR 17.40(k) [4d] , 50 CFR 17.95(a) [CH] . |
| Lynx, Spanish.................. Felis pardina.................... Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Macaque, Formosan rock.. Macaca cyclopis.............. Wherever found...................... | | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d] . |
| Macaque, Japanese............ Macaca fuscata............... Wherever found...................... | | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d] . |
| Macaque, lion-tailed......... Macaca silenus............... Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Macaque, stump-tailed...... Macaca arctoides............. Wherever found...................... | | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d] . |
| Macaque, Toque............... Macaca sinica.................. Wherever found...................... | | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d] . |
| Manatee, Amazonian........ Trichechus inunguis.......... Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Manatee, West African...... Trichechus senegalensis.... Wherever found...................... | | T | 44 FR 42910; 7/20/1979. |
| Manatee, West Indian........ Trichechus manatus........... Wherever found...................... | | T | 32 FR 4001, 3/11/1967; 35 FR 8491, 6/2/1970; 82 FR 16668, 4/5/2017; 50 CFR 17.108(a); 50 CFR 17.95(a). [CH] |

| Species | Scientific name | Where listed | Status | When listed |
|---|---|---|---|---|
| Mandrill | Mandrillus (=Papio) sphinx | Wherever found | E | 41 FR 45990; 10/19/1976. |
| Mangabey, Tana River | Cercocebus galeritus galeritus | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Mangabey, white-collared. | Cercocebus torquatus | Wherever found | E | 41 FR 45990; 10/19/1976. |
| Margay | Leopardus (=Felis) wiedii. | Wherever found | E | 37 FR 6476, 3/30/1972. |
| Markhor, chiltan (=wild goat) | Capra falconeri (=aegagrus) chiltanensis. | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Markhor, straight-horned | Capra falconeri megaceros | Wherever found | T | 41 FR 24062; 6/14/1976, 79 FR 60365; 10/7/2014, 50 CFR 17.40(d) [4d]. |
| Marmoset, buff-headed | Callithrix flaviceps | Wherever found | E | 49 FR 2779; 1/23/1984. |
| Marmoset, cotton-top | Saguinus oedipus | Wherever found | E | 41 FR 45990; 10/19/1976. |
| Marmoset, Goeldi's | Callimico goeldii | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Marmoset, white-eared (=buffy tufted-ear) | Callithrix aurita (=jacchus a.) | Wherever found | E | 51 FR 17977; 5/16/1986. |
| Marmot, Vancouver Island | Marmota vancouverensis | Wherever found | E | 49 FR 2779; 1/23/1984. |
| Marsupial, eastern jerboa. | Antechinomys laniger | Wherever found | E | 35 FR 18319; 6/2/1970. |
| Marsupial-mouse, large desert | Sminthopsis psammophila. | Wherever found | E | 35 FR 18319; 6/2/1970. |
| Marsupial-mouse, long-tailed | Sminthopsis longicaudata. | Wherever found | E | 35 FR 18319; 6/2/1970. |
| Marten, Formosan yellow-throated | Martes flavigula chrysospila | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Marten, Pacific [Coastal DPS] | Martes caurina | U.S.A. (CA (northwestern), OR (southwestern)) | T | 85 FR 63806, 10/8/2020; 50 CFR 17.40(s); [4d] |

| | | | | 50 CFR 17.95(a). [CH] |
|---|---|---|---|---|
| Monkey, black colobus...... | Colobus satanas............... | Wherever found...................... | E | 41 FR 45990; 10/19/1976. |
| Monkey, black howler....... | Alouatta pigra.................. | Wherever found...................... | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d]. |
| Monkey, Diana................. | Cercopithecus diana.......... | Wherever found...................... | E | 41 FR 45990; 10/19/1976. |
| Monkey, Guizhou snub-nosed............................. | Rhinopithecus brelichi...... | Wherever found...................... | E | 55 FR 39414; 9/27/1990. |
| Monkey, L'hoest's............ | Cercopithecus lhoesti........ | Wherever found...................... | E | 41 FR 45990; 10/19/1976. |
| Monkey, mantled howler... | Alouatta palliata............... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Monkey, Preuss' red colobus............................. | Procolobus (=Colobus) preussi (=badius p.)........... | Wherever found...................... | E | 49 FR 2779; 1/23/1984. |
| Monkey, proboscis............ | Nasalis larvatus................ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Monkey, red-backed squirrel............................ | Saimiri oerstedii............... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Monkey, red-bellied.......... | Cercopithecus erythrogaster..................... | Wherever found...................... | E | 41 FR 45990; 10/19/1976. |
| Monkey, red-eared nose-spotted............................. | Cercopithecus erythrotis... | Wherever found...................... | E | 41 FR 45990; 10/19/1976. |
| Monkey, Sichuan snub-nosed............................. | Rhinopithecus roxellana.... | Wherever found...................... | E | 55 FR 39414; 9/27/1990. |
| Monkey, spider................. | Ateles geoffroyi frontatus.. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Monkey, spider................. | Ateles geoffroyl panamensis...................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Monkey, Tana River red colobus............................. | Procolobus (=Colobus) rufomitratus (=badius r.).... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Monkey, Tonkin snub-nosed............................. | Rhinopithecus avunculus... | Wherever found...................... | E | 41 FR 45990; 10/19/1976, 55 FR 39414; 9/27/1990. |
| Monkey, woolly spider...... | Brachyteles arachnoides.... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |

| Monkey, yellow-tailed woolly | Lagothrix flavicauda | Wherever found | E | 41 FR 45990; 10/19/1976. |
| Monkey, Yunnan snub-nosed | Rhinopithecus bieti | Wherever found | E | 55 FR 39414; 9/27/1990. |
| Monkey, Zanzibar red colobus | Procolobus (=Colobus) pennantii (=kirki) kirki | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Mountain beaver, Point Arena | Aplodontia rufa nigra | Wherever found | E | 56 FR 64716; 12/12/1991. |
| Mouse, Alabama beach | Peromyscus polionotus ammobates | Wherever found | E | 50 FR 23872; 6/6/1985, 50 CFR 17.95(a)$^{CH}$. |
| Mouse, Anastasia Island beach | Peromyscus polionotus phasma | Wherever found | E | 54 FR 20598; 5/12/1989. |
| Mouse, Australian native | Notomys aquilo | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Mouse, Australian native | Zyzomys pedunculatus | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Mouse, Choctawhatchee beach | Peromyscus polionotus allophrys | Wherever found | E | 50 FR 23872; 6/6/1985, 50 CFR 17.95(a)$^{CH}$. |
| Mouse, Field's | Pseudomys fieldi | Wherever found | E | 35 FR 18319; 12/2/1970. |
| Mouse, Gould's | Pseudomys gouldii | Wherever found | E | 38 FR 14678; 6/4/1973. |
| Mouse, Key Largo cotton | Peromyscus gossypinus allapaticola | Wherever found | E | 48 FR 43040; 9/21/1983, 49 FR 34504; 8/31/1984. |
| Mouse, New Holland | Pseudomys novaehollandiae | Wherever found | E | 35 FR 18319; 12/2/1970. |
| Mouse, New Mexico meadow jumping | Zapus hudsonius luteus | Wherever found | E | 79 FR 33119; 6/10/2014, 50 CFR 17.95(a)$^{CH}$. |
| Mouse, Pacific pocket | Perognathus longimembris pacificus | Wherever found | E | 59 FR 5306; 2/3/1994, 59 FR 49752; 9/29/1994. |
| Mouse, Perdido Key beach | Peromyscus polionotus trissyllepsis | Wherever found | E | 50 FR 23872; 6/6/1985, 50 CFR 17.95(a)$^{CH}$. |

| | | | | |
|---|---|---|---|---|
| Mouse, Preble's meadow jumping............................ | Zapus hudsonius preblei.... | Wherever found...................... | T | 63 FR 26517; 5/13/1998, 78 FR 31679; 5/24/2013, 50 CFR 17.40(l) $^{4d}$, 50 CFR 17.95(a) $^{CH}$. |
| Mouse, salt marsh harvest. | Reithrodontomys raviventris........................ | Wherever found...................... | E | 35 FR 16047; 10/13/1970. |
| Mouse, Shark Bay............ | Pseudomys praeconis.... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Mouse, Shortridge's.......... | Pseudomys shortridgei..... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Mouse, smoky................. | Pseudomys fumeus........... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Mouse, southeastern beach | Peromyscus polionotus niveiventris........................ | Wherever found...................... | T | 54 FR 20598; 5/12/1989. |
| Mouse, St. Andrew beach.. | Peromyscus polionotus peninsularis...................... | Wherever found...................... | E | 63 FR 70053; 12/18/1998, 50 CFR 17.95(a) $^{CH}$. |
| Mouse, western................ | Pseudomys occidentalis..... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Muntjac, Fea's................. | Muntiacus feae................ | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Native-cat, eastern............ | Dasyurus viverrinus.......... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Numbat........................... | Myrmecobius fasciatus...... | Wherever found...................... | E | 35 FR 18319; 12/2/1970, 38 FR 14678; 6/4/1973. |
| Ocelot............................. | Leopardus (=Felis) pardalis............................ | Wherever found...................... | E | 37 FR 6476; 3/30/1972, 47 FR 31670; 7/21/1982. |
| Orangutan........................ | Pongo abelii.................... | Wherever found...................... | E | 35 FR 8491, 6/2/1970; 83 FR 2085, 1/16/2018. |
| Orangutan........................ | Pongo pygmaeus.............. | Wherever found...................... | E | 35 FR 8491, 6/2/1970; 83 FR 2085, 1/16/2018. |
| Oryx, Arabian.................. | Oryx leucoryx.................. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| Oryx, scimitar-horned....... | Oryx dammah.................. | Wherever found...................... | E | 70 FR 52319; 9/2/2005. |
| Otter, Cameroon clawless.. | Aonyx congicus (=congica) microdon......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Otter, giant...................... | Pteronura brasiliensis......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Otter, long-tailed............... | Lontra (=Lutra) longicaudis (incl. platensis)......................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/24/1976. |
| Otter, marine................... | Lontra (=Lutra) felina...... | Wherever found...................... | E | 41 FR 24062; 6/24/1976. |
| Otter, northern sea [Southwest Alaska DPS]... | Enhydra lutris kenyoni...... | Southwest Alaska, from Attu Island to Western Cook Inlet, including Bristol Bay, the Kodiak Archipelago, and the Barren Islands......................... | T | 70 FR 46366; 8/9/2005, 50 CFR 17.40(p)$^{4d}$, 50 CFR 17.95(a)$^{CH}$. |
| Otter, southern river.......... | Lontra (=Lutra) provocax.. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Otter, southern sea............ | Enhydra lutris nereis........ | Wherever found...................... | T | 42 FR 2965; 1/14/1977. |
| Panda, giant..................... | Ailuropoda melanoleuca.... | Wherever found...................... | E | 49 FR 2779; 1/23/1984. |
| Pangolin, Temnick's ground............................. | Manis temmincki............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Panther, Florida................ | Puma (=Felis) concolor coryi................................. | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Planigale, little.................. | Planigale ingrami subtilissima...................... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Planigale, southern............ | Planigale tenuirostris......... | Wherever found...................... | E | 35 FR 18319; 12/2. 1970. |
| Pocket gopher, Olympia.... | Thomomys mazama pugetensis........................ | Wherever found...................... | T | 79 FR 19759; 4/9/2014, 50 CFR 17.40(a)$^{4d}$, 50 CFR 17.95(a)$^{CH}$. |
| Pocket gopher, Roy Prairie | Thomomys mazama glacialis............................ | Wherever found...................... | T | 79 FR 19759; 4/9/2014, 50 CFR 17.40(a)$^{4d}$. |
| Pocket gopher, Tenino....... | Thomomys mazama tumuli.............................. | Wherever found...................... | T | 79 FR 19759; 4/9/2014, 50 CFR 17.40(a)$^{4d}$, 50 CFR 17.95(a)$^{CH}$. |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| Pocket gopher, Yelm | Thomomys mazama yelmensis | Wherever found | T | 79 FR 19759; 4/9/2014, 50 CFR 17.40(a)[4d], 50 CFR 17.95(a)[CH]. |
| Porcupine, thin-spined | Chaetomys subspinosus | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Porpoise, Gulf of California harbor (cochito, vaquita) | Phocoena sinus | Wherever found | E | 50 FR 1056; 1/9/1985[N], 50 FR 1056; 1/9/1985. |
| Possum, Leadbeater's | Gymnobelideus leadbeateri | Wherever found | E | 51 FR 17977; 5/16/1986. |
| Possum, mountain pygmy | Burramys parvus | Wherever found | E | 35 FR 18319; 12/2/1970. |
| Possum, scaly-tailed | Wyulda squamicaudata | Wherever found | E | 35 FR 18319; 12/2/1970. |
| Prairie dog, Mexican | Cynomys mexicanus | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Prairie dog, Utah | Cynomys parvidens | Wherever found | T | 38 FR 14678; 6/4/1973, 49 FR 22330; 5/29/1984, 50 CFR 17.40(g)[4d]. |
| Pronghorn, peninsular | Antilocapra americana peninsularis | Wherever found | E | 40 FR 44149; 9/25/1975. |
| Pronghorn, Sonoran | Antilocapra americana sonoriensis | Wherever found, except where listed as an experimental population | E | 32 FR 4001; 3/11/1967, 35 FR 8491; 6/2/1970. |
| Pronghorn, Sonoran | Antilocapra americana sonoriensis | In Arizona, an area north of Interstate 8 and south of Interstate 10, bounded by the Colorado River on the west and Interstate 10 on the east; and an area south of Interstate 8, bounded by Highway 85 on the west, Interstates 10 and 19 on the east, and the U.S.-Mexico border on the south | XN | 76 FR 25593; 5/5/2011, 50 CFR 17.84(v)[10j]. |
| Pudu | Pudu pudu | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Puma (=mountain lion) | Puma (=Felis) concolor (all subsp. except coryi) | U.S.A. (FL) | T(S/A) | 56 FR 40265; 8/14/1991, 50 CFR 17.40(h)[4d]. |

| | | | | |
|---|---|---|---|---|
| Puma, Costa Rican............ | Puma (=Felis) concolor costaricensis.................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Quokka............................ | Setonix brachyurus........... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Rabbit, Columbia Basin pygmy [Columbia Basin DPS]................................ | Brachylagus idahoensis..... | U.S.A. (WA—Douglas, Grant, Lincoln, Adams, Benton Counties).............................. | E | 68 FR 10388; 3/5/2003. |
| Rabbit, Lower Keys.......... | Sylvilagus palustris hefneri | Wherever found...................... | E | 55 FR 25588; 6/21/1990. |
| Rabbit, riparian brush........ | Sylvilagus bachmani riparius........................... | Wherever found...................... | E | 65 FR 8881; 2/23/2000. |
| Rabbit, Ryukyu................. | Pentalagus furnessi........... | Wherever found...................... | E | 44 FR 37124; 6/25/1979. |
| Rabbit, volcano................. | Romerolagus diazi............ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Rat, false water................. | Xeromys myoides............. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Rat, stick-nest.................. | Leporillus conditor............ | Wherever found...................... | E | 38 FR 14678; 6/4/1970. |
| Rat-kangaroo, brush-tailed | Bettongia penicillata......... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Rat-kangaroo, desert (=plain)............................ | Caloprymnus campestris... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Rat-kangaroo, Gaimard's... | Bettongia gaimardi............ | Wherever found...................... | E | 38 FR 14678; 6/4/1970. |
| Rat-kangaroo, Lesuer's...... | Bettongia lesueur.............. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Rat-kangaroo, Queensland. | Bettongia tropica............. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Rhinoceros, black............. | Diceros bicornis............... | Wherever found...................... | E | 45 FR 47352; 7/14/1980. |
| Rhinoceros, great Indian.... | Rhinoceros unicornis........ | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Rhinoceros, Javan............ | Rhinoceros sondaicus........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Rhinoceros, northern white | Ceratotherium simum cottoni........................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Rhinoceros, southern white................................ | Ceratotherium simum simum............................ | Wherever found...................... | T(S/A) | 79 FR 28847; 5/20/2014. |

| Rhinoceros, Sumatran...... | Dicerorhinus sumatrensis.. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Rice rat [Lower FL Keys DPS]................................. | Oryzomys palustris natator | Lower FL Keys (west of Seven Mile Bridge)............................ | E | 56 FR 19809; 4/30/1990, 50 CFR 17.95(a)[CH]. |
| Saiga, Mongolian (antelope)......................... | Saiga tatarica mongolica... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Saki, southern bearded...... | Chiropotes satanas satanas. | Wherever found...................... | E | 51 FR 17977; 5/16/1986. |
| Saki, white-nosed.............. | Chiropotes albinasus......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Sea lion, Steller [Western DPS]................................ | Eumetopias jubatus........... | Western DPS—see 50 CFR 224.101.................................... | E | 55 FR 13488; 4/10/1990, 55 FR 50005; 12/4/1990, 62 FR 24345; 5/5/1997[N], 62 FR 30772; 6/5/1997, 50 CFR 226.202[CH], 50 CFR 224.103. |
| Seal, bearded [Beringia DPS]................................. | Erignathus barbatus nauticus............................ | Beringia DPS—see 50 CFR 223.102........................................ | T | 77 FR 76740; 12/28/2012;[N] 79 FR 42687; 7/23/2014; 50 CFR 226.229.[CH] |
| Seal, bearded [Okhotsk DPS]................................. | Erignathus barbatus nauticus............................ | Okhotsk DPS—see 50 CFR 223.102........................................ | T | 77 FR 76739; 12/28/2012[N], 79 FR 42687; 7/23/2014. |
| Seal, Guadalupe fur........... | Arctocephalus townsendi... | Wherever found...................... | T | 32 FR 4001; 3/11/1967, 35 FR 16047; 10/13/1970, 50 FR 51251; 12/16/1985, 55 FR 14051; 3/23/1999[N], 50 CFR 223.201[4d]. |
| Seal, Hawaiian monk........ | Neomonachus schauinslandi (=Monachus schauinslandi).................. | Wherever found...................... | E | 41 FR 51611; 11/23/1976, 55 FR 14051; 3/23/1999[N], 50 CFR 226.201[CH]. |

| | | | | |
|---|---|---|---|---|
| Seal, Mediterranean monk. | Monachus monachus......... | Wherever found....................... | E | 35 FR 8491; 6/2/1970, 55 FR 14051; 3/23/1999 [N]. |
| Seal, ringed (Arctic subspecies)...................... | Phoca (=Pusa) hispida hispida............................. | Wherever found....................... | T | 77 FR 76706, 12/28/2012; [N] 79 FR 42687, 7/23/2014; 50 CFR 226.228. [CH] |
| Seal, ringed (Baltic subspecies)...................... | Phoca (=Pusa) hispida botnica............................ | Wherever found....................... | T | 77 FR 76705; 12/28/2012 [N], 79 FR 42687; 7/23/2014. |
| Seal, ringed (Ladoga subspecies)...................... | Phoca (=Pusa) hispida ladogensis........................ | Wherever found....................... | E | 77 FR 76705; 12/28/2012 [N], 79 FR 42687; 7/23/2014. |
| Seal, ringed (Okhotsk subspecies)...................... | Phoca (=Pusa) hispida ochotensis........................ | Wherever found....................... | T | 77 FR 76705; 12/28/2012 [N], 79 FR 42687; 7/23/2014. |
| Seal, ringed (Saimaa subspecies)...................... | Phoca (=Pusa) hispida saimensis......................... | Wherever found....................... | E | 58 FR 26920, 5/6/1993; [N] 58 FR 40538, 7/28/1993. |
| Seal, spotted [Southern DPS]............................ | Phoca largha.................... | Southern DPS—see 50 CFR 223.102................................... | T | 75 FR 65239; 10/22/2010 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.212 [4d]. |
| Seledang........................... | Bos gaurus...................... | Wherever found....................... | E | 35 FR 8491; 6/2/1970. |
| Serow........................... | Naemorhedus (=Capricornis) sumatraensis..................... | Wherever found....................... | E | 41 FR 26019, 6/24/1976. |
| Serval, Barbary................. | Leptailurus (=Felis) serval constantina...................... | Wherever found....................... | E | 35 FR 8491; 6/2/1970. |
| Shapo............................... | Ovis vignei...................... | Wherever found....................... | E | 41 FR 24062, 6/14/1976; |

| | | | | |
|---|---|---|---|---|
| | | | | 41 FR 26019, 6/24/1976. |
| Sheep, Peninsular bighorn [Peninsular CA DPS]........ | Ovis canadensis nelsoni.... | U.S.A. (CA) Peninsular Ranges.................................... | E | 63 FR 13134; 3/18/1998, 50 CFR 17.95(a)[CH]. |
| Sheep, Sierra Nevada bighorn........................... | Ovis canadensis sierrae..... | U.S.A. (CA)—Sierra Nevada... | E | 64 FR 19300; 4/20/1999, 65 FR 20; 1/3/2000, 73 FR 45534; 8/5/2008, 50 CFR 17.95(a)[CH]. |
| Shou................................ | Cervus elaphus wallichi..... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Shrew, Buena Vista Lake... | Sorex ornatus relictus........ | Wherever found.................... | E | 67 FR 10101; 3/6/2002, 50 CFR 17.95(a)[CH]. |
| Siamang........................... | Symphalangus syndactylus | Wherever found.................... | E | 41 FR 24062; 6/14/1976. |
| Sifakas............................. | Propithecus spp............... | Wherever found.................... | E | 35 FR 18319; 12/2/1970. |
| Sloth, Brazilian three-toed. | Bradypus torquatus........... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Solenodon, Cuban............ | Solenodon cubanus........... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Solenodon, Haitian........... | Solenodon paradoxus........ | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Squirrel, Carolina northern flying............................... | Glaucomys sabrinus coloratus........................... | Wherever found.................... | E | 50 FR 26999; 7/1/1985. |
| Squirrel, Mount Graham red................................... | Tamiasciurus fremonti grahamensis...................... | Wherever found.................... | E | 52 FR 20994, 6/3/1987; 50 CFR 17.95(a).[CH] |
| Squirrel, northern Idaho ground............................... | Urocitellus brunneus......... | Wherever found.................... | T | 65 FR 17779, 4/5/2000. |
| Stag, Barbary................... | Cervus elaphus barbarus.... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Stag, Kashmir.................. | Cervus elaphus hanglu...... | Wherever found.................... | E | 35 FR 8491; 6/2/1970. |
| Suni, Zanzibar.................. | Neotragus moschatus moschatus......................... | Wherever found.................... | E | 44 FR 37124; 6/25/1979. |

| | | | | |
|---|---|---|---|---|
| Tahr, Arabian.................... | Hemitragus jayakari.......... | Wherever found..................... | E | 44 FR 37124; 6/25/1979. |
| Tamaraw........................... | Bubalus mindorensis........ | Wherever found..................... | E | 35 FR 18319; 12/2/1970. |
| Tamarin, golden-rumped... | Leontopithecus spp........... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Tamarin, pied.................... | Saguinus bicolor............... | Wherever found..................... | E | 41 FR 45990; 10/19/1976. |
| Tamarin, white-footed....... | Saguinus leucopus............ | Wherever found..................... | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d]. |
| Tapir, Asian...................... | Tapirus indicus................ | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Tapir, Central American.... | Tapirus bairdii................. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Tapir, mountain................. | Tapirus pinchaque............ | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Tapir, South American (=Brazilian)...................... | Tapirus terrestris.............. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Tarsier, Philippine............. | Tarsius syrichta............... | Wherever found..................... | T | 41 FR 45990; 10/19/1976, 50 CFR 17.40(c) [4d]. |
| Tiger................................ | Panthera tigris................. | Wherever found..................... | E | 35 FR 8491; 6/2/1970, 37 FR 6476; 3/30/1972. |
| Tiger, Tasmanian.............. | Thylacinus cynocephalus... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Uakari (all species)........... | Cacajao spp..................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Urial................................ | Ovis musimon ophion....... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Vicuna [Argentina, Bolivia, Chile and Peru].... | Vicugna vicugna.............. | Wherever found, except Ecuador................................. | T | 35 FR 8491; 6/2/1970, 67 FR 37695; 5/30/2002, 50 CFR 17.40(m) [4d]. |
| Vicuna [Ecuador DPS]...... | Vicugna vicugna.............. | Ecuador............................... | E | 35 FR 8491; 6/2/1970, 67 FR 37695; 5/30/2002. |

| | | | | |
|---|---|---|---|---|
| Vole, Amargosa............... | Microtus californicus scirpensis........................ | Wherever found...................... | E | 49 FR 45160; 11/15/1984, 50 CFR 17.95(a)$^{CH}$. |
| Vole, Florida salt marsh..... | Microtus pennsylvanicus dukecampbelli................. | Wherever found...................... | E | 56 FR 1457; 1/14/1991. |
| Wallaby, banded hare....... | Lagostrophus fasciatus..... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Wallaby, brindled nail-tailed............................ | Onychogalea fraenata........ | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Wallaby, crescent nail-tailed............................. | Onychogalea lunata........... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Wallaby, Parma................. | Macropus parma.............. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Wallaby, western hare....... | Lagorchestes hirsutus....... | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Wallaby, yellow-footed rock................................. | Petrogale xanthopus.......... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Whale, beluga [Cook Inlet DPS]................................ | Delphinapterus leucas....... | Cook Inlet DPS—see 50 CFR 224.101.................. | E | 73 FR 62919; 10/22/2008$^{N}$, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.220$^{CH}$. |
| Whale, blue..................... | Balaenoptera musculus...... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Whale, bowhead............... | Balaena mysticetus........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Whale, false killer [Main Hawaiian Islands Insular DPS]................................ | Pseudorca crassidens......... | Main Hawaiian........................ Islands Insular DPS—see 50 CFR 224.101 | E | 77 FR 70915; 11/28/2012;$^{N}$ 79 FR 42687, 7/23/2014; 50 CFR 226.226. $^{CH}$ |
| Whale, finback................. | Balaenoptera physalus....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Whale, gray [Western North Pacific DPS]........... | Eschrichtius robustus........ | Western North Pacific DPS—see 50 CFR 224.101................ | E | 35 FR 8491; 6/2/1970, 59 FR 31094; 6/16/1994$^{N}$, |

| | | | | |
|---|---|---|---|---|
| | | | | 79 FR 42687; 7/23/2014. |
| Whale, humpback [Arabian Sea DPS]............ | Megaptera novaeangliae.... | Arabian Sea DPS—see 50 CFR 224.101.................................... | E | 35 FR 8491; 6/2/1970, 35 FR 18319; 12/2/1970, 81 FR 62260; 9/8/2016 [N], 81 FR 93639, 12/21/2016. |
| Whale, humpback [Cape Verde Islands/Northwest Africa DPS]..................... | Megaptera novaeangliae.... | Cape Verde Islands/Northwest Africa DPS—see 50 CFR 224.101.................................... | E | 35 FR 8491; 6/0/1970, 35 FR 18319; 12/2/1970, 81 FR 62260; 9/8/2016 [N], 81 FR 93639, 12/21/2016. |
| Whale, humpback [Central America DPS]................. | Megaptera novaeangliae.... | Central America DPS—see 50 CFR 224.101........................... | E | 35 FR 8491, 6/2/1970; 35 FR 18319, 12/2/1970; 81 FR 62260, 9/8/2016; [N] 81 FR 93639, 12/21/2016; 87 FR 8981, 2/17/2022; 50 CFR 226.227. [CH] |
| Whale, humpback [Mexico DPS].............................. | Megaptera novaeangliae.... | Mexico DPS—see 50 CFR 223.102.................................... | T | 35 FR 8491, 6/2/1970; 35 FR 18319, 12/2/1970; 81 FR 62260, 9/8/2016; [N] 81 FR 93639, 12/21/2016; 87 FR 8981, 2/17/2022; 50 CFR 223.213; 50 CFR 223.214; 50 CFR 226.227. [CH] |
| Whale, humpback [Western North Pacific DPS].............................. | Megaptera novaeangliae.... | Western North Pacific DPS— see 50 CFR 224.101................ | E | 35 FR 8491, 6/2/1970; 35 FR 18319, 12/2/1970; 81 FR 62260, 9/8/2016; [N] 81 FR 93639, 12/21/2016; 87 FR 8981, |

| | | | | |
|---|---|---|---|---|
| | | | | 2/17/2022; 50 CFR 224.103; 50 CFR 226.227.[CH] |
| Whale, killer [Southern Resident DPS]............... | Orcinus orca.................... | Southern Resident DPS—see 50 CFR 224.101.................... | E | 70 FR 69903; 11/18/2005[N], 72 FR 16284; 4/4/2007, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 80 CFR 7380; 2/10/2015[N], 50 CFR 224.103, 50 CFR 226.206[CH]. |
| Whale, North Atlantic right............................... | Eubalaena glacialis.......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970, 73 FR 12024; 3/6/2008,[N] 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 224.103, 50 CFR 224.105, 50 CFR 226.203.[CH] |
| Whale, North Pacific right. | Eubalaena japonica.......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970, 73 FR 12024; 3/6/2008[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.215[CH]. |
| Whale, Rice's................... | Balaenoptera ricei............ | Wherever found..................... | E | 84 FR 15446, 4/15/2019; 86 FR 47022, 8/23/2021;[N] 87 FR 8981, 2/17/2022. |
| Whale, sei...................... | Balaenoptera borealis........ | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Whale, Southern right....... | Eubalaena australis.......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970, 73 FR 12024; 3/6/2008[N], 76 FR 20558; 4/13/2011. |

| Whale, sperm.................Physeter catodon (=macrocephalus)............. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
|---|---|---|---|---|
| Wolf, gray........................ Canis lupus........................ | U.S.A.: All of AL, AR, CA, CT, DE, FL, GA, IA, IN, IL, KS, KY, LA, MA, MD, ME, MI, MO, MS, NC, ND, NE, NH, NJ, NV, NY, OH, OK, PA, RI, SC, SD, TN, TX, VA, VT, WI, and WV; and portions of AZ, NM, OR, UT, and WA as follows: ................................. | E | ........................................ | 32 FR 4001, 3/11/1967; 41 FR 24062, 6/14/1976; 43 FR 9607, 3/9/1978; 73 FR 75356, 12/11/2008; 74 FR 47483, 9/16/2009; 80 FR 9218, 2/20/2015; 50 CFR 17.95(a).[CH] |
| | (1) Northern AZ (that portion north of the centerline of Interstate Highway 40); | | | |
| | (2) Northern NM (that portion north of the centerline of Interstate Highway 40); | | | |
| ................................................................ | (3) Western OR (that portion of OR west of the centerline of Highway 395 and Highway 78 north of Burns Junction and that portion of OR west of the centerline of Highway 95 | | | |

| | | | | |
|---|---|---|---|---|
| | | south of Burns Junction); | | |
| ................................................ | | (4) Most of UT (that portion of UT south and west of the centerline of Interstate Highway 84 and that portion of UT south of Interstate Highway 80 from Echo to the UT/WY Stateline); and | | |
| ................................................ | | (5) Western WA (that portion of WA west of the centerline of Highway 97 and Highway 17 north of Mesa and that portion of WA west of the centerline of Highway 395 south of Mesa); Mexico. | | |
| Wolf, gray [Colorado XN]. Canis lupus...............U.S.A. (CO)........................... | | | XN | 88 FR 77014, 11/8/2023; 50 CFR 17.84(n). [10j] |
| Wolf, gray.....................Canis lupus.....................U.S.A. (MN)........................... | | | T | 43 FR 9607, 3/9/1978; 50 CFR 17.40(d); [4(d)] 50 CFR 17.95(a). [CH] |
| Wolf, maned...................Chrysocyon brachyurus.....Wherever found..................... | | | E | 35 FR 18319; 12/2/1970. |
| Wolf, Mexican..................Canis lupus baileyi...........Wherever found, except where included in an experimental population as set forth in § 17.84(k)................................. | | | E | 40 FR 17590; 4/21/1975, 80 FR 2488; 1/16/2015. |
| Wolf, Mexican..................Canis lupus baileyi...........U.S.A. (portions of AZ and NM)—see § 17.84(k).............. | | | XN | 63 FR 1752; 1/12/1998, 80 FR 2512; 1/16/2015, 50 CFR 17.84(k) [10j]. |

| | | | | | |
|---|---|---|---|---|---|
| Wolf, red........................ | Canis rufus...................... | Wherever found, except where listed as an experimental population............................... | | E | 32 FR 4001; 3/11/1967, 51 FR 41790; 11/19/1986, 56 FR 56325; 11/4/1991, 60 FR 18941; 4/13/1995. |
| Wolf, red........................ | Canis rufus...................... | U.S.A. (portions of NC and TN —see § 17.84(c)(9)).............. | | XN | 51 FR 41790; 11/19/1986, 56 FR 56325; 11/4/1991, 60 FR 18941; 4/13/1995, 50 CFR 17.84(c) [10]. |
| Wolverine, North American [Contiguous U.S. DPS]........................ | Gulo gulo luscus.............. | Where found within the contiguous U.S.A................... | T........................................ | 88 FR 83726, 11/30/2023; 50 CFR 17.40(u). [4d] |
| Wombat, Queensland hairy-nosed (incl. Barnard's)........................ | Lasiorhinus krefftii (formerly L. barnardi and L. gillespiei )................... | Wherever found...................... | | E | 35 FR 18319; 12/2/1970, 38 FR 14678; 6/4/1973. |
| Woodrat, Key Largo.......... | Neotoma floridana smalli.. | Wherever found...................... | | E | 48 FR 43040; 9/21/1983, 49 FR 34504; 8/31/1984. |
| Woodrat, riparian (San Joaquin Valley)................ | Neotoma fuscipes riparia... | Wherever found...................... | | E | 65 FR 8881; 2/23/2000. |
| Yak, wild........................ | Bos mutus (=grunniens m.).................................. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Zebra, Grevy's................. | Equus grevyi.................... | Wherever found...................... | | T | 44 FR 49218; 8/21/1979. |
| Zebra, Hartmann's mountain......................... | Equus zebra hartmannae.... | Wherever found...................... | | T | 44 FR 49218; 8/21/1979 46 FR 11665; 2/10/1981. |
| Zebra, mountain................ | Equus zebra zebra............. | Wherever found...................... | | E | 41 FR 24062; 6/14/1976 46 FR 11665; 2/10/1981. |
| Birds | | | | | |
| Adjutant, greater............... | Leptoptilos dubius............ | Wherever found...................... | | E | 76 FR 50052; 8/11/2011. |

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    **Addendum 209a**    33

| | | | | |
|---|---|---|---|---|
| Akekee (honeycreeper)..... | Loxops caeruleirostris....... | Wherever found...................... | E | 75 FR 18960; 4/13/2010 50 CFR 17.95(b)[CH]. |
| Akepa, Hawaii.................. | Loxops coccineus............. | Wherever found...................... | E | 35 FR 16047; 10/13/1970. |
| Akiapolaau....................... | Hemignathus wilsoni......... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Akikiki (honeycreeper)..... | Oreomystis bairdi............. | Wherever found...................... | E | 75 FR 18960; 4/13/2010 50 CFR 17.95(b)[CH]. |
| Akohekohe (crested honeycreeper)................... | Palmeria dolei................... | Wherever found...................... | E | 32 FR 4001, 3/11/1967; 50 CFR 17.95(b).[CH] |
| Alauahio, Oahu................. | Paroreomyza maculata...... | Wherever found...................... | E | 35 FR 16047, 10/13/1970. |
| Albatross, Amsterdam....... | Diomedea amsterdamensis | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Albatross, short-tailed....... | Phoebastria (=Diomedea) albatrus............................. | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 65 FR 46643; 7/31/2000. |
| Alethe, Thyolo.................. | Alethe choloensis............. | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Antpitta, brown-banded..... | Grallaria milleri............... | Wherever found...................... | E | 78 FR 64637; 10/29/2013. |
| Antwren, black-hooded..... | Formicivora erythronotos.. | Wherever found...................... | E | 75 FR 81794; 12/28/2010. |
| Blackbird, yellow-shouldered....................... | Agelaius xanthomus......... | Wherever found...................... | E | 41 FR 51019; 11/19/1976, 50 CFR 17.95(b)[CH]. |
| Bobwhite, masked (quail).. | Colinus virginianus ridgwayi........................... | Wherever found...................... | E | 32 FR 4001; 3/11/1967, 35 FR 8491; 6/2/1970. |
| Booby, Abbott's................ | Papasula (=Sula) abbotti.... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Bristlebird, western.......... | Dasyornis longirostris (=brachypterus l.).............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Bristlebird, western rufous | Dasyornis broadbenti littoralis........................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |

| | | | | |
|---|---|---|---|---|
| Bulbul, Mauritius olivaceous...................... | Hypsipetes borbonicus olivaceus........................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Bullfinch, Sao Miguel (finch)............................... | Pyrrhula pyrrhula murina.. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Bush-shrike, Ulugura........ | Malaconotus alius............. | Wherever found...................... | T | 60 FR 2899; 1/12/1995. |
| Bushwren, New Zealand... | Xenicus longipes.............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Bustard, great Indian........ | Ardeotis (=Choriotis) nigriceps.......................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Cahow............................... | Pterodroma cahow............ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Capercaillie, Cantabrian.... | Tetrao urogallus cantabricus....................... | Wherever found...................... | E | 76 FR 50052; 8/11/2011. |
| Caracara, crested, (Audubon's) [FL DPS]...... | Caracara plancus audubonii........................... | U.S.A. (FL)........................ | T | 52 FR 25229; 7/6/1987. |
| Cinclodes, royal............... | Cinclodes aricomae........... | Wherever found...................... | E | 77 FR 43434; 7/24/2012. |
| Cockatoo, Philippine......... | Cacatua haematuropygia... | Wherever found...................... | E | 79 FR 35870; 6/24/2014. |
| Cockatoo, salmon-crested.. | Cacatua moluccensis........ | Wherever found...................... | T | 76 FR 30758; 5/26/2011 50 CFR 17.41(c) [4d]. |
| Cockatoo, white................ | Cacatua alba.................... | Wherever found...................... | T | 79 FR 35870; 6/24/2014 50 CFR 17.41(c) [4d]. |
| Cockatoo, yellow-crested.. | Cacatua sulphurea............ | Wherever found...................... | E | 79 FR 35870; 6/24/2014. |
| Condor, Andean................ | Vultur gryphus................. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Condor, California............ | Gymnogyps californianus.. | Wherever found, except where listed as an experimental population............................ | E | 32 FR 4001, 3/11/1967; 50 CFR 17.95(b). [CH] |
| Condor, California............ | Gymnogyps californianus.. | U.S.A. (specific portions of Arizona, Nevada, and Utah)— see § 17.84(j)......................... | XN | 61 FR 54045, 10/16/1996; 50 CFR 17.84(j) [10j]. |

| | | | | |
|---|---|---|---|---|
| Condor, California............ | Gymnogyps californianus... | U.S.A. (Oregon, and specific portions of northern California and northwest Nevada)—see § 17.84(i)............................... | XN | 86 FR 15602, 3/24/2021; 50 CFR 17.84(i)[10j]. |
| Conure, golden, (=golden parakeet)......................... | Guaruba guarouba............ | Wherever found...................... | T | 41 FR 24062, 6/14/1976; 85 FR 22653, 4/23/2020; 50 CFR 17.41(c).[4d] |
| Coot, Hawaiian (alae keokeo)........................... | Fulica alai........................ | Wherever found...................... | E | 35 FR 16047, 10/13/1970. |
| Cotinga, banded............... | Cotinga maculata.............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Cotinga, white-winged...... | Xipholena atropurpurea..... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Courser, Jerdon's............... | Rhinoptilus bitorquatus..... | Wherever found...................... | E | 76 FR 50052; 8/11/2011. |
| Crane, black-necked.......... | Grus nigricollis................ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crane, Cuba sandhill........ | Grus canadensis nesiotes... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crane, hooded................. | Grus monacha.................. | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Crane, Japanese................ | Grus japonensis................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Crane, Mississippi sandhill | Antigone canadensis pulla. | Wherever found...................... | E | 38 FR 14678, 6/4/1973; 50 CFR 17.95(b).[CH] |
| Crane, Siberian white....... | Grus leucogeranus............ | Wherever found...................... | E | 35 FR 18319; 12/2/1970. |
| Crane, white-naped.......... | Grus vipio....................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crane, whooping.............. | Grus americana................ | Wherever found, except where listed as an experimental population............................. | E | 32 FR 4001; 3/11/1967, 35 FR 8491; 3/9/1978 50 CFR 17.95(b)[CH]. |
| Crane, whooping.............. | Grus americana................ | U.S.A. (AL, AR, CO, FL, GA, ID, IL, IN, IA, KY, LA, MI, MN, MS, MO, NC, NM, OH, | XN | 58 FR 5561; 1/22/1993; 62 FR 38932; 7/21/1997, |

| Common name | Scientific name | Where listed | Listing status | Citation(s) |
|---|---|---|---|---|
| | | SC, TN, UT, VA, WI, WV, western half of WY)................ | | 66 FR 33903; 6/26/2001, 76 FR 6066; 2/3/2011, 50 CFR 17.84(h)[10j]. |
| Creeper, Hawaii (alawi).....Loxops mana................... | | Wherever found..................... | E | 40 FR 44149, 9/25/1975. |
| Crow, Hawaiian (alala)......Corvus hawaiiensis........... | | Wherever found..................... | E | 32 FR 4001, 3/11/1967. |
| Crow, Mariana (aga)......... Corvus kubaryi............... | | Wherever found..................... | E | 49 FR 33881, 8/27/1984; 50 CFR 17.95(b).[CH] |
| Crow, white-necked.......... Corvus leucognaphalus....... | | Wherever found..................... | E | 56 FR 13598; 4/3/1991. |
| Cuckoo, yellow-billed [Western DPS].................. | Coccyzus americanus....... | U.S.A., Canada, Mexico, Central and South America...... | Western DPS: U.S.A. (AZ, CA, CO (western), ID, MT (western), NM (western), NV, OR, TX (western), UT, WA, WY (western)); Canada (British Columbia (southwestern); Mexico (Baja California, Baja California Sur, Chihuahua, Durango (western), Sinaloa, Sonora)............................... | T | 79 FR 59991, 10/3/2014; 50 CFR 17.95(b).[CH] |
| Cuckoo-shrike, Mauritius.. Coquus typicus................ | | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Cuckoo-shrike, Reunion.... Coquus newtoni............... | | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Curassow, blue-billed........Crax alberti..................... | | Wherever found..................... | E | 78 FR 64637; 10/29/2013. |
| Curassow, razor-billed.......Mitu mitu mitu................. | | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Curassow, red-billed......... Crax blumenbachii............ | | Wherever found..................... | E | 35 FR 18319; 12/2/1970. |
| Curassow, Sira................. Pauxi koepckeae............... | | Wherever found..................... | E | 89 FR 60327, 7/25/2024. |
| Curassow, southern helmeted (= horned curassow)....................... | Pauxi unicornis............... | Wherever found..................... | E | 89 FR 60327, 7/25/2024. |
| Curassow, Trinidad white-headed............................ | Pipile pipile pipile............. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |

| | | | | |
|---|---|---|---|---|
| Curlew, Eskimo............... | Numenius borealis........... | Wherever found..................... | E | 32 FR 4001; 3/11/1967, 35 FR 8491; 6/2/1970. |
| Curlew, slender-billed....... | Numenius tenuirostris....... | Wherever found..................... | E | 76 FR 50052; 8/11/2011. |
| Dove, cloven-feathered..... | Drepanoptila holosericea... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Dove, Grenada gray-fronted............................ | Leptotila rufaxilla wellsi... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Duck, Hawaiian (koloa maoli)............................. | Anas wyvilliana............... | Wherever found..................... | E | 32 FR 4001, 3/11/1967. |
| Duck, Laysan.................... | Anas laysanensis.............. | Wherever found..................... | E | 32 FR 4001; 3/11/1967. |
| Duck, pink-headed............ | Rhodonessa caryophyllacea.................. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Duck, white-winged wood. | Cairina scutulata.............. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Eagle, Greenland white-tailed............................ | Haliaeetus albicilla groenlandicus.................. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Eagle, harpy.................... | Harpia harpyja................. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Eagle, Madagascar sea...... | Haliaeetus vociferoides...... | Wherever found..................... | E | 60 FR 2899; 1/12/1995. |
| Eagle, Madagascar serpent | Eutriorchis astur............... | Wherever found..................... | E | 60 FR 2899; 1/12/1995. |
| Eagle, Philippine............... | Pithecophaga jefferyi........ | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Eagle, Spanish imperial..... | Aquila heliaca adalberti..... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Egret, Chinese................. | Egretta eulophotes........... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Eider, spectacled.............. | Somateria fischeri............ | Wherever found..................... | T | 58 FR 27474; 5/10/1993, 50 CFR 17.95(b)[CH]. |
| Eider, Steller's [AK Breeding DPS].................. | Polysticta stelleri.............. | U.S.A. (AK breeding population only)..................... | T | 62 FR 31748; 6/11/1997, 50 CFR 17.95(b)[CH]. |
| Elepaio, Oahu.................. | Chasiempis ibidis............. | Wherever found..................... | E | 65 FR 20760; 4/18/2000, 50 CFR 17.95(b)[CH]. |

| Falcon, Eurasian peregrine | Falco peregrinus peregrinus......................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Falcon, northern aplomado | Falco femoralis septentrionalis................... | Wherever found, except where listed as an experimental population............................. | E | 51 FR 6686; 2/25/1986. |
| Falcon, northern aplomado | Falco femoralis septentrionalis................... | U.S.A. (AZ, NM)..................... | XN | 71 FR 42298; 7/26/2006, 50 CFR 17.84(p) [10j]. |
| Finch, Laysan.................. | Telespiza cantans............. | Wherever found...................... | E | 32 FR 4001, 3/11/1967. |
| Finch, Nihoa.................... | Telespiza ultima............... | Wherever found...................... | E | 32 FR 4001, 3/11/1967. |
| Fire-eye, fringed-backed... | Pyriglena atra................... | Wherever found...................... | E | 75 FR 81794; 12/28/2010. |
| Flamingo, Andean............. | Phoenicoparrus andinus..... | Wherever found...................... | E | 75 FR 50814; 8/17/2010. |
| Flycatcher, Euler's............ | Empidonax euleri johnstonei......................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Flycatcher, Seychelles paradise........................... | Terpsiphone corvina......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Flycatcher, southwestern willow.............................. | Empidonax traillii extimus | Wherever found...................... | E | 60 FR 10695; 2/27/1995, 50 CFR 17.95(b) [CH]. |
| Flycatcher, Tahiti............. | Pomarea nigra.................. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Fody, Mauritius................ | Foudia rubra..................... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Fody, Rodrigues................ | Foudia flavicans............... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Fody, Seychelles (weaver-finch)................................ | Foudia sechellarum........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Francolin, Djibouti............ | Francolinus ochropectus.... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Frigatebird, Andrew's........ | Fregata andrewsi............... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Gallinule, Hawaiian common (Alae ula)........... | Gallinula galeata sandvicensis..................... | Wherever found...................... | E | 32 FR 4001, 3/11/1967. |
| Gnatcatcher, coastal California....................... | Polioptila californica californica....................... | Wherever found...................... | T | 58 FR 16742; 3/30/1993, 50 |

| | | | | |
|---|---|---|---|---|
| | | | | CFR 17.41(b) [4d], 50 CFR 17.95(b) [CH]. |
| Goose, Hawaiian (Nene)... | Branta sandvicensis........... | Wherever found...................... | T | 32 FR 4001, 3/11/1967; 84 FR 69918, 12/19/2019; 50 CFR 17.41(d) [4d]. |
| Goshawk, Christmas Island............................... | Accipiter fasciatus natalis.. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Goshawk, Queen Charlotte [British Columbia DPS].... | Accipiter gentilis laingi..... | British Columbia, Canada........ | T | 77 FR 45870; 8/1/2012. |
| Grackle, slender-billed...... | Quiscalus palustris........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Grasswren, Eyrean (flycatcher)....................... | Amytornis goyderi............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Grebe, Alaotra.................. | Tachybaptus rufolavatus... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Grebe, Atitlan.................. | Podilymbus gigas............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Grebe, Junín.................... | Podiceps taczanowskii.... | Wherever found...................... | E | 77 FR 43434; 7/24/2012. |
| Greenshank, Nordmann's... | Tringa guttifer................. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Ground-cuckoo, southeastern rufous-vented | Neomorphus geoffroyi dulcis............................... | Wherever found...................... | E | 75 FR 81794; 12/28/2010. |
| Ground-dove, friendly (= tuaimeo) (American Samoa DPS).................... | Gallicolumba stairi............ | U.S.A. (AS)............................ | E | 81 FR 65466; 09/22/2016. |
| Guan, cauca..................... | Penelope perspicax........... | Wherever found...................... | E | 78 FR 64637; 10/29/2013. |
| Guan, horned................... | Oreophasis derbianus........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Guan, white-winged.......... | Penelope albipennis........... | Wherever found...................... | E | 55 FR 39858; 9/28/1990. |
| Guineafowl, white-breasted........................... | Agelastes meleagrides....... | Wherever found...................... | T | 60 FR 2899; 1/12/1995. |
| Gull, Audouin's................ | Larus audouinii................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |

| | | | | |
|---|---|---|---|---|
| Gull, relict....................... | Larus relictus................... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Hawk, Galapagos.............. | Buteo galapagoensis......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Hawk, Puerto Rican broad-winged........................... | Buteo platypterus brunnescens..................... | Wherever found..................... | E | 59 FR 46710; 9/9/1994. |
| Hawk, Puerto Rican sharp-shinned........................... | Accipiter striatus venator... | Wherever found..................... | E | 59 FR 46710; 9/9/1994. |
| Hermit, hook-billed (hummingbird)................. | Ramphodon (=Glaucis) dohrnii............................ | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Hermit, Margaretta's........ | Phaethornis malaris margarettae..................... | Wherever found..................... | E | 75 FR 81794; 12/28/2010. |
| Honeyeater, helmeted....... | Lichenostomus melanops cassidix ( =Meliphaga c.).. | Wherever found..................... | E | 35 FR 18319; 12/2/1970. |
| Hornbill, helmeted............ | Buceros (=Rhinoplax) vigil................................. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Hummingbird, Honduran emerald........................... | Amazilia luciae................ | Wherever found..................... | E | 80 FR 45086; 7/29/2015. |
| Ibis, giant........................ | Pseudibis gigantea........... | Wherever found..................... | E | 73 FR 3146; 1/16/2008. |
| Ibis, Japanese crested........ | Nipponia nippon.............. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Ibis, northern bald............ | Geronticus eremita........... | Wherever found..................... | E | 55 FR 39858; 9/28/1990. |
| Iiwi (honeycreeper)........... | Drepanis coccinea............ | Wherever found..................... | T | 82 FR 43873, 9/20/2017. |
| Kagu............................... | Rhynochetos jubatus........ | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Kakapo............................ | Strigops habroptilus......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Kestrel, Mauritius............. | Falco punctatus................ | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Kestrel, Seychelles............ | Falco araea..................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Kingfisher, Guam (=sihek) | Todiramphus cinnamominus................. | Wherever found, except where listed as an experimental population............................. | E | 49 FR 33881, 8/27/1984; 50 CFR 17.95(b) [CH]. |
| Kingfisher, Guam (=sihek) | Todiramphus cinnamominus.................. | U.S.A. (Palmyra Atoll)............ | XN | 88 FR 19880, 4/4/2023; 50 |

| | | | | |
|---|---|---|---|---|
| | | | | CFR 17.84(a) [10j]. |
| Kite, Cuba hook-billed...... | Chondrohierax uncinatus wilsonii........................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Kite, Grenada hook-billed. | Chondrohierax uncinatus mirus............................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Kite, Everglade snail........ | Rostrhamus sociabilis plumbeus......................... | Wherever found.................... E........................................ | 32 FR 4001, 3/11/1967; 50 CFR 17.95(b). [CH] | |
| Knot, rufa red.................. | Calidris canutus rufa........ | Wherever found..................... | T | 79 FR 73705; 12/11/2014. |
| Kokako (wattlebird).......... | Callaeas cinerea................ | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Lark, Raso...................... | Alauda razae.................... | Wherever found..................... | E | 60 FR 2899; 1/12/1995. |
| Lark, streaked horned........ | Eremophila alpestris strigata............................ | Wherever found..................... | T | 78 FR 61451; 10/3/2013, 50 CFR 17.41(a) [4d], 50 CFR 17.95(b) [CH]. |
| Macaw, blue-throated........ | Ara glaucogularis............. | Wherever found..................... | E | 78 FR 61208; 10/3/2013. |
| Macaw, glaucous.............. | Anodorhynchus glaucus.... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Macaw, great green........... | Ara ambiguus.................. | Wherever found..................... | E | 80 FR 59975; 10/2/2015. |
| Macaw, hyacinth............... | Anodorhynchus hyacinthinus.................... | Wherever found..................... | T | 83 FR 39894, 8/13/2018; 50 CFR 17.41(c) [4d]. |
| Macaw, indigo.................. | Anodorhynchus leari......... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Macaw, little blue............. | Cyanopsitta spixii............. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Macaw, military................ | Ara militaris.................... | Wherever found..................... | E | 80 FR 59975; 10/2/2015. |
| Macaw, scarlet................. | Ara macao cyanoptera....... | Wherever found..................... | E | 84 FR 6278, 2/26/2019. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

| Macaw, scarlet [Northern DPS]............................. | Ara macao macao............ | Colombia (northwest of the Andes), Costa Rica (Pacific slope), Panama (mainland)....... | T | 84 FR 6278, 2/26/2019; 50 CFR 17.41(c).[4d] |
|---|---|---|---|---|
| Macaw, scarlet [Southern DPS]............................. | Ara macao macao............ | Bolivia, Brazil, Colombia (southeast of the Andes), Ecuador, French Guiana, Guyana, Peru, Suriname, Venezuela............................. | T(S/A) | 84 FR 6278, 2/26/2019; 50 CFR 17.41(c).[4d] |
| Macaw, scarlet [Subspecies crosses]........... | Ara macao macao X Ara macao cyanoptera............. | Costa Rica, Nicaragua (Atlantic slope border region).. | T(S/A) | 84 FR 6278, 2/26/2019; 50 CFR 17.41(c).[4d] |
| Magpie-robin, Seychelles (thrush)............................ | Copsychus sechellarum..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Malimbe, Ibadan................ | Malimbus ibadanensis........ | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Malkoha, red-faced (cuckoo)........................... | Phaenicophaeus pyrrhocephalus................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Mao (= maomao) (honeyeater)..................... | Gymnomyza samoensis..... | Wherever found...................... | E | 81 FR 65466; 09/22/2016. |
| Megapode, Maleo............. | Macrocephalon maleo....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Megapode, Micronesian (sasangat)........................ | Megapodius laperouse....... | Wherever found...................... | E | 35 FR 8491, 6/2/1970. |
| Merganser, Brazilian......... | Mergus octosetaceus........ | Wherever found...................... | E | 75 FR 81794; 12/28/2010. |
| Millerbird, Nihoa (old world warbler).................. | Acrocephalus familiaris kingi.................................. | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Mockingbird, Socorro....... | Mimus Graysoni.............. | Wherever found...................... | E | 73 FR 3146; 1/16/2008. |
| Moorhen, Mariana common (pulattat)............. | Gallinula chloropus guami. | Wherever found...................... | E | 49 FR 33881; 8/27/1984. |
| Murrelet, marbled [CA, OR, WA DPS].................. | Brachyramphus marmoratus...................... | U.S.A. (CA, OR, WA)............. | T | 57 FR 45337; 10/1/1992, 50 CFR 17.95(b)[CH]. |
| Nightjar, Puerto Rican....... | Antrostomus noctitherus.... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Nuthatch, Algerian............ | Sitta ledanti..................... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Olomao, Molokai.............. | Myadestes lanaiensis rutha | Wherever found...................... | E | 35 FR 16047, 10/13/1970. |

| | | | | |
|---|---|---|---|---|
| Ostrich, Arabian.............. | Struthio camelus syriacus.. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Ostrich, West African....... | Struthio camelus spatzi...... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| 'O'u (honeycreeper).......... | Psittirostra psittacea.......... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Owl, Anjouan scops.......... | Otus rutilus capnodes........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Owl, giant scops............... | Mimizuku (=Otus) gurneyi | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Owl, Madagascar red....... | Tyto soumagnei............... | Wherever found...................... | E | 55 FR 39858; 9/28/1990. |
| Owl, Mexican spotted....... | Strix occidentalis lucida.... | Wherever found...................... | T | 58 FR 14248; 3/16/1993 50 CFR 17.95(b) [CH]. |
| Owl, northern spotted....... | Strix occidentalis caurina.. | Wherever found...................... | T | 55 FR 26114; 6/26/1990, 50 CFR 17.95(b) [CH]. |
| Owl, Seychelles scops....... | Otus magicus (=insularis) insularis............................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Owlet, Morden's............... | Otus ireneae.................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Oystercatcher, Canarian black................................ | Haematopus meadewaldoi. | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Palila (honeycreeper)........ | Loxioides bailleui............. | Wherever found...................... | E | 32 FR 4001; 3/11/1967, 50 CFR 17.95(b) [CH]. |
| Paradise-flycatcher, caerulean........................ | Eutrichomyias rowleyi...... | Wherever found...................... | E | 73 FR 3146; 1/16/2008. |
| Parakeet, blue-throated (=ochre-marked)............... | Pyrrhura cruentata............ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Parakeet, Forbes'............... | Cyanoramphus auriceps forbesi............................. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Parakeet, golden-shouldered........................ | Psephotus chrysopterygius | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Parakeet, Mauritius........... | Psittacula echo................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Parakeet, Norfolk Island.... | Cyanoramphus cookii (=novaezelandiae c.)......... | Wherever found...................... | E | 55 FR 39858; 9/28/1990. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

| | | | | |
|---|---|---|---|---|
| Parakeet, orange-bellied.... | Neophema chrysogaster.... | Wherever found..................... | E | 35 FR 18319; 12/2/1970. |
| Parakeet, paradise............ | Psephotus pulcherrimus..... | Wherever found..................... | E | 35 FR 18319; 12/2/1970. |
| Parrot, Bahaman or Cuban. | Amazona leucocephala...... | Wherever found..................... | E | 35 FR 8491; 6/2/1970, 41 FR 24062; 6/14/1976. |
| Parrot, ground.................. | Pezoporus wallicus........... | Wherever found..................... | E | 38 FR 14678; 6/4/1973. |
| Parrot, imperial................ | Amazona imperialis.......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Parrot, night (=Australian). | Geopsittacus occidentalis.. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Parrot, Puerto Rican.......... | Amazona vittata............... | Wherever found..................... | E | 32 FR 4001; 3/11/1967. |
| Parrot, red-browed............ | Amazona rhodocorytha..... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Parrot, red-capped............. | Pionopsitta pileata............ | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Parrot, red-necked............. | Amazona arausiaca........... | Wherever found..................... | E | 44 FR 37124; 6/25/1979. |
| Parrot, red-spectacled........ | Amazona pretrei pretrei..... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Parrot, red-tailed............... | Amazona brasiliensis........ | Wherever found..................... | E | 55 FR 39858; 9/28/1990. |
| Parrot, Seychelles lesser vasa................................ | Coracopsis nigra barklyi.... | Wherever found..................... | E | 60 FR 2899; 1/12/1995. |
| Parrot, St. Vincent............. | Amazona guildingii........... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Parrot, St. Lucia................ | Amazona versicolor.......... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Parrot, thick-billed............ | Rhynchopsitta pachyrhyncha................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Parrot, vinaceous-breasted. | Amazona vinacea............. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Parrot, yellow-billed......... | Amazona collaria............. | Wherever found..................... | T | 78 FR 15624; 3/12/2013, 50 CFR 17.41(c) [4d]. |

| | | | | |
|---|---|---|---|---|
| Parrotbill, Maui (Kiwikiu). | Pseudonestor xanthophrys. | Wherever found...................... | E | 32 FR 4001; 3/11/1967, 50 CFR 17.95(b) [CH]. |
| Penguin, African............... | Spheniscus demersus......... | Wherever found...................... | E | 75 FR 59645; 9/28/2010. |
| Penguin, emperor.............. | Aptenodytes forsteri........... | Wherever found...................... | T | 87 FR 64720, October 26, 2022; 50 CFR 17.41(m). [4d] |
| Penguin, erect-crested....... | Eudyptes sclateri............... | Wherever found...................... | T | 75 FR 45497; 8/3/2010. |
| Penguin, Fiordland crested | Eudyptes pachyrhynchus... | Wherever found...................... | T | 75 FR 45497; 8/3/2010. |
| Penguin, Galapagos.......... | Spheniscus mendiculus... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Penguin, Humboldt.......... | Spheniscus humboldti....... | Wherever found...................... | T | 75 FR 45497; 8/3/2010. |
| Penguin, southern rockhopper [New Zealand-Australia DPS].................. | Eudyptes chrysocome....... | New Zealand-Australia DPS, associated with the Campbell Plateau and Macquarie Island... | T | 76 FR 9681; 2/22/2011. |
| Penguin, white-flippered... | Eudyptula minor albosignata...................... | Wherever found...................... | T | 75 FR 45497; 8/3/2010. |
| Penguin, yellow-eyed....... | Megadyptes antipodes....... | Wherever found...................... | T | 75 FR 45497; 8/3/2010. |
| Petrel, black-capped.......... | Pterodroma hasitata.......... | Wherever found..................... E.......................................... | 88 FR 89611, 12/28/2023. | |
| Petrel, Chatham................ | Pterodroma axillaris.......... | Wherever found...................... | E | 74 FR 46914; 9/14/2009. |
| Petrel, Fiji...................... | Pseudobulweria macgillivrayi.................... | Wherever found...................... | E | 74 FR 46914; 9/14/2009. |
| Petrel, Galapagos.............. | Pterodroma phaeopygia.... | Wherever found...................... | T | 75 FR 235; 1/5/2010. |
| Petrel, Hawaiian (uau)....... | Pterodroma sandwichensis | Wherever found...................... | E | 32 FR 4001, 3/11/1967. |
| Petrel, Madeira................. | Pterodroma madeira.......... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Petrel, magenta................ | Pterodroma magentae....... | Wherever found...................... | E | 74 FR 46914; 9/14/2009. |

| | | | | |
|---|---|---|---|---|
| Petrel, Mascarene black..... | Pterodroma aterrima.......... | Wherever found...................... | | E | 60 FR 2899; 1/12/1995. |
| Pheasant, bar-tailed........... | Syrmaticus humae............. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Blyth's tragopan. | Tragopan blythii.............. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, brown eared....... | Crossoptilon mantchuricum................... | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Cabot's tragopan | Tragopan caboti............... | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, cheer................. | Catreus wallichii.............. | Wherever found...................... | | E | 55 FR 39858; 9/28/1990. |
| Pheasant, Chinese monal... | Lophophorus lhuysii........ | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Edward's............ | Lophura edwardsi............. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Elliot's.............. | Syrmaticus ellioti............. | Wherever found...................... | | E | 41 FR 24062; 6/14/1976. |
| Pheasant, imperial............. | Lophura imperialis............ | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Mikado.............. | Syrmaticus mikado........... | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Palawan peacock........................... | Polyplectron emphanum.... | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Sclater's monal.. | Lophophorus sclateri......... | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, Swinhoe's.......... | Lophura swinhoii.............. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, western tragopan | Tragopan melanocephalus. | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pheasant, white eared........ | Crossoptilon crossoptilon.. | Wherever found...................... | | E | 35 FR 18319; 12/2/1970. |
| Pigeon, Azores wood........ | Columba palumbus azorica | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pigeon, Chatham Island..... | Hemiphaga novaeseelandiae chathamensis.................... | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Pigeon, Marquesan imperial........................... | Ducula galeata................. | Wherever found...................... | | E | 76 FR 50052; 8/11/2011. |

| | | | | | |
|---|---|---|---|---|---|
| Pigeon, Mindoro imperial (=zone-tailed).................. | Ducula mindorensis.......... | Wherever found...................... | | E | 41 FR 24062; 6/14/1976. |
| Pigeon, pink.................... | Columba mayeri.............. | Wherever found...................... | | E | 60 FR 2899; 1/12/1995. |
| Pigeon, Puerto Rican plain | Patagioenas inornata wetmorei.......................... | Wherever found...................... | | E | 35 FR 16047, 10/13/1970. |
| Pigeon, white-tailed laurel. | Columba junoniae............. | Wherever found...................... | | T | 60 FR 2899; 1/12/1995. |
| Piping-guan, black-fronted | Pipile jacutinga................ | Wherever found...................... | | E | 41 FR 24062; 6/14/1976. |
| Pitta, Gurney's.................. | Pitta gurneyi..................... | Wherever found...................... | | E | 73 FR 3146; 1/16/2008. |
| Pitta, Koch's.................... | Pitta kochi....................... | Wherever found...................... | | E | 41 FR 24062; 6/14/1976. |
| Plantcutter, Peruvian......... | Phytotoma raimondii......... | Wherever found...................... | | E | 77 FR 43434; 7/24/2012. |
| Plover, New Zealand shore | Thinornis novaeseelandiae | Wherever found...................... | | E | 35 FR 8491; 6/2/1970. |
| Plover, piping [Great Lakes watershed DPS]...... | Charadrius melodus.......... | Great Lakes, watershed in States of IL, IN, MI, MN, NY, OH, PA, and WI and Canada (Ont.)...................................... | | E | 50 FR 50726; 12/11/1985, 50 CFR 17.95(b)[CH]. |
| Plover, piping [Atlantic Coast and Northern Great Plains populations]............ | Charadrius melodus.......... | Wherever found, except those areas where listed as endangered............................... | | T | 50 FR 50726; 12/11/1985, 50 CFR 17.95(b)[CH]. |
| Plover, western snowy [Pacific Coast population DPS]................................ | Charadrius nivosus nivosus............................. | Pacific Coast population DPS —U.S.A. (CA, OR, WA), Mexico (within 50 miles of Pacific coast)......................... | | T | 58 FR 12864, 3/5/1993; 50 CFR 17.95(b).[CH] |
| Pochard, Madagascar........ | Aythya innotata................ | Wherever found...................... | | E | 60 FR 2899; 1/12/1995. |
| Prairie-chicken, Attwater's greater............................... | Tympanuchus cupido attwateri........................... | Wherever found...................... | | E | 32 FR 4001; 3/11/1967. |
| Prairie-chicken, lesser [Northern DPS]................ | Tympanuchus pallidicinctus................... | U.S.A. (All lesser prairie-chickens north of a line starting at 37.9868 N, 105.0133 W, and ending at 31.7351 N, 98.3773 W, NAD83; see map at § 17.41(k))................................ | | T | 87 FR 72753, 11/25/2022; |
| | | | | | 50 CFR 17.41(k). [4d] |

| Prairie-chicken, lesser [Southern DPS] | Tympanuchus pallidicinctus | U.S.A. (All lesser prairie-chickens south of a line starting at 37.9868 N, 105.0133 W, and ending at 31.7351 N, 98.3773 W, NAD83; see map at § 17.41(k)) | E | 87 FR 72753, 11/25/2022. |
|---|---|---|---|---|
| Ptarmigan, Mount Rainier white-tailed | Lagopus leucura rainierensis | Wherever found | T | 89 FR 55091, 7/3/2024; 50 CFR 17.41(i). [4d] |
| Puaiohi | Myadestes palmeri | Wherever found | E | 32 FR 4001, 3/11/1967. |
| Puffleg, black-breasted | Eriocnemis nigrivestis | Wherever found | E | 75 FR 43844; 7/27/2010. |
| Pygmy-owl, cactus ferruginous | Glaucidium brasilianum cactorum | Wherever found | T | 88 FR 46910, 7/20/2023; 50 CFR 17.41(l). [4d] |
| Quail, Merriam's Montezuma | Cyrtonyx montezumae merriami | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Quetzal, resplendent | Pharomachrus mocinno | Wherever found | E | 41 FR 24062; 6/14/1976. |
| Rail, Aukland Island | Rallus pectoralis muelleri | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Rail, California Ridgway's | Rallus obsoletus obsoletus | Wherever found | E | 35 FR 16047, 10/13/1970. |
| Rail, eastern black | Laterallus jamaicensis jamaicensis | Wherever found | T | 85 FR 63764, 10/8/2020; 50 CFR 17.41(f). [4d] |
| Rail, Guam (koko) | Gallirallus owstoni | Wherever found, except where listed as an experimental population | E | 49 FR 33881, 8/27/1984. |
| Rail, Guam (koko) | Gallirallus owstoni | Rota | XN | 54 FR 43966, 10/30/1989; 50 CFR 17.84(f). [10j] |
| Rail, Junín | Laterallus tuerosi | Wherever found | E | 77 FR 43434; 7/24/2012. |
| Rail, light-footed Ridgway's | Rallus obsoletus levipes | Wherever found | E | 34 FR 5034, 3/8/1969; 35 FR 16047, 10/13/1970. |

| | | | | |
|---|---|---|---|---|
| Rail, Lord Howe wood...... | Gallirallus (=Tricholimnas) sylvestris. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Rail, Yuma Ridgway's....... | Rallus obsoletus yumanensis...................... | Wherever found...................... E........................................ | 32 FR 4001, 3/11/1967. | |
| Rhea, lesser (incl. Darwin's)........................ | Rhea (=Pterocnemia) pennata...................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Robin, Chatham Island...... | Petroica traversi............... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Robin, dappled mountain... | Arcanator orostruthus........ | Wherever found...................... | T | 60 FR 2899; 1/12/1995. |
| Robin, scarlet-breasted (flycatcher)...................... | Petroica multicolor multicolor........................ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Rockfowl, grey-necked..... | Picathartes oreas.............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Rockfowl, white-necked.... | Picathartes gymnocephalus | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Roller, long-tailed ground.. | Uratelornis chimaera......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Sage-grouse, Gunnison...... | Centrocercus minimus....... | Wherever found...................... | T | 79 FR 69191; 11/20/2014, 50 CFR 17.95(b)[CH]. |
| Scrub-bird, noisy.............. | Atrichornis clamosus......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Scrub-jay, Florida............. | Aphelocoma coerulescens. | Wherever found...................... | T | 52 FR 20715; 6/3/1987. |
| Shama, Cebu black (thrush)............................ | Copsychus niger cebuensis | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Shearwater, Heinroth's...... | Puffinus heinrothi............. | Wherever found...................... | T | 75 FR 235; 1/5/2010. |
| Shearwater, Newell's (ao).. | Puffinus newelli............... | Wherever found...................... | T | 40 FR 44149, 9/25/1975. |
| Shrike, San Clemente loggerhead...................... | Lanius ludovicianus mearnsi............................ | Wherever found...................... | E | 42 FR 40682; 8/11/1977. |
| Siskin, red....................... | Carduelis cucullata........... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Sparrow, Cape Sable seaside............................ | Ammospiza maritima mirabilis......................... | Wherever found...................... | E | 32 FR 4001, 3/11/1967; |

| | | | | 50 CFR 17.95(b). [CH] |
|---|---|---|---|---|
| Sparrow, Florida grasshopper...................... | Ammodramus savannarum floridanus......................... | Wherever found....................... | E | 51 FR 27492; 7/31/1986. |
| Sparrowhawk, Anjouan Island............................... | Accipiter francesii pusillus | Wherever found....................... | E | 35 FR 8491; 6/2/1970. |
| Starling, Ponape mountain. | Aplonis pelzelni............... | Wherever found....................... | E | 35 FR 8491; 6/2/1970. |
| Starling, Rothschild's (myna).............................. | Leucopsar rothschildi........ | Wherever found....................... | E | 35 FR 8491; 6/2/1970. |
| Stilt, black........................ | Himantopus novaezelandiae................. | Wherever found....................... | E | 73 FR 3146; 1/16/2008. |
| Stilt, Hawaiian................. | Himantopus mexicanus (=himantopus) knudseni.... | Wherever found....................... | E | 35 FR 16047; 10/13/1970. |
| Stork, oriental white.......... | Ciconia boyciana (=ciconia b.)..................... | Wherever found....................... | E | 35 FR 8491; 6/2/1970. |
| Stork, wood [Southeast U.S. DPS]......................... | Mycteria americana........... | U.S.A. (AL, FL, GA, MS, NC, SC)........................................... | T | 49 FR 7332; 2/28/1984, 79 FR 37077; 6/30/2014. |
| Storm-petrel, band-rumped (akeake) [Hawaii DPS]...... | Hydrobates castro............. | U.S.A. (HI)............................... | E | 81 FR 67786; 9/30/2016. |
| Sunbird, Marungu............. | Nectarinia prigoginei......... | Wherever found....................... | E | 60 FR 2899; 1/12/1995. |
| Swiftlet, Mariana (yayaguak)....................... | Aerodramus bartschi......... | Wherever found....................... | E | 49 FR 33881; 8/27/1984. |
| Tanager, cherry-throated.... | Nemosia rourei................ | Wherever found....................... | E | 75 FR 81794; 12/28/2010. |
| Teal, Campbell Island flightless........................... | Anas aucklandica nesiotis.. | Wherever found....................... | E | 41 FR 24062; 6/14/1976. |
| Tern, California least......... | Sternula antillarum browni | Wherever found....................... | E | 35 FR 16047, 10/13/1970; 35 FR 8491, 6/2/1970. |
| Tern, roseate [Northeast U.S. nesting population DPS]................................ | Sterna dougallii dougallii.. | U.S.A. (Atlantic Coast south to NC), Canada (Newf., N.S, Que.), Bermuda........................ | E | 52 FR 42064; 11/2/1987. |
| Tern, roseate [Western Hemisphere DPS]............. | Sterna dougallii dougallii.. | Western Hemisphere and adjacent oceans, incl. U.S.A. (FL, PR, VI), where not listed as endangered......................... | T | 52 FR 42064; 11/2/1987. |

| | | | | |
|---|---|---|---|---|
| Thicketbird, long-legged... | Trichocichla rufa.............. | Wherever found...................... | E | 73 FR 3146; 1/16/2008. |
| Thrasher, white-breasted... | Ramphocinclus brachyurus | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Thrush, New Zealand (wattlebird)...................... | Turnagra capensis............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Thrush, St. Lucia forest..... | Cichlherminia lherminieri sanctaeluciae.................... | Wherever found...................... | E | 75 FR 50814; 8/17/2010. |
| Thrush, Taita.................. | Turdus olivaceous helleri... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Tinamou, solitary.............. | Tinamus solitarius............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Tit-spinetail, white-browed | Leptasthenura xenothorax. | Wherever found...................... | E | 77 FR 43434; 7/24/2012. |
| Tit-tyrant, ash-breasted...... | Anairetes alpinus.............. | Wherever found...................... | E | 77 FR 43434; 7/24/2012. |
| Tody-tyrant, Kaempfer's.... | Hemitriccus kaempferi...... | Wherever found...................... | E | 75 FR 81794; 12/28/2010. |
| Towhee, Inyo California.... | Melozone crissalis eremophilus..................... | Wherever found...................... | T | 52 FR 28780, 8/3/1987; 50 CFR 17.95(b).[CH] |
| Tree-finch, medium........... | Camarhynchus pauper....... | Wherever found...................... | E | 75 FR 43853; 7/27/2010. |
| Trembler, Martinique (thrasher)......................... | Cincloerthia ruficauda gutturalis......................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Turaco, Bannerman's......... | Tauraco bannermani.......... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Turtle-dove, Seychelles..... | Streptopelia picturata rostrata............................ | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Vanga, Pollen's................. | Xenopirostris polleni....... | Wherever found...................... | T | 60 FR 2899; 1/12/1995. |
| Vanga, Van Dam's............. | Xenopirostris damii........... | Wherever found...................... | T | 60 FR 2899; 1/12/1995. |
| Vireo, least Bell's.............. | Vireo bellii pusillus........... | Wherever found...................... | E | 51 FR 16474; 5/2/1986, 50 CFR 17.95(b)[CH]. |

| | | | | |
|---|---|---|---|---|
| Wanderer, plain (collared-hemipode)........................ | Pedionomus torquatus..... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Warbler, Aldabra (old world warbler)................ | Nesillas aldabranus........... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Warbler (wood), Barbados yellow.............................. | Dendroica petechia petechia........................... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Warbler, elfin-woods......... | Setophaga angelae........... | Wherever found...................... | T | 81 FR 40534, 6/22/2016; 50 CFR 17.41(e); [4d], 50 CFR 17.95(b).[CH] |
| Warbler (wood), golden-cheeked........................... | Setophaga chrysoparia...... | Wherever found...................... | E | 55 FR 18844, 5/4/1990; 55 FR 53153, 12/27/1990. |
| Warbler, Eiao Marquesas reed-................................ | Acrocephalus percernis aquilonis........................... | Wherever found...................... | E | 76 FR 50052; 8/11/2011. |
| Warbler, nightingale reed, (old world warbler)........... | Acrocephalus luscinia....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 35 FR 18319; 12/2/1970. |
| Warbler, Rodrigues (old world warbler)................. | Bebrornis rodericanus....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Warbler (wood), Semper's. | Leucopeza semperi........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Warbler, Seychelles (old world warbler)................. | Bebrornis sechellensis....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Wattle-eye, banded........... | Platysteira laticincta.......... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Weaver, Clarke's............... | Ploceus golandi............... | Wherever found...................... | E | 60 FR 2899; 1/12/1995. |
| Whipbird, western............. | Psophodes nigrogularis..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| White-eye, Norfolk Island. | Zosterops albogularis........ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| White-eye, Ponape greater. | Rukia longirostra............. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| White-eye, Rota (nosa Luta)................................ | Zosterops rotensis............ | Wherever found...................... | E | 69 FR 3022, 1/22/2004; 50 CFR 17.95(b).[CH] |

| | | | | |
|---|---|---|---|---|
| White-eye, Seychelles....... | Zosterops modesta........... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Woodpecker, imperial....... | Campephilus imperialis..... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Woodpecker, ivory-billed.. | Campephilus principalis.... | Wherever found..................... | E | 32 FR 4001; 3/11/1967, 35 FR 8491; 6/2/1970. |
| Woodpecker, red-cockaded | Picoides borealis.............. | Wherever found..................... | E | 35 FR 16047; 10/13/1970. |
| Woodpecker, Tristam's...... | Dryocopus javensis richardsi.......................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Wood-quail, gorgeted........ | Odontophorus strophium... | Wherever found..................... | E | 78 FR 64637; 10/29/2013. |
| Woodstar, Chilean............. | Eulidia yarrellii................ | Wherever found..................... | E | 75 FR 50814; 8/17/2010. |
| Woodstar, Esmeraldas....... | Chaetocercus berlepschi.... | Wherever found..................... | E | 78 FR 64637; 10/29/2013. |
| Wren, Guadeloupe house... | Troglodytes aedon guadeloupensis................. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Wren, St. Lucia house....... | Troglodytes aedon mesoleucus...................... | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| **Reptiles** | | | | |
| Alligator, American.......... | Alligator mississippiensis.. | Wherever found..................... | T(S/A) | 32 FR 4001; 3/11/1967, 40 FR 44412; 9/26/1975, 42 FR 2071; 1/10/1977, 44 FR 37130; 6/25/1979, 44 FR 59080; 10/12/1979, 46 FR 40664; 8/10/1981, 48 FR 46332; 10/12/1983, 50 FR 25672; 6/20/1985, 52 FR 21059; 6/4/1987, 50 CFR 17.42(a) [4d]. |
| Alligator, Chinese............. | Alligator sinensis............. | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |

| | | | | |
|---|---|---|---|---|
| Anole, Culebra Island giant................................. | Anolis roosevelti.............. | Wherever found...................... | E | 42 FR 37371; 7/21/1977, 50 CFR 17.95(c)[CH]. |
| Boa, Jamaican.................. | Epicrates subflavus........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Boa, Mona........................ | Epicrates monensis monensis......................... | Wherever found...................... | T | 43 FR 4618; 2/3/1978, 50 CFR 17.95(c)[CH]. |
| Boa, Puerto Rican............. | Epicrates inornatus........... | Wherever found...................... | E | 35 FR 16047; 10/13/1970. |
| Boa, Round Island (unnamed)........................ | Bolyeria multocarinata...... | Wherever found...................... | E | 45 FR 18009; 3/20/1980. |
| Boa, Round Island (unnamed)........................ | Casarea dussumieri........... | Wherever found...................... | E | 45 FR 18009; 3/20/1980. |
| Boa, Virgin Islands tree..... | Epicrates monensis granti.. | Wherever found...................... | E | 35 FR 16047; 10/13/1970, 44 FR 70677; 12/7/1979. |
| Caiman, Apaporis River.... | Caiman crocodilus apaporiensis...................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Caiman, black.................. | Melanosuchus niger.......... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Caiman, broad-snouted [Bolivia, Brazil, Paraguay, Uruguay DPS].................. | Caiman latirostris.............. | Bolivia, Brazil, Paraguay, Uruguay.................................... | E | 41 FR 24062; 6/14/1976. |
| Caiman, broad-snouted [Argentina DPS]............... | Caiman latirostris.............. | Argentina............................... | T | 78 FR 38162; 6/25/2013, 50 CFR 17.42(c)[4d]. |
| Caiman, brown.................. | Caiman crocodilus fuscus (includes Caiman crocodilus chiapasius )...... | Wherever found...................... | T(S/A) | 65 FR 25867; 5/4/2000, 50 CFR 17.42(c)[4d]. |
| Caiman, common............. | Caiman crocodilus crocodilus......................... | Wherever found...................... | T(S/A) | 65 FR 25867; 5/4/2000, 50 CFR 17.42(c)[4d]. |
| Caiman, yacare................ | Caiman yacare................... | Wherever found...................... | T | 35 FR 8491; 6/2/1970, 65 FR 25867; 5/4/2000, 50 CFR 17.42(c)[4d]. |
| Chuckwalla, San Esteban Island................................ | Sauromalus varius............. | Wherever found...................... | E | 45 FR 18009; 3/20/1980. |

| | | | | |
|---|---|---|---|---|
| Crocodile, African dwarf... | Osteolaemus tetraspis tetraspis............................ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crocodile, African slender-snouted................ | Crocodylus cataphractus.... | Wherever found...................... | E | 37 FR 6476; 3/30/1972. |
| Crocodile, American [Non-U.S. populations]..... | Crocodylus acutus............ | Wherever found, except in U.S.A. (FL)............................ | E | 40 FR 44149; 9/25/1975, 44 FR 75074; 12/18/1979 72 FR 13027; 3/20/2007. |
| Crocodile, American [FL DPS]............................... | Crocodylus acutus............ | U.S.A. (FL)............................ | T | 40 FR 44149; 9/25/1975, 72 FR 13027; 3/20/2007, 50 CFR 17.95(c)$^{CH}$. |
| Crocodile, Ceylon mugger. | Crocodylus palustris kimbula........................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crocodile, Congo dwarf.... | Osteolaemus tetraspis osborni............................ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crocodile, Cuban.............. | Crocodylus rhombifer....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Crocodile, mugger............ | Crocodylus palustris palustris........................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crocodile, Nile................. | Crocodylus niloticus......... | Wherever found...................... | T | 35 FR 8491; 6/2/1970, 52 FR 23148; 6/17/1987, 53 FR 38451; 9/30/1988, 58 FR 49870; 9/23/1993, 61 FR 32356; 6/24/1996, 50 CFR 17.42(c)$^{4d}$. |
| Crocodile, Orinoco........... | Crocodylus intermedius..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Crocodile, Philippine........ | Crocodylus novaeguineae mindorensis...................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Crocodile, saltwater [All populations except Papua New Guinea and Australia]......................... | Crocodylus porosus........... | Wherever found, except Papua New Guinea and Australia....... | E | 44 FR 75074; 12/18/1979, 61 FR 32356;6/24/1996. |
| Crocodile, saltwater [Australia DPS]................ | Crocodylus porosus........... | Australia................................. | T | 44 FR 75074; 12/18/1979, 61 FR 32356; |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| | | | | 6/24/1996, 50 CFR 17.42(c) [4d]. |
| Crocodile, Siamese | Crocodylus siamensis | Wherever found | E | 41 FR 24062; 6/4/1976. |
| Gartersnake, narrow-headed | Thamnophis rufipunctatus | Wherever found | T | 79 FR 38678; 7/8/2014; 50 CFR 17.95(c). [CH] |
| Gartersnake, northern Mexican | Thamnophis eques megalops | Wherever found | T | 79 FR 38678, 7/8/2014; 50 CFR 17.42(g); [4d] 50 CFR 17.95(c). [CH] |
| Gavial | Gavialis gangeticus | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Gecko, day | Phelsuma edwardnewtoni | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Gecko, Round Island day | Phelsuma guentheri | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Gecko, Serpent Island | Cyrtodactylus serpensinsula | Wherever found | T | 48 FR 28460; 6/22/1983. |
| Iguana, Acklins ground | Cyclura rileyi nuchalis | Wherever found | T | 48 FR 28460; 6/22/1983. |
| Iguana, Allen's Cay | Cyclura cychlura inornata | Wherever found | T | 48 FR 28460; 6/22/1983. |
| Iguana, Andros Island ground | Cyclura cychlura cychlura | Wherever found | T | 48 FR 28460; 6/22/1983. |
| Iguana, Anegada ground | Cyclura pinguis | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Iguana, Barrington land | Conolophus pallidus | Wherever found | E | 35 FR 8491; 6/2/1970. |
| Iguana, Cayman Brac ground | Cyclura nubila caymanensis | Wherever found | T | 48 FR 28460; 6/22/1983. |
| Iguana, Cuban ground | Cyclura nubila nubila | Wherever found (exluding population introduced in Puerto Rico) | T | 48 FR 28460; 6/22/1983. |
| Iguana, Exuma Island | Cyclura cychlura figginsi | Wherever found | T | 48 FR 28460; 6/22/1983. |
| Iguana, Fiji banded | Brachylophus fasciatus | Wherever found | E | 45 FR 18009; 3/20/1980. |

| | | | | |
|---|---|---|---|---|
| Iguana, Fiji crested............ | Brachylophus vitiensis...... | Wherever found..................... | E | 45 FR 18009; 3/20/1980. |
| Iguana, Grand Cayman blue................................ | Cyclura lewisi.................. | Wherever found..................... | E | 48 FR 28460; 6/22/1983. |
| Iguana, Jamaican.............. | Cyclura collei.................. | Wherever found..................... | E | 48 FR 28460; 6/22/1983. |
| Iguana, Mayaguana........... | Cyclura carinata bartschi... | Wherever found..................... | T | 48 FR 28460; 6/22/1983. |
| Iguana, Mona ground........ | Cyclura stejnegeri............ | Wherever found..................... | T | 43 FR 4618; 2/3/1978, 50 CFR 17.95(c)$^{CH}$. |
| Iguana, Turks and Caicos.. | Cyclura carinata carinata... | Wherever found..................... | T | 48 FR 28460; 6/22/1983. |
| Iguana, Watling Island ground............................ | Cyclura rileyi rileyi.......... | Wherever found..................... | E | 48 FR 28460; 6/22/1983. |
| Iguana, White Cay ground. | Cyclura rileyi cristata....... | Wherever found..................... | T | 48 FR 28460; 6/22/1983. |
| Lizard, blunt-nosed leopard............................ | Gambelia silus................. | Wherever found..................... | E | 32 FR 4001; 3/11/1967. |
| Lizard, Coachella Valley fringe-toed....................... | Uma inornata.................... | Wherever found..................... | T | 45 FR 63812; 9/25/1980, 50 CFR 17.95(c)$^{CH}$. |
| Lizard, dunes sagebrush.... | Sceloporus arenicolus....... | Wherever found..................... | E | 89 FR 43748, 5/20/2024. |
| Lizard, Hierro giant.......... | Gallotia simonyi simonyi.. | Wherever found..................... | E | 49 FR 7394; 2/29/1984. |
| Lizard, Ibiza wall............. | Podarcis pityusensis......... | Wherever found..................... | T | 49 FR 7394; 2/29/1984. |
| Lizard, Maria Island ground............................ | Cnemidophorus vanzoi...... | Wherever found..................... | E | 56 FR 49469; 9/30/1991. |
| Lizard, St. Croix ground.... | Ameiva polops................. | Wherever found..................... | E | 42 FR 28543; 6/3/1977, 50 CFR 17.95(c)$^{CH}$. |
| Monitor, desert................ | Varanus griseus............... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Monitor, Indian (=Bengal). | Varanus bengalensis.......... | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |
| Monitor, Komodo Island... | Varanus komodoensis........ | Wherever found..................... | E | 41 FR 24062; 6/14/1976. |

| | | | | |
|---|---|---|---|---|
| Monitor, yellow................ | Varanus flavescens............ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Pinesnake, black............... | Pituophis melanoleucus lodingi.............................. | Wherever found...................... | T | 80 FR 60468, 10/6/2015; 50 CFR 17.42(h)[4d]; 50 CFR 17.95(c).[CH] |
| Pinesnake, Louisiana......... | Pituophis ruthveni............. | Wherever found...................... | T | 83 FR 14958, April 6, 2018; 50 CFR 17.42(i).[4d] |
| Python, Indian.................. | Python molurus molurus... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Rattlesnake, Aruba Island.. | Crotalus unicolor.............. | Wherever found...................... | T | 48 FR 28460; 6/22/1983. |
| Rattlesnake, eastern massasauga........................ | Sistrurus catenatus............ | Wherever found...................... | T | 81 FR 67214; 9/30/2016. |
| Rattlesnake, New Mexican ridge-nosed........................ | Crotalus willardi obscurus. | Wherever found...................... | T | 43 FR 34476; 8/4/1978, 50 CFR 17.95(c)[CH]. |
| Sea snake, dusky............... | Aipysurus fuscus.............. | Wherever found...................... | E | 80 FR 60560, 10/7/2015;[N] 81 FR 76311, 11/2/2016. |
| Sea turtle, green [Central North Pacific DPS]........... | Chelonia mydas............... | Green sea turtles originating from the Central North Pacific Ocean, bounded by the following coordinates: 41° N., 169° E. in the northwest; 41° N., 143° W. in the northeast; 9° N., 125° W. in the southeast; and 9° N., 175° W. in the southwest Pacific coast of Mexico................................... | T | 81 FR 20057; 4/6/2016[J], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [Central South Pacific DPS]........... | Chelonia mydas............... | Green sea turtles originating from the Central South Pacific Ocean, bounded by the following coordinates: 9° N., 175° W. in the northwest; 9° N., 125° W. in the northeast; 40° S., 96° W. in the southeast; 40° S., 176° E. in the southwest; and 13° S., 171° E. in the west............................. | E | 81 FR 20057; 4/6/2016[J], 50 CFR 224.104. |
| Sea turtle, green [Central West Pacific DPS]............. | Chelonia mydas............... | Green sea turtles originating from the Central West Pacific Ocean, bounded by the following coordinates: 41° N., | E | 81 FR 20057; 4/6/2016[J], 50 CFR 224.104. |

| | | | | |
|---|---|---|---|---|
| | | 146° E. in the northwest; 41° N., 169° E. in the northeast; 9° N., 175° W. in the east; 13° S., 171° E. in the southeast; along the northern coast of the island of New Guinea; and 4.5° N., 129° E. in the west................. | | |
| Sea turtle, green [East Indian—West Pacific DPS].............................. | Chelonia mydas................ | Green sea turtles originating from the Eastern Indian and Western Pacific Oceans, bounded by the following lines and coordinates: 41° N. Lat. in the north, 41° N., 146° E. in the northeast; 4.5° N., 129° E. in the southeast; along the southern coast of the island of New Guinea; along the western coast of Australia (west of 142° E. Long.); 40° S. Lat. in the south; and 84° E. Long. in the east.................... | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [East Pacific DPS].................... | Chelonia mydas................ | Green sea turtles originating from the East Pacific Ocean, bounded by the following lines and coordinates: 41° N., 143° W. in the northwest; 41° N. Lat. in the north; along the western coasts of the Americas; 40° S. Lat. in the south; and 40° S., 96° W. in the southwest................................ | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [Mediterranean DPS]........ | Chelonia mydas................ | Green sea turtles originating from the Mediterranean Sea, bounded by 5.5° W. Long. in the west................................... | E | 81 FR 20057; 4/6/2016[J], 50 CFR 224.104. |
| Sea turtle, green [North Atlantic DPS].................. | Chelonia mydas................ | Green sea turtles originating from the North Atlantic Ocean, bounded by the following lines and coordinates: 48° N. Lat. in the north, along the western coasts of Europe and Africa (west of 5.5° W. Long.); north of 19° N. Lat. in the east; bounded by 19° N., 65.1° W. to 14° N., 65.1° W. then 14° N., 77° W. in the south and west; and along the eastern coasts of the Americas (north of 7.5° N., 77° W.)................................... | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [North Indian DPS].................... | Chelonia mydas................ | Green sea turtles originating from the North Indian Ocean, bounded by: Africa and Asia in the west and north; 84° | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| | | E. Long. in the east; and the equator in the south.................. | | 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [South Atlantic DPS].................. | Chelonia mydas............... | Green sea turtles originating from the South Atlantic Ocean, bounded by the following lines and coordinates: along the northern and eastern coasts of South America (east of 7.5° N., 77° W.); 14° N., 77° W. to 14° N., 65.1° W. to 19° N., 65.1° W. in the north and west; 19° N. Lat. in the northeast; 40° S., 19° E. in the southeast; and 40° S. Lat. in the south.................. | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [Southwest Indian DPS].... | Chelonia mydas............... | Green sea turtles originating from the Southwest Indian Ocean, bounded by the following lines: the equator to the north; 84° E. Long. to the east; 40° S. Lat. to the south; and 19° E. Long (and along the eastern coast of Africa) in the west........................................ | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, green [Southwest Pacific DPS]... | Chelonia mydas............... | Green sea turtles originating from the Southwest Pacific Ocean, bounded by the following lines and coordinates: along the southern coast of the island of New Guinea and the Torres Strait (east of 142° E Long.); 13° S., 171° E. in the northeast; 40° S., 176° E. in the southeast; and 40° S., 142° E. in the southwest................................ | T | 81 FR 20057; 4/6/2016[J], 50 CFR 17.42(b)[4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, hawksbill.......... | Eretmochelys imbricata..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970[J], 50 CFR 224.104[4d], 50 CFR 17.95(c)[CH], 50 CFR 226.209[CH]. |
| Sea turtle, Kemp's ridley... | Lepidochelys kempii......... | Wherever found...................... | E | 35 FR 18319; 12/2/1970[J], 50 CFR 224.104[4d]. |
| Sea turtle, leatherback....... | Dermochelys coriacea....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970[J], 50 CFR |

| | | | | |
|---|---|---|---|---|
| | | | | 17.95(c)<sup>CH</sup>, 50 CFR 226.207<sup>CH</sup>. |
| Sea turtle, loggerhead [Mediterranean Sea DPS].. | Caretta caretta................... | Mediterranean Sea DPS —Loggerhead sea turtles originating from the Mediterranean Sea east of 5°36' W. Long......................... | E | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 224.104<sup>4d</sup>. |
| Sea turtle, loggerhead [North Indian Ocean DPS] | Caretta caretta................... | North Indian Ocean DPS —Loggerhead sea turtles originating from the North Indian Ocean north of the equator and south of 30° N. Lat | E | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 224.104<sup>4d</sup>. |
| Sea turtle, loggerhead [North Pacific Ocean DPS] | Caretta caretta................... | North Pacific Ocean DPS —Loggerhead sea turtles originating from the North Pacific north of the equator and south of 60° N. Lat.................. | E | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 224.104<sup>4d</sup>. |
| Sea turtle, loggerhead [Northeast Atlantic Ocean DPS]............................... | Caretta caretta................... | Northeast Atlantic Ocean DPS—Loggerhead sea turtles originating from the Northeast Atlantic Ocean north of the equator, south of 60° N. Lat., and east of 40° W. Long., except in the vicinity of the Strait of Gibraltar where the eastern boundary is 5°36' W. Long...................................... | E | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 224.104<sup>4d</sup>. |
| Sea turtle, loggerhead [Northwest Atlantic Ocean DPS]............................... | Caretta caretta................... | Northwest Atlantic Ocean DPS—Loggerhead sea turtles originating from the Northwest Atlantic Ocean north of the equator, south of 60° N. Lat., and west of 40° W. Long.......... | T | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207, 50 CFR 17.95(c)<sup>CH</sup>, 50 CFR 226.223<sup>CH</sup>. |
| Sea turtle, loggerhead [South Atlantic Ocean DPS]............................... | Caretta caretta................... | South Atlantic Ocean DPS —Loggerhead sea turtles originating from the South Atlantic Ocean south of the equator, north of 60° S. Lat., west of 20° E. Long., and east of 67° W. Long...................... | T | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, loggerhead [South Pacific Ocean DPS] | Caretta caretta................... | South Pacific Ocean DPS —Loggerhead sea turtles originating from the South Pacific south of the equator, north of 60° S. Lat., west of 67° W. Long., and east of 141° E. Long.................................... | E | 76 FR 58868; 9/22/2011<sup>J</sup>, 50 CFR 224.104<sup>4d</sup>. |

| | | | | |
|---|---|---|---|---|
| Sea turtle, loggerhead [Southeast Indo-Pacific Ocean DPS]...................... | Caretta caretta.................. | Southeast Indo-Pacific Ocean DPS—Loggerhead sea turtles originating from the Southeast Indian Ocean south of the equator, north of 60° S. Lat., and east of 80° E. Long.; South Pacific Ocean south of the equator, north of 60° S. Lat., and west of 141° E. Long........ | T | 76 FR 58868; 9/22/2011 [J], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, loggerhead [Southwest Indian Ocean DPS]................................ | Caretta caretta.................. | Southwest Indian Ocean DPS—Loggerhead sea turtles originating from the Southwest Indian Ocean north of the equator, south of 30° N. Lat., east of 20° E. Long., and west of 80° E. Long...................... | T | 76 FR 58868; 9/22/2011 [J], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Sea turtle, olive ridley [Pacific coast of Mexico breeding DPS]................. | Lepidochelys olivacea...... | Breeding colony populations on Pacific coast of Mexico....... | E | 43 FR 32800; 7/28/1978 [J], 50 CFR 224.104 [4d]. |
| Sea turtle, olive ridley....... | Lepidochelys olivacea...... | Wherever found except when listed as endangered under 50 CFR 224.101........................... | T | 43 FR 32800; 7/28/1978 [J], 50 CFR 17.42(b) [4d], 50 CFR 223.205, 50 CFR 223.206, 50 CFR 223.207. |
| Skink, blue-tail mole......... | Eumeces egregius lividus.. | Wherever found...................... | T | 52 FR 42658; 11/6/1987, 50 CFR 17.42(b) [4d]. |
| Skink, Round Island.......... | Leiolopisma telfairi........... | Wherever found...................... | T | 48 FR 28460; 6/22/1983. |
| Skink, sand...................... | Neoseps reynoldsi............ | Wherever found...................... | T | 52 FR 42658; 11/6/1987, 50 CFR 17.42(b) [4d]. |
| Skink, Slevin's (Gualiik halumtanu, Gholuuf)......... | Emoia slevini.................... | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Snake, Atlantic salt marsh. | Nerodia clarkii taeniata..... | Wherever found...................... | T | 42 FR 60743; 11/29/1977. |
| Snake, copperbelly water [Northern DPS]................. | Nerodia erythrogaster neglecta............................ | U.S.A. (IN north of 40° N. Lat., MI, OH)...................... | T | 62 FR 4183; 1/29/1997. |
| Snake, eastern indigo........ | Drymarchon couperi......... | Wherever found...................... | T | 43 FR 4026, 1/31/1978. |
| Snake, giant garter............ | Thamnophis gigas............ | Wherever found...................... | T | 58 FR 54053; 10/20/1993. |
| Snake, Maria Island.......... | Liophis ornatus............... | Wherever found...................... | E | 56 FR 49469; 9/30/1991. |

| | | | | |
|---|---|---|---|---|
| Snake, San Francisco garter.................... | Thamnophis sirtalis tetraetania....................... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Tartaruga........................ | Podocnemis expansa........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Terrapin, river................... | Batagur baska.................. | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Tomistoma....................... | Tomistoma schlegelii........ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Tortoise, angulated............ | Geochelone yniphora........ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Tortoise, Bolson................ | Gopherus flavomarginatus. | Wherever found...................... | E | 44 FR 23062; 4/17/1979. |
| Tortoise, desert [Mojave DPS].............................. | Gopherus agassizii........... | Wherever found, except AZ south and east of Colorado R., and Mexico........................... | T | 45 FR 55654; 8/20/1980, 54 FR 32326; 8/4/1989, 55 FR 12178; 4/2/1990, 50 CFR 17.95(c)[CH]. |
| Tortoise, desert................ | Gopherus agassizii........... | AZ south and east of Colorado R., and Mexico, when found outside of Mexico or said range in AZ........................... | T(S/A) | 55 FR 12178; 4/2/1990, 50 CFR 17.42(e)[4d]. |
| Tortoise, Egyptian............ | Testudo kleinmanni (syn. Testudo werneri)............... | Wherever found...................... T........................................ | 88 FR 19004, March 30, 2023; 50 CFR 17.42(l).[4d] | |
| Tortoise, Galapagos........... | Geochelone nigra (=elephantopus)............... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Tortoise, gopher [West of Mobile and Tombigbee Rivers DPS].................... | Gopherus polyphemus....... | Wherever found west of Mobile and Tombigbee Rivers in AL, MS, and LA................. | T | 52 FR 25376; 7/7/1987. |
| Tortoise, Madagascar radiated............................ | Geochelone radiata........... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Tracaja............................ | Podocnemis unifilis.......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Tuatara............................ | Sphenodon punctatus........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 65 |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| | | | | FR 16053; 3/24/2000. |
| Tuatara, Brother's Island.... | Sphenodon guntheri.......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970, 65 FR 16053; 3/24/2000. |
| Turtle, Alabama map........ | Graptemys pulchra............ | Wherever found...................... | T (S/A) | 89 FR 57206, 7/12/2024; 50 CFR 17.42(n).[4d] |
| Turtle, Alabama redbellied | Pseudemys alabamensis.... | Wherever found...................... | E | 52 FR 22939; 6/16/1987. |
| Turtle, aquatic box............ | Terrapene coahuila............ | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Turtle, Barbour's map........ | Graptemys barbouri.......... | Wherever found...................... | T (S/A) | 89 FR 57206, 7/12/2024; 50 CFR 17.42(n).[4d] |
| Turtle, black softshell........ | Trionyx nigricans.............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, bog (=Muhlenberg) [Northern DPS]................. | Glyptemys muhlenbergii... | Wherever found, except GA, NC, SC, TN, VA..................... | T | 62 FR 59605, 11/4/1997. |
| Turtle, bog (=Muhlenberg) | Glyptemys muhlenbergii... | U.S.A. (GA, NC, SC, TN, VA). | T (S/A) | 62 FR 59605, 11/4/1997; 50 CFR 17.42(f).[4d] |
| Turtle, Brazilian sideneck.. | Phrynops hogei................ | Wherever found...................... | E | 56 FR 49469; 9/30/1991. |
| Turtle, Burmese peacock... | Morenia ocellata.............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, Cat Island.............. | Trachemys terrapen........... | Cat Island in the Bahamas........ | E | 56 FR 49469; 9/30/1991. |
| Turtle, Central American river................................. | Dermatemys mawii.......... | Wherever found...................... | E | 48 FR 28460; 6/22/1983. |
| Turtle, Cuatro Cienegas softshell............................ | Trionyx ater..................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, Escambia map........ | Graptemys ernsti.............. | Wherever found...................... | T (S/A) | 89 FR 57206, 7/12/2024; 50 CFR 17.42(n).[4d] |
| Turtle, flattened musk [Black Warrior River DPS] | Sternotherus depressus...... | Black Warrior R. system upstream from Bankhead Dam. | T | 52 FR 22418; 6/11/1987. |
| Turtle, geometric.............. | Psammobates geometricus. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |

| | | | | |
|---|---|---|---|---|
| Turtle, Inagua Island......... | Trachemys stejnegeri malonei........................... | Wherever found...................... | E | 56 FR 49469; 9/30/1991. |
| Turtle, Indian sawback...... | Kachuga tecta tecta.......... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, Indian softshell...... | Trionyx gangeticus........... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, Pascagoula map..... | Graptemys gibbonsi.......... | Wherever found...................... | T (S/A) | 89 FR 57206, 7/12/2024; 50 CFR 17.42(n).[4d] |
| Turtle, peacock softshell.... | Trionyx hurum................. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, Pearl River map..... | Graptemys pearlensis........ | Wherever found...................... | T | 89 FR 57206, 7/12/2024; 50 CFR 17.42(m).[4d] |
| Turtle, Plymouth redbelly.. | Pseudemys rubriventris bangsi............................... | Wherever found...................... | E | 45 FR 21828; 4/2/1980, 50 CFR 17.95(c)[CH]. |
| Turtle, ringed map............ | Graptemys oculifera.......... | Wherever found...................... | T | 51 FR 45907; 12/23/1986. |
| Turtle, short-necked or western swamp................. | Pseudemydura umbrina..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Turtle, Sonoyta mud......... | Kinosternon sonoriense longifemorale................... | Wherever found...................... | E | 82 FR 43897, 9/20/2017; 50 CFR 17.95(c).[CH] |
| Turtle, South American red-lined............................ | Trachemys scripta callirostris.......................... | Wherever found...................... | E | 56 FR 49469; 9/30/1991. |
| Turtle, spotted pond......... | Geoclemys hamiltonii....... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, Suwannee alligator snapping........................... | Macrochelys suwanniensis | Wherever found...................... | T | 89 FR 53507, 6/27/2024; 50 CFR 17.42(k).[4d] |
| Turtle, three-keeled Asian. | Melanochelys tricarinata... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Turtle, yellow-blotched map................................. | Graptemys flavimaculata... | Wherever found...................... | T | 56 FR 1459; 1/14/1991. |
| Viper, Lar Valley.............. | Vipera latifii.................... | Wherever found...................... | E | 48 FR 28460; 6/22/1983. |
| Whipsnake, Alameda (=striped racer)................. | Masticophis lateralis euryxanthus...................... | Wherever found...................... | T | 62 FR 64306; 12/5/1997 50 CFR 17.95(c)[CH]. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   **Addendum 242a**

Amphibians

| Species | Scientific name | Where found | Status | Citation |
|---|---|---|---|---|
| Coqui, golden.................. | Eleutherodactylus jasperi... | Wherever found...................... | T | 42 FR 58756; 11/11/1977, 50 CFR 17.95(d)[CH]. |
| Coqui, llanero.................. | Eleutherodactylus juanariveroi...................... | Wherever found...................... | E | 77 FR 60777; 10/4/2012, 50 CFR 17.95(d)[CH]. |
| Frog, California red-legged............................. | Rana draytonii................. | Wherever found...................... | T | 61 FR 25813; 5/23/1996, 50 CFR 17.43(b)[4d], 50 CFR 17.95(d)[CH]. |
| Frog, Chiricahua leopard... | Rana chiricahuensis.......... | Wherever found...................... | T | 67 FR 40790; 6/13/2002, 50 CFR 17.43(b)[4d]. |
| Frog, dusky gopher........... | Rana sevosa (= Lithobates sevosus)........................... | Wherever found...................... | E | 66 FR 63002; 12/4/2001, 50 CFR 17.95(d)[CH]. |
| Frog, foothill yellow-legged [Central Coast DPS]............................... | Rana boylii....................... | California (All foothill yellow-legged frogs in the Central Coast Range south of San Francisco Bay to San Benito and Fresno Counties)............... | T | 88 FR 59698, 8/29/2023; 50 CFR 17.43(g).[4d] |
| Frog, foothill yellow-legged [North Feather DPS]............................... | Rana boylii....................... | California (All foothill yellow-legged frogs in the North Feather River watershed largely in Plumas and Butte Counties)................................. | T | 88 FR 59698, 8/29/2023; 50 CFR 17.43(g).[4d] |
| Frog, foothill yellow-legged [South Coast DPS]. | Rana boylii....................... | California (All foothill yellow-legged frogs in the Coast Range from Coastal Monterey County south to Los Angeles County).................................... | E | 88 FR 59698, 8/29/2023. |
| Frog, foothill yellow-legged [South Sierra DPS]. | Rana boylii....................... | California (All foothill yellow-legged frogs in the Sierra Nevada Mountains south of the American River sub-basin south to the Transverse Range in Kern County)...................... | E | 88 FR 59698, 8/29/2023. |
| Frog, Goliath.................. | Conraua goliath............... | Wherever found...................... | T | 59 FR 63261; 12/8/1994. |
| Frog, Israel painted........... | Discoglossus nigriventer... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |

| Frog, mountain yellow-legged [Northern California DPS].............. | Rana muscosa.................. | Northern California DPS—U.S.A., northern California..... | E | 79 FR 24255; 4/29/2014, 50 CFR 17.95(d)[CH]. |
|---|---|---|---|---|
| Frog, mountain yellow-legged [Southern California DPS]............... | Rana muscosa.................. | Southern California DPS—U.S.A., southern California...... | E | 67 FR 44382; 7/2/2002, 50 CFR 17.95(d)[CH]. |
| Frog, Oregon spotted........ | Rana pretiosa................... | Wherever found...................... | T | 79 FR 51657; 8/29/2014, 50 CFR 17.95(d)[CH]. |
| Frog, Panamanian golden.. | Atelopus varius zeteki....... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Frog, Sierra Nevada yellow-legged................... | Rana sierrae..................... | Wherever found...................... | E | 79 FR 24255; 4/29/2014, 50 CFR 17.95(d)[CH]. |
| Frog, Stephen Island........ | Leiopelma hamiltoni........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Guajón............................ | Eleutherodactylus cooki.... | Wherever found...................... | T | 62 FR 31757; 6/11/1997, 50 CFR 17.95(d)[CH]. |
| Hellbender, eastern [Missouri DPS]................. | Cryptobranchus alleganiensis alleganiensis. | Missouri................................. | E | 86 FR 13465; 3/9/2021. |
| Hellbender, Ozark............ | Cryptobranchus alleganiensis bishopi........ | Wherever found...................... | E | 76 FR 61956; 10/6/2011. |
| Salamander, Austin blind.. | Eurycea waterlooensis....... | Wherever found...................... | E | 78 FR 51277; 8/20/2013 50 CFR 17.95(d)[CH]. |
| Salamander, Barton Springs............................ | Eurycea sosorum.............. | Wherever found...................... | E | 62 FR 23377; 4/30/1997. |
| Salamander, California tiger [Santa Barbara County DPS].................... | Ambystoma californiense.. | Santa Barbara County DPS—U.S.A. (CA-Santa Barbara County)................................ | E | 65 FR 3109; 1/19/2000, 65 FR 57242; 9/21/2000, 50 CFR 17.95(d)[CH]. |
| Salamander, California tiger [Central California DPS]............................. | Ambystoma californiense.. | Central California DPS—U.S.A. (CA-Central California) | T | 69 FR 47248; 8/4/2004, 50 CFR 17.43(c)[4d], 50 CFR 17.95(d)[CH]. |
| Salamander, California tiger [Sonoma County DPS]............................. | Ambystoma californiense.. | Sonoma County DPS—U.S.A. (CA-Sonoma County).............. | E | 67 FR 47739; 7/22/2002, 68 FR 13520; 3/19/2003, 50 CFR 17.95(d)[CH]. |

| | | | | |
|---|---|---|---|---|
| Salamander, Cheat Mountain......................... | Plethodon nettingi............ | Wherever found...................... | T | 54 FR 34464; 8/18/1989. |
| Salamander, Chinese giant. | Andrias davidianus (=davidianus d.)............... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Salamander, desert slender | Batrachoseps aridus.......... | Wherever found...................... | E | 38 FR 14678; 6/4/1973. |
| Salamander, frosted flatwoods......................... | Ambystoma cingulatum.... | Wherever found...................... | T | 64 FR 15691; 4/1/1999, 50 CFR 17.95(d) CH. |
| Salamander, Georgetown... | Eurycea naufragia............ | Wherever found...................... | T | 79 FR 10236, 2/24/2014; 50 CFR 17.43(e); 4d 50 CFR 17.95(d). CH |
| Salamander, Japanese giant................................. | Andrias japonicus (=davidianus j.)............... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Salamander, Jemez Mountains........................ | Plethodon neomexicanus... | Wherever found...................... | E | 78 FR 55599; 9/10/2013, 50 CFR 17.95(d) CH. |
| Salamander, Jollyville Plateau............................. | Eurycea tonkawae............ | Wherever found...................... | T | 78 FR 51277; 8/20/2013, 50 CFR 17.95(d) CH. |
| Salamander, Red Hills....... | Phaeognathus hubrichti..... | Wherever found...................... | T | 41 FR 53032; 12/3/1976. |
| Salamander, reticulated flatwoods......................... | Ambystoma bishopi.......... | Wherever found...................... | E | 74 FR 6700; 2/10/2009, 50 CFR 17.95(d) CH. |
| Salamander, Salado........... | Eurycea chisholmensis...... | Wherever found...................... | T | 79 FR 10236, 2/24/2014; 50 CFR 17.95(d). CH |
| Salamander, San Marcos... | Eurycea nana................... | Wherever found...................... | T | 45 FR 47355; 7/14/1980, 50 CFR 17.43(a) 4d, 50 CFR 17.95(d) CH. |
| Salamander, Santa Cruz long-toed......................... | Ambystoma macrodactylum croceum... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Salamander, Shenandoah... | Plethodon shenandoah....... | Wherever found...................... | E | 54 FR 34464; 8/18/1989. |
| Salamander, Sonoran tiger. | Ambystoma mavortium stebbinsi.......................... | Wherever found...................... | E | 62 FR 665, 1/6/1977. |

| | | | | |
|---|---|---|---|---|
| Salamander, Texas blind.... | Eurycea rathbuni.............. | Wherever found...................... | E | 32 FR 4001, 3/11/1967. |
| Toad, arroyo (=arroyo southwestern)................... | Anaxyrus californicus....... | Wherever found...................... | E | 59 FR 64859; 12/16/1994, 50 CFR 17.95(d)[CH]. |
| Toad, Cameroon............... | Bufo superciliaris.............. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Toad, Dixie Valley............ | Anaxyrus williamsi........... | Wherever found...................... | E | 87 FR 73971, 12/2/2022. |
| Toad, Houston................. | Bufo houstonensis.............. | Wherever found...................... | E | 35 FR 16047; 10/13/1970, 50 CFR 17.95(d)[CH]. |
| Toad, Monte Verde golden. | Bufo periglenes................. | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Toad, Puerto Rican crested | Peltophryne lemur............. | Wherever found...................... | T | 52 FR 28828; 8/4/1987. |
| Toad, Wyoming............... | Bufo hemiophrys baxteri... | Wherever found...................... | E | 49 FR 1992; 1/17/1984. |
| Toad, Yosemite................. | Anaxyrus canorus............. | Wherever found...................... | T | 79 FR 24255; 4/29/2014, 50 CFR 17.95(d)[CH]. |
| Toads, African viviparous.. | Nectophrynoides spp......... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Waterdog, Black Warrior... | Necturus alabamensis........ | Wherever found...................... | E | 83 FR 257, 1/3/2018. |
| Waterdog, Neuse River...... | Necturus lewisi................ | Wherever found...................... | T | 86 FR 30688, June 9, 2021; 50 CFR 17.43(f); [4d] 50 CFR 17.95(d).[CH] |
| Fishes | | | | |
| Ala Balik (trout)............... | Salmo platycephalus......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Angelshark, Argentine...... | Squatina argentina........... | Wherever found...................... | E | 82 FR 21722, 5/10/2017; [N] 84 FR 13809, 4/8/2019. |
| Angelshark, common........ | Squatina squatina............. | Wherever found...................... | E | 81 FR 50394, 8/1/2016; [N] 81 FR 76311, 11/2/2016. |

| | | | | |
|---|---|---|---|---|
| Angelshark, sawback........ | Squatina aculeata............. | Wherever found...................... | E | 81 FR 50394, 8/1/2016; [N] 81 FR 76311, 11/2/2016. |
| Angelshark, smoothback... | Squatina oculata............... | Wherever found...................... | E | 81 FR 50394, 8/1/2016; [N] 81 FR 76311, 11/2/2016. |
| Angelshark, spiny............ | Squatina guggenheim....... | Wherever found...................... | E | 82 FR 21722, 5/10/2017; [N] 84 FR 13809, 4/8/2019. |
| Ayumodoki (loach)........... | Hymenophysa curta.......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Blindcat, Mexican (catfish)........................... | Prietella phreatophila........ | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Bocaccio [Puget Sound-Georgia Basin DPS].......... | Sebastes paucispinis.......... | Puget Sound-Georgia Basin DPS—see 50 CFR 224.101...... | E | 75 FR 22276, 4/28/2010[N], 76 FR 20558, 4/13/2011, 79 FR 42687, 7/23/2014, 50 CFR 226.224[CH]. |
| Bonytongue, Asian........... | Scleropages formosus....... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Cardinalfish, Banggai....... | Pterapogon kauderni......... | Wherever found...................... | T | 81 FR 3023, 1/20/2016; [N] 81 FR 76311, 11/2/2016. |
| Catfish (Thailand)............ | Pangasius sanitwongsei..... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Catfish, Thailand giant...... | Pangasianodon gigas......... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Catfish, Yaqui.................. | Ictalurus pricei................. | Wherever found...................... | T | 49 FR 34490; 8/31/1984, 50 CFR 17.44(h)[4d], 50 CFR 17.95(e)[CH]. |
| Cavefish, Alabama........... | Speoplatyrhinus poulsoni.. | Wherever found...................... | E | 42 FR 45526; 9/9/1977, 53 FR 37968; 9/28/1988, 50 CFR 17.95(e)[CH]. |

| Cavefish, Ozark | Amblyopsis rosae | Wherever found | | T | 49 FR 43965; 11/1/1984. |
|---|---|---|---|---|---|
| Chub, bonytail | Gila elegans | Wherever found | | E | 45 FR 27710; 4/23/1980, 50 CFR 17.95(e)$^{CH}$. |
| Chub, Chihuahua | Gila nigrescens | Wherever found | | T | 48 FR 46053; 10/11/1983, 50 CFR 17.44(g)$^{4d}$. |
| Chub, Gila | Gila intermedia | Wherever found | | E | 70 FR 66664; 11/2/2005, 50 CFR 17.95(e)$^{CH}$. |
| Chub, humpback | Gila cypha | Wherever found | | T | 32 FR 4001, 3/11/1967; 86 FR 57588; 10/18/2021; 50 CFR 17.44(dd); $^{4d}$ 50 CFR 17.95(e).$^{CH}$ |
| Chub, Hutton tui | Gila bicolor ssp | Wherever found | | T | 50 FR 12302; 3/28/1985, 50 CFR 17.44(j)$^{4d}$. |
| Chub, Mohave tui | Gila bicolor mohavensis | Wherever found | | E | 35 FR 16047; 10/13/1970. |
| Chub, Owens tui | Gila bicolor snyderi | Wherever found | | E | 50 FR 31592; 8/5/1985, 50 CFR 17.95(e)$^{CH}$. |
| Chub, Pahranagat roundtail | Gila robusta jordani | Wherever found | | E | 35 FR 16047; 10/13/1970. |
| Chub, peppered | Macrhybopsis tetranema | Wherever found | | E | 87 FR 11188; 2/28/2022; 50 CFR 17.95(e).$^{CH}$ |
| Chub, slender | Erimystax cahni | Wherever found, except where listed as an experimental population | | T | 42 FR 45526; 9/9/1977, 50 CFR 17.44(c)$^{4d}$, 50 CFR 17.95(e)$^{CH}$. |
| Chub, slender | Erimystax cahni | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.84(s)(1)(i)) | | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.84(sr)$^{10j}$. |
| Chub, Sonora | Gila ditaenia | Wherever found | | T | 51 FR 16042; 4/30/1986, 50 CFR 17.44(o)$^{4d}$, |

| | | | | |
|---|---|---|---|---|
| | | | | 50 CFR 17.95(e)$^{CH}$. |
| Chub, spotfin.................. | Erimonax monachus.......... | Wherever found, except where listed as an experimental population............................... | T | 42 FR 45526; 9/9/1977, 50 CFR 17.44(e)$^{4d}$, 50 CFR 17.95(e)$^{CH}$. |
| Chub, spotfin.................. | Erimonax monachus.......... | U.S.A. (TN—specified portions of the Tellico River; see § 17.84(m)(1)(i))............... | XN | 67 FR 52420; 8/12/2002, 50 CFR 17.84(m)$^{10j}$. |
| Chub, spotfin.................. | Erimonax monachus.......... | U.S.A. (AL, TN—specified portions of Shoal Creek; see § 17.84(m)(1)(ii))...................... | XN | 70 FR 1286; 1/6/2005, 50 CFR 17.84(m)$^{10j}$. |
| Chub, spotfin.................. | Erimonax monachus.......... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.84(m)(1)(iii))................... | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.84(m)$^{10j}$. |
| Chub, Virgin River............ | Gila robusta seminuda..... | Wherever found..................... | E | 54 FR 35305; 8/24/1989, 50 CFR 17.95(e)$^{CH}$. |
| Chub, Yaqui..................... | Gila purpurea................... | Wherever found..................... | E | 49 FR 34490; 8/31/1984, 50 CFR 17.95(e)$^{CH}$. |
| Cicek (minnow)............... | Acanthorutilus handlirschi. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |
| Coelacanth, African [Tanzanian DPS].............. | Latimeria chalumnae......... | Tanzanian DPS—see 50 CFR 223.102................................... | T | 81 FR 17398, 3/29/2016;$^{N}$ 81 FR 76311, 11/2/2016. |
| Cui-ui............................. | Chasmistes cujus............. | Wherever found..................... | E | 32 FR 4001; 3/11/1967. |
| Dace, Ash Meadows speckled........................... | Rhinichthys osculus nevadensis........................ | Wherever found..................... | E | 47 FR 19995; 5/10/1982, 48 FR 608; 1/5/1983, 48 FR 40178; 9/2/1983, 50 CFR 17.95(e)$^{CH}$. |
| Dace, blackside................ | Phoxinus (=Chrosomus), cumberlandensis.............. | Wherever found..................... | T | 52 FR 22580; 6/12/1987. |
| Dace, Clover Valley speckled........................... | Rhinichthys osculus oligoporus........................ | Wherever found..................... | E | 54 FR 41448; 10/10/1989. |
| Dace, desert..................... | Eremichthys acros............ | Wherever found..................... | T | 32 FR 4001; 3/11/1967, |

| | | | | |
|---|---|---|---|---|
| | | | | 35 FR 16047; 10/13/1970, 50 FR 50304; 12/10/1985, 50 CFR 17.44(m) [4d], 50 CFR 17.95(e) [CH]. |
| Dace, Independence Valley speckled............................ | Rhinichthys osculus lethoporus........................ | Wherever found....................... | E | 54 FR 41448; 10/10//1989, 54 FR 47861; 11/17/1989. |
| Dace, Kendall Warm Springs.............................. | Rhinichthys osculus thermalis........................... | Wherever found....................... | E | 35 FR 16047; 10/13/1970. |
| Dace, laurel...................... | Chrosomus saylori........... | Wherever found....................... | E | 76 FR 48722; 8/9/2011, 50 CFR 17.95(e) [CH]. |
| Dace, Moapa.................... | Moapa coriacea................ | Wherever found....................... | E | 32 FR 4001; 3/11/1967. |
| Darter, amber.................... | Percina antesella.............. | Wherever found....................... | E | 50 FR 31597; 8/5/1985, 50 CFR 17.95(e) [CH]. |
| Darter, bayou.................... | Etheostoma rubrum........... | Wherever found....................... | T | 40 FR 44149; 9/25/1975, 50 CFR 17.44(b) [4d]. |
| Darter, bluemask............... | Etheostoma akatulo........... | Wherever found....................... | E | 58 FR 68480; 12/27/1993. |
| Darter, boulder................. | Etheostoma wapiti............ | Wherever found, except where listed as an experimental population................................ | E | 53 FR 33996; 9/1/1988. |
| Darter, boulder................. | Etheostoma wapiti............ | Shoal Creek (from Shoal Creek mile 41.7 (66.7 km)) at the mouth of Long Branch, Lawrence County, TN, downstream to the backwaters of Wilson Reservoir (Shoal Creek mile 14 (22 km)) at Goose Shoals, Lauderdale County, AL, including the lower 5 miles (8 km) of all tributaries that enter this reach. | XN | 70 FR 1286; 1/6/2005, 50 CFR 17.84(o) [10j]. |
| Darter, candy.................... | Etheostoma osburni........... | Wherever found....................... | E | 83 FR 58747, 11/21/2018; 50 CFR 17.95(e) [CH] |

| | | | | |
|---|---|---|---|---|
| Darter, Cherokee.............. | Etheostoma scotti............. | Wherever found...................... | T | 59 FR 65505; 12/20/1994. |
| Darter, Cumberland.......... | Etheostoma susanae.......... | Wherever found...................... | E | 76 FR 48722; 8/9/2011, 50 CFR 17.95(e)$^{CH}$. |
| Darter, diamond................ | Crystallaria cincotta.......... | Wherever found...................... | E | 78 FR 45074; 7/26/2013, 50 CFR 17.95(e)$^{CH}$. |
| Darter, duskytail.............. | Etheostoma percnurum...... | Wherever found, except where listed as an experimental population..................... | E | 58 FR 25758; 4/27/1993. |
| Darter, duskytail.............. | Etheostoma percnurum...... | U.S.A. (TN—specified portions of the Tellico River; see § 17.84(p)(1)(i))................ | XN | 67 FR 52420; 8/12/2002, 50 CFR 17.84(q)$^{10j}$. |
| Darter, duskytail.............. | Etheostoma percnurum...... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.84(q)(1)(ii))........................ | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.84(q)$^{10j}$. |
| Darter, Etowah................ | Etheostoma etowahae....... | Wherever found...................... | E | 59 FR 65505; 12/20/1994. |
| Darter, fountain................ | Etheostoma fonticola........ | Wherever found...................... | E | 35 FR 16047; 10/13/1970, 50 CFR 17.95(e)$^{CH}$. |
| Darter, goldline................ | Percina aurolineata.......... | Wherever found...................... | T | 57 FR 14786; 4/22/1992. |
| Darter, Kentucky arrow..... | Etheostoma spilotum........ | Wherever found...................... | T | 81 FR 68963; 10/5/2016, 50 CFR 17.44(p)$^{4d}$, 50 CFR 17.95(e)$^{CH}$. |
| Darter, leopard................ | Percina pantherina.......... | Wherever found...................... | T | 43 FR 3711; 1/27/1978, 50 CFR 17.44(d)$^{4d}$, 50 CFR 17.95(e)$^{CH}$. |
| Darter, Maryland.............. | Etheostoma sellare.......... | Wherever found...................... | E | 32 FR 4001; 3/11/1967, 50 CFR 17.95(e)$^{CH}$. |
| Darter, Niangua................ | Etheostoma nianguae........ | Wherever found...................... | T | 50 FR 24649; 6/12/1985, 50 CFR 17.44(k)$^{4d}$, 50 CFR 17.95(e)$^{CH}$. |

| | | | | |
|---|---|---|---|---|
| Darter, pearl.....................Percina aurora..................Wherever found..................... | | | T | 82 FR 43885, 9/20/2017; 50 CFR 17.95(e).[CH] |
| Darter, relict....................Etheostoma chienense.......Wherever found..................... | | | T | 58 FR 68480, 12/27/1993; 88 FR 66280, 9/27/2023; 50 CFR 17.44(hh).[4d] |
| Darter, rush.....................Etheostoma phytophilum...Wherever found..................... | | | E | 76 FR 48722; 8/9/2011, 50 CFR 17.95(e)[CH]. |
| Darter, sickle...................Percina williamsi.............Wherever found..................... | | | T | 87 FR 67380, 11/8/2022; 50 CFR 17.44(ee).[4d] |
| Darter, slackwater.............Etheostoma boschungi......Wherever found..................... | | | T | 42 FR 45526; 9/9/1977, 50 CFR 17.44(c)[4d], 50 CFR 17.95(e)[CH]. |
| Darter, trispot..................Etheostoma trisella...........Wherever found..................... | | | T | 83 FR 67131, 12/28/2018; 50 CFR 17.44(q);[4d] 50 CFR 17.95(e).[CH] |
| Darter, vermilion...............Etheostoma chermocki......Wherever found..................... | | | E | 66 FR 59367; 11/28/2001, 50 CFR 17.95(e)[CH]. |
| Darter, watercress.............Etheostoma nuchale.........Wherever found..................... | | | E | 35 FR 16047; 10/13/1970. |
| Darter, yellowcheek..........Etheostoma moorei...........Wherever found..................... | | | E | 76 FR 48722; 8/9/2011, 50 CFR 17.95(e)[CH]. |
| Eulachon [Southern DPS]..Thaleichthys pacificus.......Southern DPS—see 50 CFR 223.102................................... | | | T | 75 FR 13012; 3/18/2010[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.222[CH]. |
| Gambusia, Big Bend.........Gambusia gaigei..............Wherever found..................... | | | E | 32 FR 4001; 3/11/1967. |
| Gambusia, Clear Creek.....Gambusia heterochir.........Wherever found..................... | | | E | 32 FR 4001; 3/11/1967. |

| Common name | Scientific name | Where listed | Status | Citation(s) |
|---|---|---|---|---|
| Gambusia, Pecos | Gambusia nobilis | Wherever found | E | 35 FR 16047; 10/13/1970. |
| Goby, tidewater | Eucyclogobius newberryi | Wherever found | E | 59 FR 5494; 2/4/1994, 50 CFR 17.95(e) [CH]. |
| Grouper, gulf | Mycteroperca jordani | Wherever found | E | 81 FR 72545, 10/20/2016; [N] 84 FR 13809, 4/8/2019. |
| Grouper, island | Mycteroperca fusca | Wherever found | T | 81 FR 72545, 10/20/2016; [N] 84 FR 13809, 4/8/2019. |
| Grouper, Nassau | Epinephelus striatus | Wherever found | T | 81 FR 42268, 6/29/2016; [N] 81 FR 76311, 11/2/2016. |
| Guitarfish, blackchin | Rhinobatos cemiculus | Wherever found | T | 82 FR 6309, 1/19/2017; [N] 84 FR 13809, 4/8/2019. |
| Guitarfish, Brazilian | Rhinobatos horkelii | Wherever found | E | 82 FR 21722, 5/10/2017; [N] 84 FR 13809, 4/8/2019. |
| Guitarfish, common | Rhinobatos rhinobatos | Wherever found | T | 82 FR 6309, 1/19/2017; [N] 84 FR 13809, 4/8/2019. |
| Logperch, Conasauga | Percina jenkinsi | Wherever found | E | 50 FR 31597; 8/5/1985, 50 CFR 17.95(e) [CH]. |
| Logperch, Roanoke | Percina rex | Wherever found | E | 54 FR 34468; 8/18/1989. |
| Madtom, Carolina | Noturus furiosus | Wherever found | E | 86 FR 30688, June 9, 2021; 50 CFR 17.95(e). [CH] |
| Madtom, Chucky | Noturus crypticus | Wherever found | E | 76 FR 48722; 8/9/2011, 50 CFR 17.95(e) [CH]. |
| Madtom, frecklebelly [Upper Coosa River DPS]. | Noturus munitus | Upper Coosa River Basin (GA, TN) | T | 88 FR 13038; 3/2/2023; 50 CFR 17.44(ff); [4d] |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| | | | | 50 CFR 17.95(e).[CH] |
| Madtom, Neosho | Noturus placidus | Wherever found | T | 55 FR 21148; 5/22/1990. |
| Madtom, pygmy | Noturus stanauli | Wherever found, except where listed as an experimental population | E | 58 FR 25758; 4/27/1993. |
| Madtom, pygmy | Noturus stanauli | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.84(t)(1)(i)) | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.84(t)[10j]. |
| Madtom, smoky | Noturus baileyi | Wherever found, except where listed as an experimental population | E | 49 FR 43065; 10/26/1984, 50 CFR 17.95(e)[CH]. |
| Madtom, smoky | Noturus baileyi | U.S.A. (TN—specified portions of the Tellico River; see § 17.84(r)(1)(i)) | XN | 67 FR 52420; 8/12/2002, 50 CFR 17.84(r)[10j]. |
| Madtom, yellowfin | Noturus flavipinnis | Wherever found, except where listed as an experimental population | T | 42 FR 45526; 9/9/1977, 50 CFR 17.44(c)[4d], 50 CFR 17.95(e)[CH]. |
| Madtom, yellowfin | Noturus flavipinnis | U.S.A. (TN, VA—specified portions of the Holston River and watershed; see § 17.84(e)(1)(i)) | XN | 53 FR 29335; 8/4/1988, 50 CFR 17.84(e)[10j]. |
| Madtom, yellowfin | Noturus flavipinnis | U.S.A. (TN—specified portions of the Tellico River; see § 17.84(e)(1)(ii)) | XN | 67 FR 52420; 8/12/2002, 50 CFR 17.84(e)[10j]. |
| Madtom, yellowfin | Noturus flavipinnis | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.84(e)(1)(iii)) | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.84(e)[10j]. |
| Minnow, Devils River | Dionda diaboli | Wherever found | T | 64 FR 56596; 10/20/1999, 50 CFR 17.95(e)[CH]. |
| Minnow, loach | Tiaroga cobitis | Wherever found | E | 51 FR 39468, 10/28/1986; 77 FR 10810, 2/23/2012; 50 CFR 17.95(e).[CH] |
| Minnow, Rio Grande silvery | Hybognathus amarus | Wherever found, except where listed as an experimental population | E | 59 FR 36988; 7/20/1994, 50 CFR 17.95(e)[CH]. |

| Minnow, Rio Grande silvery.............................. | Hybognathus amarus......... | Rio Grande, from Little Box Canyon (approximately 10.4 river miles downstream of Fort Quitman, TX) to Amistad Dam; and on the Pecos River, from its confluence with Independence Creek to its confluence with the Rio Grande...................................... | XN | 73 FR 74357; 12/8/2008, 50 CFR 17.84(u)[10]. |
|---|---|---|---|---|
| Nekogigi (catfish)............. | Coreobagrus ichikawai...... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Pikeminnow, Colorado...... | Ptychocheilus lucius.......... | Wherever found, except where listed as an experimental population.............................. | E | 32 FR 4001; 3/11/1967, 50 FR 30188; 7/24/1985, 50 CFR 17.95(e)[CH]. |
| Pikeminnow, Colorado...... | Ptychocheilus lucius........... | Salt and Verde R. drainages, AZ............................................ | XN | 50 FR 30188; 7/24/1985, 50 CFR 17.84(b)[10]. |
| Poolfish, Pahrump............. | Empetrichthys latos........... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Pupfish, Ash Meadows Amargosa......................... | Cyprinodon nevadensis mionectes......................... | Wherever found...................... | E | 47 FR 19995; 5/10/1982, 48 FR 608; 1/5/1983, 48 FR 40178; 9/2/1983, 50 CFR 17.95(e)[CH]. |
| Pupfish, Comanche Springs............................. | Cyprinodon elegans.......... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Pupfish, desert................. | Cyprinodon macularius..... | Wherever found...................... | E | 51 FR 10842; 3/31/1986, 50 CFR 17.95(e)[CH]. |
| Pupfish, Devils Hole......... | Cyprinodon diabolis.......... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Pupfish, Leon Springs....... | Cyprinodon bovinus.......... | Wherever found...................... | E | 45 FR 54678; 8/15/1980, 50 CFR 17.95(e)[CH]. |
| Pupfish, Owens................. | Cyprinodon radiosus......... | Wherever found...................... | E | 32 FR 4001; 3/11/1967. |
| Pupfish, Warm Springs...... | Cyprinodon nevadensis pectoralis......................... | Wherever found...................... | E | 35 FR 16047; 10/13/1970. |
| Ray, giant manta............... | Manta birostris................. | Wherever found...................... | T | 83 FR 2916, 1/22/2018;[N] 84 FR 13809, 4/8/2019. |

| Common name | Scientific name | Where listed | Status | Citation(s) |
|---|---|---|---|---|
| Rockfish, yelloweye [Puget Sound-Georgia Basin DPS]...................... | Sebastes ruberrimus.......... | Puget Sound-Georgia Basin DPS—see 50 CFR 223.102...... | T | 75 FR 22276; 4/28/2010, [N] 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.224. [CH] |
| Salmon, Atlantic [Gulf of Maine DPS]...................... | Salmo salar...................... | Gulf of Maine DPS—see 50 CFR 224.101.......................... | E | 65 FR 69459; 11/17/2000 [J], 74 FR 29344; 6/19/2009 [J], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.217 [CH] . |
| Salmon, Chinook [California Coastal ESU]... | Oncorhynchus tshawytscha.................... | California Coastal ESU—see 50 CFR 223.102.................... | T | 64 FR 50394; 9/16/1999 [N] , 64 FR 72960; 12/29/1999, 70 FR 37160, 6/28/2005 [N] , 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d] , 50 CFR 226.211 [CH] . |
| Salmon, Chinook [Central Valley spring-run ESU]..... | Oncorhynchus tshawytscha..................... | Central Valley spring-run ESU —see 50 CFR 223.102............ | T | 64 FR 50394; 9/16/1999 [N] , 64 FR 72960; 12/29/1999, 70 FR 37160, 6/28/2005 [N] , 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.20 [4d] , 50 CFR 226.211 [CH] . |
| Salmon, Chinook [Central Valley spring-run ESU—XN]................................. | Oncorhynchus tshawytscha..................... | Central Valley spring-run ESU-XN—see 50 CFR 223.102....... | XN | 78 FR 79622; 12/31/2013 [N] , 79 FR 42687; 7/23/2014, 50 CFR 223.301 [10j] . |

| | | | | |
|---|---|---|---|---|
| Salmon, Chinook [Central Valley spring-run ESU-XN Shasta]............................. | Oncorhynchus tshawytscha..................... | Central Valley spring-run ESU-XN Shasta—see 50 CFR 223.102.................................... | XN | 88 FR 58511, 8/28/2023; [N] 89 FR 65552, 8/12/2024; 50 CFR 223.301. [10j] |
| Salmon, Chinook [Central Valley spring-run ESU-XN Yuba]................................. | Oncorhynchus tshawytscha..................... | Central Valley spring-run ESU-XN Yuba—see 50 CFR 223.102.................................... | XN | 87 FR 79808, 12/28/2022; [N] 89 FR 65552, 8/12/2024; 50 CFR 223.301. [10j] |
| Salmon, Chinook [Lower Columbia River ESU]....... | Oncorhynchus tshawytscha..................... | Lower Columbia River ESU— see 50 CFR 223.102................. | T | 64 FR 14308; 3/24/1999 [N], 64 FR 41835; 8/2/1999, 70 FR 37160, 6/28/2005 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.212 [CH]. |
| Salmon, Chinook [Puget Sound ESU]................... | Oncorhynchus tshawytscha.................... | Puget Sound ESU—see 50 CFR 223.102........................... | T | 64 FR 14308; 3/24/1999 [N], 64 FR 41835; 8/2/1999, 70 FR 37160, 6/28/2005 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.212 [CH]. |
| Salmon, Chinook [Sacramento River winter-run ESU]......................... | Oncorhynchus tshawytscha..................... | Sacramento River winter-run ESU—see 50 CFR 224.101...... | E | 55 FR 12191; 4/2/1990 [N], 55 FR 12831; 4/6/1990, 55 FR 46515; 11/4/1990 [N], 55 FR 49623; 11/30/1990, 59 FR 440; 1/4/1994 [N], 59 FR 13836; 3/23/1994, 70 FR 37160; 6/28/2005 [N], 76 FR 20558; |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.204 [CH]. |
| Salmon, Chinook [Sacramento River winter-run ESU-XN Shasta]......... | Oncorhynchus tshawytscha.................... | Sacramento winter-run ESU-XN Shasta—see 50 CFR 223.102.................................. | XN | 88 FR 58511, 8/28/2023; [N] 89 FR 65552, 8/12/2024; 50 CFR 223.301. [10j] |
| Salmon, Chinook [Snake River fall-run ESU]........... | Oncorhynchus tshawytscha.................... | Snake River fall-run ESU—see 50 CFR 223.102..................... | T | 57 FR 14653; 4/22/1992 [N], 58 FR 49880; 9/23/1993, 59 FR 42529; 8/18/1994 [N], 59 FR 54840; 11/2/1994, 70 FR 37160, 6/28/2005 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.205 [CH]. |
| Salmon, Chinook [Snake River spring/summer-run ESU].............................. | Oncorhynchus tshawytscha.................... | Snake River spring/summer-run ESU—see 50 CFR 223.102 | T | 57 FR 14653; 4/22/1992 [N], 58 FR 49880; 9/23/1993, 59 FR 42529; 8/18/1994 [N], 59 FR 54840; 11/2/1994, 70 FR 37160, 6/28/2005 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.205 [CH]. |
| Salmon, Chinook [Upper Columbia River spring-run ESU].............................. | Oncorhynchus tshawytscha.................... | Upper Columbia River spring-run ESU—see 50 CFR 224.101 | E | 64 FR 14308; 3/24/1999 [N], 64 FR 41835; 8/2/1999, 70 FR 37160; 6/28/2005 [N], 76 FR 20558; 4/13/2011, |

| | | | | 79 FR 42687; 7/23/2014, 50 CFR 226.212[CH]. |
|---|---|---|---|---|
| Salmon, Chinook [Upper Columbia River spring-run ESU-XN].................... | Oncorhynchus tshawytscha.................... | Upper Columbia River spring-run ESU-XN—see 50 CFR 223.102.................... | XN | 79 FR 40004, 7/11/2014[N], 79 FR 52576; 9/4/2014, 50 CFR 223.301[10j]. |
| Salmon, Chinook [Upper Willamette River ESU]...... | Oncorhynchus tshawytscha.................... | Upper Willamette River ESU —see 50 CFR 223.102............ | T | 64 FR 14308; 3/24/1999[N], 64 FR 41835; 8/2/1999, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.212[CH]. |
| Salmon, chum [Columbia River ESU]...................... | Oncorhynchus keta.......... | Columbia River ESU—see 50 CFR 223.102.......................... | T | 64 FR 14508; 3/25/1999[N], 64 FR 41835; 8/2/1999, 70 FR 37160; 6/28/2005[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.212[CH]. |
| Salmon, chum [Hood Canal summer-run ESU]... | Oncorhynchus keta.......... | Hood Canal summer-run ESU —see 50 CFR 223.102............ | T | 64 FR 14508; 3/25/1999[N], 64 FR 41835; 8/2/1999, 70 FR 37160; 6/28/2005[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.212[CH]. |
| Salmon, coho [Central California Coast ESU]....... | Oncorhynchus kisutch....... | Central California Coast ESU —see 50 CFR 224.101............ | E | 61 FR 56138; 10/31/1996[N], 61 FR 59028; 11/20/1996, 70 FR 37160; |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 6/28/2005 [N], 77 FR 19552; 4/2/2012 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.210 [CH]. |
| Salmon, coho [Lower Columbia River ESU]....... | Oncorhynchus kisutch....... | Lower Columbia River ESU— see 50 CFR 223.102................ | | T | 70 FR 37160; 6/28/2005, [N] 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203, [4d] 50 CFR 226.212. [CH] |
| Salmon, coho [Oregon Coast ESU]...................... | Oncorhynchus kisutch....... | Oregon Coast ESU—see 50 CFR 223.102.......................... | | T | 75 FR 29489; 5/26/2010 [N], 76 FR 20558; 4/13/2011, 76 FR 35755; 6/20/2011 [N], 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.212 [CH]. |
| Salmon, coho [Southern Oregon-Northern California Coast ESU]....... | Oncorhynchus kisutch....... | Southern Oregon—Northern California Coast ESU—see 50 CFR 223.102.......................... | | T | 62 FR 24588; 5/6/1997 [N], 62 FR 33038; 6/18/1997, 70 FR 37160; 6/28/2005 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.210 [CH]. |
| Salmon, sockeye [Ozette Lake ESU]...................... | Oncorhynchus nerka......... | Ozette Lake ESU—see 50 CFR 223.102.................................... | | T | 64 FR 14528; 3/25/1999 [N], 64 FR 41835; 8/2/1999, 70 FR 37160; 6/28/2005 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 |

| | | | | |
|---|---|---|---|---|
| | | | | CFR 223.203[4d], 50 CFR 226.212[CH]. |
| Salmon, sockeye [Snake River ESU]...................... | Oncorhynchus nerka......... | Snake River ESU—see 50 CFR 224.101........................... | E | 56 FR 58619; 11/20/1991[N], 57 FR 212; 1/3/1992, 70 FR 37160; 6/28/2005[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.205[CH]. |
| Sawfish, dwarf.................. | Pristis clavata.................. | Wherever found...................... | E | 79 FR 73978; 12/12/2014[N], 79 FR 3914; 1/26/2015. |
| Sawfish, green.................. | Pristis zijsron.................... | Wherever found...................... | E | 79 FR 73978; 12/12/2014[N], 79 FR 3914; 1/26/2015. |
| Sawfish, largetooth........... | Pristis pristis (formerly Pristis perotteti, Pristis pristis, and Pristis microdon)........................ | Wherever found...................... | E | 76 FR 40822; 9/12/2011[N], 79 FR 42687; 7/23/2014, 79 FR 73978; 12/12/2014[N], 79 FR 3914; 1/26/2015. |
| Sawfish, narrow................ | Anoxypristis cuspidata...... | Wherever found...................... | E | 79 FR 73978; 12/12/2014[N], 79 FR 3914; 1/26/2015. |
| Sawfish, smalltooth [Non-U.S. DPS]......................... | Pristis pectinata................ | Non-U.S. DPS—Smalltooth sawfish originating from non-U.S. waters............................ | E | 79 FR 73978; 12/12/2014[N], 79 FR 3914; 1/26/2015. |
| Sawfish, smalltooth [U.S. DPS]................................ | Pristis pectinata................ | U.S. DPS—Smalltooth sawfish originating from U.S. waters.... | E | 68 FR 15674; 4/1/2003[N], 70 FR 69464; 11/16/2005, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.218[CH]. |

| | | | | |
|---|---|---|---|---|
| Sculpin, grotto | Cottus specus | Wherever found | E | 78 FR 58938; 9/25/2013, 50 CFR 17.95(e)[CH]. |
| Sculpin, pygmy | Cottus pygmaeus | Wherever found | T | 54 FR 39846; 9/28/1989, 50 CFR 17.44(u)[4d]. |
| Shark, daggernose | Isogomphodon oxyrhynchus | Wherever found | E | 82 FR 21722, 5/10/2017;[N] 84 FR 13809, 4/8/2019. |
| Shark, narrownose smoothhound | Mustelus schmitti | Wherever found | T | 82 FR 21722, 5/10/2017;[N] 84 FR 13809, 4/8/2019. |
| Shark, oceanic whitetip | Carcharhinus longimanus | Wherever found | T | 83 FR 4153, 1/30/2018;[N] 84 FR 13809, 4/8/2019. |
| Shark, scalloped hammerhead [Central & SW Atlantic DPS] | Sphyrna lewini | Central & SW Atlantic DPS—see 50 CFR 223.102 | T | 79 FR 38214; 7/3/2014[N], 79 FR 52576; 9/4/2014. |
| Shark, scalloped hammerhead [Eastern Atlantic DPS] | Sphyrna lewini | Eastern Atlantic DPS—see 50 CFR 224.101 | E | 79 FR 38214; 7/3/2014[N], 79 FR 52576; 9/4/2014. |
| Shark, scalloped hammerhead [Eastern Pacific DPS] | Sphyrna lewini | Eastern Pacific DPS—see 50 CFR 224.101 | E | 79 FR 38214; 7/3/2014[N], 79 FR 52576; 9/4/2014. |
| Shark, scalloped hammerhead [Indo-West Pacific DPS] | Sphyrna lewini | Indo-West Pacific DPS—see 50 CFR 223.102 | T | 79 FR 38214; 7/3/2014[N], 79 FR 52576; 9/4/2014. |
| Shark, striped smoothhound | Mustelus fasciatus | Wherever found | E | 82 FR 21722, 5/10/2017;[N] 84 FR 13809, 4/8/2019. |
| Shiner, Arkansas River [Arkansas River Basin DPS] | Notropis girardi | Arkansas River Basin (AR, KS, NM, OK, TX) | T | 63 FR 64772; 11/23/1998, 50 CFR 17.95(e)[CH]. |
| Shiner, beautiful | Cyprinella formosa | Wherever found | T | 49 FR 34490; 8/31/1984, 50 CFR 17.44(h)[4d], |

| | | | | |
|---|---|---|---|---|
| | | | | 50 CFR 17.95(e)[CH] |
| Shiner, blue.................. | Cyprinella caerulea.......... | Wherever found...................... | T | 57 FR 14786; 4/22/1992. |
| Shiner, Cahaba................. | Notropis cahabae............. | Wherever found...................... | E | 55 FR 42961; 10/25/1990. |
| Shiner, Cape Fear............. | Notropis mekistocholas..... | Wherever found...................... | E | 52 FR 36034; 9/25/1987, 50 CFR 17.95(e)[CH]. |
| Shiner, palezone............... | Notropis albizonatus........ | Wherever found...................... | E | 58 FR 25758; 4/27/1993. |
| Shiner, Pecos bluntnose..... | Notropis simus pecosensis. | Wherever found...................... | T | 52 FR 5295; 2/20/1987, 50 CFR 17.44(r)[4d], 50 CFR 17.95(e)[CH]. |
| Shiner, sharpnose............. | Notropis oxyrhynchus....... | Wherever found...................... | E | 79 FR 45273; 8/4/2014, 50 CFR 17.95(e)[CH]. |
| Shiner, smalleye............... | Notropis buccula............. | Wherever found...................... | E | 79 FR 45273; 8/4/2014, 50 CFR 17.95(e)[CH]. |
| Shiner, Topeka................. | Notropis topeka............... | Wherever found, except where listed as an experimental population................................ | E | 63 FR 69008; 12/15/1998, 50 CFR 17.95(e)[CH]. |
| Shiner, Topeka................. | Notropis topeka............... | U.S.A. (MO—specified portions of Little Creek, Big Muddy Creek, and Spring Creek watersheds in Adair, Gentry, Harrison, Putnam, Sullivan, and Worth Counties; see § 17.84(d)(1)(i))................ | XN | 78 FR 42702; 7/17/2013, 50 CFR 17.84(d)[10j]. |
| Silverside, Waccamaw...... | Menidia extensa.............. | Wherever found...................... | T | 52 FR 11277; 4/8/1987, 50 CFR 17.44(s)[4d], 50 CFR 17.95(e)[CH]. |
| Smelt, delta.................... | Hypomesus transpacificus. | Wherever found...................... | T | 58 FR 12854; 3/5/1993, 50 CFR 17.95(e)[CH]. |
| Smelt, longfin [San Francisco Bay-Delta DPS]. | Spirinchus thaleichthys..... | U.S.A. (CA)........................... | E | 89 FR 61049; 7/30/2024. |
| Spikedace....................... | Meda fulgida.................. | Wherever found...................... | E | 51 FR 23769; 7/1/1986, 77 |

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| | | | | FR 10810; 2/23/2012, 50 CFR 17.95(e)[CH]. |
| Spinedace, Big Spring...... | Lepidomeda mollispinis pratensis........................... | Wherever found..................... | T | 50 FR 12298; 3/28/1985, 50 CFR 17.44(i)[4d], 50 CFR 17.95(e)[CH]. |
| Spinedace, Little Colorado | Lepidomeda vittata........... | Wherever found..................... | T | 32 FR 4001; 3/11/1967, 35 FR 16047; 10/13/1970, 52 FR 35034; 9/16/1987, 50 CFR 17.44(t)[4d], 50 CFR 17.95(e)[CH]. |
| Spinedace, White River..... | Lepidomeda albivallis....... | Wherever found..................... | E | 50 FR 37194; 9/12/1985, 50 CFR 17.95(e)[CH]. |
| Springfish, Hiko White River............................ | Crenichthys baileyi grandis........................... | Wherever found..................... | E | 50 FR 39123; 9/27/1985, 50 CFR 17.95(e)[CH]. |
| Springfish, Railroad Valley | Crenichthys nevadae........ | Wherever found..................... | T | 51 FR 10857; 3/31/1986, 50 CFR 17.44(n)[4d], 50 CFR 17.95(e)[CH]. |
| Springfish, White River..... | Crenichthys baileyi baileyi | Wherever found..................... | E | 50 FR 39123; 9/27/1985, 50 CFR 17.95(e)[CH]. |
| Steelhead [California Central Valley DPS].......... | Oncorhynchus mykiss....... | California Central Valley DPS —see 50 CFR 223.102............ | T | 63 FR 13347; 3/19/1998[N], 63 FR 32996; 6/17/1998, 71 FR 834; 1/5/2006[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.211[CH]. |
| Steelhead [Central California Coast DPS]....... | Oncorhynchus mykiss....... | Central California Coast DPS —see 50 CFR 223.102............ | T | 62 FR 43937; 8/18/1997[N], 63 FR 32996; 6/17/1998, 71 FR |

| | | | | |
|---|---|---|---|---|
| | | | | 834; 1/5/2006 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.211 [CH]. |
| Steelhead [Lower Columbia River DPS]....... | Oncorhynchus mykiss....... | Lower Columbia River DPS— see 50 CFR 223.102................ | T | 63 FR 13347; 3/19/1998 [N], 63 FR 32996; 6/17/1998, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.212 [CH]. |
| Steelhead [Middle Columbia River DPS]....... | Oncorhynchus mykiss....... | Middle Columbia River DPS— see 50 CFR 223.102................ | T | 64 FR 14517; 3/25/1999 [N], 64 FR 41835; 8/2/1999, 71 FR 834; 1/5/2006 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.212 [CH]. |
| Steelhead [Middle Columbia River DPS— XN]................................ | Oncorhynchus mykiss....... | Middle Columbia River DPS— XN—see 50 CFR 223.102....... | XN | 78 FR 2893, 1/15/2013 [N], 79 FR 42687; 7/23/2014, 50 CFR 223.301 [10j]. |
| Steelhead [Northern California DPS]................ | Oncorhynchus mykiss....... | Northern California DPS—see 50 CFR 223.102..................... | T | 65 FR 36075; 6/7/2000 [N], 65 FR 54177; 9/7/2000, 71 FR 834; 1/5/2006 [N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203 [4d], 50 CFR 226.211 [CH]. |
| Steelhead [Puget Sound DPS]................................ | Oncorhynchus mykiss....... | Puget Sound DPS—see 50 CFR 223.102.......................... | T | 72 FR 26722; 5/11/2007, [N] |

| | | | | |
|---|---|---|---|---|
| | | | | 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203,[4d] 50 CFR 226.212.[CH] |
| Steelhead [Snake River Basin DPS]...................... | Oncorhynchus mykiss....... | Snake River Basin DPS—see 50 CFR 223.102...................... | T | 62 FR 43937; 8/18/1997[N], 63 FR 32996; 6/17/1998, 71 FR 834; 1/5/2006[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.212[CH]. |
| Steelhead [South Central California Coast DPS]....... | Oncorhynchus mykiss....... | South-Central California Coast DPS—see 50 CFR 223.102...... | T | 62 FR 43937; 8/18/1997[N], 63 FR 32996; 6/17/1998, 71 FR 834; 1/5/2006[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.211[CH]. |
| Steelhead [Southern California DPS]................ | Oncorhynchus mykiss....... | Southern California DPS—see 50 CFR 224.101...................... | E | 62 FR 43937; 8/18/1997[N], 63 FR 32996; 6/17/1998, 71 FR 834; 1/5/2006[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.211[CH]. |
| Steelhead [Upper Columbia River DPS]....... | Oncorhynchus mykiss....... | Upper Columbia River DPS—see 50 CFR 223.102................ | T | 62 FR 43937; 8/18/1997[N], 63 FR 32996; 6/17/1998, 71 FR 834; 1/5/2006[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], |

| | | | | |
|---|---|---|---|---|
| | | | | 50 CFR 226.212[CH]. |
| Steelhead [Upper Willamette River DPS]...... | Oncorhynchus mykiss....... | Upper Willamette River DPS —see 50 CFR 223.102............ | T | 64 FR 14517; 3/25/1999[N], 64 FR 41835; 8/2/1999, 71 FR 834; 1/5/2006[N], 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.203[4d], 50 CFR 226.212[CH]. |
| Stickleback, unarmored threespine...................... | Gasterosteus aculeatus williamsoni...................... | Wherever found...................... | E | 35 FR 16047; 10/13/1970. |
| Sturgeon, Adriatic............ | Acipenser naccarii............ | Wherever found...................... | E | 79 FR 31222; 6/2/2014[N], 79 FR 52576; 9/4/2014. |
| Sturgeon, Alabama............ | Scaphirhynchus suttkusi.... | Wherever found...................... | E | 65 FR 26438; 5/5/2000, 50 CFR 17.95(e)[CH]. |
| Sturgeon, Atlantic (Atlantic subspecies) [Carolina DPS]................ | Acipenser oxyrinchus oxyrinchus...................... | Carolina DPS—see 50 CFR 224.101...................... | E | 77 FR 5914, 2/6/2012;[N] 79 FR 42687, 7/23/2014; 50 CFR 226.225.[CH] |
| Sturgeon, Atlantic (Atlantic subspecies) [Chesapeake Bay DPS]..... | Acipenser oxyrinchus oxyrinchus...................... | Chesapeake Bay DPS—see 50 CFR 224.101...................... | E | 77 FR 5880, 2/6/2012;[N] 79 FR 42687, 7/23/2014; 50 CFR 226.225.[CH] |
| Sturgeon, Atlantic (Atlantic subspecies)[Gulf of Maine DPS]................ | Acipenser oxyrinchus oxyrinchus...................... | Gulf of Maine DPS—see 50 CFR 223.102...................... | T | 77 FR 5880, 2/6/2012;[N] 79 FR 42687, 7/23/2014; 50 CFR 223.211;[4d] 50 CFR 226.225.[CH] |
| Sturgeon, Atlantic (Atlantic subspecies)[New York Bight DPS]............... | Acipenser oxyrinchus oxyrinchus...................... | New York Bight DPS—see 50 CFR 224.101...................... | E | 77 FR 5880, 2/6/2012;[N] 79 FR 42687, 7/23/2014; 50 |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   **Addendum 267a**

| | | | | |
|---|---|---|---|---|
| | | | | CFR 226.225. CH |
| Sturgeon, Atlantic (Atlantic subspecies) [South Atlantic DPS]........ | Acipenser oxyrinchus oxyrinchus...................... | South Atlantic DPS—see 50 CFR 224.101.......................... | E | 77 FR 5914, 2/6/2012; [N] 79 FR 42687, 7/23/2014; 50 CFR 226.225. CH |
| Sturgeon, Atlantic (Gulf subspecies)...................... | Acipenser oxyrinchus desotoi............................ | Wherever found...................... | T | 56 FR 49653; 9/30/1991 [N], 56 FR 49658; 9/30/1991, 50 CFR 17.44 [4d], 50 CFR 17.95(e) [CH], 50 CFR 226.214 [CH]. |
| Sturgeon, beluga.............. | Huso huso....................... | Wherever found...................... | T | 69 FR 18499; 4/8/2004, 50 CFR 17.44(y) [4d]. |
| Sturgeon, Chinese............ | Acipenser sinensis........... | Wherever found...................... | E | 79 FR 31222; 6/2/2014 [N], 79 FR 52576; 9/4/2014. |
| Sturgeon, European........... | Acipenser sturio............... | Wherever found...................... | E | 79 FR 31222; 6/2/2014 [N], 79 FR 52576; 9/4/2014. |
| Sturgeon, green [Southern DPS]................................ | Acipenser medirostris....... | Southern DPS—see 50 CFR 223.102.................................. | T | 71 FR 26835; 5/9/2006, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 223.210 [4d], 50 CFR 226.219 [CH]. |
| Sturgeon, Kaluga.............. | Huso dauricus.................. | Wherever found...................... | E | 79 FR 31222; 6/2/2014 [N], 79 FR 52576; 9/4/2014. |
| Sturgeon, pallid............... | Scaphirhynchus albus........ | Wherever found...................... | E | 55 FR 36641; 9/6/1990. |
| Sturgeon, Sakhalin........... | Acipenser mikadoi........... | Wherever found...................... | E | 79 FR 31222; 6/2/2014 [N], 79 FR 52576; 9/4/2014. |

| Species | Scientific name | Location | Status | Citation |
|---|---|---|---|---|
| Sturgeon, shortnose........... | Acipenser brevirostrum..... | Wherever found..................... | E | 32 FR 4001; 3/11/1967. |
| Sturgeon, shovelnose........ | Scaphirhynchus platorynchus.................... | Wherever found..................... | T (S/A) | 75 FR 53598; 9/1/2010, 50 CFR 17.44(aa) [4d]. |
| Sturgeon, white [Kootenai River DPS]...................... | Acipenser transmontanus... | Kootenai River DPS—U.S.A. (ID, MT), Canada (BC), (Kootenai R. system)............... | E | 59 FR 45989; 9/6/1994, 50 CFR 17.95(e) [CH] |
| Sturgeon, Yangtze............. | Acipenser dabryanus........ | Wherever found..................... | E | 86 FR 21961, 4/26/2021. |
| Sucker, June.................... | Chasmistes liorus............. | Wherever found..................... | T | 51 FR 10851, 3/31/1986; 86 FR 192, 1/4/2021; 50 CFR 17.44(cc) [4d]; 50 CFR 17.95(e). [CH] |
| Sucker, Lost River............ | Deltistes luxatus............... | Wherever found..................... | E | 53 FR 27130; 7/18/1988, 50 CFR 17.95(e) [CH]. |
| Sucker, razorback............. | Xyrauchen texanus........... | Wherever found..................... | E | 56 FR 54957; 10/23/1991, 50 CFR 17.95(e) [CH]. |
| Sucker, Santa Ana [Three CA river basins DPS]........ | Catostomus santaanae....... | Los Angeles River basin, San Gabriel River basin, Santa Ana River basin............................ | T | 65 FR 19686; 4/12/2000, 50 CFR 17.95(e) [CH]. |
| Sucker, shortnose.............. | Chasmistes brevirostris...... | Wherever found..................... | E | 53 FR 27130; 7/18/1988, 50 CFR 17.95(e) [CH]. |
| Sucker, Warner................. | Catostomus warnerensis.... | Wherever found..................... | T | 50 FR 39117; 9/27/1985, 50 CFR 17.44(l) [4d], 50 CFR 17.95(e) [CH]. |
| Sucker, Zuni bluehead....... | Catostomus discobolus yarrowi............................ | Wherever found..................... | E | 79 FR 43131; 7/24/2014, 50 CFR 17.95(e) [CH]. |
| Sunfish, spring pygmy...... | Elassoma alabamae.......... | Wherever found..................... | T | 78 FR 60766, 10/2/2013; 50 CFR 17.95(e). [CH.] |
| Tango, Miyako (Tokyo bitterling)........................ | Tanakia tanago................. | Wherever found..................... | E | 35 FR 8491; 6/2/1970. |

| Common name | Scientific name | Where listed | | Status | Listing citations and applicable rules |
|---|---|---|---|---|---|
| Temoleh, Ikan (minnow)... | Probarbus jullieni............. | Wherever found.................... | | E | 41 FR 24062; 6/14/1976. |
| Topminnow, Barrens......... | Fundulus julisia............... | Wherever found.................... | | E | 84 FR 56131, 10/21/2019. |
| Topminnow, Gila (incl. Yaqui)............................. | Poeciliopsis occidentalis.... | Wherever found.................... | E......................................... | 32 FR 4001, 3/11/1967. | |
| Totoaba (seatrout or weakfish)........................ | Cynoscion macdonaldi...... | Wherever found.................... | | E | 44 FR 29478; 5/21/1979. |
| Trout, bull [Lower 48 States DPS]..................... | Salvelinus confluentus...... | U.S.A., coterminous (lower 48 states), except where listed as an experimental population...... | | T | 63 FR 31647; 6/10/1998, 63 FR 42757; 8/11/1998, 64 FR 17110; 4/8/1999, 64 FR 58910; 11/1/1999, 50 CFR 17.44(w) $^{4d}$, 50 CFR 17.44(x) $^{4d}$, 50 CFR 17.95(e) $^{CH}$. |
| Trout, bull....................... | Salvelinus confluentus...... | Clackamas River subbasin and the mainstem Willamette River, from Willamette Falls to its points of confluence with the Columbia River, including Multnomah Channel............... | | XN | 76 FR 35979; 6/21/2011, 50 CFR 17.84(v) $^{10j}$. |
| Trout, Gila....................... | Oncorhynchus gilae.......... | Wherever found.................... | | T | 32 FR 4001; 3/11/1967, 71 FR 40657; 7/18/2006, 50 CFR 17.44(z) $^{4d}$ |
| Trout, greenback cutthroat. | Oncorhynchus clarkii stomias............................. | Wherever found.................... | | T | 32 FR 4001; 3/11/1967, 43 FR 16343; 4/18/1978, 50 CFR 17.44(f) $^{4d}$. |
| Trout, Lahontan cutthroat.. | Oncorhynchus clarkii henshawi......................... | Wherever found.................... | | T | 35 FR 16047; 10/13/1970, 40 FR 29863; 7/16/1975, 50 CFR 17.44(a) $^{4d}$. |
| Trout, Little Kern golden... | Oncorhynchus aguabonita whitei.............................. | Wherever found.................... | | T | 43 FR 15427; 4/13/1978, 50 CFR 17.44(e) $^{4d}$, 50 CFR 17.95(e) $^{CH}$. |

| | | | | |
|---|---|---|---|---|
| Trout, Paiute cutthroat....... | Oncorhynchus clarkii seleniris........................... | Wherever found..................... | T | 32 FR 4001; 3/11/1967, 40 FR 29863; 7/16/1975, 50 CFR 17.44(a) [4d]. |
| Woundfin........................ | Plagopterus argentissimus. | Wherever found, except where listed as an experimental population........................... | E | 35 FR 16047; 10/13/1970, 50 FR 30188; 7/24/1985, 50 CFR 17.95(e) [CH]. |
| Woundfin........................ | Plagopterus argentissimus. | Gila R. drainage, AZ, NM....... | XN | 50 FR 30188; 7/24/1985, 50 CFR 17.84(b) [10j]. |

### Clams

| | | | | |
|---|---|---|---|---|
| Bankclimber, purple.......... | Elliptoideus sloatianus...... | Wherever found..................... | T | 63 FR 12664; 3/16/1998, 50 CFR 17.95(f) [CH]. |
| Bean, Choctaw................. | Obovaria choctawensis...... | Wherever found..................... | E | 77 FR 61663, 10/10/2012; 50 CFR 17.95(f). [CH] |
| Bean, Cumberland........... | Villosa trabalis................. | Wherever found, except where listed as an experimental population........................... | E | 41 FR 24062; 6/14/1976. |
| Bean, Cumberland........... | Villosa trabalis................. | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1))......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a) [10j]. |
| Bean, Cumberland........... | Villosa trabalis................. | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b) [10j]. |
| Bean, Purple................... | Villosa perpurpurea.......... | Wherever found..................... | E | 62 FR 1647; 1/10/1997, 50 CFR 17.95(f) [CH]. |
| Clubshell...................... | Pleurobema clava............. | Wherever found, except where listed as an experimental population........................... | E | 58 FR 5638; 1/22/1993. |
| Clubshell...................... | Pleurobema clava............. | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1))......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a) [10j]. |
| Clubshell, black............... | Pleurobema curtum........... | Wherever found..................... | E | 52 FR 11162; 4/7/1987. |

| Clubshell, Canoe Creek..... | Pleurobema athearni.......... | Wherever found...................... | E | 87 FR 40115, July 6, 2022; 50 CFR 17.95(f). [CH] |
| Clubshell, ovate............... | Pleurobema perovatum...... | Wherever found...................... | E | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f) [CH]. |
| Clubshell, southern........... | Pleurobema decisum........ | Wherever found...................... | E | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f) [CH]. |
| Combshell, Cumberlandian................. | Epioblasma brevidens....... | Wherever found, except where listed as an experimental population............................ | E | 62 FR 1647; 1/10/1997, 50 CFR 17.95(f) [CH]. |
| Combshell, Cumberlandian................. | Epioblasma brevidens....... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a) [10j]. |
| Combshell, Cumberlandian................. | Epioblasma brevidens....... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)............................. | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b) [10j]. |
| Combshell, southern........ | Epioblasma (=Dysnomia) penita............................ | Wherever found...................... | E | 52 FR 11162; 4/7/1987. |
| Ebonyshell, round............ | Reginaia rotulata............. | Wherever found...................... | E | 58 FR 14330, 3/17/1993; 50 CFR 17.95(f). [CH] |
| Elktoe, Appalachian.......... | Alasmidonta raveneliana... | Wherever found...................... | E | 59 FR 60324; 11/23/1994, 50 CFR 17.95(f) [CH]. |
| Elktoe, Cumberland.......... | Alasmidonta atropurpurea. | Wherever found...................... | E | 62 FR 1647; 1/10/1997, 50 CFR 17.95(f) [CH]. |
| Fanshell............................ | Cyprogenia stegaria.......... | Wherever found, except where listed as an experimental population............................ | E | 55 FR 25591; 6/21/1990. |
| Fanshell............................ | Cyprogenia stegaria.......... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)............................. | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b) [10j]. |
| Fanshell, "Ouachita"......... | Cyprogenia cf. aberti........ | Wherever found...................... | T | 88 FR 41724, June 27, 2023; 50 CFR 17.45(f); [4d] 50 CFR 17.95(f). [CH] |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

| Fanshell, western............. | Cyprogenia aberti............ | Wherever found...................... | T | 88 FR 41724, June 27, 2023; 50 CFR 17.45(f); [4d] 50 CFR 17.95(f). [CH] |
| Fatmucket, Arkansas......... | Lampsilis powelli............ | Wherever found...................... | T | 55 FR 12797; 4/5/1990. |
| Fatmucket, Guadalupe....... | Lampsilis bergmanni............ | Wherever found...................... | E | 89 FR 48034, June 4, 2024; 50 CFR 17.95(f). [CH] |
| Fatmucket, Texas.............. | Lampsilis bracteata........... | Wherever found...................... | E | 89 FR 48034, June 4, 2024; 50 CFR 17.95(f). [CH] |
| Fawnsfoot, Texas.............. | Truncilla macrodon........... | Wherever found...................... | T | 89 FR 48034, June 4, 2024; 50 CFR 17.45(c); [4d] 50 CFR 17.95(f). [CH] |
| Heelsplitter, inflated.......... | Potamilus inflatus............. | Wherever found...................... | T | 55 FR 39868; 9/28/1990. |
| Heelsplitter, Carolina........ | Lasmigona decorata.......... | Wherever found...................... | E | 58 FR 34926; 6/30/1993, 50 CFR 17.95(f) [CH]. |
| Hickorynut, round............. | Obovaria subrotunda......... | Wherever found...................... | T | 88 FR 14794, March 9, 2023; 50 CFR 17.45(d); [4d] 50 CFR 17.95(f). [CH] |
| Higgins eye (pearlymussel).................. | Lampsilis higginsii............ | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Hornshell, Texas............... | Popenaias popeii............. | Wherever found...................... | E | 83 FR 5720, 2/9/2018. |
| Kidneyshell, fluted............ | Ptychobranchus subtentus. | Wherever found...................... | E | 78 FR 59269; 9/26/2013, 50 CFR 17.95(f) [CH]. |
| Kidneyshell, southern........ | Ptychobranchus jonesi....... | Wherever found...................... | E | 77 FR 61663; 10/10/2012, 50 CFR 17.95(f) [CH]. |

| Kidneyshell, triangular...... | Ptychobranchus greenii.... | Wherever found...................... | E | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f)[CH]. |
| Lampmussel, Alabama...... | Lampsilis virescens........... | Wherever found, except where listed as an experimental population...................... | E | 41 FR 24062; 6/14/1976. |
| Lampmussel, Alabama...... | Lampsilis virescens........... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1))......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)[10j]. |
| Lance, yellow.................. | Elliptio lanceolata............ | Wherever found...................... | T | 83 FR 14189, 4/3/2018; 50 CFR 17.95(f).[CH] |
| Lilliput, pale.................... | Toxolasma cylindrellus..... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Longsolid........................ | Fusconaia subrotunda........ | Wherever found...................... | T | 88 FR 14794, March 9, 2023; 50 CFR 17.45(d);[4d] 50 CFR 17.95(f).[CH] |
| Mapleleaf, winged (mussel)........................... | Quadrula fragosa............. | Wherever found, except where listed as an experimental population...................... | E | 56 FR 28345; 6/20/1991. |
| Mapleleaf, winged (mussel)........................... | Quadrula fragosa............. | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1))......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)[10j]. |
| Moccasinshell, Alabama... | Medionidus acutissimus.... | Wherever found...................... | T | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f)[CH]. |
| Moccasinshell, Coosa........ | Medionidus parvulus......... | Wherever found...................... | E | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f)[CH]. |
| Moccasinshell, Gulf.......... | Medionidus penicillatus.... | Wherever found...................... | E | 63 FR 12664; 3/16/1998, 50 CFR 17.95(f)[CH]. |
| Moccasinshell, Ochlockonee.................... | Medionidus simpsonianus. | Wherever found...................... | E | 63 FR 12664; 3/16/1998, 50 CFR 17.95(f)[CH]. |
| Moccasinshell, Suwannee.. | Medionidus walkeri.......... | Wherever found...................... | T | 81 FR 69417, 10/6/2016; 50 CFR 17.95(f).[CH] |

| | | | | |
|---|---|---|---|---|
| Monkeyface, Appalachian (pearlymussel)............... | Theliderma sparsa............. | Wherever found, except where listed as an experimental population.............................. | E | 41 FR 24062, 6/14/1976. |
| Monkeyface, Appalachian (pearlymussel)............... | Theliderma sparsa............. | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434, 9/13/2007; 50 CFR 17.85(b). [10j] |
| Monkeyface, Cumberland. | Theliderma intermedia...... | Wherever found, except where listed as an experimental population.............................. | E | 41 FR 24062, 6/14/1976. |
| Monkeyface, Cumberland. | Theliderma intermedia...... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250, 6/14/2001; 50 CFR 17.85(a). [10j] |
| Monkeyface, Cumberland. | Theliderma intermedia...... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434, 9/13/2007; 50 CFR 17.85(b). [10j] |
| Mucket, Neosho............... | Lampsilis rafinesqueana.... | Wherever found...................... | E | 78 FR 57076; 9/17/2013, 50 CFR 17.95(f)[CH]. |
| Mucket, orangenacre......... | Hamiota perovalis............ | Wherever found...................... | T | 58 FR 14330, 3/17/1993; 50 CFR 17.95(f).[CH] |
| Mucket, pink (pearlymussel)............... | Lampsilis abrupta............. | Wherever found...................... | E | 41 FR 24062, 6/14/1976. |
| Mussel, oyster................. | Epioblasma capsaeformis.. | Wherever found, except where listed as an experimental population.............................. | E | 62 FR 1647; 1/10/1997, 50 CFR 17.95(f)[CH]. |
| Mussel, oyster................. | Epioblasma capsaeformis.. | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250, 6/14/2001, 50 CFR 17.85(a) [10j]. |
| Mussel, oyster................. | Epioblasma capsaeformis.. | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434, 9/13/2007, 50 CFR 17.85(b) [10j]. |
| Mussel, rayed bean........... | Villosa fabalis.................. | Wherever found...................... | E | 77 FR 8632; 2/14/2012. |
| Mussel, scaleshell............ | Leptodea leptodon............ | Wherever found...................... | E | 66 FR 51322; 10/9/2001. |
| Orb, Guadalupe................ | Cyclonaias necki.............. | Wherever found...................... | E | 89 FR 48034, June 4, 2024; 50 CFR 17.95(f).[CH] |

| | | | | |
|---|---|---|---|---|
| Pearlshell, Alabama.......... | Margaritifera marrianae..... | Wherever found...................... | E | 77 FR 61663; 10/10/2012, 50 CFR 17.95(f)[CH]. |
| Pearlshell, Louisiana......... | Margaritifera hembeli....... | Wherever found...................... | T | 53 FR 3567; 2/5/1988, 58 FR 49935; 9/24/1993. |
| Pearlymussel, birdwing..... | Lemiox rimosus............... | Wherever found, except where listed as an experimental population...................... | E | 41 FR 24062; 6/14/1976. |
| Pearlymussel, birdwing..... | Lemiox rimosus............... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)[10j]. |
| Pearlymussel, birdwing..... | Lemiox rimosus............... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)[10j]. |
| Pearlymussel, cracking...... | Hemistena lata................ | Wherever found, except where listed as an experimental population...................... | E | 54 FR 39850; 9/28/1989. |
| Pearlymussel, cracking...... | Hemistena lata................ | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)[10j]. |
| Pearlymussel, cracking...... | Hemistena lata................ | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)[10j]. |
| Pearlymussel, Curtis......... | Epioblasma curtisii........... | Wherever found...................... | E | 41 FR 24062, 6/14/1976. |
| Pearlymussel, dromedary.. | Dromus dromas............... | Wherever found, except where listed as an experimental population...................... | E | 41 FR 24062; 6/14/1976. |
| Pearlymussel, dromedary.. | Dromus dromas............... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)[10j]. |
| Pearlymussel, dromedary.. | Dromus dromas............... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................ | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)[10j]. |
| Pearlymussel, littlewing.... | Pegias fabula................... | Wherever found...................... | E | 53 FR 45861; 11/14/1988. |
| Pearlymussel, Nicklin's..... | Megalonaias nicklineana... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |

| | | | | |
|---|---|---|---|---|
| Pearlymussel, purple cat's paw.................................. | Epioblasma obliquata........ | Wherever found, except where listed as an experimental population............................ | E | 55 FR 28209, 7/10/1990. |
| Pearlymussel, purple cat's paw.................................. | Epioblasma obliquata........ | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250, 6/14/2001; 50 CFR 17.85(a). [10j] |
| Pearlymussel, slabside....... | Pleuronaia dolabelloides.... | Wherever found...................... | E | 78 FR 59269; 9/26/2013, 50 CFR 17.95(f) [CH]. |
| Pearlymussel, Tampico...... | Cyrtonaias tampicoensis tecomatensis.................... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Pearlymussel, white cat's paw.................................. | Epioblasma perobliqua...... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Pigtoe, Atlantic.................. | Fusconaia masoni............. | Wherever found...................... | T | 86 FR 64000, November 16, 2021; 50 CFR 17.45(a); [4d] 50 CFR 17.95(f). [CH] |
| Pigtoe, Cumberland.......... | Pleuronaia gibber............. | Wherever found...................... | E | 56 FR 21084, 5/7/1991. |
| Pigtoe, dark..................... | Pleurobema furvum.......... | Wherever found...................... | E | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f) [CH]. |
| Pigtoe, finerayed.............. | Fusconaia cuneolus.......... | Wherever found, except where listed as an experimental population............................ | E | 41 FR 24062; 6/14/1976. |
| Pigtoe, finerayed.............. | Fusconaia cuneolus.......... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)).......... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a) [10j]. |
| Pigtoe, finerayed.............. | Fusconaia cuneolus.......... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)).......... | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b) [10j]. |
| Pigtoe, fuzzy.................... | Pleurobema strodeanum.... | Wherever found...................... | T | 77 FR 61663; 10/10/2012, 50 CFR 17.95(f) [CH]. |
| Pigtoe, Georgia................ | Pleurobema hanleyianum.. | Wherever found...................... | E | 75 FR 67512; 11/2/2010, 50 CFR 17.95(f) [CH]. |
| Pigtoe, heavy.................. | Pleurobema taitianum........ | Wherever found...................... | E | 52 FR 11162; 4/7/1987. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Addendum 277a**

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| Pigtoe, narrow | Fusconaia escambia | Wherever found | T | 77 FR 61663; 10/10/2012, 50 CFR 17.95(f)[CH]. |
| Pigtoe, oval | Pleurobema pyriforme | Wherever found | E | 63 FR 12664; 3/16/1998, 50 CFR 17.95(f)[CH]. |
| Pigtoe, rough | Pleurobema plenum | Wherever found, except where listed as an experimental population | E | 41 FR 24062; 6/14/1976. |
| Pigtoe, rough | Pleurobema plenum | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)) | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)[10j]. |
| Pigtoe, shiny | Fusconaia cor | Wherever found, except where listed as an experimental population | E | 41 FR 24062; 6/14/1976. |
| Pigtoe, shiny | Fusconaia cor | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1)) | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)[10j]. |
| Pigtoe, shiny | Fusconaia cor | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)) | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)[10j]. |
| Pigtoe, southern | Pleurobema georgianum | Wherever found | E | 58 FR 14330; 3/17/1993, 50 CFR 17.95(f)[CH]. |
| Pigtoe, tapered | Fusconaia burkei | Wherever found | T | 77 FR 61663; 10/10/2012, 50 CFR 17.95(f)[CH]. |
| Pimpleback, orangefoot | Plethobasus cooperianus | Wherever found, except where listed as an experimental population | E | 41 FR 24062; 6/14/1976. |
| Pimpleback, orangefoot | Plethobasus cooperianus | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)) | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)[10j]. |
| Pimpleback, Texas | Cyclonaias petrina | Wherever found | E | 89 FR 48034, June 4, 2024; 50 CFR 17.95(f).[CH] |
| Pink, ring | Obovaria retusa | Wherever found, except where listed as an experimental population | E | 54 FR 40109; 9/29/1989. |

| | | | | |
|---|---|---|---|---|
| Pink, ring......................... | Obovaria retusa................. | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))............................. | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b) [10j]. |
| Pocketbook, fat................ | Potamilus capax............... | Wherever found...................... | E | 41 FR 24062; 6/14/1976. |
| Pocketbook, finelined........ | Hamiota altilis.................. | Wherever found...................... | T | 58 FR 14330, 3/17/1993; 50 CFR 17.95(f). [CH] |
| Pocketbook, shinyrayed.... | Hamiota subangulata......... | Wherever found...................... | E | 63 FR 12664, 3/16/1998; 50 CFR 17.95(f). [CH] |
| Pocketbook, speckled........ | Lampsilis streckeri............ | Wherever found...................... | E | 54 FR 8339; 2/28/1989. |
| Rabbitsfoot....................... | Quadrula cylindrica cylindrica.......................... | Wherever found...................... | T | 78 FR 57076; 9/17/2013, 50 CFR 17.95(f) [CH]. |
| Rabbitsfoot, rough............ | Quadrula cylindrica strigillata.......................... | Wherever found...................... | E | 62 FR 1647; 1/10/1997, 50 CFR 17.95(f) [CH]. |
| Riffleshell, northern.......... | Epioblasma rangiana......... | Wherever found...................... | E | 58 FR 5638, 1/22/1993. |
| Riffleshell, tan.................. | Epioblasma florentina walkeri (=E. walkeri)........ | Wherever found...................... | E | 42 FR 42351; 8/23/1977. |
| Rock pocketbook, Ouachita........................... | Arcidens wheeleri............. | Wherever found...................... | E | 56 FR 54950, 10/23/1991. |
| Sandshell, southern........... | Hamiota australis.............. | Wherever found...................... | T | 77 FR 61663; 10/10/2012, 50 CFR 17.95(f) [CH]. |
| Sheepnose........................ | Plethobasus cyphyus......... | Wherever found...................... | E | 77 FR 14914;3/13/2012. |
| Slabshell, Chipola............. | Elliptio chipolaensis........... | Wherever found...................... | T | 63 FR 12664; 3/16/1998, 50 CFR 17.95(f) [CH]. |
| Snuffbox (mussel)............. | Epioblasma triquetra......... | Wherever found...................... | E | 77 FR 8632; 2/14/2012. |
| Spectaclecase................... | Cumberlandia monodonta. | Wherever found...................... | E | 77 FR 14914; 3/13/2012. |
| Spike, Balcones................ | Fusconaia iheringi............. | Wherever found...................... | E | 89 FR 48034, June 4, 2024; |

| Species | Scientific name | Where found | Status | When listed |
|---|---|---|---|---|
| | | | | 50 CFR 17.95(f). CH |
| Spike, false...................... | Fusconaia mitchelli........... | Wherever found...................... | E | 89 FR 48034, June 4, 2024; |
| | | | | 50 CFR 17.95(f). CH |
| Spinymussel, Altamaha..... | Elliptio spinosa................ | Wherever found...................... | E | 76 FR 62928; 10/11/2011, 50 CFR 17.95(f) CH. |
| Spinymussel, James.......... | Parvaspina collina............ | Wherever found...................... | E | 53 FR 27689, 7/22/1988. |
| Spinymussel, Tar River..... | Parvaspina steinstansana... | Wherever found...................... | E | 50 FR 26572, 6/27/1985. |
| Threeridge, fat................. | Amblema neislerii............ | Wherever found...................... | E | 63 FR 12664; 3/16/1998, 50 CFR 17.95(f) CH. |
| Wartyback, white............. | Plethobasus cicatricosus.... | Wherever found, except where listed as an experimental population........................... | E | 41 FR 24062; 6/14/1976. |
| Wartyback, white............. | Plethobasus cicatricosus.... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1))........................... | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b) 10j. |
| Wedgemussel, dwarf......... | Alasmidonta heterodon..... | Wherever found...................... | E | 55 FR 9447; 3/14/1990. |
| Snails | | | | |
| Abalone, Black................. | Haliotis cracherodii.......... | Wherever found...................... | E | 74 FR 1937; 1/14/2009 N, 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 50 CFR 226.221 CH. |
| Abalone, white................ | Haliotis sorenseni............ | Wherever found...................... | E | 66 FR 29054; 5/29/2001 N, 70 FR 69464; 11/16/2005. |
| Campeloma, slender.......... | Campeloma decampi........ | Wherever found...................... | E | 65 FR 10033; 2/25/2000. |
| Cavesnail, Tumbling Creek............................... | Antrobia culveri............... | Wherever found...................... | E | 67 FR 52879; 8/14/2002, 50 CFR 17.95(f) CH. |

| | | | | |
|---|---|---|---|---|
| Elimia, lacy..................... | Elimia crenatella............. | Wherever found...................... | T | 63 FR 57610; 10/28/1998. |
| Hornsnail, rough.............. | Pleurocera foremani.......... | Wherever found...................... | E | 75 FR 67512; 11/2/2010, 50 CFR 17.95(f)$^{CH}$. |
| Limpet, Banbury Springs... | Idaholanx fresti................ | Wherever found...................... | E | 57 FR 59244, 12/14/1992. |
| Lioplax, cylindrical.......... | Lioplax cyclostomaformis. | Wherever found...................... | E | 63 FR 57610; 10/28/1998. |
| Marstonia, armored (snail) | Marstonia pachyta............. | Wherever found...................... | E | 65 FR 10033, 2/25/2000. |
| Marstonia, royal............... | Marstonia ogmorhaphe...... | Wherever found...................... | E | 59 FR 17994, 4/15/1994. |
| Pebblesnail, flat............... | Lepyrium showalteri......... | Wherever found...................... | E | 63 FR 57610; 10/28/1998. |
| Pecos assiminea............... | Assiminea pecos.............. | Wherever found...................... | E | 76 FR 33036; 6/7/2011, 50 CFR 17.95(f)$^{CH}$. |
| Ramshorn, magnificent..... | Planorbella magnifica....... | Wherever found...................... | E | 88 FR 56471, 8/18/2023; 50 CFR 17.95(f).$^{CH}$ |
| Riversnail, Anthony's........ | Athearnia anthonyi........... | Wherever found, except where listed as an experimental population............................ | E | 59 FR 17994; 4/15/1994. |
| Riversnail, Anthony's........ | Athearnia anthonyi........... | U.S.A. (AL—specified portions of the Tennessee River; see § 17.85(a)(1))........... | XN | 66 FR 32250; 6/14/2001, 50 CFR 17.85(a)$^{10)}$. |
| Riversnail, Anthony's........ | Athearnia anthonyi........... | U.S.A. (TN—specified portions of the French Broad and Holston Rivers; see § 17.85(b)(1)).............................. | XN | 72 FR 52434; 9/13/2007, 50 CFR 17.85(b)$^{10)}$. |
| Rocksnail, interrupted....... | Leptoxis foremani............ | Wherever found...................... | E | 75 FR 67512; 11/2/2010, 50 CFR 17.95(f)$^{CH}$. |
| Rocksnail, painted............ | Leptoxis taeniata.............. | Wherever found...................... | T | 63 FR 57610; 10/28/1998. |
| Rocksnail, plicate............. | Leptoxis plicata............... | Wherever found...................... | E | 63 FR 57610; 10/28/1998. |
| Rocksnail, round.............. | Leptoxis ampla................ | Wherever found...................... | T | 63 FR 57610; 10/28/1998. |

| | | | | |
|---|---|---|---|---|
| Snail, Bliss Rapids............ | Taylorconcha serpenticola. | Wherever found...................... | T | 57 FR 59244; 12/14/1992. |
| Snail, Chittenango ovate amber.............................. | Novisuccinea chittenangoensis............... | Wherever found...................... | T | 43 FR 28932; 7/3/1978. |
| Snail, flat-spired three-toothed............................ | Triodopsis platysayoides... | Wherever found...................... | T | 43 FR 28932; 7/3/1978. |
| Snail, fragile tree (Akaleha dogas, Denden)................. | Samoana fragilis.............. | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Snail, Guam tree (Akaleha, Denden)........................... | Partula radiolata............... | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Snail, humped tree (Akaleha, Denden)............ | Partula gibba................... | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Snail, Iowa Pleistocene..... | Discus macclintocki......... | Wherever found...................... | E | 43 FR 28932; 7/3/1978. |
| Snail, Lanai tree............... | Partulina semicarinata....... | Wherever found...................... | E | 78 FR 32013; 5/28/2013. |
| Snail, Lanai tree............... | Partulina variabilis........... | Wherever found...................... | E | 78 FR 32013; 5/28/2013. |
| Snail, Langford's tree (Akaleha, Denden)............ | Partula langfordi.............. | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Snail, Manus Island tree.... | Papustyla pulcherrima....... | Wherever found...................... | E | 35 FR 8491; 6/2/1970. |
| Snail, Morro shoulderband | Helmin thoglypta walkeriana...................... | Wherever found...................... | T | 59 FR 64613, 12/15/1994; 87 FR 6063, 2/3/2022; 50 CFR 17.45(b); [4d] 50 CFR 17.95(f). [CH] |
| Snail, Newcomb's............. | Erinna newcombi............. | Wherever found...................... | T | 65 FR 4162; 1/26/2000, 50 CFR 17.95(f)[CH]. |
| Snail, Newcomb's tree....... | Newcombia cumingi........ | Wherever found...................... | E | 78 FR 32013; 5/28/2013, 50 CFR 17.95(f)[CH]. |
| Snail [no common name]... | Eua zebrina..................... | Wherever found...................... | E | 81 FR 65466; 09/22/2016. |
| Snail [no common name]... | Ostodes strigatus.............. | Wherever found...................... | E | 81 FR 65466; 09/22/2016. |
| Snail, noonday.................. | Mesodon clarki nantahala.. | Wherever found...................... | T | 43 FR 28932; 7/3/1978. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| Snail, painted snake coiled Anguispira picta...............Wherever found....................... forest................................ | | T | 43 FR 28932; 7/3/1978. |
| Snail, Snake River physa... Physella natricina.............Wherever found....................... | | E | 57 FR 59244, 12/14/1992. |
| Snail, Stock Island tree......Orthalicus reses (not incl.  Wherever found....................... nesodryas )....................... | | T | 43 FR 28932; 7/3/1978. |
| Snail, tulotoma................. Tulotoma magnifica.......... Wherever found....................... | | T | 56 FR 797; 1/9/1991, 76 FR 31866; 6/2/2011. |
| Snail, Virginia fringed       Polygyriscus virginianus... Wherever found....................... mountain......................... | | E | 43 FR 28932; 7/3/1978. |
| Snails, Oahu tree...............Achatinella spp................ Wherever found....................... | | E | 46 FR 3178; 1/13/1981, 46 FR 40025; 8/6/1981. |
| Springsnail, Alamosa........ Tryonia alamosae............. Wherever found....................... | | E | 56 FR 49646; 9/30/1991. |
| Springsnail, Bruneau Hot.. Pyrgulopsis bruneauensis.. Wherever found....................... | | E | 58 FR 5938; 1/25/1993. |
| Springsnail, Chupadera..... Pyrgulopsis chupaderae..... Wherever found....................... | | E | 77 FR 41088; 7/12/2012, 50 CFR 17.95(f)$^{CH}$. |
| Springsnail, Koster's......... Juturnia kosteri................. Wherever found....................... | | E | 76 FR 33036, 6/7/2011; 50 CFR 17.95(f).$^{CH}$ |
| Springsnail, Phantom........ Pyrgulopsis texana........... Wherever found....................... | | E | 78 FR 41227; 7/9/2013, 50 CFR 17.95(f)$^{CH}$. |
| Springsnail, Roswell......... Pyrgulopsis roswellensis... Wherever found....................... | | E | 76 FR 33036; 6/7/2011, 50 CFR 17.95(f)$^{CH}$. |
| Springsnail, San             Pyrgulopsis bernardina...... Wherever found....................... Bernardino....................... | | T | 77 FR 23060; 4/17/2012, 50 CFR 17.95(f)$^{CH}$. |
| Springsnail, Socorro.......... Pyrgulopsis neomexicana.. Wherever found....................... | | E | 56 FR 49646; 9/30/1991. |
| Springsnail, Three Forks... Pyrgulopsis trivialis.......... Wherever found....................... | | E | 77 FR 23060; 4/17/2012, 50 CFR 17.95(f)$^{CH}$. |

| | | | | |
|---|---|---|---|---|
| Tryonia, Diamond............ | Pseudotryonia adamantina. | Wherever found...................... | E | 78 FR 41227; 7/9/2013, 50 CFR 17.95(f)[CH]. |
| Tryonia, Gonzales............ | Tryonia circumstriata........ | Wherever found...................... | E | 78 FR 41227; 7/9/2013, 50 CFR 17.95(f)[CH]. |
| Tryonia, Phantom............ | Tryonia cheatumi............. | Wherever found...................... | E | 78 FR 41227; 7/9/2013, 50 CFR 17.95(f)[CH]. |

Insects

| | | | | |
|---|---|---|---|---|
| Bee, bumble, Franklin's..... | Bombus franklini............. | Wherever found...................... | E | 85 FR 47221, 8/24/21. |
| Bee, bumble, rusty patched | Bombus affinis................ | Wherever found...................... | E | 82 FR 3186, 1/11/2017. |
| Bee, yellow-faced............ | Hylaeus anthracinus........ | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Bee, yellow-faced............ | Hylaeus assimulans........... | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Bee, yellow-faced............ | Hylaeus facilis................ | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Bee, yellow-faced............ | Hylaeus hilaris................ | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Bee, yellow-faced............ | Hylaeus kuakea............... | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Bee, yellow-faced............ | Hylaeus longiceps............ | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Bee, yellow-faced............ | Hylaeus mana................. | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Beetle, American burying.. | Nicrophorus americanus.... | Wherever found, except where listed as an experimental population............................. | T | 54 FR 29652, 7/13/1989; 85 FR 65241, 10/15/2020; 50 CFR 17.47(d). [4d] |
| Beetle, American burying.. | Nicrophorus americanus.... | In southwestern Missouri, the counties of Cedar, St. Clair, Bates, and Vernon................... | XN | 77 FR 16712, 3/22/2012; 50 CFR 17.85(c). [10j] |
| Beetle, Casey's June.......... | Dinacoma caseyi............. | Wherever found...................... | E | 76 FR 58954; 9/22/2011, 50 CFR 17.95(i)[CH]. |
| Beetle, Coffin Cave mold.. | Batrisodes texanus............ | Wherever found...................... | E | 53 FR 36029; 9/16/1988, |

| | | | | |
|---|---|---|---|---|
| | | | | 58 FR 43818; 8/18/1993. |
| Beetle, Comal Springs dryopid............................ | Stygoparnus comalensis.... | Wherever found...................... | E | 62 FR 66295; 12/18/1997, 50 CFR 17.95(i)$^{CH}$. |
| Beetle, Comal Springs riffle................................. | Heterelmis comalensis...... | Wherever found...................... | E | 62 FR 66295; 12/18/1997, 50 CFR 17.95(i)$^{CH}$. |
| Beetle, delta green ground. | Elaphrus viridis................ | Wherever found...................... | T | 45 FR 52807; 8/8/1980, 50 CFR 17.95(i)$^{CH}$. |
| Beetle, Helotes mold......... | Batrisodes venyivi............ | Wherever found...................... | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(i)$^{.CH}$ |
| Beetle, Hungerford's crawling water.................. | Brychius hungerfordi........ | Wherever found...................... | E | 59 FR 10580; 3/7/1994. |
| Beetle, Kretschmarr Cave mold................................ | Texamaurops reddelli........ | Wherever found...................... | E | 53 FR 36029; 9/16/1988, 58 FR 43818; 8/18/1993. |
| Beetle, Miami tiger........... | Cicindelidia floridana........ | Wherever found...................... | E | 81 FR 68985, 10/5/2016; 50 CFR 17.95(i).$^{CH}$ |
| Beetle, Mount Hermon June.................................. | Polyphylla barbata............ | Wherever found...................... | E | 62 FR 3616; 1/24/1997. |
| Beetle, (no common name) | Rhadine exilis.................. | Wherever found...................... | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(i).$^{CH}$ |
| Beetle, (no common name) | Rhadine infernalis............. | Wherever found...................... | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(i)$^{.CH}$ |
| Beetle, Northeastern beach tiger.................................. | Habroscelimorpha dorsalis dorsalis............................ | Wherever found...................... | T | 55 FR 32088, 8/7/1990. |
| Beetle, Ohlone tiger......... | Cicindela ohlone.............. | Wherever found...................... | E | 66 FR 50340; 8/3/2001. |
| Beetle, Ohlone tiger......... | Cicindela ohlone.............. | Wherever found...................... | E | 66 FR 50340, 10/3/2001. |
| Beetle, Salt Creek tiger...... | Cicindela nevadica lincolniana........................ | Wherever found...................... | E | 70 FR 58335; 10/6/2005, 50 CFR 17.95(i)$^{CH}$. |

| | | | | |
|---|---|---|---|---|
| Beetle, Tooth Cave ground | Rhadine persephone.......... | Wherever found...................... | E | 53 FR 36029; 9/16/1988. |
| Beetle, valley elderberry longhorn........................... | Desmocerus californicus dimorphus........................ | Wherever found...................... | T | 45 FR 52803; 8/8/1980, 50 CFR 17.95(i)$^{CH}$. |
| Butterfly, Bartram's scrub-hairstreak......................... | Strymon acis bartrami....... | Wherever found...................... | E | 79 FR 47221; 8/12/2014, 50 CFR 17.95(i)$^{CH}$. |
| Butterfly, bay checkerspot. | Euphydryas editha bayensis........................... | Wherever found...................... | T | 52 FR 35366; 9/18/1987, 50 CFR 17.95(i)$^{CH}$. |
| Butterfly, Behren's silverspot......................... | Speyeria zerene behrensii.. | Wherever found...................... | E | 62 FR 64306; 12/5/1997. |
| Butterfly, callippe silverspot......................... | Speyeria callippe callippe.. | Wherever found...................... | E | 62 FR 64306; 12/5/1997. |
| Butterfly, cassius blue....... | Leptotes cassius theonus... | Coastal south and central FL.... | T (S/A) | 77 FR 20948; 4/6/2012. |
| Butterfly, ceraunus blue..... | Hemiargus ceraunus antibubastus...................... | Coastal south and central FL.... | T (S/A) | 77 FR 20948; 4/6/2012. |
| Butterfly, Corsican swallowtail...................... | Papilio hospiton................ | Wherever found...................... | E | 58 FR 4356; 1/14/1993. |
| Butterfly, El Segundo blue. | Euphilotes battoides allyni. | Wherever found...................... | E | 41 FR 22041; 6/14/1976. |
| Butterfly, Fender's blue..... | Icaricia icarioides fenderi.. | Wherever found...................... | T | 65 FR 3875, 1/25/2000; 88 FR 2025, 1/12/2023; 50 CFR 17.47(f); $^{4d}$ 50 CFR 17.95(i).$^{CH}$ |
| Butterfly, Florida leafwing | Anaea troglodyta floridalis | Wherever found...................... | E | 79 FR 47221; 8/12/2014, 50 CFR 17.95(i).$^{CH}$ |
| Butterfly, Hermes copper... | Lycaena hermes............... | Wherever found...................... | T | 86 FR 72394; 12/21/2021; 50 CFR 17.47(e); $^{4d}$ 50 CFR 17.95(i).$^{CH}$ |
| Butterfly, Homerus swallowtail...................... | Papilio homerus............... | Wherever found...................... | E | 58 FR 4356; 1/14/1993. |

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

| | | | | |
|---|---|---|---|---|
| Butterfly, island marble..... | Euchloe ausonides insulanus......................... | Wherever found...................... | E | 85 FR 26786, 5/5/2020; 50 CFR 17.95(i).[CH] |
| Butterfly, Karner blue....... | Lycaeides melissa samuelis......................... | Wherever found...................... | E | 57 FR 59236; 12/14/1992. |
| Butterfly, Lange's metalmark...................... | Apodemia mormo langei... | Wherever found...................... | E | 41 FR 22041; 6/14/1976. |
| Butterfly, lotis blue........... | Lycaeides argyrognomon lotis................................. | Wherever found...................... | E | 41 FR 22041; 6/14/1976. |
| Butterfly, Luzon peacock swallowtail...................... | Papilio chikae.................. | Wherever found...................... | E | 58 FR 4356; 1/14/1993. |
| Butterfly, Mariana eight-spot (Ababbang, Libweibwogh).................. | Hypolimnas octocula marianensis....................... | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Butterfly, Mariana wandering (Ababbang, Libweibwogh).................. | Vagrans egistina................ | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Butterfly, Miami blue........ | Cyclargus thomasi bethunebakeri.................... | Wherever found...................... | E | 77 FR 20948; 4/6/2012. |
| Butterfly, mission blue...... | Icaricia icarioides missionensis....................... | Wherever found...................... | E | 41 FR 22041; 6/14/1976. |
| Butterfly, Mitchell's satyr.. | Neonympha mitchellii mitchellii........................... | Wherever found...................... | E | 56 FR 28825; 6/25/1991, 57 FR 21564; 5/20/1992. |
| Butterfly, Mount Charleston blue................ | Icaricia (Plebejus) shasta charlestonensis.................. | Wherever found...................... | E | 78 FR 57749; 9/19/2013, 50 CFR 17.95(i)[CH]. |
| Butterfly, Myrtle's silverspot.......................... | Speyeria zerene myrtleae... | Wherever found...................... | E | 57 FR 27848; 6/22/1992. |
| Butterfly, nickerbean blue.. | Cyclargus ammon............. | Coastal south and central FL.... | T (S/A) | 77 FR 20948; 4/6/2012, 50 CFR 17.47(a)[4d]. |
| Butterfly, Oregon silverspot......................... | Speyeria zerene hippolyta. | Wherever found, except where listed as an experimental population............................... | T | 45 FR 44935, 7/2/1980; 50 CFR 17.95(i)[CH]. |
| Butterfly, Oregon silverspot......................... | Speyeria zerene hippolyta.. | U.S.A. (OR—specified portions of Clatsop and Tillamook Counties; see § 17.85(d))................................ | XN | 82 FR 28567; 06/23/2017. |

| Butterfly, Palos Verdes blue | Glaucopsyche lygdamus palosverdesensis | Wherever found | | E | 45 FR 44935; 7/2/1980, 50 CFR 17.95(i) [CH]. |
|---|---|---|---|---|---|
| Butterfly, Puerto Rican harlequin | Atlantea tulita | Wherever found | | T | 87 FR 73655, 12/1/22; 50 CFR 17.47(g); [4d] 50 CFR 17.95(i). [CH] |
| Butterfly, Queen Alexandra's birdwing | Troides alexandrae | Wherever found | | E | 54 FR 38950; 9/21/1989. |
| Butterfly, Quino checkerspot | Euphydryas editha quino | Wherever found | | E | 62 FR 2313; 1/16/1997, 50 CFR 17.95(i) [CH] |
| Butterfly, Sacramento Mountains checkerspot | Euphydryas anicia cloudcrofti | Wherever found | | E | 88 FR 6191, 1/31/2023. |
| Butterfly, Saint Francis' satyr | Neonympha mitchellii francisci | Wherever found | | E | 59 FR 18324; 4/18/1994, 60 FR 5264; 1/26/1995. |
| Butterfly, San Bruno elfin | Callophrys mossii bayensis | Wherever found | | E | 41 FR 22041; 6/14/1976. |
| Butterfly, Schaus swallowtail | Heraclides aristodemus ponceanus | Wherever found | | E | 41 FR 17736; 4/28/1976, 49 FR 34501; 8/31/1984. |
| Butterfly, silverspot | Speyeria nokomis nokomis | Wherever found | T | 89 FR 11750, February 15, 2024; 50 CFR 17.47(h). [4d] | |
| Butterfly, Smith's blue | Euphilotes enoptes smithi | Wherever found | | E | 41 FR 22041; 6/14/1976. |
| Butterfly, Taylor's checkerspot | Euphydryas editha taylori | Wherever found | | E | 78 FR 61451; 10/3/2013, 50 CFR 17.95(i) [CH] |
| Butterfly, Uncompahgre fritillary | Boloria acrocnema | Wherever found | | E | 56 FR 28712; 6/24/1991. |
| Damselfly, blackline Hawaiian | Megalagrion nigrohamatum nigrolineatum | Wherever found | | E | 77 FR 57647; 9/18/2012, 50 CFR 17.95(i) [CH]. |

| | | | | |
|---|---|---|---|---|
| Damselfly, crimson Hawaiian.......................... | Megalagrion leptodemas... | Wherever found...................... | E | 77 FR 57647; 9/18/2012, 50 CFR 17.95(i)[CH]. |
| Damselfly, flying earwig Hawaiian.......................... | Megalagrion nesiotes........ | Wherever found...................... | E | 75 FR 35990, 6/24/2010; 50 CFR 17.95(i).[CH] |
| Damselfly, oceanic Hawaiian.......................... | Megalagrion oceanicum.... | Wherever found...................... | E | 77 FR 57647; 9/18/2012, 50 CFR 17.95(i)[CH]. |
| Damselfly, orangeblack Hawaiian.......................... | Megalagrion xanthomelas. | Wherever found...................... | E | 81 FR 67786; 09/30/2016. |
| Damselfly, Pacific Hawaiian.......................... | Megalagrion pacificum..... | Wherever found...................... | E | 75 FR 35990, 6/24/2010; 50 CFR 17.95(i).[CH] |
| Damselfly, Rota blue (Dulalas Luta, Dulalas Luuta).............................. | Ischnura luta.................... | Wherever found...................... | E | 80 FR 59423; 10/1/2015. |
| Dragonfly, Hine's emerald. | Somatochlora hineana....... | Wherever found...................... | E | 60 FR 5267; 1/26/1995, 50 CFR 17.95(i)[CH]. |
| Fly, Delhi Sands flower-loving........................... | Rhaphiomidas terminatus abdominalis...................... | Wherever found...................... | E | 58 FR 49881; 9/23/1993. |
| Fly, Hawaiian picture-wing.............................. | Drosophila aglaia.............. | Wherever found...................... | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing.............................. | Drosophila differens.......... | Wherever found...................... | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing.............................. | Drosophila digressa........... | Wherever found...................... | E | 78 FR 64638, 10/29/2013; 50 CFR 17.95(i).[CH] |
| Fly, Hawaiian picture-wing.............................. | Drosophila hemipeza......... | Wherever found...................... | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing.............................. | Drosophila heteroneura..... | Wherever found...................... | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing.............................. | Drosophila montgomeryi... | Wherever found...................... | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |

| Fly, Hawaiian picture-wing............................. | Drosophila mulli.............. | Wherever found..................... | | T | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
|---|---|---|---|---|---|
| Fly, Hawaiian picture-wing............................. | Drosophila musaphilia...... | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing............................. | Drosophila neoclavisetae... | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing............................. | Drosophila obatai.............. | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing............................. | Drosophila ochrobasis....... | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing............................. | Drosophila sharpi.............. | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing............................. | Drosophila substenoptera.. | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Fly, Hawaiian picture-wing............................. | Drosophila tarphytrichia.... | Wherever found..................... | | E | 71 FR 26835; 5/9/2006, 50 CFR 17.95(i)[CH]. |
| Grasshopper, Zayante band-winged..................... | Trimerotropis infantilis...... | Wherever found..................... | | E | 62 FR 3616; 1/24/1997, 50 CFR 17.95(i)[CH]. |
| Moth, Blackburn's sphinx.. | Manduca blackburni.......... | Wherever found..................... | | E | 65 FR 4770; 2/1/2000, 50 CFR 17.95(i)[CH]. |
| Moth, bog buck................ | Hemileuca maia menyanthevora (=H. iroquois)........................... | Wherever found..................... | | E | 88 FR 15921, March 15, 2023. |
| Moth, Kern primrose sphinx.............................. | Euproserpinus euterpe....... | Wherever found..................... | | T | 45 FR 24088; 4/8/1980. |
| Naucorid, Ash Meadows... | Ambrysus amargosus........ | Wherever found..................... | | T | 50 FR 20777; 5/20/1985, 50 CFR 17.95(i)[CH]. |
| Skipper, Carson wandering | Pseudo copaeodes eunus obscurus........................... | Wherever found..................... | E........................................ | | 67 FR 51116, 8/7/2002. |

| | | | | |
|---|---|---|---|---|
| Skipper, Dakota | Hesperia dacotae | Wherever found | T | 79 FR 63671;10/24/2014, 50 CFR 17.95(i)$^{CH}$, 50 CFR 17.47(b)$^{4d}$. |
| Skipper, Laguna Mountains | Pyrgus ruralis lagunae | Wherever found | E | 62 FR 2313; 1/16/1997, 50 CFR 17.95(i)$^{CH}$. |
| Skipper, Pawnee montane | Hesperia leonardus montana | Wherever found | T | 52 FR 36176; 9/25/1987. |
| Skipperling, Poweshiek | Oarisma poweshiek | Wherever found | E | 79 FR 63671;10/24/2014, 50 CFR 17.95(i)$^{CH}$. |
| Stonefly, meltwater lednian | Lednia tumana | Wherever found | T | 84 FR 64210; 11/21/2019; 50 CFR 17.47(c).$^{4d}$ |
| Stonefly, western glacier | Zapada glacier | Wherever found | T | 84 FR 64210; 11/21/2019; 50 CFR 17.47(c).$^{4d}$ |
| Arachnids | | | | |
| Harvestman, Bee Creek Cave | Texella reddelli | Wherever found | E | 53 FR 36029; 9/16/1988, 58 FR 43818; 8/18/1993. |
| Harvestman, Bone Cave | Texella reyesi | Wherever found | E | 53 FR 36029; 9/16/1988, 58 FR 43818; 8/18/1993. |
| Harvestman, Cokendolpher cave | Texella cokendolpheri | Wherever found | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(g).$^{CH}$ |
| Meshweaver, Government Canyon Bat Cave | Cicurina vespera | Wherever found | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(g).$^{CH}$ |
| Meshweaver, Madla Cave | Cicurina madla | Wherever found | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(g).$^{CH}$ |
| Meshweaver, Robber Baron Cave | Cicurina baronia | Wherever found | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(g).$^{CH}$ |
| Pseudoscorpion, Tooth Cave | Tartarocreagris texana | Wherever found | E | 53 FR 36029; 9/16/1988. |

| Spider, Government Canyon Bat Cave............. | Tayshaneta microps........... | Wherever found...................... | E | 65 FR 81419, 12/26/2000; 50 CFR 17.95(g).[CH] |
| Spider, ivory ornamental tiger................................ | Poecilotheria subfusca....... | Wherever found...................... | E | 83 FR 36755, 7/31/2018. |
| Spider, Kauai cave wolf.... | Adelocosa anops............... | Wherever found...................... | E | 65 FR 2348; 1/14/2000, 50 CFR 17.95(g)[CH]. |
| Spider, ornate tiger............ | Poecilotheria ornata.......... | Wherever found...................... | E | 83 FR 36755, 7/31/2018. |
| Spider, Pedersen's tiger...... | Poecilotheria vittata.......... | Wherever found...................... | E | 83 FR 36755, 7/31/2018. |
| Spider, Smith's tiger.......... | Poecilotheria smithi.......... | Wherever found...................... | E | 83 FR 36755, 7/31/2018. |
| Spider, spruce-fir moss...... | Microhexura montivaga.... | Wherever found...................... | E | 60 FR 6968; 2/6/1995, 50 CFR 17.95(g)[CH]. |
| Spider, Sri Lanka ornamental tiger................ | Poecilotheria fasciata........ | Wherever found...................... | E | 83 FR 36755, 7/31/2018. |
| Spider, Tooth Cave............ | Tayshaneta myopica.......... | Wherever found...................... | E | 53 FR 36029, 9/16/1988. |
| Crustaceans | | | | |
| Amphipod, diminutive...... | Gammarus hyalleloides..... | Wherever found...................... | E | 78 FR 41227; 7/9/2013, 50 CFR 17.95(h)[CH]. |
| Amphipod, Hay's Spring... | Stygobromus hayi............. | Wherever found...................... | E | 47 FR 5425; 2/5/1982. |
| Amphipod, Illinois Cave.... | Gammarus acherondytes... | Wherever found...................... | E | 63 FR 46900; 9/3/1998. |
| Amphipod, Kauai cave...... | Spelaeorchestia koloana.... | Wherever found...................... | E | 65 FR 2348; 1/14/2000, 50 CFR 17.95(h)[CH]. |
| Amphipod, Noel's............. | Gammarus desperatus....... | Wherever found...................... | E | 76 FR 33036; 6/7/2011, 50 CFR 17.95(h)[CH]. |
| Amphipod, Peck's cave..... | Stygobromus (=Stygonectes) Pecki........ | Wherever found...................... | E | 62 FR 66295; 12/18/1997, 50 CFR 17.95(h)[CH]. |

| | | | | |
|---|---|---|---|---|
| Amphipod, Pecos............ | Gammarus pecos............ | Wherever found..................... | E | 78 FR 41227; 7/9/2013, 50 CFR 17.95(h) [CH] . |
| Crayfish, Big Creek......... | Faxonius peruncus........... | Wherever found..................... | T | 88 FR 25512, 4/27/2023; 50 CFR 17.46(c); [4d] 50 CFR 17.95(h). [CH] |
| Crayfish, Big Sandy......... | Cambarus callainus.......... | Wherever found..................... | T | 81 FR 20450, 4/7/2016; 50 CFR 17.95(h). [CH] |
| Crayfish, cave................. | Cambarus aculabrum........ | Wherever found..................... | E | 58 FR 25742; 4/27/1993. |
| Crayfish, cave................. | Cambarus zophonastes..... | Wherever found..................... | E | 52 FR 11170; 4/7/1987. |
| Crayfish, Guyandotte River............................... | Cambarus veteranus......... | Wherever found..................... | E | 81 FR 20450, 4/7/2016; 50 CFR 17.95(h). [CH] |
| Crayfish, Nashville........... | Orconectes shoupi............ | Wherever found..................... | E | 51 FR 34410; 9/3/1986. |
| Crayfish, Panama City...... | Procambarus econfinae..... | Wherever found..................... | T | 87 FR 546, 1/5/22; 50 CFR 17.46(b); [4d] 50 CFR 17.95(h). [CH] |
| Crayfish, Shasta............... | Pacifastacus fortis............ | Wherever found..................... | E | 53 FR 38460; 9/30/1988. |
| Crayfish, slenderclaw........ | Cambarus cracens............ | Wherever found..................... | E | 86 FR 50264, 9/8/21; 50 CFR 17.95(h) [CH] . |
| Crayfish, St. Francis River | Faxonius quadruncus......... | Wherever found..................... | T | 88 FR 25512, 4/27/2023; 50 CFR 17.46(c); [4d] 50 CFR 17.95(h). [CH] |
| Fairy shrimp, Conservancy | Branchinecta conservatio... | Wherever found..................... | E | 59 FR 48136; 9/19/1994, 50 CFR 17.95(h) [CH] . |
| Fairy shrimp, longhorn...... | Branchinecta longiantenna | Wherever found..................... | E | 59 FR 48136; 9/19/1994, 50 CFR 17.95(h) [CH] . |

| | | | | |
|---|---|---|---|---|
| Fairy shrimp, Riverside..... | Streptocephalus woottoni.. | Wherever found..................... | E | 58 FR 41384; 8/3/1993, 50 CFR 17.95(h)[CH]. |
| Fairy shrimp, San Diego.... | Branchinecta sandiegonensis................. | Wherever found..................... | E | 62 FR 4925; 2/3/1997, 50 CFR 17.95(h)[CH]. |
| Fairy shrimp, vernal pool.. | Branchinecta lynchi.......... | Wherever found..................... | T | 59 FR 48136; 9/19/1994; 50 CFR 17.95(h).[CH] |
| Isopod, Lee County cave... | Lirceus usdagalun............. | Wherever found..................... | E | 57 FR 54722; 11/20/1992. |
| Isopod, Madison Cave....... | Antrolana lira................... | Wherever found..................... | T | 47 FR 43699; 10/4/1982, 50 CFR 17.46(a)[4d]. |
| Isopod, Socorro................ | Thermosphaeroma thermophilus................... | Wherever found..................... | E | 43 FR 12690; 3/27/1978. |
| Shrimp, Alabama cave...... | Palaemonias alabamae...... | Wherever found..................... | E | 53 FR 34696; 9/7/1988. |
| Shrimp, anchialine pool..... | Procaris hawaiana............ | Wherever found..................... | E | 81 FR 67786; 09/30/2016. |
| Shrimp, anchialine pool..... | Vetericaris chaceorum....... | Wherever found..................... | E | 78 FR 64637; 10/29/2013. |
| Shrimp, California freshwater........................ | Syncaris pacifica.............. | Wherever found..................... | E | 53 FR 43884; 10/31/1988. |
| Shrimp, Kentucky cave..... | Palaemonias ganteri.......... | Wherever found..................... | E | 48 FR 46337; 10/12/1983, 50 CFR 17.95(h)[CH]. |
| Shrimp, Squirrel Chimney cave................................. | Palaemonetes cummingi.... | Wherever found..................... | T | 55 FR 25588; 6/21/1990. |
| Tadpole shrimp, vernal pool................................. | Lepidurus packardi........... | Wherever found..................... | E | 59 FR 48136; 9/19/1994, 50 CFR 17.95(h)[CH]. |
| Corals | | | | |
| Coral, (no common name). | Acropora globiceps........... | Wherever found..................... | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). | Acropora jacquelineae....... | Wherever found..................... | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |

| | | | |
|---|---|---|---|
| Coral, (no common name). Acropora lokani............... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Acropora pharaonis........... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Acropora retusa............... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Acropora rudis................. Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Acropora speciosa............ Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Acropora tenella.............. Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Anacropora spinosa........... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Cantharellus noumeae....... Wherever found...................... | | E | 80 FR 60560, 10/7/2015; [N] 81 FR 76311, 11/2/2016. |
| Coral, (no common name). Euphyllia paradivisa.......... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Isopora crateriformis......... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). Montipora australiensis..... Wherever found...................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |

| Coral, (no common name). | Pavona difluens.............. | Wherever found..................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
|---|---|---|---|---|---|
| Coral, (no common name). | Porites napopora.............. | Wherever found..................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). | Seriatopora aculeata.......... | Wherever found..................... | | T | 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014. |
| Coral, (no common name). | Tubastraea floreana........... | Wherever found..................... | | E | 80 FR 60560, 10/7/2015; [N] 81 FR 76311, 11/2/2016. |
| Coral, boulder star........... | Orbicella franksi.............. | Wherever found..................... | | T | 79 FR 53852, 9/10/2014; [N] 79 FR 67356, 11/13/2014; 50 CFR 226.230.[CH] |
| Coral, elkhorn.................. | Acropora palmata............. | Wherever found..................... | | T | 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014, 50 CFR 223.208[4d], 50 CFR 226.216[CH]. |
| Coral, lobed star............... | Orbicella annularis........... | Wherever found..................... | | T | 79 FR 53852, 9/10/2014; [N] 79 FR 67356, 11/13/2014; 50 CFR 226.230.[CH] |
| Coral, mountainous star..... | Orbicella faveolata........... | Wherever found..................... | | T | 79 FR 53852, 9/10/2014; [N] 79 FR 67356, 11/13/2014; 50 CFR 226.230.[CH] |
| Coral, pillar.................... | Dendrogyra cylindrus........ | Wherever found..................... | | T | 79 FR 53852, 9/10/2014; [N] 79 FR 67356, 11/13/2014; 50 CFR 226.230.[CH] |

| | | | | |
|---|---|---|---|---|
| Coral, rough cactus........... | Mycetophyllia ferox.......... | Wherever found..................... | T | 79 FR 53852, 9/10/2014;[N] 79 FR 67356, 11/13/2014; 50 CFR 226.230.[CH] |
| Coral, staghorn................. | Acropora cervicornis......... | Wherever found..................... | T | 76 FR 20558; 4/13/2011, 79 FR 42687; 7/23/2014, 79 FR 53852; 9/10/2014[N], 79 FR 67356; 11/13/2014, 50 CFR 223.208[4d], 50 CFR 226.216[CH]. |
| Cephalopods | | | | |
| Nautilus, chambered......... | Nautilus pompilius............ | Wherever found..................... | T | 83 FR 48976, 9/28/2018;[N] 84 FR 13809, 4/8/2019. |

## Credits

[45 FR 33768, May 20, 1980, as amended at 45 FR 38523, May 28, 1980; 45 FR 44942, July 2, 1980; 45 FR 47363, July 14, 1980; 45 FR 52806, 52810, Aug. 8, 1980; 45 FR 54680, Aug. 15, 1980; 45 FR 55666, Aug. 20, 1980; 45 FR 63820, Sept. 25, 1980; 45 FR 65134, Oct. 1, 1980; 46 FR 3282, Jan. 13, 1981; 46 FR 11665, Feb. 10, 1981; 46 FR 24186, April 30, 1981; 46 FR 40669, Aug. 10, 1981; 46 FR 47797, Sept. 30, 1981; 47 FR 2319, Jan. 15, 1982; 47 FR 4211, Jan. 28, 1982; 47 FR 5427, Feb. 5, 1982; 47 FR 19999, May 10, 1982; 47 FR 31672, July 21, 1982; 48 FR 39943, 40184, Sept. 2, 1983; 48 FR 43043, Sept. 21, 1983; 48 FR 46057, Oct. 11, 1983; 48 FR 46336, 46341, Oct. 12, 1983; 48 FR 49249, Oct. 25, 1983; 48 FR 52743, Nov. 22, 1983; 49 FR 1058, Jan. 9, 1984; 49 FR 1994, Jan. 17, 1984; 49 FR 2783, Jan. 23, 1984; 49 FR 7335, Feb. 28, 1984; 49 FR 7394, Feb. 29, 1984; 49 FR 7397, Feb. 29, 1984; 49 FR 10526, March 20, 1984; 49 FR 14356, April 11, 1984; 49 FR 22334, May 29, 1984; 49 FR 27514, July 5, 1984; 49 FR 33885, 33892, Aug. 27, 1984; 49 FR 34494, 34504, 34510, Aug. 31, 1984; 49 FR 35954, Sept. 13, 1984; 49 FR 43069, Oct. 26, 1984; 49 FR 43969, Nov. 1, 1984; 49 FR 45163, Nov. 15, 1984; 49 FR 49639, Dec. 21, 1984; 50 FR 1056, Jan. 9, 1985; 50 FR 4225, Jan. 30, 1985; 50 FR 4945, Feb. 4, 1985; 50 FR 12302, 12305, March 28, 1985; 50 FR 20785, May 20, 1985; 50 FR 21792, May 28, 1985; 50 FR 23884, June 6, 1985; 50 FR 24530, June 11, 1985; 50 FR 24653, June 12, 1985; 50 FR 25678, June 20, 1985; 50 FR 26375, June 27, 1985; 50 FR 27002, July 1, 1985; 50 FR 30194, July 24, 1985; 50 FR 31596, 31603, Aug. 5, 1985; 50 FR 33951, Aug. 22, 1985; 50 FR 37194, 37198, Sept. 12, 1985; 50 FR 39122, 39127, Sept. 27, 1985; 50 FR 39691, Sept. 30, 1985; 50 FR 50308, Dec. 10, 1985; 50 FR 50733, Dec. 11, 1985; 50 FR 51252, Dec. 16, 1985; 51 FR 6690, Feb. 25, 1986; 51 FR 10850, 10857, 10864, March 31, 1986; 51 FR 16047, April 30, 1986; 51 FR 16482, May 2, 1986; 51 FR 17980, May 16, 1986; 51 FR 23781, July 1, 1986; 51 FR 27492, July 31, 1986; 51 FR 31422, Sept. 3, 1986; 51 FR 34412, 34425, Sept. 26, 1986; 51 FR 39478, Oct. 28, 1986; 51 FR 41796, Nov. 19, 1986; 51 FR 45910, Dec. 23, 1986; 52 FR 288, Jan. 5, 1987; 52 FR 5302, Feb. 20, 1987; 52 FR 10892, April 6, 1987; 52 FR 11169, 11172, April 7, 1987; 52 FR 11286, April, 8, 1987; 52 FR 20719, 20999, June 3, 1987; 52 FR 21063, June 4, 1987; 52 FR 22430, June 11, 1987; 52 FR 22584, June 12, 1987; 52 FR 22943, June 16, 1987; 52 FR 23151, June 17, 1987; 52 FR 25232, July 6, 1987; 52 FR 25380, July 7, 1987; 52 FR 28785, Aug. 3, 1987; 52 FR 28831, Aug. 4, 1987; 52 FR 29780, Aug. 11, 1987; 52 FR 35040, Sept. 16, 1987; 52 FR 35378, Sept. 18, 1987; 52 FR 36038, 36180, Sept. 25, 1987; 52 FR 36776, 36780, Oct. 1, 1987; 52 FR 37423, Oct. 6, 1987; 52 FR 42068, Nov. 2, 1987; 52 FR 42662, Nov. 6, 1987; 52 FR 46085, Dec.

4, 1987; 53 FR 3570, Feb. 5, 1988; 53 FR 25611, July 8, 1988; 53 FR 27134, July 18, 1988; 53 FR 27693, July 22, 1988; 53 FR 29337, Aug. 4, 1988; 53 FR 33992, 33998, Sept. 1, 1988; 53 FR 34698, Sept. 7, 1988; 53 FR 36033, Sept.16, 1988; 53 FR 37970, Sept. 28, 1988; 53 FR 38453, 38460, 38465, 38489, Sept. 30, 1988; 53 FR 43889, Oct. 31, 1988; 53 FR 45865, Nov. 14, 1988; 54 FR 8341, Feb. 28, 1989; 54 FR 15208, April 17, 1989; 54 FR 20602, May 12, 1989; 54 FR 22906, May 30, 1989; 54 FR 29655, July 13, 1989; 54 FR 32330, Aug. 4, 1989; 54 FR 34467, 34472, Aug. 18, 1989; 54 FR 35311, Aug. 24, 1989; 54 FR 38951, Sept. 21, 1989; 54 FR 39853, 39899, Sept. 28, 1989; 54 FR 40112, Sept. 29, 1989; 54 FR 41453, Oct. 10, 1989; 54 FR 43969, Oct. 30, 1989; 54 FR 47861, Nov. 17, 1989; 55 FR 9135, March 12, 1990; 55 FR 9450, March 14, 1990; 55 FR 12190, April 2, 1990; 55 FR 12801, April 5, 1990; 55 FR 12832, April 6, 1990; 55 FR 13488, April 10, 1990; 55 FR 18845, May 4, 1990; 55 FR 19145, May 8, 1990; 55 FR 21153, 21161, May 22, 1990; 55 FR 25591, 25595, June 21, 1990; 55 FR 26194, June 26, 1990; 55 FR 28213, July 10, 1990; 55 FR 32094, Aug. 7, 1990; 55 FR 36647, Sept. 6, 1990; 55 FR 39416, Sept. 27, 1990; 55 FR 39860, 39871, Sept. 28, 1990;

55 FR 42966, Oct. 25, 1990; 55 FR 49623, Nov. 30, 1990; 55 FR 50006, Dec. 4, 1990; 55 FR 51112, 51114, Dec. 12, 1990; 55 FR 53160, Dec. 27, 1990; 56 FR 800, Jan. 9, 1991; 56 FR 1228, Jan. 11, 1991; 56 FR 1459, 1462, 1463, Jan. 14, 1991; 56 FR 13600, April 3, 1991; 56 FR 19814, April 30, 1991; 56 FR 21087, May 7, 1991; 56 FR 28349, June 20, 1991; 56 FR 28717, June 24, 1991; 56 FR 28828, June 25, 1991; 56 FR 37671, Aug. 8, 1991; 56 FR 40267, Aug. 14, 1991; 56 FR 41488, Aug. 21, 1991; 56 FR 49649, 49652, 49657, Sept. 30, 1991; 56 FR 54957, 54967, Oct. 23, 1991; 56 FR 56333, Nov. 4, 1991; 56 FR 64722, Dec. 12, 1991; 57 FR 212, Jan. 3, 1992; 57 FR 594, Jan. 7, 1992; 57 FR 1834, Jan. 15, 1992; 57 FR 13661, April 17, 1992; 57 FR 14790, April 22, 1992; 57 FR 21569, May 20, 1992; 57 FR 27858, June 22, 1992; 57 FR 28024, June 23, 1992; 57 FR 44340, Sept. 25, 1992; 57 FR 45337, Oct. 1, 1992; 57 FR 54726, Nov. 20, 1992; 57 FR 59243, 59256, Dec. 14, 1992; 58 FR 4358, Jan. 14, 1993; 58 FR 5642, 5657, Jan. 22, 1993; 58 FR 5946, Jan. 25, 1993; 58 FR 12863, 12874, March 5, 1993; 58 FR 14271, March 16, 1993; 58 FR 14339, March 17, 1993; 58 FR 16757, March 30, 1993; 58 FR 25746, 25763, April 27, 1993; 58 FR 27480, May 10, 1993; 58 FR 34931, June 30, 1993; 58 FR 40538, July 28, 1993; 58 FR 41391, Aug. 3, 1993; 58 FR 43819, Aug. 18, 1993; 58 FR 46033, Aug. 31, 1993; 58 FR 49873, 49880, 49887, Sept. 23, 1993; 58 FR 49937, Sept. 24, 1993; 58 FR 53804, Oct. 18, 1993; 58 FR 54065, Oct. 20, 1993; 58 FR 65095, Dec. 10, 1993; 58 FR 68486, Dec. 27, 1993; 59 FR 4856, Feb. 2, 1994; 59 FR 5310, Feb. 3, 1994; 59 FR 5498, Feb. 4, 1994; 59 FR 10584, March 7, 1994; 59 FR 13397, March 21, 1994; 59 FR 13836, March 23, 1994; 59 FR 17998, April 15, 1994; 59 FR 18327, April 18, 1994; 59 FR 31095, June 16, 1994; 59 FR 36995, July 20, 1994; 59 FR 42691, 42711, Aug. 18, 1994; 59 FR 46002, Sept. 6, 1994; 59 FR 46715, Sept. 9, 1994; 59 FR 48152, Sept. 19, 1994; 59 FR 49674, Sept. 29, 1994; 59 FR 50805, Oct. 5, 1994; 59 FR 54840, Nov. 2, 1994; 59 FR 60264, 60278, Nov. 22, 1994; 59 FR 60334, Nov. 23, 1994; 59 FR 63264, Dec. 8, 1994; 59 FR 64623, Dec. 15, 1994; 59 FR 64866, Dec. 16, 1994; 59 FR 65276, Dec. 19, 1994; 59 FR 65512, Dec. 20, 1994; 60 FR 2903, Jan. 12, 1995; 60 FR 5267, 5273, Jan. 26, 1995; 60 FR 6973, Feb. 6, 1995; 60 FR 10715, Feb. 27, 1995; 60 FR 12906, March 9, 1995; 60 FR 18947, April 13, 1995; 60 FR 29945, June 6, 1995; 61 FR 11331, March 20, 1996; 61 FR 25832, May 23, 1996; 61 FR 26278, May 24, 1996; 61 FR 32366, June 24, 1996; 61 FR 48412, Sept. 13, 1996; 61 FR 54056, Oct. 16, 1996; 61 FR 59028, Nov. 20, 1996; 62 FR 689, Jan. 6, 1997; 62 FR 1657, Jan. 10, 1997; 62 FR 2321, Jan. 16, 1997; 62 FR 3628, Jan. 24, 1997; 62 FR 4191, Jan. 29, 1997; 62 FR 4939, Feb. 3, 1997; 62 FR 10746, March 10, 1997; 62 FR 23392, April 30, 1997; 62 FR 30772, June 5, 1997; 62 FR 31757, 31761, June 11, 1997; 62 FR 33038, June 18, 1997; 62 FR 38939, July 21, 1997; 62 FR 39138, 39156, July 22, 1997; 62 FR 44227, Aug. 20, 1997; 62 FR 59622, Nov. 4, 1997; 62 FR 64320, Dec. 5, 1997; 62 FR 66303, Dec. 18, 1997; 63 FR 694, Jan. 7, 1998; 63 FR 1762, Jan. 12, 1998; 63 FR 3843, Jan. 27, 1998; 63 FR 12686, March 16, 1998; 63 FR 13149, March 18, 1998; 63 FR 14379, March 25, 1998; 63 FR 26530, May 13, 1998; 63 FR 31674, June 10, 1998; 63 FR 32997, June 17, 1998; 63 FR 42762, Aug. 11, 1998; 63 FR 46909, Sept. 3, 1998; 63 FR 51016, Sept. 24, 1998; 63 FR 52837, Oct. 1, 1998; 63 FR 57619, Oct. 28, 1998; 63 FR 64799, Nov. 23, 1998; 63 FR 69021, Dec. 15, 1998; 63 FR 70062, Dec. 18, 1998; 64 FR 5981, Feb. 8, 1999; 64 FR 15704, April 1, 1999; 64 FR 17124, April 8, 1999; 64 FR 19308, April 20, 1999; 64 FR 36288, July 6, 1999; 64 FR 37435, July 12, 1999; 64 FR 41836, Aug. 2, 1999; 64 FR 46558, Aug. 25, 1999; 64 FR 47134, Aug. 30, 1999; 64 FR 56608, Oct. 20, 1999; 64 FR 58932, Nov. 1, 1999; 64 FR 68520, Dec. 7, 1999; 64 FR 72960, Dec. 29, 1999; 65 FR 30, Jan. 3, 2000;

65 FR 2356, Jan. 14, 2000; 65 FR 3108, Jan. 19, 2000; 65 FR 3889, Jan. 25, 2000; 65 FR 4151, 4169, Jan. 26, 2000; 65 FR 4779, Feb. 1, 2000; 65 FR 8889, Feb. 23, 2000; 65 FR 10039, Feb. 25, 2000; 65 FR 10426, Feb. 28, 2000; 65 FR 16085, March 24, 2000; 65 FR 17786, April 5, 2000; 65 FR 19697, April 12, 2000; 65 FR 20769, April 18, 2000; 65 FR 24356, April 25,

2000; 65 FR 24422, April 26, 2000; 65 FR 25879, May 4, 2000; 65 FR 26461, May 5, 2000; 65 FR 26770, May 9, 2000; 65 FR 46654, July 31, 2000; 65 FR 54177, Sept. 7, 2000; 65 FR 57263, Sept. 21, 2000; 65 FR 58948, Oct. 3, 2000; 65 FR 60886, Oct. 13, 2000; 65 FR 63454, Oct. 23, 2000; 65 FR 63704, Oct. 24, 2000; 65 FR 69480, 69637, Nov. 17, 2000; 65 FR 69710, Nov. 20, 2000; 65 FR 81433, Dec. 26, 2000; 66 FR 8548, 8667, Feb. 1, 2001; 66 FR 8878, Feb. 2, 2001; 66 FR 9176, Feb. 6, 2001; 66 FR 9231, 9244, 9449, Feb. 7, 2001; 66 FR 14659, March 13, 2001; 66 FR 15656, March 20, 2001; 66 FR 18031, April 4, 2001; 66 FR 21475, April 30, 2001; 66 FR 22959, May 7, 2001; 66 FR 29403, May 30, 2001; 66 FR 32257, June 14, 2001; 66 FR 33915, June 26, 2001; 66 FR 35559, July 6, 2001; 66 FR 36085, July 10, 2001; 66 FR 43809, Aug. 21, 2001; 66 FR 46560, Sept. 6, 2001; 66 FR 50350, Oct. 3, 2001; 66 FR 51339, Oct. 9, 2001; 66 FR 59373, Nov. 28, 2001; 66 FR 59545, Nov. 29, 2001; 66 FR 59749, Nov. 30, 2001; 66 FR 63001, Dec. 4, 2001; 66 FR 63775, Dec. 10, 2001; 66 FR 66811, Dec. 27, 2001; 67 FR 10112, March 6, 2002; 67 FR 18382, April 15, 2002; 67 FR 19836, April 23, 2002 67 FR 37721, May 30, 2002; 67 FR 40810, June 13, 2002; 67 FR 44392, 44515, July 2, 2002; 67 FR 47739, July 22, 2002; 67 FR 51129, Aug. 7, 2002; 67 FR 52426, Aug. 12, 2002; 67 FR 52889, Aug. 14, 2002; 67 FR 54053, Aug. 20, 2002; 67 FR 57679, Sept. 11, 2002; 67 FR 61034, Sept. 27, 2002; 68 FR 10409, March 5, 2003; 68 FR 13406, 13519, March 19, 2003; 68 FR 15872, April 1, 2003; 68 FR 17190, April 8, 2003; 68 FR 17456, April 9, 2003; 68 FR 17562, April 10, 2003; 68 FR 26507, May 16, 2003; 68 FR 34758, June 10, 2003; 68 FR 37313, June 23, 2003; 68 FR 43658, July 24, 2003; 68 FR 46756, Aug. 6, 2003; 68 FR 55166, Sept. 22, 2003; 68 FR 70190, Dec. 17, 2003; 69 FR 3028, Jan. 22, 2004; 69 FR 8119, Feb. 23, 2004; 69 FR 8850, Feb. 26, 2004; 69 FR 10353, March 5, 2004; 69 FR 21438, April 21, 2004; 69 FR 29105, May 20, 2004; 69 FR 40116, July 1, 2004; 69 FR 44760, July 27, 2004; 69 FR 47247, Aug. 4, 2004; 69 FR 53160, Aug. 31, 2004; 69 FR 56373, Sept. 21, 2004; 69 FR 60046, Oct. 6, 2004; 69 FR 62980, Oct. 28, 2004; 69 FR 68597, Nov. 24, 2004; 70 FR 447, Jan. 4, 2005; 70 FR 1210, 1305, Jan. 6, 2005; 70 FR 3459, Jan. 24, 2005; 70 FR 10503, March 4, 2005; 70 FR 11141, March 8, 2005; 70 FR 17923, April 8, 2005; 70 FR 46329, 46386, Aug. 9, 2005; 70 FR 46955, Aug. 11, 2005; 70 FR 49417, Aug. 23, 2005; 70 FR 52324, Sept. 2, 2005; 70 FR 58350, Oct. 6, 2005; 70 FR 66706, Nov. 2, 2005; 70 FR 67928, Nov. 9, 2005; 70 FR 69465, Nov. 16, 2005; 71 FR 6229, Feb. 7, 2006; 71 FR 6394, Feb. 8, 2006; 71 FR 7122, Feb. 10, 2006; 71 FR 15629, March 29, 2006; 71 FR 19293, April 13, 2006; 71 FR 19458, April 14, 2006; 71 FR 24916, April 27, 2006; 71 FR 26851, May 9, 2006; 71 FR 40673, July 18, 2006; 71 FR 42314, July 26, 2006; 71 FR 53600, Sept. 12, 2006; 71 FR 54371, Sept. 14, 2006; 71 FR 60264, Oct. 12, 2006; 71 FR 63907, Oct. 31, 2006; 71 FR 66054, Nov. 9, 2006; 71 FR 74608, Dec. 12, 2006; 72 FR 6102, Feb. 8, 2007; 72 FR 13040, March 20, 2007; 72 FR 14938, March 29, 2007; 72 FR 16285, April 4, 2007; 72 FR 37372, July 9, 2007; 72 FR 39265, July 17, 2007; 72 FR 43563, Aug. 6, 2007; 72 FR 51136, Sept. 5, 2007;

72 FR 52446, Sept. 13, 2007; 72 FR 60081, Oct. 23, 2007; 72 FR 64314, Nov. 15, 2007; 73 FR 3178, Jan. 16, 2008; 73 FR 10560, Feb. 27, 2008; 73 FR 23970, May 1, 2008; 73 FR 28302, May 15, 2008; 73 FR 28318, May 15, 2008; 73 FR 39838, July 10, 2008; 73 FR 45573, Aug. 5, 2008; 73 FR 47020, Aug. 12, 2008; 73 FR 50247, Aug. 26, 2008; 73 FR 62838, Oct. 21, 2008; 73 FR 73820, Dec. 4, 2008; 73 FR 74370, Dec. 8, 2008; 73 FR 75358, Dec. 11, 2008; 74 FR 6742, Feb. 10, 2009; 74 FR 8661, Feb. 25, 2009; 74 FR 10378, March 10, 2009; 74 FR 15121, 15186, April 2, 2009; 74 FR 17344, April 14, 2009; 74 FR 26508, June 2, 2009; 74 FR 29385, June 19, 2009; 74 FR 46930, Sept. 14, 2009; 74 FR 47484, Sept. 16, 2009; 74 FR 52010, Oct. 8, 2009; 74 FR 59472, Nov. 17, 2009; 75 FR 249, Jan. 5, 2010; 75 FR 11032, March 10, 2010; 75 FR 12873, March 17, 2010; 75 FR 14497, March 26, 2010; 75 FR 17481, April 6, 2010; 75 FR 19045, April 13, 2010; 75 FR 21188, April 23, 2010; 75 FR 36011, June 24, 2010; 75 FR 43853, July 27, 2010; 75 FR 43864, July 27, 2010; 75 FR 45526, Aug. 3, 2010; 75 FR 50842, Aug. 17, 2010; 75 FR 52282, Aug. 25, 2010; 75 FR 53604, Sept. 1, 2010; 75 FR 59656, Sept. 28, 2010; 75 FR 65575, Oct. 26, 2010; 75 FR 67538, Nov. 2, 2010; 75 FR 75927, Dec. 7, 2010; 75 FR 76132, Dec. 7, 2010; 75 FR 81814, Dec. 28, 2010; 76 FR 6080, Feb. 3, 2011; 76 FR 7321, Feb. 9, 2011; 76 FR 9691, Feb. 22, 2011; 76 FR 18102, April 1, 2011; 76 FR 20560, April 13, 2011; 76 FR 25591, May 5, 2011; 76 FR 25609, May 5, 2011; 76 FR 30780, May 26, 2011; 76 FR 31873, June 2, 2011; 76 FR 33053, June 7, 2011; 76 FR 35350, June 17, 2011; 76 FR 35992, June 21, 2011; 76 FR 37675, June 28, 2011; 76 FR 47491, Aug. 5, 2011; 76 FR 48741, Aug. 9, 2011; 76 FR 49566, Aug. 10, 2011; 76 FR 50079, Aug. 11, 2011; 76 FR 50702, Aug. 16, 2011; 76 FR 54366, Aug. 31, 2011; 76 FR 54713, Sept. 2, 2011; 76 FR 58950, Sept. 22, 2011; 76 FR 58994, Sept. 22, 2011; 76 FR 61612, Oct. 5, 2011; 76 FR 61978, Oct. 6, 2011; 76 FR 62954, Oct. 11, 2011; 76 FR 66804, Oct. 27, 2011; 76 FR 81725, Dec. 28, 2011; 77 FR 8484, Feb. 14, 2012; 77 FR 8664, Feb. 14, 2012; 77 FR 10909, Feb. 23, 2012; 77 FR 14949, March 13, 2012; 77 FR 16375, March 20, 2012; 77 FR 16717, March 22, 2012; 77 FR 20986, April 6, 2012; 77 FR 23087, April 17, 2012; 77 FR 26211, May 3, 2012; 77 FR 30854, May 23, 2012; 77 FR 33103, June 5, 2012; 77 FR 35145, June 12, 2012; 77 FR

36802, June 19, 2012; 77 FR 41105, July 12, 2012; 77 FR 43467, July 24, 2012; 77 FR 45893, Aug. 1, 2012; 77 FR 55604, Sept. 10, 2012; 77 FR 57744, Sept. 18, 2012; 77 FR 60800, Oct. 4, 2012; 77 FR 61703, Oct. 10, 2012; 77 FR 63644, Oct. 16, 2012; 77 FR 71080, Nov. 28, 2012; 77 FR 73761, Dec. 11, 2012; 77 FR 75297, Dec. 19, 2012; 78 FR 500, Jan. 3, 2013; 78 FR 14023, March 4, 2013; 78 FR 15640, March 12, 2013; 78 FR 28522, May 15, 2013; 78 FR 32063, May 28, 2013; 78 FR 38189, June 25, 2013; 78 FR 41257, July 9, 2013; 78 FR 42713, July 17, 2013; 78 FR 45095, July 26, 2013; 78 FR 51325, Aug. 20, 2013; 78 FR 52384, Aug. 22, 2013; 78 FR 55627, Sept. 10, 2013; 78 FR 55656, Sept. 11, 2013; 78 FR 57096, Sept. 17, 2013; 78 FR 57774, Sept. 19, 2013; 78 FR 58954, Sept. 25, 2013; 78 FR 59287, Sept. 26, 2013; 78 FR 59584, Sept. 26, 2013; 78 FR 60782, Oct. 2, 2013; 78 FR 61042, Oct. 2, 2013; 78 FR 61219, Oct. 3, 2013; 78 FR 61502, Oct. 3, 2013; 78 FR 64688, Oct. 29, 2013; 78 FR 64733, Oct. 29, 2013; 78 FR 68371, Nov. 14, 2013; 78 FR 69588, Nov. 20, 2013; 79 FR 2381, Jan. 14, 2014; 79 FR 10292, Feb. 24, 2014; 79 FR 12650, March 5, 2014; 79 FR 18210, April 1, 2014; 79 FR 19794, April 9, 2014; 79 FR 20070, April 10, 2014; 79 FR 20107, April 11, 2014; 79 FR 24310, April 29, 2014; 79 FR 26186, May 7, 2014; 79 FR 28848, May 20, 2014; 79 FR 33137, June 10, 2014; 79 FR 35900, June 24, 2014; 79 FR 37103, June 30, 2014; 79 FR 38746, July 8, 2014; 79 FR 39819, July 10, 2014; 79 FR 42689, July 23, 2014; 79 FR 43161, July 24, 2014; 79 FR 45286, Aug. 4, 2014; 79 FR 47243, Aug. 12, 2014; 79 FR 49023, Aug. 19, 2014; 79 FR 51265, Aug. 28, 2014; 79 FR 51709, Aug. 29, 2014; 79 FR 52577, Sept. 4, 2014; 79 FR 54840, Sept. 12, 2014; 79 FR 60038, Oct. 3, 2014; 79 FR 60378, Oct. 7, 2014; 79 FR 63747, Oct. 24, 2014; 79 FR 67357, Nov. 13, 2014; 79 FR 69310, Nov. 20, 2014; 79 FR 73747, Dec. 11, 2014; 80 FR 2511, Jan. 16, 2015; 80 FR 3915, Jan. 26, 2015; 80 FR 9150, Feb. 19, 2015; 80 FR 9220, Feb. 20, 2015; 80 FR 12566, March 10, 2015; 80 FR 18032, April 2, 2015; 80 FR 24729, April 30, 2015; 80 FR 34524, June 16, 2015; 80 FR 35866, June 23, 2015; 80 FR 37428, June 30, 2015; 80 FR 45097, July 29, 2015; 80 FR 59302, Oct. 1, 2015; 80 FR 59496, Oct. 1, 2015; 80 FR 60021, Oct. 2, 2015; 80 FR 60488, Oct. 6, 2015; 80 FR 66837, Oct. 30, 2015; 80 FR 70717, Nov. 16, 2015; 80 FR 76249, Dec. 8, 2015; 80 FR 80056, Dec. 23, 2015; 81 FR 8007, Feb. 17, 2016; 81 FR 13171, March 11, 2016; 81 FR 14315, March 16, 2016; 81 FR 17959, March 30, 2016; 81 FR 20086, April 6, 2016; 81 FR 20480, April 7, 2016; 81 FR 29166, May 11, 2016; 81 FR 29375, May 11, 2016; 81 FR 36783, June 7, 2016; 81 FR 40547, June 22, 2016; 81 FR 47047, July 20, 2016; 81 FR 51348, Aug. 4, 2016; 81 FR 51556, Aug. 4, 2016; 81 FR 53332, Aug. 12, 2016; 81 FR 59090, Aug. 26, 2016; 81 FR 62659, Sept. 12, 2016; 81 FR 65507, Sept. 22, 2016; 81 FR 67214, Sept. 30, 2016; 81 FR 67856, Sept. 30, 2016; 81 FR 68984, Oct. 5, 2016; 81 FR 69007, Oct. 5, 2016; 81 FR 69425, Oct. 6, 2016; 81 FR 71408, Oct. 17, 2016; 81 FR 76313, Nov. 2, 2016; 81 FR 93640, Dec. 21, 2016;

82 FR 3208, Jan. 11, 2017; 82 FR 10285, Feb. 10, 2017; 82 FR 16540, April 5, 2017; 82 FR 16704, April 5, 2017; 82 FR 20284, May 1, 2017; 82 FR 28577, June 23, 2017; 82 FR 28588, June 23, 2017; 82 FR 30632, June 30, 2017; 82 FR 43885, Sept. 20, 2017; 82 FR 43896, Sept. 20, 2017; 82 FR 43907, Sept. 20, 2017; 83 FR 278, Jan. 3, 2018; 83 FR 2087, Jan. 16, 2018; 83 FR 3099, Jan. 23, 2018; 83 FR 5735, Feb. 9, 2018; 83 FR 14198, April 3, 2018; 83 FR 14982, April 6, 2018; 83 FR 16242, April 16, 2018; 83 FR 17110, April 18, 2018; 83 FR 36772, July 31, 2018; 83 FR 39916, Aug. 13, 2018; 83 FR 58753, Nov. 21, 2018; 83 FR 67139, Dec. 28, 2018; 84 FR 6310, Feb. 26, 2019; 84 FR 13811, April 8, 2019; 84 FR 25003, May 30, 2019; 84 FR 37145, July 31, 2019; 84 FR 48308, Sept. 13, 2019; 84 FR 52659, Oct. 2, 2019; 84 FR 52800, Oct. 3, 2019; 84 FR 54463, Oct. 9, 2019; 84 FR 56135, Oct. 21, 2019; 84 FR 64226, Nov. 21, 2019; 84 FR 69946, Dec. 19, 2019; 85 FR 189, Jan. 2, 2020; 85 FR 11262, Feb. 26, 2020; 85 FR 11305, Feb. 27, 2020; 85 FR 22663, April 23, 2020; 85 FR 26818, May 5, 2020; 85 FR 29589, May 15, 2020; 85 FR 35594, June 11, 2020; 85 FR 37588, June 23, 2020; 85 FR 39090, June 30, 2020; 85 FR 61618, Sept. 30, 2020; 85 FR 61631, Sept. 30, 2020; 85 FR 63802, Oct. 8, 2020; 85 FR 63830, Oct. 8, 2020; 85 FR 65259, Oct. 15, 2020; 85 FR 69895, Nov. 3, 2020; 86 FR 211, Jan. 4, 2021; 86 FR 2581, Jan. 13, 2021; 86 FR 13475, March 9, 2021; 86 FR 15620, March 24, 2021; 86 FR 18202, April 8, 2021; 86 FR 20939, April 21, 2021; 86 FR 21961, April 26, 2021; 86 FR 22570, April 28, 2021; 86 FR 30727, June 9, 2021; 86 FR 33142, June 24, 2021; 86 FR 34994, July 1, 2021; 86 FR 41757, Aug. 3, 2021; 86 FR 46564, Aug. 18, 2021; 86 FR 47238, Aug. 24, 2021; 86 FR 50281, Sept. 8, 2021; 86 FR 57375, Oct. 15, 2021; 86 FR 57608, Oct. 18, 2021; 86 FR 58513, Oct. 21, 2021; 86 FR 64034, Nov. 16, 2021; 86 FR 67358, Nov. 26, 2021; 86 FR 72427, Dec. 21, 2021; 87 FR 576, Jan. 5, 2022; 87 FR 6077, Feb. 3, 2022; 87 FR 8964, Feb. 17, 2022; 87 FR 8980, Feb. 17, 2022; 87 FR 8982, Feb. 17, 2022; 87 FR 11216, Feb. 28, 2022; 87 FR 14690, March 15, 2022; 87 FR 15145, March 17, 2022; 87 FR 20348, April 7, 2022; 87 FR 26142, May 3, 2022; 87 FR 40134, July 6, 2022; 87 FR 51928, Aug. 24, 2022; 87 FR 60313, Oct. 5, 2022; 87 FR 64720, Oct. 26, 2022; 87 FR 67395, Nov. 8, 2022; 87 FR 68382, Nov. 15, 2022; 87 FR 72753, Nov. 25, 2022; 87 FR 73503, Nov. 30, 2022; 87 FR 73678, Dec. 1, 2022; 87 FR 73993, Dec. 2, 2022; 87 FR 76125, Dec. 13, 2022; 88 FR 2025, Jan. 12, 2023; 88 FR 4087, Jan. 24, 2023; 88 FR 4792, Jan. 25, 2023; 88 FR 4908, Jan. 26, 2023; 88 FR 6191, Jan. 31,

2023; 88 FR 7142, Feb. 2, 2023; 88 FR 13065, March 2, 2023; 88 FR 14838, March 9, 2023; 88 FR 15938, March 15, 2023; 88 FR 19017, March 30, 2023; 88 FR 19893, April 4, 2023; 88 FR 20426, April 6, 2023; 88 FR 24712, April 24, 2023; 88 FR 25537, April 27, 2023; 88 FR 33220, May 23, 2023; 88 FR 41757, June 27, 2023; 88 FR 41854, June 28, 2023; 88 FR 46949, July 20, 2023; 88 FR 49354, July 31, 2023; 88 FR 56487, Aug. 18, 2023; 88 FR 59725, Aug. 29, 2023; 88 FR 64830, Sept. 20, 2023; 88 FR 66295, Sept. 27, 2023; 88 FR 69071, Oct. 5, 2023; 88 FR 71672, Oct. 17, 2023; 88 FR 75508, Nov. 3, 2023; 88 FR 77035, Nov. 8, 2023; 88 FR 83771, Nov. 30, 2023; 88 FR 89626, Dec. 28, 2023; 89 FR 11771, Feb. 15, 2024; 89 FR 16668, March 7, 2024; 89 FR 17955, March 12, 2024; 89 FR 37021, May 3, 2024; 89 FR 43768, May 20, 2024; 89 FR 46609, May 29, 2024; 89 FR 48099, June 4, 2024; 89 FR 53528, June 27, 2024; 89 FR 55112, July 3, 2024; 89 FR 57235, July 12, 2024; 89 FR 60327, July 25, 2024; 89 FR 61049, July 30, 2024; 89 FR 65553, Aug. 12, 2024; 89 FR 72757, Sept. 6, 2024; 89 FR 73310, Sept. 10, 2024; 89 FR 75976, Sept. 17, 2024]

SOURCE: 40 FR 44415, Sept. 26, 1975; 48 FR 34182, July 27, 1983; 52 FR 29780, Aug. 11, 1987; 54 FR 5938, Feb. 7, 1989; 54 FR 38946, Sept. 21, 1989; 55 FR 39416, Sept. 27, 1990; 77 FR 75297, Dec. 19, 2012; 86 FR 4844, Jan. 15, 2021; 86 FR 62606, 62659, Nov. 10, 2021, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

Notes of Decisions (2)

Current through October 24, 2024, 89 FR 85034. Some sections may be more current. See credits for details.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 50. Wildlife and Fisheries
        Chapter I. United States Fish and Wildlife Service, Department of the Interior
            Subchapter B. Taking, Possession, Transportation, Sale, Purchase, Barter, Exportation, and Importation of Wildlife
            and Plants
                Part 17. Endangered and Threatened Wildlife and Plants (Refs & Annos)
                    Subpart C. Endangered Wildlife

50 C.F.R. § 17.22

§ 17.22 Permits for endangered species.

Effective: May 13, 2024
Currentness

Upon receipt of a complete application, the Director may issue a permit authorizing any activity otherwise prohibited by § 17.21, in accordance with the issuance criteria of this section, for scientific purposes, for enhancing the propagation or survival, or for the incidental taking of endangered wildlife. Such permits may authorize a single transaction, a series of transactions, or a number of activities over a specific period of time. (See § 17.32 for permits for threatened species.) The Director shall publish notice in the Federal Register of each application for a permit that is made under this section. Each notice shall invite the submission from interested parties, within 30 days after the date of the notice, of written data, views, or arguments with respect to the application. The 30–day period may be waived by the Director in an emergency situation where the life or health of an endangered animal is threatened and no reasonable alternative is available to the applicant. Notice of any such waiver shall be published in the Federal Register within 10 days following issuance of the permit.

(a)(1) Application requirements for permits for scientific purposes or for the enhancement of propagation or survival. A person wishing to get a permit for an activity prohibited by § 17.21 submits an application for activities under this paragraph. The Service provides Form 3–200 for the application to which all of the following must be attained:

(i) The common and scientific names of the species sought to the covered by the permit, as well as the number, age, and sex of such species, and the activity sought to be authorized (such as taking, exporting, selling in interstate commerce);

(ii) A statement as to whether, at the time of application, the wildlife sought to be covered by the permit (A) is still in the wild, (B) has already been removed from the wild, or (C) was born in captivity;

(iii) A resume of the applicant's attempts to obtain the wildlife sought to be covered by the permit in a manner which would not cause the death or removal from the wild of such wildlife;

(iv) If the wildlife sought to be covered by the permit has already been removed from the wild, the country and place where such removal occurred; if the wildlife sought to be covered by the permit was born in captivity, the country and place where such wildlife was born;

(v) A complete description and address of the institution or other facility where the wildlife sought to be covered by the permit will be used, displayed, or maintained;

(vi) If the applicant seeks to have live wildlife covered by the permit, a complete description, including photographs or diagrams, of the facilities to house and/or care for the wildlife and a resume of the experience of those person who will be caring for the wildlife;

(vii) A full statement of the reasons why the applicant is justified in obtaining a permit including the details of the activities sought to be authorized by the permit;

(viii) If the application is for the purpose of enhancement of propagation, a statement of the applicant's willingness to participate in a cooperative breeding program and to maintain or contribute data to a studbook;

(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in § 13.21(b) of this subchapter, the following factors:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

(3) Permit conditions. In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this paragraph shall be subject to the special condition that the escape of living wildlife covered by the permit shall be immediately reported to the Service office designated in the permit.

USCA Case #24-5101    Document #2083247    Filed: 11/01/2024    Page 306 of 360

(4) Duration of permits. The duration of permits issued under this paragraph shall be designated on the face of the permit.

(b)(1) Application requirements for an incidental take permit. A person seeking authorization for incidental take that would otherwise be prohibited by § 17.21(c) submits Form 3–200–56, a processing fee (if applicable), and a conservation plan. The Service will process the application when the Director determines the application is complete. A conservation plan must include the following:

(i) Project description. A complete description of the project including purpose, location, timing, and proposed covered activities.

(ii) Covered species. As defined in § 17.3, common and scientific names of species sought to be covered by the permit, as well as the number, age, and sex, if known.

(iii) Goals and objectives. The measurable biological goals and objectives of the conservation plan.

(iv) Anticipated take. Expected timing, geographic distribution, type and amount of take, and the likely impact of take on the species.

(v) Conservation program, that explains the:

(A) Conservation measures that will be taken to minimize and mitigate the impacts of the incidental take for all covered species commensurate with the taking;

(B) Roles and responsibilities of all entities involved in implementation of the conservation plan;

(C) Changed circumstances and the planned responses in an adaptive management plan; and

(D) Procedures for dealing with unforeseen circumstances.

(vi) Conservation timing. The timing of mitigation relative to the incidental take of covered species.

(vii) Permit duration. The rationale for the requested permit duration.

(viii) Monitoring. Monitoring of the effectiveness of the mitigation and minimization measures, progress towards achieving the biological goals and objectives, and permit compliance. The scope of the monitoring program should be commensurate with the scope and duration of the conservation program and the project impacts.

(ix) Funding needs and sources. An accounting of the costs for properly implementing the conservation plan and the sources and methods of funding.

(x) Alternative actions. The alternative actions to the taking the applicant considered and the reasons why such alternatives are not being used.

(xi) Additional actions. Other measures that the Director requires as necessary or appropriate, including those necessary or appropriate to meet the issuance criteria or other statutory responsibilities of the Service.

(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (b)(1) of this section, the Director will decide whether a permit should be issued. The Director will consider the general issuance criteria in § 13.21(b) of this subchapter, except for § 13.21(b)(4). In making a decision, the Director will consider the anticipated duration and geographic scope of the applicant's planned activities, including the amount of covered species' habitat that is involved and the degree to which covered species and their habitats are affected. The Director will issue the permit if the Director finds:

(i) The taking will be incidental to, and not the purpose of, carrying out an otherwise lawful activity.

(ii) The applicant will, to the maximum extent practicable, minimize and mitigate the impacts of the taking.

(iii) The applicant will ensure that adequate funding for the conservation plan implementation will be provided.

(iv) The applicant has provided procedures to deal with unforeseen circumstances.

(v) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.

(vi) The measures and conditions, if any, required under paragraph (b)(1)(xi) of this section will be met.

(vii) The applicant has provided any other assurances the Director requires to ensure that the conservation plan will be implemented.

(3) Permit conditions. In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under the regulations in this section will contain terms and conditions that the Director deems necessary or appropriate to carry out the purposes of the permit and the conservation plan including, but not limited to, additional conservation measures, if any, that may be required pursuant to paragraph (b)(1)(xi) of this section, specified deadlines, and monitoring and reporting requirements deemed necessary for determining whether the permittee is complying with those terms and conditions. The Director will rely upon existing reporting requirements to the maximum extent practicable.

(4) Permit duration and effective date. In determining the duration of a permit, the Director will consider the duration of the activities for which coverage is requested; the time necessary to fully minimize and mitigate the impacts of the taking;

and uncertainties related to the impacts of the taking, success of the mitigation, and external factors that could affect the success of the conservation plan.

(i) Permits issued under this paragraph (b) become effective for listed covered species upon the date the permittee signs the incidental take permit, which must occur within 90 calendar days of issuance. For non-listed covered species, the permit's take authorization becomes effective upon the effective date of the species' listing provided the permittee signed the permit within 90 calendar days of issuance and has properly implemented the conservation plan.

(ii) The permit expires on the date indicated on the face of the permit.

(5) Assurances provided to permittee in case of changed or unforeseen circumstances. The assurances in this paragraph (b)(5) apply only to incidental take permits issued in accordance with paragraph (b)(2) of this section where the conservation plan is being properly implemented and the permittee is properly complying with the incidental take permit. The assurances apply only with respect to species covered by the conservation plan. These assurances do not apply to Federal agencies or to incidental take permits issued prior to March 25, 1998. The assurances provided in incidental take permits issued prior to March 25, 1998, remain in effect, and those permits will not be revised.

(i) Changed circumstances provided for in the plan. If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances and were provided for in the plan's operating conservation program, the permittee will implement the measures specified in the plan.

(ii) Changed circumstances not provided for in the plan. If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances and were not provided for in the plan's operating conservation program, the Director will not require any conservation and mitigation measures in addition to those provided for in the plan without the consent of the permittee, provided the Director determines that the plan is being properly implemented.

(iii) Unforeseen circumstances.

(A) In negotiating a response to unforeseen circumstances, the Director will not require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan without the consent of the permittee.

(B) If additional conservation and mitigation measures are deemed necessary to respond to unforeseen circumstances, the Director may require additional measures of the permittee where the conservation plan is being properly implemented, but only if such measures:

(1) Are limited to modifications within conserved habitat areas, if any, or to the conservation plan's operating conservation program for the affected species; and

(2) Maintain the original terms of the conservation plan to the maximum extent possible.

(3) Additional conservation and mitigation measures will not involve the commitment of additional land, water, or financial compensation, or additional restrictions on the use of land, water, or other natural resources otherwise available for development or use under the original terms of the conservation plan, without the consent of the permittee.

(C) The Director will have the burden of demonstrating that unforeseen circumstances exist, using the best scientific and commercial data available. These findings must be clearly documented and based upon reliable technical information regarding the status and habitat requirements of the affected species. The factors to be considered by the Director include, but are not limited to, the following:

(1) Size of the current range of the affected species;

(2) Percentage of range adversely affected by the conservation plan;

(3) Percentage of range conserved by the conservation plan;

(4) Ecological significance of that portion of the range affected by the conservation plan;

(5) Level of knowledge about the affected species and the degree of specificity of the species' conservation program under the conservation plan; and

(6) Whether failure to adopt additional conservation measures would appreciably reduce the likelihood of survival and recovery of the affected species in the wild.

(6) Additional actions. Nothing in this section will be construed to limit or constrain the Director, any Federal, State, local, or Tribal government agency, or a private entity from taking additional actions, at their own expense, to protect or conserve a species included in a conservation plan.

(7) Permit amendment or renewal. Any amendment or renewal of an existing permit issued under this part is a new agency decision and is therefore subject to all current relevant laws and regulations. The application will be evaluated based on the current policies and guidance in effect at the time of the amendment or renewal decision. Evaluation of an amendment extends only to the portion(s) of the conservation plan or permit for which the amendment is requested. Amendment or renewal applications must meet issuance criteria based upon the best available commercial and scientific data at the time of the permit decision.

(8) Discontinuance of permit activity. Notwithstanding the provisions of § 13.26 of this subchapter, a permittee under this paragraph (b) remains responsible for any outstanding minimization and mitigation measures required under the terms of the permit for take that occurs prior to surrender of the permit and such minimization and mitigation measures as may be required pursuant to the termination provisions of an implementing agreement, conservation plan, or permit even after surrendering the permit to the Service pursuant to § 13.26 of this subchapter. The Service will deem the permit canceled

only upon a determination that such minimization and mitigation measures have been implemented. Upon surrender of the permit, no further take by the permittee will be authorized under the terms of the surrendered permit.

(9) Criteria for revocation. A permit issued under this paragraph (b) may not be revoked for any reason except:

(i) The reasons set forth in § 13.28(a)(1) through (4) of this subchapter; or

(ii) If continuation of the permitted activity would be inconsistent with the criterion set forth in 16 U.S.C. 1539(a)(2)(B)(iv) and the inconsistency has not been remedied.

(c)(1) Application requirements for an enhancement of survival permit associated with conservation benefit agreements. The applicant must submit Form 3–200–54, the processing fee (if applicable), and a conservation benefit agreement. The Service will process the application when the Director determines the application has met all statutory and regulatory requirements for a complete application. A conservation benefit agreement must include the following:

(i) Conservation measures. A complete description of the conservation measure or measures, including the location of the activity or activities to be covered by the permit, and their intended outcome for the covered species.

(ii) Covered species. The common and scientific names of the covered species for which the applicant will conduct conservation measures and may need authorization for take.

(iii) Goals and objectives. The measurable biological goals and objectives of the conservation measures in the agreement.

(iv) Enrollment baseline. The baseline condition of the property or area to be enrolled as defined in § 17.3.

(v) Net conservation benefit. A description of how the measures are reasonably expected to improve each covered species' existing baseline condition on the enrolled property and result in a net conservation benefit as defined at § 17.3.

(vi) Monitoring. The steps the applicant will take to monitor and adaptively manage to ensure the goals and objectives of the conservation benefit agreement are met, the responsibilities of all parties are carried out, and the conservation benefit agreement will be properly implemented.

(vii) Neighboring property owners. A description of the enrollment process to provide neighboring property owners take coverage under paragraph (c)(5)(ii) of this section, if applicable, or any other measures developed to protect the interests of neighboring property owners.

(viii) Return to baseline condition. The applicant's choice between including authorization to return the enrolled property to baseline condition or forgoing that authorization. For applicants seeking authority to return to baseline condition, a description of steps that may be taken to return the property to baseline condition and measures to reduce the effects of the take to the covered species.

(ix) Additional actions. Any other measures that the Director may require as necessary or appropriate to meet the issuance criteria in paragraph (c)(2) of this section or to avoid conflicts with other Service conservation efforts.

(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (c)(1) of this section, the Director will decide whether to issue a permit. The Director will consider the general issuance criteria in § 13.21(b) of this subchapter, except for § 13.21(b)(4), and may issue the permit if the Director finds:

(i) The take will be incidental to an otherwise lawful activity or purposeful if it is necessary for the implementation of the conservation benefit agreement and will be in accordance with the terms of the agreement.

(ii) The implementation of the terms of the conservation benefit agreement is reasonably expected to provide a net conservation benefit to the affected covered species on the enrolled property that is included in the permit and for each individual property within a programmatic conservation benefit agreement, based upon: condition of the species or habitat, effects of conservation measures, and anticipated impacts of any permitted take.

(iii) The direct and indirect effects of any authorized take are unlikely to appreciably reduce the likelihood of survival and recovery in the wild of any listed species.

(iv) Implementation of the terms of the conservation benefit agreement will not conflict with any ongoing conservation or recovery programs for listed species and the covered species included in the permit.

(v) The applicant has shown a capability for and commitment to implementing all terms of the conservation benefit agreement.

(3) Permit conditions. In addition to any applicable general permit conditions set forth in part 13 of this subchapter, every permit issued under this paragraph (c) is subject to the following special conditions:

(i) The participating property owner must notify the Service of any transfer of property subject to a conservation benefit agreement, at least 30 calendar days prior to the transfer.

(ii) The permittee must give the Service reasonable advance notice (generally at least 30 calendar days) of when take of any covered species is expected to occur, to provide the Service an opportunity to relocate affected individuals of the species, if possible and appropriate.

(iii) Any additional requirements or conditions the Director deems necessary or appropriate to carry out the purposes of the permit and the conservation benefit agreement.

(4) Permit duration and effective date. The duration of permits issued under paragraph (c) of this section must be sufficient to provide a net conservation benefit to species covered in the enhancement of survival permit on the enrolled property.

(i) In determining the duration of a permit, the Director will consider the duration of the planned activities, the uncertainties related to the impacts of the taking, and the positive and negative effects of the planned activities covered by the permit on species covered by the conservation benefit agreement.

(ii) Permits issued under this paragraph (c) become effective for listed covered species upon the date the permittee signs the enhancement of survival permit, which must be within 90 calendar days of issuance. For non-listed covered species, the take authorized through the permit becomes effective upon the effective date of the species' listing provided the permittee signed the permit within 90 calendar days of issuance and has properly implemented the conservation benefit agreement since signing the permit.

(5) Assurances. The assurances in paragraph (c)(5)(i) of this section apply only to enhancement of survival permits issued in accordance with paragraph (c)(2) of this section where the conservation benefit agreement is being properly implemented, apply only with respect to species covered by the permit, and are effective until the permit expires. The assurances provided in this section apply only to enhancement of survival permits issued after July 19, 1999.

(i) Permittee and participating property owners. The Director and the permittee may agree to revise or modify the conservation measures set forth in a conservation benefit agreement if the Director determines that those revisions or modifications do not change the Director's prior determination that the conservation benefit agreement is reasonably expected to provide a net conservation benefit to the covered species. However, the Director may not require additional or different conservation measures to be undertaken by a permittee without the consent of the permittee.

(ii) Neighboring property owners. The Director may provide take coverage in the enhancement of survival permit for owners of properties adjacent to properties covered by the conservation benefit agreement through enrollment procedures contained in the agreement. The take covered and the method of providing take coverage will be tailored to the specific conservation benefit agreement and needs of adjacent property owners. One method is to have the neighboring property owner sign a certificate that applies the authorization and assurances in the permit to the neighboring property owner. The certificate must:

(A) Establish a baseline condition for the covered species on their property; and

(B) Give permission to the Service, the permittee, or a representative of either to enter the property, with reasonable notice, to capture and relocate, salvage, or implement measures to reduce anticipated take of the covered species.

(6) Additional actions. Nothing in this section will be construed to limit or constrain the Director, any Federal, State, local, or Tribal government agency, or a private entity from taking additional actions, at their own expense, to protect or conserve a species included in a conservation benefit agreement.

(7) Permit amendment or renewal. Any amendment or renewal of an existing permit issued under this part is a new agency decision and is therefore subject to all current relevant laws and regulations. The application will be evaluated based on the current policies and guidance in effect at the time of the amendment or renewal decision. Evaluation of an amendment extends only to the portion(s) of the conservation benefit agreement or permit for which the amendment is requested. Amendment or renewal applications must meet issuance criteria based upon the best available commercial and scientific data at the time of the permit decision.

(8) Discontinuance of permit activity. Notwithstanding the provisions of § 13.26 of this subchapter, a permittee under this paragraph (c) remains responsible for any outstanding conservation measures required under the terms of the permit for take that occurs prior to surrender of the permit and any conservation measures required pursuant to the termination provisions of the conservation benefit agreement or permit even after surrendering the permit to the Service pursuant to § 13.26 of this subchapter.

(i) The permittee of a programmatic conservation benefit agreement that conveys take authorization and assurances to participants or enrollees must follow the provisions of § 13.26 of this subchapter.

(ii) The permit will be deemed canceled only upon a determination by the Service that those conservation measure(s) have been implemented and the permittee has had ample time to return the permittee's property to baseline condition, if the permit authorized take associated with return to baseline and if the permittee chooses to exercise that authorization.

(iii) Upon surrender of the permit, no further take will be authorized under the terms of the surrendered permit, and the assurances in paragraph (c)(5)(i) of this section will no longer apply.

(9) Criteria for revocation. The Director may not revoke a permit issued under paragraph (c) of this section except as provided in this paragraph (c)(9).

(i) The Director may revoke a permit for any reason set forth in § 13.28(a)(1) through (4) of this subchapter. The Director may revoke a permit if continuation of the covered activity would either:

   (A) Appreciably reduce the likelihood of survival and recovery in the wild of any covered species; or

   (B) Directly or indirectly alter designated critical habitat such that the value of that critical habitat is appreciably diminished for both the survival and recovery of a covered species.

(ii) Before revoking a permit for either of the reasons in paragraphs (c)(9)(i)(A) or (B) of this section, the Director, with the consent of the permittee, will pursue all appropriate options to avoid permit revocation. These options may include, but are not limited to, extending or modifying the existing permit, capturing and relocating the species, compensating the property owner to forgo the activity, purchasing an easement or fee simple interest in the property, or arranging for a third-party acquisition of an interest in the property.

(d) Objection to permit issuance.

(1) In regard to any notice of a permit application published in the Federal Register, any interested party that objects to the issuance of a permit, in whole or in part, may, during the comment period specified in the notice, request notification of the final action to be taken on the application. A separate written request must be made for each permit application. Such a request must specify the Service's permit application number and state the reasons why the interested party believes

the applicant does not meet the issuance criteria contained in this section and § 13.21 of this subchapter, or other reasons why the permit should not be issued.

(2) If the Service decides to issue a permit despite objections received pursuant to paragraph (d)(1) of this section, the Service will, at least 10 days prior to issuance of the permit, make reasonable efforts to contact by telephone, or other expedient means, any party who has made a request pursuant to paragraph (d)(1) of this section and inform that party of the issuance of the permit. However, the Service may reduce the time period or dispense with such notice if the Service determines that time is of the essence and that delay in issuance of the permit would:

(i) Harm the specimen or population involved; or

(ii) Unduly hinder the actions authorized under the permit.

(3) The Service will notify any party filing an objection and request for notice under paragraph (d)(1) of this section of the final action taken on the application, in writing. If the Service has reduced or dispensed with the notice period referred to in paragraph (d)(2) of this section, the Service will include its reasons in such written notice.

## Credits

[40 FR 44415, Sept. 26, 1975, as amended at 40 FR 53400, Nov. 18, 1975; 41 FR 19926, May 11, 1976; 47 FR 30786, July 15, 1982; 50 FR 39687, Sept. 30, 1985; 63 FR 8871, Feb. 23, 1998; 63 FR 52635, Oct. 1, 1998; 64 FR 32711, June 17, 1999; 64 FR 52676, Sept. 30, 1999; 69 FR 24092, May 3, 2004; 69 FR 29670, May 25, 2004; 69 FR 71731, Dec. 10, 2004; 81 FR 95055, Dec. 27, 2016; 82 FR 8501, Jan. 26, 2017; 89 FR 26095, April 12, 2024]

SOURCE: 40 FR 44415, Sept. 26, 1975; 52 FR 29780, Aug. 11, 1987; 54 FR 5938, Feb. 7, 1989; 54 FR 38946, Sept. 21, 1989; 55 FR 39416, Sept. 27, 1990; 77 FR 75297, Dec. 19, 2012; 86 FR 4844, Jan. 15, 2021; 86 FR 62606, 62659, Nov. 10, 2021, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1361−1407; 1531−1544; and 4201−4245, unless otherwise noted.

Notes of Decisions (105)

Current through October 24, 2024, 89 FR 85034. Some sections may be more current. See credits for details.

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    Addendum 312a    11

Code of Federal Regulations
   Title 50. Wildlife and Fisheries
      Chapter I. United States Fish and Wildlife Service, Department of the Interior
         Subchapter B. Taking, Possession, Transportation, Sale, Purchase, Barter, Exportation, and Importation of Wildlife
         and Plants
            Part 17. Endangered and Threatened Wildlife and Plants (Refs & Annos)
               Subpart C. Endangered Wildlife

50 C.F.R. § 17.23

§ 17.23 Economic hardship permits.

Currentness

Upon receipt of a complete application, the Director may issue a permit authorizing any activity otherwise prohibited by §
17.21, in accordance with the issuance criteria of this section in order to prevent undue economic hardship. The Director shall
publish notice in the Federal Register of each application for a permit that is made under this section. Each notice shall invite
the submission from interested parties, within 30 days after the date of the notice, of written data, views, or arguments with
respect to the application. The 30–day period may be waived by the Director in an emergency situation where the life or health
of an endangered animal is threatened and no reasonable alternative is available to the applicant. Notice of any such waiver
shall be published in the Federal Register within 10 days following issuance of the permit.

(a) Application requirements. Applications for permits under this section must be submitted to the Director by the person
allegedly suffering undue economic hardship because his desired activity is prohibited by § 17.21. Each application must be
submitted on an official application form (Form 3–200) provided by the Service, and must include, as an attachment, all of the
information required in § 17.22 plus the following additional information:

(1) The possible legal, economic or subsistence alternatives to the activity sought to be authorized by the permit;

(2) A full statement, accompanied by copies of all relevant contracts and correspondence, showing the applicant's
involvement with the wildlife sought to be covered by the permit (as well as his involvement with similar wildlife),
including, where applicable, that portion of applicant's income derived from the taking of such wildlife, or the subsistence
use of such wildlife, during the calendar year immediately preceding either the notice in the Federal Register of review of
the status of the species or of the proposal to list such wildlife as endangered, whichever is earliest;

(3) Where applicable, proof of a contract or other binding legal obligation which:

(i) Deals specifically with the wildlife sought to be covered by the permit;

(ii) Became binding prior to the date when the notice of a review of the status of the species or the notice of proposed
rulemaking proposing to list such wildlife as endangered was published in the Federal Register, whichever is earlier; and

(iii) Will cause monetary loss of a given dollar amount if the permit sought under this section is not granted.

(b) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a permit should be issued under any of the three categories of economic hardship, as defined in section 10(b)(2) of the Act. In making his decisions, the Director shall consider, in addition to the general criteria in § 13.21(b) of this subchapter, the following factors:

(1) Whether the purpose for which the permit is being requested is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(2) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(3) The economic, legal, subsistence, or other alternatives or relief available to the applicant;

(4) The amount of evidence that the applicant was in fact party to a contract or other binding legal obligation which;

(i) Deals specifically with the wildlife sought to be covered by the permit; and

(ii) Became binding prior to the date when the notice of a review of the status of the species or the notice of proposed rulemaking proposing to list such wildlife as endangered was published in the Federal Register, whichever is earlier.

(5) The severity of economic hardship which the contract or other binding legal obligation referred to in paragraph (b)(4) of this section would cause if the permit were denied;

(6) Where applicable, the portion of the applicant's income which would be lost if the permit were denied, and the relationship of that portion to the balance of his income;

(7) Where applicable, the nature and extent of subsistence taking generally by the applicant; and

(8) The likelihood that applicant can reasonably carry out his desired activity within one year from the date a notice is published in the Federal Register to review status of such wildlife, or to list such wildlife as endangered, whichever is earlier.

(c) Permit conditions. In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this section shall be subject to the following special conditions:

USCA Case #24-5101    Document #2083247    Filed: 11/01/2024    Page 317 of 360

(1) In addition to any reporting requirements contained in the permit itself, the permittee shall also submit to the Director a written report of his activities pursuant to the permit. Such report must be postmarked or actually delivered no later than 10 days after completion of the activity.

(2) The death or escape of all living wildlife covered by the permit shall be immediately reported to the Service's office designated in the permit.

(d) Duration of permits issued under this section shall be designated on the face of the permit. No permit issued under this section, however, shall be valid for more than one year from the date a notice is published in the Federal Register to review status of such wildlife, or to list such wildlife as endangered, whichever is earlier.

**Credits**
[40 FR 44415, Sept. 26, 1975, as amended at 40 FR 53400, Nov. 18, 1975; 40 FR 58307, Dec. 16, 1975; 50 FR 39688, Sept. 30, 1985]

SOURCE: 40 FR 44415, Sept. 26, 1975; 52 FR 29780, Aug. 11, 1987; 54 FR 5938, Feb. 7, 1989; 54 FR 38946, Sept. 21, 1989; 55 FR 39416, Sept. 27, 1990; 77 FR 75297, Dec. 19, 2012; 86 FR 4844, Jan. 15, 2021; 86 FR 62606, 62659, Nov. 10, 2021, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

Notes of Decisions (5)

Current through October 24, 2024, 89 FR 85034. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Addendum 315a**

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## 50 CFR Part 402

[Docket No. FWS–HQ–ES–2018–0009; FXES11140900000–189–FF09E300000; Docket No. 180207140–8140–01; 4500090023]

RIN 1018–BC87; 0648–BH41

## Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation

**AGENCY:** U.S. Fish and Wildlife Service (FWS), Interior; National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration, Commerce.

**ACTION:** Final rule.

**SUMMARY:** FWS and NMFS (collectively referred to as the "Services" or "we") revise portions of our regulations that implement section 7 of the Endangered Species Act of 1973, as amended ("Act"). The revisions to the regulations clarify, interpret, and implement portions of the Act concerning the interagency cooperation procedures.

**DATES:** This final rule is effective on September 26, 2019.

**ADDRESSES:** This final rule is available on the internet at *http://www.regulations.gov* at Docket No. FWS–HQ–ES–2018–0009. Comments and materials we received on the proposed rule, as well as supporting documentation we used in preparing this rule, are available for public inspection at *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Gary Frazer, U.S. Fish and Wildlife Service, Department of the Interior, Washington, DC 20240, telephone 202/208–4646; or Samuel D. Rauch, III, National Marine Fisheries Service, Department of Commerce, 1315 East-West Highway, Silver Spring, MD 20910, telephone 301/427–8000. If you use a telecommunications device for the deaf (TDD), call the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Background

Title 50, part 402, of the Code of Federal Regulations establishes the procedural regulations governing interagency cooperation under section 7 of the Act, which requires Federal agencies, in consultation with and with the assistance of the Secretaries of the Interior and Commerce (the "Secretaries"), to insure that any action authorized, funded, or carried out by such agencies is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species.

On July 25, 2018, the Services published a proposed rule to amend our regulations that implement section 7 of the Act (83 FR 35178). The proposed rule addressed alternative consultation mechanisms; the definitions of "destruction or adverse modification" and "effects of the action"; certainty of measures proposed by action agencies to avoid, minimize, or offset adverse effects; and other improvements to the consultation process. The proposed rule also sought comment on: The advisability of addressing several other issues related to implementing section 7 of the Act; the extent to which the proposed changes outlined would affect timeframes and resources needed to conduct consultation; anticipated cost savings resulting from the proposed changes; and any other specific changes to any provisions in part 402 of the regulations. The proposed rule requested that all interested parties submit written comments on the proposal by September 24, 2018. The Services also contacted Federal and State agencies, certain industries regularly involved in Act section 7(a)(2) consultation, Tribes, nongovernmental organizations, and other interested parties and invited them to comment on the proposal.

In this final rule, we focus our discussion on changes from the proposed regulation revisions, including changes based on comments we received during the comment period. For background relevant to these regulations, we refer the reader to the proposed rule (83 FR 35178, July 25, 2018).

This final rule is one of three related final rules that the agencies are publishing in this issue of the **Federal Register.** All of these documents finalize revisions to various regulations that implement the Act. The revisions to the regulations in this rule are prospective; they are not intended to require that any previous consultations under section 7(a)(2) of the Act be reevaluated at the time this final rule becomes effective (see **DATES**, above).

## Final Regulatory Revisions

### Discussion of Changes From Proposed Rule

Below, we discuss the changes between the proposed regulatory text and regulatory text that we are finalizing with this rule. We did not revise the regulatory text between the proposed and final rules for the definitions of "Destruction or adverse modification," "Director," and "Programmatic consultation". Therefore, we do not address those definitions within this portion of the preamble.

### Section 402.02—Definitions

Definition of "Effects of the Action"

The Services proposed to revise the definition of "effects of the action" in a manner that simplified the definition by collapsing the terms "direct, indirect," "interrelated," and "interdependent" and by applying a two-part test of "but for" and "reasonably certain to occur."

Effects of the action was proposed to be defined as all effects on the listed species or critical habitat that are caused by the proposed action, including the effects of other activities that are caused by the proposed action. An effect or activity is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include effects occurring outside the immediate area involved in the action.

The Services requested comments on (1) the extent to which the proposed revised definition simplified and clarified the definition of "effects of the action"; (2) whether the proposed definition altered the scope of effects considered by the Services; (3) the extent to which the scope of the proposed revised definition was appropriate for the purposes of the Act; and (4) how the proposed revised definition may be improved. We received numerous comments regarding the proposed revision to the definition of "effects of the action," including the two-part test, and the scope of the definition as proposed. Some commenters felt that the proposed two-part test for both effects and activities caused by the proposed action was either inappropriate or still subject to misapplication and misinterpretation. Others were concerned that the changed definition would narrow the scope of effects of the action, resulting in unaddressed negative effects to listed species and critical habitat. As stated in the proposed rule, the Services' intended purpose of the revised definition of effects of the action was to

**Addendum 316a**

simplify the definition while still retaining the scope of the assessment required to ensure a complete analysis of the effects of proposed actions. Further, we stated that by revising the definition, consultations between the Services and action agencies, including consultations involving applicants, can focus on identifying the effects and not on categorizing them. The two-part test was included to provide a transparent description of how the Services identify effects of the proposed action. A summary of the comments and our responses are below at Summary of Comments and Recommendations.

In response to comments and upon further consideration, the Services are adopting a revised, final definition of "effects of the action" to further clarify that effects of the action include all consequences of a proposed action, including consequences of any activities caused by the proposed action. We revised the definition to read as set out in the regulatory text at the end of the document.

The principal changes we have made in this final rule include: (1) Introducing the term "consequences" to help define what we mean by an effect; and (2) emphasizing that to be considered the effect of the action under consultation, the consequences caused by the action would not occur but for the proposed action and must be reasonably certain to occur.

The Services believe that the definition of "effects of the action" contained in this final rule will reduce confusion and streamline the process by which the Services identify the relevant effects caused by a proposed action. The Services do not intend for these regulatory changes to alter how we analyze the effects of a proposed action. We will continue to review all relevant effects of a proposed action as we have in past decades, but we determined it was not necessary to attach labels to various types of effects through regulatory text. That is, we intend to capture those effects (consequences) previously listed in the regulatory definition of effects of the action— direct, indirect, and the effects from interrelated and interdependent activities—in the new definition. These effects are captured in the new regulatory definition by the term "all consequences" to listed species and critical habitat.

We introduced the term "consequences," in part, to avoid using the term "effects" to define "effects of the action". Consequences are a result or effect of an action, and we apply the two-part test to determine whether a given consequence should be considered an effect of the proposed action that is under consultation. Requiring evaluation of all consequences caused by the proposed action allows the Services to focus on the impact of the proposed action to the listed species and critical habitat, while being less concerned about parsing what label to apply to each effect (*e.g.*, direct or indirect effect, or interdependent or interrelated activity).

As discussed in the proposed rule, the Services have applied the "but for" test to determine causation for decades. That is, we have looked at the consequences of an action and used the causation standard of "but for" plus an element of foreseeability (*i.e.*, reasonably certain to occur) to determine whether the consequence was caused by the action under consultation. In this final rule, we have added regulatory text to confirm that, by definition, "but for" causation means that the consequence in question would not occur if the proposed action did not go forward. This added regulatory language does not add a more stringent standard than what was applied already under our current "but for" causation, but is meant to clarify and reinforce the standard we currently implement and will do so in the future. Additionally, there are several relevant considerations where the proposed action is not the "but for" cause of another activity (not included in the proposed action) because the other activity would proceed in the absence of the proposed action due to the prospect of an alternative approach (*e.g.*, if a Federal right-of-way (proposed action) is not granted, a private wind farm on non-federal lands (other activity) would still be developed through the building of a road on private lands (alternative approach)). In particular, the Services consider case-specific information including, but not limited to, the independent utility of the other activity and proposed action, the feasibility of the alternative approach and likelihood the alternative approach would be undertaken, the existence of plans relating to the activity and whether the plans indicate that an activity will move forward irrespective of the action agency's proposed action, and whether the same effects would occur as a result of the other activity in the absence of the proposed action. In other words, if the agency fails to take the proposed action and the activity would still occur, there is no "but for" causation. In that event, the activity would not be considered an effect of the action under consultation.

Consequences to the species or critical habitat caused by the proposed action must also be reasonably certain to occur. The term "reasonably certain to occur" is not a new or heightened standard, but it was not clearly defined or given any parameters in previous regulations. Experience has taught us that the failure to provide a definition and any parameters to the term "reasonably certain to occur" left the concept vague and occasionally produced determinations that were inconsistent or had the appearance of being too subjective. As such, there were sometimes disagreements between the Services and action agencies as to what constituted "reasonably certain to occur." Our intention in these regulations is to provide a solid framework, with specific factors for both action agencies and the Services to evaluate, in order to determine whether a consequence is "reasonably certain to occur." In addition, we added a regulatory requirement that this framework be reviewed and followed by both the action agency and the Services. See § 402.17(c). When the Services write an incidental take statement for a biological opinion, under section 7(b)(4)(iv) of the Act they can assign responsibility of specific terms and conditions of the incidental take statement to the Federal action agency, the applicant, or both taking into account their respective roles, authorities, and responsibilities. The Services have worked with Federal action agencies in the past, and will continue to do so into the future, to ensure that a reasonable and prudent measure assigned to a Federal action agency does not exceed the scope of a Federal action agency's authority.

As discussed below in our discussion of changes to § 402.17, we have clarified that for a consequence or an activity to be considered reasonably certain to occur, the determination must be based on clear and substantial information. The term "clear and substantial" is used to describe the nature of information needed to determine that a consequence or activity is reasonably certain to occur. By clear and substantial, we mean that there must be a firm basis to support a conclusion that a consequence of an action is reasonably certain to occur. The determination of a consequence to be reasonably certain to occur must be based on solid information and should not be based on speculation or conjecture. This added term also does not mean the nature of the information must support that a consequence must be guaranteed to occur, but rather, that it must have a degree of certitude.

We revised § 402.17 to help guide the determination of "reasonably certain to occur." The "reasonably certain to occur" determination applies to other

activities caused by (but not part of) the proposed action, activities considered under cumulative effects (as defined at § 402.02), and to the consequences caused by the proposed action. However, it does not apply to the proposed action itself, which is presumed to occur as described. First, in § 402.17(a), we discuss factors to consider when determining whether an activity is reasonably certain to occur for purposes of determining the effects of the action or which activities to include under Cumulative Effects. Second, we describe considerations for evaluating whether a consequence is reasonably certain to occur in § 402.17(b). For further explanation, please see our discussion of § 402.17, below.

We also continue to emphasize that effects may occur beyond the proposed action's footprint. This concept was reflected in the proposed rule and the final definition states that effects may include consequences occurring outside the immediate area involved in the action.

As discussed above, we articulated a two-part test for effects of the action that is consistent with our existing practice and prior interpretations. This test for determining effects includes effects resulting from actions previously referred to as "interrelated or interdependent" activities. In order for consequences of other activities caused by the proposed action to be considered effects of the action, both those activities and the consequences of those activities must satisfy the two-part test: They would not occur but for the proposed action and are reasonably certain to occur. As a result, when we discuss effects or effects of the action throughout the rest of this rule, we are referring only to those effects that satisfy the two-part test. For further discussion of the application of the "reasonably certain to occur" test to activities included within the definition of *effects of the action*, see our discussion of changes to proposed § 402.17, below.

Definition of Environmental Baseline

We proposed a stand-alone definition for "environmental baseline" as referenced in the discussion above in the proposed revised definition for *effects of the action*.

Environmental baseline was proposed to be defined to include the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact

of State or private actions which are contemporaneous with the consultation in process.

In the proposed rule, we also sought comment on potential revisions to the definition of "environmental baseline" as it relates to ongoing Federal actions. The Services received numerous comments regarding the proposed definition of "environmental baseline" and the consideration of ongoing Federal actions.

In response to these comments and upon further consideration, through this final rule, we are revising the definition of "environmental baseline" to read as set out in the regulatory text at the end of this document.

We revised the definition of environmental baseline to make it clear that "environmental baseline" is a separate consideration from the effects of the action. In practice, the environmental baseline should be used to compare the condition of the species and the designated critical habitat in the action area with and without the effects of the proposed action, which can inform the detailed evaluation of the effects of the action described in § 402.14(g)(3) upon which the Services formulate their biological opinion.

In addition, we added a sentence to clarify that the consequences of ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are included in the environmental baseline. This third sentence is specifically intended to help clarify environmental baseline issues that have caused confusion in the past, particularly with regard to impacts from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify.

We added this third sentence because we concluded that it was necessary to explicitly answer the question as to whether ongoing consequences of past or ongoing activities or facilities should be attributed to the environmental baseline or to the effects of the action under consultation when the agency has no discretion to modify either those activities or facilities. The Courts and the Services have concluded that, in general, ongoing consequences attributable to ongoing activities and the existence of agency facilities are part of the environmental baseline when the action agency has no discretion to modify them. With respect to existing facilities, such as a dam, courts have recognized that effects from the existence of the dam can properly be considered a past and present impact included in the environmental baseline, particularly when the Federal agency lacks discretion to modify the dam. See,

*e.g., Friends of River* v. *Nat'l Marine Fisheries Serv.,* 293 F. Supp. 3d 1151, 1166 (E.D. Cal. 2018). Having the environmental baseline include the consequences from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify is supported by the Supreme Court's conclusion in *National Ass'n of Home Builders* v. *Defenders of Wildlife,* 551 U.S. 644, 667–71 (U.S. 2007) ("Home Builders"). In that case, the Court held that it was reasonable for the Services to narrow the application of section 7 to a Federal agency's discretionary actions because it made no sense to consult on actions over which the Federal agency has no discretionary involvement or control. It follows, then, that when a Federal agency has authority for managing or operating a dam, but lacks discretion to remove or modify the physical structure of the dam, the consequences from the physical presence of the dam in the river are appropriately placed in the environmental baseline and are not considered an effect of the action under consultation.

We distinguish here between activities and facilities where the Federal agency has no discretion to modify and those discretionary activities, operations, or facilities that are part of the proposed action but for which no change is proposed. For example, a Federal agency in their proposed action may modify some of their ongoing, discretionary operations of a water project and keep other ongoing, discretionary operations the same. The resulting consultation on future operations analyzes the effects of all of the discretionary operations of the water project on the species and designated critical habitat as part of the effects of the action, even those operations that the Federal agency proposes to keep the same. We also note that the obligation is on the Federal action agency to propose actions for consultation and while they should not improperly piecemeal or segment portions of related actions, a request for consultation on one aspect of a Federal agency's exercise of discretion does not de facto pull in all of the possible discretionary actions or authorities of the Federal agency. This is a case-by-case specific analysis undertaken by the Services and the Federal action agency as needed during consultation.

Attributing to the environmental baseline the ongoing consequences from activities or facilities that are not within the agency's discretion to modify does not mean that those consequences are ignored. As discussed in more detail below, the environmental baseline is a

**Addendum 318a**

description of the condition of the species or the designated critical habitat in the action area. To the extent ongoing consequences are beneficial or adverse to a species, the environmental baseline evaluations of the species or designated critical habitat will reflect the impact of those consequences and the effects of the action must be added to those impacts in the Services' jeopardy and adverse modification analysis.

*Section 402.13—Deadline for Informal Consultation*

The Services sought comment on potentially establishing a 60-day deadline, subject to extension by mutual consent, for informal consultations. More specifically, we sought comment on (1) whether a deadline would be helpful in improving the timeliness of review; (2) the appropriate length for a deadline (if not 60 days); and (3) how to appropriately implement a deadline (*e.g.,* to which portions of informal consultation the deadline should apply [*e.g.,* technical assistance, response to requests for concurrence, etc.], when informal consultation begins, the ability to extend or "pause the clock" in certain circumstances, etc.).

The Services received numerous comments regarding the establishment of a deadline for informal consultation. A summary of those comments and our responses are below at Summary of Comments and Recommendations. In response to these comments and upon further consideration, through this final rule, we are revising § 402.13, Informal consultation, to read as set out in the regulatory text at the end of this document.

These changes institute a new § 402.13(c), which is a process framework for the Federal agency's written request for concurrence and the Service's response. The changes to the informal consultation process are limited to only the written request for concurrence and the Service's response. This preserves the flexibility in discussions and timing inherent in the portion of the informal consultation process that is intended to assist the Federal agency in determining whether formal consultation is required. In the new framework, we require in § 402.13(c)(1) that the written request for our concurrence should contain information similar to that required in § 402.14(c)(1) for formal consultation, but only at a level of detail sufficient for the Services to determine whether or not it concurs. Consistent with past practice, the Services determine whether the information provided by the Federal agency provides sufficient information upon which to make its

determination whether to concur with Federal agency's request for concurrence. We anticipate that this level of detail will often be less than that required for the initiation of formal consultation and the evaluation of adverse effects to species and designated critical habitat. Second, we establish in § 402.13(c)(2) a timeline for the written request and concurrence process. As stated in the new § 402.13(c)(2), upon receipt of an adequate request for concurrence from a Federal agency, the Services shall provide their written response within 60 days. The 60-day response period may be extended, with the mutual consent of the Federal agency (or its designated representative) and any applicant, for up to an additional 60 days, bringing the total potential timeframe for this written request and response process to 120 days. The intent of the 60-day, and no more than 120-day, deadline is to increase regulatory certainty and timeliness for Federal agencies and applicants.

The changes at § 402.13(c) do not alter or apply to the Services' review of and response to biological assessments prepared for major construction activities, as outlined at § 402.12. For those consultations, the response would be required within 30 days, as outlined at § 402.12(j) and (k).

*Section 402.14—Formal Consultation*

The Services proposed several amendments to § 402.14. Consistent with the Services' existing practice, we proposed to revise § 402.14(c) to clarify what is necessary to initiate formal consultation and to allow the Services to consider documents such as those prepared pursuant to the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) to be considered as initiation packages, as long as they meet the requirements for initiating consultation. We also proposed to: (1) Revise portions of § 402.14(g) that describe the Services' responsibilities during formal consultation; (2) revise § 402.14(h) to allow the Services to adopt all or part of a Federal agency's initiation package, or all or part of the Services' own analyses and findings that are required to issue a permit under section 10(a) of the Act, in its biological opinion; and (3) add a new provision titled "Expedited consultations" at § 402.14(l) to offer opportunities to streamline consultation, particularly for actions that have minimal adverse effects or predictable effects based on previous consultation experience.

The Services received numerous comments related to our proposed amendments to § 402.14, Formal

consultation, as set forth at 83 FR 35192, July 25, 2018. A summary of those comments and our responses are below at Summary of Comments and Recommendations.

In response to these comments and upon further consideration, in this final rule, we are finalizing the proposed revisions to § 402.14(g)(2) and (4) and (l), and we are amending § 402.14(c), (g)(8), and (h) to read as set out in the regulatory text at the end of this document.

The Services are making a non-substantive edit to the proposed regulatory text at § 402.14(c)(1)(iii). This non-substantive edit clarifies that the Services are referring to information about both the species and its habitat, including any designated critical habitat.

The Services are also making edits to the proposed regulatory text at § 402.14(g)(8) to simplify the text while maintaining the intent of the proposed regulatory revisions. More specifically, we are striking the proposed text that referenced "specific" plans and "a clear, definite commitment of resources" with respect to measures intended to avoid, minimize or, or offset the effects of an action. Instead, the Services are simplifying the regulatory text to indicate that such measures are considered like other portions of the action and do not require any additional demonstration of binding plans.

The simplified regulatory text avoids potential confusion between the need to sufficiently describe measures a Federal agency is committing to implement as part of a proposed action to avoid, minimize, or offset effects pursuant to § 402.14(c)(1), and how those measures are taken into consideration after consultation is initiated. Any type of action proposed by a Federal agency receives a presumption that it will occur, but it must also be described in sufficient detail that the Services can both understand the action and evaluate its adverse and beneficial effects. By eliminating the word "specific" in § 402.14(g)(8), we reinforce that an appropriate level of specificity regarding the description of measures included in the proposed action may be necessary to provide sufficient detail to assess the effects of the action on listed species and critical habitat. However, inclusion of measures to avoid, minimize, or offset adverse effects as part of the proposed action does not result in a requirement for an additional demonstration of binding plans. To simplify the regulatory text and improve clarity, we also eliminated the reference to "a clear, definite commitment of resources." That change is not meant to imply that an

**Addendum 319a**

additional demonstration of a clear and definite commitment of resources, beyond the commitment to implement such measures as part of the proposed action, is required before the Services can take them into consideration. Rather, we intend the phrase "do not require any additional demonstration of binding plans" that is retained in § 402.14(g)(8) to reflect that demonstrations of resource commitments and other elements are not required before allowing the Services to take into account measures included in a proposed action to avoid, minimize, or offset adverse effects. Therefore, this final rule maintains the intent of the proposed revisions to § 402.14(g)(8).

The Services are also revising the proposed regulatory text at § 402.14(h) by adding a new paragraph (h)(1)(ii); redesignating the existing (h)(1)(ii) and (iii) as (h)(1)(iii) and (iv), respectively; and making a non-substantive edit at § 402.14(h)(4). New § 402.14(h)(1)(i) clarifies that the biological opinion will also include a detailed discussion of the environmental baseline because a proper understanding of the environmental baseline is critical to our analysis of the effects of the action, as well as our determination as to whether a proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify its critical habitat. Inclusion of a detailed description of the environmental baseline is consistent with existing practice (see Services' 1998 Consultation Handbook at pp. 4–13 and 4–15) and, therefore, this requirement will not change how the Services prepare biological opinions.

*Section 402.16—Reinitiation of Consultation*

We proposed two changes to this section. First, we proposed to remove the term "formal" from the title and text of this section to acknowledge that the requirement to reinitiate consultation applies to all section 7(a)(2) consultations. Second, we proposed to amend this section to address issues arising under the Ninth Circuit's decision in *Cottonwood Environmental Law Center* v. *U.S. Forest Service,* 789 F.3d 1075 (9th Cir. 2015), *cert. denied,* 137 S. Ct. 293 (2016), by making non-substantive redesignations and then revising § 402.16 by adding a new paragraph (b) to clarify that the duty to reinitiate does not apply to an existing programmatic land management plan prepared pursuant to the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. 1701 *et seq.,* or the National Forest Management Act (NFMA), 16 U.S.C. 1600 *et seq.,* when a new species is listed or new critical habitat is designated. In addition to seeking comment on the proposed revision to 50 CFR 402.16, we sought comment on whether to exempt other types of programmatic land or water management plans in addition to those prepared pursuant to FLPMA and NFMA, and on the proposed revision in light of the recently enacted Wildfire Suppression Funding and Forest Management Activities Act, H.R. 1625, Division O, which was included in the Omnibus Appropriations bill for fiscal year 2018 ("2018 Omnibus Act").

In the proposed revisions to § 402.16, reinitiation of consultation would be required and would need to be requested by the Federal agency or by the Service. Moreover, an agency would not be required to reinitiate consultation after the approval of a land management plan prepared pursuant to 43 U.S.C. 1712 or 16 U.S.C. 1604 upon listing of a new species or designation of new critical habitat, provided that any authorized actions that may affect the newly listed species or designated critical habitat will be addressed through a separate action-specific consultation.

The Services received numerous comments related to our proposed amendments to this section. Comments were generally evenly divided in support of and in opposition to the proposed § 402.16(b), including whether we are precluded from expanding relief from reinitiation due to the 2018 Omnibus Act as well as to whether to extend the exemption to other types of plans. A summary of those comments and our responses are below at Summary of Comments and Recommendations.

In response to these comments and upon further consideration, we revised § 402.16, Reinitiation of consultation, to read as set out in the regulatory text at the end of this document.

We modified the language at § 402.16(a)(3) to correct the inadvertent failure of our proposed rule to reference the written concurrence process in this criterion for reinitiation of consultation. This criterion references the information and analysis the Services considered, including information submitted by the Federal agency and applicant, in the development of our biological opinion or written concurrence and not just the information contained within the biological opinion or written concurrence documents. The remaining three reinitiation criteria at § 402.16(a)(1), (2), and (4) were unchanged. We also took this opportunity to clarify the meaning of the reference to the Service in the current and adopted, final version of § 402.16(a) that reads, "Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, . . .". The reference to the Service in this language does not impose an affirmative obligation on the Service to reinitiate consultation if any of the criteria have been met. Rather, the reference here has always been interpreted by the Services to allow us to recommend reinitiation of consultation to the relevant Federal action agency if we have information that indicates reinitiation is warranted. It is ultimately the responsibility of the Federal action agency to reinitiate consultation with the relevant Service when warranted. The same holds true for initiation of consultation in the first instance. While the Services may recommend consultation, it is the Federal agency that must request initiation of consultation. See 50 CFR 402.14(a).

In addition, we clarified that initiation of consultation shall not be required for land management plans prepared pursuant to 43 U.S.C. 1712 or 16 U.S.C. 1604, upon listing of a new species or designation of new critical habitat, in certain specific circumstances, provided that any authorized actions that may affect the newly listed species or designated critical habitat will be addressed through a separate action-specific consultation. This exception to reinitiation of consultation shall not apply to those land management plans prepared pursuant to 16 U.S.C. 1604 if 15 years have passed since the date the agency adopted the land management plan and 5 years have passed since the enactment of Public Law 115–141 [March 23, 2018], or the date of the listing of a species or the designation of critical habitat, whichever is later.

The language at § 402.16(b) is revised from the proposed amendment to follow the time limitations imposed by Congress for the relief from reinitiation when a new species is listed or critical habitat designated for forest management plans prepared pursuant to NFMA. Because Congress did not address land management plans prepared pursuant to FLPMA in the 2018 Omnibus Act, the Services have determined that we may exempt any land management plan prepared pursuant to FLPMA from reinitiation when a new species is listed or critical habitat is designated as long as any action taken pursuant to the plan will be subject to its own section 7 consultation.

## Section 402.17—Other Provisions

We proposed to add a new § 402.17 titled "Other provisions." Within this new section, we proposed a new provision titled "Activities that are reasonably certain to occur," in order to clarify the application of the "reasonably certain to occur" standard referenced in § 402.02 (defining effects of the action and cumulative effects). The proposed revisions are set out at 83 FR 35193, July 25, 2018.

The Services received numerous comments related to the proposed provision, many of which stated the Services should further clarify the language of the provision. In response to these comments and upon further consideration, we revised § 402.17 to read as set out at the end of this document.

The revisions to the language in § 402.17 are intended to clarify several aspects of the process of determining whether an activity or consequence is "reasonably certain to occur."

First, we clarified that for a consequence or an activity to be considered reasonably certain to occur, the determination must be based on clear and substantial information. The term "clear and substantial" is used to describe the nature of information needed to determine that a consequence or activity is reasonably certain to occur. We do not intend to change the statutory requirement that determinations under the Act are made based on "best scientific and commercial data available." By clear and substantial, we mean that there must be a firm basis to support a conclusion that a consequence of an action is reasonably certain to occur. This term is not intended to require a certain numerical amount of data; rather, it is simply to illustrate that the determination of a consequence to be reasonably certain to occur must be based on solid information. This added term also does not mean the nature of the information must support that a consequence is guaranteed to occur, but must have a degree of certitude.

To be clear, these regulations do not amend a Federal agency's obligation under the Act's section 7(a)(2); nor do they change the regulatory standard that action agencies must "insure" that their actions are not likely to jeopardize listed species or destroy or adversely modify critical habitat. See H.R. Conference Report 96–697 (1979) (confirming section 7(a)(2) requires all federal agencies to ensure that their actions are not likely to jeopardize endangered or threatened species or result in the adverse modification of critical habitat).

Second, in response to requests made in public comments for clarification of the factors to consider, we revised § 402.17(a)(1) and (2) to further elaborate what we meant in the original proposed versions of those factors. In particular, we revised § 402.17(a)(1) to describe that the Services would include past experience with "activities that have resulted from actions that are similar in scope, nature, and magnitude to the proposed action" when considering whether an activity might be reasonably certain to occur as a result of the proposed action under consultation. This is intended to capture the important knowledge developed by the action agencies and Services over their decades of consultation experience. We also made minor revisions to clarify § 402.17(a)(2). The proposed language used the phrase "any existing relevant plans" but did not reference to the activity itself. We recognize that this language may have been confusing and vague for readers and therefore have modified the text to clarify that we were referencing plans specific to that activity, not general plans that may contemplate a variety of activities or uses in an area.

Finally, we added a new paragraph to § 402.17 to emphasize other considerations that are important and relevant when reviewing whether a consequence is also reasonably certain to occur. These are not exhaustive, new, or more stringent factors than what we have used in the past to determine the likelihood of a consequence occurring nor are they meant to imply that time, distance, or multiple steps inherently make a consequence not reasonably certain to occur. See *Riverside Irrigation* v. *Andrews,* 758 F2d 508 (10th Cir. 1985) (upholding the U.S. Army Corps of Engineers' determination that it properly reviewed an effect downstream from the footprint of the action).

Each consultation will have its own set of evaluations and will depend on the underlying factors unique to that consultation. For example, a Federal agency is consulting on the permitting of installation of an outfall pipe. A secondary, connecting pipe owned by a third party is to be installed and would not occur "but for" the proposed outfall pipe, and existing plans for the connecting pipe make it reasonably certain to occur. Under our revised definition for effects of the action, any consequences to listed species or critical habitat caused by the secondary pipe would be considered to fall within the effects of the agency action. As the rule recognizes, however, there are situations, such as when consequences are so remote in time or location, or are

only reached following a lengthy causal chain of events, that the consequences would not be considered reasonably certain to occur.

## Summary of Comments and Recommendations

### Section 402.02—Definitions

#### Definition of Destruction or Adverse Modification

We revised the definition of "destruction or adverse modification" by adding the phrase "as a whole" to the first sentence and removing the second sentence of the prior definition. The Act requires Federal agencies, in consultation with and with the assistance of the Secretaries, to insure that their actions are not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species. In 1986, the Services established a definition for "destruction or adverse modification" (51 FR 19926, June 3, 1986, codified at 50 CFR 402.02) that was found to be invalid by the U.S. Court of Appeals for the Fifth (2001) and Ninth (2004) Circuits. In 2016, we revised the definition, in part in response to these court rulings (81 FR 7214; February 11, 2016).

In this final rule, we have further clarified the definition. The addition of the phrase "as a whole" to the first sentence reflects existing practice and the Services' longstanding interpretation that the final destruction or adverse modification determination is made at the scale of the entire critical habitat designation. The deletion of the second sentence removes language that is redundant and has caused confusion about the meaning of the regulation. These revisions are unchanged from the proposed rule, and further explanation of their background and rationale is provided in the preamble text of the proposed rule.

#### Comments on the Destruction and Adverse Modification Definition

*Comment:* Several commenters disagreed with defining "destruction or adverse modification" at all, saying that such a definition was unnecessary and that we should rely only on the statutory language. Others suggested creating separate definitions for "destruction" and "adverse modification," and suggested that not doing so is an impermissible interpretation of the Act.

*Response:* The term "destruction or adverse modification" has been defined by regulation since 1978. We continue to believe it is appropriate and within

**Addendum 321a**

the Services' authority to define this term and believe that this revision to that definition will improve the clarity and consistency in the application of these concepts. Furthermore, the Services have discretion to issue a regulatory interpretation of the statutory phrase ''destruction or adverse modification'' and are not required to break such a phrase into separate definitions of its individual words. The Services believe that the inquiry is most usefully and appropriately defined by the general standard in our definition, and that ultimately the determination focuses on how the agency action affects the value of the critical habitat for the conservation of the species, regardless of whether the contemplated effects constitute ''destruction'' or ''adverse modification'' of critical habitat.

*Comment:* One commenter asserted that the definition should not include the phrase ''or indirect'' because it would allow for ''speculative actions to be used as determining factors.''

*Response:* The final rule does not alter the use of the phrase ''or indirect'' which has been in all prior versions of this definition. In addition, we note that the phrase has long been included in, and continues to be used in, the definitions of ''jeopardize the continued existence of'' and ''action area.'' We continue to believe its inclusion is appropriate in this context and takes into account that some actions may affect critical habitat indirectly. The Services use the best scientific and commercial data available and do not rely upon speculation in determining the effects of a proposed action or in section 7(a)(2) ''destruction or adverse modification'' determinations. The standards for determining effects of a proposed action are further discussed above under Definition of ''Effects of the Action''.

*Comment:* One commenter said that a lead agency should defer to cooperating agencies in evaluating potential impacts on critical habitat when the cooperating agencies have jurisdiction over the area being analyzed.

*Response:* The term ''cooperating agency'' arises in the NEPA context. Generally speaking, the lead agency under NEPA may also be a section 7 action agency under the Act. Cooperating agencies can be a valuable source of scientific and other information relevant to a consultation and may play a role in section 7 consultation. The Federal action agency, however, remains ultimately responsible for its action under section 7. Under 50 CFR 402.07, where there are multiple Federal agencies involved in a particular action, a lead agency may be designated to fulfill the consultation and conference responsibilities. The other Federal agencies can assist the lead Federal agency in gathering relevant information and analyzing effects. The determination of the appropriate lead agency can take into account factors including their relative expertise with respect to the environmental effects of the action.

*Comment:* Some commenters said that the revised definition creates uncertainty and potential lack of consistency regarding when formal or informal consultation is required, or that it revised the triggers for initiating consultation.

*Response:* The revisions to this definition should not create any additional uncertainty about when formal or informal consultation is required, because these revisions do not change the obligations of action agencies to consult or the circumstances in which consultation must be initiated.

*Comment:* Several commenters offered their own, alternative re-definitions of the phrase ''destruction or adverse modification.'' For example, one commenter suggested the phrase should be defined to mean ''a direct or indirect alteration caused by the proposed action that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species.''

*Response:* We recognize that there could be more than one permissible, reasonable interpretation of this phrase. The definition we have adopted is an incremental change that incorporates longstanding approaches, modified from the 2016 definition (81 FR 7214; February 11, 2016) to improve clarity and consistency of application. Our adopted definition also has the value of being succinct. We do not view the proposed alternative definitions as improving upon clarity, and they may also contain unnecessary provisions or incorporate additional terminology that could itself be subject to multiple or inappropriate meanings.

*Comment:* Several commenters suggested that the definition should clarify that the only valid consideration in making a ''destruction or adverse modification'' determination is the impact of an action on the continued survival of the species, and that it should not take into consideration the ability of the species to recover. Conversely, some commenters said the definition improperly devalues or neglects recovery.

*Response:* Our definition focuses on the value of the affected habitat for ''conservation,'' a term that is defined by statute as implicating recovery (see 16 U.S.C. 1532(3)). ''Conservation'' is the appropriate focus because critical habitat designations are focused by statute on areas or features ''essential to the conservation of the species'' (16 U.S.C. 1532(5); see also 50 CFR 402.02 (defining ''recovery'')).

*Comment:* Several commenters said that the Services should do more to identify how they assess the value of critical habitat for the conservation of a species. They recommend measures such as identifying specific metrics of conservation value, providing guidance on the use of recovery or planning tools to identify targets for preservation or restoration, and defining de minimis thresholds or standardized project modifications that could be applied to recurring categories of projects in order to avoid triggering a ''destruction or adverse modification'' determination.

*Response:* As noted in the proposed rule preamble, the value of critical habitat for the conservation of a listed species is described primarily through the critical habitat designation itself. That designation itself will identify and describe, in occupied habitat, ''physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection'' (16 U.S.C. 1532(5)(A)(i)). Similarly, designations of any unoccupied habitat will describe the reasons that such areas have been determined to be ''essential for the conservation of the species'' (16 U.S.C. 1532(5)(A)(ii)). Critical habitat designations, recovery plans, and related information often provide additional and specific discussions regarding the role and quality of the physical or biological features and their distribution across the critical habitat in supporting the recovery of the listed species.

Regarding concepts such as defining metrics of value or pre-defined de minimis standards, the Services often assist action agencies in developing conservation measures during consultation that would work to reduce or minimize project impacts to critical habitat. The final rule contains provisions on programmatic consultations that could facilitate establishing and applying broadly applicable standards or guidelines based on recurring categories of actions whose effects can be understood and anticipated in advance. However, predefined metrics, standards, and thresholds for categories of action in many instances are not feasible, given variations in the actions, their circumstances and setting, and evolving scientific knowledge.

**Addendum 322a**

Comments on the Addition of the Phrase "As a Whole"

*Comment:* Some comments supported the change, saying that the addition of this phrase was consistent with existing Services practice and guidance, or said the addition improved the definition and clarified the appropriate scale at which the "destruction or adverse modification" determination applies. Some commenters noted that the addition helps place the inquiry in its proper functional context and observed that alteration of critical habitat is not necessarily a per se adverse modification.

*Response:* We agree that the addition of "as a whole" helps clarify the application of the definition, without changing its meaning or altering current policy and practice.

*Comment:* One commenter said that the addition of "as a whole" could cause confusion as to whether it referred to the critical habitat or the species.

*Response:* The phrase "as a whole" is intended to apply to the critical habitat designation, not to the phrase "a species."

*Comment:* Some commenters asserted that adding "as a whole" to the definition meant that small losses would no longer be considered "destruction or adverse modification" because they would be viewed as small compared to the "whole" designation. Some of these comments asserted that under this definition, "destruction or adverse modification" would only be found if an action impacted the entire critical habitat designation or a large area of it. Some also noted that effects in small areas can have biological significance (*e.g.,* a migration corridor), and that impacts in a small area could be significant to a small, local population or important local habitat features.

*Response:* The addition of "as a whole" clarifies but does not change the Services' approach to assessing critical habitat impacts, as explained in the preamble to the proposed rule and in the 2016 final rule on destruction and adverse modification (81 FR 7214; February 11, 2016). In that 2016 rule, we elected not to add this phrase, but made clear that the phrase did describe and reflect the appropriate scale of "destruction or adverse modification" determinations. Consistent with longstanding practice and guidance, the Services must place impacts to critical habitat into the context of the overall designation to determine if the overall value of the critical habitat is likely to be appreciably reduced. The Services agree that it would not be appropriate to

mask the significance of localized effects of the action by only considering the larger scale of the whole designation and not considering the significance of any effects that are occurring at smaller scales (see, *e.g., Gifford Pinchot,* 378 F.3d at 1075). The revision to the definition does not imply, require, or recommend discounting or ignoring the potential significance of more local impacts. Such local impacts could be significant, for instance, where a smaller affected area of the overall habitat is important in its ability to support the conservation of a species (*e.g.,* a primary breeding site). Thus, the size or proportion of the affected area is not determinative; impacts to a smaller area may in some cases result in a determination of destruction or adverse modification, while impacts to a large geographic area will not always result in such a finding.

*Comment:* Some comments expressed concern that the "as a whole" language, along with the preamble interpretation of "appreciably diminish," undermined conservation because it would allow more piecemeal, incremental losses that over time would add up cumulatively to significant losses or fragmentation (referred to by many comments as "death by a thousand cuts"). One commenter further expressed concern that such accumulated losses would add to the regulatory burden faced by private landowners with habitat on their lands. Some commenters asserted that the "as a whole" language would be difficult or burdensome to implement, because the Services lacked sufficient capacity to track or aggregate losses over time and space.

*Response:* As already noted, the revisions to the definition will not reduce or alter how the Services consider the aggregated effects of smaller changes to critical habitat. It should be emphasized that the revisions to this definition also do not alter or impose any additional burdens on action agencies or applicants to provide information on the nature of the proposed action or that action's effects on critical habitat or listed species. The regulations require the Services' biological opinion to assess the status of the critical habitat (including threats and trends), the environmental baseline of the action area, and cumulative effects. The Services' summary of the status of the affected species or critical habitat considers the historical and past impacts of activities across time and space. The effects of any particular action are thus evaluated in the context of this assessment, which incorporates the effects of all current and previous actions. This avoids situations where

each individual action is viewed as causing only relatively minor adverse effects but, over time, the aggregated effects of these actions would erode the conservation value of the critical habitat.

In this final rule, we are also clarifying the text at § 402.14(g)(4) regarding status of the species and critical habitat to better articulate how the Services formulate their opinion as to whether an action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. This clarification will help ensure the "incremental losses" described by the commenters are appropriately considered in our jeopardy and destruction or adverse modification determinations.

The Services also make use of tracking mechanisms and tools to help track the effects of multiple agency actions. The Services have long recognized that tracking the effects of successive activities and projects is a significant challenge and continue to prioritize improvement of the methods for doing so. We also note that the use of programmatic consultations, as addressed elsewhere in this rule, can help with this challenge by encouraging consultation at a broad scale across geographic regions and programs encompassing multiple activities and actions. Finally, in response to concerns that this change would impose additional burdens on private landowners, the Services remind the public that critical habitat designation creates no responsibilities for the landowner unless the landowner proposes an activity that includes Federal funding or authorization of a type that triggers consultation. Otherwise, the designation of critical habitat requires no changes to the landowner's use or management of their land.

*Comment:* Some commenters said that adding the phrase "as a whole" would make application of the definition more subjective and less consistent.

*Response:* The comment appears to be motivated by the belief that any adverse effect to critical habitat should be considered, per se, "destruction or adverse modification," and that the change introduces a new element of subjectivity. We do not agree. As with under the prior definition, the Services are always required to exercise judgment and apply scientific expertise when making the ultimate determination as to whether adverse effects rise to the level of "destruction or adverse modification."

**Addendum 323a**

*Comment:* Some commenters said that this change would impermissibly render the definition of "destruction or adverse modification" too similar or the same as the definition of "jeopardize the continued existence of," while the statute intends them to have different meanings. Some also said that this addition conflicted with case law stating that the two phrases have distinct meanings.

*Response:* The Services do not agree that the addition of "as a whole" leads to improper conflation of the meanings of "jeopardize the continued existence of" and "destruction or adverse modification." The terms "destruction or adverse modification" and "jeopardize the continued existence of" have long been recognized to have distinct meanings yet implicate overlapping considerations in their application. See, *e.g., Sierra Club* v. *U.S. Fish & Wildlife Service,* 245 F.3d 434, 441 (5th Cir. 2001); *Greenpeace* v. *National Marine Fisheries Serv.,* 55 F.Supp.2d 1248, 1265 (W.D. Wash.1999); *Conservation Council for Hawai'i* v. *Babbitt,* 2 F.Supp.2d 1280, 1287 (D. Haw. 1998). The phrase "jeopardize the continued existence of" focuses directly on the species' survival and recovery, while the definition of "destruction or adverse modification" is focused first on the critical habitat itself, and then considers how alteration of that habitat affects the "conservation" value of critical habitat. Thus, the terms "jeopardize the continued existence of" and "destruction or adverse modification" involve overlapping but distinct considerations. See *Sierra Club* v. *U.S. Fish & Wildlife Serv.,* 245 F.3d 434, 441 (5th Cir. 2001) (noting that the critical habitat analysis is more directly focused on the effects on the designated habitat and has a "more attenuated" relationship to the survival and recovery of the species than the "jeopardize" analysis).

*Comment:* Several commenters provided arguments or recommendations regarding the geographic scale at which "destruction or adverse modification" determinations should focus and asserted that the "as a whole" was not necessarily the right scale. One commenter said the appropriate scale was the critical habitat unit or larger, especially for wide-ranging species. Some commenters said that the "as a whole" language was inappropriate because the appropriate geographic scale for assessing "destruction or adverse modification" was a scientific question. Similarly, one comment asserted the Services must use a "biologically meaningful" scale. A group of State governors questioned

how scale would be treated when there was a portion of critical habitat in one State that was geographically unconnected to critical habitat in other States.

*Response:* The use of the phrase "as a whole" is not solely meant to establish a geographic scale for "destruction or adverse modification" determinations. The phrase applies to assessing the value of the whole designation for conservation of the species. Effects at a smaller scale that could be significant to the value of the critical habitat designation will be considered. As the preamble to the proposed rule notes, "the Services must [then] place those impacts in context of the designation to determine if the overall value of the critical habitat is likely to be reduced" (83 FR 35178, July 25, 2018, p. 83 FR 35180). Thus, while the destruction or adverse modification analysis will consider the nature and significance of effects that occur at a smaller scale than the whole designation, the ultimate determination applies to the value of the critical habitat designation as a whole.

*Comment:* One commenter said that the addition of "as a whole" was inconsistent with the following language in the 1998 Consultation Handbook: "The consultation or conference focuses on the entire critical habitat area designated unless the critical habitat rule identifies another basis for analysis, such as discrete units and/or groups of units necessary for different life cycle phases, units representing distinctive habitat characteristics or gene pools, or units fulfilling essential geographic distribution requirements." See 1998 Consultation Handbook at p. 4–42.

*Response:* The revised definition is not inconsistent with the quoted 1998 Consultation Handbook guidance. As we stated in our preamble to the proposed rule, under the revised definition, "if a particular project would cause adverse effects to a portion of critical habitat, the Services must place those impacts in context of the designation to determine if the overall value of the critical habitat is likely to be reduced. This could occur where, for example, a smaller affected area of habitat is particularly important in its ability to support the conservation of a species (*e.g.,* a primary breeding site). Thus, the size or proportion of the affected area is not determinative; impacts to a smaller area may in some cases result in a determination of destruction or adverse modification, while impacts to a large geographic area will not always result in such a finding" (83 FR 35178, July 25, 2018, p. 83 FR 35180). In other words, it may be

appropriate to focus on a unit of analysis that is smaller than the entire designation, but it would not be appropriate to conclude the analysis without relating the result of the alterations at that scale back to the listed entity, which is the designation "as a whole," in order to assess whether the value of that designation to the conservation of a listed species is appreciably diminished.

*Comment:* Some commenters disagreed with the addition of "as a whole" because they said it conflicted with the plain language of the statute. In particular, some asserted that, by statute, critical habitat is "essential to the conservation of the species." They reason that, accordingly, any adverse effect is therefore per se "destruction or adverse modification" since it is the loss or reduction of something that is "essential." Some of these commenters also focused similar criticism on the preamble discussion of the phrase "appreciably diminish," as discussed further below.

*Response:* The Services do not agree that any adverse effect to critical habitat is per se "destruction or adverse modification," a subject further discussed in the discussion of "appreciably diminish" in the preamble to the proposed rule and the discussion of comments on that preamble provided below. Nor do the Services agree that the use of the term "essential to the conservation of the species" in the Act's definition of critical habitat requires such an interpretation. The phrase "essential to the conservation of the species" guides which areas will be designated but does not require that every alteration of the designated critical habitat is prohibited by the statute. Just as the determination of jeopardy under section 7(a)(2) of the Act is made at the scale of the entire listed entity, a determination of destruction or adverse modification must ultimately consider the diminishment to the value for conservation at the scale of the entire critical habitat designation. As the 1998 Consultation Handbook states, adverse effects on elements or segments of critical habitat "generally do not result in jeopardy or adverse modification determinations unless that loss, when added to the environmental baseline, is likely to result in significant adverse effects throughout the species' range, or appreciably diminish the ability of the critical habitat to satisfy essential requirements of the species." See 1998 Consultation Handbook at p. 4–36. Accordingly, the Ninth Circuit Court of Appeals has held that "a determination that critical habitat would be destroyed was thus not inconsistent with [a]

finding of no 'adverse modification.' "
See also *Butte Envir. Council* v. *U.S. Army Corps of Eng'rs,* 620 F.3d 936, 947–48 (9th Cir. 2010).

**Deletion of the Second Sentence**

*Comment:* Some commenters claimed that removal of the second sentence was unnecessary, and that doing so would eliminate important guidance embedded in the definition for appropriate factors to consider in the destruction or adverse modification analysis. Some suggested removing the provision about "preclusion or delay" of features, while keeping the remainder. One commenter suggested keeping the second sentence and expanding it to include additional language about cumulative loss of habitat required for recruitment. However, other commenters agreed with removing the second sentence, saying it was duplicative of the content of the first sentence, was vague and confusing, or that it contained provisions that overstepped the Services' authority. One commenter stated that removal of the second sentence will help place the focus on whether or not a project would "appreciably diminish" the value of critical habitat as a whole for the conservation of the species.

*Response:* This revision was made because the second sentence of the definition adopted in the 2016 final rule (81 FR 7214; February 11, 2016) has caused controversy among the public and many stakeholders. The revised definition streamlines and simplifies the definition. We agree with the commenters who stated that the second sentence was unnecessary—it had attempted to elaborate upon meanings that are already included within the first sentence. We also agree with the commenters who said that removing the second sentence will appropriately focus attention on the operative first sentence, which states that in all cases, the analysis of destruction or adverse modification must address whether the proposed action will result in an "alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."

*Comment:* Some commenters were concerned that removal of the second sentence meant that the Services were stating that a destruction or adverse modification determination must always focus only on existing features, or that the Services intended to downplay the fact that some designated habitat may be governed by dynamic natural processes or be degraded and in need of improvement or restoration to recover a species. Such commenters also pointed out that species' habitat use and distribution can also be dynamic and

change over time. Some commenters similarly asserted that this change improperly downgraded the importance of unoccupied critical habitat for recovery or asserted that the revision showed the Services were lessening their commitment to habitat improvement and recovery efforts.

*Response:* As already noted, the deletion of the second sentence was meant to clarify and simplify the definition, but not to change the Services' current practice and interpretation regarding the applicability of the definition. Nor does the change mean that the recovery role of unoccupied critical habitat will not be considered in destruction or adverse modification determinations. As noted in the preamble to the proposed rule, the intended purpose of the language about precluding or delaying "development of such features" was to acknowledge "that some important physical or biological features may not be present or are present in a sub-optimal quantity or quality. This could occur where, for example, the habitat has been degraded by human activity or is part of an ecosystem adapted to a particular natural disturbance (*e.g.,* fire or flooding), which does not constantly occur but is likely to recur." See also 79 FR 27060, May 12, 2014, p. 27061. Nor do the revisions mean that the Services are lessening their commitment to programs and efforts designed to bring about improvements to critical habitat.

*Comment:* In contrast to commenters who opposed removing the second sentence, some commenters favored the removal of the second sentence because it would remove the phrase "preclude or significantly delay development of such features." Some asserted this phrase was confusing or could lead to inconsistent or speculative application of the definition; others said that this phrase overstepped the Services' statutory authority and that "destruction or adverse modification" had to focus on existing features and could not be based on the conclusion that an action would "preclude or significantly delay" the development of such features. Some of these commenters also disputed language in the preamble of the proposed rule that they said indicated that the Services would improperly consider potential changes to critical habitat in making "destruction or adverse modification" determinations, rather than focusing solely on existing features.

*Response:* The Services agree that the second sentence was unnecessary and that its removal will simplify and clarify the definition. The Services agree that it is important in any destruction or

adverse modification assessment to focus on adverse effects to features that are currently present in the habitat, particularly where those features were the basis for its designation. However, as noted in the preamble to the proposed rule, there may also be circumstances where, within some areas of designated critical habitat at the time of consultation, "some important physical or biological features may not be present or are present in a sub-optimal quantity or quality. This could occur when, for example, the habitat has been degraded by human activity or is part of an ecosystem adapted to a particular natural disturbance (*e.g.,* fire or flooding), which does not constantly occur but is likely to recur" (79 FR 27060, May 12, 2014, p. 27061). The extent to which the proposed action is anticipated to impact the development of such features is a relevant consideration for the Services' critical habitat analysis. The Services reaffirm their longstanding practice that any destruction or adverse modification determination must be grounded in the best scientific and commercial data available and should not be based upon speculation.

Appreciably Diminish

In order to further clarify application of the definition of "destruction or adverse modification," the preamble to the proposed rule discussed the term "appreciably diminish." The proposed rule did not contain any revisions to regulatory text defining this phrase or changing how it is used in the regulations. The preamble discussion was thus not intended to provide a new or changed interpretation of the Act's requirements, but instead was intended to help clarify how the Services apply the term "appreciably diminish" and to discuss some alternative interpretations that the Services do not believe correctly reflect the requirements of the statute or the Services' regulations. Below is discussion of comments received on this proposed rule preamble discussion of "appreciably diminish," as well as related comments on the preamble discussion of associated topics of "baseline jeopardy" and "tipping point."

*Comment:* A number of commenters expressed agreement with this section of the preamble, and the Services' interpretation that not every adverse effect to critical habitat constitutes "destruction or adverse modification" (and relatedly, that not every adverse effect to a species "jeopardizes the continued existence of" a listed species). Some commenters noted that this interpretation comports with case

**Addendum 325a**

law holding that a finding of adverse effects on critical habitat do not automatically require a determination of "destruction or adverse modification," such as *Butte Env. Council,* 620 F.3d 936, 948 (9th Cir. 2010).

*Response:* We appreciate that these commenters found this preamble discussion helpful.

*Comment:* Some commenters criticized the preamble language as creating too broad of a standard. Those commenters asserted that the preamble language implied that any effect, as long as it could be measured, could trigger an adverse modification opinion. For example, one commenter asserted that the Services were lowering the standard so that "any measurable or recognizable effect" on critical habitat would be considered destruction or adverse modification.

*Response:* It was not our intention to imply, or state in any manner, that any effect on critical habitat that can be measured would amount to adverse modification of critical habitat. To the contrary, our experience with consultations has demonstrated that the vast majority of consultations that involved an action with adverse effects do not amount to a determination of adverse modification of critical habitat.

We believe some of the confusion expressed by these comments can be alleviated by providing more explanation of where in the consultation process the "appreciably diminish" concept comes into play. The consultation process sets up a multiple-stage evaluation process of effects to critical habitat. The first inquiry—even before consultation begins—is whether any effect of an action "may affect" critical habitat. In order to determine if there is an effect, of course, it would have to be something that can be described or detected. The second consideration, then, would be whether that effect has an adverse effect on the critical habitat within the action area. To make that determination, the effect would need to be capable of being evaluated, in addition to being detected or described (see 1998 Consultation Handbook at pp. 3–12–3–13 (noting that "insignificant" effects will not even trigger formal consultation, and that at this step, the evaluation is made of whether a person would "be able to meaningfully measure, detect, or evaluate" the effects)). The finding that an effect is adverse at the action-area scale does not mean that it has met the section 7(a)(2) threshold of "destruction or adverse modification"; rather, that is a determination that simply informs whether formal consultation is required at all. Therefore, an adverse effect is not,

by definition, the equivalent of "destruction or adverse modification," and further examination of the effect is necessary. As noted above, courts have also endorsed this view; see, *e.g., Butte Envtl. Council* v. *U.S. Army Corps of Eng'rs,* 620 F.3d 936, 947–48 (9th Cir. 2010) (holding that "a determination that critical habitat would be destroyed was thus not inconsistent with [a] finding of no 'adverse modification' ").

After effects are determined to be adverse at the action-area scale, they are analyzed with regard to the critical habitat as a whole. That is, the Services look at the adverse effects and evaluate their impacts when added to the environmental baseline and cumulative effects on the value of the critical habitat for the conservation of the species, taking into account the total and full extent as described in the designation, not just in the action area. It is at this point that the Services look to whether the effects diminish the role of the entire critical habitat designation. As discussed further above in our discussion of the phrase "as a whole," the Services must place impacts to critical habitat into the context of the overall designation to determine if the overall value of the critical habitat is likely to be reduced.

Even if it is determined that the effects appear likely to diminish the value of the critical habitat, a determination of "destruction or adverse modification" requires more than adverse effects that can be measured and described. At this stage in the consultation's multi-staged evaluations, the Services will need to evaluate the adverse effects to determine if the adverse effects when added to the environmental baseline and cumulative effects will diminish the conservation value of the critical habitat in such a considerable way that the overall value of the entire critical habitat designation to the conservation of the species is appreciably diminished. It is only when adverse effects from a proposed action rise to this considerable level that the ultimate conclusion of "destruction or adverse modification" of critical habitat can be reached.

*Comment:* Several commenters suggest that in addition to defining "destruction or adverse modification," the Services should adopt a new regulatory definition of "appreciably diminish." For example, one comment suggests the definition should read "means to cause a reasonably certain reduction or diminishment, beyond baseline conditions, that constitutes a considerable or material reduction in the likelihood of survival and recovery."

*Response:* The Services believe our revised definition of "destruction or adverse modification" will be clearer than before, while retaining continuity by keeping important language from prior versions of the definition. We do not think the various proposed definitions for "appreciably diminish" would improve upon the "destruction or adverse modification" definition, and we conclude they would themselves introduce additional undefined, ambiguous terminology that would not likely improve the clarity of the definition or the consistency of its application.

*Comment:* Some commenters suggest the Services state in rule text or preamble that "appreciably diminish" should be defined as it was in the 1998 Consultation Handbook: "to considerably reduce the capability of designated or proposed critical habitat to satisfy requirements essential to both the survival and recovery of a listed species." Some commenters further assert that the Services should disavow language in the 2016 final rule preamble (81 FR 7214; February 11, 2016) to the effect that "considerably" means "worthy of consideration" and that it applies where the Services "can recognize or grasp the quality, significance, magnitude, or worth of the reduction in the value of' critical habitat. They assert this language is too broad and gives the Services too much discretion or will cause the Services to find "destruction or adverse modification" in inappropriate circumstances. One commenter notes that some courts have affirmed the 1998 Consultation Handbook definition and held the term "appreciably" means "considerable" or "material." See, *e.g., Pac. Coast Feds. of Fishermen's Assn's* v. *Gutierrez,* 606 F. Supp. 2d 1195, 1209 (E.D. Cal. 2008); *Forest Guardians* v. *Veneman,* 392 F. Supp. 2d 1082, 1092 (D. Ariz. 2005).

*Response:* We believe the interpretation provided in our proposed rule preamble and as described above in detail is consistent with the guidance provided in the 1998 Consultation Handbook and the language used in the 2016 final rule (81 FR 7214; February 11, 2016). The preamble language in the draft rule did not seek to raise or lower the bar for making a finding of destruction or adverse modification. As with the 2016 definition and prior practice on the part of the Services, and as discussed above, destruction or adverse modification is more than a noticeable or measurable change. As we have detailed above, in order to trigger adverse modification, there must be an alteration that appreciably diminishes

the value of critical habitat as a whole for the conservation of a listed species.

*Comment:* Some comments sought for the Services to develop a more exact or quantifiable method of determining destruction or adverse modification. One commenter requested that the Services develop regulations setting forth quantifiable "statistical tools appropriate for the attribute of interest" to guide such determinations, based on "defensible science that leads to reliable knowledge in quantifying the impacts of proposed or extant alterations related to habitat or populations of listed species."

*Response:* Where appropriate, the Services use statistical and quantifiable methods to support determinations of "destruction or adverse modification" under the "appreciably diminish" standard, but the best scientific and commercial data available often does not support this degree of precision. As such, the Services are required to apply the statute and regulations, and reach a conclusion even where such data and methods are not available.

*Comment:* Some commenters asserted that the preamble discussion of "appreciably diminish" stated an interpretation that was inconsistent with the statute, insufficiently protective of critical habitat, and would make the bar too high for making findings of "destruction or adverse modification." Many of these comments linked the "appreciably diminish" language in the preamble with the "as a whole" change to the first sentence of the definition and concluded that these operated together to raise the tolerance for incremental and cumulative losses that would over time degrade critical habitat and undermine conservation. Thus, some of these comments are also addressed above in the discussion of "as a whole." These comments often also raise issues about the concepts of "tipping point" and "baseline jeopardy" addressed further below.

*Response:* Our preamble discussion does not raise or lower the bar for finding "destruction or adverse modification." The Services believe that this discussion of "appreciably diminish" comports with prior guidance and with the statute.

Baseline Jeopardy and Tipping Point

As discussed in our proposed rule's preamble, the definitions of "destruction or adverse modification" and "jeopardize the continued existence of" both use the term "appreciably," and the analysis must always consider whether impacts are "appreciable," even where critical habitat or a species already faces severe threats prior to the action. We thus noted that the statute

and regulations do not contain any provisions under which a species should be found to be already (pre-action) in an existing status of being "in jeopardy" "in peril," or "jeopardized" by baseline conditions, such that any additional adverse impacts must be found to meet the regulatory standards for "jeopardize the continued existence of" or "destruction or adverse modification." As we explained, the terms "jeopardize the continued existence of" and "destruction or adverse modification" are, in the plain language of section 7(a)(2), determinations that are made about the effects of Federal actions. They are not determinations made about the environmental baseline for the proposed action or about the pre-action condition of the species.

The proposed rule's preamble also explains the Services' view that, contrary to the implications of some court opinions and commenters, they are not, in making section 7(a)(2) determinations, required to identify a "tipping point" beyond which the species cannot recover from any additional adverse effect. Neither the Act nor our regulations state any requirement for the Services to identify a "tipping point" or recovery benchmark for making section 7(a)(2) determinations. Section 7(a)(2) provides the Services with discretion as to how it will determine whether the statutory prohibition on jeopardy or destruction or adverse modification is exceeded. We also noted that the state of science often does not allow the Services to identify a "tipping point" for many species.

*Comment:* Some commenters stated opposition to the Services' interpretation and said it would undermine conservation. In particular, many commenters asserted that some species are so imperiled or rare that they are in fact in a state of "baseline jeopardy" and cannot sustain any additional adverse effects. Such species, they asserted, should be considered to be in a state of "baseline jeopardy" or "baseline peril."

*Response:* The Services do not dispute that some listed species are more imperiled than others, and that for some very rare or very imperiled species, the amount of adverse effects to critical habitat or to the species itself that can occur without triggering a "jeopardize" or "destruction or adverse modification" determination may be small. However, the statute and regulations do not contain the phrase "baseline jeopardy." Nor does the statute or its regulations recognize any state or status of "baseline jeopardy." While the term "jeopardy" is sometimes

used as a shorthand, the statutory language is "jeopardize the continued existence," and it applies prospectively to the effects of Federal actions, not to the pre-action status of the species. As we stated in our proposed rule preamble, "[t]he terms 'jeopardize the continued existence of' and 'destruction or adverse modification' are, in the plain language of section 7(a)(2), determinations that are made about the effects of Federal agency actions. They are not determinations about the environmental baseline or about the pre-action condition of the species. Under the [Act], a listed species will have the status of 'threatened' or 'endangered,' and all threatened and endangered species by definition face threats to their continued existence" (83 FR 35178, July 25, 2018, p. 83 FR at 35182). For the "jeopardize" determinations, as with the "destruction or adverse modification" determinations, a determination that there are likely to be adverse effects of a Federal action is the starting point of formal consultation. The Services are then obliged to consider the magnitude and significance of the effects they cause, when added to the environmental baseline and cumulative effects, and the status of the species or critical habitat, before making our section 7(a)(2) determination.

*Comment:* Some commenters asserted that it is not possible to rationally analyze whether an action jeopardizes a species without identifying a "tipping point."

*Response:* Different commenters, as well as prior court opinions, have offered varying interpretations of what the term "tipping point" means. For example, one commenter on the proposed rule says that "[t]ipping points for species are when the environment degrades itself to where the population growth is too low to support a viable population." The Ninth Circuit Court of Appeals has described the concept as "a tipping point beyond which the species cannot recover." See *Oceana, Inc.* v. *Nat'l Marine Fisheries Serv.,* 705 F. App'x 577, 580 (9th Cir. 2017); see also *Wild Fish Conservancy* v. *Salazar,* 628 F.3d 513, 527 (9th Cir. 2010) (referring to a "tipping point precluding recovery"). Another Ninth Circuit case described the issue as one of determining "at what point survival and recovery will be placed at risk" (*Nat'l Wildlife Fed'n* v. *Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 936 (9th Cir. 2008)), in order to avoid "tipping a listed species too far into danger." *Id.* We disagree that a rational analysis of whether an action is likely to jeopardize a species necessarily requires identification of such a "tipping point."

**Addendum 327a**

The state of the science regarding the trends and population dynamics of a species may often not be robust enough to establish such tipping points with sufficient certainty or confidence, and the Services have successfully increased the abundance of some species from a very small population size (*e.g.*, California condor). In addition, there are myriad variables that affect species viability, and it would not likely be the case that one could reduce the inquiry to a single "tipping point." For example, species viability may be closely tied to abundance, reproductive rate or success, genetic diversity, immunity, food availability or food web changes, competition, habitat quality or quantity, mate availability, etc. In those cases, the attempt to define a tipping point could undermine the rationality of the determination, bind the Services to base their judgment on overly rigid criteria that give a misleading sense of exactitude, and unduly limit the ability to exercise best professional judgment and factor in the actual scientific uncertainties. The Services do not dispute that, in some cases, there could be a species that is so rare or imperiled that it reaches a point where there is little if any room left for it to tolerate additional adverse effects without being jeopardized by the action. But even in those cases, the Services would apply the necessary "reduce appreciably" standard to the "jeopardize" determination. The Services' final determination should be judged according to whether it reasonably applied the governing statutory and regulatory standards and used the best scientific and commercial data available. There is no de facto or automatic requirement that a reasonable conclusion must include an artificial requirement, ungrounded in the statute, to identify a "tipping point."

*Comment:* Some commenters asserted that the preamble, particularly with respect to "tipping point" and "baseline jeopardy," was inconsistent with the interpretation stated in a 1981 "Solicitor's opinion" referenced as Appendix D to the 1998 Consultation Handbook. The commenters call attention to a statement in that memorandum describing how, when a succession of Federal actions may affect a species, "the authorization of Federal projects may proceed until it is determined that further actions are likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat." That memo further states that "[i]t is this 'cushion' of natural resources which is available for allocation to [Federal] projects until

the utilization is such that any future use may be likely to jeopardize a listed species or adversely modify or destroy its critical habitat. At this point, any additional Federal activity in the area requiring a further consumption of resources would be precluded under section 7." Commenters assert that this language recognizes the existence of "baseline jeopardy" and/or recognizes that the Services must utilize the tipping point concept in performing a section 7(a)(2) analysis.

*Response:* The subject matter of the referenced memorandum was the treatment of cumulative effects. In any case, the guidance provided in that memorandum is not in conflict with the preamble discussion provided in the proposed rule on "appreciably diminish," "tipping point," and "baseline jeopardy," or in conflict with the Services' long-standing interpretations stated in the recent proposed rule's preamble. The position of the Services is that there is nothing in the Act or its regulations, or necessitated under the standards of the Administrative Procedure Act, requiring that a section 7(a)(2) analysis quantify or identify a "tipping point."

Definition of Director

*Comment:* Some commenters agreed with the proposed revised definition. One commenter expressed concern that revising the definition would require consultations to be finalized at the Services' Headquarters offices and result in delays. Another commenter suggested the definition make clear that any "authorized representative" of the Director meet the respective eligibility requirements for political appointment to the position of Assistant Administrator for Fisheries for NMFS and Director of FWS.

*Response:* While we understand the commenter's observation regarding occasional lapses in Senate-confirmed agency leadership, we are unaware of any actual issues related to either the existing or revised definition; therefore, we decline to make any additional changes. As stated in the proposed rule, the purpose of revising the definition is to clarify and simplify it, in accordance with the Act and the Services' current practice. The revised definition designates the head of both FWS and NMFS as the definitional Director under the Act section 7 interagency cooperation regulations. The change does not revise the current signature delegations of the Services in place that allow for signature of specified section 7 documents (*e.g.*, biological opinions and concurrence letters) at the regional

and field levels and will not increase the completion time for consultation.

Definition of Effects of the Action

The Services proposed to revise the definition of "effects of the action" in a manner that simplified the definition by collapsing the terms "direct," "indirect," "interrelated," and "interdependent" and by applying a two-part test of "but for" and "reasonably certain to occur." Related to this revised definition, we also proposed to make the definition of environmental baseline a stand-alone definition within § 402.02 and moved the instruction that the effects of the proposed action shall be added to the environmental baseline into the regulations guiding the Services' responsibilities in formal consultation in § 402.14(g). In addition, we proposed to add a new § 402.17 titled "Other provisions" and, within that new section, add a new provision titled "Activities that are reasonably certain to occur" in order to clarify the application of the "reasonably certain to occur" standard referenced in two specific contexts: activities caused by but not included as part of the proposed action, and activities under "cumulative effects." As discussed above under Discussion of Changes from Proposed Rule, the Services received numerous comments on the proposed definition of "effects of the action" and the new provision at § 402.17(a) "Activities that are reasonably certain to occur." We have adopted a final, revised definition of "effects of the action" and revised text at § 402.17(a) in response to those comments. Below, we summarize other comments received on the scope of the "effects of the action" and the proposed two-part test for effects of the action of "but for" and "reasonably certain to occur" and present our responses. We address changes to the environmental baseline definition in a separate discussion below.

Scope of Effects of the Action

*Comment:* Some commenters were concerned that removal of the terms "direct," "indirect," "interrelated," and "interdependent" would hamper discussions because those terms could no longer be used.

*Response:* The terms are not prohibited from use in discussion, as they can be useful when discussing the mode or pathway of the effects of an action or activity. However, as discussed above, elimination of these terms simplifies the definition of "effects of the action" and causes fewer concerns about parsing what label applies to each consequence. Now consequences caused by the proposed

**Addendum 328a**

action encompass all effects of the proposed action, including effects from what used to be referred to as "direct" and "indirect" effects and "interrelated" or "interdependent" activities.

*Comment:* A commenter questioned the ability of the proposed two-part test to capture the risks of low probability but high consequence impacts such as an oil spill and welcomed an explanation of this scenario.

*Response:* As discussed throughout this rule and in the proposed rule, the Service's overall approach to "effects of the action" has been retained. During consultation, the consequences of the Federal agency action are reviewed in light of specific facts and circumstances related to the proposed action. If appropriate, those effects are then considered in the effects of the action analysis. Therefore, the Services expect that scenarios such as that mentioned by the commenter will be subject to review just as they have been in current consultation practice.

*Comment:* One commenter believed that it is critical to clarify that consultation is focused on the actual effects of the agency action on listed species and designated critical habitat, and that those effects are to be differentiated from the environmental baseline. They recommended adding "[e]ffects of the action shall be clearly differentiated from the environmental baseline" to the definition of "effects of the action."

*Response:* The Services decline to make the suggested addition to the definition of "effects of the action." In the proposed rule, the Services made clear that the "environmental baseline" is a separate consideration from the effects of the proposed Federal action by both proposing to separate the definition of the term into a standalone definition and by clarifying the instruction to add the effects of the action to the environmental baseline as part of amendments to the language at § 402.14(g). As discussed above, the Services also have added an additional sentence to the definition of environmental baseline to help further clarify when the consequences of certain ongoing agency facilities and activities fall within the environmental baseline and would therefore not be considered in "effects of the action."

*Comment:* A few commenters requested that if the distinction between non-Federal "activities" and "effects" is maintained, the background to the final rule should more clearly explain the purpose and meaning of the distinction, and that the Services should clarify that discretionary Federal actions currently characterized as "interrelated and interdependent" remain subject to the consultation requirement.

*Response:* The Services are adopting a revised definition of effects of the action, as described above. The distinction between activities and effects (now "consequences") in this definition is intended to capture two aspects of the analysis of the "effects of the action." First, a proposed Federal action may cause other associated or connected actions, which are referred to as other activities caused by the proposed action in the definition to differentiate them from the proposed Federal "action." These activities would have been called "interrelated" or "interdependent" actions or "indirect effects" under the prior definition codified at § 402.02. In large part due to the three possible categories these activities could have fallen into, and the debates that regularly ensued while attempting to categorize them, we chose to collapse those three possible categories and "direct effects" into "all consequences" caused by the proposed action. Second, both the proposed action and the other activities caused by the proposed action may have physical, chemical, or biotic consequences on the listed species and critical habitat. Both the proposed action and other activities caused by the proposed action must be investigated to determine the physical, chemical, and biotic consequences. In the case of an activity that is caused by (but not part of) the proposed action, the two-part test must be examined twice—once for the activity and then again for the consequences of that activity. Additionally, if Federal activities caused by the Federal agency action under consultation are identified, those additional activities should be "combined in the consultation and a lead agency . . . determined for the overall consultation" (1998 Consultation Handbook at p. 4–28).

*Comment:* One commenter argued that, by eliminating the language directing the Services to consider direct and indirect effects together with interrelated or interdependent actions, the Services have revised the language to account only for direct effects. They argue that this proposed revision is inconsistent with the intent of the Act and its scientific underpinnings, as it ignores the fact that many imperiled species face multiple threats that compound one another.

*Response:* The proposed definition of "effects of the action" neither ignored the multiple threats facing listed species and critical habitats nor did it reduce all effects analysis only to the consideration of direct effects. The Services have adopted a revised, final definition of "effects of the action" that clarifies that all of the consequences of a proposed action must be evaluated, and that the causation tests are applied to all effects of the proposed action. Contrary to the commenter's assertion, a complete assessment of the "effects of the action" would require, where appropriate, the consideration of multiple stressors and consequences resulting from any synergistic, or compounding factors. These consequences would then be added to the environmental baseline and cumulative effects per the provisions now found at § 402.14(g)(4).

*Comment:* One commenter suggested the final regulations explicitly recognize an obligation to consider "spillover effects": "In some contexts, efforts to modify or condition an action in order to reduce the impacts of the activity may result in 'spillover effects' that, ultimately, result in more adverse impacts to the species. A 'spillover effect' is the unintended consequence that occurs when an action in one market results in a corollary effect in another market. For example, a closure of the Hawaii-based shallow-set longline fishery in the early 2000s was demonstrated to result in thousands of additional sea turtle interactions due to the replacement of market share by foreign fisheries that do not implement the same protected species measures as the U.S. fishery and consequently interact with many more turtles."

*Response:* The purpose and obligation of section 7(a)(2) of the Act is that Federal agencies are required to insure their proposed actions are not likely to jeopardize listed species or destroy or adversely modify critical habitat. This obligation is directed solely at the Federal action and may not be abrogated because of the potential response of other agencies or entities engaged in the same or similar actions. In the case of proposed Federal actions, the consequences of the proposed action, such as the incidental capture of sea turtles in Hawaii-based longline fishing gear from the commenter's example, must be evaluated. Other consequences could possibly include such "spillover effects" if they meet the "but for" and "reasonably certain to occur" causation tests applied to consequences caused by the proposed action under the revised, final definition of effects of the action, but this would have to be determined on a case-by-case basis. Further, the effects of other actions such as those described in the example may already be included in the overall jeopardy analysis as part of the status of the species, environmental baseline, and/or cumulative effects.

**Addendum 329a**

*Comment:* A few commenters were concerned that we were proposing a different standard when evaluating the effects of "harmful" or "beneficial" actions or activities, or conversely, that we were not proposing a different standard when we should hold "beneficial actions" to a higher certainty standard given their importance in minimizing or offsetting the adverse effects of proposed actions.

*Response:* Commenters pointed to examples in case law or past projects where actions or measures to avoid, minimize, or offset the effects of agency actions were held to an expectation of "specific or binding plans." While the Services appreciate the concern raised, the Services do not intend to hold beneficial activities or measures offsetting adverse effects to either a higher or lower standard than any other type of action or measure proposed by a Federal agency. Any type of action proposed by a Federal agency first receives a presumption that it will occur, but it must also be described in sufficient detail that FWS or NMFS can both understand the action and evaluate the effects of the action. Similarly, whether considered beneficial or adverse, the consequences of the various components of the Federal agency's action are governed by the same causation standard set forth in the definition of "effects of the action."

*Comment:* A few commenters suggested that the "effects" of the action should not include "effects" that an agency lacks the legal authority to lessen, offset, or prevent in taking the action.

*Response:* As we further discuss below under § 402.03, Applicability, the Services decline to limit the "effects of the action" to only those effects or activities over which the Federal agency exerts legal authority or control. As an initial matter, section 7 applies to actions in which there is discretionary Federal involvement or control (50 CFR 402.03). Once in consultation, all consequences caused by the proposed action, including the consequences of activities caused by the proposed action, must be considered under the Services' definition of "effects of the action." These may include the consequences to the listed species or designated critical habitat from the activities of some party other than the Federal agency seeking consultation, provided those activities would not occur but for the proposed action under consultation, and both the activities and the consequences to the listed species or designated critical habitat are reasonably certain to occur. Where this causation standard is met, the action agency has a substantive duty

under the statute to ensure the effects of its discretionary actions are not likely to jeopardize a listed species or destroy or adversely modify its critical habitat. We recognize that the Services and action agencies sometimes struggle with the concept of reviewing the consequences from other activities not under the action agency's control in a consultation. However, including all relevant consequences is not a fault assessment procedure; rather, it is the required analysis necessary for a Federal agency to comply with its substantive duties under section 7(a)(2). When the Services write an incidental take statement for a biological opinion, under section 7(b)(4)(iv) of the Act they can assign responsibility of specific terms and conditions of the incidental take statement to the federal agency, the applicant, or both. As the Supreme Court noted in *Home Builders,* "*TVA* v. *Hill* thus supports the position . . . that the [Act]'s no-jeopardy mandate applies to *every* discretionary agency action— *regardless* of the expense or burden its application might impose" (551 U.S. at 671 [emphasis added]).

The legislative history of section 7 of the Act confirms the Services' position. In particular, *National Wildlife Federation* v. *Coleman,* 529 F.2d 359 (1976) is a case often cited to support the proposition that indirect effects outside the authority and jurisdiction of an action agency are a relevant consideration in determining if the agency action is likely to jeopardize a listed species or destroy or adversely modify its critical habitat. The Act's legislative history from 1979 indicates that Congress was fully aware of the *Coleman* decision when they changed the definition from "does not jeopardize" to "is not likely to jeopardize." In fact, the House Conference Report 96–697 to the 1979 amendments specifically references the case. In referencing the relevant amendments to section 7, the Conference Report says, "The conference report adopts the language of the house amendment to section 7(a) pertaining to consultation by federal agencies with the Fish and Wildlife Service and the National Marine Fisheries Service. The amendment, which would require all federal agencies to ensure that their actions are not likely to jeopardize endangered or threatened species or result in the adverse modification of critical habitat, brings the language of the statute into conformity with existing agency practice, and judicial decisions, such as the opinion in *National Wildlife* 

*Federation* v. *Coleman.* H.R. Conference Report 96–697 (1979)."

"But for" Causation

*Comment:* Several commenters expressed concern that the proposed application of the "but for" test to the effects of the proposed action would result in a simplistic evaluation of effects that would miss important considerations of the consequences of multiple effects, synergistic effects, or other more complex pathways by which an action may affect listed species or critical habitat.

*Response:* As noted elsewhere, the Services have revised the definition of "effects of the action" to indicate that all consequences of the proposed action must be considered and to apply the two-part test of "but for" and "reasonably certain to occur" to all effects. This approach is, in application, consistent with the prior regulatory definition, and the Services accordingly anticipate the scope of their effects analyses will stay the same.

As with current practice, the Services intend to evaluate the appropriate pathways of causation specific to the action and its effects for the purposes of the assessment of impacts to the species and critical habitat. This is not a liability test but an assessment of the expected consequences of an action using, for example, well-founded, physical, chemical, and biotic principles that are relevant to Act consultations. For a consequence to be considered an effect of the action, it must have a causal relationship with the action or activity. "But for" causation does not impair the Services' inquiry into other complex scenarios. As we noted above, a complete assessment of the "effects of the action" would require, where appropriate, the consideration of multiple stressors and overlapping, synergistic, or contributing factors. All of these considerations are important in ecology, sufficiently captured in the application of the "but for" test, and routinely serve as the foundation for section 7(a)(2) analyses. In addition, these consequences would then be added to the environmental baseline, which along with cumulative effects, status of the species and critical habitat, are used to complete our section 7(a)(2) assessment.

*Comment:* A few commenters urged the Services to adopt a "proximate cause" standard as the appropriate standard for determining the effects of the action.

*Response:* Although the term "proximate cause" was used by several commenters, the term itself and its application to the determination of the

**Addendum 330a**

effects of the action in the context of the Act generally was not defined by the commenters. There is no Federal standard definition for "proximate cause," a term that developed through judicial decisions. Further, proximate cause can differ if used for assigning liability in criminal action as compared to civil tort matters, neither of which consideration is directly relevant in the section 7(a)(2) context of evaluating the anticipated effects of proposed Federal actions on listed species and critical habitat. With regard to use of proximate cause in an environmental context, in *Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995), Justice O'Connor described proximate cause as "introducing notions of foreseeability." Id. at 709. As set out below, the "reasonably certain to occur" test in our definition of "effects of the action" imparts similar limitations on causation as an explicit foreseeability test. Additionally, the "but for" causation standard is in essence a factual causation standard. The Services' test to determine the effects of the action, therefore, adopts analogous principles to those identified by courts for proximate causation.

*Comment:* Several commenters cited to National Environmental Policy Act (NEPA) case law, such as *Department of Transp.* v. *Public Citizen,* 541 U.S. 752 (2004) ("*Public Citizen*") in support of their view of the proper scope of the analysis of the effects of the action and the use of proximate causation to determine those effects.

*Response:* The Services decline to adopt the sort of "proximate cause" standard in the context of section 7 of the Act that has been applied by courts in the NEPA context. A "proximate cause" standard has been invoked by courts in the NEPA context (for example, see *Public Citizen,* 541 U.S. at 767). We reviewed the relevant NEPA case law, including *Public Citizen,* and do not think it is determinative in the context of section 7(a)(2) of the Act. The Services concluded that the cases cited were focused on a different issue than what is required when determining the "effects of the action." As the Eleventh Circuit noted in *Florida Key Deer* v. *Paulison,* 522 F.3d 1133 (11th Cir. 2008), *Public Citizen* "stands for nothing more than the intuitive proposition that an agency cannot be held accountable for the effects of actions it has no discretion not to take." *Id.* at 1144. In addition, many of these cases emphasized that the NEPA and Act are not similar statutes and have different underlying policies and purposes. For example, in *Public*

*Citizen,* the Supreme Court emphasized that NEPA's two purposes (to inform the decision-maker and engage the public) would not be served by analyzing those actions over which the action agency had no discretion. *Id.* at 767–68. We agree that the same is true for actions under the Act; that is, by regulation, the Act only applies to actions in which there is "discretionary Federal involvement or control" (50 CFR 402.03). See *National Ass'n of Home Builders* v. *Defenders of Wildlife,* 551 U.S. 644, 667 (U.S. 2007) (holding section 7(a)(2) applies to only discretionary Federal actions but distinguishing *Public Citizen* on the grounds that Act "imposes a substantive (and not just a procedural) statutory requirement").

With regard to that distinction, the cited cases point to the underlying policy differences between NEPA and the Act, with an emphasis on the affirmative burden on Federal action agencies with regard to endangered species. This is a significant distinction as the Supreme Court noted in *Metro. Edison Co.* v. *People Against Nuclear Energy,* 460 U.S. 766 (1983), "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Id.* at 774 n. 7. The underlying policy of a statute and legislative intent must shape the causation nexus. In that regard, section 7(a)(2) of the Act imposes an affirmative and substantive duty on Federal agencies to avoid actions that are likely to jeopardize listed species or adversely modify/destroy critical habitat. See *Home Builders,* 551 U.S. at 671 ("the [Act]'s no-jeopardy mandate applies to every discretionary agency action—regardless of the expense or burden its application might impose"). In light of the above, and the related reasons the Services discussed in rejecting a "jurisdiction or control" limit to the effects of discretionary agency actions, the Services decline to impose an additional proximate causation requirement applicable in the NEPA context for effects of the action under section 7(a)(2).

*Comment:* One commenter requested that the Services explain how the "effects of the action" assessment changes the consideration of "indirect effects," which does not currently use "but for" causation.

*Response:* The original definition of "indirect effects" in regulation at § 402.02 refers to effects that are "caused by" the proposed action whereas the Services' 1998 Consultation

Handbook includes the phrase "caused by or results from," both of which require an assessment of a causal connection between an action and an effect. The "but for" causation test in the revised, final definition of "effects of the action" is similar to "caused by" or "caused by or results from" in that both tests speak to a connection between the proposed action and the consequent results of that action, whether they be physical, chemical, or biotic consequences to the environment, the species, or critical habitat, or activities that would not occur but for the proposed action. Both tests require a determination of factual causation, and we do not anticipate a change in the Services' practice in applying "but for" causation to consequences once termed "indirect effects" compared to the regulatory term "caused by." As we noted in the preamble of the proposed rule, "[i]t has long been our practice that identification of direct and indirect effects as well as interrelated and interdependent activities is governed by the 'but for' standard of causation. Our [1998] Consultation Handbook states . . . 'In determining whether the proposed action is reasonably likely to be the direct or indirect cause of incidental take, the Services use the simple causation principle: *i.e.,* 'but for' the implementation of the proposed action. . . .' ([1998] Consultation Handbook, page 4–47)" (83 FR 35178, July 25, 2018, p. 83 FR 35183).

*Comment:* One commenter expressed concerns that the use of the "but for" test could result in a determination of "effects" that is over inclusive. They supported the retention of the current rules governing the "effects of the action" and advocated their application in conjunction with the multi-factor test for effects described in the 1998 Consultation Handbook. Conversely, one other commenter felt that the test was narrowing the scope and we should retain the term originally used in "indirect effects," "or result from" in our 1998 Consultation Handbook definition—in other words "effects or activities that are caused by or result from."

*Response:* The Services requested comment whether the proposed definition altered the scope of the effects of the action. With the revisions we are making in this final rule and as discussed elsewhere in this rule, there will not be a shift in the scope of the effects we consider under our new definition of "effects of the action," and, therefore, our analyses will be neither over nor under inclusive. Some of the commenters expressing concerns about over-inclusivity refer to a multi-factor

Addendum 331a

USCA Case #24-5101   Document #2083247      Filed: 11/01/2024      Page 334 of 360

test (pages 4–23 through 4–26 of the 1998 Consultation Handbook) for determining the effects of the action, but those factors are important to the consideration of the impact those effects will have on the species or critical habitat and not whether the effects or activity will occur. Those remain important considerations for the analysis of the effects of the action on listed species and critical habitat. Section 7(a)(2) consultation is required for all Federal actions with discretionary involvement or control that may affect listed species or critical habitat. Our assessment of the proposed and revised, final definition of "effects of the action" is that, generally, all of the effects previously considered will still be included in the scope of the "effects of the action" and that no other effects or activities not a direct or indirect effect of the proposed Federal action will be included. The improvements to the definition of "effects of the action," including the explicit establishment of the two-part test for effects, is that the underlying support for the consequences and activities considered by the Services in the analysis will be guided by a clearer standard and, therefore, be more consistent and transparent. Nor do the Services find that the proposed or revised, final definition of "effects of the action" narrows the scope of the effects that would be considered. We have explicitly retained the same full range of effects to listed species or critical habitat from the proposed action as under our prior definition through the inclusion of "all consequences" of the proposed action in the revised, final definition.

"Reasonably Certain to Occur"

*Comment:* Several commenters requested that we articulate a set of factors to apply in determining what effects are reasonably certain to occur from a proposed action.

*Response:* We agree with the commenters' suggestion. Please see our discussion of changes to § 402.17 under *Section 402.17—Other Provisions,* above.

*Comment:* Some commenters suggested that the test for effects of the action should also include "reasonably foreseeable" as a means of further avoiding speculation or over inflation of the effects of an action or activities.

*Response:* The Services responded to similar comments in the preambles to the 1986 regulation (51 FR 19926, June 3, 1986, p. 51 FR 19932) and the 2008 regulation (73 FR 76272, December 16, 2008, p. 73 FR 76277). Again in this rule, we decline to make this change.

The Services view "reasonably certain to occur" to be a higher threshold than "reasonably foreseeable," a term that is more in line with the scope of effects analysis under NEPA. As stated in the 1986 preamble, "NEPA is procedural in nature, rather than substantive, which would warrant a more expanded review of . . . effects" than the Act, which imposes "a substantive prohibition" (51 FR 19926, June 3, 1986, p. 51 FR 19933). The Act's prohibitions against Federal actions that are likely to jeopardize the continued existence of listed species or destroy or adversely modify critical habitat calls for a stricter standard than "reasonably foreseeable."

*Comment:* Some commenters requested that the Services elaborate on the factors to consider when determining whether an activity is reasonably certain to occur as part of the two-part test for effects of the action. Others provided proposals of appropriate factors or specificity that should be contained in such an assessment. These included: (1) The extent to which a prior action that is similar in scope, nature, magnitude, and location has caused a consequent action or activity to occur; (2) any existing plans for the initiation of an action or activity by the consulting action agency, the permit or license applicant or another related entity that is directly connected to, and dependent upon, implementation of the proposed action; and (3) the extent to which a potential action or activity has intervening or necessary economic, administrative, and legal requirements that are prerequisites for the action to be initiated and the level of certainty that can be attributed to the completion of such intervening or necessary steps. A few commenters suggested that the only factor should be whether the activity was "definitely planned and concretely identifiable," while others suggested the only factor should be the use of the best scientific and commercial data available.

*Response:* Identifying activities that are "reasonably certain to occur" is one part of the two-part test when evaluating the consequences of a proposed Federal action. As discussed in the proposed rule, this two-part test identifies activities previously captured under "indirect effects" and "interrelated and interdependent actions" that are now included within "all consequences" caused by the proposed action. "Reasonably certain to occur" is also the current test in the identification of non-Federal activities that should be included as cumulative effects. Our intent with the proposed factors to consider was to provide a general, but not limiting, guideline to inform the assessment. However, upon consideration of the comments and suggestions, the Services have revised the factors under § 402.17(a) to further elaborate on the factors related to the Service's past experience with identifying activities that are reasonably certain to occur as a result of a proposed action and the type of plans that would be indicative of an activity that is reasonably certain to occur. Suggestions to limit the consideration of activities that are reasonably certain to occur to only those that are "definitely planned and concretely identifiable" would inappropriately narrow the scope of our consideration of the effects of a proposed Federal action. For the factors we have identified, we also note that this list of factors is neither exhaustive nor a required minimum set of considerations.

Additionally, the Services have specified that the conclusion that an activity is reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. We believe these revisions help clarify the potentially relevant factors and the standard the Services will apply to such queries, leading to more consistent and predictable administration of the Services' section 7(a)(2) responsibilities.

Further, nothing in the language of the § 402.17(a) provision conflicts with or prevents the Services from using the best scientific and commercial data available as we are required to do for section 7(a)(2) analyses. This information is quite relevant to our consideration of the factors as both scientific and commercial information can be the sources we draw upon for "past experience," "existing plans for that activity," and "any remaining . . . requirements." In all instances, we will draw upon the best scientific and commercial data available to determine if, in light of the relevant factors and based on clear and substantial information, an activity is reasonably certain to occur.

*Comment:* A few commenters questioned how "activities that are reasonably certain to occur" are defined when the consultation is on national or large regional programs.

*Response:* Oftentimes, when a section 7(a)(2) consultation is performed at the level of a regional or national program, it is referred to as a programmatic consultation, as defined by the Services in the proposed rule, and the proposed action is referred to as a framework programmatic action from our 2015 rule revising incidental take statement regulations (80 FR 26832, May 11, 2015). In these instances, the "but for"

**Addendum 332a**

and ''reasonably certain to occur'' parts of the test extend to the consequences that would be expected to occur under the program generally, but not to the specifics of actual projects that may receive future authorization under the program. Effects analyses at this more generalized level are necessary because the Federal agency often does not have specific information about the number, location, timing, frequency, precise methods, and intensity of the site-specific actions or activities for their program.

We can expect that a program that authorizes bank stabilization, for example, will result in actions that stabilize riverbanks, streambanks, or even the banks of lakes and estuaries. However, we cannot, within those same bounds, reasonably describe the exact nature of the yet-to-be-permitted bank stabilization, its location, or timing. We are able to provide an informed effects analysis at the more generalized level, however, by analyzing the project design criteria, best management practices, standards and guidelines, and other provisions the program adopts to minimize the impact of future actions under the program. For example, best management practices such as required sediment control methods or stabilization material requirements provide the Services with an understanding of the possible scope of materials and methods that would be expected in any given project even if the specific timing, location, or extent of future unauthorized projects is unknown.

Alternatively, some Federal agencies may be able to provide somewhat more specific information on the numbers, timing, and location of activities under their plan or program. In those instances, we may have sufficient information not only to address the generalized nature of the program's effects but also the specific anticipated consequences that are reasonably certain to occur from specific actions that will be subsequently authorized under the program.

*Comment:* Several commenters questioned how ''reasonably certain to occur'' relates to the direct effects of a proposed action.

*Response:* As discussed above, we have revised the definition of ''effects of the action'' so that the reasonably certain to occur standard applies to all consequences caused by the proposed action, which include the effects formerly captured by ''direct'' and ''indirect'' effects and ''interrelated'' and ''interdependent'' activities.

*Comment:* Several commenters offered suggestions about the ''not

speculative but does not have to be guaranteed'' range described by the Services when discussing the range of probability that could encompass ''reasonably certain to occur.'' Some suggested that the determination should settle on whether the effect or activity is ''probable'' or ''likely'' rather than merely ''possible,'' or whether there was ''clear and convincing evidence.'' However, other commenters felt the spectrum was not broad enough because we should consider effects or activities that were possible even if not likely in order to give the benefit of the doubt to the species.

*Response:* As discussed above, we have revised the regulatory text related to ''reasonably certain to occur'' in the definition of ''effects of the action'' and at § 402.17(a) and (b). Both for activities caused by the action under consultation and cumulative effects, the ''reasonably certain to occur'' determination must be based on clear and substantial information, using the best scientific and commercial data available. The information need not be dispositive, free from all uncertainty, or immune from disagreement to meet this standard. By clear and substantial, we mean that there must be a firm basis to support a conclusion that a consequence of an action is reasonably certain to occur. This term is not intended to require a certain numerical amount of data; rather, it is simply to illustrate that the determination of a consequence or activity to be reasonably certain to occur must be based on solid information and should not be based on speculation or conjecture. This added term also does not mean the nature of the information must support that a consequence or activity is guaranteed to occur.

The Services expect adopting this standard will allow for more predictable and consistent identification of activities that are considered reasonably certain and is consistent with the Act generally and section 7(a)(2) in particular. For similar reasons to those discussed below, we do not read the legislative history from the 1979 amendments to section 7 that included the phrase ''benefit of the doubt to the species'' to require a different outcome.

### Definition of Environmental Baseline

The Services proposed to create a standalone definition of ''environmental baseline'' and move the instruction that the ''effects of the action'' are added to the ''environmental baseline'' into the regulations guiding the Services' responsibilities in formal consultation in § 402.14(g). In addition, we requested comment on potential revisions to the definition of ''environmental baseline''

as it relates to ongoing Federal actions, including a suggested revised definition of ''environmental baseline.''

As discussed above in Discussion of Changes from Proposed Rule, the Services received numerous comments on ''environmental baseline'' as it relates to the suggested definition and the treatment of ongoing Federal actions. As a result of the comments received and after further consideration, we have adopted a final, revised definition of ''environmental baseline.'' Below, we summarize the comments received on the definition of ''environmental baseline'' and the revisions to § 402.14(g), and we present our responses.

### Comments on the Environmental Baseline Definition

*Comment:* Many commenters supported the proposal to retain the existing wording of the definition of the environmental baseline, establishing it as a standalone definition under § 402.02, and including the instruction to add the effects of the action and the cumulative effects to the baseline in § 402.14(g)(4). They noted that this would preserve the environmental baseline as a separate and important consideration in the overall section 7(a)(2) analysis. A few commenters felt that this should result in less confusion about what aspects of an ongoing action or a continuation of what could be considered an ongoing action should be in the baseline or the effects of the action.

*Response:* The Services agree that these proposals would preserve the environmental baseline as a separate and important consideration in the overall section 7(a)(2) analysis and have adopted these proposals in the final rule. Further, although many commenters supported adoption of the existing language, other comments and the Services' experience with implementing the environmental baseline led us to add language to the final, adopted definition to clarify that the focus of the environmental baseline is on the condition of the species and critical habitat in the action area absent the consequences of the action under consultation. In addition, the adopted final, revised definition of the ''environmental baseline'' includes the following clarifying sentence: ''The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.''

*Comment:* Several commenters provided their views on the role the

separate assessments of the environmental baseline and the status of the species and critical habitat play in the overall jeopardy and adverse modification analysis and thereby argued that the environmental baseline was too narrow a construct. For example, one commenter suggested the Services eliminate the references to "action area" in the definitions of "environmental baseline" and "cumulative effects." They stated that, by continuing to limit these definitions to effects in the action area, the Services call into question the validity of their jeopardy and destruction or adverse modification findings.

*Response:* The commenters appear to misunderstand how the various regulatory provisions (*e.g.,* environmental baseline, status of the species and critical habitat, etc.) guide the Services' section 7(a)(2) analyses. The purpose of our section 7(a)(2) analyses is to determine if the action proposed to be authorized, funded, or carried out by a Federal agency is not likely to jeopardize the listed species and also not likely to destroy or adversely modify critical habitat designated for the conservation of listed species. In section 7(a)(2) analyses, we first consider the status of the species and critical habitat in order to describe the antecedent or preceding likelihood of survival and recovery of the listed species and value of critical habitat that may be affected by the proposed action. For a listed species, for example, this may be expressed in terms of the species' chances of survival and recovery or through discussion of the species' abundance, distribution, diversity, productivity, and factors influencing those characteristics. Following on the status assessment, the purpose of the environmental baseline is to describe, for the action area of the consultation, the condition of the portion of the listed species and critical habitat that will be exposed to the effects of the action. A significant body of scientific literature has established that, without understanding this antecedent condition, we cannot predict the expected responses of the species (at the individual or population level) or critical habitat (at the feature or area level) to the proposed action.

Ultimately, the environmental baseline is used to understand the consequences of an action by providing the context or background against which the action's effects will occur. Comparing alternative courses of action is not the purpose of the environmental baseline—the task is to determine only what is anticipated to occur as a result of what has been proposed. When

establishing the environmental baseline, the focus is on the past and present impacts that human activities and other factors (*e.g.,* environmental conditions, predators, prey availability) have had on the fitness of individuals and populations of the species and features or areas of critical habitat in the action area. For example, if we were to consult on pile-driving activities (*e.g.,* the installation of piles or poles into a substrate to support a structure such as a dock by hammering or vibrating the piles into place), the baseline is intended to describe the physiological and behavioral condition of an animal that will be exposed to the sound waves produced by pile driving. This condition is the product of that animal's life history, physiology, and environment and which predisposes the animal to a set reaction or range of reactions to the sound and pressure waves. Animals in good physiological condition may not be perturbed by the action, whereas animals in poor health or stressed by other natural or anthropogenic factors, may leave the area, stop feeding, or fail to reproduce. Numerous case studies in the scientific literature have examined the varying physiological and behavioral responses of individuals to perturbations given the animal's antecedent condition. Similarly, populations of animals respond differently given their abundance, distribution, productivity, and diversity in the action area. The effects of the action and cumulative effects are added to the environmental baseline to determine how (or if) the proposed action affects the fitness of individuals and populations or the function, quantity, or quality of critical habitat features and areas that are exposed to the action given that antecedent condition. Because action areas are often just a small portion of the overall critical habitat designation or contain only some of the individuals or populations that comprise the listed species, the Services must then evaluate whether these action area effects translate into meaningful changes in the numbers, reproduction, or distribution of the listed species or reductions in the functional value or role the affected critical habitat plays in the overall designated critical habitat. This information is then considered with the overall viability of the listed species and value of designated critical habitat to determine if the consequences of the proposed action are likely to appreciably reduce the species' likelihood of survival and recovery and appreciably diminish the value of critical habitat for the conservation of

the species. As we noted in the responses to comments on the revised definition of "destruction or adverse modification," the size or proportion of the affected area of critical habitat is not determinative; impacts to a smaller area may in some cases result in a determination of destruction or adverse modification, while impacts to a large geographic area will not always result in such a finding. Similarly, when considering the effects of the action on the likelihood of survival and recovery of listed species, the key consideration is the antecedent status of the species and its vulnerability to further perturbation, not simply a measure of whether the number of individuals affected by the proposed action is "small" or "large."

*Comment:* Several commenters requested clarification of the term "aggregate effects" and how the Services conduct this analysis, given the proposal to revise "effects of the action" and § 402.14(g)(2) and (4) and existing language in the 1998 Consultation Handbook at p. 4–33. This language states, "The conclusion section presents the Services' opinion regarding whether the aggregate effects of the factors analyzed under 'environmental baseline,' 'effects of the action,' and 'cumulative effects' in the action area— when viewed against the status of the species or critical habitat as listed or designated—are likely to jeopardize the continued existence of the species or result in destruction or adverse modification of critical habitat." Commenters were concerned that our proposed revisions would result in only assessing the additional effects of the proposed action and not the "aggregate effects" as they are presented in the 1998 Consultation Handbook.

*Response:* As we noted in the preamble to the proposed rule, our proposed revisions to § 402.14(g)(2) and (4) are intended to clarify the analytical steps the Services undertake in formulating its biological opinion: "In summary, these analytical steps are: (1) Review all relevant information, (2) evaluate current status of the species and critical habitat and environmental baseline, (3) evaluate effects of the proposed action and cumulative effects, (4) add effects of the action and cumulative effects to the environmental baseline, and, in light of the status of the species and critical habitat, determine if the proposed action is likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat" (83 FR 35178, July 25, 2018, p. 83 FR 35186). These steps encompass the "aggregate effects" of adding the effects of the action to the

**Addendum 334a**

environmental baseline, and then taken together with cumulative effects, considering those results in light of the status of the species and critical habitat. There is no change from current Service practice or the "aggregate effects" guidance in the 1998 Consultation Handbook.

*Comment:* One commenter noted that often there is not enough information available to quantify impacts in the baseline and that sometimes that quantification is needed to do the effects analysis. Another commenter argued for a scientific defensibility standard before putting effects into the environmental baseline for a species to avoid speculation about past impacts.

*Response:* The Services acknowledge that sometimes information about the impacts of the environmental baseline in a particular action area is sparse or lacking and that this can complicate our ability to analyze the effects of a proposed Federal action. Nevertheless, we are required to use the best scientific and commercial data available, or that can be obtained during consultation, in our assessments. The use of the "best scientific and commercial data available" is the required standard which both the Services and the Federal agency must meet.

*Comment:* Tribal commenters suggested adding the concept of tribal water rights to the definition of environmental baseline to ensure that effects are added to the Tribe's existing right rather than the other way around and also suggested that the baseline should be set to describe the time when the species and habitat were abundant to provide the context of the harms humans have caused and also include an assessment of the coming harms of climate change.

*Response:* Tribal water rights are important and may be relevant in determination of the environmental baseline. We are not changing the basic concept of the environmental baseline—it will continue to be used as a tool to determine whether the effects of an action under consultation are or are not likely to jeopardize the continued existence of a species or destroy or adversely modify designated critical habitat. We will determine the appropriate baseline at the time of consultation and include those factors relevant to that particular consultation.

*Comment:* A few commenters questioned whether natural factors would be considered in the environmental baseline as those may also play a role in the status of the species and critical habitat, and also whether impacts to species and habitat due to climate change within and outside of the action area would be considered.

*Response:* Although the definition of "environmental baseline" captures the impacts of anthropogenic activities in the past, the present, and future Federal projects that have already undergone consultation, a true discussion of the environmental baseline would be incomplete without a discussion of relevant natural factors or processes that inform the condition of the species or critical habitat in the action area. For example, natural processes such as fire and flood, or the natural erosion of sediments may play a key role in species productivity, or certain geographic features in an action area may affect the viability and connectedness of the individuals, populations, or habitat features.

Nothing in these regulations changes the manner in which the Services may consider climate change in our consultations. The depth of consideration of the effects of climate change on the species and critical habitat will vary from consultation to consultation based on the best scientific and commercial data available. The effects of climate change on the species or critical habitat (not related to effects of the action) within and outside the action area will be addressed, as appropriate, in the environmental baseline or status of the species, respectively.

*Comment:* Some commenters supported the suggested revised definition of "environmental baseline" that was presented in the preamble of the proposed rule. Those in support agreed with different treatment for ongoing (or pre-existing) actions or effects and felt that this would avoid overstatement or analysis of the effects of ongoing actions under consultation.

*Response:* As discussed above, the Services have revised the definition of environmental baseline, emphasizing that the baseline is the condition of the species and critical habitat in the action area without the consequences of the proposed action and adding a third sentence to explain that the consequences from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify will be included in the environmental baseline. The Services believe these revisions address the comments received and are consistent with the existing case law and the Services' current approach to this issue.

*Comment:* Some commenters suggested adopting the NEPA "cumulative effects" approach to capture the baseline instead of either the current definition or the proposed revision.

*Response:* The Services decline to adopt the NEPA definition because the NEPA term captures a different set of concepts.

*Comment:* Most commenters opposed to the alternative definition described in the preamble of the proposed rule were opposed on three bases: (1) That the "state of the world" is overly broad and ambiguous and should be replaced by "action area" or similar; (2) that the proposed approach was unlawful and contrary to established case law, and invites speculation about the conditions that would exist absent an action; and (3) that the proposed treatment of "ongoing activities" could have the effect of narrowing the appropriate scope of the effects analysis (and contrary to case law) while also "grandfathering" in harmful operations or activities that should be subject to section 7 analysis (for example, the U.S. Supreme Court has held that "it is clear Congress foresaw that [section] 7 would, on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act" (*Tennessee Valley Authority* v. *Hill,* 437 U.S. 153, 186 (1978))).

*Response:* The Services agree that the phrase "state of the world" is broad. As discussed above, the Services have declined to include that wording, and we confirm that the scale of the environmental baseline is the action area. The concern by one commenter that harmful impacts would be grandfathered into the environmental baseline is addressed by clarification in the third sentence. That sentence clarifies that in circumstances where there are consequences to listed species or critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify, those would be included and considered in the environmental baseline and as part of the overall aggregation of effects described in § 402.14(g). Regarding the reference to *TVA* v. *Hill,* the ongoing project in question was within the discretion of the action agency to modify, and thus our definition is consistent with the court's holding.

*Comment:* Several commenters suggested that creation of specific language or guidance in regulation to address those complex cases of ongoing actions would be a better approach rather than trying to apply one definition to all actions that undergo consultation.

*Response:* We have revised the definition of environmental baseline to address ongoing actions. Additionally,

**Addendum 335a**

the Services provide some basic discussion of the treatment of this issue earlier in this rule. In most instances, the resolution of ongoing agency activities or existing agency facilities will be a fact-based inquiry that turns on the circumstances of a particular consultation.

*Comment:* Some commenters argued against viewing any improvements in ongoing activities as ''beneficial'' and that they should be evaluated appropriately as ongoing adverse (albeit reduced) effects of an action and not through improper comparative or incremental analyses.

*Response:* The definition of environmental baseline does not alter the manner in which the effects of the action are characterized. As discussed earlier, per § 402.03, all discretionary actions are examined against the section 7(a)(2) standard, including beneficial and adverse effects. Consultation under the Act is conducted on the effects of the entire proposed action (all consequences caused by the proposed action). To further clarify, proposed actions for ongoing activities that incrementally improve conditions but still have adverse effects (*i.e.,* are not wholly beneficial) require formal consultation. As noted in the preceding response, the analysis of an action's effects is a fact-based, consultation-specific analysis.

*Comment:* Some commenters argued that ongoing operations or infrastructure should not be considered as part of the effects of the action even in the case of a new license or permit if those operations or infrastructure are unchanged and that only changes in operations or infrastructure would undergo effects analysis. In contrast, other commenters noted that operations are only considered ''ongoing'' until the valid permit period terminates.

*Response:* As discussed earlier, the new definition clarifies how to correctly differentiate between consequences belonging in the environmental baseline and of those of the proposed action in effects of the action for the situations described by the commenters.

*Comment:* A few commenters noted that the purpose of the environmental baseline is not to create a hypothetical environment in which certain features, projects, or events have, or have not, occurred. Those commenters assert that, in establishing the environmental baseline, the action agency and the Services are not picking and choosing facts, they are observing and recording data on the present conditions. They further assert that the environmental baseline should include both past and present effects of existing structures that

the Federal action agency has no discretion to modify and any impacts from their continued physical existence are not part of the proposed action, which is properly focused on future project operations.

*Response:* As discussed earlier, there are certain consequences from ongoing activities or existing facilities that, in and of themselves, would not be subject to the consultation on a particular proposed action. They are not ignored, however, as they may appropriately be included in discussions of baseline or status of the species or critical habitat. The Services' definition gives appropriate direction on recognizing those circumstances and identifying their consequences.

*Comment:* Several commenters expressed concern that it was difficult to provide informed public input absent any examples of the types of ongoing actions that the Services were intending to address with the suggested definition or the accompanying questions posed regarding the treatment of these challenging cases.

*Response:* As discussed earlier, the Services have added a third sentence to better clarify the issue of capturing the consequences of ongoing activities in the environmental baseline. This third sentence and our supporting example of the Federal dam and water operations provides the type of ''challenging case'' to which we referred in the preamble of the proposed rule.

Definition of Programmatic Consultation

We proposed to add a definition for the term ''programmatic consultation'' to codify a consultation technique that is being used with increasing frequency and to promote the use of programmatic consultations as effective tools that can improve both process efficiency and conservation in consultations. We received numerous comments on the proposed definition, several of which requested further clarification of the definition terms, scope, and geographic extent of activities and process for programmatic consultations. The discussion below contains the Services' responses to these comments.

*Comment:* Some commenters recommended the Services clarify the scope of activities, geographic extent, and coverage for multiple species that can be addressed in a programmatic consultation. Other commenters requested clarification that programmatic consultations are optional processes that can undergo both formal and informal consultations. A few commenters also provided suggestions regarding participation of applicants, multiple Federal agencies, and

information that can be used in the development of the program.

*Response:* Section 7 of the Act provides significant flexibility for Federal agency compliance with the Act, and various forms of programmatic consultations have been successfully implemented for many years now. This final regulation codifies that general practice and provides a definition that is not intended to identify every type of program or set of activities that may be consulted on programmatically. The programmatic consultation process offers great flexibility and can be strategically developed to address multiple listed species and multiple Federal agencies, including applicants as appropriate, for both informal and formal consultations.

While action agencies do have a duty to consult on programs that are considered agency actions that may affect a listed species or critical habitat, many types of programmatic consultation would be considered an optional form of section 7 compliance to, for example, address a collection of agency actions that would otherwise be subject to individual consultation. These optional types of programmatic consultation may be appropriate for a wide range of activities or a suite of programs.

*Comment:* Several commenters expressed concern about the scale at which programmatic consultations would occur. Some wanted to clarify that site-specific ''tiered'' evaluations were required to insure the same level of review for standard consultations, while another was concerned that only site-specific consultations would be completed without an overall ''holistic'' evaluation at the program level.

*Response:* As described in the proposed rule, and in the 2015 incidental take statement final rule (80 FR 26832, May 11, 2015), programmatic consultations may require section 7(a)(2) analyses at both the program level as well as at the tiered or step-down, site-specific level to insure compliance with section 7(a)(2) of the Act. Regardless of the exact process required to complete the consultation for the proposed program activities, all consultations are required to fully satisfy section 7(a)(2) of the Act. Programmatic consultations can be used to assess the effects of a program, plan, or set of activities as a whole. Depending on the type of programmatic consultation, site-specific consultations would be completed using the overarching analysis provided for in the programmatic consultation.

*Comment:* One commenter suggested the Services more clearly explain in the

**Addendum 336a**

preamble to the final rule how the terms "framework programmatic action" and "mixed programmatic action" relate to "programmatic consultation."

*Response:* As defined at § 402.02, "framework programmatic action" and "mixed programmatic action" refer to the way in which an agency's programmatic actions are structured. These definitions are applied specifically in the context of incidental take statements. The definition of "programmatic consultation" refers to a consultation addressing an action agency's multiple actions carried out through a program, region, or other basis. A consultation on either a mixed or framework programmatic action would be characterized as a programmatic consultation. As explained in the 2015 incidental take statement final rule (80 FR 26832, May 11, 2015), a framework programmatic action establishes a framework for the development of specific future actions but does not authorize any future actions and often does not have sufficient site-specific information relating to the project-specific actions that will proceed under the program, but still requires a programmatic consultation to meet the requirements of section 7(a)(2). As specific projects are developed in the future, they are subject to site-specific stepped-down, or tiered consultations where incidental take is addressed. Mixed programmatic actions generally are actions that have a mix of both a framework-level proposed action as well as site-specific proposed actions. Again, the entire mixed programmatic action requires a programmatic consultation, but in this situation, incidental take is addressed "up front" for the parts of those site-specific actions that are authorized in the mixed programmatic consultation, and stepped-down or tiered consultations are required for the future projects that are under the framework part of the proposed action.

*Section 402.13—Deadline for Informal Consultation*

In the proposed rule, we requested public comment on several questions related to the need for and imposition of a deadline on the informal consultation process described within § 402.13. Specifically we asked: (1) Whether a deadline would be helpful in improving the timeliness of review; (2) the appropriate length for a deadline (if not 60 days); and (3) how to appropriately implement a deadline (*e.g.,* which portions of informal consultation the deadline should apply to [*e.g.,* technical assistance, response to requests for concurrence, etc.], when

informal consultation begins, and the ability to extend or "pause the clock" in certain circumstances, etc.).

Based upon the comments received and upon further consideration, the Services have revised the language within § 402.13 to provide a framework and timeline on a portion of informal consultation. The revised regulatory text for § 402.13 is described earlier in this final rule. Here we provide a summary of the comments we received and our responses.

*Comment:* Those commenters who supported the imposition of a deadline generally supported: (1) That the deadline applies to the concurrence request and response aspect of informal consultation, (2) that 60 days seems reasonable (and some suggested an internal or prior time period of 15–30 days for sufficiency review), and (3) that the deadline should be extendable by mutual agreement with the Federal agency and applicant (as appropriate). One commenter was concerned that a 60-day deadline would have the adverse consequence of making 60 days the new norm for concurrence responses rather than the current condition of generally 30 to 45 days.

*Response:* As described at § 402.13, informal consultation is an optional process that includes all discussions, correspondence, etc., between the Services and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. One aspect of the informal consultation process is the further option that, if a Federal agency has determined that their proposed action is not likely to adversely affect listed species or critical habitat, they may conclude their section 7(a)(2) consultation responsibility for that action with the written concurrence of the Services. It is this final aspect of the informal consultation process that has received the most scrutiny and concerns about timeliness and the ability of Federal agencies to proceed with actions that are not likely to adversely affect listed species or critical habitat. The Services specifically requested comment on this issue in the proposed rule, including whether to add a 60-day deadline, subject to extension by mutual consent, for informal consultations.

The Services have considered the comments provided on all sides of this issue. We have developed regulatory text that addresses many of the recommendations; others are addressed in these responses to comments but not within the regulatory text. In summary, the regulatory text applies a 60-day

deadline to the "request for concurrence and Service's written response" aspect of the overall informal consultation process originally described at § 402.13(a) and now moved to § 402.13(c). This new section has been revised to include the deadline for the concurrence process and the requirement on the Federal agency to provide sufficient information in their request for concurrence to support their determination of "may affect, not likely to adversely affect" for listed species and critical habitat in order to start the 60-day clock on the Service's written response. The new § 402.13(c)(2) also provides for the Service's ability to extend the timeline upon mutual agreement with the Federal agency and any applicant for up to an additional 60 days. As a result, the entire written request and concurrence process is allowed a total of 120 days from the Service's receipt of an adequate request for concurrence as described in § 402.13(c)(1).

The Services note that our ability to provide a written response is hampered if we do not receive an adequate request for concurrence. Ideally, the Services should be able to concur in the Federal action agency's well-supported conclusion without having to create unique supplemental substantive analyses. The more that the Services have to supplement the Federal action agencies' own analyses, the more time it will take the Services to determine whether they concur.

The revised regulation points to the types of information required to initiate formal consultation under § 402.14(c)(1) as indicative of the type of information that should be included in a request for concurrence. We also note in the preamble that the level of detail is likely less than that required to initiate formal consultation. Federal agencies, designated non-Federal representatives, and applicants preparing the request for concurrence should draw upon any technical assistance provided by the Services during informal consultation and provide the amount and type of information that is commensurate with the scope, scale, and complexity of the proposed action and its potential effects on listed species and critical habitat. The Services hope to gain efficiencies in avoiding unnecessary back and forth between the Services and Federal agency by describing the information required to obtain the Services' concurrence in the revised regulation. Federal agencies submitting requests for concurrence that contain this information allow the Services to adequately evaluate whether the

concurrence is appropriate and readily meet the 60-day deadline.

Comments regarding a time period for ''sufficiency review'' are referring to the Service's review of the request for concurrence. This review is to determine if the information provided is sufficient for the Services to understand the Federal agency's action and analysis and to evaluate whether we can prepare a written response. Consistent with the approach for initiation of formal consultation, the Services have not included a specific regulatory timeline on any sufficiency review of the request for concurrence. Similar to some formal consultation initiation packages, some requests for concurrence may not initially meet the requirements. The Services are committed to providing review of these requests in a timely fashion to alert the Federal agency if more information is required to constitute an adequate request for concurrence. For formal consultations, the Services typically provide this type of sufficiency review within 30 days of receipt of the request for formal consultation and an accompanying initiation package. A similar timeframe will guide the Services' review of requests for concurrence as well.

Finally, while the revised regulation includes a 60-day deadline for the Service's written response to a request for concurrence, we allow this much time (and the option to extend) to accommodate the wide range in the type of Federal actions for which we receive requests for concurrence. We anticipate that those actions that can be responded to in less time than 60 days will still receive those quicker concurrence responses. We do not expect the revised regulation to result in an increase in numbers of concurrence requests such that our ability to respond within 60 days will be hindered. In those limited instances in which the Services need to extend the deadline for up to 60 additional days, the regulation requires the mutual consent of the Federal agency and any applicant involved in the consultation.

*Comment:* Those commenters opposed to the imposition of a deadline generally did so on one of two bases: (1) The data we present indicates that we generally complete concurrence requests in a timely fashion and so no deadline was necessary, or (2) a deadline could have the effect of truncating or hampering the ability of Federal agencies and the Services to conduct effective informal consultations generally.

*Response:* We have applied the timeline only to the request for concurrence aspect of the informal consultation process. This preserves the ability of Federal agencies, applicants, non-Federal representatives, and the Services to conduct those discussions that form the heart of this optional process without a time constraint. Although the Services generally provide our response to requests for concurrence in a timely fashion, it seems prudent to include both a general timeline for concurrence request responses and an option for extending that timeline to provide certainty and consistency for Federal agencies and applicants planning and proposing actions. Additionally, as discussed above, by specifying the information to be included in a concurrence request, the Services also anticipate gaining additional efficiencies in the informal consultation process.

*Comment:* A few commenters were concerned that failure to achieve mutual consent for time extensions could force the Services to complete their response to a request for concurrence with limited or poor information on the action and its effects.

*Response:* The Services do not believe this concern will result in the outcome predicted by the commenters. Under the new § 402.13(c)(1), the timeframe for the Services' concurrence response only commences once the Services have the information necessary to evaluate the Federal agency's request for concurrence.

*Comment:* A few commenters advocated that a failure by the Services to respond to a request for concurrence within the established deadline should result in an assumed concurrence, so the Federal agency may proceed with their action.

*Response:* The Services decline to make this change. As adopted, the regulation requires the Services to provide their response within the specified timeframe. Additionally, the concurrence of the Services assures the Federal agency that it has appropriately complied with its responsibilities under section 7(a)(2).

*Comment:* Some commenters questioned the consequence of a non-concurrence response from the Service—would formal consultation be automatically initiated? Others proposed that automatic initiation of formal consultation would be the preferred outcome.

*Response:* Formal consultation would not automatically be initiated. Typically, the next step if the Service does not concur with the Federal agency's determination of ''may affect, not likely to adversely affect'' would be either the Federal agency requesting formal consultation or the continuation of informal consultation. Upon receipt of the Service's non-concurrence, there is still an opportunity for the Federal agency to further modify either their action or their supporting analysis in response to information outlined in the Service's response. Such modification could then result in a written concurrence from the Service. Further, the Services cannot automatically initiate formal consultation if we have not already received the information required at § 402.14(c)(1) in the Federal agency's request for concurrence at the level of detail necessary to initiate formal consultation. While the information provided by the Federal agency will have satisfied the requirements of § 402.13(c)(1) for informal consultation, which generally requires the same types of information as § 402.14(c)(1) for formal consultation, the Services decline to require that formal consultation be automatically initiated upon our non-concurrence, since we cannot assume that the information required to initiate formal consultation will have been received or even that formal consultation will be necessary.

*Comment:* A few commenters stated that imposition of a deadline for any aspect of informal consultation would increase the workload and time constraints on Service staff and that any imposed deadline should come with a commensurate increase in Service staff resources to meet such obligations.

*Response:* The Services do not anticipate either an increase in requests for concurrence or time constraints on staff. Currently, the Services are generally delivering concurrence request responses in a timely fashion, and the adopted regulation would allow for time extension requests for actions that require more time to review and respond.

*Section 402.14—Formal Consultation— General—Including What Information is Needed To Initiate Formal Consultation and Considering Other Documents as Initiation Packages*

We proposed to revise § 402.14(c) to clarify what is necessary to initiate formal consultation. We also proposed to allow the Services to consider other documents as initiation packages, when they meet the requirements for initiating consultation. It is important to note the Services did not propose to require more information than existing practice; instead, we clarify in the regulations what is needed to initiate consultation in order to improve the consultation process. The Services adopt these proposed changes, and one non-substantive edit, in this final rule. We

summarize the comments received on these topics and our responses below.

*Comment:* Some commenters supported clarifying what is necessary to initiate the formal consultation process and the description of what is required in the initiation package. Those commenters said the proposed revisions, if implemented, could streamline the consultation process and reduce the need for extensive communications between the Federal agency and the Services to start the consultation process.

*Response:* The Services agree that clarifying what is necessary to initiate the formal consultation process and the description of what is required in the initiation package will help create efficiencies in the section 7 consultation process.

*Comment:* Commenters suggested clarifying the information to be submitted by an applicant to initiate formal consultation (*e.g.,* listing the categories of information required, increasing the use of data sources like GIS that meet appropriate standards, NEPA analyses, conservation work by landowners and agencies, Natural Resource Damage Assessment and Restoration Plans to support the initiation package).

*Response:* Applicants and designated non-Federal representatives may prepare or supply information required as part of the initiation package outlined at § 402.14(c)(1). These are the required elements necessary to initiate consultation. To be clear, this package is submitted to the Services by the Federal agency proposing the action and should also include the Federal agency's information and supporting analyses for the initiation package. As the Services stated in the proposed rule's preamble, in order to initiate formal consultation we will consider whatever appropriate information is provided as long as the information satisfies the requirements set forth in § 402.14(c)(1), including the types of information described by the commenters.

*Comment:* One commenter also suggested that the Services should include language in the final rule specifying that we can request additional information or documentation if an agency's initial submission is deemed inadequate.

*Response:* This proposed change is unnecessary. The Services already request Federal agencies and applicants provide information necessary to initiate consultation when it has not been provided or is unclear in the original initiation package. As discussed for informal consultation above, the Services typically provide this type of

sufficiency review within 30 days of receipt of the request for formal consultation and an accompanying initiation package. No further regulatory language is required to specify that we can request this information because initiation of formal consultation is predicated on provision of the required information as per § 402.14(c)(1). Further, as already provided by § 402.14(d) and (f), additional information may be needed or requested by the Services during the formal consultation, once it is initiated.

*Comment:* One commenter suggested that the Federal Energy Regulatory Commission's decision not to require a study under the Federal Power Act should not be construed as a failure to meet the information requirements to initiate consultation under the Act.

*Response:* In general, 50 CFR 402.14(d) provides that the Federal agency requesting formal consultation is required to provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. The Federal Energy Regulatory Commission's decision whether or not to require a study under the Federal Power Act will generally occur before that Federal agency would request initiation of formal consultation. The requirements for information that the Federal agency must submit to the Service to initiate formal consultation are described at § 402.14(c)(1). The Service's determination of whether or not the Federal agency has provided sufficient information to meet the requirements to initiate formal consultation under § 402.14(c)(1) will depend on the specific information that the Federal agency submits and the specific circumstances for each request.

After formal consultation has been initiated, § 402.14(f) provides that the Service may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. The Service's request for additional data after initiation of formal consultation is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act (or § 402.14(c)(1)). If the Federal agency does not agree to the request for extension of formal consultation, the Service will issue a biological opinion using the best scientific and commercial data available.

*Comment:* Commenters suggested that the Services should clarify that, upon the submittal of such information, formal consultation is initiated for purposes of starting the clock by which the deadline for completing consultation will be measured.

*Response:* The prior regulations at § 402.14(c) and (d), and the revision to § 402.14(c) in this rule, are clear that a request to initiate consultation shall include the list of information provided at § 402.14(c)(1) and use the best scientific and commercial data available. Requests received that meet these criteria constitute an "initiation package" and thus start the consultation "clock." Incomplete requests do not constitute an "initiation package" and therefore the consultation "clock" does not begin until the information is received. No further regulatory language is needed.

*Comment:* One commenter suggested striking language implying that an additional information request by the Service under § 402.14(f) may impose a study-funding mandate or obligation upon an applicant or non-Federal party.

*Response:* The Services decline to change the language in § 402.14(f). This language provides that the Service may request additional information necessary to formulate the Service's biological opinion once formal consultation has been initiated. Section 402.14(f) further states that the responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. Because the ultimate responsibility to comply with section 7(a)(2) lies with the Federal agency and not the Service, this language clarifies that the Service is not responsible for conducting or funding the requested studies.

*Comment:* One commenter stated that the contents of recovery plans do not dictate the outcome of the section 7 consultation process.

*Response:* We agree that recovery plans do not dictate the outcome of a section 7 consultation. However, the Services believe it is appropriate to use relevant information and recommended actions and strategies found in recovery plans along with other identified best scientific and commercial data available as we consult with Federal agencies and applicants. We encourage Federal agencies and applicants to become familiar with recovery plans for species they may affect, as this can assist them in developing proposed actions that avoid, reduce, or offset adverse effects or propose actions that address recommended recovery actions.

**Addendum 339a**

*Comment:* One commenter suggested support for the proposed definition of programmatic consultation and the use of programmatic consultations and the addition to § 402.14(c)(4).

*Response:* As discussed above, the Services agree that increasing the use of programmatic consultations will increase efficiency, reduce costs, and still fulfill section 7(a)(2) responsibilities.

*Comment:* One commenter suggested that the Services should commit to a set timeframe for notifying the Federal agencies if the initiation package is complete for non-major construction activities (*e.g.,* 30 to 45 days should be sufficient).

*Response:* The 1998 Consultation Handbook already specifies that for formal consultation leading to the development of a biological opinion the Services should, within 30 days, acknowledge the receipt of the consultation package and advise if additional information necessary to initiate consultation is required. This is the same timeframe for the Services to respond to a Federal agency's biological assessment prepared for a major construction activity under § 402.12(j). For biological assessments, § 402.12(f) provides that "the contents of a biological assessment are at the discretion of the Federal agency." This regulation continues to govern the Federal agency's responsibilities for the contents of a biological assessment; however, for purposes of initiation of formal consultation under § 402.14(c)(1), the Federal agency also is required to provide the specified information in § 402.14(c)(1) consistent with the nature and scope of the action. Although § 402.12(j) allows that "at the option of the Federal agency, formal consultation may be initiated under § 402.14(c) concurrently with the submission of the assessment," this language does not relieve the Federal agency of the requirement to submit a complete initiation package per § 402.14(c)(1), but does give the Federal agency the option to include such information along with the contents of their biological assessment.

*Comment:* One commenter stated that the Services have proposed a massive rewrite of § 402.14(c) without explaining to the public the underlying rationale for any of the changes in any detail. Thus, the proposal fails to meet the basic requirements of the Administrative Procedure Act, is not rational, and is arbitrary and capricious.

*Response:* The Services disagree that the revisions to § 402.14(c) are a massive rewrite of the section. As discussed in the preamble to the proposed rule, the

Services are not requiring more information than existing practice. The Services adopt the changes to § 402.14(c) based on years of experience implementing section 7 of the Act and believe that the revisions will provide clarity to the consultation process, increase efficiencies in the process, and meet Administrative Procedure Act requirements. The revisions to the language are based on the experiences of the Services and are intended to better describe the types of information required and the level of detail sufficient to initiate formal consultation. This rationale is explained in the preamble to the proposed regulations at 83 FR at 35186 (July 25, 2018).

*Comment:* One commenter suggested the Services not include § 402.14(c)(1)(i)(A) (the purpose of the action) because they do not believe the purpose of the action is relevant to the consultation.

*Response:* The Services decline to remove the requirement for a description of the purpose of the action from the initiation package at § 402.14(c)(1). The purpose of the action is important for the Services to understand and most effectively consult with Federal agencies and applicants in a variety of ways. During consultation, an understanding of the intended purpose of the action assists the Services in shaping recommendations they may make to avoid, minimize, or offset the adverse effects of proposed actions. Further, the purpose of the action is an important consideration when determining what activities may be caused by the proposed Federal actions and for determining what effects may result in take of listed species that is incidental to the purpose of the proposed action. Finally, the definition of reasonable and prudent alternative at § 402.02 includes the requirement that the alternative "can be implemented in a manner consistent with the intended purpose of the action."

*Section 402.14—Service Responsibilities—General*

We proposed to revise portions of § 402.14(g) that describe the Services' responsibilities during formal consultation. We proposed to clarify the analytical steps the Services undertake in formulating a biological opinion. In § 402.14(g)(4), we proposed to move the instruction that the effects of the action shall be added to the environmental baseline from the current definition of "effects of the action" to where this provision more logically fits with the rest of the analytical process. We have adopted these proposed changes in this final rule and provide the comments

received on these changes and our responses below.

*Comment:* One commenter requested that the Services revise § 402.14(g)(4) to add text to reiterate the appropriate test for jeopardy as follows: "Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species by appreciably reducing the likelihood of both survival and recovery of the species, and not recovery alone, or result in the destruction or adverse modification of critical habitat."

*Response:* The term "jeopardize the continued existence" is already defined in regulations at § 402.02. All subsequent uses of this terminology are referenced to that definition and thus no further clarification is needed in § 402.14(g)(4).

*Comment:* A couple of commenters suggested the Services clarify that nothing in the Act requires Service staff to utilize worst-case scenarios or unduly conservative modeling or assumptions.

*Response:* The commenters are correct that nothing in the Act specifically requires the Services to utilize a "worst-case scenario" or make unduly conservative modeling assumptions. The Act does require the use of the best scientific and commercial data available by all parties and obligates Federal agencies to insure their actions are not likely to jeopardize listed species or adversely modify critical habitat. The best scientific and commercial data available is not limited to peer-reviewed, empirical, or quantitative data but may include the knowledge and expertise of Service staff, Federal action agency staff, applicants, and other experts, as appropriate, applied to the questions posed by the section 7(a)(2) analysis when information specific to an action's consequences or specific to species response or extinction risk is unavailable. Methods such as conceptual or quantitative models informed by the best available information and appropriate assumptions may be required to bridge information gaps in order to render the Services' opinion regarding the likelihood of jeopardy or adverse modification. Expert elicitation and structured decision-making approaches are other examples of approaches that may also be appropriate to address information gaps. In all instances, chosen scenarios or assumptions should be appropriate to assist the Federal agency in their obligation to insure their action is not likely to jeopardize listed species or adversely modify critical habitat.

**Addendum 340a**

*Comment:* Commenters support expanded opportunities for participation by States, applicants, and designated non-Federal representatives in the section 7(a)(2) consultation process, including the review of the underlying data and scientific analyses being considered and greater input into any potential jeopardy or adverse modification finding, the development of reasonable and prudent alternatives and minimization measures, and all parts of the draft biological opinion.

*Response:* The Services already involve designated non-Federal representatives and applicants during key points of the consultation development process and will continue to do so as appropriate. Federal action agencies are best positioned to engage and encourage the involvement of applicants and designated non-Federal representatives in the review of draft biological opinions. The consultation process is intended to assist the Federal action agency in meeting its section 7(a)(2) obligations under the Act. Applicants and designated non-Federal representatives play an important role in this process. States may be engaged by Federal action agencies and applicants during the development of the proposed actions and supporting analyses.

*Comment:* One commenter suggested that the Federal agency or applicants be involved in the development of "Reasonable Prudent Measures" and/or "Terms and Conditions" as needed to ensure they are implementable and do not require major alterations of the proposed action of a plan or project in terms of design, location, scope, and results.

*Response:* The Services already involve Federal action agencies and applicants during key points of the consultation development process and will continue to do so as appropriate. Federal action agencies are best positioned to engage and encourage the involvement of applicants and designated non-Federal representatives in the review of draft biological opinions, including draft incidental take statements.

*Comment:* One commenter requested that when proposed actions have the potential to affect tribal rights or interests, formal consultation section pursuant to § 402.14(l)(3) should require disclosure of all information to affected tribes, adherence to policies regarding consultation with Native American governments, and an analysis of how the action or reasonable and prudent alternatives comport with the conservation necessity standards embodied in Secretarial Order 3206,

NOAA Procedures for Government-to-Government Consultation with Federally Recognized Indian Tribes and Alaska Native Corporations, and the FWS Native American Policy.

*Response:* As discussed above, the Services will continue to comply with Secretarial Order 3206, NOAA Procedures, and the FWS Native American Policy and other applicable tribal policies as we implement our section 7 responsibilities.

*Comment:* One commenter supports the codification that the Services will give "appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of the consultation."

*Response:* Most of the quoted language, with the exception of "as proposed," is already included in § 402.14(g)(8) and has been retained in the revisions to that provision. This final rule codifies the language the commenter supported.

*Comment:* One commenter suggested that the definition of a programmatic consultation should be modified to "clarify that the Services may utilize programmatic consultations and initiate concurrent consultations for multiple similar agency actions."

*Response:* The adopted definition of programmatic consultation already encompasses the commenters' request, making the proposed change unnecessary. As discussed above, programmatic consultations are flexible consultation tools that may be developed based on the circumstances of the proposed action and the Federal agency(ies) involved.

*Comment:* One commenter suggested that the consultation "clock" should start at the point the submission of a written request for formal consultation is transmitted to the Service with a certification that it has transmitted to the Service all of the relevant and available information upon which the action agency's request for consultation and opinion has been made.

*Response:* The Federal agency is obligated to provide the information necessary to initiate formal consultation. It is the Services' responsibility to determine that we have sufficient information to initiate formal consultation. The adopted language at § 402.14(c)(1) defines the information necessary to initiate formal consultation. We adopt this list to clarify and reduce confusion about the necessary information and create greater efficiencies in the section 7 consultation process. Starting the "clock" at the point suggested by the commenter truncates the time necessary to obtain

needed information if it was not in fact provided, reduces the ability of the Services to adequately coordinate with the Federal agency, non-Federal representative and/or applicant, and could actually lengthen the consultation process because of the need on the part of the Services to request additional information during consultation.

*Comment:* One commenter suggested that the Services have not clarified the language pursuant to formal consultations (§ 402.14) and that measures intended to avoid, minimize, or offset effects of an action are not required elements of an "initiation package" submitted by a Federal agency for the consultation.

*Response:* Consistent with the Services' existing consultation approaches, we are adopting revisions to § 402.14(c) to ensure that a Federal agency submits an adequate description of the proposed action, including available information about any measures intended to avoid, minimize, or offset effects of the proposed action. The request for a description of measures to avoid, minimize, or offset project impacts applies in those cases where these types of measures are included by the Federal agency or applicant as part of the proposed action and is not intended to require these types of measures for all proposed actions. Provided the Federal agency submits the information required by § 402.14(c)(1), the Services will take into consideration the effects of the action as proposed, both beneficial and adverse.

*Section 402.14(g)(4)—Service Responsibilities—Clarifying the Analytical Steps by Which the Services Integrate and Synthesize Their Analyses To Reach Jeopardy and Adverse Modification Determinations*

In § 402.14(g)(4), we proposed revisions to better reflect the manner in which the Services integrate and synthesize their analyses of effects of the action with cumulative effects, the environmental baseline, and status of the species and critical habitat to reach our jeopardy and adverse modification determinations. This proposed change reflects the Services' existing approach, and we adopt those proposed changes in this final rule. The comments and our responses on those changes are below.

*Comment:* Some commenters supported the proposed language at § 402.14(g)(4) because it allows other agencies and the public to understand the process, and the expectations, when biological opinions are being developed.

*Response:* The Services agree that the proposed language at § 402.14(g)(4) will

**Addendum 341a**

clarify and support gains in efficiencies in the section 7 consultation process.

*Comment:* Commenters stated that § 402.14(g) does not explain the meaning of the phrase "current status of the listed species or critical habitat" in relationship to how we assess jeopardy and destruction/adverse modification of critical habitat.

*Response:* The adopted regulations are not intended to change the manner in which the Services use the status of the listed species or critical habitat when completing its jeopardy and destruction/adverse modification analyses. Further discussion on how we use the current status of listed species and critical habitat can be found in the Services' 1998 Consultation Handbook, especially Chapter 4—Formal Consultation.

*Comment:* One commenter urges the Services to clarify that the final rule does not require any increase in the level of detail provided in the initiation package.

*Response:* The Services' adopted regulatory text at § 402.14(c)(1) clarifies what type of information is necessary to initiate the formal consultation process. Although we have added language to describe the level of detail needed to initiate consultation, this level of detail has not changed from the expectations of the preceding § 402.14(c) regulations and should be commensurate with the scope of the proposed action and the effects of the action.

*Comment:* One commenter suggested that § 402.14(g) should include consideration and deference to tribal management plans to protect listed species.

*Response:* Consistent with Secretarial Order 3206, including Appendix Section 3(c), the Services provide timely notification to affected tribes when the Services are aware that a proposed Federal agency action subject to formal consultation may affect tribal interests. Among other things, the Services facilitate the use of the best scientific and commercial data available by soliciting information, traditional knowledge, and comments from, and utilize the expertise of, affected Tribes. The Services also encourage the Federal agency to involve affected Tribes in the consultation process, which may involve consideration of tribal management plans to protect listed species and to consider such plans in the formulation of reasonable and prudent alternatives.

*Comment:* One commenter believed that § 402.14(g)(4) should be clarified to reflect that it is the responsibility of a project proponent under section 7(a)(2) of the Act to avoid or offset prohibited effects associated with the incremental impact of the proposed action that is the subject of consultation.

*Response:* Section 402.14(g)(4) describes the final step in the Services' analytical approach in evaluating a proposed action. Requiring every proposed action to avoid or offset the incremental impact of the proposed action would be inconsistent with the applicable standards for determining jeopardy and destruction or adverse modification under the Act.

Clarifications to § 402.14(g)(8) Regarding Whether and How the Service Should Consider Measures Included in a Proposed Action That Are Intended To Avoid, Minimize, or Offset Adverse Effects to Listed Species or Critical Habitat

We proposed clarifications to § 402.14(g)(8) regarding whether and how the Services should consider measures included in a proposed action that are intended to avoid, minimize, or offset adverse effects to listed species or critical habitat. Federal agencies often include these types of measures as part of the proposed action. However, the Services' reliance on a Federal agency's commitment that the measures will actually occur as proposed has been repeatedly questioned in court. The resulting judicial decisions have created confusion regarding what level of certainty is required to demonstrate that a measure will in fact be implemented before the Services can consider it in a biological opinion. In particular, the Ninth Circuit has held that even an expressed sincere commitment by a Federal agency or applicant to implement future improvements to benefit a species must be rejected absent "specific and binding plans" with "a clear, definite commitment of resources for future improvements." *Nat'l Wildlife Fed'n* v. *Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 935–36 (9th Cir. 2008). To address this issue, we are proceeding with the revisions to § 402.14(g)(8), including the changes described in Discussion of Changes from Proposed Rule, above. We summarize the comments and provide our responses on the changes to § 402.14(g)(8) below.

*Comment:* Some commenters opposed the changes and recommended that the text be modified in the final rule to specify that the action agency and/or applicant must establish specific plans and/or resource commitments to ensure that the conservation measures are implemented. In their view, if the proponent agency expects credit for proposing beneficial actions, then there must be additional assurance that those actions will take place. Some commenters stated the proposal was irrational and inconsistent with case law, including Ninth Circuit precedent in *Nat'l Wildlife Fed'n* v. *Nat'l Marine Fisheries Serv.,* 524 F.3d 917 (9th Cir. 2008), and will add further confusion to the case law on the issue.

*Response:* We disagree with the commenters' recommendation to create a heightened standard of documentation, such as requiring binding plans or clear resource commitments, before the Services can consider the effects of measures included in a proposed action to avoid, minimize, or offset adverse effects. The revisions to § 402.14(g)(8) are intended to address situations where a Federal agency includes measures to avoid, minimize, or offset adverse effects to species and/or critical habitat as part of the proposed action they submit to the Services for consultation, or where such measures are included as part of a reasonable and prudent alternative.

Section 7 of the Act places obligations on Federal agencies to insure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat. A Federal agency fulfils this substantive obligation "in consultation with" and "with the assistance of" the Services. In situations where an adverse effect to listed species or critical habitat is likely, the consultation with the Services results in a biological opinion that sets forth the Services' opinion detailing how the agency action affects the species or its critical habitat. Ultimately, after the Services render an opinion, the Federal agency must still determine how to proceed with its action in a manner that is consistent with avoiding jeopardy and destruction or adverse modification. Thus, the Act leaves the final responsibility for compliance with section 7(a)(2)'s substantive requirements with the Federal action agencies, not the Services.

Our regulatory revisions are consistent with the statutory scheme by recognizing that the Federal agencies authorizing, funding, and carrying out the action are in the best position to determine whether measures they propose to undertake, or adopt as part of a reasonable and prudent alternative, are sufficiently certain to occur. Put simply, if the commitment to implement a measure is clearly presented to the Services as part of the proposed action consistent with § 402.14(c)(1), then the Services will provide our opinion on the effects of the action if implemented as proposed.

**Addendum 342a**

We do not interpret the statutory phrases "in consultation with" and "with the assistance of" to require the Services to ignore beneficial effects of measures included in the proposed action to avoid, minimize, or offset adverse effects unless action agencies meet some heightened bar of documentation regarding their commitment. To the contrary, we interpret the Act as requiring the Services to consider the effects of the proposed action in its entirety, including aspects of the proposed action with adverse or beneficial effects.

Some courts have inappropriately conflated the Services' role with that of the action agency by concluding the Services cannot lawfully consider measures proposed to avoid, minimize, or offset adverse effects unless we second guess the intent and veracity of an action agency's commitments. The resulting case law has led to confusion. For instance, the Ninth Circuit has held that even an expressed sincere commitment by a Federal agency or applicant to implement future improvements to benefit a species must be rejected absent "specific and binding plans" with "a clear, definite commitment of resources for future improvements." *Nat'l Wildlife Fed'n* v. *Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 935–36 (9th Cir. 2008). More recently the Ninth Circuit held that its "precedents require an agency to identify and guarantee" measures to avoid, minimize, or offset adverse effects only to the extent the measures "target certain or existing negative effects" of the proposed action. *Defs. of Wildlife* v. *Zinke,* 856 F.3d 1248, 1258 (9th Cir. 2017). In some cases, courts have also stated that "mitigation measures supporting a biological opinion's no-jeopardy conclusion must be 'reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.' *Ctr. for Biological Diversity* v. *Rumsfeld,* 198 F.Supp.2d 1139, 1152 (D.Ariz. 2002) (citing *Sierra Club* v. *Marsh,* 816 F.2d 1376 (9th Cir. 1987))." *Klamath-Siskiyou Wildlands Ctr.* v. *Nat'l Oceanic & Atmospheric Admin.,* 99 F. Supp. 3d 1033, 1055 (N.D. Cal. 2015). However, the Ninth Circuit has also indicated that the question of whether measures to avoid, minimize, or offset adverse effects are sufficiently enforceable turns on whether or not the measures are included in the proposed action,

concluding that "[i]f [the measures] are part of the project design, the [Act]'s sequential, interlocking procedural provisions ensure recourse if the parties do not honor or enforce the agreement, and so ensure the protection of listed species." *Ctr. for Biological Diversity* v. *U.S. Bureau of Land Mgmt.,* 698 F.3d 1101, 1115 (9th Cir. 2012). We disagree with the commenter that the regulatory revisions to § 402.14(g)(8) will add to the confusion of the current case law on the subject. Instead, we believe it will resolve confusion by explaining our interpretation of the statute.

The regulatory change to § 402.14(g)(8) is to make it clear that, just like aspects of the proposed action with adverse effects, the Services are not required to obtain binding plans or other such documentation prior to being able to lawfully evaluate the effects of an action as proposed, including any measures included in the proposed action that would avoid, minimize, or offset adverse effects. However, the Services are also moving forward with revisions to § 402.14(c)(1). Those revisions require a Federal agency seeking to initiate formal consultation to provide a description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the proposed action. If the description of proposed measures fails to include the level of detail necessary for the Services to understand the action and evaluate its effects to listed species or critical habitat, then the Services will be unable to take into account those effects when developing our biological opinion. To avoid confusion and reinforce that an appropriate level of specificity regarding the description of measures included in the proposed action may be necessary to provide sufficient detail to assess the effects of the action on listed species and critical habitat, the Services eliminated the reference to "specific" plans in our final revisions to § 402.14(g)(8). The Services do not intend to hold these actions to either a higher or lower standard than any other type of action or measure proposed by a Federal agency. Any type of action proposed by a Federal agency receives a presumption that it will occur, but it must also be described in sufficient detail that the Services can both understand the action and evaluate its adverse effects and beneficial effects.

The Services also retain the discretion to advise Federal agencies about all aspects of measures proposed to avoid, minimize, or offset adverse effects to assist them in making an informed determination regarding compliance with section 7 and to assist in achieving the greatest conservation benefit.

Moreover, the Services retain the discretion to develop reasonable and prudent measures and associated terms and conditions related to implementation of the proposed action, including the proposed conservation measures, if appropriate (*e.g.,* minimizes the impact of the incidental take and is consistent with § 402.14(i)(2)). Therefore, the revisions to § 402.14(g)(8) in this final rule do not undermine the Services' ability to provide consultation and assistance to Federal agencies related to measures proposed to avoid, minimize, or offset adverse effects. Rather, the revisions merely clarify that Federal agencies seeking to engage in section 7 consultation with the Services are in the best position to define the action being proposed and ultimately comply with section 7's substantive mandate to avoid jeopardy and destruction or adverse modification.

*Comment:* Some commenters stated that there are examples of projects where resource impacts occurred, but that years later, measures to offset those adverse effects had not been implemented. According to some commenters, history provides numerous examples of action agencies (or the Services themselves in the development of reasonable and prudent alternatives): (1) Promising more than they could deliver in order to alleviate the harmful effects of a proposed action; and/or (2) making optimistic assumptions about the efficacy of the measures that fall far short of what's needed to avoid jeopardy. Therefore, some commenters believed the Services should require that all measures proposed to avoid, minimize, or offset adverse effects demonstrate clear and binding plans with financial assurances.

*Response:* As described above, the regulatory revisions in § 402.14(g)(8) are consistent with the statutory text and retain the Federal action agencies' substantive duty to insure that their actions are not likely to jeopardize the continued existence of listed species or result in destruction or adverse modification of designated critical habitat. An action agency that fails to implement the measures proposed to avoid, minimize, or offset adverse effects risks violating the substantive provisions of the Act, engaging in conduct prohibited by section 9, and increasing its vulnerability to enforcement action by the Services or citizen suits under section 11(g) of the Act. This is particularly true if reinitiation of consultation was required based on the failure to implement a proposed measure and the Federal agency fails to reinitiate consultation. For instance, our regulations at § 402.16

**Addendum 343a**

require reinitiation of consultation if the amount or extent of take specified in the incidental take statement is exceeded, if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, and if the action is subsequently modified in a manner that causes an effect to listed species or critical habitat that was not considered in the biological opinion. Failure to implement a measure proposed to avoid, minimize, or offset adverse effects could implicate those reinitiation triggers. Accordingly, we do not believe the revisions will encourage promises of implementing measures to avoid, minimize, or offset adverse effects that are unrealistic or unachievable.

Regarding the potential for overly optimistic assumptions about the efficacy of measures included in the proposed action to avoid, minimize, or offset adverse effects, nothing in this rule alters the requirement under the Act to use the best scientific and commercial data available when the Services evaluate the effects of a proposed action, including measures proposed to avoid, minimize, or offset adverse effects. This rule also requires Federal agencies to submit information about the measures being proposed to avoid, minimize, or offset adverse effects (§ 402.14(c)(1)) at a level of detail sufficient for the Services to understand the action and evaluate the effects of the action. Thus, we anticipate that, if anything, this rule will improve the availability and quality of information that the Services can use to evaluate the efficacy of proposed actions, including measures proposed to avoid, minimize, or offset adverse effects.

*Comment:* Some commenters stated support for the proposed changes and said the proposed text would incentivize Federal agencies and project proponents to develop measures to avoid, minimize, or offset adverse effects and may result in greater conservation. Other commenters noted that the applicant and Federal action agency are in the best position to determine the scope of the proposed action and what avoidance, minimization, or other measures can be implemented during the duration of the project, and those measures will be supported by the "best scientific and commercial data available." Some commenters agreed that the proposed changes help to clarify that the Services are not required seek "binding" plans or a clear and definite commitment of resources before measures included in a proposed action can be considered by the Services.

*Response:* The Services appreciate the comments. We believe the regulatory changes will, under certain circumstances, encourage Federal agencies and applicants to commit to implementing measures intended to avoid, minimize, or offset adverse effects. We also agree that the applicant and Federal action agency are in the best position to evaluate what commitments can be made as part of the proposed action. Section 7 consultations will continue to be based upon the best scientific and commercial data available.

*Comment:* Some commenters asserted that the Services should require specific steps of Federal agencies before considering the effects of measures proposed to avoid, minimize, or offset adverse effects, including: (1) Having those actions included in the actual project description in NEPA documents or the biological assessment; (2) having the Federal agency determine the actions are within their authority; (3) requiring signed agreements between the agency and other cooperators if there is off-site restoration; and (4) having a reinitiation of consultation clause if the actions are not implemented. Other commenters felt that the Services should determine that the plan to avoid, minimize or offset the effects of a proposed action is credible, that the plan for funding such measures is reasonable, and that there are no known obstacles that may keep the measures from being carried out. Some stated that measures to offset adverse effects should outline the amount and type of measures that will be carried out and what mechanism will be used to satisfy the commitment (*e.g.,* conservation bank). If applicants will be undertaking the measure directly, one commenter believed the Services should approve the final plan, and it should be attached or included by reference. One commenter also stated that all plans should take into account established agency guidance on the use of conservation banks and offsetting losses of aquatic resources.

*Response:* We decline to alter our proposed regulatory text in the manner suggested on these issues for a variety of reasons. First, this rule modifies § 402.14(c) to require information about measures included in a proposed action to avoid, minimize, or offset adverse effects as a prerequisite to initiating formal consultation. Therefore, there is no need to specify that the description of those measures also be included in the project design description in a NEPA document or biological assessment, although we anticipate such measures would also be described in

those documents. Similarly, the information required by § 402.14(c) will be sufficient to address the commenter's point about needing information about the type, amount, and mechanisms by which measures will be carried out. In our experience, a Federal agency also would not include a measure as part of its proposed action if it lacked authority to do so, and we do not need additional regulatory provisions to address that concern. Regarding signed agreements with cooperators if off-site measures are involved, the Federal agency proposing the action is responsible for determining the appropriate nature and timing of agreements with cooperators. Finally, our regulations already specify the triggers for reinitiation. Those triggers are adequate to require reinitiation in circumstances where measures are not implemented as proposed and where the failure to implement would alter the effects to listed species or critical habitat. As described elsewhere in our responses to comments, the Services decline to add additional steps, such as the need for a Service-approved plan or additional documentation prior to the Services' evaluation of the action as proposed. We acknowledge agency guidance on measures intended to avoid, minimize, or offset adverse effects can be useful for numerous reasons and could help inform a Federal agency or applicant regarding best practices for ensuring the success of proposed measures, but we decline to require the use of specific agency guidance on measures to avoid, minimize, or offset adverse effects, which can vary over time.

*Comment:* Some commenters were concerned that the Services have few resources dedicated to compliance monitoring and that a Federal agency's failure to complete the action as proposed cannot adequately be considered through reinitiation of consultation. Reinitiation would not ensure that implementation of the action up until the point at which the agency determines it will not implement a measure avoids jeopardy. The second option mentioned, complying with an incidental take statement, would provide no assurance that the measure is implemented, unless it is actually included as a reasonable and prudent measure as part of the incidental take statement. Another commenter stated the proposal in essence means the Services are not required to police the Federal agency, which could provoke conflict among and between the Services and agencies and require the expenditure of additional resources by agencies apart from the Service.

**Addendum 344a**

*Response:* Nothing in this final rule reduces the Services' resources available for compliance monitoring or reduces the Services' ability to require monitoring and reporting requirements as part of an incidental take statement. The Services regularly impose monitoring and implementation reporting requirements to validate that the effects of a proposed action are consistent with what was analyzed in the biological opinion, and we intend for that practice to continue. Therefore, the final rule will not interject new elements that might provoke conflict among and between the Services and Federal agencies.

As described above, an action agency that fails to implement the measures proposed to avoid, minimize, or offset adverse effects risks violating the substantive provisions of the Act, engaging in conduct prohibited by section 9, and increasing its vulnerability to enforcement action by the Services or citizen suits under section 11(g) of the Act. This is particularly true if reinitiation of consultation was required based on the failure to implement a proposed measure and the Federal agency fails to reinitiate consultation.

We disagree with the commenter that reinitiation of consultation fails to ensure that implementation of the action avoids jeopardy up until the point at which the agency determines it will be unable to implement a measure intended to avoid, minimize, or offset adverse effects. When the Services consider the effects of proposed actions on listed species and critical habitat, that process includes a consideration of the timing and scope of activities that will be implemented. If a proposed action later changes due to measures not being carried out, the adverse effects up until that point must still avoid jeopardy and destruction or adverse modification. Therefore, we believe reinitiation is an appropriate response in the event an action is subsequently modified in a manner that has effects to species or critical habitat that were not previously considered. Once consultation is reinitiated, an action agency must not make irreversible or irretrievable commitments of resources that will foreclose the formulation of reasonable and prudent alternatives, and the substantive duty to avoid jeopardizing listed species and destroying or adversely modifying critical habitat remains. If adverse effects have occurred, those will be taken into account in the reinitiated consultation and the formulation of reasonable and prudent alternatives if necessary. Given the action agencies'

substantive obligations under section 7, we do not anticipate our proposed changes to § 402.14(g)(8) will result in measures intended to avoid, minimize, or offset adverse effects being proposed with deceptive intentions.

With regard to the incidental take statement, the Services must make a determination on what reasonable and prudent measures are necessary or appropriate to minimize the impact of take on a case-by-case basis. It would be inappropriate to determine what reasonable and prudent measures and implementing terms and conditions are necessary or appropriate, including reporting requirements to monitor progress, before the Services evaluate the effects of a particular proposed action.

*Comment:* One commenter stated that if the Services are not required to obtain proof of "specific and binding plans" for implementation of minimization measures it would undermine the credibility of effects determinations and complicate the identification of the environmental baseline in future consultations, to the potential disadvantage of future project proponents. Other commenters felt that as a result of this proposed change, there will likely be situations in which the Services make decisions about the adverse impacts of an agency action based on incomplete information with no assurance the beneficial action will occur or create any benefit to species or habitat to offset adverse impacts.

*Response:* We disagree that the regulatory revisions will undermine the credibility of effects determinations. These regulations do not alter the requirement for Federal agencies and the Services to use the best scientific and commercial data available. As described above, the information needed to initiate consultation now includes a requirement to describe any measures included to avoid, minimize, or offset adverse effects. Thus, the Services will not be evaluating the effects of proposed actions with insufficient information. We do not interpret the Act as requiring a heightened standard of assurances, beyond a sincere commitment and inclusion of a proposed measure as part of the action under consultation, before the Services can lawfully evaluate the effects of the action.

The revisions to § 402.14(g)(8) also will not complicate the identification of the environmental baseline to the disadvantage of future project proponents. The relevant portions of the environmental baseline definition are unchanged in this final rule and will continue to take into account the past

and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions that are contemporaneous with the consultation in process. In any circumstance where a proposed action is subsequently modified and results in effects not previously considered, reinitiation of consultation would likely be required and would be accounted for in the environmental baseline of future consultations as appropriate.

*Comment:* One commenter remained concerned that, even with the proposed clarification, the Services may continue to exclude from consideration conservation measures that are funded by the applicant but undertaken by another entity or conducted by a related party. The commenter therefore requested that the proposed regulatory text in 50 CFR 402.14(g)(8) be further modified to state that ". . . the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed, or taken, funded or otherwise sponsored by the Federal agency, applicant, or related party, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action regardless of their geographic proximity to the proposed action, and do not require any additional demonstration of specific binding plans or a clear, definite commitment of resources."

*Response:* We appreciate the comment but decline to adopt regulatory language that would categorically expand the scope of beneficial actions due "appropriate consideration" under § 402.14(g)(8) to include actions by "related parties." Such a regulatory change is unnecessary. Beneficial actions taken or proposed in consultation by any entity are considered by the Services when developing its biological opinion by being included in the environmental baseline, cumulative effects, or the effects of the action under consultation, as appropriate.

We also decline to categorically include revisions that would expand the scope of measures that would be "considered like other portions of the action" to include those actions "regardless of their geographic

**Addendum 345a**

proximity to the proposed action." If a proposed measure is not within the geographic proximity of the other components of the proposed action, but would nonetheless have effects to listed species or critical habitat, then the action area would include the area affected by the proposed offsite measures and the effects to listed species and critical habitat would be considered during consultation to the extent they are relevant. No regulatory change is needed for that to occur.

In addition, from a critical habitat perspective, insertion of the phrase "regardless of their geographic proximity to the proposed action" would be inappropriate because measures implemented outside critical habitat would often not offset the effects of the Federal action on that critical habitat. This is because critical habitat is a specifically designated area that identifies those areas of habitat believed to be essential to the species' conservation.

*Comment:* One commenter stated concerns about requiring the information necessary to initiate formal consultation to include "the specific components of the action and how they will be carried out." With respect to beneficial actions, this provision is likely too restrictive.

*Response:* We appreciate the commenter's concern but decline to alter the scope of information necessary to initial formal consultation pursuant to § 402.14(c)(1). We continue to acknowledge, like we stated in the proposed rule, that there may be situations where a Federal agency may propose a suite or program of measures that will be implemented over time. The future components of the proposed action often have some uncertainty with regard to the specific details of projects that will be implemented. Nevertheless, a Federal agency or applicant may be fully capable of committing to specific levels and types of actions (*e.g.*, habitat restoration) and specific populations or species that will be the focus of the effort. If the Federal agency provides information in sufficient detail for the Services to meaningfully evaluate the effects of measures proposed to avoid, minimize, or offset adverse effects, the Services will consider the effects of the proposed measures as part of the action during a consultation. We believe the information requirements contained in § 402.14(c)(1) will help provide the necessary detail to evaluate the effects of measures proposed to avoid, minimize, or offset adverse effects.

*Comment:* Some commenters stated that the Act requires all Federal agencies to "insure" their actions will

avoid jeopardy and destruction or adverse modification of critical habitat. Mere promises of future benefits to species and their habitat in order to offset present adverse impacts does not meet this "insure" standard, which Congress characterized as the "institutionalization of caution."

*Response:* As described in the responses to comments above, this final rule does not alter the obligation for Federal agencies to "insure" their actions are not likely to jeopardize listed species or destroy or adversely modify critical habitat. The Services will continue to consult with, and provide assistance to, Federal agencies in their compliance with their requirements under section 7, but the Services are not required by the Act to obtain a specific demonstration of the binding nature of a Federal agencies' commitments prior to evaluating the effect of those commitments and providing our biological opinion. If a measure proposed to avoid, minimize, or offset adverse effects is essential for avoiding jeopardy or destruction or adverse modification, then implementation of that measure must occur at a time when the biological benefits to the species and/or habitat are occurring in a temporal sequence such that adverse effects cannot first result in jeopardy, but then subsequently be remediated to avoid jeopardy. Accordingly, the Services do not rely on promises of future actions to offset present adverse effects in a manner that would be inconsistent with Federal agencies ensuring that their actions are consistent with the substantive requirements of section 7.

*Comment:* One commenter stated the proposed change is a confusing false equivalency that reduces the ability of the Services to evaluate the likely impact of the action by obscuring whether measures will in fact take place. A preferable alternative would be to clarify, when some action ambiguity is warranted, that consultation can still be completed as long as avoidance, minimization, and offsetting commitments are made for each contingency.

*Response:* We disagree that allowing for ambiguity and creating alternative contingency requirements is a preferable way for the Services to evaluate the effects of a proposed action. We consult on the action as proposed by the Federal agency and will only consider the effects of measures intended to avoid, minimize, or offset adverse effects if presented with sufficient information to meaningfully evaluate the effects of the action.

*Comment:* One commenter stated that measures to avoid, minimize, or offset adverse effects impose additional costs and burdens on an agency or applicant undertaking a project. Whereas the project proponent wants to engage in the main action, it is undertaking the other measures only to avoid a jeopardy conclusion for the main action. In the commenter's view, the Services cannot rationally ignore this plain difference in the motivations for the main action and those intended to offset the harms of that action.

*Response:* If a Federal agency or applicant proposes measures to avoid, minimize, or offset adverse effects as part of its proposed action because it is necessary to avoid jeopardy, we believe the motivations for undertaking the measure, such as the need to avoid violations of the Act, are clear. We decline to probe the subjective motivations and second guess the commitments contained in an action under consultation, because doing so is unnecessary to fulfill the Services' role under the Act.

*Comment:* One commenter stated the Services' proposed changes would render the Services unable to even raise concerns about the likelihood of implementation of beneficial effects of measures proposed to avoid, minimize, or offset adverse effects when they evaluate a proposed action to determine whether it will jeopardize the continued existence of a species or destroy or adversely modify critical habitat. Some commenters asserted the proposed rule provides the "benefit of the doubt" to Federal action agencies' promises to implement beneficial measures as part of the action and creates an irrational double standard for evaluating the effects of the action such that Federal beneficial proposals enjoy a favorable presumption in the Services' analysis, but harmful effects and activities must meet a more rigorous test before they will be considered.

*Response:* We disagree that the changes would render the Services unable to raise concerns with Federal agencies with respect to measures proposed to avoid, minimize, or offset adverse effects. As described above, the Services retain the discretion to advise Federal agencies about all aspects of their proposed action to assist them in making an informed determination regarding compliance with section 7 and in achieving the greatest conservation benefit. However, the Federal agency is ultimately responsible for describing its proposed action and providing the information required by § 402.14(c)(1). If the Federal agency provides information in sufficient detail

for the Services to meaningfully evaluate the effects of measures proposed to avoid, minimize, or offset adverse effects, the Services will consider the effects of the proposed measures during a consultation. Once consultation is initiated, the Services apply the same definition of "effects of the action" adopted in this final rule both to the portions of the action with adverse effects and those portions of the proposed action intended to avoid, minimize, or offset adverse effects. Accordingly, the Services will evaluate all consequences of all portions of the proposed action that would not occur "but for" the proposed action and are reasonably certain to occur as effects of the action. Therefore, the changes to § 402.14(g)(8) do not create an irrational double standard. To the contrary, the changes eliminate a double standard such that all aspects of the proposed action are treated the same by assuming the action will be implemented as proposed in its entirety. In other words, the proposed avoidance, minimization or offsetting measures will not be forced to meet a heightened threshold but will instead be held to the same standard as the portions of the proposed action likely to result in adverse effects.

We disagree that the changes adopted in this final rule are inconsistent with the Act because they fail to provide the "benefit of the doubt to the species." That phrase originated in a Conference Report that accompanied the 1979 amendments to the Act. Relevant to section 7, those amendments changed the statutory text at section 7(a)(2) from "will not jeopardize" to the current wording of "is not likely to jeopardize." The Conference Report explained that the change in the statutory language was necessary to prevent the Services from having to issue jeopardy determinations whenever an action agency could not "guarantee with certainty" that their action would not jeopardize listed species. The Conference Report sought to explain that this change in language would not have a negative impact on species: "This language continues to give the benefit of the doubt to the species, and it would continue to place the burden on the action agency to demonstrate to the consulting agency that its action will not violate Section 7(a)(2)." H. Conf. Rep. No. 96–697, 96th Cong., 1st. Sess. 12, reprinted in [1979] U.S. Code Cong. & Ad. News, 2572, 2576. The use of the words "benefit of the doubt to the species" in the Conference Report appears intended to provide reassurance that the statutory language, as amended, would remain protective of the species. At most, the language seems to indicate that the statutory language "is not likely to jeopardize" continues to provide protections to listed species by requiring action agencies to insure that their actions are not likely to jeopardize listed species. We do not believe that the Conference Report language or the Act requires the Services to establish a more demanding standard of documentation to demonstrate that measures included in a proposed action to avoid, minimize, or offset adverse effects will in fact be implemented. This rule does not change any statutory requirements found in section 7(a)(2) of the Act, and the Services will continue to utilize the best scientific and commercial data available when evaluating the efficacy of measures proposed to avoid, minimize, or offset adverse effects.

*Comment:* One commenter stated that, if the determination that an action's impacts will not jeopardize a species relies on the implementation of conservation measures, those measures must be planned and funded.

*Response:* We agree that if the Services determine that a measure intended to avoid, minimize, or offset adverse effects is necessary to avoid jeopardy, then it is critical for the measure to be achievable and be carried out if the adverse effects of the action are also occurring. Ultimately, however, the Federal agency proposing to take the action is in the best position to determine what planning and funding is necessary to ensure that their substantive duties under section 7 are satisfied. As discussed above, the Services retain the discretion during consultation to assist the action agencies in developing or improving the effectiveness of measures proposed to avoid, minimize, or offset adverse effects and ensuring the greatest chance of success. Moreover, the Services retain the discretion to develop reasonable and prudent alternatives or reasonable and prudent measures and associated terms and conditions if doing so would be appropriate.

### Section 402.14(h)—Biological Opinions

We proposed to add new paragraphs (h)(3) and (4) to the current § 402.14(h) to allow the Services to adopt all or part of a Federal agency's initiation package in its biological opinion. Additionally, we proposed to allow the Services to adopt all or part of their own analyses and findings that are required to issue a permit under section 10(a) of the Act in its biological opinion. We are proceeding with those proposed changes, as well as the changes described under Discussion of Changes from Proposed Rule above. We summarize the comments and provide our responses on this topic below related to revisions to § 402.14(h) below.

*Comment:* We received numerous comments supporting the ability of the Services to adopt various internal or other Federal agency documents including their initiation package or the documents associated with the Services' section 10 documents because they believe this proposal would avoid unnecessary duplication of documents, streamline the consultation process, and codify existing practice. Other commenters were supportive but also recommended that an applicant's documents prepared pursuant to section 10 of the Act and tribal documents should be able to be adopted in the Service's biological opinion.

*Response:* We believe that this proposal will codify existing practice and further encourage a collaborative process between the Services, Federal agencies, and applicants that will streamline the consultation process by eliminating duplication of analyses or documents whenever appropriate. We agree with commenters that appropriate analyses and documents from both tribes (*e.g.,* tribal wildlife management plans or resource management plan) and applicants' section 10 Habitat Conservation Plans are eligible for adoption by the Services into their biological opinion.

*Comment:* Some commenters raised concern that adopting section 10 Habitat Conservation Plan analyses or documents was inappropriate because there are different standards in the two sections of the Act.

*Response:* The intent of the proposed rule is to provide flexibility to adopt in a biological opinion, after appropriate review, relevant parts of internal analyses or documents prepared to support issuance of a section 10 permit. This could include the project description, site-specific species information and environmental baseline data, proposed conservation measures, analyses of effects, etc., all of which may be appropriate for use in Service determinations pursuant to both sections 7 and 10 of the Act.

*Comment:* Several commenters were critical of the proposed rule, asserting that adoption of non-Service analyses or documents in a biological opinion would be an abdication of our responsibilities to conduct independent, science-based analyses and that only the Services possessed the requisite expertise to perform these analyses.

*Response:* The Services' proposal is not to indiscriminately adopt analyses or documents from non-Service sources, but to adopt these analyses only after

**Addendum 347a**

our independent, science-based evaluation of existing analyses or documents that meet our regulatory and scientific standards. The intent is to avoid needless duplication of analyses and documents that meet our standards, including the use of the best scientific and commercial data available. In some situations, the analyses or documents may need to be revised to merit inclusion in our biological opinions, but even those situations will make the consultation process more efficient and streamlined. For example, it is a common practice for the Services to adopt portions of biological assessments and initiation packages in their biological opinions. The codification of this practice creates a more collaborative process and incentive for Federal agencies and section 10 applicants to produce high-quality analyses and documents that are suitable for inclusion in biological opinions, which streamlines the timeframe for completion of the consultation process.

*Comment:* One commenter expressed concern that the proposed adoption process might shift the burden to the Federal agency and extend the timeline for completion of consultation.

*Response:* The Services disagree. Federal agencies currently have the responsibility under § 402.14(c) to provide the information required to initiate consultation and to use the best scientific and commercial data available. The adoption process does not affect that responsibility. The Services' adoption of internal and non-Service analyses and documents is intended to streamline and reduce the overall consultation timeline.

*Section 402.14(l)—Expedited Consultation*

We proposed to add a new provision titled "Expedited consultations" at § 402.14(l) to offer opportunities to streamline consultation, particularly for actions that have minimal adverse effects or predictable effects based on previous consultation experience. We adopt the new § 402.14(l) in this final rule and summarize the comments received and our responses below.

*Comment:* Several commenters supported the proposed process for expedited consultations as it would promote conservation and recovery, increase efficiencies, reduce permitting delays, and generally streamline the consultation process.

*Response:* The Services agree with these comments that the proposed expedited consultation provision will benefit species and habitats by promoting conservation and recovery

through improved efficiencies in the section 7 consultation process.

*Comment:* Several commenters were concerned that consultations undergoing the expedited process would have reduced oversight and not allow for a thorough analysis of the potential effects of a Federal agency's proposed action and therefore may not meet the standards required under section 7(a)(2) of the Act. Another commenter indicated that the proposed expedited consultation process could provide some benefits. However, the commenter raised concerns that the ability to evaluate a project on a specific basis would be missed, and this provision would open the door for blanket permissions to proceed on particular projects that could be detrimental to species, especially if there are new or specific impacts to species in time and place despite the project being similar to others.

*Response:* The expedited consultation provision is an optional process that is intended to streamline the consultation process for those projects that have minimal adverse impact but still require a biological opinion and incidental take statement and for projects where the effects are either known or are predictable and unlikely to cause jeopardy or destruction or adverse modification. Many of these projects historically have been completed under the routine formal consultation process and statutory timeframes. This provision is intended to expedite the timelines of the formal consultation process for Federal actions while still requiring the same information and analysis standards as the normal process. Based upon the nature and scope of the projects expected to undergo this expedited process, expedited timelines will still allow for the appropriate level of review and oversight by the Services that meet the standards and requirements of the section 7 consultation process under the Act.

*Comment:* Several commenters indicated they support this provision for an expedited consultation process. However, they requested additional clarification on when this type of consultation would be appropriate or examples of specific parameters such as time required for a proposed Federal action to undergo this expedited consultation process. A few commenters also asked for clarification on how this process differs from the programmatic consultation process.

*Response:* A key element for successful implementation of this process is mutual agreement between the Service and Federal agency (and

applicant when applicable). The mutual agreement will contain the specific parameters necessary to complete each step of the process, such as the completion of a biological opinion. Discussions between the Service and Federal agency (and applicant when applicable) will identify what projects could undergo this process. An example of an expedited consultation process that has been utilized by Services and land management agencies for many years is the streamlining agreement for western Federal lands (*https://www.fs.fed.us/r6/icbemp/esa/TrainingTools.htm*). The streamlining agreement adopts an interagency team process that frontloads much of the consultation and leads to the issuance of biological opinions within 60 days. The streamlining agreement illustrates the types of efficiencies the Services hope to gain with the adoption of the expedited consultation provision. The expedited consultation provision is an optional process that is intended to streamline the consultation process, similar to other mechanisms such as programmatic consultations. However, this process differs from programmatic consultations primarily because it is expected to be completed entirely in an expedited timeframe resulting from familiarity with the type of project being proposed and its known or predictable effects on species. Additionally, this process may differ from a programmatic consultation in that many programmatic consultations often require lengthy time for technical assistance, agreements on conservation measures, and completion of the biological opinion in the initial phases of the consultation process, with efficiencies and streamlining achieved later on once individual projects are reviewed and appended or covered under the completed programmatic biological opinion. The Services nevertheless anticipate that, if appropriate, a programmatic consultation could proceed under the expedited consultation process.

*Comment:* A few commenters indicated the proposed revisions for an expedited consultation approach may be unnecessary and unrealistic given current staffing and funding constraints of the Service(s), reducing their ability to meet expedited timelines. Additionally, one of these commenters also was concerned that the proposed changes to the definition of Director could cause additional delays if these types of consultations would all have to be signed at the U.S. Fish and Wildlife Service headquarters in Washington, DC, defeating the purpose of completion

**Addendum 348a**

of formal consultation under an expedited timeline.

*Response:* The Services do not anticipate an increase in constraints on staff or resources. The expedited consultation provision is anticipated to improve efficiencies by reducing the amount of time staff would need to spend completing consultations for projects undergoing this process. By decreasing the amount of time spent on these types of consultations, it is anticipated more staff time and resources would be available for completion of projects undergoing more complex or lengthy consultation processes.

As discussed above, the revision to the definition for Director is intended to designate the head of both FWS and NMFS as the definitional Director under the section 7(a)(2) interagency cooperation regulations. The change does not revise the current signature delegations of the Services in place that allow for signature of specified section 7 documents (*e.g.,* biological opinions and concurrence letters) at the regional level and will not increase the completion time for consultation.

*Comment:* One commenter recommended that this expedited consultation process only be undertaken for projects that are entirely beneficial to species and habitats.

*Response:* The Services agree that many projects that are beneficial for species and habitats could undergo an expedited consultation process. Such projects may have some anticipated temporary adverse effects to listed species and their habitat, but often are predictable, and, therefore, these projects could be good candidates for the expedited consultation process. However, the Services do not agree that the expedited consultation provision should be limited to only these types of beneficial actions. Other actions that meet the requirements of the provision could also benefit from an expedited process while still ensuring full compliance with the Act.

*Comment:* A few commenters opposed the proposed provision for expedited consultations since the Services generally complete consultations within the established statutory deadlines.

*Response:* The Services strive to complete consultations within the established statutory deadlines, but continue to identify ways to improve efficiencies. The proposed new provision for expedited consultations is another streamlining mechanism intended to improve efficiencies in the section 7(a)(2) consultation process for the Services, Federal agencies, and their applicants while ensuring full compliance with the responsibilities of section 7.

*Section 402.16—Reinitiation of Consultation*

The Services proposed to revise the title of section 402.16 to remove the term ''formal'' in order to recognize long standing practice between the Services and Federal agencies that reinitiation of section 7(a)(2) consultation also applies to the written concurrences that complete the section 7(a)(2) process under § 402.13 *Informal Consultation.* We are proceeding with that revision to § 402.16 and also further revising the text at § 402.16(c) to clarify the connection of the reinitiation criteria to the written concurrence process. This latter revision is described above in this final rule. We received several comments on this section, and those comments and our responses to the public comment received on the proposal to codify that reinitiation of consultation applies to the informal consultation written concurrence process are here provided.

The Services also proposed to amend § 402.16 to address issues arising under the Ninth Circuit's decision in *Cottonwood Environmental Law Center* v. *U.S. Forest Service,* 789 F.3d 1075 (9th Cir. 20016) *cert. denied,* 137 S. Ct. 293 (2016). We proposed to add a new paragraph (b) to clarify that the duty to reinitiate consultation does not apply to an existing programmatic land plan prepared pursuant to FLPMA, 43 U.S.C. 1701 *et seq.,* or NFMA, 16 U.S.C. 1600 *et seq.,* when a new species is listed or new critical habitat is designated. We proposed to narrow § 402.16 to exclude those two types of plans that have no immediate on-the-ground effects. This exclusion is in contrast to specific on-the-ground actions that implement the plan and that are subject to their own section 7 consultations if those actions may affect listed species or critical habitat. Thus, the proposed regulation also restated our position that, while a completed land management plan prepared pursuant to FLPMA or NFMA does not require reinitiation upon the listing of new species or critical habitat, any on-the-ground subsequent actions taken pursuant to the plan must be subject to a separate section 7 consultation if those actions may affect the newly listed species or newly designated critical habitat.

In addition to seeking comment on the proposed revision to § 402.16, we sought comments on whether to exempt other types of programmatic land or water management plans in addition to those prepared pursuant to FLPMA and NFMA from the requirement to reinitiate consultation when a new species is listed or critical habitat designated. We also requested comment on the proposed revision in light of the recently enacted Wildfire Suppression Funding and Forest Management Activities Act, H.R. 1625, Division O, which was included in the Omnibus Appropriations bill for fiscal year 2018.

*Comment:* Some commenters agreed that the proposed changes would align our regulations with current practice and court decisions. Some commenters expressed concern that we were expanding the requirements for reinitiation or expanding the circumstances in which reinitiation is required. One commenter suggested we clarify when reinitiation is needed by establishing ''clear standards for determining what project changes warrant a re-evaluation of previously approved environmental documentation (*i.e.,* what constitutes a material change).''

*Response:* The proposed changes do not alter the requirement that the Federal agency retain discretionary involvement and control for reinitiation to apply. Nor does the proposal change or expand the scope of reinitiation triggers for section 7(a)(2) consultation. A material change relevant to section 7(a)(2) consultations on an action is captured in the reinitiation trigger at § 402.16(c): ''[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered. . . .'' These standards for reinitiation of consultation are straightforward, and the Services do not plan further clarification in the regulatory text on this point. However, the Services are further revising § 402.16(c) to make clear that this trigger for reinitiation of consultation applies to the written request for concurrence and our response.

Informal consultation is an optional process in which a Federal agency may determine, with the Services' concurrence, that formal consultation is not necessary because the action is not likely to adversely affect listed species and critical habitat. In these cases, the relevant reinitiation triggers still apply to the action as long as the agency retains discretionary involvement or control over the action. For example, if the action is changed or new information reveals effects to listed species or critical habitat may occur in a manner not previously considered, then reinitiation of consultation is warranted. This could occur where a permitted activity proceeds in a manner different than originally proposed, or if

new scientific or commercial information indicates that the permitted activities or effects flowing from those activities have different or greater impacts on the critical habitat or species than originally evaluated during the informal consultation process.

*Comment:* Several commenters urged the Services to extend the exemption from reinitiation when a new species is listed or critical habitat designated to all programmatic plans, including water management plans, other types of programmatic land management plans such as comprehensive conservation plans prepared for National Wildlife Refuges, and other types of integrated activity plans.

*Response:* At this time, we have decided to limit only those approved land management plans prepared pursuant to FLPMA or NFMA from reinitiation when a new species is listed or critical habitat designated.

*Comment:* One commenter was concerned the reinitiation exemption would apply to other U.S. Forest Service (USFS) plans, such as travel management plans.

*Response:* Only approved USFS programmatic land management plans prepared pursuant to NFMA are temporarily relieved from the reinitiation of consultation when a new species is listed or critical habitat designated. Other types of plans are still subject to reinitiation if one of the triggers is met under § 402.16(a) and the agency retains discretionary authorization or control over the plan.

*Comment:* Many commenters believed that our proposed regulation is in contravention to controlling case law, including *Cottonwood, Forest Guardians* v. *Forsgren,* 478 F.3d 1149 (10th Cir. 2007), and *Pacific Rivers Council* v. *Thomas,* 30 F. 3d 1050 (9th Cir. 1994). Likewise, a few comments criticized the proposed regulation because the duty to reinitiate derives from the action agency's substantive and procedural duties under section 7, which would be undermined.

*Response:* We agree that Congress intended to enact a broad definition of ''action'' in the Act. We also agree that management plans may have long-lasting effects; however, those effects were addressed in a consultation when the plan was adopted. Any effects that were not considered in the original consultation may still be subject to reinitiation if certain triggers are met, including whether the agency retains discretionary authorization or control over the action. Any actions taken pursuant to the plan will be subject to its own consultation if it may affect listed species or critical habitat. We

disagree with *Cottonwood's* holding that the mere existence of a land management plan is an affirmative discretionary action subject to reinitiation. *See generally Southern Utah Wilderness Alliance* v. *Norton,* 542 U.S. 55 (2004); *see also National Ass'n of Homebuilders* v. *Defenders of Wildlife,* 551 U.S. 644 (2007). This amendment to § 402.16 reaffirms that only affirmative discretionary actions are subject to reinitiation under our regulations when any of the triggers at § 402.16(a)(1) through (4) are met.

*Comment:* Several commenters believed that the proposed § 402.16(b) violated the Wildlife Suppression Funding and Forest Management Activities Act, H.R. 1625, Division O, which was included in the Omnibus Appropriations bill for fiscal year 2018.

*Response:* After further review, the Services have revised the final regulation to include timeframes for forest land management plans prepared pursuant to NFMA to align with the temporary relief from reinitiation when a new species is listed or critical habitat designated set forth by Congress in section 208 of the Wildfire Suppression Funding and Forest Management Activities Act included in the 2018 Omnibus bill. In addition, in section 209, Congress excluded those grant lands under the Oregon and California Revested Lands Act, 39 Stat. 218, and the Coos Bay Wagon Road Reconveyed Lands Act, 40 Stat. 1179, from reinitiation of consultation when a new species is listed or critical habitat designated. Congress set no time limit for this exemption. However, a separate consultation must still occur for these particular Bureau of Land Management (BLM) lands for any actions taken pursuant to the plan, with respect to the development of a new land use plan, or the revision or significant change to an existing land use plan. *See* Wildfire Suppression Funding and Forest Management Activities Act at section 209(b).

Congress did not address in the Wildfire Suppression Funding and Forest Management Activities Act other BLM land managed pursuant to FLPMA. Thus, we are exercising our discretion and excluding from reinitiation those programmatic land management plans prepared pursuant to FLPMA when a new species is listed or critical habitat designated, provided that any specific action taken pursuant to the plan is subject to a separate section 7 consultation if the action may affect listed species or critical habitat.

*Comment:* A few commenters did not want a regulation relieving BLM and the USFS from reinitiation on its land

management plans if a new species is listed or critical habitat designated. They believed a case-by-case approach would make more sense, especially when a new listing under the Act might call for significant changes to the plan.

*Response:* If a new listing or new critical habitat designation would require significant changes to a land management plan, those changes would have to be accomplished through a plan amendment or plan revision. A plan amendment or revision would be a separate action subject to consultation if it may affect listed species or critical habitat.

*Comment:* Some commenters argued that BLM and the USFS retain sufficient discretionary involvement or control over their land management plans to require reinitiation if certain triggers are met.

*Response:* The Services may recommend reinitiation of consultation, but it is within the action agency's purview, and not the Services', to determine whether it retains discretionary involvement or control over their plans for purposes of reinitiation.

*Comment:* A few commenters supported § 406.16(b) because developers of a land management plan should have considered how to manage for healthy ecosystems when the plan was adopted and thus should not always be required to reinitiate consultation. This direction shifts management away from a species-by-species focus and towards healthy landscapes and habitats.

*Response:* We agree with this approach and note this type of focus is best achieved through a section 7(a)(1) conservation program in consultation with the Services when a new species is listed or critical habitat designated. As we noted in the proposed rule's preamble, this proactive, conservation planning process will enable an action agency to better synchronize its actions and programs with the conservation and recovery needs of listed and proposed species. Such planning can help Federal agencies develop specific, pre-approved design criteria to ensure their actions are consistent with the conservation and recovery needs of the species. Additionally, these section 7(a)(1) programs will facilitate efficient development of the next programmatic section 7(a)(2) consultations when the land management plan is renewed.

*Comment:* Many commenters expressed concern with the relief from reinitiation provision applying to a forest or land management plan that is out of date. A few suggested that we revise the regulation to require only up-

**Addendum 350a**

to-date land management plans be subject to the exemption provided in § 402.16(b) so as to ensure the science and public input are not stale.

*Response:* As noted in the proposed rule preamble, BLM and the USFS are required to periodically update their land management plans, at which time they would consult on any newly listed species or critical habitat. BLM is required to periodically evaluate and revise its Resource Management Plans (43 CFR part 1610), and reevaluations should not exceed 5 years (*see* BLM Handbook H–1601–1 at p. 34). Our proposed rule anticipated that BLM Resource Management Plans will be kept up to date in accordance with this agency directive and so did not place any limitation on the relief from reinitiation. Our final rule also does not place any limitation on the relief from reinitiation for approved BLM plans. For any BLM land management plan, we note that any separate action taken pursuant to such plans will be subject to a separate consultation, which will take into account effects upon newly listed species and designated critical habitat.

USFS is required to revise their land management plans at least every 15 years (*see* 36 CFR 219.7). Congress, in the Wildfire Suppression Funding and Forest Management Activities Act, limited the relief from reinitiation with respect to plans prepared pursuant to NFMA to only those plans that are up to date, and that Congressional limitation is now also reflected in our revised final regulation.

*Comment:* A few comments suggested adding text to the regulation not to require reinitiation on the approval of a land management plan when a new species is listed or critical habitat designated "provided that any authorized actions that may affect the newly listed species or designated critical habitat will be addressed through a separate action-specific consultation *limited in scope to the specific action.*" (emphasis added).

*Response:* We respectfully decline to add this text because we do not think it is necessary.

*Comment:* A few commented that § 404.16(b) violates the Services' duty to consider cumulative effects.

*Response:* We respectfully disagree. Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation. In other words, a land management plan's effects within the action area does not include cumulative effects, but cumulative effects within

the action area are taken into account when determining jeopardy or adverse modification.

*Comment:* One commenter believed the final regulation violates section 7(d) of the Act because failure to reinitiate on a completed land management plan results in the irretrievable commitment of resources in a manner that forecloses reasonable and prudent alternatives to the plan that could avoid jeopardy.

*Response:* Programmatic land management plans have no immediate-on-the-ground effects. Thus, making a section 7(d) determination on the mere existence of a completed land management plan that is subject to step-down, action-specific consultations does little to further the conservation goals of the Act.

*Comment:* One comment suggested that "reinitiation" does not require the completion of consultation and may not require a "full-blown" consultation.

*Response:* The Services agree that the scope and requirements of a reinitiation of consultation and documents for completion will depend on the particular facts of a given situation. We decline to issue regulations addressing this issue at this time, however. This comment also requested adding text that is already addressed under existing reinitiation triggers.

*Comment:* One comment suggested that, if the species proposed for listing were already included in the consultation on the programmatic land management plan, such plans should not have to be reinitiated when the species becomes listed.

*Response:* We agree with this comment. Also, this type of situation also lends itself well to a section 7(a)(1) program. Please see our response above.

### Section 402.17—Other Provisions

For responses related to this section, please see response to comments for "effects of the action" above.

### Miscellaneous

This section captures comments received and our responses for other aspects of the Services' proposed rule.

*Comment:* In our proposed rule, the Services sought comment regarding revising § 402.03 (applicability) to potentially preclude the need to consult under certain circumstances. We described this as ". . . when the Federal agency does not anticipate take and the proposed action will: (1) Not affect listed species or critical habitat; or (2) have effects that are manifested through global processes and (i) cannot be reliably predicted or measured at the scale of a listed species' current range, or (ii) would result at most in an

extremely small and insignificant impact on a listed species or critical habitat, or (iii) are such that the potential risk of harm to a listed species or critical habitat is remote, or (3) result in effects to listed species or critical habitat that are either wholly beneficial or are not capable of being measured or detected in a manner that permits meaningful evaluation."

*Response:* The Services appreciate the wide variety of thoughtful comments and suggestions we received on these concepts. While many commenters supported the proposed revisions, many did not. Though not an exhaustive list, the majority of the comments covered topics such as a belief that the concepts would streamline the consultation process and allow more time for consultation on projects with greater harm to listed species, potential legal risks to action agencies if we were to revise the regulations to address these circumstances, unclear legal authority to adopt such regulations, concern regarding reduced opportunity for cooperation between the Services and Federal agencies, lack of adequate expertise in Federal agencies to correctly make the needed determinations, delays in consultation completion, complication of the consultation process, and failure to examine larger environmental phenomena. While such input may inform the future development of additional regulatory amendments, policies, or guidance, we have determined at this time, in the interests of efficiency, to defer action on this issue, which we may address at a later time. Because the Services are required only to respond to those "comments which, if true, . . . would require a change in [the] proposed rule," *Am. Mining Cong.* v. *United States EPA,* 907 F.2d 1179, 1188 (D.C. Cir. 1990) (quoting *ACLU* v. *FCC,* 823 F.2d 1554, 1581 (D.C. Cir. 1987)), those that were not specifically addressed in our proposed regulatory amendments are not "significant" in context of the proposed rule. *See also Home Box Office, Inc.* v. *FCC,* 567 F.2d 9, 35 n. 58 (D.C. Cir. 1977), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Therefore, we will not respond further to these comments at this time.

*Comment:* We received many comments related to topics that were not specifically addressed in our proposed regulatory amendments, such as defining or revising definitions, clarifying emergency consultation, including economic considerations into the consultation process, revising the 1998 Consultation Handbook, and

revising the regulations implementing other sections of the Act.

*Response:* The Services appreciate the many insightful comments and suggestions we received on section 7 and the consultation process. While such input may inform the future development of additional regulatory amendments, policies, or guidance, we have determined at this time, in the interests of efficiency, to go forward with the scope of the originally proposed regulatory revisions and defer action on other issues until a later time. Because the Services are required only to respond to those ''comments which, if true, . . . would require a change in [the] proposed rule,'' *Am. Mining Cong.* v. *United States EPA,* 907 F.2d 1179, 1188 (D.C. Cir. 1990) (quoting *ACLU* v. *FCC,* 823 F.2d 1554, 1581 (D.C. Cir. 1987)), those that were not specifically addressed in our proposed regulatory amendments are not ''significant'' in context of the proposed rule. *See also Home Box Office, Inc.* v. *FCC,* 567 F.2d 9, 35 n. 58 (D.C. Cir. 1977), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Therefore, we will not respond to these ''miscellaneous'' comments at this time.

*Comment:* Several commenters were concerned that the Services effectively failed to provide adequate notice and opportunity for public comment, particularly because the three draft rules were posted simultaneously. Several commenters requested additional time for review, while others asserted we should withdraw our proposal, republish it with a more accurate and clear summary of the changes to the regulations and their implications, and provide further opportunity for public comment.

*Response:* We provided a 60-day public comment period on the proposed rule. Following publication of our proposed rule, we held numerous webinars providing an opportunity for States, tribes, non-governmental organizations, and industry groups to ask questions and provide input directly to the Services. This satisfies the Services' obligation to provide notice and comment under the Act and the Administrative Procedure Act (APA).

*Comment:* The Services received several comments that raised concern over whether we would finalize a rule without the opportunity for additional public notice and comment based upon our representation that the rulemaking should be considered as applying to all of part 402 and that we would consider whether additional modifications to the interagency cooperation regulations would improve, clarify, or streamline the administration of the Act.

*Response:* We did seek public comments recommending, opposing, or providing feedback on specific changes to any provision in part 402. Based upon comments received and our experience in administering the Act, we represented that a final rule may include revisions that are a logical outgrowth of the proposed rule, consistent with the APA. Some believed that these representations would allow us to amend any of part 402 without sufficient public notice in violation of the APA. We reiterate that any final changes to part 402 not specifically proposed would have to be a logical outgrowth of the proposal and fairly apprise interested persons of the issues. The Services have satisfied that standard here with regard to the changes adopted in this final rule compared to the proposed rule. As such, there are no substantial additional revisions that were not part of the proposed rule which would not be considered a logical outgrowth of the proposed rule.

*Comment:* Some commenters requested a hearing on the proposed rule.

*Response:* As this is an informal rulemaking under APA section 553, a hearing is not required.

*Comment:* Several Tribes commented they should have greater involvement in consultations affecting their resources and that traditional ecological knowledge should constitute the best scientific and commercial data available and be used by the Services.

*Response:* Tribes provide significant benefits to the consultation process. The Services will continue to work with tribes to meet our trust responsibilities and to comply with applicable tribal engagement policies, including Executive Order 13175, Secretarial Order 3206, NOAA Procedures for Government-to-Government Consultation With Federally Recognized Indian Tribes and Alaska Native Corporations, and the FWS Native American Policy, as part of the formal consultation process.

Traditional ecological knowledge (TEK) is important and useful information that can inform us as to the status of a species, historical and current trends, and threats that may be acting on it or its habitat. The Act requires that we use the best scientific and commercial data available to inform the section 7(a)(2) consultation process. Although in some cases TEK may be the best data available, the Services cannot determine, as a general rule, that TEK will be the best available data in every circumstance. However, we will consider TEK along with other available data, weighing all data appropriately during our section 7(a)(2) analysis.

National Environmental Policy Act

In the proposed regulation's Required Determinations section, we represented that the Services would analyze the proposed regulation in accordance with criteria of the National Environmental Policy Act (NEPA), the Department of the Interior regulations on implementation of NEPA (43 CFR 46.10–46.450), the Department of the Interior Manual (516 DM 8), the NOAA Administrative Order 216–6A, and the NOAA Companion Manual, ''Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities,'' which became effective January 13, 2017. We requested public comment on the extent to which the proposed regulation may have a significant impact on the human environment or fall within one of the categorical exclusions for action that have no individual or cumulative effect on the quality of the human environment.

*Comment:* We received comments arguing that these proposed amendments to the section 7 regulations are significant under NEPA and thus require the preparation of an environmental impact statement or, at least, an environmental analysis. Other commenters believed these amendments qualify for a categorical exclusion (CE) under NEPA.

*Response:* The Services believe that these rules will improve and clarify interagency consultation without compromising the conservation of listed species. We have not raised or lowered the bar for what is required under the regulations. For the reasons stated in the Required Determinations section of this final rule, we have determined that these amendments, to the extent they would result in foreseeable environmental effects, qualify for a CE from further NEPA review and that no extraordinary circumstances apply.

*Comment:* Other commenters remarked upon inadequate funding for the Council on Environmental Quality and inefficiencies surrounding the implementation of NEPA.

*Response:* These comments are outside the scope of these regulations.

Merit, Authority, and Means for the Services To Conduct a Single Consultation, Resulting in a Single Biological Opinion, for Federal Agency Actions Affecting Species That Are Under the Jurisdiction of Both FWS and NMFS

In the proposed rule, we sought comment on ''the merit, authority, and

**Addendum 352a**

means for the Services to conduct a single consultation, resulting in a single biological opinion, for Federal agency actions affecting species that are under the jurisdiction of both FWS and NMFS.'' We received a variety of comments in response to our request. Some of them interpreted the Services' request to mean that we were requesting comment on our ability to conduct a joint consultation, resulting in a single biological opinion, when both Services have species that require consultation (*e.g.,* both Services participate in the consultation and then prepare a single biological opinion in which each agency addresses the species for which it has responsibility). One commenter interpreted our request to be that one Service could conduct a consultation and prepare a biological opinion for a species for which the other agency has responsibility (*e.g.,* FWS could consult and prepare a biological opinion for a listed chinook salmon, which is listed under NMFS' authority).

*Comment:* Some commenters supported the Services conducting a single consultation, resulting in a single biological opinion. Examples of supporting comments include, but are not limited to: Joint consultations and biological opinions could improve the Services' process and outcomes through early collaboration on species under joint jurisdiction; there would be better alignment with the 1998 Consultation Handbook's language regarding coordination, and more consistent interpretation and application of information between the Services. Concerns raised focused on issues such as: The potential for significant delays due to the additional coordination required between the Federal agency and the Services; and the potential for an increased burden on the Federal agency to negotiate consultation schedules with the Services to accommodate a joint consultation, especially when the proposed action is time sensitive. A few commenters proposed process improvements, such as the development of guidance, for when and how the Services conduct joint consultations and prepare joint biological opinions.

*Response:* The Services acknowledge that there can be challenges with completing joint biological opinions in cases where the Services have joint jurisdiction (*e.g.,* sea turtles), as well as in cases where the species addressed by the two agencies are different but both Services are engaged in consultation on the same project. Joint consultations require additional coordination, which often adds to complexity in scheduling meetings, preparing the biological opinion, etc. However, in some circumstances (*e.g.,* where the Services' respective reasonable and prudent measures and terms and conditions have the potential to contradict one another), the additional coordination can be beneficial. Joint biological opinions are often the most efficient way to implement the Services' authorities and provide clarity to the action agencies and applicants. For these reasons, the decision to conduct a joint biological opinion is best made on a case-by-case basis.

In this rule, we are not proposing any changes to how we conduct joint consultations or prepare joint biological opinions. In a few circumstances (*e.g.,* listed sea turtles), the Services will continue to implement existing Memoranda of Understanding (MOUs) that help define our respective responsibilities. Otherwise, in accordance with our current practices, we will continue to involve the Federal agency and the applicant (working through the Federal agency) in the decision-making process on the need for, and means to, conduct joint consultations and prepare joint biological opinions.

*Comment:* One commenter suggested that it would be illegal for one Service to conduct a consultation and prepare a biological opinion evaluating effects to a species for which the other agency has responsibility.

*Response:* The Secretary of the Interior and Secretary of Commerce have specific jurisdictional authority for species listed under the Act that have been assigned to them by Congress. The Act defines ''Secretary'' as ''the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provision of Reorganization Plan Numbered 4 of 1970.''

Reorganization Plan Number 4 (Title 5. Appendix Reorganization Plan No. 4 of 1970, page 208) established the National Oceanic and Atmospheric Administration and Assistant Administrator for Fisheries and transferred certain responsibilities from the Secretary of the Interior to the Secretary of Commerce. Reorganization Plan Number 4 was amended in 1977 to state, ''The Assistant Administrator for Fisheries shall be responsible for all matters related to living marine resources which may arise in connection with the conduct of the functions of the Administration. [As amended Pub. L. 95–219, 3(a)(1), Dec. 28, 1977, 91 Stat. 1613.].''

These regulations do not address the underlying particular circumstance raised by this comment; therefore, we decline to respond to the legal question posed by the commenter.

Role of Applicants and Designated Non-Federal Representatives in Section 7(a)(2) Consultations

*Comment:* The Services received many comments regarding the role of applicants in the consultation process, including those encouraging an active role for applicants during consultation.

*Response:* The Services appreciate these comments and agree that applicants play a significant role in the consultation process. The Act, the regulations, and the 1998 Consultation Handbook all provide for a role of an applicant in several stages of the consultation process. With regard to informal consultation, an applicant can act as the non-Federal representative and, under the guidance of the action agency, write any biological evaluations or assessments. With regard to formal consultation, as delineated in the regulations and 1998 Consultation Handbook, an applicant: (1) Is provided an opportunity to submit information through the action agency; (2) must be informed by the action agency of the estimated length of time for an extension for preparing a biological assessment beyond the 180-day timeframe and the reason for the extension; (3) must be provided an explanation if the formal consultation timeframe is extended and must consent to any extension of more than 60 days; (4) may request to review a final draft biological opinion through the Federal agency and provide comments through the Federal agency; (5) have discussions with the Services for the basis of their biological determinations and provide input to the Services for any reasonable and prudent alternatives if necessary; and (6) be provided a copy of the final biological opinion.

Our implementing regulations and 1998 Consultation Handbook assign to the Federal agency the responsibility for determining whether and how an applicant will be engaged in a consultation along with that agency. In order to facilitate involvement from applicants, if any applicant reaches out to the Service, we will notify the Federal agency immediately, advise the Federal agency of the opportunities for applicant involvement in the consultation process provided by the Act, the regulations, and the 1998 Consultation Handbook, and encourage the Federal agency to afford those opportunities to the applicant throughout the consultation process.

*Comment:* Some commenters requested full participation by

**Addendum 353a**

designated non-Federal representatives in the consultation process.

*Response:* Participation by designated non-Federal representatives is addressed at § 402.08. This includes allowing the designated non-Federal representative to conduct the informal consultation and prepare biological assessments for formal consultations. The ultimate responsibility for complying with section 7(a)(2) of the Act lies with the consulting agency and, as such, they are best situated to determine when to designate non-Federal representatives, consistent with the regulations. As such, further regulation regarding non-Federal representatives in the consultation process is unnecessary.

### Required Determinations

*Regulatory Planning and Review— Executive Orders 12866 and 13563*

Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB) will review all significant rules. OIRA has determined that this rule is significant.

Executive Order 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this final rule in a manner consistent with these requirements. This final rule is consistent with Executive Order 13563, and in particular with the requirement of retrospective analysis of existing rules, designed "to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives."

*Executive Order 13771*

This rule is an Executive Order 13771 deregulatory action.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996) 5 U.S.C. 601 *et seq.,* whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare, and make available for public comment, a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of an agency, or his or her designee, certifies that the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a rule will not have a significant economic impact on a substantial number of small entities. We certified at the proposed rule stage that this action will not have a significant economic effect on a substantial number of small entities. The following discussion explains our rationale.

This rulemaking revises and clarifies existing requirements for Federal agencies under the Act. It will primarily affect the Federal agencies that carry out the section 7 consultation process. To the extent the rule may affect applicants, this rulemaking is intended to make the interagency consultation process more efficient and consistent, without substantively altering applicants' obligations. Moreover, this final rule is not a major rule under SBREFA.

This final rule will determine whether a Federal agency has insured, in consultation with the Services, that any action it would authorize, fund, or carry out is not likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. This rule is substantially unlikely to affect our determinations as to whether or not proposed actions are likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. The rule serves to provide clarity to the standards with which we will evaluate agency actions pursuant to section 7 of the Act.

*Unfunded Mandates Reform Act*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 *et seq.*):

(a) On the basis of information contained under *Regulatory Flexibility Act,* above, this final rule will not "significantly or uniquely" affect small governments. We have determined and certify pursuant to the Unfunded Mandates Reform Act, 2 U.S.C. 1502, that this rule will not impose a cost of $100 million or more in any given year on local or State governments or private entities. A Small Government Agency Plan is not required. As explained above, small governments will not be affected because this final rule will not place additional requirements on any city, county, or other local municipalities.

(b) This final rule will not produce a Federal mandate on State, local, or tribal governments or the private sector of $100 million or greater in any year; that is, this final rule is not a "significant regulatory action" under the Unfunded Mandates Reform Act. This final rule will impose no additional management or protection requirements on State, local, or tribal governments.

*Takings (E.O. 12630)*

In accordance with Executive Order 12630, this final rule will not have significant takings implications. This rule will not pertain to "taking" of private property interests, nor will it directly affect private property. A takings implication assessment is not required because this final rule (1) will not effectively compel a property owner to suffer a physical invasion of property and (2) will not deny all economically beneficial or productive use of the land or aquatic resources. This final rule will substantially advance a legitimate government interest (conservation and recovery of endangered species and threatened species) and will not present a barrier to all reasonable and expected beneficial use of private property.

*Federalism*

In accordance with Executive Order 13132, we have considered whether this final rule would have significant effects on federalism and have determined that a federalism summary impact statement is not required. This final rule pertains only to improving and clarifying the interagency consultation processes under the Act and will not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government.

*Civil Justice Reform (E.O. 12988)*

This final rule does not unduly burden the judicial system and meets the applicable standards provided in sections 3(a) and 3(b)(2) of Executive Order 12988. This final rule will clarify the interagency consultation processes under the Act.

## Government-to-Government Relationship With Tribes

In accordance with Executive Order 13175 "Consultation and Coordination with Indian Tribal Governments," the Department of the Interior's manual at 512 DM 2, and the Department of Commerce (DOC) Tribal Consultation and Coordination Policy (May 21, 2013), DOC Departmental Administrative Order (DAO) 218–8, and NOAA Administrative Order (NAO) 218–8 (April 2012), we have considered possible effects of this final rule on federally recognized Indian Tribes. Two informational webinars were held on July 31 and August 7, 2018, to provide additional information to interested Tribes regarding the proposed regulations. After the opening of the public comment period, we received multiple requests for coordination or government-to-government consultation from multiple tribes: Cowlitz Indian Tribe; Swinomish Indian Tribal Community; The Confederated Tribes of the Grand Ronde Community of Oregon; Confederated Tribes of Warm Springs, Oregon; Quinault Indian Nation; Makah Tribe; Confederated Tribes of the Umatilla Indian Reservation; and the Suquamish Tribe. We subsequently hosted a conference call on November 15, 2018, to listen to Tribal concerns and answer questions about the proposed regulations. On March 6, 2019, FWS representatives attended the Natural Resources Committee Meeting of the United and South and Eastern Tribes' Impact Week conference in Arlington (Crystal City), VA. At this meeting, we presented information, answered questions, and held discussion regarding the regulatory changes.

The Services conclude that this rule makes general changes the Act's implementing regulations and does not directly affect specific species or Tribal lands or interests. The primary purpose of the rule is to streamline and clarify the steps the Services undertake in completing section 7 consultations with Federal agencies. Therefore, the Departments of the Interior and Commerce conclude that these regulations do not have "tribal implications" under section 1(a) of E.O. 13175 and that formal government-to-government consultation is not required by E.O. 13175 and related polices of the Departments. We will continue to collaborate with Tribes on issues related to federally listed species and work with them as we implement the provisions of the Act. See Joint Secretarial Order 3206 ("American Indian Tribal Rights, Federal-Tribal Trust Responsibilities,

and the Endangered Species Act," June 5, 1997).

### Paperwork Reduction Act

This final rule does not contain any new collections of information other than those already approved under the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*). We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number.

### National Environmental Policy Act

We analyzed this final rule in accordance with the criteria of NEPA, the Department of the Interior regulations on implementation of NEPA (43 CFR 46.10–46.450), the Department of the Interior Manual (516 DM 8), the NOAA Administrative Order 216–6A, and its Companion Manual, "Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities," which became effective January 13, 2017. We have determined that, to the extent that the proposed action would result in reasonably foreseeable effects to the human environment, the final regulation is categorically excluded from further NEPA review and that no extraordinary circumstances are present. The rule qualifies for the substantially similar categorical exclusions set forth at 43 CFR 46.210(i) and NOAA Administrative Order 216–6A and Companion Manual at Appendix E (Exclusion G7). The amendments are of a legal, technical, or procedural nature. The rule only serves to clarify and streamline existing interagency consultation practices.

This final rule does not lower or raise the bar on section 7 consultations, and it does not alter what is required or analyzed during a consultation. Instead, it improves clarity and consistency, streamlines consultations, and codifies existing practice. For example, the change in the definition of "effects of the action" simplifies the definition while still retaining the scope of the assessment required to ensure a complete analysis of the effects of the proposed Federal action. The two-part test articulates the practice by which the Services identify effects of the proposed action. Likewise, the causation standard to analyze effects provides additional explanation on how we analyze activities that are reasonably certain to occur.

Other changes to 50 CFR part 402 are to aid in clarity and consistency. For example, we have separated out the definition of "environmental baseline" from effects of the action and added a

second sentence to the definition to avoid confusion over "ongoing actions." A regulatory deadline for informal consultation, as well as requiring reinitiation of informal consultation when certain triggers are met, are legal and procedural in nature. Our additional changes to 50 CFR 402.16 governing reinitiation of land management plans are also legal in nature and do not alter the review process for actions that cause ground-disturbing activities, and thus do not reduce procedural protection for listed species.

We also considered whether any "extraordinary circumstances" apply to this situation, such that the DOI and NOAA categorical exclusions would not apply. *See* 43 CFR 42.215 (DOI regulations on "extraordinary circumstances"); NOAA Companion Manual to NAO 216–6, Section 4.A.

FWS completed an environmental action statement, which NOAA adopts, explaining the basis for invoking the agencies' substantially similar categorical exclusions for the revised regulations.

### Energy Supply, Distribution or Use (E.O. 13211)

Executive Order 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. The final revised regulations are not expected to affect energy supplies, distribution, or use. Therefore, this action is a not a significant energy action, and no Statement of Energy Effects is required.

### References Cited

A complete list of all references cited in this document is available on the internet at *http://www.regulations.gov* in Docket No. FWS–HQ–ES–2018–0009 or upon request from the U.S. Fish and Wildlife Service (see **FOR FURTHER INFORMATION CONTACT**).

### Authors

The primary authors of this final rule are the staff members of the Ecological Services Program, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, Falls Church, VA 22041–3803, and the National Marine Fisheries Service's Endangered Species Division, 1335 East-West Highway, Silver Spring, MD 20910.

### Authority

We issue this final rule under the authority of the Act, as amended (16 U.S.C. 1531 *et seq.*).

### List of Subjects in 50 CFR Part 402

Endangered and threatened species.

**Regulation Promulgation**

Accordingly, we amend subparts A and B of part 402, subchapter A of chapter IV, title 50 of the Code of Federal Regulations, as set forth below:

## PART 402—INTERAGENCY COOPERATION—ENDANGERED SPECIES ACT OF 1973, AS AMENDED

■ 1. The authority citation for part 402 continues to read as follows:

**Authority:** 16 U.S.C. 1531 *et seq.*

■ 2. Amend § 402.02 by revising the definitions of ''Destruction or adverse modification,'' ''Director,'' and ''Effects of the action'' and adding definitions for ''Environmental baseline'' and ''Programmatic consultation'' in alphabetic order to read as follows:

### § 402.02   Definitions.

\*    \*    \*    \*    \*

*Destruction or adverse modification* means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species. *Director* refers to the Assistant Administrator for Fisheries for the National Marine Fisheries Service, or his or her authorized representative; or the Director of the U.S. Fish and Wildlife Service, or his or her authorized representative.

\*    \*    \*    \*    \*

*Effects of the action* are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

*Environmental baseline* refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or

designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

\*    \*    \*    \*    \*

*Programmatic consultation* is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

\*    \*    \*    \*    \*

■ 3. Amend § 402.13 by revising paragraph (a) and adding paragraph (c) to read as follows:

### § 402.13   Informal consultation.

(a) Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required.

\*    \*    \*    \*    \*

(c) If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

(1) A written request for concurrence with a Federal agency's not likely to adversely affect determination shall include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the Service to determine if it concurs.

(2) Upon receipt of a written request consistent with paragraph (c)(1) of this section, the Service shall provide written concurrence or non-concurrence with the Federal agency's determination within 60 days. The 60-day timeframe may be extended upon mutual consent of the Service, the Federal agency, and the applicant (if involved), but shall not exceed 120 days total from the date of receipt of the Federal agency's written request consistent with paragraph (c)(1) of this section.

■ 4. Amend § 402.14 by:
■ a. Revising paragraph (c);

■ b. Removing the undesignated paragraph following paragraph (c);
■ c. Revising paragraphs (g)(2), (4), and (8) and (h);
■ d. Redesignating paragraph (l) as paragraph (m); and
■ e. Adding a new paragraph (l).

The revisions and addition read as follows:

### § 402.14   Formal consultation.

\*    \*    \*    \*    \*

(c) *Initiation of formal consultation.* (1) A written request to initiate formal consultation shall be submitted to the Director and shall include:

(i) A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:

(A) The purpose of the action;

(B) The duration and timing of the action;

(C) The location of the action;

(D) The specific components of the action and how they will be carried out;

(E) Maps, drawings, blueprints, or similar schematics of the action; and

(F) Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

(ii) A map or description of all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (*i.e.,* the action area as defined at § 402.02).

(iii) Information obtained by or in the possession of the Federal agency and any applicant on the listed species and designated critical habitat in the action area (as required by paragraph (c)(1)(ii) of this section), including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat, including any critical habitat.

(iv) A description of the effects of the action and an analysis of any cumulative effects.

(v) A summary of any relevant information provided by the applicant, if available.

(vi) Any other relevant available information on the effects of the proposed action on listed species or designated critical habitat, including any relevant reports such as environmental impact statements and environmental assessments.

(2) A Federal agency may submit existing documents prepared for the

proposed action such as NEPA analyses or other reports in substitution for the initiation package outlined in this paragraph (c). However, any such substitution shall be accompanied by a written summary specifying the location of the information that satisfies the elements above in the submitted document(s).

(3) Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12.

(4) Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan. The provision in this paragraph (c)(4) does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole.

*      *      *      *      *

(g) * * *

(2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

*      *      *      *      *

(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

*      *      *      *      *

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

(h) *Biological opinions.* (1) The biological opinion shall include:

(i) A summary of the information on which the opinion is based;

(ii) A detailed discussion of the environmental baseline of the listed species and critical habitat;

(iii) A detailed discussion of the effects of the action on listed species or critical habitat; and

(iv) The Service's opinion on whether the action is:

(A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a ''jeopardy'' biological opinion); or

(B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a ''no jeopardy'' biological opinion).

(2) A ''jeopardy'' biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

(3) The Service may adopt all or part of:

(i) A Federal agency's initiation package; or

(ii) The Service's analysis required to issue a permit under section 10(a) of the Act in its biological opinion.

(4) A Federal agency and the Service may agree to follow an optional collaborative process that would further the ability of the Service to adopt the information and analysis provided by the Federal agency during consultation in the development of the Service's biological opinion to improve efficiency in the consultation process and reduce duplicative efforts. The Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat, and other relevant factors to determine whether an action or a class of actions is appropriate for this process. The Federal agency and the Service may develop coordination procedures that would facilitate adoption of the initiation package with any necessary supplementary analyses and incidental take statement to be added by the Service, if appropriate, as the Service's biological opinion in fulfillment of section 7(b) of the Act.

*      *      *      *      *

(l) *Expedited consultations.* Expedited consultation is an optional formal consultation process that a Federal agency and the Service may enter into upon mutual agreement. To determine whether an action or a class of actions is appropriate for this type of consultation, the Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat and other relevant factors. Conservation actions whose primary purpose is to have beneficial effects on listed species will likely be considered appropriate for expedited consultation.

(1) *Expedited timelines.* Upon agreement to use this expedited consultation process, the Federal agency and the Service shall establish the expedited timelines for the completion of this consultation process.

(2) *Federal agency responsibilities.* To request initiation of expedited consultation, the Federal agency shall provide all the information required to initiate consultation under paragraph (c) of this section. To maximize efficiency and ensure that it develops the appropriate level of information, the Federal agency is encouraged to develop its initiation package in coordination with the Service.

(3) *Service responsibilities.* In addition to the Service's responsibilities under the provisions of this section, the Service will:

(i) Provide relevant species information to the Federal agency and guidance to assist the Federal agency in completing its effects analysis in the initiation package; and

(ii) Conclude the consultation and issue a biological opinion within the agreed-upon timeframes.

*      *      *      *      *

■ 5. Amend § 402.16 by:
■ a. Revising the section heading;
■ b. Redesignating paragraphs (a) through (d) as paragraphs (a)(1) through (4);
■ c. Designating the introductory text as paragraph (a);
■ d. Revising the newly designated paragraphs (a) introductory text and (a)(3); and
■ e. Adding a new paragraph (b).

The revisions and addition read as follows:

### § 402.16   Reinitiation of consultation.

(a) Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

*      *      *      *      *

(3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or

*      *      *      *      *

(b) An agency shall not be required to reinitiate consultation after the approval of a land management plan prepared pursuant to 43 U.S.C. 1712 or 16 U.S.C. 1604 upon listing of a new species or designation of new critical habitat if the land management plan has been adopted by the agency as of the date of listing or designation, provided that any

**Addendum 357a**

authorized actions that may affect the newly listed species or designated critical habitat will be addressed through a separate action-specific consultation. This exception to reinitiation of consultation shall not apply to those land management plans prepared pursuant to 16 U.S.C. 1604 if:

(1) Fifteen years have passed since the date the agency adopted the land management plan prepared pursuant to 16 U.S.C. 1604; and

(2) Five years have passed since the enactment of Public Law 115–141 [March 23, 2018] or the date of the listing of a species or the designation of critical habitat, whichever is later.

■ 6. Add § 402.17 to read as follows:

### § 402.17   Other provisions.

(a) *Activities that are reasonably certain to occur.* A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Factors to consider when evaluating whether activities caused by the proposed action (but not part of the proposed action) or activities reviewed under cumulative effects are reasonably certain to occur include, but are not limited to:

(1) Past experiences with activities that have resulted from actions that are similar in scope, nature, and magnitude to the proposed action;

(2) Existing plans for the activity; and

(3) Any remaining economic, administrative, and legal requirements necessary for the activity to go forward.

(b) *Consequences caused by the proposed action.* To be considered an effect of a proposed action, a consequence must be caused by the proposed action (*i.e.,* the consequence would not occur but for the proposed action and is reasonably certain to occur). A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Considerations for determining that a consequence to the species or critical habitat is not caused by the proposed action include, but are not limited to:

(1) The consequence is so remote in time from the action under consultation that it is not reasonably certain to occur; or

(2) The consequence is so geographically remote from the immediate area involved in the action that it is not reasonably certain to occur; or

(3) The consequence is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur.

(c) *Required consideration.* The provisions in paragraphs (a) and (b) of this section must be considered by the action agency and the Services.

### § 402.40   [Amended]

■ 7. Amend § 402.40, in paragraph (b), by removing ''§ 402.14(c)(1)–(6)'' and in its place adding ''§ 402.14(c)''.

Dated: August 12, 2019.

**David L. Bernhardt,**
*Secretary, Department of the Interior.*

Dated: August 9, 2019.

**Wilbur Ross,**
*Secretary, Department of Commerce.*

[FR Doc. 2019–17517 Filed 8–26–19; 8:45 am]

**BILLING CODE 4333–15–P 3510–22–P**

**Addendum 358a**