NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5101

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

v.

MICHAEL REGAN, et al.,
*Defendants-Appellants/Defendants-Appellees*,

and

STATE OF FLORIDA, et al.,
*Intervenors-Defendants-Appellants/ Intervenors-Defendants-Appellees.*

———————————————

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-00119 (Hon. Randolph D. Moss)

———————————————

**REPLY BRIEF FOR FEDERAL APPELLANTS**

———————————————

Of Counsel:

CHASE RAINES
SIMMA KUPCHAN
ALEXIS WADE
*Attorneys*
Environmental Protection Agency

HELEN SPEIGHTS
*Attorney*
U.S. Department of the Interior

KATHERINE WAINWRIGHT
ERICA ZILIOLI
*Attorneys*
U.S. Army Corps of Engineers

TODD KIM
*Assistant Attorney General*

RACHEL HERON
JOAN PEPIN
MICHAEL EITEL
ANDREW COGHLAN
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Plaintiffs-Appellees are the Center for Biological Diversity; Defenders of Wildlife; Sierra Club; Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

Federal Defendants-Appellants are Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency (EPA); Bruno Pigott, in his official capacity as Acting Assistant Administrator for the Office of Water of the EPA; Dimple Chaudhary, in her official capacity as Acting General Counsel for the EPA; Cecil Rodrigues, in his official capacity as Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance for the EPA; Jeaneanne Gettle, in her official capacity as Acting Administrator for Region 4 of the EPA; Michael Oetker, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service (FWS); Martha Williams, in her official capacity as Director for the FWS; Lieutenant General William H. Graham, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; Colonel Brandon Bowman, in his official capacity as District Commander of the Jacksonville District for the Corps; EPA; Corps; and FWS.[*]

_____

[*] The successors in office of named public officials are automatically substituted as parties. See Fed. R. App. P. 43(c)(2).

i

Intervenor-Defendant-Appellants are the State of Florida and Florida Department of Environmental Protection.

Amici before this Court are the Florida Chamber of Commerce; the Association of Florida Community Developers, Inc.; the Mosaic Company; the Florida Home Builders Association; the Florida Transportation Builders' Association; the Leading Builders of America; the Associated Industries of Florida; the Lennar Corporation; G.L. Homes of Florida Corp.; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison Home Corp; Florida State Hispanic Chamber of Commerce.

Additional amici before this Court are the States of Utah, Alabama, Alaska, Arkansas, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming.

The Miccosukee Tribe of Indians of Florida is also an amicus before this Court.

Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd., was an additional party before the district court. Additional amici before the district court were Cameratta Companies LLC and CAM7-SUB, LLC.

**B.     Rulings Under Review**

The State of Florida, the Florida Department of Environmental Protection, and Federal Defendants appeal the district court's February 15, 2024 order, as amended on April 12, 2024. That order was made final and appealable on April 12, 2024, when the district court entered a final judgment under Federal Rule of Civil Procedure 54(b).

**C.     Related Cases**

None.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for the United States

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES .................................................................................................i

TABLE OF CONTENTS..........................................................................iv

TABLE OF AUTHORITIES .....................................................................v

GLOSSARY.............................................................................................iv

SUMMARY OF ARGUMENT ..................................................................1

ARGUMENT ............................................................................................2

I.      EPA's consultation with FWS complied with law. ..........................2

      A.     EPA's approval of Florida's assumption application had
           unknown and unknowable effects........................................2

      B.     FWS reasonably relied on the robust, mandatory
           technical-assistance process. ................................................4

      C.     The biological opinion and incidental take statement
           were sufficiently detailed. ..................................................13

           1.     The biological opinion was sufficiently detailed.....................13

           2.     The incidental take statement was sufficiently
               detailed. ....................................................................20

II.    The agencies and plaintiffs agree that EPA was required to
      consult with NMFS.......................................................................27

CONCLUSION .......................................................................................29

CERTIFICATE OF COMPLIANCE........................................................30

# TABLE OF AUTHORITIES

## Cases

*Center for Biological Diversity v. Bureau of Land Management*,
  698 F.3d 1101 (9th Cir. 2012) ..........................................................23

*Center for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) ..........................................................11

 *Cooling Water Intake Structure Coalition v. EPA*,
  905 F.3d 49 (2d Cir. 2018) ........................................................7, 24

*Department of Transportation v. Public Citizen*,
  541 U.S. 752 (2004)...............................................................14, 16

*Eldred v. Reno*,
  239 F.3d 372 (D.C. Cir. 2001)..........................................................28

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002)..........................................................18

*In re Polar Bear Endangered Species Act Listing*,
  709 F.3d 1 (D.C. Cir. 2013) ..........................................................15

*Maine Lobstermen's Ass'n v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023)..........................................................16

*Miccosukee Tribe of Indians of Florida v. EPA*,
  S.D. Fl. No. 1:22-cv-22459 ..........................................................28

*National Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007)...................................................................9

*National Parks Conservation Ass'n v. Semonite*,
  925 F.3d 500 (D.C. Cir. 2019)..........................................................27

## Statutes

1 U.S.C. § 1 ..............................................................................19

16 U.S.C. § 1536(a)(2) ................................................................... 9

16 U.S.C. § 1536(b)(1)(A) ............................................................ 22

16 U.S.C. § 1536(b)(3)(A) ............................................................ 13

16 U.S.C. § 1536(b)(4)(C) ....................................................... 20, 22

16 U.S.C. § 1536(b)(4)(C)(i) ........................................................ 23

16 U.S.C. § 1536(b)(4)(C)(iv) ...................................................... 26

33 U.S.C. § 1344(g) ........................................................................ 4

33 U.S.C. § 1344(h) ...................................................................... 15

33 U.S.C. § 1344(i) ......................................................................... 4

## Regulations

40 C.F.R. § 233.15(c) .................................................................... 15

40 C.F.R. § 233.50 .......................................................................... 5

40 C.F.R. § 233.51 .......................................................................... 5

50 C.F.R. § 402.02 ..................................................................... 3, 10

50 C.F.R. § 402.14(g)(8) ............................................................... 12

50 C.F.R. § 402.14(h)(1)(ii) .......................................................... 14

50 C.F.R. § 402.14(h)(1)(iii) ......................................................... 14

50 C.F.R. § 402.14(h)(4)(i)(1)(i) ................................................... 23

Florida Administrative Code § 62-331.051–.053 .............................. 7

Florida Administrative Code § 62-331.054(2)(a) ............................ 25

# Other Authorities

Endangered Species Consultation Handbook,
https://www.fws.gov/sites/default/files/documents/endangered-
species-consultation-handbook.pdf ............................................................22

H.R. Rep. 97-567 at 27 (1982)...................................................................22

U.S. Army Corps of Engineers, Jacksonville District Public Notices
https://www.saj.usace.army.mil/Missions/Regulatory/Public-
Notices/ ..........................................................................................................28

**GLOSSARY**

APA          Administrative Procedure Act

CWA          Clean Water Act

EPA          Environmental Protection Agency

ESA          Endangered Species Act

FWS          Fish and Wildlife Service

NMFS          National Marine Fisheries Service

## SUMMARY OF ARGUMENT

EPA and FWS ("agencies") complied with the ESA when FWS made an expert determination that EPA authorizing Florida to assume responsibility for issuing dredge-and-fill permits across the state was not likely to jeopardize any listed species or destroy critical habitat, given the species-protective guardrails built into Florida's program. FWS likewise complied with the ESA when, as required by that statute, it authorized incidental take expected to result from the program. Plaintiffs' contrary arguments misunderstand both the record and the law. This Court should therefore reverse the district court's holding that FWS's biological opinion and incidental take statement were unlawful and that EPA erred in relying on them.

As to the other issues on appeal, the agencies do not contest here that EPA erred in failing to consult with NMFS before approving Florida's application. The fact-specific contentions raised by Florida, Plaintiffs, and amici regarding the appropriate remedy for that error—including whether the vacatur order should remain in place while remedy proceedings are ongoing— are best left for resolution by the district court, whose prospective disposition of plaintiffs' remaining claims (which were dismissed as moot, and which are not the subject of these appeals) may inform that remedy.

## ARGUMENT

**I.     EPA's consultation with FWS complied with law.**

    **A.     EPA's approval of Florida's assumption application had unknown and unknowable effects.**

EPA's approval of Florida's assumption application was a one-time action that transferred authority to issue dredge-and-fill permits in certain waters in Florida indefinitely. Plaintiffs nevertheless assert that FWS had to make its jeopardy determination only after predicting and aggregating the likely effects of yet-unknown individual future permitting decisions throughout the unbounded lifetime of Florida's program. These arguments are largely beside the point: as discussed below, FWS did not need to guess at the effects of individual future permits to reach a jeopardy conclusion, because it reasonably determined that the structural protections built into Florida's program made it unlikely that any permit would jeopardize protected species, whatever its particulars.[1] But because the impossibility of the task that Plaintiffs and the district court interpret the ESA to require is relevant context, *see* Fed. Op. Br. 30-32, further discussion is warranted.

Plaintiffs argue that FWS had "ample data" to conduct its analyses and cite data from prior Section 7 consultations for Section 404 permits issued by the Army Corps. Pl. Br. 42. But FWS did not know which permits Florida would issue *in the*

---

[1] For this reason, Plaintiffs' argument that "uncertainty" does not "excuse" the agencies from "compliance," Pl. Br. 24, 45-47, misses the point.

*future*. And it certainly did not know details about future permitted activities, like the proximity of permitted activities to listed species or critical habitat, the location and extent of any disturbance, the timing of permitted activities, the duration of the permitted activity, the duration of any impacts, the frequency of any disturbance, and the nature of the effects, such as whether they would impact population size or physical habitat features. JA__FWS-006061.

As Plaintiffs note, Pl. Br. 42, FWS assumed that future 404 permit applications in Florida would be similar to those permitted in the past by the Corps. JA__FWS-006096–97. But even though the number of permit applications and "the general types of activities and overall dredge or fill quantities" would be "similar," that does not mean that FWS could identify the "consequences to listed species or critical habitat . . . reasonably certain to occur" from all 404 permits that Florida might issue in the future. 50 C.F.R. § 402.02 (defining "effects of the action"); JA__FWS-006096–97.

Moreover, even if recent past permits were a reasonable predictor of near-term future permits, *see* JA__EPA-HQ-OW-2018-0640-0649 at 72 (deeming it "reasonable" to expect that past permitting data would approximate likely permitting activity for the next five years), the agency action at issue here is not limited to authorizing Florida to issue permits over the next five, 10, or even 20

3

years.[2] To the contrary, CWA 404 contemplates that the state will assume

permitting authority permanently, unless and until EPA "determines after public

hearing" that the state is not administering the program in accordance with law.

*See* 33 U.S.C. § 1344(g)-(i). Plaintiffs provide no basis to conclude that their

suggested data can reasonably forecast what permitting activity will look like

decades from now, let alone that such predictions are the only reasonable way to

assess likely future effects on protected species.

**B.      FWS reasonably relied on the robust, mandatory technical-assistance process.**

FWS did not need to guess at the details of future permits to determine

whether EPA's proposed action — the approval of Florida's assumption

application — was likely to cause jeopardy, because Florida bound itself to a

technical-assistance process under which it may not issue any permit that FWS

deems likely to cause jeopardy or destroy critical habitat, regardless of whether

Florida agrees. *See* JA___FWS-6106–07; *see also* JA___FWS-006049-58, 6110;

Fed. Op. Br. 13-17, 33-34. EPA regulations and a memorandum of agreement

---

[2] This temporal component distinguishes this case from the 2017 biological
opinion that Plaintiffs tout, which considered past consultations to forecast the
impacts over a *five-year period* of ten categories of "common, minor" activities in
the waters off Florida's coast. *See* Endangered Species Act – Section 7
Consultation Biological Opinion (Nov. 20, 2017), *available at*
https://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577, at
20.

between Florida and EPA likewise forbid issuance of a permit that FWS determines will cause jeopardy. *See* JA___FWS-006050; JA___EPAHQ-OW-2018-0640-0018 at 5; 40 C.F.R. § 233.50, 233.51. These safeguards built into Florida's permitting program obviate the need for FWS to speculate on effects of individual permits.

Plaintiffs allege that the technical-assistance program gives *Florida* unilateral authority to decide that a permit will not affect listed species and to block FWS from concluding otherwise, *see* Pl. Br. 57-58, but the record proves otherwise. "With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, *the final USFWS position is determinative.*" JA__FWS-006068 (emphasis added). Any agency—including FWS—may unilaterally elevate "any contentious issues, disagreements or conflict"—including conflicts about the effect of a project on ESA-listed species—with the other involved agencies to higher-level decisionmakers within each agency. JA__FWS-006068; JA__EPA-HQ-OW-2018-0640-0623 at 9-10. The "overall goal" is to reach consensus, but FWS's final position on any "conclusions about the potential effects of a project on ESA-listed species" is "determinative." *Id.*

Plaintiffs rest their opposite view on a statement in the biological opinion providing that if Florida determines "that an application will have no adverse

5

impacts or adverse effects to federally listed endangered or threatened species . . . or their critical habitats, *and the USFWS has not submitted information or questions that would lead the State to reconsider its determination*, the species review concludes for that species." JA__FWS-006056 (emphasis added). But that statement simply describes what will happen in the normal course where Florida decides a permit will have no effect, and FWS does not come forward with information undermining that conclusion. It does not address what happens if FWS objects to Florida's no-effect determination and the information it provides fails to persuade Florida. In that circumstance, FWS is free to elevate the disagreement; and if that disagreement cannot be resolved, FWS's own effect determination is "determinative." JA__FWS-006068; JA__ EPA-HQ-OW-2018-0640-0623 at 9-10.[3]

Plaintiffs' attempts to characterize the technical-assistance process as optional fare no better. Like the district court, Plaintiffs note that the technical-assistance process is not codified in federal regulations and seek to distinguish the

---

[3] Plaintiffs also err in claiming that the technical-assistance process is "only triggered if and when Florida determined that a state permit was likely to adversely affect a species." Pl. Br. at 58. The first step of technical assistance requires Florida to "provide copies of *all* State 404 permit applications to" FWS for review. JA__FWS-006054 (emphasis added). Florida may simultaneously (or shortly after) send FWS its view on "whether ESA-listed species or their critical habitats are expected to be present and whether they are likely to be affected adversely or beneficially by the proposed State permit action," but Florida's view is a "preliminary determination" only. *Id.*

Second Circuit's decision in *Cooling Water* on that basis. Pl. Br. 64-65; *see*

*Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018).[4] But

Plaintiffs do not—and cannot—dispute that the technical-assistance process is

mandatory and enforceable in other legally relevant ways. It is codified in

*Florida's* regulations, *see* F.A.C. 62-331.051–.053; subject to memoranda of

agreement between Florida, FWS, and EPA, *see* JA__ FWS-006044,

JA___EPAHQ-OW-2018-0640-0018; and made enforceable by FWS's

incorporation of the process into the biological opinion and incidental take

statement. JA___FWS-006109.

　　Plaintiffs try another tack, arguing that the technical-assistance process is not

truly mandatory because, while FWS's decisions on whether a permit may issue

and what conditions are required are controlling, the procedures say only that FWS

*may* provide input, not that it *must*. Pl. Br. 56-59. But the broader context makes

clear that FWS has committed to participating actively in review of potential state

permits, such as by reviewing, providing input on, or demanding changes to

individual permits.

---

[4] Plaintiffs also seek to distinguish *Cooling Water* on the ground that—according to Plaintiffs—less data was available to predict the effects of the state-issued permits in that case. Pl. Br. 63-64. That claim is doubtful, *see* pp. 2-4, above, but more importantly misses the point. In *Cooling Water*, as here, the structural safeguards of the proposed permitting program allowed FWS to rationally conclude that no jeopardy would occur, regardless of the extent of data currently available.

To wit, a section of the biological opinion, entitled "Summary of USFWS commitments triggered by approval of the action," states explicitly that FWS "will" "[r]eceive all the 404 permit applications sent by [Florida]" and [r]eview all the 404 permit applications sent by [Florida]." JA__FWS-006057–006058. It then uses optional language to say that FWS "may provide [Florida] with technical information regarding species biology, types and likelihoods of potential effects of the proposed permit on the species, and recommended measures that would avoid or minimize effects, as appropriate with the understanding that final FWS conclusions regarding effects to species are determinative." *Id.* But the biological opinion switches to mandatory language to provide that FWS "*will* provide" any information "that would disconfirm the State's effect determination." *Id.* (emphasis added). Plaintiffs offer no contrary evidence to support their supposition that FWS will simply abstain from commenting on a proposed permit that it knows to threaten listed species. *See* Fed. Op. Br. 37-38.

For all these reasons, FWS reasonably concluded that the structural safeguards built into Florida's permitting program make jeopardy unlikely, and Plaintiffs fail to show otherwise. Plaintiffs' remaining arguments for why FWS should not have relied on the technical assistance features to reach a no-jeopardy conclusion fail as a matter of law.

Most critically, Plaintiffs consistently decry the technical-assistance features because they are not identical to the steps in the individualized Section 7 consultation that would occur for each permit if the Corps were processing the application. *See, e.g.*, Pl. Br. 52, 56-59. But they do not need to be identical. ESA Section 7 applies only to federal agencies; it does not require state agencies to comply with Section 7's jeopardy standard before issuing a permit, and Plaintiffs do not contend otherwise. *See* 16 U.S.C. § 1536(a)(2); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 653 & n.4 (2007).

Plaintiffs err in relying on caselaw holding that, where a federal action is likely to beget other federal actions that will themselves be subject to consultation under ESA Section 7, FWS may defer a conclusion on whether the subsequent actions will cause jeopardy. *See* Pl. Br. 52-56. The agencies agree that, in such cases, further consultation must be completed before the action agency takes those subsequent actions. But those are not the facts here. In this case, FWS knew that there would be no subsequent Section 7 consultation when Florida issued an individual permit, because Section 7 does not apply to Florida. *Nat'l Ass'n of Home Builders*, 551 U.S. at 653 & n.4. This case instead involved EPA's one-time approval of Florida's assumption application, and so FWS analyzed all facets of

9

the approval—including the technical-assistance process that applies to Florida's subsequent issuance of permits—at once. *See* pp. 2-5, *supra*.[5]

Plaintiffs likewise err in asserting that the agencies' argument that FWS properly considered the technical-assistance process as part of the agency action under review is new or forfeited. *See* Pl. Br. 59. FWS has been clear from the start that the technical-assistance features of Florida's program are part of the agency action under review. JA__FWS-006045 ("Measures included in the proposed action . . . that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action."); *id.* ("This [biological opinion] will examine whether and to what degree [Florida's] program, regulations, processes, and procedures insure that EPA's approval and [Florida's] subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species."). FWS has been equally clear that its no-jeopardy conclusion was based on its judgment that the technical-assistance features of Florida's program made jeopardy unlikely, and that particular impacts of individual future permits (which are not expected to rise to

---

[5] To be sure, FWS does describe the biological opinion as "programmatic." *E.g.*, JA__FWS-006039. But it does not meet the definitions of a "framework" or "mixed" programmatic biological opinion, both of which presume that further Section 7 consultations will occur. *See* 50 C.F.R. § 402.02. Here, the biological opinion is "programmatic" in the sense that FWS evaluated the structural contours of Florida's permitting program as a whole, rather than tallying up the effects of individual permitting decisions. *See* JA__FWS-006045, JA__FWS-006081.

the level of jeopardy) would be assessed during the technical-assistance process. *See* JA__FWS-006045, JA__FWS-006081.

Plaintiffs' remaining arguments as to why FWS should not have considered the technical-assistance features as part of the action under review also fail. Plaintiffs allege that some details of the technical-assistance process were fleshed out in the biological opinion and were not crystallized in Florida's original application. *See* Pl. Br. at 60. But there can be no dispute that the final, adopted version of Florida's permitting program is the one described in the biological opinion (and the memoranda of agreement and state regulations).  FWS therefore had to assess whether approval of *that* program would cause jeopardy.

Plaintiffs nevertheless maintain that FWS could have considered the technical-assistance process only if it determined that the technical-assistance features of Florida's program "(1) constitute a 'clear, definite commitment of resources'; (2) [are] 'reasonably certain to occur'; (3) [are] enforceable; and (4) address the threats to the species." *Id.* (citing *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743–48 (9th Cir. 2020)). Even if those requirements were derived from the ESA's text — which they are not — they are inapplicable here. In the case cited by Plaintiffs, the Ninth Circuit set forth a test for determining whether a no-jeopardy finding may rest on an agency's commitment to certain *mitigation* measures. *See* 982 F.3d at 743–48. Here, however, the technical-

11

assistance process is not mitigation *for* the action but rather a key feature *of* the agency action under review that is intended to avoid and minimize adverse effects. Such measures, by regulation, "are considered like other portions of the action and do not require any additional demonstration of binding plans." *See* 50 C.F.R. § 402.14(g)(8).

In any event, Plaintiffs' cursory assertion that the technical-assistance process does not meet the Ninth Circuit's requirements turns on the same flawed understanding of the technical-assistance process that the federal agencies have already rebutted. The agreements entered into by Florida, FWS, and EPA demonstrate both a clear commitment to the technical-assistance process and reasonable certainty that it will occur. The process is designed to ensure that no permit will jeopardize any listed species, including by giving FWS final say on whether permits affecting listed species may issue and, if so, with what conditions. And the regime contains multiple enforcement mechanisms, including the fact that protection from incidental take liability is contingent on compliance with the technical-assistance process. JA__FWS-006109–FWS-006110; *see also* JA__FWS-006093 (identifying compliance with the technical-assistance process as a "key assumption[]" of the biological opinion and recognizing that re-initiation of Section 7 could be triggered if those assumptions "prove incorrect or warrant changes during implementation of the State 404 Program").

12

**C.    The biological opinion and incidental take statement were sufficiently detailed.**

For all the foregoing reasons, FWS's no-jeopardy conclusion was a reasoned judgment grounded in the procedural and substantive protections built into Florida's permitting program, and should be upheld. Plaintiffs' arguments that FWS's biological opinion and accompanying incidental take statement lacked sufficient detail would not undermine that core no-jeopardy finding, even were this Court to credit them. In any event, the level of detail that Plaintiffs demand was not required by the statute.

**1.    The biological opinion was sufficiently detailed.**

ESA Section 7 does not prescribe exacting requirements for biological opinions: it calls for a "written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). The challenged biological opinion provides such a statement. It acknowledges the breadth of protected species and habitats potentially affected by permits issued under Florida's program; it recognizes that some permits will likely cause incidental take of individual members of protected species; and it explains why the mandatory processes built into Florida's program nevertheless make it unlikely that any issued permit would cause jeopardy. *See* pp. 2-8, *supra*; Fed. Op. Br. 32-45.

13

Plaintiffs zero in on the statutory word "detailing," which they define as "to report minutely and distinctly: to report with close attention to small elements," or, alternatively, as requiring "more than just lists, perfunctory statements, recitations, or anything short of analysis." Pl. Br. 48. While either definition is plausible, neither carries Plaintiffs' burden of showing that the biological opinion here was inadequate.

Plaintiffs point to two requirements for biological opinions codified in ESA's implementing regulations that they say were lacking here: "a *detailed* discussion of the environmental baseline of listed species and their critical habitats" and "a *detailed* discussion of the effects of the action on those species or critical habitats." Pl. Br. 38 (quoting 50 C.F.R. § 402.14(h)(1)(ii)-(iii)) (emphases added). As a threshold matter, Plaintiffs err in considering the word "detail" in isolation. The ESA's call for "detail" is not an end in itself, but a means to aid FWS in its statutory duty to reach a jeopardy conclusion; Section 7's purpose, like the National Environmental Policy Act's, "is not to generate paperwork — even excellent paperwork — but to foster excellent action." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). How much detail is required therefore turns on how much detail FWS needs to reach a rational conclusion.

Plaintiffs protest that the meaning of "detail" cannot change based on the circumstances, *see* Pl. Br. 51, but that is a red herring. The meaning of "detail"

does not change—all agree that it requires describing something with specificity—but how much specificity is rationally required to produce an adequate report can only be answered based on particular facts. This Court has recognized as much with regard to another ESA term —"foreseeable"—acknowledging that what that word requires in a particular context varies, including based on what reliable scientific information is available. *See In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 15 (D.C. Cir. 2013).

At base, Plaintiffs maintain that, even if their reading of "detailed" is infeasible,[6] the plain meaning of that term brooks no other result but a granular accounting. But it cannot be the case that as long as more details exist or could be uncovered, the agency must provide them; such a rule would turn drafting a biological opinion into an impossible task. Instead, common sense dictates that—in

---

[6] As to feasibility, Plaintiffs offer no serious rebuttal to the common-sense canon of interpretation disfavoring readings that would make a statute impossible to administer, *see* Fed. Op. Br. 43-44, instead insisting that the level of detail they demand was knowable. Those assertions lack substance for the reasons already discussed. Moreover, under the CWA, EPA had only 120 days to act on Florida's application. 33 U.S.C. § 1344(h)(1), (h)(3). The regulations governing Section 404 assumption provide that the state and EPA "may extend the statutory review period by agreement." 40 C.F.R. § 233.15(c). Plaintiffs contend that the State and EPA could have extended the review period. Pl. Br. 51. But EPA and FWS cannot force a state to consent to extending the review period. And even if a state would consent to some extension, Congress' view in drafting the statute was that the baseline amount of time to approve a Section 404 assumption application was 120 days. 33 U.S.C. § 1344(h)(3). It would have been incongruous for Congress to select such a timeline if it expected agencies to perform the type of individualized analysis that Plaintiffs demand—even if it was feasible for FWS to do such an analysis.

the ESA as in other contexts—how much detail is sufficiently "detailed" turns on

factors including the relevance and availability of that information. *Cf. Public

Citizen*, 541 U.S. at 767  (recognizing that the National Environmental Policy

Act's direction to prepare a statement disclosing the significant impacts of federal

action includes an implicit "rule of reason" considering "the usefulness of any new

potential information to the decisionmaking process"); *Maine Lobstermen's Ass'n

v. NMFS*, 70 F.4th 582, 596 (D.C. Cir. 2023) (ESA requires agencies to use "'the

best scientific and commercial data available,' not the best data possible."). The

analysis should be a record-based review for arbitrary or capricious action, not a

one-size-fits-all demand for detail above some abstract and indescribable

minimum. Here, the amount of detail in the biological opinion was sufficient to

support FWS's no-jeopardy conclusion.

Turning first to the discussion of the environmental baseline, the biological

opinion contains an admittedly brief description of baseline ecological conditions

in various Florida regions, along with a longer discussion of the history of

regulatory frameworks impacting species in those regions. JA__FWS-006084–91.

But the biological opinion does not stop there. It also expressly adopts EPA's

biological evaluation. JA__FWS-006083.

Plaintiffs criticize the biological evaluation too, alleging that it provides only

"broad descriptions of individual listed species" rather than an "analysis of past

and present impacts from federal, state, and private activities." Pl. Br. 39. The document itself shows otherwise. Its 14-page discussion of baseline environmental conditions begins by setting out changes in total acres of wetlands from 1845 to the present across the entire state before more specifically describing impacts from federal flood control projects and Everglades restoration. JA__FWS-005666-80. It then breaks down acreage lost due to all federal Section 404 permits issued from 2014 to 2018 by type of habitat, as well as the location of ESA consultations associated with those permits and the listed species affected. JA__FWS-005668-80. The biological evaluation also contains a separate discussion of cumulative effects from non-federal actions in the region, including watershed development, increased water consumption, and climate change impacts. JA__FWS-005690-96.

Largely ignoring these details, Plaintiffs pivot to arguing that FWS erred in "cop[ying]" EPA's analysis from the biological evaluation, which EPA in turn copied from the analysis that Florida submitted. Pl. Br. 39. But contrary to Plaintiffs' assertions, FWS did not "abdicate its ESA duties" by relying on the analysis from EPA and Florida, Pl. Br. 40; a consultation between agencies allows FWS to consider, and adopt as appropriate, analysis performed by other agencies. FWS reasonably concluded that the technical-assistance process would ensure that EPA's approval of Florida's assumption request would not jeopardize species or harm critical habitat. JA__FWS-6106–07. And FWS expressly stated that although

17

it was adopting various portions of the biological evaluation, it "conducted its own analysis of the best scientific and commercial data available."[7] JA__FWS-006045.

Turning to the biological opinion's discussion of effects on species, Plaintiffs fault FWS for evaluating guilds of species instead of individual species. Pl. Br. 40. In so doing, Plaintiffs once again disregard the biological opinion's adoption of EPA's biological evaluation, which contains 153 pages of appendices. Those appendices list every protected species in Florida and indicate what stressors associated with dredge-and-fill permits may impact that species; determine whether authorizing Florida's program is likely to affect that species; and briefly explain the grounds for each finding—generally running from two or three sentences, to one or two paragraphs. JA__ FWS-005835-86.

Plaintiffs nowhere address how the concise but reasoned explanations in that Appendix are "anything short of analysis." Pl. Br. 47-48. Nor do they assert that any of the information contained in that appendix is inaccurate or incomplete. Instead, they attack a strawman by focusing exclusively on the shorter, guild-based summaries in the biological opinion.

---

[7] *Gerber v. Norton*, cited at Pl. Br. 40, is inapposite. *See* 294 F.3d 173, 185 (D.C. Cir. 2002). In that case, the Court held that FWS failed to independently evaluate data provided by a developer, as evidenced by contradictions in the record between that data and FWS's findings.

18

To be clear, Plaintiffs are incorrect that ESA Section 7's references to "*the species*" and "*its* habitat" foreclose FWS from describing the effects on multiple species together, where the record discloses the full list of potentially affected species and the agency rationally concludes that the effects on subsets of species are likely to be comparable. *Contra* Pl. Br. 48-50. Plaintiffs fail to explain how such an approach is inconsistent with Congress' intent to ensure that FWS considers jeopardy to individual species. *Accord* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless context indicates otherwise, words importing the singular include and apply to several persons, parties, or things."). But the Court need not resolve that question, because Plaintiffs have chosen not to wrestle with the full record on which FWS relied.

As one notable example, Plaintiffs cite extra-record evidence to argue that the Key Largo woodrat and Florida bonneted bat should not have been evaluated together because habitat loss is the predominant threat to the woodrat, whereas water quality changes affect the bonneted bat. Pl. Br. 41. But FWS was absolutely aware of the threats to each species. Appendix C to the biological evaluation explicitly discloses that the woodrat is likely to be adversely affected by dredge-and-fill activities "[b]ased on the limited range and habitat preferences of the species," whereas "impacts to habitat (loss and fragmentation) and water quality" could adversely affect the bonneted bat. JA__ FWS-005836, FWS-005861, FWS-

19

005862. The precise information that Plaintiffs maintain is missing is included in the parts of the record that Plaintiffs ignore. Moreover, the impacts to those specific species do not hinge on those differences; they hinge on how the technical-assistance process safeguards those species. FWS analyzed the latter in depth, which Plaintiffs do not dispute.

In sum, Plaintiffs have not shown that further details about the baseline conditions or effects of individual permits would have affected the structural rationale behind FWS's no-jeopardy conclusion. Plaintiffs' insistence on more is unfounded.

### 2. The incidental take statement was sufficiently detailed.

ESA Section 7 provides that when a proposed action is not likely to jeopardize listed species but is likely to result in incidental take, FWS "shall provide" an incidental take statement that "specifies the impact of such incidental taking" and "sets forth the terms and conditions" with which the action agency and applicant must comply. 16 U.S.C. § 1536(b)(4)(C). As shown in the agencies' opening brief, pp. 45-50, FWS complied with the latter requirement by imposing terms and conditions requiring, among other things, monitoring, reporting, and compliance with the technical-assistance process. JA__FWS-006109-10. As to specifying the impact of incidental take, FWS explained that the inherent uncertainties about future permitting actions precluded a numeric estimate of take.

20

JA__FWS-006108. Instead, as permitted by the ESA and its regulations, FWS relied on a practicable yet specific alternative, setting forth the provisions by which "incidental take will be quantified" and "incorporate[d] as permit conditions" on a "project-specific and species-specific basis." JA__FWS-006108-09.

Echoing their arguments concerning the no-jeopardy finding, Plaintiffs first argue that FWS had "ample data" with which to set a numeric limit on incidental take associated with Florida's 404 permitting program, and thus violated the ESA by failing to do so. Pl. Br. 68-70.

FWS does have extensive information about Florida's endangered species, but at the time it issued the incidental take statement the agency did not have — and could not have had — information about *the permits Florida will issue in the future* sufficient to allow FWS to quantify the incidental take those permits are collectively likely to cause. Plaintiffs seem to believe that the latter information is unnecessary — that FWS could have imposed numeric take limits based solely on information about how many individuals each listed species could stand to lose without jeopardizing the species' survival. Pl. Br. at 69; JA__ECF No. 182 at 75. But the ESA requires that the incidental take statement specify the impact of taking *incidental to the proposed action*, not how much take each listed species could withstand, period. For the reasons discussed above, to specify this program's incidental take in the quantitative terms Plaintiffs demand would require

information that was unknowable at the time the agencies had to act. FWS therefore reasonably found that, per 16 U.S.C. § 1533(b)(1)(A), "the best scientific and commercial data *available* are not sufficient to enable [FWS] to accurately estimate the specific amount of incidental take at this time." JA__FWS-006108 (emphasis added).

Plaintiffs assert that where, as here, "the best available data does not support any anticipated level of incidental take, there can be no authorization of incidental take." Pl. Br. at 68.[8] But the ESA *requires* FWS to provide an incidental take statement whenever it determines that the proposed action is not likely to cause jeopardy but is likely to cause incidental take. 16 U.S.C. § 1536(b)(4)(C). In enacting that requirement, legislators recognized that "it may not be possible for

---

[8] Plaintiffs cite the ESA Consultation Handbook (available at https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf) for that proposition, but the Handbook says no such thing. Rather, it states that in programmatic consultations evaluating "broad programs," "the best available scientific data may not support the determination of any anticipated level of incidental take. In such instances, the incidental take statement should indicate that, based on the best available data, *no incidental take is anticipated* and that the issue will be reexamined during the consultation process for site-specific actions." Handbook at 4-50—4-51 (emphasis added). That guidance presumes that the action agency is a federal agency subject to future ESA consultations and incidental take statements for site-specific actions, so it cannot be applied to a state-run permit program, and Plaintiffs do not suggest that FWS should have found that no incidental take is anticipated here. The course that FWS followed, however — specifying that incidental take will occur and will be quantified in the permits for site-specific actions — adheres as closely as possible to that procedure given that Florida is not a federal agency.

the Secretary to specify a number in every instance." H.R. Rep. 97-567 at 27 (1982). For the same reason, courts have long acknowledged that incidental take statements may specify the impact of incidental taking by use of a "proxy" or "surrogate," as long as FWS explains why a numeric measure of take was impracticable. *Ctr. for Biological Diversity v. Bureau of Land Management*, 698 F.3d 1101, 1127 (9th Cir. 2012); *accord* 50 C.F.R. § 402.14(h)(4)(i)(1)(i).

Here, the best available information on the extent of future take incidental to Florida's permitting program is provided by the terms of the technical-assistance process, so FWS properly relied on those terms. Plaintiffs assert that "there is no statutory or regulatory authority under the ESA to substitute a process for a limit," Pl. Br. at 70, but it is they who substitute the word "limit" for the actual statutory and regulatory text, which require FWS to specify the "impact," "amount," or "extent" of take incidental to the proposed action. 16 U.S.C. § 1536(b)(4)(C)(i) ("impact"); 50 C.F.R. § 402.14(h)(4)(i)(1)(i) ("amount or extent"). A "limit" is the usual and preferred *means* of complying with that requirement, but it is not the requirement itself, and other indicia of the impact of incidental take are permissible when numerical limits are infeasible. Ecological conditions are often used as a proxy in such situations, but Plaintiffs cite no statute, regulation, or precedent endorsing their claim that *only* ecological proxies, and not procedural ones, are permissible means of specifying the impact of incidental take.

23

In fact, the only precedent on point — *Cooling Water* — rejected an argument identical to Plaintiffs' and upheld an incidental take statement that specified the incidental take from a delegated state permitting program by setting forth the terms of the technical-assistance process, under which incidental take would be quantified at the project level. 905 F.3d at 77. Seeking to distinguish and discredit the Second Circuit's holding, Plaintiffs claim it rested on "fundamentally different facts" and contravenes "the overwhelming weight of ESA authority." Pl. Br. at 70-71. But the *material* facts could hardly be more similar. And if *Cooling Water* is, as Plaintiffs claim, an outlier, that is because — similar to this case but unlike almost all Section 7 cases — it involves CWA permitting authority delegated to the states.

Plaintiffs claim that the technical-assistance process does not require FWS to set limits on incidental take at the permit level, nor does it require Florida to incorporate any such take limits into permits. The incidental take statement proves otherwise, specifically stating that for any permit expected to cause take of listed species, "incidental take *will be quantified* at that time *by the appropriate Field Office of the USFWS*," in coordination with Florida. JA___FWS-006108 (emphasis added). Florida, in turn, "*shall incorporate as permit conditions* all recommended impact avoidance and minimization measures (protection measures) provided to [Florida] by [FWS]." JA___FWS-006109 (emphasis added).

24

Plaintiffs then pivot to claiming that "[e]ven if" the technical-assistance process requires FWS and Florida to impose take limits at the permit level, it does not require permittees to obey those limits. Pl. Br. at 72. But this claim, too, is belied by the incidental take statement, which explicitly states that "any take incidental to the execution of activities permitted by a State 404 permit . . . will be exempt from Section 9 and Section 4(d) prohibitions *if the permittee implements all permit conditions*." JA___FWS-006108 (emphasis added).[9] Plaintiffs suggest that because that provision is not contained in the section of the incidental take statement headed "Terms and Conditions," it does not bind permittees. Pl. Br. at 75 n.17. But the duties imposed and the liability exemption granted in the "Terms and Conditions" section explicitly apply only to EPA and Florida. JA___FWS-006109. State permittees can neither comply with nor violate duties not directed at them, and likewise cannot invoke liability protection contingent on compliance with those duties. The *only* exemption from take liability offered to state permittees is the one quoted above, which in the very same sentence imposes the condition that they "implement[] all permit conditions." JA___FWS-006108.

---

[9] Florida's Administrative Code, § 62-331.054(2)(a), also requires permittees to "comply with all conditions of the permit, even if that requires halting or reducing the permitted activity to maintain compliance," and it provides that "[a]ny permit violation" violates both Florida law and the Clean Water Act.

Plaintiffs next argue that the technical-assistance process does not set as clear a trigger for reinitiation of consultation as would a numerical take limit. But even if true, a numerical take limit was, as shown above, impossible here. The technical-assistance process, however, does explicitly provide that if the "amount of incidental take" associated with a permit "is exceeded" — or if the magnitude of impacts is greater than expected, a new species is listed, new critical habitat is designated, or the permitted activity is changed — then Florida "will reopen the permit and coordinate with" FWS to determine if the additional impacts are likely to cause jeopardy and whether additional permit conditions are required "as deemed necessary by USFWS." JA___FWS-006110. That provision, which is functionally equivalent to a permit-specific reinitiation trigger, confirms that the technical-assistance process functions as a substitute for a numeric take limit.

Finally, Plaintiffs briefly assert that the incidental take statement failed adequately to "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant." 16 U.S.C. § 1536(b)(4)(C)(iv). That is demonstrably untrue: the incidental take statement imposes ten conditions Florida "must comply with," including forwarding *all* permit applications to FWS; incorporating as permit conditions *all* measures proposed by FWS; denying any permit FWS concludes is likely to cause jeopardy or adversely modify critical habitat; reopening permits and

26

coordinating with FWS under certain circumstances including exceedance of permit-specific incidental take; and reporting various types of information. JA__FWS-006109-10. Plaintiffs cite no authority for their claim that these terms and conditions are insufficient, instead merely repeating that FWS can ignore the technical-assistance process and state permittees can ignore the terms of their permits. As shown above, neither is true, and Plaintiffs fail to show any deficiency in the incidental take statement's terms and conditions.

## II.   The agencies and plaintiffs agree that EPA was required to consult with NMFS.

The agencies do not contest that EPA erred by failing to consult with NMFS regarding potential impacts on marine species before approving Florida's application. *See* Fed. Op. Br. 50-52. Nothing in Florida's defense of that failure undermines EPA's finding that Florida's 404 program may affect three listed species under NMFS' jurisdiction, on which NMFS has not been consulted. *Id.* at 52.

That leaves only the question of what remedy is appropriate for that narrow error. While Florida, Plaintiffs, and amici offer various equitable arguments about remedy, the agencies respectfully suggest that the district court "is best positioned to order additional briefing, gather evidence, make factual findings, and determine the remedies necessary" under the fact-specific *Allied-Signal* test. *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019). Likewise, the

district court is best positioned to determine whether the current vacatur order

should remain in place while remedy briefing proceeds, given the potential

disruption of toggling between federal and state control of Section 404 permitting

in Florida. The agencies simply note that the Corps continues to process 404

permits throughout Florida and provides public notice of all applications. *See*

https://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/.[10]

---

[10] Because Amicus Miccosukee Tribe cannot expand the issues on appeal, *Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001), the United States does not address their arguments regarding tribal sovereignty, which are the subject of a separate lawsuit. *Miccosukee Tribe of Indians of Florida v. EPA*, S.D. Fl. No. 1:22-cv-22459.

## CONCLUSION

For the foregoing reasons, the Court should reverse as to the FWS consultation, affirm as to the NMFS consultation, and remand to the district court to determine the appropriate remedy.

Respectfully submitted,

/s/ *Rebecca Jaffe*
TODD KIM
*Assistant Attorney General*

Of Counsel:

CHASE RAINES
SIMMA KUPCHAN
ALEXIS WADE
*Attorneys*
Environmental Protection Agency

HELEN SPEIGHTS
*Attorney*
U.S. Department of the Interior

KATHERINE WAINWRIGHT
ERICA ZILIOLI
*Attorneys*
U.S. Army Corps of Engineers

RACHEL HERON
JOAN PEPIN
MICHAEL EITEL
ANDREW COGHLAN
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

January 13, 2025
90-5-1-4-21866

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 6,489 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for the United States

30