ORAL ARGUMENT NOT YET SCHEDULED

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

---

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

---

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

---

**REPLY AND CROSS-APPELLEE BRIEF OF STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

---

Henry C. Whitaker
SOLICITOR GENERAL

Christopher J. Baum
SENIOR DEPUTY SOLICITOR GENERAL

Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

*Counsel for Florida Appellants*

# TABLE OF CONTENTS

**Page**

Table of Contents ............................................................. ii

Table of Authorities ..........................................................iv

Glossary.................................................................... viii

Summary of Argument ........................................................1

Argument....................................................................3

I.    Plaintiffs distort the technical-assistance process and the binding obligations it imposes on Fish & Wildlife and Florida. ...................3

II.   Plaintiffs lack standing to bring any of their claims.......................8

    A.    Ongoing federal agency oversight renders Plaintiffs' purported injuries too speculative to establish standing. .......................8

    B.    Plaintiffs' purported injuries depend on a tenuous causal chain that the Supreme Court's and this Court's precedents forbid.............12

III.  Plaintiffs cannot successfully defend the district court's erroneous summary judgment on the ESA claims. ......................................17

    A.    Plaintiffs construct a false choice between complying with the ESA or not.  ...................................................17

    B.    Plaintiffs cannot demonstrate that the BiOp and its programmatic analysis violated the ESA...................................................22

        1.    The BiOp complied with the text of the ESA...........................22

        2.    Plaintiffs have no persuasive answer for *Cooling Water*..........26

    C.    Plaintiffs cannot demonstrate that the programmatic incidental-take statement violated the ESA.........................................31

        1.    Plaintiffs identify no conflict between the incidental-take statement and the ESA's text. ..................................32

2.     *Cooling Water* remains the only persuasive authority addressing the validity of the incidental-take statement...........38

D.     Plaintiffs cannot avoid the conflict between the district court's decision and the cooperative federalism principles at play................41

1.     Plaintiffs give short shrift to cooperative federalism................41

2.     Plaintiffs' attempt to walk back the impossibility of the district court's holding only pokes more holes in their theory....................................................................43

3.     Plaintiffs' "other" methods for ESA compliance are illusory. .................................................................48

E.     This Court must also reverse the district court's invalidation of EPA's program approval. ..................................................50

IV.    EPA's "no effect" finding for marine species was not arbitrary, notwithstanding Federal Defendants' belated change in position................51

V.     Even if EPA erred, the proper remedy would be remanding to the agency for further work, not vacating the entire program............................53

Conclusion ....................................................................................57

Certificate of Compliance ........................................................................59

Certificate of Service ...........................................................................59

# TABLE OF AUTHORITIES[*]

Page(s)

## Cases

*Allied-Signal v. Nuclear Reg. Comm'n*,
　988 F.2d 146 (D.C. Cir. 1993)........................................................54, 55

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
　934 F.3d 649 (D.C. Cir. 2019)..............................................................56

*Am. Rivers v. FERC*,
　895 F.3d 32 (D.C. Cir. 2018)...........................................................23, 30

*Black Oak Energy, LLC v. FERC*,
　725 F.3d 230 (D.C. Cir. 2013)...............................................................54

*Ctr. for Biological Diversity v. EPA*,
　861 F.3d 174 (D.C. Cir. 2017).........................................................15, 16

*Ctr. for Biological Diversity v. Fish & Wildlife Serv.*,
　807 F.3d 1031 (9th Cir. 2015) ........................................................21, 28

*Ctr. for L. & Educ. v. Dep't of Educ.*,
　396 F.3d 1152 (D.C. Cir. 2005)............................................................16

*City of Oberlin v. FERC*,
　937 F.3d 599 (D.C. Cir. 2019)..............................................................55

*Conner v. Burford*,
　848 F.2d 1441 (9th Cir. 1988) ...................................................20, 29, 39

*Conserve Sw. Utah v. Dep't of Interior*,
　No. 1:21-CV-01506, 2023 WL 7922785 (D.D.C. Nov. 16, 2023)....................56

*Cooling Water Intake Structure Coalition v. EPA*,
　905 F.3d 49 (2d Cir. 2018) ............................. 1, 2, 20, 26, 27, 28, 38, 44, 45, 47

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

iv

*Crow Creek Sioux Tribe v. Brownlee,*
  331 F.3d 912 (D.C. Cir. 2003).......................................................8, 9, 10, 11, 12

*Defs. of Wildlife v. Babbitt,*
  130 F. Supp. 2d 121 (D.D.C. 2001)....................................................23

*Defs. of Wildlife v. Dep't of Interior,*
  931 F.3d 339 (4th Cir. 2019) ............................................................23

*Defs. of Wildlife v. Dep't of Navy,*
  733 F.3d 1106 (11th Cir. 2013) ........................................................19

*El Puente v. Army Corps of Eng'rs,*
  100 F.4th 236 (D.C. Cir. 2024).........................................................21

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024).........................................................................12

*Forest Serv. Emps. for Envt'l Ethics v. Forest Serv.,*
  726 F. Supp. 2d 1195 (D. Mont. 2010).........................................25, 39

*Greenpeace v. Nat'l Marine Fisheries Serv.,*
  80 F. Supp. 2d 1137 (W.D. Wash. 2000) ......................................30, 31

*Greenpeace Found. v. Mineta,*
  122 F. Supp. 2d 1123 (D. Haw. 2000).............................................43

*iTech U.S., Inc. v. Renaud,*
  5 F.4th 59 (D.C. Cir. 2021)...............................................................22

*Miccosukee Tribe of Indians of Fla. v. United States,*
  566 F.3d 1257 (11th Cir. 2009) ........................................................29

*Nat. Res. Def. Council v. Kempthorne,*
  506 F. Supp. 2d 322 (E.D. Cal. 2007) ......................................29, 30, 39

*Nat. Res. Def. Council, Inc. v. Evans,*
  279 F. Supp. 2d 1129 (N.D. Cal. 2003)............................................39

*Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
  103 F.4th 45 (D.C. Cir. 2024)...........................................................22

*N. Slope Borough v. Andrus*,
    642 F.2d 589 (D.C. Cir. 1980)..............................................................33

*Oceana, Inc. v. Pritzker*,
    75 F. Supp. 3d 469 (D.D.C. 2014)......................................................40

*Oceana, Inc. v. Ross*,
    No. CV-15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020)............................23

*Or. Nat. Res. Council v. Allen*,
    476 F.3d 1031 (9th Cir. 2007) ....................................................39, 40

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
    482 F. Supp. 2d 1248 (W.D. Wash. 2007) ..................................30, 31

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ............................................................39

*Sierra Club v. Dep't of Interior*,
    899 F.3d 260 (4th Cir. 2018) ............................................................40

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021)........................................................53

*Terry v. United States*,
    593 U.S. 486 (2021)..........................................................................52

*Texas v. United States*,
    798 F.3d 1108 (D.C. Cir. 2015)........................................................53

*Union of Concerned Scientists v. Dep't of Energy*,
    998 F.3d 926 (D.C. Cir. 2021)..........................................................16

*Waterkeeper Alliance, Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022)...............................................12, 13, 14

*W. Watersheds Project v. Kraayenbrink*,
    538 F. Supp. 2d 1302 (D. Idaho 2008) ............................................18

*Wheaton Coll. v. Sebelius*,
    703 F.3d 551 (D.C. Cir. 2012)..........................................................16

**Statutes**

1 U.S.C. § 1 ...................................................................................25

16 U.S.C. § 1531(c)(2) ................................................................41

16 U.S.C. § 1536(a)(2) ...............................................5, 18, 24, 33

16 U.S.C. § 1536(b)(3)(A) ...........................................................22

16 U.S.C. § 1536(b)(4) .................................................................32

16 U.S.C. § 1536(c)(1) .................................................................18

33 U.S.C. § 1251(b) ...............................................................41, 43

33 U.S.C. § 1344(j) ......................................................................11

F.A.C. § 62-331.053(3)(a)(4) ........................................................7

**Other Authorities**

40 C.F.R. § 233.1(b) ....................................................................48

40 C.F.R. § 233.50 .................................................................11, 49

50 C.F.R. § 402.01(b) ....................................................................5

50 C.F.R. § 402.02 .......................................................................19

50 C.F.R. § 402.14(i)(1)(i) ......................................................32, 34

50 C.F.R. § 402.16 .................................................................36, 40

80 Fed. Reg. 26,832 (May 11, 2015) ...........................................34

H.R. Rep. No. 97-567 (1982), 1982 U.S.C.C.A.N. 2807 ...........32

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| Appellants | Florida and Federal Defendants |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| Corps | U.S. Army Corps of Engineers |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| Federal Defendants | EPA, Fish & Wildlife, the Corps, and other named federal officials |
| Florida | State of Florida and Florida Department of Environmental Protection |
| FDEP | Florida Department of Environmental Protection |
| Fish & Wildlife | United States Fish and Wildlife Service |
| Marine Fisheries | National Marine Fisheries Service |
| Plaintiffs | Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| Section 7 | Section 7 of the ESA, 16 U.S.C. § 1536 |
| Section 10 | Section 10 of the ESA, 16 U.S.C. § 1539 |
| Section 404 | Section 404 of the CWA, 33 U.S.C. § 1344 |
| Services | Fish & Wildlife and Marine Fisheries |

## SUMMARY OF ARGUMENT

Striking at the core of the federalism principles embedded in our Constitution and embodied in the CWA and ESA, this case involves EPA and Fish & Wildlife working carefully and cooperatively with Florida to approve the State's Section 404 program consistent.  These agencies structured a consultation process under ESA Section 7 that protects species, while accounting for informational gaps involved in approving a statewide program covering thousands of unknown projects into the distant future.  The agencies used a programmatic consultation approach with a built-in technical-assistance process that was modeled after the one used by the Obama Administration, unanimously approved by the Second Circuit in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), employed by the Trump Administration here, and defended by the Biden Administration to this day. Under this approach, the agencies committed to conducting a permit-by-permit review with Florida and safeguarding against incidental take of listed species.

Plaintiffs' challenges cannot overcome a fatal standing problem, as they have no good answer to the undiminished federal oversight and attenuated causal links that plague their theory of harm.  Beyond that, Plaintiffs fail to meaningfully defend the merits of the district court's outlier decision vacating these agency actions.  Much of Plaintiffs' brief relies on reframing the facts and the dispute as they see fit— whether by pretending that Federal Defendants are not actually bound to the

1

technical-assistance process these agencies have repeatedly pledged to uphold, or by circularly characterizing Florida as asking for an "exemption" or "workaround" to the ESA's requirements.

The Court should not be distracted from the basic question presented: What does the ESA require for programmatic approval of a State program?  On that question, Plaintiffs offer only a myopic textual analysis that does not support the impossible requirements that the district court superimposed on the ESA.  They refuse to engage with the substance of *Cooling Water*.  And they suggest Fish & Wildlife should have left Florida's program to the fate of a speculative, encyclopedic, and largely useless upfront species analysis and cumulative take limits.  That guesswork, they say, is better than instituting a binding federal–state cooperative process ensuring incorporation of tailored, permit-specific effects analysis and take limits developed by federal agencies based on the best available data.

This Court should not construe the ESA to bless such a backwards, unworkable result that would make Florida the third—and *last*—State to ever seek Section 404 assumption.  The district court's vacatur of program approval should itself be vacated, with Florida given back the reins to administering its program subject to continuous federal oversight, as Congress intended when it created this framework of cooperative federalism.  And this Court should set this case for

expedited argument and issue that relief promptly, as enough time has passed with Florida's program languishing in litigation limbo.

**ARGUMENT**

I.    **Plaintiffs distort the technical-assistance process and the binding obligations it imposes on Fish & Wildlife and Florida.**

All parties agree that the technical-assistance process is at the heart of the programmatic consultation used here. But Plaintiffs spill much ink fighting the premise that the technical-assistance process binds federal agencies to protecting species on a permit-by-permit basis. They say Fish & Wildlife "was not required to provide technical assistance at all," and Florida could even "override [Fish & Wildlife's] determination that a permit would likely adversely affect listed species." *E.g.*, Pls.Br. 56-57 (emphasis omitted). That narrative infects every aspect of Plaintiffs' argument—from standing to the merits of the ESA claims. But it is demonstrable fiction.

Start with the text of the BiOp itself. The BiOp provides an eight-step "summary of [Fish & Wildlife's] *commitments* triggered by approval of the action"—things that Fish & Wildlife "*will*" do under the technical-assistance process, covering receipt of "all" 404 permit applications, to Fish & Wildlife setting "determinative" conclusions regarding species effects, all the way through "monitor[ing] and track[ing] the amount of anticipated take on a project by project

3

basis." Dkt.112-5 at 89-90, JA.___ (emphases added); *see also id.* at 53, JA.___ (memorandum of understanding summarizing Fish & Wildlife's commitments).

Plaintiffs declare that "other than receiving and reviewing permit applications, [Fish & Wildlife's] participation in the process was entirely voluntary." Pls.Br. 56. That selective recitation is based on the "may" language in step number 5, which Plaintiffs suggest renders the whole process a "permissive" nullity. *Id.* But that contingent phrasing simply accounts for the reality that Fish & Wildlife need not provide additional information or comments when its permit-level review *confirms* Florida's assessment. *See* Dkt.112-5 at 90, JA.___ ("the [Fish & Wildlife] response may indicate the application had been received and reviewed by [Fish & Wildlife] and [Fish & Wildlife] has no comments").

As step number 6 makes clear, Fish & Wildlife "*will* provide [such] information" if it has "information that would *disconfirm* the State's effect determination." *Id.* (emphasis added). That is, if Fish & Wildlife's mandatory review leads to a conclusion that Florida's effects determination is incorrect, Fish & Wildlife is then obligated under the technical-assistance process to say so.

Plaintiffs' contrary supposition—that Fish & Wildlife could conduct its mandatory review, find that a permit would violate the ESA, and then sit idly by— is rather remarkable. Pls.Br. 58. Fish & Wildlife is the agency charged with enforcing the ESA and is duty-bound under ESA Section 7 to "insure that any action

authorized, funded, or carried out by [the action] agency … is not likely to jeopardize" listed species or critical habitat.  50 C.F.R. § 402.01(b); 16 U.S.C. § 1536(a)(2).  That explains why the BiOp is replete with Fish & Wildlife's commitments to "*receive and review* all State 404 permit applications and *provide technical assistance to the State*, as needed, to insure State 404 permit actions are not likely to jeopardize a species or adversely modify or destroy critical habitat." Dkt.112-5 at 78, JA.__ (emphases added); *see also id.* at 70, JA.__ (Fish & Wildlife "will provide technical assistance to the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA, CWA, and Chapter 62-331, F.A.C."); *id.* at 82, JA.__ (Fish & Wildlife "will submit questions, information and comments or measures necessary to minimize effects to ESA-listed species as needed.").  When such assistance is "needed" or "necessary" to ensure compliance with the ESA, Fish & Wildlife's duty to provide it is unambiguous.

And this is not just Florida talking.  Federal Defendants have repeatedly recognized these "binding commitments."  Fed.Br. 37-39 ("the biological opinion itself repeatedly says that [Fish & Wildlife] must provide measures to avoid or minimize effects to listed species"); Dkt.99 at 37, JA.__ (same); Dkt.158 at 100-01, JA.__ (same).  Plaintiffs' claim that they understand the federal government's obligations better than the federal government itself does not withstand scrutiny.

Nor do Plaintiffs have an answer to the presumption of regularity—which dictates that the federal government will presumptively honor its obligations, Fed.Br. 37-38—besides the question-begging tactic of declaring the technical-assistance process "discretionary." Pls.Br. 58.[1]  Plaintiffs fare no better in attacking Florida's binding commitment to the technical-assistance process.  They suggest that "the process even authorized Florida to *override* [Fish & Wildlife]'s determination that a permit would likely adversely affect listed species." Pls.Br. 57.  But that assertion rests on a gross mischaracterization of the BiOp:

| Plaintiffs' Paraphrased Description | Actual Text of the BiOp |
|---|---|
| "[W]here [Fish & Wildlife] disagreed with Florida's preliminar[y] determination that a permit application was not likely [to] adversely affect listed species, Florida's determination would control unless Florida found that [Fish & Wildlife's] comments disconfirmed Florida's effect determination or led Florida to 'reconsider its determination.'" Pls.Br. 57 (citing Dkt.112-5 at 88, 90, JA.__, __). | "Once it has been determined by [Florida] that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, and [Fish & Wildlife] has not submitted information or questions that would lead the State to reconsider its determination, the species review concludes for that application." Dkt.112-5 at 88, JA.__. |

---

[1] Plaintiffs also gloss over the program's design to ensure that Fish & Wildlife must review every single permit application.  Not only is each application sent to Fish & Wildlife, but each is also posted immediately on the Florida database that is available to the agencies and the public along with *all* supporting documentation.  In other words, even if every application were not crossing Fish & Wildlife's desk, everyone has access to the application and supporting documentation at all times.  There is no hiding the ball, nor could there be.

The BiOp does not say that Florida may simply reject Fish & Wildlife's contrary determination. Instead, Florida's initial determination controls only when Fish & Wildlife "has *not submitted* information or questions that would lead the State to reconsider its determination." Dkt.112-5 at 88, JA.__ (emphasis added). And, as already discussed, Fish & Wildlife committed that it "*will* provide" "information that *would* disconfirm the State's effect determination," if it has such information. *Id.* at 90 (emphases added). Thus, the above language from the BiOp refers to a scenario where Fish & Wildlife has supplied no such information because it has no basis to "disagree[] with Florida's preliminary determination." *Contra* Pls.Br. 57.

What happens if Fish & Wildlife disagrees with the State's assessment and must therefore provide disconfirming information? The BiOp repeatedly states that "final [Fish & Wildlife] conclusions regarding effects to species are *determinative*." Dkt.112-5 at 90, JA.__ (emphasis added); *id.* at 99 (similar); *id.* at 100 (similar). And Florida's own regulations ensure that Fish & Wildlife gets the final say by prohibiting Florida from issuing any permits that "jeopardize[] the continued existence of endangered or threatened species" and rendering "[c]ompliance with any requirements resulting from consultation with, or technical assistance by" Fish & Wildlife "determinative for purposes" of satisfying that no-jeopardy requirement. F.A.C. § 62-331.053(3)(a)(4).

7

No amount of obfuscation or quotation-free references to the BiOp can transform the technical-assistance process into the hollow vessel Plaintiffs make it out to be. The Court must therefore resolve this case in light of the binding commitments the technical-assistance process unambiguously imposes.

## II. Plaintiffs lack standing to bring any of their claims.

### A. Ongoing federal agency oversight renders Plaintiffs' purported injuries too speculative to establish standing.

A proper understanding of the technical-assistance process, coupled with *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912 (D.C. Cir. 2003), crystalizes why Plaintiffs cannot establish standing.

1. *Crow Creek* dealt with the federal government transferring authority over certain lands to South Dakota. *Id.* at 913. Federal cultural-protection statutes gave the Crow Creek Sioux Tribe certain rights in those lands. *Id.* at 914. The tribe sued under these statutes and argued that the transfer harmed its protected cultural interests. *Id.* at 915. According to the tribe, nothing would stop South Dakota (or South Dakotans) from damaging that land because South Dakota law "provide[d] for nowhere near the protections for Native American cultural resources as do federal law."[2]

---

[2] Reply Brief of Appellant, *Crow Creek Sioux Tribe v. Brownlee*, No. 02-5049, 2002 WL 34244388 (D.C. Cir. Dec. 10, 2002).

This Court disagreed.  It held that despite the tribe's claims, the federal government retained authority to oversee those lands under the cultural-protection statutes.  331 F.3d at 917.  The tribe's suggestion "that federal enforcement will diminish merely because South Dakota now holds title to" the transferred land was "unsupported conjecture [that] d[id] not constitute injury in fact when the [federal statute] itself provide[d] that the [federal government would] have an ongoing and undiluted enforcement role on the transferred lands." *Id.*  Not only that, the Corps and South Dakota struck a "Memorandum of Agreement" stating that the Corps would "retain, and [would] exercise, all authority, jurisdiction, and powers of approval regarding" the cultural-protection statutes. *See id.*  This further showed the federal government's "intention and ability to continue enforcing federal cultural[-]protection statutes on the transferred lands." *Id.*

The parallels to this case are obvious.  Plaintiffs have federally protected interests (under the ESA).  The federal government (EPA) transfers primary authority governing those interests (from the Corps) to the State (Florida) but maintains a commitment (through Fish & Wildlife's BiOp/memorandum of understanding and EPA's CWA oversight) and ability (through the technical-assistance process) to ensure the State complies with federal law.  Plaintiffs' claim that the transfer diminishes the federal government's oversight over their interests is too speculative to give the Court jurisdiction under Article III.

2.    The district court did not distinguish—or even mention—*Crow Creek*. And the few differences Plaintiffs muster (at 30-31) between the cases are immaterial.

Plaintiffs first say that *Crow Creek* was about "the transfer of federal *lands*— and not 'regulatory authority'—from the Corps to a state." Pls.Br. 30 (citation omitted). That distinction makes no difference for standing purposes. The *Crow Creek* tribe complained that the federal government would either be unable or unwilling to protect its cultural interests and that South Dakota's laws were less protective, and this Court focused on the federal government's authority and willingness to continue enforcing federal law. 331 F.3d at 917. The question is not what is being transferred. The question is what control the federal government maintains.

Plaintiffs point out that the *Crow Creek* transfer "effect[ed] no legal change" to the tribe's cultural-protection rights. Pls.Br. 30. But the same is true here: The federal government has "an ongoing and undiluted enforcement role" implementing federal environmental-protection statutes under the Florida program. *Crow Creek*, 331 F.3d at 917. The BiOp requires Fish & Wildlife to review, assist, and (if necessary) provide recommendations on *every* permit "to ensure compliance with the ESA, CWA, and Chapter 62-331, F.A.C." Dkt.112-5 at 70, JA.__. Florida is bound to adopt those recommendations, *supra* 6-7, and EPA can federalize the

10

permit if it does not, 33 U.S.C. § 1344(j).  EPA is further obligated to (1) oversee implementation of the Florida program and to withdraw approval if Florida is not complying with federal laws, and (2) review every proposed permit to ensure it will not jeopardize listed species.  *See* 40 C.F.R. § 233.50.  Compliance with federal law is ensured at every step.[3]

Finally, Plaintiffs contend that here, unlike in *Crow Creek*, EPA "authorized a state program that was less protective than the federal program."  Pls.Br. 31.  And the Court must embrace that conjecture, Plaintiffs say, lest the Court improperly "decide the merits when assessing standing."  *Id.*

This proffered distinction makes no sense.  In *Crow Creek*, the tribe also argued that transferring the lands to South Dakota would disrupt federal authority and result in less protection for the tribe's cultural rights.  331 F.3d at 916-17.  But that did not stop this Court from dismissing for lack of standing based on the federal government's ongoing enforcement authority.  *Id.* at 917.  That approach did not

---

[3] Federal Defendants gesture vaguely at "problems with Florida's implementation of its 404 program" that they forthrightly concede are "not germane to the issues presented in this appeal."  Fed.Br. 19-20.  Florida vigorously disputes that suggestion, but it is as irrelevant as it is revealing.  Indeed, Federal Defendants confirm that "*none* of these [EPA] objections were based on the technical[-] assistance process or protecting listed species and their critical habitat."  Fed.Br. 20 (emphasis added).  That equates to an affirmation by the federal government that its species and habitat oversight of Florida's program and the technical-assistance process remained fully intact.

conflate standing and the merits because the tribe challenged the federal government's procedural compliance with federal cultural- and environmental-protection laws in initiating the transfer—not the transfer's alleged substantive shortcomings. *See id.* at 916. The Court was therefore *not* required to assume that the tribe's speculative harms would come to pass.

That holds true here. The merits of Plaintiffs' claims pertain to the federal government's procedural compliance with the ESA in approving Florida's program. The standing inquiry asks (if Plaintiffs are right on the merits) whether they have shown they will suffer a concrete or imminent injury rather than a hypothetical and speculative one. As in *Crow Creek*, Plaintiffs cannot, which necessitates dismissal of their claims. *Accord FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 (2024) ("[T]he broad and comprehensive conscience protections guaranteed by federal law" "break[] any chain of causation between FDA's [actions] and any asserted conscience injuries to the doctors.").

### B. Plaintiffs' purported injuries depend on a tenuous causal chain that the Supreme Court's and this Court's precedents forbid.

Plaintiffs do their best to dodge this Court's precedents and obfuscate the attenuated nature of their purported harms. The Court should see through those efforts.

1. Begin with Plaintiffs' response (at 31-32) to *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654 (D.C. Cir. 2022). *Waterkeeper* was about EPA's approval of

a State permitting program for Oklahoma. *Id.* at 659. The plaintiffs claimed that the program was unlawful in three ways: (1) EPA unlawfully approved the program before "promulgat[ing] public-participation guidelines for state permitting programs"; (2) Oklahoma "provided insufficient opportunities for the public to participate" in permitting actions; and (3) "the issuance of lifetime permits contravened" federal law's "requirement that state programs be at least as protective as federal standards." *Id.* at 658-59.

On the first, Plaintiffs describe what *Waterkeeper* held: "the plaintiffs failed to show that requiring EPA to issue public[-]participation guidelines would remedy harm from a state program with inadequate public[-]participation opportunities." Pls.Br. 31 (citing 41 F.4th at 660-61). Plaintiffs then declare that because vacatur of EPA's approval "would remedy [their] harms," *Waterkeeper* does not apply. *Id.*

But keep reading *Waterkeeper* to find what Florida actually argued. On the third of those claims, the Court held that the plaintiffs "fail[ed] to establish their standing to bring [the lifetime-permits] claim because they fail[ed] to demonstrate imminent injury" from it. 41 F.4th at 663; *see* Fla.Br. 23-24. To suffer that harm, three conditions in a causal chain had to occur before any permittee might "dispose of coal ash in a less environmentally friendly way than federally regulated facilities." 41 F.4th at 663. The plaintiffs' claim was thus premised "on the threat of a future [injury] in the event the federal standards become stricter than Oklahoma's

corresponding standards," but plaintiffs "ma[de] no effort to show when that contingency might come to pass, much less that it will do so imminently." *Id.*

Plaintiffs offer no response to this key feature of *Waterkeeper*, probably because their causal chain is even more attenuated here. Florida must (1) propose to issue a permit that would harm Plaintiffs' interests (though it is unclear where or when). EPA must then (2) determine that the permit does not meet federal standards and demand that Florida adopt different requirements (unclear why or how). Florida must (3) reject that request (which it cannot legally do), allowing EPA to federalize the permit. EPA must (4) not federalize the permit (for whatever reason), so Plaintiffs then must (5) file and lose both administrative and judicial challenges in state tribunals. Then (6) the project must proceed and harm Plaintiffs' interests. *See* Fla.Br. 23-24.

Almost every step involves a third party either exercising discretion or reacting to the prior step. As in *Waterkeeper*, where a number of conditions had to occur before anyone "dispose[d] of coal ash in a less environmentally friendly way than federally regulated facilities," 41 F.4th at 663, the same must happen for any harm to mar Plaintiffs' recreational or aesthetic interests. Plaintiffs' theories of injury are riddled with attenuated and speculative links, so their claims must fail.

2.    To avoid this, Plaintiffs shuffle the various standing elements in hopes the Court will not look any closer. But on closer examination, the links are not there.

14

Plaintiffs allege a procedural-rights theory of standing.  Under such a theory, standing "requires a showing of two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'"  *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017) (citation omitted).

The link between the purportedly omitted procedural step (EPA and Fish & Wildlife failing to properly consult) and the substantive government decision (EPA's approval of the Florida program) is apparent.  And Plaintiffs have documented their members' "aesthetic and recreational interests" in "ESA-listed species."  Pls.Br. 23, 27.  Amber Crooks, for example, has "an aesthetic and scientific appreciation of the Florida panther in the wild," and she "travel[s] to panther habitats in hopes of viewing and photographing the elusive panther."  Dkt.98-1 at 2, JA.__.  Matthew Schwartz recounts several experiences with Florida panthers and his concern over land development that could inhibit future experiences.  Dkt.98-5 at 9-10, JA.__; Pls.Br. 27-28 (referencing these declarations).

But Plaintiffs fail to establish the causal link between EPA's approval of Florida's program and any harm to those interests.  Throughout their brief, Plaintiffs

15

either label the alleged procedural misstep as the harm itself[4] or assume (without any explanation) that Florida will issue permits that the Corps would not. The former fails under the procedural-rights framework because it ignores the required link between EPA's approval and the harm to Plaintiffs' interests. *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). The latter inherently depends on comparative predictions about how Florida versus the Corps would address a given permit, and this Court is rightfully wary of finding "standing based on predictions of how agencies will exercise discretion in future proceedings." *See Union of Concerned Scientists v. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021). Plaintiffs try to rely on purported "exemplar projects subject to state 404 permitting that would adversely affect protected species and their interests in those species." Pls.Br. 27. But that is not the "substantive government decision" at issue here; EPA's approval is. *See Ctr. for Biological Diversity*, 861 F.3d at 184. And any "exemplar" projects postdate the filing of the complaint, so Plaintiffs cannot rely on them in any event—a legal reality that Plaintiffs have never acknowledged. *See Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012).

---

[4] "[Plaintiffs] established that their members suffered procedural injuries from ESA violations that were not cured by the technical[-]assistance process." Pls.Br. 28.

Because there is no connection between EPA's approval of Florida's program and Plaintiffs' purported substantive injury, this Court should vacate the district court's summary judgment and dismiss for lack of standing.[5]

## III.    Plaintiffs cannot successfully defend the district court's erroneous summary judgment on the ESA claims.

Plaintiffs defend their summary judgment on the ESA claims by doubling down on the district court's mistakes. The Court should reject those arguments and reverse and render summary judgment for Florida and Federal Defendants on the ESA claims.

### A.    Plaintiffs construct a false choice between complying with the ESA or not.

Plaintiffs repeatedly accuse Appellants of trying to "create exceptions to Section 7's requirements" and "authorize wholesale noncompliance." Pls.Br. 20, 68. They therefore erect a false choice between compliance with the ESA and "avoid[ing]" compliance through a programmatic consultation and a technical-assistance process. Pls.Br. 63. Florida must correct that false dichotomy. Programmatic consultation with federal–state technical assistance complies with the ESA.

---

[5] If the Court concludes that Plaintiffs lack standing on their ESA claims, the same reasoning applies to their APA and CWA claims that are the subject of the cross-appeal. The Court should accordingly entertain Plaintiffs' conditional cross-appeal and affirm the dismissal of those claims on standing grounds.

Appellants never suggested that programmatic consultations are "exempted" from Section 7's requirements or that "the ESA's analytical requirements [do not] apply to programmatic consultations." Pls.Br. 52-53. Plaintiffs are therefore torching strawmen by insisting that Fish & Wildlife "was required to comply with the ESA's analytical requirements at the programmatic level" and that "Section 7 'consultation requirements apply with equal strength, to site-specific and programmatic actions.'" Pls.Br. 52-53 (quoting *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1324 (D. Idaho 2008)). Everyone agrees with that. The salient question is instead *what* Section 7 requires under these programmatic circumstances. Appellants contend that the programmatic consultation and technical-assistance process here *satisfy* Section 7's requirements.

Plaintiffs leap from the unremarkable fact that programmatic consultations remain subject to Section 7's consultation requirements to conclude that all such consultations—no matter the breadth of the programmatic action or scope of available data—must look exactly the same. Nothing in the ESA's text compels that one-size-fits-all approach; indeed, the ESA says the opposite by making the Section 7 analysis dependent on the "best scientific and commercial data *available*." 16 U.S.C. § 1536(a)(2), (c)(1) (emphasis added). Nor do Plaintiffs point to anything in the Services' regulations, administrative guidance, or the case law countenancing their (and the district court's) proposed straitjacket approach to consultation. That

18

is hardly surprising, as Congress did "not require that consultation under the act take place in any particular manner" and instead gave leeway to "the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Defs. of Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013).

Continuing the parade of strawmen, Plaintiffs repeatedly characterize the technical-assistance process as impermissibly "deferring" the requisite ESA analysis to the permit level. Pls.Br. 16, 24, 42, 52 ("[Fish & Wildlife] disavowed any duty to comply with the ESA's analytical requirements at the programmatic level, deferring to a technical[-]assistance process at the permit level."). That circular framing fundamentally misunderstands the relevant "action" at issue here and the import of the technical-assistance process.

The "action" subject to consultation was EPA's *federal* approval of Florida's Section 404 program—not the various permit-level, *State* actions that Florida would carry out under the program. *See* 50 C.F.R. § 402.02 (defining "action" to encompass "all activities or programs of any kind"). As Florida explained (and Plaintiffs appear now to concede[6]), State-level permitting actions are not themselves subject to Section 7 consultation. Fla.Br. 10, 36, 44-45. So it matters not whether—

---

[6] Pls.Br. 54 ("[Fish & Wildlife] avoided Section 7's required analyses at the programmatic level and was *not required to perform them at the permit level*." (emphasis added)).

as Plaintiffs seem to assume[7]—the technical-assistance process must *itself* be identical to a permit-by-permit Section 7 consultation.  *See Cooling Water*, 905 F.3d at 73 n.15 ("reject[ing] the Environmental Petitioners' complaint that the technical assistance process 'is not the equivalent of' section 7 consultation" because "the Services have no obligation to conduct section 7 consultation or its 'equivalent' on individual permits because the issuance of such a permit is not a federal action"). Nor do Plaintiffs make any headway by likening this case to those involving staged consultations by *federal* actors that Florida has already discussed at length. *Compare* Pls.Br. 53-55, *with* Fla.Br. 36-37 (discussing *Andrus*, *Conner*, *Defenders of Wildlife*, and *Brownlee*).

To the extent Plaintiffs draw from these cases the broader point that "ESA-required analyses must occur at the programmatic level" and "consider[] the effects of the action or actions as a whole," Pls.Br. 53, 55, the parties are again talking past each other.  Florida and Federal Defendants *agree* that such analyses must—and did—occur at the relevant *program* level with respect to the *program* as a whole. Fla.Br. 30; Fed.Br. 34.  The question is what that programmatic analysis and

---

[7] Pls.Br. 52 (arguing that the technical-assistance "process did not require [Fish & Wildlife] to make ESA-required determinations either"); Pls.Br. 72 ("Congress required federal wildlife agencies, not states, to set take limits.").

incidental-take statement must look like under circumstances like these, and none of Plaintiffs' cases speaks to that question.

Rather than an impermissible "defer[ral]" of Section 7's requirements to the permit level, *e.g.*, Pls.Br. 24, 38, 42, the technical-assistance process is, as Federal Defendants put it, "a *feature of the proposed action*, which [Fish & Wildlife] *must* consider when carrying out its duties under Section 7." Fed.Br. 34; *see also Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, 807 F.3d 1031, 1046 n.12 (9th Cir. 2015) (holding that "the conservation measures in this action are not just 'incorporated as part of the action project'; they *are* the action project"). And it is beyond dispute that the Services can permissibly rely on protective or information-gathering features built into the proposed action in satisfying their duties under Section 7. *See El Puente v. Army Corps of Eng'rs*, 100 F.4th 236, 255 (D.C. Cir. 2024) (approving BiOp that relied on a "turbidity-monitoring plan"). Plaintiffs thus have no answer to the structural integrity of Federal Defendants' programmatic approach in this case.

Plaintiffs only prove Florida's point by echoing the district court's misguided distrust of what it called a "non-statutory 'technical[-]assistance' process." Pls.Br. 3, 24, 38, 52, 76. Section 7's flexible command does not enumerate the specific methods by which agencies can carry out their statutory duties. Fla.Br. 33-34. Thus, the relevant question is whether Fish & Wildlife can conduct its statutorily required

21

jeopardy assessment of the federal "action"—approval of a Florida permitting program—by relying on a binding technical-assistance process built into that program.  We now turn to that question.

### B.    Plaintiffs cannot demonstrate that the BiOp and its programmatic analysis violated the ESA.

### 1.    The BiOp complied with the text of the ESA.

Florida's brief surveyed Section 7's obligation to "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  And, consistent with this Court's directive that "text must be read in the context of the entire statute," *Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 50 (D.C. Cir. 2024), Florida explained how surrounding textual indicators—from the variable breadth of the "action," to the Services' reliance on "the best scientific and commercial data *available*," to the potentially attenuated "effects of the action"— confirm that the best interpretation of Section 7 is one that does not demand an upfront, species- and site-specific effects analysis when, as here, the scope of the action and lack of available data make such analysis infeasible.  Fla.Br. 27-30.

Plaintiffs do not directly engage with Florida's statutory construction or confront the language in tension with their position, opting instead to make two textual arguments based on "read[ing] snippets of statutory text in a vacuum." *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021).  Neither moves the needle.

a.     First, Plaintiffs claim the word "detail" requires the Services to "report minutely and distinctly" and include "more than just lists, perfunctory statements, recitations, or anything short of analysis." Pls.Br. 48. For that point, however, Plaintiffs cite cases that either do not construe the term "detail" at all or, at most, simply require that a BiOp engage in an actual analysis. *See Am. Rivers v. FERC*, 895 F.3d 32, 47 (D.C. Cir. 2018) (BiOp did not "analyze the effects"); *Defs. of Wildlife v. Dep't of Interior*, 931 F.3d 339, 355 (4th Cir. 2019) (BiOp omitted "any discussion of the impact on the species'[] recovery"); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001) (BiOp did "not analyze the effects of the activity"); *Oceana, Inc. v. Ross*, No. CV-15-0555, 2020 WL 5995125, at *20 (D.D.C. Oct. 9, 2020) (BiOp contained "no mention, let alone analysis, of" a particular species).

The BiOp here did not simply include "lists" or something "short of analysis," as in Plaintiffs' cited cases. It *analyzed* the program-wide effects on groups of species, while giving credence to the technical-assistance process and the checks and balances built into that process. Dkt.56-1 at 742-61, JA.__; Dkt.112-3 at 54-88, 124-204, 227-78, JA.__, __, __; Fed.Br. 40-45 (summarizing that analysis further). Thus, even under Plaintiffs' preferred construction of the term "detail," they cannot identify a deficiency in the BiOp or any ESA language that specifies *how much* detail is invariably required, and in *what manner* the analysis must invariably occur.

23

Plaintiffs' heavy reliance on the verb "detail" also ignores that such detailing must occur subject to the "best scientific and commercial data *available*." 16 U.S.C. § 1536(a)(2) (emphasis added). Just how "minutely and distinctly" a BiOp can "detail" the species analysis, Pls.Br. 48, depends on the data available. And the programmatic action at issue here—approving Florida's entire Section 404 permitting program—is a prime example for which the data available did not permit Fish & Wildlife to engage in the *degree* of detailing that Plaintiffs and the district court claim was required.

This does not mean "the term 'detail' means one thing for most Section 7 consultations yet means something entirely different for others," such that Fish & Wildlife can "excuse the failure to comply with the law by arguing that compliance would be too hard." Pls.Br. 50-51. The *meaning* of the term "detail" remains fixed across all Section 7 consultations, but the analysis it requires necessarily fluctuates with the data available.

b.    Second, Plaintiffs point to the "definite article[s]" in the phrase "detail[s] how the agency action affects *the* species or *its* critical habitat" to suggest that each species/habitat must receive a *separate* analysis. Pls.Br. 48-49 (emphases added). Because the BiOp organized its effects analysis into "broad categories" of species, Plaintiffs claim that the BiOp failed that supposed requirement. Pls.Br. 40.

24

That does not follow as a matter of law or language. Under the Dictionary Act, "words importing the singular include and apply to several persons, parties, or things," and vice versa. 1 U.S.C. § 1. That default rule makes perfect sense in the context of Section 7, which, despite using "the" and "its" in reference to species and habitats, naturally includes consultations—like this one—that encompass numerous species and must therefore accommodate multi-species analysis. To require a BiOp to artificially copy and paste the same analysis over and over under a different species heading (as Plaintiffs evidently contend), rather than once under a "mammals" or "amphibians" heading that cross-references each individual covered species (as the BiOp here did), would elevate form over substance. *See Forest Serv. Emps. for Envt'l Ethics v. Forest Serv.*, 726 F. Supp. 2d 1195, 1225 (D. Mont. 2010) (cited at Pls.Br. 49-50) (agreeing that "the law does not impose 'an artificial obligation to include a section expressly discussing recovery for every species'" and finding the BiOp invalid only because it "ignore[d] critical habitat entirely … for many species in its coarse filter analysis").

Plaintiffs' real complaint appears to be based less on statutory text and more on scientific second-guessing of the expert agency. They suggest that Fish & Wildlife imperfectly defined the groups of species, since they purportedly contained species with "significant differences" in their habitats or vulnerabilities. Pls.Br. 40-41. But the BiOp expressly *acknowledges* that its chosen "group[s] [we]re

intentionally broad for purposes of this macro analysis," which was consistent with its observation that a more "detailed analysis of potential effects in the future is not possible, because … the exact locations, amounts, and types of impacts are not yet known." Dkt.112-5 at 127, 130, JA.__, __. Fish & Wildlife's determination that a more granular, species-by-species assessment "was infeasible reflects a scientific determination deserving deference." *Cooling Water*, 905 F.3d at 74 (internal quotation marks omitted). It was far from arbitrary and capricious.

### 2. Plaintiffs have no persuasive answer for *Cooling Water*.

Plaintiffs' brief does not even mention *Cooling Water* until page 63, although it is the only decision to address this type of programmatic consultation. Plaintiffs' attempts at distinguishing *Cooling Water* do not withstand scrutiny. And their best effort at countering it with other ESA cases falls flat.

Plaintiffs begin by arguing that *Cooling Water*'s NPDES permit program had "long ago been delegated to the states" and "[t]here was therefore little, if any, data available to inform species analysis at the programmatic level." Pls.Br. 64. That, Plaintiffs contend, is a "fundamental factual distinction" because "[h]ere, by contrast, [Fish & Wildlife] had ample data to inform ESA-mandated effects analysis." *Id.*

That is no distinction. The *Cooling Water* plaintiffs likewise argued that the Services could have done more with existing data, but the Second Circuit rejected

that argument, deferring to the Services' assessment of "available" data.  905 F.3d at 73 ("we disagree with the Environmental Petitioners that the Services failed to 'seek out and consider' existing scientific data on thermal pollution").  Plus, as Plaintiffs admit, the *Cooling Water* rule involved "a discrete universe of existing facilities," Pls.Br. 63-64, so it is hard to imagine how the informational challenges in that case could have been more pronounced than in this one, where EPA's program approval would cover innumerable future state projects with locations and details that were almost entirely unknown.  Finally, Plaintiffs' suggestion that *Cooling Water* was justified because the effects there were *more* uncertain is puzzling, since their brief elsewhere declares that Fish & Wildlife "[i]s not authorized to avoid the ESA's requirements at the programmatic level on the basis of uncertainty."  Pls.Br. 67.  Which is it?

Plaintiffs are no more convincing in embracing the district court's proposed distinction that the *Cooling Water* "technical[-]assistance process was promulgated as part of the rulemaking action on which [Fish & Wildlife] consulted, thereby creating legally binding responsibilities for all parties," whereas the technical-assistance process here "was not part of EPA's rulemaking" and "was also not made clearly enforceable."  Pls.Br. 65.

Florida has debunked this contention in its opening brief, Fla.Br. 35, and by rebutting Plaintiffs' suggestion that the technical-assistance process is non-binding,

27

*supra* 3-7. But Plaintiffs nevertheless insist—without actually quoting *Cooling Water*—that it "plainly stated" that Fish & Wildlife was bound only "*because it codified* the technical[-]assistance process." Pls.Br. 65 (emphasis added). What *Cooling Water* actually said is that "the Rule itself is properly interpreted to require the Services' participation in the technical[-]assistance process because that process *is part of the proposed action* the Services approved pursuant to formal consultation." 905 F.3d at 72 (emphases modified). And the Second Circuit cited as support the principles that "proposed conservation measures in [a] *challenged memorandum of agreement* were enforceable because they were 'included as part of the project consulted upon,'" and for "conservation measures [that] are part of [a] proposed action, their implementation is required *under the terms of the consultation*." *Id.* (emphases added) (citing *Ctr. for Biological Diversity*, 807 F.3d at 1046 & n.12; ESA Consultation Handbook (1998), Dkt.112-1 at 275, JA.__). Thus, *Cooling Water* did not rest on the formality of rulemaking, but rather the technical-assistance process's centrality to the terms of the consultation.

Hollow distinctions aside, Plaintiffs have no substantive response to *Cooling Water*'s holdings. Plaintiffs' refusal to engage with the merits of that most relevant decision is revealing, as is their plea that the Court "need not reach the issue," Pls.Br. 65, ostensibly made in hopes of avoiding a circuit split.

Pivoting to other authority does not help Plaintiffs because none of their cited cases deals with a programmatic BiOp evaluating federal approval of a State-operated program.  Florida has already discussed and distinguished many of those cases (*e.g.*, *Andrus*, *Conner*, *Defenders of Wildlife, Brownlee, Forest Service*), Fla.Br. 36-37, which Plaintiffs recycle without meaningfully confronting their distinguishing features.  And the remainder of Plaintiffs' cases—which they cite for the principle that "the ESA does not excuse compliance based on claims of uncertainty," Pls.Br. 45-47—lend no more support for the district court's decision.

The language Plaintiffs cite (at 45) from *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1267 (11th Cir. 2009), is a quote from *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322, 360 (E.D. Cal. 2007), describing the Ninth's Circuit's holding in *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).  As Florida already explained, *Conner* involved a phase-by-federal-phase consultation in which the Services failed to consider available information from which it *could* feasibly have analyzed species impacts associated with oil-and-gas leasing information.  Fla.Br. 49; *Conner*, 848 F.2d at 1453-54.  It was in that context that *Kempthorne* described "*Conner* [as] stand[ing] for the proposition that an agency cannot abdicate its responsibility to evaluate the impacts of an action on a species by labeling *available* information 'uncertain.'"  506 F. Supp. 2d at 360 (emphasis added).  Nowhere did *Conner*, *Kempthorne*, *Miccosukee*,

29

or any other case hold that the Services must simply conjure up analysis where the information necessary to conduct that analysis is *unavailable*.

*American Rivers v. FERC* involved a quintessentially discrete federal action—licensing one hydropower plant—for which adequate data existed to conduct a more granular analysis. 895 F.3d 32, 47 (D.C. Cir. 2018). In *Greenpeace v. National Marine Fisheries Service*, "necessary data was available but simply not analyzed," meaning it "[wa]s not a situation where [Marine Fisheries] fully addressed the problem based on uncertain scientific data." 80 F. Supp. 2d 1137, 1149-50 (W.D. Wash. 2000). And, in *Pacific Coast Federation of Fishermen's Associations v. National Marine Fisheries Service*, the BiOp relied on a "*discretionary*" "analytical process [that] would be applied at the site-specific level," which did not satisfy the agencies' "burden to 'make certain' that the proposed action is not likely to jeopardize listed species or destroy or adversely modify critical habitat." 482 F. Supp. 2d 1248, 1267, 1270 (W.D. Wash. 2007) (emphasis added).

The consultation here bears none of those features. Fish & Wildlife specifically analyzed the program approval—through "which [Florida] would regulate a broad array of activities conducted over several geographic areas and long periods of time"—and concluded that there was "substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities." Dkt.112-5 at 113, JA.__. Fish & Wildlife thus made the scientific conclusion that "it [was]

*not feasible* … to conduct a meaningful site-specific and species-specific effects analysis in this BiOp." *Id.* at 124, JA.__ (emphasis added). That sets the BiOp apart from cases involving feigned uncertainty or a refusal to consider available data from which Fish & Wildlife could have readily conducted the analysis. And the BiOp's reliance on the *binding* technical-assistance process ensures that it "fully addressed the problem based on uncertain scientific data" and satisfied its burden to "make certain" that no jeopardy would result. *Greenpeace*, 80 F. Supp. 2d at 1150; *Pacific Coast*, 482 F. Supp. 2d at 1267.

### C. Plaintiffs cannot demonstrate that the programmatic incidental-take statement violated the ESA.

Plaintiffs cast aspersions on EPA's "one-time" Section 7 consultation and the upfront nature of the incidental-take statement, maligning the process as a means of "avoid[ing]" the Section 10 path for exempting take liability. Pls.Br. 11, 77. But they ultimately concede that "[a]fter [Fish & Wildlife] determine[s] that take is reasonably certain to occur," as happened here, it "*must* issue an incidental take statement." Pls.Br. 66 (emphasis added). Hence, Plaintiffs' handwringing over the sequencing of EPA's Section 7 consultation is a clumsy distraction, at best. What matters is whether Fish & Wildlife's incidental-take statement violated the ESA. The answer to that question remains "no."

### 1. Plaintiffs identify no conflict between the incidental-take statement and the ESA's text.

Plaintiffs attempt to add a textual gloss to the district court's atextual conclusion that Fish & Wildlife's incidental-take statement was invalid. But that veneer dissolves upon closer inspection.

a.    Plaintiffs declare that "[t]he ESA's plain text required a take limit," which they equate to a "numerical [limit] or in the form of a surrogate that serves the same function as a numerical limit." Pls.Br. 69-70. But that is a far cry from what the ESA and its regulations actually require—that the incidental-take statement "specify" the "impact" and "amount or extent" of the incidental taking. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). No amount of linguistic gymnastics can transform those generalized commands into an inflexible numeric-take-limit-or-surrogate-only rule. *See* H.R. Rep. No. 97-567, at 27 (1982), 1982 U.S.C.C.A.N. 2807, 2827 (explaining that "the impact should be specified in terms of a numerical limitation" "*where possible*," which does not mean "in every instance" that Fish & Wildlife should "interpret the word 'impact' to be a precise number" (emphasis added)).

As Florida explained, Fish & Wildlife "specif[ied]" the "impact" and "extent" of the anticipated takings by describing in detail the checks and balances of the technical-assistance process and concluding that the program "would minimize incidental take and detrimental effects associated with activities regulated by the

State 404 program" and "thereby avoid jeopardy to ESA-listed species."  Dkt.56-1 at 766, JA.__; Fla.Br. 38-39.  Plaintiffs respond that such specification was not specific *enough*, reading into the terms "specify," "impact," and "extent" an unspoken level of detail and degree beyond that contained in the incidental-take statement.  Pls.Br. 69-70.

Again, Plaintiffs overlook that Fish & Wildlife's obligation to specify the impact and extent of take—just like its species-effects analysis, *supra* 23-24—is bound up in the inherent limitation that it consider the "best scientific and commercial data *available*."  16 U.S.C. § 1536(a)(2) (emphasis added).  While a numeric take limit may be readily ascertainable based on data available for most consultations, this was manifestly not one of them, with Fish & Wildlife concluding that "the best scientific and commercial data available [was] not sufficient to enable [it] to accurately estimate the specific amount of incidental take" at the time of the BiOp. Dkt.56-1 at 766, JA.__.  Plaintiffs' approach runs roughshod over that scientific finding and would interpret Section 7 as setting an unachievable benchmark in this case.  *See N. Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980) (refusing to construe the ESA consultation process as creating "one overwhelming statutory obstacle").

Plaintiffs all but embrace the impossibility their test would create in circumstances like these, citing the ESA Handbook for the proposition that "where

the best available data does not support any anticipated level of incidental take, there can be no authorization of incidental take." Pls.Br. 68 (citing Dkt.112-1 at 306-07, JA.__). What the ESA Handbook actually says under those circumstances is this:

> In such instances, the incidental take statement should indicate that, based on the best available data, no incidental take is anticipated and that the issue *will be reexamined during the consultation process for site-specific actions* under the umbrella of the larger planning document.

Dkt.112-1 at 306-07, JA.__ (emphasis added). Plaintiffs omit that bolded context, but it is critically important. EPA's approval of Florida's Section 404 program was a one-time federal action, so Fish & Wildlife did not have the opportunity to "reexamine" take limits during future site-specific Section 7 consultations, as contemplated in the ESA Handbook's scenario. *See* 80 Fed. Reg. 26,832, 26,835 (May 11, 2015) ("For other types of programmatic actions not falling within the definitions provided in the rule, incidental take statements will be formulated by the Services to accompany biological opinions where incidental take is reasonably certain to occur and the proposed Federal action is compliant with the requirements of section 7(a)(2).").

Of course, Florida recognizes that an incidental-take statement must at least "set[] a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). And that is why the technical-assistance process is so important. It mandates a permit-by-permit analysis and coordination

34

between Fish & Wildlife and Florida, through which "the amount or extent of incidental take will be quantified" and monitored on a project-specific basis. Dkt.112-5 at 140, 142, JA.__, __.

Plaintiffs continue to play fast and loose with the facts. They say that Fish & Wildlife does not participate in setting limits under the technical-assistance process, Pls.Br. 71, when in reality "the amount or extent of incidental take will be quantified, at that time *by the appropriate Field Office of [Fish & Wildlife]*, in coordination with" Florida. Dkt.112-5 at 140, JA.__ (emphasis added). They say that setting such limits is optional, Pls.Br. 71, 74-75, when in reality "the amount or extent of incidental take *will* be quantified" "[i]f it is determined … that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures." Dkt.112-5 at 140, JA.__ (emphasis added). And they say that Florida was not bound by the resulting take limits, Pls.Br. 71, when in reality "term and condition" No. 9 of the incidental-take statement mandates that Florida "reopen the permit and coordinate" with Fish & Wildlife on appropriate steps if "the amount of incidental take originally anticipated by [Fish & Wildlife] is exceeded." Dkt.112-5 at 142, JA.__.

Finally, Plaintiffs protest that a "process [cannot substitute] for a limit," and even if the technical-assistance process resulted in "take limits" on a "permit by permit" basis, it would not constitute a "programmatic" take limit. Pls.Br. 70-71.

35

That is pure semantics.  A program-wide process that binds Fish & Wildlife and Florida to setting project-specific limits across the entire program is, by definition, a programmatic limit on take.

      b.    Plaintiffs' criticism of the incidental-take statement's lack of a take-limit-specific reinitiation trigger continues to rely on their misguided attack on its lack of a *numeric* take limit.  Fla.Br. 40-41; *see* Pls.Br. 72 (arguing that "without any take limits, there was no amount of take of any species" "that could exceed the limit").   And Plaintiffs' complaints regarding the lack of reinitiation upon exceedance of *project*-specific take limits, Pls.Br. 73, is impossible to square with their dismissal of those limits in search of a "programmatic" take limit, Pls.Br. 70-71.

      Regarding the incidental-take statement's program-wide reinitiation trigger, Fish & Wildlife committed that "[i]f these [key] assumptions prove incorrect or warrant changes during implementation of the State 404 Program, it could … trigger re-initiation of ESA section 7 consultation if it results in effects that were not considered herein pursuant to 50 [C.F.R. §] 402.16."  Dkt.56-1 at 751, JA.__; *see also id.* (enumerating those five "Key Assumptions").  Plaintiffs disparage that trigger as "hopelessly noncommittal."  Pls.Br. 72-73.  But they fail to explain *how else* Fish & Wildlife could have structured a reinitiation trigger to operate on a programmatic level in conjunction with a technical-assistance process like this one.

Plaintiffs attack on the incidental-take statement's reinitiation trigger thus fails alongside its broader assault on the very nature of Fish & Wildlife's programmatic consultation.

c.    Plaintiffs cannot deny that the incidental-take statement's terms and conditions bind Florida to include protection measures in permits issued under the Section 404 program.  Dkt.112-5 at 141-42, JA.__.  So they invent a distinction between the conditions binding *Florida* and those binding Florida's *permittees* who are themselves bound by the terms Florida is obligated to include in its permits. Pls.Br. 75.

The incidental-take statement rebuts any such distinction by conditioning a permittee's take-liability exemption on its compliance with all binding permit conditions:

> [A]ny take incidental to the execution of activities permitted by a State 404 permit issued through the implementation process described in this BiOp will be exempt from Section 9 and Section 4(d) prohibitions ***if the permittee implements all permit conditions*** such as effect minimization measures, monitoring, and reporting as agreed upon by the State, and the [Fish & Wildlife].

Dkt.112-5 at 140, JA.__ (emphasis added).

Plaintiffs retort (at 75 n.17) that this language is somehow a nullity because it appears on the page before the incidental-take statement's "terms and conditions" heading. But that amounts to a mere formatting gotcha.  This language, which is found in the incidental-take statement itself, describes the *effect* of compliance with

the permit conditions that Florida must impose via the "terms and conditions" section.  And, if Fish & Wildlife truly erred by not moving this paragraph down a few lines under the "terms and conditions" heading, then that error is easily remediable via remand to the agencies—not vacatur.

### 2. *Cooling Water* remains the only persuasive authority addressing the validity of the incidental-take statement.

The Second Circuit's unanimous decision in *Cooling Water*—which approved a programmatic incidental-take statement and technical-assistance process that did not itself set upfront, numeric take limits—continues to prove vexing for Plaintiffs. That decision rejected many of Plaintiffs' arguments in this case, Fla.Br. 43, and it refutes Plaintiffs' narrative that EPA and Fish & Wildlife went out on a limb by adopting and defending the same programmatic approach here.

This explains why Plaintiffs' brief devotes only two sentences to *Cooling Water*'s incidental-take-statement discussion.  Pls.Br. 70-71.  Florida has already addressed the supposed "fundamentally different facts" that Plaintiffs contend make *Cooling Water* unique.  *Id.*; *supra* 26-28.  And dismissing *Cooling Water* as "only one case," Pls.Br. 70, does not move the needle, when Plaintiffs (a) have identified no case to confront—much less reject—a programmatic incidental-take statement like this one, and (b) refuse to explain how the Second Circuit erred in *Cooling Water*.

The supposedly "overwhelming weight of ESA authority" cited in Plaintiffs' brief, Pls.Br. 71, does not live up to its billing. The bulk of those cases relate to Plaintiffs' contention that "[Fish & Wildlife] was not authorized to avoid the ESA's requirements at the programmatic level on the basis of uncertainty." Pls.Br. 67. But *Conner* (discussed *supra* 29-30; Fla.Br. 37, 49) did not involve *any* incidental-take statement and instead held that, unlike here, the BiOp compartmentalized its scope of analysis to only "the initial lease stage" of the broader federal action. 848 F.2d at 1453-54. *San Luis & Delta-Mendota Water Authority v. Jewell* involved an incidental-take statement for two identified water projects and one species—a far cry from the unknown (and unknowable) future effects associated with Florida's Section 404 program. 747 F.3d 581, 592 (9th Cir. 2014). *Forest Service* (discussed at Fla.Br. 37) lacked *any* incidental-take statement and rested on a "*non-binding* 'conservation recommendation.'" 726 F. Supp. 2d at 1203 (emphasis added). And *Natural Resources Defense Council, Inc. v. Evans* involved, unlike here, "no evidence in the administrative record that it was impractical to obtain estimates of the incidental take" for certain species. 279 F. Supp. 2d 1129, 1185 (N.D. Cal. 2003).

Moreover, Plaintiffs cite no cases holding that the ESA inflexibly demands only numeric take limits or a surrogate, or that a reinitiation trigger like the one here is deficient. *Oregon Natural Resource Council v. Allen* explains that a non-numeric

take limitation is permissible if it is "able to perform the functions of a numerical limitation."  476 F.3d 1031, 1038 (9th Cir. 2007).  *Sierra Club v. Department of Interior* merely holds that the requisite "'clear standard' must be able to adequately trigger reinitiation of consultation" and "cannot be vague and undetectable criteria."  899 F.3d 260, 272 (4th Cir. 2018) (internal quotation marks partially omitted).  And *Oceana, Inc. v. Pritzker* simply required Marine Fisheries to better explain the rationale behind its surrogate for monitoring take.  75 F. Supp. 3d 469, 494-98 (D.D.C. 2014).

The incidental-take statement is not in tension with any of these cases.  It explained Fish & Wildlife's conclusion that the best available scientific data did not permit it to establish upfront, numeric take limits.  It accordingly committed Fish & Wildlife to a binding technical-assistance process that ensured project-specific numeric take limits would be instituted, monitored, and enforced.  And it identified a program-wide reinitiation trigger based on Fish & Wildlife's duty to monitor whether enumerated "key assumptions" proved incorrect and "result[ed] in effects that were not considered herein pursuant to 50 [C.F.R. §] 402.16."  Dkt.112-5 at 125, JA.__.  Given the program approval and corresponding informational constraints, Fish & Wildlife did not act arbitrarily or capriciously in issuing that incidental-take statement.

**D.    Plaintiffs cannot avoid the conflict between the district court's decision and the cooperative federalism principles at play.**

Perhaps the most powerful evidence that the district court misconstrued the ESA is the irreconcilable conflict between its decision and the CWA's promise that States may assume control of Section 404 permitting.  Plaintiffs' brief does little to assuage those profound cooperative federalism concerns.

**1.    Plaintiffs give short shrift to cooperative federalism.**

Like the district court, Plaintiffs refuse to even mention the reciprocal cooperative federalism provisions at play.  *See* 16 U.S.C. § 1531(c)(2); 33 U.S.C. § 1251(b).  They skip over Florida's own sovereign interest in administering a water resources permitting program.  And they downplay Florida's dilemma as the simple byproduct of "states seeking to assume Section 404 authority [having to] meet federal requirements and … federal agencies involved in program approval [having to] comply with federal law."  Pls.Br. 76.  That misses the point.  The problem is that the district court construed "federal requirements" and "federal law" in a manner that effectively deprives Florida of its *federally* created right to assume Section 404 permitting.

Plaintiffs then shift the blame for the district court's confounding decision.  "It was Florida and EPA," Plaintiffs say, "who decided to pursue [the] programmatic Section 7 consultation," as if they had options *besides* "choos[ing] this path."  Pls.Br. 77.  But everyone—including Plaintiffs—agreed below that Section 7 applied to

41

EPA's program approval.  Pls.Br. 12 ("Environmental Appellees agreed that Section 7 applied but rejected Florda's 'one and done' approach.").  Having agreed to channel EPA through the Section 7 process, Plaintiffs cannot now ignore the district court's contortion of that process into an insuperable hurdle.

Equally misleading is Plaintiffs' observation that the statutes "have co-existed for more than fifty years," and "Michigan and New Jersey have assumed the 404 program without any claim of statutory conflict."  Pls.Br. 75-76.  Florida is just the third state to assume Section 404 permitting in those 50 years and, critically, it is the first to do so after a formal Section 7 consultation.  Neither Michigan nor New Jersey's program approvals underwent *any formal consultation*.  Fla.Br. 50-51; Dkt.182 at 24, JA.__; Dkt.170 at 7-8, JA.__.  Applying ESA Section 7 to Florida's consultation is therefore a watershed moment for harmonizing (or not) the two statutes.  Indeed, at the time of New Jersey's program approval, Fish & Wildlife expressly cautioned EPA that "future consultations on state assumptions will be conducted as programmatic formal consultations."  Dkt.112-5 at 159-69, JA.__.

The 19 State *amici* supporting Appellants vividly illustrate the threat to future State assumptions posed by the decision below.  Doc. #2076355.  These States' desire to ensure that Section 404 assumption remains a viable option is not a mere "policy goal," as Plaintiffs contend.  Pls.Br. 5.  Rather, it is the statutory prerogative of States to do as Congress intended—for "*States*" to "implement the permit

program[]" under Section 404.  33 U.S.C. § 1251(b) (emphasis added).  And Congress explicitly said why: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources."  *Id.*

### 2.    Plaintiffs' attempt to walk back the impossibility of the district court's holding only pokes more holes in their theory.

Having trumpeted the strictures of the ESA's "analytical requirements" in one breath, Plaintiffs swear in another that "[t]he ESA does not require perfect foresight," and Fish & Wildlife merely had to "use the best available data to do the most informed analysis it can."  Pls.Br. 47-51, 77.  But Plaintiffs simultaneously concede that circumstances can exist in which "the best available data does not support any anticipated level of incidental take."  Pls.Br. 68.  And, if Fish & Wildlife had engaged in blind speculation to reach a no-jeopardy finding, Plaintiffs surely would have cried foul that the agency had abdicated its duty under Section 7(a)(2). *See, e.g.*, *Greenpeace Found. v. Mineta*, 122 F. Supp. 2d 1123, 1133 (D. Haw. 2000) ("[Marine Fisheries] cannot speculate that no jeopardy to monk seals or adverse modification of their critical habitat will occur because it lacks enough information regarding the impact of the fishery on seals.").

Abstractions aside, Plaintiffs insist that Fish & Wildlife had "reams of data" from "prior Section 7 consultations on the Corps' permitting actions in Florida to

43

make an informed estimate of the effects of EPA's transfer decision."  Pls.Br. 42.

And they also argue that Fish & Wildlife had "ample data" to set cumulative take

limits in the State—at least for the Florida panther.  Pls.Br. 68-69.  Florida will take

each of those erroneous contentions in turn.

*Species Analysis.*  Rather than ignore prior consultation data, Fish & Wildlife

expressly considered that data with respect to the environmental baseline.  Dkt.56-1

at 742-61, JA.__; Dkt.112-3 at 54-73, 124-226, JA.__, __; *see Cooling Water*, 905

F.3d at 73-74 (rejecting argument that the Services "failed to 'seek out and consider'

existing scientific data on thermal pollution" because they "cit[ed] a report on

thermal stressors the Environmental Petitioners suggest was ignored").  That is

precisely where the ESA Handbook dictates prior-consultation information matters.

*See* Dkt.112-1 at 207, JA.__ ("Prior consultations on the species also can provide

information on baseline and cumulative effects on the species and its habitat, and

should provide the species status and environmental baseline data upon which

subsequent consultations are based.").

Despite Fish & Wildlife's conclusion that a species- and site-specific effects

analysis was "not possible" based on available data, Dkt.56-1 at 753, JA.__,

Plaintiffs claim they know better than the expert agency by second-guessing that

feasibility determination.  But *Cooling Water* rejected a near-identical attack on a

programmatic BiOp's conclusion that "a categorical assessment of … impacts was

infeasible" because it was "a scientific determination deserving deference." 905 F.3d at 74. Plaintiffs ignore that holding and seek to manufacture a concession out of Florida's observation that, *if* the district court's decision stands, the Court at most should remand for Fish & Wildlife to attempt to satisfy the test with the benefit of additional permitting data. Fla.Br. 56.

Plaintiffs naturally can identify no authority for Fish & Wildlife using prior consultation data to serve as a proxy for future species effects for unknown future projects. Proving Florida's point, Plaintiffs cite (at 43-44) a programmatic BiOp that involved, unlike here, a consultation on "10 categories of minor in-water activities" in certain limited coastal areas that must be "carried out as described," with Marine Fisheries separately reviewing and approving any "modification" to those pre-approved projects on a "case-specific basis."[8] That limited analysis of a narrow set of pre-approved projects is nothing like cataloguing species effects associated with Florida's Section 404 program, writ large.

Moreover, consider how Plaintiffs' approach would have played out. Assuming "just fifteen species accounted for 93.3% of the historical consultations" and that "historic consultations were also concentrated in areas of rapid growth and

---

[8] *Jacksonville District's Programmatic Biological Opinion* at 1, 21, 238 (Nov. 20, 2017), Dkt.125, JA.__, *available at* cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577.

45

development, like Southwest Florida," Plaintiffs' logic would ostensibly have had Fish & Wildlife simply assume that Florida's Section 404 program would—for years into the future—mirror those historical examples. Pls.Br. 44. But that says nothing about specific impacts from specific projects on specific species in areas within or outside Southwest Florida. And in any event, what would occur when a permittee proposes a project in an *undeveloped* area that impacts one of the hundreds of listed species *not* among the fifteen comprising a majority of historical consultations?

Therein lies the rub. Plaintiffs' "best it can with what it has" mantra, Pls.Br. 46, would disregard species effects in the above example (and countless others), all for the sake of inflexibly demanding a categorical effects analysis at the outset. The technical-assistance process, meanwhile, fully accounts for the fact that past does not invariably equal future, and meaningfully accounts for project-specific impacts "as new information develops." Pls.Br. 45. It is therefore *more* protective of species than the rote guesswork consultation process Plaintiffs envision.

***Take Limits.*** Plaintiffs' assurance that Fish & Wildlife had "ample data" to set cumulative take limits for (at least) the Florida panther is similarly unpersuasive. Pls.Br. 68-69. How setting a cumulative take limit for a *single* listed species (out of the hundreds in Florida) would have spared Fish & Wildlife from the district court's categorical demand for numeric take limits is anyone's guess. Regardless, this argument ignores that Fish & Wildlife made a scientific determination that setting

such specific, upfront take limits was infeasible in light of the scope of program approval and unknown nature of future projects, Dkt.56-1 at 753, 766, JA.__, __, and it is not up to Plaintiffs or the district court to "imagine" alternative ways that Fish & Wildlife could have structured its consultation, Dkt.182 at 75, JA.__; *see Cooling Water*, 905 F.3d at 74 (giving "deference" to Fish & Wildlife's "scientific determination" and concluding that "nothing else compels us to order that consultation be carried out in some other manner").

Taking Plaintiffs' cumulative-take-limit suggestion at face value for the Florida panther demonstrates the superiority of Fish & Wildlife's technical-assistance process. The technical-assistance process is specifically designed to employ the best available science to identify project-specific impacts taking into consideration all relevant factors, including conservation measures established under specific permits to aid panther populations. Ultimately, Florida 404 permits must adopt any requirement that Fish & Wildlife imposes for the protection of the Florida panther. Indeed, the Florida panther would be worse off under a speculative, cumulative take limit set years earlier based on outdated information than under the continuous oversight and binding requirements established through the technical-assistance process. Yet Plaintiffs contend that Fish & Wildlife could have satisfied Section 7 by including a token cumulative take limit for Florida panthers (and other

47

species) and jettisoning the "non-statutory" technical-assistance process entirely. That strains credulity.

### 3.    Plaintiffs' "other" methods for ESA compliance are illusory.

From there, Plaintiffs fall back on the supposed "other options" that Federal Defendants could have pursued.  But those options remain just as illusory as Florida described in its opening brief.  Fla.Br. 50-52.

*Federalizing 'may affect' permits.*  Plaintiffs suggest a solution whereby EPA federalizes all "may affect" permits (that is, EPA transfers any permit applications from Florida to the Corps if there is a potential for impact to listed species).  Pls.Br. 78-79.  But that is no solution here.  Plaintiffs ignore 40 C.F.R. § 233.1(b) and Federal Defendants' affirmation that this option would constitute a prohibited "partial assumption." Fla.Br. 51 (citing 40 C.F.R. § 233.1(b); Dkt.165 at 3, JA.__). It would be profoundly backwards to derail Florida's Section 404 program approval on the theory that Federal Defendants could try again with an approach they have already declared "practically and legally unworkable."  Dkt.165 at 3, JA.__.

*New Jersey model.*  Plaintiffs suggest that the New Jersey approach is an option, but in doing so, they blow by the legal flaw of foregoing formal Section 7 consultation as well as Fish & Wildlife's contemporaneous warning in 1993 that "future [*i.e.*, post-New Jersey] consultations on state assumptions will be conducted as programmatic formal consultations."  Dkt.112-5 at 159-69, JA.__.  They urge that

New Jersey's formal-consultation-free program approval occurred because of its "several layers of [Fish & Wildlife] review[s]" and was *not* the unique byproduct of New Jersey's relative sparsity of listed species. Pls.Br. 80-81. Plaintiffs thus suggest Florida's program could have similarly avoided the need for formal Section 7 consultation.

Not so. Plaintiffs leave out the critical fact that federal oversight for Florida's program went *above and beyond* that present in New Jersey's program. Just like New Jersey's program, EPA retained federal oversight under 40 C.F.R. § 233.50 and was committed to "transfer[ring] [any] permit application to the [Corps] for processing" (*i.e.*, federalizing the permit) if, after EPA's objection, Florida "neither satisfies EPA's objections, requirement for a permit condition, nor denies the permit." Dkt.112-5 at 83, JA.___. But, unlike New Jersey's program, which submits for Fish & Wildlife review only those permit applications for projects that New Jersey finds "may affect" listed species, *id.* at 150-52, JA.___, the BiOp here committed Fish & Wildlife to "[r]eview *all* the 404 permit applications sent by" Florida for a species- and site-specific review on a "project-by-project" basis, *id.* at 90, JA.___ (emphasis added). As addressed earlier, all Florida Section 404 permit applications are available for federal-agency review. *See supra* 6 n.1. And yet, despite those more robust "layers of [federal] review," Pls.Br. 80, Fish & Wildlife still concluded—consistent with its instruction to EPA over three decades ago—that

49

Florida's program may affect listed species and was reasonably certain to result in incidental take. The resulting formal consultation and programmatic incidental-take statement were therefore unavoidable.

***Section 10.*** Finally, Plaintiffs weakly protest that Federal Defendants could have structured Florida's program approval to require permit "applicants to seek Section 10 authorization for a state permit resulting in incidental take," just like "New Jersey's program." Pls.Br. 81. But Plaintiffs ignore that, unlike here, Fish & Wildlife found that New Jersey's program approval would *not* affect listed species and was *not* reasonably certain to result in incidental take, so it did not proceed down the mandatory path of formal Section 7 consultation and an incidental-take statement. Dkt.112-5 at 159-69, JA.___. Nor do Plaintiffs dispute that Florida and its applicants *must* seek Section 10 protection if they cannot satisfy the incidental-take statement's conditions and thus qualify for take-liability protection under Section 7. Dkt.56-1 at 766, JA.___; Fla.Br. 52. Those two undisputed facts render Plaintiffs' Section 10 argument irrelevant.

### E.   This Court must also reverse the district court's invalidation of EPA's program approval.

Plaintiffs' defense of the district court's invalidation of EPA's program approval depends entirely on their mistaken premise that the underlying BiOp and incidental-take statement were invalid. Pls.Br. 82 ("Because FWS' Biological Opinion and Incidental Take Statement were facially flawed, it was unlawful for

EPA to rely on them to approve Florida's 404 assumption application."). Because the BiOp and incidental-take statement are valid, the district court's invalidation of EPA's program approval must be reversed.[9]

IV. **EPA's "no effect" finding for marine species was not arbitrary, notwithstanding Federal Defendants' belated change in position.**

Florida's Section 404 program does not permit activities in coastal or marine waters, which are retained entirely by the Corps. Only a few listed species subject to Marine Fisheries' jurisdiction occur in those waters. Thus, for purposes of ESA Section 7, EPA's evaluation of impacts to those few species was much simpler than assessing whether Florida's program would impact over 130 listed species in assumable waters throughout Florida. Florida has already demonstrated why the record supports EPA's original commonsense view here, and why EPA's "no effect" finding certainly was not arbitrary or capricious. Fla.Br. 53-55.

Years into this litigation, Federal Defendants oddly shift positions on this comparatively minor claim, stating that EPA did not "fully consider" or "sufficiently analyze" "indirect" effects to marine species in non-assumable waters. Fed.Br. 51-52. They now call it a "narrow error" involving just three species. Fed.Reply.Br. 36. It is unclear, to say the least, that Federal Defendants will maintain that curious position after January 20, 2025. But in any event, Federal Defendants are too self-

---

[9] Contrary to Plaintiffs' suggestion, Florida did specifically "address the issue" and therefore did not "waive it." Pls.Br. 82; *see* Fla.Br. 53.

critical.  EPA did not act arbitrarily when it found "no effect" for listed marine species—a view that Marine Fisheries itself supported at the time.  Fla.Br. 53. Federal Defendants do not explain how or why purported gaps in EPA's work on this tangential issue created "arbitrary" agency action.[10]

Plaintiffs argue that EPA (1) failed to consider "indirect" effects to marine listed species in downstream retained waters, (2) only "relied on" Marine Fisheries, and (3) "punted any analysis or protection of NMFS species to future state permit review."  Pls.Br. 82-83.  Plaintiffs are wrong on all points.  To the contrary, the administrative record shows that EPA:

(1) identified the relevant marine species of concern (*e.g.*, the Atlantic sturgeon, Shortnose sturgeon, and smalltooth sawfish);

(2) described the baseline status of those species;

(3) evaluated mapping data to understand the location of these marine species in relation to assumable waters;

(4) considered various "effects" and "stressors" on marine species such as impacts from "fill," "dredging," "habitat fragmentation," and "water quality"; and

(5) evaluated the built-in protections of Florida's program including (a) Marine Fisheries' review of Florida permits, (b) Florida's obligation to adopt Marine Fisheries' requirements into permits, and (c) Florida's regulatory prohibition against issuing permits that significantly degrade water quality or violate water quality standards.

---

[10] Of course, this Court is not bound by Federal Defendants' belated litigation position.  *See Terry v. United States*, 593 U.S. 486, 492-95 (2021) (disagreeing with government confession).

Dkt.56-1 at 532, JA.__; Dkt.112-2 at 351, 370-71, JA.__, __; Dkt.112-3 at 53, 64, 137, 152-54, JA.__, __, __, __.  Ultimately, EPA reasonably found that, "where a species subject to jurisdiction under [Marine Fisheries] occurs in [retained] waters … located downstream from permitted activities in state-assumed waters, upstream protections provided by the state-issued permits would ensure that all action areas, including *downstream areas that are indirectly affected by the action*, have been considered."  Dkt.56-1 at 532, JA.___ (emphasis added).  Thus, contrary to Plaintiffs' assertion (at 82-83), EPA did not exclude these indirect downstream issues from its consideration.  EPA's original finding was not arbitrary or capricious, and EPA did not fail to consider the relevant factors such as indirect effects in downstream retained waters.  Regardless, for the reasons already explained, any such defects in EPA's action here would not justify vacatur of the entire program.

## V. Even if EPA erred, the proper remedy would be remanding to the agency for further work, not vacating the entire program.

Given all of the above, the district court "misapprehended the underlying substantive law," *Texas v. United States*, 798 F.3d 1108, 1113 (D.C. Cir. 2015), and thus abused its discretion in vacating EPA's approval of the Florida program, *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

Even assuming otherwise, the district court should have given Federal Defendants and Florida the opportunity to correct any purported errors without

upsetting the status quo.  Florida spent the better part of a decade laying the statutory, regulatory, and logistical groundwork to administer the program.  Dkt.112-3 at 21-22, JA.__.  And Florida administered the program for three years, successfully processing thousands of permit applications.  The district court disregarded all that, splitting with the Second Circuit and rejecting the long-held and considered views of EPA and Fish & Wildlife—across multiple administrations—about ESA requirements.  Because any deficiencies in the process were not "serious[]" such that the ultimate outcome—Florida assuming control of its Section 404 program—is not in doubt, remand without vacatur was the appropriate remedy.  *See Allied-Signal v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (first factor); *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (remand without vacatur appropriate where it was "plausible" agency could "redress its failure of explanation on remand while reaching the same result").

Having shifted views on the tangential claim involving marine species, Federal Defendants now say that this Court should keep the vacatur in place for a period of time to let the district court redo its remedy analysis.  This approach, they say (at 53), would prevent a "vacatur of vacatur" scenario with this Court and the district court playing "jurisdictional ping-pong" over who is running the Section 404 program.  That is both mistaken and misguided for a few reasons.

54

On the law, the district court abused its discretion in the first place by volleying the program back to the Corps. Fla.Br. 56-58; *see City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (remanding without vacatur where permitted pipeline was "currently operational" and vacatur "would be quite disruptive"). The district court raised the same concern Federal Defendants raise over "administrative flipflopping and confusion" before issuing the decision that caused that precise result. Dkt.182 at 96, JA.__. That is evidence of abused discretion and counsels in favor of this Court addressing the remedy analysis in full on appeal. The Court should not let an abuse of discretion remain in place because it was so costly and disruptive that undoing it would also be costly and disruptive—that turns the second *Allied-Signal* factor ("the disruptive consequences of an interim change that may itself be changed") on its head. 988 F.2d at 150-51 (citation omitted).

On practicalities, the Court should not punt the remedy analysis back to the district court because of the threat of never-ending litigation caused by Federal Defendants' change in position (at least the new position they are taking for now). Consider how this plays out if this Court identifies legal deficiencies in the program-approval process but merely punts the remedy. The district court has already signaled that it views the errors as vacatur-worthy. Another round of litigation in the district court and a return to this Court means years more delay, all while the program Florida built over the course of years at substantial cost sits dormant. If the

Court instead (properly) concludes that remand without vacatur was warranted under these circumstances, the district court will benefit from this Court's analysis on that issue. And any remaining issues left for the district court (and consonant remedy analysis) could be considered with this Court's analysis of the issues in mind.

Finally, Plaintiffs argue (at 86) that EPA was "required to complete Section 7 *before* approving Florida's program," seemingly indicating that remand without vacatur is categorically unavailable in this context. But they cite no authority for that proposition. Indeed, in the very next paragraph (at 86), Plaintiffs cite *Conserve Southwest Utah v. Department of Interior*, No. 1:21-CV-01506, 2023 WL 7922785 (D.D.C. Nov. 16, 2023), which involved a court remanding a BiOp *without* vacatur. *See id.* at *7-*9. The same would be proper here.

Ultimately, Plaintiffs give the game away (at 86) when they say that any subsequent re-doing of the BiOp and biological evaluation "would also be new, different agency actions" subject to judicial review. Years more in litigation over every aspect of program approval is the point. Rather than bless this approach, the Court should restore Florida's program while this litigation plays out. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (reversing district court's vacatur of agency action and directing remand without vacatur).

## CONCLUSION

The Court should vacate the judgment below for lack of standing or reverse the summary judgment vacating EPA's approval and render summary judgment in favor of Florida and Federal Defendants.  Alternatively, if the Court disagrees with any element of the agency action, it should reverse the vacatur and instruct the district court to remand for Federal Defendants to cure that error.

Dated:  January 13, 2025

Respectfully submitted,

/s/ Aaron M. Streett

Henry C. Whitaker
SOLICITOR GENERAL
Christopher J. Baum
SENIOR DEPUTY SOLICITOR GENERAL
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com
christopher.baum@myfloridalegal.com

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
anthony.lucisano@bakerbotts.com
beau.carter@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

*Counsel for the State of Florida
and the Florida Department of Environmental Protection*

58

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF SERVICE

I certify that on January 13, 2025, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett