**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

––––––––––––––––––––––––––––––––

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

––––––––––––––––––––––––––––––––

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

––––––––––––––––––––––––––––––––

**JOINT APPENDIX—VOLUME 1 (JA.1–JA.430)**

––––––––––––––––––––––––––––––––

*Counsel Listed on Inside Cover*

February 26, 2025

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

Jeffrey DeSousa
*Acting Solicitor General*
Christopher J. Baum
*Senior Deputy Solicitor General*
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Florida Appellants*

Lisa Lynne Russell
*Deputy Assistant Attorney General*

Brian Toth
Joan Pepin
Rebecca Jaffe
*Attorneys*

Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

*Counsel for Federal Appellants*

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
tgalloni@earthjustice.org
creichert@earthjustice.org
(305) 440-5432

Bonnie Malloy
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
bmalloy@earthjustice.org
(850) 681-0031

*Counsel for Environmental Appellees*

## TABLE OF CONTENTS

| VOLUME 1 (JA.1–JA.430) | | |
| --- | --- | --- |
| **District Court Docket Number** | **Document** | **Page** |
| Dkt. 1 | Plaintiffs' Complaint | 1 |
| Dkt. 4 | State of Florida and Florida Department of Environmental Protection's Motion to Intervene | 52 |
| Dkt. 73 | Memorandum Opinion and Order | 55 |
| Dkt. 77 | Plaintiffs' Amended Complaint | 117 |
| Dkt. 95-2 | Revised Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program | 176 |
| Dkt. 98 | Plaintiffs' Motion for Summary Judgment | 211 |
| Dkt. 98-1 | Declaration of Amber Crooks | 294 |
| Dkt. 98-3 | Declaration of Elizabeth H. Fleming | 417 |

| VOLUME 2 (JA.431–JA.846) | | |
| --- | --- | --- |
| Dkt. 98-4 | Declaration of Brett Hartl | 431 |
| Dkt. 98-5 | Declaration of Matthew Schwartz | 444 |
| Dkt. 98-6 | Declaration of Lisa Rinaman | 463 |
| Dkt. 98-7 | Declaration of Rachel Silverstein | 510 |
| Dkt. 98-10 | Declaration of Diana Umpierre | 543 |

| Dkt. 99 | Defendant's Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment | 644 |
| Dkt. 102 | Florida Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment | 731 |
| Dkt. 102-1 | Declaration of Justin Wolfe | 793 |

| VOLUME 3 (JA.847–JA.1190) | | |
|---|---|---|
| Dkt. 104 | Plaintiffs' Consolidated Reply in Support for Motion for Summary Judgment and Response in Opposition to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 847 |
| Dkt. 104-1 | Supplemental Declaration of Amber Crooks | 963 |
| Dkt. 107 | Florida Intervenors' Reply in Support of Cross-Motion for Summary Judgment | 1001 |
| Dkt. 113 | Notice of Completion of Biological Evaluation | 1033 |
| Dkt. 123 | Plaintiffs' Sur-Reply in Support of Plaintiffs' Motion for Summary Judgment and Response to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 1036 |
| Dkt. 125 | Plaintiffs' Notice of Filing Addition to Supplemental Joint Appendix | 1063 |
| Dkt. 127-2 | Florida Intervenors' Motion for Leave to File Post-Hearing Memorandum, Attachment 1: Standing Demonstrative | 1066 |
| Dkt. 135 | Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Center for Biological Diversity and Sierra Club | 1069 |

| Dkt. 149-3 | Exhibit C: Comparison Table of Species Review Process in Corps-Led and Florida-Led Section 404 Programs | 1113 |
|---|---|---|
| Dkt. 153 | Plaintiffs Center for Biological Diversity and Sierra Club's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 1119 |
| Dkt. 153-1 | Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation | 1182 |
| Dkt. 156 | Excerpt of Motion Hearing on October 19, 2023 | 1187 |

| **VOLUME 4 (JA.1191–JA.1469)** | | |
|---|---|---|
| Dkt. 158 | Federal Defendants' Post-Hearing Submission on Remedy | 1191 |
| Dkt. 161 | Plaintiffs' Brief on Remedy for Claims Relating to Protection of ESA-listed Species under USFWS' Jurisdiction | 1201 |
| Dkt. 164 | Order | 1218 |
| Dkt. 165 | Federal Defendants' Supplemental Brief Regarding Limited Stay | 1220 |
| Dkt. 166 | Florida Intervenors' Motion for Limited Stay of February 15, 2024 Vacatur Order | 1224 |
| Dkt. 166-1 | Exhibit A: Declaration of Justin Wolfe | 1245 |
| Dkt. 170 | Florida Intervenors' Reply in Support of Limited Stay | 1250 |
| Dkt. 171 | Florida Intervenors' Expedited Motion for Entry of Final Judgment | 1263 |

| Dkt. 182 | Amended Memorandum Opinion | 1284 |
|---|---|---|
| Dkt. 183 | Memorandum Opinion | 1382 |
| Dkt. 184 | Order | 1409 |
| Dkt. 185 | Florida Intervenors' Notice of Appeal | 1410 |
| Dkt. 189 | Plaintiffs' Response to Florida Intervenors' Motion for Stay Pending Appeal | 1411 |
| Dkt. 190 | Memorandum Opinion and Order | 1451 |
| Dkt. 193 | Plaintiffs' Notice of Appeal | 1465 |
| Dkt. 195 | Federal Defendants' Notice of Appeal | 1468 |

| VOLUME 5 (JA.1470–JA.1707) | | | |
|---|---|---|---|
| **EPA Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| EPA-HQ-OW-2018-0640-0001 | Dkt. 51 at 1-4 | Request to Assume Administration of a Clean Water Act Program: Florida, Notice and Request for Comments, 85 Fed. Reg. 57,853 (Sept. 16, 2020) | 1470 |
| EPA-HQ-OW-2018-0640-0002-A7 | Dkt. 52 at 6-15 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060: Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands, Aug. 20, 2020 | 1474 |

| EPA-HQ-OW-2018-0640-0002-A9 | Dkt. 52 at 21-30 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060 Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters, Aug. 20, 2020 | 1484 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0002-A20 | Dkt. 52 at 82-143 | Florida Section 404 Program Application: Florida Admin. Code 62-331.010(5): State 404 Program Applicant's Handbook Aug. 20, 2020 | 1494 |
| EPA-HQ-OW-2018-0640-0016-A2 | Dkt. 55-1 at 120-32 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, USFWS, and FDEP, Aug. 5, 2020 | 1556 |
| EPA-HQ-OW-2018-0640-0018 | Dkt. 55-1 at 300-13 | Memorandum of Agreement between FDEP and EPA, July 31, 2020 | 1569 |
| EPA-HQ-OW-2018-0640-0019 | Dkt. 55-1 at 314-22 | Memorandum of Agreement Between FDEP and the U.S. Department of the Army, July 31, 2020 | 1583 |
| EPA-HQ-OW-2018-0640-0051 | Dkt. 55-3 at 69-129 | Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020 | 1592 |
| EPA-HQ-OW-2018-0640-0386-A1 | Dkt. 56 at 16-70 | Letter from Tania Galloni et al., Earthjustice et al., to Kelly Laylock, EPA, Nov. 2, 2020 | 1653 |

| VOLUME 6 (JA.1708–JA.2060) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0387-A8 | Dkt. 56-1 at 65-364 | Exhibit 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida, July 24, 2020 | 1708 |
| EPA-HQ-OW-2018-0640-0387-A10 | Dkt. 112-1 at 175-76, 207, 259, 275, 306-07 | Excerpts of Exhibit 60: 1998 Endangered Species Consultation Handbook | 2008 |
| EPA-HQ-OW-2018-0640-0388-A2 | Dkt. 95-2 at 18 | Letter from Kristen L. Boyles et al., Earthjustice et al., to Kathy Hurld, EPA, July 6, 2020 | 2015 |
| EPA-HQ-OW-2018-0640-0388-A7 | Dkt. 112-2 at 2-26 | Exhibit 67: FDEP White Paper, ESA Consultation | 2032 |
| EPA-HQ-OW-2018-0640-0564 | Dkt. 56-1 at 433-34 | Approval of Florida's Clean Water Act Section 404 Assumption Request, 85 Fed. Reg. 83,533, Dec. 22, 2020 | 2057 |
| EPA-HQ-OW-2018-0640-0566 | Dkt. 56-1 at 435-36 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Dec. 17, 2020 | 2059 |

| VOLUME 7 (JA.2061–JA.2199) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0568 | Dkt. 56-1 at 437-549 | EPA, Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, Dec. 16, 2020 | 2061 |

| EPA-HQ-OW-2018-0640-0617 | Dkt. 112-2 at 351 | Letter from Jeaneanne Gettle, EPA, to Roy Crabtree, NOAA NMFS, on EPA's Section 7 Consultation, Sept. 2, 2020 | 2174 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0618 | Dkt. 112-2 at 352-53 | Letter from Virginia Fay, NOAA NMFS, to Jeaneanne Gettle, EPA, Oct. 30, 2020 | 2175 |
| EPA-HQ-OW-2018-0640-0623 (same as FWS-006015) | Dkt. 112-2 at 354-66 (same as Dkt. 112-5 at 47-59) | USFWS Biological Opinion Appendix 2: Memorandum of Understanding Between FWC, USFWS, and FDEP, August 5, 2020 | 2177 |
| EPA-HQ-OW-2018-0640-0635 | Dkt. 56-1 at 669 | Letter from David Ross, EPA, to Timothy Gallaudet, NOAA NMFS, and Rob Wallace, USFWS, on FDEP's Non-Federal Representative Designation, Dec. 13, 2019 | 2190 |
| EPA-HQ-OW-2018-0640-0636 | Dkt. 56-1 at 670-71 | Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, on FDEP's Non-Federal Representative Designation, Dec. 12, 2019 | 2191 |
| EPA-HQ-OW-2018-0640-0637 | Dkt. 112-2 at 367-69 | EPA, Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953, May 21, 2020 | 2193 |

| EPA-HQ-OW-2018-0640-0638 | Dkt. 112-2 at 370-71 | Letter from Cathryn Tortorici, NOAA NMFS, to Heather Mason, FDEP, April 15, 2020 | 2196 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0641 | Dkt. 56-1 at 684-85 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, on EPA's Completeness Determination for Florida's Assumption Request, August 28, 2020 | 2198 |

| VOLUME 8 (JA.2200–JA.2530) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0649 (same as FWS-005610) | Dkt. 112-3 at 2-298 (same as Dkt. 112-4 at 87-383) | USFWS Biological Opinion Appendix 1: EPA's Biological Evaluation | 2200 |
| EPA-HQ-OW-2018-0640-0660-A1 | Dkt. 56-1 at 774-81 | EPA, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals, Aug. 27, 2020 | 2497 |
| EPA-HQ-OW-2018-0640-0664 | Dkt. 112-3 at 301-02 | Letter from Jeaneanne Gettle, EPA, to Tania Galloni, Earthjustice, Responding to Notice of Intent to Sue, Dec. 20, 2021 | 2505 |
| EPA-HQ-OW-2018-0640-0670 | Dkt. 112-3 at 343 | Email from David Fotouhi, EPA, to Matt Leopold, EPA, et al., transmitting documents for Florida Stakeholder meeting, Sept. 17, 2018 | 2507 |

| EPA-HQ-OW-2018-0640-0670-A3 | Dkt. 112-3 at 344-52 | Potential ESA Compromise Analysis and Proposal | 2506 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0670-A5 | Dkt. 112-3 at 353-59 | Florida Proposal Regarding ESA (SSEC-Doug-P18082810080) | 2517 |
| EPA-HQ-OW-2018-0640-0686 | Dkt. 112-3 at 368-72 | Response to Comments on EPA Consultation under ESA | 2524 |
| EPA-HQ-OW-2018-0640-0690 | Dkt. 112-3 at 375-76 | Letter from Peter S. Silva, EPA, to R. Steven Brown, Environmental Council of the States, et al., re EPA Position on ESA Consultation for 404 Assumption, Dec. 27, 2010 (same as above) | 2529 |

| VOLUME 9 (JA.2531–JA.2700) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-000001 | Dkt. 112-4 at 2-3 | 20191212 Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, re: Designation of FDEP as Non-Federal Representative for Informal Consultation | 2531 |
| FWS-006015 | Dkt. 112-5 at 47-59 | 20201116 Memorandum of Understanding between FWC, USFWS, and FDEP (attached as Appx. 2 to USFWS's Biological Opinion) | 2533 |

| FWS-000749 | Dkt. 112-4 at 9-11 | 20200331 Email from H. Rauschenberger, USFWS, to M. Duncan, FDEP, J. Goff, FWC, et al., re: Comments on Draft Species Coordination Process | 2546 |
|---|---|---|---|
| FWS-003386 | Dkt. 112-4 at 43-84 | 20200820 Florida Rules Chapter 62-4, submitted as part of FDEP's application package. | 2549 |
| FWS-006028 (same as EPA-HQ-OW-2018-0640-0642) | Dkt. 112-5 at 60-147 (same as Dkt. 56-1 at 686-773) | 20201117 Programmatic Biological Opinion for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act | 2591 |
| FWS-006144 | Dkt. 112-5 at 148-69 | 20180625 Memorandum of Agreement between EPA, USFWS, and NJDEP Related to the Protection of Federally-Listed Threatened or Endangered Species and Designated Critical Habitat Under a New Jersey-Assumed Section 404 Program | 2679 |

| VOLUME 10 (JA.2701–JA.3056) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-006432 | Dkt. 93-2 at 4 | 20140519 Final Biological Opinion re EPA Final Rule - Cooling Water Intakes | 2701 |
| **Army Corps Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| CORPS004318 | Dkt. 112-8 at 106 | 20191126 Email from Robert Barron, Corps, to Shawn Zinszer, Corps, et al., re: AAR Retained Water GIS Call: We Need a "Big" Call with FDEP | 3040 |
| CORPS004319 | Dkt. 112-8 at 107-09 | 20191206 Email Dale Beter, Corps, to Shawn Zinszer, Corps, re: 404g_h Assumption Meeting Notes  Attachment: 20191206 Sec 404g Assumption Mtg Notes.docx | 3041 |
| CORPS004322 | Dkt. 112-8 at 110-22 | 20200805 Memorandum of Agreement between FDEP and U.S. Department of the Army | 3044 |

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 26, 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  All participants in this case registered with CM/ECF will be served by the CM/ECF system.

Dated:  February 26, 2025               /s/ Aaron M. Streett
                                        Aaron M. Streett
                                        BAKER BOTTS LLP
                                        910 Louisiana St.
                                        Houston, Texas 77002
                                        (713) 229-1855 (phone)
                                        (713) 229-7855 (fax)
                                        aaron.streett@bakerbotts.com

                                        *Counsel for Florida Appellants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY
378 N. Main Avenue
Tucson, AZ 85701;

DEFENDERS OF WILDLIFE
1130 17th Street, N.W.
Washington, DC 20036;

SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612;

CONSERVANCY OF SOUTHWEST FLORIDA
1495 Smith Preserve Way
Naples, Florida 34102;

FLORIDA WILDLIFE FEDERATION
2545 Blairstone Pines Drive
Tallahassee, FL 32301;

MIAMI WATERKEEPER
2103 Coral Way
Miami, FL 33145; and

ST. JOHNS RIVERKEEPER
2800 University Blvd N
Jacksonville, FL 32211,

      Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

ANDREW WHEELER, in his official capacity as
Administrator for the U.S. Environmental
Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

**CIVIL NO.** 21-cv-119

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1

JA.1

DAVE ROSS, in his official capacity as Assistant
Administrator for the Office of Water of the U.S.
Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

DAVID FOTOUHI, in his official capacity as Acting
General Counsel for the U.S. Environmental
Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

SUSAN BODINE, in her official capacity as Assistant
Administrator for the Office of Enforcement and Compliance
Assurance for the U.S. Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

MARY WALKER, in her official capacity as Administrator
for Region 4 of the U.S. Environmental Protection Agency,
61 Forsyth Street SW
Atlanta, GA 30303;

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, NW
Washington, DC 20240;

AURELIA SKIPWITH, in her official capacity as Director
for the U.S. Fish and Wildlife Service,
1849 C Street, NW
Washington, DC 20240;

LEOPOLDO MIRANDA-CASTRO, in his official capacity
as Regional Director for the U.S. Fish and Wildlife Service,
1875 Century Boulevard, Suite 400
Atlanta, GA 30345;

U.S. ARMY CORPS OF ENGINEERS
441 G Street, NW
Washington, DC 20314;

LIEUTENANT GENERAL SCOTT A. SPELLMON, in his
official capacity as Chief of Engineers and Commanding
General of the U.S. Army Corps of Engineers,
441 G Street, NW
Washington, DC 20314; and

COLONEL ANDREW KELLY, in his official capacity as
District Commander of the Jacksonville District for the U.S.
Army Corps of Engineers,
701 San Marco Boulevard
Jacksonville, FL 32207,

     Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This action arises from the U.S. Environmental Protection Agency's ("EPA")

unlawful approval of a state application to assume jurisdiction over the Clean Water Act's

Section 404 permitting program, which regulates the dredging and filling of waters of the United

States, including wetlands essential to water quality, storm and climate resiliency, threatened and

endangered species, and the economy.  EPA's approval is unlawful because the state's program

is not as stringent as federal law and rests on unprecedented arrangements that violate federal

law.  At a December 17, 2020, press conference in Washington, D.C., EPA Administrator

Andrew Wheeler announced the agency's approval of the state of Florida's novel program to

assume jurisdiction over Section 404, described the program as a roadmap, and encouraged other

states to follow suit.  On December 22, 2020, the EPA published its decision in the Federal

Register, purporting to give it immediate effect, in violation of the Administrative Procedure Act

("APA"), and without codifying the program, also in violation of federal law.  The EPA's actions

failed to effectuate a lawful transfer of authority.  Yet the EPA has advised the state that it may

proceed.  The EPA's action will allow the state to violate federal law to the detriment of waters

of the United States and the endangered and threatened species that rely on them, while

depriving those adversely affected of federal rights and remedies.

2.     Underlying the EPA's decision are unlawful actions by the U.S. Fish and Wildlife

Service ("USFWS"), which has failed to ensure no jeopardy to listed species and creates an

JA.3

unlawful scheme for take liability coverage at the permit level, in contravention of the

Endangered Species Act ("ESA").  Also, the U.S. Army Corps of Engineers' ("Corps") list of

waters over which it will retain jurisdiction is arbitrarily and capriciously truncated in violation

of the Rivers and Harbors Act ("RHA") and the APA.

3.      Defendants' actions threaten to open the floodgates for other states to seek

assumption without requiring that those programs meet federal standards, further imperiling

waters of the United States and the ESA-listed species that rely on them.  As Administrator

Wheeler stated at the December 17th press conference, states have already been reaching out to

the EPA to follow in Florida's footsteps.  Defendants' actions are unlawful and must be set aside.

## INTRODUCTION

4.      Congress enacted the Clean Water Act to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251.  The impetus for

enacting the Clean Water Act was states' failure to control water pollution as evidenced by

disasters like the Cuyahoga River catching on fire and the Hudson River filling with raw sewage

and toxic waste.

5.      The Clean Water Act Section 404 wetlands permitting program ("404 program")

regulates the discharge of dredged or fill materials into waters of the United States, including

wetlands, 33 U.S.C. § 1344, and is a vital tool to meet the Clean Water Act's goals, recognizing

that the degradation and destruction of wetlands is "among the most severe environmental

impacts."  See 33 U.S.C. § 1251; 40 C.F.R. § 230.1(a).

6.      Under the federal 404 program, it is the Corps that reviews and, where

appropriate, approves permits.

7.      Congress enacted the Endangered Species Act of 1973 ("ESA") to, among other things, "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(2)(b).

8.      Pursuant to Section 7(a)(2) of the ESA, the Corps must engage in formal consultation with USFWS and National Marine Fisheries Service ("NFMS") (collectively, "the Services") whenever it appears that a Section 404 permit applicant's proposed activity may adversely affect listed species.  Through this process, permittees may obtain protection from ESA liability for any incidental harm (called "incidental take") to listed species on a project by project basis.

9.      The Clean Water Act creates a path for states to administer their own dredge and fill permit program, if the state's program is at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  The state must submit a "full and complete" application showing that it meets this high bar.  Id. § 1344(g); 40 C.F.R. §§ 233.10, 233.15(a).  In a state 404 program, it is a state agency, rather than the Corps, that reviews 404 permit applications and issues 404 permits.

10.      Before a state may assume the 404 program, the EPA must determine that the state has demonstrated authority to issue permits that assure compliance with the Clean Water Act Section 404(b)(1) Guidelines, which, among other things, prohibit the issuance of 404 permits that would jeopardize the existence of ESA-listed species, or result in the likelihood of destroying or adversely modifying critical habitat identified under the ESA.  33 U.S.C. § 1344(h)(1)(A)(i); 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), 233.23.

11.    ESA Section 7(a) consultation between the Services and federal agencies, including the associated incidental take protection, does not extend to projects regulated under state-operated 404 programs.  16 U.S.C. § 1536(a).

12.    Permittees, however, must still comply with the ESA's take prohibition, and must therefore pursue ESA Section 10 consultation with the Services to try to obtain protection from incidental take liability if a project may harm listed species.  16 U.S.C. § 1539.

13.    When the EPA approves a state's 404 program, the Administrator must notify the state and the Corps, and, upon notification from the state that it is administering the program, the Corps must suspend its issuance of permits covered by the state program.  33 U.S.C. § 1344(h)(2)(A).

14.    Transfer of 404 permitting authority to a state is not effective until after notice is published in the Federal Register.  40 C.F.R. § 233.15(h).  As of the effective date of an approved state program, the Corps must suspend all issuance of Section 404 permits in state-regulated waters.  Id.

15.    The APA provides that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date" subject to certain exceptions not applicable here.  5 U.S.C. § 553(d).

16.    In the many years that Section 404 state assumption has been authorized under the Clean Water Act for programs that meet stringent federal standards, the EPA has approved only two.  In 1984, the EPA approved Michigan's program, and in 1994, the EPA approved New Jersey's program.  See 40 C.F.R. § 233.70 (Michigan), 40 C.F.R. § 233.71 (New Jersey).

17.    In 2005 and in 2012, Florida considered pursuing assumption but abandoned the effort considering conflicts between state and federal law, the high costs associated with administering the program, and permittees' concerns regarding protection against ESA liability.

18.    Many other states, including most recently Arizona, have reached similar conclusions.

19.    On August 20, 2020, Florida applied to the EPA proposing to take over the 404 program without adopting all federal requirements, without demonstrating "no jeopardy" to ESA-listed species, and without adequately identifying the waters over which it would assert jurisdiction.  The state also claimed it would require no funding to administer and enforce the program, even amidst major budget cuts resulting from a pandemic which the state did not address or even acknowledge in the application.

20.    On August 28, 2020, the EPA nonetheless determined that the application was "complete" as of the submission date.

21.    The EPA's "completeness" determination triggered a 120-day deadline to approve or deny the application by December 18, 2020, unless the EPA and Florida agreed to extend the timeline.  See 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).

22.    On August 28, 2020, and at Florida's request, the EPA reversed its long-standing position that agency review of an assumption application was a non-discretionary act, thereby triggering a duty to engage in ESA consultation with the Services.  The EPA agreed with the state that this duty required only a one-time programmatic consultation for purposes of considering the application.

JA.7

23.     Defendants and the state developed this novel position to facilitate programmatic incidental take coverage to the state and state permittees—an unprecedented, and ultimately unlawful, workaround to the requirements of federal law.

24.     On September 2, 2020, the EPA submitted an "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" to USFWS to initiate formal consultation on Florida's application.  It was dated August 2020.

25.     Also, on September 2, 2020, the EPA sent a letter to NMFS summarily concluding that approval of the state program would have "no effect" on NMFS' jurisdictional marine and anadromous species.  The EPA's conclusion was solely based on an April 15, 2020, letter by NMFS to Florida, stating that no species in NMFS' exclusive jurisdiction would be present "in assumable waters."  NMFS then concurred with the EPA's determination.

26.     The EPA's biological evaluation was largely a cut and paste of a biological assessment drafted by the state and was not independently assessed by the EPA.

27.     On September 16, 2020, the EPA initiated a 45-day public comment period that concluded on November 2, 2020.  See 40 C.F.R. § 233.15(e) and 5 U.S.C. § 553.  The EPA indicated that if approved, the state program would be codified at 40 C.F.R. § 233 subpart H. This was consistent with the agency's codification of the only other two approved state 404 programs.  See 40 C.F.R. § 233.70 (New Jersey); id. § 233.71 (Michigan).

28.     At the October 21, 2020, EPA public hearing on Florida's submission, Plaintiffs' counsel urged the EPA to reverse its completeness determination considering critical omissions in Florida's application.  In an October 23, 2020 letter, Plaintiffs' counsel requested suspension of the public comment period until the deficiencies were cured.  See id. § 233.15(a) (statutory review period shall not begin if the EPA finds that state's submission is incomplete).

8

JA.8

29.     The EPA did not respond to Plaintiffs' requests and closed the public comment period on November 2, 2020.

30.     On November 2, 2020, Plaintiffs and many other members of the public submitted comments challenging the legality of the EPA's approval of the state's proposal, the absence of required components prejudicing the opportunity for public comment, and the proposal's failure to meet the requirements for a state-assumed program, particularly as it relates to the protection of threatened and endangered species.  33 U.S.C. § 1344(g)–(h).

31.     On November 19, 2020, USFWS transmitted to the EPA a programmatic biological opinion dated November 17, 2020, regarding Florida's application.  USFWS' biological opinion, in conjunction with a memorandum of understanding between USFWS and the state, purports to authorize a "technical assistance" role outside the parameters of the ESA that would nevertheless grant "[i]ncidental take exemption" to the EPA for its approval and oversight of the state program, and would further grant protection from liability for any take of listed species incidental to state-permitted activities so long as the permittee complied with the conditions of a state-issued permit.

32.     Neither NMFS' April 2020 determination nor USFWS' November 2020 biological opinion was made part of Florida's application or otherwise presented to the public for an opportunity to comment before the EPA acted on the state's application.

33.     On December 17, 2020, EPA Administrator Andrew Wheeler announced the approval of Florida's assumption application at a press conference in Washington, D.C.

34.     On December 22, 2020, the EPA's approval of the state program was published in the Federal Register, with an immediate "applicable" date as of publication.  The notice did not codify the approved program.

9

35.     On the same day, counsel for Plaintiffs notified the EPA that its failure to codify and failure to comply with the APA rendered the transfer ineffective and that authority to administer the 404 program remained with the Corps.

36.     On December 28, 2020, EPA General Counsel David Fotouhi sent a letter claiming that the transfer was effective upon publication, that the decision was an adjudication rather than a rulemaking, and that the agency intended to codify the program but only for "transparency."

## JURISDICTION AND VENUE

37.     This action arises under the Clean Water Act, 33 U.S.C. §§ 1251–1387, ESA, §§ 1531–44, and the APA, 5 U.S.C. §§ 553, 701–06.

38.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201, 2202.

39.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) as the Defendants include agencies of the United States and officers and employees of the United States acting under their official capacities who reside in this district, and Plaintiff Defenders of Wildlife maintains its principal place of business, and therefore resides, in this judicial district. Id. §§ 1391(c)(2), (e)(1)(C).

## PARTIES

**Plaintiffs**

40.     CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit organization that works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is incorporated in

California, headquartered in Tucson, Arizona, and maintains an office in the District of Columbia, with field offices throughout the United States and Mexico.

41.     The Center has 81,843 members across the country.  The Center and its members are concerned with, and have concrete interests in, the conservation of imperiled species and the habitats they rely on for survival, including the ones at issue in this suit.  The Center's members and staff have researched, studied, observed, litigated over, and sought protection for federally listed threatened and endangered species in the United States, including listed turtles in Florida.  These activities support the Center's mission to save life on earth.  The Center brings this action on behalf of itself and its adversely affected members.

42.     DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit membership organization that is one of the nation's leading advocates for threatened and endangered species and wildlife conservation.  Founded in 1947, Defenders is headquartered in Washington, D.C., and maintains local field offices throughout the country.  Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments.  Defenders works toward the recovery of threatened and endangered species by means such as monitoring and engaging in public notices and comments, litigation, research, education, and federal, state, and local advocacy.

43.     Defenders is a science-based conservation organization with more than 1.8 million members and supporters nationwide and around the world.  Defenders and its members aim to protect and restore imperiled species throughout North America by transforming policies and institutions, promoting innovative solutions, and litigating over protections for threatened and endangered species in the United States.  These activities support Defenders' mission to

11

protect native plants and animals.  Defenders brings this action on behalf of itself and its
adversely affected members.

44.     SIERRA CLUB ("Sierra Club") is a national non-profit organization dedicated to
exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the
responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to
protect and restore the quality of the natural and human environment; and to using all lawful
means to carry out these objectives.

45.     Headquartered in Oakland, California, the Sierra Club has 67 chapters and more
than 808,000 members across the nation.  Sierra Club's concerns include the protection of
wetlands and federally listed threatened and endangered species.  The Sierra Club brings this
action on behalf of itself and its adversely affected members.

46.     CONSERVANCY OF SOUTHWEST FLORIDA ("Conservancy") is a nonprofit
organization that is dedicated to the protection of Southwest Florida's land, water, wildlife, and
future through advocacy, science, education, and wildlife rehabilitation.  The Conservancy was
founded in 1964 in response to plans to build a road through Rookery Bay and carries on its
mission to preserve wetlands and downstream areas important to the health of the ecosystem,
economy, and quality of life.

47.     The Conservancy has approximately 3,600 dues-paying members and over 2,000
additional donors and supporters.  The Conservancy's members and staff have researched,
studied, observed, and sought protection, including through litigation, for federally listed
threatened and endangered species and their habitat in southwest Florida.  These activities
support the Conservancy's mission to protect southwest Florida's water, land, and wildlife.  The
Conservancy brings this action on behalf of itself and its adversely affected members.

48.     FLORIDA WILDLIFE FEDERATION ("FWF") is a nonprofit corporation established in 1936.  FWF has approximately 9,000 members and 60,000 supporters.  FWF has long supported environmental sustainability and conservation in Florida through education, advocacy, and litigation.

49.     FWF's members and staff have researched, studied, observed, and sought protection, including filing lawsuits, for federally listed threatened and endangered species and their habitat.  These activities support FWF's mission to ensure that wildlife and fragile environment have a voice.  Among other things, FWF is dedicated to protecting the state's waterways, as wildlife cannot thrive where wetlands are drained, waters polluted, and habitats degraded or destroyed.  FWF brings this action on behalf of itself and its adversely affected members.

50.     MIAMI WATERKEEPER ("MWK") is a nonprofit organization whose mission is to defend, protect, and preserve South Florida's watershed through citizen engagement, education and outreach, scientific research, advocacy, and when necessary, legal action.

51.     MWK has 165 members.  MWK's members and staff have researched, studied, observed, patrolled, and sought protection, including filing lawsuits, for South Florida's watershed and the federally listed threatened and endangered species that depend on its freshwater and marine habitats, including listed corals.  These activities support MWK's mission to ensure swimmable, drinkable, fishable water for all.  MWK brings this action on behalf of itself and its adversely affected members.

52.     ST. JOHNS RIVERKEEPER ("St. Johns RK") is a nonprofit organization that provides an independent voice to defend, advocate, and activate others to protect and restore the St. Johns River, Florida's longest and most significant river for commercial and recreational use.

JA.13

53.     St. Johns RK has 1,400 members.  St. Johns RK's members and staff have researched, studied, observed, patrolled, and sought protection, including through litigation, for the St. Johns River watershed and the federally listed threatened and endangered species that depend on it.  These activities support St. Johns RK's mission to ensure a thriving watershed that sustains healthy ecosystems for future generations.  St. Johns RK brings this action on behalf of itself and its adversely affected members.

54.     Plaintiffs and their members participated throughout the EPA's rulemaking process on the state's application to assume the 404 program in an attempt to ensure that the EPA abided the requirements of the Clean Water Act, ESA and APA, and to advocate for the protection of endangered species, wetlands and other waterways, as well as the communities that rely on them.  Plaintiffs and their members have monitored, investigated, educated the public, litigated, and provided science-based policy recommendations on development projects and their associated Clean Water Act 404 permits in order to protect the environment and wildlife and intend to continue to do so in the near future.

55.     The above-described conservation, informational, and scientific interests of Plaintiffs and their respective members have been, are being, and—unless the relief prayed for herein is granted—will continue to be adversely affected and irreparably injured by the Defendants' failure to comply with the Clean Water Act, ESA, and APA as described below. Plaintiffs have no adequate remedy at law.

56.     Plaintiffs' interests fall within the zone of interests protected by the laws sought to be enforced in this action.

JA.14

**Defendants**

57.     U.S. ENVIRONMENTAL PROTECTION AGENCY ("EPA") is an independent executive agency of the United States federal government with responsibility for administering and implementing the Clean Water Act.  The EPA approved Florida's request to assume authority over the Clean Water Act 404 program.

58.     ANDREW WHEELER is the Administrator of the EPA and the highest-ranking official responsible for actions taken by the EPA, including decisions to approve state administration of Clean Water Act Section 404.  Defendant Wheeler is sued in his official capacity.

59.     DAVE ROSS is the Assistant Administrator for EPA Office of Water and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Ross is sued in his official capacity.

60.     DAVID FOTOUHI is the Acting General Counsel for the EPA and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Fotouhi is sued in his official capacity.

61.     SUSAN BODINE is the Assistant Administrator for the Office of Enforcement and Compliance Assurance for the EPA and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Bodine is sued in her official capacity.

62.     MARY WALKER is the Regional Administrator for EPA Region 4 and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Walker is sued in her official capacity.

JA.15

63.     Defendants Wheeler, Ross, Fotouhi, Bodine, Walker and the EPA will collectively be referred to as "EPA."

64.     U.S. FISH AND WILDLIFE SERVICE ("USFWS") is an agency within the U.S. Department of the Interior and has joint delegated responsibilities of administering and implementing the ESA along with NMFS.  USFWS issued the programmatic biological opinion and incidental take statement that are challenged here and underlie the EPA's challenged action.

65.     AURELIA SKIPWORTH is the Director of USFWS and highest-ranking official responsible for actions taken by USFWS, including compliance with and implementation of the ESA.  Defendant Skipworth is sued in her official capacity.

66.     LEOPOLDO MIRANDA-CASTRO is Regional Director of USFWS and is an official responsible for actions taken by USFWS, including the biological opinion and incidental take statement in this case.  Defendant Miranda-Castro is sued in his official capacity.

67.     Defendants Skipworth, Miranda-Castro and USFWS will collectively be referred to as "USFWS."

68.     U.S. ARMY CORPS OF ENGINEERS ("Corps") is a federal agency organized under the U.S. Department of Defense.  The Corps is charged with administering permits under section 404 of the Clean Water Act for the discharge of dredged or fill material into the waters of the United States and ensuring that the requirements of NEPA, the RHA and the ESA are fulfilled in connection with all evaluation and decision-making concerning such permits.  The Corps issued the "retained waters list" that is challenged here and underlies the EPA's challenged action.

69.     LIEUTENANT GENERAL SCOTT A. SPELLMON is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers and has delegated

16

responsibilities of administering and implementing the Clean Water Act 404 program.

Defendant Spellmon is sued in his official capacity.

70.     COLONEL ANDREW KELLY, is District Commander for the Jacksonville

District of the U.S. Army Corps of Engineers and is an official responsible for actions taken by

the Corps, including the determination of the waters to be retained under the Corps' jurisdiction

after state assumption.  Defendant Kelly is sued in his official capacity.

71.     Defendants Spellmon, Kelly, and the Corps will collectively be referred to as "the

Corps."

## LEGAL FRAMEWORK

**Administrative Procedure Act**

72.     Pursuant to the Administrative Procedure Act ("APA"), a reviewing court must

"hold unlawful and set aside agency action, findings, and conclusions found to be" (1) "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right"; (3) "without

observance of procedure required by law"; or (4) "unsupported by substantial evidence."  5

U.S.C. § 706(2)(A), (C)–(E).

73.     The APA grants a right of judicial review of final agency actions to any person

"suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

action."  Id. § 702.

74.     The EPA's approval of Florida's 404 assumption application is unlawful and must

be set aside for:  failing to provide an opportunity for notice and comment on a complete

program submission; approving a state program that is inconsistent with and violates federal law;

relying on unlawful, related actions by USFWS (biological opinion and incidental take

17

statement); NMFS (jurisdictional determination); the Corps (retained waters list); and making its decision effective immediately upon publication in the Federal Register and without codification.

75.     The actions by USFWS and the Corps on which the EPA relied are similarly subject to judicial review under the APA and must be set aside.

**The Clean Water Act**

76.     Before the EPA may consider a state 404 assumption application, the state must submit a "full and complete" application including a description of the program it proposes to establish and administer as well as a statement from the attorney general that the laws of the state provide adequate authority to carry out the described program.  33 U.S.C. § 1344(g); 40 C.F.R. § 233.10.

77.     A complete program description must include a description of (1) the scope and structure of the state's program, including the extent of the state's jurisdiction and permit review criteria; (2) the state's permitting, administrative, judicial review, and other applicable procedures; (3) the basic organization and structure of the state agencies which will administer the program, specifically addressing the responsibilities of each agency; (4) the funding and staffing available for program administration; (5) estimated anticipated workload; (6) permit application forms, permit forms, and reporting forms; (7) the state's compliance evaluation and enforcement programs, including how the state will coordinate with the EPA and the Corps; (8) the waters of the United States within a state over which the state assumes jurisdiction under the approved program; the waters of the United States within a State over which the Corps retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands; and (9) the specific best management practices proposed to satisfy Section 404 exemptions for construction and maintenance of certain roads.  40 C.F.R. § 233.11.

18

78.     A complete attorney general's statement must demonstrate that the laws and regulations of the state provide adequate authority to carry out the program and meet the applicable requirements of the federal Section 404 program.  Id. § 233.12(a).  The statement must cite authorities which are "lawfully adopted at the time the statement is signed and which shall be fully effective by the time the program is approved, and, where appropriate, judicial decisions which demonstrate adequate authority."  Id.  Where more than one agency has responsibility for administering the state program, the statement must certify that each agency has full authority to administer the program within its category of jurisdiction.  Id. § 233.12(d).

79.     The submission of a state assumption application sets in motion a timeline for EPA review.  33 U.S.C. § 1344(g)–(h).  The statutory review period shall not begin until a complete application is received by the EPA.  40 C.F.R. § 233.15(a).

80.     The EPA must determine if an application is complete within 30 days, 40 C.F.R. § 233.15(a), and publish notice of the application and provide for a comment period of not less than 45 days including a public hearing within the state, id. § 233.15(e)(1)–(2).  The EPA must determine whether to approve or deny the state's application within 120 days after the date of the receipt of a complete program application.  33 U.S.C. § 1344(h); 40 C.F.R. § 233.15(g).  The EPA must issue a summary of significant comments received and its response to these comments.  40 C.F.R. § 233.15(g).

81.     To approve a state application, the EPA must determine whether the state has "authority with respect to the issuance of permits pursuant to such program" to, among other things:  (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including Section 404(b)(1) Guidelines; (2) assure that the public "receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling

19

on each such application;" and (3) "abate violations of the permit or the permit program,

including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C.

§ 1344(h)(1)(A)(i), (1)(C), (1)(G).

82.     The Section 404(b)(1) Guidelines prohibit, among other things, the issuance of

404 permits that would jeopardize the existence of ESA-listed species or result in the likelihood

of destroying or adversely modifying critical habitat identified under the ESA.  40 C.F.R.

§§ 230.10(b)(3), 233.11(a)–(c), 233.23.

**The Endangered Species Act**

83.     Congress enacted the Endangered Species Act of 1973 ("ESA") because human

activities had caused the extinction of many species and other species "[had] been so depleted in

numbers that they are in danger of or threatened with extinction."  16 U.S.C. § 1531(a)(1)–(2).

All species listed as endangered or threatened by the Secretary of Interior are protected by the

ESA, which the Supreme Court has called "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437

U.S. 153, 180 (1978).

84.     Recognizing the need to protect these species and to conserve their habitat,

Congress mandated that all federal departments and agencies seek to conserve endangered and

threatened species.  16 U.S.C. § 1531(c)(1).

85.     Section 7 of the ESA establishes a federal interagency consultation process to

assist agencies in complying with their duty to avoid jeopardy to listed species or destruction or

adverse modification of critical habitat.  Under this process, a federal agency proposing an action

that "may affect" a listed species must prepare and provide to the appropriate expert agency a

description of the proposed action, its effects, and the relevant scientific evidence.  16 U.S.C. §

20

1536(a)(2); 50 C.F.R. § 402.14(a).

86.     Section 7 of the ESA prohibits agency actions that may jeopardize the survival

and recovery of a listed species or adversely modify its critical habitat:

> Each federal agency shall, in consultation with and with the assistance of the
> Secretary, insure that any action authorized, funded, or carried out by such agency
> (hereinafter in this section referred to as an "agency action") is not likely to
> jeopardize the continued existence of any endangered species or threatened species
> or result in the destruction or adverse modification of habitat of such species which
> is determined by the Secretary . . . to be critical . . . .

16 U.S.C. § 1536(a)(2).

87.     "Action" is defined broadly to encompass "all activities or programs of any kind

authorized, funded, or carried out, in whole or in part, by Federal agencies."  50 C.F.R. § 402.02.

An agency's Section 7 obligations extend to ongoing actions over which the agency retains

authority or discretionary control.

88.     For actions that may adversely affect a listed species or critical habitat, a formal

consultation with the Services is required.  Id. § 402.14.  At the conclusion of a formal

consultation, the Services issue a biological opinion assessing the effects of the action on the

species and its critical habitat, determining whether the action is likely to jeopardize the

continued existence of the species or adversely modify its critical habitat and, if so, offering a

reasonable and prudent alternative that will avoid jeopardy or adverse modification.  16 U.S.C. §

1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

89.     Federal agencies must ensure that such actions will not "result in the destruction

or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  Since critical

habitat must be designated outside of a species' current inhabited range under certain

circumstances, the "adverse modification" analysis provides habitat protection even in situations

where the "jeopardy" analysis does not apply.  See Cape Hatteras Access Pres. All. v. U.S. Dep't

21

of Interior, 344 F. Supp. 2d 108, 131 (D.D.C. 2004); accord Sierra Club v. U.S. Fish and

Wildlife Serv., 245 F.3d 434, 441 (5th Cir. 2001).

90.    Section 9 of the ESA prohibits "take" of endangered species by any person, which

includes private entities, along with state and federal agencies.  16 U.S.C. § 1538(a)(1).  "Take"

means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  Id. §

1532(19).  The Services have defined "harm" to include "significant habitat modification or

degradation which actually kills or injures fish or wildlife by significantly impairing essential

behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50

C.F.R. § 222.102.

91.    If a federal action undergoing consultation will take a listed species, the biological

opinion must include an "incidental take statement" that specifies the amount and extent of

incidental take of listed species that may occur without causing jeopardy or adverse modification

of critical habitat.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  The incidental take statement

provides a safe harbor, insulating from take liability activities undertaken in compliance with the

incidental take statement's terms and conditions.  16 U.S.C. § 1536(o)(2).  See Id.

§ 1536(b)(4)(C).  An incidental take statement also serves as a check on the biological opinion's

assumptions and conclusions and provides for monitoring.  50 C.F.R. § 402.14(i)(3).  It must set

out a "trigger" that identifies an unacceptable level of take that invalidates the safe harbor and

requires the agencies to immediately reinitiate consultation.  Id. § 402.14(i)(4).

92.    The ESA implementing regulations provide:

Reinitiation of formal consultation is required and shall be requested by the Federal
agency or by the Service, where discretionary Federal involvement or control over
the action has been retained or is authorized by law and

(a) If the amount or extent of taking specified in the incidental take statement is
exceeded; [or]

22

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . .

50 C.F.R. § 402.16 & (a)–(b).  If either of these triggers occurs, both the action agency and the expert fish and wildlife agency have a duty to request reinitiation of consultation.  Id.

93.     The Services' regulations reiterate that even when undertaking a programmatic consultation, the action agency is not relieved "of the requirements for considering the effects of the action or actions as a whole."  50 C.F.R. § 402.14(c)(4).

94.     The "action area" to be examined by the Services encompasses "all areas to be *affected directly or indirectly* by the federal action and not merely the immediate area involved in the action."  Id. § 402.02 (emphasis added).

**The Rivers and Harbors Act**

95.     A state 404 program cannot assert jurisdiction over navigable waters of the United States.  33 U.S.C. § 1344(g)(1).

96.     Navigable waters of the United States remain under the Corps' exclusive control pursuant to Section 10 of the Rivers and Harbors Act.  33 U.S.C. § 403.  They include those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  33 C.F.R. § 329.4.

97.     The Corps' exclusive jurisdiction also "extend[s] laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark."  Id. § 329.11(a).

23

JA.23

98.     Precise definitions of "navigable waters of the United States" or "navigability" are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies.  Id. § 329.3.

99.     The Corps' determination of navigable waters is made by the division engineer in a report of findings based on criteria set out in the Corps' regulations.  Id. § 329.14(b).  These reports must be reviewed by district counsel before the division engineer issues a final determination.  Id.

100.    Each report must include findings on (1) the name of the waterbody, (2) the river it feeds; (3) its physical characteristics (including the water type, length, approximate discharge volume, fall per mile, extent of tidal influence, range between high and ordinary low water, and improvements to navigation), (4) the nature and location of significant obstructions to navigation or its capability to be used in interstate commerce, (5) authorized projects (including a list of known survey documents or reports describing the waterbody), (6) past or present interstate commerce, (7) the potential use for interstate commerce, (8) the nature of jurisdiction that has been exercised by federal agencies, (9) state or federal court decisions relating to navigability of the waterbody, and (10) the Corps' finding regarding navigability.  Id. § 329.14(c).

101.    Each district of the Corps is required to maintain a tabulated list of final determinations of navigability, and to update these lists "as necessitated by court decisions, jurisdictional inquiries, or other changed conditions."  Id. § 329.16(a).

102.    Since the district's list "represent[s] only those waterbodies for which determinations have been made[,] absence from that list should not be taken as an indication that the waterbody is not navigable."  Id. § 329.16(b).

24

103.    "Deletions from the list are not authorized" and "changes are not considered final until a determination has been made by the division engineer" following updated findings.  Id. § 329.16(c).

## FIRST CLAIM FOR RELIEF

### EPA'S INTERLOCUTORY COMPLETENESS DETERMINATION VIOLATES THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT

104.    Plaintiffs adopt and incorporate by reference paragraphs 1–103 of this Complaint.

105.    The APA's rulemaking procedures and Clean Water Act regulations require that the public be given notice and an opportunity to comment on a state 404 assumption application. 5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1)–(2).

106.    Pursuant to the APA, "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."  5 U.S.C. § 551(4).  A "rule making" is the "agency process for formulating, amending, or repealing a rule."  Id. § 551(5).

107.    The EPA's decision to approve the transfer of section 404 jurisdiction from the Corps to a state is a rulemaking that must comply with the rulemaking procedures defined by Section 553 of the APA.

108.    The state application was not complete when received by the EPA because it relied on a USFWS programmatic biological opinion that was not in existence at the time of

submission and which would later result from the EPA's formal consultation with USFWS—a process that had not even begun when the application was submitted—to demonstrate that its program would ensure no jeopardy to listed species.

109.    USFWS' programmatic biological opinion and incidental take statement were submitted to the EPA on November 19, 2020, more than two weeks after the close of the public comment period.  Neither was made available to the public for review and comment.

110.    The state application was also not complete because it failed to adequately identify the waters that would be assumed under its proposed program as required by the EPA regulations dictating the contents of an assumption application.  40 C.F.R. § 233.11(h) (requiring assumption applications to include "[a] description" of the waters of the United States to be assumed by the state and to be retained by the Corps).

111.    Rather than provide this information, the state application included an unauthorized, truncated list of retained waters prepared by the Corps.

112.    Without complete information, members of the public were unable to fully evaluate and comment on the impact the EPA's approval would have on waters that are of ecological, historical, cultural, and economic benefit to the public.

113.    Finally, the state application failed to identify any funding for the implementation, operation, and enforcement of a state-level 404 program, as it claimed that no additional resources would be required and it did not identify legislative authorization for the re-purposing of funds.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding *and* manpower which will be available for program administration" (emphasis added)).

114.    The EPA's determination that Florida's application was complete as of its submission on August 20, 2020, was arbitrary, capricious, an abuse of discretion, not in

accordance with the law, unsupported by substantial evidence and otherwise in violation of the

Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344; 40 C.F.R. § 233.15.

115.     The EPA's closure of the comment period before elements of the state's

application were completed was arbitrary, capricious, an abuse of discretion, not in accordance

with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water

Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344(g); 40 C.F.R. § 233.10, 233.15(e)(1)–(2).

116.     The EPA's unlawful completeness determination precluded meaningful testing,

denied fairness to affected parties, and precluded the opportunity to develop evidence in the

record necessary for judicial review.  See Small Refiner Lead Phase-Down Task Force v. U.S.

Envtl. Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (stating public notice requirements

under the APA are intended to provide these opportunities).

117.     The EPA's actions and omissions have harmed the Plaintiffs and leave them

without any adequate remedy at law.

## SECOND CLAIM FOR RELIEF

## EPA'S APPROVAL OF FLORIDA'S ASSUMPTION PROGRAM VIOLATES THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT[1]

118.     Plaintiffs adopt and incorporate by reference paragraphs 1–117 of this Complaint.

119.     The Clean Water Act requires the EPA to determine whether a state seeking to

administer the 404 program has demonstrated that it has authority to, among other things: issue

permits that apply, and assure compliance with, the requirements of Section 404, including the

404(b)(1) Guidelines; assure that the public will have notice and an opportunity for hearing on

---

[1] The EPA also violated the Endangered Species Act by, among other things, relying on the unlawful programmatic biological opinion from USFWS, unlawfully delegating its Section 7 obligations to non-federal parties, and relying on the unlawful jurisdictional determination by NMFS.  Plaintiffs intend to amend the complaint to add the ESA claims after the required 60-day pre-suit notice, 16 U.S.C. § 1540(g)(2)(A)(i), period has expired.

every application; and abate violations of any permit and the permit program via civil and

criminal enforcement.  33 U.S.C. § 1344(h)(1); see also 33 U.S.C. § 1344(g)(1); 40 C.F.R.

§ 233.12.  The EPA may only approve a state program if it meets these criteria.  33 U.S.C.

§ 1344(h)(2)(A).

120.    The EPA acted unlawfully in approving the state's application as its program did

not meet the criteria in many regards, including, but not limited to, those identified below.

121.    As to general permits, Section 404 authorizes the Corps to issue general permits

for a duration of five years after the permitting entity determines that the regulated activities will

cause only minimal adverse environmental effects when performed separately and will have only

minimal cumulative adverse effects on the environment.  The analysis underlying the issuance of

general permits must be re-evaluated before a general permit can be renewed.

122.    The state program violates federal law by purporting to issue scores of general

permits without the state permitting authority having made the requisite determinations regarding

environmental impact, 40 C.F.R. § 233.21(b), id. § 233.2 (defining director as state agency),

relying instead on the Corps' prior determinations.

123.    The state program violates federal law by authorizing these general permits for a

duration of five years from the date of EPA approval of the program, unlawfully extending the

general permits issued initially by the Corps beyond their statutorily limited five-year duration.

33 U.S.C. § 1344(e)(2).

124.    As to emergency permits, the state program unlawfully expands the circumstances

under which emergency permits—those that do not follow the ordinary requirements of Section

404—may issue, in contravention of 40 C.F.R. § 233.22(a).

125.    As to permit conditions, the state program omits important requirements, including the requirement to "minimize" discharges in violation of a permit, Id. § 233.23(c)(4), certain monitoring and reporting requirements, id. § 233.23(c)(7), the requirement that discharges minimize adverse impacts through restoration, in addition to mitigation, id. § 233.23(c)(9), and the requirement of specifically identifying and completely describing the authorized activity, id. § 233.23(c)(1).

126.    As to the permit application process, the state does not require the same level of detailed information as is required under federal law, id. § 233.30(d), and uses different terms that change the information that must be provided, contrary to id. § 233.30(b)(3).

127.    The federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes." Id. § 233.3.  The state program, however, does not include this requirement and conceded that it "did not add this [requirement] to the rule."

128.    As to public notice, the state program does not require that the state provide public notice on receipt of a 404 permit application, in contravention of federal law, which does. Id. § 233.32(a)(1).

129.    As to definitions, the state program does not adopt all definitions in the 404(b)(1) Guidelines, omits definitions of several terms defined under federal law, and adopts more restrictive definitions for certain, critical terms (including "pollution").  Compare id. § 230.3(k) with Fla. Stat. § 403.031(7).

130.    Federal regulations require that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with

permit conditions."  40 C.F.R. § 233.40(a).  The state's application failed to demonstrate that it

has, much less maintains, any such a program.

133.    As to general procedures for determining the applicability of permit conditions

relating to the contamination of dredge and fill material, the state restricted the broad federal

duty to "determine the possibility of chemical contamination or physical incompatibility of the

material to be discharged," id. § 230.5, to only situations where that contamination may violate

state water quality standards or toxic effluent standards or prohibitions.

132.    As to general permits, id. § 230.7, the state failed to include the 404(b)(1)

Guidelines' requirement that a general permit may only be issued if "[t]he activities in such

category are similar in nature and similar in their impact upon water quality and in the aquatic

environment."  The state also failed to incorporate the 404(b)(1) Guidelines' requirements

governing the process for issuing general permits.

133.    As to restrictions on discharge, id. § 230.10, the state program creates a wholesale

exception for temporary violations of state water quality standards that is not present under

federal law.

134.    As to impacts, the state program fails to incorporate the requirement that a

determination of whether a discharge would cause or contribute to significant degradation of

wetlands or other surface waters be based on factual determinations, evaluations, and tests

required by the 404(b)(1) Guidelines "subparts B and G, after consideration of subparts C

through F, with special emphasis on the persistence and permanence of the effects outlined in

those subparts."  Id. § 230.10(c).

135.    As to factual determinations, id. § 230.11, the 404(b)(1) Guidelines lay out

specific, factual determinations that permitting authorities must use to determine the individual,

cumulative, and secondary effects of a proposed discharge of dredged or fill material on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity; contaminants; aquatic ecosystem and organism; and the proposed disposal site.  The state program does not incorporate or apply the guideline's defined set of factual determinations, and it does not require these factual determinations when considering whether to issue a 404 permit.

136.    As to findings of compliance or noncompliance with the restrictions on discharge, id. § 230.12, the 404(b)(1) Guidelines require that the permitting authority, after deciding whether to issue or deny a permit, must make findings that "include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration."  Id. § 230.12(b).

137.    The state regulations do not require the agency to make the factual determinations laid out in id. § 230.11, and therefore do not require that the agency include those factual determinations in any final permit decisions.

138.    The state application also failed to demonstrate adequate criminal enforcement authority.  33 U.S.C. § 1344(g)(1)(G).  State law requires a greater degree of intent or knowledge to establish a criminal violation of Section 404 and provides a shorter statute of limitations as compared to federal law for holding criminal violators accountable.  33 U.S.C. §§ 1319(c)(1)(A), (B), 1365(a), (g); 18 U.S.C. § 3282; 28 U.S.C. § 2462; 40 C.F.R. § 233.41(a)(3)(ii).  See United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012); United States v. Pruett, 681 F.3d 232, 243 (5th Cir. 2012); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005); United States v. Hanousek, 176 F.3d 1116, 1120 (9th Cir. 1999).

139.    The state program failed to adopt or incorporate the wide range of impacts that must be considered under the 404(b)(1) Guidelines when reviewing a permit, other than for

aesthetics.  40 C.F.R. §§ 230.20–25 (Subpart C); id. §§ 230.30–32 (Subpart D); id. §§ 230.40–45 (Subpart E); id. §§ 230.50–54 (Subpart F).  But see id. § 230.53 (aesthetics).

140.    The state program failed to adopt or incorporate the 404(b)(1) Guidelines pertaining to compensatory mitigation for loss of wetlands.

141.    The state program failed to define a whole host of terms used in the federal program, id. § 230.92, and uses definitions of comparable terms that conflict with or undermine the substance of the federal definition (for example the state definition of wetlands "creation" does not require "a gain in aquatic resource area and functions," whereas the federal definition of wetlands "establishment" does).

142.    As to general compensatory mitigation requirements, id. § 230.93, the state alters or omits vital portions of this Guideline, thereby creating less stringent requirements for its mitigation program.  For example, the state program weakens the "watershed approach" described in the 404(b)(1) Guidelines, which is necessary to ensuring that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by dredge and fill permits.  Id. § 230.93(c)(4).  The state program ignores the federal requirements pertaining to site selection for mitigation, id. § 230.93(d)(vi), which are essential to ensuring the mitigation is appropriate and effective.

143.    The state program does not include federal requirements that permit writers document certain findings pertaining to mitigation, id. § 230.93(e)(2)–(3), and omits the requirement that the permit writer "require a mitigation ratio greater than one-to-one where necessary."  Id. § 230.93(f)(2).

144.    As to the decision-making process for a permit application, federal rules require that a permit be reviewed for compliance with the 404(b)(1) Guidelines.  Id. § 233.34.

145.    The state program has not adopted or incorporated these guidelines.

146.    As to compliance evaluation programs, federal rules require a state to "maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions."  Id. § 233.40(a).

147.    The state does not maintain a program to identify violations of its current wetlands programs and has not shown it is capable to do so for an assumed 404 program.

148.    State law also does not provide comparable access to the courts for purposes of enforcement and redress as available under federal law.  This deprives affected parties of the ability to vindicate rights and ensure citizen enforcement of Section 404.

149.    Whereas federal law authorizes any aggrieved party to litigate Section 404 claims, Florida allows only citizens of the state to compel government enforcement of environmental laws, to bring suit against a person or non-governmental entity to enforce environmental laws, to initiate administrative proceedings in federally delegated programs, and to intervene in enforcement proceedings.

150.    State law also severely limits the ability to establish associational standing. Whereas federal law authorizes associational standing based on a single member's injury in fact, Am. Clinical Lab. Ass'n v. Azar, 931 F.3d 1195, 1203 (D.C. Cir. 2019), Florida law requires organizations to demonstrate that a "substantial number" of their members "are substantially affected" by the challenged conduct.

151.    For purposes of enforcement and redress, state law further conflicts with federal law by creating a mandatory fee-shifting provision that has no analog under the Clean Water Act and discourages or precludes under-resourced individuals and organizations from seeking to vindicate their rights.

152.    State 404 permitting programs must ensure that the state agency will not issue any permit that fails to comply with the requirements of the Clean Water Act and its implementing regulations, including the 404(b)(1) Guidelines.  See 40 C.F.R. § 233.20.

153.    The state program fails to adopt or incorporate by reference all 404(b)(1) Guidelines.

154.    Specifically, the state program fails to satisfy the 404(b)(1) Guidelines requirement to ensure there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act Guidelines.  Id. §§ 233.15(g), 230.10(b)(3).

155.    The state did not demonstrate that its Department of Environmental Protection has the authority to regulate species under state law that it now claims it would exercise in a state-assumed program.

156.    The state's application failed to provide the necessary statement regarding the State's takings law.  Id. § 233.12(c).  Instead, the state relied on the limited and universally applicable chance that a takings case may be reviewed by the Supreme Court of the United States.

157.    The state's application summarily asserted that it could rely on existing resources to administer and enforce a 404 program while failing to disclose, among other things:  (1) the state agency's failure to meet existing regulatory obligations; (2) the significant budget cuts brought on by the global pandemic; and (3) the resource status and needs of other state agencies which the state intends to rely on to fulfill obligations under the Clean Water Act.  Id. §§ 233.1(a), 233.11.

158.    The state also did not demonstrate that it had the legal authority to re-purpose current funding for a new federal program.

159.    The state program did not fully address or disclose all costs that will necessarily be associated with administering a state-level 404 program, including:  (1) initial resources needed to process all pending (160) applications at the time of assumption; (2) resource needs and costs required for compliance and enforcement of the pending applications that are approved; (3) sufficient staffing; (4) an adequate audit process; (5) costs associated with reissuing general permits; (6) the large area of permits where the claimed "85%" overlap of work with the state wetlands program will not be achieved; and (7) several costs associated with implementation.

160.    For these, and other reasons, the EPA's approval of the state's application was arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act, 33 U.S.C. § 1344, and APA, 5 U.S.C. § 706(2).

161.    The EPA's actions and omissions have harmed and will harm the Plaintiffs and leave them without any adequate remedy at law.

## THIRD CLAIM FOR RELIEF

**USFWS' BIOLOGICAL OPINION AND "NO JEOPARDY" DETERMINATION
VIOLATE THE ENDANGERED SPECIES ACT AND
ADMINISTRATIVE PROCEDURE ACT**

162.    Plaintiffs adopt and incorporate by reference paragraphs 1–161 of this Complaint.

163.    Section 7 of the ESA requires that a biological opinion "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).

164.    In this case, the "agency action" for Section 7 of the ESA was EPA's consideration of the state 404 program.  The ESA therefore required USFWS to make the

relevant determinations regarding the impact of the EPA's approval of the program.  The ESA's

implementing regulations specify that a biological opinion must include:  "[a] detailed discussion

of the environmental baseline of the listed species and critical habitat [and] [a] detailed

discussion of the effects of the action on listed species or critical habitat."  50 C.F.R.

§ 402.14(h)(1)(ii), (iii).

165.    These requirements apply to the issuance of programmatic biological opinions.

50 C.F.R. § 402.14(c)(4).  USFWS' biological opinion concluded that approval of the state

program would result in "no jeopardy."

166.    USFWS stated that its jeopardy analysis relied on:  (1) the status of the species;

(2) the environmental baseline, which analyzes the condition of the listed species in the action

area, without the consequences to the listed species caused by the proposed action; (3) the effects

of the action, which includes all consequences to listed species that are caused by the proposed

action, including the consequences of other activities that are caused by the proposed action; and

(4) the cumulative effects, which evaluates the effects of future, non-Federal activities in the

action area on the species.  16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(g).

167.    In the biological opinion, however, USFWS relied on the biological evaluation

submitted by the EPA, which was virtually identical to the biological assessment provided by the

state to the EPA in support of its application.

168.    In the biological evaluation, the EPA found the proposed assumption is "likely to

adversely affect" 163 species under USFWS's jurisdiction, is "not likely to adversely affect" 9

species, and would have "no effect" on 60 species.

169.    The EPA's conclusions were inconsistent and incomplete.  For example, the EPA

found the action would have "no effect" on shortnose sturgeon, Gulf sturgeon, or Atlantic

36

sturgeon, despite also stating that "the action could result in a [likely to adversely affect] determination" for shortnose sturgeon and that critical habitat for Gulf sturgeon is designated in several Florida rivers.

170.    USFWS' biological opinion also failed to provide a detailed discussion of the environmental baseline and failed to provide a detailed discussion of the effects of the action.

171.    Rather than provide the requisite detailed discussion of the environmental baseline, USFWS' biological opinion incorporated by reference the EPA's biological evaluation.

172.    The biological evaluation in turn does not provide a detailed discussion of the environmental baseline as affects listed species and critical habitats, 50 C.F.R. § 402.02.  Instead, the biological opinion merely includes a chart listing previous 404 permits that involved ESA consultations.

173.    Instead of a detailed discussion of effects on each of the listed species and critical habitats that may result from the EPA's approval of the state program, USFWS' biological opinion—again incorporating the EPA's biological evaluation, which mimics the state's biological assessment—provides only a cursory overview of the harms to species and habitat from general environmental degradation.

174.    The biological evaluation noted that critical habitat is designated for nearly 40 potentially affected species but did not map where critical habitat may exist within the action area or make any effects determinations for critical habitats.

175.    USFWS' biological opinion did not lawfully conduct a jeopardy analysis as to any species or critical habitat.  16 U.S.C. § 1536(a)(2), (b).

176.    USFWS' reliance on this insufficient biological evaluation to make determinations required under the ESA was arbitrary and capricious and otherwise not in accordance with the law.

177.    USFWS further improperly relied on its memorandum of understanding with the state in making its no jeopardy determination.  The memorandum of understanding establishes a process regarding individual permit decisions, not an assessment of whether the federal action for consultation purposes—the EPA's approval of the state's 404 assumption—may jeopardize listed species or adversely modify critical habitat, which requires assessment of the proposed program as a whole.

178.    Likewise, USFWS' consideration of the likelihood of jeopardy or adverse modification from the issuance of individual permits does not assess the likelihood of jeopardy or adverse modification from the entire action under consultation—assumed authority for all dredge and fill permits.

179.    USFWS' failures to analyze the status of the species, environmental baseline, effects of the action and cumulative effects violate the ESA, 16 U.S.C. § 1536, and APA, 5 U.S.C. § 706(2)(A), and render its "no jeopardy" determination unlawful.

## FOURTH CLAIM FOR RELIEF

### USFWS' BIOLOGICAL OPINION AND "INCIDENTAL TAKE STATEMENT" VIOLATE THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT

180.    Plaintiffs adopt and incorporate by reference paragraphs 1–179 of this Complaint.

181.    The ESA prohibits any person from "taking" an endangered species.  16 U.S.C. § 1538(a)(1)(B).  Under Section 4(d), 16 U.S.C. § 1533(d), USFWS has the authority to issue regulations extending the take prohibition to threatened species.

38

182.    The take prohibition applies to "any person."  16 U.S.C. § 1538(a)(1).  The ESA

defines "any person" to include "any officer, employee, agent, department, or instrumentality of

the Federal Government."  16 U.S.C. § 1532(13).  The ESA citizen suit provision authorizes

suits to enforce the ESA and its implementing regulations against any person, including federal

agencies.  Id. § 1540(g)(1).

183.    The EPA, the director of a state-assumed program, and permittees are persons

subject to the ESA take prohibition and to ESA citizen suits.

184.    The ESA defines "take" to include "harm."  Id. § 1532(19).

185.    If a federal action undergoing consultation will take a listed species, the biological

opinion must include an "incidental take statement" that specifies the amount and extent of

incidental take of the listed species that may occur without causing jeopardy or adverse

modification, includes "terms and conditions," and provides for monitoring of take.  16 U.S.C. §

1536(b)(4); 50 C.F.R. § 402.14(i)(1)–(3).  Incidental take must be incidental and not the purpose

of the action.  The incidental take statement insulates from take liability activities undertaken in

compliance with its terms and conditions.  16 U.S.C. § 1536(o)(2).  See 16 U.S.C. §

1536(b)(4)(C).

186.    An incidental take statement serves as a check on the biological opinion's

assumptions and conclusions.  It must set out a "trigger" that specifies an unacceptable level of

take that invalidates the safe harbor and requires the agencies to immediately reinitiate

consultation.  50 C.F.R. §§ 402.14(i)(4), 402.16(a).

187.    USFWS' biological opinion fails to specify the amount or extent of incidental

take, fails to impose a limit on incidental take, and fails to specify a take-based trigger for

reinitiating consultation, all in violation of the ESA.

188.   USFWS' failures precluded the agency from lawful authority to issue an incidental take statement purporting to extend incidental take coverage to the EPA, the state, and state permittees.

189.   USFWS' incidental take statement purports to provide permittees conditional take coverage so long as they comply with all permit conditions imposed by the state agency, as recommended by USFWS.  The nature and adequacy of such conditions is not known because there are no standards or sideboards governing them.  Accordingly, USFWS lacks a reasoned basis for determining the permits and permittee actions in compliance with them will not result in an unacceptable amount of take.

190.   The biological opinion's incidental take statement does not impose a measurable limit on allowable take.  See 50 C.F.R. 402.14(i)(1)(i).  It indicates that USFWS does not know which species will be taken, the locations of take, or the number of individual members of listed species that will be harmed, killed, or otherwise taken as a result of state permits authorizing the discharge of dredged and fill material in waters of the United States.

191.   The Services can use a surrogate to establish a take limit, provided the surrogate is an accurate and credible measure of harm to the listed species.

192.   The biological opinion provides no surrogate measure for the number of individual listed species that can be taken under the delegation without upending the biological opinion's assumptions and no-jeopardy determinations.  It therefore fails to provide a limit on take as required by the ESA and the ESA regulations and no measurable trigger for reinitiation of consultation or elimination of the safe harbor.

193.   The incidental take statement incorporates into its take limit compliance with the process set out in the memorandum of understanding.  In other words, the take limit is the same

40

as implementation of the action undergoing consultation.  It is the proposed action, rather than a separate limit and check on the biological opinion's no-jeopardy conclusions.

194.    USFWS acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. § 706(2), in setting the take limit at the level that coincides with full implementation of the action undergoing consultation.

195.    The incidental take statement relies on a future process to minimize take, but that process lacks sideboards to ensure that the take that will not cause jeopardy or be at odds with the biological opinion's assumptions and conclusions.  It provides the EPA take coverage once the delegation is approved without requiring the EPA to implement USFWS' take minimization measures.  As to the EPA, it thereby establishes no limit on the allowable amount of take that the delegation will cause.

196.    The terms and conditions of the incidental take statement require the state to implement all USFWS recommendations to avoid and minimize impacts to listed species and to deny a permit if USFWS makes a jeopardy call.  Neither the biological opinion nor the memorandum of understanding imposes any sideboards to ensure USFWS will make the necessary recommendations to avoid and minimize those impacts.  It was therefore arbitrary and capricious for the agency to claim that those documents are enough to avoid take.

197.    To the extent that the biological opinion and incidental take statement rely on future jeopardy determinations that USFWS may make in its review of individual permits, the biological opinion is abdicating its responsibility to determine whether the delegation is likely to cause jeopardy and punting to future jeopardy determinations on different proposed actions – individual permits versus the delegation of authority over all future permits throughout the entire state and for the indefinite future.  In addition, this abdication of responsibility is replacing the

41

required Section 7 consultation at the programmatic level for an unauthorized and less protective "technical assistance" review laid out in the biological opinion at the permit-level.

198.    The incidental take statement fails to include any method for recording or monitoring incidental take or to consider the cumulative impact of individual permit decisions.

199.    The incidental take statement relies on an unlawful scheme for purportedly conducting ESA review at the permit level for purposes of take liability coverage for the state and permittees.  The ESA creates two paths for extending take liability coverage, Section 7 (consultation for federal actions) and Section 10 (incidental take permits).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that USFWS created and relies upon in the incidental take statement.

200.    USFWS' actions and omissions are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the ESA, 16 U.S.C. § 1536, and APA, 5 U.S.C. § 706(2)(A).

201.    USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**

**EPA'S "NO EFFECT" DETERMINATION VIOLATES
THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT**

202.    Plaintiffs adopt and incorporate by reference paragraphs 1–201 of this Complaint.

203.    On April 15, 2020, NMFS unlawfully concluded that there were no species under its exclusive jurisdiction in assumable waters.  On its face, NMFS' determination failed to consider, much less analyze, all areas that would be affected by Florida's program directly or indirectly, as required under federal law.  See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02.

42

204.     On August 28, 2020, the EPA determined that consideration of a state 404 program was a discretionary action subject to compliance with the ESA, thereby triggering a duty to consult with USFWS and NMFS.

205.     On September 2, 2020, the EPA initiated formal consultation with USFWS, and transmitted its "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (dated August 2020) to USFWS.

206.     In the biological evaluation, the EPA concluded that Florida's application would have "no effect" on NFMS jurisdictional species, based solely on the rationale in NMFS' April 15, 2020 letter.

207.     On September 2, 2020, EPA also sent a letter to NMFS confirming there were no changes to the previous species list reviewed by NMFS in April and, relying on NMFS April 15 jurisdictional determination, concluded the state's assumption would have no effect on NMFS's jurisdictional species.

208.     On September 3, 2020, NMFS sent a letter to EPA stating that they concurred with the "no effect" determination in EPA's September 2, 2020 letter.

209.     On October 30, 2020, NMFS in an email to EPA again concurred with EPA's "no effect" determination.

210.     These determinations were all based on NMFS' conclusion that jurisdictional species would not be within assumed waters.

211.     The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344(h)(1)(A)(i); 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), 233.23(a).

212.    The EPA's actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

## SIXTH CLAIM OF RELIEF

### USFWS' UNLAWFUL SCHEME VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

213.    Plaintiffs adopt and incorporate by reference paragraphs 1–212 of this Complaint.

214.    USFWS' incidental take statement, biological opinion, and memorandum of understanding create an ESA scheme that is not authorized by law.

215.    No provision of the ESA authorizes the scheme created by USFWS in the biological opinion, incidental take statement, and memorandum of understanding to give the state a workaround regarding the mechanisms that Congress provided for establishing take limits, extending liability coverage, and determining jeopardy to species.

216.    Section 7 authorizes federal agencies to consult with USFWS.  16 U.S.C. § 1536. Pursuant to that process, USFWS can issue a biological opinion, establish take limits, and provide an incidental take statement that extends protection from ESA liability.  Id. § 1536(b)(c).

217.    USFWS' scheme in this case attempts to replicate that process with a state agency.  However, that is not authorized by the statute or regulations.

218.    Section 10 of the ESA creates a process for non-federal entities, like the state, to obtain permits that would relieve liability for the taking of listed species done incidental to an otherwise lawful activity.  16 U.S.C. § 1539(a)(1)(B).  Pursuant to that process, the applicant completes a conservation plan and submits it to USFWS.  Id. § 1539(a)(2)(A).  After review of the habitat conservation plan and public comments of the plan, USFWS may issue a permit including such terms and conditions as necessary or appropriate to carry out the purposes of the ESA.  Id. § 1539(a)(2)(B).

219.    USFWS did not act pursuant to Section 10 when establishing its scheme.

220.    USFWS' actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, in excess of statutory jurisdiction and authority, short of statutory right, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

221.    USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

### SEVENTH CLAIM FOR RELIEF

### CORPS' RETAINED WATERS DETERMINATION VIOLATES THE RIVERS AND HARBORS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

222.    Plaintiffs adopt and incorporate by reference paragraphs 1–221 of this Complaint.

223.    The Corps cannot delete identified navigable waters from its retained waters list until a determination has been made by the division engineer following the procedures and relying on the findings identified by the Corps' regulations.  33 C.F.R. § 329.14, 16.

224.    In conjunction with the state application, the Corps drastically reduced its retained waters list from 17 to 4 pages long.

225.    The Corps has not provided the public with a justification for its decision to substantially reduce the list of retained waters.

226.    The Corps' actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

227.    The Corps' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

JA.45

## EIGHTH CLAIM FOR RELIEF

### EPA'S IMMEDIATE EFFECTIVE DATE VIOLATES THE
### ADMINISTRATIVE PROCEDURE ACT

228.    Plaintiffs adopt and incorporate by reference paragraphs 1–227 of this Complaint.

229.    Pursuant to the APA, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).  The only exceptions to this rule occur when a rule is:  (1) a substantive rule that "grants or recognizes an exemption or relieves a restriction"; (2) an interpretive rule or statement of policy; or (3) "the agency otherwise provides for good cause found and published with the rule."  5 U.S.C. § 553(d)(1)–(3).

230.    The EPA's approval of a state program constitutes a substantive rule that is subject to the requirements of APA Section 553.  5 U.S.C. §§ 551(4)–(5), 553.

231.    The EPA acted pursuant to delegated authority under the Clean Water Act to approve the state's assumption of jurisdiction over the federal 404 program.  33 U.S.C. § 1344.

232.    As required for a rule of general applicability and legal effect, the EPA indicated that approval of the Florida 404 program would be codified at 40 C.F.R. 233 subpart H.  85 Fed. Reg. 57,853, 57,855 (Sept. 16, 2020).  The agency unlawfully failed to codify the program.

233.    The EPA's decision has a substantive legal effect by (1) requiring public citizens to follow a new legal process under a new set of laws, regulations, and guidance, (2) delegates decision-making authority from the federal government to a state; (3) requires compliance with a different set of laws; (4) transfers enforcement authority from the federal government to a state operating under a different set of laws in state courts rather than federal courts; (5) requires permit applicants to fill out and submit different permit application forms to be submitted to a different permit-issuing entity; (6) strips the Corps of jurisdiction over the federal 404 program;

JA.46

(7) removes citizens' NEPA rights; (8) restricts citizens' access to the courts; and (9) deprives Tribes' of their right to consult with the federal government—which bears trust obligations to the Tribes—when 404 permits would affect their natural, cultural, and historical resources.

234.    The rule does not grant or recognize an exception or relieve a restriction.

235.    Nor does the rule constitute an interpretation or statement of policy.

236.    The EPA provided no justification in the Federal Register Notice that would support application of the good cause exception.  Nor do the good cause exceptions apply.

237.    The EPA violated the APA by making its approval effective immediately upon publication in the Federal Register, rather than no less than 30 days thereafter.

238.    The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

239.    The EPA's immediate effective date for Florida's 404 program must be held unlawful and set aside.

## NINTH CLAIM FOR RELIEF

### EPA'S FAILURE TO CODIFY FLORIDA'S PROGRAM VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

240.    Plaintiffs adopt and incorporate by reference paragraphs 1–239 of this Complaint.

241.    Codification in the Code of Federal Regulations is required for all documents of an agency "having general applicability and legal effect . . . and . . . relied upon by the agency as authority."  44 U.S.C. § 1510(a).

242.    EPA's decision was intended to be a rule of general applicability that would have the legal effect of transferring authority from the Corps to the state and authorizing the state 404 program.

243.    Whenever a rule is subject to codification, the agency must draft its notice as an amendment to the Code of Federal Regulations before submitting it to the Office of the Federal Register.  1 C.F.R. § 21.1(a).  The agency must include in its publication "words of issuance" and "amendatory language that precisely describes the relationship of the new provision to the Code."  Id. § 21.1(b).

244.    The EPA's December 22, 2020, publication of its decision in the Federal Register failed to include "words of issuance" or "amendatory language" codifying the state program into the Code of Federal Regulations.  85 Fed. Reg. 83,553 (Dec. 22, 2020).

245.    The EPA indicated that approval of the Florida 404 program would be codified at 40 C.F.R. 233 subpart H.  85 Fed. Reg. at 57,855.

246.    The EPA has codified in the Code of Federal Regulations its approval of prior states that have assumed 404 jurisdiction.  See 40 C.F.R. § 233.70 (incorporating by reference Michigan's assumption program); 49 Fed. Reg 38,947-01 (approving and codifying Michigan's program into 40 C.F.R. § 233.70); 40 C.F.R. § 233.71 (incorporating by reference New Jersey's assumption program); 59 Fed. Reg. 9,933-01 (approving and codifying New Jersey's assumption program).

247.    The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

248.    The EPA's failure to codify the state program rendered the transfer of authority a nullity.  The subsequent transfer of authority must be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Issue a declaratory judgment declaring that the EPA violated the Clean Water Act and APA by taking a final agency action and making findings and conclusions that are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with law, when making the decision that the state's application was complete;

(b)     Issue a declaratory judgment declaring that the EPA violated the Clean Water Act and APA by taking a final agency action and making findings and conclusions that are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with law, when the agency approved the state's application to assume jurisdiction over the Clean Water Act 404 program;

(c)     Issue a declaratory judgment declaring that USFWS' biological opinion, "no jeopardy" determination, and incidental take statement violated the ESA and APA;

(d)     Issue a declaratory judgment declaring that USFWS' scheme for permit-level ESA "analysis" is not authorized by the law;

(e)     Issue a declaratory judgment declaring that the Corps violated the RHA and APA when producing its retained waters list;

(f)     Issue a declaratory judgment declaring that the EPA violated the APA by providing an immediate-on-publication effective date for its approval of Florida's program;

(g)     Issue a declaratory judgment declaring that the EPA violated the APA by transferring authority without codifying a lawful state program in the Code of Federal Regulations;

(h)     Vacate and set aside the EPA's decision that the state's application is complete;

(i)      Vacate and set aside the EPA's decision to approve the state's application to assume jurisdiction over the Clean Water Act 404 program and remand with instructions for reopening and completing EPA's consideration of Florida's assumption application;

(j)      Vacate and set aside USFWS' programmatic biological opinion and incidental take statement for the challenged EPA decision and remand with instructions for reopening and reinitiating consultation;

(k)      Vacate and set aside the Corps' retained waters list submitted in conjunction with the state's application;

(l)      Hold unlawful and set aside the EPA's December 22, 2020, immediate effective date for the Florida 404 program;

(m)      Enjoin the EPA's approval and transfer of authority to the state;

(n)      Issue any other appropriate injunctive relief;

(o)      Allow the Plaintiffs to recover the reasonable fees, costs, and disbursements of this action, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(p)      Grant such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 14th day of January 2021,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

*\* Appearing under LCvR 83.2(c)(1)*

JA.51

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, ET
AL.

        Plaintiffs,

    v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, ET AL.

        Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

---

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF**
**ENVIRONMENTAL PROTECTION'S**
**MOTION TO INTERVENE**

---

Pursuant to Federal Rule of Civil Procedure 24, the State of Florida and Florida Department

of Environmental Protection (collectively, "Florida Applicants") respectfully submit this motion

to intervene in the above-captioned proceedings. Plaintiffs challenge a final approval granted on

December 17, 2020, by the U.S. Environmental Protection Agency ("EPA") for Florida

Applicants' request to administer a Clean Water Act ("CWA") Section 404 Program ("Section 404

Program"). *See* EPA's Approval of Florida's Clean Water Act Section 404 Assumption Request,

85 Fed. Reg. 83,553 (Dec. 22, 2020). Pursuant to that approval, Florida Applicants are now

administering the Section 404 Program in Florida, which is consistent with the policy of Congress

as reflected in 33 U.S.C. § 1251(b). As such, Florida Applicants have a direct and substantial

interest in this case and are entitled to intervene as a party in these proceedings as a matter of right.

In the alternative, Florida Applicants should be granted intervention as a matter of this Court's

discretion.   Pursuant to Local Civil Rule 7(a), Florida Applicants set forth their arguments

supporting this motion in detail in the attached statement of points and authorities.

In accordance with Local Civil Rule 7(m), counsel for Florida Applicants has conferred

with counsel for the parties.  Counsel for Federal Defendants indicated that Federal Defendants

take no position on this motion at this time.  Counsel for Plaintiffs provided no response on the

Plaintiffs' position on this motion.


Dated:  January 19, 2021.                                   Respectfully submitted,
                                                            BAKER BOTTS L.L.P.

                                                            */s/ Jeffrey H. Wood*
                                                            Jeffrey H. Wood (D.C. Bar No. 1024647)
                                                            Jared R. Wigginton (D.C. Bar No. 1033684)
                                                            700 K Street, NW
                                                            Washington, D.C. 20001
                                                            Phone: (202) 639-7700
                                                            jeff.wood@bakerbotts.com
                                                            jared.wigginton@bakerbotts.com

                                                            Lily N. Chinn (DC Bar No. 979919)*
                                                            101 California Street
                                                            San Francisco, CA 94111
                                                            Phone: (415) 291-6200
                                                            lily.chinn@bakerbotts.com

                                                            Aaron M. Streett (TX Bar No. 24037561)*
                                                            Harrison Reback (TX Bar No. 24012897)*
                                                            910 Louisiana Street
                                                            Houston, TX 77002-4995
                                                            Phone: (713) 229-1234
                                                            aaron.streett@bakerbotts.com
                                                            harrison.reback@bakerbotts.com

                                                            *Appearing under LCvR 83.2(c)(1)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of January 2021, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 21-119 (RDM) |
| v. | |
| MICHAEL S. REGAN, *et al*,[1] | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION AND ORDER</u>

During the final days of a president's term in office, there is often a rush to complete the

regulatory work of that administration before a new administration takes office.  Incoming

administrations, in turn, will often put in place a regulatory freeze, which, among other things,

directs agencies to postpone the effective dates of rules that have not yet taken effect to provide

the new administration with the opportunity to consider any issues that those prospective rules

might present.  *See*, *e.g*., 86 Fed. Reg. 7,424 (Jan. 20, 2021) (Memo from Ronald A. Klain,

Assistant to the President and Chief of Staff); 82 Fed. Reg. 8,346 (Jan. 20, 2017) (Memo from

Reince Priebus, Assistant to the President and Chief of Staff).  This, then, adds to the outgoing

administration's rush to complete its work, so that any new rules are not only promulgated, but

effective, before the presidential transition occurs.  The questions presented by the pending

---

[1] The Court automatically substitutes the current Administrator of the EPA, Michael Regan, in
the case caption.  *See* Fed. R. Civ. P. 25(d) (providing that "when a public officer . . . ceases to
hold office while the action is pending . . [t]he officer's successor is automatically substituted as
a party").

motions in this case are whether the Environmental Protection Agency ("EPA") cut corners to finalize its decision to transfer certain Clean Water Act, 33 U.S.C. § 1251 *et seq.*, permitting authority from the Army Corps of Engineers ("Corps") to the State of Florida in late 2020, and, if so, whether the Plaintiffs—seven environmental organizations—suffered any cognizable and redressable injuries as a result.

Plaintiffs' complaint spans the (metaphorical, if not veritable) waterfront, from the Clean Water Act to the Endangered Species Act to the Rivers and Harbors Act, and asserts nine claims, which challenge both the substance of the EPA's decision and the administrative process through which the EPA reached that decision. *See* Dkt. 1 at 27–35 (Compl. ¶¶ 118–61). For present purposes, however, the parties have limited their arguments to Plaintiffs' standing to bring this action and, if they have standing, to the merits of Counts Eight and Nine of their complaint. Those counts challenge the process, rather than the substance, of the EPA's decision. In Count Eight, Plaintiffs allege that the EPA's decision to give immediate effect to its approval of Florida's Section 404 program violated the APA in two respects: first, it violated 5 U.S.C. § 553(d), which requires agencies to publish final, substantive rules "not less than 30 days before [their] effective date," and, second, the agency violated 5 U.S.C. § 706(2) because its efforts to characterize its decision as an adjudication (and not a rulemaking) and its failure to codify its decision were arbitrary and capricious and not in accordance with law. Dkt. 1 at 46–47 (Compl. ¶¶ 228–39). And, in Count Nine, Plaintiffs allege that the EPA's failure to codify Florida's Section 404 program was arbitrary and capricious and not in accordance with law in violation of 5 U.S.C. § 706(2) and that the agency's omission has "rendered the transfer of authority" to the State of Florida "a nullity." *Id.* at 47–48 (Compl. ¶¶ 240–48).

For the reasons that follow, the Court concludes that Plaintiffs have standing to assert

their claims in Count Nine; that the Court requires further briefing to determine whether

Plaintiffs' claims in Count Eight are redressable; that Plaintiffs have alleged enough to overcome

Florida's motion to dismiss the remaining counts for lack of standing, although the Court will

need to revisit standing at the summary judgment stage on Plaintiffs' remaining claims; and that

Count Nine fails on the merits.  The Court, accordingly, will **DENY** Plaintiffs' motion for partial

summary judgment, Dkt. 31, will **GRANT** in part and **DENY** in part the EPA's cross-motion for

partial summary judgment, Dkt. 34, and will **GRANT** in part and **DENY** in part the State of

Florida's motion to dismiss, Dkt. 36.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

At the core of this case is Section 404 of the Clean Water Act, which governs the

issuance of permits for "the discharge of dredged or fill material into the navigable waters at

specified disposal sites."  33 U.S.C. § 1344(a).  Although Corps is responsible for the issuance of

such permits, a state may submit an application to the EPA, 40 C.F.R. § 233.1(a), seeking

authority to "administer its own individual and general permit program for the discharge of

dredged or fill material into the navigable waters . . . within its jurisdiction," 33 U.S.C. §

1344(g)(1); *see also* Dkt. 1 at 16 (Compl. ¶ 68) ("The Corps is charged with administering

permits under [S]ection 404 of the Clean Water Act.").

A state's application to assume permitting authority under Section 404 must include,

among other things, a "complete program description" and a "statement" from the state's

attorney general.  40 C.F.R. § 233.10.  The "complete program description" "shall include" the

following:

> (a)    A description of the scope and structure of the State's program. The
>        description should include extent of State's jurisdiction, scope of

activities regulated, anticipated coordination, scope of permit exemptions if any, and permit review criteria;

(b)  A description of the State's permitting, administrative, judicial review, and other applicable procedures;

(c)  A description of the basic organization and structure of the State agency (agencies) which will have responsibility for administering the program. If more than one State agency is responsible for the administration of the program, the description shall address the responsibilities of each agency and how the agencies intend to coordinate administration and evaluation of the program;

(d)  A description of the funding and manpower which will be available for program administration;

(e)  An estimate of the anticipated workload, e.g., number of discharges[;]

(f)  Copies of permit application forms, permit forms, and reporting forms;

(g)  A description of the State's compliance evaluation and enforcement programs, including a description of how the State will coordinate its enforcement strategy with that of the Corps and EPA;

(h)  A description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands.

Note: States should obtain from the Secretary an identification of those waters of the U.S. within the State over which the Corps retains authority under section 404(g) of the Act.

(i)  A description of the specific best management practices proposed to be used to satisfy the exemption provisions of section 404(f)(1)(E) of the Act for construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment.

*Id.* § 233.11.  The attorney general's statement, in turn, must confirm "that the laws and regulations of the State, or an interstate compact, provide adequate authority to carry out the program and meet the applicable requirements." *Id.* § 233.12(a).

By statute, the EPA has 120 days to evaluate such a state application, "taking into account any comments" submitted by the Corps and the U.S. Fish and Wildlife Service ("FWS").

4

JA.58

33 U.S.C. § 1344(h)(1).  The governing regulations provide, however, that this statutory period

does not begin to run until the EPA receives a "complete State program submission," and they

require the EPA to "determine whether [a] submission is complete within 30 days of receipt of

the submission."  40 C.F.R. § 233.15(a); *see also id.* § 233.10.  Once the EPA determines that an

application is complete, the EPA must publish the application in the Federal Register and must

solicit input from the Corps, the FWS, and the National Marine Fisheries Service ("NMFS").  *Id.*

§ 233.15(d)–(f).  The EPA must also provide for a public comment period of "not less than 45

days" and must hold a public hearing within the state.  *Id.* § 233.15(e)(1)–(2).

The EPA has 120 days, in the absence of a request for an extension by the state or an

agreement between the state and the EPA to extend that window, to "approve or disapprove the

program based on whether the State's program fulfills the requirements of this part and the

[Clean Water] Act, taking into consideration all comments received."  *Id.* § 233.15(c), (g).  The

specific official tasked with making that decision is the relevant "Regional Administrator."  *Id.*

§ 233.15(g); *see also id.* § 1.5(a) (explaining that the EPA "consists of Headquarters and 10

Regional Offices," each headed by a "Regional Administrator[]").  In deciding whether to

approve the state's application, the Regional Administrator must consider "whether the State's

program fulfills the requirements of" the Clean Water Act and must take "into consideration all

comments received."  *Id.* § 233.15(g).  The Regional Administrator must then "prepare a

responsiveness summary of significant comments received and his response to these comments"

and must "respond individually to comments received from the Corps, FWS, and NMFS."  *Id.*  If

the Regional Administrator approves the state's application, he must "notify the State and the

[Corps] of the decision" and must "publish notice in the Federal Register."  *Id.* § 233.15(h).  The

"[t]ransfer of the program to the State shall not be considered effective until such notice appears

in the Federal Register."  *Id.*  Finally, the Corps is required to "suspend the issuance . . . of

[S]ection 404 permits in State regulated waters on [the] effective date."  *Id.*

   If the EPA "fails to make a determination with respect to any program submitted by a

State" within 120 days, the "program shall be deemed approved."  33 U.S.C. § 1344(h)(3).  But

even after the EPA approves a transfer of Section 404 permitting authority to a state, or the

program is "deemed approved" by virtue of agency inaction, the EPA retains some authority to

ensure that the state is administering the program in compliance with federal law.  *See id.*

§ 1344(i).  In particular, if the Administrator of the EPA (the "Administrator") "determines after

a public hearing that a State is not administering a [Section 404] program . . . in accordance

with" the Clean Water Act, "the Administrator shall so notify the State, and, if appropriate

corrective action is not taken within a reasonable time, . . . the Administrator shall (1) withdraw

approval of such program until the Administrator determines that such corrective action is taken,

and (2) notify the [Corps] that [it] shall resume the program for the issuance of permits" until the

required corrective action is taken by the State.  *Id.*

## B.     Factual and Procedural Background

### 1.     *Administrative Background*

   On August 18, 2020, the State of Florida submitted an application to administer the

Section 404 permitting program within its borders.  Dkt. 55 at 433 (AR 0004 at 1).  The EPA

deemed the application complete on August 20, 2020, Dkt. 56-1 at 684 (AR 0641 at 1–2),

triggering the statutory 120-day period for the agency to review the application, *see* 33 U.S.C.

§ 1344(h)(1); 40 C.F.R. § 233.15(a).  On September 16, 2020, the EPA issued a public "[n]otice

and request for comments" on Florida's Section 404 program application and announced that the

EPA would hold two "virtual hearings" in October 2020.  Dkt. 51 at 1 (AR 0001 at 1).  For those

hearings, the EPA "recommend[ed] that commenters also submit the text of their oral comments . . . as written comments to the rulemaking docket." *Id.* at 2 (AR 001 at 2).  Following those hearings, the EPA explained, "verbatim transcripts w[ould] be included in the rulemaking docket." *Id.*  "If," at the end of this process, the EPA "approve[d] this program, [the] EPA w[ould] also codify the approved program in 40 C.F.R. 233 subpart H," *id.* at 3 (AR 0001 at 3), where the EPA had codified the only two state Section 404 programs that the agency had approved, *see* 49 Fed. Reg. 38,947 (Oct. 2, 1984) (Michigan) (codified at 40 C.F.R. § 233.70); 59 Fed. Reg. 9,933 (Mar. 2, 1994) (New Jersey) (codified at 40 C.F.R. § 233.71).

The EPA received over 3,000 comments, Dkt. 56-1 at 433, including from the Plaintiffs in this case.  Earthjustice, counsel to Plaintiffs in this case, wrote to the EPA on October 23, 2020, arguing that Florida's application was incomplete and that the EPA had erred when it concluded otherwise.  Dkt. 55-3 at 69 (AR 0051 at 1); *see also* 40 C.F.R. § 233.11.  Florida's application, according to that letter, was unsatisfactory in at least three ways.  First, Florida had "not demonstrated how it w[ould] ensure no jeopardy to listed species" under the Endangered Species Act and, instead, had "indicated it w[ould] rely on an anticipated programmatic biological opinion and an anticipated, associated incidental take statement."  Dkt. 55-3 at 70 (AR 0051 at 2).  Second, the state had "failed to identify the waters that would be assumed under its proposed program," in contravention of applicable EPA regulations.  *Id.* at 72 (AR 0051 at 4) (citing 40 C.F.R. § 233.11(h)).  Third, Florida had not "provide[d] [the] EPA and the public with complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers."  *Id.* at 74 (AR 0051 at 6).  Earthjustice submitted that because, in its view, Florida had "failed to provide [the] EPA with a complete program submission in [these] three, critical

JA.61

respects," the proper course was to "suspend the public comment period and review of Florida's application until the State cure[d] these deficiencies and submit[ted] a complete program proposal to the agency." *Id.* at 76 (AR 0051 at 8) (citing 40 C.F.R. § 233.15(a)).

On November 2, 2020, Earthjustice submitted further, detailed comments on behalf of several of the Plaintiffs in this case. *See* Dkt. 56 at 16–64 (AR 0386 at 1–55). The crux of their letter was that the EPA should deny Florida's application "for at least three reasons: (1) the submission [wa]s not complete, (2) the proposed program [wa]s not as stringent as federal law, and (3) Florida [wa]s not equipped to administer and enforce Section 404," *id.* at 17 (AR 0386 at 2). In support of their arguments, Plaintiffs submitted hundreds of pages of exhibits. *See id.* at 71–312 (AR 0386 at 56–307); Dkt. 56-1 at 1–64 (AR 0386 at 308–71).

On December 17, 2020, the EPA Administrator, Andrew Wheeler, announced approval of Florida's program, and the agency published a notice of approval in the Federal Register on December 22, 2020. Dkt. 56-1 at 433–34 (AR 0564 at 1–2); *see also* 85 Fed. Reg. 83,553 (Dec. 22, 2020). That notice, which was signed by the Regional Administrator, asserted that the EPA had "determined that the State of Florida ha[d] the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g-1) and EPA's implementing regulations." Dkt. 56-1 at 433 (AR 0564 at 1). The notice further asserted that the "EPA has taken final action to approve Florida's assumption of the program" and that "Florida's program assumption [was] applicable December 22, 2020," *id.*, which was the day the notice was published in the Federal Register, *see* 85 Fed. Reg. 83,553 (Dec. 22, 2020).

That same day, Earthjustice sent a letter to the EPA asserting that the "EPA's transfer of authority was unlawful." Dkt. 31-1 at 6 (Crooks Decl. ¶ 19); *see also id.* at 100–01 (Crooks Decl., Ex. D) (letter). Among other things, the letter argued that, under the APA, "[t]he required

8

publication or service of a substantive rule shall be made not less than 30 days before its

effective date." *Id.* at 100 (Crooks Decl., Ex. D) (quoting 5 U.S.C. § 553(d)).  Because,

according to the letter, the EPA's approval of Florida's Section 404 program constituted a

"substantive rule" for purposes of 5 U.S.C. § 553(d), the EPA lacked authority to make its

approval immediately effective.  *Id.*  The EPA had failed, moreover, to "codify [Florida's]

program in the Code of Federal Regulations," as was required by the Federal Register Act and

governing regulations.  *Id.* at 101 (Crooks Decl., Ex. D).  The letter further asserted that Florida's

program thus "d[id] not have the force of law," and "the authority to administer Section 404 of

the Clean Water Act in Florida remain[ed] with the U.S. Army Corps of Engineers."  *Id.*

      The EPA did not respond to Earthjustice but, instead, sent a letter to the Florida

Department of Environmental Protection ("FDEP") on December 28, 2020, positing—"for the

first time," according to Plaintiffs—that the EPA's approval of Florida's application "did not

have to meet the 30-day requirement [and EPA did not have to] codify the state program because

[agency approval] was an informal order, rather than a rule."  *Id.* at 6 (Crooks Decl. ¶ 19); *see

also id.* at 103–04 (Crooks Decl., Ex. E).  In that letter, the EPA's acting general counsel, David

Fotouhi, acknowledged the "letter from Earthjustice questioning the effective date of Florida's

404 assumption."  *Id.* at 103 (Crooks Decl., Ex. E).  Contrary to Earthjustice's understanding,

however, Fotouhi argued that the EPA's immediate effective transfer of Section 404 authority to

the State of Florida complied with both the Clean Water Act and its implementing regulations as

well as the APA's relevant provisions.  *Id.* at 103–04 (Crooks Decl., Ex. E).  As for

Earthjustice's invocation of Section 553(d) of the APA, Fotouhi noted that "[a]gencies may use

adjudications to apply general rules to address specialized or fact-specific questions," and he

argued that the "EPA's approval of Florida's Section 404 program was an adjudication, not a

rulemaking," meaning that "the APA's requirement that the effective date of a rule generally be delayed for 30 days d[id] not apply." *Id.* at 104 (Crooks Decl., Ex. E) (citation omitted).

As for the EPA's failure to codify the transfer, Fotouhi acknowledged that the "EPA ha[d] stated that it intend[ed] to codify the approved program," but he argued that the "EPA's approval ha[d] taken effect . . . and [wa]s not contingent upon the forthcoming codification." *Id.* Instead, according to Fotouhi, "EPA's plan to codify the program [wa]s for the sole purpose of ensuring transparency and clarity about Florida's program for the public, as well as for consistency with the [EPA's] past practice in approving states' applications for Section 404 program assumption, not because its approval is a rule that requires C.F.R. publication." *Id.* As a result, Fotouhi argued, "the fact that [the agency's approval was] not yet codified [wa]s irrelevant for purposes of the effective date of Florida's Section 404 program." *Id.*

On January 14, 2021, the EPA published a "Pre-Publication Notice" indicating that the agency intended to "update[e] the Code of Federal Regulations" to "reflect its approval" of Florida's Section 404 program. Pre-Publication Notice, EPA, *Codifying EPA's Adjudicatory Decision on Florida's Clean Water Act Section 404 Program Request*, at 1 (Jan. 14, 2021), https://www.epa.gov/sites/default/files/2021-01/documents/pre-publication_frn-_fl_404_codification_final_rule_.pdf. ("Pre-Publication Notice"). That notice identified the relevant "Action" being announced as a "Final Rule" that the EPA Administrator had signed on January 14, 2021, and it explained that "[i]n order to facilitate transparency and consistency with past practice, [the] EPA is voluntarily amending the CFR to reflect its approval of Florida's assumption of the CWA Section 404 program." *Id.* The Pre-Publication Notice reaffirmed the EPA's view that its approval of Florida's assumption of the permitting authority "was effective on December 22, 2020," but the notice also explained (1) that the "EPA has determined that

there is good cause for making this rule final without prior proposal and opportunity for comment because such notice and opportunity for comment is unnecessary, as it simply codifies the approved Florida CWA Section 404 program" and (2) that there was "good cause to make this rule effective immediately." *Id.*

    2.   *Procedural Background*

    Plaintiffs, seven environmental organizations,[2] filed this suit on January 14, 2021, alleging that "[t]he EPA's actions failed to effectuate a lawful transfer of authority." Dkt. 1 at 3, 10–14 (Compl. ¶¶ 1, 40–53). Plaintiffs name as Defendants the EPA, the FWS, the Corps, and various officials within those agencies. *Id.* at 15–17 (Compl. ¶¶ 57–71). Plaintiffs' nine-count complaint includes allegations that the EPA's determination that Florida's application was complete on August 20, 2020, violated the Clean Water Act and the APA, *id.* at 27 (Compl. ¶ 115) (Count One); the EPA's decision to approve Florida's Section 404 application violated the Clean Water Act and the APA, *id.* at 35 (Compl. ¶ 160) (Count Two); a biological opinion that the FWS issued in support of Florida's application violated the Endangered Species Act and the APA, *id.* at 38 (Compl. ¶ 179) (Count Three); an incidental take statement that the FWS included in that biological opinion violated the Endangered Species Act and the APA, *id.* at 42 (Compl. ¶¶ 199–200) (Count Four); the EPA's determination that its consideration of Florida's Section 404 application was "discretionary," and thus triggered Section 7 consultation under the ESA, violated the Clean Water Act and the APA, *id.* at 43 (Compl. ¶ 211) (Count Five); the FWS's treatment of Florida's application circumvented Section 10 of the Endangered Species Act, in violation of the APA, *id.* at 44–45 (Compl. ¶¶ 218–20) (Count Six); the Corps' treatment

---

[2] The seven organizations are the Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper. Dkt. 1 at 10–14 (Compl. ¶¶ 40–53).

JA.65

of Florida's application violated the Rivers and Harbors Act and the APA, *id.* at 45 (Compl.

¶¶ 223–26) (Count Seven); the EPA violated the APA by making its approval of Florida's

Section 404 program immediately effective, *id.* at 47 (Compl. ¶¶ 237–38) (Count Eight); and the

EPA's failure to codify Florida's Section 404 program violated the APA, *id.* at 48 (Compl.

¶ 248) (Count Nine).

Six days later, on January 20, 2021—the day the new administration took office—

Plaintiffs returned to the EPA and again "asked [the agency] to cure the immediate effective date

and failure to codify violations regarding [Florida's] program."  Dkt. 31-1 at 8 (Crooks Decl.

¶ 24); *see also id.* at 106–29 (Crooks Decl., Ex. F) (letter).  According to Plaintiffs, however, the

EPA "has adhered to its position that the immediate effective date was lawful, prohibiting the

agency from considering" Plaintiffs' request.  *Id.* at 8 (Crooks Decl. ¶ 24).

The State of Florida and FDEP (collectively, "Florida" or "the State") moved to

intervene, Dkt. 4, to defend the EPA's decision approving the State's Section 404 program.  The

Court granted Florida's motion on February 1, 2021.  *See* Minute Order (Feb. 1, 2021).[3]  The

Court then held a pre-motion conference, Dkt. 21, at which the parties identified a set of

threshold issues, and the Court set a briefing schedule on those issues, *see* Minute Order (Feb.

17, 2021).  Pursuant to that schedule, Plaintiffs filed a partial motion for summary judgment on

March 5, 2021, addressing only Counts Eight and Nine—that is, the EPA's purported violation

of the APA by making its approval of Florida's application immediately effective and by failing

---

[3] The Florida Chamber of Commerce and Association of Florida Community Developers
("Florida Amici") separately moved to intervene in this action.  Dkt. 29.  This Court denied that
motion without prejudice, Dkt. 30, and invited both entities either to renew their motion or to
seek leave to participate in this matter as amici.  The Florida Amici filed a renewed motion to
intervene, Dkt. 32, and the Court again denied intervention but granted the Florida Amici leave
to file a response to Plaintiffs' motion for partial summary judgment, Dkt. 38; Dkt. 39, which
this Court has considered in resolving the present motions.

to codify the transfer of permitting authority from the Corps to the State.  Dkt. 31.  The EPA

cross-moved for summary judgment on Counts Eight and Nine on April 26, 2021, Dkt. 34, and

the State cross-moved to dismiss Plaintiffs' complaint in its entirety for lack of standing and

moved to dismiss Counts Eight and Nine for failure to state a claim, Dkt. 36.

The Court heard oral argument on March 15, 2022, and permitted the parties to file

supplemental memoranda addressing certain questions that the Court posed at oral argument.

The parties filed those memoranda on March 18, 2022.  *See* Dkt. 70; Dkt. 71; Dkt. 72.  Those

motions are now fully briefed and ripe for decision.[4]

## II.  LEGAL STANDARD

### A.     Motion to Dismiss

A Rule 12(b)(1) motion challenges the Court's subject-matter jurisdiction to consider a

case, and, accordingly, provides an appropriate vehicle for challenging the plaintiff's Article III

standing.  When the defendant contests the legal sufficiency of the jurisdictional allegations

contained in the complaint, the Court must accept the allegations of the complaint as true and

must construe "the complaint in the light most favorable to the non-moving party."  *Erby v.*

*United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006); *see also I.T. Consultants, Inc. v.*

*Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  When framed in this manner, the

---

[4] Plaintiffs have also moved for leave to file a surreply.  Dkt. 47; *see also* Dkt. 69 (proposed
surreply).  "The decision to grant or deny leave to file a surreply is committed to the sound
discretion of the Court, and in making its decision, the Court considers whether the surreply is
helpful to the adjudication" of the pending motions and "whether the defendant[s] will be unduly
prejudiced if the Court grants leave to allow the surreply."  *Plunkett v. Dep't of Just.*, 249 F.
Supp. 3d 73, 74 n.2 (D.D.C. 2017) (quotation marks and alterations omitted).  Because the Court
concludes that Plaintiffs' proposed surreply will be helpful to the resolution of the pending
motions, and that neither the EPA nor Florida will be unduly prejudiced by the grant of leave to
file, the Court will **GRANT** Plaintiffs leave to file their surreply, Dkt. 69.

Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).

*See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

A motion to dismiss for failure to state a claim upon which relief can be granted under

Federal Rule of Civil Procedure 12(b)(6), meanwhile, "tests the legal sufficiency of a

complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule

12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state

[the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with

adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District

of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 675, 678 (2009)) (citation omitted).  The complaint, however, need not include

"detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  Instead, a complaint may survive a Rule 12(b)(6) motion even if

"recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough

to raise a right to relief above the speculative level."  *Id.* at 555–56 (quotation marks omitted).  In

assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four

corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28

(D.D.C. 2006), along with "any documents attached to or incorporated into the complaint,

matters of which the court may take judicial notice, and matters of public record," *United States

ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

## B.    Summary Judgment

Summary judgment is appropriate under Rule 56 when the pleadings and the evidence

demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In a case involving review of a final

agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012) (citation omitted).  In the unique context of a case brought under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1341 (D.C. Cir. 1995).  The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as agency actions taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).  In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).

When it comes to standing, however, district courts are not limited to the administrative record.  In moving for summary judgment on its standing, a plaintiff may not rest on mere allegations, but, instead, must cite to evidence contained in the administrative record or submitted along with its motion, Fed. R. Civ. P. 56(c), that demonstrates that there is no genuine dispute of material fact as to the existence of "a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125

(2014) (citation omitted).  Similarly, a defendant may move for summary judgment on standing,

seeking to demonstrate "that there is no genuine dispute as to any material fact," Fed. R. Civ. P.

56(c), and that plaintiffs cannot establish the required elements of Article III standing based on

the record evidence, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "The evidence of

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.  ANALYSIS

### A.    Standing

The Court begins, as it must, with the question of Plaintiffs' standing to bring the claims

alleged in this suit.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The

"'irreducible constitutional minimum' of standing" requires that Plaintiffs demonstrate that they

have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.

Robins*, 578 U.S. 330, 338 (2015) (citing *Lujan*, 504 U.S. at 560).  Plaintiffs must satisfy these

elements of standing "in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of

the litigation." *Lujan*, 504 U.S. at 561.

This means that two different standards apply here.  First, in response to Florida's cross-

motion to dismiss this entire suit for lack of standing, Dkt. 37, Plaintiffs may rely on "general

factual allegations of injury," and the Court will "presume that general allegations embrace those

specific facts that are necessary to support the claim," *Abigail All. for Better Access to Dev.

Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (alterations and quotation marks

omitted).  Second, in support of their own motions for partial summary judgment and in response

to the EPA's cross-motion for partial summary judgment on Counts Eight and Nine, Dkt. 31;

Dkt. 34, Plaintiffs may "no longer rest on such 'mere allegations,'" *Lujan*, 504 U.S. at 561

(quoting Fed. R. Civ. P. 56(e)), but instead must provide affidavits or other evidence to

demonstrate the specific facts necessary to support standing, *Swanson Grp. Mfg. LLC v. Jewell*,

790 F.3d 235, 240 (D.C. Cir. 2015).

Plaintiffs, as environmental organizations, *see* Dkt. 1 at 10–14 (Compl. ¶¶ 40–53), "can

assert standing on [their] own"—that is, on behalf of themselves as entities—or "on behalf of

[their] members or both," *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,

797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d

1136, 1138 (D.C. Cir. 2011)).  Here, Plaintiffs attempt to do both—that is, they assert injuries to

their own concrete interests (invoking organizational standing principles) and to those of their

members (a question of associational standing).  Dkt. 31 at 35.  Although these are distinct

inquiries, *compare Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), *with Hunt v.

Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), under either theory, Plaintiffs

must identify an injury-in-fact to their concrete interests.  As such, the Court will address their

ability to make this showing, focusing (as Plaintiffs do in their brief, *see* Dkt. 31 at 40–48) on

their efforts to show an injury to a concrete organizational interest.

The Court will first address Florida's motion to dismiss under the Rule 12(b)(1) standard

and will then turn to Plaintiffs' and the EPA's cross-motions under the Rule 56 standard.

1.      *Florida's Cross-Motion to Dismiss*

Much of Florida's motion to dismiss overlaps with the EPA's motion for summary

judgment on Counts Eight and Nine, and because Plaintiffs' burden of demonstrating standing at

the summary judgment stage is more demanding than their burden of opposing a motion to

17

dismiss, the Court will address those overlapping arguments in the context of Plaintiffs' and the

EPA's cross-motions for summary judgment. Florida, however, goes beyond the arguments

pressed by the EPA with respect to Counts Eight and Nine and argues that the Court should

dismiss Plaintiffs' complaint in its entirety for lack of standing. *See* Dkt. 37 at 44–67. Although

it is well-established that "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358

n.6 (1996), in pressing these arguments, Florida does not differentiate among the counts of the

complaint. The Court will, accordingly, address Florida's categorical arguments with respect to

Plaintiffs' suit as a whole.

But before addressing those arguments, the Court must first pause to clarify the nature of

Florida's challenge to Plaintiffs' standing. "At the motion to dismiss stage, a challenge to the

plaintiff's standing may take one of two forms." *Ranchers-Cattlemen Action Legal Fund v. U.S.

Dep't of Agric.*, No. 20-cv-2552, 2021 WL 4462723, at *4 (D.D.C. Sept. 29, 2021) (quoting

*Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015)). A Rule

12(b)(1) motion may, on the one hand, "raise a 'facial' challenge to the legal sufficiency of the

plaintiff's jurisdictional allegations," in which case "the court must accept as true the allegations

in the complaint and consider the factual allegations of the complaint in the light most favorable

to the non-moving party." *Erby*, 424 F. Supp. 2d at 182. On the other hand, a Rule 12(b)(1)

motion "may pose a 'factual,' challenge to the Court's jurisdiction," in which case "the Court

may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the

plaintiff and disputed by the defendant, but must go beyond the pleadings and resolve any

disputed issues of fact the resolution of which is necessary to a ruling upon the motion to

dismiss." *Hale*, 2015 WL 7760161, at *3 (quotation marks omitted).

Florida does not specify which of these two paths it has chosen here. But its arguments,

time and again, challenge the sufficiency of Plaintiffs' allegations as they relate to standing.  The

State challenges, for example, the adequacy of Plaintiffs' "*alleged* procedural violation" under

Section 553(d), along with their theory of "*alleged* secondary procedural rights" under Sections

553(e) and 705.  Dkt. 37 at 30–31 (emphases added).  Florida also titles one section of its cross-

motion to dismiss, "Plaintiffs' *alleged* organizational injuries do not support their standing." *Id.*

at 53 (emphasis added).  Even more importantly, Florida offers no *evidence* or *factual* material

beyond the four corners of the complaint in support of its motion.  Florida does not, for example,

offer any affidavits or declarations disputing Plaintiffs' alleged injuries, and it has not sought any

jurisdictional discovery.  The Court, accordingly, concludes that Florida has "raise[d] a 'facial'

challenge" to the Court's jurisdiction to hear Plaintiffs' suit, and as such will "accept as true the

allegations in the complaint," *Erby*, 424 F. Supp. 2d at 182.

      Florida's principal categorical argument begins with the premise that Plaintiffs' theory of

standing relies on their "unspoken contention that Florida's administration of its Section 404

permitting program will cause greater harm to Florida's natural resources than if the Corps were

administering the permitting program."  Dkt. 37 at 45.  Because Florida's Section 404 program is

"at least as protective as the [f]ederal program," Florida continues, Plaintiffs' "unspoken

contention" is unfounded and the EPA's transfer decision "cannot constitute a concrete injury."

*Id.* at 45–46.  But in considering the question of Plaintiffs' standing to bring this suit, the Court

must take care "not to decide the questions on the merits for or against the plaintiff, and must

therefore assume that on the merits the plaintiffs would be successful in their claims."  *City of*

*Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).  And here, Plaintiffs allege that the EPA

violated the Clean Water Act and the APA in approving Florida's Section 404 application

because the State had not demonstrated that "it ha[d] authority to . . . issue permits that . . . assure

JA.73

compliance with[] the requirements of Section 404, including the 404(b)(1) Guidelines; assure

that the public will have notice and an opportunity for hearing on every application; and abate

violations of any permit and the permit program via civil and criminal enforcement."  Dkt. 1 at

27–28 (Compl. ¶ 119); *see also* 33 U.S.C. § 1344(h)(1).  Among a long list of alleged

deficiencies, Plaintiffs allege, for example, that the State program "violates federal law by

purporting to issue scores of general permits without the state permitting authority have made the

requisite determinations regarding environmental impact," Dkt. 1 at 28 (Compl. ¶ 122); "by

authorizing these general permits for a duration of five years from the date of EPA approval of

the program, unlawfully extending the general permits issued initially by the Corps beyond their

statutory limited five-year duration," *id.* (Compl. ¶ 123); by expanding "the circumstances under

which emergency permits—those that do not follow the ordinary requirements of Section 404—

may issue," *id*. (Compl. ¶ 124); and by omitting "important requirements, including the

requirement to 'minimize' discharges in violation of a permit, . . . certain monitoring and

reporting requirements, . . . the requirement that discharges minimize adverse impacts through

restoration, in addition to mitigation, . . . and the requirement of specifically identifying and

completely describing the authorized activity," *id.* at 29 (Compl. ¶ 125); *see also id.* at 28–33

(Compl. ¶¶ 120–47) (identifying other alleged deficiencies).  In short, the crux of Plaintiffs'

substantive challenge to the EPA's decision is that Florida's program is not, in fact, as protective

of wildlife and wildlife habitat as the federal program as administered by the Corps.

    In light of these allegations—which the Court must at present "accept as true," *Erby*, 424

F. Supp. 2d at 182—the Court concludes that Florida's argument that Plaintiffs lack standing

because the EPA's approval did no more than permit the State to "administer its substantively

equivalent [Section 404] program," Dkt. 43 at 74, is "inextricably intertwined with the merits of

the case," *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992).  And it is well-established that, "[i]n those circumstances, . . . the issue of standing need not be conclusively resolved, but instead the [C]ourt should defer its jurisdictional decision until the merits are heard."  *Kadi*, 42 F. Supp. 3d at 28 (quotation marks omitted).  The Court concludes that this path is the prudent one here, and will, accordingly, defer ruling on this particular flavor of Florida's standing-related arguments until Plaintiffs press the merits of their claims as to the substance of the EPA's decision.

Florida's challenge to Plaintiffs' asserted informational injury is even less availing. According to the State, Plaintiffs will suffer no informational injury due to the EPA's approval of its Section 404 application because neither of the two statutes that Plaintiffs invoke would otherwise entitle the Plaintiff organizations or their members to additional information about projects potentially impacting the environment.  Dkt. 37 at 56.  In particular, the State argues that the Endangered Species Act ("ESA") does not require the disclosure of information to the public, and the National Environmental Policy Act ("NEPA") does not apply to EPA actions under Section 404.  *Id.*  The State has no answer, however, to Plaintiffs' showing that, even if not required to do so, "the ESA implementing agencies[]," in practice, "regularly release federal consultations to the public, including via websites with biological opinions dating back decades." Dkt. 43 at 68–69.  And, more importantly, although the EPA's actions under Section 404 are not subject to NEPA review, the State ignores the fact that it is not the EPA—but the Corps—that typically issues Section 404 permits, and the Corps' actions are subject to NEPA, 42 U.S.C. § 4332(C); *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1366–67 (S.D. Fla. 2005) (vacating Section 404 permit issued by Corps based on failure to comply with NEPA).

Florida's alternative argument as to standing turns on the Clean Water Act's requirement that the EPA make a determination on a state's Section 404 application within 120 days.  33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).  As noted above, if the agency fails to act on application within the required time, the state's "program shall be deemed approved."  33 U.S.C. § 1344(h)(3).  According to Florida, this provision means that, "*even assuming arguendo* that the Court grants Plaintiffs' requested relief and vacates [the] EPA's approval notice, no relief for Plaintiffs would ensue because Florida's program would then be 'deemed approved' by operation of law."  Dkt. 37 at 60.  The Florida Amici echo this point, maintaining that "even if the Plaintiffs are right about the substance of [their claims], and [the] EPA's approval is vacated as a result, Congress's choice still controls and deems approved the State of Florida's [Section] 404 application because more than 120 days have passed since EPA received the State's [Section] 404 application."  Dkt. 38 at 11.

That argument is unpersuasive on several levels.  Most significantly, Section 404(b)(3)'s "deemed approved" language is triggered only if the EPA "*fails to make a determination* with respect to any program submitted by a State under subsection (g)(1)."  33 U.S.C. § 1344(h)(3) (emphasis added).  But, here, the EPA *did* make a determination—the agency approved Florida's Section 404 application.  *See* Dkt. 56-1 at 433–34 (AR 0564 at 1–2).  That is a problem for Florida and the Florida Amici because the authorities on which Florida rests its argument each involved an agency's failure to make a decision.  The first such case involved an agency "failing to adopt any order before [a] statutory deadline," prompting the D.C. Circuit to conclude that this inaction did not produce a judicially reviewable agency action.  *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131, (D.C. Cir. 2007).  This was so, the court reasoned, because "[t]he deadlocked vote cannot be considered an order of the [agency] nor can it constitute agency action."  *Id.*

JA.76

Florida's second precedent held that when Federal Energy Regulatory Commission ("FERC") "deadlocked" during a ratemaking, "the effects of that deadlock are not reviewable orders." *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1170 (D.C. Cir. 2016); *see also id.* at 1171 ("FERC did not engage in agency action at all, let alone final agency action.").  And the third concluded that an agency's "public notice" that certain statutory requirements would "sunset . . . *by operation of law*" for a specific entity did not constitute a final, reviewable agency action.  *AT&T Corp. v. FCC*, 369 F.3d 554, 561–62 (D.C. Cir. 2004).

To the extent that these decisions have any bearing on the question at hand, they do not stand for the remarkable proposition that Section 404's "deemed approved" language strips this Court of the ability to redress any substantive harms caused by the EPA's approval of Florida's application more than 120 days after its submission.  Given that judicial review of such an approval will always (or almost always) postdate the 120-day window provided for in the statute, one would expect Congress more clearly to provide for such a drastic result.  Put differently, without a more explicit statutory directive, the Court is disinclined to assume that Congress intended that "an unlawful program unlawfully approved would be 'deemed approved' once a Court finds it unlawful."  Dkt. 43 at 16.  To be sure, if the program was "deemed approved," that approval might constitute a congressional action, rather than administrative action, and it might thus avoid APA review.  But that is not what happened here.

Whether that 120-day window was even triggered, moreover, is a hotly contested question.  Plaintiffs allege that "[t]he EPA's determination that Florida's application was complete as of its submission on August 20, 2020, was arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence and otherwise in violation of the Clean Water Act and APA."  Dkt. 1 at 26–27 (Compl. ¶ 114).  This is, in fact,

JA.77

one of the grounds on which Plaintiffs intend to seek reconsideration if they secure judgment on

their claims in Count Eight. *See, e.g.*, Dkt. 31-1 at 7 (Crooks Decl. ¶ 22). The Court,

accordingly, cannot grant the premise underlying Florida's argument—that is, that the 120-day

statutory window properly began on August 22, 2020—consistent with its obligation to "assume

that on the merits the [P]laintiffs would be successful in their claims," *City of Waukesha*, 320

F.3d at 235. Although Florida might prove correct that Florida's Section 404 application was

complete at that time, that issue is, like many of Florida's other standing arguments,

"inextricably intertwined with the merits of the case," *Herbert*, 974 F.2d at 198, and so the Court

will "defer [that] jurisdictional decision until the merits are heard," *Kadi*, 42 F. Supp. 3d at 28.

       The Court will, accordingly, deny Florida's motion to dismiss Plaintiffs' complaint in its

entirety for lack of standing.

       2.    *Cross-Motions for Summary Judgment*

       The Court turns to whether Plaintiffs have satisfied the more demanding burden that they

face in moving for partial summary judgment on Counts Eight and Nine and in resisting the

EPA's cross-motion. For both counts, Plaintiffs' alleged injuries sound in an asserted procedural

harm. As a result, to demonstrate standing Plaintiffs must establish that "(1) the government

violated their procedural rights designed to protect a threatened, concrete interest, and (2) the

violation resulted in injury to that concrete, particularized interest." *California v. Trump*, No.

19-cv-960, 2020 WL 1643858, at *6 (D.D.C. Apr. 2, 2020) (quoting *New Hampshire v. Holder*,

293 F.R.D. 1152, 1157 (D.D.C. 2013)). In conducting this analysis, the Court may "relax—

while not wholly eliminating—the issues of imminence and redressability, but not the issues of

injury in fact or causation." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C.

Cir. 2005). But even though the "standards applicable in procedural injury cases" are "less

demanding," *California*, 2020 WL 1643858, at *6, the doctrine of procedural standing "does

not—and cannot—eliminate any of the 'irreducible' elements of standing," *Fla. Audubon Soc'y*

*v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc).

In practice, this means that "[w]hen a litigant is vested with a procedural right, that

litigant has standing if there is *some possibility* that the requested relief will prompt the injury-

causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v.*

*EPA*, 549 U.S. 497, 518 (2007) (emphasis added); *see Sugar Cane Growers Co-op. of Fla. v.*

*Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("All that is necessary is to show that the

procedural step was connected to the substantive result.").  Establishing causation under this test

requires two showings.  First, the plaintiff must establish a link between the omitted procedural

step and "some substantive government decision that may have been wrongly decided because of

the lack of" that procedural step.  *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C.

Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668).  Second, the plaintiff must establish a

connection between that substantive decision and its "particularized injury."  *Id.*

Because Plaintiffs "must demonstrate standing for each claim [they] seek[] to press,"

*Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChryslerCorp. v.*

*Cuno*, 547 U.S. 332, 352 (2006)), and because both the EPA and Florida direct different

arguments at the two counts on which Plaintiffs seek partial summary judgment, *see* Dkt. 34 at

17–21 (Count Eight); *id.* at 21–23 (Count Nine); Dkt. 37 at 29–41 (Count Eight); *id.* at 42–44

(Count Nine), the Court will address Counts Eight and Nine separately.

a.      Count Eight

In Count Eight, Plaintiffs allege that the "EPA violated the APA by making approval" of

Florida's Section 404 program "immediately effective upon publication in the Federal Register,

rather than no less than 30 days thereafter," as required by the APA.  Dkt. 1 at 47 (Compl. ¶ 237).  The EPA's failure to delay the effective date of this approval gives rise to four potential procedural injuries.  The EPA, at least in theory, acknowledges the first—that the transfer's immediate effective date resulted in a cognizable deprivation of Plaintiffs of "their procedural right, under 5 U.S.C. § 553(d), to a 30-day period between the date on which [the] EPA published notice that it had approved Florida's [S]ection 404 program, and the date on which that approval became effective."  Dkt. 35 at 17.  Plaintiffs' second and third asserted procedural injuries are the loss of their ability to seek reconsideration or a stay of the EPA's decision under Section 553(e) and Section 705, respectively.  *See* 5 U.S.C. §§ 553(e), 705.  But for the EPA's allegedly unlawful decision to make its approval of Florida's Section 404 program immediately effective, Plaintiffs argue, they "would have been able to exercise their procedural right to seek reconsideration or an agency stay pending judicial review to protect their concrete interests."  Dkt. 31 at 34.  Plaintiffs' fourth asserted procedural injury posits that the "EPA's decision would [also] have been subject to the [Biden] Administration's directive to agencies to review and consider staying rules that had not yet gone into effect as of January 20, 2021."  *Id.*[5]

Of these, the Court will begin with Plaintiffs' claims of procedural injury relating to the alleged loss of their right to a 30-day delay in the Section 404 transfer's effective date under

---

[5] Here, Plaintiffs reference a memorandum sent by President Biden's Chief of Staff, Ronald Klain, on January 20, 2021, the day the new administration took office. Dkt. 31 at 15; *see also* Dkt. 31-1 at 9–10 (Crooks Decl. ¶ 25).  That memorandum, which the parties refer to as the "Klain memo," directed federal agencies, "[w]ith respect to rules that have been published in the Federal Register, or rules that have been issued in any manner, but have not taken effect, [to] consider postponing the rules' effective dates for 60 days from the date of this memorandum," in part "to ensure that the President's appointees or designees have the opportunity to review any new or pending rules." 86 Fed. Reg. 7,424, 7,424 (Jan. 20, 2021) (Memo from Ronald A. Klain, Assistant to the President and Chief of Staff).

Section 553(d).  The Court will then turn to Plaintiffs' claims that this injury led to two further procedural injuries—namely, their loss of the right to seek a stay of the transfer pending judicial review, under Section 705, and the right to seek reconsideration of that transfer under Sections 553(e).[6]

> i.      Section 553(d)

Section 553(d) provides that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date," unless (1) the rule is "a substantive rule which grants or recognizes an exemption or relieves a restriction," (2) the rule is an "interpretative rule[]" or "statement[] of policy," or (3) the agency "publish[es] with the rule . . . good cause" for the immediate effective date.  5 U.S.C. § 553(d).  The EPA concedes that Plaintiffs have a procedural right under Section 553(d)—or at least that they would if, as Plaintiffs maintain, the EPA's approval of Florida's program constituted a rule—and that the immediate effective date deprived them of that right.  Dkt. 35 at 17–19 & n.4.

The primary question, then, is whether Plaintiffs have identified any concrete injuries that this right is "designed to protect," *Ctr. for Law & Educ.*, 396 F.3d at 1157, and that bear the requisite causal connection to the EPA's approval decision, *Ctr. for Biological Diversity*, 861 F.3d at 184.  To make this showing, Plaintiffs rely principally on the doctrine of organizational standing and argue that the EPA's deprivation of their rights under Section 553(d) injured their concrete interests as advocacy organizations.  *See* Dkt. 31 at 40–48.  Under that doctrine, "[i]t is not enough for the organization to show that its 'mission has been compromised,' or that it has

---

[6] Although the Court shares Florida's skepticism that the Klain memo confers on Plaintiffs any independent "procedural right . . . designed to protect their threatened concrete interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157; *see* Dkt. 37 at 32–33, at the motions hearing Plaintiffs clarified that they are not advancing any such claim, *see* Rough Tr. at 19 (Mar. 15, 2022).

experienced a 'setback to its abstract social interests.'" *Pub. Citizen v. Trump*, 297 F. Supp. 3d 6, 36 (D.D.C. 2018) (first quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015), then quoting *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). Rather, "[t]o establish organizational standing a party must show that it suffers" or will imminently suffer "a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests . . . [and] the presence of a direct conflict between the defendant's conduct and the organization's mission." *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (alterations and quotation marks omitted).

    Here, citing to the declarations they submitted alongside their motion for partial summary judgment, Plaintiffs identify the following organizational missions:

> (1) securing a future for all species, great or small, hovering on the brink of extinction, Exhibit 5 at 2 (Hartl at ¶ 7); (2) protection of all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments, Exhibit 6 at 2–6 (Carter Dec. at ¶¶ 5–23); (3) protecting wild places, promoting responsible use of the earth's ecosystems and resources, and enlisting humanity to protect and restore the quality of the natural and human environment, Exhibit 2 at 2– 3 (Umpierre Dec. at ¶¶ 6–8); (4) protecting Southwest Florida's land, water, wildlife, and future through advocacy, science, education, and wildlife rehabilitation, Exhibit 1 at 1–2 (Crooks Dec. at ¶¶ 4–7); (5) supporting environmental sustainability and conservation in Florida, Exhibit 7 at 1–2 (Robertson Dec. at ¶¶ 4–7); (6) defending, protecting, and preserving South Florida's watershed, Exhibit 3 at 2 (Silverstein Dec. at ¶¶ 5–6); and (7) providing an independent voice to defend, advocate, and activate others to protect and restore the St. Johns River, Exhibit 8 at 3 (Rinaman Dec. at ¶¶ 10–11).

Dkt. 31 at 40–41. Neither the EPA nor Florida dispute Plaintiffs' characterization of their organizational missions. Plaintiffs further explain, again without opposition, that they "accomplish these missions through citizen engagement, education, and outreach, scientific research, advocacy, and legal challenges." *Id.* at 41.

    With this background established, Plaintiffs then argue that the EPA's "immediate and

28

continued unlawful transfer of [Section 404] authority" to the State disrupted the execution of

these missions in "three key respects." *Id.* at 41. Plaintiffs first maintain that due to the

immediate effective date, they "were forced to immediately expend resources and staff time to

gather information on new and transferred [Section] 404 permit applications[] and [to] wade

through the contents of the state's obtuse permitting database, all while trying to continue their

advocacy against pending permit applications threatening their interests and those of their

members." *Id.*; *see also* Dkt. 31-1 at 8–9 (Crooks Decl. ¶ 28). The second and third ways in

which their missions have been frustrated, in contrast, go to the injuries that Plaintiffs maintain

they have incurred as a result of the transfer itself. They argue that, now that the State is

administering the Section 404 program, they have "lost the benefit of federal requirements, rights

and remedies available under NEPA and Section 7 of the ESA," and have "been substantially

limited in their ability to protect wetlands and species through litigation because of restrictive

access to the courts." Dkt. 31 at 41; *see also* Dkt. 31-2 at 15–16 (Umpierre Decl. ¶¶ 46–50)

(describing the importance of information gathered from the NEPA and ESA Section 7 review

processes in the Sierra Club's advocacy efforts); Dkt. 31-1 at 15–16 (Crooks Decl. ¶ 46)

(attesting that the Conservancy of Southwest Florida "will be severely constrained by inadequate

and costly state [court] procedures," such as "restrictive standing requirements, costly litigation

requirements[,] . . . and the potentially devastating risk of mandatory fee-shifting laws").

In response, the EPA (along with the State) argues that "the remedies available for a

violation of [Section] 553(d) are extremely limited" under the D.C. Circuit's per curiam decision

in *Prows v. Department of Justice*, 938 F.2d 274 (D.C. Cir. 1991). Dkt. 34 at 18. Under *Prows*,

the EPA argues, Plaintiffs may invoke this Court's jurisdiction only to seek redress for "concrete

injuries between December 22, 2020, and January 21, 2021"—that is, the 30-day window in

which, under Plaintiffs' theory, the transfer should not have been effective.  *Id.* at 19.  All other injuries, according to the EPA, are rendered non-redressable by *Prows*.  *Id.*  Florida Amici similarly argue that, under *Prows*, Plaintiffs' claims under Count Eight are now moot because "the 30-day delay requirement has long since expired."  Dkt. 38 at 7.

The Court does not read *Prows* quite so expansively.  To be sure, in *Prows* the D.C. Circuit held that "violations" of Section 553(d)'s effective-date requirements "are remedied by denying such a rule effectiveness for the mandated 30 days [and] allowing it to take effect in full thereafter."  938 F.2d at 275.  That holding, however, must be understood in light of the unique facts of the case.  In *Prows*, an inmate sued the Bureau of Prisons after he was fired from his work assignment for failure to comply with a new agency rule (the Inmate Financial Responsibility Program or "IFRP") requiring inmates to "devote a portion of their earnings toward specific 'legitimate financial obligations.'"  *Id.*  The plaintiff argued that the promulgation of a related rule (the "Program Statement") violated the notice-and-comment requirements of Sections 553(b) and 553(c) of the APA, and the district court agreed, declaring the rule "null and void" and ordering the inmate reinstated, with back pay, to his former position. *Id.*  After the inmate was again fired after his court-ordered reinstatement "on a basis wholly independent" of the then-invalidated Program Statement rule, the inmate argued he should be reinstated once more because the IFRP rule had been made effective immediately upon publication, in violation of Section 553(d).  *Id.* at 275–76.  The district court disagreed, and the D.C. Circuit affirmed, reasoning that Section 553(d) "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product of the violation."  *Id.* at 276.  The plaintiff "had been made whole as an incidental result of the district court's having ordered reinstatement with back pay," the D.C. Circuit explained,

and so "any violation" of Section 553(d) "was fully remedied," because even if his original firing could be traced to the enforcement of the IFRP during the 30 days during which that rule should not have been in effect, he was later fired a second time for reasons wholly unrelated to that window. *Id.*

The Court agrees with the EPA that *Prows* limits the relief that Plaintiffs may seek for violations of Section 553(d) in several respects.  The decision makes clear that Plaintiffs may not seek redress for injuries that are "not the product of the [Section 553(d)] violation" and that such violations do not typically provide a basis for vacating a rule in its entirety. *Id.* at 275–76.  These limitations imply, as the EPA argues, Dkt. 34 at 19, that Plaintiffs may seek relief only for injuries they were incurred during the 30-day window in which the rule should not (at least according to Plaintiffs) have been in effect.  This is because it is unlikely that injuries that postdate that window were "the product of the violation" of Section 553(d) standing alone, although in *Prows* the D.C. Circuit was careful to note that to the extent any injuries that occurred more than 30 days after publication were attributable to the Section 553(d) violation, those injuries were "fully remedied" by the district court's prior order that he be reinstated.  938 F.3d at 276.  At base, then, *Prows* really stands for the unremarkable proposition that a violation of Section 553(d) requires a remedy that makes "whole" "those who are affected by agency action taken [or refused] during the 30-day waiting period." *Id*.

Applying *Prows* and general principles of standing, the Court is unpersuaded that Plaintiffs have standing based on the theory that the EPA's failure to delay the effective date "forced [them] to divert resources away from core programmatic actions and focus instead on the immediately effective state 404 program." Dkt. 31 at 42.  It may be true, for example, that the immediate effective date left Plaintiffs "unable to adequately prepare for the mass of permits

immediately transferred from the Corps to [Florida]" and "required a substantial diversion of [their] attention from [their] planned activities to determining the status and impact of these transfers and what actions [Florida] would take." Dkt. 31-1 at 9 (Crooks Decl. ¶ 28) (describing impact on one Plaintiff, the Conservancy of Southwest Florida); *see also, e.g.*, Dkt. 31-3 at 7 (Silverstein Decl. ¶ 16) (similar for Plaintiff Miami Waterkeeper); Dkt. 31-5 at 11 (Hartl Decl. ¶ 32) (similar for Plaintiff Center for Biological Diversity). But there is no relief that the Court could issue to redress those injuries. Plaintiffs seek only declaratory and injunctive relief, and they expressly disclaim any request (at least based on Count Eight) to vacate the transfer in its entirety, Dkt. 31 at 49–50, a remedy that, in any event, *Prows* appears to foreclose, 938 F.3d at 275–76. As a result, even if Plaintiffs suffered concrete injuries when the immediate effective date "forced [them] to immediately expend resources and staff time to gather information on new and transferred permit applications," Dkt. 31 at 41, such injuries are no longer redressable.

But those are not the only injuries that Plaintiffs claim that they have suffered due to the EPA's alleged Section 553(d) violation. Plaintiffs argue, in addition, that they have "lost procedural rights and the benefits of additional procedures that, absent a court order, cannot be regained," including the right "to seek reconsideration under Section 553" and "to seek a stay under Section 705" Dkt. 43 at 45. Amber Crooks, who submitted a declaration on behalf of Plaintiff Conservancy of Southwest Florida, for example, attests that "[a]s a result of [the] immediate effective date, [the] Conservancy lost the procedural rights to seek agency reconsideration prior to the transfer going into effect [and] to seek an agency stay pending judicial review." Dkt. 31-1 at 7 (Crooks Decl. ¶ 22). Each of the remaining six Plaintiffs have submitted declarations echoing versions of this theory of procedural harm. *See* Dkt. 31-2 at 6 (Umpierre Decl. ¶ 15) (Sierra Club); Dkt. 31-3 at 9 (Silverstein Decl. ¶ 28) (Miami

Waterkeeper); Dkt. 31-5 at 9–10 (Hartl Decl. ¶¶ 28–29) (Center for Biological Diversity); Dkt. 31-6 at 10 (Carter Decl. ¶¶ 30–31) (Defenders of Wildlife); Dkt. 31-7 at 7 (Robertson Decl. ¶ 22) (Florida Wildlife Foundation); Dkt. 31-8 at 8–9 (Rinaman Decl. ¶¶ 28–30) (St. Johns Riverkeeper).  To the extent these injuries occurred during the 30-day window that the EPA was assertedly required to provide under Section 553(d) and were "the product of th[at] violation," *Prows* does not foreclose relief.  938 F.2d at 276.

Florida objects that such a theory of injury turns on "derivative procedural rights," Dkt. 37 at 32, but, as Plaintiffs note, Dkt. 43 at 39 n.19, the State provides no authority for the proposition that "derivative procedural injuries" are inherently unredressable or overly remote. If Plaintiffs can show that a violation of Section 553(d) deprived them of a procedural right they would have otherwise enjoyed under Section 553(e) or Section 705, and that the "derivative" Section 553(e) or Section 705 injury "threatened [their] concrete interests," *Ctr. for Law & Educ.*, 396 F.3d at 1157, the Court sees no reason why Article III precludes relief.  The Court will, accordingly, consider whether Plaintiffs have demonstrated a sufficient relationship between their asserted Section 553(d) injuries and any procedural injury arising under Section 553(e) and Section 705, and, if so, whether any such injuries under Section 553(e) or Section 705 affected their concrete interests.

ii.    Section 553(e)

Section 553(e) provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  5 U.S.C. § 553(e).  There appears to be little dispute that this provision vests a right in Plaintiffs to seek reconsideration of the EPA's approval of Florida's Section 404 program.  Indeed, the EPA argues only that Plaintiffs were not deprived of this right because they remained free to seek reconsideration even after a rule took

JA.87

effect.  Dkt. 35 at 19 n.5.  Plaintiffs respond that the right to seek reconsideration applies only to "a rule," 5 U.S.C. § 553(e), not to an adjudication, and so the EPA's position that its approval of Florida's Section 404 program was an adjudication rather than a rule, *see* Dkt. 31-1 at 103–04 (Crooks Decl., Ex. E), in fact, deprived them of their right to seek reconsideration of that decision.  Dkt. 43 at 39.

But even assuming the existence of a procedural right under Section 553(e), and even assuming that the EPA deprived them of that right, Plaintiffs must be able to trace that deprivation to the Section 553(d) violation alleged in Count Eight.  *See* Dkt. 1 at 47 (Compl. ¶ 237) ("The EPA violated the APA by making its approval effective immediately upon publication in the Federal Register, rather than no less than 30 days thereafter.").  And, at least on the present record, they have not done so.  The loss of Plaintiffs' right to seek reconsideration under Section 553(e)—which applies only to a "rule," 5 U.S.C. § 553(e)—flows not from the immediate effective date, but from the EPA's announcement that its approval of Florida's Section 404 application was an informal adjudication, and not a rulemaking, *see* Dkt. 31-1 at 103–04 (Crooks Decl., Ex. E).

Indeed, according to Plaintiffs, the EPA violated Section 553(d) on December 22, 2020, when the agency announced its decision and declared that "Florida's assumption [was] applicable" the very same day.  Dkt. 56-1 at 433.  But Plaintiffs did not lose their right to seek reconsideration under Section 553(e) until the EPA's acting General Counsel declared almost a week later, on December 28, 2020, that Florida's application "did not have to meet the 30-day requirement [and the agency did not need to] codify the state program because [the EPA's decision] was an informal adjudicatory order, rather than a rule."  Dkt. 31-1 at 6 (Crooks Decl. ¶ 19).  To illustrate the point, suppose that the EPA had, instead, issued the transfer decision as a

JA.88

rule but had erroneously relied on the "good cause" exception to give the rule immediate effect. *See* 5 U.S.C. § 553(d)(2).  Under that hypothetical, Plaintiffs would have been able to assert a violation of their Section 553(d) rights but not their Section 553(e) rights, underscoring the reality that the two procedural rights are distinct.

Put differently, the right to seek reconsideration under Section 553(e) is not the kind of interest that Section 553(d) is "designed to protect."  *California*, 2020 WL 1643858, at *6. Instead, "the purpose of the thirty-day waiting period" prescribed by Section 553(d) "is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996).  Injuries that accrue due to Section 553(d) violations must, accordingly, flow from the agency's failure to afford parties the effective-date delay required by that provision.  It is for this reason that *Prows* observes that Section 553(d) "protects those who are affected by agency action taken during the 30-day waiting period without disturbing later action that is not the product of the violation." 938 F.2d at 276.

To be sure, Plaintiffs have identified at least some (albeit nonbinding) authority for the proposition that "the primary purpose of [Section 553] was . . . to permit *petitions for reconsideration* and 'to afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take other action which the issuance may prompt.'"  *Nance v. EPA*, 645 F.2d 701, 708–09 (9th Cir. 1981) (emphasis added) (quoting *United States v. Gavrilovic*, 551 F.2d 1099, 1104 (8th Cir. 1977)); *see also Rowell v. Andrus*, 631 F.2d 699, 703 (10th Cir. 1980). The legislative history on which that authority relies, however, does not mention petitions for reconsideration and, instead, posits only that Section 553's predecessor was meant to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take

any other action which the issuance of rules may prompt."  S. Rep. No. 79-752, at 201 (1946).

That understanding of the rule makes sense, given that Section 553(d) "protects those who are

affected by agency action taken during the 30-day waiting period," *Prows*, 938 F.2d at 276,

while interested parties may seek reconsideration under Section 553(e) before, during, or after

that 30-day waiting period.

Plaintiffs might be able to assert a standalone claim based on a deprivation of their

Section 553(e) rights.  But Count Eight is predicated on a Section 553(d) violation, and whether

Plaintiffs would be able to assert standing based on an independent violation of Section 553(e)—

or, indeed, whether Plaintiffs have any interest in pursuing such a claim—is a question for

another day.  For now, the Court merely holds that Plaintiffs cannot establish standing to

challenge the EPA's asserted violation of Section 553(d) based on their inability to seek

reconsideration of the agency's Section 404 transfer decision.

iii.    Section 705

Under Section 705, "[w]hen an agency finds that justice so requires, it may postpone the

effective date of action taken by it, pending judicial review."  5 U.S.C. § 705.  That provision,

according to Plaintiffs, affords them a procedural right "to petition [the] EPA to postpone a rule's

effective date during the pendency of litigation."  Dkt. 31 at 33.  On January 20, 2021, Plaintiffs

attempted to avail themselves of this right by "ask[ing] [the] EPA to cure the immediate effective

date and failure to codify violations regarding [Florida's Section 404] program" and further

asking that the EPA "postpone the effective date . . . pending judicial review."  Dkt. 31-1 at 8

(Crooks Decl. ¶ 24).  But, Plaintiffs maintain, "the prior Administration's immediate effective

date has blocked the new Administration's authority to consider staying [the] EPA's actions

pending judicial review and has denied Plaintiffs the right to seek that relief to protect their

36

interests." Dkt. 31 at 15.  Although the EPA has declined to explain why it has failed to act on

Plaintiffs' January 20, 2021 stay request, the agency has, in the past, declined to rule on Section

705 stay requests after the agency action at issue went into effect.  *See, e.g.*, 76 Fed. Reg. 28,318,

28,326 (May 17, 2011) (concluding that, because "the effective date of the [agency action] has

already passed[,] . . . a stay under APA [S]ection 705 is not appropriate").[7]  Notably, the EPA

does not dispute Plaintiffs' assertions that the immediate effective date precludes the agency

from reviewing their pending stay request, Dkt. 31-1 at 7 (Crooks Decl. ¶ 22) ("As a result of

EPA's immediate effective date, [the] Conservancy lost the procedural right[] . . .  to seek an

agency stay pending judicial review."), and it has not argued that the request for a stay remains

pending and thus renders Plaintiffs' claim defective for lack of a final agency action, *see* 5

U.S.C. § 704.  At the motions hearing, moreover, the Court asked counsel for the EPA whether

the agency could consider Plaintiffs' January 20, 2021 stay request if the Court concluded "the

rule should not have been effective" during the 30-day window following the December 22,

2020 approval announcement in the Federal Register, given that Plaintiffs "filed [their] request

during that period of time."  Rough Tr. at 77–78 (Mar. 15, 2022).  Counsel agreed that the

agency could, if the Court granted such relief, consider Plaintiffs' stay request.  *Id.* at 78–79.

Plaintiffs' claim of a Section 705 injury, accordingly, bears a different relation to their

alleged Section 553(d) violation than their claim of a Section 553(e) injury.  Because the EPA

has previously taken the position that Section 705 stays are unavailable once an agency action

has taken effect (and it does not disavow that position now), the very act that Plaintiffs allege

---

[7] One such decision notes that "it is not clear whether EPA would have authority under APA
[S]ection 705 to stay an agency action that has already gone into effect." 76 Fed. Reg. 4,780,
4800 (Jan. 26, 2011).  That suggestion raises concerns, which are addressed below, about the
redressability of any theory of injury tied to a Section 705 procedural violation, at least insofar as
that injury is itself tied to a Section 553(d) procedural violation (and is thus subject to *Prows*).

violated Section 553(d) arguably deprived them of their right to seek a stay under Section 705.

Had Plaintiffs received the benefit of the 30-day delayed effective date that Section 553(d)

affords interested parties, *see Prows*, 938 F.2d at 276, Plaintiffs' January 20, 2021 stay request

could have been considered before the transfer decision took effect and, accordingly, the EPA

would not have been precluded from considering that request.

The EPA does not engage on this point, arguing instead that Plaintiffs cannot show that

"Congress intended [Section] 705 to confer a procedural right, the deprivation of which might

support a claim for standing." Dkt. 34 at 19–20.  The agency notes that Section 705 provides

that "'[w]hen an *agency* finds that justice so requires, *it may* postpone the effective date of the

action taken by it,'" arguing that this "is a permissive grant of agency authority [that] affords

agencies ample discretion in choosing whether to use the power conferred."  *Id.* at 20 (quoting 5

U.S.C. § 705).  Plaintiffs, of course, cannot base their standing on a "procedural right . . .

designed to protect their threatened concrete interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157, if

no such procedural right exists.  And, as the EPA observes, Dkt. 34 at 20, Section 705's

reference to an agency's authority "to postpone the effective date" of an action is a far cry from,

say, Section 553(e)'s mandatory requirement that "[e]ach agency *shall give*" a specific class of

individuals—"interested person[s]"—a designated right—"the right to petition for the issuance,

amendment, or repeal of a rule," 5 U.S.C. § 553(e) (emphasis added).

The Court is persuaded, however, that, notwithstanding this discretionary language,

Section 705 confers upon interested parties a procedural right at least to be heard.  In the only

precedent that any of the parties identify, the district court concluded that Section 705 grants

interested parties "a procedural right to petition to postpone [an agency action's] effective date."

*Env't Def. Fund v. EPA*, 515 F. Supp. 3d 1135, 1145 (D. Mont. 2021).  Nor is this the Court's

first word on Section 705; this Court has previously concluded that an agency's decision to issue

a Section 705 stay is a reviewable agency action, and in doing so, the Court rejected the

argument that such decisions are "committed to agency discretion by law."  *Bauer v. DeVos*, 325

F. Supp. 3d 74, 101 (D.D.C. 2018) (quoting *Heckler v. Chaney*, 470 U.S. 821, 828 (1985)).  In

identifying a standard of review for such decisions, the Court concluded that Section 705

imposes on agencies an obligation to "weigh the same kinds of equitable considerations that

courts have long applied and [to] explain why, in light of the pending litigation, a stay is

'require[d]' to ensure the parties will ultimately obtain an adequate and just judicial remedy."  *Id.*

at 107 (alterations in original) (quoting 5 U.S.C. § 705).

That conclusion turned on a textual analysis of the relationship between Section 705's

first sentence (which authorizes administrative stays) and the provision's second sentence, which

authorizes judicial stays of agency action:

> [1] When an agency finds that justice so requires, it may postpone the effective
> date of action taken by it, pending judicial review.  [2] On such conditions as
> may be required and to the extent necessary to prevent irreparable injury, the
> reviewing court, including the court to which a case may be taken on appeal
> from or on application for certiorari or other writ to a reviewing court, may issue
> all necessary and appropriate process to postpone the effective date of an agency
> action or to preserve status or rights pending conclusion of the review
> proceedings.

5 U.S.C. § 705.  Reading these sentences together, it is apparent that the purpose of a Section

705 stay—whether issued by the agency or by a court—is to "preserve status or rights pending

conclusion of the [judicial] review proceedings."  *Id.*; *see also Env't Def. Fund*, 515 F. Supp. 3d

at 1145 ("This process provides a petitioner with immediate relief from a regulation while the

courts consider the merits of a legal challenge.").  That interpretation is consistent with the

standard applied by courts and agencies alike when considering a request for a Section 705

stay—"the four-factor test used to evaluate requests for preliminary injunctive relief."  *Bauer*,

325 F. Supp. 3d at 105; *see also Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).

"The purpose of a preliminary injunction," after all, "is merely to preserve the relative positions

of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390,

395 (1981)).  Both sentences, moreover, use the word "may" to describe the authority to issue a

stay, and there is no question that a court must consider a stay application and must engage in

reasoned decision making.  Nothing in the first sentence suggests that the word "may" carries a

different meaning and leaves administrative agencies with unreviewable discretion to decline to

act—or to decline even to consider a stay application.

The APA's legislative history provides at least some support for this understanding of

Section 705's purpose.  It is true that, as the EPA notes, prior to the passage of the APA the

Senate Judiciary Committee noted that the "first sentence" of what is now Section 705 "merely

confirms administrative authority to grant a stay," without shedding further light on the purpose

of that authority.  Dkt. 34 at 20.  The House Committee report, however, explained that "[t]he

authority granted is equitable and should be used by both the agencies and courts to prevent

irreparable injury or afford parties an adequate judicial remedy."  H.R. Rep. No. 79-1980, at 277

(1946).  It was for this reason, according to that report, that Section 705's precursor "permit[ted]

either agencies or courts, if the proper showing be made, to maintain the status quo"—or, put

differently, to "provide intermediate relief . . . in order to make judicial review effective."  *Id.*  In

this way, Congress (or at least the House Committee) appears to have contemplated that parties

might seek the equivalent of a preliminary injunction before an agency while challenging that

agency's conduct in court.  And notably, the version of the provision under consideration by the

House—like Section 705's current iteration—referred only to the agency itself:  "Pending

judicial review any agency may postpone the effective date of its action." *Id.* If nothing else, this legislative history undermines the EPA's position, *see* Dkt. 34 at 20, that Congress *explicitly* assigns to "interested person[s]," 5 U.S.C. § 553(e), a given procedural right in every instance in which the legislature contemplates the creation of such a right.

Taken together, Section 705's text, purpose, and legislative history indicate that the provision grants Plaintiffs a right to seek a stay from the EPA to "preserve [their] rights pending conclusion of the review proceedings," 5 U.S.C. § 705. Although the EPA is correct that nothing in Section 705 obligates the agency to *grant* such stays, *see Bauer*, 325 F. Supp. 3d at 105; *Sierra Club*, 833 F. Supp. 2d at 30, the agency must at least *consider* such petitions. Here, Plaintiffs maintain that by declaring the approval of Florida's Section 404 program immediately effective, the EPA deprived them of this right. *See, e.g.*, Dkt. 31-1 at 7–8 (Crooks Decl. ¶¶ 22, 24); *see also* 5 U.S.C. § 553(e) (permitting agencies to "postpone," rather than to vacate or repeal, an agency action pending judicial review). The agency, in effect, precluded Plaintiffs from even "ask[ing] the agency to postpone the effective date of its" transfer of Section 404 authority to the State of Florida "pending judicial review" before this Court, Dkt. 31-1 at 8 (Crooks Decl. ¶ 24), an injury that affected each of the Plaintiffs, *see* Dkt. 31-2 at 7 (Umpierre Decl. ¶¶ 17–18) (similar for Sierra Club); Dkt. 31-3 at 6 (Silverstein Decl. ¶¶ 12, 14) (Miami Waterkeeper); Dkt. 31-5 at 10–11 (Hartl Decl. ¶¶ 30–31) (Center for Biological Diversity); Dkt. 31-6 at 10 (Carter Decl. ¶¶ 30, 32) (Defenders of Wildlife); Dkt. 31-7 at 8 (Robertson Decl. ¶¶ 24–25) (Florida Wildlife Foundation); Dkt. 31-8 at 9 (Rinaman Decl. ¶¶ 30–32) (St. Johns Riverkeeper).

But a violation of a procedural right does not on its own confer standing, and so the Court must return to the question of whether Plaintiffs have identified concrete interests that Section

JA.95

705 is "designed to protect," *Ctr. for Law & Educ.*, 396 F.3d at 1157.  In an effort to make this

showing, Plaintiffs point to the impact of the EPA's substantive decision to approve Florida's

Section 404 program, and Plaintiffs' corresponding loss of remedies and access to information

under NEPA and Section 7 of the ESA.  *See* Dkt. 31-2 at 16–18 (Umpierre Decl. ¶¶ 46–50).  The

crux of Plaintiffs' concerns is that, when the Corps administers the Section 404 program at the

federal level, Plaintiffs may rely on information gleaned from the environmental review

processes required by NEPA, *see* 42 U.S.C. § 4332(2)(C), and the interagency consultation

process required by Section 7 of the ESA, *see* 16 U.S.C. § 1536.  Each of the Plaintiffs have

submitted declarations attesting that they use this information—and specifically the relevant

NEPA analysis—to, consistent with their organizational missions, "educate the public and . . .

advocate for protections for wetlands and species." Dkt. 31 at 45; *see* Dkt. 31-1 at 25–27

(Crooks Decl. ¶¶ 74–77) (Conservancy of Southwest Florida); Dkt. 31-2 at 17–19 (Umpierre

Decl. ¶¶ 46–50) (Sierra Club); Dkt. 31-3 at 8, 10 (Silverstein Decl. ¶¶ 18, 25) (Miami

Waterkeeper); Dkt. 35-5 at 5, 7–9 (Hartl Decl. ¶¶ 14, 21, 26) (Center for Biological Diversity);

Dkt. 31-6 at 9, 13 (Carter Decl. ¶¶ 23–25, 39) (Defenders of Wildlife); Dkt. 31-7 at 4–5

(Robertson Decl. ¶¶ 11–14) ((Florida Wildlife Foundation); Dkt. 31-8 at 4–6 (Rinaman Decl.

¶¶ 15–20) (St. Johns Riverkeeper).

According to Plaintiffs, because these review procedures do not apply to Florida's

Section 404 program, they will "be required to hire [their] own experts in an attempt to otherwise

assess and understand impacts of" proposed projects at a cost of "cost thousands of dollars per

case." Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48).  Plaintiffs further attest that "[t]he loss of

information from these analyses will result in additional staff time to triage permits to identify

harms to the listed species and their habitats and additional costs in hiring experts," and that their

42

"conservation advocacy work would be significantly hindered." *Id.*; *see also* Dkt. 31-1 at 26 (Crooks Decl. ¶ 75) ("Now that Florida has unlawfully assumed the federal 404 program, [the] Conservancy is harmed by the loss of environmental review of projects under NEPA. This statute not only provides more scrutiny for water resources, species and their habitat, but also provides the Conservancy with vital information to vet the impacts of a proposed project and additional opportunities for public comment.").

As noted above, Plaintiffs' organizational missions include "securing a future for all species, great or small, hovering on the brink of extinction," Dkt. 31 at 40 (citing Dkt. 31-5 at 3 (Hartl Decl. ¶ 7)); "protect[ing] . . . all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments," *id.* (citing Dkt. 31-6 at 3–7 (Carter Decl. ¶¶ 5–23)); and "protecting wild places, promoting responsible use of the earth's ecosystems and resources, and enlisting humanity to protect and restore the quality of the natural and human environment," *id.* (citing Dkt. 31-2 at 3–4 (Umpierre Decl. ¶¶ 6–8)). To accomplish these missions, Plaintiffs use the information provided pursuant to NEPA and Section 7 of the ESA under the federal Section 404 program. *See, e.g.*, Dkt. 31-1 at 26 (Crooks Decl. ¶ 75); Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48). Florida objects that NEPA does not apply to the EPA's approval of Section 404 applications from states, *see* Dkt. 37 at 56, but that is beside the point because it is the Corps that would administer the Section 404 permit program if the EPA were to stay its transfer decision, and the Corps is subject to NEPA. Dkt. 43 at 69–70; *see also* Dkt. 31-1 at 26 (Crooks Decl. ¶ 75); Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48). In contrast, it is undisputed that, as a state entity, FDEP is not subject to NEPA, *see City of Bos. Delegation v. FERC*, 897 F.3d 241, 246 (D.C. Cir. 2018) (describing obligations that NEPA places on "federal agencies"), and even if some

43

Section 404 permit applications might still trigger NEPA review—because, for example, they require *federal* involvement of some kind, *see* Dkt. 37 at 56—no party contends that this will be true for all (or even most) projects with which Plaintiffs are concerned, *see* Dkt. 31-2 at 8–17 (Umpierre Decl. ¶¶ 20–44).  For those projects, then, Plaintiffs will be deprived of the kinds of environmental assessments required by NEPA of federal agencies, *see* 42 U.S.C. § 4332(c), and Plaintiffs will need to pay for their own experts to provide the same information.  That prospect qualifies as a "concrete and demonstrable injury to [Plaintiffs'] activities," *Elec. Priv. Info.*, 892 F.3d at 1255; *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding injury cognizable where agency inaction "deprived [plaintiff organization] of key information that it relie[d] on to educate the public," forcing organization to "expend[] resources to counteract those injuries").[8]

Plaintiffs are on less sure footing, however, with respect to causation and redressability.  As noted above, the causation element of standing for procedural injuries requires two showings.  Plaintiffs must establish both (1) a link between the omitted procedural step and "some substantive government decision that may have been wrongly decided because of the lack of" that procedural step; and (2) a connection between that substantive decision and their "particularized injury."  *Ctr. for Biological Diversity*, 861 F.3d at 184.  But "where, as here, the purported cause of injury (*i.e.*, promulgation of final rules [or the implementation of a final rule pending judicial review]) and the injury itself is separated by intervening actors and events, the causation and redressability inquiries may appear to merge."  *Ctr. for Law & Educ.*, 396 F.3d at

---

[8] Because the Court concludes that Plaintiffs have identified sufficiently concrete interests that Section 705 is "designed to protect," *Ctr. for Law & Educ.*, 396 F.3d at 1157, the Court need not address Plaintiffs' separate argument that the EPA's transfer harms their interests by forcing them to litigate in Florida state court, where (according to Plaintiffs) they will face burdens such as "highly restrictive standing requirements and mandatory fee shifting," Dkt. 31 at 9.

1160 n.2.  "In such cases, both prongs of standing analysis can be said to focus on principles of

causation: fair traceability turns on the causal nexus between the agency action and the asserted

injury, while redressability centers on the causal connection between the asserted injury and

judicial relief."  *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994).  At

bottom, however, the question is whether "there is *some possibility* that the requested relief will

prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."

*Massachusetts*, 549 U.S. at 518 (emphasis added).

Here, should the Court conclude that the EPA impermissibly gave its transfer decision

immediate effect, that determination might provide Plaintiffs with the opportunity to seek an

administrative stay pursuant to Section 705.  Dkt. 31 at 49–50; *see also* Dkt. 43 at 51.  Plaintiffs

submit, moreover, that there is "at least 'some possibility' that the new Administration would

grant Plaintiffs' petition to postpone the [transfer's] effective date and thereby protect Plaintiffs'

concrete interests pending judicial review."  Dkt. 31 at 50.  That argument has some force,

particularly in light of the Klain memo's directive that federal agencies "consider postponing the

rules' effective dates for 60 days" for any agency rules "that . . . have not taken effect."  86 Fed.

Reg. at 7424.

The problem, however, is that even if the EPA were inclined to issue a Section 705 stay,

it is not at all clear that the agency has the authority to do so now that the transfer has gone into

effect.  If Plaintiffs are correct, and the EPA's transfer decision was a rulemaking that has (even

if prematurely) taken effect, a stay would arguably affect the existing rights of regulated parties

in a manner that might itself require an opportunity for notice and comment.  *Cf. Clean Air

Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (concluding that "an order delaying [a] rule's

effective date . . . [was] tantamount to amending or revoking a rule").  In this respect, it is one

thing to permit an agency to stay an administrative decision pending judicial review in order to maintain the status quo, but something altogether different to alter the status quo without providing an opportunity for notice and comment.  *Cf. Sierra Club*, 833 F. Supp. 2d at 25–29 (stressing that stay did not alter the status quo).  The D.C. Circuit has declared—albeit in a non-precedential order—that Section 705 "permits an agency to postpone the effective date of a not yet effective rule, pending judicial review," but "it does not permit the agency to suspend without notice and comment a promulgated rule."  *Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, at *2–*3 (D.C. Cir. Jan. 19, 1996).  Other courts, moreover, have found that logic persuasive when analyzing the authority that Section 705 confers upon agencies.  *See, e.g.*, *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1117–18 (N.D. Cal. 2017); *Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953, 963–64 (N.D. Cal. 2017); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019).  Those decisions reflect the principle that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

    The plain language of Section 705 further supports this conclusion.  The provision authorizes an agency to "postpone the effective date" of a rule pending judicial review.  5 U.S.C. § 705.  The word "postpone" means "to put off to a later time," or to "defer."  *Postpone*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/postpone (last visited Mar. 28, 2022).  But, once a rule has taken effect, the agency can no longer "put off" the effective date; it can only rescind or modify it.  Perhaps for this reason, Section 705 confers a broader authority on reviewing courts, permitting the court "to postpone the effective date . . . *or to preserve* status or *rights* pending conclusion of the review proceedings."  5 U.S.C. § 705

(emphasis added).  When Congress uses different language in the very same section of a statute, courts should assume that it intended that difference to have some meaning.  *See Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 12 (D.C. Cir. 2011).

One answer to all of this might be that the relief that Plaintiffs contemplate in their motion is altering the effective date itself, such that Florida's Section 404 program will not take effect until 30 days from the date of this Court's order.  But that theory arguably conflicts with *Prows*, and, more significantly, would require the Court (or the agency) to alter the terms of a final rule that took effect over a year ago and to do so without the benefit of notice and comment. Changing the effective date, in this respect, arguably differs from affording Plaintiffs relief for any injury that they sustained during the 30 days following the final promulgation of the rule. The latter remedies a violation of the APA's 30-day notice requirement, while the former arguably invalidates or changes a portion of the rule—that is, the effective date.  As the D.C. Circuit observed in *Clean Air Council*, delaying the effective day of a rule "affects regulated parties' 'rights or obligations'" by at least temporarily "eras[ing] [their] obligation" to comply with it.  862 F.3d at 7 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Another answer might be that the Court could direct the agency to consider the request for a Section 705 stay that Plaintiffs submitted on January 20, 2021, because that request fell within the 30 days in which the transfer could not permissibly have taken effect but for the Section 533(d) violation.  That relief is arguably consistent with the mandate in *Prows* that Section 553(d) violations "are remedied by denying such a rule effectiveness for the mandated 30 days, allowing it to take effect in full thereafter," 938 F.2d at 275, and, indeed, counsel for the EPA acknowledged at the motions hearing that the agency would be permitted to consider Plaintiffs' stay request in those circumstances, Rough Tr. at 78 (Mar. 15, 2022).  But even if the

JA.101

Court granted that relief—by declaring that the EPA's approval should not have gone into effect until January 21, 2021—there is no avoiding the fact that Florida's Section 404 program has been in operation for over a year.  And there is no way, as far as the Court can tell, to un-ring that bell without vacating the EPA's decision at least in part, in possible contravention of *Prows*.

It is conceivable, however, that the agency retains some equitable authority to fashion a remedy in response to a timely filed Section 705 stay request that (assuming Plaintiffs are right on the merits) the agency declined to consider based on a mistake of law.  The purpose of Section 705, after all, is to enable agencies and courts to "preserve [litigants'] rights pending conclusion of the review proceedings," 5 U.S.C. § 705, and all that Plaintiffs request in Count Eight is a remedy that (roughly) accords with the right that they would have been able to seek but for the EPA's failure to comply with Section 553(d).  In attempting to fashion an equitable remedy, the Court would need to consider the interests of third parties; it would need to consider any legal restraints on its authority to act; and it would need to consider whether it is possible at this date to restore Plaintiffs to the position they would have occupied were it not for the EPA's (alleged) failure to comply with the dictates of Section 553(d).  Whether it is possible to strike such a balance is far from clear.

These questions force the Court into largely uncharted waters, without the benefit of any relevant briefing from the parties.  At the motions hearing, moreover, the EPA requested the opportunity to brief the question of remedy should the Court conclude that the Plaintiffs are right on the merits.  Rough Tr. at 53 (Mar. 15, 2022).  Although the Court cannot reach the merits without first determining whether there is "*some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant," *Massachusetts*, 549 U.S. at 518 (emphasis added), the EPA's suggestion is sensible.  The Court

JA.102

will, accordingly, direct that the parties submit further briefing as to what relief (if any) the EPA

might be able to provide to Plaintiffs should the Court find in their favor on the merits of Count

Eight.  The Court recognizes that Plaintiffs appear to have a tough row to hoe on this question,

but, before the Court renders a definitive decision, all of the parties should have the opportunity

to brief what is an important and novel question.

      With that question unanswered, the Court concludes that, for now, Plaintiffs' standing to

pursue Count Eight remains an open question, and the Court will, accordingly, deny without

prejudice both the EPA's and Plaintiffs' motion for partial summary judgment on that claim,

along with Florida's motion to dismiss as to Count Eight.

      b.    Count 9

      The Court must also consider Plaintiffs' standing for purposes of Count Nine.  In that

count, Plaintiffs allege that the EPA's transfer of Section 404 authority to the State of Florida

"was intended to be a rule of general applicability," and, as such, it should have been codified in

the Code of Federal Regulations.  Dkt. 1 at 48 (Compl. ¶ 246).  Plaintiffs note that, in the only

two prior instances in which the EPA approved such a transfer, the agency codified its decisions,

*see* 49 Fed. Reg. 38,947 (Oct. 2, 1984) (Michigan) (codified at 40 C.F.R. § 233.70), 59 Fed. Reg.

9,933 (Mar. 2, 1994) (New Jersey) (codified at 40 C.F.R. § 233.71), and they allege that "[t]he

EPA's failure to codify [Florida's] program rendered the transfer of authority a nullity," Dkt. 1 at

48 (Compl. ¶ 248).  In seeking summary judgment on this count, Plaintiffs argue that because the

EPA "failed to codify the components of [Florida's] program, that program lacks lawful

authority."  Dkt. 31 at 48.  And because Florida's program is causing Plaintiffs various concrete

and redressable injuries—such as "a threat of harm to their recreational, aesthetic, and other

interests from the anticipated issuance of permit applications that would destroy thousands of

acres of wetlands that are vital for the survival and recovery of protected species"—Plaintiffs

argue that they have standing to assert their claims in Count Nine. *Id.* at 49. Both the EPA and

Florida respond that these injuries are not causally related to the codification (or lack thereof) of

the EPA's decision. *See* Dkt. 34 at 21–23; Dkt. 37 at 43.

The EPA and Florida, however, disregard the principle that, in assessing a plaintiff's

standing, courts may not "decide the questions on the merits for or against the plaintiff, and must

therefore assume that on the merits the plaintiffs would be successful in their claims." *City of

Waukesha*, 320 F.3d at 235. That principle is dispositive here. If Plaintiffs are correct that "[t]he

EPA's failure to codify the state program rendered the transfer of authority a nullity," Dkt. 1 at

48 (Compl. ¶ 248), the agency has, since December 22, 2020, permitted Florida to administer a

Section 404 program that has no basis in law. And, if that is true, Plaintiffs have standing based

on the concrete injuries that they contend follow from the State's operation of that program. *See*

Dkt. 31 at 35–40. The Court need not assess (or re-assess) those asserted injuries in detail,

however, because it has already concluded that at least one injury that flows from Florida's

Section 404 program—the unavailability of universal environmental review under NEPA and the

ESA—is sufficient for Article III purposes. *See* Dkt. 31-1 at 25–27 (Crooks Decl. ¶¶ 74–77)

(attesting to this injury for Conservancy of Southwest Florida); Dkt. 31-2 at 17–19 (Umpierre

Decl. ¶¶ 46–50) (Sierra Club); Dkt. 31-3 at 8 (Silverstein Decl. ¶ 18) (Miami Waterkeeper); Dkt.

35-5 at 5, 7–9 (Hartl Decl. ¶¶ 14, 21, 26) (Center for Biological Diversity); Dkt. 31-6 at 7–8, 13

(Carter Decl. ¶¶ 23–25, 39) (Defenders of Wildlife); Dkt. 31-7 at 4–5 (Robertson Decl. ¶¶ 11–

14) ((Florida Wildlife Foundation); Dkt. 31-8 at 4–6 (Rinaman Decl. ¶¶ 15–20) (St. Johns

Riverkeeper).

Plaintiffs have also established causation and redressability. In particular, they have

JA.104

offered evidence that Florida's allegedly unlawful assumption of Section 404 authority has required that they "hire [their] own experts in an attempt to otherwise assess and understand impacts of" proposed projects at a cost of "thousands of dollars per case." Dkt. 31-2 at 18 (Umpierre Decl. ¶ 48); *see also* Dkt. 31-1 at 26 (Crooks Decl. ¶ 75).  Were the Court to rule in favor of the Plaintiffs on Count Nine and "set aside" the EPA's "transfer of authority" to Florida, Dkt. 1 at 48 (Compl. ¶ 248), moreover, the Corps would resume its prior authority to administer the Section 404 program within the affected waters, and Plaintiffs would, once again, be able to avail themselves of the information provided under NEPA and the ESA.

The EPA and Florida's focus on causation belies a misunderstanding of Plaintiffs' claims in Count Nine.  Although it is true that Plaintiffs cannot trace any of their Article III injuries to the codification (or lack thereof) of the transfer, *see, e.g.*, Dkt. 34 at 21, their claim is not merely that the EPA failed to engage in the ministerial act of codifying its approval of Florida's application.  Instead, Plaintiffs maintain that this failure to codify the rule "rendered the transfer of authority a nullity." Dkt. 1 at 48 (Compl. ¶ 248).  For that reason, Plaintiffs' theory of standing under Count Nine is not—at least principally—one of procedural injury; rather, Plaintiffs maintain that they suffered a direct substantive injury "as a result of [the] EPA's failure to codify its action." Dkt. 31 at 48 (emphasis added) (capitalization omitted).   As a result, whether the APA's requirement that rules be codified represents a "procedural right . . . designed to protect their threatened concrete interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157, is beside the point.  The appropriate question for present purposes is whether, assuming that Plaintiffs are correct that the failure to codify renders the EPA's actions void of legal effect, the unlawful operation of Florida's Section 404 program inflicts on Plaintiffs' constitutionally cognizable harms that are redressable by this Court.

Because the answer to that question is yes, the Court proceeds to the merits of Plaintiffs'
claims under Count Nine.

**B.    Merits**

Having concluded that Plaintiffs have standing to assert their claims in Count Nine, the
Court now turns to the merits of that claim.  As discussed above, Plaintiffs allege that the EPA
was required to codify its approval of Florida's Section 404 application because that decision
"was intended to be a rule of general applicability that would have the legal effect of transferring
authority from the Corps to [Florida] and authorizing [Florida's Section] 404 program."  Dkt. 1
at 47 (Compl. ¶¶ 241–42).  The EPA's failure to codify its decision, Plaintiffs contend, violates
Section 1510(a) of the Federal Register Act, which provides that "[t]he Administrative
Committee of the Federal Register . . . may require, from time to time as it considers necessary,
the preparation and publication in special or supplemental editions of the Federal Register of
complete codifications of the documents of each agency of the Government having general
applicability and legal effect."  44 U.S.C. § 1510(a).  That provision applies here, according to
Plaintiffs, because the EPA's approval of Florida's Section 4040 program "ha[s] general
applicability and legal effect."  Dkt. 1 at 47 (Compl. ¶ 241).

Relatedly, Plaintiffs also allege that the EPA's failure to codify its decision was "not in
accordance with law" within the meaning of the APA, *id.* at 48 (Compl. ¶ 247), because the
Corps retains authority to administer the Section 404 program unless and until the lawful transfer
of authority to Florida is effectuated through the codification process, *see* Dkt. 43 at 30–31.  The
Code of Federal Regulations sets forth the default "policies, practices, and procedures to be
followed by the Corps of Engineers in connection with the review of applications for . . . permits
to authorize the discharge of dredged or fill material into waters of the United States pursuant to

JA.106

[S]ection 404 of the Clean Water Act." 33 C.F.R. § 323.1.  Under Plaintiffs' theory, those

procedures constitute a rule, and "[r]ules published in the Code of Federal Regulations remain

effective until they expire of their own accord or *are amended by later rules*."  Dkt. 43 at 31

(emphasis added). The EPA's direction to the contrary, in Plaintiffs' view, is "not in accordance

with law" and thus should be set aside under the APA.  5 U.S.C. § 706(2)(C).

   Both the EPA and Florida challenge this claim on the merits, although they employ

different procedural vehicles in doing so.  The EPA moves for partial summary judgment, Dkt.

34 at 33, while Florida moves to dismiss Count Nine for failure to state a claim, Dkt. 37 at 74.

Although the standards that govern consideration of a motion for summary judgment and a

motion to dismiss are different, the Court can perceive no daylight between the two motions

here, both of which turn on pure questions of law.  The Court will, accordingly, consider the

EPA's motion for summary judgment and Florida's motion to dismiss together.

   The Court begins with Plaintiffs' claim that the Federal Register Act requires codification

of the EPA's decision to approve Florida's Section 404 application.  Dkt. 1 at 47 (Compl.

¶¶ 241–42).  The relevant provision of the Federal Register Act provides as follows:

> The Administrative Committee of the Federal Register, with the approval of the
> President, may require, from time to time as it considers necessary, the
> preparation and publication in special or supplemental editions of the Federal
> Register of complete codifications of the documents of each agency of the
> Government having general applicability and legal effect, issued or promulgated
> by the agency by publication in the Federal Register or by filing with the
> Administrative Committee, and are relied upon by the agency as authority for,
> or are invoked or used by it in the discharge of, its activities or functions, and
> are in effect as to facts arising on or after dates specified by the Administrative
> Committee.

44 U.S.C. § 1510(a).  In Plaintiffs' view, this provision "require[s]" publication in the Code of

Federal Regulations those documents that have "general applicability and legal effect" that are

"relied upon by the agency as authority for, or are invoked or used by it in the discharge of" its

responsibilities.  *See* Dkt. 1 at 47 (Compl. ¶¶ 241–42).  Without this final step in the regulatory

process, Plaintiffs contend, an agency cannot alter or amend existing law, and any inchoate effort

to do so remains a nullity.

There are several problems with Plaintiffs' reliance on the Federal Register Act.  First,

although the statute permits the Administrative Committee of the Federal Register to "require"

publication of certain agency decisions, its plain text does not impose an obligation on the

Administrative Committee to do so.  Second, even if such a requirement existed, it applies to

agency "documents . . . having general applicability and legal effect."  44 U.S.C. § 1510(a).

Plaintiffs read this language to mean that "[a]n agency must codify final rules in the Code of

Federal Regulations," Dkt. 31 at 29 (citing 44 U.S.C. § 1510(a)), and they argue that the Federal

Register Act thus requires codification because the "EPA's action was a rule," Dkt. 43 at 33

n.10.  But even assuming Plaintiffs are correct that the EPA engaged in a rulemaking in

approving Florida's Section 404 program, the Federal Register Act does not incorporate the

APA's definition of a rule.  Instead, the Federal Register Act speaks of agency statements

"having general applicability and legal effect," 44 U.S.C. § 1510(a); *see also* 1 C.F.R. § 8.1(a),

while the APA defines a "rule" as an agency statement of "general *or particular applicability*

and *future* effect," 5 U.S.C. § 551(4) (emphasis added).  The inclusion of agency statements of

"particular applicability" in the definition of "rule" in the APA, as a result, implicates a broader

category of agency actions than those addressed by the Federal Register Act.  In contrast, the

Federal Register Act's reference to agency statements having "legal," rather than just "future,"

effect, suggests the APA's definition of "rule" may, in other respects, be narrower.

But even granting Plaintiffs these two assumptions—that the EPA's action was a rule

subject to mandatory codification under the Federal Register Act—Plaintiffs identify no

JA.108

authority for the proposition that "[t]he EPA's failure to codify [Florida's] program rendered the transfer of authority a nullity." Dkt. 1 at 48 (Compl. ¶ 248). Plaintiffs first attempt to support their contention that a failure to comply with the Federal Register Act nullifies an otherwise proper rulemaking by citing to a footnote in *Simmons v. ICC*, 757 F.2d 296 (D.C. Cir. 1985). *See* Dkt. 31 at 29–30. That reading of *Simmons* cannot be reconciled with what the D.C. Circuit actually said. *Simmons* dealt with a regulation promulgated by the Interstate Commerce Commission ("Commission"), which the Commission defended based on a policy of requiring that railroads provide the agency with "only such information as is 'needed by the Commission on a regular and frequent basis.'" *Id.* at 299 (quoting 44 Fed. Reg. 27,537 (May 10, 1979)). The D.C. Circuit, however, concluded that the Commission could not rely on that policy to defend the rule, because the policy was "neither a principle adopted in the course of a binding adjudication . . . nor a rule promulgated in accordance with . . . notice-and-comment rulemaking procedures." *Id.* As a result, the policy did not constitute "binding agency precedent and could not be treated as such." *Id.*

Only at that point did the D.C. Circuit drop a footnote, further observing that "[t]he Commission also failed to codify the [p]olicy [s]tatement in the Code of Federal Regulations, as is required for all documents of an agency 'having general applicability and legal effect . . . and . . . relied upon by the agency as authority.'" *Id.* at 300 n.2 (quoting 44 U.S.C. § 1510). That aside was not necessary to the court's decision and, more importantly, had the D.C. Circuit concluded that the failure to codify the policy independently deprived it of legal effect, it is safe to assume that the court would have added the Federal Register Act to the list of deficiencies discussed in the text of the opinion. Read in this light, the footnote is better understood as *evidence* that the Commission itself understood that the policy lacked "legal

effect" because it was not the product of an adjudication or rulemaking.  In other words, the

Court did not hold that the policy lacked legal effect because it was not codified but, rather, that

the policy was not codified because the Commission knew that it lacked legal effect.

Plaintiffs also cite to *Brock v. Cathedral Bluffs Shale Oil Co*., 796 F.2d 533 (D.C. Cir.

1986), presumably in support of the argument that the APA itself requires codification of rules.

*See* Dkt. 31 at 30.  In *Brock*, the D.C. Circuit explained that an agency's "[f]ailure to publish in

the Federal Register is indication that the statement in question was *not* meant to be a regulation,

since the [APA] requires regulations to be so published."  796 F.2d at 539 (citing 5 U.S.C.

§ 552(a)(1)(D)).  But that does not help Plaintiffs' cause because there is no dispute that the EPA

published its approval of Florida's Section 404 application in the Federal Register.  *See* Dkt. 56-

1 at 433–34 (AR 0564 at 1–2) (published at 85 Fed. Reg. 83,553 (Dec. 22, 2020)).  That fact

likewise renders inapt the other cases on which Plaintiffs rely, *see* Dkt. 43 at 31, that stand for

the same proposition—that "[a]gencies must publish substantive rules in the Federal Register to

give them effect," *Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009); *see also*

*Morton v. Ruiz*, 415 U.S. 199, 233 & n.27 (1974) (discussing the circumstances in which agency

actions are "required to be published in the Federal Register" by the APA); *Andrews v.*

*Knowlton*, 509 F.2d 898, 905 (2d Cir. 1975) (declaring that an agency action that was not

"published in the Federal Register . . . d[id] not create legally binding rights or obligations").

Even assuming the agency action at issue constituted a "substantive rule," *Nat. Res. Def.*

*Council*, 559 F.3d at 565, the EPA did publish its decision in the Federal Register.

To be sure, in *Brock* the D.C. Circuit also observed that "the real dividing point between

regulations and general statements of policy is publication in the Code of Federal Regulations,

which the statute authorizes to contain only documents 'having general applicability and legal

effect.'"  796 F.2d at 539 (quoting 44 U.S.C. § 1510).  That assertion, however, must be

understood in light of the question that was before the court—that is, whether a "published

enforcement policy was legally binding" or merely advisory.  *Id.* at 534.  The answer to that

question, in turn, hinged on whether the policy was "a substantive rule" or "a general statement

of policy."  *Id.* at 537.  It was in this context that the court of appeals explained that both

substantive rules and policy statements are published in the Federal Register, while only

regulations—that is, documents having binding "legal effect"—are published in the Code of

Federal Regulations.  *Id.* at 539.  As in *Simmons*, the agency's failure to publish the document in

the Code of Federal Regulations was *evidence* that the agency never intended for the

enforcement policy to have binding legal effect.  That conclusion, however, is a far cry from a

holding that the Federal Register Act *nullifies* what would otherwise constitute a binding legal

rule merely because the agency fails to submit the rule to the Federal Register for codification—

or fails promptly to do so.

　　　Plaintiffs' alternative theory under Count Nine is also unavailing.  Under that theory, the

EPA was required to codify the approval of Florida's Section 404 program "because the only

legally binding and effective regulations governing dredge and fill activities in [the] waters of the

United States in Florida are those promulgated by [the] EPA and the Corps."  Dkt. 43 at 31; *see*

*also* 33 C.F.R. § 323.1 *et seq.*  This argument turns not on a freestanding obligation to codify

under the Federal Register Act or the APA but, instead, on the codification of the extant,

generally applicable permitting rule, which Florida's Section 404 application sought to amend

(by creating an exception to it).  As the EPA concedes, "codification requires a rulemaking,"

Dkt. 45 at 15, and, according to Plaintiffs, "[r]ules published in the Code of Federal Regulations

remain effective until they expire of their own accord or are amended by later rules."  Dkt. 43 at

JA.111

31.  It follows, in Plaintiffs' view, that the extant regulations regarding the federal Section 404 permitting program remain in force unless and until the regulations are amended.

This argument has some initial appeal, as there is little doubt that the extant Section 404 regulations, *see* 33 C.F.R. 323.1 *et seq.*, constitute binding rules for purposes of the APA, and "an administrative agency may not slip by the notice and comment rule-making requirements needed to amend a rule by merely adopting a *de facto* amendment to its regulation through adjudication," *Marseilles Land & Water Co. v. FERC*, 345 F.3d 916, 920 (D.C. Cir. 2003). Ultimately, however, the Court is unpersuaded for three reasons.

First, Plaintiffs themselves argue—with considerable force—that the EPA's decision to transfer Section 404 permitting authority to Florida was, in fact, a rulemaking, and not an adjudication.  Among other things, the fact that the EPA codified its decisions to grant the only two applications that it had approved prior to Florida's, *see* 49 Fed. Reg. 38,947-01 (codified at 40 C.F.R. § 233.70) (Michigan); 59 Fed. Reg. 9,933-01 (codified at 40 C.F.R. § 233.71) (New Jersey), and that it announced its intention to do the same here, 85 Fed Reg. 57,853; *see also* Dkt. 51 at 3 (AR 001 at 3), carries significant weight, since "the act of codification require[s] a rulemaking," Dkt. 45 at 15; *see also Brock*, F.2d at 539; *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595–96 (D.C. Cir. 2006).  Other indicia support this same conclusion, including the facts that the notice that initiated the agency action at issue was titled "Notice and request for comments," Dkt. 51 at 1 (AR 001 at 1), and the agency opened a "rulemaking docket" to receive written comments, *id.* at 2 (AR 001 at 2).  Even more to the point, as late as January 14, 2021, the EPA reaffirmed its intention to codify its decision in a "final rule."  *See* Pre-Publication

58

Notice at 1.[9]  That concession, in turn, forces the agency to argue that its decision approving the transfer of Section 404 permitting authority was an *adjudication*, while the EPA Administrator's approval of the codification of that decision was a *rule*.  Dkt. 45 at 15–16.  The fact that the agency is forced to turn such summersaults to maintain its claim that its approval was an adjudication, and not a rule, speaks volumes.

But the Court need not rely on this history alone to conclude that the EPA's approval of Florida's Section 404 program constituted a rule, rather than an adjudication.  The agency's decision is "generally applicable to an open class" of individuals—namely, all those who plan to seek a Section 404 permit within the transferred waters—in contrast to "a particularized order

---

[9] Other evidence further demonstrates that the EPA has long considered its approval of Section 404 programs to constitute rulemakings.  In litigation regarding Michigan's Section 404 program, for example, the government did not question the premise that the program was subject to Section 553, which, of course, applies only to rulemakings.  *See* Federal Appellees' Opp. Br. at 5, *Menominee Indian Tribe of Wisconsin v. EPA*, No. 19-1130 (7th Cir. filed Apr. 30, 2020) (Dkt. 49) (discussing plaintiffs' "ability to petition for a rulemaking" regarding Michigan's Section 404 program pursuant to Section 553(e)).  Sounding a similar theme, the concurring opinion in that case observed:

> [T]he Tribe may petition the EPA to reassume federal permitting authority over this stretch of the Menominee River as an amendment to a rule.  *See* 5 U.S.C. § 553(e).  *The EPA's 1984 approval of Michigan's Section 404 permit program bore the hallmarks of a legislative rule*.  See 49 Fed. Reg. 38,947 (Oct. 2, 1984), codified at 40 C.F.R. § 233.70.  The approval was written as a "regulation" that was promulgated after public notice and comment.  *See id.* at 38,947; *see also* 40 C.F.R. § 233.15(e) (providing for public participation in state program approvals).  The EPA would have a duty to respond to any petition for revisions to the scope of the Michigan delegation.  *See Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 794 F. Supp. 2d 39, 44 (D.D.C. 2011) ("an agency 'is required to at least definitively respond to ... [a] petition—that is, to either deny or grant the petition" (alteration in original)).

*Menominee Indian Tribe of Wisc. v. EPA*, 947 F.3d 1065, 1074–75 (7th Cir. 2020) (Hamilton, J., concurring) (emphasis added).

affecting particular [individuals] . . . upon individual grounds." *Safari Club Int'l v. Zinke*, 878

F.3d 316, 332 (D.C. Cir. 2017) (quotation marks omitted).  This is, after all, the "basic

distinction between rulemaking and adjudication."  *United States v. Fla. E. Coast Ry. Co.*, 410

U.S. 224, 244 (1973); *see also Sugar Cane Growers*, 289 F.3d at 96 (concluding, with "little

difficulty," that an agency action that, among other things, "set forth the bid submission

procedures which all applicants must follow," constituted a rule for Section 553 purposes, and

adding that "[i]t is simply absurd to call [such an action] anything but a rule 'by another name'").

The EPA's decision, moreover, "ha[s] only future effect," as compared to agency adjudications,

which more typically "bind parties by retroactively applying law to their past actions."  *Safari*

*Club*, 878 F.3d at 332 (quotation marks omitted) (collecting cases); *see also Bowen v.*

*Georgetown Univ. Hosp.*, 488 U.S. 204, 217 (1988) (Scalia, J., concurring) ("[A] rule is a

statement that has legal consequences only for the future.").  The Court, accordingly, is

persuaded that the action that Plaintiffs challenge was, in fact, a rulemaking and, as such, it

constituted a permissible mechanism for amending the extant permitting rules.

  Second, to the extent that Plaintiffs maintain that the EPA lacked authority to amend the

extant Section 404 regulations without taking the further step of codifying its amendment, they

disregard an existing provision in the governing regulations, which recognizes (1) that Section

404(h) permits the EPA "to transfer administration of the [S]ection 404 permit program . . . to

qualified States" and (2) that "[o]nce a State's 404 program is approved and in effect, the Corps

. . . will suspend processing of [S]ection 404 applications in the applicable waters."  33 C.F.R.

§ 323.5.  The Court, as a result, cannot accept Plaintiffs' premise that the extant regulations are

irreconcilable with Florida's assumption of permitting authority.

  Finally, understanding that the EPA approved the transfer of Section 404 permitting

authority to Florida through a rulemaking, the Court must return to the question (discussed briefly above) whether a rulemaking is invalid absent codification of the final rule. But the Court need not linger long, for the APA answers that question: it does not require that agencies codify their actions in the *Code of Federal Regulations*; rather, "[a]gencies must publish substantive rules in the *Federal Register* to give them effect." *Nat. Res. Def. Council*, 559 F.3d at 565 (emphasis added); *see also Brock*, 796 F.2d at 539. Because the EPA complied with that requirement, *see* Dkt. 56-1 at 433–34 (AR 0564 at 1–2), the EPA did what it had to "give . . . effect" to its decision for purposes of the APA.

For these reasons, the Court concludes that Count Nine of Plaintiffs' complaint fails on the merits. The Court will, accordingly, grant the EPA's motion for partial summary judgment and Florida's motion to dismiss Count Nine and will deny Plaintiffs' motion for partial summary judgment as to Count Nine.

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' motion for partial summary judgment, Dkt. 31, is **DENIED** with respect to Count Nine and **DENIED** without prejudice as to Count Eight; the EPA's cross-motion for partial summary judgment, Dkt. 34, is **GRANTED** with respect to Count Nine and **DENIED** without prejudice with respect to Count Eight; and Florida's cross-motion to dismiss, Dkt. 36, is **GRANTED** with respect to Count Nine, **DENIED** without prejudice as to Count Eight, and **DENIED** in all other respects.

It is further **ORDERED** that the parties shall meet and confer regarding next steps in this litigation and shall appear by video for a status conference on April 18, 2022, at 3:00 p.m.

JA.115

**SO ORDERED**.


                                        /s/ Randolph D. Moss
                                        RANDOLPH D. MOSS
                                        United States District Judge


March 30, 2022

JA.116

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY
378 N. Main Avenue
Tucson, AZ 85701;

DEFENDERS OF WILDLIFE
1130 17th Street, N.W.
Washington, DC 20036;

SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612;

CONSERVANCY OF SOUTHWEST FLORIDA
1495 Smith Preserve Way
Naples, Florida 34102;

FLORIDA WILDLIFE FEDERATION
2545 Blairstone Pines Drive
Tallahassee, FL 32301;

MIAMI WATERKEEPER
2103 Coral Way
Miami, FL 33145; and

ST. JOHNS RIVERKEEPER
2800 University Blvd N
Jacksonville, FL 32211,

      Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

MICHAEL S. REGAN, in his official capacity as
Administrator for the U.S. Environmental
Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

**CIVIL NO.** 21-cv-119

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1

RADHIKA FOX, in her official capacity as Assistant
Administrator for the Office of Water of the U.S.
Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

JEFFREY PRIETO, in his official capacity as General
Counsel for the U.S. Environmental
Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

LAWRENCE STARFIELD, in his official capacity as
Acting Assistant Administrator for the Office of
Enforcement and Compliance Assurance for the U.S.
Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

JOHN BLEVINS, in his official capacity as Acting
Administrator for Region 4 of the U.S. Environmental
Protection Agency,
61 Forsyth Street SW
Atlanta, GA 30303;

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, NW
Washington, DC 20240;

MARTHA WILLIAMS, in her official capacity as Principal
Deputy Director for the U.S. Fish and Wildlife Service,
1849 C Street, NW
Washington, DC 20240;

LEOPOLDO MIRANDA-CASTRO, in his official capacity
as Regional Director for the U.S. Fish and Wildlife Service,
1875 Century Boulevard, Suite 400
Atlanta, GA 30345;

U.S. ARMY CORPS OF ENGINEERS
441 G Street, NW
Washington, DC 20314;

LIEUTENANT GENERAL SCOTT A. SPELLMON, in his
official capacity as Chief of Engineers and Commanding
General of the U.S. Army Corps of Engineers,

2

JA.118

441 G Street, NW
Washington, DC 20314; and

COLONEL JAMES BOOTH, in his official capacity as
District Commander of the Jacksonville District for the U.S.
Army Corps of Engineers,
701 San Marco Boulevard
Jacksonville, FL 32207,

      Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This action arises from the U.S. Environmental Protection Agency's ("EPA")

unlawful approval of a state application to assume jurisdiction over the Clean Water Act's

Section 404 permitting program, which regulates the dredging and filling of waters of the United

States, including wetlands essential to water quality, storm and climate resiliency, threatened and

endangered species, and the economy.  EPA's approval is unlawful because the state's program

is not as stringent as federal law and rests on unprecedented arrangements that violate federal

law.  At a December 17, 2020, press conference in Washington, D.C., EPA Administrator

Andrew Wheeler announced the agency's approval of the state of Florida's novel program to

assume jurisdiction over Section 404, described the program as a roadmap, and encouraged other

states to follow suit.  On December 22, 2020, the EPA published its decision in the Federal

Register, purporting to give it immediate effect, in violation of the Administrative Procedure Act

("APA"), and without codifying the program, also in violation of federal law.  The EPA's actions

failed to effectuate a lawful transfer of authority.  Yet the EPA has advised the state that it may

proceed.  The EPA's action will allow the state to violate federal law to the detriment of waters

of the United States and the endangered and threatened species that rely on them, while

depriving those adversely affected of federal rights and remedies.

3

2.    Underlying the EPA's decision are unlawful actions by the U.S. Fish and Wildlife Service ("USFWS"), which has failed to ensure no jeopardy to listed species and creates an unlawful scheme for take liability coverage at the permit level, in contravention of the Endangered Species Act ("ESA").  Also, the U.S. Army Corps of Engineers' ("Corps") list of waters over which it will retain jurisdiction is arbitrarily and capriciously truncated in violation of the Rivers and Harbors Act ("RHA") and the APA.

3.    Defendants' actions threaten to open the floodgates for other states to seek assumption without requiring that those programs meet federal standards, further imperiling waters of the United States and the ESA-listed species that rely on them.  As Administrator Wheeler stated at the December 17th press conference, states have already been reaching out to the EPA to follow in Florida's footsteps.  Defendants' actions are unlawful and must be set aside.

## INTRODUCTION

4.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251.  The impetus for enacting the Clean Water Act was states' failure to control water pollution as evidenced by disasters like the Cuyahoga River catching on fire and the Hudson River filling with raw sewage and toxic waste.

5.    The Clean Water Act Section 404 wetlands permitting program ("404 program") regulates the discharge of dredged or fill materials into waters of the United States, including wetlands, 33 U.S.C. § 1344, and is a vital tool to meet the Clean Water Act's goals, recognizing that the degradation and destruction of wetlands is "among the most severe environmental impacts."  See 33 U.S.C. § 1251; 40 C.F.R. § 230.1(a).

4

6.      Under the federal 404 program, it is the Corps that reviews and, where appropriate, approves permits.

7.      Congress enacted the Endangered Species Act of 1973 ("ESA") to, among other things, "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(2)(b).

8.      Pursuant to Section 7(a)(2) of the ESA, the Corps must engage in formal consultation with USFWS and National Marine Fisheries Service ("NFMS") (collectively, "the Services") whenever it appears that a Section 404 permit applicant's proposed activity may adversely affect listed species. Through this process, permittees may obtain protection from ESA liability for any incidental harm (called "incidental take") to listed species on a project by project basis.

9.      The Clean Water Act creates a path for states to administer their own dredge and fill permit program, if the state's program is at least as stringent as the federal program. 33 U.S.C. § 1344(h)(1). The state must submit a "full and complete" application showing that it meets this high bar. Id. § 1344(g); 40 C.F.R. §§ 233.10, 233.15(a). In a state 404 program, it is a state agency, rather than the Corps, that reviews 404 permit applications and issues 404 permits.

10.     Before a state may assume the 404 program, the EPA must determine that the state has demonstrated authority to issue permits that assure compliance with the Clean Water Act Section 404(b)(1) Guidelines, which, among other things, prohibit the issuance of 404 permits that would jeopardize the existence of ESA-listed species, or result in the likelihood of

5

destroying or adversely modifying critical habitat identified under the ESA.  33 U.S.C.

§ 1344(h)(1)(A)(i); 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), 233.23.

11.     ESA Section 7(a) consultation between the Services and federal agencies,

including the associated incidental take protection, does not extend to projects regulated under

state-operated 404 programs.  16 U.S.C. § 1536(a).

12.     Permittees, however, must still comply with the ESA's take prohibition, and must

therefore pursue ESA Section 10 consultation with the Services to try to obtain protection from

incidental take liability if a project may harm listed species.  16 U.S.C. § 1539.

13.     When the EPA approves a state's 404 program, the Administrator must notify the

state and the Corps, and, upon notification from the state that it is administering the program, the

Corps must suspend its issuance of permits covered by the state program.  33 U.S.C.

§ 1344(h)(2)(A).

14.     Transfer of 404 permitting authority to a state is not effective until after notice is

published in the Federal Register.  40 C.F.R. § 233.15(h).  As of the effective date of an

approved state program, the Corps must suspend all issuance of Section 404 permits in state-

regulated waters.  Id.

15.     The APA provides that "[t]he required publication or service of a substantive rule

shall be made not less than 30 days before its effective date" subject to certain exceptions not

applicable here.  5 U.S.C. § 553(d).

16.     In the many years that Section 404 state assumption has been authorized under the

Clean Water Act for programs that meet stringent federal standards, the EPA has approved only

two.  In 1984, the EPA approved Michigan's program, and in 1994, the EPA approved New

Jersey's program.  See 40 C.F.R. § 233.70 (Michigan), 40 C.F.R. § 233.71 (New Jersey).

17.     In 2005 and in 2012, Florida considered pursuing assumption but abandoned the effort considering conflicts between state and federal law, the high costs associated with administering the program, and permittees' concerns regarding protection against ESA liability.

18.     Many other states, including most recently Arizona, have reached similar conclusions.

19.     On August 20, 2020, Florida applied to the EPA proposing to take over the 404 program without adopting all federal requirements, without demonstrating "no jeopardy" to ESA-listed species, and without adequately identifying the waters over which it would assert jurisdiction.  The state also claimed it would require no funding to administer and enforce the program, even amidst major budget cuts resulting from a pandemic which the state did not address or even acknowledge in the application.

20.     On August 28, 2020, the EPA nonetheless determined that the application was "complete" as of the submission date.

21.     The EPA's "completeness" determination triggered a 120-day deadline to approve or deny the application by December 18, 2020, unless the EPA and Florida agreed to extend the timeline.  See 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).

22.     On August 28, 2020, and at Florida's request, the EPA reversed its long-standing position that agency review of an assumption application was a non-discretionary act, thereby triggering a duty to engage in ESA consultation with the Services.  The EPA agreed with the state that this duty required only a one-time programmatic consultation for purposes of considering the application.

7

JA.123

23.     Defendants and the state developed this novel position to facilitate programmatic incidental take coverage to the state and state permittees—an unprecedented, and ultimately unlawful, workaround to the requirements of federal law.

24.     On September 2, 2020, the EPA submitted an "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" to USFWS to initiate formal consultation on Florida's application.  It was dated August 2020.

25.     Also, on September 2, 2020, the EPA sent a letter to NMFS summarily concluding that approval of the state program would have "no effect" on NMFS' jurisdictional marine and anadromous species.  The EPA's conclusion was solely based on an April 15, 2020, letter by NMFS to Florida, stating that no species in NMFS' exclusive jurisdiction would be present "in assumable waters."  NMFS then concurred with the EPA's determination.

26.     The EPA's biological evaluation was largely a cut and paste of a biological assessment drafted by the state and was not independently assessed by the EPA.

27.     On September 16, 2020, the EPA initiated a 45-day public comment period that concluded on November 2, 2020.  See 40 C.F.R. § 233.15(e) and 5 U.S.C. § 553.  The EPA indicated that if approved, the state program would be codified at 40 C.F.R. § 233 subpart H. This was consistent with the agency's codification of the only other two approved state 404 programs.  See 40 C.F.R. § 233.70 (New Jersey); id. § 233.71 (Michigan).

28.     At the October 21, 2020, EPA public hearing on Florida's submission, Plaintiffs' counsel urged the EPA to reverse its completeness determination considering critical omissions in Florida's application.  In an October 23, 2020 letter, Plaintiffs' counsel requested suspension of the public comment period until the deficiencies were cured.  See id. § 233.15(a) (statutory review period shall not begin if the EPA finds that state's submission is incomplete).

8

29.     The EPA did not respond to Plaintiffs' requests and closed the public comment period on November 2, 2020.

30.     On November 2, 2020, Plaintiffs and many other members of the public submitted comments challenging the legality of the EPA's approval of the state's proposal, the absence of required components prejudicing the opportunity for public comment, and the proposal's failure to meet the requirements for a state-assumed program, particularly as it relates to the protection of threatened and endangered species.  33 U.S.C. § 1344(g)–(h).

31.     On November 19, 2020, USFWS transmitted to the EPA a programmatic biological opinion dated November 17, 2020, regarding Florida's application.  USFWS' biological opinion, in conjunction with a memorandum of understanding between USFWS and the state, purports to authorize a "technical assistance" role outside the parameters of the ESA that would nevertheless grant "[i]ncidental take exemption" to the EPA for its approval and oversight of the state program, and would further grant protection from liability for any take of listed species incidental to state-permitted activities so long as the permittee complied with the conditions of a state-issued permit.

32.     Neither NMFS' April 2020 determination nor USFWS' November 2020 biological opinion was made part of Florida's application or otherwise presented to the public for an opportunity to comment before the EPA acted on the state's application.

33.     On December 17, 2020, EPA Administrator Andrew Wheeler announced the approval of Florida's assumption application at a press conference in Washington, D.C.

34.     On December 22, 2020, the EPA's approval of the state program was published in the Federal Register, with an immediate "applicable" date as of publication.  The notice did not codify the approved program.

9

35.     On the same day, counsel for Plaintiffs notified the EPA that its failure to codify and failure to comply with the APA rendered the transfer ineffective and that authority to administer the 404 program remained with the Corps.

36.     On December 28, 2020, EPA General Counsel David Fotouhi sent a letter claiming that the transfer was effective upon publication, that the decision was an adjudication rather than a rulemaking, and that the agency intended to codify the program but only for "transparency."

## JURISDICTION AND VENUE

37.     This action arises under the Clean Water Act, 33 U.S.C. §§ 1251–1387, ESA, §§ 1531–44, and the APA, 5 U.S.C. §§ 553, 701–06.

38.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201, 2202.

39.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) as the Defendants include agencies of the United States and officers and employees of the United States acting under their official capacities who reside in this district, and Plaintiff Defenders of Wildlife maintains its principal place of business, and therefore resides, in this judicial district. Id. §§ 1391(c)(2), (e)(1)(C).

## PARTIES

**Plaintiffs**

40.     CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit organization that works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is incorporated in

California, headquartered in Tucson, Arizona, and maintains an office in the District of

Columbia, with field offices throughout the United States and Mexico.

41.    The Center has 81,843 members across the country.  The Center and its members

are concerned with, and have concrete interests in, the conservation of imperiled species and the

habitats they rely on for survival, including the ones at issue in this suit.  The Center's members

and staff have researched, studied, observed, litigated over, and sought protection for federally

listed threatened and endangered species in the United States, including listed turtles in Florida.

These activities support the Center's mission to save life on earth.  The Center brings this action

on behalf of itself and its adversely affected members.

42.    DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit membership

organization that is one of the nation's leading advocates for threatened and endangered species

and wildlife conservation.  Founded in 1947, Defenders is headquartered in Washington, D.C.,

and maintains local field offices throughout the country.  Defenders is dedicated to the protection

of all native wild animals and plants in their natural communities and the preservation of the

habitats upon which they depend, including in wetlands and other aquatic environments.

Defenders works toward the recovery of threatened and endangered species by means such as

monitoring and engaging in public notices and comments, litigation, research, education, and

federal, state, and local advocacy.

43.    Defenders is a science-based conservation organization with more than 1.8

million members and supporters nationwide and around the world.  Defenders and its members

aim to protect and restore imperiled species throughout North America by transforming policies

and institutions, promoting innovative solutions, and litigating over protections for threatened

and endangered species in the United States.  These activities support Defenders' mission to

JA.127

protect native plants and animals.  Defenders brings this action on behalf of itself and its

adversely affected members.

44.     SIERRA CLUB ("Sierra Club") is a national non-profit organization dedicated to

exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the

responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to

protect and restore the quality of the natural and human environment; and to using all lawful

means to carry out these objectives.

45.     Headquartered in Oakland, California, the Sierra Club has 67 chapters and more

than 808,000 members across the nation.  Sierra Club's concerns include the protection of

wetlands and federally listed threatened and endangered species.  The Sierra Club brings this

action on behalf of itself and its adversely affected members.

46.     CONSERVANCY OF SOUTHWEST FLORIDA ("Conservancy") is a nonprofit

organization that is dedicated to the protection of Southwest Florida's land, water, wildlife, and

future through advocacy, science, education, and wildlife rehabilitation.  The Conservancy was

founded in 1964 in response to plans to build a road through Rookery Bay and carries on its

mission to preserve wetlands and downstream areas important to the health of the ecosystem,

economy, and quality of life.

47.     The Conservancy has approximately 3,600 dues-paying members and over 2,000

additional donors and supporters.  The Conservancy's members and staff have researched,

studied, observed, and sought protection, including through litigation, for federally listed

threatened and endangered species and their habitat in southwest Florida.  These activities

support the Conservancy's mission to protect southwest Florida's water, land, and wildlife.  The

Conservancy brings this action on behalf of itself and its adversely affected members.

JA.128

48.     FLORIDA WILDLIFE FEDERATION ("FWF") is a nonprofit corporation established in 1936.  FWF has approximately 9,000 members and 60,000 supporters.  FWF has long supported environmental sustainability and conservation in Florida through education, advocacy, and litigation.

49.     FWF's members and staff have researched, studied, observed, and sought protection, including filing lawsuits, for federally listed threatened and endangered species and their habitat.  These activities support FWF's mission to ensure that wildlife and fragile environment have a voice.  Among other things, FWF is dedicated to protecting the state's waterways, as wildlife cannot thrive where wetlands are drained, waters polluted, and habitats degraded or destroyed.  FWF brings this action on behalf of itself and its adversely affected members.

50.     MIAMI WATERKEEPER ("MWK") is a nonprofit organization whose mission is to defend, protect, and preserve South Florida's watershed through citizen engagement, education and outreach, scientific research, advocacy, and when necessary, legal action.

51.     MWK has 165 members.  MWK's members and staff have researched, studied, observed, patrolled, and sought protection, including filing lawsuits, for South Florida's watershed and the federally listed threatened and endangered species that depend on its freshwater and marine habitats, including listed corals.  These activities support MWK's mission to ensure swimmable, drinkable, fishable water for all.  MWK brings this action on behalf of itself and its adversely affected members.

52.     ST. JOHNS RIVERKEEPER ("St. Johns RK") is a nonprofit organization that provides an independent voice to defend, advocate, and activate others to protect and restore the St. Johns River, Florida's longest and most significant river for commercial and recreational use.

JA.129

53.     St. Johns RK has 1,400 members.  St. Johns RK's members and staff have
researched, studied, observed, patrolled, and sought protection, including through litigation, for
the St. Johns River watershed and the federally listed threatened and endangered species that
depend on it.  These activities support St. Johns RK's mission to ensure a thriving watershed that
sustains healthy ecosystems for future generations.  St. Johns RK brings this action on behalf of
itself and its adversely affected members.

54.     Plaintiffs and their members participated throughout the EPA's rulemaking
process on the state's application to assume the 404 program in an attempt to ensure that the
EPA abided the requirements of the Clean Water Act, ESA and APA, and to advocate for the
protection of endangered species, wetlands and other waterways, as well as the communities that
rely on them.  Plaintiffs and their members have monitored, investigated, educated the public,
litigated, and provided science-based policy recommendations on development projects and their
associated Clean Water Act 404 permits in order to protect the environment and wildlife and
intend to continue to do so in the near future.

55.     The above-described conservation, informational, and scientific interests of
Plaintiffs and their respective members have been, are being, and—unless the relief prayed for
herein is granted—will continue to be adversely affected and irreparably injured by the
Defendants' failure to comply with the Clean Water Act, ESA, and APA as described below.
Plaintiffs have no adequate remedy at law.

56.     Plaintiffs' interests fall within the zone of interests protected by the laws sought to
be enforced in this action.

JA.130

**Defendants**

57.     U.S. ENVIRONMENTAL PROTECTION AGENCY ("EPA") is an independent executive agency of the United States federal government with responsibility for administering and implementing the Clean Water Act.  The EPA approved Florida's request to assume authority over the Clean Water Act 404 program.

58.     MICHAEL S. REGAN is the Administrator of the EPA and the highest-ranking official responsible for actions taken by the EPA, including decisions to approve state administration of Clean Water Act Section 404.  Defendant Regan is sued in his official capacity.

59.     RADHIKA FOX is the Assistant Administrator for EPA Office of Water and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Fox is sued in her official capacity.

60.     JEFFREY PRIETO is the General Counsel for the EPA and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Prieto is sued in her official capacity.

61.     LAWENCE STARFIELD is the Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance for the EPA and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs. Defendant Starfield is sued in his official capacity.

62.     JOHN BLEVINS is the Acting Regional Administrator for EPA Region 4 and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Blevins is sued in his official capacity.

63.     Defendants Regan, Fox, Prieto, Starfield, Blevins and the EPA will collectively be referred to as "EPA."

JA.131

64.     U.S. FISH AND WILDLIFE SERVICE ("USFWS") is an agency within the U.S. Department of the Interior and has joint delegated responsibilities of administering and implementing the ESA along with NMFS.  USFWS issued the programmatic biological opinion and incidental take statement that are challenged here and underlie the EPA's challenged action.

65.     MARTHA WILLIAMS is the Principal Deputy Director of USFWS and highest-ranking official responsible for actions taken by USFWS, including compliance with and implementation of the ESA.  Defendant Williams is sued in her official capacity.

66.     LEOPOLDO MIRANDA-CASTRO is Regional Director of USFWS and is an official responsible for actions taken by USFWS, including the biological opinion and incidental take statement in this case.  Defendant Miranda-Castro is sued in his official capacity.

67.     Defendants Williams, Miranda-Castro and USFWS will collectively be referred to as "USFWS."

68.     U.S. ARMY CORPS OF ENGINEERS ("Corps") is a federal agency organized under the U.S. Department of Defense.  The Corps is charged with administering permits under section 404 of the Clean Water Act for the discharge of dredged or fill material into the waters of the United States and ensuring that the requirements of NEPA, the RHA and the ESA are fulfilled in connection with all evaluation and decision-making concerning such permits.  The Corps issued the "retained waters list" that is challenged here and underlies the EPA's challenged action.

69.     LIEUTENANT GENERAL SCOTT A. SPELLMON is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers and has delegated responsibilities of administering and implementing the Clean Water Act 404 program. Defendant Spellmon is sued in his official capacity.

70.     COLONEL JAMES BOOTH, is District Commander for the Jacksonville District of the U.S. Army Corps of Engineers and is an official responsible for actions taken by the Corps, including the determination of the waters to be retained under the Corps' jurisdiction after state assumption.  Defendant Booth is sued in his official capacity.

71.     Defendants Spellmon, Booth, and the Corps will collectively be referred to as "the Corps."

**LEGAL FRAMEWORK**

**Administrative Procedure Act**

72.     Pursuant to the Administrative Procedure Act ("APA"), a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be" (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; (3) "without observance of procedure required by law"; or (4) "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (C)–(E).

73.     The APA grants a right of judicial review of final agency actions to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  Id. § 702.

74.     The EPA's approval of Florida's 404 assumption application is unlawful and must be set aside for:  failing to provide an opportunity for notice and comment on a complete program submission; approving a state program that is inconsistent with and violates federal law; relying on unlawful, related actions by USFWS (biological opinion and incidental take statement); NMFS (jurisdictional determination); the Corps (retained waters list); and making its decision effective immediately upon publication in the Federal Register and without codification.

17

75.     The actions by USFWS and the Corps on which the EPA relied are similarly subject to judicial review under the APA and must be set aside.

**The Clean Water Act**

76.     Before the EPA may consider a state 404 assumption application, the state must submit a "full and complete" application including a description of the program it proposes to establish and administer as well as a statement from the attorney general that the laws of the state provide adequate authority to carry out the described program.  33 U.S.C. § 1344(g); 40 C.F.R. § 233.10.

77.     A complete program description must include a description of (1) the scope and structure of the state's program, including the extent of the state's jurisdiction and permit review criteria; (2) the state's permitting, administrative, judicial review, and other applicable procedures; (3) the basic organization and structure of the state agencies which will administer the program, specifically addressing the responsibilities of each agency; (4) the funding and staffing available for program administration; (5) estimated anticipated workload; (6) permit application forms, permit forms, and reporting forms; (7) the state's compliance evaluation and enforcement programs, including how the state will coordinate with the EPA and the Corps; (8) the waters of the United States within a state over which the state assumes jurisdiction under the approved program; the waters of the United States within a State over which the Corps retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands; and (9) the specific best management practices proposed to satisfy Section 404 exemptions for construction and maintenance of certain roads.  40 C.F.R. § 233.11.

78.     A complete attorney general's statement must demonstrate that the laws and regulations of the state provide adequate authority to carry out the program and meet the

applicable requirements of the federal Section 404 program.  Id. § 233.12(a).  The statement

must cite authorities which are "lawfully adopted at the time the statement is signed and which

shall be fully effective by the time the program is approved, and, where appropriate, judicial

decisions which demonstrate adequate authority."  Id.  Where more than one agency has

responsibility for administering the state program, the statement must certify that each agency

has full authority to administer the program within its category of jurisdiction.  Id. § 233.12(d).

79.    The submission of a state assumption application sets in motion a timeline for

EPA review.  33 U.S.C. § 1344(g)–(h).  The statutory review period shall not begin until a

complete application is received by the EPA.  40 C.F.R. § 233.15(a).

80.    The EPA must determine if an application is complete within 30 days, 40 C.F.R.

§ 233.15(a), and publish notice of the application and provide for a comment period of not less

than 45 days including a public hearing within the state, id. § 233.15(e)(1)–(2).  The EPA must

determine whether to approve or deny the state's application within 120 days after the date of the

receipt of a complete program application.  33 U.S.C. § 1344(h); 40 C.F.R. § 233.15(g).  The

EPA must issue a summary of significant comments received and its response to these

comments.  40 C.F.R. § 233.15(g).

81.    To approve a state application, the EPA must determine whether the state has

"authority with respect to the issuance of permits pursuant to such program" to, among other

things:  (1) issue permits "which apply, and assure compliance with" all Section 404

requirements, including Section 404(b)(1) Guidelines; (2) assure that the public "receive notice

of each application for a permit and to provide an opportunity for public hearing before a ruling

on each such application;" and (3) "abate violations of the permit or the permit program,

JA.135

including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C.

§ 1344(h)(1)(A)(i), (1)(C), (1)(G).

82.     The Section 404(b)(1) Guidelines prohibit, among other things, the issuance of

404 permits that would jeopardize the existence of ESA-listed species or result in the likelihood

of destroying or adversely modifying critical habitat identified under the ESA.  40 C.F.R.

§§ 230.10(b)(3), 233.11(a)–(c), 233.23.

**The Endangered Species Act**

83.     Congress enacted the Endangered Species Act of 1973 ("ESA") because human

activities had caused the extinction of many species and other species "[had] been so depleted in

numbers that they are in danger of or threatened with extinction."  16 U.S.C. § 1531(a)(1)–(2).

All species listed as endangered or threatened by the Secretary of Interior are protected by the

ESA, which the Supreme Court has called "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437

U.S. 153, 180 (1978).

84.     Recognizing the need to protect these species and to conserve their habitat,

Congress mandated that all federal departments and agencies seek to conserve endangered and

threatened species.  16 U.S.C. § 1531(c)(1).

85.     Section 7 of the ESA establishes a federal interagency consultation process to

assist agencies in complying with their duty to avoid jeopardy to listed species or destruction or

adverse modification of critical habitat.  Under this process, a federal agency proposing an action

that "may affect" a listed species must prepare and provide to the appropriate expert agency a

description of the proposed action, its effects, and the relevant scientific evidence.  16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14(a).

86.     Section 7 of the ESA prohibits agency actions that may jeopardize the survival

and recovery of a listed species or adversely modify its critical habitat:

> Each federal agency shall, in consultation with and with the assistance of the
> Secretary, insure that any action authorized, funded, or carried out by such agency
> (hereinafter in this section referred to as an "agency action") is not likely to
> jeopardize the continued existence of any endangered species or threatened species
> or result in the destruction or adverse modification of habitat of such species which
> is determined by the Secretary . . . to be critical . . . .

16 U.S.C. § 1536(a)(2).

87.     "Action" is defined broadly to encompass "all activities or programs of any kind

authorized, funded, or carried out, in whole or in part, by Federal agencies."  50 C.F.R. § 402.02.

An agency's Section 7 obligations extend to ongoing actions over which the agency retains

authority or discretionary control.

88.     For actions that may adversely affect a listed species or critical habitat, a formal

consultation with the Services is required.  Id. § 402.14.  At the conclusion of a formal

consultation, the Services issue a biological opinion assessing the effects of the action on the

species and its critical habitat, determining whether the action is likely to jeopardize the

continued existence of the species or adversely modify its critical habitat and, if so, offering a

reasonable and prudent alternative that will avoid jeopardy or adverse modification.  16 U.S.C. §

1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

89.     Federal agencies must ensure that such actions will not "result in the destruction

or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  Since critical

habitat must be designated outside of a species' current inhabited range under certain

circumstances, the "adverse modification" analysis provides habitat protection even in situations

where the "jeopardy" analysis does not apply.  See Cape Hatteras Access Pres. All. v. U.S. Dep't

of Interior, 344 F. Supp. 2d 108, 131 (D.D.C. 2004); accord Sierra Club v. U.S. Fish and

Wildlife Serv., 245 F.3d 434, 441 (5th Cir. 2001).

90.    Section 9 of the ESA prohibits "take" of endangered species by any person, which

includes private entities, along with state and federal agencies.  16 U.S.C. § 1538(a)(1).  "Take"

means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  Id. §

1532(19).  The Services have defined "harm" to include "significant habitat modification or

degradation which actually kills or injures fish or wildlife by significantly impairing essential

behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50

C.F.R. § 222.102.

91.    If a federal action undergoing consultation will take a listed species, the biological

opinion must include an "incidental take statement" that specifies the amount and extent of

incidental take of listed species that may occur without causing jeopardy or adverse modification

of critical habitat.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  The incidental take statement

provides a safe harbor, insulating from take liability activities undertaken in compliance with the

incidental take statement's terms and conditions.  16 U.S.C. § 1536(o)(2).  See Id.

§ 1536(b)(4)(C).  An incidental take statement also serves as a check on the biological opinion's

assumptions and conclusions and provides for monitoring.  50 C.F.R. § 402.14(i)(3).  It must set

out a "trigger" that identifies an unacceptable level of take that invalidates the safe harbor and

requires the agencies to immediately reinitiate consultation.  Id. § 402.14(i)(4).

92.    The ESA implementing regulations provide:

Reinitiation of formal consultation is required and shall be requested by the Federal
agency or by the Service, where discretionary Federal involvement or control over
the action has been retained or is authorized by law and

(a) If the amount or extent of taking specified in the incidental take statement is
exceeded; [or]

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . .

50 C.F.R. § 402.16 & (a)–(b).  If either of these triggers occurs, both the action agency and the expert fish and wildlife agency have a duty to request reinitiation of consultation.  Id.

93.     The Services' regulations reiterate that even when undertaking a programmatic consultation, the action agency is not relieved "of the requirements for considering the effects of the action or actions as a whole."  50 C.F.R. § 402.14(c)(4).

94.     The "action area" to be examined by the Services encompasses "all areas to be *affected directly or indirectly* by the federal action and not merely the immediate area involved in the action."  Id. § 402.02 (emphasis added).

**The Rivers and Harbors Act**

95.     A state 404 program cannot assert jurisdiction over navigable waters of the United States.  33 U.S.C. § 1344(g)(1).

96.     Navigable waters of the United States remain under the Corps' exclusive control pursuant to Section 10 of the Rivers and Harbors Act.  33 U.S.C. § 403.  They include those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  33 C.F.R. § 329.4.

97.     The Corps' exclusive jurisdiction also "extend[s] laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark."  Id. § 329.11(a).

98.     Precise definitions of "navigable waters of the United States" or "navigability" are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies.  Id. § 329.3.

99.     The Corps' determination of navigable waters is made by the division engineer in a report of findings based on criteria set out in the Corps' regulations.  Id. § 329.14(b).  These reports must be reviewed by district counsel before the division engineer issues a final determination.  Id.

100.     Each report must include findings on (1) the name of the waterbody, (2) the river it feeds; (3) its physical characteristics (including the water type, length, approximate discharge volume, fall per mile, extent of tidal influence, range between high and ordinary low water, and improvements to navigation), (4) the nature and location of significant obstructions to navigation or its capability to be used in interstate commerce, (5) authorized projects (including a list of known survey documents or reports describing the waterbody), (6) past or present interstate commerce, (7) the potential use for interstate commerce, (8) the nature of jurisdiction that has been exercised by federal agencies, (9) state or federal court decisions relating to navigability of the waterbody, and (10) the Corps' finding regarding navigability.  Id. § 329.14(c).

101.     Each district of the Corps is required to maintain a tabulated list of final determinations of navigability, and to update these lists "as necessitated by court decisions, jurisdictional inquiries, or other changed conditions."  Id. § 329.16(a).

102.     Since the district's list "represent[s] only those waterbodies for which determinations have been made[,] absence from that list should not be taken as an indication that the waterbody is not navigable."  Id. § 329.16(b).

103.     "Deletions from the list are not authorized" and "changes are not considered final until a determination has been made by the division engineer" following updated findings.  Id. § 329.16(c).

**FIRST CLAIM FOR RELIEF**

**EPA'S INTERLOCUTORY COMPLETENESS DETERMINATION VIOLATES THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT**

104.    Plaintiffs adopt and incorporate by reference paragraphs 1–103 of this Complaint.

105.    The APA's rulemaking procedures and Clean Water Act regulations require that the public be given notice and an opportunity to comment on a state 404 assumption application. 5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1)–(2).

106.    Pursuant to the APA, "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."  5 U.S.C. § 551(4).  A "rule making" is the "agency process for formulating, amending, or repealing a rule."  Id. § 551(5).

107.    The EPA's decision to approve the transfer of section 404 jurisdiction from the Corps to a state is a rulemaking that must comply with the rulemaking procedures defined by Section 553 of the APA.

108.    The state application was not complete when received by the EPA because it relied on a USFWS programmatic biological opinion that was not in existence at the time of submission and which would later result from the EPA's formal consultation with USFWS—a process that had not even begun when the application was submitted—to demonstrate that its program would ensure no jeopardy to listed species.

109.     USFWS' programmatic biological opinion and incidental take statement were submitted to the EPA on November 19, 2020, more than two weeks after the close of the public comment period.  Neither was made available to the public for review and comment.

110.     The state application was also not complete because it failed to adequately identify the waters that would be assumed under its proposed program as required by the EPA regulations dictating the contents of an assumption application.  40 C.F.R. § 233.11(h) (requiring assumption applications to include "[a] description" of the waters of the United States to be assumed by the state and to be retained by the Corps).

111.     Rather than provide this information, the state application included an unauthorized, truncated list of retained waters prepared by the Corps.

112.     Without complete information, members of the public were unable to fully evaluate and comment on the impact the EPA's approval would have on waters that are of ecological, historical, cultural, and economic benefit to the public.

113.     Finally, the state application failed to identify any funding for the implementation, operation, and enforcement of a state-level 404 program, as it claimed that no additional resources would be required and it did not identify legislative authorization for the re-purposing of funds.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding *and* manpower which will be available for program administration" (emphasis added)).

114.     The EPA's determination that Florida's application was complete as of its submission on August 20, 2020, was arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence and otherwise in violation of the Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344; 40 C.F.R. § 233.15.

115.     The EPA's closure of the comment period before elements of the state's application were completed was arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344(g); 40 C.F.R. § 233.10, 233.15(e)(1)–(2).

116.     The EPA's unlawful completeness determination precluded meaningful testing, denied fairness to affected parties, and precluded the opportunity to develop evidence in the record necessary for judicial review.  See Small Refiner Lead Phase-Down Task Force v. U.S. Envtl. Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (stating public notice requirements under the APA are intended to provide these opportunities).

117.     The EPA's actions and omissions have harmed the Plaintiffs and leave them without any adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### EPA'S APPROVAL OF FLORIDA'S ASSUMPTION PROGRAM VIOLATES THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT

118.     Plaintiffs adopt and incorporate by reference paragraphs 1–117 of this Complaint.

119.     The Clean Water Act requires the EPA to determine whether a state seeking to administer the 404 program has demonstrated that it has authority to, among other things: issue permits that apply, and assure compliance with, the requirements of Section 404, including the 404(b)(1) Guidelines; assure that the public will have notice and an opportunity for hearing on every application; and abate violations of any permit and the permit program via civil and criminal enforcement.  33 U.S.C. § 1344(h)(1); see also 33 U.S.C. § 1344(g)(1); 40 C.F.R. § 233.12.  The EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).

120.     The EPA acted unlawfully in approving the state's application as its program did not meet the criteria in many regards, including, but not limited to, those identified below.

121.     As to general permits, Section 404 authorizes the Corps to issue general permits for a duration of five years after the permitting entity determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.  The analysis underlying the issuance of general permits must be re-evaluated before a general permit can be renewed.

122.     The state program violates federal law by purporting to issue scores of general permits without the state permitting authority having made the requisite determinations regarding environmental impact, 40 C.F.R. § 233.21(b), id. § 233.2 (defining director as state agency), relying instead on the Corps' prior determinations.

123.     The state program violates federal law by authorizing these general permits for a duration of five years from the date of EPA approval of the program, unlawfully extending the general permits issued initially by the Corps beyond their statutorily limited five-year duration. 33 U.S.C. § 1344(e)(2).

124.     As to emergency permits, the state program unlawfully expands the circumstances under which emergency permits—those that do not follow the ordinary requirements of Section 404—may issue, in contravention of 40 C.F.R. § 233.22(a).

125.     As to permit conditions, the state program omits important requirements, including the requirement to "minimize" discharges in violation of a permit, Id. § 233.23(c)(4), certain monitoring and reporting requirements, id. § 233.23(c)(7), the requirement that discharges minimize adverse impacts through restoration, in addition to mitigation, id.

§ 233.23(c)(9), and the requirement of specifically identifying and completely describing the authorized activity, id. § 233.23(c)(1).

126.    As to the permit application process, the state does not require the same level of detailed information as is required under federal law, id. § 233.30(d), and uses different terms that change the information that must be provided, contrary to id. § 233.30(b)(3).

127.    The federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes." Id. § 233.3.  The state program, however, does not include this requirement and conceded that it "did not add this [requirement] to the rule."

128.    As to public notice, the state program does not require that the state provide public notice on receipt of a 404 permit application, in contravention of federal law, which does. Id. § 233.32(a)(1).

129.    As to definitions, the state program does not adopt all definitions in the 404(b)(1) Guidelines, omits definitions of several terms defined under federal law, and adopts more restrictive definitions for certain, critical terms (including "pollution").  Compare id. § 230.3(k) with Fla. Stat. § 403.031(7).

130.    Federal regulations require that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions." 40 C.F.R. § 233.40(a).  The state's application failed to demonstrate that it has, much less maintains, any such a program.

131.    As to general procedures for determining the applicability of permit conditions relating to the contamination of dredge and fill material, the state restricted the broad federal duty to "determine the possibility of chemical contamination or physical incompatibility of the

material to be discharged," id. § 230.5, to only situations where that contamination may violate state water quality standards or toxic effluent standards or prohibitions.

132.    As to general permits, id. § 230.7, the state failed to include the 404(b)(1) Guidelines' requirement that a general permit may only be issued if "[t]he activities in such category are similar in nature and similar in their impact upon water quality and in the aquatic environment." The state also failed to incorporate the 404(b)(1) Guidelines' requirements governing the process for issuing general permits.

133.    As to restrictions on discharge, id. § 230.10, the state program creates a wholesale exception for temporary violations of state water quality standards that is not present under federal law.

134.    As to impacts, the state program fails to incorporate the requirement that a determination of whether a discharge would cause or contribute to significant degradation of wetlands or other surface waters be based on factual determinations, evaluations, and tests required by the 404(b)(1) Guidelines "subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts." Id. § 230.10(c).

135.    As to factual determinations, id. § 230.11, the 404(b)(1) Guidelines lay out specific, factual determinations that permitting authorities must use to determine the individual, cumulative, and secondary effects of a proposed discharge of dredged or fill material on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity; contaminants; aquatic ecosystem and organism; and the proposed disposal site. The state program does not incorporate or apply the guideline's defined set of factual determinations, and it does not require these factual determinations when considering whether to issue a 404 permit.

136.    As to findings of compliance or noncompliance with the restrictions on discharge, id. § 230.12, the 404(b)(1) Guidelines require that the permitting authority, after deciding whether to issue or deny a permit, must make findings that "include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration." Id. § 230.12(b).

137.    The state regulations do not require the agency to make the factual determinations laid out in id. § 230.11, and therefore do not require that the agency include those factual determinations in any final permit decisions.

138.    The state application also failed to demonstrate adequate criminal enforcement authority.  33 U.S.C. § 1344(g)(1)(G).  State law requires a greater degree of intent or knowledge to establish a criminal violation of Section 404 and provides a shorter statute of limitations as compared to federal law for holding criminal violators accountable.  33 U.S.C. §§ 1319(c)(1)(A), (B), 1365(a), (g); 18 U.S.C. § 3282; 28 U.S.C. § 2462; 40 C.F.R. § 233.41(a)(3)(ii).  See United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012); United States v. Pruett, 681 F.3d 232, 243 (5th Cir. 2012); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005); United States v. Hanousek, 176 F.3d 1116, 1120 (9th Cir. 1999).

139.    The state program failed to adopt or incorporate the wide range of impacts that must be considered under the 404(b)(1) Guidelines when reviewing a permit, other than for aesthetics.  40 C.F.R. §§ 230.20–25 (Subpart C); id. §§ 230.30–32 (Subpart D); id. §§ 230.40–45 (Subpart E); id. §§ 230.50–54 (Subpart F).  But see id. § 230.53 (aesthetics).

140.    The state program failed to adopt or incorporate the 404(b)(1) Guidelines pertaining to compensatory mitigation for loss of wetlands.

141.    The state program failed to define a whole host of terms used in the federal program, id. § 230.92, and uses definitions of comparable terms that conflict with or undermine the substance of the federal definition (for example the state definition of wetlands "creation" does not require "a gain in aquatic resource area and functions," whereas the federal definition of wetlands "establishment" does).

142.    As to general compensatory mitigation requirements, id. § 230.93, the state alters or omits vital portions of this Guideline, thereby creating less stringent requirements for its mitigation program.  For example, the state program weakens the "watershed approach" described in the 404(b)(1) Guidelines, which is necessary to ensuring that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by dredge and fill permits.  Id. § 230.93(c)(4).  The state program ignores the federal requirements pertaining to site selection for mitigation, id. § 230.93(d)(vi), which are essential to ensuring the mitigation is appropriate and effective.

143.    The state program does not include federal requirements that permit writers document certain findings pertaining to mitigation, id. § 230.93(e)(2)–(3), and omits the requirement that the permit writer "require a mitigation ratio greater than one-to-one where necessary."  Id. § 230.93(f)(2).

144.    As to the decision-making process for a permit application, federal rules require that a permit be reviewed for compliance with the 404(b)(1) Guidelines.  Id. § 233.34.

145.    The state program has not adopted or incorporated these guidelines.

146.    As to compliance evaluation programs, federal rules require a state to "maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions."  Id. § 233.40(a).

147.    The state does not maintain a program to identify violations of its current wetlands programs and has not shown it is capable to do so for an assumed 404 program.

148.    State law also does not provide comparable access to the courts for purposes of enforcement and redress as available under federal law.  This deprives affected parties of the ability to vindicate rights and ensure citizen enforcement of Section 404.

149.    Whereas federal law authorizes any aggrieved party to litigate Section 404 claims, Florida allows only citizens of the state to compel government enforcement of environmental laws, to bring suit against a person or non-governmental entity to enforce environmental laws, to initiate administrative proceedings in federally delegated programs, and to intervene in enforcement proceedings.

150.    State law also severely limits the ability to establish associational standing. Whereas federal law authorizes associational standing based on a single member's injury in fact, Am. Clinical Lab. Ass'n v. Azar, 931 F.3d 1195, 1203 (D.C. Cir. 2019), Florida law requires organizations to demonstrate that a "substantial number" of their members "are substantially affected" by the challenged conduct.

151.    For purposes of enforcement and redress, state law further conflicts with federal law by creating a mandatory fee-shifting provision that has no analog under the Clean Water Act and discourages or precludes under-resourced individuals and organizations from seeking to vindicate their rights.

152.    State 404 permitting programs must ensure that the state agency will not issue any permit that fails to comply with the requirements of the Clean Water Act and its implementing regulations, including the 404(b)(1) Guidelines.  See 40 C.F.R. § 233.20.

153.    The state program fails to adopt or incorporate by reference all 404(b)(1)
Guidelines.

154.    Specifically, the state program fails to satisfy the 404(b)(1) Guidelines
requirement to ensure there will be no jeopardy to listed species prior to the issuance of permits
for the discharge of dredged or fill material pursuant to the Clean Water Act Guidelines.  Id. §§
233.15(g), 230.10(b)(3).

155.    The state did not demonstrate that its Department of Environmental Protection has
the authority to regulate species under state law that it now claims it would exercise in a state-
assumed program.

156.    The state's application failed to provide the necessary statement regarding the
State's takings law.  Id. § 233.12(c).  Instead, the state relied on the limited and universally
applicable chance that a takings case may be reviewed by the Supreme Court of the United
States.

157.    The state's application summarily asserted that it could rely on existing resources
to administer and enforce a 404 program while failing to disclose, among other things:  (1) the
state agency's failure to meet existing regulatory obligations; (2) the significant budget cuts
brought on by the global pandemic; and (3) the resource status and needs of other state agencies
which the state intends to rely on to fulfill obligations under the Clean Water Act.  Id. §§
233.1(a), 233.11.

158.    The state also did not demonstrate that it had the legal authority to re-purpose
current funding for a new federal program.

159.    The state program did not fully address or disclose all costs that will necessarily
be associated with administering a state-level 404 program, including:  (1) initial resources

34

needed to process all pending (160) applications at the time of assumption; (2) resource needs and costs required for compliance and enforcement of the pending applications that are approved; (3) sufficient staffing; (4) an adequate audit process; (5) costs associated with reissuing general permits; (6) the large area of permits where the claimed "85%" overlap of work with the state wetlands program will not be achieved; and (7) several costs associated with implementation.

160.    For these, and other reasons, the EPA's approval of the state's application was arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act, 33 U.S.C. § 1344, and APA, 5 U.S.C. § 706(2).

161.    The EPA's actions and omissions have harmed and will harm the Plaintiffs and leave them without any adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### USFWS' BIOLOGICAL OPINION AND "NO JEOPARDY" DETERMINATION VIOLATE THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT

162.    Plaintiffs adopt and incorporate by reference paragraphs 1–161 of this Complaint.

163.    Section 7 of the ESA requires that a biological opinion "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).

164.    In this case, the "agency action" for Section 7 of the ESA was EPA's consideration of the state 404 program.  The ESA therefore required USFWS to make the relevant determinations regarding the impact of the EPA's approval of the program.  The ESA's implementing regulations specify that a biological opinion must include:  "[a] detailed discussion of the environmental baseline of the listed species and critical habitat [and] [a] detailed

discussion of the effects of the action on listed species or critical habitat." 50 C.F.R.

§ 402.14(h)(1)(ii), (iii).

165.    These requirements apply to the issuance of programmatic biological opinions.

50 C.F.R. § 402.14(c)(4).  USFWS' biological opinion concluded that approval of the state

program would result in "no jeopardy."

166.    USFWS stated that its jeopardy analysis relied on:  (1) the status of the species;

(2) the environmental baseline, which analyzes the condition of the listed species in the action

area, without the consequences to the listed species caused by the proposed action; (3) the effects

of the action, which includes all consequences to listed species that are caused by the proposed

action, including the consequences of other activities that are caused by the proposed action; and

(4) the cumulative effects, which evaluates the effects of future, non-Federal activities in the

action area on the species.  16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(g).

167.    In the biological opinion, however, USFWS relied on the biological evaluation

submitted by the EPA, which was virtually identical to the biological assessment provided by the

state to the EPA in support of its application.

168.    In the biological evaluation, the EPA found the proposed assumption is "likely to

adversely affect" 1643 species under USFWS's jurisdiction, is "not likely to adversely affect" 9

species, and would have "no effect" on 60 species.

169.    The EPA's conclusions were inconsistent and incomplete.  For example, the EPA

found the action would have "no effect" on shortnose sturgeon, Gulf sturgeon, or Atlantic

sturgeon, despite also stating that "the action could result in a [likely to adversely affect]

determination" for shortnose sturgeon and that critical habitat for Gulf sturgeon is designated in

several Florida rivers.

170.    USFWS' biological opinion also failed to provide a detailed discussion of the environmental baseline and failed to provide a detailed discussion of the effects of the action.

171.    Rather than provide the requisite detailed discussion of the environmental baseline, USFWS' biological opinion incorporated by reference the EPA's biological evaluation.

172.    The biological evaluation in turn does not provide a detailed discussion of the environmental baseline as affects listed species and critical habitats, 50 C.F.R. § 402.02.  Instead, the biological opinion merely includes a chart listing previous 404 permits that involved ESA consultations.

173.    Instead of a detailed discussion of effects on each of the listed species and critical habitats that may result from the EPA's approval of the state program, USFWS' biological opinion—again incorporating the EPA's biological evaluation, which mimics the state's biological assessment—provides only a cursory overview of the harms to species and habitat from general environmental degradation.

174.    The biological evaluation noted that critical habitat is designated for nearly 40 potentially affected species but did not map where critical habitat may exist within the action area or make any effects determinations for critical habitats.

175.    USFWS' biological opinion did not lawfully conduct a jeopardy analysis as to any species or critical habitat.  16 U.S.C. § 1536(a)(2), (b).

176.    USFWS' reliance on this insufficient biological evaluation to make determinations required under the ESA was arbitrary and capricious and otherwise not in accordance with the law.

177.    USFWS further improperly relied on its memorandum of understanding with the state in making its no jeopardy determination.  The memorandum of understanding establishes a

process regarding individual permit decisions, not an assessment of whether the federal action

for consultation purposes—the EPA's approval of the state's 404 assumption—may jeopardize

listed species or adversely modify critical habitat, which requires assessment of the proposed

program as a whole.

178.    Likewise, USFWS' consideration of the likelihood of jeopardy or adverse

modification from the issuance of individual permits does not assess the likelihood of jeopardy

or adverse modification from the entire action under consultation—assumed authority for all

dredge and fill permits.

179.    USFWS' failures to analyze the status of the species, environmental baseline,

effects of the action and cumulative effects violate the ESA, 16 U.S.C. § 1536, and APA, 5

U.S.C. § 706(2)(A), and render its "no jeopardy" determination unlawful.

## FOURTH CLAIM FOR RELIEF

### USFWS' BIOLOGICAL OPINION AND "INCIDENTAL TAKE STATEMENT" VIOLATE THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT

180.    Plaintiffs adopt and incorporate by reference paragraphs 1–179 of this Complaint.

181.    The ESA prohibits any person from "taking" an endangered species.  16 U.S.C. §

1538(a)(1)(B).  Under Section 4(d), 16 U.S.C. § 1533(d), USFWS has the authority to issue

regulations extending the take prohibition to threatened species.

182.    The take prohibition applies to "any person."  16 U.S.C. § 1538(a)(1).  The ESA

defines "any person" to include "any officer, employee, agent, department, or instrumentality of

the Federal Government."  16 U.S.C. § 1532(13).  The ESA citizen suit provision authorizes

suits to enforce the ESA and its implementing regulations against any person, including federal

agencies.  Id. § 1540(g)(1).

183.    The EPA, the director of a state-assumed program, and permittees are persons subject to the ESA take prohibition and to ESA citizen suits.

184.    The ESA defines "take" to include "harm."  Id. § 1532(19).

185.    If a federal action undergoing consultation will take a listed species, the biological opinion must include an "incidental take statement" that specifies the amount and extent of incidental take of the listed species that may occur without causing jeopardy or adverse modification, includes "terms and conditions," and provides for monitoring of take.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)–(3).  Incidental take must be incidental and not the purpose of the action.  The incidental take statement insulates from take liability activities undertaken in compliance with its terms and conditions.  16 U.S.C. § 1536(o)(2).  See 16 U.S.C. § 1536(b)(4)(C).

186.    An incidental take statement serves as a check on the biological opinion's assumptions and conclusions.  It must set out a "trigger" that specifies an unacceptable level of take that invalidates the safe harbor and requires the agencies to immediately reinitiate consultation.  50 C.F.R. §§ 402.14(i)(4), 402.16(a).

187.    USFWS' biological opinion fails to specify the amount or extent of incidental take, fails to impose a limit on incidental take, and fails to specify a take-based trigger for reinitiating consultation, all in violation of the ESA.

188.    USFWS' failures precluded the agency from lawful authority to issue an incidental take statement purporting to extend incidental take coverage to the EPA, the state, and state permittees.

189.    USFWS' incidental take statement purports to provide permittees conditional take coverage so long as they comply with all permit conditions imposed by the state agency, as

39

recommended by USFWS.  The nature and adequacy of such conditions is not known because there are no standards or sideboards governing them.  Accordingly, USFWS lacks a reasoned basis for determining the permits and permittee actions in compliance with them will not result in an unacceptable amount of take.

190.    The biological opinion's incidental take statement does not impose a measurable limit on allowable take.  See 50 C.F.R. 402.14(i)(1)(i).  It indicates that USFWS does not know which species will be taken, the locations of take, or the number of individual members of listed species that will be harmed, killed, or otherwise taken as a result of state permits authorizing the discharge of dredged and fill material in waters of the United States.

191.    The Services can use a surrogate to establish a take limit, provided the surrogate is an accurate and credible measure of harm to the listed species.

192.    The biological opinion provides no surrogate measure for the number of individual listed species that can be taken under the delegation without upending the biological opinion's assumptions and no-jeopardy determinations.  It therefore fails to provide a limit on take as required by the ESA and the ESA regulations and no measurable trigger for reinitiation of consultation or elimination of the safe harbor.

193.    The incidental take statement incorporates into its take limit compliance with the process set out in the memorandum of understanding.  In other words, the take limit is the same as implementation of the action undergoing consultation.  It is the proposed action, rather than a separate limit and check on the biological opinion's no-jeopardy conclusions.

194.    USFWS acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. § 706(2), in setting the take limit at the level that coincides with full implementation of the action undergoing consultation.

195.    The incidental take statement relies on a future process to minimize take, but that process lacks sideboards to ensure that the take that will not cause jeopardy or be at odds with the biological opinion's assumptions and conclusions.  It provides the EPA take coverage once the delegation is approved without requiring the EPA to implement USFWS' take minimization measures.  As to the EPA, it thereby establishes no limit on the allowable amount of take that the delegation will cause.

196.    The terms and conditions of the incidental take statement require the state to implement all USFWS recommendations to avoid and minimize impacts to listed species and to deny a permit if USFWS makes a jeopardy call.  Neither the biological opinion nor the memorandum of understanding imposes any sideboards to ensure USFWS will make the necessary recommendations to avoid and minimize those impacts.  It was therefore arbitrary and capricious for the agency to claim that those documents are enough to avoid take.

197.    To the extent that the biological opinion and incidental take statement rely on future jeopardy determinations that USFWS may make in its review of individual permits, the biological opinion is abdicating its responsibility to determine whether the delegation is likely to cause jeopardy and punting to future jeopardy determinations on different proposed actions – individual permits versus the delegation of authority over all future permits throughout the entire state and for the indefinite future.  In addition, this abdication of responsibility is replacing the required Section 7 consultation at the programmatic level for an unauthorized and less protective "technical assistance" review laid out in the biological opinion at the permit-level.

198.    The incidental take statement fails to include any method for recording or monitoring incidental take or to consider the cumulative impact of individual permit decisions.

199.     The incidental take statement relies on an unlawful scheme for purportedly conducting ESA review at the permit level for purposes of take liability coverage for the state and permittees.  The ESA creates two paths for extending take liability coverage, Section 7 (consultation for federal actions) and Section 10 (incidental take permits).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that USFWS created and relies upon in the incidental take statement.

200.     USFWS' actions and omissions are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the ESA, 16 U.S.C. § 1536, and APA, 5 U.S.C. § 706(2)(A).

201.     USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### EPA'S "NO EFFECT" DETERMINATION VIOLATES
### THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT

202.     Plaintiffs adopt and incorporate by reference paragraphs 1–201 of this Complaint.

203.     On April 15, 2020, NMFS unlawfully concluded that there were no species under its exclusive jurisdiction in assumable waters.  On its face, NMFS' determination failed to consider, much less analyze, all areas that would be affected by Florida's program directly or indirectly, as required under federal law.  See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02.

204.     On August 28, 2020, the EPA determined that consideration of a state 404 program was a discretionary action subject to compliance with the ESA, thereby triggering a duty to consult with USFWS and NMFS.

42

JA.158

205.     On September 2, 2020, the EPA initiated formal consultation with USFWS, and transmitted its "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (dated August 2020) to USFWS.

206.     In the biological evaluation, the EPA concluded that Florida's application would have "no effect" on NFMS jurisdictional species, based solely on the rationale in NMFS' April 15, 2020 letter.

207.     On September 2, 2020, EPA also sent a letter to NMFS confirming there were no changes to the previous species list reviewed by NMFS in April and, relying on NMFS April 15 jurisdictional determination, concluded the state's assumption would have no effect on NMFS's jurisdictional species.

208.     On September 3, 2020, NMFS sent a letter to EPA stating that they concurred with the "no effect" determination in EPA's September 2, 2020 letter.

209.     On October 30, 2020, NMFS in an email to EPA again concurred with EPA's "no effect" determination.

210.     These determinations were all based on NMFS' conclusion that jurisdictional species would not be within assumed waters.

211.     The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344(h)(1)(A)(i); 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), 233.23(a).

212.     The EPA's actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

## SIXTH CLAIM OF RELIEF

### USFWS' UNLAWFUL SCHEME VIOLATES THE
### ADMINISTRATIVE PROCEDURE ACT

213.    Plaintiffs adopt and incorporate by reference paragraphs 1–212 of this Complaint.

214.    USFWS' incidental take statement, biological opinion, and memorandum of understanding create an ESA scheme that is not authorized by law.

215.    No provision of the ESA authorizes the scheme created by USFWS in the biological opinion, incidental take statement, and memorandum of understanding to give the state a workaround regarding the mechanisms that Congress provided for establishing take limits, extending liability coverage, and determining jeopardy to species.

216.    Section 7 authorizes federal agencies to consult with USFWS.  16 U.S.C. § 1536. Pursuant to that process, USFWS can issue a biological opinion, establish take limits, and provide an incidental take statement that extends protection from ESA liability.  Id. § 1536(b)(c).

217.    USFWS' scheme in this case attempts to replicate that process with a state agency.  However, that is not authorized by the statute or regulations.

218.    Section 10 of the ESA creates a process for non-federal entities, like the state, to obtain permits that would relieve liability for the taking of listed species done incidental to an otherwise lawful activity.  16 U.S.C. § 1539(a)(1)(B).  Pursuant to that process, the applicant completes a conservation plan and submits it to USFWS.  Id. § 1539(a)(2)(A).  After review of the habitat conservation plan and public comments of the plan, USFWS may issue a permit including such terms and conditions as necessary or appropriate to carry out the purposes of the ESA.  Id. § 1539(a)(2)(B).

219.    USFWS did not act pursuant to Section 10 when establishing its scheme.

44

220.     USFWS' actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, in excess of statutory jurisdiction and authority, short of statutory right, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

221.     USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**

**CORPS' RETAINED WATERS DETERMINATION VIOLATES THE RIVERS AND HARBORS ACT AND THE ADMINISTRATIVE PROCEDURE ACT**

222.     Plaintiffs adopt and incorporate by reference paragraphs 1–221 of this Complaint.

223.     The Corps cannot delete identified navigable waters from its retained waters list until a determination has been made by the division engineer following the procedures and relying on the findings identified by the Corps' regulations.  33 C.F.R. § 329.14, 16.

224.     In conjunction with the state application, the Corps drastically reduced its retained waters list from 17 to 4 pages long.

225.     The Corps has not provided the public with a justification for its decision to substantially reduce the list of retained waters.

226.     The Corps' actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

227.     The Corps' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

45

## EIGHTH CLAIM FOR RELIEF

### EPA'S IMMEDIATE EFFECTIVE DATE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

228.    Plaintiffs adopt and incorporate by reference paragraphs 1–227 of this Complaint.

229.    Pursuant to the APA, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).  The only exceptions to this rule occur when a rule is:  (1) a substantive rule that "grants or recognizes an exemption or relieves a restriction"; (2) an interpretive rule or statement of policy; or (3) "the agency otherwise provides for good cause found and published with the rule."  5 U.S.C. § 553(d)(1)–(3).

230.    The EPA's approval of a state program constitutes a substantive rule that is subject to the requirements of APA Section 553.  5 U.S.C. §§ 551(4)–(5), 553.

231.    The EPA acted pursuant to delegated authority under the Clean Water Act to approve the state's assumption of jurisdiction over the federal 404 program.  33 U.S.C. § 1344.

232.    As required for a rule of general applicability and legal effect, the EPA indicated that approval of the Florida 404 program would be codified at 40 C.F.R. 233 subpart H.  85 Fed. Reg. 57,853, 57,855 (Sept. 16, 2020).  The agency unlawfully failed to codify the program.

233.    The EPA's decision has a substantive legal effect by (1) requiring public citizens to follow a new legal process under a new set of laws, regulations, and guidance, (2) delegates decision-making authority from the federal government to a state; (3) requires compliance with a different set of laws; (4) transfers enforcement authority from the federal government to a state operating under a different set of laws in state courts rather than federal courts; (5) requires permit applicants to fill out and submit different permit application forms to be submitted to a different permit-issuing entity; (6) strips the Corps of jurisdiction over the federal 404 program;

46

(7) removes citizens' NEPA rights; (8) restricts citizens' access to the courts; and (9) deprives Tribes' of their right to consult with the federal government—which bears trust obligations to the Tribes—when 404 permits would affect their natural, cultural, and historical resources.

234.    The rule does not grant or recognize an exception or relieve a restriction.

235.    Nor does the rule constitute an interpretation or statement of policy.

236.    The EPA provided no justification in the Federal Register Notice that would support application of the good cause exception.  Nor do the good cause exceptions apply.

237.    The EPA violated the APA by making its approval effective immediately upon publication in the Federal Register, rather than no less than 30 days thereafter.

238.    The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

239.    The EPA's immediate effective date for Florida's 404 program must be held unlawful and set aside.

## NINTH CLAIM FOR RELIEF

### EPA'S FAILURE TO CODIFY FLORIDA'S PROGRAM VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

240.    Plaintiffs adopt and incorporate by reference paragraphs 1–239 of this Complaint.

241.    Codification in the Code of Federal Regulations is required for all documents of an agency "having general applicability and legal effect . . . and . . . relied upon by the agency as authority."  44 U.S.C. § 1510(a).

242.    EPA's decision was intended to be a rule of general applicability that would have the legal effect of transferring authority from the Corps to the state and authorizing the state 404 program.

243.     Whenever a rule is subject to codification, the agency must draft its notice as an amendment to the Code of Federal Regulations before submitting it to the Office of the Federal Register.  1 C.F.R. § 21.1(a).  The agency must include in its publication "words of issuance" and "amendatory language that precisely describes the relationship of the new provision to the Code."  Id. § 21.1(b).

244.     The EPA's December 22, 2020, publication of its decision in the Federal Register failed to include "words of issuance" or "amendatory language" codifying the state program into the Code of Federal Regulations.  85 Fed. Reg. 83,553 (Dec. 22, 2020).

245.     The EPA indicated that approval of the Florida 404 program would be codified at 40 C.F.R. 233 subpart H.  85 Fed. Reg. at 57,855.

246.     The EPA has codified in the Code of Federal Regulations its approval of prior states that have assumed 404 jurisdiction.  See 40 C.F.R. § 233.70 (incorporating by reference Michigan's assumption program); 49 Fed. Reg 38,947-01 (approving and codifying Michigan's program into 40 C.F.R. § 233.70); 40 C.F.R. § 233.71 (incorporating by reference New Jersey's assumption program); 59 Fed. Reg. 9,933-01 (approving and codifying New Jersey's assumption program).

247.     The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

248.     The EPA's failure to codify the state program rendered the transfer of authority a nullity.  The subsequent transfer of authority must be held unlawful and set aside.

JA.164

## TENTH CLAIM FOR RELIEF

**EPA'S UNLAWFUL RELIANCE ON THE PROGRAMMATIC BIOLOGICAL
OPINION VIOLATES ENDANGERED SPECIES ACT**

249.    Plaintiffs adopt and incorporate by reference paragraphs 1–248 of this Complaint.

250.    Section 7 of the ESA requires that a biological opinion "detail[] how the agency
action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).

251.    Here, the "agency action" for Section 7 of the ESA was EPA's decision to
approve the state 404 program and transfer 404 authority to the state.

252.    Accordingly, before approving a state's assumption of the CWA's Section 404
permitting program, Section 7(a)(2) of the ESA required EPA to ensure that the state's
assumption, and thus implementation of the program, would not jeopardize the continued
existence and recovery of listed species and critical habitat.

253.    The ESA's implementing regulations specify that a biological opinion must
include: "[a] detailed discussion of the environmental baseline of the listed species and critical
habitat [and] [a] detailed discussion of the effects of the action on listed species or critical
habitat."  50 C.F.R. § 402.14(h)(1)(ii), (iii).

254.    These requirements apply to the issuance of programmatic biological opinions.
50 C.F.R. § 402.14(c)(4).  USFWS' biological opinion concluded that approval of the state
program would result in "no jeopardy."

255.    USFWS' biological opinion stated that its jeopardy analysis relied on:  (1) the
status of the species; (2) the environmental baseline, which analyzes the condition of the listed
species in the action area, without the consequences to the listed species caused by the proposed
action; (3) the effects of the action, which includes all consequences to listed species that are
caused by the proposed action, including the consequences of other activities that are caused by

49

the proposed action; and (4) the cumulative effects, which evaluates the effects of future, non-Federal activities in the action area on the species.  16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(g).

256.    On July 24, 2020, the state sent EPA its final biological assessment containing the state's conclusions regarding the effects of the state's to-be proposed 404 program if approved by EPA.  50 C.F.R § 402.12.

257.    On September 2, 2020, EPA submitted a biological evaluation to USFWS to initiate formal consultation on the state's application.  The biological evaluation was largely a cut and paste of the biological assessment drafted by the state.

258.    On November 19, 2020, USFWS transmitted to EPA a programmatic biological opinion and incidental take statement regarding EPA's approval of the state's application.  The biological opinion relied heavily on and incorporated large portions of the biological evaluation submitted by EPA.

259.    In the biological evaluation, EPA found the proposed assumption is "likely to adversely affect" 164 species under USFWS' jurisdiction, is "not likely to adversely affect" nine species, and would have "no effect" on sixty species.

260.    EPA's conclusions were inconsistent and contradictory.  For example, EPA found the action would have "no effect" on shortnose sturgeon, Gulf sturgeon, or Atlantic sturgeon, despite also stating that "the action could result in a [likely to adversely affect] determination" for shortnose sturgeon and that critical habitat for Gulf sturgeon is designated in several Florida rivers, which may be affected by state 404 permits.

261.    USFWS' biological opinion also failed to provide a detailed discussion of the environmental baseline and failed to provide a detailed discussion of the effects of the action.

262.     Rather than provide the requisite detailed discussion of the environmental baseline, USFWS' biological opinion incorporated by reference a portion of EPA's biological evaluation which merely consists of a chart listing previous 404 permits in Florida that involved ESA consultations.

263.     Instead of a detailed discussion of effects on each of the listed species and critical habitats that may result from EPA's approval of the state program, USFWS' biological opinion—again incorporating EPA's biological evaluation, which mimics the state's biological assessment—provided only a cursory overview of the harms to species and habitat from general environmental degradation.

264.     USFWS' biological opinion did not conduct a legally sufficient jeopardy analysis as to any species or an analysis of the potential destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(a)(2), (b).

265.     USFWS' biological opinion's reliance on EPA's insufficient biological evaluation to make determinations required under the ESA was arbitrary and capricious and otherwise not in accordance with the law.

266.     USFWS' biological opinion further improperly relied on USFWS' memorandum of understanding with the state in making its no jeopardy determination.  The memorandum of understanding establishes a process regarding individual permit decisions, not an assessment of whether the federal action for consultation purposes—EPA's approval of the state's 404 assumption—may jeopardize listed species or adversely modify critical habitat, which requires assessment of the proposed program as a whole.

267.     Likewise, USFWS' consideration of the likelihood of jeopardy or adverse modification from the issuance of individual permits does not assess the likelihood of jeopardy

or adverse modification from the action under consultation—assumed authority for all dredge and fill permits.

268.    USFWS' biological opinion impermissibly failed to analyze the status of the species, environmental baseline, effects of the action and cumulative effects in violation of the ESA, 16 U.S.C. § 1536, and APA, 5 U.S.C. § 706(2)(A), rendering unlawful its "no jeopardy" determination and determination that the action is not likely to destroy or adversely modify designated critical habitat.

269.    An "incidental take statement" must specify the amount and extent of incidental take of the listed species that may occur without causing jeopardy or adverse modification, include "terms and conditions," and provide for monitoring of take.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)–(3).

270.    USFWS' biological opinion incidental take statement fails to specify the amount or extent of incidental take, fails to impose a limit on incidental take, and fails to specify a take-based trigger for reinitiating consultation, all in violation of the ESA.

271.    The incidental take statement also fails to include any method for recording or monitoring incidental take or to consider the cumulative impact of individual permit decisions.

272.    EPA's reliance on USFWS' inadequate biological opinion and accompanying incidental take statement to approve Florida's assumption of the CWA Section 404 permitting program violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).

273.    EPA's actions and omissions have harmed the Plaintiffs and—unless enjoined— leave them without any adequate remedy at law.

## ELEVENTH CLAIM FOR RELIEF

### EPA'S FAILURE TO CONSULT WITH NMFS VIOLATE THE ENDANGERED SPECIES ACT

274.    Plaintiffs adopt and incorporate by reference paragraphs 1–273 of this Complaint.

275.    Whenever an agency action "may affect" a listed species in the "action area," the agency must consult with either NMFS and/or USFWS.  16 U.S.C. § 1536; 50 C.F.R. § 402.13–14.

276.    "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).  The "threshold for formal consultation must be set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' under Section 7(a)(2)." Id.  Only where the action agency determines its actions will have no effect on listed species or critical habitat may it forego consultation. 50 C.F.R. § 402.14(a).

277.    The "action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.  "Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur."  Id.

278.    On April 15, 2020, NMFS concluded that there were no species under its exclusive jurisdiction in assumable waters, and therefore unlawfully concluded that assumption would have no effect on listed species.  On its face, NMFS' determination failed to consider, much less analyze, all areas that would be affected by Florida's program directly or indirectly, as required under federal law.  See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02.

279.    On August 28, 2020, EPA determined that consideration of a state 404 program was a discretionary action subject to compliance with the ESA, thereby triggering a duty to consult with USFWS and NMFS.

280.    On September 2, 2020, EPA initiated formal consultation with USFWS, and transmitted its "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (BE) (dated August 2020) to USFWS.  In the biological evaluation, EPA concluded that Florida's application would have "no effect" on NFMS jurisdictional species, based solely on the rationale in NMFS' April 15, 2020, letter.

281.    On September 2, 2020, EPA also sent a letter to NMFS confirming there were no changes to the previous species list reviewed by NMFS in April and, relying on NMFS' April 15, 2020, jurisdictional determination, concluded the state's assumption would have no effect on NMFS' jurisdictional species.

282.    On September 3, 2020, NMFS sent a letter to EPA stating that they concurred with the "no effect" determination in EPA's September 2, 2020, letter.

283.    On October 30, 2020, NMFS in an email to EPA again concurred with EPA's "no effect" determination.

284.    These determinations were all based on NMFS' categorical conclusion that because jurisdictional species would not be within assumed waters themselves, state assumption would have no effect on species under their jurisdiction.

285.    However, EPA's approval of the state assumption application may directly and indirectly affect species that are under NMFS' jurisdiction.

JA.170

286.    EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the ESA and APA, 5 U.S.C. § 706(2).

287.    The EPA's actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

## TWELFTH CLAIM FOR RELIEF

### EPA'S FAILURE TO CONSULT ON CERTAIN SPECIES AND CRITICAL HABITATS UNDER USFWS JURISDICTION VIOLATES THE ENDANGERED SPECIES ACT

288.    Plaintiffs adopt and incorporate by reference paragraphs 1–287 of this Complaint.

289.    EPA is required by ESA section 7(a)(2) to initiate and *complete* consultation with USFWS to ensure the state's assumption would not jeopardize the continued existence of ESA-listed species.  16 U.S.C. § 1536(a)(2).

290.    Dredge and fill activities in assumed waters may affect nesting sea turtles and adversely modify or destroy designated critical habitat for these species.

291.    EPA therefore was required to consult with USFWS on those effects.  16 U.S.C. § 1536(a)(2).

292.    EPA did not consider or make effects determinations for ESA-listed sea turtles that nest on Florida's beaches or their designated critical habitats.  USFWS did not consult with EPA regarding these ESA-listed sea turtles or their critical habitats.

293.    EPA's failure to complete consultation on these USFWS jurisdictional species and habitats violates EPA's procedural and substantive obligations under ESA Section 7.

294.    EPA's actions and omissions have harmed the Plaintiffs and—unless enjoined—leave them without any adequate remedy at law.

### THIRTEENTH CLAIM FOR RELIEF

### USFWS' CREATION OF THE TECHNICAL ASSISTANCE PROCESS IS AN UNLAWFUL ULTRA VIRES ACTION

295.    Plaintiffs adopt and incorporate by reference paragraphs 1–296 of this Complaint.

296.    Plaintiffs have a cause of action to enjoin and declare unlawful official agency actions that are *ultra vires* and exceed USFWS' statutory authority.

297.    USFWS' incidental take statement, biological opinion, and memorandum of understanding create an ESA scheme that is not authorized by law.

298.    No provision of law authorizes the "technical assistance process" scheme created by USFWS in the programmatic biological opinion, incidental take statement, and memorandum of understanding to give the state and state permittees a workaround to avoid the requirements that Congress provided for establishing take limits, extending liability coverage, and determining jeopardy to species.

299.    Because USFWS' scheme is not authorized under any provision of law, it is *ultra vires* and unlawful.

300.    USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)    Issue a declaratory judgment declaring that the EPA violated the Clean Water Act and APA by taking a final agency action and making findings and conclusions that are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with law, when making the decision that the state's application was complete;

(b)      Issue a declaratory judgment declaring that the EPA violated the Clean Water Act and APA by taking a final agency action and making findings and conclusions that are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with law, when the agency approved the state's application to assume jurisdiction over the Clean Water Act 404 program;

(c)      Issue a declaratory judgment declaring that USFWS' biological opinion, "no jeopardy" determination, incidental take statement, and technical assistance process are ultra vires and violated the ESA and APA;

(d)      Issue a declaratory judgment declaring that EPA's reliance on USFWS' unlawful biological opinion violated the ESA;

(e)      Issue a declaratory judgment declaring that EPA violated the ESA by failing to consult with NMFS;

(f)      Issue a declaratory judgment declaring that EPA violated the ESA by failing to consult with USFWS regarding nesting sea turtles;

(g)      Issue a declaratory judgment declaring that USFWS' scheme for permit-level ESA "analysis" is not authorized by the law;

(h)      Issue a declaratory judgment declaring that the Corps violated the RHA and APA when producing its retained waters list;

(i)      Issue a declaratory judgment declaring that the EPA violated the APA by providing an immediate-on-publication effective date for its approval of Florida's program;

(j)      Issue a declaratory judgment declaring that the EPA violated the APA by transferring authority without codifying a lawful state program in the Code of Federal Regulations;

JA.173

(k)     Vacate and set aside the EPA's decision that the state's application is complete;

(l)     Vacate and set aside the EPA's decision to approve the state's application to assume jurisdiction over the Clean Water Act 404 program and remand with instructions for reopening and completing EPA's consideration of Florida's assumption application;

(m)     Vacate and set aside USFWS' programmatic biological opinion and incidental take statement for the challenged EPA decision and remand with instructions for reopening and reinitiating consultation;

(n)     Vacate and set aside the Corps' retained waters list submitted in conjunction with the state's application;

(o)     Hold unlawful and set aside the EPA's December 22, 2020, immediate effective date for the Florida 404 program;

(p)     Enjoin the EPA's approval and transfer of authority to the state;

(q)     Issue any other appropriate injunctive relief;

(r)     Allow the Plaintiffs to recover the reasonable fees, costs, and disbursements of this action, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(s)     Grant such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 4th day of January 2022,

> /s/ Tania Galloni
> TANIA GALLONI*
> Fla. Bar No. 619221
> CHRISTINA I. REICHERT*
> Fla. Bar No. 0114257
> Earthjustice
> 4500 Biscayne Blvd., Ste 201
> Miami, FL 33137
> T: 305-440-5432
> F: 850-681-0020

58

JA.174

tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

*\* Admitted Pro Hac Vice*

Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0001 | Request To Assume Administration of a Clean Water Act Program: Florida | Federal Register Notice | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0001 |
| EPA-HQ-OW-2018-0640-0002 | Florida State Statutes and Regulations Table of Contents | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A1 | Florida Administrative Code: 62-330.010(4)(a): Environmental Resource Permit Applicant's Handbook Volume I: through Appendix D | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A2 | Florida Administrative Code: 62-330.010(4)(a): Environmental Resource Permit Applicant's Handbook Volume I: Appendices E through K | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A3 | Southwest Florida Water Management District Environmental Resource Permit Applicant's Handbook Volume II. . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A4 | Environmental Resource Permit Applicant's Handbook Volume II For Use Within the Geographic Limits of the South Florida Water Management District | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A5 | Florida Administrative Code: 62-340: F.A.C. Data Form | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A6 | Florida Administrative Code: 62-330.050: Request for Verification of an Exemption | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A7 | Florida Administrative Code: 62-330.060 Section A: Application for Individual and Conceptual Approval Environmental Resource Permit . . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A8 | Florida Administrative Code: 62-330.060 Section B: For Single-Family Projects | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A9 | Florida Administrative Code: 62-330.060 Section C: Supplemental Information for Works or Other Activities . . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A10 | Florida Administrative Code: 62-330.060 Section D: Supplemental Information for Works or Activities . . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A11 | Florida Administrative Code: 62-330.060 Section E: Supplemental Information Required for Works . . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A12 | Florida Administrative Code: 62-330.060 Section F: Application for Authorization to Use State-Owned Submerged Lands | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A13 | Florida Administrative Code: 62-330.060 Section G: Supplemental Information Required for Mitigation Banks | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A14 | Florida Administrative Code: 62-330.060 Section H: Supplemental Information for Stormwater Management Systems for Mines | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A15 | Florida Administrative Code: 62-330.060 Section I: Supplemental Information for State 404 Program Permits | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A16 | Florida Administrative Code: 62-330.201(2): Petition for a Formal Determination of the Landward Extent of Wetlands . . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A17 | Florida Administrative Code: 62-330.340(1): Request to Transfer Environmental Resource and/or State 404 Program Permit | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A18 | Florida Administrative Code: 62-330.402(1): Notice of Intent to Use an Environmental Resource . . . | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A19 | Florida Administrative Code: 40D-1.660 Publications, Forms, and Agreements Incorporated by Reference | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A20 | Florida Administrative Code: 62-331.010(5): State 404 Program Applicant's Handbook | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A21 | Florida Administrative Code: 62-331.020(1): 40 CFR Vol 27 Sec 232-3 2019 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A22 | Florida Administrative Code: 62-331.053(3)(a)3: 33 USC 1317 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A23 | Florida Administrative Code: 62-331.100(1): Transfer of State 404 Program General Permit Verification | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |

JA.176

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0002-A24 | Florida Administrative Code: 62-331.200(1): Certification of Compliance with a State 404 Program General Permit | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A25 | Florida Administrative Code: 62-331.201(3)(l): 16 U.S.C. 668 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A26 | Florida Administrative Code: 62-331.201(3)(l): 16 U.S.C. 703-712 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A27 | Florida Administrative Code: 62-331.201(3)(n): Manatee Conditions | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A28 | Florida Administrative Code: 62-331.201(3)(o): Sea Turtle and Smalltooth Sawfish Construction Conditions | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A29 | Florida Administrative Code: 62-331.201(3)(v): 16 U.S.C. 470aa-470mm | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A30 | Florida Administrative Code: 62-331.201(3)(v): 25 U.S.C. 3001-3013 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A31 | Florida Administrative Code: 62-331.210(1)(a): 33 CFR 330.3 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A32 | Florida Administrative Code: 62-331.221(1)(a): 40 CFR 300 7-1-2019 Part 1 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A33 | Florida Administrative Code: 62-331.221(1)(a): 40 CFR 300 7-1-2019 Part 2 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A34 | Florida Administrative Code: 62-331.221(1)(a): 40 CFR 112.3 7-1-2019 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A35 | Florida Administrative Code: 62-331.221(1)(b): 40 CFR 761 7-1-2019 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A36 | Florida Administrative Code: 62-331.221(2)(a): National Response Team Guidance | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A37 | Florida Administrative Code: 62-331.227(3)(d): February 19, 2007 Letter SFESO to COE Regarding the Panther Key | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A38 | Florida Administrative Code: 62-331.244(2)(b): U.S.C. Title 16 Chapter 67 (2018) | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A39 | Florida Administrative Code: 62-331.245(3)(d): U.S. Fish and Wildlife Service Land-Based Wind Energy Guidelines | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A40 | Florida Administrative Code: 62-331.248(3)(f): Permit Streamlining Quality Enhancement Strategies (QES) for Wetland Impact Minimization | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A41 | Florida Administrative Code: 62-331.248(3)(s): Standard Protection Measures for the Eastern Indigo Snake | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A42 | Florida Administrative Code: 62-331.248(1): As-Built Certification By Professional Engineer | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A43 | Florida Administrative Code: 62-331.110(1): State 404 Program Emergency Field Authorization | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A44 | Florida Administrative Code: 62-4 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A45 | Florida Administrative Code: 62-110: Exceptions to the Uniform Rules of Procedure | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A46 | Florida Administrative Code: 62-330 2018 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A47 | Florida Administrative Code: 62-330 adopted changes | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A48 | Florida Administrative Code: 62-331 as adopted | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A49 | Florida Administrative Code: 62-340: Delineation of the Landward Extent of Wetlands and Surface Waters | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A50 | Florida Statute: Chapter 120: Administrative Procedure Act | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A51 | Florida Statute: Chapter 373: Water Resources | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A52 | Florida Statute: Chapter 403: Environmental Control | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A53 | Florida Statute: HB1091 enrolled | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0002-A54 | Florida Statute: SB712 enrolled | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0002 |
| EPA-HQ-OW-2018-0640-0003 | Cover Page and Table of Contents for Florida's Request to Assume Administration of a Clean Water Act (CWA) Section 404 Program | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0003 |

JA.177

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 3 of 35
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 192 of 444
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0004 | Letter from Florida Governor Ron DeSantis to EPA Regional Administrator Mary S. Walker Requesting to Assume Administration of a Clean Water Act (CWA) Section 404 Program | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0004 |
| EPA-HQ-OW-2018-0640-0005 | Letter from Florida Department Environmental Protection (FDEP) Secretary Noah Valenstein to EPA Regional Administrator Mary S. Walker Requesting to Assume Administration of a Clean Water Act (CWA) Section 404 Program | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0005 |
| EPA-HQ-OW-2018-0640-0006 | Florida's State 404 Program Description Cover Page and Introduction | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0006 |
| EPA-HQ-OW-2018-0640-0007 | Florida's State 404 Program Description Section a: Description of the Scope and Structure of the State's Program (Required by 40 C.F.R. § 233.11(a)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0007 |
| EPA-HQ-OW-2018-0640-0007-A1 | Appendix (a)-1: Overview of The Wetland and Other Surface Water Regulatory and Proprietary Programs in Florida | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0007 |
| EPA-HQ-OW-2018-0640-0008 | Florida's State 404 Program Description Section b: Description of the State's Permitting, Administrative, Judicial Review, and Other Applicable Procedures (Required by 40 C.F.R. § 233.11(b)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0008 |
| EPA-HQ-OW-2018-0640-0009 | Florida's State 404 Program Description Section c: Description of the Basic Organization and Structure of the Florida Department of Environmental Protection, which will have Responsibility for Administering the State 404 Program (Required by 40 C.F.R. § 233.11(c)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0009 |
| EPA-HQ-OW-2018-0640-0010 | Florida's State 404 Program Description Section d: Description of the Funding and Person-Power Which Will Be Available for Program Administration (Required by 40 C.F.R. § 233.11(d)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0010 |
| EPA-HQ-OW-2018-0640-0011 | Florida's State 404 Program Description Section e: An Estimate of the Anticipated Workload (Required by 40 C.F.R. § 233.11(e)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0011 |
| EPA-HQ-OW-2018-0640-0012 | Florida's State 404 Program Description Section f: Copies Of Permit Application Forms, Permit Forms, And Reporting Forms (Required by 40 C.F.R. § 233.11(f)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A1 | Application Form: Request For Verification Of An Exemption | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A2 | Application Form: Section A: Application For Individual And Conceptual Approval Environmental Resource Permit... | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A3 | Application Form: Section B: For Single-Family Projects | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A4 | Application Form: Section C: Supplemental Information For Works Or Other Activities In, On, Or Over Wetlands And/or Other Surface... | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A5 | Application Form: Section D: Supplemental Information For Works Or Activities Within Surface Waters (Other Than A Single-Family... | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A6 | Application Form: Section E: Supplemental Information Required For Works Or Other Activities Involving A Stormwater Management... | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A7 | Application Form: Section F: Application For Authorization To Use State-Owned Submerged Lands | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A8 | Application Form: Section G: Supplemental Information Required For Mitigation Banks | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A9 | Application Form: Section H: Supplemental Information For Stormwater Management Systems For Mines | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A10 | Application Form: Section I: Supplemental Information For State 404 Program Permits | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |

JA.178

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0012-A11 | Application Form: Petition For A Formal Determination Of The Landward Extent Of Wetlands And Other Surface Waters | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A12 | Application Form: Notice of Intent To Use An Environmental Resource And/or State 404 Program General Permit | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A13 | Other Form: Request To Transfer Environmental Resource And/or State 404 Program Permit | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A14 | Other Form: Transfer Of State 404 Program General Permit Verification | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A15 | Other Form: Certification Of Compliance With A State 404 Program General Permit | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A16 | Other Form: As-Built Certification By Professional Engineer | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A17 | Other Form: State 404 Program Emergency Field Authorization | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A18 | Other Form: Chapter 62-340 F.A.C. Data Form | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A19 | Permit Template: 404 Exemptions | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A20 | Permit Template: 404 General Permits | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A21 | Permit Template: 404 General Permits Does Not Qualify | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A22 | Permit Template: 404 Individual Permits | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A23 | Permit Template: State 404 Program Technical Staff Report Regulatory Basis Of Issuance | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A24 | Public Notice Template: Public Notice Template For Enforcement | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0012-A25 | Public Notice Template: Public Notice Template For Permitting | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0012 |
| EPA-HQ-OW-2018-0640-0013 | Florida's State 404 Program Section g: Description of the State's Compliance Evaluation and Enforcement Programs (Required by 40 C.F.R. § 233.11(g)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0013 |
| EPA-HQ-OW-2018-0640-0013-A1 | Attachment 1: DEP Directive 923: Settlement Guidelines for Civil and Administrative Penalties | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0013 |
| EPA-HQ-OW-2018-0640-0013-A2 | Attachment 2: Guidelines for Characterizing ERP Violations | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0013 |
| EPA-HQ-OW-2018-0640-0014 | Florida's State 404 Program Section h: Description of the Waters of the United States within a State over which the State Assumes Jurisdiction Under the Approved Program (Required by 40 C.F.R. § 233.11(h)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0014 |
| EPA-HQ-OW-2018-0640-0015 | Florida's State 404 Program Section i: Description of Specific Best Management Practices for Exemptions (Required by 40 C.F.R. § 233.11(i)) | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0015 |
| EPA-HQ-OW-2018-0640-0016 | Florida's State 404 Program Section j: Additional Information Related to the Program Description | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0016 |
| EPA-HQ-OW-2018-0640-0016-A1 | Appendix j-1: Operating Agreement Between the Florida Department of Environmental Protection and the Florida Division of... | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0016 |
| EPA-HQ-OW-2018-0640-0016-A2 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the United States Fish... | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0016 |
| EPA-HQ-OW-2018-0640-0016-A3 | Appendix j-3: ERP Comparison with Federal Requirements | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0016 |
| EPA-HQ-OW-2018-0640-0017 | Statement from Justin G. Wolfe, General Counsel, Florida Department of Environmental Protection | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0017 |
| EPA-HQ-OW-2018-0640-0018 | Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0018 |
| EPA-HQ-OW-2018-0640-0019 | Memorandum of Agreement Between the Florida Department of Environmental Protection and the Department of the Army | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0019 |
| EPA-HQ-OW-2018-0640-0020 | Cover Page and Table of Contents on Federal Statutes and Policies | Program Request | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0020 |
| EPA-HQ-OW-2018-0640-0020-A1 | Attachment 1: CWA Section 404(b)(1) Guidelines (30 CFR 230) | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0020 |

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 5 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 194 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0020-A2 | Attachment 2: CWA Section 404(g) Regulations on State and Tribal Section 404 Program Assumption | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0020 |
| EPA-HQ-OW-2018-0640-0020-A3 | Attachment 3: National Historic Preservation Act Section 106 Implementing Regulations at 36 CFR Part 800 | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0020 |
| EPA-HQ-OW-2018-0640-0020-A4 | Attachment 4: The National Historic Preservation Act | Support Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0020 |
| EPA-HQ-OW-2018-0640-0021 | Comment submitted by C. Reilly | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0021 |
| EPA-HQ-OW-2018-0640-0022 | Comment submitted by Tori A. (no surname provided) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0022 |
| EPA-HQ-OW-2018-0640-0023 | Comment submitted by Tanya Portillo, Executive Director, Florida Electric Power Coordinating Group (FCG) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0023 |
| EPA-HQ-OW-2018-0640-0023-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0023 |
| EPA-HQ-OW-2018-0640-0024 | Comment submitted by V. Weiss | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0024 |
| EPA-HQ-OW-2018-0640-0025 | Comment submitted by J. Wiggs | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0025 |
| EPA-HQ-OW-2018-0640-0026 | Comment submitted by A. Taylor | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0026 |
| EPA-HQ-OW-2018-0640-0026-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0026 |
| EPA-HQ-OW-2018-0640-0027 | Comment submitted by J. and R. Promin | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0027 |
| EPA-HQ-OW-2018-0640-0027-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0027 |
| EPA-HQ-OW-2018-0640-0028 | Comment submitted by M. Gale | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0028 |
| EPA-HQ-OW-2018-0640-0028-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0028 |
| EPA-HQ-OW-2018-0640-0029 | Comment submitted by P. Burke | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0029 |
| EPA-HQ-OW-2018-0640-0029-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0029 |
| EPA-HQ-OW-2018-0640-0030 | Comment submitted by R. Hall | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0030 |
| EPA-HQ-OW-2018-0640-0030-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0030 |
| EPA-HQ-OW-2018-0640-0031 | Comment submitted by R. A. Gibbons | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0031 |
| EPA-HQ-OW-2018-0640-0031-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0031 |
| EPA-HQ-OW-2018-0640-0032 | Comment submitted by Rainer W. Schael, President, RS Environmental Consulting, Inc. | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0032 |
| EPA-HQ-OW-2018-0640-0032-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0032 |
| EPA-HQ-OW-2018-0640-0033 | Comment submitted by G. Goepper | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0033 |
| EPA-HQ-OW-2018-0640-0033-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0033 |
| EPA-HQ-OW-2018-0640-0034 | Comment submitted by S. Terranova | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0034 |
| EPA-HQ-OW-2018-0640-0034-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0034 |
| EPA-HQ-OW-2018-0640-0035 | Comment submitted by T. Crew | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0035 |
| EPA-HQ-OW-2018-0640-0035-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0035 |
| EPA-HQ-OW-2018-0640-0036 | Comment submitted by T. E. Storch | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0036 |
| EPA-HQ-OW-2018-0640-0036-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0036 |
| EPA-HQ-OW-2018-0640-0037 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0037 |
| EPA-HQ-OW-2018-0640-0038 | Comment submitted by Z. Tosteson Losada | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0038 |
| EPA-HQ-OW-2018-0640-0039 | Comment  submitted by L. Bening | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0039 |
| EPA-HQ-OW-2018-0640-0040 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0040 |
| EPA-HQ-OW-2018-0640-0041 | Comment submitted by J. Koehler | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0041 |
| EPA-HQ-OW-2018-0640-0042 | Comment submitted by P. Street | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0042 |
| EPA-HQ-OW-2018-0640-0043 | Comment submitted by W. Gardner | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0043 |
| EPA-HQ-OW-2018-0640-0044 | Comment submitted by S. Chiappetta | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0044 |
| EPA-HQ-OW-2018-0640-0045 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0045 |
| EPA-HQ-OW-2018-0640-0046 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0046 |
| EPA-HQ-OW-2018-0640-0047 | Comment submitted by H. Elko | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0047 |
| EPA-HQ-OW-2018-0640-0048 | Comment submitted by L. Donahoe | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0048 |
| EPA-HQ-OW-2018-0640-0049 | Comment submitted by Frank C. Walker, III, Vice President of Government Affairs, Florida Chamber of Commerce | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0049 |
| EPA-HQ-OW-2018-0640-0049-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0049 |

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0050 | Comment submitted by Ariel Hoover, Chair, Lee County Chapter Climate Reality | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0050 |
| EPA-HQ-OW-2018-0640-0051 | Comment submitted by Bonnie Malloy, Tania Galloni and Christina I. Reichert, Attorneys, Earthjustice | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0051 |
| EPA-HQ-OW-2018-0640-0051-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0051 |
| EPA-HQ-OW-2018-0640-0051-A2 | Exhibits 1-11 Request to Reconsider Completeness Determination | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0051 |
| EPA-HQ-OW-2018-0640-0052 | Comment submitted by Sally B. Philips, Mayor and Thomas Hope, City Attorney et al., City of South Miami | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0052 |
| EPA-HQ-OW-2018-0640-0052-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0052 |
| EPA-HQ-OW-2018-0640-0053 | Comment submitted by David Hartgrove, President and Conservation Chair, Halifax River Audubon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0053 |
| EPA-HQ-OW-2018-0640-0053-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0053 |
| EPA-HQ-OW-2018-0640-0054 | Comment submitted by P. Cangialosi | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0054 |
| EPA-HQ-OW-2018-0640-0054-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0054 |
| EPA-HQ-OW-2018-0640-0055 | Comment submitted by R. T. Platt | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0055 |
| EPA-HQ-OW-2018-0640-0055-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0055 |
| EPA-HQ-OW-2018-0640-0056 | Comment submitted by J. Thomas | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0056 |
| EPA-HQ-OW-2018-0640-0056-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0056 |
| EPA-HQ-OW-2018-0640-0057 | Comment submitted by Vincent Lamb, Chair, Brevard Indian River Lagoon Coalition (BIRLC) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0057 |
| EPA-HQ-OW-2018-0640-0057-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0057 |
| EPA-HQ-OW-2018-0640-0058 | Comment submitted by Melanie Markel, President and Suzanne Graham, Governmental Affairs Chair, Charlotte DeSoto Building Industry Association (CDBIA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0058 |
| EPA-HQ-OW-2018-0640-0058-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0058 |
| EPA-HQ-OW-2018-0640-0059 | Comment submitted by Rusty Payton, Chief Executive Officer, Florida Home Builders Association (FHBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0059 |
| EPA-HQ-OW-2018-0640-0059-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0059 |
| EPA-HQ-OW-2018-0640-0060 | Comment submitted by Laura R. Perkins, Executive Officer, Volusia Building Industry Association (VBIA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0060 |
| EPA-HQ-OW-2018-0640-0060-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0060 |
| EPA-HQ-OW-2018-0640-0061 | Comment submitted by Jon Mast, MPA, Chief Executive Officer, Manatee-Sarasota Building Industry Association (MSBIA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0061 |
| EPA-HQ-OW-2018-0640-0061-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0061 |
| EPA-HQ-OW-2018-0640-0062 | Comment submitted by Brian K. Will, President, Tallahassee Builders Association (TBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0062 |
| EPA-HQ-OW-2018-0640-0062-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0062 |
| EPA-HQ-OW-2018-0640-0063 | Comment submitted by Stanley Lindsey, President, Bay Building Industries Association (BBIA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0063 |
| EPA-HQ-OW-2018-0640-0063-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0063 |
| EPA-HQ-OW-2018-0640-0064 | Comment submitted by David Peaden, Executive Director, Home Builders Association of West Florida (HBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0064 |
| EPA-HQ-OW-2018-0640-0064-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0064 |
| EPA-HQ-OW-2018-0640-0065 | Comment submitted by Phillip Ford, Executive Vice President, Lee Building Industry Association (LBIA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0065 |
| EPA-HQ-OW-2018-0640-0065-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0065 |
| EPA-HQ-OW-2018-0640-0066 | Comment submitted by the Mark Perry and Marisa Carrozzo, Co-Chairs, Everglades Coalition | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0066 |
| EPA-HQ-OW-2018-0640-0066-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0066 |
| EPA-HQ-OW-2018-0640-0066-A2 | February 19, 2020 Notice of Proposed Rules Regarding 404 Assumption | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0066 |

JA.181

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 7 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 196 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0066-A3 | EVCO Resolution SB1402 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0066 |
| EPA-HQ-OW-2018-0640-0067 | Comment submitted by Russell Littlefield, Chair, Board of Trustees, Unitarian Universalist Congregation of Lake County | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0067 |
| EPA-HQ-OW-2018-0640-0067-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0067 |
| EPA-HQ-OW-2018-0640-0068 | Comment submitted by Alan Baggett, Executive Vice President (EVP) and Jeremy Stewart, 2020 President, The Building Industry Association (BIA) of Okaloosa-Walton Counties, Florida Home Builders Association (FHBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0068 |
| EPA-HQ-OW-2018-0640-0068-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0068 |
| EPA-HQ-OW-2018-0640-0068-A2 | 29OCT20 PRES - Comment 2 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0068 |
| EPA-HQ-OW-2018-0640-0069 | Comment submitted by K. T. Catlin, Executive Officer, Gold Coast Builders Association (GCBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0069 |
| EPA-HQ-OW-2018-0640-0069-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0069 |
| EPA-HQ-OW-2018-0640-0070 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0070 |
| EPA-HQ-OW-2018-0640-0070-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0070 |
| EPA-HQ-OW-2018-0640-0071 | Comment submitted by A. Stauber | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0071 |
| EPA-HQ-OW-2018-0640-0071-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0071 |
| EPA-HQ-OW-2018-0640-0072 | Comment submitted by A. Krilloff | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0072 |
| EPA-HQ-OW-2018-0640-0072-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0072 |
| EPA-HQ-OW-2018-0640-0073 | Comment submitted by C. Nagele | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0073 |
| EPA-HQ-OW-2018-0640-0073-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0073 |
| EPA-HQ-OW-2018-0640-0074 | Comment submitted by D. Peterson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0074 |
| EPA-HQ-OW-2018-0640-0074-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0074 |
| EPA-HQ-OW-2018-0640-0075 | Comment submitted by Lindsay Dublin, Staff Attorney, Defenders of Wildlife | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0075 |
| EPA-HQ-OW-2018-0640-0075-A1 | Cover Letter | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0075 |
| EPA-HQ-OW-2018-0640-0075-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0075 |
| EPA-HQ-OW-2018-0640-0076 | Comment submitted by D. Sutton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0076 |
| EPA-HQ-OW-2018-0640-0076-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0076 |
| EPA-HQ-OW-2018-0640-0077 | Comment submitted by S. Hawken | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0077 |
| EPA-HQ-OW-2018-0640-0077-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0077 |
| EPA-HQ-OW-2018-0640-0078 | Comment submitted by Christine Rupp, Executive Director, Dade Heritage Trust | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0078 |
| EPA-HQ-OW-2018-0640-0078-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0078 |
| EPA-HQ-OW-2018-0640-0079 | Comment submitted by Lindsay Dubin, Staff Attorney, Defenders of Wildlife | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0079 |
| EPA-HQ-OW-2018-0640-0079-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0079 |
| EPA-HQ-OW-2018-0640-0080 | Comment submitted by R. S. Mahoney | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0080 |
| EPA-HQ-OW-2018-0640-0080-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0080 |
| EPA-HQ-OW-2018-0640-0081 | Comment submitted by Olivia Collins, Director of Programs, The CLEO Institute | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0081 |
| EPA-HQ-OW-2018-0640-0081-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0081 |
| EPA-HQ-OW-2018-0640-0082 | Comment submitted by Ed Thomas, Director, Regulatory Affairs, The Fertilizer Institute (TFI) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0082 |
| EPA-HQ-OW-2018-0640-0082-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0082 |
| EPA-HQ-OW-2018-0640-0082-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0082 |
| EPA-HQ-OW-2018-0640-0083 | Comment submitted by W. A. and D. J. Mills | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0083 |
| EPA-HQ-OW-2018-0640-0083-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0083 |
| EPA-HQ-OW-2018-0640-0084 | Comment submitted by Truly Brown, Executive Vice President, Builders Association of South Florida (BASF) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0084 |
| EPA-HQ-OW-2018-0640-0084-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0084 |

Case 1:21-cv-00119-RDM  Document 95-2  Filed 11/01/22  Page 8 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 197 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0085 | Comment submitted by Chassity Vega, Chief Executive Officer, Greater Orlando Builders Association (GOBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0085 |
| EPA-HQ-OW-2018-0640-0085-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0085 |
| EPA-HQ-OW-2018-0640-0086 | Comment submitted by Alicia Dixon, Planning and Environmental Compliance, Department Director, Lee County Port Authority | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0086 |
| EPA-HQ-OW-2018-0640-0086-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0086 |
| EPA-HQ-OW-2018-0640-0087 | Comment submitted by Mark McIntosh, Director, Land Development,Toll Brothers, Florida Home Builders Association (FHBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0087 |
| EPA-HQ-OW-2018-0640-0087-A1 | Comment Seth Bennett, Land Development, Assistant Manager, Toll | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0087 |
| EPA-HQ-OW-2018-0640-0088 | Comment Seth Bennett, Land Development, Assistant Manager, Toll Brothers, Florida Home Builders Association (FHBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0088 |
| EPA-HQ-OW-2018-0640-0088-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0088 |
| EPA-HQ-OW-2018-0640-0089 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0089 |
| EPA-HQ-OW-2018-0640-0089-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0089 |
| EPA-HQ-OW-2018-0640-0090 | Comment submitted by  Zachery Holmes, Avian Ecologist, Quest Ecology, Inc. | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0090 |
| EPA-HQ-OW-2018-0640-0090-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0090 |
| EPA-HQ-OW-2018-0640-0091 | Comment submitted by  W. Hausmann | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0091 |
| EPA-HQ-OW-2018-0640-0091-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0091 |
| EPA-HQ-OW-2018-0640-0092 | Comment submitted by  V. Balsamo | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0092 |
| EPA-HQ-OW-2018-0640-0092-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0092 |
| EPA-HQ-OW-2018-0640-0093 | Comment submitted by  T. Riley | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0093 |
| EPA-HQ-OW-2018-0640-0093-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0093 |
| EPA-HQ-OW-2018-0640-0094 | Comment submitted by  H. B. Treanor | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0094 |
| EPA-HQ-OW-2018-0640-0094-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0094 |
| EPA-HQ-OW-2018-0640-0095 | Comment submitted by  T. Baugher | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0095 |
| EPA-HQ-OW-2018-0640-0095-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0095 |
| EPA-HQ-OW-2018-0640-0096 | Comment submitted by T.  Grantham | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0096 |
| EPA-HQ-OW-2018-0640-0096-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0096 |
| EPA-HQ-OW-2018-0640-0097 | Comment submitted by R. Thibeault | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0097 |
| EPA-HQ-OW-2018-0640-0097-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0097 |
| EPA-HQ-OW-2018-0640-0098 | Comment submitted by P. Lippart | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0098 |
| EPA-HQ-OW-2018-0640-0098-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0098 |
| EPA-HQ-OW-2018-0640-0099 | Comment submitted by P. Anderson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0099 |
| EPA-HQ-OW-2018-0640-0099-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0099 |
| EPA-HQ-OW-2018-0640-0100 | Comment submitted by S. Pancoast | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0100 |
| EPA-HQ-OW-2018-0640-0100-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0100 |
| EPA-HQ-OW-2018-0640-0101 | Comment submitted by R. Palmer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0101 |
| EPA-HQ-OW-2018-0640-0101-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0101 |
| EPA-HQ-OW-2018-0640-0102 | Comment submitted by P. Deganello | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0102 |
| EPA-HQ-OW-2018-0640-0102-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0102 |
| EPA-HQ-OW-2018-0640-0103 | Comment submitted by D. Olinick | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0103 |
| EPA-HQ-OW-2018-0640-0103-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0103 |
| EPA-HQ-OW-2018-0640-0104 | Comment submitted by N. Triana | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0104 |
| EPA-HQ-OW-2018-0640-0104-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0104 |
| EPA-HQ-OW-2018-0640-0105 | Comment submitted by N. Mahomar | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0105 |
| EPA-HQ-OW-2018-0640-0105-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0105 |
| EPA-HQ-OW-2018-0640-0106 | Comment submitted by N. Russell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0106 |
| EPA-HQ-OW-2018-0640-0106-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0106 |
| EPA-HQ-OW-2018-0640-0107 | Comment submitted by N. Klein | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0107 |

JA.183

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0107-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0107 |
| EPA-HQ-OW-2018-0640-0108 | Comment submitted by M. Judge | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0108 |
| EPA-HQ-OW-2018-0640-0108-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0108 |
| EPA-HQ-OW-2018-0640-0109 | Comment submitted by M. Virginia Grady | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0109 |
| EPA-HQ-OW-2018-0640-0109-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0109 |
| EPA-HQ-OW-2018-0640-0110 | Comment submitted by L. Schneider | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0110 |
| EPA-HQ-OW-2018-0640-0110-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0110 |
| EPA-HQ-OW-2018-0640-0111 | Comment submitted by L. Losi | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0111 |
| EPA-HQ-OW-2018-0640-0111-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0111 |
| EPA-HQ-OW-2018-0640-0112 | Comment submitted by L. Neapolitan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0112 |
| EPA-HQ-OW-2018-0640-0112-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0112 |
| EPA-HQ-OW-2018-0640-0113 | Comment submitted by S. Leon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0113 |
| EPA-HQ-OW-2018-0640-0113-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0113 |
| EPA-HQ-OW-2018-0640-0114 | Comment submitted by L. Smith | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0114 |
| EPA-HQ-OW-2018-0640-0114-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0114 |
| EPA-HQ-OW-2018-0640-0115 | Comment submitted by L. Wolaver and J. Wolaver | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0115 |
| EPA-HQ-OW-2018-0640-0115-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0115 |
| EPA-HQ-OW-2018-0640-0116 | Comment submitted by K. St. Onge | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0116 |
| EPA-HQ-OW-2018-0640-0116-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0116 |
| EPA-HQ-OW-2018-0640-0117 | Comment submitted by J. Coolidge | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0117 |
| EPA-HQ-OW-2018-0640-0117-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0117 |
| EPA-HQ-OW-2018-0640-0118 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0118 |
| EPA-HQ-OW-2018-0640-0118-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0118 |
| EPA-HQ-OW-2018-0640-0119 | Comment submitted by T. Kaplan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0119 |
| EPA-HQ-OW-2018-0640-0119-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0119 |
| EPA-HQ-OW-2018-0640-0120 | Comment submitted by S. Robinson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0120 |
| EPA-HQ-OW-2018-0640-0120-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0120 |
| EPA-HQ-OW-2018-0640-0121 | Comment submitted by S. Herr | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0121 |
| EPA-HQ-OW-2018-0640-0121-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0121 |
| EPA-HQ-OW-2018-0640-0122 | Comment submitted by M. Stacy | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0122 |
| EPA-HQ-OW-2018-0640-0122-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0122 |
| EPA-HQ-OW-2018-0640-0123 | Comment submitted by S. Vrusho | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0123 |
| EPA-HQ-OW-2018-0640-0123-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0123 |
| EPA-HQ-OW-2018-0640-0124 | Comment submitted by S. Guerin | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0124 |
| EPA-HQ-OW-2018-0640-0124-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0124 |
| EPA-HQ-OW-2018-0640-0125 | Comment submitted by S. & G. Marshall | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0125 |
| EPA-HQ-OW-2018-0640-0125-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0125 |
| EPA-HQ-OW-2018-0640-0126 | Comment submitted by S. Roan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0126 |
| EPA-HQ-OW-2018-0640-0126-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0126 |
| EPA-HQ-OW-2018-0640-0127 | Comment submitted by S. Hay | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0127 |
| EPA-HQ-OW-2018-0640-0127-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0127 |
| EPA-HQ-OW-2018-0640-0128 | Comment submitted by R. Thoman | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0128 |
| EPA-HQ-OW-2018-0640-0128-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0128 |
| EPA-HQ-OW-2018-0640-0129 | Comment submitted by R. Justice | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0129 |
| EPA-HQ-OW-2018-0640-0129-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0129 |
| EPA-HQ-OW-2018-0640-0130 | Comment submitted by R. Dunaif | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0130 |
| EPA-HQ-OW-2018-0640-0130-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0130 |
| EPA-HQ-OW-2018-0640-0131 | Comment submitted by R. Linville | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0131 |
| EPA-HQ-OW-2018-0640-0131-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0131 |
| EPA-HQ-OW-2018-0640-0132 | Comment submitted by R. Reichert | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0132 |
| EPA-HQ-OW-2018-0640-0132-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0132 |

JA.184

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0133 | Comment submitted by N. Bond | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0133 |
| EPA-HQ-OW-2018-0640-0133-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0133 |
| EPA-HQ-OW-2018-0640-0134 | Comment submitted by M. J. Waters | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0134 |
| EPA-HQ-OW-2018-0640-0134-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0134 |
| EPA-HQ-OW-2018-0640-0135 | Comment submitted by M. Weller | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0135 |
| EPA-HQ-OW-2018-0640-0135-A1 | Comment submitted by P. B. Milone | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0135 |
| EPA-HQ-OW-2018-0640-0136 | Comment submitted by P. B. Milone | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0136 |
| EPA-HQ-OW-2018-0640-0136-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0136 |
| EPA-HQ-OW-2018-0640-0137 | Comment submitted by M. Brown | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0137 |
| EPA-HQ-OW-2018-0640-0137-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0137 |
| EPA-HQ-OW-2018-0640-0138 | Comment submitted by M. Slocum | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0138 |
| EPA-HQ-OW-2018-0640-0138-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0138 |
| EPA-HQ-OW-2018-0640-0139 | Comment submitted by M. Gale | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0139 |
| EPA-HQ-OW-2018-0640-0139-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0139 |
| EPA-HQ-OW-2018-0640-0140 | Comment submitted by M. Heyden | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0140 |
| EPA-HQ-OW-2018-0640-0140-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0140 |
| EPA-HQ-OW-2018-0640-0141 | Comment submitted by M-Slater Linn | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0141 |
| EPA-HQ-OW-2018-0640-0141-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0141 |
| EPA-HQ-OW-2018-0640-0142 | Comment submitted by M. Lane | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0142 |
| EPA-HQ-OW-2018-0640-0142-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0142 |
| EPA-HQ-OW-2018-0640-0143 | Comment submitted by M. Finnan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0143 |
| EPA-HQ-OW-2018-0640-0143-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0143 |
| EPA-HQ-OW-2018-0640-0144 | Comment submitted by M. White | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0144 |
| EPA-HQ-OW-2018-0640-0144-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0144 |
| EPA-HQ-OW-2018-0640-0145 | Comment submitted by M. Youngbluth | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0145 |
| EPA-HQ-OW-2018-0640-0145-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0145 |
| EPA-HQ-OW-2018-0640-0146 | Comment submitted by M. Wiles | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0146 |
| EPA-HQ-OW-2018-0640-0146-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0146 |
| EPA-HQ-OW-2018-0640-0147 | Comment submitted by M. Silver | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0147 |
| EPA-HQ-OW-2018-0640-0147-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0147 |
| EPA-HQ-OW-2018-0640-0148 | Comment submitted by M. McCarthy | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0148 |
| EPA-HQ-OW-2018-0640-0148-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0148 |
| EPA-HQ-OW-2018-0640-0149 | Comment submitted by M. Zuzack | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0149 |
| EPA-HQ-OW-2018-0640-0149-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0149 |
| EPA-HQ-OW-2018-0640-0150 | Comment submitted by M. Leal | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0150 |
| EPA-HQ-OW-2018-0640-0150-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0150 |
| EPA-HQ-OW-2018-0640-0151 | Comment submitted by M. Barger | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0151 |
| EPA-HQ-OW-2018-0640-0151-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0151 |
| EPA-HQ-OW-2018-0640-0152 | Comment submitted by M. Daniels | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0152 |
| EPA-HQ-OW-2018-0640-0152-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0152 |
| EPA-HQ-OW-2018-0640-0153 | Comment submitted by L. Malpass | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0153 |
| EPA-HQ-OW-2018-0640-0153-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0153 |
| EPA-HQ-OW-2018-0640-0154 | Comment submitted by J. K. Reed | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0154 |
| EPA-HQ-OW-2018-0640-0154-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0154 |
| EPA-HQ-OW-2018-0640-0155 | Comment submitted by S. Iseman | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0155 |
| EPA-HQ-OW-2018-0640-0155-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0155 |
| EPA-HQ-OW-2018-0640-0156 | Comment submitted by F. H. Howell-Coleman | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0156 |
| EPA-HQ-OW-2018-0640-0156-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0156 |
| EPA-HQ-OW-2018-0640-0157 | Comment submitted by H. Wayne White | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0157 |
| EPA-HQ-OW-2018-0640-0157-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0157 |
| EPA-HQ-OW-2018-0640-0158 | Comment submitted by A. Gordon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0158 |

JA.185

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0158-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0158 |
| EPA-HQ-OW-2018-0640-0159 | Comment submitted by D. Goldberg | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0159 |
| EPA-HQ-OW-2018-0640-0159-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0159 |
| EPA-HQ-OW-2018-0640-0160 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0160 |
| EPA-HQ-OW-2018-0640-0160-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0160 |
| EPA-HQ-OW-2018-0640-0161 | Comment submitted by G. Houchens | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0161 |
| EPA-HQ-OW-2018-0640-0161-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0161 |
| EPA-HQ-OW-2018-0640-0162 | Comment submitted by M. Frandsen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0162 |
| EPA-HQ-OW-2018-0640-0162-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0162 |
| EPA-HQ-OW-2018-0640-0163 | Comment submitted by D. and K. Feeser | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0163 |
| EPA-HQ-OW-2018-0640-0163-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0163 |
| EPA-HQ-OW-2018-0640-0164 | Comment submitted by E. Johnston | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0164 |
| EPA-HQ-OW-2018-0640-0164-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0164 |
| EPA-HQ-OW-2018-0640-0165 | Comment submitted by Aldo D Martin, Chief Executive Officer, Bellavista Homes | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0165 |
| EPA-HQ-OW-2018-0640-0165-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0165 |
| EPA-HQ-OW-2018-0640-0166 | Comment submitted by Amanda Bowen, Executive Director, Manufacturer's Association of Florida (MAF) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0166 |
| EPA-HQ-OW-2018-0640-0166-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0166 |
| EPA-HQ-OW-2018-0640-0167 | Comment submitted by John Riddle, Vice President, Turning Leaf Construction | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0167 |
| EPA-HQ-OW-2018-0640-0167-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0167 |
| EPA-HQ-OW-2018-0640-0168 | Comment submitted by R. Franklin Rash | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0168 |
| EPA-HQ-OW-2018-0640-0168-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0168 |
| EPA-HQ-OW-2018-0640-0169 | Comment submitted by  P.  Morgan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0169 |
| EPA-HQ-OW-2018-0640-0169-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0169 |
| EPA-HQ-OW-2018-0640-0170 | Comment submitted by  J. N. Baker | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0170 |
| EPA-HQ-OW-2018-0640-0170-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0170 |
| EPA-HQ-OW-2018-0640-0171 | Comment submitted by  J.  Mullen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0171 |
| EPA-HQ-OW-2018-0640-0171-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0171 |
| EPA-HQ-OW-2018-0640-0172 | Comment submitted by J. Banks | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0172 |
| EPA-HQ-OW-2018-0640-0172-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0172 |
| EPA-HQ-OW-2018-0640-0173 | Comment submitted by J. Jung | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0173 |
| EPA-HQ-OW-2018-0640-0173-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0173 |
| EPA-HQ-OW-2018-0640-0174 | Comment submitted by J. Lee | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0174 |
| EPA-HQ-OW-2018-0640-0174-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0174 |
| EPA-HQ-OW-2018-0640-0175 | Comment submitted by J. Liakos | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0175 |
| EPA-HQ-OW-2018-0640-0175-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0175 |
| EPA-HQ-OW-2018-0640-0176 | Comment submitted by J. Erke and M. Fulton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0176 |
| EPA-HQ-OW-2018-0640-0176-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0176 |
| EPA-HQ-OW-2018-0640-0177 | Comment submitted by J. Stats | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0177 |
| EPA-HQ-OW-2018-0640-0177-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0177 |
| EPA-HQ-OW-2018-0640-0178 | Comment submitted by J. M. Gilmer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0178 |
| EPA-HQ-OW-2018-0640-0178-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0178 |
| EPA-HQ-OW-2018-0640-0179 | Comment submitted by J. Griffiths | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0179 |
| EPA-HQ-OW-2018-0640-0179-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0179 |
| EPA-HQ-OW-2018-0640-0180 | Comment submitted by J. Elmore | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0180 |
| EPA-HQ-OW-2018-0640-0180-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0180 |
| EPA-HQ-OW-2018-0640-0181 | Comment submitted by E. Searcy | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0181 |
| EPA-HQ-OW-2018-0640-0181-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0181 |
| EPA-HQ-OW-2018-0640-0182 | Comment submitted by E. R. Shaw | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0182 |

JA.186

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0182-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0182 |
| EPA-HQ-OW-2018-0640-0183 | Comment submitted by  D. Hansen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0183 |
| EPA-HQ-OW-2018-0640-0183-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0183 |
| EPA-HQ-OW-2018-0640-0184 | Comment submitted by  D. Berray | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0184 |
| EPA-HQ-OW-2018-0640-0184-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0184 |
| EPA-HQ-OW-2018-0640-0185 | Comment submitted by  D. Cassidy | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0185 |
| EPA-HQ-OW-2018-0640-0185-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0185 |
| EPA-HQ-OW-2018-0640-0186 | Comment submitted by  D. soule | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0186 |
| EPA-HQ-OW-2018-0640-0186-A1 | COmment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0186 |
| EPA-HQ-OW-2018-0640-0187 | Comment submitted by  D.  Helms | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0187 |
| EPA-HQ-OW-2018-0640-0187-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0187 |
| EPA-HQ-OW-2018-0640-0188 | Comment submitted by  D. C. Botto | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0188 |
| EPA-HQ-OW-2018-0640-0188-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0188 |
| EPA-HQ-OW-2018-0640-0189 | Comment submitted by C. Longmuir | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0189 |
| EPA-HQ-OW-2018-0640-0189-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0189 |
| EPA-HQ-OW-2018-0640-0190 | Comment submitted by  C. Heath | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0190 |
| EPA-HQ-OW-2018-0640-0190-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0190 |
| EPA-HQ-OW-2018-0640-0191 | Comment submitted by A. Economy | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0191 |
| EPA-HQ-OW-2018-0640-0191-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0191 |
| EPA-HQ-OW-2018-0640-0192 | Comment submitted by A. Reakes | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0192 |
| EPA-HQ-OW-2018-0640-0192-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0192 |
| EPA-HQ-OW-2018-0640-0193 | Comment submitted by C. Ragan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0193 |
| EPA-HQ-OW-2018-0640-0193-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0193 |
| EPA-HQ-OW-2018-0640-0194 | Comment submitted by I. Uhlhorn | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0194 |
| EPA-HQ-OW-2018-0640-0194-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0194 |
| EPA-HQ-OW-2018-0640-0195 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0195 |
| EPA-HQ-OW-2018-0640-0196 | Comment submitted by J. Morton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0196 |
| EPA-HQ-OW-2018-0640-0196-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0196 |
| EPA-HQ-OW-2018-0640-0197 | Comment submitted by J. and P. See | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0197 |
| EPA-HQ-OW-2018-0640-0197-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0197 |
| EPA-HQ-OW-2018-0640-0198 | Comment submitted by  Dan Overstreet, Atlantic Mortgage Services, Inc. | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0198 |
| EPA-HQ-OW-2018-0640-0198-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0198 |
| EPA-HQ-OW-2018-0640-0199 | Comment submitted by J. C. Birdsall | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0199 |
| EPA-HQ-OW-2018-0640-0199-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0199 |
| EPA-HQ-OW-2018-0640-0200 | Comment submitted by B. Jurgaitis | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0200 |
| EPA-HQ-OW-2018-0640-0200-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0200 |
| EPA-HQ-OW-2018-0640-0201 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0201 |
| EPA-HQ-OW-2018-0640-0201-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0201 |
| EPA-HQ-OW-2018-0640-0202 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0202 |
| EPA-HQ-OW-2018-0640-0202-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0202 |
| EPA-HQ-OW-2018-0640-0203 | Comment submitted by  A. J. Anderson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0203 |
| EPA-HQ-OW-2018-0640-0203-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0203 |
| EPA-HQ-OW-2018-0640-0204 | Comment submitted by A. Leathers | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0204 |
| EPA-HQ-OW-2018-0640-0204-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0204 |
| EPA-HQ-OW-2018-0640-0205 | Comment submitted by A. D. Pray | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0205 |
| EPA-HQ-OW-2018-0640-0205-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0205 |
| EPA-HQ-OW-2018-0640-0206 | Comment submitted by W. Burdick | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0206 |
| EPA-HQ-OW-2018-0640-0206-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0206 |
| EPA-HQ-OW-2018-0640-0207 | Comment submitted by B. Brown | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0207 |
| EPA-HQ-OW-2018-0640-0207-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0207 |

JA.187

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 13 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 202 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0208 | Comment submitted by Carol Herbert, President, Conradina Chapter Fl. Native Plant Society on behalf of Brevard Indian River Lagoon Coalition (BIRLC) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0208 |
| EPA-HQ-OW-2018-0640-0208-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0208 |
| EPA-HQ-OW-2018-0640-0209 | Comment submitted by E. H. Hughes | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0209 |
| EPA-HQ-OW-2018-0640-0209-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0209 |
| EPA-HQ-OW-2018-0640-0209-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0209 |
| EPA-HQ-OW-2018-0640-0210 | Comment submitted by Kae Hovater, President, Florida Association of Mitigation Bankers (FAMB) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0210 |
| EPA-HQ-OW-2018-0640-0210-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0210 |
| EPA-HQ-OW-2018-0640-0210-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0210 |
| EPA-HQ-OW-2018-0640-0211 | Comment submitted by James Evans, Environmental Policy Director, Sanibel-Captiva Conservation Foundation (SCCF) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0211 |
| EPA-HQ-OW-2018-0640-0211-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0211 |
| EPA-HQ-OW-2018-0640-0211-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0211 |
| EPA-HQ-OW-2018-0640-0212 | Comment submitted by Victoria Jean Tschinkel, Chair, Litigation Committee, 1000 Friends of Florida | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0212 |
| EPA-HQ-OW-2018-0640-0212-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0212 |
| EPA-HQ-OW-2018-0640-0212-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0212 |
| EPA-HQ-OW-2018-0640-0213 | Comment submitted by Annamaria Abad, Executive Officer and Scott Sowers, President, Flagler Home Builders Association (FHBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0213 |
| EPA-HQ-OW-2018-0640-0213-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0213 |
| EPA-HQ-OW-2018-0640-0214 | Comment submitted by John C. Fowke, Chairman of the Board, National Association of Home Builders (NAHB) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0214 |
| EPA-HQ-OW-2018-0640-0214-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0214 |
| EPA-HQ-OW-2018-0640-0215 | Comment submitted by Amber Crooks, Environmental Policy Manager, Conservancy of Southwest Florida (CSWFL) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0215 |
| EPA-HQ-OW-2018-0640-0215-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0215 |
| EPA-HQ-OW-2018-0640-0215-A2 | Att A - FDEP retained waters list compare to ACOE nav list | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0215 |
| EPA-HQ-OW-2018-0640-0215-A3 | Att B - Jacksonville District Section 10 Waters | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0215 |
| EPA-HQ-OW-2018-0640-0215-A4 | Att C - Oct 2017 - Supplement To Jacksonville District Section 10 Waters | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0215 |
| EPA-HQ-OW-2018-0640-0215-A5 | Att D - 4-18-18 ACOE re Navigability of waters in southwest Florida | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0215 |
| EPA-HQ-OW-2018-0640-0216 | Comment submitted by R. Mayer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0216 |
| EPA-HQ-OW-2018-0640-0217 | Comment submitted by L. Miller | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0217 |
| EPA-HQ-OW-2018-0640-0218 | Comment submitted by Julie Wraithmell VP and  Executive Director and Beth Alvi, Director of Policy, Audubon Florida | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0218 |
| EPA-HQ-OW-2018-0640-0218-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0218 |
| EPA-HQ-OW-2018-0640-0219 | Comment submitted by Georgia Ackerman, Riverkeeper and Executive Director, Apalachicola Riverkeeper | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0219 |
| EPA-HQ-OW-2018-0640-0219-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0219 |
| EPA-HQ-OW-2018-0640-0220 | Comment submitted by Adriene Barmann, Chair, Broward Sierra Club | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0220 |
| EPA-HQ-OW-2018-0640-0221 | Comment submitted by N. Fried | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0221 |
| EPA-HQ-OW-2018-0640-0222 | Comment submitted by O. Williams | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0222 |
| EPA-HQ-OW-2018-0640-0222-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0222 |
| EPA-HQ-OW-2018-0640-0223 | Comment submitted by Noah Valenstein, Secretary, Florida Department of Environmental Protection (FDEP) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0223 |
| EPA-HQ-OW-2018-0640-0223-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0223 |
| EPA-HQ-OW-2018-0640-0224 | Comment submitted by D. Harbeitner | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0224 |
| EPA-HQ-OW-2018-0640-0225 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0225 |

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 14 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 203 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0226 | Mass Comment Campaign sponsoring organization unknown. Sample attached (web) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0226 |
| EPA-HQ-OW-2018-0640-0227 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0227 |
| EPA-HQ-OW-2018-0640-0228 | Comment submitted by M. Weinberg | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0228 |
| EPA-HQ-OW-2018-0640-0229 | Comment submitted by J. Becker | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0229 |
| EPA-HQ-OW-2018-0640-0230 | Comment submitted by M. Hill | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0230 |
| EPA-HQ-OW-2018-0640-0231 | Comment submitted by P. Moskal | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0231 |
| EPA-HQ-OW-2018-0640-0232 | Comment submitted by M. Costello | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0232 |
| EPA-HQ-OW-2018-0640-0233 | Comment submitted by S. Stephens | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0233 |
| EPA-HQ-OW-2018-0640-0234 | Comment submitted by B. Berry | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0234 |
| EPA-HQ-OW-2018-0640-0235 | Comment submitted by H. Matzelle | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0235 |
| EPA-HQ-OW-2018-0640-0236 | Comment submitted by M. VanKleunen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0236 |
| EPA-HQ-OW-2018-0640-0237 | Comment submitted by B. Korner | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0237 |
| EPA-HQ-OW-2018-0640-0238 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0238 |
| EPA-HQ-OW-2018-0640-0239 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0239 |
| EPA-HQ-OW-2018-0640-0240 | Comment submitted by B. Moore | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0240 |
| EPA-HQ-OW-2018-0640-0241 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0241 |
| EPA-HQ-OW-2018-0640-0242 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0242 |
| EPA-HQ-OW-2018-0640-0243 | Comment submitted by T. Crew | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0243 |
| EPA-HQ-OW-2018-0640-0244 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0244 |
| EPA-HQ-OW-2018-0640-0245 | Comment submitted by P. Stoddard | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0245 |
| EPA-HQ-OW-2018-0640-0246 | Comment submitted by J. Shea | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0246 |
| EPA-HQ-OW-2018-0640-0247 | Comment submitted by K. Ruddick | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0247 |
| EPA-HQ-OW-2018-0640-0248 | Comment submitted by K. Kurowski | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0248 |
| EPA-HQ-OW-2018-0640-0249 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0249 |
| EPA-HQ-OW-2018-0640-0250 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0250 |
| EPA-HQ-OW-2018-0640-0251 | Comment submitted by M. Lorand | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0251 |
| EPA-HQ-OW-2018-0640-0252 | Comment submitted by E. Bloch | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0252 |
| EPA-HQ-OW-2018-0640-0253 | Comment submitted by R. Ludwig | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0253 |
| EPA-HQ-OW-2018-0640-0254 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0254 |
| EPA-HQ-OW-2018-0640-0255 | Comment submitted by C. Colburn | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0255 |
| EPA-HQ-OW-2018-0640-0255-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0255 |
| EPA-HQ-OW-2018-0640-0256 | Comment submitted by  F. J. Clifford | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0256 |
| EPA-HQ-OW-2018-0640-0256-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0256 |
| EPA-HQ-OW-2018-0640-0257 | Comment submitted by C.  Newman | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0257 |
| EPA-HQ-OW-2018-0640-0257-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0257 |
| EPA-HQ-OW-2018-0640-0258 | Comment submitted by C. Charland | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0258 |
| EPA-HQ-OW-2018-0640-0258-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0258 |
| EPA-HQ-OW-2018-0640-0259 | Comment submitted by  C. Ryan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0259 |
| EPA-HQ-OW-2018-0640-0259-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0259 |
| EPA-HQ-OW-2018-0640-0260 | Comment submitted by  C. R. Sharp | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0260 |
| EPA-HQ-OW-2018-0640-0260-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0260 |
| EPA-HQ-OW-2018-0640-0261 | Comment submitted by  B. B. Morton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0261 |
| EPA-HQ-OW-2018-0640-0261-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0261 |
| EPA-HQ-OW-2018-0640-0262 | Comment submitted by  B. Paradise | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0262 |
| EPA-HQ-OW-2018-0640-0262-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0262 |
| EPA-HQ-OW-2018-0640-0263 | Comment submitted by  B. & R. Pinga | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0263 |
| EPA-HQ-OW-2018-0640-0263-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0263 |
| EPA-HQ-OW-2018-0640-0264 | Comment submitted by  W. Brant | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0264 |
| EPA-HQ-OW-2018-0640-0264-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0264 |
| EPA-HQ-OW-2018-0640-0265 | Comment submitted by  P.  Bodette | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0265 |

JA.189

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 15 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936        Filed: 02/26/2025      Page 204 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0265-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0265 |
| EPA-HQ-OW-2018-0640-0266 | Comment submitted by J. Carl Blow | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0266 |
| EPA-HQ-OW-2018-0640-0266-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0266 |
| EPA-HQ-OW-2018-0640-0267 | Comment submitted by C. Kroehler | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0267 |
| EPA-HQ-OW-2018-0640-0268 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0268 |
| EPA-HQ-OW-2018-0640-0269 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0269 |
| EPA-HQ-OW-2018-0640-0270 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0270 |
| EPA-HQ-OW-2018-0640-0271 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0271 |
| EPA-HQ-OW-2018-0640-0272 | Comment submitted by J. and B. Baron | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0272 |
| EPA-HQ-OW-2018-0640-0273 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0273 |
| EPA-HQ-OW-2018-0640-0274 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0274 |
| EPA-HQ-OW-2018-0640-0275 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0275 |
| EPA-HQ-OW-2018-0640-0276 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0276 |
| EPA-HQ-OW-2018-0640-0277 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0277 |
| EPA-HQ-OW-2018-0640-0278 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0278 |
| EPA-HQ-OW-2018-0640-0279 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0279 |
| EPA-HQ-OW-2018-0640-0280 | Comment submitted by M. McGrath | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0280 |
| EPA-HQ-OW-2018-0640-0281 | Comment submitted by J. R. McGrath | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0281 |
| EPA-HQ-OW-2018-0640-0282 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0282 |
| EPA-HQ-OW-2018-0640-0283 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0283 |
| EPA-HQ-OW-2018-0640-0284 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0284 |
| EPA-HQ-OW-2018-0640-0285 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0285 |
| EPA-HQ-OW-2018-0640-0286 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0286 |
| EPA-HQ-OW-2018-0640-0287 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0287 |
| EPA-HQ-OW-2018-0640-0288 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0288 |
| EPA-HQ-OW-2018-0640-0289 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0289 |
| EPA-HQ-OW-2018-0640-0290 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0290 |
| EPA-HQ-OW-2018-0640-0291 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0291 |
| EPA-HQ-OW-2018-0640-0292 | Comment submitted by M. Diamicis | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0292 |
| EPA-HQ-OW-2018-0640-0293 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0293 |
| EPA-HQ-OW-2018-0640-0294 | Comment submitted by J. Rainbrook | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0294 |
| EPA-HQ-OW-2018-0640-0295 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0295 |
| EPA-HQ-OW-2018-0640-0296 | Comment submitted by C. Hood | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0296 |
| EPA-HQ-OW-2018-0640-0297 | Comment submitted by R. Woodard | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0297 |
| EPA-HQ-OW-2018-0640-0298 | Comment submitted by T. Sechler | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0298 |
| EPA-HQ-OW-2018-0640-0299 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0299 |
| EPA-HQ-OW-2018-0640-0300 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0300 |
| EPA-HQ-OW-2018-0640-0301 | Comment submitted by M. Brawer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0301 |
| EPA-HQ-OW-2018-0640-0302 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0302 |
| EPA-HQ-OW-2018-0640-0303 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0303 |
| EPA-HQ-OW-2018-0640-0304 | Comment submitted by C. Greenspan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0304 |
| EPA-HQ-OW-2018-0640-0305 | Comment submitted by W. Leuzinger | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0305 |
| EPA-HQ-OW-2018-0640-0306 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0306 |
| EPA-HQ-OW-2018-0640-0307 | Comment submitted by M. Lowery | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0307 |
| EPA-HQ-OW-2018-0640-0308 | Comment submitted by K. Fette | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0308 |
| EPA-HQ-OW-2018-0640-0309 | Comment submitted by B. Ambrose | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0309 |
| EPA-HQ-OW-2018-0640-0310 | Comment submitted by J. Hostler | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0310 |
| EPA-HQ-OW-2018-0640-0311 | Comment submitted by F. Nielander | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0311 |
| EPA-HQ-OW-2018-0640-0312 | Comment submitted by K. Steindal | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0312 |
| EPA-HQ-OW-2018-0640-0313 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0313 |
| EPA-HQ-OW-2018-0640-0314 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0314 |

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0315 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0315 |
| EPA-HQ-OW-2018-0640-0316 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0316 |
| EPA-HQ-OW-2018-0640-0317 | Comment submitted by S. Faucher | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0317 |
| EPA-HQ-OW-2018-0640-0318 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0318 |
| EPA-HQ-OW-2018-0640-0319 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0319 |
| EPA-HQ-OW-2018-0640-0320 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0320 |
| EPA-HQ-OW-2018-0640-0321 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0321 |
| EPA-HQ-OW-2018-0640-0322 | Comment submitted by K. Moore | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0322 |
| EPA-HQ-OW-2018-0640-0323 | Comment submitted by C. Meketa | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0323 |
| EPA-HQ-OW-2018-0640-0324 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0324 |
| EPA-HQ-OW-2018-0640-0325 | Comment submitted by L. Edwards | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0325 |
| EPA-HQ-OW-2018-0640-0326 | Comment submitted by D. A Whitehair | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0326 |
| EPA-HQ-OW-2018-0640-0327 | Comment submitted by J. Tatum | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0327 |
| EPA-HQ-OW-2018-0640-0328 | Comment submitted by C. Dawson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0328 |
| EPA-HQ-OW-2018-0640-0329 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0329 |
| EPA-HQ-OW-2018-0640-0330 | Comment submitted by S. McMahon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0330 |
| EPA-HQ-OW-2018-0640-0331 | Comment submitted by J. Compel | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0331 |
| EPA-HQ-OW-2018-0640-0332 | Comment submitted by D. Cowans | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0332 |
| EPA-HQ-OW-2018-0640-0333 | Comment submitted by P. Sigmann | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0333 |
| EPA-HQ-OW-2018-0640-0334 | Comment submitted by B. Schwartz | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0334 |
| EPA-HQ-OW-2018-0640-0335 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0335 |
| EPA-HQ-OW-2018-0640-0336 | Comment submitted by V. Wilmot | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0336 |
| EPA-HQ-OW-2018-0640-0337 | Comment submitted by J. Kessel | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0337 |
| EPA-HQ-OW-2018-0640-0338 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0338 |
| EPA-HQ-OW-2018-0640-0339 | Comment submitted by B. A. Angelucci | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0339 |
| EPA-HQ-OW-2018-0640-0340 | Comment submitted by M. Holt | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0340 |
| EPA-HQ-OW-2018-0640-0341 | Comment submitted by D. Umpierre | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0341 |
| EPA-HQ-OW-2018-0640-0342 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0342 |
| EPA-HQ-OW-2018-0640-0343 | Comment submitted by L. Cheval | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0343 |
| EPA-HQ-OW-2018-0640-0344 | Comment submitted by C. Charland | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0344 |
| EPA-HQ-OW-2018-0640-0345 | Comment submitted by R. Eslinger | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0345 |
| EPA-HQ-OW-2018-0640-0346 | Comment submitted by Lindsay Dubin, Staff Attorney and Kent L. Wimmer, AICP, Senior Representative, Defenders of Wildlife | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0346 |
| EPA-HQ-OW-2018-0640-0346-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0346 |
| EPA-HQ-OW-2018-0640-0346-A2 | Defenders of Wildlife Comments Ex. E - Ex. I | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0346 |
| EPA-HQ-OW-2018-0640-0347 | Comment submitted by Sara Johnson, Executive Director, Ecological Restoration Business Association (ERBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0347 |
| EPA-HQ-OW-2018-0640-0347-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0347 |
| EPA-HQ-OW-2018-0640-0348 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0348 |
| EPA-HQ-OW-2018-0640-0348-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0348 |
| EPA-HQ-OW-2018-0640-0349 | Comment submitted by LeeAnne Wendt, Tribal Archaeologist, Historic and Cultural Preservation Department, Muscogee (Creek) Nation (MCN) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0349 |
| EPA-HQ-OW-2018-0640-0349-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0349 |
| EPA-HQ-OW-2018-0640-0350 | Comment submitted by E. Watkins | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0350 |
| EPA-HQ-OW-2018-0640-0351 | Comment submitted by B. Dunk | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0351 |
| EPA-HQ-OW-2018-0640-0352 | Comment submitted by K. McDonald | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0352 |
| EPA-HQ-OW-2018-0640-0353 | Comment submitted by C. Charland | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0353 |
| EPA-HQ-OW-2018-0640-0354 | Comment submitted by T. Grantham | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0354 |
| EPA-HQ-OW-2018-0640-0355 | Comment submitted by Jeffrey G. Schnellmann, Silliman CitySide Homes | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0355 |

JA.191

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0356 | Comment submitted by A. Deschane | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0356 |
| EPA-HQ-OW-2018-0640-0357 | Comment submitted by John Holt, Solar Tite, Inc. for Florida Home Builders Association (FHBA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0357 |
| EPA-HQ-OW-2018-0640-0358 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0358 |
| EPA-HQ-OW-2018-0640-0359 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0359 |
| EPA-HQ-OW-2018-0640-0360 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0360 |
| EPA-HQ-OW-2018-0640-0361 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0361 |
| EPA-HQ-OW-2018-0640-0362 | Comment submitted by M. Ciocci | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0362 |
| EPA-HQ-OW-2018-0640-0363 | Comment submitted by C. Lawler | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0363 |
| EPA-HQ-OW-2018-0640-0364 | Comment submitted by E. Cori-Jones | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0364 |
| EPA-HQ-OW-2018-0640-0365 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0365 |
| EPA-HQ-OW-2018-0640-0366 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0366 |
| EPA-HQ-OW-2018-0640-0367 | Comment submitted by L. Kontnik | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0367 |
| EPA-HQ-OW-2018-0640-0368 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0368 |
| EPA-HQ-OW-2018-0640-0369 | Comment submitted by S. Terranova | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0369 |
| EPA-HQ-OW-2018-0640-0370 | Comment submitted by Marian Ryan, Ancient Islands Group of the Sierra Club Florida | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0370 |
| EPA-HQ-OW-2018-0640-0371 | Comment submitted by D. Curry | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0371 |
| EPA-HQ-OW-2018-0640-0372 | Comment submitted by P. M. Dammann | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0372 |
| EPA-HQ-OW-2018-0640-0373 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0373 |
| EPA-HQ-OW-2018-0640-0374 | Comment submitted by S. Huss | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0374 |
| EPA-HQ-OW-2018-0640-0375 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0375 |
| EPA-HQ-OW-2018-0640-0376 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0376 |
| EPA-HQ-OW-2018-0640-0377 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0377 |
| EPA-HQ-OW-2018-0640-0378 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0378 |
| EPA-HQ-OW-2018-0640-0379 | Comment submitted by D. Clark | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0379 |
| EPA-HQ-OW-2018-0640-0380 | Comment submitted  L. Weiner | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0380 |
| EPA-HQ-OW-2018-0640-0381 | Comment submitted by D. Mericle | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0381 |
| EPA-HQ-OW-2018-0640-0382 | Comment submitted by J. Farris | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0382 |
| EPA-HQ-OW-2018-0640-0383 | Comment submitted by L. Hoffmeyer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0383 |
| EPA-HQ-OW-2018-0640-0384 | Comment submitted by J. L. Thomas | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0384 |
| EPA-HQ-OW-2018-0640-0385 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 2 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A1 | Exhibit 9: Editorial - Rick Scott Record an Environmental Disaster | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A2 | Exhibit 10: PEER, Scott's Undeclared Polluters' Holiday Stains Florida | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A3 | Exhibit 11: PEER Report on Enforcement Efforts by FDEP | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A4 | Exhibit 12: St. Johns Riverkeeper, State Failing to Protect Our Waterways | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A5 | Exhibit 13: State Assumption of Federal Section 404 Dredge and Fill Permitting Authority | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A6 | Exhibit 14: Consolidation of State and Federal Wetland Permitting Programs Implementation of House Bill 759 (Chapter 2005-273... | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A7 | Exhibit 15: The Florida Senate Bill Analysis and Fiscal Impact Impact | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A8 | Exhibit 16: 2018 Letter from Silverstein - Miami Waterkeeper | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A9 | Exhibit 17: Dont Let FL Take Over Wetlands Permitting | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |
| EPA-HQ-OW-2018-0640-0385-A10 | Exhibit 18: Everglades Coalition Resolution Opposing SB1402 and HB7043: State Assumption of Federal Section 404 Dredge and Fill... | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0385 |

JA.192

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0386 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation et al. Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 1 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A2 | 01 - 2002 Purdum FL Waters - Resource Manual | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A3 | 02 - 2009 Hine - Geology of FL | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A4 | 03.a - 1996 USGS Natl Water Wetlands | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A5 | 03.b - 1996 USGS Natl Water Wetlands | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A6 | 04 - 2016 Kotala - FL Declared a Global Biodiversity Hotspot | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A7 | 05 - FWC Freshwater Priority | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A8 | 06 - 2016 - Rocus & Mazzotti - Threats to FL Biodiversity | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A9 | 07 - VisitFlorida - Tourism Fast Facts | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0386-A10 | 08 - Florida Agriculture Overview and Statistics - Florida Department of Agriculture & Consumer Services | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0386 |
| EPA-HQ-OW-2018-0640-0387 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 6 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A1 | Exhibit 51: Transcript of Public Hearing on April 27, 2020 - Noticed in the Florida Administrative Register on April 17, 2020... | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A2 | Exhibit 52: Letter from Mary S. Walker, Regional Administrator, USEPA | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A3 | Exhibit 53: Letter from Bonny Malloy, Earthjustice, et al to Kelly Laycock Oceans, Wetlands and Streams Protection Branch, USEPA... | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A4 | Exhibit 54: Public Hearing Transcripts 10/21/2020 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A5 | Exhibit 55: Public Comment Hearing Transcripts 10/27/2020 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A6 | Exhibit 56: Idaho Conservation League (ICL) v. EPA Opinion 9/10/20 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A7 | Exhibit 57: Memorandum of Understanding between the Florida Fish and Wildlife Conservation Commission ("FWC"), the United States... | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A8 | Exhibit: 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida July 24, 2020 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A9 | Exhibit 59: Letter from Peter S. Silva, Assistant Administrator, USEPA | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0387-A10 | Exhibit 60: Endangered Species Consultation Handbook | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0387 |
| EPA-HQ-OW-2018-0640-0388 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 7 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A1 | 061 - Reg Review - ESA | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A2 | 062 - EPA Discretionary Decision to Approve State Assumption of CWA S. 404 Triggering ESA S. 7 Consultation | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A3 | 63 - Threatened Endangered Species | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A4 | 64 - Quick Facts - DOS | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A5 | 65 - DEP 2016 Integrated Report 2 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A6 | 066 - Letter Murphy NWF Final Comment 7-6-20 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A7 | 067 - FDEP White Paper - ESA Consultation | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A8 | 068 - Florida Panther Population Estimate Updated - USFWS | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A9 | 069 - Panther Recovery Plan | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |
| EPA-HQ-OW-2018-0640-0388-A10 | 070 - Panther 5 Year Review | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0388 |

JA.193

Case 1:21-cv-00119-RDM Document 95-2 Filed 11/01/22 Page 19 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101 Document #2102936 Filed: 02/26/2025 Page 208 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0389 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 8 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A1 | 71 - Letter from Cathryne Tortorici Nat'l Marine Fisheries Serv. to Heather Mason Fla Dept of Envt Prot Apr 15 2020 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A2 | 72 - Ryan Dailey, Florida DEP Gets New Duties, Including Septic Systems Oversight, Under New Law, WFSU, Jun. 30, 2020 - | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A3 | 73 - Affidavit Fry 10-2020 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A4 | 74 - 1 ERP Rulemaking SERC - | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A5 | 75 - OA DHR and DEP may 20 JHA Comments | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A6 | 76 - Florida Agencies Asked To Cut 8.5 Percent to Adjust | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A7 | 77 - 2020 08 14 EDR grsummary | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A8 | 78 - VA 404 Feasibility Study 2012 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A9 | 79 - Wetland Regulatory MN 404 Assumption Feasibility Study 2017 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0389-A10 | 80 - Az. Dep't of Env't Quality, Clean Water Act § 404 Assumption Roadmap Review Meeting | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0389 |
| EPA-HQ-OW-2018-0640-0390 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 10 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0390 |
| EPA-HQ-OW-2018-0640-0390-A1 | 100 - Trio of Fish, Waterkeeper, McClash challenge Long Bar Permit Fish's Blog | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0390 |
| EPA-HQ-OW-2018-0640-0390-A2 | 101 - 2016 09 14 Long Bar Pointe (LBP) Corps Denial | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0390 |
| EPA-HQ-OW-2018-0640-0390-A3 | 102 - Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, May 5, 2017 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0390 |
| EPA-HQ-OW-2018-0640-0390-A4 | 103 - Hannah Morse, Corps Denies Long Bar Pointe's Second Mitigation Bank Proposal, Bradenton Herald, May 5, 2017 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0390 |
| EPA-HQ-OW-2018-0640-0391 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 5 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A1 | 41 - 2020 03 23 DEP Notice of Hearing 62-330 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A2 | 42 - 2020 03 30 FCC Request for Postponement | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A3 | 43 - 2020 03 31 EVCO 404 Request for Postponement | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A4 | 44 - EO 20-91-Compressed | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A5 | 45 - 2020 4 20 WKFL 404 Rulemaking Suspension Request | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A6 | 46 - 2020.04.30 Section 404 Public Comments to DEP | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A7 | 47 - WEBINAR HEARING 4-2-20 PDF | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A8 | 48 - WEBINAR HEARING 4-6-20 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A9 | 49 - WEBINAR HEARING 4-10-20 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0391-A10 | 50 - WEBINAR HEARING 4-24-20 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0391 |
| EPA-HQ-OW-2018-0640-0392 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 3 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A2 | Exhibit 19 - Tschinkel - Florida's treasured wetlands 3/12/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A3 | Exhibit 20 - Letter to Kenneth Detzner from Rick Scott 3/23/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A4 | Exhibit 21 - U.S. Dept of the Army - Navigable Waters 03/19/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A5 | Exhibit 22 - Corps seeks public comment navigation waters 4/5/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |

JA.194

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0392-A6 | Exhibit 23 - Corps Cessation of Public Comment 4/10/2018 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A7 | Exhibit 24 - Florida Conservation Coalition 04/18/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A8 | Exhibit 25 - Crooks Letter - Conservancy to US Dept of Army 04/18/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A9 | Exhibit 26 - Silverstein Waterkeeper Letter to US Corps Engineers 4/18/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A10 | Exhibit 27 - Letter Julie Wraithmell, Audubon to US Corps Engineer 04/17/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A11 | Exhibit 28 - Sierra Club - Frank Jackalone Letter to US Corps Engineer 4/16/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A12 | Exhibits 29 - Letter Tania Galloni to Jason A. Kirk USACE 04/18/18 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0392-A13 | Exhibit 30 - Corps Supplement Jacksonville Navigable Waters Lists 10/05/17 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0392 |
| EPA-HQ-OW-2018-0640-0393 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part 4 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A1 | 31 - Letter from Tania Galloni Earthjustice | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A2 | 32 - 2018 DEP 404 SERC | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A3 | 33 - FDEP Notice of Proposed Rule | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A4 | 34 - Letter dated March 9, 2020 from EVCO | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A5 | 35 - 2020 3 11 DEP Notice of Hearing 62 330 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A6 | 36 - Exec Order 20-51 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A7 | 37 - Exec Order 20-52 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A8 | 38 - Florida coronavirus K-12 schools to close through April 15 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A9 | 39 - Exec. Order 20-68 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0393-A10 | 40 - 2020 03 19 Request to Reschedule 404 Hearing | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0393 |
| EPA-HQ-OW-2018-0640-0394 | Comment submitted by Tania Galloni et al., Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper - Part - 9 | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A1 | 81 - PEER Report on Enforcement Efforts By the Florida Department of Environmental Protection - Calendar Year 2019 (2020) | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A2 | 82 - Press Release PEER - Florida Eco-Noncompliance Rises as Enforcement Wanes | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A3 | 83 - Press Release PEER - Fewer Florida Eco-Inspections Equals Less Compliance 2019 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A4 | 84 - PEER Report on Enforcement Efforts By the Florida Department of Environmental Protection - Calendar Year 2018 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A5 | 85 - Press Release PEER - Florida Racks up Second Worst Eco Enforcement in 30 Years | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A6 | 86 - PEER Report on Enforcement Efforts By the Florida Department of Environmental Protection - Calendar Year 2017 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A7 | 87 - Press Release PEER - Florida Eco-Enforcement Still Scraping Bottom | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A8 | 88 - PEER Report on Enforcement Efforts By the Florida Department of Environmental Protection - Calendar Year 2016 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A9 | 89 - FDEP ERP 2013 Training Test Results Summary | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A10 | 90 - 2015 ERP Individual Permit Review | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A11 | 91 - Compilation of Individual Permit Audits | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A12 | 92 - Enforcement Audits | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |

JA.195

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0394-A13 | 93 - Nov. 2 Letter from CSWFL | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A14 | 94 - Nov. 2 Letter from Waterkeepers | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A15 | 95 - Everglades Law Center Comments - August 2018 | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A16 | 96 - Protect NEPA | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A17 | 97 - Notice of Intent to Issue Environmental Resource / Mitigation Bank Permit | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A18 | 98 - Politico Article | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0394-A19 | 99 - Environmentalist Appeals Long Bar - DEP Mitigation Permit - Anna Maria Island News | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0394 |
| EPA-HQ-OW-2018-0640-0395 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0395 |
| EPA-HQ-OW-2018-0640-0396 | Comment submitted by L. Nixon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0396 |
| EPA-HQ-OW-2018-0640-0397 | Comment submitted by K. Rohrer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0397 |
| EPA-HQ-OW-2018-0640-0398 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0398 |
| EPA-HQ-OW-2018-0640-0399 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0399 |
| EPA-HQ-OW-2018-0640-0400 | Comment submitted by W. Billings | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0400 |
| EPA-HQ-OW-2018-0640-0401 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0401 |
| EPA-HQ-OW-2018-0640-0402 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0402 |
| EPA-HQ-OW-2018-0640-0403 | Comment submitted by R. V. Qua | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0403 |
| EPA-HQ-OW-2018-0640-0403-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0403 |
| EPA-HQ-OW-2018-0640-0404 | Comment submitted by John Williams, RWA inc., President and Amelia Vasquez, Executive Officer, Collier Building Industry Association (CBIA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0404 |
| EPA-HQ-OW-2018-0640-0404-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0404 |
| EPA-HQ-OW-2018-0640-0404-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0404 |
| EPA-HQ-OW-2018-0640-0405 | Comment submitted by Noah Valenstein, Secretary, Florida Department of Environmental Protection (FDEP) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0405 |
| EPA-HQ-OW-2018-0640-0405-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0405 |
| EPA-HQ-OW-2018-0640-0405-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0405 |
| EPA-HQ-OW-2018-0640-0406 | Comment submitted by S. Ansley Samson, General Counsel, Everglades Law Center, Inc. Karen Marcus, President, Sustainable Palm Beach County and  Melissa E. Abdo, Regional Director, Sun Coast Region, National Parks Conservation Association | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0406 |
| EPA-HQ-OW-2018-0640-0406-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0406 |
| EPA-HQ-OW-2018-0640-0407 | Comment submitted by Kenya Rothstein, Legal Intern, Friends of Biscayne Bay (FOBB) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0407 |
| EPA-HQ-OW-2018-0640-0407-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0407 |
| EPA-HQ-OW-2018-0640-0408 | Comment submitted by Bruce Matheson, President, and Laura Reynolds Vice-President , both Friends of Biscayne Bay (FOBB) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0408 |
| EPA-HQ-OW-2018-0640-0408-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0408 |
| EPA-HQ-OW-2018-0640-0409 | Comment submitted by C. Bersok | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0409 |
| EPA-HQ-OW-2018-0640-0409-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0409 |
| EPA-HQ-OW-2018-0640-0410 | Comment submitted by Senator Debbie Mayfield, District 17, Florida Senate | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0410 |
| EPA-HQ-OW-2018-0640-0410-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0410 |
| EPA-HQ-OW-2018-0640-0410-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0410 |
| EPA-HQ-OW-2018-0640-0411 | Comment submitted by K. Yates | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0411 |
| EPA-HQ-OW-2018-0640-0411-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0411 |
| EPA-HQ-OW-2018-0640-0412 | Comment submitted by Julie Wraithmell, Vice President (VP) and Executive Director and Elizabeth Alvi, Director, Policy, Audubon Florida et al. | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0412 |
| EPA-HQ-OW-2018-0640-0412-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0412 |

JA.196

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0412-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0412 |
| EPA-HQ-OW-2018-0640-0413 | Comment submitted by Alan Keller, Conservation Chair, Audubon Western Everglades, Audubon Florida | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0413 |
| EPA-HQ-OW-2018-0640-0413-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0413 |
| EPA-HQ-OW-2018-0640-0413-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0413 |
| EPA-HQ-OW-2018-0640-0414 | Comment submitted by Aaron J. Adams, Director, Science and Conservation, Bonefish & Tarpon Trust | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0414 |
| EPA-HQ-OW-2018-0640-0414-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0414 |
| EPA-HQ-OW-2018-0640-0414-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0414 |
| EPA-HQ-OW-2018-0640-0415 | Comment submitted by S. Ansley Samson, General Counsel, Everglades Law Center, Inc., Karen Marcus, President, Sustainable Palm Beach County, and Melissa E. Abdo, Regional Director, Sun Coast Region, National Parks Conservation Association | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0415 |
| EPA-HQ-OW-2018-0640-0415-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0415 |
| EPA-HQ-OW-2018-0640-0415-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0415 |
| EPA-HQ-OW-2018-0640-0416 | Comment forwarded from Wesley R. Brooks, Director of Federal Affairs, Florida Department of Environmental Protection | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0416 |
| EPA-HQ-OW-2018-0640-0416-A1 | Cover Email | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0416 |
| EPA-HQ-OW-2018-0640-0416-A2 | Attachment 1 - Comment submitted by Daniel Webster, et al. House of Representatives, Congress of the United States | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0416 |
| EPA-HQ-OW-2018-0640-0416-A3 | Attachment 2 - Comment submitted by Mario Diar-Balart and Alcee L. Hastings, Members of Congress, Congress of the United States | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0416 |
| EPA-HQ-OW-2018-0640-0416-A4 | Attachment 3 - Comment submitted by Marco Rubio and Rick Scott, U.S. Senators | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0416 |
| EPA-HQ-OW-2018-0640-0417 | Comment submitted by F. Adams | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0417 |
| EPA-HQ-OW-2018-0640-0417-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0417 |
| EPA-HQ-OW-2018-0640-0417-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0417 |
| EPA-HQ-OW-2018-0640-0418 | Comment submitted by J. Regan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0418 |
| EPA-HQ-OW-2018-0640-0418-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0418 |
| EPA-HQ-OW-2018-0640-0418-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0418 |
| EPA-HQ-OW-2018-0640-0419 | Comment submitted by Danielle Hopkins, Executive Director, Florida Stormwater Association (FSA), Inc. | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0419 |
| EPA-HQ-OW-2018-0640-0419-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0419 |
| EPA-HQ-OW-2018-0640-0419-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0419 |
| EPA-HQ-OW-2018-0640-0420 | Comment submitted by Eric Sutton, Executive Director, Florida Fish and Wildlife Conservation Commission (FWC) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0420 |
| EPA-HQ-OW-2018-0640-0420-A1 | Cover Page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0420 |
| EPA-HQ-OW-2018-0640-0420-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0420 |
| EPA-HQ-OW-2018-0640-0421 | Comment submitted by Dan Lamson, Executive Director, Indian River Neighborhood Association (IRNA) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0421 |
| EPA-HQ-OW-2018-0640-0421-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0421 |
| EPA-HQ-OW-2018-0640-0421-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0421 |
| EPA-HQ-OW-2018-0640-0422 | Comment submitted by C. Wallace | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0422 |
| EPA-HQ-OW-2018-0640-0422-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0422 |
| EPA-HQ-OW-2018-0640-0423 | Comment submitted by S. Burd | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0423 |
| EPA-HQ-OW-2018-0640-0423-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0423 |
| EPA-HQ-OW-2018-0640-0423-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0423 |
| EPA-HQ-OW-2018-0640-0424 | Comment submitted by Leesa Souto, Ph.D., Executive Director and Terrence Casto, Board Chairman, Marine Resources Council (MRC) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0424 |
| EPA-HQ-OW-2018-0640-0424-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0424 |
| EPA-HQ-OW-2018-0640-0424-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0424 |

JA.197

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0425 | Comment submitted by Rachel Silverstein, Executive Director & Waterkeeper, Miami Waterkeeper | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0425 |
| EPA-HQ-OW-2018-0640-0425-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0425 |
| EPA-HQ-OW-2018-0640-0425-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0425 |
| EPA-HQ-OW-2018-0640-0425-A3 | Waterkeepers Florida (Addendum) | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0425 |
| EPA-HQ-OW-2018-0640-0426 | Comment submitted by P. B. Milone | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0426 |
| EPA-HQ-OW-2018-0640-0426-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0426 |
| EPA-HQ-OW-2018-0640-0427 | Comment submitted by Katie Paulson, Legislative Assistant on behalf of Congresswoman Donna E. Shalala, Florida's 27th Congressional District, Member of Congress | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0427 |
| EPA-HQ-OW-2018-0640-0427-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0427 |
| EPA-HQ-OW-2018-0640-0427-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0427 |
| EPA-HQ-OW-2018-0640-0428 | Comment submitted by Michael J. Roth, President, Our Santa Fe River, Inc | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0428 |
| EPA-HQ-OW-2018-0640-0428-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0428 |
| EPA-HQ-OW-2018-0640-0428-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0428 |
| EPA-HQ-OW-2018-0640-0429 | 10-21-2020 Virtual Public Hearing on FL's Request to Assume Administration of CWA Section 404 Program | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0429 |
| EPA-HQ-OW-2018-0640-0430 | 10-27-2020 Virtual Public Hearing on FL's Request to Assume Administration of CWA Section 404 Program | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0430 |
| EPA-HQ-OW-2018-0640-0431 | Comment submitted by Michelle Diffenderfer, President/Shareholder, Seminole Tribe of Florida (Seminole Tribe) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0431 |
| EPA-HQ-OW-2018-0640-0431-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0431 |
| EPA-HQ-OW-2018-0640-0431-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0431 |
| EPA-HQ-OW-2018-0640-0432 | Comment submitted by Marco Rubio and Rick Scott, U.S. Senator, United States Senate | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0432 |
| EPA-HQ-OW-2018-0640-0432-A1 | Cover page | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0432 |
| EPA-HQ-OW-2018-0640-0432-A2 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0432 |
| EPA-HQ-OW-2018-0640-0433 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0433 |
| EPA-HQ-OW-2018-0640-0433-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0433 |
| EPA-HQ-OW-2018-0640-0434 | Comment submitted by B. O'Donnell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0434 |
| EPA-HQ-OW-2018-0640-0434-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0434 |
| EPA-HQ-OW-2018-0640-0435 | Comment submitted by B. Joanne | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0435 |
| EPA-HQ-OW-2018-0640-0435-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0435 |
| EPA-HQ-OW-2018-0640-0436 | Comment submitted by C. Colburn | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0436 |
| EPA-HQ-OW-2018-0640-0436-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0436 |
| EPA-HQ-OW-2018-0640-0437 | Comment submitted by D. Asoule | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0437 |
| EPA-HQ-OW-2018-0640-0437-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0437 |
| EPA-HQ-OW-2018-0640-0438 | Comment submitted by G. Robbins | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0438 |
| EPA-HQ-OW-2018-0640-0438-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0438 |
| EPA-HQ-OW-2018-0640-0439 | Comment submitted by J. Gardner | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0439 |
| EPA-HQ-OW-2018-0640-0439-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0439 |
| EPA-HQ-OW-2018-0640-0440 | Comment submitted by G. Stilwell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0440 |
| EPA-HQ-OW-2018-0640-0440-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0440 |
| EPA-HQ-OW-2018-0640-0441 | Comment submitted by W. Newkumet | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0441 |
| EPA-HQ-OW-2018-0640-0441-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0441 |
| EPA-HQ-OW-2018-0640-0442 | Comment submitted by R. Dunaif | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0442 |
| EPA-HQ-OW-2018-0640-0442-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0442 |
| EPA-HQ-OW-2018-0640-0443 | Comment submitted by R. Thoman | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0443 |
| EPA-HQ-OW-2018-0640-0443-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0443 |
| EPA-HQ-OW-2018-0640-0444 | Comment submitted by S. Gornto | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0444 |

Case 1:21-cv-00119-RDM Document 95-2 Filed 11/01/22 Page 24 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101 Document #2102936 Filed: 02/26/2025 Page 213 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0444-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0444 |
| EPA-HQ-OW-2018-0640-0445 | Comment submitted by G. Mitchell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0445 |
| EPA-HQ-OW-2018-0640-0445-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0445 |
| EPA-HQ-OW-2018-0640-0446 | Comment submitted by M. Hill | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0446 |
| EPA-HQ-OW-2018-0640-0446-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0446 |
| EPA-HQ-OW-2018-0640-0447 | Comment submitted by J. C. Blow | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0447 |
| EPA-HQ-OW-2018-0640-0447-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0447 |
| EPA-HQ-OW-2018-0640-0448 | Comment submitted by J. and P. See | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0448 |
| EPA-HQ-OW-2018-0640-0448-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0448 |
| EPA-HQ-OW-2018-0640-0449 | Comment submitted by J. Elmore | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0449 |
| EPA-HQ-OW-2018-0640-0449-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0449 |
| EPA-HQ-OW-2018-0640-0450 | Comment submitted by J. Griffiths | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0450 |
| EPA-HQ-OW-2018-0640-0450-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0450 |
| EPA-HQ-OW-2018-0640-0451 | Comment submitted by J. M. Gilmer | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0451 |
| EPA-HQ-OW-2018-0640-0451-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0451 |
| EPA-HQ-OW-2018-0640-0452 | Comment submitted by J. Statts | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0452 |
| EPA-HQ-OW-2018-0640-0452-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0452 |
| EPA-HQ-OW-2018-0640-0453 | Comment submitted by J. Erke and M. Fulton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0453 |
| EPA-HQ-OW-2018-0640-0453-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0453 |
| EPA-HQ-OW-2018-0640-0454 | Comment submitted by J. Lee | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0454 |
| EPA-HQ-OW-2018-0640-0454-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0454 |
| EPA-HQ-OW-2018-0640-0455 | Comment submitted by B. Robert | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0455 |
| EPA-HQ-OW-2018-0640-0455-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0455 |
| EPA-HQ-OW-2018-0640-0456 | Comment submitted J. Brantley | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0456 |
| EPA-HQ-OW-2018-0640-0456-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0456 |
| EPA-HQ-OW-2018-0640-0457 | Comment submitted by J. Banks | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0457 |
| EPA-HQ-OW-2018-0640-0457-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0457 |
| EPA-HQ-OW-2018-0640-0458 | Comment submitted by J. Mullen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0458 |
| EPA-HQ-OW-2018-0640-0458-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0458 |
| EPA-HQ-OW-2018-0640-0459 | Comment submitted by John K. Reed, Research Professor, Cooperative Institute of Ocean Research, Exploration and Technology, Harbor Branch Oceanographic Institute, Florida Atlantic University | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0459 |
| EPA-HQ-OW-2018-0640-0459-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0459 |
| EPA-HQ-OW-2018-0640-0460 | Comment submitted by J. Kedian | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0460 |
| EPA-HQ-OW-2018-0640-0460-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0460 |
| EPA-HQ-OW-2018-0640-0461 | Comment submitted by L. and J. Wolaver | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0461 |
| EPA-HQ-OW-2018-0640-0461-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0461 |
| EPA-HQ-OW-2018-0640-0462 | Comment submitted by J. C. Birdsall | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0462 |
| EPA-HQ-OW-2018-0640-0462-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0462 |
| EPA-HQ-OW-2018-0640-0463 | Comment submitted by M. Frandsen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0463 |
| EPA-HQ-OW-2018-0640-0463-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0463 |
| EPA-HQ-OW-2018-0640-0464 | Comment submitted by J. Coolidge | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0464 |
| EPA-HQ-OW-2018-0640-0464-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0464 |
| EPA-HQ-OW-2018-0640-0465 | Comment submitted by J. Jung | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0465 |
| EPA-HQ-OW-2018-0640-0465-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0465 |
| EPA-HQ-OW-2018-0640-0466 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0466 |
| EPA-HQ-OW-2018-0640-0466-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0466 |
| EPA-HQ-OW-2018-0640-0467 | Comment submitted by K. Dorn | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0467 |
| EPA-HQ-OW-2018-0640-0467-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0467 |
| EPA-HQ-OW-2018-0640-0468 | Comment submitted by K. St. Onge | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0468 |

JA.199

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0468-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0468 |
| EPA-HQ-OW-2018-0640-0469 | Comment submitted by L. Smith | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0469 |
| EPA-HQ-OW-2018-0640-0469-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0469 |
| EPA-HQ-OW-2018-0640-0470 | Comment submitted by J. Liakos | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0470 |
| EPA-HQ-OW-2018-0640-0470-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0470 |
| EPA-HQ-OW-2018-0640-0471 | Comment submitted by L. Langston | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0471 |
| EPA-HQ-OW-2018-0640-0471-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0471 |
| EPA-HQ-OW-2018-0640-0472 | Comment submitted by L. Neapolitan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0472 |
| EPA-HQ-OW-2018-0640-0472-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0472 |
| EPA-HQ-OW-2018-0640-0473 | Comment submitted by L. Losi | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0473 |
| EPA-HQ-OW-2018-0640-0473-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0473 |
| EPA-HQ-OW-2018-0640-0474 | Comment submitted by L. Malpass | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0474 |
| EPA-HQ-OW-2018-0640-0474-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0474 |
| EPA-HQ-OW-2018-0640-0475 | Comment submitted by A. Sepri | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0475 |
| EPA-HQ-OW-2018-0640-0475-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0475 |
| EPA-HQ-OW-2018-0640-0476 | Comment submitted by J. McBride | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0476 |
| EPA-HQ-OW-2018-0640-0476-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0476 |
| EPA-HQ-OW-2018-0640-0477 | Comment submitted by M. Stephens | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0477 |
| EPA-HQ-OW-2018-0640-0477-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0477 |
| EPA-HQ-OW-2018-0640-0478 | Comment submitted by P. Scott | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0478 |
| EPA-HQ-OW-2018-0640-0478-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0478 |
| EPA-HQ-OW-2018-0640-0479 | Comment submitted by P. Scott | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0479 |
| EPA-HQ-OW-2018-0640-0479-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0479 |
| EPA-HQ-OW-2018-0640-0480 | Comment submitted by R. Raymond | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0480 |
| EPA-HQ-OW-2018-0640-0480-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0480 |
| EPA-HQ-OW-2018-0640-0481 | Comment submitted by A. W. Ondich | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0481 |
| EPA-HQ-OW-2018-0640-0481-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0481 |
| EPA-HQ-OW-2018-0640-0482 | Comment submitted by L. Crockett | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0482 |
| EPA-HQ-OW-2018-0640-0482-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0482 |
| EPA-HQ-OW-2018-0640-0483 | Comment submitted by L. Monzon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0483 |
| EPA-HQ-OW-2018-0640-0483-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0483 |
| EPA-HQ-OW-2018-0640-0484 | Comment submitted by N. Layton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0484 |
| EPA-HQ-OW-2018-0640-0484-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0484 |
| EPA-HQ-OW-2018-0640-0485 | Comment submitted by D. Lichtenstein | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0485 |
| EPA-HQ-OW-2018-0640-0485-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0485 |
| EPA-HQ-OW-2018-0640-0486 | Comment submitted by L. Smithe | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0486 |
| EPA-HQ-OW-2018-0640-0486-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0486 |
| EPA-HQ-OW-2018-0640-0487 | Comment submitted by L. T. Jones | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0487 |
| EPA-HQ-OW-2018-0640-0487-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0487 |
| EPA-HQ-OW-2018-0640-0488 | Comment submitted by L. Brosius | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0488 |
| EPA-HQ-OW-2018-0640-0488-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0488 |
| EPA-HQ-OW-2018-0640-0489 | Comment submitted by L. Bills | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0489 |
| EPA-HQ-OW-2018-0640-0489-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0489 |
| EPA-HQ-OW-2018-0640-0490 | Comment submitted by D. Lockhart | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0490 |
| EPA-HQ-OW-2018-0640-0490-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0490 |
| EPA-HQ-OW-2018-0640-0491 | Comment submitted by W. Lundell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0491 |
| EPA-HQ-OW-2018-0640-0491-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0491 |
| EPA-HQ-OW-2018-0640-0492 | Comment submitted by M. Fuller | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0492 |
| EPA-HQ-OW-2018-0640-0492-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0492 |
| EPA-HQ-OW-2018-0640-0493 | Comment submitted by S. Markowitz | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0493 |
| EPA-HQ-OW-2018-0640-0493-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0493 |

JA.200

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 26 of 35

Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 215 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0494 | Comment submitted by D. Halleran | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0494 |
| EPA-HQ-OW-2018-0640-0494-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0494 |
| EPA-HQ-OW-2018-0640-0495 | Comment submitted by D. Martin | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0495 |
| EPA-HQ-OW-2018-0640-0495-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0495 |
| EPA-HQ-OW-2018-0640-0496 | Comment submitted by E. A. Arabian | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0496 |
| EPA-HQ-OW-2018-0640-0496-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0496 |
| EPA-HQ-OW-2018-0640-0497 | Comment submitted by E. Jones | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0497 |
| EPA-HQ-OW-2018-0640-0497-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0497 |
| EPA-HQ-OW-2018-0640-0498 | Comment submitted by M. Breckle | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0498 |
| EPA-HQ-OW-2018-0640-0498-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0498 |
| EPA-HQ-OW-2018-0640-0499 | Comment submitted by M. Wikle | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0499 |
| EPA-HQ-OW-2018-0640-0499-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0499 |
| EPA-HQ-OW-2018-0640-0500 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0500 |
| EPA-HQ-OW-2018-0640-0500-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0500 |
| EPA-HQ-OW-2018-0640-0501 | Comment submitted by E. Brady | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0501 |
| EPA-HQ-OW-2018-0640-0501-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0501 |
| EPA-HQ-OW-2018-0640-0502 | Comment submitted by E. Katz | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0502 |
| EPA-HQ-OW-2018-0640-0502-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0502 |
| EPA-HQ-OW-2018-0640-0503 | Comment submitted by P. J. Hennig | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0503 |
| EPA-HQ-OW-2018-0640-0503-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0503 |
| EPA-HQ-OW-2018-0640-0504 | Comment submitted by H. Fitz Gibbon | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0504 |
| EPA-HQ-OW-2018-0640-0504-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0504 |
| EPA-HQ-OW-2018-0640-0505 | Comment submitted by B. Hunton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0505 |
| EPA-HQ-OW-2018-0640-0505-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0505 |
| EPA-HQ-OW-2018-0640-0506 | Comment submitted by I. Flynn | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0506 |
| EPA-HQ-OW-2018-0640-0506-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0506 |
| EPA-HQ-OW-2018-0640-0507 | Comment submitted by J. Patten | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0507 |
| EPA-HQ-OW-2018-0640-0507-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0507 |
| EPA-HQ-OW-2018-0640-0508 | Comment submitted by J. Zynko | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0508 |
| EPA-HQ-OW-2018-0640-0508-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0508 |
| EPA-HQ-OW-2018-0640-0509 | Comment submitted by J. Chandler | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0509 |
| EPA-HQ-OW-2018-0640-0509-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0509 |
| EPA-HQ-OW-2018-0640-0510 | Comment submitted by  Jess C. (no surname provided) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0510 |
| EPA-HQ-OW-2018-0640-0510-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0510 |
| EPA-HQ-OW-2018-0640-0511 | Comment submitted by J. Metzger | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0511 |
| EPA-HQ-OW-2018-0640-0511-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0511 |
| EPA-HQ-OW-2018-0640-0512 | Mass Comment Campaign sponsoring organization unknown. Sample attached (email) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0512 |
| EPA-HQ-OW-2018-0640-0512-A1 | Mass Mail EA | Sample Comment Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0512 |
| EPA-HQ-OW-2018-0640-0513 | Mass Comment Campaign sponsoring organization unknown. Sample attached (email) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0513 |
| EPA-HQ-OW-2018-0640-0513-A1 | Mass Mail EA | Sample Comment Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0513 |
| EPA-HQ-OW-2018-0640-0514 | Mass Comment Campaign sponsoring organization unknown. Sample attached (email) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0514 |
| EPA-HQ-OW-2018-0640-0514-A1 | Mass Mail EA | Sample Comment Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0514 |
| EPA-HQ-OW-2018-0640-0515 | Mass Comment Campaign sponsoring organization unknown. Sample attached (email) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0515 |
| EPA-HQ-OW-2018-0640-0515-A1 | Mas Mail EA | Sample Comment Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0515 |
| EPA-HQ-OW-2018-0640-0516 | Mass Comment Campaign sponsoring organization unknown. Sample attached (email) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0516 |
| EPA-HQ-OW-2018-0640-0516-A1 | Mass Mail EA | Sample Comment Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0516 |

JA.201

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 27 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 216 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0517 | Mass Comment Campaign sponsoring organization unknown. Sample attached (email) | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0517 |
| EPA-HQ-OW-2018-0640-0517-A1 | Mass Mail EA | Sample Comment Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0517 |
| EPA-HQ-OW-2018-0640-0518 | Comment submitted by A. Dunham | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0518 |
| EPA-HQ-OW-2018-0640-0518-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0518 |
| EPA-HQ-OW-2018-0640-0519 | Comment submitted by J. Thompson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0519 |
| EPA-HQ-OW-2018-0640-0519-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0519 |
| EPA-HQ-OW-2018-0640-0520 | Comment submitted by J. Debusk | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0520 |
| EPA-HQ-OW-2018-0640-0520-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0520 |
| EPA-HQ-OW-2018-0640-0521 | Comment submitted by D. Kalvan | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0521 |
| EPA-HQ-OW-2018-0640-0521-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0521 |
| EPA-HQ-OW-2018-0640-0522 | Comment submitted by L.  Baldwin | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0522 |
| EPA-HQ-OW-2018-0640-0522-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0522 |
| EPA-HQ-OW-2018-0640-0523 | Comment submitted by M. Bell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0523 |
| EPA-HQ-OW-2018-0640-0523-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0523 |
| EPA-HQ-OW-2018-0640-0524 | Comment submitted by B. Shepherd | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0524 |
| EPA-HQ-OW-2018-0640-0524-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0524 |
| EPA-HQ-OW-2018-0640-0525 | Comment submitted by B. Buie | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0525 |
| EPA-HQ-OW-2018-0640-0525-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0525 |
| EPA-HQ-OW-2018-0640-0526 | Comment submitted by B. Greggs | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0526 |
| EPA-HQ-OW-2018-0640-0526-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0526 |
| EPA-HQ-OW-2018-0640-0527 | Comment submitted by Brian Brunhofer, Division President, Taylor Morrison | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0527 |
| EPA-HQ-OW-2018-0640-0527-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0527 |
| EPA-HQ-OW-2018-0640-0528 | Comment submitted by B. Cook | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0528 |
| EPA-HQ-OW-2018-0640-0528-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0528 |
| EPA-HQ-OW-2018-0640-0529 | Comment submitted by C. Marotta | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0529 |
| EPA-HQ-OW-2018-0640-0529-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0529 |
| EPA-HQ-OW-2018-0640-0530 | Comment submitted by R. McCarthy | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0530 |
| EPA-HQ-OW-2018-0640-0530-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0530 |
| EPA-HQ-OW-2018-0640-0531 | Comment submitted by Carrie Ludicke Adams, Chief Executive Officer (CEO), Adams Media Group | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0531 |
| EPA-HQ-OW-2018-0640-0531-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0531 |
| EPA-HQ-OW-2018-0640-0532 | Comment submitted by C. Mitchell | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0532 |
| EPA-HQ-OW-2018-0640-0532-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0532 |
| EPA-HQ-OW-2018-0640-0533 | Anonymous public comment | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0533 |
| EPA-HQ-OW-2018-0640-0533-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0533 |
| EPA-HQ-OW-2018-0640-0534 | Comment submitted by J. McCluney | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0534 |
| EPA-HQ-OW-2018-0640-0534-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0534 |
| EPA-HQ-OW-2018-0640-0535 | Comment submitted by C. Popkin | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0535 |
| EPA-HQ-OW-2018-0640-0535-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0535 |
| EPA-HQ-OW-2018-0640-0536 | Comment submitted by David J. White, Public Interest Environmental Law | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0536 |
| EPA-HQ-OW-2018-0640-0536-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0536 |
| EPA-HQ-OW-2018-0640-0537 | Comment submitted by D. Green | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0537 |
| EPA-HQ-OW-2018-0640-0537-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0537 |
| EPA-HQ-OW-2018-0640-0538 | Comment submitted by D. R. Deevey | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0538 |
| EPA-HQ-OW-2018-0640-0538-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0538 |
| EPA-HQ-OW-2018-0640-0539 | Comment submitted by D. S. Green | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0539 |
| EPA-HQ-OW-2018-0640-0539-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0539 |
| EPA-HQ-OW-2018-0640-0540 | Comment submitted by T.  Butcher | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0540 |

JA.202

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0540-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0540 |
| EPA-HQ-OW-2018-0640-0541 | Comment submitted by P. Burke and L. Eads | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0541 |
| EPA-HQ-OW-2018-0640-0541-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0541 |
| EPA-HQ-OW-2018-0640-0542 | Comment submitted by H. O. Stevenson | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0542 |
| EPA-HQ-OW-2018-0640-0542-A1 | Comment | Public Comment Copyrighted | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0542 |
| EPA-HQ-OW-2018-0640-0543 | Comment submitted by Richard Baker, President, Pelican Island Audubon Society | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0543 |
| EPA-HQ-OW-2018-0640-0543-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0543 |
| EPA-HQ-OW-2018-0640-0544 | Comment submitted by J. Clausner | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0544 |
| EPA-HQ-OW-2018-0640-0544-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0544 |
| EPA-HQ-OW-2018-0640-0545 | Comment submitted by K. Freeman | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0545 |
| EPA-HQ-OW-2018-0640-0545-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0545 |
| EPA-HQ-OW-2018-0640-0546 | Comment submitted by Angela Krause, Pipe-Tytes, Inc. | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0546 |
| EPA-HQ-OW-2018-0640-0546-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0546 |
| EPA-HQ-OW-2018-0640-0547 | Comment submitted by G. Leathers | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0547 |
| EPA-HQ-OW-2018-0640-0547-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0547 |
| EPA-HQ-OW-2018-0640-0548 | Comment submitted by L. Souto | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0548 |
| EPA-HQ-OW-2018-0640-0548-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0548 |
| EPA-HQ-OW-2018-0640-0549 | Comment submitted by A. Record | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0549 |
| EPA-HQ-OW-2018-0640-0549-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0549 |
| EPA-HQ-OW-2018-0640-0550 | Comment submitted by R. Mayo | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0550 |
| EPA-HQ-OW-2018-0640-0550-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0550 |
| EPA-HQ-OW-2018-0640-0551 | Comment submitted by A. Fritz | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0551 |
| EPA-HQ-OW-2018-0640-0551-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0551 |
| EPA-HQ-OW-2018-0640-0552 | Comment submitted by Christian Wagley, Coastal Organizer, Florida-Alabama, Healthy Gulf | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0552 |
| EPA-HQ-OW-2018-0640-0552-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0552 |
| EPA-HQ-OW-2018-0640-0553 | Comment submitted by J. Sparks | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0553 |
| EPA-HQ-OW-2018-0640-0553-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0553 |
| EPA-HQ-OW-2018-0640-0554 | Comment submitted by R. Jetton | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0554 |
| EPA-HQ-OW-2018-0640-0554-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0554 |
| EPA-HQ-OW-2018-0640-0555 | Comment submitted by J. H. Archdale | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0555 |
| EPA-HQ-OW-2018-0640-0555-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0555 |
| EPA-HQ-OW-2018-0640-0556 | Comment submitted by C. Smith | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0556 |
| EPA-HQ-OW-2018-0640-0556-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0556 |
| EPA-HQ-OW-2018-0640-0557 | Comment submitted by R. Hermann | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0557 |
| EPA-HQ-OW-2018-0640-0557-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0557 |
| EPA-HQ-OW-2018-0640-0558 | Comment submitted by R. Virnstein | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0558 |
| EPA-HQ-OW-2018-0640-0558-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0558 |
| EPA-HQ-OW-2018-0640-0559 | Comment submitted by S. Madden | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0559 |
| EPA-HQ-OW-2018-0640-0559-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0559 |
| EPA-HQ-OW-2018-0640-0560 | Comment submitted by S. Burnsed | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0560 |
| EPA-HQ-OW-2018-0640-0560-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0560 |
| EPA-HQ-OW-2018-0640-0561 | Comment submitted by S. Nielsen | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0561 |
| EPA-HQ-OW-2018-0640-0561-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0561 |
| EPA-HQ-OW-2018-0640-0562 | Comment submitted by G. Sherry | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0562 |
| EPA-HQ-OW-2018-0640-0562-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0562 |
| EPA-HQ-OW-2018-0640-0563 | Comment submitted by S. Parker | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0563 |
| EPA-HQ-OW-2018-0640-0563-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0563 |
| EPA-HQ-OW-2018-0640-0564 | Approval of Florida's Clean Water Act Section 404 Assumption Request | Federal Register Notice | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0564 |

JA.203

Case 1:21-cv-00119-RDM   Document 95-2   Filed 11/01/22   Page 29 of 35
Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 218 of 444

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0565 | Action Memorandum from Jeanneanne Gettle (U.S. EPA) to Regional Administrator Mary Walker on Florida's Assumption Request | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0565 |
| EPA-HQ-OW-2018-0640-0566 | December 17, 2020 Letter from Regional Administrator Mary Walker to Florida Governor Ron DeSantis on EPA's Approval of Florida's Program | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0566 |
| EPA-HQ-OW-2018-0640-0567 | December 17, 2020 Letter from Regional Administrator Mary Walker to the Honorable R. D. James (Army) on EPA's Approval of Florida's Program | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0567 |
| EPA-HQ-OW-2018-0640-0568 | Responsiveness Summary to Comments Received on Florida's Assumption Request | Comment Response | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0568 |
| EPA-HQ-OW-2018-0640-0569 | August 28, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the U.S. Army Corps of Engineers on EPA's Receipt of a Complete Package from Florida | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0569 |
| EPA-HQ-OW-2018-0640-0570 | November 24, 2020 Letter from Major General William Graham, Jr. (U.S. Army Corps of Engineers) to Jeanneanne Gettle (U.S. EPA) on Florida's Assumption Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0570 |
| EPA-HQ-OW-2018-0640-0571 | December 17, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to Major General William Graham Jr. (U.S. Army Corps of Engineers) | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0571 |
| EPA-HQ-OW-2018-0640-0572 | December 17, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to Regional Administrator Roy Crabtree (NOAA Fisheries Service) | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0572 |
| EPA-HQ-OW-2018-0640-0573 | September 4, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to Interested Parties Regarding the State of Florida's Assumption Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0573 |
| EPA-HQ-OW-2018-0640-0574 | Florida Assumption Public Hearing Transcripts from October 27, 2020 | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0574 |
| EPA-HQ-OW-2018-0640-0575 | Florida Assumption Public Hearing Attendee List from October 27, 2020 | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0575 |
| EPA-HQ-OW-2018-0640-0576 | August 28, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Marcellus Osceola, Jr. (Seminole Tribe of Florida) on Tribal Consultation on Florida's Assumption Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0576 |
| EPA-HQ-OW-2018-0640-0577 | August 31, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Billy Cypress (Miccosukee Tribe of Indians of Florida) on Tribal consultation on Florida's Assumption Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0577 |
| EPA-HQ-OW-2018-0640-0578 | August 31, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Stephanie Bryan (Poarch Band of Creek Indians) on Tribal Consultation on Florida's Assumption Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0578 |
| EPA-HQ-OW-2018-0640-0579 | December 17, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Stephanie Bryan (Poarch Band of Creek Indians) on EPA's Approval of Florida's Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0579 |
| EPA-HQ-OW-2018-0640-0580 | December 17, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Billy Cyprus (Miccosukee Tribe of Indians of Florida) on EPA's Approval of Florida's Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0580 |
| EPA-HQ-OW-2018-0640-0581 | December 17, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Marcellus Osceola, Jr. (Seminole Tribe of Florida) on EPA's Approval of Florida's Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0581 |
| EPA-HQ-OW-2018-0640-0582 | September 2, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Nita Battise (Alabama-Coushatta Tribe of Texas) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0582 |
| EPA-HQ-OW-2018-0640-0583 | September 2, 2020 Letter from Jeanneanne Gettle (U.S. EPA) to the Honorable Stephanie Bryan (Poarch Band of Creek Indians) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0583 |

JA.204

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0584 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Gary Batton (Choctaw Nation of Oklahoma) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0584 |
| EPA-HQ-OW-2018-0640-0585 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Billy Cypress (Miccosukee Tribe of Indians of Florida) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0585 |
| EPA-HQ-OW-2018-0640-0586 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Cyrus Ben (Mississippi Band of Choctaw Indians) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0586 |
| EPA-HQ-OW-2018-0640-0587 | September 2, 2020 Letter from Jeaneanne Gettle to the Honorable David Hill of the Muscogee (Creek) Nation on Consultation under the NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0587 |
| EPA-HQ-OW-2018-0640-0588 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable David Sickey (Coushatta Tribe of Louisiana) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0588 |
| EPA-HQ-OW-2018-0640-0589 | Florida Assumption Public Hearing Attendee List from October 21, 2020 | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0589 |
| EPA-HQ-OW-2018-0640-0590 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Timothy Parsons (Florida State Historic Preservation Officer) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0590 |
| EPA-HQ-OW-2018-0640-0591 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Reid Nelson (Advisory Council on Historic Preservation) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0591 |
| EPA-HQ-OW-2018-0640-0592 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Noah Valenstein (Florida Department of Environmental Protection) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0592 |
| EPA-HQ-OW-2018-0640-0593 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable David Hill of the Muscogee (Creek) Nation on EPA's Response to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0593 |
| EPA-HQ-OW-2018-0640-0594 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Stephanie Bryan (Poarch Band of Creek Indians) on EPA's Response to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0594 |
| EPA-HQ-OW-2018-0640-0595 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Reid Nelson (Advisory Council on Historic Preservation) and Enclosure A | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0595 |
| EPA-HQ-OW-2018-0640-0596 | October 19, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Nita Battise (Alabama-Coushatta Tribe of Texas) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0596 |
| EPA-HQ-OW-2018-0640-0597 | October 19, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Cyrus Ben (Mississippi Band of Choctaw Indians) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0597 |
| EPA-HQ-OW-2018-0640-0598 | Notes from the September 28, 2020 Government-to-Government Consultation with the Seminole Tribe of Florida | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0598 |
| EPA-HQ-OW-2018-0640-0599 | Notes from the October 8, 2020 Government-to-Government Consultation with the Miccosukee Tribe of Indians of Florida | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0599 |
| EPA-HQ-OW-2018-0640-0600 | Notes from the December 3, 2020 Government-to-Government Consultation with the Miccosukee Tribe of Indians of Florida | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0600 |
| EPA-HQ-OW-2018-0640-0601 | Notes from the October 15, 2020 NHPA Section 106 Consultation with the Muscogee Creek Nation | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0601 |
| EPA-HQ-OW-2018-0640-0602 | Presentation for the Choctaw Nation of Oklahoma on NHPA Section 106 Consultation | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0602 |

JA.205

Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0603 | Florida Assumption Public Hearing Presentation from October 27, 2020 | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0603 |
| EPA-HQ-OW-2018-0640-0604 | Florida Assumption Public Hearing Transcripts from October 21, 2020 | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0604 |
| EPA-HQ-OW-2018-0640-0605 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Gary Batton (Choctaw Nation of Oklahoma) on EPA's Response to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0605 |
| EPA-HQ-OW-2018-0640-0606 | EPA Responses to Comments from the National Historic Preservation Act Section 106 Consulting Parties on Florida's Request for Assumption | Comment Response | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0606 |
| EPA-HQ-OW-2018-0640-0607 | Response to Comments- Enclosure C to the December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Reid Nelson (Advisory Council on Historic Preservation) | Comment Response | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0607 |
| EPA-HQ-OW-2018-0640-0608 | August 28, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to U.S. FWS on EPA's Receipt of a Complete Package from Florida | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0608 |
| EPA-HQ-OW-2018-0640-0609 | December 17, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Robert Tawes (U.S. FWS) | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0609 |
| EPA-HQ-OW-2018-0640-0610 | December 9, 2020 Letter from Billy Cypress (Miccosukee Tribe of Indians of Florida) to Jeaneanne Gettle (U.S. EPA) | Consultation Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0610 |
| EPA-HQ-OW-2018-0640-0611 | December 7, 2020 Letter from Paul Backhouse (Seminole Tribe of Florida) to Jeaneanne Gettle (U.S. EPA) on Consultation under NHPA | Consultation Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0611 |
| EPA-HQ-OW-2018-0640-0612 | December 4, 2020 Letter from Reid Nelson (Advisory Council on Historic Preservation) to Jeaneanne Gettle (U.S. EPA) on Consultation under NHPA | Consultation Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0612 |
| EPA-HQ-OW-2018-0640-0613 | December 7, 2020 Letter from Jason Aldridge (Florida Department of State) to Jeaneanne Gettle (U.S. EPA) on Consultation under NHPA | Consultation Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0613 |
| EPA-HQ-OW-2018-0640-0614 | December 7, 2020 Letter from Larry Haikey (Poarch Band of Creek Indians) to Jeaneanne Gettle (U.S. EPA) | Consultation Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0614 |
| EPA-HQ-OW-2018-0640-0615 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Leopoldo Miranda (U.S. FWS) on ESA's Section 7 Consultation | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0615 |
| EPA-HQ-OW-2018-0640-0616 | November 19, 2020 Letter from Robert Tawes (USFWS) to Jeaneanne Gettle (U.S. EPA) Transmitting the Biological Opinion | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0616 |
| EPA-HQ-OW-2018-0640-0617 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Regional Administrator Roy Crabtree (NOAA Fisheries Service) on EPA's Section 7 Consultation | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0617 |
| EPA-HQ-OW-2018-0640-0618 | October 30, 2020 Letter from Assistant Regional Administrator Virginia Fay (NOAA National Marine Fisheries Service) to Jeaneanne Gettle (U.S. EPA) | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0618 |
| EPA-HQ-OW-2018-0640-0619 | September 22, 2020 NHPA Consultation Overview Presentation | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0619 |
| EPA-HQ-OW-2018-0640-0620 | Notes From The October 7, 2020 Government-to-Government Consultation With The Poarch Band of Creek Indians | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0620 |
| EPA-HQ-OW-2018-0640-0621 | Notes From The October 30, 2020 Government-to-Government Consultation With The Poarch Band of Creek Indians | Meeting Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0621 |
| EPA-HQ-OW-2018-0640-0622 | December 16, 2020 Memo To The File On The Magnuson-Stevens Fishery Conservation And Management Act | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0622 |
| EPA-HQ-OW-2018-0640-0623 | USFWS Biological Opinion Appendix 2- Memorandum of Understanding | Publication- Other Governmental | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0623 |

JA.206

Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0624 | Ketterer, Amber L. and Suarez-Rivas, Rafael E. 2015. The Bert J. Harris, Jr., Private Property Rights Protection Act: An Overview, Recent Developments, and What the Future May Hold. The Florida Bar Journal, Vol. 89, No. 8., Page 49 | Publication- Copyrighted Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0624 |
| EPA-HQ-OW-2018-0640-0625 | August 28, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to NOAA Fisheries on EPA's Receipt of a Complete Package from Florida | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0625 |
| EPA-HQ-OW-2018-0640-0626 | September 2, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Marcellus Osceola, Jr. (Seminole Tribe of Florida) on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0626 |
| EPA-HQ-OW-2018-0640-0627 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Billy Cypress (Miccosukee Tribe of Indians of Florida) on EPA's Response to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0627 |
| EPA-HQ-OW-2018-0640-0628 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Marcellus Osceola, Jr. (Seminole Tribe of Florida) on EPA's Responses to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0628 |
| EPA-HQ-OW-2018-0640-0629 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Timothy Parsons (Florida State Historic Preservation Officer) on EPA's Response to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0629 |
| EPA-HQ-OW-2018-0640-0630 | December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable Noah Valenstein (Florida Department of Environmental Protection) on EPA's Response to NHPA Consultation Comments | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0630 |
| EPA-HQ-OW-2018-0640-0631 | December 15, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Jeanine Bennett (Miccosukee Tribe of Indians of Florida) | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0631 |
| EPA-HQ-OW-2018-0640-0632 | Florida Assumption Public Hearing Presentation from October 21, 2020 | Public Hearing Materials | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0632 |
| EPA-HQ-OW-2018-0640-0633 | October 19, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to the Honorable David Sickey on Consultation under NHPA | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0633 |
| EPA-HQ-OW-2018-0640-0635 | December 13, 2019 Letter from David Ross (U.S. EPA) to NOAA and the U.S. FWS on FDEP's Non-Federal Representative Designation | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0635 |
| EPA-HQ-OW-2018-0640-0636 | December 12, 2019 Letter from Regional Administrator Mary Walker (U.S. EPA) to the Honorable Noah Valenstein (Florida Department of Environmental Protection) on Florida's Non-Federal Representative Designation | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0636 |
| EPA-HQ-OW-2018-0640-0637 | Federal Register Notice: Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation | Federal Register Notice | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0637 |
| EPA-HQ-OW-2018-0640-0638 | April 15, 2020 Letter from Cathryn Tortorici (NOAA National Marine Fisheries Service) to Heather Mason (Florida Department of Environmental Protection) | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0638 |
| EPA-HQ-OW-2018-0640-0639 | Programmatic Agreement under NHPA Section 106 | Agreement | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0639 |
| EPA-HQ-OW-2018-0640-0640 | December 16, 2020 Memo to the File on the Coastal Zone Management Act | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0640 |
| EPA-HQ-OW-2018-0640-0641 | August 28, 2020 Letter from Regional Administrator Mary Walker (U.S. EPA) to Florida Governor Ron DeSantis on Florida's Completeness Determination for Florida's Assumption Request | Letter | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0641 |
| EPA-HQ-OW-2018-0640-0642 | Programmatic Biological Opinion from the U.S. FWS for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act | Publication- Other Governmental | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0642 |

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0643 | September 4, 25 and 30, 2020 Email Communications between EPA and ACHP under NHPA | Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0643 |
| EPA-HQ-OW-2018-0640-0644 | October 27, 2020 email from Kelly Laycock to the Florida Anthropological Society | Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0644 |
| EPA-HQ-OW-2018-0640-0645 | October 27, 2020 email from Kelly Laycock to the Florida Archaeological Council | Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0645 |
| EPA-HQ-OW-2018-0640-0646 | October 27, 2020 email from Kelly Laycock to the Florida Trust for Historic Preservation | Email | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0646 |
| EPA-HQ-OW-2018-0640-0648 | Signed Programmatic Agreement- Enclosure B to the December 16, 2020 Letter from Jeaneanne Gettle (U.S. EPA) to Reid Nelson (Advisory Council on Historic Preservation) | Agreement | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0648 |
| EPA-HQ-OW-2018-0640-0649 | USFWS Biological Opinion Appendix 1- EPA's  Biological Evaluation | Publication- Other Governmental | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0649 |
| EPA-HQ-OW-2018-0640-0650 | Comment submitted by Rachel Silverstein, Miami Waterkeeper and Lisa Rinaman, St. Johns Riverkeeper | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0650 |
| EPA-HQ-OW-2018-0640-0650-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0650 |
| EPA-HQ-OW-2018-0640-0651 | Comment submitted by B. Dees | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0651 |
| EPA-HQ-OW-2018-0640-0651-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0651 |
| EPA-HQ-OW-2018-0640-0652 | Comment submitted by G. Soto | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0652 |
| EPA-HQ-OW-2018-0640-0652-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0652 |
| EPA-HQ-OW-2018-0640-0653 | Comment submitted by J. Zuzack | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0653 |
| EPA-HQ-OW-2018-0640-0653-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0653 |
| EPA-HQ-OW-2018-0640-0654 | Comment submitted by J. McCluney | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0654 |
| EPA-HQ-OW-2018-0640-0654-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0654 |
| EPA-HQ-OW-2018-0640-0655 | Comment submitted by K. Booth | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0655 |
| EPA-HQ-OW-2018-0640-0655-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0655 |
| EPA-HQ-OW-2018-0640-0656 | Comment submitted by L. Williams | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0656 |
| EPA-HQ-OW-2018-0640-0656-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0656 |
| EPA-HQ-OW-2018-0640-0657 | Comment submitted by P. Holland | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0657 |
| EPA-HQ-OW-2018-0640-0657-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0657 |
| EPA-HQ-OW-2018-0640-0658 | Comment submitted by T.  Bachmann | Public Comment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0658 |
| EPA-HQ-OW-2018-0640-0658-A1 | Comment | Public Comment Attachment | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0658 |
| EPA-HQ-OW-2018-0640-0660 | August 27, 2020 Memorandum from David Ross (U.S. EPA) to Mary Walker (U.S. EPA R4) on Consultation Requirements under the Endangered Species Act for State and Tribal Clean Water Act Section 404 Program Approvals | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0660 |
| EPA-HQ-OW-2018-0640-0660-A1 | August 27, 2020 Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0660 |
| EPA-HQ-OW-2018-0640-0661 | May 10, 2017 NACEPT Assumable Waters Subcommittee Final Report | Publication- Other Governmental | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0661 |
| EPA-HQ-OW-2018-0640-0662 | July 30, 2018 Memorandum from R.D. James (Assistant Secretary of the Army, Civil Works) on Assumable Waters | Memorandum | https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0662 |
| EPA-HQ-OW-2018-0640-0663 | September 3, 4, 2020 Email Response from NMFS Regarding ESA No Effect Letter | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0663 |
| EPA-HQ-OW-2018-0640-0664 | December 20, 2021 Letter from Jeaneanne M Gettle (U.S.EPA) to Tania Galloni (EarthJustice) responding to a March 31, 2021 Notice of Intent to Sue | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0664 |
| EPA-HQ-OW-2018-0640-0665 | FDEP's Criminal Program | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0665 |
| EPA-HQ-OW-2018-0640-0666 | Cases | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0666 |
| EPA-HQ-OW-2018-0640-0667 | Idaho Letter | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0667 |

JA.208

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0667-A1 | PA IPDES Negligence-Standard Letter | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0667 |
| EPA-HQ-OW-2018-0640-0668 | Criminal intent issues | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0668 |
| EPA-HQ-OW-2018-0640-0668-A1 | Environmental Crime Comes of Age - The Evolution of Criminal Enforcement in the Environmental Regulatory Scheme | Publication- Copyrighted Materials | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0668 |
| EPA-HQ-OW-2018-0640-0668-A2 | Minimizing Risk Under the Clean Water Act | Publication- Copyrighted Materials | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0668 |
| EPA-HQ-OW-2018-0640-0668-A3 | The Criminalization of Negligence Under the Clean Water Act | Publication- Copyrighted Materials | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0668 |
| EPA-HQ-OW-2018-0640-0670 | Email transmitting documents for Florida Stakeholder meeting | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0670-A1 | Federal Register of Thursday, February 22, 2001 (66FR11202). FR11202 (Coordination MOA.pdf) | Federal Register Notice | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0670-A2 | Flowchart image 2018-08-06-205339 | Flow Chart | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0670-A3 | Potential ESA Compromise Analysis and Proposal | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0670-A4 | Agency Action Memo | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0670-A5 | Florida proposal regarding ESA (SSEC-Doug-P18082810080) | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0670-A6 | FL DA MOA 9-21-18 | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0670 |
| EPA-HQ-OW-2018-0640-0671 | Urgent Heads up on issues for call today with FL at 1 pm | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0671 |
| EPA-HQ-OW-2018-0640-0673 | 404 Assumption | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0673 |
| EPA-HQ-OW-2018-0640-0674 | Letter from member of FL House re: Assumption | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0674 |
| EPA-HQ-OW-2018-0640-0675 | Attachments related to ESA consultation | Folder | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0675 |
| EPA-HQ-OW-2018-0640-0675-A1 | OW to ECOS-ASWM 404 Assumption final | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0675 |
| EPA-HQ-OW-2018-0640-0675-A2 | State Assumption of 404 permitting authority and ESA consulation ADA 01.02.20-1 Redacted | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0675 |
| EPA-HQ-OW-2018-0640-0675-A3 | Reference: RGL 83-06 | Publication - Other Governmental | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0675 |
| EPA-HQ-OW-2018-0640-0675-A4 | ECOS wkgp summary to NS re 404 assumption 7-11 | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0675 |
| EPA-HQ-OW-2018-0640-0675-A5 | ECOS incoming Letter on 404 Assumption and ESA ADA 01.02.20 | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0675 |
| EPA-HQ-OW-2018-0640-0677 | Email Info for Larry Starfield Call | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0677 |
| EPA-HQ-OW-2018-0640-0678 | FL Assumption ESA Meeting Notes | Meeting Materials | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0678 |
| EPA-HQ-OW-2018-0640-0679 | RE: FL Assumption DRAFT BA | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0679 |
| EPA-HQ-OW-2018-0640-0680 | Transmittal to Region 4 RA - Final ESA Memo | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0680 |
| EPA-HQ-OW-2018-0640-0680-A1 | Final Memorandum - ESA- 7(a)(2) Consultation for State and Tribal CWA 404 Program Approvals - 08.27.2020 Signed.pdf | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0680 |
| EPA-HQ-OW-2018-0640-0681 | 9th Cir decision on simple negligence | Case law | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0681 |
| EPA-HQ-OW-2018-0640-0682 | EPA Letter to OFR | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0682 |
| EPA-HQ-OW-2018-0640-0683 | Request for Government-to-Government Consultation EPA and USACOE State of Florida 404 Assumption | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0683 |
| EPA-HQ-OW-2018-0640-0684 | 404 Programmatic Agreement - Digital Signature | Email | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0684 |
| EPA-HQ-OW-2018-0640-0685 | Rationale for Non-Significance by Office of Water - Codifying EPA's Adjudicatory Decision | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0685 |
| EPA-HQ-OW-2018-0640-0686 | Response to Comments on EPA Consultation under ESA | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0686 |
| EPA-HQ-OW-2018-0640-0687 | Collective notes from 09-28-19 FL stakeholder meeting | Meeting Materials | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0687 |
| EPA-HQ-OW-2018-0640-0688 | ESA 316b Background Materials | Folder | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0688 |
| EPA-HQ-OW-2018-0640-0688-A1 | Memorandum to the Record - 316b Rulemaking | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0688 |
| EPA-HQ-OW-2018-0640-0688-A2 | Cooling-water ESA instructional memo | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0688 |
| EPA-HQ-OW-2018-0640-0688-A3 | 2014 NPDES Cooling Water Intake Structures Preamble and Rule | Final Rule | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0688 |
| EPA-HQ-OW-2018-0640-0688-A4 | 2001 MOA with services | Federal Register Notice | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0688 |
| EPA-HQ-OW-2018-0640-0688-A5 | 2014 Joint BioOP- final 316b bo and appendices | Publication - Other Governmental | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0688 |
| EPA-HQ-OW-2018-0640-0689 | ESA Background Materials | Folder | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0689 |
| EPA-HQ-OW-2018-0640-0689-A1 | MI 2011 MOA | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0689 |

| Document ID | Title | Type | URL |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0689-A2 | FL-EPA draft MOA | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0689 |
| EPA-HQ-OW-2018-0640-0689-A3 | 2010 EPA Memo in "ESA Materials" | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0689 |
| EPA-HQ-OW-2018-0640-0689-A4 | NJDEP- EPA Assumption MOA | Memorandum | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0689 |
| EPA-HQ-OW-2018-0640-0689-A5 | Oregon 404 ESA Assumption Final Report | Report | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0689 |
| EPA-HQ-OW-2018-0640-0690 | 2010 12 27 EPA Silva Memo Former Position on ESA Consultation | Letter | https://www.regulations.gov/document/EPA-HQ-OW-2018-0640-0690 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

LEGAL FRAMEWORK .......................................................................................... 3

    I.    The Clean Water Act. ................................................................................ 3

    II.   The Endangered Species Act. ................................................................... 5

    III.  The Rivers and Harbors Act. .................................................................... 7

STATEMENT OF FACTS ....................................................................................... 8

    I.    Florida's Vast Waterways. ........................................................................ 8

    II.   Florida's Abysmal Environmental Record. ........................................... 10

    III.  Florida's Pursuit of 404 Assumption. ................................................... 10

    IV.  The Corps' Retained Waters List. .......................................................... 12

    V.   Endangered Species Act Consultation. .................................................. 15

    VI.  EPA's Approval of the State's Application. ........................................... 20

PROCEDURAL BACKGROUND ......................................................................... 21

STANDARD OF REVIEW .................................................................................... 22

ARGUMENT .......................................................................................................... 23

    I.    USFWS Violated the ESA by Substituting a Non-Statutory Technical Assistance
         Process for the ESA's Statutory Framework. ......................................... 24

         A.   USFWS Abdicated Its Duties to Abide by the ESA's Requirements. ................. 25

         B.   USFWS' ITS Unlawfully Extended Take Liability Exemptions Without
             Creating ESA-Mandated Guardrails. ..................................................... 30

         C.   USFWS Unlawfully Relied on a Novel Technical Assistance Process to Avoid
             the Mandates of Section 7 Consultation. ................................................ 33

    II.   EPA Unlawfully Relied on USFWS' Arbitrary and Capricious BiOp and ITS. ........... 39

    III.  EPA Arbitrarily and Capriciously Determined "No Effect" to NMFS Species. ........... 40

    IV.  EPA Unlawfully Approved a State Program that is Less Stringent Than Federal
         Law. ......................................................................................................... 43

         A.   EPA Approved a State Program That Failed to Meet Minimum Enforcement
             Standards Required to Abate Violations of a Permit or the Permit Program. ...... 44

         B.   EPA Approved a State Program That Relied on Applicants' "Assurances" In
             Lieu of the Federal 404(b)(1) Guidelines' Requirement that the Permitting
             Authority Independently Make Factual Determinations....................... 49

C.   EPA Approved a State Program with a Narrow View of Water Quality Effects Determinations Contrary to the Federal 404(b)(1) Guidelines. ............................ 52

D.   EPA Approved a State Program That Failed to Comply with 404(b)(1) Guideline to Ensure No Jeopardy from State Permits. ........................................ 54

E.   EPA Approved a State Program That Failed to Demonstrate That Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State. ........................................................................................ 55

V.   The Corps Unlawfully Relinquished 404 Jurisdiction Over Certain Waters. ............... 58

VI.   EPA Arbitrarily and Capriciously Determined the State's Inadequate Application Was Complete. .......................................................................................... 60

STANDING ............................................................................................................. 63

CONCLUSION ........................................................................................................ 69

JA.213

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Akiak Native Cmty. v. EPA,*
   625 F.3d 1162 (9th Cir. 2010) ...............................................................................48

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
   937 F.3d 559 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA,*
   140 S. Ct. 2792 (2020) ........................................................................................43

\*  *Am. Rivers v. FERC,*
   895 F.3d 32 (D.C. Cir. 2018) ...........................................................22, 29, 39, 42

\*  *Am. Rivers v. U.S. Army Corps of Eng'rs,*
   271 F. Supp. 2d 230 (D.D.C. 2003) .....................................................................33

*Appalachian Voices v. U.S. Dep't of Interior,*
   25 F.4th 259 (4th Cir. 2022) ................................................................................29

*Arizona Cattle Growers' Ass'n v. USFWS,*
   273 F.3d 1229 (9th Cir. 2001) ..........................................................................7, 32

\*  *Bennett v. Spear,*
   520 U.S. 154 (1997) .......................................................................................58, 59

\*  *Chesapeake Bay Found. v. Bethlehem Steel Corp.,*
   608 F. Supp. 440 (D. Md. 1985) ..........................................................................49

\*  *City of Tacoma v. FERC,*
   460 F.3d 53 (D.C. Cir. 2006) ..........................................................................39, 42

*In re Clean Water Act Rulemaking,*
   568 F. Supp. 3d 1013 (N.D. Cal. 2021) ...............................................................3

\*  *Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .........................................................................30, 34

*Cooling Water Intake Structure Coal. v. EPA,*
   905 F.3d 49 (2d Cir. 2018)...............................................................................37, 38

*Ctr. for Biological Diversity v. EPA,*
   56 F.4th 55 (D.C. Cir. 2022) ...............................................................................65

\*  *Ctr. for Biological Diversity v. EPA,*
   861 F.3d 174 (D.C. Cir. 2017) .............................................................................68

\*  *Ctr. for Biological Diversity v. Regan,*
   597 F. Supp. 3d 173 (D.D.C. 2022) ................................................................58, 63

*Ctr. for Biological Diversity v. Rumsfeld*,
    198 F. Supp. 2d 1139 (D. Ariz. 2002) ...................................................34

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) .............................................................7

\*   *Ctr. for Biological Diversity v. Zinke*,
    369 F. Supp. 3d 164 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*,
    961 F.3d 1197 (D.C. Cir. 2020) .......................................................65

*Defs. of Crooked Lake, Inc., v. FDEP*,
    2018 WL 3387900 (Fla. Div. Admin. Hearings May 7, 2018) ...............51

\*   *Defs. of Wildlife v. Babbitt*,
    130 F. Supp. 2d 121 (D.D.C. 2001) ......................................27, 28, 41

*Defs. of Wildlife v. U.S. Dep't of Interior*,
    931 F.3d 339 (4th Cir. 2019) .............................................................27

*Env't Def. v. U.S. Army Corps of Eng'rs*,
    515 F. Supp. 2d 69 (D.D.C. 2007) .....................................................52

*EPA v. California*,
    426 U.S. 200 (1976) .......................................................................3

*Fisher v. Pension Benefit Guar. Corp.*,
    468 F. Supp. 3d 7 (D.D.C. 2020) ......................................................22

\*   *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
    726 F. Supp. 2d 1195 (D. Mont. 2010) ........................................28, 34

\*   *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................................45, 64

*Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2002) .........................................................35

*Gifford Pinchot Task Force v. USFWS*,
    378 F.3d 1059 (9th Cir. 2004) .........................................................34

\*   *Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021) .........................................................42, 43

*Hawaii Longline Ass'n. v. NMFS*,
    281 F. Supp. 2d 1 (D.D.C. 2003), *on reconsideration in part sub nom. Hawaii*
    *Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1 (D.D.C. 2003) ...............39

\*    *Idaho Conservation League v. EPA,*
     820 F. App'x 627 (9th Cir. 2020) .......................................................22, 46

     *Karuk Tribe of Cal. v. U.S. Forest Serv.,*
     681 F.3d 1006 (9th Cir. 2012) .........................................................29, 43

\*    *Lujan v. Defs. of Wildlife,*
     504 U.S. 555 (1992) ...............................................................................66

     *Massachusetts v. EPA,*
     549 U.S. 497 (2007) ...............................................................................65

\*    *Mayo v. Jarvis,*
     177 F. Supp. 3d 91 (D.D.C. 2016) .......................................................40

\*    *Menominee Indian Tribe v. EPA,*
     947 F.3d 1065 (7th Cir. 2020) ..............................................................58

\*    *N. Slope Borough v. Andrus,*
     642 F.2d 589 (D.C. Cir. 1980) .............................................................34

     *Nat. Res. Def. Council, Inc. v. EPA,*
     859 F.2d 156 (D.C. Cir. 1988) .............................................................48

     *Nat'l Ass'n of Clean Air Agencies v. EPA,*
     489 F.3d 1221 (D.C. Cir. 2007) ...........................................................22

     *Nat'l Wildlife Fed'n v. Brownlee,*
     402 F. Supp. 2d 1 (D.D.C. 2005) .........................................................34

\*    *Nat'l Wildlife Fed'n v. Norton,*
     332 F. Supp. 2d 170 (D.D.C. 2004) .................................................29, 40

     *Native Ecosystems Council v. Dombeck,*
     304 F.3d 886 (9th Cir. 2002) ...............................................................42

\*    *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.,*
     496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL
     161666 (D.C. Cir. Jan. 12, 2021) .................................................64, 65, 66

\*    *Oceana, Inc. v. Pritzker,*
     125 F. Supp. 3d 232 (D.D.C. 2015) .....................................................67

\*    *Oceana, Inc. v. Ross,*
     No. CV 15-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ..........27, 28, 31

     *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior,*
     144 F. Supp. 3d 35 (D.D.C. 2015) .......................................................64

\*     *Pasqua Yaqui Tribe v. EPA,*
        557 F. Supp. 3d 949 (D. Ariz. 2021) ...................................................56

        *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology,*
        511 U.S. 700 (1994)............................................................................3

        *Res. Ltd., Inc. v. Robertson,*
        35 F.3d 1300 (9th Cir. 1993) .............................................................40

\*     *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC,*
        992 F.3d 1071 (D.C. Cir. 2021)........................................................39

        *Sierra Club v. Chevron U.S.A., Inc.,*
        834 F.2d 1517 (9th Cir. 1987) ...........................................................49

\*     *Sierra Club v. Jewell,*
        764 F.3d 1 (D.C. Cir. 2014)...............................................................66

\*     *Sierra Club v. U.S. Dep't of the Interior,*
        899 F.3d 260 (4th Cir. 2018) .............................................................31

\*     *Small Refiner Lead Phase-Down Task Force v. EPA,*
        705 F.2d 506 (D.C. Cir. 1983)...................................................62, 65

        *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
        531 U.S. 159 (2001)............................................................................4

        *Spokeo, Inc. v. Robins,*
        578 U.S. 330 (2016)..........................................................................64

\*     *State v. Greene,*
        348 So. 2d 3 (Fla. 1977)....................................................................46

\*     *State v. Hamilton,*
        388 So. 2d 561 (Fla. 1980)................................................................46

        *Summers v. Earth Island Inst.,*
        555 U.S. 488 (2009)..........................................................................65

        *Tenn. Valley Auth. v. Hill,*
        437 U.S. 153 (1978)........................................................................5, 6

        *Transohio Sav. Bank v. Dir., Office of Thrift Supervision,*
        967 F.2d 598 (D.C. Cir. 1992)..........................................................34

        *United States v. Earth Sciences, Inc.,*
        599 F.2d 368 (10th Cir. 1978) ...........................................................45

JA.217

\*       *United States v. Hanousek,*
         176 F.3d 1116 (9th Cir. 1999) ...............................................46, 47

\*       *United States v. Maury,*
         695 F.3d 227 (3d Cir. 2012)...........................................................45

\*       *United States v. Ortiz,*
         427 F.3d 1278 (10th Cir. 2005) .....................................................45

\*       *United States v. Pruett,*
         681 F.3d 232 (5th Cir. 2012) .........................................................45

\*       *United States v. Ursitti,*
         543 F. Supp. 2d 971 (C.D. Ill. 2008) .............................................48

         *Wild Fish Conservancy v. Salazar,*
         628 F.3d 513 (9th Cir. 2010) .........................................................26

\*       *WildEarth Guardians v. Jewell,*
         738 F.3d 298 (D.C. Cir. 2013) .......................................................66

         *WildEarth Guardians v. Salazar,*
         741 F. Supp. 2d 89 (D.D.C. 2010) .................................................22

**Federal Statutes**

5 U.S.C. § 553 ...............................................................................20, 62, 65

5 U.S.C. § 704 ..........................................................................................58

5 U.S.C. § 706 ....................................................................................22, 51

16 U.S.C. § 1531 ........................................................................................5

16 U.S.C. § 1532 ....................................................................................5, 9

16 U.S.C. § 1536 ................................................................................ *passim*

16 U.S.C. § 1538 ........................................................................................5

16 U.S.C. § 1539 ....................................................................................5, 7

16 U.S.C. § 1540 ........................................................................................5

18 U.S.C. § 3282 ......................................................................................48

33 U.S.C. § 401 .....................................................................................8, 59

33 U.S.C. § 403 .....................................................................................8, 59

JA.218

33 U.S.C. § 407 ...................................................................................8

33 U.S.C. § 1251 ...............................................................................3, 4

33 U.S.C. § 1311 ..................................................................................3

33 U.S.C. § 1319 ......................................................................24, 45, 48

33 U.S.C. § 1344 ...........................................................................*passim*

33 U.S.C. § 1362 ..................................................................................3

**Federal Regulations**

33 C.F.R. § 230.4 .................................................................................8

33 C.F.R. § 328.3 ............................................................................15, 59

33 C.F.R. § 328.3 (2020) .......................................................................59

33 C.F.R. § 329.4 ............................................................................8, 59

33 C.F.R. § 329.15 ..............................................................................59

33 C.F.R. § 329.16 ..............................................................................59

40 C.F.R. pt. 230 .............................................................................4, 44

40 C.F.R. pt. 233 .............................................................................4, 44

40 C.F.R. § 125.94 ..............................................................................38

40 C.F.R. § 230.1 .................................................................................4

40 C.F.R. § 230.3 (2015) .......................................................................8

40 C.F.R. § 230.3 ................................................................................53

40 C.F.R. § 230.10 ....................................................................50, 54, 60

40 C.F.R. § 230.11 ..............................................................................50

40 C.F.R. § 230.20 ..............................................................................50

40 C.F.R. § 230.21 ..............................................................................50

40 C.F.R. § 230.22 ..........................................................................50, 53

40 C.F.R. § 230.23 ..............................................................................50

40 C.F.R. § 230.24 ..................................................................................................50

40 C.F.R. § 230.25 ..................................................................................................50

40 C.F.R. § 230.30 ..................................................................................................50

40 C.F.R. § 230.31 ..................................................................................................50

40 C.F.R. § 230.32 ..................................................................................................50

40 C.F.R § 230.40 ..................................................................................................50

40 C.F.R § 230.41 ..................................................................................................50

40 C.F.R § 230.42 ..................................................................................................50

40 C.F.R § 230.43 ..................................................................................................50

40 C.F.R § 230.44 ..................................................................................................50

40 C.F.R § 230.45 ..................................................................................................50

40 C.F.R. § 230.50 ..................................................................................................50

40 C.F.R. § 230.51 ..................................................................................................50

40 C.F.R. § 230.52 ..................................................................................................50

40 C.F.R. § 230.53 ..................................................................................................50

40 C.F.R. § 230.54 ..................................................................................................50

40 C.F.R. § 230.60 ..................................................................................................53

40 C.F.R. § 230.61 ..................................................................................................53

40 C.F.R. § 232.2 ..................................................................................................55

40 C.F.R. § 233.1 ..............................................................................................45, 55

40 C.F.R. § 233.10 ..................................................................................................60

40 C.F.R. § 233.12 ..................................................................................................60

40 C.F.R. § 233.15 ..............................................................................................*passim*

40 C.F.R. § 233.20 ..................................................................................................55

40 C.F.R. § 233.30 ..................................................................................................55

ix

40 C.F.R. § 233.34 ...................................................................................................54

40 C.F.R. § 233.40 ...................................................................................................55

40 C.F.R. § 233.41 .................................................................................45, 46, 49

50 C.F.R. § 17.22 .......................................................................................................7

50 C.F.R. § 17.31 .......................................................................................................5

50 C.F.R. § 402.02 ........................................................................................ passim

50 C.F.R. § 402.13 ...............................................................................................6, 41

50 C.F.R. § 402.14 ........................................................................................ passim

50 C.F.R. § 402.16 .............................................................................................7, 31

45 Fed. Reg. 85,336 (Dec. 24, 1980) ..............................................................51

84 Fed. Reg. 44,976 (Aug. 27, 2019) .............................................................33

85 Fed. Reg. 57,853 (Sept. 16, 2020) .............................................................60

**State Statutes**

Fla. Stat. § 373.430 .............................................................................................46, 48

Fla. Stat. § 373.4146 .........................................................................................50, 55

Fla. Stat. § 775.15 ...................................................................................................48

**State Regulations**

Fla. Admin. Code R. 62-330.301 .................................................................50, 53

Fla. Admin. Code R. 62-331.051 ........................................................................61

Fla. Admin. Code R. 62-331.053 .................................................................51, 62

**Other Authorities**

EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008) ............................................................................................................................59

State Assumption of Federal Section 404 Dredge and Fill Permitting Authority, S.B. 1402, 2017 Leg. (2018 Fla. Laws 2018-88) .................................................10

x

USFWS, *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* (Dec. 16, 2016)..........................................................................................7

USFWS & NMFS, *Endangered Species Consultation Handbook* (1998)...................................35

JA.222

## PRELIMINARY STATEMENT

Plaintiff conservation organizations bring this action to protect our Nation's waters and the endangered species that rely on them. During the Trump Administration, Florida worked hand in glove with developers to achieve developers' "holy grail":[1] state assumption over Section 404 of the Clean Water Act—which governs dredging and filling of many sensitive wetlands—in one of the most biodiverse states in the country. Between 2017 and 2020, the State and the U.S. Environmental Protection Agency ("EPA"), U.S. Fish and Wildlife Service ("USFWS"), and the U.S. Army Corps of Engineers ("Corps"), worked to make this dream a reality. The Defendants' actions, however, violated multiple federal laws and must be set aside.

EPA's approval of Florida's 404 program is based upon multiple legal errors. First, EPA failed to ensure that the state program is as stringent as, and equivalent to, federal law. Second, EPA relied on USFWS' inadequate biological opinion ("BiOp") to determine the state program would not jeopardize threatened and endangered species, even though the BiOp unlawfully replaced the statutory framework and analyses Congress required in the Endangered Species Act ("ESA") with a non-statutory technical assistance process lacking those guardrails. USFWS then unlawfully extended broad liability coverage for harm to protected species from administration of the state program to EPA, the State, and state permittees, for the life of the program. Third, EPA allowed the State to assume authority over waters required by law to remain under the Corps' exclusive jurisdiction. Defendants' actions threaten to open the floodgates for other states to seek assumption without complying with federal standards, further imperiling our Nation's waters and the ESA-listed species that rely on them.

---

[1] *See* Ex. 10 at 5 (Umpierre Dec. ¶ 14).

The improper delegation of a core Clean Water Act program poses a significant threat in Florida, a state whose waters are a national treasure and economic mainstay; a state that is home to more than 130 threatened and endangered species; and a state where these assets and resources face intense ecological pressure as a result of mining, development, and other industry projects. The epicenter of this crisis may well be Southwest Florida, a richly biodiverse corner of the world that also provides the last remaining habitat for the critically endangered Florida panther. Panthers are one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.

The State is currently considering Section 404 permits for several projects that threaten to destroy habitat and breeding ground essential to the Florida panther. These include Troyer Mine (a lime rock and fill dirt mine), Bellmar Development (a mixed-use community covering 1,500 acres), and Immokalee Road Rural Village (a mixed-use residential and commercial development over 2,780 acres). These projects also threaten harm to other listed species, including Audubon's crested caracara, the Everglade snail kite, and the Florida scrub jay. Many other projects that pose major threats to listed species are in the same pipeline.

Congress enacted the ESA to ensure that federal actions would not jeopardize the continued existence of threatened and endangered species, like the Florida panther, and mandated specific processes for federal wildlife agencies to fulfill this promise. But EPA's unlawful transfer of authority to Florida gave away the keys to kingdom, putting the panther— and the more than 130 other listed species in Florida—in peril.

The Federal Defendants' actions are unlawful and must be set aside.  Given the severity of the violations and the harms to Plaintiffs, EPA's approval of Florida's program should be vacated, restoring 404 authority over assumable waters in Florida to the Corps.[2]

## LEGAL FRAMEWORK

### I.    The Clean Water Act.

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" after states had failed to control water pollution as evidenced by disasters like the Cuyahoga River catching on fire and the Hudson River filling with raw sewage and toxic waste.  33 U.S.C. § 1251; *In re Clean Water Act Rulemaking*, 568 F. Supp. 3d 1013, 1018 (N.D. Cal. 2021).  *See also EPA v. California*, 426 U.S. 200, 202–09 (1976).  Congress thus strengthened the laws protecting the Nation's waters because previously, it only provided assistance to states, seeking to incentivize them to protect and clean up the water.  *Id*.  That state-dependent system had failed, necessitating more thorough measures.  *Id.*

Based upon this history and Congress' direction, a fundamental tenet of the Clean Water Act is that the Act is a *floor*, a minimum baseline in all respects for protection of the Nation's waters.  States retain only the flexibility to be more, but never less, protective than the Clean Water Act's foundational protections.  *See* 33 U.S.C. § 1311(b)(1)(C); *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 705–07 (1994).

At its heart, the Clean Water Act prohibits the unpermitted discharge of pollution (defined broadly to include dredge and fill material) into waters of the United States.  33 U.S.C. §§ 1311(a), 1362(6), (12), (19).[3]  It is thus a vital tool to meet the Clean Water Act's goals.  *See*

---

[2] Plaintiffs respectfully request the opportunity to brief the appropriate remedy following the Court's ruling on summary judgment.

[3] The Clean Water Act defines limited circumstances where a permit would not be required.  33 U.S.C. § 1344(f).

*id.* § 1251.  Waters of the United States are defined to include wetlands, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001), and the Clean Water Act recognizes that the degradation and destruction of wetlands is "among the most severe environmental impacts."  40 C.F.R. § 230.1(a).

Section 404 authorizes the Corps to issue permits regulating the discharge of dredge or fill materials into waters of the United States, including wetlands, 33 U.S.C. § 1344(a).  The Clean Water Act allows states to administer their own dredge and fill permit program, excepting "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto."  *Id.* § 1344(g)(1).  The Corps retains 404 jurisdiction over waters not assumable by the State.  *Id.* § 1344(h)(3)–(4); 40 C.F.R. § 233.15(h).

The Clean Water Act requires that any state 404 program be at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  EPA must determine that a state has authority to, among other things:  (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(C), (1)(G); 40 C.F.R. pt. 233.  EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).  EPA's approval requires the Corps to suspend issuance of 404 permits for activities covered by the state program.  *Id.* § 1344(h)(2)(A), (4)–(5).

4

JA.226

## II.      The Endangered Species Act.

Almost fifty years ago, Congress enacted the ESA to provide for the conservation of

threatened and endangered species and their habitats.  16 U.S.C. § 1531.  Congress created this

regime in response to increasing concerns about how many "species of fish, wildlife, and plants"

had been rendered extinct "as a consequence of economic growth and development untempered

by adequate concern and conservation."  *Id*. § 1531(a)(1).  With this legislation, Congress made

a "conscious decision ... to give endangered species priority over the 'primary missions' of

federal agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Indeed, an

"examination of the language, history, and structure [of the ESA] indicates beyond doubt that

Congress intended endangered species to be afforded the highest of priorities."  *Id.* at 174.

Section 9 of the ESA prohibits any person, including private parties, states, and federal

agencies, from "taking" a protected species.  16 U.S.C. § 1538(a)(1)(B).[4]  "Take" means to

"harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  *Id.* § 1532(19).

Congress established civil and criminal penalties for illegal take and authorized the public to

bring civil suits to ensure compliance with the Act.  *Id.* § 1540(a)–(b), (g).

Recognizing that take may still occur as a result of otherwise lawful activities, Congress

created two distinct paths to ensure that this "incidental take" would not jeopardize protected

species or adversely modify or destroy critical habitat:  (1) Section 7, which applies to federal

agency actions, *id.* § 1536; and (2) Section 10, which applies to non-federal actions, *id.* § 1539.

These mechanisms exempt liability for incidental take only so long as the wildlife agencies and

consulting agencies abide by the specific measures and standards developed by Congress.

---

[4] USFWS and NMFS have extended take prohibitions by regulation to most threatened species
under their respective jurisdictions.  *See* 50 C.F.R. § 17.31(a).

Whenever a federal agency action may affect protected species or critical habitat, the action agency must consult with wildlife agencies—USFWS and National Marine Fisheries Service ("NMFS")—pursuant to Section 7. *Id.* § 1536; 50 C.F.R. §§ 402.13, 402.14. Section 7 creates affirmative duties for both the action agency and wildlife agencies. The Act prescribes the analysis that the wildlife agencies must undertake during consultation, which includes a requirement that the wildlife agencies provide a BiOp detailing how the agency action affects protected species and critical habitat. 16 U.S.C. § 1536(b)(3)(A). *Accord* 50 C.F.R. § 402.14(g), (h). Section 7 requires that the wildlife agencies and action agency employ the "best scientific and commercial data available" during consultation. 16 U.S.C. § 1536(a)(2). It sets the standard for the wildlife agencies' ultimate opinion, determining whether the action would (1) jeopardize protected species or (2) destroy or adversely modify critical habitat. *Id.* § 1536(a)(2). And Section 7 mandates that action agencies, through consultation, must ensure their actions are not likely to jeopardize protected species or adversely modify or destroy critical habitat. *Id.* The obligation to ensure against a likelihood of jeopardy or adverse modification requires agencies to give the benefit of the doubt to protected species. *See Tenn. Valley Auth.*, 437 U.S. at 174–84.

Additionally, Section 7 creates guidelines and requirements whenever the wildlife agencies intend to extend incidental take liability exemption. 16 U.S.C. § 1536(b)(4). If the wildlife agencies determine that incidental take is reasonably certain to occur, they must formulate an incidental take statement ("ITS") that specifies (1) the amount or extent of incidental take; (2) reasonable and prudent measures required to minimize take impacts; and (3) implementing terms and conditions with which the action agency must comply. *Id. Accord* 50 C.F.R. § 402.14(g)(7), (i). "The [ITS] functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are

otherwise lawful and in compliance with its terms and conditions." *Arizona Cattle Growers'*

*Ass'n v. USFWS*, 273 F.3d 1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)).  And an ITS

serves as a check on the BiOp, acting as a "trigger" by denoting when an unacceptable level of

take has occurred, which then invalidates the safe harbor provision and requires the action

agency to (1)  reinitiate consultation to reevaluate the action; (2) determine if the action may now

jeopardize protected species or critical habitat; and (3) determine what additional protective

measures may be required to reduce impacts from the action.  50 C.F.R. §§ 402.14(i)(3), (4),

402.16(a); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 910–11 (9th Cir. 2012).

As it did for Section 7 consultation, Congress mandated robust analyses and standards for

wildlife agencies when they extend incidental take liability exemption to a non-federal entity

pursuant to Section 10 of the ESA.  16 U.S.C. § 1539(a).[5]  The Act creates binding requirements

on a non-federal applicant to submit an application along with enumerated analyses, protective

measures, and a demonstration of funding to implement required protective measures.  *Id.*

§ 1539(a)(2)(A).[6]  And Section 10 establishes the standard for the wildlife agencies to issue an

incidental take permit, including the requirement that the taking will not appreciably reduce the

likelihood of the survival and recovery of protected species.  *Id.* § 1539(a)(2)(B).

## III.    The Rivers and Harbors Act.

The Rivers and Harbors Act ("RHA") grants the Corps exclusive jurisdiction over certain

waterways.  Section 10 prohibits the excavation or fill of any canal, lake, harbor, "or inclosure

---

[5] *See also* 50 C.F.R. § 17.22 (detailing the robust analysis and process for obtaining a Section 10 incidental take permit).

[6] *See* USFWS, *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* at 7-1, 14-8 (Dec. 16, 2016), https://www.fws.gov/media/habitat-conservation-planning-and-incidental-take-permit-processing-handbook ("robust" analysis must be more than a mere "tally" of take and often requires biological studies, species population surveys, species distribution information, and/or habitat modeling and distribution to obtain the "thorough, up-to-date biological information" required).

within the limits of any breakwater, or of the channel of any navigable water" without the

consent of the Corps.  33 U.S.C. § 403.  Section 9 grants the Corps jurisdiction over construction

in navigable waters, except for "waters that are not subject to the ebb and flow of the tide and

that are not used and are not susceptible to use in their natural condition or by reasonable

improvement as a means to transport interstate or foreign commerce."  *Id.* § 401.  And Section

13 prohibits the discharge of any refuse into navigable waters.  *Id.* § 407.  Although the Corps'

authority under the Clean Water Act is broader than under the RHA, the Corps defines navigable

waters under the RHA and traditionally navigable waters under the Clean Water Act the same.[7]

## STATEMENT OF FACTS

Florida's vast waterways, and the endangered and threatened species that rely on them,

have long depended on the protections of federal law.  But as the record shows, the EPA,

USFWS, and the Corps skirted those laws to allow an unlawful state 404 program to take effect.[8]

### I.     Florida's Vast Waterways.

Water is one of Florida's most prominent features, with almost 1,200 miles of coastline,

more than 7,500 major lakes, thirty-three first magnitude springs, and approximately 27,500

linear miles of rivers and streams.  EPA-HQ-OW-2018-0640-0386-A2, at 49 (*Florida Waters: A*

---

[7] *Compare* 33 C.F.R. § 329.4 (defining RHA navigable waters as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce") *with id.* § 328.3(a)(1) (2020) (defining traditionally navigable waters under Clean Water Act as "waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.").

[8] In this motion, EPA records are identified by their document ID on the administrative record index.  *See* Dkt. 95-2 (*e.g.*, EPA-HQ-OW-2018-0640-0001).  Because EPA documents are not bates-stamped, Plaintiffs cite page numbers corresponding to the PDF page number of each document.  Corps and USFWS records are identified by the beginning bates number as indicated on the index, *see* Dkt. 94-2 (*e.g.*, CORPS000001), 93-2 (*e.g.*, FWS-000001), followed by a pin cite to the corresponding bates number within the document.  Administrative record cites are followed by a title or brief description of the document when necessary for context.

*Water Resources Manual*).  Countless valuable wetlands are widely distributed throughout the

State, including the renowned Everglades and the Big Cypress Swamp.  EPA-HQ-OW-2018-

0640-0386-A3, at 20–21 (*Geology of Florida*).  With approximately eleven million acres of

wetlands, Florida has more wetlands than any of the other lower forty-eight states.  EPA-HQ-

OW-2018-0640-0386-A4, at 11 (USFWS, *Florida's Wetlands: An Update on Status and Trends

1985–1996* (document continues to EPA-HQ-OW-2018-0640-0386-A5)).

      Florida's waters help sustain some of the world's most renowned biodiversity.  Florida

lies within the North American Coastal Plan, the World's Thirty-Sixth Biodiversity Hotspot, and

is considered the richest area biologically for endemic species.  EPA-HQ-OW-2018-0640-0386-

A6 (*Florida Declared a Global Biodiversity Hotspot*).  Freshwater resources in Florida provide

nesting, foraging, wintering, and migrating habitats for numerous species of fish and wildlife.

EPA-HQ-OW-2018-0640-0386-A1, at 4 (citing *Florida's Freshwater Priority Resources: A

Guide for Future Management* at 1, EPA-HQ-OW-2018-0640-0386-A7).

      And these waters support the more than 130 ESA-listed species in Florida, as well as

another 96 under consideration for listing.  *See* FWS-005610, at FWS-005647 (EPA Biological

Evaluation [hereinafter "BE"]).  These include the critically endangered Florida panther, as well

as the West Indian manatee, Key deer, Everglade snail kite, Audubon's crested caracara,

bonneted bat, and smalltooth sawfish.  *Id.* at FWS-005734, FWS-005737, FWS-005741, FWS-

005742, FWS-005748–50, FWS-005761–62.  USFWS has also designated "critical habitat"[9] for

more than thirty ESA-listed species in Florida.  *See id.* at FWS-005648–60 (chart of ESA-listed

species also indicating those with designated critical habitat).  With one of the highest rates of

---

[9] Critical habitat means areas containing the features essential to conservation of species which
may require special management considerations as identified based on wildlife agencies'
decision that such areas are essential to the conservation of the species.  16 U.S.C. § 1532(5)(A).

habitat loss, Florida's water resources and the species that depend on them are some of the most

threatened.  *See* EPA-HQ-OW-2018-0640-0386-A8 (*Threats to Florida's Biodiversity*).

## II.      Florida's Abysmal Environmental Record.

Despite the importance of environmental protection to the State's biodiversity and waters,

leading up to Florida's request to assume 404 permitting authority, the State slashed staff and

funding for its Department of Environmental Protection ("FDEP"), including in its wetlands

division.  EPA-HQ-OW-2018-0640-0386-A1, at 5 (Plaintiffs' Comments).  Florida's leading

paper called FDEP's recent record "an environmental disaster" because of reduced budgets,

rushed permitting, weakened enforcement, and widespread layoffs of experts who were replaced

with political appointees focused on advancing business interests.  EPA-HQ-OW-2018-0640-

0385-A1 (*The Rick Scott Record: An Environmental Disaster*).

A 2016 Public Employees for Environmental Responsibility ("PEER") analysis found

that FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines in

twenty-eight years, and assessed no penalties in a third of cases.  EPA-HQ-OW-2018-0640-

0385-A2 (*Scott's Undeclared Polluters' Holiday Stains Florida*); EPA-HQ-OW-2018-0640-

0385-A3 (*Report on Enforcement Efforts by the Florida Department of Environmental*

*Protection Calendar Year 2015*); EPA-HQ-OW-2018-0640-0385-A4 (*State Failing to Protect*

*Our Waterways*) (collecting articles describing the State's environmental record).

## III.     Florida's Pursuit of 404 Assumption.

It was against this backdrop that in late 2017, the Florida legislature quietly introduced a

bill to authorize FDEP to pursue assumption over Section 404 assumable waters.  State

Assumption of Federal Section 404 Dredge and Fill Permitting Authority, S.B. 1402, 2017 Leg.

(2018 Fla. Laws 2018-88), https://www.flsenate.gov/Session/Bill/2018/1402.

10

JA.232

The legislature considered but rejected a similar effort in 2005, after FDEP concluded

that for assumption in Florida to be feasible, several changes to state and federal statutes would

be required.  EPA-HQ-OW-2018-0640-0385-A6, at 4–6 (FDEP, *Consolidation of State and*

*Federal Wetland Permitting Programs Implementation of House Bill 759*).  In 2005, FDEP also

recognized that assumption would require "substantial staff resources" for the State to be able to

take on the additional responsibilities and workload required under federal law.  *Id.* at 4–5.

An analysis of the 2017 bill also recognized that assumption would generate costs.  EPA-

HQ-OW-2018-0640-0385-A7, at 3, 14, 17 (*Bill Analysis and Fiscal Impact Statement: S.B.*

*1402*).  FDEP claimed, however, that it did "not anticipate" an increase in expenditures with

assumption, and that it believed administration and enforcement of the 404 program could be

"absorbed without an increase in staffing or administrative costs."  *Id.* at 17.  FDEP sought no

funding and advised that it would charge no fees.  *Id.*

There was great public outcry.  Waterkeepers across Florida urged legislators to reject the

proposed legislation, citing concerns about FDEP taking on an additional program without

additional resources and its woefully inadequate regulation of another delegated Clean Water Act

program.  EPA-HQ-OW-2018-0640-0385-A8 (Letter from Miami Waterkeeper).  On behalf of

its more than sixty member organizations, the Everglades Coalition issued a resolution opposing

the legislation, identifying concerns regarding state assumption and the risk to Florida's

remaining wetlands, which are critical to cleansing water, recharging groundwater, providing

fish and wildlife habitat, and storm resiliency.  EPA-HQ-OW-2018-0640-0385-A10 (Everglades

Coal., *Resolution Opposing SB1402 and HB7043*).

And former FDEP Secretary Victoria Tschinkel urged the Governor to veto the bill,

which she observed had been pushed for "fast and simple permitting" rather than being in the

best interests of the State.  EPA-HQ-OW-2018-0640-0392-A2 (*Florida's Treasured Wetlands on the Eve of Destruction—We Cannot Allow It*).  Former Secretary Tschinkel noted, among other things, that "Florida has already lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control."  *Id.  See also* EPA-HQ-OW-2018-0640-0385-A9 (*Don't Let Florida Take Over Wetlands Permitting*) (raising concerns about FDEP's workforce and funding; "There is no reason to have confidence that the state agency is prepared to take on this obligation ... The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

Over these objections and concerns, on March 23, 2018, Governor Rick Scott signed the bill authorizing FDEP "to explore whether the state should issue 404 permits."  EPA-HQ-OW-2018-0640-0392-A3.  In 2019, Ron DeSantis became governor and continued these efforts.

**IV.    The Corps' Retained Waters List.**

As the State began pursuing 404 program assumption, the Corps began to evaluate the Florida waters over which it would retain jurisdiction upon assumption.  On March 19, 2018, the Corps initiated a thirty-day comment period to identify navigable waters in the State, including "those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities."  CORPS003213, at CORPS003214 (Public Notice).  The Corps sought to determine "which waters are subject to permitting authority under Section 10" of the RHA and which "would be retained" after state assumption.  *Id.*

By March 20, 2018, the Corps had provided FDEP with two lists of navigable waters in Florida.  CORPS003215, at CORPS3215, CORPS003217 (Corps email) (map).  The first was dated 2014 and identified more than 480 navigable rivers, creeks, and lakes.  CORPS002987, at CORPS002987 (Jacksonville District Navigable Waters Lists).  The second was dated 2017 and

12

identified more than 1,700 navigable rivers, creeks, and lakes in Florida.  CORPS003117, at

CORPS003117 (Supplement to the Jacksonville District Navigable Waters Lists).

In response to the Corps' public notice, members of the public began submitting

information on Florida's navigable waters.  CORPS003227, at CORPS00327 (Seminole Tribe of

Florida email) (historic use of Florida waterways for canoe travel and trade); CORPS003617, at

CORPS3617–708 (same) (navigability in the Florida Everglades for sugar cane production);

CORPS003230, at CORPS003230–616 (same) (canoe exploration through, and navigability of,

the Everglades); CORPS003709, at CORPS003709 (Florida Division of Recreation and Parks)

(updated paddling trails information).

Unbeknownst to the public, however, FDEP's Secretary asked the Corps to stop the

navigability studies, and the Corps acquiesced.  CORPS003714, at CORPS003714 (April 9,

2018, Email) (stating that, per their discussion FDEP would send written request that the Corps

"cease the navigation studies").  Corps leadership quickly responded to this "clear guidance,"

stated they would "direct [their] team to execute as directed," and directed that the Corps

"CEASE WORK on all actions related to the NAVIGABLE WATERS STUDIES to support

ASSUMABLE WATERS STUDY leading to assumption of 404 permit authorities by the

STATE of FLORIDA."  *Id.* at CORPS003714 (capitalization in original).

The next day, the Corps issued a public notice summarily terminating the comment

period.  CORPS003717, at CORPS003717 (Updated Public Notice) (terminating comment

period "until further notice").  The public, undeterred, continued to submit comments through the

original deadline of April 20, 2018.  CORPS003724, at CORPS003725–29 (Sierra Club) (asking

that the Corps ensure a complete inventory of navigable waters in Florida prior to assumption);

CORPS003843, at CORPS003844 (Audubon Florida); CORPS003846, at CORPS003846

13

(Center for Biological Diversity); CORPS003850, at CORPS003892–99 (Conservancy of Southwest Florida) (identifying dozens of additional waterways in Florida counties that should be reviewed for navigability); CORPS003900, at CORPS003900–4064 (Earthjustice); CORPS004065, at CORPS004067–68 (Florida Conservation Coalition) (former U.S. Senator and Florida Governor Bob Graham, urging the Corps to recognize the vast network of navigable waterways in Florida over which the Corps would have to retain jurisdiction); CORPS004069, at CORPS004069–74 (Florida Keys Environmental Fund); CORPS004085, at CORPS004085–87 (Waterkeepers Florida).[10]

On June 18, 2018, Corps leadership directed staff to "suspend its efforts relating to a navigability study of waters" in response to Florida's proposal to assume 404 authority. CORPS004093, at CORPS004094–95 (Corps email). The Corps acknowledged that it had "initiated a navigability study" to identify retained waters but now cited a forthcoming rulemaking to revise the definition for "waters of the United States" as justification to "suspend the current navigability studies." *Id.*

Then, on July 30, 2018, the Corps issued a memorandum on "non-assumable waters." CORPS004096, at CORPS004097–98 (Corps Memorandum). The Corps asserted it would use existing RHA Section 10 lists as a "starting point" for 404 retained waters lists, subject to amendments by the Corps. *Id.*, at CORPS004098. The memo, however, also directed that the Corps would not retain 404 jurisdiction over Section 10 waters that "qualify as 'navigable' solely because they were 'used in the past' to transport interstate or foreign commerce." *Id.* at CORPS004097–98. This reversed the position the Corps had taken while participating on an

---

[10] The comments submitted by Conservancy of Southwest Florida and by Earthjustice (on behalf of some of the Plaintiffs) were also copied to EPA at the time.

EPA Assumable Waters Subcommittee based on its own regulations and guidance.[11]  The Corps'

memorandum also stated that while EPA intended to address assumable waters in a rule, it was

not necessary to wait for "any such rulemaking."  *Id.*, at CORPS004096–97.

In 2019, the Corps provided FDEP with a four-page "Retained Waters List" that the State

included in its draft "State 404 Program Handbook" which it adopted through state rulemaking

for the purpose of its 404 application to EPA.  EPA-HQ-OW-2018-0640-0002-A20, at 43–46.

The Corps' Retained Waters List was based on the 2014 (and not 2017) navigable waters list,

CORPS004149, at CORPS004149, and "remove[d] … Historic Navigation Segments" from the

list.  CORPS004238, at CORPS004238–4264.  On August 5, 2020, the Corps executed a

memorandum of agreement ("MOA") with FDEP, which attached the final Retained Waters List

(now dated August 5, 2020).  CORPS004322, at CORPS004322–34.

## V.   Endangered Species Act Consultation.

When it came to protected species issues, EPA and USFWS also changed course

expressly at Florida's request and for the purpose of its assumption aspirations.  Since at least

2010, EPA had taken the position that its approval of a state 404 program was a non-

discretionary decision, and that therefore consultation under Section 7 of the Endangered Species

Act ("ESA") for the review of an assumption application was not required.  EPA-HQ-OW-2018-

0640-0690, at 1–2 (EPA ESA Consultation Position Memo).

---

[11] According to the Subcommittee Report, EPA formed the subcommittee to "clarify" which
waters could be assumed under Section 404 under 33 U.S.C. 1344(g)(1).  The majority proposed
that the Corps not retain jurisdiction over "historic use" waters, CORPS002999, at CORPS
003017–21, while the Corps recommended that it retain jurisdiction over all Traditional
Navigable Waters (TNWs) under the Clean Water Act in accordance with 33 C.F.R.
§ 328.3(a)(1) and the agency's *Rapanos* guidance.  CORPS002999, at CORPS003015–16,
CORPS003021–22.

But in its quest to ensure a "streamlined" approach for state 404 permittees to receive liability coverage for incidental take, Florida asked EPA to change course on whether Section 7 consultation was required when it approved state 404 programs.  EPA-HQ-OW-2018-0640-0670 (email from Florida to EPA attaching "Florida's First White Paper"); EPA-HQ-OW-2018-0640-0670-A5 (Florida White Paper I).  As later outlined in another of Florida's white papers, Florida proposed that EPA engage in a "one-time" programmatic consultation that would result in a programmatic ITS extending take liability coverage to EPA, the State, and state permittees following a "technical assistance" process.  EPA-HQ-OW-2018-0640-0388-A7, at 2 (FDEP White Paper II).

Florida complained that currently, "where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10."  *Id.*  Florida sought an out from this "dynamic" precisely because there are so many ESA-listed species in the State.  *Id.*  Florida estimated that about 10% of 404 permits in Florida required some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects[.]"  *Id.*

Other options were available to protect permittees from incidental take liability while also complying with the ESA.  EPA acknowledged that state programs can (1) entirely avoid impacts to protected species; (2) federalize state 404 permits when they may impact species (passing those permits to the Corps);[12] or (3) require state permittees to engage in ESA Section 10 review,

---

[12] This was the approach taken by New Jersey in its state program.  FWS-006144, at FWS-006149–50 (NJ MOU).

the process Congress designed to extend incidental take liability exemption to non-federal actors. EPA-HQ-OW-2018-0640-0686, at 1–2 (EPA response to comments).[13]

On December 12, 2019, EPA designated FDEP as the non-federal representative for "informal" consultation with USFWS.  FWS-000001, at FWS-000001–02 (EPA letter).  EPA stated that it was voluntarily initiating informal consultation while it gave "further consideration" to its position on whether consultation was required for approving a state 404 program. *Id.*

But as early as November 2019, FDEP was already telling the Corps that the State had hired a contractor to prepare a biological assessment ("BA"), and that EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the program level.  CORPS004318, at CORPS004318 (Corps email).  In December 2019, FDEP further advised the Corps that EPA would use the BA to request consultation and produce a programmatic BiOp.  CORPS004319, at CORPS004320–21 (Corps email) (sending meeting notes).  And on April 1, 2020, USFWS staff also made explicit to FDEP the plan that was already in the works:

> After assumption, [USFWS] will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit. [USFWS] will merely be providing technical assistance on the project by project reviews to [FDEP], [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [FDEP] issuing any particular 404 permit.

FWS-000749–751, at FWS-000749 (USFWS email).

---

[13] As Florida itself acknowledged, there was a fourth approach available where EPA would consult with USFWS on individual state 404 permits based on its oversight of state permits that have the reasonable potential to affect protected species.  EPA-HQ-OW-2018-0640-0670-A3, at 1–2 (ESA Compromise).

17

Still, on May 21, 2020, EPA invited public comment on whether EPA's approval of a

Section 404 program is nondiscretionary for purposes of ESA Section 7 consultation,

representing to the public that this was still an open question on which they could be heard.[14]

EPA-HQ-OW-2018-0640-0637 (85 Fed. Reg. 30,953).

In the meantime, on July 24, 2020, Florida sent EPA its BA.  EPA-HQ-OW-2018-0640-

0387-A8 (BA).  And the State worked with USFWS to draft a Memorandum of Understanding

("MOU") that claimed the State would ensure permits would not jeopardize species based on a

"technical assistance" process that it predicted would be articulated in an "anticipated" BiOp.

EPA-HQ-OW-2018-0640-0016-A2, at 5 (Application MOU) (unexecuted).

On August 27, 2020, EPA announced the reversal of its longstanding position for

purposes of considering the state's application, so that EPA could use Section 7 consultation to

deliver broad protection to the State and its permittees for incidental take.  EPA-HQ-OW-2018-

0640-0660-A1, at 1 (ESA Consultation Memo).  But EPA did not stop there.  Instead, the agency

also articulated exactly how the wildlife agencies would perform their consultation duties.  EPA

explained that it had been persuaded by Florida's advocacy for a one-time ESA Section 7

programmatic consultation in conjunction with EPA's initial review "as an efficient and legally-

defensible approach to resolving the lack of incidental take coverage for permittees and

permitting agencies" by providing a programmatic ITS, preferable to the status quo of requiring

permittees to "avoid adverse impacts to listed species or otherwise seek an incidental take permit

under ESA Section 10."  *Id.* at 3.

---

[14] Several Plaintiffs agreed that EPA's action was discretionary, thereby requiring Section 7
consultation, but opposed the use of Section 7 to follow the path advocated by Florida (and on
which EPA also sought comment) as unlawful under the ESA.  EPA-HQ-OW-2018-0640-0388-
A2 (Conservation Groups' comment letter).

Just four business days later, on September 2, 2020, EPA submitted a biological evaluation ("BE") to USFWS to initiate formal consultation on Florida's application.  FWS-005608, at FWS-005608–09 (submittal letter); FWS-005610, at FWS005610–906 (BE).  EPA's BE was largely a cut and paste of the State's BA, which was not independently assessed by EPA.  *Compare* EPA-HQ-OW-2018-0640-0387-A8 (BA) *with* FWS-005610–5906 (BE).

Also, on September 2, 2020, EPA sent a letter to NMFS summarily concluding that approval of the state program would have "no effect" on NMFS' jurisdictional marine and anadromous species.  EPA-HQ-OW-2018-0640-0617 (EPA letter).  EPA's conclusion was solely based on an April 15, 2020, letter by NMFS to Florida, stating that no species in NMFS' exclusive jurisdiction would be present "in assumable waters."  EPA-HQ-OW-2018-0640-0638 (NMFS letter).  *See also* EPA-HQ-OW-2018-0640-0649 at 52 (BE) (EPA explaining basis for no effect determination).  NMFS' letter, however, did not consider the entire action area, including areas indirectly affected by the federal action, as required by law.  50 C.F.R. § 402.02.  On September 3, 2020, NMFS concurred with EPA's determination.  *See* EPA-HQ-OW-2018-0640-0618 (NMFS letter).

On November 17, 2020, USFWS produced a programmatic BiOp and ITS for EPA's approval of Florida's application.  FWS-006028 (BiOp).  The BiOp did not conduct species-specific analyses of the baseline status of species or impacts of EPA's action.  *See id.* at FWS-006092, FWS-006094–95 (stating USFWS would not and was not "required" to analyze species-specific effects).  Instead, the BiOp devoted nearly half its length describing the technical assistance process by which the State would take the lead in considering and addressing impacts to listed species and critical habitat for individual permit decisions.  *Id.* at FWS-006045–75.  USFWS would have "opportunities" to engage in this process but would only be required to

19

receive and review permit applications.  USFWS then granted broad incidental take exemption to EPA for its approval and oversight of the state program, to the State for its role as the "applicant," and to state permittees for any take of listed species incidental to state-permitted activities, without specifying the extent of that incidental take, adequate monitoring of take, or terms and conditions that would meaningfully limit incidental take.[15]

## VI.    EPA's Approval of the State's Application.

On August 20, 2020, the State submitted its application to EPA.  *See* EPA-HQ-OW-2018-0640-0001, at 1 (Federal Register notice).  The application relied on a technical assistance process that would be outlined in a later programmatic BiOp, failed to adopt Section 404(b)(1) Guidelines, failed to adequately identify waters to be assumed, and relied on lesser enforcement standards.  Ensuring a decision would be made before any change in administration, on August 28, 2020, EPA determined that Florida's application was "complete" as of the submission date. EPA-HQ-OW-2018-0640-0641, at 1–2 (Completeness Determination).  EPA's "completeness" determination triggered a 120-day deadline to approve or deny the application by December 18, 2020, unless EPA and Florida agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a), (c).  And on September 16, 2020, EPA initiated a public comment period on Florida's assumption application that would conclude on November 2, 2020.  EPA-HQ-OW-2018-0640-0001, at 1 (Federal Register notice).  *See* 40 C.F.R. § 233.15(e); 5 U.S.C. § 553.

In an October 23, 2020, letter, Plaintiffs' counsel urged EPA to reverse its completeness determination considering critical omissions in Florida's application and requested suspension of the public comment period until the deficiencies were cured, including as to the treatment of

---

[15] Although USFWS stated that permittees would be required to comply with species-related permit conditions, USFWS extended take liability coverage without any terms and conditions requiring that permittees do so.  *See* 16 U.S.C. § 1536(o).

ESA-listed species.  EPA-HQ-OW-2018-0640-0051, at 1–9 (Completeness Letter).  *See* 40

C.F.R. § 233.15(a) (review period begins only if EPA finds state application complete).

On November 2, 2020, Plaintiffs and many other members of the public submitted

comments opposing the state program, citing, among other things, the absence of required

components which prejudiced the opportunity for public comment, and the proposal's failure to

meet the requirements for a state-assumed program, particularly as relates to the protection of

listed species, the failure to adopt the federal 404(b)(1) Guidelines, and enforcement.  *See, e.g.*,

EPA-HQ-OW-2018-0640-0386-A1 (Plaintiffs' Comments). 33 U.S.C. § 1344(g)–(h).

On December 17, 2020, EPA approved Florida's application.  EPA-HQ-OW-2018-0640-

0566 (Approval Letter).  On December 22, 2020, EPA published its approval with an immediate

effective date, in violation of 553(d), ensuring the transfer of authority would occur before the

next administration took office.  EPA-HQ-OW-2018-0640-0564 (85 Fed. Reg. 83,553).

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on January 14, 2021, alleging that the Federal Defendants

violated the Clean Water Act, ESA, RHA, and Administrative Procedure Act ("APA").  Dkt. 1.

On February 1, 2021, the Court granted the Motion to Intervene by the State of Florida and

FDEP ("Florida" or "Intervenors").  Minute Order.

On March 5, 2021, Plaintiffs filed a Motion for Partial Summary Judgment on Claims

Eight and Nine.  Dkt. 31.  On April 26, 2021, Defendant EPA cross-moved, Dkt. 34, and

Intervenors filed a Cross-Motion to Dismiss, Dkt. 36.  On March 30, 2022, the Court entered

summary judgment in favor of EPA on Claim Nine, reserved ruling on Claim Eight pending

further briefing on redressability, and denied Florida's Motion to Dismiss on all claims.  Dkt. 73.

On April 19, 2022, Plaintiffs filed an Amended Complaint asserting additional claims against

EPA and USFWS.  Dkt. 77.

On November 1, 2022, the Federal Defendants each filed a Certified Index to their respective Revised Administrative Record.  Dkt. 93, 94, and 95.  On November 15, 2022, the parties filed a status report requesting to propose a case management order following the Court's decision on Claim Eight.  Dkt. 96.  On January 30, 2023, the parties filed a Joint Motion for a Summary Judgment Scheduling Order, Dkt. 97, which the Court granted.  Jan. 31, 2023, Minute Order.  This motion is filed in accordance with that Order.

## STANDARD OF REVIEW

In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is ... consistent with the APA standard of review.'"  *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).  The APA provides that a court shall "hold unlawful and set aside agency action" that is (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or (3) "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C)–(D).  *See also WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010) (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th Cir. 2020) (EPA abused its discretion approving a state-delegated Clean Water Act program that was less stringent than federal law).  Courts apply the same APA standard for ESA citizen suit claims.  *Am. Rivers v. FERC*, 895 F.3d 32, 44–45 (D.C. Cir. 2018).  Questions of statutory interpretation are reviewed de novo.  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).

## ARGUMENT

From 2017 to 2020, the Federal Defendants created unlawful regulatory shortcuts to allow Florida to assume Section 404 authority without meeting the standards of federal law.  The agencies' actions violated not only the Clean Water Act, but also the ESA, RHA, and APA.  These unlawful agency actions harmed Plaintiffs' interests, and those of the tens of thousands of members they represent.

First, USFWS—the entity Congress directed to administer the ESA—produced a shallow programmatic BiOp that relied on a state-driven, non-statutory technical assistance process that itself does not require the same rigorous analyses Congress established in the ESA.  Based on this unlawful BiOp, USFWS then granted broad take liability exemption to EPA, the State, and all future state permittees for the life of the state program.

Second, once Florida's application was submitted, EPA moved at breakneck speed to approve the program before a change in administration.  EPA ignored Plaintiffs' request to reverse its "completeness" determination as to Florida's application, which triggered a 120-day decision clock, even though the State had failed to demonstrate authority to ensure against jeopardy of protected species and modification or destruction of critical habitat and had failed to adequately describe the waters over which it would assume jurisdiction.  EPA closed the public comment period more than two weeks before USFWS produced the BiOp that would contain the technical assistance process on which Florida (and EPA) relied to support the program's adequacy as to protected species.  And EPA did not complete consultation with NMFS, relying on an unlawful "no effects" determination as to species under that agency's jurisdiction.

EPA failed to require Florida's program to come into compliance with federal law even after Plaintiffs notified the agency of its inadequacies, including a criminal intent standard already found by a U.S. Court of Appeals to have constituted an abuse of discretion in EPA's

approval of another state's Clean Water Act program.  In December 2020, EPA approved the application "effective immediately," depriving Plaintiffs of the right to seek an agency stay pending judicial review as a new administration was taking office.

Third, the Corps unlawfully washed its hands of exclusive jurisdiction over certain navigable waters by failing to perform navigability studies to determine the scope of its authority post-assumption and arbitrarily creating a "Retained Waters List" that rendered hundreds of those waterways assumable by the State.  EPA abused its discretion by failing to ensure that the state program only assumed authority over assumable waters.  In approving Florida's program, EPA unlawfully delivered non-assumable waterways to state 404 jurisdiction and away from further federal protection under NEPA and the ESA.

While Congress preserved important roles for states under the Clean Water Act, including the ability to administer permit programs when certain criteria are met, any state program authorized under the Clean Water Act must be as stringent as federal law.  33 U.S.C. § 1344(h)(1).  Congress made plain that the Clean Water Act set the minimum standards to address previous shortcomings in state clean water efforts.  *See id.* §§ 1319, 1344.

The Federal Defendants' actions were unlawful.  While Congress created a path for states to assume 404 jurisdiction, federal agencies are not authorized to disregard federal law to grease the skids.  The Federal Defendants' actions must therefore be vacated and set aside.

**I.      USFWS Violated the ESA by Substituting a Non-Statutory Technical Assistance Process for the ESA's Statutory Framework.**

USFWS violated the ESA by substituting an inadequate, non-statutory technical assistance process for the statutory framework established by Congress in Sections 7 and 10 of the ESA.  USFWS's non-statutory approach abandoned key protections for threatened and endangered species that would be afforded to them if the statutory process were followed.  There

24

were other options for the State to obtain take liability exemption for state permittees—such as federalizing permits that would impact species, thereby triggering Section 7 consultation, or obtaining Section 10 authorization—which would include statutory safeguards at the permit level to minimize and mitigate take and use the best scientific and commercial data available.

USFWS' approach here, however, discarded both statutory avenues to rely on a novel procedure for state 404 permits to issue without the key statutory protections congressionally mandated by the ESA.  First, at the programmatic level, USFWS produced a programmatic BiOp that was devoid of the analyses and rigor required under Section 7 of the ESA, and without regard to the quantity, location, scope, methods, species, and habitat impacts, or any other details about these future wetland-filling projects.  Second, USFWS extended broad take liability exemption to all parties involved, in perpetuity, relying on a technical assistance process that lacks the statutory guardrails that specify the extent of take permitted, require the monitoring of take, and establish meaningful terms and conditions to implement the ITS.  Third, USFWS wrongly claimed that the technical assistance process would provide the same level of species and habitat protection as the Section 7 consultation process would have provided had the Corps retained 404 permitting authority.  At both the programmatic and permit level, USFWS gave away the keys to the kingdom in violation of the ESA and APA (Claims 3, 4, 6, 12, and 13).

A.      **USFWS Abdicated Its Duties to Abide by the ESA's Requirements.**

By adopting the State's approach, USFWS did not abide by the standards and procedures laid out in Section 7.  It failed to analyze the full extent of the agency action, failed to evaluate the baseline status of the species affected, and failed to assess the effect of EPA's action on protected species.  USFWS then arbitrarily and capriciously opined that EPA's action would not jeopardize protected species or adversely modify or destroy critical habitat.  USFWS' actions violated the direct mandates of the ESA and its implementing regulations and must be vacated.

25

First, a core flaw in USFWS' BiOp was its evaluation of only the process the State would undertake when issuing individual Section 404 permits and authorizing new general 404 permits, rather than the State's program as a whole.  FWS-006028, at FWS-006043, FWS-006045–69 (BiOp).  Agency action is defined broadly, because "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action."  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010).  USFWS' narrow view excluded the impact on species that would occur through the State's (1) application of existing general permits across the State; (2) decisions on when permits would not be required, including those based on the State's evaluation of whether the wetlands at issue are assumed "waters of the United States;" and (3) compliance and enforcement activities.  Nor did USFWS consider the impacts to species that result from the loss of NEPA review and ESA Section 7 consultations at the site-specific level.

Second, USFWS failed to evaluate the baseline status of protected species and critical habitat.  *Contra* 50 C.F.R §§ 402.14(g)(2), 402.02.  USFWS vaguely listed information devoid of any analysis or connection to protected species, critical habitat, or the past, present, and anticipated impacts on protected species and critical habitat.  The "Environmental Baseline" section contained only (1) an introductory section that includes the unremarkable premise that species are affected when their habitats are affected and then adopts, without explanation or independent analysis, sections of the BE, FWS-006028, at FWS-006083–84 (BiOp); (2) a "procedural baseline" section describing the regulatory structure in place before assumption by the State, *id.* at FWS-006084–88; (3) an "ecological baseline" section that generally describes the existing acreage of different types of wetlands without mentioning or connecting those wetlands to a single protected species or critical habitat area, *id.* at FWS-006089–91; and (4) a generic description from EPA's BE of estimates about a subset of Corps permitting data focused

on the number and type of ESA consultations conducted, not species impacts, *id.* at FWS-006091.  Of the 139 protected species at risk, *id.* at FWS-006083, only two species were named in this section, *id.* at FWS-006091.  And even there, USFWS made no mention of the information required in a baseline analysis.  *Id.*

USFWS thus failed to "evaluate the current status and environmental baseline of affected species or critical habitats."  50 C.F.R. §§ 402.14(g), 402.02.  *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) (requiring USFWS to conduct an "analysis of the status of the environmental baseline given the listed impacts, not simply a recitation of the activities of the agency"); *Oceana, Inc. v. Ross*, No. CV 15-0555 (PLF), 2020 WL 5995125, at *11 (D.D.C. Oct. 9, 2020) (USFWS cannot just "list and describe data that it purported to incorporate into its jeopardy analysis—without indicating how that data actually factors into the analysis"); *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353 (4th Cir. 2019) (short, perfunctory statements do not suffice).

Third, rather than evaluating and analyzing the impact of EPA's action on protected species and critical habitat, USFWS stated that it was "not feasible, *nor is it required*" to detail or analyze any "species-specific effects."  FWS-006028, at FWS-006092, FWS-006094–95 (BiOp) (emphasis added).  But evaluating the individual and cumulative effects on protected species is exactly what the ESA demanded.  16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g)(3).  Rather than conduct the analyses required by law, however, USFWS (1) relied on sections of EPA's BE that it incorporated without analysis or explanation, including the assessment of general "stressors" and summary table, FWS-006028, at FWS-006092, FWS-006094–96 (BiOp); (2) made unfounded and unsupported assumptions that failed to evaluate the effects of the action, *id.* at FWS-006093; and (3) provided a generic, 30,000-foot view of

27

stressors, *id.* at FWS-006095–96 (*e.g.*, "Biotic Stressors" are harms to organisms from other organisms; "Physical Stressors" are physical changes that have biological impacts); and (4) taxa-level impacts that provided nothing more than general information without meaningful connection to the proposed action, *see, e.g.*, *id.* at FWS-006097–98 (mammals may occupy waters of the United States; dredge and fill activities may affect habitat in terms of water quality or habitat fragmentation).[16]   And nowhere does USFWS evaluate cumulative impacts.

Even where the BiOp named particular species, it fell far short of considering the most concerning impacts that result from 404 permits.  For example, the BiOp mentioned panthers, *id.* at FWS-006097, but omitted the leading cause of death for panthers: vehicle strikes, which often increase as a result of development or road projects that must clear wetlands and obtain Section 404 permits.  *See* EPA-HQ-OW-2018-0640-0388-A9, at 35–41, 87–94 (Panther Recovery Plan); EPA-HQ-OW-2018-0640-0388-A10, at 12–15, 16–17 (Panther Five-Year Review).

The BiOp's vague listing of potential impacts at the taxa level was insufficient.  *See Defs. of Wildlife*, 130 F. Supp. 2d at 127–28 (requiring analysis of effects, not mere listing, and analysis of effects cannot simply address the impacts of the particular agency action in isolation); *Oceana*, 2020 WL 5995125, at *20 (listing without connecting information to analysis is insufficient); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1224 (D. Mont. 2010) (rejecting a programmatic BiOp that failed "to explain how a discussion of

---

[16] *Accord id.* at FWS-006098–99 (BiOp) (dredge and fill may disturb birds, alter water quality, and affect their habitats); *id.* at FWS-006099–100 (reptiles may be affected by impacts to their habitats); *id.* at FWS-006100–01 (amphibians may be affected by fill of wetlands, hydrology alteration, habitat fragmentation); *id.* at FWS-0060101 (fish may be affected by sedimentation, water quality degradation, and habitat loss); *id.* at FWS-006101–02 (insects may be affected by habitat impacts); *id.* at FWS-006102 (crustaceans may be affected "via direct mortality" or habitat alteration and water quality changes); *id.* at FWS-006102 (mollusks are likely to be impacted by dredge and fill activities); *id.* at FWS-006103 (plants may be affected by direct mortality, habitat loss, water quality).

the effects on an entire taxonomic group can support a finding as to the effects on the value for recovery of specific designated critical habitat for a specific species"); *Am. Rivers*, 895 F.3d at 47 (USFWS must "analyze the effects" of the proposed action, not merely list some effects and omit others); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 176–77  (D.D.C. 2004) (rejecting BiOp that failed to evaluate reasonably likely impacts).

Moreover, USFWS ignored how Section 404 permitting actions that occur in state-assumed waters may affect nesting sea turtles, e.g., from light pollution or sedimentation.  By this omission, USFWS violated its obligations under the ESA.  EPA violated its independent duty to consult, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a), by omitting nesting sea turtles from its BE and relying on an insufficient BiOp, *see Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (agency must consult when action may affect species).

Fourth, after failing to undertake ESA-mandated analyses, USFWS made a blanket "no jeopardy" determination for over a hundred protected species in one fell swoop.  FWS-006028, at FWS-006106–07 (BiOp).  USFWS did not attempt to conduct the mandated jeopardy analysis, nor could it given its refusal to assess species-specific effects.  *Cf.* 50 C.F.R. § 402.14(g)(4) (requiring USFWS to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of this information, formulate its opinion as to whether the action is likely to jeopardize the continued existence of a protected species or result in the destruction or adverse modification of critical habitat").  USFWS' blanket jeopardy determination failed to employ the best available science or otherwise comply with the ESA.  16 U.S.C. § 1536(a)(2), (b).  *See Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) ("These are not passive directives; rather, [USFWS] 'must seek out and consider all existing scientific data relevant to the decision it is tasked with making.'").

29

**B.     USFWS' ITS Unlawfully Extended Take Liability Exemptions Without
Creating ESA-Mandated Guardrails.**

Next, despite not having performed the required statutory analyses, USFWS then

extended broad take liability exemption to EPA, the State, and all future state 404 permittees, in

perpetuity, without the ESA-mandated guardrails, which include: (1) identifying the amount or

extent of take that serves as an adequate trigger for reinitiation; (2) requiring adequate take

monitoring; and (3) creating adequate terms and conditions to limit take and justify the broad

safe harbor it created for EPA, the State, and state permittees.

First, the ITS failed to specify the amount or extent of incidental take and instead merely

asserted, without explanation, that the information provided by EPA and Florida "did not allow

[USFWS] to ... estimate the number of individuals that might be affected by the permitted

activities." FWS-006028, at FWS-006107 (BiOp). *Contra* 16 U.S.C. § 1536(b)(4); 50 C.F.R.

§ 402.14(i)(1)(i).  But USFWS itself was a hub of data on Section 7 consultations for Section

404 permits in Florida given its decades of consulting with the Corps on those permits.  Despite

the wealth of information at its fingertips, USFWS baldly asserted it lacked the information

necessary to comply with the ESA's mandate. *See Conner v. Burford*, 848 F.2d 1441, 1453 (9th

Cir. 1988) (rejecting USFWS' position that there was insufficient information on site-specific

activities, because although the "precise location and extent" of such activities may be "unknown

at the time, extensive information about the behavior and habitat of the species in the areas

covered by" potential site-specific activities "was available").  Nor did USFWS identify or

justify the use of a surrogate. *Contra* 50 C.F.R. § 402.14(i)(1)(i).

One of the consequences of the ITS' failure to specify the amount of take is that the ITS

contained no adequate "trigger" for reinitiation.  Without specifying the amount or extent of take,

there is no way to say when it has been exceeded such that reinitiation of consultation would be

required.  50 C.F.R. § 402.16(a)(1).  The ITS provided no other clear reinitiation triggers either.

For example, although "new" information requires reinitiation, given USFWS' failure to

evaluate the information at its disposal, it is unclear what new information would trigger

reinitiation.  *Id.* § 402.16(a)(2).  Moreover, USFWS' "reinitiation notice" stated that (1) any

exceedance of take anticipated in a Section 404 permit would not require reinitiation, but rather

the reopening of only that permit, FWS-006028, at FWS-006111 (BiOp); and that (2) the listing

of a new species—a condition for reinitiation under ESA regulations, 50 C.F.R. § 402.16(a)(4)—

would *not* require reinitiation either, *id.*  But reinitiation cannot "be left to 'the unfettered

discretion of [USFWS], leaving no method by which the applicant or the action agency can

gauge their performance.'"  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir.

2018) (requiring USFWS to set "a clear standard for determining when the level of anticipated

take has been exceeded" that will "adequately trigger reinitiation of consultation" and cannot be

based on "vague and undetectable criteria").  "This lack of a clear standard also create[d] a

transparency problem," because now, "the agency makes the decision about whether to reinitiate

consultation behind closed doors and without a record."  *Oceana*, 2020 WL 5995125, at *13.

Second, after failing to identify any incidental take limit, the ITS then failed to require

adequate monitoring or reporting of incidental take at the permit level.  An ITS must establish an

adequate monitoring mechanism.  *Id.* at *15.  The ITS noted only that USFWS would track take

levels through the technical assistance process.  It did not explain how those take numbers would

be estimated, how it would determine if a specific project's anticipated take individually and

cumulatively fell below USFWS' "anticipated take limit" at the programmatic level, or what it

would do with that information (e.g., would the public have access to it to ensure the ITS is

working and enforced).

Third, and most fundamentally, the ITS established no meaningful reasonable and prudent measures nor implementing terms and conditions that the parties must abide by to stay within the safe harbor of the ITS.  16 U.S.C. § 1536(o).  Under the ESA, USFWS must include specific terms and conditions and articulate a rational connection between these terms and conditions and the taking of species.  *Arizona Cattle Growers'*, 273 F.3d at 1251.  Rather than abiding by the ESA's mandates, 16 U.S.C. § 1536(b)(4)(ii), (iv), the BiOp merely required EPA to take actions already required by law and required only that the State (1) follow the technical assistance process described in the BiOp; (2) provide training on that process; (3) provide an annual summary report; and (4) inform permittees to notify USFWS of dead or injured protected species.  FWS-006028, at FWS-006109–10 (BiOp).  In other words, the ITS created no new or additional requirements on EPA and no meaningful conditions for the State.  As for USFWS, no terms and conditions required the agency to engage in the technical assistance process laid out in the BiOp, participate robustly in that process, or take all "opportunities" that are available under the process.  *Id.*  Nor were any terms and conditions that apply to future 404 permittees, such as requiring compliance with state 404 permit terms and conditions.  *Id.*  Such vague, empty promises were insufficient to satisfy the law.  *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv).

USFWS' BiOp and ITS also relied on wholesale compliance by EPA (oversight), compliance by Florida (minimizing impacts and abiding by its role in the "technical assistance" process), compliance by USFWS (in taking all "opportunities" to engage in the "technical assistance" process), compliance by all future permittees, and (presumably) compliance by all others who would dredge and fill wetlands in Florida so that they obtain all necessary Section 404 permits before dredging and filling wetlands in WOTUS.  *See* FWS-006028, at FWS-006093 (BiOp).  But because the terms and conditions did nothing to guarantee this compliance,

at any level or across the board, these assumptions on "purely speculative actions" could not

support a no jeopardy determinations. *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d

230, 253–54 (D.D.C. 2003) (rejecting a BiOp dependent on the Corps' "purely speculative"

compliance with USFWS' terms and conditions).

### C. USFWS Unlawfully Relied on a Novel Technical Assistance Process to Avoid the Mandates of Section 7 Consultation.

Having failed to produce an adequate BiOp at the programmatic level, USFWS could not

then rely on an inadequate "technical assistance" process at the permit-level.  USFWS had a

mandatory duty to comply with the ESA, and it failed twice.  To grant the State's wish and

extend broad take liability coverage to state permittees without requiring the robust analysis of

Section 10, USFWS produced a Section 7 programmatic BiOp but then claimed it could rely on a

non-statutory technical assistance process as a substitute for its Section 7 duties.  This approach

was in direct conflict with the ESA and undermined the specific requirements Congress put in

place before allowing incidental take liability exemptions.  USFWS' programmatic BiOp must

therefore be set aside.

First, USFWS was required to conduct the ESA-mandated analyses at the programmatic

level and failed to do so as described above.  Congress did not distinguish between consultation

that is programmatic in nature as opposed to site-specific, but mandated that the processes,

standards, and findings required by statute apply to consultation, period.  16 U.S.C. § 1536.  And

although the ESA regulations contemplate programmatic BiOps, those rules still bind USFWS to

conduct an analysis based on the "best scientific and commercial data available," considering the

effects of a proposed federal action "*as a whole*."  50 C.F.R. § 402.14(c)(4), (d) (emphasis

added).  *See* 84 Fed. Reg. 44,976, 44,996 (Aug. 27, 2019) (codified at 50 C.F.R. § 402.02)

(describing the added definition of "programmatic consultation" as consultation used to "assess the effects of a program, plan, or set of activities *as a whole*" (emphasis added)).

And as courts have explained, it is permissible to tier site-specific BiOps to programmatic BiOps only where (1) USFWS evaluates the federal agency action *as a whole* at the programmatic level—which USFWS did not do here; and (2) the action agency engages in site-specific consultation to produce site-specific BiOps and ITSs—which USFWS claimed it would do through the insufficient technical assistance process. *See N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980) (multi-stage actions do not excuse failure to consider effects at the earliest stage).[17]  Step two is critical for USFWS to comply with its continuing duty to ensure all effects are properly considered as required by the ESA.  *See* 50 C.F.R. § 402.14(k).

Second, the non-statutory technical assistance process was not an adequate stand in for the robust analysis required by Section 7 consultation because it is not subject to the requirements and mandates in the ESA.  No regulation or statutory provision affirmatively authorizes a "technical assistance" process for ESA consultations.[18]  Nor are there any statutory or regulatory standards that applied to USFWS' approach here, such as Section 7's requirement to consider the best available scientific and commercial information.  The most authoritative legal source that discusses "technical assistance" is an agency guidance document, which merely

---

[17] *See, e.g.*, *Conner*, 848 F.2d at 1453–54 (ESA Section 7 "on its face requires the FWS in this case to consider all phases of the agency action, which includes post-leasing activities, in its biological opinion."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1063 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004) (tiering site-specific BiOp to programmatic BiOp); *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10–11 (D.D.C. 2005) (future analyses considering species effects would "not relieve the Federal agency of the requirements for considering the effects of the action as a whole"); *Forest Serv. Emps.*, 726 F. Supp. 2d at 1229–32 (programmatic BiOp can tier only with full BiOps); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002) (staged analysis not allowed by ESA).
[18] USFWS' actions are thus also ultra vires and must be set aside.  *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).  (Claim 13).

shows it was created for an entirely different use: as a preliminary step available during *informal* consultation with *federal* agencies to allow USFWS to assist agencies in that process, not as an alternative to the ESA-mandated procedures and standards pursuant to Section 7 (for federal actions) or Section 10 (for non-federal actions).  USFWS & NMFS, *Endangered Species Consultation Handbook* (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

And in fact, there are no statutory or regulatory guidelines to bind the process or manner of USFWS' engagement in the technical assistance process here.  USFWS is not required to evaluate the baseline status of protected species that may be affected by state permits.  The agency need not evaluate the effects of the permit on protected species and critical habitat.  There is no requirement that USFWS evaluate jeopardy or the potential to adversely modify or destroy critical habitat.  And the agency need not apply the best available science in its assessment, if any, of state 404 permits.  There are therefore no guardrails for how USFWS would make determinations for state 404 permits.

Third, the technical assistance process that USFWS created is State led, with only "opportunities" for USFWS to be involved.  "When a statute requires an agency to make a finding as a prerequisite to action, it must do so."  *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (USFWS violated ESA by allowing regulated entity to make findings USFWS was required to make under Section 10 of the ESA).  Here, the State (not USFWS) determines whether a permit application will have adverse impacts on protected species or critical habitat and may stick to that determination even if USFWS provides information contrary to that conclusion.  FWS-006028, at FWS-006056, FWS-006058 (BiOp).  If the State concludes there

35

will be no adverse impacts, the technical assistance process concludes.[19]  *Id.* at FWS-006056.  If

the State finds there will be an adverse impact, it will send information to USFWS requesting

technical assistance.  *Id.* at FWS-006057.  The State then coordinates with USFWS on potential

protective measures, which the State may propose to USFWS; it is voluntary for USFWS to

respond.  *Id.* at FWS-006057–58.  Where a permit is likely to jeopardize protected species or

destroy or adversely modify critical habitat, the State need only "coordinate" with USFWS to

develop measures that must be incorporated into the permit (meaning the State may be the one to

develop those measures), but there is no obligation on USFWS' part to engage and no parameters

for USFWS to follow if it does engage.  *Id.* at FWS-006057.

As for USFWS' role under the technical assistance process, its only mandatory duty is to

receive and review complete permit applications.  *Id.* at FWS-006049.  USFWS may, but is not

required to, request additional information to ensure the applicant provides the information

necessary to assess the species impacts of the proposed permit.  *Id.*  USFWS' review of permit

applications, *id.* at FWS-006050, is bereft of any enumerated process or standards.  USFWS is

not required to follow and abide by any of the guardrails the ESA requires (such as baseline,

effects analyses, best available science, and cumulative effects) to inform USFWS' opinions and

recommended protective measures.  USFWS has the "opportunity" to provide comments during

the public comment period but is not required to do so.  *Id.* at FWS-006057.  USFWS "may"

suggest measures to protect species, "as needed," but is not required to do so.  *Id.* at FWS-

006054.  *Accord id.* at FWS-006055, FWS-006058.[20]  Even if a permit will lead to incidental

---

[19] While the BiOp asserted USFWS' determinations as to species effects are "determinative,"
that only applies if and when the State has already made the determination that a state permit will
affect species, and it assumes that USFWS will weigh in.  FWS-006028, at FWS-006058 (BiOp).
[20] Although not required to do so, if USFWS does decide to recommend protective measures, the
State must incorporate them or deny the permit.  FWS-006028, at FWS-006054 (BiOp).

36

take, the BiOp stated USFWS will establish take limits "in coordination with" the State, without USFWS meeting any of the underlying ESA requirements to quantify take and set take limits that would trigger reinitiation. *Id.* at FWS-006108. Even in the BiOp, USFWS explicitly relied on its own "assumption" that it would later develop appropriate measures to minimize take, but nothing in the BiOp, the technical assistance process, or the law committed the agency to do so. And nothing in the process requires USFWS to follow the ESA when it does. *Id.*

USFWS modeled their approach on its programmatic BiOp assessing EPA's 316(b) regulations, which codified a technical assistance process in very different circumstances. *See* FWS-000113, at FWS-000113–16 (USFWS email); FWS-000129, at FWS-000129 (same); FWS-006523, at FWS-006523 (same). That programmatic BiOp was upheld in *Cooling Water*, but the circumstances and case are inapposite for three key reasons. *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 63, 72 (2d Cir. 2018).[21]

First, the federal action at issue was much narrower in scope. *Cooling Water* involved regulations EPA promulgated to create a technology standard aimed at reducing impacts to aquatic species from the operation of cooling water intake structures at select existing facilities that operate in similar ways (e.g., power plants) with similar effects. *Id.* at 59–60. That standard would then be implemented as a permit condition in a facility's National Pollutant Discharge Elimination System permit. *Id.* at 59. *Cooling Water* was thus similar to other programmatic BiOps that address the same type of action across different locations (e.g., the same technology operating in the same way at multiple facilities). Here, by contrast, Section 404 dredge and fill

---

[21] Plaintiffs also submit that *Cooling Water* was an outlier that was wrongly decided and is inconsistent with the ESA and the weight of authority, for the reasons articulated above. But the Court need not reach that issue because the case is also distinguishable.

activities cover a broad spectrum (ranging from building a house to large-scale residential,

commercial, or industrial developments and road projects) which impact species in distinct ways.

Second, the 316(b) regulations served a very different purpose: they codified prescriptive

measures designed to *reduce* impacts to aquatic species, *see* 40 C.F.R. § 125.94(c), and would

cause a *net reduction* in incidental take, *Cooling Water*, 905 F.3d at 81.  The 404 program,

however, will necessarily harm species because it authorizes dredge and fill activities that

destroy wetlands (habitat) and replace them with roads, developments, industrial facilities, etc.

(causing secondary impacts like vehicle strikes, habitat segmentation, and pollution).  *See* FWS-

006028, at FWS-006096–103 (BiOp) (generally listing the potential effects from Section 404

permits); EPA-HQ-OW-2018-0640-0388-A9, at 35–41, 87–94 (Panther Recovery Plan); EPA-

HQ-OW-2018-0640-0388-A10, at 12–15, 16–17 (Panther Five-Year Review).

Third, the 316(b) technical assistance process was codified as part of the 316(b)

rulemaking, creating legally binding responsibilities for all parties.  *Cooling Water*, 905 F.3d at

72.  And the court explicitly upheld the 316(b) BiOp's programmatic approach because the

316(b) rules "*require[d]* [USFWS'] participation in the technical assistance process."  *Id.*

(emphasis in original).[22]  Here, the technical assistance process was both created in, and relied

upon by, the programmatic BiOp.  There is no regulatory framework binding the parties' actions

as in *Cooling Water*.[23]  Further, as demonstrated above, the technical assistance process here

does not require USFWS' participation, unlike in *Cooling Water*.  The circumstances in *Cooling*

---

[22] USFWS also verified this commitment to the court.  *Cooling Water*, 905 F.3d at 72.
[23] The USFWS MOU contemplated a technical assistance process being created but explained
that the process would be outlined in the BiOp.  EPA-HQ-OW-2018-0640-0016-A2, at 5
(Application MOU).

*Water* are too far afield from 404 permitting to support the breathtaking approach the Federal

Defendants adopted here.  Defendants' actions thus violated the ESA.

## II.     EPA Unlawfully Relied on USFWS' Arbitrary and Capricious BiOp and ITS.

Because the BiOp was facially flawed, it was arbitrary and capricious for EPA to rely on

it.  As detailed above, Section 7 of the ESA required EPA to ensure that the State's assumption,

and implementation of the program, would not jeopardize the survival and recovery of listed

species or adversely modify or destroy critical habitat.  16 U.S.C. § 1536(a)(2).  *See City of*

*Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006);[24] *Am. Rivers*, 895 F.3d at 55 (reliance on

legally flawed BiOp in NEPA document was arbitrary because it incorporated opinion's

inadequate consideration of cumulative impacts); *Hawaii Longline Ass'n. v. NMFS*, 281 F. Supp.

2d 1, 27 (D.D.C. 2003), *on reconsideration in part sub nom. Hawaii Longline Ass'n v. NMFS*,

288 F. Supp. 2d 7 (D.D.C. 2003) (reliance on vacated, procedurally invalid BiOp as legal basis

for continued application of regulations was arbitrary).

As the action agency, EPA bore the "ultimate responsibility for compliance with the

ESA." *City of Tacoma*, 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)–(2)).  But EPA blindly

adopted the pre-ordained (and unsupported) conclusions of USFWS.  *Contra id.* (agency must

not blindly adopt consultant agency's conclusions).  Here, EPA failed to assess the impacts of its

actions, because it relied entirely on USFWS' wholly inadequate BiOp which in turn unlawfully

sought to punt its ESA duties to a non-statutory technical assistance process that itself was

inadequate.  It was unreasonable for EPA to rely on the BiOp to conclude that its actions would

---

[24] While in that case the court found that reliance was lawful where the plaintiffs could point to no "new" information the action agency should have considered, this standard has not been applied when a BiOp is facially invalid because of missing analysis or incorporation of inadequate analysis, as is the case here.  *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *Am. Rivers*, 895 F.3d at 55.

avoid jeopardy or to satisfy its procedural duties under the ESA.  *Id.  See also Mayo v. Jarvis*,

177 F. Supp. 3d 91, 146 (D.D.C. 2016) (reliance on facially flawed addendum to BiOp was

arbitrary where addendum failed to explicitly discuss all effects); *Nat'l Wildlife Fed'n*, 332 F.

Supp. 2d at 182 (BiOp was unlawful for failing to provide proper analysis of cumulative impacts

and make rational connection between facts and no jeopardy finding, therefore reliance on it for

NEPA assessment was arbitrary).

 Moreover, the BiOp asserted that the information EPA and Florida provided did not

allow USFWS to "estimate the number of individuals that might be affected by the permitted

activities."  FWS-006028, at FWS-006107 (BiOp).  This too rendered EPA's reliance on the

BiOp arbitrary.  *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1993) (reliance on

BiOp arbitrary because of action agency's failure to give expert agency all relevant data and

information).  EPA's reliance was therefore unlawful and must be set aside (Claim 10).

### III. EPA Arbitrarily and Capriciously Determined "No Effect" to NMFS Species.

 EPA also made an unlawful "no effect" determination for protected species that are under

NMFS jurisdiction, omitting potential indirect effects by relying on an improperly narrow

definition of the "action area."  Both EPA and NMFS ignored the fact that, while no NMFS-

protected species may be found in the waters over which Florida would assume jurisdiction, such

species may nonetheless be impacted by the 404 assumption because they are found in waters

that are fed by state-assumed waters.  The ESA prohibits making a "no effect" determination—

and thus bypassing further consultation—when an action has even the potential for such indirect

effects on protected species.  Because of this unlawful "no effect" determination, EPA failed to

properly consult with NMFS and its actions must be vacated (Claims 5 and 11).

 EPA had a duty under the ESA to consult with NMFS and ensure its action—approval of

Florida's program—would not jeopardize the survival and recovery of protected species or

adversely modify or destroy their critical habitat *in the area of the proposed action*.  16 U.S.C. § 1536(a)(2), (c)(1); 50 C.F.R. §§ 402.13(a), 402.14(a).  "Action area" is defined to be broader than simply the project area: it means "all areas to be affected directly *or indirectly* by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02 (emphasis added).  *Accord Defs. of Wildlife*, 130 F. Supp. 2d at 128–29 ("action area" more than the "immediate area").

EPA based its "no effect" determination solely on NMFS' April 15, 2020, letter stating that ESA-listed species under NMFS' jurisdiction "do not occur *in* waters that are assumable by the state."  EPA-HQ-OW-2018-0640-0617 (EPA Letter) (emphasis added).  *See also* EPA-HQ-OW-2018-0640-0649, at 52 (BE).  EPA's determination was arbitrary and capricious given that NMFS' statement ignored areas that would be *indirectly* impacted by the federal action, including retained waters where NMFS species are present.  *See* 50 C.F.R. § 402.02.  As a matter of law, the relevant action area was not only "assumed" waters, or even just the "immediate area" of assumed waters.  *See Defs. of Wildlife*, 130 F. Supp. 2d at 128–29.  The "action area" included areas that would be *indirectly* impacted by the federal action, like waters downstream of assumed waters, where species under NMFS jurisdiction are found.

On its face, NMFS' determination that was limited to "assumed waters" failed to consider, much less analyze, all areas that would be indirectly affected by Florida's program.  *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  In relying solely on NMFS' jurisdictional determination, EPA also failed in its independent duty to consider, much less analyze, the proper action area—and the listed species that live there—as required under federal law.  *See* 16 U.S.C.

41

§ 1536(a)(2); 50 C.F.R. § 402.02(d).[25]  And EPA failed to provide a rational basis for its

determination.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002)

(agency must justify no effect determination with methodology, facts, or rational connections).

Moreover, EPA had ample evidence of the connections linking the action's potential

impacts to NMFS jurisdictional species and habitats within the action area.[26]  *See, e.g.*, EPA-

HQ-OW-2018-0640-0649, at 255–58 (BE) (finding action was likely to adversely affect several

species that inhabit the same coastal waters as NMFS jurisdictional species); *id.* at 151–153

(discussing certain NMFS jurisdictional species that exist in Florida waters).  In particular,

dredge and fill in assumed waters can affect downstream estuarine, marine, and tidal waters and

the species that inhabit them.  *See, e.g.*, EPA-HQ-OW-2018-0640-0642, at 42 (BiOp) (explaining

how "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and

marine ecosystem"); EPA-HQ-OW-2018-0640-0649, at 58 (BE) (Fig. 4-1) (Historic freshwater

flows compared to freshwater flows after C&SF Project); *id.* at 256 (describing adverse impacts

to coastal and marine birds).  For example, these activities impact habitat (including critical

habitat), hydrology, and water quality in coastal areas where NMFS species, such as smalltooth

sawfish and sea turtles, dwell.  *See, e.g.*, EPA-HQ-OW-2018-0640-0642, at 61 (BiOp)

("Permitted activities may also result in changes to hydrologic regimes and water quality in

---

[25] Just as EPA could not blindly rely on the BiOp, it could not rely on NMFS' facially invalid
jurisdictional determination to issue a "no effects" determination and avoid consultation with
NMFS.  An action agency (here, EPA) acts arbitrarily and capriciously when it relies on a
"facially flawed BiOp" or when "blindly adopt[ing]" the faulty conclusions of the consulting
agency (here, NMFS).  *See City of Tacoma*, 460 F.3d at 75–76; *Am. Rivers*, 895 F.3d at 55.
[26] "'May affect' sets a low bar: 'Any possible effect, whether beneficial, benign, adverse or of an
undetermined character, triggers the formal consultation requirement.  Thus, actions that have
any chance of affecting listed species or critical habitat—even if it is later determined that the
actions are 'not likely' to do so—require at least some consultation under the ESA.'"  *Growth
Energy v. EPA*, 5 F.4th 1, 30 (D.C. Cir. 2021) (internal citations omitted).

coastal areas."); EPA-HQ-OW-2018-0640-0649, at 256 (BE) (stating action could impact "habitat, hydrology, and water quality" affecting birds in coastal and marine habitats).

Despite this evidence of potential impacts to NMFS-regulated species, EPA failed to explain how it could reach the conclusion that its action would have "no effect" on NMFS species.  EPA's determination was therefore arbitrary and must be set aside.  *See Growth Energy*, 5 F.4th at 31–33; *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) (EPA should have consulted; not "attribut[ing]" harm "with reasonable certainty" is not the same "no effect").

Because of EPA's unlawful "no effect" determination, the agency failed to properly consult with NMFS, in violation of the ESA.  *Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA.").

## IV.   EPA Unlawfully Approved a State Program that is Less Stringent Than Federal Law.

In addition to the ESA violations, EPA's approval of Florida's program was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, because it authorized a state program that is not as stringent as federal law requires, in violation of the Clean Water Act and APA (Claim 2).[27]

---

[27] Plaintiffs submitted comments to EPA raising these issues.  EPA's administrative record divided Plaintiffs' comments and exhibits into multiple non-sequential parts.  In order, the comments appear as follows:  EPA-HQ-OW-2018-0640-0386 [Part 1] (Comment Letter and Exhibits 1-8); EPA-HQ-OW-2018-0640-0385 [Part 2] (Exhibits 9-18); EPA-HQ-OW-2018-0640-0392 [Part 3] (Exhibits 19-30); EPA-HQ-OW-2018-0640-0393 [Part 4] (Exhibits 31-40); EPA-HQ-OW-2018-0640-0391 [Part 5] (Exhibits 41-50); EPA-HQ-OW-2018-0640-0387 [Part 6] (Exhibits 51-60); EPA-HQ-OW-2018-0640-0388 [Part 7] (Exhibits 61-70); EPA-HQ-OW-2018-0640-0389 [Part 8] (Exhibits 71-80); EPA-HQ-OW-2018-0640-0394 [Part 9] (Exhibits 81-99); EPA-HQ-OW-2018-0640-0390 [Part 10] (Exhibits 100-103).

Any state 404 program must be at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  EPA must determine that a state has authority to, among other things: (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(C), (1)(G); 40 C.F.R. pt. 233.  EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).

Yet, here, EPA unlawfully approved the State's application, because the program failed to: (1) provide for enforcement as stringent as federal law to abate violations of a permit or the permit program; (2) adopt the Section 404(b)(1) Guidelines or create equivalent standards requiring the permitting authority to conduct the evaluations and factual determinations required by federal law; (3) determine water quality impacts other than those that would violate water quality standards or toxic effluent guidelines, contrary to the 404(b)(1) Guidelines; (4) ensure that state permits would not jeopardize protected species or adversely modify or destroy critical habitat, as required by the Section 404(b)(1) Guidelines; and (5) properly define the scope of its jurisdiction over assumable waters of the United States.  EPA's action was thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise in violation of the Clean Water Act and APA.

A.      **EPA Approved a State Program That Failed to Meet Minimum Enforcement Standards Required to Abate Violations of a Permit or the Permit Program.**

First, although federal law criminalizes negligent violations of the Clean Water Act, Florida's 404 program does not.  Instead, Florida law requires a higher level of culpability to establish a criminal 404 violation.  Florida's enforcement scheme thus excludes an entire class of

44

violators from criminal liability, rendering its program less stringent than the federal program and undermining the deterrent effect of the Clean Water Act's enforcement mechanisms.

Enforcement serves as a critical safeguard and deterrent to violations of the Clean Water Act. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1978) ("The [Clean Water] Act would be severely weakened if only intentional acts were proscribed. We will not interpret it that narrowly, particularly when the legislative history is clear Congress intended strong regulatory enforcement.").

EPA regulations require that "the burden of proof and degree of knowledge or intent required under State law for establishing violations under … this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." 40 C.F.R. § 233.41(b)(2). *See also id.* § 233.1(d) (state 404 program "may not impose any less stringent requirements for any purpose").

In Section 309(c)(1), Congress spoke directly and unambiguously to the mens rea requirement for Clean Water Act violations. Section 309(c)(1) states: "[a]ny person who ... negligently violates ... any requirement imposed ... in a permit issued under [sections 402 or 404] of this title by the Secretary of the Army or by a State ... shall be punished[.]" 33 U.S.C. § 1319(c)(1). Every federal circuit court to have considered this language has held that its plain meaning establishes liability for simple or ordinary negligence for Clean Water Act violations, rather than a higher criminal negligence standard, such as gross negligence. *See United States v. Maury*, 695 F.3d 227, 259 (3d Cir. 2012) (plain language of "negligence" means ordinary negligence); *United States v. Pruett*, 681 F.3d 232, 243 (5th Cir. 2012) (same); *United States v.*

45

*Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (same); *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) (same).  No other court has interpreted this statutory provision otherwise.

The intent standard under Florida law, on the other hand, is gross or culpable (criminal) negligence.  *See* Fla. Stat. § 373.430(1)(a), (3)–(4) (requiring willfulness, reckless indifference, or gross careless disregard to establish criminal liability for a pollution offense); *id.* § 373.430(1)(b)–(c), (5) (requiring willfulness to establish criminal liability for permit violations and false statements).[28]  Indeed, under Florida law it is unconstitutional to criminally penalize "mere negligent conduct."  *State v. Hamilton*, 388 So. 2d 561, 563–64 (Fla. 1980).  In Florida, culpable negligence is "reckless indifference or grossly caress disregard of the safety of others." *State v. Greene*, 348 So. 2d 3, 4 (Fla. 1977).  It has also been defined as "a gross and flagrant character, evincing reckless disregard for human life or of the safety of persons exposed to its dangerous effects;" or "the entire want of care which would raise the presumption of indifference to consequences;" or "reckless indifference to the rights of others, which is equivalent to an intentional violation of them."  *Id.*

Florida law therefore is not as stringent as to criminal enforcement as is the Clean Water Act.  It excludes from criminal liability an entire class of permit violations that are subject to criminal penalty under federal law.  EPA therefore abused its discretion in approving Florida's program.  *See Idaho Conservation League*, 820 F. App'x 627 (EPA abused its discretion in

---

[28] Under 40 C.F.R. § 233.41(a)(3)(ii), for example, a state agency must show it has authority to "seek criminal fines against any person who willfully or with criminal negligence discharges dredged or fill material without a required permit or violates any permit condition issued under section 404[.]"  But Florida law requires more than simple negligence to establish a criminal permit violation subject to punishment.  *See* Fla. Stat. § 373.430(1)(b) (making permit violations unlawful); *id.* § 373.430(4) (providing that (1)(b) violation with reckless indifference or gross careless disregard is misdemeanor in the second degree); *id.* § 373.430(5) (providing that willful Section 373.430(1)(b) violation is misdemeanor in the first degree).

approving a state delegated program with a mens rea standard greater than the burden of proof required under the Clean Water Act); EPA-HQ-OW-2018-0640-0681 (copy of decision).

Moreover, EPA's action undermined the deterrent effect that Congress sought by prohibiting negligent violations of Section 404 and the incentives to ensure full compliance with the 404 program.  Ordinary negligence is the lowest form of criminal mens rea aside from strict liability.  It is the failure to use care that a reasonably prudent and careful person would under similar circumstances. *Hanousek*, 176 F.3d at 1120.  This mens rea standard allows robust criminal enforcement of permit violations—and therefore greater environmental protections— because it sets a lower bar the government must meet to bring and prevail in an enforcement action and promotes compliance through deterrence.

EPA was aware of this deficiency in Florida law and willfully disregarded it in approving Florida's program. *See* EPA-HQ-OW-2018-0640-0665, at 1 (EPA email) ("[EPA's] criminal folks view 'reckless indifference' or 'gross careless disregard' as a different standard than simple or ordinary criminal negligence."); EPA-HQ-OW-2018-0640-0666, at 2 (EPA email) ("[G]iven [Florida case law] ... it does seem like there is a real question in FL as to whether a statute can constitutionally provide criminal penalties for simply negligent conduct."); EPA-HQ-OW-2018-0640-0667 & EPA-HQ-OW-2018-0640-0667-A1, at 1 ("EPA has concluded that Idaho must revise the statutory language for the criminal intent standard in order for the EPA to approve the IPDES program.").[29]  The deficiency was also brought to EPA's attention during public comment on Florida's application.  EPA-HQ-OW-2018-0640-0386-A1, at 32–34.

---

[29] As noted above, EPA went on to approve Idaho's program anyway, something the Ninth Circuit Court of Appeals subsequently held to be an abuse of discretion.  Still, EPA was undeterred and willfully abused its discretion again in approving Florida's program.

In its response to comments, EPA-HQ-OW-2018-0640-0568, at 75–76, EPA relied on inapposite cases that posed the question whether states might impose different *penalties* for certain violations, not whether state could impose a higher criminal intent before a violation could be established in the first place. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 180 (D.C. Cir. 1988) (penalties); *Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1171–72 (9th Cir. 2010) (civil administrative penalties).  EPA dismissed the Ninth Circuit's decision which found the agency had *abused its discretion in identical circumstances* as merely "unpublished and non-binding."  EPA-HQ-OW-2018-0640-0568, at 76.  And then, by approving Florida's program anyway, EPA abused its discretion again.

In addition, Florida law is not as stringent as federal law because it provides a shorter statutes of limitation for enforcement of environmental crimes.  Under federal law, criminal enforcement actions brought under 33 U.S.C. § 1319(c) are generally subject to a five-year statute of limitations.  *See United States v. Ursitti*, 543 F. Supp. 2d 971, 974 (C.D. Ill. 2008) (case involving Clean Water Act criminal violation, citing to 18 U.S.C. § 3282(a) and stating "[t]here is a five-year statute of limitations for criminal offenses, which is applicable to the offenses charged in this case"); *see also* Joseph J. Lisa, *Negligence-Based Environmental Crimes: Failing to Exercise Due Care Can Be Criminal*, 18 Vill. Env't L.J. 1, 43 n.109 (2007) (citing 18 U.S.C. § 3282(a) as statute of limitations for Section 1319(c) enforcement actions).

The statutes of limitation applicable to violations under state law, however, are between one and three years depending on the severity of the offense. Fla. Stat. § 373.430(1)(a)–(c) (identifying crimes relating to pollution, failure to comply with permit requirements, and fraud); *id.* § 373.430(3)–(5) (setting degree of offense depending on the crime); *id.* § 775.15 (setting for statute of limitations depending on the severity of the offense).  State law regarding criminal

48

enforcement is therefore deficient also in this regard, making its program less stringent than

federal law.  *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F. Supp. 440, 447–48 (D.

Md. 1985) (recognizing in the citizen suit context that shorter state statutes of limitations under

Clean Water Act would "frustrate several policies" of the Clean Water Act, including a lack of

uniformity from state to state and that shorter statutes of limitation would be "very hospitable to

industries that violate the Act" and could make violators nearly immune); *see also Sierra Club v.

Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522–23 (9th Cir. 1987) (same; applying shorter state

statutes of limitations would "diminish the effective enforcement" of the Clean Water Act).

Although 40 C.F.R. § 233.41(d)(1) authorizes EPA to approve a state program that has

less stringent *penalties* than federal law provides,[30] the Clean Water Act does not authorize

approval of a state program with a less stringent enforcement scheme in terms of criminal

culpability and statutes of limitations.  To the contrary, these failures rendered the program non-

approvable, and it was an abuse of discretion for EPA to approve the program anyway.

**B.      EPA Approved a State Program That Relied on Applicants' "Assurances" In Lieu of the Federal 404(b)(1) Guidelines' Requirement that the Permitting Authority Independently Make Factual Determinations.**

Further, rather than adopting the federal 404(b)(1) Guidelines, which create duties and

obligations for the permitting authority to evaluate the potential impacts of a Section 404 permit

and to make factual determinations about those effects, Florida chose to rely on an existing state

regulatory program, which merely asks the applicant to provide the permitting authority with the

applicant's "reasonable assurances."

The federal 404(b)(1) Guidelines require that the permitting authority "determine in

writing the potential short-term or long-term effects of a proposed discharge of dredged or fill

---

[30] Note that the State has claimed that this regulatory provision was "not applicable" to the State's application.  EPA-HQ-OW-2018-0640-0016-A3, at 54.

material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F." 40 C.F.R. § 230.11. Subparts C through F deal with a detailed list of the ways that dredge and fill activities may affect (1) physical and chemical characteristics (including substrate and salinity levels), *id.* §§ 230.20–230.25; (2) biological characteristics (including protected species, fish and other aquatic species, and other wildlife), *id.* §§ 230.30–230.32; (3) special aquatic sites (including wetlands), *id.* §§ 230.40–230.45; and (4) human use (including municipal water supplies, fisheries, recreation, aesthetics, and parks), *id.* §§ 230.50–230.54. The permitting authority's factual determinations and evaluations of those effects then form the basis for the agency's decision about whether a discharge of dredge and fill material will cause or contribute to significant degradation of the waters of the United States. *Id.* § 230.10(c). If the answer is yes, the Guidelines prohibit the issuance of the permit. *Id.*

The State, however, did not adopt the federal 404(b)(1) Guidelines. Instead, the state program incorporated non-equivalent provisions from its existing state Environmental Resource Program, which only require that an "[a]pplicant provide reasonable assurance" about the potential adverse impacts of their project. *See, e.g.*, Fla. Stat. § 373.4146; Fla. Admin. Code R. 62-330.301. Under state law, the agency's job is merely to determine whether the reasonable assurances required have been provided. EPA-HQ-OW-2018-0640-0002-A1, at 64 (ERP Handbook 5.5.4.1) ("The decision to issue or deny a permit will be based on a determination of whether the reasonable assurances required in the above rules and the Handbook have been provided."). *Accord id.* at 81 (ERP Handbook 8.1) ("The staff recommendation to approve any individual or conceptual approval permit will be based upon a determination of whether reasonable assurance has been provided that the activity meets the criteria for evaluation, and whether the applicable permit fee has been submitted."). Although the State does prohibit

50

permits that cause or contribute to significant degradation of wetlands, Fla. Admin. Code R. 62-331.053(3)(a)(6), that determination is based on an applicant's "reasonable assurances."

The state program thus does not require FDEP to make findings of its own or even to independently evaluate and make findings as to the applicant's reasonable assurances. *See, e.g.*, *Defs. of Crooked Lake, Inc., v. FDEP*, 2018 WL 3387900, at *3 (Fla. Div. Admin. Hearings May 7, 2018) (asking only whether evidence showed the applicant provided reasonable assurances). There is no legally binding requirement that *the permitting authority* evaluate the project's effects or even the adequacy of the applicant's reasonable assurances.  Nor is there a requirement that *the permitting authority* make written factual determinations about either.

As EPA explained when issuing the 404(b)(1) Guidelines, it purposefully placed the duty on the permitting authority because "[s]pecific documentation is important to ensure an understanding of the basis for each decision to allow, condition, or prohibit a discharge through application of the Guidelines."  45 Fed. Reg. 85,336, 85,343 (Dec. 24, 1980).  EPA explained that this documentation "provides a record of actions taken that can be evaluated for adequacy and accuracy and ensures consideration of all important impacts in the evaluation of a proposed discharge of dredge or fill material."  *Id.*  Without FDEP making the 404(b)(1) Guidelines' factual determinations, the public cannot ensure an understanding of FDEP's decisions, and are hamstrung in evaluating the adequacy and accuracy of FDEP's permitting decisions.  And FDEP cannot ensure that all important impacts have been considered.

Further, when a duty falls on a federal agency, the public can ensure that the agency undertake reasoned actions that comply with the agency's legal authority and the APA.  *See* 5 U.S.C. § 706.  This proves to be a strong incentive for federal agencies to follow the law.  And it provides an opportunity for the public to step in when a federal agency fails at that duty.  *See*

*Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 77–79 (D.D.C. 2007) (Corps'

factual determinations arbitrary and capricious).  Because the only obligations under the state

program fall with the *applicant*, those incentives and enforcement opportunities do not exist.

Additionally, unlike the clear, prescriptive requirements in the federal program, the state

program's use of the term "reasonable assurance" leaves space for interpretation.  A reasonable

assurance by a self-interested applicant that there will not be significant adverse effects is not the

same as the rigorous evaluations and determinations that must be made by an independent

agency as required under the Section 404(b)(1) Guidelines.

This subjective, vague, and applicant-driven process is thus not equivalent to the federal

program's prescriptive and clear requirements.  EPA's approval was thus arbitrary, capricious,

and an abuse of discretion.

### C.    EPA Approved a State Program with a Narrow View of Water Quality Effects Determinations Contrary to the Federal 404(b)(1) Guidelines.

Another stringency issue with the state program is that it limits consideration of water

quality impacts to situations where the high bar of water quality standards or toxic effluent limits

will be violated.  Federal law prohibits the introduction of any pollutant without a permit.  But in

the state program, the water quality impacts that result from dredge and filled material into

waterways only matter if and when that introduction would violate water quality standards or

toxic effluent limitations.  Such a narrow view is less stringent than what federal law requires.

The federal 404(b)(1) Guidelines rightly focus on the introduction of pollutants—defined

broadly—into waters of the United States, recognizing the threat of harm that this poses.  The

Guidelines do not limit that concern only to situations where specific water quality standards or

toxic effluent limitations are or may be violated.  That would be overly narrow for the purpose

and intent of the Clean Water Act as a whole.  Yet that is exactly the narrowing effect of the state

program, rendering EPA's decision to approve it arbitrary, capricious, and an abuse of discretion.

     While the federal 404(b)(1) Guidelines include many provisions focused on water quality

generally, many of the state program's "parallels" limit those considerations to situations where

specific water quality standards or toxic effluent limitations may or will be violated.  For

example, the federal 404(b)(1) Guidelines require that the permitting authority evaluate and

determine the potential impacts on water, generally.  40 C.F.R. § 230.22.  The state program,

however, focuses instead on adverse effects to receiving waters "such that the state water quality

standards … and any special standards … will be violated."  Fla. Admin. Code R. 62-

330.301(1)(e); EPA-HQ-OW-2018-0640-0002-A1, at 93 (ERP Handbook 10.2.4).  This means

that the same dredge and fill activity that the federal program would deem as having negative

impacts on water quality, which must be mitigated, would not necessarily receive the same

treatment under the state program.  And this allows dredge and fill activities under the state

program that under the federal program would either not be permitted or would require

measures, mitigation, or controls.

     As another illustration, the federal 404(b)(1) Guidelines require the permitting authority

to evaluate the material to be discharged to "determine the possibility of chemical contamination

or physical incompatibility," generally.  40 C.F.R. § 230.60.  *See id.* § 230.61(b)(1) (explaining

that the evaluation required by Section 230.60 concerns the "potential effects on the water

column and on communities of aquatic organisms" with no mention of water quality standard or

toxic effluent limitation violations); *id.* § 230.3(d) (defining "contaminant" broadly as "a

chemical or biological substance in a form that can be incorporated into, onto or be ingested by

and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic

<div align="center">53</div>

environment, and includes but is not limited to the [toxic pollutants]").  The state program, by

contrast, requires evaluation of material to be dredged or filled for chemical contamination "that

may violate state water quality standards…, or any toxic effluent standards or prohibition."

EPA-HQ-OW-2018-0640-0002-A20, at 32 (404 Handbook 8.2(g)).  Again, this means that the

same fill material may be considered as creating the possibility of chemical contamination under

the federal program but not under the state program.  And again, that contaminated fill material

may require additional controls, cleanup, or even prohibitions for use under federal law which

would not be required under the state program.

By limiting its assessment of water quality impacts to situations where water quality

standards or toxic effluent limitations may be violated, the state program is more narrow, and

thus less stringent, than federal law requires.  EPA's decision to approve it in spite of these

differences was arbitrary, capricious, and an abuse of discretion that must be vacated.

### D.    EPA Approved a State Program That Failed to Comply with 404(b)(1) Guideline to Ensure No Jeopardy from State Permits.

Next, EPA abused its discretion in approving Florida's program because the State's

application failed to show the authority on which it would rely to claim that the state program

would ensure no jeopardy to protected species and critical habitat.  EPA may only approve a

state program if it determines that no state permit will issue that would jeopardize the continued

existence of protected species or adversely modify or destroy critical habitat.  40 C.F.R.

§§ 230.10(b)(3), 233.34(a).  The State, however, relied on a technical assistance process to be

laid out in the anticipated, future programmatic BiOp that was not part of the program

application, as discussed below.  Further, the technical assistance process established by the

BiOp was insufficient to ensure no jeopardy, as described above.

54

**E.      EPA Approved a State Program That Failed to Demonstrate That
Assumable Waters Would be Regulated and Transferred Authority over
Non-Assumable Waters to the State.**

Finally, EPA's approval of the state program violated the Clean Water Act because the

State failed to demonstrate that it would regulate all assumable waters of the United States, and

only those waters.  EPA can only approve a state program if the state demonstrates it has

authority to regulate the proper scope of waters.  33 U.S.C. § 1344(g)(1), (h)(1)(A)(i), (h)(1)(G);

40 C.F.R. §§ 233.20(a), 233.30(a), 233.40(a).  A state program must regulate *all* assumable

waters of the United States as defined in Section 404(g)(1).  *See* 40 C.F.R. § 233.1(b) (partial

programs are not approvable).  And a state 404 program can only regulate assumable waters.

Section 404 authority "cannot be transferred for those waters" required by law to remain under

the Corps' exclusive jurisdiction.  *See* 40 C.F.R. § 232.2 (defining waters that can be state

regulated).  Yet, here, the state program failed to demonstrate it would regulate all assumable

waters.  Further, EPA's approval of the program also transferred authority over non-assumable

waters to the State.

First, Florida's program did not demonstrate authority to regulate all assumable waters of

the United States.  As a result, the State has failed to exercise jurisdiction over assumable waters,

leaving those waters unregulated.  The state program claimed it would assume jurisdiction over

"state-assumed waters," which it described as "all waters of the United States that are not

retained waters."  EPA-HQ-OW-2018-0640-0002-A20, at 4–5 (404 Handbook 1.1).  *Accord* Fla.

Stat. § 373.4146(1) (defining "state-assumed waters" as "waters of the United States that the

state assumes permitting authority over pursuant to s. 404 of the Clean Water Act … and rules

promulgated thereunder").  However, the state program did not define "waters of the United

States."  *See* EPA-HQ-OW-2018-0640-0016-A3, at 11 (Comparison Table) ("No state

definition" for "waters of the United States").[31]  The State therefore did not demonstrate what waters constituted "waters of the United States" for purposes of its application.  Although state regulations could have affirmed that "waters of the United States" are those waters as defined by federal law, or incorporated the federal definition, the State did neither.

As Plaintiffs feared, the State has exploited this gap and abrogated its authority over assumable waters by failing to require permits for discharges in all assumable waters.  Indeed, the State has continued applying the Trump-era definition—which substantially reduced waters covered by the Clean Water Act—after it was vacated by a federal court as unlawful.  *Pasqua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 955 (D. Ariz. 2021); Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  The State continued to do so even after EPA (repeatedly) told the State that the State was required to cease applying the vacated Trump definition and that it was required to apply the controlling federal definition of waters of the United States (the pre-2015 regulatory regime).  Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  *See also* Dkt. 59.

Despite the federal agency's directives, the State has continued making "no permit required" decisions for discharges into assumable waters when those waters are excluded pursuant to the vacated, Trump-era definition of "waters of the United States."  Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  By claiming these waters are not under its jurisdiction, based on the vacated definition, the State is also abdicating its duty to enforce against unpermitted discharges in all assumable waters because the State does not consider those discharges to be in violation of Section 404.

---

[31] Although the State application claimed the program would use the federal definition, nothing in the program incorporates, adopts, or ensures the State will follow the federal definition.

EPA's approval of a state program that failed to demonstrate it would adhere to the

federal definition of waters of the United States violated the Clean Water Act.  EPA thus

unlawfully approved a partial 404 program and left assumable waters in Florida unregulated.[32]

Second, EPA was not authorized to transfer Section 404 authority to the State over waters

that federal law requires remain under the Corps' exclusive jurisdiction.  Specifically, the Clean

Water Act prohibited EPA from allowing the State to administer Section 404 over "those waters

which are presently used, or are susceptible to use in their natural condition or by reasonable

improvement as a means to transport interstate or foreign commerce shoreward to their ordinary

high water mark, including all waters which are subject to the ebb and flow of the tide shoreward

to their mean high water mark, or mean higher high water mark on the west coast, including

wetlands adjacent thereto."  33 U.S.C. § 1344(g)(1).

Yet, EPA failed to ensure that its approval of Florida's program met this requirement of

the Clean Water Act.  There is no record evidence that EPA undertook any independent action to

ensure its approval of Florida's application complied with its duty under Section 404(g)(1).  To

the contrary, EPA took no action when the Corps summarily and arbitrarily terminated its 2018

navigability studies to determine the extent of non-assumable waters in Florida.  EPA also was

copied on public comments to the Corps identifying the need for these navigability assessments

but ignored them.  EPA determined Florida's 404 application was "complete" even (1) though

the Corps' navigability assessments were never completed; (2) Florida's application relied on a

truncated "Retained Waters List" that omitted navigable waterways listed by the Corps as

recently as 2017; (3) the public identified numerous waterways that should be deemed non-

---

[32] Because the Corps cannot regulate assumable waters once a State has assumed the Section 404 program, the Corps too is not exercising jurisdiction over those waters.  EPA's unlawful action means no one is regulating those waters while Florida administers its 404 program.

assumable; and (4) substantial questions remained over which waters the State would regulate. EPA-HQ-OW-2018-0640-0051, at 4–6 (Completeness Letter).  EPA abused its discretion by approving Florida's application based solely on the Corps' unlawful "Retained Waters List."

EPA's failure to undertake any inquiry to ensure compliance with Section 404(g)(1) and its unreasonable reliance on arbitrary and capricious actions by the Corps were unlawful.  EPA's action had the legal effect of transferring 404 authority from the Corps to the State, cementing the allocation of authority between those two entities.[33]  EPA's action also affected which projects would continue to be subject to additional environmental protections, including Section 7 of the ESA and NEPA review.  EPA had a duty to independently determine that only assumable waters were transferred to State authority, including by evaluating Florida's reliance on the Corps' "Retained Waters List" on its own and in light of the concerns raised by others. EPA's approval of Florida's program thus unlawfully transferred 404 authority from the Corps to the State over "non-assumable" waters in violation of the Clean Water Act.

## V.  The Corps Unlawfully Relinquished 404 Jurisdiction Over Certain Waters.

Further, the Corps' "Retained Waters List" constituted a final agency action which, when adopted by EPA, unlawfully rendered certain waters "assumable" by the State, contrary to the RHA, CWA, and APA (Claim 7).  *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  It marked the consummation of the agency's decision-making (as to which waters would be retained for purposes of Florida's 404 assumption application) and was an action by which "rights or obligations have been determined" or from which "legal consequences will flow" (because it set forth the scope of retained waters, i.e., it altered the legal status of those waters,

---

[33] Indeed, EPA has argued that after assumption, changes to the list require modification of the program (which only EPA can approve).  *Menominee Indian Tribe v. EPA*, 947 F.3d 1065, 1074–75 (7th Cir. 2020) (Hamilton, J. concurring) (cited by *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 212 n.9 (D.D.C. 2022)); EPA-HQ-OW-2018-0640-0568, at 66.

rendering others assumable). *See Bennett*, 520 U.S. at 177–78. Once EPA approved Florida's program, the State assumed 404 jurisdiction over waters not retained. That change also had legal consequences for the public, who are subject to different rules and legal regimes depending on whether the Corps or the State has jurisdiction over a particular waterway.

Under Section 404(g)(1) the Clean Water Act, the Corps must retain exclusive jurisdiction over navigable waters related to commerce. The Clean Water Act also provides for more expansive authority by requiring the Corps also to retain 404 jurisdiction over dredge and fill in adjacent wetlands. *See id.* § 1344(g)(1).

The RHA similarly provides for the Corps' exclusive jurisdiction over construction and fill in navigable waters amenable to commerce. 33 U.S.C. § 401 (Section 9, construction); *id.* § 403 (Section 10, fill); *id.* § 407 (Section 13, discharges). Under the RHA, the Corps has a duty to maintain lists of Section 10 navigable waters, not to remove waterbodies from its lists without following a procedure absent here, and to make findings and determinations "whenever a question arises regarding the navigability of a waterbody." 33 C.F.R. §§ 329.15(a), 329.16(a), 329.16(c). Finally, the Corps' regulations under both the Clean Water Act and the RHA define navigable waters under its exclusive jurisdiction as including "historic use" waters. *Compare id.* § 328.3(a)(1) (2015)[34] *with id.* § 329.4.[35]

---

[34] The Trump Administration's definition did not materially alter this part of the definition. *See* 33 C.F.R. § 328.3(a)(1) (2020) ("The territorial seas, and waters which are currently used, or *were used in the past*, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." (emphasis added)).

[35] *See also Subcommittee Report*, CORPS002993, at CORPS002999, CORPS003015–16, CORPS003021–22 (citing 33 C.F.R. § 328.3(a)(1) and *Rapanos* guidance). *See also* EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008), https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf (waters are considered "traditional navigable waters" if they are subject to Section 9 or Section 10 of the RHA).

The Corps violated the Clean Water Act, RHA, and APA by arbitrarily and capriciously (1) failing to complete navigability assessments necessary to ascertain the scope of its 404 jurisdiction post-assumption; (2) relying on an outdated and incomplete RHA Section 10 list from 2014 as the basis for its Clean Water Act "Retained Waters List;" (3) omitting waterways identified on the 2017 list without justification; and (4) removing "historic use" navigable waters from the list.  The "Retained Waters List" should therefore be set aside.

## VI.   EPA Arbitrarily and Capriciously Determined the State's Inadequate Application Was Complete.

EPA also acted arbitrarily and capriciously by deeming Florida's application complete when submitted (Claim 1).  Eight days after receiving Florida's application, EPA deemed the application complete as of the date of submission, EPA-HQ-OW-2018-0640-0608, thereby triggering a statutory 120-day deadline to approve or deny the application unless EPA and the State agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).  On September 16, 2020, EPA issued a notice and request for comment on the application with the opportunity to comment closing on November 2, 2020.  85 Fed. Reg. 57,853 (Sept. 16, 2020).

But the public was deprived of an adequate opportunity to comment on the application because the application was not, in fact, complete at the time of submission.  The elements required for a state submission included "a complete program description" and a statement from the Attorney General showing that the State had "adequate authority to carry out the program and meet the applicable requirements of this part."  40 C.F.R. §§ 233.10(b)–(c), 233.12(a).  An integral part of any 404 program is demonstrating that state-issued permits will result in no jeopardy to listed species.  33 U.S.C. § 1344(h)(1)(A)(i) (state must show it has authority to comply with 404(b)(1) Guidelines); 40 C.F.R. § 230.10(b)(3) (404(b)(1) Guideline requiring that no permit jeopardizes a listed species or destroys or adversely modifies critical habitat).

60

Florida's submission, however, did not demonstrate this authority. The application included an unexecuted MOU between state and federal agencies stating that USFWS would give "technical assistance" to state agencies for purposes of ensuring no jeopardy to listed species.[36] EPA-HQ-OW-2018-0640-0016-A2, at 12 (Application MOU) (unexecuted). What this process would entail, however, was not defined. Instead, the MOU stated that "the technical assistance" process was "anticipated to be outlined in the USFWS' BiOp based on information included in the [BA] submitted by EPA." *Id.* at 5. And so it would be, but not until November 17, 2020, two weeks after public comment closed.

Florida's submission also included, and relied on, state-promulgated regulations. But those too only referenced a "technical assistance" that would later be defined; they did not themselves define it. *See* Fla. Admin. Code R. 62-331.051 (applicants for individual permits will be required to provide "data and information for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable requirements resulting from consultation with, or technical assistance by," the state agencies and USFWS); *id.* 62-331.053(3)(a) (no permit shall be issued that causes jeopardy to listed species or results in adverse modification of critical habitat as determined by compliance with "any requirements resulting from consultation with, or technical assistance by" the state agencies and USFWS); *id.* 62-331.010(5) (incorporating State 404 Handbook); EPA-HQ-OW-2018-0640-0002-A20, at 6 (404 Handbook 1.3.33) (requiring compliance with requirements resulting from the "technical

---

[36] EPA dismissed the objection that the unexecuted MOU or absence of the BiOp rendered Florida's application incomplete on the basis that these are not required for a program submission. EPA-HQ-OW-2018-0640-0568, at 19. EPA's position, however, did not address the fact that *Florida* relied on the MOU to establish its authority for a component of the program, and that the MOU in turn relied on a "forthcoming" technical assistance process that it said would be produced in a later BiOp.

61

assistance" process); *id.* at 23 (404 Handbook 5.2.3) (referring to the "technical assistance"

process)).  The Attorney General's statement only made general references to the 404(b)(1)

Guidelines and to the state individual permit conditions rule, Fla. Admin. Code R. 62-331.053.

*See* EPA-HQ-OW-2018-0640-0017, at 7 (AG Statement).

 EPA's reliance on Florida's program description failed too, since the program description

itself relied on the unexecuted MOU, which relied on the then non-existent BiOp to define the

technical assistance process.  EPA-HQ-OW-2018-0640-0568, at 19–20 (Response to

Comments).  Moreover, EPA's view that these materials described how "reviews" would be

"handled" itself fell short of claiming that they established the State's authority to ensure that

there would be no jeopardy to listed species.  Indeed, in defending Florida's authority to protect

listed species, EPA itself relied on the BiOp.[37]

 By relying on processes that had not yet been articulated or produced, Florida's

application could not demonstrate the State's authority to ensure protection of listed species, and

so its application was not complete.  EPA's completeness determination was therefore arbitrary

and capricious.  It deprived the public of the opportunity to comment on an integral component

of Florida's program.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1); *Small Refiner Lead Phase-

Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983).  And it unlawfully set in motion a

---

[37] EPA-HQ-OW-2018-0640-0568, at 95 (Response to Comments) (citing BiOp to describe state process for evaluating impacts to listed species and designated critical habitat); *id.* at 95–96 (citing BiOp for FDEP's duty to follow USFWS' recommended measures as permit conditions); *id.* at 97 (citing BiOp for conclusion "that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat"); *id.* at 98 (citing BiOp for conclusion that state process is adequate to protect listed species); *id.* at 99 (citing BiOp in paragraph concluding that state process "is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat"); *id.* at 101 (citing BiOp to defend how State will comply with 404(b)(1) Guidelines); *id.* at 102 (stating that "as a result" of EPA's consultation and resulting BiOp state and federal agencies will coordinate on state permits to avoid jeopardy).

62

120-day clock ending December 17, 2020.  Had EPA found the application complete when it received the programmatic BiOp containing the technical assistance process on which Florida's program relied (November 19, 2020), the public would have had at least until January 4, 2021, to comment (forty-five days), and the 120-day clock would not have run until Friday, March 19, 2021, well into the next Presidential administration.

Lastly, for the reasons demonstrated above, EPA's conclusion that Florida's application was complete as submitted was also unlawful based on the State's failure to demonstrate that it would assume authority over all assumable waters, and only assumable waters.

**STANDING**

Plaintiffs have been injured by the Federal Defendants' actions and have standing to pursue their claims.  As demonstrated in Plaintiffs' Motion for Partial Summary Judgment, EPA's transfer of 404 authority to Florida threatens Plaintiffs' organizational and associational interests in protecting Florida's valuable waterways, including the endangered and threatened species that rely on them.  Dkt. 31 at 32–51.  The loss of ESA Section 7 consultation on 404 permits in assumed waters and the loss of NEPA analysis have (1) eliminated levels of environmental review to which Plaintiffs would otherwise be entitled; (2) limited Plaintiffs' statutory avenues to advocate for robust environmental protection; (3) removed Plaintiffs' access to critical environmental analyses that Plaintiffs use to educate the public, engage in advocacy, and seek redress for environmental harm;[38] and (4) unduly restricted Plaintiffs' access to courts

---

[38] *See Ctr. for Biological Diversity*, 597 F. Supp. 3d at 190 (finding Florida's challenge to Plaintiffs' asserted informational injury unavailing).

to challenge inadequate environmental protection.[39]  Plaintiffs are also harmed by USFWS' and

EPA's failures to comply with the ESA, and the Corps' abdication of jurisdiction over certain

navigable waters.

To establish standing, Plaintiffs must show, "by a preponderance of the evidence," *Otay*

*Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 56 (D.D.C. 2015), that they "have

(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the

defendant; and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.*

*Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  An association may bring suit on its

members behalf when (1) "its members would otherwise have standing to sue in their own

right;" (2) "the interests at stake are germane to the organization's purpose;" and (3) "neither the

claim asserted nor the relief requested requires the participation of individual members in the

lawsuit."  *Friends of the Earth*, 528 U.S. at 181.

"'[T]o establish organizational standing a party must show that it suffers' or will

imminently suffer 'a concrete and demonstrable injury to its activities, distinct from a mere

setback to the organization's abstract social interests.'"  *Nw. Immigrant Rights Project v. U.S.*

*Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46 (D.D.C. 2020), *appeal dismissed*, No. 20-

5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021) (quoting *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d

1249, 1255 (D.C. Cir. 2018)) (alterations in original).  First, a plaintiff "must show a 'direct

conflict between the defendant's conduct and the organization's mission.'"  *Id.* (citation

---

[39] *See* Dkt. 31 at 35–48 (discussing harms resulting from EPA's transfer of authority in context
of Claims 8 and 9; same applies to other claims based on EPA's approval of Florida's program);
Dkt. 43 at 67–74 (discussing informational standing as to all claims).  Plaintiffs hereby adopt and
incorporate these showings as to all claims related to EPA's approval of Florida's program.

omitted).  Second, a "plaintiff must show that it has 'used its resources to counteract [the asserted] harm.'"  *Id.* (alterations in original) (citation omitted).

A person who has been accorded a procedural right to protect their concrete interests may "assert that right without meeting all the normal standards for redressability and immediacy." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (emphasis omitted) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).  A plaintiff has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). "A plaintiff asserting procedural injury 'never has to prove that if he had received the procedure the substantive result would have been altered.'"  *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 68 (D.C. Cir. 2022).

Plaintiffs have standing to challenge EPA's interlocutory completeness determination as a procedural injury (Claim 1).  Among other things, to be deemed complete, Florida's application was required to demonstrate authority to ensure that its permit actions would not result in jeopardy to listed species or adverse modification to critical habitat.  But for this requirement, the application relied on a technical assistance process in a forthcoming BiOp that was not produced until more than two weeks after the public comment period concluded.  EPA's completeness determination initiated the public comment period while depriving Plaintiffs of the opportunity to comment on an integral component of Florida's program.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1); *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 547.  The inability to review and comment on Florida's claimed authority to ensure no jeopardy to listed species or adverse modification to critical habitat from its state permits created a demonstrable risk to Plaintiffs' aesthetic and recreational interests in listed species.  *Ctr. for Biological*

65

*Diversity v. Zinke*, 369 F. Supp. 3d 164, 179 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*, 961 F.3d 1197 (D.C. Cir. 2020). Ex. 1 at 6–7 (Crooks Dec. ¶ 23); Ex. 2 at 7–8 (Carter Dec. ¶¶ 26, 28); Ex. 6 at 6–7 (Rinaman Dec. ¶¶ 24–25); Ex. 8 at 6 (Robertson Dec. ¶ 19); Ex. 9 at 3 (Gledhill Dec. ¶ 8).

Plaintiffs have standing to challenge EPA's unlawful approval of Florida's 404 program (Claim 2) and the deficiencies underlying that approval. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013). As a result of EPA's action, the State is considering (and approving) permit applications that substantially risk harm to their members' aesthetic, recreational, and other interests by authorizing developers to fill precious wetland habitat for projects that will harm threatened and endangered species. *Lujan*, 504 U.S. at 562–63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014) ("impairment of the affiant's ability to enjoy the 'natural vistas' of the nearby hills from her own home, regardless of the absence (or existence) of any legal right on her part to view or make an entry onto the nearby hills" is sufficiently concrete for injury-in-fact (citing *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 715 (D.C. Cir. 1988)). Ex. 1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶32–37); Ex. 5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Ex. 7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1, 3–14, 24–25 (Umpierre Dec. ¶¶ 2–3, 10–11, 15–40, 73).

In addition, EPA's approval of Florida's program poses a direct conflict with Plaintiffs' organizational missions, and Plaintiffs have used their resources to counteract the resulting harm. *Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 6. Plaintiffs' missions, writ large, are to

66

ensure environmental protection, something they accomplish through citizen engagement,

education, and outreach, scientific research, advocacy, and legal challenges.  EPA's approval of

Florida's program has impaired Plaintiffs' missions by (1) causing them to lose the benefit of

federal requirements, rights, and remedies available under NEPA and Section 7 of the ESA;

(2) causing a loss of access to information essential to accomplishing their missions; and

(3) substantially limiting their ability to protect wetlands and species through litigation because

of restrictive access to the courts.  Plaintiffs have had to use and will continue to use their

resources to counteract these harms and/or divert resources away from their core program work.

Ex. 1 at 1–3, 6–30 (Crooks Dec. ¶¶ 4–12, 21–53, 55–63, 65–85); Ex. 2 at 2–11 (Carter Dec.

¶¶ 5–7, 11–17, 20–25, 27, 29–34, 38); Ex. 3 at 2, 10–11, 13 (Fleming Dec. ¶¶ 4–5, 30–33, 37);

Ex. 4 at 2–9, 11 (Hartl Dec. ¶¶ 6–7, 9–16, 22–31, 38); Ex. 6 at 3–6, 9–10 (Rinaman Dec. ¶¶ 10–

23, 31, 33–34); Ex. 7 at 1–14 (Silverstein Dec. ¶¶ 3–27, 29–36); Ex. 8 at 1–10 (Robertson Dec.

¶¶ 4–7, 9–18, 22–29); Ex. 9 at 2–3 (Gledhill Dec. ¶¶ 4–8); Ex. 10 at 1–5, 19–25 (Umpierre Dec.

¶¶ 1, 4, 6–9, 12–14, 60–74).

      Plaintiffs have standing to challenge USFWS' BiOp and ITS (Claims 3 and 4), as well as

USFWS' attempt to use a non-statutory "technical assistance" process as a proxy for ESA

consultation (Claims 6 and 13).  *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C.

2015).  Plaintiffs' members have an interest in the enjoyment of listed species, and this interest is

germane to Plaintiffs' organizational interests.  USFWS' unlawful BiOp and ITS threatens

Plaintiffs' interests by failing to (1) analyze the impact of Florida's program on listed species and

critical habitat; (2) render a lawful jeopardy determination; and (3) set limits on incidental take.

Vacating the BiOp and ITS would redress Plaintiffs' injuries by requiring reinitiation of

consultation to assess the impacts to species and habitat and requiring EPA to reconsider its

<div align="center">67</div>

assessment of Florida's program.  USFWS' unlawful "technical assistance" proxy threatens

Plaintiffs' interests by failing to ensure Florida's program would not jeopardize listed species or

adversely modify or destroy critical habitat and giving a blank check on incidental take.  Ex. 1 at

1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–

13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶ 32–37); Ex. 5 at 3–18 (Schwartz Dec.

¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Ex. 7 at 1, 4, 9–14

(Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1–14 (Umpierre Dec. ¶¶ 2–3, 6–40).

     Plaintiffs have standing to challenge EPA's reliance on that BiOp to approve Florida's

program (Claim 10), as EPA similarly harmed Plaintiffs' interests by failing to ensure that

Florida's program would not jeopardize listed species or adversely modify critical habitat.

Vacating EPA's reliance on the BiOp would redress Plaintiffs' injuries by invalidating EPA's

approval of Florida's program and requiring reinitiation of consultation.  Plaintiffs also have

standing on this claim for the same reasons as they have standing to challenge EPA's approval of

Florida's program (Claim 2).  Ex. 1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62,

64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶

32–37); Ex. 5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9,

26–29, 32); Ex. 7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1–14

(Umpierre Dec. ¶¶ 2–3, 6–40).

     Plaintiffs have standing to challenge EPA's "no effect" determination as to NMFS (Claim

5), failure to engage in adequate consultation with NMFS (Claim 11), and failure to consult with

USFWS on the agency action's impact on nesting sea turtles (Claim 12).  *Ctr. for Biological

Diversity v. EPA*, 861 F.3d 174, 182–84 (D.C. Cir. 2017) (failure to meet statutory consultation

obligations constitutes archetypal procedural injury; environmental organization has obvious

interest in failure to consult; neither action nor relief requested requires participation of individual members).  Ex. 1 at 2–3, 29–30 (Crooks Dec. ¶¶ 8–12, 85(d)); Ex. 7 at 1, 4, 9–11 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28); Ex. 3 at 1–3, 4–10, 13 (Fleming ¶¶ 1, 7–9, 14–29, 36).

Lastly, Plaintiffs have standing to challenge EPA's failure to ensure that all assumable waters, and only assumable waters, would be assumed by the State (Claims 2 and 7) and EPA's determination that the State's application was complete when the State had failed to adequately identify the waters over which it would assume jurisdiction (Claim 1).  In addition to the harms sustained as a result of EPA's unlawful approval of the state program, as shown above, Plaintiffs' aesthetic and recreational interests are harmed by the Corps' "Retained Waters List" and EPA's reliance on it, which rendered assumable by the State scores of waterways that should have remained under the Corps' jurisdiction.  As a result of the Corps' abdication of jurisdiction, Plaintiffs' interests in those waterways are at risk from the State's 404 permitting program, inadequate enforcement, and unlawful granting of "no permit required" determinations, all without access to Section 7 consultation or NEPA processes.  Ex. 6 at 7 (Rinaman Dec. ¶ 25); Ex. 10 at 1–3, 14–19 (Umpierre Dec. ¶¶ 1, 4, 6–7, 41–59); Ex. 11 at 1–3 (Hamann Dec. ¶¶ 3–8); Ex. 12 at 1–3 (Hollenhorst Dec. ¶¶ 3–8); Ex. 13 at 1–3 (Knight Dec. ¶¶ 2–8).

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on their Claims One through Seven and Ten through Thirteen.[40]

Dated: February 28, 2023

---

[40] Plaintiffs also respectfully renew their motion for summary judgment as to Claim Eight, Dkt. 31, which the Court has taken under advisement, Minute Orders Apr. 19, 2022, Oct. 17, 2022; *see also* Dkt. 78, 82, 83, 87, and request that the Court grant that motion as well.

JA.291

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing *pro hac vice*

JA.292

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of February 2023, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

<u>/s/ Tania Galloni</u>
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
<u>tgalloni@earthjustice.org</u>

JA.293

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-CCB24385A15E

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 1 of 123
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 308 of 444

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## <u>DECLARATION OF AMBER CROOKS</u>

I, Amber Crooks, make the following declaration:

1. I am a resident of Naples, Florida.

2. I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3. I am a member of the Conservancy of Southwest Florida ("Conservancy"), and I am also employed by Conservancy as the Environmental Policy Manager.

4. Conservancy is a 501(c)(3) nonprofit that focuses on environmental conservation in Southwest Florida.  Our water policy work addresses issues at local, statewide, and federal levels.  Conservancy was founded in 1964 and has grown in membership to approximately over 3,600 dues-paying members, and approximately over 2,000 additional donors and supporters. The mission of Conservancy is to protect the natural environment, species, and habitats of Southwest Florida, summed up in our motto: "Our Water, Land, Wildlife, Future."  We do this

through four main program areas: 1) Science and Research, 2) Policy and Advocacy, 3) Wildlife Rehabilitation, and 4) Environmental Education.

5.      Conservancy's Policy and Advocacy program focuses on protecting water, wildlife, and land.  In protecting wetlands and waterways, we work to promote better water management and resource protection by working with stakeholders and decision-makers to ensure that stringent water management tools, regulations, and best practices are in place and utilized.  In protecting wildlife and endangered species, we work to prevent harm by preserving species' habitats from environmental changes, conserving landscape corridors and critical habitat, and ensuring that protections are strong to recover imperiled species populations.  We perform this work at the local, state, and federal levels.

6.      Conservancy's Wildlife Rehabilitation program operates the von Arx Wildlife Hospital, which treats approximately 4,200 injured, sick, or orphaned native animals on an annual basis.  These native species include small mammals, birds (including migratory and protected birds), turtles, gopher tortoises, and many others.

7.      Protection of water resources such as wetlands and conservation of native species are core programmatic areas for Conservancy's policy work.

8.      I have a deep personal commitment to the protection and recovery of Florida's protected species, and I engage in both professional and personal activities to further this commitment.

9.      I have an aesthetic and scientific appreciation of the Florida panther in the wild, and travel to panther habitats in hopes of viewing and photographing the elusive panther.  I enjoy recreating in panther habitat areas, including hiking, camping, wildlife viewing, and nature photography.

JA.295

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-5CB24385A15E

10.     I graduated with a B.A. in political science from Stetson University in 2003, and I received a Masters of Public Administration in Environmental Policy and Planning from Florida Gulf Coast University in 2011.

11.     Through my work at Conservancy and through my formal education, I have studied endangered species policy issues, including critical habitat designation, Habitat Conservation Plans, and the Florida panther, among other topics.  As the environmental policy manager at Conservancy, I specialize in wildlife policy and am the organization's listed (endangered and threatened) species expert.  Endangered species that my work focuses on include, but are not limited to, Florida panthers, bonneted bats, and smalltooth sawfish.  My job duties also include overseeing policy staff members' technical analysis of issues related to state and federal permitting processes.

12.     Southwest Florida, as a region, has many endangered and threatened species that receive regulatory review by federal agencies as required under the Endangered Species Act ("ESA").  One such species is the Florida panther, one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  According to the U.S. Environmental Protection Agency's ("EPA") Biological Evaluation in this case, this region had the highest concentration of ESA consultations in all of Florida from 2014-2018.  *See* Dkt. No. 031-1, at 30-32 (Exhibit A, Excerpt from ESA Evaluation for Clean Water Act Section 404 Assumption by the State of Florida).

13.     One of the main tools Conservancy uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; utilize geographic information system (GIS) analysis, a data mapping

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-6CB24385A15E

tool that allows us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters.  As with this case, we also engage in litigation when needed to carry out our organization's goals.

**Conservancy's Engagement on Florida Assumption of Section 404**

14.     Conservancy has dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program, in light of the State's poor permitting track record in environmental protection and the State's failure to demonstrate that it would provide the same level of protection, rights and remedies available under federal law, and that its program meets the requirements of federal law.

15.     Between 2017 and 2020, I advocated on behalf of Conservancy, against efforts to pursue assumption on Section 404 in Florida.  Among other things, I testified before the State legislature, participated in the State's rulemaking process (via comments and hearings), regularly raised concerns directly with the Secretary of Department of Environmental Protection and his staff, and helped engage our membership in advocacy against the proposed program at the state and federal levels.

16.     In 2018, we launched a campaign to urge Governor Rick Scott to veto a quickly passed bill that authorized the Department of Environmental Protection to pursue seeking approval from EPA to administer Section 404.  This included our supporters sending more than 700 emails in opposition, online advertisements that reached more than 70,000 viewers, and advertisements and opinion pieces published in local newspapers.  We submitted comments to the U.S. Army Corps of Engineers ("Corps") as it was considering modification to the list of waters that could be assumed by the State under Section 404.  In our comments, we submitted a

JA.297

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-6CB24385A15E

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 5 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 312 of 444

comparison of the 2014 and 2017 navigable waters lists, urged the Corps to use its 2017 list as

the starting point for a retained waters list, and identified dozens of waterways in Florida

counties that should be considered for navigability in addition to the those listed by the Corps.  In

2019, we sent an action alert to our members and supporters asking them to contact the new

Governor, Ron DeSantis, to urge him to reverse course on 404 assumption, as he had made

promises about protecting our water quality.

17.     From 2018 to 2020, we participated in the State's rulemaking process, the final

steps of which were conducted at the height of uncertainty around the coronavirus pandemic

(February to April 2020), urging the State not to rush the process when the community was

facing a public health emergency involving stay at home orders, closed schools and scarce

household supplies, and requiring families to focus on protecting their health, livelihood, and

well-being.

18.     After the State submitted its 404 application to EPA in August 2020, and EPA

initiated a public comment period in September 2020, Conservancy, along with other Plaintiffs

in this action, objected to the incompleteness of the application in October 2020, and in

November 2020 submitted comprehensive comments objecting to Florida's proposed program as

grossly inadequate and unlawful under federal law.  *See* Dkt. No. 031-1, at 33, 43 (Exhibits B

and C).

19.     After EPA published its notice approving Florida's program and gave it

immediate legal effect on December 22, 2020, Conservancy's counsel notified EPA and the

other federal defendants, as well as the State, that EPA's transfer of authority was unlawful.  *See*

Dkt. No. 031-1, at 99-101 (Exhibit D).  On December 28, 2020, EPA responded by claiming for

the first time that the agency's December 22, 2020, action did not have to meet the 30-day

DocuSign Envelope ID: A49EDED1-91B9-4E45-88F9-GCB24385A15E

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 6 of 123
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 313 of 444

requirement or codify the State program because it was an informal adjudicatory order, rather

than a rule.  *See* Dkt. No. 031-1, at 102-104 (Exhibit E).

20.     On January 14, 2021, Conservancy joined with the other Plaintiffs in this action to

filed the present suit.

21.     Conservancy was harmed, and continues to be harmed, by EPA's decision to

approve the State-assumed 404 program, and the other agency actions related to that decision

which are also challenged in this case.  Florida's implementation of the unlawful 404 program

harms Conservancy's ability to carry out its organizational mission of protecting the environment

and wildlife, and harms members' aesthetic, recreational, and other interests.

### Organizational Harms from the State Program

22.     EPA's approval of the State's 404 program causes Conservancy to divert

resources, threatens wetlands and wildlife, and undermines Conservancy's ability to fully realize

its mission by depriving the organization of information, rights, and remedies available when

Section 404 is administered by the Corps as it has been for decades.

23.     To begin, Conservancy was harmed by Florida's incomplete assumption

application.  The application relied on a "technical assistance" process in a "forthcoming"

biological opinion that was not produced until weeks after the public comment period

ended.  This prevented Conservancy from fully commenting on this vital component of Florida's

program.  This harmed Conservancy's ability to achieve one of its core missions—to protect

listed species and their habitat—by providing EPA with its comment on the inadequacy of such

an approach and the more protective options available and required.  Moreover, since the

"technical assistance" process in the biological opinion was not produced until November 2020,

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-6CB24385A15E

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 7 of 123
USCA Case #24-5101      Document #2102936        Filed: 02/26/2025      Page 314 of 444

the 120-day review clock would have run through March 2021, well into the next Presidential administration where many bad environmental decisions were stalled, reversed, or revised.

24.     Once Florida was allowed to assume the 404 program, it restarted the review process for all applications received from the Corps. This meant Conservancy was forced to re-engage in our advocacy on pending 404 permits of concern to us, but now all at once. In addition to ensuring that our existing comments were forwarded to the State, we also had to submit new comments to the State for each 404 project impacting our mission, tailored to the specifics of the new program. Since then, because applications for many projects Conservancy has been engaged on for years were submitted or transferred at around the same time, those projects landed on a similar review schedule for the expedited state process, requiring us to monitor developments on the permit applications all at once, rather than if the permits had remained on their own natural timeline under the Corps' jurisdiction. As a result, we are continuing to divert staff time from other important local and state matters affecting species and water quality to keep up with the state 404 process. This includes reassigning a substantial amount of several employees' job duties.

25.     In addition to troubling projects progressing along the same state timeframe, applications are being processed more quickly than under the Corps' 404 program. The State's expressed goal in assuming 404 authority was to streamline and expedite permitting. The quicker processing times means the Conservancy has less time to try to obtain project information, review and analyze the information, and voice concerns. For instance, over the course of several years, Conservancy opposed several projects in eastern Lee County and eastern Collier County, including those that at the time were part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan (HCP) that was being considered by the U.S. Fish

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-9CB24385A15E

and Wildlife.  Projects that comprised the HCP were transferred or submitted to the State upon

404 assumption, as well as major projects across the county border in eastern Lee County.

Under the State's program, these projects are being processed at a much quicker pace that makes

the Conservancy question whether the impacts are adequately being considered as compared to

our experiences under the federal program.

26.     In this shorter period of time, Conservancy also has to divert considerable staff

time in order to monitor and obtain information about projects as compared to under the Corps'

404 program.  First, as explained more fully below, Conservancy no longer has the analyses

available under NEPA and ESA while the State implements the program.  In addition, it is

incredibly difficult to obtain project information under the State's program.  The State's main

database for collecting project information, Oculus, is incredibly difficult to navigate and often

has little information available, especially as to a project's impacts to species.  Therefore,

Conservancy has dedicated a significant amount of resources to tracking the State's "Oculus"

search engine to figure out where and how to access 404 application documents.  Even when

records are available, frequently it is unclear what each document is for, who the author is, or

even whether a particular document is a final or a draft.  This requires the Conservancy also to

have to contact the State via phone and email to ascertain what various documents found in

Oculus mean.

27.     Under the State's program, Conservancy's ability to comment on a permit

application is also significantly hindered.  Despite the State's recent draft annual report

applauding its online public commenting system as encouraging comments, in reality the

system's design has had the opposite effect.  As a core part of Conservancy's work, Conservancy

has expertise and designed strategies for submitting public comments on its behalf and on behalf

JA.301

DocuSign Envelope ID: A49FDED1-91B9-4E45-88F9-6CB24385A15E

of its members.  DEP's system is burdensome because it requires members of the public to

register for an account through a multi-step registration process, as opposed to simply accepting

public comment sent via email or a one-click online docket.  In our experience, the longer and

more cumbersome a process is, the less likely members of the public are to complete the process

and post a comment.  And because of Florida's system, Conservancy has had to expend still

more time and divert more resources to develop new strategies to comment in an accessible way

and to encourage its members and try to facilitate their ability to comment in a meaningful way.

  28. To make matters worse, under the State program public notices are often issued

without much, if any, detail on the impacts to listed species, a primary concern of

Conservancy's.  In its MOA with FWS and EPA, the State said that it would complete its species

review, the "technical assistance" process, prior to issuing public notices to ensure the public

would have this information to comment on.  But this has not been the case.  In the public

notices on projects of concern to Conservancy, not one has contained the proposed required

permit conditions needed to protect federally-listed species.  Nor has Conservancy been able to

obtain this information typically through Oculus.  Where Conservancy has been able to obtain

information on the impacts to federally-listed species, this has typically been only after the close

of the public comment period.  Again, with the lack of information provided, Conservancy must

not only re-allocate staff time toward trying to obtain it or expend resources on experts to

develop it, but must do so in time to attempt to comment on project applications.  Sadly, since

the proposed permit conditions revealed through the technical assistance process has not been

available before public notices are issued, Conservancy is greatly hindered in its mission to

advocate for proper species protections.  This increase in work and required resources has

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

redirected Conservancy's resources and staff capacity that were dedicated to other aspects of the organization's core planned conservation programs.

29.     In addition to not having species related project information before public notice issuance, the State's "technical assistance" process overall has been a black box.  Whether checking Oculus or asking the State and federal agencies directly for information, there is rarely much analysis documented or publicly shared on projects pending with the State.  Without the benefit of the ESA's analyses, Conservancy is again left having to redirect staff and resources from other core work to try to assess the impact of projects on species.

30.     While attempting to obtain this information from the agencies, Conservancy has also been met with confusion by State and Federal staff who seem unclear as to their agency's duties under the "technical assistance" process.  On several occasions on different projects, Conservancy was told by Florida Fish and Wildlife Conservation Commission (FWC) that any analysis for federally-listed species would be conducted by USFWS.  USFWS, which has historically been the expert on federally-listed species, has claimed the opposite, indicating that at best they could only provide non-regulatory recommendations to the State on these species. This has left an obvious void on who, if anyone, is actually looking at impacts to federally-listed species.  Conservancy has expended and diverted staff time in order to pressure and stay on top of both agencies to ensure one of them will consider federally-listed species.  For instance, for the Troyer mine project discussed below, Conservancy urged USFWS to review impacts to federally-listed species especially given the large scale of the mining operation and its location in the panther's last remaining habitat.  USFWS at first seemed unsure of the project's status, but later confirmed it would plan to comment, and that it would need to request additional time in order to do so.

JA.303

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

31.     Conservancy also has concerns with the State's compliance with the requirements laid out in the "technical assistance" process.  On at least one occasion, the State failed to include a permit condition required by USFWS to protect species on a project of concern to the Conservancy.  Namely, in its permit for a large residential development called Fleischmann Parcel (AKA Isles of Collier Preserve), the State failed to include a USFWS required condition for the eastern indigo snake.  In other instances, the State's permit conditions are vague and subject to interpretations that could lead to insufficient protection of listed species.

32.     One example of the State's concerning technical assistance process involved Babcock Property Holdings, LLC's, 404 permit application to expand its nearly 18,000-acre property development with an 8,711-acre project area located in the Tidal Caloosahatchee River Watershed.  *See* Dkt. No. 031-1, at 19-20 (describing project and concerns).  During the application process, the Conservancy voiced concerns over the potential harms to the caracara and the Florida bonneted bat.  This project was permitted on November 19, 2021.  Prior to and again after permit issuance, Conservancy voiced its concerns regarding the technical assistance process.  First, FWC's final proposed permit conditions for listed species were only available a few days prior to permit issuance and well after the close of the public notice window.  Further, Conservancy could not locate any information—not in the permit, not in FWC comments, and not in the public record—that assured us USFWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat for this project, or a proper analysis of whether or not take would occur, or if they adequately assessed take associated with this project.  This is particularly of concern, as there are significant nesting resources for the threatened crested caracara that can be affected in the project area.  The permit condition requiring the applicant to follow conservation measures to protect the caracara is only triggered "if nesting is observed"

11

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM    Document 98-1    Filed 02/28/23    Page 12 of 123
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 319 of 444

even though there were documented nests within the impact area, the caracara is a non-migratory bird, and it uses its territory year-round. The permit acknowledges an estimated take of up to five different pairs of caracara, but stops short of setting a take limit from this project.

33.    Similarly, there is also Florida bonneted bat presence that will likely be impacted by the activities for this project. The USFWS had acknowledged that there is likely to be take of the bonneted bat as well. *See* Attachment A (Jan. 2022 Conservancy Comments). However, again, the permit does not assess take to Florida bonneted bat or provide a take limit associated with this project. The State's wholly inadequate technical assistance process harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests.

34.    Conservancy is also harmed by the loss of environmental review of projects under NEPA. This statute not only provides more scrutiny for water resources, species, and their habitat, but also provides the Conservancy with vital information to vet the impacts of a proposed project and additional opportunities for public comment. In order to carry out our mission of protecting species and wetlands, we are now obligated to hire our own experts or divert significant staff time to engage in alternatives analyses, again draining our resources that would go elsewhere.

35.    The NEPA review process provides Conservancy with an opportunity to engage in the Corps decision-making, which can lead to better environmental decisions, opportunities that are lost now while Florida is allowed to continue administering this 404 program. For example, four proposed large-scale projects in Lee and Collier counties were previously subject to NEPA, under which an environmental impact statement ("EIS") was determined to be required. As a result of this decision, two of the applications – which would have impacted over

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 13 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 320 of 444

9,000 acres – were either suspended or withdrawn.  These projects are now under consideration

by FDEP for State 404 permit without the benefit of a NEPA EIS review; Old Corkscrew

Plantation (Kingston), Troyer Mine, and FFD were three of the four project areas considered in

the former Army Corps determination.  *See* Dkt. No. 031-1, at 235 (Exhibit P, correspondence

between permit applicants and the Corps documenting the EIS as the reason for

withdrawal/suspension).

  36. The loss of critical information and procedural safeguards afforded by NEPA has

significantly set back our established methods of advocating for and protecting water resources,

species and their habitats, and as the pending 404 project applications discussed above

demonstrate, these losses will continue to occur while Florida administers the 404 program.

  37. Furthermore, Conservancy has challenged 404 permits in federal court as one of

our advocacy tools to further our mission, and we are harmed by the loss of federal court as a

venue when permits are issued by the State.  Litigating in federal court provides us with the

necessary access to protect the interests of our organizational mission and our members.  We do

not have the same access to state courts because of the significantly higher costs of state court

litigation and the anticipated drain on our resources to litigate at the state level.

  38. With assumption, there is now an entirely different legal scheme to challenge

wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").

Because legal proceedings in front of DOAH are conducted from scratch and are not treated as

administrative record review cases, Conservancy would have to incur considerable expense to

hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of

dollars to retain on a case, which is thousands of dollars Conservancy would have to divert from

JA.306

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 14 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 321 of 444

other programmatic goals in order to litigate in state court. This also means that Conservancy may be restricted from challenging 404 permits.

39.     Conservancy also certainly will not be able to utilize the same tools as it had under the federal regime. In state administrative proceedings, we do not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes affords. Rather, in state court, we have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses. A case before Florida's Division of Administrative Hearings ("DOAH") can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time. With our limited budget, one permit challenge in state court could eat up a significant portion of the policy department's budget. In order to engage in such costly litigation we would have to 1) raise additional money to fund these challenges, 2) pull funds from other areas within our existing operating budget, or 3) forego certain litigation, as funding is not included in our budget. All three options would damage our ability to carry out our mission.

40.     It is my understanding that Conservancy would also risk exposure to a mandatory "fee-shifting" provision in which we risk being liable for the costs and fees to engage in litigation, costs, and fees that we would not automatically be subject to if we retained the ability to litigate in federal court. Such a fee-shifting provision further diminishes our ability to engage in litigation, because we are required to weigh this financial risk in addition to the above costs, regardless of how strong our claim might be.

41.     It is also my understanding that it would be significantly harder for Conservancy to even bring a permit-specific lawsuit for environmental harms on behalf of our members,

JA.307

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 15 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 322 of 444

because we would be required to show harm to a significant number of our members under
Florida law, rather than to just one member under federal law.

42.   The lack of procedural safeguards, and in turn, a weaker system for evaluating
and testing the environmental impacts of permitting, also significantly increase the risk of harms
to Florida's water resources, species, and their habitats, environmental harms that are felt
personally by me as a member of Conservancy and a long-time resident of Naples.  I regularly
partake in outdoor activities such as hiking, camping, observing wildlife, and nature
photography.  Some of the areas that I like to visit include, but are not limited to, Big Cypress
National Preserve, Fakahatchee Strand Preserve State Park, Picayune Strand State Forest, Collier
Seminole State Park, Florida Panther National Wildlife Refuge, Corkscrew Regional Ecosystem
Watershed's Corkscrew Marsh, Bird Rookery Swamp and Flint Pen Strand, Corkscrew Swamp
Sanctuary, Stormwater Treatment Area 5, Babcock Ranch Preserve, Fisheating Creek,
Okaloacoochee Slough State Forest and Spirit of the Wild Wildlife Management Area, and
county owned conservation properties such as those in Collier and Lee counties.

43.   If Florida is allowed to continue operating this unlawful 404 program,
Conservancy would be irreparably harmed in its ability to carry out its mission of protecting
native and endangered species, their habitats, and waters.

**Organizational and Membership Harms From Pending Project Application**

44.   The Conservancy is particularly concerned about certain permit applications
before the State[1] for major projects.

---

[1] https://depedms.dep.state.fl.us/Oculus/servlet/login and
https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal.

JA.308

45.    **Troyer Mine.**  According to DEP's online search portal, the Corps transferred a

404 permit application by Troyer Brothers Florida, LLC, for construction and operation of a lime

rock and fill dirt mine, to the State, in state application number 0292013007.  The proposed

project includes the extraction of approximately 256,000 cubic yards of crushed lime rock from

the project site.[2]  The project was withdrawn March 1, 2022 and later resubmitted March 31,

2022 with the state application number of 0292013008.

46.    Troyer Mine would cover 1,803.51 acres and would affect waters that are part of

the Big Cypress Swamp Watershed.  The project site is within the consultation areas for several

endangered and threatened species, including the Florida panther, bonneted bat, red cockaded

woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail

kite, and the Florida scrub jay.  Additionally, the site has suitable habitat for the threatened

eastern indigo snake and wood stork.  Other listed species observed on the site include the bald

eagle, Florida sandhill crane, roseate spoonbill, limpkin, little blue heron, snowy egret, tricolored

heron, white ibis, American alligator, and Big Cypress fox squirrel.  The project is also within

three wood stork colony Core Foraging Areas.  *See* Dkt. No. 031-1, at 130-153 (Exhibit G,

Public Notice, Permit Application No. SAJ-2008-03793).

47.    While the application for Troyer Mine was pending before the Corps,

Conservancy submitted public comments opposing the project.  *See* Dkt. No. 031-1, at 154-66

(Exhibit H).  Ninety percent of the project site is in Florida panther Primary Zone habitat,

meaning it is habitat essential for the continued survival and recovery of the species.  This

project site is about 90% Primary Zone and Adult Breeding Habitat for the Florida panther.  Due

---

[2] State 404 File for Troyer Mine: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-
documents/ST404_292013/gis-facility!search.

to the proposed placement of the mine between two public lands and important panther habitat, linkages will be fragmented. Expert review prepared for the FDEP Public Notice by Dr. Robert Frakes in August 2022 identified that Troyer Mine is the major current link for panthers to access habitat east of the mine, which includes large segments of panther habitat. Cumulatively with other proposed projects currently being reviewed by the state of Florida, about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost.

48.     Vehicular collisions are the leading cause of known deaths for the Florida panther. Troyer Brother's proposed project would result in at least 1,160 daily truck trips to or from the site, adding heavy traffic to already deadly roadways for panthers.

49.     Troyer Mine would also likely destroy 172 acres of wetland that are part of regional flowways, or connected strands of water that comprise a wetland ecosystem within the Density Reduction Groundwater Resource Area of Lee County, a large area of protected wetlands, agricultural lands, and conservation lands. This area includes preserved lands of Imperial Marsh Preserve, Corkscrew Regional Mitigation Bank, and Southwest Florida International Airport mitigation lands. Wetlands in this area are critical to preserving aquifers and water supply for Lee County and surrounding areas; for example, water from rain runoff naturally flow to and re-charge the aquifers. These wetlands also provide panther habitat. As explained in our attached Comments (*See* Dkt. No. 031-1, at 154-66 (Exhibit H)), the mining project would likely impact evaporation rates of water supply due to seepage from wetlands into the mines, resulting in a lower water table, with the potential for adjacent wetlands to be drained as a result.

50.     For the state 404 program, within 10 days of a completeness determination, DEP must provide public notice of the proposed application, which opens a 30-day comment period

JA.310

for most permits that is extended to the close of any public meeting, if one is held.  If EPA does

not comment or signal it may comment or object, FDEP generally has 60 days from the close of

the comment period (or its determination that the application is technically complete) to make a

final permit decision.  If a request for additional information is issued, applicants have 90 days to

respond, though, they may respond sooner.

51.     Troyer Mine went to public notice twice (on November 5, 2021, after the

application was first before the State, and on July 8, 2022, after the application was resubmitted).

At neither junction were proposed permit conditions to address federally-listed species made

available either in Oculus or in the Public Notice.

52.     Despite the potential impacts to listed species, including the Florida panther, the

July 2022 Public Notice stated that "The Department has requested review from the Florida Fish

and Wildlife Conservation Commission (FWC) and the US Fish and Wildlife Service (USFWS).

FWC and USFWS contacted the Department to notify us that they did not have any comments

regarding the ST404_292013-008 application."  In July, Conservancy reached out to FDEP,

EPA, and USFWS with concerns about the apparent lack of technical assistance.  At first,

USFWS was uncertain as to their review status and the status of the project.  Later, USFWS staff

stated that (contrary to the public notice) their technical assistance was not yet complete, and that

the agency would request more time to review this large project.  The USFWS stated that they

had started to work on terms and conditions, but that these were never sent to the State.  We are

concerned that this important project may well have slipped through the cracks if not for our

advocacy.

53.     If the Troyer Mine permit is granted, Conservancy's ability to challenge the

permit and harms that result from the project will be severely constrained by inadequate and

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 19 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 326 of 444

costly state procedures (including restrictive standing requirements, costly litigation

requirements because of the need to retain expert witnesses, and the potentially devastating risk

of mandatory fee-shifting laws), that are not comparable to the processes or remedies available

under federal law.  Conservancy will also be harmed from not having had access to information

about the project's impacts that would have been generated through NEPA review and Section 7

of the ESA.

     54.    In addition to harming Conservancy's organizational interests, the Troyer Mine

project would be located approximately three and a half miles away from the public lands I

enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike,

camp, and observe the wildlife listed above.  Panthers require huge swaths of territory for

roaming, foraging, and breeding, can have ranges over 200 square miles, and can travel 12 or

more miles a day.  I visit Corkscrew for a near-annual camping trip with friends, and I plan to

return here as often as possible.  Environmental harms from Troyer Mine, including harms to

essential species habitat, would negatively impact my ability to enjoy these lands and observe

wildlife.

     55.    **Rural Lands West.**  According to FDEP's online search portal, the 404 permit

application for Rural Lands West was transferred to the State, in state application number

0396966001.[3]  Interestingly, Corps personnel advised Conservancy that this 404 application was

transferred to the State as of December 21, 2020, a day before EPA published notice of its

approval of the state program.

---

[3] State 404 File for Rural Lands West:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396966/gis-facility!search.

JA.312

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 20 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025    Page 327 of 444

56.     Collier Enterprises Management, Inc., seeks this permit to develop approximately 4,000 acres in the Big Cypress Drainage Basin.  This drainage basin includes critical wetland ecosystems such as Shaggy Cypress, Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand, which are proximate or downstream to this proposed project.  Rural Lands West is a project to clear, grade, excavate, dredge, and fill to construct and maintain a mixed-used development consisting of two golf courses; a commercial town center; an elementary, middle, and high school; and residential neighborhoods with roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure.  The project would discharge 196,217 cubic yards of fill into 98.25 acres of jurisdictional wetlands and 1,360 cubic yards of materials into 0.68 acre of isolated wetlands in the watershed for the Big Cypress Drainage Basin.  Approximately 27,820 cubic yards of materials would be discharged into 13.90 acres of remnant farm-field ditches.  The project also would dredge/excavate approximately 2,951,250 cubic yards of native materials from 197.45 acres of jurisdictional wetlands and 16,500 cubic yards of material from 1.1 acre of isolated wetlands.  *See* Dkt. No. 031-1, at 167-173 (Exhibit I, Public Notice).

57.     While the Rural Lands West application was pending before the Corps, Conservancy submitted comments in opposition to the project.  *See* Dkt. No. 031-1, at 174-204 (Exhibits J and K).  Conservancy owns 1.4 acres of land for conservation purposes that are approximately 1.5 miles away from Rural Lands West, and another 26 acres of land within 3 miles of the project.

58.     The project would result in approximately 10,000 new residents arriving to the area and would impact over 300 acres of wetlands.  The project falls within important regional flowways and ecosystems.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FF

59.    Regarding water resources, we additionally raised concerns that Rural Lands West would be in an impaired water body that does not meet water quality standards, particularly for nutrients or where nutrients are the pollutant.  Conservancy asked federal agencies for better hydrological analysis of the impacts of this project on downstream and adjacent wetlands.

60.    As stated in the comments Conservancy submitted to the Corps in opposition to this project, there would be 4,000 acres of impacts to panther habitat, with 75% of the project in the Primary Zone habitat.  A substantial amount of the project is also in panther Adult Breeding Habitat.  The Rural Lands West project was part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan that was being considered by the USFWS from 2010-2022 for which the Conservancy opposed, in part, due to loss of panther habitat from projects like Rural Lands West.  A draft Biological Opinion showed a statistically significant reduction in panther population viability if Rural Lands West and the other development envisioned in the HCP, such as Bellmar and Hogan West (AKA Brightshore), were approved.

61.    The Conservancy obtained expert review by Dr. Robert Frakes, who conducted an analysis of Rural Lands West in September 2022.  He found that Rural Lands West, in combination with Bellmar, would result in direct and indirect destruction of 5,680 acres (23 square kilometers) of Adult Breeding Habitat.

62.    In April 2022, Conservancy submitted comments asking the State to elevate this application as a project with a significant degree of public interest to hopefully ensure a public hearing would be provided, given the size, potential effect ton environment or public, controversial nature, and the location within the panther's primary zone habitat, bonneted bat's critical habitat, and wood stork's Core Foraging Areas.  *See* Attachment B.

JA.314

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FE

63. If the Rural Lands West permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law. Conservancy will also be harmed from not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA.

64. I would also be personally harmed by the Rural Lands West development. I regularly hike the public trails at the Florida Panther National Wildlife Refuge. The Refuge boundary is about four miles from the project site, and I plan to return as often as possible. Environmental harms from the Rural Lands West development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.

65. **Bellmar Development.** Collier Enterprises Management, Inc., applied to develop a mixed-use community that would cover about 1,700 acres within the Big Cypress Drainage Basin.[4] This drainage basin includes critical wetland ecosystems such as the Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand which are proximate or downstream to this proposed project. The project would impact about 130 acres of wetlands.

66. In October 2021 and September 2022, Conservancy submitted comments discussing the shortcomings of the alternative and cumulative impact analyses for Bellmar. *See* Attachment C (September 2022 Comments). Conservancy explained that the project would have

---

[4] 404 File for Bellmar Development: https://prodenv.depStatel.us/DepNexus/public/electronic-documents/ST404_396364/gis-facility!search.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F9-CED34385A1FF

unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources.  As it is located within a flowway and key wildlife corridor, it would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR).  It is also apparent that this project will cause jeopardy to listed species due to habitat loss, infringement of wildlife corridors, indirect impacts on adjacent preserves, and impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

67.     The Bellmar project is proposed completely within 100% Primary Zone habitat for the Florida panther, and about 80% of the site is Adult Breeding Habitat for the panther as well.  The Bellmar project was part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan (HCP) that was being considered by the US Fish and Wildlife Service from 2010-2022 for which the Conservancy opposed, in part, due to loss of panther habitat from projects like Bellmar.  A draft Biological Opinion showed a statistically significant reduction in panther population viability if Bellmar and the other development envisioned in the HCP, such as Rural Lands West and Hogan West (AKA Brightshore), were approved.  *See* Attachment C (Conservancy Comments).

68.     The Conservancy hired an expert, Dr. Robert Frakes, to conduct an analysis of Bellmar and, in combination with Rural Lands West in response to the FDEP Public Notice.  He found that these two projects would result in direct and indirect destruction of 5,680 acres (23 square kilometers) of Adult Breeding Habitat.

JA.316

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

69.     The project would likely impact lands that are part of the Florida Panther National Wildlife Refuge, where I love to regularly visit and recreate and plan to continue regularly visiting.  Conservancy also owns property about 3 miles from the proposed project site.

70.     Bellmar went to public notice on August 16, 2022.  As common in the State's public notices, there were no proposed permit conditions for listed species despite the findings that the project "may affect" and was "likely to adversely affect" the panther, bonneted bat, and eastern indigo snake.  In fact, the notice merely says that the agencies would "work with" the applicant to determine "any necessary permit conditions."  *See* Attachment D (Public Notice).

71.     On November 9, 2022, EPA stated they had no comments on the project.

72.     In 2021 and throughout 2022 and in its comments, Conservancy raised its concerns the need for traffic analyses for this project which were necessary for proper review. The State issued the Public Notice for Bellmar despite the USFWS asking in a RAI for the traffic information to be submitted, but the applicant did not provide the requested specific information. The State eventually informed Conservancy that they would request this information and that it would also hold a public hearing after receipt of the information as a last step before granting or denying the permit.

73.     In January 2023, the applicant's proposed permit conditions were submitted for review.

74.     The State has informed Conservancy that a public hearing will be set within the next couple of months.  There appears to be no further outstanding issues regarding this application before the State and a permit could issue shortly after such public hearing.

75.     Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly State procedures (including

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8B59-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 25 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 332 of 444

restrictive standing requirements, costly litigation requirements because of the need to retain

expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not

comparable to the processes or remedies available under federal law.  Conservancy will also lose

access to information about the project that would have been provided under NEPA and Section

7 of the ESA.

76.     **Immokalee Road Rural Village (IRRV)**.  27th/Pico Boulevard Limited

Partnership seeks to construct a mixed-use residential and commercial development over 2,780

acres in Collier County (application #396348-001), which would approximately result in the

discharge of 159,091 cubic yards of fill material into 32.87 acres of wetlands and 1,942,195

cubic yards of fill material into 200.64 acres of other surface waters.  The project would also

involve the excavation of approximately 179,241 cubic yards of material from over 11 acres of

wetlands.  The site is within the USFWS designated Focus Area for the Florida panther and is

within the USFWS designated consultation area for the crested caracara.  Conservancy sent a

letter seeking consideration and action on the severe panther roadkill hotspot adjacent to this

project.

77.     The IRRV project is situated near the conservation lands of Bird Rookery Swamp.

The project is located within the consultation area for the Everglade snail kite, Florida scrub-jay,

Florida bonneted bat, red cockaded woodpecker, eastern indigo snake, wood stork, Audubon's

crested caracara, and the Florida panther; there are a number of state-listed species also in the

area.  The applicant's field survey documented at least 110 gopher tortoise burrows on site, and

bonneted bat calls on the site.

78.     In April 2022, Conservancy submitted comments flagging this project to the State

given the size, potential effects on environment or public, controversial nature, and the location

JA.318

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

within the panther's primary zone habitat (675 acres within primary zone and 344 acres within adult breeding habitat) and wood stork's Core Foraging Areas. *See* Attachment B.

79.     In October 2022, Conservancy again submitted comments voicing concerns over the project in response to materials submitted by the applicant. *See* Attachment E.

80.     If the Immokalee Road development permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.

81.     I would also be personally harmed by the Immokalee Road development.  I like to hike at Corkscrew Swamp Sanctuary and Corkscrew Regional Ecosystem Watershed Bird Rookery Swamp.  The Sanctuary is about two miles from the project site, and Bird Rookery even closer, essentially across the street from IRRV. I plan to return as often as possible. Environmental harms from this development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

82.     **Old Corkscrew Plantation Mine (AKA Kingston)**.  Cameratta Companies is pursuing this large-scale development project that would span over 6,671 acres.  It had an active 404 permit application in 2011, which was withdrawn after the Army Corps determined an EIS under NEPA was necessary, and now is being considered under application #0423130-001.  The project already received its ERP for mining from FDEP in 2011, and now is being considered by the State for a new ERP consistent with this application.  Much of the project is panther habitat,

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FF

including Adult Breeding Habitat, and the project also contains Florida panther Primary Zone habitat.  The applicant would add 95,000 additional trips per day.  Expert review by Dr. Robert Frakes in August 2022 identified that Old Corkscrew (AKA Kingston) would have a substantial impact cumulatively with other proposed projects Troyer Mine and FFD; about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost directly and indirectly with these three projects.

83.     The following species have been previously documented on site, including crested caracara, Everglades snail kite, wood stork, Florida panther, Florida sandhill crane, little blue heron, roseate spoonbill, Big Cypress Fox squirrel, and Florida black bear.  The project also contains Core Foraging Area for four wood stork colonies.  This project would also be approximately one and a half miles away from the public lands I enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp, and observe wildlife.

84.     Further demonstrating the harms discussed above and below, here are additional applications before the State that Conservancy has been monitoring and has already engaged in:

a.     **Hogan West (AKA Brightshore)**.  Barron Collier is seeking a permit (application #0405559-001-NPR, 0405559-002-SFI) for this project that would convert habitat to approximately 2,300 homes and commercial development.  Of the 640-acre site, about 210 of those acres are Primary Zone panther habitat and the remainder is Secondary Zone panther habitat.  A draft Biological Opinion showed a statistically significant reduction in panther population viability if Hogan West and the other development envisioned in the HCP, such as Rural Lands West and Bellmar, were approved.  The project sits within the Corkscrew Swamp wetland ecosystem and adjacent to the Poggie Strand.  In October 2021, we notified the State and the federal agencies that the applicant was attempting to receive a

27

verification of a no permit required (NPR) determination. We did not receive a response. However, sometime thereafter, the project was resubmitted as an Individual Permit. I am concerned that the NPR may have been granted if not for our advocacy. Conservancy will continue to monitor this project due to its potential impacts to the panther.

      b. **FFD (AKA Orchid)**. FFD Land Co., Inc. is seeking a State 404 permit for a large scale development in Lee County (application #0291030-004-SFI). The application would result in over 550 acres of impact to Primary Zone panther habitat and 1,370 acres of Adult Breeding Habitat directly. Expert review by Dr. Robert Frakes in August 2022 identified that with FFD, cumulatively with other proposed projects currently being reviewed by the state of Florida for Troyer Mine and Old Corkscrew Plantation (Kingston), about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost. *See* Attachment F (June 2022 Conservancy Comments).

      85.    Conservancy has also identified and has been monitoring project developments that will likely need a 404 permit in the future:

      a. **State Road 29.** This is a project to widen State Road 29 in Collier County, and it is already beyond the beginning stages of the planning process with the Florida Department of Transportation. The State Road 29 project encompasses Florida roadkill hotspots that threaten panthers, and it is adjacent to the public lands of Big Cypress National Preserve and the Florida Panther National Wildlife Refuge. This project would be located directly adjacent to these key public lands, where I enjoy hiking and other outdoor activities.

      b. **Wilson-Benfield Road.** This is a project to extend a major roadway in Collier County, and it would be within or adjacent to the Picayune Strand State Forest. The Picayune Strand provides habitat for numerous species, including the wood stork, red

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

cockaded woodpecker, Florida black bear, Florida panther, and others. This roadway may impact important downstream resources, fragment wildlife habitat, and alter hydrological connections. This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects. Collier County is currently engaged in the alignment selection process. I live about 1.5 miles way from this project area, and enjoy recreation, such as hiking and wildlife observation, in the Picayune Strand State Forest and plan to continue doing so as often as I can.

c. **I-75 Interchange near Everglades Blvd**. This is a project to construct a new interchange on I-75 in Alligator Alley. An interchange in this area would increase development in Golden Gate Estates and the Rural Lands Stewardship Areas. These areas provide habitat for wildlife such as Florida black bears and Florida panthers, among other species. This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects.

d. **Eden Oak Development**. This is a project to develop a 55-home community on 306 acres along the Caloosahatchee River. The project was previously pending with the Corps starting in 2012, it would have impacted at least 35 acres of mangrove and salt marsh, and it was within smalltooth sawfish critical habitat and Florida manatee critical habitat. The wetlands within this site were recognized by agencies as Aquatic Resources of National Importance. The developer has an active application for development at the local level. We

29

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

do not know definitely yet, as no 404 application has been submitted, if this project would be in solely assumed waters that would be processed by FDEP or if the project would be retained by the Army Corps.

86.     A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Conservancy's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress Conservancy's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of February, 2023.

DocuSigned by:
50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

JA.323

# ATTACHMENT A

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

**CONSERVANCY**
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life … now and forever.*

January 10, 2022                                                    sent via email

John Truitt, Deputy Secretary for Regulatory Programs
Florida Department of Environment Protection
3900 Commonwealth Boulevard MS 15
Tallahassee, FL 32399
 john.truitt@dep.state.fl.us

Jose Rivera, Supervisory Biologist
U.S. Fish and Wildlife Service
1339 20th St. Vero Beach, FL 32960
Jose_rivera@fws.gov

Jason Hight, Director
Office of Conservation Planning Services
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399
Jason.Hight@myfwc.com

Dear Mr. Truitt, Mr. Rivera, and Mr. Hight,

On behalf of the Conservancy of Southwest Florida and our more than 6,400 supporting families, we are providing comment on Babcock development, permit #0396574-001, issued on November 19, 2021, which appears to incorporate Florida Fish and Wildlife Conservation Commission (FWC) comments, recommendations, and permit conditions from a letter dated October 25, 2021.

**Listed Species Coordination**

Throughout their letter, the Florida Fish and Wildlife Conservation Commission states that they "have provided avoidance conditions" for a number of federally and state listed species.[1]  We have some questions that we hope can be clarified.  The unclear and ambiguous language was incorporated into the November 19, 2021 permit.

Further, the FWC letter states that the US Fish and Wildlife Service (USFWS) coordinated on the comments; however, questions remain about how impacts to federally-listed species were considered. Neither the letter, nor the permit, illuminates the coordination between FWC and the

---

[1] Letter from Jason Hight to Curtis Hardman dated October 25, 2021 re: Babcock Ranch Community, Florida Department of Environment Protection, State 404 Permit Application (396574-001-SFI), Lee and Charlotte Counties, pp. 3-6



Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FF

Case 1.21-cv-00119-RDM    Document 98-1    Filed 02/29/23    Conservancy of Southwest Florida    Page 33 of 128

USCA Case #24-5101        Document 2102306      Babcock Ranch Community State 404 Permit Application 36574-001 Filed: 03/28/2025    Page 340 of 444

Page **2** of **11**

USFWS, both in terms of timing of coordination and substance of the agencies' analysis and conclusions.

The state 404 program Memorandum of Agreement (MOA) stipulates that "technical assistance with the USFWS <u>will</u> be accomplished <u>prior</u> to the Public Notice, when possible. The Public Notice will include...the proposed protection measures to offset those impacts."[2] (emphasis added)  We outlined our concerns about the timing of the wildlife review in comparison to the public notice in our last comments dated September 15, 2021; the FWC letter with proposed permit conditions was only available for a matter of days before the permit was issued, and was only available well after the close of the public notice window.

Further, as illustrated below, the provided technical assistance from FWC, in coordination with USFWS, does not appear to meet the expectations presented in the USFWS Biological Opinion for the state assumed program. We do not see any information in the permit, FWC letter, or public record that assures us if and how the USFWS conducted an analysis of jeopardy/adverse modification of critical habitat for this project, or how the agency analyzed whether or not take would occur, or  if they concluded that there would be take associated with this  proposed project.[3]

This is particularly of concern, as demonstrated below, as there are significant nesting resources for the threatened crested caracara, as well as proposed critical habitat for the Florida bonneted bat that will be impacted by the proposed activities. Additionally, the USFWS has already acknowledged that there is likely to be take from this project (see Attachment A).

The agencies are to monitor and track the amount of anticipated take[4] but it is not clear to the public if there has been assessed take associated with this project; none is mentioned in the FWC letter or the permit. Instead these documents appear to further bifurcating assessment of take for the crested caracara until a later date, despite acknowledgement of 5 different pairs in active nests currently within the development footprint.[5] The USFWS 404 program Biological Opinion states that "if it is determined, though technical assistance on permit review with the State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified."[6]

Critically, the 404 program Biological Opinion does not quantify take for *any* of the species it is intending to provide incidental take coverage for. It appears to us that unless the applicant modifies

---

[2] Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, The United States Fish and Wildlife Service, and the Florida Department of Environmental Protection, 2020. August 5, 2020. P. 6.

[3] US Fish and Wildlife Service, 2020. Programmatic Biological Opinion for US Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act. P. 19-20. "This process of USFWS coordination and technical assistance operates similarly to a section 7 consultation because it has a similar objectives of 1) ensuring a State 404 permit action is not likely to jeopardize or adversely modify or destroy critical habitat, and 2) minimizing and tracking the amount of incidental take if take is reasonably certain to occur**.**"

[4] *Ibid.*

[5] FDEP, 2021. Babcock Ranch Community Phases 1 and 2, Permit No. 36574-001, November 19, 2021, P**.** 13**.** "...potential take, which is estimated to be up to five different pairs... If evidence of caracara nesting is observed….**".**

[6] US Fish and Wildlife Service, 2020**.** Programmatic Biological Opinion for US Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act. P.70.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FF

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/29/23   Page 34 of 123

USCA Case #24-5101      Document #2063009      Filed: 05/15/2024      Page 340 of 444

Conservancy of Southwest Florida
Babcock Ranch Community State 404 Permit Application 396574-001

Page **3** of 11

this permit to completely avoid listed species impacts, especially the crested caracara nests, that take will occur. Thus, it would become necessary for EPA to reinitiate consultation about the entirety of the 404 program since "the amount of extent of incidental take is exceeded."[7]

**Audubon's Crested Caracara**

Our last comment letter provides relevant background on the caracara as well as the likely impacts to caracara on the project site. We have some questions and concerns about the conditions set forth in the FWC letter dated October 25, 2021, which were incorporated into the November 19, 2021 permit.

*Condition 23.a*

This condition begins by requiring inspections of palm trees and oaks between January and April in the undeveloped portions of the BRC property.[8] What is considered the undeveloped portions of the BRC property? The mitigation areas? The phased development areas that haven't been cleared? Both? Is the applicant required to do this every year until the caracaras are either harassed into abandoning their nests or forcibly have their nests moved to allow development?

As the condition reads, up to five pairs of caracara could potentially be taken.[9] This is a lot, and appears to be based on the BRC habitat model (dated July 2020) provided to FWC and USFWS during the 404 permit review.[10] Is this document available to the public? It does not appear to be under that name (or a related name) in Oculus. We would like to review this model, and it should be part of the public record.

*Condition 23.b*

Condition 23.b states "if" caracara nesting is observed on the property, conservation measure "shall be implemented…to the extent feasible".[11] It seems clear from condition 23.a (and the map of nests produced by the applicant (Attachment B) and photos included in the Babcock Ranch Community 2020 Crested Caracara Survey (Attachments C, D, and E)) that caracara nesting is occurring on the project site. What does FWC and/or USFWS consider feasible? What does FDEP consider feasible? Is the agencies definition of feasible the same as the applicant? It seems feasible to us to change the layout of the mitigation areas to protect at least some of the caracara nests, which were requests that we made in our prior comments, provided previous to the permit being awarded.

---

[7] *Ibid.* P. 73.
[8] Permit No. 396574-001, Babcock Property Holdings LLC and Babcock Ranch Community Independent Special District, p. 12
[9] *Ibid.*
[10] *Ibid.*
[11] *Ibid.*

DocuSign Envelope ID: A49FDFD1-91B9-4E46-88B9-CED34385A1FF

Case 1:21-CV-00119-RDM   Document 98-1   Filed 02/20/23   Page 33 of 123

USCA Case #24-5101      Document #2071433      Filed: 04/25/2024      Page 342 of 444

Conservancy of Southwest Florida

Babcock Ranch Community State 404 Permit Application 396574-001

Page **4** of **11**

*Condition 23.c*

Condition 23.c states "if" nesting is discovered to contact the USFWS and FWC. Nesting is on the site. What does this condition mean? Shouldn't the technical assistance[12] referred to in the condition be happening now?

*Condition 23.d*

Condition 23.d appears to allow for take of nests. Is this an accurate reading of this condition? If this is allowing for take, why is the word 'take' not in this condition or acknowledged anywhere in the permit or in the wildlife agency's documents?

*Condition 23.h*

Please provide the rationale as to why the GPS tagging of caracara constitutes "mitigation." Typically, mitigation relates to alleviating impacts. Trapping, tagging and monitoring two adult caracaras prior to destroying their nests does not appear to fall into the typical definition of mitigation. Also, pursuant to condition 23.a, there are up to 5 pairs that could be taken. Are these one from each of two specific pairs of caracaras? If so, which ones?

**Florida Bonneted Bat**

On January 21, 2021, the USFWS noted there would be take of Florida bonneted bat (see Attachment A). The applicant's Florida bonneted bat survey found onsite locations recorded 9+ calls overnight, and noted the potential for onsite roost(s).

The agencies should consider the impact of Babcock's proposed activities on roosting, as well as foraging bats. Bailey et al 2017[13] states that bonneted bats utilize agricultural lands for a significant part of their daily life needs - foraging. That study found that bonneted bat occupancy was positively correlated with the amount of crop-based agriculture.

Because Florida bonneted bats and their proposed critical habitat were not previously considered in prior Babcock Biological Opinions, we are very concerned that the current programmatic biological opinion and technical assistance process will result in less protection and analysis for this endangered species.

*Condition 22.c*

Condition 22.c states "[i]f evidence of use by any bat species is observed during pre-construction survey, removal efforts shall be discontinued".[14] However, the last sentence of this condition indicates that after consultation with USFWS and FWC, removal of a roost tree can happen "outside of maternity season".[15] Does this mean that the take of roosts is not permitted, or just not

---

[12] *Ibid.*
[13] Bailey et al, 2017. Impact of Land Use and Climate on the Distribution of the Endangered Florida Bonneted Bat. Journal of Mammology, 98(6): 1586-1593.
[14] Permit No. 396574-001, Babcock Property Holdings LLC and Babcock Ranch Community Independent Special District, p. 11
[15] *Ibid.*

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1.21-CV-00119-RDM   Document 98-1   Filed 02/29/23   Page 58 of 123
USCA Case #24-5101          Document #2083548          Filed: 10/30/2024          Page 344 of 444

Conservancy of Southwest Florida
Babcock Ranch Community State 404 Permit Application 396574-001
Page **5** of **11**

permitted during maternity season?  What does the service define as maternity season?  Pursuant to FWC's website:

> Florida bonneted bats are thought to have a low reproductive capacity, only giving birth to one offspring per breeding season.  However, the female has the capability of going into heat many times during the year (polyestrous).  This species may have two breeding seasons each year.  Reproduction has been documented during the summer and also during January and February.[16]

Is maternity season January, February, June, July, and August?  The permit condition is too vague.

*Conditions 22 g & h*

Condition 22.g states that "widespread application of insecticides…shall be minimized to the extent feasible".[17] Condition 22.h states "[m]ature trees and snags within the preserve areas shall be maintained to the maximum extent feasible".[18]  What do FWC and/or USFWS consider feasible?  Is the agencies definition of feasible the same as the applicant?  When would maintaining a tree in a preserve area not be feasible? There are no safeguards in the technical assistance process for the environmental community or public to understand what triggers will be required of the applicant as this project goes forward.

## Florida panther

The Babcock area has long been established as an important area for panthers, particularly for northern expansion and most recently as supporting the first documented breeding north of the Caloosahatchee River since 1973.[19] Thatcher et al., 2009,[20] established that the Babcock area, including what appears to be portions of the subject property, as an important habitat patch. Similarly, the recent study Frakes & Knight, 2021, also appears to indicate this as a panther habitat suitability area.[21]

Was this new information utilized to inform agency review of the application to ensure that breeding in this area will not be diminished by Babcock's proposed activities? Did the USFWS determine that the Biological Opinion conditions that were contemplated years ago are adequate given this new information? If so, could this analysis be made public and placed on Oculus?  If not, what was the basis for agency determination that breeding in this area will not be diminished by Babcock's proposed activities?

---

[16] https://myfwc.com/wildlifehabitats/profiles/mammals/land/florida-bonneted-bat/
[17] Permit No. 396574-001, Babcock Property Holdings LLC and Babcock Ranch Community Independent Special District, p. 11
[18] *Ibid.*
[19] Florida Fish and Wildlife Conservation Commission, 2020. Assessment of the Distribution of Florida Panther North of the Caloosahatchee River. Written by Brian Kelly and Dave Onorato. August 18, 2020.
[20] Thatcher et al., 2009. Journal of Mammalogy, 90(4): 918-925.
[21] Frakes & Knight, 2021. Location and Extent of Unoccupied Panther Habitat in Florida: Opportunities for Recovery. Global Ecology and Conservation, 26, e01516.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FF

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 37 of 125
USCA Case #24-5101        Document #2060769   Filed: 04/12/2024   Page 396574-0144

Conservancy of Southwest Florida
Babcock Ranch Community State 404 Permit Application

Page **6** of 11

**Conclusion**

While we understand that the Babcock permit has already been issued, the questions raised in this letter are still timely, relevant, and in need of clarification, particularly as many of our questions would persist throughout the life of this permit.  Further, we are concerned that the problems illustrated in this letter about the technical assistance and wildlife review process could unfortunately be replicated for other major permits under FDEP and wildlife agencies' review.

We ask for your agencies' responsiveness in providing these much needed answers.  We were concerned when the state assumed section 404 permitting that protection of listed species would be compromised.  This permit reinforces our concerns.

Please note that this letter does not constitute support for the state-assumed section 404 permitting program, which we believe is unlawful.

Please add this letter to the permit file for this project.


Sincerely,

/s/                                                     /s/

Julianne Thomas                                        Amber Crooks
Senior Environmental Planning Specialist               Environmental Policy Manager
(239) 262-0304 x 252                                   (239) 776-5601
juliannet@conservancy.org                              amberc@conservancy.org

cc:
Curtis Hardman, FDEP
Cindy Owens, FDEP
Jon Iglehart, FDEP
Larry Williams, USFWS
Connie Cassler, USFWS
Bryan Phillips, FWC
Laura DiGruttolo, FWC
Josh Cucinella, FWC
Jeaneanne Gettle, US EPA
Kathy Hurld, US EPA
Megan Mills, FDEP

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FE



**Subject:** Fw: [EXTERNAL] State 404 Permit No.: 396574-001 SFI Individual Lee County/ Babcock Ranch Community
**Date:** Friday, January 15, 2021 2:53:13 PM
**Attachments:** Project Map.pdf

To Whom it May Concern,

The Service plans on providing some comments in the future based on conversations we had with the Applicants when the project was with the Corps.  I tried to use the link in the DEP email to look at the permit application.  When I did that, the website told me "There are no documents that meet your criteria."  Can you please send a working link so I can look at the permit application?

Will the website also tell me who the FWC reviewer is?  If not, can you please let me know who that is?

We know there will be take of Florida bonneted bats.  Also, we are waiting on a 2021 caracara survey from the applicants.  We will have additional comments later in the process.

Connie

Constance L. Cassler, Ph.D.
Supervisory Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, Florida  32960
office:  772-469-4243
Fax:  772-562-4288
email:  constance_cassler@fws.gov

Follow us on Twitter @USFWSVERO
Follow us on Facebook@USFWSSouthFlorida
Follow us on InstaGram @usfws_south_florida
Visit our website at www.fws.gov/verobeach/

Note:  All email correspondence and attachments received from or sent to me are subject to the Freedon of Information Act (FOIA) and may be disclosed to third parties.



*Attachment B*

Babcock Ranch Community
Lee and Charlotte Counties, Florida

JOHNSON ENGINEERING

July of 2020 Caracara Nest Locations and USFWS Restriction Zones
(Overlay on 2010 Preserve Configuration)

DocuSign Envelope ID: A49FDFD1-91B9-4E46-8859-CED34385A1FE

*Attachment C*

SITE 4



Adult feeding fledgling near nest tree in Site 4 on January 29, 2020.



Fledgling perched near nest tree in Site 4 on January 30, 2020.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88E9-CCD34385A1EE

*Attachment D*



SITE 6

Fledgling perched in nest tree in Site 6 on February 25, 2020.



Two fledglings foraging on the ground in Site 6 on March 10, 2020.

DocuSign Envelope ID: A49FDFD1-91B9-4E46-8859-CCD34385A1EE

*Attachment E*





Adult on nest in Site 8 on April 13, 2020.

JA.335

DocuSign Envelope ID: A49FDFD1-91B9-4E45-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 43 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 350 of 444

# ATTACHMENT B

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

*Protecting Southwest Florida's unique natural environment and quality of life … now and forever.*

April 8, 2022                                                                                              sent via email

Jennifer Smith, Chief of Staff
South Florida Water Management District
3301 Gun Club Road
West Palm Beach, FL 33406
Jsmith@sfwmd.gov

Megan Mills, Permitting Administrator
Florida Department of Environmental Protection South District
PO Box 2549
Fort Myers, FL 33902-2549
Megan.Mills@FloridaDEP.gov

Dear Ms. Smith and Ms. Mills,

On behalf of the Conservancy of Southwest Florida and our more than 6,400 supporting families, we are writing to identify projects we believe deserve elevation by the Florida Department of Environmental Protection (FDEP) and/or South Florida Water Management District (SFWMD) to projects of heightened public concern and warranting expanded public opportunities to comment.

The Conservancy believes that these projects merit being elevated as each of them will have substantial and severe impacts to the environment, if approved.

Both FDEP and SFWMD (under the Environmental Resource Permit process), and FDEP (with the 404 program), allow for projects to be flagged for public meetings if there is public interest in the proposed project. The ERP handbook states that projects of large size, potential effects on the environment or public, a controversial nature, and/or impact on the conservation of wildlife and their habitats can result in a project being flagged as of "heightened public concern."[1]

Further, the ERP handbook also lays out the criteria for the public interest test.[2] Of particular note is Section 10.1.1.a.2, which states that an applicant must provide reasonable assurance that the proposed activity will not adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats. We contend that destruction and/or fragmentation of species habitat is an adverse impact from the projects detailed herein, thereby not only failing the public interest test (and perhaps other permit criterion regarding impact to listed species and wildlife), but also qualifying as a project of heightened public concern.

---

[1] FDEP, Environmental Resource Permit Applicant's Handbook, Vol. 1, Section 5.5.2.3.
[2] FDEP, Environmental Resource Permit Applicant's Handbook, Vol. 1, Section 10.1.1. (As referenced in rule 62-330.302, F.A.C.).



Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way | Naples, Florida 34102 | 239.262.0304 | Fax 239.262.0672 | www.conservancy.org

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FF

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 49 of 123

USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 49 of 123

Conservancy of Southwest Florida
Projects of Heightened Concern
Page **2** of 5

For FDEP, there is a webpage titled "Projects of Heightened Public Concern" in which "Selected Environmental Resource Permit Application and/or Agency Action" are listed. [3]  The following projects with FDEP ERP or state 404 applications should be added to this webpage.

For pending ERP projects before the SFWMD, we ask that you reinstate your regular regulatory meetings.[4] These meetings began as a result of 2009 changes to the Florida Statutes to provide continuing public engagement in the permitting process, but meetings were suspended in 2020. At these meetings, projects of heightened public concern were a standing agenda item for which members of the public could provide comments.

The projects below meet the criteria listed on the webpage and in the rules based on their size, potential effect on the environment or the public, potential controversial nature, and the location of the activities. They should be elevated to project of heightened public concern, be reviewed for compliance with the public interest test and other permit issuance criterion regarding impacts to endangered species and wildlife habitats.  We ask that a public meeting be made available for citizens to share their concerns prior to the agency permitting these projects.

Inclusion on these lists will allow for additional public engagement by making it easier for the public to track and learn about these projects.  We believe that input from the public and concerned parties should be a priority for FDEP and SFWMD.  After all, these projects, as seen in Figure 1, will change the landscape and future of the area –the trajectory of species survival and recovery- if approved. The Conservancy requests the agencies elevate the below identified applications[5].

- Bellmar, Collier County – 404 Application #396364-001 (& any future ERP construction/operation permit application)
    - Bellmar will destroy 1,700+ acres located entirely in Primary Zone panther habitat.
    - Over 130 acres of wetlands would also be destroyed.
    - The location is only about 1 mile away from the Florida Panther National Wildlife Refuge (FPNWR). Refuge manager shared concerns about the development's secondary and cumulative impacts on the Refuge.
    - The project proposes to impact caracara nest in the center of the parcel.
    - More than 650 letters expressing concern about this project have been submitted to FDEP from citizens and organizations.
    - Bellmar is located in proposed critical habitat for the Florida bonneted bat.

- Rural Lands West, Collier County – 404 Application #396966-001 (& any current or future ERP construction/operation permit applications such as ERP application #220107-32645)
    - Rural Lands West would impact about 4,500 acres, and a majority of the site is Primary Zone panther habitat.
    - Over 300 acres of wetlands would be destroyed.

---

[3] Accessed at <https://floridadep.gov/south/sd-permitting/content/projects-heightened-public-concerns>.
[4] Accessed at <https://www.sfwmd.gov/doing-business-with-us/rules.>
[5] ERP and state 404 applications by Burnett Oil for new projects at Nobles Grade and Tamiami Prospect within the Big Cypress National Preserve are projects of concern and when they resubmit, we ask that their application be elevated.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FE

Case 1:21-CV-00119-RDM   Document 98-1   Filed 02/28/23   Page 46 of 123

USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 353 of 444

Conservancy of Southwest Florida
Projects of Heightened Concern

Page **3** of 5

- o The southern end of the development impact footprint is located in proposed critical habitat for the Florida bonneted bat.

- o Rural Lands West is also within 5 wood stork colony's Core Foraging Areas.

- o Concerns about impacts from Rural Lands West have been expressed by FPNWR.

- o The project is adjacent to and within the Camp Keais Strand flowway that feeds the FPNWR and other public/mitigation lands.

- Troyer Mine, Lee County – 404 Application #292013-008

  - o Troyer Mine is nearly 2,000 acres with a proposed mine pit of nearly 800 acres.

  - o The location is adjacent to conservation lands on the east and west sides of the project.

  - o EPA objected to the methodology/definition used by the applicant to calculate WOTUS wetland impacts in December 2021.

  - o More than 15 letters of objection asking for a public hearing were submitted from citizens, organizations, and businesses, including Sakata Seed, the adjacent landowner who will be negatively impacted by this project.

  - o Miccosukee Tribe concerns do not appear to be resolved based on public information available on FDEP Oculus webpage.

  - o The site was previously identified by Army Corps of Engineers in 2010 for NEPA Environmental Impact Statement (EIS) due to cumulative impacts in eastern Lee County. The Determination Letter by the ACOE stated concerns for public drinking water resources, infrastructure and traffic safety, conservation lands and mitigation lands adjacent or nearby the mine, as well as impacts to water resources, hydrology, flowways, and wildlife habitat.

  - o Troyer Mine will impact 3 wood stork Core Foraging Areas.

- FFD, Lee County – ERP Application #211005-7746 and 404 Application #291030-004

  - o FFD would impact more 2,500+ acres.

  - o The project is bounded on three sides by conservation and mitigation lands that could be negatively impacted by development.

  - o The proposed impact area is in Primary and Secondary Zone panther habitat.

  - o The site was previously identified by the Army Corps of Engineers in 2010 for an Environmental Impact Statement due to cumulative impacts in eastern Lee County.

- Immokalee Road Rural Village, Collier County – ERP Application #211201-32383 and 404 Application #396348-001

  - o The project is nearly 3,000 acres, with over 1,000 acres slated for impacts.

  - o Immokalee Road Rural Village would impact over 240 acres of wetlands and other surface waters.

  - o There are 675 acres of panther Primary Zone & 344 acres of Adult Breeding Habitat on site.

  - o Immokalee Road, adjacent to the project, is a panther-vehicle collision hot spot with 8 recorded deaths, along with several black bear deaths.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FF

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 47 of 123
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025

Conservancy of Southwest Florida
Projects of Heightened Concern
Page **4** of 5

- o There are 113 gopher tortoise burrows on site and the threatened eastern indigo snake is a potential commensal species.

- o The project will impact 5 wood stork colonies Core Foraging Area.

While there are many other projects we are tracking, these projects are the ones that we presently believe should have heightened awareness and be brought to the attention of the public.

Please let us know if you would like additional information about these projects as you consider our request.

Sincerely,

Julianne Thomas                              Amber Crooks
Senior Environmental Planning Specialist     Environmental Policy Manager
(239) 262-0304 x 252                          (239) 776-5601
juliannet@conservancy.org                     amberc@conservancy.org


cc:
Shawn Hamilton, FDEP
Melissa Roberts, SFWMD
Laura Layman, SFWMD

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1EE

*Figure 1*


Date: 2/1/2022







JA.341

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8B59-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 49 of 123
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 356 of 444

| | |
|---|---|
| **From:** | Mills, Megan |
| **To:** | SD-ERPcomments |
| **Subject:** | FW: Projects of Heightened Public Concern |
| **Date:** | Monday, April 11, 2022 8:06:40 AM |
| **Attachments:** | CSWFLProjects of Heightened Public Concern.pdf |

Please insert to Oculus under DEP Files:

ST404 Program Catalog

396364

396966

291030

396348


Note the Troyer Mine project is not our 404 and will be handled by Mining and Mitigation.


Sincerely,

Megan


**From:** Julianne Thomas <JulianneT@conservancy.org>
**Sent:** Friday, April 8, 2022 5:38 PM
**To:** Smith, Jennifer <jsmith@sfwmd.gov>; Mills, Megan <Megan.Mills@dep.state.fl.us>; Laura Layman <llayman@sfwmd.gov>; Melissa Roberts <mroberts@sfwmd.gov>; Hamilton, Shawn <Shawn.Hamilton@FloridaDEP.gov>
**Cc:** nicole johnson <nicolej@conservancy.org>; Amber Crooks <amberc@conservancy.org>
**Subject:** Projects of Heightened Public Concern

**EXTERNAL MESSAGE**
This email originated outside of DEP. Please use caution when opening attachments, clicking links, or responding to this email.

Please find attached the Conservancy of Southwest Florida's letter which identifies projects we believe deserve elevation by the Florida Department of Environmental Protection (FDEP) and/or South Florida Water Management District (SFWMD) to projects of heightened public concern and warrant expanded public opportunities to comment.


Please let me know if you have any questions or need additional information.


Julianne Thomas

Senior Environmental Planning Specialist

Conservancy of Southwest Florida

# ATTACHMENT C

  

September 15, 2022                                                                    *sent via email*

Director Martha Williams
U.S. Fish and Wildlife Service
1849 C. St. NW
Washington DC, 20240

State Supervisor Larry Williams
U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960

Regional Administrator Daniel Blackman
U.S. Environmental Protection Agency
61 Forsyth Street SW
Atlanta, GA 30303

Secretary Shawn Hamilton
Florida Department of Environmental Protection
3900 Commonwealth Blvd. MS 49
Tallahassee, FL 32399

Director Eric Sutton
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399

Re: Bellmar Development Application (Collier County) and Public Notice, #396364-001

Dear Director Williams, State Supervisor Williams, Regional Administrator Blackman, Secretary
Hamilton, and Director Sutton:

On behalf of our respective organizations and our members, the Center for Biological Diversity,
Conservancy of Southwest Florida, and Sierra Club are providing comment on the Bellmar
project proposal that is being sought under the Florida Department of Environmental Protection
(FDEP) state assumed 404 program (application #396364-001). This letter supplements our prior

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FF

correspondence on both the Bellmar project, as well as our comments provided regarding the Eastern Collier Multiple Species Habitat Conservation Plan (ECMSHCP). Please consider this letter as a request that FDEP hold a public meeting,[1] as well as a request that the US Environmental Protection Agency also hold a public meeting.[2]

We oppose authorization of this project and are asking you to deny the request for a section 404 permit because it will have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources. This controversial project is within a flowway and key wildlife corridor, would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR).

Further, it is apparent that the project will not meet the "no jeopardy" requirement of the Endangered Species Act and the state 404 permitting program, not only due to habitat loss, infringement of wildlife corridors, and indirect impacts on adjacent preserves, but also due to the impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

Not only does Bellmar fail to meet the criteria for permit issuance under rule 62-331 F.A.C. and other requirements of Florida's state assumed 404 program, but it also would be inconsistent with the Endangered Species Act (ESA).

I.    **Bellmar Cannot Be Authorized Absent an Affirmative Demonstration that the Effects of the Authorization, Considered with Regard to Cumulative Effects, Are Not Likely to Jeopardize the Florida Panther**

ESA Section 7 requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."[3] When EPA decided to allow FDEP to take over the 404 permitting, it relied on a programmatic Biological Opinion to purportedly satisfy its duties under ESA Section 7 to ensure against jeopardy.[4] Rather than analyze the impacts to species from EPA's decision, which included the effects of the permitting that would occur under the State 404 Program, that programmatic Biological Opinion relied on a structured process for technical assistance whereby the analysis would occur at the State program permitting stage instead, and would comply with the terms in the programmatic Biological Opinion, deferring the actual analysis of jeopardy. To comply with the programmatic Biological Opinion, the agencies must now consider all the indirect, direct, and cumulative effects of Bellmar and other reasonably foreseeable development to ensure the project will not jeopardize listed species, including the Florida panther. As outlined below, because these effects, when added to the environmental baseline, are likely to jeopardize the Florida panther, the agencies cannot authorize Bellmar.

---

[1] 62-331.060, Florida Administrative Code.
[2] 62-331.052, Florida Administrative Code.
[3] 16 U.S.C. § 1536(a)(2).
[4] CSWF, CBD, Sierra Club and others are currently challenging the lawfulness of that approach in court, and in no manner waive the claims, issues, or arguments raised in that litigation.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FF

A.  **The agencies must consider the impact of the Bellmar project with the cumulative effects of other reasonably foreseeable development that will be authorized under the State 404 program and will affect ESA-listed species and habitats in the areas affected by the Bellmar project.**

The "no jeopardy" conclusion in the Biological Opinion for EPA's approval of the Florida State 404 program (404 Programmatic BiOp) relies on the "structured process" established pursuant to the Memorandum of Understanding (MOU) between FDEP, the Florida Fish and Wildlife Conservation Commission (FWC), and the U.S. Fish and Wildlife Service (FWS) to avoid jeopardy,[5] which characterizes that structured process as being "as protective" as ESA section 7 consultation.[6] For that to be the case, the jeopardy determination for any given permit would have to consider the effects of the permitted activity cumulatively with other reasonably foreseeable non-federal actions, which here would necessarily include other reasonably foreseeable State 404 permits affecting the same area affected by the permit at issue.

An ESA section 7 analysis of effects would require consideration of cumulative effects. ESA regulations state, "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."[7] "Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."[8] Effects include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action."[9] "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[10]

With regard to how cumulative effects will be considered in making the effects determinations pursuant to the "structured process," the 404 Programmatic BiOp states: "The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[11] The BiOp states that State 404 permit applications must include: "Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably

---

[5] U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act (hereafter "404 Programmatic BiOp"), at 68–69.
[6] 404 Programmatic BiOp at 56.
[7] 50 C.F.R § 402.02.
[8] 50 C.F.R § 402.02.
[9] 50 C.F.R § 402.02.
[10] 50 C.F.R § 402.02.
[11] 404 Programmatic BiOp at 20. *See also id.* at 25 ("The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.").

certain to occur within the project area."[12] It defines "project area" to mean: "a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones," but specifies that, "In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas."[13]

With regard to how jeopardy will be evaluated as part of the "structured process," the 404 Programmatic BiOp states that, "the USFWS's project-specific, species-specific, review of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[14] "Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur."[15]

Reasonably foreseeable activities requiring authorization under the State 404 Program seemingly are non-federal actions, and therefore in making jeopardy determinations for each State 404 Program permit, their effects in the area affected by the permit application at issue must be considered as cumulative effects and added on top of the baseline when considering whether the effects of the permit are likely to cause jeopardy.

The cumulative impacts proposed by this applicant and others, which are pending or otherwise reasonably foreseeable, are extreme. These impacts include, but are not limited to, the 45,000 total acres of mining and development that were pursued under the ECMSHCP for over twelve years.

As of the date of this letter, Rural Lands West (about 4,000 acres), Bellmar (about 1,790 acres), and Hogan West (640 acres)[16]—approximately 6,430 acres of the remaining 39,973 acres unpermitted but previously considered under the ECMSHCP—are now pending before the FDEP state 404 program. Additionally, the Barron Collier Rod and Gun Club, an approximately 895-acre project that proposes impacts within the ECMSHCP development and "preserve" area, including golf courses, shooting ranges, and residential estates within a panther corridor, was recently active with FDEP for verification that no state 404 permit was needed.[17] In their withdrawal letter, the applicants state that they soon intend to apply for the FDEP state 404 permit.

---

[12] 404 Programmatic BiOp at 16.

[13] 404 Programmatic BiOp at vii.

[14] 404 Programmatic BiOp at 66 (discussing cumulative effects of EPA assumption decision).

[15] 404 Programmatic BiOp at 21.

[16] Of Rural Lands West's impact acres, 3100 acres are with Primary Zone panther habitat. All of Bellmar is within the Primary Zone. Of Hogan West's (AKA Brightshore) impact acres, 211 of these acres within Primary Zone. The remainder of these projects are within Secondary Zone panther habitat.

[17] Barron Collier withdrew its request for FDEP's action on May 20, 2022, stating that "we intend to apply for a SFWMD ERP and FDEP 404 permit later in the summer."

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 55 of 123
USCA Case #24-5101      Document #2102936      Filed: 04/26/2024      Page 363 of 444
Bellmar 404 Application 3/2022
Page 5 of 42

Therefore, projects put forth in the ECMSHCP are reasonably foreseeable and thus must be considered by FDEP under the cumulative impacts analysis. It is clear, by advancing the Rural Lands West and Bellmar projects with the U.S. Army Corps of Engineers' 404 program and now the state-assumed 404 program, that the landowners intend to pursue their developments regardless of whether the ECMSHCP is completed. Moreover, since the 404 Programmatic BiOps purports to provide authorization for incidental take to State 404 permittees, it is reasonably foreseeable that the other developments under the Covered Activities will proceed via the State 404 program.

Additional developments, not covered by the now-withdrawn ECMSHCP but located within the same critical panther areas, are also under consideration by FDEP. The Immokalee Road Rural Village is adjacent to Hogan West and the ECMSHCP boundary. The project is 2,780 acres, with 676 acres that are Primary Zone panther habitat and the remainder Secondary Zone panther habitat. It is situated between the 7,000+ acre Bird Rookery Swamp and the Collier County Panther Walk Preserve, as well as the state protected lands of the Corkscrew Regional Ecosystem Watershed (CREW). The wetland ecosystems constitute travel ways for large mammals, and the project site is adjacent to one of the deadliest areas for Florida panthers. The proposed project includes the construction of a rural village on a 2,787-acre site within the Rural Fringe Mixed Use area of Collier County. Per the applicant's 404 permit application, the proposal includes a mixed-use development consisting of residential, commercial uses, and civic/institutional, with associated infrastructure, amenities, and stormwater management system. The applicant proposes to construct over 4,000 residential units: 2,842 single family residential homes and up to 1,200 multi-family residential units.

Eastern Lee County, adjacent to the ECMSHCP boundary, has also experienced extreme development pressure. The projects known as FFD, Troyer Mine, and Kingston (FKA Old Corkscrew Plantation) would directly destroy 2,573 acres of Primary Zone panther habitat, and directly and indirectly impact about 7,400 acres of Adult Breeding Habitat for panthers.[18]

| Project[19] | Homes | Residents | Panther habitat | Primary Zone | Wetland direct |
|---|---|---|---|---|---|
| Rural Lands West | 5,100 | 10,496 | 4,000 ac | 3,100 ac | 311 ac |
| Bellmar | 4,132 | 8,683 | 1,790 ac | 1,790 ac | 135 ac |
| Collier Rod and Gun Club | 225 | 583 | 895 ac | 895 ac | TBD |
| Hogan West | 2,000 | 4,893 | 640 ac | 211 ac | 21 ac |
| Immokalee Road Rural Village | 4,042 | 9,874 | 2,780 | 676 ac | 244 ac |
| Troyer Mine | 0 | 0 | 907 ac | 841 ac | 214 ac |
| Kingston | 10,000 | 25,800 | 6,676 ac | 1,177 ac | 12 ac |
| FFD | 5,208 | 13,436 | 2,596 ac | 555 ac | 79 ac |
| **Totals** | **30,707** | **73,7652** | **20,284 ac** | **9,245 ac** | **1,016 ac** |

[18] Conservancy of Southwest Florida, August 2, 2022. Letter to FDEP, FWC, and USFWS regarding Troyer Mine state 404 permit, citing modeling analysis by Dr. Robert Frakes.
[19] Selection of state 404 applications. Estimates based on best available information at time of drafting this letter.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34365A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 56 of 123
USCA Case #24-5101      Document #2102936      Filed 06/06/2024   Page 56 of 123
Below for 4242 application #396364-0044
Page **6** of **42**



Date: 9/9/2022

Additionally, Florida Power and Light Beautyberry Solar Energy Center is a proposed approximately 2,200-acre project located in Primary Zone panther habitat in Hendry County.[20] A proposed widening of State Road 82 would widen SR 82 for 23 miles to expand the road from two lanes to four lanes (and ultimately, to six lanes) through Lee, Hendry and Collier Counties. The segment between the Collier County line and Gator Slough is under review by FDEP for a proposed state 404 permit. The continuous flow intersection at the center of the first of seven parts of this project is expected to average about 2,700 cars per hour, more than a conventional intersection can handle. The road runs north of and adjacent to important public lands and panther habitat such as the Wild Turkey Preserve, Corkscrew Mitigation Bank, and Pepper Ranch Preserve.[21] Daniel's Parkway South is a proposed mixed-use development in the DR/GR area of Lee County requesting 1,600 residences and 350,000 sq ft of commercial development on 1,233 acres. Of those 1,233 acres, 944.5 acres are primary panther habitat. There is also a proposal to widen 18 miles of SR 29 from Collier County to Hendry County from the existing two lanes to four lanes. Traffic volumes on SR 29 are projected to increase from 6,200 vehicles per day to 23,800 vehicles per day by the year 2035. The road widening project is adjacent to or

---

[20] FDEP Oculus file for application #419224-002.

[21] WFTX Digital Team, New Continuous Flow Intersection now open in Lehigh Acres (Jul. 9, 2019 6:37 AM), https://www.fox4now.com/news/local-news/continuous-flow-intersection-now-open-in-lee-county; Florida Department of Transportation, State Road (SR) 82 from Hendry County Line to Gator Slough Lane, Collier County Resurface/Add Lanes Financial Project No. 430848-1-51-01(last visited Jul. 15, 2021), http://www.swflroads.com/sr82/hendrytogatorslough/; No. 9 - S.R. 82 From Lee Boulevard to 40th Street, Roads & Bridges (last visited July 15, 2021), https://www.roadsbridges.com/no-9-sr-82-lee-boulevard-40th-street; FDOT, Project description, Project ID 425841-3, http://www.sr82design1.com/ (last visited Jul. 15, 2021).

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FE

near major public lands and habitat.[22] Additionally, a proposed widening of Snake Road in Hendry County would involve approximately eight miles that cross an important wildlife corridor connecting the Big Cypress National Preserve to public and private lands in southeast Hendry County and the southwest corner of Palm Beach County.[23]

Notably, lands within the action area of the Bellmar project have already been eaten away by development over recent years, particularly in eastern Lee County. Though we highlight just a handful of projects here, the habitat losses have been substantial. Wildblue Residential Development (2015), Corkscrew Crossing (2018), The Place (FKA Corkscrew Farms) (2016), Verdana Village (2020), and Hyde Park (2020), have resulted in 11,600 acres of panther habitat loss.[24] The agencies must consider the impacts of the current proposal and reasonably foreseeable development combined with the impacts of these developments.



[22] Florida Department of Transportation, SR 29 - SR 82 to County Line (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sr82tocountyline/; FDOT, SR 29 from North of New Market Road North to SR 82 (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/newmarkettosr82/; FDOT, SR 29 from CR 846 E to North of New Market Road N (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/cr846tonewmarket/; FDOT, SR 29 Design from South of Agriculture Way to CR 846 E (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/agriculturetocr846/; FDOT, SR 29 from Sunniland Nursery Road to South of Agriculture Way (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sunnilandnurserytoagriculture/; Tony Sherrard (FDOT), S.R. 29 PD&E Study From North of S.R. 82 to South of C.R. 80A (last visited Jul. 15, 2021), http://swflroads.com/sr29/northof82/Images/Hearing%20Handout.pdf
[23] Tara Backhouse, Snake Road Construction!, Seminole Tribe of Florida Ah-Tah-Thi-Ki Museum Blog (Feb. 6, 2011), https://ahtahthiki.wordpress.com/2011/02/16/snake-road-construction/.
[24] Date of US Fish and Wildlife Service Biological Opinion for each project provided.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FE

Case 1:21-cv-00119-RDM    Document 98-1    Filed 02/28/23    Page 58 of 123
USCA Case #24-5101    Document #2102936    Filed: 06/24/2025    Page 364 of 444
Bellmar Application 396364-00144
Page **8** of **42**

**B. The agencies must address FWS's prior analysis showing that the combined effects of the Bellmar project and other planned development in eastern collier county will cause jeopardy to the Florida panther.**

FWS has previously made draft determinations indicating that the effects of authorizing the Bellmar project in combination with other development in Eastern Collier County, and other reasonably foreseeable impacts, will jeopardize the Florida panther. The Bellmar project was one of multiple proposed developments from the Eastern Collier Property Owners ("ECPO") seeking an ESA section 10 Incidental Take Permit ("ITP") in reliance on their proposed Eastern Collier Multi-Species Habitat Conservation Plan ("ECPO HCP"). According to a recent statement by FWS:

> The first full draft of the HCP was received on April 22, 2015. Modifications to the original HCP were received by the Service on October 14, 2017, April 6, 2018, April 23, 2018, August 22, 2018, March 8, 2019, March 25, 2019, and September 17, 2019 (HCP Addendum). Also, a modification to the original ITP application was received on September 9, 2019.[25]

According to FWS, the ECPO applicants submitted a letter to FWS to withdraw their ITP applications on July 28, 2022.[26] While the letter indicates the ECPO applicants wish to withdraw their ITP application, it confirms that the applicants will "move forward case-by-case on [their] individual projects" within the HCP area through "project-specific reviews," with some already in that process and others "fast approaching."[27] While not explicitly stated in the letter, the project-specific reviews the ECPO applicants are referring to apparently are state-assumed Clean Water Act Section 404 permitting and associated reviews through the technical assistance process, not ESA section 7 consultations. Following the ECPO applicants' withdrawal, FWS stated that, "[a]t the time of withdrawal, the Service had not made a final determination regarding jeopardy or non-jeopardy for any of the covered species."[28] Nonetheless, FWS's analyses in publicly available draft Biological Opinions for the proposed ITPs under the proposed ECPO HCP indicate that the combined effect of the proposed ECPO developments would cause jeopardy to the Florida panther. FWS has publicly released two draft Biological Opinions dated from December 2020 and December 2021, respectively.[29] The December 2020 draft BiOp indicates that it is based on an iteration of the HCP from January 28, 2020, whereas the December 2021 draft BiOp indicates that it is based on that version of the HCP "plus subsequent addenda."[30]

---

[25] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[26] *See id. See also* Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, *available at* https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.
[27] *Id.* at 2−3.
[28] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[29] It is our understanding that there is a 2022 draft of the BiOp, but we do not currently have public access to a copy.
[30] *Compare* Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record] *to* Biological Opinion and Conference Opinion

A February 24, 2021 letter from the ECPO ITP applicants to FWS regarding the December 2020 draft Biological Opinion ("BiOp") makes clear their understanding that the draft BiOp concluded that absent additional commitments from the ITP applicants to "fund public roadway improvement projects (wildlife crossings and fencing) and 'capture' traffic within future community developments," the additional panther mortality from vehicle collisions due to increased traffic induced by the proposed developments "would cause jeopardy."[31]

Indeed, the December 2020 draft HCP BiOp makes clear that, even taking into account the proposed mitigation measures under the draft ECPO HCP, the proposed ECPO developments would result in a statistically significant increase in the risk of extinction for the Florida panther, with a net loss of 12 panthers per year at full build-out.[32] The December 2020 draft HCP BiOp found that the risk of extinction with the HCP increased to 5.7%, compared to an extinction risk of approximately 1.1% or 1.38% without it.[33] The December 2020 draft HCP BiOp then explained that to sufficiently reduce the increased risk of extinction so that it was no longer a statistically significant increase, additional mitigation measures and/or changes to the proposed developments to increase internal capture rates for traffic or otherwise reduce impacts would be required.[34] The 2020 draft HCP BiOp stated:

> If the Applicants are able to achieve a greater than 50 percent community (internal) capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. [confidence interval] of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[35]

The next paragraph in the December 2020 draft HCP BiOp indicates that a "no jeopardy" conclusion is contingent on finding that a "further net reduction of effects to *fewer than* 10 panthers per year at full build-out" will "be accomplished through the maintenance of high community (internal) trip capture, adaptive management, and the mitigative effects of actions

---

Eastern Collier Multi-Species Habitat Conservation Plan (filename DRAFT-USFWS-ECPO-full-Biological-Opinion-December-2021.pdf) (hereafter "2021 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record].

[31] "ECPO's High-Level Comments on Draft BO" at 12, transmitted to Robert Tawes Chief, Environmental Review Division, U.S. Fish and Wildlife Service, Southeast Region by Bruce Johnson, Principal, Senior Scientist , Stantec Consulting Services, as attachment to letter dated February 24, 2021. (Obtained from FWS via FOIA) [submitted with these comments for inclusion in the administrative record]; *see also* Email from Leopoldo Miranda, Regional Director, FWS, to Jack Arnold, Acting Assistant Regional Director, FWS, regarding a Revised ECPO Information Memorandum (June 5, 2019) (quoting a draft information memorandum stating, "We have also begun frank discussions with ECPO, most recently May 10 and 14, based on the Service's preliminary, internal analyses of traffic volume effects on the continued survival or recovery of the Florida panther.") [submitted with these comments for inclusion in the administrative record].

[32] Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 158–159.

[33] *Id*. at 158–159.

[34] *See id*. at 159.

[35] *Id*. at 159.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-CV-00119-RDM    Document 98-1    Filed 02/28/23    Page 60 of 123
USCA Case #24-5101    Document #2102936    Filed 06/26/2025    Page 367 of 444
Bellmar Application 39364-00144
Page 10 of 42

facilitated by the Marinelli Fund."[36] In short, the December 2020 draft HCP BiOp shows that the combined impacts of the proposed ECPO developments would cause jeopardy to the Florida panther absent additional changes to the design or additional mitigation measures to reduce the anticipated number of annual panther losses caused by implementing the proposed covered activities.

The December 2021 draft HCP BiOp similarly states:

> [O]ur PVA [population viability analysis] predicts the implementation of the HCP, in the absence of further actions to reduce the impact of the action to the panthers, could reduce the abundance of panthers across their range such that the probability of extinction is predicted to increase from 1 percent (95 percent C.I. 0.2 to 1.8 percent) to 5.7 percent (95 Percent C.I. 2.2 to 9.2 percent). When cumulative effects are added to the effects of the HCP the probability of extinction further increases to 6.6 percent (95 percent C.I. 2.3 to 10.9 percent). The probability of extinction after implementation of the HCP is statistically significantly different than baseline conditions. If the Applicants are able to achieve a greater than 50 percent community (internal) traffic capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[37]

Notably, whereas the draft HCP BiOps both state that additional panther losses must be limited to "no more than 10" per year over present levels, other portions of the draft HCP BiOps indicate that the number actually must be *fewer than* 10 over present levels to avoid a statistically significant increase in extinction risk.[38]

Just like the 2020 draft HCP BiOp, the modeling in the 2021 draft HCP BiOp finds that, even with 8 wildlife crossings *and* assuming a 50% internal capture rate for traffic, implementation of the HCP will cause a total of 12 additional panther deaths per year, 8 from vehicle collisions resulting from increased traffic induced by the HCP developments, and 4 from habitat loss and

---

[36] 2020 draft HCP BiOp at 159 (emphasis added).

[37] 2021 draft HCP BiOp at 148.

[38] *See* 2020 draft HCP BiOp at 146 ("Internal population viability analysis contingency modelling, and statistical comparison of possible thresholds found that the probability of extinction 100 years after ITP expiration of BSLR, BSLR + HCP, and BSLR + HCP + CE scenarios do not differ significantly (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are taken annually, above present.") (emphasis added); 2021 draft HCP BiOp at 133–134 ("Our analysis of these PVAs found that though there was still a difference in final abundances, the probability of extinction 100 years after ITP expiration does not differ significantly from Baseline + Sea Level Rise (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are lost annually, above present, from any cause (*e.g.,* habitat loss, roadway mortality, etc.).") (emphasis added).

degradation.[39] And both the 2020 and 2021 BiOps find that the cumulative effects of traffic induced by other non-HCP, non-federally authorized actions will cause an additional 2 panther deaths per year, even after accounting for the mitigation provided by 8 wildlife crossings.[40] In sum, both versions conclude that the additional panther deaths associated with implementation of the HCP will be 12 per year, and that such panther losses must be limited to fewer than 10 per year to avoid a statistically significant increase in the risk of extinction (i.e. jeopardy). Both versions indicate that additional changes to the proposed HCP, such as commitments to achieve internal capture of traffic greater than 50% and/or additional commitments for mitigation, would be necessary to conclude that the panther losses will be reduced to 10 or fewer.

Based on the available records, there appears to be no indication that the HCP applicants further modified their project designs or mitigation commitments to achieve the necessary reductions in the number of additional panther losses per year.[41] Consequently, the Service's draft analyses appear to indicate that, absent additional changes to the project designs to increase internal capture above 50% or commitments for additional avoidance or mitigation of impacts, the combined impacts of the Bellmar project and the other projects formerly part of the proposed HCP, will result in total panther losses that are likely to cause jeopardy to the Florida panther.

This result is especially concerning because the 2020 and 2021 draft HCP BiOps reflect multiple assumptions that result in underestimating the risk of extinction, as detailed below in section **I.C.**

### C. The 2020 and 2021 draft HCP BiOps underestimate the risk of extinction for Florida Panthers and the impacts of the HCP Covered Activities, which include the Bellmar project, on that risk.

Although FWS's analyses in the 2020 and 2021 draft HCP BiOps raise legitimate concerns that the cumulative effects of the Bellmar project and other proposed projects will jeopardize the Florida panther, even these analyses underestimate the harm to the species and the extent of projected jeopardy by relying on unsupported assumptions. To accurately and lawfully consider the direct, indirect, and cumulative effects of Bellmar on the panther and other listed species, the agencies must first address these problematic assumptions.

---

[39] *See* 2020 draft HCP BiOp at 153, lines 5444-5447; 2021 draft HCP BiOp at 142, lines 5055-5057.

[40] *See* 2020 draft HCP BiOp at 153; 2021 draft HCP BiOp at 142.

[41] In contrast to the Florida panther opinion section from the 2020 draft HCP BiOp, the 2021 draft HCP BiOp omits a paragraph indicating that a no jeopardy conclusion hinged on additional changes such as assuring greater internal capture of traffic or committing to additional impact reductions or mitigation. In its place is a paragraph indicating that instead of actually specifying the changes to the HCP necessary to ensure greater internal capture rates above 50%, or to ensure commitments to undertake specific additional avoidance or mitigation measures, the Service may have intended to rely on "adaptive management measures" added to the conditions in yet unidentified permit terms to somehow provide an avenue for additional impact reduction post-permit issuance. *Compare* 2021 draft HCP BiOp at 148 *to* 2020 draft HCP BiOp at 159. Notably, in ESA contexts, courts have found that the Service unlawfully relied on "adaptive management" in lieu of specific measures or specific criteria to ensure satisfaction of ESA standards. *See, e.g.*, *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1025–28 (9th Cir. 2011) (reliance on "adaptive management" to justify delisting grizzlies in the face of substantial uncertainty about extent of impacts on population from harmful factor was unlawful given lack of specific criteria to address that factor).

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FF

1. **In estimating extinction risk resulting from implementation of the HCP, the draft HCP BiOps assume that the developments under the HCP's Covered Activities will result in 50% internal capture, despite evidence indicating actual internal capture rates as low as 2% for proposed projects.**

In estimating the impacts to panthers from increased traffic that would be induced by implementation of the HCP, the modeling in both the 2020 and 2021 draft HCP BiOps *assumes* that the developments under the Covered Activities will have a 50% internal capture rate. That assumption was based on the assertion that "future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria" which FWS asserted "approaches 50 percent."[42] Despite adopting that assumption in the modeling, the 2020 draft HCP BiOp conceded that:

> [R]ecent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned *will achieve an internal capture rate of 2 percent* as indicated by the Applicants' planning documents. If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development proposed in the HCP, and thus the total impact the proposed developments may have on panthers. If the Applicants build communities with a lower internal capture rate, but still use the $12.5 million to construct crossings (*e.g.,* 8 crossings are constructed), we would nonetheless expect higher panther mortality due to greater traffic on existing roads (Tables 13a and 13b in Appendix I).[43]

In other words, the 2020 draft HCP BiOp conceded that, even if 8 wildlife crossings were built, its model would underestimate the actual impacts to panthers if the proposed developments under the HCP's Covered Activities did not actually achieve 50% internal capture. When paired with the reality that at least some of those proposed developments would apparently achieve a mere 2% internal capture rate, FWS clearly underestimated projected impacts for the panther. The 2021 draft BiOp similarly states:

> One of the more important assumptions made when the traffic model was produced was that future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria, which approaches 50 percent. *However, recent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned will achieve an internal capture rate of 2 percent as indicated by the Applicants' planning documents.* If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development

---

[42] 2020 draft HCP BiOp at 129; *see also* 2021 draft BiOp at 42 ("Specifically, we assumed such metrics as future housing density, number of people per dwelling, employment, and daily vehicle trips per household would be similar to what is currently exists in the Town of Ave Maria.").
[43] 2020 draft HCP BiOp at 129–130 (emphasis added).

proposed in the HCP, and thus the total impact the proposed developments may have on panthers.[44]

And the 2021 draft HCP BiOp further states:

> [I]t is possible future developments will have a lesser internal traffic capture rate, higher dwelling unit density, and higher number of residents per dwelling unit than the Town of Ave Maria, which was a template for future development proposed in the HCP when we estimated how much traffic would likely be generated on existing roadways. If this were to occur, we would expect to see greater traffic volume and effects to panthers than we have estimated in this BO.[45]

Nonetheless, neither BiOp indicated that FWS intended to provide any binding requirement that would actually ensure internal capture of at least 50%. Nor does either BiOp assert that the HCP itself provides plan components that would result in at least 50% internal capture. Instead, maintaining at least 50% internal capture is merely suggested as a conservation *recommendation*.[46] Thus, the BiOp's estimates that implementation of the HCP would result in 12 panther deaths per year, with 8 of those deaths resulting from increased traffic, are based on an assumption about internal capture that was not supported by actual internal capture rates, nor assured by any binding requirement, nor incorporated as a fixed feature of the proposed action.[47] And the PVA modeling used to reach conclusions about extinction risk from implementation of the HCP were based on the similarly assumed 12 panther deaths per year from the HCP, with 8 from increased traffic, based on the internal capture rate of 50% and 8 crossings.

Importantly, both of the draft HCP BiOps do contain analyses showing how lower internal capture rates increase the number of panther fatalities per year that would result from the HCP

---

[44] 2021 draft HCP BiOp Appendix H (Analysis of Panther Motor Vehicle Mortality) at 7 (emphasis added).

[45] 2021 draft HCP BiOp at 136.

[46] *See* 2021 draft HCP BiOp at 310 (suggesting maintaining internal capture of at least 50% as a conservation recommendation); 2020 draft HCP BiOp at 320 (same); 2020 draft HCP BiOp at 130 ("…the HCP *does not identify explicit targets for internal trip capture*, a maximum number of crossings, where they will be located, or what measures they are likely to take to maximize their effectiveness. Thus, our analysis remains confined to the assumption of 50% internal trip capture in newly constructed communities and the construction of a minimum of 8 wildlife crossings.") (emphasis added).

[47] Consequently, reliance on that assumption of 50% internal capture to reach a no jeopardy conclusion would violate the ESA because achievement of that rate was not reasonably certain to occur based on the record before FWS, and apparently was not assured by any binding requirement or component of the plan. *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008) (requiring measures relied on to reach no jeopardy conclusion be set forth in specific and binding plans). The ESA's express requirement to "insure" that agency actions are not likely to cause jeopardy, 16 U.S.C. § 1536(a)(2), plainly requires that the Services cannot reach a no jeopardy conclusion that relies on mitigation offsetting harm unless there is reasonable certainty that the mitigation will actually render jeopardy unlikely. As the Supreme Court has recognized in construing section 7(a)(2), "To 'insure' something…means '[t]o make certain, to secure, to guarantee (some thing, event, etc.).'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (quoting appellate court, in turn quoting Oxford English Dictionary 1059 (2d ed.1989)). The plain text of the Act therefore requires that the Service cannot issue a no jeopardy conclusion unless the action agency has indeed made it certain, secured, or guaranteed that mitigation relied upon to avoid jeopardy will actually occur.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 64 of 123
USCA Case #24-5101      Document #2102936       Filed 06/24/2025   Page 395 of 444
Bellmar 404 Application 396364-00144
Page 14 of 42

developments at a given number of wildlife crossings.[48] That analysis indicates, for example, that assuming 8 wildlife crossings added by the HCP, an internal capture rate of 30% would add approximately three more panther deaths per year than an internal capture rate of 50%.[49] That analysis also shows how the total number of panther fatalities from the HCP and cumulative effects would change with lower internal capture rates.[50]

However, the BiOps do not include any modeling to estimate the extinction risk from the HCP associated with internal capture rates under 50%. This is critical where, to the extent the applicants are working to increase the internal capture rate by merging Bellmar into the larger Rural Lands West project, there is no data to suggest it would reach the 50% threshold set forth in the draft HCP BiOps.

Consequently, in evaluating whether the Bellmar project, considered with the cumulative effects of other reasonably foreseeable state and private actions (such as the other former HCP projects and the cumulative effects in the draft HCP BiOps), will likely cause jeopardy to the Florida panther, the agencies must consider what the actual internal capture rates of the projects will be, and how those capture rates will affect the total additional panther mortalities that will foreseeably result from the developments.

### 2. The draft HCP BiOps underestimate the impacts on panthers by underestimating the amount of traffic induced by the developments covered under the draft HCP.

In the 2021 draft HCP BiOp Appendix B.1 "Description of the Traffic Model," the Service attempts to estimate a density for proposed development to estimate a likely population in the eastern Collier area. The Service estimates that the Town of Ave Maria has 1.4 units per acre and uses that as the basis to assume "a comparable residential unit density on the remaining 39,973 acres proposed for development."[51] The resulting population estimate is approximately 152,000 people. However, the Bellmar project, and the other locally approved projects, have an average density of 2.6 development units per acre and an average of 2.5 people per household.[52] With a

---

[48] *See* 2020 draft HCP BiOp Appendix I at Table 2a [2020 draft HCP BiOp Appendices submitted with these comments for inclusion in the administrative record]; 2021 draft HCP BiOp Appendix H at Table AH2a [2021 draft HCP BiOp submitted with these comments for inclusion in the administrative record].
[49] *See* 2020 draft HCP BiOp Appendix I at Table 2a; 2021 draft HCP BiOp Appendix H at Table AH2a.
[50] *See* 2020 draft HCP BiOp Appendix I at Table 13b; 2021 draft HCP BiOp Appendix H at Table AH2b.
[51] 2021 draft BiOp at Appendix B.1.
[52] Average density for the components of Rural Lands West is 2.6 development units per acre (per Approved Town Agreement between Collier County Board of County Commissioners and Collier Land Holding, LLC/CDC Land Investments, LLC, dated June 8, 2021. And respective Village approvals, Collier County Resolution 2021-119, Collier County Resolution 2020-24). Density for Bellmar Village (a portion of state 404 footprint) is 2.75 development units per acre (per Collier County Resolution 2021-120). Other projects such as Hogan West (AKA Brightshore Village) have a projected density of 2.9 development units per acre (per Brightshore Village SRA Development Document for Collier County SRA Application, June 29, 2022). Of the seven Stewardship Receiving Areas (SRA) approved and pending in eastern Collier County, the average density is 2.6 development units per acre. The average persons per household in Collier County is 2.54 based on Census information accessed at https://www.census.gov/quickfacts/fact/table/colliercountyflorida,US/HCN010217.

more realistic density, the projected estimate for the 'new' population within the 45,000 acres of the eastern Collier area would be closer to 300,000+ people.[53]

This underestimation of human population -and the number of cars on roadways- within Bellmar and other reasonably foreseeable development can also be found when looking at the Economic Assessments provided to Collier County. The assessments for Rural Lands Wests, Bellmar, Hogan West, and others have averaged around 6.7 people per acre, which again estimates the population for the eastern Collier developments at around 300,000 people.[54]

3.  **The draft 2021 HCP BiOp underestimates cumulative effects by failing to update the analysis in light of Florida's assumption of Clean Water Act 404 permitting.**

Both the 2020 and 2021 draft HCP BiOps use the same assumptions about future non-HCP, non-federal actions in their modeling of cumulative effects. Both draft HCP BiOps assume that 25.3% of future, non-HCP developments will occur without a federal permitting nexus to trigger federal action, and therefore warrant inclusion in the assessment of cumulative effects as defined per 50 C.F.R § 402.02.[55] Both draft HCP BiOps only consider the traffic impacts of that 25.3% of future development in modeling the cumulative effects, and the increased extinction risk resulting from the HCP plus cumulative effects. Yet by December 2021, Florida DEP had assumed Clean Water Act Section 404 permitting pursuant to EPA's decision on the State 404 Program, a decision that drastically altered whether future projects would require a federally issued permit to fill wetlands. Though 404 permits for wetlands fills now frequently will be issued by the state rather than the U.S. Army Corps of Engineers, the 2021 draft HCP BiOp does not appear to engage in any re-evaluation of whether it is still true that only 25.3% of future, non-HCP developments will entail no federal action subject to ESA section 7 consultation. Consequently, it is plain that the analysis in the BiOps fails to address the reality that a much larger proportion of non-HCP traffic induced in the action area will be from future projects that will not be subject to ESA section 7 consultation due to the State 404 permitting scheme, and therefore should have been evaluated as sources of cumulative effects.

As the Service recognizes in the draft 2021 HCP BiOp documents, a jeopardy determination must be based on whether the action, either individually *or taken together with cumulative effects*, will appreciably diminish the likelihood of survival or recovery for the species.[56] By

---

[53] Any mining within the eastern Collier HCP area is likely to become lake-front development once mining uses are complete. The estimate of over 300,000 people does not include the addition of one home per five-acre ranchettes.

[54] Based on information provided in DPFG Town of Big Cypress Economic SRA Assessment, Revised June 28, 2022, p. 42; DPFG Bellmar Village SRA Economic Assessment, Revised January 8, 2021, p. 36; DPFG Longwater Village SRA Economic Assessment, Revised January 8, 2021; DPFG Rivergrass Village SRA Economic Assessment, Revised September 3, 2019, p. 38. DPFG Brightshore Village (AKA Hogan West) SRA Economic Assessment, Revised August 26, 2022, p. 31; DPFG Hyde Park Village (aka Skysail) Economic Assessment, Revised November 13, 2019, p. 35.

[55] *Compare* 2021 draft HCP BiOp Appendix H at 5–6; 2021 draft HCP BiOp Appendix J at 1, 2-3 *to* 2020 draft HCP BiOp Appendix H at 4 of 8; 2020 draft HCP BiOp Appendix J at 1.

[56] *See* 2021 draft HCP BiOp Appendix L at 10 ("Under section 7 of the ESA, we compare the future with the project scenario ($B_{SLR}$ + HCP) to the Baseline condition ($B_{SLR}$) to help us determine whether the effects of the action are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. In addition, under section 7 of the ESA, we consider the cumulative effects, and compare the future with the project

failing to evaluate the impacts of all of the reasonably foreseeable non-HCP future development that will not entail federal action subject to ESA consultation requirements, the draft HCP BiOps underestimate the increased risk of extinction that will result from the HCP projects and other reasonably foreseeable non-HCP development in the action area.

    **4.**  **The 2021 draft HCP BiOp's PVA modeling underestimates baseline risk of extinction because it assumes artificial introgressions to maintain genetic health will be conducted, even though there are no plans to conduct those introgressions.**

The 2021 draft HCP BiOp makes clear that a key assumption of the PVA modeling it used to estimate the risk of extinction is that: "The Service will maintain the genetic health of the population through translocation when necessary, and in a manner consistent with the recommendations of van de Kerk et al. (2019)."[57] The Service explains that:

> If recommendations of introducing 5-10 individuals from other Puma populations every 20-40 years aren't adopted, van de Kerk et al (2019) predicted probability of quasi-extinction would increase to 13 percent (0–99) at 100 years and 23 percent (0–100) at 200 years (Minimum Population Count Scenario) or to 10 percent (0–99) at 100 years and 12 percent (0–99) at 200 years (Motor Vehicle Mortality Scenario). If the van de Kerk et al. (2019) recommendations aren't adopted, it would mean our estimates of extinction probability and abundance would change similarly.[58]

Although the risk modeling in the BiOp is therefore based on the assumption that the Service will undertake those actions to supplement the panther population, the draft 2021 HCP BiOp concedes that the Service in fact has no actual plans to conduct those actions; the draft 2021 HCP BiOp states, "It is not known if efforts to translocate panthers or apply some other measure to increase genetic variability in the panther population may occur in the future."[59] Consequently, it is arbitrary and capricious for the Service to base its analyses of extinction risks, and jeopardy, on the assumption that these actions will take place when the Service concedes that it is in fact unknown whether those actions will occur or not. There is no indication that the Service even attempted to evaluate how changing that assumption would alter its analysis of total extinction risk with the HCP, or the total extinction risk with the HCP and cumulative effects. So while the 2021 draft HCP BiOp does acknowledge that the baseline extinction risk would be substantially higher absent these management activities to supplement the population, it fails to evaluate the compounding effect of the HCP and cumulative impacts against a baseline scenario of substantially increased risk. When considering the direct, indirect,

---

and cumulative effects scenario (B$_{SLR}$+HCP+CE) to the Baseline condition (B$_{SLR}$) to help us determine whether the effects of the action along with other actions that are reasonably certain to occur in the future without consultation with the Service are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. We consider both of these comparisons when we make our jeopardy determination.").
[57] 2021 draft HCP BiOp Appendix L at 1.
[58] 2021 draft HCP BiOp Appendix L at 12.
[59] 2021 draft HCP BiOp at 141.

and cumulative effects of the Bellmar project, the agencies must correct this unsupported assumption.

**5.   The draft HCP BiOps conceal the true risk of extinction by using speculation about carrying capacity to mask the impacts of habitat loss from sea level rise.**

The PVA modeling results in both draft HCP BiOps conceal the true baseline risk of extinction by averaging together the results from model runs based on three different assumptions about whether the population is currently at carrying capacity for the remaining habitat. Although past PVAs assumed that the population reflected either 100% of the carrying capacity of the existing habitat, or 80% of the carrying capacity, the draft HCP BiOps, with little explanation or justification, also assume that the current population may reflect only 60% of the carrying capacity of the existing habitat.[60]

First, the assumption that the current population reflects only 60% of the carrying capacity of the panther's remaining habitat appears to be based on speculation rather than the best available scientific information. The 2021 draft BiOp states:

> The present Florida panther population is at or near average annual carrying capacity ($K$) of habitat south of the Caloosahatchee River. However, *it is possible* future habitat management may increase carrying capacity to range-wide effect. It is also *possible* present assumptions about maximum attainable panther densities are wrong. Thus, we assume the true $K$ could actually be up to 40 percent higher than the present population size.[61]

This makes plain that FWS has based its analysis on mere "possibility" and conjecture rather than on what conditions are likely based on the best available scientific information, in violation of ESA requirements. It is also plainly irrational, as FWS elsewhere concedes, that "the true carrying capacity is unknown but *Service and FWC biologists infer the population may be at or near carrying capacity (K)*" but then proceeds to state that it nonetheless "assumed it is possible $N_0$ (the current population size) represents 100 percent, 80 percent, and 60 percent of carrying capacity."[62] There is no explanation of how 60% of carrying capacity is somehow rationally consistent with evidence suggesting the population is "at or near" 100% of carrying capacity. Most people would not consider a glass that is 60% full to be "at or near" being 100% full. This assertion is especially egregious given that the Service's peer reviewer pointed out that the studies cited by FWS regarding population trends could not be relied on to rule out that the population may already be either stable or in decline, rather than growing.[63] Moreover, the most

---

[60] *See* 2021 draft HCP BiOp Appendix L at 4 (Table AL1 n.2) ("Our past PVA only utilized $N_0 = K_0$ and $N_0 = 80$ percent of $K_0$. Our current PVA incorporates scenarios where $N_0$ may equal 60, 80, and 100 percent of $K_0$.").
[61] 2021 draft HCP BiOp Appendix L at 2 (emphasis added).
[62] 2021 draft HCP BiOp Appendix L at 7 (emphasis added).
[63] *See* 2021 draft HCP BiOp Appendix M at 3 of 166 ("In the report Dr. Martin noted that recent efforts to estimate the Florida panther population over time contained a great deal of uncertainty. Particularly, he noted that though the central tendency of these estimates indicates a growing population, the confidence intervals surrounding these estimates were so wide that the possibility of an unchanging population or population in decline couldn't be rejected. Dr. Martin also indicated concern that were the panther population to be declining, rather than growing, future catastrophes, such as disease outbreaks of more serious diseases than seen to date, could have a greater affect [sic] on population viability than had been estimated in previous PVAs. Based on Dr. Martin's advice, the Service

recent population estimates indicate that the population is no longer increasing. As the 2020 SSA acknowledges, the most recent population trend data indicate the population did not grow between 2016 and 2018, and began to decline from 2017 to 2018.[64]

Second, rather than separately presenting the results of models based on the assumption of the population being at 100%, 80%, and 60% of the carrying capacity of the habitat, the draft HCP BiOps only present the results showing the *averaging* of model runs reflecting these three very different carrying capacity assumptions. Thus, the draft HCP BiOps conceal the extinction risk associated with the impacts of habitat loss given the more realistic assumption that the population is already at 100% of carrying capacity. Notably, in the BiOp's PVA analysis, FWS models sea level rise by 2070 as resulting in an 18% habitat loss for the Florida panther.[65] Yet its model shows little impact on the projected future population from that enormous amount of habitat loss, and indeed, shows the same result as a prior model *that totally failed to address the impacts of sea level rise (SLR)-related habitat loss at all*.[66] Without ever contemplating whether that might indicate that there is something wrong with the BiOp's modeling of SLR impacts, FWS instead asserts that "SLR as we modeled it here does not influence probability of extinction as much as small population size and genetic variation might."[67] FWS totally fails to consider that the reason that there is little impact from this enormous amount of habitat loss is because the assumption that the current population is only at 60% of carrying capacity would mean that the population could still *grow* by about 20% even with a 20% habitat loss. And the assumption that the current population is at 80% of carrying capacity similarly would mean that the population can stay the same, even with a 20% habitat loss. Averaging these results together with the scenario where the population is already at 100% of carrying capacity, and therefore would likely drop by about 20% in response to a 20% habitat loss would unsurprisingly mask the substantial population drop under the K = 100% scenario by averaging it out against the increase under the K= 60% scenario. Indeed, it is almost as if the modeling, and the otherwise arbitrary choice of the K=60% scenario was selected specifically to ensure this result, and mask the impacts of SLR on the baseline extinction risk.

Notably, the 2020 draft HCP BiOp acknowledges that the choice of carrying capacity explained a substantial portion of the variance in the projected abundances, but otherwise fails to examine how the treatment of carrying capacity in the modeling irrationally and unreasonably masked the impacts of SLR.[68] This error taints both the representations about the baseline extinction risk, and the impact of the HCP and cumulative effects in compounding the baseline extinction risk, with the upshot being that the analysis in the HCP BiOps underestimates the extinction risk

---

amended portions of the Biological Opinion that treated 'rapid growth of the panther population' as fact to reflect this was but one possibility for the true population trend but that others, like population decline, could also be true.").

[64] *See* U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at 88, 90, Figure 6.8.
[65] 2021 draft HCP BiOp Appendix L at 8.
[66] *See* 2021 draft HCP BiOp Appendix L at 12 ("Our results were also similar to van de Kerk et al.'s (2019) despite the fact their model did not consider the impact of sea level rise, while ours did.").
[67] 2021 draft HCP BiOp Appendix L at 12.
[68] *See* 2020 draft HCP BiOp at 145 (stating that the choice of carrying capacity explained 17.8% of the variance in final abundance whereas scenario explained 38.15%, and initial population 33.09%).

resulting from the impacts of the HCP and cumulative effects exacerbating the disastrous habitat loss from SLR.

### 6. The PVA modeling underestimates extinction risk by failing to account for the impacts of additional habitat loss from SLR between 2070 and 2170.

The PVA modeling relied on in the draft HCP BiOps to estimate extinction risk evaluates what the Florida panther population will be 100 years after the end of the proposed 50-year period for the proposed Incidental Take Permits in 2070.[69] FWS explains that its PVA model accounted for habitat loss due to sea level rise by "treat[ing] Sea Level Rise up to 2070 as an effect in the baseline portion of [the] assessment[.][70] FWS acknowledged that SLR "will have range-wide effects on demographic parameters and habitat availability for panthers within the proposed permit duration of the HCP."[71] FWS estimated that by 2070, 1 meter of SLR would cause the loss of 18% of the Florida panther's habitat.[72] "To input SLR in the PVA [FWS] assumed SLR would accumulate linearly and only to 1 m by 2070, and divided the acreage by 50 years with 0 acres lost to SLR being equivalent to a proportion of individuals represented by a given $N_0$ … and to 18 percent of habitat loss to SLR being equivalent to 18 percent of $N_0$."[73] FWS explicitly states that the PVA modeling relies on the assumption that "Sea Level Rise of 1m will occur by 2070 but will not take additional Florida panther habitat beyond that time."[74] Thus, FWS apparently only modeled habitat loss due to SLR up until 2070, but did not account for additional habitat loss that would occur as sea levels continue to rise after 2070. FWS's modeling purports to assess the population 100 years after 2070 but ignores the impacts on that population of continued habitat loss from SLR between 2070 and 2170, even though SLR projections are available through at least 2100. Indeed, in the 2020 Species Status Assessment for the Florida Panther, FWS used sea level rise models of up to two meters to estimate possible loss of panther habitat through 2100.[75] And, in 2017, NOAA estimated that global mean sea level rise in 2100 would be nearly double that in 2070 under the Intermediate through High scenarios.[76] By failing to account for continued sea level rise related habitat loss after 2070, the PVA modeling likely overestimates panther abundance in 2170 and underestimates the extinction risk. Revised

---

[69] *See* 2021 HCP BiOp Appendix L at 10 ("For each of the three scenarios above, we simulated a 150-year population trajectory (50-year build-out plus 100 years beyond) and compared the predicted change in population viability for the panther."); 14, Table AL3 ("The probability of extinction and predicted population size of the Florida panther under Baseline with Future Sea Level Rise (BSLR), BSLR plus HCP Development Effects (BSLR+HCP), and BSLR+HCP plus Cumulative Effects (BSLR+HCP+CE) scenarios given three different beginning female panther population sizes. BSLR = Baseline (Current conditions + 1m SLR by 2070) and the end time is 100 years after HCP full build-out in 2070.").

[70] 2021 draft HCP BiOp at 132.

[71] 2021 draft HCP BiOp at 132.

[72] 2021 draft HCP BiOp Appendix L at 8.

[73] 2021 draft HCP BiOp Appendix L at 8.

[74] 2021 draft HCP BiOp Appendix L at 2.

[75] U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at vii, 189; *see also* SSA at 230–32.

[76] *See* Sweet, W. V., R. E. Kopp, C. P. Weaver, J. Obeysekera, R. M. Horton, E. R. Thieler, and C. 12769 Zervas. 2017. Global and regional sea level rise scenarios for the United States. NOAA 12770 Technical Report NOS CO-OPS 083. National Oceanic and Atmospheric Administration, 12771 Silver Spring, MD, at 23 (Table 5), *available at* https://tidesandcurrents.noaa.gov/publications/techrpt83_Global_and_Regional_SLR_Scenarios_for_the_US_final.pdf (showing GMSL in 2070 of 0.57 m, 0.79 m, and 1.0 m for the Intermediate, Intermediate-High, and High scenarios, and GMSEL in 2100 of 1.0 m, 1.5 m, and 2.0 m for those same scenarios, respectively).

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-CV-00119-RDM Document 98-1 Filed 02/28/23 Page 70 of 123
USCA Case #24-5101 Document #2102936 Filed 04/24/2025 Bellmar Application 395364-00144 Page 396 of 444
Page **20** of **42**

analysis to correct this problem is necessary, and should utilize the best available scientific information available, such as NOAA's most recent sea level rise projections.[77]

**D. The agencies cannot rely on proposed mitigation for species impacts in the ECMSHCP because the applicant has withdrawn its associated permit application and thus the ECMSHCP provides no assurances the mitigation will occur.**

The Bellmar applicant and other landowners have been seeking incidental take coverage through the ECMSHCP for development of 45,000 acres since 2010. In a letter submitted to the U.S. Fish and Wildlife Service (FWS) in July 2022, the landowners formally withdrew their application for an incidental take permit.[78] However, to-date we have not seen any documentation indicating that the applicant has informed FDEP that the ECMSHCP application has been withdrawn or that the applicant has updated its application materials to reflect this significant change. As the ECMSHCP has been withdrawn by the applicant, any promises from the applicant to adhere to the tenets of the ECMSHCP are toothless unless incorporated as conditions in the FDEP permit, if awarded.

Moreover, fatal flaws in the ECMSHCP have not evaporated; our letters regarding the proposal and the review by experts are enclosed. We do not consider any intent to work towards the tenets of the ECMSHCP[79] adequate to meet the requirements of the state 404 program nor the Endangered Species Act.

**E. The applicant has failed to provide necessary information for the agencies to estimate Bellmar's effects on the Florida panther.**

On August 31, 2022, FWS corresponded with FDEP to request additional time to prepare appropriate conservation recommendations for the Bellmar project, taking into account the project's size, location, and anticipated effects to federally protected species.[80] FWS further indicated the need for information currently missing from the applicant's biological assessment:

---

[77] *See, e.g.*, Sweet, W.V., B.D. Hamlington, R.E. Kopp, C.P. Weaver, P.L. Barnard, D. Bekaert, W. Brooks, M. Craghan, G. Dusek, T. Frederikse, G. Garner, A.S. Genz, J.P. Krasting, E. Larour, D. Marcy, J.J. Marra, J. Obeysekera, M. Osler, M. Pendleton, D. Roman, L. Schmied, W. Veatch, K.D. White, and C. Zuzak, 2022: Global and Regional Sea Level Rise Scenarios for the United States: Updated Mean Projections and Extreme Water Level Probabilities Along U.S. Coastlines. NOAA Technical Report NOS 01. National Oceanic and Atmospheric Administration, National Ocean Service, Silver Spring, MD, 111 pp., at 23, https://oceanservice.noaa.gov/hazards/sealevelrise/noaa-nostechrpt01-global-regional-SLR-scenarios-US.pdf (projecting relative sea level rise in 2100 in the eastern Gulf of Mexico will be 1.2, 1.7, and 2.2 meters under intermediate, intermediate-high, and high scenarios, respectively)
[78] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).USFWS response to HCP withdrawal, provided by email on September 1, 2022, and enclosed
[79] Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, available at https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.Letter dated July 28, 2022, from ECPO re: Withdrawal of ECPO Incidental Take Permit Applications
[80] Email from Charles Kelso, U.S. Fish and Wildlife Service, to Toby Schwetje, Florida Department of Environmental Protection regarding U.S. Fish and Wildlife Service's initial comments regarding the Bellmar proposal (Aug. 31, 2022).

Because our recommendations are based on anticipated effects of the action, the Service will require an estimate of the project's future effects to the Florida panther. Therefore, we recommend updating Applicant's July 2021 Biological Assessment to include an estimate of panther mortality due to traffic volume increases upon project completion.[81]

The agencies had already requested in a prior Request for Additional Information (RAI) for the applicant to "provide a traffic analysis specific to the Bellmar project. The traffic analysis should include an estimation of daily trips generated by village residents, employees, and municipal services and identify the roads these trips will most likely take place on."[82] However, this information was not provided and yet FDEP still advanced the Bellmar project to Public Notice.

The applicant has obscured the amount of traffic attributable to the Bellmar 404 project, and, as illustrated above, this information is vital to avoiding jeopardy to the Florida panther. The applicant has requested "that the USFWS include a proportional level of coverage for the incidental take expected as a result of the Project in the incidental take statement for this action" should FDEP complete their review before an ITP is issued.[83] However, critical information in which the agencies would need to ensure roadkill mortalities are adequately considered and avoided is not provided.

We are aware that in materials submitted to Collier County (Attachment A), the applicant's traffic engineer calculated that total traffic created by the 1,000 acre Bellmar Village would be 26,232 trips per day.[84] Please note that this estimate is for only part of the state 404 project area—there are more than 700 acres, 1,000 additional residential units, and commercial development not included in this estimate that, if developed, will generate thousands of additional trips to this total.

The table below summarizes the information available through the Collier County materials in regard to the Bellmar 404 application and a portion of the Rural Lands West state 404 project.[85] This 404 application is fairly equivalent to the village of Bellmar and most of the town connector as seen in the table below.

---

[81] *Id.*

[82] FDEP, 2021. Request for Additional Information, Bellmar. August 20, 2021.

[83] Letter from Applicant to FDEP dated April 14, 2022, page 14

[84] Traffic Impact Statement for Bellmar Stewardship Receiving Area (SRA) by Treblicock Engineering for Collier Enterprises dated August 19,2020, p. 7, Table 2. The project footprint for the Bellmar SRA is at least 700 acres less than the state 404 project that is the subject of this letter.

[85] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, June 2022,Page 7. The Town of Big Cypress SRA, as known at the Collier County level, includes the state 404 Bellmar project, and a portion of the Rural Lands West state 404 project. There would be about an additional 1,000 acres of development added to these figures as part of the Rural Lands West state 404 project footprint.

| TOWN OF BIG CYPRESS | |
|---|---|
| | Estimated daily trips generated |
| Rivergrass[86] | 23,929 |
| Longwater[87] | 24,919 |
| Bellmar[88] | 26,232 |
| Town Connector | 64,125 |
| | |
| Total [89] | 139,205*<br><br>*Does not include a portion of the state 404 Rural Lands West project |
| | |
| Bellmar state 404 application | 90,357 |

We emphasize that the application trips are the best estimate the public currently has access to, given that the applicant has failed to provide the required traffic and transportation information. The total daily trips generated are likely to be more than what we show here. The agencies should not proceed with decisionmaking on the Bellmar permit until the applicant provides this necessary information. To determine species effects, mitigation, or make a jeopardy determination without this information would violate the ESA's core requirement to use the best available science,[90] as well as the technical assistance process's requirement that applicants provide sufficient information to review potential adverse impacts to listed species and critical habitat.[91]

## II. Bellmar Is Inconsistent with the State 404 Program, 62-331, F.A.C.

### A. The alternatives analysis is inadequate.

The project identifies an approximately 1,790-acre footprint in eastern Collier County that is proposed for construction of a master-planned community. We note for the record that there is no

---

[86] Traffic Impact Statement for Rivergrass SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2019, Page 7.

[87] Traffic Impact Statement for Longwater SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, March 2020, Page 7.

[88] Traffic Impact Statement for the Bellmar SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2020, Page 7.

[89] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, June 2022, Page 7.

[90] 16 U.S.C. § 1536(a)(2); 404 Programmatic BiOp at 5.

[91] 404 Programmatic BiOp at 16 ("Applicants submitting a State 404 permit application will be required to submit information that allows the State of Florida (FDEP and FWC) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats and allow the USFWS to review and provide technical assistance as needed (62-331.051, F.A.C.).").

public benefit of the project, and rather, the public's resources and interests are threatened by the Bellmar project.

The state rules governing section 404 permitting state that FDEP shall not grant a permit "if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem."[92] We disagree with the applicant that there is "no less environmentally damaging practicable alternative."[93]

The general project purpose of providing a master-planned community can be achieved while avoiding and minimizing impacts to wetlands and listed species habitats, such as Florida panther Primary Zone habitat and crested caracara primary nest buffer, when considering other site alternatives, as required.[94]

The applicant improperly restricts the alternatives they are considering to areas that are 2,000 acres or greater, within eastern Collier, within the Collier County Rural Lands Stewardship Program, and ECMSHCP. There may be lands with less impact to natural resources that are of a different size and outside of these boundaries that should have been considered as an alternative. We note the ECMHCP is withdrawn as of July 28, 2022, and cannot be relied on by the applicant to ignore all alternatives. This change requires the applicant to redo and resubmit a new alternatives analysis including non ECMSHCP properties.

The applicant offers no evidence, that 2,000 acres is required for a master-planned community.[95] In fact, we contend that approving this type of sprawling development is damaging to the future of Florida as it erodes the urban rural boundary and removes important agricultural lands from production. There are many examples both in and out of Florida using smart growth design that provide the desired number residences as well as commercial development on sites significantly smaller than 2,000 acres.

Sustainable, compact development – which the proposed project is not – would also appeal to "ecologically minded consumers"[96], and truly ecologically minded consumers would not support destroying important panther habitat needed for survival and recovery of the Florida panther.

Further, the applicant failed to consider other sites, even those not owned by the applicant, which can serve the general residential and commercial uses proposed by this project in an area closer to existing development, outside of primary panther habitat, and not adjacent to a wildlife refuge.[97] The applicant does not fully consider lands directly north of the Bellmar parcel as alternatives. The alternative analysis speaks to "Parcel 5" as containing lands that would meet

---

[92] 62-331.053, Florida Administrative Code.
[93] Bellmar Alternatives Analysis, April 2022, page 1.
[94] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020; 62-331, Florida Administrative Code.
[95] Bellmar Alternatives Analysis, April 2022, page 1.
[96] Bellmar Alternatives Analysis, April 2022, page 1.
[97] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020, Appendix C, p. 57 states If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, if an applicant does not own an alternative parcel, that does not rule that parcel out as a practicable alternative.

the applicant's constrained restrictions, but it does not go on to fully consider these areas as alternatives.

Within Parcel 5, there are more than 20,000 acres, many of which are owned by the applicant (not a limiting factor), and others recently sold to Gargiulo (who also owns part of this pending Bellmar project area) (see Attachment B).

The applicant appears to not consider lands to the north because of the also-proposed Rural Lands West state 404 application, which is not a justifiable reason to exclude from the analysis.

Importantly, there are also lands to the north of both Bellmar and Rural Lands West that should be considered as an alternative. There are lands north of Oil Well Road that are also contemplated for future development, as evidenced by the ECMSHCP. The Conservancy of Southwest Florida has recommended Collier Enterprises move its developments to this area since the area would result in little to no Primary Zone panther habitat to be impacted. In fact, the Service asked the applicant to consider this northern area as an alternative to avoid and minimize listed species impacts, when the Rural Lands West project was seeking a permit from the U.S. Army Corps of Engineers.[98]

Instead of providing an Alternatives Analysis that would satisfy the state 404 program requirements, the applicant vies for developing the entirety of Parcel 5, with this Bellmar application and several other proposals.

To make matters worse, the applicant provided no scenario that considered a smaller footprint, or any footprint that would avoid the primary zone for the active caracara nest on the site or redesign stormwater lakes to avoid wetland impacts. Most of the wetland impacts are coming from the choice to place stormwater lakes into wetlands. With a project size of over 1,700 acres there is no excuse to use the adjacent wetlands to dredge stormwater lakes; such development uses could be contained within uplands.

The applicant did not adequately analyze "alternative on-site configurations" or "extensively redesign the Project to avoid and minimize impacts."[99] If that were true, the applicant would have made a small adjustment to the footprint to avoid impacts to the primary zone of the caracara nest in the center of the property. Avoiding this caracara primary zone would require an alteration and avoidance of approximately 52 acres. This has never been done, and it undermines the applicant's genuine interest in avoiding and minimizing impacts. It is particularly egregious for the applicant to state that their "development should be designed to incorporate protection and preservation of habitat and natural resources"[100] in light of their refusal to avoid the primary zone of this existing caracara nest.

---

[98] Letter from U.S. Fish and Wildlife Service to Army Corps of Engineers regarding Collier Enterprises Management, Inc. project Town of Big Cypress dated November 18, 2008. "The Service recommends the alternatives analysis includes alternative project sites and configurations that avoid and minimize the impacts to wetlands and open waters, as well as minimize impacts to endangered species. Specifically, other applicant-owned lands north of Oil Well Road may be more suited to a development of this sort."
[99] Bellmar Alternatives Analysis, April 2022, page 1.
[100] Bellmar Alternative Analysis, April 2022, page 7.

In sum, the applicant has failed to provide an adequate analysis of less damaging alternatives. Furthermore, FDEP should consider a "no action alternative."[101] The impacts of the proposed project are contrary to the public interest.

### B. The application fails to adequately analyze secondary effects.

The Bellmar project also fails to meet the requirements to adequately consider secondary impacts. FDEP must consider secondary effects from proposed activities, particularly on sanctuaries and refuges.[102] These areas, as the FDEP Handbook states, are "managed principally for the preservation and use of fish and wildlife resources," and dredge and fill activities may "result in the establishment of undesirable competitive species of plants and animals," or "change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices."[103]

We note that Collier Enterprises Management Inc. discusses its "long tradition of environmental stewardship," land transfers, and sales in its response to the request for additional information.[104] But that generalized historical narrative does nothing to address the harmful impacts of the applicant's proposal on the Florida panther and other natural resources through this project. The Bellmar project will destroy more than 1,700 acres of the most important and critical category of delineated panther habitat, will infringe on and fragment a landscape corridor, and cause additional panther and other species mortalities due to habitat loss and vehicle collisions, while adding more than 8,600 new residents in an area heavily utilized by wildlife. In fact, the applicant's proposed project threatens the future integrity of the Florida Panther National Wildlife Refuge, one of the lands they mention in their history. As they note, the Refuge was founded with the purpose of protecting Florida panthers and their habitat.[105] However, the Bellmar project is a direct affront to this publicly held sanctuary.

The FPNWR has informally and formally shared concerns regarding both the Rural Lands West and Bellmar projects since 2006.[106] Major concerns of the FPNWR managers even then was the impact of these developments on hydrology and prescribed fire use. Staff wrote "building a community adjacent to the west side of the refuge would severely limit or prohibit prescribed burning to nearly half of the refuge fire units due to smoke management limitations…. Staff is concerned that the new developments will cause more water to either be stored in retention ponds, thereby reducing water flow into the refuge or developments will increase runoff into Camp Keais Strand, which flows into the refuge."[107] Already-altered hydrology has shifted the land cover on the FPNWR to dense cabbage palm, and the Refuge expends considerable effort in

---

[101] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.1.
[102] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[103] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[104] Passarella & Associates, Inc., 2021. Bellmar Biological Assessment. July 2021, p. 1.
[105] *Id.* at 2-4.
[106] Meeting notes and staff summaries regarding Rural Lands West and Bellmar projects impacts to listed species and impacts to FPNWR, dated 2006. Received through Freedom of Information Act request.
[107] *Id.*

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-CV-00119-RDM   Document 98-1   Filed 02/28/23   Page 76 of 123
USCA Case #24-5101      Document #2102936      Filed 05/24/2024   Page 396 of 444
Bellmar 404 Application 396364-00144
Page 26 of 42

vegetation management and prescribed fire to maintain the publicly-held refuge as suitable habitat for the Florida panther and its prey.

These same concerns about degradation to the 26,400 acres of the FPNWR were echoed repeatedly, in the Refuge staff comments on the ECMSHCP and in a letter to Collier County when the local authorizations for Bellmar were sought.[108]

In a 2016 letter from FPNWR, the Panther Review Team (PRT) configuration alternative was recommended. This alternative would "protect critical linkages and buffer areas."[109] The PRT alternative would mean the Bellmar property would not be intensified above existing agriculture and would not be developed (Attachment C).

Both the 2016 and 2021 letters shared concerns that development contemplated in the ECMSHCP would encroach upon conservation areas like the FPNWR. Because of the Refuge's position against roadways I-75 and State Road 29, prescribed burn can only direct smoke in the direction of Bellmar and Rural Lands West.

While we understand that efforts were made to provide smoke easement language, future Florida Forest Service authorizations for burning are not assured, once these massive developments are built. If Rural Lands West and Bellmar are built, they would place about 19,170 people -a population about the size of the City of Naples[110]- in direct conflict with management of the Refuge. The FPNWR currently is the most densely occupied Florida panther habitat[111] and any degradation or encroachment of the adjacent-proposed development would be an unacceptable secondary impact and could also contribute to jeopardy for the Florida panther.

### C. FDEP must analyze all cumulative effects.

Under the state 404 program, FDEP must also consider the impact of cumulative effects. As in the sections above, there are a number of projects both pending before the agency or otherwise reasonably foreseeable, that contribute to unacceptable cumulative impacts.

From just seven state 404 applications, there would be over 1,000 acres of wetlands lost.[112] Further, FDEP is also currently considering additional proposed state 404 actions. There are 259 activities reviewed or under review as part of the state 404 program within 5 miles of Bellmar, and 785 within 25 miles of Bellmar (Attachment D and Attachment E).[113] Though these actions

---

[108] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016; Letter from Florida Panther National Wildlife Refuge to Collier County Planning Commission Re: Longwater and Bellmar Village SRA Resolutions, March 1, 2021.

[109] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016.

[110] City of Naples census population, as of 2020.

[111] Dorazio & Onorato, 2015. Estimating the Density of Florida Panthers Using Camera Trapsand Telemetry - Report for Phase I of the Project, final report.

[112] Bellmar, Rural Lands West, Hogan West, Immokalee Road Rural Village, FFD, Troyer Mine, Kingston.

[113] Based on ArcGIS analysis. Feature Layer from Florida Department of Environmental Protection, Managed by FDEPOpenDataPortal.

may be small or large projects, the total cumulative impacts on wetlands and aquatic resources must be considered.

### D. Bellmar will have adverse effects on aquatic ecosystems, including listed species and their habitats.

The state's 404 program stipulates that no permits can be granted for projects that would cause or contribute to significant degradation of wetlands, which can include adverse effects on wetland-dependent species, ecosystem diversity, and fish and wildlife habitat.[114] Wildlife surveys provided by the applicant show how valuable this area is for a multitude of state and federally listed species. We address quite a bit of this in our prior letters on Bellmar, however, we provide the new or updated information as below, including an analysis by panther habitat modeling expert, Dr. Robert Frakes. Bellmar's impacts to fish and wildlife and their habitats is significant and unacceptable, and thus the permit should be denied.

#### 1. Bellmar will have unacceptable impacts on the Florida panther.

The Bellmar project site is an important area for the endangered and wetland-dependent Florida panther. There have been 112,065 telemetry points collected from Florida panthers since 1981 through 2022, from at least 267 panthers.[115] Looking at just a 5-mile area around the Bellmar site, 8.3% of all documented telemetry points and 29.2% of all collared panthers fall within this area.

The Bellmar project is completely comprised of Primary Zone habitat and nearly all Adult Breeding Habitat area – two models depicting the most critical lands to the survival and recovery of the Florida panther. It is situated close to the FPNWR and a critical linkage called Camp Keais Strand is within and adjacent to the project.

The 2020 draft HCP BiOp described a range of impacts to the Florida panther from development in Eastern Collier:

- Increased mortality from intra-specific aggression among panthers displaced by proposed development and human activity;
- Increased mortality and decreased individual fitness caused by intensification of intra and inter- specific competition;
- Increased predation of panther kittens from other predators when preferred prey populations decline;
- Effects to individuals from habitat loss, degradation, and fragmentation because of new roads connecting new areas of development to one another and the existing road network;
- Increased injury and mortality from collisions with traffic on new roads;
- Management removal because of depredation and human/panther interactions;
- Increased exposure to disease; and
- Increased exposure to toxins.[116]

---

[114] 62-331.053, Florida Administrative Code.

[115] https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/about

[116] 2020 draft HCP BiOp at 125.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FE

To review the impacts to Adult Breeding Habitat, panther habitat modeling expert Dr. Robert Frakes utilized a landscape-scale panther habitat model that was described in Frakes, et al, 2015.[117] The model analyzes forest land cover and forest edge, human density, and road density, amongst other factors to determine suitable breeding habitat for the panther.

Using this published model with updates, Dr. Frakes compared the existing conditions to post-project scenario for Bellmar alone as well as Bellmar and RLW together. There is one set of maps to show the raw results and one set to show in an interpolated model that "smooths" the cells.

Frakes et al., 2015 acknowledges that "protection of the remaining breeding habitat in south Florida is essential to the survival and recovery of the subspecies and should receive the highest priority by regulatory agencies."[118] Yet, adult breeding habitat maps show that Bellmar alone will cause the loss of 10 km2 (2,471 acres) of breeding habitat.

When Bellmar is combined with RLW, it would cause a combined loss of 23 km$^2$ (5,683 acres). The interpolated maps show a significant narrowing of the Camp Keais Strand dispersal corridor, especially when Bellmar and RLW are considered together.

Allowing Bellmar to move forward will have unacceptable direct and indirect impacts on panther habitat and corridor connections.



---

[117] Frakes, R.A., Belden, R.C., Wood, B.E. & James, F.E. (2015). Landscape analysis of adult Florida panther habitat. PLoS One 10, e0133044.
[118] *Id.* at 15-16.

Panther Habitat Suitability (P)
Before Development
High : 0.99486
Low : 0.00384327
Bellmar Impact Area
Bellmar

Panther Habitat Suitability (P)
After Development
High : 0.99486
Low : 0.00384327
Bellmar Impact Area
New Roads
Stormwater Lakes
Bellmar

Rural Lands West
Bellmar
Before Development
Adult Panther Habitat P>0.338 (Frakes et al. 2015)
Project Impact Areas

Rural Lands West
Bellmar
After Development
Adult Panther Habitat P>0.338 (Frakes et al. 2015)
Project Impact Areas
Agriculture
Residential
Water
New Roads











We note for the record that in addition to the direct impacts to areas with development, the Public Notice states that "[m]anagement objectives to the preserves adjacent to development will the implemented to limit prey and foraging conditions that otherwise may attract panther and bears".[119] We need clarification on what this means and assurance that if permitted, the applicant will not be seeking or be given Panther Habitat Unit (PHU) credits for lands that are actively being managed to deter panthers. The PN states that the proposed project will need 1,793.4 acres and the estimated PHU credits needed are 16,844.[120] The PN then states that the conservation areas of the project exceed this amount by providing 18,648 PHUs.[121] However, without a map detailing the areas being considered, there is no way to ensure that the applicant is considering preserves being managed to deter panthers as impacted and that these preserves are not being used for compensation.

Further, in the 2020 draft HCP BiOp, the FWS recommended more than 25 different actions to minimize impacts on the Florida panther, including the following:

- Maintain internal traffic capture of each development at or above 50 percent.

---

[119] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 3.
[120] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.
[121] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.

- Prohibit residents from keeping domestic animals (chickens, goats, etc.) that attract panthers and other predators.
- Require full vaccination of all pets in new developments from diseases that can be acquired by panthers.
- Require pets be kept indoors, leashed, or maintained in fenced enclosures at all times. Encourage residents to feed pets indoors and to not leave pet food dishes outside.
- Encourage residents to clean grills and store them indoors when not in use.
- Minimize the use of bird feeders and supplemental feeding stations for deer and other game species.
- Require residents to deer proof gardens.
- Restore agricultural lands to native habitats that are more beneficial to the panther, especially forested habitats, and maintain in perpetuity. [122]

We have no indication from the applicant whether they are going to follow or incorporate this advice into the proposed development. These draft recommendations should inform the evaluation of whether the project should be authorized absent any commitment by the applicant to implement them, for example, by informing whether the proposal is in the public interest or meets requirements to minimize impacts. The agencies should also consider whether these recommendations should be incorporated as binding permit terms to ensure that impacts are minimized.

## 2. Bellmar will have unacceptable impacts on the Florida bonneted bat.

The applicant's Florida bonneted bat (FBB) survey, dated July 2021, found that calls were recorded "within the time frame considered by USFWS that roosting is likely nearby (Attachment F)."[123] Thus, the agencies need to look closely at not only how Bellmar would impact proposed critical habitat, but also foraging and roosting within the project. If the Bellmar project will impact a roost(s), there is an increased likelihood that Bellmar would also pose jeopardy to the bonneted bat. Based on our review, the applicant has not adequately addressed this issue.

We also note that this project is in FBB Proposed Critical Habitat (PCH), specifically Unit 3 of the PCH (Attachment G).

## E. Ownership and other information must be addressed.

### 1. Ownership within the Project Boundary

It appears that the applicant does not, in fact, own all of the property contained in the application (Attachment H). About 503.57 acres were sold in June 2019 to Gargulio, Inc. This is 9.8% of the 5,105.49 acres. We note that Gargulio does not appear to be indicated as or listed as an adjacent property owner and is not part of the permit notice. To our knowledge, Gargulio is also not an applicant. While it appears that the Gargulio property is not designated as development or conservation, it does call into question the appropriateness of including this property in the

---

[122] 2020 draft HCP BiOp at 320.
[123] Passarella & Associates, Inc., 2021. Bellmar Florida Bonneted Bat Acoustic Survey Report. Prepared for Collier Enterprises Management, Inc. July 2021.

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Bellmar 404 boundary without the documented acknowledgement of the property owner. The agencies should determine why land not owned by the applicant is included in the boundary of the application.

| Parcel ID | Acres |
|-----------|-------|
| **354930004** | 96.88 |
| **354960207** | 9.03 |
| **354520100** | 225.97 |
| **354480606** | 171.69 |
|  |  |
| TOTAL | 503.57 |

This information was found on the Collier County Property Appraiser on October 15, 2021, confirmed on August 30, 2022.

> **2. The applicants have yet to comply fully with all requests for additional information.**

In addition to the other RAI request that was not addressed, as discussed above, the following RAI comments from the August 20, 2021 RAI letter have not been addressed in part or in full:

Excerpt from the Agency RAI:

*25. Page 34 of the BA addresses incidental take of the project by referring to the HCP. The ITP has not been issued yet. Therefore, please provide a stand-alone analysis of incidental take for each species that will have take (as defined by the ESA) associated with the Bellmar project. In order to remain within the State 404 process, a project must not cause jeopardy. Please provide an analysis supporting that the Bellmar project is not likely to cause jeopardy to the panther.*

The applicant's response to this request is not adequate because the ECMSHCP has been withdrawn. To date, we have not seen any new information submitted to FDEP and FWC informing them that the ECMSHCP has been withdrawn.

Excerpt from the Agency RAI:

*34. The provided plans do not seem to provide any indication of the proposed lot size. What is the approximate site of each residential lot? How many residences are proposed or anticipated?*

The applicant refers to the Town Connector as intended for commercial uses, however at least 1,000 residential units – both affordable and market rate – are also proposed along with the commercial uses. The applicant should be required to answer this question completely and in adequate detail to ensure that the impacts of its proposal, in particular the traffic-inducing impacts, are assessed accurately.

Excerpt from the Agency RAI:

*48. What are the potential effects of the project on the Florida panther, including the direct, indirect, interrelated, and interdependent effects? What is the extent of habitat loss that would result from the proposed project?*

The applicant avoids answering these questions. The applicant must address these issues and answer these questions fully and directly.

Excerpt from the Agency RAI:

*50. How would the proposed mitigation offset the proposed impacts to the panther?*

*The assessment includes a traffic analysis section but does not specifically address the extent of the proposed traffic increases that would result from the implementation of the project. What is the specific anticipated increase in traffic (volume, location, etc.) and how would that increase impact the panther?*

The applicant has refused to answer these questions. Particularly, in light of the analysis in the 2020 draft HCP BiOp and 2021 draft HCP BiOp, the applicant must address these issues and answer these questions fully and directly.

## III.    Conclusion

Thank you for considering our comments. We ask that you deny the Bellmar project because it would pose unacceptable direct, indirect, and cumulative impacts, and would seal the fate of the Florida panther. Bellmar, and other reasonably foreseeable projects, would not only remove habitat, but also would cause increased roadkill, increase human-wildlife interaction, and pose threats to trust resources and properties in conservation. Furthermore, Bellmar is inconsistent with the requirements of the State 404 Program.

Please note that this letter does not constitute support for the state-assumed section 404 permitting program, which we believe is unlawful.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
 juliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776- 5601
amberc@conservancy.org

Karimah Schoenhut
Staff Attorney
Sierra Club
Sierra Club Environmental Law Program
50 F Street NW, 8th Floor
Washington DC 20001
Phone: 202-548-4584
karimah.schoenhut@sierraclub.org

Elise Pautler Bennett
Florida Director & Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33703
(727) 755-6950
ebennett@biologicaldiversity.org

Cc:
Shannon Estenoz, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior
Bob Carey, Environmental Review Branch Manager, USFWS
Jose Rivera, Environmental Review Supervisor, USFWS
John Truitt, Deputy Secretary, FDEP
Jon Iglehart, South District Director, FDEP
Megan Mills, Permitting Administrator, FDEP
Toby Schwetje, Environmental Specialist III, FDEP
Jason Hight, Director Office of Conservation Planning Services, FWC
Jeaneanne Gettle, Director of Water Division, EPA
Rosemary Calli, Section Chief Wetlands & Streams, EPA
FWC records FWCConservationPlanningServices@myfwc.com
FDEP records SD-ERPcomments@floridadep.gov

DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED34385A1FF

Attachment A

<div align="center">

Table 2
**Project Specific Trip Generation – Build-out Conditions – Average Weekday**

</div>

| ITE LUC | Daily Two-Way Volume | AM Peak Hour | | | PM Peak Hour | | |
|---|---|---|---|---|---|---|---|
| | | Enter | Exit | Total | Enter | Exit | Total |
| **Single Family Detached** | 13,250 | 284 | 850 | **1,134** | 911 | 535 | **1,446** |
| **Multifamily Housing (Low-Rise)** | 8,729 | 112 | 377 | **489** | 329 | 194 | **523** |
| **Office Park** | 424 | 36 | 4 | **40** | 2 | 27 | **29** |
| **Shopping Center** | 5,383 | 120 | 74 | **194** | 231 | 251 | **482** |
| **Total Traffic** | 27,786 | 552 | 1,305 | **1,857** | 1,473 | 1,007 | **2,480** |
| **Internal Capture** | 806 | 24 | 24 | **48** | 97 | 97 | **194** |
| **External Traffic** | 26,980 | 528 | 1,281 | **1,809** | 1,376 | 910 | **2,286** |
| **Pass-by Traffic** | 748 | 26 | 17 | **43** | 51 | 46 | **97** |
| **Net External Traffic** | 26,232 | 502 | 1,264 | **1,766** | 1,325 | 864 | **2,189** |

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F9-CCD24385A1FE

Attachment B



DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Attachment C[124]



[124] Florida Panther Protection Program Technical Review Team, 2009. Technical Review of the
Florida panther Protection program Proposed for the Rural Lands Stewardship Area of Collier
County, Florida. Final Report. Note that the PRT did not analyze the Big Cypress DRI (AKA
Rural Lands West) but did find that the Bellmar state 404 area should be retained in no more
intense than current agricultural uses.

DocuSign Envelope ID: A49FDFD1-91B9-4E46-88F9-CED34385A1FE

Attachment D

Date: 9/13/2022




CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

There are 259 404 permits within 5 miles of the Bellmar 404 impact area

DocuSign Envelope ID: A49FDFD1-91B9-4E46-88F9-CED24385A1FE

Attachment E

Date: 9/13/2022



Legend

State 404 Program Permits
Bellmar 404 Impact Area
25 mile buffer



0  2  4     8     12     16
                              Miles

There are 785 404 permits within 25 miles of the Bellmar 404 impact area

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CED34385A1FF

Attachment F[125]



---

[125] Calls indicating roost nearby at stations #1, 16, 18, 20, 26, 28.

DocuSign Envelope ID: A49FDFD1-91B9-4E45-8859-CCD34385A1FE

Attachment G

### Bellmar & Florida Bonneted Bat Critical Habitat



DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FF

Attachment H

Date: 9/14/2022



DocuSign Envelope ID: A49EDFD1-91B9-4E46-88F9-CED24385A1FF

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 93 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 400 of 444

# ATTACHMENT D

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CCD34385A1EF



# FLORIDA DEPARTMENT OF
# Environmental Protection

**Ron DeSantis**
Governor

**Jeanette Nuñez**
Lt. Governor

**Shawn Hamilton**
Secretary

South District
PO Box 2549
Fort Myers FL 33902-2549
SouthDistrict@FloridaDEP.gov

August 16, 2022

## STATE 404 PROGRAM
## PUBLIC NOTICE

Permit Application No. 396364-001

TO WHOM IT MAY CONCERN: The Department of Environmental Protection has received an application for a State 404 Program permit pursuant to 62-331, Florida Administrative Code, as described below:

APPLICANT:        Collier Enterprises Management Inc.
                  999 Vanderbilt Beach Road, Suite 507
                  Naples, Florida 34108
                  (239) 261-4455

LOCATION: The Project site is located in Section 34, Township 48 South, Range 28 East; and Sections 1, 2, 3, 10, 11, 12, 15, and 22; Township 49 South; Range 28 East; Collier County. More specifically, the Project is located east of Golden Gate Estates and is approximately 2.29 miles south of Oil Well Road (CR 858).

APPROXIMATE CENTRAL COORDINATES:
Latitude 26.219790° Longitude -81.492157°

PROJECT PURPOSE: The overall project purpose is to construct a master-planned mixed-use community east of Golden Gatge Estates in Collier County.

PROPOSED WORK: The applicant seeks authorization to discharge dredge or fill material into "waters of the United States" (WOTUS). The authorized discharges would total approximately 144 acres, and would occur in connection with construction of a master-planned mixed-use community, including roads, utility features, pedestrian trail crossings, graded slopes along stormwater management and development areas, and commercial areas.

The site of the village and town center is a 5,105 acre area. Planned features within that area include an approximately 1,000 acre village, a 350 acre commercial town center, 750 acres of continued

JA.387

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CED34385A1FF

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 95 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 402 of 444

agriculture activities, 400 acres of water management features and other ancillary components, and over 2,500 acres of conservation lands.

Of the 144.23± acres of wetland impacts, 132.23± acres are associated with direct wetland impacts and 12.00± acres are associated with secondary wetland impacts. Structures to be erected on fills include road, utility, and pedetrain trail crossings, commercial areas, and graded slopes along the perimeters of development areas and stormwater management lakes. Excavations primarily consist of the construction of stormwater management lakes, which are primarily located along the perimeters of the existing agricultural fields. **All wetlands and surface waters delineated using Chapter 62-340, F.A.C. and regulated under Part IV of Chapter 373, F.S. were determined to be waters of the United States.**

The Project will be constructed in three phases that each correspond with three proposed surface water management basins. In accordance with Section 5.3.2 of the State 404 Applicant's Handbook, the applicant has provided a Long-Term Planning Document that addresses the phasing of the Project. Per the plan, of the Project's 144.23± acres of WOTUS impacts, 17.65± acres are associated with Basin 1; 79.07± acres are associated with Basin 2; and 47.51± acres are associated with Basin 3.

EXISTING CONDITIONS: The Project area contains a variety of land cover types, including a mix of previously-disturbed areas used for large-scale row crop production and other agricultural purposes as well as native habitats. A total of 69 vegetative associations and land uses, as defined by the Florida Land Use, Cover and Forms Classification System (FLUCFCS) codes, were identified on the property. The description and locations of these land uses can been seen on the plan drawings. The dominant land use on the property is agricultural. The land use types Cropland and Pastureland (FLUCFCS Code 210), Row Crops (FLUCFCS Code 214), Rural Open Land (FLUCFCS Code 260), Fallow Cropland, Hydric (FLUCFCS Code 2611), and Low Pasture, Hydric (FLUCFCS Code 262) comprise approximately 43.7 percent (2,231.21± acres) of the site.

The native areas on-site are dominated by Cypress, Disturbed (FLUCFCS Code 6219) which comprises approximately 23.8 percent (1,214.40± acres) of the Project site and Wetland Mixed Hardwood Conifer, Disturbed (FLUCFCS Code 6309) which comprises approximately 9.2 percent (470.38± acres) of the Project site.

Wetlands deemed to be jurisdictional WOTUS constitute a total of 2,283.22± acres or approximately 44.7 percent of the Project site. The wetlands are generally forested and are dominated by cypress with areas of cypress/pine, hydric pine, mixed wetland hardwood, and freshwater marsh habitats. The wetlands contain varying degrees of exotic infestation including the exotic species Brazilian pepper (*Schinus terbinthifolia*), primrose willow (*Ludwigia* sp.), torpedograss (*Panicum repens*), paragrass (*Urochola mutica*), and trompetilla (*Hymenachne amplexcaulis*). Exotic vegetation is most dense where wetlands border agricultural fields. The hydrology of the landscape within and surrounding the Project area has been historically affected by roadways, ditches, and permitted agricultural activities. The wetlands that would be impacted by the project are primarily limited to lower quality wetlands which are part of the historical agricultural operations.

AVOIDANCE AND MINIMIZATION INFORMATION: The applicant proposes to conform to the Collier County's Rural Land Stewardship Program, which is designed by Collier County to preserve lands with the highest natural resource values and identifies certain lands with relatively low natural resource values (such as cleared agricultural fields) for development of new communities.

The applicant proposes to utilize existing agricultural fields for the planned development to the extent possible and avoid and minimize direct impacts to the natural wetland habitats on-site. The planned discharges to jurisdictional wetlands are primarily for infrastructure construction such as road crossings and surface water management facilities.

The proposed Project would avoid impacts to the majority of the existing native habitats. For example, the proposed Project would avoid impacts to the Camp Keais Strand located on the Project's eastern boundary. The proposed site plan has been designed to minimize impacts to listed species by utilizing agriculture fields for development and preserving the majority of the natural wetland and upland habitats on-site. Approximately 94.2 percent (2,156.97± acres) of the wetlands on-site will be preserved. The proposal would establish 2,570.66± acres of Conservation Area. Priority has been given to preserving higher quality native vegetation that provides habitat for listed species.

To avoid and minimize impacts to protected species, the Conservation Area will be managed as habitat for the listed species documented on the Project site, in accordance with a Listed Species Management and Human-Wildlife Coexistence Plan. Management objectives for the preserves adjacent to development will be implemented to limit prey and foraging conditions that otherwise may attract panthers and bears; therefore, discouraging these species from accessing areas within the development. Preserves internal to the Project site will be managed to limit panther prey species such as white-tailed deer (*Odocoileus virginianus*) and feral hogs (*Sus scrofa*). The Project site design includes a lake buffer between the proposed development areas and Camp Keais Strand. The goal of this buffer is to limit potential access to development areas by large mammals. Where construction of a lake buffer is not feasible, wildlife fencing will be constructed to deter access by these species. Since the majority of the Project is currently an active agricultural operation, the proposed on-site preservation, enhancement, and restoration activities (described in more detail below) are anticipated to result in a net benefit to the conservation of fish, wildlife, listed species, and their habitats.

COMPENSATORY MITIGATION: The proposed compensatory mitigation plan for the Project has been designed in accordance with Section 8.5.2 of the 404 Applicant's Handbook to compensate for unavoidable impacts to jurisdictional waters. The proposed Conservation Area consists of 2,570.66± acres, of which approximately 2,100.17± acres will be utilized as compensatory mitigation for impacts to jurisdictional wetlands. The proposed mitigation for wetland impacts includes wetland preservation and enhancement. Exotic vegetation will be hand removed from 1,871.99± acres of wetlands. Mechanical removal of exotics and supplemental planting will be conducted in 228.18± acres of wetlands. In addition to the compensatory mitigation, the mitigation plan also includes the enhancement and preservation of 429.55± acres of existing upland habitat important to the life cycle of wetland-dependent wildlife species. These

429.55± acres are included in the mitigation plan, but are not used to offset functional loss associated with impacts to wetlands.

The proposed compensatory mitigation is located within the same watershed as the impact site and in a location where it is most likely to successfully replace lost functions and services. The compensatory mitigation for the Project is located within a regional flow-way and wildlife corridor and includes high-value habitat targeted by the Florida Forever Program within Camp Keais Strand. The South Florida Water Management District has also identified the Camp Keais Strand as a valuable resource for restoration and protection because it would provides attenuation of flood peaks, water quality improvements, and long-term protection of core wetland ecosystems.

A Uniform Mitigation Assessment Methodology (UMAM) functional analysis was prepared and provided with the application for the Project. The UMAM analysis indicates that the functional loss associated with wetland impacts for the Project totals 70.85 functional units. The functional gain associated with the proposed compensatory mitigation totals 128.57 functional units. Therefore, the UMAM analysis demonstrates that the proposed compensatory mitigation will more then offset the functional loss associated with the Project and yield a net gain of 57.72 functional units.

The proposed mitigation would occur in three phases. Each of the three Mitigation Areas corresponds to the basin number it offsets. Mitigation Area 1 is comprised of 645.04± acres and results in a functional gain of 23.89 units. Mitigation Area 2 is comprised of 1,011.61± acres and results in a functional gain of 60.21 units. Mitigation Area 3 is comprised of 873.07± acres and results in a functional gain of 42.76 units. Therefore, each Mitigation Area generates more than enough functional gain to offset the functional loss associated with each corresponding basin or phase of construction.

CULTURAL RESOURCES: An archaeological and historical survey was conducted by Archaeological Consultant's, Inc. (ACI) in July 2006 for the Big Cypress Stewardship District, which encompasses the project site. No archaeological or historic sites were documented during the survey. The Florida Department of State, Division of Historical Resources (DHR) issued a letter dated August 29, 2007 indicating concurrency with ACI's determination. The DHR letter states that the development of the Project site will have no effect on any historic properties eligible for listing in the National Register of Historic Places, or otherwise of historical or archaeological value.

The Department has requested review from the State Historic Preservation Officer (SHPO) and those federally recognized Tribes with concerns in Florida and the permit area. No comments have been received.

FEDERALLY AND STATE-LISTED SPECIES: The Department has requested review from the Florida Fish and Wildlife Conservation Commission (FWC) and the US Fish and Wildlife Service (USFWS), and the below comments have been received.

FEDERALLY AND STATE-LISTED SPECIES:  The project is located within the U.S. Fish and Wildlife Service (USFWS) Consultation Areas for the Audubon's crested caracara (*Polyborus plancus audubonii*, Federally Threatened [FT]), Everglade snail kite (*Rostrhamus*

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 98 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 405 of 444

*sociabilis plumbeus*, Federally Endangered [FE]), Florida scrub-jay (*Aphelocoma coerulescens*, FT), Florida panther (*Felis concolor coryi*, FE), red-cockaded woodpecker (*Picoides borealis*, FE), Florida bonneted bat (*Eumops floridanus*, FE), and Core Foraging Areas (CFA) for the wood stork (*Mycteria americana*, FT). The project site may also provide habitat for the eastern indigo snake (*Drymarchon corais couperi*, FT), gopher tortoise (*Gopherus polyphemus*, State Threatened [ST]), Florida pine snake (*Pituophis melanoleucus mugitis*, ST), southeastern American kestrel (*Falco sparverius paulus*, ST), Florida sandhill crane (*Antigone canadensis pratensis*, ST), little blue heron (*Egretta caerulea*, ST), roseate spoonbill (*Platalea ajaja*, ST), tricolored heron (*Egretta tricolor*, ST), Everglades mink (*Neovison vison evergladensis*, ST), and Big Cypress fox squirrel (*Sciurus niger avicennia*, ST).

Florida Fish and Wildlife Conservation Commission (FWC) staff determined the proposed project will have **no effect** on the Florida scrub-jay and red-cockaded woodpecker; and **may affect but is not likely to adversely affect** the wood stork, Everglade snail kite, and Audubon's crested caracara. The project **may affect and is likely to adversely affect** the Florida panther, Florida bonneted bat, and eastern indigo snake.

Florida Panther:  The entire project site is located with the Panther Focus Area Primary Zone. Use of the USFWS *Panther Effect Determination Key,* resulted in the following sequential determination: A > C = "may affect" the Florida panther. Florida panthers have been documented utilizing the forested uplands and forested wetland areas on the project site based on radio-collar telemetry points. According to the applicant's environmental representative, Passarella and Associates Inc. (PAI), the proposed project would result in impacts to 1,793.4 acres. The estimated number of Panther Habitat Unit (PHU) credits needed is 16,844 based on PAI's use of USFWS's Panther Compensation Calculator. The applicant has proposed to offset potential impacts to the Florida panther through a combination of onsite preservation and enhancement consisting of 2,391.6 acres. According to information provided by PAI, the project would provide compensation totaling 18,648 PHUs, which is a net increase of 1804 PHUs. The applicant has indicated a willingness to evaluate and implement avoidance, minimization, and compensation measures needed to offset potential adverse impacted to Florida panthers associated with any roadway improvements needed to accommodate future increases in traffic. Based on this information, the proposed project "may affect, and is likely to adversely affect" the Florida panther. FWC staff will work with USFWS staff, Florida Department of Environmental Protection (FDEP) staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Florida Bonneted Bat:  The Florida bonneted bat roosts in a variety of habitats including tropical hardwoods, pinelands, and mangroves that include tall, mature trees or other areas in which suitable structural features for breeding and sheltering are present. Foraging habitat is comprised of relatively open areas including open fresh water, permanent or seasonal freshwater wetlands, within and above wetland and upland forests, agricultural lands, and man-made habitats such as golf courses and parks. The project site is located within proposed Critical Habitat for the Florida bonneted bat and PAI has noted that the site contains physical and biological habitat features for bonneted bat. According to PAI, the project would result in an impact to approximately 1,550 acres of potential foraging and/or roosting habitat, but approximately 821 acres is currently in active row crop production and provides limited foraging and roosting

DocuSign Envelope ID: A49EDFD1-91B9-4E46-8859-CED34385A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 99 of 123
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 406 of 444

habitat.  An acoustic survey for the Florida bonneted bat was performed at 30 stations located on the property.  A total of 153 Florida bonneted bat calls were recorded at 6 survey stations, with 12 identified as near the time of roosting.

The applicant has proposed to implement several Best Management Practices from the Consultation Key.  PAI indicates that the proposed project would preserve and enhance approximately 2,571 acres of foraging and roosting habitat, resulting in an overall net increase in permanently protected habitat, so that the impacts would not result in an overall loss of available critical habitat for Florida bonneted bat.  Based on this information, use of the USFWS *Florida Bonneted Bat Consultation Guidelines* key resulted in the following sequential determination:  1a
> 2a > 3b > 6a > 7a > 8b, "likely to adversely affect."  FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.  The potential impacts to the Florida bonneted bat were evaluated using the.  and further coordination with USFWS staff is required.

Eastern Indigo Snake:  Over most of its range, the eastern indigo snake inhabits pine flatwoods, scrubby flatwoods, high pine, dry prairie, tropical hardwood hammocks, edges of freshwater marshes, agricultural fields, coastal dunes, and human-altered habitats.  Eastern indigo snakes appear to need a mosaic of habitats to complete their life cycle.  Wherever the eastern indigo snake occurs in xeric habitat, it is closely associated with the gopher tortoise.  No gopher tortoise burrows were observed during the 2019-2020 surveys of the site.  The project site includes approximately 2,724 acres of habitat that could potentially be used by the eastern indigo snake. According to information provided by PAI, eastern indigo snakes were documented on the site during surveys conducted in 2007 and 2009.  The potential impacts to the eastern indigo snake were evaluated using the USFWS *Eastern Indigo Snake Programmatic Effect Determination Key*.  Use of the key resulted in the following sequential determination:  A > B > C, "may affect" since the project will result in impacts to more than 25 acres of potential habitat for the eastern indigo snake.  The applicant has committed to following the USFWS-approved *Standard Protection Measures for the Eastern Indigo Snake* during the clearing and construction phases of the project.  Based on the available information, the proposed project "may affect, and is likely to adversely affect" the eastern indigo snake. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Wood Stork:  The project lies within the 18.6-mile buffer of the 619141, 619018 (Corkscrew), 619316, and 619161 (North Catherine Island II) colonies and wood storks have been observed

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F8-9CB24285A1FE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 100 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 407 of 444

foraging on the property. The project site is located approximately 1.7 miles from the North Catherine Island II nesting location. The proposed project would potentially affect suitable foraging habitat and impacts are unavoidable. The applicant is proposing to provide on-site mitigation which is within the appropriate CFA and of matching hydroperiod of the proposed impacts, and the project is not contrary to the Habitat Management Guidelines for the Wood Stork in the Southeast Region. Use of the USFWS *South Florida Ecological Services Office Effect Determination Key,* resulted in the following sequential determination: A > B > C > E, "not likely to adversely affect" provided the permit is conditioned on the applicant complying with approved wetland mitigation and monitoring requirements. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Audubon's Crested Caracara: The Audubon's crested caracara prefers habitats that contain largely short-stature vegetation with a low density of trees, including dry or wet prairie and improved and unimproved pasture containing scattered cabbage palms, their preferred nesting tree. They may also be found in lightly wooded areas with scattered saw palmetto, scrub oaks, and cypress. Seasonal freshwater marsh wetlands of less than 2.47 acres may increase habitat attractiveness. Audubon's crested caracaras have been observed foraging on site and a nest was documented on-site during 2020. PAI conducted bi-weekly observations and documented that the young fledged. PAI conducted surveys in 2021 and no nesting activity was observed on the property. Potential nesting habitat is present on the property. The applicant intends to conduct additional surveys and will avoid any nests during the nesting season. Based on this information, FWC staff determined that the proposed project "may affect but is not likely to adversely affect" Audubon's crested caracara. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Everglade Snail Kite: Everglade snail kite foraging habitat consists of relatively shallow wetland vegetation, either within extensive marsh systems, or in lake littoral zones. This species nests in a variety of vegetation types, usually over open water and almost always in areas with good foraging habitat nearby. Its preferred habitat is lowland freshwater marshes mostly in the Everglades, Lake Okeechobee, Lake Kissimmee, and upper St. Johns River watersheds. Most of the wetlands on the property are forested, but the property does contain approximately 78 acres of potential habitat. According to information provided by PAI, an adult Everglade snail kite was observed flying on the property during 2019-2020 surveys, and piles of apple snail shells have been observed on the property. No nesting has been observed on the site. Based on this information, FWC staff determined that the proposed project "may affect but is not likely to adversely affect" the Everglade snail kite. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Florida Scrub-Jay: The Florida scrub-jay is endemic to peninsular Florida's ancient dune ecosystems of oak-dominated scrub, or xeric oak scrub habitat, which occur on well-drained to excessively well-drained sandy soils. Optimal habitat for scrub-jays is dominated by low growing oaks (sand live oak [*Quercus geminata*], Chapman oak [*Q. chapmanii*], myrtle oak [*Q. myrtifolia*], scrub oak [*Q. inopina*]), which are 1 to 3 meters high, interspersed with 10 to 50

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-6C5D34285A1EE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 101 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 408 of 444

percent unvegetated, sandy openings for foraging and acorn-caching space, and a sand pine (*Pinus clausa*) canopy of less than 20 percent.  The project lies within the consultation area for Florida scrub-jay, but suitable habitat for this species is not present on the site based on existing site conditions.  Based on this information, FWC staff has determined that the project would have "no effect" on the Florida scrub-jay and no State 404 permit conditions are necessary for this species.

Red-Cockaded Woodpecker:  The red-cockaded woodpecker lives and forages in mature pine forests, specifically those with longleaf pines averaging 80 to 120 years old and loblolly pines averaging 70 to 100 years old.  Red-cockaded woodpeckers live in groups with a breeding pair and as many as four helpers, usually male offspring from the previous year.  Each group needs about 200 acres of old pine forest to support its foraging and nesting needs.  The applicant's environmental representative, PAI, conducted surveys during 2020 and 2021 and no potential nesting cavities were observed on the property.  No red-cockaded woodpeckers have been observed foraging on the property.  Based on this information, FWC staff has determined that the proposed project would have "no effect" on the red-cockaded woodpecker and no State 404 permit conditions are necessary for this species.

Gopher Tortoise:  Gopher tortoises are found in dry, sandy soils in habitats such as sandhills, xeric oak, and dry pine flatwoods.  The onsite uplands represent potentially suitable habitat for the gopher tortoise.  In their *Biological Assessment*, PAI indicated that no gopher tortoise burrows were observed onsite during surveys performed in 2019-2020.  FWC's Gopher Tortoise Permitting Guidelines found at http://www.myfwc.com/license/wildlife/gopher-tortoise-permits/ can be referenced for survey methodology, measures for avoiding impacts, as well as options and state requirements for minimizing, mitigating, and permitting. FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Southeastern American Kestrel:  The project site may provide suitable habitat for the southeastern American kestrel, including the open field habitat present on-site.  PAI conducted surveys in March and April 2020 and observed kestrels on site but was not able to determine if the kestrels were non-migratory.  The *Species Conservation Measures and Permitting Guidelines for Southeastern American Kestrel* found at https://myfwc.com/wildlifehabitats/wildlife/species-guidelines/ can be referenced for biological information, survey methodology, measures for avoiding impacts, and recommended conservation practices.  If nesting is identified on the project site, avoidance measures include maintaining a 490-feet (150-meter) buffer around the nest cavity location.  FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

State-Listed Wading Birds:  The forested wetlands present onsite may provide potential habitat for wading birds, including the little blue heron, roseate spoonbill, and tricolor heron which have been observed foraging on-site.  No nesting was observed during surveys conducted in 2019-2020.  The *Species Conservation Measures and Permitting Guidelines for Little Blue Heron, Reddish Egret, Roseate Spoonbill, Tricolored Heron* found at https://myfwc.com/wildlifehabitats/wildlife/species-guidelines/ can be referenced for biological

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-9CB34285A1EE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 102 of 123
USCA Case #24-5101      Document #2102936        Filed: 02/26/2025      Page 409 of 444

information, survey methodology, measures for avoiding impacts, and recommended conservation practices. If nesting is discovered after site activities have begun, the applicant will need contact the FWC to discuss potential avoidance measures, which include maintaining a 330-feet (100-meter) buffer around the nesting area, or other alternatives. FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Florida Sandhill Crane: The open marsh on the project site may provide suitable foraging and nesting habitat for the Florida sandhill crane. Florida sandhill cranes have been observed foraging on-site and a potential nesting area was documented on the property. The *Species Conservation Measures and Permitting Guidelines for Florida Sandhill Crane* found at https://myfwc.com/wildlifehabitats/wildlife/species-guidelines/ can be referenced for biological information, survey methodology, measures for avoiding impacts, and recommended conservation practices. If nesting is identified on the project site, avoidance measures include maintaining a 400-foot (122-meter) buffer around the nesting area. FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Big Cypress Fox Squirrel: The Big Cypress fox squirrel typically inhabit pine flatwoods, cypress swamps and hard wood hammocks with open to moderately dense understory and shrub cover. According to information provided by PAI, Big Cypress fox squirrels have been observed during on-site surveys conducted in 2007-2009, 2019-2020, and during other field work on the site. The *Species Conservation Measures and Permitting Guidelines for Big Cypress Fox Squirrel* (https://myfwc.com/media/11559/bigcypressfoxsquirrelguidelines-2018.pdf) can be referenced for biological information, survey methodology, measures for avoiding impacts, and recommended conservation practices. FWC staff will work with the applicant and FDEP staff to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Everglades Mink: The project site is located within the range of the Everglades mink and the site contains potential habitat including ditches, freshwater marsh, and prairie. Everglades mink rely on multiple wetland habitat types, do not avoid human activity, and frequently utilize man- made structures such as canals and levees located near wetland habitat. Their dens, if present, may be located near canals and wetlands. In March and April 2020, PAI conducted a camera trap survey for Everglades mink, and none were observed or recorded. FWC staff will work with the applicant and FDEP staff to determine any necessary permit conditions for the State 404 permit based on this information.

OTHER INFORMATION:
Please note that, to advance the objectives of the RLSP, Collier County requested that the applicant file an amendment to the Longwater Village Stewardship Receiving Area (SRA) to create a town SRA. The footprint of the requested town SRA would overlap with the current Longwater Village footprint and with the northern tip of the footprint of the Project but would not change the footprint of either Longwater Village or the Project. The applicant agreed and filed the requested amendment with Collier County on January 27, 2022. The outcome of the request will not be known until the County takes final action on the potential amendment, which is not anticipated until fall of 2022 or later. Regardless of the

County's final action on the amendment under the RLSP, the footprint, overall timing of development and acreage of impacts (including WOTUS impacts) would not change as a result of the amendment.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing through the business portal (Public Comment | DEP Business Portal (fldepportal.com) or to Toby Schwetje at Florida Department of Environmental Protection, South District Office, PO Box 2549, Fort Myers, Florida 33902-2549 within 30 days from the date of this notice. Written comments will be made part of the record and should reference the above permit application number. Objections must be factual, specific, and fully describe the reasons upon which any objection is founded. Any comments received will be considered by the Department to determine whether to issue, modify, condition, or deny a permit for this proposal. Unless a written request is filed with the Department within the 30-day public comment period, the Department may decide on the application without a public meeting.

EVALUATION: The determination as to whether a permit will be issued, or a public meeting held, will be based on an evaluation of all relevant factors, including the public comments received and the effect of the proposed work on the public interest, including, but not limited to, fish, wildlife, historical resources, and pollution. The specific permit decision criteria can be found in Chapter 62-331, Florida Administrative Code.

The Department is soliciting comments from the public; federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. To make this consideration, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and other public interest factors. Comments are also used to determine the need for a public meeting and to determine the overall public interest of the proposed activity.

FOR FURTHER INFORMATION regarding this application, please visit the State 404 Permit File at https://depedms.dep.state.fl.us:443/Oculus/servlet/shell?command=hitlist&[freeText=]&[folderName=]&[profile=Permitting_Authorization]&[creator=]&[entityType=any]&[createdDateTo=]&[catalog=45]&[searchBy=Profile]&[sortBy=Facility Site+ID]&[createdDate=]&{County=_EQ_COLLIER}&{District=_EQ_SD}&{Facility-Site+ID=_EQ_ST404_396364}, or contact the project manager, Toby Schwetje, in writing at Florida Department of Environmental Protection, South District Office, PO Box 2549, Fort Myers, Florida 33902-2549; by electronic mail at Toby.Schwetje@floridadep.gov, or by telephone at (239)344-5631. Please include the permit application number referenced at the top of this page in any correspondence.

REQUEST FOR PUBLIC MEETING: Any person may request a public meeting. The request must be submitted to SD-ERPcomments@floridadep.gov, within the designated comment period of the notice and must state the specific reasons for requesting the public meeting.

# ATTACHMENT E

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F8-GGB24285A1EE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 105 of 123
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 412 of 444



*Protecting Southwest Florida's unique natural environment and quality of life … now and forever.*

October 27, 2022

Megan Mills, Program Administrator Permitting and Engineering
Florida Department of Environmental Protection South District
PB Box 2549
Fort Myers, FL 33902
Megan.Mills@FloridaDEP.gov

Robert Carey, Environmental Review Branch Manager
U.S. Fish and Wildlife Service
1339 20th St.
Vero Beach, FL 32960
robert_carey@fws.gov

Jason Hight, Director
Office of Conservation Planning Services
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399
Jason.Hight@myfwc.com


RE: Immokalee Road Rural Village 404 Permit Application No. 396348-001


Dear Ms. Mills, Mr. Carey, and Mr. Hight,

The Conservancy of Southwest Florida writes on behalf of our over 6,400 supporting families to provide additional comments on the Immokalee Road Rural Village (IRRV) state 404 permit application currently under review (application number 396348-001). Our previous comments addressed the original state 404 permit application that was transferred from the U.S. Army Corps of Engineers (USACE) for this proposed project in Collier County. We are now writing in response to the applicant's February 17, 2022 materials submitted in response to the Department's Request for Additional Information (RAI). To our knowledge, no further RAIs or response materials for the state 404 permit application have been exchanged since this date.

We continue to highlight our past concerns with this 2,787-acre project, including impacts to water resources and listed species, as well as the cumulative effects of this and other large-scale projects under review or permitted in the region. The habitat fragmentation, loss of wetlands, and related impacts to upland systems in this part of southwest Florida is of increasing concern,

 Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way | Naples, Florida 34102 | 239.262.0304 | Fax 239.262.0672 | www.conservancy.org

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-GSB24285A1EE

Conservancy of Southwest Florida
IRRV Application 396348-001
2

especially as this project is nearby the critically important greater Corkscrew ecosystem. We ask that the agencies thoroughly review all impacts posed by this proposed project and require the applicant to provide additional information as indicated in questions in our previous comments and this updated letter. The IRRV project poses a substantial risk to wetlands and listed species, both individually and cumulatively, and we ask that the agencies deny this project.

**Site plan and environmental impacts**

The updated application materials indicate that wetlands were reviewed by the Florida Department of Environmental Protection (FDEP) and the South Florida Water Management District (SFWMD) on May 21 and June 23 and 25, 2021.[1] We request that FDEP clarify which definition of "Waters of the U.S." (WOTUS) the Department utilized for this application. FDEP must ensure consistency with the current definition of WOTUS, which the USACE and the U.S. Environmental Protection Agency (US EPA) interpret to be the pre-2015 regulatory regime definition.[2] For this and other issues highlighted in this letter and our past comments, we ask that the US EPA reserve its right for federal review of this 404 permit application.[3]

It is evident that the site plan for the IRRV project has been updated since the original 404 permit application materials were transferred to FDEP, and includes changes to the proposed preserve areas, development footprint, roadways in and around IRRV, and water features on-site. As a result of these changes, there are additional environmental impacts on-site; thus, the site plan alterations and related impacts must be reconsidered by the permitting agencies. For example, the FWC provided their determinations on the impact of the proposed IRRV project in a letter dated March 15, 2022[4]; was this based on the original footprint or on the newer proposal submitted?

Originally, the northern preserve area extended to the eastern edge of the project area, and as we suggested in our previous letter, the widening of this preserve area could better serve as a connector for large mammals. We remind the agencies that the wetland ecosystems in this part of southwest Florida constitute existing travel ways for large mammals, like the Florida panther. This is evidenced by the fact that CR846 Immokalee Road at the site of IRRV is one of the worst existing hotspots for Florida panther vehicle collisions; several Florida black bear have also been killed on this stretch.[5] Newly proposed alterations to the site plan now show a portion of the preserve removed from the northwest, a narrowing of the preserve area moving east, and the

---

[1] IRRV Wetland Map, prepared by Passarella & Associates, Inc., (Revised February 3, 2022).
[2] USEPA, Current Implementation of Waters of the United States, accessed from: https://www.epa.gov/wotus/current-implementation-waters-united-states
[3] State 404 Program Applicant's Handbook, section 5.2.5, and as described in Rule 62-331.052(3), F.A.C.
[4] Florida Fish and Wildlife Conservation Commission, 2022. FWC's Public Notice Response Immokalee Road Rural village Mixed-used Development. Posted on Oculus March 15, 2022.
[5] Southwest Florida Road Hot Spots, 2.0 Transportation SubTeam Report to Florida Panther Recovery Implementation Core Team. June 2020, and subsequent updates.

northeastern portion now cut off before reaching the proposed connecting road.[6] It is unclear from the application materials if large mammal crossings have been proposed by the applicant either on CR846 or for the internal road.

The updated proposed uplands preserve is now only approximately 265 acres in the northwestern section and 100 acres in the southeastern section as a gopher tortoise preserve.[7] The previous site plan shows 484.84 acres of upland preserve.[8] In addition, the site plan now shows "passive recreational trails" in the conservation areas, including in what could be the gopher tortoise preserve area.[9] How will the applicant ensure minimized human-wildlife interactions, as well as provide for continued protection of these proposed preserves, wildlife, listed species, and compensatory mitigation areas?

The updated application materials indicate direct impacts to approximately 46 acres of wetlands and 216 acres of other surface waters on-site.[10] While this is 1.72 acres of additional impacts to wetlands, the most recent UMAM data submitted as part of the related ERP application indicates greater loss of wetland functional units. The applicant now proposes approximately 153 acres of wetland preservation and enhancement to offset these direct wetland impacts, as well as to offset the loss in prey biomass for the federally threatened wood stork. It appears that the Mitigation, Monitoring and Maintenance Plan included in the 404 application RAI response was updated in February 2022; however, this document no longer includes proposed acreage impacts and mitigation lift/gain numbers to support the narrative. Instead, the November 2021 OCULUS upload of the SFWMD ERP Environmental Supplement materials includes a UMAM analysis, which shows that the applicant's calculated net gain in wetland functional units would be 10.10 units (down from the estimated 13.93 units in the July 2020 UMAM analysis).[11] Further, the applicant's most recent UMAM analysis, submitted to SFWMD in August 2022, shows updated scoring, additional functional units lost, and even lower functional units gained after now utilizing the upland preservation and enhancement areas to supplement mitigation.[12] As a result, we ask: what supporting data are the permitting agencies reviewing? Are the agencies aware of the site plan alterations and the modifications to related impacts and proposed mitigation provided in updated materials in the related ERP application?

---

[6] IRRV Conservation Areas Map, Prepared by Passarella & Associates, Inc. (Revised February 3, 2022). The intended land uses for the portions of the preserve that are now removed are unclear.

[7] IRRV, Biological Assessment, prepared by Passarella & Associates, Inc., (Revised February 2022).

[8] IRRV Impact Map Dwg No. 99WAI374-15, (October 21, 2019), Received by FDEP on December 28, 2020.

[9] IRRV Wetland Mitigation and Monitoring Plan, (Revised February 3, 2022), prepared by Passarella and Associates Inc.; IRRV Preserve Area and Listed Species Management Plan, Exhibit 43A, (Revised February 7, 2022), prepared by Passarella & Associates, Inc.

[10] IRRV, Biological Assessment, (Revised February 2022). Prior application materials indicated approximately 44 acres of direct impacts to wetlands and 201 acres of impacts to other surface waters (see November 19, 2019 application materials from 404 permit application to US Army Corps of Engineers as transferred to FDEP).

[11] IRRV Environmental Supplement for SFWMD ERP, (November 2021), prepared by Passarella & Associates, Inc., received electronically by FDEP South District on December 15, 2021.

[12] IRRV UMAM Analysis, (Revised August 2022), submitted to SFWMD ERP application RAI response August 17, 2022. The applicant states that 3.74 functional units will be gained, though there appears to be errors in calculations as indicated in the SFWMD RAI letter dated September 16, 2022.

Conservancy of Southwest Florida
IRRV Application 396348-001
4

The applicant continues to suggest that the proposed restoration and enhancement would fully compensate for wetland functional loss; however, in the May 4, 2022 and September 16, 2022 RAI letters for the project's related ERP application, SFWMD indicated that the proposed mitigation is insufficient to offset the wetland impacts.[13] In light of the site plan alterations and impacts and mitigation changes, what less damaging alternatives[14] and "appropriate and practicable changes to the project plan to avoid or minimize the environmental impact of the activity"[15] have been considered and analyzed by the applicant? We also ask that FDEP require an updated and full accounting of the proposed compensatory mitigation be provided to support the applicant's proposed on-site mitigation, and that FDEP thoroughly review the proposed mitigation as required by the State 404 Program. As this proposed development relies on compensatory mitigation to offset impacts to wetlands and listed species, accurate and uniform data are crucial for a comprehensive review and assessment of whether the proposed mitigation fulfills the criteria established in the State 404 Applicant's Handbook.[16]

## Listed Species

The updated Biological Assessment included in the RAI response shows that listed species surveys for the project site were conducted in 2018 and 2019.[17] The applicant reported that crested caracara nesting surveys were performed January through April 2020, and that this and past site surveys have observed caracara utilizing the site for foraging. Due to the presence of caracara, the applicant should perform updated caracara survey and also account for any nests that are off-site but where the project falls within the 1,500 meter protective buffer area, consistent with USFWS survey policy.[18] Florida Bonneted Bat acoustic and roost surveys were completed in 2020. The updated materials show red cockaded woodpecker (RCW) surveys from 2007.[19]

The entirety of the project site is within the Panther Primary and Secondary Zones. The updated Biological Assessment shows that the loss of Panther Habitat Units (PHUs) is now estimated at 6,227 (569 PHUs more than was previously estimated). In addition, as included in the updated materials, the applicant's panther vehicle mortality study, completed in October 2020, found that "based on existing and projected panther mortality for the roadway segments in the study area, vehicle-related panther deaths are projected to increase due to Project traffic."[20] Mortality from

---

[13] SFWMD, (May 4, 2022), Request for Additional Information ERP application number 211207-32383, item number 12; SFWMD (September 17, 2022), Request for Additional Information, item numbers 9 and 10.
[14] 62-331.053, F.A.C.
[15] State 404 Applicant's Handbook, Section 8.2 (i).
[16] State 404 Applicant's Handbook, Section 8.5.5 Use of Preservation as Compensatory Mitigation. Under the state 404 program, the applicant's compensatory mitigation plan must satisfy requirements of Rule 62-331.130, F.A.C.
[17] IRRV Biological Assessment, (revised February 2022), p. 3.
[18] USFWS, 2017. USFWS Crested Caracara Draft Survey Protocol, Additional Guidance.
[19] The USFWS October 2016 Endangered Species Act Consultation Checklist (Service Consultation Code 2020-TA-1186) asked the applicant to provide a previous survey report from 2015 for the RCW. We are unable to locate this in the application materials submitted with the February 17, 2022 RAI response.
[20] IRRV Biological Assessment, (revised February 2022), p. 19.

Conservancy of Southwest Florida
IRRV Application 396348-001
5

panther-vehicle collisions is a major threat to the species and population expansion, and as we previously indicated, the western border of the proposed IRRV development (Immokalee Road) is one of the top eight deadliest areas for panthers (and the site is also Primary Zone habitat and Adult Breeding Habitat). As recently as July 9, 2022, FWC announced that a four-year old female panther was struck and killed by a vehicle on Immokalee Road, directly next to the proposed development.[21] The potential for increase in panther mortality due to traffic from the proposed project needs to be fully considered by the permitting agencies and adequately avoided, minimized, and mitigated.

We remind the agencies that the Biological Assessment states that 113 gopher tortoise burrows were identified on site.[22] The applicant proposes to relocate gopher tortoises "to on-site preservation areas," which we understand could be the southeastern proposed preserve area.[23] Considering that this area is approximately 100 acres, this preserve might be able to accommodate less than half of the gopher tortoises potentially located on-site.[24] Further, this map includes species survey data from 2018, and without updated data it is unclear how many potentially occupied gopher tortoise burrows are currently on-site and how this would influence the avoidance and minimization needed to adequately protect this state-designated threatened species. Further, as we understand from FWC, there may only be approximately one year's worth of offsite gopher tortoise relocation site capacity left available statewide.[25] The continued permitting of gopher tortoises to be relocated offsite at levels seen in the past two years (approximately 19,000 tortoises in 2021 and over 11,000 tortoises in 2022, as of July) is not sustainable; the agencies must work with this applicant to ensure that the gopher tortoise preserves are appropriate and large enough to accommodate all gopher tortoises from the site, and that preservation of the existing burrows in place are maximized.

This project is also within the core foraging area of five wood stork colonies; the closest of which is less than two miles away at the historic Corkscrew Swamp Sanctuary. The analysis of the cumulative effects to the wood stork does not appear to have been updated, as the analysis references data from 2016 to 2019.[26] The updated Biological Assessment shows that the project would pose an even greater risk to wood stork prey biomass than what was proposed in the original application (now estimated at 1,040 kilograms of biomass loss versus 945.95 kg of biomass loss in the initial application). The Biological Assessment references calculations using

---

[21] FWC Panther Pulse, 2022 data, accessed from: https://myfwc.com/wildlifehabitats/wildlife/panther/pulse/.
[22] IRRV Biological Assessment, USFWS 2020-TA-1186, (Revised February 2022), Prepared by Passarella & Associates, Inc., p. 6.
[23] IRRV Preserve Area and Listed Species Management Plan, Exhibit 43A, (revised February 7, 2022).
[24] Figure 7, IRRV Aerial with Listed Species Locations, (July 12, 2019), in Exhibit 6, IRRV Updated Listed Plant and Wildlife Species Survey, Revised July 2019. As of this survey, it appears that the proposed preserve area in the southeastern portion has approximately 70 burrows alone.
[25] Preservation at Marco Island Summer School, July 2022. Estimate by FWC staff as about 15,000 spaces left in capacity for offsite relocation of gopher tortoises statewide. FWC staff stated that in 2021 there were 2,300 offsite relocation permits granted for about 19,000 tortoises, and in 2022 there had been over 1,440 offsite relocation permits for over 11,000 tortoises.
[26] Figure 7, IRRV Aerial with Listed Species Locations, (July 12, 2019), in Exhibit 6, IRRV Updated Listed Plant and Wildlife Species Survey, Revised July 2019, pp. 11-12.

the USFWS wood stork compensation calculator in Exhibit 39; however, we are unable to locate the updated calculations to support the changes described in the narrative.[27] In addition, the FWC Notice, dated March 15, 2022 on FDEP's Information Portal site, states the proposed project is "not likely to adversely affect" the wood stork due to the applicant "proposing to provide mitigation at an approved mitigation bank."[28] However, the application materials state that the applicant intends to mitigate for the loss of wood stork biomass through "on-site restoration and enhancement activities, particularly in the form of preserving and enhancing 152.85+/- acres of existing wetlands."[29] Is this the same area as that which is intended to provide compensatory mitigation for the direct impacts to wetlands? We would also appreciate clarification on the updated biomass loss calculations and information regarding the proposed mitigation included in the FWC Public Notice Response document and the application materials.

**Cumulative and secondary effects**

The cumulative and secondary effects to wildlife, wetlands, and other natural resources must be fully accounted for, analyzed by the applicant, and considered by the agencies during permit review. There are now over 540 state 404 permit applications within 10 miles of the IRRV site, including similar large development projects that would add over 15,000 new homes to this area (see Attachments A and B).[30] In terms of secondary effects, we remind the agencies that the proposed project would be located near the protected lands and wetland ecosystems of the Corkscrew Swamp Sanctuary and Corkscrew Regional Ecosystem Watershed (CREW). As such, a secondary effects analysis per the State 404 Applicant's Handbook, Section 8.3.6, should be required for this project. As FDEP and the Water Management Districts continue to receive more 404 and ERP applications than originally anticipated, the cumulative and secondary impact analyses for this project must be updated for an informed review of the considerable amount of development taking place in this part of southwest Florida.

**Conclusion**

We appreciate the opportunity to submit additional comments on this project and hope that this information will assist with a thorough review of the impacts of this project on water resources and listed species. Given its size, location, and impacts on natural resources and listed species both individually and cumulatively, we ask that you deny this project. Should this project move forward, we continue to request that FDEP hold a public meeting for this application and ask that

---

[27] For example, see "IRRV Wood Stork Foraging Habitat Analysis" (August 2020), p. 5; table in Appendix D Wood Stork Suitable Foraging Prey Base Loss; and Appendix E IRRV Wood Stork Compensation Calculator May 8, 2020.
[28] Florida Fish and Wildlife Conservation Commission's Public Notice Response, Immokalee Road Rural Village Mixed-used Development State 404 Permit App. No. 396348-001, Collier County, (dated March 15, 2022).
[29] IRRV Biological Assessment, (Revised February 2022), p. 21.
[30] Feature Layer from Florida Department of Environmental Protection, State 404 Program Permits, accessed from: https://geodata.dep.state.fl.us/, track State 404 Program facilities and sites which have applied for various environmental and/or regulatory permits, with additional fields added to allow better querying of data. Other proposed large development projects include Rural Lands West, Hogan West, and Bellmar.

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-GCB24285A1EE

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 111 of 123
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 418 of 444
Conservancy of Southwest Florida
IRRV Application 396348-001
7

the US EPA reserve its right to object to a permit application should additional information be uncovered during the public notice comment period. This comment letter does not constitute support for the state-assumed Section 404 permitting program, which we believe is unlawful. FDEP, the wildlife agencies, and US EPA should use every latitude in the framework to fully review this permit application.

Thank you again for your consideration of our comments and if you have any questions, please contact me at (239) 430-2467.


Sincerely,


Jessica P. Wilson, Ph.D.
Senior Water Policy Specialist
jessicaw@conservancy.org


cc:
Toby Schwetje, FDEP
Jennifer Carpenter, FDEP
John Truitt, FDEP
Jose Rivera, USFWS
Jeaneanne Gettle, US EPA
ConservationPlanningServices@MyFWC.com
SD-ERPcomments@floridadep.gov

Conservancy of Southwest Florida
IRRV Application 396348-001
8

Attachment A



DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-CCD24285A1EE

Conservancy of Southwest Florida
IRRV Application 396348-001
9

Attachment B



# ATTACHMENT F

**CONSERVANCY**
of Southwest Florida
™ OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

June 7, 2022                                                    *sent via email*

Laura Layman, Section Leader
South Florida Water Management District
2301 McGregor Boulevard
Fort Myers, Florida 33901
llayman@sfwmd.gov

Jason Hight, Acting Director
Office of Conservation Planning Services
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399
Jason.Hight@myfwc.com


Re: FFD Corkscrew Road Property, #211005-7746

Dear Ms. Layman and Mr. Hight,

On behalf of our more than 6,400 supporting families, the Conservancy of Southwest Florida is
providing comment on FFD Conceptual Environmental Resource Permit Application No. 211005-7746.
We again request that this project be designated a Project of Heightened Public Concern and that the
public be provided an opportunity to give verbal comment about this project at an upcoming Regulatory
Meeting before the South Florida Water Management District (SFWMD) decides whether or not to grant
this permit.

As the applicant has not addressed our concerns from November 2021, many of our issues remain the
same and we refer you to our November letter for additional details.

**Listed Species Survey Too Old To Reliably Meet Issuance Criteria**

The Environmental Resource Permit (ERP) rule and handbooks stipulate that proposed activities cannot
adversely impact fish and wildlife wetland habitat functions.[1] This includes impacts to the abundance
and diversity of listed species, or the habitat of those species.

---

[1] Environmental Resource Permit, Applicant's Handbook, Vol. I, Section 10.1.1., Section 10.2.2.



Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good
governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's
largest and most respected independent evaluator of charities.

Further, to meet the additional conditions for issuance of individual permits, the SFWMD must know whether the proposed activities will adversely affect the conservation of fish and wildlife, including endangered and threatened species, or their habitats.[2]

It is not possible to provide these reasonable assurances as the applicant relies on listed species surveys conducted in 2007 and 2008. Data that is more than a decade old - some 15 years old - cannot meet the requirements of the SFWMD, and should not be deemed as adequate. The environmental supplement repeatedly refers to the protected species survey done in 2007 and 2008.[3] While there is publicly available data for some species (such as the Florida panther, Florida black bear, and wood stork), most listed species do not have this resource available and on-site surveys are necessary.

Comment 20 from the Request for Additional Information dated November 4, 2021 requires an updated wildlife survey, conducted within the past year. This request was ignored as all documents in the revised plans refer to the listed species surveys conducted in 2007 and 2008. Please reiterate your request for an updated wildlife survey, conducted within the past year.

**Impacts to Listed Species and Their Habitats**

Further, of the information we do know of this proposed project, it would have adverse impacts on listed species and their habitats, and would be contrary to the public interest, as considered in Applicant's Handbook Section 10.2.3.[4]

*Florida Panthers*
The applicant is proposing to impact 555.3 acres of primary panther habitat while there are 404 acres of secondary habitat outside of the impact footprint.[5] If the applicant were to slightly compress and modify their footprint, the development could avoid most – if not all – primary panther habitat.

Kautz et al. (2006)[6] is considered best available science and recognizes the habitat areas delineated in the study as crucial for Florida panther recovery.[7] The area defined as the Primary Zone is the minimum "space to support a population that is barely viable demographically as long as the habitat base remains stable" and therefore advocates for a "no net loss of landscape function or carrying capacity."[8] The delineated habitat zones are essential to long-term viability, survival, and recovery of the species, yet this project proposes to destroy more than a thousand of acres of panther habitat. We note that panther habitat is not mentioned in the provided survey dated 2008.

[2] 62-330.302, Additional Conditions for Issuance of Individual and Conceptual Approval Permits.
[3] FFD Corkscrew Road Property Listed Species Management and Human-Wildlife Coexistence Plan, April 2022.
[4] Environmental Resource Permit, Applicant's Handbook, Vol. I, Section 10.2.3.
[5] We acknowledge that there is an area designated as a wildlife corridor in the center of the impact area, however, as that area is not designed to facilitate movement of large mammals (or any animals, discussed below), we are including this area as part of the impact area.
[6] Kautz, R. et al, How much is enough? Landscape-scale conservation for the Florida panther, BIOLOGICAL CONSERVATION 130 (2006) 129
[7] US Fish and Wildlife Service, 2008. Florida Panther Recovery Plan, 3rd Revision.
[8] Kautz, R. et al, How much is enough? Landscape-scale conservation for the Florida panther, BIOLOGICAL CONSERVATION 130 (2006) 129

Lands within the FFD project site have also been designated as "Adult Breeding Habitat"[9]. Scientists modeled Adult Breeding Habitat for the species and have stated that protecting this remaining breeding habitat in south Florida is essential to the survival and recovery of the Florida panther.[10] Further loss of adult panther breeding habitat is likely to reduce the prospects for survival of the existing population, and decrease the probability of natural expansion of the population into south-central Florida.[11]

The proposed development area impacts 1,372.6 acres of Adult Breeding Habitat.

The applicant should consider an alternative that would reduce these proposed impacts through a more compact, walkable community that is built only on secondary panther habitat rather than impacting both primary and secondary panther habitat.

The Florida Panther Recovery Plan indicates that while loss and fragmentation of habitat is the leading threat to the survival of the species, panthers also "avoid areas within their home range with intensification of disturbance."[12] Frakes et al, 2015, also shows that panthers begin to avoid areas with increasing density of people and density of roadways.[13] Being directly adjacent to heavily utilized wildlife habitat, this intensification of use has the potential to seriously impact both the function and value of these areas for the Florida panther and wildlife in general.

*Audubon's Crested Caracara*
Caracara were observed on the site in 2007 and 2008.[14] Are caracara still using the property? We don't know. Is there a caracara nest on the property? We don't know. No listed species survey has been conducted in more than a decade.

*Red-Cockaded Woodpecker*
We note that evidence of several red-cockaded woodpecker (RCW) cavity trees were observed on site according to Table 1 of the environmental supplement.[15]

*Wood Storks*
The proposed FFD project is also within the Core Foraging Area (CFA) of 3 active wood stork colonies.

The applicant should address each of the foraging areas separately and cumulatively as to impacts, as the applicant needs to ensure each colony will have adequate foraging habitat. We also believe that impacts for other developments in each CFA must be looked at cumulatively.

---

[9] Frakes RA, Belden RC, Wood BE, James FE (2015) Landscape Analysis of Adult Florida Panther Habitat. PLoS ONE 10(7): e0133044. https://doi.org/10.1371/journal.pone.0133044
[10] *Ibid.*
[11] *Ibid.*
[12] US Fish and Wildlife Service, 2008. Florida Panther Recovery Plan. P. viii. P.33.
[13] Frakes RA, Belden RC, Wood BE, James FE (2015) Landscape Analysis of Adult Florida Panther Habitat. PLoS ONE 10(7): e0133044. https://doi.org/10.1371/journal.pone.0133044
[14] FFD Corkscrew Road Property Environmental Supplement for the South Florida Water Management District Environmental Resource Permit, October 2021, p.4.
[15] FFD Corkscrew Road Property Environmental Supplement for the South Florida Water Management District Environmental Resource Permit, October 2021. P.4.

JA.410

**Cumulative and Secondary Impacts**

If a large development, such as proposed by FFD, is approved, it could have devastating secondary and cumulative impacts on critically-important landscapes in southeast Lee County and into Collier County. If FFD is approved, it has the potential to change water quality, water quantity, hydrology, increase invasive plants and animals, and contribute to light pollution.

The applicant must address the plethora of alternative sites already approved along Corkscrew Road for Master Planned Communities, and explain why building additional housing along Corkscrew Road is better/more efficient/less impactful than infill and redevelopment in more urbanized areas in Lee County.  The applicant has failed to show why this development would not result in adverse direct, secondary, and cumulative environmental impacts.

**Conclusion**

Thank you for considering our comments and we hope that this will help assist in your evaluation of the impacts of the FFD Project on water resources and listed species. Eastern Lee and Collier counties natural resources are extremely threatened by continuing mining and development, and FFD in particular is located within an area heavily utilized by listed and wetland-dependent species, a regional corridor, and is adjacent to critical conserved lands.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
 juliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776-5601
amberc@conservancy.org

Cc:
Melissa Roberts, SFWMD mroberts@sfwmd.gov
Jennifer Smith, Chief of Staff, South Florida Water Management District, jsmith@sfwmd.gov

JA.411

**DocuSign**

| Certificate Of Completion | | |
|---|---|---|
| Envelope Id: A49FDFD191B94E4588F9CCD24385A1FE | | Status: Completed |
| Subject: Please Complete DocuSign, Case: FL 404 Assumption - 2023 02 24 Conservancy Final Com.pdf | | |
| Source Envelope: | | |
| Document Pages: 118 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Briana Kleiner |
| AutoNav: Enabled | | 50 California Street, Suite 500 |
| EnvelopeId Stamping: Enabled | | San Francisco, CA  94111 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | bkleiner@earthjustice.org |
| | | IP Address: 63.144.247.236 |

| Record Tracking | | |
|---|---|---|
| Status: Original | Holder: Briana Kleiner | Location: DocuSign |
|     2/24/2023 11:09:08 AM |     bkleiner@earthjustice.org | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Amber Crooks | *DocuSigned by:* | Sent: 2/24/2023 11:14:16 AM |
| amberc@conservancy.org | 50496CAE7D21435... | Viewed: 2/24/2023 11:17:17 AM |
| Security Level: Email, Account Authentication (None) | | Signed: 2/24/2023 11:41:35 AM |
| | Signature Adoption: Drawn on Device | |
| | Using IP Address: 209.180.221.66 | |
| **Electronic Record and Signature Disclosure:** | | |
|   Accepted: 2/24/2023 11:17:17 AM | | |
|   ID: eb553d3b-3c08-4b43-941a-be30303dde8f | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Bonnie Malloy | **COPIED** | Sent: 2/24/2023 11:14:16 AM |
| bmalloy@earthjustice.org | | Viewed: 2/26/2023 8:03:01 AM |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** | | |
|   Not Offered via DocuSign | | |
| Briana Kleiner | **COPIED** | Sent: 2/24/2023 11:14:16 AM |
| bkleiner@earthjustice.org | | Resent: 2/24/2023 11:41:43 AM |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** | | |
|   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/24/2023 11:14:16 AM |
| Certified Delivered | Security Checked | 2/24/2023 11:17:17 AM |
| Signing Complete | Security Checked | 2/24/2023 11:41:35 AM |
| Completed | Security Checked | 2/24/2023 11:41:35 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on 7/18/2017 2:50:45 PM
Parties agreed to: Amber Crooks

Case 1:21-cv-00119-RDM   Document 98-1   Filed 02/28/23   Page 121 of 123
USCA Case #24-5101        Document #2102936        Filed: 02/26/2025        Page 428 of 444

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Earth Justice (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

JA.414

**How to contact Earth Justice:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: ndiamond@earthjustice.org

**To advise Earth Justice of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at ndiamond@earthjustice.org and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Earth Justice**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to ndiamond@earthjustice.org and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Earth Justice**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to ndiamond@earthjustice.org and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies •Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Earth Justice as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Earth Justice during the course of my relationship with you.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**DECLARATION OF ELIZABETH H. FLEMING**

I, Elizabeth H. Fleming, hereby declare as follows:

1.      I am a resident of St. Petersburg, Florida, and a member of Defenders of Wildlife ("Defenders"). As a member of Defenders, I rely on the organization to represent my interests in protecting all native wild animals and plants in their natural communities, including from two of the most serious environmental threats to the planet: the accelerating rate of extinction of species and associated loss of biological diversity, and habitat alteration and destruction. Florida panthers and sea turtles are particular passions of mine and I am grateful for the work that Defenders does to protect them in my native state.

2.      I attended Tufts University in Massachusetts from 1983 to 1987 and graduated *magna cum laude* with a degree in political science and a minor in biology. I had designed a curriculum that allowed me to take graduate courses and undertake independent studies on the environment.  In 2002, I returned to St. Petersburg, Florida.

1

JA.417

**Membership and Work with Defenders of Wildlife**

3.        I began working for Defenders as the Florida Representative in 2004 and became the Senior Florida Representative in 2012. As a member of Defenders and a Florida, protecting the Florida panther and sea turtles is an ongoing and important part of my professional life and my personal interests.

4.        Founded in 1947, Defenders is a national non-profit conservation organization focused solely on wildlife and habitat conservation and the safeguarding of biodiversity with a mission to protect all native animals and plants in their natural communities. The organization protects and restores imperiled species throughout North America by transforming policies and institutions and by promoting innovative solutions informed by scientific, legal, and policy expertise, hands-on wildlife management experience, and effective advocacy.

5.        Defenders reaches thousands of people through print and online media and communications. Defenders' Florida/Georgia/Alabama Facebook page reaches a network of over 1,000 people. Our Defenders magazine is circulated to around 300,000 members and is available on our website.

6.        As Defenders' Senior Florida Representative, I work to protect and restore Florida's imperiled wildlife, wildlife habitat, and a state ecological network. I coordinate with partners to conserve core and connective habitat for threatened and endangered wildlife, especially wide-ranging species that use a mosaic of habitats such as the Florida panther and Florida manatee.

7.        I also coordinate with partners to conserve core and connective habitat for sea turtles; some of these habitats include nesting beaches, seagrass beds, coral reefs, mangroves, sargassum mats, estuaries, and open water.

2

JA.418

8.      As part of my work, I engage with members and supporters to help protect the wildlife and wildlife habitat throughout Florida. I have personally written letters to federal agencies regarding a number of rulemakings, including reclassification of species and refuge planning.  I also oversee programs that foster responsible coexistence with wildlife, including the Florida panther, manatees and sea turtles.

9.      In my capacity at Defenders and as a board member of the Friends of the Florida Panther National Wildlife Refuge, which supports Ten Thousand Islands National Wildlife Refuge, I have helped advance efforts to darken beaches, such as by endorsing allocation of monies from the BP Deepwater Horizon restoration funds to retrofit buildings on entire stretches of beach. I am currently endorsing efforts to secure Dark Sky designation for Ten Thousand Islands National Wildlife Refuge in the western Everglades.  The outer barrier islands of the Refuge are important nesting areas for several endangered and threatened sea turtle species that need dark beaches for their survival.

10.      I lead Defenders' work on the Florida panther.  Because of our comprehensive approach to panther conservation and recovery, I serve as conservation representative for the Florida Panther Recovery Implementation Team ("PRIT"), a state and federal public-private initiative formed in 2013 to help USFWS implement the 2008 Florida Panther Recovery Plan and advance recovery objectives.  I helped write parts of the current panther recovery plan.  And I serve as the liaison between the PRIT's core team and the transportation sub-team, which aims to reduce road fatalities (vehicle strikes), the largest human source of panther deaths.

11.      I have also worked on securing wildlife crossings for the Florida panther, which are necessary as roads are constructed in areas where wide-ranging panthers roam.   Wildlife crossings help protect panthers against vehicle strikes, a leading cause of death.  Wildlife

JA.419

crossings can allow panthers to move safely throughout their large home ranges as to improve

foraging and breeding opportunities. Panthers need to expand their range northward for the

population to increase, and fragmentation and destruction of habitat, along with roads

necessitated by new development, are a major threat to their conservation and recovery.

12.     As part of my work, I also advocate for co-existence when people and wildlife

come into contact.  For example, we have a predator resistant enclosure program where we help

fund and construct sturdy enclosures that help keep goats and other small livestock and pets safe

from panthers and other predators.  I have worked to try to improve state and federal funding

programs to help compensate ranchers who've lost livestock, and also to receive payment for

ecological services to provide a financial incentive to maintain land in ways that benefit wildlife.

13.     The Florida panther is important not only because it is critically endangered, but it

also serves as an umbrella species.  That means that when we conserve the panther—a large,

wide-ranging animal that requires vast areas of connected habitat to survive—we are also

benefting other plants and wildlife, including landscapes and watersheds that fall within panther

range, and so the overall biological diversity in the state.

14.     I also co-lead Defenders' work on sea turtles and on the Everglades. Defenders'

work on sea turtles focuses on reducing threats to these species and their habitats from fisheries

interactions, entanglement in and ingestion of plastics and other marine debris, coastal and

upstream development, offshore oil and gas development, climate change, and other stressors.

Defenders has been an active participant in multiple notice-and-comment rulemaking processes

related to sea turtle conservation. We also have worked statewide on policies and regulations to

improve coastal construction practices, inappropriate lighting and inadequate habitat protection,

as well as on-site specific projects in different areas in Florida. Our members regularly use,

4

JA.420

enjoy, and benefit from healthy coastal and marine ecosystems and the presence of diverse coastal and marine life, including sea turtles.

15.     In my work on behalf of sea turtle conservation, I work specifically along the Atlantic and Gulf of Mexico coasts of Florida to preserve sea turtle nesting beaches and foraging areas; improve coastal-construction policies so that jetties and sea walls do not prevent turtles from nesting; promote responsible lighting along nesting beaches; encourage local residents, visitors, and businesses to remove trash that attracts raccoons and other predators that devour eggs and hatchlings; and organize workshops and beach clean-ups. For instance, in 2010, I worked with Defenders staff to document beach lighting violations in Bay County, in the Florida Panhandle on the Gulf of Mexico, and supported local efforts to adopt protective lighting ordinances in Bay County and in Panama City.

16.     Over the years, I have organized opportunities for Defenders staff and other conservation professionals to accompany sea turtle researchers with the University of Central Florida to monitor sea turtle nesting at Archie Carr National Wildlife Refuge. The Refuge was established in 1991 to protect nesting habitat for sea turtles. In May 2015, we were fortunate to be able to observe an endangered leatherback turtle laying her eggs.

17.     As part of my work at Defenders, I have also organized a number of events to help educate the general public about threats to sea turtles and connect them with opportunities to help conserve sea turtles. In 2006, I organized a site visit to Archie Carr National Wildlife Refuge with reporters and other conservation professionals to witness nesting green and loggerhead sea turtles from a responsible distance. Several of the reporters wrote uplifting stories about the importance of conserving sea turtles and actions people can take to help. On May 31, 2008, I organized and hosted a workshop at Gumbo Limbo Nature Reserve in Boca Raton for

JA.421

around 100 coastal residents in Broward and Palm Beach counties, educating them about responsible practices fostering sea turtle conservation in their communities, with a focus on reducing artificial lighting that disorients nesting and hatchling sea turtles, and including disposal of trash, reducing pollution, and planting native vegetation. The workshop included a nighttime beach walk to observe artificial and natural beach lighting conditions and allowed participants to observe sea turtles nesting from a responsible distance.

18.     On July 9, 2021, I participated in filming in Boca Raton for a program about sea turtles hosted by conservationist and television personality Jeff Corwin. The program is part of a new television series called "Wildlife Nation," sponsored by Defenders, which focuses on efforts to save endangered species across North America. The sea turtle episode premiered on ABC on October 9, 2021 and will air again on November 13, 2021. During the filming I emphasized the global importance of Florida's beaches and waters to sea turtles, and I helped release a loggerhead sea turtle that had been rescued following a boat strike and rehabilitated in captivity. It was a phenomenal and moving experience to observe this 105-pound loggerhead sea turtle reenter the wild to be able to reproduce and help her species.

19.     Defenders actively supported the establishment of the Nature Coast Aquatic Preserve in 2020 to protect 400,000 acres of shallow seagrass meadows, which are abundant foraging habitat for green sea turtles, manatees, and other species. I have also supported recent efforts to launch a Sea Turtle Protection Zone in Palm Beach County. Launched earlier this year, the initiative, which is voluntary, is intended to protect sea turtles from unintended boat strikes during nesting season between March 1 and October 31.

JA.422

**Recreational and Aesthetic Interests**

20.     I grew up in Florida from age 7 and have been interested in wildlife my whole

life.  I remember driving across Alligator Alley when it was a two-lane highway and reading the

signs letting the public know how many Florida panthers were still left.  The signs would be

crossed out with grim new numbers as more panthers died.  I've always been aware of how

precarious their continued existence is.

21.     Growing up on the east coast of Florida in Lighthouse Point, my family was very

engaged in outdoor marine activities. I saw my first sea turtle and manatee from our family's

boat sometime around the mid-1970s. Following that initial experience, my family and I

frequently observed sea turtles while boating and snorkeling, at home and during trips and

vacations around the state. I have vivid memories of my sea turtles encounters and experienced

several life-changing events observing and engaging with them. For instance, when I was in high

school, I recall sitting at Deerfield Beach with a group of my friends and witnessing a loggerhead

sea turtle crawl up the beach to within 30 feet of where we were and proceed to dig her nest

chamber and lay her eggs. I also used to sail a lot in middle and high school and often saw sea

turtles, including mating sea turtles on several occasions. I even have scooped up sea turtle

hatchlings crossing a road fronting Fort Lauderdale beach. They were heading the wrong way

because of artificial lighting from hotels and were being run over on the roadway separating the

beach and the hotels. These formative experiences shaped my love of sea turtles and my

commitment to their conservation.

22.     Personally, I enjoy seeing sea turtles and other marine wildlife at every

opportunity near my home in St. Petersburg, Florida. I live in Shore Acres, a manmade island in

St. Petersburg accessible by bridges. Most mornings, I walk four to six miles from my home

JA.423

across a bridge to Snell Isle. While walking along the shoreline and across bridges in my neighborhood situated within Tampa Bay, I often look for and will sometimes have the occasion to see  juvenile loggerhead and green sea turtles foraging in seagrasses and swimming in the water.

23.     Every year from May through October during sea turtle nesting season, I also see sea turtle nests, marked and protected, while strolling along St. Pete Beach, a Gulf Coast beach near where I live. I drive over to that beach just to walk, to observe evidence of sea turtles nesting and to visit friends.

24.     While I was growing up, my family regularly visited and vacationed in many areas of Florida along the Gulf and Atlantic coasts, such as the Keys, Marco Island, Sanibel Island, Melbourne (Archie Carr National Wildlife Refuge), and other places to see sea turtles swimming, nesting, and/or hatching. To this day we still visit many of these places as a family in hopes of viewing sea turtles in the wild. Most recently, from October 16 to October 23, 2021, my mother and I vacationed in Sanibel Island in hopes of seeing sea turtles. We were able to see two green sea turtle nests. As it was later in the nesting season, there were significantly fewer nests than the last time we had visited in September 2020 when there were more than a dozen loggerhead nests on that same stretch of beach. Last year, my mother and I had made the same trek to Sanibel Island and were thrilled to see many marked nests on the beach that had been laid the night before and tiny tracks in the sand where hatchings had emerged. We also had the pleasure of chatting with sea turtle researchers every morning who were on the beach monitoring and studying the sea turtle nests. We plan to continue these family trips to Sanibel Island and other areas of Florida next year and every year into the future. Seeing sea turtles in their natural habitat is a wonderful and integral part of these trips.

25.     I also go boating on occasion to enjoy the ocean and to view wildlife such as sea turtles. My sister lives in Boca Raton, Florida, on the Atlantic Coast, and for years, at least twice a year, I have gone boating with her family whenever I visit. Boca Raton is one of the most important beaches for sea turtle nesting and my sister lives within ten miles of where I grew up. When I visit her, we go out boating and look for sea turtles. We mostly see loggerhead sea turtles, although on occasion also see green and leatherback sea turtles out in the water. It is a great bonding experience and I look forward to these trips with her. I plan to visit her and her family for Christmas this year.

26.     Conservation of sea turtles is important to me because it is a passion that I share with my family members who also live in Florida and are active Defenders members. I enjoy seeing sea turtles and other wildlife with my family and knowing that it is a love that has been passed down through the generations. My mother enjoys photographing wildlife, especially seabirds and shorebirds. My father always enjoyed walking the beach and collecting seashells, beach glass, fossilized sharks' teeth and driftwood that washed in with the tide. I have always been particularly fascinated with sea turtles, knowing they have been around in their current form for 110 million years, roaming the Earth's oceans since the time of the dinosaurs, and that they navigate the world's oceans throughout different stages of their lives. Spending time as a family at the beach and on the water has been a wonderfully relaxing way to connect and experience nature together.

27.     One of the reasons I am so committed to conserving sea turtles is that Florida is globally important for multiple sea turtle species. Florida's beaches provide nesting habitat for five of the world's seven species of sea turtles: loggerhead, green, leatherback, Kemp's ridley, and hawksbill, all of which are listed as either threatened or endangered under the U.S.

Endangered Species Act (ESA). More than 90% of all sea turtle nesting in the continental U.S. occurs in Florida. Florida beaches host the world's largest nesting aggregation of loggerhead turtles and almost all the nesting in North America for green turtles and leatherback turtles. The turtles that use Florida's nesting beaches forage in and migrate through the nearshore and coastal waters of the U.S. Gulf of Mexico and South Atlantic waters.

28.     Seeing sea turtles in the wild, both onshore and in my local and surrounding waters, brings me immense joy in my day-to-day life. I have often tried to photograph them even though it is difficult to capture the right shot. I want to be able to see sea turtles nesting on our Atlantic and Gulf beaches and swimming in the waters of the Atlantic and Gulf of Mexico this year and in the coming years.

**Harms and Redressability**

29.     My professional and personal interests in the Florida panther, manatees and sea turtles are harmed by EPA's approval of Florida's 404 permitting program because it is not as stringent as federal law and allows for 404 permitting without the protections of ESA Section 7 consultations or, where appropriate, NEPA review.  Florida's program is also less protective because it extends incidental take coverage to permittees without requiring them to go through the Section 7 or Section 10 processes under the ESA.

30.     I devoted years of my professional life to cultivating the collaborative relationships with private landowners and others that led to development of a proposed Habitat Conservation Plan ("HCP") for the Florida panther that was going to take place over 50 years. Under Section 10, the HCP would take a "big picture" science-based approach to panther conservation, taking into account growth, development, transportation, agriculture, and habitat connectivity, providing coverage against incidental take liability in exchange.

10

JA.426

31.     The HCP would have covered approximately 152,000 acres of rural, agricultural, and wild lands in eastern Collier County in southwest Florida that connects the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region.  The HCP covered  11 federally listed or candidate species, including the Florida panther, Florida scrub jay, and Florida bonneted bat.

32.     However, once the state assumed the 404 process, which relies on a "technical assistance" process for ESA review rather than Section 7 or Section 10 of the ESA, landowners who were party to the HCP began considering abandoning that process.  And ultimately, in August 2022, they withdrew from the HCP.

33.     As a result, much of Defenders' investment in the HCP has been thwarted, and we will have to divert resources to try to secure comparable gains in terms of mitigation and conservation as individual projects move forward.  We know that in addition to pending 404 permits, there are other projects that will be coming into the pipeline and that will also pose a threat to the Florida panther, especially in terms of habitat loss and fragmentation.  A few of many projects include Rivergrass, Rural Lands West, and several other projects popping up in Collier County and on Corkscrew Road in Lee County that are north of the the lands that would have been covered by the HCP.

34.     My personal and professional interests are harmed by the threats to the Florida panther from the state program.  I have recreated in and around panther habitat for many years and do so whenever I get the chance. My parents live in Estero in southwest Florida and I often visit and work from there when I have meetings, events and other engagements involving panthers. Since 2008 I have served as a board member and advocacy chair of the Friends of the Florida Panther National Wildfe Refuge, and I have been to the panther refuge dozens of times

JA.427

of the years for the annual Save the Florida Panther Day open house and for additional meetings

and field outings. Some other areas in panther habitat that I have frequented over the years

include Big Cypress National Preserve many times, notably in June 2006 when I was down there

working on a proposal for a wildlife underpass to reduce panther mortality along the Turner

River section of US41 Big Cypress, the biologist got the call that a Florida panther mother that

they had been monitoring had left the den to hunt. I got to accompany the biologist and the

superintendent of the park in a helicopter to travel to the  den while the biologist "worked up" the

three kittens (e.g., examine, deworm, microship, hair sample). Over the course of several hours, I

was able to hold a panther kitten as they worked on the others, an experience I will never forget

as they are so vulnerable and adorable. I've driven on trails and hiked in Fakahatchee Strand

State Preserve Park, Picayune Strand State Forest, Collier Seminole State Park, Audubon's

Corkscrew Swamp Sanctuary, Okaloacoochee Strand State Forest, Spririt of the Wild Wildlife

Management Area, Babcock Ranch Preservation Area and other conservation lands occupied by

panthers, and I have spent time on the properties of more than two dozen private ranches in

panther country and in panther expansion areas.

      35.    Even though panther sightings are rare, I have seen panther tracks, scat, scrapes

and other panther sign on many occasions, and I know that some of the panthers that left this

sign saw me even though I didn't see them. It gives me tremendous joy to know that Florida

landscapes are still healthy enough to support Florida panthers, which represent the only

remaining population of pumas east of the Mississippi, and as such they play a vital role in

maintaining wild and natural landscapes in Florida. In recognition of the importance to the rest of

the ecosystem in which it occurs, the Florida panther is aptly designated as our official state

animal. I am travelling down to panther country tomorrow to staff the annual Swamp Cabbage

Festival in LaBelle near Okaloacoochee Slough State Forest in Hendry County to display our

predator resistant enclosure and interact with members of the public about living responsibly

with Florida panthers. This festival is held in an area close to where I saw a panther crossing a

forest road in December 2011 as I described in this blog, *Florida Panther Sighting Heralds Slow

Zone Designation*, available at https://defenders.org/blog/2011/12/florida-panther-sighting-

heralds-slow-zone-designation.  I will also be going to the panther refuge on Save the Florida

Panther Day on March 18, 2023. Harms to those habitats will affect my use and enjoyment of

that environment.

36.     My personal and professional interests are also harmed by EPA's failure to

consult at all on the potential impact of Florida's 404 program on nesting sea turtles.

Development and construction projects near beaches can adversely affect nesting sea turtles

especially when it comes to artificial lighting that disorients nesting and hatchling sea turtles.

Reduced protections for sea turtles will make it less likely that I will able to observe and enjoy

these species in their natural habitat.

37.     My work will also be harmed by the loss of information now that many 404

projects, including those affecting the Florida panther, will be handled by the State where they

will not be studied in USFWS Biological Opinions and will not undergo any NEPA review.  We

rely on important information produced in biological opinions and NEPA documents to educate

our members, identify projects of particular concern, and engage in advocacy.  Without access to

that information, we will have to divert organizational resources to try to assess the impact

projects on a variety of listed species.

38.     I understand that Defenders, alongside other organizations, is suing EPA,

USFWS, and the Corps over their failure to comply with the requirements of the Administrative

Procedure Act, the Clean Water Act, the Endangered Species Act, and the Rivers and Harbors Act. I depend on the federal government to comply with these laws to protect and conserve sea turtle populations and the Florida panther.

39.     My injuries would be redressed if the Court sets aside the agency actions in this case and remands the matter to comply with federal law. Vacating EPA's approval of Florida's 404 program would restore the Corps' authority over all 404 permitting in Florida, making those actions once again subject to the protections of NEPA and ESA Section 7 consultations. This would also ensure that protection against liability for incidental take of listed species would be extended only pursuant to a biological opinion issued after Section 7 consultation or pursuant to a Section 10 Habitat Conservation Plan.

40.     A ruling in Defenders' favor on our ESA claims would also redress my harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonable and prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

41.     I declare under penalty of perjury that the foregoing is true and correct. Executed this 23th day of February 2023, at St. Petersburg, Florida.

Elizabeth H. Fleming

JA.430