**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

---

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

---

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

---

**JOINT APPENDIX—VOLUME 2 (JA.431–JA.846)**

---

*Counsel Listed on Inside Cover*

February 26, 2025

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

Jeffrey DeSousa
*Acting Solicitor General*
Christopher J. Baum
*Senior Deputy Solicitor General*
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Florida Appellants*

Lisa Lynne Russell
*Deputy Assistant Attorney General*

Brian Toth
Joan Pepin
Rebecca Jaffe
*Attorneys*

Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

*Counsel for Federal Appellants*

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
tgalloni@earthjustice.org
creichert@earthjustice.org
(305) 440-5432

Bonnie Malloy
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
bmalloy@earthjustice.org
(850) 681-0031

*Counsel for Environmental Appellees*

## TABLE OF CONTENTS

| VOLUME 1 (JA.1–JA.430) | | |
| --- | --- | --- |
| **District Court Docket Number** | **Document** | **Page** |
| Dkt. 1 | Plaintiffs' Complaint | 1 |
| Dkt. 4 | State of Florida and Florida Department of Environmental Protection's Motion to Intervene | 52 |
| Dkt. 73 | Memorandum Opinion and Order | 55 |
| Dkt. 77 | Plaintiffs' Amended Complaint | 117 |
| Dkt. 95-2 | Revised Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program | 176 |
| Dkt. 98 | Plaintiffs' Motion for Summary Judgment | 211 |
| Dkt. 98-1 | Declaration of Amber Crooks | 294 |
| Dkt. 98-3 | Declaration of Elizabeth H. Fleming | 417 |

| VOLUME 2 (JA.431–JA.846) | | |
| --- | --- | --- |
| Dkt. 98-4 | Declaration of Brett Hartl | 431 |
| Dkt. 98-5 | Declaration of Matthew Schwartz | 444 |
| Dkt. 98-6 | Declaration of Lisa Rinaman | 463 |
| Dkt. 98-7 | Declaration of Rachel Silverstein | 510 |
| Dkt. 98-10 | Declaration of Diana Umpierre | 543 |

| Dkt. 99 | Defendant's Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment | 644 |
|---|---|---|
| Dkt. 102 | Florida Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment | 731 |
| Dkt. 102-1 | Declaration of Justin Wolfe | 793 |

| **VOLUME 3 (JA.847–JA.1190)** | | |
|---|---|---|
| Dkt. 104 | Plaintiffs' Consolidated Reply in Support for Motion for Summary Judgment and Response in Opposition to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 847 |
| Dkt. 104-1 | Supplemental Declaration of Amber Crooks | 963 |
| Dkt. 107 | Florida Intervenors' Reply in Support of Cross-Motion for Summary Judgment | 1001 |
| Dkt. 113 | Notice of Completion of Biological Evaluation | 1033 |
| Dkt. 123 | Plaintiffs' Sur-Reply in Support of Plaintiffs' Motion for Summary Judgment and Response to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 1036 |
| Dkt. 125 | Plaintiffs' Notice of Filing Addition to Supplemental Joint Appendix | 1063 |
| Dkt. 127-2 | Florida Intervenors' Motion for Leave to File Post-Hearing Memorandum, Attachment 1: Standing Demonstrative | 1066 |
| Dkt. 135 | Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Center for Biological Diversity and Sierra Club | 1069 |

| Dkt. 149-3 | Exhibit C: Comparison Table of Species Review Process in Corps-Led and Florida-Led Section 404 Programs | 1113 |
|---|---|---|
| Dkt. 153 | Plaintiffs Center for Biological Diversity and Sierra Club's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 1119 |
| Dkt. 153-1 | Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation | 1182 |
| Dkt. 156 | Excerpt of Motion Hearing on October 19, 2023 | 1187 |

| VOLUME 4 (JA.1191–JA.1469) | | |
|---|---|---|
| Dkt. 158 | Federal Defendants' Post-Hearing Submission on Remedy | 1191 |
| Dkt. 161 | Plaintiffs' Brief on Remedy for Claims Relating to Protection of ESA-listed Species under USFWS' Jurisdiction | 1201 |
| Dkt. 164 | Order | 1218 |
| Dkt. 165 | Federal Defendants' Supplemental Brief Regarding Limited Stay | 1220 |
| Dkt. 166 | Florida Intervenors' Motion for Limited Stay of February 15, 2024 Vacatur Order | 1224 |
| Dkt. 166-1 | Exhibit A: Declaration of Justin Wolfe | 1245 |
| Dkt. 170 | Florida Intervenors' Reply in Support of Limited Stay | 1250 |
| Dkt. 171 | Florida Intervenors' Expedited Motion for Entry of Final Judgment | 1263 |

| Dkt. 182 | Amended Memorandum Opinion | 1284 |
|---|---|---|
| Dkt. 183 | Memorandum Opinion | 1382 |
| Dkt. 184 | Order | 1409 |
| Dkt. 185 | Florida Intervenors' Notice of Appeal | 1410 |
| Dkt. 189 | Plaintiffs' Response to Florida Intervenors' Motion for Stay Pending Appeal | 1411 |
| Dkt. 190 | Memorandum Opinion and Order | 1451 |
| Dkt. 193 | Plaintiffs' Notice of Appeal | 1465 |
| Dkt. 195 | Federal Defendants' Notice of Appeal | 1468 |

| VOLUME 5 (JA.1470–JA.1707) | | | |
|---|---|---|---|
| **EPA Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| EPA-HQ-OW-2018-0640-0001 | Dkt. 51 at 1-4 | Request to Assume Administration of a Clean Water Act Program: Florida, Notice and Request for Comments, 85 Fed. Reg. 57,853 (Sept. 16, 2020) | 1470 |
| EPA-HQ-OW-2018-0640-0002-A7 | Dkt. 52 at 6-15 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060: Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands, Aug. 20, 2020 | 1474 |

| EPA-HQ-OW-2018-0640-0002-A9 | Dkt. 52 at 21-30 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060 Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters, Aug. 20, 2020 | 1484 |
| EPA-HQ-OW-2018-0640-0002-A20 | Dkt. 52 at 82-143 | Florida Section 404 Program Application: Florida Admin. Code 62-331.010(5): State 404 Program Applicant's Handbook Aug. 20, 2020 | 1494 |
| EPA-HQ-OW-2018-0640-0016-A2 | Dkt. 55-1 at 120-32 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, USFWS, and FDEP, Aug. 5, 2020 | 1556 |
| EPA-HQ-OW-2018-0640-0018 | Dkt. 55-1 at 300-13 | Memorandum of Agreement between FDEP and EPA, July 31, 2020 | 1569 |
| EPA-HQ-OW-2018-0640-0019 | Dkt. 55-1 at 314-22 | Memorandum of Agreement Between FDEP and the U.S. Department of the Army, July 31, 2020 | 1583 |
| EPA-HQ-OW-2018-0640-0051 | Dkt. 55-3 at 69-129 | Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020 | 1592 |
| EPA-HQ-OW-2018-0640-0386-A1 | Dkt. 56 at 16-70 | Letter from Tania Galloni et al., Earthjustice et al., to Kelly Laylock, EPA, Nov. 2, 2020 | 1653 |

| VOLUME 6 (JA.1708–JA.2060) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0387-A8 | Dkt. 56-1 at 65-364 | Exhibit 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida, July 24, 2020 | 1708 |
| EPA-HQ-OW-2018-0640-0387-A10 | Dkt. 112-1 at 175-76, 207, 259, 275, 306-07 | Excerpts of Exhibit 60: 1998 Endangered Species Consultation Handbook | 2008 |
| EPA-HQ-OW-2018-0640-0388-A2 | Dkt. 95-2 at 18 | Letter from Kristen L. Boyles et al., Earthjustice et al., to Kathy Hurld, EPA, July 6, 2020 | 2015 |
| EPA-HQ-OW-2018-0640-0388-A7 | Dkt. 112-2 at 2-26 | Exhibit 67: FDEP White Paper, ESA Consultation | 2032 |
| EPA-HQ-OW-2018-0640-0564 | Dkt. 56-1 at 433-34 | Approval of Florida's Clean Water Act Section 404 Assumption Request, 85 Fed. Reg. 83,533, Dec. 22, 2020 | 2057 |
| EPA-HQ-OW-2018-0640-0566 | Dkt. 56-1 at 435-36 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Dec. 17, 2020 | 2059 |

| VOLUME 7 (JA.2061–JA.2199) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0568 | Dkt. 56-1 at 437-549 | EPA, Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, Dec. 16, 2020 | 2061 |

| EPA-HQ-OW-2018-0640-0617 | Dkt. 112-2 at 351 | Letter from Jeaneanne Gettle, EPA, to Roy Crabtree, NOAA NMFS, on EPA's Section 7 Consultation, Sept. 2, 2020 | 2174 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0618 | Dkt. 112-2 at 352-53 | Letter from Virginia Fay, NOAA NMFS, to Jeaneanne Gettle, EPA, Oct. 30, 2020 | 2175 |
| EPA-HQ-OW-2018-0640-0623 (same as FWS-006015) | Dkt. 112-2 at 354-66 (same as Dkt. 112-5 at 47-59) | USFWS Biological Opinion Appendix 2: Memorandum of Understanding Between FWC, USFWS, and FDEP, August 5, 2020 | 2177 |
| EPA-HQ-OW-2018-0640-0635 | Dkt. 56-1 at 669 | Letter from David Ross, EPA, to Timothy Gallaudet, NOAA NMFS, and Rob Wallace, USFWS, on FDEP's Non-Federal Representative Designation, Dec. 13, 2019 | 2190 |
| EPA-HQ-OW-2018-0640-0636 | Dkt. 56-1 at 670-71 | Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, on FDEP's Non-Federal Representative Designation, Dec. 12, 2019 | 2191 |
| EPA-HQ-OW-2018-0640-0637 | Dkt. 112-2 at 367-69 | EPA, Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953, May 21, 2020 | 2193 |

| EPA-HQ-OW-2018-0640-0638 | Dkt. 112-2 at 370-71 | Letter from Cathryn Tortorici, NOAA NMFS, to Heather Mason, FDEP, April 15, 2020 | 2196 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0641 | Dkt. 56-1 at 684-85 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, on EPA's Completeness Determination for Florida's Assumption Request, August 28, 2020 | 2198 |

| VOLUME 8 (JA.2200–JA.2530) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0649 (same as FWS-005610) | Dkt. 112-3 at 2-298 (same as Dkt. 112-4 at 87-383) | USFWS Biological Opinion Appendix 1: EPA's Biological Evaluation | 2200 |
| EPA-HQ-OW-2018-0640-0660-A1 | Dkt. 56-1 at 774-81 | EPA, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals, Aug. 27, 2020 | 2497 |
| EPA-HQ-OW-2018-0640-0664 | Dkt. 112-3 at 301-02 | Letter from Jeaneanne Gettle, EPA, to Tania Galloni, Earthjustice, Responding to Notice of Intent to Sue, Dec. 20, 2021 | 2505 |
| EPA-HQ-OW-2018-0640-0670 | Dkt. 112-3 at 343 | Email from David Fotouhi, EPA, to Matt Leopold, EPA, et al., transmitting documents for Florida Stakeholder meeting, Sept. 17, 2018 | 2507 |

| EPA-HQ-OW-2018-0640-0670-A3 | Dkt. 112-3 at 344-52 | Potential ESA Compromise Analysis and Proposal | 2506 |
| EPA-HQ-OW-2018-0640-0670-A5 | Dkt. 112-3 at 353-59 | Florida Proposal Regarding ESA (SSEC-Doug-P18082810080) | 2517 |
| EPA-HQ-OW-2018-0640-0686 | Dkt. 112-3 at 368-72 | Response to Comments on EPA Consultation under ESA | 2524 |
| EPA-HQ-OW-2018-0640-0690 | Dkt. 112-3 at 375-76 | Letter from Peter S. Silva, EPA, to R. Steven Brown, Environmental Council of the States, et al., re EPA Position on ESA Consultation for 404 Assumption, Dec. 27, 2010 (same as above) | 2529 |

| VOLUME 9 (JA.2531–JA.2700) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-000001 | Dkt. 112-4 at 2-3 | 20191212 Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, re: Designation of FDEP as Non-Federal Representative for Informal Consultation | 2531 |
| FWS-006015 | Dkt. 112-5 at 47-59 | 20201116 Memorandum of Understanding between FWC, USFWS, and FDEP (attached as Appx. 2 to USFWS's Biological Opinion) | 2533 |

| FWS-000749 | Dkt. 112-4 at 9-11 | 20200331 Email from H. Rauschenberger, USFWS, to M. Duncan, FDEP, J. Goff, FWC, et al., re: Comments on Draft Species Coordination Process | 2546 |
|---|---|---|---|
| FWS-003386 | Dkt. 112-4 at 43-84 | 20200820 Florida Rules Chapter 62-4, submitted as part of FDEP's application package. | 2549 |
| FWS-006028 (same as EPA-HQ-OW-2018-0640-0642) | Dkt. 112-5 at 60-147 (same as Dkt. 56-1 at 686-773) | 20201117 Programmatic Biological Opinion for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act | 2591 |
| FWS-006144 | Dkt. 112-5 at 148-69 | 20180625 Memorandum of Agreement between EPA, USFWS, and NJDEP Related to the Protection of Federally-Listed Threatened or Endangered Species and Designated Critical Habitat Under a New Jersey-Assumed Section 404 Program | 2679 |

| VOLUME 10 (JA.2701–JA.3056) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-006432 | Dkt. 93-2 at 4 | 20140519 Final Biological Opinion re EPA Final Rule - Cooling Water Intakes | 2701 |
| **Army Corps Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| CORPS004318 | Dkt. 112-8 at 106 | 20191126 Email from Robert Barron, Corps, to Shawn Zinszer, Corps, et al., re: AAR Retained Water GIS Call: We Need a "Big" Call with FDEP | 3040 |
| CORPS004319 | Dkt. 112-8 at 107-09 | 20191206 Email Dale Beter, Corps, to Shawn Zinszer, Corps, re: 404g_h Assumption Meeting Notes<br><br>Attachment: 20191206 Sec 404g Assumption Mtg Notes.docx | 3041 |
| CORPS004322 | Dkt. 112-8 at 110-22 | 20200805 Memorandum of Agreement between FDEP and U.S. Department of the Army | 3044 |

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 26, 2025, I electronically filed this document

with the Clerk of the Court for the United States Court of Appeals for the D.C.

Circuit by using the CM/ECF system.  All participants in this case registered with

CM/ECF will be served by the CM/ECF system.

Dated:  February 26, 2025                    /s/ Aaron M. Streett
                                          Aaron M. Streett
                                          BAKER BOTTS LLP
                                          910 Louisiana St.
                                          Houston, Texas 77002
                                          (713) 229-1855 (phone)
                                          (713) 229-7855 (fax)
                                          aaron.streett@bakerbotts.com

                                          *Counsel for Florida Appellants*

DocuSign Envelope ID: 9102F847-213F-417C-AC5A-7AA6D58DF609

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

    Plaintiffs,

    v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

    Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## DECLARATION OF BRETT HARTL

I, Brett Hartl, make the following declaration:

    1.    I am a resident of Prescott, AZ.

    2.    I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

    3.    I am the Government Affairs Director at the Center for Biological Diversity ("Center"), and I work out of both the Center's Washington, D.C., and Arizona offices.  I have been with the Center since 2013.

    4.    I am also a member of the Center and have been a member of the Center since 2013.  As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

    5.    I hold a bachelor's degree from Prescott College in conservation biology, and a law degree from Lewis and Clark Law School.  Prior to law school, I spent five years as a field

DocuSign Envelope ID: 9182F847-213F-417C-AC5A-74A8DF58DF609

biologist working with endangered species in the northwest Hawaiian Islands, Kauai, and Southern California. I also worked in the House of Representatives Natural Resources Committee for Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

6. The Center is a member organization incorporated under the laws of the State of California. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. The Center has 84,324 active members across the country, including more than 4,092 members in Florida. The Center is based in Tucson, AZ, and works throughout the entire United States. Our other major offices are in Washington, D.C.; San Francisco, CA; and Portland, OR.

7. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

8. In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact endangered species, wildlife, clean water, and environmental protection broadly. This includes agency rulemaking and their policy consequences throughout the country. I coordinate the Center's response and engagement, meet with agency officials, and work with outside stakeholders. I oversee or am involved with

DocuSign Envelope ID: 9182F847-213F-417C-AC5A-74A8DF58DF609

Freedom of Information Act ("FOIA") requests, formal commenting, advocacy, lobbying, and litigation.

9.      Protection of endangered and threatened species is a core organizational focus of the Center.  Whether large or small, we believe all species have an intrinsic right to live.  The United States and the world at large are currently in the midst of a biodiversity crisis:  the diversity of life that sustains ecological systems and human cultures around the world are collapsing.  As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats for species, and holding federal agencies accountable to their duties to protect species as directed by Congress.

10.      Many of the species we work to protect throughout the country rely on healthy, intact wetlands to survive—whether directly or indirectly.  Wetlands are therefore vital to our endangered species work.  To that end, the Center has longstanding programs to protect freshwater and protected species in the Southeast, which is a hotspot of extinction nationally.

11.      One such program is the Southeast Freshwater Extinction Campaign, which seeks to protect the unique and vast aquatic biodiversity of the Southeastern United States.  The Southeastern United States has some of the richest aquatic fauna of any temperate area in the world, including globally significant diversity of freshwater mussels, freshwater fish and other species.  The Southeast contains two-thirds of North America's species and subspecies of crayfishes and contains more amphibians and aquatic reptiles than any other region.  It is also home to the largest number of listed species and extinct species in the lower 48 states.  For example, nearly 70% of all freshwater mussel species in North America are either protected under the Act or already extinct, and most of the remaining species are declining and will need

DocuSign Envelope ID: 9182E847-213F-417C-AC5A-74A8DF8DF609

protection under the Endangered Species Act in the future.  Loss of these aquatic species in this region represents not only a loss to the nation as a whole but to the entire global biodiversity of freshwater systems.

12.     Within the Southeastern United States, Florida has irreplaceable ecosystems not found anywhere else in the country, made up of semi-tropical environments, marine estuary systems, and springs.  These include iconic ecosystems such as the Everglades and the Pine Rockland ecosystems.  Florida is also home to unique protected species, including but not limited to the Florida panther, West Indian manatee, frosted flatwoods salamander, wood stork, eastern indigo snake, various species of turtles, smalltooth sawfish, and freshwater mussels. Florida is also home to some of the largest populations of protected sea turtles nationally.  Any loss of biodiversity in Florida represents a loss to the nation at large.  The uniqueness of these species and ecosystems means these losses cannot be replaced.

13.     Florida's wetlands provide key migratory stopover habitats for numerous species of birds that migrate between the United States and Central America, the Caribbean, and South America.  Examples of listed species that are migratory and rely on Florida's wetlands include the Red Knot, which migrate from South America to Canada and back each year and the Black Rail, which winters in Florida and migrates to the east coast to breed.  Other listed species of birds like the Everglades Snail Kite and Audubon's Caracara rely on Florida's wetland ecosystems year-round.

14.     The federal section 404 wetlands permitting program provides a vital check on actions that would otherwise destroy wetlands, and it ensures vital information is gathered to understand how an action impacts wetlands and the species who rely on them.  It provides

DocuSign Envelope ID: 9102F847-213F-417C-AC5A-74A8DF58DF609

federally mandated minimum levels of protections that have been instrumental in conservation of protected species.

15.     Assumption by the states that is not in strict compliance with federal law is extremely problematic, because it will not provide the same level of transparency and substantive protections that the federal program provides.

16.     Unlawful state assumption of 404 programs would harm the Center's ability to protect wildlife, in Florida and around the country.

17.     Just as the Center is engaged in litigation in this case to challenge EPA's approval of Florida's program and related federal agency actions, the Center has also been monitoring other states that have expressed an interest in assuming the CWA 404 program.  For example, one state we are monitoring closely is Arizona, which since 2018 has been considering changes to its wetlands regulation program that may ultimately include the State applying to assume the 404 program.  Wetland and riparian areas in desert environments are particularly critical to wildlife.  Nearly 80 percent of all wildlife species, including numerous listed species like the Yellow-billed Cuckoo, SW Willow Flycatcher and narrow-headed gartersnake, are found close to riparian and wetland ecosystems.

18.     Since 2020, Alaska has also apparently indicated to the EPA that it might be interested in assumption of the state's 404 program. The Center has submitted several Freedom of Information Act requests to learn more about the status of these efforts.  If states such as Alaska or Arizona or others were to assume 404 permitting without sufficient safeguards, many of endangered species could be harmed across the country.

19.     It is my understanding that former U.S. Environmental Protection Agency Administrator Andrew Wheeler, at the press conference announcing EPA's approval of Florida's

DocuSign Envelope ID: 9182F847-213F-417C-AC5A-74A8DF58DF609

404 program, encouraged other states to follow Florida's example as a model.  If EPA's approval of Florida's 404 program is upheld, it would set a dangerous precedent of state 404 programs that are inadequate to protect listed species and wetlands.

20.    The Center is particularly concerned with how EPA's approval of Florida's 404 program will likely result in increased negative impacts to wildlife and water quality, as follows:

21.    I understand that DEP has stated that its intention is to approve permits faster.

22.    I also understand that DEP has and continues to apply the 2020 Navigable Water Protection Rule, which has been invalidated and vacated by two federal courts.  DEP's application of this unlawful rule significantly reduces and the number of waterways, and wetlands in particular, that are protected under the Clean Water Act.

23.    I believe that with the Florida dredge-and-fill permitting program, the wetlands that are impacted by development projects do not receive the same level of environmental review that they would otherwise under the dredge-and-fill permitting program administered by the U.S. Army Corps of Engineers and consulting federal agencies like the USFWS and National Marine Fisheries Service.  While Florida is permitted to continue administering the 404 program, the Center is prevented from fully assessing and publicly engaging on specific project applications and is forced to expend significant resources in the process to discover or develop information that would otherwise be afforded by NEPA and the ESA.

24.    In fact, the Center has already had significant difficulty fully assessing and publicly engaging on projects going through the state-administered 404 program.  For example, I understand that Center staff are tracking the application and impacts of the Bellmar development (permit application no. 396364-001) because of its potential to adversely affect the Florida panther, Florida bonneted bat, and eastern indigo snake, among other species.

JA.436

25.     I understand the system for submitting public comments is also more burdensome

and inconvenient than the federal public commenting process.  I understand that DEP accepts

electronically submitted comments through its business portal, which requires registration and is

difficult to navigate. Records relating to applications are posted on another DEP portal, which is

also very difficult and time-consuming to navigate.  Furthermore, I understand that DEP is

failing to make records relating to 404 permits that it has in its possession available to the public

in a timely manner.  I also understand that the documents generated by DEP's 404 process are far

less informative and useful than the documentation produced during the federal 404 process.  All

of these impediments make it more difficult and time-consuming for the Center to advocate for

species and their habitat, and they likely deter participation from the general public, who do not

have the time and resources to figure out the portals.

26.     Additionally, EPA's approval of Florida's assumption program harms the

Center's ability to litigate on behalf of wetland habitats and the species that rely on them.

Because legal challenges to state permits have to be filed in state administrative court, rather than

proceed as administrative record cases litigated in federal court, it is my understanding that the

Center would be required to spend significant monetary resources to hire expert witnesses to

successfully bring legal challenges—monetary resources that would otherwise be put toward

other important organizational initiatives and goals.  The significant expense involved in

bringing expert-driven challenges in state court means that the Center may have to forego

challenging permits it would and could otherwise have challenged in federal court.

27.     It is also my understanding that it is significantly more difficult to establish

standing in state court when compared to federal court.  For example, in Florida state court, an

organization like the Center is required to show that a *substantial number* of its members will be

DocuSign Envelope ID: 9182F847-213F-417C-AC5A-7AA8DF58DF609

affected by the challenged action, while in federal court organizations can establish standing based on harms suffered by an individual member. With a national membership, it would be exceedingly difficult, if not impossible, for the Center to establish standing to challenge individual permits under such a state standard.

28.     It is also my understanding that, in state court, the Center would be exposed to liability for legal fees and costs under mandatory fee-shifting state law provisions for certain types of permit challenges that it would not be exposed to in federal court. This can hamper the Center's ability to participate in vigorous advocacy for species and habitat because the Center would be required to weigh that significant financial risk—even if the Center had strong legal claims.

29.     With Florida's assumption of the 404 program, the lack of project-by-project consultation with USFWS under Section 7 or Section 10 of the ESA, and the blanket exemption from incidental take liability extended to the state and state permittees, imperils protected species that the Center's mission is to protect.

30.     Moreover, without the information that is made available under the ESA consultation process and NEPA review process—including a robust alternatives analysis—the Center is denied important information about environmental and species impacts, forcing the Center to hire scientific experts to carry out the analysis. This will cost the Center significant financial resources that could have been put toward other organizational priorities and can reduce the number of potentially harmful and concerning projects on which the Center could engage. As a result, the Center and its members do not have access to important information about the effects of wetland destruction on species, nor do we have a clear process to advocate on behalf of endangered and threatened species at the administrative level. This, in turn, harms the Center's

interest in meaningfully evaluating how wetland destruction harms endangered and threatened species, and advocating on their behalf. It also requires the Center to hire its own scientific experts to analyze the species effects, which requires the Center to use financial resources it could have put toward other organizational missions.

31.    The loss of procedural rights the Center has sustained as a result of EPA's transfer of authority to the state, has resulted in immediate and ongoing organizational and membership harms while the state's unlawful program operates. The state's 404 program causes the Center to divert resources, threatens wetlands and wildlife, and undermines the Center's ability to realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

32.    The state is poised to issue 404 permits on major projects that will harm the Center's organizational interests the interests of its members.

33.    Of particular concern to the Center are several proposed developments in southwest Florida that would adversely affect many endangered and threatened species.

34.    For example, DEP is considering a permit application for the Bellmar development (permit application no. 396364-001), which is likely to adversely affect the Florida panther, Florida bonneted bat, and eastern indigo snake, among other species. The Center is particularly concerned about adverse effects on the Florida panther because the proposed development is located within the core breeding range for the only remaining population of Florida panthers. The proposed development is also about a mile away from Florida Panther National Wildlife Refuge and would stand between the panther and its ability to expand north through its historic range—a necessary prerequisite for the species' recovery. Bellmar would

DocuSign Envelope ID: 9402E847-213F-417C-AC5A-71A9DF8DF680

also induce the construction of more roads and more vehicle trips, which will, in turn, increase the number of panther deaths from vehicle strikes, the leading cause of death for the species.

35.     The Center is concerned about the direct, indirect, and cumulative effects of Bellmar, particularly on the endangered Florida panther.  I understand that the Center has received public records from U.S. Fish and Wildlife Service relating to a now-withdrawn Endangered Species Act Section 10 permitting application for massive planned development in eastern Collier County that indicate Bellmar and other reasonably foreseeable developments in the county are likely to jeopardize the survival and recovery of the panther through habitat destruction, infringement of wildlife corridors, indirect impacts on adjacent preserves, and increased vehicle-caused panther mortality driven by increased traffic and transportation needs.

36.     The state-assumed 404 permitting process and USFWS's technical assistance fall short of the Endangered Species Act's requirements for analyses, study, and evaluation to ensure against jeopardy for the panther.  For example, as described above, DEP provided public notice for an incomplete file that omitted key traffic information.  This falls far short of the Endangered Species Act's mandate that jeopardy determinations be based on the best scientific and commercial data available.  Furthermore, if USFWS misses a time-limited opportunity to comment, it appears that there is no mechanism for USFWS to stop the issuance of a permit— even if it determines that issuing the permit may jeopardize an endangered or threatened species or adversely modify critical habitat.  Not only would this violate the Service's ESA-mandated duty to ensure against jeopardy but it would have real and dire consequences for species like the Florida panther, particularly in view of USFWS analyses that indicate the cumulative impact of Bellmar and reasonably foreseeable projects nearby, which will likely also be permitted under the state 404-permit process, are likely to jeopardize the panther.  Under Section 7 consultation,

DocuSign Envelope ID: 9102E847-213F-417C-AC5A-71A9DF8DF600

Case 1:21-cv-00119-RDM   Document 98-4   Filed 02/28/23   Page 11 of 13
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 25 of 430

by contrast, no permit could issue unless and until USFWS makes a "no jeopardy"

determination.

37.     If DEP were to approve Bellmar and other projects in southwest Florida, it would

harm the Center's interest in preventing the decline and extinction of endangered and threatened

species in Florida.  In particular, it would harm the Center's interest in securing the survival and

recovery of the Florida panther and the Florida bonneted bat, species whose protection we have

advocated for years. The approval of Bellmar and nearby developments would harm those

interests, setting the species' recovery back and putting them at greater risk of extinction.

38.     It's also my understanding that DEP has failed to provide the public with the

information it needs to meaningfully weigh in on the permit application for Bellmar. For

example, at the time DEP issued its public notice on Bellmar's state 404-permit application,

USFWS indicated that it needed more information that was missing from the applicant's

biological assessment; namely, an estimate of panther mortality due to traffic volume increases

upon completion of the development.  Without this key information, the public and the Center

were unable to fully and meaningfully participate during the open comment period.  While in this

instance, DEP has stated they will hold another public hearing after submittal of traffic analyses

by the applicant, it is still not clear if the public will have USFWS' comments or proposed permit

conditions for consideration.

39.     Additionally, the Center is concerned about the proposed Burnett Oil drilling

projects, whose 404 applications are expected to be re-submitted to the state, that would pave the

way for oil drilling in Big Cypress National Preserve for the next 30 years.  Dkt. 031-4

(Declaration of Ann Wiley in Support of Plaintiffs' Partial Motion for Summary Judgment, dated

March 3, 2021).  Not only will the Center experience the aforementioned harms to its mission of

JA.441

protecting species and the natural environment as these permits are being processed and if approved, the Center's members will be harmed by these projects to develop in our nation's first national preserve. The freshwaters of Big Cypress are vital to the health of the neighboring Everglades and to the wildlife that inhabit it—waters and wildlife that the Center strives to protect and that our members enjoy.

40.     If Florida is allowed to continue administering an unlawful dredge-and-fill permitting program, the Center and its members will be harmed in their ability to protect wetlands, imperiled species, and their habitat.

41.     The Center's harms would be redressed by a ruling that invalidates EPA's approval of Florida's program. This ruling would restore 404 authority over assumable waters to the Corps, restore Section 7 and NEPA review for projects, and ensure that all requirements of federal law are met and can be enforced in federal court. In addition, a ruling in Plaintiffs' favor on the agencies' ESA violations would redress the Center's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require a legally sufficient biological opinion that properly analyzes the impact to listed species and critical habitat, sets limits on incidental take, and imposes reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
_23_ day of February 2023, in Prescott, AZ.

DocuSigned by:

_Brett Hartl_
17B8BD37BB374A7...

Brett Hartl
Government Affairs Director

DocuSign Envelope ID: 9102E847-213F-417C-AC5A-71A9DF8DF600

Center for Biological Diversity
1411 K Street, NW, Ste. 1300
Washington, D.C. 20005

JA.443

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## <u>DECLARATION OF MATTHEW SCHWARTZ</u>

I, Matthew Schwartz, state and declare as follows:

1. I am a resident of Tampa, Florida. The following facts are personally known to me and if called as a witness I could and would truthfully testify to these facts.

2. I have been a resident of South Florida since 1995.

3. I have a bachelor's degree from the State University of New York-Albany, a master's degree in psychology (counseling) from New York University, and a master's degree in sociology from City College of the City University of New York. I did my master's thesis in sociology on recreational activities of residents in Bronx, NY.

4. I am a member of the Center for Biological Diversity since 2019. I frequently read press releases and documents the Center provides links to on its website. I have also read the Center's action alerts and news stories where the organization is cited. On occasion, I interact with Center staff. I trust the Center represents my interests and I rely on the Center to represent my interests in addition to my own advocacy.

DocuSign Envelope ID: EEF87686-107C-42BC-B8DA-867420DD5A63

5. I am the Executive Director of South Florida Wildlands Association, a nonprofit organization founded in 2010 that is dedicated to the protection of wildlife and habitat in the Greater Everglades. My work focuses on places where human development impacts wildlife.

6. Along with my work at South Florida Wildlands Association, I also work as a tour guide in the Everglades where I lead group hiking, biking, and kayaking tours. I give talks on the human, natural, and geologic history of the Everglades and take the public on airboat tours with the Miccosukee Tribe of Indians. On airboat tours, I have traveled deep into the Everglades as far west as the border of the Big Cypress and into Mullet Slough where pristine waters of the Big Cypress join the Everglades. I also led swamp walks with the Sierra Club in the Big Cypress for about five years. I continue to provide these tours, talks, and activities to visitors to the Everglades.

7. As an environmentalist, I routinely interact with federal, state, and county agencies. I communicate with the Department of Interior (DOI), the U.S. Fish & Wildlife Service (FWS), the U.S. National Park Service (NPS), the Florida Fish and Wildlife Conservation Commission (FWC), the Florida Department of Transportation (FDOT), and the Florida Department of Environmental Protection (DEP) regarding development, energy, and transportation projects and their impacts to wildlife. I regularly send requests under the Freedom of Information Act and Florida's Public Records Act to obtain project specific information. I speak to agency staff by email, telephone, and in person regarding these projects. I also frequently speak with staff of South Florida county governments about upcoming projects and speak at county commission meetings on topics of interest including the rezoning of agricultural lands to make way for new development.

DocuSign Envelope ID: EEF87686-107G-42BC-B9DA-86742DDD5A63

Case 1:21-cv-00119-RDM   Document 98-5   Filed 02/28/23   Page 3 of 19
USCA Case #24-5101       Document #2102936       Filed: 02/26/2025   Page 30 of 430

8. I serve on several Management Advisory Groups for State Wildlife Management Areas (WMAs), including the Okaloacoochee Slough WMA, Dinner Island Ranch WMA, and Spirit of the Wild WMA in southwest Florida. Former agricultural lands like those found in these WMAs provide important habitat to species like the endangered Florida panther. Unfortunately, many agricultural lands outside the WMAs and other public lands are being converted to development.

9. I enjoy hiking, kayaking, and exploring public lands throughout the state and especially in South Florida where I lived for many years before relocating to Tampa. I have visited virtually all the public lands in South Florida and plan to continue visiting them in the future.

10. In the southeast part of the state, I have visited and recreated in Jonathan Dickinson State Park, Allapattah Flats WMA, Loxahatchee Slough, Grassy Waters Preserve, J.W. Corbett WMA, Dupuis Wildlife and Environmental Area, Hungryland Wildlife and Environmental Area, Rotenberger WMA, Holeyland WMA, Everglades and Francis S. Taylor WMA, Stormwater Treatment Area (STA) 1 West, STA 1 East, the Loxahatchee NWR, the Harold Campbell Public Use Area of STA 3 and 4, STA 5 and 6, the A-1 Flow Equalization Basin, and Everglades National Park. I regularly kayak in Biscayne Bay and in the Intracoastal Waterway in Broward and Palm Beach Counties.

11. I enjoy hiking, birding, photography, and animal watching in all the above public lands and in the WMAs in the Southwestern corner of Palm Beach County. I am on the management advisory group of the Everglades Complex of WMAs, which includes the Everglades and Francis Taylor WMA, the Rotenberger WMA, and the Holeyland WMA.

DocuSign Envelope ID: EEF87686-107G-42BC-B8DA-867420DD5A63

One of my favorite activities in all these lands is looking for tracks, scat, and other signs of wildlife. I have seen bear and panther tracks in many of these public lands.

12. In southwest Florida, I have visited the Florida Panther National Wildlife Refuge (NWR), Big Cypress National Preserve, Fakahatchee Strand State Preserve, Picayune Strand State Forest, Ten Thousand Islands NWR, and Collier Seminole State Park. I have enjoyed kayaking and looking for wildlife in the mangroves of the Turner River south of U.S. Highway 41 towards the Gulf of Mexico and kayaking from Chockoloskee to Ten Thousand Islands NWR. I have enjoyed seeing sharks, manatees, rays, dolphins, birds, mollusks, and crustaceans while I kayak these waters. I have also kayaked, walked, and camped along Fisheating Creek, bicycled, and walked the levee of Lake Okeechobee and kayaked its waters. I have walked and kayaked Myakka River State Park, and walked the trails of Little Manatee River State Park, Alafia River State Park, Highlands Hammock State Park, and the Lake Wales Ridge State Forest. I have also kayaked in the Estero River, Terra Ceia Preserve State Park, Upper Hillsborough River, Chassahowitzka WMA, and Cedar Key.

13. In central Florida, I have kayaked the Kissimmee River, Lake Istokpoga, Blue Cypress Lake, Shingle Creek, Lake Panasoffkee, the Indian River Lagoon, Banana River, and the Mosquito Lagoon. As part of a kayak trip on the Indian River Lagoon in 2021, I kayaked to the site of a "manatee graveyard" north of Manatee Cove County Park in Brevard County. I took photos and video of the site. I am aware that scientists have determined the leading cause of death for manatees in this part of Florida to be the lack of seagrass (the manatees' main food supply) as a result of poor water quality in the lagoon. I also witnessed the near-complete lack of seagrass in this part of the lagoon. It saddened me to

DocuSign Envelope ID: EEF87686-107G-42BC-B8DA-86742DDD5A63

Case 1:21-cv-00119-RDM   Document 98-5   Filed 02/28/23   Page 5 of 19
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025   Page 32 of 430

think that so many of Florida's manatees are now dying due to years of nutrient-rich runoff that has been allowed to pour into this once-biodiverse estuary. Indian River Lagoon has been deteriorating for decades primarily due to the improperly regulated run-off from surrounding fertilized lawns, agriculture, and septic systems. I have enjoyed hiking and star watching in Kissimmee Prairie Preserve State Park, and hiking in the Fort Drum WMA, Blue Cypress Conservation Area, Little Big Econ State Forest, Ocala National Forest, the Green Swamp WMA, Withlacoochee State Forest, Richloam WMA, Half Moon WMA, Flying Eagle WMA, and Citrus WMA.

14. In North Florida, I have enjoyed kayaking in Anastasia State Park, Guana River WMA, and the Saint John's River near Palatka. I have also explored the Goethe State Forest, Saint Marks NWR, Apalachicola National Forest, Tate's Hell State Forest, St. Joseph Peninsula State Park, the Dead Lakes north of Wewahitchka, Osceola National Forest, and the Okefenokee NWR. I enjoyed hiking in the Black Water River State Forest while being trained as a wilderness first responder in Century, Florida.

15. As an environmentalist, I have spent many years on several campaigns to create management plans and policies on public lands that put wildlife protection first. In the Big Cypress National Preserve, I have worked to rein in the use of recreational motor vehicles in some of the preserve's more sensitive areas. I have also worked to limit damage to seagrass beds, coral reefs, and bird rookeries from power boats in Everglades and Biscayne National Parks. In Biscayne National Park I also advocated for the 10,000-acre marine reserve which is now a part of the park's management plan. While serving on the Management Advisory Groups for various state-run WMAs, I advocate for management plans that emphasize wildlife protection as well as public education that

teaches the public why these protected lands are so important and why they should be

supported. I also routinely oppose new developments and transportation projects on

private lands that buffer all these protected public lands.

16. In the course of my environmental work, I have also opposed five proposals to explore

and drill for oil in the Greater Everglades. In chronological order, they include: 1) an

exploratory oil well by the Dan A. Hughes Company on land that sits between the Florida

Panther National Wildlife Refuge and the Golden Gate Estates; 2) seismic testing for oil

using shot holes and explosives by Tocala LLC across more than 100,000 acres of land

north of the Big Cypress National Preserve; 3) seismic testing (using vibroseis vehicles)

and exploratory oil wells by Burnett Oil on 235,000 acres of mineral rights leased inside

the Big Cypress National Preserve; 4) an exploratory oil well in the Everglades of

Broward County by Kanter Real Estate; and 5) an exploratory oil well proposed by Trend

Exploration inside the community of Immokalee.  In all cases, I opposed the projects due

to potential negative impacts to underlying aquifers and drinking water supplies, surface

wetlands, native vegetation, and state and federally listed wildlife. Public lands and their

enjoyment by residents and visitors was also a concern. I engaged in litigation involving

the Dan A. Hughes Company, Tocala, Burnett (with CBD and other environmental

allies), and Kanter Realty – with legal issues including federally jurisdictional wetlands,

NEPA, state ERPs, state laws on oil drilling, NPS rules on oil drilling, and federal and

state laws regarding listed wildlife species.  In the case of the Dan A. Hughes Company,

the company was also applying for a Class II Injection Well from the EPA for the

disposal of liquids connected with their oil operations. I actively opposed that application

as well. I also helped write extensive comments for the Apalachicola Riverkeeper in their

DocuSign Envelope ID: EEF87686-107G-42BC-B9DA-86742DDD5A63

Case 1:21-cv-00119-RDM   Document 98-5   Filed 02/28/23   Page 7 of 19
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 34 of 430

opposition to an exploratory oil well by Spooner Petroleum in the floodplain of the Apalachicola River. Three of the five operations I worked on in South Florida – Dan A. Hughes, Tocala LLC, and Kanter Realty – are no longer pursuing their applications (Kanter Realty received a buyout of their land inside Water Conservation Area 3 from the state).

17. I routinely visit natural areas in Southwest Florida with friends and on my own and I intend to do so in the future.

18. On January 31 and February 1, 2023, I visited Dinner Island Ranch WMA, Sprit-of-the-Wild WMA, and Okaloacoochee Slough WMA, and the Okaloacoochee Slough State Forest while staying in the area to attend the February 1st Management Advisory Group meeting for the Okaloacoochee Slough WMA. During my visit I hiked several trails, observed habitats, and practiced wildlife photography. I also engaged in night photography in Dinner Island Ranch where some of the darkest night skies in Southwest Florida are found. Stargazing has been an important hobby for me ever since I arrived in South Florida in 1995. Seeing dark skies that are less impacted by urban and suburban light pollution is another reason for me to spend time on Florida's public lands.

19. I frequently explore the state's waters and wetlands and intend to visit them in the future. I have explored marshes in Eastern Bear Island (Little Marsh), the California Slough in the Big Cypress "Addition Lands," Mullet Slough on the Florida Trail in the Big Cypress, and in the Hungryland Wildlife and Environmental Area in Martin and Palm Beach Counties. I frequently hike into the wet interior of cypress domes and cypress strands in these areas for the variety of vegetation and animal life they host. I have also swamp-walked through parts of the Okaloacoochee Slough, which feeds public lands and waters

DocuSign Envelope ID: EEF87686-107G-42BC-B9DA-86742DDD5A63

south to the 10,000 islands. These wetlands are important to the hydrology of the larger Everglades ecosystem. I am concerned about the drainage of nearby wetlands and how this impacts the groundwater and the public lands I visit. We have already seen the effects of drainage. In the places like the Florida Panther NWR and the Picayune Strand State Forest, sabal palms that normally cannot handle standing water for long periods of time, have taken over vast swaths of the former wetland landscape. The area around the Florida Panther National Wildlife Refuge has also become a significant area for new residential development. The increased development I am seeing in this region bothers me a great deal. Southwest Florida's aquifers are nearly tapped out. The state is urging people to use less water and it is trying to switch to desalinating parts of the Florida Aquifer as an alternative water supply. But in addition to the direct loss of habitat from development, important wetlands are continuously being degraded and lost to development.

20. The amount of development occurring in Southwest Florida saddens me. In the past two months, I hiked Bird Rookery Swamp in the CREW lands in Corkscrew, Florida as well as other CREW lands south of Florida State Road 82. These lands include the Caracara Prairie Preserve, Flint Pen, and the Cypress Dome trails off Corkscrew Road. I also visited Audubon's Corkscrew Swamp. Each time I return to this area, it seems that the level of development as well as traffic on area roads is increasing. This increased traffic and resulting wildlife road fatalities diminish my opportunities to see wildlife when I'm in these areas. The noise from traffic and light pollution from these developments also affect my ability to enjoy these areas because the feeling is one of being in suburbia as opposed to being immersed in nature.

21. I almost always visit Big Cypress National Preserve when I visit Collier County. In the past month, I also explored the Picayune State Forest for a day. I entered the forest from Everglades Blvd on the north side and hiked various trails and photographed the landscape. I also visited the massive new pump stations that were built south of I-75 to help bring back the natural hydrology of the area. I document what I see through photography that I often share with my organization's followers on social media and in PowerPoint presentations.

22. Now living in the Tampa Bay area, I continually frequent public lands on drives to Collier County. I have increasing interest in the Babcock/Webb WMA and Babcock Ranch Preserve, which I enjoy exploring. I am aware that the FWS has considered those lands for their excellent potential in expanding Florida panther habitat north of the Caloosahatchee River. I have also explored public lands on Pine Island and other nearby locations on other occasions.

23. I enjoy viewing native plants and I am always looking for wildlife tracks including scrapes and scat. I have seen Florida panthers on more than one occasion. On my first visit to the Big Cypress National Preserve soon after arriving in South Florida, I camped in the Bear Island section of the Big Cypress National Preserve. On my way home after the weekend, I was driving at dusk on Turner River Road and saw wild piglets on the side of the road. I then saw what appeared to me at the time to be a very large breed of dog walking north as I drove south. As I got closer, it turned sideways and showed itself as a large panther before it disappeared into the brush on the side of the road. I also saw a panther at night in the Okaloacoochee Slough WMA and one just outside the protective fence on the west side of the Florida Panther National Wildlife Refuge along SR 29. The

DocuSign Envelope ID: E5E87686-187C-42BC-BBDA-86743DDD5A63

fourth panther I encountered in the wild was when I was driving north late at night on State Road 29. I stopped to help a motorist who said he had accidentally hit an alligator that damaged the plastic under his vehicle. We walked back to where he thought he had hit the gator, but the gator had walked off. As we returned to the vehicles, we hugged the fence on the side of the road to be away from the traffic on a dark road. A panther hissed and spit loudly and slapped the fence we were walking alongside of. We were only separated from the panther by about a foot – but had the fence between us.

24. I am interested in visiting the Carlton Reserve soon. I also recently visited the Little Manatee River State Park several times near my home. Because of its proximity to the Myakka River State Park, the Carlton Reserve and the stretch of lands north of the Caloosahatchee River could be a place for panthers, but recent development and transportation projects make that a challenge. I plan to spend more time in the public lands of Central Florida and exploring wildlife connections between the I-4 Corridor and the Caloosahatchee River. I am interested in and will be visiting public lands in this region because I now live closer to these lands, and they are within the Florida Wildlife Corridor and the expansion area for the Florida panther. When the M-CORES highway project was still working its way through the state approval process, I advocated strongly to stop the project due to severe disruption to the habitat and the movement of wildlife in this area.

25. I often look at development and road widening projects during my travels through these areas. My photography captures the interaction between human development and habitat. Growing up in New York, the large amount of remaining wilderness and the degree of biodiversity in South Florida fascinated me. It was also interesting for me to see the

DocuSign Envelope ID: E5E87686-187C-42BC-BBDA-86743DDD5A63

proximity of this wilderness and wildlife habitat to the intense level of human development that is also a part of this region.

26. The juxtaposition interests me, but I don't like to see it. I feel the state is trading off its most important natural habitats, including those that are vital for its state animal, the Florida panther, for subdivisions and strip malls. I consider this to be this to be a very bad tradeoff. It makes me sad that it is happening, and that state and local governments are greenlighting it. I also believe the state-assumed 404 permits are coming in with great frequency right now and many are receiving quick approvals.

27. I am concerned about the boom-and-bust history of development in Florida and the burden this new development and growing population places on local governments to provide services, to residents like me.

28. There is something about Florida that I believe is special and that I love. I have hiked around the world, including in the Rocky Mountains, the Andes, and Alaska. In Florida, you can hike year-round, and the biodiversity is overwhelming. Aside from the wildlife, I love natural places for my own well-being. I feel bad when I do not get outside for any length of time. I have also learned to navigate on foot by compass and GPS and feel very comfortable in Florida's most wild landscapes.

29. I grew up with a passion for fishing in New York City.  I fished regularly in Jamaica Bay near my home in Brooklyn and then along many parts of the Hudson and East Rivers. I believe these experiences were what first introduced me to caring about the environment. I fell in love with the nature and wildlife I experienced when I moved to Florida, but I also saw it disappearing right before my eyes. This made me an environmentalist. The

DocuSign Envelope ID: E5E87686-187C-42BC-B8DA-86743DDD5A63

Everglades is a special place, and it is sad that it is being destroyed. It is an incredible world resource that should be treated better than it is.

30. I enjoy talking to the locals I meet when I am exploring these places. I like having conversations with them about Florida's history and what the landscape once looked like pre-development. I have gotten to know some of the locals that live in the towns around Lake Okeechobee who have described to me what the northern Everglades looked like before sugar fields covered the landscape.

31. My experiences as an environmentalist have changed through the years. Initially, I was more of a naturalist – and tried hard to learn the names of many native plants, birds, and wildlife. But as I learned more about the history, law, and policy affecting these places I became more knowledgeable. I now understand the politics more and how Florida's environment is being managed. I often think about the changes being made to the natural environment. When I view a landscape now, I see the land as it is. But I also know what the land was like before, how and why it changed, and often I have the knowledge of what is coming.

32. I am familiar with the state's assumption of the 404-permitting program. I voiced opposition to the state's assumption of the program in public comment. I provided verbal comments at the EPA hearing on the state's assumption of the program.

33. One of my main concerns is that the transfer of the program to the state eliminates the biological opinion process under the federal Endangered Species Act. It also eliminates full NEPA review and the consideration of other laws such as the National Historic Preservation Act.

DocuSign Envelope ID: EEE87686-187C-42BC-BBDA-86743DDD5A63

Case 1:21-cv-00119-RDM  Document 98-5  Filed 02/28/23  Page 13 of 19
USCA Case #24-5101  Document #2102936  Filed: 02/26/2025  Page 40 of 430

34. I know how in-demand housing development is, and biological opinions are one of the only tools to fall back on for the survival and recovery of species like the Florida panther. Section 7 of the Endangered Species Act allows a line to be drawn to stop development that would jeopardize these species. It is the last and best tool we have, and it directly implements the intention of the ESA to conserve rare species.

35. This won't take place through the State's technical assistance process. The new process speeds up the pace of development with many more applications coming in and being approved.

36. As a non-lawyer, it was not easy for me to learn and become familiar with the federal process for protecting endangered species. Yet, in one swoop of the pen it was replaced with a process I still don't fully understand. FWC has very little experience with the ESA, and it is now the lead agency in approving projects in the habitat of federally listed wildlife. FWC's previous reviews were at best anemic for development projects applying for state permits. Often, their comment on a project they were asked to review was "no comment." They never issued biological opinions and have no experience with them. In my opinion, though FWC staff were extremely knowledgeable about Florida's wildlife and their needs, they were not an agency that did a rigorous review of the impacts of development projects. My experience with the FWS is that their review yielded a full biological opinion for individual projects. At the very least, it was a written document produced according to the guidelines laid out in the Endangered Species Act. I knew there was a formal federal process for submitting public comment and that people could challenge a biological opinion in federal court if it was thought to be inadequate.

DocuSign Envelope ID: E5E87686-197C-42BC-BBDA-86743DDD5A63

Case 1:21-cv-00119-RDM   Document 98-5   Filed 02/28/23   Page 14 of 19
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025   Page 41 of 430

37. This technical assistance process is novel and does not have all the requirements of a biological opinion. Components like the environmental baseline, action area, and effects analysis are described in the ESA and the ESA regulations. The components of a biological opinion make the process intelligible and subject to review and one can challenge them in federal court if they are deficient. These components are lost through the state's assumption of the program.

38. It also makes it more difficult to challenge the state's decision in state court as there are fewer resources to do so. I have previously brought suits in federal court to protect the panther and the ESA was front and center. Previously, I relied on federal legal practitioners who were ESA experts to represent me in federal court. I will lose the expertise of many federal lawyers to interpret the adequacy of biological opinions for me and challenge a permit that harms endangered species.

39. The blanket incidental take statement in the Programmatic Biological Opinion was one of the biggest daggers. There was no specificity for any project, current or future, and the impacts to each species of concern are unknown. New development projects in Southwest Florida will bring new roads, which will inevitably lead to more vehicle trips, resulting in more roadkill. Vehicle mortality is one of the major impacts to panthers and this will greatly affect my ability to see and look for them in the wild. I am also concerned about how these projects will affect the species as a whole as well as the many other wildlife species which share the panther's habitat.

40. I don't believe state protections are adequate. There is no superfluous habitat for panthers. I am now left with the problem of not knowing what I can do to advocate for the panther and how I can best make a difference.

DocuSign Envelope ID: E5E87686-187C-42BC-BBDA-86743DDD5A63

41. The state's assumption of the permitting program creates a lot more anxiety knowing the places I explore and the wildlife I like to see will be impacted by the new roads and development. The light pollution from these developments will destroy my ability to see the night sky in the places I enjoy visiting, particularly in Southwest Florida. Newly approved development will cause degradation in all kinds of ways and is already impacting the public lands I visit. I am concerned about not seeing wildlife in places like Big Cypress. I also enjoy seeing the signs of them - their scat, tracks, and markings. Not seeing them will make me sad.

42. I have been extensively involved in transportation, development, and energy projects that impact panthers, especially in Collier County.

43. I regularly attend County Commission and Planning Commission meetings.

44. I speak out against new development at public meetings.

45. I created an online petition that garnered more than 165,000 signatures to ask FWS to reject approval of the Eastern Collier Multi-Species Habitat Conservation Plan.

46. I have met with FWS and other federal agencies about projects that threatened species like the panther in Southwest Florida. I have given numerous interviews with the press and track a lot of projects including the Town of Big Cypress and its three component villages. I spoke in opposition to these projects at the public meetings I attended and my comments were often picked up in the local press. These component villages include Belmar, Longwater, and Rivergrass. Each of these separate villages are approximately 1,000 acres each and were each the subject of separate planning and county commission hearings. I attended most of those hearings. These projects run from just north of Oil Well Road to just north of the Florida Panther National Wildlife Refuge. The villages and

DocuSign Envelope ID: E5F87686-187C-42BC-BBDA-86743DDD5A63

the town itself are deep in the primary zone of the panther and will have multiple impacts on the panther and many other species. I also warned the commissioners that in approving these projects, they were inviting human-wildlife conflicts. The Florida Panther Wildlife Refuge is a haven for Florida black bears as well as panthers. And food odors from the new residences will surely attract bears into the new neighborhoods.

47. My top concern with these projects is their proximity to the Florida Panther NWR that I frequently visit and plan to continue visiting. I visit the Refuge because it has the greatest density of panthers based on telemetry points. I know from the FWC's annual reports which track the movement of collared panthers, that these panthers are constantly moving in and out of the Refuge boundaries. The surrounding lands are very important to wildlife of the Refuge, but also because they form habitat connections between the Refuge and the CREW Lands and many other public lands in the vicinity that I also enjoy visiting. Allowing these developments to fragment this rural, undeveloped, and currently unpopulated area harms the panther and other species living there. This harm will impact my ability to enjoy these largely untouched areas and the wildlife that lives there.

48. I am also monitoring the Immokalee Road Rural Village, which is a 2,500-acre project south and east of Immokalee Road. It is in close proximity to Audubon's Corkscrew Swamp Sanctuary (to the north) and the CREW lands to the west - specifically Flint Pen Strand and Bird Rookery Swamp (areas I regularly hike in). I have also attended planning and county commission hearings on this project. The west side of the project is in the primary zone of the panther and the east side is in the secondary zone. I am aware of numerous panthers that have already died as a result of roadkill on the part of Immokalee Road which separates the west side of Immokalee Road Rural Village from the CREW

DocuSign Envelope ID: E5E87686-187C-42BC-B8DA-86743DDD5A63

Case 1:21-cv-00119-RDM    Document 98-5    Filed 02/28/23    Page 17 of 19
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 44 of 430

Lands further west. This project is also near public lands I regularly use and will continue to use. Like the projects discussed above, this large-scale project also threatens to further fragment panther habitat and, as such, harms my ability to enjoy these lands and view wildlife.

49. Another project I was very engaged in was Brightshore Village, which is on the north side of Immokalee Road in the same general vicinity as Immokalee Road Rural Village. I opposed this project as well at the planning and county commission level.

50. The area is deteriorating and there are other projects everywhere in rural parts of Southwest Florida. I try to track as many as I can to help these panthers through my advocacy. Once we had the potential for a Habitat Conservation Plan (HCP) for a significant section of Eastern Collier County, but now we won't even have individual biological opinions for each of these new projects. My concern is nobody at the state is watching these projects, that they are not being looked at as a whole and that their impacts are not being considered cumulatively. I also don't believe the new process will provide the "hard look" that NEPA previously provided and required.

51. Previously, biological opinions would be posted on FWS's Vero Beach office website for public review. I could also provide comments to FWS and U.S. Army Corps of Engineers on permit applications that were under review and a biological opinion was being prepared. It was a slower process, but it provided protections and adequate time to review complex decisions. Who actually benefits now from this new "streamlined process?" I believe this transfer of authority was a gift to developers without any benefit for wildlife or the current residents of this rapidly developing part of Southwest Florida.

DocuSign Envelope ID: E5E87686-187C-42BC-BBDA-86743DDD5A63

Case 1:21-cv-00119-RDM    Document 98-5    Filed 02/28/23    Page 18 of 19
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 45 of 430

52. I also don't believe the public understands the new process. In my experience, when previously appearing before local government officials, I would be told that it is for the federal scientists to determine if the project would harm endangered wildlife (or cause their extinction) under the Endangered Species Act.  Now that process is no longer in place. I have been involved in the federal process for a long time and I am still trying to wrap my head around this new state approval process.

53. From what I've seen so far, the approval process now feels like an applicant for a building permit receiving specific terms and conditions on how he/she should construct a given project. In a Biological Opinion, all the components of the review including the specifics of how listed wildlife will be impacted by the project are spelled out in the ESA. It is a formal process that others, including federal courts, could review and determine the sufficiency under the ESA. It was easily subject to outside review and challenge.

54. While Florida is allowed to implement this 404 program, I will be personally harmed by permitted developments that do not undergo the same rigorous review as under the Federal program. The fragmentation of largely untouched rural areas and impacts to wildlife from these developments threaten my ability to enjoy the public lands and advocate for the protection of the panther and other species for the reasons discussed above.

55. If I had the ability, I would immediately bring the process back to the U.S. Army Corps of Engineers and FWS whenever federally listed species would be affected. The previous system was imperfect, but it was codified and subject to challenge in federal court when there were inconsistencies with the requirements of the Biological Opinion and the ESA. It carried with it the bigger lens of federal law including NEPA.

DocuSign Envelope ID: EEF87686-187C-42BC-BBDA-86743DDD5A63

I declare under penalty of perjury that the foregoing is true and correct. Executed on February
<u>23</u>, 2023.

DocuSigned by:

*Matt Schwartz*

16A5ED2A5C724D5...

Matthew Schwartz

DocuSign Envelope ID: 6A30EE86-D439-48DD-0346-F86584EEFCD4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## DECLARATION OF LISA RINAMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Lisa Rinaman, make the following declaration:

1.     I am a resident of Jacksonville, Florida.

2.     I am competent to make this declaration.  I provide this declaration based upon my personal and professional knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.     I am a member of St. Johns Riverkeeper, and I am also employed by St. Johns Riverkeeper as the Riverkeeper.

4.     At 310 miles long, the St. Johns River is the longest river in the state of Florida and is a significant waterway for commercial and recreational use.  It flows south to north and spans the northern half of the state on the eastern side.

5.     Through my work at St. Johns Riverkeeper, I have extensive experience advocating for the St. Johns River's water quality and health.  My work includes holding regulatory agencies and polluters accountable, including investigating and reporting threats and

JA.463

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD4

monitoring for permit violations; identifying and advocating for solutions to protect and restore

the river; building coalitions across government entities, businesses, and the community to solve

problems affecting the river; working with the media to highlight river-related issues; and

educating the public about river related issues.

6.      Before being named Riverkeeper, I previously served in the St. Johns Riverkeeper

Water Policy Group, where I advocated for water conservation and reuse policies that are more

protective of our water resources.

7.      I also previously worked as a senior staff member for Jacksonville Mayor John

Peyton, where I was instrumental in leading the effort to develop and implement irrigation,

fertilizer, and Florida-friendly landscape ordinances to better protect the St. Johns River and

local waterways.  I also played a key role in securing state funding for water quality

improvements, organized Jacksonville's Manatee Protection Plan, and advocated for robust

programs to fulfill the River Accord restoration plan for the Lower St. Johns River.

8.      I graduated with a Bachelor of Arts in Communications from the University of

Arkansas in 1991.

9.      I have a deep and personal commitment to the protection and conservation of the

St. Johns River.  I regularly enjoy recreating in the river, where I kayak, boat, swim, fish, bird-

watch, and take photos with my husband and teenage boys.  I also regularly enjoy hiking and

camping in the areas surrounding the river.  These are activities that members of St. Johns

Riverkeeper also regularly partake in and enjoy.  These activities depend on there being a clean,

pollution-free river whose waters are fresh and not depleted.

JA.464

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD4

10.     St. Johns Riverkeeper is a 501(c)(3) nonprofit with approximately 1,400 dues-paying members made up of businesses, families, single members.  We also receive support and funding from foundations.

11.     The core purpose of St. Johns Riverkeeper, for which my work is vitally intertwined, is to protect the river, tributaries, and watershed.  In doing so, we are also protecting the habitat of all the species who depend on the river.

12.     EPA's approval of Florida's application to assume control of section 404 permitting undermines St. John Riverkeeper's mission.  Among other failings, when Florida submitted its application to EPA, it claimed it would not need to commit any new financial resources to the program.  Additionally, the state program has no lawful plans to ensure that listed species are adequately protected, and analyses of section 404 permit applications issued by Florida would no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the Endangered Species Act ("ESA"), as they would if 404 authority remained with the U.S. Army Corps of Engineers instead.

13.     Because section 404 permit applications processed by Florida do not undergo a NEPA analysis or site-specific ESA section 7 consultation, state 404 projects are subject to a far less rigorous environmental review, which is increasing risk of harm to the St. Johns River water quality and ecosystem.

14.     Overdevelopment, overpopulation, reduced water quality, and loss of critical wildlife habitat would harm my and St. Johns Riverkeeper members' ability to enjoy this natural area.

15.     The state's administration of this unlawful section 404 program is preventing St. Johns Riverkeeper from being able to monitor and engage in proposed permits to the same

degree that the federal program afforded us.  As an organization, we heavily rely on federal

review and analysis of projects that affect the river and its entire ecosystem.

16.     Because FDEP state assumption of the 404 program is in place, we are losing the

protections that the federal law allows under the Clean Water Act, NEPA, and ESA.  This means

that there is no federal analysis or comment process on projects and permits under those laws.

As an organization, we do not have the ability to take on every advocacy effort, so we rely on

that federal review to evaluate those projects to protect the river.  We can then review the

information provided by those federal reviews to assess the impact of those projects, share that

information with our members, and advocate for necessary protections.  Our organization now

suffers from losing that information.

17.     Our organization will be significantly harmed without these federal analyses

because to advocate effectively, we will be required to hire our own experts in an attempt to

otherwise assess and understand impacts of agency actions.

18.     One of the main tools St. Johns Riverkeeper uses to protect the river is the

commenting process afforded by the NEPA.  When there is a proposed agency action (such as a

Corps 404 permit), we review the applications and documents; review applicable laws and

regulations; determine the scope and effects it would have on the St. Johns, its tributaries, and

watershed; and submit comment letters as needed.  As with this case, we also engage in litigation

when needed to carry out our organization's goals.

19.     Additionally, the environmental assessments and analyses required under NEPA

are crucial to St. Johns Riverkeeper's ability to carry out its mission.  We rely on this

information that we otherwise would not have access to in order to fully and accurately

understand the scope and impacts of a proposed agency action.  In turn, we use this information

to educate our members about a proposal and how it impacts the river and their ability to utilize the river.  This information is also vital for our advocacy, monitoring, and litigation efforts.

20.     Because Florida has assumed 404 wetlands permitting, we have lost NEPA review and the high-level of protections it affords for the environment and our water resources. The loss of crucial information is extremely detrimental to St. Johns Riverkeeper's ability to carry out its mission of protecting the river.  And because of this loss, we would be required to hire our own experts to ascertain information previously provided under federal law.  Experts costs thousands of dollars to retain, which is thousands of dollars that would otherwise go toward our programmatic goals.  The loss of information from NEPA analyses will result in additional staff time to triage permits to identify harms to the river and additional costs in hiring experts.

21.     NEPA also provides our organization with an avenue for challenging 404 permits and ensuring better environmental analyses.  St. Johns Riverkeeper is being harmed by the loss of federal court as a venue to challenge agency actions taken on section 404 permits.  As with this case, our organization engages in federal court litigation as a tool to advocate for the river and oppose actions that would harm it.  Without federal court access to challenge certain permits, we are now required to bring permit challenges in state court before the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH do not involve records review from an administrative record, St. Johns Riverkeeper would be required to spend money to hire expert witnesses if it were to bring a legal challenge.  Factoring in the time and costs to build a case from the ground up in state court, one single challenge could cost upwards of several hundreds of thousands of dollars, which represents 35% of our annual operating budget.  We either have to fundraise in order to cover additional costs to litigate, which would be a significant drain on our time and resources with no guarantee of success; divert

JA.467

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD4

Case 1:21-cv-00119-RDM   Document 98-6   Filed 02/28/23   Page 6 of 47
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025   Page 52 of 430

resources to cover these costs that would otherwise cover other items in our budget; or be foreclosed completely from this avenue to protect the river.

22.      Engaging in state court litigation would also risk St. Johns Riverkeeper's exposure to a mandatory "fee-shifting" provision, in which we would risk being liable for the costs and fees to engage in litigation, costs and fees that we would not be subject to if Florida was not allowed to assume the 404 program.  Such a fee-shifting provision would further diminish our ability to engage in litigation, because we would be required to weigh this financial risk in addition to the above costs, regardless of how strong our claim might be.

23.      Assuming we would be able to overcome the steep barriers to litigating a case in state court, St. Johns Riverkeeper might still be precluded from challenging a proposal or action in state court as a result of different legal requirements under state versus federal law.  It is my understanding that under Florida law, we would be required to show harm to a significant number of our members to be able to bring a claim, rather than to just one member under federal law.

24.      St. Johns Riverkeeper was also harmed by Florida's incomplete application, which did not include the technical assistance process the state proposed to use to ensure state permits will not jeopardize ESA-protected species.  In doing so, the application did not address how ESA-protected species review would occur, how a no-jeopardy determination would be made, or relevant and important information about the take of listed species.  While Florida's application referred to a "technical assistance" process that it said would be described in "an anticipated biological opinion," the biological opinion containing that information was not part of the application, frustrating St. Johns Riverkeeper's ability to analyze and comment on the process.  Florida relied on this missing information when asserting that it complied with the

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD4

Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for St. Johns Riverkeeper to comment on whether the state's plan would in fact protect listed species.

25. We were also harmed by the Corps creation and the state's use of an incomplete list of assumed versus retained waters. This harmed St. Johns Riverkeeper's ability to carry out its organizational mission. The incomplete list did not include the headwaters of the St. Johns River, which is a series of lakes and wetlands that are hydrologically connected to the river. Without the full list of retained waters, we were unable to educate our members about the impacts and decision-making process of such a momentous shift in Florida wetlands. And the headwaters that were not retained are now subject to the state's flawed 404 program.

26. The state's enforcement of its section 404 program also harms St. Johns Riverkeeper. St. Johns Riverkeeper engages in enforcement activities to protect the river. This includes investigating and reporting pollution, monitoring for permit violations (including dredge and fill permits), and ensuring that environmental laws and regulations are implemented and enforced. To that end, we patrol the river regularly in our organization's boat, the Kingfisher, which is captained by our patrol unit. When appropriate, we refer issues to the authorities for investigation and criminal prosecution, for which we provide any necessary assistance. The state program, however, does not include the same enforcement standards and requirements as federal law.

27. For example, in 2021, St. Johns Riverkeeper was contacted about a construction site on Pottsburg Creek that was pumping muddy water into the adjacent wetlands and that was failing to construct permit-required siltation fences to control sedimentation released into the waterways. See Pictures (Att. A). We investigated these conditions along with the neighbors,

DocuSign Envelope ID: 6A30EE86-D439-48DD-9346-F96584EEFCD1

Case 1:21-cv-00119-RDM   Document 98-6   Filed 02/28/23   Page 8 of 47
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 54 of 430

who had reported the violation to FDEP.  Overall, it took months for FDEP to issue a consent order requiring the construction site to stabilize the site to ensure no further sedimentation reached the adjacent wetlands.  Because FDEP did not move with necessary speed to protect these wetlands, more polluted water being released into wetlands than should have been (over 1,000 times the amount allowed by law).

28.    My personal recreational and aesthetic interests as a member of St. Johns Riverkeeper are also being harmed by the state 404 program because the state is considering permits that would impact the headwaters of the St. Johns River.  One such project is Mattamy Homes at Fiske Blvd, which would permit Phase 1 of a project to construct and develop an approximately 246-acre site.  The permit applicant states that the project will impact 22.64 acres of jurisdictional wetlands, but the applicant used the vacated Trump definition of waters of the United States to make that assessment.  The project will also likely impact wading birds because the current site contains habitat for nesting and migratory birds.  Permit Application, ST404_398515 (Att. B); Email from FDEP to Commenting Agencies (Sept. 2, 2022) (Att. C); RAI Response, ST404_398515 (Att. D).

29.    Destruction of these wetlands so close to St. Johns River headwaters and construction of a housing development will impact the St. Johns River and my ability to enjoy recreating on the River.  The project is also concerning because its impact on wading and migratory birds, which will likely harm my interest in birdwatching on the St. Johns River.

30.    As a plaintiff to this case and for the reasons stated in this declaration, it is St. Johns Riverkeeper's position that Florida's 404 program is unlawful and will result in harms to the river that our organization strives to protect.  This was reflected in St. Johns Riverkeeper's advocacy during the state's 404 application process, during which I was engaged in our review

of Florida's proposal during EPA's public comment period and participated in the development of our comments in opposition to the program.

31.     Because the EPA granted the state's application to take over the 404 program, the state has been applying and will continue to apply its unlawful program for permits that will destroy wetlands and risk significant harm to listed species.  And our organization will now have substantial difficulty furthering our mission because of the significant barriers for advocacy, as discussed above.

32.     My recreational and aesthetic interests are also being harmed by the state's operation of the 404 program because the state is now considering permits that would affect the water quality and habitat in St. Johns River headwaters.  My ability to enjoy boating, kayaking, swimming, fishing, bird-watching, and photography on the St. Johns River depends on a healthy river with necessary water supply.  These permits threaten the St. Johns River water quality and supply.

33.     Absent EPA's unlawful approval of the state 404 program, St. Johns Riverkeeper would continue to enjoy rights and protections guaranteed by federal law, including participation in the lawful 404 program administered by the U.S. Army Corps of Engineers for more than 40 years in Florida, the public participation process afforded by NEPA, the protections afforded to species through the ESA whenever a project may affect a listed species, and the ability to enforce all these rights in federal court, where St. Johns Riverkeeper can meet more permissive standing requirements and afford to litigate based on an administrative record, unlike the undue barriers that litigation in state court present.

34.     Florida's assumption of the Section 404 program has and will lead to greater environmental harms that irreparably harms St. Johns Riverkeeper's programmatic operations

9

and will also harm my and our members' enjoyment and use of the river and the beautiful and unspoiled natural areas that surround it.

35.    A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress St. Johns Riverkeeper's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress St. Johns Riverkeeper's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of February 2023.

DocuSigned by:

*Lisa Rinaman*

42AEE8821F824DB...

Lisa Rinaman
Riverkeeper at St. Johns Riverkeeper
2800 University Blvd N
Jacksonville, FL 32211

JA.472

# ATTACHMENT A





# ATTACHMENT B

# Application for

# Individual and Conceptual Approval

# Environmental Resource Permit,

# State 404 Program Permit,

# and Authorization to Use State-Owned

# Submerged Lands

Florida Department of Environmental Protection/

Water Management Districts

Effective 12/22/2020



**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.477

**Instructions for Use of This Form:**

This form is designed to assist you in submitting a complete application. All applications must include Section A-General Information for All Activities. Sections B through H list typical information that is needed based on the proposed activities and are only required as applicable. Part 1-C of Section A will guide you to the correct sections needed based on your proposed activities. Applicants are advised to consult Chapter 62-330, F.A.C., and the Environmental Resource Permit Applicant's Handbooks Volumes I and II for information regarding the ERP permitting process and requirements while preparing their application. Internet addresses for Chapter 62-330, F.A.C., and the Applicant's Handbook, Agency contact information, and additional instructions for this form can be found in Attachment 1.

# What Sections of the Application Must I Fill Out?

| Type of Activity | Section A | Section B | Section C | Section D | Section E | Section F | Section G | Section H | Section I |
|---|---|---|---|---|---|---|---|---|---|
| Fill in wetlands or waters for a single family residence? | Y | Y | N | N | N | N | N | N | Y, if in assumed waters |
| Docks, shoreline stabilization, seawalls associated with a single family residence? | Y | Y | N | N | N | Y, as needed | N | N | Y, if in assumed waters |
| Wetland impacts (other than association with an individual residence)? | Y | N | Y | N | N | N | N | N | Y, if in assumed waters |
| Boating facilities, a marina, jetty, reef, or dredging? | Y | N | Y | Y | N | Y, as needed | N | N | Y, if in assumed waters |
| Any work on state owned submerged land? | Y | N | Y | N | N | Y | N | N | Y, if in assumed waters |
| Construction of a stormwater management system? | Y | N | Y, as needed | N | Y | N | N | N | N |
| Constructing a mitigation bank? | Y | N | Y | N | Y, as needed | N | Y | N | Y, if in assumed waters |
| Creating a mine? | Y | N | Y, as needed | N | N | N | N | Y | Y, if in assumed waters |

**If you have any questions, or would like assistance completing this form, please contact the staff of the nearest office of either the Florida Department of Environmental Protection (DEP) or a Water Management District (WMD) (see Attachment 2).**

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.478

# Section A:
# General Information for All Activities

## Part 1: Name, Application Type, Location, and Description of Activity

A.    Name of project, including phase if applicable:  **Mattamy Homes at Fiske Blvd**

B.    This is for (check all that apply):

☒    Construction or operation of **new** works, activities and/ or a stormwater management system

☐    **Conceptual Approval** of proposed works, activities and/ or a stormwater management system

☐    Modification or Alteration of **existing** works activities and / or a stormwater management system. Provide the existing DEP or WMD permit #, if known: _____   Note: Minor modifications do not require completion of this form, and may instead be requested by letter in accordance with section 6.2 of Applicant's Handbook Volume I.

☐    **Maintenance or repair** of works, activities and/ or stormwater management system previously permitted by the DEP or WMD. Provide existing permit #, if known: _____

☐    Abandonment or removal of works, activities and/ or stormwater management system Provide existing DEP or WMD permit #, if known: _____

☐    Operation of an **existing unpermitted** work, activity, and/or stormwater management system.

☐    Construction of additional phases of a permitted work, activity, or system.

     Provide the existing DEP or WMD permit #, if known: _____

☒    A State 404 Program authorization:

     ☐ Exemption   ☐ General Permit   ☒ Individual Permit

     If requesting an Exemption or General Permit provide Rule #, if known:

     ☐ **By checking this box**, I hereby voluntarily waive, in accordance with Rule 62-330.090(8), F.A.C., the agency action deadlines in section 5.5.3 of Volume I in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP and State 404 Program authorizations be issued at the same time. (This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.) If this box is checked and the Agency(ies) determines that no State 404 Program authorization is required, the Agency will continue to abide by section 5.5.3 of Volume I.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.479

C.  **List the type of activities proposed. Check all that apply, and provide the supplemental information requested in each of the referenced application sections.** Please also reference Applicant's Handbooks I and II for the type of information that may be needed.

☐  Activities associated with one single-family residence, duplex, triplex, or quadruplex that do not qualify for an exemption or a Noticed General Permit: **Provide the information requested in Section B. Do not complete Section C.**

☒  Activities within wetlands or surface waters, or within 25 feet of a wetland or surface water, (not including the activities associated with an individual single-family residence). *Examples include dredging, filling, outfall structures, docks, piers, over-water structures, shoreline stabilization, mitigation, reclamation, restoration/ enhancement.* **Provide the information requested in Section C.**

☐  Activities within navigable or flowing surface waters such as a multi-slip dock or marina, dry storage facility, dredging, bridge, breakwaters, reefs, or other offshore structures: **In addition to Section C, also provide the information requested in Section D.**

☐  Activities that are (or may be) located within, on or over state-owned submerged lands (See Chapter 18-21, F.A.C.  https://www.flrules.org/gateway/ChapterHome.asp?Chapter=18-21): **In addition to Section B or C, also provide the information requested in Section F**

☒  Construction or alteration of a stormwater management system serving residential, commercial, transportation, industrial, agricultural, or other land uses, or a solid waste facility (excluding mines that are regulated by DEP). **Provide the information requested in Section E.**

☐  Creation or modification of Mitigation Bank (refer to Chapter 62-342, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=62-342): **Provide the information requested in Section G.**

☐  Mines (as defined by in Section 2.0 of Applicant's Handbook Volume I) that are regulated by the DEP: **Provide the information requested in Section H.**

☐  Other, describe: _____   Please contact the Agency to determine which additional sections of the application are needed. See Attachment 2 for Agency contacts.

D.  Describe in general terms the proposed project, system, works, or other activities. For permit modifications, please briefly describe the changes requested to the permit: **This project consists of the construction and development of a +/- 246 acre site to include Townhouses and detached single-family units with associated drainage, utilities and roadway improvements. This will be Phase 1. Future Phases of the project will include Multi-Family units and commercial outparcels along Fiske Blvd. This application will be a master permit that will cater for the entire development.**

E.  Project/Activity Street/Road Address or other location (if applicable): **4151 FISKE TRL CELLTW**
City: **Rockledge**                    County(ies)**Brevard**              Zip: **32955**
Note: For utility, road, or ditch/canal activities, provide a starting and ending point using street names and nearest house numbers or provide length of project in miles along named streets or highways.

F.  Project location map and Section, Township, and Range information (use additional sheets if needed):

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.480

**Please attach a location map showing the location and boundaries of the proposed activity in relation to major intersections or other landmarks. The map should also contain a north arrow and a graphic scale; show Section(s), Township(s), and Range(s); and must be of sufficient detail to allow a person unfamiliar with the site to find it.**

Land Grant name, if applicable:

      Section(s):   19            Township:   25S          Range:   36E

G.    Latitude (DMS)                    Longitude (DMS)                    (Taken from central location of the activity). Explain source for obtaining latitude and longitude (i.e. U.S.G.S. Quadrangle Map, GPS, online resource):

H.    Tax Parcel Identification Number(s): **25 3620-00-250, 2510453, 2510480, 2510481, 2521572, 252160**

    [Number may be obtained from property tax bill or from the county property appraiser's office; if on multiple parcels, provide multiple Tax Parcel Identification Numbers]

I.    Directions to Site (from major roads; include distances and landmarks as applicable): **From Interstate 95 (I-95), take exit 195 towards Fiske Blvd, travel southbound of S-Fiske Blvd. Turn Left on Fiske Trail after 0.5 miles. The site is located at the entrance of Fiske Trail on the south west corner of Fiske Boulevard and I-95.**

J.    Project area or phase area:   **246.16**  acres

K.    Name of waterbody(ies) (if known) in which activities will occur or into which the system will discharge:

| Receiving Waterbody | Class Type | Outstanding Florida Water | Aquatic Preserve |
|---|---|---|---|
| Saint Johns River | III Fresh | no | no |

**The following questions (L-N) are not applicable to activities related to a single-family residence, including private single-family residential docks, piers, seawalls or boat ramps.**

L.    Is it part of a larger plan of development or sale?   ☐ yes  ☒ no

M.    Impervious or semi-impervious area excluding wetlands and other surface waters (if applicable): **51.05** acres or                square feet

N.    Volume of water the system is capable of impounding (if applicable):

Normal Pool:                acre-feet.  Depth                ft.
Maximum Pool:                acre-feet.  Depth                ft.

## Part 2: Supplemental Information, and Permit History

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.481

A. Is this an application to modify an existing Environmental Resource Permit, or to construct or implement part of a multi-phase project, such as a project with a Conceptual Approval permit?  ☐ Yes  ☒ No *If you answered "yes", please provide permit numbers below:*

| AGENCY | DATE | PERMIT/ APPLICATION NO. | PROJECT NAME |
|--------|------|------------------------|--------------|
|        |      |                        |              |

B. Indicate if there have been any **pre-application meeting(s)** with the DEP, WMD, or delegated local government, or other discussions, meetings, or coordination with other stakeholders or agencies about the proposed project, system or activity. If so, please provide the date(s), location(s) of the meeting, and the name(s) of Agency staff that attended the meeting(s):

| AGENCY | DATE | LOCATION | MEETING ATTENDEES |
|--------|------|----------|-------------------|
| SJR | 26-APR-22 | Microsoft Teams | Richard Lee |

C. **Attach a depiction (plan and section views), which clearly shows the works or other activities proposed to be constructed.** Use multiple sheets, if necessary, a scale sufficient to show the location and type of works, and include a north arrow and a key to any symbols used. **Specific information to be included in the plans is based on the activities proposed and is further described in Sections B-H.** However, supplemental information may be required based on the specific circumstances or location of the proposed works or other activities.

D. Processing Fee: **Please submit the application processing fee along with this application form and supplemental information.** Processing fees vary based on the size of the activity, the type of permit applied for, and the reviewing Agency. Please reference Appendix D of Applicant's Handbook Volume 1 to determine the appropriate fee.

## Part 3: Applicant and Associated Parties Information

Instructions: Please complete the following sections. For corporations, list a person who is a registered agent or officer of the corporation who has the legal authority to bind the corporation.

| A. Applicant (Entity Must Have Sufficient Real Property Interest) ☐ This is a Contact Person for Additional Information |||
|---|---|---|
| Name: Last: **Tucker** | First: **John F** | Middle: |
| Title: | Company: ||
| Address: **250 N-Orange Ave Suite 1500** |||
| City: **Orlando** | State: **FL** | Zip: **32801** |
| Home Telephone: **000-000-0000** | Work Telephone: **407 616 9554** ||
| Cell Phone: |||
| E-mail Address: **mike@bbdre.com** |||
| **Correspondence will be sent via email.** Check here to receive correspondence via US Mail:  ☒ |||

Form 62-330.060(1) - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.482

**B.   Land Owner(S) (If Different or in Addition to Applicant)**

☐ **Check here if land owner is also a co-applicant**

| Name: Last: **Tucker** | First: **John F** | Middle: |
|---|---|---|
| Title: | Company: | |
| Address: **250 N-Orange Ave Suite 1500** | | |
| City: **Orlando** | State: **FL** | Zip: **32801** |
| Home Telephone:  **000-000-0000** | Work Telephone:  **407 616 9554** | |
| Cell Phone: | | |
| E-mail Address: **mike@bbdre.com** | | |
| Correspondence will be sent via email. Check here to receive correspondence via US Mail:  ☒ | | |

**C. Operation and Maintenance Entity**          **(see Applicant's Handbook I, Section 12.3)**

| Entity Name: | Contact: Last: **Droor** | First: **Jon** | Middle: |
|---|---|---|---|
| Title: | Company: **Mattamy Homes** | | |
| Address: **2450 Maitland Center Parkway Suite 300** | | | |
| City: **Maitland** | State: **FL** | | Zip: **32751** |
| Home Telephone: | Work Telephone:  **407-215-6264** | | |
| Cell Phone: | | | |
| E-mail Address: jon.droor@mattamycorp.com | | | |
| Correspondence will be sent via email. Check here to receive correspondence via US Mail:  ☐ | | | |

**D. Co-Applicant (If Different or In Addition to Applicant and Owner)**

| Name: Last: **Droor** | First: **Jon** | Middle: |
|---|---|---|
| Title: **Manager** | Company: **Mattamy Homes** | |
| Address: **2450 Maitland Center Parkway Suite 300** | | |
| City: **Maitland** | State: **FL** | Zip: **32751** |
| Home Telephone:  **407-215-6264** | Work Telephone: | |
| Cell Phone: | | |
| E-mail Address: jon.droor@mattamycorp.com | | |
| Correspondence will be sent via email. Check here to receive correspondence via US Mail:  ☐ | | |

**E. Registered Professional Consultant**   ☒ **This is a contact person for additional information**

| Name: Last: **Petersen** | First: **Andrew** | Middle: |
|---|---|---|
| Title: | Company: **Bowman** | |
| Address: **4450 W Eau Gallie Blvd Suite 144** | | |
| City: **Melbourne** | State: **FL** | Zip: **32934** |
| Home Telephone: | Work Telephone:  **321-255-5434** | |
| Cell Phone: | | |

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.483

| E-mail Address: **apetersen@bowman.com** | | |
|---|---|---|
| **Correspondence will be sent via email.** Check here to receive correspondence via US Mail: ☐ | | |

| **F. Environmental Consultant**   ☒ **This is a contact person for additional information** | | |
|---|---|---|
| Name: Last: **Gough** | First: **Daniel** | Middle: |
| Title: **Manager** | Company: **Bio-Tech Consulting Inc.** | |
| Address: **3025 East South Street** | | |
| City: **Orlando** | State: **FL** | Zip: **32803** |
| Home Telephone: | Work Telephone: **407-894-5969** | |
| Cell Phone: | | |
| E-mail Address: **danny@bio-techconsulting.com** | | |
| **Correspondence will be sent via email.** Check here to receive correspondence via US Mail: ☐ | | |

| **G. Agent Authorized to Secure Permit (If Different from Consultant)**  ☐ **This is a contact person for additional information** | | |
|---|---|---|
| Name: Last: | First: | Middle: |
| Title: | Company: | |
| Address: | | |
| City: | State: | Zip: |
| Home Telephone: | Work Telephone: | |
| Cell Phone: | | |
| E-mail Address: | | |
| **Correspondence will be sent via email.** Check here to receive correspondence via US Mail: ☐ | | |

**If necessary, please add additional pages for other contacts and property owners related to this project.**

**H.  Real Property Interest**

a.   Permits are only issued to entities having sufficient real property interest as described in Section 4.2.3(d) of Applicant's Handbook Volume I**. Please attach evidence of the applicant's real property interest over the land upon which the activities subject to the application will be conducted, including mitigation areas (if applicable).** Refer to Sections 4.2.3(d)-(e) for sufficient real property interest documentation.

b.   For activities that require a recorded notice in accordance with rule 62-330.090(7), F.A.C., please provide either the complete legal description of the property or a copy of the pages of the document recorded in the public records that contains the complete legal description. If the land upon which the proposed activities are to occur is not owned by the applicant, the applicant must also provide copies of any right-of-way, leases, easements, or other legal agreement which authorizes the applicant to perform the activities on those lands.

**Additional Addresses**

| Applicant | |
|---|---|
| | , |

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.484

| **Land Owner** | , |
|---|---|

| **Operation and Maintenance Entity** | , |
|---|---|

| **Registered Professional Consultant** | , |
|---|---|

| **Environmental Consultant** | , |
|---|---|

| **Agent** | , |
|---|---|

| **Compliance Entity** | , |
|---|---|

| **Consultant** | , |
|---|---|

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit and Authorization to Use State-Owned Submerged Lands Incorporated by reference in subsection 62-330.060(1), F.A.C.(12/22/2020)

JA.485

# ATTACHMENT C

**BaileyCutkomp, Laurie**

| | |
|---|---|
| **From:** | 404_DataEntry |
| **Sent:** | Friday, September 2, 2022 2:50 PM |
| **To:** | 'CompliancePermits@dos.myflorida.com'; 'ConservationPlanningServices@MyFWC.com'; 'Florida_404@fws.gov' |
| **Cc:** | Lowenstein, Alicia; 'applicationsupport@sjrwmd.com' |
| **Subject:** | State 404 Permit App No. --SFI Individual / Associated ERP Permit App No. 183900 - 2 (SJRWMD) / Brevard County |

The above-referenced State 404 Program application was submitted to the Submerged Lands and Environmental Resources Program. We are currently processing the request as required by Chapters 253, 258, and 373, F.S. This application is being submitted for your review and comment.

Applicant Name: John F Tucker, Mattamy Homes

Project Name: Mattamy Homes at Fiske Blvd

Application Receipt Date: 8/31/22

Permit Application Link (available within 2 business days): https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_/gis-facility!search

Location Map Link (Clearly Depicting Project Boundaries): see link above

Project Location:
        Address: 4151 FISKE TRL CELLTW, Rockledge, FL 32955;
        Parcel ID: 25 3620-00-250, 2510453, 2510480, 2510481, 2521572, 252160;
        Section/Township/Range: 19 / 25S / 36E;
        Latitude/Longitude: 28.28856 N, -80.74349238 W

Project Description: This project consists of the construction and development of a +/- 246 acre site to include Townhouses and detached singlefamily units with associated drainage, utilities and roadway improvements. This will be Phase 1. Future Phases of the project will include Multi-Family units and commercial outparcels along Fiske Blvd. This application will be a master permit that will cater for the entire development.

Project Size: 246.16 ac.

DEP requires your response in order to issue a permit. If you do not have adequate information to provide comments at this time, please return written questions and/or request for additional information by the below due date. The requested information will be incorporated into the DEP response to the applicant. If you have no questions at this time but require additional time to prepare final comments, please let us know you intend to provide comments.

DEP received the application information on 8/31/22. DEP must issue a response to the applicant within 30 days of receipt. Return your comments at least two days before the 30-day deadline to allow sufficient time for DEP to process the response.

Return your comments (referencing the applicant name and file number) to our office at the following email address: DEP_CD@dep.state.fl.us. If you have questions, please call us at (407) 897-4100.

JA.487

Thank you.

JA.488

# ATTACHMENT D

# Bio-Tech Consulting Inc.
## Environmental and Permitting Services

October 26, 2022

Alicia Lowenstein
**FDEP**
3319 Maguire Blvd, Suite 232
Orlando, Florida  32803

**Proj:**  **Fiske Road Property; Brevard County, Florida**
**Parcel IDs #25-36-20-00-250, #25-36-20-00-268, #25-36-20-00-501,**
**#25-36-20-00-751, #25-36-20-00-757 and #25-36-20-00-758**
**Section 20, Township 25 South, Range 36 East**
**(BTC File #525-54)**
**Re:**    **Request for Additional Information**
**App. No. 398515-002-SFI**

Dear Ms. Lowenstein

The following are the responses to the District's Environmental comments in
reference to the ERP for the above referenced project.  The District comments
and responses are below:

1.      The Department must conduct a site visit to verify the delineation of
wetlands and other surface waters onsite in accordance with Chapter
62-340, F.A.C. and perform an assessment of the proposed impacts
using the Universal Mitigation Assessment Method in accordance with
Chapter 62-345, F.A.C. The site visit has been scheduled for
**December 5, 2022**. Please have the wetland boundary flagged for
verification by staff in advance of the scheduled site inspection. Do not
survey the limits of wetland and other surface water boundaries until
the Department has verified the delineation. [Chapter 62-340, F.A.C.;
Section 1.1, 404 Handbook]

**A site review to approve the wetland/surface water limits was conducted**
**with Thomas Evans of the SJRWMD, who is CWE certified, on**
**September 9/7/2022.  The reviewed and approved wetland/surface water**
**limits are depicted on the attached site plan.**

Orlando: Main Office
3025 East South Street
Orlando, FL 32803

Jacksonville Office
11235 St Johns Industrial Pkwy N
Suite 2
Jacksonville, FL 32246

Tampa Office
6011 Benjamin Road
Suite 101-B
Tampa, FL 33634

Vero Beach Office
4445 North A1A
Suite 221
Vero Beach, FL 32963

Key West Office
1107 Key Plaza
Suite 259
Key West, FL 33040

Land & Aquatic Management
3825 Rouse Road
Orlando, FL 32817

407.894.5969
877.894.5969
407.894.5970 fax

JA.490

*Alicia Lowenstein, FDEP*
*Fiske Road Property (BTC File #525-54)*
*Page 2 of 7*

2.  You have requested that the Department perform a Waters of the United States (WOTUS) jurisdictional determination on the subject property. To provide certainty, streamlining, and efficiency, the State will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered Waters of the United States, and will treat them as if they are, unless the applicant clearly demonstrates otherwise [State 404 Program Applicant's Handbook, section 1.1]. In order to evaluate your request, please complete and submit the attached form *"Information Required for a WOTUS Determination in State-assumed Waters,"* including listed maps and attachments, as applicable, to clearly demonstrate the wetlands delineated are not WOTUS in accordance with 40 C.F.R. 120.

**Please see attached WOTUS form and corresponding maps and attachments.**

Please note: Accepting WOTUS jurisdiction over all wetlands and surface waters onsite may save significant review time since WOTUS determinations require extra processing steps, time, and review effort by the Department. If you would like to accept WOTUS jurisdiction for all wetlands and other surface waters onsite to ensure expeditious project review, please indicate that you no longer request that the Department perform a WOTUS determination.

**Based on the revised site plan boundary, all onsite wetlands/surface waters will be accepted as WOTUS.**

3.  Please provide pre-addressed, stamped envelopes and/or email addresses for each adjoining property owner. These will be used by the Department to send the public notice. Do not include a return address; it will be added by the Department. Envelopes should be #10 size and stamped with one, US Postal Service first-class forever stamp. [62-331.060(1)(c), F.A.C.]

**Envelopes will be delivered directly to the FDEP Central Office.**

4.  The proposed project has been sent to commenting entities for review and we are awaiting responses from the: Florida Fish and Wildlife Conservation Commission, State Historic Preservation Office, Tribal Historic Preservation Office(s), US Fish and Wildlife Service. The Department will forward any requests for additional information from these entities upon receipt. Such requests will become part of this request for additional information. [404 Handbook, section 5.2 and 62-331.051(4), F.A.C.]

**Acknowledged.**



*Alicia Lowenstein, FDEP*
*Fiske Road Property (BTC File #525-54)*
*Page 3 of 7*

5.      Please provide a copy of your Environmental Resource Permit (ERP) or provide the ERP file number for the project. To address water quality review and consistency with the Coastal Zone Management Program, the State 404 Program authorization cannot be issued until the Environmental Resource Permit for the project is issued. If no ERP has been issued or applied for, we recommend that the State 404 Program application be withdrawn and that the application for the ERP and State 404 Permit be resubmitted. [62-331.070, F.A.C.]

**The SJRWMD ERP App. No. is 183900-2.**

6.      Please complete Section I of Form 62-330.060(1), attached, including all requested supporting documentation. [62-331.051(1), F.A.C.]

**Please see attached Section I of Form 62-330.060(1).**

7.      Please submit a detailed wetland and surface water impact map. The map should depict direct, secondary, and temporary impacts with an overlay of the proposed project layout. [62-331.053,F.A.C., 62-330.301(1)(i), F.A.C.]

**See attached FDEP Wetland Impacts Map.**

8.      No dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. Please provide an alternativesanalysis prepared in accordance with Section 62-331.053(1), F.A.C. and Appendix C of the 404 Handbook.

### FISKE ALTERNATIVES ANALYSIS

An evaluation of alternatives is required under Rule 62-331.053, F.A.C. for all jurisdictional activities. An evaluation of alternatives is required under the Section 404(b) (1) Guidelines for projects that include the discharge of dredged or fill material. 404 requires discussion of Purpose and Need, to Identify Alternatives, and determine practicability of alternatives if there is a less environmentally damaging practicable alternative.

To be practicable, an alternative must be available, achieve the overall project purpose, and be feasible when considering cost, logistics, and existing technology. The following Site Selection Criteria were used for evaluating alternatives:



*Alicia Lowenstein, FDEP*
*Fiske Road Property (BTC File #525-54)*
*Page 4 of 7*

**Table 1: Site Selection Criteria**

| Category | Comparison Matrix Criteria |
|---|---|
| **Availability** | • Existing zoning appropriate or potential for change<br>• Owned by applicant or available for purchase. |
| **Logistics** | • Sufficient size parcel (80-100 acres)<br>• Access from/to a primary roadway.<br>• Located within City of Rockledge<br>• Reasonable access to existing governmental services. |
| **Cost** | • Reasonable acquisition costs.<br>• Infrastructure cost does not exceed 15% of dwelling unit market value (Cost Burden)<br>• Residual Land Value in acceptable range<br>• Fiscal Impact – will the project generate enough annual revenue to the local government to pay for public services and other public benefits?<br>• Compensatory mitigation cost |
| **Environment** | • Fill in jurisdictional wetlands.<br>• Impacts to federally listed species<br>• Project would contribute to downstream flooding<br>• Project would degrade water quality |

## ALTERNATIVE SITE ANALYSIS

## NO ACTION ALTERNATIVE:

Access to the proposed development site is limited to South Fiske Boulevard which is the only public road that accesses the subject property, which runs along the project site's eastern boundary. Due to the size, location, and orientation of the wetlands and ditches (waters) that traverse the project site, the total avoidance of work affecting these waters of the U.S. is not practical. The applicant also was unable to identify an alternate site that would not incorporate the discharge of fill into waters of the United States. As such, the "no action" alternative would prevent the implementation of the project and the attainment of the project goals and objectives.

OFF-SITE ALTERNATIVES:

In addition to the applicant's preferred property (Alternative 4), three (3) other potential sites were identified by the applicant. Of these, all three potential alternative sites were eliminated because



*Alicia Lowenstein, FDEP*
*Fiske Road Property (BTC File #525-54)*
*Page 5 of 7*

they did not meet the criteria in Table 1. These three alternative sites were evaluated further using the criteria in Table 1.

## Alternative 1 – Pluckerbaum Road

The Pluckerbaum Road site was of sufficient size (148.2 acres) and has roadway access. The site is currently zoned for Agricultural land use, is not adjacent to existing infrastructure. Additionally, there are approximately 110-acres of on-site wetlands. The majority of these wetlands, and associated surface waters would be considered jurisdictional as they connect to navigable waters.

The property has been owned by the CG Reed Land Clearing, Inc. since 2002. The owner was approached about selling the property but an offer was not made as it was determined during due diligence that the best utilization for the site would be continued agricultural operations.

Given the widespread occurrence of wetlands, current zoning designation and lack of surrounding infrastructure, development potential for this site is severely restricted. Upon analysis of these factors, Alternative 1 was considered inferior to the Fiske property.

## Alternative 2 – Tucker Ranch

The Tucker Ranch site is of sufficient size, has roadway access but no adjacent infrastructure. The site is currently zoned for Agriculture. Of the 130-acres, approximately 90-acres, 69% of the site, would be considered federally jurisdictional wetlands. Avoiding these wetlands would not be feasible as they are located throughout the site and not concentrated in one area.

The property owner was approached about selling the property but an agreed upon purchase price could not be achieved.  The current owner intends to develop the site. Given the extent of wetlands on site and inability to obtain the property, Alternative 2 was considered inferior to the Fiske property.

## Alternative 3 – Moore Property

The property is within the target range for size (159.97 acres), currently zoned for Vacant Residential, but has roadway access issues due to the parcel configuration. Developing the site would require considerable direct impacts as the wetland extends well into the site. Of the sites 160-acres, 80-acres, or 50% of the site, would be considered federally jurisdictional wetlands.

Given the size, extent of wetlands and challenges to access the site, Alternative 3 was considered inferior to the Fiske property.



*Alicia Lowenstein, FDEP*
*Fiske Road Property (BTC File #525-54)*
*Page 6 of 7*

## Alternative 4 – Fiske Property:

The property is of the target range for size, within the City of Rockledge and is re-zoned for Residential Use. Additionally, there is sufficient surrounding infrastructure and roadway access. Of the sites 246-acres, 22.64-acres, or 9% of the site is proposed for wetland impact.

Given the property meets the minimum size requirements, has appropriate zoning, roadway access & infrastructure, the Fiske site was considered the most practicable and desirable alternative.

| Category | Comparison Matrix Criteria | Preferred Alternative | Alternative 1: Pluckerbaum | Alternative 2: Tucker Ranch | Alternative 3: Moore |
|---|---|---|---|---|---|
| Availability | Available? | Yes | No | No | No |
| | Zoning | Yes | Yes | Yes | No |
| Logistics | Sufficient Size? | Y | Y | Y | Y |
| | Roadway Access? | Y | Y | Y | N |
| | Access to governmental/services | Excellent | Moderate | Poor | Moderate |
| Cost | Acquisition cost? | N/A | N | N | N |
| | Mitigation Cost? | Y | Y | Y | Y |
| Environment | Wetland Impacts | Y | Y | Y | Y |
| | Impacts to T&E Species | N | Potentially | Potentially | Potentially |
| | Downstream Flooding | N | N | Y | N |

9.   Please describe how the proposed project configuration avoids or minimizes secondary effects to the greatest extent practicable. [404 Handbook, section 8.3.6, A.H. Volume I, section 10.2.7]

**The proposed project will have minimal secondary effects realized.  The wetland impacts are confined to the highly degraded pasture wetlands that have been utilized for agricultural purposes for decades and contain numerous cattle and land management activities that have degraded the systems significantly.  The only potential future secondary effects could be in the introduction of development to impede wildlife access.  The vegetative composition will likely improve due to the current domination of exotic pasture grasses in the wetland and the water quality will likely improve by removing the existing cattle and agricultural**



*Alicia Lowenstein, FDEP*
*Fiske Road Property (BTC File #525-54)*
*Page 7 of 7*

**practices.  Therefore, the Applicant has minimized potential future secondary effects to the greatest extent practicable.**

10.    Please describe how the proposed project configuration avoids or minimizes cumulative effects to the greatest extent practicable. [404 Handbook, section 8.3.5]

**The only wetland/surface water impacts proposed are to highly degraded and low-quality pasture wetlands and a man-made borrow pit surface water.  The cumulative effect of impacting these types of systems will have minimal effect on water resources and the productivity and water quality of aquatic ecosystems within the drainage basin and general vicinity of the subject property. Therefore, the proposed project minimizes the cumulative effects to the greatest extent practicable.**

11.    Please provide a compensatory mitigation plan that satisfies the requirements of Rule 62-331.130, F.A.C. Please note that if mitigation bank credits are proposed, federal credits are required to offset impacts under the State 404 Program. Contact your Department processor if you have questions or need guidance. See also, State 404 Program Handbook, section 8.5 and A.H. Volume I, section 10.3.

Please Note: All wetland and surface water impacts must be consistent between the ERP and State 404 permit. If the functional assessments are evaluated using different methods, a conversion table must be provided to show consistency.

**Federal WRAP Credits will be purchased from either TM-Econ Phases I-III or Colbert Cameron Mitigation Bank.**

Should you have any questions, please do not hesitate to contact me at (407) 894-5969.

Regards,

Daniel Gough
Project Manager

Attachments



# Section I:
# Supplemental Information for State 404 Program Permits

State 404 Program authorization is required for activities within state-assumed waters under Chapter 62-331, F.A.C. The following information is necessary to facilitate the State 404 Program review when a project is within state-assumed waters.

1.  Identify the project purpose. (*Describe the purpose and need for the proposed project. Why are you proposing the work? How will you use the proposed structure(s); and/or, how will the proposed fill area(s) be used?*) Include a description of any related activities that may be developed as a result of the proposed project. Provide the approximate dates you plan to both begin and complete all work: **The project purpose is to construct a residential subdivision in the City of Rockledge close to I-95.**

2.  List all other certificates or approvals/denials received or pending from federal, state, or local agencies for work affecting wetlands and/or other surface waters encompassed by the overall project site: (*You need not have obtained all other permits before applying for a State 404 Program permit.*)

| Agency | Action Type | ID Number | Date Applied | Date Approved/Denied |
|--------|-------------|-----------|--------------|----------------------|
| SJRWMD | ERP Application | 183900-2 | 7-3-2022 | TBD |
|  |  |  |  |  |
|  |  |  |  |  |

4.  Identify the specific reason/need for the proposed activity (What will the activity be used for and why? Include activities that are linked to or reasonably related to the proposed activity.) **Residential Community to address the need for housing in the City of Rockledge with easy access for commuters.**

5.  Provide an alternatives analysis as described in the 404 Handbook, Appendix C. **See attached.**

6.  Describe any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity. Include the name(s) of those listed species or critical habitat areas. Describe any actions proposed to be taken to avoid or minimize adverse effects to listed species. Provide any other available data and information necessary for purposes of reviewing impacts to state and federal listed species. **The only anticipated Listed species within the subject property limits are wading birds. The centrally located man-made borrow pit is adequate habitat for nesting and migratory birds. The majority (107.90 acres) of the borrow pond will remain intact with no alterations proposed. This will provide significant habitat for Listed wildlife and wetland/surface water dependent species.**

7.  Clearly show location and extent of all wetlands and other surface waters, delineated in accordance with Chapter 62-340, F.A.C. Label all special aquatic sites (e.g., wetlands, sanctuaries and refuges, mudflats, vegetated shallows, and riffle and pool complexes). Each type of boundary (for example, ordinary high water line, mean high water line, wetlands, or other special aquatic sites) must be clearly annotated and/or symbolized to ensure they are differentiable on the map. Unless indicated below, all wetlands and other surface waters on the site, as delineated in accordance with Chapter 62-340, F.A.C., that will be impacted by the proposed activities will be evaluated for permitting purposes under Section 404 of the Clean Water Act. **Please find the attached FDEP Wetland Impacts Map.**

     

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date: December 22, 2020)      **Section I**, Page 1 of 2

JA.497

☐  Check this box if you do not accept that all or a portion of the wetlands and other surface waters on the site are jurisdictional under Section 404 of the Clean Water Act, and provide documentation demonstrating which wetlands and other surface waters on the site are not jurisdictional, using reasonable scientific judgement.

8.  Provide the complete names and full correct mailing address of the owners (public and private) of properties contiguous to the overall project site where the work is proposed. You may also provide email addresses, if available. Use additional sheets as necessary. (*This information may be obtained from your County Property Appraiser Office, which is typically accessible on the Internet; this information is needed so that, if required, the contiguous owners may be notified of the proposed activity (for example, through a public notice.*)

   1.  Name: St. Johns River Water Management District
       Mailing Address: PO Box 1429
       City, State, Zip Code: Palatka, FL 32177
       Email:

   2.  Name: Viera Stewardship District
       Mailing Address: 610 Sycamore Street – C/o Moyer Management Group
       City, State, Zip Code: Kissimmee, FL 34747
       Email:

   3.  Name: Tuckaway Lakes Homeowners Association, Inc.
       Mailing Address: 1978 US Highway 1, Suite 106
       City, State, Zip Code: Rockledge, FL 32955
       Email:

   4.  Name:
       Mailing Address:
       City, State, Zip Code:
       Email:

   5.  Name:
       Mailing Address:
       City, State, Zip Code:
       Email:

   6.  Name:
       Mailing Address:
       City, State, Zip Code:
       Email:

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date: December 22, 2020)     **Section I**, Page 2 of 2
JA.498

**Bowman**

PROPERTY LINE

I-95

S FISKE BLVD

EXISTING WETLANDS:
45.78 AC

POST DEVELOPMENT
WETLANDS: 22.78 AC

SECONDARY IMPACT
1.62 AC (3.54%)

IMPACTED: 19.65 AC (42.91%)

SURFACE WATER IMPACT
0.39 AC (0.35%)

EXISTING WETLANDS:
110.89 AC

POST DEVELOPMENT
WETLANDS: 107.90 AC

SECONDARY IMPACT
0.39 AC (0.85%)

SURFACE WATER IMPACT
2.60 AC (2.34%)

LIMITS OF PROPOSED DEVELOPMENT

STADIUM PKWY

FDEP WETLAND IMPACT MAP
MATTAMY HOMES
AT FISKE BLVD
INT OF FISKE BLVD & STADIUM PKWY
BREVARD COUNTY, FL

CITY OF ROCKLEDGE

NOT FOR
CONSTRUCTION

ANDREW J. PETERSEN
LICENSE NO. 75493

PLAN STATUS

| DATE | DESCRIPTION |
|---|---|

| DATE | | | |
|---|---|---|---|
| IMEU | VCP | SD | |
| DESIGN | DRAWN | CHKD | |
| SCALE | 1" = 200' | | |
| JOB No. | D11107-01-001 | | |
| DATE | | | |

EX - 12A

JA 409

GRAPHIC SCALE
0'    100'    200'    200'

( IN FEET )
SCALE 1" = 200'

# Information Required for a WOTUS Determination in State-assumed Waters

## I. General Information

The following information is required if an applicant is requesting that the Department perform a Waters of the United States (WOTUS) jurisdictional determination pursuant to the Navigable Waters Protection Rule (40 C.F.R. 120) during review of a State 404 Program permit application, a Formal Determination under Chapter 62-340, F.A.C., or a request for verification that no permit is required under the State 404 Program. This form is provided as a service to applicants and petitioners. Use of the form may assist efficient review.

## II. Findings

### A. Summary

Check all that apply. At least one box from the following list MUST be selected. Complete the corresponding sections/tables and summarize data sources.

☐ The review area is comprised entirely of dry land (i.e., there are no waters or water features, including wetlands, of any kind in the entire review area).  Rationale: (N/A or describe rationale)

☒ There are "waters of the United States" within Clean Water Act jurisdiction within the review area (complete appropriate tables in Section II.B).

☐ There are waters or water features excluded from Clean Water Act jurisdiction within the review area (complete table in Section II.C)

### B. Clean Water Act Section 404 Jurisdiction (40 C.F.R. 120)

Please expand tables or use additional sheets as needed. Include measurement units in size column (acres, linear feet, etc.).

Traditional Navigable Waters ((1)(i) waters)

| (1)(i) Name | (1)(i) Size | | (1)(i) Criteria | Rationale for (1)(i) Determination |
|---|---|---|---|---|
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |

Note: All Territorial Seas and any Traditional Navigable Water listed in Appendix B of the 404 Handbook (Retained Waters List) are not assumable under the State 404 Program. If your project site contains or borders one of these waters and you are proposing or plan to propose dredge or fill activities within 300 feet of the mean high tide line or ordinary high water mark, please apply to the US Army Corps of Engineers for a permit or jurisdictional determination under Section 404 of the Clean Water Act.

Tributaries ((1)(ii) waters)

| (1)(ii) Name | (1)(ii) Size | | (1)(ii) Criteria | Rationale for (1)(ii) Determination |
|---|---|---|---|---|
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |

Lakes and ponds, and impoundments of jurisdictional waters ((1)(iii) waters)

| (1)(iii) Name | (1)(iii) Size | | (1)(iii) Criteria | Rationale for (1)(iii) Determination |
|---|---|---|---|---|
| SW1 | 110.89 | acre(s) | (1)(iii) Intermittent tributary contributes surface water flow directly or indirectly to an (1)(i) water in a typical year. | Surface Water discharge |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |

Adjacent wetlands ((1)(iv) waters)

| (1)(iv) Name | (1)(iv) Size | | (1)(iv) Criteria | Rationale for (1)(iv) Determination |
|---|---|---|---|---|
| W1 | 45.78 | acre(s) | (1)(iv) Wetland separated from an (1)(i)-(1)(iii) water only by an artificial structure allowing a direct hydrologic surface connection between the wetland and the (a)(1)-(a)(3) water, in a typical year. | Contiguous wetlands |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |

C. Excluded Waters or Features

Excluded waters ((2)(i) – (2)(xii))

| Exclusion Name | Exclusion Size | | Exclusion[1] | Rationale for Exclusion Determination |
|---|---|---|---|---|
| N/A. | N/A. | N/A. | N/A. | N/A. |

---

[1] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

| Exclusion Name | Exclusion Size | Exclusion[1] | Rationale for Exclusion Determination |
|---|---|---|---|
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |
| N/A. | N/A. | N/A. | N/A. | N/A. |

## III. Supporting Information

### A. Resources Used

Select/enter all resources that were used to aid in this determination and attach data/maps to this document and/or references/citations in the administrative record, as appropriate.

Information submitted by, or on behalf of, the applicant/consultant (Title(s) and date(s)):

☒Current 62-340, F.A.C. delineation:

☒Aerial photographs:

☐Other photographs:

☐Previous WOTUS jurisdictional determinations (Corps PJD or AJD/Department WOTUS determination):

☐Previous or current 62-340, F.A.C. formal jurisdictional determination:

☐Antecedent Precipitation Tool (provide detailed discussion in Section III.B.):

☒USDA NRCS Soil Survey (Title(s) and/or date(s)):

☒USFWS NWI maps (Title(s) and/or date(s)):

☒USGS topographic maps (Title(s) and/or date(s)):

Other data sources used to aid in this determination:

| Data source | Name and/or date and other relevant information |
|---|---|
| USGS Sources | |
| USDA Sources | |
| NOAA Sources | |
| USACE Sources | |
| State/Local/Tribal Sources | |
| Other Sources | |

### B. Typical Year Assessments

N/A or provide typical year assessment for each relevant data source used to support the determination:

## C. Additional comments to support the WOTUS jurisdictional determination

N/A or provide additional discussion as appropriate:



## Legend

 Fiske Road Property



**Bio-Tech Consulting Inc.**
Environmental and Permitting Services
3025 E. South Street   Orlando, FL  32803
Ph: 407-894-5969   Fax: 407-894-5970
www.bio-techconsulting.com

Fiske Road Property
Brevard County, Florida
Figure 1
Location Map

Project #: 525-54
Produced By: JDH
Date: 9/9/2021

JA 504



Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community



**Bio-Tech Consulting Inc.**
Environmental and Permitting Services
3025 E. South Street   Orlando, FL  32803
Ph: 407-894-5969  Fax: 407-894-5970
www.bio-techconsulting.com

Fiske Road Property
Brevard County, Florida
Figure 2
2021 Aerial Photograph



770
Feet

Project #: 525-54
Produced By: JDH
Date: 11/8/2022

JA.505

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 90 of 430



Fiske Road Property
Brevard County, Florida
Figure 3
USGS Topographic Map



**Bio-Tech Consulting Inc.**
Environmental and Permitting Services
3025 E. South Street   Orlando, FL   32803
Ph:  407-894-5969   Fax:  407-894-5970
www.bio-techconsulting.com

1,900
Feet

Project #: 525-54
Produced By: JDH
Date: 06/8/2022
JA 506



Legend

- Fiske 404 Boundary
- <all other values>
- 3 : Anclote sand, frequently flooded
- 19 : Riviera sand, 0 to 2 percent slopes
- 23 : Floridana sand

Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community



Bio-Tech Consulting Inc.
Environmental and Permitting Services
3025 E. South Street   Orlando, FL  32803
Ph: 407-894-5969   Fax: 407-894-5970
www.bio-techconsulting.com

Fiske Road Property
Brevard County, Florida
Figure 4
USDA-NRCS Soils Map



770 Feet

Project #: 525-54
Produced By: JDH
Date: 11/8/2022

JA.507



**Legend**

☐ Fiske Boundary

☐ 110, Single Family Residential

☐ 211, Improved Pasture

☐ 530, Reservoir

☐ 640, Vegetated Non-Forested Wetland

☐ 822, Transmission Tower

Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community



**Bio-Tech Consulting Inc.**
Environmental and Permitting Services
3025 E. South Street  Orlando, FL 32803
Ph: 407-894-5969  Fax: 407-894-5970
www.bio-techconsulting.com

Fiske Road Property
Brevard County, Florida
Figure 5
FLUCFCS Map



580
Feet

Project #: 525-54
Produced By: JDH
Date: 11/8/2022

JA.508

WRAP SUMMARY

**Project: Fiske**   10/28/2022

| 3 Impacts : | Habitat type | Wildlife Utilization | | Wetland Overstory Shrub Canopy | | Wetland Vegetative Groundcover | | Adjacent Upland/ Wetland Buffer | | Wetland Hydrology | | Water Quality & Input Treatement | | Acres | Functional units lost | Total Impact Acres | Total Enhancment Acres | Total Preserve Acres | Total Creation Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | before | after | before | after | before | after | before | after | before | after | before | after | | | | | | |
| | | | | | | | | | | | | | | | | 24.65 | 0.00 | 0.00 | 0.00 |
| W1 | 640 | 1.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.00 | 1.00 | 0.00 | 0.50 | 0.00 | 0.50 | 0.00 | 19.65 | 3.821 | | | | |
| SW1 | 530 | 1.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.00 | 0.50 | 0.00 | 1.00 | 0.00 | 0.50 | 0.00 | 2.99 | 0.58 | Functional Units lost | | Functional Units gained | Mitigation Acres gained |
| W1 Sec. | 640 | 1.00 | 0.50 | 0.00 | 0.00 | 0.50 | 0.50 | 1.00 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 2.01 | 0.11 | | | | |
| | | | | | | | | | | | | | | | | 4.52 | | 0.000 | 0.00 |
| | | | | | | | | | | | | | | 24.65 | 4.514 | | | | |

| | Type | w/o | w | w/o | w | w/o | w | w/o | w | w/o | w | w/o | w | lag | factor | Factor | Gain | Provided | gained |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| creation | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| enhance | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| preserve | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | Credits | |

JA.509

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F8889DEB2BAD

Case 1:21-cv-00119-RDM   Document 98-7   Filed 02/28/23   Page 1 of 33
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025   Page 94 of 430

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

### DECLARATION OF RACHEL SILVERSTEIN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Rachel Silverstein, Ph.D., make the following declaration:

1.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

2.      I am a resident of Coral Gables, Florida.

3.      I am the Executive Director and Waterkeeper of Miami Waterkeeper, one of the Plaintiffs in this case.  I am also a member of Miami Waterkeeper.  I have been a member of Miami Waterkeeper since 2014.

4.      As Executive Director and Waterkeeper, I lead and oversee all of Miami Waterkeeper's programs and initiatives, utilizing my expertise in marine biology and deep working knowledge of South Florida's waterways, wetlands, and ecosystems.  I hold a Ph.D. in Marine Biology and Fisheries from the University of Miami and a B.S. degree in Ecology, Evolution, and Environmental Biology from Columbia University.

1

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F8889DFB2BAD

5.      Miami Waterkeeper is a 501(c)(3) nonprofit whose mission in South Florida is to ensure swimmable, drinkable, fishable water for all; protect marine ecosystems and habitats; and to ensure resiliency and preparedness for sea-level rise.  We accomplish these goals through legal advocacy, community outreach, and education and scientific research.  Collectively, our organization's work focuses primarily on water quality and aquatic habitat protection, such as marine and wetland ecosystems.  Founded in 2010, Miami Waterkeeper has paying members as well social media followers.

6.      Miami Waterkeeper's clean water initiatives are specifically grounded on the bedrock protections of the federal Clean Water Act ("CWA").[1]  We work to keep South Florida's waters clean by (1) training the public to document and report pollution through our 1000 Eyes on the Water program; (2) litigating against polluters who violate environmental laws; (3) referring matters to the authorities for investigation and prosecution; (4) reporting stormwater runoff violations to regulatory agencies for possible enforcement action; (5) preventing algae blooms by working to reduce fertilizer use, stormwater runoff, septic tanks, and sewage spills; (6) protecting against contamination from Miami's aging nuclear power plant; (7) fighting against proposed rules that would allow more toxic and cancer-causing chemicals in Florida's water; (8) training the next generation of environmental leaders and clean water advocates through our Junior Ambassador program; (9) testing popular recreation beaches and waterways for bacteria on a weekly basis; (10) reporting the latest water quality data to the public on theswimguide.org; and (11) working to stop unnecessary application of herbicides like glyphosate into our waterways.

---

[1] Miami Waterkeeper, About Us, Our Focus Areas, Clean Water: https://www.miamiwaterkeeper.org/clean_water ("Swimmable, drinkable, and fishable water is a right granted to all of us under the Clean Water Act").

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F8889DFB2BAD

Case 1:21-cv-00119-RDM   Document 98-7   Filed 02/28/23   Page 3 of 33
USCA Case #24-5101   Document #2102936      Filed: 02/26/2025   Page 96 of 430

7.     Miami Waterkeeper's ecosystem and habitat protection initiatives focus on protecting freshwater wetlands, coral reefs, saltwater and mangrove wetlands, and seagrasses. The coral reefs that we work to protect are protected under the Magnuson-Stevens Fisheries Management Act; and specific corals and their critical habitats in our local reefs are protected under the Endangered Species Act.  Along with the aforementioned initiatives, additional ways we accomplish this mission include (1) protecting coral reefs from dredging and supporting coral restoration and research; (2) litigating to stop illegal destruction of our natural areas; (3) litigating to enforce the Endangered Species Act ("ESA") and the National Environmental Protection Act ("NEPA"); (4) advocating to improve water quality in Biscayne Bay and surrounding waters; (5) producing economic studies that value ecosystem services; (6) supporting efforts to get more fresh water to Biscayne Bay, like the Biscayne Bay Coastal Wetlands project; and (7) conducting key scientific research to inform policy decisions.

8.     Miami Waterkeeper reviews proposed agency actions, and when we determine it is necessary to engage to protect South Florida's waters and marine habitats, the main tools we employ include (1) thorough review of said agency action under NEPA and the ESA; (2) engaging in the comment process; (3) organizing public participation in the comment process[2]; (4) litigation; and (5) public education, i.e. a blog, social media, and/or newsletter posts to our members and followers relying on environmental assessments, environmental impact statements, and biological opinions.

---

[2] As an example, see our Port Everglades Action Alert page: https://www.miamiwaterkeeper.org/port_everglades_action_alert, which documents how we organized over 10,000 comments and circulated a petition that was sent to the U.S. Army Corps of Engineers for stronger protections of coral reefs in response to the Corps' dredging project at Port Everglades in Fort Lauderdale, FL.

9.      Our legal challenge to the Port Everglades dredging project, beginning in 2016 and ongoing, is an example of how Miami Waterkeeper harnesses the protections of NEPA and ESA to protect ESA-listed coral.  To protect the reefs near Port Everglades from the devastation to coral that occurred in a similar dredging project in Miami (in which we also took legal action), we filed a NEPA and ESA lawsuit against the Army Corps and the National Oceanic Atmospheric Administration ("NOAA").  We argued that by ignoring the unexpected harm that occurred to the reef at Port Miami, the Corps failed to use "best available science" in their Port Everglades environmental analyses.  In response, the Corps agreed to conduct new environmental studies before starting its planned dredging project to expand Port Everglades.

10.      As discussed in this declaration and for the reasons stated in Plaintiffs' complaint, Miami Waterkeeper is opposed to Florida's assumption of the 404 permitting program because state 404 permits are not subject to NEPA review and analysis, ESA consultation, nor federal CWA processes and guidelines, on which we rely when reviewing, commenting, and challenging permits; and it will make it more challenging, if not impossible, to bring permit challenges in court.  The proposed state 404 projects that would be within Miami Waterkeeper's purview to challenge, as discussed at paragraphs 27–44 below, demonstrate the harms that are and will occur as Florida continues to operate the program, harms that impact Miami Waterkeeper's organizational mission and my and our members' recreational and aesthetic interests.

**Miami Waterkeeper and Its Members are Harmed by Florida's Assumption of the 404 Permitting Program**

11.      Miami Waterkeeper and its members are harmed, and will continue to be harmed, by Florida's assumption of the state 404 permitting program.

12.      Miami Waterkeeper almost exclusively litigates in federal court.  We typically do not litigate state court claims because of the significantly high costs and drain on our resources to

4

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F2889DFB2BAD

Case 1:21-cv-00119-RDM   Document 98-7   Filed 02/28/23   Page 5 of 33
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 98 of 430

do so.  Permit challenges in state court are not administrative review cases, as they are in federal court.  Therefore, we do not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA litigation affords. Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case like this before Florida's Division of Administrative Hearings can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.

13.     A state permit challenge would significantly cut into our operating budget, requiring us to divert resources that would otherwise be dedicated to our programmatic work. We would have to (1) raise additional money to fund these challenges; (2) use funds from our existing operating budget; or (3) no longer engage in litigation as an advocacy tool.  Under the first option—raise additional money to fund these challenges—the time spent fundraising would prevent us from carrying out our other programmatic work, and it is unknown whether we would even be successful in raising funds to cover legal costs.  Under the second option—use funds from our existing budget—factoring in our other operating and overhead costs, we would not be able to carry out as much of our other robust programmatic work.  Under the third option— abandoning litigation as an advocacy tool—we would no longer have this powerful tool of seeking legal remedies to carry out our organization's mission of protecting South Florida's waters, wetlands, and species' habitats.  All three options would damage our operations, with the first two resulting in a depletion of our time, resources, and money away from our existing program work to the detriment of our ability to actually carry out other work.  The third option would drastically impede our ability to carry out our organization's mission by eliminating one of the main advocacy tools we use to accomplish our mission, namely, litigation.

JA.514

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F2889DFB2BAD

Case 1:21-cv-00119-RDM   Document 98-7   Filed 02/28/23   Page 6 of 33
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025   Page 99 of 430

14.     On top of the aforementioned irreparable harms, Miami Waterkeeper would be further harmed by the mandatory fee-shifting provision for permit enforcement and 404 unpermitted discharge litigation, which we would not be subject to in federal court.  This further financial risk on top of the above-listed costs of litigating in state court means we would effectively have to choose between bringing these challenges in state court or carrying out our other existing programs and initiatives.

15.     Furthermore, even if we somehow were able to raise enough funds to cover state court litigation, we would still face potentially insurmountable hurdles to getting into court, since Florida law requires harm to a significant portion of our members to pursue litigation on their behalf, whereas federal law would only require us to show harm to at least one member.

16.     Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations.  For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

17.     There have already been gaps in Florida Department of Environmental Protection's ("FDEP") enforcement of environmental laws.  For example, Miami Waterkeeper took an inventory of NPDES permits along the Miami River and discovered that many of the permits were outdated or that discharges were occurring without a permit.  Miami Waterkeeper went through the painstaking process of researching each permit in FDEP's Oculus search engine. We also had to work with graduate students and law students to assist with the inventory, which further resulted in a diversion of resources to manage the students.  Among the violations we discovered, four were particularly egregious.  This process culminated in a letter to FDEP

JA.515

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F8889DFB2BAD

urging them to enforce the NPDES permit program.  Miami Waterkeeper letter to FDEP (Borja Crane Amores), 30 March 2018.

18.    Another example of FDEP's enforcement limitations concerns the Municipal Separate Storm Sewer (MS4) permittees.  FDEP, as the MS4 program administrator, has the oversight responsibility to provide support, assist with compliance, and ultimately enforce the permit terms and conditions.  Miami Waterkeeper reviewed the compliance and practices of 35 Phase I MS4 operators in Miami-Dade County to ascertain the Permittee's compliance with their MS4 permits.  We found that none of the 35 MS4 permit holders were 100% compliant with their permit requirements, and the average compliance score was below a C-, based on our rubric.  We consulted Oculus for compliance records and examined the five lowest-performing municipalities. We found that enforcement actions, where they were started or attempted, were ineffectual at gaining full compliance. For a full review of our findings, please see: *An Audit of Miami-Dade County Stormwater Permit Compliance: 2022 Report Card and Recommendations*, Miami Waterkeeper & Everglades Law Center, July 8, 2022, https://www.miamiwaterkeeper.org/stormwater.

19.    Aside from litigation and enforcement, the loss of NEPA, ESA, and CWA review, analyses, and public notice and comment requirements that have resulted from Florida's assumption of the 404 program will also harm our organizational mission.  Without these required evaluations and analyses, we will lose access to information that allows us to assess projects and understand the impacts of those projects on waters, wetlands, and species.  This information is necessary to determine how to advocate effectively and to inform our members and followers of the crucial developments that could impact them.  As a result, we will either be unable to carry out a major aspect of our organizational mission, or we will be required to

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826F-F8889DFB2BAD

expend significant resources hiring experts to provide us with this information we otherwise would have access to.  Either option will cause great harm to Miami Waterkeeper's ability to protect local waters, species, and their habitats.

20.    Overdevelopment, and the resulting environmental harms to South Florida's freshwater and marine ecosystems, are also more likely to occur with this assumption because of the state's lack of federal guidelines and reviews as well as public notice and comment required by the Clean Water Act, NEPA, and the ESA.  Dense urban development increases contaminated stormwater runoff.  It also leads to increased pressure on the aging sewage infrastructure or an increased number of septic tanks.  Both sewage leaks and septic tanks increase nutrient runoff and bacteria levels, leading to algae blooms and/or public health and recreation implications. Additionally, without the natural filtration system wetlands provide for stormwater runoff, nutrient runoff to lakes, ponds, ocean, and surrounding bays would increase, leading to increased turbidity and algae blooms that are harmful to marine species and renders waters unsafe for humans.  Nutrient-loading and harmful algal blooms are well-documented problems in Florida, as was seen earlier this year with algal bloom and nutrient loading that caused a massive fish die-off and made parts of Biscayne Bay a temporary dead zone.[3] Last, development authorizations that fail to incorporate credible endangered species review imperil the biodiversity of our area of responsibility, Miami-Dade and Broward counties.

---

[3] For further information on this event, see Miami Waterkeeper's coverage: https://www.miamiwaterkeeper.org/fish_kill.

DocuSign Envelope ID: 9A44C8E8-1C99-4906-826E-F8889DEB8BAD

Case 1:21-cv-00119-RDM    Document 98-7    Filed 02/28/23    Page 9 of 33
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 102 of 430

**Organizational and Membership Harms from Particular Projects**

21.     Because the state is presently administering the 404 program, the state is poised to issue 404 permits on major projects that will impact Miami Waterkeeper's organizational interests and my interests as a member.

22.     **Port 1850**.  A project that would have been in our purview to challenge is Port 1850 LLC's application to place 44,107 cubic yards of fill within 4.21 acres of mangrove wetlands for the construction of a new commercial warehouse in Fort Lauderdale.  See Army Corps of Engineers public notice for this project, Dkt. 31-1, at 29–39.  This project was transferred to the state of Florida on December 28, 2020.[4]

23.     Mangroves and other estuarine environments provide critical habitat for protected species in southeast Florida including the eastern brown pelican, wood stork, manatee, and common snook.  Mangrove forests provide habitat for adult fish and also act as nurseries for juvenile species.  They stabilize shorelines, protecting coastal areas from storm surge and providing erosion control.  South Florida is particularly vulnerable to sea level rise, so this protective buffer area is of critical importance.  Mangroves trap sediments and maintain water quality by absorbing nutrients and other pollutants from the water.  See U.S. Fish and Wildlife Service's informational report on mangroves:

https://www.fws.gov/verobeach/msrppdfs/mangroves.pdf.   Mangroves also absorb carbon dioxide and other greenhouse gasses from the atmosphere and store those gasses—an important ecosystem service to combat climate change.  Mangrove forests have declined across the state due to overdevelopment.  See FDEP's informational page on mangroves:

---

[4] State 404 File for Port 1850 Project: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396518/gis-facility!search.

DocuSign Envelope ID: 9A44C8F8-1699-4906-9265-E2890DF83BAD

https://floridadep.gov/rcp/rcp/content/floridas-mangroves. For these reasons, mangrove species have been protected by law in the state of Florida.  *See* Florida's Mangrove Trimming and Preservation Act: https://floridadep.gov/sites/default/files/mtpa96_0.pdf.

24.     The smalltooth sawfish is one such species, <u>see</u> Dkt. 31-3, at 40–55, listed as endangered under the Endangered Species Act by the National Marine Fisheries Service. Destruction of mangroves will have a direct, negative impact on this species which uses mangroves for nursery habitat.  This area of South Florida where the project is located is part of the historic range for smalltooth sawfish.

25.     Destruction of mangroves releases large amounts of sediment, carbon, and nutrients, which can be fatal to seagrasses by causing shading, suffocation or eutrophication, which can lead to algae blooms.  Other federally listed species depend on seagrass in South Florida; these include the West Indian manatee, American crocodile, loggerhead sea turtle, hawksbill sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, roseate tern, wood stork, and bald eagle.  *See id.* at 122 (describing species that depend on seagrass); *id.* at 124 (describing the ecological function of seagrass).  Furthermore, the coastal area of South Florida is home to one of the world's largest loggerhead rookeries and increasing green turtle and leatherback breeding populations.  *See id.* at 144–158, Bovery, Wyneken, *Seasonal Variation in Sea Turtle Density and Abundance in Southeast Florida Current and Surrounding Waters*, at 9. This area of Fort Lauderdale is also home to the West Indian manatee.

26.     Preservation of these endangered and threatened species are critical to Miami Waterkeeper's mission, and to the recreational and aesthetic interests of Miami Waterkeeper's members.  Miami Waterkeeper has members in Broward County who regularly recreate on the water canals and intercoastal waterway area downstream of the project area, which will be

DocuSign Envelope ID: 9A44C8F8-1699-4906-8265-E2890DF33BAD

Case 1:21-cv-00119-RDM   Document 98-7   Filed 02/28/23   Page 11 of 33
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 104 of 430

negatively impacted by the destruction of the mangroves. This project site is also approximately

two miles west of Eula Johnson State Park, where Miami Waterkeeper has led beach clean-ups

with members and the general public and has given lectures and presentations on South Florida

marine ecology, habitats, and species. We have also held a diving "Bioblitz" event and coral

identification trainings just offshore of Port Everglades. Harms to habitat and species are very

likely to occur here if this project is allowed to go forward, negatively impacting Miami

Waterkeeper's members and Miami Waterkeeper itself in its mission to protect and study marine

species and access natural areas to carry out program activities.

27.     Miami Waterkeeper's ability to challenge this project's permit and harms that

result from the project will be severely constrained by inadequate and costly state procedures

(including restrictive standing requirements, costly litigation requirements because of the need to

retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that

are not comparable to the processes or remedies available under federal law. The state program

also lacks enforcement capacity and measures required under federal law, reducing the incentive

to comply with permit requirements, further increasing the risk to wetlands and species.

28.     Harms to the waters and species would also affect me personally as a member of

Miami Waterkeeper. I go boating and diving at the mouth of Port Everglades, which is

approximately two miles north of the above-cited warehouse project. When I go boating and

diving, I enjoy observing listed coral and other marine wildlife, and I look out for and try to

observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and dolphins. My

ability to enjoy these waters and wildlife are dependent on there being clean, safe waters. The

approval of this project and likely resulting harms would negatively impact my ability to recreate

in this area, due to harms to the waters and wildlife.

DocuSign Envelope ID: 9A44C8F8-1699-4906-9265-E2980DEB3BAD

29.    In 2021, Miami Waterkeeper began a water quality sampling contract with the City of Fort Lauderdale, which will include routine monitoring of multiple sites within a few miles of project SAJ-2020-01739.  *See* Dkt. 31-3 at 159–60, Miami Waterkeeper's Water Monitoring Map.  Members of the community and followers of Miami Waterkeeper depend on our weekly water quality updates on our mobile platform to gather information about water quality at these sites where they recreate.  These activities include paddle-boarding, kayaking, jet-skiing, and swimming, among others.  Increased development under an unlawful state-assumed program and the aforementioned environmental harms from project SAJ-2020-01739 would impede community members and Waterkeeper followers from engaging in these recreational activities and may negatively impact water quality.

30.    **CPN West, LLC.**  Based on the permit file,[5] this project would impact wetlands and should have required a state 404 permit, but FDEP applied the vacated Navigable Waters Protection Rule ("NWPR") to issue a "No Permit Required" decision on October 6, 2021, over a month after the rule was vacated on August 31, 2021.  *Pasqua Yaqui Tribe, et al. v. U.S. Env't Prot. Agency, et al.*, No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021).  Miami Waterkeeper's attorneys notified the state and EPA about Florida's need to stop using

---

[5] State 404 File for CPN West LLC, https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_402032/facility!search.

NWPR on multiple occasions.[6]  EPA notified the state that it must apply the pre-2015 regulatory regime rather than NWPR.[7]  But Florida has continued to apply NWPR regardless.[8]

31.     A tree survey included with application documents suggests that this is a palustrine, forested wetland with cypress, maples, and palms.  Pictures included in the file show trees exhibiting morphological adaptations: cypress knees and buttressed bases—these indicate the site floods.  A soil survey derived from the National Resources Conservation Service classifies the soil in this location as "Sanibel muck," a hydric soil.  This property's mature wetland canopy and its position in the landscape make it a unique, relict natural area in the urban landscape surrounding it.

32.     This project, involving the placement of fill for several buildings and access roads, impacts recreational and aesthetic interests by removing mature, scenic wetlands, and by adding fill to an area that drains into the Cypress Creek canal, which is tributary to Lake Santa Barbara and the intracoastal waterway, which is in the geographic area that my organization protects and defends.

---

[6] Letter from Tania Galloni, Earthjustice, to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment A); Letter from Tania Galloni, Earthjustice, to Mark Wilson & Lance Pierce, Developers, Feb. 16, 2022 (Attachment B) (copying EPA and FL); Letter from Christina I. Reichert, Earthjustice, to Radhika Fox, EPA, Jan. 30, 2022 (Attachment C).

[7] Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment D); Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment E).

[8] *See* Final NPR (granted Feb. 16, 2023), *in State 404 File for Int of Moccasin Wallow Rd & Carter Rd, ST404_417551,* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_417551/facility!search; Final NPR (granted Feb. 14, 2023), *in State 404 File for East Daytona North — Phase 2 Paving, ST404_428112,* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_428112/facility!search.

JA.522

DocuSign Envelope ID: 9A44C8F8-1699-4906-8265-E2880DEB3BAD

33. A portion of the site is also within the 300-foot buffer retained by the Corps. Because a portion is within this 300-foot buffer, the 404 application files should have contained a determination as to which agency would review under 404 purview.

34. Moreover, the NPR letter states that the site "current[ly] connect[s] through a drainage ditch that runs to the Cypress Creek Canal." Therefore, the project contains a direct surface-water connection to seagrasses, mangroves, and corals that I and other Miami Waterkeeper members enjoy and seek to protect.

35. If the state were not operating the 404 program in assumed waters, this permit would have required a Section 404 permit from the Corps, including application of the Corps' compensatory mitigation rule at 33 CFR Part 332, and Executive Order 11990, "no Net Loss of Wetlands." Moreover, the Corps permit would have been subject to NEPA review, ESA Section 7 consultation, and the rigors of the federal Clean Water Act program more generally.

36. If Florida is allowed to continue operating this unlawful 404 program, Miami Waterkeeper will be harmed in its ability to carry out its mission of protecting South Florida's waters, wetlands, species, and their habitats. Additionally, the recreational and aesthetic interests of Miami Waterkeeper's members, including myself, will continue to be harmed by the state processing section 404 permits.

37. A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Miami Waterkeeper's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 consultation and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court. A ruling in Plaintiffs' favor on our ESA claims would redress Miami Waterkeeper's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of

Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of February, 2023.

Rachel Silverstein, Ph.D.
Executive Director and Waterkeeper
Miami Waterkeeper
P.O. Box 141596
Coral Gables, FL 33114-1596
(305) 905 0856

# ATTACHMENT A



September 1, 2021
Via Email shawn.hamilton@floridadep.gov

Shawn Hamilton, Interim Secretary
Florida Department of Environmental Protection
3900 Commonwealth Boulevard M.S. 49
Tallahassee, FL 32399

**Re:**     **Impact of Court Ruling Vacating WOTUS Rule on Florida 404 Program**

Dear Secretary Hamilton:

As you know, we are challenging EPA's approval of Florida's 404 Program as unlawful under federal law.  We write to ensure you are also aware of the recent ruling in Pasqua Yaqui Tribe, et al. v. United States Env't Prot. Agency, et al., No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021), vacating "The Navigable Waters Protection Rule: Definition of 'Waters of the United States'" (Apr. 1, 2020) ("NWPR") on which Florida's Section 404 program is based.  Enclosed please find a copy of that decision for your convenience.

Florida assumed jurisdiction over the dredging and filling of "waters of the United States" under Section 404 of the Clean Water Act on or about December 22, 2020.  Since that time, the state has proceeded under the 2020 NWPR definition of "waters of the United States" to determine the scope of its jurisdiction.  The Court's vacatur of the NWPR as unlawful requires that DEP immediately re-assess the scope of waterways in Florida covered by Section 404.

As the Court observed, the NWPR substantially reduced the number of waterways, including wetlands, protected under the Clean Water Act as compared to prior rules and practices.  Pasqua Yaqui Tribe, 2021 WL 3855977, at *5.  Vacatur of the rule restores broader coverage of waterways under the Clean Water Act as existed in years past.  This will have considerable impacts in Florida and on the state's duties under federal law.  It is therefore critical that DEP act immediately to ensure protection of all waterways covered by the Clean Water Act.

Among other things, DEP must immediately: (1) ensure that the regulated community is notified of the Court's action; (2) ensure against the unlawful (unpermitted) dredging and filling of additional covered waterways; (3) re-visit its "no permit required" and other jurisdictional determinations made while the unlawful NWPR was in effect; (4) defer issuance of any permit to re-assess the scope of the state's jurisdiction and obligations relative to the permit application; and (5) ensure adequate staffing and training to make correct jurisdictional determinations.

Sincerely,

Tania Galloni
Managing Attorney

FLORIDA REGIONAL OFFICE  *  4500 BISCAYNE BLVD., STE 201  *  MIAMI, FL 33137
T: 305.440.5434  *  FLOFFICE@EARTHJUSTICE.ORG  *  WWW.EARTHJUSTICE.ORG

JA.526

Bonnie Malloy
Senior Attorney

Christina Reichert
Associate Attorney

Enc.

cc w/enc.:   Justin George Wolfe, General Counsel
             Florida Department of Environmental Protection
             justin.g.wolfe@dep.state.fl.us

JA.527

# ATTACHMENT B



February 16, 2022

Mark Wilson
President and Chief Executive Officer
Florida Chamber of Commerce
36 S. Bronough Street
Tallahassee, Florida 32301
mwilson@flchamber.com


Lance Pierce
Executive Director
Association of Florida Community Developers
310 W College Avenue
Tallahassee, FL 32301
lance.pierce@afcd.com


<u>Re:</u>    **Liability Risk for Entities Relying on State 404 Determinations**

Dear Mr. Wilson and Mr. Pierce:

As you know, Florida assumed jurisdiction over the Clean Water Act's Section 404
dredge and fill permitting program on or about December 22, 2020.  Since that time, the state has
applied the 2020 Navigable Waters Protection Rule ("NWPR") definition of "waters of the
United States" to determine the scope of its 404 jurisdiction.  On August 30, 2021, however, a
federal court vacated the NWPR as unlawful at the time of its adoption.  <u>Pasqua Yaqui Tribe, et
al. v. U.S. Env't Prot. Agency, et al.</u>, No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz.
Aug. 30, 2021).  <u>Accord</u> <u>Navajo Nation v. Regan</u>, No. 2:20-CV-00602, 2021 WL 4430466
(D.N.M. Sept. 27, 2021).  As the Court observed, the NWPR substantially reduced the number of
waterways, including wetlands, protected under the Clean Water Act as compared to prior rules
and practices.  <u>Pasqua Yaqui Tribe</u>, 2021 WL 3855977, at *5.

In September 2021, the U.S. Army Corps of Engineers ("Corps") and U.S.
Environmental Protection Agency ("EPA") halted implementation of the NWPR nationwide and
returned to the pre-2015 regulatory regime to define waters of the United States.  <u>Current
Implementation of Waters of the United States</u>, U.S. Env't Prot. Agency,
https://www.epa.gov/wotus/current-implementation-waters-united-states (updated Dec. 20, 2021)
(Attachment 1).  The return to the pre-2015 regulatory regime restores broader coverage of
waterways under the Clean Water Act as existed in years past.

On September 1, 2021, we notified the Florida Department of Environmental Protection
("DEP") of its obligation to abide by the vacatur of the NWPR and asked that DEP notify the
regulated community regarding this change in the law.  Letter from Tania Galloni, Earthjustice,
to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment 2).  As we explained, it
was critical that Florida act immediately to ensure protection of all waterways covered by the
Clean Water Act.  However, at risk to itself and the development community, Florida has

FLORIDA REGIONAL OFFICE  *  4500 BISCAYNE BLVD., STE 201  *  MIAMI, FL 33137
T: 305.440.5434  *  FLOFFICE@EARTHJUSTICE.ORG  *  WWW.EARTHJUSTICE.ORG

JA.529

continued to apply the unlawful, vacated NWPR to its 404 actions, including determinations that no permit is required and the issuance of individual and general permits.

By letter to DEP dated December 9, 2021, EPA confirmed that the CWA and its implementing regulations require Florida to administer its 404 program consistent with the current definition of "waters of the United States." Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment 3). As EPA explained, "The Clean Water Act and its implementing regulations, as well as Florida's statute and regulations, require Florida to implement its program consistent with the definition of 'waters of the United States,'" which is "the pre-2015 Rule regulatory regime." Id.

EPA further confirmed that those in noncompliance since August 30, 2021, are liable for violations of federal law and at risk for enforcement actions. Id. "[A]ny discharges of pollutants into waters protected under the pre-2015 Rule regulatory regime, including **discharges into waters outside the scope of the vacated NWPR**, **which do not have a permit** or are not otherwise exempted from permitting requirements under that regime (e.g., under section 404(f)), violate the Act and **are subject to citizen suits as well as state and federal enforcement**." Id. (emphasis added).[1]

Notwithstanding the foregoing, Florida continues to apply the unlawful, vacated NWPR in its review of individual and general permits[2] and "no permit required" determinations. Please be advised that those taking action based on permits and other determinations applying NWPR's definition of WOTUS have been, remain, and will continue to be at risk of liability and enforcement action.

Sincerely,

Tania Galloni
Managing Attorney

Bonnie Malloy
Senior Attorney

Christina I. Reichert
Senior Associate Attorney

Enc.

---

[1] EPA reiterated Florida's obligation to apply the pre-2015 regulatory regime in its more recent letter from January 31, 2022. Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment 4).
[2] EPA has now begun objecting to individual state 404 permits on this basis. See, e.g., Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to Benjamin M. Melnick, Fla. Dep't Env't Prot., Dec. 17, 2021 (Attachment 5).

JA.530

cc w/enc.:

Shawn Hamilton, Secretary, Florida Department of Environmental Protection,
shawn.hamilton@floridadep.gov

Justin George Wolfe, General Counsel, Florida Department of Environmental Protection,
justin.g.wolfe@dep.state.fl.us

Radhika Fox, Director, Office of Water, EPA, fox.radhika@epa.gov

John Goodin, Director, Office of Wetlands, Oceans and Watersheds, EPA, goodin.john@epa.gov

Macara Lousberg, Director, Water Policy Staff, EPA, lousberg.macara@epa.gov

Patrick Utter, Chair, Association of Florida Community Developers, patrick.utter@afcd.com

TJ Thornberry, President, Florida Homebuilders Association, tthornberry@fhba.com

Kevin J. Thibeault, Secretary, Florida Department of Transportation,
kevin.thibeault@dot.state.fl.us

Ovelio A. Ruiz, President, Florida Chapter of the American Public Works Association,
truiz@miamigardens-fl.gov

Ryan Goldman, President, Florida Association of Environmental Professionals,
rgoldman@broward.org

JA.531

# ATTACHMENT C



*Via Email*

January 30, 2022

Director Radhika Fox
Office of Water
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
fox.radhika@epa.gov

<u>Re:</u>   **Florida's Unlawful Application of the Navigable Waters Protection
Rule to Determine Waters of the United States in State-Assumed Clean
Water Act 404 Program**

Dear Director Fox:

After more than a year ignoring federal law, it is time for EPA to require Florida to stop
applying the long-vacated 2020 Navigable Waters Protection Rule ("NWPR").  Florida's refusal
to comply with federal law threatens national waters and wetlands, as well as the wildlife and
communities that depend on them.

As you know, Florida assumed jurisdiction over the Clean Water Act's Section 404
dredge and fill permitting program on or about December 22, 2020.  Since that time, the state has
applied the NWPR definition of "waters of the United States" to determine the scope of its 404
jurisdiction.  On August 30, 2021, a federal court vacated the NWPR as unlawful at the time of
its adoption.  *Pasqua Yaqui Tribe, et al. v. U.S. Env't Prot. Agency, et al.*, No. CV-20-00266-
TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021).  *Accord Navajo Nation v. Regan*, No.
2:20-CV-00602, 2021 WL 4430466 (D.N.M. Sept. 27, 2021).  As the Court observed, the NWPR
substantially reduced the number of waterways, including wetlands, protected under the Clean
Water Act as compared to prior rules and practices.  *Pasqua Yaqui Tribe*, 2021 WL 3855977, at
*5.

On September 1, 2021, we notified the Florida Department of Environmental Protection
("DEP") of its obligation to abide by the vacatur of the NWPR.  Letter from Tania Galloni,
Earthjustice, to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment 1).  As we
explained, it was critical that Florida act immediately to ensure protection of all waterways
covered by the Clean Water Act.  DEP did not respond.

FLORIDA REGIONAL OFFICE  *  4500 BISCAYNE BLVD., STE 201  *  MIAMI, FL 33137
T: 305.440.5434  *  FLOFFICE@EARTHJUSTICE.ORG  *  WWW.EARTHJUSTICE.ORG

JA.533

Also in September 2021, the U.S. Army Corps of Engineers ("Corps") and U.S. Environmental Protection Agency ("EPA") announced that they had halted implementation of the NWPR nationwide and returned to the pre-2015 regulatory regime to define waters of the United States. *Current Implementation of Waters of the United States*, U.S. Env't Prot. Agency, https://www.epa.gov/wotus/current-implementation-waters-united-states (updated Dec. 20, 2021) (Attachment 2). But still DEP continued to apply NWPR.

By letter to DEP dated December 9, 2021, EPA affirmed that the Clean Water Act and its implementing regulations require Florida to administer its 404 program consistent with the definition of "waters of the United States" under the pre-2015 regulatory regime. Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment 3). EPA then reiterated Florida's obligation to apply the pre-2015 regulatory regime in its January 31, 2022, letter. Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment 4). Still, DEP refused to conform to the law.

Now for more than a year, Florida has continued to apply the unlawful, vacated NWPR to 404 actions, including determinations that no permit is required, enforcement and compliance decisions, and the issuance of general permits. We understand that DEP has been continuing to use the vacated portions of the Code of Federal Regulations containing the NWPR's definition of waters of the United States for making jurisdictional determinations, and the agency is publicly directing the regulated community to the vacated definition. *WOTUS Determinations*, Fla. Dep't Env't Prot., https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/wotus-determinations (last visited January 17, 2022) (using the "waters of the United States" definition in 40 C.F.R. 120—NWPR at the time—in option three for performing jurisdictional determinations) (Attachment 5). Florida is flouting federal law, and EPA is failing to step in.

DEP has attempted to justify this flagrant violation in a number of ways, including saying the state was waiting for EPA's clarification, then that the state had a year to comply with the change in federal law, and finally that a new rule would add another one-year period for the state to come into compliance. *See, e.g.*, House Environment, Agriculture and Flooding Subcommittee Hearing, at 21:10–24:15, https://www.myfloridahouse.gov/ VideoPlayer. aspx?eventID=7473. None of those rationalizations hold water. Rather, they reveal that Florida's actions are nothing more than the willful failure to regulate waters of the United States in Florida.

EPA has allowed Florida to violate the law for too long. More than one year has passed since the court issued its decision in *Pasqua Yaqui Tribe*, and more than one year has passed since EPA notified DEP that it must apply the pre-2015 regulatory regime. And EPA has

2

codified a new definition of waters of the United States, which Florida will no doubt delay in implementing for as long as possible.  In the meantime, wetlands properly protected as waters of the United States are being destroyed across the state.

EPA must ensure that DEP comes into compliance and stops applying NWPR to the detriment of Florida's precious wetlands.  Continued inaction is a de facto acceptance of DEP's flagrant disregard of the law, and EPA cannot turn a blind eye while Florida's critical wetlands are degraded and developed.  We formally request a meeting with EPA to discuss this ongoing issue to ensure that DEP follows the law.

Sincerely,

Christina I. Reichert
Senior Associate Attorney

Tania Galloni
Managing Attorney

Bonnie Malloy
Senior Attorney

Enc.

cc w/enc.:

Michael S. Regan, Administrator, EPA, regan.michael@epa.gov

John Goodin, Director, Office of Wetlands, Oceans and Watersheds, EPA, goodin.john@epa.gov

Macara Lousberg, Director, Water Policy Staff, EPA, lousberg.macara@epa.gov

Navis Bermudez, Deputy Assistant Administrator, Office of Policy, EPA,
       bermudez.navis@epa.gov

Lawrence Starfield, Acting Assistant Administrator, Acting Assistant Administrator, Office of
       Enforcement and Compliance, EPA, starfield.lawrence@epa.gov

JA.535

Shawn Hamilton, Secretary, Florida Department of Environmental Protection,
shawn.hamilton@floridadep.gov

Justin George Wolfe, Interim Deputy Secretary for Regulation, Florida Department of
Environmental Protection, justin.g.wolfe@dep.state.fl.us

Chad Stevens, Acting General Counsel, Florida Department of Environmental Protection,
chad.r.stevens.@dep.state.fl.us

4

# ATTACHMENT D



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

December 9, 2021

Secretary Emile D. Hamilton
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida 32399

Dear Secretary Hamilton:

As the new Regional Administrator for the Environmental Protection Agency, Region 4, I look forward
to working with you and your office to continue the important work of ensuring the protection of human
health and environment in Florida. My staff has briefed me on recent communications between our
offices regarding the scope of waters subject to the Clean Water Act Section 404 program that Florida
has assumed. In consideration of the significance of this matter, I am writing this letter as a follow up to
those discussions.

I would like to confirm that the EPA and the U.S. Army Corps of Engineers (the agencies) interpret the
current definition of "waters of the United States" subject to the Section 404 program to be the
regulatory interpretation in place prior to promulgation of the 2015 Clean Water Rule. Florida's Section
404 permitting program must therefore regulate discharges of dredged or fill material into "waters of the
United States" consistent with the pre-2015 Rule regulatory regime.

As background, the Clean Water Act generally prohibits the discharge of pollutants into "waters of the
United States" unless authorized by a permit, including a permit issued pursuant to Section 404 of the
Act. 33 USC §§ 1311(a); 502(7), (12). The Clean Water Act and the EPA's implementing regulations
require that any state administering a Section 404 program regulate the discharge of dredged or fill
material into all "waters of the United States" within its jurisdiction, aside from those retained by the
Corps. 33 USC § 1344(g); 40 CFR § 233.1(b). The EPA's regulations further provide that a state
program shall at all times be conducted in accordance with the Act. 40 CFR § 233.1(d). Florida's statute
and regulations are consistent with this mandate. *See* Fl. Stat. 373.4146 (defining state-assumed waters
as "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the
Clean Water Act… and rules promulgated thereunder, for the purposes of permitting the discharge of
dredge or fill material"); 62 Fla. Admin. Code Ann. 62-331.010 (providing that the "State 404 Program
governs all dredging and filling in waters of the United States regulated by the State under Section
373.4146").

When EPA approved Florida's request to assume the Section 404 program, the term "waters of the United States" was defined by the 2020 Navigable Waters Protection Rule (NWPR). On August 30, 2021, the U.S. District Court for the District of Arizona vacated and remanded the NWPR. *Pascua Yaqui Tribe v. U.S. Environmental Protection Agency*, No. 20-00266 (D. Ariz. Aug. 30, 2021). On September 27, 2021, the U.S. District Court for the District of New Mexico also issued an order vacating and remanding the NWPR. *Navajo Nation v. Regan*, No. 2:20-cv-00602 (D.N.M. Sept. 27, 2021). Pursuant to these cases, the agencies interpret "waters of the United States" under the statute and implementing regulations to mean the pre-2015 regulatory regime.

The Clean Water Act and its implementing regulations, as well as Florida's statute and regulations, require Florida to implement its program consistent with the definition of "waters of the United States," which since August 30, 2021, has effectively been the pre-2015 Rule regulatory regime. Accordingly, any discharges of pollutants into waters protected under the pre-2015 Rule regulatory regime, including discharges into waters outside the scope of the vacated NWPR, which do not have a permit or are not otherwise exempted from permitting requirements under that regime (e.g., under section 404(f)), violate the Act and are subject to citizen suits as well as state and federal enforcement.

If you have any questions or wish to discuss this matter, please contact me, or have a member of your staff contact Ms. Jeaneanne Gettle, Director of the Water Division at gettle.jeaneanne@epa.gov or 404-562-8979.

Sincerely,

Daniel Blackman
Regional Administrator

# ATTACHMENT E



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

January 31, 2022

Deputy Secretary John Truitt
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida  32399

Dear Deputy Secretary Truitt:

Thank you for your letter of December 17, 2021, seeking to better understand the Environmental
Protection Agency's position that the current definition of "waters of the United States," applicable
nationwide, is the regulatory interpretation in place prior to promulgation of the 2015 Clean Water Rule
("pre-2015 Rule regulatory regime") and that this definition currently applies to Florida's Clean Water
Act (CWA) Section 404 program.

Your letter affirms Florida's commitment to administering the assumed CWA Section 404 program
consistent with the requirements of the statute, and the EPA appreciates this commitment. However, you
also suggest that there is "confusion" and a "complex and unusual legal situation" regarding the
governing definition of "waters of the United States." In this matter, we disagree; the applicable
standard is straightforward. As we stated in our letter of December 9, 2021, to Secretary Hamilton, two
district courts have vacated the most recent regulation defining "waters of the United States," the
Navigable Waters Protection Rule. *Pascua Yaqui Tribe v. U.S. Environmental Protection Agency*, No.
20-00266 (D. Ariz. Aug. 30, 2021) and *Navajo Nation v. Regan*, No. 2:20-cv-00602 (D.N.M. Sept. 27,
2021). Based on those court decisions and the vacaturs, the EPA and the U.S. Army Corps of Engineers
(Corps) have been clear that the definition of "waters of the United States" currently in effect nationwide
is the pre-2015 Rule regulatory regime. *See* EPA, Current Implementation of Waters of the United
States, https://www.epa.gov/wotus/currentimplementation-waters-united-states.

The CWA and the EPA's implementing regulations require that any state administering a Section 404
program regulate the discharge of dredged or fill material into all "waters of the United States" within its
jurisdiction, aside from those retained by the Corps. 33 USC § 1344(g); 40 CFR § 233.1(b). The EPA's
regulations further provide that a state program shall at all times be conducted in accordance with the
CWA. 40 CFR § 233.1(d). Pursuant to these requirements, Florida is required to implement the current
applicable definition of "waters of the United States," consistent with the pre-2015 Rule regulatory
regime.

Florida's statute and regulation governing its administration of the Section 404 program are consistent
with these federal requirements, as they simply codify the term "waters of the United States." Florida's

JA.541

statute authorizing assumption of the CWA Section 404 permitting program defines "state assumed waters" to mean "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act…and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." Fl. Stat. 373.4146. Florida's implementing regulations, in turn, provide that "[t]he State 404 Program governs all dredging and filling in waters of the United States regulated by the State under Section 373.4146." 62 Fla. Admin. Code Ann. 62-331.010. The EPA has not identified, and your letter did not reference, any Florida statute or regulation that would impede Florida's implementation of the currently applicable federal definition of "waters of the United States."

Your letter also refers to the EPA's regulation at 40 CFR 233.16(b), which allows states a period of time to implement certain changes to federal regulations when the federal change "requires revision" of state law. That regulation is inapplicable for the reasons discussed above.

Your letter includes other questions about, among other things, any deliberations the EPA or the Department of Justice may have had regarding the applicability of the vacaturs of the Navigable Waters Protection Rule, the EPA's past experience in overseeing state adoption of federal standards, and the EPA's schedule for rulemaking to redefine the scope of "waters of the United States." None of these questions are relevant to Florida's obligation, outlined above and in our letter of December 9, 2021, to implement the pre-2015 Rule regulatory regime defining "waters of the United States."  We also recognize that the Supreme Court has recently granted certiorari in a case implicating the definition of "waters of the United States," *Sackett v. EPA* (21-454), but the Supreme Court's pending review of this case does not affect Florida's current obligations. We would be glad to discuss these issues or other questions you may have, other than internal federal government deliberations, by phone or video conference at your convenience.

The EPA appreciates the productive working relationship that our agencies have shared related to Florida's administration of the CWA Section 404 program. Please feel free to reach out to me if you would like to discuss this matter or have a member of your staff contact Ms. Rosemary Calli, Section Chief, Wetlands & Streams Regulatory Section, at Calli.Rosemary@epa.gov or 404-562-9846.

Sincerely,

JEANEANNE GETTLE
Digitally signed by
JEANEANNE GETTLE
Date: 2022.01.31 19:02:59
-05'00'

Jeaneanne Gettle
Director, Water Division
US EPA Region 4

JA.542

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525189EFCE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## <u>DECLARATION OF DIANA UMPIERRE</u>

I, Diana Umpierre, make the following declaration:

1.      I submit this declaration in support of the Sierra Club in the above-captioned action.

2.      I live in Pembroke Pines, Broward County, Florida, near the Everglades and the associated Water Conservation Areas, and have lived here since 2000. I spend a considerable amount of time enjoying and trying to help protect the natural environment and wildlife in South Florida. I believe our unique ecosystem and wildlife are very important to the communities here and for biodiversity in general.

3.      Accordingly, I became an active member of the Sierra Club in 2014 to help protect and conserve endangered species and natural ecosystems in South Florida.

4.      I became an employee of the Sierra Club in June 2016 and since then have been serving as an Organizing Representative for the Sierra Club's Everglades Restoration Campaign.

JA.543

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525139EFCE

5.      Prior to joining Sierra Club, my experience included working as a geoscientist for environmental consulting firms in New Jersey and Florida where I provided geographic data analysis of impacts to ecologically sensitive habitats and water quality from planned transportation and water/wastewater projects as part of NEPA environmental assessments. My experience also includes working as a geographer for the South Florida Water Management District where I supported regional water supply long-range planning for 16 counties in South Florida, including analysis of geographic data on water resources and of land cover over time to determine wetland impacts.  I assisted the Southeast Florida Regional Climate Change Compact by coordinating with government and academic partners in analyzing, mapping, and communicating sea level rise vulnerability for four counties in Southeast Florida, including Miami-Dade.  I earned my Bachelor of Science degree in Geological Sciences from Cornell University in 1990.

6.      The Sierra Club is a national non-profit grassroots environmental organization with over 700,000 members across the United States dedicated to practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.  Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, wilderness preservation, public lands and waters protection, and the protection of clean air and water resources.  These activities support Sierra Club's mission to explore, enjoy, and protect the wild places of the earth.

JA.544

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31535189EFCE

7.      The Sierra Club headquarters is in Oakland, California.  Sierra Club has chapters across the nation, including Florida, with members interested in wildlife and wildlife habitats.  Most of the Sierra Club chapters include all-volunteer groups, whose members work to preserve and protect their area's natural resources.  Sierra Club's Florida Chapter has nearly 5,000 members and focuses on protecting Florida's unique natural wonders, including its springs, wetlands, and endangered wildlife like the Florida panther and the Florida bonneted bat.

8.      One of the Sierra Club's main national initiatives, the Our Wild America campaign, which includes Everglades restoration efforts, tackles pressing environmental problems including global warming and threats to wildlife.  Sierra Club has long advocated for protections for species under the ESA, and has brought litigation to ensure that Federal agencies meet their ESA obligations.

9.      My work involves supporting and expanding volunteer-based grassroots efforts to promote the restoration of the Greater Everglades ecosystem and the protection of its remaining natural wildlife habitats from threats such as water mismanagement, development, and sea level rise.

10.      As an active member, I have advocated for Everglades restoration, the protection of native habitat, and the restoration of natural and clean water flows, which are important for healthy wildlife.  I also spend time educating people about the importance of protecting Florida panther and Florida bonneted bat habitat.  I plan to continue participating in these activities in the future.

JA.545

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525189EFCE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 4 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 130 of 430

11.     I am also an active member of the International Dark Sky Association and have advocated for the protection of the natural nocturnal environment, which is important for wildlife, including nocturnal species like fireflies, the Florida panther, and the Florida bonneted bat.  In 2016, I helped Big Cypress National Preserve become the first National Park Service unit east of Colorado to achieve an International Dark Sky Place designation, in part because this protection is important for the Florida panther and other nocturnal species.  I have also been actively engaged in advocating for similar Dark Sky Place designations and stronger nocturnal environment protections for other parts of the Greater Everglades, including Miami-Dade County, Florida Panther National Wildlife Refuge, and Everglades National Park.  Therefore, protecting the natural night sky and the nocturnal environment of these conservation areas is very important to me.

12.     EPA's approval of Florida's application to assume control of section 404 permitting undermines Sierra Club's mission.  Among other failings, Florida has no lawful plans to ensure that listed species are adequately protected and analyses of section 404 permit applications issued by Florida will no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers ("Corps") instead.

13.     Because section 404 permit applications processed by Florida do not undergo a NEPA analysis or site-specific ESA section 7 consultation, these projects are subject to a far less rigorous environmental review, which increases the risk of harm to listed species and their habitat and harms Sierra Club's mission.

JA.546

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525139EFCE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 5 of 101
USCA Case #24-5101      Document #2102936        Filed: 02/26/2025      Page 131 of 430

14.     Florida claimed this permitting program would be easily streamlined with their current state environmental resource permitting ("ERP") program which has significant differences and is required for projects that impact surface waters.  Florida also stated throughout the assumption process that it will process permits faster than the Corps has in the past.  The harms from this transfer of authority are detailed in an article written by Craig Pittman wherein he describes how lobbyists for the developers called this handover "the Holy Grail."  *See* Attachment A.  The bottom line is that "super-fast permit approvals" prioritize development over our precious wetlands in Florida.

**Organizational and Membership Harms From Particular Projects**

15.     The state's 404 program undermines Sierra Club's ability to realize its mission by depriving the organization of information, rights, and remedies available when Section 404 is administered by the Corps, as it has been for decades.  As a result of EPA's unlawful transfer of 404 authority to the state, the state will continue to issue 404 permits on major projects that will harm Sierra Club's organizational interests and my interests as a member.

16.     A project we are particularly concerned about is the Bellmar development project (state 404 application number 0396364-001) in Southwest Florida.  Collier Enterprises Management, Inc., applied on December 16, 2020, to build the Bellmar project in eastern Collier County, Florida, which would encompass over 5,000 acres and affect approximately 132 acres of wetlands. The project is located approximately one mile from the Florida Panther National Wildlife Refuge, which protects the core habitat of the endangered Florida panther. Telemetry data also shows the presence of the Florida

JA.547

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31535189EFCE

panthers on the project site. The proposed development would also impact habitat of the endangered Florida bonneted bat and crested caracara. On September 15, 2022, Sierra Club submitted public comments to Director Martha Williams of the U.S. Fish and Wildlife Service on the threats the development would pose to the Florida Panther. *See* Attachment B.

17.     Two additional project proposals that we are particularly concerned about are oil drilling projects in Big Cypress National Preserve that, if approved, would pave the way for oil drilling and production in the preserve for the next 30 years.

18.     Spanning over 700,000 acres, Big Cypress National Preserve is the nation's first national preserve.  It is a continuous freshwater ecosystem comprised of five habitats that are connected by the water that flows through them, and it is replenished entirely by rainwater.  The water flows from the hardwood hammocks to the pinelands, across the prairies, into the cypress swamps, and then into the estuaries that flow to the Gulf of Mexico.  The freshwaters of Big Cypress are crucial to the health of the neighboring Everglades and critical to the wildlife that inhabits it.  Big Cypress provides habitat for various listed species and has the largest contiguous acreage of habitat for the endangered Florida panther in south Florida.

19.     For the first proposed Big Cypress project I am concerned about, the Nobles Grade Prospect (previous state 404 application number 323836-004), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad for three vertical wells and an access road in Big Cypress National Preserve for the purposes of oil

JA.548

drilling.[1]  On February 22, 2022, the applicant withdrew this proposal for this project but stated it would resubmit its application pending further project development.  The project as originally proposed would cover 21.21 acres and would result in the filling of 85,000 cubic yards of wetlands in Big Cypress.  The proposed area is located approximately three miles southwest of the rest stop at Interstate 75 mile marker 63.  This rest stop serves as an access point to hiking trails that go directly into the backcountry of Big Cypress.[2]

20.     Big Cypress National Preserve provides habitat for threatened and endangered species.  Endangered Species Act-listed species observed or potentially occurring within or near the Nobles Grade proposed project area include the following: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, crested caracara, and the Florida panther.

21.     For the second proposed Big Cypress project I am concerned about, the Tamiami Prospect (previous state 404 application number 397879-002), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad and an access road in Big Cypress National Preserve at the eastern boundary of the Preserve for the purposes of oil drilling.  On February 22, 2022, the applicant withdrew this proposal as well, and again stated it would resubmit its application pending further project development.  The

---

[1] Burnett Oil's ERP / State 404 Application for Nobles Grade Prospect, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_323836/gis-facility!search .

[2] National Park Service, Big Cypress, I-75 Mile Marker 63, *see* https://www.nps.gov/bicy/planyourvisit/i-75-mm-63.htm .

JA.549

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525139EFCE

area would cover 10.99 acres and would result in the filling of 46,000 cubic yards of wetlands in Big Cypress.

22.     Endangered Species Act-listed species observed or potentially occurring within or near the Tamiami proposed project area include: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, crested caracara, Florida bonneted bat, and the Florida panther.

23.     On February 3, 2021, several conservation groups sent a letter to the Florida Department of Environmental Protection ("FDEP") raising concerns about the impacts of the proposed projects.  I have reviewed this letter and incorporate it in this declaration, *see* Attachment C, because I share the same concerns regarding these oil projects.

24.     For example, not included and fully analyzed in Burnett Oil's applications are the scope of activities attendant to oil development and drilling and their impacts such as development activities associated with access roads, staging areas and seismic operations, and construction of gathering, transmission, and distribution pipelines.

25.     Because Big Cypress National Preserve is a continuous ecosystem connected by the flow of freshwater, any disruption to this flow from the oil projects would lead to still or stagnant water directly north and south of the site, altering and disturbing the natural environment on which plant and animal species depend.  Similarly, pollution at one location in Big Cypress will affect the remaining habitats to which that water flows, thereby threatening water quality downstream and in turn, threatening the species that rely on this habitat.

JA.550

DocuSign Envelope ID: D73B0293-BD78-4025-B260-31525159EECE

Case 1:21-cv-00119-RDM    Document 98-10    Filed 02/28/23    Page 9 of 101
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 135 of 430

26.     Aside from disruptions to the flow of water and the threat of pollution/water quality degradation, the construction and operation of oil drilling infrastructure will negatively impact the species within the vicinity of the projects. Birds and other wildlife will be forced to flee as a result of the noise, artificial light at night, ground vibration, the presence of machinery, vehicles, and humans, and other attendant circumstances.  Animals that cannot get away risk injury from construction and operation activities.

27.     Burnett Oil's proposed projects are particularly concerning in light of the harmful impacts from previous seismic exploration activities in Big Cypress National Preserve in 2017 and 2018, when Burnett Oil utilized Vibroseis (seismic vibration technology) to send signals into the earth to locate subsurface oil and natural gas deposits within Big Cypress.  This seismic exploration took place over approximately 110 square miles of the Preserve and resulted in significant environmental damage that is still present today.  The damage included severely altered and rutted wetland soils; removal of dwarf cypress trees, which provide roosting sites for birds and other wildlife above high water levels; significantly diminished vegetation groundcover; the presence of dwarf pond cypress tree stumps that are not re-sprouting and the absence of seedlings for these trees; and uneven ground elevations as a result of the company's reclamation attempts, among other harms.

28.     Big Cypress is not suitable for any oil exploration or drilling because of ecological importance and sensitivity, as well as the damage already caused by those activities to this preserve and the protected species that rely on it.  So even if the projects

JA.551

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F251B9F5CF

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 10 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 136 of 430

are modified, similar activities will harm our organizational and my membership interests.

29.     Another concerning project is the State Road 836 (Dolphin Expressway) Extension (state 404 application number 13-396515-001-SFI).  On March 26, 2019, the Miami-Dade Expressway Authority submitted its initial 404 permit application to the Corps (SAJ-2018-01778 (SP-MLC)).  That 404 permit application was transferred from the Corps to the state (FDEP) on or about December 28, 2020, a few days after state assumption became effective. On August 20, 2021, the applicant withdrew this proposal for this project stating as reason that  "the State 404 authorization cannot be issued until the [Environmental Resource Permit] has been issued," suggesting that the 404 application would be resubmitted once the applicant completed a "pre-permit application process with the FDEP."  *See* Attachment D.

30.     While the application was under Corps jurisdiction, on May 22, 2019, the Corps issued a Public Notice "soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity."[3]

31.     On July 26, 2019, the Everglades Coalition, comprised of over 60 organizations committed to the health and protection of America's Everglades, including Sierra Club, submitted comments to the Corps opposing the proposed 404 permit, *see* Attachment E.

---

[3] U.S. Army Corps of Engineers public notice SAJ-2018-01778(SP-MLC), available at https://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1855244/saj-2018-01778sp-mlc/ .

JA.552

32.      Furthermore, in a letter sent to Governor DeSantis on June 24, 2020, the Everglades Coalition asked him to uphold a recent ruling by Florida Administrative Law Judge Suzanne Van Wyk, which held that the Miami-Dade County Comprehensive Plan Amendment adopted by Miami-Dade County via Ordinance 2018-109 on September 27, 2018, that would allow for the proposed highway extension, demonstrated inconsistency with Everglades restoration efforts, with Miami-Dade County's Comprehensive Development Master Plan, and with state law.  *See* Attachment F.

33.      This project's purpose is to construct a 14-mile toll road extending the current Dolphin Expressway.[4]  The project will consist of a six-lane toll road extending State Road (SR) 836 through jurisdictional wetlands within the Comprehensive Everglades Restoration Plan's (CERP) footprint.  The project would result in the filling of 360 acres of wetlands and secondary impacts to almost 100 acres of wetlands located in the Bird Drive and North Trail Wetland Basins which are adjacent to the Everglades National Park.  These basins have been set aside as a water quality, water seepage, and habitat buffer for the Park.  Freshwater wetlands are essential to the region for water quality and wildlife benefits.

34.      Everglades National Park spans 1.5 million acres that stretch over the southern part of Florida and is home to a vast diversity of plants and wildlife across different ecosystems: freshwater sloughs, marl prairies, tropical hammocks, pinelands, cypress, mangrove, coastal lowlands, marine, and estuarine.  The State Road 836

---

[4] Miami-Dade Expressway Authority State 404 related documents are available at
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396515/gis-facility!search .

JA.553

DocuSign Envelope ID: D73B0293-BD78-402F-B260-84F251B9F5CE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 12 of 101
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 138 of 430

Extension project would impact the progress made and on-going efforts to restore water flows and quality, fragile ecosystems, and natural resources within the Everglades National Park.

35.     In an August 23, 2019 letter to the Corps, the EPA voiced concerns and stated that the road extension project "may have substantial and unacceptable adverse secondary impacts to the Greater Everglades wetland ecosystem and direct impacts to 350 acres of freshwater wetlands located in the Bird Drive Basin and within Congressionally authorized CERP project boundaries that are an ARNI [aquatic resource of national importance]."[5]  In a subsequent letter on September 16, 2019, the EPA once again expressed its concerns and that it had "received no additional information from the Corps to address these concerns" and that "the EPA finds that the proposed project will have a substantial and unacceptable impact on aquatic resources of national importance."

36.     According to the Corps' May 2019 public notice, there are several listed species that may use the wetlands that would be affected if the SR 836 extension 404 permit is granted, including the wood stork, the Eastern indigo snake, and the Florida bonneted bat.

37.     I am personally and professionally very worried about the federally endangered Florida bonneted bat, the largest bat in Florida.  On June 10, 2020, the U.S. Fish and Wildlife Service proposed critical habitat that includes part of the footprint of

---

[5] U.S. Environmental Protection Agency letter to Army Corps of Engineers, August 23, 2019, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396515/gis-facility!search .

JA.554

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F251B9E5CE

Case 1.21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 13 of 101
USCA Case #24-5101      Document #2102936        Filed: 02/26/2025    Page 139 of 430

the proposed highway project.[6]  I am very concerned that SR 836 extension will induce
more traffic that would affect the wetlands and water quality, and invite more
development.  All of which will cause harm to the listed species in this area impeding
Sierra Club's mission and my personal use and enjoyment of this area.  Several likely
consequences include increased bird and snake road fatalities as this area is very close to
a water conservation area and wildlife management area within the Everglades Protection
Area.  I am also very concerned about a substantial increase of light pollution in nearby
conservation areas that may come from new artificial lighting on the highway and
associated infrastructure, including exit interchanges and parking areas.  Increased noise
will likely also affect listed species that may be present in this area.

38.     All of these projects are particularly concerning to me, because I love and
enjoy visiting the Everglades Protection Area, Everglades National Park, and Big
Cypress National Preserve.  Over the years I have visited many preserves, but Big
Cypress National Preserve is still my most beloved and I visit about four times a year.  I
also thoroughly enjoy visiting Everglades National Park, which I visit about two to four
times a year.  During my visits, I typically hike, observe the flora and fauna, stargaze, and
take photographs.  I enjoy recreating in nature to keep myself healthy, and to observe
wildlife.  I enjoy getting outdoors to experience the unique environment and native
wildlife, including opportunities to see or hear the Florida panther and Florida bonneted

---

[6] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for
Florida Bonneted Bat, 50 C.F.R. § 17 (2020), available at
https://www.govinfo.gov/content/pkg/FR-2020-06-10/pdf/2020-10840.pdf#page=1 .

JA.555

DocuSign Envelope ID: D73B0293-BD78-402E-B269-84F251B9F5CE

bat, of South Florida.  I have plans to continue regularly visiting Big Cypress National Preserve and Everglades National Park as well.

39.     I also attend night education events hosted by park rangers at Big Cypress National Preserve.  I always look for panthers and fireflies when I am out at night.  I plan to continue these activities in the future.

40.     It is important to me to see the natural environment of South Florida preserved in a way that will maintain the integrity of the ecosystem.  My personal enjoyment of the ecosystem and natural areas in which I recreate will diminish significantly if the ecosystem and species like the panther are harmed.  For example, panthers are critical to supporting and maintaining the health of the South Florida ecosystem.  Without the panther, or with fewer panthers in the wild, there will be a domino effect on the ecosystem and its biodiversity.  This substantial alteration of the native ecosystem will fundamentally change the character and way of life in and around South Florida, adversely affecting my use and enjoyment.

**Organizational Harms from Waters Excluded from the Retained Waters List**

41.     Members of the Sierra Club reside in nearly every corner of the state and our members enjoy, explore, and do everything they can to protect the water bodies in their local regions.

42.     On April 16, 2018, Sierra Club sent a letter to then-District Commander Jason A. Kirk of the Jacksonville District Corps of Engineers, demanding that "the Corps completely rectify its inventory of Florida's navigable waters before any actions take place concerning the assumption of delegation of Section 404 dredge and fill permitting

JA.556

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F251B9F5CF

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 15 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 141 of 430

authority by Florida's Department of Environmental Protection." Our well-founded concern was then, and is now, that many of the water bodies left off the current Retained Waters List will be further imperiled by FDEP's failure to provide them protection under an adequate 404 permitting system.

43.     The following water bodies are a sample of water bodies that are ecologically and/or recreationally significant to our members, and which were excluded from the Corps' 2020 Retained Waters List but had been present in the 2017 version of the same list:

44.     The Alapaha River (Hamilton County), is a tributary of the Suwannee River that is impacted by the Hamilton phosphate mining district. Near Jennings, Florida, the Alapaha drains into a sinkhole into the Floridan Aquifer. That aquifer supplies drinking water to more than 90 percent of people in northeast and east-central Florida. This aquifer system underlies an area of about 100,000 square miles in southern Alabama, eastern and southern Georgia, southeastern Mississippi, southern South Carolina, and all of Florida. The Alapaha River and its water trail,[7] like the Suwannee River, is a treasured, popular spot for recreation (fishing, paddling, outings, and camping) for our members.

45.     Several other waterways are imperiled by industry activity and are at further risk with 404 permitting in the hands of the state. Deep Creek (Duval and Baker counties), near U.S. Route 301, runs behind and receives runoff from the Chemours mine

---

[7] Georgia River Network, *Alapaha River Water Trail*, https://garivers.org/alapaha-river-water-trail/.

JA.557

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F251B9E5CE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 16 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 142 of 430

dump. Water Oak Creek (Bradford County) is also a repository for wastewater from the Chemours mine. Our members have experienced and witnessed skin burns from contact with the water in Water Oak Creek that feeds into Lake Rowell and Lake Sampson via Alligator Creek (see below).

46.     Deep Creek (Suwannee County) receives phosphate waste from the Nutrien White Springs Phosphate plant and flows into the Suwannee River.

47.     Swift Creek (Hamilton and Suwannee counties) receives phosphate waste from the Nutrien Swift Creek processing plant.

48.     Turkey Creek (Baker County) receives mining discharge from the Chemours mine and the City of McClenny sewage treatment system.

49.     Horse Creek (Hardee and DeSoto counties) is surrounded in Hardee County by existing phosphate mines and is threatened by a new phosphate mine proposal from Mosaic in DeSoto County.[8] Horse Creek in Hardee County flows within and south of phosphate mines. Horse Creek is the largest tributary of the Peace River and begins at the "Four Corners," where the counties of Hillsborough, Manatee, Polk and Hardee meet in the heart of phosphate mining territory.

50.     Peace River (Polk, Hardee, DeSoto, and Charlotte counties) is vital to maintain the delicate salinity of Charlotte Harbor, which hosts several endangered species including the smalltooth sawfish. Phosphate strip mining and fertilizer processing

---

[8] The Mosaic Company, *DeSoto County Project*, https://mosaicfloridaphosphate.com/communities/desoto-county/desoto-project/.

JA.558

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F251B9E5CE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 17 of 101
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 143 of 430

continue to threaten this river.  DeSoto County is under the threat of phosphate mining by Mosaic, the nation's largest producer of fertilizer.

51.     Peacock Slough (Suwannee County) is in Wes Skiles Peacock Springs State Park, which has two major springs, a spring run, and six sinkholes.  Many of our members recreate at this site (hiking, swimming, cave diving, and picnicking).

52.     Ichetucknee River (Columbia County) flows through the Ichetucknee Springs State Park – an area of high ecological and recreational value to our members (paddling, tubing, etc.). The Ichetucknee is imperiled by nutrient pollution that fuels the harmful algae that now chokes its once-pristine waters, in addition to the over-pumping of groundwater.

53.     Santa Fe River (Columbia, Suwannee, Bradford, Baker, Union, Gilchrist, and Alachua counties) flows underground in O'Leno State Park through an intricate cave system, emerges in River Rise Preserve State Park, and empties into the Suwannee River; this river sink/river rise system in O'Leno is the largest swallet-to-resurgence system in Florida.  Gilchrist Blue, Ginnie, Hornsby, Lily, Poe, and Rum Island springs are some of the 36 named springs and numerous smaller springs along the banks of or submerged by the river.  The headwaters of the river are Lake Santa Fe, near Keystone Heights.

54.     The Santa Fe River, its springs, and its tributaries, play a major role in the recreational (spring hopping, paddling, camping, and fishing) lives of our members.  The Santa Fe is also threatened by development in its sizable watershed.  The following Santa Fe River tributaries are also missing from the retained waters list: New River (Union and Bradford counties), the largest of the Santa Fe River tributaries, is near significant

JA.559

DocuSign Envelope ID: D73B0293-BD78-402F-B260-84F251B9F5CF

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 18 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 144 of 430

phosphate deposits and was threatened by the HPS II phosphate mining project proposal, which would have mined over 7,400 acres across Union and Bradford counties. We expect that additional mining proposals will arise because Julian Hazen, who worked for the Florida Industrial and Phosphate Research Institute, is quoted in media as stating that because the United States is low on phosphate rock "[s]omeday, this deposit will be mined. . . [w]hether it's 5 years from now or 20 years from now."[9]

55.     Alligator Creek (Bradford County) receives discharges from the Chemours mine, and it feeds several local waterways. It was once a beautiful paddling spot that has become a polluted drainage ditch. Braggs Branch (Bradford County), just south of Brooker, is also impacted by mining. New River is part of the Santa Fe River Basin that spans nine counties including parts of Alachua, Gilchrist, Suwannee, Columbia, Union, Bradford, Baker, Clay, and Putnam. This watershed is an important recharge area for the Floridan Aquifer; Olustee Creek (Washington County) and Sampson River (Bradford County) are also tributaries of the Santa Fe River.

56.     Silver River (Marion County) is a seven-mile run from the outflow from Silver Springs State Park to a confluence with the Ocklawaha River. While it still provides a breathtaking scenic experience for those in canoes or kayaks, and is a popular and beloved destination for our members, it is now choked with algae. The iconic glass-bottomed boats on the river show a vastly different river bottom from that of 50 years ago. The Silver River is further threatened by the River Creek RV Resort project (State

---

[9] Molly Minta, WUFT News, *What's Mine Is Yours*, available at https://projects.wuft.org/peakflorida/whats-mine-is-yours/

JA.560

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F2F1B9F5CE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 19 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 145 of 430

404 Program Permits: 671124).  The River Creek RV Resort is a proposed 385 Site

Recreation Vehicle Resort on 160.76 Acres located near the confluence of the Silver and

Ocklawaha rivers.

57.     Hendry Creek (Lee County) is located within Caloosahatchee River Basin

and was designated as impaired in FDEP's implementation of its Impaired Waters

Rule.  It runs through the Hendry Creek neighborhood in South Ft. Myers.

58.     Hickey Creek (Lee County) runs through the Hickey Creek Mitigation

Park,  a popular hiking, paddling, and birding location for our members. The creek's

ecosystem supports the threatened Florida Scrub-Jay and gopher tortoises.

59.     Powell Creek (Lee County), a tributary of the Caloosahatchee River, runs

through Powell Creek Preserve and is a popular recreation spot for our members and their

families for walking, biking, and viewing wildlife, including pileated woodpeckers and

gopher tortoises.  The endangered gopher tortoise is a keystone species; it shares its

burrows with more than 350 other species.

**Organizational Harms from the State Program**

60.     The state's administration of this unlawful section 404 program prevents

Sierra Club from being able to monitor and engage in proposed permits to the same

degree that the federal program afforded us.

61.     To start, we do not have the same access to basic information about 404

applications open for public comment under the state program that we were readily able

to obtain from the Corps.  As a staff member, I would regularly review 404 public notices

from the Corps and forward those to Sierra Club groups located throughout the state.

DocuSign Envelope ID: D73B0293-BD78-402F-B269-84F251B9F5CF

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 20 of 101
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 146 of 430

Those groups would then use the information to identify projects of concern, help set their advocacy priorities, and prepare members to engage in advocacy, particularly during the comment period. Sierra Club used this information also to monitor development pressures and trends so that we could tailor our advocacy around those.

62. The state program, however, does not provide this information in an accessible manner. The state has an email subscription service, called Permit Application Subscription Service (PASS), that provides a periodic email that lists different permit applications they received for processing. However, that service does not email public notices of 404 permits applications open for public comment. This unduly burdens Sierra Club's ability to get prompt information about 404 permits open for public comment, which I do get by email from USACE for any 404 individual permit application open for public comment to the Corps from anywhere in Florida. Prompt access is important because 404 permits typically only have a 30-day public comment period and a limited timeframe for Sierra Club and any member of the public to request a public hearing. We cannot do this promptly or effectively to advocate against harmful 404 projects. We are required to divert resources to try to find the pertinent information, and to do so in time to notify local Sierra Club groups that may be most concerned, and to ensure they have the opportunity to review the application and engage in advocacy before it is too late. Each of the six FDEP local district posts its 404 public notices on their own separate district web pages. There is no easy means to subscribe to a single email distribution list that automatically informs me when a 404 permit application is open for public comment. It is onerously burdensome, and often not possible, to check six different FDEP district web

JA.562

pages, every single day, to see if there any 404 permit applications that might be of concern to our Sierra local groups. That is just one example of how the State's assumption of 404 permit is hurting our ability to protect our waters.

63. Without being able to receive public notices in a timely, orderly manner as we had before, we are unable to forward that information in a timely way to Sierra Club groups, and they and we as a result are hindered in our ability to track trends in development that may collectively require coordinated advocacy. This harms our ability to execute our mission.

64. As an organization, we also heavily rely on federal review and analyses of projects that affect wildlife, land conservation, climate, and water. We act on them as needed depending on the impacts of the proposed project. We utilize information required under NEPA, the ESA, and the Clean Water Act to review permit applications. These federal analyses also provide a common baseline for issues, from which we can assess proposed agency actions and their environmental impacts.

65. Because the state program is in place, we are losing all of the protections that the federal law allows. This means that there will be no federal analysis or comment process on state 404 projects and permits. As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

66. Our organization is significantly harmed without these federal analyses because we must hire our own experts in an attempt to assess and understand the impacts of agency actions. Experts cost thousands of dollars per case, we are longer able to

JA.563

DocuSign Envelope ID: D73B0293-BD78-402F-B269-84F251B9F5CF

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 22 of 101
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 148 of 430

review and act on proposals or projects at the rate we normally do.  The loss of

information from these analyses results in additional staff time to triage permits to

identify harms to the listed species and their habitats and additional costs in hiring

experts.  As a result, our conservation advocacy work is significantly hindered.

      67.     One of the main tools Sierra Club uses to protect species, their habitats,

and waters is the public commenting process.  When there is a proposed agency action,

we review the applications and documents; determine the scope and effect it would have

on the wildlife and waters we seek to protect; review the geographic information and

maps that allow us to visually understand the affected geographic environment; review

wetland impacts and potential means to avoid, minimize, and mitigate those impacts;

review applicable rules and laws; and submit comment letters.

      68.     Under the Florida's 404 program, however, this public commenting

process has become significantly more difficult, harming the advocacy of our members

and volunteers. First, the state provides far less information about projects than the

federal process does.  Second, FDEP has moved the online public commenting process to

the FDEP Nexus Business Portal, which requires commenters to provide their personal

information including address and phone number to register for an account before

allowing them to submit public comments. This onerous system discourages public

comments in Sierra Club's grassroots campaigns, to the detriment of our organizational

mission and to members concerned with harmful projects.

      69.     The loss of critical information and procedural safeguards afforded by

NEPA and the ESA significantly sets back our ability to advocate for and protecting

DocuSign Envelope ID: D73B0293-BD78-402F-B268-8AF251B9E5CE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 23 of 101
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 149 of 430

water resources, species and their habitats. As the pending 404 project applications discussed above demonstrate, these losses are caused by Florida's assumption of the 404 program.  Furthermore, for any of the projects which Sierra Club would challenge through litigation, a tool employed by our organization, it is guaranteed that Sierra Club will either have to divert significant resources to engage in state court litigation, or forego litigation completely, damaging our organizational mission.

70.     The state's unlawful assumption also hinders in other ways our ability to litigate over illegal section 404 permitting actions, when necessary.  Sierra Club challenges 404 permits in federal court as one of our advocacy tools to further our mission, and we are harmed by the loss of federal court as a venue as a result of Florida assuming the 404 program because it is much more difficult and expensive to bring these challenges in Florida's state courts.

71.     It is my understanding that there is a higher bar to establish standing in Florida state court because we are required to show that a substantial number of our members will be affected by the challenged action, while in federal court we are only required to show that a single member is adversely affected.  It is also my understanding that Sierra Club risks exposure to mandatory "fee-shifting" which creates the risk of liability for the opposing parties' costs and fees to engage in litigation.  We are not exposed to this same risk in federal court, where the Corps is the section 404 permitting agency.  The risk of incurring these substantial costs and fees results in our inability to challenge illegal permit authorizations in Florida that would cause serious harm to threatened and endangered species, even if our claims are strong.

JA.565

DocuSign Envelope ID: D73B0293-BD78-402E-B268-84F251B9E5CE

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 24 of 101
USCA Case #24-5101   Document #2102936       Filed: 02/26/2025   Page 150 of 430

72.     With assumption, there is now an entirely different legal scheme to challenge wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Sierra Club will have to incur considerable expense to hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Sierra Club would have to divert from other programmatic goals if we did not have to litigate in state court.  In state court, we also would not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes afford.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case before DOAH can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.  As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

73.     The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that are felt personally by me as a member of Sierra Club.  I regularly partake in outdoor activities such as hiking, camping, observing wildlife, stargazing, and nature photography.  Some of the areas that I like to visit include, but are not limited to, Everglades National Park, Big Cypress National Preserve, Fakahatchee

JA.566

Strand Preserve State Park, Florida Panther National Wildlife Refuge, Corkscrew Swamp

Sanctuary, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild

Wildlife Management Area, and several state, county and municipal-owned natural areas

in South Florida.

74.   Sierra Club is and will continue to be irreparably harmed in its ability to

carry out its mission of protecting native and endangered species, their habitats, and

waters if Florida is allowed to continue operating this unlawful 404 program.

**Redressability**

75.   A ruling in Plaintiffs' favor in this litigation would redress Sierra Club's

and my harms.  A ruling on our Clean Water Act claims invalidating EPA's approval of

Florida's program would restore 404 authority over assumable waters to the Corps,

restoring ESA Section 7 and NEPA review to projects (and the essential information and

analyses that those processes generate), and ensuring that all requirements of federal law

are met and can be enforced in federal court.

76.   A ruling in Plaintiffs' favor on our ESA claims would redress Sierra

Club's and my harms by invaliding EPA's approval of the state program; requiring EPA

to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the

effects of Florida's application on listed species and critical habitat; require the wildlife

agencies to produce legally sufficient biological opinions that properly analyze the

impact to listed species and critical habitat, set limits on incidental take, and impose

reasonable and prudent measures and triggers for reinitiation that are protective under the

JA.567

ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

77.     A ruling in Plaintiffs' favor on the Retained Waters List would invalidate EPA's approval of the state program, set aside the Corps' inadequate retained waters list, prevent state 404 permitting on waters required to remain under the Corps' jurisdiction, require EPA to ensure that no non-assumable waters are placed under state 404 authority, and require re-evaluation of the Corps' list to comply with federal law..

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___27___ day of February 2023, at Pembroke Pines, Florida.
.

DocuSigned by:

*Diana Umpierre*

A1CFBA93B2C3410...

Diana Umpierre

JA.568

# Attachment A

9/17/2020
Handing federal wetlands permitting to FL DEP is an idea that's all wet | Florida Phoenix

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 28 of 101
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 154 of 430

# Handing federal wetlands permitting to FL DEP is an idea that's all wet

By **Craig Pittman** · September 17, 2020



*Roseate spoonbills are pictured at the Blackpoint Drive Wildlife Refuge on Merritt Island. Credit Michael Seeley via Wikimedia Commons*

Florida is best known for its gorgeous beaches, but we also have a lot of wetlands. Bogs, swamps, marshes, you name it, we've got 'em — more than any other state besides Alaska.

Some are famous — everyone's heard of the Everglades — but most are just anonymous soggy spots that help recharge our underground aquifer, filter pollution, soak up floodwaters, and provide valuable habitat for a whole lot of species.

Not everyone is a fan, of course. When John James Audubon visited Florida in 1832, he was blown away by the flocks of roseate spoonbills and other wading birds he found, but he couldn't deal with how wet our landscape was.

"The general wildness, the eternal labyrinth of waters and marshes, interlocked and apparently never ending, the whole surrounded by interminable swamps — all these things had a tendency to depress my spirits," he wrote in a letter to his editor.

If the swamp-hating Audubon were around today, he would no doubt be delighted to hear that the job of protecting our wetlands is on the verge of being handed over entirely to the state Department of Environmental Protection.

Right now, under the Clean Water Act, two federal agencies are in charge of preserving wetlands: the U.S. Army Corps of Engineers, which issues permits for dumping fill in them, and the Environmental Protection Agency, which can veto those permits. But now both are considering handing the job of federal wetlands permitting in Florida over to the state DEP, according to a Federal Register notice published on Sept. 4 seeking public comment over the next 45 days.

9/17/2020                    Handing federal wetlands permitting to FL DEP is an idea that's all wet | Florida Phoenix

Case 1:21-cv-00119-RDM    Document 98-10    Filed 02/28/23    Page 29 of 101
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 155 of 430

Florida's developers have been pushing for this handover to the state for a couple of decades. In 2005, a lobbyist for Florida developers said that a state takeover of federal wetlands permitting would be "the Holy Grail."

Why? Because they are convinced the state would grant them super-fast permit approvals, no matter how many acres of wetlands they were going to pave over, and because the state doesn't protect as many different types of wetlands as the feds do.

In 2006, the Florida DEP, which already issues state wetland permits, looked into taking over the federal permitting program, something only two other states had done. State officials quickly dropped the idea for one very simple reason: Florida builders were requesting so many permits already that taking over the feds' workload would overwhelm the agency. The state wouldn't have enough people to issue permits, much less follow up to make sure all the permit conditions were being followed.

### Scott the slasher



That was under then-Gov. Jeb Bush. In 2011, after Rick Scott became governor, he slashed the size of the DEP by more than 600 employees.

Many of those who were ousted had been in place for decades and were considered experts in their fields. He also cut funding for the state's water management districts, which issue some wetland permits.

*Former governor and current Republican U.S. Sen. Rick Scott of Florida. Official Senate portrait; U.S. Senate website.*

Under Bush, a pro-business governor, the DEP spent an average of 45 days considering permits before granting them. That was too slow for Scott, who urged the agency to crank them out faster. In 2014, he stood in front of a room full of DEP employees to praise them for cutting the amount of time to get permits to an average of just two days. That means they were processing those permits with all the care and consideration of a batting cage pitching machine shooting out fast balls.

Scott's administration is the one that began pursuing the Holy Grail of a state takeover of federal wetlands permitting. However, Scott's people insisted they could do it without hiring any new people to accommodate the huge increase in workload.



His staff persuaded the Legislature to pass a bill approving the changeover, and now Gov. Ron DeSantis — who pledged to be more environmentally friendly than Scott — is ready to carry Scott's plan to its fruition.

When I asked DEP press secretary Weesam Khoury if the agency expected the staff to take on this new challenge without hiring any additional workers, she said that the agency "will enhance the protection of Florida's wetlands by having the same statewide team of environmental experts who are already administering Florida's robust wetlands protection program also administer the similar federal ... program."

*Republican Gov. Ron DeSantis of Florida. Photo by Joe Raedle/Getty Images*

(In other words, no.)

When I asked if that would overwhelm the staff, she said, "The state has more than 400 staff" working on environmental permitting, and "DEP is confident that these knowledgeable staff would be able to work together to handle this slight workload increase."

Putting the DEP in charge of the federal permits "would provide a streamlined permitting procedure," she said. Usually, when state officials say some regulatory function is being "streamlined" that means

JA.571

We're going to hand out permits like they're beads being tossed to the crowd from a Gasparilla float.

To Eric Hughes, this seems particularly worrisome for the future of Florida's valuable wetlands. Hughes spent 37 years at the EPA, most of them dealing with wetland permits in Florida, retiring at the end of 2016. Far from a "slight workload increase," he said, the number of federal wetland permit applications per year tends to fall between 1,500 and 2,000 in Florida.

### 'Directly controlled by the governor'

Not only would DEP permit reviewers face an overwhelming boost in their workload, he said, but the state agency is more likely to face serious political interference in its permitting decisions than the Corps or EPA do.

"These people [at DEP] are directly controlled by the governor," Hughes told me.

Lest you think he's exaggerating, let me point you to the case of the Highlands Ranch Mitigation Bank, a Jacksonville-area project that in 2012 got negative reviews from two water district employees who subsequently found themselves unemployed because they didn't give the politically connected owners what they wanted.

Then, when the DEP's top wetlands expert, Connie Bersok, balked at issuing the permit, she wound up being suspended then removed from reviewing that permit. She had refused an order from the deputy secretary of the DEP to bend the rules to cater to the wishes the applicants. A judge later ruled that she was right about everything.

Bersok retired in 2017 after 30 years, so I called her up to ask what she thought about her former co-workers taking over issuing federal wetlands permits. She called it "a terrible plan."

She also said Khoury's claim of having 400 DEP employees working on wetlands permitting sounded, shall we say, "inflated." The only way to get to 400 is to count every single state employee involved in every kind of permitting, including issuing permits for air pollution and other things that have nothing to do with wetlands.

"We've always been shorthanded," she told me.

A lot of DEP's permitting has been handed off to the state's five water management districts and even to some of the counties, she said. According to Hughes, if the DEP does that with federal wetlands permits, that would be even worse for the wetlands than if DEP handled them alone.

Florida's water boards tend to be run by well-connected gubernatorial appointees from the development and agricultural industries. In 2015, the developer who was chairman of the Southwest Florida Water Management District board pushed through approval of a wetlands permit for a friend and former business partner, then insisted he had no conflict of interest.

Last year, the chairman of the St. Johns River Water Management District faced ethics complaints because he tried hiding conflicts of interest involving permits for clients of his environmental consulting business. One of DeSantis' first actions as governor was to demand the resignations of all nine members of the South Florida water board because they kowtowed to Big Sugar.

### More than just the Everglades

I asked Khoury if the DEP plans to dump its new federal permitting duties on the water management districts. Instead of saying "no," she replied, "Any consideration for the delegation of the program to the

water management districts would be considered after the program is implemented."

To me that sounds like, "Yes, but we don't want to say anything about that yet."

The funny thing, Bersok said, is that legally the builders and developers aren't getting what they really want. Even if state employees are the ones reviewing federal wetland permits, those permits would not be subject to state deadlines, she explained.

In other words, if the DEP handled the permits the way it should under the Clean Water Act, then the federal wetland permits would not be issued any faster — unless, of course, the permits are just going to be rubber-stamped, especially those involving a developer with major political connections.

Of course, given who's in charge of the federal government right now, that sort of arrangement would not be a considered a deterrent to the feds handing over permitting to the state.

The bottom line, then, is this: A lot of politicians say they're in favor of saving the Everglades. In Florida, it's become the equivalent of supporting motherhood and apple pie.

It's nice to see that one wetland get so much love. But the other wetlands deserve some love too, especially for those of us who like our water clean, our property flood-free, and our spoonbills abundant — no matter what old Mr. Audubon might say.

---

### Craig Pittman

Craig Pittman is a native Floridian. In 30 years at the Tampa Bay Times, he won numerous state and national awards for his environmental reporting. He is the author of five books, including the New York Times bestseller Oh, Florida! How America's Weirdest State Influences the Rest of the Country, which won a gold medal from the Florida Book Awards. His latest, published in January, is Cat Tale: The Wild, Weird Battle to Save the Florida Panther. The Florida Heritage Book Festival recently named him a Florida Literary Legend. He lives in St. Petersburg with his wife and children.



JA.573

# Attachment B





September 15, 2022                                              *sent via email*

Director Martha Williams
U.S. Fish and Wildlife Service
1849 C. St. NW
Washington DC, 20240

State Supervisor Larry Williams
U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960

Regional Administrator Daniel Blackman
U.S. Environmental Protection Agency
61 Forsyth Street SW
Atlanta, GA 30303

Secretary Shawn Hamilton
Florida Department of Environmental Protection
3900 Commonwealth Blvd. MS 49
Tallahassee, FL 32399

Director Eric Sutton
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399

Re: Bellmar Development Application (Collier County) and Public Notice, #396364-001

Dear Director Williams, State Supervisor Williams, Regional Administrator Blackman, Secretary
Hamilton, and Director Sutton:

On behalf of our respective organizations and our members, the Center for Biological Diversity,
Conservancy of Southwest Florida, and Sierra Club are providing comment on the Bellmar
project proposal that is being sought under the Florida Department of Environmental Protection
(FDEP) state assumed 404 program (application #396364-001). This letter supplements our prior

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 34 of 101

USCA Case #24-5101      Document #2102936           Filed: 06/04/2025      Page 390 of 430
Bellmar 404 Application 3903-0010
Page **2** of **42**

correspondence on both the Bellmar project, as well as our comments provided regarding the Eastern Collier Multiple Species Habitat Conservation Plan (ECMSHCP). Please consider this letter as a request that FDEP hold a public meeting,[1] as well as a request that the US Environmental Protection Agency also hold a public meeting.[2]

We oppose authorization of this project and are asking you to deny the request for a section 404 permit because it will have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources. This controversial project is within a flowway and key wildlife corridor, would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR).

Further, it is apparent that the project will not meet the "no jeopardy" requirement of the Endangered Species Act and the state 404 permitting program, not only due to habitat loss, infringement of wildlife corridors, and indirect impacts on adjacent preserves, but also due to the impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

Not only does Bellmar fail to meet the criteria for permit issuance under rule 62-331 F.A.C. and other requirements of Florida's state assumed 404 program, but it also would be inconsistent with the Endangered Species Act (ESA).

I.    **Bellmar Cannot Be Authorized Absent an Affirmative Demonstration that the Effects of the Authorization, Considered with Regard to Cumulative Effects, Are Not Likely to Jeopardize the Florida Panther**

ESA Section 7 requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."[3] When EPA decided to allow FDEP to take over the 404 permitting, it relied on a programmatic Biological Opinion to purportedly satisfy its duties under ESA Section 7 to ensure against jeopardy.[4] Rather than analyze the impacts to species from EPA's decision, which included the effects of the permitting that would occur under the State 404 Program, that programmatic Biological Opinion relied on a structured process for technical assistance whereby the analysis would occur at the State program permitting stage instead, and would comply with the terms in the programmatic Biological Opinion, deferring the actual analysis of jeopardy. To comply with the programmatic Biological Opinion**,** the agencies must now consider all the indirect, direct, and cumulative effects of Bellmar and other reasonably foreseeable development to ensure the project will not jeopardize listed species, including the Florida panther. As outlined below, because these effects, when added to the environmental baseline, are likely to jeopardize the Florida panther, the agencies cannot authorize Bellmar.

---

[1] 62-331.060, Florida Administrative Code.
[2] 62-331.052, Florida Administrative Code.
[3] 16 U.S.C. § 1536(a)(2).
[4] CSWF, CBD, Sierra Club and others are currently challenging the lawfulness of that approach in court, and in no manner waive the claims, issues, or arguments raised in that litigation.

**A. The agencies must consider the impact of the Bellmar project with the cumulative effects of other reasonably foreseeable development that will be authorized under the State 404 program and will affect ESA-listed species and habitats in the areas affected by the Bellmar project.**

The "no jeopardy" conclusion in the Biological Opinion for EPA's approval of the Florida State 404 program (404 Programmatic BiOp) relies on the "structured process" established pursuant to the Memorandum of Understanding (MOU) between FDEP, the Florida Fish and Wildlife Conservation Commission (FWC), and the U.S. Fish and Wildlife Service (FWS) to avoid jeopardy,[5] which characterizes that structured process as being "as protective" as ESA section 7 consultation.[6] For that to be the case, the jeopardy determination for any given permit would have to consider the effects of the permitted activity cumulatively with other reasonably foreseeable non-federal actions, which here would necessarily include other reasonably foreseeable State 404 permits affecting the same area affected by the permit at issue.

An ESA section 7 analysis of effects would require consideration of cumulative effects. ESA regulations state, "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."[7] "Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."[8] Effects include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action."[9] "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[10]

With regard to how cumulative effects will be considered in making the effects determinations pursuant to the "structured process," the 404 Programmatic BiOp states: "The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[11] The BiOp states that State 404 permit applications must include: "Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably

---

[5] U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act (hereafter "404 Programmatic BiOp"), at 68–69.

[6] 404 Programmatic BiOp at 56.

[7] 50 C.F.R § 402.02.

[8] 50 C.F.R § 402.02.

[9] 50 C.F.R § 402.02.

[10] 50 C.F.R § 402.02.

[11] 404 Programmatic BiOp at 20. *See also id*. at 25 ("The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.").

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 36 of 101

USCA Case #24-5101     Document #2102936          Filed 05/24/2025     Page 36 of 130
Bellmar 404 Application 39364-001
Page **4** of **42**

certain to occur within the project area."[12] It defines "project area" to mean: "a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones," but specifies that, "In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas."[13]

With regard to how jeopardy will be evaluated as part of the "structured process," the 404 Programmatic BiOp states that, "the USFWS's project-specific, species-specific, review of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[14] "Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur."[15]

Reasonably foreseeable activities requiring authorization under the State 404 Program seemingly are non-federal actions, and therefore in making jeopardy determinations for each State 404 Program permit, their effects in the area affected by the permit application at issue must be considered as cumulative effects and added on top of the baseline when considering whether the effects of the permit are likely to cause jeopardy.

The cumulative impacts proposed by this applicant and others, which are pending or otherwise reasonably foreseeable, are extreme. These impacts include, but are not limited to, the 45,000 total acres of mining and development that were pursued under the ECMSHCP for over twelve years.

As of the date of this letter, Rural Lands West (about 4,000 acres), Bellmar (about 1,790 acres), and Hogan West (640 acres)[16]—approximately 6,430 acres of the remaining 39,973 acres unpermitted but previously considered under the ECMSHCP—are now pending before the FDEP state 404 program. Additionally, the Barron Collier Rod and Gun Club, an approximately 895-acre project that proposes impacts within the ECMSHCP development and "preserve" area, including golf courses, shooting ranges, and residential estates within a panther corridor, was recently active with FDEP for verification that no state 404 permit was needed.[17] In their withdrawal letter, the applicants state that they soon intend to apply for the FDEP state 404 permit.

---

[12] 404 Programmatic BiOp at 16.

[13] 404 Programmatic BiOp at vii.

[14] 404 Programmatic BiOp at 66 (discussing cumulative effects of EPA assumption decision).

[15] 404 Programmatic BiOp at 21.

[16] Of Rural Lands West's impact acres, 3100 acres are with Primary Zone panther habitat. All of Bellmar is within the Primary Zone. Of Hogan West's (AKA Brightshore) impact acres, 211 of these acres within Primary Zone. The remainder of these projects are within Secondary Zone panther habitat.

[17] Barron Collier withdrew its request for FDEP's action on May 20, 2022, stating that "we intend to apply for a SFWMD ERP and FDEP 404 permit later in the summer."

Therefore, projects put forth in the ECMSHCP are reasonably foreseeable and thus must be considered by FDEP under the cumulative impacts analysis. It is clear, by advancing the Rural Lands West and Bellmar projects with the U.S. Army Corps of Engineers' 404 program and now the state-assumed 404 program, that the landowners intend to pursue their developments regardless of whether the ECMSHCP is completed. Moreover, since the 404 Programmatic BiOp purports to provide authorization for incidental take to State 404 permittees, it is reasonably foreseeable that the other developments under the Covered Activities will proceed via the State 404 program.

Additional developments, not covered by the now-withdrawn ECMSHCP but located within the same critical panther areas, are also under consideration by FDEP. The Immokalee Road Rural Village is adjacent to Hogan West and the ECMSHCP boundary. The project is 2,780 acres, with 676 acres that are Primary Zone panther habitat and the remainder Secondary Zone panther habitat. It is situated between the 7,000+ acre Bird Rookery Swamp and the Collier County Panther Walk Preserve, as well as the state protected lands of the Corkscrew Regional Ecosystem Watershed (CREW). The wetland ecosystems constitute travel ways for large mammals, and the project site is adjacent to one of the deadliest areas for Florida panthers. The proposed project includes the construction of a rural village on a 2,787-acre site within the Rural Fringe Mixed Use area of Collier County. Per the applicant's 404 permit application, the proposal includes a mixed-use development consisting of residential, commercial uses, and civic/institutional, with associated infrastructure, amenities, and stormwater management system. The applicant proposes to construct over 4,000 residential units: 2,842 single family residential homes and up to 1,200 multi-family residential units.

Eastern Lee County, adjacent to the ECMSHCP boundary, has also experienced extreme development pressure. The projects known as FFD, Troyer Mine, and Kingston (FKA Old Corkscrew Plantation) would directly destroy 2,573 acres of Primary Zone panther habitat, and directly and indirectly impact about 7,400 acres of Adult Breeding Habitat for panthers.[18]

| Project[19] | Homes | Residents | Panther habitat | Primary Zone | Wetland direct |
|---|---|---|---|---|---|
| Rural Lands West | 5,100 | 10,496 | 4,000 ac | 3,100 ac | 311 ac |
| Bellmar | 4,132 | 8,683 | 1,790 ac | 1,790 ac | 135 ac |
| Collier Rod and Gun Club | 225 | 583 | 895 ac | 895 ac | TBD |
| Hogan West | 2,000 | 4,893 | 640 ac | 211 ac | 21 ac |
| Immokalee Road Rural Village | 4,042 | 9,874 | 2,780 | 676 ac | 244 ac |
| Troyer Mine | 0 | 0 | 907 ac | 841 ac | 214 ac |
| Kingston | 10,000 | 25,800 | 6,676 ac | 1,177 ac | 12 ac |
| FFD | 5,208 | 13,436 | 2,596 ac | 555 ac | 79 ac |
| **Totals** | **30,707** | **73,7652** | **20,284 ac** | **9,245 ac** | **1,016 ac** |

---

[18] Conservancy of Southwest Florida, August 2, 2022. Letter to FDEP, FWC, and USFWS regarding Troyer Mine state 404 permit, citing modeling analysis by Dr. Robert Frakes.

[19] Selection of state 404 applications. Estimates based on best available information at time of drafting this letter.



Additionally, Florida Power and Light Beautyberry Solar Energy Center is a proposed approximately 2,200-acre project located in Primary Zone panther habitat in Hendry County.[20] A proposed widening of State Road 82 would widen SR 82 for 23 miles to expand the road from two lanes to four lanes (and ultimately, to six lanes) through Lee, Hendry and Collier Counties. The segment between the Collier County line and Gator Slough is under review by FDEP for a proposed state 404 permit. The continuous flow intersection at the center of the first of seven parts of this project is expected to average about 2,700 cars per hour, more than a conventional intersection can handle. The road runs north of and adjacent to important public lands and panther habitat such as the Wild Turkey Preserve, Corkscrew Mitigation Bank, and Pepper Ranch Preserve.[21] Daniel's Parkway South is a proposed mixed-use development in the DR/GR area of Lee County requesting 1,600 residences and 350,000 sq ft of commercial development on 1,233 acres. Of those 1,233 acres, 944.5 acres are primary panther habitat. There is also a proposal to widen 18 miles of SR 29 from Collier County to Hendry County from the existing two lanes to four lanes. Traffic volumes on SR 29 are projected to increase from 6,200 vehicles per day to 23,800 vehicles per day by the year 2035. The road widening project is adjacent to or

---

[20] FDEP Oculus file for application #419224-002.

[21] WFTX Digital Team, New Continuous Flow Intersection now open in Lehigh Acres (Jul. 9, 2019 6:37 AM), https://www.fox4now.com/news/local-news/continuous-flow-intersection-now-open-in-lee-county; Florida Department of Transportation, State Road (SR) 82 from Hendry County Line to Gator Slough Lane, Collier County Resurface/Add Lanes Financial Project No. 430848-1-51-01(last visited Jul. 15, 2021), http://www.swflroads.com/sr82/hendrytogatorslough/; No. 9 - S.R. 82 From Lee Boulevard to 40th Street, Roads & Bridges (last visited July 15, 2021), https://www.roadsbridges.com/no-9-sr-82-lee-boulevard-40th-street; FDOT, Project description, Project ID 425841-3, http://www.sr82design1.com/ (last visited Jul. 15, 2021).

near major public lands and habitat.[22] Additionally, a proposed widening of Snake Road in Hendry County would involve approximately eight miles that cross an important wildlife corridor connecting the Big Cypress National Preserve to public and private lands in southeast Hendry County and the southwest corner of Palm Beach County.[23]

Notably, lands within the action area of the Bellmar project have already been eaten away by development over recent years, particularly in eastern Lee County. Though we highlight just a handful of projects here, the habitat losses have been substantial. Wildblue Residential Development (2015), Corkscrew Crossing (2018), The Place (FKA Corkscrew Farms) (2016), Verdana Village (2020), and Hyde Park (2020), have resulted in 11,600 acres of panther habitat loss.[24] The agencies must consider the impacts of the current proposal and reasonably foreseeable development combined with the impacts of these developments.



---

[22] Florida Department of Transportation, SR 29 - SR 82 to County Line (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sr82tocountyline/; FDOT, SR 29 from North of New Market Road North to SR 82 (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/newmarkettosr82/; FDOT, SR 29 from CR 846 E to North of New Market Road N (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/cr846tonewmarket/; FDOT, SR 29 Design from South of Agriculture Way to CR 846 E (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/agriculturetocr846/; FDOT, SR 29 from Sunniland Nursery Road to South of Agriculture Way (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sunnilandnurserytoagriculture/; Tony Sherrard (FDOT), S.R. 29 PD&E Study From North of S.R. 82 to South of C.R. 80A (last visited Jul. 15, 2021), http://swflroads.com/sr29/northof82/Images/Hearing%20Handout.pdf
[23]Tara Backhouse, Snake Road Construction!, Seminole Tribe of Florida Ah-Tah-Thi-Ki Museum Blog (Feb. 6, 2011), https://ahtahthiki.wordpress.com/2011/02/16/snake-road-construction/.
[24] Date of US Fish and Wildlife Service Biological Opinion for each project provided.

**B. The agencies must address FWS's prior analysis showing that the combined effects of the Bellmar project and other planned development in eastern collier county will cause jeopardy to the Florida panther.**

FWS has previously made draft determinations indicating that the effects of authorizing the Bellmar project in combination with other development in Eastern Collier County, and other reasonably foreseeable impacts, will jeopardize the Florida panther. The Bellmar project was one of multiple proposed developments from the Eastern Collier Property Owners ("ECPO") seeking an ESA section 10 Incidental Take Permit ("ITP") in reliance on their proposed Eastern Collier Multi-Species Habitat Conservation Plan ("ECPO HCP"). According to a recent statement by FWS:

> The first full draft of the HCP was received on April 22, 2015. Modifications to the original HCP were received by the Service on October 14, 2017, April 6, 2018, April 23, 2018, August 22, 2018, March 8, 2019, March 25, 2019, and September 17, 2019 (HCP Addendum). Also, a modification to the original ITP application was received on September 9, 2019.[25]

According to FWS, the ECPO applicants submitted a letter to FWS to withdraw their ITP applications on July 28, 2022.[26] While the letter indicates the ECPO applicants wish to withdraw their ITP application, it confirms that the applicants will "move forward case-by-case on [their] individual projects" within the HCP area through "project-specific reviews," with some already in that process and others "fast approaching."[27] While not explicitly stated in the letter, the project-specific reviews the ECPO applicants are referring to apparently are state-assumed Clean Water Act Section 404 permitting and associated reviews through the technical assistance process, not ESA section 7 consultations. Following the ECPO applicants' withdrawal, FWS stated that, "[a]t the time of withdrawal, the Service had not made a final determination regarding jeopardy or non-jeopardy for any of the covered species."[28] Nonetheless, FWS's analyses in publicly available draft Biological Opinions for the proposed ITPs under the proposed ECPO HCP indicate that the combined effect of the proposed ECPO developments would cause jeopardy to the Florida panther. FWS has publicly released two draft Biological Opinions dated from December 2020 and December 2021, respectively.[29] The December 2020 draft BiOp indicates that it is based on an iteration of the HCP from January 28, 2020, whereas the December 2021 draft BiOp indicates that it is based on that version of the HCP "plus subsequent addenda."[30]

---

[25] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[26] *See id. See also* Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, *available at* https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.
[27] *Id.* at 2–3.
[28] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[29] It is our understanding that there is a 2022 draft of the BiOp, but we do not currently have public access to a copy.
[30] *Compare* Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record] *to* Biological Opinion and Conference Opinion

A February 24, 2021 letter from the ECPO ITP applicants to FWS regarding the December 2020 draft Biological Opinion ("BiOp") makes clear their understanding that the draft BiOp concluded that absent additional commitments from the ITP applicants to "fund public roadway improvement projects (wildlife crossings and fencing) and 'capture' traffic within future community developments," the additional panther mortality from vehicle collisions due to increased traffic induced by the proposed developments "would cause jeopardy."[31]

Indeed, the December 2020 draft HCP BiOp makes clear that, even taking into account the proposed mitigation measures under the draft ECPO HCP, the proposed ECPO developments would result in a statistically significant increase in the risk of extinction for the Florida panther, with a net loss of 12 panthers per year at full build-out.[32] The December 2020 draft HCP BiOp found that the risk of extinction with the HCP increased to 5.7%, compared to an extinction risk of approximately 1.1% or 1.38% without it.[33] The December 2020 draft HCP BiOp then explained that to sufficiently reduce the increased risk of extinction so that it was no longer a statistically significant increase, additional mitigation measures and/or changes to the proposed developments to increase internal capture rates for traffic or otherwise reduce impacts would be required.[34] The 2020 draft HCP BiOp stated:

> If the Applicants are able to achieve a greater than 50 percent community (internal) capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. [confidence interval] of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[35]

The next paragraph in the December 2020 draft HCP BiOp indicates that a "no jeopardy" conclusion is contingent on finding that a "further net reduction of effects to *fewer than* 10 panthers per year at full build-out" will "be accomplished through the maintenance of high community (internal) trip capture, adaptive management, and the mitigative effects of actions

---

Eastern Collier Multi-Species Habitat Conservation Plan (filename DRAFT-USFWS-ECPO-full-Biological-Opinion-December-2021.pdf) (hereafter "2021 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record].

[31] "ECPO's High-Level Comments on Draft BO" at 12, transmitted to Robert Tawes Chief, Environmental Review Division, U.S. Fish and Wildlife Service, Southeast Region by Bruce Johnson, Principal, Senior Scientist , Stantec Consulting Services, as attachment to letter dated February 24, 2021. (Obtained from FWS via FOIA) [submitted with these comments for inclusion in the administrative record]; *see also* Email from Leopoldo Miranda, Regional Director, FWS, to Jack Arnold, Acting Assistant Regional Director, FWS, regarding a Revised ECPO Information Memorandum (June 5, 2019) (quoting a draft information memorandum stating, "We have also begun frank discussions with ECPO, most recently May 10 and 14, based on the Service's preliminary, internal analyses of traffic volume effects on the continued survival or recovery of the Florida panther.") [submitted with these comments for inclusion in the administrative record].

[32] Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 158–159.

[33] *Id.* at 158–159.

[34] *See id.* at 159.

[35] *Id.* at 159.

facilitated by the Marinelli Fund."[36] In short, the December 2020 draft HCP BiOp shows that the combined impacts of the proposed ECPO developments would cause jeopardy to the Florida panther absent additional changes to the design or additional mitigation measures to reduce the anticipated number of annual panther losses caused by implementing the proposed covered activities.

The December 2021 draft HCP BiOp similarly states:

> [O]ur PVA [population viability analysis] predicts the implementation of the HCP, in the absence of further actions to reduce the impact of the action to the panthers, could reduce the abundance of panthers across their range such that the probability of extinction is predicted to increase from 1 percent (95 percent C.I. 0.2 to 1.8 percent) to 5.7 percent (95 Percent C.I. 2.2 to 9.2 percent). When cumulative effects are added to the effects of the HCP the probability of extinction further increases to 6.6 percent (95 percent C.I. 2.3 to 10.9 percent). The probability of extinction after implementation of the HCP is statistically significantly different than baseline conditions. If the Applicants are able to achieve a greater than 50 percent community (internal) traffic capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[37]

Notably, whereas the draft HCP BiOps both state that additional panther losses must be limited to "no more than 10" per year over present levels, other portions of the draft HCP BiOps indicate that the number actually must be *fewer than* 10 over present levels to avoid a statistically significant increase in extinction risk.[38]

Just like the 2020 draft HCP BiOp, the modeling in the 2021 draft HCP BiOp finds that, even with 8 wildlife crossings *and* assuming a 50% internal capture rate for traffic, implementation of the HCP will cause a total of 12 additional panther deaths per year, 8 from vehicle collisions resulting from increased traffic induced by the HCP developments, and 4 from habitat loss and

---

[36] 2020 draft HCP BiOp at 159 (emphasis added).

[37] 2021 draft HCP BiOp at 148.

[38] *See* 2020 draft HCP BiOp at 146 ("Internal population viability analysis contingency modelling, and statistical comparison of possible thresholds found that the probability of extinction 100 years after ITP expiration of BSLR, BSLR + HCP, and BSLR + HCP + CE scenarios do not differ significantly (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are taken annually, above present.") (emphasis added); 2021 draft HCP BiOp at 133–134 ("Our analysis of these PVAs found that though there was still a difference in final abundances, the probability of extinction 100 years after ITP expiration does not differ significantly from Baseline + Sea Level Rise (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are lost annually, above present, from any cause (*e.g.,* habitat loss, roadway mortality, etc.).") (emphasis added).

degradation.[39] And both the 2020 and 2021 BiOps find that the cumulative effects of traffic induced by other non-HCP, non-federally authorized actions will cause an additional 2 panther deaths per year, even after accounting for the mitigation provided by 8 wildlife crossings.[40] In sum, both versions conclude that the additional panther deaths associated with implementation of the HCP will be 12 per year, and that such panther losses must be limited to fewer than 10 per year to avoid a statistically significant increase in the risk of extinction (i.e. jeopardy). Both versions indicate that additional changes to the proposed HCP, such as commitments to achieve internal capture of traffic greater than 50% and/or additional commitments for mitigation, would be necessary to conclude that the panther losses will be reduced to 10 or fewer.

Based on the available records, there appears to be no indication that the HCP applicants further modified their project designs or mitigation commitments to achieve the necessary reductions in the number of additional panther losses per year.[41] Consequently, the Service's draft analyses appear to indicate that, absent additional changes to the project designs to increase internal capture above 50% or commitments for additional avoidance or mitigation of impacts, the combined impacts of the Bellmar project and the other projects formerly part of the proposed HCP, will result in total panther losses that are likely to cause jeopardy to the Florida panther.

This result is especially concerning because the 2020 and 2021 draft HCP BiOps reflect multiple assumptions that result in underestimating the risk of extinction, as detailed below in section **I.C.**

### C. The 2020 and 2021 draft HCP BiOps underestimate the risk of extinction for Florida Panthers and the impacts of the HCP Covered Activities, which include the Bellmar project, on that risk.

Although FWS's analyses in the 2020 and 2021 draft HCP BiOps raise legitimate concerns that the cumulative effects of the Bellmar project and other proposed projects will jeopardize the Florida panther, even these analyses underestimate the harm to the species and the extent of projected jeopardy by relying on unsupported assumptions. To accurately and lawfully consider the direct, indirect, and cumulative effects of Bellmar on the panther and other listed species, the agencies must first address these problematic assumptions.

---

[39] *See* 2020 draft HCP BiOp at 153, lines 5444-5447; 2021 draft HCP BiOp at 142, lines 5055-5057.

[40] *See* 2020 draft HCP BiOp at 153; 2021 draft HCP BiOp at 142.

[41] In contrast to the Florida panther opinion section from the 2020 draft HCP BiOp, the 2021 draft HCP BiOp omits a paragraph indicating that a no jeopardy conclusion hinged on additional changes such as assuring greater internal capture of traffic or committing to additional impact reductions or mitigation. In its place is a paragraph indicating that instead of actually specifying the changes to the HCP necessary to ensure greater internal capture rates above 50%, or to ensure commitments to undertake specific additional avoidance or mitigation measures, the Service may have intended to rely on "adaptive management measures" added to the conditions in yet unidentified permit terms to somehow provide an avenue for additional impact reduction post-permit issuance. *Compare* 2021 draft HCP BiOp at 148 *to* 2020 draft HCP BiOp at 159. Notably, in ESA contexts, courts have found that the Service unlawfully relied on "adaptive management" in lieu of specific measures or specific criteria to ensure satisfaction of ESA standards. *See, e.g.*, *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1025–28 (9th Cir. 2011) (reliance on "adaptive management" to justify delisting grizzlies in the face of substantial uncertainty about extent of impacts on population from harmful factor was unlawful given lack of specific criteria to address that factor).

1.  **In estimating extinction risk resulting from implementation of the HCP, the draft HCP BiOps assume that the developments under the HCP's Covered Activities will result in 50% internal capture, despite evidence indicating actual internal capture rates as low as 2% for proposed projects.**

In estimating the impacts to panthers from increased traffic that would be induced by implementation of the HCP, the modeling in both the 2020 and 2021 draft HCP BiOps *assumes* that the developments under the Covered Activities will have a 50% internal capture rate. That assumption was based on the assertion that "future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria" which FWS asserted "approaches 50 percent."[42] Despite adopting that assumption in the modeling, the 2020 draft HCP BiOp conceded that:

> [R]ecent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned *will achieve an internal capture rate of 2 percent* as indicated by the Applicants' planning documents. If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development proposed in the HCP, and thus the total impact the proposed developments may have on panthers. If the Applicants build communities with a lower internal capture rate, but still use the $12.5 million to construct crossings (*e.g.,* 8 crossings are constructed), we would nonetheless expect higher panther mortality due to greater traffic on existing roads (Tables 13a and 13b in Appendix I).[43]

In other words, the 2020 draft HCP BiOp conceded that, even if 8 wildlife crossings were built, its model would underestimate the actual impacts to panthers if the proposed developments under the HCP's Covered Activities did not actually achieve 50% internal capture. When paired with the reality that at least some of those proposed developments would apparently achieve a mere 2% internal capture rate, FWS clearly underestimated projected impacts for the panther. The 2021 draft BiOp similarly states:

> One of the more important assumptions made when the traffic model was produced was that future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria, which approaches 50 percent. *However, recent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned will achieve an internal capture rate of 2 percent as indicated by the Applicants' planning documents.* If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development

---

[42] 2020 draft HCP BiOp at 129; *see also* 2021 draft BiOp at 42 ("Specifically, we assumed such metrics as future housing density, number of people per dwelling, employment, and daily vehicle trips per household would be similar to what is currently exists in the Town of Ave Maria.").
[43] 2020 draft HCP BiOp at 129–130 (emphasis added).

proposed in the HCP, and thus the total impact the proposed developments may have on panthers.[44]

And the 2021 draft HCP BiOp further states:

> [I]t is possible future developments will have a lesser internal traffic capture rate, higher dwelling unit density, and higher number of residents per dwelling unit than the Town of Ave Maria, which was a template for future development proposed in the HCP when we estimated how much traffic would likely be generated on existing roadways. If this were to occur, we would expect to see greater traffic volume and effects to panthers than we have estimated in this BO.[45]

Nonetheless, neither BiOp indicated that FWS intended to provide any binding requirement that would actually ensure internal capture of at least 50%. Nor does either BiOp assert that the HCP itself provides plan components that would result in at least 50% internal capture. Instead, maintaining at least 50% internal capture is merely suggested as a conservation *recommendation*.[46] Thus, the BiOp's estimates that implementation of the HCP would result in 12 panther deaths per year, with 8 of those deaths resulting from increased traffic, are based on an assumption about internal capture that was not supported by actual internal capture rates, nor assured by any binding requirement, nor incorporated as a fixed feature of the proposed action.[47] And the PVA modeling used to reach conclusions about extinction risk from implementation of the HCP were based on the similarly assumed 12 panther deaths per year from the HCP, with 8 from increased traffic, based on the internal capture rate of 50% and 8 crossings.

Importantly, both of the draft HCP BiOps do contain analyses showing how lower internal capture rates increase the number of panther fatalities per year that would result from the HCP

---

[44] 2021 draft HCP BiOp Appendix H (Analysis of Panther Motor Vehicle Mortality) at 7 (emphasis added).

[45] 2021 draft HCP BiOp at 136.

[46] *See* 2021 draft HCP BiOp at 310 (suggesting maintaining internal capture of at least 50% as a conservation recommendation); 2020 draft HCP BiOp at 320 (same); 2020 draft HCP BiOp at 130 ("…the HCP *does not identify explicit targets for internal trip capture*, a maximum number of crossings, where they will be located, or what measures they are likely to take to maximize their effectiveness. Thus, our analysis remains confined to the assumption of 50% internal trip capture in newly constructed communities and the construction of a minimum of 8 wildlife crossings.") (emphasis added).

[47] Consequently, reliance on that assumption of 50% internal capture to reach a no jeopardy conclusion would violate the ESA because achievement of that rate was not reasonably certain to occur based on the record before FWS, and apparently was not assured by any binding requirement or component of the plan. *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008) (requiring measures relied on to reach no jeopardy conclusion be set forth in specific and binding plans). The ESA's express requirement to "insure" that agency actions are not likely to cause jeopardy, 16 U.S.C. § 1536(a)(2), plainly requires that the Services cannot reach a no jeopardy conclusion that relies on mitigation offsetting harm unless there is reasonable certainty that the mitigation will actually render jeopardy unlikely. As the Supreme Court has recognized in construing section 7(a)(2), "To 'insure' something…means '[t]o make certain, to secure, to guarantee (some thing, event, etc.).'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (quoting appellate court, in turn quoting Oxford English Dictionary 1059 (2d ed.1989)). The plain text of the Act therefore requires that the Service cannot issue a no jeopardy conclusion unless the action agency has indeed made it certain, secured, or guaranteed that mitigation relied upon to avoid jeopardy will actually occur.

developments at a given number of wildlife crossings.[48] That analysis indicates, for example, that assuming 8 wildlife crossings added by the HCP, an internal capture rate of 30% would add approximately three more panther deaths per year than an internal capture rate of 50%.[49] That analysis also shows how the total number of panther fatalities from the HCP and cumulative effects would change with lower internal capture rates.[50]

However, the BiOps do not include any modeling to estimate the extinction risk from the HCP associated with internal capture rates under 50%. This is critical where, to the extent the applicants are working to increase the internal capture rate by merging Bellmar into the larger Rural Lands West project, there is no data to suggest it would reach the 50% threshold set forth in the draft HCP BiOps.

Consequently, in evaluating whether the Bellmar project, considered with the cumulative effects of other reasonably foreseeable state and private actions (such as the other former HCP projects and the cumulative effects in the draft HCP BiOps), will likely cause jeopardy to the Florida panther, the agencies must consider what the actual internal capture rates of the projects will be, and how those capture rates will affect the total additional panther mortalities that will foreseeably result from the developments.

## 2. The draft HCP BiOps underestimate the impacts on panthers by underestimating the amount of traffic induced by the developments covered under the draft HCP.

In the 2021 draft HCP BiOp Appendix B.1 "Description of the Traffic Model," the Service attempts to estimate a density for proposed development to estimate a likely population in the eastern Collier area. The Service estimates that the Town of Ave Maria is 1.4 units per acre and uses that as the basis to assume "a comparable residential unit density on the remaining 39,973 acres proposed for development."[51] The resulting population estimate is approximately 152,000 people. However, the Bellmar project, and the other locally approved projects, have an average density of 2.6 development units per acre and an average of 2.5 people per household.[52] With a

---

[48] *See* 2020 draft HCP BiOp Appendix I at Table 2a [2020 draft HCP BiOp Appendices submitted with these comments for inclusion in the administrative record]; 2021 draft HCP BiOp Appendix H at Table AH2a [2021 draft HCP BiOp submitted with these comments for inclusion in the administrative record].
[49] *See* 2020 draft HCP BiOp Appendix I at Table 2a; 2021 draft HCP BiOp Appendix H at Table AH2a.
[50] *See* 2020 draft HCP BiOp Appendix I at Table 13b; 2021 draft HCP BiOp Appendix H at Table AH2b.
[51] 2021 draft BiOp at Appendix B.1.
[52] Average density for the components of Rural Lands West is 2.6 development units per acre (per Approved Town Agreement between Collier County Board of County Commissioners and Collier Land Holding, LLC/CDC Land Investments, LLC, dated June 8, 2021. And respective Village approvals, Collier County Resolution 2021-119, Collier County Resolution 2020-24). Density for Bellmar Village (a portion of state 404 footprint) is 2.75 development units per acre (per Collier County Resolution 2021-120). Other projects such as Hogan West (AKA Brightshore Village) have a projected density of 2.9 development units per acre (per Brightshore Village SRA Development Document for Collier County SRA Application, June 29, 2022). Of the seven Stewardship Receiving Areas (SRA) approved and pending in eastern Collier County, the average density is 2.6 development units per acre. The average persons per household in Collier County is 2.54 based on Census information accessed at https://www.census.gov/quickfacts/fact/table/colliercountyflorida,US/HCN010217.

more realistic density, the projected estimate for the 'new' population within the 45,000 acres of the eastern Collier area would be closer to 300,000+ people.[53]

This underestimation of human population -and the number of cars on roadways- within Bellmar and other reasonably foreseeable development can also be found when looking at the Economic Assessments provided to Collier County. The assessments for Rural Lands Wests, Bellmar, Hogan West, and others have averaged around 6.7 people per acre, which again estimates the population for the eastern Collier developments at around 300,000 people.[54]

> ### 3. The draft 2021 HCP BiOp underestimates cumulative effects by failing to update the analysis in light of Florida's assumption of Clean Water Act 404 permitting.

Both the 2020 and 2021 draft HCP BiOps use the same assumptions about future non-HCP, non-federal actions in their modeling of cumulative effects. Both draft HCP BiOps assume that 25.3% of future, non-HCP developments will occur without a federal permitting nexus to trigger federal action, and therefore warrant inclusion in the assessment of cumulative effects as defined per 50 C.F.R § 402.02.[55] Both draft HCP BiOps only consider the traffic impacts of that 25.3% of future development in modeling the cumulative effects, and the increased extinction risk resulting from the HCP plus cumulative effects. Yet by December 2021, Florida DEP had assumed Clean Water Act Section 404 permitting pursuant to EPA's decision on the State 404 Program, a decision that drastically altered whether future projects would require a federally issued permit to fill wetlands. Though 404 permits for wetlands fills now frequently will be issued by the state rather than the U.S. Army Corps of Engineers, the 2021 draft HCP BiOp does not appear to engage in any re-evaluation of whether it is still true that only 25.3% of future, non-HCP developments will entail no federal action subject to ESA section 7 consultation. Consequently, it is plain that the analysis in the BiOps fails to address the reality that a much larger proportion of non-HCP traffic induced in the action area will be from future projects that will not be subject to ESA section 7 consultation due to the State 404 permitting scheme, and therefore should have been evaluated as sources of cumulative effects.

As the Service recognizes in the draft 2021 HCP BiOp documents, a jeopardy determination must be based on whether the action, either individually *or taken together with cumulative effects*, will appreciably diminish the likelihood of survival or recovery for the species.[56] By

---

[53] Any mining within the eastern Collier HCP area is likely to become lake-front development once mining uses are complete. The estimate of over 300,000 people does not include the addition of one home per five-acre ranchettes.

[54] Based on information provided in DPFG Town of Big Cypress Economic SRA Assessment, Revised June 28, 2022, p. 42; DPFG Bellmar Village SRA Economic Assessment, Revised January 8, 2021, p. 36; DPFG Longwater Village SRA Economic Assessment, Revised January 8, 2021; DPFG Rivergrass Village SRA Economic Assessment, Revised September 3, 2019, p. 38. DPFG Brightshore Village (AKA Hogan West) SRA Economic Assessment, Revised August 26, 2022, p. 31; DPFG Hyde Park Village (aka Skysail) Economic Assessment, Revised November 13, 2019, p. 35.

[55] *Compare* 2021 draft HCP BiOp Appendix H at 5–6; 2021 draft HCP BiOp Appendix J at 1, 2-3 *to* 2020 draft HCP BiOp Appendix H at 4 of 8; 2020 draft HCP BiOp Appendix J at 1.

[56] *See* 2021 draft HCP BiOp Appendix L at 10 ("Under section 7 of the ESA, we compare the future with the project scenario ($B_{SLR}$ + HCP) to the Baseline condition ($B_{SLR}$) to help us determine whether the effects of the action are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. In addition, under section 7 of the ESA, we consider the cumulative effects, and compare the future with the project

failing to evaluate the impacts of all of the reasonably foreseeable non-HCP future development
that will not entail federal action subject to ESA consultation requirements, the draft HCP BiOps
underestimate the increased risk of extinction that will result from the HCP projects and other
reasonably foreseeable non-HCP development in the action area.

### 4. The 2021 draft HCP BiOp's PVA modeling underestimates baseline risk of extinction because it assumes artificial introgressions to maintain genetic health will be conducted, even though there are no plans to conduct those introgressions.

The 2021 draft HCP BiOp makes clear that a key assumption of the PVA modeling it used to
estimate the risk of extinction is that: "The Service will maintain the genetic health of the
population through translocation when necessary, and in a manner consistent with the
recommendations of van de Kerk et al. (2019)."[57] The Service explains that:

> If recommendations of introducing 5-10 individuals from other Puma populations
> every 20-40 years aren't adopted, van de Kerk et al (2019) predicted probability
> of quasi-extinction would increase to 13 percent (0–99) at 100 years and 23
> percent (0–100) at 200 years (Minimum Population Count Scenario) or to 10
> percent (0–99) at 100 years and 12 percent (0–99) at 200 years (Motor Vehicle
> Mortality Scenario). If the van de Kerk et al. (2019) recommendations aren't
> adopted, it would mean our estimates of extinction probability and abundance
> would change similarly.[58]

Although the risk modeling in the BiOp is therefore based on the assumption that the Service
will undertake those actions to supplement the panther population, the draft 2021 HCP BiOp
concedes that the Service in fact has no actual plans to conduct those actions; the draft 2021
HCP BiOp states, "It is not known if efforts to translocate panthers or apply some other measure
to increase genetic variability in the panther population may occur in the future."[59]
Consequently, it is arbitrary and capricious for the Service to base its analyses of extinction
risks, and jeopardy, on the assumption that these actions will take place when the Service
concedes that it is in fact unknown whether those actions will occur or not. There is no
indication that the Service even attempted to evaluate how changing that assumption would alter
its analysis of total extinction risk with the HCP, or the total extinction risk with the HCP and
cumulative effects. So while the 2021 draft HCP BiOp does acknowledge that the baseline
extinction risk would be substantially higher absent these management activities to supplement
the population, it fails to evaluate the compounding effect of the HCP and cumulative impacts
against a baseline scenario of substantially increased risk. When considering the direct, indirect,

---

and cumulative effects scenario ($B_{SLR}$+HCP+CE) to the Baseline condition ($B_{SLR}$) to help us determine whether the
effects of the action along with other actions that are reasonably certain to occur in the future without consultation
with the Service are likely to result in an appreciable decrease or increase in the probability of survival and recovery
over time. We consider both of these comparisons when we make our jeopardy determination.").

[57] 2021 draft HCP BiOp Appendix L at 1.
[58] 2021 draft HCP BiOp Appendix L at 12.
[59] 2021 draft HCP BiOp at 141.

and cumulative effects of the Bellmar project, the agencies must correct this unsupported assumption.

### 5. The draft HCP BiOps conceal the true risk of extinction by using speculation about carrying capacity to mask the impacts of habitat loss from sea level rise.

The PVA modeling results in both draft HCP BiOps conceal the true baseline risk of extinction by averaging together the results from model runs based on three different assumptions about whether the population is currently at carrying capacity for the remaining habitat. Although past PVAs assumed that the population reflected either 100% of the carrying capacity of the existing habitat, or 80% of the carrying capacity, the draft HCP BiOps, with little explanation or justification, also assume that the current population may reflect only 60% of the carrying capacity of the existing habitat.[60]

First, the assumption that the current population reflects only 60% of the carrying capacity of the panther's remaining habitat appears to be based on speculation rather than the best available scientific information. The 2021 draft BiOp states:

> The present Florida panther population is at or near average annual carrying capacity ($K$) of habitat south of the Caloosahatchee River. However, *it is possible* future habitat management may increase carrying capacity to range-wide effect. It is also *possible* present assumptions about maximum attainable panther densities are wrong. Thus, we assume the true $K$ could actually be up to 40 percent higher than the present population size.[61]

This makes plain that FWS has based its analysis on mere "possibility" and conjecture rather than on what conditions are likely based on the best available scientific information, in violation of ESA requirements. It is also plainly irrational, as FWS elsewhere concedes, that "the true carrying capacity is unknown but *Service and FWC biologists infer the population may be at or near carrying capacity ($K$)*" but then proceeds to state that it nonetheless "assumed it is possible $N_0$ (the current population size) represents 100 percent, 80 percent, and 60 percent of carrying capacity."[62] There is no explanation of how 60% of carrying capacity is somehow rationally consistent with evidence suggesting the population is "at or near" 100% of carrying capacity. Most people would not consider a glass that is 60% full to be "at or near" being 100% full. This assertion is especially egregious given that the Service's peer reviewer pointed out that the studies cited by FWS regarding population trends could not be relied on to rule out that the population may already be either stable or in decline, rather than growing.[63] Moreover, the most

---

[60] *See* 2021 draft HCP BiOp Appendix L at 4 (Table AL1 n.2) ("Our past PVA only utilized $N_0 = K_0$ and $N_0 = 80$ percent of $K_0$. Our current PVA incorporates scenarios where $N_0$ may equal 60, 80, and 100 percent of $K_0$.").

[61] 2021 draft HCP BiOp Appendix L at 2 (emphasis added).

[62] 2021 draft HCP BiOp Appendix L at 7 (emphasis added).

[63] *See* 2021 draft HCP BiOp Appendix M at 3 of 166 ("In the report Dr. Martin noted that recent efforts to estimate the Florida panther population over time contained a great deal of uncertainty. Particularly, he noted that though the central tendency of these estimates indicates a growing population, the confidence intervals surrounding these estimates were so wide that the possibility of an unchanging population or population in decline couldn't be rejected. Dr. Martin also indicated concern that were the panther population to be declining, rather than growing, future catastrophes, such as disease outbreaks of more serious diseases than seen to date, could have a greater affect [sic] on population viability than had been estimated in previous PVAs. Based on Dr. Martin's advice, the Service

recent population estimates indicate that the population is no longer increasing. As the 2020 SSA acknowledges, the most recent population trend data indicate the population did not grow between 2016 and 2018, and began to decline from 2017 to 2018.[64]

Second, rather than separately presenting the results of models based on the assumption of the population being at 100%, 80%, and 60% of the carrying capacity of the habitat, the draft HCP BiOps only present the results showing the *averaging* of model runs reflecting these three very different carrying capacity assumptions. Thus, the draft HCP BiOps conceal the extinction risk associated with the impacts of habitat loss given the more realistic assumption that the population is already at 100% of carrying capacity. Notably, in the BiOp's PVA analysis, FWS models sea level rise by 2070 as resulting in an 18% habitat loss for the Florida panther.[65] Yet its model shows little impact on the projected future population from that enormous amount of habitat loss, and indeed, shows the same result as a prior model *that totally failed to address the impacts of sea level rise (SLR)-related habitat loss at all*.[66] Without ever contemplating whether that might indicate that there is something wrong with the BiOp's modeling of SLR impacts, FWS instead asserts that "SLR as we modeled it here does not influence probability of extinction as much as small population size and genetic variation might."[67] FWS totally fails to consider that the reason that there is little impact from this enormous amount of habitat loss is because the assumption that the current population is only at 60% of carrying capacity would mean that the population could still *grow* by about 20% even with a 20% habitat loss. And the assumption that the current population is at 80% of carrying capacity similarly would mean that the population can stay the same, even with a 20% habitat loss. Averaging these results together with the scenario where the population is already at 100% of carrying capacity, and therefore would likely drop by about 20% in response to a 20% habitat loss would unsurprisingly mask the substantial population drop under the K = 100% scenario by averaging it out against the increase under the K= 60% scenario. Indeed, it is almost as if the modeling, and the otherwise arbitrary choice of the K=60% scenario was selected specifically to ensure this result, and mask the impacts of SLR on the baseline extinction risk.

Notably, the 2020 draft HCP BiOp acknowledges that the choice of carrying capacity explained a substantial portion of the variance in the projected abundances, but otherwise fails to examine how the treatment of carrying capacity in the modeling irrationally and unreasonably masked the impacts of SLR.[68] This error taints both the representations about the baseline extinction risk, and the impact of the HCP and cumulative effects in compounding the baseline extinction risk, with the upshot being that the analysis in the HCP BiOps underestimates the extinction risk

---

amended portions of the Biological Opinion that treated 'rapid growth of the panther population' as fact to reflect this was but one possibility for the true population trend but that others, like population decline, could also be true.").

[64] *See* U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at 88, 90, Figure 6.8.

[65] 2021 draft HCP BiOp Appendix L at 8.

[66] *See* 2021 draft HCP BiOp Appendix L at 12 ("Our results were also similar to van de Kerk et al.'s (2019) despite the fact their model did not consider the impact of sea level rise, while ours did.").

[67] 2021 draft HCP BiOp Appendix L at 12.

[68] *See* 2020 draft HCP BiOp at 145 (stating that the choice of carrying capacity explained 17.8% of the variance in final abundance whereas scenario explained 38.15%, and initial population 33.09%).

Case 1:21-cv-00119-RDM   Document 98-10   Filed 02/28/23   Page 51 of 101
USCA Case #24-5101   Document #2102936   Filed: 06/24/2025   Page 396 of 430

Belmar 4042 Application 396564-00130
Page **19** of **42**

resulting from the impacts of the HCP and cumulative effects exacerbating the disastrous habitat loss from SLR.

### 6.  The PVA modeling underestimates extinction risk by failing to account for the impacts of additional habitat loss from SLR between 2070 and 2170.

The PVA modeling relied on in the draft HCP BiOps to estimate extinction risk evaluates what the Florida panther population will be 100 years after the end of the proposed 50-year period for the proposed Incidental Take Permits in 2070.[69] FWS explains that its PVA model accounted for habitat loss due to sea level rise by "treat[ing] Sea Level Rise up to 2070 as an effect in the baseline portion of [the] assessment[.][70] FWS acknowledged that SLR "will have range-wide effects on demographic parameters and habitat availability for panthers within the proposed permit duration of the HCP."[71] FWS estimated that by 2070, 1 meter of SLR would cause the loss of 18% of the Florida panther's habitat.[72] "To input SLR in the PVA [FWS] assumed SLR would accumulate linearly and only to 1 m by 2070, and divided the acreage by 50 years with 0 acres lost to SLR being equivalent to a proportion of individuals represented by a given $N_0$ … and to 18 percent of habitat loss to SLR being equivalent to 18 percent of $N_0$."[73] FWS explicitly states that the PVA modeling relies on the assumption that "Sea Level Rise of 1m will occur by 2070 but will not take additional Florida panther habitat beyond that time."[74] Thus, FWS apparently only modeled habitat loss due to SLR up until 2070, but did not account for additional habitat loss that would occur as sea levels continue to rise after 2070. FWS's modeling purports to assess the population 100 years after 2070 but ignores the impacts on that population of continued habitat loss from SLR between 2070 and 2170, even though SLR projections are available through at least 2100. Indeed, in the 2020 Species Status Assessment for the Florida Panther, FWS used sea level rise models of up to two meters to estimate possible loss of panther habitat through 2100.[75] And, in 2017, NOAA estimated that global mean sea level rise in 2100 would be nearly double that in 2070 under the Intermediate through High scenarios.[76] By failing to account for continued sea level rise related habitat loss after 2070, the PVA modeling likely overestimates panther abundance in 2170 and underestimates the extinction risk. Revised

---

[69] *See* 2021 HCP BiOp Appendix L at 10 ("For each of the three scenarios above, we simulated a 150-year population trajectory (50-year build-out plus 100 years beyond) and compared the predicted change in population viability for the panther."); 14, Table AL3 ("The probability of extinction and predicted population size of the Florida panther under Baseline with Future Sea Level Rise (BSLR), BSLR plus HCP Development Effects (BSLR+HCP), and BSLR+HCP plus Cumulative Effects (BSLR+HCP+CE) scenarios given three different beginning female panther population sizes. BSLR = Baseline (Current conditions + 1m SLR by 2070) and the end time is 100 years after HCP full build-out in 2070.").

[70] 2021 draft HCP BiOp at 132.

[71] 2021 draft HCP BiOp at 132.

[72] 2021 draft HCP BiOp Appendix L at 8.

[73] 2021 draft HCP BiOp Appendix L at 8.

[74] 2021 draft HCP BiOp Appendix L at 2.

[75] U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at vii, 189; *see also* SSA at 230–32.

[76] *See* Sweet, W. V., R. E. Kopp, C. P. Weaver, J. Obeysekera, R. M. Horton, E. R. Thieler, and C. 12769 Zervas. 2017. Global and regional sea level rise scenarios for the United States. NOAA 12770 Technical Report NOS CO-OPS 083. National Oceanic and Atmospheric Administration, 12771 Silver Spring, MD, at 23 (Table 5), *available at* https://tidesandcurrents.noaa.gov/publications/techrpt83_Global_and_Regional_SLR_Scenarios_for_the_US_final.pdf (showing GMSL in 2070 of 0.57 m, 0.79 m, and 1.0 m for the Intermediate, Intermediate-High, and High scenarios, and GMSEL in 2100 of 1.0 m, 1.5 m, and 2.0 m for those same scenarios, respectively).

analysis to correct this problem is necessary, and should utilize the best available scientific information available, such as NOAA's most recent sea level rise projections.[77]

**D. The agencies cannot rely on proposed mitigation for species impacts in the ECMSHCP because the applicant has withdrawn its associated permit application and thus the ECMSHCP provides no assurances the mitigation will occur.**

The Bellmar applicant and other landowners have been seeking incidental take coverage through the ECMSHCP for development of 45,000 acres since 2010. In a letter submitted to the U.S. Fish and Wildlife Service (FWS) in July 2022, the landowners formally withdrew their application for an incidental take permit.[78] However, to-date we have not seen any documentation indicating that the applicant has informed FDEP that the ECMSHCP application has been withdrawn or that the applicant has updated its application materials to reflect this significant change. As the ECMSHCP has been withdrawn by the applicant, any promises from the applicant to adhere to the tenets of the ECMSHCP are toothless unless incorporated as conditions in the FDEP permit, if awarded.

Moreover, fatal flaws in the ECMSHCP have not evaporated; our letters regarding the proposal and the review by experts are enclosed. We do not consider any intent to work towards the tenets of the ECMSHCP[79] adequate to meet the requirements of the state 404 program nor the Endangered Species Act.

**E. The applicant has failed to provide necessary information for the agencies to estimate Bellmar's effects on the Florida panther.**

On August 31, 2022, FWS corresponded with FDEP to request additional time to prepare appropriate conservation recommendations for the Bellmar project, taking into account the project's size, location, and anticipated effects to federally protected species.[80] FWS further indicated the need for information currently missing from the applicant's biological assessment:

---

[77] *See, e.g.*, Sweet, W.V., B.D. Hamlington, R.E. Kopp, C.P. Weaver, P.L. Barnard, D. Bekaert, W. Brooks, M. Craghan, G. Dusek, T. Frederikse, G. Garner, A.S. Genz, J.P. Krasting, E. Larour, D. Marcy, J.J. Marra, J. Obeysekera, M. Osler, M. Pendleton, D. Roman, L. Schmied, W. Veatch, K.D. White, and C. Zuzak, 2022: Global and Regional Sea Level Rise Scenarios for the United States: Updated Mean Projections and Extreme Water Level Probabilities Along U.S. Coastlines. NOAA Technical Report NOS 01. National Oceanic and Atmospheric Administration, National Ocean Service, Silver Spring, MD, 111 pp., at 23,
https://oceanservice.noaa.gov/hazards/sealevelrise/noaa-nostechrpt01-global-regional-SLR-scenarios-US.pdf
(projecting relative sea level rise in 2100 in the eastern Gulf of Mexico will be 1.2, 1.7, and 2.2 meters under intermediate, intermediate-high, and high scenarios, respectively)

[78] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).USFWS response to HCP withdrawal, provided by email on September 1, 2022, and enclosed

[79] Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, available at https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.Letter dated July 28, 2022, from ECPO re: Withdrawal of ECPO Incidental Take Permit Applications

[80] Email from Charles Kelso, U.S. Fish and Wildlife Service, to Toby Schwetje, Florida Department of Environmental Protection regarding U.S. Fish and Wildlife Service's initial comments regarding the Bellmar proposal (Aug. 31, 2022).

> Because our recommendations are based on anticipated effects of the action, the
> Service will require an estimate of the project's future effects to the Florida
> panther. Therefore, we recommend updating Applicant's July 2021 Biological
> Assessment to include an estimate of panther mortality due to traffic volume
> increases upon project completion.[81]

The agencies had already requested in a prior Request for Additional Information (RAI) for the
applicant to "provide a traffic analysis specific to the Bellmar project. The traffic analysis should
include an estimation of daily trips generated by village residents, employees, and municipal
services and identify the roads these trips will most likely take place on."[82] However, this
information was not provided and yet FDEP still advanced the Bellmar project to Public Notice.

The applicant has obscured the amount of traffic attributable to the Bellmar 404 project, and, as
illustrated above, this information is vital to avoiding jeopardy to the Florida panther. The
applicant has requested "that the USFWS include a proportional level of coverage for the
incidental take expected as a result of the Project in the incidental take statement for this action"
should FDEP complete their review before an ITP is issued.[83] However, critical information in
which the agencies would need to ensure roadkill mortalities are adequately considered and
avoided is not provided.

We are aware that in materials submitted to Collier County (Attachment A), the applicant's
traffic engineer calculated that total traffic created by the 1,000 acre Bellmar Village would be
26,232 trips per day.[84] Please note that this estimate is for only part of the state 404 project
area—there are more than 700 acres, 1,000 additional residential units, and commercial
development not included in this estimate that, if developed, will generate thousands of
additional trips to this total.

The table below summarizes the information available through the Collier County materials in
regard to the Bellmar 404 application and a portion of the Rural Lands West state 404 project.[85]
This 404 application is fairly equivalent to the village of Bellmar and most of the town connector
as seen in the table below.

---

[81] *Id.*
[82] FDEP, 2021. Request for Additional Information, Bellmar. August 20, 2021.
[83] Letter from Applicant to FDEP dated April 14, 2022, page 14
[84] Traffic Impact Statement for Bellmar Stewardship Receiving Area (SRA) by Treblicock Engineering for Collier
Enterprises dated August 19,2020, p. 7, Table 2. The project footprint for the Bellmar SRA is at least 700 acres less
than the state 404 project that is the subject of this letter.
[85] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock
Consulting Solutions, June 2022,Page 7. The Town of Big Cypress SRA, as known at the Collier County level,
includes the state 404 Bellmar project, and a portion of the Rural Lands West state 404 project. There would be
about an additional 1,000 acres of development added to these figures as part of the Rural Lands West state 404
project footprint.

| TOWN OF BIG CYPRESS | |
|---|---|
| | Estimated daily trips generated |
| Rivergrass[86] | 23,929 |
| Longwater[87] | 24,919 |
| Bellmar[88] | 26,232 |
| Town Connector | 64,125 |
| | |
| Total [89] | 139,205*<br><br>*Does not include a portion of the state 404 Rural Lands West project |
| | |
| Bellmar state 404 application | 90,357 |

We emphasize that the application trips are the best estimate the public currently has access to, given that the applicant has failed to provide the required traffic and transportation information. The total daily trips generated are likely to be more than what we show here. The agencies should not proceed with decisionmaking on the Bellmar permit until the applicant provides this necessary information. To determine species effects, mitigation, or make a jeopardy determination without this information would violate the ESA's core requirement to use the best available science,[90] as well as the technical assistance process's requirement that applicants provide sufficient information to review potential adverse impacts to listed species and critical habitat.[91]

## II.  Bellmar Is Inconsistent with the State 404 Program, 62-331, F.A.C.

### A.  The alternatives analysis is inadequate.

The project identifies an approximately 1,790-acre footprint in eastern Collier County that is proposed for construction of a master-planned community. We note for the record that there is no

---

[86] Traffic Impact Statement for Rivergrass SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2019, Page 7.
[87] Traffic Impact Statement for Longwater SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, March 2020, Page 7.
[88] Traffic Impact Statement for the Bellmar SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2020, Page 7.
[89] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, June 2022, Page 7.
[90] 16 U.S.C. § 1536(a)(2); 404 Programmatic BiOp at 5.
[91] 404 Programmatic BiOp at 16 ("Applicants submitting a State 404 permit application will be required to submit information that allows the State of Florida (FDEP and FWC) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats and allow the USFWS to review and provide technical assistance as needed (62-331.051, F.A.C.).").

public benefit of the project, and rather, the public's resources and interests are threatened by the Bellmar project.

The state rules governing section 404 permitting state that FDEP shall not grant a permit "if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem."[92] We disagree with the applicant that there is "no less environmentally damaging practicable alternative."[93]

The general project purpose of providing a master-planned community can be achieved while avoiding and minimizing impacts to wetlands and listed species habitats, such as Florida panther Primary Zone habitat and crested caracara primary nest buffer, when considering other site alternatives, as required.[94]

The applicant improperly restricts the alternatives they are considering to areas that are 2,000 acres or greater, within eastern Collier, within the Collier County Rural Lands Stewardship Program, and ECMSHCP. There may be lands with less impact to natural resources that are of a different size and outside of these boundaries that should have been considered as an alternative. We note the ECMHCP is withdrawn as of July 28, 2022, and cannot be relied on by the applicant to ignore all alternatives. This change requires the applicant to redo and resubmit a new alternatives analysis including non ECMSHCP properties.

The applicant offers no evidence, that 2,000 acres is required for a master-planned community.[95] In fact, we contend that approving this type of sprawling development is damaging to the future of Florida as it erodes the urban rural boundary and removes important agricultural lands from production. There are many examples both in and out of Florida using smart growth design that provide the desired number residences as well as commercial development on sites significantly smaller than 2,000 acres.

Sustainable, compact development – which the proposed project is not – would also appeal to "ecologically minded consumers"[96], and truly ecologically minded consumers would not support destroying important panther habitat needed for survival and recovery of the Florida panther.

Further, the applicant failed to consider other sites, even those not owned by the applicant, which can serve the general residential and commercial uses proposed by this project in an area closer to existing development, outside of primary panther habitat, and not adjacent to a wildlife refuge.[97] The applicant does not fully consider lands directly north of the Bellmar parcel as alternatives. The alternative analysis speaks to "Parcel 5" as containing lands that would meet

---

[92] 62-331.053, Florida Administrative Code.
[93] Bellmar Alternatives Analysis, April 2022, page 1.
[94] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020; 62-331, Florida Administrative Code.
[95] Bellmar Alternatives Analysis, April 2022, page 1.
[96] Bellmar Alternatives Analysis, April 2022, page 1.
[97] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020, Appendix C, p. 57 states If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, if an applicant does not own an alternative parcel, that does not rule that parcel out as a practicable alternative.

the applicant's constrained restrictions, but it does not go on to fully consider these areas as alternatives.

Within Parcel 5, there are more than 20,000 acres, many of which are owned by the applicant (not a limiting factor), and others recently sold to Gargiulo (who also owns part of this pending Bellmar project area) (see Attachment B).

The applicant appears to not consider lands to the north because of the also-proposed Rural Lands West state 404 application, which is not a justifiable reason to exclude from the analysis.

Importantly, there are also lands to the north of both Bellmar and Rural Lands West that should be considered as an alternative. There are lands north of Oil Well Road that are also contemplated for future development, as evidenced by the ECMSHCP. The Conservancy of Southwest Florida has recommended Collier Enterprises move its developments to this area since the area would result in little to no Primary Zone panther habitat to be impacted. In fact, the Service asked the applicant to consider this northern area as an alternative to avoid and minimize listed species impacts, when the Rural Lands West project was seeking a permit from the U.S. Army Corps of Engineers.[98]

Instead of providing an Alternatives Analysis that would satisfy the state 404 program requirements, the applicant vies for developing the entirety of Parcel 5, with this Bellmar application and several other proposals.

To make matters worse, the applicant provided no scenario that considered a smaller footprint, or any footprint that would avoid the primary zone for the active caracara nest on the site or redesign stormwater lakes to avoid wetland impacts. Most of the wetland impacts are coming from the choice to place stormwater lakes into wetlands. With a project size of over 1,700 acres there is no excuse to use the adjacent wetlands to dredge stormwater lakes; such development uses could be contained within uplands.

The applicant did not adequately analyze "alternative on-site configurations" or "extensively redesign the Project to avoid and minimize impacts."[99] If that were true, the applicant would have made a small adjustment to the footprint to avoid impacts to the primary zone of the caracara nest in the center of the property. Avoiding this caracara primary zone would require an alteration and avoidance of approximately 52 acres. This has never been done, and it undermines the applicant's genuine interest in avoiding and minimizing impacts. It is particularly egregious for the applicant to state that their "development should be designed to incorporate protection and preservation of habitat and natural resources"[100] in light of their refusal to avoid the primary zone of this existing caracara nest.

---

[98] Letter from U.S. Fish and Wildlife Service to Army Corps of Engineers regarding Collier Enterprises Management, Inc. project Town of Big Cypress dated November 18, 2008. "The Service recommends the alternatives analysis includes alternative project sites and configurations that avoid and minimize the impacts to wetlands and open waters, as well as minimize impacts to endangered species. Specifically, other applicant-owned lands north of Oil Well Road may be more suited to a development of this sort."
[99] Bellmar Alternatives Analysis, April 2022, page 1.
[100] Bellmar Alternative Analysis, April 2022, page 7.

In sum, the applicant has failed to provide an adequate analysis of less damaging alternatives. Furthermore, FDEP should consider a "no action alternative."[101] The impacts of the proposed project are contrary to the public interest.

### B.  The application fails to adequately analyze secondary effects.

The Bellmar project also fails to meet the requirements to adequately consider secondary impacts. FDEP must consider secondary effects from proposed activities, particularly on sanctuaries and refuges.[102] These areas, as the FDEP Handbook states, are "managed principally for the preservation and use of fish and wildlife resources," and dredge and fill activities may "result in the establishment of undesirable competitive species of plants and animals," or "change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices."[103]

We note that Collier Enterprises Management Inc. discusses its "long tradition of environmental stewardship," land transfers, and sales in its response to the request for additional information.[104] But that generalized historical narrative does nothing to address the harmful impacts of the applicant's proposal on the Florida panther and other natural resources through this project. The Bellmar project will destroy more than 1,700 acres of the most important and critical category of delineated panther habitat, will infringe on and fragment a landscape corridor, and cause additional panther and other species mortalities due to habitat loss and vehicle collisions, while adding more than 8,600 new residents in an area heavily utilized by wildlife. In fact, the applicant's proposed project threatens the future integrity of the Florida Panther National Wildlife Refuge, one of the lands they mention in their history. As they note, the Refuge was founded with the purpose of protecting Florida panthers and their habitat.[105] However, the Bellmar project is a direct affront to this publicly held sanctuary.

The FPNWR has informally and formally shared concerns regarding both the Rural Lands West and Bellmar projects since 2006.[106] Major concerns of the FPNWR managers even then was the impact of these developments on hydrology and prescribed fire use. Staff wrote "building a community adjacent to the west side of the refuge would severely limit or prohibit prescribed burning to nearly half of the refuge fire units due to smoke management limitations…. Staff is concerned that the new developments will cause more water to either be stored in retention ponds, thereby reducing water flow into the refuge or developments will increase runoff into Camp Keais Strand, which flows into the refuge."[107] Already-altered hydrology has shifted the land cover on the FPNWR to dense cabbage palm, and the Refuge expends considerable effort in

---

[101] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.1.
[102] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[103] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[104] Passarella & Associates, Inc., 2021. Bellmar Biological Assessment. July 2021, p. 1.
[105] *Id.* at 2-4.
[106] Meeting notes and staff summaries regarding Rural Lands West and Bellmar projects impacts to listed species and impacts to FPNWR, dated 2006. Received through Freedom of Information Act request.
[107] *Id.*

vegetation management and prescribed fire to maintain the publicly-held refuge as suitable habitat for the Florida panther and its prey.

These same concerns about degradation to the 26,400 acres of the FPNWR were echoed repeatedly, in the Refuge staff comments on the ECMSHCP and in a letter to Collier County when the local authorizations for Bellmar were sought.[108]

In a 2016 letter from FPNWR, the Panther Review Team (PRT) configuration alternative was recommended. This alternative would "protect critical linkages and buffer areas."[109] The PRT alternative would mean the Bellmar property would not be intensified above existing agriculture and would not be developed (Attachment C).

Both the 2016 and 2021 letters shared concerns that development contemplated in the ECMSHCP would encroach upon conservation areas like the FPNWR. Because of the Refuge's position against roadways I-75 and State Road 29, prescribed burn can only direct smoke in the direction of Bellmar and Rural Lands West.

While we understand that efforts were made to provide smoke easement language, future Florida Forest Service authorizations for burning are not assured, once these massive developments are built. If Rural Lands West and Bellmar are built, they would place about 19,170 people -a population about the size of the City of Naples[110]- in direct conflict with management of the Refuge. The FPNWR currently is the most densely occupied Florida panther habitat[111] and any degradation or encroachment of the adjacent-proposed development would be an unacceptable secondary impact and could also contribute to jeopardy for the Florida panther.

## C. FDEP must analyze all cumulative effects.

Under the state 404 program, FDEP must also consider the impact of cumulative effects. As in the sections above, there are a number of projects both pending before the agency or otherwise reasonably foreseeable, that contribute to unacceptable cumulative impacts.

From just seven state 404 applications, there would be over 1,000 acres of wetlands lost.[112] Further, FDEP is also currently considering additional proposed state 404 actions. There are 259 activities reviewed or under review as part of the state 404 program within 5 miles of Bellmar, and 785 within 25 miles of Bellmar (Attachment D and Attachment E).[113] Though these actions

---

[108] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016; Letter from Florida Panther National Wildlife Refuge to Collier County Planning Commission Re: Longwater and Bellmar Village SRA Resolutions, March 1, 2021.

[109] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016.

[110] City of Naples census population, as of 2020.

[111] Dorazio & Onorato, 2015. Estimating the Density of Florida Panthers Using Camera Trapsand Telemetry - Report for Phase I of the Project, final report.

[112] Bellmar, Rural Lands West, Hogan West, Immokalee Road Rural Village, FFD, Troyer Mine, Kingston.

[113] Based on ArcGIS analysis. Feature Layer from Florida Department of Environmental Protection, Managed by FDEPOpenDataPortal.

may be small or large projects, the total cumulative impacts on wetlands and aquatic resources must be considered.

### D. Bellmar will have adverse effects on aquatic ecosystems, including listed species and their habitats.

The state's 404 program stipulates that no permits can be granted for projects that would cause or contribute to significant degradation of wetlands, which can include adverse effects on wetland-dependent species, ecosystem diversity, and fish and wildlife habitat.[114] Wildlife surveys provided by the applicant show how valuable this area is for a multitude of state and federally listed species. We address quite a bit of this in our prior letters on Bellmar, however, we provide the new or updated information as below, including an analysis by panther habitat modeling expert, Dr. Robert Frakes. Bellmar's impacts to fish and wildlife and their habitats is significant and unacceptable, and thus the permit should be denied.

#### 1. Bellmar will have unacceptable impacts on the Florida panther.

The Bellmar project site is an important area for the endangered and wetland-dependent Florida panther. There have been 112,065 telemetry points collected from Florida panthers since 1981 through 2022, from at least 267 panthers.[115] Looking at just a 5-mile area around the Bellmar site, 8.3% of all documented telemetry points and 29.2% of all collared panthers fall within this area.

The Bellmar project is completely comprised of Primary Zone habitat and nearly all Adult Breeding Habitat area – two models depicting the most critical lands to the survival and recovery of the Florida panther. It is situated close to the FPNWR and a critical linkage called Camp Keais Strand is within and adjacent to the project.

The 2020 draft HCP BiOp described a range of impacts to the Florida panther from development in Eastern Collier:

- Increased mortality from intra-specific aggression among panthers displaced by proposed development and human activity;
- Increased mortality and decreased individual fitness caused by intensification of intra and inter- specific competition;
- Increased predation of panther kittens from other predators when preferred prey populations decline;
- Effects to individuals from habitat loss, degradation, and fragmentation because of new roads connecting new areas of development to one another and the existing road network;
- Increased injury and mortality from collisions with traffic on new roads;
- Management removal because of depredation and human/panther interactions;
- Increased exposure to disease; and
- Increased exposure to toxins.[116]

---

[114] 62-331.053, Florida Administrative Code.
[115] https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/about
[116] 2020 draft HCP BiOp at 125.

To review the impacts to Adult Breeding Habitat, panther habitat modeling expert Dr. Robert Frakes utilized a landscape-scale panther habitat model that was described in Frakes, et al, 2015.[117] The model analyzes forest land cover and forest edge, human density, and road density, amongst other factors to determine suitable breeding habitat for the panther.

Using this published model with updates, Dr. Frakes compared the existing conditions to post-project scenario for Bellmar alone as well as Bellmar and RLW together. There is one set of maps to show the raw results and one set to show in an interpolated model that "smooths" the cells.

Frakes et al., 2015 acknowledges that "protection of the remaining breeding habitat in south Florida is essential to the survival and recovery of the subspecies and should receive the highest priority by regulatory agencies."[118] Yet, adult breeding habitat maps show that Bellmar alone will cause the loss of 10 km2 (2,471 acres) of breeding habitat.

When Bellmar is combined with RLW, it would cause a combined loss of 23 km$^2$ (5,683 acres). The interpolated maps show a significant narrowing of the Camp Keais Strand dispersal corridor, especially when Bellmar and RLW are considered together.

Allowing Bellmar to move forward will have unacceptable direct and indirect impacts on panther habitat and corridor connections.



---

[117] Frakes, R.A., Belden, R.C., Wood, B.E. & James, F.E. (2015). Landscape analysis of adult Florida panther habitat. PLoS One 10, e0133044.
[118] *Id.* at 15-16.

Panther Habitat Suitability (P)
Before Development
High : 0.99486
Low : 0.00384327
Bellmar Impact Area
Bellmar

Panther Habitat Suitability (P)
After Development
High : 0.99486
Low : 0.00384327
Bellmar Impact Area
New Roads
Stormwater Lakes
Bellmar

Rural Lands West
Bellmar
Before Development
Adult Panther Habitat P>0.338 (Frakes et al. 2015)
Project Impact Areas

Rural Lands West
Bellmar
After Development
Adult Panther Habitat P>0.338 (Frakes et al. 2015)
Project Impact Areas
Agriculture
Residential
Water
New Roads











We note for the record that in addition to the direct impacts to areas with development, the Public Notice states that "[m]anagement objectives to the preserves adjacent to development will the implemented to limit prey and foraging conditions that otherwise may attract panther and bears".[119] We need clarification on what this means and assurance that if permitted, the applicant will not be seeking or be given Panther Habitat Unit (PHU) credits for lands that are actively being managed to deter panthers. The PN states that the proposed project will need 1,793.4 acres and the estimated PHU credits needed are 16,844.[120] The PN then states that the conservation areas of the project exceed this amount by providing 18,648 PHUs.[121] However, without a map detailing the areas being considered, there is no way to ensure that the applicant is considering preserves being managed to deter panthers as impacted and that these preserves are not being used for compensation.

Further, in the 2020 draft HCP BiOp, the FWS recommended more than 25 different actions to minimize impacts on the Florida panther, including the following:

- Maintain internal traffic capture of each development at or above 50 percent.

---

[119] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 3.
[120] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.
[121] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.

- Prohibit residents from keeping domestic animals (chickens, goats, etc.) that attract panthers and other predators.
- Require full vaccination of all pets in new developments from diseases that can be acquired by panthers.
- Require pets be kept indoors, leashed, or maintained in fenced enclosures at all times. Encourage residents to feed pets indoors and to not leave pet food dishes outside.
- Encourage residents to clean grills and store them indoors when not in use.
- Minimize the use of bird feeders and supplemental feeding stations for deer and other game species.
- Require residents to deer proof gardens.
- Restore agricultural lands to native habitats that are more beneficial to the panther, especially forested habitats, and maintain in perpetuity. [122]

We have no indication from the applicant whether they are going to follow or incorporate this advice into the proposed development. These draft recommendations should inform the evaluation of whether the project should be authorized absent any commitment by the applicant to implement them, for example, by informing whether the proposal is in the public interest or meets requirements to minimize impacts. The agencies should also consider whether these recommendations should be incorporated as binding permit terms to ensure that impacts are minimized.

### 2.  Bellmar will have unacceptable impacts on the Florida bonneted bat.

The applicant's Florida bonneted bat (FBB) survey, dated July 2021, found that calls were recorded "within the time frame considered by USFWS that roosting is likely nearby (Attachment F)."[123] Thus, the agencies need to look closely at not only how Bellmar would impact proposed critical habitat, but also foraging and roosting within the project. If the Bellmar project will impact a roost(s), there is an increased likelihood that Bellmar would also pose jeopardy to the bonneted bat. Based on our review, the applicant has not adequately addressed this issue.

We also note that this project is in FBB Proposed Critical Habitat (PCH), specifically Unit 3 of the PCH (Attachment G).

### E.  Ownership and other information must be addressed.

### 1.  Ownership within the Project Boundary

It appears that the applicant does not, in fact, own all of the property contained in the application (Attachment H). About 503.57 acres were sold in June 2019 to Gargulio, Inc. This is 9.8% of the 5,105.49 acres. We note that Gargulio does not appear to be indicated as or listed as an adjacent property owner and is not part of the permit notice. To our knowledge, Gargulio is also not an applicant. While it appears that the Gargulio property is not designated as development or conservation, it does call into question the appropriateness of including this property in the

---

[122] 2020 draft HCP BiOp at 320.
[123] Passarella & Associates, Inc., 2021. Bellmar Florida Bonneted Bat Acoustic Survey Report. Prepared for Collier Enterprises Management, Inc. July 2021.

Bellmar 404 boundary without the documented acknowledgement of the property owner. The agencies should determine why land not owned by the applicant is included in the boundary of the application.

| Parcel ID | Acres |
|---|---|
| **354930004** | 96.88 |
| **354960207** | 9.03 |
| **354520100** | 225.97 |
| **354480606** | 171.69 |
| | |
| TOTAL | 503.57 |

This information was found on the Collier County Property Appraiser on October 15, 2021, confirmed on August 30, 2022.

> **2. The applicants have yet to comply fully with all requests for additional information.**

In addition to the other RAI request that was not addressed, as discussed above, the following RAI comments from the August 20, 2021 RAI letter have not been addressed in part or in full:

Excerpt from the Agency RAI:

*25. Page 34 of the BA addresses incidental take of the project by referring to the HCP. The ITP has not been issued yet. Therefore, please provide a stand-alone analysis of incidental take for each species that will have take (as defined by the ESA) associated with the Bellmar project. In order to remain within the State 404 process, a project must not cause jeopardy. Please provide an analysis supporting that the Bellmar project is not likely to cause jeopardy to the panther.*

The applicant's response to this request is not adequate because the ECMSHCP has been withdrawn. To date, we have not seen any new information submitted to FDEP and FWC informing them that the ECMSHCP has been withdrawn.

Excerpt from the Agency RAI:

*34. The provided plans do not seem to provide any indication of the proposed lot size. What is the approximate site of each residential lot? How many residences are proposed or anticipated?*

The applicant refers to the Town Connector as intended for commercial uses, however at least 1,000 residential units – both affordable and market rate – are also proposed along with the commercial uses. The applicant should be required to answer this question completely and in adequate detail to ensure that the impacts of its proposal, in particular the traffic-inducing impacts, are assessed accurately.

Excerpt from the Agency RAI:

*48. What are the potential effects of the project on the Florida panther, including the direct, indirect, interrelated, and interdependent effects? What is the extent of habitat loss that would result from the proposed project?*

The applicant avoids answering these questions. The applicant must address these issues and answer these questions fully and directly.

Excerpt from the Agency RAI:

*50. How would the proposed mitigation offset the proposed impacts to the panther?*

*The assessment includes a traffic analysis section but does not specifically address the extent of the proposed traffic increases that would result from the implementation of the project. What is the specific anticipated increase in traffic (volume, location, etc.) and how would that increase impact the panther?*

The applicant has refused to answer these questions. Particularly, in light of the analysis in the 2020 draft HCP BiOp and 2021 draft HCP BiOp, the applicant must address these issues and answer these questions fully and directly.

## III.   Conclusion

Thank you for considering our comments. We ask that you deny the Bellmar project because it would pose unacceptable direct, indirect, and cumulative impacts, and would seal the fate of the Florida panther. Bellmar, and other reasonably foreseeable projects, would not only remove habitat, but also would cause increased roadkill, increase human-wildlife interaction, and pose threats to trust resources and properties in conservation. Furthermore, Bellmar is inconsistent with the requirements of the State 404 Program.

Please note that this letter does not constitute support for the state-assumed section 404 permitting program, which we believe is unlawful.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
juliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776- 5601
amberc@conservancy.org


Karimah Schoenhut
Staff Attorney
Sierra Club
Sierra Club Environmental Law Program
50 F Street NW, 8th Floor
Washington DC 20001
Phone: 202-548-4584
karimah.schoenhut@sierraclub.org


Elise Pautler Bennett
Florida Director & Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33703
(727) 755-6950
ebennett@biologicaldiversity.org


Cc:
Shannon Estenoz, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior
Bob Carey, Environmental Review Branch Manager, USFWS
Jose Rivera, Environmental Review Supervisor, USFWS
John Truitt, Deputy Secretary, FDEP
Jon Iglehart, South District Director, FDEP
Megan Mills, Permitting Administrator, FDEP
Toby Schwetje, Environmental Specialist III, FDEP
Jason Hight, Director Office of Conservation Planning Services, FWC
Jeaneanne Gettle, Director of Water Division, EPA
Rosemary Calli, Section Chief Wetlands & Streams, EPA
FWC records FWCConservationPlanningServices@myfwc.com
FDEP records SD-ERPcomments@floridadep.gov

Attachment A

**Table 2**
**Project Specific Trip Generation – Build-out Conditions – Average Weekday**

| ITE LUC | Daily Two-Way Volume | AM Peak Hour | | | PM Peak Hour | | |
|---|---|---|---|---|---|---|---|
| | | Enter | Exit | Total | Enter | Exit | Total |
| Single Family Detached | 13,250 | 284 | 850 | 1,134 | 911 | 535 | 1,446 |
| Multifamily Housing (Low-Rise) | 8,729 | 112 | 377 | 489 | 329 | 194 | 523 |
| Office Park | 424 | 36 | 4 | 40 | 2 | 27 | 29 |
| Shopping Center | 5,383 | 120 | 74 | 194 | 231 | 251 | 482 |
| Total Traffic | 27,786 | 552 | 1,305 | 1,857 | 1,473 | 1,007 | 2,480 |
| Internal Capture | 806 | 24 | 24 | 48 | 97 | 97 | 194 |
| External Traffic | 26,980 | 528 | 1,281 | 1,809 | 1,376 | 910 | 2,286 |
| Pass-by Traffic | 748 | 26 | 17 | 43 | 51 | 46 | 97 |
| Net External Traffic | 26,232 | 502 | 1,264 | 1,766 | 1,325 | 864 | 2,189 |

Attachment B



Case 1:21-cv-00119-RDM    Document 98-10    Filed 02/28/23    Page 69 of 101

USCA Case #24-5101      Document #2102936       Filed: 02/26/2025      Page 195 of 430
Bellmar 404 Application 396364-001
Page **37** of **42**

Attachment C[124]



---

[124] Florida Panther Protection Program Technical Review Team, 2009. Technical Review of the Florida panther Protection program Proposed for the Rural Lands Stewardship Area of Collier County, Florida. Final Report. Note that the PRT did not analyze the Big Cypress DRI (AKA Rural Lands West) but did find that the Bellmar state 404 area should be retained in no more intense than current agricultural uses.

Attachment D

Date: 9/13/2022





There are 259 404 permits within 5 miles of the Bellmar 404 impact area

Attachment E



Date: 9/13/2022

**Legend**
- ▨ State 404 Program Permits
- ▨ Bellmar 404 Impact Area
- ⬚ 25 mile buffer



0 2 4    8    12    16
Miles

There are 785 404 permits within 25 miles of the Bellmar 404 impact area

Attachment F[125]



---

[125] Calls indicating roost nearby at stations #1, 16, 18, 20, 26, 28.

Attachment G

## Bellmar & Florida Bonneted Bat Critical Habitat



Bellmar 404 Application 396364-001
Page 42 of 42

Attachment H



Date: 9/14/2022



FLORIDA PANTHER NATIONAL WILDLIFE REFUGE

**Legend**

| | |
|---|---|
| Florida Panther National Wildlife Refuge | COLLIER ENTERPRISES |
| Bellmar 404 Boundary | GARGIULO |
| **ONAME** | PACIFIC LAND LTD |
| BARRON COLLIER PARTNERSHIP LLP | |

0  0.2 0.4    0.8    1.2    1.6
Miles

# Attachment C

**Natural Resources Defense Council • Conservancy of Southwest Florida • National Parks Conservation Association • Center for Biological Diversity**

February 3, 2021

Noah Valenstein, Secretary
Florida Department of Environmental Protection
*Via electronic mail to*: noah.valenstein@dep.state.fl.us

**RE: Burnett Oil Company, Inc.'s Section 404 Clean Water Act/Environmental Resource Permit application nos. 323836-004 and 397879-002 to facilitate new oil drilling in the Big Cypress National Preserve and public records request under Chapter 119, Florida Statutes**

Dear Secretary Valenstein,

The undersigned organizations have repeatedly written to the Department and the National Park Service, most recently on December 16, 2020, regarding our opposition to Phase I geophysical oil exploration for the Nobles Grade 3-D Geophysical Seismic Survey in the Big Cypress National Preserve (Preserve) by the Burnett Oil Company, and its failure to adhere to existing permit conditions and fully reclaim and properly monitor the related damage. We now write to express our opposition to the Department's issuance of permits under Section 404 of the Clean Water Act and Part IV of Chapter 373, Florida Statutes, or any other permits, that would authorize or facilitate new oil exploration or drilling in the Preserve.

On December 22, 2020, the Environmental Protection Agency (EPA) published in the Federal Register notice of its approval of the state of Florida's application to assume jurisdiction over the Clean Water Act's Section 404 permitting program.[1] Conservation organizations are challenging the EPA's actions in *Center for Biological Diversity v. U.S. Environmental Protection Agency*, Case No.: 21-cv-119 (D.D.C. January 14, 2021). Public comments submitted in opposition to the Department's request to assume this program highlighted concerns regarding the unlawfulness of the proposed program and the lack of analyses, consultation, and public disclosures that would normally occur under federal law, including the Clean Water Act (CWA), National Environmental Policy Act (NEPA), Endangered Species Act (ESA), and National Historic Preservation Act (NHPA).

We recently became aware of state 404 application nos. 323836-004 and 397879-002, submitted on January 22, 2021, by the Burnett Oil Company to the Department, for Section 404 Clean Water Act and Environmental Resource Permit authorization to construct oil well pads and access roads in wetlands in two new locations in the Big Cypress National Preserve. The undersigned organizations did not receive notice of any permit applications from the Department despite repeatedly requesting such notice in prior correspondence. We became aware of these permit applications as a result of an exploratory search of the Department's new Section 404 permit

---

[1] 85 Fed. Reg. 83,553 (Dec. 22, 2020).

1

program database. The website itself lists no public notices regarding any Section 404 permit. This lack of transparency is concerning and serves as an example of inadequate public notice under the state Section 404 permit program.

It is also unclear whether Burnett Oil has applied for a permit under Chapter 377, Florida Statutes, and we request clarity from the Department on this, as well as the status of obligations under the Endangered Species Act regarding the effects these activities will have on endangered and threatened species, including the Florida panther and Florida bonneted bat, and their critical habitats in the Preserve.

*Existing Damage Caused by Oil Exploration in the Preserve Remains*

As stated most recently in our December 16, 2020 letter, and, in other prior correspondence, we continue to have concerns about the success of the reclamation Burnett Oil has attempted thus far to reclaim the wetland damage caused by its seismic activities in the Preserve in 2017 and 2018, and the lack of compensatory mitigation for the loss of wetland function and endangered Florida panther habitat. Specifically, numerous issues remain with the oil company's monitoring of and reporting on the reclamation, and compensatory mitigation remains incomplete as of the date of this letter. We have shared numerous reports[2] written by our environmental consultants at Quest Ecology, Inc. Most recently, Quest Ecology reviewed the 2020 Reclamation Monitoring Report (dated October 2020) prepared by Turrell, Hall and Associates, Inc. on behalf of Burnett Oil and Quest Ecology continues to identify issues with the reclamation monitoring. To date, we have not received a response regarding the issues with Burnett Oil Company's monitoring raised by Quest Ecology.

The following is a summary of the damage to the Preserve caused by Burnett Oil Company's Phase I seismic survey, as documented by Quest Ecology:[3]

- Wetland soils were severely altered due to rutting and compaction caused by vibroseis and other off-road vehicles driving over them and then re-disturbed by subsequent reclamation attempts. The 33-ton vibroseis vehicles compacted and deeply rutted soils due to their sheer weight. The soils ruts created were almost 2-feet deep and up to 15-feet wide in places;

---

[2] *See* Quest Ecology, *Comments on Turrell, Hall and Associates, Inc.'s 2020 Reclamation Monitoring Report – October 20th, 2020 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (December 15, 2020), available at: https://www.nrdc.org/sites/default/files/quest-comments-monitoring-report-20201215.pdf; Quest Ecology, *Summary of March 6, 2020 Site Assessment within Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration area, Big Cypress National Preserve, Collier County, Florida* (March 15, 2020), available at: https://www.nrdc.org/sites/default/files/final-quest-ecology-memorandum-20200306.pdf; Quest Ecology, *Comments on Turrell, Hall & Associates, Inc.'s 2019 Reclamation Monitoring Report – August 30th, 2019 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (January 3, 2020), available at: https://www.nrdc.org/sites/default/files/quest-ecology-memorandum-2019-reclamation-monitoring-report-01032020.pdf; Quest Ecology, *Seismic Survey Inspection Report, Big Cypress National Preserve* (June 2019), available at: https://www.nrdc.org/sites/default/files/seismic-survey-inspection-report-20190615.pdf; Quest Ecology, *Phase I Seismic Survey Inspection Report, Big Cypress National Preserve* (May 2018), available at: https://assets.nrdc.org/sites/default/files/seismic-survey-inspection-big-cypress-20180531.pdf?_ga=2.61695279.2044034844.1586532000-1336211018.1533580820.
[3] *Id.*

2

- Despite their small size, dwarf cypress trees can range in age from 31 to 2,500 years. These trees provide important roosting sites and refuge from high water levels for birds and other wildlife. Nonetheless, dwarf cypress trees were cut or run over to make way for the vibroseis vehicles. Plant species and abundance within the representative seismic line inspected is significantly different from adjacent habitats not directly impacted by seismic survey activities—for example, dwarf cypress trees were observed in less than 1% of the seismic line, whereas these trees make up 50% of the plant cover in adjacent undisturbed habitats;
- Average total groundcover was around 5-10% within the seismic line inspected, as opposed to 40-60% in adjacent undisturbed habitats;
- Trees, shrubs, herbaceous species, and epiphytes (primarily consisting of Florida butterfly orchids and State-listed bromeliad species) were conspicuously absent within the seismic survey line observed compared to adjacent undisturbed habitats;[4]
- Dwarf pond cypress tree stumps that were cut with chainsaws by oil company crews—many exceeding two feet in diameter—were abundantly observed in the seismic line inspected and were not re-sprouting;
- Desiccation (drying out) of bromeliads and Florida butterfly orchids on the edges of the seismic lines due to removal of the adjacent dwarf cypress tree canopy important for maintaining temperature and moisture levels;
- Dwarf pond cypress tree seedlings were rarely observed in the seismic line inspected, although they were frequently observed in adjacent undisturbed habitats;
- The extent of torpedograss, a Category I invasive plant species in Florida, appear to have increased since the seismic survey activities began;
- Two native, but potentially nuisance plant species with the potential to spread once established—common reed and Carolina willow—were observed within the seismic survey line observed, suggesting that conditions are favorable for their continued growth and spread into other parts of the Preserve;
- Periphyton cover was significantly reduced within the seismic line observed compared to adjacent undisturbed habitats—periphyton is a critical component of the food web because it provides the primary food source for small consumers such as fish and invertebrates; and
- The oil company's initial reclamation attempts of ground elevations impacted by vibroseis vehicles resulted in a difference of up to seven inches in some locations—the differences in ground elevations will have adverse effects on the natural recruitment of desirable native plants.

Despite Burnett Oil Company's initial reclamation attempts, damage remains. Further, Quest Ecology identified problems with the representations made in the oil company's initial monitoring report, many of which still remain, according to a second monitoring report, including:[5]

---

[4] Notably, "reclamation" requirements include re-grading the soil ruts, but not the replanting of cypress trees or other destroyed or damaged vegetation. Vegetation is supposed to naturally recruit on its own.

[5] Quest Ecology, *Comments on Turrell, Hall & Associates, Inc.'s 2019 Reclamation Monitoring Report – August 30th, 2019 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (January 3, 2020), available at https://www.nrdc.org/sites/default/files/quest-ecology-memorandum-2019-reclamation-monitoring-report-01032020.pdf.

- The oil company is re-grading soils within 3 inches of adjacent undisturbed areas in places, as opposed to re-grading soil ruts to match original grade, as required by federal and state permits. Meaning, the Preserve is not the same as it was prior to the seismic testing, despite the oil company's claims that there would be no long-term impacts;
- The number of monitoring stations within each designated reclamation area is not proportional to the length of the impacts caused by the oil exploration;
- The number and size of disturbed vegetation monitoring plots are insufficient to yield statistically significant results and do not include the full width of the seismic lines the oil company created;
- It's unclear whether state and federal agencies will base the "success of the reclamation" on individual reclamation areas or the 110-square mile Phase I seismic survey area in its entirety;
- The center of the seismic line is the least disturbed area because it was located between the vibroseis vehicle tires, yet the disturbed vegetation monitoring is taking place there;
- The method for comparing the topographic elevations of adjacent undisturbed areas to reclaimed areas is "biased and inconsistent" with the oil company's permits;
- Fundamental plant community attributes—such as species richness and diversity—between impacted and adjacent, undisturbed areas are not being disclosed; and
- Plant species are misidentified.

It is important for Burnett Oil Company to get the monitoring of the reclamation right from the start. Otherwise, subsequent years of monitoring will not be effective in identifying problems with the oil company's reclamation attempts so they can be promptly corrected. In short, despite the oil company's claims to the contrary, our scientific experts continue to conclude that long-term soil, hydrologic, and vegetation damage will persist as a result of Burnett Oil Company's seismic survey activities.[6]

*Impacts from Proposed Oil Development Must Not be Piecemealed*

In addition to exploration, oil development (drilling and related infrastructure) can have long-lasting impacts. However, it appears that Burnett Oil Company may be piecemealing its permit applications to avoid analyzing and disclosing to the public the secondary and cumulative impacts of the forthcoming oil development, including drilling and any well stimulation techniques, such as hydraulic fracturing or acidizing. It appears from a review of the Department's Section 404 permitting database that Burnett Oil Company is applying for authorization to fill wetlands to construct oil well pads and access roads at two new locations in the Preserve. However, we have not seen any related oil and gas permit applications submitted to the Department, or any federal access permits submitted to the National Park Service, to authorize oil drilling or other development, as of the date of this letter. Therefore, it appears that Burnett Oil Company is seeking authorization for direct wetland impacts associated with preemptive oil drilling activities (filling of wetlands to construct well pads and access roads), without disclosing the full impacts associated with oil development, including secondary and cumulative impacts. This approach thwarts

---

[6] Quest Ecology, *Comments on Turrell, Hall and Associates, Inc.'s 2020 Reclamation Monitoring Report –October 20th, 2020 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (December 15, 2020), available at: https://www.nrdc.org/sites/default/files/quest-comments-monitoring-report-20201215.pdf.

4

informed and transparent environmental review and fails to provide the Department with the reasonable assurances required to issue permits for these activities. Impacts associated with oil development that can occur and must be analyzed here are as follows:[7]

   A. *Upstream (Well) Development Activities*

- Development activities, including those associated with access roads, staging areas, seismic operations, as well as geophysical exploration including surveying/staking, land/tree clearing, explosives use, boring and vehicle traffic.
- Well field development activities, including those associated with production wells, well pads, drilling rigs, pump/well heads, reserve pits, storage tanks, fuel tanks, water tanks, electric equipment, drilling pipe storage, water wells, waterlines, surface water intakes, disposal wells, water impoundments, borrow pits, reserve pits, electric distribution lines, communication towers.
- Construction activities associated with well pads and ancillary features and onsite components, including but not limited to surveying/staking, land/tree clearing, grading, stormwater and erosion and sediment control infrastructure, wetland, stream and sensitive area mitigation/protection, trenching/boring, surface water pumping, spoil/debris, vegetation piles, vehicle traffic, drilling/well pad development and completion activities, office, control, utility, storage and maintenance structures incidental to specific projects.
- Production and operations activities, including those related to access roads, production, gas flaring, vehicle traffic, post-construction stormwater management, maintenance of well pads and ancillary features and components (including supporting infrastructure installation, repair and replacement, equipment upgrades, inspections and repairs, workovers and recompletions, minor amounts of soil disturbance, vegetation maintenance, road maintenance, etc.).
- Decommissioning and reclamation activities, including those associated with vehicle traffic, land/tree clearing, land excavation/backfilling, vegetation restoration and well plugging.

   B. *Midstream (Pipeline) Development Activities*

- Construction of gathering, transmission and distribution pipelines and associated activities, including but not limited to access roads, staging areas, pipe storage/laydown areas, stream and water crossings, road borings, surveying/staking, land/tree clearing, stormwater and erosion and sediment controls, grading, trenching/boring, stockpiles, pipeline assembly, trench backfilling, vehicle traffic, revegetation and reclamation of surface impacts.
- Construction of surface features, including but not limited to access roads, staging areas and storage yards, booster, compressor and pump stations and related facilities, meter stations, mainline valves, pig launcher/receiver facilities, regular facilities, facilities to process, refine, stabilize and store natural gas and/or other hydrocarbons, communication towers, electric distribution lines, electric substations, capacitor stations, transformer

---

[7] *See* U.S. Fish and Wildlife Service, *Oil & Gas Coalition Multi-State Habitat Conservation Plan*, https://www.fws.gov/northeast/PDF/OG_HCP_EIS_FAQs.pdf.

stations, office/control/utility/storage/maintenance structures incidental to specific projects, parking areas, cathodic protection, storage tanks.

- Operation and maintenance of pipeline and surface facilities, including but not limited to vehicle traffic, equipment upgrades, inspections and repairs/replacements, leak detection, pigging, painting, minor amounts of soil disturbance, vegetation maintenance to preserve the ROW [right-of-way], road maintenance, and odorization.
- Installation of new culverts/ditches, gas flaring, blow downs, and hydrostatic testing and discharge.
- Decommissioning and reclamation of pipeline and surface facilities, including but not limited to vehicle traffic, land excavation/backfilling, and vegetative restoration.

For example, as the photograph below shows, existing oil pads and associated roads in Big Cypress National Preserve are clearly visible in the landscape.



An oil pad and road near Raccoon Point in the Big Cypress National Preserve (January 2019)
Photo credit: Jonathan Milne, LightHawk

6

JA.623

C. *Greenhouse Gas Emissions from Oil Development, including Downstream Activities, and Climate Change*

- A large and growing body of scientific research demonstrates, with ever increasing confidence, that climate change is occurring and is caused by emissions of greenhouse gases (GHGs) from human activities, primarily the use of fossil fuels. The 2018 Intergovernmental Panel on Climate Change (IPCC) Special Report on Global Warming of 1.5°C found that human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, and that warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.[8]

- The 2018 United States Fourth National Climate Assessment found (NCA4), "that the evidence of human-caused climate change is overwhelming and continues to strengthen, that the impacts of climate change are intensifying across the country, and that climate-related threats to Americans' physical, social, and economic well-being are rising."[9] Like the IPCC, the authors of NCA4 found that impacts are already occurring, concluding that "[t]he impacts of global climate change are already being felt in the United States and are projected to intensify in the future—but the severity of future impacts will depend largely on actions taken to reduce GHG emissions and to adapt to the changes that will occur."[10]

- Both the IPCC and National Climate Assessment, respectively, acknowledge the role of fossil fuels in driving climate change.[11][12]

- Research shows that fossil fuels produced from U.S. federal lands are already a significant source of GHG emissions and that together, coal, oil, and natural gas produced on federal lands account for approximately 25 percent of the total fossil fuels produced annually in the United States.[13]

- Federal lands are also a critical carbon sink. The U.S. Geological Survey (USGS) found that in 2014, federal lands of the conterminous United States stored an estimated 83,600 MMT CO2 Eq., in soils (63 percent), live vegetation (26 percent), and dead organic matter (10 percent).79 In addition, the USGS estimated that Federal lands "sequestered an average of 195 MMT CO2 Eq./yr between 2005 and 2014, offsetting approximately 15 percent of the CO2 emissions resulting from the extraction of fossil fuels on Federal lands and their end-use combustion."[14] Here, surface disturbing activities from the oil development will likely reduce the Preserve lands carbon sequestration ability.

---

[8] 2018 Intergovernmental Panel on Climate Change, *Summary for Policymakers*, *in* Global Warming of 1.5°C: An IPCC Special Report on the Impacts of Global Warming of 1.5°C Above Pre-industrial Levels and Related Global Greenhouse Gas Emission Pathways, in the Context of Strengthening the Global Response to the Threat of Climate Change, Sustainable Development, and Efforts to Eradicate Poverty 6 (Valérie Masson-Delmotte et al. eds., 2018) (attached) [hereinafter, *Summary of IPCC 1.5°C Report*].

[9] U.S. Global Change Research Program, Fourth National Climate Assessment: Volume II Impacts, Risks, and Adaptation in the United States 36 (David Reidmiller et al. eds. 2018)[hereinafter, *NCA4*].

[10] *Id*. at 32.

[11] 2014 Intergovernmental Panel on Climate Change, *Climate Change 2014 Synthesis Report: Contribution of Working Groups I, II, and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* 46 (Rajendra K. Pachauri et al. eds. 2015) [hereinafter, *AR5*].

[12] *NCA4* at 76.

[13] Matthew D. Merrill, et al., Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-14: U.S. Geological Survey Scientific Investigations Report 2018-5131 6 (2018)[hereinafter, *USGS 2018 Report*].

[14] *Id*. at 1.

- The Biden-Harris Administration recently issued an executive order acknowledging the climate crisis and the potential climate and other impacts associated with oil and gas activities on public lands,[15] and a memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships.[16]

- The emissions associated with the production of fossil fuels from federal lands can be divided into two categories: (1) direct emissions associated with activities such as construction, drilling, completion, and well operation; and (2) indirect or "downstream" emissions associated with activities such as transportation, processing and end use of those fuels. Since direct emissions from production represent only a small proportion of the life cycle emissions from fossil fuels, agencies must analyze and disclose to the public both the direct and indirect effects for the entire supply chain. This includes emissions from exploration, development, drilling, completion (including hydraulic fracturing), production, gathering, boosting, processing, transportation, transmission, storage, distribution, refining, and end use.

- End uses of fossil fuels include combustion, which is the largest source of energy-related GHG emissions.[17] Other end uses may result in oil or gas being used as a feedstock to create other products rather than being combusted. The creation and use of such products may also result in GHG emissions, and those emissions could be greater or lesser than the GHG emissions caused by combustion.

All of the aforementioned impacts must be analyzed and disclosed together, rather than in a piecemeal fashion.

*Formal Government-to-Government Tribal Consultation is Required*

Additionally, we understand that the areas of the Preserve encompassed in Burnett Oil Company's new permit applications contain identified archaeological and culturally sensitive sites, and that the Miccosukee Tribe of Indians of Florida opposes these permit applications and have requested formal consultation. Formal consultation must also be initiated with the Seminole Tribe of Florida. We oppose any permit applications that adversely impact cultural and archaeological resources or impact the spiritual and cultural traditions of Native American tribes or interfere with sacred landscapes of indigenous peoples.

*Public Records Request under Chapter 119, Florida Statutes*

Finally, we found it difficult to locate and view all of Burnett Oil Company's permit application materials on the Department's state 404 permit MapViewer website and we could not locate any related documents through a project-specific search on the Department's Oculus database, even though the 404 web page directs the public that files are available there. The documents we were

---

[15] The White House, *Executive Order on Tackling the Climate Crisis at Home and Abroad* (January 27, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

[16] The White House, *Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships* (January 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-tribal-consultation-and-strengthening-nation-to-nation-relationships/.

[17] *See* Bureau of Land Management, *Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, DOI-BLM-UT-0000-2021-0001-EA* (Oct. 2020) at 27.

able to locate thus far include the following: NPDES Discharge Control Plans and Details; Section A: General Information for All Activities; Tamiami Prospect; ERP/State 404 Environmental Supplement; and Stormwater Management System Engineering Supplemental Report. We request that the Department treat this as a public records request under Chapter 119, Florida Statutes, seeking any other records[18] related to Burnett Oil Company's Section 404 and Environmental Resource Permit applications, including any correspondence with the Department. If these documents are readily available online, please advise. Please also contact the undersigned before doing anything that would cause the related costs or fees to exceed $150.00.

*Conclusion and Formal Meeting and Notice Request*

Based on the foregoing, we fail to understand how Burnett Oil Company can demonstrate compliance with state and federal laws for issuance of the requested Section 404 Clean Water Act and Environmental Resource Permits. Therefore, we renew our request for a "time out" on further seismic, filling, drilling, or other related activities so that the Department, in consultation with the National Park Service, U.S. Fish and Wildlife Service, and Tribal governments can: (1) fully assess the existing damage caused by Burnett Oil Company's seismic testing and require completion of scientifically-based reclamation, monitoring, and compensatory mitigation for the damage that has already occurred; (2) request additional information on the secondary and cumulative impacts associated with new oil development; (3) analyze and disclose this information to the public and Tribal governments; (4) ensure Endangered Species Act obligations will be met; (5) engage in consultation under the National Historic Preservation Act; and (6) engage in meaningful government-to-government Tribal consultation. This is necessary for the Department to evaluate the full picture of the environmental damage already caused by Burnett Oil Company, and to analyze and disclose to the public whether the company can provide scientifically supported reasonable assurances to meet all applicable permit criteria for its proposed oil development activities.

We will continue to attempt to work with state and federal agencies to protect America's first National Preserve, which provides immeasurable values to the Everglades, Tribal and other frontline communities, public water supplies, tourism, wildlife, and the economy.[19] To this end, we respectfully request a meeting with you to further discuss our grave concerns with the adverse impacts that have already occurred to Preserve resources as a result of oil exploration, and the additional adverse impacts that would likely occur if Section 404 and Environmental Resource Permits are issued allowing more oil development. We will also submit detailed comments once

---

[18] "Records" means anything denoted by the use of that word or its singular form in the text of the Freedom of Information Act and includes correspondence, minutes of meetings, memoranda, notes, emails, notices, facsimiles, charts, tables, electronic data, Geographic Information Systems (GIS) data and shape files, aerial imagery and photography, data contained within cell phone applications, video footage, presentations, orders, filings, and other writings (handwritten, typed, electronic, or otherwise produced, reproduced, or stored). This request seeks responsive records in the custody of any Department office.

[19] Frank Ackerman, Ph.D., Synapse Energy Economics, *Why Drill for Oil in Florida? Tiny Industry, Huge Risks* (2018), available at: https://www.nrdc.org/sites/default/files/why-drill-for-oil-in-florida-tiny-industry-huge-risks_2018-10-22.pdf.

JA.626

we have had a chance to review all of Burnett Oil Company's permit application materials and any documents responsive to our public records request.[20]

Finally, we request Department notification of all activity on the pending permit applications and renew our requests for the Department to notify us of any public notices and/or notices of intent to issue any Department permits to Burnett Oil Company. Please do not hesitate to contact us if you have any questions. Thank you in advance for your consideration.

Sincerely,


Alison Kelly
Senior Attorney
Natural Resources Defense Council
1152 15th Street, NW
Suite 300
Washington, DC 20005
(202) 717-8297
akelly@nrdc.org

Melissa Abdo, Ph.D.
Sun Coast Regional Director
National Parks Conservation Association
777 6th Street, NW Suite 700
Washington, DC 20001
(954) 298-0819
mabdo@npca.org

Nicole Johnson, Director of Environmental Policy
Amber Crooks, Environmental Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, FL 34102
(239) 262-0304
nicolej@conservancy.org
amberc@conservancy.org

Jaclyn Lopez
Florida Director/Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
(727) 490-9190
jlopez@biologicaldiversity.org

---

[20] NRDC also has three outstanding Freedom of Information Act Requests from 2017 and 2018 pending with the National Park Service that have not been fulfilled.

JA.627

cc:

Scott de la Vega, Acting Secretary, U.S. Department of the Interior
Stan Austin, Southeast Regional Director, U.S. Department of the Interior
Shannon Estenoz, Principal Deputy Assistant Secretary, U.S. Department of the Interior
Pedro Ramos, Superintendent, Everglades and Dry Tortugas National Parks
Thomas Forsyth, Superintendent, Big Cypress National Preserve
Tony Pernas, Chief of Resource Management, Big Cypress National Preserve
Don Hargrove, Regional Minerals Manager, Big Cypress National Preserve
Jane Nishida, Acting Administrator, Environmental Protection Agency
John Blevins, Region IV Administrator, Environmental Protection Agency
Radhika Fox, Acting Assistant Administrator for Water, Environmental Protection Agency
Tom Wall, Director, Office of Wetlands, Oceans and Watersheds, Environmental Protection Agency
John A. Coates, Mining and Minerals Programs Director, Florida Department of Environmental Protection
Cindy Mulkey, Oil and Gas Program Administrator, Florida Department of Environmental Protection
Jon M. Iglehart, South District Director, Florida Department of Environmental Protection
Pierre Bruno, Florida Department of Environmental Protection
Larry Williams, State Supervisor, Florida, U.S. Fish and Wildlife Service
Colonel Andrew Kelly, Jacksonville District Commander, U.S. Army Corps of Engineers
John Policarpo, Chief, Fort Myers Section, U.S. Army Corps of Engineers

JA.628

# Attachment D



MIAMI-DADE EXPRESSWAY AUTHORITY

3790 N.W. 21 St.  Miami, FL 33142   T 305.637.3277   F 305.637.3283
www.mdxway.com

August 20, 2021


David White
Environmental Specialist II
Florida Department of Environmental Protection
3300 PGA Boulevard, MSC 7210-1
West Palm Beach, FL 33406


Re: State 404 Permit Application No. 13-396515-001-SFI

Dear Mr. White:

The Miami-Dade Expressway Authority (MDX) submitted a 404-permit application to the United States
Army Corps of Engineers (USACE) as part of the federal review process under Section 404 and the National
Environmental Policy Act (NEPA). This permit application was transferred to the Florida Department of
Environmental Protection (FDEP) under the recently approved State 404 Permit Program.

In correspondence with both the South Florida Water Management District (SFWMD) and the FDEP
regarding the Environmental Resource Permit (ERP) and State 404 permit applications, both agencies have
recommended that the process be pursued through joint agency collaboration. Due to the extent of the
project and to ensure the ERP permit application submissions meet agency requirements, the MDX is
engaging with the SFWMD through a pre-application process. A formal application has not yet been
submitted to the SFWMD.

Since the State 404 authorization cannot be issued until the ERP has been issued (as per FAC 62-331.070),
the MDX would like to respectfully withdraw the current State 404 permit application (application no. 13-
396515-001-SFI) and continue the project review through a pre-permit application process with the FDEP.

The MDX would like to engage in this review of pre-permit application documents with the FDEP, initiated
through a written agreement between the two agencies. In addition, we would like confirmation of the
time frames for review of these pre-application documents, since the FDEP 404 Handbook does not
provide for such.

JA.630



MIAMI-DADE EXPRESSWAY AUTHORITY

3790 N.W. 21 St.  Miami, FL 33142   T 305.637.3277   F 305.637.3283

www.mdxway.com

If you have any questions or comments, please feel free to reach me at (305) 637-3277 ext. 2115 or jtoledo@mdxway.com.

Sincerely,


Juan Toledo, P.E.
Deputy Executive Director/Director of Engineering

Cc: Jeffery Meyer, Environmental Manager, ERP Permitting (FDEP)
    Norva Blandin, Program Administrator, Permitting & Waste Clean-up (FDEP)
    Claudio Diaferia, M.S., P.E., Assistant Director of Engineering (MDX)
    Kevin Brown, Program Director (MDX/HNTB)

# Attachment E



# Everglades Coalition

1000 Friends of Florida
Arthur R. Marshall Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
Snook and Gamefish Foundation
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
The Urban Environment League of
Greater Miami
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

July 26, 2019

Megan Clouser
Senior Project Manager
U.S. Army Corps of Engineers
9900 SW 107th Avenue, Suite 203
Miami, FL 33176

Re: Opposition to 404 Wetland Degradation Permit Application for 836 Extension Permit Application No. SAJ-2018-01778 (SP-MLC)

Dear Ms. Clouser:

The Everglades Coalition - comprised of 62 organizations committed to the health and protection of America's Everglades - opposes the proposed 404 Wetlands Degradation permit sought by the Miami Dade Expressway Authority (MDX) for the purpose of developing a six-lane toll road extending State Road (SR) 836 through jurisdictional wetlands within the Comprehensive Everglades Restoration Plan's (CERP) footprint. We ask that this permit be denied, and that MDX consider other existing hybrid alternatives that do not bisect the Bird Drive Basin and instead take advantage of existing infrastructure. The detrimental impacts to the CERP footprint are unnecessary and avoidable.

CERP was authorized by Congress to "restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection."[1] While we recognize CERP is not static and uses adaptive management to evolve, we also recognize that preserving the east coast buffer within the ecosystem will likely be more important than ever to improve water quality and eliminate harmful discharges to the east and west as we seek to increase the ability to send more water south to this very transmissive area for aquifer recharge. The proposed project has damaging impacts to CERP. Most notably, the project involves construction of a permanent fixture in a very low-lying area, which will require additional flood and groundwater protection measures. Further, the project's induced development will drive up the cost of land needed for acquisition, potentially eliminating willing sellers. These impacts undermine the goals and benefits of CERP and set a negative precedent.

---

[1] Comprehensive Everglades Restoration Plan (CERP), National Park Service, https://www.nps.gov/ever/learn/nature/cerp.htm.

*Committed to full protection and restoration of America's Everglades*

MDX's current proposal poses a particular threat to the Bird Drive Recharge Area (BDRA) project within CERP. The goals of this project include reducing seepage from Everglades National Park to improve the hydrology of the park's ecosystem, recharge groundwater east of Krome Avenue to improve Miami-Dade County water supply, improve the spatial extent of wetlands, and improve water supply to the South Dade Conveyance System.[2] A fully-developed plan for the Bird Drive Basin (BDB) has not yet been identified. Until critical project components have been fully modeled and defined, a project like this six-lane tollway cutting through the project footprint is premature and threatens critical federal initiatives to protect and restore Everglades National Park.

The Everglades Coalition has opposed the expansion of the SR 836 into the sensitive and CERP-critical wetlands west of the Miami-Dade County Urban Development Boundary (UDB) since 2013. The Everglades Coalition passed a resolution in opposition to the project in May 2013, sent a letter to MDX stating our opposition to the current iteration of their plans in April 2015[3], and sent a letter to the South Florida Water Management District (SFWMD) detailing the impacts this project would have on CERP and the broader Everglades ecosystem in July 2018.[4] The negative impacts of this project on CERP necessitate the denial of the applicant's permit request.

**Impacts to CERP Bird Drive Recharge Area**

The physical presence of a major roadway would undermine CERP viability within the BRDA footprint because a central aspect of the project involves developing the ability to store surface water up to four feet, allowing for aquifer recharge. We are also concerned with how increased light pollution and noise in close proximity to Everglades National Park will not be compatible with wildlife and endangered species that use this area for foraging and nesting such as snail kites, panthers, bonneted bats, and woodstorks.

The BDRA is linked to both upstream CERP projects and the downstream South Dade Conveyance System (SDCS). The BDRA can provide water storage year-round and release water to the SDCS throughout the dry season. Modeling performed by Dr. Thomas Van Lent of the Everglades Foundation demonstrates that the successful implementation of the BDRA project is critical to prevent dry season water shortages in South Dade and to maintain a freshwater head that helps fight against saltwater intrusion at coastal structures.[5] With the full seepage barrier implementation, this recharge may be more important to this region than previously modeled, as the CERP model run only modeled for a seepage barrier that was partially engaged.

At their July 11, 2019 meeting, the South Florida Water Management District (SFWMD) Governing Board discussed the importance of BDRA project's north-south connectivity as a part of overall efforts to restore this critical area of the ecosystem. Specifically, the east coast buffer provided by the project and spatial extent of wetlands were discussed as critical CERP components needed to send clean water south. While the BDRA project was delayed for a restudy purpose in

---

[2] https://www.sfwmd.gov/sites/default/files/documents/bdrupdate_eb_12_14_11.pdf
[3] EVCO Ltr RE: 836/Dolphin Expressway Southwest Extension (Project 83618), 4/3/2015.
https://docs.wixstatic.com/ugd/599879_33911d71b9344705b62b72ed3730f649.pdf
[4] EVCO Ltr RE: Re: Kendall Parkway Comprehensive Plan Amendment, State Application Review, 7/31/2018,
https://docs.wixstatic.com/ugd/599879_fc6383a4af6c4817b2297aa1a083e666.pdf
[5] Analysis of the Potential for the State Road 836 Expansion to Affect the Comprehensive Everglades Restoration Plan, Thomas Van Lent, 6/18/2019

*Committed to full protection and restoration of America's Everglades*

2008 and currently lacks a specific timeframe for construction and engineering, it is still on track for implementation.[6] The restudy called for a change of course and a "conveyance concept" project was presented to concentrate land acquisition on the western part of Bird Drive Basin, which was approved by the SFWMD in resolution No. 2012-511**:**

A RESOLUTION OF THE GOVERNING BOARD OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT ACCEPTING THE FORMULATION FINDINGS AND RECOMMENDATION OF THE LEADERSHIP OF THE U.S. ARMY CORPS OF ENGINEERS JACKSONVILLE DISTRICT AND THE STAFF OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT REGARDING THE BIRD DRIVE RECHARGE AREA PLAN; ACKNOWLEDGING THAT DISTRICT STAFF WILL COORDINATE WITH THE DEPARTMENT OF INTERIOR TO RECONCILE OBLIGATIONS UNDER LAND AND WATER CONSERVATION FUND GRANTS WITH RESPECT TO CERTAIN PARCELS WITHIN THE BIRD DRIVE BASIN AND SOLICIT IDEAS FOR POSSIBLE INTEGRATION OF DISTRICT OWNED LANDS INTO OTHER REGIONAL PROJECTS; DIRECTING DISTRICT STAFF TO COORDINATE WITH OTHER STAKEHOLDERS TO SOLICIT IDEAS FOR OTHER PROJECTS WITHIN THE REGION; PROVIDING AN EFFECTIVE DATE.

To our knowledge, no further action, including meeting all the benefits described in CERP or satisfying the above highlighted language above has been completed by the SFWMD. The development of this multi-lane highway would constitute a permanent decision that directly impacts up to 500 acres of wetlands and will only worsen our ability to expand the spatial extent of wetlands within the east coast buffer area. Many of these lands are encumbered by federal grant obligations for conservation and there is no mitigation elsewhere that would deliver the same benefits.

**Impacts to other CERP components and Everglades Projects**

This project would also impact the following CERP components as listed in the Yellow Book[7]: V (L-31N Improvements for Seepage Management), FF (S-356 Structures), BB (Dade/Broward Levee/ Pennsuco Wetlands), S/EE (Central Lake Belt Storage Area), XX (North Lake Belt Storage Area), YY and ZZ. Component V involves the extension of the L-31 N canal along an altered course. The road would intercept the east west running portion of the L-31 N canal and either preclude its use or minimize its effectiveness. All of the other project components previously mentioned either rely in whole or in part on the successful implementation of component V.[8]

---

[6] SFWMD, Bird Drive Basin-Background and Current Status. April 30, 2012.
[7] "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (PEIS) for the Central and Southern Florida Project, Comprehensive Review Study" (Yellow Book), April 1999
[8] Potential Hydrological Effects of the Proposed 836 Extension on Everglades Restoration (CERP) and the Miami-Dade Consumptive Use Permit (CUP) for the M-D West Wellfield, Christopher McVoy, Ph.D.
June 19, 2019

*Committed to full protection and restoration of America's Everglades*



Taken from: "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (PEIS)
for the Central and Southern Florida Project, Comprehensive Review Study" (Yellow Book), April 1999, Appendix A4,
Alternative D13R, Bird Drive Basin and L-31N Seepage Management, Component Map 7 (pg. A4-59)

The proposed road would also impose on the Pennsuco wetlands north of Tamiami Trail. The Pennsuco wetlands and the BDRA are important components of the East Coast Buffer. The wetlands of the East Coast Buffer provide a boundary between the wetlands of Everglades National Park and the urban core of Miami-Dade and Broward Counties. This buffer is critical to seepage management, groundwater recharge, and wetland protection.

The SFWMD has acquired land in the Pennsuco wetlands area using a myriad of state and federal funding sources, in addition to funding from developers seeking off-site mitigation. On October 25, 2017, the District acquired an additional 1,100 acres within the Pennsuco wetlands via Lake Belt Mitigation funds, bringing approximately 86% of the 12,732 acre Pennsuco wetlands into public ownership.

*Committed to full protection and restoration of America's Everglades*

**Alternatives**

Under 40 C.F.R. § 230.12(a)(3)(i-iv), 404 permits may not be issued if: (i) there is a practicable alternative which would have less adverse impact and does not have other significant adverse environmental consequences, (ii) the discharge will result in significant degradation, (iii) the discharge does not include all appropriate and practicable measures to minimize potential harm, or (iv) there is insufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Corp's Guidelines for permit issuance.[9]

Practical alternatives exist to this project, and the applicant has not adequately studied or reported these alternatives. The only alternatives explored by MDX were a limited number of alternative road corridors – twelve out of thirteen of which bisect the BDRA. The applicant has failed to sufficiently explore hybrid alternatives which use existing infrastructure in combination with improvements and transit. Only one alternative inside the UDB was evaluated and it was determined as being the most effective way to solve traffic congestion. However, MDX deemed it infeasible because of cost and displacement of existing infrastructure. MDX failed to review real public transit alternatives that would effectively service the existing built environment but has instead chosen an alternative that would incite urban sprawl next to a critical CERP project footprint. We feel that is because the applicant (MDX)'s primary focus is on building expressways and it relies on collecting toll revenues. Therefore, MDX did not adequately vet all transportation alternatives to solve the stated traffic problem. The only viable option is the no action alternative because it (1) does not interfere with a federally-funded project (CERP), (2) is not contrary to USACE guidelines, and (3) forces mass transit to become a priority in Miami-Dade County.

**No Action Alternative**

In a white paper written on behalf of the Transit Alliance Miami, Walter Kulash, a transit and development expert, concludes that **there is no demonstrated need for the SR 836 expansion.** According to The Corridor Evaluation Traffic Technical Memorandum prepared on behalf of MDX, of 112 segments of major arterial and collector streets examined in the traffic study area, only thirteen failed to meet Miami Dade County CDMP multi-mode level of service standards with a volume to capacity ratio of less than 1.20 in either the AM or PM periods. Overall, the Traffic Technical Memorandum failed to show a sufficient current or future need that justifies MDX's proposal for a new multi-lane toll highway.

MDX proposed highway project does not provide the right solution to traffic needs. Studies show that expanding highways creates more traffic over time, not less.[10,11,12,13]   The Kulash report estimates that ten years after the 836 extension opens, the daily vehicle count of induced traffic

[9] 40 C.F.R. § 230.12(a)(3)(i-iv).
[10] Goodwin, Phil. Empirical evidence on induced traffic. Transportation. February 1996, Volume 23, Issue 1, pp 35–54
[11] Milam et al., 'Closing the Induced Vehicle Travel Gap Between Research and Practice', Transportation Research Record: Journal of the Transportation Research Board, 2017, DOI 10.3141/2653-02
[12] Litman. Generated Traffic and Induced Travel Implications for Transport Planning. Victoria Transport Policy Institute, 2017
[13] Schwager, Diane. 'Consequences of the Development of the Interstate Highway System for Transit'. Transit Cooperative Research Program Sponsored by the Federal Transit Administration RESEARCH RESULTS DIGEST. August 1997. http://onlinepubs.trb.org/onlinepubs/tcrp/tcrp_rrd_21.pdf

*Committed to full protection and restoration of America's Everglades*

will be four times greater than the reduction in traffic on the arterial streets that the extension was designed to alleviate. In other words, the induced traffic would be far greater than the intended traffic reduction.[14] As such, a 'No Action' alternative remains the best alternative not only for the health of the Everglades, but also for traffic conditions and congestion reduction on Miami-Dade County's roadways.

**Transit Alternative**

The Kulash report goes on to describe a plan for solving the traffic issues alluded to via major transit improvements along SW 137th Avenue, between SW 136th Street and NW 12th Street. This transit extension would constitute a reasonable extension of Miami Dade County's   Strategic Miami Area Rapid Transit (SMART) plan. This plan would result in far greater reduction in vehicle miles traveled and improve traffic services in the area in question far more effectively than the road extension.[15]

In spite of the viability of this alternative – which achieves county traffic goals while protecting the federal investment in CERP – this alternative has not been fully vetted by the applicant. We believe it is premature to grant a 404 wetland fill permit on this project before other reasonable alternatives have been thoroughly considered.

**Road Alternatives**

The Miccosukee Tribe of Indians has consistently indicated that the proposed roadway would have a detrimental impact on adjacent tribal resources. As such, the Tribe has promoted a road expansion alternative that would not impact tribal land or resources and that may have lesser impacts on the Everglades system and ongoing Everglades restoration projects. This alternative would involve linking the SR-836 to the recently widened Krome Avenue via an elevated highway, which makes use of existing infrastructure. This alternative would facilitate vehicle traffic while minimizing wetland degradation and negative impacts to the BDRA.

**Insufficiency of the interlocal agreement**

Much of the supposed protections that MDX has offered for wetland resources are derived from an interlocal agreement, not actual Comprehensive Development Master Plan (CDMP) amendments. An interlocal agreement is a wholly inappropriate tool to use in order to ensure that obligations for ensuring there are no conflicts with CERP projects. At a minimum, these protections would need to be ensured within the four corners of the CDMP in order to be considered legitimate and enforceable. A simple majority of the Miami-Dade County Commission can change the details of the interlocal agreement very easily whereas a CDMP change would require a supermajority from the Commission.

---

[14] Selected Traffic and Transit Issues SR 836 Extension Dade County, Florida, Walter Kulash, Miami Transit Alliance, 12/24/2018
[15] Ibid.

**Conclusion**

The United States of America and the State of Florida have invested hundreds of millions of dollars to protect and restore Everglades National Park through implementation of CERP. Indeed, the U.S. Army Corps of Engineers is a close restoration partner facilitating the planning, construction, and operations of key restoration projects. The proposed SR 836 as offered by MDX represents a significant threat to the viability of CERP components that are essential to supplying clean water to the Everglades and protecting Miami-Dade County's water supply. The member organizations of the Everglades Coalition strongly urge you to deny this permit application on the virtue of its negative impacts on CERP – especially given that there are a number of viable alternatives that have not been fully vetted by the applicant which would eliminate the significant detrimental impacts of the current proposal.

Sincerely,


Mark Perry
Co-Chair

Marisa Carrozzo
Co-Chair

*Committed to full protection and restoration of America's Everglades*

# Attachment F



# Everglades Coalition

1000 Friends of Florida
Angler Action Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

*Sent Via Email*

June 24, 2020

Office of Governor Ron DeSantis
State of Florida
The Capitol
400 S. Monroe St.
Tallahassee, FL 32399-0001
governorron.desantis@eog.myflorida.com

**Re: Miami-Dade County SR-836 Extension Proposal Ruling**

Dear Governor DeSantis and members of the Florida Cabinet:

On behalf of the 61 member organizations of the Everglades Coalition[1] committed to the protection and restoration of America's Everglades, we write to you to ask you to uphold the recent ruling by Administrative Law Judge Suzanne Van Wyk, which held that the proposed expansion of Miami-Dade's SR-836 tollway demonstrated inconsistency with Everglades restoration efforts, is inconsistent with Miami-Dade County's Comprehensive Development Master Plan, and is inconsistent with state law. The proposed 6 lane toll road would snake 14 miles outside of Miami-Dade County's Urban Development Boundary. It would impact water quality and disrupt fragile ecosystems and natural resources on the Miami-Dade County periphery, which the State has invested significant resources toward protecting and preserving for the benefit of all Floridians. We urge you to uphold your record as champions of Florida's Everglades, protect the State's investments, and put an end to the ill-fated campaign that violates state planning law, threatens our Everglades, and would not provide meaningful benefits to Florida residents.

Judge Van Wyk arrived at two clear findings in her order: First, the project's planning did not adequately consider potential for negative impacts to Comprehensive Everglades Restoration Plan projects and goals; nor did the County receive an adequate determination by the South Florida Water Management District that the project would not compromise the goals of CERP. The failure of the county to obtain an adequate determination is particularly concerning in light of the South Florida Water Management District's ongoing plans to construct a CERP project component in the Bird Drive Basin, which the road bisects. Second, the billion-dollar project itself is not an appropriate reaction to transportation data, and would elicit only meager mobility improvements in the target area and virtually no improvement for commuters. Testimony from the county's own experts revealed that drivers would shave a mere 6 minutes off a two-hour commute as a result of this project's implementation[2]. The County CDMP requires that it shift the travel mode from single occupancy vehicle to mass transit[3], and yet no data or analysis proves that the mass transit option listed in the Plan Amendment would actually be used.

---

[1] Abstaining from the Everglades Coalition on this matter were Tropical Audubon Society and Friends of the Everglades.
[2] Trial Tr. *TAS et al v. Miami-Dade County*, Fla. DOAH Case No. 2018-5695GM. Vol. 12, 1881:11-1882:15, July 26, 2019
[3] Miami-Dade Comprehensive Development Master Plan, Policy MT-7C

This project would exert an outsized negative impact on state investments[4], freshwater resources, ecological resources[5], and would negatively impact CERP[6]. The County fell far short of meeting its burden to prove that the tollway would be consistent with Everglades restoration; and it adopted the tollway amendment despite the South Florida Water Management District's claim that the County had not proved the amendment would not cause harm.

The project has also encountered significant criticism at the Federal level. The Federal Government is Florida's partner towards the shared goal of Everglades restoration under CERP, and has invested significant resources towards future projects in the area in question. The office of Florida Senator Marco Rubio has criticized the project on a number of occasions, and the U.S. Department of the Interior and the U.S. Environmental Protection Agency have both expressed their concerns with the proposed project. The U.S. EPA claims the tollway would "incur substantial and unacceptable consequences for the Everglades as a whole"[7].

The EPA went on to say that the area "plays a critical strategic role in the overall plan for restoration of the southern Everglades." As you are aware, South Florida's water-related dilemmas are playing out in real time for both its residents and its wildlife. The Judge found that the new tollway "creates a risk of contamination to the wellfield" and that the Plan Amendment violates the County's requirement to "protect and enhance" wellfields. The Plan Amendment is also inconsistent with the County's requirement to protect the Pennsucco wetlands, an area designated as critical habitat for the threatened and endangered species that is protected by the CDMP.

For all of the problems it creates, the tollway doesn't solve the problem for which it was created. The Judge found that "Not only [did] the data reveal that the improvements in West Kendall, congestion would be … 'meager,' …they provide no support for a finding that the Plan Amendment will … improve the commute time to downtown and other employment centers."[8]

The Judge's summation of the proposal was apt: "commuters will drive 13 miles, outside of the UDB, through active agricultural lands, through environmentally-sensitive lands, and through the West Wellfield, only to connect with the existing expressway operating at [a level of service] lower than it operates at today."[9] Placing this tollway outside of the UDB is inconsistent with the very intent of the UDB, and the proposed tollway, unfortunately, would harm rather than help the people, land, water, and wildlife it would literally and figuratively touch.

We need not convince you of the Everglades' paramount importance to the health and prosperity of Miami-Dade and our state as a whole, and the vital role it plays in so many of our state affairs, from public health to drinking water to tourism. Making the choice to move against this proposal is a straightforward, common-sense decision to protect Floridians from the echoing impacts of a poorly executed plan.

There is no ideal time to engage in a project that offers unproven benefits at the cost of proven harms. It is time to declare an end to this pursuit, and instead turn our attention to proven solutions. When Miami-Dade recovers from the struggles our entire country is facing, a host of alternative infrastructure improvements await, offering the prospect of faster, more convenient, more affordable commutes. We need not spend taxpayer dollars and years navigating thorny legal waters for what would garner a weak return on

---

[4] Department of the Interior Letter
[5] McVoy Dep. 31:21-31:20, June 24, 2019, *TAS et al v. Miami-Dade County*, DOAH Case No's 2018-5695GM, 2018-5696GM)
[6] McVoy Dep. 31:21-31:20, June 24, 2019, *TAS et al v. Miami-Dade County*, DOAH Case No's 2018-5695GM, 2018-5696GM)
[7] August 2019 Letter from EPA to USACE
[8] State of Florida DOAH Order Case No. 18-5695GM p. 56
[9] State of Florida DOAH Order Case No. 18-5695GM p. 44

*Committed to full protection and restoration of America's Everglades*

investment for Floridians. We urge you to recognize the illusory appeal of this proposal as just that—an idea initiated with good intentions, but ultimately not in Florida's best interest.

While the tollway's purported benefits reflect what Miami-Dade's residents rightfully desire—less time spent idling in standstill traffic—this proposal has ultimately painted a picture of a panacea that, sadly, is no more than a mirage. Miami-Dade invested considerable amounts of time and money into pursuing this project, and the truth remains: This road would have negative consequences for the Everglades, for Miami-Dade, and for the state of Florida.

We understand the appeal of the project, and believe that the County had the best interests of its community at heart. When one weighs the costs against the benefits, however, it is clear that this simply does not pan out as a solution to Miami-Dade's problems. We trust that each of you, as proven advocates for the Everglades and pragmatic decisionmakers, will choose to uphold the Judge's ruling and close this chapter, making way for new projects that will benefit and protect us all.

Sincerely,


Mark Perry                                        Marisa Carrozzo
Co-Chair                                          Co-Chair

CC:

**Shane Strum, Chief of Staff**
Shane.Strum@eog.myflorida.com

**Erin Sumpter, Director of Office of Cabinet Affairs**
Erin.Sumpter@myfloridalegal.com

**Ashley Moody, Attorney General of Florida**
ashley.moody@myfloridalegal.com

**Nicole "Nikki" Fried, Commissioner of Florida Department of Agriculture & Consumer Services**
Nikki.Fried@FDACS.gov

**Jimmy Patronis, Chief Financial Officer of Florida**
CFO.Patronis@myfloridacfo.com


*Committed to full protection and restoration of America's Everglades*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

    Plaintiffs,

       v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al*.

    Defendants.

Case No. 1:21-cv-0119 (RDM)

## DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY ........................................................................................................... xiv

INTRODUCTION ...................................................................................................... 1

LEGAL FRAMEWORK ............................................................................................. 2

   I.   The Clean Water Act ...................................................................................... 2

   II.   The Endangered Species Act ......................................................................... 6

   III.   The Rivers and Harbors Act .......................................................................... 9

FACTUAL BACKGROUND ...................................................................................... 10

   I.   Florida's Section 404 Assumption Request ................................................. 10

   II.   Development of the Corps' Retained Waters List ........................................ 12

   III.   Consideration of Endangered and Threatened Species and Critical Habitat ................ 14

STANDARD OF REVIEW ........................................................................................ 18

ARGUMENT ........................................................................................................... 19

   I.   EPA Reasonably Concluded That Florida's Submission Was Complete. ......................... 23

      A.   The BiOp was not a required element of Florida's assumption request. ...................... 23

      B.   Plaintiffs had sufficient notice and opportunity to comment. ........................................ 25

   II.   EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines. ................................................................... 30

      A.   FDEP must make written determinations, which are subject to judicial review........... 31

      B.   FDEP must consider effects on water quality generally. ................................................. 33

      C.   EPA reasonably concluded that FWS's review of state permit applications would safeguard species and habitat. ........................................................................................ 34

   III.   EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements. ........................................................................................ 35

      A.   The CWA does not preclude Section 404 assumption in states with a gross negligence culpability standard or a statute of limitations of less than five years................................... 35

      B.   EPA's regulations do not establish simple negligence as a precondition for state assumption. ............................................................................................................................ 39

   IV.   EPA Reasonably Did Not Demand that Florida Affirm or Incorporate the Federal Definition of "Waters of the United States" in State Regulations. ........................................... 42

   V.   The Corps Reasonably Defined Retained Waters........................................... 43

   VI.   The BiOp Complies with the ESA. ............................................................... 47

   VII.   The Technical Assistance Process Complies with the ESA............................. 55

VIII.   The Incidental Take Statement Complies with the ESA and Is Reasonable...................61

IX.   EPA Rationally Relied on FWS's BiOp. ........................................................67

X.   EPA's No-Effect Determination For NMFS Species Was Reasonable...........................68

CONCLUSION...........................................................................................................70

JA.646

# TABLE OF AUTHORITIES

**Cases**

*1902 Atl. Ltd. v. Hudson*,
  574 F. Supp. 1381 (E.D. Va. 1983) ........................................ 46

*Air Transp. Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999) .............................. 26, 27, 28

*Akiak Native Cmty. v. EPA*,
  625 F.3d 1162 (9th Cir. 2010) ........................................ 37

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ........................................................ 41

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ...................................... 19

*Am. Coke & Coal Chemicals v. EPA*,
  452 F.3d 930 (D.C. Cir. 2006) ........................................ 30

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998) ........................................ 54

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
  Serv., 273 F.3d 1229 (9th Cir. 2001) ............................ 61

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992) .......................................................... 20

*Balt. Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) .......................................................... 19

*Cabinet Mountains Wilderness v. Peterson*,
  685 F.2d 678 (D.C. Cir.1982) ......................................... 19

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971) ........................................................ 19

*City of Olmsted Falls v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ........................................ 19

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006) .................................... 67, 68

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003) ................................................................ 29, 30

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ...................................................................... 63

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ................................................................... passim

*Crutchfield v. Cnty. of Hanover*,
   325 F.3d 211 (4th Cir. 2003) ........................................................................ 32

*CSX Transp. Inc. v. Surface Trans. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009) .................................................................... 28

*Ctr. For Biological Diversity v. U.S. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ....................................................................... 8

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) ........................................................................ 43

*Defs. of Wildlife v. Babbitt*,
   130 F. Supp. 2d 121 (D.D.C. 2011) ............................................................. 54

*Defs. of Crooked Lake, Inc. v. FDEP*,
   Nos. 17-5328, 17-0972, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) ............. 33

*Defs. of Wildlife v. U.S. Dep't of Interior*,
   931 F.3d 339 (4th Cir. 2019) ........................................................................ 54

*Duval Util. Co. v. Fla. Pub. Serv. Comm'n*,
   380 So. 2d 1028 (Fla. 1980) ......................................................................... 33

*Edmond v. United States*,
   117 S. Ct. 1573 (1997) ................................................................................. 41

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
   726 F. Supp. 2d 1195 (D. Mont. 2010) ........................................................ 50

*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir.1986) ......................................................................... 32

*Hardy Salt Co. v. S. Pac. Trans. Co.*,
   501 F.2d 1156 (10th Cir. 1974) .................................................................... 46

iv

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981) ........................................................................... 20

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
    722 F.3d 1053 (7th Cir. 2013) ........................................................... 32

*Idaho Conservation League v. EPA*,
    820 F. App'x 627 (9th Cir. 2020) ...................................................... 41

*Innovator Enters., Inc. v. Jones*,
    28 F. Supp. 3d 14 (D.D.C. 2014) ....................................................... 19

*Jama v. Immigr. & Customs Enf't*,
    543 U.S. 335 (2005) ........................................................................... 36

*Louisiana v. Salazar*,
    170 F. Supp. 3d 75 (D.D.C. 2016) ..................................................... 19

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................... 19

*Marx v. Gen. Revenue Corps.*,
    568 U.S. 371 ....................................................................................... 41

*Mia. Valley Conservancy Dist. v. Alexander*,
    692 F.2d 447 (6th Cir. 1982) ............................................................. 10

*Miccosukee Tribe of Indians v. United States*,
    556 F.3d 1257 (11th Cir. 2009) ........................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 19

*NRDC v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988) ............................................... 36, 37, 45

*NRDC v. Houston*,
    146 F.3d 1118 (9th Cir. 1998) ........................................................... 69

*Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*,
    551 U.S. 644 ................................................................................. 26, 52

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................................... 20

*N. Slope Borough v. Andrus*,
   642 F.2d 589 (D.C Cir. 1980) ........................................................ 58, 59

*Oceana v. Pritzker*,
   75 F. Supp. 3d 469 (D.D.C. 2014) .................................................... 61

*Oceana, Inc. v. Ross*,
   No. 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...................... 54, 64

*Or. Nat. Res. Council v. Allen*,
   476 F.3d 1031 (9th Cir. 2007) ........................................................ 66

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
   144 F. Supp. 35 (D.D.C. 2015) ........................................................ 55

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
   538 F. Supp. 2d 242 (D.D.C. 2008) .................................................. 61

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
   898 F.2d 1410 (9th Cir. 1990) ........................................................ 67

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) .......................................................... 48

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
   992 F.3d 1071 (D.C. Cir. 2021) .................................................. 67, 68

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991) ........................................................ 28

*United States v. Hanousek*,
   176 F.3d 1116 (9th Cir. 1999) ..................................................... 3, 38

*United States v. Ortiz*,
   427 F.3d 1278 (10th Cir. 2005) ........................................................ 3

*United States v. Pruett*,
   681 F.3d 232 (5th Cir. 2012) ........................................................... 3

*Wildearth Guardians v. Salazar*,
   880 F. Supp. 2d 77 (D.D.C. 2012) .................................................... 69

*Wyandotte Transp. Co. v. United States*,
   389 U.S. 191 (1967) ....................................................................... 9

JA.650

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................... 19

16 U.S.C. § 1531(b) .............................................................................................. 6

16 U.S.C. § 1532(3) .............................................................................................. 6

16 U.S.C. § 1532(7) .............................................................................................. 7

16 U.S.C. § 1532(13) ............................................................................................ 7

16 U.S.C. § 1532(15) ............................................................................................ 6

16 U.S.C. § 1532(19) ............................................................................................ 6

16 U.S.C. § 1533(b)(4) ......................................................................................... 26

16 U.S.C. § 1533(b)(5) ......................................................................................... 26

16 U.S.C. § 1536(a)(2) ............................................................................... 7, 52, 54

16 U.S.C. § 1536(a)(3) ......................................................................................... 26

16 U.S.C. § 1536(b) .............................................................................................. 26

16 U.S.C. § 1536(b)(3)(A) .................................................................................... 9

16 U.S.C. § 1536(b)(4) ......................................................................................... 9

16 U.S.C. § 1536(b)(4)(A) .................................................................................... 9

16 U.S.C. § 1536(b)(4)(C)(i) ................................................................................ 61

16 U.S.C. § 1536(b)(4)(C)(ii) ............................................................................... 65

16 U.S.C. § 1536(b)(4)(C)(iv) .......................................................................... 65, 66

16 U.S.C. § 1536(o)(2) ......................................................................................... 9

16 U.S.C. § 1538(a)(1)(B) .................................................................................... 7

16 U.S.C. § 1538(a)(1)(G) .................................................................................... 7

16 U.S.C. § 1539(a)(1)(B) .................................................................................... 7

16 U.S.C. § 1540(e)(6) .......................................................................................... 57

16 U.S.C. § 1540(g) ................................................................... 57

18 U.S.C. § 3282 ............................................................... 35, 36

33 U.S.C. § 1251(a) ................................................................... 2

33 U.S.C. § 1251(b) ........................................................... passim

33 U.S.C. § 1251(b)(1) ......................................................... 3, 37

33 U.S.C. § 1311(a) ................................................................... 1

33 U.S.C. § 1319 ............................................................... passim

33 U.S.C. § 1319(c)(1) ............................................................... 3

33 U.S.C. § 1342 ....................................................................... 3

33 U.S.C. § 1342(b) ................................................................... 3

33 U.S.C. § 1342(b)(7) ............................................................. 36

33 U.S.C. § 1344(a) ................................................................... 3

33 U.S.C. § 1344(g)-(l) ............................................................ 52

33 U.S.C. § 1344(g) .............................................................. 3, 24

33 U.S.C. § 1344(g)(1) ....................................................... passim

33 U.S.C. § 1344(h) ............................................................. 20, 24

33 U.S.C. § 1344(h)(1)(A)(i) ............................................. 5, 20, 36

33 U.S.C. § 1344(h)(1)(B) ........................................................ 36

33 U.S.C. § 1344(h)(1)(G) ..................................................... 5, 36

33 U.S.C. § 1344(h)(2)(A) ..................................................... 5, 21

33 U.S.C. § 1344(h)(3) ............................................................... 5

33 U.S.C. § 1344(h)(4) ............................................................... 6

33 U.S.C. § 1344(i) ................................................................... 6

JA.652

33 U.S.C. §§ 1344(j)-(*l*) ............................................................................ 6

33 U.S.C. § 1344(n) ............................................................................ 6, 39

33 U.S.C. § 1362(6) ............................................................................ 2

33 U.S.C. § 1362(7) ............................................................................ 2

33 U.S.C. § 1362(12)(A) .................................................................... 2

33 U.S.C. § 1377(e) ............................................................................ 3

**Legislative Materials**

H.R. Rep. No. 95–830 (1977) ............................................................ 3

H.R. Rep. No. 97-567, reprinted in 1982 U.S.C.C.A.N. 2807 ............ 61

Model Penal Code § 2.02(d) ............................................................. 38

**State Statutes**

Fla. Stat. § 373.4146(2) ..................................................................... 11

Fla. Stat. § 120.68(7)(b) .................................................................... 33

**State Administrative Code**

F.A.C. 62-331.051(4) .......................................................................... 24

F.A.C. 62-331.052(1)(a) ..................................................................... 24

F.A.C. 62-331.052(1)(c) ..................................................................... 24

F.A.C. 62-331.053(1) .......................................................................... 31

F.A.C. 62-331.053(3)(a)1-3 ................................................................ 33

F.A.C. 62-331.053(3)(a)1-4 ................................................................ 31

F.A.C. 62-331.053(3)(a)4 ................................................................... 24

F.A.C. 62-331.053(3)(a)6 ................................................................... 31

F.A.C. 62-331.053(3)(a)6.i-iv ............................................................ 31

F.A.C. 62-331.053(3)(a)6.i ..................................................................... 34

F.A.C. 62-331.053(3)(a)6.ii .................................................................... 34

F.A.C. 62-331.053(3)(a)6.iii ................................................................... 34

F.A.C. 62-331.053(3)(a)6.iv ................................................................... 34

F.A.C. 62-33.053(3)(b) .......................................................................... 34

**Code of Federal Regulations**

33 C.F.R. pt. 328 ..................................................................................... 2

33 C.F.R. § 329.4 ............................................................................ 10, 45

33 C.F.R. § 329.14(b) ............................................................................ 10

33 C.F.R. § 329.16(a) ............................................................................ 10

33 C.F.R. § 329.16(b) ...................................................................... 10, 44

33 C.F.R. § 329.16(c) ...................................................................... 10, 44

40 C.F.R. pt. 120 ..................................................................................... 2

40 C.F.R. § 120.2(a)(1)(i) ........................................................................ 2

40 C.F.R. § 127.27(b)(2) ....................................................................... 41

40 C.F.R. pt. 230 ..................................................................................... 5

40 C.F.R. § 230.10(a) ............................................................................ 31

40 C.F.R. § 230.10(b)(1)-(4) ................................................................. 31

40 C.F.R. § 230.10(b)(1)-(2) ................................................................. 33

40 C.F.R. § 230.10(b)(3) ......................................................................... 5

40 C.F.R. § 230.10(c) ............................................................................ 31

40 C.F.R. § 230.10(c)(1)-(4) ................................................................. 31

40 C.F.R. § 230.10(c)(1) ....................................................................... 34

40 C.F.R. § 230.10(c)(2) ....................................................................... 34

40 C.F.R. § 230.10(c)(3) ........................................................ 34

40 C.F.R. § 230.10(d) .......................................................... 34

40 C.F.R. pt. 233 ............................................................. 11, 67

40 C.F.R. § 233.2 ............................................................... 4

40 C.F.R. § 233.10–.14 ...................................................... 11, 24

40 C.F.R. § 233.11(a)-(b) .................................................... 24

40 C.F.R. § 233.11(h) ......................................................... 42

40 C.F.R. § 233.11–.12 ........................................................ 4

40 C.F.R. § 233.12(a) .......................................................... 24

40 C.F.R. § 233.14 ............................................................. 22

40 C.F.R. § 233.14(b)(1) .................................................... 4, 44

40 C.F.R. § 233.15(a) ........................................................... 5

40 C.F.R. § 233.15(e)(1) ........................................................ 5

40 C.F.R. § 233.15(e)(2) ........................................................ 5

40 C.F.R. § 233.15(g) ........................................................... 5

40 C.F.R. § 233.41 ...................................................... 39, 41, 42

40 C.F.R. § 233.41(a)(3)(i)-(iii) .............................................. 40

40 C.F.R. § 233.41(b)(2) .................................................. 40, 42

40 C.F.R. § 233.50 ............................................................. 67

50 C.F.R. § 17.11 ............................................................... 6

50 C.F.R. § 402 ................................................................ 16

50 C.F.R. § 402.01(b) ........................................................... 6

50 C.F.R. § 402.02 ....................................................... 7, 9, 53

50 C.F.R. § 402.03 ................................................................................................ 7

50 C.F.R. § 402.12(b) ........................................................................................... 8

50 C.F.R. § 402.12(j) ............................................................................................ 8

50 C.F.R. § 402.12(k) ........................................................................................... 8

50 C.F.R. § 402.13 ................................................................................................ 8

50 C.F.R. § 402.13(a) ........................................................................................... 8

50 C.F.R. §§ 402.14(a)-(b) ................................................................................... 8

50 C.F.R. § 402.14 ................................................................................................ 8

50 C.F.R. § 402.14(b)(1) ...................................................................................... 8

50 C.F.R. § 402.14(c)(4) ..................................................................................... 57

50 C.F.R. § 402.14(d) ......................................................................................... 57

50 C.F.R. § 402.14(g) ..................................................................................... 8, 53

50 C.F.R. § 402.14(g)(4) ...................................................................................... 9

50 C.F.R. § 402.14(g)(8) ...................................................................................... 9

50 C.F.R. § 402.14(i)(I)(iv) ................................................................................ 66

50 C.F.R. § 402.14(i)(2) ..................................................................................... 65

50 C.F.R. § 402.14(i)(3) ..................................................................................... 66

50 C.F.R. § 402.16 .............................................................................................. 64

**Federal Register**

51 Fed. Reg. 19,926 (June 3, 1986) .............................................................. 26, 69

85 Fed. Reg. 30,953 (May 21, 2020) ............................................................ 15, 29

85 Fed. Reg. 57,853 (Sept. 16, 2020) ...................................................... 11, 12, 29

85 Fed. Reg. 80,713 (Dec. 14, 2020) .................................................................. 42

85 Fed. Reg. 83,553 (Dec. 22, 2020) ............................................................. 12

88 Fed. Reg. 3004 (Jan. 18, 2023) ................................................................. 2

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| ESA | Endangered Species Act |
| FDEP | Florida Department of Environmental Protection |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWS | U.S. Fish and Wildlife Commission |
| ITS | Incidental Take Statement |
| MOU | Memorandum of Understanding |
| NMFS | National Marine Fisheries Service |
| NPDES | National Pollutant Discharge Elimination System |
| RHA | Rivers and Harbors Act |
| RTC | Response to Comments |
| TNWs | Traditionally Navigable Waters |

JA.658

## INTRODUCTION

The Clean Water Act ("CWA" or "the Act") establishes permitting programs that govern the discharge of pollutants to waters of the United States, and the Act authorizes the federal government to administer those programs. But Congress wished to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), and so the CWA also authorizes states deemed qualified by the U.S. Environmental Protection Agency ("EPA") to administer CWA permitting programs under state law. Starting in 2018, Florida enacted statutes and regulations to implement a state law CWA permitting program and, in summer 2020, the State requested EPA's approval to issue permits for discharges of dredge or fill material into certain waters within its borders. EPA granted that request after concluding, based on the information then before it, that Florida' proposed program satisfied statutory and regulatory requirements. Plaintiffs challenge EPA's approval and a related action by the U.S. Army Corps of Engineers ("the Corps"). But both actions are consistent with governing law and are supported by the administrative record. Plaintiffs' CWA-related challenges thus fail.

Before approving Florida's request to assume CWA permitting authority, EPA consulted with the U.S. Fish and Wildlife Service ("FWS") to determine whether a Florida-administered permitting program would likely to jeopardize the continued existence of species listed under the Endangered Species Act ("ESA") or would destroy or adversely modify designated critical habitat. FWS found that it would not, a conclusion that it explained in a programmatic Biological Opinion ("BiOp"). In the BiOp, FWS examined Florida's permit review procedures, and EPA's procedures for overseeing Florida's implementation of its program, and it found that so long as those procedures were followed, permits issued by Florida would comply with the ESA. That finding was reasonable, EPA's reliance on the BiOp was reasonable, and EPA also reasonably determined

that its approval of Florida's permitting program would have no effect on ESA-listed species under

the jurisdiction of the National Marine Fisheries Service ("NMFS"). Plaintiffs' challenges under

the ESA also fail.

Accordingly, the Court should enter summary judgment for EPA, FWS, and the Corps

(collectively, "Federal Defendants") on all remaining claims.

## LEGAL FRAMEWORK

### I.    The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological

integrity of the Nation's waters," 33 U.S.C. § 1251(a), while also "recogniz[ing], preserv[ing], and

protect[ing] the primary responsibilities and rights of States to prevent, reduce, and eliminate

pollution," *id.* § 1251(b). The CWA prohibits the unauthorized "discharge of any pollutant." *Id.*

§ 1311(a). "Discharge" includes "any addition of any pollutant to navigable waters from any point

source." *Id.* § 1362(12)(A). The term "pollutant" includes "dredged spoil" and fill material, such

as "rock" and "sand." *Id.* § 1362(6). And "navigable waters" is broadly defined as "the waters of

the United States, including the territorial seas." *Id.* § 1362(7). EPA and the Corps have issued

regulations interpreting the phrase "waters of the United States." 40 C.F.R. Part 120 (EPA) and 33

C.F.R. Part 328 (Corps). As relevant here, those regulations have consistently defined "waters of

the United States" to include waters which "are [c]urrently used, or were used in the past, or may

be susceptible to use in interstate or foreign commerce, including all waters which are subject to

the ebb and flow of the tide." 40 C.F.R. § 120.2(a)(1)(i).[1]  Waters in this category are known as

"TNWs" (short for "traditionally navigable waters").

---

[1] On January 18, 2023, EPA and the Department of the Army issued a revised definition of
"waters of the United States," which took effect on March 20, 2023. 88 Fed. Reg. 3004. The
2023 rule is the latest in a series of changing regulatory definitions dating back to 2015.  In light

The CWA establishes two permitting programs for authorizing discharges. Under Section 404, the Corps may issue a permit "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Under Section 402, EPA may issue a "National Pollutant Discharge Elimination System," or "NPDES," permit for the discharge of other pollutants, such as chemical waste or sewage. *Id.* § 1342.

CWA Section 309, 33 U.S.C. § 1319 authorizes certain administrative, civil, and criminal penalties for discharges without, or in violation of, a permit. Penalties include fines of up to $25,000 per day of violation, or up to one year of prison, for anyone who "negligently" violates a Section 404 or NPDES permit, or negligently violates the Act's prohibition on unauthorized discharges. 33 U.S.C. § 1319(c)(1). All courts of appeals to consider the issue have held that Section 309 requires only a showing of "simple" negligence to establish criminal liability.[2]

While the CWA authorizes federal implementation of the Section 404 and NPDES permitting programs, it "is the policy of Congress that the States . . . implement" those programs. 33 U.S.C. § 1251(b). To that end, the Act allows states and tribes to assume primary responsibility for NPDES and Section 404 permitting programs for waters within their jurisdictions. *Id.* §§ 1342(b), 1344(g), 1377(e). The transfer of CWA permitting authority from the federal government to states or tribes "is not a delegation of Federal authority." H.R. Rep. No. 95–830 at

---

of court orders preliminarily enjoining the 2023 rule, EPA and the Corps are currently interpreting "waters of the United States" consistent with the pre-2015 regulatory regime in 27 States, including Florida. The differences between the 2023 rule and the pre-2015 regulatory regime are minor and are not relevant to the Court's assessment of EPA's approval action.

[2]   *See United States v. Hanousek*, 176 F.3d 1116, 1121 (9th Cir. 1999); *United States v. Ortiz*, 427 F.3d 1278, 1282 (10th Cir. 2005); *United States v. Pruett*, 681 F.3d 232, 242 (5th Cir. 2012).

104 (1977). Rather, states "establish[] programs under State law," which "function[] in lieu of the Federal program." *Id.* In the Section 404 context, this is known as state or tribal "assumption."[3]

States may not assume Section 404 permitting authority for all waters of the United States within their borders. The Corps continues to administer the Section 404 program in "waters which are presently used, or are susceptible to use . . . as a means to transport interstate or foreign commerce," in "waters which are subject to the ebb and flow of the tide," or in "wetlands adjacent thereto." *Id.* § 1344(g)(1). Waters over which the Corps continues to exercise Section 404 permitting authority following assumption are known as "retained waters," while waters under state jurisdiction are known as "assumed waters."

A state seeking to assume Section 404 permitting authority must submit an assumption request to EPA. That submission must include "a full and complete description of the program" that the state "proposes to establish and administer under State law" and "a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), . . . that the laws of such State . . . provide adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1). EPA regulations elaborate on those general statutory requirements, prescribing, for example, eight required elements of a "full and complete" program description, and four required elements of the "attorney general's statement." 40 C.F.R. § 233.11–.12. EPA regulations also require states to submit a "Memorandum of Agreement with the Secretary [of the Army]" that includes a "description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary." *Id.* § 233.14(b)(1). That description typically includes a list of Corps-retained waters, known as a "retained waters list."

---

[3] The CWA refers to "State" assumption of the Section 404 program. EPA's regulations define "State" to include Indian Tribes meeting certain requirements. 40 C.F.R. § 233.2. The references to "States" in the statute and regulations are therefore to be interpreted to include Tribes.

Once EPA receives a Section 404 assumption request, it has 30 days to "determine whether the submission is complete." 40 C.F.R. § 233.15(a). If so, the Agency will publish a notice to that effect in the Federal Register and must solicit comments from members of the public and federal agencies and hold a public hearing. *Id.* § 233.15(e)(1), (2). Within 120 days of receipt of a complete application, EPA must "approve or disapprove" the State's Section 404 assumption request, unless the State agrees to an extension. 40 C.F.R. § 233.15(g). If EPA fails to act within that period, and a state does not agree to an extension, then the state's assumption request is "deemed approved" by operation of law. 33 U.S.C. § 1344(h)(3).

EPA "shall approve" a state assumption request if, based on the materials submitted and comments received, it determines that the state's program meets the eight criteria at CWA Section 404(h)(1). *Id.* § 1344(h)(2)(A). These criteria define the minimum standards that a state Section 404 program must satisfy. For instance, Section 404(h)(1)(G) requires that a state have the authority to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1344(h)(1)(G). While Section 404(h)(1)(A)(i) requires EPA to determine if state-issued permits would "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title [referring, respectively to toxic pollutant standards and ocean discharge criteria]" *Id.* § 1344(h)(1)(A)(i). The "guidelines established under subsection (b)(1)" refer to regulations codified at 40 C.F.R. Part 230, which are known as the "404(b)(1) Guidelines." Among other things, the 404(b)(1) Guidelines bar Section 404 permits for discharges that "[j]eopardize[] the continued existence" of ESA listed-species or "result[] in likelihood of the destruction or adverse modification" of critical habitat. 40 C.F.R. § 230.10(b)(3).

5

Following EPA approval (or deemed approval through inaction), the Corps suspends its Section 404 permitting activity in waters subject to the state's authority. 33 U.S.C. § 1344(h)(4). EPA then exercises oversight of the state-administered Section 404 program, including by reviewing and, if warranted, objecting to permits. *Id.* § 1344(j)–(*l*). If EPA objects to a permit and the state does not address its objection, then authority to issue that permit reverts to the Corps. *Id.* EPA also retains its enforcement authority even after state assumption, which in no way "limit[s] the authority of the Administrator to take action" under 33 U.S.C. § 1319. 33 U.S.C. § 1344(n). Finally, if the Agency determines that a state "is not administering" its Section 404 program "in accordance with" the requirements of the CWA, then it may withdraw its approval and return the program to the Corps. *Id.* § 1344(i).

## II.   The Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to bring such species "to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. §§ 1531(b), 1532(3). The Secretary of the Interior is generally responsible for listed terrestrial and inland fish species and administers the ESA through FWS, while the Secretary of Commerce is generally responsible for listed marine species and administers the ESA through NMFS (jointly, "the Services"). *Id.* at § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b). Once a species is listed, it receives the protections afforded by the ESA.

ESA Section 9 prohibits the "take" of endangered species within the United States, as well as those threatened species to which the Services have extended the protections.[4] 16 U.S.C.

---

[4] The ESA term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

§ 1538(a)(1)(B) and (G).  This prohibition applies to any "person," including corporations, States and their instrumentalities, and the United States and its agencies. *Id.* § 1532(13). Take that is "incidental"[5] to an otherwise lawful activity may be exempted pursuant to the procedures set forth in ESA Sections 7 or 10. ESA Section 10 sets forth a permit process through which private actors with no Federal nexus may obtain an incidental take permit. *Id.* § 1539(a)(1)(B).

ESA Section 7 addresses the obligations of Federal agencies. Section 7(a)(2) directs each federal agency, in consultation with FWS or NMFS (the "consulting agency"), to "insure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat that has been designated for such species. *Id.* § 1536(a)(2).[6]  "Federal agency" is defined as "any department, agency, or instrumentality of the United States." *Id.* § 1532(7). Neither States nor State agencies come within this definition thus, ESA Section 7(a)(2)'s requirements do not extend to State actions. ESA Section 7(a)(2)'s obligations are triggered only by those Federal actions over which the agency has discretionary involvement or control. 50 C.F.R. § 402.03.

The Services have issued implementing regulations governing the ESA consultation process.[7] Consultation is required if the agency proposing action ("action agency") determines that

---

[5] "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

[6] The regulations further define the statutory phrase "[j]eopardize the continued existence of" to mean "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

[7] The Services also have jointly issued a "Consultation Handbook" that "provides internal guidance and establishes national policy for conducting consultation" pursuant to ESA Section 7. https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf (last visited Apr. 26, 2023); *see* EPA-HQ-OW-2018-0640-0387_attachment_10. The Services' views in the Consultation Handbook are entitled to deference. *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009).

7

the action "may affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. If the action

will have no effect on a listed species, the consultation requirement is not triggered. *See Ctr. for*

*Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009).

If the action agency determines that its action "may affect" listed species, it must pursue

either informal or formal consultation as appropriate. Informal consultation is an optional process

comprised of all discussions and correspondence between the resource agency and the action

agency in order to determine whether formal consultation is necessary. 50 C.F.R. § 402.13(a). The

action agency may prepare a "biological assessment" ("BA," sometimes called a "biological

evaluation" or "BE," as here) to assist in determining whether formal consultation is required. *Id.*

§ 402.12(b) (pointing out that any person "may" but is not required to prepare a BA for Federal

actions that are not "major construction activities."). If the action agency determines, with the

written concurrence of the Service(s), that the action "is not likely to adversely affect" the listed

species or critical habitat, the consultation process is terminated and formal consultation is not

necessary. 50 C.F.R. §§ 402.12(j), (k), 402.13, 402.14(b)(1).

If either the action agency or the Service(s) determines that the proposed action is "likely

to adversely affect" listed species or designated critical habitat, the agencies must engage in formal

consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). During formal consultation, the Service

evaluates the agency's proposed action in the context of the current status of the species or critical

habitat, the environmental baseline, the effects of the action, and the cumulative effects. 50 C.F.R.

§ 402.14(g). Effects of the action

> are all consequences to listed species or critical habitat that are caused by the
> proposed action, including the consequences of other activities that are caused by
> the proposed action. A consequence is caused by the proposed action if it would
> not occur but for the proposed action and it is reasonably certain to occur. Effects
> of the action may occur later in time and may include consequences occurring
> outside the immediate area involved in the action.

8

*Id.* § 402.02. At the conclusion of formal consultation, the Service issues its biological opinion as to whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. *Id.* § 402.14(g)(4); 16 U.S.C. § 1536(b)(3)(A). If the action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat, the biological opinion will set forth a reasonable and prudent alternative to the action, if any is available. 50 C.F.R. § 402.14(g)(8).

If the Service determines at the conclusion of the consultation that the action is not likely to jeopardize the species, but "incidental take" of individuals of the species caused by the action is reasonably certain to occur, it will issue a written "incidental take statement" ("ITS") that specifies the impact of the incidental taking on the species, those "reasonable and prudent measures" necessary or appropriate to minimize such impact, measures necessary to comply with any take authorizations issued under the Marine Mammal Protection Act, as relevant, and any terms and conditions required to implement these measures. 16 U.S.C. § 1536(b)(4)(A). Any taking that is in compliance with the terms and conditions specified in the ITS is not considered to be a prohibited taking of the species. *Id.* § 1536(o)(2). This exemption may extend to private applicants covered by the Federal action. *Id.* § 1536(b)(4).

## III.   The Rivers and Harbors Act

Congress enacted the Rivers and Harbors Act of 1899 ("RHA") "to prevent obstructions in the Nation's waterways." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). RHA Section 10 makes it illegal to, among other things, "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States" except as authorized by the Corps of Engineers. "Navigable waters of the United States" subject to Corps RHA Section 10 jurisdiction—"Section 10 waters"—are "those waters

9

that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4. As indicated by the phrase "or have been used in the past," Section 10 waters include "historic use" waters that are not, and cannot be, used to transport interstate commerce, but were used for that purpose. *See Mia. Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 450 (6th Cir. 1982).

Determinations of "whether a waterbody is a navigable water of the United States will be made by the division engineer," based on a "report of findings" prepared "by the district engineer, accompanied by an opinion of the district counsel." 33 C.F.R. § 329.14(b).[8]  These reports are known as "navigability studies." Each district maintains "[t]abulated lists of final determinations of navigability," to be updated "by court decisions, jurisdictional inquiries, or other changed conditions." *Id.* § 329.16(a). These lists are known as "Section 10 lists." Section 10 lists are not presumed to be exhaustive and a waterbody's "absence from" such a list "should not be taken as an indication that the waterbody is not navigable." *Id.* § 329.16(b). A "change in status of a waterbody from navigable to non-navigable" is "not considered final until a determination has been made by the division engineer." *Id.* § 329.16(c).

## FACTUAL BACKGROUND

### I.    Florida's Section 404 Assumption Request

More than 40 years after Congress enacted Section 404(g)(1), just two states—New Jersey (1994) and Michigan (1984)—had assumed Section 404 permitting authority. Then, in 2018, Florida's Legislature passed a law conferring on the Florida Department of Environmental Protection ("FDEP") "the power and authority to assume, in accordance with 40 C.F.R. part 233,

---

[8] The Corps is divided into "divisions" and its divisions are sub-divided by "district." *See* https://www.usace.army.mil/Missions/Locations/ (last visited Apr. 25, 2023).

the dredge and fill permitting program established in s. 404 of the Clean Water Act." Fla. Stat. § 373.4146(2). Over the ensuing years, FDEP enacted new regulations, modified existing regulations, and developed other elements of its Section 404 program.

On August 20, 2020, Florida submitted to EPA a formal assumption request. 85 Fed. Reg. 57,853 (Sept. 16, 2020). The State's submittal, comprising over 100 documents, was organized by reference to EPA's assumption regulations (40 C.F.R. § 233.10–.14) and included materials responsive to each of the required elements in those regulations. *See* Dkt. 95-2 at 1–5 (EPA Record Index listing submission documents); *see also* EPA-HQ-OW-2018-0640-0003 (table of contents). Among many other things, it included hundreds of pages of existing and newly enacted sections of the Florida Administrative Code, and a new State 404 Program Applicant's Handbook outlining various guidelines and procedures that are incorporated by reference in state regulations. EPA-HQ-OW-2018-0640-A20 ("State 404 Handbook"). It also included a 155-page table showing how those state regulations compare to analogous provisions of the 404(b)(1) Guidelines. EPA-HQ-OW-2018-0640-0016-A3, at 55–155. And it included a Memorandum of Understanding ("MOU") among FDEP, FWS, and the Florida Fish and Wildlife Conservation Commission ("FWC") detailing procedures for coordinated interagency review and assessment of potential species and habitat impacts from state-issued Section 404 permits. EPA-HQ-OW-2018-0640-0016-A2.[9]

Because Florida's submission included every element required by EPA's Section 404 assumption regulations, the Agency declared the submission complete as of the date of submission. EPA-HQ-OW-2018-0640-0641. EPA posted Florida's complete submission on a public non-

---

[9] The FWS-FDEP-FWS MOU included in Florida's submission was signed by FDEP's Secretary and FWC's Executive Director. EPA-HQ-OW-2018-0640-0016-A2, at 12. An otherwise identical version of the same MOU that was also signed by FWS's Regional Director is included in FWS's record at FWS-006015.

11

rulemaking docket, and on September 16, it published a Federal Register notice of its receipt of a complete assumption request package and opened a 45-day public comment period during which it scheduled two virtual public hearings. 85 Fed. Reg. at 57,853.

EPA received and reviewed over 3,000 comments submitted during the comment period and public hearings. EPA-HQ-OW-2018-0640-0568, at 1. In the roughly six weeks allotted under the statute, the Agency summarized and responded to significant comments in a 113-page Response to Comments ("RTC"). *Id.* at 1–113. Based on its review of Florida's submission and the comments received, the Agency concluded that the State had "the necessary authority to operate a program in accordance with the requirements in CWA Section 404 and 40 C.F.R. part 233," and on December 22, 2020, it published notice of its approval. 85 Fed. Reg. 83,553.

## II.   Development of the Corps' Retained Waters List

As part of its years-long effort to develop a state Section 404 program, in 2017 FDEP reached out to the Corps' Jacksonville District to identify the scope of assumable and retained waters in Florida. *See* CORPS003115–16. In response, the District sought to augment its Section 10 list, which was last updated in 2014 ("2014 Section 10 List"). *See* CORPS003115. On October 3, 2017, a manager in the Jacksonville District directed a staff member to add to that list "whatever additional waterbodies, tributaries we think might be remotely section 10 OR TNWs. Whether there is an approved navigability study or not, put it on the website." *Id.* The resulting list—dated October 5, 2017, and titled "Supplement to the Jacksonville District Navigable Waters Lists" ("2017 Supplement")—described itself as a "first preliminary increment of an effort to update" the 2014 Section 10 List. CORPS003117.

Florida's interest in Section 404 assumption also prompted the Jacksonville District to plan new navigability studies and to issue a public notice in March 2018 seeking information in support

of its "analysis of waterways in the state of Florida to determine the extent of navigability."
CORPS003213. A few weeks later, however, the Corps' leadership directed the Jacksonville
District to suspend work on its pre-assumption navigability studies, CORPS003714, and the
District retracted its call for public comment, CORPS003717.

Then, in July 2018, the Assistant Secretary of the Army for Civil Works issued a guidance
document stating that the Corps would henceforth "use existing RHA Section 10 lists of waters"
to develop retained waters lists when approached by a state seeking to pursue Section 404
assumption. In so doing, the Assistant Secretary endorsed the findings and recommendations of
the Assumable Waters Subcommittee, a group that EPA convened in 2015 after several states
complained that "uncertainty over the scope of assumable waters" had hindered their efforts to
pursue assumption, CORPS002997, because their discussions with Corps district offices had
"broken down or stopped due to lack of clarity, uncertainty, or disagreement over the scope of
retained waters or wetlands," CORPS003005. The Subcommittee's charge was to recommend a
way in which EPA could clarify which waters are assumable. CORPS003053. In May 2017, 21 of
the subcommittee's 22-members—all but the Corps' representative—recommended, among other
things: (1) that retained waters comprise only Section 10 waters, but not those Section 10 waters
deemed navigable based solely on historic use; and (2) that the Corps base its retained waters lists
on existing Section 10 lists, rather than on a more open-ended inquiry into the scope of retained
waters. CORPS003013–22. In the majority's view, that more streamlined approach was both
necessary to facilitate state assumption, and consistent with the text and legislative history of
Section 404(g)(1). *Id.* The Assistant Secretary agreed on both counts and noted in his guidance
memorandum that he had "personally heard from state officials who—but for . . . uncertainty
[about the scope of retained waters]—would pursue Section 404(g) assumption." CORPS004096.

13

Following the Assistant Secretary's guidance, the Jacksonville District stated in an August 2018 memorandum that it would use the 2014 Section 10 List as "the basis of the list of retained waters" in Florida. CORPS004149. The District refined that list over the course of 2018 and 2019, removing duplicate listings and waters deemed navigable based solely on historic use. *See, e.g.*, CORPS004238–64; CORPS004265–4312.

The final version of the Retained Waters List was appended to a Memorandum of Agreement between FDEP and the Corps dated August 5, 2020. CORPS004322–34. That Memorandum explained that the Corps would "retain responsibility" for Section 404 permitting "in those waters identified in the Retained Waters List . . . , as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary," and in waters of the United States within " 'Indian Country,' as that term is defined at 18 U.S.C. § 1151." CORPS004323. FDEP would assume permitting responsibility in "[a]ll waters of the United States not retained by the Corps." *Id.* And the Corps would update the Retained Waters List based on new navigability determinations or by agreement of FDEP and the Corps that a proposed project lay "within the Corps' jurisdiction," as defined in 33 U.S.C. § 1344(g), "but is not within the Retained Waters List." CORPS004324.

**III.    Consideration of Endangered and Threatened Species and Critical Habitat**

In a 2010 guidance letter, EPA took the position that Section 7 consultation was not required before approving a Section 404 assumption request. EPA-HQ-OW-2018-0640-0689-A3. But Florida urged EPA to reconsider that position, and on May 21, 2020, EPA published a request for comment on whether its approval of a CWA Section 404 Program is discretionary for the purposes of ESA consultation. 85 Fed. Reg. 30,953. While EPA was reconsidering its policy

14

position, FDEP developed a draft BA. FWS-006040; *see* EPA-HQ-OW-2018-040-617. Following several rounds of comments from FWS, FDEP submitted a final BA to EPA and FWS on July 24, 2020. *Id.*

On August 27, 2020, EPA issued a memorandum announcing that it had reconsidered its prior position on consultation and, "[f]or Florida and other states and tribes seeking to assume the CWA Section 404 program," EPA intended "to engage in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption request if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat."[10]   EPA-HQ-OW-2018-0640-0660-A1 at 6–7. This process, EPA explained, would allow the Services "to issue a programmatic biological opinion and programmatic incidental take statement" for a state Section 404 program based on "procedural requirements and permitting conditions or measures" to safeguard listed species and critical habitat. *Id.* at 7. EPA concluded that approval of Florida's assumption request may affect species listed as threatened or endangered under the ESA or designated critical habitat under the jurisdiction of FWS, but made a "no effect" determination with respect to species under the jurisdiction of NMFS. Thus, EPA prepared a BE based on FDEP's BA, which it transmitted to FWS on September 2, 2020, with a request to initiate a programmatic consultation on the possible effects of EPA's potential approval of Florida's assumption request on federally listed species, proposed species, designated critical habitat, and proposed critical habitat under FWS's jurisdiction. FWS-005608-09; FWS-005610-5906.

---

[10]  A programmatic consultation addresses an agency's multiple actions on a program, region, or other basis. FWS-006043. Programmatic consultations allow the Services to consult on the effects of programmatic actions, such as multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas, and a proposed program, plan, policy, or regulation providing a framework for future proposed actions. FWS-006035.

15

Consultation concluded on November 17, 2020, when FWS issued a programmatic Biological Opinion in which it determined that EPA's action would not jeopardize listed species under its jurisdiction. FWS-006108–6115. The BiOp analyzed the change in Section 404 permitting authority in assumed waters in Florida, including the effect of the state-issued permits on ESA-considered species[11] and critical habitat. FWS-006043. Based on the information available, the BiOp assessed other program activities that would occur if EPA approved the State's assumption request, including the State's implementation of its Section 404 program, EPA's oversight of the State's program, EPA's coordination of federal review of state permit actions, and the execution of state-permitted activities by permit holders. FWS-006043-45; FWS-006048. FWS considered the consequences of the potential approval of the State's assumption (including those related to any program activities caused by the potential approval) on ESA-considered species and critical habitat to be effects of the action, pursuant to 50 C.F.R. § 402. FWS-006043; FWS-006048.

As described in the BiOp, FWS will receive and review all State Section 404 permit applications when submitted, including those that FDEP or FWC has preliminarily determined as "no effect/no impact." FWS-006067. FWS will provide technical assistance to the State to ensure that State 404 permit actions are not likely to jeopardize a species or destroy or adversely modify critical habitat. FWS-006046; FWS-006047 (flow chart identifying FWS's role in the State's permitting program); FWS-006106. FDEP committed that its processes and procedures to review State Section 404 applications "will be similar to and will utilize [FWS]-approved permitting guidance that currently is used by the [Corps], to ensure consistency with CWA and ESA requirements." FWS-006105; *see also* FWS-006048 (describing Florida's 404 Program Rule at

---

[11]   The BiOp used the term "ESA-considered species" to "include ESA-listed species [i.e., those listed as threatened or endangered], ESA Candidate species, species proposed for listing, and petitioned species." FWS-006045. We use that term for purposes of consistency with the BiOp.

62-331, F.A.C.).[12] FDEP, FWC, and FWS will participate in a State Section 404 program species coordination technical team to oversee the species coordination process, including assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decisionmaking to a group with technical expertise, and assist in refining coordination processes, procedures, and future improvements, as needed, related to the State's permitting. FWS-006105. State permit review staff will be trained in the new State Section 404 program species coordination procedures and processes, and FDEP, FWC, and FWS will collaborate on the development of training material. *Id.* Most importantly, FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by FWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat and EPA will maintain oversight authority over the program. FWS-006057; FWS-006066; FWS-006106; *see also* FWS-006050 ("FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from [FWS] into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.)").

In FWS's opinion, the proposed action, including the associated subsequent program activities, had a sufficiently structured process to ensure that the State's Section 404 program is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species by reducing the reproduction, numbers, or distribution of that species. FWS-006106–07. FWS also opined that the proposed action had a sufficiently structured process to ensure the State's Section 404 program was not likely to result in destruction or adverse

---

[12] Record documents cite to the Florida Administrative Code as "[section number], F.A.C." For consistency, this brief employs the same citation format.

modification of critical habitat. FWS-006107. The BiOp included an Incidental Take Statement ("ITS"), which stated that the amount and extent of incidental take anticipated from these proposed activities in which the State has permitting authority will be quantified and evaluated on a project-specific basis through the technical assistance process between FWS and the State. FWS-006107. The BiOp also found that through implementation of Florida's Section 404 program, and EPA's oversight of the program and coordination of Federal review of state permit actions, project-specific information would be provided to FWS through its receipt of all State 404 permit applications. FWS-006107–08. Through the technical assistance process, FWS would provide input so that the State can adjust an action that may result in the take of ESA-listed species, and identify appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State Section 404 program. FWS-006108. If it is determined during the technical assistance process that take of ESA-listed species still is expected to occur after implementation of recommended minimization measures, FWS would quantify the amount or extent of incidental take in coordination with FDEP. FWS-006108. Levels of take would be reported and tracked through the technical assistance process and exempted by the ITS. *See id.* As set forth in the terms and conditions, if new information shows that the magnitude of impacts to ESA-considered species is greater than anticipated or the amount of incidental take originally anticipated is exceeded, FDEP will re-open the permit to determine if any additional impacts are likely to jeopardize species and if additional minimization measures, reporting, or monitoring are required. FWS-006110.

## STANDARD OF REVIEW

"[W]hen a party seeks review of agency action under the" Administrative Procedure Act ("APA"), "the district judge sits as an appellate tribunal" and the " 'entire case' on review is a

question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001).

"Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and otherwise consistent with the APA

standard of review." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014). But the

ordinary Rule 56 standard does not apply. *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C.

2016). Instead, the APA provides the governing standard. *Id.*; *see also Cabinet Mountains*

*Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) (judicial review of ESA claims

governed by APA standard of review).

Under that deferential standard, agency action can be overturned only if it is found to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). "The scope of review" is "narrow and a court is not to substitute its judgment for that

of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983). Where, as here, an agency's technical expertise is involved, the reviewing court should be

particularly zealous in guarding the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S.

360, 376-77 (1989); *accord Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). Agency

action "is entitled to a presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*,

401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977),

and so the "party challenging an agency's action . . . bears the burden of proof," *City of Olmsted*

*Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (internal quotation marks omitted).

## ARGUMENT

The Court should grant summary judgment to Federal Defendants on all claims.[13]

---

[13] Plaintiffs have "request[ed] the opportunity to brief the appropriate remedy following the Court's ruling on summary judgment." Dkt. 98 at 15 n.2. Federal Defendants join Plaintiffs' request for supplemental briefing on remedy should the Court be inclined to grant them any relief.

Section 404 assumption is not a delegation of federal authority; rather, it is one way that Congress "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" within the framework of a federal statutory scheme. 33 U.S.C. § 1251(b); *cf. Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (The CWA "anticipates a partnership between the States and the Federal Government"); *New York v. United States*, 505 U.S. 144, 167 (1992) (describing the CWA as an example of "cooperative federalism"). In such "a program of cooperative federalism," states, "within limits established by federal minimum standards," can "enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981).

Congress called on EPA to determine whether a state's Section 404 program satisfies the Act's minimum standards. 33 U.S.C. § 1344(h). Those standards are broad and, in some cases, defined by reference to complex federal statutory and regulatory regimes, such as the 404(b)(1) Guidelines. *See id.* § 1344(h)(1)(A)(i). To apply those standards, EPA must decide whether the state laws that make up a state's Section 404 program would be consistent with and no less stringent than non-identical federal laws. That is no simple task. In carrying it out, the Agency must make discretionary judgments that balance the CWA's competing policy aims of respecting state autonomy and ensuring the minimum thresholds set by the federal standards are met.

At the same time, however, Congress made clear that EPA "shall approve" a state's assumption request if the state's Section 404 program satisfies statutory and regulatory criteria. *Id.* § 1344(h)(2)(A). Conversely, then, EPA cannot deny a request based on its noncompliance with an unwritten rule. *See id.* And for good reason. As Florida's experience demonstrates, preparing a state Section 404 program requires years of regulatory and legislative groundwork. *See supra* pp. 10–12. In undertaking that effort, states necessarily rely on statutory and regulatory criteria to

shape an approvable program. EPA cannot undercut that reliance by denying an assumption request by reading into the statute and regulations preconditions that are not there.

In approving Florida's Section 404 program in 2020, EPA acted reasonably within the circumscribed scope of its authority based on the applicable regulatory criteria. Plaintiffs disagree and point to differences between Florida's program and the federal Section 404 program. But the very point of state assumption—or any exercise in cooperative federalism—is to allow for some degree of variation subject to minimum federal standards. And EPA permissibly concluded that the differences in Florida's program did not fall outside the boundaries set by statute and regulation. Plaintiffs also point to problems with Florida's implementation of its Section 404 program. But those problems post-date the approval action challenged here and so lie outside the administrative record and beyond the scope of this litigation. EPA need not, and does not, defend Florida's post-decisional implementation of its Section 404 program. For present purposes, what matters is that the Agency's approval of that program was reasonable based on information available at the time of its decision. Plaintiffs fail to show otherwise and so their CWA-based claims against EPA (Claims 1 and 2) fail.

Plaintiffs' claim against the Corps (Claim 7) betrays a similar misapprehension of state assumption generally, and the Corps' limited role in the state assumption process. Congress wanted the Corps to permanently retain Section 404 authority in a subset of the waterbodies subject to the Corps' Section 10 permitting authority, "and in wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1). So, before a state can assume Section 404 permitting authority, the Corps must first identify retained waters. 40 C.F.R. § 233.14. According to Plaintiffs, this meant that the Corps had to conduct a statewide Section 10 navigability determination to support the Retained Waters List. But experience strongly suggests that this kind of comprehensive investigation would have

21

substantially hindered, or effectively defeated, Florida's assumption bid. *See supra* p. 13. The Corps rightly refused to let the retained waters tail wag the state assumption dog. Instead, it developed the Retained Waters List using the information on Section 10 waters already in its possession. That decision gave effect to Section 404(g)(1)'s parenthetical definition of retained waters without also undermining Section 404(g)'s broader aim of facilitating state assumption. Claim 7 therefore fails.

Plaintiffs' ESA-related claims fare no better. FWS prepared a programmatic biological opinion that reasonably assessed whether, and to what degree, FDEP structured its regulatory program and EPA structured its oversight program to ensure that approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species, or to destroy or adversely modify designated critical habitat. This programmatic approach was appropriate, and properly tailored to address information available and uncertainties regarding the location, timing, frequency, and intensity of future State Section 404 permit actions. As the BiOp explained, FWS will evaluate permits on a site- and species-specific basis through a defined technical assistance process during which FWS's position on the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures is determinative. That process is not optional, as Plaintiffs suggest; it is part of the action and binding on FWS.

Nor is there any merit to Plaintiffs' attacks on the ITS. As FWS explained, it is not feasible at this time to anticipate the location of all future State 404 permit activities; thus, take will be determined, calculated, and tracked through the technical assistance process. The ITS has an appropriate reinitiation trigger and contained both reasonable and prudent measures and terms and conditions. Notably, this very programmatic approach and the technical assistance process were approved by the U.S. Court of Appeals for the Second Circuit in a 2018 case, involving another

22

EPA CWA action. The Court should follow the reasoning in that decision and reject Plaintiffs' challenges to the BiOp, the ITS, and the technical assistance process in Claims 3, 4, 6, 12, and 13.

Similarly, there is no merit to Plaintiffs' argument that EPA improperly relied on the BiOp. EPA acted reasonably in doing so and Plaintiffs have not identified any new, contrary information that FWS did not take into account. Claim 10 therefore fails.

Finally, EPA's determination that approval of Florida's assumption request would have no effect on ESA-listed species under NMFS's jurisdiction was reasonable, and does not violate the CWA, the APA, nor the ESA. Nonetheless, while not required to do so, after Plaintiffs notified EPA of their intent to sue regarding the determination, EPA has initiated a process to address the issue of potential effects downstream of assumed waters. EPA is evaluating the effects of its approval on species under NMFS's jurisdiction and preparing a biological evaluation that ultimately should resolve the matter. Claims 5 and 11 also fail.

## I.      EPA Reasonably Concluded That Florida's Submission Was Complete.

Claim 1 of the Complaint disputes EPA's threshold determination that Florida submitted a complete assumption request. Plaintiffs note that Florida's submission did not include FWS's BiOp, and on that basis, they argue that Florida's submission was incomplete and, relatedly, deprived them of their right to provide comment on the process of interagency permit review outlined in the BiOp. Dkt. 98 at 72–75. Neither claim succeeds.

### A.   The BiOp was not a required element of Florida's assumption request.

Neither the CWA nor EPA's assumption regulations require states to include a biological opinion as part of their assumption request. *See* 33 U.S.C. §§ 1344(g), (h); 40 C.F.R. §§ 233.10–.14. Thus, as EPA explained in response to comments, Florida's submission was not incomplete simply because it did not include the BiOp. EPA-HQ-OW-2018-0640-0568, at 13 (RTC).

23

What EPA's regulations did require is a "description" of the "coordination" activities, "permit review criteria," "procedures," and enforceable "statutes and administrative regulations" that Florida would implement to satisfy the substantive requirements of the 404(b)(1) Guidelines, including the prohibition on discharges that jeopardize the continued existence of ESA-listed species or result in likelihood of the destruction or adverse modification of critical habitat. 40 C.F.R. § 233.11(a)–(b); *id.* § 233.12(a). Florida's submission satisfied that requirement by detailing, at length, how FDEP would safeguard listed species and critical habitat, including by working with FWS to review individual permits.

As the regulations contained in that submission make clear, FDEP may not issue any permit that "[j]eopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of . . . critical habitat." 62-331.053(3)(a)4, F.A.C. Thus, all permit applicants must provide any "data and information necessary for purposes of reviewing impacts to state and federal listed species," *id.* 62-331.051(4), including any additional information sought by FDEP within a 30-day window, *id.* 62-331.052(1)(a), (c). And state regulators must determine—based on a review of "scientific literature, species keys, . . . habitat maps, or" observations during a site visit—whether a proposed project "may" affect listed species. EPA-HQ-OW-2018-0640-A20 at 23 (State 404 Handbook § 5.2.3.). If so, FDEP must "seek consultation with or technical assistance by" FWS. *Id.* And if, through that process, FWS identifies measures necessary "to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat," then FDEP "shall incorporate as permit conditions all" such "recommended impact avoidance and minimization measures." *Id.* But if FWS finds that "no protection measures are available to reduce the risk" of jeopardy or adverse habitat modification "to an acceptable level," then FDEP "shall deny the permit or shall take no action." *Id.* at 23–24.

The MOU among FWC, FWS, and FDEP, which was also included in Florida's submission, provides additional details on the contemplated inter-agency permit review process. As the MOU explains, FDEP would send all permit applications to FWS and FWC "as soon as possible after receipt" and FWS and FWC would make requests for additional information within 20 days so that FDEP could relay the request to the applicant within the 30 days allotted under state regulations. EPA-HQ-OW-2018-0640-0016-A2, at 5. A state regulator's initial assessment of species or habitat impacts would be "preliminary" and subject to review by FWS. *Id.* at 5–6. The public would have an opportunity to comment on "the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts." *Id.* at 6. And while interagency disputes could be elevated within each agency, "the final FWS position [would be] determinative" as to "the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures." *Id.* at 10.

EPA reviewed all of this and concluded that "Florida's rules, Program Description, and other documents provide sufficient details for the public to assess how the state plans to handle listed species issues." EPA-HQ-OW-2018-0640-0568, at 20 (RTC). EPA's regulations demanded nothing more for a threshold showing of completeness, and so EPA reasonably concluded that Florida's application was complete.

B.  Plaintiffs had sufficient notice and opportunity to comment.

Approaching the same issue from a different angle, Plaintiffs also claim that they were denied their right to comment on information contained in the BiOp. But neither the ESA nor the APA confers such a right.

The ESA requires notice and comment for proposed rules that list species and designate critical habitat, 16 U.S.C. § 1533(b)(4) & (5), but Section 7 consultation has no parallel notice and

25

JA.683

comment requirement, *see id.* §1536(a)(3), (b); *see also* 51 Fed. Reg. 19,926, 19,928 (June 3, 1986) ("Nothing in section 7 authorizes or requires the Service to provide for public involvement (other than that of an applicant) in the 'interagency' consultation process."). Indeed, Section 7 consultation is routinely conducted without public notice and comment. And courts have repeatedly upheld that practice in the face of procedural arguments like those that Plaintiffs raise here. *See, e.g.*, *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 78 (2d Cir. 2018) (holding that "no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services"); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (holding that there is no "independent right to public comment with regard to consultations conducted under § 7(a)(2)").

Nor did the APA's rulemaking procedures entitle Plaintiffs to comment on the BiOp. Only "the most critical factual material that is used to support the agency's position" must be submitted for public comment during the administrative proceeding. *Air Transp. Ass'n of Am. v. F.A.A.*, 169 F.3d 1, 7 (D.C. Cir. 1999). And the focus in rulemaking cases "is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not published for comment." *Id.* In *Air Transportation Association of America*, the D.C. Circuit applied this legal framework to a fact pattern like the one here. That case, like this one, involved an agency's review and approval of an application following notice and comment. *Id.* at 3–4. And there, as here, parties objected to the agency's consideration of documents that were not included with the application on which comment was sought. *Id.* at 4. In this context, the D.C. Circuit reasoned that "the application itself . . . is the analogy to the proposed rule," and the "the question . . . is whether" the extra-application material "critically deviated from" anything in the "application itself." *Id.* at 7.

26

By that logic—and assuming without conceding that EPA's approval action was a rulemaking—then EPA's posting of Florida's submission on its public docket "is analogous to a notice of proposed rulemaking." *See id.* at 6. And the question is whether the BiOp's discussion of interagency permit review "critically deviated" from the process of interagency permit review described in the submission materials, *see id.* at 7.

It did not. The essential elements of interagency permit review—the participants, timing, subject matter, dispute resolution mechanisms, and binding effect—are all set forth in Florida's assumption request. *See supra* pp.24–25. In describing how FWS would provide "technical assistance," the BiOp simply summarizes that submission's interagency framework while filling in certain technical details. For instance, while noting that "State regulations dictate the process and general timeframes" for permit review, the BiOp estimates the duration of certain gap-filling interim steps between regulatory milestones. *See* FWS-006055–56 (noting, for example, that FDEP would provide permits to FWS within "3–5 days" of receipt). Similarly, while the Florida Administrative Code requires state regulators to make an initial determination of whether a proposed project might affect ESA-listed species, the BiOp lists existing "Federal decision tools" that can aid the State in making that determination and aid FWS's review of the State's findings, *see* FWS-006058–60 (discussing, among other things, FWS's "Information for Planning and Consultation (IpaC) website," which allows users to draw a "geographically referenced" polygon representing a project area). And while the FWS-FWC-FDEP MOU makes clear that FWS will review all permits shortly after they are submitted, the BiOp notes that FWS may also "submit its questions during the public notice period for the State 404 application should [it] not respond during the early phase of FDEP-USFWS coordination," FWS-006056.

These statements in the BiOp and others like them, "expand[] on and confirm[]" what Florida submitted in its application, but in no way depart from that application's discussion of interagency permit review. *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991). Agencies need not solicit comment on such "supplementary" information during a rulemaking proceeding. *Air Transp. Ass'n of Am.*, 169 F.3d at 7.

Plaintiffs do not demonstrate otherwise by insisting that EPA "relied on the BiOp." Dkt. 98 at 74. A biological opinion is, by definition, the consulting agency's opinion "as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat." FWS-006032. EPA of course relied on the BiOp, but so too does virtually every action agency that issues a rule following a no-jeopardy determination by one of the consulting agencies. Yet Plaintiffs cite no case—and we are aware of none—in which a court has grafted the APA's notice and comment requirements onto ESA Section 7 consultation by declaring a biological opinion to be "critical factual material" on which public comment must be sought.

The Court should not do so here. The APA's notice and comment requirements are satisfied when an agency asks the public "for comments on a particular issue or otherwise ma[kes] clear that" it is "contemplating" a course of action. *CSX Transp. Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). Plaintiffs knew how Florida and FWS would handle permit review because Florida's submission described those interagency coordination procedures in detail. And Plaintiffs "should have anticipated" that the BiOp would consider those permit review procedures because EPA twice gave notice that this would likely be the case. *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003).

28

First, in May 2020, when EPA sought comment on whether it should reconsider its prior position on ESA consultation (85 Fed. Reg. 30,953), it posted on its public docket an FDEP-authored white paper advocating the issuance of "a programmatic Biological Opinion . . . and a programmatic incidental take statement" that "identif[ied] procedural requirements for state permitting under Section 404." EPA-HQ-OW-2018-0640-0388-A7, at 1–2. A few months later, when EPA solicited comments on Florida's Section 404 application, it also explained its intent to seek Section 7 consultation, identified its August 27, 2020 memorandum as a source of "more information regarding EPA's position on ESA Section 7 consultation under CWA Section 404(g)," and provided a link to the memo. 85 Fed. Reg. at 57,856.

Plaintiffs responded to both notices with comment letters in which they supported the agencies' ESA Section 7 consultation process but opposed incidental take protection based on permit-by-permit interagency review. *See* EPA-HQ-OW-2018-0640-0388-A2 (July 6, 2020 letter); EPA-HQ-OW-2018-0640-0386-A1, at 35–42. The arguments that Plaintiffs raised in those comment letters mirror the arguments in their summary judgment brief, down to the cases cited. *Compare* EPA-HQ-OW-2018-0640-0386-A1, at 35–41 *with* Dkt. 98 at 45–51. That symmetry underscores the extent to which the BiOp's outline of "technical assistance" tracks the description of interagency permit review contained in the materials on which Plaintiffs commented. Under these circumstances, Plaintiffs cannot now claim undue surprise at the BiOp's discussion of interagency permit review. *See Cooling Water Intake Structure.,* 905 F.3d at 78 (finding under similar circumstances that EPA's proposed rule fairly apprised interested persons of the subjects and issues of its rulemaking). Claim 1 therefore fails.

Even if Plaintiffs *could* demonstrate a lack of proper notice, they could not show prejudice. *See Am. Coke & Coal Chemicals v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006) (showing of prejudice

required in procedural challenges to adequacy of notice). Plaintiffs raised objections to interagency permit review in their comment letters, which EPA considered and rejected. EPA-HQ-OW-2018-0640-0568, at 90–103 (RTC). After reviewing the BiOp, Plaintiffs raise essentially the same arguments in their brief. Thus, they have not shown that but for the purported lack of notice regarding the BiOp, they "would have submitted additional, different comments that could have invalidated the rationale" for EPA's approval action. *City of Waukesha*, 320 F.3d at 246. Any claim of prejudice therefore fails, and with it Claim 1 fails as well.

## II.    EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines.

On the merits, Plaintiffs repeatedly fault EPA for approving a program that did not "adopt[] the federal 404(b)(1) Guidelines." Dkt. 98 at 61; *see also id.* at 61–64. But Congress did not require verbatim incorporation of the 404(b)(1) Guidelines as a precondition of assumption. Instead, it allowed states leeway to adopt their own programs, and left it to EPA to determine whether those state programs will ensure compliance the 404(b)(1) Guidelines' requirements. EPA reasonably concluded that Florida's regulations and procedures, as drafted, would meet that standard.

Although Florida did not (and was not required to) adopt the Section 404(b)(1) Guidelines into state law, the State's regulations overlap considerably with their federal analogs. For instance, both Florida's regulations and the 404(b)(1) Guidelines prohibit any discharge of dredge or fill material that "causes or contributes to violations of" an applicable water quality standard, "violates any applicable toxic effluent standard," "jeopardizes" listed species, and threatens "critical habitat." 62-331.053(3)(a)1–4, F.A.C.; *accord* 40 C.F.R. § 230.10(b)(1)–(4). Both the federal and state regulations also bar any discharge that "[c]auses or contributes to significant degradation of wetlands or other surface waters." 62-331.053(3)(a)6, F.A.C.; *accord* 40 C.F.R. § 230.10(c). Both sets of regulations define "significant degradation" by reference to the same criteria. 62-

331.053(3)(a)6.i.–iv, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(1)–(4). And both bar any discharge if there is "a practicable alternative to the proposed activity" that would "have less adverse impact on the aquatic ecosystem." 62-331.053(1), F.A.C.; *accord* 40 C.F.R. § 230.10(a). Based on these and other parallels, EPA concluded that the State's Section 404 regulations, as submitted, satisfied the requirements of the 404(b)(1) Guidelines. EPA-HQ-OW-2018-0640-0568, at 27 (RTC).

Plaintiffs fail to acknowledge the substantial similarities between Florida's regulations and the 404(b)(1) Guidelines and focus instead on what they claim are two differences that render the federal and state regulations "non-equivalent." Dkt. 98 at 62. First, Plaintiffs claim that while the Corps must make written determinations and findings of fact, FDEP bases its permit decisions solely on permit applicants' "reasonable assurances." *Id.* at 61–64. Second, Plaintiffs insist that while federal law "focuse[s] on water quality generally," under Florida's program, discharges of dredge and fill material "only matter if and when" they "would violate water quality standards or toxic effluent limitations." *Id.* at 64–66. Plaintiffs also rehash their argument about the completeness of Florida's application, again contending that Florida's submission did not demonstrate compliance with the 404(b)(1) Guidelines because it did not include the BiOp. *Id.* at 66. None of these arguments withstand scrutiny.

A. FDEP must make written determinations, which are subject to judicial review.

Plaintiffs mischaracterize the record when they claim that Florida's program does not require FDEP to "evaluate [a proposed] project's effects," or "make written factual determinations" or "findings of its own." *Id.* at 63. In fact, upon receipt of a permit application, FDEP must: (1) "Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.," which include the state law analogs the 404(b)(1) Guidelines, described above; (2) "Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-

31

331.053, F.A.C."; and (3) "Prepare a written determination on each application outlining the

permitting decision and the rationale for the decision," which it must "include[] in the official

record prior to final action on the application," along with its "Technical Staff Report." EPA-HQ-

OW-2018-0640-A20 at 32 (State 404 Handbook § 8.2(j)-(*l*)).

That FDEP bases its written findings on information submitted by the project applicant

does nothing to distinguish Florida's Section 404 program from the federal program. By necessity,

the Corps also relies on applicant-supplied information in making its permit determinations. *See,*

*e.g.*, *Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 223–24 (4th Cir. 2003) (The Corps "receives

thousands of [Section 404] permit applications per year" and so "reasonably rel[ies]" on "studies

given to them by applicants"); *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–36 (9th Cir. 1986)

("The Corps is not a business consulting firm" and may therefore base its analysis "entirely upon

information supplied by the applicant."). Of course, the Corps may not rely "uncritically" on

applicant's supporting documentation. *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722

F.3d 1053, 1061 (7th Cir. 2013). But then neither may FDEP, which must "determine whether the

information provided by the applicant is sufficient to provide reasonable assurance that the

applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C., will be met."

EPA-HQ-OW-2018-0640-A20 at 32 (State 404 Handbook § 8.2(f)).

And while Plaintiffs say otherwise, Dkt. 98 at 63–64, FDEP's determinations *are* subject

to judicial review. An FDEP-issued permit can be "set aside" if, among other things, it "depends

on any finding of fact that is not supported by competent, substantial evidence." Fl. St.

§ 120.68(7)(b). "Competent substantial evidence is such evidence as will establish a substantial

basis of fact from which the fact at issue can reasonably be inferred or such relevant evidence as a

reasonable mind would accept as adequate to support a conclusion." *Duval Util. Co. v. Fl. Pub.*

*Serv. Comm'n*, 380 So. 2d 1028, 1031 (Fla. 1980) (cleaned up). It is not, in other words, "evidence which is incredible, mere speculation, or unreliable." *Defs. Of Crooked Lake, Inc. v. FDEP*, Nos. 17-5328, 17-0972, 2018 WL 3387900, at *7 (Fla. Div. Admin. Hrgs., May 7, 2018). Plaintiffs are thus wrong to suggest that any "subjective, vague" promise by a "self-interested applicant" will rise to the level of a "reasonable assurance." Dkt. 98 at 64. And EPA was right to conclude that Florida's "'reasonable assurance' language" did not render the State's program "[in]consistent with federal requirements." EPA-HQ-OW-2018-0640-0568, at 27 (RTC).

   B.   <u>FDEP must consider effects on water quality generally.</u>

  Plaintiffs also argue that Florida's Section 404 program is less stringent than the federal program because, they assert, it is concerned only with discharges that violate water quality standards or toxic effluent limitations. Dkt. 98 at 64–66. That assertion is belied by the record.

  Just like the 404(b)(1) Guidelines, Florida's regulations prohibit any discharge that "causes or contributes to" violations of state water quality standards or that violates toxic effluent limitations. 62-331.053(3)(a)1–3, F.A.C.; *accord* 40 C.F.R. § 230.10(b)(1)–(2). So, like the Corps, FDEP must determine a proposed project's effect on water quality by reference to those standards and limitations. But that is not FDEP's sole focus, as Plaintiffs suggest. Dkt. 98 at 65. Rather, just like the Corps, FDEP must also assess a proposed project's impact on water quality based on its:

- "effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites," 62-331.053(3)(a)6.i, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(1);

- "effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of

<div align="center">33</div>

the project site through biological, physical, and chemical processes," 62-331.053(3)(a)6.ii,

F.A.C.; *accord* 40 C.F.R. § 230.10(c)(2);

- "effects on aquatic ecosystem diversity, productivity, and stability," including "loss of fish

  and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water,

  or reduce wave energy," 62-331.053(3)(a)6.iii, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(3); and

- "effects on recreational, aesthetic, and economic values," 62-331.053(3)(a)6.iv, F.A.C.;

  *accord* 40 C.F.R. § 230.10(c)(4).

In other words, just like the 404(b)(1) Guidelines, Florida's regulations demand an examination of

a proposed project's effect "on water quality generally." Dkt. 98 at 65.

And just like the 404(b)(1) Guidelines, Florida's regulations bar discharges unless the

permit applicant takes "appropriate and practicable steps" to "minimize potential adverse impacts

of the activity on the aquatic ecosystem." 62-331.053(3)(b), F.A.C.; *accord* 40 C.F.R. § 230.10(d).

There is thus no reason to assume, based on the text of Florida's regulations, that "negative impacts

on water quality" that "must be mitigated" under the federal program would somehow escape

regulation under Florida's program. Dkt. 98 at 65.

   C.  <u>EPA reasonably concluded that FWS's review of state permit applications would
       safeguard species and habitat.</u>

Briefly reprising their argument about completeness, Plaintiffs again argue that because

Florida's assumption request did not include the BiOp, the State failed to demonstrate how it would

avoid issuing permits that jeopardize the continued existence of ESA-listed species or result in

likelihood of the destruction or adverse modification of critical habitat, as required by the 404(b)(1)

Guidelines, *Id.* at 66. That argument rests on a flawed premise. As explained above, while Florida's

submission did not include the BiOp, it did explain how FDEP, FWC, and FWS would jointly

review permits. *Supra* pp.24–25. Based on that process of interagency coordination—one in which

FWS would have the last word on species and habitat impacts—EPA reasonably concluded that Florida-issued permits would neither jeopardize listed species, nor harm critical habitat.

## III.   EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements.

Plaintiffs next argue that EPA erred in approving Florida's assumption request because the State's criminal enforcement authority differs from federal enforcement authority in two respects. Dkt. 98 at 56–61. First, Florida, has a graduated one-to-three-year statute of limitations applicable to environmental crimes, while 18 U.S.C. § 3282 creates a default five-year statute of limitations for non-capital federal crimes. Second, criminal convictions in Florida generally require a minimum showing of "gross or culpable (criminal) negligence," Dkt. 98 at 58, while 33 U.S.C. § 1319, authorizes criminal convictions on a showing of simple negligence. Plaintiffs contend that these differences preclude state assumption. In so doing they raise statutory and regulatory arguments; both fail.

### A.   The CWA does not preclude Section 404 assumption in states with a gross negligence culpability standard or a statute of limitations of less than five years.

Plaintiffs' statutory argument—that the CWA itself precludes Section 404 assumption in states with a less-than-five-year statute of limitations or a gross negligence culpability standard— is unsupported by the text and purpose of the Act, and at odds with Circuit precedent.

Under CWA Section 404(h)(1), a state need only demonstrate authority necessary to "abate violations of" its permitting program, "including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G). That broad language suggests that states have some flexibility in devising criminal enforcement regimes, and, relatedly, that EPA has discretion to approve state programs that deviate in at least some respects from the federal enforcement model. *See* EPA-HQ-OW-2018-0640-0568, at 75 (RTC).

35

Considerations of statutory context bolster those inferences. Where Congress demanded equivalence between state and federal law, it made plain its intent. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). Elsewhere in Section 404(h)(1), Congress required that state-issued permits "assure compliance with any applicable requirements" of "sections 1317 and 1343 of this title." 33 U.S.C. § 1344(h)(1)(A)(i). Congress also required that state-issued permits include inspection, monitoring, entry, and reporting requirements "to at least the same extent as required in section 1318 of this title." *Id.* § 1344(h)(1)(B). The lack of any reference to 33 U.S.C. § 1319 or 18 U.S.C. § 3282 is good reason not to read the CWA to foreclose assumption in states with less-than-five-year statutes of limitations or culpability standards higher than simple negligence.

This reading of the statute is entirely consistent with the D.C. Circuit's decision in *NRDC v. EPA*, 859 F.2d 156 (D.C. Cir. 1988). That case involved CWA Section 402(b)(7), which, like Section 404(h)(1)(G), requires states seeking to assume NPDES permitting authority to demonstrate "adequate authority" to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1342(b)(7). Acting under Section 402(b)(7), EPA established minimum criminal penalties for state NPDES programs at levels below the federal penalties authorized under 33 U.S.C. § 1319. The petitioners in *NRDC* challenged those regulations, arguing (much like Plaintiffs) that state criminal penalties needed to mirror federal penalties to effectively abate violations.

The D.C. Circuit disagreed. While acknowledging that "[u]niformity is indeed a recurrent theme in the Act," the court stressed that Congress's "quest for homogeneity is in tension with its

independent emphasis on state autonomy, which is repeated throughout the legislative history of the Act, is enshrined in the Act as the basic policy to 'recognize, preserve, and protect the primary responsibilities and rights of States,' and is the very foundation of the [state-assumed] permit program." 859 F.2d at 175 (quoting 33 U.S.C. § 1251(b)(1)). Noting that criminal penalties "are traditionally under control of the individual states," and that the statute affords EPA "broad[] discretion to respect state autonomy in the criminal sector," the court declined to infer "an unexpressed congressional intent that state requirements must mirror the federal ones." *Id.* at 180.[14]

The statute-based reasoning in *NRDC* applies with equal force here. The CWA makes no mention of statutes of limitations or state culpability standards. So, EPA may exercise its "broad discretion" to allow Section 404 assumption in states that depart from the federal simple negligence standard or five-year statute of limitations. Indeed, in keeping with its long-held view that the CWA "does not require total uniformity between federal and state enforcement authorities," EPA-HQ-OW-2018-0640-0568, at 76 (RTC), the Agency has never in 50 years denied a state Section 404 assumption request or NPDES program application because the state provided for criminal prosecution based on a standard more demanding than simple negligence or employed a less-than-five-year statute of limitations.

That is not for want of opportunity. For instance, three states that assumed NPDES permitting authority relatively recently—Idaho (2018), Arizona (2002), and Maine (2001)—do not authorize prosecutions based on simple negligence. *See* Exhibit A at 1–3. Neither does New Jersey

---

[14] For similar reasons, the Ninth Circuit rejected a challenge to EPA's approval of Alaska's state NPDES program in *Akiak Native Community v. EPA*, 625 F.3d 1162, 1171–72 (9th Cir. 2010). The petitioners there argued that Alaska lacked adequate enforcement authority because—unlike EPA—the State could not assess administrative penalties and could recover penalties only by initiating a court proceeding. *Id.* at 1171. But the court noted that "[t]here is no requirement in the CWA . . . that state officials have the authority to impose an administrative penalty," and so it found no "reason to conclude" that EPA's approval violated the Act. *Id.* at 1171–72.

(1994), the last state before Florida to assume Section 404 permitting authority. *See id.* at 4. And of those four states, three have statutes of limitations of less than five years for at least some environmental crimes. *See id.* at 6.

This is unsurprising. The definition of "negligence" sufficient to give rise to criminal penalties varies significantly by jurisdiction. "Simple" or "ordinary" negligence is the rule in federal prosecutions of certain misdemeanor offenses under the CWA. *Hanousek*, 176 F.3d at 1121; 33 U.S.C. § 1319. But at least 25 states, including Florida, require a heightened showing of "gross" or "culpable" negligence to establish criminal liability. *See* Exhibit A at 1–5. So too does the Model Penal Code, which defines "negligently" as follows:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves *a gross deviation from the standard of care* that a reasonable person would observe in the actor's situation.

Model Penal Code § 2.02(d) (emphasis added). Similarly, 38 states have a statute of limitations of less than five years for at least some environmental crimes. *See* Exhibit A at 6–7. EPA has declined to treat those deviations from federal enforcement authority as insuperable boundaries to state NPDES or Section 404 assumption, and it reasonably declined to do so here.

Plaintiffs' counter arguments exaggerate the legal and practical effects of Florida's criminal negligence standard on CWA enforcement. Dkt. 98 at 56–59. While states must assume primary enforcement responsibility over their Section 404 programs, state assumption does not "limit the authority of the Administrator to take action pursuant to" 33 U.S.C. § 1319, with its simple negligence standard. 33 U.S.C. § 1344(n). Plaintiffs are thus wrong to insist that Florida's definition of negligence removes "an entire class of violators from criminal liability." Dkt. 98 at 56–57. Moreover, any theoretical gap between gross or culpable negligence and simple negligence

<div align="center">38</div>

narrows considerably in practice. A study of federal criminal enforcement of the CWA, cited in a

law review article in the record, found that over a six-year period, just 3.9% of prosecutions—12

out of 307—were brought solely for simple negligence, without any aggravating factors like

knowing violations, deceptive conduct, or substantial harm. EPA-HQ-OW-2018-0640-0668-A2,

at 9.[15]  There is thus good reason to doubt Plaintiffs' suggestion that Florida's negligence standard

would, by itself, vastly erode the scope of Section 404 enforcement.

In sum, EPA's longstanding approach of extending some measure of deference to states in

matters of criminal enforcement is entirely consistent with the relevant statutory text and with the

federal-state partnership that Congress envisioned. Plaintiffs' inflexible reading of the CWA is

not. Their statutory argument fails.

B. EPA's regulations do not establish simple negligence as a precondition for state assumption.

Plaintiffs' regulatory argument fares no better. They contend that EPA violated 40 C.F.R.

§ 233.41 by approving Florida's assumption request despite the state's "gross or culpable

(criminal) negligence" standard. Dkt. 98 at 57–58. But that contention rests on a selective reading

of the regulatory text.

Section 233.41 sets out the "[r]equirements for enforcement authority" necessary to satisfy

Section 404(h)(1)(G). Two of its subparagraphs, (a)(3) and (b)(2), are relevant here. Subparagraph

(a)(3) requires that states have the authority to: (i) seek civil fines of at least $5,000 per day against

anyone who illegally discharges or violates a discharge permit condition; (ii) seek criminal fines

of at least $10,000 per day against anyone who illegally discharges or violates a permit condition,

---

[15] As the Principal Deputy Solicitor General explained during argument last October, under the CWA, it is "very unusual for simple negligence to give rise to criminal liability," and federal "criminal prosecutions are brought only when there's some sort of serious aggravating conduct." Transcript of Oral Argument at 114, *Sackett v. EPA*, 21-454.

if they do so with "*criminal negligence*"; and (iii) seek criminal fines of at least $5,000 per day against anyone who engages in certain deceptive conduct, if they do so "knowingly." 40 C.F.R. § 233.41(a)(3)(i)–(iii) (emphasis added). Subparagraph (b)(2) then requires that the "burden of proof and degree of knowledge or intent required under State law for establishing violations under paragraph (a)(3) of this section, shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." *Id.* § 233.41(b)(2).

Plaintiffs focus only on sub-paragraph (b)(2), which they read to bar Section 404 assumption in any state that fails to conform its criminal code to the "mens rea," or "level of culpability," applicable under 33 U.S.C. § 1319. Dkt. 98 at 56–57. Thus, according to Plaintiffs, because that provision authorizes EPA to seek criminal penalties from anyone who, acting with ordinary negligence, discharges without a permit or violates a permit condition, states must be able to prosecute the same misconduct based only on a showing of simple negligence. But that argument runs headlong into sub-paragraph (a)(3)(ii), which demands only that states seek criminal fines from those who illegally discharge or violate permit conditions "with criminal negligence."

Black's defines "criminal negligence" as "[g]ross negligence so extreme that it is punishable as a crime," or (referencing the Model Penal Code) as the "objectively assessed mental state of an actor" who engages in prohibited conduct despite "a substantial and unjustifiable risk that the social harm that the law is designed to prevent will occur." NEGLIGENCE, Black's Law Dictionary (11th ed. 2019). Under Plaintiffs' reading of Section 233.41, a state could satisfy the express terms of (a)(3)(ii) by providing for prosecution of "criminal negligence," as that term is widely understood, and *in so doing*, violate the requirements of (b)(2). That cannot be right.

"Ordinarily, where a specific provision conflicts with a general one, the specific governs." *Edmond v. United States*, 520 U.S. 651, 657 (1997). That interpretive principle resolves any

40

superficial inconsistency within Section 233.41. The general language in sub-paragraph (b)(2) should be read to complement rather than contradict the more specific text of sub-paragraph (a)(3). To illustrate, where sub-paragraph (a)(3)(i) requires authority to seek civil fines but establishes no culpability standard, (b)(2) clarifies that those penalties must be assessable consistent with the federal standard of strict liability. Similarly, where sub-paragraph (a)(3)(iii) requires authority to seek criminal fines for certain "knowing[]" violations, (b)(2) clarifies that, as in the federal context, "knowingly" means something less than "intentionally." But where (a)(3)(ii) requires authority to bring prosecutions based on a showing of "criminal negligence," (b)(2) should not be read to strike the word "criminal" from the regulation. Rather, any form of negligence will suffice.

This understanding of Section 233.41 gives effect to every word in that provision. *See Marx v. Gen. Revenue Corps.*, 568 U.S. 371, 386 (2013) ("the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"). It also ensures that Section 233.41 coheres. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (laws "must, to the extent possible," be construed to "ensure that the statutory scheme is coherent and consistent"). Neither of these things can be said of Plaintiffs' reading of Section 233.41.

That reading finds little support in *Idaho Conservation League v. EPA*, 820 F. App'x 627 (9th Cir. 2020). There, the Ninth Circuit summarily held that under 40 C.F.R. § 127.27(b)(2), a state must have a simple negligence culpability standard to implement a state NPDES program. But that decision is thinly reasoned and thus unpersuasive. And while Plaintiffs' reading of 40 C.F.R. § 233.41 may be consistent with an unpublished out-of-circuit decision, EPA's conclusion that Florida's "culpable negligence" standard satisfied the requirements of 40 C.F.R. § 233.41 is consistent with the CWA's text and purpose, with EPA's past practice of approving state NPDES

41

and Section 404 programs that employ a gross negligence standard, and with the better reading of the regulatory text. Plaintiffs' regulatory argument therefore fails.[16]

## IV.  EPA Reasonably Did Not Demand that Florida Affirm or Incorporate the Federal Definition of "Waters of the United States" in State Regulations.

Plaintiffs next contend that EPA erred in approving Florida's assumption request because Florida neither "affirm[ed]" in its regulations "that 'waters of the United States' are those waters as defined by federal law," nor did it "incorporate the federal definition" of "waters of the United States" into state law. Dkt. 98 at 68. This argument is meritless.

Florida made clear that it would assume Section 404 permitting authority in all " 'waters of the United (WOTUS) as defined at 40 C.F.R. Part 120,' " other than those waters over which the Corps would retain Section 404 permitting authority. EPA-HQ-OW-2018-0640-0568, at 65 (RTC quoting FDEP's Program Description); *accord* CORPS004323. Neither the CWA nor EPA's Section 404 assumption regulations demanded anything more. *See generally* 33 U.S.C. § 1344(g)(1); 40 C.F.R. § 233.11(h). They certainly did not require Florida to define the phrase "waters of the United States." That definition is a matter of federal law. Florida's assumption in no way altered it. State assumption only shifted "responsibility for administering the Section 404 program for certain waters of the United States." EPA-HQ-OW-2018-0640-0568, at 67 (RTC). The federal definition thus remains binding in Florida regardless of whether the State "affirm[s]" or "incorporate[s]" it. And EPA reasonably declined to treat Florida's affirmation or incorporation of an already applicable federal standard as a precondition for assumption.

---

[16] EPA proposed amending 40 C.F.R. § 233.41(b)(2) to clarify that "any form or type of negligence" is sufficient for state Section 404 assumption. 85 Fed. Reg. 80,713, 80,718 (Dec. 14, 2020). It is currently preparing to propose updated changes to its Section 404 assumption regulations. *See* https://www.reginfo.gov/public/do/eoDetails?rrid=300864 (last visited Apr. 25, 2023). EPA will keep the parties and the Court apprised of any developments.

42

Plaintiffs do nothing to advance their argument by noting that, in some instances, Florida has continued to rely on a regulatory definition of "waters of the United States" that was vacated in 2021. Dkt. 98 at 68. The outdated regulatory definition, known as the Navigable Waters Protection Rule, was operative at the time that Florida requested assumption. EPA-HQ-OW-2018-0640-0568, at 67 (RTC). And the problem is not that Florida failed to "affirm" or "incorporate" that outdated definition in state law (which would have only compounded the concern Plaintiffs raise), but rather that Florida fails to acknowledge intervening changes in binding federal law.

EPA believes that Florida's continued reliance on the Navigable Waters Protection Rule is problematic. But it is a problem that arose after EPA's approval and one that EPA is addressing through its oversight authority. Most importantly for present purposes, it is a problem that is beyond the scope of this litigation. As a matter of "black-letter administrative law," the reviewing court in APA cases like this one "should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (cleaned up). Information concerning Florida's implementation of its Section 404 program is not part of the administrative record. And Plaintiffs do not even attempt to justify the inclusion of post-decision extra-record evidence under one of the "narrow and rarely invoked" exceptions to record review. *Id.* Florida's implementation track record is simply not at issue here.

## V.     The Corps Reasonably Defined Retained Waters.

Plaintiffs attack the Corps' Retained Waters List. Dkt. 98 at 67–72. The crux of their complaint is that the list was based on less-than-perfect information about which of Florida's "7,500 major lakes, thirty-three first magnitude springs, and approximately 27,500 linear miles of rivers and streams" are in fact Section 10 waters. *Id.* at 20. But experience and commonsense both

suggest that the pursuit of an exhaustive retained waters list will come at the expense of state assumption, and so the Corps reasonably opted for a different approach here.[17]

Rather than undertaking the state-wide navigability study that Plaintiffs demand, the Jacksonville District used the 2014 Section 10 List to develop the Retained Waters List. CORPS004149. The 2014 Section 10 List drew on navigability determinations, was familiar to the regulated community, and reflected the District's informed judgments about the Section 10 status of many waters within Florida. It was, in short, the best currently available information on the scope of Section 10 waters. The 2014 Section 10 List thus served as a reasonable basis for developing the "description of" retained waters required for state assumption. 40 C.F.R. § 233.14(b)(1).

That list was not exhaustive, nor was it intended to be static. *See* 33 C.F.R. § 329.16(b) (noting that a waterbody's "absence from" from a Section 10 list "should not be taken as an indication that the waterbody is not navigable"); *see id.* § 329.16(c) (procedures for updating Section 10 lists). Rather, it was the product of an iterative approach to identifying Section 10 waters. The Corps developed that approach through its long experience implementing the RHA and it reasonably employed a similar approach to identifying retained waters in Florida. While using the 2014 Section 10 List as an off-the-shelf starting point for the Retained Waters List, the Memorandum of Agreement among FDEP and the Corps provides mechanisms for updating the Retained Waters List as new information comes to light. CORPS004324.

The record of state assumption (or the lack thereof) supports the pragmatic approach that the Corps employed here. As noted in the Assumable Waters Subcommittee Report, the Corps'

---

[17] Plaintiffs contend that the Corps' development of the Retained Waters List was a final agency action. Dkt. 98 at 70–71. Assuming without conceding that it was, the Corps' action was reasonable for the reasons discussed in the text.

44

prior, open-ended inquiries into the scope of retained waters had effectively, if inadvertently, discouraged states from pursuing assumption. CORPS003001, CORPS003005. When the Assistant Secretary of the Army for Civil Works adopted the report's majority recommendations, he referenced that past experience, noting that he had "personally heard from state officials who— but for . . . uncertainty [about the scope of the Corps' retained waters]—would pursue Section 404(g) assumption on behalf of their state." CORPS004096. The Assistant Secretary sought to address this problem by directing the Corps to use existing Section 10 lists (here the 2014 Section 10 List) as the basis for retained waters lists. That decision struck a balance between Congress's twin goals of maintaining federal oversight in channels of interstate or foreign commerce and facilitating Section 404 assumption. The Court should "not disturb this reasonable accommodation of manifestly competing interests." *NRDC*, 859 F.2d at 181 (internal quotation marks omitted).

Though Plaintiffs argue otherwise, Dkt. 98 at 72, the Corps properly excluded "historic use" Section 10 waters from the Retained Waters List. Section 404(g)(1), which defines the scope of retained waters, reflects Congress's concern with channels of current or future—not historic— interstate and foreign commerce. That provision retains the Corps' jurisdiction over "waters which *are presently* used, or *are susceptible to use* in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . and wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1) (emphasis added). Unlike the definition of RHA Section 10 "navigable waters of the United States" that it otherwise closely tracks, Section 404(g) makes no mention of waters that "have been used in the past" to "transport interstate or foreign commerce." 33 C.F.R. § 329.4. The statutory text is thus clear: Congress did not want the Corps to retain CWA jurisdiction over waters deemed navigable based solely on historic practice. The Corps gave effect

45

to that clear congressional intent when it declined to include on its retained waters list " 'historic use' navigable waters." Dkt. 98 at 72.

The Corps also reasonably declined to include on the Retained Waters List every water that appeared on the 2017 Supplement. Unlike the 2014 Section 10 List, the 2017 Supplement was avowedly a draft—the "first preliminary increment of an effort" to update the District's list of Section 10 waters. CORPS003117. And the 2017 Supplement's deliberately over-inclusive scope—"whatever" waters the Jacksonville District thought "might be remotely . . . *TNWs*," CORPS003115 (emphasis added)—far exceeded that of any retained waters list.

Section 10 waters and TNWs are not co-extensive. "The term 'navigable waters of the United States' as used in the [RHA] has a substantially different, and more limited, meaning than" navigable waters under the CWA. *1902 Atl. Ltd. v. Hudson*, 574 F.Supp. 1381, 1392 (E.D. Va. 1983). The RHA "contemplat[es] . . . a body of water forming a continued highway over which commerce is or may be carried on with other states or foreign countries, by water." *Hardy Salt Co. v. S. Pac. Transp. Co.*, 501 F.2d 1156, 1169 (10th Cir. 1974). But under longstanding agency guidance, a TNW need only be "navigable-in-fact." *Waters that Qualify as "Traditional Navigable Waters" Under Section (a)(1) of the Agencies' Regulations*, available at https://www.epa.gov/wotus/waters-qualify-traditional-navigable-waters-under-section-a1-agencies-regulations; *see also id.* (noting that TNWs "include but are not limited to," Section 10 waters). Thus, as the Assumable Waters Subcommittee Report noted, "there are more . . . TNW waters" than Section 10 waters. CORPS003021. Unsurprisingly, the Jacksonville District more-than-doubled the number of waterbodies named on the 2014 Section 10 List by including on the 2017 Supplement everything that "might . . . remotely" be a TNW. Sorting retained waters from a

46

list of speculative TNWs would have been time-consuming and, likely, contentious. The Corps relied instead on the 2014 Section 10 List. That decision was reasonable; Claim 7 therefore fails.

Because the Corps' Retained Waters list was reasonable, EPA acted reasonably in approving Florida's assumption request based in part on the Retained Waters list, and Plaintiffs' argument to contrary, Dkt. 98 at 69–70, fails as well.

## VI.   The BiOp Complies with the ESA.

Plaintiffs take issue with the BiOp's programmatic approach, which evaluated whether and to what degree FDEP and EPA structured their regulatory and oversight programs, respectively to ensure that approval and implementation of Florida's Section 404 program is not likely to jeopardize the continued existence of ESA-considered species (as the BiOp defined that term (FWS-006045)) or destroy or adversely modify designated critical habitat. *See also* n.11, *supra*. As explained below, the BiOp outlined the technical assistance process in which FWS will engage with FDEP to evaluate permits on a site-specific and species-specific basis. Plaintiffs accuse FWS of unlawfully abdicating its duties, and argue that every future permit issued by FDEP is required to either undergo ESA Section 7 consultation or obtain a permit under ESA Section 10. Dkt. 98 at 36–50. These arguments lack merit.

At the threshold, Plaintiffs' overriding criticism of the BiOp rests on their belief that neither EPA nor FWS can satisfy ESA Section 7 by relying on a programmatic or process-based approach. Instead, in their view, the only valid approach would be to undertake an analysis encompassing individualized, site-specific impacts for every permit Florida will issue after assumption of the program. But the ESA does not prohibit use of a programmatic approach. EPA is free to choose how to structure its action to meet its obligations under ESA Section 7(a)(2). In turn, FWS's sole responsibility is to determine whether the agency action as structured satisfies Section 7(a)(2)'s

47

command. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 624 (9th Cir. 2014) (FWS does not need to pick an approach that may more effectively protect a species from jeopardy; FWS need only find that the final action complies with the jeopardy standard) (citation omitted). Here, the action presented for consultation was EPA's approval of FDEP's request to assume the Section 404 program in all assumable waters, which included process-based protections and conditions directed at ESA considered species. FWS-006081. FWS properly concluded that this action is not likely to cause jeopardy or adverse modification. That is all that is required.

As explained in the BiOp, approval of Florida's request would result in FDEP regulating a broad array of activities conducted over several geographic areas and for long periods of time. *Id*. The BiOp specifically acknowledged that, as a result, there was substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. *Id*. In lieu of site-specific or species-specific analyses, FWS determined that a programmatic or process-based approach to EPA's potential approval of FDEP's request was appropriate. Accordingly, FWS "examin[ed] whether and to what degree FDEP's program, regulations, processes, and procedures insure that EPA's approval and FDEP's subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat." FWS-006045. With this programmatic approach, species-specific analyses were deferred, to be assessed on a permit-by-permit basis through the technical assistance process. FWS-006081. As the BiOp explained at length, that process requires all permit applications to be forwarded to FWS for review and provides a structured framework for coordinating review of State 404 permits to assess potential effects on ESA-considered species to ensure that no Section 404 permit action jeopardizes the continued existence of listed species or adversely destroys or modifies critical habitat. FWS-006049–58.

48

FWS previously utilized a similar programmatic approach for a one-time EPA nationwide action that would result in a wide array of subsequent implementation actions where impacts similarly were unknown at the time of consultation. When FWS's approach was challenged in court, the Second Circuit held both that approach and the determinations set forth in that biological opinion were reasonable. In that case, environmental petitioners brought nearly identical complaints, alleging that the consulting agencies' (FWS and NMFS) use of a structured and programmatic approach that deferred species-specific analysis until a later time was unlawful. *Cooling Water Intake Structure*, 905 F.3d at 73-74. The Second Circuit rejected those arguments and held that the lack of available data and uncertainties as to how and where the rule would be implemented did not allow for a meaningful assessment of impacts on a national scale. Therefore, it was reasonable for the consulting agencies to defer consideration of those impacts to the site-specific permitting process. *See id*. Here too, FWS determined that it was not feasible to conduct a meaningful site-specific and species-specific effects analysis in the BiOp nor was it required to do so. FWS-006092. To the contrary, the scope of EPA's approval of FDEP's request to administer the Section 404 program in assumable waters was statewide, covering an array of operations that may affect a wide variety of ESA-considered species and proposed and designated critical habitat depending on the site-specific action, making it an appropriate action for consideration at the programmatic level. *Id*. Thus, FWS properly assessed whether FDEP had structured its regulatory program and EPA structured its oversight program to ensure that approval and implementation of the State 404 program satisfied ESA Section 7. FWS-006081; FWS-006093; FWS-006104. Like the Second Circuit, this Court should uphold that approach.

Plaintiffs assert at least seven different specific arguments in support of their claim that the BiOp failed to comply with the ESA; none of them has merit. First, despite Plaintiffs' efforts to

draw similarities between this programmatic consultation and the one in *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), the two cases are plainly different. Dkt. 98 at 40–41. There, both consulting agencies envisioned that take would be authorized through emergency consultation on a case-by-case basis.  726 F. Supp. 2d at 1203, 1205. In analyzing the reasonable and prudent alternative challenged by the plaintiffs, the court held that FWS had deferred improperly to the action agency on whether to impose restrictions for the benefit of listed species, and that unwarranted deference suggested that FWS would not impose meaningful restrictions during future emergency consultations. *Id*. at 1228. Here, FWS has reserved to itself the final say on protective measures; there simply is no deference to FDEP. *See* FWS-006050; FWS-006057; FWS-006066; FWS-006106; (requiring FDEP to incorporate all recommended protection measures as permit conditions). The circumstances are inapposite.

Second, for the same reasons, Plaintiffs' contention that FWS unlawfully made a "no jeopardy" determination is flawed. Dkt. 98 at 41. The proposed programmatic action and its related activities provided FWS with enough information to analyze effects at the programmatic level, while analysis of specific projects (and impacts of those projects on specific species) will be addressed in the technical assistance process. FWS-006081. As explained, there was substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. *Id*. While Plaintiffs characterize this approach as a "refusal to assess species-specific affects," Dkt. 98 at 41, FWS exercised its expertise and discretion and made a determination using the information that it had about Florida's proposed program and EPA's intended oversight of that program under the CWA. FWS-006081. The Second Circuit rejected similar arguments in *Cooling Water Intake Structure*, holding that "[n]othing in the ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis." 905 F.3d at 73. Instead, the Second

Circuit held that it was proper to construe the agency action as promulgation of standards under Section 316(b) of the CWA, rather than a phased action consisting of both the promulgation of standards and the states' later implementation of those standards. Having properly defined the scope of the action at issue, the Court held that the consulting agencies' biological opinions discharged their duty to assess the effects of the action as a whole. *Id*. So too here, where FWS properly construed the agency action as EPA's approval of Florida's request to assume Section 404 permitting at the state level and assessed the entirety of the effects of that action.

Third, Plaintiffs argue FWS failed to analyze the full extent of the action because it did not consider potential impacts to species from existing general permits, decisions on when permits would not be required, and compliance and enforcement activities. Dkt. 98 at 38. Yet Plaintiffs overlook that Florida had issued no Section 404 general permits prior to EPA's approval of Florida's assumption request. Thus, an assessment of impacts from "existing" state general permits was not possible. The BiOp did, however, contemplate the proposed issuance of permits as described in the State's Section 404 program rule, which allows special conditions to be attached to such permits if needed. FWS-003408-09 (Florida rules 62-4.070 and 62-4.080); *see also* FWS-006110 (BiOp's terms and conditions, referencing 62-331.080, F.A.C., which allows FDEP to reevaluate the circumstances and conditions of a permit at any time for sufficient cause); FWS-005631–32. The State 404 Handbook also described how projects that apply for general permits will be evaluated for consistency with those proposed general permits and how proposed general permits would be processed and their effects reviewed by FWS. FWS-005631–32; FWS-006048; FWS-006051; FWS-006085–86. Moreover, FWS determined that permit compliance would be monitored and enforced through the species coordination process. FWS-006105. As explained in the BiOp, FWS assessed monitoring and enforcement compliance actions, including EPA's receipt

51

of all applications with a determination other than no effect/impact, which allows EPA to monitor the effectiveness of the species coordination process and oversee State permit actions and program operations. FWS-006067; FWS-006081. As part of the overall action, FWS reasonably evaluated the process for issuing general permits and EPA's oversight of that process.

Plaintiffs wrongly contend that FWS should have evaluated the impact on species from "decisions on when permits would not be required,"[18] and considered impacts that will result from "the loss of NEPA review and ESA Section 7 consultations."[19] Dkt. 98 at 38. The BiOp considered a programmatic action that included the process by which FDEP would determine if a project required a Section 404 permit. FWS-006086–88. If a project requires a Section 404 permit, the BiOp considered how that permit would be evaluated for effects to federally listed species and designated critical habitat, and what conditions would be imposed as outlined in coordination with FWS to insure that listed species would not be jeopardized and critical habitat would not be destroyed or adversely modified. FWS-006105-06. Conversely, if Florida finds that a project does not require a State Section 404 permit, then the project is beyond the regulatory reach of its Section 404 permitting program, and not part of the species' coordination process considered in the BiOp.[20]

---

[18] This argument is a red herring in any event. If an agency determines that no permit is required, then it never had discretionary control over a project in the first place and, therefore, cannot cause any effects to listed species in the first place. *See* 16 U.S.C. § 1536(a)(2). This is so when the Corps issued Section 404 permits and remains true now that FDEP is issuing Section 404 permits.

[19] Arguments as to "the loss of NEPA review and ESA Section 7 consultations at the site-specific level" fail to acknowledge that the CWA allows states to apply to assume the Section 404 permitting process at the state level. 33 U.S.C. § 1344(g)–(l). In such circumstances, Congress decided that neither NEPA review nor ESA Section 7 consultation is required. *Nat'l Ass'n of Home Builders*, 551 U.S. at 653 n.4 (the ESA's consultation requirement "does not apply to permitting decisions by state authorities").

[20]   To the extent Plaintiffs are criticizing how Florida decides that a project does not require a permit, the BiOp considered the relevant portions of Florida's Administrative Code, FWS-006044, and found the FDEP's 404 program was structured to ensure that no permit will be issued that is likely to jeopardize listed species and adversely destroy or modify critical habitat. FWS-006092.

Nor is there any merit to Plaintiffs' additional argument that FWS failed to evaluate the environmental baseline. Dkt. 98 at 38–39. The environmental baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that already have undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. The BiOp properly considered the environmental baseline. *See* FWS-006044–45 (BiOp, explaining that it adopted and adapted various portions of the BE, which it considered to be the best scientific and commercial data available); FWS-006084; FWS-005662–80 (BE, devoting an entire chapter to the environmental baseline). The BiOp adopted the BE's detailed description of the environmental baseline, which addressed the baseline of listed species, their habitats, and the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the United States, adjacent uplands, and the ESA-considered species that reside in them. FWS-006084. The BiOp specifically cited the BE's description of the baseline for Section 404 permitting in Florida and its past and ongoing effects on ESA-considered species. *Id*. FWS further separately addressed ecological aspects of the environmental baseline, including the Everglades Restoration, the Central and Southern Florida Project, and other historical ESA consultations triggered by federal wetlands permitting. FWS-006094.[21] This thorough analysis was more than sufficient to satisfy the requirements of 50 C.F.R. § 402.14(g), particularly given the programmatic nature of

---

[21] Plaintiffs do not appear to identify any actions or human activities that they believe were omitted improperly from the environmental baseline. Dkt. 98 at 38-39.

the BiOp and future consideration of projects for site-specific and species-specific impacts.[22]
FWS-006086–87; FWS-006092–93.

Plaintiffs also contend that FWS improperly relied on EPA's BE and incorporated sections
of it "without analysis or explanation." Dkt. 98 at 39.[23] As explained above, FWS explained in the
BiOp that it adopted and adapted various portions of ESA's consultation package, which it
considered the best available scientific and commercial data. FWS-006044–45. FWS also
explained that it conducted its own analysis of the best scientific and commercial data available as
required by the ESA, *id.*, thus Plaintiffs' assertion that FWS did no analysis is inaccurate. This
fulfilled the ESA's mandate that FWS's opinion be based on the best available scientific and
commercial data available, 16 U.S.C. § 1536(a)(2), and its determination is entitled to deference.
*Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998).

---

[22]    The cases cited by Plaintiffs are inapposite. None of them concerned programmatic
consultations such as the one in this case, where FWS will conduct site-specific and species-
specific analyses of each permit through the technical assistance process. To the contrary, the
individual biological opinions at issue in *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121,
128 (D.D.C. 2001) addressed the effects of individual agency actions on a single species, which
the Court held simply provided a "recitation of the activities of the agencies." This BiOp delved
into the environmental baseline and, for that reason, is distinguishable on the facts. Nor does
*Oceana, Inc. v. Ross*, No. 15-055, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) apply. There, the Court
found that the consulting agency listed and described data without indicating how it factored into
its jeopardy analysis. But here, FWS discussed, for example, data on Section 404 permits issued
from 2014 through 2018; stated its relevance to the action under review (namely, EPA's approval
of Florida's assumption request) and that it likely approximates the number and types of permitting
activities that could occur in the next five years. FWS-006081; FWS-006094. There is simply no
basis to describe the BiOp's evaluation of the environmental baseline as short or perfunctory. *Cf.*
Dkt. 98 at 39 (citing *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339 (4th Cir. 2019)).

[23]   Plaintiffs also ignore those parts of the BiOp where FWS discussed data from the BE on Section
404 permits issued from 2014 through 2018 that the Corps provided and explained that the
permitting history approximates permitting activities that could occur in the next five years,
although the precise number and location of future permit applications are unknown. FWS-
006089; FWS-006094.

Finally, Plaintiffs devote just three sentences of argument in their brief in support of Claim 12, in which they allege that EPA failed to consult on ESA-listed sea turtles and their designated critical habitats under FWS's jurisdiction. Dkt. 98 at 41; *see* Dkt. 77 (Am. Complaint ¶¶ 288–294). As explained at length above, the BiOp includes all ESA-considered species and their critical habitat; species-specific impacts will be addressed in the technical assistance process and on a permit-by-permit basis. Neither EPA nor FWS violated their obligation to comply with the ESA in this regard. The Court should enter judgment for Federal Defendants on Claims 3 and 12.

## VII.   The Technical Assistance Process Complies with the ESA.

Throughout their brief, Plaintiffs contend that the technical assistance process is merely voluntary, questioning whether it will be followed and whether FWS and the other agencies will participate in the process as outlined. *E.g.*, Dkt. 98 at 44, 48. Plaintiffs' arguments on this point are easily resolved in favor of Federal Defendants.

At the threshold, the agencies' commitments to the technical assistance process are entitled to a presumption of regularity, which Plaintiffs cannot overcome with mere speculation. *Overton Park,* 401 U.S. at 415; *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 54 (D.D.C. 2015). The plaintiffs made similar arguments in *Cooling Water Intake Structure*, claiming that the technical assistance process was "wholly voluntary" and "not designed to provide meaningful species protection." 905 F.3d at 76. The Second Circuit rejected those arguments, however, holding that the technical assistance process involved a binding commitment by the consulting agencies in that case. *Id*. Here, the BiOp's no jeopardy determination similarly was conditioned on compliance with specific procedures that are part of the description of the action, and the agencies' commitment to them. FWS-006106–07. The agency participants—EPA, FDEP, and FWS—must abide by the commitments made and considered in the BiOp. FWS-006104–05;

55

FWS-006106–07. Just as the Second Circuit held that the rule at issue in *Cooling Water Intake Structure* was interpreted to require participation in the technical assistance process, so too here that process was part of the action that was approved in this programmatic consultation. *See* 905 F.3d at 72. While Plaintiffs insist that FWS's involvement is simply optional, Dkt. 98 at 47–48, their suggestion that FWS is not committed to the process has no basis in fact. To the contrary, the BiOp contemplated that the express purpose of the technical assistance process was to allow FWS to determine if state-issued 404 permits are likely to jeopardize species or destroy or adversely modify critical habitat. FWS-006056–57. That is the standard that FWS will apply in its review of permits, as expressly stated in the BiOp, thus clearly incorporating the meaning of those terms from the ESA and its implementing regulations.[24] *See id*. Plaintiffs' statement that FWS "need not evaluate the effects of the permit on protected species and critical habitat" nor "evaluate jeopardy or the potential to adversely modify or destroy critical habitat," Dkt. 98 at 47, is pure speculation.

Nor is it true that FDEP "determines whether a permit application will have adverse impacts . . . and may stick to that determination even if USFWS provides information contrary to that conclusion." *Id.* at 47. To the contrary, Florida must comply with the technical assistance process, FWS-006109, and the BiOp explicitly stated that FWS's final conclusions regarding potential impacts and necessary measures to address impacts are "determinative," FWS-006056, FWS-006068, a provision to which the state agencies agreed. EPA-HQ-OW-2018-0640-0623, at 10 (MOU among FDEP, FWC, and FWS). FDEP must "incorporate any reasonable and prudent measures and terms and conditions provided by [FWS] into permit conditions for a State 404 permit" and "will incorporate as permit conditions all recommended impact avoidance and

---

[24]   In addition, both federal regulations and the State 404 applicant handbook state that issuance of a State 404 permit that is likely to jeopardize ESA-listed species is prohibited. FWS-006067.

minimization measures (protection measures)" provided by FWS to avoid jeopardy to species and/or adverse modification or destruction of critical habitat. FWS-006065; FWS-006106. This means that FWS, utilizing its expertise, has the final say.[25]  Nor is it accurate for Plaintiffs to say that if the FDEP concludes there will be no adverse impacts, the technical assistance process automatically concludes. Dkt. 98 at 47–48. To the contrary, the BiOp contemplated that FWS "will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as 'No Effect/No Impact.' " FWS-006067; *see also* EPA-HQ-OW-2018-0640-0623, at 13 (MOU among FDEP, FWC, and FWS). If FWS does not respond to such applications upon first submittal, FWS "will still receive public notices for these applications and may elect to comment at that time." FWS-006067. As stated in the BiOp, receipt of public notices for "all applications also provides an opportunity for [FWS] to re-review all of the effect determinations made by the State and provide oversight of the species coordination process." *Id*. (emphasis added).

Plaintiffs' argument that FWS should have considered the effects of the action "as a whole," Dkt. 98 at 45 (citing 50 C.F.R. § 402.14(c)(4), (d)), is just another attack on FWS's programmatic approach. FWS did not have information to allow it to predict every future Section 404 permit application, its location, or its potential overlap with listed species or designated critical habitat. FWS properly recognized the inherent uncertainties and made a decision based on the best

---

[25]   To the extent that Plaintiffs are implying that unlawful take will be permitted to occur notwithstanding the extensive technical assistance process outlined in and committed to in the BiOp, Dkt. 98 at 49, nothing in EPA's approval of Florida's assumption request or the BiOp itself changes the ESA's prohibition of take of listed species. This prohibition operates independently of EPA's approval and the BiOp. If unauthorized take of ESA-listed species occurs, Congress authorized Plaintiffs, other citizens, or the United States to file an action directly against the person or entity responsible to enjoin such take. 16 U.S.C. §§ 1540(g), (e)(6); *see Cooling Water Intake Structure*, 905 F.3d at 75 n.16.

available information. FWS-006093. Accordingly, the action subject to consultation here is EPA's approval of Florida's request to assume its CWA 404 program, not the actual issuance of permits for dredging and filling activities in assumed waters. *See* FWS-006046–48. FWS properly analyzed the effect of that approval, namely Florida's assumption of permitting authority on ESA-species of concern, and that future state permit actions are program activities caused by the proposed action. FWS-006043; FWS-006048. The environmental baseline addressed the baseline of listed species and their habitats, and the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the U.S., adjacent uplands, and the ESA-listed and considered species that reside there. FWS-006084. The analysis of effects assessed EPA's oversight authority and whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat. FWS-006104. The ESA does not mandate an assessment of effects on a site-specific and species-specific basis where the specifics of future projects are uncertain.

In addition to contending that FWS must analyze a programmatic action "as a whole," Plaintiffs argue that FWS must engage in site-specific consultations and produce site-specific biological opinions. Dkt. 98 at 46 (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C Cir. 1980)) & n.17 (citing cases). But *North Slope* simply said that a biological opinion "may not deal exclusively with any one particular stage of an outer continental shelf project." 642 F.2d at 608. The "foresight" that the D.C. Circuit held is required by the ESA is built into the BiOp at issue in

this case, mandating processes and giving FWS final say on potential effects and proposed protective measures to elevate protection of listed species to the highest priority. While Plaintiffs also cite the Ninth Circuit's decision in *Conner v. Burford* and other cases for the proposition that a court must consider all phases of an agency action, Dkt. 98 at 46 n.17, the D.C. Circuit has held that ESA compliance must be assessed in the context of the applicable statutory scheme and future checks and balances and mitigating measures "adopted in pursuance thereof." *North Slope*, 642 F.2d at 609. That is precisely what the BiOp does here. Indeed, the Second Circuit rejected this same argument (and specifically declined to follow *Conner*) in *Cooling Water Intake Structure*, holding that "the rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA." 905 F.3d at 73. Plaintiffs' arguments on this point lack legal support, and their claim that the technical assistance process is not "an adequate stand in for the robust analysis required by Section 7 consultation," Dkt. 98 at 46, misses the point. Federal Defendants do not claim that the technical assistance process equals Section 7 consultation, and the law is clear that absent any further federal permitting, no further Section 7 consultation is required. Under these circumstances, FWS properly treated and analyzed the future impacts of state-issued 404 permits as effects of the action.

Plaintiffs correctly state that the approach taken in this BiOp follows the programmatic approach taken in the *Cooling Water Intake Structure* case. Dkt. 98 at 49. To do so was reasonable, given the Second Circuit's rejection of the attacks on the biological opinion there. Plaintiffs assert three arguments in an effort to distinguish this BiOp from the consultation in that case, all of which fall flat. First, the federal action in *Cooling Water Intake Structure* was a nationwide consultation on EPA's promulgation of a final rule under CWA Section 316(b); the one at issue in this case is limited to approval of Florida's request to assume CWA Section 404 permitting in waters of the

JA.717

United States within the State of Florida. On its face, the federal action in *Cooling Water Intake Structure* cannot seriously be characterized as "much narrower in scope." Dkt. 98 at 49.

Second, the Court should dismiss any suggestion that the CWA Section 316(b) regulations at issue in *Cooling Water Intake Structure* "served a very different purpose." *Id.* at 98 at 50. The measures in the 316(b) rule were codified to ensure that any NPDES permit issued by either the EPA or a state that had assumed NPDES permitting authority would not jeopardize listed species or adversely modify or destroy critical habitat, with the goal of reducing impacts of the ongoing operation of NPDES permitted facilities over time. *See* 905 F.3d at 71–72. The purpose of the BiOp in analyzing EPA's approval of Florida's assumption request is the same: to ensure that permitted activities do not jeopardize ESA-listed species or adversely modify or destroy critical habitat as a result of dredge or fill activities. *See* FWS-006103. Both agency actions arise under the CWA and both allow the permitting of otherwise prohibited discharges of pollutants under the CWA subject to certain conditions. Even if the two agency actions could be found to have differences, they are inconsequential considering their common goal as to listed species and designated critical habitat.

Finally, there is no merit to Plaintiffs' claim that the obligations in *Cooling Water Intake Structure* were "legally binding" only because they were codified in a rulemaking, whereas the obligations here are not because EPA did not codify its approval of Florida's assumption request. Dkt. 98 at 50-51. EPA's incidental take coverage is conditioned on the agency's continued oversight of Florida's implementation of the State 404 program, as well as its coordination of federal review of State Section 404 permit actions. *See* FWS-006109 (setting forth these requirements in Terms and Conditions and citing 40 C.F.R. Part 233). Florida's incidental take coverage is similarly conditioned on its compliance with an extensive list of terms and conditions

in the BiOp, FWS-006109–10, as well as use of its authorities in the State Section 404 program rule. FWS-006109. By attempting to distinguish the *Cooling Water Intake Structure* case, Plaintiffs implicitly concede that the holding would apply, absent the distinctions they try to draw. But any distinctions are easily dispensed with, and Plaintiffs' arguments have no merit. The Court should grant judgment in favor of FWS on Claims 6 and 13.

## VIII.   The Incidental Take Statement Complies with the ESA and Is Reasonable.

Much like their general attacks on the BiOp, *see* Section VI, *supra*, Plaintiffs disagree with the approach in FWS's ITS. These arguments also lack merit.

Plaintiffs first argue that the ITS failed to specify the amount or extent of incidental take and seem to contend that FWS had sufficient information to allow FWS to estimate the number of individuals that might be affected by future permitted activities. Dkt. 98 at 42. This argument lacks legal and factual support. The ESA provides that an incidental take statement shall, among other things, specify the impact of incidental take on species. 16 U.S.C. § 1536(b)(4)(C)(i). Although Congress expressed a preference for quantifying take in the incidental take statement, it recognized that such specificity is not always possible. *See* Endangered Species Act of 1982, H.R. Rep. No. 97-567, at 27, reprinted in 1982 U.S.C.C.A.N. 2807, 2827; *see Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 257 (D.D.C. 2008); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001) ("We have never held that a numerical limit is required."). An ITS that has no numerical cap is considered adequate if it explains why it was impracticable to express a numerical measure of take. *Cf. Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 498-99 (D.D.C. 2014).

Consistent with these authorities, FWS explained in the BiOp that it was unable to anticipate the locations of future State Section 404 permit applications, thus it could not conduct a site-specific or species-specific analysis to estimate the number of individuals that may be affected

61

by the permitted activities. FWS-006081; FWS-006107. Project-specific information will be provided to FWS in the future because FWS will receive all State Section 404 permit applications. FWS-006107–08. This will afford FWS the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis. FWS-006108. The ITS further stated: "we assume that through technical assistance with the State, appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State 404 program will be developed by [FWS], and these measures will ensure that each permit will minimize adverse effects and therefore avoid jeopardy to ESA-considered species or destruction or adverse modification to critical habitat." *Id*. The ITS further explained that "[i]f it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement." FWS-006108; *see also id*. ("the amount or extent of incidental take of listed species will be quantified during the technical assistance process that is required" by Florida's 404 program rule, the MOU signed by FDEP, FWS and FWC, and EPA oversight regulations (40 C.F.R. § 233)). Through this process, take will be quantified and monitoring will track the levels of take estimated through the technical assistance process and exempted by the ITS. FWS-006108.

Plaintiffs nonetheless insist that prior consultations with the Corps on past Section 404 permit applications provided sufficient information to establish numeric take limits and/or identify a surrogate. Dkt. 98 at 42. But prior consultations could have provided only information about the types of impacts from specific past projects, not projects that will be proposed and considered in

the future.[26]  Plaintiffs' citation to *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), does not change this result. There, the court held that there was sufficient information about behavior and habitat of species in areas covered by potential site-specific activities because the areas already had been leased; thus, the agencies knew the specific areas where future oil and gas activities were likely to occur. *See id*. at 1453–54. This fact-specific holding does not apply here, where there is no information to allow FWS to predict who will apply for permits, what activities will be the subject of permit applications, or the location of the proposed activities, which impairs FWS's ability to make a reasonable estimate of potential take. The Second Circuit rejected similar arguments in *Cooling Water Intake Structure*, 905 F.3d at 73, finding that it was reasonable for FWS and NMFS to defer consideration of how pollution would affect aquatic ecosystems. The court held that it was rational for the consulting agencies to engage in a technical assistance process carefully defined in a programmatic biological opinion, which would allow the agencies to more reliably estimate the stressors that are likely to be produced as a direct or indirect result of thermal discharge activities at individual facilities. *See id*. In so ruling, the Second Circuit rejected the plaintiffs' argument that FWS and NMFS had failed to seek out and consider existing scientific data, instead agreeing with the agencies that the exact nature of future impacts would be species-specific and require individual analyses. *Id*. This reasoning also applies here.

---

[26]  FWS considered information presented in EPA's BE about ESA consultations triggered by federal wetlands permitting between 2014 and 2018 and incorporated it in the BiOp. FWS-006091. As stated above, this information was not used to generate take limits. Rather, the analysis of former consultations (i.e., the percentage of permit applications that resulted in formal or informal consultations or were covered by existing programmatic consultations) provided information about long-term implementation of the Section 404 assumption process. *Id*. FWS properly relied on this information to determine that it approximates the number and types of permitting activities that could occur over the next five years, FWS-006094, and properly deferred setting take limits to the species-specific analysis that will occur on individual permit applications.

Plaintiffs' complaint that the ITS did not have an "adequate trigger for reinitiation," Dkt. 98 at 42, is similarly flawed. FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance. FWS-006081. If assumptions about those processes prove incorrect or warrant changes during implementation of the State program, it could affect the validity of the analysis and trigger reinitiation of consultation if effects occur that were not considered. FWS-006093 (citing 50 C.F.R. § 402.16); *see* FWS-006110 (if new information shows that magnitude of impacts to species is greater than originally anticipated or amount of incidental take is exceeded, FDEP will re-open the permit and coordinate further with FWS). This is the sort of "new" information that could trigger reinitiation. *Cf.* Dkt. 98 at 43.

Nor was it unreasonable for FWS to determine that the listing of a new species alone would not require reinitiation of this programmatic consultation. FWS-006111. FWS evaluated the proposed State 404 program's species coordination framework, which requires that a current list of ESA-listed species be used when a State 404 permit application is received. FWS-006083. Thus, the State 404 review process can maintain compliance with the ESA by adapting to future changes to the list of species listed as threatened or endangered under the ESA, and reinitiation of consultation may not be required or necessary. *Id.* Furthermore, as explained in the BiOp, Florida's regulations require the State to comply with the technical assistance process for ESA-listed species and critical habitat, and any effects to newly listed species or their critical habitat would be sufficiently considered and addressed through the same technical assistance process. FWS-006111. The cases cited by Plaintiffs address biological opinions on individual agency actions, not programmatic biological opinions that include a site-specific and species-specific evaluation via a technical assistance process. *See* Dkt. 98 at 43 (citing, *e.g.*, *Oceana v. Ross*, 2020 WL 5995125, at

64

*13 (D.D.C. Oct. 9, 2020)). The events triggering reinitiation of consultation were announced clearly; nothing was done "behind closed doors" in this regard. *Cf.* Dkt. 98 at 43.

Plaintiffs next incorrectly contend that the ITS established "no meaningful reasonable and prudent measures nor implementing terms and conditions." Dkt. 98 at 44. The ESA does not mandate any particular form or content for "reasonable and prudent measures," directing only that a biological opinion authorizing incidental take specify the measures "that the Secretary considers necessary or appropriate" to minimize the impact of the incidental taking. 16 U.S.C. § 1536(b)(4)(C)(ii); *see Cooling Water Intake Structure*, 905 F.3d at 77. The ESA similarly vests FWS with broad discretion under the statutory phrase "terms and conditions," which are those necessary to comply with the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C)(iv). The implementing regulations provide some additional substance by stating that both reasonable and prudent measures and terms and conditions "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2).

Here, the ITS requires EPA to use its authorities under the CWA to minimize impacts to listed species pursuant to its oversight of the State's 404 Program, which in turn incorporates FWS's expertise in determining measures to eliminate or minimize take. FWS-006108-09. The ITS also requires FDEP "to participate in [the] State 404 program species coordination technical team" with FWC and FWS per their MOU, which provides a structured framework for coordinating review of State 404 permits to assess potential effects on ESA-considered species and critical habitat and to ensure that no State 404 permit action jeopardizes the continued existence of an ESA-listed species (as well as species listed under Florida's endangered species statute), or adversely modifies or destroys designated critical habitat. FWS-006109; *see* FWS-006110, FWS-006043–44. The ITS states that all protection measures recommended by FWS shall

65

be incorporated as permit conditions. FWS-006109. Plaintiffs' demand that "new or additional requirements" be imposed on EPA or FDEP has no basis in the ESA or its implementing regulations, particularly where FWS determined that the commitments made by state and federal agencies, and memorialized in the ITS, were sufficient. In *Cooling Water Intake Structure*, the Second Circuit held that a nearly identical reasonable and prudent measure regarding EPA's use of its oversight authority satisfied the ESA because "reliance on the binding technical assistance process was a 'meaningful attempt to minimize incidental takings associated with the project.'" 905 F.3d at 77 (quoting *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007)).

The ITS also contains terms and conditions prescribed to implement the reasonable and prudent measures, which more than satisfy the scarce guidance provided in the ESA and its implementing regulations. The only example of terms and conditions given in the statute and regulations is "reporting requirements." 16 U.S.C. § 1536(b)(4)(C)(iv); 50 C.F.R. § 402.14(i)(1)(iv). Similarly, the regulations require the action agency to "report the progress of the action and its impact on the species to the Service as specified in the incidental take statement." *Id.* § 402.14(i)(3). The terms and conditions proscribed here impose a detailed annual reporting requirement on FDEP, requiring a summary of the number and types of 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat. FWS-006110. The ITS further contains a lengthy list of additional terms and conditions for FDEP, including that it oversee the species coordination process; implement a training program; forward all applications to FWS for review according to the timeframes and processes in the BE and in the BiOp's description of the action; accept the technical assistance process; and incorporate as permit conditions all protection measures that FWS provides to FDEP. FWS-006109–10. If FWS concludes that a permit is likely to jeopardize a listed species or adversely destroy or modify critical habitat, then

66

FDEP must issue a notice of intent to deny the permit. FWS-006110. The terms and conditions contain other mandatory measures, namely that EPA oversee operation of Florida's 404 program to ensure that it operates in accordance with the requirements of 40 C.F.R. pt. 233 and coordinate federal review of State Section 404 permit actions pursuant to 40 C.F.R. § 233.50. FWS-006109. *In Cooling Water Intake Structure*, the Second Circuit held that "various administrative conditions, like a detailed annual reporting requirement, and several substantive implementing conditions" were sufficient to satisfy the "terms and conditions" requirement. *See* 905 F.3d at 77. The same conclusion should be applied in this case. For these reasons, the Court should reject Plaintiffs' claim that the ITS fails to comply with the ESA and enter judgment for FWS on Claim 4.

## IX.    EPA Rationally Relied on FWS's BiOp.

Under the ESA, EPA is fully entitled to rely on FWS's expert analysis and conclusions contained in a BiOp to ensure its compliance with the ESA. In reviewing EPA's approval of Florida's assumption request, "the critical question is whether the action agency's reliance was arbitrary and capricious, not whether [the BiOp] itself is somehow flawed." *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006). Even in situations where the consulting agency's opinion "is based on 'admittedly weak' information," an action agency satisfies its obligations under the ESA "if a challenging party can point to no 'new' information—i.e., information the [Service] did not take into account—which challenges the [biological] opinion's conclusions." *Id*. at 76 (citing *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021).[27]

---

[27]  Plaintiffs argue that this standard "has not been applied when a BiOp is facially invalid because of missing analysis or incorporation of inadequate analysis, as is the case here." Dkt, 98 at 51 n.24 (citing *Shafer & Freeman Lakes*, 992 F.3d at 1096). But the D.C. Circuit held in *Shafer & Freeman Lakes* that the plaintiffs failed to show that the action agency overlooked new information in the administrative record that had been unavailable to the consulting agency, therefore, the action

67

Plaintiffs fail to meet the relevant standard, which requires them to identify "new information" that FWS failed to consider in its BiOp. Here, EPA rationally relied on FWS's BiOp. Plaintiffs' claim that the BiOp arbitrarily and capriciously asserted that FWS could not estimate the number of individuals that might be affected by permitted activities, which in turn rendered EPA's reliance on the BiOp arbitrary, is a thinly disguised argument that the BiOp itself is flawed. This is not the proper focus in assessing whether EPA rationally relied on the BiOp. The law does not require EPA to "'undertake a separate, independent analysis' of the issues addressed in the BiOp." *City of Tacoma*, 460 F.3d at 75. Plaintiffs' "reargu[ment] of factual issues [that FWS] already took into consideration" is insufficient to show that EPA should have rejected the BiOp. *Id*. at 76. The Court should grant judgment for EPA on Claim 10.

## X.   EPA's No-Effect Determination For NMFS Species Was Reasonable.

EPA determined that its approval of Florida's assumption request would have no effect on ESA-listed species that are under NMFS's jurisdiction. The allegations in Claim 5 that this no effect determination violates the CWA and APA, and in Claim 11 that this no effect determination violates the ESA, lack merit.

In a letter dated November 19, 2019, EPA requested that NMFS identify any species under its jurisdiction that existed in waters that are assumable by the state. EPA-HQ-OW-2018-0640-0638 (20200415 Ltr. from NMFS to EPA). After communications between the two agencies, a review of state mapping products, NMFS's own mapping analysis, and a review of state-provided

---

agency reasonably relied on the consulting agency's scientific judgments and properly granted a license. *Id*. at 1093. Contrary to Plaintiffs' contention, the Court did not reject the "no new information standard" or otherwise discuss it. The "missing analysis" cited by Plaintiffs in that case was the consulting agency's failure to analyze whether its proposal of a specific reasonable and prudent measure "satisfied its own governing regulation" that such measures "qualif[y] as only a minor change within the meaning of 50 C.F.R. § 402.14(i)(2)." *Id*. at 1095. This is a significantly different issue than the one presented here, where Plaintiffs allege that FWS failed to comply with ESA Section 7, even though it followed an approach specifically upheld by the Second Circuit.

68

documents about the assumption, NMFS concluded that ESA-listed species under NMFS's jurisdiction do not occur in waters that are assumable by the state. EPA-HQ-OW-2018-0640-0638 (20200415 Ltr. from NMFS to EPA); *see also* FWS-005931. In making this determination, NMFS stated that it specifically analyzed the possible spatial overlap of the assumption with waters used by certain sturgeon species that occur in waters that will remain under USACE's jurisdiction. *See id*. NMFS concluded by stating that it assumed that EPA would make a "no effect" determination for NMFS's ESA-listed species that were identified as part of the proposed assumption. *See id*. And EPA did so, ultimately deciding that its approval or disapproval of FDEP's assumption of the Section 404 program would have no effect on ESA-listed species under NMFS's jurisdiction. EPA-HQ-OW-2018-0640-0617 (Sept. 2, 2020 Ltr. from NMFS to EPA). NMFS acknowledged receipt of EPA's "no effect" determination, stating that such determinations do not require NMFS's concurrence nor does the agency provide concurrence on them. EPA-HQ-OW-2018-0640-0663. NMFS, however, did confirm that it had coordinated closely with FDEP on the potential for effects to endangered and threatened species under NMFS's jurisdiction. *See id*.

With its no effect determination, EPA fulfilled its procedural obligation to review its action and determine whether consultation with NMFS was required. *See* 51 Fed. Reg. at 19,945; *see also NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (before initiating any agency action in an area that contains threatened or endangered species or a critical habitat, the action agency must either "(1) make an independent determination of whether its action 'may affect' a protected species or habitat, or (2) initiate a formal consultation with the agency that has jurisdiction over the species"). If an action agency makes a "no effect" determination, there is no trigger for formal consultation. *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 94 (D.D.C. 2012). EPA explained its decision, namely that ESA-listed species under NMFS's jurisdiction do not occur in

waters that are assumable by the State, and its determination that approval of FDEP's assumption request would have no effect on such species was reasonable. EPA-HQ-OW-2018-0640-617.

Nevertheless, recognizing that Plaintiffs raised issues about potential effects downstream of assumed waters, EPA has undertaken to address that issue. EPA-HQ-OW-2018-0640-664. In March 2021, Plaintiffs sent EPA (as well as several other agencies) a notice of intent to sue for alleged violations of the ESA, contending (among other things) that EPA's no effect determination was arbitrary and capricious. Out of an abundance of caution, EPA, in its response to this notice, stated that it had considered the issue further and would prepare a biological evaluation and effects determinations for NMFS-listed species and critical habitats within that evaluation. EPA-HQ-OW-2018-0640-664 (Dec. 20, 2021 Ltr. EPA to Plaintiffs). Once EPA has prepared the BE, it will initiate consultation with NMFS, as appropriate. *Id*. EPA further explained that it would consider issues raised in the notice of intent to sue, including potential impacts to listed marine species and their critical habitats downstream of assumed waters. *Id*. EPA's work on the biological evaluation is ongoing and includes coordination with NMFS. *See* Exhibit B (Declaration of D. Diaz at ¶ 6). EPA expects to complete its biological evaluation on or about July 14, 2023. *Id*. ¶ 7. Thus, while EPA's initial "no effect" determination was reasonable, should the Court determine otherwise, EPA's ongoing work should provide a more fulsome analysis and ultimately resolve the matter.

## CONCLUSION

For these reasons, the Court should enter summary judgment for Federal Defendants on Plaintiffs' Claims One through Seven and Ten through Thirteen.

JA.728

Respectfully Submitted,

Dated: April 26, 2023

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/Andrew S. Coghlan
Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: andrew.coghlan@usdoj.gov

Alison Finnegan (PA Bar 88519)
United States Department of Justice
Environment & Natural Resources
Division Wildlife & Marine Resources
Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov

*Attorneys for Federal Defendants*

71

JA.729

**Certificate of Service**

I certify that on April 26, 2023, I filed the foregoing with the Court's CMS/ECF system, which will notify each party.

/s/Andrew S. Coghlan
ANDREW S. COGHLAN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL. | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL. | |
| Defendants, | |
| STATE OF FLORIDA, ET AL. | |
| Intervenors. | |

—————————————————

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

—————————————————

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

I.  Legal & Factual Background ............................................................ 4

    A.  Florida's Comprehensive Approach to Environmental Protection
    and Conservation of Water Resources ..........................................5

    B.  FDEP's Early Efforts to Prepare its Proposed Section 404 Program ..........7

    C.  Florida's 404 Handbook is a Binding Rule that Helpfully
    Summarizes the Key Aspects of the Program...........................................10

    D.  FDEP's Close Coordination with Federal & State Wildlife
    Agencies.......................................................................................11

    E.  Public Access to Environmental Information in Florida ..........................15

    F.  Florida's Authority to Enforce Section 404....................................18

    G.  Plaintiffs' Ability to Impact FDEP Permit Actions and to
    Challenge FDEP 404 Permits under Florida Law....................................19

    H.  EPA Oversight of FDEP Permit Decisions.................................................23

STANDARD OF REVIEW ...................................................................................26

ARGUMENT .........................................................................................................27

I.  Plaintiffs' Claims Are Not Subject to Judicial Review Due to Lack of
    Standing, Lack of Final Agency Action, or Lack of Ripeness. .......................... 27

    A.  Plaintiffs Lack Standing For All Claims Based on Purported
    Informational Injuries. ................................................................27

    B.  Plaintiffs Cannot Challenge EPA's Completeness Determination
    (Claim 1). ...................................................................................32

    C.  Plaintiffs Suffer No Injuries from State Assumption of *Primary*
    Permitting Responsibility, Especially Where EPA Maintains
    Program-Level and Permit-by-Permit Oversight and Independent
    Enforcement Authority (Claim 2). ..............................................34

        1.  Plaintiffs Lack Standing to Challenge State 404
        Assumption Generally. ................................................34

        2.  Plaintiffs Lack Standing to Challenge EPA's Approval
        Based on Concerns with Criminal Negligence & Statute of
        Limitations. ..................................................................39

JA.732

D.    Many of Plaintiffs' Attacks Are Not Ripe For Review (Claims 3 to 5, 7, 11-12). ...................................................................................... 41

1.    Plaintiffs' Claim That FWS "Unlawfully Extended Take Liability Exemptions" Is Not Ripe For Review (Claims 3 and 4). ........................................................................................... 43

2.    Plaintiffs' Challenge to the Corps' List Of "Retained Waters" Is Neither Ripe Nor Based on "Final Agency Action" (Claim 7). .......................................................... 45

3.    Plaintiffs' Claims Based on NMFS Species Are Unripe and Likely Moot (Claims 5, 11, and 12). ............................... 49

CONCLUSION ....................................................................................................... 50

JA.733

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967)....................................................................................41, 42

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
   406 So. 2d 478 (Fla. 2d DCA 1981) ...................................................................20

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
   No. 83-2708, 1984 WL 54261 (Fla. Div. of Admin. Hr'g, June 27, 1984) ............36

*Am. Oversight v. U.S. Dep't of Veterans Affairs*,
   498 F. Supp. 3d 145 (D.D.C. 2020) (Moss, J.) ...................................................41

*Am. Petroleum Inst. v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012) ...........................................................................42

*Am. Tunaboat Ass'n v. Ross*,
   391 F. Supp. 3d 98 (D.D.C. 2019) .....................................................................44

*Ass'n of Am. Physicians & Surgeons v. Sebelius*,
   901 F. Supp. 2d 19 (D.D.C. 2012) .....................................................................29

*Bennett v. Spear*,
   520 U.S. 154 (1997).........................................................................................33

*Capeletti Bros. v. Dep't of Gen. Servs.*,
   432 So.2d 1359 (Fla. 1st DCA 1983) .................................................................21

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).........................................................................................35

*Coal. to Save Menominee River Inc. v. U.S. Env't. Prot. Agency*,
   423 F. Supp. 3d 560 (E.D. Wis. 2019)...............................................................47

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018)...............................................................15, 31, 43

*Crow Creek Sioux Tribe v. Brownlee*,
   331 F.3d 912 (D.C. Cir. 2003) ........................................................................2, 38

*Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 173 (D.D.C. 2022)...................................1, 27, 34, 40, 48

*Ctr. for Biological Diversity v. Zinke*,
   369 F. Supp. 3d 164 (D.D.C. 2019) ................................................................29, 34

*Defs. of Wildlife v. Dep't of Navy,*
      733 F.3d 1106 (11th Cir. 2013) ................................................................15

*Devia v. NRC,*
      492 F.3d 421 (D.C. Cir. 2007) ................................................................41

*Ecological Rights Found. v. EPA,*
      No. CV 19-2181, 2022 WL 4130818 (D.D.C. Sept.12, 2022) ................29

*Elec. Priv. Info. Ctr. v. FAA,*
      892 F.3d 1249 (D.C. Cir. 2018) ..............................................................34

*Env't Integrity Project v. McCarthy,*
      139 F. Supp. 3d 25 (D.D.C. 2015) ..........................................................34

*Fed. Trade Comm'n v. Standard Oil Co.,*
      449 U.S. 232 (1980) ................................................................................33

*Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.,*
      412 So. 2d 351 (Fla. 1982)......................................................................20

*Friends of Animals v. Jewell,*
      828 F.3d 989 (D.C. Cir. 2016) ................................................................29

*Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Env't Regul.,*
      587 So.2d 1378 (Fla. 1st DCA 1991) ......................................................21

*Heckler v. Chaney,*
      470 U.S. 821 (1985)................................................................................40

*Hous. Study Grp. v. Kemp,*
      736 F. Supp. 321 (D.D.C. 1990) ............................................................33

*Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.,*
      No. 91-8088, 1992 WL 322912 (Fla. Div. of Admin. Hr'g, July 23, 1984)...........36

*Lujan v. Defs. of Wildlife,*
      504 U.S. 555 (1992)..................................................................26, 27, 40, 46

*McCray v. Biden,*
      574 F. Supp. 3d 1 (D.D.C. 2021) (Moss, J.) ..................................41, 46

*Menominee Indian Tribe of Wis. v. Env't. Prot. Agency,*
      947 F.3d 1065 (7th Cir. 2020) ..........................................24, 36, 48

*NAACP, Inc. v. Fla. Bd. of Regents,*
      863 So. 2d 294 (Fla. 2003)......................................................................22

JA.735

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)........................................................................31

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)........................................................................42

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C. 2005) ........................................42, 46

*Palm Beach Cnty. Env't Coal. v. Fla. Dep't of Env't Prot.*,
    14 So.3d 1076 (Fla. 4th DCA 2009) .............................................22

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    740 F.2d 21 (D.C. Cir. 1984) .......................................................42

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002)................................................26, 27

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) .....................................................34

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2015)......................................................................26

*Suburban Trails, Inc. v. New Jersey Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986)..........................................................44

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015).......................................................27

*Texas v. United States*,
    523 U.S. 295 (1998)......................................................................41

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)............................................................26, 28

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016).................................................................33, 47

*Waterkeeper All., Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022).........................................................2

*Wyo. Outdoor Council v. Dombeck*,
    148 F. Supp. 2d 1 (D.D.C. 2001) ..................................................43

## Federal Statutes

5 U.S.C. § 551(6) ..................................................................................11

v

5 U.S.C. § 551(8) ....................................................................................................11

5 U.S.C. § 704 .......................................................................................................47

16 U.S.C. § 1531(a)(5) ...........................................................................................12

16 U.S.C. § 1536(a)(2) ...........................................................................................28

16 U.S.C. § 1540(g) ...............................................................................................43

33 U.S.C. § 1251(b) .................................................................................................4

33 U.S.C. § 1319 ...............................................................................................38, 41

33 U.S.C. § 1341 ....................................................................................................26

33 U.S.C. § 1342 .....................................................................................................4

33 U.S.C. § 1344 ....................................................................................................35

33 U.S.C. § 1344(a) ...............................................................................................26

33 U.S.C. § 1344(g) .......................................................................................3, 4, 38

33 U.S.C. § 1344(g)(1) ..........................................................................................49

33 U.S.C. § 1344(h) .........................................................................................23, 39

33 U.S.C. § 1344(h)(1)(F) .....................................................................................24

33 U.S.C. § 1344(h)(1)(G) ....................................................................................39

33 U.S.C. § 1344(i) .........................................................................................23, 25

33 U.S.C. § 1344(j) .........................................................................................13, 23

33 U.S.C. § 1344(k) ...............................................................................................13

33 U.S.C. § 1344(l) ................................................................................................13

33 U.S.C. § 1344(m) ..............................................................................................24

33 U.S.C. § 1344(n) .........................................................................................38, 40

**Florida Statues**

Fla. Stat. § 119.07(1)(a) .........................................................................................16

Fla. Stat. § 119.011(12) ..........................................................................................16

JA.737

Fla. Stat. § 120.56(1)(a) ................................................................22

Fla. Stat. § 120.56(3) ...................................................................22

Fla. Stat. § 120.57 ...................................................................21, 22

Fla. Stat. § 120.57(1)(b) .......................................................20, 21, 36

Fla. Stat. § 120.68 ...................................................................22, 23

Fla. Stat. § 120.68(6)(a) ...........................................................22, 23

Fla. Stat. § 120.569 .................................................................21, 22

Fla. Stat. § 373.129(7) ..................................................................18

Fla. Stat. § 373.430 .....................................................................18

Fla. Stat. § 373.430(1)(b) ...............................................................19

Fla. Stat. § 373.430(1)(c) ...............................................................19

Fla. Stat. § 373.430(4) ..................................................................19

Fla. Stat. § 373.430(5) ..................................................................19

Fla. Stat. § 373.4146(2) ...............................................................7, 8

Fla. Stat. § 403.021(2) ...................................................................5

Fla. Stat. § 403.121(1) ..................................................................18

Fla. Stat. § 403.161 .....................................................................18

Fla. Stat. § 403.412(6) ..................................................................20

Fla. Stat. § 403.412(7) .............................................................20, 37

## Cod of Federal Regulations

40 C.F.R. § 147.500 ......................................................................6

40 C.F.R. § 233 .........................................................................13

40 C.F.R. § 233.10 .......................................................................8

40 C.F.R. § 233.11 .......................................................................8

40 C.F.R. § 233.12 .......................................................................8

40 C.F.R. § 233.13 ...............................................................................8, 24

40 C.F.R. § 233.14 ......................................................................................8

40 C.F.R. § 233.15(d) ................................................................................24

40 C.F.R. § 233.15(g) ................................................................................24

40 C.F.R. § 233.15(h) ................................................................................11

40 C.F.R. § 233.16(d) ................................................................................47

40 C.F.R. § 233.41 ....................................................................................18

40 C.F.R. § 233.41(a)(3) ...........................................................................19

40 C.F.R. § 233.41(b)(2) ...........................................................................19

40 C.F.R. § 233.50(j) .................................................................................13

40 C.F.R. § 233.53(b) ................................................................................25

40 C.F.R. § 233.53(c) ................................................................................25

50 C.F.R. § 402.02 ....................................................................................15

50 C.F.R. § 402.12 ....................................................................................31

**Federal Register**

85 Fed. Reg. 57,853 (Sept. 16, 2020) .........................................................9

85 Fed. Reg. 83,553 (Dec. 22, 2020) ........................................................11

**State Executive Order**

Executive Order No. 23-06 (Fla. Jan. 10, 2023) ..........................................5

**State Constitutional Provisions**

Fla. Const. Art. I, § 24 .............................................................................16

Fla. Const. Art. II, § 7(a) ............................................................................5

Fla. Const. Art. V, § 21 ............................................................................23

**Other Authorities**

Congressional Research Service, *Federal Land Ownership: Overview and Data*
   (Feb. 21, 2020) .....................................................................................30

JA.739

NOAA, *Coastal Zone Management Programs,*
   https://coast.noaa.gov/czm/mystate/ ........................................................6

Fla. Dep't Env't Prot, *Source & Drinking Water Program,*
   https://floridadep.gov/water/source-drinking-water ..............................6

U.S. Army Corps of Eng'rs, Jurisdictional Determinations & Permit Decisions
   https://permits.ops.usace.army.mil/orm-public# ...................................17

ECOS, *Resolution 08-3: State Assumption of Clean Water Act Section 404 Permit
   Program,* https://www.ecos.org/documents/resolution-08-3-state-delegation-
   of-clean-water-act-section-404-permit-program/ ...................................4

Fla. Dep't of State, *404 Handbook*
   https://www.flrules.org/gateway/reference.asp?No=Ref-12064 ............9

*EPA, NPDES State Program Authorization Information*,
   https://www.epa.gov/npdes/npdes-state-program-authorization-information .........................6

EPA, *Clean Air Act Permitting in Florida,*  https://www.epa.gov/caa-
   permitting/clean-air-act-permitting-florida ...........................................6

NOAA, *Species Directory*, https://www.fisheries.noaa.gov/species-
   directory/threatened-endangered..........................................................49

EPA, *State Authorization under the Resource Conservation and Recovery Act*,
   https://www.epa.gov/rcra/state-authorization-under-resource-conservation-
   and-recovery-act-rcra........................................................................6

ix

JA.740

## INTRODUCTION

For many years, the State of Florida has administered most federal environmental programs that are subject to state delegation or assumption. In 2020, after enacting new state legislation, adopting state regulations, and expending substantial resources over the course of several years to develop a new comprehensive permit program, Florida sought and obtained federal approval – the first such state to do so in almost thirty years – to administer the Clean Water Act (CWA) Section 404 dredge-and-fill permit program. This effort was part and parcel of Florida's longstanding commitment – based in the Florida Constitution – to environmental conservation. Here, Plaintiffs challenge Florida's right to administer this permit program.

Florida fully agrees with Federal Defendants on the merits. Plaintiffs ignore Congress' clear objective that CWA Section 404 programs should be administered through a system of cooperative federalism, with states holding the primary role in processing permits subject to ongoing federal oversight. Likewise, Plaintiffs' 13-count complaint contravenes this clear intent by mounting a broad attack on virtually all aspects of the Federal Defendants' review and approval of Florida's program. Two procedural claims (Claims 8 and 9) were taken up separately by this Court. The remaining eleven claims are all entirely without merit for the reasons Federal Defendants provide.

Yet this Court need not reach the merits of these eleven claims because Plaintiffs do not meet their burden to prove that each claim is justiciable.[1] Plaintiffs are uninjured in any legally cognizable manner by Florida administering a program under federal standards where EPA has

---

[1] At the motion to dismiss stage, this Court decided to "defer ruling on this particular flavor of Florida's standing-related arguments [i.e., that Plaintiffs lack standing to challenge the mere transfer of permit authority where EPA oversight ensures a compliant program] until Plaintiffs press the merits of their claims as to the substance of the EPA's decision." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 190 (D.D.C. 2022) (Dkt. 73 at 21).

1

continuous oversight and enforcement responsibility on a program level and permit-by-permit. The D.C. Circuit has been skeptical of standing in contexts involving transfers of federal roles or responsibilities to states where federal standards remained applicable and/or the federal agency had oversight and enforcement authority. *See Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 661 (D.C. Cir. 2022) (dismissing *sua sponte* an environmental group's challenge to EPA's approval of Oklahoma's state coal ash program for lack of standing); *Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912, 917 (D.C. Cir. 2003) (holding that Indian tribe lacked standing to challenge transfer of federal lands to state government where the federal land transfer statute ensured continued enforcement of cultural protection requirements).

Many of Plaintiffs' other individual claims also should not be entertained by this Court. Plaintiffs clearly lack standing to challenge the adequacy of criminal enforcement – a function solely within the unreviewable discretion of the Executive Branch at both the federal and state levels. They are also uninjured by a loss of environmental information, as coextensive information is either readily available via Florida's program or is information that Congress, by statute, has decided is not required for a state program. Florida previously filed a supplemental brief addressing environmental informational standing (Dkt. 72)[2], and as part of this motion, Florida provides an additional declaration showing that, among other things, Plaintiffs' assertions of "losses" of environmental information do not hold water. *See* Declaration of Justin Wolfe, Florida Department of Environmental Protection (FDEP) General Counsel (Wolfe Dec.) attached as Exhibit A.

And certain other claims – such as Plaintiffs' challenge to the incidental take statement – are based on speculations of harm that may never arise (e.g., that Florida will issue a 404 permit for a project that causes an unlawful take of species without interdiction by the federal oversight

---

[2] For citations to filings in this case, Florida cites to the docket number and the relevant PDF page number.

agencies). Such claims are not ripe for review at this early point in the implementation of Florida's

program, though Plaintiffs are certainly free to bring a legal challenge to a specific permit action

down the road that actually involves claims of unlawful take of species.

Likewise, whether particular waterbodies should be added or removed from the list of

"retained waters" is not an issue that this Court can or should take up here. Florida is home to

thousands of waterbodies. As part of the assumption process, the Corps of Engineers (Corps)

provided an initial list of over 500 rivers, lakes, streams, and creeks in Florida that, based on

available information, reasonably constituted waters that could not be assumed by the State under

CWA Section 404(g). But this list was not meant to be the final word. Some waters, like the St.

John's River and Lake Okeechobee, are easy to classify as "retained waters," but many others

require an intensive analysis as to, for example, whether the waterbodies are "presently used, or

are susceptible to use in their natural condition or by reasonable improvement as a means to

transport interstate or foreign commerce..." 33 U.S.C. § 1344(g). In fact, the list (and its related

Memorandum of Agreement (MOA)) expressly include all other waters found to be non-assumable

waters (even if not listed), and the Corps and Florida agreed to a process for regularly updating the

list to ensure that waters are properly classified. Thus, the retained waters list is not "final agency

action," but even if it were, Plaintiffs' concerns that certain waters are classified incorrectly can

and should wait for an as-applied challenge to a particular permit involving a particular waterbody.

Similar ripeness concerns (and ongoing activity that is likely to trigger mootness) support

dismissal of the claims based on protection of marine and coastal species under the jurisdiction of

the National Marine Fisheries Service (NMFS).

For these reasons, and for the reasons set forth in the Federal Defendants' summary

judgment brief, Florida respectfully requests that the Court deny Plaintiffs' motion for summary

JA.743

judgment and enter judgment for the Federal Defendants and Florida Intervenors on all claims. [3]

## I.      Legal & Factual Background

Built on cooperative federalism, the CWA shares stewardship responsibilities for water resources among the States and Federal government. 33 U.S.C. § 1251(b). Congress created two CWA permit programs: one program under Section 402 to control point-source pollution to surface waters (known as the National Pollutant Discharge Elimination System, or NPDES, program) and another under Section 404 to regulate the dredge or fill of surface waters (including wetlands) constituting "waters of the United States." *Id.* §§ 1342, 1344.

**"It is the policy of Congress that the States . . . implement the permit programs under sections [402] and [404]." *Id***. **§ 1251(b).** To that end, Sections 402 and 404 invite States to seek EPA's approval to administer State-level permit programs in place of the federal permit programs. *Id*. §§ 1342(b), 1344(g). Over 40 States have obtained approval to administer State NPDES programs under Section 402, while just three States—Michigan, New Jersey, and Florida—have assumed responsibility for administering their own Section 404 programs. [4] The Federal Defendants' brief provides a thorough explanation of Section 404 and the regulations governing 404 assumption (40 C.F.R. Part 233). In this brief, Florida provides further details about Florida's statutes, regulations, policies, and other relevant background legal principles, while also sharing additional factual details about Florida's Section 404 program.

---

[3] Florida Intervenors are filing a *consolidated* opposition brief and cross-motion for summary judgment, total combined length not to exceed 50 pages consistent with this Court's order of January 31, 2023. *See* Dkt. 33.

[4] The Environmental Council of the States (ECOS), which is the nonpartisan association comprised of environmental agency leaders from *all 50 states*, recently adopted a resolution supporting state assumption of CWA 404 programs. The resolution is available at https://www.ecos.org/documents/resolution-08-3-state-delegation-of-clean-water-act-section-404-permit-program/ (last visited May 10, 2023).

A.   **Florida's Comprehensive Approach to Environmental Protection and Conservation of Water Resources**[5]

The Florida Constitution establishes the "policy of the state to conserve and protect its natural resources and scenic beauty," with "[a]dequate provision" for the "conservation and protection of natural resources." Fla. Const. Art. II, Sec. 7(a). The "public policy of [Florida] [is] to conserve the waters of the state," Fla. Stat. § 403.021(2), and "to provide for the management of water and related land resources," *id*. § 373.016(3)(a). On this basis, Florida takes a comprehensive approach to protecting wetlands and other water resources. Those efforts have accelerated in recent years, with Florida dedicating an unprecedented amount of state funding to the restoration and protection of the Florida Everglades (over $3.3 billion since 2019), increasing investment in state environmental permitting programs, and completing efforts to obtain federal approval to administer the Section 404 permit program.[6] Uniquely, for water resource management purposes, Florida has divided the State into five "Water Management Districts," or "WMDs," each with technical staff trained to supplement the work of the Florida Department of Environmental Protection (FDEP) in conserving water resources in Florida.

Even before obtaining authority to administer the CWA Section 404 program, Florida had already spent many years (in some cases, decades) administering most other major federal environmental programs capable of state delegation/assumption, including:

- CWA Section 402 National Pollutant Discharge Elimination System (NPDES) Program;
- Clean Air Act (CAA) permit program including construction permits for minor sources,

---

[5] While Florida provides additional context in its background section, Federal Defendants' brief helpfully summarizes key aspects of Florida's Section 404 program. *See, e.g.,* Dkt. 99 at 45-46 (describing provisions of Florida's program that satisfy the 404(b)(1) requirements); Dkt. 99 at 46-48 (describing provisions of Florida law requiring FDEP to give written determinations that are subject to judicial review); Dkt. 99 at 48-50 (describing provisions of Florida's program addressing impacts to water quality from proposed 404 projects).

[6] *See* Executive Order No. 23-06 Signed by Governor Ron DeSantis (Jan. 10, 2023), available at https://www.flgov.com/wp-content/uploads/2023/01/EO-23-06.pdf (last visited May 10, 2023).

JA.745

major source PSD and nonattainment permitting and Title V operating permits;

- Resource Conservation Recovery Act (RCRA) Subtitle C Program (Hazardous Waste);
- Coastal Zone Management Act (CZMA) Program (approved by the National Oceanic and Atmospheric Administration);
- Safe Drinking Water Act (SDWA) Program for regulating public water systems in Florida; and
- Underground Injection Control (UIC) Program.[7]

On top of these federally-approved programs, FDEP has administered various other state-specific environmental programs. For decades, FDEP has administered the State Environmental Resource Permit (ERP) Program, which is broader in scope than the federal Section 404 program because, among other things, ERP regulates dredging or filling of *all waters* in the State, not merely the narrower category of "waters of the United States" regulated under Section 404. EPA-HQ-OW-2018-0640-0007-A1 at 5-6; EPA-HQ-OW-2018-0640-0016-A-3 at App. J-3, ERP Comparison with Federal Requirements"; EPA-HQ-OW-2018-0017 at 3.

At the same time, Florida and its citizens experienced significant permit delays and other challenges with the Corps of Engineers' administration of the CWA Section 404 program within the State.[8] Florida believed that, consistent with the cooperative federalism framework of the CWA, FDEP and its staff would be better suited to administer the Section 404 program,

---

[7] *See* EPA, *NPDES State Program Authorization Information*, available at https://www.epa.gov/npdes/npdes-state-program-authorization-information (last visited May 10, 2023); EPA, *Clean Air Act Permitting in Florida*, available at https://www.epa.gov/caa-permitting/clean-air-act-permitting-florida (last visited May 10, 2023); *see* EPA, *State Authorization under the Resource Conservation and Recovery Act (RCRA)*, available at https://www.epa.gov/rcra/state-authorization-under-resource-conservation-and-recovery-act-rcra (last visited May 10, 2023); *see* NOAA, *Coastal Zone Management Programs*, available https://coast.noaa.gov/czm/mystate/ (last visited May 10, 2023); FDEP SDWA approval available at https://floridadep.gov/water/source-drinking-water (last visited May 10, 2023); EPA UIC program approval issued via regulation at 40 C.F.R. § 147.500.

[8] *See, e.g.,* Letter from Rep. Diaz-Balart (R-FL) and Rep. Alcee Hastings (D-FL) (Nov. 2, 2020). EPA-HQ-OW-2018-0640-0416-A2 (explaining that Everglades restoration projects have been "plagued by design, permitting, and construction delays under the U.S. Army Corps of Engineers").

particularly in light of FDEP's longstanding implementation of the ERP program, localized knowledge and experience, a larger number of FDEP offices and staff spread throughout the State, and the availability of Florida's five Water Management Districts. Florida also hoped to benefit from the improved economic climate that comes from more efficient government permit programs of any kind. In 2017, FDEP started efforts to obtain approval for its own Section 404 program. EPA-HQ-OW-2018-0640-0006 at 2; EPA-HQ-OW-2018-0640-0007-A1 at 5-6.

### B.   FDEP's Early Efforts to Prepare its Proposed Section 404 Program

For many years, the State of Florida considered the possibility of assuming the federal 404 program. *See, e.g.*, Chapter 2016-195, Law of Florida (legislation in 2016 authorizing FDEP to pursue assumption). In March 2018, the Governor of Florida signed into law a new statute again authorizing FDEP to establish a Section 404 Program. *See* Chapter 2018-88, Laws of Florida (codified at Fla. Stat. § 373.4146). This new state law, which expanded upon previous state laws allowing for the pursuit of assumption, sought to "enable the [FDEP] to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program.…" Fla. Stat. § 373.4146(2).

In early 2018, FDEP began to discuss 404 assumption with the Jacksonville District of the Corps of Engineers as well as EPA (CORPS003213, at 1-2; EPA-HQ-OW-2018-0640-0649 at 20-21, providing a timeline of key events). In February 2020, after almost two full years of work by FDEP staff, FDEP initially proposed Section 404 regulations at the state level. EPA-HQ-OW-2018-0640-0006 at 2-3. An extensive state-level public notice and comment process ensued. *Id.* at 3. This included multiple public workshops and public meetings in April 2020. *Id.* In response to the public notice process, FDEP modified the proposed regulations in various respects and ultimately finalized the State 404 regulations in June 2020. *Id.* at 3-4. The state regulations were adopted into the Florida Administrative Code (F.A.C.) but, by express statutory provision, were

not effective unless and until EPA approved Florida's program. *See* Fla. Stat. § 373.4146(2) ("…Any rule, standard, or other requirement adopted pursuant to the authority granted in this subsection for purposes of obtaining assumption may not become effective or otherwise enforceable until [EPA] has approved the state's assumption application."). FDEP's regulations creating the State 404 Program are now codified primarily at Chapter 62-331 of the Florida Administrative Code. EPA-HQ-OW-2018-0640-0006 at 3; EPA-HQ-OW-2018-0640-0002-A48.[9]

On August 20, 2020, Florida filed a complete application with EPA to administer a Section 404 Program. *See* EPA-HQ-OW-2018-0640-0002 through EPA-HQ-OW-2018-0640-0020 (including attachments). Florida's application contained all of the required elements of a State 404 program as set forth in 40 C.F.R. § 233.10. This included (among other things): (a) a letter from Florida's Governor requesting program approval; (b) a complete program description as set forth in 40 C.F.R. § 233.11; (c) a State legal opinion as set forth in 40 C.F.R. § 233.12; (d) a MOA with the EPA Regional Administrator as set forth in 40 C.F.R. § 233.13; (e) a MOA with the Corps of Engineers as set forth in 40 C.F.R. § 233.14; and (f) copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures. Florida's application was available for public review via FDEP's website, EPA's website, and the Federal government's regulatory docket website.

The application documents comprehensively described and delineated Florida's 404 program. To help the public "understand the rules, procedures, standards, and criteria that apply to the State 404 Program," FDEP developed the "State 404 Program Applicant's Handbook." EPA-

---

[9] Plaintiffs in this action filed comments in the state rulemaking process opposing FDEP's assumption rules, but they did not seek further administrative or judicial review of the final State regulations. *See, e.g.,* EPA-HQ-OW-2018-0640-0391-A6.

HQ-OW-2018-0640-0002-A20 at 4. [10] More than mere guidance, the 404 Handbook is "incorporated by reference" into FDEP's regulations (*see* F.A.C. 62-331.010(5)), and "therefore operates as a rule of the Agencies." *Id.* As such, the Handbook was itself subject to public review and comment before adoption and serves as an authoritative compendium for reference by this Court (and for others seeking to understand how the State 404 Program is administered in Florida). This Handbook was included in the State's 404 application and was at all times available to the public, along with the other application materials.

On August 28, 2020, EPA acknowledged receipt of Florida's complete application (EPA-HQ-OW-2018-0640-0641), and promptly opened a public comment period and scheduled public hearings. 85 Fed. Reg. 57,853 (Sept. 16, 2020). Over 3,000 comments were submitted. EPA-HQ-OW-2018-0640-0568 at 1, 10-13. EPA held public hearings on Florida's Section 404 Program application on October 21 and October 27, 2020, via virtual platforms that allowed remote participation by any member of the public. EPA-HQ-OW-2018-0640-0429, 0430, 0574, 0575, 0589 and 0604. The State of Florida and FDEP consulted with the Seminole Tribe of Florida, Miccosukee Tribe of Indians of Florida, and other Indian tribes concerning Florida's assumption of the Section 404 Program. *See*, *e.g.*, EPA-HQ-OW-2018-0640-0223 at 6 (discussing Florida's cooperative engagement with tribes). FDEP entered into an Operating Agreement whereby FDEP committed to direct engagement with the Florida State Historic Preservation Officer (Florida SHPO) and interested Indian tribes early in the permit application review process. EPA-HQ-OW-2018-0640-0016-A1. FDEP also entered a Programmatic Agreement with EPA, the Advisory Council on Historic Preservation, and the Florida SHPO for purposes of Section 106 of the

---

[10] The currently applicable "404 Handbook" is available on the State of Florida administrative regulation website found at https://www.flrules.org/gateway/reference.asp?No=Ref-12064 (last visited May 10, 2023).

National Historic Preservation Act. EPA-HQ-OW-2018-0640-0595, 0630, and 0639.

Furthermore, Florida invested significant time and resources in preparing to assume authority to establish and implement the CWA Section 404 program. For example, in addition to obtaining statutory authority from the State legislature, adopting State regulations via the State of Florida's administrative rulemaking process, preparing all requisite application materials, and complying with extensive federal regulatory requirements, FDEP held more than a dozen staff training sessions beginning in August 2020 covering all aspects of the Section 404 program, as well as many meetings and interactions with outside stakeholders concerning the establishment and implementation of a Section 404 Program in Florida. EPA-HQ-OW-2018-0640-0006 at 3; *see also* Dkt. 4-2 at 6. The State of Florida and FDEP also ensured that the program would have the necessary resources. EPA-HQ-OW-2018-0640-0223 at 6-7.

Since assumption of the Section 404 program in December 2020, FDEP has received over 7,700 applications. *See* Wolfe Decl. ¶ 10. Currently, over 1,780 applications are pending review and determination by FDEP. *Id.* ¶ 11. To date, FDEP has issued 460 individual permits (including permit modifications) under the Section 404 program. FDEP has denied 168 applications (including individual permits, regional and general permit requests, and NPR requests). *Id.* ¶ 12. Approximately 2,900 applications have been withdrawn by permit applicants (in many instances, applications are withdrawn after FDEP staff submit requests for additional information or flag concerns with project proposals). *Id.* ¶ 13.

### C.      Florida's 404 Handbook is a Binding Rule that Helpfully Summarizes the Key Aspects of the Program.

As explained in the 404 Handbook, ERP permits are required for projects impacting any surface water in the State of Florida, while 404 permits are required for projects discharging dredged or fill material into "waters of the United States." EPA-HQ-OW-2018-0640-0002-A20 at

4-5. Any surface water in the State is, for 404 permitting purposes, "considered Waters of the United States" and FDEP "will treat them as if they are, *unless the applicant clearly demonstrates otherwise*." *Id.* at 5 (emphasis added). In other words, the presumption is that any project requiring an ERP will also require a Section 404 permit. And "[a]ctivities that require both an ERP and a State 404 permit shall not commence before both permits are issued." *Id.* As explained in further detail below, the Handbook and other Florida 404 Program-related materials specifically address how impacts to species and habitat are considered and addressed.

On December 17, 2020, EPA issued a notice determining that the State of Florida "has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g-l) and EPA's implementing regulations," and therefore approved Florida's assumption of the program. *See* EPA-HQ-OW-2018-0640-0566; *see also* 85 Fed. Reg. 83,553-54 (Dec. 22, 2020) at EPA-HQ-OW-2018-0640-0564.[11] The approval notice was sent from the EPA Regional Administrator to the Governor of Florida on December 17, 2020. EPA-HQ-OW-2018-0640-0566. Approval of the program became effective upon publication in the Federal Register on December 22, 2020, *see* 85 Fed. Reg. at 83,553, as provided under 40 C.F.R. § 233.15(h).

FDEP now administers two separate (yet overlapping) wetlands protection programs: the State's 404 Program and the State's ERP program. Projects within State-assumed waters require both an ERP and a State 404 Program authorization.

### D.     FDEP's Close Coordination with Federal & State Wildlife Agencies

Section 2(a)(5) of the Endangered Species Act (ESA) provides: "Federal agencies shall cooperate with [s]tate and local agencies to resolve water resource issues in concert with

---

[11] The parties dispute whether this "notice" constitutes an "order" under the APA. *See* 5 U.S.C. § 551(6), (8) (defining "order" and "license," respectively).

conservation of endangered species." 16 U.S.C. § 1531(a)(5). At Florida's request, EPA engaged

in Section 7 consultation because EPA's review of Florida's Section 404 program application

requires considering impacts to listed species and habitat.  Dkt. 99 at 29-30. EPA designated FDEP

as the non-Federal representative for purposes of engaging in consultation with the U.S. Fish &

Wildlife Service (FWS). EPA-HQ-OW-2018-0640-0635, -0636. FDEP submitted a Biological

Assessment (BA) to EPA concerning the impact of Florida's Section 404 Program on federally

listed species and critical habitat. FWS-006040. In turn, EPA prepared a Biological Evaluation

(BE) and submitted it to EPA. EPA-HQ-OW-2018-0640-0649; FWS-005610.[12]

On November 17, 2020, FWS issued a Biological Opinion (BiOp) to accompany EPA's

determination concerning Florida's 404 assumption request. EPA-HQ-OW-2018-0640-0642 at

12-14; FWS-006028. As is appropriate for programmatic consultations, the FWS BiOp with

Incidental Take Statement (ITS) established procedures, terms, and conditions governing the

review of state 404 permit applications with regard to impacts to federally-listed species and

habitat. EPA-HQ-OW-2018-0640-0642. This included adoption of a "technical assistance

process" - modeled after other programmatic consultation processes used by EPA - that brings

together all relevant federal and state agencies to review projects for potential impacts to species

and habitat. *Id.* at 31-35, 66-67, 80-83.

The "BiOp/ITS" explains that the Biological Evaluation "provided a detailed analysis of

---

[12] Based on information from the National Marine Fisheries Service (NMFS), which has
jurisdiction over coastal and marine species, EPA reached the reasonable conclusion that federal
approval of Florida's 404 permit program for assumable waters (i.e., not coastal or marine waters)
would not be expected to have adverse impacts to species under NMFS jurisdiction. EPA-HQ-
OW-2018-0640-0638;  EPA-HQ-OW-2018-0640-0663;  EPA-HQ-OW-2018-0640-0617;  EPA-
HQ-OW-2018-0640-0572. Section 3.2 of the Biological Evaluation discusses NMFS species,
noting: "While ESA-listed species under NMFS jurisdiction are anticipated to occur only in
retained waters, they are included in the BE as part of the comprehensive review of all Florida's
imperiled species." EPA-HQ-OW-2018-0640-0649 at 52.

typical impacts related to stressors to ESA-listed species," while also explaining that the programmatic nature of the consultation does not allow for an actual estimate of the number of species individuals that might be affected by permitted activities. EPA-HQ-OW-2018-0640-0642 at 80. Instead, the BiOp/ITS explains: "through implementation of the State 404 program (62-331, F.A.C.) and EPA's oversight of the State 404 program and coordination of Federal review of state permit actions (40 C.F.R. § 233), this project-specific information will be provided to the USFWS because USFWS will receive all State 404 permit applications." *Id.* at 80-81.

The BiOp/ITS (and the technical assistance process that it utilizes) is well explained in the Federal Defendants' brief, with which Florida fully concurs. Dkt. 99 at 22-24. The main upshot, of course, is that, in all respects related to impacts to federally-protected species or habitat, the position of the federal agencies always controls: "With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, the final USFWS position is determinative." EPA-HQ-OW-2018-0640-0642, at 41. The BiOp/ITS repeats this point to make it abundantly clear. EPA-HQ-OW-2018-0640-0642, at 31 ("…final FWS conclusions regarding effects to species are determinative"); *id.* at 40 ("USFWS conclusions regarding potential impacts and necessary measures to address impacts are determinative"). The Memorandum of Understanding between FDEP, Florida Fish & Wildlife Conservation Commission (FWC), and FWS also expressly states that "the final FWS position" is "determinative" for purposes of "potential effects on ESA-listed species or the effectiveness of proposed mitigation measures." EPA-HQ-OW-2018-0640-0016-A2, at 10. As such, FDEP administers the 404 program fully committed to the requirement that any such determinations by FWS are binding. In the event FDEP did not accept or adopt any such requirement, EPA would be authorized to transfer the permit to the Corps. 33 U.S.C. § 1344(j)-(*l*); 40 C.F.R. § 233.50(j).

This reality is also made abundantly plain in the Florida 404 Handbook, which addresses reviews associated with protected species and habitat. Specifically, the Handbook explains that "[c]ompliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Service (NMFS) for permits reviewed under the State 404 Program." EPA-HQ-OW-2018-0640-0002-A20 at 6. FDEP provides FWS, NMFS, and FWC with the opportunity to review all applications for projects "with reasonable potential for affecting endangered or threatened species." *Id.* at 23. FDEP is required to consult with or obtain technical assistance from these three agencies whenever FDEP "determines that the project may have the potential to affect listed species." *Id.* FDEP "shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat." *Id.* Importantly, "[i]f the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, [FDEP] shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C." *Id.*

Programmatic consultation, as used here, is firmly engrained in the existing regulatory landscape as a means to streamline ESA consultation and improve conservation outcomes. As defined in the ESA regulations, "programmatic consultation" means "a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as: (1) Multiple similar,

frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. § 402.02.

The programmatic approach used here was built upon and supported by the approach discussed in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49, 76-77 (2d Cir. 2018), where the Second Circuit upheld the use of programmatic consultation for an EPA water quality permit program that applied to state and EPA permitting actions, covered the entire country, and provided an incidental take statement that, using a technical assistance process, did not set a numerical cap on take but used a process for evaluating and limiting take on a permit-by-permit basis as the program was being implemented. Federal Defendants have fully explained why *Cooling Water* gives a solid basis for the kind of approach used here. Dkt. 99 at 75-76, 78-82.[13]

### E.    Public Access to Environmental Information in Florida

Florida's 404 program provides extensive, readily available, real-time information to interested members of the public, as well as a robust opportunity for involvement in the permit process. *See* Wolfe Dec. at ¶¶ 16-33. The 404 Handbook fully describes the public notice and comment process for FDEP 404 permits. EPA-HQ-OW-2018-0640-0002-A20 at 26-27. The

---

[13] The programmatic approach here is also supported by the Eleventh Circuit's decision in *Defs. of Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1112-13 (11th Cir. 2013), which the Second Circuit relied upon. There, the Eleventh Circuit considered an ESA challenge to the Navy's undersea warfare training range off the coast of Florida. Environmental plaintiffs contended that a BiOp issued by NMFS failed to "meaningfully analyze" the "entire action" that was "proposed by the Navy," including the "the installation and the operation phases" of the training range. 733 F.3d at 1118. The Eleventh Circuit denied this challenge, rejecting the notion that BiOps "must be coextensive in scope with the 'entire action'." *Id.* at 1121. "It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Id.* (explaining that NMFS' decision was "due deference" as "there is no statutory basis for ordering that the consultation be carried out in some other manner"). The Eleventh Circuit was persuaded that, by leaving room for subsequent consultation activities to address future undersea training range operations, NMFS would "ensure that any adverse impacts to listed species will be considered closer in time to when operations will actually commence." *Id.* at 1122.

JA.755

Handbook also describes the information that is developed as part of the permit review process, which includes, among other things, an analysis of project alternatives that would avoid impacts to wetlands; an analysis of environmental impacts (including cumulative and secondary effects, where appropriate); a review of impacts on state water quality; and written documentation on each application outlining the permitting decision and the rationale for the decision. All of this, and more, is made publicly available. Wolfe Dec. ¶¶ 18-23. In addition, Florida's Sunshine Laws (found at Chapter 119, Florida Statutes) provide very broad access to governmental records and information. Access to state records is a state constitutional right and Florida's Sunshine laws are broader than the federal corollary statute, the Freedom of Information Act, 5 U.S.C. § 552.[14]

Likewise, Florida provides *real-time access* to state permit records related to Section 404 permit applications via publicly accessible DEP websites. Written communications to or from state officials (including permitting staff) regarding state business are available to the public. Wolfe Dec. ¶ 20. Records and information are readily available at no cost via any one of four FDEP's online resources that contain detailed information about (1) areas classified as "assumable waters" (FDEP 404 permitting) versus "retained waters" (Corps 404 permitting); and (2) provides site-specific information about permit applications (including those that have been withdrawn, remain pending, etc.) and links to download the permit file. *Id.* These online resources are Florida's "Oculus" System, DEP Information Portal, FDEP Permitting Information

---

[14] See Fla. Const. Art. I, § 24 (establishing constitutional right of access to public records in Florida); Fla. Stat. § 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied by any person desiring to do so, at any reasonable time, under reasonable conditions, and under supervision by the custodian of the public records."); Fla. Stat. § 119.011(12) (broadly defining a "public record").

16

JA.756

Database and FDEP ARCGIS Mapping Tool.[15] *Id.*

For example, a member of the public can go to a project location on the FDEP mapping tool (such as the "Troyer Mine" located in Lee County, which is cited in Plaintiffs' standing declarations), and, from there, access substantial information about the project. *Id.* ¶ 22. The public databases for this project provide extensive materials, including thousands of pages of permit application records, environmental reports, biological assessments, correspondence between federal and state agencies, public notice information, requests for additional information, and a host of other points of information. *Id.* For example, Troyer Mine project remains in "pending" status as FDEP is awaiting a response to its request for additional information. *Id.*

All major categories of environmental information available to the public under the Corps-led 404 program are also available to the public in a comparable manner after Florida's assumption of the Section 404 program.[16] *Id.* ¶¶ 24-30 and Enclosure D. This includes the essential contents of a NEPA Environmental Impact Statement (EIS) and/or Environmental Assessment, such as purpose and need for a project, alternatives to the project, information about the affected environment, environmental impacts (including cumulative effects, secondary effects, etc.), mitigation measures, socioeconomic information, historic/cultural/tribal information, species and habitat information, coastal zone impacts, and a wide range of "public interest" information. *Id.* ¶ 28 and Enclosure D.

---

[15] These databases provide more information on a real-time basis than is available from the Corps, which has an on-line permit database searching system available at https://permits.ops.usace.army.mil/orm-public# (last visited May 10, 2023).

[16] In response to this Court's request at the March 15, 2022 motions hearing, Florida Intervenors submitted a supplemental brief providing a "side-by-side" comparison of the environmental information available to the public that was available to Plaintiffs by virtue of NEPA review and ESA consultation when the Corps led the Section 404 program versus what is available now under the Florida-led program. *See* Dkt. 72.

### F.      Florida's Authority to Enforce Section 404

As part of its application, FDEP had to satisfy federal requirements related to the State's authority to enforce the Section 404 program. Section 373.129(7), Fla. Stat., authorizes enforcement of the State 404 Program in the same manner and to the same extent as provided in other relevant parts of Florida's environmental laws. This includes reference to Sections 373.430 (criminal remedies water resources), 403.121(1) and (2) (civil and administrative remedies), 403.131 (injunctive relief), 403.141 (civil liability), and 403.161 (criminal remedies pollution control). EPA-HQ-OW-2018-0640-0013 at 6.

As in the federal system, enforcement in Florida can take the form of administrative, civil and/or criminal proceedings. Fla. Stat. § 403.121(1) (administrative, civil); Fla. Stat. § 403.161 and Fla. Stat. § 373.430 (criminal). Enforcement of the State 404 Program is implemented through FDEP's six regulatory district offices with the Office of General Counsel or the Office of the State Attorney providing legal support depending on the type of enforcement initiated. EPA-HQ-OW-2018-0640-0013 at 2, 6; Wolfe Dec. ¶ 34.

As required by 40 C.F.R § 233.41, FDEP is empowered to restrain unauthorized activity, (§§ 373.129(1) and 373.430(1)); to enjoin and abate violations of statutes, rules, and orders adopted pursuant to Chapter 373 (§ 373.129(2)); and to recover civil penalties up to $15,000 per violation (§ 373.129(5)). EPA-HQ-OW-2018-0640-0017 at 10; EPA-HQ-OW-2018-0640-0002-A51 at 50; EPA-HQ-OW-2018-0640-0002-A53 at 8. FDEP is also authorized to seek criminal remedies against someone who:

- with criminal negligence (reckless indifference or gross careless disregard) discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(4));

- willfully discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(5)); or

18

- knowingly makes false statements, representation or certification in any application, record, report, plan, or other document filed or required to be maintained part IV, Chapter 373, or falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under the permit in an amount of $10,000. (§ 373.430(1)(c) & (5)).[17]

*See also* EPA-HQ-OW-2018-0640-0017 at 10; EPA-HQ-OW-2018-0640-0002-A51 at 140; EPA-HQ-OW-2018-0640-0002-A53 at 10.

Additionally, EPA may file its own enforcement actions, even where there is a state program in place, pursuant to EPA's authority under Section 309 and 404(n) of the CWA. In other words, though rarely exercised in most state program contexts, EPA may initiate independent or parallel enforcement actions to any Florida enforcement action involving the Section 404 program. EPA-HQ-OW-2018-0640-0017 at 10; *see also* EPA-HQ-OW-2018-0640-0018 at 10; EPA-HQ-OW-2018-0640-0568 at 72.

## G.    Plaintiffs' Ability to Impact FDEP Permit Actions and to Challenge FDEP 404 Permits under Florida Law

As Federal Defendants correctly observed (Dkt. 99 at 47-48), Florida's program includes a system of administrative checks that allow the public to hold the State accountable if it errs in granting or denying a permit. Likewise, Florida's program gives many opportunities for public engagement throughout the permitting process as well as ample opportunities to bring permit

---

[17] In relevant part, 40 C.F.R. § 233.41(a)(3) requires a state agency to have authority to "seek criminal fines against any person who *willfully* or with *criminal negligence* discharges dredged or fill material without a required permit or violates any permit condition issued under section 404." Emphasis added. Further, 40 C.F.R. § 233.41(b)(2) requires "[t]he *burden of proof* and *degree of knowledge or intent required under State law* for establishing violations under paragraph (a)(3) of this section, shall be *no greater* than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." Emphasis added. Florida statutes §§ 373.430(1)(b), (1)(c), (4) & (5) as summarized in the text above comply with this requirement. The requirements in 40 C.F.R. § 233.41(b)(2) related to the degree of knowledge or intent are only applicable to crimes requiring willfulness or knowledge and not criminal negligence, which does not require intent or knowledge by definition.

JA.759

challenges under the Florida APA (Fla. Stat. Ch. 120) and the Florida Environmental Protection

Act (Fla. Stat. § 403.412). In fact, just as environmental groups have a right to broader information

under Florida's Sunshine laws, Florida administrative law also gives them greater opportunities to

use that information to advance their interests in permit challenges. Consistent with the federal

process, an environmental group (or other person) may submit any information that they would

like during the public notice and comment process. *See* F.A.C. § 62-331.060 (describing public

notice and comment procedures).

Florida law also provides for a *de novo* permit hearing before a Florida 404 permit becomes

effective, which provides affected parties with an additional opportunity to obtain and submit even

more information (including via depositions and interrogatories) and to ensure consideration of

that additional information in the hearing record. *See* Fla. Stat. § 120.57(1)(b). Environmental

groups have at least three avenues for establishing standing to challenge state 404 permit actions

under Florida law. But most importantly for this case, Florida law expressly provides that, "[i]n a

matter pertaining to a federally delegated or approved program," like Florida's Section 404

program, "a citizen of the state may initiate an administrative proceeding under this subsection *if*

*the citizen meets the standing requirements for judicial review of a case or controversy pursuant*

*to Article III of the United States Constitution*." [18] Fla. Stat. § 403.412(7) (emphasis added). In

_____

[18] In addition, environmental groups can also establish standing under state law in several other
ways. First, under the seminal case in Florida known as *Agrico Chem. Co. v. Dep't of Env't Regul.*,
406 So. 2d 478 (Fla. 2d DCA 1981), plaintiffs have standing to challenge permitting actions if
they can demonstrate that their "substantial interests" are determined or affected by the action and
their interests fall within the zone of interests of the relevant program. Under the *Agrico*
framework, associations have standing if a "substantial number of its members, although not
necessarily a majority, are substantially affected'...." *Fla. Home Builders Ass'n v. Dep't of Labor*
*and Emp't Sec.*, 412 So. 2d 351, 353-54 (Fla. 1982). This is the traditional avenue for
environmental plaintiffs to obtain standing in Florida. Second, under separate statutory authority,
environmental groups in Florida with "at least 25 current members residing within the county
where the activity is proposed" have *automatic standing* to challenge a permitting action. *See* Fla.
Stat. § 403.412(6).

other words, if Plaintiffs seek to challenge a permitting decision by FDEP under Florida's Section 404 Program, Florida law will simply require them to satisfy Federal standing doctrine. *Id.*

Environmental groups can build the administrative record in a *de novo* hearing, with testimony, presentation of experts, and questions directed toward state environmental officials and permit writers, something that is not available to them under federal procedures. Of course, nothing prevents them from using the same information that they provided during the public comment process during an administrative hearing.

Likewise, FDEP's issuance of a permit is not final agency action if an administrative challenge is timely filed (meaning that the permit is automatically stayed pending resolution of the administrative challenge). *See* Fla. Stat. § 120.569, § 120.57. In Florida, the "administrative hearing process is designed to formulate agency action" so FDEP's "final action may be different from the proposed agency action and may result in the issuance of a permit as requested by the applicant or as modified in the course of the [administrative] proceeding or by settlement." F.A.C. § 62-110.106(7)(e)(2). Since permit challenges in Florida are *de novo* proceedings, FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence. . . ." *Id.* § 120.57(1)(b); *see*, *e.g.*, *Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Env't Regul.*, 587 So.2d 1378, 1387-88 (Fla. 1st DCA 1991). In other words, these *de novo* administrative proceedings are designed to give aggrieved "parties an opportunity to change the agency's mind." *Capeletti Bros. v. Dep't of Gen. Servs.*, 432 So.2d 1359, 1363 (Fla. 1st DCA 1983). If the administrative process results in a final order issuing the permit, Florida law provides for a right to seek judicial review.

*See* Fla. Stat. § 120.68.[19]

In Florida, the "reviewing court's decision may be mandatory, prohibitory, or declaratory in form, and it shall provide whatever relief is appropriate irrespective of the original form of the petition." Fla. Stat. § 120.68(6)(a). Florida courts may, among other things, "[o]rder agency action required by law; order agency exercise of discretion when required by law; set aside agency action; remand the case for further agency proceedings; or decide the rights, privileges, obligations, requirements, or procedures at issue between the parties; and [o]rder such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld." *Id.* If the "court sets aside agency action or remands the case to the agency for further proceedings, it may make such interlocutory order as the court finds necessary to preserve the interests of any party and the public pending further proceedings or agency action." *Id.* § 120.68(6)(b). And as Federal Defendants also noted, the court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds the "agency's action depends on any finding of fact that is not supported by competent, substantial evidence in the record of a hearing conducted pursuant to §§ 120.569 and 120.57; however, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." *Id.* § 120.68(7)(b).

Likewise, if the "fairness of the proceedings or correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure," the court

---

[19] Under Florida law, any person "substantially affected" by an FDEP rule or proposed rule may seek an administrative determination that the rule is invalid. *See* Fla. Stat. § 120.56(1)(a); § 120.569(1). Florida courts have interpreted Chapter 120 liberally to achieve the statutory purpose of increasing public participation in agency decisions. *NAACP, Inc. v. Fla. Bd. of Regents*, 863 So. 2d 294, 298 (Fla. 2003); *Palm Beach Cnty. Env't Coal. v. Fla. Dep't of Env't Prot.*, 14 So.3d 1076 (Fla. 4th DCA 2009). This includes the opportunity to challenge the validity of an existing rule "at any time during which the rule is in effect." Fla. Stat. § 120.56(3).

may set it aside. *Id*. And the same is true if the "agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action…" *Id*. The same is true if the "agency's exercise of discretion was," among other things, "[o]utside the range of discretion delegated to the agency by law" or "inconsistent with agency rule," such as FDEP's Section 404 program rules or handbook. Id. § 120.68(8). And under Florida law, unlike federal law, agencies do not receive any deference to their interpretations. Fla. Const. Art. V, § 21 ("In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo.").

## H.  EPA Oversight of FDEP Permit Decisions

After approving a State program, EPA maintains an active role to ensure compliance with the requirements of Federal law. *Id*. § 1344(i)-(j). First, EPA oversees the State permitting process – both on a program level as well as permit-by-permit basis – to ensure continued compliance with Federal requirements. *Id*. § 1344(h); 40 C.F.R. § 233, Subpart F (Federal Oversight). For example, unless a kind of activity is exempted by EPA under Section 404(k)(1), a State must provide EPA with a "copy of each permit application received by such State and provide notice to [EPA] of every action related to the consideration of such permit application, including each permit proposed to be issued by such State," along with a "copy of each proposed general permit which such State intends to issue." *Id*. § 1344(j). EPA may provide comments or otherwise "object" to the issuance of any permit by the State. *Id*. And EPA may hold a public hearing on its objection. *Id*. Ultimately, if the State rejects EPA's comments or changes, the State must deny the permit or that particular permit must be federalized (*i.e.*, the Corps takes over issuance of that particular

JA.763

permit).[20] *Id.*; *see also* Mem. of Agreement between FDEP and EPA (July 31, 2020) at EPA-HQ-OW-2018-0640-0018 at 7-9; F.A.C. § 331.052(3)(b) at EPA-HQ-OW-2018-0640-0002-A48 at 8-9. Besides EPA and the Corps, other Federal agencies also have significant opportunities for involvement in State 404 permits. *See, e.g.*, 33 U.S.C. §§ 1344(h)(1)(F) (U.S. Coast Guard); 1344(m) (FWS); *see also* 40 C.F.R. § 233.15(d) (requiring EPA to submit copies of the State's submission to the Corps, FWS, and NMFS); 40 C.F.R. § 233.15(g) (requiring EPA to respond to comments from those agencies).

Second, EPA remains actively involved in the administration of the State program as a whole. Any State seeking to administer its own Section 404 program must enter a memorandum of agreement with EPA that, among other things, requires submission of regular "reports, documents and other information" to EPA along with an "annual report" documenting the State's administration of its program. 40 C.F.R. § 233.13. States are also required to "allow EPA routinely to review State records, reports and files relevant to the administration and enforcement of the approved program." *Id.* § 233.13(b)(2); *see also id.* § 233.52 ("Program reporting"). As part of this oversight function, Florida provides EPA with copies of No Permit Required (NPR) letters for review as requested (although all NPR information is publicly accessible on FDEP's website).[21] Wolfe Dec. ¶¶ 41, 45. An applicant may apply for a State 404 NPR verification when the activity

---

[20] Since program approval, EPA has raised objections to some of Florida's proposed decisions on Section 404 permits. In just three instances, however, EPA has determined that Florida had not, in EPA's view, adequately addressed EPA's concerns, and thus, EPA transferred processing of the permit to the Corps (i.e., federalized the permit application). Wolfe Dec. ¶ 31. While Florida disagreed with EPA's decision in those instances, this is how the oversight mechanism in the CWA Section 404 program is designed to work. *Menominee Indian Tribe of Wis. v. Env't. Prot. Agency*, 947 F.3d 1065, 1071 (7th Cir. 2020) ("where Section 404 permitting authority has been delegated to a state, the EPA retains an oversight role… The EPA reviews, and can object to, proposed permits…If the agency lodges objections, the state cannot issue a permit without revising and resubmitting it for approval…").

[21] *See* https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp (last visited May 10, 2023)

has avoided all impacts to wetland or surface waters delineated using 62-340, F.A.C., or when the activity has been designed to only impact wetlands or surface waters that are excluded from jurisdiction as waters of the United States. *Id.* ¶ 43. NPR verifications are voluntary, non-binding advisory letters designed to assist the regulated community and help to promote overall compliance with the law. *Id.* ¶ 42.

Third, where a State program does not comply with Federal standards, EPA may seek to withdraw the program. 33 U.S.C. § 1344(i). EPA regulations set forth the withdrawal process, which includes an opportunity for the State to "take corrective action"; an "informal review" to determine whether "cause exists" to commence formal proceedings; a formal hearing on the record that is announced in the Federal Register; completion of proceedings in general conformance with EPA's Consolidated Rules of Practice found at 40 C.F.R. Part 22 (with opportunities for interested parties to intervene as parties or participate as *amici curiae*); a recommended decision by a hearing officer with compilation of a full hearing record; and ultimately a determination by the Administrator of EPA with a "list" of "deficiencies in the program" (if any) and "providing the State a reasonable time, not to exceed 90 days, to take such appropriate corrective action as the Administrator determines necessary." 40 C.F.R. § 233.53(b)-(c). If the State fails to correct the deficiencies, EPA "shall issue a supplementary order withdrawing approval of the State program," and such order "shall constitute final Agency action" subject to judicial review under the Administrative Procedure Act. *Id.* § 233.53(c)(8)(vi)-(vii). Withdrawal proceedings can be initiated by EPA "or in response to a petition from an interested person alleging failure of the State to comply" with Federal requirements. 40 C.F.R. § 233.53(c). Thus, the Section 404 assumption process ensures expedited admission of States into the program, with ongoing federal oversight and a careful, deliberate process for correcting or withdrawing deficient State programs.

Where a State has not assumed responsibility for its own Section 404 program or has its program withdrawn, the Corps retains responsibility to issue permits authorizing the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In that context, where the federal-state roles are reversed from Congress' preferred alignment, States play a supplementary role in the Federal 404 permitting process, including, for example, through the process of certifying that Corps permitting actions comply with State water quality standards pursuant to CWA Section 401, 33 U.S.C. § 1341, and state concurrence review under the Coastal Zone Management Act, 16 U.S.C. §§ 1451, et seq.

Taken together, Florida administrative and environmental law-including Florida's new Section 404 program combined with the federal overlay arising from EPA oversight of Florida's Section 404 Program-ensures that Florida's water resources are conserved and protected consistent with federal standards.

## STANDARD OF REVIEW

Standing is an "essential and unchanging" requirement for judicial review in any case, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). It must be "demonstrate[d] for each claim" and "for each form of relief that [Plaintiffs] seek." *Id.* at 2208. The "irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each claim, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2015) (citing *Lujan*, 504 U.S. at 560).

Plaintiffs bear the burden of establishing that a court has jurisdiction to hear each of their claims. *See Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002). In the D.C. Circuit, Plaintiffs must include in their opening briefs sufficient evidence to demonstrate their standing where it is

26

not self-evident. *Id.* at 900. Moreover "[a]bsent good cause shown," Plaintiffs should not expect

the court to allow them to submit evidence of standing for the first time in their reply brief or after

oral argument. *Id.*

Plaintiffs must satisfy each element of standing "in the same way as any other matter on

which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required

at the successive stages of the litigation." *Lujan,* 504 U.S. at 561. While general factual allegations

of harm may suffice at the pleading stage, such "mere allegations" are insufficient to support

standing at the summary judgment stage. *See id.* Instead, a plaintiff "must provide affidavits or

other evidence to demonstrate the specific facts necessary to support standing," *Ctr. for Biological*

*Diversity v. Regan*, 597 F. Supp. 3d 173, 188 (D.D.C. 2022) (citing *Swanson Grp. Mfg. LLC v.*

*Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

Florida adopts and incorporates by reference the Standard of Review for summary judgment

as set forth in the Federal Defendants' brief. *See* Dkt. 99 at 33-34.

## ARGUMENT

## I.    Plaintiffs' Claims Are Not Subject to Judicial Review Due to Lack of Standing, Lack of Final Agency Action, or Lack of Ripeness.

### A.    Plaintiffs Lack Standing For All Claims Based on Purported Informational Injuries.

Plaintiffs seem to suggest that certain alleged informational losses provide standing to

support all of their claims in gross. Dkt. 98 n.39 at 76. They make no effort to expressly connect

their alleged informational losses to specifically numbered claims in the Amended Complaint, but

it appears that they want this Court to assume that their "loss" of environmental information creates

standing to challenge essentially everything: EPA's approval of Florida's program in totality, the

programmatic consultation approach, and the Corps' approach to assumable waters (i.e., all claims

27

except Claims 1, 8, 9). However, by alleging informational injury for *all of these claims*, Plaintiffs have made no direct showing of harm for *any specific claim. TransUnion,* 141 S. Ct. at 2207. Since standing is not dispensed in gross, this Court must find that, as alleged, Plaintiffs' informational losses do not support standing here.

To the extent the Court considers the informational standing arguments further, they should be rejected as to each claim. Contrary to Plaintiffs' assertions, their purported informational injuries do not support standing for any claims asserted here. Indeed, there is no actual loss of meaningful information for which Plaintiffs experience cognizable injuries. To support standing for informational injury, Plaintiffs assert a loss of information in two respects: first, the "loss of ESA Section 7 consultation on 404 permits in assumed waters"; and second, "the loss of NEPA analysis..." Dkt. 98 at 75. Neither works.

Florida Intervenors have previously briefed this question in significant detail and re-adopt those points here. *See* Dkt. 37 at 56-57; Dkt. 46 at 23-25; Dkt. 72 (Florida's supplemental brief concerning availability of environmental information). These "losses" of information are not cognizable grounds for asserting standing because Congress, not EPA, decided that state programs are not subject to the NEPA provisions that may trigger environmental impact statements. Nor are they subject to ESA Section 7's provisions that may result in biological assessments and the ensuing BiOps. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall … insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any [listed] species…") and 16 U.S.C. § 1536(a)(2) ("…Each Federal agency shall…conduct a biological assessment…"). Thus, EPA did not cause any purported loss of information; Congress did. Dkt. 99 at 67 n.19 (explaining that "Congress decided that neither NEPA review nor ESA consultation is required" for state permits). The "levels of environmental

review," which Plaintiffs believe are missing are only missing, if at all, by congressional design. *See Ass'n of Am. Physicians & Surgeons v. Sebelius*, 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (holding that injuries "caused by statutes and regulations that pre-date the agency actions plaintiffs' challenge" suffered from "a causation problem" and the harms were "not redressable"); *Ecological Rights Found. v. EPA*, No. CV 19-2181, 2022 WL 4130818 , at *14 (D.D.C. Sept.12, 2022) (finding no injury where "EPA followed Congress's instructions to the letter" and authority for the decision being challenged was bestowed by Congress); *see also Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 181 n.5 (D.D.C. 2019) ("Although the federal defendants mention informational standing in their motion to dismiss, . . . plaintiffs put forth no argument for informational standing in their opposition and fail to identify any statute entitling them to any information deprived under the Service's new policy); *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (stating that in order to claim informational standing, a plaintiff must allege: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.").

But even if that was not determinative here, Florida Intervenors have shown how Plaintiffs do not actually suffer the loss of information they claim. Dkt. 72. With this brief, Florida Intervenors have provided a declaration by the General Counsel of FDEP addressing, among other things, the alleged loss of environmental information and access to permit records. Wolfe Dec. ¶¶ 24-30.

First, Plaintiffs contend that EPA's approval of Florida's program "removed Plaintiffs' access to critical environmental analyses that Plaintiffs use to educate the public, engage in advocacy, and seek redress for environmental harm." Dkt. 98 at 76. But Plaintiffs receive the same

kinds of environmental information under the Florida-led program as they did under the Corps-led program, and in many respects, they receive *more information more quickly*. Wolfe Dec. ¶¶ 25, 28. The side-by-side comparison demonstrates Florida's point here. *Id.* at Enclosure D.

Moreover, in asserting informational injuries, Plaintiffs vastly overstate the extent to which an EIS or biological opinion is prepared for Corps-led 404 permits. In fact, relatively few permit applications under the Corps-led program in Florida resulted in preparation of a BiOp and/or EIS. Wolfe Dec. ¶¶ 26-27. And for that narrow category of projects, many (if not most) would still generate the exact same federal BiOp and EIS *after assumption* because of some other federal nexus. Wolfe Dec. ¶ 27; Dkt. 72 at 5-8. That is because Section 404 permitting is usually *not* the only federal nexus for the kinds of major projects that result in a BiOp and/or EIS. Projects that involve use of federal lands (4.5 million acres of federal lands in Florida),[22] use of federal funds (such as major transportation projects), or other federal "hooks" will likely continue to require the same BiOp or EIS that they required pre-assumption. Some projects that Plaintiffs listed in their brief and/or standing declarations, such as the withdrawn application for an oil development project (Nobles Grade/Burnett Oil) in South Florida, would be located on federal lands within the Big Cypress National Preserve and, thus, would likely require NEPA and ESA compliance on that basis (independent of a Section 404 permit).

And while Plaintiffs make much in their briefs on the lack of NEPA review, that point is glaringly omitted from their Amended Complaint, which only contains one minor reference to NEPA – and that reference is in relation to the already resolved Claim 8. Dkt. 77 at 47 (Amended Complaint) (listing removal of citizen's NEPA rights as a substantive legal effect of EPA's giving

---

[22] Congressional Research Service, *Federal Land Ownership: Overview and Data*, at 7 (Feb. 21, 2020) (showing approximately 12.9% of the surface area of Florida as owned or managed by federal agencies) (https://sgp.fas.org/crs/misc/R42346.pdf (lasted visited May 10, 2023)).

JA.770

its approval an immediate effective date when published in the Federal Register).

Likewise, nothing in the ESA provides any right of access to review and comment on BiOps. Dkt. 99 at 38-40. Under ESA Section 7 and its regulations, formal consultation is between the action agency (here, EPA) and the consulting agency (here, FWS), and there is no requirement for public notice and comment or public access to the action agency's biological assessment or the consulting agency's BiOp during the consultation process. *See* 50 C.F.R. § 402.12 (setting forth procedures for biological assessments and not requiring publication or public notice and comment); *id.* § 402.14(g)(5) ("The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft BiOp must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service."). Thus, for purposes of consultation under the Corps-led 404 program, while the project applicant may be involved, there is no *right* of notice and comment for the public within the Section 7 consultation process. *Cooling Water Intake Structure Coal.*, 898 F.3d 173, amended, 905 F.3d 49, 78 (2nd Cir. 2018) ("[T]here is no independent right to public comment with regard to consultations conducted under §7(a)(2) of the ESA…So no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services."); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (explaining that there is not an "independent right to public comment with regard to consultations conducted under § 7(a)(2)" of the ESA).

In their declarations, Plaintiffs now point to a long list of specific projects that they claim as a basis for injury. The Wolfe Declaration provides an update on the status of each of those projects with pending applications. Wolfe Dec. ¶ 17 and Enclosure A. Plaintiffs referenced several proposed projects for which a Section 404 application has *not* been submitted. Various other

JA.771

projects referenced in Plaintiffs' declarations have been *withdrawn* by the permit applicant and are

no longer pending (*e.g.*, Nobles Grade/Burnett Oil; Tamiami Prospect; State Road 836, Port 1850).

Plaintiffs also referenced the CPN West LLC project, a commercial development that met the

requirements for a No Permit Required letter. None of these projects can supply the basis for

standing. Each of the active applications seeking Section 404 permits, as referenced by Plaintiffs

for standing, are described in Enclosure A of the Wolfe Declaration, with a link to the relevant

FDEP online permit files, which clearly demonstrate that each of these projects are in the midst of

a pending review process with direct involvement by state and federal agencies, including FWS

and FWC. Those agencies are actively involved in evaluating projects and providing the technical

assistance contemplated by the BiOp/ITS. As just one example (among several described in

Enclosure A), the permit file for the FFD (Orchid) project, with FDEP Permit No. 0291030-004-

SFI, contains an applicant-prepared Biological Assessment (with over 1,100 pages of

documentation) as well as an environmental site assessment of more than 200 pages (completed at

the request of FWS). As a careful review of FDEP's publicly-available permitting records show,

FWS and FWC are clearly engaged in reviewing and evaluating the projects, and the same kinds

of information that Plaintiffs decry as lacking are available for them to review, or will be through

the completion of the permit process.

### B.  Plaintiffs Cannot Challenge EPA's Completeness Determination (Claim 1).

Plaintiffs also challenge EPA's finding that Florida's application was "complete" for

purposes of allowing EPA to begin the process of evaluating whether to approve or disapprove the

program. Dkt. 99 at 38-45. Florida Intervenors concur with Federal Defendants' argument that

Florida's application was complete, and certainly EPA's decision to find it complete was not

arbitrary. But before reaching the merits of this issue, the Court should carefully weigh whether

such claims are even properly subject to judicial review. Here, Florida suggests at least two

grounds for finding this claim non-justiciable.

One, the finding by an agency of an application's completeness lacks the hallmarks of "final agency action" for purposes of the Administrative Procedure Act (APA). Agency actions are "final" under the APA if, first, it "marks the consummation of the agency's decisionmaking process—*it must not be of a merely tentative or interlocutory nature*," and second, it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 592 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added).

Taking those two elements in turn, the first is not met here as the "completeness" determination is not the "consummation of the agency's decisionmaking process." It is just the beginning of the process - the very first step in EPA's process for reaching a final determination. *See Fed. Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (explaining that a "threshold determination that further inquiry is warranted" is not a "definitive statement of position," thus it is not final agency action); *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 331 (D.D.C. 1990) ("Agency action which merely initiates proceedings has no legal force, is not a definitive statement of position, and therefore is not final agency action ripe for review.").

But even on the second step, though consequences may flow from a completeness determination – namely, the triggering of a 120-day clock for EPA to make a final decision - that is it. And that 120-day clock was created by congressional design to protect the interests of the State applicants, not the public. Dkt. 37 at 15-16. There are no consequences *impactful to Plaintiffs* that would give rise to standing here. The completeness determination merely gets folded into the final approval determination, which becomes the final agency action subject to review. Plaintiffs cite no cases recognizing that an agency's finding of completeness is reviewable.

Two, even if the "completeness" finding is final agency action, Plaintiffs fail to show how *they* suffer any cognizable injury related to EPA's completeness determination. Indeed, Plaintiffs have not cited, and Florida Intervenors have not located, any case law standing for the proposition that a non-applicant would have standing to challenge an agency's finding that an application is complete.[23] The absence of precedent is telling here.

### C. Plaintiffs Suffer No Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority (Claim 2).

#### 1. Plaintiffs Lack Standing to Challenge State 404 Assumption Generally.

Plaintiffs assert both organizational and associational standing "to challenge EPA's unlawful approval of Florida's 404 program (Claim 2)" based on alleged informational injuries from the transfer of the primary permitting authority to the State.[24] Dkt. 98 at 78. However, as shown in Argument Section I.A above, there is no actual loss of meaningful information for which Plaintiffs experience cognizable standing injuries.

Plaintiffs also allege that their members have standing for Claim 2 because "as a result of EPA's action, the State is considering (and approving) permit applications that substantially risk

---

[23] In its argument concerning standing to challenge the completeness of the application, Plaintiffs cite two cases, Dkt. 98 at 77-78, none of which address standing to challenge the completeness of an application. Neither *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983), nor *Center for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 179 (D.D.C. 2019), involved a challenge to the completeness of an application.

[24] To establish organizational standing a party "must show that it suffers or will imminently suffer 'a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests [and] the presence of a direct conflict between the defendant's conduct and the organization's mission.'" *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 194 (quoting *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (cleaned up). "To establish associational standing, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Dkt. 30 at 2 (quoting *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 38 (D.D.C. 2015)).

harm to their members' aesthetic, recreational, and other interests by authorizing developers to fill precious wetland habitat for projects that will harm threatened and endangered species." *Id.* In truth, Florida's expanded role causes no increased risk of injury relative to the pre-assumption 404 program, especially because EPA maintains oversight on a permit-by-permit basis.[25] To be sure, if Florida approved a proposed project without appropriate mitigation, that could result in harm to Plaintiffs' aesthetic, recreational, and other interests in wetlands or protected species. But that would be equally true if the Corps approved such a proposed project before assumption. Thus, any such harm is not specific to the State issuing the permit instead of the federal government, and thus is not an injury fairly traceable to EPA's approval of Florida's 404 Program.

On that relevant metric, Plaintiffs have not established any proof that state permitting will be less rigorous than pre-assumption federal permitting--especially given that the EPA retains permit-level review and oversight more generally over Florida's actions. Mere speculation of future harm cannot support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient") (internal quotations and citations omitted). Because Plaintiffs have proffered no evidence of any concrete, particularized harms caused by Florida making a Section 404 permitting decision instead of the federal government, they have failed to meet their burden of proof on standing.

Next, Plaintiffs' standing declarations assert injury from EPA's approval of Florida's 404 Program because now any challenge to 404 permitting decisions must be filed in state court rather

---

[25] Though Florida does not rehash the argument here, Florida preserves and incorporates by reference its previously-made argument that Plaintiffs' claims are not redressable because of the "deemed approved" provision found in 33 U.S.C. § 1344. Dkt. 37 at 59-64.

JA.775

than federal court, which allegedly has a different standard of review,[26] fee shifting provisions, and more restrictive standing requirements.[27] Plaintiffs aversion to state courts and preference for federal courts is baseless. *Menominee Indian Tribe*, 947 F.3d at 1071 ("It is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act…Nothing has been brought to our attention to suggest that the Tribe cannot receive full and fair review in a Michigan court."). Plaintiffs do not identify any pending or planned state court litigation, much less explain how these supposed differences constitute a cognizable Article III injury. In fact, as discussed above, the fee shifting provision at Section 403.412(2)(f) "applies only to circuit court actions for injunctive relief," not administrative actions,[28] and there is no difference in standing because Florida law expressly provides that, "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an

---

[26] Plaintiffs provide no actual evidence beyond general speculation that the *de novo* standard of review in state court would negatively impact unidentified future litigation involving state issued 404 permits. First, as explained above, Plaintiffs are free to submit comments, including technical information, to FDEP during the administrative review of the permit application, similar to the federal process, which will be part of the administrative record of the agency. If Plaintiffs chose to challenge the FDEP's permit decision, they have the option in a *de novo* proceeding to supplement the administrative record if they wish. But this is not a requirement and Plaintiffs can rely on documents submitted in the notice and comment process to litigate their claim. Second, under the *de novo* standard, FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence….". F.S § 120.57(1)(b). This is an advantage for Plaintiffs seeking to challenge FDEP 404 permits, not an injury.

[27] *See* Carter Dec. ¶ 25; Crooks Dec. ¶¶ 37-40; Hartl Dec. ¶¶ 26, 28; Rinaman Dec. ¶¶ 21-22; Silverstein Dec. ¶¶ 12-14; Robertson Dec. ¶¶ 18, 27; and Umpierre Dec. ¶¶ 70-72 regarding higher costs of state court. See Carter Dec. ¶ 25; Crooks Dec. ¶ 41; Hartl Dec. ¶ 27; Rinaman Dec. ¶ 23; Silverstein Dec. ¶ 15; Robertson Dec. ¶ 18; and Umpierre Dec. ¶ 71 regarding standing in state court.

[28] *See Agrico Chem. Co. v. Dep't of Env't Regul.*, No. 83-2708, 1984 WL 54261, at *2 (Fla. Div. of Admin. Hr'g, June 27, 1984); *accord Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*, No. 91-8088, 1992 WL 322912, at *13 (Fla. Div. of Admin. Hr'g, July 23, 1984); (explaining that Section 403.412(2)(f) only "relates to a civil injunction action and not to an administrative proceeding").

JA.776

administrative proceeding under this subsection *if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution*." Fla. Stat. § 403.412(7) (emphasis added). Plaintiffs simply have not shown a reasonable prospect that they would bring a Florida state court action and lose that action even though they would have prevailed under federal standards.

Crucially, this Court held earlier in this case that an almost identical argument from the Florida Chamber of Commerce (Chamber) and the Association of Florida Community Developers (AFCD) was too speculative to support standing. In their renewed motion to intervene, the Chamber and AFCD argued that the loss of "the right to a de novo proceeding under the Florida APA, complete with discovery and fact-finding adduced through the presentation of evidence before an impartial administrative law judge" if EPA's approval was vacated constitutes a cognizable, Article III injury. Dkt. 32-1 at 12. In denying the motion for lack of standing, this court held that "Movants' members do not aver that they are currently bringing (or are likely soon to bring) proceedings under the Florida APA. . . .And the mere prospect that the Florida permitting authorities *might* rule against one of Movants' members in the future on an issue that the member *might* then raise under the Florida APA, where that member would be unable to raise a similar (or equally effective) challenge under the federal APA, is too speculative to support Article III jurisdiction." Dkt. 39 at 7-8 (emphasis in original). Applying this same logic to Plaintiffs' arguments necessitates dismissing Claim 2 for lack of standing as well.

Even if there were some theoretical differences between Florida and federal law, or Florida and federal enforcement practices,[29] Plaintiffs would still lack standing. That is because Congress

---

[29] *See e.g.,* Rinaman Dec. ¶¶ 26-27, Silverstein Dec. ¶¶ 17-18 (referencing FDEP enforcement related to stormwater permits issued under Section 402, which like the Section 404 program, has been assumed from EPA).

explicitly provided that EPA retains independent enforcement authority under CWA Section 309 and 404(n) when a state assumes a 404 program.[30] As a result, federal authorities review every permit that Florida proposes to issue as well as the validity of Florida's overall program on an ongoing basis, including issuance of No Permit Required verifications. EPA-HQ-OW-2018-0640-0018 at 4-9, 11-12; Wolfe Dec. ¶¶ 41, 45.

Binding precedent teaches that a transfer from federal to state authority cannot support standing where the federal government maintains the ability to apply federal law. *See Crow Creek Sioux Tribe,* 331 F.3d at 917. In *Crow Creek,* an Indian Tribe argued that the transfer of lands from U.S. Army Corps of Engineers to the State of South Dakota would impede or reduce the likelihood of enforcement of federal cultural protection statutes on the transferred lands by federal agencies, injuring the Tribe's rights under those statutes. *Id.* at 913. The D.C. Circuit found that the Tribe lacked standing because the statute that required the land to be transferred explicitly provided that the federal cultural protection statutes continue to apply on the transferred lands. *Id.* In addition, the court deemed "purely speculative" assertions that transfer of the land to the State would diminish enforcement because the federal government retained full legal enforcement authority. *Id.* at 917. Where a statute provides that the federal government "will have an ongoing and undiluted enforcement role," concerns about reduced enforcement were simply "unsupported conjecture" that do not constitute an injury for Article III standing purposes. *Id.* Accordingly, the D.C. Circuit dismissed the case. Likewise, this Court should dismiss Claim 2 for the same reason given EPA's independent enforcement authority pursuant to CWA Section 309 and 404(n).

---

[30] Section 404(g) sets forth the requirements for state assumption of 404 permitting. 33 U.S.C. § 1344(g). Section 404(n) states "[n]othing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title." 33 U.S.C. § 1344(n). Section 309 sets forth the scope of the Administrator's enforcement authority, including for violations of permits issued under state assumed 404 programs. *See* 33 U.S.C. § 1319.

    **2.**      **Plaintiffs Lack Standing to Challenge EPA's Approval Based on Concerns with Criminal Negligence & Statute of Limitations.**

*Crow Creek* is particularly instructive here as Plaintiffs' challenge to EPA's approval of Florida's 404 program is based in part on the state's criminal enforcement standard and criminal statute of limitations, which Plaintiffs assert provides harm sufficient for standing. Specifically, Plaintiffs refer to criminal enforcement in a couple of sentences in two standing declarations— one by Lisa Rinaman, a member of St. Johns Riverkeeper, and another by Rachel Silverstein, a member of Miami Waterkeeper. *See* Dkt. 98 at 78. In relevant part, Ms. Rinaman declares

> The state's enforcement of its section 404 program also harms St. Johns Riverkeeper . . . When appropriate, we refer issues to the authorities for investigation and criminal prosecution, for which we provide any necessary assistance. The state program, however, does not include the same enforcement standards and requirements as federal law.

Dkt. 98-6 at 7 (Rinaman Decl. ¶ 26). And, in relevant part, Ms. Silverstein declares

> Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations. For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

Dkt. 98-7 at 6 (Silverstein Decl. ¶ 16) (emphasis added).

First, neither declaration demonstrates (or even suggests) that the individuals or their respective organizations suffered (or will suffer) any actual, imminent, or concrete injuries that are remotely traceable to application of Florida's criminal enforcement regime instead of the federal enforcement regime to CWA Section 404 violations. At most, Ms. Rinaman's declaration simply states that the state program is not the "same" as the federal program. However, the CWA does not require that a state program be identical to the federal program. It simply requires that a state program "abate violations of the permit or the permit program including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G); *see also* Federal

Defendants' Brief, Dkt. 99 at 50-54.

Plaintiffs' broader, unsupported allegations concerning Florida's statute of limitations fare no better. Though Plaintiffs argue that "Florida law is not as stringent as federal law because it provides a shorter statute[] of limitation for enforcement of environmental crimes," Dkt. 98 at 48, none of the standing declarations assert any harm that can be traced to these "shorter statutes of limitation." Thus, Plaintiffs have also failed to meet their burden of proof for standing as to Claim 2 based on Florida's criminal statute of limitations. "Standing is not 'an ingenious academic exercise in the conceivable,' but . . . requires . . . a factual showing." *Lujan*, 504 U.S. at 566 (citation omitted); *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 188 (explaining that a plaintiff "must provide affidavits or other evidence to demonstrate the specific facts necessary to support standing").

Second, neither Ms. Rinaman's nor Ms. Silverstein's declaration attempt to explain how the difference between the federal ordinary negligence and state gross negligence definitions, as applied to criminally negligent discharges in violation of the CWA, could result in a legally cognizable injury to them sufficient for standing purposes. This may be because under *Crow Creek*, Plaintiffs cannot suffer such an injury here as EPA retains independent federal criminal (and civil) enforcement authority relating to both unpermitted discharges and conditions or limitations in permits issued by a state under CWA Section 404. Thus, Ms. Rinaman and Ms. Silverstein can continue to refer criminal enforcement matters to EPA, and Congress has authorized EPA to bring a CWA enforcement action if it chooses based on the federal definition of negligence and the federal statute of limitations even after Florida's assumption of the 404 program regardless of

40

whether the state brings its own enforcement action under state law.[31] *See* 33 U.S.C. §§ 1319, 1344(n).

Because Plaintiffs' standing declarations are deficient on their face and fail to meet Plaintiffs' burden of proof, this Court does not have jurisdiction to determine the merits of Plaintiffs' challenge to EPA's approval of Florida's 404 program.

**D.      Many of Plaintiffs' Attacks Are Not Ripe For Review (Claims 3 to 5, 7, 11-12).**

"Ripeness is a justiciability doctrine designed to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (Moss, J.) (internal quotations and citations omitted). Ripeness is assessed under the two-pronged test established by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *McCray,* 574 F. Supp. 3d at 12 (quoting *Texas v. United States*, 523 U.S. 295, 300 (1998)) (internal quotations omitted). This test is based on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Am. Oversight v. U.S. Dep't of Veterans Affairs*, 498 F. Supp. 3d 145, 157 (D.D.C. 2020) (Moss, J.) (citing *Abbott Labs.*, 387 U.S. at 149) (internal quotation marks omitted).

First, the agency action must have a "sufficiently direct and immediate" impact on the party challenging the action. *Abbott Labs.*, 387 U.S. at 152. A "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (internal quotation marks omitted). Second, the court must determine

---

[31] Of course, the federal government's decision as to whether to bring a civil or criminal enforcement action is not subject to judicial review under the APA. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985).

JA.781

whether withholding judicial review would cause hardship to the parties. *Abbott Labs.*, 387 U.S. at 136. Any hardship caused by the deferral of adjudication must be "immediate and significant," to warrant judicial intervention. *Devia v. NRC,* 492 F.3d 421, 424 (D.C. Cir. 2007). However, the consideration of hardship "will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Pub. Citizen Health Rsch. Grp. v. FDA,* 740 F.2d 21, 30 (D.C. Cir. 1984). An agency action that "does not require [plaintiff's] to engage in, or to refrain from, any conduct, and [where] plaintiff does not identify any other imminent harm" does not constitute sufficient hardship for the purposes of ripeness. *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 254-55 (D.D.C. 2005).

Part of the ripeness doctrine in both these factors is "subsumed into the Article III requirement of standing," whereby a petitioner must show injury-in-fact. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). However, "[e]ven if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Id.* (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003)). Accordingly, the doctrine of prudential ripeness attempts to avoid inefficient and unnecessary "piecemeal review" and "ensures that Article III courts make decisions only when they have to, and then, only once." *Pub. Citizen,* 740 F.2d at 30; *Am. Petroleum Inst.*, 683 F.3d at 387. In challenges to agency action, the ripeness doctrine protects agencies from judicial interference until their decisions have been formalized and their effects have been felt in a concrete way. As the Supreme Court explained in *Abbott Laboratories*, ripeness helps to prevent premature judicial interference with agency decision-making, which could lead to "abstract disagreements over administrative policies." *Abbott Labs.*, 387 U.S. at 148. By promoting administrative efficiency and preventing unnecessary litigation, the ripeness doctrine helps to ensure that agencies can effectively carry out their

statutory duties.

Here, Plaintiffs have asserted several claims that are not presently ripe for review in this case, including (1) Plaintiffs' claim that FWS unlawfully extended "take liability" protection; (2) Plaintiffs' claim that the Corps' list of "retained waters" incorrectly omits certain waterbodies; and (3) Plaintiffs' claim related to consultation over impacts to species under NMFS jurisdiction. Each of these claims should be dismissed on ripeness grounds.

> ### 1.   Plaintiffs' Claim That FWS "Unlawfully Extended Take Liability Exemptions" Is Not Ripe For Review (Claims 3 and 4).

Plaintiffs contend that FWS "extended broad take liability exemption to EPA, the State, and all future state 404 permittees" without including "ESA-mandated guardrails." Dkt. 98 at 42. Federal Defendants have fully explained why FWS' Incidental Take Statement complies with the ESA's requirements. Dkt. 99 at 76-82. Any challenge to the scope of incidental take coverage (including the terms and conditions that ensure that activities do not jeopardize federally-listed species or adversely modify designated critical habitat) should await an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate. Given the project-by-project involvement and oversight of EPA and FWS, *see supra* at 23-26, any such scenario is speculative at best and unripe for review at this stage. *See Cooling Water Intake Structure Coal.,* 905 F.3d at 79 n.19 (finding claim "unripe" where "EPA may still veto the permit" and "[i]f EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge"); *see also Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9, 2001 (D.D.C. 2001) (finding environmental challenge, which was based on ESA Section 7 to agency approval of oil and gas leases on federal lands, unripe where leases had not yet been issued). Indeed, to the extent a particular permit application creates an unlawful risk of take, Plaintiffs would have at least two viable, as-applied legal options at their disposal: first, they

43

could challenge the FDEP 404 permit under Florida administrative and judicial review processes *(see supra* at 19-23); and (2) second, Plaintiffs could sue in federal court under the ESA's citizen suit provisions. 16 U.S.C. § 1540(g).

This case resembles the Third Circuit's decision in *New Hanover Township v. U.S. Army Corps of Engineers.* There, the court dismissed as unripe a citizen group challenge to the Corps' use of a nationwide permit (under CWA Section 404) to authorize a city landfill project because a necessary state water quality certification (under CWA Section 401) had not yet been granted. 992 F.2d 470, 473-74 (3d Cir. 1993). The Third Circuit explained that the "results of the [state water quality certification] process cannot be predicted." *Id.* In that situation, "[b]ecause neither the [plaintiffs] nor anyone else will experience any effects from the Corps' decision [to approve use of the nationwide permit to authorize the project] unless and until Pennsylvania grants a water quality certificate, when fill work can begin, this case is not ripe." *Id.* The Third Circuit instructed that the citizen group in that case "should wait until Pennsylvania makes its decision [to approve or deny a water quality certificate] and then, assuming that injury is impending, file suit." *Id.* (relying upon *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 367 (3d Cir. 1986), where the Third Circuit "ruled that a challenge to a state agency's decision regarding the allocation of new buses among transportation companies was not ripe *because a federal agency possessed veto power over the state agency's decision*" (emphasis added)).

The crucial point is that no harm to Plaintiffs from the Incidental Take Permit would arise unless and until FDEP takes a particular action that implicates take liability in the first instance.[32]

---

[32] In *Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 110 (D.D.C. 2019), a district court found that, in the context of ESA Section 7 consultation related to continuation of an approved tuna fishery, NMFS's refusal to treat a fishing industry association as an "applicant" in the consultation process was ripe for review. Of course, here, Plaintiffs do not claim to be an applicant in an ongoing consultation process.

44

That outcome is contingent upon how FWS and EPA exercise their oversight authority, which allows these federal agencies to impose requirements necessary to protect federally-listed species and habitat. In other words, any harm arising from the Incidental Take Statement is multiple steps away: at step one, it requires FDEP to propose to issue a new 404 permit that would cause take of species; at step two, it requires FWS to take inadequate action to protect federally-listed species and habitat; and at step three, it requires EPA to concur and also decline to impose protective measures in its oversight capacity. While Plaintiffs may eventually encounter a situation where they may want to challenge an FDEP 404 permit for allowing unacceptable adverse impacts to federally-listed species, no such situation is presented here. The Court should decline to review an abstract, unripe claim, when concrete, as-applied challenges will be available later.

### 2. Plaintiffs' Challenge to the Corps' List Of "Retained Waters" Is Neither Ripe Nor Based on "Final Agency Action" (Claim 7).

Plaintiffs contend that the Corps violated the law when it approved the list of "retained waters" in Florida.[33] Dkt. 98 at 70-72. In their view, the Corps should have completed "navigability assessments" or "studies" of every waterbody in the State of Florida to ensure that it correctly captured all "historic use" waters and any other waters that fall within the statutory definition for

---

[33] Plaintiffs separately argue in (Part IV.E) that "Florida's program did not demonstrate authority to regulate all assumable *waters of the United States*." Dkt. 98 at 67-70. This argument, however, is focused on the scope of "waters of the United States" under Florida's program, particularly on the impact of post-decisional litigation regarding the definition of this phrase. Federal Defendants have explained that these concerns are not relevant here. Dkt. 99 at 58. Florida's program requires permit coverage for "waters of the United States," and going beyond that, Florida requires Section 404 permits for *all waters*, unless the applicant "clearly demonstrates" that "waters of the United States" are not present. *See* Florida 404 Handbook at pages 4-5 (codified at F.A.C. 62-331.010(5); EPA-HQ-OW-2018-0640-0002-A20). While post-approval disagreements have arisen between Florida and EPA over the proper interpretation of "waters of the United States," particularly in light of various recent district court orders, these post-decisional issues are not relevant to the merits in this matter, nor do they provide Plaintiffs a basis for standing. For the Court's awareness, in October 2022, the Supreme Court heard argument in *Sackett v. EPA*, No. 21-454, which involves the proper interpretation of "waters of the United States," and a decision is expected by the end of the current term.

non-assumable waters. Again, Federal Defendants have fully and persuasively explained why this

claim lacks merit. Dkt. 99 at 43-47. But this is yet another issue that this Court need not reach,

because it is not ripe.

This is precisely the kind of issue that the *Abbott Labs'* ripeness test rules out. The Corps'

approval of the retained waters list does not have a "sufficiently direct and immediate" impact on

Plaintiffs unless and until they challenge a specific project involving a specific waterbody that they

believe is incorrectly excluded from the list. This "claim is not ripe for adjudication [because] it

rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

all." *McCray*, 574 F. Supp. 3d at 12. Awaiting such a scenario would ensure that the "scope of the

controversy" and "factual components" are "fleshed out, by some concrete action applying the

regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan*, 497

U.S. at 891 .

Even if the list were faulty in its current state, which Florida does not believe to be true, an

agency action that "does not require [plaintiffs] to engage in, or to refrain from, any conduct, and

plaintiff does not identify any other imminent harm" does not constitute sufficient hardship for the

purposes of ripeness. *Oceana*, 384 F. Supp. 2d at 255. Ruling now on the correctness of the

Retained Waters List, when a waterbody's inclusion on the list is an exceedingly fact-specific issue

involving analysis of historic and current navigation and other factors, would be a fruitless and

hypothetical exercise in the abstract. This is especially true where, as here, Florida's program

includes a process for updating the Retained Waters List, as needed and as warranted.

Separately, and contrary to Plaintiffs' assertion in their summary judgment motion (Dkt.

98 at 70-71), Plaintiffs are very likely challenging a list that does not actually constitute final

agency action under the APA.[34] The Retained Waters List is attached to the MOA between FDEP and the Corps (CORPS004322-CORPS004334). The list (which includes over 500 rivers, lakes, creeks, and streams – spread across the State of Florida – that are considered, for purposes of Section 404(g), to be "retained waters" (non-assumable waters)) expressly includes "all waters subject to the ebb and flow of the tide shoreward to their high water mark *that are not specifically listed* …, including wetlands adjacent thereto landward to the administrative boundary." CORPS004331. This same understanding is reflected in the MOA itself, CORPS004323, which also provides that the list will be updated when: "the Corps makes a navigability determination," "a Federal court makes a navigability determination," "Congress makes" such a determination, or "there are applicable rule changes." Additionally, the MOA explains that the list will be updated, as appropriate, through "Joint Coordination Procedures" between the Corps and FDEP. CORPS004324. And the MOA recognizes that modifications to the Retained Waters List are subject to EPA approval under 40 C.F.R. § 233.16(d). CORPS004324.

Whether this list meets the test for final agency action is suspect. *Hawkes*, 578 U.S. 590, 597 (2016) (applying *Bennett v. Spear's* two-part test to find that Corps' approved jurisdictional determinations, which are binding on the Corps and subject landowners to potential enforcement action, constitute final agency action subject to judicial review). "Even if final, an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *Id.* at 600 (citing 5 U.S.C. § 704). And here, any person (including Plaintiffs) may seek a modification to the list of retained waters in any circumstance.[35]

---

[34] *See* Dkt. 99 at 59 n.17 (Federal Defendants note that they have not conceded that the retained waters list was final agency action reviewable under the APA).

[35] In 2019, a district court in Wisconsin found that the retained waters list approved for the Michigan 404 program constituted final agency action. *See Coal. to Save Menominee River Inc. v. U.S. Env't. Prot. Agency*, 423 F. Supp. 3d 560, 568 (E.D. Wis. 2019) ("The final agency action,

Plaintiffs point out that "EPA has argued [in other cases] that after assumption, changes to the [retained waters] list require modification of the program (which only EPA can approve)." Dkt. 98 at 70 n.33 (citing *Menominee Indian Tribe,* 947 F.3d at 1074–75  (Hamilton, J. concurring) (cited by *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 212 n.9 (D.D.C. 2022))). That may have been true for the Michigan program, but the Florida 404 Program, as approved by EPA, allows the Corps and Florida to cooperatively resolve issues involving whether particular projects are inside or outside of "retained waters," as noted above. This is entirely logical as the exercise of identifying "retained versus assumable waters" in theory is easier than in actual project-specific situations, which inherently involve line-drawing based on a close review of individual projects' location and impacts. In Florida's program, the Corps and Florida are working collaboratively to address the status of waters when needed. Wolfe Dec. ¶ 48. Certainly, EPA can and should reassess the list of retained waters at a program level where warranted, but nothing in the statute or regulations preclude the Corps and Florida from collaborating to ensure that lines are properly drawn with regard to classification of specific projects. Here, where a project sits on both sides of the administrative line demarcating the divide between retained and assumable waters, the default rule under the MOA is that the permit application is processed by the Corps of Engineers. CORPS004323.

Whether as a matter of ripeness or lack of final agency action, the Corps' list of retained waters is not properly subject to judicial review at this juncture. Plaintiffs are free to bring a

_____

here, is the EPA's 1984 decision allowing Michigan to assume permitting authority over Section 404 permits related to the Menominee River, and the statute of limitations period to challenge that action has long expired."). But that was in the context of an as-applied challenge to EPA's decision in 2018 to not object to a state 404 permit for a river that the plaintiff believed should have been classified as a retained water. There was also no discussion in that case as to whether the Michigan program defined the list of retained waters in the same manner (i.e., with a list of rivers, lakes, creeks, and streams along with a catch-all for any other water that meets the definition). The approach to retained waters lists has improved since 1984. Dkt. 99 at 59-62.

separate challenge later to a permit action involving a particular waterbody that they believe should be removed from the list. In fact, a plaintiff "may argue in state court that [the State] lacks permitting jurisdiction over [a specific] portion of [a] River under § 1344(g)(1)" and "a state court will need to decide it." *Id.* at 1075 (Hamilton, J., concurring) (noting that "Michigan courts have heard Clean Water Act challenges to state actions").

### 3. Plaintiffs' Claims Based on NMFS Species Are Unripe and Likely Moot (Claims 5, 11, and 12).

Plaintiffs assert several claims (Claims 5, 11, 12) related to the decision by EPA and/or NMFS to not engage in formal consultation. These claims are specific to listed marine or coastal species in Florida under NMFS jurisdiction.[36] For the same reasons explained above, claims related to adverse impacts to NMFS species are not ripe for review here.

Florida's 404 program is limited to "assumable waters," which includes *no coastal or marine waters*. NMFS species would be anticipated to occur in marine waters, coastal waters, or other areas subject to the ebb and flow of the tide, which would all be classified as "retained waters" for these purposes (and thus, subject to Corps Section 404 permitting, not Florida 404 permitting). To the extent a proposed Florida 404 permit may eventually affect NMFS species, the federal agencies (EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns at that time. Otherwise, such a decision would be subject to challenge at that time.

But again, a scenario where Florida approves a 404 permit that causes harm to marine or coastal species is unlikely to occur given the assignments of regulatory jurisdiction here among the federal and state agencies. Certainly, any such scenario would be highly species-specific,

---

[36] NMFS (also known as "NOAA Fisheries") currently has regulatory jurisdiction "over 163 endangered and threatened marine species (79 endangered; 84 threatened), including 65 foreign species (39 endangered; 26 threatened)." NMFS, *Species Directory*, available at https://www.fisheries.noaa.gov/species-directory/threatened-endangered.

JA.789

project-specific, and location-specific. All federal agencies have a duty under ESA Section 7(a)(1) to exercise their authorities to ensure conservation of species. Nothing about Florida's Section 404 program triggers new or unique impacts to NMFS species. Moreover, these NMFS-based claims are likely moot due to EPA's decision to initiate consultation with NMFS at this time. Dkt. 99 at 85; Wolfe Dec. ¶ 50.

## CONCLUSION

For the foregoing reasons, Florida Intervenors are entitled to summary judgment on all claims and Plaintiffs' motion for summary judgment should be denied. With regard to the litany of extra-record, post-hoc arguments asserted by Plaintiffs in the context of merits arguments, this Court should ignore them. The record before the Court strongly supports the validity of EPA's approval of Florida's Section 404 Program and the related Programmatic BiOp, as well as the actions by the Corps. Though Plaintiffs are not entitled to any relief, if this Court is inclined to find in favor of Plaintiffs with respect to any particular claim, Florida Intervenors concur with the Federal Defendants that the Parties should be afforded an opportunity to brief remedy separately.

Dated: May 10, 2023

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)

JA.790

(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

51

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May 2023, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, ET
AL.

                 Plaintiffs,

       v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, ET AL.

                Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**DECLARATION OF JUSTIN WOLFE**

1.     My name is Justin Wolfe. I declare under penalty of perjury under the laws of the United States of America and the State of Florida that the following statements are true and correct to the best of my knowledge and belief.

2.     I serve as General Counsel to the Florida Department of Environmental Protection ("FDEP"). FDEP is the state agency in Florida authorized by law to "control and prohibit pollution of air and water…." Fla. Stat. § 403.061.

3.     Pursuant to Section 20.255(c), Florida Statutes, as General Counsel, I am responsible for all legal matters of FDEP. I have held this position for approximately four years. Before serving as the General Counsel for FDEP, I served as the Deputy General Counsel for the Water, Air, and State Lands Section of FDEP's Office of General Counsel.

4.     I am authorized by the Office of the Governor of the State of Florida, the Office of Attorney General of the State of Florida, and the Secretary of the FDEP to provide this declaration to this Court.

1

5.      I am aware that a coalition of environmental organizations ("Plaintiffs") filed a Complaint in the U.S. District Court for the District of Columbia seeking, among other things, to invalidate and enjoin EPA's approval of Florida's Section 404 Program.

6.      I am aware that Plaintiffs submitted several sworn declarations in support of standing to bring their lawsuit. I am providing this declaration to provide sworn facts to this Court that I believe are relevant to evaluating whether Plaintiffs have standing, i.e., whether they are injured by EPA's approval of Florida's Section 404 Program or otherwise have standing for the claims brought in this case.

7.      Previously, I signed a declaration in support of FDEP's standing to intervene, which was filed in this proceeding on January 19, 2021 (Dkt. 4-2) and which I hereby re-affirm and incorporate by reference, subject to any additional information or clarifications provided herein.

8.      Some of the grounds for standing, as asserted by Plaintiffs in their most recent motion, relate to "statutory avenues to advocate for robust environmental protection" and "access to courts." These points were addressed, at least in part, in my prior declaration, as well as in the briefs filed by FDEP in this case.

***FDEP Implementation of the State 404 Program***

9.      FDEP has been working cooperatively with the U.S. Environmental Protection Agency (EPA), the U.S. Army Corps of Engineers (Corps), the U.S. Fish and Wildlife Service (FWS), and other federal, state, and local agencies on implementation of the Section 404 program in Florida.

10.     Since assumption of the Section 404 program in December 2020, FDEP has received over 7,700 applications. This includes applications for individual permits, coverage under

2

general permits or regional permits, requests for No Permit Required (NPR) determinations, and other Section 404 permit-related requests.

11.     Currently, over 1,780 permit applications are pending review and determination by FDEP.

12.     To date, FDEP has issued approximately 460 individual permits (including modifications) under the Section 404 program and has denied over 168 applications (including individual permits, regional and general permit requests, and NPR requests).

13.     Approximately 2,900 applications filed with the Florida 404 program have been withdrawn by permit applicants. In many instances, applications are withdrawn after FDEP staff submit requests for additional information or flag concerns with project proposals.

14.     Permit statistics are available via the FDEP's public database available at https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp (last visited May 10, 2023) (query based on "State 404 Program" with a permit application date range of December 2020 through May 2023).

15.     For the Court's reference, any member of the public can access this database and, from there and other FDEP online resources, link directly to permit files.

***Plaintiffs' Assertions of Standing/Injury from EPA's Approval of Florida's 404 Program***

16.     To support their standing, Plaintiffs' declarations cite several pending permit applications and suggest that Florida's processing of those applications cause injuries to Plaintiffs sufficient to support standing.

17.     In Enclosure A to this declaration, I have provided information (in a summary table format) showing the current status of review for each of the projects identified by Plaintiffs (in their declarations) which are pending review with FDEP. Additionally, Plaintiffs referenced

JA.795

several proposed projects for which a Section 404 application has not yet been submitted, so those projects are not listed in the table. Various other projects referenced in Plaintiffs' declarations have been withdrawn by the permit application (e.g., Nobles Grade/Burnett Oil; Tamiami Prospect; State Road 836, Port 1850), and are also not listed in the table.

18.     Via FDEP's website, Plaintiffs (and the general public) have access to readily-available, real-time information as well as a robust opportunity for involvement in the permit process. The Florida 404 Handbook fully describes the public notice and comment process for FDEP 404 permits. EPA-HQ-OW-2018-0640-0002-A-51 at 26-27.[1] The Handbook also describes the information that is developed as part of the permit review process, which includes: an analysis of project alternatives that would avoid impacts to wetlands; an analysis of environmental impacts (including cumulative and secondary effects, where appropriate); a review of impacts on state water quality; development of a technical staff report to document how the project addresses the requirements found in Rules 62-330.301, 62-330.302, and 62-331.053; written documentation on each application outlining the permitting decision and the rationale for the decision. All of this is made publicly available.

19.     Plaintiffs contend that obtaining information from FDEP related to 404 permit applications is difficult or costly. That is not the case. FDEP provides access to records in a much more user-friendly, cost-effective, and streamlined way than the Corps-led program.

20.     Florida provides *real-time access* to state permit records related to Section 404 permit applications via publicly accessible FDEP websites. Written communications to or from state officials (including permitting staff) regarding state business are available to the public.

---

[1] The currently applicable "404 Handbook" is available on the State of Florida administrative regulation website found at https://www.flrules.org/gateway/reference.asp?No=Ref-12064 (last visited May 10, 2023).

JA.796

Records and information are readily available at no cost via one of FDEP's online resources,[2] including:

      a.      <u>Florida's "Oculus" System</u>, which is a web-based electronic document management system providing real-time access to public records associated with FDEP permitted facilities and activities. Documents in Oculus are filed under a specific FDEP program and facility. The public can access this system and search for all records under the Florida 404 Program, ERP Program, and various other Florida environmental programs. *See* https://depedms.dep.state.fl.us/Oculus/servlet/search (last visited May 10, 2023).

      b.      <u>FDEP Information Portal</u>, which provides extensive information that is updated on a daily basis about projects, including permit application materials, public comments, agency correspondence, and all other associated records. *See* https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal (last visited May 10, 2023).

      c.      <u>FDEP Permitting Information Database</u>, which provides extensive information about permit status. *See* https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp (last visited May 10, 2023).

      d.      <u>FDEP ARCGIS Mapping Tool</u>, which is a digital geographic information system mapping tool where the public can easily access information on 404 permit applications (including those that have been withdrawn, remain pending, etc.) on a real-time basis (shown in yellow boxes in Figure 1). *See* https://fdep.maps.arcgis.com/apps/mapviewer/index.html?layers=ce4369c29c0c428f8316

---

[2] These databases provide more information on a real-time basis than is available from the Corps, which has an on-line permit database searching system available at https://permits.ops.usace.army.mil/orm-public# (last visited May 10, 2023).

<u>af480c19fe65</u> (last visited May 10, 2023). The mapping tool shows detailed information about (1) areas classified as "assumable waters" (FDEP 404 permitting) versus "retained waters" (Corps 404 permitting); and (2) provides site-specific information about pending permit applications.

Figure 1. Showing FDEP ARCGIS Mapping Too



21.    A member of the public can go to any project location (shown as yellow boxes in Figure 1) on the FDEP mapping tool, and from there access substantial information about the project, including a link to the permit application file (see the "View" hyperlink inside the red box

JA.798

in Figure 2). Or, if they prefer, they can simply use the search tool on the FDEP Information Portal, FDEP Permitting Information Database, or Oculus system and download relevant project documents that way.

Figure 2. Showing FDEP ARCGIS Mapping Tool, with Information Box.



22.     For example, by searching the FDEP Information Portal, FDEP Permitting Information Database, Oculus system, and/or FDEP ARCGIS Mapping Tool, Plaintiffs can access the permit file link for "Troyer Brothers Florida – Troyer Mine" (application # 0292013-008-SFI) referenced in Plaintiffs' standing declarations and brief. *See* Enclosure B for screenshots of how to search and identify publicly available information related to Troyer Mine from these four FDEP

JA.799

websites. This permit file information shows that the permit application has been "pending" for over 390 days while it undergoes review by FDEP. *Id.* It also shows that public notice and comment was opened in July 2022. *Id.* The permit file records provide extensive information, including thousands of pages of permit application records, environmental reports, correspondence between federal and state agencies, public notice information, requests for additional information, etc., and are all available for download online. *Id.* The summary table in Enclosure A also provides additional current information on this permit application.

23.     Likewise, information in the FDEP databases about the "Kingston Project" located in Lee County, Florida (cited in Plaintiffs' standing declarations) provide downloadable links to extensive materials, including thousands of pages of permit application records, environmental report, biological assessment, correspondence between federal and state agencies, public notice information, requests for additional information, and a host of other points of information.[3] This particular project, which is also referenced in Enclosure A, remains in "pending" status.

***Availability of Information Comparable to Corps-led Program (NEPA & ESA)***

24.     I have also been made aware that Plaintiffs allege that they are deprived of information under the Florida-led 404 program that they would otherwise receive by virtue of the Corps-led 404 program. I do not believe their concern is justified, because under the Florida-led program, the same or very similar kinds of information is made available to the public, and in many situations, much more information is provided and in a timelier way.

25.     All major categories of environmental information available to the public under the Corps-led 404 program are also available to the public in a comparable manner after Florida's

---

[3] *See* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_423130/gis-facility!search (last visited May 10, 2023).

JA.800

assumption of the Section 404 program. This includes the essential contents of a NEPA Environmental Impact Statement ("EIS") and/or Environmental Assessment ("EA"): purpose and need for a project, alternatives to the project, information about the affected environment, environmental impacts (including cumulative effects, secondary effects, etc.), mitigation measures, socioeconomic information, historic/cultural/tribal information, species and habitat information, coastal zone impacts, and a wide range of "public interest" information. Plaintiffs still have access to the environmental information that they had before.

26.     It is also important to bear in mind that the vast majority of Section 404 permits under the Corps-led program never trigger the requirement to prepare an EIS.

27.     Notably, based on a review of the nationwide searchable online database (Environmental Conservation Online System) maintained by FWS and NMFS that tracks Biological Opinions, relatively few Section 404 permits issued in Florida actually trigger a requirement for a Biological Opinion.[4] A search of the database identified 138 Biological Opinions prepared for Corps permits/projects in Florida from 2009 to the present. *See* list attached as Enclosure C. (It appears that the database does not yet contain Corps' Biological Opinions issued in 2022 or 2023.)  A review of the list shows that many of the projects (if proposed today) clearly would have involved retained waters and thus would have remained under the Corps' permitting authority (e.g., 28 beach/shoreline renourishment or restoration projects and 3 dredging projects in major rivers or coastal areas). Various other projects on the list appear to be federal projects that would otherwise trigger a Biological Opinion requirement irrespective of state 404 assumption. Thus, conservatively, it is likely that less than 100 Corps permits/projects from 2009 to the present

---

[4] *See* https://ecos.fws.gov/ecp/report/adhocDocumentation?catalogId=species&reportId=bo (last visited May 10, 2023).

(in what would now be assumable waters in Florida) required preparation of a Biological Opinion.[5] During this same timeframe, the Jacksonville District of the Corps made 8,690 individual 404 permit decisions according to the Corps' publicly available permit database.[6] Thus, less than 1.6% of the individual permit applications submitted to the Corps triggered a need for a Biological Opinion at all from 2009 to the present.[7] As these figures suggest, permit applicants often go to great lengths to avoid adverse effects to listed species and designated critical habitat, thereby avoiding the need for formal consultation. This reality further calls into question Plaintiffs' allegations that they are harmed by a loss of environmental information from the purported lack of biological opinions for projects of concern. Moreover, the FWS database only provides basic information about the biological opinions and not actual copies of the analyses, which must be obtained elsewhere (e.g., through FOIA).

28.    As shown in Enclosure D, which is a side-by-side comparison of environmental information available via the Corps-led 404 program versus the Florida-led program, Plaintiffs can

---

5 According to a decade-old GAO report, in fiscal year 2008, a total of 278 actions by the Corps (for all Corps activities, not just limited to the smaller set of 404 permits) triggered formal ESA consultation *across 11 Western States* (Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming). *See* https://www.gao.gov/assets/gao-09-550.pdf at 6, 14 (last visited May 10, 2023).Though a limited data set, this would support the view that, in any given year, only a small handful of Section 404 permits in any given state would trigger a need for a biological opinion.

6 *See* the Corps' database for permit actions, available at https://permits.ops.usace.army.mil/orm-public (last visited May 10, 2023).

7 To support this estimate, I identified the number of individual permit decisions made by Jacksonville District (8,690 total including issuing 8,603 permits and denying 86 permits) between 2009 to the present in the Corps' database. I then calculated the percentage of total individual permit applications that could have received biological opinions by dividing the number of biological opinions issued according to the FWS and NMFS database (138) by the number individual permit applications (8,690) acted upon by the Corps according to its database for the time period 2009 to the present.

still obtain essentially all of the same kinds of information, and in many cases, get that information more quickly and easily. This comparison was previously submitted to this Court. Dkt. 72-1.

29.    Plaintiffs also say that they lack access to information about the "technical assistance process." This, too, is incorrect. First, Plaintiffs are comprised of some of the most sophisticated environmental non-profits in Florida and routinely engage with FDEP to obtain information. In addition, the FDEP meets with Plaintiffs' organizations to hear their concerns and discuss solutions. Moreover, Plaintiffs know that, to obtain any public record in Florida, they merely need to ask for it and Florida law provides them with a constitutional right to the information. FDEP staff respond promptly to such requests wherever possible, but most information is, as already noted, publicly available via online FDEP databases. The records related to the Kingston Project, noted above, provide a useful example.

30.    Another useful example is the FFD project (FDEP Permit Application No. 0291030-004-SFI), which was referenced in Plaintiffs' standing declarations to support their purported injuries from the loss of environmental information especially related to species impacts. The FDEP online database contains extensive information about the FFD project (permit file), including an applicant-prepared Biological Assessment (with over 1,100 pages of documentation), as well as an environmental site assessment of more than 200 pages (completed at the request of FWS). FWS and FWC are reviewing and evaluating this information. The permit application remains pending. Additional information about the application is shown in Enclosure A. Though these projects are in the middle of the permit process and have ongoing engagement between FDEP, FWS, FWC, and other agencies and stakeholders, they do illustrate how Florida's 404 program makes significant information available to the public on a real-time basis, including the same kinds of information that Plaintiffs incorrectly claim they do not receive.

11

JA.803

*EPA Oversight*

31.     EPA is actively overseeing Florida's 404 Program. As noted above, FDEP has issued 460 individual permits and permit modifications so far. EPA has objected to 39 permits to date (or around 8.5% of permits issued). Of these 39, EPA was not satisfied with FDEP's response to EPA's concerns for three permits (less than 1% of permits issued) and, thus, EPA federalized those three permit applications (i.e., transferred the applications to the Corps of Engineers for processing under the federal-led program). While FDEP disagreed with EPA in those circumstances, FDEP abided by EPA's decision. FDEP believes these numbers are an excellent illustration of FDEP and EPA's cooperative work in resolving EPA's concerns regarding Florida's implementation of its 404 Program.

*Enforcement*

32.     FDEP takes its responsibility to enforce environmental laws seriously.

33.     Florida law authorizes enforcement of the State 404 Program in the same manner and to the same extent as provided in other relevant parts of Florida's environmental laws. Florida has administrative, civil, and criminal enforcement authorities comparable to federal enforcement.

34.     Enforcement of the State 404 Program is implemented through FDEP's six regulatory district offices distributed across the state as shown in Figure 3, below, with the Office of General Counsel or the Office of the State Attorney providing legal support depending on the type of enforcement initiated.

12

JA.804

Figure 3: FDEP Regional Offices[8]



35.     FDEP is authorized to restrain unauthorized activity (§§ 373.129(1) and 373.430(1)); to enjoin and abate violations of statutes, rules, and orders adopted pursuant to Chapter 373 (§ 373.129(2)); and to recover civil penalties up to $15,000 per violation (§ 373.129(5)).

36.     FDEP is also authorized to seek criminal remedies against someone who: with reckless indifference or gross careless disregard (criminal negligence) discharges dredged or fill

---

[8] Source: https://floridadep.gov/districts (last visited May 10, 2023).

material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(4)); willfully discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(5)); or knowingly makes false statements, representation or certification in any application, record, report, plan, or other document filed or required to be maintained part IV, Chapter 373, or falsifies tampers with or knowingly renders inaccurate any monitoring device or method required to be maintained under the permit in an amount of $10,000. (§ 373.430(1)(c) & (5)).

37.     FDEP has a Division of Law Enforcement, which consists of the Environmental Crimes Unit and the Office of Emergency Response. This division is responsible for enforcing environmental laws and responding to incidents where environmental impacts are reported or discovered. The Environmental Crimes Unit ensures compliance with environmental laws through inspections and enforcement. The unit works in conjunction with the Office of Emergency Response, which provides technical and on-site assistance to ensure threats to the environment and human safety are quickly and effectively addressed.

38.     Division staff respond to incidents involving petroleum spills caused by vehicle accidents to chemical plant explosions to coastal oil spills. In addition, the division works with local public safety officials and emergency response contractors to minimize threats to the environment.

39.     FDEP and Florida Water Management District staff have conducted 280 compliance inspections of State 404 permit sites since assuming the program. More than 179 warning letters and 2 notices of violations have been issued, and 37 matters have been referred to FDEP's Office of General Counsel for review for possible further enforcement. A total of 19 consent orders (resolving violations) have been executed.

40.     FDEP has a comprehensive "Enforcement Manual," updated regularly, which guides the enforcement work of the agency's staff. This manual and a variety of other materials related to FDEP enforcement is available at https://floridadep.gov/ogc/ogc/content/enforcement-manual (last visited May 10, 2023) The manual includes chapters covering enforcement organization, compliance options, enforcement options, inspections and investigations, administrative process and remedies, judicial process and remedies, litigation procedures, and data management.

***No Permit Required Letters***

41.     Plaintiffs have expressed concerns in their standing declaration about No Permit Required ("NPR") letters. Notably, at EPA's request, FDEP has been providing EPA with copies of specific NPR determinations issued by FDEP under the Section 404 program.

42.     Florida's NPRs are entirely voluntary and non-binding and provided only as a courtesy. And while FDEP believes NPRs provide valuable assistance to the regulated community and help to promote overall compliance with the law, a property owner in Florida with an NPR issued by FDEP still proceeds at their own risk. If projects occur in "waters of the United States," they remain subject to Section 404 purview and possible enforcement by FDEP or EPA, or both.

43.     An NPR is not a determination of waters of the United States, or a tool to establish jurisdiction. An applicant may apply for a State 404 "No Permit Required" verification when the activity has avoided all impacts to wetland or surface waters delineated using 62-340, F.A.C., or when the activity has been designed to only impact wetlands or surface waters that are excluded from jurisdiction as waters of the United States.

44.     Importantly, from the start of Florida's program, NPRs have been available to EPA for review upon request. NPRs can also be identified using the search tools available on the Oculus and FDEP Permitting Information publicly-accessible databases.

45.     In its oversight capacity, EPA has been requesting copies of NPRs and FDEP has been providing NPRs to EPA, as requested. To the extent EPA has questions or concerns about a particular NPR determination, FDEP has encouraged EPA to raise those issues to our attention for further discussion and resolution.

***Retained Waters List***

46.     Plaintiffs claim injury from the alleged failure by the Corps to provide a complete and perfect list of "retained waters." It is hard to fathom how Plaintiffs are injured by the issuance of this list, as it expressly identifies those waters that the Corps has determined to be "retained waters" for purposes of Section 404(g) of the Clean Water Act, while also expressly stating that the list also includes all other waters that meet the definition of non-assumable waters under 404(g).

47.     According to FDEP's sister agency, the Florida Fish and Wildlife Conservation Commission, there are more than "7,500 lakes, ponds and reservoirs" in Florida, along with "approximately 12,000 miles of fishable rivers, streams and canals."[9]

48.     As reflected in the Memorandum of Agreement (MOA) between Florida and the Corps (AR-00019), the retained waters list will be updated on an as-needed basis.  Part II.A of the MOA explains that the "Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List…, as well as all waters subject

---

[9] https://myfwc.com/fishing/freshwater/sites-forecasts/lakes-and-rivers/#:~:text=Florida%27s%20freshwater%20fisheries%20comprise%20more,canals%E2%80%94with%20no%20closed%20seasons (last visited May 10, 2023).

JA.808

to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary." As stated in the MOA, the Corps provided Retained Waters GIS layers to FDEP, and those GIS layers are to be updated "as necessary, in accordance with II.C. and III.B" of the MOA, which allows for modifications to the list in a variety of circumstances. For example, in the first year of assumption, FDEP has asked the Corps to evaluate certain coastal areas to determine whether they should be considered tidal and shown on the Retained Waters List GIS Layer. An area of canals in Cape Coral was recently added to the GIS layer because they were found to be tidally influenced in accordance with the Section III.B of the MOA.

49.    FDEP staff do not rely solely on the list of retained waters to determine whether a particular permit application should be handled by FDEP or the Corps. FDEP staff look at site-specific data for each project. If information shows that the project may result in discharges to non-assumable waters, i.e., waterbodies that are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce...," and "all waters subject to the ebb and flow of the tide shoreward to their high water mark that are not specifically listed …, including wetlands adjacent thereto landward to the administrative boundary," FDEP will raise that issue with the Corps Jacksonville District.

*NMFS Review*

50.    FDEP has been informed that EPA continues to prepare a Biological Evaluation (BE) regarding EPA's approval of FDEP's CWA 404 program in coordination with the National Marine Fisheries Service (NMFS). EPA has communicated with FDEP throughout this process. It is our understanding that EPA plans to complete and issue the BE for NMFS species in the near future. FDEP is actively supporting efforts by EPA and NMFS to complete consultation

JA.809

Executed on the 10th day of May, 2023.

_____

Justin Wolfe
General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd M.S. 35
Tallahassee, FL 32399

18

JA.810

# ENCLOSURE A

## CURRENT STATUS OF 404 PERMIT APPLICATIONS

## CITED IN PLAINTIFFS' STANDING DECLARATIONS

*Status of FDEP 404 Permit Applications Referenced in Plaintiffs' Standing Declarations*

| Project Name | FDEP Permit Application Nos. | Plaintiffs' Declaration | Status of Permit / Appeal |
|---|---|---|---|
| Troyer Mine | 0292013-007 0292013-008 | Crooks ¶ 45-54 | This permit application remains pending and under review. Permit application originally filed with FDEP but then withdrawn by the applicant and resubmitted. Public notice period provided (Plaintiffs submitted comments). FDEP has requested additional information from the applicant. The FDEP online database provides extensive information (permit file), including significant engagement and information exchange with other agencies and stakeholders. Permit file contains information concerning biological issues related to species and habitat. Process is ongoing. |
| Rural Lands West | 0396966-001 | Crooks ¶ 55-64 | This permit application is early in the review process. FDEP has engaged with FWS and FWC concerning potential species impacts. FDEP has been informed that "FWC and USFWS are currently evaluating the Rural Lands West project and additional information from the applicant may be required to determine whether, and to what extent, the proposed activities will adversely impact listed species or designated critical habitats." The FDEP online database provides extensive information (permit file). Process is ongoing. |
| Bellmar Community Development | 396364-001 | Crooks ¶ 65-74 Hartl Dec. ¶34-37 Umpierre Dec. ¶16 | This permit application remains pending and under review. FDEP has engaged with FWS and FWC concerning potential species impacts. FWS has been engaged in review of this project. The FDEP online database provides extensive information (permit file). Public notice period provided (Plaintiffs submitted comments). FDEP has requested additional information from applicant. |

A-1

*Status of FDEP 404 Permit Applications Referenced in Plaintiffs' Standing Declarations*

| Project Name | FDEP Permit Application Nos. | Plaintiffs' Declaration | Status of Permit / Appeal |
|---|---|---|---|
| Immokalee Road Rural Village | 396348-001 | Crooks ¶ 75-81 Schwartz Dec. ¶48 | This permit application is pending and under review. Permit file shows that FWS is engaged on this project and has stated that it intends to recommend "Conservation Measures similar to what was included" in a habitat conservation plan for another project, including "identifying areas of habitat that can be conserved or managed to promote high quality habitat, facilitating the installation of wildlife crossings in high priority areas, providing funds to assist these efforts into the future," etc. FDEP online database provides extensive information about this permit application. (permit file). Plaintiffs have submitted comments. Public comment period will be provided. |
| Old Corkscrew Plantation Mine (Kingston) | 0423130-001 | Crooks ¶ 82-83 | This permit is under review by FDEP. Extensive documentation is available to the public in the permit file (including an applicant-prepared Biological Assessment with over 500 pages of documentation), an environmental supplement report (with over 620 pages of documentation), and various other applicant and agency records. FDEP has issued several Requests for Additional Information (most recent request dated March 13, 2023). FWC and USFWS are currently evaluating this project and additional information from the applicant may be required to determine whether, and to what extent, the proposed activities will adversely impact listed species or designated critical habitats. After the review is completed and additional information is required, FWC will send another RAI request. If no additional information is needed, FWC will notify DEP. FWC has communicated with FWS and FDEP that, based on its initial review, the applicant's Biological Assessment may be incomplete and that additional information is needed to complete the review for species impacts. Public comment process with public meeting(s) will be provided if FDEP proposes issuance of a Section 404 permit for this project. |

**Status of FDEP 404 Permit Applications Referenced in Plaintiffs' Standing Declarations**

| Project Name | FDEP Permit Application Nos. | Plaintiffs' Declaration | Status of Permit / Appeal |
|---|---|---|---|
| Hogan West (Brightshore) | 0405559-001-NPR<br><br>0405559-002-SFI | Crooks ¶ 84(a) | This permit application remains under review. FDEP has requested additional information. FWC has stated that it is "coordinating with the USFWS and developing the affected species list and anticipated effect determination statements for the Public Notice." FDEP online database contains extensive information about the project, including environmental report with discussion of impacts to species and habitat, among other things (permit file). Public notice period will be provided. Plaintiffs have provided comments and information |
| FFD (Orchid) | 0291030-004-SFI | Crooks ¶ 84(b) | This permit application remains under review. FDEP has requested additional information. FDEP online database contains extensive information about the project (permit file). Permit file contains applicant-prepared Biological Assessment (with over 1,100 pages of documentation), as well as an environmental site assessment of more than 200 pages (completed at the request of FWS). FWS and FWC are engaged in reviewing and evaluating. Permit application remains pending. Public comment process to be provided. |

*Note: Plaintiffs referenced several proposed projects in their standing declarations for which a Section 404 application has not yet been submitted (e.g., Wilson-Benfield Road, Eden Oak Development). Various other projects referenced in Plaintiffs' declarations have been withdrawn by the permit application (e.g., Nobles Grade/Burnett Oil; Tamiami Prospect; State Road 836, Port 1850). Plaintiffs also referenced the CPN West LLC project, a commercial development that met the requirements for a No Permit Required letter (FDEP file).

# ENCLOSURE B

## EXAMPLES OF FLORIDA'S PUBLICLY AVAILABLE

## SECTION 404 PERMIT INFORMATION

## (TROYMER MINE PROJECT EXAMPLE)

**1. Florida's "Oculus" System Screenshots:**

https://depedms.dep.state.fl.us/Oculus/servlet/search (last visited May 10, 2023)

OCULUS
Search
Actions
Tools
Help
Logout
Search
Catalog
SCO - Siting Coordination Office
Solid Waste
State 404 Programs
State Revolving Fund
Storage Tanks
Underground Injection Control
Search By
Property
Property
Document Subject
Document Type
Facility-Site ID
Facility Type
FLAIR Contract Number
Inspection Type
Sort By
Facility-Site ID
Type
Any
Creator
Folder Name
Created
MM-DD-YYYY
To
MM-DD-YYYY
Search
Clear
Facility-Site ID
=
ST404_292013
TROYER BROTHERS FLORIDA - TROYER MINE
Search
Clear

https://depedms.dep.state.fl.us/Oculus/servlet/hitlist?action=sort (last visited May 10, 2023)

OCULUS
Search
Actions
Tools
Help
Logout
netuser
Search Results
Catalog
106 documents in 1 catalog
State 404 Programs (106)
Results/Page 55
Refresh
Operations View
Export to Excel
Printable Hitlist
Send Search Results
Showing Results 1 to 55
Page(s) 1 2 Next

| File Type | Profile | Facility-Site ID | Document Date | Received Date | Document Type | Inspection Type | Permit Type | Facility Type | 404 Review Office | Application Num |
|---|---|---|---|---|---|---|---|---|---|---|
| | Permitting_Authorization | ST404_292013 | 10-18-2022 | 10-18-2022 | OUTGOING CORRESPONDENCE | | WATER STATE 404 INDIVIDUAL PER | ST404 | | 0166176034 |
| | Permitting_Authorization | ST404_292013 | 10-17-2022 | 10-17-2022 | OUTGOING CORRESPONDENCE | | WATER STATE 404 INDIVIDUAL PER | ST404 | | 0166176034 |
| | Permitting_Authorization | ST404_292013 | 10-17-2022 | 10-17-2022 | OUTGOING CORRESPONDENCE | | WATER STATE 404 INDIVIDUAL PER | ST404 | | 0166176034 |
| | Permitting_Authorization | ST404_292013 | 09-06-2022 | 09-06-2022 | REVIEW COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-19-2022 | 08-19-2022 | REQUEST FOR ADDITIONAL INFORMA | | WATER STATE 404 INDIVIDUAL PER | ST404 | | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-11-2022 | 08-11-2022 | OUTGOING CORRESPONDENCE | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-06-2022 | 08-06-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-05-2022 | 08-05-2022 | PUBLIC INTEREST RELATED | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-05-2022 | 08-05-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-04-2022 | 08-04-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-02-2022 | 08-02-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-02-2022 | 08-02-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-02-2022 | 08-02-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-02-2022 | 08-02-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-02-2022 | 08-02-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 08-02-2022 | 08-02-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 07-26-2022 | 07-26-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 07-26-2022 | 07-26-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 07-22-2022 | 07-22-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 07-22-2022 | 07-22-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |
| | Permitting_Authorization | ST404_292013 | 07-13-2022 | 07-13-2022 | PUBLIC COMMENTS | | WATER STATE 404 INDIVIDUAL PER | ST404 | TAL | 0292013008 |

2.    **FDEP Information Portal Screenshots:**

https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal (last visited May 10, 2023)



https://prodenv.dep.state.fl.us/DepNexus/public/facilitysearch (last visited May 10, 2023)

INFORMATION PORTAL

Nexus
Enterprise Solutions

Search Home » Facilities Search Results

## Facilities Search Results

**Criteria selected:**
Facility Name = troyer mine
Searching For = Search all facilities

**For additional information, select the hyperlinks under "Data Links" where available.**
D - Provides a list of electronic documents associated with the facility.
F - Provides a facility summary report.
P - Provides facility-related permit information.
M - Provides a GIS map focused on the facility.
Q - Provides a contact for user questions and quality control.

Records on this page = 4 of 4
**Your search returned these facilities:**

| Facility/Site Id | Facility Name | District | County | Address | City | Program | Facility Type | Data Links |
|---|---|---|---|---|---|---|---|---|
| ST404_292013 | TROYER BROTHERS FLORIDA - TROYER MINE | SD | LEE | 12700 TROYER BROTHERS ROAD | FT. MYERS | ST404 | ST404_PA | D F P M Q |
| MMR_292013 | TROYER BROTHERS FLORIDA - TROYER MINE | SD | LEE | 12700 TROYER BROTHERS ROAD | FT. MYERS | MMR | MMR | D Q |
| FLA678872 | TROYER MINE | SD | LEE | 14700 Troyer Brothers Rd | FORT MYERS | WW | WW | D F P Q |
| ERP_292013 | TROYER BROTHERS FLORIDA - TROYER MINE | SD | LEE | 12700 TROYER BROTHERS ROAD | FT. MYERS | ERP | ERP_PA | D F P M Q |

**Disclaimer:** The Florida Department of Environmental Protection (FDEP) has made a reasonable effort to ensure that the information provided is up-to-date and comprehensive but cannot guarantee the accuracy or completeness of the data. Any specific, missing information may be obtained through a public records request. For more information visit our Public Records web site.



Click on "D" hyperlink from redbox *supra*
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_292013/facility!search (last visited May 10, 2023)

INFORMATION PORTAL

Nexus
Enterprise Solutions

**Criteria selected:**
Facility ID = ST404_292013
**Facility Details:**
Program = ST404
Facility Name = TROYER BROTHERS FLORIDA - TROYER MINE
Address = 12700 TROYER BROTHERS ROAD
City = FT. MYERS
District/County = SD / LEE

Records on this page = 50 of 106

**Your search returned these documents available online from DEP's unrestricted EDMS catalogs:**
Click on the **View** link below to open a specific document.

Export CSV Data

1 2 3

| Document Date | Document Type | Document Subject | Permit / Application Number | File Type and Size | View |
|---|---|---|---|---|---|
| 10-18-2022 | OUTGOING CORRESPONDENCE | REVISED ERP SHEET NO. 7 WITH NEW SITE HOURS BASED ON FWS REQUEST / SUGGESTION | / | .pdf - 1021.8 KB | ► |
| 10-17-2022 | OUTGOING CORRESPONDENCE | CORRESPONDENCE TO FWS .ZIP FILE - DOCUMENT SHARING | / | .zip - 64.2 MB | ► |
| 10-17-2022 | OUTGOING CORRESPONDENCE | CORRESPONDENCE TO FWS - DOCUMENT SHARING | / | .msg - 531.0 KB | ► |
| 09-06-2022 | REVIEW COMMENTS | DHR REVIEW COMMENTS | / | .msg - 481.5 KB | ► |
| 08-19-2022 | REQUEST FOR ADDITIONAL INFORMATION | APPLICANT RESPONSE TO PUBLIC COMMENTS | / | .msg - 1.1 MB | ► |
| 08-11-2022 | OUTGOING CORRESPONDENCE | FDEP EMAIL TO FWC REGARDING PUBLIC COMMENTS | / | .msg - 96.5 KB | ► |
| 08-06-2022 | PUBLIC COMMENTS | PAULA J. HALUPA COMMENTS - EMAIL, RECEIVED AUG 6, 2022 | / | .msg - 363.0 KB | ► |
| 08-05-2022 | PUBLIC INTEREST RELATED | MEMO TO THE FILE - PUBLIC COMMENTS RECEIVED UNDER APPLICATION NO. ST404_292013-007-SFI | / | .pdf - 197.4 KB | ► |
| 08-05-2022 | PUBLIC COMMENTS | EPA - NO FURTHER COMMENTS - PUBLIC NOTICE RESPONSE - REQUESTED DRAFT DEP / FWS PERMIT CONDITION LANGUAGE | / | .msg - 225.0 KB | ► |

**Note: This portal page contains 106 records (only a small portion of the list is shown above).*

### 3.     FDEP Permitting Information Database Screenshots

https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp (last visited May 10, 2023)



https://fldep.dep.state.fl.us/parep/pa_rep_pa_data.asp?report_name=QUERY+PA+DATA&Dist_County=DISTRICT&program1=ST404&i_program_type=%27ST404%27&i_permit_type=&USERNAME=&project_name=troyer&site_name=&site_id=&appl_name=&agent_name=&where_search=DISTRICT&area=ALL&rec_month1=01&rec_year1=2020&rec_month2=05&rec_year2=2023&agency_action=&month1=01&year1=2020&month2=05&year2=2023&status=OPEN&open_period=&rai_count=&project_site_name=1&SORT1=b.program_abbrev&SORT2=office_abbrev&SORT3=permit_type_abbrev&SORT4=permit_subtype_abbrev&SORT5=b.receive_date&Choice=HTML&SUBMIT1=Submit+Query (last visited May 8, 2023)

Permitting Information

Destination | Topics | Search | Main Contacts |

DEPARTMENT OF ENVIRONMENTAL PROTECTION

Executive Reports | District Reports | Summary & Pending Reports | Errors | Help |

**Permitting Application Data**
**Query Results:**

Report Date: **May 8, 2023**
Application Received: **01/2020 - 05/2023**
Agency Action Date: **01/2020 - 05/2023**
Permit Count: **1**
Select Application# for Project and Event Details

| # | Program | Office | County | Application # | Site Name | Project Name | Permit Type / Subtype | Received | Application Action | Agency Action | Agency Action Date | Time In House | RAI Count | Applicant | Applicant Company | Agent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ST404 | TLMN | LEE | 0292013-008-SFI | TROYER BROTHERS FLORIDA - TROYER MINE | TROYER 404 PERMIT MOD | SFI 33 | 4/1/2022 | NEW | Pending, | | 402 | 1 | AARON TROYER, | TROYER BROTHERS FLORIDA, INC., | , |

**Query Permitting Data Criteria:**

**Program:** ST404
**Location:** ALL
**Permit Type:** ALL
**Permit SubType:** ALL
**Processor Name:** NONE
**Project Name:** troyer
**Applicant Name:** NONE
**Application Received:** 01/2020 - 05/2023
**Agency Action Date:** 01/2020 - 05/2023
**Agency Action:** ALL
**Current Status:** OPEN
**Application Age:**
**RAI Count:**



Click on "Application #" hyperlink from redbox *supra*
https://fldep.dep.state.fl.us/parep/rep_detail/master_detail.asp?bis_id=660466
(last visited May 8, 2023)



Permitting
Information

Executive Reports | District Reports | Summary & Pending Reports | Errors | Help |

**May 8, 2023**

**Application Number:** 0292013-008-SFI
**Project Name:** TROYER 404 PERMIT MOD

| | Application/Permit Details |
|---|---|
| Processing Office: | TLMN - MINING AND MINERALS REGULATION |
| County: | LEE |
| Permit Type/Subtype: | SFI - 33 |
| Application Action: | NEW |
| Site/Facility: | TROYER BROTHERS FLORIDA - TROYER MINE |
| Received Date: | 4/1/2022 |
| Logged in by: | SHELY_Z |
| Time in House: | 402 days |
| Number of Requests for Additional Information (RFI): | 1 |
| Processor: | SHELY_Z |
| Complete Date: | 7/1/2022 |
| Agency Action: | Pending |
| Agency Action Date: | |
| Remaining Days: | -278 |
| Applicant Name: | AARON TROYER |
| Applicant Company: | TROYER BROTHERS FLORIDA, INC. |
| Comments: | No comments |

Events Scheduled: Database View

| Event | Begin Date | Prd | Status | End Date | Date Event Posted | Posted by |
|---|---|---|---|---|---|---|
| Receive Request | 4/1/2022 | 1 | Done | 4/1/2022 | 4/1/2022 9:16:32 AM | SHELY_Z |
| Completeness Review | 4/1/2022 | 30 | Incomplete | 4/29/2022 | 4/29/2022 11:37:59 AM | SHELY_Z |
| RESET CLOCK | 4/29/2022 | 1 | Done | 4/29/2022 | 4/29/2022 11:38:00 AM | SHELY_Z |
| Awaiting Additional Information | 4/29/2022 | 90 | Received | 6/3/2022 | 6/10/2022 1:22:36 PM | SHELY_Z |
| Completeness Review | 6/3/2022 | 30 | Administratively Complete | 7/1/2022 | 7/1/2022 9:42:34 AM | SHELY_Z |
| Publish Public Notice | 7/1/2022 | 10 | Done | 7/8/2022 | 7/18/2022 9:55:02 AM | SHELY_Z |
| 30 Day Commenting | 7/8/2022 | 30 | Pending | | 7/18/2022 9:55:03 AM | SHELY_Z |

Data is normally current as of previous business day.

B-7

JA.822

**4.       FDEP ARCGIS Mapping Tool Screenshots**

https://fdep.maps.arcgis.com/apps/mapviewer/index.html?layers=ce4369c29c0c428f8316af480c
19fe65 (last visited May 10, 2023)





Zoom to
1 of 2
State 404 Program Permits: 611095
ACT_DATE February 28, 2022
ADDRESS 12700 TROYER BROTHERS ROAD
AGENCY_ACT Withdrawn
APP_NAME AARON TROYER
APP_NO 0292013 007 SFI
CITY FT. MYERS
COE_NUMBER
COMP_DATE October 12, 2021
COMPANY TROYER BROTHERS FLORIDA, INC.
COUNTY_ID 36
DATUM WGS84
DISTRICT HEADQUARTERS
DOCUMENTS View
EXPIR_DATE
LAT_DD 26
LAT_MM 31
LAT_SS 13
Denaud
Lehigh Acres
Imperial Marsh Preserve
San Carlos Park
Larry Kiker Preserve
CREW
Immokalee Rd
Tice
Alva Scrub Preserve
Esri, NASA, NGA, USGS | University of South Florida, County of Collier, County of Lee, FL, FDEP, Esri, HERE, Garmin, SafeGraph, METI/NASA, USGS, EPA, NPS, USDA | FDEP, W
Powered by Esri

Click on "View" hyperlink in redbox *supra*
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_292013/gis-facility!search (last visited May 10, 2023)

INFORMATION PORTAL
Nexus
Enterprise Solutions

## DEP Facility/Site Details and Associated Documents

**Facility/Site Details**

Facility/Site ID = ST404_292013
Facility/Site Name = TROYER BROTHERS FLORIDA - TROYER MINE
Address = 12700 TROYER BROTHERS ROAD
City = FT. MYERS
County = LEE
District = SD

For more information regarding this facility, navigate to the following DEP webpage and identify your district contact: http://www.dep.state.fl.us/secretary/dist/

Records on this page = 50 of 106

**Your search returned these documents available online from DEP's unrestricted EDMS catalogs:**
Click on the **View** link below to open a specific document.

Export CSV Data

1 2 3

| Document Date | Document Type and Subject | File Type and Size | View |
|---|---|---|---|
| 10/18/2022 | OUTGOING CORRESPONDENCE REVISED ERP SHEET NO. 7 WITH NEW SITE HOURS BASED ON FWS REQUEST / SUGGESTION | .pdf - 1021.8 KB | ▸ |
| 10/17/2022 | OUTGOING CORRESPONDENCE CORRESPONDENCE TO FWS .ZIP FILE - DOCUMENT SHARING | .zip - 64.2 MB | ▸ |
| 10/17/2022 | OUTGOING CORRESPONDENCE CORRESPONDENCE TO FWS - DOCUMENT SHARING | .msg - 531.0 KB | ▸ |
| 09/06/2022 | REVIEW COMMENTS DHR REVIEW COMMENTS | .msg - 481.5 KB | ▸ |
| 08/19/2022 | REQUEST FOR ADDITIONAL INFORMATION APPLICANT RESPONSE TO PUBLIC COMMENTS | .msg - 1.1 MB | ▸ |
| 08/11/2022 | OUTGOING CORRESPONDENCE FDEP EMAIL TO FWC REGARDING PUBLIC COMMENTS | .msg - 96.5 KB | ▸ |
| 08/06/2022 | PUBLIC COMMENTS PAULA J. HALUPA COMMENTS - EMAIL, RECEIVED AUG 6, 2022 | .msg - 363.0 KB | ▸ |

**Note: This portal page contains 106 records (only a small portion of the list is shown above).*

# ENCLOSURE C

## FWS AND NMFS

## ENVIRONMENTAL CONSERVATION

## ONLINE SYSTEM

## BIOLOGICAL OPINIONS FOR CORPS OF ENGINEERS'

## FLORIDA PROJECTS

## (2009-Present)

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2016-F-0170 | 5/30/2019 | Boardwalk Construction, Texas Holdem LLC, SAJ-2015-02626 | Lee (FL) | ** OTHER ** |
| 04EF2000-2016-F-0168 | 12/19/2018 | Town of Palm Beach Reach 8 and 9 Sand Placement | Palm Beach (FL) | ** OTHER ** |
| 04EF2000-2016-F-0169 | 5/4/2018 | Town of Palm Beach County Sand Placement & Groin Construction | Palm Beach (FL) | ** OTHER ** |
| 41420-2006-F-0472-R001 | 5/24/2019 | Chapel Creek, SAJ-2006-3929 (NW-MAE) | Lee (FL) | DEVELOPMENT |
| 04EF2000-2017-F-0204 | 2/11/2019 | Sonoma Preserve | DeSoto (FL) | DEVELOPMENT |
| 04EF2000-2017-F-0116 | 8/14/2018 | Palm Beach Park of Commerce - Surf Ranch | Palm Beach (FL) | DEVELOPMENT |
| 41420-2006-F-0899-R001 | 4/2/2018 | Pelican Landing, Bay Wings Mixed-use Residential Development | Lee (FL) | DEVELOPMENT |
| 04EF2000-2017-F-0403 | 2/23/2018 | RAVINIA SAJ-2005-09762 | St. Lucie (FL) | DEVELOPMENT |
| 04EF2000-2019-F-0599 | 2/12/2020 | SAJ-1996-01274 Paradise Isles | Lee (FL) | Development - Commercial |
| 04EF2000-2019-F-1011 | 1/28/2020 | Fort Myers Contact Center SAJ-2013-2704 | Lee (FL) | Development - Commercial |
| 04EF2000-2017-F-0675 | 2/15/2019 | Stor-Rite RV Facility Expansion | Lee (FL) | Development - Commercial |
| 04EF2000-2018-F-0080 | 2/15/2019 | Buc-ee's LTD MLK-75 Development | Lee (FL) | Development - Commercial |
| 04EF2000-2018-F-0298 | 1/30/2019 | Smyrna Ready Mix East Trail Plant | Collier (FL) | Development - Commercial |
| 04EF2000-2017-F-0183 | 5/9/2018 | LT Ranch | Sarasota (FL) | Development - Commercial |
| 04EF1000-2017-F-0229 | 8/28/2017 | Cross Creek Fill - Clay | Clay (FL) | Development - Commercial |
| 04EF1000-2016-F-0025 | 11/4/2015 | Walt Disney World Resort Long Term Permit II | Orange (FL) | Development - Commercial |
| 04EF2000-2017-F-0004 | 7/30/2019 | Tuckers Grade - Crimson Tamiami Trail Holdings | Charlotte (FL) | Development - Commercial, Development |
| 04EF2000-2019-F-1146 | 1/6/2020 | SAJ-2018-01385 Collier Lakes Villages/Hyde Park Village | Collier (FL) | Development - Commercial, Development - Residential |
| 04EF2000-2019-F-0791 | 10/28/2019 | SAJ-2006-07829 Burnt Store Road / Coral Creek | Charlotte (FL) | Development - Commercial, Development - Residential |
| 41420-2006-F-1032-R001 | 8/31/2018 | Ave Maria University | Collier (FL) | Development - Commercial, Development - Residential |
| 04EF2000-2017-F-0035 | 4/26/2018 | Avenir - Palm Beach County | Palm Beach (FL) | Development - Commercial, Development - Residential |

C-1

https://ecos.fws.gov/ecp/report/adhocDocumentation?catalogId=species&reportId=bo (last visited May 10, 2023).

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2018-F-0308-R001 | 3/19/2020 | Big Corkscrew Island Regional Park | Collier (FL) | Development - Government / Municipal |
| 04EF2000-2019-F-0965 | 11/4/2019 | SAJ-2019-1797 Collier County Sports Complex | Collier (FL) | Development - Government / Municipal |
| 04EF2000-2018-F-0308 | 1/29/2019 | Big Corkscrew Island Regional Park | Collier (FL) | Development - Government / Municipal |
| 04EF1000-2020-F-0776 | 9/4/2020 | Rhodine Development - Hillsborough | Hillsborough (FL) | Development - Residential |
| 04EF2000-2020-F-0660 | 8/20/2020 | Savanna Lakes SAJ-1999-04313 | Lee (FL) | Development - Residential |
| 04EF2000-2019-F-0931 | 7/15/2020 | SAJ-2019-01196 Westview | Miami-Dade (FL) | Development - Residential |
| 04EF2000-2017-F-1045 | 5/20/2020 | KE Willow Run Properties | Collier (FL) | Development - Residential |
| 04EF2000-2019-F-1178 | 3/10/2020 | Cayo Pelon | Lee (FL) | Development - Residential |
| 04EF2000-2019-F-0083 | 12/17/2019 | Hudson Creek - GA-Pinnacle Cape Coral c/o Passarella & Assocs | Lee (FL) | Development - Residential |
| 04EF2000-2019-F-0506 | 6/19/2019 | SAJ-2018-03064 Ventana Pointe Parcel Development Earth Tech Environmental | Collier (FL) | Development - Residential |
| 04EF2000-2019-F-0590 | 5/24/2019 | Oak Creek, SAJ-2003-12543 | Lee (FL) | Development - Residential |
| 04EF2000-2019-F-0132 | 3/1/2019 | Sunbridge A/B SAJ-2018-02766 | Osceola (FL) | Development - Residential |
| 04EF2000-2018-F-1085 | 2/22/2019 | Palmer Ranch 6A | Sarasota (FL) | Development - Residential |
| 04EF2000-2018-F-0849 | 11/16/2018 | Sunbridge C/D/E/F | Osceola (FL) | Development - Residential |
| 04EF2000-2018-F-0848 | 11/15/2018 | Del Webb | Osceola (FL) | Development - Residential |
| 04EF2000-2018-F-0217 | 11/13/2018 | Promenade Estates SAJ-2017-02139 | Sarasota (FL) | Development - Residential |
| 41420-2007-F-0491-R001 | 9/24/2018 | Habitat for Humanity of Collier County | Collier (FL) | Development - Residential |
| 04EF2000-2018-F-0871 | 9/24/2018 | St. Cloud Airfield Development | Osceola (FL) | Development - Residential |
| 04EF2000-2016-F-0223 | 9/20/2018 | The Glen at West Haven | Polk (FL) | Development - Residential |
| 04EF2000-2017-F-0005 | 9/11/2018 | Lennar Homes Timber Creek Residential Development - Lee County | Lee (FL) | Development - Residential |
| 04EF2000-2017-F-0182 | 8/9/2018 | Verdana / Corkscrew Grove | Lee (FL) | Development - Residential |
| 04EF1000-2018-F-0230 | 5/25/2018 | South Hampton Lakes - Brevard | Brevard (FL) | Development - Residential |
| 04EF1000-2018-F-0214 | 5/23/2018 | Antigua Bay - Brevard | Brevard (FL) | Development - Residential |

C-2

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2017-F-0335 | 3/13/2018 | Walton Development - Ridgewood Lakes | Polk (FL) | Development - Residential |
| 04EF1000-2018-F-0081 | 3/1/2018 | Eisenhower Property Group - Hillsborough | Hillsborough (FL) | Development - Residential |
| 04EF2000-2017-F-0578 | 1/4/2018 | Twin Lakes | Osceola (FL) | Development - Residential |
| 04EF1000-2017-F-0600 | 12/27/2017 | Serenoa Active-Adult - Lake | Lake (FL) | Development - Residential |
| 04EF1000-2018-F-0023 | 11/9/2017 | Grande Palisades at Lake Austin Preserve Reinitiation - Orange | Orange (FL) | Development - Residential |
| 04EF1000-2017-F-0354 | 9/28/2017 | Hanover Hickory Nut - Orange | Orange (FL) | Development - Residential |
| 04EF1000-2017-F-0251 | 7/14/2017 | Waterleigh Residential Subdivision - Orange | Orange (FL) | Development - Residential |
| 04EF2000-2016-F-0591 | 4/4/2017 | FCC Creek LLC and Oyster Harbor LLC residential community | Collier (FL) | Development - Residential |
| 04EF1000-2016-F-0298 | 11/22/2016 | Zanzibar Subdivision - Orange | Orange (FL) | Development - Residential |
| 04EF2000-2014-CPA-0115, 04EF2000-2014-F-0148 | 7/9/2014 | Parkland Royale TLH 15 Dolly to fill wetlands SAJ-2013-00799 | Palm Beach (FL) | Development - Residential |
| 04EF2000-2015-F-0261 | 1/24/2018 | Van Haastrecht Argo Corkscrew Crossing - Monte Cristo Lee County | Lee (FL) | Development - Residential, Fill - Wetland |
| 04EF2000-2019-F-0139 | 2/19/2019 | Naples to Big Marco Pass O&M | Collier (FL) | DREDGE / EXCAVATION |
| 04EF1000-2018-F-0922 | 9/13/2018 | Atlantic Intracoastal Waterway Maintenance Dredging - Nassau | Nassau (FL) | DREDGE / EXCAVATION |
| 04EF1000-2015-F-0053 | 9/24/2015 | Long Boat Pass Maintenance Dredge - Manatee | Manatee (FL) | DREDGE / EXCAVATION |
| 04EF1000-2015-F-0382 | 2/6/2017 | Dredging and spoil placement areas - Duval/Nassau | Duval (FL), Nassau (FL) | Dredge / Excavation - Disposal |
| 41420-2006-F-0339 | 7/12/2018 | Florida Rock Industries East Naples Mine | Collier (FL) | Dredge / Excavation - Gravel / Sand |
| 04EF3000-2018-F-0100 | 6/5/2018 | Eastern Coastal Dune Lake Outfall - Emergency Opening, Walton Co. | Walton (FL) | Dredge / Excavation - Other |
| 41420-2010-CPA-0395, 41420-2010-F-0249, 41420-2010-F-0249-R001 | 8/2/2017 | Clam Pass Dredging and Sand Placement | Collier (FL) | Dredge / Excavation - Other |
| 04EF2000-2016-F-0172 | 8/22/2017 | Morrison CMW, SAJ-2015-03722 | Sarasota (FL) | FILL |
| 04EF1000-2015-F-0216 | 2/6/2017 | Egmont Key Sheet Pile Wall Construction - Pinellas | Pinellas (FL) | Fill - Intertidal / Subtidal |

JA.829

https://ecos.fws.gov/ecp/report/adhocDocumentation?catalogId=species&reportId=bo (last visited May 10, 2023).

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2019-F-0981 | 1/7/2020 | SAJ-2019-00241 Mosaic South Fort Meade Hardee County | Hardee (FL) | Fill - Lake / Reservoir |
| 41420-2010-CPA-0532, 41420-2011-F-0011 | 10/24/2013 | Fellsmere Water Management Areas 1 throug 5 flooding, Fellsmere Water Management Areas 1 thru 3 overall plan | Indian River (FL) | Land Flooding - Agricultural, etc. |
| 41420-2010-CPA-0532, 41420-2011-F-0011 | 6/9/2011 | Fellsmere Water Management Areas 1 throug 5 flooding, Fellsmere Water Management Areas 1 thru 3 overall plan | Indian River (FL) | Land Flooding - Agricultural, etc. |
| 41420-2010-CPA-0532, 41420-2011-F-0011 | 3/23/2011 | Fellsmere Water Management Areas 1 throug 5 flooding, Fellsmere Water Management Areas 1 thru 3 overall plan | Indian River (FL) | Land Flooding - Agricultural, etc. |
| 04EF2000-2019-F-1066 | 9/25/2020 | C-139 Flow Equalization Basin | Hendry (FL) | Land Flooding - Wetland |
| 41420-2006-F-0363 | 11/12/2019 | Loxahatchee River Watershed Restoration Project | Palm Beach (FL) | Land Restoration / Enhancement - Other |
| 04EF2000-2018-F-0560 | 12/21/2018 | Garcia Mine | Hendry (FL) | MINING |
| 04EF2000-2012-F-0327 | 5/27/2014 | Star Ranch Limestone Mine | Palm Beach (FL) | MINING |
| 04EF2000-2013-F-0081, 41420-2010-CPA-0339 | 5/22/2014 | Cemex, MINE EIS - CEMEX Alico North Quarry Phase 3C | Lee (FL) | MINING |
| 41420-2010-CPA-0114, 41420-2010-F-0473 | 6/9/2014 | CF South Pasture Mine | Hardee (FL) | Mining - Subsurface |
| 41420-2008-F-0921-R002 | 3/26/2020 | SEIS on Rock Mining in the Lake Belt Region | Miami-Dade (FL) | Mining - Subsurface Extraction - Non Energy Materials |
| 04EF2000-2019-F-0780 | 7/15/2019 | Mosaic-South Fort Meade Phosphate Mine - Additional Tract | Hardee (FL) | Mining - Subsurface Extraction - Non Energy Materials |
| 41420-2007-F-0247-R002 | 10/2/2019 | Florida Rock Industries Mine 2 SAJ-1994-02942 | Lee (FL) | Mining - Surface Extraction - Non Energy Materials |
| 04EF2000-2017-F-0988 | 11/6/2018 | Ona Phosphate Mine | Hardee (FL) | Mining - Surface Extraction - Non Energy Materials |
| 04EF2000-2017-F-0045 | 3/21/2018 | Corrigan Ranch Mine | Indian River (FL) | Mining - Surface Extraction - Non Energy Materials, Mining |
| 04EF2000-2019-F-0782 | 6/12/2019 | FPL Palm Bay Solar Energy Center | Brevard (FL) | Power Gen - Solar |

C-4

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2019-F-0570 | 5/6/2019 | Poinsett Solar Energy Center | Brevard (FL), Osceola (FL) | Power Gen - Solar |
| 04EF2000-2018-F-0999 | 10/2/2018 | FPL Blue Solar Energy Center | Hendry (FL) | Power Gen - Solar |
| 04EF2000-2018-F-0660 | 8/23/2018 | FPL Indiantown Solar Energy Center SAJ-2017-03238 | Martin (FL) | Power Gen - Solar |
| 04EF2000-2018-F-0631 | 7/17/2018 | FPL Okeechobee Solar Energy Center | Okeechobee (FL) | Power Gen - Solar |
| 04EF2000-2018-F-0506 | 5/10/2018 | FPL Interstate Solar | St. Lucie (FL) | Power Gen - Solar |
| 04EF2000-2018-F-0836 | 8/17/2018 | Sailfish Groin Restoration | Martin (FL) | Shoreline / Beach Protect - Groins |
| 04EF2000-2018-F-0437 | 4/4/2018 | Fisher Island Groin Rehabilitation | Miami-Dade (FL) | Shoreline / Beach Protect - Groins |
| 04EF2000-2020-F-0855 | 8/17/2020 | Broward Co Shore Protection Segment II Beach Renourishment | Broward (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF2000-2018-F-1098-R001 | 4/26/2019 | Broward County Segment 3 Sand Placement | Broward (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF1000-2019-F-0594 | 4/18/2019 | Manatee County Beach Nourishment - Manatee | Manatee (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF2000-2018-F-1098 | 10/16/2018 | Broward County Segment 3 Sand Placement | Broward (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF1000-2018-F-0716 | 7/19/2018 | Canaveral Harbor SPP - Brevard | Brevard (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF1000-2018-F-0715 | 6/20/2018 | Tampa Channel Egmont Nourishment | Hillsborough (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF1000-2017-F-0070 | 8/7/2017 | Sand Key Beach Rehabilitation - Pinellas | Pinellas (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF2000-2013-F-0110, 04EF2000-2013-F-0110-R002, 04EF2000-2013-F-0110-R035, 41420-2006-F-0013, 41420-2010-F-0224, 41420-2010-F-0225 | 8/2/2017 | Collier County Sand Placement Project | Collier (FL) | Shoreline / Beach Protect - Renourishment |

JA.831

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF3000-2017-F-0106 | 6/30/2017 | Gulf County- St Joseph Peninsula Beach nourishment | Gulf (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF3000-2017-F-0106 | 6/30/2017 | Gulf County- St Joseph Peninsula Beach nourishment | Gulf (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF3000-2015-F-0028 | 1/6/2015 | Pensacola Beach Re-nourishment | Escambia (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF2000-2014-CPA-0205, 04EF2000-2014-F-0126 | 8/12/2014 | Siesta Key Sand Placement | Sarasota (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF2000-2014-CPA-0011, 04EF2000-2014-F-0064 | 2/25/2014 | Phipps Ocean Park Reach 7 & 8 | Palm Beach (FL) | Shoreline / Beach Protect - Renourishment |
| 41420-2007-F-0839, 41420-2010-F-0222, 41420-2010-F-0222-R001 | 12/31/2013 | Sector 3 Beach Nourishment Project | Indian River (FL) | Shoreline / Beach Protect - Renourishment |
| 41420-2007-F-0396, 41420-2007-F-0396-R001, 41420-2007-FA-0477 | 10/22/2013 | North Boca Raton Beach Nourishment | Palm Beach (FL) | Shoreline / Beach Protect - Renourishment |
| 41420-2007-F-0396, 41420-2007-F-0396-R001, 41420-2007-FA-0477 | 8/20/2013 | North Boca Raton Beach Nourishment | Palm Beach (FL) | Shoreline / Beach Protect - Renourishment |
| 41410-2009-F-0096 | 12/22/2009 | Okaloosa County Beach Nourishment (West Destin) | Okaloosa (FL) | Shoreline / Beach Protect - Renourishment |
| 04EF2000-2019-F-0553 | 9/27/2019 | Sanibel Causeway Island B Shoreline Stabilization Project | Lee (FL) | Shoreline / Beach Protection |
| 04EF2000-2019-F-0108 | 12/4/2018 | Indian River County Sector 5 Sand Placement | Indian River (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2018-F-1101 | 10/16/2018 | Gasparilla Island Sand Placement | Lee (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2016-F-0325 | 1/4/2018 | Marco Island Beach Re-grading and Sand Placement | Collier (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |

JA.832

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2015-CPA-0304, 04EF2000-2015-F-0376, 04EF2000-2015-F-0376-R001, 04EF2000-2015-F-0376-R002, 04EF2000-2015-F-0376-R003 | 4/24/2017 | Sailfish Point and Bathtub Beach Sand Placement Project | Martin (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2014-CPA-0023, 04EF2000-2014-F-0027, 04EF2000-2014-F-0027-R001 | 12/10/2014 | Midtown Reaches 3 & 4 Sand Placement | Palm Beach (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2012-CPA-0053, 04EF2000-2012-F-0036 | 6/5/2014 | Venice Beach Sand Placement | Sarasota (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2013-CPA-0183, 04EF2000-2013-F-0163 | 5/22/2014 | FCCE Projects (2013) | Broward (FL), Lee (FL), Miami-Dade (FL), Palm Beach (FL), St. Lucie (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2014-CPA-0023, 04EF2000-2014-F-0027 | 2/25/2014 | Midtown Reaches 3 & 4 Sand Placement | Palm Beach (FL) | SHORELINE / BEACH PROTECTION / RENOURISHMENT |
| 04EF2000-2018-F-0885 | 12/19/2019 | Lake Okeechobee Watershed Restoration Project | Glades (FL) | STREAM / WATERBODY / CANALS / LEVEES / DIKES |
| 04EF2000-2018-F-0205 | 3/22/2018 | Duke Energy Fort Meade to West Lake Wales Substation | Polk (FL) | Transmission Line - Electrical |
| 04EF2000-2017-TA-0846, 04EF2000-2018-F-0205 | 3/20/2018 | Duke Energy Fort Meade to West Lake Wales Substation, Duke Energy - West Lake Wales 230kV Transmission Line Rebuild Project | Polk (FL) | TRANSMISSION LINE, Transmission Line - Electrical |
| 04EF1000-2019-F-0211 | 7/9/2019 | SR 40 from CR 314 to CR 314A - Marion | Marion (FL) | Transport - Road / Hwy - M / M / R / U - Federal |
| 04EF2000-2018-F-0736 | 11/14/2018 | Burnt Store Road from Zemel Drive to Notre Dame Boulevard | Charlotte (FL) | Transport - Road / Hwy - M / M / R / U - Federal |

JA.833

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2018-F-0653 | 7/5/2018 | State Road 82 from Shawnee Road to Alabama Road | Lee (FL) | Transport - Road / Hwy - M / M / R / U - Federal |
| 04EF2000-2016-F-0266 | 6/13/2019 | Hanson Road Roundabout | Lee (FL) | Transport - Road / Hwy - New Constr - Federal |
| 04EF2000-2016-F-0597 | 4/24/2017 | Bay Street Extension SAJ-2015-02875 | Sarasota (FL) | Transport - Road / Hwy - New Constr - Federal |
| 41420-2010-CPA-0464, 41420-2010-F-0328, 41420-2010-F-0328-R001, 41420-2010-F-0328-R002 | 8/18/2017 | St. Lucie Inlet Maintenance Dredging and Sand Placement | Martin (FL) | Transport - Shipping - Inland Waterway / Navigation |
| 04EF2000-2013-CPA-0188, 04EF2000-2013-F-0167 | 12/2/2013 | Gordon Pass M&O | Broward (FL), Collier (FL) | Transport - Shipping - Inland Waterway / Navigation |
| 04EF2000-2019-F-1095 | 1/17/2020 | Collier County NESA Utility Site | Collier (FL) | Wastewater Facility - New Construction |
| 04EF2000-2019-F-0190 | 5/3/2019 | Gumbo Limbo Nature Center Intake Pipes | Palm Beach (FL) | WATER SUPPLY / DELIVERY |
| 04EF2000-2016-F-0245 | 6/4/2018 | Lake Okeechobee Regulation Schedule and Portable Forward Pumps | Glades (FL), Highlands (FL), Okeechobee (FL), Palm Beach (FL) | WATER SUPPLY / DELIVERY |
| 04EF2000-2018-F-1113 | 5/29/2019 | SAJ-2016-03400 McCarty Ranch | St. Lucie (FL) | Water Supply Facility |
| 04EF2000-2018-F-0419 | 2/19/2019 | Istokpoga Marsh Water Improvment District Phase 2 | Highlands (FL) | Waterbody Creation |
| 41420-2006-F-0603-R002 | 10/4/2021 | C-44 Reservoir and Stormwater Treatment Area, - Indian River Lagoon-South | Martin (FL) | Waterbody Restoration / Enhancement |
| 04EF2000-2021-F-0239 | 7/16/2021 | Indian River Lagoon South STA C-23 C-24 Reservoirs | St. Lucie (FL) | |
| 04EF2000-2020-F-0401 | 3/18/2020 | Alico Dispersed Water management Alternative | Hendry (FL) | |
| 04EF2000-2018-F-0939 | 1/13/2020 | C-139 Abiaki Phase II C-13 Annex | Hendry (FL) | |
| 04EF2000-2019-F-0456 | 5/30/2019 | SAJ-2018-03023 Pursuit Boats | St. Lucie (FL) | |
| 04EF2000-2017-F-0701 | 2/11/2019 | SWFIA Air Traffic Control Tower (ATCT) | Lee (FL) | |
| 04EF2000-2018-F-0850 | 11/29/2018 | Sunbridge Cyrils Drive | Orange (FL), Osceola (FL) | |

https://ecos.fws.gov/ecp/report/adhocDocumentation?catalogId=species&reportId=bo (last visited May 10, 2023).

| Project Code(s) | Biological Opinion Date | Title(s) | Counties | Activity Type(s) |
|---|---|---|---|---|
| 04EF2000-2016-F-0396 | 6/15/2018 | Stewart Materials Mine | Palm Beach (FL) | |
| 04EF2000-2017-F-0875 | 1/5/2018 | Southern Pines Phases 3B, 4, and 5 | Osceola (FL) | |
| 04EF2000-2015-F-0436 | 4/7/2017 | San Marino H LD | Collier (FL) | |

JA.835

# ENCLOSURE D

## A SIDE-BY-SIDE COMPARISON OF

## ENVIRONMENTAL INFORMATION AVAILABLE VIA

## THE CORPS-LED 404 PROGRAM VERSUS THE

## FLORIDA-LED 404 PROGRAM

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| Environmental Information Available under Corps-led 404 Program[1] | Environmental Information Available under Florida 404 Program (All information described below is publicly available) |
|---|---|
| Purpose & Need for the Project (NEPA) | The purpose and need for a project are described in the permit documents and considered as part of the "public interest" review and environmental conditions for issuance of permits. *See* Fla. Stat. § 373.414(1)(a); Fla. Admin. Code § 62-330.301; Florida ERP Handbook[2] §§ 10.1.1, 10.2.1, 10.2.3. Florida ERP Handbook § 10.2.1 explains that DEP evaluates the purpose of the project in light of whether impacts can be reduced or eliminated. DEP application forms for ERP/404 permits (General Permit Form 62-330.402(1), section K; individual permit application form 62-330.060, section I) also reference project purpose information. *See also* Fla. Admin. Code ch. 62-331 and the Florida 404 Handbook[3] for additional discussion related to project purpose and need. This information is publicly available. |
| Project Alternatives (NEPA) | Project alternatives are considered and evaluated as part of the Florida 404/ERP procedures. *See* Fla. Admin. Code § 62-331.053; Florida 404 Handbook § 5.2, § 8.3.1. This includes consideration of "no action alternatives." *See* Florida 404 Handbook at § 8.3.1. A detailed discussion of Florida's consideration of alternatives is provided in Appendix C of the Florida 404 Handbook Appendix C ("Guidance for Conducting Alternatives Analysis"), which explains that a 404 "permit cannot be issued if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, as long as the alternative does not have other significant adverse environmental consequences.

The level of detail in an alternatives analysis shall be commensurate with the scale of the adverse environmental effects of the project. Analysis of projects proposing greater adverse environmental effects shall be more detailed and explore a wider range of alternatives than projects proposing lesser effects." In this analysis, Florida considers the "purpose and need" for the project proposal; identifies and evaluates "alternatives" that could meet the overall project purpose; analyze practicability and availability considerations; and identify the "least environmentally damaging practicable alternative," which "must be selected." *Id.* Florida also identifies the "environmental impacts for each remaining practicable alternate site." *Id.* This information is publicly available. |

**Side-by-Side Comparison of Environmental Information
Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| *Environmental Information Available under Corps-led 404 Program[1]* | *Environmental Information Available under Florida 404 Program* <br> *(All information described below is publicly available)* |
|---|---|
| Affected Environment (NEPA) <br><br> *This is included in the requirements for an EIS but is not a requirement for an EA prepared by the Corps (33 CFR 230.10).* | The Florida ERP and 404 permit application and review process obtains information about the project location and surrounding environment including affected waterbodies. *See, e.g.*, *Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands* (EPA-HQ-OW-2018-0640-0012). Section C of the Application (EPA-HQ-OW-2018-0640-0012-A4), for example, requires descriptions of the wetlands or other surface waters impacted by the project, along with aerials, maps, and other documents and materials to describe the affected environment. <br><br> Section I of the Application requires, among other things, a description of "any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity," including "the name(s) of those listed species or critical habitat areas," description of "any actions proposed to be taken to avoid or minimize adverse effects to listed species" and "any other available data and information necessary for purposes of reviewing impacts to state and federal listed species." Section I also requires the application to show the "location and extent of all wetlands and other surface waters, delineated in accordance with Chapter 62-340, F.A.C. The applicant must label all special aquatic sites (e.g., wetlands, sanctuaries and refuges, mudflats, vegetated shallows, and riffle and pool complexes). Each type of boundary (for example, ordinary high water line, mean high water line, wetlands, or other special aquatic sites) must be clearly annotated and/or symbolized to ensure they are differentiable on the map. Unless indicated below, all wetlands and other surface waters on the site, as delineated in accordance with Chapter 62-340, F.A.C., that will be impacted by the proposed activities will be evaluated for permitting purposes under Section 404 of the Clean Water Act." Moreover, Florida evaluates project impacts on a "watershed" basis. *See* Florida 404 Handbook 2.0(52) (defining "watershed plan" as a plan that "addresses aquatic resource conditions in the watershed, multiple stakeholder interests, and land uses"). Additional information about the environment affected by the project is described in the Florida ERP and 404 Handbooks. This information is publicly available. |

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| *Environmental Information Available under Corps-led 404 Program[1]* | *Environmental Information Available under Florida 404 Program*<br>*(All information described below is publicly available)* |
|---|---|
| Environmental impacts of proposed action (NEPA) | Florida Statutes Section 373.414(1) requires consideration of environmental impacts. *See also* Fla. Admin. Code § FAC 62-330.301; Florida Environmental Resource Permit Applicant's Handbook Sections 10.1.1 & 10.2.3; Florida 404 Handbook Sections 8.1(a) & 8.2(i). DEP must weigh the environmental impacts as part of the review of Florida 404 permits. Florida considers direct impacts, cumulative effects, secondary effects, and other similar issues. *See* Florida 404 Handbook § 8.3.5 and § 8.3.6. Florida ERP Handbook Section 10 describes all sources that should be evaluated and how the factors should be weighed. *See also* Fla. Admin. Code 331.060(1)(f), the Florida ERP Handbook, and the Florida 404 Handbook for additional information. This information is publicly available. |
| Mitigation Measures (NEPA) | Florida considers and prepares information concerning mitigation measures as part of the Florida 404 Program. *See* Fla. Stat. 373.414 (discussing mitigation measures for wetlands permitting); *see generally* Fla. Admin. Code ch. 62-330. The Florida ERP Handbook (including Section 10.3) and the Florida 404 Handbook (Section 8.5 – 8.5.6.3) provide additional details on mitigation measures under the ERP/404 program. *See also* Fla. Admin. Code 62-331.130 & .140.<br><br>Importantly, as explained in the Florida 404 Handbook Section 8.3.3: "[m]itigation for State 404 Program permits is generally evaluated in accordance with Volume I, section 10.3, like ERP. However, in addition to those requirements, the federal mitigation hierarchy described in section 8.5.1 of this Handbook, shall apply to any mitigation for State 404 Program permits." Mitigation is also discussed extensively in the project application documents (including, for example, in Section C of the ERP/404 Application (EPA-HQ-OW-2018-0640-0012-A4)). This information is publicly available. |

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| Environmental Information Available under Corps-led 404 Program[1] | Environmental Information Available under Florida 404 Program (All information described below is publicly available) |
|---|---|
| Socioeconomic Information (NEPA) | Florida considers public health, safety, or welfare or the property of others as part of the "public interest" review. *See* Fla. Stat. 373.414(1)(a)1. Moreover, socioeconomic and demographic information related to projects remains publicly available through a variety of sources, including the Florida Office of Economic & Demographic Research[4] (which produces demographic-related data and products, including by county/municipality/age/race/sex/national origin) and the U.S. Census Bureau[5] (which publishes a wide range of demographic and socioeconomic information about all project locations, including population data, income and poverty statistics, education and employment metrics, housing, health, family, race and ethnicity, and other similar data used for purposes of considering effects on populations in and around project locations). Separately, Plaintiffs continue to have access to a variety of publicly available databases specific to Environmental Justice, including EPA's Environmental Justice mapping and screening system known as "EJScreen"[6] as well as the CEQ's Climate and Economic Justice Screening Tool.[7] This information is publicly available. |

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| *Environmental Information Available under Corps-led 404 Program[1]* | *Environmental Information Available under Florida 404 Program* *(All information described below is publicly available)* |
|---|---|
| Historic/cultural/tribal (NEPA/NHPA) | Florida engages in consultation regarding historic, archeological, cultural, and tribal resources as part of the Florida ERP and 404 programs. As detailed in the Florida ERP Handbook at Section 10.2.3.6, Florida considers whether the regulated activity will adversely affect or will enhance significant historical and archaeological resources. The applicant must map the location of and characterize the significance of any known historical or archaeological resources that may be affected by the regulated activity located in, on or over wetlands or other surface waters."<br><br>DEP also coordinates with the State Historic Preservation Office and other relevant federal and state agencies. The applicant will be required to perform an archaeological survey and to develop and implement a plan as necessary to demarcate and protect the significant historical or archaeological resources, if such resources are reasonably expected to be impacted by the regulated activity. DEP and the State Historic Preservation Office have entered into an Operating Agreement (available in the Administrative Record at EPA-HQ-OW-2018-0640-0016-A1), whereby DEP consults with the SHPO and the Indian Tribes. This Operating Agreement was approved by the Federal Historic Preservation Office as part of the federal consultation process, and was approved by EPA, integrating it as part of the 404 program.<br><br>For individual permits, DEP shall send a copy of the public notice required by Rule 62-331.060, F.A.C., to EPA for review and comment. Additional information about DEP consideration of historic, cultural, and tribal issues under the Florida ERP and 404 Programs is available at: Florida 404 Handbook Section 5.2.2 and 5.2.6; Fla. Admin. Code 62-331.052(3)(b), .060(2), .110(7), .200(3)(g) – (i), .201(t) – (v); and the Programmatic Agreement with EPA (EPA-HQ-OW-2018-0640-0639) providing for elevation of issues of concern under Section 106 of the NHPA. This information is publicly available. |

**Side-by-Side Comparison of Environmental Information
Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| *Environmental Information Available under Corps-led 404 Program[1]* | *Environmental Information Available under Florida 404 Program* <br> *(All information described below is publicly available)* |
|---|---|
| Protected Species (NEPA, ESA) | The Florida ERP and 404 Programs require consideration of impacts to listed species and habitat. *See* Fla. Stat. 373.414(1)(a)2; ERP Handbook Section 10.2.2; Fla. Admin. Code 62-331.053(1)(4) and .200(3)(c); Florida 404 Handbook s. 5.2.3. For purposes of the Florida 404 Program, review and consideration of impacts to listed species and habitat is fully described in the State 404 Program Programmatic Biological Opinion issued by the U.S. Fish & Wildlife Service in conjunction with EPA's approval of Florida's program, as well as in the Memorandum of Agreement between DEP, the Florida Fish & Wildlife Commission, and USFWS. In particular, the Florida 404 Handbook 1.3.3 explains: "Compliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Services (NMFS) for permits reviewed under the State 404 Program." <br><br> Section 5.2.3 of the Florida 404 Handbook also explains: "The Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species. Consultation with, or technical assistance by, FWC, FWS, or NMFS shall be required when DEP determines that the project may have the potential to affect listed species. <br><br> To determine whether a project may have the potential to affect listed species, DEP may use available resources such as scientific literature, species keys, and habitat maps, or it may observe signs that the site is used by listed species during the site visit. If DEP determines that a listed species may be affected, DEP shall seek consultation with or technical assistance by FWC, FWS, and NMFS, as applicable, regarding the proposed project. |

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| Environmental Information Available under Corps-led 404 Program[1] | Environmental Information Available under Florida 404 Program (All information described below is publicly available) |
|---|---|
| Protected Species (NEPA, ESA) (continued) | DEP shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat.  For individual permits, DEP shall send a copy of the public notice required by Rule 62-331.060, F.A.C., to EPA for review and comment.<br><br>If the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, DEP shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C." Additional details are provided in the documents referenced above. This information is publicly available. |
| Coastal Zone (NEPA/CZM) | Within Florida's 404 program, compliance with the Coastal Zone Management Program is required for issuance of a permit. *See* Rule 62-331.070(2), F.A.C. Florida's coastal zone includes the area encompassed by the state's 67 counties and its territorial seas. The Florida Coastal Zone Management Program consists of a network of 24 Florida statute chapters administered by nine state agencies and five water management districts. Coastal zone impacts are considered consistent with Florida ERP Handbook 1.3.1.1. *See also* Fla. Admin. Code 62-331.070. This information is publicly available. |

JA.843

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| Environmental Information Available under Corps-led 404 Program[1] | Environmental Information Available under Florida 404 Program (All information described below is publicly available) |
|---|---|
| CWA 404(b)(1) Guidelines<br><br>*Not a requirement under NEPA but included here because Plaintiffs referenced these guidelines at the March 15, 2022 hearing* | Florida reviews and considers comparable information to the information considered by the Corps pursuant to the Corps' Section 404(b)(1) Guidelines, which provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."<br><br>For a comprehensive (155-page) comparison of the Corps 404 Program requirements and the Florida ERP and 404 Programs, please refer to the comparison table found in the Administrative Record at EPA-HQ-OW-2018-0640-0016-A3. In particular, pages 37 to 39 of the comparison spreadsheet identify Florida regulations that align with the requirements of the federal 404(b)(1) guidelines. Florida Admin. Code 62-331.052 and 62-331.053 also provide requirements comparable to the federal 404(b)(1) guidelines. This information is publicly available. |

JA.844

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

| *Environmental Information Available under Corps-led 404 Program[1]* | *Environmental Information Available under Florida 404 Program*<br>*(All information described below is publicly available)* |
|---|---|
| Public Interest Factors (33 CFR 320.4(a)) | Florida evaluates "public interest" factors in evaluating 404 permits. *See* Fla. Stat. § 373.414. This includes, among other things, effects to the public health, safety, or welfare or the property of others; effects to the conservation of fish and wildlife, including endangered or threatened species, or their habitats; effects to navigation or the flow of water or cause harmful erosion or shoaling; effects to the fishing or recreational values or marine productivity in the vicinity of the activity; temporary or permanent nature of a project; effects on significant historical and archaeological resources; and the current condition and relative value of functions being performed by areas affected by the proposed activity. *Id.* § 373.414(a). Public interest information is also obtained as part of the ERP/404 Applications (see, e.g., Section C of the Application). The public interest review is also discussed extensively in the Florida ERP Handbook at Section 10.2.3. This information is publicly available. |
| Agencies and Persons Consulted (NEPA) | Florida provides information about all federal, state, and local agencies and other persons consulted or who otherwise comment on Section 404 permit applications. DEP is required to send public notice to the applicant, any other agency with jurisdiction over the activity or project site, adjoining property owners, any State or tribe who's waters may be affected, and all persons who have requested copies of public notices. Fla. Admin. Code Ann. r. 62-331.060. This information is publicly available. |

**Side-by-Side Comparison of Environmental Information**
**Available to Public under Corps-led 404 Program and Florida-led 404 Program**

---

[1] The Corps' NEPA regulations provide that "[m]ost permits will normally require only an EA," not an EIS, 33 § C.F.R. 230.7(a), and that an "EA is a brief document which provides sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a [Finding of No Significant Impact, or FONSI]." 33 C.F.R. § 230.10(a). An EA must "include a *brief discussion* of the need for the proposed action, or appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources, of the environmental impacts of the proposed action and alternatives and a list of the agencies, interested groups and the public consulted." *Id.* at § 230.10(b) (emphasis added).

[2] The Florida DEP's Environmental Resource Permit Applicant's Handbook is available in the Administrative Record at EPA-HQ-OW-2018-0640-0002-A1 through EPA-HQ-OW-2018-0640-0002-A4. Copies are also available for public review on-line at https://floridadep.gov/water/water/content/water-resource-management-rules.

[3] DEP's State 404 Program Applicant's Handbook is available in the Administrative Record at EPA-HQ-OW-2018-0640-0002-A20. Copies are also available for public review on-line at https://floridadep.gov/water/water/content/water-resource-management-rules.

[4] http://edr.state.fl.us/content/population-demographics/data/index-floridaproducts.cfm.

[5] https://www.census.gov/data.html

[6] https://www.epa.gov/ejscreen

[7] https://screeningtool.geoplatform.gov/en/

JA.846