**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

---

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

---

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

---

**JOINT APPENDIX—VOLUME 3 (JA.847–JA.1190)**

---

*Counsel Listed on Inside Cover*

February 26, 2025

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

Jeffrey DeSousa
*Acting Solicitor General*
Christopher J. Baum
*Senior Deputy Solicitor General*
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Florida Appellants*

Lisa Lynne Russell
*Deputy Assistant Attorney General*

Brian Toth
Joan Pepin
Rebecca Jaffe
*Attorneys*

Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

*Counsel for Federal Appellants*

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
tgalloni@earthjustice.org
creichert@earthjustice.org
(305) 440-5432

Bonnie Malloy
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
bmalloy@earthjustice.org
(850) 681-0031

*Counsel for Environmental Appellees*

## TABLE OF CONTENTS

| | VOLUME 1 (JA.1–JA.430) | |
|---|---|---|
| **District Court Docket Number** | **Document** | **Page** |
| Dkt. 1 | Plaintiffs' Complaint | 1 |
| Dkt. 4 | State of Florida and Florida Department of Environmental Protection's Motion to Intervene | 52 |
| Dkt. 73 | Memorandum Opinion and Order | 55 |
| Dkt. 77 | Plaintiffs' Amended Complaint | 117 |
| Dkt. 95-2 | Revised Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program | 176 |
| Dkt. 98 | Plaintiffs' Motion for Summary Judgment | 211 |
| Dkt. 98-1 | Declaration of Amber Crooks | 294 |
| Dkt. 98-3 | Declaration of Elizabeth H. Fleming | 417 |

| | VOLUME 2 (JA.431–JA.846) | |
|---|---|---|
| Dkt. 98-4 | Declaration of Brett Hartl | 431 |
| Dkt. 98-5 | Declaration of Matthew Schwartz | 444 |
| Dkt. 98-6 | Declaration of Lisa Rinaman | 463 |
| Dkt. 98-7 | Declaration of Rachel Silverstein | 510 |
| Dkt. 98-10 | Declaration of Diana Umpierre | 543 |

| Dkt. 99 | Defendant's Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment | 644 |
|---|---|---|
| Dkt. 102 | Florida Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment | 731 |
| Dkt. 102-1 | Declaration of Justin Wolfe | 793 |

| **VOLUME 3 (JA.847–JA.1190)** | | |
|---|---|---|
| Dkt. 104 | Plaintiffs' Consolidated Reply in Support for Motion for Summary Judgment and Response in Opposition to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 847 |
| Dkt. 104-1 | Supplemental Declaration of Amber Crooks | 963 |
| Dkt. 107 | Florida Intervenors' Reply in Support of Cross-Motion for Summary Judgment | 1001 |
| Dkt. 113 | Notice of Completion of Biological Evaluation | 1033 |
| Dkt. 123 | Plaintiffs' Sur-Reply in Support of Plaintiffs' Motion for Summary Judgment and Response to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 1036 |
| Dkt. 125 | Plaintiffs' Notice of Filing Addition to Supplemental Joint Appendix | 1063 |
| Dkt. 127-2 | Florida Intervenors' Motion for Leave to File Post-Hearing Memorandum, Attachment 1: Standing Demonstrative | 1066 |
| Dkt. 135 | Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Center for Biological Diversity and Sierra Club | 1069 |

| Dkt. 149-3 | Exhibit C: Comparison Table of Species Review Process in Corps-Led and Florida-Led Section 404 Programs | 1113 |
|---|---|---|
| Dkt. 153 | Plaintiffs Center for Biological Diversity and Sierra Club's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 1119 |
| Dkt. 153-1 | Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation | 1182 |
| Dkt. 156 | Excerpt of Motion Hearing on October 19, 2023 | 1187 |

| **VOLUME 4 (JA.1191–JA.1469)** | | |
|---|---|---|
| Dkt. 158 | Federal Defendants' Post-Hearing Submission on Remedy | 1191 |
| Dkt. 161 | Plaintiffs' Brief on Remedy for Claims Relating to Protection of ESA-listed Species under USFWS' Jurisdiction | 1201 |
| Dkt. 164 | Order | 1218 |
| Dkt. 165 | Federal Defendants' Supplemental Brief Regarding Limited Stay | 1220 |
| Dkt. 166 | Florida Intervenors' Motion for Limited Stay of February 15, 2024 Vacatur Order | 1224 |
| Dkt. 166-1 | Exhibit A: Declaration of Justin Wolfe | 1245 |
| Dkt. 170 | Florida Intervenors' Reply in Support of Limited Stay | 1250 |
| Dkt. 171 | Florida Intervenors' Expedited Motion for Entry of Final Judgment | 1263 |

| Dkt. 182 | Amended Memorandum Opinion | 1284 |
|---|---|---|
| Dkt. 183 | Memorandum Opinion | 1382 |
| Dkt. 184 | Order | 1409 |
| Dkt. 185 | Florida Intervenors' Notice of Appeal | 1410 |
| Dkt. 189 | Plaintiffs' Response to Florida Intervenors' Motion for Stay Pending Appeal | 1411 |
| Dkt. 190 | Memorandum Opinion and Order | 1451 |
| Dkt. 193 | Plaintiffs' Notice of Appeal | 1465 |
| Dkt. 195 | Federal Defendants' Notice of Appeal | 1468 |

| VOLUME 5 (JA.1470–JA.1707) | | | |
|---|---|---|---|
| **EPA Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| EPA-HQ-OW-2018-0640-0001 | Dkt. 51 at 1-4 | Request to Assume Administration of a Clean Water Act Program: Florida, Notice and Request for Comments, 85 Fed. Reg. 57,853 (Sept. 16, 2020) | 1470 |
| EPA-HQ-OW-2018-0640-0002-A7 | Dkt. 52 at 6-15 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060: Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands, Aug. 20, 2020 | 1474 |

| | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0002-A9 | Dkt. 52 at 21-30 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060 Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters, Aug. 20, 2020 | 1484 |
| EPA-HQ-OW-2018-0640-0002-A20 | Dkt. 52 at 82-143 | Florida Section 404 Program Application: Florida Admin. Code 62-331.010(5): State 404 Program Applicant's Handbook Aug. 20, 2020 | 1494 |
| EPA-HQ-OW-2018-0640-0016-A2 | Dkt. 55-1 at 120-32 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, USFWS, and FDEP, Aug. 5, 2020 | 1556 |
| EPA-HQ-OW-2018-0640-0018 | Dkt. 55-1 at 300-13 | Memorandum of Agreement between FDEP and EPA, July 31, 2020 | 1569 |
| EPA-HQ-OW-2018-0640-0019 | Dkt. 55-1 at 314-22 | Memorandum of Agreement Between FDEP and the U.S. Department of the Army, July 31, 2020 | 1583 |
| EPA-HQ-OW-2018-0640-0051 | Dkt. 55-3 at 69-129 | Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020 | 1592 |
| EPA-HQ-OW-2018-0640-0386-A1 | Dkt. 56 at 16-70 | Letter from Tania Galloni et al., Earthjustice et al., to Kelly Laylock, EPA, Nov. 2, 2020 | 1653 |

| VOLUME 6 (JA.1708–JA.2060) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0387-A8 | Dkt. 56-1 at 65-364 | Exhibit 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida, July 24, 2020 | 1708 |
| EPA-HQ-OW-2018-0640-0387-A10 | Dkt. 112-1 at 175-76, 207, 259, 275, 306-07 | Excerpts of Exhibit 60: 1998 Endangered Species Consultation Handbook | 2008 |
| EPA-HQ-OW-2018-0640-0388-A2 | Dkt. 95-2 at 18 | Letter from Kristen L. Boyles et al., Earthjustice et al., to Kathy Hurld, EPA, July 6, 2020 | 2015 |
| EPA-HQ-OW-2018-0640-0388-A7 | Dkt. 112-2 at 2-26 | Exhibit 67: FDEP White Paper, ESA Consultation | 2032 |
| EPA-HQ-OW-2018-0640-0564 | Dkt. 56-1 at 433-34 | Approval of Florida's Clean Water Act Section 404 Assumption Request, 85 Fed. Reg. 83,533, Dec. 22, 2020 | 2057 |
| EPA-HQ-OW-2018-0640-0566 | Dkt. 56-1 at 435-36 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Dec. 17, 2020 | 2059 |

| VOLUME 7 (JA.2061–JA.2199) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0568 | Dkt. 56-1 at 437-549 | EPA, Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, Dec. 16, 2020 | 2061 |

| | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0617 | Dkt. 112-2 at 351 | Letter from Jeaneanne Gettle, EPA, to Roy Crabtree, NOAA NMFS, on EPA's Section 7 Consultation, Sept. 2, 2020 | 2174 |
| EPA-HQ-OW-2018-0640-0618 | Dkt. 112-2 at 352-53 | Letter from Virginia Fay, NOAA NMFS, to Jeaneanne Gettle, EPA, Oct. 30, 2020 | 2175 |
| EPA-HQ-OW-2018-0640-0623 (same as FWS-006015) | Dkt. 112-2 at 354-66 (same as Dkt. 112-5 at 47-59) | USFWS Biological Opinion Appendix 2: Memorandum of Understanding Between FWC, USFWS, and FDEP, August 5, 2020 | 2177 |
| EPA-HQ-OW-2018-0640-0635 | Dkt. 56-1 at 669 | Letter from David Ross, EPA, to Timothy Gallaudet, NOAA NMFS, and Rob Wallace, USFWS, on FDEP's Non-Federal Representative Designation, Dec. 13, 2019 | 2190 |
| EPA-HQ-OW-2018-0640-0636 | Dkt. 56-1 at 670-71 | Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, on FDEP's Non-Federal Representative Designation, Dec. 12, 2019 | 2191 |
| EPA-HQ-OW-2018-0640-0637 | Dkt. 112-2 at 367-69 | EPA, Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953, May 21, 2020 | 2193 |

| EPA-HQ-OW-2018-0640-0638 | Dkt. 112-2 at 370-71 | Letter from Cathryn Tortorici, NOAA NMFS, to Heather Mason, FDEP, April 15, 2020 | 2196 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0641 | Dkt. 56-1 at 684-85 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, on EPA's Completeness Determination for Florida's Assumption Request, August 28, 2020 | 2198 |

| VOLUME 8 (JA.2200–JA.2530) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0649 (same as FWS-005610) | Dkt. 112-3 at 2-298 (same as Dkt. 112-4 at 87-383) | USFWS Biological Opinion Appendix 1: EPA's Biological Evaluation | 2200 |
| EPA-HQ-OW-2018-0640-0660-A1 | Dkt. 56-1 at 774-81 | EPA, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals, Aug. 27, 2020 | 2497 |
| EPA-HQ-OW-2018-0640-0664 | Dkt. 112-3 at 301-02 | Letter from Jeaneanne Gettle, EPA, to Tania Galloni, Earthjustice, Responding to Notice of Intent to Sue, Dec. 20, 2021 | 2505 |
| EPA-HQ-OW-2018-0640-0670 | Dkt. 112-3 at 343 | Email from David Fotouhi, EPA, to Matt Leopold, EPA, et al., transmitting documents for Florida Stakeholder meeting, Sept. 17, 2018 | 2507 |

| EPA-HQ-OW-2018-0640-0670-A3 | Dkt. 112-3 at 344-52 | Potential ESA Compromise Analysis and Proposal | 2506 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0670-A5 | Dkt. 112-3 at 353-59 | Florida Proposal Regarding ESA (SSEC-Doug-P18082810080) | 2517 |
| EPA-HQ-OW-2018-0640-0686 | Dkt. 112-3 at 368-72 | Response to Comments on EPA Consultation under ESA | 2524 |
| EPA-HQ-OW-2018-0640-0690 | Dkt. 112-3 at 375-76 | Letter from Peter S. Silva, EPA, to R. Steven Brown, Environmental Council of the States, et al., re EPA Position on ESA Consultation for 404 Assumption, Dec. 27, 2010 (same as above) | 2529 |

| VOLUME 9 (JA.2531–JA.2700) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-000001 | Dkt. 112-4 at 2-3 | 20191212 Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, re: Designation of FDEP as Non-Federal Representative for Informal Consultation | 2531 |
| FWS-006015 | Dkt. 112-5 at 47-59 | 20201116 Memorandum of Understanding between FWC, USFWS, and FDEP (attached as Appx. 2 to USFWS's Biological Opinion) | 2533 |

| FWS-000749 | Dkt. 112-4 at 9-11 | 20200331 Email from H. Rauschenberger, USFWS, to M. Duncan, FDEP, J. Goff, FWC, et al., re: Comments on Draft Species Coordination Process | 2546 |
|---|---|---|---|
| FWS-003386 | Dkt. 112-4 at 43-84 | 20200820 Florida Rules Chapter 62-4, submitted as part of FDEP's application package. | 2549 |
| FWS-006028 (same as EPA-HQ-OW-2018-0640-0642) | Dkt. 112-5 at 60-147 (same as Dkt. 56-1 at 686-773) | 20201117 Programmatic Biological Opinion for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act | 2591 |
| FWS-006144 | Dkt. 112-5 at 148-69 | 20180625 Memorandum of Agreement between EPA, USFWS, and NJDEP Related to the Protection of Federally-Listed Threatened or Endangered Species and Designated Critical Habitat Under a New Jersey-Assumed Section 404 Program | 2679 |

| VOLUME 10 (JA.2701–JA.3056) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-006432 | Dkt. 93-2 at 4 | 20140519 Final Biological Opinion re EPA Final Rule - Cooling Water Intakes | 2701 |
| **Army Corps Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| CORPS004318 | Dkt. 112-8 at 106 | 20191126 Email from Robert Barron, Corps, to Shawn Zinszer, Corps, et al., re: AAR Retained Water GIS Call: We Need a "Big" Call with FDEP | 3040 |
| CORPS004319 | Dkt. 112-8 at 107-09 | 20191206 Email Dale Beter, Corps, to Shawn Zinszer, Corps, re: 404g_h Assumption Meeting Notes  Attachment: 20191206 Sec 404g Assumption Mtg Notes.docx | 3041 |
| CORPS004322 | Dkt. 112-8 at 110-22 | 20200805 Memorandum of Agreement between FDEP and U.S. Department of the Army | 3044 |

## CERTIFICATE OF SERVICE

I hereby certify that, on February 26, 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  All participants in this case registered with CM/ECF will be served by the CM/ECF system.

Dated:  February 26, 2025

    */s/ Aaron M. Streett*
Aaron M. Streett
BAKER BOTTS LLP
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com

*Counsel for Florida Appellants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' AND
INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

i

## **TABLE OF CONTENTS**

TABLE OF CONTENTS....................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................ v

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT .................................................................................................................... 3

   I.   USFWS Violated the ESA by Failing to Assess the Impacts of EPA's Action. ................. 4

     A.  USFWS Failed to Conduct the Analysis Required by the ESA. ...................................... 6

       1.   USFWS Failed to Assess the Full Scope of EPA's Action. ........................................ 7

       2.   USFWS Failed to Evaluate the Baseline Status of Protected Species.......................... 9

       3.   USFWS Ignored the Wealth of Information at Its Disposal on Which Its Impacts Analysis Could and Should Have Been Based.............................................. 11

     B.  USFWS Failed to Limit Incidental Take of Protected Species. ..................................... 14

       1.   The ITS Exempted an Unlimited Amount of Incidental Take from Liability............ 14

       2.   The ITS Failed to Include a Trigger for Reinitiation.................................................. 15

       3.   The ITS Included No Meaningful Terms and Conditions to Minimize Incidental Take............................................................................................................. 17

     C.  The Non-Statutory, Permit-Level Technical Assistance Process Cannot and Does Not Substitute for the Programmatic Consultation ESA Requires................................. 20

       1.   USFWS Was Required to Conduct the ESA-Mandated Analyses at the Programmatic Level.................................................................................................... 20

       2.   The Non-Statutory Technical Assistance Process Was Not an Adequate Substitute for the Robust Analysis Required by Section 7. ........................................ 26

     D.  The Defendants' Reliance on *Cooling Water* Fails Because That Case is an Outlier That is Distinguishable, Poorly Reasoned, and Wrongly Decided. ................................ 30

   II.   EPA's Reliance Was Unlawful................................................................................................ 33

   III.  EPA Arbitrarily Determined "No Effect" to NMFS Species. ............................................. 35

   IV.  EPA Unlawfully Approved Florida's Program. .................................................................... 37

     A.  Florida's Program Failed to Meet Minimum Enforcement Standards. ........................... 38

       1.   Florida's Mens Rea Conflicts with the Clean Water Act. ........................................... 38

       2.   Florida's Statute of Limitations is Contrary to the Clean Water Act. ........................ 49

     B.  The State Program's Consideration of Water Quality Impacts and Contamination is Less Stringent. ................................................................................................................ 50

C.  The State Program Unlawfully Does Not Require the State to Independently Assess and Evaluate the Impacts of an Individual Permit. ........................................................ 53

D.  The State Program Did Not Demonstrate that No Permit Would Be Issued that Would Jeopardize Species or Adversely Modify or Destroy Critical Habitat. ............... 57

E.  EPA Approved a State Program That Failed to Demonstrate That Only Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State. ........................................................................... 58

    1.  Under the Clean Water Act, the Corps Retains Exclusive Jurisdiction Over Traditionally Navigable Waters ("TNWs"). ................................................. 58

    2.  The Corps Unlawfully Excluded "Historic Use" RHA Section 10 Waters from the "Retained Waters" List. ................................................. 62

    3.  It was Unreasonable for the Corps to Base its Retained Waters List on An Admittedly Outdated RHA Section 10 List. ................................................. 64

    4.  EPA's Approval of Florida's Program Based on the Corps' Retained Waters List Was Unreasonable. ................................................. 69

    5.  Florida Unlawfully Failed to Incorporate the Federal Definition of WOTUS. .......... 70

V.  EPA's Determination that Florida's Application was Complete was Unlawful and Therefore not Reasonable. ................................................. 71

STANDING AND JUSTICIABILITY ................................................. 74

I.  Plaintiffs Have Standing to Challenge EPA's Approval of Florida's Program and the Underlying Deficiencies on Which the Approval Is Based (Claim Two). ....................... 74

    A.  EPA's Decision to Transfer 404 Authority to the State Harms Plaintiff Organizations. ................................................. 74

        1.  Plaintiffs are Harmed by the Loss of Information Developed Through NEPA Review and ESA Consultation. ................................................. 74

        2.  Plaintiffs are Harmed Because of Florida's Restrictive Access to Courts. ............... 79

    B.  EPA's Decision to Transfer 404 Authority to the State Threatens the Aesthetic and Recreational Interests of Plaintiffs' Members. ................................................. 83

    C.  Plaintiffs Need Not Independently Show Harm from the State's Less Stringent Enforcement Program, But They Have Done So. ................................................. 85

II.  Plaintiffs Have Standing to Challenge EPA's Arbitrary and Capricious Completeness Determination (Claim One). ................................................. 90

III.  Plaintiffs' Claims Are Ripe for Review. ................................................. 91

    A.  Plaintiffs' Challenge to USFWS' Unlawful ITS is Ripe. ................................................. 92

    B.  The Corps' Unlawful Retained Waters List, and EPA's Reliance on It to Approve Florida's Program, is Ripe for Review. ................................................. 96

C.  EPA's Unlawful Determinations on NMFS-listed Species Are Ripe for Review. ......... 98

CONCLUSION.................................................................................................................... 99

iv

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Air Transp. Ass'n of Am. v. FAA,*
  169 F.3d 1 (D.C. Cir. 1999) ................................................................72

*Akiak Native Cmty. v. EPA,*
  625 F.3d 1162 (9th Cir. 2010) ...........................................................42

*Ali v. Fed. Bureau of Prisons,*
  552 U.S. 214 (2008) ............................................................................46

*Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce,*
  697 F.2d 303 (D.C. Cir. 1982) ...........................................................84

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
  937 F.3d 559 (D.C. Cir. 2019) ...........................................................90

*Am. Oversight v. U.S. Dep't of Veterans Affairs,*
  498 F. Supp. 3d 145 (D.D.C. 2020) ...................................................92

*Am. Petroleum Inst. v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012) ......................................................92, 94

*  *Am. Rivers v. FERC,*
  895 F.3d 32 (D.C. Cir. 2018) .............................................................84

*Am. Tel. & Tel. Co. v. FCC,*
  974 F.2d 1351 (D.C. Cir. 1992) .........................................................54

*Am. Wild Horse Campaign v. Bernhardt,*
  442 F. Supp. 3d 127 (D.D.C. 2020) ...................................................98

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,*
  282 F.3d 818 (D.C. Cir. 2002) ...........................................................70

*Appalachian Power Co. v. EPA,*
  135 F.3d 791 (D.C. Cir. 1998) ...........................................................10

*Appalachian Voices v. U.S. Dep't of Interior,*
  25 F.4th 259 (4th Cir. 2022) ..............................................................12

*Ariz. Cattle Growers' Ass'n v. USFWS,*
  273 F.3d 1229 (9th Cir. 2001) ...........................................................14

*Ass'n of American Physicians & Surgeons, Inc. v. Sebelius,*
  901 F. Supp 2d 19 (D.D.C. 2012) ......................................................75

\*      *Bennett v. Spear*,
       520 U.S. 154 (1997)..................................................................................91, 93

\*      *Burlington Truck Lines, Inc. v. United States*,
       371 U.S. 156 (1962)..................................................................................45, 53

       *Camp v. Pitts*,
       411 U.S. 138 (1973)........................................................................................53

       *Chevron v. Nat. Res. Def. Council, Inc.*,
       467 U.S. 837 (1984)..................................................................................46, 49

       *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
       316 F. Supp. 3d 349 (D.D.C. 2018)................................................................63

       *Citizens to Preserve Overton Park, Inc. v. Volpe*,
       401 U.S. 402 (1971)........................................................................................28

       *City of Dania Beach v. FAA*,
       485 F.3d 1181 (D.C. Cir. 2007)......................................................................90

\*      *City of Tacoma v. FERC*,
       460 F.3d 53 (D.C. Cir. 2006).....................................................................33, 35

       *City of Waukesha v. EPA*,
       320 F.3d 228 (D.C. Cir. 2003)........................................................................73

       *Clapper v. Amnesty Int'l USA*,
       568 U.S. 398 (2013)..................................................................................84, 85

       *Clean Wis. v. EPA*,
       964 F.3d 1145 (D.C. Cir. 2020)......................................................................11

\*      *Coal. to Save the Menominee River Inc. v. EPA*,
       423 F. Supp. 3d 560 (E.D. Wis. 2019)............................................................97

       *Conn. Nat. Bank v. Germain*,
       503 U.S. 249 (1992)........................................................................................21

\*      *Conner v. Burford*,
       848 F.2d 1441 (9th Cir. 1988) ................................................................. *passim*

       *Cooling Water Intake Structure Coal. v. EPA*,
       905 F.3d 49 (2d Cir. 2018)........................................................................ *passim*

       *Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
       365 F. Supp. 3d 28 (D.D.C. 2019) ..................................................................61

vi

*Crow Creek Sioux Tribe v. Brownlee,*
    331 F.3d 912 (D.C. Cir. 2003) ........................................................87, 88

*Crutchfield v. Cnty. of Hanover,*
    325 F.3d 211 (4th Cir 2003) ...............................................................55

*CSX Transp., Inc. v. Surface Transp. Bd.,*
    584 F.3d 1076 (D.C. Cir. 2009) ..........................................................73

*Ctr. for Biological Diversity v. EPA,*
    316 F. Supp. 3d 1156 (N.D. Cal. 2018) ...............................................36

*Ctr. for Biological Diversity v. NMFS,*
    No. CV 21-930 (BAH), 2022 WL 4235013 (D.D.C. Sept. 14, 2022) ...................60

*Ctr. for Biological Diversity v. Regan,*
    539 F. Supp. 3d 136 (D.D.C. 2021) .....................................................79

\*  *Ctr. for Biological Diversity v. Regan,*
    597 F. Supp. 3d 174 (D.D.C. 2022) ............................................ *passim*

*Ctr. for Biological Diversity v. Salazar,*
    804 F. Supp. 2d 987 (D. Ariz. 2011) ......................................18, 24, 28

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012) ...........................................................14

*Ctr. for Biological Diversity v. USFWS,*
    450 F.3d 930 (9th Cir. 2006) .............................................................95

*Ctr. for Biological Diversity v. USFWS,*
    807 F.3d 1031 (9th Cir. 2015) ..........................................12, 24, 31

*Ctr. for Biological Diversity v. Zinke,*
    369 F. Supp. 3d 164 (D.C. Cir. 2020) .................................................76

*Defs. of Crooked Lake, Inc. v. Fla. Dep't of Env't Prot.,*
    No. 17-5328, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) ....56, 57, 80

*Defs. of Wildlife v. U.S. Dep't of Interior,*
    931 F.3d 339 (4th Cir. 2019) ...............................................................9

*Devia v. NRC,*
    492 F.3d 421 (D.C. Cir. 2007) .......................................................92, 94

*Duval Utility Co. v. Fla. Public Serv. Comm'n,*
    380 So. 2d 1028 (Fla. 1980) ..............................................................56

vii

*Env't Def. v. U.S. Army Corps of Eng'rs*,
  515 F. Supp. 2d 69 (D.D.C. 2007) ...................................................80

*Env't Health Tr. v. FCC*,
  9 F.4th 893 (D.C. Cir. 2021) .......................................................35

*Ergon-W. Va., Inc. v. EPA*,
  980 F.3d 403 (4th Cir. 2020) .......................................................70

\* *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
  726 F. Supp. 2d 1195 (D. Mont. 2010) ..................................... *passim*

*Friends of Animals v. Bernhardt*,
  961 F.3d 1197 (D.C. Cir. 2020) .....................................................76

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) .......................................................76

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ........................................................55

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002) .......................................................10

*In re Grand Jury Investigation*,
  315 F. Supp. 3d 602 (D.D.C. 2018) .......................................22, 37, 51

*Greenpeace v. NMFS*,
  80 F. Supp. 2d 1137 (W.D. Wash. 2000) ............................................24

\* *Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ...........................................................92

*Hawai'i Orchid Growers Ass'n v. U.S. Dep't of Ag.*,
  436 F. Supp. 2d 45 (D.D.C. 2006) ..................................................24

*Hunton & Williams LLP v. EPA*,
  346 F. Supp. 3d 61 (D.D.C. 2018) ..................................................65

\* *Idaho Conservation League v. EPA*,
  820 F. App'x 627 (9th Cir. 2020) ........................................... *passim*

*Jama v. U.S. Immigr. & Customs Enf't*,
  543 U.S. 335 (2005) ..................................................................39

*Judulang v. Holder*,
  565 U.S. 42 (2011) ...................................................................54

*Kadi v. Geithner*,
  42 F. Supp. 3d 1 (D.D.C. 2012) ........................................................84

*Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*,
  702 So.2d 1352 (Fla. 1st Dist. Ct. App. 1997)..................................82

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ............................................................................40

\*    *Lone Mountain Processing, Inc. v. U.S. Sec'y of Labor*,
  709 F.3d 1161 (D.C. Cir. 2013) ..................................................60, 61

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................78

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................................................................90

*Mcclash v. Manasota-88, Inc.*,
  No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hearings June 25, 2015)  ....................82

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) ....................................................92

\*    *Menominee Indian Tribe of Wis. v. EPA*,
  947 F.3d 1065 (7th Cir. 2020) .................................................. *passim*

\*    *Miccosukee Tribe of Indians of Fla. v. United States*,
  566 F.3d 1257 (11th Cir. 2009) ..................................................12, 14

\*    *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..........................................................................13

\*    *Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ............................................................86

\*    *N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) ........................................................22

*Nat. Res. Def. Council, Inc. v. Evans*,
  279 F. Supp. 2d 1129 (N.D. Cal. 2003) .................................... *passim*

*Nat. Res. Def. Council v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988)................................................41, 42, 45

\*    *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ........................................................63

*Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior*,
  538 U.S. 803 (2003)................................................................................70, 92

\* *Nat'l Wildlife Fed'n v. Brownlee*,
  402 F. Supp. 2d 1 (D.D.C. 2005)....................................................23, 27, 91

\* *Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ..................................................................36

*New Hanover Township v. U.S. Army Corps of Eng'rs*,
  992 F.2d 470 (3d Cir. 1993)................................................................94, 95

\* *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
  496 F. Supp. 3d 31 (D.D.C. 2020)..........................................................79

*Oceana Inc. v. Evans*,
  384 F. Supp. 2d 203 (D.D.C. 2005)..........................................................92

*Oceana, Inc. v. Pritzker*,
  75 F. Supp. 3d 469 (D.D.C. 2014) ..........................................................15

\* *Oceana, Inc. v. Ross*,
  No. 15-055, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ..............10, 15, 16

*Oceana, Inc. v. Ross*,
  No. CV 12-0041 (PLF), 2020 WL 5834832 (D.D.C. Oct. 1, 2020) ..........37

\* *Or. Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ..................................................................14

*Otay Mesa Prop. L.P v. U.S. Dep't of Interior*,
  144 F. Supp. 3d 35 (D.D.C. 2015)..........................................................28

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
  538 F. Supp. 2d 242 (D.D.C. 2008)..........................................................15

*Patel v. Garland*,
  142 S.Ct. 1614 (2022)..........................................................................60

\* *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015)..............................................................79

*Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*,
  43 F. Supp. 3d 28 (D.D.C. 2014).............................................................65

*Pub. Citizen Health Resch. Grp. v. FDA*,
  740 F.2d 21 (D.C. Cir. 1984)..............................................................92, 94

x

*PUD No. 1, of Jefferson County v. Wash. Dep't of Ecology*,
    511 U.S. 700 (1994) ............................................................................41

*Sackett v. EPA*,
    598 U.S. ___, 2023 WL 3632751 (2023) .............................38, 59, 70

\*  *San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ....................................................8, 12, 25

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ...........................................................................8

\*  *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
    992 F.3d 1071 (D.C. Cir. 2021) .......................................................33, 34

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ...........................................................87

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ..............................................................15

\*  *Sierra Club v. W. Va. Dep't of Env't Prot.*,
    64 F.4th 487 (4th Cir. 2023) ...........................................................55, 57

*Strahan v. Roughead*,
    910 F. Supp. 2d 358 (D. Mass. 2012) ...................................................12

*Suburban Trails, Inc. v. N.J. Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986).............................................................95, 96

*Sw. Ctr. for Biological Diversity v. Babbitt*,
    215 F.3d 58 (D.C. Cir. 2000) ..............................................................12

*Texas v. United States*,
    523 U.S. 296 (1998)......................................................................92, 94

*TransUnion LLC v. Ramirez*,
    141 S.Ct. 2190, 2207 (2021)................................................................78

*U.S. Dep't of Com. v. New York*,
    139 S.Ct. 2551 (2019)...................................................................71, 76

*United States v. Atl. States Cast Iron Pipe Co.*,
    No. 03-852 (MLC), 2007 WL 2282514 (D.N.J. Aug. 2, 2007).............................48

*United States v. Doe*,
    701 F.2d 819 (9th Cir. 1983) ..............................................................46

xi

*United States v. Maes*,
  546 F.3d 1066 (9th Cir. 2008) ..................................................................46

*United Techs. Corp. v. U.S. Dep't of Def.*,
  601 F.3d 557 (D.C. Cir. 2010) ............................................................10, 11

*W. Watersheds Project v. Kraayenbrink*,
  538 F. Supp. 2d 1302 (D. Idaho 2008) .....................................................21

*Waterkeeper Alliance v. Regan*,
  41 F.4th 654 (D.C. Cir. 2022) ..................................................................88

*White v. U.S. Army Corps of Eng'rs*,
  No. 22-CV-06143-JSC, 2023 WL 2347379 (N.D. Cal. Mar. 3, 2023) ...........36

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) .....................................................................7

* *WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) .............................................................85, 86

*WildEarth Guardians v. U.S. Army Corps of Eng'rs*,
  429 F. Supp. 3d 1224 (D.N.M. 2019) ..........................................15, 18, 24

*Wyo. Outdoor Council v. Dombeck*,
  148 F. Supp. 2d 1 (D.D.C. 2001) .............................................................94

**Federal Statutes**

5 U.S.C. § 706(2)(A)..........................................................................46, 49

16 U.S.C. § 1536................................................................................21

16 U.S.C. § 1536(a)(2).................................................................11, 21

16 U.S.C. § 1536(b)(1)(A)...................................................................21

16 U.S.C. § 1536(b)(3)(A).........................................................7, 21, 28

16 U.S.C. § 1536(b)(4) .......................................................................14

16 U.S.C. § 1536(b)(4)(iv) ...........................................................17, 18

16 U.S.C. § 1536(c)(2).......................................................................10

16 U.S.C. § 1536(o).............................................................17, 19, 26, 30

16 U.S.C. § 1536(o)(2) .......................................................................17

xii

JA.858

33 U.S.C. § 401 ..................................................................................................63

33 U.S.C. § 403 ..................................................................................................63

33 U.S.C. § 407 ..................................................................................................63

33 U.S.C. § 1311(b)(1)(C) ................................................................................40

33 U.S.C. § 1313(d) ..........................................................................................52

33 U.S.C. § 1313(d)(4)(B) ................................................................................52

33 U.S.C. § 1319 ..............................................................................................40

33 U.S.C. § 1319(a)(1) ......................................................................................39

33 U.S.C. § 1319(c)(1) ................................................................................38, 48

33 U.S.C. § 1319(c)(1)(A) ................................................................................39

33 U.S.C. § 1319(g)(1) ......................................................................................39

33 U.S.C. § 1344 ..............................................................................................41

33 U.S.C. § 1344(g)(1) ..........................................................................59, 63, 71

33 U.S.C. § 1344(h)(1) ..........................................................................37, 49, 87

33 U.S.C. § 1344(h)(1)(A)(i) ..................................................................37, 40, 50

33 U.S.C. § 1344(h)(1)(B) ................................................................................40

33 U.S.C. § 1344(h)(1)(G) ............................................................................37, 39

33 U.S.C. § 1344(h)(2) ......................................................................................87

33 U.S.C. § 1344(h)(2)(A) ............................................................................37, 50

33 U.S.C. § 1344(s) ..........................................................................................40

33 U.S.C. § 1365(a) ..........................................................................................82

33 U.S.C. § 1365(g) ..........................................................................................82

**Legislative Materials**

H.R. Rep. No. 97-567, pt. 1 (1982) ....................................................................18

S. Rep. No. 97-418 (1982) ................................................................................18

**Code of Federal Regulations**

33 C.F.R. § 328.3(a)(1) (2020) ..............................................................................63

33 C.F.R. § 329.4 ...........................................................................................63, 65

33 C.F.R. § 329.16(a) .....................................................................................64, 65

40 C.F.R. pt. 230 .................................................................................................37

40 C.F.R. pt. 233 .................................................................................................37

40 C.F.R. § 131.12 ..............................................................................................50

40 C.F.R. § 230.3(d) ...........................................................................................52

40 C.F.R. § 230.10(c) ..........................................................................................56

40 C.F.R. § 230.11 ........................................................................................52, 56

40 C.F.R. § 230.11(d) ..........................................................................................52

40 C.F.R. § 230.20–54 .........................................................................................56

40 C.F.R. § 230.22 ..............................................................................................52

40 C.F.R. § 233.1 ..........................................................................................43, 49

40 C.F.R. § 233.1(c) ............................................................................................45

40 C.F.R. § 233.1(d) ............................................................................................37

40 C.F.R. § 233.41(a)(3) ......................................................................................45

40 C.F.R. § 233.41(a)(3)(i) ..................................................................................45

40 C.F.R. § 233.41(a)(3)(ii) ...........................................................................44, 45

40 C.F.R. § 233.41(a)(3)(iii) ................................................................................46

40 C.F.R. § 233.41(b)(2) ..........................................................................42, 43, 44

40 C.F.R. § 233.41(d) ..........................................................................................47

40 C.F.R. § 233.41(d)(1) ......................................................................................42

50 C.F.R. § 402.02 ..............................................................................................22

50 C.F.R. § 402.12(a) ..........................................................................................10

50 C.F.R. § 402.12(k) ................................................................................10

50 C.F.R. § 402.14 .....................................................................................7

50 C.F.R. § 402.14(a) ...............................................................................22

50 C.F.R. § 402.14(c)(4) ...........................................................................21

50 C.F.R. § 402.14(d) ..........................................................................11, 28

50 C.F.R. § 402.14(g) ....................................................................10, 22, 28

50 C.F.R. § 402.14(h) .........................................................................22, 28

50 C.F.R. § 402.14(i) ..........................................................................22, 28

50 C.F.R. § 402.14(i)(1)(i) .......................................................................14

50 C.F.R. § 402.16(a)(1) ..........................................................................16

50 C.F.R. § 402.16(a)(2) ..........................................................................16

50 C.F.R. § 402.16(a)(4) ..........................................................................16

**Federal Register**

44 Fed. Reg. 34,244 (June 14, 1979) ........................................................43

45 Fed. Reg. 85,336 (Dec. 24, 1980) ..........................................51, 55, 84

45 Fed. Reg. 85,343 (Dec. 24, 1980) ........................................................55

53 Fed. Reg. 20,764 (June 6, 1988) ......................................43, 45, 47, 48, 50

80 Fed. Reg. 51,020 (Aug. 21, 2015) ................................................50, 52

85 Fed. Reg. 83,533 (Dec. 22, 2020) ........................................................54

**State Statutes**

Fla. Stat. § 120.57 ....................................................................................82

Fla. Stat. § 120.569 ..................................................................................82

Fla. Stat. § 373.4146 ................................................................................56

Fla. Stat. § 403.412 ............................................................................81, 82

Fla. Stat. § 403.412(2)(a) ...................................................................81, 82

Fla. Stat. § 403.412(5)................................................................................81, 82

Fla. Stat. § 403.412(6)........................................................................................82

Fla. Stat. § 403.412(7)................................................................................81, 82

**State Administrative Code**

Fla. Admin. Code R. 62-330.301...........................................................................56

Fla. Admin. Code R. 62-330.301(1)(e)..................................................................52

Fla. Admin. Code R. 62-330.302...........................................................................56

Fla. Admin. Code R. 62-331.053(3)(a)(6)..............................................................56

Fla. Admin. Code R. 62-331.210–248.....................................................................8

**Other Authorities**

Complaint, Miccosukee Tribe of Indians of Fla. v. EPA, No. 22-CV-22459-KMM
(S.D. Fla. Aug. 4, 2022).............................................................................3

EPA, *NPDES State Program Authority*, https://www.epa.gov/npdes/npdes-state-
program-authority (last accessed June 3, 2023)..........................................31

Letter from Roy E. Crabtree, NMFS, to Donald W. Kinard, Corps, (Nov. 20, 2017)
http://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577..................25

NMFS, Biological Opinion on the Federally Regulated Oil and Gas Program Activities
in the Gulf of Mexico (2020), https://repository.library.noaa.gov/view/noaa/23738.............25

NOAA, NOAA Institutional Repository,
https://repository.library.noaa.gov/gsearch?collection=noaa%3A5&terms=Bio
logical+opinion (last visited May 19, 2023)...........................................77

U.S. Army Corps of Eng'rs, *Supplement to the Jacksonville District Navigable Waters Lists*
(October 5, 2017),
https://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_f
actors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-
123156-363 (last accessed June 4, 2023)...................................................64

USFWS & NMFS, ESA Section 7 Consultation Handbook (1998).......................................12, 21

USFWS, Environmental Conservation Online System (ECOS),
https://ecos.fws.gov/ecp/report/biological-opinion (last visited May 19, 2023) ...................77

xvi

## INTRODUCTION

The Defendants and Florida rely heavily on "cooperative federalism" to justify EPA's end-run around statutory requirements to approve Florida's 404 program.  But Congress did not authorize the approval of state programs that circumvent federal requirements in the name of "cooperation."  Congress intended that states administer Clean Water Act Section 404 programs *only* insofar as states are willing and able to establish programs that meet federal requirements. In the years since state assumption has been authorized, Congress has seen no need to amend these statutes so as to "facilitate" more states' assumption of Section 404.

The Defendants argue their actions were "reasonable" because 404 assumption is hard. But if it is hard, there is good reason.  The Clean Water Act recognizes the potential for environmental devastation from dredging and filling waters of the United States, including wetlands, and, along with the Rivers and Harbors Act ("RHA"), ensures federal control over the Nation's navigable, and traditionally navigable, waters.  The Endangered Species Act recognizes that protecting biodiversity must be given the highest of priorities.  That few states have been able or willing to meet federal standards does not empower federal agencies to override federal statutes.

Moreover, the record shows that the Defendants could have complied with federal law but chose not to.  They argue that USFWS could not possibly have projected the impacts to species from future 404 projects even though they had complete information about prior 404 projects because USFWS had performed those consultations itself.  They do not dispute that they had other options available to them, including federalizing permits likely to adversely affect listed species, that would have complied with the ESA and allowed assumption to occur.  And EPA argues that it was good enough for the state program to be close enough, even where the

1

state program failed to meet minimum federal standards.  They argue that the Corps could not have performed the assessment of Florida's waterways that the Corps itself began before abruptly changing course, because it would have been "time-consuming."  Ensuring compliance with federal law may have taken more time than the Defendants were willing to expend, but expedience does not trump federal law.

Congress' enactments mean that the Defendants were not writing on a blank slate.  The agencies were required to follow federal law; they were not entitled to choose their own adventure to find a path for state approval outside of what Congress has authorized.  Cooperative federalism is not a magic erase pen for the laws Congress has written.

## **STATEMENT OF FACTS**

Neither the Defendants nor Florida contests Plaintiffs' Statement of Facts.  Florida, for example, offers no record evidence to rebut Plaintiffs' factual assertions on the State's abysmal environmental record.  *Compare* Dkt. 98 at 22 *with* Dkt. 102 at 15–17.  Indeed, the Florida experience of "already operating most federal environmental programs," Dkt. 102 at 15, has been a failure, especially in the realm of the Clean Water Act.  *See, e.g.*, Dkt. 98 at 22; EPA-HQ-OW-2018-0640-0386-A1, at 5 (Plaintiffs' Comments to EPA).

Florida also makes a series of disputed claims, many of which cite no evidence at all, much less anything found in the administrative record.  For example, Florida boasts of all its purported investments in environmental protection, Dkt. 102 at 15, while neglecting to mention that its application to EPA claimed it could (and would) administer the Section 404 program without an additional cent in funding.  Florida touts its February–June 2020 state rulemaking process, *id.* at 17, without acknowledging the disruptions to the public caused by the unfolding of the novel coronavirus pandemic and multiple requests to postpone rulemaking to allow adequate

2

participation.  And the State touts its engagement with Florida's tribes, *id.* at 19, without

acknowledging that one of them is suing EPA for approving Florida's program, in a case in

which Florida has intervened.  *See* Complaint, Miccosukee Tribe of Indians of Fla. v. EPA, No.

22-CV-22459-KMM (S.D. Fla. Aug. 4, 2022).

Florida relies on a May 10, 2023, declaration by the Florida Department of

Environmental Protection's ("FDEP's") general counsel to offer a rosy picture of its

administration of the 404 program.  But this declaration fails even to acknowledge EPA's April

6, 2023, correspondence to FDEP expressing the federal agency's "continued concerns with

FDEP's implementation" of the program, including (1) its continued disregard for EPA's

directive as to the State applying a vacated, illegal federal regulation; (2) inadequacies with the

FDEP's jurisdictional determinations; (3) incomplete or missing information and documentation

from FDEP's database; (4) issues with FDEP's coordination with the Corps; and (5) problems

with retaining staff in its 404 program, which leads to a drain of expertise.  Ex. 1 at 6, 29–38

(Crooks Dec. ¶ 10, Ex. B).[1]  The Court should also reject the remainder of Florida's unreliable

assertions, which Plaintiffs address below to the extent they relate to particular claims.

## **ARGUMENT**

Plaintiffs have demonstrated that EPA's approval of Florida's 404 program, and the

agency actions underlying that decision, failed to comply with the Clean Water Act, the ESA,

and the RHA.  As shown below, the Defendants' theory that cooperative federalism authorized

the agencies to circumvent Congressional requirements for state assumption is contrary to law.

---

[1] Nor does the declaration acknowledge that the purported "denials" of individual permit applications make clear that the applicant can resubmit another application without prejudice and were based solely on the applicant's non-responsiveness.  Ex. 1 at 6 (Crooks Dec. ¶ 10).

Florida's justiciability arguments also lack merit. Plaintiffs therefore respectfully request that their Motion for Summary Judgment be granted, that the Defendants' and Florida's Cross-Motions for Summary Judgment be denied, and that the Defendants' actions be vacated.

**I.     USFWS Violated the ESA by Failing to Assess the Impacts of EPA's Action.**

Before EPA could approve Florida's program, the agency was required to engage in ESA Section 7 programmatic consultation with federal wildlife agencies to determine whether EPA's approval of Florida's program, and its implementation as a whole, threatened to jeopardize ESA-listed species and/or adversely modify or destroy their critical habitat.[2]  If, after performing the analyses required by Section 7 of the ESA, the wildlife agencies found that EPA's action was not likely to have impermissible effects but would likely lead to incidental take of protected species, the wildlife agencies were required to issue an incidental take statement ("ITS") articulating limits on that take, which, if exceeded, would trigger reinitiation of programmatic consultation. But USFWS failed at these tasks, and this alone is a sufficient basis for the Court to find that EPA's approval of Florida's program was unlawful and must be set aside.

Plaintiffs have shown that USFWS violated the ESA in three ways. First, in the programmatic biological opinion ("BiOp"), USFWS refused to consider impacts to threatened and endangered species that would result from EPA's transfer of 404 authority to the State and the resulting implementation of the State 404 program. Dkt. 98 at 37–41. This refusal violated the ESA's requirement that any BiOp—including a programmatic BiOp—use the best available science to analyze the impacts to species from the agency action under review. *Id.*  Second,

---

[2] Plaintiffs agree that EPA's approval of a state 404 program is a discretionary action requiring the agency to consult with USFWS and NMFS on the impact of that action on ESA-listed species. *Cf.* Dkt. 73 at 11 (characterizing Count Five as challenging decision that EPA approval of 404 assumption program is discretionary action triggering ESA consultation).

4

despite its refusal to assess species impacts, USFWS must have determined that take of species was likely (a predicate to issuing an ITS) yet failed to project the amount or extent of anticipated take, also in violation of the ESA. *Id.* at 42–43. Third, without setting any limit on the anticipated take, USFWS issued an ITS that granted the State and all future state permittees an exemption from all incidental take liability for permits issued by the State, so long as permittees complied with permit conditions. *Id.* at 42–45.

USFWS' attempt to defend this BiOp based on the non-statutory technical assistance process fails because the ESA does not authorize proxies for meeting the procedural and substantive requirements of Section 7. Dkt. 99 at 62. Further, Plaintiffs have shown that (1) the technical assistance process, too, lacks key ESA guardrails—including the requirement to use the best available science to determine impacts to species; and (2) USFWS failed to bind itself to performing any analysis or making any recommendations for individual permits, meaning that state 404 permits may issue without USFWS providing any input at all. Dkt. 98 at 45–49. If allowed to stand, USFWS' approach would allow the agency to avoid the ESA's rigorous procedural and substantive requirements at both the programmatic and the permit level.

The Defendants have no viable response to these points. They deflect as to their programmatic duties by claiming that it would be too difficult to "predict" future impacts, Dkt. 99 at 72, ignoring the fact that USFWS had complete historical information of 404 consultations in Florida on which it could (and should) have based this analysis and made projections, as wildlife agencies routinely do in programmatic BiOps as shown below. Dkt. 98 at 42.

As to the ITS, the Defendants admit that they did not specify any limit on incidental take, again on the theory this would be too difficult to predict, Dkt. 99 at 76–78, even though take limits are not intended as predictions but rather as safeguards to require reinitiation for an agency

to reconsider its assumptions and the adequacy of its protective measures should the anticipated

take be exceeded.  USFWS also deflects when it points to the possibility of reinitiating

consultation on individual permits, *id.* at 79–80, because that reinitiation by definition can only

relate to an individual permit, not the exceedance of take at a programmatic level which would

require reinitiation of consultation at the programmatic level.  There is also no way to tell when

or whether USFWS' take assumptions prove inaccurate at the programmatic level because

USFWS failed to analyze the impacts from EPA's action on species and failed to project

expected levels of take.  This leaves only USFWS' closed-door, subjective judgment.

The Defendants ask the Court to ignore all these ESA violations because the BiOp and

ITS were modeled on a similar approach approved by the Second Circuit in *Cooling Water*

*Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018)  Dkt. 99 at 56–61.  Although

Plaintiffs submit that *Cooling Water* was wrongly decided, as discussed later, the Court need not

reach that issue because the circumstances in that case were materially different from those

presented here, most notably because the agency in that case had no information at its disposal

on which to base the analyses required by the ESA.  Dkt. 98 at 49–51, 49 n.21.

**A.  USFWS Failed to Conduct the Analysis Required by the ESA.**

In determining that EPA's approval of Florida's program would not jeopardize protected

species, USFWS failed to conduct an adequate programmatic consultation, believing it could

defer any analysis to the technical assistance process for individual permits.[3]  Dkt. 98 at 37–38.

As a result, the programmatic BiOp failed to include the analysis and information required to

---

[3] "Individual permits" are required for dredge and fill projects that do not qualify for a State 404
general permit and are not otherwise exempt from Section 404 requirements.  EPA-HQ-OW-
2018-0640-0002-A20, at 14 (404 Handbook).

determine whether EPA's action (as opposed to any individual permit) would jeopardize protected species or adversely modify or destroy critical habitat. *Id.* at 38–41.

But Congress clearly defined the required contents of a BiOp which must include the information on which the jeopardy opinion is based, stating the BiOp must "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). *Accord* 50 C.F.R. § 402.14. Thus, the BiOp here is unlawful because it failed to (1) analyze the full scope of EPA's action; (2) use the best available science to analyze the effects of that action; (3) analyze the baseline status of the species; and (4) add the effects to the baseline to determine whether EPA's action would jeopardize species or adversely modify or destroy critical habitat.

Unable to point to anywhere in the BiOp for the programmatic analyses required by the ESA (because there are none), the Defendants cobble together references to state laws and regulations (which contain no analysis) and rely on EPA's vacuous biological evaluation ("BE"). At most, USFWS relied on the BE as providing an analysis of the baseline status of the species. The Defendants do not dispute that USFWS failed to consider the effects of EPA's action on Florida's threatened and endangered species, and do not attempt to defend USFWS' BiOp as having performed an adequate effects analysis on the merits.

### 1. USFWS Failed to Assess the Full Scope of EPA's Action.

USFWS' myopic focus on Florida's individual permit process failed to account for and to consider the impacts to species from EPA's entire action as required by the ESA. The agency action included not only individual permit decisions, but also the State's administration of existing general permits, its "no permit required" decisions, its compliance and enforcement activities, and the loss of NEPA analysis and ESA consultation. Dkt. 98 at 38. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) ("agency action" is defined broadly).

7

The Defendants fail to point to any evidence that USFWS analyzed the impacts of these components of EPA's decision to transfer authority over the 404 program to the State. They cite no explanation in the BiOp as to the impacts of those aspects of the program, how those program components factored into USFWS' jeopardy determination, or whether those program components would likely result in incidental take. The Defendants' claim that Florida had not issued any general permits, Dkt. 99 at 66, is belied by the thirty-eight general permits promulgated in the state program, Fla. Admin. Code R. 62-331.210–248, and only underscores the fact that USFWS failed to consider the impacts of general permits to be issued by the State.

The Defendants argue that USFWS could ignore "no permit required decisions" because Florida has no discretionary control over projects that do not require permits, Dkt. 99 at 67 & n.18, but USFWS itself did not assert this as a basis for declining to consider the impact of those decisions. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (reviewing court "must judge the propriety" of an agency's action "solely by the grounds invoked by the agency"). Moreover, *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014), explains that even non-discretionary components of an agency action must be considered as part of the agency action analyzed. *Id.* at 639–40. And, in any event, the State *does* exercise discretion when deciding to issue a "no permit required" decision.[4]

As to NEPA and the ESA, the Defendants concede that these processes would no longer apply but argue that USFWS was authorized to ignore them for that reason. Dkt. 99 at 67 n.19. They cite no authority, however, for the proposition that an agency can ignore the impact of the

---

[4] The Defendants attempt to draw parallels to the Corps' jurisdictional determinations to argue "no permit required" decisions are non-discretionary, but EPA itself has said that they are different. Ex. 1 at 38 (Crooks Dec. Ex. B).

loss of protections, when the ESA mandates that all impacts to species be considered, even if those impacts flow from actions that are otherwise lawful.[5]

And as to monitoring and enforcement, the Defendants point to the BiOp's conclusory statement that the technical assistance process will ensure that compliance is monitored and enforced for individual state 404 permits. Dkt. 99 at 66–67. The technical assistance process, however, operates only at the individual permit-by-permit level. The Defendants' argument, thus, does not demonstrate that USFWS considered the impact to species of Florida's monitoring and enforcement at the programmatic level. Nor do the Defendants' citations to state laws, Dkt. 99 at 66–67 & n.20, show that USFWS considered the impacts of those laws. *See Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353 (4th Cir. 2019) (short, perfunctory statements do not suffice for analysis of effects).

### 2. USFWS Failed to Evaluate the Baseline Status of Protected Species.

As Plaintiffs have shown, the baseline section of the BiOp includes only generic descriptions of wetlands losses without articulating the connection between those wetlands losses and any particular species or critical habitat area. Dkt. 98 at 38–39. The Defendants are unable to point to any baseline analysis of species performed by USFWS relying instead on the mirror-image section in EPA's BE, Dkt. 99 at 68–69; *compare* FWS-006028, at FWS-006083–92 (BiOp) *with* FWS-005610, at FWS-005662–80 (BE), which is a near carbon copy of Florida's BA, *compare* EPA-HQ-OW-2018-0640-0387-A8 (BA) *with* FWS-005610–5906 (BE), and which suffers the same flaws as the BiOp.[6]

---

[5] Even if the loss of NEPA and the ESA was an intended result of 404 assumption, that does not mean it is not an "effect" that USFWS was required to analyze.

[6] USFWS' incorporation of the BE's discussion of Corps permitting data does not show any USFWS analysis. Dkt. 99 at 69 n.23. And neither the BA or BE contain the ESA-mandated analyses, and so USFWS could not rely on them to claim the analysis has been done.

9

But the Defendants identify nothing in the BiOp or the record to show any independent analysis by USFWS in adopting the BE, and their conclusory statement that the BE was the best available information deserves no deference, Dkt. 99 at 68–69. *See United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ("[Courts] do not defer to [an] agency's conclusory or unsupported suppositions."); *Oceana, Inc. v. Ross*, No. 15-055, 2020 WL 5995125 at *23 (D.D.C. Oct. 9, 2020) (rejecting NMFS' attempt to "list and describe data that it purported to incorporate into its jeopardy analysis—without indicating how that data actually factors into the analysis"). USFWS has an independent duty to evaluate the baseline status of species, 50 C.F.R. § 402.14(g), which cannot be met by adopting, without discussion or analysis, the action agency's BE, which is intended only "to identify any endangered or threatened species which is likely to be affected" by the proposed action, 16 U.S.C. § 1536(c)(2); *see also* 50 C.F.R. § 402.12(a), (k). USFWS cannot hang its hat on the self-interested submission provided by the State and EPA. *See Gerber v. Norton*, 294 F.3d 173, 184–85 (D.C. Cir. 2002) (USFWS unlawfully allowed regulated entity to make findings USFWS was required to make).

The Defendants curiously suggest that Plaintiffs failed to identify any actions that were omitted from the baseline, Dkt. 99 at 68 n.21, but Plaintiffs have pointed precisely to what USFWS failed to consider in its baseline analysis: species and critical habitat, Dkt. 98 at 38–39.

Contrary to the Defendants' argument, *Appalachian Power Co. v. EPA* does not justify granting USFWS deference here. Dkt. 99 at 69. In *Appalachian Power*, plaintiffs challenged EPA's use of computer models to analyze technological improvements needed to reduce nitrogen oxides emissions. 135 F.3d 791, 801 (D.C. Cir. 1998). EPA conducted its own analyses, and plaintiffs raised factual challenges regarding the data used. *Id.* Here, by contrast, USFWS does not show it conducted any analyses that would warrant deference. "[Courts] do not defer to [an]

10

agency's conclusory or unsupported suppositions." *United Techs. Corp.*, 601 F.3d at 562. *See*

*Clean Wis. v. EPA*, 964 F.3d 1145, 1161–64 (D.C. Cir. 2020) (denying deference when nothing

in the record justified or explained agency's decision). USFWS' conclusory, unsupported

statements warrant no deference.

### 3. USFWS Ignored the Wealth of Information at Its Disposal on Which Its Impacts Analysis Could and Should Have Been Based.

As Plaintiffs have shown, USFWS possessed decades of data on consultations for Section

404 permits issued by the Corps which the agency could, and should, have analyzed to determine

the impact of EPA's decision to transfer the 404 program to the State on protected species. Dkt.

98 at 42. Assessing the roughly seventy consultations per year from 2014–2018, FWS-006028,

at FWS-006091 (BiOp), would have allowed USFWS to analyze the impacts on species based on

(1) development trends in Florida regions (e.g., Southwest Florida, which has the last remaining

habitat for the critically endangered Florida panther); (2) the types of projects that regularly

obtain Section 404 permits in Florida (e.g., road and housing projects); (3) the types and

seriousness of impacts of 404 projects (e.g., vehicle strikes for panthers, which is one of the

leading causes of panther deaths); (4) the manner and volume of potential incidental take from

404 projects, which would allow them to project the allowable level of take for species (e.g.,

assessing the take that could occur for panthers, which has an existing wild population of only

120 to 230 adults). USFWS' decision to ignore this wealth of data was impermissible, and its

vague listing of potential impacts at the taxa level was insufficient. Dkt. 98 at 39–41. *See* FWS-

006028, at FWS-006097–98 (e.g., mammals may occupy waters of the United States; dredge and

fill activities may affect habitat in terms of water quality or habitat fragmentation).

The ESA requires USFWS to use "the best scientific and commercial data available" in

its analysis. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d). "[T]he 'best scientific ... data

11

available,' does not mean 'the best scientific data possible.'" *San Luis*, 747 F.3d at 602 (citing

*Building Indus. Ass'n Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001)). *Accord*

*Nat. Res. Def. Council, Inc. v. Evans* ("NRDC"), 279 F. Supp. 2d 1129, 1180 (N.D. Cal. 2003);

*Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).  Under the ESA

"an agency cannot abdicate its responsibility to evaluate the impacts of an action on a species by

labeling available information '*uncertain*,' because doing so violates Congress' intent that

agencies 'give the benefit of the doubt to the species.'" *Miccosukee Tribe of Indians of Fla. v.*

*United States* ("*Miccosukee Tribe I*"), 566 F.3d 1257, 1267 (11th Cir. 2009) (emphasis added).

*Accord* USFWS & NMFS, ESA Section 7 Consultation Handbook at 1-7 (1998) [hereinafter

"Consultation Handbook"] (if there are gaps in information, provide the benefit of the doubt to

the species).  "These are not passive directives; rather, [USFWS] 'must seek out and consider all

existing scientific data relevant to the decision it is tasked with making.'" *Appalachian Voices v.*

*U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022).  USFWS thus cannot "ignore available

biological information." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

　　　　Here, USFWS ignored the wealth of data at its disposal, and then claimed that it would

have been too difficult to project potential impacts to species from EPA's transfer of 404

authority to the State.  But federal wildlife agencies regularly use historical consultation

information to project future impacts and take. *See, e.g.*, *Ctr. for Biological Diversity v. USFWS*,

807 F.3d 1031, 1048, 1050 (9th Cir. 2015) (programmatic BiOp using projections and modeling

to evaluate impacts and take); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 381–82 (D. Mass.

2012) (programmatic BiOp using historical data on ship strikes to project impacts); *San Luis*,

747 F.3d at 600–01, 612, 615 (conducting multiple analyses and modeling future impacts; using

historical take data to project future potential take).  And where the wildlife agencies ignore

12

available data, courts have found that decision arbitrary and capricious. *See Conner*, 848 F.2d at

1453–54 (rejecting USFWS' argument that it could not assess impacts at the programmatic level

because agency did not know the precise location of the future site-specific activities, where

USFWS had extensive information about species in the broad areas covered by lease sales).

In light of the foregoing, the Defendants' claim that historical data are only relevant as to

past projects, Dkt. 99 at 77–78, falls flat.  It cannot be squared with the fact that in this case, both

USFWS and EPA used the same historical data to determine that EPA's approval decision may

affect protected species, thus requiring formal consultation.  FWS-006028, at FWS-006089

(BiOp); FWS-005610, at FWS-005681 (BE); Dkt 99 at 78 n.26 (acknowledging USFWS' own

use of this data to approximate "number and types of permitting activities that could occur over

the next five years").  USFWS must have also relied on that information to determine that take of

protected species was likely, a required predicate finding before the agency could issue an ITS

(as it did).  There was no reasoned or adequate basis for USFWS to disregard this wealth of

information to assess the anticipated impacts of EPA's proposed action.  *See Motor Vehicle Mfrs.*

*Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Defendants' response to Plaintiffs' claim that USFWS failed to consider impacts to

Florida's nesting sea turtles is particularly telling.  Several species of protected sea turtles nest

along the beaches in Florida, with more than 90% of all sea turtle nesting in the continental U.S.

occurring in Florida.  Dkt. 98-2 at 5 (Carter Dec. ¶ 19); Dkt. 98-3 at 9–10 (Fleming Dec. ¶ 27).

Baby sea turtles can become confused and head in the wrong direction due to artificial light from

nearby development, which would require state 404 permits.  Dkt. 98-3 at 5–7 (Fleming Dec.

¶¶ 17, 21).  Light can also disorient female sea turtles when they come ashore to nest.  *Id.* at 5–6,

13 (Fleming Dec. ¶¶ 17, 36).  And yet the record contains no mention of nesting sea turtles.  The

Defendants ask the Court to merely take them at their word that USFWS considered "all ESA-listed species and their critical habitat." Dkt. 99 at 70.[7] But the law requires more.

### B. USFWS Failed to Limit Incidental Take of Protected Species.

After failing to analyze the baseline status of the species, and the impacts to any species, USFWS granted unlimited take liability exemption to EPA, the State, and all future state permittees, in perpetuity. Dkt. 98 at 42. The ITS fails to comply with ESA requirements because it does not limit incidental take, provide adequate triggers for reinitiation, or establish meaningful guardrails with which these parties must abide to be exempt from liability.

### 1. The ITS Exempted an Unlimited Amount of Incidental Take from Liability.

USFWS failed to establish any take limit for EPA's action, and so failed to create a safeguard the ESA requires. *Id.* Both the ESA and its implementing regulations explicitly require USFWS to create an incidental take limit—as either a numerical limit or a surrogate[8]—when it exempts incidental take from liability. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). *Accord NRDC*, 279 F. Supp. 2d at 1184–85 (rejecting a programmatic BiOp that failed to set take limits and instead sought to defer that decision to later review of specific actions); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1037–38 (9th Cir. 2007) (explaining that a programmatic ITS must limit take as to each species, preferably with a numerical take limit, but if not possible, a surrogate that "performs the functions of a numerical limitation" may be permitted as to the species); *Miccosukee I*, 566 F.3d at 1275 (same for a project-specific BiOp); *Ariz. Cattle Growers' Ass'n v. USFWS*, 273 F.3d 1229, 1250 (9th Cir. 2001) (same); *Ctr. for*

---

[7] The Defendants' only qualm appears to be with the length of Plaintiffs' argument, Dkt. 99 at 70, but it does not take much to say, "there is nothing there."

[8] To use a surrogate in lieu of a numerical take limit, USFWS must meet the regulatory requirements. 50 C.F.R. § 402.14(i)(1)(i). In any event, the Defendants do not claim that they used a surrogate nor that they conducted the required analysis to do so.

*Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012) (same); *Oceana, Inc., v. Ross*, 2020 WL 5995125, at *11–13 (same). There must always be some limit on take when USFWS grants liability exemptions for that take. *Contra* Dkt. 99 at 76–77. The Defendants do not contest that the ITS failed to establish a take limit at the programmatic level for any imperiled species in Florida. *Id.* at 33, 77–78.

As already explained, USFWS had a wealth of information from which it could assess what incidental take had occurred in prior projects and project potential future incidental take based on project types and development trends. This is what wildlife agencies do. *See WildEarth Guardians v. U.S. Army Corps of Eng'rs*, 429 F. Supp. 3d 1224, 1261–62, 1266–67 (D.N.M. 2019) (upholding programmatic BiOp that had designated numerical take limits for both direct take and habitat loss). The Defendants' suggestion that they lacked sufficient information to project potential incidental take therefore rings hollow. Dkt. 99 at 77–78.

The cases cited by the Defendants do not support USFWS' decision to create *no* take limit. Dkt. 99 at 76. *See Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 256–57 (D.D.C. 2008) (explaining USFWS must identify a numerical limit or use a surrogate); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 494–97 (D.D.C. 2014) (same).

### 2. The ITS Failed to Include a Trigger for Reinitiation.

Having failed to limit take, the ITS also failed to include an adequate trigger for reinitiation. Dkt. 98 at 42–43. Reinitiation cannot "be left to 'the unfettered discretion of [USFWS], leaving no method by which the applicant or the action agency can gauge their performance.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018) (requiring "a clear standard for determining when the level of anticipated take has been

15

exceeded" that cannot be based on "vague and undetectable criteria"). "This lack of a clear standard also creates a transparency problem," because now, USFWS "makes the decision about whether to reinitiate consultation behind closed doors and without a record." *Oceana*, 2020 WL 5995125, at *14. *Accord NRDC*, 279 F. Supp. 2d at 1182 (applying same "trigger" requirements for a programmatic BiOp); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1231–32 (D. Mont. 2010) (same).

By not creating a take limit, USFWS failed to articulate any measurable standard by which one can determine when an authorized amount of take has been exceeded at the programmatic level so as to require reinitiation of programmatic consultation to re-evaluate the adequacy of USFWS' analyses and protective measures. 50 C.F.R. § 402.16(a)(1).[9] Reinitiation of the technical assistance process on an individual permit is no substitute for USFWS' duties at the programmatic level. *Contra* FWS-006028, at FWS-006111 (BiOp).[10]

Further, because USFWS also failed to analyze the impacts to species in the BiOp or ITS, it is also impossible to know when "new information" as to those impacts would require reinitiation of programmatic consultation because USFWS' assumptions as to the impacts on species have proven untrue. 50 C.F.R. § 402.16(a)(2). *Contra* Dkt. 99 at 79.

Lastly, and contrary to its own regulatory requirements, USFWS avers that it would not reinitiate consultation on EPA's action even when a new species is listed. *Compare* 50 C.F.R. § 402.16(a)(4) *with* FWS-006028, at FWS-006111 (BiOp). The Defendants' argument that

---

[9] The Defendants have no response to Plaintiffs' argument that the ITS did not establish adequate monitoring and reporting requirements for incidental take at the permit level. Dkt. 98 at 43.
[10] The Defendants misleadingly cite this same language to suggest that USFWS would reinitiate consultation for the programmatic BiOp, Dkt. 99 at 33, 79 (citing FWS-006028, at FWS-006081, FWS-006093, FWS-006110), but that argument is contrary to what the ITS says, which is that reinitiation would occur as to an individual permit.

16

newly listed species would be handled through the technical assistance process, Dkt. 99 at 79,
fails because, again, that process operates only at the *individual permit* level, and not the
*programmatic* level.  It is illustrative, however, of USFWS' approach here: that it failed to
consider the impact of EPA's action on any species.

### 3. The ITS Included No Meaningful Terms and Conditions to Minimize Incidental Take.

Having failed to set any limit for incidental take so as to trigger reinitiation of
programmatic consultation, USFWS also failed to establish any meaningful reasonable and
prudent measures or implementing terms and conditions.  Dkt. 98 at 44.[11]  Instead, the ITS
simply requires that EPA abide by its own, pre-existing obligations under the Clean Water Act
and that the State engage in the technical assistance process.  *Id.*

The Defendants' claim that only reporting is required as a term and condition, Dkt. 99 at
80–81, is contrary to law.  An ITS (including a programmatic ITS) must include "terms and
conditions (*including, but not limited to*, reporting requirements) that must be complied with by
the Federal agency or applicant (if any), or both."  16 U.S.C. § 1536(b)(4)(iv) (emphasis added).
Reporting is therefore a necessary, but not solely sufficient, component of an ITS.

This language must also be read in conjunction with Section 1536(o), which extends take
liability exemption only for "taking that is in compliance with the terms and conditions specified
in a written statement provided under subsection (b)(4)(iv)."  *Id.* § 1536(o)(2).  Terms and
conditions therefore serve as the basis for the ITS' exemption of incidental take.

---

[11] The Defendants have no response to Plaintiffs' argument that the ITS' reliance on compliance
from the EPA, USFWS, the State, and all future permittees was unreasonable.  Dkt. 98 at 44–45
(citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 253–54 (D.D.C. 2003)).

Legislative history confirms that when Congress amended the ESA to create liability

exemption pursuant to Section 7, it did so with the intention of USFWS creating "mandatory and

enforceable controls on the means and level of incidental takings that may be allowed with

respect to agency action."  S. Rep. No. 97-418, at 24 (1982).  *Accord* H.R. Rep. No. 97-567, pt.

1, at 26 (1982) ("The Committee intends that such incidental takings be allowed provided that

the terms and conditions specified by the Secretary to minimize the impact of the taking are

complied with.").  Congress did not intend to weaken "one of the most effective tools for

conserving endangered wildlife," namely Section 9's take prohibition.  S. Rep. No. 97-418, at

25.  And it did "not intend[] to provide a liberal exemption from the taking prohibitions of the

Act for a large class of activities."  *Id.* at 24.  Only a "narrow set of activities that are conducted

in compliance with the specified reasonable and prudent measures shall be exempt."  *Id.*[12]

This interpretation is consistent with case law requiring that protective measures

established in an ITS be reasonably specific, certain to occur, and more than merely advisory.

*See Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1001–02 (D. Ariz. 2011)

(rejecting conservation measures that were not reasonably specific nor certain to occur);

*Forest Serv. Emps.*, 726 F. Supp. 2d at 1228 (reasonable and prudent measures cannot merely be

"advisory"); *cf. WildEarth*, 429 F. Supp. 3d at 1272 (describing programmatic BiOp terms and

conditions, including one that prohibits construction during cuckoo breeding period).

The Defendants' reliance on EPA's Clean Water Act oversight does not save the ITS'

inadequate terms and conditions.  Dkt. 99 at 80.  Fundamentally, EPA oversight is baked into

state assumption by law; it is not an additional requirement USFWS created for the purpose of

---

[12] Those "reasonable and prudent measures" are implemented as "terms and conditions."  16
U.S.C. § 1536(b)(4)(iv).

minimizing impacts to species, but part of the underlying agency action.  The Defendants cite no

authority for the proposition that directing compliance with existing law constitutes a "term and

condition" imposed by the agency to minimize impacts to species as required by the ESA.  Nor is

EPA's oversight of individual permits established under the Clean Water Act a lawful substitute

for USFWS' separate, independent duty under the ESA to impose terms and conditions to

minimize impacts to species.[13]  Importantly, compliance with the terms and conditions of an ITS

serves as a guardrail, where the failure to comply removes any incidental take liability exemption

USFWS has otherwise extended under the ESA.  16 U.S.C. § 1536(o).  EPA's oversight pursuant

to a different statute, the Clean Water Act, serves a different function, and does not determine

when and whether incidental take liability exemption is available under the ESA.

     Nor does the Defendants' reliance on the State's engagement in the non-statutory

technical assistance process constitute an adequate term and condition, Dkt. 99 at 80–81,

particularly where, as here, the Defendants contend that process is also part of the underlying

agency action.  The ESA requires USFWS to impose terms and conditions to minimize the

impact *of the action under review*.  It cannot be sufficient for USFWS to rely on the same action

to claim it has imposed the necessary terms and conditions to minimize the effects of that action.

This circular reasoning is part and parcel of USFWS' failure to comply with the ESA twice, by

---

[13] Further, EPA reviews only certain individual permit decisions as the State is processing them, allowing EPA to object or federalize those permits.  FWS-002888, at FWS-002892–93 (EPA MOU).  It does not have input on the issuance of already promulgated state general permits or the State's no permit required decisions.  *Id.*  Moreover, although EPA will review individual permits that have a "reasonable potential for affecting endangered or threatened species as determined by USFWS," *id.* at FWS-002892, USFWS' determination is only as to which species are "endangered or threatened," FWS-006639, at FWS-006639 (USFWS email), whereas the effects of the proposed individual permit are determined "by [the State], in coordination with USFWS," which is not required to provide input.  FWS-006028, at FWS-006051 (BiOp).

avoiding its obligations at the programmatic level and then claiming they will be addressed at the

permit level, which also does not follow the strictures of the ESA.

### C.  The Non-Statutory, Permit-Level Technical Assistance Process Cannot and Does Not Substitute for the Programmatic Consultation ESA Requires.

To justify these ESA violations, USFWS relied on a non-statutory technical assistance

process that (1) lacks key ESA guardrails, such as the requirement to use the best available

science; (2) only deals with individual permits and new general permits; and (3) does not require

USFWS' input on individual permit applications after preliminary species determinations.  Dkt.

98 at 45–49.  Under USFWS' approach, the agency would be allowed to avoid complying with

ESA Section 7's rigorous procedures and substantive standards altogether.  But USFWS cannot

have it both ways: the agency cannot forego full and detailed compliance with the ESA's

protective Section 7 analytical requirements at the programmatic level by deferring that analysis

until the downstream permitting stage, when the downstream permitting stage too will not apply

the full scope of the ESA's protective Section 7 analytical requirements.  The Court should reject

this attempt to create a vast loophole in the ESA's clear and rigorous protection of species.[14]

### 1.  USFWS Was Required to Conduct the ESA-Mandated Analyses at the Programmatic Level.

The ESA required USFWS to complete an adequate programmatic consultation using the

ample information USFWS has at its disposal to consider how EPA's decision and its

implementation would impact protected species and critical habitat in Florida.  Dkt. 98 at 45–46.

The plain language of the ESA, its implementing regulations, decades of case law, and the

---

[14] Counts 6 and 13 challenge USFWS' technical assistance process, and the extension of incidental take liability coverage through that process. Dkt. 77 at 44–45 ¶¶ 213–221, at 44–45 ¶¶ 213–221; Cf. Dkt. 73 at 11 (characterizing Count 6 as challenging only that USFWS circumvented Section 10 of the ESA).

wildlife agencies' own practice demonstrate that the ESA required USFWS to analyze the impact of EPA's action and its implementation at the programmatic level.[15]

First, as Plaintiffs demonstrated in their motion, *id.*, "the ESA's consultation requirements apply with equal strength, to site-specific and programmatic actions." *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1324 (D. Idaho 2008), *aff'd in part, vacated in part, remanded*, 620 F.3d 1187 (9th Cir. 2010), *and aff'd in part, vacated in part, remanded*, 632 F.3d 472 (9th Cir. 2011). The terms "programmatic" and "site-specific" appear nowhere in the statute. *See* 16 U.S.C. § 1536. Rather, Congress wrote the ESA to apply equally to "any action" taken by a federal agency. *Id.* § 1536(a)(2), (b)(1)(A). Thus, for "any action," USFWS must issue a "written statement setting forth [USFWS'] opinion, and a summary of the information on which the opinion is based detailing how the agency action affects … species or … critical habitat." *Id.* § 1536(b)(3)(A). Congress "says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992). To hold otherwise would re-write the ESA, something neither the Defendants nor the Court are authorized to do.

Second, the ESA's singular approach to consultations is confirmed by USFWS' own implementing regulations, which also treat programmatic and site-specific consultation the same. The regulations *explicitly* state that the availability of programmatic consultation "does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole." 50 C.F.R. § 402.14(c)(4). *Accord* Consultation Handbook, at E-17. Nor do the

---

[15] Plaintiffs do not contest, as the Defendants claim, the availability of programmatic consultation, Dkt. 99 at 37, 62, but rather address the legal shortcomings of *this* programmatic consultation. Nor have Plaintiffs argued that programmatic consultation requires USFWS to foretell the exact locations and impacts of future state 404 permits. *Cf. id.*

regulations create different standards for site-specific and programmatic consultations.  Formal

consultation is required for "any action" that "may affect listed species or critical habitat."  50

C.F.R. § 402.14(a), (g)–(i).  "Action" is defined broadly to include "all activities or programs of

any kind," including "the promulgation of regulations."  *Id.* § 402.02.  "When a regulation's

'language is plain, [a court] must enforce it according to its terms.'"  *In re Grand Jury*

*Investigation*, 315 F. Supp. 3d 602, 633 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019).

Third, the overwhelming weight of authority requires that any programmatic consultation

include the ESA's mandated analyses.  In the germinal case *Conner v. Burford*, 848 F.2d 1441,

the Ninth Circuit rejected USFWS' argument that the ESA permitted an incremental consultation

approach where the agency would consult on a lease sale considering only the impacts of the

lease sale, and not subsequent oil and gas activities, because the agency could consider those

site-specific impacts in later consultations.  *Id.* at 1452–53.  The court held that USFWS must

prepare a "comprehensive" BiOp that assessed all aspects of the agency action "as a whole,"

based on the best available science.  *Id.* at 1453, 1455–56.  "To hold otherwise would eviscerate

Congress' intent to 'give the benefit of the doubt to the species.'"  *Id.* at 1454.

The court in *Conner* also found support in the D.C. Circuit's opinion in *North Slope*

*Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980), because that case also recognized "that

incremental-step consultation does not vitiate the ESA requirement that [USFWS] prepare a

comprehensive [BiOp]."  *Conner*, 848 F.2d at 1455.  Rather, the court in *North Slope* recognized

a discrete exception for leasing decisions under the Outer-Continental Shelf Lands Act

("OCSLA"), because OCSLA required Section 7 consultation at all future stages and had a

system of "checks and balances" that ensured all ESA consultation requirements would be

carried out at each stage.  *Id.* at 1455–56.  *Conner* rejected USFWS' attempt to read a similar

22

exception into the Mineral Leasing Act ("MLA") because the MLA did not include the same

system of "checks and balances" as OCSLA nor require consultation at each stage, thus there

was no justification to obviate the ESA's congressional mandate. *Id.* at 1456.[16]

       Another court in the D.C. Circuit has similarly rejected an attempt to avoid adequate

programmatic consultation by relying on future permitting actions.  In *National Wildlife*

*Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), the Corps sought to avoid

programmatic consultation on a nationwide Section 404 permit because the agency planned to

evaluate each future site-specific dredge-and-fill activity that may affect the critically

endangered Florida panther. *Id.* at 10.  The court rejected this argument because the future

consideration of species-specific impacts at the permit level did not relieve the agency of its

obligation to consider the action "as a whole" at the programmatic level. *Id.* (citing 50 C.F.R.

§ 402.14(c)).  The court recognized that comprehensive consultation was necessary to "avoid

piece-meal destruction of panther habitat through [the Corps' and USFWS'] failure to make a

cumulative analysis of the program as a whole." *Id.*

       These holdings are consistent with the overwhelming body of case law.[17] *See, e.g.*,

*Forest Serv. Emps.*, 726 F. Supp. 2d at 1224–25 (rejecting a programmatic BiOp with a

superficial analysis of the effects of the action and use of a coarse filter analysis that ignored

---

[16] The Defendants ask the Court to read a similar exception into ESA consultations for the Clean
Water Act, Dkt. 99 at 74–75.  The Clean Water Act does not contain the same "checks and
balances" as OCSLA.  *See id*. at 74.

[17] As discussed in detail below, *Cooling Water* is an outlier in this body of law.

23

critical habitat impacts);[18] *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1144–45, 1150 (W.D.

Wash. 2000) (rejecting a programmatic BiOp for a fishery management plan because it did not

consider the action as a whole, including all the activities involved in fishing); *Ctr. for Biological*

*Diversity v. Salazar*, 804 F. Supp. 2d 987, 1005–10 (D. Ariz. 2011) (same and rejecting

agencies' impacts analysis that failed to address all aspects of the action and was not supported

by the best available science); *Hawai'i Orchid Growers Ass'n v. U.S. Dep't of Ag.*, 436 F. Supp.

2d 45, 54–55 (D.D.C. 2006), *aff'd sub nom. Hawai'i Orchid Growers Ass'n v. Johanns*, 249 F.

App'x 204 (D.C. Cir. 2007) (upholding a programmatic BiOp because the administrative record

was "replete with discussion" demonstrating that the impacts of the entire action were

thoroughly considered); *Ctr. for Biological Diversity v. USFWS*, 807 F.3d at 1048, 1050

(upholding a programmatic BiOp because USFWS used the best available science to analyze the

effects of the action, including extensive projections and modeling of the effects on species);

*WildEarth*, 429 F. Supp. 3d at 1264, 1266–67, 1270–72 (upholding a programmatic BiOp that

considered impacts of the action "as a whole").

Fourth, the wildlife agencies are fully capable of producing programmatic BiOps that

address the required criteria. *See, e.g.*, Biological Opinion on the Federally Regulated Oil and

Gas Program Activities in the Gulf of Mexico, Mar. 13, 2020 (programmatic BiOp including

discussion of the baseline status and impacts on marine species and critical habitat, partially

---

[18] The Defendants' attempt to distinguish *Forest Service Employees* fails.  Dkt. 99 at 64–65.  In *Forest Service Employees* and here, USFWS relied on future consideration of site-specific, species-specific impacts that would take place through a process that fell short of full Section 7 consultation (emergency consultation, 726 F. Supp. 2d at 1228, and the technical assistance process).  And in both *Forest Service Employees* and here, USFWS' actions were driven by the political winds: there, the Washington Office advised USFWS that a measure limiting aerial fire retardant on parts of the forests was "not an option," *id.*, and here EPA/USFWS took this approach at the behest of Florida, a fact the Defendants do not dispute, Dkt. 98 at 27–30.

24

specifying numerical take limits, and outlining specific terms and conditions for partially

mitigating harm to species).[19]

USFWS was not "free to choose" whether to abide by the ESA's clear mandates.  Dkt. 99

at 62–63.  And *San Luis*, 747 F.3d 581, does not counsel for such a blank check to disregard the

ESA's plain language.  That case stands for the long-understood principle that the ESA requires

USFWS to use the best information available—even if uncertain or imperfect—to conservatively

evaluate the impacts of federal actions as a whole on species while giving the benefit of the

doubt to imperiled species.  *Id.* at 607–10.  In *San Luis*, the court reviewed a "more than 400-

page [BiOp]—described by [USFWS] as the most complex [BiOp] ever prepared" dealing with

"an extremely complicated and technical subject matter covering multiple federal and state

agencies and affecting millions of acres of land and tens of millions of people."  *Id.* at 591–92,

605.  And there, USFWS conducted a thorough analysis of species and proposed a surrogate take

limit based on its analysis of historical data.  *Id.* at 598–600, 615.

Nor are Defendants correct that the action "as a whole" consisted only of EPA's approval

of the state program, Dkt. 99 at 66, and not the State's implementation of that decision, meaning

that all analysis could be deferred to the permit level.   USFWS' own description of the agency

action in the BiOp included both EPA's approval and the State's implementation of the program,

FWS-006028, at FWS-006045, FWS-006048 (BiOp).  And the ITS extends incidental take

---

[19] *Available at* https://repository.library.noaa.gov/view/noaa/23738.  *See also* Letter from Roy E.
Crabtree, NMFS, to Donald W. Kinard, Corps, (Nov. 20, 2017)
http://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577 (programmatic
BiOp for dredge and fill activities in Florida and Caribbean analyzing baseline status and impacts
on species and critical habitat, using historical consultations to project impacts from future
actions, creating criteria to mitigate harm, and authorizing no incidental take).

25

liability exemption to the State in implementing the 404 program and to all future state

permittees, *id.* at FWS-006108.  USFWS defined the agency action broadly, because an ITS can

exempt incidental take for liability only if those actions are contemplated by the BiOp.  16

U.S.C. § 1536(o).  USFWS thus had the duty to perform the requisite analyses at the

programmatic level, taking the agency action "as a whole" into account.

### 2.  The Non-Statutory Technical Assistance Process Was Not an Adequate Substitute for the Robust Analysis Required by Section 7.

To justify its failure to conduct an adequate programmatic consultation, USFWS sought

to rely on an inadequate, state-driven technical assistance process that contemplates only

individual permits and new general permits.  Dkt. 98 at 45–49.  But this technical assistance

process cannot, and does not, serve as an adequate proxy for legally mandated programmatic

consultation.  The Defendants themselves do not argue that the technical assistance process is

equivalent to Section 7 consultation.  Dkt. 99 at 74.  It has no basis in law, does not mandate

compliance with ESA guardrails like the requirement to use the best available science, and

allows the State to issue permits without any input from USFWS.  Dkt. 98 at 45–49.

But USFWS cannot have its take and eat it too.  USFWS must conduct Section 7

consultation *somewhere*, either at the programmatic level—which it refused to do—or at the site-

specific level—which it admits it does not do, instead relying on the technical assistance process

that also fails to comply with the ESA.  If USFWS had complied with its obligations to produce

an adequate programmatic BiOp that rigorously evaluates the impacts of EPA's action on species

in the State, and imposed the requisite take limits and guardrails on incidental take (such as

design characteristics for particular classes of projects, seasonal prohibitions in sensitive nesting

sites, or even no-fill zones for endemic species with limited habitat areas), then it is conceivable

that the agency could have relied on *a* technical assistance process to ensure that its assumptions

26

from the programmatic consultation proved true and to ensure that the guardrails it established were being observed. Dkt. 98 at 28–29 & n.13 (identifying other options that would have allowed assumption while also complying with the ESA). But what USFWS cannot do is use *this* technical assistance process, which itself does not conform to the requirements of Section 7 of the ESA, to avoid its duties at the programmatic level to comply with Section 7 of the ESA.

The Defendants point to nothing in the ESA that authorizes USFWS' attempt to circumvent the requirements for programmatic consultation by relying on a non-statutory, state-driven technical assistance process at the site-specific level. Nor do the Defendants show USFWS' role in this process is anything more than voluntary in nature, unbound from the requirements, standards, and procedures mandated by the ESA. Therefore, the Defendants' arguments do not support the Court "carv[ing] out a judicial exception to ESA's clear mandate that a comprehensive [BiOp] … be completed before initiation of the agency action." *See Conner*, 848 F.2d at 1455 (finding a stipulation that allegedly ensured environmental review for site-specific actions did not substitute for comprehensive programmatic consultation); *accord Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d at 10 (future site-specific consultations do not replace comprehensive programmatic consultation).

The Defendants' suggestion that the technical assistance process's use of the term "jeopardy" somehow incorporates the rigorous processes and standards required for Section 7 consultation, Dkt. 99 at 71, is contradicted by their own concession that they do not argue the technical assistance process is equivalent to Section 7 consultation, *id.* Moreover, "jeopardy" is not a term that exists in isolation in the ESA. Rather the ESA specifically directs how wildlife agencies, including USFWS, are to make determinations regarding jeopardy. The Defendants incorrectly suggest that it is sufficient under the ESA for USFWS to focus on the finish line

27

(jeopardy), without having to take the road established by Congress to get there (use best available science, perform baseline analysis of species, analyze impacts of action, determine whether take is likely, establish take limits, impose terms and conditions).  That position is contrary to law.  *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(d), (g)–(i).

Contrary to the Defendants' argument, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) does not suggest that non-statutory technical assistance provisions in which a state may issue permits that affect species without USFWS' input somehow become lawful and binding because of the "presumption of regularity."  In *Overton Park*, the Court merely alluded to the presumption of regularity in lieu of applying de novo review or requiring the agency to meet a substantial evidence test.  *Id.* at 415.  The Court itself stated that the presumption did not "shield [the agency's] action from a thorough, probing, in-depth review."  *Id.*  *Accord Otay Mesa Prop. L.P v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 54 (D.D.C. 2015) (same).  Moreover, even if that presumption required the Court to presume USFWS could create a non-statutory, voluntary technical assistance process in lieu of abiding by clear congressional mandates, Plaintiffs have overcome that presumption given the irregularity of the entire assumption process in this case.  Dkt. 98 at 22–33.

USFWS' role in the technical assistance process here is vague and voluntary.  *See Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d at 1001–02 (rejecting programmatic BiOp where conservation measures were not reasonably specific nor certain to occur); *Forest Serv. Emps.*, 726 F. Supp. 2d at 1228 (rejecting BiOp where protective measures were merely advisory).  Other than receiving and reviewing permits or providing information in response to the State's preliminary determination as to impacts on species, USFWS is not required to do

28

anything at all.[20]  USFWS *may* provide "technical assistance," but is not required to.  USFWS

"may" provide comments but is not required to.  And whatever that technical assistance might

entail, or the comments might address, is not specified at all, nor is any process by which

USFWS might arrive at the technical assistance or comments that it *may* offer.  Nothing guides

or defines USFWS' participation in the process.

And most fundamentally, the State can issue permits without any input from USFWS.

Dkt. 98 at 47–49.  These are facts the Defendants cannot dispute, because they are plain on the

face of the BiOp itself: "Once it has been determined by [the State] that an application will have

no adverse impacts or adverse effects to federally listed endangered or threatened species (or

species proposed to be listed) or their critical habitats, and the USFWS has not submitted

information or questions that would lead the State to reconsider its determination, the species

review concludes for that application."  FWS-006028, at FWS-006056.  The Defendants'

references to the *State's* obligations, Dkt. 99 at 31–32, 71–72, not only have no bearing on

*USFWS'* role, they also confirm that USFWS' role is voluntary.  FWS-006028, at FWS-006046,

FWS-006056 (USFWS "may" submit questions within twenty-days or have their silence deemed

"no comment]");  FWS-006028, at FWS-006057 (USFWS "may submit recommendations to

[the State]" for protective measures).  That the State has committed to incorporate any measures

USFWS proposes into permit conditions, Dkt. 99 at 32, 71, presupposes that USFWS will have

---

[20] The fact that USFWS will receive and review individual 404 permits, Dkt. 99 at 31, 72, is
insufficient because it does not require USFWS to then use the best available science to
rigorously examine the baseline of affected species and potential impacts from the project, nor
create take limits.  Nor would receiving and reviewing individual 404 permits be a sufficient
substitute for evaluating EPA's action at the *programmatic* level.  The Defendants' citations, *id.*
at 31, show only that USFWS (1) "may" provide technical assistance "as needed," FWS-006028,
at FWS-006046, (2) "may" submit comments, FWS-006028, at FWS-006047; and (3) will be
"provide[d] an opportunity" to provide technical assistance, FWS-006028, at FWS-006106.

proposed protective measures, something USFWS is not required to do, because the technical assistance process does not require USFWS to make any determinations at all.

Finally, the ESA's Section 9 prohibition of take would not solve the problems with the technical assistance process, Dkt. 99 at 72 n.25, because USFWS' ITS exempts incidental take from liability for the State in operating the 404 program as well as all future state permittees as long as they comply with their individual 404 permits.  FWS-006028, at FWS-006108; 16 U.S.C. § 1536(o).  In other words, when take occurs pursuant to Section 404 permitted actions, that take is exempt from Section 9 liability as long as the permittee complies with their permit; that is true even when the State issues the permit without any input from USFWS.

### D.  The Defendants' Reliance on *Cooling Water* Fails Because That Case is an Outlier That is Distinguishable, Poorly Reasoned, and Wrongly Decided.

To defend USFWS' abdication of its Section 7 duties at the programmatic level, and its wholesale reliance on the individual permit-by-permit technical assistance process as a proxy for Section 7 compliance, the Defendants put all their eggs in the *Cooling Water* basket.[21]  Dkt. 99 at 64–65, 70–71, 72 n.25, 74–76, 78, 80–82.  But *Cooling Water* is contrary to law.  As relates to the issue presented here, *Cooling Water* is an outlier that goes against the current in a vast sea of case law on programmatic BiOps.  It was poorly reasoned and was wrongly decided for all the reasons why USFWS' actions here are unlawful.  However, the Court need not reach that issue because *Cooling Water* is also distinguishable on its facts.

First, in *Cooling Water*, USFWS did not have extensive prior consultation data on which it could base an analysis of the impacts of NPDES programs that regulate cooling water intake

---

[21] *Cooling Water* is an out of circuit case that does not bind this Court, and, because the decision conflicts the ESA, it does not constitute persuasive authority either.  Contrary to the Defendants' claim, Dkt. 99 at 76, Plaintiffs argue *Cooling Water* was wrongly decided, Dkt. 98 at 49 n.21.

systems, because those programs had long ago been delegated to the States.[22]  *Cooling Water*,

905 F.3d at 59 & n.2.  Moreover, there were no pre-existing Section 316(b) regulations that had

been implemented in federal NPDES permitting processes, and therefore no prior consultations

on those activities.  *Id*. at 61–62.  Here, by contrast, USFWS had extensive, on-point data from

its own consultations on Corps 404 permits, specifically in Florida, that it could and should have

used to develop its analyses and projections.

Second, unlike in *Cooling Water*, the technical assistance process laid out in the BiOp

here was not part of the agency action being reviewed by USFWS.  Dkt. 98 at 50–51.  The

Defendants mischaracterize our argument and suggest that Plaintiffs take issue solely with EPA

not codifying its approval of the state 404 program.  Dkt. 99 at 76.  Not so.  Whether the

technical assistance process was part of the agency action under review affects its legal effect.

Only measures consulted upon as part of the underlying agency action are legally enforceable

under the ESA.  *Ctr. for Biological Diversity v. USFWS*, 807 F.3d at 1046 & n.12.  If, as in

*Cooling Water*, the technical assistance process had been promulgated as part of the rule that

USFWS consulted upon, that process would be enforceable under the ESA.  905 F.3d at 72.

However, here, the Memorandum of Agreement explicitly said that the technical assistance

process "would be outlined in the USFWS' [BiOp]," and EPA has consistently maintained that

the BiOp was not part of the program.[23]  FWS-006028, at FWS-006045–68 (BiOp).

---

[22] *See NPDES State Program Authority*, EPA, https://www.epa.gov/npdes/npdes-state-program-authority (last accessed June 3, 2023).

[23] The Defendants did not dispute Plaintiffs' argument that the agency action did not include the technical assistance process, Dkt. 98 at 73 & 73 n.36, and instead merely cited the BiOp's outline of the technical assistance process.  *See, e.g.*, Dkt. 99 at 31–33, 42, 44, 70–72, 77, 79, 81.

Third, the scope of the action in *Cooling Water* is distinct from EPA's action here.  Dkt. 98 at 49–50.  Although the Defendants focus on the geographic scope (Florida's program being statewide whereas the 316(b) regulations are national), that does not address the more relevant difference in *regulatory* scope.  In *Cooling Water*, EPA promulgated a technical standard to reduce take for cooling water intake structures that would be implemented in individual NPDES permits under already delegated state programs (akin to EPA establishing a maximum level of allowable discharges for a pollutant), 905 F.3d at 65–70; whereas here, EPA transferred a dredge and fill program to the State, which would be implemented through permits (individual and general), no permit required decisions, and compliance and enforcement measures, Dkt. 98 at 49–50.  Unlike a dredge and fill program, the agency action in *Cooling Water* was protective, aiming to reduce harm to aquatic species from cooling water intake structures, and would result in a *net reduction* of incidental take.  Dkt. 98 at 50.  The Defendants have no response to these differences, and instead focus only on the purpose of the *Section 7 consultations* for both actions, rather than the purpose of agency actions being reviewed.  Dkt. 99 at 75.

At bottom, the technical assistance process in *Cooling Water* served as an extra check on a rule that, by design, would reduce incidental take of protected species and would be implemented through permits for a discrete universe of existing facilities.[24]  Here, by contrast, the State 404 program, by design, would result in incidental take from habitat destruction and the associated construction of, e.g., roads, housing developments, and mines that harm species through, e.g., increased pollution and risks of vehicle strikes.  So, here, the means by which species are protected at a programmatic level must be rigorous and thorough as required by the

---

[24] The court issued its decision after several prior attempts to regulate this harm to species, and the agency's ultimate solution was opposed by both environmental groups and advocates.

ESA and not left entirely to a technical assistance process that applies only at the individual permit level and that allows the State to issue a permit without USFWS' input.

## II.     EPA's Reliance Was Unlawful.

To contest its unlawful reliance on the BiOp, EPA erroneously treats *City of Tacoma* as establishing a single bright-line rule—that a plaintiff must always point to new information that challenges the BiOp's conclusions to show that an action agency's reliance on that BiOp was unlawful.  Dkt. 99 at 82–83.  However, as recognized in *City of Tacoma* and then later applied in *Shafer*, an action agency's reliance on a *facially* flawed BiOp is arbitrary and capricious regardless of new information.  *City of Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006); *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021).  EPA fails to acknowledge this standard and the cases Plaintiffs cited from within this Circuit and elsewhere that have followed it.  *See* Dkt. 98 at 51–52.

The Defendants mischaracterize Plaintiffs' position as arguing that *Shafer* rejected the "new information" standard.  Dkt. 99 at 82–83 & n.27.  Rather, Plaintiffs relied on *Shafer* (and other cases) because the court did not apply the "new information" standard to find an agency's reliance arbitrary when the court was confronted with a BiOp's *inadequate* analysis.[25]  *See* Dkt. 98 at 51–52.  The courts' not requiring plaintiffs in those cases to identify "new information" supports the Plaintiffs' argument that, when a BiOp is facially inadequate, a challenger need not point to "new information" that undermines the BiOp's conclusions.

---

[25] While the court in *Shafer* separately applied the "new information" standard when analyzing a BiOp's evidence-based plan for river flow management, it first found that the analysis was "reasoned and thorough" and then found reliance on it was also reasonable absent a showing the action agency overlooked new information or evidence in the record.  *Shafer*, 992 F.3d at 1092–1093.  Similarly, in *City of Tacoma*, the court did not find inadequacies on the face of the BiOp. 460 F.3d at 76–78.

Like in *Shafer*, here the BiOp fails to address several important issues that are apparent on its face.  Indeed, the Defendants admit that they did not complete the effects analyses, claiming that they did not have to.  FWS-006028, at FWS-006092, FWS-006094–95 (BiOp).  Also, like in *Shafer*, these inadequacies raise questions of law, including whether the BiOp is missing analysis that is required to be undertaken at the programmatic level as opposed to only permit by permit analyses to be conducted at a later time by state agencies.  While EPA attempts to distinguish *Shafer* on the facts, the missing analysis in *Shafer* also raised a question of law— whether a reasonable and prudent measure constituted a minor change in compliance with ESA regulations.  The court did not rely on whether the action agency was made aware of the minor change requirement or whether there was new information.  The facial flaw of failing to address a legal requirement alone made reliance by the action agency arbitrary.

Where, as here, a BiOp is facially unlawful, it would make no sense to require the Plaintiffs to identify "new information," because what Plaintiffs challenge is USFWS' theory that it can avoid programmatic analyses in favor of a permit-level technical assistance process that also does not abide by ESA requirements.  In other words, the debate is not over factual issues USFWS took into consideration, or any analytical conclusion that USFWS may have reached, because USFWS did not analyze information for the purpose of reaching any analytical conclusion required by the ESA.

EPA's reliance on *Cooling Water* fails for the same reasons that *Cooling Water* should not be extended to the circumstances of this case, as argued above.  Plaintiffs do not argue that EPA had to undertake its own independent analysis as insinuated by the Defendants, but that it is EPA's ultimate burden to satisfy the ESA by ensuring that the BiOp the agency relies on is

lawful.  *See City of Tacoma*, 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)–(2)).  Accordingly, if

USFWS did not comply with the ESA, then EPA also failed to meet its duty.

Indeed, the Defendants fail to cite a case that finds reliance on a facially invalid BiOp to

have been lawful.  *City of Tacoma* did not hold that flaws in a BiOp are irrelevant to the reliance

analysis, only that the focus of the inquiry is on the action agency's reliance.  *City of Tacoma*,

460 F.3d at 75–76.  Here, the action agency (EPA) actually set forth the unsound approach

followed by the expert agency (USFWS).  *See* EPA-HQ-OW-2018-0640-0660-A1, at 3, 7 (ESA

Consultation Memo) (EPA adopting process-based proxy approach for 404 assumption).  This is

therefore not a situation where the action agency blindly relied on the expert's advice, and where

fairness would dictate that the action agency be put on notice of legal errors sometime thereafter.

*City of Tacoma*, 460 F.3d at 75–76 (rationale for "new information" standard is to give action

agency a basis for doubting the expert conclusions).

The Defendants' argument that Plaintiffs' concern is about USFWS' failure to estimate

the number of each ESA-listed species that would be affected for purposes of estimating take

misses the point.  Plaintiffs' argument is that EPA failed to provide all relevant data to the expert

agency, which also makes EPA's reliance arbitrary.  Dkt. 98 at 52.

Finally, the Defendants' position would lead to absurd results, allowing two wrongs to

make a right.  "One agency's unexplained adoption of an unreasoned analysis just compounds

rather than vitiates the analytical void.  Said another way, two wrongs do not make a

right."  *Env't Health Tr. v. FCC*, 9 F.4th 893, 910–11 (D.C. Cir. 2021).

## III.   EPA Arbitrarily Determined "No Effect" to NMFS Species.

The Defendants do not dispute that EPA's "no effect" determination relied solely on

NMFS' conclusion that NMFS-listed species do not occur *in* assumable waters.  Dkt. 99 at 84.

35

And the Defendants do not dispute that the proper "action area" for EPA's "no effect" determination includes areas that would be indirectly impacted, including downstream from assumable waters where NMFS-listed species are found.  Dkt. 98 at 53.  Nor do the Defendants dispute the evidence in the record illustrating potential impacts to NMFS-listed species and habitats within the action area.  Dkt. 98 at 54–55.  Indeed, once Plaintiffs notified EPA of their intent to sue on this claim, EPA indicated that the agency would pursue a BE to consider these impacts.  Dkt. 99 at 85.  The Defendants argue that EPA's claim that NMFS species are not within assumed waters is reasonable but fail to provide any explanation to back that up.  Given that EPA failed to analyze the legally required "action area" and failed to provide a rational connection between its conclusion and evidence in the record, EPA's "no effect" determination was arbitrary.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).  EPA's decision not to consult based on this unduly narrow definition of the action area and its approval of Florida's program without having conducted that consultation were also arbitrary.[26]

Contrary to Florida's unsupported contention, Dkt. 102 at 60, these claims are not "likely" mooted by EPA's two-years-too-late initiation of a BE on NMFS species because there is still meaningful relief that the Court can grant.[27]  *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 316 F. Supp. 3d 1156, 1174–75 (N.D. Cal. 2018) (claim of failure to consult not mooted by reinitiation because relief is available in injunctions and vacatur); *White v. U.S. Army Corps of*

---

[26] EPA's complaint that consultation is not required if an action agency makes a "no effect" determination is irrelevant when that determination is improper.

[27] Though EPA initially claimed it would initiate consultation "as appropriate" within ninety days of its response to Plaintiffs' notice of intent to sue, it has been almost two years since EPA began its BE for NMFS-listed species.  EPA-HQ-OW-2018-0640-0664, at 1 (EPA Response to NOI).  EPA now claims they anticipate completion of this preliminary step roughly a week *after briefing in this case is scheduled to end*.  Dkt. 99 at 85.

36

*Eng'rs*, No. 22-CV-06143-JSC, 2023 WL 2347379, at *5 (N.D. Cal. Mar. 3, 2023) (challenge on

failure to abide by ITS not moot because relief available in injunction of underlying action while

BiOp is completed).  Plaintiffs seek a declaratory judgment as to EPA's failure to consult and

vacatur of EPA's ultimate action—approval of Florida's program.  Neither of these remedies is

mooted by EPA's belated development of a BE.  Because EPA has not issued a superseding

effects determination or BiOp addressing NMFS-listed species, Plaintiffs' claims are also not

moot on those grounds.  *Oceana, Inc. v. Ross*, No. CV 12-0041 (PLF), 2020 WL 5834832, at *4

(D.D.C. Oct. 1, 2020) (reinitiation alone does not moot claims against BiOp).

## IV.    EPA Unlawfully Approved Florida's Program.

In addition to failing to comply with the ESA, EPA's approval also failed to comply with

the Clean Water Act.  The Defendants aver that Plaintiffs only qualm is with the State not

adopting the federal 404(b)(1) Guidelines, Dkt. 99 at 45, but that is not the case.

Under the Clean Water Act, any state 404 program must be at least as stringent as the

federal program.  33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.1(d).  EPA may only approve a state

program when the state has authority to, among other things: (1) issue permits "which apply, and

assure compliance with" all Section 404 requirements, including the Section 404(b)(1)

Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program,

including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C.

§ 1344(h)(1)(A)(i), (1)(G), (2)(A); 40 C.F.R. pt. 233.

To defend EPA's approval, the Defendants point to areas where the federal and state

program are consistent.  Dkt. 99 at 45–46.  But they fail to account for the places where the state

program is not as stringent as federal law requires.  Dkt. 98 at 55–70.  *See In re Grand Jury*, 315

F. Supp. 3d at 633 (requiring all regulatory provisions to be given effect).

37

By failing to: (1) recognize criminal liability for negligent violations or adopt the federal statute of limitations; (2) either adopt *or* demonstrate it would assure compliance with all 404(b)(1) Guidelines, including as to factual determinations, water quality, and protection of species; and (3) properly define assumable and retained waters, Florida's program failed to meet Clean Water Act criteria and EPA's approval of the program was therefore unlawful.

## A. Florida's Program Failed to Meet Minimum Enforcement Standards.

The Defendants' argument that Florida's less stringent mens rea and statute of limitations are sufficient under the "flexibility" afforded by the Clean Water Act conflicts with the statute's plain meaning and EPA's unambiguous regulations. Dkt. 99 at 50–57.

### 1. Florida's Mens Rea Conflicts with the Clean Water Act.

The Clean Water Act unambiguously criminalizes negligent violations both for state and federal permitting programs. EPA's approval of a state program that contains a less stringent mens rea is an abuse of discretion. *See Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th Cir. 2020). In defending Florida's failure to adopt the same mens rea established by Congress, the Defendants conflate the question of what *constitutes* a violation under the Clean Water Act with the flexibility as to *how* a state may abate those violations.

#### a. The Clean Water Act Criminalizes Negligent Violations.

As four Circuit Courts of Appeal have held, Congress unambiguously established simple negligence as a category of violations for all 404 permits, including state permits. 33 U.S.C. § 1319(c)(1). Dkt. 98 at 56–58. *See Sackett v. EPA*, 598 U.S. ___, 2023 WL 3632751, at *9–10, 15 (2023) (recognizing criminalization of negligent violations under CWA). Nothing in the statute authorizes states to employ a different criminal intent standard when issuing 404 permits.

38

While the Defendants seek to minimize the importance of Congress' criminalization of negligent violations by claiming that these make up a small percentage of criminal prosecutions, Dkt. 99 at 53–54, that argument rings hollow given the lengths to which the Government has gone to repeatedly litigate their right to prosecute negligent violations, *see* Dkt. 98 at 56–58 (discussing cases).  Because Congress directed that negligent violations of the law constitute criminal violations (whether permits are issued by the Corps or a state), it set the minimum standard for EPA approval of state programs as well, which must recognize that negligent violations of the law constitute criminal violations to be as stringent as federal law.

In addition to establishing what constitutes a violation, Congress separately required state programs to have authority to "abate violations" of the Act.  33 U.S.C. § 1344(h)(1)(G).  Contrary to the Defendants' contention, Dkt. 99 at 50–52, there is nothing in the Clean Water Act that authorizes a state program to decline to recognize an entire class of criminal violations.  To permit the Defendants' interpretation would allow a state 404 program to legalize activity that is patently unlawful under the Clean Water Act.  More importantly, there is no language in the statute allowing "flexibility" as to what constitutes a violation for state-assumed programs.

As further evidence, Congress did not limit negligent criminal violations of the Clean Water Act to only federal prosecution.  33 U.S.C. § 1319(c)(1)(A) (establishing criminal violation for negligent violations of 404 permits issued by federal agency or a state); *id.* § 1319(a)(1) (referring to state enforcement of Section 404).  Where Congress intended to dictate only how federal agencies handled a matter, Congress did so *explicitly*.  *See id.* § 1319(g)(1) (establishing administrative penalties that EPA or the Corps may impose).  The Defendants' position that states may exclude negligent violations from criminal liability would impermissibly rewrite the act.  *See Jama v. U.S. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do

39

not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

The Defendants' argument that state programs need only mirror certain requirements, Dkt. 99 at 51, misses the point. The issue is one of stringency, not exactness. The provisions the Defendants cite merely illustrate that Congress set the floor, the minimum requirements state programs must meet. Section 1344(h)(1)(A)(i) requires that state programs "apply, and assure compliance with, *any* applicable requirements of this section, *including, but not limited to,* the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title." 33 U.S.C. § 1344(h)(1)(A)(i) (emphasis added). One of those requirements is the ability to enforce violations of the Clean Water Act, which are defined by statute. *Id.* § 1319. Section 1344(h)(1)(B) further requires state programs to demonstrate they have authority "[t]o issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports *to at least the same extent* as required in section 1318 of this title." *Id.* § 1344(h)(1)(B) (emphasis added).[28]

This is hardly surprising. Congress made plain that the Clean Water Act is a floor in all respects because it was intended to protect the Nation's waters. State programs cannot be less protective because that would defeat the purpose of the Act. *See* 33 U.S.C. § 1311(b)(1)(C);

---

[28] Although the Defendants also rely on the fact Section 404(h) does not refer to Section 319(c) in describing the violations, Dkt. 99 at 51, it was unnecessary as they were already laid out. The use of the term "violation" elsewhere in the statute likewise does not typically refer to Section 319, including provisions in the same section regarding how the Corps shall bring enforcement actions for violation of permits. 33 U.S.C. § 1344(s). The Defendants' interpretation would render Section 319 meaningless in all of these instances. *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) ("[Courts] must give effect to every word . . . wherever possible.").

*PUD No. 1, of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 705–707 (1994).  The

Defendants' view of "flexibility" would allow state programs to be less stringent for each and

every Clean Water Act requirement not expressly referenced in Section 404 assumption

provisions, thereby allowing assumed programs with standards below the floor set by Congress.

33 U.S.C. § 1344.  Congress may have intended for cooperation, but not evisceration of

minimum standards, including for the protection and deterrent effect they provide.

The Defendants' reliance on *Natural Resources Defense Council ("NRDC") v. EPA* is

also to no avail.  Dkt. 99 at 51–52.  What constitutes a violation of the Clean Water Act was not

at issue in *NRDC*, instead the court was confronted with *how* violations would be abated in a

state program (specifically, the *penalties* that a state program might impose *after* finding a

violation).  859 F.2d 156, 180 (D.C. Cir. 1988).  There, plaintiffs argued that the regulations had

to set maximum criminal penalties for state programs, not just a minimum.  *Id.* at 174.  In

reaching its decision, the court relied on statutory text instructing EPA to "promulgate guidelines

establishing the *minimum* procedural and other elements of any State program," explicitly

including "enforcement provisions."  *Id.* at 173 n.15 (citing 33 U.S.C. § 1314(i)(2) (emphasis

added).  Again, enforcement relates to how a state responds to a violation.  It does not establish

what constitutes a violation.  There was also no statutory text the court found to support

plaintiffs' position.  *Id.* at 178–79.  And, despite discussion on state roles and flexibility on

which EPA relies, the court recognized that while EPA regulations establish "a floor for . . . state

enforcement authority," Congress made its intent clear that state-assumed Clean Water Act

programs must be administered to "provide a much more effective program than that which

would result from control in the regional offices of [EPA]."  *Id*. at 174.

41

Unlike the penalties issue in *NRDC*, here the Clean Water Act unambiguously criminalizes negligent violations both for state and federal permitting. Dkt. 98 at 57–58. EPA has no discretion to create an exemption from the statutory requirements. Nor does *NRDC* provide any support to the contrary.[29] Rather, implicit in *NRDC* is that a state program that is less effective than a federally administered program runs counter to the Act and defeats its very purpose. The explicit minimum protections of the statute, not uniformity, are at issue here.

The same is true of *Akiak Native Community v. EPA*, on which EPA also relied, Dkt. 99 at 52 n.14. 625 F.3d 1162, 1171–72 (9th Cir. 2010) (declining to find inadequate enforcement authority where a state lacked authority to impose administrative penalties available to the EPA). Like *NRDC*, *Akiak* did not involve criminal liability, but a challenge to how Alaska abated violations—its inability to assess civil penalties administratively as compared to the federal NPDES program. *Id.* The court relied on the statute's silence on state imposition of administrative penalties and EPA's regulations, which provide EPA flexibility in approving a state program's civil penalties, 40 C.F.R. § 233.41(d)(1). 625 F.3d at 1171–72. Here, the statute is not silent, and EPA's regulations confirm that a state must have the same minimum criminal intent standard as the federal program. 40 C.F.R. § 233.41(b)(2).

---

[29] Indeed, unlike EPA's approval here of a less stringent program, in *NRDC* the minimum penalties EPA required for state programs were higher than the minimum penalties in the Clean Water Act. 859 F.2d at 178–79. This is, of course, consistent with the overall policy and goal of Congress to make the Clean Water Act the minimum baseline protections for our water resources. EPA's reasoning in promulgating the minimum penalty baseline regulation was "to ensure effective State enforcement programs" so that EPA would not "be forced to take its own enforcement action in approved States" because of an inadequate state program. *Id.* at 181. The same policy, goal, and reasoning dictates against EPA's interpretation here.

### b. Florida's 404 Program Excludes Simple Negligence Criminal Violations and Therefore is Less Stringent Than Federal Law

As shown above, the Clean Water Act criminalizes negligent violations of Section 404, regardless of whether permitting is performed by state or federal agencies.  The Defendants' argument that EPA could approve Florida's program notwithstanding its heightened criminal intent standard is contrary to law.  Dkt. 99 at 50–54.  *See Idaho*, 820 F. App'x at 628.

The Defendants' argument that state programs need not criminalize negligent violations is also contrary to EPA's regulation, which plainly requires the mens rea for state 404 enforcement programs to be "no greater" than that under federal law.  40 C.F.R. § 233.41(b)(2).  EPA's regulations also explicitly embody the Clean Water Act's central tenet that the federal program sets the floor for state programs, which "may not impose any less stringent requirements for *any purpose*."  *Id.* § 233.1 (emphasis added).  *See also* 44 Fed. Reg. 34,244, 34,258 (June 14, 1979) (state satisfies requirement if its burden of proof for "criminal negligence" is equivalent to "negligence" in federal criminal prosecution); 53 Fed. Reg. 20,764, 20,770 (June 6, 1988) (a state program component that is not as stringent as the Clean Water Act cannot be compensated for by another state component that is more stringent; state program "must be at least as stringent and extensive").

The Defendants' argument here is strikingly similar to the argument EPA raised and lost before the Ninth Circuit.  *Idaho*, 820 F. App'x at 628.  In *Idaho,* a unanimous panel relied on the plain language of the statute and the almost identical mens rea regulation under the 402 NPDES program to conclude that EPA abused its discretion when it approved a state program with a criminal intent higher than simple negligence.  *Contra* Dkt. 99 at 56.  The court held that EPA abused its discretion in approving the state program because the Clean Water Act criminalizes simple negligence and EPA's 402 regulation, like the 404 regulation here, requires the mens rea

43

for state enforcement programs be "no greater" than that under federal law. *Idaho*, 820 F. App'x at 628. The court rejected EPA's argument that broad language in the mens rea regulation was inconsistent with more specific language in a provision regarding penalty assessments. *Id.* The court also noted that while state programs need not "mirror" the federal program as to mens rea, they must include criminal liability for simple negligence. *Id.* The same is true here.

Similarly, here, EPA's approval of Florida's program was an abuse of discretion because Florida's program excludes from criminal liability an entire class of criminal violations under the Clean Water Act. And, as in *Idaho*, the Defendants advance a similarly faulty interpretation that conflicts with the plain meaning of the statute and its own regulation. Dkt. 99 at 50–54.

Here, the Defendants' argument that the mens rea regulation's "general" language should be governed by more specific language in a different provision that relates to penalties fails here for the same reasons it did in *Idaho*. Dkt. 99 at 55–56; *Compare* 40 C.F.R. § 233.41(b)(2) *with id.* § 233.41(a)(3)(ii). The mens rea provision could not be clearer. It plainly provides that states may not impose a higher mens rea than that required of EPA to establish a violation. The penalty provision, by contrast, relates to *the consequences* for committing a violation. That EPA may not have prescribed a minimum monetary penalty for simple negligence criminal violations at most means that states retain full flexibility as to the monetary penalty for those violations.[30]

---

[30] Contrary to the Defendants' argument, Dkt. 99 at 55, EPA's penalty provision does not ban or limit a state's ability to impose criminal penalties for negligent violations; at most, that provision simply declines to set a *minimum* monetary penalty for negligent violations. In addition, sanctions other than financial penalties are available for criminal violations, and there are advantages to prosecuting criminal violations other than recouping fines, including the deterrent effect. *See* EPA-HQ-OW-2018-0640-0668-A1 at 5, 9 n.125 (criminal prosecution of corporations can cause loss of "lucrative government contracts," damage to their public and commercial images, payment of criminal fines, probation, and other sanctions; criminal prosecution of corporate officials, as opposed to corporation, may provide even greater deterrence as they would face possible incarceration).

44

Indeed, EPA has recognized that the criminal intent and penalty provisions are different in kind, and, consistent with the Clean Water Act, has expressly afforded flexibility only to the latter. *See* 53 Fed. Reg. at 20,771 (specifically retaining the mens rea provision while amending the penalty provision to provide states with flexibility as to enforcement).  As explained in the regulation's preamble, the penalty provision simply sets the minimum *penalty* scheme for certain criminal violations in a state program.  *Id*. at 20,770 ("These regulations establish monetary penalties for which the State must have the authority to assess; they need not be assessed by the State for every violation.").  It does not authorize state programs to have different (and harder to prove) standards for criminal intent.[31]

The Defendants' theory that the "general" mens rea regulation "supplements" the three penalty provisions is incongruous and fails.[32]  Dkt. 99 at 56.  The first penalty provision says nothing about criminal intent, and simply requires states to have authority to "assess and recover civil penalties" for unpermitted discharges or permit violations.  40 C.F.R. § 233.41(a)(3)(i). The second penalty provision requires states to have authority to "seek criminal fines against any person who willfully or with criminal negligence" causes unpermitted discharges or permit violations.  *Id.* § 233.41(a)(3)(ii).  The use of the word "criminal" in this provision simply

---

[31] EPA's regulation reasonably ensures that more egregious violations receive more punitive treatment by setting a minimum monetary penalty for the more serious violations.  This would help relieve EPA from having to "step-in" like the agency wanted to avoid in *NRDC*. 859 F.2d at 181.  Nothing in the regulation precludes states from seeking criminal remedies from simple negligence.  *See* 40 C.F.R. § 233.1(c).  Also, given that the provision addresses both civil and criminal penalties, it makes sense that placing "criminal" before negligence was intended to distinguish criminal from civil penalties.  *See Id.* § 233.41(a)(3) ("recover civil penalties and to seek criminal remedies").

[32] The Court should also reject this rationale because EPA did not rely on it, and the Defendants advance it for the first time in this litigation.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (agency action must "be upheld, if at all, on the same basis articulated in the order by the agency itself.").

distinguishes it from the prior provision, which relates to enforcement for civil, rather than criminal, offenses.  And the third provision requires states to have authority to "seek criminal fines against any person who knowingly makes false statements" and other acts.  *Id.* § 233.41(a)(3)(iii).  There is no reason to conclude, as the Defendants claim, that the mens rea regulation somehow supplements, clarifies, or otherwise affects these penalty provisions.

Inserting an "any negligence" standard, as the Defendants urge, would impermissibly rewrite the Clean Water Act, which plainly criminalizes simple negligence for permits, whether issued by federal agencies or a state.[33]  Agencies cannot override Congress's plain direction, either explicitly or in the manner the agency interprets and applies its rule.  *See United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008) ("[A] regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides.").  *United States v. Doe*, 701 F.2d 819, 823 (9th Cir. 1983) ("Where an administrative regulation conflicts with a statute, the statute controls.").  Because Congress has spoken directly to the standard of negligence required for a violation of section 402 and 404 permits issued by the Corps or a state, EPA is not authorized to construe a regulation otherwise.[34]  *See* 5 U.S.C. § 706(2)(A); *Chevron v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

---

[33] It also fails to abide by the statutory scheme to ensure state programs provide the minimum standards of the Clean Water Act.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (laws "must, to the extent possible," be construed to "ensure that the statutory scheme is coherent and consistent").

[34] Accordingly, there is no reason to resort to Black's Law Dictionary, as the Defendants do. Dkt. 99 at 55.  The Defendants rely on the definition for "criminal negligence;" however, the Clean Water Act uses just "negligence," and all courts to have interpreted this provision have relied on the ordinary negligence meaning and definitions.  Dkt. 98 at 57–58.  Certainly, dictionary definitions do not trump federal court rulings.

The history of EPA's mens rea regulation is also telling.  When EPA revised its Clean Water Act regulations in 1987, the agency expressly retained the "requirement that the burden of proof for State enforcement cases shall be no greater than the burden of proof required of EPA." 53 Fed. Reg. at 20,771.  In contrast, EPA overhauled its penalty scheme in response to comments requesting the agency provide as much flexibility as possible to states to set their own penalty scheme.  *Id.*  This is why the regulation allows states to use an alternative enforcement mechanism when they lack specific monetary penalty authority.  40 C.F.R. § 233.41(d).  So, while EPA provided states more flexibility as to penalties, it did not (because it cannot) provide flexibility as to the mens rea requirement.

The Defendants' reliance on EPA's decades-old approvals of other state programs (primarily NPDES), Dkt. 99 at 52–53, is unavailing.[35]  First, most of EPA's past Sections 402 (NPDES) and 404 state program approvals occurred in the 1970s and 1980s, years before the Circuit Courts held that the Clean Water Act criminalizes simple negligence.  Second, past approvals of state programs lacking the required criminal intent standard are not probative of the lawfulness of that practice, particularly where those approvals were not challenged on this basis.  Third, the Defendants' argument is inconsistent with EPA's own instructions to Idaho, during the Obama Administration, that it would have to adopt a simple negligence standard for its Clean Water Act Section 402 program to be approved.  *See* Dkt. 98 at 59 (discussing EPA's recognition of Florida's heightened mens rea and EPA's instruction to Idaho to enact authority to prosecute simple negligence to obtain program approval before the agency changed course).

---

[35] Likewise, EPA's decision to approve Michigan's and New Jersey's 404 programs without engaging in formal consultation under the ESA is not dispositive of whether such consultation was required, something EPA has since acknowledged.  Plaintiffs assume, without conceding, that other states have Clean Water Act programs that fail to criminalize simple negligence.

The Defendants' reliance on the Model Penal Code is likewise unavailing.  Dkt. 99 at 53.

Model instructions are not binding on any court or agency, cannot invalidate past court decisions,

and cannot trump statutory mandates.  *See United States v. Atl. States Cast Iron Pipe Co.*, No.

03-852 (MLC), 2007 WL 2282514, *13–14 (D.N.J. Aug. 2, 2007) (declining to use Model Penal

Code's "heightened" negligence standard for section 1319(c)(1) jury instructions).

Finally, EPA's oversight responsibilities for state assumed programs cannot cure state

program inadequacies, nor is there a de minimis exception for program failures.  Dkt. 99 at 53–

54.  Oversight is intended to ensure a program is operating as approved, not to remedy a

program's failure to comply with federal law.  EPA cites no authority to suggest otherwise.  That

negligent violations may constitute a small percentage of criminal prosecutions does not

authorize EPA to act contrary to congressional direction.  Even infrequent prosecutions can be a

meaningful component of Clean Water Act enforcement.[36]

Allowing EPA's interpretation would also be contrary to the Clean Water Act by

allowing significant inconsistency between state and federal administration of Clean Water Act

programs (and between states themselves).  Such inconsistency would be contrary to EPA's own

policy and objectives regarding assumption of permitting programs.  *See* 53 Fed. Reg. at 20,771

("We are concerned about national consistency in administration and effectiveness of State

---

[36] *See, e.g.*, EPA-HQ-OW-2018-0640-0668-A3, at 4 (*The Criminalization of Negligence under the Clean Water Act*) (discussing prosecution for negligence involving CITGO's petroleum refinery operations that resulted in discharge of about 53,000 barrels into two rivers; CITGO received a thirteen million dollar fine that was at the time "the largest [fine] ever for a criminal misdemeanor violation of the Clean Water Act" and was required to implement a compliance plan.  "CITGO stands as yet another stark reminder that misdemeanors can result in significant monetary fines and should not be underestimated or belittled.").

programs.")  And it would fly in the fact of Congress' intent: to provide a minimum baseline of water protection across the Nation.  33 U.S.C. § 1344(h)(1).

Like all Courts of Appeal that considered this issue have found, the Clean Water Act unambiguously criminalizes negligent violations.  Dkt. 98 at 57–58.  That criminal intent standard applies to 404 permits, whether issued by federal agencies or a state and whether prosecuted by federal agencies or a state.  Like the court found in *Idaho*, EPA's nearly identical mens rea regulation here is unambiguous and consistent with the penalty assessment provisions. *Idaho*, 820 F. App'x at 628.  Since the statute is clear that EPA employs a simple negligence standard (indeed, EPA does not contest this)—states must as well.  The only flexibility afforded by the Clean Water Act is a one-way ratchet, allowing states to be *more*, not less, protective.[37]

### 2.  Florida's Statute of Limitations is Contrary to the Clean Water Act.

While the Clean Water Act is silent as to the statute of limitations, state programs that employ a shorter statute of limitations create the same problem as those with a higher mens rea— a reduced ability for a state to prosecute Clean Water Act violations—and they thereby provide for less stringency than a program administered by the federal agencies.  Dkt. 98 at 60–61. Again, the purpose and scope of EPA's own regulations state that "[a]ny approved State Program shall, at all times, be conducted in accordance with the requirements of the Act and of this part. While States may impose more stringent requirements, *they may not impose any less stringent requirements for any purpose*."  40 C.F.R. § 233.1 (emphasis added).  Allowing a shorter statute of limitations in a state program allows a state to have a weaker, less protective program.  This is

---

[37] While EPA points to a rulemaking specific to this mens rea standard, Dkt. 99 at 57 n.16, that proposal has been sitting dormant for almost three years.  In any event, any future rule must abide by Congress' express standard for negligence.  *See* 5 U.S.C. § 706(2)(A); *Chevron*, 467 U.S. at 844.

not what Congress intended or instructed.  Nor what EPA itself has recognized in promulgating

its 404 assumption regulations.

**B. The State Program's Consideration of Water Quality Impacts and Contamination is Less Stringent.**

Plaintiffs have shown that the state program significantly limits its analysis of water

quality impacts and potential contamination from dredge and fill material, because the state

program myopically focuses only on violations of water quality standards or toxic effluent

limitations, whereas the federal program considers all potential water quality impacts and

contamination from a project.  Dkt. 98 at 64–66.  The federal program's lens is necessary to

achieve the Clean Water Act's principal objective: "to maintain the 'chemical, physical and

biological integrity of the Nation's waters.'"  80 Fed. Reg. 51,020, 51,021, 51,024, 51,029 (Aug.

21, 2015) (describing purpose of Clean Water Act and its water quality standards, and the need

for the antidegradation policy that aims to maintain high quality waters); 40 C.F.R. § 131.12.

The Defendants do not contest these limitations in the State's analysis nor the fact that

this creates a difference between federal and State administration of the 404 program.  Instead,

the Defendants deflect, redirecting the Court's attention away from the portions of Florida's

program that fail to meet the stringency levels applied by the federal program by urging the

Court to focus instead on a handful of other federal provisions that are paralleled in the state

program.  Dkt. 99 at 48–49.  The Court should reject such attempts at distraction.

The Clean Water Act requires a state program to comply with *all* of the 404(b)(1)

Guidelines.  33 U.S.C. § 1344(h)(1)(A)(i), (2)(A).  *Accord* 53 Fed. Reg. at 20,770 ("Any State

environmental review criteria must be at least equivalent to the 404(b)(1) Guidelines for an

approvable program.").  EPA drafted the Guidelines as more than "simply advisory," stating that,

*together*, they constitute the "substantive criteria for dredged and fill material discharges under the Clean Water Act." 45 Fed. Reg. 85,336, 85,336–37 (Dec. 24, 1980). EPA also specifically "eliminate[d] duplicative material" from the Guidelines, so no provision can stand in the shoes of another. *Id.* at 85,338. Nothing in the 404(b)(1) Guidelines suggests that a state may pick and choose which ones to follow. Therefore, whatever provisions in Florida's program that parallel the federal program cannot also stand in for parts of the 404(b)(1) Guidelines that the state program completely lacks. Each part of the federal program must either be replaced by the State with an equally stringent requirement, or the State must demonstrate how its program provides each and all of the same protections as the federal program. It is not sufficient to say, as the Defendants do, that "some" provisions are parallel, and that this is close enough.

The Defendants' reading of EPA's regulations is thus at odds with one of the most basic interpretive canons: "a regulation 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *In re Grand Jury*, 315 F. Supp. 3d at 633 (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). The Defendants' reading would violate this principle, by treating two of the 404(b)(1) Guidelines as void.

As illustrated below, federal law requires consideration of water quality impacts and an analysis of potential contamination from dredge and fill activities at the time of permit issuance; that consideration is not limited only to those impacts that rise to the level of violating water quality standards.[38] By contrast, Florida's program limits the State's analysis of water quality impacts to situations where water quality or toxic effluent standards will actually be violated.

---

[38] The Defendants do not dispute that these considerations are required.

| Federal 404(b)(1) Guidelines | Florida Program |
|---|---|
| "The permitting authority shall determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of" Subpart C, which includes a broad array of water quality impacts.  40 C.F.R. §§ 230.11, 230.22. | "[A]n applicant must provide reasonable assurance that" their project "[w]ill not adversely affect the quality of receiving waters *such that the state water quality standards ... will be violated*."  Fla. Admin. Code R. 62-330.301(1)(e) (emphasis added). *Accord* EPA-HQ-OW-2018-0640-0002-A1, at 93 (ERP Handbook 10.2.4). |
| The permitting authority shall "[d]etermine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants."  40 C.F.R. § 230.11(d); *id.* § 230.3(d) (defining "contaminant" broadly as "a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the [toxic pollutants]"). | The State must "[e]valuate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, *that may violate state water quality standards ..., or any toxic effluent standard or prohibition*."  EPA-HQ-OW-2018-0640-0002-A20, at 32 (404 Handbook 8.2(g)) (emphasis added). |

This difference is significant because under the state program, no contamination or water quality impacts or degradation of waters from dredge and fill activities need be considered unless and until they reach the high bar of violating water quality standards or toxic effluent standards, at which point the water is now polluted and requires cleanup.  *See* 33 U.S.C. § 1313(d).  The point of permitting and antidegradation requirements in the law, however, is to *avoid* this outcome.  *Id.* § 1313(d)(4)(B); 80 Fed. Reg. at 51,029–30.  The Clean Water Act was enacted to restore and maintain the quality of the Nation's waters, not to wait to act until they are so polluted that they violate water quality standards.

As an illustration, under the state program, when there is potential for a discharge into a pristine waterway that has low levels of pollution, the State would not have to evaluate water quality impacts or contamination unless that discharge would release large enough volumes of

pollution to risk a violation.  The State would not have to consider water quality impacts from

discharges until this same pristine waterway was so polluted that it was on the brink of not

meeting water quality standards.  By contrast, the Corps must consider how *any* increase in

pollution or contamination might affect the natural landscape in that waterway—which is

supported by the Clean Water Act's general prohibition on discharges of any amount and the

Clean Water Act's antidegradation policy—and act proactively to prevent waterways from

becoming so polluted that they are violating water quality standards.

### C.  The State Program Unlawfully Does Not Require the State to Independently Assess and Evaluate the Impacts of an Individual Permit.

Under the state program, the State need not engage in an independent assessment of

representations by a permit applicant regarding the potential impacts of a project.  Rather, the

State need only assess whether the applicant provided "reasonable assurances" regarding the

impacts of their project to water quantity, flood risk, species, and water quality standards.  This is

significantly less stringent than the federal program, which requires the Corps to independently

assess and make explicit factual determinations regarding the enumerated impacts listed for

analysis in the 404(b)(1) Guidelines.  Dkt. 98 at 61–64.

The Defendants present post-hoc rationales to defend EPA's arbitrary and capricious

decision.  But an agency cannot rely on post-hoc rationalizations to justify inadequacies in the

agency's original decision, and an agency cannot support the decision it has already made with

additional explanation added after-the-fact and in response to legal challenge.  An agency's

decision, instead, must "be upheld, if at all, on the same basis articulated in the order by the

agency itself." *Burlington Truck Lines, Inc.*, 371 U.S. at 168–69; *Camp v. Pitts*, 411 U.S. 138,

142–43 (1973) (agency cannot rely on post hoc rationalizations to defend its earlier decisions).

53

JA.915

Nowhere in the record did EPA analyze the impact of the State's use of "reasonable assurances," nor does the record allude to the Defendants' arguments presented here, something it was required to do for those arguments to be considered. *See Judulang v. Holder*, 565 U.S. 42, 45 (2011) ("When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one."); *Am. Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) ("[W]e will not uphold an agency's action where it has failed to offer a reasoned explanation that is supported by the record."). EPA's response to comments included only conclusory statements that "EPA has reviewed Florida's environmental review criteria and found them to be consistent with the Section 404(b)(1) Guidelines" and that EPA "disagrees" that the framing of the state program around an applicant's reasonable assurances rendered it "inconsistent with the federal program." EPA-HQ-OW-20188-0640-0568, at 25, 27–28 (Response to Comments). Nor did EPA explain its rationale in its ultimate decision. 85 Fed. Reg. 83,533 (Dec. 22, 2020); EPA-HQ-OW-20188-0640-0566, at 1–2 (Approval Letter). The Court should therefore reject the Defendants' post-hoc arguments.

The Defendants then mischaracterize the issues raised by Plaintiffs to allow themselves an easier response. The issues here are not whether the State must write down findings, Dkt. 99 at 46–47, nor whether a state permit can be challenged in court, *id.* at 47–48. Rather, the issue is that under the program EPA approved, the State is not required to independently assess and evaluate information submitted by an applicant as is required by the federal program. Because it does not, the program is significantly less stringent in its protections, and EPA's unlawful approval of the state program must be vacated.

Under the federal program, when a self-interested applicant gives reasonable assurances, even ones that appear reasonable on their face, about impacts to species, wetlands, and water

54

JA.916

quality, the Corps must independently assess that application, make factual findings regarding the impacts enumerated in the 404(b)(1) Guidelines, and use its own analysis, expertise, and application of its own guidelines and the law to decide whether to issue a permit and what mitigation and conditions must be included in that permit.  The State, however, only asks itself whether an applicant "reasonably assured" the State about the project's impacts on water quantity, flood risk, species, and water quality standards.  No independent investigation or analysis is required, no apparent guidelines for the State to apply, and no factual determinations the State is required to make.[39]

The import of this difference is demonstrated in *Sierra Club v. West Virginia Department of Environmental Protection ("WVDEP")*, 64 F.4th 487 (4th Cir. 2023).  That case involved a state's water quality certification for a federal 404 permit.  *Id.* at 498–99.  The plaintiffs argued that the state had an affirmative duty to verify whether the applicant's proposal complied with state best management practices.  *Id.* at 507 (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986)).[40]  But the court distinguished *Hintz*, explaining that the Corps' rules "conferred an independent duty on the [Corps] to verify the information supplied" by an applicant.  *Id.*[41]  The state regulation, however, "does not impose any affirmative duties on the

---

[39] Notably, neither the State's regulations nor handbooks define what qualifies as a "reasonable assurance."

[40] *Hintz* holds that the Corps "has an obligation to independently verify the information supplied to it" including "evaluation of the environmental issues."  800 F.2d at 835.  *Accord Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 214 (4th Cir 2003) (processing individual permits requires extensive, research, documentation, and formal analysis).  It is precisely this independent review and analysis that is absent from the state program.

[41] The Defendants concede that the Corps must critically review an applicant's documentation. Dkt. 99 at 47.  Nor do they dispute EPA's intent behind the 404(b)(1) Guidelines at issue or demonstrate the state program would similarly satisfy this intent.  Dkt. 98 at 63 (citing 45 Fed. Reg. 85,336, 85,343 (Dec. 24, 1980)).

55

[state agency]" because it "speaks only to requirements of an application." *Id.* (citing West Virginia Code § 47-5A-4.2).

The same distinction appears here. The federal 404(b)(1) Guidelines impose an independent duty on the permitting agency, 40 C.F.R. §§ 230.10(c), 230.11, 230.20–54, while the state program only requires the agency to determine whether an "[a]pplicant provide[d] reasonable assurances" about the potential adverse impacts of their project, Fla. Stat. § 373.4146; Fla. Admin. Code R. 62-330.301–02; EPA-HQ-OW-2018-0640-0002-A1, at 64, 81 (ERP Handbook 5.5.4.1 and 8.1).[42] It matters not that the State must document—i.e., take notes on—how the permit applicant complied with the requirement to provide reasonable assurances. Dkt. 99 at 46–47. The fact of the matter is that nothing requires the State to independently make factual determinations based on its own independent analysis.

Similarly, state court review of state permits does not inquire into whether the State independently assessed and verified information provided by an applicant to decide whether to issue a permit. Dkt. 99 at 47–48. Neither case cited by the Defendants holds otherwise. *Duval Utility Co. v. Florida Public Service Commission*, 380 So. 2d 1028, 1031 (Fla. 1980), is irrelevant as it involved a challenge to the Public Service Commission regarding the Commission's satisfaction of its own independent duty to "set just and reasonable charges and conditions for service availability" pursuant to Florida Statute Section 367.101. *Id.* By contrast, *Defenders of Crooked Lake, Inc. v. FDEP*, No. 17-5328, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018), underlines exactly the issues raised by Plaintiffs: in considering an

---

[42] Although Fla. Admin. Code R. 62-331.053(3)(a)(6) does not include the term "reasonable assurances," the agency's determinations as to the impacts of a permit are all based on the requirements and findings from Fla. Admin. Code R. 62-330.301–02, which are couched in an applicant's reasonable assurances.

56

individual permit challenge, the state administrative law judge ("ALJ") (1) assessed whether "an Applicant provided reasonable assurances," *id.* at *3, 5, 8; (2) asked whether the applicant had used the proper criteria to evaluate her own project, *id.* at *5; and (3) applied a presumption "that reasonable assurances were provided as to all applicable regulatory criteria" that would only be rebutted by a preponderance of the evidence presented by the petitioner, *id.* at *8.  Absent from the ALJ's analysis was any indication that the State performed its own independent analysis, findings, and determinations.  *Accord Sierra Club v. WVDEP*, 64 F.4th at 507.[43]

### D.  The State Program Did Not Demonstrate that No Permit Would Be Issued that Would Jeopardize Species or Adversely Modify or Destroy Critical Habitat.

Further, as Plaintiffs have shown, the state program did not demonstrate that no permit will issue that would jeopardize species or adversely modify or destroy critical habitat because (1) EPA has adhered to the position that the programmatic BiOp, which contains the technical assistance process, was not part of the program submission and thus cannot be considered or relied on as part of the state program, Dkt. 99 at 38–40; and (2) even if it were, as demonstrated above, the technical assistance process is a non-statutory, state driven process that cannot and does not ensure that no permit will issue that would jeopardize species or adversely modify or destroy critical habitat because it does not require USFWS to weigh in.  EPA's approval of the state program was thus arbitrary, capricious, and an abuse of discretion.  It must be vacated.

---

[43] Although the state ALJ made findings of fact regarding the showing made by the applicant, there was no discussion of any such findings by the agency to issue the permit.  To rely on the courts to satisfy the Clean Water Act's mandate would require the public to challenge every state 404 permit to obtain review equivalent to that provided under federal law.  Given the barriers to permit challenges, including cost, evidentiary requirements, and standing restrictions, it cannot be sufficient to stand in for the agency having an independent obligation to evaluate that information when issuing permits.  Moreover, EPA did not rely on this court review to justify the adequacy of Florida's program and cannot do so *post hoc* here.

**E. EPA Approved a State Program That Failed to Demonstrate That Only Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State.**

The Defendants implausibly argue that the Corps acted reasonably in creating a retained waters list for Florida that is completely contrary to statutory requirements.  They further argue that EPA acted reasonably when it approved Florida's application based on the Corps' retained waters list, even though there is no evidence EPA made *any* determination to ensure it was transferring authority to the State over only assumable waters.  The Defendants' arguments fail.

The Corps acted arbitrarily when it:  (1) excluded traditionally navigable waters ("TNWs") from the retained waters list; (2) excluded "historic use" RHA Section 10 waters from the retained waters list; and (3) relied on an admittedly out-of-date RHA Section 10 list to create the 404 retained waters list.  These actions were contrary to the RHA, the Clean Water Act, and applicable regulations.  EPA then acted unreasonably when it relied on that list to approve Florida's program, unlawfully transferring authority to the State over non-assumable waters. That complying with the law may have been "time-consuming," as the Defendants complain, does not excuse these unlawful actions.  Dkt. 99 at 62.

**1. Under the Clean Water Act, the Corps Retains Exclusive Jurisdiction Over Traditionally Navigable Waters ("TNWs").**

The Defendants' argument that TNWs were properly excluded from the Corps' retained waters list conflicts with the plain meaning of the Clean Water Act.  Subject to EPA approval, the Clean Water Act authorizes states to assume 404 authority over waters of the United States,

> except as to those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto.

58

33 U.S.C. § 1344(g)(1).  Because the "except as to" waters cannot be assumed by the State, they are the waters over which the Corps retains exclusive jurisdiction after state assumption; in other words, the "retained waters."[44]  It was therefore unlawful for the Corps to omit TNWs from the retained waters list and for EPA to approve Florida's program based on that list.

The Corps itself recognized that TNWs under the Clean Water Act were *not* assumable when the Corps served on EPA's Assumable Waters Subcommittee, a fact the Defendants completely fail to mention.  CORPS002993, at CORPS002999 (Subcommittee Report).  Indeed, as stated in the *Assumable Waters Subcommittee Report*, the Corps had taken that position for at least a decade, before abruptly changing course at Florida's behest.  *See id.* at CORPS003021 (Corps has "maintained this position since at least the 2008 post-*Rapanos* guidance was issued and it is not a 'new' position created by the agency for purposes of this subcommittee.").[45]

The Defendants' reliance on the Corps' 2018 Memorandum ultimately adopting the subcommittee's majority recommendation (Dkt. 99 at 60) is wholly misplaced.  As shown above, the majority position (that TNWs are assumable by states) is contrary to the Clean Water Act.

---

[44] The Supreme Court's recent *Sackett* decision appears to align with Plaintiffs' view, although Section 404(g)(1) was not at issue in the case.  *Sackett*, 2023 WL 3632751, at *12 ("[S]tate permitting programs may regulate discharges into (1) any waters of the United States, (2) except for traditional navigable waters, (3) including wetlands adjacent thereto.").

[45] The Corps correctly recognized that "there should not be a distinction between different uses of the term 'navigable waters' under different sections of the statute" and that retained waters include *both* TNWs under the Clean Water Act *and* Section 10 waters under the RHA.  *See* CORPS002993, at CORPS002999 (Subcommittee Report).  The Corps also recognized that this position serves Congress' intent.  *Id.* at CORPS003021 ("TNWs reflect the concept of 'navigability' appropriate to ensure the objective of the CWA to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.").  Plaintiffs agree with the Defendants that RHA Section 10 waters and Clean Water Act TNWs are not co-extensive.  But that argument serves them no better because neither are assumable by the State.

59

The Corps could not lawfully have adopted a policy position that conflicts with the plain language of a statute. *Patel v. Garland*, 142 S.Ct. 1614, 1627 (2022).

Even if the statute were not plain, the Court could not defer to the Corps' new position because it was based on a policy reversal that the Corps failed to acknowledge, much less adequately justify. *Lone Mountain Processing, Inc. v. U.S. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (agency reversal of position must be supported by "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"); *Ctr. for Biological Diversity v. NMFS*, No. CV 21-930 (BAH), 2022 WL 4235013, at *13 (D.D.C. Sept. 14, 2022) (affording deference to agency that "pointedly acknowledge[d]" a change in position and then elaborated on the reasons for it).

In its 2018 Memorandum, the Corps did not pointedly acknowledge that it was reversing course on whether TNWs were assumable waters. To the contrary, the memorandum disingenuously claimed in a footnote that the Corps "ha[d] not previously taken any formal position on the recommendations contained in [the Assumable Waters Subcommittee] report." CORPS004096, at CORPS004096 (Corps Memorandum).[46]

Having failed even to acknowledge (and in fact, preposterously denying) its prior position, the Corps obviously did not provide a reasoned explanation for the reversal. But to be afforded deference, an agency must not only acknowledge the change, but also "show that there are good reasons for the new policy." *Ctr. for Biological Diversity v. NMFS*, 2022 WL 4235013,

---

[46] The memo also sought to deflect attention away from the Corps' prior position by making only an oblique reference to the Corps' participation in the Subcommittee. CORPS004096, at CORPS004097 (Corps Memorandum) (describing the subcommittee's majority as all members except for "a Corps technical representative"). The *Report*, however, makes clear that the Corps' representative was not a mere "technical" member, but was rather conveying the agency's longstanding position.

60

at *12 (finding change in agency position adequately explained where agency listed and elaborated on several reasons for change).

Indeed, neither the Corps nor EPA has provided a reasoned explanation based on the administrative record to justify this reversal of position, nor could they provide a lawful basis to disregard the express language of the Clean Water Act.  The agencies' actions were therefore arbitrary and capricious.  *Lone Mountain Processing*, 709 F.3d at 1164 ("Failing to supply such analysis renders the agency's action arbitrary and capricious.").

The only "new" information the Defendants specifically cite is an unsupported hearsay statement that the Assistant Secretary had "personally heard" from unidentified state officials that they would pursue assumption if the Corps changed its position on whether TNWs are assumable waters. Dkt. 99 at 60. The Defendants, however, cite no case where personal entreaties have been found sufficient to warrant an administrative about-face, and protecting against arbitrary favors of this nature is precisely why administrative law requires agencies to acknowledge, explain, and justify changes in position.  Further, the same rationales on which the majority relied to exclude TNWs were considered and rejected by the Corps when it served on the Subcommittee and therefore were inadequate to justify a change in position.  *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019) (data that "proves nothing new" was inadequate to justify a change in agency position).

The Corps' admitted exclusion of Clean Water Act TNWs from its retained waters list, and EPA's approval of Florida's program as based on that list, transferred authority to the State over non-assumable waters in violation of the Clean Water Act and must be set aside.

61

JA.923

**2. The Corps Unlawfully Excluded "Historic Use" RHA Section 10 Waters from the "Retained Waters" List.**

In addition to unlawfully excluding Clean Water Act TNWs, the Corps also unlawfully excluded "historic use" RHA Section 10 waters from the retained waters list. The Defendants do not dispute that the Corps has exclusive RHA jurisdiction over "historic use" waters, Dkt. 99 at 25, but claim that the State can somehow still assume Clean Water Act 404 jurisdiction over them. This position flies in the face of the common meaning of "exclusive" jurisdiction.

The Defendants defend this suspect proposition by claiming that Section 404(g)(1) of the Clean Water Act does not refer to "historic" use waters (as among waters to be retained by the Corps), whereas RHA regulations defining the Corps' jurisdiction do. Dkt. 99 at 61. That might be a persuasive argument if the Defendants were comparing apples to apples and oranges to oranges. But they are not. They are comparing apples (statutory language) to oranges (regulatory language). And it is here where the Defendants' theory falls apart.

As demonstrated in the chart below, an apples to apples and oranges to oranges comparison shows that *neither* the Clean Water Act nor the RHA expressly refers to historic use waters, but that the Corps' interpretation of *both* statutes *does*. Thus, the Clean Water Act prohibits the transfer of authority over "historic use" waters, which must remain under the Corps' exclusive jurisdiction, and it was unlawful for the Corps to remove these from its retained water list for Florida.

62

JA.924

| Definition | Clean Water Act | Rivers and Harbors Act |
| --- | --- | --- |
| Statute | Clean Water Act authorizes states to assume 404 authority, except as to "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto." <br><br> 33 U.S.C. § 1344(g)(1). | The RHA grants the Corps exclusive jurisdiction over construction in navigable waters, except for "waters that are not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce." <br><br> The RHA further prohibits excavation or fill of, or discharge of refuse into, any navigable water, without the consent of the Corps. <br><br> 33 U.S.C. §§ 401, 403, 407. |
| Regulation | CWA traditionally navigable waters are "waters which are currently used, **were used in the past,** or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." <br><br> 33 C.F.R. § 328.3(a)(1) (2020) | RHA navigable waters are "those waters that are subject to the ebb and flow of the tide and/or are presently used, or **have been used in the past,** or may be susceptible for use to transport interstate or foreign commerce." <br><br> 33 C.F.R. § 329.4 |

The Defendants cite no authority for the proposition that they are free to disregard their own interpretation of nearly identical statutory language. *Cf. Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (axiomatic that agencies are not free to disregard their own regulations). And they offer no rationale for why their interpretation should be disregarded. *See Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 382–83 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020) (in analogous context based on textual comparison of statutory requirement with language in regulation, rejecting agency interpretation "which stands virtually barren of any substantive explanation that would provide a

rationale for the difference").  It was therefore not reasonable or lawful for the Corps to exclude

RHA "historic" use waters from the retained waters list.[47]

### 3.  It was Unreasonable for the Corps to Base its Retained Waters List on An Admittedly Outdated RHA Section 10 List.

Consistent with the Corps' RHA' regulations, in 2017 the Corps initiated a process to

update its 2014 Navigable Waters List.  *See* CORPS003115, at CORPS003115 (Corps internal

email stating it was "absolutely imperative" to update the 2014 list and to remind Florida that the

2014 List "is not inclusive of all Section 10 waters nor necessarily informed by navigability

studies."); 33 C.F.R. § 329.16(a) (requiring Corps to update Section 10 lists "as necessitated by

court decisions, jurisdictional inquiries, or other changed conditions.").

As a first step, the Corps produced a 2017 Supplement to the Navigable Waters List,

identifying additional waters in Florida subject to the Corps' exclusive jurisdiction.  The Corps

published the 2017 Supplement to its website.  *See* CORPS003724, at CORPS003727, 29

(identifying at "Appendix F" the link where Corps posted supplement).[48]  In 2018, the Corps

invited public comment on a navigability assessment for Florida waters.  CORPS003213, at

CORPS003213 (Corps' Public Notice).

But at Florida's request, the Corps abruptly terminated that process, without explanation,

and never looked at the 2017 supplement again.  The Defendants argue that the Corps reasonably

---

[47] Although in the *Assumable Waters Subcommittee Report* the Corps acquiesced in the view that
retained waters excluded "historic" use Section 10 waters, CORPS002993 at CORPS002999, the
Corps provided no rationale to square that view with its position that "navigable waters" should
not be defined differently in different parts of the Clean Water Act and that TNWs (which also
define navigable waters with regard to historic use) are retained waters.
[48] The 2017 Supplement remains posted to the Corps' website.  *See*
https://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/
20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-123156-363
(last accessed June 4, 2023).

"declined to include ... every water" from its 2017 Supplement.  Dkt. 99 at 61.  But there is no evidence that the Corps considered the 2017 Supplement at all.  To the contrary, the Defendants admit the Corps used the 2014 list, only, as a "starting point" for its retained waters list.  *Id.* at 29.  By disregarding updates to the 2014 list, the Corps violated its own regulations, which require the Corps to update its navigable waters lists when jurisdictional questions arise.  33 C.F.R. § 329.16(a).  The Corps then removed "historic use" waters from the list, further in violation of the regulation that holds that once a navigability determination has been made it cannot be extinguished by later actions that "impede or destroy" navigability.  *Id.* § 329.4.

The Defendants now claim that the 2017 supplement was only "a draft."  Dkt. 99 at 61. But the 2017 list was not marked as a draft, and its publication on the Corps' official website suggests it was not a draft.[49]  Agencies do not typically publish draft documents, but rather guard them zealously against any public disclosure.  *See, e.g.*, *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 85 (D.D.C. 2018) (Corps properly withheld draft documents pursuant to deliberative process privilege).  Indeed, information posted on an official agency website is so reliable that courts often take judicial notice of it.  *Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

That the 2017 list stated it was part of a "first preliminary increment of an effort to update the Jacksonville District Navigable Waters List" also does not indicate that the document was a

---

[49] Having been published to the Corps' official website, the 2017 Supplement was therefore also familiar to the regulated community, belying the Defendants' justification for using the admittedly outdated 2014 list due to familiarity.

draft, but simply (as it says) that the supplement was the start of an update.  The 2014 list

contained similar caveats, including that it reflected only waters over which the Corps

"currently" exercised regulatory authority, that "[t]he absence of a water on these lists does not

mean it or a portion of it is not a navigable water," and that "[t]he District makes no claim that

[the 2014 list is] complete or completely accurate."  CORPS002987, at CORPS002987.

The Defendants rely on an internal Corps email to argue that the 2017 list was

"deliberatively over-inclusive."  Dkt. 99 at 61.  But the same email made clear that the 2014 list

was *under*-inclusive, and therefore using it as the starting point for the retained waters list meant

unlawfully transferring authority to the State over non-assumable waters.  Given the availability

of the 2017 Supplement, and the Corps' inchoate navigability assessment, the Defendants'

argument that the 2014 list was the "best" information available falls flat.

Without citing anything in the record, the Defendants lament that "[s]orting retained

waters from a list of speculative TNWs would have been time-consuming and, likely,

contentious" and on this basis claim it was reasonable not to bother considering the 2017 list.

Dkt. 99 at 61–62.  But as shown above, TNWs *are* retained (i.e., non-assumable) waters and

including them on the retained waters list was therefore required by law.  The same is true for the

"retained waters" the Defendants admit the Corps did not bother "sorting" from the 2017 list.

The Defendants cite no authority for the proposition that the Corps was free to take these

shortcuts because compliance with the law might be "time-consuming" or potentially

"contentious."  Dkt. 99 at 62.  They cite no time constraints that forced their hand (and indeed

completed the list in August 2019, a full year before Florida even submitted its application to

EPA in August 2020).  And they cite no rationale for why avoiding "contention" justified their

approach.  It was not reasonable for the Defendants to favor expedience at the expense of a lawful process to ensure against the transfer of non-assumable waters to the State.

The Defendants do not dispute that the Corps (1) initiated a statewide navigability assessment to determine the scope of retained waters in Florida; (2) summarily terminated the public comment period for that assessment without explanation; and (3) ignored all public comment on the topic.  Dkt. 99 at 58–62.  But the Defendants claim that these actions were reasonable because doing anything more than what the Corps ultimately did would have come "at the expense of state assumption."  *Id.* at 58.  In other words, the Corps' goal was not to identify which waters could lawfully be assumed under federal law, *but rather to ensure state assumption*.  *That* is the tail wagging the dog.

The Defendants oddly decry the undertaking of a statewide navigability study as a "demand" by the Plaintiffs, *Id.* at 59, when it was *the Corps* that initiated that study precisely for the purpose of Florida's application before putting an abrupt end to a reasoned administrative process.  The Defendants argue that the Corps' about-face was justified because "prior, open-ended inquiries" into retained waters had discouraged states from pursuing assumption.  *Id.* at 60.  But even if prior actions by the Corps had had the effect of discouraging state assumption,[50] nothing about *completing* a navigability assessment is "open-ended."

The Defendants claim that because Congress intended for states to assume the 404 program under the Clean Water Act, the Corps must adopt a "pragmatic" approach to reconcile that intent with congressional intent under the RHA.[51]  *Id.* at 59–60.  But this overlooks that

---

[50] Importantly, if states decide not to pursue assumption because of the requirements put in place by Congress, it is not for agencies to second guess Congress' judgment and "fix" this.

[51] Of course, there are many other reasons why states may decline to pursue 404 assumption, including perhaps most importantly, the cost.

Congress also intended to limit the waters over which states could assume jurisdiction *under the Clean Water Act*.  Nothing in the statute reflects a congressional intent to expand the scope of assumable waters to make assumption more palatable to states.  Congress intended that states assume the program, but only under the terms Congress prescribed.

The Defendants blame "uncertainty" over the scope of retained waters for few states pursuing assumption.  *Id.* at 60.  But excluding Clean Water Act TNWs and historic RHA Section 10 waters from retained waters lists does not eliminate uncertainty.  What it eliminates is hundreds of waterways from the additional protections that federal law affords when the Corps administers the 404 program.  Certainty is served when a retained waters list is consistent with federal law, by identifying the waterways that Congress required remain under the Corps' 404 authority.  A process that properly identifies those waters Congress will certainly yield more retained waters.  But it also provides certainty.  And it is what the law requires.

The Defendants argue that the Corps' approach was reasonable because the retained waters list is "not exhaustive" or "static."  *Id.* at 90.  But the list was exhaustive (though inaccurate) because the MOA that incorporates it provides that the State assumes 404 authority over "*all* waters of the United States [in Florida]" other than those that are tidally influenced or appear on the list.  CORPS004322, at CORPS004323.  Modifications to the list that affect jurisdiction require EPA approval.  *Id.* at CORPS004324.  Nothing in the list provides any gray area: a water is either retained because it is tidally influenced or on the retained waters list, or it is assumed by the State and subject to the State's 404 jurisdiction.

And the list is also static.  There is no process for correction whereby the State may transfer authority over an assumed waterway to the Corps or whereby the Corps may transfer authority over a retained water to the State.  The MOA's "joint procedures" only require Florida

68

to notify the Corps of an application that relates to retained waters and the Corps to notify

Florida if it receives an application that relates to assumed waters; whether a water is assumed or

retained is already determined by the retained waters list.  *Id.* at CORPS004324.[52]

Unlike the Corps' determinations *under the RHA*, on which the Defendants rely, retained

waters lists under the Clean Water Act cannot unilaterally be amended or revised by the Corps.

To the contrary, a 404 retained waters list can only be changed with the approval of EPA through

rulemaking.  *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020).  And

unless and until such modifications are made through rulemaking, the allocation of authority

remains as stated in the approved program.

That the list may theoretically be modified after the fact does not address the Defendants'

failure to ensure that only assumable waters were transferred to the State's authority when EPA

approved the program.  It is particularly cold comfort to suggest that "new information" will

easily yield new determinations given that when the Corps *was* provided with new information

(both by its own preliminary update to the list and through public comment), the Corps did

exactly nothing with that information.  The EPA was aware of all this information as well, Dkt.

98 at 26 n.10, and did not do anything with it either.

## 4.  EPA's Approval of Florida's Program Based on the Corps' Retained Waters List Was Unreasonable.

The Defendants do not contest that EPA had the ultimate duty under the Clean Water Act

to ensure that its approval of Florida's program did not transfer Section 404 authority to the State

over waters required to remain in the Corps' exclusive jurisdiction, and that EPA failed to take

---

[52] While Section II.A. of the MOA includes the statutory language of 404(g)(1), it also clearly states that the Corps retains jurisdiction only over those waters on the retained waters list and any tidal waters.  CORPS004322, at CORPS004323.

69

any independent action or conduct any independent analysis to comply with this duty.  Dkt. 98 at

69.  EPA's action therefore was not reasonable.  *See Ergon-W. Va., Inc. v. EPA*, 980 F.3d 403,

422 (4th Cir. 2020).  The Defendants cite no authority for their conclusory assertion that

"because the Corps' Retained Waters list was reasonable, EPA acted reasonably in approving

Florida's assumption request" based on that list.  Dkt. 99 at 62.  No matter.  Since the Corps'

action was not reasonable, neither was EPA's reliance on it.

### 5.  Florida Unlawfully Failed to Incorporate the Federal Definition of WOTUS.

Lastly, EPA erred in approving Florida's program, which failed to incorporate the federal

definition of WOTUS or commit to applying the federal definition.  The Defendants claim that

the problem was not the program, but rather Florida's "fail[ure] to acknowledge intervening

changes in binding federal law."  Dkt. 99 at 58.  But that is precisely the problem: the State did

not "bind" itself to the federal definition, and so does not consider it "binding."  Dkt. 98 at 67–

69.  That Florida has continued to ignore the scope of waters covered by the Clean Water Act

even with EPA's oversight demonstrates the limits of that oversight.  EPA's failure to require the

State to incorporate the federal definition into its program (and not only its program *description*)

has allowed it to flout federal law, to the detriment of the Nation's waters.[53]

---

[53] The Defendants do not dispute that Florida has flouted federal law but argue that the Court
should not consider the relevant evidence because it is not part of the administrative record.  Dkt.
99 at 58.  Yet Plaintiffs are required to demonstrate harms resulting from the Defendants'
unlawful actions, and that requirement necessarily entails submitting extra-record evidence.
*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818, 830 (D.C. Cir. 2002), *vacated
in part on other grounds sub nom. Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803
(2003). Plaintiffs were therefore not required to invoke an exception to record review, as the
Defendants complain (and themselves failed to do when citing their oral argument in *Sackett* or
attaching an extra-record chart to their filing).  Plaintiffs recognize that the Supreme Court's
decision in *Sackett* has narrowed the scope of wetlands covered by the Clean Water Act and
understand that the Corps and EPA are reviewing the decision.

**V.     EPA's Determination that Florida's Application was Complete was Unlawful and Therefore not Reasonable.**

Plaintiffs' completeness claim arises under the Clean Water Act, 33 U.S.C. § 1344(g)(1), which required the State to submit a "full and complete" program submission before it could be deemed "complete" for purposes of triggering the notice and comment period and the one-hundred-and-twenty-day decision clock.  To demonstrate (and determine) that Florida's program complied with the Clean Water Act 404(b)(1) Guideline that prohibits issuing permits that may jeopardize species or adversely modify or destroy critical habitat, Florida (and EPA) expressly relied on the technical assistance process as outlined in the BiOp.  *See* Dkt. 98 at 73–74 & n.37.  The BiOp was thus a necessary component of Florida's submission, and therefore the application was not "full and complete" without it.  *See U.S. Dep't of Com. v. New York*, 139 S.Ct. 2551 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.").

The Defendants' focus on *other* information in Florida's application fails because it either simply restates the law or describes only the beginning and the end of the technical assistance process (with USFWS receiving and reviewing permits on the front end and potentially making recommendations at the back end).  Dkt. 99 at 39–40.  The state regulations and MOU fail to articulate what the "consultation" or "technical assistance"—the process USFWS later claimed would ensure against jeopardy of species or adverse modification or destruction of critical habitat—entails.  *See* Dkt. 98 at 73.  The process remains a black box.  The Defendants' reliance on EPA's Response to Comments fares no better, Dkt. 99 at 40, as it relied on the Program Description, which relied on the MOU, which relied on the BiOp.  All roads lead to the BiOp.

71

The Defendants' reliance on cases that stand for the proposition that there is no independent right *under the ESA* to comment on BiOp, *id.* at 40–41, is neither here nor there, as Plaintiffs' claim arises under the Clean Water Act, which provided the right to comment on Florida's full and complete program submission.[54]  That Florida and EPA decided those procedures should be articulated in a BiOp (which EPA separately relies on to claim it has met its Section 7 obligations under the ESA) does not eviscerate this right, nor have Florida and EPA pointed to any authority to support that claim.  The Defendants' claim that "EPA of course relied on the BiOp," Dkt. 99 at 43, pursuant to its Section 7 obligations *under the ESA* similarly sidesteps this point, that EPA relied on the technical assistance process in the BiOp to approve Florida's program *under the Clean Water Act*.

Florida's application did not put Plaintiffs on notice of how the State intended to ensure no jeopardy to threatened and endangered species.  For example, Florida's BA stated that "[b]ecause of the terms and conditions anticipated in the [programmatic] BiOp and its [ITS], the State 404 program would not issue a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats."  EPA-HQ-OW-2018-0640-0386-A1, at 36 (Plaintiffs' Comments to EPA); EPA-HQ-OW-2018-0640-0387-A8, at 7 (BA).  The "terms and conditions" and ITS, however, were not known until USFWS produced the BiOp, which contained them.[55]  *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) (extra-application material sufficiently deviated from application requiring notice and comment).

---

[54] The Second Circuit's decision in *Cooling Water*, 905 F.3d at 78, expressly relied on Section 7 of the ESA and did not address the claim presented here, which is based on the Clean Water Act.
[55] The "completeness" of Florida's application did not rest on merely identifying "the participants, timing, subject matter, dispute resolution mechanisms, and binding effect" of an undefined process.  *Cf.* Dkt. 99 at 42.  It rested on demonstrating *how* its permits would ensure protection of federally listed species.

Although EPA's final decision was not a "complete turnaround" on how Florida might

demonstrate compliance with the Clean Water Act, *CSX Transp., Inc. v. Surface Transp. Bd.*,

584 F.3d 1076, 1082 (D.C. Cir. 2009), it was not enough to give notice that *a* technical

assistance process (or some "terms and conditions") would be used to ensure Plaintiffs could

comment on *the* process EPA ultimately approved.

 The Defendants' argument that it was sufficient for Plaintiffs to know that "permit review

procedures" would be addressed in the BiOp effectively means that EPA could have approved

any process at all, and Plaintiffs would have been deemed to have had adequate notice of it.  *CSX

Transp.*, 584 F.3d at 1982.  When what is proposed is a black box, virtually anything could fit

into it.  Therefore, it is impossible to say that the process as laid out in the BiOp was "a logical

outgrowth" of the empty outline that was proposed.  Unlike in *City of Waukesha v. EPA*, where

"the petitioners conceded that there were no additional comments or evidence they could have

proffered for the record," 320 F.3d 228, 246 (D.C. Cir. 2003), here Plaintiffs would have

commented on the unlawfulness of the technical assistance process and terms and conditions that

were adopted, for the reasons argued above.  The agency could have "learned from comments"

to reach a different result in the final rule.  *Cf. id.* at 245.

 The Defendants unreasonably claim that Plaintiffs had adequate notice of this black box

from the earlier ESA consultation rulemaking based on Florida's proposal there.  But the

*conclusion* of that rulemaking was EPA's August 27, 2020, decision, which on its face did not

adopt Florida's proposal wholesale.  EPA-HQ-OW-2018-0640-0660-A1, at 1–8 (ESA

Consultation Memo).  Instead, EPA concluded that ESA programmatic consultation at the

approval stage would "help ensure *a process* is in place to consider potential adverse impacts to

73

species resulting from [state] permitting decisions" and that the BiOp may identify additional procedures and measures which may differ from state to state.  *Id.* at 3, 5, 6–7.[56]

## STANDING AND JUSTICIABILITY

While the Defendants challenge Plaintiffs' claims on the merits, Florida challenges Plaintiffs' standing to bring those claims.  These arguments fail.

### I.      Plaintiffs Have Standing to Challenge EPA's Approval of Florida's Program and the Underlying Deficiencies on Which the Approval Is Based (Claim Two).

Plaintiffs have shown that EPA's decision to transfer the Section 404 program to Florida threatens their organizational and associational interests in protecting Florida's waterways, including the endangered and threatened species that rely on them.  Dkt. 98 at 75–79.  EPA's action threatens harm to (1) Plaintiff organizations' access to information provided through NEPA review and ESA consultation and access to courts to challenge inadequate environmental protection; and (2) Plaintiffs' members' aesthetic and recreational interests in wild Florida lands, wetlands, and waters where panthers roam and sea turtles nest.

#### A.  EPA's Decision to Transfer 404 Authority to the State Harms Plaintiff Organizations.

As Plaintiffs have shown, they have and continue to divert their resources to counteract the harms caused by EPA's unlawful transfer of the 404 program to the State.  *Id.* at 78–79.

##### 1.  Plaintiffs are Harmed by the Loss of Information Developed Through NEPA Review and ESA Consultation.

This Court has already found that Plaintiffs informational harms qualified as a concrete and demonstrable injury despite Florida's same challenges to Plaintiffs' Motion for Partial

---

[56] The Defendants claim that EPA provided notice by referring to a white paper by FDEP.  Dkt. 99 at 44.  That argument fails for the same reasons; moreover, EPA did not adopt or incorporate that white paper by reference in its August 27, 2020, decision, or in its request for comment on Florida's application.

74

Summary Judgment.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 174, 202–03, 207

(D.D.C. 2022).[57]  Here, Florida seeks to relitigate this issue, raising the same arguments as it did

in response to Plaintiffs' Motion for Partial Summary Judgment, now supported by an

unconvincing affidavit.  Dkt. 102 at 11–14; Dkt. 102-1 (Wolfe Aff.).  Florida makes erroneous

arguments regarding the specificity of Plaintiffs' allegations of harm that are easily rebutted.

Dkt. 102 at 11–14.  Plaintiffs have thus established standing.

      First, Florida attempts to re-litigate arguments this Court already rejected regarding

Plaintiffs' informational harm.  *Id.* at 12, 39–41.  The State again argues that Plaintiffs have not

been harmed because (1) not all state 404 projects would have required an EIS and BiOp under

the federal program and that those that would are usually ones with a federal nexus; (2) state 404

permits do not require NEPA analysis or ESA consultation; (3) the ESA does not provide a right

of access to review and comment on BiOps.  *Compare* Dkt. 102 at 39–41 and Dkt. 102-1 at 4–

11, 23–54 (Wolfe Aff. ¶¶ 18–30, encl. B–D) *with* Dkt. 37 at 56–57, Dkt. 46 at 23–25, and Dkt.

72; *see* Dkt. 43 at 67–71; *see generally* Dkts. 70, 70-2.  The Court already considered and

rejected all of these arguments.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 190,

202–03, 207.

      Florida cites new cases to support its repeated arguments, Dkt. 102 at 39, but those are

unavailing.  The existing federal 404 program required NEPA review and ESA consultation,

which has now disappeared under the state program.  *Id.*  Thus, *Association of American*

*Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp 2d 19, 42–44 (D.D.C. 2012), is inapposite

---

[57] While the Court reached this decision in the context of Claim Nine, the same reasoning applies
to Claims Two, Seven, and Ten, where the harms to Plaintiffs similarly resulted from EPA's
transfer of 404 authority to the State.

because, there, plaintiffs were harmed by requirements in *existing* Medicare statute not the

changes made in the *new* agency actions that were challenged.  Plaintiffs have specifically

alleged informational harm from the loss of information from NEPA and the ESA, Dkt. 98 at 75–

76, 78–79, and the Court has found those allegations sufficient.  *Ctr. for Biological Diversity v.*

*Regan*, 597 F. Supp. 3d at 202–03.  Thus, Florida's use of *Center for Biological Diversity v.*

*Zinke* is also unavailing because the plaintiffs there alleged no informational harm.  369 F. Supp.

3d 164, 181 & n.5 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*, 961 F.3d

1197 (D.C. Cir. 2020).  Further, Plaintiffs have shown, and the Court has confirmed, that (1) they

have lost access to information that must be disclosed; and (2) they suffer the type of harm

Congress sought to prevent by requiring disclosure.  Dkt. 98 at 75–76, 78–79; *Ctr. for Biological*

*Diversity v. Regan*, 597 F. Supp. 3d at 202–03.  They have satisfied the standard cited in *Friends*

*of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

     The only new spin on Florida's argument is the introduction of an Affidavit by FDEP

General Counsel Justin Wolfe.  Dkt. 102-1 (Wolfe Aff.).  But it too raises the same arguments

already rejected by this Court.  In the Affidavit, Mr. Wolfe generally contends that Plaintiffs

have access to readily available, real-time information developed through the permit review

process.  *Id.* at 4–7 (Wolfe Aff. ¶¶ 18–21).  Mr. Wolfe claims that Plaintiffs can obtain

"essentially all of the same kinds of information" of the "essential contents" of a NEPA analysis

and BiOp through Florida's permitting databases, pointing to the same side-by-side comparison

this Court considered when ruling that Plaintiffs had established information standing for Claim

Nine.  *Id.* at 8–11, 44–54 (Wolfe Aff. ¶¶ 25, 28, encl. D).[58]  Further, Mr. Wolfe avers again that

some projects would not require EISs or BiOps but falls short of alleging or showing that the

projects of concern to Plaintiffs would not have required EAs, EISs, or BiOps.  Dkt. 102-1 at 9

(Wolfe Aff. ¶¶ 26–27).[59]  And in fact when the Troyer Mine project was before the Corps, it was

determined that an EIS would be required.  *See* Dkt. 98-1 at 12–13 (Crooks Dec. ¶ 35).  To

support the arguments this Court has already considered and rejected, Mr. Wolfe points to the

Troyer, Kingston, and FFD permit files as containing information provided by the *applicant* in

the form of application records and environmental reports.  Dkt. 102-1 at 7–8, 11 (Wolfe Aff.

¶¶ 22–23, 30).  On the technical assistance process in particular, Mr. Wolfe points to the FFD

and Kingston permit files.  *Id.* at 8, 11 (Wolfe Aff. ¶¶ 23, 29–30).

      Unlike NEPA and the ESA, however, these permit files include no documents containing

the State's analysis of applicant submitted information, the State's findings as to impacts,

incidental take, required permit conditions, and alternatives, nor the State's rationale for those

decisions; and Mr. Wolfe points to none.  Similarly, the files contain no analytical information

from USFWS as to impacts on species.  Ex. 1 at 2–4 (Crooks Dec. ¶¶ 4–7).  That is the

information—i.e., contained in an EA, EIS, or BiOp—that Plaintiffs use to understand projects

and their impacts, and to educate their members and engage in advocacy necessary to further

---

[58] Mr. Wolfe spends much of his declaration pointing to ways that Plaintiffs can reach publicly available information, Dkt. 102-1 at 4–8, 23–33 (Wolfe Aff. ¶¶ 19–23, encl. B), which would only be useful to the extent that the information paralleled that generated pursuant to NEPA and the ESA.  Ex. 1 at 2–4 (Crooks Dec. ¶¶ 4–7).  However, as Plaintiffs have shown, it does not.
[59] Mr. Wolfe also mistakenly claims that BiOps are not publicly provided.  Dkt. 102-1 at 9–10, 34–43 (Wolfe Aff. ¶ 27, encl. C).  *Contra* Env't Conservation Online System, USFWS, https://ecos.fws.gov/ecp/report/biological-opinion (last visited May 19, 2023) (containing links to publicly available BiOps); NOAA Institutional Repository, NOAA, https://repository.library.noaa.gov/gsearch?collection=noaa%3A5&terms=Biological+opinion (last visited May 19, 2023) (same).

their goals.  Even if information submitted by an applicant could in some way be equivalent to an

agency's independent analysis and findings, those submissions still fall short of providing the

contents required by NEPA and the ESA.  *Id.*; Dkt. 70 at 2–7; Dkt. 70-2.  Mr. Wolfe does not

truly contest this, because he merely avers that the permit files contain "essentially all" of what

he deems to be the "essential" information.  Dkt. 102-1 at 8–11 (Wolfe Aff. ¶¶ 25, 28).

Second, Florida erroneously claims that Plaintiffs have not alleged informational harm as

to any particular claim.  Dkt. 102 at 37–38 (citing *TransUnion*).  However, Plaintiffs clearly tied

their informational harms to Claims Two, Seven, and Ten.  Dkt. 98 at 78–79, 80–81.  As such,

Plaintiffs have satisfied *TransUnion LLC v. Ramirez*'s requirement that Plaintiffs demonstrate

standing as to each of these claims.  141 S.Ct. 2190, 2207 (2021).

Third, Florida makes arguments regarding the sufficiency of Plaintiffs' Complaint and its

allegations regarding informational harm.  Dkt. 102 at 40.  However, there is nothing in the

pleading standard that requires such allegations, and Florida has not demonstrated otherwise.

Florida had the opportunity to test the sufficiency of Plaintiffs' Complaint at the outset of this

litigation but chose not to raise this argument then.  Florida has been on notice of Plaintiffs'

informational harm at least since the briefing on Plaintiffs' Motion for Partial Summary

Judgment.  Dkt. 31 at 40–49.  Moreover, now that this case is at summary judgment on the

remaining claims, Plaintiffs have submitted additional declarations alleging specific facts and

citing records to demonstrate standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Florida's argument based solely on Plaintiffs' Complaint therefore lacks merit in the face of the

substantial evidence Plaintiffs have provided.

Finally, Amici cite the Court's denial of their motion to intervene to contend that

Plaintiffs' organizational injuries are speculative.  Dkt. 103 at 5–6.  This Court, however, has

already ruled that Plaintiffs have established informational standing in its order on Claim Nine in

the face of similar arguments. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. at 190,

203–04, 207; Dkt. 37 at 54–58. Regardless, Amici's arguments fail. The Court rejected Amici's

motion to intervene because they failed to identify any (1) likely proceedings under the Florida

APA; (2) likely prospect for seeking records from the State under the Florida FOIA; (3) evidence

to show that Florida will process permits faster than the Corps; nor (4) evidence that their

members will have Section 404 permits pending when the merits are decided. *Ctr. for Biological*

*Diversity v. Regan*, 539 F. Supp. 3d 136, 142–45 (D.D.C. 2021). Here, by contrast, Plaintiffs

have provided extensive evidence of (1) the differences in information generated by the NEPA

process and ESA consultation as opposed to the information available pursuant to Florida's

program; (2) the particular ways in which the state court system is more restrictive than the

federal court system; and (3) specific projects and permits where Plaintiffs are losing access to

this information and would be subjected to Florida's restrictive permit appeal and court system.

Dkt. 98 at 75–76, 76 n.39, 78–79; Dkt. 31 at 48–49; Dkt. 43 at 72–73.

### 2.   Plaintiffs are Harmed Because of Florida's Restrictive Access to Courts.

Plaintiffs have also demonstrated that EPA's action subjects Plaintiffs to a restrictive

state court system when adversely affected by state-issued permits and unpermitted activities.

The state court system will either force Plaintiffs to divert significant resources from their

programs or forego challenging legal violations and inadequate permit decisions. Dkt. 31 at 22–

23, 47–48; Dkt. 43 at 73–74 nn.45–46. *See Nw. Immigrant Rts. Project v. U.S. Citizenship &*

*Immigr. Servs.*, 496 F. Supp. 3d 31, 45–50 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021

WL 161666 (D.C. Cir. Jan. 12, 2021) (finding organizational standing where agency action

restricted Plaintiffs' ability to litigate to protect immigrants); *People for the Ethical Treatment of*

79

*Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094–97 (D.C. Cir. 2015) (finding organizational standing when agency action precluded plaintiff from "its normal process" of submitting complaints).  Florida, however, raises arguments similar to those Plaintiffs addressed in briefing for the State's Motion to Dismiss and again contends that (1) de novo review in administrative court proceedings does not harm Plaintiffs; (2) the State's mandatory fee shifting provision would not apply; (3) standing in state court is the same as federal court; and (4) that Plaintiffs' allegations of harm are speculative.  *Compare* Dkt. 102 at 30–33, 45–47, *with* Dkt. 37 at 46–49, 57–58.[60]  These arguments fail.

First, Plaintiffs have specifically alleged the harm from the state administrative court's use of de novo review for state permitting actions: the substantial cost required to present an affirmative case by hiring experts and conducting independent investigations.  Dkt. 31 at 47–48 (citing declarations); Dkt. 43 at 72–73 nn.45–46 (same).  *Contra* Dkt. 102 at 46 n.26.  Rather than litigating the adequacy of an agency's independent analysis and decision-making, *Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 77–79 (D.D.C. 2007), parties challenging a state permit must rebut a presumption in favor of the permittee by presenting evidence, *Crooked Lake*, 2018 WL 3387900, at *8.  Because of this evidentiary burden, it is not enough for Plaintiffs to simply rely on public comments, *contra* Dkt. 102 at 31; Plaintiffs must present analyses to rebut those presented by the permit applicant, which requires costly independent investigations and expert testimony.[61]  This is particularly true in Florida because, as described

---

[60] Florida also erroneously relies on *Menominee*, 947 F.3d at 1070–71, Dkt. 102 at 46, even though there, the Tribe raised concerns about the substantive scope of their state court challenge as opposed to the federal court challenge and did not raise concerns about the state court's standard of review, fee-shifting provisions, or standing requirements.
[61] *See* Dkt. 98-1 at 13–14 (Crooks Dec. ¶¶ 38–39); Dkt. 98-4 at 7 (Hartl Dec. ¶ 26); Dkt. 98-7 at 4–5 (Silverstein Dec. ¶¶ 12–13); Dkt. 98-10 at 24 (Umpierre Dec. ¶ 72).

above, the State is not required to independently evaluate and provide written findings and analyses, and Plaintiffs no longer have the benefit of the analyses and information provided pursuant to NEPA and the ESA.  As Ms. Rinaman explained, because of this de novo review, a state administrative court challenge would "cost upwards of several hundreds of thousands of dollars, which represents 35% of [St. Johns Riverkeepers'] annual budget" because of the need to hire expert witnesses.  Dkt. 98-6 at 5–6 (Rinaman Dec. ¶ 21).

Second, Florida seeks to dispute Plaintiffs' harms from the State's mandatory fee shifting provision by arguing that it applies only to suits for enjoining environmental violations.  Dkt. 102 at 46.  But that is precisely the point.  For Plaintiffs to enforce Section 404 violations, they would be exposed to the State's mandatory fee shifting provision.[62]  Dkt. 98 at 79; Dkt. 31 at 23. As Ms. Crooks has explained, Conservancy has faced the impact of this fee-shifting provision firsthand, because if they lose their case on remand to the Circuit Court, they could face a demand for fees of nearly $2.4 million.[63]  Ex. 1 at 5 (Crooks Dec. ¶ 9).

Third, Florida wrongly contends that Plaintiffs will not face a different burden to prove standing in state court.  Dkt. 102 at 46–47.  Although Florida relies heavily on Florida Statute Section 403.412, Dkt. 102 at 30, 46, that law authorizes only a "citizen of the state" to maintain an enforcement action and explains that only a "citizen of the state" will have standing to initiate an administrative permit challenge or intervene in any proceeding brought under this statute. Fla. Stat. § 403.412(2)(a), (5), (7).  At least one Florida appellate court has found that a foreign

---

[62] Although Florida elsewhere contends that Plaintiffs could still bring enforcement suits in federal court, Florida does not cite any authority on that point in the Eleventh Circuit nor does Florida address the fact that defendants in those cases often seek remand to state court.
[63] Conservancy of Southwest Florida is challenging this demand for fees as Ms. Crooks further explains.  Ex. 1 at 5 (Crooks Dec. ¶ 9).

corporation would not quality as a citizen of the State, even when they hold a valid certificate of authority to operate in the State. *Legal Env't Assistance Found. v. FDEP*, 702 So.2d 1352, 1353 (Fla. 1st Dist. Ct. App. 1997). *See Mcclash v. Manasota-88, Inc.*, No. 14-4735, 2015 WL 3966050, at *8 (Fla. Div. Admin. Hearings June 25, 2015) ("Sierra Club is not a citizen of the state; it is a foreign nonprofit corporation."). Federal law, by contrast, authorizes citizen suits under the Clean Water Act by "any citizen" (i.e., "a person or persons having an interest which is or may be adversely affected"). 33 U.S.C. § 1365(a), (g).

Moreover, the language of Florida Statute Section 403.412(7) is unclear as to which proceedings it applies. It states, "In a matter pertaining to a federally delegated or approved program, a citizen of the state may initiate an administrative proceeding under this *subsection* if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution." Fla. Stat. § 403.412(7) (emphasis added). However, 403.412(7) is a subsection of Section 403.412, and "subsection" 403.412(7) does not authorize any administrative proceedings. *Id.* Assuming, arguendo, that the State legislature intended the term "subsection" to apply to all of "Section" 403.412, that still would not explain to which "administrative proceedings" this more liberal standing standard applies. Florida Statute Section 403.412 authorizes injunctive actions to enforce environmental laws, but it does not authorize administrative proceedings. *Id.* § 403.412(2)(a). The only other mentions of administrative proceedings in Section 403.412 discuss the standing requirements for administrative hearings initiated pursuant to Sections 120.569 and 120.57. *Id.* § 403.412(5), (6). But those provisions do not independently authorize administrative proceedings. The clearest reading of the statute would be for Florida Statute Section 403.412(7) to apply Article III standing for injunctive suits regarding delegated programs.

Fourth, Florida cites this Court's denial of Amici's intervention to argue that Plaintiffs have failed to identify any pending or planned state court litigation, and thus, their allegations of harm are speculative.  Dkt. 102 at 46–47.  However, unlike Amici, Plaintiffs have pointed to specific Section 404 permit applications that the State is considering as well as other decisions of concern to Plaintiffs.[64]  Plaintiffs have explained that litigation and permit challenges are tools they regularly use to further their missions of environmental protection.[65]  Thus, any of these permit decisions would implicate potential future state court challenges.  As Ms. Umpierre explained, due to EPA's action, "it is guaranteed that Sierra Club will either have to divert resources to engage in state court litigation, or forego litigation completely, damaging [the Club's] organizational mission."  Dkt. 98-10 at 22–23 (Umpierre Dec. ¶ 69).

### B. EPA's Decision to Transfer 404 Authority to the State Threatens the Aesthetic and Recreational Interests of Plaintiffs' Members.

Florida raises the same arguments that this Court has already rejected to claim that Plaintiffs' members will not be harmed by EPA's unlawful decision to approve the less stringent State (or that their harm is speculative) because Plaintiffs have not "proven" that the state program is less stringent than the federal program.  Dkt. 102 at 45.  Plaintiffs have already responded to this illogical argument, Dkt. 43 at 74–76, and this Court has already rejected it, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 189.

---

[64] Dkt. 98-1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Dkt. 98-3 at 2–13 (Fleming Dec. ¶¶ 6–36); Dkt. 98-4 at 9–11 (Hartl Dec. ¶¶ 32–37); Dkt. 98-5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Dkt. 98-6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Dkt. 98-7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Dkt. 98-10 at 1, 3–14, 24–25 (Umpierre Dec. ¶¶ 2–3, 10–11, 15–40, 73).

[65] Dkt. 98-1 at 13 (Crooks Dec. ¶ 37); Dkt. 98-2 at 2 (Carter Dec. ¶¶ 7, 11); Dkt. 98-4 at 3 (Hartl Dec. ¶ 9); Dkt. 98-5 at 6–7, 14 (Schwartz Dec. ¶¶ 16, 38); Dkt. 98-6 at 4 (Rinaman Dec. ¶ 18); Dkt. 98-7 at 2–4 (Silverstein Dec. ¶¶ 6–9); Dkt. 98-10 at 3, 23 (Umpierre Dec. ¶¶ 8, 70).

83

First, as the Court has explained, it must "take care 'not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Id.  Accord Am. Rivers v. FERC*, 895 F.3d 32, 41–42 (D.C. Cir. 2018) (rejecting challenge to standing based on merits arguments); *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982) ("For purposes of the standing issue, we accept as valid [plaintiff's] pleaded legal theory."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 28 (D.D.C. 2012) (finding that the "issue of standing need not be conclusively resolved" where jurisdictional facts "are inextricably intertwined with the merits of the case").

Second, Plaintiffs' allegations regarding member harms are not speculative or vague. The State has issued, is considering, and will likely issue several specific Section 404 permits that will harm the aesthetic and recreational interests of Plaintiffs' members.  Dkt. 98 at 78. Contrary to Florida's suggestion otherwise, Dkt. 102 at 20; Dkt. 102-1 at 3 (Wolfe Aff. ¶ 12), the State has not denied a single individual 404 permit for purposes of protecting the environment; those denials have all been based on an applicants' delay in responding to requests for information, and the State has invited the re-submission of those applications once the applicant is ready.  Ex. 1 at 6 (Crooks Dec. ¶ 10).

Third, EPA's oversight does not supplant an adequate state program nor remove this risk of harm.  *Contra* Dkt. 102 at 45.  EPA itself has explained that its ability to block the issuance of a 404 permit does not "lessen" the need for the regulatory requirements embodied in the 404(b)(1) Guidelines.  45 Fed. Reg. at 85,337.

Fourth, as Plaintiffs have already explained, *Clapper v. Amnesty International USA* does not apply.  Dkt. 43 at 41–42.  In *Clapper*, the plaintiffs lacked standing because the harms would not occur absent a series of events, including decisions by multiple independent actors, none of

84

which were even alleged to have occurred.  568 U.S. 398, 415–18 (2013).  The same attenuated

chain of events is not present here.  To the contrary, (1) Florida will likely issue permits pursuant

to an unlawful 404 program, Ex. 1 at 6 (Crooks Dec. ¶ 10); (2) EPA will likely not object to or

federalize that permit, Dkt. 102-1 at 12 (Wolfe Aff. ¶ 31) (stating EPA has only objected to 8.5%

of permits and federalized less than 1% of permits); and (3) the permittee will likely clear

wetlands and waters that are vital to protected species and water quality.

### C.  Plaintiffs Need Not Independently Show Harm from the State's Less Stringent Enforcement Program, But They Have Done So.

Florida argues that Plaintiffs lack standing to challenge EPA's approval of Florida's

program (Claim Two) because they have not demonstrated injuries traceable to the State's higher

criminal intent standard and shorter statute of limitations.  Dkt. 102 at 49–51.  But Florida

misapprehends Plaintiffs' burden.

In *WildEarth Guardians v. Jewell*, which Plaintiffs cite, Dkt. 98 at 78, and neither the

Defendants nor Florida address, the plaintiffs challenged the adequacy of a Final Environmental

Impact Statement ("FEIS"), including for the failure to adequately consider "global climate

change caused by future mining, before authorizing the leasing of" certain lands, and alleged

harm from local pollution from mining activities that would follow.  738 F.3d 298, 304–08 (D.C.

Cir. 2013).  The district court ruled that the plaintiffs lacked standing to challenge the failure to

adequately address climate change because they could not demonstrate a link between their

members' local interests and "the diffuse and unpredictable effects of [greenhouse gas]

emissions."  *Id.* at 306–07 (alteration in original).  The Court of Appeals rejected that approach,

which would have required the plaintiffs to show "that the specific type of pollution causing the

Appellants' aesthetic injury—here, local pollution—[was] the same type that was inadequately

85

considered in the FEIS." *Id.* The appellate court found that the plaintiffs established standing because: (1) their members would be injured by increased pollution resulting from the mining activities; and (2) that pollution/injury followed inexorably from the decision to authorize leases which rested on the FEIS. *Id.* The appellate court reasoned that the plaintiffs' aesthetic injuries followed from the order that relied on the FEIS and would be redressed by vacatur of that order "on the basis of any of the procedural defects identified in the FEIS" because the agency "could change its mind about authorizing the lease offering" if "required to adequately consider each environmental concern." *Id.* at 306, 308.

Similarly, in *Mozilla Corporation v. Federal Communications Commission*, the Court held that "[w]hen a party alleges concrete injury from promulgation of an agency rule, it has standing to challenge essential components of that rule, invoked by the agency to justify the ultimate action, even if they are not directly linked to Petitioners' injuries; if Petitioners' objections carry the day, the rule will be struck down and their injury redressed." 940 F.3d 1, 46–47 (D.C. Cir. 2019) (citing *Sierra Club v. FERC*, 867 F.3d 1357, 1366–67 (D.C. Cir. 2017)).

The same reasoning applies here. The state program's failure to meet minimum enforcement standards required to abate violations of the 404 program is one of the several deficiencies that renders EPA's approval of the program unlawful. Plaintiffs have demonstrated that they are harmed by EPA's approval of the program, which resulted in the transfer of 404 authority to the State. They therefore have standing to challenge that approval and the legal deficiencies that underlie it.[66]

---

[66] The Court has already determined that EPA's approval of Florida's program constituted a rule. *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 211–12. The essential components of that rule are the criteria the State had to meet before EPA could lawfully approve the state

Florida's oblique citation to *Crow Creek Sioux Tribe v. Brownlee* is unavailing.  Dkt. 102

at 48.  In *Crow Creek*, a Tribe sued to enjoin the implementation of a federal water resources

management statute, which would use a memorandum of agreement to transfer federal lands

from the Corps to the State of South Dakota.  331 F.3d 912 (D.C. Cir. 2003).  The court held that

the Tribe lacked standing because "the transfer effect[ed] no legal change that would lessen the

protection of the Tribe's cultural heritage under federal law," including that the Corps would

retain all jurisdiction over cultural protection statutes that it held prior to the transfer and that the

Corps would have undiluted enforcement power.  *Id.* at 917.  The same is not true here.  Unlike

in *Crow Creek*, Florida will administer its program "in lieu of the permitting program

implemented by the Corps," and "[t]he Corps *will not be responsible* for enforcing against

unauthorized discharges of dredged or fill material in violation of the CWA which occur in State

assumed waters after the effective date of assumption."  EPA-HQ-OW-2018-0640-0019, at 1, 7.

EPA's action also changed EPA's role in protecting Florida's waters by waiving EPA's review

of numerous permit categories.  EPA-HQ-OW-2018-0640-0018, at 5–6.  And it rendered

assumable scores of waterbodies that should have remained under the Corps' jurisdiction.

Furthermore, unlike in *Crow Creek*, where the same substantive law was enforced before and

---

program, including as to criminal enforcement.  *See* 33 U.S.C. § 1344(h)(1)–(2).  EPA relied on
the State meeting those criteria to justify its ultimate action: approval of the state program.  EPA-
HQ-OW-2018-0640-0565, at 6 (approval pursuant to Section 404(g) and (h)); EPA-HQ-OW-
2018-0640-0566, at 1 (notifying Florida of approval based on EPA's determination "that
Florida's program has the necessary authority to operate a CWA Section 404 program in
accordance with the requirements found in CWA Sections 404(g-l) and EPA's implementing
regulations").  Vacatur of the approval would restore 404 authority to the Corps, thereby
redressing Plaintiffs' injuries.  Plaintiffs therefore have standing to object to any deficiency in
EPA's approval, even if they are not directly linked to Plaintiffs' injuries.  *See also Sierra Club
v. FERC*, 867 F.3d 1357, 1366–67 (D.C. Cir. 2017) (where agency action involving multiple
projects was treated as integrated whole, final order was not severable, and plaintiffs could
challenge it all even if not separately injured by each project).

after the transfer, Florida's assumption program is substantively different from—and less

protective than—the law that applied before the transfer, namely the federal 404 program.[67]  *See*

*Crow Creek*, 331 F.3d at 917.[68]

Lastly, even if Plaintiffs were required to establish harm from the State's lesser

enforcement scheme, they have done so.  *Contra* Dkt. 102 at 49–50.  Contrary to Florida's

contention, Plaintiffs' harms are not limited to just a couple of assertions.  Instead, Plaintiffs'

harms as to enforcement are comparable to those that were sufficient to establish plaintiffs'

standing in *Idaho*, 820 F. App'x at 628 (challenging EPA's approval of a state program with a

less stringent enforcement program), over objections that parallel Florida's contentions here.

As to organizational harm, Plaintiffs have alleged that (1) part of their organizational

missions and core work involves enforcement actions to ensure polluters comply with the law,

Dkt. 98-6 at 1–3, 7–8 (Rinaman Dec. ¶¶ 5, 11, 26–27); Dkt. 98-7 at 2–3, 6–7 (Silverstein Dec.

¶¶ 5–7, 16–18); (2) they accomplish this goal through investigations based on violations that are

discovered through patrolling the waters they protect, responding to members' inquiries, and

assessing public records, Dkt. 98-6 at 7–8 (Rinaman Dec. ¶ 26–27); Dkt. 98-7 at 2, 6–7

(Silverstein Dec. ¶¶ 5–6, 17–18); and (3) they report violations to the State to bring enforcement

---

[67] This includes aspects that make the state program less stringent, including the failure to cover all assumable waters, the State's inadequate enforcement authority, and the failure to comply with the ESA and 404(b)(1) Guidelines.

[68] Florida's vague reliance on *Waterkeeper Alliance, Inc. v. Regan*, Dkt. 102 at 12, is similarly misplaced.  In *Waterkeeper Alliance*, the plaintiffs failed to show that their harm from a state program's public participation opportunities would be remedied by EPA issuing federal guidelines for public participation, because there was no showing that EPA would withdraw approval of the state program or that the state would have to "cease its injurious conduct."  41 F.4th 654, 660–61 (D.C. Cir. 2022).  Here, Plaintiffs have shown that their harms stemming from the State's operation of the program would be remedied by the Court vacating EPA's decision to approve the state program.

actions and ensure compliance with the law as well as bringing their own enforcement actions,

Dkt. 98-6 at 7–8 (Rinaman Dec. ¶ 26–27); Dkt. 98-7 at 2, 6–7 (Silverstein Dec. ¶¶ 5–6, 17–18).

As to their members' harm, Plaintiffs have explained that (1) their members use the

Biscayne Bay, St. Johns River, their tributaries, and the lands adjacent to them to kayak, boat,

swim, fish, bird-watch, hike, camp, and take photos with their families, Dkt. 98-6 at 2 (Rinaman

Dec. ¶ 9); Dkt. 98-7 at 11 (Silverstein Dec. ¶ 28); (2) the water quality in these waterways is

already degraded, Ex. 3 at 2 (Rinaman Dec. ¶¶ 5–6); Dkt. 98-7 at 8 (Silverstein Dec. ¶ 20); Ex. 2

at 4–5 (Silverstein Dec. ¶¶ 12–14); and (3) poor water quality affects their recreational and

aesthetic interests, Dkt. 98-6 at 2 (Rinaman Dec. ¶ 9); Ex. 3 at 2 (Rinaman Dec. ¶ 7); Dkt. 98-7

at 11 (Silverstein Dec. ¶ 28); Ex. 2 at 5 (Silverstein Dec. ¶ 15).

Additionally, they have alleged that as a result of the State's less stringent enforcement

program, there is less deterrence for violations of the Clean Water Act and the State has limited

its ability to enforce those violations, Dkt. 98-6 at 7 (Rinaman Dec. ¶ 26); Ex. 3 at 2 (Rinaman

Dec. ¶¶ 7–8); Dkt. 98-7 at 11 (Silverstein Dec. ¶ 27).

Therefore, Plaintiffs are harmed as organizations because Plaintiffs will be forced to

divert resources more often to step in the shoes of the State and bring enforcement actions on

their own, Ex. 2 at 5–6 (Silverstein Dec. ¶ 16); Ex. 3 at 2 (Rinaman Dec. ¶ 8).  And Plaintiffs'

members are harmed because water quality in the waters of concern will likely degrade even

further, impairing their members' aesthetic and recreational use and enjoyment, Dkt. 98-6 at 3

(Rinaman Dec. ¶ 14); Ex. 3 at 2 (Rinaman Dec. ¶ 7); Dkt. 98-7 at 8, 11 (Silverstein Dec. ¶¶ 20,

27); Ex. 2 at 5 (Silverstein Dec. ¶ 15).

Aside from the sufficiency of Plaintiffs' declarations, Florida raises two main arguments

to contest Plaintiffs' standing.  First, Florida relies heavily on EPA's independent enforcement

authority to suggest it eliminates Plaintiffs' injuries.  Dkt. 102 at 48 & n.30.  However, Plaintiffs

have already addressed the role of that oversight, and how it does not overcome the inadequacies

of the state program.[69]  EPA's oversight thus does not eliminate the harms Plaintiffs experience

because of the State's less stringent enforcement program.  Second, Florida raises an argument

regarding the justiciability of an agency's exercise of enforcement discretion, Dkt. 102 at 51 n.31

(citing *Heckler v. Chaney*, 470 U.S. 821, 832–33 (1985)), which is equally unavailing.  This case

is not about Florida deciding not to exercise its enforcement authority.  It is about the State's lack

of authority to enforce Clean Water Act violations.  There is no enforcement discretion at play.[70]

## II.    Plaintiffs Have Standing to Challenge EPA's Arbitrary and Capricious Completeness Determination (Claim One).

Florida's argument that Plaintiffs have failed to show harm for Claim One is belied by

the inability to comment on a full and complete application, as shown above, and the triggering

of the one-hundred-and-twenty-day decision clock that required EPA to render a decision on

Florida's application on the eve of a change in administration.  Had EPA determined the

application was not complete until the BiOp was produced, there is a possibility that the agency

would have reached a different decision and/or granted an agency stay pending review.

*Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *City of Dania Beach v. FAA*, 485 F.3d 1181,

1186 (D.C. Cir. 2007); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 595 (D.C. Cir.

2019).[71]  Florida's claim that EPA's completeness determination was not a final agency action

---

[69] Further, contrary to Florida's averment, Dkt. 102 at 48, EPA does not review every permit the State proposes to issue.  EPA-HQ-OW-2018-0640-0018, at 5–6.

[70] Florida also raises merits arguments to contest Plaintiffs' standing, alleging a state's enforcement authority need not be equivalent to the federal program.  Dkt. 102 at 49.  That argument is addressed in detail above.

[71] Plaintiffs adopt, and incorporate by reference, their prior briefing and evidence submitted in support of Plaintiffs' Motion for Partial Summary Judgment.  *See* Dkts. 31, 43, 69.

has no merit.  Plaintiffs previously briefed this issue and adopt and incorporate the same

arguments here.  *See* Dkt. 69 at 7–10.

### III.      Plaintiffs' Claims Are Ripe for Review.

Florida raises a host of ripeness claims, none of which have any merit.[72]  To the contrary,

Plaintiffs' action presents facial challenges to several agency actions that have altered the legal

regime for 404 permitting in Florida to the detriment of Plaintiffs.  Plaintiffs' claims are ripe

because they challenge final agency actions[73] with determinative and coercive effect.  *See*

*Bennett v. Spear*, 520 U.S. 154, 168–71 (1997) (finding standing for facial challenge to BiOp and

ITS because they "alter[] the legal regime to which the action agency is subject;" later decisions

by action agency does not eliminate injury produced by this coercive effect).

A challenge to EPA's approval of Florida's program, and the underlying programmatic

agency action, could never be any riper as that approval has resulted in the transfer of 404

authority to the State, with consequences for Plaintiffs.  Contrary to Florida's suggestion, there is

no later "as-applied" challenge that would allow Plaintiffs to challenge EPA's approval of

Florida's program, and the agency actions that underlie that approval, as a whole.  Any as-

applied challenge to a particular permit would not afford Plaintiffs the opportunity to challenge

EPA's approval of the program, or any of the underlying agency actions as they relate to the

approval of the program.  A case such as this is therefore ripe for review as a facial challenge.

*See, e.g.*, *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d at 8–10 (finding claims against

agency's refusal to conduct programmatic BiOp on the action as a whole ripe despite agency's

---

[72] Specifically, Florida argues that Plaintiffs' challenges to USFWS' programmatic ITS (Claims Three and Four), the Corps' retained waters list (Claim Seven), and EPA's ESA violations with regard to NMFS species (Claims Five, Eleven, and Twelve) are not ripe.
[73] Florida only disputes finality as to the Corps' Retained Waters List.  *See* Dkt. 102 at 56–57.

plans to evaluate individual actions later at the permit level); *Cooling Water*, 905 F.3d at 76–78

(2d Cir. 2018) (deciding facial challenge to programmatic ITS on merits); *Menominee*, 947 F.3d

at 1069–70 (suggesting that challenge to Michigan's authority over a particular waterbody

should have been brought at the time of EPA's approval of that state's 404 program, not at the

time of permit decision); *Growth Energy v. EPA*, 5 F.4th 1, 30–31 (D.C. Cir. 2021) (finding no

effect determination in facial challenge arbitrary).[74]   Delay of judicial review would serve no just

purpose, and only prejudice Plaintiffs.[75]

### A.   Plaintiffs' Challenge to USFWS' Unlawful ITS is Ripe.

Florida's argument that later permitting actions render Plaintiffs' challenge to the

programmatic ITS (Claims Three and Four) unripe lacks any merit.  Dkt. 102 at 53–54.  That

Plaintiffs may challenge individual take actions at the individual permit level also misses the

point, as no individual permit challenge would afford Plaintiffs to bring a programmatic

challenge to a programmatic agency action.  Plaintiffs are harmed by the programmatic ITS now

---

[74] *See* discussion of programmatic BiOp cases above.

[75] Florida cherry-picks ripeness language from a slate of cases that are materially different from
the circumstances presented here.  *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803,
808 (2003) (general policy statement that had no force of law and created no hardship to plaintiff
besides uncertainty was not ripe); *Texas v. United States*, 523 U.S. 296, 300 (1998) (application
of statute was not foreseeable or likely so claim not ripe); *Am. Petroleum Inst. v. EPA*, 683 F.3d
382, 386 (D.C. Cir. 2012) (regulation challenge not ripe because on-going agency action and
proposed rule would eliminate exclusion sought); *Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir.
2007) (claim not ripe where other permit denials blocked project from occurring); *Pub. Citizen
Health Resch. Grp. v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984) (agencies' preliminary, tentative
findings on drug impacts not ripe because not final and part of ongoing agency decision-
making); *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (Moss, J.) (claim not ripe where
injury was contingent on denial of exemption request, no evidence showed may be denied, there
were ways to cure alleged reasons for denial, and no imminent harm); *Am. Oversight v. U.S.
Dep't of Veterans Affairs*, 498 F. Supp. 3d 145, 156 (D.D.C. 2020) (Moss, J.) (deferring decision
on ripeness until merits); *Oceana Inc. v. Evans*, 384 F. Supp. 2d 203, 254–55 (D.D.C. 2005)
(claim not ripe where impossible to predict if future frameworks created pursuant to statute
would exceed agency's authority and no hardship was shown).

because it creates an "unlawful risk of take" for Florida's program *as a whole* by failing to set limits on incidental take for the program *as a whole*, in contravention of the ESA. Dkt. 98 at 42–45, 79–80. Delaying judicial review would further burden Plaintiffs by allowing these harms to continue. *Id.* at 75–81. The ITS is a concrete application of the ESA that is ripe for review.

Tellingly, Florida fails to cite any case where a similar challenge to a programmatic ITS was found unripe. And in *Cooling Water*, the court ruled on the merits of a similar challenge to a programmatic ITS without requiring the plaintiffs to pursue an "as-applied" challenge at the permit level instead. 905 F.3d at 76–78. Florida misleadingly cites the case here for having found a *different* claim to be unripe and fails to acknowledge that the case found the claim that parallel's Plaintiffs' claim implicitly ripe for review. *Id.* at 79–80.

Contrary to Florida's theory, EPA's oversight and Florida's technical assistance process are not the type of "later actions by independent third parties not before the court" that makes harm too speculative and claims unripe. *See Bennett*, 520 U.S. at 168–71 (later decisions on water releases in long-term irrigation project by action agency pursuant to or in violation of ITS did not eliminate injury from ITS itself). Neither affect the *programmatic* ITS' finality, determinative effect, or risk of harm from its unfettered extension of take exemption for the program as a whole. The potential for later challenges to individual permits[76] or the possibility that EPA *may* veto an individual permit has no bearing. Plaintiffs' programmatic challenge to the agency's programmatic actions can only be decided now. Florida's theory would lead to an absurd result—precluding Plaintiffs' ability to challenge programmatic actions and allowing only challenges to individual permits.

---

[76] A permit challenge would also not provide further factual development necessary to decide whether the programmatic ITS is legal.

Also contrary to several of the cases on with Florida relies, this claim does not present a situation where a court is asked to step into the middle of an agency's decision-making or to speculate on future application of a *valid* statute. *See, e.g.*, *Pub. Citizen*, 740 F.2d at 31 (not ripe because not final and ongoing decision-making); *Texas*, 523 U.S. at 300 (application of statute was not foreseeable or likely, so claim as to its inapplicability to a state code not ripe). Nor are there later agency actions that could supersede or undo the violation or remedy the harm wholesale. *See, e.g.*, *Am. Petroleum Inst. v. EPA*, 683 F.3d at 386 (regulation challenge not ripe because on-going agency action and proposed rule would eliminate exclusion sought); *Devia v. NRC*, 492 F.3d at 424, 426 (not ripe because project blocked from occurring by other permit denials); *Pub. Citizen*, 740 F.2d at 31 (D.C. Cir. 1984) (not ripe because not final and ongoing agency decision-making).

Florida's reliance on an oil and gas leasing case also fails. Dkt. 102 at 53. Given the multifaceted nature of the leasing process, there is a body of case law specific to oil and gas leasing that dictates when those claims are ripe based on the action agency's ability to continually fulfill their NEPA duties. *Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9–10 (D.D.C. 2001). As for the ESA, however, case law makes it quite clear that the initial BiOp must consider the agency action as a whole, and that its failure to do so is subject to judicial review. *Conner*, 848 F.2d at 1455–56 (discussing differences between NEPA and ESA and analysis timing required).

Nor does reliance on *New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470, 473–74 (3d Cir. 1993), help Florida. Dkt. 102 at 54. There the challenge was directly to an approved use of a general permit. The court found the claim was unripe because the underlying project required other permits before it could move forward. Here, the same concerns do not

94

apply because there are no subsequent steps or required approvals that will undo USFWS'

unlawful extension of take protection or the State's implementation of the illegal program.  And,

if Plaintiffs prevail, USFWS' BiOp and EPA's approval of the program would be vacated.

Similar to the reasons the Ninth Circuit declined to follow *New Hanover*, here we also argue that

no ITS should issue until the ESA's legal requirements are met and those legal inadequacies are

central to the case.  *Ctr. for Biological Diversity v. USFWS*, 450 F.3d 930, 941 (9th Cir. 2006)

(finding claim against BiOp ripe because if plaintiff prevailed, BiOp would be withdrawn until

mining project complied with other laws plaintiff argued the ESA required to be addressed

before an ITS could issue).

 Unlike in *New Hanover*, the effects of the ITS have already been felt; they were essential

to EPA's approval of Florida's program, and indeed, as Florida admitted in the record, essential

to Florida's interest in assuming the 404 program.  Dkt. 98 at 27–32.  The transfer of authority

has since allowed the State to issue permits with incidental take coverage obtained through the

inadequate programmatic BiOp, which created a pass-through for the agencies to extend liability

coverage to state permittees who otherwise would have had to go through the rigorous processes

Congress established in Section 10 for non-federal actors.  Dkt. 98 at 75–81.  *See, e.g.*, Dkt. 98-1

at 11–12 (Crooks Dec. ¶¶ 31–33) (discussing failures to include required conditions, use of

vague conditions which could lead to insufficient protection, findings that take will occur, but no

take limits were set and insufficient conditions to ensure conservation measures would be taken).

 *Suburban Trails, Inc. v. New Jersey Transit Corporation* is also inapposite.  Dkt. 102 at

54.  In *Suburban Trails*, the court held that federal preemption and antitrust claims were not ripe

because the state regulatory action was far from final and subject to modification by the federal

95

agency that would eventually fund the subsidies.  800 F.2d 361, 362 (3d Cir. 1986).[77]  Among

other things, the state had not made a final eligibility decision, plaintiffs were parties in a state

administrative proceeding that could affect their subsidy eligibility, plaintiffs also had a

complaint pending before the federal agency regarding the matter, and the federal agency (a

significant player) was not a party.  *Id.* at 362, 367.  Moreover, there was no hardship to the

plaintiff, just uncertainty.  *Id.* at 366–367.  Unlike in *Suburban Trails*, here we have a final

agency action—a programmatic ITS—and all the context necessary to determine a question of

law—whether it violates the ESA.  Potential future interaction between the agencies at the permit

level and EPA's oversight power will not disrupt these facts or its finality.  The administrative

decision-making is complete, and Plaintiffs are concretely affected.  Future decisions at the

permit level do not nullify the harms from the programmatic action.  Dkt. 98 at 75–81.

### B.  The Corps' Unlawful Retained Waters List, and EPA's Reliance on It to Approve Florida's Program, is Ripe for Review.

Again here, Florida's claim that as-applied challenges would be available fails to reckon

with the fact that Plaintiffs challenge the program as a whole:  (1) the Corps unlawfully produced

a retained waters list that allowed non-assumable waters to be assumed by the State; and

(2) EPA's approval of Florida's program, based on the Corps' flawed retained waters list,

unlawfully transferred authority over non-assumable waters to the State.  Dkt. 102 at 56.  Any

as-applied challenge would not reach these programmatic harms because it would necessarily

apply to each waterway at a time on a permit-by-permit basis.  Indeed, the only court to have

considered a similar claim (EPA's transfer of authority over the Menominee River to the state of

---

[77] While the court concluded that the federal modification power was "more significant[]" than the non-finality of the state action, the court's analysis relied heavily on the non-finality of the state's action and pending state and federal administrative proceedings.  *Id.* at 365–66.

Michigan) ruled that plaintiffs' as-applied challenge came too late. That court held that instead, the plaintiffs were required to have challenged EPA's approval of the program that transferred authority over the river to Michigan. *Menominee*, 947 F.3d at 1069–70 (affirming *Menominee Indian Tribe of Wis. v. EPA*, 360 F. Supp. 3d 847, 860 (E.D. Wis. 2018)).

Florida's bald assertion that Plaintiffs have suffered no harm, Dkt. 102 at 56, ignores evidence in the record, including harm from the State's administration of the 404 program. Dkt. 98 at 81. Florida misconstrues the relief Plaintiffs seek, Dkt. 102 at 56, which is simply for the Corps and EPA to engage in a lawful process to ensure that authority over non-assumable waters remains with the Corps as the Clean Water Act and RHA require. EPA should then only approve Florida's program after assuring that its action too will only transfer authority over assumable waters to the State. Dkt. 98 at 70–72.

Florida's argument that the Corps' retained waters list "likely" did not constitute a final agency action subject to challenge, Dkt. 102 at 56–57, also fails.[78] *See* Dkt. 98 at 70–71. *See also Coal. to Save the Menominee River Inc. v. EPA*, 423 F. Supp. 3d 560, 567 (E.D. Wis. 2019) (Corps' retained waters list for Michigan was final agency action because Corps' determination regarding assumable waters was binding on the Corps). That Florida's list does not enumerate all waters subject to the ebb and flow of the tide does not render the list non-final. The Corps' MOA with Florida explicitly states that the Corps retains jurisdiction over all waters identified in the retained waters list *and* all tidally influenced waters (whether listed or not), including adjacent wetlands. CORPS004322, at CORPS004324. All non-tidal waters that are not identified on the list are thus assumed by the State.

---

[78] The Defendants offer no argument on this point, but instead "assume, without conceding" that the retained waters list is a final agency action. Dkt. 99 at 59 n.17.

Florida's argument that the list is not final because it can be updated in the future is

similarly unavailing.  Dkt. 102 at 57.  *See Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp.

3d 127, 148 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14

(D.C. Cir. 2021) (agency's ability to amend its action "did not vitiate the finality" of its action).

That this agency action, like any other, may be modified at some future date does not render a

final agency action non-final.  Contrary to Florida's suggestion, there is no process in the MOA

for Florida or the Corps to modify the retained waters list.  Rather, the MOA merely provides

procedures for each entity to alert the other if it receives a permit in the other's jurisdiction.  The

Corps may propose changes to the list, but those must be approved by EPA through rulemaking.

*Menominee*, 947 F.3d at 1070.

### C.  EPA's Unlawful Determinations on NMFS-listed Species Are Ripe for Review.

Florida again erroneously argues that later permit decisions and future potential as-

applied challenges to permits cause even EPA's unlawful NMFS determinations to be unripe.

Dkt. 102 at 59–60.  But Florida ignores that EPA was required to consult with NMFS *before*

approving Florida's program, and its unsupported "no effects" determination renders unlawful

EPA's approval.  The potential for later, site-specific determinations as to certain NMFS' species

affected by individual permits cannot cure those violations or remedy the harms to Plaintiffs.  It

is indisputable that a project-specific analysis will not consider impacts from Florida's

implementation of the *entire* program.  If Florida's implementation of the 404 program "may

affect" NMFS species, as Florida admits, *see id.*, then EPA was obligated under Section 7 of the

ESA to properly consider those impacts prior to approving Florida's program.  Dkt. 98 at 52–55.

And Florida's reliance on the agencies' duty to "ensure conservation of species" is not an

exemption from complying with Section 7 in the first place.  Dkt. 102 at 60.

Plaintiffs have demonstrated how this violation harms their mission and members.  Dkt.

98 at 80–81.  These harms continue to burden Plaintiffs in carrying out their missions and daily

work.  *Id.*  Further factual development would not aid the Court with its determination either.

The claims all rest on the same illegally narrow definition of the action area (which is not

disputed by the Defendants or Florida).  *Id.* at 52–55.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant summary judgment

in their favor on their Claims One through Seven and Ten through Thirteen.


Dated:  June 9, 2023


Respectfully submitted,


/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

99

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

\* Appearing *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June 2023, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

100

JA.962

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D89E21A2FC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.                                                                    **CASE NO.** 1:21-cv-00119 (RDM)

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     Defendants.

---

**SUPPLEMENTAL DECLARATION OF AMBER CROOKS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Amber Crooks, make the following declaration:

    1.     I am a resident of Naples, Florida.

    2.     I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

    3.     I submitted a declaration in support of Plaintiffs' Motion for Partial Summary Judgment on March 5, 2021, Dkt. 031-1, and a second declaration in support thereof on May 24, 2021, Dkt. 043-1.  I submitted another declaration in support of Plaintiffs' Motion for Summary Judgment on February 28, 2023.  Dkt. 98-1.  I am providing this supplemental declaration to provide updates on events that have transpired since my last declaration regarding particular projects and in response to factual matters raised by Florida, including in the Declaration by Justin Wolfe, Dkt. 102 and 102-1.

1

4.      **Available Information**:  I have been an environmental advocate in Florida for over 15 years.  As I previously stated, it is incredibly difficult to obtain meaningful project information under the State's 404 program.  While there are several *access methods* available online to try to obtain public documents regarding pending 404 applications (Oculus, Information Portal, Permitting Information Database and ARCGIS Mapping Tool), all of these lead to the same pot of information.  And that pot of information is lacking.  The available information contains primarily submittals by the applicant.  I rarely, if ever, see agency factual determinations on whether the permit complies with the regulations' requirements, permit conditions negotiated with the applicant, or agency assessments of the applicant's alternatives analysis (and whether it is reliable).

5.      This is of specific concern for our work, because obtaining the types of information we need to understand the impacts of projects on listed species and their habitat is central to our mission.  That information would include state or federal agency analysis of impacts to species, determinations of necessary conditions and conservation measures based on the analyses, assessments of take and jeopardy, and discussion of take triggers.  Dkt. 98-1, at 9-10 (discussing that this information is missing from the publicly available files, that technical assistance is not completed in a transparent way, and that when this information may be obtained it is typically after the close of the public comment period harming our ability to advocate for necessary protections).  In other words, I do not usually find anything in the files that tells me what the Florida Department of Environmental Protection ("DEP") and the wildlife agencies are doing with that information to make *their* decisions or any analysis of the applicant-submitted information.  For instance, the applicant submits a biological assessment, but I cannot find information on how the agencies use it to form their own decisions.  Or, the applicant submits

JA.964

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D89F21A25C

information on an alternatives analysis and cumulative impacts, and there are no documents to indicate what DEP does with those documents (analysis, reliance, etc.). In addition, for the projects I monitor, I have yet to find agency documents containing environmental information comparable to what an environmental impact statement or environmental assessment would contain under NEPA.

6.      Though biological opinions are not produced for every 404 permit, most of the projects the Conservancy monitors and has concerns over typically trigger Section 7 consultation under the Endangered Species Act, when those types of projects are processed under the Corps' program because of their impacts to imperiled species. For instance, the following projects discussed in my prior declaration were subject to or would be subject to receiving a biological opinion: Troyer Mine, Rural Lands West development, Bellmar development, Immokalee Road Rural Village development, Old Corkscrew Plantation (AKA Kingston) development, Hogan West development, and FFD development, *see* Dkt. 98-1, at 16-28. This is unsurprising considering it is typically the larger scale developments that pose the most threats to listed species and their habitats and are therefore of most concern to Conservancy and to me.

7.      I recently reviewed the same database (Environmental Conservation Online System) to review issued biological opinions that Justin Wolfe discusses in his declaration. Dkt. 102-1, at 9-10. In addition to missing opinions from 2022 and 2023 as he mentions, depending on which dropdown choices you select (like selecting the Florida Field Office), the query function may not always include the Florida panther. Therefore, many biological opinions for the Florida panther (e.g. WildBlue development, Argo Manatee development, Corkscrew Farms/the Place development, with which I am familiar because the Conservancy tracked these major developments) appear to be missing from Enclosure C provided by Mr. Wolfe. That may

3

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D89F21A25C

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 4 of 38
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 134 of 358

mean that he underestimated the amount of Biological Opinions occurring in assumed waters. The EPA's Biological Evaluation acknowledged that a small number of species make up a majority of the consultations. Notably, the Florida panther and Florida bonneted bat (another species that occurs in assumed waters here in southwest Florida) make up a large number of these reviews. The Biological Evaluation depicts Southwest Florida as a hotspot for ESA consultations. Finally, the database that Mr. Wolfe relies on in his declaration would also not reflect several biological opinions that had been under consideration by the Corps (such as for transferred projects) but were never completed. Those opinions collectively covered thousands of non-coastal acres that would have received biological opinion-level analysis.

8.      **Take of Listed Species**. Since Florida's implementation of the 404 program, the Conservancy has been unable to track take that is occurring in Southwest Florida from Florida's program cumulatively as a whole because no biological opinions are being produced for projects in assumed waters. For the projects of interest to the Conservancy, we have not seen details of take analysis or take authorization, even when take seems likely. The Conservancy is especially concerned with tracking take for the listed crested caracara, Florida panther, smalltooth sawfish, and Florida bonneted bat. More importantly, because the programmatic biological opinion's incidental take statement does not identify the amount or extent of incidental take that is authorized for these species for Florida's implementation of the program, the Conservancy can also not determine if or when the authorized amount of take has been exceeded for these species or ensure the agencies reinitiate programmatic consultation when it is exceeded. This means the Conservancy's mission to advocate on behalf of and seek protections for these species is gravely impaired. Given the lack of information about the technical assistance process and vagueness of the reasonable and prudent measures and implementing terms and conditions in the ITS, the

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D99F31A25C

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 5 of 38
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 135 of 358

Conservancy cannot monitor compliance with these processes and conditions. This likewise harms the Conservancy's mission and members who seek to protect listed species in Southwest Florida.

9.     **Access to Courts**. I previously referred to the fee shifting provision whereby attorney's fees are required to be assessed against the non-prevailing party in state court. The potential risk of being responsible for paying an opposing party's fees, including not only the agency being sued, but also any third parties that have intervened, is a serious consideration for organizations contemplating a legal challenge, including the Conservancy. As an example of some of the monetary considerations associated with suits where fee shifting applies, the Conservancy need look no further than our litigation against Collier County and Collier Enterprises Management over the Rivergrass Development Order (Conservancy of Southwest Florida, Inc., Plaintiff, v. Collier County, Florida and Collier Enterprises Management, Inc., Defendants. Case No: 11-2020-CA-000780-0001-XX). While no party has yet prevailed in this litigation, the trial court has determined amounts of fees previously incurred that, if the Conservancy were to lose, the Conservancy would have to pay Defendants. The Conservancy disputes the constitutionality of the fee shifting provision to which that specific case is subject. And the Conservancy has not lost the case, which has been remanded to Collier County Circuit Court for additional proceedings. Therefore, these numbers are provided only to demonstrate the *potential* significant financial risks associated with challenges that require losing parties to pay prevailing party fees. Specifically, the trial court found that Defendant Collier County would be entitled to fees of $118,142.45 and that Defendant Collier Enterprises Management would be entitled to fees of $2,381,436.88. This is illustrative of the financial risk that *could* be associated with losing under a fee shifting provision.

JA.967

DocuSign Envelope ID: B572E0DA-75AF-46DB-9B55-D4D90F31A25C

10. **Current Status of DEP's 404 Program**.  Upon reviewing the Declaration by Justin Wolfe, Dkt. 102-1, at 2-3, I noticed that in his description of Florida's program activities since implementation there were several important updates not provided.  This includes three separate letters from EPA raising concerns about Florida's implementation, which I have reviewed and attached here.  Exhibit A Combined RAI Letters; Exhibit B Annual Report Letter. In addition, as to the denied applications he mentions, Dkt. 102-1, at 3, based on my review of data from Oculus, all permit denials were because of non-responsiveness to a request for further information and the applicant was instructed that they could resubmit their application without prejudice.  As to no permit required requests, almost exclusively, DEP denied the requests for non-responsiveness to DEP's request for additional information or due to a lack of information sufficient to determine no permit is required.

11. **Bellmar Development.**  On or around May 9, 2023, Conservancy saw correspondence from U.S. Fish and Wildlife Service that their final comments would be provided to DEP by the end of May for this mixed-use community that would cover about 1,700 acres within the Big Cypress Drainage Basin.  DEP also stated they plan to hold a public hearing once this information is obtained.  After that, we fear the permit will be issued, as there appears to be no other outstanding issues before the State.  As explained in my prior declaration, this project is of particular concern and would have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources.  This includes jeopardizing the Florida panther and resulting in take of this species and others.

12. **Troyer Mine.**  Based on documents that are available through DEP's publicly assessable databases, there has been no request for additional information (RAI) from DEP since April 29, 2022.  On June 3, 2022, Troyer provided a response document.  Under DEP's rules,

applicants have 90 days to respond to an RAI.  There has been no request for extension by the

applicant nor a subsequent RAI from DEP that I have been able to locate on Oculus.  The

Declaration of Justin Wolfe however indicates that DEP is still waiting on a response to an RAI.

Dkt. 102-1, at 9-10.

   13. **Eden Oak Development**.  Conservancy has been monitoring this project because

it will likely need a 404 permit in the future.  Given a recent zoning denial at the local Lee

County level, the applicant cannot submit the same or similar project for at least one year.  We

will continue monitoring any future development proposals on this parcel.

   I declare under penalty of perjury that the foregoing is true and correct.  Executed this

<u>24</u> day of May, 2023.

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

JA.969

# Exhibit A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

November 12, 2021

Secretary Emile D. Hamilton
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida  32399

Dear Secretary Hamilton:

Thank you for your agency's transmission of the draft annual report evaluating the Florida Department of Environmental Protection's (FDEP) administration of its Clean Water Act (CWA) section 404 program, pursuant to the Memorandum of Agreement (MOA) between FDEP and the EPA, Section IV.A, and 40 CFR 233.52. We have reviewed the draft report closely and on October 14 and 21, 2021, transmitted to FDEP requests for additional information on a number of topics. For your reference, the requests for information that we transmitted are enclosed. We look forward to receiving FDEP's response.

We would like to ensure that FDEP has the time it needs to adequately respond to the EPA's questions, and that the EPA has the ability to fully evaluate the information that FDEP provides. The EPA's regulations and the MOA provide that FDEP will finalize the annual report within 30 days of receipt of the EPA's comments. MOA at IV.B.6; 40 CFR 233.52(e). We are writing to confirm that we do not view the EPA's initial requests for additional information as having begun this 30 day period for finalization of the annual report. Rather, we view the EPA and FDEP as engaging in a productive process for exchanging information and feedback, consistent with the intent of the program reporting requirements. The EPA will promptly assess all of the information, once FDEP submits it in response to EPA's requests. The 30-day period for finalizing the report would not begin until the EPA submits final comments, questions, or requests for additional information.

The EPA is committed to assisting and supporting FDEP's efforts to comply with the CWA section 404 state program reporting requirements and we look forward to engaging with FDEP in the completion of a robust annual report. If you have any questions or wish to discuss this matter, please contact me, or have a member of your staff contact Ms. Rosemary Calli at 404-562-9846.

Sincerely,

CAROL MONELL
Digitally signed by CAROL MONELL
Date: 2021.11.12 09:36:50 -05'00'

John Blevins
Acting Regional Administrator
EPA Region 4

Enclosures (2)

1. October 14, 2021 transmittal of request for additional information

2. October 21, 2021 transmittal of request for additional information

| **From:** | Calli, Rosemary |
|---|---|
| **To:** | Mason, Heather |
| **Cc:** | Laycock, Kelly; Mcgill, Thomas |
| **Subject:** | EPA request for additional evaluation and information |
| **Date:** | Thursday, October 14, 2021 4:23:47 PM |
| **Attachments:** | Fl404-AnnualReview-Planning2021_Transmittal20211014.docx |

Hello, Heather – As part of EPA's review of FDEP's program reporting per 40 CFR Part 233.52, we have compiled the attached questions as an initial request for additional evaluation and information. Please feel free to reach out if we can provide any clarification.

Best regards,
Rosemary

Request for additional evaluation and information                                    October 14, 2021
Supporting EPA review of program reporting

**Public participation**
-    Please describe the public participation opportunities, including types of participatory forums,
     formats, frequency, and outreach to EJ communities and tribal groups.
-    Do all public notices contain the information specified at 40 CFR 233.32(d)?
-    Has the Department heard from the public concerns that information shared with public notices
     is insufficient? If so, what measures is FDEP taking to address these concerns?
-    Are there criteria a potential commenter must demonstrate in order to participate, e.g.
     residency, impact on economic interest, etc?
-    As part of its public notice process, does FDEP include supporting documentation, or a link to
     where supporting documentation can be found, for the items listed in 62-331.060(1)(a)-(i)?
-    Does FDEP upload all information submitted by an applicant as part of the initial application or
     in response to FDEP's requests for information onto the OCULUS platform? If not, what factors
     does FDEP consider in whether to include information on OCULUS? How soon after receiving
     this information does FDEP upload it to OCULUS?
-    What species review information does FDEP include with the public notice?
-    Does FDEP upload ESA technical assistance communications between FDEP, FFWCC, U.S. FWS,
     and/or NMFS onto OCULUS? How soon after receiving this information does FDEP upload it to
     OCULUS?
-    How many requests has the Department received for comment period extension, and how many
     of these requests have been granted?
-    Have any permitting decisions been appealed and what was the outcome?


**Delineations/Waters Determinations**
-    Under the Navigable Waters Protection Rule (NWPR), EPA and the U.S. Army Corps of Engineers
     (Corps) Corps Districts, including the Jacksonville District, coordinated on approved jurisdictional
     determinations where a negative jurisdictional decision was made based solely on a finding that
     a non-jurisdictional feature (e.g., ephemeral stream) or artificial structure (e.g., dam, spillway)
     did not convey surface water flow to a downstream jurisdictional water in a typical year and
     thus severed jurisdiction of the subject water and potentially implicated upstream aquatic
     resources. EPA is interested in learning if FDEP made similar determinations under the NWPR,
     where waters were not jurisdictional based solely on the finding described above. Please
     provide the number of these determinations made and the relevant information to support the
     determinations.
-    Under the NWPR, EPA and the Corps Districts, including the Jacksonville District, coordinated on
     approved jurisdictional determinations where affirmative jurisdictional decisions were based
     solely on a finding that a particular wetland, lake, pond, or impoundment of a jurisdictional
     water was inundated by flooding from a jurisdictional water in a typical year. EPA is interested in
     learning if FDEP made similar determinations under the NWPR, where waters were jurisdictional
     based on the finding described above. Please provide the number of these determinations made
     and the relevant information to support the determinations.
-    EPA is aware that FDEP has an approved wetland delineation methodology for assumed waters
     (outlined in Chapter 62-340, F.A.C. and 62-340 F.A.C. Data Form) whereas the Corps follows
     federal delineation methodologies for retained waters, including those for federal mitigation
     banks (outlined in the Corps 1987 Wetlands Delineation Manual and Regional Supplement to

Request for additional evaluation and information                                   October 14, 2021
Supporting EPA review of program reporting

the Corps Wetland Delineation Manual for the Atlantic and Gulf Coastal Plain Region, as well as
the associated Wetland Determination Data Form). EPA is aware of instances where
discrepancies between the two methodologies have been identified. Please provide the number
of discrepancies that FDEP is aware of, including relevant documentation illustrating how the
discrepancies were resolved.

- Certified Wetland Evaluators (CWEs) must verify the delineation of wetlands and other surface
waters made by FDEP and Water Management District (WMD) staff for 404-permitting
purposes. Has FDEP identified projects where CWEs have not been able to field verify the
delineation of waters for 404-permitting purposes? If so, please provide the number of projects
where FDEP was not able to perform the necessary field verification for 404-permitting
purposes and the steps that FDEP has taken to resolve this oversight role discrepancy.

**Expedited Review/Long-Term Conceptual Planning**

- Has FDEP reviewed any applications under the expedited permit review process? If so, how
many?
- For purposes of determining whether there has been a "material permit modification" or
"material changes in the scope of the project," how does FDEP determine whether there has
been a significant increase in the total project environmental impact, including but not limited
to wildlife impacts, or a significant increase in the impact to state-assumed or retained waters?
- Has FDEP received any applications with long-term planning documents? If so, how many?
- Has FDEP received any permit applications with existing long-term planning documents issued
under the ERP program? How is the state working with applicants to ensure state 404 permits
comply with the statute and regulatory limitation of 5-year permits?
- Did the long-term planning documents include all of the elements required in Section 5.3.2 of
the State 404 Program Applicant's Handbook?
- Have the long-term planning documents been included with the public notice?
- How does FDEP determine whether applications are unique or part of the same larger project?
- How does FDEP account for cumulative impacts associated with multiple applications that are
part of the same larger project?
- Have any NPRs been issued as part of the expedited permit review process?

**Compensatory mitigation**

- How much in-kind vs. out-of-kind mitigation has been provided?
- Please explain the ratios of impact to compensation required in permits.
- Are credits available within the watershed where the impacts have occurred? How often have
permittees proposed or needed to purchase mitigation credits from outside the watershed?
- For projects where compensatory mitigation was not required, please explain why not in the
context of mitigation sequencing to avoid, minimize, and compensate for any impacts (e.g.,
were impacts requiring mitigation reduced through avoidance?).
- What are the overall cumulative losses and/or benefits provided through Florida's 404
permitting program? How are these accounted for and tracked?

Request for additional evaluation and information                                    October 14, 2021
Supporting EPA review of program reporting

## Staffing levels of program

-   What is the staffing vacancy rate? How has it ranged since the State 404 Program became effective?
-   How have FTE numbers and allocations for the 404 program changed since the program went into effect? What functions are new staff being hired for, and at what expertise level?
-   Have any FTE been shifted from other programs into the 404 program, and if so, how many?
-   How many staff have had Corps wetland delineation training?
-   How many staff are Certified Wetland Evaluators?
-   What other training has been provided staff for the State 404 Program?
-   How many permits on average is each staff member assigned? How has this changed pre- and post-Assumption?
-   EPA understands that as part of workload management, FDEP is piloting dual employment of WMD staff as FDEP employees. How does FDEP envision WMD staff's roles in audits of jurisdictional decisions (e.g., FDs)? If fully implemented, how would this change the permitting process and structure of the approved program?

## Assumed vs. Retained Waters

-   Have there been discussions with the Corps about potential updates and/or activities that may lead to updates to the Retained Waters List or Retained Waters List GIS Layer pursuant to Section III.B. of the Corps-FDEP MOA, or otherwise? If so, what is the status of these discussions and any anticipated upcoming activities and/or decisions?
-   Have applicants or members of the public questioned the accuracy of the Retained Waters List GIS Layer and, if so, what has been FDEP's response?

## Enforcement

The EPA/FDEP MOA states in Section III.B that FDEP will take timely and appropriate enforcement action against persons in violation of permit conditions of permits issued pursuant to the State 404 permit program. The Program Description states that "all potential violations of the State 404 Program reported to the Department will be entered into a statewide database and tracked until resolution." The Program Description also states that "FDEP will investigate and provide written responses to all citizen complaints."

-   Since audits were designed to ensure consistent implementation of delineation methodology and would likely be separate from compliance monitoring, how are sites selected and is there a target number?

The EPA/FDEP MOA in Section III.E (Unauthorized Activity) states that FDEP is to inform EPA of the status of the file *as enforcement actions are taken* including any decision to accept an ATF application.

-   The annual report will identify the number of actions taken for unauthorized activities and the status and/or nature of the actions taken. How is FDEP planning to meet the requirement for status of enforcement actions as they occur?
-   The EPA is willing to participate in periodic meetings to discuss enforcement topics but wants to avoid ad-hoc and time-limited requests for input and/or review of specific case related material(s).

Request for additional evaluation and information                                    October 14, 2021
Supporting EPA review of program reporting

- The Draft Report indicates that no permit compliance inspections were completed, citing four occurrences that would trigger an inspection, none of which have occurred during the reporting period: 1) a permittee submits Form 62-330.350(1), "Construction Commencement Notice," (for individual permits); 2) a permittee submits Form 62-331.200(1) – "Certification of Compliance with a State 404 Program General Permit"; 3) at least one year has passed since permit issuance; or 4) a complaint is received. The program description outlines annual compliance monitoring requirements and in the first year requires 100% of individual permits and 25% of general permits are to be inspected (regardless of the triggering conditions outlined above). How does FDEP track these submittals/occurrences? For individual permits, how soon after receipt of a "Construction Commencement Notice" would an inspection be scheduled? For general permits, how are sites selected for inspection? How does FDEP plan to meet the Minimum Inspection Responsibilities for the first year or even the minimum annual inspection rates of 20% of the individual permits and 10% of the general permits found in the Program Description?
- What is the database of record for permit compliance inspections? Is data uploaded to ICIS?
- For suspected unauthorized activities, how are sites selected and/or identified? What is the nature of the response action?
- How is the state maintaining its "program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions," as required by 40 CFR 233.40(a)? Has the state inspected and monitored activities subject to regulation?
- Are all potential violations (from citizen complaints/tips, compliance monitoring activities, referrals from other agencies, targeting, etc.), confirmed violations, and resolution being entered into a statewide database? If yes, can EPA access this data? If no, is a program being developed and what is the expected timeline for implementation?
- The Draft Report lists 801 suspected unauthorized activities, with 191 confirmed violations. Of the 191 confirmed violations, 82 were offered compliance assistance and 22 were issued warning letters, leaving 87 confirmed violations with no known status related to enforcement activities. How were the violations confirmed (field verification/inspection)? What is the status of the remaining (87) confirmed violations? What is the status of the remaining (610) suspected unauthorized activities?
- What types of violations warranted compliance assistance? What types of compliance assistance were offered? How is resolution documented?
- For Warning Letters, what types of violations warranted a warning letter and what follow-up activity is conducted to ensure resolution?
- How is the state maintaining its "program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions," as required by 40 CFR 233.40(a)?

**EPA/federal oversight process**
- What technical assistance provided by EPA has been helpful? What additional support does FDEP need?
- What areas of concern has FDEP identified as needing to be addressed to effectively administer the program? How is FDEP planning on addressing these? What support can EPA provide?
- What implementation issues has FDEP encountered, how were they identified and what steps has FDEP taken to address these and avoid similar future implementation challenges?

Request for additional evaluation and information                    October 14, 2021
Supporting EPA review of program reporting

**ESA**
- On what percentage of permit reviews has there been ESA early coordination engagement?
- Have there been any instances where FDEP and/or the Florida Fish and Wildlife Conservation Commission (FWC) were not able to fully implement the provisions of the 8/5/2020 Memorandum of Understanding (MOU) between FDEP, FWC and the U.S. Fish and Wildlife Service (USFWS)? If so, please explain and share any relevant supporting documentation.
- Please discuss whether and how often the Endangered and Threatened Species Technical Team has convened and what, if any, challenges the Team has identified with respect to implementing the MOU.
- Please discuss the process by which FWC and FDEP determine which agency is the species coordination lead to coordinate the federally listed species review with USFWS for each permit application?

**NHPA Programmatic Agreement (PA) Implementation**
- Please provide a summary of the following actions taken to implement the terms of the PA:
  - Advance Notice to commenting agencies and interested Tribes on an individual permit application.
    - Number of instances when DEP issued such Advance Notice, including a breakdown for the commenting agencies/interested parties.
    - Number of instances when DEP received an initial determination of effect, requested additional information, or suggested permit conditions.
  - Public Notice process where FDEP specifically solicited comments on potential effects to historic/cultural resources, and recommendations received by SHPO/THPO/Indian Tribes during FDEP's initial review of the application.
    - Number of instances where DEP solicited such comments.
      - Number of instances where DEP received specific comments.
      - Were there any instances where DEP did not accept the recommendations and/or determination from a commenting agency or Tribe?
  - Resolving Adverse Effects
    - Number of instances where a consulting party determined that an undertaking will adversely affect historic or cultural resources.
  - Human Remains
    - Number of instances when human remains were discovered.
- Does FDEP upload all information generated during the Advance Notice and Public Notice processes onto the OCULUS platform? If not, what factors does FDEP consider in whether to include information on OCULUS?
- Does FDEP recommend any actions or revisions to the FDEP-SHPO Operating Agreement or the PA?

**Tribal engagement outside of the implementation of the NHPA Programmatic Agreement**
- For any public notices for which FDEP did not solicit comments on the potential effects to historic/cultural resources, how many sets of comments were received from tribal representatives?

**From:** Calli, Rosemary
**Sent:** Thursday, October 21, 2021 4:28 PM
**To:** Mason, Heather <Heather.Mason@FloridaDEP.gov>; Gray, Stephanie A
<Stephanie.A.Gray@FloridaDEP.gov>
**Cc:** Kelly Laycock <laycock.kelly@epa.gov>
**Subject:** EPA request 2 (additional questions) for additional evaluation and information

Hello, Heather, Stephanie –
As part of EPA's review of FDEP's program reporting per 40 CFR Part 233.52, we have compiled the
additional (shorter) list of questions below as part of our request for additional evaluation and
information. Please feel free to reach out if we can provide any clarification.

Best regards,
Rosemary

- FDEP indicates a higher number of permits than expected has required additional hiring and
training. Please provide information regarding what hiring has occurred and what is planned as
well as information regarding the additional training.
- FDEP also indicates that the higher number of permits than expected has led to a decision that
the Department would not perform stand-alone Waters of the United States (WOTUS)
determinations (determinations performed on a property without a planned project and project
drawings). To get a WOTUS determination under the State 404 Program, applicants are required
to do one of three things: (1) apply for a permit and request a WOTUS determination during
review; (2) apply for a formal determination under Chapter 62-340, Florida Administrative Code
(F.A.C.) and request a WOTUS determination in conjunction with the formal determination; or
(3) request a "No Permit Required" letter for a project where the applicant plans to avoid
impacts to WOTUS (project drawings required). Has the Department experienced a change in
the volume of requests for determinations in these three categories that it attributes to the
decision to not perform stand-along determinations? Please provide a description of any
resulting changes to the Department's workload.
- A large percentage of individual and general permits were withdrawn (6 issued individual
permits vs 167 withdrawn, 66 general permits issued vs 152 withdrawn. FDEP indicates the
reasons for these withdrawals are not readily available. EPA requests information regarding the
withdrawals and a proposed solution so that the information is readily available in the future.
- What were the reasons for the 17 General Permit denials?
- Please provide information regarding No Permit Required (NPR) and exemption requests that
have been processed. Were any NPR decisions due to jurisdictional determinations? If so, for
what sites?
- The FDEP Program Description Section (e) – Workload Analysis, page 15 outlines that "subject
matter experts in the Department's Submerged Lands and Environmental Resources
Coordination (SLERC) program will audit a percentage of State 404 Program permits and
compliance actions and associated wetland delineations. All formal jurisdictional
determinations will be audited. Other estimated audit numbers are shown for the first year
for purposes of this workload analysis and reflect the minimum percentage of actions that
will be audited [see Tables (e)-22 through (e)-29, below]." Tables (e)-22 through (e)-27
outline the percentage of specific permit actions that will undergo both desktop and/or field
delineation audits. Please provide information that details the status as outlined in tables
(e)-22 through (e)-27.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

November 15, 2022

Mr. Michael Lynch
Director
Division of Water Resource Management
Florida Department of Environmental Protection
2600 Blair Stone Road
Mail Station 3500
Tallahassee, Florida  32399

Dear Mr. Lynch:

Thank you for your agency's transmission of the draft annual report evaluating the Florida Department of Environmental Protection's (FDEP) administration of its Clean Water Act (CWA) section 404 program, pursuant to the Memorandum of Agreement (MOA) between FDEP and the EPA, Section IV.A, and 40 CFR 233.52. We reviewed the draft report closely and on October 27, 2022, transmitted to FDEP a request for additional information on several topics. For your reference, the request for information that we transmitted is enclosed. We look forward to receiving FDEP's response and request that FDEP provide the additional information within 30 days from receipt of this letter.

We would like to ensure that FDEP has the time it needs to adequately respond to the EPA's questions, and that the EPA has the ability to fully evaluate the information that FDEP provides. The EPA's regulations and the MOA provide that FDEP will finalize the annual report within 30 days of receipt of the EPA's comments. MOA at IV.B.6; 40 CFR 233.52(e). We are writing to confirm that we do not view the EPA's initial request for additional information as having begun this 30-day period for finalization of the annual report. Rather, we view the EPA and FDEP as engaging in a productive process for exchanging information and feedback, consistent with the intent of the program reporting requirements. The EPA will promptly assess all the information, once FDEP submits it in response to the EPA's request. The 30-day period for finalizing the report would not begin until the EPA submits final comments, questions, or requests for additional information.

The EPA is committed to assisting and supporting FDEP's efforts to comply with the CWA section 404 state program reporting requirements and we look forward to engaging with FDEP in the completion of a robust annual report.

If you have any questions or wish to discuss this matter, please contact me at 404-562-9345, or have a member of your staff contact Ms. Rosemary Calli at 404-562-9846.

Sincerely,

CHRISTOPHER THOMAS

Digitally signed by CHRISTOPHER THOMAS
Date: 2022.11.15 09:19:05 -05'00'

Denisse D. Diaz, Acting Director
Water Division

Enclosure (1)

1. October 27, 2022, Request for Additional Information

JA.981

October 27, 2022

Request For Additional Information

| From: | Calli, Rosemary |
|---|---|
| To: | Timothy Rach; Minick, Allyson |
| Cc: | Mcgill, Thomas; Laycock, Kelly |
| Subject: | EPA questions, information request for annual report |
| Date: | Thursday, October 27, 2022 4:23:00 PM |
| Attachments: | FDEP-FY22AR_EPACQuestions.docx |

Tim, Allyson -

As I just said in voicemail for each of you, EPA is transmitting the attached questions and requests for information to support our review of Florida's FY2023 annual report on its Section 404 program. We would appreciate receiving responses as soon as practicable so that we can continue our review with the requested clarifications and additional information. Responses by topic as they are ready would be very helpful to facilitate EPA continuing its review. Also, we would appreciate sharing of any information presented in table form in a raw format such as Excel (i.e., not PDF) to facilitate analysis.

Please let us know if you have any questions or would like to discuss,
Rosemary


**Rosemary (Hall) Calli**
**Section Chief, Wetlands & Streams Regulatory Section**
Aquatic Ecotoxicologist
U.S. Environmental Protection Agency, Region IV

404.562.9846
Calli.Rosemary@epa.gov
she/her

JA.983

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

Public participation

| Report ref. | Request for Additional Information |
|---|---|
| p. 7 | Q: What information is located in OCULUS that would not be located within the Information Portal, and vice versa? |
| p.7 | It was mentioned that DEP does not collect information about requests for extension of comment periods on individual projects and whether they are granted. It was also mentioned that DEP is not aware of any instance where a member of the public stated that the information contained within the public notices is insufficient. Q: What kind of public comment information is tracked, and how are public comments considered? |
| p. 8 | Q: DEP uploads confidential information to restricted files that are accessible to the public in redacted form if requested. However, EPA is not aware of a separate folder filled with restricted files. Is the existence of a restricted file visible to the public? Are restricted files sufficiently named so as to determine the general contents? If not, how would EPA or the public know that this information exists and how to ask for it in redacted form? |
| p. 9 | Q: In the previous annual report, it was stated that "[a]s of June 30, 2021, no permitting decisions had been petitioned". Have any permitting decisions been appealed in this reporting period, and what was the outcome? |
| p. 12 | Q: Are public comments submitted through the FDEP Nexus Business Portal collected and uploaded to OCULUS and/or the Information Portal? |

Number of violations identified, and number and nature of action taken

| Report ref. | Request for Additional Information |
|---|---|
| p. 20 | Were penalties assessed for all six settlement agreements executed or a portion thereof? The total penalties assessed is $24,525; penalties collected are lower. |

An estimate of extent of activities regulated by general permits

| Report ref. | Request for Additional Information |
|---|---|
| | 62-331.215 General Permit for Utility Line Activities has a threshold of ½ acre, yet 64 permits led to 56.1 acres of impacts. Please explain how impacts above the threshold were permitted. |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

Delineations/WOTUS determinations (including NPRs)

| Report ref. | |
|---|---|
| p.12, App 3 | Q: As previously noted by EPA after FDEP's first reporting period, "a large percentage of individual and general permits were withdrawn." EPA formerly asked the reasons for these withdrawals, but a limited response was provided. For this reporting period, EPA again notes the large number of permits withdrawn. FDEP provides a list of withdrawn applications in Appendix 3, including the application #, the project name, the permit type and the withdrawal date. However, the reasons for the application withdrawals are not provided. If a reason for an application withdrawal was provided to FDEP, please provide the reason in an additional column in Appendix 3. Also, EPA has had some challenges finding the referenced application information in Appendix 3. Please confirm that the information in Appendix 3 is accurate and if not, please provide the correct information. In addition, since the specific permit types are abbreviated, please provide a legend or table footnote defining the permit types in Appendix 3.<br>EPA would appreciate sharing of any information in table form in a raw format such as Excel (i.e., not PDF). |
| p.6 of Appendix 1 | Regarding the statement in Appendix 1, "Notably, NPRs are similar to Preliminary Jurisdictional Determinations issued routinely by the Corps of Engineers to aid the regulated community."<br>Q: Please clarify why FDEP likens Corps PJDs to FDEP NPR letters. This clarification will help EPA more clearly understand FDEP's use and application of NPR letters.<br><br>Regarding the statement, "Like Preliminary JDs, NPRs are entirely voluntary and non-binding, and provided only as a courtesy."<br>Q: Please clarify how FDEP interprets the purpose and resiliency of NPR letters. For example, does FDEP consider NPR letters only as preliminary advice and not final agency actions? FDEP (like the Corps) can reconsider and reissue, but that's not the same as non-binding or not representing a final agency action. If the NPR letters are not binding and not final agency actions, please clarify FDEP's perspective on the role of NPR letters.<br><br>Q: Is the version of the NPR Guidance attached to the July 28, 2022, letter the most up-to-date version? If not, please provide the most recent version for EPA to review/consider. |
| | Q: Per EPA's request on April 7, 2022, FDEP provided a table with NPR letter information for the period between February 1, 2022, and March 31, 2022. EPA is now requesting the same information that FDEP provided in a similarly formatted table, for the time frame between April 1, 2022, and June 30, 2022. |
| p.6, p.14, p. 18, App 4 (p.194) | Out of 352 total NPRs issued (AR error notes 353) for State-assumed waters, 268 were issued based on the NWPR and 84 were based on use of the 62.340 F.A.C. approach.<br>Q: EPA has had some challenges finding the referenced application information in Appendix 4. Please confirm that the information in Appendix 4 is accurate and if not, please provide the correct information. EPA would appreciate sharing of any information in table form in a raw format such as Excel (i.e., not PDF). |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| p.33-p.36, App 2, Section 7 Applicant's Handbook Vol 1, various state statutes | Q: EPA requests that FDEP more clearly state in the AR and consistently throughout the AR, that formal jurisdictional determinations performed previously for ERP purposes that are not in compliance with the 62.340 method, will not be used for 404 permitting purposes. Further, EPA requests information regarding the methodology used for any determinations made during the reporting period and for any currently in process (91 according to pg 18 of the annual report). (Page 18 of the AR lists "wetland determinations" as a separate category from IPs, GPs, NPRs, etc.) This will address contradicting language in the AR, and in other resources cited (*e.g.*, procedures in Section 7 of the Applicant's Handbook Vol I, state statutes). As the AR currently reads, it appears to contradict this requirement in some places. |
|---|---|
| p.10 | Q: In terms of field staff verification of wetland delineations and those for other surface waters (on page 10), what does 'review' mean (*e.g.*, a desktop verification or a field verification)? Does FDEP have additional information to facilitate EPA's understanding as to whether FDEP has confirmed field verification of all the delineations of wetlands and other surface waters made by FDEP and WMD staff for 404-permitting purposes? |
| p.19, Appendix 1, 404 Handbook Appendix B, Discharge of fill material, page 48-49 (2)-(2)(i), FDEP's July 28, 2022, letter, NPR Draft Guidance, and EPA's Q&A document addressing utility poles and pilings. | Q: There are various statements about pilings in several FDEP documents. EPA encourages FDEP to be clearer, more transparent, and more consistent when discussing how pilings may or may not be regulated as discharges of fill. This will ensure that FDEP staff and the regulated community are very clear on the requirements. For example, the placement of pilings for linear projects, such as bridges, may or may not be regulated as discharges of fill according to the case-specific circumstances as outlined in the 404 Handbook Appendix B, Discharge of fill material section, pages 48-49, in both sections (2)-(2)(i). Section (2) of Appendix B should be clearly explained when discussing the regulatory approach to pilings. |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| p. 15, p.33-36, p.37 | Q: It's unclear who specifically performs the FDEP audits. Please clarify who is referenced as 'staff' (on page 33) and 'SLERC' (on page 35). What specific qualifications do these 'staff' have to perform the audits and evaluate the audited information? |
|---|---|
| | *(Formal Determinations).* The AR states that the formal determination audit focused on data forms submitted with FD applications. |
| | Q: Is FDEP aware of other circumstances where data forms would be necessary and used as part of the permitting process, that were not evaluated as part of the audit? If so, please describe. |
| | Q: Based on the audit, the AR states that SLERC identified potential topics for discussion and lists four general areas that were identified that need improvement (pages 35-36). Can FDEP quantify the findings (*e.g.*, how many FDs, IPs and GPs lacked adequate descriptions and photographs of indicators, how may renewal and reissuance of FDs did not use the data form)? |
| | "SLERC conducted an audit of all sixty-three Formal Determinations (FDs) issued during the auditing period to evaluate implementation of the CWE and 62-340 data form requirements, determine consistency in documentation standards, and identify future training needs..." The AR states that for findings related to "Renewal and Reissuance: SLERC will reiterate to staff the data form is also required for the renewal and reissuance of FD authorizations." |
| | Q: Please list the number of FDs found as part of the audit process that didn't have the required data form discussed in the AR as part of the 'renewal and reissuance' of FD authorizations. Were FDs previously issued for ERP-permitting purposes (not using the 62.340 method) part of the audited 'renewal and reissuance' dataset? Please clarify how SLERC identified/audited FDs previously issued for ERP-permitting purposes that didn't use the 62.340 method (*e.g.*, based on a certified survey, approximate delineation), that were administratively extended and used for 404-permitting purposes. |
| | Q: Please clarify the number of staff members with CWE certifications as of June 30, 2022, and if they are: a) serving as official CWEs for FDEP, b) serving as full-time CWEs for FDEP or if they have other duties, and c) how many these CWEs are dual employees, working as CWEs for both the WMDs and for FDEP? |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

Expedited review/long-term conceptual planning

| Report ref. | Request for Additional Information |
|---|---|
| p.14 | The second annual report says that "[t]he Department issued one individual permit with a long-term plan during this reporting period [The Chemours Company, TT, LLC, for the Florida Mine Trial Ridge West Levee, file number 137482-022-SFI]. Three other long-term planning projects remain under review during this reporting period and are included in Table 2 below." But the first annual report says that 12 long term projects were under review during the first reporting period. |
| | Q: Please explain what happened to the 12 long term projects that were under review from the first reporting period, none of which were permitted or are currently under review during the second review period. |
| p.14 | Q: Please explain why "[n]o subsequent phases [of long-term planning projects] were reviewed under the expedited permit review process outlined in Rule 62-331.060(8), F.A.C. for long term projects. |

Compensatory mitigation

| Report ref. | Request for Additional Information |
|---|---|
| p. 10, Appendix 2, pp. 103-132 | Q: DEP has indicated that compensatory mitigation sometimes was considered for impacts outside of the mapped service area on a case-by-case basis. Please identify these projects, providing rationale for why the selected compensatory mitigation was determined to be the most environmentally preferable option (e.g., credit and/or in-kind resource availability). Please also provide explanation for how credits were determined, such as whether a proximity ratio was applied. Please indicate whether MBI signatories and the IRT had an opportunity to comment in each instance. |
| Appendix 2, pp. 49-102 | Q: For individual and general permits where no mitigation was required, please identify the projects that provided environmental benefit, indicating the amount of functional gain, if possible. If it is not possible to determine functional gain for such projects, please explain how it was determined that there was no functional loss. For instance, 0375475-004 had >40 acres of impacts but no functional loss is indicated. |
| Appendix 2, pp. 49-102 | Q: For the projects that were determined to have insignificant impacts, please indicate why these were determined to be insignificant. For example, there does not appear to be a threshold for significance, since some projects required mitigation with a functional loss of 0.001 (e.g., 0409386-001 SFG), while others did not require mitigation for greater functional loss (e.g., 0396423-001, 0403414-001, 0396501-001 SFI, 0410615-001 SFG, 0394692-001 SFRP, and others). |
| Appendix 2, pp. 127-132 | Q: How many permittee-responsible mitigation activities occurred off-site or were out-of-kind? For each permittee-responsible mitigation project, did FDEP require a mitigation plan that complied with 40 C.F.R. Section 230.91? For example, did each permittee-responsible mitigation project submit detailed plans that included performance standards, monitoring requirements, financial assurances, and other relevant documentation listed in the 2008 Compensatory Mitigation Rule? |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| p.9-10 | The description indicates that CWEs 'verify' all assessment methodology scores submitted by applicants to ensure that the scores reflect a reasonably accurate accounting of loss and compensation, and that the compensation is adequate to fully mitigate impacts. Q: What does 'verify' mean (desktop review only)? If so, how does the CWE confirm that the assessment 'accurately reflects site conditions?' |
|---|---|

Staffing levels/training

| Report ref. | Request for Additional Information |
|---|---|
| NPR guidance | Q: In the supplied NPR guidance, it stated that "[o]nly a FDEP CWE is able to evaluate a WOTUS determination (not dual employed WMD CWE's)." Is this the only distinction, or are there other roles performed by FDEP CWEs that differ from dual employed WMD CWEs? |
| pp. 34, 36 | Q: By June 30, 2022, 159 staff members had received CWE certification. If there are currently 69 staff members directly responsible for working on State 404 permits, how many of these are CWE certified (e.g., are all permit processors also CWEs)? How many staff are dual employees, working as CWEs for both the WMDs and for DEP? |
| p. 36 | Q: In the previous annual report, it was stated that "[p]rior to assumption, the average workload per permit processor was 11.7 applications. As of June 30, 2021, the average workload per permit processor had increased to 30.2 applications." In this report, there appears to be the same number of staff as stated in the previous report, indicating that workload may not have changed since the program was assumed. Please address whether workload has changed for this reporting period and provide rationale for the lack of increased staffing in this reporting period. With 33 new employees, how is workload expected to change? |
| p. 22 | Q: Each processing office is assigned a Division Mentor. How many years of experience is required to become a Division Mentor? How many staff, on average, does each Division Mentor oversee? |
| pp. 22-25 | Q: DEP has indicated that multiple field and virtual trainings have taken place, with high participation rates among staff. Are virtual trainings and other documents available for new staff? |
| pp. 34, 36 | Q: What steps has DEP taken to improve retention, aside from hiring? |

Enforcement

| Report ref. | Request for Additional Information |
|---|---|
| Table 8, p.19 | Q: Have the minimum number of inspections for IPs and GPs been conducted? Table 8 also now shows violations (31 reported). Q: Are these permit violations? Were they referred to enforcement? If so, what was the enforcement response? If not, how were these violations rectified? |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| Table 9, p. 20 | Report states that Table 9 shows the total number of suspected unauthorized activities during the current reporting period, which is 1074. The total for confirmed violations (191) is the same as the previous reporting period. The total still under investigation (103) is also the same as the previous reporting period. Assuming that FDEP received 1074 (191 confirmed) new complaints/referrals for the current reporting period along with the 971 (191 confirmed) from the previous reporting period and considering the 31 violations that were identified through Permit Compliance Inspections – it appears that there are at least 413 confirmed violations, but only 46 formal responses (of which only 6 were consent orders) to these violations were reported. <br> Q: What is the total number of confirmed violations for the current reporting period? What is the total number of confirmed violations for both reporting periods? |
|---|---|
| p. 36 | AR states that the State 404 Program Compliance and Enforcement team consists of 54 persons. <br> Q: Of these positions, how many are dedicated to conducting inspections of unauthorized activities? How many of the suspected unauthorized activities are targeted for inspection? |
| Table 10, p.20 | Q: Why is the penalties assessed amount greater than the penalties collected? <br> Q: There were 6 reported consent orders issued, how many included penalties? For those consent orders that did not assess penalties, if any, what justification was used? |

EPA oversight process

| Report ref. | Request for Additional Information |
|---|---|
| NA | Q: What is the status of the Scrub Oaks enforcement matter? |

| Report ref. | Request for Additional Information |
|---|---|
| p. 26 | Q: The report describes engagement with two tribes; has DEP received comments or recommendations from any other tribe that may have historical or cultural ties to Florida (e.g., The Mississippi Band of Choctaw Indians, The Muscogee (Creek) Nation, The Poarch Band of Creek Indians, or The Seminole Nation of Oklahoma)? |

NHPA programmatic agreement implementation

| Report ref. | Request for Additional Information |
|---|---|
| p.26 | Q: Which of the SHPO's and Tribes' requests for additional information, effects determinations, and recommendations were provided in response to advance notice under the Operating Agreement or in response to a public notice? |

# Exhibit B



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 4**
**SAM NUNN ATLANTA FEDERAL CENTER**
**61 FORSYTH STREET, SW**
**ATLANTA, GEORGIA 30303-8960**

April 6, 2023

Secretary Emile D. Hamilton
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida 32399

Dear Secretary Hamilton:

Thank you for the draft annual report and supplemental information your office provided regarding the
Florida Department of Environmental Protection's (FDEP) administration of its Clean Water Act
(CWA) Section 404 program for the reporting period, July 1, 2021, through June 30, 2022. The
Environmental Protection Agency (EPA) received the draft report on September 30, 2022 and
supplemental information on January 6, 2023, in response to the EPA's request for additional information
on October 27, 2022. The FDEP's submission of the draft annual report and the EPA's comments,
questions, and requests for additional information are pursuant to the program reporting requirements set
forth at 40 CFR 233.52, as well as described in the Memorandum of Agreement between our two
agencies regarding FDEP's CWA Section 404 program.

The EPA's comments regarding the draft annual report are enclosed. In accordance with the
requirements set forth in 40 CFR 233.52(e), FDEP must finalize the annual report, incorporating and/or
responding to the EPA's comments, and transmit the final report to the EPA within 30 days of receipt of
this letter.

In addition to identifying issues and additional information needs related to the draft annual report, the
EPA is taking this opportunity to express our continued concerns with FDEP's implementation of its
CWA Section 404 program. The concerns identified in this letter reflect the EPA's review of FDEP's
program as of the date of this letter, and any additional concerns that may arise from the EPA's
continued oversight of FDEP's implementation and enforcement of the program will be communicated
to FDEP under separate cover. The EPA requests a meeting with FDEP to discuss the following issues at
its earliest convenience.

- **FDEP's Continued Use of the Vacated Navigable Waters Protection Rule.**
  FDEP continues to use the vacated Navigable Waters Protection Rule (NWPR) for interpreting
  "waters of the United States" (WOTUS) in the implementation of its CWA Section 404 program. As
  outlined in numerous EPA letters provided to FDEP since December 9, 2021, the CWA and its
  implementing regulations require FDEP to implement its program consistent with the current
  definition of WOTUS, which the EPA and the U.S. Army Corps of Engineers (Corps) interpreted to
  be the pre-2015 regulatory regime following vacatur of the NWPR and up until the effective date of
  the recently published final "Revised Definition of 'Waters of the United States.'" The rule went into

effect in Florida on March 20, 2023 (see
https://www.federalregister.gov/documents/2023/01/18/2022-28595/revised-definition-of-waters-of-
the-united-states). To date, the EPA has objected to 33 permits proposed by FDEP on the basis that
the information provided was insufficient to determine the extent to which the FDEP considered
discharges into all WOTUS and therefore did not demonstrate consistency with the CWA or the
regulations at 40 CFR Part 233. As described in the enclosure to this letter, we have concerns that
FDEP issued 183 No Permit Required (NPR) determinations that used the vacated NWPR for
jurisdictional assessments which may result in unauthorized discharges to WOTUS.

- **FDEP's Delineations and Determination of Waters.**
  The EPA has identified that many of FDEP's jurisdictional determinations are not in compliance
  with the required 62-340 F.A.C. delineation method. The EPA has concerns with the lack of
  consistent field verifications, and the lack of mandatory 62-340 F.A.C. Data Forms and incomplete
  or missing WOTUS Determination Forms. Accordingly, the EPA will conduct a detailed review of
  the FDEP's 404 Delineation Guidance and will offer comments and recommendations outside of the
  annual reporting process.

- **Majority of FDEP's NPR Determinations Lack Required Supporting Documentation.**
  According to FDEP's own Oculus database, a majority of the NPR determinations made during the
  reporting period do not include required supporting documentation. Specifically, the EPA's review
  of the 258 NPR determinations issued by FDEP revealed at least 170 of the assessments were
  incomplete and/or missing at least one necessary dataset. Please see the enclosure for additional
  details.

- **FDEP's Joint Coordination with the Corps.**
  FDEP's coordination with the Corps, pursuant to the joint coordination procedures set forth in
  Section III of the Memorandum of Agreement between FDEP and the Corps, has in some instances,
  led to errors regarding decisions about the appropriate permitting authority. The EPA has issued
  objections to two proposed permits based on such errors to date. We encourage FDEP to work with
  the Corps to improve how such joint coordination is conducted and are pleased to offer our
  participation and assistance in this process.

- **Support on the EPA's preparation of a Biological Evaluation.**
  Pursuant to the Endangered Species Act (ESA), the EPA continues to prepare a Biological
  Evaluation (BE) regarding FDEP's CWA 404 program in coordination with the National Marine
  Fisheries Service. The EPA has communicated with FDEP throughout this process, and we
  anticipate completing and issuing the BE in the near future.

- **Retention of Staff.**
  FDEP officials have made public statements during the past year about the challenge of retaining
  staff in the Department's CWA Section 404 program. Maintaining significant staff knowledge and
  expertise is required to effectively implement the program; developing staff expertise may warrant a
  year or more of training and experience, which would be undermined by a significant level of staff
  turnover. We are concerned that staff retention may be contributing to some of the issues identified
  in this letter. As stated in the enclosure, we request the final annual report describe what steps, if
  any, FDEP has taken to identify the primary causes of the challenges with staff retention in its CWA
  Section 404 program and any steps that FDEP is taking to improve staff retention.

If you have any questions or wish to discuss these matters, please contact me, or have a member of your staff contact Ms. Denisse Diaz, Acting Director of the Water Division, at Diaz.Denisse@epa.gov or 404-562-9248.

Sincerely,

JEANEANNE GETTLE  Digitally signed by JEANEANNE GETTLE
Date: 2023.04.06 13:09:06 -04'00'

Jeaneanne M. Gettle
Deputy Regional Administrator
*Performing the functions and duties of the Regional Administrator for this matter*

Enclosure

JA.994

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 33 of 38
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 163 of 358
ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

The comments that follow are organized under the same headings included in the Florida Department of Environmental Protection's (FDEP) draft annual report.

### *Program Administration*

Appeals of permitting decisions

In FDEP's reply dated January 6, 2023, to the EPA's request for additional information issued on October 27, 2022, FDEP indicated that no Clean Water Act (CWA) Section 404 program permitting decisions were appealed. Please include this information in the final annual report. In future annual reports, please provide information including the project name, number, short description of the appeal, and rationale behind the final decision.

Restricted files

For future annual reports, the EPA requests that FDEP include the number and type of permits with restricted files. We recommend including a table with this information, indicating the project name and number.

### *An Assessment of the Cumulative Impacts of the State's Permit Program on the Integrity of the State Regulated Waters*

Evaluation of compensatory mitigation and cumulative loss

The documentation provided in this section of the annual report and in Appendix 2 does not provide readily verifiable information needed for the EPA to evaluate questions about compensatory mitigation and cumulative loss. The EPA appreciates that FDEP has begun tracking requests for out-of-service-area mitigation for the next reporting period. In future annual reports, the EPA expects FDEP to include the following additional information: 1) the location of the impact site (*e.g.*, coordinates or the 8-digit HUC); 2) the name of the mitigation site used and its location, especially if it is outside of the service area; 3) whether credits applied as mitigation were in-kind or out-of-kind, with a brief rationale for out-of-kind; 4) if applicable, the proximity ratio that was applied; 5) the total functional loss; 6) any functional gains, especially those that do not propose mitigation or that proposes a combination of mitigation types (*e.g.*, PRM vs. TPM credit purchases, etc.); 7) if applicable, a short, one-sentence explanation as rationale for why mitigation was not required for a project with demonstrated functional losses; and 8) totals for all columns involving a numeric statistic.

Continued use of the vacated Navigable Waters Protection Rule

The annual report states that "Florida is working cooperatively with EPA to navigate the changing definitional regimes of [waters of the United States (WOTUS)] and is committed to administering its assumed CWA Section 404 program in accordance with the requirements of the CWA and regulations promulgated thereunder." FDEP continues to use the vacated Navigable Waters Protection Rule (NWPR) for interpreting WOTUS in the implementation of its CWA Section 404 program, which is inconsistent with the requirements of the CWA. The CWA and its implementing regulations require FDEP to implement its program consistent with the current

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 34 of 38
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 164 of 358
ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

definition of WOTUS which the EPA and the U.S. Army Corps of Engineers (Corps) interpreted to be the pre-2015 regulatory regime following vacatur of the NWPR and up until the effective date (i.e., March 20, 2023) of the recently published final "Revised Definition of 'Waters of the United States'." FDEP's current interpretation of WOTUS creates a situation whereby FDEP's CWA Section 404 program is narrower in scope than contemplated under the CWA. To address this inconsistency with the CWA, the EPA is objecting to projects proposed by FDEP, requiring permit conditions to ensure consistency with the CWA, and requiring FDEP and the permit applicants to spend additional time and resources to address the objections. This leads to inefficiency and confusion, specifically, potential inconsistencies between federal and state actions, inefficiencies in FDEP's program implementation, confusion on the part of the regulated community and the public, and most importantly, insufficient protections for the quality of the nation's waters. If the FDEP does not enforce CWA Section 404 program requirements in waters not covered by the NWPR, the lack of enforcement could lead to suits brought by citizens or potential enforcement by the EPA.

<u>FDEP's Delineations and Determination of Waters</u>

Based on information FDEP provided, discussions between the EPA and FDEP staff, and the EPA's review of information in its Oculus database, the EPA has identified numerous concerns. The EPA is concerned, for example, that many of the jurisdictional determinations are not in compliance with the required 62-340 F.A.C delineation method. The EPA is concerned that field verifications are conducted inconsistently. The EPA is concerned about the lack of mandatory 62-340 F.A.C. Data Forms and incomplete or missing WOTUS Determination Forms.

In addition, based on the EPA's concerns about how FDEP performs delineations of waters, FDEP previously drafted "Delineations for Projects that May Require a State 404 Program Permit," (Delineation Guidance), dated October 27, 2021. In response to the EPA's request for additional information for this draft annual report (dated October 27, 2022), FDEP referenced the Delineation Guidance and stated that the document memorializes the requirement to always use the 62-340 F.A.C. delineation method. If FDEP is using the Delineation Guidance to direct staff to always require the use of the 62-340 F.A.C. delineation method, that should be clearly described in the final annual report and any relevant program documentation. The EPA plans to perform a detailed review of the Delineation Guidance under separate cover.

### ***The Number and Nature of Individual and General Permits Issued, Modified, and Denied***

<u>No Permit Required (NPR) Letters</u>

The EPA is providing comments regarding NPR determinations issued by FDEP. These comments are based on review of the draft annual report, including Appendix 4, FDEP's reply dated January 6, 2023, to the EPA's request for additional information issued on October 27, 2022, and FDEP's Oculus database.

- FDEP utilized the vacated NWPR, and therefore the incorrect definition of WOTUS, as the basis for issuing 183 of 258 NPR determinations. The available information does not include sufficient documentation to quantify the amount (*e.g.*, acreage, linear feet) of waters that met the current definition of WOTUS (*i.e.*, the pre-2015 regulatory regime for

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 35 of 38
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 165 of 358
ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

the portion of the reporting period between August 30, 2021, and June 30, 2022) but were not considered in FDEP's NPR determinations. Accordingly, the EPA believes that the NPR determinations issued by FDEP may lead to unauthorized discharges to WOTUS. Based on the information reviewed, which for many projects does not include sufficient documentation as described below, the EPA cannot confirm the extent of WOTUS and potential scope of unauthorized discharges.

- The available information, including FDEP's Oculus database, appears to indicate that a majority of the NPR determinations made during the reporting period do not include required supporting documentation. Specifically, the EPA's review of the 258 NPR determinations issued by FDEP, revealed at least 170 of the assessments were incomplete and/or missing at least one necessary dataset. For example,
    o 119 of 258 NPR determinations did not include complete documentation that field verifications were conducted. Specifically, 105 determinations were based on desktop only assessments, and of those that included onsite verification, 14 were missing 62‑340 F.A.C. Data Forms.
    o 124 of 258 NPR determinations did not have complete WOTUS Determination Forms. In particular, 48 determinations did not include a WOTUS Determination Form, and the 76 determinations that included a WOTUS Determination Form did not include a signature from the Certified Wetland Evaluator (CWE).
  FDEP should ensure that all previously issued and future NPR determinations are fully supported and documented in the Oculus database, and in accordance with relevant program requirements.

- The reply issued by FDEP on January 6, 2023, in response to the EPA's request for additional information dated October 27, 2022, suggests that NPR determinations are similar to Preliminary Jurisdictional Determinations (PJDs) issued by the Corps, because they are both preliminary in nature. However, the language included in the FDEP's NPR letters states that FDEP has verified that the activity as proposed does not require a permit or other form of authorization and that the verification is valid for a period of five years unless new information warrants a revision to the verification. The EPA believes the characterization of NPR determinations as preliminary is not accurate and that comparisons to PJDs may lead to misunderstandings about the NPR process being similar to the process used by the Corps. Accordingly, we recommend the language describing NPR determinations/letters in the final annual report should not include comparisons to PJDs, nor should these claims be articulated in other correspondences with the EPA.

- The EPA appreciates the detailed tabular information regarding NPR determinations provided by FDEP on January 6, 2023. Please include this detailed information in the final annual report (*i.e.*, the application number and the name of the office that processed the action, relevant county, project name, agency action date, documentation of whether a WOTUS Determination Form was used and/or whether the CWE signature page was signed, documentation of whether a relevant 62‑340 F.A.C. Data Form was completed, documentation of whether there was coordination with the Corps, the jurisdictional assessment method used, documentation of whether a site inspection or desktop assessment was performed, and the relevant link to the Oculus database). For future

3

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 36 of 38
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 166 of 358
ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

annual reports, please provide a similar table that includes the same type of information along with additional information for each project that describes whether the disclaimer language was included on the CWE signature page of the WOTUS Determination Form, the types and amounts (*e.g.*, acreage, linear feet) of any waters that were excluded on the WOTUS Determination Form, and where applicable, any prior permit applications submitted and related withdrawal dates.

- In the final annual report, FDEP should correct the number of NPR letters issued during the reporting period. The language on page 14 of the draft report indicates 353 NPR letters were issued during the reporting period; however, the EPA's review of the information provided by FDEP on January 6, 2023, indicates that 258 NPR letters were issued.

- The EPA appreciates that FDEP shared NPR Guidance as an enclosure to the letter issued to the EPA on July 28, 2022. We wish to discuss the procedures used by FDEP to evaluate and document its NPR determinations, particularly in the context of the above comments and recommendations and will follow-up with your office under separate cover.

Long-Term Projects

FDEP's final annual report should address and resolve the following discrepancies between the draft annual report and the additional information shared by FDEP on January 6, 2023, regarding permits with long-term planning.

- Page 14 of FDEP's draft annual report states that "[t]he Department issued one individual permit with a long-term plan during this reporting period [The Chemours Company, TT, LLC, for the Florida Mine Trail Ridge West Levee, file number 137482-022-SFI]. However, FDEP's response to the EPA's request for additional information dated October 27, 2022, indicates that two permits were issued with long-term planning during the second reporting period (396565-001; issued July 9, 2021, and 396574-001; issued November 19, 2021), neither of which match the Chemours/Trail Ridge West Levee permit which has a file number of 137482-002-SFI.

- FDEP's response to the EPA's request for additional information dated October 27, 2022, says that three of the twelve permits for long-term projects that were under review during the previous annual reporting period are still actively being processed during the current reporting period (file numbers 400133-001, and 396364-001, 396966-001). However, these three file numbers do not match the file numbers in Table 2 (Long-Term Planning Projects Under Review as of June 30, 2022) on page 14 of the draft annual report.

We request that FDEP's final annual report also reconcile the discrepancy in the draft annual report regarding the status of the permitting action for the Chemours/Trail Ridge West Levee. The first full paragraph on page 14 indicates a permit was issued, whereas Table 2 suggests the project was still under review during the reporting period.

Case 1:21-cv-00119-RDM   Document 104-1   Filed 06/09/23   Page 37 of 38
USCA Case #24-5101      Document #2102936      Filed: 02/26/2025      Page 167 of 358
ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

## *An Estimate of Extent of Activities Regulated by General Permits*

Based on the information included in the draft annual report and the FDEP's reply dated January 6, 2023, to the EPA's request for additional information on October 27, 2022, the EPA understands that authorizations issued under the 62-331.215 General Permit for Utility Line Activities (GP) during the reporting period exceed the allowable impact threshold specified by GP. Specifically, FDEP's draft annual report states that 64 activities were authorized by the GP that impacted a total of 56.1 acres, which indicates that the average impact of the authorized activities (*i.e.*, approximately 0.88 acres) exceeds the threshold of 0.5 acres for each activity set forth by the GP. Authorizing activities that exceed the GP's threshold is inconsistent with the approach articulated in the Program Description of Florida's Section 404 program, which indicates general permits are modeled after Nationwide Permits issued by the Corps. Regarding future permitting decisions, FDEP should ensure that each authorization under the GP does not exceed the 0.5-acre threshold for each activity.

## *Historical, Cultural, and Tribal Resources*

FDEP indicated in response to the EPA's request for additional information dated October 27, 2022, that it does not track at what point in the process (advance notice or public notice) a response from a State Historic Preservation Office (SHPO) or a Tribe is received. This information is useful to the EPA, and we believe the public would also find this information helpful. We also note that FDEP was able to track this information in the previous annual report (see pg. 28 "DEP received the following in response to advanced notices:…," and pg. 30 "There were 12 instances where DEP received specific comments during the public comment period on potential effects to historic/cultural resources, broken down as follows: Table 15 - Comments received during the notice and comment period."). Please include this information in the final annual report and in all future annual reports.

## *Program Auditing*

For future annual reports, the audit findings of FDEP's formal determinations (FDs) of the landward extent of wetlands and other surface waters should include: a quantification of the specific issues identified (*i.e.*, the number of FDs without the necessary 62-340 F.A.C. Data Forms, including those for renewal/reissuance purposes; the number of FDs that did not accurately apply the 62-340 F.A.C. delineation method, including those that lacked necessary photographs of indicator factors or narrative descriptions; the number of FDs with clerical errors, such as files referencing specific information that was not uploaded to the Oculus database; the number of FDs with issues regarding the site visit; the number of FDs that did not meet the requirements for the renewal/reissuance of an authorized FD; and the number of FDs with any other errors or issues regarding compliance with FDEP's CWA Section 404 Program).

FDEP's reply dated January 6, 2023, to the EPA's request for additional information issued on October 27, 2022, included a copy of FDEP's 404 Delineation Guidance (Guidance), which had previously been shared with the EPA, along with a statement that the Guidance memorializes the requirement for FDEP to use the 62-340 F.A.C. delineation method for CWA Section 404 permitting purposes, among other requirements. We request that FDEP include this requirement

Case 1:21-cv-00119-RDM  Document 104-1  Filed 06/09/23  Page 38 of 38
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 168 of 358
ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

in the final annual report. In consideration of the audit findings (described immediately above) and the records in FDEP's Oculus database regarding NPR determinations that did not include all of the required documentation (described on pp. 2-3 of this enclosure), the EPA will conduct a detailed review of the Guidance and will follow-up with FDEP outside of the annual reporting process to discuss and/or offer comments and any recommendations.

### *Other Information*

The EPA's request for additional information on October 27, 2022, asked about steps FDEP has taken to improve retention of its employees, aside from hiring. FDEP's response dated January 6, 2023, provided general information about hiring benefits that appear to be applicable to any state government employee and did not include any information specific to the CWA Section 404 program. Please include information in the final annual report that clarifies what steps, if any, have been taken to identify the primary cause(s) of the challenges with staff retention in its CWA Section 404 program (*e.g.*, conducting exit interviews) and any steps that FDEP is taking to improve staff retention. For future annual reports, the EPA requests that FDEP describe whether staff retention has improved, and any steps that have been taken or will be taken to identify the causes of turnover and improve staff retention.

JA.1000

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL. | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL. | |
| Defendants, | |
| STATE OF FLORIDA, ET AL. | |
| Intervenors. | |

———————————————

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY
JUDGMENT**

———————————————

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................5

    I.    Plaintiffs' Claims Are Not Justiciable. ................................................. 5

        A.    Informational Injury Does Not Provide Standing Here. .............................6

        B.    Plaintiffs Lack Standing to Challenge EPA's Early Finding that Florida's Application Was "Complete." ....................................................12

        C.    Plaintiffs' Attempt to Show Standing Based on "Restrictive Access" to Florida Courts Fails. ............................................................12

        D.    Standing Based on "Aesthetic and Recreational Interests" Also Fails.........................................................................................................16

        E.    Plaintiffs Lack Standing to Challenge Florida's Program on the Basis of Criminal Enforcement or Statute of Limitations. ........................17

    II.    Several of Plaintiffs' Claims Are Not Ripe. ........................................ 20

        A.    Take Liability Claims Are Not Ripe For Review (Claims 3 and 4). .........20

        B.    Plaintiffs Challenge to the "Retained Waters" List Is Not Ripe (Claim 7). .................................................................................................23

        C.    Plaintiffs' NMFS-Based Claims Are Not Ripe (Claims 5, 11, and 12). .........................................................................................................25

CONCLUSION ...................................................................................................26

JA.1002

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*Abbott Labs v. Gardner*,
    387 U.S. 136 (1967)..................................................................................................20

*Am. Legion v. Am. Humanist Ass'n*,
    139 S. Ct. 2067 (2019)...............................................................................................5

*Association of American Physicians & Surgeons, Inc. v. Sebelius*,
    901 F. Supp. 2d 19 (D.D.C. 2012) ..........................................................................10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971), *abrogated on other grounds*, *Califano v. Sanders*,
    430 U.S. 99 (1977)................................................................................................2, 17

*Cooling Waters v. EPA*,
    905 F.3d 49 (2d Cir. 2018).......................................................................................21

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013).................................................................................................16

*Clean Wisconsin v. EPA*,
    964 F.3d 1145 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) .....4

*Coal. to Save Menominee River Inc. v. EPA*,
    423 F. Supp. 3d 560 (E.D. Wis. 2019)....................................................................24

*Crow Creek Sioux Tribe v. Brownlee*,
    331 F.3d 912 (D.C. Cir. 2003).................................................................................17

*Ctr. for Biological Diversity v. Zinke*,
    369 F. Supp. 3d 164 (D.D.C. 2019) ....................................................................6, 10

*Dallas Safari Club v. Bernhardt*,
    518 F. Supp. 3d 535 (D.D.C. 2021) .........................................................................14

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008)...................................................................................................5

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015).......................................................................................4

*Gen. Elec. Co. v. EPA*,
    360 F.3d 188 (D.C. Cir. 2004).................................................................................14

*Lake Brooklyn Civic Ass'n, Inc. v. St. John's River Water Mgmt. Dist.*,
   1993 WL 943540 (Fla. Div. Admin. Hrgs. 1993) .................................................. 14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................... 5

*McCray v. Biden*,
   574 F. Supp. 3d 1 (D.D.C. 2021) .......................................................................... 20

*Menominee Indian Tribe of Wis. v. EPA*,
   947 F.2d 1065 (7th Cir. 2020) .............................................................................. 24

*Mississippi v. EPA*,
   744 F.3d 1334 (D.C. Cir. 2013) ............................................................................ 13

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) .................................................................................. 19

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
   489 F.3d 1221 (D.C. Cir. 2007) ............................................................................ 14

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
   734 F.3d 1115 (D.C. Cir. 2013) ............................................................................ 13

*New Hanover Twp. v U.S. Army Corps of Eng'rs*,
   992 F.2d 470 (3d Cir. 1993) ................................................................................. 22

*Oceana, Inc. v. Evans*,
   384 F. Supp. 2d 203 (D.D.C. 2005) ...................................................................... 24

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998) ......................................................................................... 20, 24

*Paul Still v. New River Solid Waste Ass'n & FDEP*,
   2001 WL 1917255 (Fla. Div. Admin. Hrgs. 2001) ............................................... 14

*Rapanos v. United States*,
   547 U.S. 715 (2006) ............................................................................................... 1

*Sackett v. EPA*,
   598 U.S. 590 (2023) ........................................................................................... 1, 11

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ............................................................................. 3, 5

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................... 5

JA.1004

*Sugar Cane Growers Cooperative of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ................................................................12

*Texas v. United States*,
  523 U.S. 295 (1998) ...........................................................................20

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .........................................................5, 7, 8, 10

*Waterkeeper Alliance, Inc. v. Regan*,
  41 F.4th 654 (D.C. Cir. 2022) ..................................................6, 7, 8

*WildEarth Guardians v. Jewell*,
  783 F.3d 298 (D.C. Cir. 2013) ...........................................................19

*Wyoming Outdoor Council v. Dombeck*,
  148 F. Supp. 2d 1 (D.D.C. 2001) ...............................................21, 22

## STATUTES & CODES

16 U.S.C. § 1540(g) .................................................................................23

33 U.S.C. § 1319 .....................................................................................18

33 U.S.C. § 1344(k) .................................................................................18

33 U.S.C. § 1344(n) .................................................................................18

Public Law No. 118-5, 137 Stat. 10, 41 (2023) ......................................11

Fla. Stat. § 379.2291 ................................................................................2

Fla. Stat. § 403.412(2)(f).........................................................................14

Fla. Stat. § 403.412(7).............................................................................15

## OTHER AUTHORITIES

A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17
  Suffolk U. L. Rev. 881, 882 (1983) ......................................................5

Dep't of Justice, *Justice Manual*, available at https://www.justice.gov/jm/jm-5-12000-
  environmental-enforcement-section#5-12.523 (last visited July 7, 2023)................................19

Fla. Const. Art. V, § 21 ...........................................................................13

iv

## INTRODUCTION

The State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively, "Florida Intervenors") concur with Federal Defendants that Plaintiffs' challenge lacks merit. Consistent with Section 404 of the Clean Water Act (CWA) and its cooperative federalism design, the U.S. Environmental Protection Agency (EPA) properly approved Florida's Section 404 Program almost three years ago. Today, FDEP has primary responsibility for administering the Section 404 Program in assumable waters within Florida, with EPA consistently reviewing FDEP's program as well as reviewing individual permits. In the implementation of the program, FDEP, the State's five water management districts, and the Florida Fish and Wildlife Conservation Commission (FWC) cooperate and coordinate with EPA, the U.S. Army Corps of Engineers (Corps), and the U.S. Fish and Wildlife Service (FWS) to ensure that state-assumed waters in Florida and all listed species are protected in the manner required by Section 404 of the CWA and the Endangered Species Act (ESA), respectively.

With regard to water resources protection, Florida's Section 404 program regulates dredge and fill activities impacting the "waters of the United States" (WOTUS) for which the State has assumed primary authority, while Florida also administers a separate state wetlands program – the "Environmental Resource Permit (ERP) Program" – that provides regulatory protection for *all waters* in the State irrespective of whether they fall within the narrower (and often disputed[1]) WOTUS category. Likewise, with regard to species protection, Florida adopted its own state

---

[1] *See Sackett v. EPA*, 598 U.S. 590, 603 (2023) (recounting long track record of confusion over the proper understanding of "waters of the United States," rejecting definitions built on the notion of "significant nexus," and adopting Justice Scalia's definition from *Rapanos v. United States*, 547 U.S. 715 (2006) (plurality)).

endangered species protection law decades ago to avoid and minimize impacts to listed species.[2]

In furtherance of its own federal ESA Section 7 obligations, FWS issued a Biological Opinion (BiOp) with an Incidental Take Statement (ITS) in conjunction with EPA's review and approval of Florida's Section 404 Program. This BiOp/ITS provides reasonable assurance that no permitted action under Florida's Section 404 program would jeopardize listed species or adversely modify critical habitat, so long as the protective measures adopted in the BiOp/ITS are followed by the agencies.[3] This includes a "technical assistance process" that ensures an effective and lawful coordination mechanism for federal and state agencies to cooperate in the protection and conservation of listed species. Dkt. 99 at 70-76; Dkt. 106 at 42-46. The administrative record in this case strongly supports EPA's decision to approve Florida's Section 404 Program and also strongly supports the BiOp/ITS issued in conjunction with that approval. Accordingly, for the reasons set forth in Federal Defendants' briefs (Dkt. 99; Dkt. 106), this Court should enter judgment in favor of Federal Defendants and Florida Intervenors as to all claims in this case.

Yet, as Florida Intervenors have also demonstrated, this Court need not (and should not) reach the merits of most, if not all, of Plaintiffs' claims. Plaintiffs do not suffer cognizable harm sufficient for standing by the mere transfer of primary permitting responsibility from the Corps to FDEP, especially where EPA maintains continuous oversight at both a program level and on a permit-by-permit basis. Across the waterfront of Plaintiffs' broad-based challenge to virtually all aspects of Florida's program, they have identified no claims for which they suffer cognizable harm.

---

[2] The Florida Endangered and Threatened Species Act is codified at Fla. Stat. § 379.2291 and adopts the "policy of [Florida] to conserve and wisely manage these resources, with particular attention to those species defined by the Fish and Wildlife Conservation Commission, the Department of Environmental Protection, or the United States Department of Interior, or successor agencies, as being endangered or threatened."

[3] Agencies are entitled to a presumption of regularity. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

2

The baseline against which to measure harm is the Corps' administration of the program, and here, Plaintiffs have not shown a single situation where the Corps would decide a permit differently than Florida in a way that presents a unique cognizable injury. Subtle purported differences in criminal enforcement cannot be the basis of that harm, nor can contrived gaps in "environmental information" since Florida's program provides the same or similar environmental information to the public (and actually more information is available on a real-time basis than in the federal permitting system). Many other claims are simply not ripe for review. Therefore, Plaintiffs have not met their burden of demonstrating that each separate claim is justiciable now.

Florida Intervenors' opening brief (Dkt. 102) enclosed a Declaration of Justin Wolfe, FDEP General Counsel, addressing Plaintiffs' factual assertions related to standing. *See* Dkt. 102-1 ("Wolfe Dec."). In their reply, Plaintiffs try to rehabilitate their standing arguments through various legally and factually flawed arguments but the bulk of their standing arguments in the reply brief are based upon a new set of declarations asserting new facts and contesting aspects of Mr. Wolfe's declaration. Dkt. 105 at 90-106. Many assertions in Plaintiffs' new declarations are incorrect.[4]

But more importantly, Plaintiffs' new declarations submitted at the reply brief stage should not be considered by this Court. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). As previously noted, Plaintiffs were obliged to include *in their opening briefs* sufficient evidence to demonstrate standing (where it is not self-evident) in order to meet their burden of proof. Dkt. 102 at 36-37. "Absent good cause shown," Plaintiffs should not expect this Court to allow them to submit new evidence of standing in a reply brief. *Sierra Club,* 292 F.3d at 900-01. Here, Plaintiffs have not provided good cause to be allowed to supplement their standing declarations on reply, so

---

[4] Florida Intervenors concur with Federal Defendants that Plaintiffs' arguments "misstate the record, misstate the law, or misstate both." Dkt. 106 at 9.

JA.1008

those new declarations should be ignored. While "*Sierra Club* is not a gotcha trap,"[5] Plaintiffs knew standing was a key hurdle in this case ever since Florida filed its cross-motion to dismiss over two years ago.  See Dkt. 36-37.  Thus, Plaintiffs should not be permitted to rehabilitate their standing declarations at this late stage.

To the extent this Court considers Plaintiffs' new declarations, Florida Intervenors respectfully request consideration of the Supplemental Declaration of Justin Wolfe ("Wolfe Supp. Dec.") which, among other things, addresses Plaintiffs' new assertions concerning Florida's record of environmental protection generally; Florida's implementation of the Section 404 Program; availability of environmental information; coordination between the Corps and FDEP related to Section 404 program issues; Florida administrative law and avenues for judicial review in state courts; and other topics.[6]

While the merits strongly support Federal Defendants' actions here, this case should be resolved on justiciability grounds. Under that scenario, Plaintiffs would remain free to pursue legal challenges as to any particular projects where they have an adequate interest and can demonstrate that the coordinated efforts of the federal and state agencies failed to follow the law.

---

[5] See *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1159 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) (explaining that a court retains "discretion to look beyond the opening brief and consider material submitted later if the petitioner reasonably believed its standing was self-evident" (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015)).

[6] Florida Intervenors have submitted a supplemental declaration for purposes of contesting Plaintiffs' standing, not on the merits. As Federal Defendants have correctly explained, the merits of this case are governed strictly by the administrative record. Dkt. 99 at 33-34. Further, "[i]nformation concerning Florida's implementation of its Section 404 program is not part of the administrative record. And Plaintiffs do not even attempt to justify the inclusion of post-decision extra-record evidence under one of the 'narrow and rarely invoked' exceptions to record review. Florida's implementation track record is simply not at issue here." *Id.* at 58 (citation omitted).

4

# ARGUMENT

## I.    Plaintiffs' Claims Are Not Justiciable.

Plaintiffs lack standing across the board. They raise nothing more than speculative, non-concrete injuries based on a fundamental misunderstanding of the relevant legal framework. "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. . . ." *Id.* at 2208. Standing is evaluated based on whether cognizable injury existed at the time of filing of the complaint, not at some distant point in the future. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

"Under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.' … The plaintiff's injury in fact [must] be 'concrete'—that is, 'real, and not abstract." *TransUnion*, 141 S. Ct. at 2203-04 (citing, among other cases, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) and *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2103 (2019)). Here, Plaintiffs "must be able to sufficiently answer the question: What's it to you," if Florida – instead of the Corps – has the primary role in administering the Section 404 Program for assumable waters in Florida where EPA retains oversight responsibility? *Id.* at 2203 (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). And while Plaintiffs need not prove the merits of their case to demonstrate standing, they must show a "substantial probability" that their cognizable interests will be "adversely affected" by the agency action. *See Sierra Club,* 292 F.3d at 898 ("The organization need not prove the merits of its case — '*i.e.*, that localized harm has in fact resulted from a federal rulemaking' — in order to establish its standing, but it 'must demonstrate that there is a `substantial probability' that

5

JA.1010

local conditions will be adversely affected' and thereby injure a member of the organization."
(citation omitted)).

With regard to standing for environmental plaintiffs to challenge EPA's approval of a state environmental program, the most relevant recent D.C. Circuit opinion is *Waterkeeper Alliance, Inc. v. Regan*, where environmental plaintiffs claimed that EPA's approval of a state coal ash program was unlawful because EPA had not yet adopted "public-participation guidelines for state programs" and the state program gave "inadequate public-participation opportunities." 41 F.4th 654, 659, 662 (D.C. Cir. 2022). Though no party raised justiciability concerns, the D.C. Circuit found *sua sponte* that these claims were not sufficient to support standing. *Id.* at 662. (finding that "they fail to show that their requested relief would redress their injuries"). With regard to plaintiffs' claim that the state program allowed for "lifetime permits," which plaintiffs said were not adequately protective, the D.C. Circuit found that they "fail[ed] to demonstrate imminent injury in connection with [that claim]." *Id.* at 663.

When evaluating standing based on a "procedural right afforded to them by statute," federal courts "relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." *Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 176-77 (D.D.C. 2019) (citation omitted). Plaintiffs have not shown standing as to their substantive claims, nor have they carried their burden of proving standing for procedural claims built on theories of informational injury.

## A.   Informational Injury Does Not Provide Standing Here.

In their reply brief, Plaintiffs contend that they have standing for "Claims Two, Seven, and Ten" because "EPA's action threatens harm to … Plaintiff organizations' access to information provided through NEPA review and ESA consultation…" Dkt. 105 at 90, 94. They simply claim, without further explanation, that they "clearly tied their informational harms to Claims Two,

JA.1011

Seven, and Ten."[7] Yet their opening brief only attempted to tie this flavor of environmental informational standing to Claim Two, not Claims Seven or Ten. Dkt. 98 at 78-79. For this kind of informational standing, Plaintiffs' opening brief vaguely refers to Claims One, Two, and Seven in reference to "the harms sustained as a result of EPA's unlawful approval of the state program, as shown above…" Dkt. 98 at 81. This is not enough. Florida Intervenors previously explained why this "environmental information" standing argument fails. Dkt. 102 at 37-42. In their reply, Plaintiffs make several flawed arguments to try to rehabilitate their standing argument.

First, Plaintiffs argue incorrectly that this Court must find informational injury standing for Claim Two simply because this Court found informational standing for Claim Nine. Dkt. 105 at 90-91 and n. 57. In its March 30, 2022 order (Dkt. 73), this Court evaluated standing for purposes of Claim Nine at an early stage addressing a narrow procedural claim. Now, at this stage, Florida Intervenors have sought summary judgment as to all remaining claims and have challenged Plaintiffs' specious claims of informational injury by submitting a factual declaration showing that Plaintiffs do not suffer actual informational harms by virtue of Florida's administration of the Section 404 program. While this Court did find standing for Claim Nine based on the assumption that Plaintiffs' allegations of injury were true, *see* Dkt. 73 at 13, the Court is not bound to apply the same analysis and to reach the same conclusions at this stage particularly given the evidence before the Court regarding the inaccuracies in Plaintiffs' standing declarations.[8] *Waterkeeper*

---

[7] Plaintiffs still make no viable effort – whether in the complaint, the briefs, or the declarations – to tether their alleged informational injuries to specifically numbered claims in their complaint. It is simply inadequate to generally reference a loss of some kinds of information as a basis for any and all claims. *TransUnion*, 141 S. Ct. at 2208 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . .").

[8] In any event, this Court is always free to reconsider its previous standing analysis in the context of separate claims at separate stages and with the benefit of additional briefing and declarations. In this respect, Florida Intervenors note that this Court's March 31, 2022 opinion did not address

JA.1012

*Alliance*, 41 F.4th at 659-61 (stating that "[courts] have an independent obligation to assure ourselves of our jurisdiction" and finding, where "neither EPA nor Intervenors contest[ed] plaintiffs' standing," that plaintiffs lacked standing to challenge EPA's approval of Oklahoma's coal ash program).

Second, Plaintiffs fail to show at this stage that they have suffered an actual loss of environmental information to the degree required to support Article III standing. While "disclosure of *private* information" may constitute the kind of "intangible harms" that can be sufficiently "concrete" to show standing, *Transunion*, 141 S. Ct at 2204 (emphasis added), this case involves a different kind of *general* environmental information that is part of the public record and not specific to Plaintiffs. In that context, Plaintiffs must do more than assert a vague kind of informational harm; they must show deprivation of specific information as well as show how that deprivation causes them injury. Dkt. 72 at 3-4. Here, however, they do not identify any concrete, non-speculative injury arising from a loss of environmental information to which they are entitled. Florida Intervenors' declarations show that, under Florida's Section 404 program, Plaintiffs may access the same kinds of environmental information (and in fact even get more environmental information more quickly than under the federal program). Dkt. 102-1, at 3-11 ¶¶ 16-30 (Wolfe Dec.); Wolfe Supp. Dec. ¶¶ 9-15.

Third, Plaintiffs' reference to certain pending projects in Florida does not help their standing argument. To support their speculative NEPA-based standing argument, Plaintiffs rely heavily on a comparison between the Corps' 404 permit process for the Troyer Mine project (a proposed limestone mine) and the current FDEP 404 permit process, arguing that, "when the Troyer Mine project was before the Corps, it was determined that an EIS would be required." Dkt.

---

or discuss the supplemental briefs on informational standing filed by the parties in response to the Court's request days before the opinion was issued. Dkt. 70, 71 and 72.

JA.1013

105 at 93. Plaintiffs' sole support for this comparison is found in one of their declarations (Dkt. 98-1 at 12-13 ¶ 35), which in turn relies on a decade-old letter from the Corps dated July 18, 2011 (Dkt. 31-1, at 240-42).

Contrary to Plaintiffs' claim, however, the Corps' July 18, 2011 letter does not actually say that an "EIS would be required." Instead, the Corps recognizes that, due to changes in the project, the Corps was willing to proceed with an Environmental Assessment (EA). Dkt. 31-1, at 240. Specifically, the Corps recognized that a pre-2011 iteration of the Troyer Mine proposed project triggered an EIS because, in combination with "three projects proposed near regional wetland preserves," the project "cumulatively propos[ed] 418 acres of direct wetland impacts." *Id*. The Corps explained that, since the other three projects were no longer "active" proposals, it was re-evaluating whether an EIS was required. *Id.* ("Based on the reduced cumulative impact, the Corps is willing to conduct a review of your project by means of an [Environmental Assessment].") Even now, more than a decade later, an EIS is unlikely to be triggered for the currently proposed version of the Troyer Mine project. Wolfe Supp. Dec. ¶ 14. The updated project, as reflected in the FDEP November 5, 2021 public notice, shows that this project proposes approximately 104 acres of wetlands impacts (approximately 25% of the impacts in the original pre-2011 proposal). *Id.*[9] Given the substantial reduction in impacted wetlands acres and the changes in cumulative impact concerns, it seems unlikely that an EIS would be required by the Corps for the project in its present form, if the Corps was still administering the program for assumable waters in Florida. Wolfe Supp. Dec. ¶ 14. Nevertheless, as with the other projects flagged by Plaintiffs as part of their informational injury argument, even a cursory review of the FDEP database shows many hundreds,

---

[9] Another Corps' public notice for the Troyer Mine project dated May 30, 2019 (and available via the database shown in the Wolfe Declaration) explains that the revised project proposes approximately 203 acres of permanent wetland impacts and 11 acres of temporary wetland impacts but does not state whether an EIS or EA would be required.

JA.1014

if not thousands, of pages of environmental information related to the project. These facts further undercut Plaintiffs' speculative assumption that they would be deprived of specific information in legally cognizable respects.

Ultimately, it was Congress – not EPA – which decided that state agencies are not required to prepare an EIS or a Biological Opinion. Dkt. 102 at 38-39. *Association of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 42-44 (D.D.C. 2012), is not "inapposite," as Plaintiffs suggest. In that case, a group of physicians challenged an agency action requiring non-Medicare providers to comply with certain "opt-out" procedures before obtaining Medicare reimbursement. 901 F. Supp. 2d at 42-43.[10] But since the Medicare statute already required compliance with opt-out procedures, the court found plaintiffs had no standing, explaining that injuries caused by pre-existing statutes and regulations present a "causation problem" for standing. *Id.* at 42. Plaintiffs are also wrong to evade *Center for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 181 (D.D.C. 2019), on the sole basis that it did not involve "informational harm." Dkt. 105 at 92. While the court noted that it did not involve claims of informational injury, the court did, however, highlight a key requirement for such cases; namely, that the plaintiff "identify [a] statute entitling them to any information deprived under the [agency action]." 369 F. Supp. 3d at 181 n.5. NEPA and the ESA expressly provide that they only apply to federal agencies, not state agencies. When deciding whether harm is concrete enough, "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant…" *Transunion*, 141 S. Ct at 2204.

---

[10] In that case, the court looked first to the complaint to see if the alleged injury was referenced there. *Id.* at 42. Of course, here, Plaintiffs' complaint says nothing about NEPA-based injuries arising from EPA's approval of Florida's program. Dkt. 102 at 27-32.

JA.1015

Indeed, recent statutory amendments further undercut Plaintiffs' claims of informational harm. On June 3, 2023, the President signed into law the "Fiscal Responsibility Act of 2023," which raised the federal government's debt ceiling and, relevant here, amended NEPA by capping page limits for EISs at 150 pages and EAs at 75 pages (both limits exclusive of appendices). *See* Public Law No. 118-5, 137 Stat. 10, 41 (2023). Only for proposed actions of "extraordinary complexity" is a larger page limit allowed. *Id*. at 42. In addition, these newly-enacted NEPA reforms expressly prescribe procedures for permittees to prepare an EIS or EA and for the lead agency to then "independently evaluate" and "take responsibility for" the document. 137 Stat. at 42. This further undercuts Plaintiffs' assertion of a cognizable, legally-enforceable injury from the loss of an agency's *independently-prepared* NEPA document. *Cf.* Dkt. 105 at 93-94. Plaintiffs' claim of informational harm cannot be based on the lack of *any environmental information*; to the contrary, Plaintiffs can only try to say that they lack access to *certain kinds of environmental information*. But these new statutory changes further call into question the validity of Plaintiffs' assertion of a "loss" of legally-required environmental information.

Just as recent legislation curbs Plaintiffs' claims, recent Supreme Court action does as well. In *Sackett v. EPA*, issued in May 2023, the Supreme Court clarified the proper scope of "waters of the United States." 598 U.S. at 603. Under the *Sackett* test, the scope of CWA jurisdiction over the "waters of the United States" is narrower than has been employed in the past by EPA, the Corps, or FDEP. Wolfe Supp. Dec. ¶¶ 28-29.  A narrower scope of Section 404 jurisdiction means fewer permits require Section 404 permit coverage, and similarly, fewer projects that require NEPA and/or ESA procedures. Wolfe Supp. Dec. ¶¶ 28-29.

JA.1016

**B.      Plaintiffs Lack Standing to Challenge EPA's Early Finding that Florida's Application Was "Complete."**

Florida Intervenors agree with Federal Defendants that EPA did not err when finding Florida's application to be complete. Dkt. 106 at 9-10. But, again, this Court need not reach that issue as an agency's finding that an application is "complete" is not final agency action subject to judicial review. Federal courts review final agency actions, not every step in the long process that leads to a final decision. Nor do Plaintiffs experience cognizable injuries sufficient to support standing to assert such a novel claim.

Plaintiffs provide no valid arguments to support standing for this purpose and still cite no cases where a court found that a completeness determination was reviewable. Plaintiffs assume that, "[h]ad EPA determined the application was not complete until the BiOp was produced, there is a possibility that the agency would have reached a different decision and/or granted an agency stay pending review." Dkt. 105 at 106. Yet this argument fails as a matter of law since there is no such legal obligation to complete the BiOp before deciding whether a CWA Section 404 assumption application is complete. *See* Dkt. 106 at 10. Whether there is such a "possibility" is beyond even mere speculation. There is simply no showing that this "procedural step was connected to the substantive result." *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

**C.      Plaintiffs' Attempt to Show Standing Based on "Restrictive Access" to Florida Courts Fails.**

Plaintiffs conjure highly speculative and legally dubious reasons to argue that the Florida Section 404 program "subjects Plaintiffs to a restrictive state court system …" Dkt. 105 at 95. They are incorrect. Florida's judicial system provides a fair and appropriate process that allows Plaintiffs to seek to vindicate their concerns if FDEP issues a permit that they believe is improper in any way. This Court should not accept Plaintiffs' invitation to demean the judicial system of the

JA.1017

State of Florida. The Constitution and the Laws of the State of Florida provide a fair, just, and reasonable system for reviewing agency actions. In many ways, Plaintiffs are better off challenging agency actions in Florida courts than in federal courts. Wolfe Supp. Dec. ¶¶ 19-26.

First, Plaintiffs are not harmed by Florida's *de novo* approach to permit appeals, as explained in the Supplemental Wolfe Declaration. Wolfe Supp. Dec. ¶ 22. Indeed, they benefit. Under Florida law, there is no presumption of "correctness" in an administrative hearing challenging an FDEP permit; administrative law judges (ALJs) hear permit challenges *de novo* at the Florida Division of Administrative Hearings (DOAH); and no deference is given to FDEP's permit decision. Wolfe Supp. Dec. ¶ 22.[11] Nor are Plaintiffs *required* to incur "substantial cost" to "present an affirmative case by hiring experts and conducting independent investigations." Wolfe Supp. Dec. ¶ 22. They may rely on their written comments, but they also have the opportunity, in a *de novo* setting, to have their arguments – factual, legal, scientific, and policy – heard by an impartial administrative law judge *before* FDEP renders a "final" decision on the permit. Wolfe Supp. Dec. ¶ 22.

For those challenging permits, this system is preferable to the federal approach where the permitting agency receives deference, both as to legal interpretations and on technical issues. *Mississippi v. EPA,* 744 F.3d 1334, 1349 (D.C. Cir. 2013); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1155 (D.C. Cir. 2013) ("Because we owe significant deference to EPA in areas of its technical expertise, we reject Sierra Club's challenge to EPA's method of addressing non-detect data."). And permit challengers are not entitled to develop the record in an adversarial setting; to the contrary, they must rely on the submittal of comment letters with supporting exhibits

---

[11] *See also* Fla. Const. Art. V, § 21 ("In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo.").

JA.1018

and materials (and in some cases, oral comments at a public meeting). *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 189 (D.C. Cir. 2004). There is a strong presumption that the agency acted properly. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). To overcome this highly deferential standard of review under the APA, Plaintiffs must typically expend resources to submit comprehensive and compelling comments supported by expert testimony, without the benefit of obtaining any testimony from agency officials or others involved in the process. *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 537 (D.D.C. 2021).

Plaintiffs' attempt to conjure standing based on these differences is wholly inadequate. Plaintiffs obviously already hire experts to generate comments and to provide supporting information. Those are funds that they are spending already when projects of concern are under consideration. Their declarations do not address how much more they are spending *over current expenditures* – and any such effort would be inherently speculative and case specific.

Second, Plaintiffs are not likely to be injured by fee-shifting provisions in the context of Florida's Section 404 program. As Florida has already explained, the fee shifting provision at Section 403.412(2)(f) "applies only to circuit court actions for injunctive relief," not administrative actions. Dkt. 102 at 46.[12] Here, Plaintiffs are making a meritless argument; i.e., that somehow they will face a situation one day where FDEP will change its view of the relevant statute and seek to obtain fees for an appeal brought by Plaintiffs that is rejected on the merits. The only situation

---

[12] *See, e.g., Lake Brooklyn Civic Ass'n, Inc. v. St. John's River Water Mgmt. Dist.*, 1993 WL 943540, at *19 (Fla. Div. Admin. Hrgs. 1993) (["Section 403.412(2)(f)] only applies to suits to maintain an action for injunctive relief in circuit court, and not to an administrative action such as this."); *Paul Still v. New River Solid Waste Ass'n & FDEP*, 2001 WL 1917255, at *2 (Fla. Div. Admin. Hrgs. 2001) (adopting ALJ's recommendation that association was not entitled to attorney's fees and costs from petitioner under Fla. Stat. § 403.412(2)(f) because these statutory provisions do not apply to administrative actions brought under subsection 403.412(5)).

14

cited by Plaintiffs in their brief (Dkt. 105 at 97) involves a *potential* scenario in a case that does not even involve FDEP. Plaintiffs' fears are unfounded. Wolfe Supp. Dec. ¶ 23.

Third, Plaintiffs are wrong to suggest that Florida law concerning standing to challenge permits will harm them. Florida Intervenors have previously explained that environmental groups have at least three avenues to establish standing to challenge permits under Florida law. Dkt. 102 at 30-31. Their new spin on this point has been refuted. Wolfe Supp. Dec. ¶¶ 24-26.  Plaintiffs argue that one of the three paths for standing, under Florida Statutes Section 403.412(7), "is unclear as to which proceedings it applies." Dkt. 105 at 98. They argue that the "clearest reading" is that Section 403.412(7) "appl[ies] Article III standing for injunctive suits regarding delegated programs," and nothing else. Dkt. 105 at 98. But Plaintiffs cite no case or other authority for this exceedingly narrow and (temporarily) self-serving construction. And they ignore the plain language of Section 403.412(7), which says it applies to "administrative proceedings" (not injunctive cases in civil court) in a "matter pertaining to a federally delegated or approved program." As such, this statutory avenue applies to environmental permit challenges. Additionally, Plaintiffs argue that Florida's approach to standing harms Plaintiffs because the statutory avenues are limited to "citizens of the state." This argument is misleading. The first and most traditional path for standing, under the *Agrico* test, remains available irrespective of state citizenship. Wolfe Supp. Dec. ¶ 26.  But even if an environmental petitioner looked to the other avenues for standing, Plaintiffs cite no authority for their premise that state citizenship in this context is a basis for legally cognizable injury.[13]

---

[13] Last, Plaintiffs lack standing on these grounds for reasons similar to those encountered by the Florida businesses that sought intervention. Dkt. 102 at 37.

JA.1020

**D.      Standing Based on "Aesthetic and Recreational Interests" Also Fails.**

Plaintiffs also continue to assert standing on the basis of general aesthetic and recreational interests. But they make no showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim arise from FDEP permits, nor have they made any showing that Florida permitting will be any less rigorous than Corps-led permitting, especially given EPA's oversight function. In other words, the mere issuance of Section 404 permits cannot form the basis of standing; there must be some non-speculative showing that Florida 404 permits will harm Plaintiffs' aesthetic and recreational interests in a way that Corps 404 permits would not.

Florida Intervenors relied on *Clapper v. Amnesty International USA*, where the Supreme Court reiterated that a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient." 568 U.S. 398, 409 (2013) (internal quotations omitted). Plaintiffs seek to avoid *Clapper* by suggesting that their claims of harm do not depend upon a "series of events." Dkt. 105 at 100. But as they acknowledge, no harm would arise to their purported aesthetic and recreational interests unless a long series of events transpires. Dkt. 105 at 101.

In truth, the series of events is even longer than they suggest. No harm to Plaintiffs' aesthetic and recreational interests would arise, if at all, *unless and until* (1) FDEP proposes to issue a permit that harms them in some manner; (2) EPA fails to convince FDEP to address the issue and EPA neither objects to nor federalizes the permit; (3) FDEP proceeds to issue the permit without correcting the concerns submitted in the public comment process; (4) Plaintiffs file an administrative challenge and the Florida administrative and judicial review processes result in no changes to the project[14]; and (5) the permitted project proceeds in a manner that actually harms

---

[14] If an administrative challenge is filed, FDEP's permit decision is not final agency action until the completion of the hearing process and the issuance of a final order. Dkt. 102 at 31.

JA.1021

Plaintiffs' aesthetic and recreational interests. This is the kind of chain of events that cannot support standing. Plaintiffs admit that at least three independent actions need to occur to make harm likely, Dkt. 105 at 101, and they give no evidence whatsoever that these three actions are imminent with respect to any project that will actually cause harm to their protected interests.

Here, the pivotal break in the chain of events is EPA's continued oversight of the state program on both a program level and permit-by-permit. Plaintiffs erroneously contend that "EPA's oversight does not supplant an adequate state program nor remove this risk of harm." While Florida's program clearly meets the requirements of the CWA, EPA's role is to ensure that no unlawful permits are issued by the states. Agencies are entitled to a presumption of regularity, not illegality. *Citizens to Pres. Overton Park*, 401 U.S. at 415.

### E.   Plaintiffs Lack Standing to Challenge Florida's Program on the Basis of Criminal Enforcement or Statute of Limitations.

In its opening brief, Florida cited to binding D.C. Circuit precedent, *Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912 (D.C. Cir. 2003), to show that, "[w]here a statute provides that the federal government 'will have an ongoing and undiluted enforcement role,' concerns about reduced enforcement were simply 'unsupported conjecture' that do not constitute an injury for Article III standing purposes." Dkt. 102 at 48 (citing to *Crow Creek*). Therefore, Plaintiffs lack standing for Claim Two to the extent their alleged injury is based on a heightened mens rea for criminal negligence or shorter statute of limitations under state law or even allegations of insufficient future state enforcement.

Despite their attempts, Plaintiffs' reply brief has failed to meaningfully distinguish *Crow Creek* from the facts of this case. While Plaintiffs argue that the role of EPA and the Corps will be

JA.1022

different under state assumption regarding certain aspects of the 404 program,[15] they do not dispute

that Section 404(n) of the Clean Water Act states "[n]othing in this section shall be construed to

limit the authority of the Administrator to take action pursuant to section 1319 of this title." 33

U.S.C. § 1344(n). Nor do Plaintiffs dispute that Section 309 sets forth the scope of the EPA's

enforcement authority, including for violations of permits issued under a state assumed 404

programs. *See* 33 U.S.C. § 1319. Moreover, the federal government's ongoing and undiluted CWA

enforcement authority is further reinforced by Section III.G of the EPA-FDEP Memorandum of

Agreement which plainly states that "EPA may initiate independent or parallel enforcement

actions in accordance with Sections 309 and 404(n) of the CWA." EPA-HQ-OW-2018-0640-0018

at 10.

It is also reinforced by Section 5-12.523 ("Coordination with State Programs") of the

Justice Manual (formerly known as the U.S. Attorney's Manual), which provides more detail on

how the federal government exercises its enforcement discretion in this context. It explains:

"Frequently, an unauthorized activity constitutes a violation of both federal and state law. United

States Attorneys should remain advised of pending state environmental enforcement actions. If it

appears that all federal interests in the case will be vindicated in the state court proceeding, action

in federal court may be an unnecessary duplication of effort. **On the other hand, if federal**

---

[15] For example, Plaintiffs' argument that the Corps will not have primary enforcement authority in
assumed waters, Dkt. 105 at 103, is a red herring given that EPA retains independent enforcement
authority. Similarly, Plaintiffs' argument that EPA has waived review of certain 404 permit
categories is unavailing. *Id.* While EPA has agreed to waive initial review of certain categories of
state issued 404 permits under the Memorandum of Agreement (MOA) with FDEP (as Congress
intended pursuant to Section 404(k), 33 U.S.C. § 1344(k)), it has not relinquished its oversight
over waived categories as Section II.B.(3) and II.D.(4).a of the MOA requires FDEP to provide
EPA with permit applications, related public notices and supplemental materials for waived permit
categories upon request and Section II.B.(2) provides EPA with unilateral authority to terminate
waiver of any of the categories identified in the MOA pursuant to EPA regulations. EPA-HQ-OW-
2018-0640-0018 at 6-8. Further under the MOA, EPA retains the right to review any of FDEP's
compliance and enforcement records upon request. *Id.* at 9.

**interests will not be protected completely in state court, federal proceedings may be
warranted.** Where legal action in federal court appears warranted, the United States Attorney
should continue to consult and, as appropriate, coordinate with relevant state authorities..." Dep't
of Justice, *Justice Manual*, at 5-12.523 available at https://www.justice.gov/jm/jm-5-12000-
environmental-enforcement-section#5-12.523 (last visited July 7, 2023) (emphasis added).

Simply put, EPA's approval of Florida's Section 404 program does not block the federal
government from bringing civil or criminal enforcement actions under federal law, subject to
federal statute of limitations, in federal court for violations of CWA Section 404 in state assumed
waters, regardless of whether Florida, in its enforcement discretion, determines to pursue or
decline enforcement in a particular context. Wolfe Supp. Dec. ¶¶ 30-32. Consequently, Plaintiffs
have not been suffered a cognizable injury sufficient for Article III standing.

Plaintiffs' reliance on *WildEarth Guardians v. Jewell*, 783 F.3d 298 (D.C. Cir. 2013) and
*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) in its reply are of no relevance either. Dkt. at
101-02. In relevant part, *WildEarth Guardians* involved standing related to a procedural injury
under NEPA. 783 F.3d at 305-08. Here, Plaintiffs' allegations related to the state criminal intent
standard or statute of limitations are not procedural injuries, so this case is simply not relevant to
standing based on these alleged claims. Similarly, *Mozilla* is also inapposite. In that case, the
petitioners challenged a portion of an FCC order that required "[a]ny person providing broadband
Internet access service shall publicly disclose accurate information regarding the network
management practices, performance, and commercial terms of its broadband Internet access
services sufficient to enable consumers to make informed choices." 940 F.3d at 46-47. The FCC
asserted that petitioners did not have standing to challenge this portion of the rule based on lack
of injury, but the court disagreed. *Id.* However, the petitioners in *Mozilla*, unlike the Plaintiffs

JA.1024

here, would have been required to affirmatively provide public disclosures if the rule being challenged was upheld, which the court recognized as a concrete injury directly tied to the rule itself. In contrast, EPA's approval of the Florida's 404 application, with its heightened mens rea and shorter statute of limitations, does not in itself require Plaintiffs to do anything. Nor does EPA's action result in any concrete injury to the Plaintiffs as EPA retains independent enforcement authority under federal law even under state assumption.

## II.     Several of Plaintiffs' Claims Are Not Ripe.

Plaintiffs either misstate or misunderstand this Court's ripeness doctrine as applied to EPA's approval of Florida's 404 program. Claims related to the FWS Incidental Take Statement (Claims Three and Four), the Corps' list of "retained waters" (Claim Seven), and National Marine Fisheries Service (NMFS) consultation (Claims Five, Eleven and Twelve) all rely on contingent future events that are too speculative to adjudicate at this time and are, therefore, unripe under the test set forth in *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967). Generally, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *McCray*, 574 F. Supp. 3d at 12 (quoting *Texas v. United States*, 523 U.S. 295, 300 (1998)) (internal quotations omitted).[16]

### A.     Take Liability Claims Are Not Ripe For Review (Claims 3 and 4).

With regard to the ITS, Plaintiffs' reply brief only points to "creat[ing] an 'unlawful risk of take.'" Dkt. 105 at 108-09. However, Plaintiffs fail to address why challenging particular projects in an as-applied context would be insufficient to prevent any "unlawful risk of take." The

---

[16] *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (explaining ripeness test for challenging agency action as including "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development.").

JA.1025

Florida Section 404 Program, in combination with the BiOp/ITS, provides comprehensive regulatory guarantees concerning species impacts. Further, Plaintiffs do not demonstrate any scenarios under the Florida Section 404 program that actually create an "unlawful risk of take."

Plaintiffs' attempt to have it both ways with regards to the import of the Second Circuit's *Cooling Water* case. 905 F.3d 49 (2d Cir. 2018). While they cite it in support of ripeness, they separately criticize it as "poorly reasoned" and "wrongly decided" when attacking the Federal Defendants' reliance on it for the merits. Dkt. 105 at 46. Moreover, Plaintiffs inaccurately claim that "Florida misleadingly cites the case for having found a different claim to be unripe." Dkt. 105 at 109. But in its opening brief, Florida Intervenors directly quoted *Cooling Water*'s finding that a claim was "unripe" in a scenario where "EPA may still veto the permit" and, "[i]f EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge." *See* Dkt. 102 at 53. Such a situation exists here.

Plaintiffs' reply also suggests that *Cooling Water* "implicitly" ruled on the ripeness of the biological opinion. No such implied ruling is present. In *Cooling Water*, ripeness is only discussed in the footnote previously cited by Florida Intervenors. Dkt. 102 at 53 (citing *Cooling Water*, 905 F.3d at 79 n. 19). The Court did not address ripeness in the context of the direct BiOp challenge and no inference should be drawn from an issue that was not contested or addressed in the case.

Without identifying authority that directly supports their position, Plaintiffs also attempt to distinguish other cases cited by Florida Intervenors but miss the target. For example, Plaintiffs ignore the similarities between the present case and *Wyoming Outdoor Council v. Dombeck*, where plaintiffs challenged EPA's ESA Section 7 procedure during its approval of an application for oil and gas leases. 148 F. Supp. 2d 1, 9 (D.D.C. 2001). The court in *Wyoming Outdoor* found the challenges to EPA's approval to be unripe where subsequent action would need to occur before

21

final approval occurred. *Id.*

Likewise, Plaintiffs attempt to distinguish the facts of this case from those in *Suburban Trails, Inc. v. New Jersey Transit Corp.,* by arguing that there was no final federal action in that case and no hardships to the plaintiff, just uncertainty. Dkt. 105 at 112. However, Plaintiffs do not address Florida's point that the challenge "was not ripe because a federal agency possessed veto power over the state agency's decision," Dkt. 102 at 54, which is the situation here.

Finally, Plaintiffs incorrectly argue in a footnote that "Florida cherry-picks ripeness language" from a series of cases. Dkt. 105 at 108. Plaintiffs mistake legal synthesis for cherry-picking. Florida provided a series of cases that support each factor of its ripeness argument. Each supports the premise they are cited for. Dkt. 102 at 51-52. Plaintiffs are wrong to argue that there are no "later agency actions that could supersede or undo the violation or remedy the harms wholesale." Dkt. 105 at 110. The ITS, including the required Technical Assistance Process, provide a litany of steps involving multiple federal and state agencies that work in tandem to avoid any of the speculative take concerns that Plaintiffs seem to fear. EPA's veto authority is also a "later agency action" that would be in place to prevent any future harm to the Plaintiffs under the ESA take provisions.

Plaintiffs' rebuttal concerning *New Hanover* is also ineffectual. In *New Hanover*, the challenge to the Corps' use of a nationwide permit to authorize a city landfill project was unripe where the necessary state water permits had not yet been granted because the "results of the [state water permitting] process cannot be predicted." 992 F.2d 470, 473-74 (3d Cir. 1993). Here, the outcome of the agencies' technical assistance process as well as EPA's Section 404 oversight role cannot be predicted and no harm will be caused to Plaintiffs' interest unless and until they show inadequate take protection will occur.

JA.1027

Ultimately, Plaintiffs have not been harmed by the issuance of the ITS and cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions.[17] A comprehensive, coordinated process involving FDEP, EPA, FWS and FWC exists to ensure that no such scenario arises, but if it does, it will invariably entail an exceedingly fact-specific scenario with a developed administrative record for review. Thus, a challenge to the scope of incidental take coverage should await an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate.[18]

**B.    Plaintiffs Challenge to the "Retained Waters" List Is Not Ripe (Claim 7).**

Despite assertions to the contrary, Plaintiffs have not shown that the Retained Waters List has a "sufficiently direct and immediate" impact *on the Plaintiffs* such that *Abbott Lab'* ripeness test is met. A challenge to the Retained Waters List should await a specific as-applied challenge where FDEP permits dredge and fill activity at a particular waterbody excluded from the Retained Waters List but which Plaintiffs believe should be on the List. Of course, such a challenge would only be viable, if at all, where (1) FDEP and the Corps fail to properly follow their agreed-upon process under the Memorandum of Agreement (EPA-HQ-OW-2018-0640-0018 at 8) for evaluating, in the context of specific projects, whether particular waterbodies belong on or off the List; (2) Plaintiffs comment to FDEP that the project should be handled by the Corps based on impacts to waters that should be treated as Retained Waters; and (3) FDEP

---

[17] Plaintiffs have expressed concern about the "Eden Oak Development." An application for a Section 404 permit has not yet been submitted to FDEP for this potential project. Dkt. 102-1 at 22. Even Plaintiffs' declaration notes that the project did not receive local zoning approval, *see* Crooks Dec., Dkt. 105-1 at 7.

[18] If a situation arose with the potential for unlawful take, Plaintiffs would have at least two viable, as-applied legal options at their disposal: first, they could challenge the FDEP 404 permit under Florida administrative and judicial review processes; or second, Plaintiffs could sue in federal court under the ESA's citizen suit provisions (16 U.S.C. § 1540(g)).

JA.1028

and the Corps ignore or reject those comments and/or EPA takes no action in its oversight role. An agency action, such as EPA's approval of Florida's program, that "does not require [plaintiffs] to engage in, or to refrain from, any conduct" does not constitute sufficient hardship for the purposes of ripeness. *Oceana*, 384 F. Supp. 2d at 254-55.[19]

Plaintiffs' main point here seems to be that the ripeness doctrine does not apply to a challenge of a "program as a whole." Dkt. 105 at 112. Yet they cite no case law for such a broad carve-out from the ripeness doctrine. *Cf. Ohio Forestry*, 523 U.S. at 733-34 (finding environmental group's challenge to forest management plan not ripe for review where subsequent challenges could await actual logging projects). Instead, they point to litigation involving the Michigan Section 404 Program, Dkt. 105 at 112-13 (discussing *Menominee*, 947 F.2d 1065, 1069-70 (7th Cir. 2020), but do not address possible differences between the Florida-Corps MOA and any such process in the Michigan context, *see, e.g.*, Dkt. 102 at 57 n. 35). Whether a particular waterbody is on or off the Retained Waters List is of no real consequence to Plaintiffs, at least not yet.

Nor have Plaintiffs demonstrated that the Retained Waters List constitutes "final agency action." Plaintiffs predictably rely on *Coal. to Save Menominee River Inc. v. EPA,* 423 F. Supp. 3d 560, 568 (E.D. Wis. 2019), which Florida Intervenors previously cited to this Court (Dkt. 102 at 57 n. 35), to argue that the Corps' retained water list is final agency action. Plaintiffs ignore the fact-specific distinctions between Florida's Retained Waters List (which, based on the record here, lacks hallmarks of final agency action) and Michigan's Retained Waters List (which is not before this Court and for which the Parties do not have the benefit of comparing the 1984 list and

---

[19] Contrary to Plaintiff's assertion, Dkt. 105 at 113, allegations of insufficient future state enforcement do not constitute harm for standing purposes, particularly where EPA retains independent enforcement authority under the CWA as addressed in previous section.

JA.1029

its accompanying MOA). On the record before this Court, the Florida 404 Program contains a process of routine refinement of the Retained Waters List as particular projects are reviewed. The Corps and FDEP have established "Joint Coordination Procedures" to ensure that the List is appropriately updated, as appropriate. Dkt. 102 at 57. This process is working well and is ensuring that, as stated in the MOA, the list includes "all other waters" that are not expressly listed if they meet the definition of non-assumable waters under 404(g). Dkt. 102-1 at 16-17. To challenge the list as a whole now would be to jump ahead of the process selected by the agencies for ensuring that particular projects are correctly permitted based on whether they are inside or outside the bounds of "retained waters."

### C. Plaintiffs' NMFS-Based Claims Are Not Ripe (Claims 5, 11, and 12).

Plaintiffs contest EPA's decision to not engage in formal consultation with the National Marine Fisheries Service (NMFS). Florida has explained why these claims are not ripe for review; namely, marine species under NMFS' jurisdiction are unlikely to be found in any assumable waters because the Corps retains jurisdiction over "all waters subject to the ebb and flow of the tide...including wetlands adjacent thereto." Dkt. 102 at 59. Accordingly, it is highly unlikely that FDEP Section 404 permits in assumable waters (non-marine waters) will affect NMFS-listed species and, to the extent any such concerns arise, those would be addressed in the normal permitting procedures. A final permit action involving impacts to species under NMFS jurisdiction could be challenged at that time. No actual harm – and certainly none that is ripe for review at this stage – accrues to Plaintiffs from EPA's decision to defer NMFS consultation. Wolfe Supp. Dec. ¶ 33. In any event, ongoing coordination between EPA and NMFS should decisively cut-off these claims. Dkt. 106 at 48.

JA.1030

**CONCLUSION**

For the foregoing reasons, Florida Intervenors respectfully request entry of summary judgment in favor of Defendants and Intervenors as to all claims.

Dated: July 7, 2023

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

JA.1031

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July 2023, I electronically filed the foregoing document

using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:21-cv-0119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## NOTICE OF COMPLETION OF BIOLOGICAL EVALUATION

As stated in a previous filing, the Environmental Protection Agency ("EPA") considered the issues raised in Plaintiffs' March 31, 2021 Notice of Intent to Sue EPA for violations of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., and undertook preparation of a Biological Evaluation and effects determination for ESA-listed species and designated critical habitat under the jurisdiction of the National Marine Fisheries Service ("NMFS"). Dkt. No. 99-2 at ¶¶ 3-4. EPA stated that it anticipated completion of the Biological Evaluation on or around July 14, 2023, and that it intended to submit the Biological Evaluation to NMFS shortly thereafter pursuant to 50 C.F.R. § 402.12(j), as appropriate. *Id.* ¶ 7. Accordingly, EPA notifies the parties and the Court that it transmitted the Biological Evaluation to NMFS on July 14, 2023.

Dated: July 19, 2023                      Respectfully submitted,

                                         TODD KIM
                                         Assistant Attorney General
                                         Environment & Natural Resources Division
                                         United States Department of Justice

                                          /s/ Alison C. Finnegan
                                         Alison C. Finnegan (PA Bar 88519)

1

JA.1033

United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov

Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: Andrew.Coghlan@usdoj.gov

*Attorneys for Federal Defendants*

JA.1034

**Certificate of Service**

I certify that on July 19, 2023, I filed the foregoing with the Court's ECF system, which will notify other counsel of record.

/s/ Alison C. Finnegan

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**PLAINTIFFS' SUR-REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO
DEFENDANTS' AND INTERVENORS' CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

   I.   USFWS Violated the ESA. .............................................................................. 1

      A.   The BiOp Failed to Analyze the Entirety of Florida's Program, the Baseline of the Species, and Impacts to Species from EPA's Transfer Decision. ................. 1

      B.   The ITS Unlawfully Authorizes Unlimited Incidental Take. ...................... 3

      C.   USFWS Violated the ESA by Relying Entirely on a Non-Statutory Technical Assistance Process Conducted at the Permit-Specific Level. ..................... 4

      D.   *Cooling Water* is Not Persuasive Authority. ............................................. 7

   II.   EPA's Reliance on the BiOp Was Unlawful. ................................................. 7

   III.   EPA Violated the Clean Water Act by Approving a State 404 Program that is Less Stringent than Federal Law. ......................................................................... 9

      A.   State 404 Programs Must Be "As Stringent" As Federal Law, Including As to Criminal Intent and Statutes of Limitations. ............................................ 9

      B.   The State 404 Program's "Reasonable Assurances" Regime is Less Stringent. ........ 10

      C.   The Defendants' Belated Attempts to Salvage the Corps' Retained Waters List As Reasonable Fail. .................................................................................. 12

   IV.   Plaintiffs Have Standing. ............................................................................... 16

   V.   Plaintiffs' Claims are Ripe. ........................................................................... 19

JA.1037

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Butler v. Enter. Integration Corp.*,
   459 F. Supp. 3d 78 (D.D.C. 2020) ....................................................................................7

*City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ..........................................................................................8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)........................................................................................................18

*Coal. to Save Menominee River Inc. v. EPA*,
   423 F. Supp. 3d 560 (E.D. Wis. 2019)..........................................................................20

\*  *Conner v. Buford*,
   848 F.2d 1441 (9th Cir. 1988) ....................................................................................6, 7

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018)..........................................................................................6, 7

*Crutchfied v. County of Hanover*,
   325 F.3d 211 (4th Cir. 2003) ........................................................................................12

\*  *Ctr. for Biological Diversity v. EPA*,
   No. CV 22-486, 2023 WL 5035782 (D.D.C. Aug. 8, 2023)...........................................4

\*  *Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 174 (D.D.C. 2022) .......................................................................16, 17

*CTS Corps. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) ........................................................................................11

\*  *The Daniel Ball*, 77 U.S. (10 Wall.) 557 (1870).............................................................13

*Defs. of Crooked Lake, Inc. v. Fla. Dep't of Env't Prot.*,
   No. 17-5328, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) ...................12

\*  *Defs. of Wildlife v. EPA*,
   420 F.3d 946 (9th Cir. 2005) ......................................................................................5, 8

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
   733 F.3d 1106 (11th Cir. 2013) ......................................................................................6

\*  *Economy Light & Power Co. v. United States*,
   256 U.S. 113 (1921)........................................................................................................13

ii

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ...........................................................12

\* *Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002) ......................................................2, 3

*Menominee Indian Tribe of Wisc. v. EPA*,
  947 F.3d 1065 (7th Cir. 2020) ........................................................20

\* *Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ........................................................18, 19

\* *North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) .......................................................6, 7

*Nat. Res. Def. Council v. Evans*,
  279 F. Supp. 2d 1129 (N.D. Cal. 2003) ..........................................4

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  51 U.S. 644 (2007) .........................................................................4, 5

\* *Nat'l Wildlife Fed'n v. Brownlee*,
  402 F. Supp. 2d 1 (D.D.C. 2005) ...................................................6, 7

*Nat'l Wildlife Fed'n v. Norton*,
  332 F. Supp. 2d 170 (D.D.C. 2004) ................................................17

\* *Oceana Inc. v. Ross*,
  No. CV 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...........4

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) .......................................................................20

*Pacific Coast Fed'n of Fishermens Ass'ns v. NMFS*,
  482 F.Supp. 2d 1248 (W.D. Wash. 2007) ........................................5

\* *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
  992 F.3d 1071 (D.C. Cir. 2021) .......................................................8

\* *Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) ...........................................................4

\* *Sierra Club v. W. Va. Dep't of Env't Prot.*,
  64 F.4th 487 (4th Cir. 2023) ..........................................................11

\* *United States v. Hanousek*,
  176 F.3d 1116 (9th Cir. 1999) .........................................................9

JA.1039

\*   *WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) ........................................................................18

**Statutes**

16 U.S.C. § 1536(a)(2) .....................................................................................4

16 U.S.C. § 1536(b)(3)(A) ...............................................................................6

33 U.S.C. § 1319 ..........................................................................................9, 10

33 U.S.C. § 1344(h)(1)(G) .............................................................................10

**Legislative Materials**

H.R. Conf. Rep. 95-830 (1977) ......................................................................13

**State Administrative Code**

Fla. Admin. Code R. 62-330.301 ...................................................................12

**Code of Federal Regulations**

33 C.F.R. § 328.3(a)(1) .............................................................................13, 14

33 C.F.R. § 329.4 ............................................................................................13

40 C.F.R. § 233.1(d) .........................................................................................9

40 C.F.R. § 233.41(b)(2) ................................................................................10

50 C.F.R. § 402.02 .......................................................................................2, 6

50 C.F.R. § 402.14(c)(4) ..................................................................................6

50 C.F.R. § 402.14(g)(2) ..................................................................................2

50 C.F.R. § 402.14(h)(1)(ii) .............................................................................2

50 C.F.R. § 402.16(a) .......................................................................................4

**Federal Register**

45 Fed. Reg. 33,290 (May 19, 1980) .............................................................10

53 Fed. Reg. 20,764 (June 6, 1988) ............................................................9, 10

84 Fed. Reg. 44,976 (Aug. 27, 2019) ..............................................................6

88 Fed. Reg. 49,924 (July 31, 2023) .............................................................17

iv

## INTRODUCTION

EPA's approval of Florida's 404 program and the agency actions underlying that decision were unlawful.  The new arguments raised by the Defendants and Florida on reply lack any merit.  Plaintiffs' Motion for Summary Judgment should therefore be granted.

## ARGUMENT

### I.      USFWS Violated the ESA.

None of the Defendants' new arguments on reply rebut Plaintiffs' showing that USFWS violated the ESA by (1) refusing to evaluate the baseline status of species and the impacts of EPA's action; (2) authorizing an unlimited amount of incidental take at the programmatic level; and (3) claiming that the requisite analyses would occur later at the permit level through a non-statutory technical assistance process that lacks key ESA guardrails—e.g., that USFWS must use the best available science to analyze baseline of the species, evaluate impacts to species, and make incidental take and jeopardy determinations—and allows the State to issue permits without any input from USFWS.  Dkt. 98 at 37–51; Dkt. 104 at 20–49.

### A.      The BiOp Failed to Analyze the Entirety of Florida's Program, the Baseline of the Species, and Impacts to Species from EPA's Transfer Decision.

The Defendants' reply confirms that USFWS excluded parts of EPA's action from its review, including the effect of the general permits Florida adopted as part of the 404 program EPA approved.  Dkt. 98 at 38; Dkt. 104 at 23–25.  The Defendants now contend that USFWS was not required to consider these impacts because Florida's 404 general permits "were not issued pursuant to CWA Section 404," Dkt. 106 at 31, but rather pursuant to state law.  However, all aspects of Florida's 404 program were issued pursuant to state law.  The Defendants' argument would mean that USFWS was not required to consider the impacts of *any* part of the state 404 program, because *all of it* was promulgated pursuant to state law.  FWS-006028, at

1

FWS-006045–46 (BiOp).  To the contrary, USFWS was not authorized to evaluate *some* parts of the state program while ignoring others.  50 C.F.R. § 402.02 ("*all activities or programs of <u>any kind authorized</u>*" by a federal agency) (emphasis added); Dkt. 98 at 38; Dkt. 104 at 23–25.  Here, the agency action was EPA's approval of Florida's 404 program, which included scores of general permits, and USFWS therefore had to consider them.

As to baseline, neither the BiOp, BE, nor BA satisfied the ESA.  Dkt. 98 at 38–39; Dkt. 104 at 25–27.  On reply, the Defendants suggest Plaintiffs' only complaint is that USFWS unlawfully adopted the BE.  Dkt. 106 at 34.  Not so.  The BE also failed to include the required analysis.  Although USFWS copied parts of the BE almost word-for-word,[1] this just transferred the same missing analysis from the BE into the BiOp.  Dkt. 98 at 38–39; Dkt. 104 at 25–27.  *Contra* 50 C.F.R. §§ 402.14(g)(2), (h)(1)(ii), 402.02.

USFWS also unlawfully adopted the BE without independently analyzing it.  Dkt. 104 at 25–27.  On reply, the Defendants still fail to point to anything in the record to rebut this showing, other than conclusory statements.  Dkt. 106 at 33–34.  Instead, they belatedly try to distinguish *Gerber v. Norton*, where the Court found that USFWS unlawfully allowed a regulated entity to make decisions Congress had delegated to USFWS.  294 F.3d 173, 184–85 (D.C. Cir. 2002).  There, the regulated entity rejected an alternative that USFWS proposed and USFWS acquiesced.  *Id.*  Here, the regulated entities (EPA and Florida) proposed the "system" USFWS adopted in the BiOp: a programmatic consultation and ITS paired with a non-statutory technical assistance process at the permit level to obtain incidental take coverage while avoiding appropriately rigorous ESA analysis.  Dkt. 98 at 27–32.  The regulated entities here also

---

[1] *Compare* FWS-006028, at FWS-006083–92 (BiOp), *with* FWS-005610, at FWS-005662–80 (BE).  The BE in turn is a near carbon copy of the BA prepared by Florida.  *Compare* EPA-HQ-OW-2018-0640-0387-A8 (BA), *with* FWS-005610–5906 (BE).

produced the actual language (in the BA and BE) that USFWS largely copied-and-pasted together to form the BiOp, which was supposed to represent *USFWS'* independent, reasoned analysis.  Dkt. 98 at 27–32.

Following these directives, USFWS disavowed any duty to analyze the impacts of EPA's action on species, unreasonably claiming it lacked sufficient information to conduct such analysis, despite having access to historical permitting and consultation data on Section 404 permits in Florida.[2]  Dkt. 98 at 39–41; Dkt. 104 at 27–30.  USFWS then opined that EPA's action would not jeopardize species or adversely modify or destroy critical habitat.  Dkt. 98 at 41.  What transpired here is therefore even more troubling than the events in *Gerber*, because USFWS allowed the regulated entities to commandeer the consultation almost entirely.

Additionally, on reply, the Defendants argue that Plaintiffs failed to point to sea turtle habitat that will be directly impacted by the state 404 program.  Dkt. 106 at 36.[3]  But this ignores the evidence Plaintiffs provided on light pollution and sedimentation impacts to nesting sea turtles.  Dkt. 98 at 41; Dkt. 104 at 29–30.  The Defendants offer no evidence to the contrary.

### B.      The ITS Unlawfully Authorizes Unlimited Incidental Take.

On reply, the Defendants throw new arguments at the wall to defend the ITS' broad grant of liability exemption for incidental take, but none stick.  Dkt. 106 at 36–42.  The Defendants' argument that annual State reports satisfy the requirement to set take limits, Dkt. 106 at 39, fails. Because USFWS did not establish any take limits (neither a numerical limit, e.g., x number of panthers injured or killed, or through use of a surrogate limit, e.g., using x acres of panther

---

[2] *See also* Letter from NMFS to Donald W. Kinard, USACE, at 1, 16–17, 24, 45, 48–52, 71–239, 268–72 (Nov. 20, 2017), https://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1383940/final-programmatic-biological-opinion-jaxbo (using historical 404 data for analysis).

[3] The Defendants also ignore that USFWS' lack of any analysis of nesting sea turtles both renders USFWS' BiOp invalid and demonstrates EPA's failure to consult.  *See* Dkt. 106 at 36.

habitat loss as a surrogate for take of panthers), the ITS provides no way to trigger reinitiation if the amount or extent of taking specified in the ITS is exceeded.  Dkt. 98 at 42–43; Dkt. 104 at 31–32.  No amount of "reporting" changes the fact that there is no take limit that USFWS and the public can use to determine when the authorized amount of take has been exceeded.  *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018); *Oceana Inc. v. Ross*, No. CV 15-0555, 2020 WL 5995125, at *13 (D.D.C. Oct. 9, 2020); *Nat. Res. Def. Council v. Evans*, 279 F. Supp. 2d 1129, 1182 (N.D. Cal. 2003).

The Defendants' argument that reinitiation based on newly listed species will not be required because the 404 program has already been transferred also lacks any merit.  Dkt. 106 at 40.  EPA and USFWS have ongoing duties to ensure compliance with the ESA where, as here, there is still discretionary federal involvement over the action.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a).  *See Ctr. for Biological Diversity v. EPA*, No. CV 22-486, 2023 WL 5035782, at *6–7, *10 (D.D.C. Aug. 8, 2023).  EPA retains discretionary authority over Florida's program, including through oversight, and thus must reinitiate consultation when a new species is listed.[4]

### C.     USFWS Violated the ESA by Relying Entirely on a Non-Statutory Technical Assistance Process Conducted at the Permit Level.

In a last-ditch effort to defend their reliance on the unlawful technical assistance process, the Defendants argue that the ESA's requirements for Section 7 consultations do not apply to *programmatic* consultation on EPA's decision to approve a state 404 program because *site-specific* consultation is not required for state-issued 404 permits.  Dkt. 106 at 44.  But this position would allow USFWS to evade compliance with the ESA altogether: first at the programmatic level and then at the permit level.  This would turn the ESA on its head.  Nor does

---

[4] This same argument would apply to all of the reinitiation requirements.  If that were the case, the ITS would truly operate as a blank check for incidental take under Florida's 404 program.

4

*National Association of Home Builders v. Defenders of Wildlife* require this result, as Defendants

now claim.  Rather, *Home Builders* held that EPA's approval of state Section 402 (NPDES)

programs is non-discretionary and therefore not subject to ESA consultation, whereas EPA has

conceded that its approval of state Section 404 programs is discretionary, and therefore requires

compliance with the ESA.  551 U.S. 644, 650, 669 (2007); EPA-HQ-OW-2018-0640-0660-A1.

In fact, the Ninth Circuit considered and rejected a similar argument in *Home Builders*,

where the defendants argued that even if programmatic consultation were required, the ESA did

not require that the BiOp evaluate impacts to species from EPA's approval of state 402 programs

because Congress decided not to require Section 7 consultation on state permits.  *Defs. of*

*Wildlife v. EPA*, 420 F.3d 946, 961 (9th Cir. 2005), *rev'd and remanded on other grounds Home*

*Builders*, 551 U.S. 644.  The court rejected this "nonsensical" argument, finding it incongruous

that Congress could have required EPA to consult on and exempt take from the transfer of a

Clean Water Act program to a state but not consider the impacts on species from that transfer,

including from state permits.  *Id.*[5]

The Defendants' theory would also mean that the ESA requires USFWS to comply with

the Section 7 consultation requirements only when a programmatic action also involves future

permit-level Section 7 consultations, but not when there are no further consultations (leading to a

---

[5] *Defenders of Wildlife* also held that neither a voluntary permit-level process, EPA oversight, or
the Section 9 take prohibition were substitutes for Section 7 consultation.  420 F.3d at 973–75.
The Supreme Court's subsequent decision did not address these issues.  Contrary to the
Defendants' claim, Dkt. 106 at 44, *Pacific Coast Federation of Fishermen's Associations v.*
*NMFS* held that an agency may not defer all ESA consultation to future site-specific
consultations; it did not cite *Defenders of Wildlife* to suggest that the *lack* of future consultation
would require a different result.  482 F. Supp. 2d 1248, 1267 & n.9 (W.D. Wash. 2007).

never-need-comply scenario).[6]  Moreover, if the ESA's requirements are to apply only once, it is even more essential that the agency comply with those requirements at the programmatic level.

On reply, the Defendants urge the Court to ignore *Conner v. Buford*'s germinal holding that USFWS must consider the impacts of an agency action as a whole, 848 F.2d 1441 (9th Cir. 1988), and that it should rely instead on dicta from *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106, 1118–23 (11th Cir. 2013).  But in *Defenders v. Navy*, the wildlife agency had, in fact, considered the whole action (both the installation and operation of a Naval undersea training range).  *Id.*  Although the court indicated that it was not adopting *Conner* because the ESA does not explicitly state that a BiOp must be coextensive in scope with the entire action, *id.* at 1121, the court did not address the ESA-mandated process by which USFWS must make jeopardy determinations, 16 U.S.C. § 1536(b)(3)(A), nor the ESA regulations that specifically require USFWS to consider the impacts of a programmatic action as a whole.  50 C.F.R. § 402.02; § 402.14(c)(4).[7]  84 Fed. Reg. 44,976, 44,996 (Aug. 27, 2019) (defining programmatic consultation and explaining that "all consultations" must "fully satisfy" the ESA).

Moreover, *Defenders v. Navy* is contrary to the law of this Circuit.  *North Slope Borough v. Andrus* created a default rule that programmatic consultations must consider all aspects of an agency action with a narrow exception for OCSLA leasing.  642 F.2d 589, 608 (D.C. Cir. 1980).  *Accord Conner*, 848 F.2d at 1455 (finding support in *North Slope*); *Nat'l Wildlife Fed'n v.*

---

[6] The Defendants also use this flawed reasoning in their attempt to distinguish the body of caselaw showing that programmatic BiOps must include the components laid out in the ESA and its implementing regulations.  Dkt. 106 at 44–45 & n.25.  For the same reason, that attempt fails.
[7] *Cooling Water* similarly ignores the language of the ESA and its implementing regulations, and that USFWS itself described the action as both the promulgation and implementation of the 316(b) rules in the BiOp and ITS.  *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 63, 73 n.15 (2d Cir. 2018).  FWS-006432, at FWS-006447–53; *id.* at FWS-006473; *id.* at FWS-006512.

*Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005) (requiring a programmatic consultation "as a

whole" for Corps nationwide 404 permit). The Eleventh Circuit's dicta is therefore neither

governing nor persuasive, and USFWS was required to consider the agency action as a whole.

     **D.**    ***Cooling Water* is Not Persuasive Authority.**

    The Defendants do not dispute that the out-of-circuit decision in *Cooling Water Intake*

*Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), stands alone in a sea of contrary

authority, including from this Circuit. Dkt. 98 at 49–51 & n.21; Dkt. 104 at 46–49. Instead, they

assert that *Cooling Water* is persuasive authority. Dkt. 106 at 28 (citing *Butler v. Enterprise*

*Integration Corporation*, 459 F. Supp. 3d 78, 106 (D.D.C. 2020)). However, *Butler* explains that

out-of-circuit authority may be persuasive where "[c]ourts in this Circuit have had little occasion

to interpret the statute." 459 F. Supp. 3d at 105. That is not the case here. The D.C. Circuit has

had many occasions to interpret the ESA and has held that wildlife agencies must evaluate all

aspects of a programmatic agency action (including its implementation) at the programmatic

level. *See North Slope*, 642 F.2d at 608; *Brownlee*, 402 F. Supp. 2d at 10;[8] *Conner*, 848 F.2d at

1455 (relying on *North Slope*). *Cooling Water* is therefore both contrary to the law of this

Circuit and not persuasive authority. Dkt. 98 at 49–51 & n.21; Dkt. 104 at 46–49.

**II.**    **EPA's Reliance on the BiOp Was Unlawful.**

    Contrary to the Defendants' misleading assertions on reply, Dkt. 106 at 46–47, Plaintiffs

addressed the caselaw governing EPA's unlawful reliance on the BiOp and provided ample

supporting authority for the standard that should apply to this claim. Dkt. 98 at 51–52; Dkt. 104

at 49–51. Plaintiffs also discussed (with supporting authority) the rationale behind the "new

---

[8] Contrary to the Defendants' arguments that initiating programmatic consultation somehow
satisfies *Brownlee*, Dkt. 106 at 42–43 n.22, that case holds that punting analysis to the site-
specific level cannot stand in for *adequate* programmatic consultation.

information" standard, namely how it applies to factual disputes revolving over what information the agency considered in reaching a determination, rather than facial challenges to the legal approach taken in a BiOp, as is at issue here.[9] Dkt. 98 at 51 & n.24; Dkt. 104 at 49–50 & n.25.

While the Defendants point to language in *City of Tacoma v. FERC* stating that the court's inquiry should focus on the action agency's reliance and not on whether the BiOp is flawed, Dkt. 106 at 46–47, the court also acknowledged that "the two inquiries overlap to some extent, because reliance on a facially flawed BiOp would likely be arbitrary and capricious." 460 F.3d 53, 75 (D.C. Cir. 2006). Indeed, the most recent Ninth Circuit decision cited in *City of Tacoma* in support of the "new information" standard explained that it applies to cases involving "factual objections" to a BiOp rather than when a BiOp's "flaws are legal in nature." *Defs. of Wildlife v. EPA*, 420 F.3d at 976. *Defenders of Wildlife v. EPA* even held that the action agency's reliance was arbitrary regardless of there being new information because the BiOp's analysis had legal errors.[10] *Id.* at 962–63, 971, 976 (BiOp failed to consider harm from the loss of ESA Section 7 consultations on future projects being permitted by the state after transfer of federal Clean Water Act program). The court explained that these legal flaws require no "technical or scientific expertise" by the action agency and thus do not undermine the notion that action agencies should be able to rely on expert judgments. *Id.* at 976. The D.C. Circuit followed this same logic in *Shafer* where it applied the new information standard for factual disputes, but not for flaws that are legal in nature. *Shafer*, 992 F.3d at 1096; Dkt. 104 at 50.

_____

[9] While the Defendants disagree over which holding is relevant in *Shafer & Freeman Lakes Environmental Conservation Corp. v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021), Plaintiffs did not "skip" a holding; rather they explained fully the only holding relevant here. Dkt. 98 at 51 & n.24; Dkt. 104 at 49–50 & n.25.

[10] The court explicitly makes this finding and then goes on to say even if new information were required it was provided. *Defs. of Wildlife v. EPA*, 420 F.3d at 976.

III.   **EPA Violated the Clean Water Act by Approving a State 404 Program that is Less Stringent than Federal Law.**

As Plaintiffs have shown, EPA's decision to approve a less stringent state 404 program violated the Clean Water Act.  Dkt. 98 at 55–70; Dkt. 104 at 53–86.  Although the Defendants' reply introduces new arguments seeking to defend EPA's unlawful actions, they too fail.

A.   **State 404 Programs Must Be "As Stringent" As Federal Law, Including As to Criminal Intent and Statutes of Limitations.**

The Defendants claim that there is no "free-floating stringency test" or "generally applicable stringency requirement" for state 404 programs.  Dkt. 106 at 18 & n.5.  And so, the Defendants argue, there was no requirement for Florida's criminal enforcement program to be as stringent as the Clean Water Act.  But the Clean Water Act sets the floor for state programs, and EPA itself promulgated the "free-floating stringency requirement" it now claims does not exist.  40 C.F.R. § 233.1(d) (state 404 program "may not impose *any* less stringent requirements for *any* purpose" (emphasis added)).  *Accord* 53 Fed. Reg. 20,764, at 20,766 (June 6, 1988) ("A State's [404] program must be at least as stringent and extensive as the Federal program.").  By excluding an entire class of criminal violations from criminal liability, and providing shorter statutes of limitation, Florida's criminal enforcement program is less stringent than federal law.

Next, the Defendants raise a novel argument that the criminal intents set forth in Section 1319 are not elements of a criminal offense and only determine penalties for those offenses.  Dkt. 106 at 17.  But it is blackletter law that criminal intent is an element of a criminal offense.  *See, e.g.*, *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) (describing intent as an element of the government's burden of proof to establish a violation under Section 1319).

The Defendants claim that the violations a state must be able to "abate" are not contained in Section 1319 and are instead defined "elsewhere" in the Act.  Dkt. 106 at 17.  But for this proposition, they point to Section 1311(a), which prohibits only the unauthorized discharge of a

9

JA.1049

pollutant, and then right back again to Section 1319(c)(1)(A) itself, which addresses permit violations (e.g., non-discharge violations, such as those related to incidental take or failure to provide mitigation). At most, then, Defendants' citation to Section 1311(a) merely identifies *another* place in the statute that defines a type of violation that states must abate. Notably, Section 1311, like Section 1319, is not specifically enumerated in Section 1344. Under the Defendants' specific enumeration theory, then, neither Section 1311 nor Section 1319—nor any other provision of law—would identify the violations of the Act that states are required to be able to abate in order to assume Section 404. Plainly this could not have been Congress's intent.

The Defendants concede, as they must, that simple negligence violations constitute criminal violations under the Clean Water Act but claim that because EPA retains the authority to prosecute those violations, the states need not have that authority. However, Section 1344(h)(1)(G) explicitly requires that *states* show they have authority "[t]o abate violations of the permit or the permit program, including civil *and* criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G) (emphasis added). EPA has consistently made clear that state programs must meet minimum enforcement criteria precisely so that EPA will not be "forced to take its own enforcement action." 45 Fed. Reg. 33,290, 33,382 (May 19, 1980); 53 Fed. Reg. at 20,771 ("We are interested in ensuring that State programs have strong enforcement capability, since it is not desirable for EPA to constantly overfile in State enforcement actions); *id.* (states "are expected to assume primary responsibility"). EPA's regulations have consistently required that state programs not impose a higher burden of proof as to criminal intent than that required of EPA under the Act. 40 C.F.R. § 233.41(b)(2).

### B.    The State 404 Program's "Reasonable Assurances" Regime is Less Stringent.

On reply, the Defendants rely on *post-hoc* rationales to defend the adequacy of Florida's "reasonable assurances" approach to permitting. They claim they may do so because EPA's

response at the time was "proportional" to Plaintiffs' raising of this issue during public comment, but cite no proportionality doctrine that would allow an agency to rely on *post-hoc* rationales to defend its action.  Dkt. 106 at 12–16.  Regardless, Plaintiffs argued in comment that Florida's program was inadequate because it "only places obligations on permit applicants to provide 'reasonable assurances'" about their project's impacts, while the federal guidelines "obligate the permitting authority to make those factual findings, rather than relying whole cloth on assurances submitted by permit applicants."  EPA-HQ-OW-2018-0640-0386-A1, at 23 (Plaintiffs' Comments).  That is the very same argument Plaintiffs have made here.  Dkt. 98 at 61–64; Dkt. 104 at 69–73.  Therefore, Plaintiffs clearly stated their position to EPA, and EPA's decision must be upheld, if at all, on the basis articulated for its position at the time.  *CTS Corps. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014).[11]  At the time, however, the agency only stated that it "disagreed" with Plaintiffs' objection, with no explanation as to why.  EPA-HQ-OW-2018-0640-0568, at 27.

Now the Defendants ask the Court to uphold EPA's decision because: (1) the State program involves documentation; and (2) the Corps' program also relies on applicant-submitted information.  Dkt. 106 at 14–16.  But neither rationale supports the agency's action either.  That the State writes down *whether an applicant has provided reasonable assurances* that its project complies with the law does not alter the fact that the State is not required to independently evaluate the applicant's information and make its own factual findings as to the 404(b)(1) permit requirements.  By contrast, the Corps may rely on applicant information, but must independently evaluate that information to make its own findings.[12]  The Defendants' attempt to conflate

---

[11] That Plaintiffs have cited additional authority in briefing is not remarkable.  It does not mean they failed to adequately raise the issue with EPA or that EPA may rely on *post-hoc* rationales.
[12] Because the Defendants conflate independent review—assessing applicant information to determine whether a permit application would comply with the 404(b)(1) Guidelines, *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 507 (4th Cir. 2023)—with independent

independent investigation (i.e., performing a completely independent study, which is not required) with independent verification (i.e., making an independent assessment of the information provided, which is required) fails.

On reply, the Defendants also try to characterize *Defenders of Crooked Lake, Inc., v. FDEP* as showing that the State develops analyses to support its permit decisions, Dkt. 106 at 15–16, but the decision makes no reference to any independent analyses by the State.  No. 17-5328, 2018 WL 3387900, at \*2–5 (Fla. Div. Admin. Hrgs., May 7, 2018) (identifying FDEP's exhibits as only the permit application, requests for information, the original and amended notice of intent to issue the permit).  Moreover, FDEP's testimony showed that the agency asked only if the project met the statutory criteria, *id.* at \*5, and those criteria ask only whether an applicant has provided "reasonable assurances" as to impacts including to fish and wildlife.  Fla. Admin. Code R. 62-330.301.  The statutory criteria do not require the State to independently assess and make findings as to those same impacts, which is the crux of the issue here.[13]  Federal law requires the permitting authority to assess and evaluate applicant-provided information to reach its own conclusions as to permit impacts, while Florida law does not.

**C.    The Defendants' Belated Attempts to Salvage the Corps' Retained Waters List As Reasonable Fail.**

The Defendants' assertion on reply that Plaintiffs have not "identified any flaws" in the retained waters list, Dkt. 106 at 27 & n.11, is flat wrong.  Among other things, Plaintiffs identified flaws in the 2014 Section 10 list, urged the Corps to include waters from the 2017 list,

---

investigation, their reliance on *Crutchfied v. County of Hanover*, 325 F.3d 211, 223–24 (4th Cir. 2003), and *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–36 (9th Cir. 1986), is misplaced. Dkt. 106 at 14–15.  Both cases show that the Corps must independently verify, assess, and analyze applicant information, something that the State program does not require.

[13] Moreover, contrary to the Defendants' statement, Dkt. 106 at 16, Plaintiffs provided reasons for why de novo administrative review is an inadequate replacement for the State conducting this independent evaluation.  Dkt. 104 at 73 n.43, 96–97.

and identified waterways *not on either list* that should be retained.  *See, e.g.*, CORPS003900;

CORPS003850; CORPS004085.  Plaintiffs identified flaws again during EPA's comment period

on Florida's application.  EPA-HQ-OW-2018-0640-0386-A-1, at 2, 3, 7–9, 20, 49–50.

Plaintiffs have also identified as flaws the retained waters list's failure to include historic

use RHA Section 10 waters and Clean Water Act TNWs.[14]  *See* Dkt. 98 at 24–27; Dkt. 98-11,

98-12, 98-13; Dkt. 104 at 74–86.  The examples the Defendants cite on reply, Dkt. 106 at 24–25

& n.8, only bolster Plaintiffs' position.  In *The Daniel Ball*, the Supreme Court defined navigable

waters using virtually identical language to the language Congress used to define retained

waters: waters that are used, or are *susceptible to use in their natural condition,* for interstate

commerce.  77 U.S. (10 Wall.) 557, 563 (1870).  In *Economy Light & Power Co. v. United

States*, 256 U.S. 113, 123 (1921), the Court interpreted the *Daniel Ball* test as including waters

used for commerce in the past.  The principal difference between the scope of the RHA and the

Clean Water Act is that *commerce* has been construed narrowly under the former (continuous

highway for commerce over waters) and broadly under the latter (to reach other forms of

commerce).  And that is why the Great Salt Lake is covered by the Clean Water Act, but not the

RHA.  *See* Dkt. 106 at 24 n.8.  Since the retained waters provision appears in the Clean Water

Act, the term "commerce" in that provision must be given its meaning under that statute.  Thus,

retained waters encompass both TNWs under the Clean Water Act, 33 C.F.R. § 328.3(a)(1), and

all waters under the RHA, *id.* § 329.4, including historic use.  *See also* H.R. Conf. Rep. 95-830 at

104 (1977) (Corps to retain 404 jurisdiction over traditionally navigable waters).

---

[14] Plaintiffs use "TNWs" as shorthand for those waters under the Clean Water Act, as defined in
33 C.F.R. § 328.3(a)(1).

On reply, the Defendants also claim that the Corps never had a position on assumable waters that it later changed.  Dkt. 106 at 24–26.  The Defendants' belated denial, however, is belied by the record and the Defendants' Cross-Motion.  *See* CORPS002993, at CORPS002999, CORPS003021–22 (describing Corps' position that it retains jurisdiction over Section 10 waters and TNWs, referring to the latter as "CWA (a)(1) TNWs;" narrower reading of retained waters "would not take into consideration the evolution of the USACE Regulatory Program since 1977"); Dkt. 99 at 27–28 (in 2017, Corps initiated process to determine scope of retained waters in Florida, including Section 10 waters under RHA and TNWs under the Clean Water Act; acknowledging that the Corps took a contrary position in 2018).  The Corps' statement about its position is followed by the Corps' explanation of its position *on retained waters*, which is that a narrow reading would not take into account the evolution of the Corps' program over more than 40 years and would result in confusion to the public.

It is therefore the Defendants that have taken the Corps' words out of context by arguing that the Corps' reference to "this position" in the Subcommittee Report related to the Corps' position on navigability.  *See* Dkt. 106 at 25.  Indeed, the Subcommittee's purpose was to address the scope of retained waters, not to exchange views on navigability.  And the Corps explained why it would not take a narrow reading of *retained waters*, not navigability.  The Corps did not claim that its position was *based on* the post-*Rapanos* guidance (as Defendants now suggest), but only that it had taken this position *since* the issuance of that guidance.  And even if the Corps had not taken a position on retained waters *before* the Subcommittee Report, it is plain that the Corps took a position as of that Report, acted on that position in 2017–18, and

14

then reversed course in July 2018.[15]  The Court should not defer to the Corps' about-face without an acknowledgement of the change and an adequate, reasoned justification for it.

In tacit recognition of the arbitrariness of the Corps' actions, the Defendants now also claim that the Corps considered the 2017 update to the navigable waters list, and even public comments, in developing Florida's retained waters list.  Dkt. 106 at 26–27.  But the Defendants' opening brief stated only (and often) that the Corps used the 2014 list, Dkt. 99 at 29, 59–60, 62, and "refined" that list only to remove duplicates and "historic use waters," *id.* at 29.  The Defendants cite no evidence to show that the Corps actually considered the waterbodies on the 2017 list or those the public identified through public comment as waters that should be retained.

The Defendants cite no authority to support the claim that the mere presence of the 2017 list and public comments in the administrative record is sufficient to demonstrate that the agency considered the waterbodies on that list and in those comments.  Dkt. 106 at 27.  And they cite no evidence to show that the Corps made reasoned judgments about the "more than double" number of waterbodies on the 2017 list (or any of those identified by the public), Dkt. 99 at 61, as compared to the 2014 list.  Indeed, the evidence—and the Defendants' own statements in this litigation—demonstrate that the Corps did not.  *See* Dkt. 99 at 61–62 (stating that identifying all retained waters added to the 2017 list would have been "time-consuming and, likely, contentious," and so the Corps "relied instead on the 2014 Section 10 List.").[16]

---

[15] That the Report framed the Corps' position as a "recommendation" is of no moment, given that the purpose of the Report was to advise *EPA* of what position *EPA* should take.  It does not defeat the fact that the Corps had a position when it served on the subcommittee.

[16] Even if the Court were to find that retained waters are comprised only of Section 10 waters, the Corps' action would have been unreasonable because the record shows that the Corps knew the 2014 Section 10 List was out of date, had navigability studies nearing completion, and considered it "absolutely imperative" that the list be updated.  Dkt. 104 at 80–81.  The Defendants' claim that the Corps did not publish the 2017 list to its public website, Dkt. 106 at 26 & n.10, presumably in support of their argument that the update was merely a draft that could

15

## IV.    Plaintiffs Have Standing.

Florida's final arguments challenging Plaintiffs' standing are also unavailing.  The Court earlier found that Plaintiffs are harmed by the loss of information provided through NEPA review and ESA consultation.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 174, 202–03, 207 (D.D.C. 2022); *see also* Dkt. 98 at 78–79; Dkt. 104 at 90–95; Dkt. 31 at 45–46; Dkt. 43 at 67–74.[17]  Contrary to Florida's claim, the Court applied the summary judgment standard, not the more lenient motion to dismiss standard.  597 F. Supp. 3d at 203, 207.

The Court also previously found that no one had disputed that NEPA review is lost after transfer or that NEPA review would not be available for all (or even most) projects of concern.  *Id.* at 203.  On reply, Florida claims that Plaintiffs' standing turns on whether one of the many projects that Plaintiffs identified would require an EA versus an EIS.  Dkt. 107 at 13–14.  That assertion is wrong on the law and misleading.  It remains undisputed that Troyer Mine would require *NEPA review*, which would generate a document that provides the agency's independent assessment of the project's impacts.  When the Corps considered Troyer Mine along with two other projects, it decided to prepare the more comprehensive EIS.  Dkt. 31-1 at 240.  When the other two projects were withdrawn, the Corps opted to begin with an EA first to determine if an EIS would still be necessary.  *Id.*  And it likely would, given that the two other projects have now been re-submitted for similar state 404 permits, a fact Mr. Wolfe fails to mention.  Dkt. 31-1 at 235–42 (Crooks Dec. Ex. P); Dkt. 98-1 at 12–13, 26–28 (Crooks Dec. ¶¶ 35, 82–83, 84(b)).

be disregarded by the agency, conflicts with their prior statements.  Dkt. 99 at 27.  In fact, Plaintiffs accessed (and could only have accessed) the 2017 list via the Corps' public website when they urged the Corps to use that list in developing the retained waters list.  The 2018 email attached as an exhibit conclusively demonstrates that the Corps published the 2017 list to its website and was proceeding with a navigability assessment consistent with its prior position.

[17] Florida's suggestion that this type of information loss is not cognizable because it does not involve "disclosure of private information" is unsupported and contrary to authority.

Florida's suggestion that new page limits for EISs and EAs (excluding appendices) defeat Plaintiffs' information loss fails, because it assumes agencies would meet these requirements by failing to produce the analyses required by NEPA. Dkt. 107 at 16. Florida's argument that agencies will now be able to rely on materials prepared by others rather than produce their own independent documents also fails. Agencies have long been permitted to rely on outside information so long as their independent analyses comply with NEPA. That has not changed. *See* 88 Fed. Reg. 49,924–25 (July 31, 2023) (amendments are "codifying existing practice with a few minor adjustments"). Florida's bald claim that the Supreme Court's decision in *Sackett*[18] has somehow eliminated Plaintiffs' harm, Dkt. 107 at 16, is not supported by any evidence.

In his supplemental declaration, Mr. Wolfe seeks to dispute Plaintiffs' information loss but relies on the same materials previously submitted to the Court and found lacking.[19] He fails to identify where in the state system comparable information might be located (because it does not exist), and instead points to the availability of state "permit records." Dkt. 107-1 at 4 (Wolfe Supp. Dec. ¶ 10). But Mr. Wolfe describes those records as nothing more than applicant-provided information and the final permit decision. *Id.* His insinuation that BiOps are *only* made publicly available "long after" the federal permit process is completed, *id.* at 4–5 (Wolfe Supp. Dec. ¶¶ 11–12), ignores that BiOps are often made public during the permitting process via the Corps' NEPA document. *See, e.g.*, *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 174 (D.D.C. 2004). It remains uncontested that Plaintiffs use BiOps both *during* the permitting process (for education and advocacy) as well *after* permits issue (for education, advocacy,

---

[18] EPA and the Corps are actively working on what this decision means and how to implement that decision using the framework set out by the Biden WOTUS rule.

[19] Contrary to Florida's suggestion, the Court clearly considered those materials when they were submitted. *Regan*, 597 F. Supp. 3d at 185 (citing Dkts. 70–72).

17

litigation, and tracking take of ESA species).  *See, e.g.*, Dkt. 98-1 at 3–4, 8, 9–10, 12–14 (Crooks

Dec. ¶¶ 13, 26, 28–29, 34–36, 39); Dkt. 104-1 at 2–5 (Crooks Supp. Dec. ¶¶ 5–8).

      On reply, Florida disputes that Plaintiffs are also harmed because permit challenges in

state court would be far more costly than in federal court.  Dkt. 107 at 19 (claiming Plaintiffs are

not injured because they hire experts to comment on permit applications).[20]  But it remains

undisputed that the cost to *challenge* a permit in a de novo administrative trial is higher (which

would require not only investigation, but also expert reports, depositions, and trial testimony),

and often prohibitive, to the Plaintiffs.  Dkt. 98 at 78–79 (citing declarations); Dkt. 104 at 95–99.

      Florida exaggerates the events that must occur before Plaintiffs would, in Florida's view,

suffer harm, relying on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).  Dkt. 107 at

21–22.  But there is no comparison.  In *Clapper*, the plaintiffs had no relevant evidence of prior

harm.  568 U.S. at 412–13.  Here, Florida has already issued permits that adversely affect

Plaintiffs.  In *Clapper*, the plaintiffs speculated that the Government would specifically target

their communications.  *Id.*  Here, Florida is actively considering permits that threaten Plaintiffs'

interests.  In *Clapper*, judges would have to find the feared surveillance lawful.  *Id.*  Here, even if

EPA could object to a permit, the agency is defending the very legal regime causing Plaintiffs'

harms.  It is unreasonable to posit that EPA would object when it avers the program is unlawful.

      As to standing to challenge Florida's inadequate criminal enforcement scheme, Florida's

belated claim that *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013), and *Mozilla

Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), are "of no relevance," Dkt. 107 at 24–25, fails.  Both

cases held that a plaintiff has standing to challenge an agency's action so long as the action

---

[20] Mr. Wolfe's attempt to rebut Plaintiffs' fee shifting arguments, Dkt. 107-1 at 9 (Wolfe Supp. Dec. ¶ 23), also fails.  Plaintiffs' example related to a case without FDEP as a party, but the same fee-shifting provisions would apply to cases involving FDEP and serve as a strong deterrent.

injures the plaintiff; the plaintiff need not be harmed by each of the action's deficiencies.  Dkt. 104 at 101–102.  That *WildEarth* involved a procedural injury has no bearing on this principle, and Florida fails to articulate how it would.  Florida claims that *Mozilla* is "inapposite" because the rule at issue there would have injured petitioners by requiring them to affirmatively provide public disclosures, whereas the rule here does not require specific actions of the Plaintiffs.  Dkt. 107 at 24–25.  But the court's holding was that a party can challenge the essential elements of a rule, even if those elements are *not* directly linked to the party's injuries.  940 F.3d at 46–47.  A plaintiff need only show that they are harmed by the rule.  There, as here, "if Petitioners' objections carry the day, the rule will be struck down and their injury redressed."  *Id.*

Florida's suggestion that EPA's "independent enforcement authority" means that Plaintiffs are not injured, Dkt. 107 at 23–24, also misses the mark.  It is undisputed that in an assumed program the state takes primary enforcement responsibility.  If it were sufficient to rely on EPA's supplemental authority, Congress would not have required states to demonstrate that *they* have the capacity to abate criminal violations of the Act.  It is also undisputed that EPA does not even review every state 404 permit and has waived review of entire categories of permits.  *See* Dkt. 104 at 103, 106 n.69.  How would it then go about enforcing those permits?[21] Florida's hail Mary reference to a U.S. Department of Justice manual only confirms that EPA's enforcement role is narrow.  Dkt. 107 at 23–24 (federal proceedings may be initiated if *pending* state environmental enforcement actions appear inadequate to protect federal interests).

## V.     Plaintiffs' Claims are Ripe.

Finally, as to ripeness, Florida's claim that Plaintiffs have failed to specify how they would be harmed by the ITS fails.  Dkt. 107 at 25–28.  Plaintiffs identified two projects Florida

---

[21] That EPA may "request" information not otherwise provided to it in the ordinary course of program administration, Dkt. 107 at 23 n.15, does not change this.

has already permitted where the record showed that take was likely but the permit set no take limit.  Dkt. 98-1 at 9–12 (Crooks ¶¶ 28–33).  Florida's claim also ignores all the other projects Plaintiffs have identified that threaten listed species and their habitats, such as Troyer Mine, Bellmar, and Immokalee Road Rural Village.  Dkt. 98 at 78–80 (citing declarations).

Also, contrary to Florida's reply, Plaintiffs have not argued that their retained waters claim falls into an exception to the ripeness doctrine.  *Contra* Dkt. 107 at 29.  Far from an exception or "carve-out," Plaintiffs directly addressed why their claims against two final agency actions—the Corps' retained waters list and EPA's approval of Florida's program based on the retained waters list—could not be any riper than they are now.[22]

Florida's attempt to diminish the relevance of *Menominee* and *Coalition to Save Menominee River* on the basis that Michigan's retained waters list and coordination process with the Corps are not before the Court, Dkt. 107 at 29–30, is a red herring.  Any difference between the states' coordination processes is irrelevant to whether a retained waters list constitutes a final agency action and when a challenge to that list becomes ripe.  Dkt. 104 at 112–113.  There, as here, the allocation of jurisdiction between the Corps and the State does not change unless and until proposed changes are approved by EPA.[23]  *Menominee Indian Tribe of Wisc. v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020); *Coal. to Save Menominee River Inc. v. EPA*, 423 F. Supp. 3d 560, 567 (E.D. Wis. 2019).  Any discussion about specific projects does not change this.

---

[22] Nor does *Ohio Forestry Association, Inc. v. Sierra Club* support Florida's position.  523 U.S. 726, 733–36 (1998) (finding unripe a challenge to an unimplemented forest plan that was merely a "tool[] for agency planning" and could be modified prior to implementation).

[23] While acknowledging that the court found Michigan's retained waters list was a final agency action, Dkt. 107 at 29, Florida ignores that the MOA here does not create a different mechanism to modify the retained waters list.  Coordination to determine whether projects fall "inside or outside of 'retained waters'" to determine which agency processes the permit, Dkt. 107 at 30; Dkt. 102 at 58, is application of the retained waters list, not a modification of it.

Dated: October 12, 2023

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing under LCvR 83.2(c)(1))

JA.1061

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October 2023, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**PLAINTIFFS' NOTICE OF FILING
ADDITION TO SUPPLEMENTAL JOINT APPENDIX**

Plaintiffs, by and through undersigned counsel, respectfully submit the document identified

as FWS-006639 in Plaintiffs' Consolidated Reply in Support of Plaintiffs' Motion for Summary

Judgment, *see* Dkt. 104 at 35 n.13, which was inadvertently omitted from the parties'

Supplemental Joint Appendix.  Also, the "JAXBO" (shorthand for Jacksonville District

Biological Opinion), which Plaintiffs cited in briefing and referenced during yesterday's hearing,

is available at http://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577,

*see* Dkt. 104 at 41 n.19.

Dated: October 20, 2023

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432

1

F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing *pro hac vice*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of October 2023 I electronically filed the foregoing

document and attachment using the CM/ECF system.  Service was accomplished by the

CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

JA.1065

# Attachment 1

Case 1:21-cv-00119-RDM   Document 127-2   Filed 10/26/23   Page 2 of 3
USCA Case #24-5101   Document #2102930   Filed: 02/26/2025   Page 235 of 358
*CBD v. EPA*, No. 1:21-cv-00119 (RDM)

# Plaintiffs' Claims Are Not Justiciable

| | Claim | No Informational Injury | No Substantive Injury | Not Ripe/Not Final |
|---|---|:---:|:---:|:---:|
| 1 | EPA complete application finding violates CWA/APA | ✓ | ✓ | ✓ |
| 2 | EPA approval of FL's program violates CWA/APA | ✓ | ✓<br>*Crow Creek, Waterkeeper Alliance* | |
| 3 | FWS BiOp + "No Jeopardy" violate ESA/APA | ✓ | * | ✓ |
| 4 | FWS BiOp + Incidental Take Statement violate ESA/APA | ✓ | * | ✓ |
| 5 | EPA "No Effect" for NMFS species violates CWA/APA | ✓ | * | ✓ |
| 6 | FWS Incidental Take "scheme" violates APA | ✓ | * | *Arguably not ripe* |
| 7 | Corps "Retained Waters List" violates RHA/APA | ✓ | * | ✓ |
| 10 | EPA use of Programmatic BiOp violates ESA | ✓ | * | *Arguably not ripe* |
| 11 | EPA failed to consult w/ NMFS | ✓ | * | ✓ |
| 12 | EPA failed to consult w/ FWS (sea turtles) | ✓ | * | ✓ |
| 13 | FWS "Technical Assistance Process" is ultra vires | ✓ | * | *Arguably not ripe* |

\* - Plaintiffs do not prove/rely on substantive injuries.

JA.1067

# Plaintiffs' Aesthetic and Recreational Injuries Are Speculative

Under *Clapper, n*o injury to Plaintiffs *unless* all "dominos" fall. (FL Br., Dkt. 101 at 45; FL Reply Br., Dkt. 107 at 21-22)













FDEP proposes to issue 404 permit that would harm Pls, and Pls submit comments.

EPA fails to convince FDEP to resolve the issue, and EPA neither objects to nor federalizes the permit.

FDEP proceeds to issue the permit without correcting concerns submitted in the public comment process.

Pls file administrative challenge (automatically forestalls final agency action).  FL admin hr'g and judicial review results in no changes to project.

Project proceeds in a manner that actually harms Pls' cognizable interests.

JA.1068

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
et al.,

       Plaintiffs,

       v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

       Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION BY PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY AND SIERRA CLUB

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ............................................................................................... 1

LEGAL FRAMEWORK ..................................................................................... 3

FACTUAL BACKGROUND ............................................................................... 4

   I.   The Permits at Issue Will Harm the Florida Panther. ............................... 6

      A.  The Florida Panther is Critically Endangered. .................................. 6

      B.  The Permits at Issue Will Destroy Panther Habitat and Take Panthers. ................... 9

   II.   The Permits at Issue Will Harm Florida's Crested Caracara ........................... 12

      A.  Habitat Loss Threatens Florida's Threatened Crested Caracara. ..................... 12

      B.  The Permits at Issue Will Destroy Caracara Habitat and Result in Loss of Reproductive Success. ............. 14

STANDARD OF REVIEW .................................................................................. 15

ARGUMENT .................................................................................................... 16

   I.   Plaintiffs are Likely to Succeed on the Merits. ....................................... 17

   II.   Absent Immediate and Preliminary Relief, Plaintiffs will Suffer Irreparable Harm. ........ 19

      A.  USFWS' Technical Assistance Fails to Adequately Protect ESA Species and Does Not Produce Biological Opinions Clearly Reviewable in Federal Court. ................... 19

      B.  The Projects Will Irreparably Harm Panthers and Plaintiffs' Members. ................ 26

      C.  The Projects Will Irreparably Harm Caracara and Plaintiffs' Members. ............... 31

   III.  The Balance of Equities and the Public Interest Favor Preliminary Relief. ............... 32

   IV.  Preliminary Relief Should Issue Without Bond. ....................................... 35

CONCLUSION .................................................................................................. 36

JA.1070

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Aamer v. Obama*,
   742 F. 3d 1023 (D.C. Cir. 2014) ...........................................................................35

\*   *Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ............................................................ *passim*

\*   *Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)..............................................................................27, 32

*Angelo v. D.C.*,
   648 F. Supp. 3d 116 (D.D.C. 2022) ......................................................................15

*Bennett v. Spear*,
   520 U.S. 154 (1997)............................................................................4, 18, 25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1, 26 (D.D.C. 2009)....................................................................34

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*,
   No. 95-CV-1702, 1995 WL 748246 (D.D.C. 1995) ..............................................34

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ............................................................................15

*Defs. of Wildlife v. Bernal*,
   204 F.3d 920 (9th Cir. 1999) ................................................................................26

*Earth First v. Block*,
   569 F. Supp. 415 (D. Or. 1983) ...........................................................................28

*Fed. Maritime Comm'n v. City of L.A.*,
   607 F. Supp. 2d 192 (D.D.C. 2009) .....................................................................32

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
   636 F.2d 755 (D.C. Cir. 1980) ..............................................................................35

\*   *Fund for Animals v. Clark*,
   27 F. Supp. 2d 8 (D.D.C. 1998) ....................................................................29, 32

\*   *Fund for Animals v. Espy*,
   814 F. Supp. 142 (D.D.C. 1993) ....................................................................30, 34

*Humane Soc'y of the U.S. v. Kempthorne*,
   481 F. Supp. 2d 53 (D.D.C. 2006) ..................................................................27, 34

*Isbrandtsen Co. v. United States*,
   211 F.2d 51 (D.C. Cir. 1954).................................................................................15

\*    *League of Women Voters of the U.S. v. Newby*,
   838 F. 3d 1 (D.C. Cir. 2016).......................................................................15, 35

*Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*,
   702 So.2d 1352 (Fla. 1st Dist. Ct. App. 1997).......................................................25

*Mcclash v. Manasota-88, Inc.*,
   No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hearings June 25, 2015) .......25

*Morgan Stanley DW, Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001)..........................................................................15

\*    *Nat. Res. Def. Council, Inc. v. Morton*,
   337 F. Supp. 167 (D.D.C. 1971).............................................................................36

\*    *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
   628 F.2d 604 (D.C. Cir. 1980)................................................................................33

\*    *Nat'l Audubon Soc. v. Butler*,
   160 F. Supp. 2d 1180 (W.D. Wash. 2001)..............................................................28

*Nat'l Wildlife Fed'n v. Andrus*,
   440 F. Supp. 1245 (D.D.C. 1977)..........................................................................34

\*    *Nat'l Wildlife Fed'n v. Burford*,
   835 F.2d 305 (D.C. Cir. 1987)...............................................................................28

\*    *Nat'l Wildlife Fed'n v. NMFS*,
   886 F.3d 803 (9th Cir. 2018) ..........................................................................16, 30

*S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*,
   588 F.3d 718 (9th Cir. 2009) ................................................................................33

*Safari Club Int'l v. Jewell*,
   960 F. Supp. 2d 17 (D.D.C. 2013)...........................................................................3

*Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*,
   628 F. Supp. 1438 (D.D.C. 1986)..........................................................................15

*Sutton Invs. LLC v. Perlmutter*,
   No. 1:21-CV-3226, 2021 WL 6062635 (D.D.C. Dec. 22, 2021).............................35

\*    *Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978)...........................................................................3, 33, 34, 35

JA.1072

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
 103 F. Supp. 3d 133 (D.D.C. 2015) .................................................15

*Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*,
 766 F.2d 1319 (9th Cir. 1985) .......................................................35

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982) .......................................................................34

*Winter v. Nat. Res. Def. Council, Inc.*,
 129 S. Ct. 365 (2008) .....................................................................15

**Federal Statutes**

16 U.S.C. § 1536(a)(2) ...........................................................3, 4, 20

16 U.S.C. § 1536(b)(3)(A) ...........................................................3, 20

16 U.S.C. § 1536(b)(4) .....................................................................3

16 U.S.C. § 1536(o) .........................................................................24

33 U.S.C. § 1344(h)(1)(a)(i) .............................................................4

16 U.S.C. § 1536 ...............................................................................3

**Code of Federal Regulations**

50 C.F.R. § 402.02 ...........................................................20, 22, 24

50 C.F.R. § 402.13 ............................................................................3

50 C.F.R. § 402.14 ............................................................................3

50 C.F.R. § 402.14(i) .................................................................3, 20

50 C.F.R. § 402.14(i)(3) ...................................................................4

50 C.F.R. § 402.14(4) .......................................................................4

50 C.F.R. § 402.14(g) ................................................................3, 20

50 C.F.R. § 402.14(g)(3) .................................................................22

50 C.F.R. § 402.14(g)(7) ...................................................................3

50 C.F.R. § 402.14(g)(8) .................................................................22

50 C.F.R. § 402.14(h) ................................................................3, 20

JA.1073

50 C.F.R. § 402.14(h)(1)(iii)...................................................................................22

50 C.F.R. § 402.16(a)..............................................................................................4

**State Statutes**

Fla. Stat. §120.57(k)...............................................................................................25

Fla. Stat. § 403.412(6)............................................................................................25

Fla. Stat. § 403.412(7)............................................................................................25

v

## INTRODUCTION

Plaintiffs Center for Biological Diversity and Sierra Club ("Plaintiffs") respectfully request a temporary restraining order ("TRO") by December 7, 2023, and preliminary injunction thereafter, to prevent the imminent issuance of two state 404 permits for projects that will cause them irreparable harm: the Bellmar and Kingston development projects.[1]  U.S. Fish and Wildlife Service ("USFWS") anticipates that, together, these projects will destroy thousands of acres of critically important Primary Zone habitat for the endangered Florida panther, and that this habitat loss will result in the take of 2 panthers from injury or death.[2]  The projects will injure or kill 6 to 25 panthers from vehicle strikes at the year of buildout and each and every year thereafter. USFWS also anticipates that the projects will collectively destroy more than 4,500 acres of nesting and foraging habitat for Florida's threatened crested caracara and result in the loss of breeding for 2 caracara pairs in the first year of the projects.

Plaintiffs' experts have shown that these projects are even more harmful than USFWS has anticipated.  The agency made its assessments through an unlawful and inadequate technical assistance process that failed to use the best available science and failed to provide the analysis, standards, guardrails, or accountability required at the federal level and under the ESA.  And because of USFWS' inadequate analyses and unlawful actions at both the programmatic and site-specific level, these two projects will be authorized to take panther and caracara without any express limitation on the amount of authorized take.  USFWS' actions under the technical

---

[1] Plaintiffs Center for Biological Diversity and Sierra Club are national non-profit organizations that have retained experts whose opinions, along with member declarations, are submitted here to show the inadequacies of USFWS' actions and the threat of irreparable harm if injunctive relief is not granted.

[2] According to USFWS, take is "anticipated" when the agency deems it "reasonably certain" to occur, which means there is clear and substantial information to support that conclusion.  FWS-006028, at FWS-006058, FWS-006095 (BiOp).

1

assistance process do not result in a biological opinion ("BiOp") that is clearly susceptible to challenge in federal court.  And under Florida law, Plaintiffs also face barriers to challenging state permits in state administrative proceedings because of restrictive standing requirements under Florida law and the costs of bringing such actions there as compared to federal court.

During the October 19, 2023, oral argument on the parties' cross-motions for summary judgment, Plaintiffs' counsel asked the Court to prioritize Plaintiffs' claims regarding species protected under the Endangered Species Act ("ESA") because certain major projects in panther habitat were on the cusp of being permitted, and Plaintiffs hoped to avoid having to seek emergency relief.  Hr'g Tr. at 133–34.  Then, on November 6, 2023, the Florida Department of Environmental Protection ("FDEP") issued a final 30-day public notice for the Bellmar State 404 Permit Application, and on November 20, 2023, FDEP issued a 30-day final public notice for the Kingston State 404 Permit Application.  These projects are in the heart of key habitat for the only remaining population of Florida panthers.

The Defendants and Intervenors have rejected Plaintiffs' requests to postpone action on these permits until the Court renders judgment on their claims related to ESA-listed species.  The Court's intervention is thus necessary to prevent irreparable harm and maintain the status quo pending resolution of these claims, including any relief.

Plaintiffs therefore respectfully request that the Court (1) immediately issue a TRO enjoining Defendants and Intervenor FDEP from taking any action furthering the issuance of these permits, up to and including issuing the permits; and (2) preliminarily enjoin any further action on these permits until the Court grants final judgment, including any remedy, on Plaintiffs' claims related to ESA-listed species.

## LEGAL FRAMEWORK

By enacting the ESA, Congress made a "conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). Indeed, an "examination of the language, history, and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174. "A major goal of the ESA is the recovery of species to the point at which the protection of the ESA is no longer necessary." *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 27 (D.D.C. 2013).

Congress required federal agencies to consult with wildlife agencies—USFWS and the National Marine Fisheries Service—for any action that may affect an ESA-listed species. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.13, 402.14. The ESA requires the wildlife agencies to issue a BiOp that uses the "best scientific and commercial data available" to (1) evaluate the baseline status of the species affected; (2) analyze the direct and cumulative effects of the action on those species; (3) assess whether the action would jeopardize the survival and recovery of protected species; and (4) propose reasonable and prudent alternatives if the agency concludes jeopardy is likely. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g), (h).

When the wildlife agencies anticipate that a federal action is reasonably certain to result in incidental take, USFWS must also issue an incidental take statement ("ITS") that specifies (1) the amount or extent of incidental take; (2) reasonable and prudent measures required to minimize take impacts; and (3) implementing terms and conditions with which the action agency must comply. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), (i). An ITS serves as a check on a BiOp, acting as a "trigger" by denoting when an unacceptable level of take has occurred, which then invalidates the safe harbor provision and requires the action agency to (1) reinitiate consultation to reevaluate the action; (2) determine if the action may now jeopardize protected

3

species or critical habitat; and (3) determine what additional protective measures may be required to reduce impacts from the action.  50 C.F.R. §§ 402.14(i)(3), (4), 402.16(a).

A BiOp and ITS constitute final agency actions that are clearly reviewable in federal court to enforce these requirements.  *See Bennett v. Spear*, 520 U.S. 154, 177–79 (1997).

## FACTUAL BACKGROUND

In approving Florida's program to administer permits under Section 404 of the Clean Water Act, EPA relied on USFWS' Programmatic BiOp (and the "technical assistance process" outlined therein) to conclude that:  (1) EPA's approval of Florida's program would not result in jeopardy to ESA species or adversely modify their critical habitat; and (2) Florida's program complied with the 404(b)(1) requirement for state assumption to demonstrate that state-issued permits would not jeopardize species or adversely modify their critical habitat.  *See* 16 U.S.C. § 1536(a)(2); 33 U.S.C. § 1344(h)(1)(a)(i).  As demonstrated in summary judgment briefing (and at oral argument), nothing requires USFWS to engage in the "technical assistance" process.  And even when USFWS does engage in the process, the "technical assistance" scheme does not impose the standards, requirements, or duties on USFWS that exist when the agency creates a biological opinion under the ESA.

USFWS' Programmatic ITS for Florida's 404 program exempted state permittees from liability for the incidental take of ESA-listed species so long as FDEP assures there will be compliance with the terms of state-issued permits.  But nothing in the technical assistance process requires permit conditions that limit authorized incidental take.  Thus, under the EPA-approved program, state permittees are granted immunity from liability for the incidental take of ESA-protected species without having to undergo any of the rigorous, and clearly enforceable, processes Congress enacted to protect threatened and endangered species, including Section 7 (consultation) and Section 10 (incidental take permits), and without any express limit on take.

4

USFWS engaged in the technical assistance process for the Bellmar and Kingston projects, producing a technical assistance "form" for each.  In those forms, USFWS concluded that neither project would cause jeopardy to the Florida panther and crested caracara (or any other ESA-listed species) and recommended inadequate permit conditions.  USFWS also determined that each project would cause a great deal of incidental take of the Florida panther and crested caracara.  Yet, USFWS' permit conditions expressed no limit on that take.  Pursuant to USFWS' Programmatic ITS, the state permittees will enjoy immunity from liability for incidental take so long as FDEP assures compliance with permit conditions, none of which expressly limit take.

On November 6, 2023, FDEP issued a 30-day public notice for the Bellmar development permit and scheduled a public meeting for December 7, 2023.  Ex. 4 at 6 (McGrath Dec. ¶ 22).  On November 9, 2023, Plaintiffs asked FDEP to postpone the Bellmar meeting for 60 days or until the Court ruled on Plaintiffs' ESA-related claims, but on November 17, 2023, FDEP declined.  Ex. 4 at 6–7 (McGrath Dec. ¶¶ 24–26).  On November 21, 2023, USFWS advised Plaintiffs that the agency did not intend to provide further comment on the Bellmar permit, aside from the October 31, 2023, Technical Assistance Form ("TA Form") it had completed for the project.  Ex. 4 at 6–7 (McGrath Dec. ¶ 26).  On November 28, 2023, EPA explained it was reserving its right to comment on the Bellmar permit, but would not say whether EPA would, or intended to, comment on the permit.  *Id.*  EPA could waive its right to comment on the permit at any time, allowing FDEP to issue the permit at any time following the December 7, 2023, hearing.[3]  EPA-HQ-OW-2018-0640-0018, at 8 (MOA between EPA and FDEP).

---

[3] By reserving its right, EPA may provide comments on the Bellmar permit by February 4, 2024, at the latest.  However, nothing prevents the agency from commenting sooner or stating sooner that it has no further comments.

JA.1079

On November 20, 2023, FDEP issued a 30-day public notice for the Kingston development.  Ex. 4 at 7 (McGrath Dec. ¶ 28).  On November 21, 2023, Plaintiffs asked FDEP to postpone action on that permit as well.  Ex. 4 at 7 (McGrath Dec. ¶ 28).  On December 1, 2023, FDEP declined.[4]  On November 21, 2023, Plaintiffs also asked whether the federal agencies intended to comment further on the Kingston project.  Plaintiffs have received no response as to USFWS.  On December 4, 2023, DOJ informed Plaintiffs' counsel that EPA will be reserving its right to provide comments on the Kingston Project.  However, as with Bellmar, EPA could waive that right at any time, allowing FDEP to issue the permit following the close of the public comment period.  EPA-HQ-OW-2018-0640-0018, at 8 (MOA between EPA and FDEP).

As demonstrated below, the Bellmar and Kingston permits are likely to cause irreparable harm to the critically endangered Florida panther, the threatened Florida population of the crested caracara, and Plaintiffs' interests in both.

## I.      The Permits at Issue Will Harm the Florida Panther.

### A.  The Florida Panther is Critically Endangered.

The Florida panther is critically endangered, with a single population consisting of only 120 to 230 adults and subadults in the wild.  EPA-HQ-OW-2018-0640-0388-A8, at 1 (Florida FWC Panther Population Estimate); Ex. 1 at 6–7 (Frakes Dec. ¶ 18).[5]  USFWS estimates that only 9 panthers are added to the population each year, Bellmar TA Form at 17, and even this estimate is likely inaccurate because it relies on questionable methods and assumptions.  Ex. 1 at

---

[4] Counsel for FDEP notified Plaintiffs' counsel that it would not agree to postpone action on the Kingston permit after Mr. McGrath's declaration was finalized.
[5] Dr. Robert Frakes is a panther habitat modeling expert who was retained by Center for Biological Diversity to provide his professional opinion regarding matters in this case.  Ex. 1 (Frakes Dec.).

21 (Frakes Dec. ¶ 59).[6]  Indeed, recent evidence suggests that panther population growth has leveled off and may be declining.  *Id.*  USFWS has determined that the panther will be recovered only when 3 populations of at least 240 individual panthers exist.  EPA-HQ-OW-2018-0640-0388-A9, at 115–16 (Panther Recovery Plan); Ex. 1 at 8 (Frakes Dec. ¶ 22).

Although Florida panthers historically ranged across the southeastern United States, they are now restricted to less than 5% of that range, with their last remaining occupied range found in southwest Florida.  EPA-HQ-OW-2018-0640-0388-A9, at 22 (Panther Recovery Plan); Ex. 1 at 9 (Frakes Dec. ¶ 25).  Southwest Florida, however, is subject to tremendous development pressure, which is further imperiling the species.  EPA-HQ-OW-2018-0388-A10, at 15 (Panther Status Report); EPA-HQ-OW-2018-0640-0388-A9, at 54 (Panther Recovery Plan).  Currently, "the land in southwest Florida is all there is for the species."  Ex. 1 at 10 (Frakes Dec. ¶ 27).

USFWS has categorized land in the panthers' remaining occupied range into "zones" to indicate the relative importance and need for conservation of particular areas.  EPA-HQ-OW-2018-0640-0388-A9, at 45 (Panther Recovery Plan).  The most important habitat is "Primary Zone" habitat, which consists of "lands essential to the long-term viability and persistence of the panther in the wild."  *Id.*; Ex. 1 at 10 (Frakes Dec. ¶ 28).  USFWS has stated that conservation efforts should "focus on maintaining the total available area, quality, and spatial extent of habitat within the Primary Zone" to "prevent further loss of population viability."  EPA-HQ-OW-2018-0640-0388-A9, at 45, 107 (Panther Recovery Plan); Ex. 1 at 10 (Frakes Dec. ¶ 28).  Secondary Zone habitat is located near Primary Zone habitat, is used by panthers, and could be used for

---

[6] USFWS has estimated a population growth rate of 8 panthers per year in the Kingston technical assistance form, Ex. 10 at 23 (Kingston TA Form), and 9 panthers per year in the Bellmar form, Ex. 8 at 17 (Bellmar TA Form).  The agency provides no explanation for these different population growth rates in its contemporaneous assessments.

population expansion and connectivity.  EPA-HQ-OW-2018-0640-0388-A9, at 107 (Panther

Recovery Plan); Ex. 1 at 10 (Frakes Dec. ¶ 28).  Adult breeding habitat refers to areas that

modeling predicts would be used for establishing home ranges and reproducing, which overlaps

but is not coextensive with Primary Zone habitat yet is equally important.  Ex. 1 at 10 (Frakes

Dec. ¶¶ 29–30).

 The leading threat to the Florida panther's survival and recovery is the loss, degradation,

and fragmentation of its remaining occupied range because panthers require large areas to hunt,

forage, and breed.  EPA-HQ-OW-2018-0640-0388-A9, at 11 (Panther Recovery Plan).  USFWS

has found that "[r]apid development in southwest Florida has compromised the ability of

landscapes to support a self-sustaining panther population." *Id.* at 56.  As USFWS has

acknowledged, the long-term survival of panthers could require as much as 156,000 to 234,000

square miles of habitat (roughly 60–70% of their historical range), in contrast to the 3,548 square

miles of breeding range in southwest Florida now occupied by the panther.  EPA-HQ-OW-2018-

0640-0388-A9, at 22, 24 (Panther Recovery Plan).  Conservation of this remaining range is vital

for the panther's survival and recovery.  EPA-HQ-OW-2018-0640-0388-A10, at 13 (Panther

Status Report); Ex. 1 at 9–10 (Frakes Dec. ¶¶ 26–27).  Further, because of the limited habitat and

increasing development in southwest Florida, USFWS has concluded that the Florida panther

must have access to corridors that connect southwest Florida to the suitable unoccupied habitat

areas in north Florida and other parts of the panther's historic range.  EPA-HQ-OW-2018-0640-

0388-A9, at 107, 110 (Panther Recovery Plan); Ex. 1 at 9 (Frakes Dec. ¶ 25).

 Accompanying this rapid development are road expansions and traffic increases, which

amplify the risk of a leading cause of panther deaths: vehicle strikes.  EPA-HQ-OW-2018-0640-

0388-A9, at 11, 35, 67–69 (Panther Recovery Plan); EPA-HQ-OW-2018-0640-0388-A10, at 7,

JA.1082

19 (Panther Status Report).  "Panther-vehicle collisions are a significant source of mortality and pose an on-going threat."  EPA-HQ-OW-2018-0640-0388-A9, at 69 (Panther Recovery Plan).  These vehicle strikes also limit panthers' ability to expand their range northward.  *Id.* at 11.  USFWS estimates that approximately 26 panthers are struck and killed by vehicles each year.  Ex. 10 at 18 (Kingston TA Form).

### B.  The Permits at Issue Will Destroy Panther Habitat and Take Panthers.

The projects here will irreparably harm the panther.  The Bellmar permit application is for a mixed-use community (residential village and commercial town center) covering a 5,105-acre area.  Ex. 6 at 1 (Bellmar Public Notice).  The project is entirely within Primary Zone panther habitat, and a panther den, where panther kittens are born and reared, is located just over 2 miles away.  Ex. 8 at 10 (Bellmar TA Form).  Bellmar is also roughly a mile from the Florida Panther National Wildlife Refuge, which was established in 1989 to protect core habitat for the panther and important wildlife corridors.  Ex. 1 at 21 (Frakes Dec. ¶ 60); *Florida Panther National Wildlife Refuge*, USFWS.[7]  Currently, 17 panthers on average are struck and killed per year by vehicles in the Bellmar project's action area (as compared to a range-wide annual average of 26).  Ex. 8 at 13 (Bellmar TA Form).  USFWS estimates that Bellmar alone would increase traffic in the area by 13%.  *Id.*

According to USFWS, the land clearing and construction activities from this project will destroy approximately 1,793 acres of panther habitat.  *Id.* at 11.  But in fact, the actual loss of functional panther habitat will be much greater, destroying nearly 2,500 acres. Ex. 1 at 11–14, 23–24 (Frakes Dec. ¶¶ 34–42, 66).  Although the applicant proposes to primarily develop agricultural land onsite, USFWS does not acknowledge that these agricultural lands are near

---

[7] *Available at* https://www.fws.gov/refuge/florida-panther/about-us (last visited Dec. 2, 2023).

JA.1083

forests, which are valuable to panthers who use the periphery of forests to hunt. *Id.* at 13–14 (Frakes Dec. ¶ 41). The project will also constrain the west side of the Camp Keais Strand corridor that panthers use to move between larger areas of habitat. *Id.* at 14 (Frakes Dec. ¶ 42). In the Panther Recovery Plan, USFWS created a specific goal to conserve and protect the Camp Keais Strand. EPA-HQ-OW-2018-0640-0388-A9, at 122, 150 (Panther Recovery Plan).

USFWS anticipates that the acreage destroyed will result in the take of 1 panther by assuming this habitat loss represents a portion of the average home range for 1 Florida panther. Ex. 8 at 12 (Bellmar TA Form). USFWS explains that this habitat loss is permanent and would not only harm panthers but also the prey they rely on to survive. *Id.* at 11. In other words, even according to USFWS' assessment, the panther population will be permanently reduced because the permanent habitat loss will prevent the successful replacement of the lost individual. USFWS further anticipates that this net loss of habitat may cause male panthers to attack and kill other panthers (to defend their territory) as they adjust their home ranges (known as "intraspecies aggression"). *Id.* at 11–12, 16.

But in fact, the impact of the Bellmar project will likely be even worse because the panther habitat it will destroy is likely part of several panthers' home ranges, rather than only 1. Ex. 1 at 14, 16–17 (Frakes Dec. ¶¶ 44, 49). Dr. Frakes' analysis of historical data from radio-collared panthers showed that Bellmar is likely to impact at least 7 panther home ranges. *Id.* at 17 (Frakes Dec. ¶ 49).

In addition to harm from habitat loss, USFWS anticipates that the project will result in vehicle strikes that injure or kill an additional 3 panthers at year of buildout. Ex. 8 at 16

(Bellmar TA Form).[8]  USFWS then anticipates that 3 more panthers will be injured or killed *each year* thereafter due to vehicle strikes.  *Id.*

Kingston is a large-scale mixed-use development project that will span 6,673 acres.  Ex. 10 at 7 (Kingston TA Form).  The project is proposed within Primary and Secondary Zone habitat, and a panther den is located less than half a mile from the site.  *Id.* at 15.  USFWS anticipates that the project will increase traffic to varying extents depending on the road segment, with increases in traffic ranging between 7.3% and 84.3%.  *Id.* at 18.

According to USFWS, the land clearing and construction activities from this project will destroy approximately 3,400 acres of Florida panther habitat.  *Id.* at 16.  But in fact, the actual loss of functional panther habitat will be much greater, destroying nearly 5,200 acres.  Ex. 1 at 25 (Frakes Dec. ¶ 72).  USFWS anticipates this habitat loss will take 1 panther by comparing the acreage loss to an average panther's home range, Ex. 10 at 21 (Kingston TA Form), although the agency states elsewhere that this habitat loss could impact 2 panthers, *id.* at 23.  USFWS anticipates that this net loss of habitat may cause panthers to attack and kill other panthers as they adjust their home ranges, which would cause further harm.  *Id.* at 16–17, 21.

So as with Bellmar, even according to USFWS' Form, the Kingston project will permanently reduce the panther population because the permanent habitat loss will prevent the

---

[8] USFWS reached this conclusion based on a traffic study that only estimated traffic increases once the project is completed years from now, Ex. 8 at 12 (Bellmar TA Form), but the agency failed to address or account for traffic increases that will necessarily result from clearing and construction activities and as homes are built and sold over time.  *See also* Passarella & Associates, Bellmar Traffic Analysis, Feb. 13, 2023, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396364/facility!search.  The developer's own website anticipates that once permits are obtained in 2023, construction will also begin in 2023, and that homes will begin to be constructed in 2024.  *See* Ex. 4 at 20 (McGrath Dec. Ex. 2).  It was therefore arbitrary for USFWS to address increases in traffic, and the resulting increases in panther injuries and deaths from vehicle strikes, only after the entire project is completed.

successful replacement of 1 to 2 individuals.  And again as with Bellmar, USFWS' assessment is likely an underestimate because panther home ranges overlap with one another, meaning that several panthers likely rely on the resources provided by the habitat that will be destroyed by the Kingston project. Ex. 1 at 27–28 (Frakes Dec. ¶ 77).  Dr. Frakes' analysis of historical home range data (2004–2013) showed that 6 collared panthers included the Kingston footprint in their home range. *Id.*  In addition, the Kingston project will impinge upon or block panther corridors which are essential to habitat connectivity. *Id.* at 28 (Frakes Dec. ¶ 80).

USFWS also estimates that additional traffic from the Kingston project will result in the lethal take of 16 panthers per year at project buildout, which it later re-states as a range of between 4 and 23 panthers that will be taken by vehicle strikes at project buildout.[9]  Ex. 10 at 6, 23 (Kingston TA Form).  USFWS expects that a comparable number of panthers will be taken *per year* afterward. *Id.* at 23.[10]

## II.     The Permits at Issue Will Harm Florida's Crested Caracara

### A.     Habitat Loss Threatens Florida's Threatened Crested Caracara.

The crested caracara is a large, boldly patterned raptor with a unique appearance, including a long neck, unusually long yellow legs, and large gray-blue bill, as well as a white head and throat, white wing tips, and white tail that contrast with its dark body and signature

---

[9] As with Bellmar, USFWS here relied on an applicant's traffic study that only analyzed traffic increases at project buildout, Kingston TA Form at 18, but the agency failed to account for the traffic increases that will result from construction activities and as homes are built and sold over time.  It is therefore arbitrary to assume that increases in traffic, and therefore increases in panther injuries and deaths from vehicle strikes, will only begin the moment the project is completed.

[10] Although later in the form USFWS suggests that the agency does not expect the actual number of panthers killed by vehicles to reach the upper bounds of this estimate, Kingston TA at 23–24, that range represents the best estimate that USFWS itself has provided and is the number USFWS relies on for its technical assistance assessment.  Moreover, even the lower bounds of this estimate (together with anticipated take from Bellmar) would exceed the 9 panthers that USFWS purports are added to the already precarious panther population each year.

black crest.  *South Florida Multispecies Recovery Plan: Species*, USFWS, at 221 (1999)

[hereinafter "Caracara Recovery Plan"].[11]  The Bellmar and Kingston projects will also harm the

Florida population of this threatened bird of prey.

   Recent estimates show the Florida population of the caracara consists of approximately

564.4 individuals, or 280 breeding pairs.  Ex. 2 at 7 (Morrison Dec. ¶ 22).[12]  Caracara mating

pairs occupy home territories of approximately 3,200 acres of foraging habitat centered around a

nest tree.  Ex. 2 at 4 (Morrison Dec. ¶ 13); Caracara Recovery Plan at 226.  Caracara breeding

pairs return to the same nesting site for years and rely on their home range to provide essential

foraging habitat to feed and raise their young.  Ex. 2 at 4–5 (Morrison Dec. ¶¶ 14, 16).

   The caracara's decline is primarily due to habitat loss from agriculture and residential

development.  Caracara Recovery Plan at 227–28.  The Florida population of the caracara is

isolated with a restricted range that is rapidly urbanizing, and habitat loss is the primary threat to

the caracara's survival and recovery.  Caracara Recovery Plan at 227–28, 235; *Florida*

*Population of Audubon's Crested Caracara = Northern Crested Caracara 5-Year Review:*

*Summary and Evaluation*, USFWS, at 9–10 (2008) [hereinafter "Caracara Review"].[13]  USFWS

recognizes that the caracara population in Florida is "sensitive to even modest habitat loss."

Caracara Review at 8.

---

[11] Available at https://ecos.fws.gov/docs/recovery_plan/140903.pdf.
[12] Dr. Joan Morrison is a conservation biologist who has been studying the Florida population of
the crested caracara for thirty years.  She was retained by Sierra Club to provide her professional
opinion regarding matters in this case.  Ex. 2 (Morrison Dec.).
[13] *Available at* https://ecosphere-documents-production-
public.s3.amazonaws.com/sams/public_docs/species_nonpublish/1417.pdf.

13

**B.  The Permits at Issue Will Destroy Caracara Habitat and Result in Loss of Reproductive Success.**

USFWS has recognized that the remaining available habitat for the caracara is

"saturated," meaning the habitat is already claimed by breeding pairs of caracara.  Ex. 8 at 9

(Bellmar TA Form); Ex. 2 at 5–6 (Morrison ¶¶ 19–20).  "[C]urrently available evidence provides

substantial reasons to believe that habitat loss that reduces the number of breeding pairs likely

appreciably diminishes survival and recovery."  Ex. 2 at 8 (Morrison Dec. ¶ 24).

Bellmar contains approximately 2,285 acres of suitable habitat for the caracara.  Ex. 8 at

7 (Bellmar TA Form).  Through construction activities, the Bellmar project will destroy 1,440.33

acres of the home range for the resident nesting pair of caracara, which constitutes nearly 50% of

an average caracara's home range.  *Id.*  USFWS anticipates that noise and activity from

construction will also disturb foraging and nesting caracara.  *Id.* at 7–8.  USFWS anticipates that

the project will eliminate the reproductive capacity for the known breeding pair in the initial year

of the project.  *Id.* at 8.

In actuality, the harm to the breeding pair will likely be permanent, and will likely

cascade into further harm for other pairs in the population as the displaced breeding pair attempt

to move into the already occupied territories of other breeding pairs, resulting in fierce

competition for insufficient resources.  Ex. 2 at 5 (Morrison Dec. ¶ 20).  Loss of reproductive

success means that the nesting pair will not be able to reproduce or will reproduce but their

offspring will not survive.  Ex. 2 at 2, 5, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–38, 45).

Kingston contains approximately 5,383.44 acres of suitable habitat for the caracara.  Ex.

10 at 7 (Kingston TA Form).  This habitat is sufficient to support portions of 6 caracara

territories.  *Id.*  The Kingston project, however, will destroy 3,233.36 acres of caracara habitat,

representing the "complete loss" of this nesting pair's habitat.  *Id.*  USFWS anticipates the

JA.1088

project will result in the loss of reproductive success for the resident breeding pair during construction. *Id.* at 8.

## STANDARD OF REVIEW

To obtain a TRO or preliminary injunction, Plaintiffs must make a clear showing that four factors, taken together, warrant relief: (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) the balance of the equities weigh in their favor; and (4) an injunction is in accord with the public interest. *League of Women Voters of the U.S. v. Newby*, 838 F. 3d 1, 6–7 (D.C. Cir. 2016); *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).[14] The final two factors in the Court's analysis of a request for preliminary relief—the balance of equities and the public interest—"merge" in cases where, as here, the relief sought is against the government. *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 163–64 (D.D.C. 2015) (Moss, J.), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).[15] Although the D.C. Circuit has not addressed whether there should be a presumption in favor of injunctions to avoid irreparable harm under the ESA, Plaintiffs submit, and the Ninth Circuit has recognized, that there should be, and thus presumes "that remedies at law are

---

[14] Courts in the D.C. Circuit apply a "sliding scale" to these four factors. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). If a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92. Although the D.C. Circuit has "hinted on several occasions" that *Winter v. NRDC*, 129 S. Ct. 365, 375 (2008), "should be read to suggest that 'a likelihood of success is an independent, free-standing requirement for a preliminary injunction,'" it "'has not yet needed to decide th[e] issue.'" *Angelo v. D.C.*, 648 F. Supp. 3d 116, 121–22 (D.D.C. 2022) (Moss, J.). Regardless, Plaintiffs here have demonstrated likelihood of success on the merits.
[15] The Court has authority to enjoin Intervenor FDEP because it is considered "a full participant in the lawsuit and is [to be] treated just as if it were an original party." *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1440 (D.D.C. 1986). *Accord Isbrandtsen Co. v. United States*, 211 F.2d 51, 57 (D.C. Cir. 1954) (enjoining intervenors).

inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *See, e.g.*, *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018).

## ARGUMENT

Through briefing and at oral argument on summary judgment, Plaintiffs have shown that they are likely to succeed on their claims that EPA's approval of Florida's 404 program violated federal requirements to ensure that the state 404 program (and permits issued thereunder) avoid jeopardy to species and adverse modification or destruction of critical habitat.[16]  But Plaintiffs now face the risk of irreparable harm because FDEP is poised to authorize major projects that will cause incidental take of threatened and endangered species, damaging Plaintiffs' members' ability to enjoy these species in the wild, and will do so through an unlawful and inadequate "technical assistance" process that does not produce a BiOp subject to challenge in federal court.

Together, the Bellmar and Kingston projects would destroy thousands of acres of panther habitat and result in the take of 8 to 27 panthers at year of buildout.  The projects will then result in the take of at least 6 to 25 panthers per year thereafter.  The likely loss of even relatively few individuals from a protected species is "a significant, and undoubtedly irreparable, harm." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003).  In addition, the projects will collectively destroy 4,673.69 acres of caracara habitat, eliminate the reproductive success of 2 breeding pairs at year of buildout, and likely result in the permanent displacement and permanent loss of reproductive capacity for at least 1 breeding pair.  These activities will be authorized following the "technical assistance" process that is challenged here and which does not result in a BiOp that can clearly be challenged in federal court.  Absent a

---

[16] Plaintiffs are focusing on their claims related to ESA-protected species for purposes of this motion but are also likely to succeed on all other claims.

TRO and preliminary injunction, Plaintiffs will suffer imminent and irreparable harm.  The balance of the equities and the public interest in protecting threatened and endangered species weigh in favor of maintaining the status quo until the Court has entered judgment on Plaintiffs' claims related to ESA-species, including any relief.

**I.      Plaintiffs are Likely to Succeed on the Merits.**

As demonstrated in summary judgment briefing and oral argument, Plaintiffs have shown that they are likely to succeed on the merits of their claims.  Dkts. 98, 104, 123, 128, Oct. 19, 2023, Hr'g Tr.[17]  Specifically, for purposes of this motion, Plaintiffs submit that they have shown they are likely to succeed on their claims related to the protection of ESA-listed species under USFWS' jurisdiction, namely Claims 3, 4, 6, and 13.  USFWS' Programmatic BiOp and ITS failed to comply with the ESA at the programmatic level, punting all analysis to the permit level.  Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.

But the "technical assistance" scheme at the permit level imposes no meaningful requirements on USFWS and does not require the agency to comply with ESA guardrails at that step either.  Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.  At most, USFWS has committed only to receive and review permit applications.  Dkt. 98 at 46–49; Dkt. 104 at 42–46; Dkt. 123 at 9–12; Dkt. 129 at 2 & n.2.  The "technical assistance" process does not bind the agency to comply with the procedures and standards of the ESA, including the requirement to use the best available science, analyze the baseline status of the species, evaluate impacts, assess jeopardy, and impose limits on incidental take.  Dkt. 98 at 46–49; Dkt. 104 at 42–46; Dkt. 123 at 9–12; Dkt. 129 at 2 & n.2.

---

[17] Plaintiffs hereby adopt and incorporate their briefing on summary judgment, Dkts. 98, 104, 123, 128, in support of this motion.

When the Court asked the Defendants' counsel whether USFWS was under a legal obligation even to review permit applications, Hr'g Tr. 89:7–10, counsel could only point to statements in the BiOp that "[USFWS] has internal processes in place to ensure that all applications are received and reviewed," that USFWS "may" submit comments or questions and that the failure to do so by the deadline would mean that no further information was required from USFWS, and that—as a "fail-safe"— USFWS "may" submit comments during the public comment period. *Id.* at 91:14–92:1. The "technical assistance" process also does not result in a BiOp that is clearly enforceable in federal court. *Cf. Bennett*, 520 U.S. at 177–79.

In the Programmatic ITS, USFWS unlawfully extended unlimited incidental take liability exemption to EPA, the State, and all future state permittees for the life of the program, and provided no trigger for reinitiating consultation. Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2. It shielded all future state 404 permittees so long as FDEP assures compliance with permit conditions, without requiring permittees to obtain that protection through Section 7 or 10 of the ESA as Congress intended. Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2. *See also* Hrg. Tr. 92:8–94:18. However, the technical assistance process does not require that USFWS propose permit conditions to limit incidental take. Even when USFWS anticipates take, nothing in the program gives that expectation of take the force of a permit condition that expressly limits authorized take.

Plaintiffs have also shown that they are likely to succeed on Claims 2[18] and 10 because of EPA's arbitrary and capricious reliance on the BiOp and ITS to approve Florida's program. By relying on the BiOp (and the technical assistance process outlined therein) to approve Florida's

---

[18] For purposes of this motion, Plaintiffs focus on the ESA-related deficiency in EPA's approval of Florida's program (Claim 2). The summary judgment briefing on Claim 2, however, addresses several other deficiencies that also rendered EPA's approval unlawful.

program, EPA failed to ensure that the State program would satisfy the 404(b)(1) Guideline that prohibits the issuance of permits that may jeopardize species or adversely modify or destroy critical habitat. *See* Dkt. 98 at 66; Dkt. 104 at 73 (Claim 2). As a result of that reliance, EPA also failed to satisfy its independent duties under the ESA. Dkt. 98 at 51–52; Dkt. 104 at 49–51; Dkt. 123 at 12–13 (Claim 10).

## II.   Absent Immediate and Preliminary Relief, Plaintiffs will Suffer Irreparable Harm.

The Bellmar and Kingston permits will cause imminent and irreparable harm to the Florida panther and crested caracara, to their habitat, and to the Plaintiffs, whose members recreate to observe these threatened and endangered species in the wild. The permits will authorize take of the Florida panther and caracara without USFWS having complied with its ESA duties at the programmatic or the permit level. This take will be authorized through the unlawful and inadequate "technical assistance" process created in the programmatic BiOp that does not impose any meaningful requirements on USFWS to comply with the ESA and does not result in a permit-level BiOp that clearly can be challenged in federal court to enforce the ESA. To make matters worse, the permits will not include any express limitation on the amount of incidental take authorized, while FDEP and the permittee are immunized from liability for that take under the terms of the Programmatic ITS.

### A.   USFWS' Technical Assistance Fails to Adequately Protect ESA Species and Does Not Produce Biological Opinions Clearly Reviewable in Federal Court.

Having avoided compliance with the ESA at the programmatic level, USFWS also failed to comply with its requirements at the permit level. USFWS' "technical assistance" forms for Bellmar and Kingston failed to satisfy the standards and procedures that would be required for Section 7 consultations and would allow the issuance of permits that will irreparably harm the Florida panther, crested caracara, and Plaintiffs' interests in both.

19

JA.1093

The "technical assistance" process does not require USFWS to comply with ESA requirements for a BiOp, meet ESA standards, or apply its guardrails.  At oral argument, Florida heralded Bellmar as reflecting the gold standard of what Florida's program *can* do.  Hr'g Tr. 115:25–116:5.[19]  And yet USFWS' technical assistance forms fall far short of what the ESA would require of a BiOp.  The "technical assistance" forms make various assessments without using the best available science, performing the required analyses, or articulating a limit on incidental take, all while USFWS extends incidental take liability protection to developers through its unlawful Programmatic BiOp and ITS.  And this is precisely the point.  Because of how Florida's 404 program is structured, the technical assistance process does not require USFWS to do any of those things.  When asked by the Court, the Defendants, notably, refused to provide assurance that USFWS can be held accountable for the inadequacy of its actions in the technical assistance process the same way that it could for an inadequate BiOp.  *Id.* at 95:20–22, 95:23–96:7, 96:8–21.

Whereas Section 7 consultation requires USFWS to use the best available science to determine whether a project will cause jeopardy to a protected species, the effects of the action on the species, and the likely anticipated take, the technical assistance process does not contain these requirements, and USFWS failed to use the best available science for its assessments.  *See* 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(g)–(i); Ex. 1 at 23 (Frakes Dec. ¶ 65).  In fact, USFWS' entire house is built on a broken foundation, because USFWS did not use the best available science to estimate the populations of ESA-protected species.  For example, USFWS based its review of panther impacts on an unreasonably broad and arbitrarily

---

[19] It is worth noting that these are projects that have been under considerable scrutiny as a result of their being highlighted in this litigation.

high population estimate, ranging from 222 to 773 panthers.  Ex. 8 at 10–11 (Bellmar TA Form);

Ex. 10 at 15 (Kingston TA Form).  But as Dr. Frakes explains, the panther's existing occupied

habitat could not possibly support the upper end of that estimate, which would be 3 times the

density of puma in any other place in North America.  Ex. 1 at 20 (Frakes Dec. ¶ 58).[20]  The

authors of the study who arrived at this estimate recommended *against* using it because it far

exceeds the carrying capacity of existing habitat.  *Id.*  Critically, USFWS *itself* has stated in the

most recent publicly available draft species status assessment that this estimate's margin of error

is far too wide to inform conservation decisions for the panther.  *Id.*  USFWS' reliance on an

unreasonable population assessment tainted its assessment of the projects' impacts on the Florida

panther.

Similarly, USFWS' discussion of the caracara failed to use the best available population

estimates for the caracara and, in fact, failed to discuss the caracara's population at all.  Ex. 8 at 7

(Bellmar TA Form); Ex. 10 at 7 (Kingston TA Form).  The best and most reliable estimate of

Florida's caracara population found that there are approximately 565 individual caracara,

representing approximately 280 breeding pairs.  Ex. 2 at 7 (Morrison Dec. ¶ 22).  The absence of

population information for the caracara in USFWS' Technical Assistance Forms renders wholly

unreliable the agency's assessments of the projects' impacts on that species.

USFWS' baseline discussions also failed to use the best available science to analyze the

species' current condition, the anticipated impacts of all proposed federal projects in the action

---

[20] The Florida panther is the most endangered big cat in North America.  *See Florida's Big Cat*,
National Park Service,
https://www.nps.gov/features/bicy/climatechange/BICY708/#:~:text=Big%20Cats%E2%80%94
Little%20Population&text=The%20Florida%20panther%20is%20the,Preserve%20as%20their%
20main%20habitat (last visited Dec. 2, 2023).

JA.1095

area, and the consequences to the species from ongoing activities.  50 C.F.R. §§ 402.02, 402.14(g)(3), (g)(8), (h)(1)(iii).  The Technical Assistance Forms failed to adequately assess these elements as compared to what is required in a BiOp.  Ex. 1 at 20–24 (Frakes Dec. ¶¶ 56, 61, 65–66).  As to the panther, USFWS merely pointed to tracking data in the action area and the unreasonable population estimates the agency itself has said it should not use.  Ex. 8 at 10–11 (Bellmar TA Form); Ex. 10 at 15 (Kingston TA Form).  As to the caracara, USFWS provided even less information on the baseline of the species.  Ex. 8 at 7 (Bellmar TA Form); Ex. 10 at 7 (Kingston TA Form).  Specifically, USFWS failed to consider federal actions approved since 2019 that will collectively destroy 29,000 acres of caracara habitat, resulting in the take of around 15 breeding pairs.  Ex. 2 at 20 (Morrison Dec. ¶ 47).

USFWS' baseline sections also fail to include a review of important literature and research regarding issues such as the species' habitat needs, population changes, birth and death rates, and disease prevalence, as would appear in a BiOp.  Ex. 1 at 23 (Frakes Dec. ¶ 65). USFWS mentions only *one* peer-reviewed publication for the panther even though several new studies have been published in recent years.  *Id.*  The agency's failure to include this literature review further demonstrates its failure to use the best available science to assess the baseline status of the species.  And like USFWS' unreasonable (or missing) population estimates, this failure taints USFWS' subsequent discussion of impacts and jeopardy.

USFWS also failed to use the best available science to consider the effects on species.  50 C.F.R. §§ 402.02, 402.14(g)(3), (g)(8), (h)(1)(iii).  USFWS assumed that the habitat lost for each project will impact only 1 panther by comparing the acreage destroyed by each project to the average home range for a panther.  Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form).  However, panther home ranges overlap.  Therefore, the projects are likely

to affect multiple individuals and multiple panther home ranges.  Ex. 1 at 16–17, 19, 27–28

(Frakes Dec. ¶¶ 49, 53, 77).  As explained by Dr. Frakes, tracking data for radio-collared

panthers (between 2004 and 2013) indicate that the Bellmar footprint could impact the home

ranges of as many as 7 adult panthers, and Kingston could impact the home ranges of as many as

6 adult panthers.  *Id.*  Therefore, each project will likely impact multiple panther home ranges,

and could impact even more than 6 or 7 panthers' home ranges today.  *Id.*

Next, USFWS failed to consider cumulative impacts on panthers as to each project as

would be required during Section 7 consultation.  USFWS expressly assumed that these

developments would occur even without the 404 permitting, and with less mitigation.  TA

Forms.  There is no basis for this assumption.  USFWS then described projects that do not

impact wetlands, and therefore, would not require any regulatory review under Section 404.  Ex.

1 at 22–23 (Frakes Dec. ¶ 61).  USFWS ultimately acknowledged that there are "other" 404

permit projects that are reasonably foreseeable, but only listed the acreage lost from three:

Kingston, FFD, and Rural Lands West.  Ex. 8 at 14–15 (Bellmar TA Form); Ex. 10 at 20–21

(Kingston TA Form).  In other words, USFWS omitted most future wetlands development

permits from its assessment.  And, for those it did mention, USFWS only looked at gross acreage

numbers.  USFWS failed to consider impacts or potential incidental take from those projects (in

addition to impacts from Bellmar and Kingston) as a result of changes to habitat ranges,

corridors, and traffic, which are the key factors leading to harms to panthers and incidental take.

For the caracara, USFWS unreasonably limited the area considered to the project

footprint and therefore did not perform a cumulative impacts analysis at all.  The ESA, however,

requires the agency to consider the cumulative impacts from future State or private activities that

are reasonably foreseeable to occur within the action area, which would include all areas with

23

direct and indirect impacts beyond the immediate area involved in the action.  50 C.F.R.

§ 402.02 (defining action area); Ex. 2 at 20–21 (Morrison Dec. ¶¶ 48–52).  The Bellmar TA

Form's limitation of the action area to the project footprint itself is particularly egregious

considering that USFWS elsewhere recognizes the reasonably foreseeable development of Rural

Lands West, immediately north of Bellmar, and the Kingston project, approximately 15 miles

northwest of Bellmar.  Ex. 2 at 20–21 (Morrison Dec. ¶ 49).  These projects, together, will likely

have a domino effect on the caracara population as breeding pairs are displaced into the

territories of other breeding pairs.  *Id.* at 5–6, 21 (Morrison Dec. ¶¶ 20, 50–51).

As a final example, USFWS' forms did not articulate any incidental take limit or

recommend any permit condition that expressed a limit on incidental take for either project.  Ex.

8 at 5, 17 (Bellmar TA Form); Ex. 10 at 5, 22–23 (Kingston TA Form).  And yet, by its terms,

USFWS' Programmatic BiOp and ITS exempts permittees from liability for incidental take so

long as FDEP and EPA comply with the terms and conditions of the ITS.  FWS-006028, FWS-

006109–10 (BiOp); 16 U.S.C. § 1536(o).[21]  USFWS anticipates that together, Bellmar and

Kingston will result in the likely injury or death of 2 panthers from habitat loss and the death or

injury of another 6 to 25 panthers at project buildout and *each year* thereafter.  Take at the upper

range (combined with the damage to existing corridors) would jeopardize the survival and

recovery of the panther.  Ex. 1 at 30 (Frakes Dec. ¶ 84).  USFWS further anticipates the loss of

reproductive success for 2 breeding pairs of caracara at year of buildout (e.g., construction).  For

the caracara, "currently available evidence provides substantial reasons to believe that habitat

---

[21] As Plaintiffs explained in briefing on summary judgment, the ITS creates no terms and conditions for state permittees and only requires that EPA abide by its existing duties under the Clean Water Act and that FDEP comply with its obligations under the technical assistance process.  Dkt. 98 at 44; Dkt. 104 at 33–36; Hr'g Tr. 21:8–21.

loss that reduces the number of breeding pairs likely appreciably diminishes survival and recovery."  Ex. 2 at 8 (Morrison Dec. ¶ 24).

Moreover, unlike when the Corps issues a 404 permit, here there is no site-specific BiOp that is clearly reviewable in federal court to enforce the guarantees of the ESA.  *See Bennett*, 520 U.S. at 177–79.  When directly asked by the Court, the Defendants would not concede that USFWS could be held liable for its actions under the technical assistance process.[22]

And as Plaintiffs have shown throughout, they face barriers to challenging state 404 permits because Florida law restricts access to administrative courts to citizens of the State.  Dkt. 104 at 97–98.  At least one Florida appellate court has found that a foreign corporation would not quality as a citizen of the State, even when they hold a valid certificate of authority to operate in the State.  *Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*, 702 So.2d 1352, 1353 (Fla. 1st Dist. Ct. App. 1997); *Mcclash v. Manasota-88, Inc.*, No. 14-4735, 2015 WL 3966050, at *8 (Fla. Div. Admin. Hearings June 25, 2015) ("Sierra Club is not a citizen of the state; it is a foreign nonprofit corporation."). This is true under both the administrative code and Florida statutes.  *See* Fla. Stat. §§ 403.412(6) (standing for environmental non-profit that is a "Florida corporation"); *id.* § 403.412(7) (Art. III standing for challenges by citizens of the state related to federally delegated programs).  Even if Plaintiffs had standing, they would face the potentially prohibitive expense of having to litigate a de novo proceeding, including costs related to retaining experts not only to render opinions, but to participate in depositions and trial.  Dkt. 104 at 96–97; Dkt. 123 at 23; Fla. Stat. § 120.57(k) (de novo proceedings).

---

[22] The Defendants' arrangement with the State punts all species review to the permit level while not requiring anything meaningful of USFWS at the permit level, and not producing a site-specific BiOp that is clearly reviewable in federal court.  *See* Hr'g Tr. 92:8–94:18, 95:14–19.  At argument, DOJ notably declined to concede that USFWS could be sued for its permit-level actions or inaction.  *Id.* at 95:20–22, 95:23–96:7.

Lastly, the Bellmar and Kingston projects would be authorized without having undergone review under the National Environmental Policy Act, which would be required if the projects' 404 permit applications were under consideration by the Corps.  As a result, Plaintiffs are deprived of the NEPA documents generated during NEPA review, and the project has not undergone the same level of environmental scrutiny as it would under NEPA, something Plaintiffs could also enforce in federal court if the review proved inadequate.

**B.      The Projects Will Irreparably Harm Panthers and Plaintiffs' Members.**

USFWS anticipates that the Bellmar and Kingston projects will destroy thousands of acres of Primary Zone panther habitat and collectively result in the injury or death of 2 panthers from habitat loss during construction activities, as well as the injury or death of 6 to 25 panthers at buildout.[23]  Ex. 8 at 16 (Bellmar TA Form); Ex. 10 at 21–22 (Kingston TA Form).  As Dr. Frakes explains, these are likely underestimates as his modeling shows the projects will likely destroy more functional habitat and that the estimated habitat loss will therefore likely impact more panthers than USFWS anticipates.  Ex. 1 at 11–13, 23–25 (Frakes Dec. ¶¶ 34–40, 66, 72).

The likely loss of even relatively few individuals from a protected species is "a significant, and undoubtedly irreparable, harm."  *Am. Rivers*, 271 F. Supp. 2d at 258–59 (citing *Fund for Animals v. Turner*, No. 91-cv-2201, 1991 WL 206232, at *8 (D.D.C. Sept. 27, 1991)); *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1999) (reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction).  Environmental injury, such as what will occur here, "can seldom be adequately remedied by money damages

---

[23] As noted previously, the injuries and deaths of panthers from vehicle strikes are also likely to begin as traffic increases during clearing and construction activities and as homes are built and occupied.

JA.1100

and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

In *American Rivers*, for example, the court found irreparable harm where a project would result in the loss of 15 to 121 individual least terns and piping plovers out of populations of 7,000 and 2,000 birds, respectively. 271 F. Supp. 2d at 258–59. And as to the pallid sturgeon (for which USFWS had been unable to create a numerical estimate of take), the Court found that this species (with a population of 2,000) was in such a "weakened state" that "*any* potential harm" would be "irreparable and must be avoided." *Id.* (emphasis in original).

Here, the panther population is estimated to be 120 to 230 adults and subadults (and is likely not genetically viable in the long term). Ex. 1 at 8–9 (Frakes Dec. ¶ 23). USFWS anticipates the injury or death of 2 panthers from construction activities and habitat loss, Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form), and even more panthers will likely be harmed. Ex. 1 at 11–14, 16–17, 20, 25, 27–28 (Frakes Dec. ¶¶ 34–44, 49, 57, 72, 77). USFWS also anticipates that 6 to 25 panthers will be injured or killed from vehicle strikes at project buildout, Ex. 8 at 12–14, 16 (Bellmar TA Form); Ex. 10 at 17–20, 22 (Kingston TA Form), and yet failed to assess the take that will occur as traffic increases with construction activities between now and then. That take is significant on its face, but in the context of USFWS' own (and likely over-) estimate that only 8 or 9 panthers are added to the population each year, take of this magnitude, from just two of many projects in southwest Florida, would be devastating to the panther's prospects of survival and recovery.[24] This level of take is

---

[24] To show imminent, irreparable harm, Plaintiffs need not show that the action to be enjoined will jeopardize the survival and recovery of a protected species. *Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 69 (D.D.C. 2006), *judgment vacated on other grounds by* 527 F.3d 181 (D.C. Cir. 2008) ("The Court agrees" that "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head.

27

particularly concerning given that it almost matches USFWS' annual anticipated growth rate for the panther population and, at its upper range, is three times higher than the growth rate. Ex. 1 at 29 (Frakes Dec. ¶ 83) (discussing USFWS anticipated take range as to Kingston). In Dr. Frakes' opinion, the upper end of this range, in combination with the damage done to panther movement pathways, would jeopardize the survival and recovery of the Florida panther. *Id.* at 30 (Frakes Dec. ¶ 84). When considering the baseline number of vehicle deaths already occurring, the harm is only magnified. USFWS' own estimates show that these projects could nearly double the amount of take from vehicle strikes, adding up to 27 takes from vehicle strikes to the current annual average of 26 takes from vehicle strikes throughout their entire occupied range. Ex. 8 at 12–14, 16 (Bellmar TA Form); Ex. 10 at 17–20, 22 (Kingston TA Form).

In addition to take of individual panthers, these projects will permanently destroy 6,707.6 acres of the panther's remaining habitat without replacing any of those acres, resulting in a net loss of already insufficient available habitat in the core breeding range for the sole remaining population of Florida panthers. Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form). *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324–25 (D.C. Cir. 1987) (in action challenging lifting of protective land restrictions, finding irreparable harm from damage to land that will harm the recreational and aesthetic interests of plaintiffs' members); *Nat'l Audubon Soc. v. Butler*, 160 F. Supp. 2d 1180, 1191 (W.D. Wash. 2001) (in action challenging agency plan to relocate bird population without NEPA EIS, destroying habitat without a long-term alternative would result in irreparable harm); *Earth First v. Block*, 569 F. Supp. 415, 417, 422 (D. Or. 1983) (in case challenging redesignation of wilderness area, building

_____

Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction.").

of road would cause irreparable harm by destroying wilderness habitat which cannot be

restored).  As soon as bulldozers arrive and construction crews begin work, panthers will be

pushed away from their habitat because panthers avoid areas where there is a lot of noise and

activity.  Ex. 8 at 11 (Bellmar TA Form); Ex. 10 at 16 (Kingston TA Form); Ex. 1 at 3–4, 13–14

(Frakes Dec. ¶¶ 11, 41).  Importantly, these projects will not replace the lost habitat with

compensatory restoration of functional habitat somewhere else.  Ex. 8 at 11–12, 16 (Bellmar TA

Form); Ex. 10 at 16–17, 21 (Kingston TA Form); Ex. 1 at 8–10, 13–14, 18 (Frakes Dec. ¶¶ 23–

27, 39–41, 51).  Instead, they purport to "preserve" other habitat areas that are not being

destroyed.  Ex. 8 at 11–12, 16 (Bellmar TA Form); Ex. 10 at 16–17, 21 (Kingston TA Form).  As

Dr. Frakes explains, several peer-reviewed papers state that further habitat loss in the panther's

core breeding range is not acceptable.  Ex. 1 at 8–10, 18 (Frakes Dec. ¶¶ 23–27, 51).  He is not

aware of *any* scientific publication that states panthers can afford to lose more habitat, *id.*, and

USFWS points to none in their Technical Assistance Forms.

  The Bellmar and Kingston projects would also constrain existing corridors (e.g., the

Camp Keais Strand) that are vital for panthers to move between high-quality habitat areas.  *Id.* at

14, 23 (Frakes Dec. ¶¶ 42, 66).  These corridors connect the fragmented panther habitat in

southwest Florida and serve as the only means to expand the panther range into north Florida,

which USFWS says is needed for panther recovery.  *Id.* at 9 (Frakes Dec. ¶ 25).

  This irreparable harm to the panther will also irreparably harm Plaintiffs' members who

seek to observe panthers in the wild.  The loss of opportunities to view wildlife constitutes

irreparable harm.  *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding

irreparable harm from planned bison hunt where plaintiffs' evidence established that "seeing or

even contemplating the type of treatment of the bison inherent in an organized hunt would cause

them to suffer an aesthetic injury that is not compensable in money damages"); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (same); *Nat'l Wildlife Fed'n v. NMFS,* 886 F.3d at 822 (holding that plaintiffs established "irreparable harm to their own interests stemming from the irreparable harm to the listed species").

Here, Center for Biological Diversity member Matthew Schwartz frequently seeks out panthers and signs of their presence in the Florida Panther National Wildlife Refuge—which is roughly a mile from the Bellmar project and contains core panther habitat—as well as Corkscrew Regional Ecosystem Watershed ("CREW") lands that are connected by the habitat in the Bellmar and Kingston projects' footprint. Dkt. 98-5 at 3–4, 7, 15–16 (Schwartz Dec. ¶¶ 8–12, 17–23, 45–47); Ex. 3 at 2–8 (Schwartz Second Dec. ¶¶ 10–34). Permitting Kingston and Bellmar would harm Mr. Schwartz's ability to observe panthers in these and other areas. Dkt. 98-5 at 3–4, 7, 15–16 (Schwartz Dec. ¶¶ 8–12, 17–23, 45–47); Ex. 3 at 2–8 (Schwartz Second Dec. ¶¶ 10–34).

Sierra Club members Rhonda Roff and Michael McGrath will also be harmed by these developments. Ms. Roff regularly visits preserves near both the proposed Bellmar and Kingston developments and frequently observes wildlife along the road that is north of the Bellmar site. Ex. 5 at 3–5, 7–9 (Roff Dec. ¶¶ 10, 16, 20, 25–26, 28–30). Mr. McGrath frequents public lands and trails that are near both projects and enjoys looking for panthers and engaging in wildlife photography. Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 16, 19). Ms. Roff has even been lucky to observe panthers in the wild several times. Ex. 5 at 7–8 (Roff Dec. ¶ 26). These projects will harm Ms. Roff's and Mr. McGrath's ability to observe panthers in these and other areas where they regularly recreate. *Id.* at 3–5, 7–9 (Roff Dec. ¶¶ 10, 16, 20, 25–26, 28–30); Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 16, 19).

JA.1104

**C.      The Projects Will Irreparably Harm Caracara and Plaintiffs' Members.**

In addition to harming the panther, these projects will permanently destroy thousands of acres of foraging and nesting habitat for at least 2 breeding pairs of caracara and will destroy the reproductive success of those 2 pairs at least during the construction year.  Ex. 8 at 7–8 (Bellmar TA Form); Ex. 10 at 7–8 (Kingston TA Form).  For a species estimated to consist of only 280 nesting pairs, Ex. 2 at 7 (Morrison Dec. ¶ 22), the loss of reproduction from 2 nesting pairs is significant and irreparable.  *Am. Rivers*, 271 F. Supp. 2d at 258–59.

Dr. Morrison assessed the impacts that the Bellmar project would have on the caracara. In her professional opinion, the Bellmar project alone would cause the *permanent* loss of reproductive success for the resident breeding pair.  Ex. 2 at 2, 5, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–38, 45).  As USFWS itself acknowledges, caracara habitat in Florida is saturated (meaning there is no vacant habitat in which this pair can establish a new home range and reproduce).  Ex. 8 at 9 (Bellmar TA Form); Ex. 2 at 5–6 (Morrison Dec. ¶¶ 19–20).  Dr. Morrison explains the problem as an ever-shrinking fishbowl, where fewer and fewer resources support fewer and fewer caracara.  Ex. 2 at 5–8 (Morrison Dec. ¶¶ 20–23).  The habitat loss from Bellmar will thus displace the nesting pair and force them to move into another territory where they will have to compete for resources with other caracara breeding pairs, with habitat sufficient for only 1 to survive.  *Id.* at 2, 5, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–38, 45).  This represents a potential domino effect where displacement ripples out as resident caracara breeding pairs are pushed from their territories by incoming displaced pairs.  *Id.*  For the caracara, "currently available evidence provides substantial reasons to believe that habitat loss that reduces the number of breeding pairs likely appreciably diminishes survival and recovery."  *Id.* at 8 (Morrison Dec. ¶ 24).

31

This harm to the caracara will irreparably harm Plaintiffs' members. *Fund for Animals v. Clark*, 27 F. Supp. 2d at 14. Ms. Roff is an avid birdwatcher who specifically enjoys seeing crested caracaras when she recreates and travels in Collier County. Ex. 5 at 3–5, 7 (Roff Dec. ¶¶ 12, 16, 20, 25, 27–29). Ms. Roff regularly travels along portions of the roads adjacent to the Bellmar site to view birds, including the caracara. *Id.* Similarly, Mr. McGrath regularly travels to natural areas near these two proposed projects to view wildlife, including the caracara. Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 14, 16, 19). As a result of these projects, Plaintiffs' members ability to birdwatch for caracara will be irreparably harmed. Ex. 5 at 3–5, 7, 11 (Roff Dec. ¶¶ 12, 16, 20, 25, 27–29, 38); Ex. 4 at 3–5 (McGrath Dec. ¶¶ 10, 13, 14, 16, 19).

## III.     The Balance of Equities and the Public Interest Favor Preliminary Relief.

The irreparable harms to endangered species and Plaintiffs' interests posed by the impending permits outweigh any purported harm to the opposing parties. An injunction also furthers the public interest by protecting threatened and endangered species from irreparable harm and ensuring compliance with the ESA. An injunction also preserves federal rights and remedies to ensure the enforceability of Congress' mandates.

When weighing the balance of equities, the Court must consider "the competing claims of injury and the effect an injunction would have on each party." *Fed. Maritime Comm'n v. City of Los Angeles*, 607 F. Supp. 2d 192, 203 (D.D.C. 2009). When, as here, there is environmental injury, the balance of harm favors preliminary relief because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco*, 480 U.S. at 545. As discussed above, the harms Plaintiffs face are irreparable and imminent. By contrast, there is no substantial harm to the Defendants, Intervenors, or developers.

As to the Defendants and Intervenors, the preliminary relief Plaintiffs seek would at most postpone a permitting decision by FDEP on only two permit applications until the Court has entered final judgment, including any remedy, on the merits of Plaintiffs' ESA claims. Since the parties' cross-motions for summary judgment have been fully briefed, and the Court has already held oral argument, the matter is ripe for adjudication. FDEP would be able to continue administering the state 404 permit during that time, and the Defendants would be able to continue their activities related to the state program.[25]

The developers could face some delay in the permitting decision but could also benefit from the Court's ruling on the legality of the technical assistance process and incidental take coverage in the program that issues that permit. Additionally, there is no reason to believe that the potential burden of some additional delay would be substantial or sufficiently substantial to overtake the irreparable harm to Plaintiffs and the public interest in protecting threatened and endangered species. *See Tenn. Valley Auth.*, 437 U.S. at 178 (observing that the value of our "genetic heritage" in the form of endangered species is "quite literally, incalculable" (quoting H.R. Rep No. 93-412, at 4–5 (1973))); *Am. Rivers*, 271 F. Supp. 2d at 261 (granting preliminary injunction); *see also Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 614 (D.C. Cir. 1980) (balance of equities favored farmworker organizations seeking to enjoin use of pesticide based on health effects to 10- and 11-year-olds even where growers might experience diminished labor pool, delays, and increased costs to attract other workers or seek waivers of the prohibition); *S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (temporary economic harms did not outweigh environmental harms).

---

[25] It is also possible that the parties could transfer the permits to the Corps for processing, which would restore federal protections under the ESA and NEPA and ensure accountability in federal court.

The requested relief is also in the public interest because it would ensure protection of threatened and endangered species that rely on habitat areas that would be destroyed by the Bellmar and Kingston projects.  "Congress' enactment of the ESA clearly indicates that the balance of interests 'weighs *heavily* in favor of protected species.'"  *Am. Rivers*, 271 F. Supp. 2d at 261 (emphasis in original).  *Accord Humane Soc'y*, 481 F. Supp. 2d at 71 ("Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the 'public interest' lies in the protection of the endangered [species]….").  When it comes to the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth.*, 437 U.S. at 194.  *Accord Am. Rivers*, 271 F. Supp. 2d at 261.  The public "unquestionably" has a "substantial stake" in "preservation of the natural environment." *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977).  And here, "only an injunction [can] vindicate the objectives of the [ESA]." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982).

There is also a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. at 152.  *See also Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. at 1256 (same); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702, 1995 WL 748246, at *12 (D.D.C. 1995) ("Issuance of a preliminary injunction here would thus directly serve the public interest by ensuring that federal agencies thoroughly consider the environmental consequences of their actions…").  There can be "no question" that the public has an interest in having Congress' environmental mandates "carried out accurately and completely." *Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 26 (D.D.C. 2009).  Here, Plaintiff's "extremely high likelihood of success on the

merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

Moreover, the "primary 'purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo.'" *Aamer v. Obama*, 742 F. 3d 1023, 1043 (D.C. Cir. 2014). In this case, the targeted relief Plaintiff seeks would prevent the issuance of specific state 404 permits until final resolution of the merits. This would preserve the status quo as to those applications because the permits have not issued.

## IV.   Preliminary Relief Should Issue Without Bond.

Lastly, the Court should exercise its discretion to issue a TRO and preliminary injunction without requiring a bond or, in the alternative, requiring a nominal bond of $100. While harm to Plaintiffs would be incalculable, *Tenn. Vall. Auth.*, 437 U.S. at 178, the relief requested would preserve the status quo of the permits and the parties' interests. It is well within the Court's broad discretion not to require a bond. *Sutton Invs. LLC v. Perlmutter*, No. 1:21-CV-3226, 2021 WL 6062635, at *6 n.4 (D.D.C. Dec. 22, 2021). This discretion has been applied to require no bond where it would in effect deny nonprofit environmental organizations from obtaining judicial review of the Government's violation of environmental laws. *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (setting no bond for an environmental non-profit "to ensure access to the courts . . . where Congress has provided for private enforcement of a statute"). Courts have also declined to require a bond for a TRO and preliminary injunction where, as here, the restraint will do the defendant "no material damage." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (outlining discretion for bonds on injunctions and stays).

If the Court does require a bond, a nominal bond of $100 is appropriate because a TRO

and preliminary injunction is in the public interest and a substantial bond requirement would in

effect prevent environmental nonprofits from enforcing environmental laws against the

Government. *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168–69 (D.D.C. 1971)

(requiring only a nominal bond in a NEPA case).

## CONCLUSION

For the reasons expressed above, Plaintiffs therefore respectfully request that the Court

(1) immediately issue a TRO enjoining the parties from taking any action furthering the issuance

of the Bellmar and Kingston permits, up to and including issuing the permits; and

(2) preliminarily enjoin any further action on these permits until the Court grants final judgment,

including any remedy, on Plaintiffs' claims related to ESA-listed species.

In the alternative, Plaintiffs request an expedited ruling on Plaintiffs' Motion for

Summary Judgment as to Claims 2–4, 6, 10, and 13, with an order restoring authority to the

Corps over permits that may affect ESA species, by the date that any TRO expires, while the

parties further brief remedy regarding vacatur of the programmatic BiOp, programmatic ITS, and

EPA's approval of the State 404 program.

In accordance with LCvR 7(m), Plaintiffs' counsel conferred with opposing counsel in a

good faith effort to determine whether there is opposition to the motion and were not able to

come to an agreement regarding the motion.  Defendants have reserved their position on the

motion and intend to file a response.  Intervenors oppose the motion.

Dated:  December 4, 2023

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221

36

JA.1110

CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing under LCvR 83.2(c)(1)

37

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of December 2023, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

JA.1112

# EXHIBIT C

## COMPARISION TABLE OF SPECIES REVIEW PROCESS IN CORPS-LED AND FLORIDA-LED SECTION 404 PROGRAMS

**Comparison of Species Review Process in Corps-led and Florida-led Section 404 Programs**

| | Corps-led 404 Program | Florida-led 404 Program |
|---|---|---|
| **Agency Participants** | Corps, EPA, FWS, FWC | FDEP, EPA, FWS,[a] FWC |
| **Review Standard** | Whether permit "is likely to jeopardize the continued existence of" listed species or "adversely modify" designated "critical habitat"[b] | Same standard[c] |
| **"No Effect" Finding by Corps/FDEP** | No FWS review[d] | FWS receives and reviews all permit applications[e] |
| **"May Affect" Finding by Corps/FDEP** (Informal Consultation) | If permit "may affect" listed species or critical habitat, Corps informally consults with FWS.[f] | Same standard[g] |
| **"May Affect, Not Likely to Adversely Affect" Finding** (Informal Consultation Ends) | If permit "is not likely to adversely affect" listed species or critical habitat, consultation ends.[h] | Same standard[i] |
| **"Likely to Adversely Affect" Finding** (Formal Consultation) | If either the Corps or FWS determines that the proposed permit is "likely to adversely affect" listed species or critical habitat, formal consultation between the Corps and FWS begins.[j] | Same standard[k] |
| **Jeopardy Standard** | FWS issues a "biological opinion" evaluating whether the permit is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat; if it makes that finding, the BiOp will include "reasonable and prudent" alternatives to the action, if any.[l] | Same standard[m] |
| **Incidental Take Authorization** | If there is "no jeopardy" but "incidental take" of listed species or critical habitat is reasonably certain to occur, FWS will issue an incidental take statement that specifies the impact of the incidental taking on the species, those "reasonable and prudent measures" necessary or appropriate to minimize such impact, measures necessary to comply with any take authorization, and any terms and conditions required to implement these measures.[n] | Same standard[o] |
| **Incidental Take Liability Protection Only If Complies with FWS Conditions** | Take liability protection is afforded only if permittee complies with FWS's conservation measures, terms and conditions.[p] This exemption may extend to private applicants covered by the federal action (i.e., Corps' issuance of a permit).[q] | Same standard[r] |
| **Species Review Terms and Conditions** | Corps has the <u>option</u> to accept or disregard FWS conditions[s] | FDEP must accept FWS's conditions[t] |
| **Permit Denial based on Species Concerns** | Corps "<u>may</u>" decide to not grant the permit.[u] | "If the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, [FDEP] <u>shall deny</u> the permit or shall |

| | Corps-led 404 Program | Florida-led 404 Program |
|---|---|---|
| | | take no action and notify EPA and the applicant of the decision…"[v] |
| **EPA Oversight** | EPA may veto permits issued by the Corps of Engineers for limited reasons.[w] | EPA retains full oversight authority including the ability to object to or make recommendations on avoidance, minimization, and compensation measures for species.[x] |
| **Public Comment** | No right of public comment on project BiOp/ITS[y] | Public review and comment on all aspects of FDEP permit, including FWS and FWC species analysis and conservation measures, terms and conditions[z] |
| **Public Access to Species Review Documentation** | FOIA[aa] | Available in real-time on FDEP Information Portal[bb] |
| **Best Available Science** | FWS uses best available science[cc] | FWS must use "best available science" and BiOp requires State of Florida to use "best available data"[dd] |
| **Legal Challenges** | District court lawsuit challenging 404 permit and/or Biological Opinion[ee] | Florida Administrative Hearing[ff]<br>Florida Judicial Review in state courts[gg] |
| **Need for TRO/PI to Block an Issued Permit** | Plaintiff must obtain TRO/PI from federal court to block project pending judicial review | No final agency action if state administrative appeal is filed[hh] |
| **Standard of Review for Challenges to Species Protection Provisions in Section 404 Permits** | Arbitrary or Capricious, Abuse of Discretion, or Not in Accordance with Law[ii] | Factual findings not supported by competent, substantial evidence, erroneous interpretation of law, or exercise of discretion outside the range of discretion delegated to the agency by law[jj] |
| **Enforcement for Take due to Non-compliance with Incidental Take Provisions** | Federal enforcement[kk]<br>Citizen suit[ll] | State enforcement[mm]<br>Federal enforcement[nn]<br>Citizen suit[oo] |
| **Primary Source/Guidance** | FWS ESA Regulations (50 CFR Part 17)<br>ESA Consultation Handbook | Programmatic BiOp with ITS<br>FDEP-FWS-FWC Memorandum of Understanding<br>FDEP 404 Regulations<br>FDEP "will utilize [FWS]-approved permitting guidance that currently is used by the [Corps]"[pp] |

Agencies: U.S. Army Corps of Engineers (Corps), Florida Department of Environmental Protection (FDEP), U.S. Environmental Protection Agency (EPA), U.S. Fish & Wildlife Service (FWS), National Marine Fisheries Service (NMFS), Florida Fish & Wildlife Conservation Commission (FWC).[qq]

Documents: The ESA Section 7 Consultation Handbook ("ESA Handbook") is publicly available at https://www.fws.gov/media/endangered-species-consultation-handbook, and in the Administrative Record ("AR") at EPA-HQ-OW-2018-0640-0387-A10. The State 404 Program Applicant's Handbook ("Florida 404 Handbook"), which was adopted by Florida as a regulation (Fla. Admin. Code. R. 62-331.010(5)), is available in the AR at EPA-HQ-OW-2018-0640-0002-A20. The FWS Programmatic Biological Opinion ("BiOp") is found in the AR at EPA-HQ-OW-2018-0640-0642. The Memorandum of Understanding between FDEP, FWC, and FWS ("MOU") is available in the AR at EPA-HQ-OW-2018-0640-0016-A2.

---

[a] "Technical assistance refers to a type of coordination process described in the ESA Section 7 Consultation Handbook (1998) that outlines a variety of ways in which the FWS provides expertise and guidance on an individual project basis. In the context of FDEP's 404 permit application reviews, the FWS will provide technical assistance to the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA, CWA, and Chapter 62-331, F.A.C." BiOp at x (emphasis added).

[b] 16 U.S.C. § 1536(a)(2).

[c] Florida-led process is intended to be "as protective as" the ESA Section 7 process in the Corps-led permit program. *See* MOU at 4. FWS "will provide technical assistance to FDEP to insure that no State 404 permit action jeopardizes the continued existence of ESA-listed species or adversely modifies or destroys critical habitat…" BiOp at 5 (emphasis added). FWS uses the same review standards as for Corps-led permits. *See id.* at 24-25 (explaining analysis for "no effect/no impact," "not likely to adversely affect/impact," "likely to adversely affect/impact," and "jeopardizes the continued existence of the species, and/or destroys or adversely modifies critical habitat"). As explained in the BiOp, "FDEP's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA requirements." BiOp at 67.

[d] If the Corps finds that a proposed permit will have "no effect" on listed species or critical habitat, ESA consultation does not occur. ESA Handbook at 3-12.

[e] BiOp at 11 ("FDEP will … forward submitted applications to FWS and USFWS"); *id.* at 12 ("USFWS will receive all permit applications and public notices directly from FDEP…USFWS will review all permit applications and effects assessments received from FDEP and FWC. USFWS will submit questions, information and comments or measures necessary to minimize effects to ESA-listed species as needed. FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from USFWS into its permit actions…"). FWS will "[r]eceive all the 404 permit applications sent by FDEP" and "[r]eview all the 404 permit applications sent by FDEP," and will "determine whether the permit application has the required information to assess: a. Whether or not issuing the permit is likely to jeopardize an ESA-listed or proposed fish, wildlife, or plant species or cause adverse modification to proposed or designated critical habitat of such species; and b. whether or not take, as defined by the ESA and [its] implementing regulations…is reasonably certain to occur as a result of issuing the permit after taking into account all the protection measures that the FDEP and/or the applicant propose to implement." *Id.* at 19-20; *see also* BiOp at 67-68 (explaining that "[a]ll State 404 applications will be forwarded to USFWS for review," with "FDEP or FWC preliminary determinations for effects to ESA-listed species…").

[f] ESA Handbook at 3-1.

[g] If permit "may affect/impact" listed species or critical habitat, FWS provides technical assistance and FDEP must adopt all FWS comments, terms, conditions, and protective measures. *See* BiOp at 11-12, 16.

[h] ESA Handbook at 3-12.

[i] BiOp at 24-25.

[j] ESA Handbook at 3-13.

[k] BiOp at 24-25.

[l] ESA Handbook at 4-1 to 4-2.

[m] FDEP is "prohibit[ed] [from] issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA." BiOp at 25.

[n] ESA Handbook at 4-1 to 4-2.

[o] BiOp at 69-73.

ᵖ ESA Handbook at 2-12.

�q 16 U.S.C. § 1536(b)(4); ESA Handbook at 2-12 to 2-13.

ʳ BiOp at 69-73 (requiring compliance with all FWS terms and conditions in order for incidental take liability protection to apply).

ˢ If a jeopardy/adverse modification determination results, the Corps "may" adopt FWS's reasonable and prudent alternatives, decide not to grant the permit, propose modifications of the action or offer other alternatives "not yet considered," or "choose to take other action if it believes, after a review of the biological opinion and the best available scientific information, such action satisfies [ESA] section 7(a)(2)." ESA Handbook at 2-11 to 2-12.

ᵗ FDEP "shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat." Florida 404 Handbook, Section 5.2.3; BiOp at 68 (explaining that "FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat").

ᵘ ESA Handbook at 2-11 to 2-12.

ᵛ Florida 404 Handbook, Section 5.2.3.

ʷ 33 U.S.C. § 1344(c) (authorizing EPA veto of Corps permit in certain instances, i.e., "unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas").

ˣ BiOp at 12. While EPA may waive review of certain 404 permits, any Florida 404 permit applications "with reasonable potential for affecting ESA-listed or ESA-proposed species or critical habitat, however, are not waived" by EPA under any situation. Id. at 13. "Under the State 404 program, projects with reasonable potential for affecting ESA-listed species or ESA-proposed species or critical habitat are defined as projects that have been determined by FDEP and FWC, in coordination with USFWS, to affect listed species and their critical habitats, whether effects are beneficial or adverse." Id.

ʸ Dkt. 99 at 38-40; Dkt. 102 at 41; Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 660 n.6 (2007) (explaining that there is not an "independent right to public comment with regard to consultations conducted under § 7(a)(2)" of the ESA).

ᶻ BiOp at 13. "Details regarding the types and magnitude of effects to species and their critical habitats, as well as proposed protection measures are to be included in the public notice." Id.

ᵃᵃ https://www.usace.army.mil/FOIA/Offices.aspx; see also Dkt. 72 (comparing availability of environmental documents under Florida-led versus Corps-led programs).

ᵇᵇ Technical assistance process with FWS "will be accomplished prior to the Public Notice, when possible." MOU at 6. This is intended to allow species impact analysis and proposed protection measures to be available for public input, and to allow FWS and FWC the ability to consider and address those comments, as appropriate, including through changes to permit conditions and requirements. Id.

ᶜᶜ 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

ᵈᵈ Because FWS is participating in the Technical Assistance Process by virtue of its obligations arising under Section 7(a)(2) of the ESA in accordance with the Programmatic Biological Opinion, FWS must use the best available science. Id.; see also Dkt. 99 at 69. As explained in the Programmatic Biological Opinion, the State of Florida and FWS must use the "best available data," defined as: "Best available data means data to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under Section 7(a)(2) of the ESA, the USFWS is required to use the best available science..." BiOp at iv (emphasis added).

ᵉᵉ Permit applicants and permit opponents seek judicial review of Corps-led permit actions in federal district court.

ᶠᶠ Fla. Stat. § 120.569-.57; Fla. Admin. Code R. 28-106.215-.217.

ᵍᵍ Fla. Stat. § 120.68.

ʰʰ Fla. Admin. Code R. 62-110.106(7)(e)(2), (10)(a).

ⁱⁱ 5 U.S.C. § 706(2)(A).

[jj] Fla. Stat. § 120.68(7)(b), (d), (e).

[kk] 16 U.S.C. § 1540(e)

[ll] 16 U.S.C. § 1540(g)

[mm] Fla. Stat. § 120.68(7)(b).

[nn] 16 U.S.C. § 1540(e)

[oo] 16 U.S.C. § 1540(g)

[pp] BiOp at 67.

[qq] Since 1976, FWS and FWC have been parties to a cooperative agreement under Section 6(a) of the Endangered Species Act, which directs FWS to "cooperate to the maximum extent practicable with the States." *See* MOU at 4.

JA.1118

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY AND SIERRA CLUB'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

   I.   Plaintiffs are Likely to Succeed on the Merits.............................................. 2

      A.  The Programmatic BiOp and ITS Violate the ESA, and EPA's Reliance
          Was Unlawful. ...................................................................................... 3

      B.  Plaintiffs Have Established Standing........................................................ 9

   II.  Absent Immediate Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm. ............ 11

      A.  USFWS' Technical Assistance Fails to Adequately Protect ESA Species and
          Is Not Clearly Reviewable in Federal Court to Ensure ESA Compliance.................... 13

      B.  The Projects Will Irreparably Harm Panthers and Plaintiffs' Members........................ 20

      C.  The Projects Will Irreparably Harm Caracara and Plaintiffs' Members. ..................... 26

      D.  Issuance of the Permits is Imminent. ..................................................... 29

      E.  Plaintiffs' Request for Preliminary Relief is Timely. .................................. 31

  III.  The Balance of Equities and Public Interest Favor Preliminary Relief. ........................ 36

      A.  Preliminary Injunctions Are Temporary.................................................. 36

      B.  Plaintiffs' Requested Relief Would Preserve the Status Quo............................ 37

      C.  The Public Interest is in Protecting ESA-Listed Species............................... 37

      D.  Plaintiffs' Motion Serves the Public Interest in Cooperative Federalism.................... 38

      E.  Plaintiffs' Harms Outweigh FDEP's Asserted Harms................................... 39

      F.  Plaintiffs' Harms Outweigh the Developers' Asserted Harms. ......................... 42

      G.  The Public Interest Favors Preliminary Relief.......................................... 44

  IV.  The Court Has Authority to Enter the Requested Relief. .................................... 45

   V.  The Requested Relief is Narrowly Tailored and Appropriate. ............................... 51

CONCLUSION.................................................................................................. 55

CERTIFICATE OF SERVICE .............................................................................. 56

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Agrico Chem. Co. v. Dep't of Env't Regul.*,
    406 So. 2d 478 (Fla. 2d Dist. Ct. App. 1981) ...........................................................9

*Am. Forest Res. Council v. Williams*,
    No. CV 21-601 (RJL), 2021 WL 4819846 (D.D.C. Oct. 13, 2021) .......................33

\*   *Am. Rivers v. Corps*,
    271 F. Supp. 2d 230 (D.D.C. 2003) ......................................................12, 21, 26

\*   *Appalachian Voices v. U.S. Dep't of Interior*,
    25 F.4th 259 (4th Cir. 2022) ...................................................................15, 16

*Arkansas v. Oklahoma*,
    503 U.S. 91 (1992)....................................................................................39

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983)....................................................................................13

*Bennett v. Spear*,
    520 U.S. 154 (1997)....................................................................................9

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................51

\*   *Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ....................................................................37

*Conservancy of Sw. Fla. v. Williams*,
    No. 13-14477, 2018 WL 11422990 (S.D. Fla. Dec. 21, 2018)...............................14

*D.C. v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................37

*Defs. of Conewango Creek v. Echo Devs., LLC.*,
    No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007)......................32

*Defs. of Wildlife v. EPA*,
    420 F.3d 946 (9th Cir. 2005) ......................................................................53

*Defs. of Wildlife v. Salazar*,
    812 F. Supp. 2d 1205 (D. Mont. 2009)..........................................................11

*Defs. of Wildlife v. U.S. Dep't of Interior*,
    931 F.3d 339 (4th Cir. 2019) ......................................................................24

*District of Columbia v. Schramm*,
631 F.2d 854 (D.C. Cir. 1980) ...................................................................46

\* *Eco Tour Adventures, Inc. v. Zinke*,
249 F. Supp. 3d 360 (D.D.C. 2017) ...........................................................32

\* *Fed. Nat'l Mortg. Ass'n v. LeCrone*,
868 F.2d 190 (6th Cir. 1989) ......................................................................51

\* *Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge*,
679 F. Supp. 37 (D.D.C. 1987) .............................................................41, 42

\* *Fla. Wildlife Fed'n v. Fla. Dep't of Env't Prot.*,
No. 14-1420RU, 2014 WL 4627151 (Fla. Div. Admin. Hr'gs Sept. 11, 2014) .....................10

\* *Friends of Crystal River v. EPA*,
794 F. Supp. 674 (W.D. Mich. 1992) .....................................................38, 47

\* *Fund for Animals, Inc. v. Turner*,
No. CIV. A. 91-2201, 1991 WL 206232 (D.D.C. Sept. 27, 1991) ...........................12

\* *Fund for Animals v. Clark*,
27 F. Supp. 2d 8 (D.D.C. 1998) ..................................................................13

\* *Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003) ............................................................13

*Fund for Animals v. Rice*,
85 F.3d 535 (11th Cir. 1996) .......................................................................14

*General Motors Corp. v. EPA*,
168 F.3d 1377 (D.C. Cir. 1999) ..................................................................46

\* *Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ..............................................................30, 32

*State ex rel. Guste v. Lee*,
635 F. Supp. 1107 (E.D. La. 1986) .............................................................44

\* *Humane Soc'y of U.S. v. Kempthorne*,
481 F. Supp. 2d 53 (D.D.C. 2006) ..............................................................12

\* *League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...................................................................38, 42

*Loper Bright Enters., Inc. v. Raimondo*,
45 F.4th 359 (D.C. Cir. 2022) .....................................................................14

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ............................................................................................ 50

*McClash v. Manasota-88, Inc.,*
    No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hr'gs June 25, 2015) .......................... 10

\*   *Melendres v. Maricopa Cnty.,*
    897 F.3d 1217 (9th Cir. 2018) ............................................................................... 39

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ............................................................................................ 53

\*   *Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) ..................................................................... 40, 43

*Nat'l Treasury Emps. Union v. Yeutter,*
    918 F.2d 968 (D.C. Cir. 1990) ............................................................................... 53

\*   *Nat'l Wildlife Fed'n v. Brownlee,*
    402 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................... 17, 50

*Nat'l Wildlife Fed'n v. Caldera,*
    No. 00-cv-1031, 2002 WL 628649 (D.D.C. Mar. 26, 2002) .......................................... 50

\*   *Nat'l Wildlife Fed'n v. NMFS,*
    886 F.3d 803 (9th Cir. 2018) ............................................................................... 13

*Nat'l Wildlife Fed'n v. Norton,*
    332 F. Supp. 2d 170 (D.D.C. 2004) ............................................................. 17, 25, 27

*Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.,*
    435 F.3d 326 (D.C. Cir. 2006) ............................................................................... 52

*New York v. United States,*
    505 U.S. 144 (1992) ............................................................................................ 39

*Nw. Env't Def. Ctr. v. Corps,*
    817 F. Supp. 2d 1290 (D. Or. 2011) ..................................................................... 11

\*   *Prairie Band of Potawatomi Indians v. Pierce,*
    253 F.3d 1234 (10th Cir. 2001) ............................................................................. 52

\*   *Quechan Tribe of the Ft. Yuma Rsrv. v. U.S. Dep't of the Interior,*
    755 F. Supp. 2d 1104 (S.D. Cal. 2010) ................................................................... 41

*Safari Club Int'l v. Salazar,*
    No. 11-CV-01564, 2012 WL 13069816 (D.D.C. Mar. 21, 2012) .................................... 36

JA.1123

*Sierra Club v. Ga. Power Co.*,
    180 F.3d 1309 (11th Cir. 1999) ...........................................................44

*Sierra Club v. USFWS*,
    No. 2:20-CV-13, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023) .........................................17, 20

*Siesta Key Ass'n of Sarasota, Inc. v. City of Sarasota*,
    320 So.2d 833 (Fla. 2d Dist. Ct. App. 2021) ........................................51

*Standing Rock Sioux Tribe v. Corps*,
    239 F. Supp. 3d 77 (D.D.C. 2017) ........................................34, 35, 36

\*     *Tate v. Pompeo*,
    513 F. Supp. 3d 132 (D.D.C. 2021) ........................................37

\*     *Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ........................................38

\*     *Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ........................................47

\*     *United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2010) ........................................14

\*     *W. Watersheds Project v. Bernhardt*,
    468 F. Supp. 3d 29 (D.D.C. 2020) ........................................12, 32

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................26

**Federal Statutes**

16 U.S.C. § 1536(a)(2) ........................................8

16 U.S.C. § 1536(b)(4)(C)(i) ........................................5

16 U.S.C. § 1536(o) ........................................6

**Federal Regulations**

33 C.F.R. § 325.2(b)(5) ........................................9

33 C.F.R. § 325.4(a)(1) ........................................9

40 C.F.R. § 230.10(b)(3) ........................................9

40 C.F.R. § 230.30(c) ........................................9

50 C.F.R. § 402.02 ........................................15, 17, 18, 27

50 C.F.R. § 402.14(i)(1)(i) ..................................................................................5

50 C.F.R. § 402.14(g)(2) ...................................................................................15

50 C.F.R. § 402.14(g)(3) ...................................................................................17

50 C.F.R. § 402.14(h)(1)(ii) ..............................................................................15

50 C.F.R. § 402.16(a)(1) .....................................................................................5

**State Statutes**

Fla. Stat. § 403.412 ...........................................................................................10

Fla. Stat. § 403.412(2) .......................................................................................11

Fla. Stat. § 403.412(7) .......................................................................................10

**State Legislative Material**

S.B. 738, 126th Reg. Sess. (Fla. 2024) .............................................................11

**Other Authorities**

USFWS & NMFS, Endangered Species Consultation Handbook (1998), *available
    at* https://www.fws.gov/sites/default/files/documents/endangered-species-
    consultation-handbook.pdf................................................................................15

JA.1125

**INTRODUCTION**

In this action, Plaintiffs challenge the Florida Department of Environmental Protection's ("FDEP") authority to issue any 404 wetlands permit under the Clean Water Act because the State's program was unlawfully approved by the Environmental Protection Agency ("EPA") and relies on unlawful actions by U.S. Fish and Wildlife Service ("USFWS") and the U.S. Army Corps of Engineers ("Corps"). FDEP is now poised to exercise that authority to issue permits for the Bellmar and Kingston projects, which USFWS anticipates will result in significant take of the critically endangered Florida panther and the loss of reproductive success for threatened crested caracara, causing irreparable harm to Plaintiffs Center for Biological Diversity and Sierra Club ("Plaintiffs"). To avoid a preliminary injunction, the opposing parties raise a number of arguments (sometimes at cross-purposes), none of which have merit.

The argument that Plaintiffs have not established a likelihood of success on the merits is not supported by the administrative record or the law, as Plaintiffs have shown on summary judgment. The argument that Plaintiffs will not be irreparably harmed relies on the opposing parties' attempt to walk back USFWS' own determinations. It also relies on the demonstrably false premise that there is an adequate remedy at law, when in fact state courts lack authority to review federal agency actions even if Plaintiffs had adequate access to them (which they do not). The claim that delay in the issuance of two permits outweighs Plaintiffs' and the public's interest in preventing irreparable harm to ESA-listed species conflicts with Congress' intent to afford protection of these species the highest of priorities. The invocation of "cooperative federalism" ignores that state and federal cooperation that is unlawful is not in the public interest.

Collectively, the opposing parties argue that Plaintiffs have moved too late (they should have sought a preliminary injunction at the start of the litigation) but also too soon (the permits' issuance is not imminent). They argue that it is improper to mount a permit attack here, but also

1

that there are no permits yet to attack.  And they argue that Plaintiffs should not "target" two specific projects, but also that the requested relief is not narrowly tailored.  The Developers[1] add that delay would purportedly be costly, but cost alone does not outweigh these irreparable harms.

As further shown below, these arguments have no merit.  Plaintiffs seek relief from this Court to avoid irreparable harm to the Florida panther and crested caracara that will also harm Plaintiffs' interests in these species.  The risk of irreparable harm to ESA-listed species has existed since EPA transferred authority over 404 permitting to Florida.  But with the completion of USFWS' Technical Assistance Forms ("TA Forms") for the Bellmar and Kingston projects, that threat has now become concrete and imminent.  The gravity of the threat from these projects also demonstrates that the balance of equities weighs in the Plaintiffs' favor and that injunctive relief is in the public's interest.  In light of the standard for preliminary injunctive relief, it is therefore not only necessary but also proper that Plaintiffs seek this relief now.  Plaintiffs therefore respectfully request that the motion be granted.

## ARGUMENT

### I.      Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs have demonstrated that they are likely to succeed on their claims against USFWS and EPA that are related to the protection of ESA-listed species under USFWS' jurisdiction (Claims 2–4, 6, 10, and 13).[2]  On November 7, 2023, the Court ordered that "[n]o further briefs will be accepted with respect to the fully briefed and submitted cross-motions for

---

[1] In this filing, Plaintiffs refer to Collier Enterprises (the developer for the Bellmar project) as "Collier," and refer to Cameratta Companies, LLC, and CAM7-SUB, LLC (the developer for the Kingston project), collectively, as "Cameratta."

[2] Florida argues that Plaintiffs in Claim 2 alleged that EPA violated the Clean Water Act by approving a program that provides inadequate access to the courts. Dkt. 149 at 12, 35.  But the Claim 2 allegation relevant to this motion is that EPA failed to ensure that the State program would satisfy the 404(b)(1) Guideline that prohibits the issuance of permits that may jeopardize species or adversely modify or destroy critical habitat.  Dkt. 135 at 24–25 & n.18.

2

summary judgment."  Minute Order, Nov. 7, 2023.  Plaintiffs have therefore relied on their prior

briefing to demonstrate their likelihood of success on these claims.  Dkt. 135 at 23–25.  In

response, the Defendants have tried to rehabilitate arguments they raised on summary judgment,

but to no avail.  Florida, for its part, has improperly raised new arguments (and submitted a new

"comparison" chart) in apparent contravention of the Court's directive.  Should the Court

consider those arguments, Plaintiffs address them below.

### A.      The Programmatic BiOp and ITS Violate the ESA, and EPA's Reliance Was Unlawful.

As Plaintiffs have shown, USFWS had a duty to comply with the ESA, and it failed

twice.[3]  Dkt. 135 at 23–24.  First, USFWS' Programmatic BiOp and ITS failed to comply with

the ESA at the programmatic level, punting all ESA-required analysis to the permit level.  *Id.*

Second, the permit-level technical assistance process does not require anything of USFWS other

than to receive and review state permit applications.[4]  *Id.*  That USFWS provided technical

assistance as to the Bellmar and Kingston projects does not alter the fact that the agency is not

*required* to as part of the EPA-approved Florida program, and that therefore the agency's failure

to do so (or doing so inadequately) is not clearly enforceable.

The Defendants suggest that the technical assistance process requires USFWS to comply

with the ESA's guardrails and contend that USFWS' technical assistance "clearly incorporates

the meaning of the terms from the ESA and its implementing regulations."  Dkt. 148 at 18–19,

n.2 & n.3.  But as an initial matter, USFWS *still* cannot point to *any* language in the BiOp that

---

[3] Cameratta mis-states Plaintiffs' burden as having to show that *their project* violates the ESA, Dkt. 146-2 at 9, but Plaintiffs' burden is as to the merits of the claims in their Complaint.  Collier does not address the prong at all.

[4] The Defendants had options to ensure that the State 404 program complied with both the ESA and the Clean Water Act's 404(b)(1) Guidelines regarding species protection.  Dkt. 98 at 28–29 & n.13.  Not all would have required programmatic consultation.  *Contra* Dkt. 149 at 15–16.

requires USFWS to comply with the guardrails of the ESA, including using the best available science to (1) analyze the baseline status of species; (2) evaluate the impacts of a proposed permit; (3) assess jeopardy; (4) propose reasonable and prudent alternatives; and (5) impose limits on authorized incidental take. *See id.*[5]  Moreover, as Plaintiffs have demonstrated, the technical assistance for the Bellmar and Kingston permit applications falls far short of complying with the ESA's guardrails.  Dkt. 135 at 25–32.

And even if USFWS had provided thorough review of these high-profile projects (which have been subject to exceptional scrutiny) consistent with its ESA Section 7 obligations (which it has not), that would not change the fact that Florida's 404 program, as approved by EPA, does not require USFWS to do so.  Similarly, even if USFWS had expressly set a limit on incidental take for these projects, the Programmatic BiOp does not require them to do so, does not provide any mechanism to clearly enforce a project's take limit, and does not identify any mechanism to hold USFWS accountable for unlawful actions by the agency regarding take limits.

The Defendants also adhere to their position that USFWS' technical assistance is not a final agency action subject to judicial review but suggest that this has no bearing on the merits of Plaintiffs' claims.[6]  Dkt. 148 at 23.  However, the fact that the technical assistance process does not produce a BiOp that is clearly enforceable in federal court only amplifies the inadequacy of USFWS' standardless and voluntary engagement in the technical assistance process.  *See* Dkt. 135 at 23–24.  It would allow USFWS to avoid undertaking the analysis required to ensure against jeopardy at the programmatic level (by punting all ESA-required analysis to the permit level) and again at the permit level (by employing this non-statutory technical assistance process

---

[5] The same is true for Florida.

[6] USFWS' position that these actions are unreviewable in any court only underscores the need for urgent relief from this Court before these state permits issue.

for which USFWS disavows any reviewability of *its own* actions).  The programmatic BiOp thus would simply become a vehicle for USFWS to extend unlimited incidental take liability protection not only to EPA, but also to the State and State permittees for the life of the program. The absence of accountability asserted by the Defendants only underscores that the technical assistance process does not comply with the ESA as it would allow federal wildlife agencies to evade enforcement of that statute, contrary to Congress' intent.  *Id.  Accord* Oct. 19, 2023, Hr'g Tr. 92:8–94:18, 95:14–96:9.  The technical assistance process thus does not and cannot stand in for adequate ESA consultation at the programmatic level.

In response to Plaintiffs' showing that the technical assistance process does not expressly require USFWS to identify permit conditions to cap the amount of incidental take authorized by the programmatic ITS, Dkt. 135 at 23–24, the Defendants claim that "the BiOp provides otherwise," Dkt. 148 at 19, but fail to point to any language to support that proposition.  Indeed, the BiOp states only that the amount or extent of incidental take will be *quantified* by USFWS and that this will be done "in coordination with FDEP/[the Florida Fish and Wildlife Conservation Commission ("FWC")]."  FWS-0006028, at FWS-0006108 (BiOp).  It does not require USFWS to articulate a permit condition to limit take or otherwise expressly cap the amount of take that will be authorized per the programmatic ITS, as is required in an ITS associated with a project specific BiOp.  *See* 16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. §§ 402.14(i)(1)(i), (4), 402.16(a)(1) (requiring a clear, enforceable standard for determining when the level of anticipated take has been exceeded such that consultation must be reinitiated).

Not having set take limits at the programmatic level, USFWS cannot evade its duty again by not setting take limits at the permit level.  The lack of any express take limits in the conditions for the projects' TA Forms is the foreseeable consequence of a technical assistance process that

5

JA.1130

does not require USFWS to establish them, even though this generates uncertainty about how much take is shielded from ESA liability pursuant to the programmatic ITS.  Dkt. 135 at 30–31.  The Defendants and Florida contend otherwise, Dkt. 148 at 19 n.3, 42; Dkt. 149 at 18, but their arguments are contradicted by the TA Forms and Public Notices.

As Plaintiffs have explained, the ESA creates a liability shield for incidental take "that is in compliance with the terms and conditions specified in [an ITS]," 16 U.S.C. § 1536(o), but the Programmatic ITS specifies no terms and conditions that apply to permittees.  Dkt. 135 at 24, 30, & 30 n.21.  At most, the ITS' terms and conditions require only that the State will assure compliance with state permit conditions.  *Id.* at 30 (citing FWS-006028, FWS-006109–10 (BiOp)).[7]  Therefore, to ensure compliance with the ESA, USFWS would have had to specify a take limit at the permit level, since it did not do so at the programmatic level.  But the TA Forms do not expressly establish take limits, nor do they include permit conditions expressly limiting the amount of take.  Dkt. 135-8 at 8–9, 16–17, 29–37; Dkt. 135-10 at 8–9, 22–23, 33–42.  The Defendants and Florida make unsupported arguments that USFWS' anticipated take estimates will be incorporated by FDEP as conditions, but USFWS itself did not identify them as permit conditions.  Dkt. 135-8 at 8–9, 16–17, 29–37; Dkt. 135-10 at 8–9, 22–23, 33–42.  *See* Dkt. 148-1 at 19, 26, 28, 33 (Carey Dec. ¶¶ 31, 41, 46, 54).[8]  Although the ITS states that FDEP will

---

[7] Florida relies on a statement from the ITS that "any take" incidental to a state 404 permit is exempt "if the permittee implements all permit conditions ... as agreed upon by the State and the USFWS," Dkt. 148 at 18; Dkt. 149-3 at 2, 5 n.r (citing FWS-006028, at FWS-006108 (BiOp)); but this is not included as a term and condition of the programmatic ITS.  FWS-006028, at FWS-006109–10.  Nor does this language state that a permittee must comply with a take limit established by USFWS at the permit-level to receive take liability protection or even that USFWS must establish a permit-level take limit at all.  *Id.* at FWS-006108.

[8] Florida's argument that a permittee must comply with permit requirements, Dkt. 149 at 19, falls flat because USFWS has not proposed permit conditions that would expressly limit incidental take, Dkt. 135-8 at 8–9, 16–17, 29–37; Dkt. 135-10 at 8–9, 22–23, 33–42.

6

"reopen the permit" if take exceeds that anticipated by USFWS (if and when USFWS identifies an amount of anticipated take), FWS-006028, at FWS-006110 (BiOp), the ITS does not say that take exceeding the anticipated amount would be unauthorized and therefore subject to an ESA enforcement action by the public or USFWS. *Contra* Dkt. 148 at 42.

For its part, Florida belatedly seeks to introduce extensive argument on the merits of Plaintiffs' claims, including a new comparison chart that purports to show that the same process and standards apply to Corps-led and State-led 404 permit review.[9] Dkt. 149 at 20; Dkt. 149-3. But that is not the case. Plaintiffs attach their own comparison chart citing the applicable legal authority that shows otherwise and address Florida's meritless arguments here.

First, Florida argues that USFWS uses the same "review standard" for State 404 permits, but the BiOp language cited as support describes "FDEP's processes and procedures," the overarching "jeopardy" standard, and preliminary effect determinations made "by FDEP and FWC, and coordinated with USFWS."[10]

Second, Florida places great weight on the BiOp's definition of "best available data" to suggest that this definition creates a legal requirement for USFWS to use the best available science when engaging in the technical assistance process. Dkt. 149 at 19. However, that definition is not an express requirement to use the best available science during the technical assistance process, and Florida points to no authority that suggests it is. The ESA *requires* USFWS to use the best available science in developing its programmatic BiOp (yet it did not).

---

[9] The Defendants, by contrast, explicitly stated at summary judgment that they do not argue that the technical assistance process is equivalent to Section 7 consultation. Dkt. 99 at 74.

[10] Florida also touts the State's "track record" of species protection, Dkt. 149 at 21–22, but only says that USFWS "reviewed" applications they received, *id.*, which is all the program requires, and that "conditions were included" to protect species. Plaintiffs, however, have identified other specific examples of USFWS' inadequate involvement. *See, e.g.*, Dkt. 98-1 at 9–12, 18, 38 (Crooks Dec. ¶¶ 28–32, 51–52, att. A); Dkt. 104-1 at 4 (Crooks Dec. ¶ 70).

7

But nothing in the technical assistance process binds USFWS to comply with the ESA's best available science requirement at the permit level.[11]  Indeed, that term is not used at all in the BiOp's description of USFWS' voluntary engagement in the technical assistance process.  FWS-006028, at FWS-006049–75 (BiOp).[12]

Florida also asserts that USFWS is participating in the technical assistance process "by virtue of its obligations arising under Section 7(a)(2)" and therefore must use the best available science.  Dkt. 149-3 at 3, 5 n.dd.  However, Section 7 on its face only applies to USFWS' actions fulfilling its obligations to consult with a federal agency on a federal agency action, 16 U.S.C. § 1536(a)(2), whereas here, USFWS is only providing "assistance" to a state agency on a state agency action.  Indeed, the Defendants have clearly said that they "do not claim that the technical assistance process equals Section 7 consultation" and that "absent any further federal permitting, no further Section 7 consultation is required."  Dkt. 99 at 74.

Third, Florida misstates federal law when it suggests that, unlike FDEP, the Corps may accept or disregard USFWS conditions when granting a permit.  Dkt. 149 at 20–21, 45; Dkt. 149-3 at 5 n.s, n.t.  The Supreme Court has explained that this is "technically" possible, but a federal agency would "do[] so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal

---

[11] In the programmatic BiOp and MOU, USFWS could have made plain that it must use the best available science in technical assistance decisions—it did not do so.  The Defendants attempt to cure this defect by asserting broadly in their brief that the ESA requirements for consultations apply to technical assistance.  But the same brief also makes clear their position that USFWS's compliance with those requirements would not be subject to judicial review.

[12] Plaintiffs searched "best available data" and "best available science," and aside from the definition, found only one reference in the entire BiOp, which says that the best available data would be used by FDEP and FWC, and coordinated with USFWS, to make the preliminary effects determinations that decide whether technical assistance is required.  FWS-006028, at FWS-006062 (BiOp).

penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (noting that

agency action causing take in a manner inconsistent with terms and conditions of an ITS would

violate ESA).   Therefore, as the Court "put it mildly," USFWS is "keenly aware of the virtually

determinative effect of its [BiOps]." *Id.*[13]   Florida's improperly raised merits arguments fail.

### B.      Plaintiffs Have Established Standing.

Florida also attempts to re-hash its baseless arguments that Plaintiffs lack standing to

prosecute this case at all.  But Plaintiffs have established their standing as to every claim,

including the claims on which this motion focuses, based on several harms.[14]  Dkt. 98 at 75–81;

Dkt. 104 at 90–101, 107–112.

To the extent Plaintiffs' standing in this case relies on the harm of inadequate access to

state courts, Florida continues to argue that *Agrico*'s "substantial interest" test would allow

Plaintiffs to bring state permit challenges, Dkt. 149 at 35–38, but that is simply not the case.

*Agrico* addressed whether economic injury was sufficient to confer standing on a businesses

seeking to intervene in a permit proceeding involving a competitor.  *Agrico Chem. Co. v. Dep't*

*of Env't Regul.*, 406 So. 2d 478, 482 (Fla. 2d Dist. Ct. App. 1981).  The case was about the type

of *interest*, not the type of *party*; it did not address associational standing.

As Plaintiffs have shown, under Florida law, associational standing requires showing that

a "substantial number" of an organization's members are "substantially affected" by an agency

---

[13] Indeed, the Corps must ensure that no 404 permit will jeopardize an ESA-listed species, 40 C.F.R. § 230.10(b)(3), which the agency satisfies through Section 7 consultation, *see* 33 C.F.R. §§ 325.2(b)(5), 325.4(a)(1).  *Accord* 40 C.F.R. § 230.30(c).

[14] Citing nothing, Florida wrongly speculates that five Plaintiffs were "jettison[ed]" from the motion for preliminary injunction to "manufacture" standing (based on barriers to access to state courts) for Plaintiffs that do not qualify as "citizens of the state."  Dkt. 149 at 9 n.2 & 35.  *See also* Dkt. 146-2 at 8 n.2.  But Florida ignores that Plaintiff Defenders of Wildlife is also a national organization.  And the moving Plaintiffs have an independent right to protect their interests and would assert the same harms even if the motion had been filed by all Plaintiffs.

9

action.  Dkt. 98 at 75–76 & n.39; Dkt. 31 at 47–48.  Using this test, standing has even been found lacking for a Florida organization.  Dkt. 31 at 47.  The application of the test places particularly unreasonable restrictions on national organizations with hundreds of thousands of members who seek to defend the conservation interests of their Florida members.  *Id.*; Dkt. 98 at 75–76 & n.39.

Florida has previously argued that Florida Statute Section 403.412 removes this obstacle, Dkt. 102 at 46–47, but that too is not the case.  Under Section 403.412, only "citizens of the state" qualify for Article III standing in administrative proceedings pertaining to federally delegated programs.  Fla. Stat. § 403.412(7).  *See* Dkt. 104 at 97.  Therefore, to challenge a permit in a state administrative proceeding, Plaintiffs must either show that (1) a substantial number of members are substantially affected to establish associational standing pursuant to Chapter 120; or (2) they are a citizen of the state under Section 403.412.  Although the administrative court in *McClash* found that Sierra Club had associational standing under Chapter 120 (but not under Section 403.412), that finding was based entirely on the parties' stipulation that Sierra Club had a substantial number of members that were substantially affected.  *McClash v. Manasota-88, Inc.*, No. 14-4735, 2015 WL 3966050, at *8 (Fla. Div. Admin. Hr'gs June 25, 2015).  Where there has been no such stipulation, the administrative court has found otherwise, even as to a Florida organization.  *Fla. Wildlife Fed'n v. FDEP*, No. 14-1420RU, 2014 WL 4627151, at *5, *14 (Fla. Div. Admin. Hr'gs Sept. 11, 2014).

Contrary to Florida's accusation, Dkt. 149 at 35, Plaintiffs did not "ignore" Chapter 120.  *See* Dkt. 31 at 47–48; Dkt. 98 at 78–79; Dkt. 104 at 95–98; Dkt. 135 at 31.  Plaintiffs have identified several obstacles to bringing permit challenges, including restrictive standing and the prohibitive expense of having to litigate cases de novo that likely require significant

expenditures.[15]  *Contra* Dkt. 149 at 38 n.19.  As Plaintiffs have noted, retaining an expert to prepare a declaration based on their review of records hardly compares to putting on an affirmative case in a de novo proceeding, including depositions and expert testimony.

To make matters worse, national organizations who are not citizens of the state completely lose the ability to bring enforcement actions in state court.  Fla. Stat. § 403.412(2) (only "a citizen of the state" may "maintain an action for injunctive relief" in state court).  In other words, non-citizens of the state are barred from suing to enjoin 404 permit violations or to compel FDEP to take enforcement action for 404 violations.  *Id.*  So, for instance, if the Developers receive the state 404 permits at issue here, Plaintiffs would face barriers to filing a state enforcement action to enforce compliance with mitigation requirements and other conditions that the opposing parties tout in their filings as ensuring species protection.

## II.        Absent Immediate Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm.

Plaintiffs have shown that these projects threaten irreparable harm to the critically endangered Florida panther and the threatened crested caracara, as well as Plaintiffs' interest in those species.  Dkt. 135 at 25–38.  The opposing parties' arguments to the contrary fail.  As an initial matter, the Defendants ask this Court to apply a standard for irreparable harm to species (population-level harm) that has been rejected by all courts in the D.C. Circuit that have considered it.  Dkt. 148 at 29.[16]  Florida argues for an even more unreasonable standard, also rejected by the district courts, that would require a showing of jeopardy.  Dkt. 149 at 8.

---

[15] Notably, the Florida Legislature has been considering a bill that would require the mandatory award of attorney fees against the losing party in a permit challenge, a barrier to access the courts that already exists for permit enforcement actions.  S.B. 738, 126th Reg. Sess. (Fla. 2024).
[16] The Defendants' cases are easily distinguishable.  *Nw. Env't Def. Ctr. v. Corps*, 817 F. Supp. 2d 1290, 1315–16 (D. Or. 2011) (no irreparable harm where the proposed mining project would not directly harm any protected salmon); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) (no irreparable harm where scientists have found that the species "can easily withstand" the proposed wolf hunt).

*Western Watersheds Project v. Bernhardt* specifically addressed this question and found that applying a test that required even a showing of population-level harm would be a "dubious proposition," and that the requirement to show jeopardy would "stand the ESA on its head." 468 F. Supp. 3d 29, 46–48 (D.D.C. 2020) (quoting *Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 69 (D.D.C. 2006), *vacated sub nom. on other grounds Humane Soc. of U.S. v. Kempthorne*, 527 F.3d 181 (D.C. Cir. 2008)). The court ultimately denied the request for preliminary relief because the killing of a *single* threatened grizzly bear may not be irreparable, especially where the population "has been growing for years" and USFWS' rules allow grizzlies to be killed for self-defense, defense of property, or if they are a nuisance. *Id.* at 46–48. The court "expressed no view on whether the taking of a *single endangered* species would constitute irreparable harm." *Id.* at 48 n.10. Here, the panther and caracara have small populations, these projects will likely injure and kill many panthers and permanently destroy reproductive success for caracara, and neither species may be killed or harmed without USFWS approval.

Indeed, courts in the D.C. Circuit have held that the likely loss of even relatively few individuals from a species protected by the ESA is "a significant, and undoubtedly irreparable, harm." *Am. Rivers v. Corps*, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003). *Accord Fund for Animals, Inc. v. Turner*, No. CIV. A. 91-2201, 1991 WL 206232, at *8 (D.D.C. Sept. 27, 1991) ("[T]he loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable, harm."); *Kempthorne*, 481 F. Supp. 2d at 69 ("The Court agrees with Plaintiffs' contention that '[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head. Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered

species before a species was on the brink of extinction."). *See also Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 819 (9th Cir. 2018) ("[T]he fact that [the ESA] permits some incidental take of listed species does not establish that harm to individual members of a species cannot be irreparable."). "[T]he question of irreparable injury does not focus on the significance of the injury, but rather, whether the injury, irrespective of its gravity, is irreparable—that is whether there is any adequate remedy at law." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) (internal citation and quotations omitted).

### A.   USFWS' Technical Assistance Fails to Adequately Protect ESA Species and Is Not Clearly Reviewable in Federal Court to Ensure ESA Compliance.

Plaintiffs have shown that USFWS failed to comply with the ESA at the programmatic level and failed to satisfy the standards and procedures of Section 7 consultations during technical assistance for the Bellmar and Kingston permit applications. *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (procedural injury tied to concrete harm also constitutes irreparable harm). The Defendants' arguments to the contrary are unconvincing. To set the stage, the Defendants argue that the Court must provide USFWS "special deference" for its technical assistance and, presumably, find no irreparable harm. Dkt. 148 at 30–31. There are at least three problems with this request.

First, USFWS itself anticipates take that will irreparably harm the panther and caracara. As shown further below, USFWS' efforts to walk back, undermine, and question the import of its own assessments to avoid the relief Plaintiffs seek here fail.

Second, no deference is due to the agency's unsupported claim that the amount of take USFWS anticipates will not be reached. To support this claim, the Defendants tailor-make a quote from *Baltimore Gas* that omits a key part of the test the Court established: that the agency is making predictions, "within its area of special expertise *at the frontiers of science*." *Balt. Gas*

*& Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).[17]  But here, the Defendants did

not even use the best available science in their TA Forms, much less anything at its frontiers.

Third, the Defendants cite no authority for the proposition that they are entitled to

deference when they engage in a non-statutory technical assistance process that is not authorized

by federal law and that fails to bind USFWS to the requisite standards and procedures set forth in

the ESA.  Dkt. 135 at 23–25.  *See Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 370

(D.C. Cir. 2022), *cert. granted in part sub nom. Loper Bright Enters. v. Raimondo*, 143 S. Ct.

2429 (2023) (no deference owed if agency has no delegated authority from Congress to act).

Additionally, "[courts] do not defer to [an] agency's conclusory or unsupported suppositions,"

such as those made by USFWS here.  *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557,

562 (D.C. Cir. 2010).  USFWS therefore deserves no "special deference," and none of the

Defendants' cited cases provide otherwise.[18]

As for USFWS' technical assistance here, Plaintiffs have explained that USFWS' entire

house is built on a broken foundation because USFWS did not use the best available science to

estimate the populations of the ESA-protected species affected by these two permits.  Dkt. 135 at

26–27.  Any conclusions the agency has drawn without the proper foundation are unreliable.

For the caracara, USFWS takes the position that it was not required to include a

discussion of the species' current population.  Dkt. 148 at 32; Dkt. 148-1 at 26 (Carey Dec. ¶ 42).

---

[17] *Baltimore Gas* is also a NEPA case, and so the review standard provided by the Defendants, Dkt. 148 at 30–31, is inapplicable in an ESA case.

[18] *Conservancy of Sw. Fla. v. Williams*, No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990, at \*17 (S.D. Fla. Dec. 21, 2018) (relying on "exceedingly deferential" standard to find that "no jeopardy" decision was not arbitrary because (1) there would be no injury or death of panthers; and (2) USFWS explained how mitigation would compensate for the quality, function, and value of lost habitat); *Fund for Animals v. Rice*, 85 F.3d 535, 547–48 (11th Cir. 1996) (upholding "no jeopardy" opinion where panthers had not been sighted on or near project footprint for ten years, and the panther had no occupied territory in entire county).

And that is precisely Plaintiffs' point:  Section 7 consultation requires that USFWS evaluate the current status and environmental baseline for listed species, which includes an assessment of the current population.  50 C.F.R. §§ 402.14(g)(2), (h)(1)(ii); USFWS & NMFS, Endangered Species Consultation Handbook at 4-20 to 4-21 (1998).[19]  A Section 7 BiOp's analysis builds on that foundation and relies on it to draw conclusions about a project's impact on the species.  *See Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (rejecting baseline analysis; explaining that if USFWS conducted "jeopardy analysis in a vacuum … then a listed species could be gradually destroyed, so long as each step on the path of destruction [wa]s sufficiently modest" (internal citation and quotation marks omitted)).  And although Plaintiffs' burden to show irreparable harm does not require a showing of jeopardy, for USFWS to evaluate jeopardy under *the ESA*, the agency must determine whether the action is likely to appreciably reduce the likelihood of the species' survival and recovery "by reducing the reproduction, *numbers*, or *distribution* of that species."  50 C.F.R. § 402.02 (emphasis added).  By failing to assess the current status and environmental baseline of the species, USFWS did not and could not have met its obligations under the ESA, and its determination that the actions would not appreciably reduce the numbers and distribution of that species did not comply with the ESA.

As for the panther, the Defendants' declarant now avers that USFWS "does not believe the actual number of panthers in the population is at or near the upper bound (>700)" of the estimate that the agency relied upon in the TA Forms.  Dkt. 148-1 at 7 (Carey Dec. ¶ 11).  Instead, he claims that the agency used the lower range.  *Id.*  But that position is not articulated in the TA Forms, which specifically stated, without qualification, that "[b]ased on the data," the

---

[19] *Available at* https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

panther population has increased "to between approximately 222 and 773 individuals in 2018," Dkt. 135-8 at 11; Dkt. 135-10 at 15, and then proceeded to its discussion of effects.[20] Additionally, Plaintiffs have shown that the margin of error was too high for this population estimate range to be relied upon in conservation decision-making, as explained by both USFWS and the authors of the study.  Dkt. 135 at 26–27; Dkt. 135-1 at 20 (Frakes Dec. ¶ 58); Dkt. 149-2 at 100 (Duncan Dec. att. A) (USFWS' Species Status Assessment for the Panther, "SSA").

Regarding the TA Forms' "baseline" sections for the panther, the Defendants do not contest that USFWS failed to include a review of important literature and research, as would appear in a BiOp.  Dkt. 135 at 28.  Nor do they contest that USFWS cited only one peer-reviewed publication despite several studies being published in recent years.  *Id.*  But, "[w]hen it comes to protecting listed species, environmental context is critical."  *Appalachian Voices*, 25 F.4th at 269.  The failure to include this context severely undermines the sufficiency of USFWS' technical assistance and demonstrates that USFWS did not abide by the ESA.

As for the effects of the proposed projects on the panther population, Dkt. 135 at 28–29, the Defendants contend that USFWS "disagrees with the concept" that multiple panthers include the project footprints in their home ranges, as Dr. Frakes' studies have shown.[21]  *See* Dkt. 148 at 35 n.11; Dkt. 148-1 at 8 (Carey Dec. ¶ 13).  Instead, USFWS states it does not have the information to estimate the number of panthers using a proposed project site, Dkt. 148-1 at 8 (Carey Dec. ¶ 13), and thus uses oblique acreage amounts to determine if a project will destroy a

---

[20] The Defendants also fail to address recent trends that indicate the panther population may be "stabilizing or declining," as evidence submitted by Florida shows.  Dkt. 149-2 at 328–29 (Duncan Dec. Att. B) (FWC Annual Panther Report 2023).

[21] Contrary to Mr. Carey's critique, Dkt. 148-1 at 8 (Carey Dec. ¶ 13), Dr. Frakes identified *overlapping* home ranges, where multiple panthers use the same habitat, Dkt. 135-1 at 16–17, 27–28 (Frakes Dec. ¶¶ 49, 77), and mentioned "shifting ranges" to say panthers will have to adjust to lost habitat, *id.* at 14, 19 (Frakes Dec. ¶¶ 44, 53).

portion of an average panther's home range.[22]  But that information is readily available.
Dr. Frakes used radio telemetry data to assess the number of panthers that include the project
footprints in their home ranges.  Dkt. 135-1 at 16–17, 27–28 (Frakes Dec. ¶¶ 49, 77).  This
telemetry data comes from radio-collared panthers, is publicly available from FWC, and was last
updated November 22, 2023.[23]  Moreover, it is the same telemetry data that USFWS itself used
in the TA Forms to show that panthers use the habitat areas in the project footprints.  Dkt. 135-8
at 10; Dkt. 135-10 at 15.[24]  USFWS articulates no reasonable basis not to have considered that
data to determine how many panthers currently rely on the habitat in the project footprints.

     Regarding the "cumulative effects" sections, the ESA requires USFWS to assess the
effect from future State or private activities that are reasonably certain to occur, which means
USFWS must consider all "but for" consequences to listed species resulting from the project
under review.  50 C.F.R. §§ 402.14(g)(3), 402.02.  *See Nat'l Wildlife Fed'n v. Norton*, 332 F.
Supp. 2d 170, 178 (D.D.C. 2004) (in isolation, individual projects may impact only small
portions of panther habitat, but cumulative impacts might be significant); *Nat'l Wildlife Fed'n v.
Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005) (same).  But USFWS did not do that here.
Plaintiffs have shown that USFWS looked only at the raw acreage lost for each of the 404
permits, rather than assessing the *effects* from that loss of habitat, including the incidental take
anticipated from intraspecies aggression caused by habitat loss and from vehicle strikes caused

---

[22] USFWS claims that even if it had data, it would consider this a "one-time impact" for those
individual panthers, Dkt. 148-1 at 8 (Carey Dec. ¶ 13), but this "one-time impact" would likely
be injury or death from intraspecies aggression.  Dkt. 135-8 at 11–12; Dkt. 135-10 at 16–17.
[23] *Florida Panther Telemetry*, FWC, https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/about (last visited Jan. 25, 2024).
[24] Plaintiffs also note that USFWS has previously been able to use this telemetry data to
determine the number of panthers using an action area.  *See Sierra Club v. USFWS*, No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933, at *4 (M.D. Fla. Nov. 1, 2023).

by increased traffic from these other planned developments.  Dkt. 135 at 29.  The Defendants do

not contest that USFWS looked solely at raw acreage to draw conclusions about take and instead

contend that Plaintiffs "have not identified any specific deficiency."  Dkt. 148 at 41.[25]  But the

specific deficiency is plain.  USFWS did not employ or meet ESA standards in this review

because it failed to consider the but-for consequences to listed species from the loss of acreage

associated with reasonably certain to occur activities.  Dkt. 135 at 29.

        As for the caracara, USFWS provided no cumulative effects assessment at all because it

unreasonably limited the "action area" to the project footprint, even though the development will

likely have direct and indirect effects beyond the project footprint, *id.* at 29–30, a fact the

Defendants did not dispute.  Nor do the Defendants dispute that these impacts would likely cross

into the Rural Lands West project footprint, located immediately north of Bellmar.[26]  *See id.*

Instead, they focus on the *existing federal projects* attached to Dr. Morrison's declaration and

state that those existing projects are too far away and not interrelated with Bellmar.  Dkt. 148 at

33.[27]  This argument completely overlooks the *future state and private* projects that are

reasonably foreseeable, including Rural Lands West.  Dkt. 135 at 30.  The additional destruction

of the Rural Lands West habitat would certainly compound the impacts of the Bellmar project.

*Id.*; Dkt. 135-2 at 16, 20–21 (Morrison Dec. ¶¶ 41, 48–49).

---

[25] Plaintiffs have also shown that USFWS expressed the unfounded assumption that these developments would occur regardless of 404 permitting, Dkt. 135 at 29, and the Defendants do not dispute this or provide a basis for the assumption.

[26] Rural Lands West is a development project that is proposed for the area immediately North of Bellmar.  *See* Dkt. 135-8 at 36; Dkt. 139-1 at 6–7 (Passarella Dec. ¶¶ 18, 20) (explaining that Rural Lands West and Bellmar were conceived as *one* project that Collier later broke into two).

[27] These existing federal projects should have been considered as part of the baseline status of the caracara, but were not.  50 C.F.R. § 402.02 (baseline includes consideration of past and present federal projects); Dkt. 135-2 at 9, 76–78 (Morrison Dec. ¶ 27, att. D).

Regarding incidental take, the TA Forms do not articulate express incidental take limits nor recommend any permit conditions that set or identify a limit on incidental take. Dkt. 135 at 30–31. As discussed at length above, the Defendants' arguments to the contrary are unavailing. Anticipating the amount of take, and limiting the amount of take authorized, are very different things. And yet, if these permits are allowed to issue before the Court has determined whether this TA scheme is lawful, the permittees will be shielded from liability for incidental take by virtue of the Programmatic ITS, without any clear permit condition limiting the amount of take.

Additionally, as Plaintiffs have shown, when the Corps issues a 404 permit, there is a site-specific BiOp and ITS that is clearly reviewable in federal court to enforce the guardrails and procedures of the ESA. *Id.* at 31.[28] Here, such a clear avenue for relief does not exist; and indeed, the Defendants and Florida take it a step further to describe a non-statutory process that would avoid such accountability entirely. In their response, the Defendants adhere to their position that USFWS "is not engaged in a reviewable 'agency action' when it provides technical assistance." Dkt. 148 at 23. If this position is taken as true, their assertion that Plaintiffs (even if they faced no barrier to standing or exorbitant cost) would have an adequate remedy to challenge permits that rely on USFWS' BiOp, ITS, and technical assistance in state court fails, because a state court has no authority over a federal agency and cannot opine on the legality of Florida's program. And, as Florida admits, FDEP is required to accept permit conditions USFWS proposes. But a state court would not have authority to review USFWS' permit conditions.

---

[28] Florida suggests Plaintiffs are concerned with form over substance, Dkt. 149 at 49, but that is belied by the extensive substantive flaws with the TA Forms as outlined by Plaintiffs.

JA.1144

Florida's lengthy discussion of an irrelevant Middle District of Florida case involving a 3-mile road expansion has no bearing on this case.[29]  Dkt. 149 at 46–47; *Sierra Club v. USFWS*, No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023).  Although the plaintiffs there asked the Court to review USFWS' original action, the Court concluded that it should review only the amended BiOp and found it lawful.  *Id*. at *2–6.  But there is nothing in that case that has any bearing on the issues raised in this litigation.  *Contra* Dkt. 149 at 47–48.  Although the plaintiffs challenged USFWS' analysis, the central issue in that case was USFWS' failure to create a numerical take limit, as opposed to relying on a habitat loss surrogate.  *Sierra Club v. USFWS*, 2023 WL 7188933, at *6–7.  Here, USFWS anticipated a numerical amount of take, and has not proposed to use any sort of surrogate in lieu of a numerical estimate.  If anything, *Sierra Club v. USFWS* demonstrates that when the Corps administers the 404 program and consults with USFWS pursuant to Section 7 of the ESA, (1) USFWS is required to produce more thorough, detailed analyses, and that it will revisit and reassess those analyses when challenged in federal court; and (2) affected organizations have a clear avenue for receiving their day in court for a determination as to whether USFWS has met its duty.[30]

### B.    The Projects Will Irreparably Harm Panthers and Plaintiffs' Members.

As Plaintiffs have shown, the Bellmar and Kingston projects will destroy thousands of acres of Primary Zone panther habitat located near panther dens, where panthers birth and rear their kittens, and near crucial conservation areas, including the Florida Panther National Wildlife

---

[29] In that case, USFWS responded by re-initiating consultation, which resulted in a 59-page BiOp addressing the impacts on *just* the panther.  *Cf.* Dkt. 149 at 46 (asserting BiOp was 21 pages).
[30] Contrary to Florida's contention, Dkt. 149 at 48 n.27, Plaintiffs have shown the deficiencies in the State program as well as the barriers to challenging state permits in state court, Dkt. 135 at 25–32.  Moreover, Plaintiffs ultimately seek vacatur of EPA's approval of Florida's program and not, as the case Florida cites suggests, Dkt. 149 at 48 n.27 (citing *Marino v. NOAA*, 33 F.4th 593, 596–98 (D.C. Cir. 2022)), a remand for the favorable exercise of agency discretion.

Refuge, that support the critically endangered panther population.  Dkt. 135 at 32–36.  USFWS

has said that it anticipates the construction of these projects, alone, will likely injure or kill 3

panthers[31] from attacks by other male panthers (i.e., intraspecies aggression) as panthers are

thrust from their home ranges (now destroyed) and forced into neighboring territories.  *Id.* at 32.

And USFWS has said it anticipates that these projects will also likely result in the injury or death

of 6 to 25 panthers as roadkill resulting from traffic increases caused by these projects *each year*.

*Id.* at 7, 32–33.  Rather than addressing these startling numbers, the Defendants attempt to shift

focus to mitigation measures (e.g., money donations and one wildlife crossing located in the

project footprint of another planned development).[32]

Although the Defendants suggest that USFWS does not expect the upper end of the take

estimates to occur, it is nevertheless the range that USFWS has expressed as its best estimate.

Moreover, it is not necessary that the take reach the highest anticipated level for Plaintiffs to

establish that the projects will cause irreparable harm.  As an initial matter, the take of even a

small number of endangered species constitutes irreparable harm.  *Am. Rivers*, 271 F. Supp. 2d at

258–59.  Here, the upper range of anticipated take (up to 28 panthers at buildout and 25 annually

thereafter) is more than three times the (likely overestimated) annual growth rate of the panther

population (8 or 9 panthers).  Dkt. 135-8 at 12–17, 16; Dkt. 135-10 at 21–23.  As Dr. Frakes

concluded, take at the upper range in combination with the damage done to panther movement

---

[31] In the TA Form, USFWS stated both that habitat loss from Kingston would impact 2 panthers, while anticipating take of only 1 panther from habitat loss.  The Defendants now appear to concede that habitat loss alone will likely take 2 panthers.  Dkt. 148-1 at 24 (Carey Dec. ¶ 40).
[32] Cameratta contends that take is not only the killing but also other forms of harm, Dkt. 146-2 at 10–11, but this argument disregards that lethal take is not required to show irreparable harm, and that USFWS' take estimate largely contemplates death from vehicle strikes.  Cameratta's claim that there is no correlation between increased traffic and panther deaths, *id.* at 11, is contradicted by USFWS' own assessment, Dkt. 135-10 at 23.

pathways would harm the panther far beyond the bar necessary to establish irreparable harm—to the point of jeopardy.  Dkt. 135-1 at 30 (Frakes Dec. ¶ 84).  At the midrange, this amount of take would still exceed the growth rate by one and a half times (8 or 9 panthers compared with 14 panthers).  Even the lowest estimate would remove two thirds of the projected growth rate, placing the panther in a very precarious position, particularly with the number of other development projects on the horizon that will destroy more habitat and take more panthers.  *See, e.g.*, Dkt. 31-1 at 13–16, 23 (Crooks Dec. ¶¶ 37–47, 72(b)); Dkt. 98-1 at 16–19, 25–28 (Crooks Dec. ¶¶ 45–54, 76–81, 84(a)–(b)); Dkt. 105-1 at 6–7 (Crooks Dec. ¶ 2).[33]  The Defendants themselves characterize USFWS' TA Forms as "generating an estimate of take that [USFWS] believes *is reasonably certain to occur*."  Dkt. 148 at 35–36 (emphasis added).  The Defendants' attempt to now walk their own assessment back should not be countenanced.

Cameratta attempts to dismiss the anticipated vehicular strike take as uncertain, Dkt. 146-4 at 8–10 (Johnson Dec. ¶ 21), but that uncertainty is built into the range of USFWS' estimate, which is that vehicular strike take is likely to be between 4 to 23 panthers, each year, Dkt. 135-10 at 21–22.[34]  Further, USFWS determines anticipated incidental take *after* taking into account the project's minimization measures.  *See* FWS-006028, at FWS-006108 (BiOp).  And while Cameratta attempts to raise questions of causation (by pointing out that it can be difficult to distinguish between project and non-project related vehicle collisions), it nevertheless admits that USFWS has determined the anticipated vehicular take will be "due primarily to Project-related traffic increases."  Dkt. 146-4 at 8 (Johnson Dec. ¶ 21).  Cameratta further admits that USFWS

---

[33] *See State 404 Permits*, FDEP, https://www.arcgis.com/apps/mapviewer/index.html?layers=ce4369c29c0c428f8316af480c19fe65 (last visited Jan. 20, 2024).

[34] Cameratta's reliance on cases where there was no harm or where measures were designed to restore damaged land after mining activities ended is therefore misplaced.  Dkt. 146-2 at 11.

intends to implement measures to reduce vehicle take *only* if that takes exceeds "the annual average of 16 panthers per year" within the action area.  Dkt. 146-4 at 11 (Johnson Dec. ¶ 24).[35]

The Defendants also point to the proposed permit conditions to suggest that these take amounts are unlikely to occur, Dkt. 148 at 38–39, but those conditions are not likely to reduce take appreciably.  For example, Bellmar includes a permit condition to fund a wildlife crossing, *id.* at 39 n.12, but that crossing is located north of the project footprint within another development project (Rural Lands West) that will destroy more habitat, introduce more traffic, and result in more incidental take of panthers, Dkt. 135-8 at 36.  *See also* Dkt. 31-1 at 16–19 (Crooks Dec. ¶¶ 48–56); Dkt. 98-1 at 19–22 (Crooks Dec. ¶¶ 55–64).[36]  The Defendants also point to money payments to the various funds, Dkt. 148 at 39 n.12, but those funds are not solely dedicated to measures that would limit the anticipated take from these projects, and nothing requires that the money provided by the Developers be used to fund such measures.[37]

The Defendants' claim that mitigation measures developed through the panther habitat assessment methodology (which identifies the amount of mitigation credits, called PHUs, that must be obtained) defeats Plaintiffs' claim of irreparable harm fails, because PHUs are not an

---

[35] And Cameratta's claim that even more harmful mining or other projects "could" occur in lieu of Kingston, Dkt. 146-2 at 9; Dkt. 146-4 at 7 (Johnson Dec. ¶ 18), are speculative and irrelevant as to whether Kingston is likely to irreparably harm Plaintiffs.

[36] Cameratta claims that the estimated vehicular take here will also be reduced by "proposed" mitigation measures such as wildlife crossings that may one day come to pass, but as noted above, the additional impacts of the projects where those crossings may be placed have yet to be considered.  Dkt. 146-4 at 11 (Johnson Dec. ¶ 24).  Cameratta cites no authority to suggest that the promise of theoretical—and unenforceable—mitigation can cure the risk of irreparable harm.

[37] Cameratta argues that Plaintiffs have not established the threat of irreparable harm because permit conditions for that project "have yet to be finalized."  Dkt. 146-2 at 11.  But USFWS has indicated it has no further comment on the project (and so no further recommendations as to permit conditions), *see* Dkt. 135-6 at 4; Dkt. 135-9 at 4, and Cameratta has admitted that it has "already agreed to" the permit conditions, Dkt. 146-2 at 11–12; Dkt. 146-4 at 11–12 (Johnson Dec. ¶¶ 25–26).  And as Plaintiffs have shown, once the permits issue it will be too late to prevent irreparable harm.

adequate substitute and because that methodology relies on outdated information.  Dkt. 135-1 at

3 (Frakes Dec. ¶¶ 9–10).  The Defendants argue extensively about Dr. Frakes' critique of the

panther habitat assessment methodology, Dkt. 148 at 36–37, but fail to recognize that this is a

methodology Dr. Frakes helped create, Dkt. 135-1 at 3 (Frakes Dec. ¶ 9).  Dr. Frakes' criticism is

not with the methodology, but that USFWS is not using the best available science (or data) in its

calculations, relying instead on outdated data.  *Id.* (Frakes Dec. ¶¶ 9–10).  Thus, contrary to the

Defendants' claim that Dr. Frakes' critique would require them to "create new science," Dkt. 148

at 37, Dr. Frakes has clearly said that they need to use existing, updated data.  *See Defs. of*

*Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 346, 349, 351 (4th Cir. 2019).

In addition to causing the injury and death of many panthers, Dr. Frakes model showed

that these projects will result in the functional loss of over 7,500 acres of Primary Zone Habitat.

Dkt. 135-1 at 11–14, 23–25 (Frakes Dec. ¶¶ 34–42, 66, 72).  The Defendants contend that

USFWS does not consider Dr. Frakes' model to be the best available science.  Dkt. 148 at 36–37.

But USFWS itself has extensively relied on that model in the SSA.  *See, e.g.*, Dkt. 149-2 at 121–

38, 146, 150, 156–58, 164, 187–188, 225, 263–64 (Duncan Dec. Att. A).

As for the thousands of acres of Primary Zone Habitat USFWS itself anticipates will be

destroyed, Dkt. 135 at 34–35, the Defendants contend this destruction is not irreparable because

it is "small" compared to the overall (remaining) range of the panther.  Dkt. 148 at 11, 16, 37.[38]

But their myopic view misses the point.  To begin, the panther's remaining range is exceedingly

small compared to its original range.  Dkt. 135 at 12–14.  Any *further* reduction of that range

threatens the panther.  *Id.*  Primary Zone habitat in particular is necessary to a species that

---

[38] The Defendants also point out that Bellmar will focus its destruction on row crops, Dkt. 148 at
38, which Plaintiffs have already explained provide vital edge habitat where panthers hunt, Dkt.
135 at 15–16, a fact the Defendants do not dispute.

requires more, not less, habitat. *Id.* USFWS itself acknowledges that this loss of habitat, alone, will likely result in the injury or death of at least 3 panthers, and Plaintiffs have shown it will likely injure or kill even more. *Id.* at 15–18. *See Norton*, 332 F. Supp. 2d at 177 (USFWS cannot look only at habitat loss percentages while "mak[ing] no effort to discuss what these percentages mean for the panther").

The Defendants mischaracterize Plaintiffs' arguments as being that *any* destruction of Primary Zone habitat cannot be approved and argue that the recovery plan in which this habitat was identified does not create legal requirements. Dkt. 148 at 37–39. However, Plaintiffs' argument is that (1) in the recovery plan, USFWS itself has identified Primary Zone habitat and stated that it must be preserved for the survival and recovery of the panther; and (2) the scientific community has said that Primary Zone habitat must be preserved for the survival and recovery of the panther. Dkt. 135 at 34–35. Therefore, a *net loss* of Primary Zone habitat would likely harm the panther's survival and recovery, and the mere preservation of other existing Primary Zone habitat will not remediate that harm. *Id.*[39]

Plaintiffs have also shown that these projects will damage important corridors that USFWS has said must be preserved. Dkt. 135 at 35. In response, the Defendants argue that

---

[39] Notwithstanding USFWS' assessment, Cameratta claims that the project will provide a net benefit to panthers by improving habitat (presumably excluding the habitat the project destroys), saving the site from an otherwise mining destiny, funding various entities, and building crossings. Dkt. 146-2 at 9–10; Dkt. 146-4 at 3–8 (Johnson Dec. ¶¶ 8, 11–20). However, these mitigation measures are built into USFWS' assessment and conflict with USFWS' own assessment that the project will result in considerable take, both from habitat loss and annual vehicular strikes. *See* FWS-006028, at FWS-006108 (BiOp). Moreover, the project purports to restore only 156 acres to Primary Zone conditions and 249 acres to Secondary Zone conditions, resulting in a net loss of approximately 357 acres of Primary Zone Habitat and 2,641 acres of Secondary Zone Habitat. Comments from Karimah Schoenhut, Sierra Club, and Elise Pautler Bennett, Center for Biological Diversity, to Jonathan Guinn et al., FDEP et al., Jan. 16, 2024, at 13–14, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_423130/facility!search [hereinafter "Plaintiffs' Kingston Comments"].

these projects were designed with the improvement of corridors in mind.  Dkt. 148 at 38.  But

whatever was "in mind" cannot trump scientific evidence presented by Dr. Frakes that these

projects will, in fact, harm panther corridors.  Dkt. 135-1 at 14, 23–24 (Frakes Dec. ¶¶ 42, 66).

The Defendants have presented no analysis or evidence to support its contentions otherwise.[40]

These impacts to the panther population and its habitat will irreparably harm Plaintiffs'

members who seek to observe panthers in the wild.[41]  Dkt. 135 at 35.  No party has disputed the

declarations provided by Plaintiffs' members.

### C.    The Projects Will Irreparably Harm Caracara and Plaintiffs' Members.

Plaintiffs have also demonstrated that these two projects will permanently destroy

thousands of acres of foraging and nesting habitat for at least 2 breeding pairs of caracara and

will destroy the reproductive success of those 2 pairs at least during construction.[42]  *Id.* at 37–38;

*Am. Rivers*, 271 F. Supp. 2d at 258–59.

In response to Plaintiffs' motion, the Defendants claim that USFWS does not anticipate

any "lethal take" of caracara, Dkt. 148 at 31, but that is not entirely true.  As Plaintiffs explained,

the loss of reproductive success can include the death of caracara young that may be hatched

during this period.  Dkt. 135 at 20; Dkt. 135-2 at 2, 5–6, 10–15, 19 (Morrison Dec. ¶¶ 6, 20, 30–

---

[40] Cameratta disagrees with these irreparable harms to the panther and implausibly claims that its
project will increase habitat connectivity, Dkt. 146-2 at 10, but relies on its consultant who did
not demonstrate an expertise in panthers, *see also Senior Staff*, Passarella & Associates,
https://passarella.net/about-us/senior-staff (last visited Jan. 24, 2024) (describing Mr. Johnson's
species experience as relating to birds, reptiles, rodents, tortoises, and amphibians).  This is not
competent evidence to rebut the evidence on which Plaintiffs rely.
[41] Relying on *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21–22 (2008),
Cameratta argues that Plaintiffs' alleged irreparable harm "is in the abstract."  Dkt. 146-2 at 11.
But in *Winter*, the plaintiffs were concerned about the risk of sonar injury to marine mammals
from a Navy practice that in 40 years had never resulted in a documented case of sonar-related
injury to marine mammals in the area.  555 U.S. at 21–22.  Here, by contrast, vehicle strikes in
Southwest Florida are a leading cause of death for the Florida panther.  Dkt. 135 at 14–15.
[42] Neither Developer contests the harm Plaintiffs have shown as to the caracara.

38, 45).  Moreover, jeopardy can occur when an action "reduce[s] the reproduction" of the listed species, even if it does not lead to lethal take of adults.  50 C.F.R. § 402.02.

Although the Defendants acknowledge that the habitat destruction at Bellmar accounts for nearly half of a caracara pair's average home range and at Kingston accounts for more than one caracara's average home range, they also claim that this destruction is "minimal" compared to the overall habitat range of the caracara.  Dkt. 148 at 31–32; Dkt. 148-1 at 26–27 (Carey Dec. ¶ 43).  This approach fails to account for the fact that the caracara habitat in Florida is saturated, which the Defendants concede.  Dkt. 135-8 at 9.  This means that all suitable remaining caracara habitat is already inhabited by nesting pairs (which are territorial), and therefore no habitat is *available* for the resident nesting pairs.  Dkt. 135 at 20, 37.  *See Norton*, 332 F. Supp. 2d at 177 (finding it arbitrary for USFWS to identify habitat loss percentages without assessing how that loss affects an ESA-listed species).  The Defendants' claim that the caracara nesting pairs will simply move into adjacent territory is therefore unfounded.[43]  Rather, the resident nesting pairs will likely *attempt* to move into neighboring territories and face fierce competition until only one caracara pair remains, or the other caracara pair moves into another territory, starting the cycle over again.  Dkt. 135 at 37.  In short, the amount of habitat affected may appear minimal considering only crude acreage amounts, but the potential impact on the caracara based on the context of their population and distribution is likely substantial.  Dkt. 135-2 at 8 (Morrison Dec. ¶ 24).  This context is also the reason USFWS' failure to require habitat replacement is inadequate to ensure that the caracara will survive.  *Contra* Dkt. 148 at 31–32.

---

[43] The Defendants also suggest that caracara regularly alter their territory, Dkt. 148 at 32; Dkt. 148-1 at 26 (Carey Dec. ¶¶ 43), but this is inaccurate.  As Dr. Morrison explained, caracara are "strongly site faithful" and though they sometimes use alternate nest trees when a prior tree is damaged, they remain within 0.5 km of the original tree and stay within their 3,200-acre territory.  Dkt. 135-2 at 5 (Morrison Dec. ¶ 16).

The Defendants contend that the proposed permit conditions and mitigation measures will further reduce impacts to the caracara nesting pairs, but those measures are unlikely to reduce the harm.  The Defendants cite the permit condition that prohibits the removal of an "active tree,"[44] *id.* at 33, but fail to mention that clearing can proceed once the nest is empty (either because it has been abandoned or the caracara young have fledged and left the site), Dkt. 135-8 at 3.  It also fails to account for the fact that, as Dr. Morrison explained, caracara require foraging habitat to support their young, and the destruction of their foraging habitat (even if the nest tree temporarily remains) would impact the caracara's ability to rear any young in an "active tree."  Dkt. 135-2 at 13 (Morrison Dec. ¶ 35).  This destruction of foraging habitat also explains why the presence of "alternate trees," Dkt. 148 at 32–33; Dkt. 148-1 at 28–29 (Carey Dec. ¶ 47), does not minimize the harm to the caracara pair, because any alternative nest relies on the same foraging habitat, Dkt. 135-2 at 11–12 (Morrison Dec. ¶¶ 33–34).

The Defendants also point to measures that require restoration of a comparable area if the primary zone around an active nest tree is impacted.  Dkt. 148 at 34.  However, as Dr. Morrison explained, that does not remedy the harm because the pair is still likely to abandon their home range.  Dkt. 135-2 at 15 (Morrison Dec. ¶ 40).  Bellmar will destroy 1,440 acres of caracara foraging habitat; replacing the "primary zone" (70 acres) would not provide enough habitat to support a nesting pair.  *Id.*  For example, Dr. Morrison is aware of a situation where clearing land 500 meters from an active nest caused nest failure and subsequent territory abandonment.  *Id.*

---

[44] The Defendants claim that there is no "active" nest tree on the Bellmar footprint, Dkt. 148 at 12, but this is patently incorrect.  A nest tree is only considered "inactive" after a 3-year period of documented inactivity, Dkt. 135-2 at 17 (Morrison Dec. ¶ 43), and the Bellmar nest trees were active in 2020 and 2022, Dkt. 135-8 at 7.

None of these permit conditions will prevent the permanent loss of reproductive success for the resident nesting pair, nor the likely ripple effect of displacement.

These impacts to the caracara and its habitat will irreparably harm Plaintiffs' members who seek to observe caracara in the wild.  Dkt. 135 at 38.  No party has disputed the declarations provided by Plaintiffs' members.

### D. Issuance of the Permits is Imminent.

Plaintiffs have provided ample evidence to show that FDEP is poised to issue these permits—which the opposing parties fail to persuasively rebut—and that irreparable harm is therefore imminent.[45]  Indeed, Florida admits that FDEP could issue these permits for Bellmar as early as February 5th and for Kingston as early as February 19th.  Dkt. 149 at 26–27.[46]  USFWS has issued final comments on both permit applications.  Dkt. 135-5 at 4–5 (Roff Dec. ¶¶ 17, 21); Dkt. 135-6 (stating USFWS had provided its "final" comments and conditions for Bellmar); Dkt. 135-9 (same for Kingston).[47]  For both projects, FDEP issued public notices, has now held public meetings (Bellmar on December 7, 2023, and Kingston on January 16, 2024), Dkt. 148 at 23, and

---

[45] Plaintiffs do not seek to cut any agency review short as Florida claims, Dkt. 149 at 8, 10, but rather to ensure that the agency review is lawful.

[46] The Developers also appear to expect the imminent issuance of the permits.  Collier describes Plaintiffs' motion as coming "at the eleventh hour" and "at the end of the [permitting] process." Dkt. 145 at 2.  *See also* Dkt. 139 at 13 (the permit review process for Bellmar "is in its final stages").  Cameratta asserts that "any delays will cost [them] thousands of dollars per day," Dkt. 146 at 2; Dkt. 146-2 at 12, an assertion that presumes issuance of the permit is imminent.

[47] And although the Defendants now claim that USFWS has not yet decided the "suite of conditions" that could be included in the permits, Dkt. 148 at 22, USFWS' own "final" comments belie that assertion, Dkt. 135-6 at 4; Dkt. 135-9 at 4. While Cameratta echoes the argument that permit conditions "have yet to be finalized," Dkt. 146-2 at 11, its declarants admit that Cameratta has "already agreed to" the permit conditions that will be required by USFWS and FWC.  Dkt. 146-2 at 11–12; Dkt. 146-4 at 11–12 (Johnson Dec. ¶¶ 25, 26) (acknowledging that TA document identified the avoidance and minimization measures USFWS has deemed necessary for permit issuance, that Cameratta has agreed to these conditions, and that these will be incorporated into the permit as permit conditions).  Cameratta's claim that delay will cost thousands of dollars *per* day demonstrates not only that the developer believes the state permit is imminent, but also that the agreed-to conditions are not going to change.

29

JA.1154

has closed public comment periods.  And, although EPA has retained the right to comment, the agency has not indicated that it intends to comment and is free to waive that right at any time. Dkt. 135 at 11–12.  The opposing parties' (often contradictory) contentions are unavailing.

Florida and the Defendants argue that any irreparable harm asserted by Plaintiffs is not imminent because the Bellmar and Kingston permits have not been issued.  Dkt. 148 at 22–26; Dkt. 149 at 41–42.  However, preliminary injunctive relief is intended to prevent irreparable harm.  *Gordon v. Holder*, 632 F.3d 722, 724–25 (D.C. Cir. 2011) (a motion for preliminary injunctive relief may fail to establish irreparable harm "if the harm has occurred and the parties cannot be returned to the status quo").

And as Plaintiffs have explained above, to avoid irreparable harm, Plaintiffs cannot wait until the permits have been issued because the State restricts their access to state courts and state courts would lack jurisdiction over federal agency actions.  The state court's jurisdiction would only determine whether a permit complies with the State 404 program, which Plaintiffs contend is unlawful as a result of the federal actions that resulted in its approval.  The state court process would not provide an avenue to challenge whether USFWS' take estimates and no jeopardy conclusions complied with ESA requirements.  Indeed, the state court would lack jurisdiction to review any of USFWS' actions as to particular projects.  As for federal challenges, there is no BiOp or permit specific ITS to challenge, and the Defendants assert that USFWS' technical assistance is not reviewable, Dkt. 148 at 23.  Instead, they point to ESA Section 9 suits against those directly causing take, ignoring that USFWS' purportedly unreviewable technical assistance, coupled with the programmatic ITS, would shield that take from Section 9 suits.

Although Florida and the Defendants claim that there are various, possible future steps in the permitting process that make Plaintiffs' harms speculative, *id.* at 22–25; Dkt. 149 at 8–10,

30

28–29, 41–42, the reverse is true.  Every reliable indication is that this train has left the station

and will reach its destination shortly.  What is speculative is the parade of potential actions the

opposing parties identify in an effort to defeat the relief Plaintiffs seek.  The likelihood of any of

these theoretical additional steps occurring is particularly low given all the steps Florida lays out

at length as having taken for these two permits, including requests for information, public

meetings, "final" comments from USFWS, and the Developers' expectations.  Dkt. 149 at 41–

42; Dkt. 149-1 at 7, 9–11 (Wolfe Dec. ¶¶ 25–26, 33–34); *see also* Dkt. 135-6; Dkt. 135-9; Dkt.

145 at 2–3; Dkt. 139 at 13; Dkt. 146 at 2; Dkt. 146-2 at 12–13.  Therefore, while some of the

actions the opposing parties point to (e.g., further permit conditions or modifications) *could*

occur, none of the parties have given any reason to believe that they are *likely* to occur.[48]  The

only actions FDEP states will or are likely to happen are the review of submitted comments and,

once the agency grants the permit, execution of an approved "proposed" permit by FDEP and

Developers.  Dkt. 149 at 28–29; Dkt. 149-1 at 11 (Wolfe Dec. ¶ 35).  These actions indicate the

imminence of a final decision.[49]

**E.      Plaintiffs' Request for Preliminary Relief is Timely.**

Plaintiffs have not delayed in requesting preliminary, emergency relief.  They promptly

sought this relief once irreparable harm from the issuance of major permits pursuant to FDEP's

unlawful program became concrete and demonstrably imminent, a prerequisite to obtaining

preliminary injunctive relief.  Notably, no party has argued that Plaintiffs delayed once USFWS

---

[48] Florida's assertion that a Plaintiff could simply file an administrative appeal to render an
issued permit non-final (for the pendency of that proceeding) ignores the hurdles that Plaintiffs
have identified and the inadequacy of that forum to redress Plaintiffs' harms.

[49] Plaintiffs need not show that FDEP will purposefully bypass a particular process that must
occur.  *Contra* Dkt. 149 at 42.  Plaintiffs need only show that the permits are close to issuance
and will cause them irreparable harm.

provided final comments and issuance of the permits became imminent.[50]  And no party has

shown that FDEP would have authority to issue the permits if Plaintiffs prevail on their claims.

The circumstances presented here are far removed from the (mostly out of Circuit) cases

cited by Florida, where plaintiffs' motion alleged immediate, irreparable harm arising before or

at the time of filing suit, but delayed in promptly seeking preliminary injunctive relief.  *See, e.g.*,

*W. Watersheds Project*, 468 F. Supp. 3d at 49–50 (denying preliminary injunction where there

was no irreparable harm and there were unexplained delays in plaintiffs' filing suit and bringing

motion); *Defs. of Conewango Creek v. Echo Devs., LLC.*, No. CIV.A. 06-242 E, 2007 WL

3023927, at *5 (W.D. Pa. Oct. 12, 2007) (finding unreasonable delay where plaintiffs sought

injunctive relief more than a year *after the issuance of the permit* that threatened irreparable

harm to protected species).

The standard in this Circuit was articulated in *Gordon v. Holder*, 632 F.3d at 724–25,

which holds that delay is not a proper basis to deny preliminary injunctive relief but may be

considered when determining whether the irreparable harm prong for relief has been met.  *Id.*

("The factor of delay is only significant if the harm has occurred and the parties cannot be

returned to the status quo...." (quoting *McDermott ex rel. NLRB v. Ampersand Pub., LLC*, 593

F.3d 950, 965 (9th Cir. 2010) (internal quotation marks omitted))).  The relevant question is not

the length of any purported delay, but the context of the motion's timing.  *See Eco Tour*

*Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 387–89 (D.D.C. 2017).

---

[50] Collier argues that Plaintiffs should have moved sooner because "the potential effects" of
Bellmar should have been known to Plaintiffs when Collier first filed for a 404 permit.  Dkt. 145
at 9–10 & n.9.  But Plaintiffs could not have known what USFWS' TA Forms would conclude
until those documents were completed.  And as shown above, it would have been premature to
act before Plaintiffs' demonstrable irreparable harms became concrete and imminent.

Plaintiffs here have presented a more than reasonable explanation for the timing of their motion, properly filing it when serious, irreparable harm became concrete and imminent (including from USFWS' issuance of TA Forms at the conclusion of the permitting process anticipating high levels of take, even with mitigation measures) and before the irreparable harm to be enjoined has occurred.[51]  *Cf. Am. Forest Res. Council v. Williams*, No. CV 21-601 (RJL), 2021 WL 4819846, at *4 (D.D.C. Oct. 13, 2021) (denying preliminary injunction where plaintiffs failed to demonstrate concrete, imminent harm and nowhere contended that the threatened injuries had only become apparent recently to justify delay).  It would have been premature for Plaintiffs to file this motion before the irreparable harm became concrete and imminent and it would be too late to seek relief once the permits issue.

Plaintiffs have acted judiciously in reserving that extraordinary action for this extraordinary moment—when two permits that pose an unacceptable, demonstrable, and irreparable harm to ESA-listed species and Plaintiffs' interests—are on the cusp of being permitted pursuant to a State program unlawfully authorized and approved by the Defendants in this case.[52]  Plaintiffs filed the motion promptly after USFWS' issuance of the TA documents for these projects, and within days of confirming that USFWS intended no further comment and that the Defendants and Florida would not agree to postpone action pending a ruling on Plaintiffs' ESA claims.  Dkt. 135 at 11–12.

---

[51] Indeed, Florida struggles with the appropriate timing by arguing that Plaintiffs' request for relief is premature, Dkt. 149 at 35, and yet also too late.  Dkt. 149 at 43 (arguing that Plaintiffs' demonstration of irreparable harm is "undercut" by the timing of this motion).

[52] It is true that Plaintiffs previously asserted they would face imminent, irreparable harm from EPA's transfer of authority to Florida.  Dkt. 149 at 44 n.25.  And there was a reasonable basis for the assertion at the time, including Florida's aspirational claims that FDEP would have the staff and resources to handle the program at the get-go and that its 404 permitting program would be easier and faster than the Corps' program.  Florida's assertions, particularly as to major permits of concern to the Plaintiffs, proved unfounded.

33

Relying on *Standing Rock Sioux Tribe v. Corps*, 239 F. Supp. 3d 77 (D.D.C. 2017), Collier asserts that Plaintiffs' motion is barred by the doctrine of laches.  Dkt. 145 at 9–11.  But the circumstances in the two cases could not be any more different, and a comparison confirms that Plaintiffs' motion is not so barred.  To avoid this reality, Collier begins by mischaracterizing the case as turning on a lack of diligence in *pursuing injunctive relief*.  Dkt. 145 at 9.  But as *Standing Rock* explains, the question of laches turns instead on whether the plaintiff has been diligent in *raising the concerns* on which the motion is based, including in the administrative process and earlier stages of the litigation, such that the other party would have had an opportunity to address them.  239 F. Supp. 3d at 84.

In *Standing Rock*, the plaintiff Tribe had long been aware of the plan to send oil through a pipeline under the bed of Lake Oahe.  *Id*. at 84–87.  And while the Tribe had raised a number of concerns about the risk of harm from a leak or rupture of the pipeline, they had never raised the concern that the mere presence of a crude oil under the Lake would interfere with the Lakota people's religious exercise—not until they moved for a temporary restraining order and preliminary injunction on that claim.  *Id*. at 82.  The Court observed that Tribes were put on notice of the pipeline's route in 2014, that in 2015 they made several general claims about how the pipeline might adversely affect sacred sites, including water, in their consultations with the Corps, and that in 2016 they filed suit alleging only generally that the affected waters were religiously significant, and that spills or ruptures posed risks to those waters.  *Id.* at 85–86.  But it was not until 2017—when construction of the pipeline was nearly completed—that the Tribe for the first time raised the concern about the impact on religious practice of the pipeline's mere presence, regardless of spill or rupture, beneath Lake Oahe, and relied on that claim (which required amending the complaint) as the basis for its request for preliminary injunctive relief.  *Id.*

at 85.  It was under *these* circumstances that the Court found the plaintiff had not acted diligently and that its multi-year delay in raising religious exercise objections was inexcusable, therefore precluding its motion on the basis of laches.  *Id.* at 87.

The Court further noted that the Tribe's failure to raise its specific religious objection had unduly prejudiced the Defendants, because they could have considered whether and how to accommodate the concern had it been raised sooner.  *Id.* at 87.  With permits issued, the necessary easement granted, and construction just days from completion, the Court found that granting an injunction now was an extraordinary and drastic remedy barred by laches.

Nothing of the sort can be said here.  Plaintiffs have raised concerns about the impact of Florida's program on the Florida panther and caracara repeatedly, including with reference to specific projects.  *See, e.g.*, Dkt. 98 at 14, 21, 40, 50; Dkt. 98-1 at 22–25, 26–27 (Crooks Dec. ¶¶ 65–75, 82–83); Dkt. 98-4 at 9–11 (Hartl Dec. ¶¶ 32–38); Dkt. 98-5 at 3–4, 7–9, 15–16 (Schwartz Dec. ¶¶ 8–12, 17–23, 45–47); Dkt. 98-10 at 5–6 (Umpierre Dec. ¶ 16).  Plaintiffs have repeatedly, consistently, and from the beginning, raised these concerns to state and federal agencies under the ESA and the Clean Water Act.  Plaintiffs need not dwell much on this fact, because Collier acknowledges it too.  Dkt. 145 at 5–6 & n.6 (describing how Plaintiffs have "submitted several letters" both in response to public comment periods and on their own initiative throughout the permit application review process); *id.* at 11 ("Plaintiffs have been regular commenters in [the State's] permitting process"); Dkt. 139 at 6 (same).

Plaintiffs' ESA claims—the same claims on which the motion for a preliminary injunction is based—appeared in the original and amended complaints.  Dkt. 1 at 20–23, 25–26, 34–42, 44–45 (Compl. ¶¶ 108–09, 154, 162–201, 213–21); Dkt. 77 at 49–52, 56 (Am. Compl. ¶¶ 249–73, 295–300).  As Collier again acknowledges, Plaintiffs have consistently raised these

concerns also in this litigation.  Dkt. 145 at 6.  Unlike in *Standing Rock*, Collier here does not, and could not, aver that the concerns Plaintiffs have continued to raise during the state permitting process are different from the ESA concerns they have raised in this litigation.

**III.      The Balance of Equities and Public Interest Favor Preliminary Relief.**

Plaintiffs have demonstrated that the irreparable harm to Plaintiffs outweighs any purported harms to the opposing parties.  Dkt. 135 at 38–41.  An injunction also furthers the public interest by protecting ESA-listed species and ensuring that government actors comply with the law.  *Id.* at 40–41.  Although the opposing parties point to past investments, economic losses from the *temporary* delay in obtaining a permit do not outweigh the irreparable and significant harms Plaintiffs will experience if the permits issue unlawfully.  And although the Defendants and Florida point to concerns regarding cooperative federalism, *unlawful* cooperation between the federal government and the State is not in the public interest.

**A.      Preliminary Injunctions Are Temporary.**

The Defendants begin with a baseless claim that the balance of equities tip in their favor because there is no "guarantee" the delay from a preliminary injunction would be temporary and that suspending action on the permits in question until the Court enters final judgment would result in "indefinite" delay.[53]  Dkt. 148 at 43–44.  But preliminary injunctions are, by definition, temporary.  *Safari Club Int'l v. Salazar*, No. 11-CV-01564 (BAH), 2012 WL 13069816, at *2 (D.D.C. Mar. 21, 2012) ("As the federal defendants argue ... a preliminary injunction is a temporary means for a court to maintain the status quo until adjudication of the merits....").

In reality, the Defendants appear to take issue with the possibility that an injunction could last longer than they prefer.  Dkt. 148 at 43 ("potentially lengthy period").  Yet, the Defendants

---

[53] Collier Enterprises likewise claim that a preliminary injunction would lead to an "indefinite[] halt."  Dkt. 145 at 2. They too provide no explanation or legal authority for this proposition.

assert no harm that would result from this delay.  And they fail to acknowledge that Plaintiffs'
alternative request for relief would reduce delay by expediting a decision on the merits.

### B.      Plaintiffs' Requested Relief Would Preserve the Status Quo.

The Defendants' next argument, that the relief Plaintiffs seek would alter rather than
preserve the status quo, *id.* at 9, 44, similarly lacks merit.  The purpose of a preliminary
injunction is "to preserve the relative positions of the parties" until the merits are resolved.
*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal
citation omitted).  The Court has authority to enjoin actions that are likely to be unlawful in order
to protect Plaintiffs from irreparable harm.  *Tate v. Pompeo*, 513 F. Supp. 3d 132, 154 (D.D.C.
2021), *dismissed sub nom. Tate. v. Blinken*, No. 21-5068, 2021 WL 3713559 (D.C. Cir. July 22,
2021) (enjoining defendants from relying on challenged Presidential Proclamations to suspend or
refuse visa adjudications to the plaintiffs).

Plaintiffs' motion requests an injunction against taking further action to issue certain
permits, which is to refrain from acting.  Dkt. 135 at 42.  The requested relief would preserve the
status quo, which is that no state 404 permit for Bellmar or Kingston has yet been issued, by
temporarily preserving the relative positions of the parties until Plaintiffs' claims are resolved.
*D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).[54]

### C.      The Public Interest is in Protecting ESA-Listed Species.

As for the public interest, the Defendants suggest that the public's interest "in the
protection of threatened and endangered species" should be considered against the public's
interest in a state 404 program's ability to issue permits uninterrupted.  Dkt. 148 at 44–45.

---

[54] For these same reasons, the Defendants' argument that this request is inconsistent with "the
current legal regime," Dkt. 148 at 44, also fails.  Plaintiffs' preliminary relief does not alter the
current legal regime in any way.  Plaintiffs' alternate request for relief would be based on the
Court's ruling that the current legal regime is not legal.

However, one of these things is not like the other.  It is "beyond doubt" that in passing the ESA, "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  The public interest in guarding against irreparable harm to ESA-protected species outweighs a temporary interruption in the issuance of two permits. Even Plaintiffs' alternate request for relief would simply transfer permits that may affect ESA-listed species to the Corps, restoring the default permitting mechanism authorized by Congress.

### D. Plaintiffs' Motion Serves the Public Interest in Cooperative Federalism.

That federal courts should generally consider principles of federalism and comity "before enjoining state action," Dkt. 148 at 23 n.4, presents no bar to the relief requested in this motion or this case.  *See Friends of Crystal River v. EPA*, 794 F. Supp. 674, 685 (W.D. Mich. 1992), *aff'd*, 35 F.3d 1073 (6th Cir. 1994) (permanently enjoining state from issuing 404 permit after finding that authority over the permit was vested with the Corps once EPA federalized the permit; EPA lacked authority to "return" the permit to the state's jurisdiction).

The assertion that an injunction would disserve the public's interest in "cooperative federalism," Dkt. 148 at 45–46; Dkt. 149 at 50–51, ignores that Congress intended state assumption to comply with federal law.  *See* Dkt. 104 at 17–18; *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action....  To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (citation omitted)).

In the Clean Water Act, Congress spelled out the requirements for state assumption, and in the ESA, Congress prescribed the requirements to ensure the protection of listed species. Congress' interest in cooperative federalism is not served by state assumption in violation of these statutes.  And state and federal cooperation that is unlawful does not serve the public

interest.  *See Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1219–20, 1224 (9th Cir. 2018)

(affirming injunction against county sheriff's office for constitutional violations based on racial

profiling under guise of enforcing state and federal immigration laws) (cited by the Defendants,

Dkt. 148 at 23 n.4).  States have no authority to limit federal authority under the Clean Water

Act.  *Arkansas v. Oklahoma*, 503 U.S. 91, 105–07 (1992) (rejecting Arkansas' challenge to

EPA's authority to require federal NPDES permit for Arkansas facility discharging into interstate

waters to comply with downstream state's water quality standards) (cited by the Defendants,

Dkt. 148 at 46).  And although states may choose whether to take on federal programs, when

they do, they must meet federal standards.  *New York v. United States*, 505 U.S. 144, 167–68

(1992) (cited by the Defendants, Dkt. 148 at 46).

Since Plaintiffs' motion is premised on the likelihood that the Defendants violated the

Clean Water Act and the ESA in approving Florida's program, the relief Plaintiffs seek is

entirely consistent with Congress' design.  Nothing in the congressional design weighs against

the relief Plaintiffs seek, *contra* Dkt. 148 at 46, because the Defendants violated federal law, and

so issuance of these permits pursuant to an unlawfully approved program would be unlawful.[55]

### E.      Plaintiffs' Harms Outweigh FDEP's Asserted Harms.

Florida argues that the balance of equities tips in their favor based on a

mischaracterization of the relief Plaintiffs' motion seeks.  In any case, although Florida laments

the loss of past expenditures, the loss of program efficiencies, and other alleged harms tied to

program implementation, Dkt. 149 at 11, 15, 51; Dkt. 149-1 at 15–16 (Wolfe Dec. ¶¶ 48–52),

---

[55] The Defendants' argument that Plaintiffs' "complaint lies with the design of the [Clean Water Act]," Dkt. 148 at 46, completely disregards the precondition of legality.  If the relief Plaintiffs seek is not granted, Plaintiffs will be irreparably harmed by an unlawful program that relies on USFWS' unlawful actions.  And even if Plaintiffs faced no barrier to state court (which they do), USFWS' actions would not be amenable to suit there either.

none of these are affected by the relief Plaintiffs seek, *contra* Dkt. 149-1 at 16 (Wolfe Dec. ¶ 52). Past efforts and money expended to assume and implement the state program are utterly unaffected, as those funds and efforts have been used to administer the program. *See id.* Nor is the public or FDEP deprived of any alleged benefits generated by past expenditure because Florida has used those funds to operate the 404 program during the pendency of this case. *See id.* Future allocations of resources are also not impacted by the preliminary injunction Plaintiffs seek because FDEP would still administer the state program pending the final resolution of this case.[56] And should Plaintiffs prevail, the State would presumably modify its future expenditures and allocation of staff accordingly. Nor are Florida's arguments about losing the "combined efficiencies" in processing ERP and 404 applications, *id.* at 15 (Wolfe Dec. ¶ 49), availing because preliminary relief would only affect the two permits at issue.

Even if Florida's past expenditures and future resources could somehow be "lost" by a preliminary injunction against two applications (which they plainly could not), Florida failed to provide the proper showing of proof. Florida's argument contains only conclusory statements as to past expenditures and no proof of future losses. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (bare assertions of only past losses without detailed accounting of how business would go out of business within 18 months was insufficient to show irreparable harm). Indeed, there were (and remain) plenty of other environmental issues for FDEP to tackle for the public's benefit, e.g., preventing toxic algal blooms, improving poor water quality, and addressing the emerging disease that is further imperiling the panther. EPA-HQ-OW-2018-0640-0386-A1, at 5, 45–47 (Plaintiff Comments); Dkt. 149-2 at 177 (Duncan Dec. att. A).

---

[56] According to Florida's estimate that there is an 85% overlap between the ERP and 404 programs, EPA-HQ-OW-2018-0640-0011 at 9 (State Assumption Application), it is especially difficult to see how FDEP's resources could be appreciably affected.

And Florida has been well aware of these claims of illegality since undertaking

assumption and deciding allocation of these resources.  *See, e.g.*, *Quechan Tribe of the Ft. Yuma*

*Rsrv. v. U.S. Dep't of the Interior*, 755 F. Supp. 2d 1104, 1121 (S.D. Cal. 2010) ("While the

court is sympathetic to the problems Defendants face, the fact that they are now pressed for time

and somewhat desperate after having invested a great deal of effort and money is a problem of

their own making and does not weigh in their favor."); *Fed'n of Japan Salmon Fisheries Co-op.*

*Ass'n v. Baldridge*, 679 F. Supp. 37, 48–49 (D.D.C. 1987), *aff'd and remanded sub nom.*

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*, 839 F.2d 795 (D.C. Cir. 1988) (harm to species

outweighs economic harms).[57]

Additionally, no competent evidence supports the claim that Plaintiffs' narrowly tailored

request for relief would "severely undermine" Florida's implementation of the program, affect

public confidence, much less have a "severe chilling effect" on the 404 permitting division and

create "chaos."  *See* Dkt. 149 at 51; Dkt. 149-1 at 15–16 (Wolfe Dec. ¶¶ 48, 50).[58]  If anything

has undermined public confidence, it is the manner in which Florida and the Defendants crafted

workarounds for (or otherwise disregarded) federal law to approve Florida's program

notwithstanding its many legal defects.  If anything has created a chilling effect, it is the

increasing barriers Florida has adopted to preclude access to the courts.  And if anything has

generated regulatory chaos, it is Florida's ill-preparedness to have taken on this federal program

from the outset, and its unwillingness to abide by federal law, including in its application of

definition of waters of the United States.  *See* Dkt. 31 at 11; Dkt. 42 at 67 n.38; Dkt. 98 at 68.

---

[57] The Developers have also long been on notice of the challenge to the State's program.

[58] Florida's claim that it might see "fewer activities that seek permits for projects," Dkt. 149-1 at
16 (Wolfe Dec. ¶ 51), is belied by its contention that it has received more than 9,000 applications
notwithstanding the chaos of its program administration and this ongoing lawsuit.

As the D.C. Circuit has opined, there is generally "no public interest" in perpetuating unlawful agency action, but there is "substantial public interest" in agencies abiding by federal law. *League of Women Voters,* 838 F.3d at 12. Certainly, Florida does not suggest that principles of federalism, past expenditure of funds while on notice of legal defects, and potential short-term (if any) uncertainty in program implementation overrides public interest in the government abiding by the law. After all, the injunction Plaintiffs seek only helps ensure that FDEP's "legal duty to process permits" is, in fact, "in accordance with the law." *See* Dkt. 149-1 at 15 (Wolfe Dec. ¶ 47).

### F.  Plaintiffs' Harms Outweigh the Developers' Asserted Harms.

For their part, the Developers assert that the harm to them outweigh the harms to the Plaintiffs. But their alleged harms are financial, have not been established by competent evidence, and are not irreparable. The Developers both point to money they have already invested in the two projects. *See* Dkt. 146-2 at 8–10, 12–13; Dkt. 139 at 6 (citing Dkt. 139-1 at 8 (Passarella Dec. ¶ 36)). But granting Plaintiffs relief pending resolution of this case has zero effect on that past investment. The only impact Developers assert is from economic losses caused by delay, which is insufficient to outweigh the harms to Plaintiffs. *Japan Salmon Fisheries*, 679 F. Supp. at 48–49 (harm to species outweighs economic harms).

Notably, Collier does not say how or during what period this money has been expended (averring elsewhere it has worked for 20 years on the Bellmar development, *see* Dkt. 139-1 at 4 (Passarella Dec. ¶ 8)) and submits no competent evidence to support the claim. Dkt. 139 at 6 (citing Dkt. 139-1 at 8 (Passarella Dec. ¶ 36)) (relying on conclusory statement by consultant).[59]

---

[59] Also, based on Collier's assertion that it has worked on the Bellmar project for twenty years, it is difficult to see how a temporary delay to ensure the lawfulness of Florida's program, would be particularly harmful.

Cameratta vaguely claims that it will "incur thousands of dollars in damages per day if the Project is delayed" (as well as other, unspecified harm from delays), Dkt. 146-2 at 12, but cites no evidence for this assertion, and does not assert that its business would be jeopardized. *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (requiring detailed accounting of how business would go out of business within 18 months and proof of future losses). Collier also points to additional monies spent on another permit not at issue in the motion and on the draft Habitat Conservation Plan ("HCP") it voluntarily considered and then abandoned. *See, e.g.*, Dkt. 139-1 at 9 (Passarella Dec. ¶ 36).[60] Having failed to establish financial harm, much less harm that would outweigh the irreparable harm to the Plaintiffs, the balance of the equities plainly is in Plaintiffs' favor.

---

[60] As to the Bellmar project, Collier attempts to undermine Plaintiffs' request for relief by referring to its participation, along with Plaintiffs Defenders of Wildlife and Florida Wildlife Federation ("FWF"), in efforts to develop a voluntary HCP for Eastern Collier County. Dkt. 145 at 3. This reference misleadingly suggests that those conservation groups support, or at least do not oppose, Bellmar when in fact they have opposed it and requested greater protections than developers were willing to provide. As those organizations have explained, their objective in seeking to negotiate an HCP was to promote an approach they hoped would enable conservation on a landscape-level scale that considered multiple projects in concert with mitigation measures and conservation initiatives to provide for habitat connectivity and travel corridors, with aiming to provide a net benefit to panthers unavailable outside the HCP. Had an agreement concerning a potential HCP been reached, it would have gone through a rigorous ESA process that also requires NEPA review and Section 7 consultation. Dkt. 31-6 at 11–12 (Carter Dec. ¶¶ 35–38); Dkt. 31-7 at 10–12 (Robertson Dec. ¶¶ 32–35). Although irrelevant to the issues before the Court, the reference to this abandoned process, if anything, illustrates the harm from Florida's deficient program. Defenders and FWF expressed concern that landowners would walk away from the HCP effort since EPA's approval of Florida's program provided an easier and less expensive route to incidental take protection; that is exactly what the landowners did. Dkt. 98-2 at 9–10 (Carter Dec. ¶¶ 30–33); Dkt. 98-3 at 10–11 (Fleming Dec. ¶¶ 30–33); Dkt. 98-8 at 7–9 (Robertson Dec. ¶¶ 23–27). Collier's invocation of Audubon's participation in that process fares no better, as that organization is also opposing the proposed Bellmar project. *See* Comments from Bradley Cornell, Audubon West Everglades, to Toby Schwetje, FDEP, Dec. 7, 2023, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396364/facility!search.

43

JA.1168

### G.    The Public Interest Favors Preliminary Relief.

Cameratta also claims that the public interest would be *better* served by issuance of this permit than its being temporarily enjoined.  Dkt. 146-2 at 13–14.  First, Cameratta presents a false choice, suggesting that granting Plaintiffs preliminary relief pending resolution of this case equates to precluding the Kingston project in its entirety.  *Id*.  But as shown above, the requested relief is temporary.  Once Plaintiffs' claims are resolved, Cameratta will either be able to continue the permitting process with FDEP or with the Corps.  Cameratta's assertion of theoretical losses involving infrastructure improvements, tax revenue, economic development, and ecological benefits is therefore unavailing.  *Id.* at 13.  Even if Cameratta had established that Kingston would bring these benefits (which it has not), or that these benefits outweigh the public interest in avoiding irreparable harm to ESA-listed species and compliance with the law (which it has not), preliminary relief serves the public interest because Plaintiffs' requested relief would only preserve the status quo, Dkt. 135 at 41, pending a final decision as to whether Florida's 404 program complies with federal law.

Similarly, because the relief Plaintiffs seek is preliminary, Cameratta's parade of potential horribles—that an injunction would delay economic benefits or "leave the possibility" that the land would be mined or developed piecemeal—is misplaced.  Dkt. 146-2 at 13.  The circumstances here are a far cry from the facts presented in the cases on which Cameratta relies. *Id.  See, e.g.*, *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1310 (11th Cir. 1999) (preliminary injunction would cause Georgia Power to reduce electrical power generation and have temporary and insignificant effects on fish); *State ex rel. Guste v. Lee*, 635 F. Supp. 1107, 1128–29 (E.D. La. 1986) (permanent injunctive relief in NEPA would cause "the immediate cessation of shell dredging operations," resulting in the demise of a 50 year-old industry, the loss of jobs, and the loss of capital investments, and plaintiffs' harms were speculative).  Because of the irreparable

44

harm that the Kingston project will cause to the Plaintiffs, the status quo *should* be preserved pending resolution of Plaintiffs' ESA claims.

Cameratta's final argument, that it is up to USFWS (rather than the Court) to determine whether a project is in the public interest, Dkt. 146-2 at 14, fails. First, Cameratta cites no authority for the proposition that USFWS may decide whether a project is in the public interest. Second, Cameratta's claim that Plaintiffs' request is "improper" and asks the Court to "usurp" the role of a federal agency has no basis in law and ignores that federal agencies must comply with federal law. Third, whatever purported benefits may accrue to the public from Kingston would only be delayed until the Court determines whether FDEP may lawfully issue the permit. And because denying preliminary relief would cause irreparable harm to the Plaintiffs, who are likely to succeed on the merits of their claims that FDEP's program is unlawful, the public interest will be served by issuing the requested relief.

## IV.    The Court Has Authority to Enter the Requested Relief.

Florida argues that the Court lacks jurisdiction over this case, over the Florida Intervenors, and over State permits. Dkt. 149 at 29–34. Florida's first two claims fail as a matter of law,[61] and the third fails as a matter of fact.

Florida's argument that the Court lacks jurisdiction "to adjudicate state permit applications," *id.* at 29, is a red herring because Plaintiffs have not asked the Court to adjudicate state permit applications. Therefore, Florida's lengthy discussion of state authority to adjudicate the merits of state permit applications, *id.* at 29–34, is neither here nor there.

---

[61] Plaintiffs demonstrated the Court's jurisdiction over their claims in the briefing on summary judgment and the Court's jurisdiction over the Florida Intervenors in the instant motion. Dkt. 98 at 75–80; Dkt. 104 at 90–115; Dkt. 123 at 21–25.

JA.1170

Similarly, Florida's complaint that state permits must be challenged in state court fails, as permits here have not been issued and Plaintiffs are therefore not challenging state-issued permits. *See, e.g.*, *id.* at 32–33 (quoting *Conewango Creek*, 2007 WL 3023927, at *5 (stating that challenges to state permits should be brought in state court "assuming Plaintiff is challenging final Pennsylvania-issued permits…")).

Florida's assertion that the relief Plaintiffs seek is "contrary to D.C. Circuit precedent," *id.* at 9, 30–34, is unavailing.  In *District of Columbia v. Schramm*, 631 F.2d 854, 856, 860 (D.C. Cir. 1980), the District asked a federal court to *revoke* a state permit because EPA had declined to veto it.  The Court held that EPA's decision not to veto a permit was not reviewable because the decision was committed to agency discretion as a matter of law.  *Id.*  But here, the permits in question have not issued, there is nothing to revoke, and no "inaction" involved.  Also, unlike in *Schramm*, Plaintiffs in this case have challenged EPA's approval of Florida's program (and related agency actions), which is the source of FDEP's authority to issue 404 permits.  It therefore cannot be said that "federal involvement is merely secondary."  *Id.* at 861.  To the contrary, the Defendants' actions underlie the very authority on which the State relies to issue 404 permits at all.  Any discussion of congressional intent regarding the delegation of Clean Water Act programs to the states presumes that the federal approval of those programs (and so the delegation) has been lawful.

Florida's reliance on *General Motors Corporation v. EPA*, *see* Dkt. 149 at 31–34, fares no better as that case involved a collateral attack on the merits of an already-issued state permit. 168 F.3d 1377, 1382 (D.C. Cir. 1999) (rejecting General Motors' effort to attack terms of its own state permit in the course of an EPA enforcement action; observing that Clean Water Act did not authorize federal courts to review merits of permits issued by state).

Florida has *no* response to the actual basis for Plaintiffs' motion, which is a request to temporarily enjoin the issuance of two state permits that pose the risk of irreparable harm until the Court has determined whether FDEP has lawfully been granted the authority to issue 404 permits in the first place.  And Florida cites *no* authority to support its wishful assertion that the Court lacks authority to grant the narrow relief Plaintiffs have requested.  Dkt. 149 at 29–34.

To the contrary, the Court enjoys broad authority to craft the terms of a preliminary injunction.  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.").  This is because "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Id.* at 580 (internal citation omitted).

The most analogous case is *Friends of Crystal River v. EPA*, 794 F. Supp. 674 (W.D. Mich. 1992), *aff'd*, 35 F.3d 1073 (6th Cir. 1994), which Florida cites, Dkt. 149 at 33 n.17.  In that case, the court permanently enjoined the state agency from issuing a state 404 permit on the basis that it was the federal government, and not the state, that had lawful authority to issue the permit.  749 F. Supp. at 685, 694.  There, EPA had objected to the permit, transferred authority from Michigan to the Corps, and then sought to "return" the permit to the state's jurisdiction even though the state had not taken the requisite action to address EPA's objection.  *Id.* at 692–93.  The Court found that given the state's inaction, EPA lacked the statutory authority to return the permit to the state's jurisdiction.  *Id.*  Although the facts differ, whether FDEP or the Corps has the lawful authority to issue these permits is also the question presented by this case.  If

47

Plaintiffs prevail on the merits that EPA's approval of Florida's program was unlawful and therefore must be vacated, then permitting authority rests with the Corps.[62]

Without citing any authority, the Developers similarly argue that the Court may not enjoin FDEP's issuance of permits, Dkt. 145 at 7, even though, as Plaintiffs have shown, FDEP's authority to issue the 404 permits arises from the unlawful actions by federal agencies challenged in this case.[63]  Cameratta argues that Plaintiffs' motion for preliminary relief constitutes a challenge to a "new agency action" and that even a ruling in Plaintiffs' favor on the merits "would not automatically vacate approved projects."  Dkt. 146-2 at 6.  But again, these projects have not been approved.

Aside from demonstrating that Cameratta considers this permit approval a done deal, the argument has no bearing on this motion.  Plaintiffs are *not* challenging a new agency action or seeking vacatur of any state-approved project.  To the contrary, this case challenges the state's *authority* to issue state 404 permits on the basis that EPA's approval of the state program and the related agency actions by USFWS and the Corps were unlawful.  Plaintiffs have specifically sought *preliminary* relief to prevent the issuance of unlawful state 404 permits authorizing the Bellmar and Kingston projects because of the irreparable harm this would cause.  Plaintiffs have also specifically requested this relief pending the Court's final judgment, including as to remedy, on Plaintiffs' claims related to the protection of ESA-species under USFWS jurisdiction.  The

---

[62] Florida cites no authority for its confounding assertion that enjoining FDEP would be improper "because, in Movants' words" the agency has "'intervened' to defend the EPA decision to approve Florida's 404 program," Dkt. 149 at 30, when that is, as Florida concedes, precisely what the agency has done, *see id.*

[63] Collier's argument that Plaintiffs' motion is not directed at the actions challenged in this litigation, Dkt. 145 at 7, flatly ignores that the entirety of Plaintiffs' case challenges the State's authority to issue any state 404 permit because they submit that EPA's approval (and related federal agency actions) were unlawful in part for their failure to comply with the ESA, including the unlawful Programmatic BiOp and ITS and the unlawful technical assistance process.

relief Plaintiffs seek here is therefore by definition not, as Cameratta suggests, the final word on remedy. *See* Dkt. 146-2 at 12–14.

The Developers seek to defeat Plaintiffs' motion by attempting to re-cast it as a permit challenge. Under their re-imagining of Plaintiffs' filing, the Developers posit that this (nonexistent) permit challenge must fail for various reasons, including that the yet-to-be issued permits are not final agency actions ripe for review, the State administrative records as to each permit are not before the Court, and any challenge to State-issued permits must be brought in State court. Dkt. 145 at 7–8; Dkt. 146-2 at 6–8.[64] Whatever abstract merit these general principles may have, they have zero relevance here, because Plaintiffs' request for preliminary relief is not a permit challenge.

From the start, Plaintiffs have alleged that EPA's approval of Florida's 404 program and related agency actions are unlawful, rendering the state's authority to issue 404 permits null and void. Plaintiffs' motion for preliminary injunctive relief seeks to prevent irreparable harm resulting from that unlawful state program—serious, irreparable harm that has become imminent now that the permits for Bellmar and Kingston—two major projects posing serious harm—are about to be granted. Granting the relief Plaintiffs request here does not render judgment on these permits—it only ensures that the permits will not be issued unless and until the Court has determined that the federal actions challenged in this case were lawful. And should Plaintiffs

---

[64] In addition to concerns raised as to both projects during this litigation, Plaintiffs have submitted comments to FDEP on both the Bellmar and Kingston permits, *contra* Dkt. 146-2 at 7, and also participated in FDEP's public meetings as to Bellmar on December 7, 2023, and as to Kingston on January 16, 2024. *See* Comments from Karimah Schoenhut, Sierra Club, & Elise Pautler Bennett, Center for Biological Diversity, to Shawn Hamilton et al., FDEP et al., Dec. 7, 2023, *available at* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ ST404_396364/facility!search; Plaintiffs' Kingston Comments.

prevail on the merits, that too does not render judgment on the permits, it only requires that the

permit applications be processed by the Corps rather than the state.

Collier's argument that this motion is somehow an "end-run" around the Administrative

Procedures Act ("APA"), Dkt. 145 at 8, is not supported by fact or law.[65]  Plaintiffs have (and

continue to) seek relief on the merits of their claims under the APA (and other federal statutes).

While that action is pending, they are entitled to seek preliminary relief to preserve forestall

irreparable harm when the risk of that harm has become imminent, as it has here.  The cases on

which Collier relies are inapposite.  *Id.  See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891–94

(1990) (plaintiffs could not challenge various continually changing agency operations where

operations did not constitute a final agency action or have actual or immediate threatened effect;

plaintiffs would instead have to challenge final actions case by case); *Nat'l Wildlife Fed'n v.

Caldera*, No. 00-cv-1031, 2002 WL 628649, at *1–5 (D.D.C. Mar. 26, 2002) (plaintiffs could

not seek programmatic relief requiring agency to develop comprehensive plan to protect Florida

panther by pointing to 23 already-issued permits they had not sought to enjoin).  *See also

Brownlee*, 402 F. Supp. 2d at 6, 10–11 (holding that *Caldera* did not bar procedural challenge to

nationwide permits affecting panther habitat and that Corps violated the ESA for failing to

consult with USFWS at a programmatic level (even if it would consult at the site-specific level)

because those authorizations "may affect" the Florida panther).  Indeed, *Caldera* is particularly

instructive here, where Plaintiffs have properly mounted a programmatic challenge to

programmatic actions and now seek to enjoin permits that threaten irreparable harm during the

pendency of that challenge.  Rather than seek any "end-run" around anything, Plaintiffs' motion

---

[65] The absurdity of the argument is underscored by efforts to characterize Plaintiffs' motion as
both unripe and tardy.

is exceedingly conservative, asking the Court only to enjoin the issuance of specific permits that threaten them with specific irreparable harm until the Court has determined whether FDEP has the lawful authority to issue those permits.

Cameratta's argument that "Plaintiffs Are in the Wrong Court," Dkt. 146-2 at 8, misses the mark by far. Plaintiffs' illustration of the barriers they face in state court to challenge state 404 permits is not a "lament," *id.*; it is demonstration of additional irreparable harm to which Plaintiffs will, absent preliminary injunctive relief, be subjected as a result of EPA's unlawful approval of Florida's 404 program. Even if Plaintiffs faced *no* barriers to state court to challenge a state 404 permit, the state court would lack authority to rule on the lawfulness of the Defendants' actions underlying that approval (and thus FDEP's authority to issue the permits in the first place), which is the crux of this litigation.[66] That authority resides solely with this Court. And if the permits were to issue pursuant to a State 404 program ultimately deemed unlawful, Plaintiffs will have been irreparably harmed by EPA's unlawful approval and USFWS' failure to produce a BiOp that met Section 7 standards and is enforceable in federal court.[67]

## V.     The Requested Relief is Narrowly Tailored and Appropriate.

Lastly, the Defendants implausibly argue that the very specific relief Plaintiffs seek is not "narrow or appropriately tailored." Dkt. 148 at 9, 46–48. As a preliminary matter, Rule 65

---

[66] For this reason, Florida's argument that the State provides an adequate remedy at law, Dkt. 149-1 at 12 (Wolfe Dec. ¶¶ 37–38), has no bearing. As Florida has repeatedly argued, a state permit challenge would only address whether FDEP's permit complied with *state law*. Dkt. 149 at 30. State courts, however, lack authority to review actions by federal agencies absent a waiver of sovereign immunity. *Siesta Key Ass'n of Sarasota, Inc. v. City of Sarasota*, 320 So.2d 833, 835 n.1 (Fla. 2d Dist. Ct. App. 2021). In the APA, Congress waived sovereign immunity for suits against federal agencies, other than for money damages, brought in federal court. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). The waiver does not apply to state court. *See Fed. Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 193 (6th Cir. 1989).

[67] Indeed, it is the Defendants' position that USFWS' TA Form is not a reviewable agency action at all, Dkt. 148 at 23–24.

imposes requirements on court orders granting injunctions.  Fed. R. Civ. P. 65(d)(1)(C).

Nevertheless, the relief Plaintiffs seek "describe[s] in reasonable detail—and not be referring to

the complaint or other document—the act or acts restrained or required."  *Id.*  Indeed, the

Defendants have not articulated any plausible confusion over the scope of the requested relief,

which is plainly intended to prevent the issuance of two specific permits.  *See Prairie Band of

Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1244 (10th Cir. 2001) (court was "at a loss" as to

how preliminary injunction that barred state from "any further application and enforcement" of

its motor vehicle registration or titling laws against the Tribe, or persons with vehicles registered

and titled under the tribal motor vehicle code, was inadequate).

The Defendants cite *Nebraska Department of Health & Human Services v. U.S.

Department of Health & Human Services*, Dkt. 148 at 46, for the general proposition that

injunctions must be narrowly tailored to remedy specific harm.  435 F.3d 326, 330 (D.C. Cir.

2006) (observing that vacatur "is the normal remedy for an unlawful agency rule" and reviewed

in the same way as are injunctions).  In this case, Plaintiffs seek (among other things) vacatur of

EPA's approval of Florida's 404 program, vacatur of USFWS' Programmatic BiOp and ITS, and

an injunction of EPA's transfer of 404 authority to the state.  Dkt. 77 at 58 (Am. Compl. ¶¶ (l)–

(m), (p)).  But for purposes of *this* motion, Plaintiffs have carefully narrowed their request for

relief to enjoin the issuance of only two state permits that pose the risk of irreparable harm.[68]

Plaintiffs' alternative request for relief is also narrowly tailored by requesting relief specific to

Plaintiffs' ESA-related claims, and to permits that would affect ESA-listed species, should the

Court rule in Plaintiffs' favor on the merits of those claims.  Plaintiffs' requests therefore easily

---

[68] Florida's objection to a remedy that "targets specific Florida 404 permit applications," Dkt.
149 at 40, is at odds with its claim that Plaintiffs' request is not narrowly tailored, *id.* at 40 n.21.

meet the test of being carefully tailored to remedy specific harm.  *See Nat'l Treasury Emps.*
*Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).

Florida misapprehends Plaintiffs' alternative request as applying "pending a decision by
the Court on the merits."  Dkt. 149 at 40 n.21.  To the contrary, the request is for an expedited
ruling on Plaintiffs' ESA-related claims with, presuming the Court has ruled in Plaintiffs' favor,
an order restoring authority to the Corps over permits that may affect ESA-listed species.  Dkt.
135 at 42.  Plaintiffs' reference to further briefing on remedy was intended to refer to additional
remedies that may be warranted in light of the Court's ruling on those claims.  Although Florida
complains that this would constitute improper partial vacatur,[69] Dkt. 149 at 40 n.21, it would
actually be narrowly tailored relief, applying only to a subset of permits, to remedy violations
affecting ESA-listed species.[70]  Florida cites no authority for its claim that simply because this
may involve hundreds of applications (of the more than 9,000 Florida says it has received, *id.* at
15), the relief is not narrow or tailored.

---

[69] Florida's claim that a federal court has never vacated a federally delegated program, Dkt. 149
at 39, is incorrect.  A federal court vacated EPA's approval of Arizona's NPDES program.  *See
Defs. of Wildlife v. EPA*, 420 F.3d 946, 979 (9th Cir. 2005).  The Supreme Court reversed that
decision not because of the remedy, but because it reached the contrary legal conclusion on the
merits.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 649 (2007).  And
contrary to Florida's related claim, Dkt. 149 at 39, the Ninth Circuit did not "decid[e]" not to
vacate EPA's approval of Idaho's NPDES program after finding the agency had abused its
discretion.  It granted the relief petitioners requested: remand without vacatur.  *See* Petr's Br. at
51, June 26, 2019, ICL v. EPA, Case No. 18-72684 (9th Cir.), ECF No. 30-1.
[70] Florida's argument that the only remedy for these violations would be the loss of incidental
take protection, Dkt. 149 at 40 n.22, lacks any merit.  If Plaintiffs prevail on their claims that
USFWS' Programmatic BiOp (which concludes with a determination that EPA's approval would
not jeopardize protected species) was unlawful and that EPA unlawfully approved Florida's
program as demonstrating compliance with the 404(b)(1) Guidelines, EPA's approval would be
null and void, and the state would lack authority to issue 404 permits.  The relief Plaintiffs
request in the present notion is therefore far narrower than ("rather than "far beyond," *id.* at 11)
the relief available should they prevail on the merits of even a subset of their claims.

The Defendants' argument that it would not make sense to enjoin EPA "unless the Court also enjoins FDEP," Dkt. 148 at 47, is consistent with Plaintiffs' request, which is to enjoin them both, *see id.* at 46 (quoting Plaintiffs' request). The Defendants object that Plaintiffs did not identify USFWS or the Corps in their proposed order or what specific actions by those agencies would be enjoined. *Id.* at 47 n.13. But at the time of filing, USFWS had communicated to Plaintiffs that the agency had no further comment on the proposed projects, and so Plaintiffs understood that there was no further action for USFWS to take. In opposition to the present motion, however, USFWS appears to suggest it could yet take more actions. To the extent that these speculative actions by USFWS would *prevent* issuance by providing FDEP with a jeopardy conclusion, for example, Plaintiffs do not seek to enjoin them. Plaintiffs' motion seeks only to enjoin USFWS actions that would further issuance of the proposed permits. *See* Dkt. 135 at 8 (seeking injunction of any action furthering issuance of these permits, which necessarily would be limited only to those agencies with authority to take further action regarding the permits).[71]

Mischaracterizing the requested relief, the Defendants complain that Plaintiffs are asking the Court to "direct" EPA to take action and that this would constitute a mandatory injunction. Dkt. 148 at 47–48. But nothing in Plaintiffs' request, including the language the Defendants cite, is in the form of a mandatory injunction; it does not direct EPA to do anything in the affirmative and would not, contrary to the Defendants' claim, require EPA to object to a permit. It simply enjoins EPA from acting. Dkt. 135 at 42.[72] Therefore, even if a higher burden applied to mandatory injunctions, Dkt. 148 at 48 n.15, it would not apply here.

---

[71] Plaintiffs do not, however, seek to enjoin the Corps, an agency that apparently has no role in the issuance of these permits at present and thus would not be covered by the requested relief.
[72] Plaintiffs are not, as the Defendants suggest, seeking to enjoin EPA from objecting to the permits, as an objection would not be in furtherance of the state issuing the permits.

**CONCLUSION**

For the reasons expressed above, Plaintiffs therefore respectfully request that their motion

be granted by February 5, 2024.

Dated:  January 26, 2024

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

Counsel for Plaintiffs

* Appearing pro hac vice

JA.1180

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 26th day of January 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

<u>/s/ Tania Galloni</u>
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

JA.1181

**Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation**

| Requirement | Section 7 Consultation | Technical Assistance Process |
|---|---|---|
| **Triggering Event/ Effects Determination** | Whenever a discretionary federal agency action may affect a species, an action agency must engage in Section 7 consultation. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). <br><br> If the action agency determines after preparing a BA or during information consultation that the action is not likely adversely affect species, and USFWS provides a written concurrence, consultation is not required. 50 C.F.R. § 402.14(b)(a).  *Accord id.* §§ 402.12(k)(1). 402.13(c), 402.14(m)(3).[1] | If the State determines an application may cause an adverse impact or adverse effect to listed species, technical assistance continues.[2] FWS-006028, at FWS-006057. <br><br> If the State determines that an application will have no adverse impacts, and USFWS has not submitted information or questions **that would lead the State to reconsider its determination**, the species review concludes for the application. FWS-006028, at FWS-006056. <br><br> USFWS will provide information if it "**disconfirms**" the State's effect determination.  Otherwise, USFWS response may indicate the application had been received and reviewed and USFWS had no comments. FWS-006028, at FWS-006058. <br><br> "USFWS **will not 'concur'** with any effect determinations made by the State of Florida, but rather **may provide comments and conditions** that must be implemented in order for the permit to be issued." FWS-006028, at 006058. |

---

[1] Florida contends otherwise, Dkt. 149-3 at 2, 4 n.d, but USFWS must concur with an agency's "may affect, not likely to adversely effect" determination, 50 C.F.R. § 402.14(b)(a).  Moreover, when a federal agency makes an unlawful "no effect" determination, that decision is subject to an ESA enforcement action from USFWS or the public.  *Karuk Tribe v. USFS*, 681 F.3d 1006 (9th Cir. 2012).

[2] *See* USFWS & NMFS, Endangered Species Consultation Handbook at 67–68 (1998), *available at* https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf (describing technical assistance provided to federal agencies during informal ESA consultation).

| | | |
|---|---|---|
| **Biological Opinion** | USFWS must create a written statement of USFWS' opinion, summary of information on which opinion is based, and detail of how the action affects species or its critical habitat.<br>16 U.S.C. § 1536(b)(3)(A). | |
| **Best Available Science** | Both action agency and USFWS must use best scientific and commercial data available during consultation.<br>16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).[3] | |
| **Baseline Analysis** | USFWS must analyze the environmental baseline, which is the condition of the species or critical habitat, accounting for the past and present impacts of all federal, state, or private actions in the action area; the anticipated effects of all proposed federal actions that have already undergone consultation; and the impact of state or private actions that are contemporaneous.<br>50 C.F.R. §§ 402.14(g)(2), 402.02. | |

---

[3] Florida cites the definition of "best available data" from the BiOp to suggest that USFWS must use the "best available science" during technical assistance, Dkt. 149-3 at 3, 4 n.dd, but that definition is not an express requirement to use the best available science during the technical assistance process, and Florida points to no authority that suggests it is. Plaintiffs searched "best available data" and "best available science," and aside from the definition, found only one reference in the entire BiOp, which says that the best available data would be used by FDEP and FWC, and coordinated with USFWS, to make the preliminary effects determinations that decide whether technical assistance is required. FWS-006028, at FWS-006062 (BiOp). Nothing in the technical assistance process binds USFWS to comply with the ESA's best available science requirement at the permit level.

| | | |
|---|---|---|
| **Effects Analysis** | USFWS must evaluate the effects and cumulative effects on listed species and critical habitat.  "Effects of the action" include all effects of the proposed action, along with consequences of other activities that would not occur but-for the action and that are reasonably certain to occur.  "Cumulative effects" are effects of future state or private activities that are reasonably certain to occur within the action area. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.14(g)(2)–(3), 402.02. | USFWS "**may or may not**" comment on impacts. FWS-006028, at FWS-006064.  *Contra* Dkt. 106 at 34 n.15 (citations do not support the Defendants' characterizations). |
| **Jeopardy Analysis** | USFWS must add the effects of the action and cumulative effects to the environmental baseline and in light of this information, formulate its opinion as to whether the action is likely to jeopardize the continued existence of a protected species or result in the destruction or adverse modification of critical habitat. "Jeopardize the continued existence" means to take an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. "Destruction or adverse modification" means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(g)(4), 402.02. | USFWS will receive and review 404 permits and provide technical assistance "**as needed**" to ensure permitting is not likely to jeopardize species or adversely modify or destroy critical habitat. FWS-006028, at FWS-006046.  *Accord id.* at FWS-006106 (USFWS will be "**provided an opportunity**" to provide technical assistance), FWS-006056 (USFWS "**may**" submit questions within twenty days or have their silence deemed "no comment"), FWS-006058 (USFWS "**may**" provide information to the State), FWS-006108 (process "**will allow**" USFWS to provide input).  *Contra* Dkt. 99 at 31 (citations do not support the Defendants' characterization). |
| **Reasonable and Prudent Alternatives** | If USFWS finds that jeopardy is likely to occur, it must propose reasonable and prudent alternatives that could be implemented consistent with the action that would avoid jeopardizing the species or destroying or adversely modifying critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). | If an action may jeopardize species, the State, USFWS, and the applicant "**will discuss** to determine what **if any** protective measures **may be appropriate**." FWS-006028, at FWS-006068. |

| | | |
|---|---|---|
| **Incidental Take Statement** | If take is likely to occur, USFWS must issue an incidental take statement. 16 U.S.C. § 1536(b)(4). | |
| **Incidental Take Limit** | In the incidental take statement, USFWS must specify the amount or extent of take; surrogate may be used in lieu of a numerical limit only if USFWS describes the causal link between the surrogate and the take, explains why a numerical limit is impractical, and sets a clear standard for reinitiation of consultation. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). | If take is likely, the amount or extent of take will be quantified by USFWS "**in coordination with**" the State. FWS-006028, at FWS-006108.  *Accord* Dkt. 99 at 33. |
| **Incidental Take Liability** | "[A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o).[4] | |
| **Terms and Conditions** | USFWS must set forth terms and conditions that implement reasonable and prudent measures necessary or appropriate to minimize the impact of take. 16 U.S.C. § 1536(b)(4)(C)(ii), (iv), (o); 50 C.F.R. § 402.14(i)(1)(ii), (iv). | "In some cases, **depending upon the project**, the USFWS **may** submit recommendations to [the State]" for protective measures. FWS-006028, at FWS-006057.  USFWS "**may or may**" nor comment on proposed protective measures. FWS-006028, at FWS-006064.  The State and USFWS will monitor and track take. FWS-006028, at FWS-006108. |

---

[4] The terms and conditions of the programmatic ITS create no obligations for permittees.  FWS-006028, at FWS-006109–10.  Florida relies on a statement from the ITS that "any take" incidental to a state 404 permit is exempt "if the permittee implements all permit conditions ... as agreed upon by the State and the USFWS," Dkt. 149-3 at 2, 5 n.r (citing FWS-006028, at FWS-006108 (BiOp)); but this is not included as a term and condition of the programmatic ITS.  FWS-006028, at FWS-006109–10.  Nor does this language state that a permittee must comply with a take limit established by USFWS at the permit-level to receive take liability protection or even that USFWS must establish a permit-level take limit at all.  *Id.* at FWS-006108

| | | |
|---|---|---|
| **Reinitiation** | USFWS and the federal action agency must reinitiate consultation when agency retains discretionary involvement or control and: (1) take limit has been exceeded; (2) new information reveals effects in a manner or to an extent not previously considered; (3) the action is modified in a way that effects species; or (4) a new species is listed or new critical habitat designated that may be affected. 50 C.F.R. § 402.16(a). | **The State** will reopen the permit if take is exceeded or a new species is listed. FWS-006028, at FWS-006111. *Accord* Dkt. 99 at 33. |
| **EPA Oversight** | EPA may veto permits by the Corps for limited reasons. 33 U.S.C. § 1344(c). | EPA will retain oversight over permits with the reasonable potential for affecting listed species and critical habitat. FWS-006028, at FWS-006051.<br><br>EPA interprets this phrase to mean USFWS determines "which species are endangered or threatened." FWS-006639, at FWS-006639 (USFWS email). |

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3       CENTER FOR BIOLOGICAL          )  Civil Action
         DIVERSITY, et al.,             )  No. 1:21-CV-119
 4                                      )
                          Plaintiffs,   )  MOTION HEARING
 5                                      )
         vs.                            )
 6                                      )  Washington, D.C.
         ANDREW WHEELER, et al.,        )  October 19, 2023
 7                                      )  Time:  2:08 P.M.
                          Defendants.   )
 8       _____

 9

10                     TRANSCRIPT OF MOTION HEARING
             HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
11                     UNITED STATES DISTRICT JUDGE

12       _____

13                      A P P E A R A N C E S

14

15       For Plaintiffs:        TANIA GALLONI
                                CHRISTINA REICHERT
16                              BONNIE MALLOY
                                Earthjustice
17                              4500 Biscayne Boulevard
                                Suite 201
18                              Miami, FL 33137

19       For Defendants:        ANDREW COGHLAN
                                ALISON C. FINNEGAN
20                              U.S. Department of Justice
                                P.O. Box 7611
21                              4 Constitution Square
                                150 M Street, NE
22                              Washington, DC 20002

23

24

25
```

```
 1              A P P E A R A N C E S (CONT'D.)

 2
        For Intervenor:        JEFFREY H. WOOD
 3                             Baker Botts, LLP
                               700 K Street, NW
 4                             Washington, DC 20001

 5                             LILY N. CHINN
                               Baker Botts, LLP
 6                             101 California Street
                               Suite 3200
 7                             San Francisco, CA 94111

 8

 9      Also Present:          AMBER CROOKS, Conservancy of Southwest
                               Florida;
10
                               ELISE BENNETT, Center of Biological
11                             Diversity;

12                             DANIEL FRANZ, Defenders of Wildlife;

13                             JUSTIN WOLFE, Florida Department of
                               Environmental Protection;
14
                               ERICA ZILIOLI, Army Corps of Engineers;
15
                               SIMMA KUPCHAN, EPA Office of General
16                             Counsel.

17

18

19

20
        Court Reporter:        Tamara M. Sefranek, RMR, CRR, CRC
21                             Official Court Reporter
                               United States Courthouse, Room 6714
22                             333 Constitution Avenue, NW
                               Washington, D.C. 20001
23                             202-354-3246

24

25
```

JA.1188

1          MS. FINNEGAN:  Okay.  Just making sure.  I heard you

2     say killing endangered species.

3          THE COURT:  But incidental take is killing.

4          MS. FINNEGAN:  Okay.  Well, it takes up a whole lot

5     of other things, too.  I want to make sure you and I are on the

6     same page.  We're talking about --

7          THE COURT:  You're right, it could be harming.

8     You're right.  It's not just killing, but it could be harming

9     as well.

10          MS. FINNEGAN:  In the beginning you asked me where is

11    the commitment that the Fish and Wildlife Service will review

12    the permits, and it's throughout the biological opinion.  I can

13    give you a couple of pinpoint cites if you want them right now.

14          THE COURT:  I should have all that to look at.  There

15    may be more like this, but it still leads me to the question

16    of, is this anything that is legally enforceable, and does it

17    require Fish and Wildlife Service to actually comply with all

18    the ordinary guardrails that would apply with respect to the

19    best scientific methods or whatever the rules are that apply?

20          MS. FINNEGAN:  Okay.  So it's its own biological

21    opinion.  Of course, it's going to comply with it.  It's in an

22    MOU.  It's committed to that, Your Honor.  It's committed to --

23          THE COURT:  Come on.  Are you willing to commit to me

24    here that the United States concedes that someone can sue them

25    if they don't comply with this?

1          MS. FINNEGAN:  If the Fish and Wildlife Service

2     doesn't review the permit?

3          THE COURT:  Yes.  Not only doesn't review the permit,

4     but doesn't apply the best scientific standards or whatever the

5     requirements are ordinarily, and doesn't do all those things,

6     that someone would have a basis to sue the Fish and Wildlife

7     Service, and say, well, you put it in your biological opinion.

8          MS. FINNEGAN:  Well, I'm not sure what the cause of

9     action would be for that, Your Honor.  But in terms of the

10     standards, the express purpose of the technical assistance

11     process is to determine if state-issued 404 permits would

12     jeopardize species or adversely modify or destroy critical

13     habitats.

14          That's the standard the Fish and Wildlife Service is

15     going to apply.  And it clearly incorporates the meaning of

16     those terms from the Endangered Species Act and its

17     implementing regulations.  That interpretation is reinforced by

18     the fact that federal regulations that apply to EPA, the state

19     program rule, State 404 applicant handbook, all prohibit

20     issuance of a State 404 permit that's likely to jeopardize

21     ESA-listed species.

22          Those permits are not -- it's not just the biological

23     opinion that binds them to that, Your Honor.  It's not just the

24     memorandum of understanding.  That's what makes it a little

25     tiny bit different than the cooling water case.