**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

**JOINT APPENDIX—VOLUME 4 (JA.1191–JA.1469)**

*Counsel Listed on Inside Cover*

February 26, 2025

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

Jeffrey DeSousa
*Acting Solicitor General*
Christopher J. Baum
*Senior Deputy Solicitor General*
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Florida Appellants*

Lisa Lynne Russell
*Deputy Assistant Attorney General*

Brian Toth
Joan Pepin
Rebecca Jaffe
*Attorneys*

Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

*Counsel for Federal Appellants*

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
tgalloni@earthjustice.org
creichert@earthjustice.org
(305) 440-5432

Bonnie Malloy
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
bmalloy@earthjustice.org
(850) 681-0031

*Counsel for Environmental Appellees*

## TABLE OF CONTENTS

| **VOLUME 1 (JA.1–JA.430)** | | |
|---|---|---|
| **District Court Docket Number** | **Document** | **Page** |
| Dkt. 1 | Plaintiffs' Complaint | 1 |
| Dkt. 4 | State of Florida and Florida Department of Environmental Protection's Motion to Intervene | 52 |
| Dkt. 73 | Memorandum Opinion and Order | 55 |
| Dkt. 77 | Plaintiffs' Amended Complaint | 117 |
| Dkt. 95-2 | Revised Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program | 176 |
| Dkt. 98 | Plaintiffs' Motion for Summary Judgment | 211 |
| Dkt. 98-1 | Declaration of Amber Crooks | 294 |
| Dkt. 98-3 | Declaration of Elizabeth H. Fleming | 417 |


| **VOLUME 2 (JA.431–JA.846)** | | |
|---|---|---|
| Dkt. 98-4 | Declaration of Brett Hartl | 431 |
| Dkt. 98-5 | Declaration of Matthew Schwartz | 444 |
| Dkt. 98-6 | Declaration of Lisa Rinaman | 463 |
| Dkt. 98-7 | Declaration of Rachel Silverstein | 510 |
| Dkt. 98-10 | Declaration of Diana Umpierre | 543 |

| | | |
|---|---|---|
| Dkt. 99 | Defendant's Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment | 644 |
| Dkt. 102 | Florida Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment | 731 |
| Dkt. 102-1 | Declaration of Justin Wolfe | 793 |

| VOLUME 3 (JA.847–JA.1190) | | |
|---|---|---|
| Dkt. 104 | Plaintiffs' Consolidated Reply in Support for Motion for Summary Judgment and Response in Opposition to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 847 |
| Dkt. 104-1 | Supplemental Declaration of Amber Crooks | 963 |
| Dkt. 107 | Florida Intervenors' Reply in Support of Cross-Motion for Summary Judgment | 1001 |
| Dkt. 113 | Notice of Completion of Biological Evaluation | 1033 |
| Dkt. 123 | Plaintiffs' Sur-Reply in Support of Plaintiffs' Motion for Summary Judgment and Response to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 1036 |
| Dkt. 125 | Plaintiffs' Notice of Filing Addition to Supplemental Joint Appendix | 1063 |
| Dkt. 127-2 | Florida Intervenors' Motion for Leave to File Post-Hearing Memorandum, Attachment 1: Standing Demonstrative | 1066 |
| Dkt. 135 | Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Center for Biological Diversity and Sierra Club | 1069 |

| Dkt. 149-3 | Exhibit C: Comparison Table of Species Review Process in Corps-Led and Florida-Led Section 404 Programs | 1113 |
|---|---|---|
| Dkt. 153 | Plaintiffs Center for Biological Diversity and Sierra Club's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 1119 |
| Dkt. 153-1 | Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation | 1182 |
| Dkt. 156 | Excerpt of Motion Hearing on October 19, 2023 | 1187 |

| **VOLUME 4 (JA.1191–JA.1469)** | | |
|---|---|---|
| Dkt. 158 | Federal Defendants' Post-Hearing Submission on Remedy | 1191 |
| Dkt. 161 | Plaintiffs' Brief on Remedy for Claims Relating to Protection of ESA-listed Species under USFWS' Jurisdiction | 1201 |
| Dkt. 164 | Order | 1218 |
| Dkt. 165 | Federal Defendants' Supplemental Brief Regarding Limited Stay | 1220 |
| Dkt. 166 | Florida Intervenors' Motion for Limited Stay of February 15, 2024 Vacatur Order | 1224 |
| Dkt. 166-1 | Exhibit A: Declaration of Justin Wolfe | 1245 |
| Dkt. 170 | Florida Intervenors' Reply in Support of Limited Stay | 1250 |
| Dkt. 171 | Florida Intervenors' Expedited Motion for Entry of Final Judgment | 1263 |

| Dkt. 182 | Amended Memorandum Opinion | 1284 |
|---|---|---|
| Dkt. 183 | Memorandum Opinion | 1382 |
| Dkt. 184 | Order | 1409 |
| Dkt. 185 | Florida Intervenors' Notice of Appeal | 1410 |
| Dkt. 189 | Plaintiffs' Response to Florida Intervenors' Motion for Stay Pending Appeal | 1411 |
| Dkt. 190 | Memorandum Opinion and Order | 1451 |
| Dkt. 193 | Plaintiffs' Notice of Appeal | 1465 |
| Dkt. 195 | Federal Defendants' Notice of Appeal | 1468 |

| **VOLUME 5 (JA.1470–JA.1707)** | | | |
|---|---|---|---|
| **EPA Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| EPA-HQ-OW-2018-0640-0001 | Dkt. 51 at 1-4 | Request to Assume Administration of a Clean Water Act Program: Florida, Notice and Request for Comments, 85 Fed. Reg. 57,853 (Sept. 16, 2020) | 1470 |
| EPA-HQ-OW-2018-0640-0002-A7 | Dkt. 52 at 6-15 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060: Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands, Aug. 20, 2020 | 1474 |

| EPA-HQ-OW-2018-0640-0002-A9 | Dkt. 52 at 21-30 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060 Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters, Aug. 20, 2020 | 1484 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0002-A20 | Dkt. 52 at 82-143 | Florida Section 404 Program Application: Florida Admin. Code 62-331.010(5): State 404 Program Applicant's Handbook Aug. 20, 2020 | 1494 |
| EPA-HQ-OW-2018-0640-0016-A2 | Dkt. 55-1 at 120-32 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, USFWS, and FDEP, Aug. 5, 2020 | 1556 |
| EPA-HQ-OW-2018-0640-0018 | Dkt. 55-1 at 300-13 | Memorandum of Agreement between FDEP and EPA, July 31, 2020 | 1569 |
| EPA-HQ-OW-2018-0640-0019 | Dkt. 55-1 at 314-22 | Memorandum of Agreement Between FDEP and the U.S. Department of the Army, July 31, 2020 | 1583 |
| EPA-HQ-OW-2018-0640-0051 | Dkt. 55-3 at 69-129 | Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020 | 1592 |
| EPA-HQ-OW-2018-0640-0386-A1 | Dkt. 56 at 16-70 | Letter from Tania Galloni et al., Earthjustice et al., to Kelly Laylock, EPA, Nov. 2, 2020 | 1653 |

| VOLUME 6 (JA.1708–JA.2060) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0387-A8 | Dkt. 56-1 at 65-364 | Exhibit 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida, July 24, 2020 | 1708 |
| EPA-HQ-OW-2018-0640-0387-A10 | Dkt. 112-1 at 175-76, 207, 259, 275, 306-07 | Excerpts of Exhibit 60: 1998 Endangered Species Consultation Handbook | 2008 |
| EPA-HQ-OW-2018-0640-0388-A2 | Dkt. 95-2 at 18 | Letter from Kristen L. Boyles et al., Earthjustice et al., to Kathy Hurld, EPA, July 6, 2020 | 2015 |
| EPA-HQ-OW-2018-0640-0388-A7 | Dkt. 112-2 at 2-26 | Exhibit 67: FDEP White Paper, ESA Consultation | 2032 |
| EPA-HQ-OW-2018-0640-0564 | Dkt. 56-1 at 433-34 | Approval of Florida's Clean Water Act Section 404 Assumption Request, 85 Fed. Reg. 83,533, Dec. 22, 2020 | 2057 |
| EPA-HQ-OW-2018-0640-0566 | Dkt. 56-1 at 435-36 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Dec. 17, 2020 | 2059 |

| VOLUME 7 (JA.2061–JA.2199) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0568 | Dkt. 56-1 at 437-549 | EPA, Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, Dec. 16, 2020 | 2061 |

| EPA-HQ-OW-2018-0640-0617 | Dkt. 112-2 at 351 | Letter from Jeaneanne Gettle, EPA, to Roy Crabtree, NOAA NMFS, on EPA's Section 7 Consultation, Sept. 2, 2020 | 2174 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0618 | Dkt. 112-2 at 352-53 | Letter from Virginia Fay, NOAA NMFS, to Jeaneanne Gettle, EPA, Oct. 30, 2020 | 2175 |
| EPA-HQ-OW-2018-0640-0623 (same as FWS-006015) | Dkt. 112-2 at 354-66 (same as Dkt. 112-5 at 47-59) | USFWS Biological Opinion Appendix 2: Memorandum of Understanding Between FWC, USFWS, and FDEP, August 5, 2020 | 2177 |
| EPA-HQ-OW-2018-0640-0635 | Dkt. 56-1 at 669 | Letter from David Ross, EPA, to Timothy Gallaudet, NOAA NMFS, and Rob Wallace, USFWS, on FDEP's Non-Federal Representative Designation, Dec. 13, 2019 | 2190 |
| EPA-HQ-OW-2018-0640-0636 | Dkt. 56-1 at 670-71 | Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, on FDEP's Non-Federal Representative Designation, Dec. 12, 2019 | 2191 |
| EPA-HQ-OW-2018-0640-0637 | Dkt. 112-2 at 367-69 | EPA, Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953, May 21, 2020 | 2193 |

| EPA-HQ-OW-2018-0640-0638 | Dkt. 112-2 at 370-71 | Letter from Cathryn Tortorici, NOAA NMFS, to Heather Mason, FDEP, April 15, 2020 | 2196 |
| EPA-HQ-OW-2018-0640-0641 | Dkt. 56-1 at 684-85 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, on EPA's Completeness Determination for Florida's Assumption Request, August 28, 2020 | 2198 |

| **VOLUME 8 (JA.2200–JA.2530)** | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0649 (same as FWS-005610) | Dkt. 112-3 at 2-298 (same as Dkt. 112-4 at 87-383) | USFWS Biological Opinion Appendix 1: EPA's Biological Evaluation | 2200 |
| EPA-HQ-OW-2018-0640-0660-A1 | Dkt. 56-1 at 774-81 | EPA, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals, Aug. 27, 2020 | 2497 |
| EPA-HQ-OW-2018-0640-0664 | Dkt. 112-3 at 301-02 | Letter from Jeaneanne Gettle, EPA, to Tania Galloni, Earthjustice, Responding to Notice of Intent to Sue, Dec. 20, 2021 | 2505 |
| EPA-HQ-OW-2018-0640-0670 | Dkt. 112-3 at 343 | Email from David Fotouhi, EPA, to Matt Leopold, EPA, et al., transmitting documents for Florida Stakeholder meeting, Sept. 17, 2018 | 2507 |

| EPA-HQ-OW-2018-0640-0670-A3 | Dkt. 112-3 at 344-52 | Potential ESA Compromise Analysis and Proposal | 2506 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0670-A5 | Dkt. 112-3 at 353-59 | Florida Proposal Regarding ESA (SSEC-Doug-P18082810080) | 2517 |
| EPA-HQ-OW-2018-0640-0686 | Dkt. 112-3 at 368-72 | Response to Comments on EPA Consultation under ESA | 2524 |
| EPA-HQ-OW-2018-0640-0690 | Dkt. 112-3 at 375-76 | Letter from Peter S. Silva, EPA, to R. Steven Brown, Environmental Council of the States, et al., re EPA Position on ESA Consultation for 404 Assumption, Dec. 27, 2010 (same as above) | 2529 |

| VOLUME 9 (JA.2531–JA.2700) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-000001 | Dkt. 112-4 at 2-3 | 20191212 Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, re: Designation of FDEP as Non-Federal Representative for Informal Consultation | 2531 |
| FWS-006015 | Dkt. 112-5 at 47-59 | 20201116 Memorandum of Understanding between FWC, USFWS, and FDEP (attached as Appx. 2 to USFWS's Biological Opinion) | 2533 |

| FWS-000749 | Dkt. 112-4 at 9-11 | 20200331 Email from H. Rauschenberger, USFWS, to M. Duncan, FDEP, J. Goff, FWC, et al., re: Comments on Draft Species Coordination Process | 2546 |
|---|---|---|---|
| FWS-003386 | Dkt. 112-4 at 43-84 | 20200820 Florida Rules Chapter 62-4, submitted as part of FDEP's application package. | 2549 |
| FWS-006028 (same as EPA-HQ-OW-2018-0640-0642) | Dkt. 112-5 at 60-147 (same as Dkt. 56-1 at 686-773) | 20201117 Programmatic Biological Opinion for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act | 2591 |
| FWS-006144 | Dkt. 112-5 at 148-69 | 20180625 Memorandum of Agreement between EPA, USFWS, and NJDEP Related to the Protection of Federally-Listed Threatened or Endangered Species and Designated Critical Habitat Under a New Jersey-Assumed Section 404 Program | 2679 |

| VOLUME 10 (JA.2701–JA.3056) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-006432 | Dkt. 93-2 at 4 | 20140519 Final Biological Opinion re EPA Final Rule - Cooling Water Intakes | 2701 |
| **Army Corps Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| CORPS004318 | Dkt. 112-8 at 106 | 20191126 Email from Robert Barron, Corps, to Shawn Zinszer, Corps, et al., re: AAR Retained Water GIS Call: We Need a "Big" Call with FDEP | 3040 |
| CORPS004319 | Dkt. 112-8 at 107-09 | 20191206 Email Dale Beter, Corps, to Shawn Zinszer, Corps, re: 404g_h Assumption Meeting Notes<br><br>Attachment: 20191206 Sec 404g Assumption Mtg Notes.docx | 3041 |
| CORPS004322 | Dkt. 112-8 at 110-22 | 20200805 Memorandum of Agreement between FDEP and U.S. Department of the Army | 3044 |

## CERTIFICATE OF SERVICE

I hereby certify that, on February 26, 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  All participants in this case registered with CM/ECF will be served by the CM/ECF system.

Dated:  February 26, 2025

   */s/ Aaron M. Streett*
Aaron M. Streett
BAKER BOTTS LLP
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com

*Counsel for Florida Appellants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

    Plaintiffs,

        v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

    Defendants.

Case No. 1:21-cv-0119 (RDM)

**FEDERAL DEFENDANTS' POST-HEARING SUBMISSION ON REMEDY**

## I.     INTRODUCTION

On January 30, 2024, the Court authorized supplemental submissions from the parties on the appropriate remedy if the Court were to identify errors with the U.S. Fish and Wildlife Service's ("FWS") November 17, 2020 programmatic Biological Opinion ("BiOp") and incidental take statement ("ITS").  With the caveat that Federal Defendants are submitting this memorandum without knowing how the Court intends to rule on any, let alone all, pending claims,[1] Federal Defendants submit that if the Court is inclined to invalidate the BiOp, it should remand without vacatur. If the Court is inclined to vacate the BiOp, Federal Defendants request that the Court issue a limited ruling to minimize the disruptive consequences of vacatur. Further, Federal Defendants request that the Court not vacate the Environmental Protection Agency's ("EPA") approval of Florida's assumption request.

## II.    LEGAL STANDARD

In Administrative Procedure Act ("APA") cases, the reviewing court is not authorized to "'reach its own conclusions based on [a de novo] inquiry.'" *Immigr. & Naturalization Serv. v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (citation omitted).[2] Rather, if the Court finds error "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). And the Court has discretion to remand an agency decision without vacating it. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). The D.C.

---

[1]   Federal Defendants renew their request—shared by all other parties—for the opportunity to provide a further submission on remedy following the Court's decision on the other claims pending before it.

[2]   We note that questions have recently been raised about whether vacatur is an appropriate remedy at all under the APA, see *United States v. Texas*, 599 U.S. 670, 693–703 (2023) (Gorsuch, J., concurring), but the remedy analysis presented here is consistent with controlling Circuit precedent.

Circuit has "commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking, . . . but also where the order was otherwise arbitrary and capricious[.]" *Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990) (citations omitted).

Remand without vacatur is available in cases involving agencies' compliance with Section 7 of the Endangered Species Act ("ESA"), including biological opinions and incidental take statements. *See, e.g.*, *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188-89 (D.C. Cir. 2017). In this Circuit, the decision whether to vacate or remand without vacatur depends on: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." *See Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted). The balance of these factors "rests in the sound discretion of the court." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 606 F.2d 1261, 1272 (D.C. Cir. 1979).

## III.   ARGUMENT

### A.   Any Remand of the BiOp Should Be Without Vacatur.

When deciding whether to vacate or remand without vacatur, the Court first assesses the seriousness of the deficiencies. *Allied–Signal*, 988 F.2d at 150–51. If the Court remands the BiOp, it should do so without vacatur because this factor is in Federal Defendants' favor. Specifically, the ESA does not dictate one path to Section 7(a)(2) compliance, nor does it prohibit a programmatic approach. An action agency, such as EPA, must ensure its action does not cause jeopardy or adverse modification of listed species. However, it is free to choose *how* it meets these obligations, and a consulting agency, such as FWS, is free to choose *how* it conducts consultations.

JA.1193

The BiOp's programmatic approach and the technical assistance process under which FWS has reviewed permit applications to conduct site-specific and species-specific analyses were modeled on the approach reviewed and approved in *Cooling Water Intake Structures Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018). FWS has been providing technical assistance to the Florida Department of Environmental Protection ("FDEP") for over three years. Plaintiffs' concern that FWS would not engage in the technical assistance process has failed to materialize, nor have Plaintiffs established that any State 404 permits issued during this time have caused jeopardy to any listed species under FWS's jurisdiction. In short, FWS had a reasonable belief that its programmatic BiOp, accompanied by the technical assistance to be provided to Florida, complied with the law, and FWS has provided technical assistance as anticipated. On these facts, FWS clearly attempted to "[choose] correctly." *See Allied–Signal*, 988 F.2d at 150–51.

If the Court finds that the BiOp is flawed, the severe consequences of vacatur here outweigh any errors that might be identified by the Court; thus, the Court should not vacate. That is, if the Court finds that the BiOp is arbitrary and capricious, a remand to FWS would prompt a reopening of the consultation with EPA, which would allow FWS to correct any errors or deficiencies identified by the Court under the ESA without vacatur. For example, FWS can clarify that the ESA obliges it to use the best available science in providing technical assistance to FDEP, or otherwise clarify the mandatory nature of the technical assistance process and the extent to which FWS is required to review permit applications, provide comments, and analyze take. Similarly, FWS can explain the ITS's terms and conditions to make clear that permittees must comply with all permit conditions, including any project-specific take limit articulated by FWS, or else risk liability for incidental take. In short, FWS could "offer better reasoning" on remand. *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020) (citation omitted).

JA.1194

With respect to the second *Allied Signal* factor, vacatur would be highly disruptive. Vacating the BiOp entirely would introduce regulatory uncertainty in the State of Florida as to how to seek incidental take coverage under the ESA, particularly given the Florida laws codifying the process and successful implementation of the program for the past three years. Additionally, vacatur would cause confusion for permit holders who have already navigated the process. More specifically, vacatur could cause questions as to whether permit holders who had received incidental take authorization under the BiOp retain the benefit of that authorization and, if not, potentially subject them to citizen suits for unauthorized take despite having followed the required procedures. Future applicants could face similar uncertainty, lacking clarity about how to proceed under a rapidly changing legal landscape. *See also* Section III.B, *infra*. Federal Defendants further maintain that vacatur that invalidates or undermines the BiOp's programmatic approach would be overbroad and widely disruptive. *See supra*.

If the Court nonetheless intends to vacate any part of FWS's decision, Federal Defendants request that the Court limit vacatur and issue a targeted order that applies only prospectively to minimize the potential disruptions outlined above. For example, the Court could focus solely on vacating the ITS prospectively, consistent with the concerns the Court articulated during the hearing on January 30, 2024 regarding application of the ITS to permit applicants. A targeted and prospective vacatur would reduce uncertainty for permit holders who previously obtained permits and already underwent a species-specific and site-specific effects review. If the Court limited vacatur in this way, prospective permittees will not have exemption from liability under ESA Section 9 if take occurs. *See* 16 U.S.C. § 1536(o)(2) ("[A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned."). Thus, Section 404 permit

applicants in Florida would have to decide whether to move forward on projects without incidental take coverage, seek incidental take coverage through ESA Section 10, or forego development.[3]

The severe consequences of vacatur outweigh any errors that might be identified by the Court; thus, the Court should not vacate. At a minimum, the Court should issue a prospective and limited vacatur to minimize disruptions that would ensue if the BiOp were vacated in its entirety.

### B.   The Court Should Not Vacate EPA's Approval of the Assumption Request.

If the Court finds flaws in, and vacates, the BiOp, it does not follow that EPA's approval of Florida's assumption was likewise flawed, and it certainly does not follow that the assumption itself should be vacated.[4] EPA's approval action rested, in relevant part, on the agency's determination that Florida had "the authority" to "issue permits which . . . apply and ensure compliance with . . . the [404(b)(1)] [G]uidelines," 33 U.S.C. § 1344(h)(1)(A)(i), including the requirement that no permit shall issue that "[j]eopardizes the continued existence of" ESA-listed species or "results in likelihood of the destruction or adverse modification" of critical habitat, 40 C.F.R. § 230.10(5)(b)(3). EPA reached that determination based on its review of the regulations in Florida's program submittal, not in the BiOp. Dkt. 99 at 39–40, 42. An order vacating the BiOp would have no effect on Florida's procedures and standards, leaving intact the bases for EPA's determination. And if the Court finds errors with the BiOp, it could be for reasons having nothing

---

[3]   Seeking an incidental take permit is a voluntary action. *See* Habitat Conservation Planning & Incidental Take Permit Processing Handbook at 3-2 (available at https://www.fws.gov/sites/default/files/documents/habitat-conservation-planning-handbook-entire_0.pdf).  If a project proponent chose not to seek an incidental take permit, there would be no ESA analysis.

[4]   As a general mater, courts can and frequently do exercise their equitable discretion to remand without vacating agency actions after concluding that those actions rested on flawed ESA review. *See, e.g.*, *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 601 (D.C. Cir. 2023); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019); *Ctr. for Biological Diversity*, 861 F.3d at 188–89.

to do with EPA's approval action. For instance, a holding that the ITS sweeps too broadly—as the Court suggested during argument—would cast no doubt on EPA's underlying approval, which did not rest on the scope of incidental take liability protection afforded under the ITS. Such a holding would therefore do nothing to support a ruling for Plaintiffs on Claim 2, which attacks the reasonableness of EPA's approval action, not the adequacy of the BiOp.

The Court should not vacate EPA's approval action even if it finds for Plaintiffs on Claim 2. No one disputes that if the Court were to vacate the BiOp's ITS, then permit applicants would have to rely on ESA Section 10 to secure incidental take liability-protection for actions without any federal nexus. That outcome could have severe disruptive consequences for the regulated community, as noted above. But no one disputes that ESA Section 10 adequately safeguards species and habitat. Thus, even if the Court holds that EPA erred in concluding that Florida's proposed program satisfied the species and habitat-protection requirements of the 404(b)(1) Guidelines, as Plaintiffs allege in Claim 2, it would make little sense to vacate the program. Instead, the Court should remand without vacating EPA's approval action.

On remand, Florida could propose modifications to its Section 404 program in response to the Court's opinion. EPA would review any proposals, and its review of any "substantial" proposed modifications would follow the notice and hearing procedures set forth in 40 C.F.R. § 233.16(d). Alternatively, if, following the Court's order, Florida no longer wished to administer the Section 404 program, then it could provide the 180-day notice and "plan for the orderly transfer of all relevant program information" necessary to revert permitting authority to the U.S. Army Corps of Engineers ("Corps"). *Id.* § 233.53(a). Federal Defendants submit that either path would advance the public interest in an orderly Section 404 permitting program consistent with the judgements of this Court.

JA.1197

By contrast, an order vacating EPA's approval would have substantial disruptive consequences. As Federal Defendants noted previously, upon vacatur, Florida would need to transfer to the Corps, the roughly 1,500 applications pending before FDEP.[5] While continuing its review of the Section 404 permits already before it, the Corps would also have to review each transferred application for completeness. 33 C.F.R. § 325.2(a)(1). It would then have to initiate review and federal consultation processes that various statutes require for Corps-issued Section 404 permits, but not for state-issued permits. *See, e.g.*, 42 U.S.C. § 4332; 16 U.S.C. § 1855(b)(2); 54 U.S.C. § 306108. And because federal and state Section 404 processes differ, the Corps might need additional information from applicants who originally sought permits from Florida. The result of all this, and the reasonably foreseeable consequence of vacatur, is a prolonged delay in the issuance of individual Section 404 permits in Florida now pending with the State. That impact weighs against vacatur. If the Court ultimately decides to vacate EPA's approval, however, Federal Defendants request that it postpone the effective date of its vacatur by at least 180 days to allow time for Florida to ramp down, and the Corps to ramp up, their respective permitting programs in an orderly fashion.

## IV.   CONCLUSION

This case involves complex issues associated with a one-time EPA action that has resulted in subsequent implementation actions whose impacts were unknown at the time of consultation. The BiOp navigated these issues in in a manner that was consistent with governing case law. If the Court identifies errors in the way that FWS proceeded, the proper remedy is to remand to FWS to correct those errors. The Court should do so without vacating the BiOp or EPA's approval action.

---

[5] Applications for Florida Section 404 permits are listed on the State's public database: https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp

JA.1198

Dated: February 4, 2024     Respectfully submitted,

             TODD KIM
             Assistant Attorney General
             Environment & Natural Resources Division
             United States Department of Justice

               /s/  Alison C. Finnegan
             Alison C. Finnegan (PA Bar 88519)
             Wildlife & Marine Resources Section
             P.O. Box 7611
             Washington, DC 20044-7611
             Tel: 202-305-0500
             Email: Alison.C.Finnegan@usdoj.gov

             Andrew S. Coghlan (CA Bar 313332)
             Environmental Defense Section
             P.O. Box 7611
             Washington, D.C. 20044-7611
             Tel: (202) 514-9275
             Fax: (202) 514-8865
             Email: Andrew.Coghlan@usdoj.gov
             *Attorneys for Federal Defendants*

JA.1199

**CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2024, a true and correct copy of the foregoing was filed

electronically with the Clerk of Court using the CM/ECF system, which will send notification of

this filing to the attorneys of record.

/s/      Alison C. Finnegan

JA.1200

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | **CASE NO.** 1:21-cv-00119 (RDM) |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## PLAINTIFFS' BRIEF ON REMEDY FOR CLAIMS RELATING TO PROTECTION OF ESA-LISTED SPECIES UNDER USFWS' JURISDICTION

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................. 1

   I.    The BiOp, Technical Assistance Process, and ITS Should Be Vacated. ............................ 2

   II.   EPA's Approval of Florida's Inadequate 404 Program Should Be Vacated. ..................... 7

   III.  Vacatur Should Not Be Delayed or Limited. ...................................................... 9

CONCLUSION ......................................................................................................... 10

CERTIFICATE OF SERVICE ................................................................................. 12

JA.1202

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

\*     *Allied-Signal, Inc. v. USNRC*,
      988 F.2d 146 (D.C. Cir. 1993) ................................................................2, 4, 6

\*     *Allina Health Servs. v. Sebelius*,
      746 F.3d 1102 (D.C. Cir. 2014) ...................................................................1

      *Am. Bioscience, Inc. v. Thompson*,
      269 F.3d 1077 (D.C. Cir. 2001) ...................................................................1

      *Am. Fuel & Petrochemical Mfrs. v. EPA*,
      937 F.3d 559 (D.C. Cir. 2019) .....................................................................5

      *Am. Great Lakes Ports Ass'n v. Schultz*,
      962 F.3d 510 (D.C. Cir. 2020) .....................................................................9

\*     *Appalachian Voices v. Interior*,
      25 F.4th 259 (4th Cir. 2022) ........................................................................3

\*     *CBD v. Bernhardt*,
      982 F.3d 723 (9th Cir. 2020) .......................................................................7

\*     *CBD v. BLM*,
      698 F.3d 1101 (9th Cir. 2012) .....................................................................7

      *CBD v. EPA*,
      861 F.3d 174 (D.C. Cir. 2017) ..................................................................5, 9

      *CBD v. Raimondo*,
      No. 18-112, 2022 WL 17039193 (D.D.C. Nov. 17, 2022) ........................10

\*     *CBD v. Ross*,
      480 F. Supp. 3d 236 (D.D.C. 2020) .......................................................3, 10

      *Conservation Law Found. v. Pritzker*,
      37 F. Supp. 3d 254 (D.D.C. 2014) ...............................................................2

      *Conserve SW. Utah v. Interior*,
      No. 1:21-cv-01506-ABJ, 2023 WL 7922785 (D.D.C. Nov. 16, 2023) ........3

\*     *Defs. of Wildlife v. EPA*,
      420 F.3d 946 (9th Cir. 2005) ................................................................1, 4, 7

      *Defs. of Wildlife v. Jackson*,
      791 F. Supp. 2d 96 (D.D.C. 2011) ...............................................................9

JA.1203

\*    *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
      726 F. Supp. 2d 1195 (D. Mont. 2010)...................................................................3

\*    *Friends of Crystal River v. EPA*,
      794 F. Supp. 674 (W.D. Mich. 1992) .....................................................................7

\*    *Friends of the Earth v. Haaland*,
      583 F. Supp. 3d 113 (D.D.C. 2022) ........................................................................2

\*    *Humane Soc'y v. Jewell*,
      76 F. Supp. 3d 69 (D.D.C. 2014) ...........................................................................5

\*    *Humane Soc'y v. Kempthorne*,
      579 F. Supp. 2d 7 (D.D.C. 2008) ...........................................................................7

     *Me. Lobstermen's Ass'n v. NMFS*,
      70 F.4th 582 (D.C. Cir. 2023) ............................................................................5, 9

     *Nat. Res. Def. Council v. EPA*,
      489 F.3d 1250 (D.C. Cir. 2007) ...............................................................................1

     *Nat. Res. Def. Council v. Wheeler*,
      955 F.3d 68 (D.C. Cir. 2020) ................................................................................10

     *Nat'l Fam. Farm Coal. v. EPA*,
      966 F.3d 893 (9th Cir. 2020) ...................................................................................4

\*    *Nat'l Parks Conservation Ass'n v. Jewell*,
      62 F. Supp. 3d 7 (D.D.C. 2014) ..............................................................................7

     *Oglala Sioux Tribe v. USNRC*,
      896 F.3d 520 (D.C. Cir. 2018) ................................................................................9

\*    *PEER v. Hopper*,
      827 F.3d 1077 (D.C. Cir. 2016) ..............................................................................3

\*    *Sierra Club v. Corps*,
      909 F.3d 635 (4th Cir. 2018) ...................................................................................5

\*    *Sierra Club v. Interior*,
      899 F.3d 260 (4th Cir. 2018) ...............................................................................3, 7

\*    *Standing Rock Sioux Tribe v. Corps*,
      985 F.3d 1032 (D.C. Cir. 2021) ..............................................................................7

\*    *Tenn. Valley Auth. v. Hill*,
      437 U.S. 153 (1978).............................................................................................2, 4

iii

*U.S. Sugar Corp. v. EPA*,
  844 F.3d 268 (D.C. Cir. 2016) .................................................................4

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982).................................................................................9

\* *Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) ..................................................................7

**Federal Statutes**

5 U.S.C. § 706(2)(A)...................................................................................1

**Legislative Materials**

Sen. Rep. No. 97-418 (1982) ......................................................................3

## ARGUMENT

In the rush to approve Florida's 404 program during the prior administration, EPA relied on USFWS' unlawful programmatic BiOp to determine that EPA's approval of the state program—and permits issued pursuant to the state program—would not jeopardize ESA-listed species, even though the BiOp unlawfully replaced the ESA' statutory framework with a non-statutory, unenforceable, and unreviewable technical assistance process.  USFWS also issued an unlawful ITS that shielded EPA, FDEP, and state permittees from incidental take liability in perpetuity without limiting incidental take or imposing meaningful terms and conditions.  These serious, substantive violations render EPA's approval unlawful, because the state program does not meet the Clean Water Act's criteria to ensure adequate protection of ESA-listed species.  The violations cannot be cured by further explanation of or changes to the technical assistance process on remand.  The only other court to have considered a similar scenario vacated EPA's approval of a state's Clean Water Act Section 402 program that did not comply with the ESA.  *See Defs. of Wildlife v. EPA*, 420 F.3d 946, 979 (9th Cir. 2005).[1]  The Court should therefore vacate the BiOp (including technical assistance process and ITS) and EPA's approval.

The APA provides that the "reviewing court shall … set aside agency action, findings, and conclusions found to be" unlawful, 5 U.S.C. § 706(2)(A), so relief granted under the APA "normally will be a vacatur."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001).  *Accord Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (vacatur "normal remedy" for unsustainable agency action); *see Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007).  A court may remand without vacatur where the deficiencies in the agency action are not serious (meaning the agency could substantiate its decision on remand).

---

[1] *Rev'd on other grounds, Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 649 (2007).

JA.1206

*Allied-Signal, Inc. v. USNRC*, 988 F.2d 146, 151 (D.C. Cir. 1993).  And because vacatur is the default remedy, defendants bear the burden to prove that vacatur is unnecessary or impermissibly disruptive.  *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 157 (D.D.C. 2022).[2]

To ensure ESA compliance, any remedy would have to require that prospective permits that may affect ESA-listed species undergo Section 7 review and are thus subject to the ESA's clearly enforceable requirements governing effects analyses, jeopardy determinations, and incidental take limits, since pursuing an incidental take permit ("ITP") under Section 10 is voluntary.  The ESA's mandate to protect species cannot be gambled on whether developers are willing to risk liability for take.  To allow FDEP to continue issuing permits under its unlawful program would defeat Congress' intent to ensure that protection of ESA-listed species is accorded the "highest of priorities."[3]  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).

## I.     The BiOp, Technical Assistance Process, and ITS Should Be Vacated.

The Defendants' unlawful evasion of the ESA calls for vacatur because it was a serious violation that cannot be cured on remand.  *Allied-Signal*, 988 F.2d at 150–51; *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014) (agency action ought to be vacated "where there is no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand").

---

[2] *Appeal dismissed in part sub nom. Friends of Earth v. Haaland*, No. 22-5036, 2022 WL 4293098 (D.C. Cir. Apr. 15, 2022), *vacated and remanded on other grounds*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

[3] Because FDEP is poised to issue permits for major projects pursuant to the unlawful technical assistance process and state program, Plaintiffs Center for Biological Diversity and Sierra Club respectfully request this relief be granted before February 16, 2024, to enjoin FDEP from issuing those permits and prevent irreparable harm to ESA-listed species.  *See* Dkt. 135.  This relief would resolve their motion for a temporary restraining order and preliminary injunction.  *See id.*

JA.1207

First, USFWS failed to conduct any of the analyses mandated by the ESA to reach a "no jeopardy" determination, which is a severe substantive and procedural violation.[4]  *See Appalachian Voices v. Interior*, 25 F.4th 259, 264 (4th Cir. 2022) ("[S]ubstantive duty to avoid jeopardy is policed by a procedural consultation requirement.").  Instead, USFWS claimed there would be no jeopardy because the agency would engage in a non-statutory permit-level technical assistance process that only required USFWS to receive and review permit applications.[5]  Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.  These violations strike at the heart of the ESA and demand vacatur.  *Appalachian Voices*, 25 F.4th at 283 (vacating BiOp when USFWS failed to conduct analysis to find no jeopardy); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1232 (D. Mont. 2010) (vacating programmatic BiOp that deferred all analysis to later, site-specific USFWS review).

Second, USFWS acted contrary to the plain language of the ESA by issuing an ITS without any take limits or meaningful terms and conditions, undermining "one of the most effective tools for conserving endangered wildlife."  Sen. Rep. No. 97-418, at 25 (1982); Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2; *PEER v. Hopper*, 827 F.3d 1077, 1090 (D.C. Cir. 2016) (vacating unlawful ITS); *Sierra Club v. Interior*, 899 F.3d 260, 295 (4th Cir. 2018) (same); *CBD v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) ("little 'doubt'" as to whether agency chose correctly; ESA required an ITS with required measures to minimize take).

Third, these violations are severe because they allow harm to species without compliance with the stringent procedures and standards that Congress created in the ESA to "halt and reverse

---

[4] The case Florida cites is distinguishable.  Dkt. 160 at 6.  *Conserve Sw. Utah v. Interior*, No. 1:21-cv-01506-ABJ, 2023 WL 7922785, at *9 (D.D.C. Nov. 16, 2023) (denying request for vacatur because court could not find legal error without the benefit of summary judgment).
[5] Plaintiffs have already rebutted, Dkt. 153 at 14 n.10, claims that the technical assistance process has been working well, Dkt. 158 at 4; Dkt. 160-1 at 3–6, 8 (Wolfe Dec. ¶¶ 6–13, 20).

JA.1208

the trend toward species extinction—whatever the cost." *See Tenn. Valley Auth.*, 437 U.S. at
154.  Remand without vacatur means that potentially hundreds of permits a year will be issued,
*see* Dkt. 160 at 5, in a state with 139 listed species, all without lawful Section 7 consultation ever
having taken place.[6]  This is especially concerning for critically endangered species like the
Florida panther, with a population as low as 120 adults and subadults, because many permits are
currently proposed in the panther's last remaining occupied habitat.  Dkt. 135 at 12–13; Dkt. 153
at 29 & n.33.  "The purpose of the Endangered Species Act—to conserve endangered and
threatened species rather than allow them to go extinct []—renders the risk of harm to listed
species too great."  *Defs. of Wildlife v. EPA*, 420 F.3d at 978 (internal citation omitted).

Fourth, the violations are severe because they were undertaken with the express purpose
of providing a work-around to the ESA.  USFWS invoked its Section 7 authority to engage in
programmatic consultation to provide incidental take coverage without performing the requisite
analyses and without setting any take limits.  The goal was to extend liability coverage without
Florida or its permittees having to obtain a Section 10 ITP or have permits undergo Section 7
review subject to the ESA's Section 7 guardrails.  Dkt. 98 at 27–29.  The opposing parties'
reliance on *Cooling Water* to claim that these violations are not severe, Dkt. 158 at 4, 8; Dkt. 160
at 3–5, fails since any remedy presumes that the Court has rejected the relevance of that case on
the merits.  The argument that USFWS is "free to choose" how it complies with the ESA, Dkt.
158 at 3, ignores that an unlawful path is not compliance at all.  Dkt. 104 at 41.[7]

---

[6] *Cf. U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (voluntary remand without
vacatur because vacatur would remove protections) (cited by Florida, Dkt. 160 at 6).
[7] Whether the Defendants had a "reasonable belief" that the path they chose complied with the
law, Dkt. 158 at 4, is immaterial.  The relevant question is whether the agency's approach could
conceivably be justified on remand.  *Allied-Signal*, 988 F.2d at 151.  And it cannot.  *Cf. Nat'l
Fam. Farm Coal. v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020) (legal error was minor and
technical; EPA could provide better reasoning on remand to justify its action).

Tellingly, the Defendants continue to stand by their unlawful actions, offering that on remand USFWS could simply adjust the non-statutory technical assistance process.  Dkt. 158 at 4.[8]  However, none of the supposed fixes would remedy USFWS' abrogation of the ESA nor USFWS' actions that exceeded its statutory authority.  *See Humane Soc'y v. Jewell*, 76 F. Supp. 3d 69, 137 (D.D.C. 2014)[9] (vacating rule where USFWS acted outside authority); *Sierra Club v. Corps*, 909 F.3d 635, 655 (4th Cir. 2018) (vacating action that exceeded agency's authority).

Indeed, to comply with the ESA, USFWS would either have to (1) develop an adequate BiOp and ITS at the programmatic level; or (2) determine that Section 7 programmatic consultation is not required (i.e., that there would be "no effect" to listed species) so long as any permit that "may affect" species (as determined by USFWS) would be processed by the Corps (and subject to Section 7 consultation) or include proof that the applicant had already obtained a Section 10 ITP.  But here, the Defendants have adhered to the position that the first option is not possible,[10] and have expressed no interest in pursuing the second option.  Vacatur is therefore not only appropriate but necessary.  That permittees *could* obtain Section 10 ITPs does not eliminate the need for vacatur because it does not render the violations non-serious and because the decision to seek an ITP is entirely voluntary.  Dkt. 158 at 6 n.3; Dkt. 160-1 at 8–9 (Wolfe Dec. ¶ 21).  Applicants would therefore be able to obtain state 404 permits that harm species without having complied with the ESA.

---

[8] The Defendants cite distinguishable cases to claim remand without vacatur is a frequent remedy for ESA violations.  Dkt. 158 at 6 n.4.  *See Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601 (D.C. Cir. 2023) (vacating BiOp but not rule where legal error was not fatal to rule); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019) (remanding without vacatur where petitioners did not request vacatur); *CBD v. EPA*, 861 F.3d 174, 188–89 (D.C. Cir. 2017) (no vacatur of pesticide registration where pesticide was less toxic than alternatives).
[9] *Aff'd sub nom. Humane Soc'y v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017).
[10] Plaintiffs have shown that USFWS had ample historical data to conduct this analysis, as is common for programmatic consultations.  Dkt. 98 at 42; Dkt. 104 at 27–30, 40–41 & n.19.

JA.1210

The opposing parties' claim that the "disruption" factor weighs against vacatur ignores that it was the unlawful agency actions challenged here that displaced (i.e., disrupted) the congressionally mandated ESA processes for determining impacts to species and limiting take. Now they ask the Court to deprive Plaintiffs of a meaningful remedy because this would displace (i.e., disrupt) the unlawful path they chose. But this is not the sort of "disruption" contemplated in *Allied-Signal*, which concerned an agency action that might be adequately justified on remand, in which case vacatur in the interim would be unduly disruptive. 988 F.2d at 150–51.

The Defendants' argument that vacatur would be unduly disruptive rests entirely on the concern that permittees would have to find another (lawful) way to obtain liability coverage for incidental take.[11] Dkt. 158 at 5–6. But that is what the law requires. And vacatur, in fact, would provide greater clarity to the Defendants and developers that the BiOp and ITS are no longer in effect and may no longer be relied upon for incidental take coverage. Rather than create uncertainty, *id.* at 5, vacatur would make clear to developers that the familiar, congressionally mandated processes for complying with the ESA apply in Florida too. Any concern over potential impacts on already-issued permits (a concern also raised by Florida) would be addressed by making the relief apply prospectively.[12]

Florida's hyperbolic claims that vacatur of the BiOp and ITS would cause severe uncertainty, chaos, and a chilling effect on 404 permitting, Dkt. 160-1 at 6–9 (Wolfe Dec. ¶¶ 14–21), are easily rebutted, as these effects are much more likely to occur if the Court holds the

---

[11] The Defendants argue against vacating the BiOp "entirely," Dkt. 158 at 5, but fail to aver purported disruption beyond that which they say would flow from vacatur of the ITS alone.
[12] Prospective relief would not invalidate issued permits or coverage for incidental take that has occurred. Existing projects that could cause future incidental take (no more than 32 projects, Dkt. 106-1 at 6 (Wolfe Dec. ¶ 13)) could obtain coverage for future take through Section 10.

JA.1211

BiOp and ITS unlawful but leaves them intact.[13]  Vacatur of the BiOp and ITS, and injunctive relief that restores the Corps' authority over permits that may affect ESA-listed species, would ensure that those permits receive the review required by the ESA while also providing clarity over the applicable species review process for those permits (Section 7) and how to obtain liability coverage for incidental take (an ITS or ITP).[14]

## II.    EPA's Approval of Florida's Inadequate 404 Program Should Be Vacated.

Vacatur of EPA's approval is warranted because the agency relied on unlawful workarounds not only to claim compliance with the ESA, but also to find that Florida's program met the Clean Water Act's criteria for approval.  Dkt. 98 at 51–52, 66, 73–74 & n.37; Dkt. 104 at 49–51, 73; Dkt. 123 at 12–13.  These severe violations call for vacatur.  *See Defs. of Wildlife v. EPA*, 420 F.3d at 978–79 (vacating EPA approval of state Clean Water Act program because of ESA violations); *Sierra Club v. Interior*, 899 F.3d at 295 (vacating agency action that relied on unlawful ESA consultation); *CBD v. Bernhardt*, 982 F.3d 723, 751 (9th Cir. 2020) (same); *CBD v. BLM*, 698 F.3d 1101, 1128 (9th Cir. 2012) (same); *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 22 (D.D.C. 2014) (same).

---

[13] Florida's vague, unsupported references to past expenditures and staff training, Dkt. 160-1 at 6–10 (Wolfe Dec. ¶¶ 15, 20, 24), do not add much, especially given that agency resources are regularly re-allocated depending on need and there are many other areas where FDEP could expend resources for environmental protection.  That staff in a high-turnover program have been trained on an unlawful species review process is no reason to allow that process to continue.

[14] *See* Dkt. 153 at 54–55; *Standing Rock Sioux Tribe v. Corps*, 985 F.3d 1032, 1054 (D.C. Cir. 2021) (courts must consider effect of vacatur and whether injunction is required); *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (little disruption from reinstating prior regime); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) (instructing district court to enjoin agency action until USFWS complies with the ESA); *Friends of Crystal River v. EPA*, 794 F. Supp. 674, 685, 694 (W.D. Mich. 1992), *aff'd*, 35 F.3d 1073 (6th Cir. 1994) (permanently enjoining state from issuing 404 permit after finding Corps had authority once EPA federalized permit).

JA.1212

The Defendants continue to argue that EPA did not rely solely on the BiOp and technical assistance process to find that the State 404 program complied with the 404(b)(1) no-jeopardy requirement, which was required for program approval.  Dkt. 158 at 6.  But the record shows that EPA relied on the BiOp to justify its approval.  Dkt. 98 at 74 n.37.  Indeed, the technical assistance process in the BiOp underpinned all the other authority EPA cited to find that Florida satisfied the no jeopardy 404(b)(1) Guideline.  *Id.* at 73–74; Dkt. 104 at 87.[15]

Contrary to the Defendants' argument, Dkt. 158 at 7, these violations cannot be cured on remand.  If the Court rules for Plaintiffs on the BiOp and technical assistance process, there is no way that EPA can justify its decision.  Indeed, the Defendants all but concede that if the Court rules for Plaintiffs, the State program would need to *change.  See id.*  The Defendants point to no authority that would justify remand without vacatur in such a situation.

The Defendants' claim of disruption, should the Court vacate EPA's approval of Florida's program, similarly fails because it focuses on the purported disruption that would be required for permittees to obtain incidental take coverage through lawful means.  *Id.* at 7–8.  This argument, however, overlooks two key points: first, that seeking incidental take coverage through Section 10 is entirely voluntary, *see id.* at 6 n.3; and second, that compliance with the ESA, and with the Clean Water Act's 404(b)(1) Guidelines, is not.

The Defendants' description of the Corps' process following a transfer of authority, Dkt. 158 at 8, does not identify any disruption other than potential delay to pending applications. Moreover, that delay should be reduced given that unlike Florida, which had no experience with 404 permitting when its program was approved, the Corps already has trained staff with

---

[15] For these reasons, the Defendants' claim that vacatur of the BiOp (and thus the technical assistance process) would not affect Florida's program, Dkt. 158 at 6, is simply untrue.

expertise in 404 permitting that are, have been, and will continue administering 404 permits in

Florida, given the Corps' obligation regarding retained waters.  And having permittees obtain

their permits from the Corps, which follows the ESA process, promotes certainty.[16]

     None of the cases Florida cites support allowing FDEP to continue issuing state 404

permits, particularly those that may affect ESA-listed species, pursuant to a BiOp that violates

the ESA and a program that violates the Clean Water Act.[17]  The Developers urge that disruption

to their individual permit interests (additional expense and time) warrant denying Plaintiffs relief

or carving out an exception to allow state permits for Bellmar and Kingston notwithstanding the

unlawfulness of USFWS' actions and EPA's approval.  Dkts. 157, 159.  But the Developers

present no legal basis for such exemption from the law and there will be irreparable harm if the

State issues those permits.  Dkts. 135, 153; *CBD v. EPA*, 861 F.3d at 188–89 (remanding

unlawful pesticide registration without vacatur where vacatur would have removed an

environmental benefit by leaving only more toxic pesticides available).

## III.    Vacatur Should Not Be Delayed or Limited.

     The Court should not stay or "postpone the effective date" of its ruling on remedy as the

Defendants and Florida request.  *See* Dkt. 158 at 7; Dkt. 160 at 7.  The opposing parties have

---

[16] Requiring compliance with federal law does not infringe on Florida's authority or cooperative federalism, *contra* Dkt. 160-1 at 9 (Wolfe Dec. ¶ 23), since a state's ability to administer federal programs presumes compliance with federal law.  That Florida may find the technical assistance process more "efficient," *id.* at 10 (Wolfe Dec. ¶¶ 25, 27), does not provide a basis to allow unlawful agency action to continue.

[17] *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (remedies other than injunctions available to ensure compliance with law); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (vacatur would undo completed financial transactions); *Oglala Sioux Tribe v. USNRC*, 896 F.3d 520, 538 (D.C. Cir. 2018) (agency could satisfy NEPA on remand; no construction until NEPA compliance); *Me. Lobstermen's Ass'n*, 70 F.4th at 601 (court "not convinced" BiOp's legal error was fatal to rule; vacatur could lead to fishery closure); *Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118–19 (D.D.C. 2011) (pesticide was already in use and vacatur would cause "scattered resurrection" of local registrations, not restore status quo).

JA.1214

made no showing to justify allowing the State to issue permits that may affect ESA-listed species

pursuant to the Defendants' unlawful actions and Florida's unlawful program.[18]  Delay would

allow significant state permits to issue that would harm ESA-listed species.  *See* Dkts. 135,

153.[19]  Although the Corps would experience an increase in workload, the Corps has continued

to administer 404 permitting Florida (in retained waters), has the requisite expertise, and would

not be starting from scratch.[20]

The Court should also reject Florida's request to limit vacatur of the state permitting

program only as to projects that "may affect, [are] likely to adversely affect" species, Dkt. 160 at

7, because to comply with the ESA, any project that "may affect" ESA-listed species must be

reviewed pursuant to Section 7 of the ESA, and not the unlawful technical assistance process.

*See, e.g.*, FWS-006144, at FWS-006148 (NJ MOU).[21]

## CONCLUSION

As Plaintiffs have shown, vacatur is the appropriate remedy.  The Defendants and Florida

may explore other options for any future program the State may propose.  But where, as here, the

Defendants have committed serious substantive violations of the ESA and Clean Water Act,

leaving FDEP's program intact—particularly as to permits that may affect ESA-listed species—

is no remedy at all.

---

[18] *Contra CBD v. Ross*, 480 F. Supp. 3d at 246, 249 (fishers could go out of business; no likely harm to protected species); *CBD v. Raimondo*, No. 18-112, 2022 WL 17039193, at *2 (D.D.C. Nov. 17, 2022), *vacated on other grounds*, 2024 WL 324103 (D.D.C. Jan. 29, 2024) (same).

[19] The Developers' investments in their projects would not go to waste.  They have claimed that they would present the same information for a 404 permit issued by the Corps.

[20] Collier's concerns about EPA's process for federalizing state 404 permits, Dkt. 159 at 7–8, are misplaced since vacatur of the program approval would result in transfer of permits to the Corps and would not depend on EPA federalizing permits.  Collier's concern that USFWS would receive "hundreds or thousands of ITP" applications, *id.* at 6, is not supported by any evidence and was not raised by the Defendants.

[21] Florida's cited case, Dkt. 160 at 8, supports Plaintiffs' request.  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (court should vacate parts of a rule it finds invalid).

10

Dated: February 9, 2024

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

Counsel for Plaintiffs

* Appearing pro hac vice

JA.1216

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of February 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

<u>/s/ Tania Galloni</u>
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

12

JA.1217

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

     *Plaintiffs*,

    v.

MICHAEL S. REGAN, *et al.*,

     *Defendants.*

Civil Action No. 21-119 (RDM)

## ORDER

For the reasons explained in the Court's memorandum opinion, Dkt. 163, it is hereby

**ORDERED** that Plaintiffs' motion for summary judgment, Dkt. 98, is **GRANTED** with respect

to Counts 3, 4, 6, and 10–13 of Plaintiffs' amended complaint, Dkt. 77.  The Federal Defendants'

cross-motion for summary judgment, Dkt. 99, and Defendant-Intervenors' cross-motion for

summary judgment, Dkt. 102, are hereby **DENIED** as to those same Counts; and

It is further **ORDERED** that the programmatic biological opinion and incidental take

statement are **VACATED**.  It is also **ORDERED** that the EPA's approval of Florida's

application to assume authority to issue permits under Section 404 of the Clean Water Act, 33

U.S.C. § 1344, is hereby **VACATED**.  The Court will, however, permit Defendants to seek a

limited stay of the Court's order vacating the assumption decision within ten days of this order,

as explained in the Court's memorandum opinion, but, unless and until such a limited stay issues,

the State is without any authority to issue a Section 404 permit, and all Section 404 permitting

authority in the State of Florida is vested in the Army Corps of Engineers;

JA.1218

It is further **ORDERED** that the Center for Biological Diversity and the Sierra Club's motion for a temporary restraining order and preliminary injunction, Dkt. 135, is **DENIED** as moot; and

It is further **ORDERED** that the State of Florida's request that the Court enter partial final judgment pursuant to Federal Rule of Civil Procedure 54(b) is **DENIED** without prejudice as premature.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 15, 2024

2

JA.1219

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

    Plaintiffs,

        v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

    Defendants.

Case No. 1:21-cv-0119 (RDM)

## FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING LIMITED STAY

In its February 15, 2024, Memorandum Opinion, the Court offered Federal Defendants and

Defendant-Intervenors the opportunity to submit supplemental briefs seeking a limited stay of its

order vacating EPA's approval of Florida's Section 404 program.  Dkt. 163 at 94–96.  The Court

noted that the appropriateness of a limited stay turned in part on "question[s] [of] whether the EPA

could authorize a more modest assumption—and whether Florida would want it to do so."  *Id.* at

96.  By "more modest assumption," Federal Defendants understand the Court to mean a Section

404 program that would divide permitting responsibility in state-assumed waters, with Florida

issuing permits for projects that would have "no effect" on ESA-listed species, and the Corps

issuing permits for projects "that 'may affect' any listed species under the jurisdiction of the FWS

or the NMFS."  *Id.*  Because that bifurcated program would be impractical and inconsistent with

the CWA, a limited stay of the Court's vacatur is neither "desirable [nor] workable."  *Id.* at 97.[1]

---

[1] In opposing a partial stay of the Court's vacatur, Federal Defendants do not waive their right to
appeal the Court's decision.  The Solicitor General is responsible for determining whether, and to
what extent, the United States will pursue an appeal when the federal government receives an
adverse decision.  *See* 28 C.F.R. § 0.20.  The Solicitor General has not yet decided whether to
authorize an appeal from the Court's February 15th order.

As a practical matter, it is unclear how, or even if, Florida and the Corps could divide permitting responsibilities for projects in state-assumed waters depending on whether those projects "may affect" listed species.  Under such an arrangement, would applicants apply to Florida or the Corps in the first instance?  Who would then determine impacts on ESA-listed species?  And what would happen if Florida and the Corps disagreed on that determination?  The time needed to answer these, and many other difficult questions could exceed the uncertain duration of a limited stay and would consume considerable agency resources that might otherwise go toward processing permit applications in the meantime.

The fact remains, moreover, that Florida and the Corps require applicants for individual Section 404 permits to submit different information.  *See* Dkt. 158 at 8 (discussing differences in state and federal Section 404 permit review requirements).  Thus, a project proponent who applies for an individual Section 404 permit from the State, but whose application is transferred to the Corps based on a "may affect" determination, would effectively have to apply for the same project twice.  This redundancy weighs against a partial stay of vacatur to accommodate a "more modest assumption."  Dkt. 163 at 96.

Practical considerations aside, legal considerations further weigh against a partial stay of vacatur.  For one thing, there is no statutory or regulatory mechanism under which permitting authority could toggle between Florida and the Corps depending only on whether a proposed project "may affect" ESA-listed species.  Under 33 U.S.C. § 1344(j) and 40 C.F.R. § 233.50(e), authority to process a particular Section 404 permit application transfers from a state to the Corps only if EPA objects to the state's potential issuance of that permit.  EPA can only object "if the proposed permit is (1) the subject of an interstate dispute under § 233.31(a) and/or (2) outside requirements of the Act, these regulations, or the 404(b)(1) Guidelines."  40 C.F.R. § 233.50(e).

2

JA.1221

A "may affect" determination satisfies neither of those conditions.  More still, EPA can transfer authority to approve a Section 404 permit application from a state to the Corps only after holding a hearing on EPA's objections (if the state requests one), and only after giving the state a chance to amend the permit to address the objections. 33 U.S.C. § 1344(j); *accord* 40 C.F.R. § 233.50(f)– (j).[2]  Those procedural requirements simply do not accommodate a system in which the Corps routinely processes all "may affect" permit applications in state-assumed waters.

Finally, a state Section 404 program that regulates only those discharges associated with projects deemed to have "no effect" on ESA-listed species would directly conflict with 40 C.F.R. § 233.1(b), which provides that "[p]artial State programs are not approvable under section 404" and that "a State program must regulate all discharges of dredged or fill material into waters regulated by the State under section 404(g)–(1)."  *See also* "Clean Water Act Section 404 Tribal and State Program Regulation," 88 Fed. Reg. 55276, 55314–15 (Aug. 14, 2023) (discussing EPA's longstanding view that CWA Section 404 precludes partial assumption).

\* \* \*

For these reasons, a limited state assumption under which the Corps processes permits for all projects in state-assumed waters that "may affect" ESA-listed species is practically and legally unworkable.  The Court should not enter a partial stay of its vacatur to accommodate such a program.

Dated: February 26, 2024                               Respectfully submitted,

                                                      TODD KIM
                                                      Assistant Attorney General

---

[2] Under New Jersey's and Michigan's Section 404 programs, state permit applications are transferred to the Corps only if EPA objects based on the limited grounds in 40 C.F.R. § 233.50 and the state does not address those objections.

3

JA.1222

Environment & Natural Resources Division
United States Department of Justice

/s/ Andrew S. Coghlan
Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: Andrew.Coghlan@usdoj.gov

Alison C. Finnegan (PA Bar 88519)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov
*Attorneys for Federal Defendants*

JA.1223

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

              *Plaintiffs*,

     v.

MICHAEL S. REGAN, *et al.*,

              *Defendants*.

Civil Action No. 21-119 (RDM)

**FLORIDA INTERVENORS' MOTION FOR LIMITED STAY
OF FEBRUARY 15, 2024 VACATUR ORDER**

**I.     Introduction**

On February 15, 2024, this Court vacated the Environmental Protection Agency's (EPA's) approval of Florida's Section 404 program assumption application while allowing Defendants to "seek a limited stay of that vacatur within ten days[1] of this decision." Dkt. 163 at 96; Dkt. 164 at 1-2. As anticipated, vacatur of Florida's program has already begun to create enormously disruptive consequences and raise complex problems for the State and thousands of Floridians to navigate. While Florida continues to administer its state wetlands permitting program (the "ERP" program) for *all waters and wetlands in the State*, substantial confusion now exists over the ability of applicants with pending or forthcoming applications to obtain necessary Section 404 permits in assumable "waters of the United States." Well over 1,000 pending 404 individual and general permit applications – the vast majority of which have been in the Florida 404 permit review process

---

[1] The order was entered at 11:42 p.m. EDT on the night of February 15, 2024. The tenth day would fall, at the earliest, on Monday, February 26, 2024, pursuant to Fed. Rule of Civ. Proc. 6(a).

JA.1224

for more than six months (with many far along toward a final decision) – are now in regulatory limbo with no clear timeline or expectation for a permit decision. This includes pending permit applications for roads and bridges, hospital construction projects, school buildings and facilities, affordable housing, military base projects, power grid reliability projects (including construction of new power generation facilities and transmission lines), and various projects necessary to improve water quality in the Everglades, just to name a handful of examples. *See* Wolfe Decl. ¶¶ 8-10 (Exhibit A).

The State of Florida and FDEP (collectively, Florida Intervenors) remain committed to administering the Section 404 program for all assumable waters in a manner consistent with the law. To that end, Florida Intervenors intend to move forward on efforts to ensure that FDEP continues to implement the program to the fullest extent. While those details will take additional time to sort out, Florida Intervenors respectfully move for a limited stay based on a "may affect" concept referenced by this Court. Florida Intervenors agree that a limited stay will help to minimize some of the disruptive consequences arising from vacatur. In this Motion, Florida Intervenors present a workable interim solution, while also flagging several issues that, with clarification from this Court as part of a limited stay, will further help to minimize disruptions that go beyond the specific concerns underlying this Court's February 15 ruling.

While Florida Intervenors have endeavored to present a limited stay approach that is responsive to the Court's invitation and conditions, "partial assumption" concerns associated with a pure "may affect" approach (as raised by Federal Defendants) would, as explained in more detail at the end of this Motion, countenance in favor of simply using the New Jersey/Michigan model

2

JA.1225

for purposes of a limited stay.[2] A proposed Order for a limited stay based on either approach is filed with this Motion.

## II.    Standard of Review

In this Circuit, district courts have discretion to grant a limited stay as to implementation of a judicial vacatur order, either as part of its inherent discretion to modify its own remedy orders, *AARP v. Equal Emp. Opportunity Comm'n*, 292 F. Supp. 3d 238, 245 (D.D.C. 2017), or based on the *Allied-Signal* factors, *Chamber of Com. v. SEC,* 443 F.3d 890, 909 (D.C. Cir. 2006). Both avenues provide strong support for granting a limited stay here. *Cook Inlet Tribal Council v. Mandregan*, No. 14-CV-1835 (EGS), 2019 WL 3816573, at *4 (D.D.C. Aug. 14, 2019); *AARP*, 292 F. Supp. 3d at 245 ("the Court will exercise its discretion to stay the effective date of its vacatur order until January 1, 2019"). Under the *Allied-Signal* factors, a court weighing the remedy to address an agency error must consider (1) the "seriousness of the order's deficiencies" and (2) the likely "disruptive consequences" of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted).

## III.    Limited Stay Is Necessary to Minimize Highly Disruptive Consequences of Vacatur[3]

While this Court's inherent discretion over enforcement of its own orders provides ample basis for a stay of its vacatur order, the *Allied-Signal* factors confirm that a limited stay, at a

---

[2] In New Jersey, EPA does not "federalize those [state 404] applications likely to adversely affect listed species." *Cf.* Dkt. 163 at 5, 23 (equating "federalize" with "pass to the FWS and NMFS for review"). Instead, those applications are forwarded to FWS for purposes of "federal review" under 40 C.F.R. Part 233, just as occurs in Florida. *See infra* at 15-18. For species review purposes, federalizing occurs where (1) a New Jersey state 404 permit would jeopardize the continued existence of listed species and/or adversely modify designated critical habitat *and* (2) New Jersey refuses to deny the permit or fails to adopt the measures deemed necessary to avoid jeopardy. *Id.* Failing to adopt federal conditions to "avoid or minimize" incidental take is also a basis for an objection in New Jersey.

[3] While seeking a limited stay here, Florida Intervenors expressly reserve the right to seek a full stay of the order and/or stay of the District Court proceedings at a later time. Moreover, as

minimum, is appropriate. *Bauer v. DeVos*, 332 F. Supp. 3d 181, 185 (D.D.C. 2018) (Moss, J.) ("Vacatur with a brief stay may be warranted, for example, where the *Allied-Signal* factors are satisfied, but where a prolonged agency remand threatens to deprive one or more parties of significant rights."); *Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006) (remand with instructions to vacate EPA's approvals but recognizing that "the district court retains some remedial discretion, however, and the parties may move to stay the district court's order on remand."). This Court's February 15 ruling assessed EPA's approval of Florida's assumption program under the *Allied-Signal* factors and found that it is "difficult to make a definitive determination" as to either factor on whether and how the program would operate without the protection provided by the now-vacated BiOp and ITS and whether a scaled back version of the program without incidental take protection could be approved by EPA. Dkt. 163 at 95.

As this Court acknowledges, "the assumption has been in place now for over three years" creating "expectation interests among the affected parties." *Id.* Moreover, "administrative difficulties would result from returning the permitting authority to the Corps." *Id.* Accordingly, both this Court's ruling and the *Allied-Signal* factors suggest that, if the program could be remediated and/or "EPA could authorize a more modest assumption" on remand, then a limited stay should be granted to keep most of the Florida program in place while the federal and state agencies decide next steps. *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. 2020) (vacating BiOp but staying the Order for nine months to allow the agency time to produce new BiOp and conservation measures). A stay as to issuance of permits that will not affect endangered species would avoid hamstringing a large number of (likely exceeding 1,000) pending

---

suggested in the post-hearing remedy brief (Dkt.160 at 2 n.1) and addressed in the vacatur ruling (Dkt. 163 at 97), Florida Intervenors currently anticipate renewing their request for entry of partial final judgment under Rule 54(b) or, in the alternative, certification of appeal under 28 U.S.C. § 1292(b).

and forthcoming permit applications that do not implicate the ESA-based concerns underlying this Court's ruling and vacatur order. As also explained below, pending applications for projects that otherwise will undergo Section 7 consultation for other reasons or will otherwise obtain Section 10 coverage should also receive the temporary benefits of this Court's stay discretion. Requiring that category of projects to restart the Section 404 process via transfer back to the U.S. Army Corps of Engineers (Corps) would unnecessarily impose additional unwarranted disruptions with potentially far-reaching consequences for public welfare, environmental protection, and economic development in one of the fastest growing states in the nation.[4]

Beyond just large-scale development projects, the vacatur order directly impedes efforts to review and authorize a wide range of 404 permits currently pending before FDEP. Wolfe Decl. ¶¶ 8-10. Exhibit B provides a list of all applications for individual or general 404 permits currently pending before the FDEP for review to date.[5] This includes approximately 1,065 permit applications of a wide variety, including many projects that benefit the environment and/or the public, such as:

- Four public projects by the State or the Corps to improve water quality in the Everglades (e.g., a shoal repair project, Permit No. 0444917-001), and an emergency pump station repair to avoid flooding of agricultural areas in the Everglades (Permit No. 0444333-001)[6];

- Nearly 200 public projects by state and local governments and agencies, the majority of which are intended to build or improve sidewalks, bridges, utilities, roads, and

---

[4] U.S. Census, *U.S. Population Trends*, available at https://www.census.gov/newsroom/press-releases/2023/population-trends-return-to-pre-pandemic-norms.html (last visited Feb. 24, 2024) (showing Florida as the nation's third most-populous state with the second highest rate of population growth).

[5] Exhibit B was exported from https://prodapps.dep.state.fl.us/pa/summarypending/PaData on February 24, 2024.

[6] Under a longstanding consent decree entered by a federal district court in Florida, the State of Florida is undertaking a significant number of actions in South Florida to remove nutrient pollution from water flowing to the Everglades. FDEP is far along in the process of permitting several of these permits.

JA.1228

highways across the state (e.g., 21 pending applications involving projects proposed by the state transportation department including a project to construct a wildlife crossing over US 27 (Permit No. 0045151-001));

- Nine solar energy projects, including several solar power stations (e.g., Permit No. 0439260-003) and dozens of other electric utility projects impacting grid reliability;

- Stormwater infrastructure repairs and improvements at U.S. Naval Air Station-Pensacola due to damage from Hurricane Sally (Permit Nos. 0442107-003, 0442052-003);

- Three projects to build new medical facilities in different parts of the state, including a new emergency department in South Florida (Permit No. 0426421-001), a new 144 bed behavioral health hospital in Orange County (Permit No. 0433001-001), and an additional campus for the Mayo Clinic in Jacksonville (Permit No. 0441377-001);

- Six projects to construct new schools or improve existing school facilities, including construction of a new charter school (Permit No. 0427091-001) and construction of a secondary access road to address traffic, bus schedules and safety for an existing school (Permit No. 0424791-001); and

- Hundreds of housing projects, including many dozen multi-family or large single family developments (e.g., 128 unit senior living facility (Permit No. 0438783-001)), to provide residences for thousands of people in Florida's fastest growing areas.

After months (and in over 100 cases, more than two years) of permit review, many Florida 404 permit applications were at or near the conclusion of the Section 404 permit process when the Court's February 15 order was issued. Of those currently pending, over 840 permit applications have been in the permit review process for more than six months. Wolfe Decl. ¶10. Now all pending 404 permits in Florida are in some form of regulatory limbo, at least until a new regime can be established or further judicial orders alter the situation.[7] Likewise, many of those permits

---

[7] When the program transferred from the Corps of Engineers to the State of Florida in December 2020, FDEP did not begin issuing 404 permits for approximately five months. Between December 2020 and July 2021, FDEP issued 11 permits under the state 404 program.  While the Corps may be able to issue some new permits, there is limited information at this time about the Corps' timeframes for receiving applications and issuing final permit decisions for over a 1,000 pending Florida 404 permits. Significant delays are certainly to be expected.

JA.1229

would impose mitigation measures benefitting the environment and species conservation, but those beneficial actions are now similarly on hold as well.

Keeping the bulk of Florida's Section 404 Program in place would ensure the greatest degree of environmental protection and, of particular relevance to the cooperative federalism structure of the Clean Water Act, would ensure continued active engagement of both federal and state agencies across all facets of 404 permitting in the State. As extensively briefed in this case, Florida administers the Section 404 program with permit-by-permit oversight by EPA – a process that would continue to work to protect water resources and species. Under Florida's program, FWS receives and reviews all Florida 404 permit applications, and FDEP "shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat." Florida 404 Handbook, Section 5.2.3. This would continue in full force with a limited stay in place.

Alternatively, bringing Florida's Section 404 Program to an abrupt halt would severely disrupt and delay innumerable projects across the state, negate the benefits of cooperative federalism engagement between federal and state agencies, deprive Florida and its citizens of the benefits of substantial investments and expenditures in the existing program, deprive permit applicants with pending permits of the benefits of expenditures on permit applications, and cause various other significant burdens on permit applicants, those who benefit from the projects, as well as the general public.

## IV. Proposed Limited Stay of February 15 Vacatur Order

In its February 15 ruling, this Court set two conditions for a limited stay request:

(1)     the "request should exempt all pending and future permit applications that 'may affect' any listed species under the jurisdiction of the FWS or the NMFS"; and

JA.1230

(2)   the request "should propose a mechanism for determining which permit applications 'may affect' listed species."

Dkt. 163 at 96. As this Court requested, Florida Intervenors have considered whether "any such stay is desirable and workable" and concluded that it is.

Under the requested limited stay, Florida would continue to process applications for all Section 404 permits and permit modifications in assumable waters, except those which "may affect" listed species or designated critical habitat with the contours described herein. This will not eliminate the harsh consequences of vacatur, but it will allow Florida to continue administering the bulk of the 404 program while the state and federal agencies determine appropriate steps to address the Court's order.

To ensure that the limited stay is structured appropriately, Florida Intervenors suggest that at least seven key questions need to be addressed and clarified by the Court, including:

(a) What is a "may affect" situation for these purposes?

(b) What process/mechanism should be used to identify a "may affect" situation?

(c) What options are available to "may affect" permit applicants?

(d) How should a limited stay address permit applications that otherwise already trigger Section 7 procedures and/or will obtain Section 10 permit coverage?

(e) To what extent may FDEP continue to enforce Section 404 violations in assumable waters?

(f) How long should the limited stay be in place?

(g) If this Court finds that the proposed "may affect" mechanism constitutes an impermissible "partial assumption" (even in the context of a limited stay order), would the approach employed in New Jersey and Michigan provide a legally acceptable alternative model for purposes of the limited stay?

Each of these questions is addressed in turn below.

JA.1231

A.      **First, what is a "may affect" situation?**

As proposed here, a "may affect" permitting situation would include any situation where FDEP, Florida Fish and Wildlife Conservation Commission (FWC), EPA, the U.S. Fish and Wildlife Service (FWS), <u>or</u> National Marine Fisheries Service (NMFS) find, at any point in the permit process, that a Section 404 permit application, if granted, would authorize activities that may affect (or pose a reasonable potential for affecting) endangered or threatened species or critical habitat. *See* 40 C.F.R. § 233.51(b)(2); State 404 Handbook Section 5.2.3 (Fla. Admin. Code). The phrase "reasonable potential for affecting endangered or threatened species" (as used in EPA's Section 404 Program Regulations found at 40 C.F.R. Part 233 and in Florida's Section 404 Handbook Section 5.2.3) is synonymous with the phrase "may affect listed species or critical habitat" (as used in the ESA Section 7 regulations found at 50 C.F.R. Part 402). This "may affect" understanding is consistent with the ESA Consultation Handbook, which explains that "may affect" is "the appropriate conclusion when a proposed action may pose any effects on listed species or designated critical habitat." ESA Consultation Handbook at xvi. This can be both adverse or beneficial effects. Similarly, the Programmatic Biological Opinion defines "may affect" as the "appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed species or designated critical habitat." BiOp at vi. The BiOp further notes that the term "reasonable potential to affect" refers to a situation where a "project may affect federally listed species or their critical habitat." BiOp at vii.

B.      **Second, what process/mechanism would be used for "may affect" findings during the period of the limited stay?**

Florida Intervenors respectfully propose to use the existing process set forth in the Memorandum of Understanding (MOU) signed by FWC, FWS, and FDEP, the Florida 404

JA.1232

Handbook (Fla. Admin. Code § 62-331.010(5)), and the Biological Opinion (page 17-30)[8] with certain additional features to alleviate concerns raised by the Court's February 15 order as the mechanism for determining which permit applications have a reasonable potential for impacting listed species or designated critical habitat. This existing process is familiar to the federal and state agencies, the regulated community, and the public. Thus, this process would serve, at least temporarily, as the least confusing and most effective mechanism to meet the Court's conditions for a limited stay.

In the current process, FDEP receives Section 404 applications and forwards a copy of all such applications to FWS and FWC for review. Typically, FDEP, along with FWS and FWC, exchange Requests for Additional Information (RAI). At this early stage in the permit process, FWS and FWC "may determine whether there is reasonable potential to affect listed species, or critical habitats, and if so, the types of effects, and any appropriate protective measures." BiOp at 17. "These determinations are forwarded to FDEP." *Id.* Where a permit application is found to have <u>no</u> reasonable potential for affecting endangered or threatened species or critical habitat, the technical assistance process ends and the state permit process continues. MOU at 13.

For the duration of the limited stay, FDEP would administer the "may affect" process in this manner, with two additional features to further alleviate concerns this Court might have. Additional details for this "may affect" mechanism are outlined below and described in detail in Exhibit C.[9]

---

[8] While this Court has vacated the Programmatic Biological Opinion, the permit review procedures set forth in the BiOp could still be utilized by the agencies to process permits during the period of a limited stay. In particular, those procedures are consistent with the procedures otherwise set forth in the state regulations underpinning Florida's program.

[9] Florida Intervenors also adopt here their prior arguments and supporting declarations regarding a proper remedy in this case. Dkt. 160, 160-1; Dkt. 162, 162-1.

JA.1233

One, FDEP will consider a "may affect" situation as existing where FDEP, FWC, FWS, NMFS, or EPA find that a permit application, if approved, "may affect" any federally-listed species or designated critical habitat (as opposed to only FWS and FWC). This includes a situation where any of these agencies find that a permit application has a "reasonable potential for affecting endangered or threatened species or critical habitat." In other words, to the extent *any one of these agencies* makes a "may affect" finding, the Court's limited stay order would govern how it is processed.

Two, an initial "no effect" finding may be revisited if, after public notice, any of these agencies (FDEP, FWC, FWS, NMFS, or EPA) find that a permit application "may affect" listed species or critical habitat. In other words, the initial "no effect" finding for a permit application can be reconsidered based on comments received during the public notice process or other new information that is received during the permitting process.[10]

**C.    Third, if one of the agencies triggers a "may affect" finding, what options would be available to the permit applicant?**

Under the limited stay requested here, any "may affect" permits would be processed in the manner set forth in the stay order. Based on a review of the current program, Florida currently estimates that approximately 15% of Florida 404 permit applications (including general permits and individual permits) trigger a "may affect" finding.[11] *See* Wolfe Decl. ¶ 13. For "may affect" permits, FDEP would invite the permit applicant to select one of the following options:

(1)    Request that FDEP hold the permit application in abeyance pending further notice from the applicant;

_____

[10] As explained in the BiOp, these procedures typically ensure that FWS has at least 55-70 days to provide an initial "may affect" finding. BiOp at 17.

[11] This Court noted a possible discrepancy between Florida's estimate in 2019 that approximately 10% of Florida permit applications require some form of incidental take coverage, while Florida estimated in its most recent filings with this Court that approximately 1.4% of

JA.1234

    (2)      Amend the permit application with changes to ensure "no effect" on listed species/critical habitat;

    (3)      Withdraw the permit application; <u>or</u>

    (4)      Request that FDEP transfer the permit application file to the Corps of Engineers for processing.

This set of options accounts for the evolving 404 situation in Florida while also seeking to minimize concerns based on EPA's view about "partial assumptions" of the 404 program. (As explained later in this Motion, if EPA's concerns in that respect are a hindrance to this Court's inclination to grant the limited stay as requested here, this Court should simply align the limited stay with the approaches allowed by the federal agencies in New Jersey and Michigan.)

    **D.**      **Fourth, what happens to Florida 404 permit applications that independently involve Section 7 procedures (e.g., federal funding) or otherwise are obtaining Section 10 coverage?**

    Florida Intervenors would respectfully suggest at least one "may affect" scenario where FDEP should retain 404 permitting authority during the period of the limited stay: permit applications where a project has been, is, or necessarily will be subject to a Section 7 consultation process (*e.g.*, for a project requiring an additional federal action triggering Section 7 consultation procedures)[12] or a Section 10 Incidental Take Permit process (*e.g.*, for a project where the applicant has voluntarily decided to obtain a Section 10 permit).  This carve-out would be consistent with

_____

Florida 404 permits indicate incidental take. Dkt. 163 at 94. For clarification, the 2019 statistic was an estimate based on *individual permits* issued by the Corps in the years preceding Florida assumption application. The 2024 statistic cited by FDEP in recent briefing is based on *general and individual permits* that were *actually issued by FDEP* during the last three years. As a point of reference, Michigan's public website for its 404 program states that approximately 1% of Michigan 404 permits trigger EPA review there. *See infra* at 18.

[12] For example, FDEP is currently processing various permits for road projects funded through the federal highway program. As federally-funded projects, the Florida Department of Transportation (FDOT) stands in the shoes of the Federal Highway Administration for purposes of obtaining permits and approvals for projects. These FDOT projects are able to undertake Section 7 consultation procedures. This is a clear category of projects that should be exempt from this Court's vacatur order. *See* Wolfe Decl. ¶ 14.

JA.1235

this Court's rationale for its February 15 ruling and ensure that the core concerns underlying this Court's vacatur order are addressed. Those avenues also ensure the requested clear path for judicial review for Plaintiffs or other affected parties as to specific projects with potential effects to listed species. This approach is also already reflected in the Florida process, as set forth in Section 5.2.3 of the Florida 404 Handbook and as approved by EPA, so it should not require modification of the program to implement.

     **E.**     **Fifth, may FDEP continue to enforce Section 404 violations in all assumable waters during the pendency of the limited stay?**

FDEP is committed to fair and vigorous enforcement of the Section 404 program. To that end, Florida Intervenors also wish to emphasize that, for the duration of the limited stay, FDEP should be viewed as retaining primary enforcement authority in all assumable waters for any violations. This clarification is particularly important with regard to *unpermitted* discharges (i.e., where persons engage in dredge and fill activities in assumable waters in Florida without obtaining a 404 permit). The limited stay should clearly state that nothing in the order restricts Florida's authority to enforce the Section 404 program in assumable waters. As always, the Clean Water Act specifically allows for parallel federal enforcement where warranted. *See* 33 U.S.C. § 1344(n).

     **F.**     **Sixth, how long should the limited stay remain in effect?**

Florida Intervenors respectfully suggest that the limited stay should be in place for at least six months, with the possibility of extensions as granted by this Court as circumstances may warrant. Courts in this Circuit have regularly stayed vacatur of agency decisions for the amount of time it would take for the federal agency (or the state with delegated authority) to remedy the issue. *Friends of Earth*, 446 F.3d at 148 ("[W]e remand to the district court with instructions to vacate EPA's approvals… however, [] the parties may move to stay the district court's order on

JA.1236

remand to give either the [State with the flawed delegated CWA program] or EPA a chance to

[remedy the vacated issue]. These timelines defer to the discretion of the agency on the length of

time."); *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 501 (D.C. Cir. 1988)

("Because we are not in the best position to determine the shortest reasonable timetable ..., we

remand the case for [the] district court to establish, in consultation with the parties, an expedited

schedule for further rulemaking proceedings consistent with this opinion.").

G.      **Seventh, if this Court declines this proposed "may affect" process based on Federal Defendants' "partial assumption" concern, would the approach employed in New Jersey and Michigan serve as an appropriate mechanism for the duration of the limited stay?**

Florida Intervenors have previously expressed concerns with "partial assumption" given

EPA's position that states must assume the *entirety* of the 404 program in assumable waters. Dkt.

162-1 at 2.  Federal Defendants continue to have reservations about a limited stay that

"federalizes" permit applications on the basis of a "may affect" mechanism. Dkt. 165. Florida

Intervenors share that concern, but respectfully suggest that the "may affect" process set forth in

this Motion navigates those concerns appropriately in the context of a limited stay, within the

confines of the conditions set by this Court in its February 15 ruling.[13]

Nevertheless, if this Court is not inclined to grant a limited stay based on the proposed

"may affect" mechanism presented above, Florida Intervenors respectfully request that this Court

fashion a limited stay following the New Jersey and Michigan approach. Under that form of

limited stay, FDEP would continue to implement both the existing technical assistance process

(as reflected in the Florida-specific program documents) as supplemented by the same basic

"Procedures" set forth in Section III of the New Jersey-EPA-FWS MOA (AR FWS-006148 to -

---

[13] To the extent this Court set those conditions in light of New Jersey permits being "federalized" in "may affect" or even "adversely affect" situations, that underlying premise is not correct and would be a basis for altering the conditions set by this Court for a limited stay.

006152). The procedures used in all three states are similar in relevant respects. While incidental

take liability coverage would not be provided to Florida 404 permittees under that process, it

would still serve as a consistent and appropriate process for species review purposes (including

for purposes of 40 C.F.R. § 233.51). And since it is the process currently employed by EPA and

FWS in New Jersey and Michigan, implementation in this context should not pose partial

assumption concerns.

In the case of New Jersey, FWS has committed via MOA to review a state 404 permit

where a "may affect" situation exists (but not otherwise). *See* New Jersey-FWS MOA at 3-4

(FWS-006148 to 006149) (explaining that "NJDEP staff will screen" all general permits for

potential impacts to species and send over for FWS review any general permits that NJDEP

determines to have "potential to adversely affect federally listed species," and NJDEP provides

FWS "with a copy of all applications for individual permits from locations with federally listed

species"). Yet, under the New Jersey MOA, a permit is only *federalized* (transferred to the Corps

for processing, as opposed to simply sent to FWS/EPA for federal review) if EPA/FWS actually

*objects* to NJDEP's plans to issue a permit and imposes conditions that NJDEP refuses to accept.

*Id.* at 4-5 (FWS-006149 to -006150). Again, that is the same basic process already used in

Florida.

Here, it is important to pause to address a potential misconception in this Court's

February 15 ruling, which describes the New Jersey model as involving a process where "the

State [of New Jersey] has agreed to 'federalize' – *that is, pass to the FWS and NMFS for*

*review* – any permits that might affect protected species…"  Dkt. 163 at 23 (emphasis added).

Earlier in its ruling, the Court similarly describes the New Jersey model as involving a process

where "EPA can *federalize those applications likely to adversely affect listed species*, thereby

JA.1238

triggering Section 7 consultation…" Dkt. 163 at 5 (emphasis added). This understanding of the

New Jersey model (and the Michigan model) warrants some clarification. Federal "review" is not

the same as "federalizing." Specifically, federal "review" for purposes of 40 C.F.R. §§ 233.50-

.51 involves EPA/FWS evaluating whether a permit application will jeopardize listed species or

adversely modify designated critical habitat, whereas "federalizing" a state 404 permit occurs

when EPA, after a state refuses to deny a permit or otherwise fails to adequately address a

concern raised by the federal agencies, takes the permit away from the state and hands it to the

Corps of Engineers for processing (in accordance with 40 C.F.R. § 233.50(j)). In New Jersey,

EPA does not "federalize those applications likely to adversely affect listed species." *Compare*

Dkt. 163 at 5. To the contrary, state 404 permits in New Jersey undergo "federal review" (i.e.,

review by FWS and EPA) and terms and conditions provided by EPA/FWS can be incorporated

into the New Jersey 404 permit, but those permits are only "federalized" in "the event that [New

Jersey] neither satisfies the EPA's objections or requirements for a permit condition … nor

denies the permit…" *See* Section III(K)-(O) of the MOA between NJ-FWS-EPA (FWS-006152).

New Jersey has an opportunity to accept the conditions to avoid adversely affecting listed

species. See Section III(L). If New Jersey does not agree to those actions specified by  FWS,

FWS then proceeds with making a "finding as to whether the proposed permitting action *is likely

to jeopardize the continued existence of the federally-listed species, adversely modify or destroy

designated critical habitat, or result in the incidental take of federally-listed species.*" Section

III(M) (emphasis added). And New Jersey "may also include" other "appropriate terms and

conditions to minimize or avoid adverse effects" to listed species. *Id.* Ultimately, EPA's

objections and possible "federalizing" of a New Jersey 404 permit is not based on "adversely

affecting" species; those objections must be based on a finding that issuance of the permit would

JA.1239

"jeopardize" the continued existence of listed species or adversely modify designated critical habitat or otherwise fail to "avoid or minimize incidental take of federally-listed species." *See* Section III(N)-(O). Crucially in fact, this is the same basic process already used in the Florida 404 program for purposes of the "federal review" requirements under 40 C.F.R. Part 233. Additionally, at the back end of the federal review process in New Jersey, an objection "may be reconsidered if the project, as permitted by NJDEP, changes or if additional information on federally-listed species or designated critical habitat becomes available." Section III(P).

Michigan has a MOA with EPA governing Michigan's Section 404 Program, but unlike Florida and New Jersey, Michigan apparently has no MOA with FWS for conducting species reviews. Instead, the Michigan-EPA MOA provides that FWS reviews permit applications for projects proposing "discharges with reasonable potential for affecting endangered or threatened species as determined by the USFWS." Thus, in Michigan, FWS *reviews* state 404 permit applications where *Michigan* finds that a project "may affect" listed species. This is spelled out on the 404 website for the Michigan Environmental Department (agency known as "EGLE")[14]:

> [Michigan's] 1983 Memorandum of Agreement (as amended) with USEPA Region 5 outlines the procedures to be followed in program administration. This agreement waives federal review of the vast majority of applications in areas under Michigan's 404 jurisdiction. However, federal agencies must review projects which impact critical environmental areas, or which involve major discharges. These projects are identified in the Memorandum of Agreement [to] include … [p]rojects with potential to affect endangered or threatened species as determined by the U.S. Fish and Wildlife Service… At the present time, USEPA reviews about one percent of all applications received. If EGLE determines that an application under Michigan's 404 program is subject to federal review, copies of the public notice are sent to USEPA Region 5, Detroit District Corps, and the U.S. Fish and Wildlife Service. The USEPA is responsible for compiling all federal comments and submitting comments on the federal position to EGLE....

---

[14] *See* https://www.michigan.gov/egle/about/organization/water-resources/wetlands/state-and-federal-wetland-regulations.

In other words, in Michigan and New Jersey, a "may affect" finding (or even a finding of "likely to adversely affect") does not result in transfer of the permit application to the Corps of Engineers (federalizing). For both of those state 404 programs (which, again, do not have now, and never had, any programmatic biological opinion), Michigan and New Jersey continue to process all "may affect" permits *unless and until* the state refuses to adopt conditions imposed by EPA and/or FWS in a "jeopardy" or "minimize incidental take" situation. That serious disconnect between what this Court may envision for a "may affect" mechanism and what actually happens in New Jersey and Michigan warrants further consideration with respect to the appropriate remedy here.

A limited stay built on the New Jersey and Michigan approach has other virtues as well. Most notably, that form of limited stay would avoid imposing restrictions and burdens on Florida 404 permit applicants that are not applicable to Michigan and New Jersey 404 permit applicants as it relates to species reviews. It is one thing to say that state permittees in Florida will no longer receive incidental take liability protection via state 404 permits; that is already the case in New Jersey and Michigan (since formal consultation procedures were not used in either state's 404 assumption process). But it is something else entirely to say that Florida 404 permit applications are *automatically* transferred to the Corps of Engineers on the mere basis of a "may affect" finding, where that is *not* the actual practice in New Jersey or Michigan and it potentially runs afoul of partial assumption concerns. As an exercise of this Court's equitable discretion, this Court's limited vacatur remedy should take into account equitable treatment of the three states in this particularly unique context. Likewise, even though this Court finds fault with the formal consultation approach employed by Florida, EPA, and FWS, that is a process that goes above and beyond what was done in the other two states at the assumption stage.

JA.1241

Likewise, a limited stay built on the New Jersey and Michigan approach would obviate many of the difficult implementation questions identified earlier in this Motion. For example, it would simplify the "may affect" approach and mechanism, and it would create fewer scenarios where complex questions of "federalizing" permits need to be addressed. The Corps of Engineers would, likewise, not be met with an onslaught of permits for processing from scratch. And it avoids many concerns related to reducing Florida's enforcement authority over assumable waters.

## CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully move for a limited stay of this Court's February 15 vacatur order, as described above and set forth in the proposed order filed concurrently. Given the urgency of the issue, Florida Intervenors respectfully request expedited decision on this Motion.

Dated: February 26, 2024                          Respectfully submitted,

                                                  BAKER BOTTS L.L.P.

                                                  */s/ Jeffrey H. Wood*
                                                  Jeffrey H. Wood (D.C. Bar No. 1024647)
                                                  700 K Street, NW
                                                  Washington, D.C. 20001
                                                  Phone: (202) 639-7700
                                                  jeff.wood@bakerbotts.com

                                                  Lily N. Chinn (D.C. Bar No. 979919)
                                                  101 California Street
                                                  San Francisco, CA 94111
                                                  Phone: (415) 291-6200
                                                  lily.chinn@bakerbotts.com

                                                  Aaron M. Streett (TX Bar No. 24037561)
                                                  Harrison Reback (TX Bar No. 24012897)
                                                  (*pro hac vice*)
                                                  910 Louisiana Street
                                                  Houston, TX 77002-4995

JA.1242

Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERIFICATE OF SERVICE**

I hereby certify that on this the 26th day of February 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

JA.1244

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.

          Plaintiffs,

    v.

MICHAEL S. REGAN, et al.,

          Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

---

**DECLARATION OF JUSTIN WOLFE IN SUPPORT OF LIMITED STAY**

1.     My name is Justin Wolfe. I declare under penalty of perjury under the laws of the United States of America and the State of Florida that the following statements are true and correct to the best of my knowledge and belief.

2.     I serve as General Counsel to the Florida Department of Environmental Protection ("FDEP"). FDEP is the state agency in Florida authorized by law to "control and prohibit pollution of air and water…." Fla. Stat. § 403.061.

3.     I have signed and submitted five sworn declarations in this case (Dkt. 4-2, Dkt. 102-1, Dkt. 107-1, Dkt. 149-1, Dkt. 160-1), all of which I hereby re-affirm and incorporate by reference, subject to any additional information or clarifications provided herein.

4.     I am providing this additional declaration to provide sworn facts to this Court in support of Florida Intervenors' Motion for a Limited Stay (Motion). I have reviewed the Motion and affirm the facts therein.

6.     Upon receipt of this Court's February 15 order, FDEP promptly posted on its Section 404 website a statement, as follows:

1

JA.1246

"*A federal court order was issued just before midnight on Feb. 15, 2024, divesting, at least for now, DEP of its authority to issue State 404 Program permits in Florida. Consequently, all activity under the State 404 Program is paused until further order of the court. DEP is currently evaluating any and all legal options in light of the court's order. As an initial step to limit the disruption to the State's 404 Program, DEP will seek a limited stay of the court's order.*"[1]

7.      As anticipated, vacatur of Florida's program has already begun to create enormously disruptive consequences and raise complex problems for the State and thousands of Floridians to navigate.

8.      Well over 1,000 pending 404 individual and general permit applications – the vast majority of which have been in the Florida 404 permit review process for more than six months (with many far along toward a final decision) – are now in regulatory limbo with no clear timeline or expectation for a permit decision.

9.      This includes pending permit applications for roads and bridges, hospital construction projects, school buildings and facilities, affordable housing, military base projects, power grid reliability projects (including construction of new power generation facilities and transmission lines), and various projects necessary to improve water quality in the Florida Everglades, just to name a few examples. Exhibit B, enclosed with Florida Intervenors' Motion for Limited Stay, provides a list of all permit applications for individual or general 404 permits currently pending before the FDEP for review.[2] This includes approximately 1,065 permit applications of a wide variety, including many projects that benefit the environment and/or the public, as described in the Motion for Limited Stay.

---

[1] https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/state-404-program.

[2] In my declaration filed with Florida's post-hearing remedy brief, I noted that approximately 1,500 permit applications were then-pending with FDEP. That estimate included permittee requests for "No Permit Required" or other similar determinations, which are also essential to assisting the public with understanding compliance obligations.

JA.1247

10.     After months (and in over 100 cases, more than two years) of permit review, many pending Florida 404 permit applications were at or near the conclusion of the Section 404 permit process when the Court's February 15 order was issued. Of those currently pending, over 840 permit applications have been in the permit review process for more than six months. Now all pending 404 permits in Florida are in some form of regulatory limbo, at least until a new regime can be established or further judicial orders alter the situation.  Likewise, many of those permits would impose mitigation measures benefitting the environment and species conservation, but those beneficial actions are now similarly on hold as well.

11.     The State of Florida and FDEP remain committed to administering the Section 404 program for all assumable waters in a manner consistent with law. The State of Florida intends to move forward on efforts to ensure that FDEP continues to implement the program to the fullest extent. Those details will take additional time to sort out.

12.     FDEP would move forward with implementation of the Florida 404 program in compliance with this Court's order granting a limited stay under either of the approaches set forth in Florida's Motion (i.e., the "may affect" mechanism described in the Motion based on this Court's two conditions for a limited stay, or the approach based on the New Jersey/Michigan model).

13.     Based on a review of the current program, FDEP currently estimates that approximately 15% of Florida 404 permit applications (including general permits and individual permits) trigger a "may affect" finding. (For clarity, a "may affect" finding is the first initial step; subsequent possible findings include "may affect, not likely to adversely affect" or "may affect, likely to adversely affect"; all of which are distinct from a possible later finding as to whether a

3

JA.1248

project would "jeopardize" the continued existence of listed species and/or adversely modify designated critical habitat).

14.    Various projects requiring a Florida 404 permit have been, are, or necessarily will be subject to a Section 7 consultation process (e.g,, for a project requiring an additional federal action triggering Section 7 consultation procedures) or a Section 10 Incidental Take Permit process (e.g., for a project where the applicant has voluntarily decided to obtain a Section 10 permit).  For example, FDEP is currently processing various permits for road projects funded through the federal highway program. As federally-funded projects, the Florida Department of Transportation stands in the shoes of the Federal Highway Administration for purposes of obtaining permits and approvals for projects. These FDOT projects are able to undertake Section 7 consultation procedures. This is a category of projects that should be exempt from this Court's vacatur order because those projects already undergo separate Section 7 procedures (independent of any 404 process in Florida).

Executed on the 26th day of February, 2024.

Justin Wolfe
General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd M.S. 35
Tallahassee, FL 32399

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

    *Plaintiffs*,

   v.

MICHAEL S. REGAN, *et al.*,

    *Defendants*.

Civil Action No. 21-119 (RDM)

———————————————

**FLORIDA INTERVENORS' REPLY IN SUPPORT OF LIMITED STAY**

———————————————

  Florida Intervenors submit this reply in support of a limited stay. In their opposition (Dkt. 169), Plaintiffs contend that Florida's proposed approach for processing Clean Water Act (CWA) Section 404 permits during a period of limited stay would be "unworkable," "convoluted," "create confusion," "perpetuate violations of the ESA," and provide no "role [for NMFS] to play." Plaintiffs are incorrect on each point, as explained below. Perhaps more significantly, this reply also responds to Plaintiffs' belated acknowledgment – buried in a footnote (Dkt. 169 at 9 n.4) – about their own "confusion" regarding the New Jersey 404 program. More than mere confusion, Plaintiffs repeatedly misinformed this Court about how permit applications that "may affect" listed species are handled in New Jersey – an incorrect view that found its way into this Court's February 15 ruling and seemingly led (at least in part) to the Court's "condition" that any limited stay *must* require that all "may affect" permits be transferred to the Corps of Engineers.

  Accordingly, the better course would be for this Court to remove its "may affect"/"federalize" condition for a limited stay. While Florida's motion presented a workable interim solution that was responsive to this Court's conditions for a stay, a corrected understanding

of what actually happens in New Jersey and Michigan - and what happens under 40 C.F.R. Part 233 with regard to "may affect" permit situations - strongly favors simply using the same approach for purposes of this limited stay. That ensures "federal review" (not "federalization") in a manner consistent with existing federal regulations. Not coincidentally, this is the same basic process that has already been in place in Florida for over three years. To be clear, even under this approach, Florida 404 permittees would not receive incidental take coverage during the period of limited stay because this Court's vacatur of the ITS would remain in place.[1]

As explained in the separately-filed Motion for Entry of Final Judgment (Dkt. 171), Florida Intervenors respectfully suggest that a status conference is not necessary before final judgment should be issued, nor is it necessary before a limited stay should be granted. In the event the Court decides to hold a status conference, Florida Intervenors respectfully urge the Court to set it for the earliest date possible within the next 10 days. Florida Intervenors continue to seek expedited consideration of the limited stay motion. Dkt. 166 at 19.

## I.   Plaintiffs Admit They Were Wrong About Species Reviews for 404 Permitting in New Jersey and Michigan.

At the summary judgment hearing in October 2023, this Court asked, "why not do something like the New Jersey model here"? Tr. at 107 (Oct. 19, 2023 Hr'g). Plaintiffs told this Court: "They could have done the New Jersey model." *Id.* at 131. And then they proceeded to give this Court entirely incorrect information about what the New Jersey program actually entails. In particular, Plaintiffs have told this Court that New Jersey federalizes all state 404 permits that "may affect" species. Dkt. 98 at 16 and n.12 (informing the Court incorrectly that state programs

---

[1] Florida Intervenors are permitted to file a reply in support of the limited stay motion. LCvR 7(d). To the extent this Court finds that leave is required here, Florida Intervenors respectfully seek leave to file this reply. Good cause exists because, among other things, Florida Intervenors should have an opportunity to respond to several new arguments raised by Plaintiffs and to address additional factual mischaracterizations that they have continued to make to this Court.

can "federalize state 404 permits when they may impact species (passing those permits to the Corps)," and specifically stating that "[t]his was the approach taken by New Jersey in its state program"). And, Plaintiffs previously posited to this Court a number of times that a proper remedy would be to order that "any permit that 'may affect' species" would be "processed by the Corps." Dkt. 161 at 10; *see also* Dkt. 135 at 42 (asking this Court for injunctive "order restoring authority to the Corps over permits that may affect ESA species"). In reality, no such "may affect"/"federalize" process ever existed in New Jersey or Michigan, and both Florida Intervenors and Federal Defendants previously explained that such an approach would be contrary to EPA's regulations.[2]

To be clear, permits in New Jersey that "may affect" or are "likely to adversely affect" species are not "federalized." Dkt. 166 at 3 n.2. They are simply subject to "federal review" under 40 C.F.R. Part 233 (not as a matter of Section 7 consultation), the same as they are in Florida already. Permit applications are "federalized" – transferred to the Corps for action – when EPA objects to the issuance of a permit because EPA determined that issuance of the permit would not comply with the (b)(1) Guidelines including the requirement for not causing jeopardy to a species. This concept is the same in New Jersey as it is in Florida. FWS-006144. Realizing their mistake after Florida Intervenors alerted them to it (*see, e.g.*, Dkt. 166 at 3 n.2), Plaintiffs simply dropped a footnote on page 9 of their brief, stating:

> Plaintiffs now recognize that they previously described the New Jersey approach as transferring permits to the Corps based only on a "may affect" determination, when the New Jersey process is more complex. Some confusion has arisen partly because the term "federalization" has been used to describe both when federal species determinations are required to be made by federal agencies (which USFWS

_____

[2] *See, e.g.*, Dkt. 162-1, Dkt. 149 at 40 n.21; Dkt. 102 at 33-34 (explaining process applicable to all state 404 programs under 40 C.F.R. Part 233 for federalizing permits); Tr. at 101 (Jan. 30, 2024 Hr'g) (counsel for Florida addressing the Court's question about "federalize" by explaining that permits are federalized when the 404(b)(1) guidelines are "not complied with").

3

> does not consider to be Section 7 consultation) and when permits are transferred to
> the Corps for processing (which requires Section 7 consultation)…

Dkt. 169 at 9 n.4. It is not that New Jersey's process is "more complex"; Plaintiffs have simply operated under a total misunderstanding of federal species review procedures under 40 C.F.R. Part 233 for the duration of this litigation. Nor is it mere excusable "confusion" over the distinction between "federal review" (federal agencies giving comments to states on permits) versus "federalization" (Corps of Engineers taking the permit away from the state), as Plaintiffs have used "federalizing" correctly in other contexts.

Regrettably, Plaintiffs' mistaken view of New Jersey and their "confusion" over "federalizing" versus "federal review" found its way into this Court's February 15 ruling. *See* Dkt. 163 at 27 (stating that state programs can "federaliz[e] all state 404 permits that may impact species, as occurs in New Jersey …"); Dkt. 163 at 23 ("the State [of New Jersey] has agreed to 'federalize' – that is, pass to the FWS and NMFS for review – any permits that might affect protected species…"); Dkt. 163 at 46-47 (describing a "process for federalizing permits that may affect listed species (as was done in New Jersey)"); Dkt. 163 at 95 ("…without federalizing permits likely to adversely affect species (as in New Jersey)").

Indeed, both Plaintiffs (and this Court) treated the practice of sending "may affect" permits to FWS for "federal review" as something that was unique to New Jersey (and Michigan) and, more significantly, *as if it was a process that was not occurring in Florida*, which is wrong for all of the reasons that Florida has fully explained many times here. *See* Dkt. 166 at 9-11; Dkt. 149 at 19-21; Dkt. 149-1 at 4; Dkt. 149-2 at ¶ 24; Dkt. 102 at 21-24. And, Plaintiffs (and at times, this Court) characterized New Jersey as "federalizing" (as in, transferring permits to the Corps for

processing) where a project "may affect" or is "likely to adversely affect" listed species, which also is not correct.[3]

In fact, when this Court asked Plaintiffs' counsel: "How does this work in [] New Jersey and Michigan," Tr. at 21 (Oct. 19, 2023 Hr'g), Plaintiffs told this Court, incorrectly, that "any permit [in New Jersey] that may affect species would go through the federal agencies, and *therefore, they found there would be no effect on any protected species through their program.*" *Id.* at 22 (emphasis added). This Court responded: "I see. Which, I take it, is – your bottom line here is that Florida or the EPA, in conjunction with [the] Fish and Wildlife [Service] *could have done either of those two things here*…" *Id.* (emphasis added). Of course, the irony here is that Florida and EPA took a more protective path by providing for federal review *of every permit* including those that *may affect* species and requiring Florida permits to adopt *any protective measures* imposed by FWS, something that is not present in the other two state programs.

Additional misinformation was provided at the January 30, 2024 TRO hearing, where this Court again asked Plaintiffs about New Jersey. The Court indicated a view that the New Jersey and Michigan programs require, for "a permit application that raises a potential risk to an endangered or threatened species, either Florida and the EPA and *the Corps have to federalize that particular application and then Section 7 applies*, or the permit applicant has to comply with Section 7." Tr. at 9 (Jan. 30, 2024 Hr'g). That is incorrect legally and factually. Yet counsel for

---

[3] *Doe I v. Exxon Mobil Corp.*, No. 1:01-CV-1357-RCL, 2021 WL 1910892, at *7 (D.D.C. May 12, 2021) (noting counsel's obligation to "correct a false statement of fact to a tribunal"). It seems likely that, but for Florida Intervenors making the Court aware of Plaintiffs' mischaracterization of the New Jersey process, Plaintiffs would not have corrected it themselves. *United States ex rel. Barko v. Halliburton Co.*, 75 F. Supp. 3d 532, 545 n.56 (D.D.C. 2014), *mandamus granted, order vacated sub nom. In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015) ("This Court must rely on counsel to present issues fully and fairly, and counsel have a continuing duty to inform the Court of any development which may conceivably affect an outcome." (quoting *Fusari v. Steinberg*, 419 U.S. 379, 390–91, (1975) (Burger, C.J., concurring)).

Plaintiffs continued to mischaracterize the New Jersey model as being "very different" than Florida because "[*New Jersey] was not taking over any permitting actions that would affect species*, and that's why [FWS] determined they did not need to do a biological opinion." *Id.* at 11. That, of course, is entirely wrong; yet this Court responded: "*Because theirs would all be federalized*"? *Id.* (emphasis added). Plaintiffs' counsel replied: "Correct." *Id.* Later, this Court described Florida's approach as one where Florida essentially said, "We don't want to go back to the Federal Government *like in New Jersey and federalize permits*." *Id.* at 60 (emphasis added). That, too, was wrong.

Coincidentally, Plaintiffs' counsel was also wrong on virtually every other point made in the "How does this work in New Jersey and Michigan" colloquy with the Court at the October 2023 hearing (as found at Tr. at 21-23). Counsel for Plaintiffs told the Court that "Michigan has its own state Endangered Species Act program, *which is what it uses to ensure no jeopardy at the permit level*." *Id.* at 21-22 (emphasis added).[4] This is incorrect. Michigan satisfies the "no jeopardy" requirement the same way that Florida and New Jersey do; that is, by virtue of the requirement under the federal "review" procedures in 40 C.F.R. Part 233 providing that no state 404 permit would be issued that *jeopardizes* a species because any such permit must be *objected* to (and *if* the objection is not resolved by avoiding jeopardy, the permit must be *federalized* by transfer to the Corps).[5]

---

[4] Florida has a robust state ESA. *See* Fla. Stat. § 379.2291 ("The Florida Threatened and Endangered Species Act").

[5] Whether a permit application would *jeopardize* a listed species (per the Part 233 objection/federalization process) is a different inquiry from whether federal approval of a state program "may affect" listed species for purposes of triggering Section 7 consultation at the assumption stage. *Cf.* Dkt. 163 at 22-23 n.3 ("The question whether a State has adequate authority to ensure that no state-issued permit causes jeopardy, however, at least arguably differs from the

JA.1255

Next, counsel for Plaintiffs told this Court that the federal agencies "didn't do consultation under [Section 7 of] the Endangered Species Act" when approving the Michigan program, to which this Court asked, "I take it that was because at that point in time the EPA was of the view that the assumption authority was nondiscretionary?" Tr. at 22. Counsel for Plaintiffs incorrectly responded, "Right, Your Honor." *Id.* That, too, was incorrect and unsupported. EPA approved Michigan's 404 program in 1984. Nothing in the record before this Court suggests that consultation did not occur because "assumption authority was nondiscretionary." *Id.*[6] Instead, as explained in public records, FWS long ago advised EPA that "Michigan's original assumption, during 1984, of the CWA section 404 permit program should have been subjected to formal consultation with the FWS, pursuant to Section 7 of the ESA (reiterating positions that the FWS had stated in letters dated April 8, 1983, and August 19, 1983). At that time, EPA had determined that approval of

---

question whether the federal action—here, the approval of the assumption application—*is likely to jeopardize a listed species*.") (emphasis added).

[6] Indeed, whether "assumption authority" is "discretionary" ("may" approve) or "nondiscretionary" ("shall" approve) is beside the point on the issue of whether Section 7 is triggered. EPA clearly has a *nondiscretionary* duty to approve a state 404 program that meets the criteria found in Section 404. 33 U.S.C. § 1344(h)(2)(A) (providing that EPA "shall" approve a state program that meets the required criteria). The question for triggering Section 7 consultation is different; it is whether EPA has "discretion" to consider impacts to listed species as part of the state assumption process – a point that is made clear in the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007). This Court expressed severe skepticism about Florida's (and Federal Defendants') position on this point at the January 30, 2024 hearing. Tr. at 42 (Jan. 30, 2024 Hr'g) ("you're wrong when you say the Supreme Court has said that Section 7 applies"); Dkt. 163 at 22-23 n. 3. In the February 15 ruling, however, the Court opted to defer taking up that question. Dkt. 163 at 22-23 n.3. If the Court does not agree that Section 7 is triggered under the rationale of the Supreme Court's decision in *National Association of Home Builders*, *and if this Court is right*, then ESA Section 7 consultation is *not* triggered and any state can simply take the easier path blazed by New Jersey and Michigan – one that looks very similar to Florida's without, of course, the preparation of a programmatic BiOp/ITS, supplementary technical assistance process to provide a more robust level of species review and protection, and the benefits of Section 7 consultation (including incidental take liability coverage pursuant to Section 7(o) of the ESA).

Michigan's section 404 program was not a 'federal action' and, therefore, EPA did not invoke Section 7's consultation requirement."[7] In other words, as far back as 1983, the position of FWS has been that Section 404 assumption triggers formal consultation (something Florida and EPA agreed should occur). And FWS kept to that position when it told EPA that it should enter formal programmatic consultation when approving New Jersey's program as well (though EPA did not agree and no formal consultation occurred).

Third, counsel for Plaintiffs incorrectly told this Court that, for Michigan, "any take liability coverage is due to their own already preexisting agreement on their state program…" Tr. at 22. Incidental take liability coverage is <u>not</u> provided to Michigan 404 permittees, because Michigan's program did <u>not</u> undergo *formal programmatic consultation* and, thus, a BiOp/ITS was not prepared.[8] There is simply no basis for Plaintiffs' alternate theory as to that question.

The upshot of Plaintiffs' acknowledgment is that this Court should, at a minimum, reconsider relevant aspects of the February 15 ruling and order, at least insofar as it relates to the pending motion for limited stay. This Court's "may affect"/"federalize" condition for a limited stay has no basis in actual practice in New Jersey or Michigan or under Part 233. A change in this

---

[7] EPA, Final Report - Results of the U.S. Environmental Protection Agency Region 5 Review of Michigan Department of Environmental Quality's Section 404 Program, at 91 n.43 (May 2008).

[8] Counsel for Plaintiffs repeated this incorrect information at the January 2024 TRO hearing. Tr. at 12-13 (Jan. 30, 2024 Hr'g) (advising this Court incorrectly that, through Michigan's ESA "Section 6" agreement with the federal government, Michigan has "already, in some sense, an assumption in Michigan of [ESA] authority). ESA Section 6 allows for "cooperative" agreements with federal funding to support state species protection programs. 16 U.S.C. § 1535. Florida entered a Section 6 cooperative agreement with U.S. Fish and Wildlife Service *over four decades ago*. *See* Memorandum of Understanding between FDEP-FWS-FWC at 4 (EPA-HQ-OW-2018-0640-0016-A2). Many other states have those agreements as well. It is not clear why Plaintiffs sought to interject that point into the case; nonetheless, contrary to counsel for Plaintiffs' explanation to this Court, ESA Section 6 has nothing to do with take liability. *See* 16 U.S.C. § 1535(c)(1)(ii).

Court's "conditions" for a limited stay is due. *Franklin-Mason v. England*, No. 96-2505JMF, 2005 WL 1804426, at *1 n.1 (D.D.C. Aug. 1, 2005) ("Indeed, the D.C. Circuit has suggested that courts have not only 'the power' but also 'the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake.'") (quoting *Howard Sober, Inc. v. I.C.C.*, 628 F.2d 36, 41 (D.C. Cir. 1980)).

Florida Intervenors now turn to Plaintiffs' main arguments in their response brief; namely, that Florida's proposed approach for the period of a limited stay would be "unworkable," "convoluted," "create confusion," "perpetuate violations of the ESA," and provide no "role [for NMFS] to play." As addressed below, Plaintiffs are incorrect on each of these points as well.

## II.  Florida's Proposal Is Not "Unworkable," "Convoluted," or Likely to "Create Confusion."

In its motion, Florida Intervenors proposed an approach that aligns with this Court's condition that any permit that "may affect" listed species must be transferred to the Corps. Notwithstanding "partial assumption" and the concerns raised above about whether such a condition is necessary (in light of Plaintiffs' acknowledgment in their footnote 4), Florida remains committed to administering the program during a period of limited stay under that condition, if the Court requires it.

However, it does seem clear that such a condition should be lifted for the reasons explained. Thus, Florida's second proposed option – i.e., use the federal review process to ensure that "may affect" permits undergo review by FWS and NMFS, which provides for federalization in the same manner as used in Michigan and New Jersey in the rare circumstance that the federal agencies make a "jeopardy" determination and the state refuses to deny the permit (which is the same manner also already administered in Florida). Contrary to Plaintiffs' assertions, that approach for processing 404 permits during a limited stay is absolutely workable and clearly set forth in existing

9

program documents. Indeed, with a proper understanding of what happens in New Jersey and Michigan, it should be abundantly clear now to even the Plaintiffs that Florida's proposed approach aligns with those programs, which means the approach is necessarily workable and understood by all stakeholders, for all of the reasons already explained.

### III.      Florida's Proposal Does Not "Perpetuate Violations of the ESA."

Contrary to Plaintiffs' contention (Dkt. 169 at 8), Florida's proposed approach does not "perpetuate violations of the ESA." They claim Florida would be "violating" the ESA because "Florida's proposal provides that state or federal agency may make a 'may effect' [sic] determination but does not impose a duty on any of them to make that determination…." Dkt. 169 at 8. Plaintiffs' position is unreasonable. FWS receives a copy of *all 404 permit applications* in Florida (not just the "may affect" permits). Dkt. 149-3; *see also* Florida 404 Handbook, Section 5.2.3 (EPA-HQ-OW-2018-0640-0002-A20 at 23); BiOp (EPA-HQ-OW-2018-0640-0642) at 11-12, 19-20, 67-68; *compare* New Jersey MOA (AR FWS-001644) at III.A ("The NJDEP staff will screen [] Statewide general permit[s]...in locations with the potential for occurrences of federally-listed species or designated critical habitat…." (emphasis added)). Florida's 404 Handbook expressly explains in Section 5.2.3:

> The Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species. Consultation with, or technical assistance by, FWC, FWS, or NMFS shall be required when the Agency determines that the project may have the potential to affect listed species.

Moreover, the FWS Biological Opinion, which Florida remains committed to, expressly provides that FDEP will send all permit applications to FWS. BiOp at 11-12. As Florida Intervenors have extensively explained already, the species review process under the Florida 404 program is intentionally equivalent to the process that would otherwise apply in a Corps-led

10

JA.1259

program. Dkt. 149 at 20-21; Dkt. 149-3. And all Florida permit applications are available for review on-line by <u>everyone</u>, not just agencies.

Of course, here, we are in a context where this Court has already ruled and vacated approval of the program, so the question is whether, as a function of this Court's equitable discretion to fashion a stay of its vacatur order, this Court may allow the program to remain in place in some manner. Requiring Florida to follow this process will provide adequate assurances to this Court that species are protected while Florida continues to administer the program (*albeit without incidental take liability coverage for state permittees).*

## IV.     Florida Fully Addresses NMFS' Role During the Limited Stay.

Plaintiffs are also wrong that "Florida makes no provision for what role NMFS would play in a limited stay." As noted above, the Florida 404 Handbook already provides for NMFS review of Florida 404 permits. Florida has a long history of coordinating with NMFS on state permits and remains committed to ensuring that NMFS has every opportunity for reviewing Florida 404 permits. Beyond that, Florida's 404 program does not apply to coastal waters, as all such waters are retained by the Corps of Engineers. Thus, NMFS involvement is relatively infrequent for Florida 404 permits. Last, EPA and NMFS were engaged in Section 7 consultation regarding Florida's program but Florida's current understanding is that this consultation has recently ceased in light of this Court's vacatur order. Florida has no qualms with making sure NMFS has a copy of all permit applications.

## CONCLUSION

At this moment, a host of permit applications – many squarely in the public interest – are held in a state of unconscionable limbo by virtue of this Court's vacatur order. Florida 404 permittees who have been in the queue for many months or even years are faced with a choice of

JA.1260

restarting a permit process with the Corps (likely from scratch at tremendous cost and delays) or awaiting some reprieve from this Court. Florida Intervenors respectfully seek relief in accordance with the Motion for Limited Stay.

Florida is prepared to proceed in accordance with either of the two options proposed in the motion, though the State would respectfully request that the "may affect"/"federalize" condition set by this Court should be reconsidered for the reasons explained herein. If this Court lifts the condition, the second approach – the one consistent with existing federal review procedures and the *actual* permit practices in New Jersey and Michigan – would serve as the better course during the period of limited stay.

Dated:  March 11, 2024                                    Respectfully submitted,

                                                         BAKER BOTTS L.L.P.


                                                         */s/ Jeffrey H. Wood*
                                                         Jeffrey H. Wood (D.C. Bar No. 1024647)
                                                         700 K Street, NW
                                                         Washington, D.C. 20001
                                                         Phone: (202) 639-7700
                                                         jeff.wood@bakerbotts.com

                                                         Lily N. Chinn (D.C. Bar No. 979919)
                                                         101 California Street
                                                         San Francisco, CA 94111
                                                         Phone: (415) 291-6200
                                                         lily.chinn@bakerbotts.com

                                                         Aaron M. Streett (TX Bar No. 24037561)
                                                         Harrison Reback (TX Bar No. 24012897)
                                                         (*pro hac vice*)
                                                         910 Louisiana Street
                                                         Houston, TX 77002-4995
                                                         Phone: (713) 229-1234
                                                         aaron.streett@bakerbotts.com
                                                         harrison.reback@bakerbotts.com

**CERIFICATE OF SERVICE**

I hereby certify that on this the 11th day of March 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

JA.1262

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al*.,

               *Plaintiffs*,

       v.

MICHAEL S. REGAN, *et al*.,

               *Defendants*.

Civil Action No. 21-119 (RDM)

————————————————

**FLORIDA INTERVENORS' EXPEDITED MOTION**
**FOR ENTRY OF FINAL JUDGMENT**

————————————————

On February 15, 2024, this Court granted summary judgment to Plaintiffs on their Endangered Species Act (ESA) claims. Dkt. 163, 164. The Court vacated the Programmatic Biological Opinion (BiOp) and Incidental Take Statement (ITS) that the U.S. Fish and Wildlife Service (FWS) rendered in conjunction with federal approval of Florida's Clean Water Act (CWA) Section 404 program application. Dkt. 164 at 1. And despite unified opposition from the United States and the State of Florida as to vacatur (Dkt. 158, Dkt. 160), this Court vacated the entirety of the Environmental Protection Agency's (EPA's) approval of Florida's program. Dkt. 164 at 1. This single judicial ruling, which gave complete relief to Plaintiffs, immediately placed over 1,000 projects across Florida (including permit applications for environmental restoration, roads and bridges, hospitals, schools, affordable housing, senior living facilities, and grid reliability, among many others) in regulatory limbo with no clear timeline or expectation for a permit decision. The situation was immediately urgent and becomes more so with each passing day.

Recognizing the severe disruptive consequences of its order, this Court invited "Defendants to seek a limited stay of that vacatur" within ten days. Dkt. 163 at 96. The State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively, Florida Intervenors) filed such a limited stay motion on February 26, 2024. Dkt. 166. With that motion, Florida Intervenors provided sworn testimony about severe disruptive consequences of vacatur (Dkt. 166-1), along with a complete list of the pending permit applications (Dkt. 166-2). Florida Intervenors also asked this Court, at a minimum, to allow Florida to process Section 404 permits during a limited stay in the same manner as New Jersey and Michigan (without incidental take liability protection for state permittees). Dkt. 166 at 14-19. Florida requested an "expedited decision" on the stay motion. *Id.* at 19. Amici in Florida filed a brief in support of Florida Intervenors' stay request and further described the severe and urgent impacts arising from this Court's vacatur. Dkt. 168. On March 7, 2024, Plaintiffs filed an opposition to a limited stay, Dkt. 169,[1] which opposed any relief for Florida and Florida permittees yet conceded, for the first time in this case, that Plaintiffs were wrong about important details concerning New Jersey's 404 program. Dkt. 169 at 9 n.4.[2]

---

[1] Florida Intervenors have filed a reply in support of Florida's limited stay request addressing Plaintiffs' arguments opposing a stay. Dkt. 170.

[2] Contrary to Plaintiffs' repeated claims to this Court, the New Jersey program does not "federalize" permit applications that "may affect" species (*i.e.*, removed from state permitting and transferred to the Corps of Engineers). *See* Dkt. 98 at 16 and n.12; Dkt. 161 at 10; Dkt. 135 at 42; Tr. at 22, 131 (Oct. 19, 2023 Hr'g); Tr. at 11 (Jan. 30, 2024 Hr'g) (New Jersey "was not taking over any permitting actions that would affect species…"). Though Federal Defendants and Florida Intervenors had previously explained that such a "may affect" approach was tantamount to "partial assumption" in contravention of EPA regulations, this Court, in its February 15 ruling, took Plaintiffs' view that New Jersey federalized all permits that may affect listed species. *See* Dkt. 163 at 5 ("as in New Jersey, the EPA can federalize those applications likely to adversely affect listed species…"); *Id.* at 27 (stating that state programs can "federaliz[e] all state 404 permits that may impact species, as occurs in New Jersey …"); *Id.* at 23 ("the State [of New Jersey] has agreed to 'federalize' – that is, pass to the FWS and NMFS

2

The Court previously stated that it would allow Florida Intervenors to renew its request for entry of final judgment after the Court decided the stay motion (Dkt. 163 at 97), which further suggested prompt action on the stay request. Instead of deciding the pending motion, on March 8, 2024, the Court issued a minute order setting a status conference for **April 4, 2024** – almost one month from now – to "discuss next steps in the litigation." Thus, just as Florida's 404 pending permits remain in limbo, so is Florida's opportunity to seek review from the Court of Appeals. Florida Intervenors respectfully urge this Court to accelerate the process. While Florida Intervenors recognize that this Court stated that it would reconsider entry of judgment *after* deciding the stay motion (Dkt. 163 at 97), delaying that action for at least another month is untenable for the State of Florida.

Ultimately, this Court has already given Plaintiffs what they sought: vacatur of federal approval of Florida's program. That relief obviates all remaining claims. The logical (and required) next step in this litigation is for the Court to simply enter final judgment in accord with Rule 58(d) or enter partial final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. To defer ruling on the stay motion while also holding back final judgment would deprive the State of Florida of near-term relief from the severe disruptions caused by vacatur while also deferring indefinitely Florida's opportunity to seek appellate review for what is, in all respects, already a final decision. Indeed, even with the 13-count, kitchen-sink complaint filed by Plaintiffs, there can be no doubt as to propriety of entering final judgment. Stated simply, because this Court has already afforded complete relief to Plaintiffs in the form of vacatur of the BiOp/ITS *and* vacatur

---

for review – any permits that might affect protected species…"); *Id.* at 46-47 (describing a "process for federalizing permits that may affect listed species (as was done in New Jersey)"); *Id.* at 95 ("…without federalizing permits likely to adversely affect species (as in New Jersey)"). To be clear, permits in New Jersey that "may affect" or are "likely to adversely affect" species are not "federalized." Dkt. 166 at 3 n.2. This issue is addressed in more detail in Florida Intervenors' reply brief in support of a limited stay.

of EPA's approval of Florida's program, this Court need not and should not address the remaining claims. *Coal River Mountain Watch v. Jewell*, No. 08-CV-02212 (BJR), 2014 WL 12884029, at *2 (D.D.C. July 9, 2014) (explaining that "any opinion that this Court were to offer regarding whether the vacated rule violated the NEPA, CWA, and/or APA would necessarily be advisory, something a federal district court is prohibited from doing"). Instead, this Court should simply and immediately enter final judgment, which comports with Rule 58(d)'s purpose to "protect all needs for prompt commencement of the periods for … appeals …." *See* Fed. R. Civ. P. 58, Advisory Committee Notes for the 2002 Amendment.

If, however, this Court does not enter final judgment, this Court should exercise its discretion to enter a partial final judgment under Rule 54(b). *United States v. All Assets Held in Acct. No. XXXXXXXX*, 314 F.R.D. 12, 14 (D.D.C. 2015) (explaining that Rule 54(b) provides "flexibility" for "appellate review in complex cases") (citing *Blue v. D.C. Pub. Schs.*, 764 F.3d 11, 15 (D.C. Cir. 2014)).[3] The Court's definitive resolution of a central claim – one that this Court finds warrants total vacatur of federal approval of Florida's Section 404 program and thereby creates severe disruptive consequences across the entire state – leaves "no just reason for delay."

In terms of timing for a decision, Florida Intervenors respectfully suggest that a status conference is not necessary before final judgment should be issued. In the event the Court decides to hold a hearing or status conference on the limited stay motion or this motion for entry of judgment, Florida Intervenors respectfully request that the status conference be expedited to the

---

[3] Though Rules 58(d) and 54(b) provide clear avenues for entry of an appealable order, this Court could, in the alternative, certify a controlling question of law from the February 15 ruling for immediate appellate review under 28 U.S.C. § 1292(b). For that reason, if this Court were to deny the present motion, Florida Intervenors expressly reserve the option to seek § 1292(b) relief at an appropriate juncture. For the Court's awareness, Florida Intervenors also intend to move for a stay of the vacatur order pending appeal, and depending upon the nature of this Court's entry of an appealable order, Florida Intervenors may also seek a stay of the District Court proceedings pending appeal.

next earliest available date, preferably within the next 10 days, so that expedited appellate review can be sought forthwith given the extraordinary impact of the Court's February 15 order. Florida Intervenors also seek expedited consideration of this motion and respectfully suggest that Plaintiffs (and all other parties) should be afforded no more than seven (7) days to submit a response. Florida Intervenors sought the position of the other parties on this motion: Plaintiffs oppose the motion and intend to file a response in opposition; and Federal Defendants reserve their position.

## I.    Background

Plaintiffs filed their original nine-count complaint in this matter over three years ago, on January 14, 2021, challenging EPA's approval of Florida's application to assume the CWA Section 404 dredge-and-fill permit program for assumable waters in Florida. EPA's approval took effect on December 22, 2020. On April 19, 2022, Plaintiffs amended their complaint to add four additional claims, Dkt. 77, bringing the total number to thirteen, as follows:

- Claims 1, 2 and 5 allege violations of the CWA and/or Administrative Procedure Act (APA);
- Claim 7 alleges violations of the Rivers and Harbors Act (RHA) and APA;
- Claims 8 and 9 allege violations of the APA; and
- Claims 3, 4, 6, and 10 to 13 allege violations of the ESA Section 7 and/or APA.

*Id.* Plaintiffs sought vacatur of (a) the BiOp/ITS, (b) EPA's approval of Florida's 404 Program, and (c) the Corps of Engineers' list of "retained waters" submitted in conjunction with Florida's application. *Id.* They also sought declaratory judgments that various federal agencies violated the CWA, RHA, ESA and APA, and an award of attorneys' fees. *Id.*

Near the outset of the case, the Court ordered the parties to file dispositive motions on Claims 8 and 9, pursuant to Plaintiffs' request. After extensive briefing, *see* Dkt. 31, 34-37, 43-48, 51-57, 59-60, 65-72, the Court dismissed Claim 9 in March 2022 and Claim 8 in August 2023. Dkt. 73, 119. The administrative records for the various agency actions under review were

JA.1267

certified, and the parties then proceeded to cross-move for summary judgment on all remaining claims. Dkt. 98-108, 111-12, 114, 119, 121, 123, 125-26. This Court held a summary judgment hearing on October 19, 2023, with additional post-hearing supplemental briefing occurring in October and November 2023. Dkt. 130, 133-34. On December 4, 2023, two of seven Plaintiffs filed a motion for preliminary injunction to enjoin FDEP and EPA from completing the State 404 permit process for two specific projects. Dkt. 135. After extensive briefing on that motion, *see* Dkt. 135-137, 139, 145-146, 148, 149, 153, 155, and 157-161, and a hearing on January 30, 2024, this Court issued an order on February 15, 2024 denying the motion for a preliminary injunction as moot but granting Plaintiffs' motion for summary judgment on Claims 3, 4, 6, and 10 to 13. Dkt. 163. As part of that decision, the Court vacated the BiOp/ITS and EPA's approval of Florida's Section 404 assumption application. The Court permitted Federal Defendants and Florida Intervenors to seek a limited stay of the vacatur of EPA's approval (subject to certain conditions) within 10 days. *Id.* at 93, 96. On February 26, 2024, Florida Intervenors moved for a limited stay. Dkt. 166.

Given the complexities of this case, all of the parties (including Plaintiffs) had previously sought comprehensive remedy briefing *after* the Court ruled on the pending cross motions for summary judgment. *See* Dkt. 98 at 15 n.2 ("Plaintiffs respectfully request the opportunity to brief the appropriate remedy *following* the Court's ruling on summary judgment.") (emphasis added). This Court decided at the TRO hearing on January 30, 2024 that, if the parties wished to be heard on the ultimate remedy in this case, the parties should submit remedy briefs within a week and limited to just seven (7) pages, and that they had to do so *in anticipation of a potential decision by the Court* (Tr. at 101-103). In its post-hearing remedy brief (filed Feb. 4, 2024), Florida Intervenors stated:

> To the extent the Court decides only some, but not all, pending claims in its forthcoming ruling, Florida Intervenors respectfully urge the Court to direct entry of final judgment as to those specific claims pursuant to Federal Rule of Civil Procedure 54(b). Given the consequences of such a ruling and the strong public interest in this case, "no just reason for delay" of entry of final judgment would exist. *See Curtiss-Wright Corp. v. Gen. Elec. Co*., 446 U.S. 1, 1 (1980).

Dkt. 160 at 2 n.1. In response, this Court denied "that request as premature" while expressly stating that the Court "will permit the State to renew its request after the parties have reviewed this decision and have decided whether to seek a limited stay of the Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has decided how to proceed." Dkt. 163 at 97.[4]

On March 8, 2024, one day after Plaintiffs filed an opposition to the limited stay motion, the Court set a "status conference" for April 4, 2024 for the parties to discuss "next steps" in the litigation. Given the urgency of the situation, and because it is plain that Plaintiffs have been afforded complete relief, Florida Intervenors now renew their request for entry of judgment. And with the benefit of knowing the Court's views by virtue of the February 15 ruling, Florida Intervenors clarify that this Court should enter final judgment directly (as a matter of Rule 58(d)'s separate document requirement) or, in the alternative, based on Rule 54(b). Both are clear avenues to the same basic outcome: final judgment that is immediately appealable.[5]

---

[4] This Court's directive for Florida Intervenors to await a ruling on a limited stay request before seeking entry of judgment is, at least arguably, in tension with cases suggesting that such motions should be filed within 30 days of the ruling in question. *See, e.g., U.S. Liab. Ins. Co. v. Krawatsky*, 610 F. Supp. 3d 745, 749 (D. Md. 2022).

[5] Plaintiffs sought an injunction to block two specific projects; instead of granting that injunction, this Court vacated the entire program and then found the injunction motion "moot." Obviously, an order by this Court granting the injunction would have been immediately appealable under § 1292(a), but this Court's approach also makes that path less clear. That said, Florida expressly reserves the right to also seek appeal via § 1292(a) if necessary as this Court's order clearly has the effect of an injunction in this context.

7

**II.     This Court Should Enter Final Judgment Because Complete Relief Has Already Been Provided to Plaintiffs.**

Federal courts render final judgments when a case is finally decided. But the point at which a case is decided with finality is, at times, unclear. Rule 58(d) addresses that situation and allows a party to "request that judgment be set out in a separate document as required by Rule 58(a)." The purpose of Rule 58(d) is to ensure timely issuance of an appealable order. In its February 15 order, this Court provided Plaintiffs with complete relief. Plaintiffs themselves stated in the very first sentence of their complaint: "[t]his action arises from the [EPA's] approval of a state application to assume jurisdiction over the Clean Water Act's Section 404 permitting program" Dkt. 1 at 3. On February 15, 2024, when this Court vacated EPA's approval, "the vacatur of the final agency decisions from which [plaintiffs] appealed, provides them with all the judicial relief to which they are entitled …" *Lewis v. Becerra*, No. 18-2929 (RBW), 2023 WL 3884595, at *4 (D.D.C. June 8, 2023). Accordingly, because Plaintiffs have been provided complete relief, their remaining claims are now moot or otherwise non-justiciable at this time, and final judgment should be entered in recognition of that reality.

**A.     Complete relief renders additional claims moot.**

"[W]hen a court decides that a challenged practice is unlawful on one ground, the question whether it is also unlawful on some other ground would generally be moot, because it can make little difference whether a practice is unlawful for one or for several reasons, provided only that it is indeed unlawful." *Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1397 (7th Cir. 1990). In those circumstances, remaining claims are moot in the sense that they "refer to an issue that need not be decided in light of the resolution by the court in the same opinion of another issue." *Novella v. Westchester Cnty.,* 661 F.3d 128, 149 (2d Cir. 2011) (internal quotes omitted). Where "a litigant asserts multiple arguments in support of the relief he seeks, and the court grants him

8

complete relief based upon one contention, courts also sometimes use the word 'moot' ... to refer to an issue that need not be decided in light of the resolution by the court in the same opinion of another issue." *Id*. (internal quotes omitted).

In other words, where vacatur provides all the judicial relief to which a plaintiff is entitled and effectively resolves the underlying action, there remains no "case or controversy" for remaining claims to stand on. *See Coal River Mountain Watch*, 2014 WL 12884029, at *2 ("this Court has already vacated the 2008 Rule, and any opinion that this Court were to offer regarding whether the vacated rule violated the NEPA, CWA, and/or APA would necessarily be advisory, something a federal district court is prohibited from doing"); *Lewis*, 2023 WL 3884595, at *4 (agreeing with federal agency that "proposed partial judgment in the plaintiffs' favor, and vacatur of the final agency decisions from which they appealed, provides them with all the judicial relief to which they are entitled, and therefore, the plaintiffs' remaining claims should be dismissed as moot") (internal citations omitted).

In these contexts, the test for mootness involves "whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)." *Air Line Pilots Ass'n*, 897 F.2d at 1396. That is because the "real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant ....*" *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (internal citation omitted). Here, vacatur of EPA's approval on ESA grounds has, for all

JA.1271

intents and purposes, obviated any need for this Court to decide other claims, such as counts arising under the CWA, RHA, or the APA that seek identical relief.[6]

### B. Mootness exceptions do not apply here.

Nor do the typical exceptions to the mootness doctrine – "capable of repetition yet evading review" and "voluntary cessation" – apply here. *Lewis*, 2023 WL 3884595, at *9-14. Plaintiffs have the burden of showing that one of the mootness exceptions apply. *Id.* While it is true that Florida's Section 404 program could be resurrected from vacatur (e.g., appellate review or changes on remand), the remaining claims would not "evade review" as Plaintiffs could certainly pursue additional APA-based challenges later. *Id.* at *9-10 (explaining that, "because the 'capable of repetition, yet evading review' test 'requires that the challenged action be both capable of repetition and evading review") (emphasis in original).

The "voluntary cessation" exception to the mootness doctrine also clearly does not apply. That exception "prevent[s] a private defendant from manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to return to his old ways." *Id*. at *10 (internal citation omitted) (explaining that the D.C. Circuit "has been skeptical of applying this exception to agency actions") (citing *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1227 (D.C. Cir. 2021). Because of this Court's February 15 ruling and vacatur order, the "challenged" agency action cannot be reinstituted in the same form absent appellate reversal or significant changes. *Id*. at *11 (citing cases on this point). And as is

_____

[6] A limited or full stay of a vacatur would not affect whether a final judgment may be entered. Courts frequently grant stays of orders in cases where a final judgement is being entered. *See, e.g., Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 153 F. Supp. 3d 93, 95 (D.D.C. 2016), *rev'd on other grounds*, 650 F. App'x 13 (D.C. Cir. 2016) (involving case where district court vacated DHS work permit rule but "stayed the effect of vacatur for six months to allow DHS enough time to promulgate a replacement rule," and while stay was in effect a final judgment was entered and appeal taken to the D.C. Circuit).

the case with the mootness doctrine generally, the "voluntary cessation" exception does not apply where the plaintiff already received complete relief. *Id.* at *13 (refusing to apply "voluntary cessation" exception where plaintiffs "already obtained all the relief that they sought" (cleaned up)). That is certainly the case here.

### C.     Plaintiffs' Declaratory Judgment Claims Do Not Prevent Entry of Final Judgment.

Alongside their vacatur requests, Plaintiffs also sought "declaratory judgment" that EPA violated the CWA and that the Corps violated the RHA and APA, among other things. But declarations as to the state of the law in this context would have no practical effect on the "behavior of the defendant towards the plaintiff," and would be tantamount to mere advisory opinions. *NBC-USA Hous., Inc., Twenty-Six v. Donovan*, 674 F.3d 869, 873 (D.C. Cir. 2012) ("Where an intervening event renders the underlying case moot, a declaratory judgment can no longer "affect [ ] the behavior of the defendant towards the plaintiff,") (quoting *Hewitt v. Helms*, 482 U.S. 755, 761, (1987). Nor would Plaintiffs have standing for separate forward-looking declaratory judgment claims at this time. *City of Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994) ("[T]his circuit's case law provides that if a plaintiff's specific claim has been mooted, it may nevertheless seek declaratory relief forbidding an agency from imposing a disputed policy in the future, *so long as the plaintiff has standing to bring such a forward-looking challenge and the request for declaratory relief is ripe*" (emphasis added)).[7]

---

[7] Plaintiffs' remaining claim for attorney's fees does not prevent entry of final judgment. The Supreme Court has adopted "a uniform rule that an unresolved issue of attorney's fees for the litigation in question [did] not prevent [the earlier] judgment on the merits from being final." *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202 (1988).

Accordingly, because the Court has granted complete relief to Plaintiffs, rendering the remaining claims moot, this Court should proceed with entering final judgment in a separate appealable order as required by Rule 58(d).

**III.    In the Alternative, This Court Should Enter a Partial Final Judgment under Rule 54(b) as to the Endangered Species Act Section 7 Claims.**

Under Federal Rule of Civil Procedure 54(b), "when an action presents more than one claim for relief… the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Rule 54(b) may be properly used to "meet the demonstrated need for flexibility in providing for appellate review in complex cases," *United States v. All Assets Held in Acct. No. XXXXXXXX*, 314 F.R.D. at 14 (citing *Blue v. D.C. Public Schools*, 764 F.3d 11, 15 (D.C. Cir. 2014)), and to "mediate[ ] between the sometimes antagonistic goals of avoiding piecemeal appeals and giving parties timely justice." *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 760 (D.C. Cir.1997).

Courts apply a three-step test to certify an otherwise interlocutory order as a final judgment under Rule 54(b): "(1) the order must resolve a distinct 'claim for relief'; (2) the order must be 'final' with respect to that claim; and (3) the district court must permissibly determine that there is 'no just reason for delay...'" *Attias v. CareFirst, Inc*., 969 F.3d 412, 417 (D.C. Cir. 2020). In considering all three factors, a Rule 54(b) determination "weighs both justice to the litigants and the interest of sound judicial administration." *Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 806 (D.C. Cir. 2010) (internal quotations omitted). "The factors affecting 'justice to the parties' will inevitably differ from case to case, but the factors pertaining to judicial administration include 'whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined [is] such that no appellate court [will] have to decide the same issues more than once even if there [are] subsequent appeals.'" *Id.* (internal

citation omitted). Ultimately, the decision whether to grant a Rule 54(b) motion rests with the district court. *See Petties v. District of Columbia*, 227 F.3d 469, 472 (D.C. Cir. 2000) (internal citation and quotations omitted) ("[T]he district court [functions] as a dispatcher, determining in its sound discretion when a claim should proceed on to appellate resolution and when it should await its fellows."). Here, all three factors support entry of judgment under Rule 54(b).

### A.   Final Judgment for the ESA Section 7 Claims Satisfies the First Two Steps of the Rule 54(b) Analysis.

The first two steps in the Rule 54(b) analysis, "whether the district court [(1)] finally resolved [(2)] one or more distinct claims for relief," are frequently assessed together. *Attias*, 969 F.3d at 417. These steps require a court to determine whether the judgment is "final [in that it constitutes] an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Bldg. Indus. Ass'n of Superior Cal. v. Babbitt*, 161 F.3d 740, 744 (D.C. Cir. 1998) (internal citations omitted). Regarding finality, "[t]he issue is not whether every claim filed has been finally adjudicated but rather whether any single claim distinct from the others has been." *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Sci. & Com. Sys. Corp.*, 249 F. Supp. 3d 130, 133–34 (D.D.C. 2017); *Capital Transit Co. v. District of Columbia*, 225 F.2d 38, 40 (D.C. Cir. 1955) ("There must be multiple claims of which at least one has been adjudicated.") (internal citation omitted).

The first two steps in the Rule 54(b) analysis are met in this case because the Court has granted summary judgment to Plaintiffs on the ESA Section 7 claims (Counts 3, 4, 6, 10–13). This Court's February 15 ruling is an "ultimate disposition of [] individual claim[s] entered in the course of a multiple claims action." *Bldg. Indus. Ass'n*, 161 F.3d at 744 (internal citation omitted). And

the remaining claims (Counts 1, 2, 5, and 7) are substantively distinct from the ESA Section 7 claims.[8]

This Court's February 15 ruling centered on ESA Section 7-based claims (Counts 3, 4, 6, and 10–13) that are separate and distinct from other claims in this case, which are focused on compliance with the CWA and RHA. On one hand, the third, fourth, and tenth claims allege that the BiOp and ITS violate ESA Section 7 (Dkt. 77 at 35-42, 49-52); the sixth and thirteenth claims challenge the "technical assistance process" as violating ESA Section 7 (Dkt. 77 at 44-45); and the eleventh and twelfth claims allege that EPA violated ESA Section 7 by failing to consult with NMFS and/or FWS in various respects (e.g., with regard to sea turtles) (Dkt. 77 at 55). The fifth claim is a narrow procedural claim based on a lack of Section 7 consultation with NMFS. Thus, all of these distinct claims involve alleged non-compliance with ESA Section 7.

On the other hand, the four remaining counts in this case are distinct and separate from the ESA Section 7 claims. The first claim alleges that Florida's program application was not "complete" for purposes of Section 404 compliance. The second claim alleges that EPA's approval of Florida's program violated the Clean Water Act's requirements for a state program. And the seventh claim alleges that the Corps of Engineers violated the Rivers and Harbors Act in adopting a list of retained waters that, according to Plaintiffs, allows Florida to assume 404 authority over too many waters. Again, these claims are separate from the ESA Section 7 claims ruled upon in the February 15 opinion, all of which focus on ESA Section 7 compliance. At their core, the adjudicated claims focus on the BiOp/ITS issues, while the remaining claims focus on CWA and RHA compliance. Thus, with regard to the ESA Section 7 claims, this Court has rendered "an ultimate disposition" of those claims in the course of a "multiple claims action."

---

[8] This Court dismissed Claim 8 on August 23, 2023 and Claim 9 on March 30, 2022. *See* Dkt. 119 and 73.

Plaintiffs may contend that Claim Two is not "distinct" because it somehow overlaps with ESA Section 7. Claim Two contains a long list of various contentions that EPA's approval violates the CWA in regard to general permits, notice and comment procedures, enforcement authority, emergency permits, information requirements, definitions, water quality standards, mitigation requirements, among other things. Dkt. 77 at 27-35. One of the points within Claim Two is Plaintiffs' argument that EPA's approval of Florida's program violates the "404(b)(1) Guidelines." Section 404(h)(1)(A)(i) requires 404 permits to "assure compliance with" the "guidelines established under [Section 404(b)(1)]." 33 U.S.C. § 1344(h)(1)(A)(i). In turn, the "Section 404(b)(1) Guidelines" cover a variety of requirements for protecting water quality and species. *See* 40 C.F.R. Part 230. One of those "Guidelines" is the requirement that "[n]o discharge of dredged or fill material shall be permitted if it … [j]eopardizes the continued existence of [listed] species" or "results in likelihood of the destruction or adverse modification of [designated critical] habitat." 40 C.F.R. § 230.10(b)(3). State programs, including New Jersey, Michigan, and Florida, satisfy this requirement for purposes of CWA compliance by (1) establishing in their own state regulations that 404 permits will not be issued if they would jeopardize listed species or adversely modify critical habitat; and (2) subjecting permit applications to the federal "review" process set forth in 40 C.F.R. Part 233. *See* 40 C.F.R.§§ 233.50-.51. As fully explained by Federal Defendants and Florida Intervenors in this case, the fact that Section 404(b)(1) requires consideration of impacts to species as part of the 404 assumption process is one reason why Section 7 consultation was triggered for purposes of Florida's program. But that does not convert a 404(b)(1) claim into a Section 7 claim. To put a finer point on it, formal consultation is triggered under ESA Section 7 where federal agency action (such as EPA approval of a state 404 program application) is "likely to adversely affect" listed species or designated critical, *and not on the basis of the "jeopardy"*

JA.1277

*analysis*. When states like New Jersey, Michigan, and Florida provide 404 permit applications to FWS for "federal review," they are doing so for purposes of 404(b)(1), not for ESA Section 7. Thus, they remain "distinct" claims for purposes of Rule 54(b).

Plaintiffs may also contend that Claim One (i.e., the "complete application" claim) is not "distinct" because it overlaps with ESA Section 7 claims due to the lack of availability of a final BiOp/ITS at the time of EPA's "completeness" determination. Prior briefing showed why Claim One should be dismissed for a host of reasons (*see, e.g.*, Dkt. 99 at 38-45; Dkt. 102 at 42-44), but even so, that claim is obviously distinct from an ESA Section 7 claim. Whether a Section 404 program application is complete is an entirely distinct claim from whether the federal agency action complies with ESA Section 7.

### B. As to the Third Step in the Rule 54(b) Analysis, No "Just Reason" Exists for Further Delay of Entry of an Immediately Appealable Final Judgment.

The third step addresses whether there is "no just reason" for delay. *Curtiss–Wright Corp.,* 446 U.S. at 7. Several factors influence that determination, including:

(1) the relationship between the adjudicated and unadjudicated claims;

(2) the possibility that the need for review might or might not be mooted by future developments in the district court;

(3) the possibility that the reviewing court might be obliged to consider the same issue a second time;

(4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; [and]

(5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Serv. Emps. Int'l Union,* 249 F. Supp. 3d at 133. Although these factors are not all-inclusive, they "represent the main considerations courts focus on in making Rule 54(b) determinations." *Id.*

Here, the relevant factors show that there is no "just reason" for delaying entry of final

16

judgment on the ESA Section 7 claims. "District courts have "substantial discretion" in determining whether there is no just reason for delay." *In re Papst Licensing GmbH & Co. KG Litig.*, 987 F. Supp. 2d 58, 61 (D.D.C. 2013), *vacated on unrelated grounds* (internal citation omitted).

The first factor - "the relationship between the adjudicated and unadjudicated claims" – supports entry of final judgment because, as already explained above, these are distinct and separate claims, and the disposition of the other remaining claims will not impact the ESA Section 7 claims. Although "there is some relationship between [the resolved counts] and the counts still pending," where claims are "factually and legally distinct" entry of final judgment as to the resolved counts is appropriate. *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 44, 47 n.1 (D.D.C. 2008). Indeed, even where two sets of claims against a federal agency involve the same subject and arise under the same statute, where the actual resolution of the claims on which certification is sought turns on separate agency findings or actions, they are distinct. *Am. Forest Res. Council v. Ashe*, 301 F.R.D. 14, 18 (D.D.C. 2014) ("To be sure, all of AFRC's claims involve the marbled murrelet and the Endangered Species Act—that is why they were brought in the same action… But beyond that high-level overlap, the actual resolution of the delisting claims bears minimal factual or legal similarity to the resolution of the habitat claims."). Here, the remaining claims and the ESA claims are even more distinct than those in *American Forest Resource Council* in that they arise under different statutes.

The second factor – potential mootness concerns – also favors entry of judgment. Even if the remaining claims are still considered live cases and controversies, a ruling on the remaining claims by the district court would have no effect on the issues being appealed and certainly would not moot the need for review. Indeed, "the decision on those counts will have no impact on the

decision entered on count[s 3, 4, 6, 10–13]." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 00-273, slip op. at 4 (D.D.C. Dec. 21, 2004) (entering final judgment on decision invalidating rule because it would not affect pending challenges to related agency actions). The "unlikelihood that a trial on [the remaining claims] will inform a subsequent appeal of [the ESA claims] heavily favors certification of final judgment on the latter claims." *Seed Co. v. Westerman*, No. 08-355 (RJL), 2019 WL 3222412, at *4 (D.D.C. July 17, 2019). Here, if this Court were to resolve the remaining claims, it would have no impact on the appeal of the ESA claims: for example, if this Court resolves the remaining claims in Defendants' favor, Florida Intervenors will still appeal the decision on the ESA claims, and if the Court resolves the remaining claims in Plaintiffs' favor, Florida Intervenors' appeal of that decision will address completely separate agency actions and will appeal a separate kind of relief. *Id.* "The two are separate issues and there is thus no possibility of mootness in review." *Serv. Emps. Int'l Union*, 249 F. Supp. 3d at 135.

The third factor – possible consideration of the "same issue a second time" – supports Rule 54(b) entry because the ESA claims are distinct, and none of the remaining claims request a vacatur of the BiOp or ITS. This Court would not be obliged to consider the same issues again. If the Court of Appeals affirms this Court's decision, the ESA claims will be resolved and "no court need address them further." *Id.* (internal citation omitted). If the Court of Appeals reverses, and the remaining claims are appealed, the D.C Circuit will have to address separate claims and separate requested relief.

The fourth factor – claims/counterclaims requiring a "set-off" against the judgment – is not relevant to this APA action where there is no "set-off" concern.

The last "catch-all" factor strongly supports Rule 54(b) entry for all of the reasons already set forth

in Florida Intervenors' Motion for Limited Stay, including adverse consequences from further delay. *See* Dkt. 166, 166-1. Delaying entry of a final judgment would likely result in further delays in issuance of an appealable order, which in turn will further delay resolution of the complex legal issues raised in this litigation.

## IV. CONCLUSION

For the foregoing reasons, the Court should enter final judgment as a separate document at this time (in accord with Rule 58(d)) or, in the alternative, the Court should enter a partial final judgment under Rule 54(b) as to the ESA Section 7 claims. To the extent the Court finds that a status conference is necessary before taking action on this motion (or on the pending motion for limited stay), Florida Intervenors respectfully request that this Court schedule a status conference within ten days and order expedited responses from the parties.


Dated: March 11, 2024                    Respectfully submitted,

                                         BAKER BOTTS L.L.P.


                                         */s/ Jeffrey H. Wood*
                                         Jeffrey H. Wood (D.C. Bar No. 1024647)
                                         700 K Street, NW
                                         Washington, D.C. 20001
                                         Phone: (202) 639-7700
                                         jeff.wood@bakerbotts.com

                                         Lily N. Chinn (D.C. Bar No. 979919)
                                         101 California Street
                                         San Francisco, CA 94111
                                         Phone: (415) 291-6200
                                         lily.chinn@bakerbotts.com

                                         Aaron M. Streett (TX Bar No. 24037561)
                                         Harrison Reback (TX Bar No. 24012897)
                                         (*pro hac vice*)
                                         910 Louisiana Street

JA.1281

Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

20

**CERIFICATE OF SERVICE**

I hereby certify that on this the 11th day of March 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

_/s/ Jeffrey H. Wood_
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

21

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

            *Plaintiffs*,

     v.

MICHAEL S. REGAN, *et al.*,

           *Defendants*.

Civil Action No. 21-119 (RDM)

<u>**AMENDED MEMORANDUM OPINION**</u>

Plaintiffs the Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper ("Plaintiffs") bring this challenge to various agency actions relating to the Environmental Protection Agency's ("EPA") approval of the State of Florida's application to assume (from the U.S. Army Corps of Engineers ("Corps")) permitting authority under Section 404 of the Clean Water Act ("CWA") within the State. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 179 (D.D.C. 2022) ("*CBD I*"). Defendants include the EPA, the Corps, the U.S. Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS"), and several federal officials sued in their official capacities (collectively, the "Federal Defendants"). Defendants also include the State of Florida and the Florida Department of Environmental Protection ("FDEP") (collectively, "Florida" or the "State"), which have intervened to defend the assumption and resulting permitting program.

Plaintiffs allege that the Federal Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Endangered

Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq*., in their rush to transfer this permitting authority to Florida in the final days of the last administration.  In prior opinions, the Court addressed some, but not all, of Plaintiffs' APA claims.  This opinion addresses only Plaintiffs' claims involving the Endangered Species Act; the Court will, if necessary, address the remaining claims in a subsequent opinion.

Given the complexity of the relevant statutory and regulatory background, it is necessary to provide somewhat greater detail than usual to introduce the questions presented.  Under the ESA's implementing regulations, an "action agency"—here, the EPA—is required to "review its [contemplated] actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines that an "action may affect a listed species or critical habitat," *id.*, the agency must consult with the FWS and/or the National Marine Fisheries Service ("NMFS") (collectively, the "Service" or "Services") to ensure that its contemplated action "is not likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).  That process, which is referred to as "Section 7 consultation," requires the "consulting agency"—that is, the FWS and/or the NMFS—to prepare a Biological Opinion ("BiOp"), which details "how the agency action [at issue] affects the species or its critical habitat" and to determine whether the proposed action is likely to jeopardize the continued existence of any listed species.  *Id.* § 1536(b)(3)(A).  "If jeopardy . . . is found," the consulting agency is required to "suggest those reasonable and prudent alternatives which [the consulting agency] believes would not violate [the ESA] and [that] c[ould] be taken by the [action] agency or applicant in implementing the agency action."  *Id.*  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the

Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).

On the other hand, if the Service determines that the agency action will not violate the ESA (*i.e.*, that no "jeopardy" is likely) or that "reasonable and prudent alternatives" would avoid any such violation, the consulting agency must determine whether any "incidental take" of a listed species is nevertheless "likely to occur."  50 C.F.R. § 402.14(g)(5)–(7).  The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, trap, kill, capture, or collect, or to attempt to engage in any such conduct" with respect to a listed species.  16 U.S.C. § 1532(19).  "Take" is incidental if it "results from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.

If "incidental take" is "reasonably certain to occur," *id.* § 402.14(g)(7); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021), the consulting agency is required to issue an Incidental Take Statement ("ITS"), which, among other things, "specifies the impact of such incidental taking on the species" and "sets forth the terms and conditions . . . that must be complied with by the [action] agency or applicant (if any), or both," in order to "minimize such impact," 16 U.S.C. § 1536(b)(4).  Significantly, the ITS must specify "the amount or extent[] of such incidental taking on the species" or must use a "surrogate (e.g., similarly affected species or habitat or ecological conditions)" that can "be used to express the amount or extent of anticipated take" and that "sets a clear standard for determining when the level of anticipated take has been exceeded."  50 C.F.R. § 402.14(i).  The ITS serves the ESA's mandate "to give endangered species priority over the 'primary missions' of federal agencies," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978) ("*TVA*"), because, if the incidental take limit

is exceeded, the action agency "must reinitiate consultation *immediately*."  50 C.F.R.

§ 402.14(i)(4) (emphasis added).

     The ITS is also important to regulated parties and serves their need for clarity, because "any taking that is in compliance with the terms and conditions specified in the [ITS] shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(2).  As discussed further below, however, formal consultation under Section 7 is not the only way a State or permittee can obtain liability protection:  Under Section 10 of the ESA, a State or private party may seek a permit that allows "any taking otherwise prohibited by" the ESA and that, accordingly, provides protection from liability for incidental take, *id.* § 1539(a)(1)(B).  But absent liability protection of some sort, anyone who violates the ESA by taking an endangered or listed "species within the United States," *id.* § 1538(a)(1)(B), risks civil penalties, criminal liability, and "[c]itizen suits," *id.* § 1540(a), (b) & (g).

     This case turns on the meaning and operation of these provisions, along with the subsection of the CWA that authorizes a State to apply to the EPA to assume Section 404 permitting authority from the Corps.  *See* 33 U.S.C. § 1344(g).  Here, Florida submitted an assumption application on August 20, 2020.  Only twice before has the EPA approved a State's assumption application—it approved Michigan's application in 1984 and New Jersey's application in 1994.  *See* 40 C.F.R. § 233.70 (Michigan); *id.* § 233.71 (New Jersey).  In this case, however, Florida proposed something novel:  It sought to confer, through the Section 7 mechanism, broad ESA liability protection on all future state permittees for incidental take resulting from *state*-issued dredge and fill permits.  Under the approach that Florida proposed, the EPA would engage in Section 7 consultation with the FWS at the outset.  The agency action under review would be the EPA's approval of Florida's assumption application, and the FWS

would issue a "programmatic" BiOp finding no jeopardy followed by a "programmatic" ITS that would protect all future state Section 404 permittees.

As Florida explained during the administrative process, "where a state administers the Section 404 program, permittees" who cannot "avoid entirely adverse impacts to listed species" must "seek an incidental take permit under ESA Section 10," Dkt. 112-2 at 3, or, as in New Jersey, the EPA can, at least at times, federalize those applications likely to adversely affect listed species (*i.e.*, when the State neither satisfies the EPA's objections or requirements for a permit condition nor denies the permit) thereby triggering Section 7 consultation, Dkt. 112-3 at 369.  But because those paths to ESA liability protection were, in Florida's view, "burdensome," "time consuming[,] and resource-intensive," Dkt. 112-2 at 3–4, the State suggested a third option: a one-time Section 7 programmatic consultation in connection with the EPA's review of Florida's assumption application, thus allowing the FWS to issue a programmatic BiOp and a programmatic ITS, which would provide Florida permittees with liability protection under the ESA for all future permits issued under the state program—without requiring future Section 7 or Section 10 consultation.

This, then, brings the Court to the crux of the current dispute.  In Plaintiffs' view, the EPA and the FWS failed in this programmatic effort because neither the programmatic BiOp nor the programmatic ITS satisfies the demanding standards set by the ESA.  Neither, in their view, includes the ESA-mandated species-specific analysis, effects analysis, numerical quantification of take, and related statutory and regulatory requirements.  In short, neither document wrestles with the core ESA considerations or includes the fundamental ESA safeguards.

Defendants respond that, even if the programmatic BiOp and programmatic ITS lack these ESA-mandated elements, the FWS (and the EPA) permissibly deferred the relevant

considerations to a "technical assistance process" involving Florida, the FWS, and the EPA.

That technical assistance process, in their view, promises to address all of the ESA requirements

down the road, on a permit-by-permit basis—and they contend (over Plaintiffs' dissent) that the

technical assistance process has successfully done so to date.  Under this process, Florida is

required to consult with the FWS regarding each permit application, the FWS is provided the

"opportunity" to specify take limits, and the State is required to include those limits, if supplied,

in its state-issued permits.  In Defendants' view, this alternative process was not only justified,

but necessary, because it would have been too difficult to conduct the required species-specific

analyses, to quantify take, and to address similar concerns at the programmatic level given the

scope of the agency action at issue.

To this, Plaintiffs reply:  If the FWS lacked the time, information, or ability to make the

assessments and to set the limits required by the ESA and its implementing regulations, the FWS

acted beyond its authority in purporting to make a no jeopardy finding and in conferring blanket

ESA immunity on all future Florida Section 404 permittees.  The difficulty in their view,

moreover, was not merely a product of the rush to finish the BiOp and ITS in the waning days of

the last administration but, more fundamentally, was a product of the fact that the BiOp and ITS

seek to attain an unlawful goal—that is, take liability protection premised on something other

than the rigors of Section 7 or Section 10 of the ESA.

Now before the Court are the parties' cross-motions for summary judgment, Dkt. 98; Dkt.

99; Dkt. 101; Dkt. 102, and the Center for Biological Diversity ("CBD") and Sierra Club's

motion for a temporary restraining order and preliminary injunction, Dkt 135.  CBD and the

Sierra Club's motion seeks to enjoin Florida from issuing Section 404 permits for two

developments, which they contend pose an imminent threat to the critically endangered Florida

panther and the threatened crested caracara, a rare bird of prey similar to a falcon.[1]  On October 19, 2023, the Court heard oral argument on the parties' cross-motions for summary judgment and, on January 30, 2024, the Court heard oral argument on CBD and the Sierra Club's motion for a preliminary injunction.  In addition to the administrative record, the parties, intervenors, and amici have submitted many hundreds of pages of briefs and exhibits.

For the following reasons, the Court will **GRANT** Plaintiffs' motion for partial summary judgment with respect to Counts 3, 4, 6, 10–13 of the Third Amended Complaint, Dkt. 77, and will **DENY** the Federal Defendants' and Florida's cross-motions with respect to those Counts.  In short, the Court is persuaded that the FWS's programmatic BiOp and ITS fail to satisfy the requirements of the ESA, and the Court is unpersuaded that the non-statutory technical assistance process is a lawful substitute for the procedures and remedies that Congress enacted in the ESA and that the Services established in the implementing regulations.  The Court previously dismissed Counts 8 and 9 and, at least for now, defers addressing Counts 1, 2, 5, and 7 of the Amended Complaint.  Because the Court grants substantive relief on the merits of Plaintiffs' ESA-related claims, the Court will **DENY** as moot CBD and the Sierra Club's motion for a temporary restraining order and preliminary injunction, Dkt. 135, on the ground that the relief granted on summary judgment will address the risk of imminent harm raised in that motion.

## I. BACKGROUND

This is the Court's third opinion addressing the merits of this case—and probably not the last.  In the Court's first merits decision, it rejected Florida's threshold challenge to Plaintiffs' standing to bring this action; rejected Defendants' contention that the EPA's decision to grant

---

[1] The Court granted both developers—Tarpon Blue Silver King I, LLC and Cameratta Companies LLC—leave to intervene for the limited purpose of opposing this motion.  *See* Dkt. 145; Dkt. 146; Min. Order (Jan. 24, 2024).

Florida's assumption application was an adjudication, rather than a rulemaking; granted Defendants' motions for summary judgment with respect to Count Nine, which challenged EPA's failure to codify Florida's Section 404 program; and denied without prejudice Defendants' motions for summary judgment with respect to Count Eight, which challenged the EPA's decision to give immediate effect to its decision, on the ground that the Court required further briefing to determine whether that claim was redressable. *CBD I*, 597 F. Supp. 3d at 179–80. The second opinion picked up where the first left off and further considered whether the EPA's failure to provide 30 days' notice before its assumption decision took effect was redressable—or whether that action constituted "a bell that cannot be unrung." *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, *4 (D.D.C. Aug. 23, 2023) ("*CBD II*"). Concluding that it lacked authority to remedy the alleged wrong, the Court granted the Federal Defendants' renewed motion for summary judgment and Florida's renewed motion to dismiss with respect to Count Eight for lack of jurisdiction. *Id.* at *10.

Having rejected Plaintiffs' procedural objections under the APA, the Court now turns to the question whether the FWS and the EPA violated the ESA in approving Florida's assumption application. Central to that question are the "programmatic" BiOp and "programmatic" ITS issued by the FWS—both lack, among other things, required species-specific analyses and take limits, and they purport to confer ESA liability protection on, among others, future Florida Section 404 permittees without complying with the dictates of Section 7 or Section 10 of the ESA.

A.     **Statutory and Regulatory Landscape**

1.     *The Endangered Species Act*

Almost fifty years ago, Congress enacted the Endangered Species Act "to provide a

means whereby the ecosystems upon which endangered species and threatened species depend

may be conserved" and "to provide a program for the conservation of such endangered species

and threatened species." 16 U.S.C. § 1531(b). With that legislation, Congress made a

"conscious decision . . . to give endangered species priority over the 'primary missions' of

federal agencies," *TVA*, 437 U.S. at 185, and to afford "endangered species the highest of

priorities," *id.* at 194. The ESA is "the most comprehensive legislation for the preservation of

endangered species ever enacted by any nation." *Id.* at 180.

Under the ESA, a species may be listed as either "endangered" or "threatened." *See* 16

U.S.C. § 1533. An endangered species is "any species which is in danger of extinction

throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any

species which is likely to become an endangered species within the foreseeable future throughout

all or a significant portion of its range." *Id.* § 1532(20). The ESA is administered by two federal

agencies: the FWS and the NMFS. 50 C.F.R. § 402.01(b). The FWS administers the statute

with respect to species under the jurisdiction of the Secretary of the Interior, while the NMFS

does so with respect to species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n*

*of Home Builders*, 551 U.S. at 651.

Section 9 of the ESA prohibits any person, including private parties, States, and federal

agencies, from "taking" a protected species. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to

harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

any such conduct." *Id.* § 1532(19). "Harm in the definition of 'take' in the Act means an act

which actually kills or injures wildlife.  Such act may include significant habitat modification or

degradation where it actually kills or injures wildlife by significantly impairing essential

behavioral patterns, including breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

To enforce Section 9's prohibition on take, the Secretary of the Interior or the Secretary

of Commerce (collectively, the "Secretary") may assess civil penalties against alleged violators

through administrative, trial-like proceedings.  *See* 16 U.S.C. § 1540(a)(1)–(2).  The ESA also

authorizes the imposition of criminal penalties on those who knowingly violate the Act, a permit

issued under the Act, or certain regulations, *id.* § 1540(b), and it authorizes the Attorney General

to bring civil actions for injunctive relief, *id.* § 1540(e)(6).  Finally, the ESA authorizes citizen

suits, which allow private parties to bring suit in federal district court to enforce the substantive

provisions of the ESA and its implementing regulations against regulated parties, 16 U.S.C.

§ 1540(g)(1)(A); *see Bennett v. Spear*, 520 U.S. 154, 173–74 (1997), or to compel the Secretary

to apply the prohibition on the taking of listed species in any State, 16 U.S.C. § 1540(g)(1)(B).

Recognizing that some take can occur as a result of otherwise lawful activities, Congress

created two paths to ensure that "incidental take" does not jeopardize protected species or

adversely modify or destroy critical habitat:  The first path, under Section 7, applies to federal

agency actions, *id.* § 1536; and the second, under Section 10, applies to non-federal actions, *id.*

§ 1538.  Both mechanisms offer the promise of liability protection for incidental take if, but only

if, those involved abide by the specific measures and standards specified by Congress and the

Services.  *See id.* § 1536(o)(2); *id.* § 1539(a); 50 C.F.R. § 402.14(i)(5).

2.      *Section 7 and Formal Consultation*

"Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that

their actions do not jeopardize endangered wildlife and flora."  *Nat'l Ass'n of Home Builders*,

551 U.S. at 652; *see* 16 U.S.C. § 1536.  An action "jeopardize[s] the continued existence of" a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  Section 7 applies only to "actions in which there is discretionary Federal involvement or control," *Id.* § 402.03, however, because if a statute mandates that an agency act in a specified manner, the consultation process would "override" that statutory mandate "by subjecting such [agency] action to the further condition that it pose no jeopardy to endangered species," *Nat'l Ass'n of Home Builders*, 551 U.S. at 664.  That conclusion applies, moreover, even when the statutory mandate "is not entirely mechanical"—that is, even when "it involves some exercise of judgment" on the agency's part "as to whether" the statutory criteria have been met—because, even then, the statute "does not grant [the agency] discretion to add another entirely separate prerequisite to [the] list" of relevant criteria, namely consideration of "the protection of threatened and endangered species as an end in itself."  *Id.* at 671.

Under Section 7(a)(2), "[e]ach Federal agency shall, in consultation with and with the assistance of [Service], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).  To achieve that end, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines—and the consulting agency concurs—that "the proposed action is not likely to adversely affect any listed species or critical habitat," then no formal consultation is required.  *Id.* § 402.14(b)(1).  But if a federal agency

11

concludes after an initial review that its action "may affect listed species or critical habitat," that agency must engage in "consultation" with the Service.  *Id.* § 402.14(a).

The agency that proposes to act in a manner that might affect listed species or critical habitat is referred to as the "action agency," while either the FWS and/or the NMFS serves at the "consulting agency."  *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 474 n.3 (D.D.C. 2014). In this case, the EPA was the "action agency," the FWS was the "consulting agency" (although, in Plaintiffs' view, the EPA should have also engaged in formal consultation with the NMFS), and the agency action subject to consultation was the EPA's approval of Florida's assumption application.

"Broadly speaking, the object of consultation under the statute is for the [consulting] agency to determine whether the project will violate [Section 7's] prohibition on jeopardizing the continued existence of endangered and threatened species."  *Ctr. for Biological Diversity v. Ross*, 2020 WL 1809465, at *2 (D.D.C. Apr. 9, 2020).  At the conclusion of the Section 7 consultation process, the consulting agency must issue a biological opinion—that is, a BiOp—"setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

<u>The Biological Opinion</u>

The consulting agency's BiOp must "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C § 1536(b)(3)(A).  To prepare the required BiOp, the consulting agency must:

(1)   Review all relevant information provided by the [action] agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.

12

JA.1295

(2)    Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3)    Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4)    Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat[,] [and]

. . .

(7)    Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

50 C.F.R. § 402.14(g).  "In formulating its [a] biological opinion, [b] any reasonable and prudent alternatives, and [c] any reasonable and prudent measures, the Service" is required to "use the best scientific and commercial data available." *Id.* § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

Establishing the "environmental baseline of the listed species or critical habitat" is a substantial undertaking.  The "environmental baseline" is "the condition of the listed species . . . without the consequences to the listed species . . . caused by the proposed action."  50 C.F.R. § 402.02.  It includes (a) "the past and present impacts of all Federal, State, or private actions and other human activities in the action area;" (b) "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation;" and (c) "the impact of State or private actions which are contemporaneous with the consultation in process."  *Id.*  The environmental baseline considers "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify."  *Id.*

13

The consulting agency must then "[e]valuate the effects of the action and cumulative effects on the listed species." *Id.* § 402.14(g)(3). The "effects of the action" include "all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02. A consequence is "caused by" the proposed action if (a) "it would not occur but for the proposed action" and (b) "it is reasonably certain to occur." *Id.* "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* "Cumulative effects" on the listed species, by contrast, are "those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* (emphasis added).

It is only after engaging in this detailed analysis that the consulting agency can "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4). With that analysis complete, the consulting agency must then offer its "opinion on whether the action" will violate Section 7, *i.e.*, will cause jeopardy to a listed species or result in destruction or adverse modification of a critical habitat. *Id.* § 402.14(h)(1); *see also* 16 U.S.C. § 1536(a)(2).

In sum, a BiOp (a) must use the best scientific data available, (b) must determine the environmental baseline of the listed species or critical habitat, (c) must evaluate the effects of the action and cumulative effects on the listed species or critical habitat, and (d) must add that baseline to the effects of the action and cumulative effects on the listed species or critical habitat (in light of the status of the species and critical habitat), 50 C.F.R. § 402.14(g), and (e) must then use this data and analysis to determine whether the action at issue  is "[l]ikely to jeopardize the

continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'jeopardy' biological opinion," or is "[n]ot likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'no jeopardy' biological opinion," *id.* § 402.14(h)(1)(iv).

In the event of a "jeopardy biological opinion," the consulting agency "shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(3), (g)(5). "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Nat'l Ass'n of Home Builders*, 551 U.S. at 652.

<u>The Incidental Take Statement</u>

In the event of a "no jeopardy biological opinion," the consulting agency must provide an incidental take statement, 16 U.S.C. § 136(b)(4); 50 C.F.R. § 402.14(i), if it concludes that take is "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7); *Shafer & Freeman Lakes Env't Conservation Corp*, 992 F.3d at 1080. "Incidental take" refers "to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. The ESA requires that the ITS:

(i)     specif[y] the impact of such incidental taking on the species,

(ii)    specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii)   in the case of marine mammals, specif[y] those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

15

(iv)   set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C.A. § 1536(4).

The governing regulations define "the impact" of the incidental take to mean "the amount or extent[] of such incidental taking on the species." 50 C.F.R. § 402.14(i)(1)(i). If necessary, the consulting agency may use a "surrogate (e.g., similarly affected species or habitat or ecological conditions) . . . to express the amount or extent of anticipated take," but only if the BiOp or ITS "[d]escribe[s] the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take . . . and sets a clear standard for determining when the level of anticipated take has been exceeded." *Id.* The regulations also require monitoring of incidental take and provide that "the Federal agency or any applicant must report the progress of the action and its impact on the species to the [FWS or NMFS] as specified in the incidental take statement." *Id.* § 402.14(i)(3). Most significantly, the action agency and consulting agency "must reinitiate consultation *immediately*" if the "amount or extent of incidental taking" specified in the ITS, as required by the regulations, "is exceeded." *Id.* § 402.14(i)(4) (emphasis added); *id.* § 402.16(a). Finally, as discussed more fully below, "any taking that is in compliance with the terms and conditions specified" in an ITS "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1563(o)(2).

<u>Framework Programmatic Action</u>

The Services have jointly issued a "Consultation Handbook," which defines programmatic consultation as a "consultation addressing an agency's multiple actions on a

16

program, regional or other basis."  Dkt. 112-1 at 195 (ESA Section 7 Consultation Handbook).[2]

The ESA's implementing regulations further explain that "[f]or a framework programmatic

action, an incidental take statement is not required at the programmatic level."  50 C.F.R.

§ 402.14(i)(6).  This is because "any incidental take resulting from any action subsequently

authorized, funded, or carried out under the program will be addressed in subsequent section 7

consultation, as appropriate."  *Id.*  "For a mixed programmatic action, an incidental take

statement is required at the programmatic level only for those program actions that are

reasonably certain to cause take *and* are not subject to further section 7 consultation."  *Id.*

(emphasis added).

The regulations define a "[f]ramework programmatic action" to mean "a Federal action

that approves a framework for the development of future action(s) that are authorized, funded, or

carried out at a later time," where "any take of a listed species would not occur unless and until

those future action(s) are authorized, funded, or carried out and subject to further section 7

consultation."  *Id.* § 402.02.  Similarly, a "[m]ixed programmatic action" is defined to mean "a

Federal action that approves action(s) that will not be subject to further section 7 consultation,

and also approves a framework for the development of future action(s) that" will be "authorized,

funded, or carried out at a later time" and that will be "subject to further section 7 consultation."

*Id.*  In short, the regulations recognize that certain framework programmatic actions might not be

ripe for meaningful Section 7 consultation at the outset and thus permit the required consultation

to occur in stages, as the future federal actions are authorized, funded, or carried out.

---

[2] The Federal Defendants argue that the "Services' views in the Consultation Handbook are
entitled to deference."  Dkt. 99 at 22 n.7 (citing *Miccosukee Tribe of Indians v. United States*,
566 F.3d 1257, 1273 (11th Cir. 2009)).

Section 7 Liability Protection

Section 9 of the ESA provides that "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any [listed endangered species] within the United States or the territorial sea of the United States," 16 U.S.C. § 1538(a)(1)(B), and this prohibition, in turn, triggers potential civil or criminal liability under Section 11 of the Act, *id.* § 1540. Section 7, however, provides an escape hatch for "any taking that is in compliance with the terms and conditions specified" in an ITS.  16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).  Importantly, compliance with the terms and conditions specified in an ITS provides take liability protection not just to the federal agency and applicant, but to any party who "engage[s] in incidental takes consistent with the statement without applying for section 10 permits."  *Ramsey v. Kantor*, 96 F.3d 434, 437 (9th Cir. 1996).

The ITS thus acts as both a safe harbor and as a check.  Private entities and individuals (as well as government officers and employees) can avoid Section 9 liability for take in compliance with the terms and conditions of an applicable ITS—but, as soon as the take limit specified in the ITS is exceeded, the action and consulting agencies must "immediately" reinitiate consultation, 50 C.F.R. § 402.14(i)(4), thereby allowing the Service to reassess whether its original "no jeopardy" determination still holds in light of the unanticipated take and, if not, whether additional limitations and conditions are necessary to protect the species.

3.   *Section 10 and Incidental Take Permits*

Not all acts that result in incidental take involve a federal agency action, and thus not all such acts fall within the scope of the Section 7 consultation process.  For non-federal action, Section 10 of the ESA authorizes the Services to issue permits, "under such terms and conditions

18

JA.1301

as [the Service] shall prescribe," that allow "any taking otherwise prohibited by" Section 9, but

only "if such taking is incidental to, and not the purposes of, the carrying out of an otherwise

lawful activity."  16 U.S.C. § 1539(a)(1)(B).  As with Section 7 consultation, however, Congress

mandated robust analyses and standards that the Services must satisfy before permitting

incidental take pursuant to Section 10.  *See id.* § 1539(a).

To obtain a Section 10 permit, the applicant must submit a conservation plan, known as a

"Habitat Conservation Plan" or "HCP," that describes:

> (i)    the impact which will likely result from such taking;

> (ii)   what steps the applicant will take to minimize and mitigate such impacts,
>        and the funding that will be available to implement such steps;

> (iii)  what alternative actions to such taking the applicant considered and the
>        reasons why such alternatives are not being utilized; and

> (iv)   such other measures that the [Service] may require as being necessary or
>        appropriate for purposes of the plan.

*Id*. § 1539(a)(2)(A).  The Service must publish notice of the permit application in the Federal

Register, and "[i]nformation received by the [Service] as part of [the] application shall be

available to the public as a matter of public record at every stage of the proceeding."  *Id*.

§ 1539(c).  The Service must also provide an "opportunity for public comment" on the

application and related conservation plan.  *Id*. § 1539(a)(2)(B).  Finally, before issuing the

permit, the Service must make certain findings, including findings that the taking will be

incidental, that it "will not appreciably reduce the likelihood of the survival and recovery of the

species in the wild," and that "the applicant will, to the maximum extent practicable, minimize

and mitigate the impacts of such taking."  *Id*.

Section 10 requires all incidental take permits to include "such terms and conditions as

the [Service] deems necessary or appropriate" and directs that the Service "*shall* revoke a

19

JA.1302

permit . . . if he finds that the permittee is not complying with the terms and conditions of the

permit." *Id.* § 1539(a)(2)(B)–(C) (emphasis added).

**B.      Administrative Background**

Under Section 404 of the Clean Water Act, the Army Corps of Engineers is authorized to

issue permits, "after notice and opportunity for public hearings[,] for the discharge of dredged or

fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a); *see also*

*id.* § 1344(d) ("The term 'Secretary' as used in this section means the Secretary of the Army,

acting through the Chief of Engineers.").  When Congress enacted the CWA, however, it

"expressed its desire 'to recognize, preserve, and protect the primary responsibilities and rights

of States to prevent, reduce, and eliminate pollution,'" and it thus established a process to allow

States to implement the Section 404 permit program on their own, "so long as the EPA first gives

them permission to do so."  *CBD I*, 539 F. Supp.3d at 139 (quoting 33 U.S.C. § 1251(a)).  To

apply, a State must submit an application to the EPA containing "a full and complete description

of the program it proposes to establish and administer under State law" and "a statement from the

attorney general" affirming that "the laws of such State . . . provide adequate authority to carry

out the described program."  33 U.S.C. § 1344(g)(1).  After determining that the State's

"submission is complete," 40 C.F.R. § 233.15(a), the EPA must publish the application in the

Federal Register for public comment and must provide copies of the application to the Corps, the

FWS, and the NMFS for comment, *id.* § 233.15(d)–(f); *see also* 33 U.S.C. § 1344(g).  Then,

"[w]ithin 120 days of receipt of a complete program submission (unless an extension is agreed to

by the State), the Regional Administrator [of the EPA] shall approve or disapprove the program

based on whether the State's program fulfills the requirements of [the governing regulations] and

the [CWA], taking into consideration all comments received."  40 C.F.R. § 233.15(g); *see also*

33 U.S.C. § 1344(h)(1).

 After the EPA has transferred permitting authority to a State, the agency continues to

oversee that State's permitting program.  The State must transmit copies of each permit

application to the EPA; the EPA must then provide copies of each permit application to the FWS

and the NMFS; the EPA may also "provide written comments to such State with respect to such

permit application" within 90 days; and, if the EPA objects to the issuance of the permit, the

State may not issue the permit "unless it modifies [the] proposed permit in accordance with [the

agency's] comments."  33 U.S.C. § 1344(j).  "In the event that the [State] neither satisfies EPA's

objections or requirement for a permit condition nor denies the permit, the Secretary [of the

Army] shall process the permit application."  40 C.F.R. § 233.50(j); *see also id.* § 233.2; *id.*

§ 233.1(a).  In other words, permitting authority power reverts to the Corps for that particular

permit.  To facilitate this ongoing oversight, an EPA regulation requires participating States to

enter into a Memorandum of Agreement ("MOA") with the EPA that "set[s] out the State and

Federal responsibilities for program administration and enforcement" and that specifies the

"classes and categories of permit applications for which EPA will waive Federal review."  40

C.F.R. § 233.13(b), (b)(1).  Finally, if the EPA determines "after public hearing that a State is not

administering" its Section 404 program "in accordance with" the requirements of the CWA, and

if the State does not take "appropriate corrective action . . . within a reasonable time," the EPA

"shall . . . withdraw approval of such program until [it] determines" that the State has taken the

required "corrective action."  33 U.S.C. § 1344(i).  During any period of withdrawal, the Corps

"shall resume" administration and enforcement of the Section 404 program in the relevant

jurisdiction.  *Id.*

On August 18, 2020, the State of Florida submitted to the EPA an application to administer the Section 404 permitting program within its borders, and, just two days later, the EPA determined that the application was complete, thus triggering the 120-day review period. *See CBD I*, 597 F. Supp. 3d at 182; *see also* 33 U.S.C. § 1344(h)(3). Roughly four months later, in December 2020, the EPA published a notice in the Federal Register approving Florida's application, making it the first State to assume Section 404 authority in nearly thirty years. *CBD I*, 597 F. Supp. 3d at 183. Other than Florida, just two other states, New Jersey in 1994 and Michigan in 1984, have assumed Section 404 permitting authority. *Id.* at 182 (citing 40 C.F.R. § 233.70 (Michigan); 40 C.F.R. § 233.71 (New Jersey)).

Notably, the EPA did not engage in formal Section 7 consultation before approving either prior application. *See* Dkt. 104 at 63 n.35. When New Jersey applied to assume Section 404 permitting authority, the EPA undertook only informal Section 7 consultation.[3] Formal

---

[3] As explained further below, at that time, the EPA's view was that its approval of a Section 404 assumption application was discretionary and therefore subject to Section 7 of the ESA. *Cf.* Dkt. 112-3 at 373–74. The EPA changed its view following the Supreme Court's decision in *National Association of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644 (2007), *see* Dkt. 112-3 at 373, and then subsequently reversed position again at Florida's urging, *see* Dkt. 56-1 at 775 (ESA Consultation Memo). Because Plaintiffs and Defendants agree that the EPA's approval of a State's Section 404 assumption application is discretionary and, accordingly, that it triggers the Section 7 consultation process, the Court need not—and does not—express a view on that question.

The Court notes, however, that the EPA premised its most recent view—that its approval of a State's 404 assumption application is discretionary and thus triggers Section 7 consultation—on the fact that the EPA is required "to consider the Services' comments before deciding to approve an assumption request, and [the requirement that] states . . . comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program." Dkt. 56-1 at 779. The first of these premises, however, is in significant tension with the Federal Defendants' recent assertion that its decision to grant Florida's assumption application was not "based on its review of . . . the BiOp." Dkt. 158 at 6. Nor is it clear that the second of these premises shows that approving a State's Section 404 assumption application is "discretionary" under the reasoning of *National Association of Homebuilders*. There, the Supreme Court explained that the relevant

---

22

consultation was not required because the EPA determined, during informal consultation, that its approval of New Jersey's assumption application would not adversely affect any species. *See* 50 C.F.R. § 402.14(b)(1) ("A federal agency need not initiate formal consultation if . . . the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.").  That was so for two reasons: First, because the "EPA ha[d] committed to ensuring that a State permit w[ould] be issued only if it [wa]s not likely to jeopardize the continued existence of federally-listed species . . . and if it avoid[ed] or minimize[d] incidental take of federally listed species"—if the State "disagreed with [the] EPA's decision, the permit application w[ould] be transferred to the Corps of Engineers for processing under Section 404 of the Clean Water Act."  Dkt. 112-5 at 161 (FWS letter to the EPA concurring that the EPA's approval of New Jersey's assumption application was not likely to adversely affect listed species); *see also* Dkt. 112-5 at 149, 152–56 (New Jersey MOA describing the process for federalizing permits).[4]  And, second, because the State had agreed

---

question is whether, as a matter of statutory interpretation, formal consultation would "override" the statutory text by "subjecting" the relevant agency action (here, the EPA's approval of a state Section 404 assumption application) to the "further condition that it pose no jeopardy to endangered species."  551 U.S. at 664.

Here, the EPA says that the statutory text effectively includes a no-jeopardy condition because Section 404 requires the EPA "to determine whether [the] [S]tate [submitting the application] . . . has the authority to issue permits which," among other things, prohibit the issuance of any permit that could "jeopardize the continued existence of" a listed species.  Dkt. 56-1 at 778 (citing 40 C.F.R. § 230.10(b)(3)).  The question whether a State has adequate *authority* to ensure that no state-issued permit causes jeopardy, however, at least arguably differs from the question whether the federal action—here, the approval of the assumption application—is likely to jeopardize a listed species.

[4] Under the terms of the governing MOA, New Jersey provides the FWS with "a copy of all applications for individual permits."  Dkt. 112-5 at 153.  The MOA details several layers of mandated FWS review and determinations.  *Id.* at 153–54.  Ultimately, if the FWS determines that the "proposed permit action is likely to adversely affect federally-listed species or critical

that, when the "[c]oordination process under the MOA" failed to eliminate adverse effects to listed species, it would ensure that it or the permit applicant would "seek authorization for [] incidental take" under Section 10. Dkt. 112-5 at 160; *see also id.* at 161 ("Any residual incidental take *must be dealt with* under section 10(a)(1)(B) of the ESA if not addressed through section 7 consultation with the Corps." (emphasis added)). Because neither the FWS nor the NMFS prepared a BiOp or ITS, New Jersey permit applicants did not receive federal incidental take liability protection under Section 7 as part of New Jersey's assumption. To the contrary, the governing MOA states: "Nothing in this MOA authorizes any take of federally listed threatened or endangered spec[ies]." Dkt. 112-5 at 157 (New Jersey MOA). Thus, any take liability protection would flow from either Section 7 (through a federalized permit) or Section 10.

Although the record is less revealing with respect to Michigan, all agree that it also assumed Section 404 permitting authority without the EPA engaging in formal Section 7 consultation and, accordingly, without the benefit of Section 7 liability protection for future, Michigan permittees. According to the Plaintiffs, this is because Michigan entered into a cooperative agreement with the Services pursuant to Section 6 of the ESA. *See* 16 U.S.C. 1535. For present purposes, however, the Court need not go beyond what is disclosed by the administrative record and the parties' agreement—that is, that Florida is the first State to seek liability protection for the State and future Section 404 permittees based on a programmatic BiOp and ITS issued pursuant to Section 7 of the ESA. *See, e.g.*, Dkt. 156 at 7, 87 (Oct. 19, 2023 Hrg. Tr.).

---

habitat," the EPA "*will* object to permit issuance." *Id.* at 155 (emphasis added). And, if New Jersey "neither satisfies the EPA's objections or requirements for a permit condition . . . nor denies the permit, the permit application *will* be transferred to the Corps for processing pursuant to 40 CFR Part 233.50(j)." *Id.* at 156 (emphasis added).

In 2010—long after Michigan and New Jersey had assumed Section 404 permitting authority—the EPA concluded in a letter memorandum that its decision whether to approve a state application to assume Section 404 permitting authority constituted a non-discretionary federal action and, accordingly, was not subject to Section 7 of the ESA.  *See* Dkt. 112-3 at 375–76 (2010 EPA ESA Consultation Position Memo).  The EPA explained that, based on its reading of the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the decision to transfer Section 404 authority to a State is non-discretionary because once a State satisfies the statutory criteria, the EPA *must* approve the State's application.  Dkt. 112-3 at 375 (2010 EPA ESA Consultation Position Memo).  Indeed, if the EPA does not act on a complete application within 120 days, the "program shall be deemed approved."  33 U.S.C. § 1344(h)(3).

To achieve a "streamlined" process for Section 404 permittees to receive liability protection for incidental take, Florida asked the EPA to reconsider its 2010 conclusion that the Section 404 assumption process was non-discretionary under N*ational Association of Home Builders* and to conclude that the assumption process requires Section 7 consultation and can, accordingly, yield programmatic ESA liability protection.  *See, e.g.*, Dkt. 112-2 at 3 (Florida white paper "Streamlined Approach to Address Endangered Species Act Incidental Take Coverage"); Dkt. 112-3 at 344 ("Potential Endangered Species Act Compromise").  Florida argued that the EPA's 2010 analysis "resulted from a rushed review, ignored the actual text and legislative history of Section 404, and misapplied Supreme Court precedent" in *National Association of Home Builders*, which had considered Section 402, not Section 404, of the CWA.  Dkt. 112-2 at 4.  Florida further argued that the ESA is "*at least ambiguous*" and that, as a result, if the EPA agreed to change its position, it would "likely receive deference under *Chevron*

*U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Id.* at 11 (emphasis in original).

Building on this argument, Florida proposed that the EPA engage in a "one time" "programmatic consultation" under Section 7 "in connection with [the] EPA's initial review of a state [Section 404 assumption] application." *Id.* at 3, 11.  According to Florida's submission:

> This would allow the Services to issue a programmatic Biological Opinion ('BiOp') and a programmatic incidental take statement ('ITS'), which would identify procedural requirements for state permitting under Section 404 . . . . Provided these requirements are followed, the programmatic ITS would bring state Section 404 permits within the Section 7(o)(2) exemption from take liability.

*Id.* at 4.  By taking this approach, the State posited, the EPA and Service could "provide project applicants the needed liability protection from claims arising under the ESA even though the activity is authorized pursuant to a state permit."  Dkt. 112-3 at 345.  To support its contention that the EPA and the Services have the authority to issue programmatic BiOps and programmatic ITSs, which defer species-specific analyses and take limitations to a "technical assistance process," Dkt. 112-2 at 11–14, Florida invoked the Second Circuit's decision in *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76–77 (2d Cir. 2018).  The State stressed that the Second Circuit had upheld the use of a programmatic ITS in that case "despite its failure to numerically quantify the impacts" of take.  Dkt. 112-2 at 14.

Florida further argued that this programmatic approach was needed because, "thus far, where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10 separate and apart from the Section 404 permit process, which can take years to complete in contrast to the Section 7 process and is more burdensome for all involved."  Dkt. 112-2 at 3. According to the State, around ten percent of the Section 404 permits in Florida would require

26

some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects with significant economic benefits to the State." *Id.* at 3. Moreover, to "facilitate the process" that it had proposed, Florida volunteered to "develop [a biological] assessment on [the] EPA's behalf or in cooperation with [the] EPA." *Id.* at 14 & n.25; *see* 50 C.F.R. § 402.08. A biological assessment ("BA") is "information prepared by or under the direction of" a federal agency to determine whether a proposed action may affect listed species. 50 C.F.R. § 402.02. The EPA later used that BA (or, in Plaintiffs' words, "largely . . . cut and paste[d] it," Dkt. 98 at 31) to prepare its biological evaluation ("BE"), which it submitted to the FWS to assist in evaluating "the possible effects of [its] potential approval of . . . Florida's assumption" application. Dkt. 112-4 at 89.

As the EPA acknowledged, there were other options available to protect state permittees from incidental take liability under the ESA. It observed that state programs can (1) "completely avoid[] impacts" to protected species; (2) "concede to 'federalizing' permit applications that may adversely impact listed species;" or (3) require state permittees to engage in Section 10 review. *See* Dkt. 112-3 at 368 (EPA response to comments).[5] On December 12, 2019, however, the EPA agreed to Florida's "request[] that the [EPA] initiate an informal" ESA Section 7 consultation with the Services and "designate FDEP as the non-Federal representative to conduct informal consultation." Dkt. 112-4 at 2 (EPA letter to FDEP). The EPA explained that it was voluntarily initiating informal consultation while it gave "further consideration to [its] position" on whether

---

[5] At one point, the EPA expressed "institutional concerns regarding [Florida's] initial proposal to provide ESA Incidental Take authorization to permit applicants through the Section 7 consultation process." Dkt. 112-3 at 344. In response, Florida suggested yet a different approach under which the EPA would consult with the FWS on individual state 404 permits based on the EPA's oversight of state permits. *Id.* at 344–45.

consultation was required for approving a state 404 program.  *Id.*; *see also* Dkt. 112-2 at 351 (EPA letter to NMFS).

As early as November 2019, the FDEP told the Corps that the EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the programmatic level, and that the State had hired a contractor to prepare a BA. Dkt. 112-8 at 106 (Corps email).  During a December 2019 meeting about Florida's assumption application, the FDEP further advised the Corps that the EPA would use that BA "to request consultation and produce a programmatic B[i]O[p]."  *Id.* at 107–09 (Corps email sending meeting notes).  Then, in February 2020, an FWS deputy field supervisor stated as follows in an email:

> FYI—we had a good meeting yesterday with FWC, FDEP, EPA, and FDEP's consultants—GHD . . . .  They went through the draft BA but I was not given a copy.  The draft BA follows the [*Cooling Water*] BE as expected.  We provided some suggestions like "be careful of using words like consultation when you really mean coordination and technical assistance" . . . .
>
> I've already started writing parts of the B[i]O[p] by adapting generic standard language from the [*Cooling Water*] B[i]O[p] where appropriate.

Dkt. 112-5 at 170.  On April 1, 2020, FWS staff described the plan as follows:

> After assumption, FWS will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit. FWS will merely be providing technical assistance on the project by project reviews to [F]DEP, [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [F]DEP issuing any particular 404 permit.

Dkt. 112-4 at 9 (FWS email to FDEP and FWC staff).  During that period, the EPA's formal position remained that Section 7 did not apply to the agency's approval of a Section 404 assumption application, because such approvals were non-discretionary.

28

JA.1311

That changed when, five months after the EPA had initiated informal consultation and had designated the FDEP as its non-federal representative for consultation, it solicited public comment on "whether EPA's approval of a Clean Water Act Section 404 Program is non-discretionary for purposes of Endangered Species Act Section 7 consultation."  Dkt. 112-2 at 367 (85 Fed. Reg. 99 at 30,953 (May 21, 2020)) (capitalization altered).  The EPA expressly referenced Florida's white paper in its request for comment, seeking public comment on whether it "should . . . adopt the position articulated in the FDEP white paper."  Dkt. 112-2 at 369.  That is, the EPA requested comment on the programmatic BiOp-plus-ITS model that Florida had proposed.

On July 24, 2020, Florida submitted its completed BA to the EPA, "as the non-federal representative" designated by the EPA "to prepare this BA."  *See* Dkt. 56-1 at 66, 68 (Florida BA).  That document explained that, "[b]ecause of the statewide nature of [the State's assumption application], the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis [was] not possible in th[e] BA."  *Id.* at 69. Instead, the BA set out "to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits."  *Id.*  Under that process, the FDEP proposed to "send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the []FWS for review and comment," to "consider any information that the []FWS provides as technical assistance," and to "include all species protection measures that the []FWS may recommend as permit conditions or [to] deny the request for a permit."  *Id*. at 70.  The BA concluded that "[i]t is anticipated" that a programmatic approach and technical assistance process "will result in procedural and substantive protections

29

JA.1312

that are at least as protective as the protections afforded by the [Corps] Section 404 program and
through section 7 consultation with the [Corps] under the ESA." *Id.* at 179.

On August 20, 2020, the State submitted its Section 404 assumption application to the
EPA, and the EPA deemed the submission complete two days later. *See CBD I*, 597 F. Supp. 3d
at 182–83; Dkt. 112-4 at 85.  A draft Memorandum of Understanding ("MOU") was among the
materials the State submitted.  Dkt. 55-1 at 120 (unexecuted application MOU).  As that
document explained, "[u]pon assumption of the Section 404 Program, coordination between the
[]FWS and FDEP related to the proposed action's effects on species will occur through the
technical assistance process, *which is anticipated to be outlined* in the []FWS's biological
opinion based on information included in the biological assessment," which Florida prepared,
and the EPA "submitted" to the FWS. *Id.* at 124 (emphasis added).  The BiOp was not,
however, complete at that time and, therefore, was not included in Florida's assumption
application.

A week later, on August 27, 2020, the EPA announced the reversal of its prior position
regarding the applicability of the Section 7 consultation process to the EPA's consideration of
Section 404 assumption applications.  Agreeing with Florida, the EPA concluded that the Section
7 process—including the issuance of a programmatic BiOp and ITS, and the extension of
"Section 9 liability protections to individual permits issued pursuant to the state . . . program"—
would apply.  Dkt. 56-1 at 775, 778, 781 (ESA Consultation Memo).  In its response to public
comments, the EPA stressed that neither relying on federalized permits nor Section 10
consultation was "realistically feasible for states with an abundance of ESA listed species like
Florida," Dkt. 112-3 at 368, and in its final decision, the EPA explained that the "streamlined
permitting process" that the programmatic BiOp and ITS would put in place "would reduce costs

30

and duplication of efforts by state . . . and federal authorities and facilitate more effective and efficient state . . . CWA Section 404 programs."[6]  Dkt. 56-1 at 781.  Later, the EPA wrote that "requiring Florida's permittees to seek an ESA Section 10 Incidental Take Permit, with the requirement to prepare a Habitat Conservation Plan, would be extremely costly and take years to complete and therefore is . . . not an option that Florida would pursue."  Dkt. 112-3 at 369.

A few days later, on September 2, 2020, the EPA submitted a request for formal consultation under Section 7(a)(2) to the FWS.  Dkt. 112-4 at 85 (EPA letter).  Enclosed with the EPA's letter to the FWS was the EPA's Biological Evaluation.  *Id.*; *see also* Dkt. 112-4 at 87 (EPA BE).  The EPA stated that it was "requesting a *programmatic* consultation."  *Id.* at 85 (EPA letter) (emphasis added).

That same day, the EPA also sent a letter to the NMFS, but it did not request formal Section 7 consultation from the NMFS.  Dkt. 112-2 at 351 (EPA letter to the NMFS).  Rather, the EPA explained that, in its view, its decision whether to approve Florida's assumption application would have "no effect" on any species within the NMFS's jurisdiction.  *Id.*  The next day, the NMFS concurred with the EPA's "no effect" determination.  *See* Dkt. 112-2 at 352 (September 2020 NMFS letter to EPA).

On November 17, 2020, the FWS finalized its programmatic BiOp and programmatic ITS.  Dkt. 112-5 at 60 (BiOp); Dkt. 112-5 at 139 (ITS).  The BiOp did not include any species-specific analyses of the baseline status of species or effects of the EPA's action; instead, it explained that "[s]pecies-specific and site-specific analyses will occur during the technical

---

[6] Although several of the Plaintiffs in this case agreed with the EPA's new view that approval of a State's assumption application was *discretionary*, thereby requiring Section 7 consultation, all opposed the use of Section 7 in the programmatic manner advocated by Florida as unlawful under the ESA.  *See* Dkt. 56-1 at 785.

assistance process conducted between the []FWS and FDEP, and whenever EPA coordinates

with []FWS on State permit actions." Dkt. 112-5 at 114 (BiOp).  The BiOp further explained

that it was "not feasible, nor [wa]s it required" to detail or analyze any "species-specific effects."

*Id.* at 124 (BiOp).  Like the BA that Florida had prepared, the BiOp explained that "[b]ecause the

precise number and locations of future State 404 permit applications are unknown, the exact

effects to ESA-species cannot be accurately determined."  *Id.* at 126 (BiOp).  Instead of species-

specific analysis, the BiOp analyzed whether the Florida program was "structured" to ensure that

no future permit would likely jeopardize ESA-listed species.  *Id.* (BiOp).  The FWS ultimately

"determined that the endangered species *coordination processes*" set out in the technical

assistance process ("TAP") were "as protective" as Section 7(a)(2) of the ESA.  *Id.* (BiOp).

The final portion of the BiOp contained the FWS's programmatic ITS, which extended

ESA liability protection to (1) the EPA; (2) the State of Florida; and (3) any and all individual

state permittees for all take of listed species incidental to state-permitted activities so long as that

take is in compliance the "terms and conditions" of the ITS.  Notably, however, none of the

listed "terms and condition" govern the conduct of state permittees; instead, the "terms and

conditions" bind only the EPA and FDEP.  *Id.* at 141–42 (ITS).  The ITS also does not specify

the amount or extent of permissible take or set a trigger for the reinitiation of consultation.  *Id.* at

139–40 (ITS).

On December 17, 2020, then-EPA Administrator Andrew Wheeler announced approval

of Florida's assumption application, and the agency published a notice of approval in the Federal

Register on December 22, 2020.  Dkt. 56-1 at 433–34; *see also* 85 Fed. Reg. 83,553 (Dec. 22,

2020).  Among other things, that notice asserted that the EPA had "determined that the State of

Florida ha[d] the necessary authority to operate a CWA Section 404 program in accordance with

the requirements found in CWA section 404(g)–(l) and EPA's implementing regulations."  Dkt. 56-1 at 433.  The notice further stated that the "EPA has taken final action to approve Florida's assumption of the program" and that "Florida's program assumption" took immediate effect on December 22, 2020, *id.*, which was the day the notice was published in the Federal Register, *see* 85 Fed. Reg. 83,553 (Dec. 22, 2020).  Because the decision purported to constitute an adjudication, rather than a rule, and was made immediately effective, it was not subject to the regulatory freeze, which took effect on January 20, 2021.  *But see CBD I*, 597 F. Supp. 3d at 173, 212 (concluding "that the EPA's approval of Florida's Section 404 program constituted a rule, rather than an adjudication").

## C.    Procedural Background

Plaintiffs filed this suit on January 14, 2021, alleging that "[t]he EPA's actions failed to effectuate a lawful transfer of [Section 404 permitting] authority" to Florida.  Dkt. 1 at 3, 10–14 (Compl. ¶¶ 1, 40–53).  Plaintiffs' original Complaint included nine claims.  *See* Dkt. 1 at 25–48 (Compl. ¶¶ 100–248).  As explained above, however, the Court has already granted summary judgment in Defendants' favor with respect to Count Nine and has held that Plaintiffs lack standing to pursue Count Eight.  *See CBD I*, 597 F. Supp. 3d at 179–80; *CBD II*, 2023 WL 5437496, at *9–10.  Seven of Plaintiffs' original claims, plus four additional claims that Plaintiffs later added to their Complaint, remain pending.  *See generally* Dkt. 77 (Am. Compl). For present purposes, however, the Court addresses only Plaintiffs' ESA claims.

Plaintiffs' ESA claims against the FWS challenge the adequacy and lawfulness of that agency's programmatic BiOp and no-jeopardy decision (Count 3), the adequacy and lawfulness of its programmatic ITS (Count 4), and the adequacy and lawfulness of the combination of the ITS, the BiOp, and the technical assistance process (Counts 6 and 13), which Plaintiffs argue,

"create an ESA scheme that is not authorized by law," *id.* at 44, 56 (Am. Compl.  ¶¶ 214, 297),

and "give [Florida] a workaround regarding the mechanisms that Congress provided for

establishing take limits, extending liability coverage, and determining jeopardy to species," *id.* at

44 (Am. Compl. ¶ 215).  Plaintiffs further allege that the EPA violated the ESA by relying on the

facially deficient BiOp and ITS, *id.* at 49–52 (¶¶ 249–73) (Count 10); by failing to consult with

the NMFS, *id.* at 53–55 (¶¶ 274–87) (Count 11); and by failing to consult with the FWS

regarding "ESA-listed sea turtles that nest on Florida's beaches," *id.* at 55 (¶¶ 288–94) (Count

12).  Plaintiffs' Amended Complaint asks the Court to, among other things, "[v]acate and set

aside [the] []FWS' programmatic biological opinion and incidental take statement for the

challenged EPA decision and [to] remand with instructions for reopening and reinitiating

consultation" and to "[e]njoin the EPA's approval and transfer of authority to the state." *Id.* at

58 (Am. Compl. ¶¶ (m), (p)).

On February 28, 2023, Plaintiffs moved for summary judgment as to the remaining

counts contained in the Amended Complaint.  Dkt. 98.  The Federal Defendants cross-moved for

summary judgment, Dkt. 99, as did Florida, Dkt. 101.  The Court heard oral argument on

October 19, 2023.[7]

---

[7] Before argument, the Court granted Plaintiffs' motion for leave to file a surreply, which they
filed on October 12, 2023.  *See* Dkt. 123; Min. Order (Oct. 6, 2023); Min. Order (Oct. 5, 2023).
After oral argument, the Court granted Defendant-Intervenors' motion for leave to file a post-
hearing memorandum, Dkt. 127, and provided Plaintiffs an opportunity to respond, which they
did on October 30, 2023, Dkt. 129.  *See* Min. Order (Oct. 27, 2023); *see also* Dkt. 130
(separately filing the memorandum originally attached to the Defendant-Intervenors' motion,
Dkt. 127).  The Federal Defendants then sought leave to file a supplemental response to
Plaintiffs' supplemental filing, Dkt. 131, which the Court granted, *see* Min. Order (Nov. 7,
2023); *see also* Dkt. 134 (separately filing the memorandum originally attached to the Federal
Defendants' motion, Dkt. 131).  The Court also allowed Plaintiffs to submit a short response,
Min. Order (Nov. 7, 2023), which Plaintiffs filed on November 9, 2023, Dkt. 133.

On December 4, 2023, CBD and the Sierra Club moved for a temporary restraining order and/or preliminary injunction, seeking to preclude Florida from issuing two Section 404 permits that, according to Plaintiffs, will cause irreparable harm to the endangered Florida panther and the threatened crested caracara.  Dkt. 135.  Following a scheduling conference at which the EPA indicated that it intended to comment on the permits in question (thereby delaying their issuance), the parties agreed to a briefing schedule.  Min. Entry (Dec. 5, 2023); Dkt. 138 at 1–2. The Court granted leave to intervene to the two developers whose permits CBD and the Sierra Club sought to enjoin, Min. Order (Dec. 22, 2023); Min. Order (Jan. 24, 2024) and heard oral argument from all parties on January 30, 2024.  At that time, Florida indicated that the two permits in question would issue no sooner than February 16, 2024.  Jan. 30, 2024 Hrg. Tr. (Rough at 25:9–13).[8]

---

[8] In resolving the pending motions, the Court has considered over twenty briefs: Dkt. **98** (Plaintiffs' Motion for Summary Judgment); Dkt. **99** (Federal Defendants' Cross-Motion for Summary Judgment); Dkt. **102** (Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition); Dkt. **104** (Plaintiffs' Consolidated Reply); Dkt. **106** (Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment); Dkt. **107** (Defendant-Intervenors' Reply in Support of Cross-Motion for Summary Judgment); Dkt. **123** (Plaintiffs' Sur-Reply); Dkt. **127-1**/Dkt. **130** (Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **129** (Plaintiffs' Response to Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **131-1**/Dkt. **134** (Federal Defendants' Supplemental Brief); Dkt. **133** (Plaintiffs' Response to Federal Defendants' Supplemental Brief); Dkt. **135** (CBD and Sierra Club's Motion for TRO and PI); Dkt. **145** (Limited-Intervenor Tarpon Blue Silver King I's Memorandum in Opposition to TRO and PI); Dkt. **146** (Limited-Intervenor Cameratta's Memorandum in Opposition to TRO and PI); Dkt. **148** (Federal Defendants' Memorandum in Opposition to TRO and PI); Dkt. **149** (Defendant-Intervenors' Memorandum in Opposition to TRO and PI); Dkt. **153** (Plaintiffs' Reply); Dkt. **157** (Limited-Intervenor Cameratta's Supplemental Remedy Brief); Dkt. **158** (Federal Defendant's Supplemental Remedy Brief); Dkt. **159** (Limited-Intervenor Tarpon Blue Silver King I's Supplemental Remedy Brief); Dkt. **160** (Defendant-Intervenors' Supplemental Remedy Brief); Dkt. **161** (Plaintiffs' Supplemental Remedy Brief).  The Court also received and has considered two briefs from the Florida Chamber of Commerce and the Association of Florida Community Developers.  Dkt. **103**; Dkt. **108**; *see CBD I*, 597 F. Supp. 3d at 185 n.3.

## II.  LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA[,] the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to a review of agency action.  But summary judgment nonetheless "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  In other words, "[t]he entire case on review is a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is deferential; it requires that agency action simply be 'reasonable and reasonably explained.'" *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009)); *see also Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only reasonableness, not perfection.").  A "court is not to substitute its judgment for that of the agency" if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Airmotive Eng'g Corp. v. Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (alterations in original) (internal

quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983)).

"The Court's review, however, must be 'searching and careful.'" *Colo. River Cutthroat*

*Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't. Dev. Ass'n's*

*Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)). "An agency decision is arbitrary

and capricious if it 'relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. FCC*, 649

F.3d 695, 714 (D.C. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43). Just as the Court may not

"substitute [its] judgment for that of the agency" to set aside an agency action, *Rural Cellular*

*Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also typically may not "affirm an agency

decision on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety*

*Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

### III. ANALYSIS

The Court starts with standing and ripeness and then turns to the merits of the parties

ESA arguments.

### A.    Justiciability

Although Florida previously argued that Plaintiffs lack standing to pursue any of their

claims, it now appears to limit its standing challenge (other than its general challenge to

informational standing) to Counts One and Two, which are not presently at issue. *See generally*

Dkt. 102; Dkt. 107; Dkt. 127-2 at 2. With respect to Plaintiffs' ESA claims, Florida instead

argues that at least some—Counts Three, Four, Eleven, and Twelve—are not ripe. *See generally*

Dkt. 102; Dkt. 107.  It does not, however, include other ESA claims—that is, Counts Six, Ten,

and Thirteen—in that ripeness challenge.  *Id.  But see* Dkt. 127-2 at 2 (labelling these claims

"arguably not ripe").  The Federal Defendants and the more recent intervenors, for their part,

raise no justiciability defenses at all.  But because the Court has an independent duty to ensure

that it has subject-matter jurisdiction, *see Attias v. Carefirst, Inc*., 865 F.3d 620, 623 (D.C. Cir.

2017), the Court will address both standing and ripeness.

    1.    *Standing*

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6

(1996), the Court must assess Plaintiffs' standing with respect to "each claim" currently at issue

and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  The

"irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each

claim, that they have (1) "suffered an 'injury in fact'" (2) that is "fairly . . . trace[able] to the

challenged action of the defendant," and (3) that is "'likely' . . . that the injury will be 'redressed

by a favorable decision.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555. 560–61 (1992) (citations

omitted).  At the summary judgment stage, Plaintiffs bear the burden of proffering "affidavits or

other evidence to demonstrate the specific facts necessary to support standing."  *CBD I*, 597 F.

Supp. 3d at 188 (citing *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

When an association seeks to invoke the jurisdiction of a federal court, it can establish

standing in one of two ways.  It can assert "associational standing" to sue on behalf of its

members.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Or it can

assert "organizational standing" to sue on its own behalf.  *See People for the Ethical Treatment

of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Because Plaintiffs' invocation of

associational standing suffices on the facts of this case, the Court need not consider whether Plaintiffs also have organizational standing.

Associational standing requires that "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation." *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022) (citing *Hunt*, 432 U.S. at 343). "When more than one association brings suit, '[the Court] need only find one party with standing' to satisfy the requirement." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013)).

Here, the Court concludes that at least the Conservancy of Southwest Florida ("the Conservancy"), the Defenders of Wildlife ("the Defenders"), and CBD satisfy the requirements of associational standing. To start, each of these Plaintiffs easily meets the second and third requirements for associational standing. The missions of all three associations include the protection of the diverse species and habitats, including listed species in Florida. *See, e.g.*, Dkt. 98-1 at 1 (Crooks Decl. ¶ 4); Dkt. 98-3 at 2 (Fleming Decl. ¶¶ 4, 6); Dkt. 98-4 at 2, 3–4 (Hartl Decl. ¶¶ 7, 11–12). The claims that they assert, moreover, do not require the participation of individual members. *See Ctr. for Biological Diversity*, 56 F.4th at 67.

The Court is also satisfied that all three associations have carried their burden of demonstrating that at least one, identified member has suffered or faces an imminent risk of

39

suffering an injury-in-fact that is fairly traceable to the challenged actions and that a favorable decision is likely to redress.[9]

    a.    <u>Counts 3, 4, 6, 10, 12, and 13</u>

The Court will analyze Counts Three, Four, Six, and Thirteen together because each challenges the FWS's programmatic approach, including the issuance of a programmatic BiOp, a programmatic ITS, and the use of a "technical assistance process" in lieu of the statutorily mandated approach. And because Counts Ten and Twelve challenge the EPA's reliance on that same, allegedly unlawful approach, the Court considers Plaintiffs' standing to pursue those claims at the same time. Each of these Counts rests on a similar premise—that the BiOp and ITS prepared by the FWS failed to satisfy the dictates of the ESA—and each seeks the same remedy—vacatur of the BiOp and ITS and remand for reinitiation of consultation, *see* Dkt. 77 at 58 (Am. Compl. ¶¶ (m), (n)).

As the D.C. Circuit has held, "[a] claim of failure to fulfill the statutory consultation obligation under the ESA is at least in significant part a claim of procedural injury, as to which [courts] 'relax the redressability and imminence requirements' of standing." *Ctr. for Biological Diversity*, 56 F.4th at 67 (quoting *Ctr. for Biological Diversity*, 861 F.3d at 182) (citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 667). Indeed, the D.C. Circuit has described an agency's failure to meet its statutory consultation requirement as the "archetypal procedural injury." *Ctr. for Biological Diversity*, 861 F.3d at 182 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298,

---

[9] The Court previously noted that there are grounds to conclude that Plaintiffs also have informational standing. *CBD I*, 597 F. Supp. 3d at 179. Florida responds by offering additional evidence regarding its provision of information to members of the public relating to permitting decisions. Given the Court's finding that Plaintiffs have established their standing to sue on other grounds, the Court need not reach this issue and expresses no view on the sufficiency of Florida's additional evidence.

305 (D.C. Cir. 2013)).  These precedents involved challenges to the action agency's failure to meet its consultation requirement, while, here, Plaintiffs challenge the failure of both the action agency (the EPA) and the consulting agency (the FWS) to comply with the ESA.  But the Court can discern no material difference when it comes to standing.  *See Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015) (holding that conservation groups had standing to challenge a BiOp in which the NMFS concluded that the combined operation of seven fisheries was not likely to jeopardize the continued existence of certain sea turtles because, by permitting "an unlawfully excessive amount of harm to [the turtles], [the BiOp] threaten[ed Plaintiffs'] enjoyment and study of those animals"); *Oceana, Inc. v. Ross*, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) (same).  Even with relaxed redressability and imminence requirements that come with a procedural injury, however, "the injury in fact requirement [remains] a hard floor of Article III jurisdiction," and "a plaintiff alleging a procedural violation" is not "freed" of the burden of establishing causation.  *Ctr. for Biological Diversity*, 861 F.3d at 182–83.

Starting with injury, the administrative record and the declarations submitted by members of the Conservancy, the Defenders, and CBD amply support Plaintiffs' claims of injury in fact. The declarations show that members of the associations have concrete interests in minimizing the loss of listed species in the State, including, among others, the Florida panther, the crested caracara, and sea turtles.  *See*, *e.g.*, Dkt. 98-1 (Crooks Decl.); Dkt. 98-3 (Fleming Decl.); Dkt. 98-5 (Schwartz Decl.); *cf. Lujan*, 504 U.S. at 562–63.  When the FWS concluded that it was necessary to issue an ITS, the FWS concluded that approval of Florida's assumption application was "reasonably certain" to result in some take of all 139 listed species present in the State.  *See* 50 C.F.R. § 402.14(g)(7).  The FWS's preparation of a no-jeopardy BiOp and ITS that "bypass[es]" the core requirements of the ESA, and the EPA's approval of Florida's Section 404

assumption application based on that BiOp and ITS poses a material risk to the declarants' work and recreational interests in areas of Florida that will be directly affected.  *Cf. Ctr. for Biological Diversity*, 56 F.4th at 67–68.  Assuming that Plaintiffs will prevail on the merits, as the Court must for purposes of assessing standing, *see In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)), Plaintiffs' allegations demonstrate a concrete injury in fact.

Without developing an objection as to the ESA claims specifically, Florida broadly objects to the idea that the Plaintiffs will suffer an injury from having Florida administer the 404 program rather than the federal agencies.  For example, the State argues that "Plaintiffs 'must be able to sufficiently answer the question: What's it to you,' if Florida—instead of the Corps—has the primary role in administering the Section 404 Program for assumable waters in Florida where EPA retains oversight responsibility?"  *See* Dkt. 107 at 10.  This is a version of Florida and the Federal Defendants' argument that whatever ESA requirements may have been omitted from the programmatic BiOp and programmatic ITS will be sufficiently addressed at the individual permit level through consultation with the FWS via the "technical assistance process."  But, contrary to Defendants' position, as more fully discussed in the merits section, that process does not eliminate the "'substantial probability' that the [Plaintiffs'] cognizable interests will be 'adversely affected.'"  *Id.*  In their briefing and their standing declarations, Plaintiffs aver to the multitude of ways that the technical assistance process has proven inadequate.  Conservancy member Amber Crooks recounts, for example, how "[o]n at least one occasion, the State failed to include a permit condition required by [the] []FWS to protect species on a project of concern to the Conservancy."  Dkt. 98-1 at 11 (Crooks Decl. ¶ 31).  She also discusses at length her "concerning" experience with the technical assistance process that occurred in the State's

42

consideration of a particular permit application. *Id.* (Crooks Decl. ¶ 32). During that application

process, the Conservancy voiced concerns over potential harms to the crested caracara and the

Florida bonneted bat. *Id.* The FWS shared these concerns, writing in an email that it was unable

to submit a comment on the FDEP's website but that, in the agency's words: "We know there

will be take of Florida bonneted bats." Dkt. 98-1 at 38 (Attachment A to Crooks Decl.). Florida

permitted the project even though the state-issued permit "d[id] not assess take to [the] Florida

bonneted bat *or* provide a take limit." *Id.* at 12 (Crooks Decl. ¶ 33) (emphasis added).[10] Florida

offers no evidentiary response to these assertions of fact: Neither of the two declarations from

Justin Wolfe, the General Counsel of the FDEP, submitted by the State addresses the project.

*See* Dkt. 102-1 (Wolfe Decl.); Dkt. 107-1 (Supplemental Wolfe Decl.).

Even more fundamentally, the technical assistance process is no substitute for what

Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that

the FWS must conduct *before* it can make a no-jeopardy finding and accord incidental take

protection on the EPA, the State, and future state-permittees. *See* Dkt. 112-1 at 202 (ESA

Section 7 Consultation Handbook instructing the Services to "[n]ever determine the conclusion

of a biological opinion before completing the analysis of the best available data"). Plaintiffs

allege, for example, that the technical assistance program does not require the FWS (or the

NMFS) to evaluate the "effects of the action and cumulative effects to the environmental

---

[10] Crooks further avers that the Conservancy "could not locate any information—not in the permit, not in FWC comments, and not in the public record—that assured [the Conservancy that the] []FWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat for this project, or a proper analysis of whether or not take would occur, or if they adequately assessed take associated with this project." *Id.* at 11 (Crooks Decl. ¶ 32). For instance, the permit "acknowledge[d] an estimated take of up to five different pairs of caracara, but stop[ped] short of setting a take limit for th[e] project." *Id.* at 12 (Crooks Decl. ¶ 32). If the Corps, instead of Florida, permitted the project in question, it would have been subject to Section 7 of the ESA—not the "technical assistance" process.

baseline" using "the best scientific and commercial data available," 50 C.F.R. § 402.14(g); *see also* 16 U.S.C. § 1536(a)(2), and they allege that the BiOp that the FWS did prepare was wholly deficient.  They allege that Florida's Section 404 program is less protective of listed species than the Corps' program.  And they allege that the FWS's ITS failed to satisfy ESA standards because, among other things, it was not founded on an adequate BiOp, and—most critically—it omitted any limit on incidental take, which functions to trigger reinitiation of consultation in order to ensure that the Service's initial determination of no jeopardy remains sound.  Each of these allegations supports a concrete injury in fact that is not avoided through the technical assistance program.

Two additional procedural injuries merit brief mention.  First, because the allegedly deficient ITS purports to bestow ESA liability protection on future, state-permittees, those permittees will be relieved of the need to seek protection under Section 10 of the ESA; indeed, one of the two private intervenors in this case was in the process of seeking a Section 10 permit before the ITS issued, Jan. 30, 2024 Hrg. Tr. (Rough at 70:6–9).  Plaintiffs, however, would receive far greater protection under the Section 10 process than under the technical assistance process.  Section 10, for example, requires the applicant to prepare a Habitat Conservation Plan that includes steps to "minimize and mitigate" takings, "funding that will be available to implement such steps," and an explanation for why "alternative actions" were "not being utilized," 16 U.S.C. § 1539(a)(2)(A), and—significantly—it requires the Service to provide notice and an opportunity for public comment on the plan, *see id.* § 1539(a)(2)(B).

Second, because the ITS lacks both any take limits *and* any terms and conditions which bind individual permittees, Plaintiffs cannot bring citizen suits pursuant to Section 11 of the ESA against permittees who engage in excess take.  *See* 16 U.S.C. § 1540(g).  Florida responds that a

violation of a take limit included in a state-issued permit, to the extent the permit contains one, would open the door to a citizen suit, but its argument turns on the mistaken premise that the "terms and conditions" set forth in the ITS impose duties on state permittees. *See* Dkt. 112-5 at 141–42 (ITS). The Federal Defendants, nonetheless, suggested at oral argument that a court could, in the future, read *other* language included elsewhere in the ITS to create implied "terms and conditions," which would bind state permittees and provide a basis for bringing a citizen suit. Jan. 30, 2024 Hrg. Tr. (Rough at 31–32, 59–64). But that argument both ignores the plain language of the ITS and is itself unduly speculative.

Plaintiffs have also established causation and redressability. As to causation, a plaintiff asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002)). Rather, causation in the context of a procedural injury requires a showing of two causal links: First that the omitted procedural step is connected to some substantive government decision that may have been wrongly decided because of the omission, and second, that that substantive government decision is connected to the plaintiff's harm. *Ctr. for Biological Diversity*, 861 F.3d at 184. Plaintiffs do not need to show but-for causation, only that the procedure and substance are connected and that there is a "substantial probability" that the procedural failure will create an adverse effect. *Id.* at 184–85. Here, it suffices that the FWS's bypassing of its ESA obligations led to the approval of Florida's Section 404 program and led to the ITS' authorization for the taking of listed species, without due attention to the risks posed to those species.

JA.1328

As for redressability, when a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing is "ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562. When "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction," *id.*, the plaintiff must establish "facts . . . sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007). Here, the ultimate injury that Plaintiffs assert is the increased risk that Florida's program will jeopardize listed species, which will result in losses to their aesthetic, scientific, and occupational endeavors. *See, e.g.*, Dkt. 98 at 79–80. The question, then, is whether vacating the allegedly deficient programmatic BiOp and ITS and/or setting aside the EPA's assumption decision is likely to result in take limits that would not otherwise apply or is otherwise likely to reduce the risk of jeopardy and take to listed species in Florida. Although the redressability requirement is relaxed in a case alleging procedural injury, it is not "wholly eliminat[ed]." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). The Court is satisfied that Plaintiffs have met their burden.

Notably, if the Court vacates the BiOp and ITS, the ESA liability protection that currently protects the State and state-permittees will no longer apply. At the very least, this means that for projects that may affect listed species, and where the permittee is unwilling to risk civil and criminal liability under the ESA, permittees will need to follow the process set forth in Section 10 of the ESA (or hope that the EPA federalizes the permit in question through its objection

JA.1329

power).[11]  In either case, both Section 7 and Section 10 are demanding processes, and there is at

least "some possibility," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)—and, indeed, it seems

likely—that the process will result in greater protection for listed species in at least some cases.

On the programmatic level, there is also "some possibility"—and, again, a likelihood—

that the FWS and the EPA would conclude during any renewed Section 7 consultation that the

prospect of developing a legally and factually sufficient programmatic BiOp and programmatic

ITS is simply too daunting and that, instead, they should either: (1) rely on the CWA process that

allows for the federalizing of permits (at least when certain conditions are met) or (2) leave it to

Florida permittees to seek protection under Section 10.  *See* Dkt. 112-5 at 161.  In either

scenario, however, the FWS would be required to engage in far more detailed consideration of

the risks posed by particular projects to listed species, and there is "some possibility"—and,

indeed, a likelihood—that this more searching analysis would lead to greater protection for at

least some listed species.  Moreover, and of equal importance, actually setting take limits in a

Section 7 ITS or Section 10 incidental take permit would require, respectively, that the action

agency and the FWS immediately reinitiate consultation or revoke the permit if that limit is

exceeded.  Those take limits, if exceeded, would also unambiguously—and in stark contrast to

the instant ITS—provide grounds under which Plaintiffs could bring citizen suits under the ESA.

In addition, if the FWS prepares a new BiOp that finds jeopardy, that finding might

provide a basis for the EPA to withdraw its approval of Florida's program.  *See Nat'l Ass'n of*

---

[11] *Cf.* Dkt. 112-3 at 344 ("[The] EPA's initial draft MOA . . . directs the Corps to take over processing of any permit application where EPA's objections are not satisfied.  The Corps could still process any permit application where an applicant does not agree to include the reasonable and prudent measures as special permit conditions.  This will provide permit applicants for large scale projects, which typically have endangered species impacts, the choice to have their permit processed by [F]DEP or transferred to the Corps.").

JA.1330

*Home Builders*, 55 U.S. at 652 ("Following the issuance of a 'jeopardy' opinion, the agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."); Dkt. 102 at 35 ("[W]here a State program does not comply with Federal standards, [the] EPA may seek to withdraw the program." (citing 33 U.S.C. § 1344(i))).[12]  If the EPA withdraws its approval of the Florida program—or if the Court sets aside the assumption decision—Section 404 permitting authority would revert to the Corps.  That reversion, in turn, would satisfy redressability by providing a process that will result, where appropriate, in the issuance of individual ITSs that contain take limits, which, if exceeded, will require reinitiation of the consultative process as mandated by the ESA.

To be sure, it is possible that the Court might set aside the BiOp and ITS and that the EPA, the State, and future state permittees will simply decide to proceed without protection from potential ESA liability.  But that prospect is extremely remote.  A BiOp and ITS have "'powerful coercive effect,'" since those who engage the take of one or more listed species "risk civil and criminal penalties."  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023) (quoting *Bennett*, 520 U.S. at 169).  The prospect that the EPA, the State, and future state permittees would run that risk here, moreover, seems particularly unlikely, given the breadth of the agency action at issue, the large number of listed species, and the fact that the EPA, the FWS, and the State went to extraordinary lengths to put a programmatic ITS in place precisely to avoid such risks.

---

[12] Although Defendants maintain that the EPA's assumption decision is not dependent on the BiOp or the ITS, that is a disputed question in the case, which the Court defers to the merits.

b.        Count 11

Count Eleven raises slightly different issues, which merit brief discussion.  That Count

alleges that the EPA was required to consult with the NMFS because the marine species under

the NMFS's jurisdiction, even if not found in assumed waters, could be affected downstream of

assumed waters.  Dkt. 77 at 53–55 (Am. Compl. ¶¶ 274–87).  This claim, once again, turns in

substantial part on an alleged, procedural injury, so the Court will address it with that framework

in mind.  *See Ctr. for Biological Diversity*, 861 F.3d at 182 (describing an action agency's failure

to consult as the "archetypal procedural injury").

Because a procedural right "*in vacuo*" is insufficient to create Article III standing,

*Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009), Plaintiffs must show that the failure

to initiate consultation affects its members' concrete interests.  They have done so.  Plaintiffs

have submitted declarations showing that their members have concrete research, conservation,

aesthetic, and moral interests in various marine species.  One declaration, for example, describes

the enjoyment the declarant derives from viewing marine wildlife and recreating in places where

she can observe them in the wild.  Dkt. 98-3 at 7–10 (Fleming Decl. ¶¶ 20–28).  And another

declaration describes how the declarant's work focuses on the smalltooth sawfish, Dkt. 98-1 at 3

(Crooks Decl. ¶ 11), which is "listed as endangered under the [ESA] by [the NMFS]," Dkt. 98-7

at 10 (Silverstein Decl. ¶ 24).  As the Executive Director of Miami Waterkeeper attests, she is a

resident of Coral Gables, Florida, who (1) uses her Ph.D. in marine biology and fisheries to

research aquatic species, (2) "enjoy[s] observing listed coral and other marine wildlife," and (3)

tries to "observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and

dolphins."  Dkt. 98-7 at 1, 2, 11 (Silverstein Decl. ¶¶ 2–4, 7, 28).  The EPA's approval of

Florida's Section 404 program without engaging in the requisite consultation with the NMFS created a risk of harm to the endangered and threatened marine species of Florida.

Plaintiffs have also established a causal link between the EPA's decision and their alleged injury.  The EPA's omitted procedural step of consulting with the NMFS is connected to the substantive government decision that Plaintiffs challenge—that is, the EPA's approval of Florida's Section 404 program without considering what effects, if any, that decision would have on marine life and without obtaining expert input from the NMFS regarding the approval's ecological impact.  Those "omitted steps," moreover, "unquestionably connect to the EPA's decision," *Ctr. for Biological Diversity*, 861 F.3d at 184, to approve Florida's program.  The Court is also persuaded that the EPA's failure to consult regarding listed marine species poses a substantial risk to Plaintiffs' aesthetic, scientific, and professional interest in those animals.  And, the Court is unpersuaded that this causal link fails because the Corps might have issued the same permits without consulting with the NMFS.  The simple answer is that, had the Corps done so, Plaintiffs could have challenged that allegedly unlawful conduct.

Turning to redressability, Plaintiffs ask the Court to "[i]ssue a declaratory judgment declaring that [the] EPA violated the ESA by failing to consult with NMFS" and to "[i]ssue any other appropriate injunctive relief."  Dkt. 77 at 57–58 (Am. Compl. ¶¶ (e), (q)).  As noted, a procedural-rights plaintiffs need not show that court-ordered compliance with the procedure would alter the outcome.  Instead, all Plaintiffs need to show is that "any required consultation would redress [Plaintiffs'] members' injury because the EPA *could* reach a different conclusion." *Ctr. for Biological Diversity*, 861 F.3d at 185 (emphasis in original).  They have made that showing since "there remains at least the possibility that" the EPA could reach a different

JA.1333

conclusion or modify its approval of Florida's Section 404 program based on its consultation with the expert agency. *Id.*

    2.    *Ripeness*

Although Florida does not dispute that Plaintiffs have met their summary judgment burden of establishing standing to pursue their ESA claims, it maintains that at least some of those claims are not ripe for review. In particular, Florida argues that Plaintiffs' ESA claims related to the ITS (Counts Three and Four) and to consultation for the NMFS-listed species (Count Eleven) are not ripe for review because they are "based on speculations of harm that may never arise." Dkt. 102 at 12. The Court is unpersuaded with respect to Counts Three and Four and agrees only in part with respect to Count Eleven.[13]

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807, (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)); *see also Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007). "The doctrine is premised, in part, on Article III's case or controversy limitation and, in part, on prudential considerations 'for refusing to exercise jurisdiction.'" *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (citation omitted). Prudential ripeness is assessed under the two-pronged test established in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967). The Court must "evaluate both the fitness of the

---

[13] Florida mistakenly labels Count Twelve as an "NMFS-based" claim. *See* Dkt. 102 at 59. But Count Twelve asserts that the EPA was required to consult with the FWS, not the NMFS, regarding ESA-listed sea turtles. *See* Dkt. 77 at 55 (Am. Compl. ¶¶ 288–94). That claim is ripe for the same reasons that Plaintiffs' challenges to the BiOp and ITS, asserted with respect to *all* FWS-listed species, are ripe. Plaintiffs' "NMFS-based" claim is set forth in Count Eleven, which is addressed below.

issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

With respect to Counts Three and Four, Florida argues that Plaintiffs must wait to bring a legal challenge to "an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate." Dkt. 107 at 28. In the State's view, without that context, the Court will be unable to assess whether and how the supplanting of the usual ESA processes with the technical assistance process affects Plaintiffs' rights. Plaintiffs disagree and observe that they have already identified two projects that the State permitted where the record showed that take was likely to occur, but the permit failed to include a take limit. *See* Dkt. 123 at 24–25 (citing Dkt. 98-1 at 9–12 (Crooks Decl. ¶¶ 28–33)). The Court is persuaded that Plaintiffs' challenges to the biological opinion and programmatic ITS are ripe.

First, the programmatic ITS is likely to cause "hardship" to Plaintiffs because it creates a legal right at odds with Plaintiffs' interests in preserving listed species:  It authorizes the incidental taking of all listed species in Florida, subject only to the non-statutory technical assistance process. The FWS's action constitutes "a definitive statement of [the] agency's position, has direct and immediate effect on the complaining parties, and has the status of law." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted) (holding that claim challenging ITS was ripe for review). Second, prompt judicial review of Plaintiffs' claim "will not interfere with further administrative action." *Id.* The FWS's position in the programmatic ITS "will not be reconsidered because the consultation process is complete once the biological opinion is issued." *Id.* To be sure, the FWS may have further involvement in the technical

assistance process, but it will not have any further input on the ITS itself, and it is the

programmatic ITS that Plaintiffs challenge.  Third, "further factual development will not assist

[the Court] in resolving the legal question at issue," *id.* at 941, which concerns the statutory

authorization for extending, as the FWS did here, broad immunity from take liability through a

technical assistance process distinct from and not authorized by the Section 7 process.

More generally, Florida's ripeness argument misapprehends the nature of Plaintiffs'

challenges to the ITS.  Plaintiffs challenge the ITS because it has conferred liability protection

for incidental take on the EPA, the State, and state permittees without setting any statutorily-

required take limits and without the necessary scientific, species-specific and effects analysis.

The crux of Plaintiffs' claim, and the root of their alleged harm, is the fact that the programmatic

ITS "creates an unlawful risk of take for Florida's program *as a whole* by failing to set limits on

incidental take for the program *as a whole*, in contravention of the ESA."  Dkt. 104 at 109

(internal quotation marks and citation omitted).  Plaintiffs correctly observe that the possibility

that they might be able to bring a state-court challenge to a particular permit, or the possibility

that the FWS and/or the EPA might prevent an individual permit from issuing, does not render

their challenge to the administrative action that the EPA and the FWS have already taken—

authorizing take without the risk of ESA liability and thereby supplanting the Section 7 and

Section 10 processes—unripe for review.

But even placing those broader—and dispositive—considerations aside, the Court agrees

with Plaintiffs that they have identified particular Florida-issued permits without take limits.

*Contra* Dkt. 107 at 27 ("[T]he outcome of the agencies' technical assistance process as well as

[the] EPA's Section 404 oversight role cannot be predicted and no harm will be caused to

Plaintiffs' interest unless and until they show inadequate take protection will occur."); *id.* at 28

("Plaintiffs . . . cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions."). Florida contends that Plaintiffs can bring suit in Florida court to challenge permits that pose a risk of jeopardy to listed species, but that state-court remedy is not a substitute for the rights and remedies provided in the ESA. Although Florida also suggested during oral argument that Plaintiffs might be able to bring a citizen suit under the ESA, for the reasons discussed above, the Court is not so sure. *See infra* 44. And, in any event, the remote possibility that a federal court might someday entertain a collateral challenge to the FWS's ITS based on the State's failure to include or to enforce a state-take-limit in a state-issued permit, hardly shows that the legal question presented in this case is not fit for judicial review or is unlikely to result in any hardship to Plaintiffs.

Florida argues that this case is like *Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9–10 (D.D.C. 2001), where the Court held that an ESA Section 7 claim was not ripe for review because the relevant oil and gas leases had not yet issued. But, here, Florida has issued permits—more specifically, over 700 individual permits as of February 2024, Dkt. 160 at 5. And in *Wyoming Outdoor Council*, unlike here, the FWS "was free to engage in further efforts to fulfill its [statutory] obligations before the leases were issued." 148 F. Supp. 2d at 10 (quoting *Wyo. Outdoor Council v. U.S. For. Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)). The ripeness requirement is intended to "protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (internal quotation marks and citation omitted). There is little doubt that the FWS's issuance of its programmatic ITS clears that hurdle. Finally, because the FDEP has issued hundreds of permits, Florida's reliance on *New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470 (3d Cir. 1993), is

similarly misplaced.  There, the Third Circuit reasoned that because "neither the Township nor anyone else will experience any effects from the Corps' decision *unless and until* Pennsylvania grants a water quality certificate, when fill work can begin, this case is not ripe."  *Id.* at 473 (emphasis added); *see also Ctr. for Biological Diversity*, 450 F.3d at 941 (holding that challenge to an ITS was ripe and distinguishing *New Hanover Township* on similar grounds).

    With respect to Count Eleven, Florida argues that Plaintiffs' claims related to adverse effects to species within the jurisdiction of the NMFS are not ripe because marine species under NMFS' jurisdiction are "unlikely to be found in any assumable waters because the Corps retains jurisdiction over" tide waters and adjacent wetlands.  Dkt. 107 at 30.  Florida asserts that if a proposed Florida Section 404 permit "may eventually affect NMFS species, the federal agencies (EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns at that time.  Otherwise, such a decision would be subject to challenge at that time."  Dkt. 102 at 59; *see also* Dkt. 107 at 30 (asserting that Plaintiffs have not been harmed by the EPA's decision "to defer NMFS consultation").  This argument, however, ignores the fact that the EPA was required to consult with the NMFS *before* approving Florida's Section 404 program. Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species."  *Lujan*, 504 U.S. at 603 (Blackmun, J., dissenting).  That procedural harm has already occurred—no further factual development is necessary or helpful.  Indeed, by Florida's logic no claim for failure to consult would ever be ripe for review unless and until the federal action was complete.  That contention is untenable.

    The Court does agree with the State, however, that Plaintiffs' NMFS-based challenge is at least arguably unripe in one respect.  Apparently recognizing its fault, the EPA has initiated

JA.1338

informal consultation with NMFS, and that consultation is still ongoing.  It requires no further

analysis to conclude that, to the extent Plaintiffs seek to challenge the adequacy of that not-yet-

complete consultation, their claim is unripe.

      3.    *Mootness*

      Finally, Florida argues that Count Eleven is moot to the extent it challenges the EPA's

failure to consult with the NMFS.  Dkt. 102 at 60.  As further explained below, however, that

argument fails to confront the thrust of Plaintiffs' claim—which is that the EPA was required to

consult with the NMFS *before* approving Florida's assumption application—and it fails to

confront the State's own observation (just discussed) that any post-approval consultation has yet

to reach fruition.

## B.    Merits

      This, then, brings the Court to the merits of Plaintiffs' ESA claims.  The Court will first

address Plaintiffs' challenges to the FWS's programmatic BiOp, will then address the FWS's no-

jeopardy determination and programmatic ITS, along with the related technical assistance

process, and, finally, will turn to Plaintiffs' challenges to the EPA's related actions.

      1. *ESA Claims Against the FWS*

      The parties disagree about many things.  But they agree that the EPA was required to

engage in a meaningful Section 7 consultation with the FWS (and perhaps the NMFS) where the

Service(s) would determine (as reflected in a biological opinion) whether the EPA's approval of

Florida's Section 404 program threatened to jeopardize ESA-listed species and/or to adversely

modify or destroy their critical habitat.  If the FWS concluded that EPA's action was not likely to

jeopardize a listed species or to threaten a critical habitat but that the EPA's action was likely to

lead to incidental take of a protected species, the FWS was required to issue an ITS setting limits

on that take, which, if exceeded, would trigger immediate reinitiation of the consultative process. Plaintiffs allege that the FWS failed at these tasks, and they argue that the non-statutory technical assistance process is—as both a matter of law and as applied here—no substitute for the procedural and substantive requirements of Section 7.

a.   <u>Challenges to the Biological Opinion</u>

Plaintiffs first argue that the FWS's programmatic BiOp failed to include the analysis and data required to determine whether the EPA's action in approving Florida's program—as opposed to the State's action in issuing individual permits—would jeopardize a listed species. The Court agrees.  Under the plain language of the statute, the FWS was required to prepare a BiOp "detailing how the agency action affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A), but, here, the FWS did not do so.  Under the regulations, the BiOp "shall include" a "detailed discussion of the environmental baseline of the listed species and critical habitat" and a "detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h).  The FWS is expressly required to "[r]eview all relevant information . . . available;" to "[e]valuate the current status and environmental baseline of the listed species;" to "[e]valuate the effects of the action and cumulative effects on the listed species;" and, in the end, to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species . . . formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g).  And, the ESA and the implementing regulations require the Service to "use the best scientific and commercial data available" in making these assessments.  *Id*. § 402.14(g)(8); *accord* 16 U.S.C. § 1536(a)(2).

JA.1340

For present purposes, the Court need not address every asserted shortcoming in the

FWS's programmatic BiOp because it is clear that, at the very least, the FWS failed to undertake

*any* species-specific analysis.  The most compelling evidence in support of this aspect of

Plaintiffs' claim are the words of the BiOp itself.  To start, the BiOP states that the FWS merely

"evaluated the effects of the action on *guilds* of ESA-proposed and -listed species and designated

and proposed critical habitat."  Dkt. 112-5 at 114 (BiOp) (emphasis added); *see also supra* 31.

The BiOp does not define "guild"—nor does the ESA or the implementing regulations—but,

according to Merriam-Webster, a "guild" is "a group of organisms that use the same ecological

resource in a similar way."  "Guild," *Meriam Webster*, www.merriam-

webster.com/dictionary/guild (last visited Feb. 11, 2024).  The BiOp explains that, in the FWS's

view, "[a]nalysis of effects using a guild approach is more appropriate at the programmatic

level," leaving the mandated "[s]pecies-specific and site-specific analyses [to] occur during the

technical assistance process."  Dkt. 112-5 at 114 (BiOp).  But an analysis at the guild-level fails

the statutory and regulatory demand to assess the environmental baseline, effects, and cumulative

effects at the species-level.

Throughout, the BiOp is forthright that the FWS did not endeavor to address species-

specific considerations, opting instead to defer analysis to the technical assistance process.  Here

is a non-exhaustive sampling:

- "Because this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp.  Therefore, the []FWS determined that a programmatic consultation is appropriate in determining whether FDEP's 404 program and EPA's oversight of FDEP's 404 program is structured to insure that no permit will be issued that is likely to jeopardize threatened and endangered species and destroy or adversely modify critical habitat.  For future permits issued under the State 404 program, site-specific and species-specific information will be available and assessed through the technical assistance process with the State and/or through coordination with the EPA,

when EPA has not waived its review of the State permit action." Dkt. 112-5 at 124–25 (BiOp).

- "We developed a programmatic consultation approach to determine whether and to what degree FDEP has structured their regulatory program and EPA has structured its oversight program to ensure approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species . . . . This approach also recognizes that site- and species-specific considerations would be addressed with the []FWS in subsequent technical assistance efforts . . . ." Dkt. 112-5 at 113 (BiOp).

- "The [biological evaluation] lists anticipated stressors in Table C.1. of Appendix C and notes anticipated effect determinations in Table C.1.b of Appendix C.  During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews." Dkt. 112-5 at 95 (BiOp).

Against this backdrop, it comes as no surprise that of the over one hundred protected species in Florida, the BiOp names just a handful and, even for those, offers little analysis.  Dkt. 112-5 at 123, 129 (BiOp).  Instead, it merely addresses the effects on "mammalian species/subspecies," "birds," "reptiles," "amphibians," "fish," "insects," "crustaceans," "mollusks," and "plants."  *Id.* at 129–35.  The ESA demands far more specific and detailed analysis of the effects of an agency action to satisfy Section 7.

At first, the Federal Defendants seemed to concede that the BiOp failed to consider species-specific baselines and effects.  They wrote that, "[i]n lieu of site-specific or species-specific analyses, [the] FWS determined that a programmatic or process-based approach to EPA's potential approval of FDEP's request was appropriate" and that, "[w]ith this programmatic approach, species-specific analyses were deferred, to be assessed on a permit-by-permit basis through the technical assistance process."  Dkt. 99 at 63.  Later, however, the Federal Defendants double back, arguing that there is "no merit" to Plaintiffs' contention that the FWS failed to evaluate the environmental baseline because the BiOp "adopted the BE's detailed

description of the environmental baseline, which addressed the baseline of listed species." *Id.* at 68.

Even if such incorporation by reference were proper (which Plaintiffs dispute) and even assuming that the BE's analysis satisfied the ESA's requirement for setting a species-specific environmental baseline (which is far from clear), the argument nonetheless fails for two reasons. First, although the BiOp purports to adopt the BE and its "detailed description of the environmental baseline," Dkt. 112-5 at 116 (BiOp); *see also id.* at 76, it simultaneously disavows any ability to engage in "site- and species-specific considerations," which it defers to the technical assistance process, *id.* at 113 (BiOp). Second, even if the BiOp adequately addressed the environmental *baseline*, there is no dispute that it fails to consider any species-specific effects or the cumulative effects of the EPA's action. Without those essential components, the BiOp fails to meet the minimum statutory and regulatory requirements.

In response, the Federal Defendants make two principal arguments. First, they argue that "[n]othing in the ESA requires the [FWS] assess every future phase of an agency action" and that, here, the relevant action was the EPA's transfer of permitting authority from the Corps to Florida, which was assessed, in FWS's discretion and expertise, only at the programmatic level. Dkt. 99 at 65 (quoting *Cooling Water*, 905 F.3d at 73). In the words of the Federal Defendants, the FWS's analysis passes muster because the only "effect" that it assessed was the transfer of permitting authority from the Corps to the FDEP and

> whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and [the] FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat.

JA.1343

Dkt. 99 at 73.

The problem with this framing is that the EPA and the FWS cannot have it both ways: they accepted Florida's request that they engage in Section 7 consultation in order to provide the State and future state-permittees with Section 7 liability protection. *See, e.g.*, Dkt. 112-2 at 3. But to do so, they were required to make a finding that the proposed action—here, granting Florida's assumption application and adopting a technical assistance process—"may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Indeed, formal consultation is not required if "as a result of the preparation of a biological assessment . . . the Federal agency determines, with the written concurrence of the [Service], that the proposed action is *not* likely to adversely affect any listed species or critical habitat." *Id.* § 402.14(b)(1) (emphasis added). That was not their determination. Having concluded that the proposed action *was* likely to adversely affect one or more listed species, the Federal Defendants cannot now argue that a detailed BiOp is unnecessary because the technical assistance process, which purports to replicate traditional FWS review under Section 7, will (as a matter of process) preclude any adverse effects on listed species. If the assumption and technical assistance process "may affect listed species," *id.*, the FWS is required to engage in the detailed, species-specific analysis necessary to evaluate whether those contemplated effects are "likely to jeopardize the continued existence of any [listed] species," 16 U.S.C. § 1536(a)(2).

To the extent this sounds like circular logic, that is the Federal Defendants' doing. As the EPA explained in its response to comments regarding its proposal to engage in Section 7 consultation:

> As set forth in the FDEP White Paper and in Federal Register notice, EPA has *the discretion to consider impacts to listed species* and critical habitat when deciding whether to approve a state's Section 404 program. However, *whether [the] EPA is ultimately required to engage in Section 7 consultation when*

> *approving a State 404 program is a factual case-by-case determination and will*
> *depend on how a state chooses to develop its 404 program and whether [the]*
> *EPA's approval of that program may affect listed species and critical habitat.*
> States remain free to fashion their particular programs in such a way *as to avoid*
> *any possibility of effect on species or habitat* as part of the assumption process
> by, for example, mandating that their state permittees entirely avoid impacts to
> listed species or critical habitat or require federalizing state 404 permits where
> such impacts may occur.  But Florida's program is not fashioned in this manner,
> for the reasons set forth in the White Paper, and we believe the approach Florida
> would take provides for a more effective and streamlined program.

Dkt. 112-3 at 368 (emphases added).  The bottom line is that Federal Defendants were required

to conduct the required species-specific analyses because Florida structured, designed, and

implemented its program so as to provide incidental take liability upfront to itself and all future

state permittees.  But incidental take liability protection flows from the rigorous analysis required

by Section 10 (for private actions) or Section 7 (for federal agency actions).  Congress did not

codify a third option, whereby incidental take liability might flow from an alternative set of

arguably similar procedures.

The Federal Defendants' argument, accordingly, boils down to this:  We exercised our

discretion to cast Florida's assumption program in a manner designed to confer ESA liability

protection on future, state-permittees by inviting Section 7 consultation; to trigger the Section 7

process, we had to determine that the proposed technical assistance process would likely

adversely affect species; during consultation, the FWS was unable meaningfully to assess the

species-specific effects of that decision because, in our discretion, we have deferred species-

specific review to the technical assistance process; but we should nonetheless be allowed to take

advantage of Section 7 liability protection even though we did not engage in any species-specific

analysis in the BiOp or engage in a consultation that went beyond assessing whether the

proposed technical assistance process is an adequate proxy for Section 7 consultation.  That

argument is untenable.

The Federal Defendants' second argument is that the FWS was unable to conduct any species-specific analysis because it lacked sufficient information to anticipate the effects of every future Section 404 permit application. *See, e.g.*, Dkt. 99 at 72–73. But "Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion on that basis." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). To the contrary, Section 7 "admits of no exception." *Nat'l Ass'n of Home Builders*, 551 U.S. at 674 (Stevens, J., dissenting) (quoting *TVA*, 437 U.S. at 173). Nor is the hurdle quite as high as Defendants suggest; Plaintiffs point, for example, to the programmatic BiOp that the FWS prepared for the Jacksonville District to demonstrate what the FWS can—and must—do to prepare a legally and factually sufficient programmatic BiOp. Dkt. 125 at 1 (the programmatic BiOp based on the FWS's review of the impacts associated with the Corps' Jacksonville District can be found at cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577 (last visited Feb. 11, 2024)); *see also* Dkt. 140 at 40–42.

The ESA does not require perfect foresight—only that the FWS use the best available information to create an assessment of jeopardy. In light of the ESA requirement that the FWS use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. § 1536(a)(2), the FWS cannot simply "ignore available biological information or fail to develop projections" of the effects of the agency action, *Conner*, 848 F.2d at 1454. Here, it is undeniable that the FWS had at its disposal reams of data from previous Section 7 consultations, which it tabulated but did not meaningfully discuss or analyze. Many species in Florida have been the subject of hundreds of prior Section 7 consultations—the panther alone had 108 consultations, the bonneted bat had 383 consultations, and the wood stork

had 216 consultations, to name a few.  *See* Dkt. 112-4 at 151 (EPA BE).  The information was

available to the FWS, but the agency did not give it meaningful consideration.

Simply put, incomplete information about future Section 404 permits that the State might

issue does not excuse the FWS's failure to comply with the statutory requirement that it prepare

a comprehensive biological opinion.  With the biological information that was available,

moreover, the Court is persuaded that the FWS "could have determined whether post-

[assumption] activities in particular areas were fundamentally incompatible with the continued

existence of the species."  *Conner*, 848 F.2d at 1454.  For instance, in some areas, even minimal

permitted activities likely would be "incompatible with the conservation of the species," *id.*—

those areas could have been identified before any future permit location was known, and if they

could not have been the FWS failed to explain why.  *Id.*; *see also* Dkt. 156 at 14–16 (Oct. 19,

2023 Hrg. Tr.)

Regardless of how Defendants got here, district courts across the nation have rejected

similar abdications in the past.  In *Forest Service Employees for Environmental Ethics v. U.S.

Fish & Wildlife Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), for example, the court evaluated

a BiOp analyzing the use of chemical fire retardant to fight wildfires.  The court held that the

FWS had failed to consider, among other things, critical habitat when it applied a "coarse filter"

and analyzed species at only the "taxonomic group-level."  *Id.* at 1204, 1224–25.  The FWS

argued that it was both rational and necessary to proceed as it had given that the chemical

retardant had the potential to affect 387 species, spread out over 192 million acres.  *Id.* at 1224.

But the court disagreed, holding that the FWS could not "excuse the failure to comply with the

law Congress [enacted] by arguing that compliance would be too hard."  *Id.* at 1224.  The same

holds true here.

JA.1347

The Federal Defendants' sole remaining argument is that the approach they took mirrors the approach that the Second Circuit approved in *Cooling Water*, 905 F.3d at 49. *Cooling Water*, however, is distinguishable on its facts. In that case, the federal agency action under review was not the approval of a state assumption application but, instead, the promulgation of a final rule pursuant to Section 316(b) of the CWA, 33 U.S.C. § 1326(b). *Cooling Water*, 905 F.3d at 58. The rule established requirements for cooling water intake structures at power plants and manufacturing facilities and was intended to address impacts to aquatic life from entrainment or impingement of fish and shellfish. *Id.*; 79 Fed. Reg. 48,300 (Aug. 15, 2014). The standards promulgated under Section 316(b) of the CWA are implemented by permits issued through the National Pollutant Discharge Elimination System ("NPDES")—at the time that *Cooling Water* was decided, 47 states administered NPDES permitting programs. *Cooling Water*, 905 F.3d at 59 & n.2.[14]

Notably, the requirements of the 316(b) technical assistance process were codified as part of the rulemaking, creating legally binding responsibilities for all parties. *Cooling Water*, 905 F.3d at 72 ("[T]he Rule obligates the Services to abide by those procedures."). Here, in contrast, the "Final Notice" published in the Federal Register approving Florida's program makes no mention of the technical assistance process or any of its procedures, stating only: "[The] EPA has met its requirements under ESA section 7(a)(2) by completing ESA consultation and receiving a 'no jeopardy' Biological Opinion from the []FWS on November 17, 2020." 85 Fed. Reg. 83,553

---

[14] One law review article has observed that state assumption of 402 permitting authority is more common in part because of "the attitude of [the] EPA, which might feel more comfortable delegating a program that will continue to operate on the basis of objective, numerical federal standards; the decisions to be made under section 404 are both far more subjective and susceptible to influence by local politics." Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States*, 54 Md. L. Rev. 1242, 1293 (1995).

JA.1348

(Dec. 22, 2020).  The technical assistance process is, instead, set out in the programmatic BiOp, that is itself evaluating the efficacy and protectiveness of those same procedures, and discussed in various memoranda.  In other words, here, there is no regulatory framework binding the parties' actions as in *Cooling Water*.  When the Court inquired of counsel for the FWS whether anything in the technical assistance process is "legally enforceable," counsel responded:  "So it's [FWS's] own biological opinion.  Of course, it's going to comply with it.  It's in an MOU.  It's committed to that, Your Honor."  Dkt. 156 at 95 (Oct. 19, 2023 Hrg. Tr.); *see also id.* at 98–99, 111.  But there is a fundamental difference between a notice and comment rulemaking of the sort at issue in *Cooling Water*, which adopted a "legislative" rule requiring state officials to send applications "to the Services for a sixty-day review period, after which [the state official] must publish any information or recommendation the Services provide," 905 F.3d at 72, and the technical assistance process employed here, which was adopted without the benefit of a notice and comment rulemaking and which binds only the signatories.

To be sure, the programmatic BiOp and ITS of *Cooling Water* are similar to those now before the Court.  That is not a coincidence.  As the record makes clear, Florida modeled its proposal on the path charted in *Cooling Water*.  *See, e.g.*, Dkt. 112-5 at 170 (email from FWS supervisor) ("The draft BA follows the 316b BE as expected."); Dkt. 112-4 at 4 (FWS email setting as an agenda item for discussion "the key assumptions used in the nationwide 316b consultation, as much as that consultation serves as a model for this one"); Dkt. 112-4 at 8 (FWS email discussing the claims that the "enviro-oriented litigants" raised before the Second Circuit in *Cooling Water*); Dkt. 112-2 at 14 (Florida white paper highlighting that the *Cooling Water* ITS was held "valid despite its failure to numerically quantify the impacts of the rule on take").  But, as counsel for both sides have confirmed, *Cooling Water* stands alone as the only case

66

concerning, much less approving, a programmatic biological opinion and incidental take statement of this sort: To quote counsel for the Federal Defendants, this case represents the "first next time" that an agency has deployed this type of programmatic approach. Dkt. 156 at 87 (Oct. 19, 2023 Hrg. Tr.).

More importantly, *Cooling Water* is at odds with the statute, regulations, and caselaw. The critical misstep in *Cooling Water* occurs in the following passage:

> According to the Environmental Petitioners, the Services improperly disregarded their obligation to "consider all phases" of the agency action in their initial biological opinion, as the Ninth Circuit appears to require. Envtl. Br. 100 (citing *Connor v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988)). But "the rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA," *Defs. of Wildlife*, 733 F.3d at 1121. . . , and like the Eleventh Circuit, we decline to adopt such a rule here.[] Nothing in the ESA requires that the Services assess every future "phase" of an agency action on a site-specific or species-specific basis.

905 F.3d at 73. That is, according to *Cooling Water*, an agency need not "assess every future" species-specific effect of an action in its "initial" BiOp. That much is true. The governing regulations permit "[p]rogrammatic consultation" when "[a] proposed program" sets forth "a framework for future proposed actions." 50 C.F.R. § 402.02 ("Programmatic consultation"). But what *Cooling Water* (like Defendants in this case) fails to confront is that a "phase[d]" approach to consultation requires either (1) complete and adequate consultation at the outset; (2) partial consultation at the outset, followed by the remaining Section 7 consultation at the later "phase" or "phases;" or (3) complete and adequate consultation solely at the later "phase," if that is the phase likely to adversely affect listed species. What matters is that adequate consultation occur *at some point*; the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required, "detailed discussion of the effects of the action on listed species," 50 C.F.R. § 402.14(g), to a later phase, only to conclude—as in *Cooling Water*

and here—that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7, *Cooling Water*, 905 F.3d at 73 n.15.

This understanding of the ESA is not only consistent with, but compelled by, the Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), which is the sole precedent—and the only authority—that *Cooling Water* cites in support of its contrary holding.  That case involved the Navy's installation and operation of an underwater submarine warfare training range ("USWTR").  The NMFS prepared an "initial" BiOp, which concluded "that *installation* of the USWTR [was] not likely to adversely affect listed species," but that "*operations* on the USWTR [were] likely to adversely affect listed species." *Id.* at 1113 (emphases added).  For reasons that are not relevant here, the Navy and the NMFS decided that, even though the initial BiOp considered the "impacts of the expected operations" of the USWTR, they would not rest on that early assessment alone and would, in addition, conduct a "new" Section 7 consultation in the future "before operational activities commence[d]." *Id.* at 1122.  It was in that context that the Eleventh Circuit opined that it was permissible for the Navy and the NMFS to structure the consultative process in phases. *Id.*  As the court explained, "[i]t is for the agencies to determine how best to structure consultation *to fulfill Section 7(a)(2)'s mandate*," and the approach crafted in that case, if anything, better served that mandate than a single, early consultation. *Id.* at 1121–22 (emphasis added).  The essential point, though, is that the consulting Service must prepare one or more BiOps—even if in phases—that employ "the best scientific and commercial data available" to offer a "detailed discussion of the effects of the action on listed species." *Id.* at 1112 (internal quotation marks omitted).

68

This understanding of the ESA is not only consistent with the statutory text and purpose but finds further, compelling support in the governing regulations.  Here, as in *Cooling Water*, the government characterizes the BiOp as a form of "programmatic consultation."  That phrase is defined in the regulations, and applies to "a consultation addressing an agency's multiple actions," 50 C.F.R. § 402.02—not a single agency action followed by state-licensing decisions that may occur years later and that, on Defendants' own telling, do not constitute federal action subject to Section 7 consultation.  That understanding of "programmatic consultation," moreover, finds additional support in the definition of "[f]ramework programmatic action," which means "a framework for the development of future action(s) that are . . . carried out at a later time," where "any take of a listed species [will] not occur unless and until those future action(s) are . . . carried out and *subject to further section 7 consultation*."  *Id.* (emphasis added); *see also id*. ("Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that [1] will not be subject to further section 7 consultation, and also approves [2] a framework for the development of future action(s) [for which . . .] any take of a listed species [will be . . .] subject to further section 7 consultation.").

D.C. Circuit precedent, although not directly on point, further supports the sensible conclusion that an agency may not avoid its obligation to engage in meaningful Section 7 consultation by deferring detailed, species-specific analysis for another day—particularly when, by the time that day arrives, the relevant action will be out of the agency's hands and beyond the reach of Section 7.  In *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), the D.C. Circuit considered the interaction between the ESA and the Outer Continental Shelf Lands Act ("OCSLA") in the context of a lease sale for the development of oil and gas properties in waters north of Alaska.  Under the OCSLA, the lease sale itself is, as the court explained, "only a

preliminary and relatively self-contained stage within an overall oil and gas development

program which requires substantive approval and review prior to the implementation of each of

the major stages: leasing, exploring, and producing." *Id.* at 593 (emphasis omitted).  The district

court had held that the biological opinion at issue violated the ESA because it considered *only*

the leasing stage, and it had "rejected the defendant's contention that the multistage flexibility

contemplated within the OCSLA framework was an indication that ESA 'endangered life'

considerations should be entertained stage-by-stage." *Id.* at 608.

The D.C. Circuit agreed, holding that it was in "qualified agreement with the district

court's ruling that a 'biological opinion' may not deal exclusively with any one particular stage

of an outer continental shelf project." *Id.*  In the end, however, the *North Slope* court concluded

that the "[m]andatory stage-by-stage review" required by the OCSLA meant that the consultation

before it did not violate the ESA when viewed in light of the "full contingent of OCSLA checks

and balances." *Id.* at 609.  Fairly construed, the D.C. Circuit's opinion requires courts to

consider whether "stage-by-stage" consultation under Section 7 is consistent with the ESA's

mandate to consider the "agency action" as a whole.  *See Conner*, 848 F.2d at 1453–54 (so

reading *North Slope*).  The programmatic approach applied here fails that test by a wide margin,

since the FWS never considered the EPA's action as a whole, and deferring that consideration to

a non-statutory technical assistance process cannot substitute for what the statute requires.  *See*

*also National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 10 & n.15 (D.D.C. 2005)

(distinguishing *North Slope* and holding that the Corps violated the ESA by seeking to defer

consultation with the FWS regarding the effects of individual actions authorized under four general permits, which the Corps was aware "m[ight] affect" the Florida panther). *Id.*[15]

Ultimately, however, *Defenders of Wildlife* and *North Slope* both address a distinct question: Whether *federal* agencies conducting *federal* actions that proceed in tiers or stages can engage in Section 7 consultation at each tier, or instead whether the initial Section 7 consultation must evaluate the proposed agency action *in toto*, all tiers included. The question in those cases was simply whether Section 7 consultation could be phased, or whether doing so might lead to "piecemeal chipping away of habitat." *Conner*, 848 at 1454. The Court's conclusion that the BiOp at issue here was inadequate, however, follows *a fortiori*: If a phased assessment of federal action is suspect, even when each phase will receive review under Section 7, a programmatic BiOp that fails to adequately address the effects of the agency action of listed species and that provides no further opportunity for Section 7 consultation cannot stand.

For all of these reasons, the Court concludes that the FWS was not free to disregard the ESA's mandate that it "detail[] how the agency action affects the species," 16 U.S.C. § 1536. The Court, accordingly, concludes that the BiOp is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law" and must be set aside. 5 U.S.C. § 706(2).

b.   Challenges to the Incidental Take Statement

As explained above, formal consultation under Section 7 is required if the action agency concludes that its action "may affect listed species or critical habitat"—unless that agency determines, with the Service's concurrence, that the "action is not likely to adversely affect any

---

[15] Although no party makes the point, the Court notes for completeness that the FWS, at least according to its handbook, views the consultation at issue in *Conner* as an "incremental step," not a programmatic, consultation under 50 C.F.R. § 402.14(k). *See* Dkt. 112-1 at 332–34 (ESA Section 7 Consultation Handbook).

listed species." 50 C.F.R. § 402.14(a) & (b).  Absent a finding that listed species may be

affected, the Section 7 process never commences: the Service never prepares a BiOp and never

opines on the question of jeopardy and—most importantly for present purposes—the Service

never issues an ITS.  Before issuing an ITS, moreover, the Service must determine that incidental

"take is reasonably certain to occur."  *Id.* § 402.14(g)(7).  The Court considers the adequacy of

the programmatic ITS at issue here against this backdrop.  Consistent with this understanding,

Defendants cannot plausibly argue both (1) that it was necessary to issue an ITS (resulting in

take protection for future permittees) and (2) that the technical assistance process replicates the

Section 7 consultation process (thereby obviating the need for any species-specific analyses or

take limits).  *Cf.* Dkt. 107 at 8 ("Plaintiffs have not shown a single situation where the Corps

would decide a permit differently than Florida . . . ."); *see also id.* at 21 ("[Plaintiffs] make no

showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim

arise from FDEP permits . . . .").

The ITS is crucial in a no-jeopardy BiOp.  It defines the extent of the permissible

incidental take of listed species resulting from the agency action, 16 U.S.C. § 1536(b)(4); 50

C.F.R. § 402.14(i)(1), and it ensures that the level of incidental take will not jeopardize any

species in violation of the ESA, 16 U.S.C. § 1536(b)(4)(B).  When the Service issues a no-

jeopardy BiOp, the ITS serves to monitor the impact that the approved action has on the listed

species in real time.  50 C.F.R. § 402.14(i)(3).  And "[i]f during the course of the action the

amount or extent of incidental taking, as specified [in the ITS], is exceeded"—in other words, if

the effect on the species from the action is greater than anticipated and permitted by the

Service—then "the Federal agency must reinitiate consultation *immediately*."  50 C.F.R.

§ 402.14(i)(4) (emphasis added).  Here, Plaintiffs challenge the FWS's programmatic ITS on

72

numerous grounds, including that it fails to quantify the permissible take, and thus fails to set a

reinitiation trigger.  For the reasons set forth below, the Court agrees that the FWS's

programmatic ITS is unlawful.

The analysis here "is not taxing."  *Center for Biological Diversity v. Ross*, 613 F. Supp.

3d 336, 345 (D.D.C. 2020).  The ESA requires the Service to specify "the impact of [the]

incidental taking on the species," 16 U.S.C. § 1536(b)(4)(C)(i), and the implementing regulations

define "the impact" to mean "the amount or extent[] of such incidental taking on the species," 50

C.F.R. § 402.14(i)(1)(i).  The regulations further provide that the Service may use a "surrogate

. . . to express the amount or extent of anticipated take," if it "explains why it is not practical to

express the amount or extent of anticipated take," and it "sets a clear standard for determining

when the level of . . . take has been exceeded."  *Id.*  In selecting an appropriate "surrogate," the

Service can look to "similarly affected species," *id.*, or to measurable "changes in ecological

conditions affecting the species," *Wildlife Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th

Cir. 2010).[16]  But whether the Service sets a numerical take limit for the listed species or, if

necessary, uses a surrogate, the regulations unambiguously require that it to set "a clear standard

for determining when the level of anticipated take has been exceeded."  50 C.F.R.

§ 402.14(i)(1)(i).  Under no circumstances may the Service fail, in any way, to "specif[y] the

impact."  16 U.S.C. § 1536(b)(4).

---

[16] *See also Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Engineers*, 538 F.
Supp. 2d 242, 257 (D.D.C. 2008) (accepting ecological surrogate of harm to habitat as a
permissible surrogate for quantifying take); *but cf. Oceana, Inc. v. Ross*, 2020 WL 5995125, at
*12–13 (D.D.C. Oct. 9, 2020) (rejecting shrimp fishing "effort" as an inadequate surrogate for
turtle take based on insufficient explanation); *Pritzker*, 75 F. Supp. 3d at 497 (rejecting surrogate
that pegged 161 turtle takes to 252,323 dredge hours without sufficient explanation);

As discussed above, the ITS serves two functions:  It provides a safe harbor for regulated parties, while ensuring that the ESA's core goal of "afford[ing] first priority to . . . saving endangered species," *TVA*, 437 U.S. at 185, remains front and center.  *See CBD v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (explaining that the ITS "serves as a check on the agency's original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species]" (alteration in original)).  Those who comply with the terms and conditions set forth in an ITS—including its numerical take limits—are protected from Section 9 liability.  16 U.S.C. § 1536(o).  But when the numerical take limit (or its surrogate) is exceeded, the safe harbor offers no shelter, and the Service and action agency must *immediately* reinitiate consultation to determine whether the original "no jeopardy" determination remains valid.  *See Salazar*, 695 F.3d at 909; 50 C.F.R. § 402.14(i)(4); *id.* § 402.16(a)(1) (requiring reinitiation "[i]f the amount or extent of taking specified in the incidental take statement is exceeded; *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038–39 (9th Cir. 2007) (rejecting ITS for using improper surrogate that authorized the take of all spotted owls in certain acreage, which could not be measured during the course of the project and thus did not set forth an adequate reinitiation trigger).

Here, the FWS's programmatic ITS omits this essential term.  *See Oceana*, 2020 WL 5995125, at *23 (holding that the ITS included in a shrimp BiOp was inherently flawed because it did "not function as an automatic trigger and no amount of further explanation by the agency" could remedy that flaw.  It sets no numerical take limit, offers no surrogate, and provides no "clear standard for determining when the level of anticipated take has been exceeded."  50 C.F.R. § 402.14(i)(1)(i).  Instead, the BiOp and ITS once again fall back on a claimed inability to make the necessary determinations at the programmatic level and once again look to the non-

statutory technical assistance process to fill the scientific and regulatory gap.  Dkt. 112-5 at 139–40 (BiOp).  Neither argument can withstand scrutiny.

To start, as Plaintiffs persuasively argue, it is difficult to believe that the FWS lacked information sufficient to permit it to quantify numerical take for *any* species given the wealth of previous permit and ESA consultation data at their disposal.  *See* Dkt. 98 at 42.  The FWS's stated "inability to anticipate the *locations* of future State 404 permit applications," Dkt. 112-5 at 139 (BiOp) (emphasis added), moreover, is both implausible (the Corps was in the midst of reviewing permit applications at the time the assumption application was approved) and beside the point.  The FWS failed to explain why or how the *location* of future projects is inescapably tied to incidental take limits for *all* endangered or threatened species in the State.  *See Conner*, 848 F.2d at 1454.  Consider the Florida panther, for example.  The FWS failed to explain why it was unable to set a numerical limit on incidental take based on previously issued BiOps and incidental take statements.  If there are about 150 panthers left in Florida, for example, it is not difficult to imagine a cumulative take limit per year for the entire State (or for particular regions of the State).

Given the wealth of information and experience that the FWS has in assessing threats to listed species in Florida, the FWS was at least required to offer *some* meaningful explanation for why it could not do more.  *See State Farm Mutual Automobile Ins. Co*., 463 U.S. at 52 ("The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" (citation omitted)).  By any measure, it is not enough—on a question of this importance—merely to assert in conclusory terms that "because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the []FWS to accurately estimate the specific amount of

incidental take at this time that is anticipated to occur as a result of the action."  Dkt. 112-5 at 140 (ITS).

The Federal Defendants offer little by way of response.  They cite to cases holding that numerical take limits are not always required and that surrogates may at times be used.  Dkt. 99 at 76 (collecting cases).  That assertion is literally correct, but it overstates the precedential support for what the EPA and the FWS have sought to do here—namely, issue an ITS intended to confer ESA immunity on the EPA, the State, and future state-permittees, without (1) setting a take limit or (2) employing a surrogate.  Notably, in a case that has been briefed beyond the point of exhaustion, the parties have identified only one case—*Cooling Water*—in which a court has upheld a final ITS that lacked either a numerical take limit or a surrogate.  For the reasons explained above, however, that case is both distinguishable and unpersuasive.

A couple of additional observations regarding *Cooling Water*, moreover, bear on the present discussion.  First, *Cooling Water* itself recognizes that "an ITS that 'contains no numerical cap . . . *normally* violates the ESA.'"  905 F.3d at 77 (emphasis added) (quoting *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012)).  To be sure, the case that *Cooling Water* cites for this proposition also held, as the Second Circuit noted, that an ITS need not set a numerical take limit if it explains "why it was impractical to" do so.  *Ctr. for Bio. Diversity*, 698 F.3d at 1127.  But in that case, *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012), the Ninth Circuit held that the impracticality of setting a numerical limit was "self-evident, in light of the very large number and minute size of [the] fish eggs and fry" at issue, and, more importantly, stressed that the ITS "did not ignore the incidental take issue, *but instead used a surrogate for determining incidental take levels*."  *Id.* at 1127 (emphasis added).

76

Second, the Eleventh Circuit's decision in *Defenders of Wildlife* is once again more persuasive than *Cooling Water*. Recall that *Defenders of Wildlife* involved a Navy project that involved two stages: the (1) installation and (2) operation of an Undersea Warfare Training Range. 733 F.3d at 1113. Although the initial BiOp did not include an ITS for the operation phase, the Eleventh Circuit concluded that "the NMFS provided a valid reason" for this omission—and, more importantly, the court stressed that the NMFS merely "postpone[d] the issuance of an incidental take statement" until the operation stage was scheduled to occur years later. *Id.* at 1123. As the Eleventh Circuit explained, the absence of an ITS meant that *any* take would require "reinitiating consultation" and that, in any event, "the Navy ha[d] repeatedly committed to obtaining the required . . . incidental take statement during a future consultation with the NMFS, prior to operations on the range commencing." *Id.* at 1124. The ITS in *Cooling Water* and the ITS in the instant case, in contrast, extend take liability protection through incidental take statements that lack a numerical take limit or a surrogate. In this respect, *Cooling Water*—and this case—stand alone.

Ultimately, the Federal Defendants once again fall back on the technical assistance process and argue that the "FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance." *See* Dkt. 99 at 79. As previously explained, that argument improperly seeks to replace the statutory and regulatory ESA regime with a process defined in a BiOp and various memoranda that differs in important respects from the governing law. Most notably, when the take limit set forth in an ITS is exceeded, the action and consulting agencies are required immediately to reinitiate consultation under Section 7. 50 C.F.R. §§ 402.14(i)(4), 402.16(a)(1). The Federal Defendants' assertion that, "[i]f [the] FWS's

assumptions about [the technical assistance process] prove incorrect or warrant changes to the implementation of the State program, it *could* . . . trigger reinitiation of consultation if effects occur that were not considered," Dkt. 106 at 38 (emphasis added), is both hopelessly noncommittal and, in any event, at odds with the terms of the ITS, which contain no program-level reinitiation trigger and, indeed, expressly disavows any such obligation.

After reciting the regulatory standard for reinitiation, the ITS provides as follows:

> For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat *shall not trigger reinitiation* of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the []FWS has *no obligation to conduct section 7 consultation* on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with [the] []FWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed.

Dkt. 112-5 at 143 (ITS) (emphases added). Term and Condition 9, in turn, provides that *Florida*—not the FWS—will "reopen" *individual permits*—not Section 7 consultation at the program-level—in the event of new information or exceedance of take as authorized in the original permit. *Id.* at 142 (BiOp). So, in short, the ITS provides that the federal agencies—the FWS and the EPA—will *not* reinitiate formal consultation, (1) even if the take limits set in the state-issued permits (with input from the FWS) are exceeded and (2) even if new species found in Florida are listed as endangered or threatened. In the words of the ITS, "[s]ince the State [will] administer the CWA 404 program, the []FWS has *no obligation* to conduct section 7 consultation on individual permits." *Id.* at 143 (emphasis added). Thus, in this and in other

JA.1361

respects,[17] the technical assistance process provides far less robust ESA protection of listed species than the ESA procedures it supplants. *See* 50 C.F.R. § 402.16(a)(1) (requiring reinitiation of formal consultation "[i]f the amount or extent of taking specified in the incidental take statement is exceeded"); *id.* § 402.16(a)(4) (requiring reinitiation "[i]f a new species is listed . . . that may be affected by the identified action"); *see also Am. Rivers v. FERC*, 895 F.3d 32, 48–49 (D.C. Cir. 2018) (stressing the need for a trigger to reinitiate formal consultation).[18]

The District Court for the District Court of Montana's analysis in *Forest Service Employees for Environmental Ethics*, which rejected a similar scheme, is persuasive. There, the court considered a biological opinion prepared by the FWS for use of chemical fire retardant. 726 F. Supp. 2d at 1195. The FWS's BiOp in that case did not include an ITS, instead explaining that take would be "authorized through emergency consultation on a case-by-case basis" because of uncertainty over where and to what extent the fire retardant would be used. *Id.* at 1205, 1231. The court rejected this approach as inconsistent with the ESA. "The problem with the ESA agencies' approach," the court explained, "is that it means that the first and only meaningful analysis under Section 7(a)(2) will occur during emergency consultation." *Id.* at

---

[17] Plaintiffs also challenge the ITS's "reasonable and prudent measures" and terms and conditions on the ground that neither created new, additional requirements on the EPA or Florida. Dkt. 98 at 44. An ITS must specify "reasonable and prudent measures" deemed "necessary or appropriate" to minimize incidental take from the action in question. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(ii). And an ITS must also set forth "terms and conditions (including, but not limited to, reporting requirements) that must be complied with" in order to implement the reasonable and prudent measures specified. 16 U.S.C. § 1536(b)(4)(iv); 50 C.F.R. § 402.14(i)(1)(iv).

[18] As the Federal Defendants point out, *see* Dkt. 106 at 39, the BiOp requires *Florida* to provide the FWS with an annual report summarizing the number of permits issued or denied and a "table that identifies all ESA-listed species taken by state 404 permitted activities along with the amount or extent of such take," Dkt. 112-5 at 142 (BiOp). Florida's reporting requirement, however, is not the equivalent of a reinitiation trigger which ordinarily serves to compel the FWS to immediately reinitiate consultation and reasses its original no jeopardy determination.

1231.  The result is "biological opinions that purportedly constitute Section 7 consultation" but "defer[] significant aspects of the required Section 7 analysis until emergency consultation."  *Id.*  There, all that stood "between the listed species and take from exposure to fire retardant is an undefined emergency consultation process," in contrast to cases like *Conner*, *Defenders of Wildlife*, and *North Slope*, where, as discussed above, future site-specific biological opinions will be prepared in full compliance with Section 7.  *Id.* at 1232.

The Federal Defendants' final argument is that the EPA's continued oversight of Florida's implementation of the Section 404 program saves the above-identified deficiencies in the programmatic BiOp and ITS.  *E.g.*, Dkt. 99 at 62; Dkt. 106 at 29, 41.  The Federal Defendants point to, for example, the EPA's right to review those permits with "reasonable potential for affecting endangered or threatened species," as determined during the technical assistance process.  *See* Dkt. 55-1 at 304 & n.2 (MOA between the EPA and FDEP); *see also* 33 U.S.C. § 1344(j); 40 C.F.R. § 233.51.  To be sure, if the EPA objects to a permit and the State does not address its objection, the authority to issue that permit reverts to the Corps.  33 U.S.C. § 1344(j); 40 C.F.R. § 233.20(b); *id.* § 233.50(j) ("In the event that the Director neither satisfies [the] EPA's objections or requirement for a permit condition nor denies the permit, the Secretary shall process the permit application.").[19]  Similarly, at the program-level, if the EPA determines that Florida is "not administering" its 404 program "in accordance with" the requirements of the CWA, then the EPA may withdraw its approval and return the program to the Corps.  33 U.S.C. § 1344(i).

---

[19] Director means the state director, *see* 40 C.F.R. 233.2, and Secretary means Secretary of the Army, *see* 40 C.F.R. 233.1(a) (first mention).

But the EPA's oversight of individual permits and authority to withdraw its approval of an assumption application, as established under the CWA, are not substitutes for the FWS's distinct duty under the ESA.  The EPA's oversight pursuant to a different statute—the CWA—serves a different purpose and does not determine whether and when incidental take liability protection is available under the ESA.  Oversight is intended to ensure that a state program is operating as approved, not to remedy a violation of the ESA.

The long and short of it is that the ESA creates two paths for extending take liability coverage: Section 7 (consultation for federal actions) and Section 10 (incidental take permits for non-federal actions).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that the EPA and the FWS constructed in the ITS at issue in this case.  That ITS was issued without the benefit of any species-specific analysis in the BiOp; it contains no numerical take limit and provides no surrogate for one; and it expressly disavows any duty to reinitiate formal consultation pursuant to Section 7 should the EPA's approval of the State's Section 404 program result in excess take or otherwise jeopardize the continued existence of an endangered species.  It is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be set aside.  5 U.S.C. § 706(2)(A).

\*   \*   \*

For all of these reasons, Plaintiffs are entitled to summary judgment on Counts Three, Four, Six, and Thirteen.

2. *ESA Claims Against the EPA*

Plaintiffs bring two ESA claims against the EPA:  First, they allege that the EPA unlawfully relied on the FWS's BiOp when it approved Florida's assumption application.

JA.1364

Second, they allege that the EPA failed to consult on nesting sea turtles and other species under

the jurisdiction of the NMFS.  The Court addresses each claim in turn.

a.   <u>The EPA's Reliance on the Biological Opinion</u>

The EPA was required, pursuant to the ESA, to ensure that its approval of Florida's

assumption application would not jeopardize any listed species.  16 U.S.C. § 1536(a)(2).  As the

action agency, the EPA bore the "ultimate responsibility for compliance with the ESA."  *City of

Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006).  Arbitrarily relying on a faulty BiOp violates

that duty.  *Id.*  Plaintiffs and the Federal Defendants, however, dispute the standard that this

Court should apply.  The Federal Defendants argue that Plaintiffs must point to some "new"

information that the Service should have considered in order to succeed on this claim; Plaintiffs

argue that the "new" information standard does not apply to a facially invalid BiOp.

To an extent, each side has a point.  The Federal Defendants are correct that an agency

can withstand an arbitrary and capricious challenge to an "admittedly weak" BiOp, if there is "no

'new' information . . . the [Service] did not take into account[,] which challenges the [biological]

opinion's conclusions."  *Id.* at 76 (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of

Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) and then citing *Defs. of Wildlife v. EPA*, 420 F.3d

946, 959, 976 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Assoc. of Home Builders*, 551 U.S.

644 (2007); and *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459–60 (9th Cir. 1984)).  As the D.C.

Circuit explained in *City of Takoma v. FERC*, this rule strikes a balance between two competing

sets of considerations.  *Id.* at 75–76.  On the one hand, a court's review of an action agency's

reliance on a BiOp differs from its review of the sufficiency of the BiOp itself.  *Id.* at 75.  The

question is not "whether the BiOp itself is somehow flawed," but "whether the action agency's

reliance [on it] was arbitrary and capricious."  *Id.* (emphasis omitted).  That assessment must be

82

made, moreover, in light of the unique "expertise of the consultant agency," which "would be seriously undermined" if the action agency was required "to undertake an independent analysis" of the relevant data and science.  *Id.* at 76.  On the other hand, however, "the two inquiries [necessarily] overlap to some extent, because reliance on a facially flawed BiOp would likely be arbitrary and capricious."  *Id.* at 75.  And given the action agency's "ultimate responsibility for compliance with the ESA," "the action agency must not blindly adopt the conclusions of the consultant agency."  *Id.* at 76.

The "new" information rule makes eminent sense when dealing with the types of expert, technical, and scientific judgments made by consulting agencies.  In those circumstances, the action agency can and should typically defer to the reasoned conclusions of the experts.  But that logic fails when a BiOp is "facially flawed" or when the alleged flaw in a BiOp is legal in nature, because discerning this type of flaw "requires no technical or scientific expertise," *Defs. of Wildlife*, 420 F.3d at 976.  In observing that an action agency's "reliance on a facially flawed BiOp would likely be arbitrary and capricious," *City of Tacoma* makes just this point.  460 F.3d at 75.  The distinction finds additional support, moreover, in the D.C. Circuit's decision in *Shafer & Freeman Lakes Environmental Conservation Corporation v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021).

In that case, the D.C. Circuit considered whether the action agency, the Federal Energy Regulatory Commission ("FERC"), unreasonably relied on a BiOp prepared by the FWS.  With respect to the FWS's scientific judgments, the *Shafer* court applied the "no new information" standard.  The court explained, "because the Service acted reasonably in using a linear scaling methodology, [FERC] too acted reasonably in relying on the Service's resulting scientific judgments in the Biological Opinion."  992 F.3d at 1093.  Quoting *City of Tacoma*, the *Shafer*

83

court once again stressed that in deciding whether FERC acted reasonably, "'the critical question [was] whether [FERC's] *reliance* [on the Service's BiOp] was arbitrary and capricious.'" *Id.* (internal citation omitted).

But that did not end the *Shafer* court's relevant analysis. In the following section of the opinion, the court took up the plaintiffs' distinct "*legal objection* to the Biological Opinion and [FERC]'s reliance on it." *Id.* at 1093 (emphasis added). And, in considering that question, the court applied the "facially flawed" standard and held that FERC's reliance on the BiOp was unreasonable. *Id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75). The *Shafer* court did not ask whether the plaintiffs had identified any new information not considered, concluding instead that "the Service's complete failure to address an important issue was apparent on the face of the Biological Opinion." *Id.* In sum, then, when confronted with a *scientific* or *technical* challenge to a BiOp, the *Shafer* court applied the "new information" standard, and, when confronted with a *legal* challenge to the BiOp, the court applied the "facially flawed" standard. *Shafer*, 992 F.3d at 1093 (citing *City of Tacoma*, 460 F.3d at 75); *see id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75).

Applying that same distinction here, the Court is persuaded that the EPA impermissibly relied on a facially flawed BiOp. As in the final section of the *Shafer* decision, the programmatic BiOp at issue here entirely fails to address essential questions, and, instead, defers those question for another day and another process that is untethered to Section 7. The Court will not repeat its critique of the FWS's BiOp here but, instead, simply notes that the deficiencies do not involve scientific or technical judgments about which fair minds might differ. To the contrary, major swaths of what the ESA and its governing regulations require a consulting agency to consider in a BiOp are simply absent. Indeed, for example, the BiOp makes no effort to undertake *any*

species-specific effects analyses whatsoever. *See, e.g.*, Dkt. 112-5 at 129–30 (BiOp).  As in the final section of the *Shafer* opinion, these inadequacies raise questions of law, rather than science.

The EPA was as well situated as the FWS, for example, to decide whether the ESA permits the consulting and action agencies to defer all species-specific effects analyses to a non-statutory, technical assistance process that does not occur until after the federal action is complete and that lacks a trigger for reinitiating consultation because it does not specify any take limits, numerical or otherwise.  In fact, if anything, this case flips the usual presumption on its head:  Here, it was the action agency (the EPA) and the applicant (Florida) that proposed the technical assistance process to the consulting agency (the FWS) and that performed the initial legal analysis.  As a result, this case is a far cry from one in which the action agency can reasonably claim that it deferred to the expertise of the consulting agency.  *See City of Tacoma*, 460 F.3d at 75–76 (rationale for "new information" standard is to give action agency a basis for doubting the expert conclusions).

Because the BiOp and ITS that the FWS issued in this case were facially and legally flawed, the EPA unreasonably relied on those documents in approving Florida's assumption application.  Plaintiffs are entitled to summary judgment on Count Ten.[20]

---

[20] Plaintiffs separately allege in Count Twelve that the EPA failed to consult with the FWS regarding Florida's nesting sea turtles.  Plaintiffs explain that more than 90% of all sea turtle nesting in the continental U.S. occurs in Florida, and yet, the record contains no mention of them.  *See* Dkt. 98 at 41; Dkt. 104 at 29–30.  The Federal Defendants respond that Plaintiffs have not identified "any habitat that would be in or near assumed waters," the action area in question.  Dkt. 106 at 36.  The Court views Plaintiffs' turtle-specific challenge as subsumed by their larger claims that the FWS failed to evaluate the effects of the agency action on *any* species and that the EPA relied on the FWS's facially invalid BiOp and ITS.  For these reasons, Plaintiffs are entitled to summary judgment on Count Twelve.

b.    The EPA's "No Effect" Determination

Whenever an agency action "may affect" a listed species in the "action area," the agency

must consult, as applicable, with the FWS, which administers the ESA with respect to species

under the jurisdiction of the Secretary of the Interior, and with the NMFS, which administers the

ESA with respect to species under the jurisdiction of the Secretary of Commerce.[21]  *See* 16

U.S.C. § 1536; *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.  Only if the action agency

determines that its actions will have *no* effect on listed species or critical habitat may it forego

consultation.  50 C.F.R. § 402.14(a), (b).  The "action area" includes "all areas to be affected

directly *or indirectly* by the Federal action and not merely the immediate area involved in the

action."  50 C.F.R. § 402.02 (emphasis added).  "Effects of the action may occur later in time

and may include consequences occurring outside the immediate area involved in the action."  *Id.*

Here, the EPA requested formal Section 7 consultation with FWS.  It did not, however,

request consultation with the NMFS.  As the EPA explained in its September 2, 2020 letter to the

NMFS, the NMFS had previously informed the State that no "ESA-listed species under [the]

NMFS'[s] jurisdiction . . . occur in waters that are assumable by the [S]tate based on the ESA-

listed species that were identified . . . as part of th[e] proposed assumption."  Dkt. 112-2 at 351.

The NMFS had concluded, based on discussions with the State, a review of various mapping

products and analysis, and a review of documentation provided by the State, that no ESA-listed

species "under NMFS'[s] jurisdiction" are found "in the waters that are assumable by the

[S]tate."  Dkt. 112-4 at 207.  Unsurprisingly, then, the day after the NMFS received the EPA's

---

[21] The NMFS (also known as "NOAA Fisheries") currently has jurisdiction "over 164 endangered and threatened marine species (79 endangered; 85 threatened)."  NMFS, *Species Directory*, https://www.fisheries.noaa.gov/species-directory/threatened-endangered?oq=&field_species_categories_vocab=All&field_region_vocab=All&items_per_page=350 (last visited Feb. 15, 2024).

September 2, 2020 letter, it "provided a courtesy concurrence of this determination."  Dkt. 112-2

at 352.  What matters for present purposes is that the EPA's no-effect determination, and the

NMFS's "courtesy concurrence," were based on the premise that no listed-species within NMFS

jurisdiction "occur" *in* the assumable waters.

    The problem with this determination is that it misapprehends the relevant "action area."

As explained above, the relevant "action area" is not limited to areas that are directly affected by

the agency action but also includes areas indirectly affected, including areas outside the

"immediate area involved in the action."  50 C.F.R. § 402.02.  Nor was that error self-evidently

harmless; to the contrary, the record suggests that listed species under NMFS jurisdiction may

well have been affected by the EPA's decision.  The BiOp observes, for example, that

"freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine

ecosystem," Dkt. 112-5 at 112 (BiOp), raising the prospect that the EPA's action might affect

listed species outside assumable waters.  At a minimum, the EPA was required to provide a

reasoned basis for considering affects only in the assumable waters and failing to consider "an

important aspect of the problem," *State Farm Mut Auto. Ins. Co*., 463 U.S. at 43—that is whether

species found in areas beyond the assumable waters might be "indirectly" affected by the agency

action.  The EPA's failure to consider the potential effects on any listed species under the

jurisdiction of the NMFS that occur outside the assumable waters, but within the action area as

defined by 50 C.F.R. § 402.02, and failure to offer a reasoned basis for that omission, runs afoul

of the APA's arbitrary and capricious standard.

    Although the Federal Defendants continue to maintain that the EPA's initial "no effect"

determination was reasonable, the EPA has, "[o]ut of an abundance of caution," "undertaken to

address [the] issue."  Dkt. 99 at 85.  In response to Plaintiffs' notice of intent to sue, the EPA

stated that it had "considered th[e] issue further" and was "preparing a Biological Evaluation." Dkt. 112-3 at 301. Nearly two years later, the EPA informed the Court that its biological evaluation was complete and had been transmitted to the NMFS. *Compare id.* (dated December 20, 2021) *with* Dkt. 113 ("Notice of Completion of Biological Evaluation" filed July 19, 2023). At oral argument another three months later, in October 2023, counsel for the Federal Defendants informed the Court that the NMFS did "not have a timeline for completion of any consultation at this time." Dkt. 156 at 87 (Oct. 19, 2023 Hrg. Tr.).

For the reasons explained above, the EPA's "no effect" determination was arbitrary and capricious at the time it was made—and at the time the agency approved the State's assumption application without the benefit of consultation with the NMFS. The EPA may be correct that its "ongoing work should provide a more fulsome analysis and ultimately resolve the matter," Dkt. 99 at 85, but Plaintiffs are not required to wait forever, and the EPA has had years to correct is omission. Nor can the Court conclude that this claim is "likely moot," Dkt. 102 at 60, based on the EPA's ongoing informal consultation with the NMFS. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 316 F. Supp. 3d 1156, 1174–75 (N.D. Cal. 2018) (claim of failure to consult not mooted by reinitiation because relief is available in injunctions and vacatur). Because the EPA has not issued a superseding effects determination or BiOp addressing NMFS-listed species and because the EPA was required to complete the Section 7 process before deciding to approve Florida's application, Plaintiffs' claims are not moot. *Cf. Oceana*, 2020 WL 5834832, at *4 (agreeing with NMFS argument that reinitiation alone did not moot case, but the issuance of a new, superseding BiOp would).

Plaintiffs are entitled to summary judgment on Count Eleven.

JA.1371

C.        Remedy

That brings the Court to the question of remedy.  Although the parties asked to brief

remedy following the Court's ruling on summary judgment, Dkt. 98 at 15 n.2 (Plaintiffs); Dkt.

99 at 34 n.13 (Federal Defendants); Dkt. 102 at 60 (Florida), the posture of the case shifted with

CBD and Sierra Club's motion for a temporary restraining order or preliminary injunction, Dkt.

135.  At the January 30, 2024 hearing on that motion, the Court sought the parties' views on

what remedy would be appropriate if the Court were to identify substantial flaws in the

programmatic BiOp and ITS.  The Court subsequently authorized and the parties submitted

supplemental briefs on that question.  Dkt. 157 (Intervenor Cameratta); Dkt. 158 (Federal

Defendants); Dkt. 159 (Intervenor Tarpon Blue Silver King I); Dkt. 160 (Florida); Dkt. 161

(Plaintiffs).

The APA directs that "[t]he reviewing court shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706.  "[A]lthough vacatur is the normal

remedy," courts in this circuit "sometimes decline to vacate an agency's action." *Allina Health

Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The decision whether to vacate turns

on the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d

146 (D.C. Cir. 1993), which consider (1) the "seriousness of the order's deficiencies" and (2) the

likely "disruptive consequences" of vacatur.  *Id.* at 150–51 (internal citation omitted).

The Court has now held that the FWS's programmatic BiOp and ITS, and the EPA's

reliance on those documents in approving Florida's assumption application, violate both the ESA

and the APA.  Under the APA, the normal remedy is vacatur of the FWS's BiOp and ITS, as

well as the EPA's approval of Florida's program.  Defendants, nonetheless, argue that vacatur is

not warranted and that the Court should, instead, remand the matter for further consideration. Dkt. 158 at 2; Dkt. 160 at 3.  Doing so, they explain, would prompt the FWS to reopen formal consultation with the EPA and would allow the FWS to "correct any errors or deficiencies identified by the Court."  Dkt. 158 at 4.  The FWS could, in their view, "clarify that the ESA obliges it to use the best available science in providing technical assistance to FDEP," *id.*, and "strik[e] particular language in the ITS," Dkt. 160 at 3.

With respect to the first *Allied-Signal* factor, Defendants argue that any deficiencies are not serious because the FWS and the EPA had a good faith and reasonable belief, based on *Cooling Water*, that the programmatic approach taken in the BiOp and ITS, and the technical assistance process, were lawful.  Dkt. 158 at 3–4; Dkt. 160 at 3–4 (discussing *Cooling Water* and arguing that this case presents "*at least* a close call" (emphasis in original)).  On the second factor, they argue that vacatur would be highly disruptive because it would introduce regulatory uncertainty in Florida regarding "how to seek incidental take coverage under the ESA," particularly given the "successful implementation of the program for the past three years."  Dkt. 158 at 5; *see also* Dkt. 160 at 5 ("Over 1,130 days have elapsed since Florida's Section 404 program commenced.").  To this, the State adds that remand without vacatur would pose little, if any, harm to Plaintiffs or the public because the technical assistance process "remains protective of listed species and ensures no jeopardy."  Dkt. 160 at 6.[22]

As for the EPA's approval of Florida's assumption application, the Federal Defendants argue that any deficiencies in the BiOp and ITS—no matter how grave—did not

---

[22] The intervenors join in these arguments.  *See generally* Dkt. 157; Dkt. 159.  Cameratta seems to suggest that the Court should allow its permit to move forward based on assurances provided in its brief, but it identifies no legal basis for such a remedy.  *See* Dkt. 157 at 2 ("In the interim of the remand, Cameratta would prepare and submit to [the FWS] and [the FWC] a site-specific biological assessment . . . .").

infect the EPA's approval of Florida's assumption because the EPA did not rely on the BiOp in

approving Florida's program.  Dkt. 158 at 6.  On their telling:

> EPA's approval action rested, in relevant part, on the agency's determination
> that Florida had "the authority" to "issue permits which . . . apply and ensure
> compliance with . . . the [404(b)(1)] [G]uidelines," 33 U.S.C. § 1344(h)(1)(A)(i),
> including the requirement that no permit shall issue that "[j]eopardizes the
> continued existence of" ESA-listed species or "results in likelihood of the
> destruction or adverse modification" of critical habitat, 40 C.F.R.
> § 230.10(5)(b)(3).  EPA reached that determination based on its review of the
> regulations in Florida's program submittal, not in the BiOp.

Dkt. 158 at 6.  But that argument is belied by the Federal Defendants own words in this very

case.  They observed in their cross-motion for summary judgment that the "EPA of course relied

on the BiOp, but so too does virtually every action agency that issues a rule following a no-

jeopardy determination by one of the consulting agencies."  Dkt. 99 at 43.  It is also belied by the

fact that the consultation considered one—and only one—federal action, the EPA's decision to

approve Florida's Section 404 assumption application.  And it is further belied by the fact that

the Federal Defendants and Florida justified the issuance of an ITS, which accorded incidental

take protection on the EPA, Florida, and future, state-permittees, on a theory that required far

more than assessment of whether Florida had the authority, under state regulations, to protect

ESA-listed species.

Plaintiffs' operative complaint asks the Court, among other things, to "[v]acate and set

aside []FWS' programmatic biological opinion and incidental take statement for the challenged

EPA decision and remand with instructions for reopening and reinitiating consultation" and

"[e]njoin the EPA's approval and transfer of authority to the state."  Dkt. 77 at 58 (Am. Compl.

¶¶ (m), (p)).  In their supplemental brief, Plaintiffs renew those requests and argue that the Court

should vacate the BiOp, technical assistance process, and ITS.  Dkt. 161 at 7.  Plaintiffs also

argue that because the EPA relied on an invalid BiOp and ITS to justify its approval of Florida's

program, that approval must be set aside as unlawful as well.  *Id.* at 12–13.  The Plaintiffs also

seek, for the first time, injunctive relief that "restores the Corps' authority over permits that may

affect ESA-listed species."  Dkt. 161 at 12.

      1.      *The Biological Opinion and ITS*

      The Court concludes that it should vacate the BiOp and ITS.  The Court agrees, as all

parties request, that this vacatur should be prospective and should not call into question

previously issued Section 404 permits.  Dkt. 158 at 5; Dkt. 160 at 7; Dkt. 161 at 11 & n.12.

      With respect to the first *Allied-Signal* factor, the Court concludes that the flaws in those

documents are serious, and that these flaws cannot be cured merely by further explanation or

changes to the technical assistance process on remand.  *See Conservation Law Found.*, 37 F.

Supp. 3d at 271 (vacating agency action is proper where there is "no question that the agency has

violated the law and absolutely no possibility of the [agency action's] survival on remand"); *Ctr.*

*for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (vacating biological

opinion because "neither *Allied-Signal* factor provides a reason to depart from the standard

vacatur remedy"); *Forest Serv. Emps for Env't Ethics*, 726 F. Supp. 2d at 1232 (vacating

programmatic biological opinion that deferred analysis to later, site-specific FWS review).

      Nor is the gravity of those flaws mitigated by the fact that the Federal Defendants and

Florida modeled the programmatic BiOp and ITS on *Cooling Water*.  As explained at length

above, *Cooling Water* is both distinguishable and the lone decision that has ever approved the

use of a programmatic BiOp and ITS that fails to undertake any species-specific analysis, fails to

set any numerical take limits or to employ surrogates to set a clear standard for determining

when the level of anticipate take has been exceeded, and that purports to accord ESA-liability

protection on future permittees without those limits.  Other settled precedent, moreover, has long

raised serious questions about the approach the EPA and the FWS took here.  Finally,

Defendants cite no authority for the proposition that vacatur is not required when an agency acts

with some good faith basis to believe that its actions are lawful.  To the contrary, such good faith

is generally presumed, yet the presumptive remedy under the APA remains vacatur.

      With respect to the second *Allied-Signal* factor, courts typically focus on the disruption

that might result from "an interim change," which "may itself be changed" at a later date—that

is, the disruption that might result from flipflopping policies.  *Ross*, 180 F. Supp. 3d at 246

(internal quotations omitted) (quoting *Allied-Signal*, 988 F.2d at 150–51).  Here, Defendants

have failed to show that the EPA can—and is likely to—reinstate the type of non-statutory

incidental take protection that applied under the technical assistance program.  This does not

leave the Federal Defendants, the State, or state-permittees without options, moreover.  A

permittee can still, for example, seek protection under Section 10, and, indeed, one of the two

developers that has intervened here was in the midst of doing so when the FWS issued is

programmatic ITS.  *See* Dkt. 135-8 at 29 (Tarpon Blue Silver King I, LLC).  In addition, as the

New Jersey model and the administrative record in this very case show, the EPA and the State

can pursue other options.  Those options, however, are appropriately explored and crafted by the

administrative agencies and the State—and not by the Court.

      Finally, the Federal Defendants point to a "prolonged delay in the issuance of individual

Section 404 permits in Florida now pending with the State."  Dkt. 158 at 8.  The Court does not

doubt that some disruption will occur, but the record says little about the extent of that

disruption, and, in any event, setting aside unlawful agency action almost always results in some

disruption.  Here, moreover, as discussed below, only a small percentage of state-permits require

some form of ESA incidental take protection.  Finally, the type of disruption that Defendants

JA.1376

invoke is inherent in the Section 404 program.  The Court is unaware of any complaints of

disruption that were lodged when the EPA transferred Section 404 permitting authority from the

Corps to the State, and the CWA anticipates that, if the State does not administer the program in

accordance with the CWA, the EPA can—and should—withdraw its approval of the assumption.

The Court will, accordingly, **VACATE** effective immediately the FWS's programmatic

BiOp and ITS.

> 2.      *The EPA's approval of Florida's assumption application*

Next, the Court must consider how the *Allied-Signal* factors apply to the EPA's

decision granting Florida's assumption application and whether the Court should vacate that

decision, in whole or in part, pending further consideration on remand.

Here, the Federal Defendants' principal argument for why the ordinary remedy of vacatur

is unwarranted is that the EPA did not rely on the programmatic BiOp and ITS in approving

Florida's assumption application under the CWA.  But, as explained above, that argument carries

little weight.  *Cf. Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601–02 (D.C. Cir. 2023)

(directing district court to vacate BiOp but allowing challenged rule to stay in place because the

court was "not convinced the error [in the BiOp] is fatal to the rule").  The Court, accordingly,

undertakes its own analysis of whether to vacate the assumption decision.

With respect to the first *Allied-Signal* factor, the Court remains convinced that the

ESA violation was a serious one, which will not easily be remedied on remand.  "In such

circumstances—where there is no question that the agency has violated the law and [there is]

absolutely no possibility of the [agency action's] survival on remand—the D.C. Circuit has

suggested that the rule ought to be vacated."  *Conservation Law Found.*, 37 F. Supp. 3d at 271

(citing *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).  "Section 7 of the

ESA is the most powerful safeguard in environmental law, and in the section 404

program," Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A*

*Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the*

*States*, 54 Md. L. Rev. 1242, 1259 (1995), and by eliding the requirements of Section 7, the

Federal Defendants committed a serious error.  In the ordinary course, the Court would have

little difficulty in concluding that error of this magnitude requires vacatur.

Here, however, the extent to which the ESA violations infect the overall Florida

assumption program is far from clear.  Most recently, Florida has told the Court that "just 1.4%

of Florida 404 permit applications" are likely to adversely affect species.  Dkt. 160 at 8.  That

estimate, however, is considerably smaller than the State's representation leading up to the

adoption of the assumption program "that approximately ten percent of Section 404 permits

issued in Florida require some form of incidental take coverage."  Dkt. 112-2 at 3.  But, either

way, it seems likely (or at least possible) that a large percentage of the permits at issue will have

no effect on listed species.  It is even less clear, though, whether the EPA would have

approved—or Florida would have asked the EPA to approve—an assumption application that did

not provide incidental take protection to Florida permittees through the programmatic ITS and

technical assistance program.  *See, e.g.*, Dkt. 112-3 at 369.

For similar reasons, it is also difficult to make a definitive determination regarding the

second *Allied-Signal* factor on the present record.  To start, the assumption has been in place now

for over three years, giving rise to some expectation interests among the affected parties.  The

Court also recognizes that Florida has expended funds to implement its 404 permitting program

and that some, although far from insurmountable, administrative difficulties would result from

returning the permitting authority to the Corps.  But the real question comes down to whether,

JA.1378

and, if so, the extent to which vacatur could lead to further administrative flipflopping and confusion. For the reasons explained throughout this opinion, the Court is skeptical that the EPA and the FWS will be able to replicate the current assumption program on remand and, more generally, is skeptical that the FSW and the EPA can accord incidental take liability protection on future, state-permittees without requiring Section 10 consultation, without relying on the CWA process for federalizing permits where appropriate (as in New Jersey), or, at the very least, preparing a dramatically different BiOp and ITS than those addressed above. The question whether the EPA could authorize a more modest assumption—and whether Florida would want it to do so—thus, cannot be answered on the present record.

Anticipating these issues, the Federal Defendants and Florida request that, if the Court is inclined to vacate the assumption decision, (1) it vacate the approval only as to those projects in the "may affect, likely to adversely affect" category, as those are the projects "*indicating incidental take*," Dkt. 160 at 7–8 (emphasis in original) (Florida); (2) it stay the order of vacatur for at least six months "to allow the federal and state agencies to chart a new course," *id.* at 7 (Florida); or (3) it postpone the effective date of its vacatur by at least 180 days, Dkt. 158 at 8 (Federal Defendants).

After considering these requests and weighing the seriousness of the defects as well as the potential disruptive consequences of vacatur, the Court concludes that the appropriate remedy is to **VACATE** the EPA's approval of Florida's assumption application. The Court will, however, permit Defendants to seek a limited stay of that vacatur within ten days of this decision. Any such request should exempt all pending and future permit applications that "may affect" any listed species under the jurisdiction of the FWS or the NMFS and should propose a mechanism for determining which permit applications "may affect" listed species. Because the

APA does not "contemplate that a court should substitute its judgment for that of the agency," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978), the Court will leave it to the administrative agencies to determine, at least in the first instance, whether any such stay is desirable and workable, and, if so, how it should work.  Finally, the Court notes that this invitation to seek a limited stay is not intended to foreclose any arguments Plaintiffs may have to the contrary or to pretermit Plaintiffs' remaining claims, which challenge the assumption decision more broadly.

Having vacated the BiOp, ITS, and assumption decision, the Court will **DENY** as moot CBD and the Sierra Club's motion for a temporary restraining order and preliminary injunction. Given the Court's decision, neither of the two permits that they seek to enjoin can issue, and, even if the Court eventually grants a limited stay of its vacatur of the assumption decision, and even if those permittees were willing to risk ESA liability without the protection of the ITS or a Section 10 permit, the State will lack authority under Section 404 to issue those permits.

Finally, the State requests that the Court enter partial final judgment pursuant to Federal Rule of Civil Procedure 54(b).  Dkt. 160 at 2 n.1.  The Court will **DENY** that request as premature but will permit the State to renew its request after the parties have reviewed this decision and have decided whether to seek a limited stay of the Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has decided how to proceed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, Dkt. 98, is hereby

**GRANTED** with respect to Counts 3, 4, 6 and 10–13 of Plaintiffs' Amended Complaint, Dkt.

77.  The Federal Defendants' cross-motion for summary judgment, Dkt. 99, and Defendant-

Intervenors' cross-motion for summary judgment, Dkt. 101; Dkt. 102, are hereby **DENIED** as to

those same Counts.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  February 15, 2024

JA.1381

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

    *Plaintiffs*,

  v.

MICHAEL S. REGAN, *et al.*,

    *Defendants*.

Civil Action No. 21-119 (RDM)

## <u>MEMORANDUM OPINION</u>

Two motions are currently before the Court: (1) the State of Florida's motion, Dkt. 166, for a limited stay of the Court's February 15, 2024 order, Dkt. 164, which both Plaintiffs and the Federal Defendants oppose, Dkt. 165; Dkt. 169, and (2) Florida's expedited motion for entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d), or, in the alternative, entry of partial, final judgment pursuant to Rule 54(b), Dkt. 171, which Plaintiffs oppose, Dkt. 178, and which the Federal Defendants support in part and "take no position on" in part, Dkt. 175 at 1.

For the reasons that follow, the Court will deny Florida's motion for a limited stay, Dkt. 166. With respect to Florida's second motion, however, the Court will dismiss as prudentially moot Counts 1, 2 and 5 of the Amended Complaint, Dkt. 77; will deny Florida's motion for entry of final judgment pursuant to Rule 58(d); and will grant Florida's motion for entry of partial, final judgment as to Counts 1–6 and 8–13 of the Amended Complaint pursuant to Rule 54(b).

## I.  PROCEDURAL BACKGROUND

The Court's analysis of the substantive issues presented by this case has filled many pages. For present purposes, however, the Court need only briefly summarize some of the

central holdings in those decisions.  Two years ago, the Court granted partial summary judgment

in favor of the Federal Defendants and granted Florida's motion to dismiss with respect to Count

9 of the original complaint, which alleged that the Environmental Protection Agency's ("EPA")

failure to codify Florida's Section 404 program was arbitrary and capricious and not in

accordance with law.  *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 213

(D.D.C. 2022) ("*CBD I*").  Then, about a year later, the Court granted the Federal Defendants'

renewed motion for partial summary judgment and Florida's renewed motion to dismiss with

respect to Count 8 of the original complaint, which alleged that the EPA had unlawfully treated

its approval of Florida's Section 404 assumption application as an adjudication, rather than a

rulemaking, to avoid the 30-day notice requirement found in 5 U.S.C. § 706(2).  *See Ctr. for*

*Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, at *9–*10 (D.D.C. Aug.

23, 2023) ("*CBD II*").  Although the Court had previously held, in considering the challenge to

Count 9, that the approval of Florida's assumption application was a rulemaking, *see CBD I*, 597

F. Supp. 3d at 212, the Court concluded that Plaintiffs' corresponding injury was non-redressable

and that, as a result, Plaintiffs lacked Article III standing to pursue Count 8.  *See CBD II*, 2023

WL 5437496, at *4–9.  And, most recently, on February 15, 2024, the Court granted summary

judgment in Plaintiffs' favor on Counts 3, 4, 6 and 10–13 of the Amended Complaint.  *See Ctr.*

*for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 655368, at *4 (D.D.C. Feb. 15,

2024) ("*CBD III*").

While *CBD I* and *II* addressed Plaintiffs' procedural challenges brought under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, *CBD III* focused exclusively on a

subset of Plaintiffs' substantive challenges under the APA to certain actions taken by the Fish

and Wildlife Service ("FWS") pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §

JA.1383

1531 *et seq.*, and the EPA's reliance on those actions in its approval of Florida's Section 404

assumption application.  Without repeating the extensive analysis contained in that opinion, it

suffices for present purposes to note that, at Florida's request, the EPA "exercised [its] discretion

to cast Florida's assumption program in a manner designed to confer ESA liability protection on

future, state-permittees by inviting Section 7 consultation," which, in turn, required a

determination that the proposed program "would likely adversely affect" listed species, *CBD III*,

2024 WL 655368, at *28—but, having triggered the formal Section 7 process, the FWS failed to

prepare a Biological Opinion ("BiOp") containing the required species-specific analysis, *id.* at

*26–32, and failed to issue an Incidental Take Statement ("ITS") that included, among other

things, numerical take limits for listed species or surrogates for such limits, *id.* at *32–36.  The

Court, accordingly, set aside the BiOp and ITS, and, having done so, also set aside the EPA's

approval of Florida's Section 404 assumption application on the ground that the "the EPA

impermissibly relied on a facially flawed BiOp" (and ITS) in taking that action, and thus also

violated the APA.  *Id.* at *38; *see id.* at *37–39, *41–42.  Finally, after considering the factors set

forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir.

1993), the Court concluded that vacatur was required.  *See CBD III*, 2024 WL 655368, at *41–45

(citing 5 U.S.C. § 706).[1]

    The Court, however, left open the possibility of staying its vacatur order in part, in light

of the fact that not all permits issued pursuant to Section 404 of the Clean Water Act ("CWA")

implicate the ESA.  *Id.* at *44.  At the same time, the Court recognized that the parties had not

---

[1] The Court also denied as premature Florida's request for entry of partial final judgment
pursuant to Federal Rule of Civil Procedure 54(b) but invited the State to "renew its request after
the parties have reviewed this decision and have decided whether to seek a limited stay of the
Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has
decided how to proceed."  *Id.* at *45.

briefed the desirability or workability (or, as the parties now stress, the legality) of crafting a program that would permit Florida to continue to process some, but not all, Section 404 permit applications.  *Id.*  The Court was also cognizant that crafting such a program, even if possible and desirable, would require the exercise of administrative discretion and that courts must take care not to "substitute [their] judgment for that of the agency."  *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)).  Finally, the Court acknowledged that, if it were inclined to grant a limited stay, it might need to go on to consider Plaintiffs' remaining claims, which challenge the Section 404 assumption decision in other respects.  *Id.*

To provide the parties with an opportunity to consider—and, if necessary, to brief—these issues, the Court gave Defendants ten days to seek a limited stay but made clear that, unless and until a stay was granted, Florida lacked authority to issue Section 404 permits and that "all [relevant] Section 404 permitting authority . . . is vested in the Army Corps of Engineers."  Dkt. 164 at 1.  On February 26, 2024, the Federal Defendants informed the Court that, in their view, a limited stay was neither workable nor lawful.  Dkt. 165 at 1–2.  Florida disagreed and moved for a limited stay of at least six months.  Dkt. 166 at 13, 19.  Plaintiffs opposed Florida's motion for a limited stay, Dkt. 169, and, finally, Florida filed a reply brief in support of its motion, Dkt. 170.  Given the significant concerns about the workability (and legality) of the requested stay raised by the parties—and, in particular, given the opposition of the federal agencies that would be responsible for implementing such a program—the Court directed the parties to appear for a hearing on the motion.  *See* Min. Order (Mar. 8, 2024).

Before that hearing could take place, Florida filed a second motion—this time seeking immediate entry of final judgment pursuant to Federal Rule of Civil Procedure 58(d) or, in the

JA.1385

alternative, entry of partial, final judgment pursuant to Rule 54(b).  Dkt. 171.  And, failing either, Florida "reserved the right" to ask the Court to certify the questions decided in the February 15, 2024 opinion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  *Id.* at 4 n.3.  Plaintiffs opposed both requests, Dkt. 178, and the Federal Defendants took a middle path, agreeing with Florida that the Court should enter final judgment pursuant to Rule 58(d) while taking "no position on Florida's [other] . . . requests," Dkt. 175 at 1.  Briefing closed on March 25, 2024, when Florida filed a reply brief in support of its motion, Dkt. 179, and the Court held a hearing on April 4, 2024, *see* Min. Entry (Apr. 4, 2024).

Both of Florida's motions are now ripe for decision.

## II.  ANALYSIS

### A.    Florida's Motion for a Limited Stay

All agree that district courts, in general, have authority to stay vacatur orders, whether as an exercise of the court's inherent authority or based on the *Allied-Signal* factors.  *See* Dkt. 166 at 3; Dkt. 169 at 6.  The parties disagree, however, about whether it would be wise (or lawful) for the Court to do so under the present circumstances.  In Florida's view, a limited stay is needed to avoid undue disruption, confusion, and delay in Section 404 permitting within the State.  Dkt. 166 at 3–7.  Plaintiffs and the Federal Defendants take the opposite view.  They contend that a limited stay would be unworkable, would result in increased confusion and would, if anything, increase delays in the Section 404 permitting process.  *See* Dkt. 165 at 2; Dkt. 169 at 6–7.  The Federal Defendants, moreover, point to a regulation that precludes the EPA from approving "[p]artial State programs . . . under section 404," Dkt. 165 at 3 (alteration in original) (quoting 40 C.F.R. § 233.1(b)), and they argue that a limited stay would, in effect, create the type of "partial State program" that the regulation precludes.

The Court is persuaded that a limited stay is neither workable nor desirable.  The Court

begins, once again, with the core tenet of administrative law that a court should not "substitute its

judgment for that of the agency." *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 555 (quoting

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  That principle applies here because a

limited stay would require more than simply holding the Court's order in partial abeyance; it

would require that various federal agencies, including the EPA, the FWS, and the U.S. Army

Corps of Engineers ("Corps"), work with the State of Florida to design mechanisms and

procedures that would permit the State to continue processing Section 404 applications that do

not implicate the ESA, while requiring the Corps to process those that do implicate the ESA.  It

is not the Court's role to develop such a program over the objection of the federal agencies, nor

would such a judicially mandated approach come dressed for success.

Significantly, the Federal Defendants stress just how real these concerns are.  They

observe:

> As a practical matter, it is unclear how, or even if, Florida and the Corps could
> divide permitting responsibilities for projects in state-assumed waters depending
> on whether those projects "may affect" listed species.  Under such an
> arrangement, would applicants apply to Florida or the Corps in the first instance?
> Who would then determine impacts on ESA-listed species?  And what would
> happen if Florida and the Corps disagreed on that determination?  The time
> needed to answer these, and many other difficult questions could exceed the
> uncertain duration of a limited stay and would consume considerable agency
> resources that might otherwise go toward processing permits in the meantime.

Dkt. 165 at 2.  Nor do they stop there.  The Federal Defendants further observe that a limited stay

would result in needless "redundancy"—for instance, if review of a proposed permit commences

at the state level, only to then be transferred to the Corps later if it is determined that the

proposed project "may affect" listed species.  *Id.*  Florida, for its part, agrees that a limited stay

would raise a host of questions, including: how to define "a 'may affect' situation for these

6

purposes;" what "mechanism should be used to identify a 'may affect' situation;" "[w]hat options [would be] available to 'may affect' permit applicants;" and "[h]ow should a limited stay address permit applications that otherwise already trigger Section 7 procedures and/or will obtain Section 10 permit coverage." Dkt. 166 at 8. Although Florida proposes answers to some of these questions (and asks the Court to answer others), the Court will not step into the shoes of the federal agencies and design a new or modified Section 404 assumption program, which those agencies submit is neither workable nor lawful.

Recognizing these hurdles, Florida suggests a "second proposed option," which it submits is similar to the Section 404 programs currently in place in Michigan and New Jersey. Dkt. 170 at 9. Under that approach, Florida "would continue to implement both the existing technical assistance process . . . as supplemented by the same basic 'Procedures' set forth in Section III of the New Jersey-EPA-FWS MOA." Dkt. 166 at 14. There are several problems, however, with this alternative. First, and foremost, it is not the program that the EPA approved in response to Florida's Section 404 assumption application. Notably, unlike the program that the EPA approved, this approach would provide no incidental take liability protection to Florida permittees. *Id.* at 15. That is a critical difference because incidental take protection is vastly more important in Florida than it is in Michigan and New Jersey; as Florida itself stressed at an earlier stage of the proceedings, New Jersey "has only 17 listed species and less than 1,400 square miles of water area," while "Florida has *over 130 listed species* and *over 12,000 square miles* of water area." Dkt. 127-1 at 5 (emphasis in original). Indeed, during the administrative process preceding the EPA's decision on Florida's Section 404 assumption application, the State represented that operating a state program without Section 7 incidental take protection at the program level would be "*more burdensome* than the existing federal program," due to the

prevalence of listed species in Florida.  *See* Dkt. 112-2 at 4 (emphasis added).  The EPA

similarly explained that in States, like Florida, with "an abundance of ESA listed species," the

absence of program-level incidental take protection would "present a significant obstacle to

assuming the 404 program."  Dkt. 112-3 at 368.  It follows that a stay that would allow Florida to

process Section 404 permit applications without incidental take protection would likely hinder—

rather than grease—the wheels of progress, since few developers would "risk civil and criminal

penalties."  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023).

In response, Florida insists that the "vast majority of the projects in Florida don't

implicate incidental take."  Dkt. 181 at 11 (Apr. 4, 2024 Hrg. Tr.).  It estimates that on average

only about 15% of Florida Section 404 permit applications would likely trigger a "may affect"

finding.  Dkt. 166 at 11; Dkt. 166-1 at 4 (Wolfe Decl. ¶ 13).  The United States disagrees with

this estimate and would, instead, place the figure as high as 85%.  Dkt. 181 at 35–36 (Apr. 4,

2024 Hrg. Tr.).  That disagreement itself raises red flags about the workability of the proposed

stay, which would require considerable federal-state cooperation and agreement on key aspects

of the modified program.  But, even setting aside that concern, neither of Florida's proposed

approaches makes sense.

To take just one significant example, under its first proposed approach, Florida argues

that the need for incidental take protection—which it deemed an essential component of its

assumption application—can be addressed by providing "may affect" permit applicants with

several options, including the option to hold an application in abeyance with the State, to amend

an application to ensure that the proposed project would have "no effect" on listed species, to

withdraw an application, or to request that the State "transfer the permit application file to the

Corps of Engineers for processing."  Dkt. 166 at 11–12.  It goes without saying, however, that

the first three options are unlikely to result in greater ease of administration, efficiency, or

expedition than simply allowing the Corps to process all Florida Section 404 permits—with the

concomitant benefit, where appropriate, of incidental take protection.  The fourth option,

moreover, runs head-on into Florida's contention that Plaintiffs have somehow misled the Court

about how the New Jersey program works.  Dkt. 170 at 1–3.

For present purposes, the Court need not address Florida's accusation in any detail, other

than to note that the Court was not, in fact, misled.[2]  What does matter for present purposes is

that Florida maintains (and the Federal Defendants agree) that under Section 404 of the CWA

and the relevant implementing regulations, the EPA may transfer a permit application from a

State to the Corps only if "the proposed permit is (1) the subject of an interstate dispute under

§ 233.31(a) and/or (2) outside requirements of the Act, these regulations, or the 404(b)(1)

Guidelines[,]" 40 C.F.R. § 233.50(e), and the State is provided an opportunity to amend the

---

[2] Without going too far down this tangent, the Court notes that it had before it the New Jersey
Memorandum of Agreement, which it reviewed and relied upon in its opinion.  The Court also
notes that Florida did not take issue with Plaintiffs' (admittedly abbreviated) description of the
New Jersey program until after the Court issued its February 15, 2024 decision.  And, although
Florida spends pages chastising Plaintiffs for mischaracterizing the New Jersey program as
allowing for the "federalization" of Section 404 permit applications, *see* Dkt. 170 at 1–6; Dkt.
171 at 2 n.2; Dkt. 179 at 10–11, the Court notes that it was the EPA—and not Plaintiffs—that
first referred to "federalizing" Section 404 permit applications and that first treated the
"federalizing" of permit applications as one of "[t]he limited options" that was available "for
states seeking to assume the 404 program."  *See* Dkt. 112-3 at 368.  To the extent any blame can
be assigned regarding this issue—and, to be clear, in the Court's view, no blame is due—it lies in
the failure of all of the parties to add to the many hundreds of pages of briefing (and thousands of
pages of administrative documents) before the Court by providing additional detail about a
decades-old program not directly at issue in this litigation and in the failure of the Court to
describe that program more precisely in its opinion.

To put this issue firmly to rest, however, and to avoid any continuing confusion regarding the
New Jersey program, the Court has amended its February 15, 2024 opinion, in minor respects, to
add the further detail omitted in the parties' filings and the Court's original opinion.  *See* Dkt.
182.  None of these changes have any bearing on the Court's conclusions.

permit to address those objections, 33 U.S.C. § 1344(j).  *See* Dkt. 165 at 2–3 (Federal

Defendants); Dkt. 170 at 3, 6 (Florida).  Whether that view is correct, how those principles apply

in practice, and whether adoption of such a program would result in an impermissible "[p]artial

State program[]," 40 C.F.R. § 233.1(b), are questions beyond the scope of this opinion.[3]  For

present purposes it suffices to note that Florida's proposal that permittees simply "[r]equest that

[the State] transfer the permit application file to the Corps of Engineers for processing," Dkt. 166

at 12, is of dubious legality and, in any event, is unworkable given the opposition of the Federal

Defendants.  To the extent that Florida asks the Court to utilize its broad, equitable authority to

craft a limited stay that differs from the type of Section 404 program that the EPA would have

the authority to approve, the Court is unpersuaded that such a novel approach is warranted on the

facts of this case, particularly given the serious concerns raised by the federal agencies that

would need to implement that approach.

 For all of these reasons, the Court concludes that a limited stay—in any form—would not

alleviate disruption, ameliorate confusion (to the extent any exists), or avoid delays in the

processing of Section 404 permit applications.  If anything, a limited stay would have just the

opposite effect.  Moreover, and of equal importance, the Court notes that the Corps stands ready

and able to process the outstanding permit applications and that, to date, any delay in processing

those applications is a result of Florida's effort to keep some semblance of the Section 404

assumption in place—even if only temporarily.  In these respects, the representations made by

counsel for the Federal Defendants at the most recent hearing bear repeating at length:

---

[3] *Cf.* Dkt. 112-5 at 154–56 (New Jersey MOA stating that the EPA "*will* object" to any
individual permit that the FWS determines is "likely to adversely affect federally-listed species"
and if New Jersey "neither satisfies the EPA's objections or requirements for a permit
condition . . . nor denies the permit, the permit application *will* be transferred to the Corps for
processing" (emphases added)).

[A]s of February 15, there were about 1,000 permit applications pending before the State of Florida. The Corps has identified and allocated resources to process those permits. And it starts with the Jacksonville District of the Corps, which is the office that has hand[l]ed Section 404 permitting in Florida since forever, pre-assumption . . . . [T]here are more people in the Jacksonville district today to process [S]ection 404 permits than there were before state assumption. And it is not just a couple more, it is a couple dozen more. In addition to the Jacksonville district, there are four other districts within the South Atlantic division. And the Corps has identified people in the other districts and the South Atlantic division as well as [at] Corps headquarters who can help with the anticipated surge of permits given the number of permits that were pending before Florida.

And I say the anticipated surge, Your Honor, because Florida has not transferred permits to the Corps yet. The Corps is prepared to process those permits. But if those permits exist in a state of regulatory limbo today, I want the Court to understand it is not because the Corps has not taken steps to comply with the Court's Order of February 15th. The Corps is ready to process permits.

Now, notwithstanding the fact that we haven't gotten permits from Florida yet. We have had meetings at the Corps with quite a few project proponents, including project proponents who have permits that were pending before Florida as of February 15th. And a number of those entities have congressionally approved agreements with the Corps to seek expedited Corps review of Section 404 permit applications for priority projects.

. . . . For those folks who don't have one of the congressionally approved expedited review agreements, I want to emphasize that a project will not go to the back of the line just because the applicant had previously applied to Florida. The idea here is that the Corps will, as much as possible, pick up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements. And I think the Corps' hope here is that a project that got pretty close to the end of the line in Florida, because of the work that went into preparing the documents for Florida, will get through the Corps' process faster. That is the hope. But I just want to emphasize again . . . the Corps' intention here is not to make people start from square one, it is to do this as efficiently as possible.

. . . . [T]he state of play is [that] the Corps [is] processing permits. It has done that for decades. It is familiar to the regulated community. I think the efforts the Corps has made really cut against granting the limited stay of the vacatur.

Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.); *contra id.* at 5 (Florida asserting that "permit

applicants are faced with the dilemma currently of being required to go back to square one [and]

have their permits restarted" by the Corps).  In short, the Corps is "open for business today," *id.*
at 31; it has unquestionable legal authority to act; it has substantial experience processing Section
404 permit applications; it can, if appropriate, trigger the Section 7 consultative process; and,
where appropriate, that process will lead to issuance by the FWS of incidental take statements
and any corresponding liability protection.

The Court will, accordingly, deny Florida's motion for a limited stay.

**B.     Florida's Motion for Entry of Final Judgment**

Florida also moves for entry of final judgment pursuant to Federal Rule of Civil
Procedure 58(d) or for entry of partial, final judgment pursuant to Rule 54(b).  For the reasons
explained below, the Court will dismiss Counts 1, 2, and 5 as moot, but because Count 7
remains, the Court will deny Florida's request for entry of final judgment pursuant to Rule 58(d).
The Court will, however, enter partial, final judgment as to Counts 1–6 and 8–13 of the
Amended Complaint pursuant to Rule 54(b).

**1.**

Florida first argues (with the concurrence of the Federal Defendants) that the Court
should enter final judgment pursuant to Rule 58(d) because, in its view, Plaintiffs have received
all the relief that they sought and, as a result, their remaining claims are moot. Dkt. 171 at 8–11
(Florida); Dkt. 175 at 1 (Federal Defendants).[4]  Rule 58(d) provides that a "party may request
that judgment be set out in a separate document as required by Rule 58(a)."  As used in the
Federal Rules of Civil Procedure, the term "judgment" means "any order from which an appeal
lies," Fed. R. Civ. P. 54(a), and, in the usual course, an appeal must await the entry of a "final

---

[4] The Federal Defendants argue that Plaintiffs' remaining claims are moot but take no position
on Florida's request for partial final judgment under Rule 54(b). *See* Dkt. 181 at 36 (Apr. 4,
2024 Hrg. Tr.); Dkt. 175 at 1.

JA.1393

decision," 28 U.S.C. § 1291.  A "final decision," under 28 U.S.C. § 1291, "ordinarily must resolve every claim of every party in a case."  *Attias v. CareFirst, Inc.*, 969 F.3d 412, 416 (D.C. Cir. 2020).

Because the Court has yet to resolve every claim involving every party in the case, the Court cannot enter final judgment on the present record.  Recognizing as much, Florida asks the Court to dismiss the remaining claims as moot and, after having done so, to enter final judgment pursuant to Rule 58(d).  Dkt. 171 at 9–10.  According to Florida, the remaining claims are moot because nothing remains for the Court to adjudicate in this case; it argues that because the Court has set aside the BiOp, the ITS, and the Section 404 assumption determination, Plaintiffs have obtained all the relief that they sought and thus, even were they to prevail on the remaining claims, there is no additional relief that the Court could grant.  As a fallback position, Florida argues that "[r]egardless of whether [Plaintiffs'] remaining claims are formally 'moot' or not . . . this Court, at least, has *discretion* to enter final judgment at this point."  Dkt. 179 at 3 (emphasis in original).  Under either formulation of the argument, Florida bears the burden of convincing the Court to dismiss the claims.  *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 569–70 (1984).

As the D.C. Circuit has recognized, the doctrine of mootness has "two distinct branches." *Chamber of Com. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).  The first branch is "grounded in the jurisdictional limitations dictated by the Constitution:  Under Article III, a federal court is without power to act unless it is presented with a live 'case or controversy.'" *City of New York v. Baker*, 878 F.2d 507, 509 (D.C. Cir. 1989) (first citing *Chamber of Com.*, 628 F.2d at 291; and then citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)).  The second branch is often termed "prudential mootness."  *Id.*  It "does not concern [the] [C]ourt's power to

grant relief, but rather its exercise of discretion in the use of that power." *Id.* "Where it is so

unlikely that the court's grant of [remedy] will actually relieve the injury," *Penthouse Int'l,*

*Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991), the court has discretion to "stay its hand,

and to withhold relief it has the power to grant," *Chamber of Com.*, 627 F.2d at 291. "The

cousin of the mootness doctrine, in its strict Article III sense," prudential mootness is "a melange

of doctrines relating to the court's discretion in matters of remedy and judicial administration."

*Id.* (citing 13C A. Miller Wright & E. Cooper, Federal Practice and Procedure § 3533 (1975)).

As a leading treatise explains:

> Despite the clear separation in received theory between mootness principles
> mandated by Article III and principles merely of remedy or judicial
> administration, most decisions do not undertake any explanation of the sources
> drawn upon. At times, to be sure, a court may take pains to explain that it need
> not choose between Article III and prudential concerns in finding a case moot.
> It is more common, however, to focus instead on the ability to provide any
> presently meaningful remedy, in light of the court's ability to surmise continuing
> effects or to forecast possible future effects. Probably this focus reflects a
> disposition to exercise remedial discretion in favor of the litigant who has once
> had a living claim for relief, or to withhold possible remedies that seem too
> drastic in relation to current circumstances.

13B Edward H. Cooper, Federal Practice and Procedure § 3533.1 (3d ed. 2023). For the reasons

explained below, the Court concludes that Counts 1, 2, and 5 of the Amended Complaint are, at

the very least, prudentially moot. The Court is unpersuaded, however, that Count 7 is either

jurisdictionally or prudentially moot.

The Court's analysis of jurisdictional mootness begins with the Seventh Circuit's

decision in *Air Line Pilots Association, Int'l v. UAL Corp.*, 897 F.2d 1394 (7th Cir. 1990). In

that case, the Seventh Circuit held that a provision of a collective bargaining agreement violated

the Railway Labor Act ("RLA") and then remanded the case to the district court to determine

whether that provision and another provision violated state law. *Id.* at 1396. The district court

concluded that both provisions violated state law, and, on a subsequent appeal, the employer

argued that the case had become moot because the time to petition for a writ of certiorari

regarding the Seventh Circuit's earlier RLA holding had expired, and "no purpose could be

served . . . by a declaration that" the same provision of the collective bargaining agreement that

the circuit had already held violated federal law also violated state law.  *Id.*  For two reasons, the

Seventh Circuit was unpersuaded.  First, the court noted that the time to file a petition for

certiorari had not, in fact, expired, because the prior decision was not final.  *Id.* at 1397.  Second,

and of greater importance here, the court held that a case does not become moot simply because

a court grants complete relief based on one theory of recovery.  *Id.*  As the Seventh Circuit

explained, "it is cases rather than reasons that become moot," and "[w]hether a court gives one or

ten grounds for its result is not a question to which Article III prescribes an answer."  *Id.*  "The

practical reason" for this rule "is that the alternative grounds are ripe for decision and deciding

them may help a higher or a subsequent court" decide the case.  *Id.*

In *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 587 (D.C. Cir. 2001), the D.C. Circuit

cited *Air Line Pilots Association* with approval and adopted the Seventh Circuit's reasoning.

Echoing the Seventh Circuit, the court wrote:  "If a plaintiff presents two or more alternative

grounds as routes to its hoped-for ultimate victory, a court does not lose jurisdiction over the

second claim once it has ruled in the plaintiff's favor on the first claim; victory on the first claim

doesn't moot the second."  *Id.*  The D.C. Circuit had faced a similar question several months

earlier in *WorldCom, Inc. v. FCC*, 246 F.3d 690 (D.C. Cir. 2001), where the court declared it

"settled law" that resolution of one basis for granting relief does not moot a second ground for

granting that same relief.  *Id.* at 695 (citing *Air Line Pilots Ass'n*, 897 F.2d at 1397).  Embracing

the Seventh Circuit's "practical reason" for this rule, the D.C. Circuit observed that "[b]y

15

JA.1396

considering both bases, there is obviously potential for economy by the inferior federal courts, as higher-level review might remove the first basis for the outcome." *Id.*

This line of authority provides ample support for the notion that this Court could have—consistent with Article III—resolved all of Plaintiffs' claims and could have, if supported by the law and facts, provided alternative grounds for awarding the same relief. As the Seventh Circuit observed in *Air Line Pilots Association*, "in a vast number of cases the court, having decided that the defendant's conduct is unlawful on ground A, goes on to decide that it is also unlawful on ground B." 897 F.2d at 1397. That is certainly correct. But, as the Seventh Circuit also observed, courts are not "compelled" to reach alternative theories that might, at most, provide a second or third rationale for granting the same relief already justified on the basis of the first theory. *Id.* To continue the Seventh Circuit's observation of common practice, courts will often decide that a defendant's conduct is unlawful on ground A and will decline to go on to consider whether it is also unlawful on grounds B, C, and D. *See id.* (explaining that courts often use the word "moot" "to refer to an issue that need not be decided in light of the resolution in the same opinion of another issue," even though they do not mean moot in an Article III sense (citing *Bazemore v. Friday,* 478 U.S. 385, 387 n.2 (1986))). In other words, courts often have the discretion to treat alternative claims, which offer the plaintiff no prospect of obtaining any further relief, as prudentially moot.

By way of analogy, this is the same thing that the D.C. Circuit does when it affirms a lower court's decision without reaching the merits of a cross-appeal. As the court has explained:

> [W]here . . . the losing party's theories are rejected, courts appear uniformly to dismiss a conditional cross-appeal. . . . While characterizing such a cross-appeal as moot may be in tension with the general recognition that a court's acceptance of one of an appellant's two independent bases for attack does not render the second basis moot, *see Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1397 (7th Cir. 1990), this case presents no reason to break out of conventional

16

practice.  Thus, on affirming the [agency's] decision . . . , we dismiss [this unconditional cross-appeal] without reaching the merits.

*Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 649–50 (D.C. Cir. 1998); *cf. Belton v. WMATA*, 20 F.3d 1197, 1203 (D.C. Cir. 1994) (treating an issue as "moot as a practical matter," even though the appellate court could have reached the issue under *Air Line Pilots Ass'n*).

The fact that courts have discretion to reach alternative legal theories supporting the same relief, accordingly, does not mean that they must always utilize that authority.  Judges "[f]requently . . . decide no more than they have to decide," Cass R. Sunstein, *Foreword: Leaving Things Undecided*, 110 Harv. L. Rev. 4, 6 (1996), and they often have very good reasons for doing so.  This is a common practice in the district courts,[5] and, at least in cases involving pure questions of law, it does not necessarily preclude an appellate court from reaching the claims left undecided by the district court.[6]  The practice ensures that judicial decisions are rendered only after careful consideration, and it permits courts to avoid the pointless—and at times jurisdictionally dubious—task of deciding a broad array of legal and factual issues (including difficult and time-consuming ones) that, in the parlance of mootness, will "make [no] difference to the legal interests of the parties," *Air Line Pilots Ass'n*, 897 F.2d at 1396.

---

[5] *See, e.g.*, *Lewis v. Becerra*, 2023 WL 3884595, at *6 n.6 (D.D.C. June 8, 2023) ("[T]he Court need not reach the plaintiffs' other arguments under alternative provisions of the APA, which request the same relief."); *Dist. Hosp. Partners, L.P. v. Sebelius*, 932 F. Supp. 2d 194, 199 n.5 (D.D.C. 2013) (declining to reach alternative grounds under the APA asserted by plaintiff in vacating an administrative decision); *Burke v. Coggins*, 521 F. Supp. 3d 31, 45 (D.D.C. 2021) (declining to reach plaintiffs' first amendment and appointments clause arguments given complete relief on APA challenge); *Poett v. United States*, 657 F. Supp. 2d 230, 242 (D.D.C. 2009) (denying without prejudice plaintiff's constitutional claims for same reasons).

[6] *See, e.g.*, *Hutchins v. District of Columbia*, 188 F.3d 531, 547–48 (D.C. Cir. 1999) ("Appellees argued before the district court that the curfew also violated their First and Fourth Amendment rights, but because the district court found the curfew unconstitutional on equal protection and due process grounds, it did not reach these additional constitutional claims.  We exercise our discretion to resolve these purely legal claims in the interest of judicial economy.").

Applying these considerations, the Court will exercise its discretion—as a matter of prudential mootness and 5 of the Amended Complaint, but will decline to dismiss Count 7. Counts 1, 2, and 5 are each asserted against the EPA, each challenges the EPA's decision-making process leading up to its decision to approve Florida's Section 404 assumption application, and each seeks vacatur of that approval.  Dkt. 77 at 25–27 (Compl. ¶¶ 104–17) (Count 1) (challenging the EPA's interlocutory completeness determination); *id.* at 27–35 (Compl. ¶¶ 118–61) (Count 2) (challenging the EPA's approval of Florida's program on a variety of theories); *id.* at 42–43 (Compl. ¶¶ 202–12) (Count 5) (challenging the EPA's "no effect" determination with respect to species under the jurisdiction of the National Marine Fisheries Service ("NMFS")); *see id.* at 56–58 (Prayer).  For the reasons given in *CBD III*, the Court has already ruled against the EPA and has already granted Plaintiffs the relief that they seek in Counts 1, 2, and 5—vacatur of the assumption determination.  Dkt. 164.  The Court's vacatur order, moreover, does not merely embody that legal conclusion; it has current, operative effect, and it has fully redressed the injuries alleged in Counts 1, 2, and 5.  That is the ultimate relief to which Plaintiffs are entitled, and, accordingly, reaching the merits of Counts 1, 2, and 5 is unlikely to "make a difference to the legal interests of the parties," *Air Line Pilots Ass'n*, 897 F.2d at 1396.  There is, in short, no assumption program left for Plaintiffs to challenge.

Plaintiffs argue that their claims are not moot "in light of the State's intention to appeal." Dkt. 178 at 7.  But that argument speaks only of jurisdictional mootness and ignores the prudential considerations described above.  Considered in that light, Plaintiffs' argument proves too much; it would require district courts to address all alternative grounds for relief in every case in which an appeal is reasonably anticipated.  The real question is whether reaching the alternative grounds presented will likely assist the court of appeals in its consideration of the

18

case or avoid an unnecessary remand, and the corresponding delay and expenditure of judicial

resources.  Here, however, the Court concludes that the additional judicial time and resources

necessary to resolve Plaintiffs' alternative theories (all of which are premised on the APA) is

unlikely to be justify by the remote possibility that these alternative rulings would assist the court

of appeals or would, in the end, conserve judicial resources.

Plaintiffs also argue that a decision granting them declaratory relief on Counts 1 and 2

would provide additional relief, beyond that which the Court has already granted.  *Id.* at 11.  But

the Declaratory Judgment Act provides only that a court "*may* declare the rights and other legal

relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a) (emphasis

added).  And "[w]here it is uncertain that declaratory relief will benefit the party alleging injury,

the court will normally refrain from exercising its equitable powers."  *Penthouse*, 939 F.2d at

1020 (affirming district court's denial of request for declaratory judgment on prudential

mootness grounds).  Here, where the challenged program no longer exists (and may never again

exist), it is "uncertain"—to say the least—that a declaratory judgment would meaningfully

benefit Plaintiffs.  *Cf. Baker*, 878 F.2d at 510 (1989) ("[D]eclaratory judgment is [a]

discretionary remedy that may be withheld where challenged practice is undergoing significant

change so that its ultimate form cannot be predicted." (citing *Mechling Barge Lines, Inc. v*

*United States*, 368 U.S. 324, 331 (1961))).  Thus, even "assuming that there is some trace of a

continuing injury sufficient to satisfy Article III," declaratory relief would not be "appropriate as

an exercise of the court's discretionary, equitable powers."  *Penthouse*, 939 F.2d at 1019.

The Court recognizes that the remaining claims do not precisely duplicate the claims that

the Court has resolved to date; the remaining claims against the EPA are premised on the APA

and the CWA, while the claims that the Court has already adjudicated are premised either

19

exclusively on the APA or on the APA and the ESA.  But they are all APA claims—there is no available cause of action under the CWA or the ESA.  *See Nat'l Ass'n of Homebuilders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005).  And, in any event, the line between Plaintiffs' CWA and ESA claims is, as Plaintiffs themselves acknowledge, a blurry one.  *See* Dkt. 178 at 28 ("The claims at issue here are inextricably linked . . . .").  In Count 1, for example, Plaintiffs allege (among other things) that the EPA violated the APA by treating Florida's Section 404 assumption application as complete before the BiOp—which is discussed at length in the Court's February 15, 2024 opinion—was itself complete.  Dkt. 77 at 25 (Compl. ¶ 108); *see also* Dkt. 178 at 28–31.  Similarly, Count 2 alleges that the EPA erred in approving Florida's assumption application, which, on Plaintiffs' telling, failed (among other things) to comply with certain requirements relating to the protection of listed species.  Dkt. 77 at 34 (Compl. ¶ 154); Dkt. 178 at 29–30.  Finally, Count 5 alleges that the EPA's "no effect" determination relating to species under the jurisdiction of the NMFS violated the APA and the CWA.  Dkt. 77 at 42–43 (Compl. ¶¶ 202–12); Dkt. 178 at 31.  In short, Counts 1, 2, and 5 not only seek the same relief (vacatur of the EPA's approval of Florida's assumption application) from the same party (the EPA) as the Court has already awarded, but they tread much of the same ground.

Under these circumstances, devoting time and resources to resolve the remaining claims will not accord Plaintiffs any meaningful relief beyond that which they have already achieved, will provide little (if any) assistance to the D.C. Circuit in its consideration of the case on appeal, and, based on the Court's assessment of the various claims, will not serve judicial economy by protecting against the possibility that appellate "review might remove the first basis for the

outcome," *WorldCom, Inc.*, 246 F.3d at 695.[7]  The Court will, accordingly, dismiss Counts 1, 2 and 5 without prejudice.

Count 7, however, presents a different story.  That count is brought against a different defendant—the Army Corps of Engineers—and it challenges a different agency action—the Corps' retained waters determination.  Dkt. 77 at 45 (Compl. ¶¶ 222–27).  Although this count is also brought under the APA, it is supported by an entirely distinct legal theory arising under the Rivers and Harbors Act ("RHA"), *id.*, and it involves distinct portions of the administrative record prepared by the Army Corps, *see* Dkt. 126-1 at 14–16.  Most importantly, this count seeks relief—vacatur of the Corps' retained waters list, Dkt. 77 at 58 (Prayer)—that the Court has not already granted to Plaintiffs.  Unlike with respect to Counts 1, 2 and 5, the Court is persuaded that if Plaintiffs prevail on this claim (and the Court expresses no view on that question at this point), they will be entitled to relief that would "have a more-than-speculative chance of affecting" the legal rights and interests of the parties "in the future."  *Adbelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015).

Under these circumstances, a real controversy continues to exist, and the Court will decline Florida's invitation to dismiss Count 7 as moot, either as a matter of jurisdiction or

---

[7] Even assuming that the exceptions to jurisdictional mootness apply to prudential mootness as well, no exception is available here.  Plaintiffs concede that the voluntary cessation exception is inapplicable but urge that their remaining claims qualify for the "capable of repetition yet evading judicial review" exception.  Dkt. 178 at 18–19.  But, even if the Court's order vacating the BiOp, the ITS, and the EPA's approval of Florida's assumption application were set aside, it is unlikely that Plaintiffs would lose the opportunity to press their alternative claims on remand or in a separate suit.  Plaintiffs maintain that the statute of limitations "*could* result in complete evasion of review" down the line, Dkt. 178 at 19 (emphasis added), but the statute of limitations is not jurisdictional, *see Jackson v. Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020) ("[W]e hold that § 2401(a)'s time bar is nonjurisdictional and subject to equitable tolling."), and, in any event, the six-year period would not run until the end of 2026, and would, of course, restart from any new agency action.  Finally, Plaintiffs can further avoid any risk that their claims would "evade review" by filing a conditional cross-appeal.

prudence.  Because the Court has yet to render a "final decision" resolving "every claim of every

party in [the] case," *Attias*, 969 F.3d at 416, which would permit Florida to file an appeal

pursuant to 28 U.S.C. § 1291, the Court cannot enter final judgment pursuant to Rule 58(d) and

must go on to consider whether to issue partial, final judgment pursuant to Rule 54(b).

**2.**

Normally, an order in a case involving multiple claims or defendants is not "final" (and

therefore not appealable) until the district court has "disposed of all claims against all parties."

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 221 (D.C. Cir. 2011).  Rule

54(b) relaxes this requirement by allowing the district court to "direct entry of a final judgment

as to one or more, but fewer than all, claims or parties" upon an express finding that "there is no

just reason for delay."  Rule 54(b) allows district courts to balance "the demonstrated need for

flexibility in providing for appellate review in complex cases," *Blue v. D.C. Pub. Schs.*, 764 F.3d

11, 15 (D.C. Cir. 2014) (internal quotation marks omitted), against the goal of "avoiding

piecemeal appeals," *Taylor v. FDIC*, 132 F.3d 753, 760 (D.C. Cir. 1997).  "Rule 54(b) is the key

to the problem of appealability when summary judgment is granted on less than the entire suit in

multiple-party or multiple-claim litigation."  *See* 10A Charles Alan Wright, Arthur R. Miller, &

Adam N. Steinman, Federal Practice and Procedure § 2715 (4th ed. 2023).  "It is left to the sound

judicial discretion of the district court to determine the 'appropriate time' when each final

decision in a multiple claims action is ready for appeal."  *Curtiss-Wright Corp. v. Gen. Elec. Co.*,

446 U.S. 1, 8 (1980) (citation omitted).

Rule 54(b) "establishes three requirements for an otherwise interlocutory order to be

certified as a final judgment."  *Attias*, 969 F.3d at 417.  First, "the order must resolve a distinct

'claim for relief;'" second, "the order must be 'final' with respect to that claim;" and, third, "the

district court must permissibly determine that there is 'no just reason for delay' in entering

judgment." *Id.* (citation omitted). The first two requirements serve a jurisdictional function: If

there is no final judgment on one or more distinct claims, the court of appeals lacks appellate

jurisdiction. *See id.* If the jurisdictional requirements are met, the court must then "weigh[] both

'justice to the litigants' and 'the interest of sound judicial administration'" to determine whether

there is "no just reason for delay" in entering the judgment. *Brooks v. Dist. Hosp. Partners, L.P.*,

606 F.3d 800, 806 (D.C. Cir. 2010) (quoting *Curtiss-Wright Corp.*, 446 U.S. at 6, 8).

There is no set formula for deciding whether there is "no just reason" for delay in

entering partial, final judgment, and the relevant factors "will inevitably differ from case to

case." *Id.* (internal quotation marks omitted). The factors pertaining to "sound judicial

administration" include "whether the claims under review were separable from the others

remaining to be adjudicated and whether the nature of the claims already determined was such

that no appellate court would have to decide the same issues more than once even if there were

subsequent appeals." *Curtiss-Wright Corp.*, 446 U.S. at 8. How best to balance these factors is

left to the district court's discretion. *Sears, Roebuck &Co. v. Mackey*, 351 U.S. 427, 437 (1956).

No one factor is dispositive, but where any of the factors pertaining to judicial administration

point against certification, the court should not enter partial, final judgment unless it "find[s] a

sufficiently important reason for nonetheless granting certification." *Curtiss-Wright Corp.*, 446

U.S. at 8 n.2.

Applying this test, the Court is persuaded that the order entered today, as well as the

orders entered on February 15, 2024, Dkt. 164, on August 23, 2023, Dkt. 119, and on March 30,

2022, Dkt. 73, resolve distinct claims (*i.e.*, Counts 1–6 and 8–13 of the Amended Complaint,

Dkt. 77), are final with respect to those claims, and that there is no just reason to delay entry of final judgment with respect to those claims.[8]

For the reasons explained above, the only count of the Amended Complaint that remains pending is Count 7, which alleges that the Army Corps of Engineers violated the APA and the RHA when it made its retained waters determination.  Plaintiffs, for their part, seem to concede that Count 7 asserts a distinct claim for relief for purposes of Rule 54(b), Dkt. 178 at 27 n.15— and for good reason.  That count is asserted against a different defendant than the defendants named in the adjudicated counts, it turns on different facts, and it seeks different relief. Applying the D.C. Circuit's decision in *Attias v. Carefirst, Inc.*, 969 F.3d 412, 417–18 (D.C. Cir. 2020), the claim involves a distinct transaction and nucleus of operative facts and, as such, would not "fall afoul of the rule against splitting claims if brought separately," *Tolson v. United States*, 732 F.2d 998, 1001 (D.C. Cir. 1984) (internal quotation marks and citation omitted); *see also Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004); *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002).

The Court also concludes that there is no just reason to delay entering final judgment with respect to the orders entered today, on February 15, 2024, Dkt. 164, on August 23, 2023,

---

[8] Although Florida's motion concerns only the Court's February 15, 2024 order, *see* Dkt. 171, a district court may *sua sponte* direct entry of final judgment under Rule 54(b), *see, e.g.*, *Bank of Lincolnwood v. Fed. Leasing*, 622 F.2d 944, 947, 952 (7th Cir. 1980) (affirming district court's *sua sponte* entry of final judgment pursuant to Rule 54(b)); *Mitchell v. Lyons Pro. Servs., Inc.*, 727 F. Supp. 2d 116, 119–20 (E.D.N.Y. 2010) ("[T]he Court has broad discretion in determining whether to make the [Rule 54(b)] certification . . . and may do so *sua sponte*."); *Guinan v. A.I. duPont Hosp. for Child.*, 2009 WL 2877595, at *3 (E.D. Pa. Aug. 28, 2009) ("[A] district court may *sua sponte* direct entry of final judgment under Federal Rule of Civil Procedure 54(b).") (collecting cases).  In the present circumstances, the Court concludes that the fair administration of justice, and judicial efficiency, would be served by entering partial, final judgment as to each of the claims adjudicated to date.  As explained below, each claim is distinct and separable from Count 7, and there is "no just reason for delay[ing]" the entry of final judgment as to all of the adjudicated claims.

Dkt. 119, and on March 30, 2022, Dkt. 73. The Court's March 30, 2022 and August 23, 2023 opinions and orders fully resolved Plaintiffs' procedural challenges brought under the APA, and nothing remains to be resolved with respect to those claims. Those claims, moreover, do not overlap in any way with Plaintiffs' retained waters claim. Similarly, for the reasons explained above, the Court's February 15, 2024 opinion and order fully resolved all of Plaintiffs' APA claims against the EPA and FWS, even if that order left some counts presenting alternative theories for relief unresolved. Those counts seeking the same ultimate relief on alternative grounds, moreover, have now been dismissed, and have thus also been fully resolved.

The Court is further persuaded that entry of partial, final judgment on all of Plaintiffs' claims, with the exception of their retained waters claim, would serve the interests of justice and judicial administration. As Florida and the other interveners and amici stress, there is an important interest in achieving the certainty that will come with prompt appellate review. In the words of a Florida developer, who the Court permitted to intervene in this case, "[i]t just needs to know the rules" that will govern Section 404 permit applications. Dkt. 177 at 2. In structuring the litigation, moreover, the Court has attempted to reach and to resolve the core and most far-reaching claims first—and it has finally done so. All that remains is a stand-alone claim that is unlikely to have any bearing on the issues now subject to appeal, and the issues likely to be raised on appeal are unlikely to have any bearing on Plaintiffs' retained waters claim.

Finally, the Court is persuaded that entering partial, final judgment will substantially advance the interests of justice. The Court has set aside the BiOp, the ITS, and the EPA's approval of Florida's Section 404 assumption application, and, for the reasons explained above, even staying that order in limited fashion will result in confusion, delay, and inefficiency. That decision is operative now, and, in the Court's view, Florida should be allowed to appeal it

JA.1406

without delay.  Nor do Plaintiffs identify any countervailing concerns premised on
"miscellaneous factors such as delay, economic and solvency considerations, or expense."  *SEIU
Nat'l Indus. Pension Fund v. Sci &Comp. Sys. Corp.*, 249 F. Supp. 3d 130, 136 (D.D.C. 2017).
They instead argue that Florida will not be prejudiced if partial, final judgment is denied.  The
Court disagrees.  Although the Court's decision is unlikely to result in the dire consequences that
Florida proffers—as noted above, the Corps stands ready, willing, and able to issue Section 404
permits in Florida, as it did for decades before the EPA approved Florida's assumption
application and as it does in 47 other States—Florida nonetheless has a legitimate and substantial
interest in obtaining prompt appellate review of a decision and order that set aside a program to
which it has devoted extensive time and effort.  Florida may or may not prevail on appeal, but
there is no just reason to delay its ability to seek review.

  The Federal Rules of Civil Procedure "should be construed, administered, and employed
by the court and the parties to secure the just, speedy, and inexpensive determination of every
action and proceeding."  Fed. R. Civ. P. 1.  Here, that guidance and the dictates of Rule 54(b)
militate in favor of the entry of partial, final judgment.

JA.1407

**CONCLUSION**

For the foregoing reasons, Florida's motion for a limited stay, Dkt. 166, will be denied.

The Court will also dismiss without prejudice Counts 1, 2, and 5 of Plaintiffs' Amended

Complaint, Dkt. 77.  Finally, Florida's motion for entry of final judgment pursuant to Rule 58(d)

will be denied, its motion for the entry of partial, final judgment pursuant to Rule 54(b) will be

granted, Dkt. 171, and the Court will enter partial, final judgment as to Counts 1-6, 8-13 of the

Amended Complaint.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 12, 2024

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,
                    *Plaintiffs*,

          v.                                        Civil Action No. 21-119 (RDM)

MICHAEL S. REGAN, *et al.*,

                    *Defendants*.

---

## **ORDER**

For the reasons explained in the Court's memorandum opinion, Dkt. 183, it is

**ORDERED** that Florida's motion for a limited stay, Dkt. 166, is hereby **DENIED**.

It is further **ORDERED** that Counts 1, 2, and 5 of Plaintiffs' Amended Complaint, Dkt.

77, are hereby **DISMISSED** without prejudice.

It is further **ORDERED** that Florida's motion for entry of final judgment, Dkt. 171, is

hereby **GRANTED** with respect to entry of partial judgment under Federal Rule of Civil

Procedure 54(b) and is hereby **DENIED** with respect to entry of final judgment under Rule

58(d).

The Court hereby directs the entry of final judgment pursuant to Rule 54(b) as to Counts

1–6 and 8–13 of Plaintiffs' Amended Complaint, Dkt. 77.

**SO ORDERED**.

                              /s/ Randolph D. Moss
                              RANDOLPH D. MOSS
                              United States District Judge


Date:  April 12, 2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

        *Plaintiffs*,

    v.

MICHAEL S. REGAN, *et al.*,

        *Defendants*.

Civil Action No. 21-119 (RDM)

## NOTICE OF APPEAL

Notice is hereby given on this fifteenth day of April, 2024 that the State of Florida and Florida Department of Environmental Protection (collectively, Florida Intervenors), pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the judgment entered in this action on April 12, 2024 (Dkt. 184) in favor of Plaintiffs against Defendants and Florida Intervenors, in accordance with the Memorandum Opinion of this Court entered in this action on February 15, 2024 (Dkt. 163) and the February 15, 2024 vacatur order (Dkt. 164), as amended on April 12, 2024 (Dkt. 182).  Florida Intervenors intend to file with this Court a Motion for a Stay Pending Appeal.

Dated:  April 15, 2024

                                                  Respectfully submitted,

                                                  BAKER BOTTS L.L.P.

Aaron M. Streett (pro hac vice)           */s/ Jeffrey H. Wood*
Harrison Reback (pro hac vice)          Jeffrey H. Wood (DC Bar No. 1024647)
910 Louisiana Street                          700 K Street NW
Houston, TX 77002                          Washington, D.C. 20001
Phone: (713) 229-1234                    Phone: (202) 639-7700
aaron.streett@bakerbotts.com            jeff.wood@bakerbotts.com
harrison.reback@bakerbotts.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## <u>PLAINTIFFS' RESPONSE TO FLORIDA INTERVENORS' MOTION FOR STAY PENDING APPEAL</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ....................................................................................................... 1

PROCEDURAL HISTORY .......................................................................................... 2

LEGAL STANDARD .................................................................................................... 3

ARGUMENT ................................................................................................................ 4

   I.   Florida Is Not Likely to Succeed on the Merits of Its Appeal. ........................ 5

      A.   Florida Has Forfeited Any Showing of a Likelihood of Success on Appeal. ................ 5

      B.   The Court's Decision Rests Firmly on the Plain Language of the ESA, ESA Regulations, and ESA Case Law. .............................................................. 5

      C.   The Court Properly Determined That Plaintiffs Have Standing. .................. 12

      D.   The Court Properly Weighed the *Allied-Signal* Factors to Determine That Vacatur was Warranted. ............................................................... 14

   II.   Florida Has Failed to Demonstrate That It Will Suffer Irreparable Harm. ...................... 16

      A.   Florida's Sovereign Interests Will Not Be Irreparably Harmed. ................ 17

      B.   No Enforcement Void Will Result Absent a Stay. ...................................... 19

      C.   Florida's Claims of Cost and Delay Do Not Constitute Irreparable Harm. ................ 21

   III.   The Balance of Equities and Public Interest Weigh Against a Stay. ................ 25

      A.   A Stay Would Cause Plaintiffs Substantial Harm. ...................................... 26

      B.   The Public Interest Weighs in Favor of Denying Florida's Stay Request. ................ 28

CONCLUSION .......................................................................................................... 32

CERTIFICATE OF SERVICE ................................................................................... 34

JA.1412

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Akiachak Native Cmty. v. Jewell*,
   995 F. Supp. 2d 7 (D.D.C. 2014) ..................................................................4, 18

\*   *Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ........................................................................16

\*   *Alvarez v. Smith*,
   558 U.S. 87 (2009) ............................................................................................13

\*   *Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ................................................1, 27, 29, 31

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
   480 U.S. 531 (1987) ..........................................................................................25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1 (D.D.C. 2009) .....................................................................29

*Cigar Ass'n of America v. FDA*,
   317 F. Supp. 3d 555 (D.D.C. 2018) ..................................................................11

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*,
   No. 95-CV-1702, 1995 WL 748246 (D.D.C. 1995) .........................................29

\*   *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
   904 F.3d 1014 (D.C. Cir. 2018) ..........................................................................5

*Co. River Indian Tribes v. Marsh*,
   605 F. Supp. 1425 (C.D. Cal. 1985) ................................................................31

*Comanche Nation v. United States*,
   No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) .............30

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ..........................................................................7, 8, 9

\*   *Cuomo v. U.S. Nuclear Regulatory Comm'n*,
   772 F.2d 972, 978 (D.C. Cir. 1985) ...................................................................3

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
   733 F.3d 1106 (11th Cir. 2013) ..........................................................................9

\*   *Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
   319 F. Supp. 3d 70 (D.D.C. 2018) .....................................................................4

\*     *Fund for Animals v. Espy,*
     814 F. Supp. 142 (D.D.C. 1993) ....................................................................29

     *Georgia v. Pruitt,*
     326 F. Supp. 3d 1356 (S.D. Ga. 2018) ..........................................................18

     *Hilton v. Braunskill,*
     481 U.S. 770 (1987) .........................................................................................4

     *Humane Soc'y of U.S. v. Kempthorne,*
     481 F. Supp. 2d 53 (D.D.C. 2006) .................................................................29

     *Kentucky v. Biden,*
     23 F.4th 585 (6th Cir. 2022) ..........................................................................18

\*     *League of Women Voters of U.S. v. Newby,*
     838 F.3d 1 (D.C. Cir. 2016) .............................................................................4

\*     *Lujan v. Defs. of Wildlife,*
     504 U.S. 555 (1992) .......................................................................................13

     *Menominee Indian Tribe of Wisconsin v. EPA,*
     947 F.3d 1065 (7th Cir. 2020) .......................................................................30

     *Mexichem Specialty Resins, Inc. v. EPA,*
     787 F.3d 544 (D.C. Cir. 2015) .......................................................................17

     *Miccosukee Tribe of Indians of Fla. v. EPA,*
     No. 1:22-CV-22459 (S.D. Fla. Mar. 18, 2024) .............................................30

\*     *N. Slope Borough v. Andrus,*
     642 F.2d 589 (D.C. Cir. 1980) .......................................................................10

     *Nat. Res. Def. Council v. EPA,*
     489 F.3d 1250 (D.C. Cir. 2007) .....................................................................16

\*     *Nat'l Ass'n of Farmworkers Orgs. v. Marshall,*
     628 F.2d 604 (D.C. Cir. 1980) .......................................................................31

     *Nat'l Wildlife Fed'n v. Andrus,*
     440 F. Supp. 1245 (D.D.C. 1977) .................................................................29

\*     *Nat'l Wildlife Fed'n v. Brownlee,*
     402 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................10

\*     *Nken v. Holder,*
     556 U.S. 418 (2009) ........................................................................... *passim*

JA.1414

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*,
  755 F. Supp. 2d 1104 (S.D. Cal. 2010)................................................................30

\*   *S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*,
  588 F.3d 718 (9th Cir. 2009) ..............................................................................31

\*   *Scripps-Howard Radio v. FCC*,
  316 U.S. 4 (1942).................................................................................................17

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) .............................................................................4

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001)............................................................................................18

\*   *In re Special Proceedings*,
  840 F. Supp. 2d 370 (D.D.C. 2012) ......................................................................5

\*   *Tenn. Valley Auth. v Hill*,
  437 U.S. 153 (1978)....................................................................................1, 29, 31

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977)...........................................................................4, 5

*West Virginia v. EPA*,
  669 F. Supp. 3d 781 (D.N.D. 2023)....................................................................18

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008).................................................................................................4

\*   *Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985).......................................................................16, 21

**Federal Statutes**

33 U.S.C. § 1344(i)......................................................................................19, 22

**State Statutes**

Fla. Stat. § 403.121................................................................................................20

Fla. Stat. § 403.131................................................................................................21

Fla Stat. § 403.161(1)............................................................................................20

iv

## INTRODUCTION

The U.S. Army Corps of Engineers ("Corps") administered the entirety of Section 404 of the Clean Water Act in nearly every other state, including Florida, for more than 40 years until late 2020, when EPA approved Florida's request to administer the program as to assumable waters. In February of this year, this Court vacated that approval because it violated procedural and substantive requirements of the Endangered Species Act ("ESA"). Dkt. 183. The Corps immediately resumed its administration of the program, putting its decades of experience doing so to work. It has identified and allocated resources to process pending 404 permits, including by increasing staff to levels higher than before state assumption. It has met with project proponents and prioritized several projects by giving them expedited review, and it has confirmed that others will proceed apace.

Florida asks the Court to disturb this status quo by granting a stay pending appeal, which would flipflop regulatory authority for the third time in as many years. A stay would create regulatory uncertainty by allowing Florida to issue permits pursuant to a program already found to be unlawful, creating questions about the legality of those permits, any incidental take they may purportedly authorize, and any exemption from liability for incidental take that the program might purport to ensure. A stay would also harm threatened and endangered species by allowing the State to authorize projects that will adversely affect those species and their habitat without ESA compliance, contrary to Congress' intent that protection of these species be accorded the highest of priorities. *Tenn. Valley Auth. v Hill*, 437 U.S. 153, 174 (1978). *Accord Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003).

Florida has not met its burden for such extraordinary relief. Florida has failed to show it is likely to prevail on appeal and has failed to demonstrate irreparable harm. The balance of the

1

JA.1416

equities and public interest weigh sharply against a stay because the Corps' administration of the program is longstanding, familiar to the regulated community, and compliant with the ESA.

## PROCEDURAL HISTORY

In late December 2020, the Environmental Protection Agency ("EPA") approved Florida's request to assume Clean Water Act 404 authority over assumable waters, making it only the third state authorized to administer the program in more than forty years. In January 2021, Plaintiffs promptly challenged EPA's action as unlawful, seeking vacatur of the approval and related agency actions by U.S. Fish and Wildlife Service ("USFWS") and the Corps. Dkt. 1.

With leave of Court, in March 2021, Plaintiffs sought early summary judgment on their procedural claims (Claims 8 and 9), arguing that EPA's transfer of 404 authority to Florida was unlawful and that as a matter of law, Section 404 authority over assumable waters either remained with—or should be restored to—the Corps. Dkt. 31. In March 2022, the Court denied one of Plaintiffs' procedural claims on the merits. Dkt. 73 (Claim 9). And in August 2023, the Court dismissed Plaintiffs' other procedural claim as no longer redressable. Dkt. 119 (Claim 8).

In February 2024—after reviewing hundreds of pages of briefing on the merits, studying a voluminous administrative record, hearing oral argument on the merits of Plaintiffs' ESA claims (twice), and considering additional briefing on the appropriate remedy—the Court issued a 97-page memorandum opinion granting summary judgment to the Plaintiffs on their ESA-related claims and vacating the challenged agency actions. *See* Dkt. 163 at 7. Florida moved for a limited stay of the ruling, Dkt. 166, while the Federal Defendants averred that such a stay was neither "workable [n]or desirable." Dkt. 165.

In March 2024, the Court scheduled a status conference for early April 2024 in light of what the Court later called the "unique posture" of the matter, with Florida seeking a stay while the Federal Defendants opposed it. *See* Minute Order Mar. 14, 2024. While the motion was

2

JA.1417

pending, Florida moved for final judgment (on the theory that Plaintiffs' remaining claims were

moot) or, in the alternative, for partial final judgment, in order to be able to immediately appeal

the Court's rulings.  Dkt. 171.  The Federal Defendants agreed that Plaintiffs' remaining claims

were moot only if a stay were to be denied and took no position on the motion for partial final

judgment.  Dkt. 175.  Plaintiffs opposed entry of final or partial judgment.  Dkt. 178.

On April 4, 2024, the Court heard argument on both motions and, at Florida's request for

an expedited ruling, ruled on both motions on April 12, 2024.  Dkt. 183.  The Court issued an

Amended Memorandum and Opinion on the ESA claims.  Dkt. 182.  The Court also denied

Florida's stay request, dismissed without prejudice Plaintiffs' Clean Water Act claims as

prudentially moot, and entered partial final judgment on all claims except for Plaintiffs' claim

under the Rivers and Harbors Act.  Dkt. 183.  Florida then filed a notice of appeal.  Dkt. 185.  On

April 16, 2024, Florida filed the instant motion for a stay pending appeal, Dkt. 187.[1]

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy."  *See Cuomo v. U.S. Nuclear*

*Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).  The party seeking a stay bears the

burden of establishing that relief is warranted.  *See Nken v. Holder*, 556 U.S. 418, 433–34

(2009).  A decision to grant or deny a stay is "an exercise of judicial discretion."  *Id.* at 433

(internal quotations and citation omitted).  When assessing a stay request, a court must consider

four factors: (1) whether the movant has made a "strong showing" that they are likely to succeed

on the merits; (2) whether the movant "will be irreparably injured absent a stay;" (3) "whether

issuance of the stay will substantially injure the other parties interested in the proceeding;" and

---

[1] Florida's insinuation that the Court has unduly delayed action following its February 15, 2024,
ruling, Dkt. 187 at 1–2, is belied by the record.  To the contrary, for each of Florida's three post-
decision motions, the Court has shortened the response time at Florida's request.  Minute Orders
Feb. 26, 2024, Mar. 12, 2024, & Apr. 17, 2024.

3

JA.1418

(4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

Courts in the D.C. Circuit apply a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another."[2] *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The first two factors though are "the most critical." *Nken*, 556 U.S. at 434. Whether a case presents a "serious legal question" can help tip the scales in favor of a stay "where likelihood of success on appeal is low," but "only where the movants would otherwise prevail on the harm prong." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 106 (D.D.C. 2018) (Moss, J.). *Accord Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12–13 (D.D.C. 2014) ("[T]he motion to stay may be granted when a 'serious legal question is presented, when little if any harm will befall other interested persons or the public, and when denial of the order would inflict irreparable injury on the movant.'" (internal quotation omitted)).

## ARGUMENT

Florida's motion is due to be denied because it has failed to satisfy the criteria for a stay pending appeal. To the contrary, the Court's ruling and remedy on Plaintiffs' ESA claims are soundly rooted in this Circuit's precedents. Florida's interest in resuming the 404 program does not implicate any harm that is irreparable. Moreover, the balance of the equities and the public interest weigh heavily against a stay. Only the Corps' continued administration of the 404 program pending appeal will ensure the lawful application of the ESA as Congress intended.

---

[2] Whether the sliding-scale approach survives the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), has not yet been resolved by the D.C. Circuit. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

4

**I.    Florida Is Not Likely to Succeed on the Merits of Its Appeal.**

Florida has failed to demonstrate that it is likely to succeed on the merits of its appeal. To receive a stay, Florida must make a "strong showing that [it] is likely to succeed on the merits." *Nken*, 556 U.S. at 426. "[M]ore than a mere 'possibility' of relief is required." *Id.* at 434. Indeed, likelihood of success is "one of the two most 'critical prongs' of the test for a stay." *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (quoting *Nken*, 556 U.S. at 434). Florida must demonstrate a "substantial" likelihood of success. *Id.* at 1018. *Accord Wash. Metro.*, 559 F.2d at 843.

**A.    Florida Has Forfeited Any Showing of a Likelihood of Success on Appeal.**

Florida's motion forfeits the requisite "likelihood of success" prong by relying instead on a "serious legal question" theory that would only be available if the State had shown all other factors weighed in favor of a stay (which it has not). *See In re Special Proceedings*, 840 F. Supp. 2d 370, 372 (D.D.C. 2012) (*citing, e.g.*, *Wash. Metro.*, 559 F.2d at 844) (finding that "serious legal question" standard replaces likelihood of success on the merits "only when the other three factors tip sharply in the movant's favor"). But as shown below, Florida has also failed to satisfy the remaining prongs, much less show that they tip sharply in favor of a stay. Florida's motion for a stay should therefore be denied on this basis alone.

**B.    The Court's Decision Rests Firmly on the Plain Language of the ESA, ESA Regulations, and ESA Case Law.**

Florida's "serious legal question" argument fails to establish a likelihood of success on appeal. Florida presents no facts or legal arguments that in any way undermine this Court's well-reasoned decision. In fact, Florida's argument does not address any of this Circuit's ESA case law, relying instead on an outlier out-of-Circuit decision. Florida's argument therefore establishes no basis to find that the State is likely to succeed on appeal.

This Court relied on the plain language of the ESA and its implementing regulations to rule in Plaintiffs' favor. Dkt. 182 at 57–71. The Court's ruling was also firmly rooted in this Circuit's ESA precedents. USFWS' Programmatic Biological Opinion ("BiOp") failed to comply with the ESA at the programmatic level, punting all analysis to a non-statutory and inadequate technical assistance process at the permit level. *Id.* at 7, 57–71. *Accord* Dkt. 98 at 36–41, 45–51; Dkt. 104 at 20–30, 36–49; Dkt. 123 at 6–12; Dkt. 129 at 2 & n.2.[3] USFWS' Programmatic Incidental Take Statement ("ITS") unlawfully extended unlimited incidental take liability exemption to EPA, the State, and all future state permittees for the life of the program, while providing no trigger for reinitiating consultation and again relying on the inadequate and non-statutory assistance process to fill in the gaps. Dkt. 182 at 7, 71–81. *Accord* Dkt. 98 at 42–45; Dkt. 104 at 30–36; Dkt. 123 at 8–9; Dkt. 129 at 2. And EPA arbitrarily and capriciously relied on the facially invalid Programmatic BiOp and ITS to approve Florida's program, thereby failing to satisfy its independent duty under the ESA to ensure that its action would not jeopardize protected species or adversely modify or destroy critical habitat. Dkt. 182 at 82–85. *Accord* Dkt. 98 at 51–52; Dkt. 104 at 49–51; Dkt. 123 at 12–13. Additionally, EPA entirely failed to engage in Section 7 consultation on impacts to (1) species under the jurisdiction of the National Marine Fisheries Service ("NMFS"), instead relying on an erroneous "no effect" determination that excluded indirect effects, Dkt. 182 at 86–88; and (2) nesting sea turtles under USFWS' jurisdiction, despite the likelihood that state 404 permits would at least indirectly affect those species, *id.* at 85 n.20. *Accord* Dkt. 98 at 52–55; Dkt. 104 at 51–53; Dkt. 98 at 41; Dkt. 104 at 29–30.

---

[3] Plaintiffs hereby incorporate their prior briefing on their ESA claims and justiciability. Dkts. 31, 43, 98, 104, 123, 135, 153, 161, 169.

Florida's reliance on *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d

Cir. 2018), Dkt. 187 at 4–8, does not establish a likelihood of success. The Court thoroughly

considered, and rejected, the same arguments that Florida now raise relying on an outlier out-of-

Circuit opinion that is contrary to the overwhelming weight of authority and is in any event, as

the Court explained, distinguishable on the facts. *See id.*[4] Florida's failure to grapple with this

Circuit's case law is fatal to establishing a likelihood of success on appeal.

Florida fails to show that the Court incorrectly distinguished *Cooling Water* on the facts.

Florida mischaracterizes the circumstances of *Cooling Water* as "analogous" to EPA's approval

of a state permitting program, claiming that both involve EPA adopting a "program that allowed

states to issue permits" that would impact species and rely on "'technical assistance' from federal

agencies." *Id.* at 4. However, as this Court correctly observed, the federal agency action in

*Cooling Water* (EPA's promulgation of a national rule creating standards for the impingement

and entrainment of aquatic life that would be implemented in both state and federal Section 402

programs) was fundamentally different from the agency action in this case (EPA's approval of a

state Section 404 program that transferred authority from the Corps to the State). Dkt. 182 at 65.

*Accord* Dkt. 98 at 49–50; Dkt. 104 at 48.

Florida claims the Court erred in distinguishing *Cooling Water* on the basis that in that

case, EPA had formally promulgated the "technical assistance" process into federal regulations,

Dkt. 187 at 7–8, whereas here EPA and USFWS relied solely on non-binding assertions

contained in a BiOp that itself was unlawful, *see* Dkt. 182 at 65–66. As it did on summary

judgment, Florida leans on the Memorandum of Understanding ("MOU") with USFWS and the

---

[4] The Court's opinion shows that the Court studied the *Cooling Water* decision thoroughly, even
reviewing the oral arguments in that case. Jan. 30, 2024, Hr'g Tr. 59:18–25.

state program's Handbook to suggest that the technical assistance process here is equally binding and enforceable, but Florida itself concedes that the "anticipated" technical assistance procedures were "established in the BiOp/ITS." Dkt. 187 at 8. Florida also fails to acknowledge that (1) the MOU states that the technical assistance process will be contained in the final BiOp, Dkt. 55-1 at 124; (2) the Handbook fails to articulate the technical assistance process that is contained in the BiOp, Dkt. 52 at 104–05; and (3) the BiOp does not require anything of USFWS other than to receive and review applications, *see* Dkt. 182 at 43, 66. Even the Federal Defendants took the position that none of the technical assistance process's so-called requirements were legally binding so as to be enforceable, Dkt. 148 at 23 (arguing that USFWS' technical assistance did not constitute a reviewable "agency action" subject to judicial review), and were unable to point to any binding duty on USFWS other than to "receive and review" permit applications. Oct. 19, 2023, Hr'g Tr. 89:7–10, 91:14–92:1.

Florida avers that these distinguishing facts are not relevant but fails to explain why that would be the case. Dkt. 187 at 7–8. Florida's argument rests on a comparison of the *Cooling Water* BiOp to the BiOp at issue here. Dkt. 187 at 6–7. However, the Court acknowledged that this similarity was by design and found that those similarities did not affect its analysis as to whether the BiOp complied with the plain language of the ESA, its implementing regulations, and the overwhelming weight of authority. Dkt. 182 at 66–67. Florida's continued reliance on *Cooling Water* therefore fails to establish the likelihood of success or "serious legal question" required for a stay.

Ignoring the weight of authority supporting the Court's ruling, Florida suggests that this Court erred by taking a "fundamentally different legal approach" from the Second Circuit in *Cooling Water*, Dkt. 187 at 4. But Florida cannot establish a likelihood of success on appeal by

8

claiming the Court should have relied on an outlier out-of-Circuit decision rather than on this Circuit's longstanding precedent (and the overwhelming weight of authority). Florida's argument also fails to overcome the Court's well-reasoned disagreement with that case. Indeed, according to Plaintiffs' review of caselaw, the "legal approach" approved in *Cooling Water* has not been adopted by any other court, and Florida points to no case where it has. Instead, this case represents the "first next time" that an agency has used this approach. Dkt. 182 at 67.

Moreover, the Court was not persuaded by *Cooling Water* to reach a different conclusion because the Court relied on the plain language of the ESA's regulations to explain that "the ESA does not permit an agency to bypass the Section 7 consultative process altogether by postponing the required, 'detailed discussion of the effects of the action on listed species, to a later phase, only to conclude" "that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7." *Id.* at 67–68 (internal citations omitted).

Florida fails to address the Court's analysis of *Cooling Water*, which showed, among other things, that *Cooling Water* relied on caselaw that conflicted with its own ruling. For example, the Court explained that *Cooling Water*'s reliance on *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), was misplaced because that case involved a programmatic BiOp that *did* evaluate the species effects of both the installation *and* operation stage of a Naval underwater submarine warfare training range. Dkt. 182 at 68. The Court also pointed out that *Cooling Water* relied on cases that held a take limit *must exist*, either as a numerical limit or a properly supported surrogate, to find the contrary: that the lack of an incidental take limit in that case was lawful. *Id.* at 76.[5]

---

[5] The Court found additional support on this point from *Defenders of Wildlife* because there, the programmatic BiOp did not include an ITS, which meant that *any* take would require reinitiating consultation. Dkt. 182 at 77 (citing *Defs. of Wildlife*, 733 F.3d at 1124).

9

JA.1424

Florida also fails to address the fact that the Court relied on D.C. Circuit precedent that "although not directly on point, further supports the [Court's] sensible conclusion that an agency may not avoid its obligation to engage in meaningful Section 7 consultation by deferring detailed, species-specific analysis for another day." *Id.* at 69.  The Court relied on *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), which "requires courts to consider whether 'stage-by-stage' consultation under Section 7 is consistent with the ESA's mandate to consider the 'agency action' as a whole," which the Federal Defendants' approach failed to do "by a wide margin."  Dkt. 182 at 70 (citing *Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988) (so reading *North Slope*)).  And the Court relied on *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), which held the Corps violated the ESA by deferring consultation regarding the effects of individual actions authorized under four general permits, which the Corps was aware "m[ight] affect" the Florida panther.  Dkt. 182 at 70–71 (citing *Nat'l Wildlife Fed'n*, 402 F. Supp. at 10 & n.15).

Florida wrongly asserts that the Court adopted Plaintiffs' purported position that the only avenue for incidental take liability coverage for state 404 permittees is an incidental take permit under Section 10.  The record clearly establishes that Florida urged EPA to adopt this programmatic consultation/technical assistance scheme for the purpose of securing broad incidental take liability to state permittees without requiring them to obtain Section 10 permits.  *See, e.g.*, Dkt. 182 at 26–27, 30–31 (quoting Dkt. 112-2 at 3; Dkt. 112-3 at 269, 368–69; Dkt. 56-1 at 781).  As the Court explained, EPA had acknowledged that there were options for the State to assume the 404 program while complying with the ESA.  *Id.* at 27.  In addition, the Court found that the scheme urged by Florida (and adopted by the Federal Defendants) was unlawful

10

JA.1425

because "Congress did not codify a third option" outside of Section 7 or Section 10 for

exempting incidental take from liability.  *Id.* at 62.

The Court articulated that on remand, the Federal Defendants and Florida could either

(1) require state permittees to obtain Section 10 permits; (2) rely on a Clean Water Act process

for sending permits back to the Corps where appropriate; or (3) prepare a "dramatically different

BiOp and ITS" under Section 7.  *Id.* at 96.  Florida's argument that USFWS was required to

issue an ITS pursuant to Section 7, Dkt. 187 at 8, completely ignores that USFWS was first

required to prepare a lawfully sufficient BiOp, something the Court rightly concluded the agency

had not done.  Dkt. 182 at 71.

Contrary to Florida's characterization, Plaintiffs argued that the Federal Defendants had

other options to address ESA compliance (a fact EPA conceded, as the Court recognized), but

having chosen to engage in Section 7 programmatic consultation, USFWS was required to

comply with the requirements of the ESA and its implementing regulations.  Dkt. 98 at 28–29;

Dkt. 104 at 42–43.  The Court agreed, holding that Section 7 review must occur somewhere and

that the Federal Defendants approach "cannot stand" because it failed to address species effects

at the programmatic level and provided no further Section 7 consultation at the permit-level.

Dkt. 182 at 67, 71.

Florida's reliance on *Cigar Association of America v. FDA*, 317 F. Supp. 3d 555 (D.D.C.

2018), Dkt. 187 at 4, is also misplaced.  In *Cigar Association*, the court found a "serious legal

question" weighed in favor of a stay, where the matter involved difficult constitutional questions

that "the D.C. Circuit might well disagree with [that] court's resolution of them," 317 F. Supp.

3d at 561, and a recent Supreme Court decision "only add[ed] to the substantiality of the issues

Plaintiffs intend[ed] to raise on appeal."  *Id.*  Neither circumstance is present here.

Here, the Court resolved the relevant legal questions through a straight-forward application of the plain language of the ESA and its implementing regulations to conclude that USFWS had failed to prepare a lawful programmatic BiOp.  As to the Programmatic BiOp, the Court recognized that the plain language of the ESA and its implementing regulations required a detailed analysis of species-specific effects and concluded that "it [was] clear that, at the very least, [USFWS] failed to undertake *any* species-specific analysis."  Dkt. 182 at 57–58.  As the Court found when analyzing the Programmatic ITS, its analysis was "not taxing" because, contrary to the plain language of the ESA and its implementing regulations, the ITS "set[] no numerical take limit, offer[ed] no surrogate, and provide[d] 'no clear standard for determining when the level of anticipated take has been exceeded.'"  *Id.* at 73–74.  EPA had a duty to comply with these requirements once it determined that its approval of Florida's program was likely to adversely affect ESA-listed species and result in incidental take.  Florida has identified no Supreme Court or D.C. Circuit decision that would raise questions about this Court's decision.

### C.    The Court Properly Determined That Plaintiffs Have Standing.

Florida also has not shown that it would be likely to prevail on its twice-rejected claims that Plaintiffs lacked standing to prosecute this case.  In considering the parties' early cross-motions for summary judgment on Claim 9, the Court found that Plaintiffs had established informational standing emanating from EPA's approval of Florida's program.  Dkt. 73 at 21, 24, 49–52.  And on final summary judgment, the Court concluded Plaintiffs had standing to prosecute all remaining claims, including the ESA claims, based on their associational interests in protecting Florida's valuable waterways and the endangered and threatened species that rely

on them.[6] Dkt. 182 at 38–51. *Accord* Dkt. 98 at 78; Dkt. 104 at 90–101. Plaintiffs' members have an interest in the enjoyment of listed species, including NMFS species and sea turtles, and this interest is germane to Plaintiffs' organizational interests. Dkt. 182 at 41–42, 49–50. *Accord* Dkt. 98 at 79–81; Dkt. 104 at 99–101. USFWS' unlawful BiOp and ITS threatened Plaintiffs' interests by failing to (1) analyze the impact of Florida's program on listed species and critical habitat; (2) render a lawful jeopardy determination; and (3) set limits on incidental take. Dkt. 182 at 41–44. *Accord* Dkt. 98 at 79. EPA's reliance on the BiOp and ITS harmed Plaintiffs' interests by failing to ensure that Florida's program would not jeopardize listed species or adversely modify critical habitat. Dkt. 182 at 41–44. *Accord* Dkt. 98 at 80. And EPA's failure to consult on NMFS species and to consult with USFWS on impacts to nesting sea turtles threatened Plaintiffs' interests as to those species. Dkt. 182 at 49–50. *Accord* Dkt. 98 at 80–81.

Florida contends that the Court erred in relying on facts that arose after the Complaint was filed. Dkt. 187 at 10. But Florida cites no authority for this argument nor points to any language in the decision where the Court relied on such facts. *Id.* Plaintiffs demonstrated standing throughout this litigation, as the case and controversy requirement requires. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009). And it was appropriate for this Court to consider evidence in Plaintiffs' declarations submitted during summary judgment briefing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Florida therefore cannot establish a likelihood of success on this theory either.

---

[6] Having found standing on this basis, the Court declined Florida's invitation to re-visit its earlier conclusion on informational standing on the basis of new evidence. Dkt. 182 at 40 n.9. But as Plaintiffs have shown, Florida's supposedly new evidence was simply a regurgitation of the same evidence the Court previously considered and rejected. Dkt. 104 at 90–94.

To the contrary, the Court found that Plaintiffs' member declarations demonstrated concrete interests in minimizing the loss of protected species in the State.  Dkt. 182 at 41. *Accord* Dkt. 98 at 79–81; Dkt. 104 at 90–101.  The Court explained that USFWS concluded that approval of Florida's program was "'reasonably certain' to result in some level of take of all 139 listed species present in the State."  Dkt. 182 at 41.  And the Court found that USFWS' unlawful BiOp (and ITS) "poses a material risk to the declarants' work and recreational interest in areas of Florida that will be directly affected."  *Id.* at 41–42.

To the extent the Court referred to the inadequacy of the technical assistance process as applied after approval, it did so in response to Florida's and the Federal Defendants' argument that whatever ESA requirements may have been omitted from the Programmatic BiOp and ITS would be addressed through the "technical assistance process."  *Id.* at 42–43.  Importantly, the Court went on to hold that "more fundamentally, the technical assistance process is no substitute for what Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that [USFWS] must conduct *before* it can make a no-jeopardy finding and accord incidental take protection on the EPA, the State, and future state-permittees."  *Id.* at 43.  These gaps in analysis existed from the time EPA approved Florida's program and, therefore, existed at the time Plaintiffs' Complaint was filed.

### D.    The Court Properly Weighed the *Allied-Signal* Factors to Determine That Vacatur was Warranted.

After ruling in Plaintiffs' favor on the ESA Claims, the Court vacated the BiOp, the ITS, and EPA's approval of Florida's program after thoughtfully weighing the *Allied-Signal* factors. *Id.* at 92–94 (ESA violations were serious and could not easily be cured on remand); *id.* at 93–96 (disruption inherent in Congress' design in the Section 404 program; Florida had not demonstrated that normal remedy of vacatur was not appropriate in this case).  *Accord* Dkt. 161

at 7–10, 12–13.  Florida disagrees with the decision but does not identify any legal error or any

matter that the Court failed to consider or address in weighing the factors and exercising its

discretion to fashion a remedy.

Florida offers nothing to support its claim that it would likely prevail on appeal as to the

Court's remedy either as a matter of fact or law.  *See* Dkt. 187 at 10–11.  Florida continues to

point to potential delay in the issuance of 404 permits, but Plaintiffs showed how any such

disruption would not be sufficient to avoid vacatur, Dkt. 161 at 11–14, and the Corps has moved

swiftly to increase staff and develop a plan to avoid undue delays even while Florida has failed

to transfer any state 404 permit to the Corps, Dkt. 183 at 10–12.

First, in an effort to call the Court's remedy into question, Florida quotes the Court as

saying it was "difficult to make a definitive determination" as to the *Allied-Signal* factors, Dkt.

187 at 10, but omits the context of that statement and mischaracterizes the Court's reasoning.

The Court stated that it was "convinced that the violation was a serious one, which will not easily

be remedied on remand," and that "[i]n the ordinary course, the Court would have little difficulty

in concluding that error of this magnitude requires vacatur."  Dkt. 182 at 94–95.  But the Court

added that it was "far from clear" the extent to which the ESA violations infected the overall

Florida assumption program because Florida had offered different representations of the number

of state permits that were likely to adversely affect protected species.  *Id.* at 95.  The Court went

on to say, "For similar reasons, it is also difficult to make a definitive determination regarding

the second *Allied-Signal* factor on the present record."  *Id.*

While these statements provide a window into the Court's reasoning, the Court ultimately

did make the determination that vacatur was the appropriate remedy, and that determination is

firmly supported by this Circuit's precedents.  After considering all the arguments, the Court

concluded that the real question was whether vacatur would lead to further administrative

flipflopping and confusion.  *Id.* at 96.  Finding that the ESA violations were serious and could

not easily be cured on remand, the Court determined that vacatur was warranted.  *Id.* at 94–96.

Second, Florida erroneously characterizes the Court's remedy as "extreme."  To the

contrary, vacatur is the normal remedy for APA violations.  *Allina Health Servs. v. Sebelius*, 746

F.3d 1102, 1110 (D.C. Cir. 2014) (vacatur "normal remedy" for unsustainable agency action).

*See also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007) (vacating rule

because of "wholesale revision" required on remand as well as harm to petitioners).  Moreover,

restoring authority to the Corps is part of Congress' design of the Section 404 program.  Under

the statute's plain language, where a state 404 program is deemed unlawful, EPA must withdraw

its approval and during any period of withdrawal, the Corps "shall resume" administration and

enforcement of the Section 404 program.  Dkt. 182 at 21 (citing 33 U.S.C. § 1344(i)).  There is

no basis to conclude that Florida is likely to prevail on appeal.

## II.    Florida Has Failed to Demonstrate That It Will Suffer Irreparable Harm.

Irreparable harm is one of "the most critical" factors when determining whether to issue a

stay pending appeal.  *Nken*, 556 U.S. at 434.  To satisfy this factor, Florida must show more than

just some "possibility of irreparable injury."[7]  *See id.* at 433–34.  Indeed, "[b]are allegations of

what is likely to occur are of no value since the court must decide whether the harm will *in fact*

occur."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis in

original).  The "injury must be both certain and great, actual and not theoretical, beyond

---

[7]  As the Court found, the programmatic BiOp, ITS, and technical assistance process woefully
failed to comply with the ESA.  *See* Dkt. 183.  *Accord* Dkt. 163.  As explained above, Florida's
motion for a stay fails to raise any justification to call this Court's decision into question.  As
such, they have not demonstrated "probable success on the merits," Dkt. 187 at 11, and any
relaxation of the irreparable harm factor does not apply.

remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (internal quotations and citations omitted).  Even if irreparable injury to Florida were found, granting of a stay is not a matter of right; "[i]t is an exercise of 'judicial discretion,'" and "[t]he propriety of its issue is dependent upon the circumstances of the particular case."  *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 10–11 (1942).

Florida fails to show any irreparable injury will result in the absence of a stay.  As explained below, the only harms Florida claims are either not at play (e.g., sovereign interests are not implicated), not irreparable (e.g., potential permitting delays), or both.  There is no dispute that Florida could once again seek EPA approval for an assumption program that complies with federal law.  Moreover, any of the harms Florida has asserted are outweighed by the harms Plaintiffs and the public would face if a stay were granted.

### A.   Florida's Sovereign Interests Will Not Be Irreparably Harmed.

Florida's claim that vacatur of the state 404 program irreparably harms their sovereign interests in "areas of traditional state responsibility," Dkt 187 at 11, fails.  There is no dispute that EPA's lawful transfer of Section 404 authority from the Corps to a state first requires compliance with federal law, including the ESA and the Clean Water Act.  Absent that lawful action, states have no 404 authority over waters of the United States.  And indeed, in 48 states, it is the Corps that administers the entirety of the Section 404 program.

Also, vacatur of Florida's assumed 404 program has no impact on Florida's traditional power and responsibility over its waters and land.  Florida continues to enjoy the same authority and sovereignty over state waters as it had before assuming the federal 404 program.  Waters of the United States, however, are also subject to federal law.  Florida maintains its traditional power and control to enforce state laws, provide public services, tax, ensure public safety, and

JA.1432

protect state waters. And specifically, Florida still retains control and permitting authority over wetlands through its ERP program, which applies to all state waters, including those that also require a 404 permit under federal law.

Because this case does not implicate state sovereignty, the cases on which Florida relies to claim that infringement of state sovereignty can constitute irreparable harm are irrelevant. *See Akiachak*, 995 F. Supp. 2d at 16–17 (enjoining proposed regulation that would allow federal government to take Alaska tribal lands into trust and thus beyond Alaska's control thereby impinging state sovereignty); *Kentucky v. Biden*, 23 F.4th 585, 611–12 n.19 (6th Cir. 2022) (declining to stay preliminary injunction of COVID-19 vaccine mandate for federal contractors residing in three states that opposed a vaccine requirement); *West Virginia v. EPA*, 669 F. Supp. 3d 781, 807–09 (D.N.D. 2023) (state challenge to newly expanded scope of waters of the United States); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (same).[8]

This case does not involve the scope of the Clean Water Act, and therefore Florida's reliance on cases that do is misplaced.[9] While determining that the reach of Clean Water Act authority may implicate state sovereignty interests by demarcating lines between state and federal authority, this case is about the allocation of authority over waters that are indisputably waters of the United States covered by the federal Clean Water Act. Unlike the situations in

---

[8] Florida's citation to *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001), Dkt. 187 at 11, is also to no avail. That case too involved the scope of waters of the United States under the Clean Water Act's jurisdiction. 531 U.S. at 162. There the Court recognized a heightened concern over a more expansive interpretation of Section 404's jurisdictional extent that Congress had not clearly spoken on because such interpretation would allow federal encroachment on traditional state power over land and water use. *Id.* at 173. More importantly, the Court also made clear that when Congress' intent is clear, such federal encroachment is permissible. *Id.* at 172–73. Here, Congress spoke clearly on what Section 7 consultation requires; EPA and USFWS both failed to comply.
[9] Additionally, unlike here, in both the West Virginia and Georgia cases, the states had not yet been heard on the merits. *See, e.g.*, *West Virginia v. EPA*, 669 F. Supp. 3d at 807.

Georgia and West Virginia, the Court's ruling here does not broaden the scope of waters subject to Clean Water Act jurisdiction, and therefore does not subject more waters in the State to regulation under the Clean Water Act or impose any new burdens on the State to comply with the Clean Water Act on additional waters.

Florida's traditional authority over waters is fully intact. And Florida retains the ability to pursue state assumption for assumable waters under the Clean Water Act by proposing a program that complies with federal law. Thus, while Florida may have an *interest* in implementing a state-run 404 program, such interest cannot preempt clear congressional mandates like those in Section 7 of the ESA. Nor does Florida cite any support for such an assertion. Congress' view of cooperative federalism still requires compliance with federal law. *See* Dkt. 182 at 20–21.

### B.    No Enforcement Void Will Result if the Court Denies a Stay.

Florida's claim that it has been irreparably harmed by its inability to take enforcement action against 404 violations lacks any basis in fact or law. To begin, there is no enforcement void because restoring the program to the Corps simply means that the Corps will enforce Section 404 in Florida, as it did for decades before state assumption. *See* 33 U.S.C. § 1344(i). There is no confusion, contrary to Florida's claim, because all 404 authority has reverted to the Corps. Moreover, as Plaintiffs have demonstrated in this litigation, administration of the program by the Corps provides for more robust enforcement (and deterrent effect) because Florida's program exempted simple negligence violations from criminal liability (contrary to federal law). Dkt. 98 at 22, 56–61; Dkt. 104 at 54–65; Dkt. 123 at 14–15.

In an effort to manufacture a claim for irreparable harm, Florida avers that its 404 program consisted of "more than 300" staff members, suggesting that this size staff would be better equipped to handle 404 permitting and enforcement in Florida than the "handful of new

19

employees" the Jacksonville District may have added to its roster following the Court's ruling.[10]
Dkt. 187 at 12–13. But even if this comparison somehow amounted to an irreparable harm
(which it does not), Florida's factual assertions do not withstand scrutiny.

Florida fails to mention that the same FDEP staff also administer the State's
Environmental Resource Permitting program ("ERP"), a wetlands permitting program the State
was already administering under state law prior to assumption, Dkt. 55 at 501, and that staff
continue to administer the ERP program since the Court's ruling.[11] Florida also fails to mention
that EPA's oversight of Florida's program identified problems with staff retention (which FDEP
had publicly acknowledged) and expressed concern that inadequate staffing could be
contributing to a number of program failures (including as to wetlands delineations, the failure to
document "no permit required" determinations, and inadequate coordination with the Corps).
Dkt. 104-1 at 30–31, 38 (EPA Oversight Letters).

Moreover, the State retains authority under state law to take action to remedy or prevent
environmental harm, including irreparable harm. Florida Statutes Section 403.161(1) makes it a
violation under state law for anyone to cause pollution, except as authorized by Florida law, "so
as to harm or injure human health or welfare, animal, plant, or aquatic life or property." Fla.
Stat. § 403.161(1). *See also id.* § 403.121 (FDEP may institute a civil action "to establish

---

[10] Florida's characterization of the Corps' staffing is contradicted by statements by the Corps'
counsel. Apr. 4, 2024, Hr'g Tr. 29:8–9 (Corps' counsel stating "it is not just a couple more, it is
a couple dozen more"). Indeed, the Corps' counsel stated that "there are more people in the
Jacksonville district today to process section 404 permits than there were before state
assumption." *Id.* 29:5–7.

[11] When Florida assumed the 404 program, the State assured EPA that it could do so within
existing resources because it would incorporate the 404 program into the State's ERP program,
with staff administering both. Dkt. 55 at 501–02. As of June 2023, Florida reported that there
were 355 positions that supported the program "in some capacity," but only 177 of those were
described as relating to permitting, compliance, *and* enforcement, and only 44 were primarily
responsible for compliance and enforcement. Dkt. 160-1 at 302.

liability and recover damages for any injury to the air, waters, or property, including animal, plant, and aquatic life, of the state caused by any violation"); *id.* § 403.131 (FDEP may institute a civil action "to seek injunctive relief to enforce compliance with this chapter or any rule, regulation, permit certification, or order; to enjoin any violation specified in s. 403.161(1); and to seek injunctive relief to prevent irreparable injury to the air, waters, and property, including animal, plant, and aquatic life, of the state and to protect human health, safety, and welfare caused or threatened by any violation").

### C.    Florida's Claims of Cost and Delay Do Not Constitute Irreparable Harm.

Florida briefly reasserts that the loss of resources it has spent taking on the 404 program constitutes an irreparable harm.  Dkt. 187 at 14.  But economic loss alone typically does not constitute irreparable harm.  *See Wis. Gas*, 758 F.2d at 674 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958))).

Moreover, the expended resources are not, as Florida suggests, simply "lost."  *Contra* Dkt. 187 at 13.  Florida's expenditures to develop the program may still be applied to any future state proposal, so long as that proposal complies with federal law.  Its expenditures on permitting and compliance were put to use during the time the State administered the program.  And the overlap between the State's ERP and 404 permitting programs (which the State put at 85%) suggests that the vast majority of on-going expenditures will continue to serve the State's ERP program.  *See* Dkt. 55 at 501; Dkt. 31-1 at 14–15 (Crooks Dec. ¶ 43).

Florida's claim about the loss of regulatory efficiencies while it administered the state 404 program, Dkt. 187 at 14, fails to substantiate the assertion with evidence, ignores that at least the ESA-related "efficiencies" have been declared unlawful, and fails to show that any supposed loss of efficiency would constitute an irreparable harm.

21

Florida claims irreparable harm on the basis of cost and delay associated with "thousand(s)" of 404 permit applications that were pending with the State when the Court vacated EPA's approval of the state 404 program.[12]  *Id.* at 10–15.  Elsewhere, Florida avers that it issued about 26 individual permits *or permit modifications* each month, *id.* at 13 n.3, which if true would mean that the State would have issued no more than 312 permits (and likely less once permit modifications are considered) in the next year or two while this appeal is pending.

Florida asserts that these projects now face "regulatory limbo," *id.* at 13, but as the Federal Defendants confirmed at oral argument, there is no regulatory limbo because 404 authority has been restored to the Corps.  Apr. 4, 2024, Hr'g Tr. 31:17–23.  There is a clear path forward, which is for the Corps to review those permit applications.  Dkt. 183 at 10–12.  *See also* 33 U.S.C. § 1344(i).  The Corps has also taken affirmative steps to reduce delay, including by adding far more staff assigned to 404 permits than before state assumption, and has taken affirmative steps to prioritize projects and ensure that applicants are not, contrary to Florida's assertion, Dkt. 187 at 13, starting from "square one."  *See* Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr. 30:23–25).

Moreover, although Florida has claimed that only about 15% of permit applications "may affect" ESA-listed species, Dkt. 166-1 at 4 (Wolfe Dec. ¶ 13), counsel for the Corps advised the Court that "Florida and the Corps have very different views about the ratio of no effect and may affect projects."  Apr. 4, 2024, Hr'g Tr. 35:11–12.  In stark contrast, the Corps believes that "the

---

[12] In opposing vacatur, Florida claimed that there would be significant cost and delay associated with the transfer to the Corps of the "thousands of permit applications" pending with Florida. Dkt. 160-1 at 11 (Wolfe Dec. ¶ 29).  In moving for a limited stay, Florida asserted that "[w]ell over 1,000" permit applications are in "regulatory limbo."  Dkt. 166-1 at 3 (Wolfe Dec. ¶ 8). And in this motion, Florida repeats and tempers both claims.  Dkt. 187 at 10 (header asserts "thousands pending"); *id.* at 13 ("more than a thousand" pending); *id.* at 15 ("as many as a thousand" pending).

vast majority of the projects that it sees in the State of Florida are what it would classify as may affect permits," and puts that number closer to 85%. *Id.* 35:13–17, 86:6. The State's narrow view of how many permits "may affect" ESA-listed species. as opposed to the Corps' view, further weighs against a stay.

Even as to the fifty or so permits the State claims it would have issued since the Court vacated EPA's approval of its program, Dkt. 187 at 13, Florida has not identified any irreparable harm. The State's general claim that it has "lost the benefit" of various public projects in the pipeline, *id.*, is not sufficient to establish harm, much less irreparable harm. Because the same projects can be considered and permitted by the Corps, Florida has no basis to claim it has lost any benefit from these projects, much less that it has lost any benefit for all time. The time and resources expended on reviewing pending permit applications is also not "lost," since the State uses much of the same information and processes to issue state ERP permits. To the extent any of that information is relevant only to 404 permits, it too is not "lost" since the Corps has committed to reviewing and using as much of that information as possible. Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr. 30:23–25, 31:1–3).

Florida's prior submissions asserting similar harms fare no better. FDEP's vague claim that "many" pending permit applications were "near the conclusion of the Section 404 permit process" at the time of vacatur, Dkt. 166-1 at 4 (Wolfe Dec. ¶ 10) (describing how long permits have been pending), does not identify how many permits fit this category, how many of these permits were due to be granted versus denied, or that any near-completion permit involved a project so essential as to require immediate permitting to avoid irreparable harm. Florida's assertion that the public would lose the benefit of "mitigation measures" that might be included in state permits, *id.* (Wolfe Dec. ¶ 10), ignores that mitigation is intended to *offset harm* that

23

results from the permitted activity. Florida anticipated that restoring authority to the Corps

would likely delay permits by "six months or more" but rested this assertion on the delays

*Florida's* assumption caused permit applicants when its program was approved. Dkt. 160-1 at

11 (Wolfe Dec. ¶ 29). As the Court has observed, the Corps has had decades of expertise in

administering this program, something Florida lacked when it assumed the program in 2020.

Dkt. 183 at 11–12.

Florida's arguments about substantial delays also conflict with "the Corps' perspective

about the state of play of Section 404 permitting in Florida today." Apr. 4, 2024, Hr'g Tr. at

28:16–17. Specifically, counsel for the Corps disputed Florida's claim that "the state of play in

Florida right now is regulatory limbo." *Id.* at 31:17–29. Indeed, as to Florida's motion for a

partial stay, counsel for the Corps explained that "the efforts the Corps has made really cut

against granting the limited stay of the vacatur." Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr.

31:22–23). The Corps has been processing 404 permits "for decades," and "[i]t is familiar to the

regulated community." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 31:21–22). Any delay in processing

those permits at this point is due to Florida's refusal to transfer those permits to the Corps. Apr.

4, 2024, Hr'g Tr. 29:16–20.

"The Corps has identified and allocated resources to process those permits" that were

pending before Florida at the time of vacatur. Dkt. 183 at 11 (quoting Apr. 4, 2024, Hr'g Tr.

29:1–2). "[T]here are more people in the Jacksonville district today to process section 404

permits than there were before state assumption," and not just "a couple more" but "a couple

dozen more." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 29:5–8). There are also four other districts

within the South Atlantic division and Corps headquarters where the Corps has identified staff

outside the Jacksonville District "who can help with the anticipated surge of permits given the

number of permits that were pending before Florida." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 29:11–14). *Contra* Dkt. 187 at 12–13.

The Corps has also been meeting with "quite a few project proponents." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 29:23–24). A number of those entities have congressionally approved agreements to seek expedited Corps review. *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 30:1–4). In particular, the South Florida Water Management District has identified pending Everglades Restoration Projects, and the Corps has agreed to give expedited review to those projects. Apr. 4, 2024, Hr'g Tr. 30:5–10. As for the remainder of the pending permit applications, no project will "go to the back of the line just because the applicant had previously applied to Florida." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 30:23–25). Instead, the Corps will be "pick[ing] up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements." *Id.* (quoting Apr. 4, 2024, Hr'g Tr. 31:1–3).

## III.    The Balance of Equities and Public Interest Weigh Against a Stay.

The Court should also deny Florida's stay request because the balance of the equities and the public interest weigh in favor of maintaining the Corps' administration of the 404 program, which ensures the application of the ESA's protections for ESA-listed species and their critical habitat. When considering a stay request, the Court must consider "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted). When, as here, a stay would cause environmental injury, the balance of harm favors denying the stay request because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

A.    **A Stay Would Cause Plaintiffs Substantial Harm.**

Throughout this litigation, Plaintiffs have identified 404 permit applications pending with the State that threaten substantial harm to the environment and protected species.  Those still pending at the time of the Court's ruling in Plaintiffs' favor include the following:

- The Troyer Mine project would consist of a 1,803-acre open mine that would harm the Florida panther, Florida bonneted bat, and eastern indigo snake.  Dkt. 31-1 at 13–16 (Crooks Dec. ¶¶ 37–47); Dkt. 98-1 at 10, 16–19 (Crooks Dec. ¶¶ 30, 45–54); Dkt. 105-1 at 6–7 (Crooks Dec. ¶ 12).

- The Immokalee Road Rural Village project would destroy hundreds of acres of surface water and wetlands, including areas vital to the Florida panther and Florida crested caracara.  Dkt. 31-1 at 23 (Crooks Dec. ¶ 72(b)); Dkt. 98-1 at 25–26 (Crooks Dec. ¶¶ 76–81); Dkt. 98-5 at 16–17 (Schwartz Dec. ¶ 48).

- The Hogan West project would consist of a 640-acre development on Primary and Secondary Zone Florida panther habitat.  Dkt. 98-1 at 27–28 (Crooks Dec. ¶¶ 84(a)).

- The FFD project would destroy 550 acres of Primary Zone Florida panther habitat. Dkt. 98-1 at 28 (Crooks Dec. ¶ 84(b)).

- The Mattamy Homes project would build a 246-acre development that would harm water quality, wading birds, and migratory bird nesting.  Dkt. 98-6 at 8 (Rinaman Dec. ¶¶ 28–29).

Together, these projects would result in the destruction of thousands of acres of wetlands that are habitat for species protected under the ESA and important for water quality in the State. Allowing these projects to be permitted by the State without the analyses, guardrails, protections,

26

incidental take limits, and enforcement the ESA ensures would cause Plaintiffs and the public irreparable harm.

Indeed, just before the Court ruled, the State was poised to issue two other permits that would also have caused irreparable harm to the critically endangered Florida panther and the threatened Florida crested caracara. Plaintiffs Center for Biological Diversity and Sierra Club moved for a preliminary injunction to prevent this irreparable harm, which was amply supported by evidence submitted with the motion. Dkt. 135; Dkt. 153; *Am. Rivers*, 271 F. Supp. 2d at 258–59. After ruling in Plaintiffs' favor on the ESA claims and vacating EPA's approval of Florida's program, the Court denied the motion for preliminary injunction as moot. Dkt. 182 at 97. A stay of the vacatur ruling would allow the State to issue those permits, causing Plaintiffs Center for Biological Diversity and Sierra Club irreparable harm.

The motion showed that the Bellmar and Kingston projects would destroy thousands of acres of Primary Zone Florida panther habitat located near panther dens, where panthers birth and rear their kittens, and near crucial conservation areas, including the Florida Panther National Wildlife Refuge, that support the sole, critically endangered panther population remaining in the wild. Dkt. 135 at 32–36; Dkt. 153 at 27–33. USFWS has said that it anticipates the construction of these projects, alone, will likely injure or kill 3 panthers from attacks by other male panthers (i.e., intraspecies aggression) as panthers are thrust from their home ranges (now destroyed) and forced into neighboring territories. Dkt. 153 at 28. And USFWS has said it anticipates that these projects will also likely result in the injury or death of 6 to 25 panthers every year as roadkill resulting from traffic increases caused by these projects. Dkt. 135 at 32; Dkt 153 at 28. As for the caracara, the Bellmar and Kingston projects would permanently destroy thousands of acres of

JA.1442

foraging and nesting habitat for at least 2 pairs of caracara and would inhibit the reproductive
success of those 2 pairs at least during construction.  Dkt. 135 at 37–38; Dkt. 153 at 33–36.

Additionally, a stay would harm Plaintiffs and the public by depriving them of access to
information they would have obtained through National Environmental Policy Act ("NEPA")
and ESA during federal 404 permitting.  Dkt. 98 at 75–76; Dkt. 104 at 90–95.  *See also* Dkt. 73
at 21, 41–44, 50 (holding that Plaintiffs had standing on Claim 9 because of informational harm
from the loss of environmental information developed under NEPA and the ESA).

Plaintiffs would also be harmed by the State's restrictive access to its court system that
would either force Plaintiffs to divert significant resources from their programs or forego
challenging legal violations and inadequate permit decisions.  Dkt. 98 at 75–76; Dkt. 104 at 95–
99.  This harm is amplified by the Federal Defendants' position that their technical assistance is
not an agency action subject to review in federal court.  Dkt. 148 at 23.  And as this Court
recognized, because the ITS lacks both take limits and terms and conditions that bind individual
state permittees, Plaintiffs would not have a clear mechanism to bring an ESA enforcement
action against permittees who harm, injure, or kill protected species.  Dkt. 182 at 44–45.

Moreover, because of the vacatur decision, this Court deemed prudentially moot
Plaintiffs' remaining claims that demonstrate the state program failed to comply with the
requirements of the Clean Water Act.  Should the Court grant Florida's stay request, Plaintiffs
would face additional harm due to the program's other inadequacies.  Dkt. 98 at 55–79; Dkt. 104
at 53–99.  Plaintiffs would also be deprived of an adjudication on those claims while they are
simultaneously harmed by the unlawful state program.

**B.**     **The Public Interest Weighs in Favor of Denying Florida's Stay Request.**

Maintaining the Court's vacatur decision would ensure protection of threatened and
endangered species that rely on habitat areas that would be destroyed by projects permitted

28

through the state 404 program.  "Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species."  *Am. Rivers*, 271 F. Supp. 2d at 261 (emphasis in original) (citation and internal quotation marks omitted).  *Accord Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 71 (D.D.C. 2006), *vacated on other grounds sub nom. Humane Soc. of U.S. v. Kempthorne*, 527 F.3d 181 (D.C. Cir. 2008) ("Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the 'public interest' lies in the protection of the endangered [species]….").  When it comes to the ESA, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities."  *Tenn. Valley Auth.*, 437 U.S. at 194.  *Accord Am. Rivers*, 271 F. Supp. 2d at 261.  "The public unquestionably has a substantial stake in the enforcement of [federal environmental laws] and in preservation of the natural environment."  *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977).

There is also a "strong public interest in meticulous compliance with the law by public officials."  *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993).  *See also Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. at 1256 (same); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702, 1995 WL 748246, at *12 (D.D.C. 1995) (public interest served "by ensuring that federal agencies thoroughly consider the environmental consequences of their actions").  There can be "no question" that the public has an interest in having Congress' environmental mandates "carried out accurately and completely."  *Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 26 (D.D.C. 2009).

Stay of the Court's vacatur decision would also harm the federally recognized Miccosukee Tribe of Indians of Florida.  The Tribe separately challenged EPA's approval of

Florida's 404 program in the Southern District of Florida alleging, among other things, that the

State's administration of Section 404 unlawfully ceded permitting authority over tribal lands to

the State rather than maintaining that authority with the federal government.[13]  Transferring this

authority back to the State would once again relegate the Tribe to having to seek 404 permits

from the State for activities on the Tribe's lands, including leased lands, other lands on which the

Tribe's rights have been codified by Congress, the Tribe's sacred sites, and Indian lands within

Everglades National Park.  P. Mot. Summ. J. at 16–20, *Miccosukee Tribe of Indians of Fla. v.

EPA*, No. 1:22-CV-22459 (S.D. Fla. July 28, 2023), ECF No. 32.

     All federally recognized tribes in Florida would also be harmed by a stay because it

would result in their loss of federal government-to-government consultation on 404 permitting

decisions guaranteed under the National Historic Preservation Act.  *See Menominee Indian Tribe

of Wisconsin v. EPA*, 947 F.3d 1065, 1074 (7th Cir. 2020), *reh'g denied* (May 8, 2020).  Damage

to sacred or culturally significant sites from the State's administration of the 404 program would

likely be irreparable.  *See Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of

Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) (damage to or destruction of any sacred

lands or culturally significant sites would almost by definition constitute irreparable harm);

*Comanche Nation v. United States*, No. CIV-08-849-D, 2008 WL 4426621, at *19 (W.D. Okla.

Sept. 23, 2008) (economic harm would "pale in comparison to the prospect of irreparable harm

---

[13] The Tribe has alleged that EPA's approval of Florida's program failed to comply with the
Clean Water Act and the United States Constitution.  P. Mot. Summ. J. at 1–2, *Miccosukee Tribe
of Indians of Fla. v. EPA*.  The case was stayed and administratively closed following this
Court's vacatur decision.  Order at 2–3, *Miccosukee Tribe of Indians of Fla. v. EPA*, No. 1:22-
CV-22459 (S.D. Fla. Mar. 18, 2024), ECF No. 50.  The Federal Defendants recently requested
that the court in that case extend the stay until the conclusion of appellate review in the D.C.
Circuit in this case.  Fed. D. Status Rep. at 5, *Miccosukee Tribe of Indians of Fla. v. EPA*, No.
1:22-CV-22459 (S.D. Fla. Apr. 17, 2024), ECF No. 51.

to sacred lands and centuries-old religious traditions which would occur absent injunctive relief"). Harm to culturally significant lands also harms the public interest. *Co. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("The importance of these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public.").

Florida's arguments that a stay would benefit the public fail for the same reasons discussed above.

First, Florida again points to potential delays in permitting, Dkt. 187 at 14–15, but fails to acknowledge that the Corps is open for business and does not intend to require permit applicants to "start from square one." Dkt. 183 at 10–12. There is no reason to believe that the potential burden of administrative delays would be substantial or sufficiently substantial to outweigh the harm to Plaintiffs and the public interest in protecting threatened and endangered species as Congress intended. *See Tenn. Valley Auth.*, 437 U.S. at 178 (observing that the value of our "genetic heritage" in the form of endangered species is "quite literally, incalculable" (quoting H.R. Rep No. 93-412, at 4–5 (1973))); *Am. Rivers*, 271 F. Supp. 2d at 261 (granting preliminary injunction to prevent harm to ESA-listed species); *see also Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 614–16 (D.C. Cir. 1980) (balance of equities favored farmworker organizations seeking to enjoin use of pesticide based on health effects to 10- and 11-year-olds even where growers might experience diminished labor pool, delays, and increased costs to attract other workers or seek waivers of the prohibition); *S. Fork Band of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (temporary economic harms did not outweigh environmental harms).

JA.1446

Second, Florida's suggestion that there will be no enforcement of the Clean Water Act post vacatur, Dkt. 187 at 15, is belied by the fact that the Corps has now resumed that enforcement authority, which, as shown above, is more robust than the State's enforcement authority was when it administered the program.

Third, Florida points to the alleged harm to its sovereign interests. *Id.* at 15–16. However, as explained above, Florida's sovereign interests over its waters and land have not been infringed or limited in any way. Florida continues to enjoy the same authority and sovereignty over state waters as it had before assuming the federal 404 program and can always try to assume the program again.

## CONCLUSION

For the reasons stated above, Florida has failed to carry its burden to demonstrate a stay is required. The Court should therefore deny Florida's stay request.

Dated: April 22, 2024

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice

111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

Counsel for Plaintiffs

* Appearing pro hac vice

JA.1448

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of April 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

JA.1449

**CERIFICATE OF SERVICE**

I hereby certify that on this the 15th day of April 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

        *Plaintiffs*,

   v.

MICHAEL S. REGAN, *et al.*,

        *Defendants*.

Civil Action No. 21-119 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is the motion of Defendant-Intervenors the State of Florida and the Florida Department of Environmental Protection (hereinafter "Florida") for a stay pending appeal. Dkt. 187. The Federal Defendants "take no position on Florida's motion," Dkt. 188 at 1, and Plaintiffs oppose the motion, Dkt. 189 at 9. For the reasons explained below, the Court will **DENY** Florida's motion.

## I.

Over the past two years, the Court has issued four decisions resolving all but one of Plaintiffs' claims in this case. In March 2022, the Court ruled in favor of the Federal Defendants and Florida with respect to Count 9 of Plaintiffs' original complaint. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022) ("*CBD I*"). Then, in August 2023, the Court held that Count 8 of Plaintiffs' original complaint was non-redressable and, accordingly, dismissed that count for lack of Article III standing. *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496 (D.D.C. Aug. 23, 2023) ("*CBD II*"). In February 2024, the Court issued a decision resolving all of Plaintiffs' claims under the Endangered Species Act

("ESA"), 16 U.S.C. § 1531 *et seq.* Ruling in favor of Plaintiffs on Counts 3, 4, 6 and 10–13 of

their amended complaint, Dkt. 77 (Am. Compl.), the Court set aside the U.S. Fish and Wildlife

Service's ("FWS") programmatic Biological Opinion ("BiOp") and Incidental Take Statement

("ITS") and the Environmental Protection Agency's ("EPA") approval of Florida's Section 404

assumption application. *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL

655368 (D.D.C. Feb. 15, 2024), *amended by* ___ F. Supp. 3d ___, 2024 WL 1602457 (D.D.C.

Apr. 12, 2024) ("*CBD III*"). Finally, on April 12, 2024, the Court dismissed Counts 1, 2 and 5 of

the amended complaint on prudential mootness grounds. *Ctr. for Biological Diversity v. Regan*,

___ F. Supp. 3d ___, 2024 WL 1591671 (D.D.C. Apr. 12, 2024) ("*CBD IV*").

After resolving all but one count of Plaintiffs' sprawling complaint, at Florida's request,

the Court entered partial final judgment as to Counts 1–6 and 8–13 of the amended complaint,

concluding that the parties should be permitted to appeal the Court's final decisions on those

counts "without delay." *Id.* at *12; Dkt. 184. On April 15, 2024, Florida noticed its appeal, Dkt.

185, and, the following day, it filed the present motion, which asks the Court to stay its "vacatur

order" pending appeal.[1] Dkt. 187 at 1. Because Florida requested a ruling on its motion by

April 23, 2024, *id.* at 2, the Court directed "any party wishing to be heard on th[e] motion [to]

file a response on or before April 22, 2024 at 3:00 p.m.," Min. Order (Apr. 17, 2024).

In response, the Federal Defendants filed a notice taking "no position on Florida's motion

for a stay pending appeal," but observing that the U.S. Army Corps of Engineers ("Corps") is

currently administering the Section 404 permitting program "in a way that serves the public" and

---

[1] As discussed further below, it is unclear whether Florida is seeking a stay of the Court's order
vacating the EPA's approval of Florida's Section 404 assumption application or a stay of that
order as well as a stay of the Court's order vacating the BiOp and ITS. *See generally CBD III*,
2024 WL 1602457, at *43–45.

"is diligently processing permit applications and will continue to do so to mitigate any disruption and delay to applicants." Dkt. 188 at 1. Plaintiffs oppose Florida's motion for a stay pending appeal, arguing that a stay would create regulatory uncertainty by allowing Florida to "issue permits pursuant to a program already found to be unlawful, creating questions about the legality of those permits, any incidental take they may purportedly authorize, and any exemption from liability for incidental take that the program might purport to ensure." Dkt. 189 at 6.

## II.

To obtain the relief it seeks, Florida bears the burden of satisfying "the stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016 (D.C. Cir. 2018); *Archdiocese of Wash. v. WMATA*, 877 F.3d 1066, 1066 (D.C. Cir. 2017). In deciding whether to grant a stay, the Court must consider four factors: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits;" (2) "whether the applicant will be irreparably injured absent a stay;" (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and (4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). As the Supreme Court has observed, "[t]here is substantial overlap between these [factors] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "The first two factors of the traditional standard are the most critical," and they require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some 'possibility of irreparable injury.'" *Id.* (internal citations omitted).

3

As an initial matter, Florida submits that the "sliding-scale" approach applies here. Under that approach, Florida argues, it need establish only "a serious legal question on the merits" at the first step, and, (conversely) if it "can demonstrate probable success on the merits," then it need establish only "a possibility of irreparable injury" at the second step.  Dkt. 187 at 3, 11 (internal citations and quotation marks omitted).  Florida is correct that prior to the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the D.C. Circuit applied a "sliding-scale" approach, under which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Since *Winter*, however, the D.C. Circuit has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93); *see also Archdiocese of Wash v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (suggesting that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").  "[I]t remains an open question," however, "whether the 'likelihood of success' factor is an 'independent, free-standing requirement,' or whether, in cases where the three other factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 393, 398).

Despite this uncertainty, two propositions are settled.  First, *Winter* leaves no doubt that a mere "possibility" of irreparable injury is not enough, regardless of the movant's likelihood of success on the merits.  555 U.S. at 22.  As the Supreme Court explained, "[i]ssuing a preliminary

injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*  In short, "a showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted).  That same principle also applies to stays pending appeal. *See Nken*, 556 U.S. at 434 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor." (internal citation and quotation marks omitted)).  Second, even if the sliding-scale approach *did* apply to irreparable injury, double dipping—or double sliding—is not allowed: that is, a movant cannot argue at the likelihood-of-success-on-the-merits step that a "serious legal question" suffices, and then argue at the irreparable-injury step that a "possibility of irreparable injury" also suffices. *Contra* Dkt. 187 at 3, 11.

For present purposes, however, none of this matters, because Florida has failed to carry its burden with respect to any of the four factors, even assuming that the sliding-scale approach still applies.

### III.

Although Florida asserts in conclusory terms that it has a "substantial likelihood of success" on the merits, Dkt. 187 at 4, most—if not all—of its argument seeks to clear the lower hurdle of showing that its appeal raises a "serious legal question," *id.* at 4–9.  Florida's argument is based almost entirely on this Court's disagreement with the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018).  But Florida's argument fails to address other portions of the Court's opinion, which explain in detail why the BiOp and ITS at issue in this case failed to comply with ESA and its governing regulations. *See*

*CBD III*, 2024 WL 1602457, at *25–29, *32–34.  To take one example, the regulations provide

that a BiOp "shall include" a "detailed discussion of the environmental baseline of the listed

species" and a "detailed discussion of the effects of the action on listed species," 50 C.F.R.

§ 402.14(h), yet the BiOp at issue here failed to include "*any* species-specific analysis," *CBD III*,

2024 WL 1602457, at *26 (emphasis in original).  Or, to take another example, "the regulations

unambiguously require that [an ITS] set 'a clear standard for determining when the level of

anticipated take has been exceeded,'" yet the ITS at issue here "omit[ted] this essential term."

*Id.* at *33 (quoting 50 C.F.R. § 402.14(i)(1)(i)).

Moreover, although Florida focuses on the differences between the Court's opinion and

the Second Circuit's opinion in *Cooling Water*, it never explains why this Court's analysis is

wrong—or even subject to serious dispute.  As the Court observed in *CBD III*, the Second

Circuit's analysis of the programmatic BiOp and ITS before it came down to a single paragraph

in the decision.  In that paragraph, the court cited the Eleventh Circuit's decision in *Defenders of*

*Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), for the following

proposition:  "'[T]he rule that biological opinions must be coextensive in scope with the entire

action or else violate the ESA is nowhere to be found in the language of the ESA.'"  *CBD III*,

2024 WL 1602457, at *30 (quoting *Cooling Water*, 905 F.3d at 73, quoting in turn *Defs. of*

*Wildlife*, 733 F.3d at 1121).  But, as this Court explained, *Defenders of Wildlife* does not stand

for the proposition that the FWS may, at times, ignore the requirement of preparing a legally

sufficient BiOp—instead, that court merely held that the National Marine Fisheries Service (the

FWS's marine counterpart) may address species-specific effects in phases, as a federal project

moves from planning to implementation.  *Id.*; *see also North Slope Borough v. Andrus*, 642 F.2d

589, 593 (D.C. Cir. 1980).  That phased approach differs markedly from the present context,

6

where the BiOp and ITS at issue purported to extend ESA liability protection to all future

Section 404 permittees in Florida, without *ever* conducting *any* species-specific analysis or

including *any* numerical take limits (or surrogates) in the ITS.  As the Court explained, "the ESA

does not permit an agency to bypass the Section 7 consultative process altogether by postponing

the required, 'detailed discussion of the effects of the action on listed species,' 50 C.F.R.

§ 402.14(g), to a later phase, only to conclude" "that the later phase involves state, rather than

federal, action and thus lies beyond the reach of Section 7."  *CBD III*, 2024 WL 16022457, at

*30.

        The Court's conclusion followed from the statutory text and implementing regulations.

*See id.* at *31.  The Court will not repeat its analysis here but notes that the regulations define

"programmatic consultation" and "framework programmatic action" in a manner that permits

phased review but that leaves little doubt that the FWS (or the National Marine Fisheries

Service) will engage in the required species-specific analysis at some point down the line.  *Id.*

Under Florida's reading of the law, in contrast, the core requirements of liability protection under

the ESA—that the FWS prepare a detailed BiOp containing the required species-specific

analyses and that it issue an ITS containing numerical take limits or their surrogates—can be

replaced with a non-statutory, non-regulatory "technical assistance" process.  That might (or

might not) make policy sense.  But it is not the law that Congress enacted or that the relevant

agencies included in the implementing regulations.  In seeking a stay, Florida never explains why

any of the above-described analysis—or any of the other analysis contained in *CBD III*—is

incorrect.

        As a fallback, Florida argues that it is likely to prevail by showing that Plaintiffs lack

standing—or at least that their standing "raises serious legal questions."  Dkt. 187 at 9–10.

Notably, the Federal Defendants have never questioned Plaintiffs' standing, and, in the most recent round of briefing, Florida pressed only a narrow challenge to Plaintiffs' standing. *See CBD III*, 2024 WL 1602457, at *17. For present purposes, apart from referencing its prior arguments, Florida simply asserts that the "Court erroneously based standing injury on facts arising after the complaint was filed." Dkt. 187 at 10. In pressing that argument, however, Florida ignores the very next paragraph of the Court's opinion, which points to independent grounds to support Plaintiffs' standing, and Florida ignores the fact that the Plaintiffs' declarations—which were properly offered at the summary judgment stage—merely responded to Florida's own contention that it was administering the Section 404 program in a manner that accorded Plaintiffs all the protection that they would otherwise have received under federal law. *CBD III*, 2024 WL 1602457, at *19–20.

Finally, Florida argues that the Court's decision to set aside the Section 404 assumption decision, rather than remanding without vacatur, "raises serious legal questions." Dkt. 187 at 10. But that argument ignores the plain language of the APA, which treats vacatur as the presumptive or "normal" remedy, *see Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020); it ignores D.C. Circuit precedent holding that "remand without vacatur remains an exceptional remedy," *id.* at 519; and, beyond observing that the Court gave serious consideration to whether to limit its vacatur to the BiOp and ITS, it offers no reason to question the Court's ruling, Dkt. 187 at 10. Even more importantly, it ignores the Court's decision in *CBD IV*, which provides ample reason to conclude that vacating the BiOp and the ITS, but not vacating the Section 404 assumption decision, would invite confusion and inefficiency and would do little, if anything, to preserve the program. *See* 2024 WL 1591671, at *3–4.

8

For all of these reasons, the Court concludes that Florida has failed to identify any theory of appeal on which it is likely to prevail or that even raises a serious legal question.

## IV.

Florida has also failed to demonstrate that it is likely to suffer an irreparable injury if the Court declines to grant a stay.  As explained above, irreparable injury is the *sine qua non* for injunctive relief and for a stay pending appeal.  *See Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 167.  Here, however, the federal agencies that issued the BiOp and the ITS and that approved Florida's Section 404 assumption application represent that the Corps is ready, willing, and able to administer the Section 404 permitting program in Florida during the pendency of an appeal—as the Corps did for decades before Florida's assumption application was approved and as it does in 47 other States.  The further representations that the Federal Defendants made for purposes of *CBD IV* bear repeating here:

> [A]s of February 15, there were about 1,000 permit applications pending before the State of Florida.  The Corps has identified and allocated resources to process those permits.  And it starts with the Jacksonville District of the Corps, which is the office that has hand[l]ed Section 404 permitting in Florida since forever, pre-assumption . . . .  [T]here are more people in the Jacksonville district today to process [S]ection 404 permits than there were before state assumption.  And it is not just a couple more, it is a couple dozen more.  In addition to the Jacksonville district, there are four other districts within the South Atlantic division.  And the Corps has identified people in the other districts and the South Atlantic division as well as [at] Corps headquarters who can help with the anticipated surge of permits given the number of permits that were pending before Florida.

> And I say the anticipated surge, Your Honor, because Florida has not transferred permits to the Corps yet.  The Corps is prepared to process those permits.  But if those permits exist in a state of regulatory limbo today, I want the Court to understand it is not because the Corps has not taken steps to comply with the Court's Order of February 15th.  The Corps is ready to process permits.

> Now, notwithstanding the fact that we haven't gotten permits from Florida yet. We have had meetings at the Corps with quite a few project proponents, including project proponents who have permits that were pending before Florida

9

JA.1459

> as of February 15th.  And a number of those entities have congressionally
> approved agreements with the Corps to seek expedited Corps review of Section
> 404 permit applications for priority projects.

2024 WL 1591671, at *5 (quoting Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.)).  Against this

backdrop, Florida offers three arguments in support of its claim of irreparable injury, none of

which is persuasive.

First, Florida argues that a stay is required to prevent "irreparable harm to [its] sovereign

interests in the conservation and management of water resources and wildlife," which are "both

areas of traditional state responsibility."  Dkt. 187 at 11.  But that overstates the State's interest

in administering the Section 404 permitting program pursuant to the Clean Water Act.  To be

sure, Section 404 of the Clean Water Act, 33 U.S.C. § 1344(g), recognizes that some states may

have an interest in administering their "own individual and general permit program[s] for the

discharge of dredged or fill material into the navigable waters" of the United States, and it

provides a process by which a State may assume the Section 404 permitting authority typically

exercised at the federal level by the Corps.  *See also id.* § 1251(b) ("It is the policy of Congress

that the States . . . implement the permit programs under sections 1342 and 1344 of this title.").

But the Clean Water Act is a federal statute that protects the navigable waters of the United

States.  *See Sackett v. EPA*, 598 U.S. 651, 671 (2023).  In the words of the Supreme Court, it is

"the principal federal law regulating water pollution in the United States."  *Id.* at 657–58.

Regardless of whether Florida is authorized to implement that *federal* law with respect to the

navigable waters of the United States, it remains free to enforce *state* law and to exercise its

traditional sovereign authority to prevent pollution and other environmental harms in the State.

*See, e.g.*, Fla. Stat. § 403.161(1); *id.* § 403.121.  Indeed, as Florida stressed when it filed its

Section 404 assumption application, it "administers the comprehensive state Environmental

JA.1460

Resource Permitting (ERP) program, which includes permitting dredge and fill activities" and "overlap[s] with the federal Clean Water Act (CWA) Section 404 permitting program approximately 85%." Dkt. 55 at 501. Nothing that the Court has decided curtails in any manner the State's authority to exercise this traditional sovereign authority. In the State's view, it would promote efficiency for a single regulator to administer the federal and state permitting programs—but that is a question of efficiency, not sovereignty.

Second, Florida argues that a stay is necessary to ensure that it has "authority to enforce the [Section] 404 program for all" permits that it has already issued. Dkt. 187 at 12. That, again, raises (at most) an efficiency concern and does not constitute the type of "certain and great" injury necessary to support a stay. *Chaplaincy of Full Gospel Church v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Nor is it even clear that a stay is necessary to promote efficiency in the enforcement of Section 404, since the Corps is currently administering the Section 404 program—as it did before assumption, as it would do in the case of a withdrawal of assumption approval, *see* 33 U.S.C. § 1344(i), and as it does in 47 other States—and it is fully capable of enforcing Section 404 during the pendency of Florida's appeal.

Third, Florida argues that it will suffer irreparable injury in the absence of a stay because "over 1,000 permit applications were pending in the [state Section] 404 process and as a result of the vacatur order these projects face delay, regulatory limbo and/or will be forced to start their [Section] 404 application process essentially from 'square one' with the Corps." Dkt. 187 at 13. But the Federal Defendants have represented to the Court that the Corps will move expeditiously to process the pending applications; that "a project will not go to the back of the line just because the applicant had previously applied to Florida;" and that, "as much as possible," the Corps

11

intends to "pick up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements." *See* Dkt. 181 at 30–31 (Apr. 4, 2024 Hrg. Tr.).  Notably, counsel for the Federal Defendants specifically addressed Florida's "square one" argument in the context of *CBD IV*:  The "Corps' intention here is not to make people start from square one" but, rather, "to do this as efficiently as possible. *Id.* at 31 (Apr. 2, 2024 Hrg. Tr.).

Finally, Florida argues (1) that a stay is required because the State has "expended substantial resources applying for and obtaining approval of its [Section] 404 program application" and in "staffing, organizing, and implementing the . . . program," and (2) that permitting the Court's vacatur order to stand would "eliminate[] critical efficiencies gained in the [Section] 404 permitting process in Florida." Dkt. 187 at 14.  It goes without saying that a stay would do nothing to make Florida whole for its past expenditures and that neither the loss of the benefit that Florida anticipated achieving based on those expenditures nor the efficiencies that it hopes to bestow on future Section 404 permit applicants constitutes "certain and great" harm necessary to support emergency relief.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  It is well settled that neither the "expense" nor the "annoyance of litigation . . . constitute[s] irreparable injury," *United States v. Facebook, Inc.*, 2024 U.S. App. LEXIS 5979, at *2 (D.C. Cir. Mar. 12, 2024) (per curiam), and it follows with even greater force that past expenditures pursuing an application before an administrative agency do not support the issuance of prospective, emergency relief.

The Court, accordingly, concludes that Florida has failed to demonstrate that it is likely to suffer irreparable harm if the Court's vacatur order is not stayed pending appeal.

## V.

With respect to the final two factors, the risk of injury to Plaintiffs and the public interest, Florida reprises many of the arguments discussed above.  In particular, it argues that the public interest is and will continue to be jeopardized by (1) the delays and disruption faced by permit applicants forced to "return to square one by refiling their applications with the Corps;" (2) the absence of State Section 404 enforcement authority in the waters of the United States; and (3) the harm to "Florida's sovereign interests in the management and conservation of water resources and wildlife in the state, all of which fall squarely in the traditional authority of the states, not the federal government."  Dkt. 187 at 15.  Those arguments are unpersuasive for the same reasons explained above.  *See also, e.g.*, Dkt. 188 at 1; Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.).

Finally, the Court notes that it is unclear whether Florida seeks to stay the Court's vacatur of the EPA's Section 404 assumption decision alone or whether it also seeks to stay the Court's vacatur of the FWS's programmatic BiOp and ITS.  *But see* Dkt. 187 at 1 (requesting that the Court stay its "order vacating the Environmental Protection Agency's . . . approval of Florida's Clean Water Act . . . Section 404 assumption application").  That distinction matters.  As explained in *CBD IV*, it is far from clear that leaving Florida with Section 404 permitting authority in the absence of incidental take protection for Florida's developers would serve anyone's interests.  2024 WL 1591671 at *4.  Among other things, few developers would "risk civil and criminal penalties" by engaging in conduct likely to affect listed species without first obtaining incidental take protection.  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023).  But, on the other hand, an order staying the Court's vacatur of the FWS's ITS would have significant repercussions, affecting interests well beyond those identified in Florida's motion.  For example, as Plaintiffs point out, the Court denied as moot the motion for a

JA.1463

temporary restraining order and preliminary injunction, Dkt. 135, which sought to enjoin two permits from issuing that the Center for Biological Diversity and the Sierra Club argued would cause irreparable harm to the critically endangered Florida panther and threatened crested caracara.  Dkt. 189 at 32.[2]  Having decided the merits of Plaintiffs' summary judgment motion, the Court had no occasion to reach Plaintiffs' motion for a preliminary injunction.  *See CBD III*, 2024 WL 1602457, at *45.  But were the Court to stay its decision pending appeal, the Court would, in effect, deny Plaintiffs the preliminary relief that they sought, notwithstanding their likelihood (indeed, certainty) of success on the merits and without ever reaching their claim of irreparable harm.

The Court, accordingly, concludes that factors three and four also weigh against issuing a stay pending appeal.

## CONCLUSION

On a motion for a stay, "it is the movant's obligation to justify the [C]ourt's exercise of such an extraordinary remedy."  *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).  Florida has failed to carry that heavy burden here.  Accordingly, Florida's motion for a stay pending appeal, Dkt. 187, is hereby **DENIED**.

**SO ORDERED**.


                                    /s/ Randolph D. Moss
                                    RANDOLPH D. MOSS
                                    United States District Judge


Date:  April 23, 2024

---

[2] The motion for a temporary restraining order and preliminary injunction, Dkt. 135, was filed by two of the plaintiffs in this case, the Center for Biological Diversity and the Sierra Club.

JA.1464

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>    Defendants. | **CASE NO.** 1:21-cv-00119 (RDM) |

### <u>NOTICE OF APPEAL</u>

Notice is hereby given this 10th day of June, 2024, that Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper, pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, hereby appeal to the U.S. Court of Appeals for the D.C. Circuit from the judgment on Claims 1, 2, and 5 entered on April 12, 2024, in favor of the Defendants and Intervenor-Defendants and against Plaintiffs, Dkt. 184, in accordance with the Memorandum of Opinion entered on April 12, 2024, Dkt. 183 at 12–22, 27.

Dated:  June 10, 2024

Respectfully submitted,

<u>/s/ Christina I. Reichert</u>
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
TANIA GALLONI*
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432

F: 850-681-0020
creichert@earthjustice.org
tgalloni@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

Counsel for Plaintiffs

* Appearing pro hac vice

2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of June 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Christina I. Reichert
CHRISTINA I. REICHERT
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
creichert@earthjustice.org

JA.1467

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

Defendants.

Case No. 1:21-cv-0119 (RDM)

## FEDERAL DEFENDANTS' NOTICE OF APPEAL

Pursuant to Rules 3and 4(a) of the Federal Rules of Appellate Procedure, notice is hereby
given that all Federal Defendants in the above-captioned matter appeal to the United States Court
of Appeals for the District of Columbia Circuit the judgment entered in this action on April 12,
2024 (Dkt. 184), and related orders.

Dated: June 11, 2024

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/ *Andrew S. Coghlan*
Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: Andrew.Coghlan@usdoj.gov

Michael R. Eitel (NE Bar 22889)
United States Department of Justice

1

JA.1468

Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 302
Denver, Colorado 80202
Tel: 303-844-1479
Email: Michael.Eitel@usdoj.gov

*Attorneys for Defendants*